**HALEY GUILIANO LLP**
JOSHUA V. VAN HOVEN (CSB No. 262815)
    E-Mail: joshua.vanhoven@hglaw.com
GREGORY J. LUNDELL (CSB No. 234941)
    E-Mail: greg.lundell@hglaw.com
111 N Market Street, Suite 900
San Jose, California 95113
Telephone: 669.213.1050
Facsimile: 669.500.7375

RICHARD T. MCCAULLEY  (*pro hac vice*)
    E-Mail: richard.mccaulley@hglaw.com
116 W. Hubbard, Suite 20
Chicago, Illinois 60654
Telephone: 312.330.8105

Attorneys for Plaintiff
SURGICAL INSTRUMENT SERVICE COMPANY, INC.

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SURGICAL INSTRUMENT SERVICE COMPANY, INC., <br><br> Plaintiff, <br><br> vs. <br><br> INTUITIVE SURGICAL, INC., <br><br> Defendant. | CASE NO. 3:21-cv-03496-VC <br><br> Honorable Vince Chhabria <br><br> **PLAINTIFF SURGICAL INSTRUMENT SERVICE COMPANY, INC.'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS** <br><br> Hearing: September 30, 2021 <br> Time: 2:00 p.m. |

## STATEMENT OF ISSUES TO BE DECIDED

Whether SIS's Complaint plausibly alleges (1) a relevant market of replacement or repair of instruments for use with surgical robots used in minimally invasive soft tissue surgery; (2) anticompetitive conduct with respect to Intuitive's Xi generation products; (3) antitrust injury related to Intuitive's Xi generation products; (4) actionable false statements under the Lanham Act relating to non-existent FDA requirements; and (5) actionable false statements under the Lanham Act relating to non-existent intellectual property rights.

# TABLE OF CONTENTS

**Table of Contents**

I. INTRODUCTION ...................................................................................................... 1

II. STANDARD OF REVIEW ....................................................................................... 1

III. ARGUMENT ........................................................................................................... 2

   A. SIS Properly Pleads a Relevant Market ............................................................. 2

   B. Intuitive Improperly Attempts to Exclude Xi EndoWrists from this Case ....................................... 5

      1. SIS does not Allege a "Refusal to Deal" – Allegations Related to Intuitive's Coercion of Hospitals to Switch to Xi, and Purely Exclusionary Xi Encryption Changes, Properly Allege Anticompetitive Conduct Under Section 2 .................................................. 5

      2. Intuitive's Anticompetitive Scheme is Delaying Competition in the Xi Repair Market and Limiting the Si Repair Market – This is an Antitrust Injury .................................... 11

   C. SIS's Lanham Act Claim Should *Not* Be Dismissed ...................................... 12

      1. The FDCA Does Not Preclude SIS's Lanham Act Claim ............................ 13

      2. Intuitive's Statements About Its IP Rights Are Not Immune From Prosecution Under the Lanham Act ...................................................................... 14

IV. CONCLUSION ...................................................................................................... 15

# **TABLE OF AUTHORITIES**

**Cases**

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Group LP*, 592 F.3d 991 (9th Cir. 2010).
..................................................................................................................................... 6, 8

*Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051 (9th Cir. 1999). ............................ 11

*Arista Networks, Inc. v. Cisco Sys.*, No. 16-cv-00923-BLF, 2018 U.S. Dist. LEXIS 241347 (N.D.
Cal. May 21, 2018) ................................................................................................................... 12

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ................................................................................... 1, 2

*Axis, S.p.A v. Micafil, Inc.*, 870 F.2d 1105 (6th Cir. 1989) ........................................................ 12

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ................................................................. 1

*Cal. Comp. Prods., Inc. v. IBM Corp.*,  613 F.2d 727 (9th Cir. 1975). ......................................... 5

*Catch Curve, Inc. v. Venali, Inc.*, 519 F.Supp.2d 1028 (C.D. Cal. 2007) ..................................... 12

*City of Pittsburgh v. West Penn Power Co.*, 147 F.3d 256 (3rd Cir. 1998) ................................... 12

*Coastal Abstract Serv. v. First Am. Title Ins. Co.*, 173 F.3d 725 (9th Cir. 1999) ........................ 15

*Datel Holdings Ltd. v. Microsoft Corp.*, 712 F.Supp.2d 974 (N.D. Cal. 2010) ........................ 3, 4

*Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451 (1992) .................................................. 2

*Foremost Pro Color, Inc. v. Eastman Kodak Co.*, 703 F.2d 534 (9th Cir. 1983) ..................... 8, 9

*Free Freehand Corp. v. Adobe Sys.*, 852 F.Supp.2d 1171 (N.D. Cal. 2012) .............................. 12

*Image Tech. Servs. v. Eastman Kodak Co.*, 125 F.3d 1195 (9th Cir. 1997) ................................. 7

*Impeva Labs, Inc. v. Sys. Planning Corp.*, No. 5:12-CV-00125-EJD, 2012 U.S. Dist. LEXIS
120011 (N.D. Cal. Aug. 23, 2012) ...................................................................................... 14, 15

*In re Apple iPod iTunes Antitrust Litig.*, No. 05-cv-0037 YGR, 2014 U.S. Dist. LEXIS 165276
(N.D. Cal. Nov. 25, 2014) ............................................................................................................ 7

*In re Keurig Green Mt. Singleserve Coffee Antitrust Litig*, 383 F. Supp. 3d 187 (S.D.N.Y. 2019)
.................................................................................................................................................. 10

*Kentmaster Mfg. Co. v. Jarvis Prods. Corp*, No. 96-56341, 1998 U.S. App. LEXIS 34129 (9th
Cir. June 11, 1998) .................................................................................................................. 3, 4

*Levitt v. Yelp! Inc.*, 765 F.3d 1123 (9th Cir. 2014) ..................................................................... 2

