1                    UNITED STATES DISTRICT COURT

2                   NORTHERN DISTRICT OF CALIFORNIA

3              Before The Honorable Vince Chhabria, Judge

4

5    SURGICAL INSTRUMENT SERVICE    )
     COMPANY, INC.,                 )
6                                   )
              Plaintiff,            )
7                                   )
     vs.                            )   No. C 21-03496-VC
8                                   )
     INTUITIVE SURGICAL, INC.,      )
9                                   )
              Defendant.            )
10   _____)

11

12                                  San Francisco, California
                                    Thursday, October 7, 2021
13

14     TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
                RECORDING 3:32 - 4:19 = 47 MINUTES

15   APPEARANCES:

16   For Plaintiff:
                                    Ropes Gray, LLP
17                                  191 North Wacker Drive
                                    32nd Floor
18                                  Chicago, Illinois 60606
                             BY:    RICHARD T. MCCAULLEY, JR.,
19                                    ESQ.

20                                  Spector Roseman & Kodroff,
                                      P.C.
21                                  2001 Market Street, Suite 3420
                                    Philadelphia, Pennsylvania
22                                    19103
                             BY:    JEFFREY J. CORRIGAN, ESQ.
23

24

25              (APPEARANCES CONTINUED ON NEXT PAGE)

2

1  <u>APPEARANCES</u>:   (Cont'd.)

2  For Plaintiff:                    Haley Guiliano, LLP
                                      111 Market Street, Suite 900
3                                     San Jose, California 95113
                                 BY:  JOSHUA V. VANHOVEN, ESQ.
4
   For Defendant:                     Allen Ruby Attorney at Law
5                                     1559 Union Avenue, Suite 138
                                      Los Gatos, California 95032
6                                BY:  ALLEN RUBY, ESQ.

7                                     Skadden Arps Slate Meagher
                                        Flom, LLP
8                                     One Manhattan West
                                      New York, New York 10001
9                                BY:  KAREN H. LENT, ESQ.

10 Transcribed by:                    Echo Reporting, Inc.
                                      Contracted Court Reporter/
11                                    Transcriber
                                      echoreporting@yahoo.com
12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1    <u>Thursday, October 7, 2021</u>                              <u>3:32 p.m.</u>

2                        P-R-O-C-E-E-D-I-N-G-S

3                             --oOo--

4           THE CLERK:  Now calling 21-CV-3496, Surgical

5    Instrument Service Company, Inc. versus Intuitive Surgical,

6    Inc.

7        Counsel for the Plaintiff, please state your

8    appearance.

9           MR. MCCAULLEY (via Zoom):  Good afternoon, your

10   Honor.  Richard McCaulley, and I have my partner, Joshua

11   Vanhoven here on behalf of Plaintiff.  And I apologize, your

12   Honor.  I have a medical issue that kept me from tying a

13   tie, and despite my -- my family's best efforts, I think I'm

14   better off open neck for today.

15          THE COURT:  No worries.

16          MR. MCCAULLEY:  Thank you.

17          MR. CORRIGAN (via Zoom):  Hi, your Honor.  This is

18   Jeff Corrigan.  I represent the Hospital Plaintiffs, and

19   while this is not our motion today, we are a related case,

20   and counsel for the Defendants have said that they motion

21   that they're going to file against us will be very similar

22   to this one.  So I thought I'd come on and just monitor

23   goings on in case it sort of bleeds into our case somehow.

24          THE COURT:  Okay.

25          THE CLERK:  For the Defendant?

4

1          MS. LENT (via Zoom):  Good afternoon, your Honor.
2     Karen Lent from Skadden on behalf of Intuitive.
3          THE COURT:  Good afternoon.
4       Okay.  So, I would be happy to talk a little bit about
5     the tying issue.  I don't need to talk about the market
6     definition issue.  I don't want to hear any argument about
7     that, but why don't we start with the question that I asked
8     you the other day or maybe it was last night.  I don't
9     remember any more.
10         It seems to me that the -- that -- that <u>PhotoMedex</u> is
11    irreconcilable with the Supreme Court's decision in <u>Palm</u>
12    <u>Wonderful</u>, and so <u>PhotoMedex</u> is no longer good law, and if
13    you apply -- if you take the approach taken by the Supreme
14    Court in <u>Palm Wonderful</u>, you would say that this claim does
15    not need to be dismissed based on preclusion by the FDCA.
16         So why am I wrong about that?
17         MS. LENT:  Thank you, your Honor.  Would you like
18    me to address that?
19         THE COURT:  Yes, please.
20         MS. LENT:  Okay.  <u>PhotoMedex</u> we don't believe has
21    been effectively overruled by <u>Palm Wonderful</u>.  <u>Palm</u>
22    <u>Wonderful</u> held that the FDCA didn't categorically preclude
23    all Lanham Act claims, but it did preserve the possibility
24    that some Lanham Act claims might be precluded by the FDC.
25         THE COURT:  No, but -- but the Ninth Circuit's --