*LiveUniverse, Inc. v. MySpace, Inc.*, No. 07-56604, 304 Fed. Appx. 554 (9th Cir. Dec. 2, 2008)
.................................................................................................................................................. 12

*Morongo Band of Mission Indians v. Rose*, 893 F.2d 1074 (9th Cir. 1990) ............................... 15

*Nespresso United States v. Ethical Coffee Co.*, No. 16-194-GMS, 2016 U.S. Dist. LEXIS 202275
(D. Del. Sept. 7, 2016) ............................................................................................................... 7

*Newcal Indus. v. Ikon Office Sol'n*, 513 F.3d 1038 (9th Cir. 2008) ...................................... 2, 3, 4

*Northbay Healthcare Grp., Inc. v. Kaiser Found. Health Plan, Inc.*, No. 18-16769, 838 Fed. Appx. 231 (9th Cir. Dec. 8, 2020) ............................................................................. 11

*PhotoMedex, Inc. v. Irwin*, 601 F.3d 919 (9th Cir. 2010) ...................................................... 13, 14

*POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102 (2014) ................................................. 13

*Postx Corp. v. Secure Data in Motion*, 2005 U.S. Dist. LEXIS 58745 (N.D. Cal. 2005) ............ 15

*Rebotix Repair LLC v. Intuitive Surgical*, No. 8:20-cv-2274-VMC-TGW, 2021 U.S. Dist. LEXIS 67039 (M.D. Fla. Mar. 8, 2021) ............................................................................. 10

*Rick-Mik Enters. v. Equilon Enters., LLC*, 532 F.3d 963 (9th Cir. 2009) ................................... 2

*See Wyeth v. Levine*, 555 U.S. 555 (2009) ............................................................................. 13

*Simon & Simon, PC v. Align Tech., Inc.*, No. 20-cv-03754-VC, 2021 U.S. Dist. LEXIS 69583 (N.D. Cal. Apr. 8, 2021) ................................................................................... 11

*Siva v. Am. Bd. of Radiology*, 418 F. Supp. 3d 264 (N.D. Ill. 2019) ............................................ 3

*Staley v. Gilead*, 446 F.Supp.3d 578 (N.D. Cal. 2020) ............................................................ 8, 9

*Teradata Corp. v. SAP SE*, No. 18-cv-03670-WHO, 2018 U.S. Dist. LEXIS 209872 (N.D. Cal. Dec. 12, 2018) ....................................................................................................... 9

*United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) ................................................. 6

*Xerox Corp. v. Media Scis. Int'l, Inc.*, 511 F. Supp. 2d 372 (S.D.N.Y. 2007) ........................... 6, 8

*Zenith Elecs. Corp. v. Exzec, Inc.*, 182 F.3d 1340 (Fed. Cir. 1999) ........................................... 15

**Statutes**

15 U.S.C. §1125(a)(1)(B) ...................................................................................................... 13

**Rules**

Fed. R. Civ. P. 15(a)(2) ........................................................................................................ 15

## I.      INTRODUCTION

Although Intuitive characterizes SIS's repair business as "breaking into" and "adulterating"
EndoWrist instruments (Dkt. 37 at p. 1), these unsupported aspersions bear no relation to reality.  As
alleged in the Complaint, SIS's repair procedures for EndoWrists involve mechanical and electrical
operations such as inspection, sharpening, and testing similar to those it "has performed for decades on
dozens of types of surgical instruments and medical devices of similar or greater complexity."  Dkt. 1 at
¶¶ 34-35.  "Particularly after completion of SIS's rigorous set of procedures, the EndoWrist instruments
are suitable for many more uses, and at least a number of uses equivalent to Intuitive's originally
specified usage limit."  *Id.* at ¶ 35.  There are no FDA limitations on SIS performing these repair
services, and no relevant IP protections.  *Id.* at ¶¶ 97-99.  Thus, hospitals are clamoring for SIS's
EndoWrist repair services and the resulting substantial cost savings.  *Id.* at ¶¶ 5, 18, 36-40.

This motion is about "Intuitive's aggressive and ever-changing tactics for extracting an exorbitant
per-surgery fee for EndoWrists [that] is financially damaging for hospitals and results in excessive costs
for patients."  Dkt. 1 at ¶ 36.  Intuitive seeks to exempt its anticompetitive activities from scrutiny in
four ways: (1) despite allegations of a separate market for EndoWrist repair and replacement, Intuitive
ignores this well-pleaded market based on factually inapposite cases involving franchise agreements; (2)
Intuitive ignores allegations of its overarching forced obsolescence scheme and related caselaw
regarding anticompetitive conduct in favor of another district court decision based on substantially
different pleadings; (3) Intuitive cites caselaw involving intervening third-party conduct to incorrectly
conclude that its own conduct cannot cause antitrust injury; and (4) Intuitive attempts to explain away its
facially incorrect statements regarding FDA and IP.  Our opposition addresses each issue below.

## II.     STANDARD OF REVIEW

Following the Supreme Court's decisions in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell
Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), a Complaint's "factual allegations 'must . . . suggest

that the claim has at least a plausible chance of success.'" *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1135 (9th Cir. 2014) (internal citation omitted).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.  "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*.

## III.   ARGUMENT

Intuitive's motion ignores both the allegations of SIS's Complaint and relevant controlling authority, as is explained in detail in the following sections.  The motion should be denied in its entirety.