5

1  the foundation on which the Ninth Circuit's ruling rested in
2  Palm Wonderful was PhotoMedex, right?  I mean, the Ninth
3  Circuit said in its ruling in Palm Wonderful, our precedent,
4  that is, PhotoMedex, requires us to conclude that this claim
5  is precluded by the FDCA.  And then the Supreme Court says,
6  No, no.  You've got it all wrong.  You -- you approached
7  this question completely incorrectly.  And so how could -- I
8  don't understand how you could argue with a straight face
9  that there's not an irreconcilable difference -- an
10  irreconcilable conflict between PhotoMedex and the Supreme
11  Court's ruling in Palm Wonderful.
12          MS. LENT:  Well, I think what the Supreme Court
13  was holding was that the -- the circumstances in Palm
14  Wonderful didn't require a finding of preclusion and that --
15          THE COURT:  No.  What the Supreme Court said in
16  Palm Wonderful is that, you know, the Ninth Circuit took the
17  completely wrong approach.  The Ninth Circuit assumed that
18  there's this -- applied this presumption in favor of FDCA
19  preclusion of Lanham Act claim and assumed that anything
20  that a court does in a Lanham Act claim that constitutes a
21  pronouncement on, you know, whether something is lawful
22  under the FDCA is -- is inappropriate.  And so any Lanham
23  Act claim that requires the Court to do that is precluded,
24  and that was completely wrong.  The two statutes operate
25  together.  One gives a competitor the ability to sort of

6

1 protect itself, and the other gives the FDA the ability to

2 enforce the FDCA.  And if you take that approach to our case

3 right now, I think you lose, for the same reason -- for

4 similar reasons to why they -- they lost -- the Defendant

5 lost in Palm Wonderful.  I mean, I don't -- and I think that

6 if you apply the approach in Palm Wonderful, PhotoMedex has

7 to come out the other way.  I don't understand how

8 PhotoMedex could have come out the same way with the Supreme

9 Court's ruling in Palm Wonderful hanging over its head.

10      Can you explain how PhotoMedex could have come out the

11 same way?

12           MS. LENT:  Yes, because what Palm Wonderful was

13 saying, the Court was saying there, was that the Lanham Act

14 claims in Palm didn't require any court to delve into the

15 meaning or the impact or the enforcement of FDA regulations.

16 Those were two separate issues.

17           THE COURT:  Can you show me the -- show me the

18 language that you're referring to in Palm Wonderful.

19           MS. LENT:  I'm on page 2231, and this is a

20 syllabus, but I'm just looking at it.

21           THE COURT:  Yeah, let's not look at the syllabus.

22 Let's look at the actual case.

23           MS. LENT:  I'm trying to find the same place that

24 is in the -- the language that I'm looking at is that

25 neither Lanham Act nor the FDCA forbids or limits Lanham Act

7

1 claims challenging labels that are regulated by the FDCA.

2 And so there's no conflict there.

3          THE COURT:  Right.  But, I mean --

4          MS. LENT:  And other courts have held that under

5 circumstances where there is --

6          THE COURT:  Show me the -- show me the language in

7 Palm Wonderful that you think would support the Ninth

8 Circuit's prior ruling in PhotoMedex.

9          MS. LENT:  So, on 2239, it says under other types

10 of labels regulated by the FDA, such as drug labels, it

11 would appear --

12          THE COURT:  Wait.  Hold on.  Let me -- let me make

13 sure I'm at the -- we're at the same place.  With the --

14 which paragraph are you on, the one that says holding at the

15 -- the one that begins, "A holding at the FDCA"?

16          MS. LENT:  Yes, yes.

17          THE COURT:  Okay.  Where are you?

18          MS. LENT:  So I'm -- the fifth line down that

19 starts -- the sentence starts "Unlike other types of

20 labels."

21          THE COURT:  Okay.

22          MS. LENT:  "Unlike other types of

23          labels regulated by the FDA such as drug

24          labels, it would appear the FDA does not

25          preapprove food and beverage labels

8

1            under its regulations and, instead,

2            relies on enforcement actions, warning

3            letters and other measures."

4            THE COURT:  But how does that help the Ninth

5   Circuit's decision in PhotoMedex or how does that help you?

6            MS. LENT:  Well, that helps us because the FDA

7   does regulate clearance of medical devices under 510(k),

8   whereas in this case, they were saying that the types of

9   labels that were at issue here at not regulated by the FDA.

10           THE COURT:  But they don't regulate -- I mean, the

11   FDA doesn't regulate what you are saying when your client is

12   saying to hospitals.  I mean, the FDA doesn't even come

13   close to regulating what your client is saying to hospitals,

14   right?

15           MS. LENT:  But an adjudication of what -- whether

16   what our client is saying to hospitals is false requires

17   interpretation of the FDCA.

18           THE COURT:  Well, that's true in the Palm

19   Wonderful case too, isn't it?  I mean --

20           MS. LENT:  No.

21           THE COURT:  Why not?  Why not?

22           MS. LENT:  It's not, because it's not a question

23   of whether the FDA would have allowed that label.  That's

24   not what the question was in Palm Wonderful.