### A.  SIS Properly Pleads a Relevant Market

Intuitive first argues that "SIS fails to plausibly allege that Intuitive's EndoWrist instruments occupy a relevant product market that is distinct from the da Vinci systems in which those instruments are used."  Dkt. 37 at p. 7.  As an initial matter, "[t]here is no requirement that [relevant market] be pled with specificity" and a complaint should not be dismissed unless "the complaint's 'relevant market' definition is facially unsustainable."  *Newcal Indus. v. Ikon Office Sol'n*, 513 F.3d 1038, 1045 (9th Cir. 2008) (internal citation omitted).  For related product markets, the inquiry is not whether the repair market would exist absent the market for the original product.  *See, e.g.*, *Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 463 (1992) ("By that logic, we would be forced to conclude that there can never be separate markets, for example, for cameras and film, computers and software, or automobiles and tires.").  Rather, the issue at the pleading stage is whether the plaintiff has pleaded a separate market encompassing appropriate economic substitutes.  *Newcal*, 513 F.3d at 1045.

Intuitive's cited cases are factually inapposite.  For example, *Rick-Mik* involved a franchisee's allegations that a franchisor gas station chain improperly tied "credit-card processing" to a gas station franchise.  *Rick-Mik Enters. v. Equilon Enters., LLC*, 532 F.3d 963, 966 (9th Cir. 2009).  Relying on a long line of cases analyzing the economics of franchise agreements, the *Rick-Mik* Court rejected "a

separate and distinct" credit-card processing product, noting that "[f]ranchises, almost by definition, necessarily consist of 'bundled' and related products or services -- not separate products." *Id.* at 974 (citations omitted). *Siva* involved allegations that a board certification program for radiologists improperly tied an ongoing obligation to obtain "maintenance of certification" to the original certification. *Siva v. Am. Bd. of Radiology*, 418 F. Supp. 3d 264, 270 (N.D. Ill. 2019). The *Siva* Court analogized "board certification in medical specialties" to "the franchise model" in rejecting "attempts to isolate components of what is essentially a business method . . . ." *Id.* at 274.

The Ninth Circuit has explained that Courts' refusal to consider separate markets in the "franchise" line of cases is "grounded . . . in the fact that the primary market for franchise agreements is a competitive market" such that a franchisor's "ability to abuse [its] contractual power would be restrained by competition in the primary market for franchise agreements." *Newcal*, 513 F.3d at 1046-47. In contrast, the present Complaint alleges (and Intuitive does not dispute) Intuitive's market power in the primary surgical robot market. *E.g.* Dkt. 1 at ¶¶ 3, 6-11, 44, 62, 65, 81, 105, 110, 112, 118, 121. Absent a competitive market in surgical robots, there is no economic logic for folding EndoWrists into the robot market. *See Newcal*, 513 F.3d at 1047 (explaining that "competition in the primary market . . . sufficed to discipline anticompetitive conduct in the aftermarket" such that abuses in the aftermarket would cause the franchisor to "lose business in the primary market"); *see also Datel Holdings Ltd. v. Microsoft Corp.*, 712 F.Supp.2d 974, 988 (N.D. Cal. 2010)) ("Here, Plaintiff has made even stronger allegations insofar as it alleges that the primary market is also not very competitive.").

Intuitive also relies on *Kentmaster Mfg. Co. v. Jarvis Prods. Corp*, No. 96-56341, 1998 U.S. App. LEXIS 34129 (9th Cir. June 11, 1998). The parties in *Kentmaster* were direct competitors in the market for slaughterhouse equipment, and the Complaint alleged that each sold specialized "spares" that worked only with their own slaughterhouse equipment. *Id.* at *2-4. The Court rejected an attempt to parse the

equipment and spares markets, since "on the face of the complaint, [the] equipment and spares are described so that they necessarily constitute a single product." *Id.* at *9. Put another away, the plaintiff in *Kentmaster* did not allege a separate market in the defendant's spares, let alone that it competed in such a market. *See id.* ("Like Kentmaster, Jarvis enjoys a monopoly position in the sale of its spares.").

Here, SIS has specifically pleaded a separate market for "replacement or repair of instruments for use with surgical robots used in minimally invasive soft tissue surgery," as compared to the markets for surgical robots and surgical robot repair for minimally invasive surgery. Dkt. 1 at ¶¶ 43-44 (defining separate markets); ¶¶ 66-77 (discussing repair and replacement market); ¶ 112 (pleading tying in this market); ¶ 115 (pleading exclusive dealing in this market); ¶ 118 (pleading monopolization in this market); *and* ¶ 121 (pleading attempted monopolization in this market). Intuitive similarly recognizes separate robot and instrument markets in its own public reporting. *Id.* at ¶ 71. And unlike Intuitive's cited cases, SIS pleaded substantial independent demand in this replacement and repair market, as evidenced at least by SIS's own contracts with hospitals worth millions annually. *Id.* at ¶ 5 (discussing SIS EndoWrist repair, contracts for providing repair, and substantial demand and recognition of EndoWrist repair program); ¶¶ 36-37 (noting hospital demand for SIS repair services for EndoWrists and SIS contracts and negotiations); ¶¶ 78-80 (describing contracts for SIS repair services for EndoWrists, substantial demand for those services, and Intuitive campaign to put SIS out of the EndoWrist repair business); *and* ¶ 91 (discussing Intuitive's awareness of SIS repair services for EndoWrists). Courts regularly find a separate aftermarket based on similar allegations, even in the absence of market power in the primary market as is undisputed here. *See, e.g.*, *Newcal*, 513 F.3d at 1049 (discussing copier lease market which "is a competitive market" and separate "aftermarket for replacement equipment"); *Datel,* 712 F.Supp.2d at 990 (finding a separate "single-brand Aftermarket dependent on the primary market" for Xbox 360 accessories and add-ons).