25           THE COURT:  No.  I mean, in the food labeling

1  cases, if the FDCA would allow the statement, you can't

2  pursue a -- you can't pursue a false advertising claim under

3  state law.  It's preempted, right?  And you -- you -- the --

4  I mean, what the -- what <u>Palm Wonderful</u> says is -- at least

5  as far as I read it, is, Look, yes, the FDCA has -- the FDA

6  has authority over this, right.  But the FDA does not have

7  the same perspective or expertise in assessing market

8  dynamics that day-to-day competitors possess.  Competitors

9  who manufacture or distribute products have detailed

10 knowledge regarding how consumers rely on certain sales and

11 marketing strategies.  Their awareness of unfair competition

12 practices may be far more immediate and accurate than that

13 of the agency rule makers and regulators.  Lanham Act suits

14 draw on this market expertise by empowering private parties

15 to sue competitors to protect their interest on a case-by-

16 case basis.  The FDA does not necessarily pursue enforcement

17 measures regarding all objectionable labels.  And so if the

18 Lanham Act claims were to be precluded, then commercial

19 interests and indirectly, the public at large, could be left

20 with less effective protection in the food and beverage

21 labeling realm than many other less regulated industries.

22       I mean, why don't all of those concepts apply to show

23 that the Ninth Circuit was -- that -- that <u>PhotoMedex</u> is no

24 longer good law and that you cannot get a ruling that the

25 Lanham Act claim is -- is precluded here by the FDCA?

1          MS. LENT:  Because the claim in _Palm_ was that the
2     label was misleading to consumers, and the label can be
3     misleading to consumers about whether it is pomegranate
4     juice when it only contains less than a percentage of
5     pomegranate juice without knowing --

6          THE COURT:  But if the FDCA -- if the FDCA allows
7     the label, if the label is permissible under the FDCA, then
8     it can't be misleading, right, because the FDCA prevents
9     misleading labeling, right?

10         MS. LENT:  Well, I don't think that's -- I don't
11    think that's what the Court was saying.  The Court was
12    saying we can decide whether this is misleading to
13    consumers, regardless of whether it would be acceptable
14    under the FDCA.

15         THE COURT:  Where does it say that in _Palm_
16    _Wonderful_?  I just want to make sure you have a chance to
17    show me where it says that, because I didn't see anything
18    like that in _Palm Wonderful_.  Now, I might have missed it,
19    but now is your chance to show me where that language is.

20         MS. LENT:  So, your Honor, I think you're raising
21    an issue about the _Palm_ -- about whether there was a
22    violation of the FDCA or whether the FDA would allow the
23    label that wasn't expressly addressed in _Palm Wonderful_.  I
24    mean, the Court just said that the claim --

25         THE COURT:  But the -- that's why the Ninth

1    Circuit ruled in favor of the Defendants in <u>Palm Wonderful</u>,

2    right?  And the Ninth Circuit says, no, this -- a court

3    ruling on this would infringe on the FDCA -- FDA's authority

4    to decide whether this is misleading or not.  And the

5    Supreme Court says, No, no, no.  You analyzed that totally

6    wrong.

7                MS. LENT:  But that's not what the Plaintiff's

8    argument was in <u>Palm Wonderful</u>.  They weren't saying that

9    the FDA said that the label was approved.  They were just

10   saying, Well, the FDA regulates labeling on beverages.

11               THE COURT:  Right.

12               MS. LENT:  And so it has to be --

13               THE COURT:  If the --

14               MS. LENT:  -- precluded.

15               THE COURT:  Right.  And the Defendants were saying

16   if -- and the Ninth Circuit said if the Court were to hold

17   under the Lanham Act that this was misleading, that would

18   interfere with the FDA's prerogative because it's for the

19   FDA to decide whether it's misleading under the FDC -- FDCA,

20   right.  And the Supreme Court said, No, you totally got it

21   wrong.

22        And so you're making the same argument here to -- in

23   support of a ruling that the Lanham Act claim is precluded.

24   You're making the same argument that the Supreme Court said

25   the Ninth Circuit got all wrong, and it was -- that was the

1  approach that the Ninth Circuit took in Photo -- whatever it

2  was called, PhotoMedex?

3          MS. LENT:  PhotoMedex.  I don't think we are

4  making the same argument, your Honor, because in Palm

5  Wonderful, the FDA hadn't done anything, whereas, in our

6  case, this is about Intuitive's 510(k) approval and the

7  scope of that approval, and the FDA has done something with

8  respect to the 510 clearance.  It has granted it.  And

9  whether the adulterated devices that SIS would like to offer

10 are -- are allowed or not or would -- would be contrary to

11 the 510(k) clearance is a different issue, and there are a

12 number of courts that have said that the Palm Wonderful

13 court left open this issue of when the FDA has affirmatively

14 acted.  There are --

15         THE COURT:  But so --

16         MS. LENT:  There are --

17         THE COURT:  So --

18         MS. LENT:  There are a number -- I'm sorry.

19         THE COURT:  Tell -- tell me about those cases.

20         MS. LENT:  So --

21         THE COURT:  What are -- give me the cites is what

22 I mean to say.

23         MS. LENT:  Sure.  So one case that we've already

24 cited in our briefing is JHP Pharmaceuticals, and that's 52

25 F.Sup.3d, 992.  It's a Central District of California case

13

1  from 2014, and that case extensively analyzed the effect of

2  <u>Palm</u> on <u>PhotoMedex</u>.  In fact, the Court there stayed the

3  case pending the Supreme Court decision in <u>Palm</u>, and the <u>JHP</u>

4  court concluded that the Lanham Act claim was precluded in

5  the absence of a clear statement by the FDA.  So -- so

6  there, you know, it was -- if someone was saying that the

7  FDA approved something and the FDA hadn't approved

8  something, then you could have a Lanham Act claim, but

9  otherwise, you could not, and it would be precluded because

10 the --

11        THE COURT:  That sounds like an artificially -- I

12 mean, I haven't read the case, and I'll read it, but it

13 sounds like an artificially narrow reading of <u>Palm</u>

14 <u>Wonderful</u>.  I mean, that's -- <u>Palm Wonderful</u> didn't say

15 that, you know, the Lanham Act claims are precluded unless

16 -- unless the Defendant said some -- said that the FDA said

17 something that it didn't say.