B.  <u>Intuitive Improperly Attempts to Exclude Xi EndoWrists from this Case</u>

Intuitive next challenges the application of SIS's Section 2 claims to its Xi EndoWrists.  A Section 2 monopolization claim has three essential elements: (1) "the possession of monopoly power in the relevant market;" (2) "the willful acquisition or maintenance of that power; and" (3) "causal 'antitrust' injury."  *Cal. Comp. Prods., Inc. v. IBM Corp.*,  613 F.2d 727, 735 (9th Cir. 1975).  Intuitive's motion challenges only the second and third elements.[1]  Dkt. 37 at p. 8 (addressing "anticompetitive conduct" and "antitrust injury," but not monopoly power).  SIS will address each in turn.

1.  *SIS does not Allege a "Refusal to Deal" – Allegations Related to Intuitive's Coercion of Hospitals to Switch to Xi, and Purely Exclusionary Xi Encryption Changes, Properly Allege Anticompetitive Conduct Under Section 2*

Citing to ¶ 108 of the Complaint, Intuitive characterizes SIS's allegations related to Xi EndoWrists as merely "challenging Intuitive's usage counter" (Dkt. 37 at p. 8), and based on that characterization, asserts that "prevent[ing] third parties from modifying the Xi instrument usage counter constitute[s] a refusal to deal claim . . . ."  *Id.* at p. 9.  As an initial matter, SIS is not challenging Intuitive's inclusion of a "usage counter" in any Intuitive products.  Rather, ¶ 107 of the Complaint alleges improper ***changes*** to encryption and countermeasures for the Xi EndoWrist counter for which "[t]here is no technical or safety justification" and for the "sole purpose [to] prevent competition in repair services and to unjustifiably protect its supra-competitive EndoWrist profits":

> 107. For its most recent Xi generation of da Vinci robots and EndoWrist instruments, Intuitive has made an inordinate investment in encryption and other countermeasures of the internal EndoWrist chip.  There is no technical or safety justification for these excessive efforts, except to prevent third parties such as SIS from accessing the counter.  Specifically, it would not be possible to operate an EndoWrist instrument with a da Vinci robot if other values of the EndoWrist chip such as the EndoWrist serial number were modified.  Intuitive's sole purpose is to prevent competition in repair services and to unjustifiably protect its supra-competitive EndoWrist profits. Intuitive's anticompetitive conduct operates to the detriment of patients, hospitals, and SIS, by using unjustified

---

[1] Intuitive does not separately address any additional elements of SIS's attempted monopolization claim.

technical measures to prevent an EndoWrist repair market from existing for the Xi EndoWrists. (Dkt. 1 at ¶ 107).

"[C]hanges in product design are not immune from antitrust scrutiny and in certain cases may constitute an unlawful means of maintaining a monopoly under Section 2." *Allied Orthopedic Appliances Inc. v. Tyco Health Care Group LP*, 592 F.3d 991, 998 (9th Cir. 2010). A monopolist can be found to have engaged in anticompetitive conduct when a changed product feature has **"no 'procompetitive justification'"** such that it fails to "provid[e] a new benefit to consumers . . . ." *Id.* (internal quotes to *United States v. Microsoft Corp.*, 253 F.3d 34, 59 (D.C. Cir. 2001)); *see also Xerox Corp. v. Media Scis. Int'l, Inc.*, 511 F. Supp. 2d 372, 389 (S.D.N.Y. 2007) ("To the contrary, several courts have found that product redesign, when it suppresses competition and is without other justification, can be violative of the antitrust laws.").

SIS's design change allegations are similar to product changes that the D.C. Circuit found to be anticompetitive in *US v. Microsoft*. As in *Microsoft*, Intuitive's "contractual restrictions . . . would not be sufficient in themselves" to protect market share in a secondary product market. *Compare Microsoft*, 253 F.3d at 64 (discussing Microsoft loss of browser market share to Netscape) *with* Dkt. 1 at ¶¶ 5, 37, 78, 80, 110 (discussing substantial SIS contracts for Si EndoWrist repair and resulting losses in Intuitive's Si EndoWrist replacement sales). Like Microsoft, Intuitive "set out to bind [the secondary product] more tightly to [the monopolized product] as a technical matter." *Microsoft*, 253 F.3d at 64; *see also* Dkt. 1 at ¶ 107 ("For its most recent Xi generation of da Vinci robots and EndoWrist instruments, Intuitive has made an inordinate investment in encryption and other countermeasures of the internal EndoWrist chip."). Just as Microsoft "reduce[d] the usage share of rival browsers not by making Microsoft's own browser more attractive to consumers" but instead through anticompetitive means, Intuitive has made changes that its customers do not want (but must accept) solely to exclude competitors. *Microsoft*, 253 F.3d at 64; *see also* Dkt. 1 at ¶ 36 ("These health care providers universally

conveyed their frustration with Intuitive and its abusive business practices.  In sum, Intuitive's

aggressive and ever-changing tactics for extracting an exorbitant per-surgery fee for EndoWrists is

financially damaging for hospitals and results in excessive costs for patients.").

In *Nespresso United States v. Ethical Coffee Co.*, the District of Delaware refused to dismiss a

Section 2 claim based on Nespresso's design change of its espresso machine capsule housing to exclude

competitors from providing competitive capsules.  No. 16-194-GMS, 2016 U.S. Dist. LEXIS 202275, *3

n.2 (D. Del. Sept. 7, 2016).  While recognizing that scrutiny of product design choices is generally

disfavored,[2] the Court noted that "[a] firm's product design choice will call for antitrust scrutiny when

the design choice discourages distribution of competitor's product, **while not making the product**

**more attractive to consumers**."  *Id.* (emphasis added); *see* Dkt. 1 at ¶ 107 (noting that "Intuitive's

anticompetitive conduct [related to Xi encryption redesign] operates to the detriment of patients,

hospitals, and SIS").  Similar to the Complaint in this case, the *Nespresso* pleadings were sufficient

based on allegations that the "sole purpose" of the feature redesign was to exclude competitive products.