18        MS. LENT:  Well --

19        THE COURT:  But, anyway, what else?  I want to

20 make sure to read the other cases that you're referring to.

21        MS. LENT:  So there's a case called <u>Catheter</u>

22 <u>Connections v. Iverna Medical Corporation</u>, and the citation

23 is 2014 Westlaw 3536573, and that's from the District of

24 Utah in 2014, and that case directly addresses the issue we

25 have here.  In that case, the Plaintiff alleged that the

14

1  Defendant engaged in false advertising, in violation of the
2  Lanham Act when it represented that its product did not need
3  510(k) clearance, and the Catheter Connections court held
4  that the claim was precluded by the FDCA even --
5              THE COURT:  And that was a post -- that was a
6  post-Palm Wonderful case?
7              MS. LENT:  Post-Palm Wonderful.  It considered
8  Palm Wonderful, and it said the -- the rationale of
9  PhotoMedex survived this part of Palm Wonderful or this --
10  this rational of PhotoMedex survived Palm Wonderful because
11  the -- the Plaintiff was essentially arguing that the
12  Defendant hadn't complied with Section 510(k) of the FDCA.
13  It's the -- it's very similar to the situation we have here.
14  And those courts, the JHP Pharmaceuticals court and the
15  Catheter Connections court essentially said that the Lanham
16  Act claim could be precluded if it relies on the Court to
17  interpret and apply the FDCA.
18       There's a difference between what the --
19              THE COURT:  But the Court was being -- but the
20  court was being relied on to effectively interpret the FDCA
21  in the Palm Wonderful case, right, because --
22              MS. LENT:  I don't agree with that, your Honor.  I
23  don't agree with that.  I think that the Plaintiffs claimed
24  that the -- that the advertisement was misleading, that the
25  label was misleading, and the Defendants came in and said --

15

1  and they waived their hands around, and they said, Oh,

2  labels, labels, they are regulated by the FDCA, and the

3  Court said, That's not enough.  You can't say that.  These

4  two statutes can exist in harmony, and it is possible to do

5  your consumer survey and say, This label is misleading.  I

6  thought this label meant that the juice was pomegranate

7  juice, and there's barely any in it, and you could win on

8  your Lanham Act claim under that --

9          THE COURT:  But -- but what if the -- but then

10  that -- the decision of whether that assertion about

11  pomegranate juice is a decision that the FDA can make,

12  right, or the FDA can decide under the FDCA whether that

13  assertion is misleading or not.  So you have a court issuing

14  a ruling about whether a label is misleading when the FDA

15  has the authority to decide whether the label is misleading,

16  and you have the Supreme Court saying that's not a problem.

17          MS. LENT:  But it said that's not a problem and

18  the language I read to you because the FDA doesn't

19  preapprove food and beverage labels.  In this instance, the

20  FDA preapproves the marketing of medical devices under

21  either 510(k) or, you know, a premarket application.  So

22  that's the difference, and that's why it matters that the

23  Supreme Court said the different here is that there's no

24  preapproval process for labels.  The FDA hasn't spoken and

25  preapproved this label.  This is just a label that exists.

16

1  Sure, the FDA could come in and enforce the fact that this

2  label is misleading, but it doesn't have to do that.  And so

3  there's no tension between these Plaintiffs saying this is

4  false and misleading advertisement and the fact that the FDA

5  could potentially bring a claim like that, but they don't

6  need to exist in tension.

7              THE COURT:  Okay.  And what claim would the FDA

8  bring against you for asserting to hospitals that the --

9  that the Plaintiff's actions are outside the scope of FDA

10  approval?

11             MS. LENT:  I don't think that the FDA would bring

12  a claim against us saying that --

13             THE COURT:  So this is conduct -- so -- so this is

14  conduct that you've engaged in that is covered neither by

15  the Lanham Act nor the FDCA?

16             MS. LENT:  No, not --

17             THE COURT:  Because -- because in the -- in the --

18  at least in the PhotoMedex case, if I remember correctly,

19  and in the Palm Wonderful case, right, the conduct that the

20  Defendant engaged in, the argument was, Hey, this conduct

21  that the Defendant engaged in is covered by the FDCA, and

22  the FDA could go in and enforce the FDCA as it relates to

23  this conduct if it wanted to.  Here the Plaintiffs are

24  alleging that you've engaged in certain conduct, and the FDA

25  -- I think the FDA could not take any sort of enforcement

1 action against you for the assertions that you made about

2 the Plaintiffs, but you're saying that, nonetheless, the --

3 the Plaintiffs cannot bring a Lanham Act claim against you

4 for that conduct either. So neither statute covers the

5 conduct that you've been -- the misconduct that you've been

6 accused of engaging in.

7           MS. LENT: Under the case law, your Honor, that

8 follows -- that predates and follows Palm, when the analysis

9 would require interpreting the FDCA in a -- and involve

10 interpreting an action that the FDA has taken, such as the

11 granting 510(k) clearance to -- into EndoWrist products, the

12 claim is precluded.