*Compare Nespresso*, 2016 U.S. Dist. LEXIS 202275, *3, n.2 ("ECC pled that Nespresso redesigned its

capsule housing for the sole purpose of excluding the manufacturers of biodegradable, single-use

espresso capsules from the market.") *with* Dkt. 1 at ¶ 107 ("Intuitive's sole purpose is to prevent

competition in repair services and to unjustifiably protect its supra-competitive EndoWrist profits." );

---

[2] Although Courts are wary of balancing legitimate product improvements versus anticompetitive
effects, they do consider whether purported product improvements were in fact pretextual.  *In re Apple
iPod iTunes Antitrust Litig.*, No. 05-cv-0037 YGR, 2014 U.S. Dist. LEXIS 165276, *7-9 (N.D. Cal.
Nov. 25, 2014); *see also Image Tech. Servs. v. Eastman Kodak Co.*, 125 F.3d 1195, 1219 (9th Cir. 1997)
("Evidence regarding the state of mind of Kodak employees may show pretext, when such evidence
suggests that the proffered business justification played no part in the decision to act.").  SIS alleges that
any purported justifications for Intuitive's Xi encryption changes and forced obsolescence of Si were
pretextual.  *E.g.*, Dkt. 1 at ¶ 107 (discussing "inordinate investment in encryption and countermeasures"
for "sole purpose . . . to prevent competition in repair services"); *id.* at ¶ 8 ("Intuitive's anti-competitive
conduct cannot be justified by any purported safety or regulatory requirements.").
.

*see also Xerox*, 511 F. Supp. 2d at 389 (denying "motion to dismiss claims based on product redesign" where "[Plaintiff] plausibly alleges that [Defendant's] conduct was anticompetitive and not otherwise justified . . . [and] serves no benefit to consumers").

**Furthermore, even a "design change that improves a product by providing a new benefit to consumers" may violate Section 2 when accompanied with "some associated anticompetitive conduct."** *Allied Orthopedic*, 592 F.3d at 998-999; *see also id.* at 999 (explaining that "introduction of a new and improved product design could constitute a violation of Section 2 where 'some associated conduct . . . supplies the violation'" (quoting *Foremost Pro Color, Inc. v. Eastman Kodak Co.*, 703 F.2d 534, 545 (9th Cir. 1983))). Intuitive's motion ignores that the non-excerpted portions of ¶ 108 allege that it has coupled Xi EndoWrist encryption/countermeasure changes with an anticompetitive scheme to "force" customers to switch from fully functional existing product generations to Xi:

> 108. In order to protect its EndoWrist monopoly pricing, Intuitive has taken steps to force customers to switch from da Vinci robots (typically "S" and "Si" robots) for which EndoWrist repair is possible to Xi da Vinci robots for which EndoWrist repair is not currently possible. For example, Intuitive has announced that as of 2023 it intends to stop selling S and Si EndoWrist instruments, and to discontinue providing service and technical support for da Vinci S and Si robots. By withdrawing service and technical support, Intuitive is effectively rendering these robots inoperable. (Dkt. 1 at ¶ 108).

In *Staley v. Gilead*, the Court rejected dismissal of a Section 2 claim based on attempts to switch AIDS patients to a new drug regimen that "would be protected by the 'No-Generics Restraints.'" 446 F.Supp.3d 578, 613 (N.D. Cal. 2020). After addressing the *Allied Orthopedic* and *Foremost* cases,[3]

---

[3] In *Allied Orthopedic*, the challenged product feature change moved substantial functionality and control for pulse oximeter sensors from the monitors to the sensors, which "added flexibility" in a manner that "allows new functions" and "reduces costs[.]" 592 F.3d at 1001. In contrast, the present Complaint alleges that Intuitives's changes to encryption and countermeasures had "no technical or safety justification[.]" Dkt. 1 at ¶ 107. Further, the accused monopolist (Tyco) was unable to "force" or "coerce" hospitals to move to the new product generation because its market share of new monitor sales in the U.S. "had dropped to 35%" by the time of the product change. 592 F.3d at 1002. Here, the Complaint alleges and Intuitive does not dispute that Intuitive maintains a 99%+ market share in all relevant markets at all relevant times. Dkt. 1 at ¶¶ 58, 70, 81 , 118, 121. In *Foremost*, there were no

Judge Chen noted that "Plaintiffs are not contesting per se Gilead's introduction of the TAF-based FDCs – *i.e.*, the product introduction, improvement, and/or innovation." *Id.* at 615.  The Court continued:

> Rather, Plaintiffs are challenging Gilead's purposeful conduct — namely, moving consumers over to the TAF-based FDC (instead of letting the superiority of the products drive that change).  For this conduct, Plaintiffs have a plausible argument that there is no procompetitive justification for the action.  For instance, what purpose is served by Gilead degrading Stribild and/or standalone TAF?  What purpose is served by Gilead not putting a HIV indication on TAF?  Whether this was an unlawful restraint cannot be determined on this motion to dismiss.  (*Id.* at 615)

Similarly, SIS alleges that Intuitive is "forcing" hospitals to move from Si and similar products to the Xi system to protect its windfall EndoWrist profits.  *See* Dkt. 1 at ¶¶ 108, 109 ("Intuitive is effectively rendering [prior generation] robots inoperable" at a loss while knowing it can "recoup lost revenue many times over by preventing repair of Xi EndoWrist instruments").  Indeed, why not let customers decide when and if to move to Xi based on the purported superiority of the new product?  *See Gilead*, 446 F.Supp.3d at 615 (asking "what purpose" is served by "moving customers" to new product?); *see also Teradata Corp. v. SAP SE*, No. 18-cv-03670-WHO, 2018 U.S. Dist. LEXIS 209872, *40 (N.D. Cal. Dec. 12, 2018) (finding "leverage" of monopoly power pleaded under *Allied Orthopedic* where "[Plaintiff] asserts that [Defendant] is a dominant player in the [relevant] market and made its newest version [of the product] incompatible with other [related products], while at the same time announcing that it is ending support for prior versions of its [product]").