13           THE COURT: Okay. I -- I will go back and read

14 your cases to make sure I'm not missing something. So, JHP

15 Pharmaceuticals you said?

16           MS. LENT: Yes.

17           THE COURT: And Catheter Connections. Anything

18 else?

19           MS. LENT: Yeah. I would also point you to the --

20 let me see. I would also point you to Excela Pharma

21 Sciences v. Sandos.

22           THE COURT: How do you spell Exela?

23           MS. LENT: E-X-E-L-A.

24           THE COURT: Okay.

25           MS. LENT: And that is --

18

1          THE COURT:  And what's the cite?

2          MS. LENT:  486 F.Supp.3d., 1001, and Azurity, A-Z-

3 U-R-I-T-Y, Pharmaceuticals v. Edge, and the cite for that is

4 2021 U.S. District Lexis 95300.

5      And -- and then just finally, your Honor, I would point

6 you to -- to Thermolife v. Gaspari Nutrition, which is a

7 Ninth Circuit case, 648 F. Appendix 609.  And in that case,

8 the Ninth Circuit expressly declined to determine whether

9 PhotoMedex was --

10          THE COURT:  Yeah, but it -- but it wasn't --

11 wasn't presented to them, right?

12          MS. LENT:  It was presented to them, and they --

13          THE COURT:  No, because they said even under

14 PhotoMedex, the Plaintiff wins here, right.  So it doesn't

15 matter.

16          MS. LENT:  Right, but they distinguished the

17 circumstance, and so I think it's -- it's instructive to the

18 analysis that we've been talking about today.

19          THE COURT:  Okay.  Thanks.  Do the Plaintiffs

20 briefly want to respond to anything?

21          MR. MCCAULLEY:  Just briefly, your Honor.  We do

22 agree that Palm Wonderful is -- is broad and if it doesn't

23 completely overrule PhotoMedex, gives it very little room to

24 breathe.

25      We note that Judge Praegerson in the JHP case, that --

19

1  I haven't read many of the cases that I've heard of for the

2  first time today, but I do know that in the THP (sic) case,

3  I think there's some instructive language that relates to

4  this case. Judge Praegerson there found that not being

5  asked to usurp, this isn't a Lanham Act claim that is

6  masquerading as an enforcement action or vice versa. When

7  we're simply being asked to interpret what the FDA has done,

8  certainly the Court can and has the power to do that under

9  the Lanham Act. And that's the nature of our claim here,

10 your Honor. The FDA has made an approval of the EndoWrist

11 products, and we contend that they misrepresented the nature

12 of that approval. That's the nature of our Lanham Act

13 claim.

14      So, even if there is some room, if there is some oxygen

15 for the PhotoMedex case, it wouldn't apply in this case.

16 That's all, your Honor.

17          THE COURT: Okay. Let me ask -- Ms. Lent, let me

18 ask you about the tying issue, and I don't want to take too

19 much time on it, but I will say that I've read the Florida

20 -- the district -- Florida District Court ruling, and I've

21 read your arguments, and I guess I'm just not -- I'm having

22 a hard time getting through my brain why we should conceive

23 of this claim as a refusal to deal claim rather than a tying

24 claim. I mean, it kind of seemed like the District Court in

25 Florida was just sort of waving a wand and saying, I deem

1 this a refusal to deal claim, but I -- I didn't -- it

2 doesn't make a logical sense to me why you would conceive of

3 this as a refusal to deal claim.  I mean, what they're

4 alleging is that, you know, there is this -- you know, that

5 there's this demand for this competitor's product, and the

6 Defendant has altered their product to -- to prevent that

7 demand from being realized, and -- and to ensure that only

8 the Defendant's tied product can be used with the primary

9 product, and I just don't understand why we should -- it

10 seems like you're asking to just pronounce it a refusal to

11 deal claim when that's really not what it is.  That's not

12 what they're arguing.  That's not what they're alleging.

13          MS. LENT:  Well, as an initial matter, your Honor,

14 I think your question assumes that there are two separate

15 products here, and we are --

16          THE COURT:  And I believe that for the purposes of

17 the pleadings stage, there are two separate markets.

18          MS. LENT:  Okay.

19          THE COURT:  And I don't need to hear argument on

20 that.  That will be the ruling on the motion to dismiss.

21          MS. LENT:  Okay.  Well -- okay.  Well, this is not

22 a product redesign like the cases that Plaintiffs have

23 cited.  The EndoWrists have always been designed so that

24 they contain a usage counter.  That's what was approved by

25 the FDA, and customers have always known from the start when

21

1   Intuitive started selling Da Vinci systems in the early

2   2000's that the EndoWrist were limited-use instruments.

3          THE COURT:  But why -- I just -- I read that

4   argument, but I guess I don't understand why that matters,

5   because their claim is that -- I think they would agree with

6   what you -- everything you just said, right, and they would

7   say, but what we are alleging is that this was always

8   designed to have a, you know, use limit.  A market developed

9   for a service that allowed that use limit to be exceeded,

10  and that's a -- there's a market for that, and the -- the --

11  the -- the Defendant made a design change to snuff that out,

12  and the only purpose was to snuff that out, and the only

13  purpose of it was anti-competitive.