Moreover, SIS's Section 1 allegations (exclusive dealing and tying) must also be considered when determining whether Intuitive has violated Section 2.  *See Cal. Comp.*, 613 F.2d at 735-736 (explaining

---

allegations that Kodak "abused its monopoly power in [a first market] or used that power as a lever to create, or attempt to create, a monopoly in the [other markets]."  703 F.2d at 544.  Nor did the Complaint in *Foremost* "allege that the dominant purpose motivating Kodak's design and introduction of the [new] system was to compel purchase of the entire system as a package[.]"  *Id.* at 543.  Here SIS alleges both improper leverage due to Intuitive's surgical robot monopoly (Dkt.. 1 at ¶¶ 6, 8, 44, 65, 81, 105, 110) and that the "dominant purpose" for encryption and countermeasure changes was to compel the purchase of new Xi EndoWrists (Dkt. 1 at ¶ 107).

that Section 1 conduct often gives rise to Section 2 liability).  The Southern District of New York's

decision in *In re Keurig Green Mt. Singleserve Coffee Antitrust Litig.* is instructive.  Defendant Keurig

argued that "Plaintiffs' product design claims fail to allege anticompetitive conduct" for a new brewer

and pod design, because they "cannot allege that consumers have been coerced into buying the 2.0

brewer[.]"  383 F. Supp. 3d 187, 229-30 (S.D.N.Y. 2019).  Unlike Intuitive's forced obsolescence of

previously purchased robots and EndoWrists in the present case, "Keurig continue[d] to make K-Cups

that work in [the prior generation] 1.0 brewers . . . ."  *Id.* at 230.  Nonetheless, the Court found that the

plaintiffs stated a claim against Keurig based on "allegations of 'associated conduct'" such as "exclusive

dealing [and] tying arrangements" and "allegations detailing Keurig's intent in developing the 2.0

Brewer . . . 'to lock out the competitors'"  *Id*; *see also Rebotix Repair LLC v. Intuitive Surgical*, No.

8:20-cv-2274-VMC-TGW, 2021 U.S. Dist. LEXIS 67039, *27 (M.D. Fla. Mar. 8, 2021) (considering

"contractual tying, contractual exclusivity, and threats of economic retaliation" for Section 2 Xi claim).

In the present matter SIS has alleged "associated conduct" of forced obsolescence, tying and exclusive

dealing, as well as "intent to lock out competition" for the Xi.  Dkt. 1 at ¶¶ 82-110 (pleading

"INTUITIVE MONOPOLIST TACTICS AND ANTI-COMPETITIVE ACTS").

In sum, Intuitive mischaracterizes and ignores the actual allegations of SIS's Complaint.[4]  Under a

long line of controlling authority in this Circuit, SIS's Complaint has alleged anticompetitive product

changes, associated coercion, and additional anticompetitive conduct that support Section 2 claims.

---

[4] Intuitive relies heavily on the *Rebotix* decision from Florida.  Dkt. 37 at pp. 9-10.  Unlike the present case, the Plaintiff in Rebotix "does not allege . . . a software update or design change" but instead "alleges that from the beginning, it had to design a workaround to the usage counter."  *Compare Rebotix*, 2021 U.S. Dist. LEXIS 67039, *23-24 *with* Dkt. 1 at ¶ 107 (discussing Intuitive's "inordinate investment" in Xi encryption and countermeasure changes for which "[t]here is no technical or safety justification" and for the "sole purpose [to] prevent competition in repair services and to unjustifiably protect its supra-competitive EndoWrist profits").  Nor did that Court consider allegations of coercion to switch to Xi or Intuitive incurring short-term losses to do so.  *Compare Rebotix*, 2021 U.S. Dist. LEXIS 67039, *23-27 (discussing Rebotix allegations) *with* Dkt. 1 at ¶¶ 108-109.  In any event, even if SIS's

2. *Intuitive's Anticompetitive Scheme is Delaying Competition in the Xi Repair Market and Limiting the Si Repair Market – This is an Antitrust Injury*

In the Ninth Circuit, antitrust injury has four elements. *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1055 (9th Cir. 1999). Intuitive appears to be challenging the first and third elements, *i.e.*, whether SIS has alleged "unlawful conduct" and injury "that flows from that which makes the conduct unlawful." *Id.*; *see* Dkt. 37 at p. 1`(arguing that SIS's "purported injury is fully attributable to conduct that is not anticompetitive—i.e., Intuitive's design of the Xi instrument usage counter"). As an initial matter, Intuitive's antitrust injury argument fails because it is based on its mischaracterization of its Xi-related conduct as limited to the "Xi instrument usage counter" and thus "not anticompetitive." Dkt. 37 at p. 11. To the contrary, as explained in the preceding section, SIS is challenging Intuitive's encryption and countermeasure changes (not the mere presence of a usage counter) coupled with forced obsolescence of existing product generations and associated anticompetitive conduct. *See supra*. Because SIS's inability to repair Xi EndoWrists is caused by those changes and related conduct, SIS has pleaded antitrust injury. *See, e.g.*, *Northbay Healthcare Grp., Inc. v. Kaiser Found. Health Plan, Inc.*, No. 18-16769, 838 Fed. Appx. 231, 235 (9th Cir. Dec. 8, 2020) (finding injury flowing from anticompetitive conduct where "Defendants' unlawful conduct has worked" to prevent competition).