14      Now, I can imagine in my own mind all sorts of

15  legitimate reasons why that design change might have been

16  made, and I'm -- I will say that I'm sort of at least

17  initially somewhat skeptical of the claim, but that's not

18  the test at the motion to dismiss stage.  You know, they --

19  what they have alleged is that there was this demand for

20  this service that developed.  You just changed the design

21  for the sole purpose of snuffing it out, and it has no -- it

22  has -- that was the -- it was only that anti-competitive

23  reason that you made the change.  And I -- I'm sort of

24  skeptical of it, but it's not implausible or at least I

25  believe that the design change was made to prevent people

22

1  from circumventing the use limit, but I'm sort of suspecting
2  that there may have been legitimate reasons to do that, but
3  that is for the motion -- for the summary judgment stage,
4  right?  That's not for this stage, and I don't -- that's
5  what they allege, and I don't understand why we would just
6  sort of pronounce that this is a refusal to deal claim.  I
7  don't even understand the argument that it's a refusal to
8  deal claim.  It's not.  It's a -- it's a tying claim, and
9  it's a -- you know, and -- and at the pleading stage, I
10 think we have to accept that.  So I guess I don't really
11 understand why the District Court in Florida ruled the way
12 that it did, and I don't understand how I can sort of
13 re-conceptualize their claim in the way you're asking me to
14 do here.
15         MS. LENT:  So -- so the reason why I say it's not
16 a design change is because there's always been a usage
17 counter, and that's always been a part of the instrument.
18 The fact that the usage counter was done with one chip
19 versus another chip later, that's -- that's what -- what
20 we're disputing is an actual design change.  The instrument
21 was always designed to prevent people from using it past 10
22 uses, and that has not changed from the S and SI instruments
23 to the X and XI instruments.  That's the design.  There's a
24 different technology.  There's a different chip in the
25 device because technology changes over time, but that's not

23

1   change to the design of the EndoWrist in terms of preventing

2   it from being used more than usually 10 times.

3       The other point that I want to make, your Honor, in

4   response to your -- your question about, you know, why --

5   why is -- why isn't this something that was done

6   intentionally to prevent or for the sole purpose of

7   preventing SIS and others like it to -- to do what they're

8   doing, the timing is all wrong, right.  And if you look at

9   the complaint, it says that the X and XI robot and

10  instruments were introduced in 2014, right.  No one was out

11  there trying to reset the usage counters on any EndoWrist

12  until at least 2018, and certainly SIS hasn't alleged that

13  they were engaged in some process of trying to reset usage

14  counters on EndoWrist before 2014.  They weren't.  So there

15  was -- so the premise that -- that the technology that

16  supports the usage counter was changed because it was an

17  attempt to prevent this market that had sprung up to repair

18  EndoWrist, that's not supported -- that's not alleged in the

19  complaint anywhere.  Actually, the complaint alleges a

20  different timeline that, again, the -- the change that  the

21  Plaintiffs are claiming was made was made in 2014.

22             THE COURT:  Okay.

23             MS. LENT:  So I --

24             THE COURT:  That's not a -- that's not a point

25  that I had zeroed in on.  So -- so do you want to -- the

24

1  Plaintiffs want to start by addressing that point?

2           MR. MCCAULLEY:  Sure.  Thank you, your Honor.

3       We said it's in response to SIS and others, and seeing

4  where the market was going, at the pleadings stage --

5           THE COURT:  Well, but if SIS didn't start doing it

6  until 2019 -- 2018 --

7           MR. MCCAULLEY:  They did not, but our

8  understanding, your Honor, is people are doing it around --

9           THE COURT:  The change was made in 2014.  Do you

10 -- is that accurate?  Is that what your complaint alleges,

11 that the change was made in 2014 and you didn't start doing

12 it until 2018?

13          MR. MCCAULLEY:  I believe that's right, your

14 Honor.  But I -- I do believe the evidence that will develop

15 at trial will show that others around the world were doing

16 it as of 2014.  That's what we understand.

17          THE COURT:  Well, but -- but the question is not

18 what the evidence will show.  It's -- the question is what

19 you've pled.  So if you've pled that they -- they did this

20 to stop SIS and others from -- from changing the counter and

21 if SIS wasn't doing it then, isn't that -- I mean, haven't

22 -- isn't that a problem?  I mean, don't you need to -- I

23 mean, it sounds like what you're saying to me is we need

24 leave to amend -- I -- like I said, I haven't looked at

25 this.  I haven't looked at this issue.  I haven't -- I

1 haven't zeroed in on this, but it sounds like what you may

2 be saying is we said they did this to stop SIS and others

3 from changing the counter.  We alleged that incorrectly

4 because the timing is all wrong.  We need to go back and fix

5 it to explain what -- to give a better explanation of what

6 the anti-competitive purpose was.  I mean, is that what

7 you're saying or --

8          MR. MCCAULLEY:  We certainly would be happy to

9 replead it, your Honor, if that's necessary.  I think the

10 indirect response to others and then seeing where the market

11 was headed, which ultimately was occupied by SIS, but it is

12 accurate to say that SIS was not doing this as of 2014.

13 That's accurate.

14          THE COURT:  Okay.  All right.  What about the --

15 what about the larger point about whether this should be

16 construed as a -- as refusal to deal with --

17          MR. MCCAULLEY:  I'm sorry, your Honor.  I didn't

18 hear you.