Moreover, just because it is "not currently possible" to repair Xi instruments does not mean that cognizable antitrust injuries are not alleged based on Intuitive's Xi-related conduct. First, SIS has pleaded that Intuitive's forced obsolescence will impact SIS's Si instrument repair business. Dkt. 1 at ¶ 108 (alleging that "Intuitive has taken steps to force customers to switch from da Vinci robots (typically

---

Section 2 allegations are treated as a "refusal to deal," the present Complaint falls within the parameters of an *Aspen Skiing* claim: (1) a prior profitable course of dealing based on agreements with Si owners (¶¶ 71-73, 101); (2) a unilateral change to that course of dealing, by sunsetting Si (¶ 108) and changing counter values and IFUs (¶¶ 75, 84); (3) refusing to continue Si sales even if fully compensated (¶ 108); and (4) enduring short term losses to obtain higher profits in the long run (¶ 109). *See Simon & Simon, PC v. Align Tech., Inc.*, No. 20-cv-03754-VC, 2021 U.S. Dist. LEXIS 69583, *18 (N.D. Cal. Apr. 8, 2021) (discussing elements of *Aspen Skiing / Lorain Journal* refusal to deal claim).

'S' and 'Si' robots) for which EndoWrist repair is possible"). Second, SIS, hospitals, and patients are injured by Intuitive's other anticompetitive conduct (*e.g.*, tying and exclusive dealing) that apply equally to Xi. SIS has alleged that Intuitive's other anticompetitive conduct has caused hospitals to back out of contracts with SIS. Dkt. 1 at ¶ 92. Without adjudication of Intuitive's ongoing anticompetitive restrictions that prevent hospitals from working with alternative providers, investment and innovation in Xi repair services and product alternatives will be foreclosed or significantly diminished.[5] *See id.* at ¶ 89 ("Through Intuitive's coercive practices directed at da Vinci customers, it foreclosed rivals from supplying customers with aftermarket EndoWrist instruments through repair and refurbishment services."); *see also, e.g.*, *Free Freehand Corp. v. Adobe Sys.*, 852 F.Supp.2d 1171, 1185 (N.D. Cal. 2012) (finding antitrust injury pleaded based on anticompetitive conduct "decreasing innovation in the market for professional vector graphics software"); *Catch Curve, Inc. v. Venali, Inc.*, 519 F.Supp.2d 1028, 1035-36 (C.D. Cal. 2007) (allegations of "'stifl[ing] innovation' in the market" support antitrust injury); *Arista Networks, Inc. v. Cisco Sys.*, No. 16-cv-00923-BLF, 2018 U.S. Dist. LEXIS 241347, *65 (N.D. Cal. May 21, 2018) (noting that reduction in "R&D resources" due to anticompetitive conduct "interfered with . . . ability to innovate and denied customers the benefits of innovation in the market").

C.  SIS's Lanham Act Claim Should *Not* Be Dismissed

 SIS's Lanham Act claims are viable and should not be dismissed. Intuitive has violated the Lanham Act through misrepresenting the scope of its FDA's 510(k) clearance and the applicability of its

---

[5] In contrast to the present allegations of Xi-related injuries caused by Intuitive's anticompetitive actions, Intuitive's cited cases all involve situations where a third party was an intervening factor preventing injury to the plaintiff. *See City of Pittsburgh v. West Penn Power Co.*, 147 F.3d 256, 268 (3rd Cir. 1998) ("There are no facts averred in the complaint which even permit us to speculate as to the likelihood of the PUC granting certification to Allegheny Power."); *LiveUniverse, Inc. v. MySpace, Inc.*, No. 07-56604, 304 Fed. Appx. 554, 557 (9th Cir. Dec. 2, 2008) ("Consumers remain free to choose which online social networks to join, and on which websites they upload text, graphics, and other content."); *Axis, S.p.A v. Micafil, Inc.*, 870 F.2d 1105, 1111 (6th Cir. 1989) (in lawsuit against Micafil, "Axis admitted . . . the Possis and Globe patents precluded its entry into the U.S. market").

intellectual property ("IP").  The Lanham Act permits one competitor to sue another for unfair

competition arising from precisely these kinds of false or misleading statements.  15 U.S.C.

§1125(a)(1)(B).  As there is nothing precluding SIS's claims, it is premature to extinguish them.

    *1.  The FDCA Does Not Preclude SIS's Lanham Act Claim*

Intuitive's attempt to couch SIS's claims as preempted by the Federal Food, Drug, and Cosmetic

Act ("FDCA") is wrong.  As an initial matter, this is not a preemption case; preemption applies where a

state law is in conflict with a federal statute, or in some instances, a federal agency action. *See Wyeth v.*

*Levine*, 555 U.S. 555, 563 (2009).  The issue here is whether the FDCA limits SIS's claims under the

Lanham Act.  While there are cases where the FDCA does reserve enforcement for the FDA, this is not

one of them.  The issue Intuitive raises concerns the alleged preclusion of a cause of action under one

federal statute by the provisions of another federal statute.  *See POM Wonderful LLC v. Coca-Cola Co.*,

573 U.S. 102, 111-12 (2014).  Under the proper inquiry, SIS's claims are not precluded.

Intuitive's reliance on *PhotoMedex, Inc. v. Irwin*, 601 F.3d 919 (9th Cir. 2010), is misplaced.  In

*PhotoMedex*, the plaintiff predicated its Lanham Act claim on the allegation that a competitor violated

the FDCA by misrepresenting that its product had received FDA 510(k) clearance, when the FDA in fact

declined to make a finding that there was no valid clearance or to bring an enforcement action itself.  *Id.*

at 922.  *PhotoMedex's* holding was expressly limited to its "particular circumstances," namely "where

the FDA permits Defendants to determine in the first instance whether their laser device was covered by

clearance previously given to a similar device and to market their device without an affirmative

statement of approval by the FDA … ."  *Id.*  Indeed, the Ninth Circuit in *PhotoMedex* stated: "To be

clear, we do not suggest that the Lanham Act can never support private party claims involving FDA

approval or clearance of drugs or medical devices.  That is not the case."  *Id.* at 924.