19          THE COURT:  What about the larger point that Ms.

20 Lent makes about the -- that this should be construed as a

21 refusal to deal claim because it wasn't really a change to

22 the -- to the technoloy?  It was just -- the product was

23 always designed to, you know, exclude more than 10 uses.

24          MR. MCCAULLEY:  The product was always designed to

25 exclude more than 10 uses.  And, as we've alleged I believe

1 in paragraphs 107 and 108 and 74, the usage counter has no

2 impact on the function of the device and that there's no

3 pro-competitive benefit to beefing up the security on that

4 chip.  It only had an anti-competitive effect.  So it wasn't

5 that the function was changed.  The level of the security

6 and the nature of the security on the chip was changed, for

7 no -- no reason that benefitted consumers, no reason that

8 benefitted Mr. Corrigan's clients, simply to keep -- to

9 suppress competition, to prevent people from servicing the

10 EndoWrist and meeting the demand that existed and exists in

11 the market for those.  And so there's no pre-competitive

12 reason for increasing and changing the security.  So what

13 I'll -- the usage counter, we're not disputing that they're

14 entitled to have the usage counter.  We're just saying the

15 change to the security in the chip had no pro-competitive

16 reason and that it had an anti-competitive effect by --

17          THE COURT:  When you say there -- you're not

18 disputing that they're entitled to have the usage counter,

19 you're saying that you're not disputing that they have the

20 -- they're entitled to configure it so that it won't work

21 after 10 uses?

22          MR. MCCAULLEY:  They're entitled to have the

23 configuration that they had.  There's no pro-competitive

24 reason to change the level of security.  That's what we're

25 contending.

27

1           THE COURT:  Okay.

2           MS. LENT:  Your Honor, may I --

3           THE COURT:  Can I just --

4           MS. LENT:  I'm sorry.

5           THE COURT:  Well, I just wanted to ask Mr.

6  McCauley while I had him that I wanted -- I have to say, I

7  mean, this -- let's take a step back from the motion to

8  dismiss for a second and -- or maybe not take a step back

9  from the motion to dismiss.  Let's talk about plausibility.

10 We have this company that has this device and sells this

11 device, and it seems to me as a matter of common sense that,

12 you know, and it's been approved by the FDA, and the -- the

13 company has to be very very concerned about whether this

14 device that it's sending out to hospitals is going to

15 malfunction, and the company has to be very very concerned

16 that if other, you know, companies are opening up the device

17 and messing with it and changing the number of times it's

18 able to be used, that you're -- you're really increasing the

19 risk of these products malfunctioning, and obviously it's in

20 the -- it's in the company's interest to minimize that risk,

21 and it's in the patient's interest for that risk to be

22 minimized.

23      Just sort of as a matter of logic, doesn't it seem

24 reasonable for the company to advocate for hospitals not to

25 allow other companies to come in and override the settings

28

1   on the device that -- that the Defendant is selling?  I

2   mean, I know we're at the motion to dismiss stage, and I'm

3   sort of -- maybe you get past the motion to dismiss stage

4   because, you know, the question that I'm asking relates to

5   summary judgment, but when we get to summary judgment, I

6   mean, aren't you going to lose your -- this case?  I mean,

7   it -- I have a hard time imagining how a company doesn't

8   have -- a company like the Defendant doesn't have the

9   ability to advocate in the strongest possible terms that you

10  shouldn't be allowing, you know, third parties to come in

11  and override the settings of our device -- of our devices,

12  which are designed to minimize, you know, risk to patients.

13          MR. MCCAULLEY:  I think that's tied up -- I'm

14  sorry, your Honor.  Am I interrupting?  Are you --

15          THE COURT:  No, no.  I was done.

16          MR. MCCAULLEY:  I think, your Honor, that will be

17  tied in with how the limit of 10 uses was -- was set, are

18  there legitimate safety concerns after a device has been

19  used 10 times.  Now, as I understand it, hospitals are

20  required to -- to throw these devices away after 10

21  sterilizations.  They haven't even been used once, when the

22  approvals for these devices were based on -- based on

23  standard surgical devices that are reused hundreds if not

24  thousands of times, and this is what our clients heard from

25  hospitals.  And so the maintenance of the limitation and

29

1  providing security and preventing competition in inspecting

2  these devices, repairing them, and putting them back on the

3  market ties in with the entire claim.

4      So I think we'll hear a lot of evidence, and we'll

5  develop a lot of evidence about what -- how this limitation

6  of 10 uses was set and whether it's a legitimate safety

7  concern or a mechanism to drive up profits based on the very

8  expensive prices of these replacement EndoWrists.

9          THE COURT:  Okay.  Ms. Lent, do you want to have

10  the last word on any of this stuff briefly?

11          MS. LENT:  Sure.  I just wanted to go back to

12  address Mr. McCauley's agreement that it's not -- that it's

13  fine for Intuitive to put a usage counter in the

14  instruments.  So they're not --

15          THE COURT:  Yeah, I was -- I was sort of startled

16  by that.  So go ahead.

17          MS. LENT:  Yeah.  So there's not an anti-trust

18  violation from using a usage counter.  They -- what they

19  want is for the usage counter to be simple enough so that

20  they can hack into it, and I don't understand how that's an

21  appropriate claim for relief.