The "particular circumstances" present in *PhotoMedex* are not in this case.  Instead, Intuitive

violates the Lanham Act through its false, deceptive, and misleading statements mischaracterizing the

scope of Intuitive's own 510(k) clearance for its EndoWrist instruments and insinuating liability to its customers for using a refurbished device.  Unlike *PhotoMedex*, SIS's claims do not rest on an affirmative (mis)statement of FDA clearance.  *Id.* at 926.  Intuitive's statements are more insidious. Intuitive's letters say, for example, "the regulatory clearance provided to Intuitive by the FDA and other regulatory authorities may not apply to products that have been remanufactured or refurbished by unauthorized third parties" and "any modification to allow for use of a da Vinci product beyond its labeled useful life exceeds the scope of the original clearance by expanding the FDA cleared indications for use."  These statements misrepresent the actual scope of Intuitive's certification.  Intuitive's EndoWrist 510(k) certification does not limit the EndoWrist's useful life.  *So how could its useful life be exceeded?*  Moreover, Intuitive's statements accomplish Intuitive's purpose of implying that services from companies like SIS will cause customers to violate FDA regulation, to destroy SIS's business.

### 2. Intuitive's Statements About Its IP Rights Are Not Immune From Prosecution Under the Lanham Act

Intuitive tries to place a false "burden" on SIS to identify an express statement connecting Intuitive's misrepresentation about its IP with SIS.  SIS is a third party that repairs EndoWrists, and Intuitive's letter warns of third parties "offering 'reprogrammed instruments'" that violate Intuitive's IP. But, Intuitive has no IP prohibiting refurbishing EndoWrists.  Thus, Intuitive's statement is false and misleading.  *See, e.g.*, Dkt. 1 at ¶¶ 66, 99.  In defending a motion to dismiss, these allegations are taken as true.  More importantly, Intuitive's statement is manifestly false as to Endowrists (*id.*), constituting an actionable claim for bad faith violation of the Lanham Act.  *See, e.g., Impeva Labs, Inc. v. Sys. Planning Corp.*, No. 5:12-CV-00125-EJD, 2012 U.S. Dist. LEXIS 120011, at *10 (N.D. Cal. Aug. 23, 2012) (denying motion to dismiss Lanham Act claim for improper assertion of patent rights).

Intuitive's attempt to cloak its statements as opinion also fail.  SIS's allegations are based on Intuitive's objective statements and reach beyond Intuitive's belief.  There are no relevant IP rights that

Intuitive could claim are implicated.  Dkt. 1 at ¶¶ 66, 99.  If Intuitive has a substantive IP right as stated in its letter, it could and should have identified that right in its Motion.  It did not.  Drawing all inferences in favor of SIS, it properly pleaded that Intuitive made a false (and bad faith) statement, knowing it to be false at the time it was made.  *Impeva Labs,* 2012 U.S. Dist. LEXIS 120011, at *14. Intuitive's reliance on *Coastal Abstract Serv. v. First Am. Title Ins. Co.*, 173 F.3d 725 (9th Cir. 1999) is misplaced, and highlights the difference in the present case.  In *Coastal*, the statement at issue was that the plaintiff was "too small" to handle a customer's business.  The Court found that such a statement was "vague and subjective."  *Id.* at 731 ("It was not a specific and measurable claim, capable of being proved false or of being reasonably interpreted as a statement of objective fact. [I]t could not give rise to liability under either the Lanham Act ….").  Here, whether SIS's services were covered by any IP owned by Intuitive is not vague, subjective, or subject to any meaningful legal interpretation.  SIS alleges there are no such IP rights and Intuitive could not have reasonably believed otherwise.  *See Zenith Elecs. Corp. v. Exzec, Inc.*, 182 F.3d 1340, 1354 (Fed. Cir. 1999) (holding that false statements of IP rights can be grounds for Lanham Act claims); *see also Postx Corp. v. Secure Data in Motion*, 2005 U.S. Dist. LEXIS 58745 (N.D. Cal. 2005).[6]

## IV.    CONCLUSION

For the above reasons, Intuitive's motion should be denied in its entirety.[7]

---

[6] Intuitive's citation to the *Phillips* case is puzzling. There is simply no discussion of the relevant issue in the case cited by Intuitive. There can be no doubt, however, that couching an objectively baseless fact in wiggle words like "believes" and "may" while ignoring the threatening false statements like "has intellectual property" and "violating intellectual property rights that belong to Intuitive," does not shield such a statement from Lanham Act liability.

[7] Should the Court find any aspect of SIS's Complaint not technically pleaded, Rule 15 mandates that "[t]he court should freely give leave when justice so requires."  Fed. R. Civ. P. 15(a)(2).  This policy is applied with "extraordinary liberality."  *Morongo Band of Mission Indians v. Rose*, 893 F.2d 1074, 1079 (9th Cir. 1990).

Dated: August 20, 2021                    **HALEY GUILIANO LLP**

By: */s/ Joshua Van Hoven*
JOSHUA V. VAN HOVEN
joshua.vanhoven@hglaw.com
GREGORY J. LUNDELL
greg.lundell@hglaw.com
111 N. Market Street, Suite 900
San Jose, California 95113
Telephone: 669.213.1050
Facsimile: 669.500.7375

RICHARD T. MCCAULLEY  (*pro hac vice*)
richard.mccaulley@hglaw.com
116 W. Hubbard, Suite 20
Chicago, Illinois 60654
Telephone: 312.330.8105

*Attorneys for Plaintiff*
SURGICAL INSTRUMENT SERVICES
COMPANY, INC.