22          THE COURT:  But if it's --

23          MS. LENT:  They're upset -- excuse me.  They're

24  upset because someone figured out how to hack into the first

25  usage counter, but the usage counter in the new instrument

1 they haven't quite figured that out yet, but it's okay that

2 it's there.  It's just that it's too hard for them --

3          THE COURT:  Yeah.  I mean, I didn't -- I didn't --

4 I was surprised by that too, but was that in the complaint?

5 I mean, was -- does the complaint say that it's okay that

6 the usage counter is there?

7          MS. LENT:  So the complaint doesn't challenge the

8 usage counter as an anti-trust violation.  And, your Honor,

9 their business actually depends on there being a usage

10 counter, because if the instrument is -- doesn't need to

11 have its usage counter reset and a hospital's just going to

12 continue to use it, despite the safety risks that Intuitive

13 has identified, then no one's going to SIS in order to have

14 a usage counter reset.  So they need the usage counter to

15 support their business model.

16          THE COURT:  But they might still -- I mean, I

17 guess that begs the question of how much money are they

18 making on usage counter reset and how much money are they

19 making on, you know, repairs and stuff.

20          MS. LENT:  Yes.  I think it's much less actually.

21 And, you know, I know that that's not part of the pleadings

22 in this case, but there's a reason why companies want to get

23 into this business, and it's because sharpening the ends of

24 scissors in laparoscopic instruments is not a profitable

25 enterprise, but trying to reset a usage counter on a

31

1  sophisticated piece of equipment like an EndoWrist is

2  something they can charge more money for.

3          MR. MCCAULLEY:  Your Honor, if I -- oh, I'm sorry.

4          THE COURT:  No, go ahead.

5          MR. MCCAULLEY:  Well, I -- and I think it goes to

6  the point -- and I -- I perhaps should not have shorthanded

7  it by saying we're not objecting to the usage counter.  The

8  usage counter as set by Intuitive allows them to charge

9  super competitive prices for products that are unnecessarily

10  limited in the number of uses, and we certainly contest

11  that.

12      We -- so I -- I hope I didn't make a vague or

13  inaccurate statement that surprised everyone.  I mean, we

14  obviously are contesting the way that the intuitive products

15  are configured, marketed, sold when there is a viable

16  replacement market.  That does not violate any FDA

17  restrictions, and that provides significant value to the

18  market.

19      Oh, I think we did plead in our complaint that we have

20  -- are aware of safety data testing that was done to

21  validate up to 50 uses, safe uses of the EndoWrist, and I'm

22  sure it probably goes beyond that.  That is in -- I'm not

23  sure what paragraph it is, but I'm sure we can find it for

24  you, your Honor, that --

25          THE COURT:  Okay.

32

1          MR. MCCAULLEY:  -- that --

2          THE COURT:  Okay.  I will -- I will -- I'll give

3   all of this a little more thought and issue a ruling.

4          MR. CORRIGAN:  Your Honor, if I might, since I --

5   I may justify my appearance here, if I might.  Ms. Lent said

6   something.  She said that SIS needs a usage counter.  Well,

7   I will step in for the Hospitals and say certainly the

8   Hospitals do not need a usage counter.  As Mr. McCaulley

9   pointed out before, Intuitive got these EndoWrists approved

10  by likening them to laparoscopic surgical instruments.

11  There's no use limit on the laparoscopic surgical

12  instruments.  So slapping a 10-use limit on --

13         THE COURT:  Yeah, but the laparoscopic surgical

14  instruments are not attached to a complicated robot.

15         MR. CORRIGAN:  We're saying that the operative

16  part is the scissors, is the scalpel.  I mean, can you using

17  a pair of scissors 10 times and having to throw it out?  I

18  mean, somebody in Intuitive --

19         THE COURT:  I think that -- I think that's very

20  question begging.  I don't -- it doesn't seem relevant to

21  why you might want to have a counter for the -- for the --

22  the parts that are attached to a complicated robot.  But, in

23  any event, I think we may have plenty of time to debate that

24  as --

25         MR. CORRIGAN:  Thank you, your Honor

33

1        THE COURT:  -- as time goes on.

2     So, okay.  I'll think more about this and look -- I

3  want to in particular look more closely at the 24 -- 2014,

4  2018 issue, which I hadn't noticed, and -- and then I want

5  to read your cases on the preclusion issue, the Palm

6  Wonderful issue, and so it may take a little while, but I'll

7  issue a ruling.

8        MS. LENT:  Thank you, your Honor.

9        THE COURT:  Thank you.

10        MR. MCCAULLEY:  Thank you, your Honor.

11        MR. CORRIGAN:  Thank you, your Honor.

12     (Proceedings adjourned at 4:19 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

34

<u>CERTIFICATE OF TRANSCRIBER</u>

1

2

3      I certify that the foregoing is a true and correct

4  transcript, to the best of my ability, of the above pages of

5  the official electronic sound recording provided to me by

6  the U.S. District Court, Northern District of California, of

7  the proceedings taken on the date and time previously stated

8  in the above matter.

9      I further certify that I am neither counsel for,

10  related to, nor employed by any of the parties to the action

11  in which this hearing was taken; and, further, that I am not

12  financially nor otherwise interested in the outcome of the

13  action.

14

15

16          Echo Reporting, Inc., Transcriber

17             Thursday, October 14, 2021

18

19

20

21

22

23

24

25

*Echo Reporting, Inc.*