# Exhibit 3

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **SURGICAL INSTRUMENT SERVICE COMPANY, INC.,** | |
| Plaintiff/Counterclaim Defendant, | Case No. 3:21-cv-03496-VC |
| v. | |
| **INTUITIVE SURGICAL, INC.,** | JURY TRIAL DEMANDED |
| Defendant/Counterclaim Plaintiff. | |

## EXPERT DAMAGES REBUTTAL REPORT OF LOREN K. SMITH, PH.D.
### January 18, 2023

**HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER**

TABLE OF CONTENTS

I.  **Introduction**...........................................................................................................1

    A.  Qualifications ................................................................................................1

    B.  Assignment ...................................................................................................3

    C.  Summary of Opinions....................................................................................5

II.  **Mr. Bero's lost profits analysis suffers from conceptual and methodological flaws that inflate SIS's purported damages** .........................................................................8

    A.  Mr. Bero does not properly analyze the "but-for" market structure and Intuitive's likely response to third-party sales of reset EndoWrist instruments ...........................................10

    B.  Mr. Bero's damages associated with resets of X/Xi EndoWrist instruments are speculative and contrary to the evidence in the case ......................................12

    C.  Correcting the identified computational errors in Mr. Bero's lost profits analysis alone lowers damages by as much as 11.2 percent ................................16

    D.  Key assumptions that underpin Mr. Bero's calculations are unreliable and increase his damages estimates ................................................................17

        1.  The implied "market penetration" rate of reset EndoWrist instruments is high relative to Mr. Bero's own benchmarks ................................................19

        2.  Mr. Bero's assumptions fail to account for "real world" factors that likely would lower his "market penetration" rate and damages estimates....................................24

            a.  Mr. Bero's "expiration rate of new sales units" is based on Intuitive's "top 5" X/Xi EndoWrist instruments, which likely cause Mr. Bero to overstate the expiration rate of all resettable EndoWrist instruments....................................25

            b.  Neither the Bero Report nor the Sargent Report provides a proper analysis of hospitals that likely would take up SIS's reset services....................................26

            c.  Mr. Bero inflates his damages calculations by using a target collection rate of 70 percent ....................................28

    E.  Implementing corrections to Mr. Bero's assumptions reduces damages by as much as 98.9 percent ................................................................28

III.  **Mr. Bero's disgorgement damages pertaining to SIS's claims under the Lanham Act are overstated** ................................................................30

## I.   INTRODUCTION

### A.   QUALIFICATIONS

1. My name is Loren K. Smith. I am a Principal at The Brattle Group and have been an economic consultant since April 2013. From September 2005 to March 2013, I was a staff economist at the U.S. Federal Trade Commission ("FTC"). I received my Ph.D. in economics from the University of Virginia in 2006.

2. I specialize in the application of economic and econometric tools to antitrust and competition matters. I have taught economics and econometrics to undergraduates and graduate students at the University of Virginia and Johns Hopkins University. I have taught courses on the application of economic and econometric tools to antitrust matters to lawyers and economists of foreign antitrust agencies in South Africa, Hungary, and Brazil, and at Fordham University. My research has been published in leading economics and antitrust journals, including the Journal of Applied Econometrics, the Journal of Economics and Management Strategy, and Antitrust Source.

3. While at the FTC, I led economic investigations into high-profile mergers and conduct matters, including in healthcare generally and medical devices, specifically. I also supported litigation and settlement efforts. Since leaving the FTC for private practice, I have consulted with clients on government investigations, federal merger challenges, and private litigations in a wide variety of industries, including healthcare, retail, lodging, medical devices, and various consumer products and intermediate goods.

4. I have significant experience studying the economics of healthcare, including several matters that required detailed economic analyses of competition among healthcare suppliers and providers. On behalf of healthcare providers as well as for the government, I have analyzed the competitive impact of healthcare provider mergers, including numerous hospital mergers. I recently testified as the economic expert for the Plaintiffs in *FTC et al. v. Thomas Jefferson*

*University et al.*[1] Both at the FTC and in private practice, I have assessed unilateral conduct in the healthcare industry, including analyses of market definition, market power, conduct, effects and justifications.

5.  I provided expert testimony in *Rebotix Repair LLC v. Intuitive Surgical, Inc.* and *Restore Robotics LLC, Restore Robotics Repair LLC, and Clif Parker Robotics LLC v. Intuitive Surgical, Inc*. In both cases, I submitted expert reports on (i) the profits to be disgorged from the plaintiffs and (ii) Intuitive's lost profits from the "[plaintiffs'] alleged false advertising, unfair competition, deceptive and unfair trade practices, and tortious interference with contract."[2] I also submitted expert reports addressing, from an economics perspective, the plaintiffs' allegations that Intuitive engaged in conduct to "monopoliz[e] trade in the worldwide and domestic aftermarkets for service of da Vinci surgical robots and the worldwide and domestic aftermarkets for service and replacement of EndoWrist surgical robotic instruments."[3] In *Rebotix Repair LLC v. Intuitive Surgical, Inc.*, I submitted an expert report responding to the damages analysis of the plaintiff's expert.[4]

6.  My curriculum vitae, which provides additional details about my qualifications, including my prior testimony and publications, is provided in Exhibit A.

---

[1]  20-cv-03499, Pennsylvania Eastern District Court, September 15 and 16, and October 1, 2020.

[2]  Expert Report of Loren K. Smith, Ph.D., *Restore Robotics LLC and Restore Robotics Repair LLC v. Intuitive Surgical, Inc.*, Case No. 5:19-cv-55, August 20, 2021, ¶ 6. Expert Report of Loren K. Smith, Ph.D., *Rebotix Repair LLC v. Intuitive Surgical, Inc.*, Case No. 8:20-cv-02274, July 26, 2021, ¶ 6.

[3]  Expert Rebuttal Report of Loren K. Smith, Ph.D., *Restore Robotics LLC, Restore Robotics Repair LLC, and Clif Parker Robotics LLC v. Intuitive Surgical, Inc.*, Case No. 5:19-cv-55, September 27, 2021, ¶ 7. Expert Antitrust Merits Report of Loren K. Smith, Ph.D., *Rebotix Repair LLC v. Intuitive Surgical, Inc.*, Case No. 8:20-cv-02274, August 30, 2021, ¶ 7. Rebotix's claims did not include "service of da Vinci surgical robots."

[4]  Expert Damages Rebuttal Report of Loren K. Smith, Ph.D., *Rebotix Repair LLC v. Intuitive Surgical, Inc.*, Case No. 8:20-cv-02274, August 30, 2021, ¶ 7.

7. I submitted an expert report in this matter on December 2, 2022 that "quantif[ies] (i) SIS's profits to be disgorged; and (ii) Intuitive's lost profits from SIS's alleged false advertising, unfair competition, deceptive and unfair trade practices, and tortious interference with contract."[5] I am simultaneously to this Report submitting an expert report that reviews and analyzes the expert report submitted by Dr. Russell Lamb on behalf of Surgical Instrument Service Company, Inc. ("SIS" or "Plaintiff").[6]

## B.   ASSIGNMENT

8. I have been asked by counsel for Intuitive Surgical, Inc. ("Intuitive") to review the expert report submitted by Mr. Richard F. Bero on behalf of SIS.[7] SIS alleges that the purported antitrust misconduct challenged in its Complaint has allowed Intuitive to "leverage its monopoly power in robots for use in minimally invasive soft tissue surgery, the repair and support of those robotic systems, and its monopoly power in instruments for use with such robots to foreclose aftermarket repair of those instruments by any competitors."[8] In addition, SIS claims that Intuitive violated the Lanham Act by "assert[ing] false or misleading descriptions of facts or representations in its correspondence with its and SIS's customers…."[9]

9. Mr. Bero represents that he was asked to "calculate lost profit damages in two primary alternative scenarios" and "address disgorgement of Intuitive's profits damages under the

---

[5]   Expert Report of Loren K. Smith, Ph.D., *Surgical Instrument Service Company, Inc. v. Intuitive Surgical, Inc.*, Case No. 3:21-cv-03496-VC, December 2, 2022 ("Smith Counterclaims Damages Report"), ¶ 7.

[6]   Expert Antitrust Merits Rebuttal Report of Loren K. Smith, Ph.D., *Surgical Instrument Service Company, Inc. v. Intuitive Surgical, Inc.*, Case No. 3:21-cv-03496-VC, January 18, 2023 ("Smith Antitrust Merits Rebuttal Report"); Expert Report of Dr. Russell L. Lamb, *Surgical Instrument Service Company, Inc. vs. Intuitive Surgical, Inc.*, Case No. 5:21-cv-03496, December 2, 2022 ("Lamb Report").

[7]   Expert Report of Richard F. Bero, CPA, CVA, *Surgical Instrument Service Company, Inc. v. Intuitive Surgical, Inc.*, Case No. 3:21-cv-03496-VC, December 2, 2022 ("Bero Report").

[8]   Complaint, *Surgical Instrument Service Company, Inc. v. Intuitive Surgical, Inc.*, Case No. 5:21-cv-03496-SK, May 10, 2021 ("Complaint"), ¶ 110.

[9]   Complaint, ¶ 123.

Lanham Act (Count 5)."[10] ███████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████[14] In addition, Mr. Bero calculates damages under two different

assumptions ███████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

---

[10]   Bero Report, p. 1.

[11]   Bero Report, p. 6.

[12]   Bero Report, pp. 46-47. In Scenario 1 of Mr. Bero's lost profits analysis, damages associated with alleged lost sales of reset X/Xi EndoWrist instruments span the period January 1, 2020 through the end of 2025. *See* Bero Report, p. 47.

[13]   Bero Report, p. 6.

[14]   Bero Report, pp. 57-58. Scenario 2 of Mr. Bero's lost profits analysis includes estimates for a "2 Year X/Xi delay" (where damages associated with alleged lost sales of reset X/Xi EndoWrist instruments span January 1, 2022 through the end of 2025) and a "1 Year X/Xi delay" (where damages associated with alleged lost sales of reset X/Xi EndoWrist instruments span January 1, 2021 through the end of 2025). *See* Bero Report, Schedules 4.2 and 4.5.

[15]   Bero Report, p. 6. I understand that Intuitive alleges that SIS misrepresents the nature of its service through which it bypasses the usage limits on EndoWrist instruments by characterizing that service as a "repair." I refer to this service as a "reset" for convenience only and express no opinion as to whether it accurately describes the work that SIS performs.

[16]   Bero Report, p. 6.

████████████████████████████████████████████████████████

██████████████████████████████ [17]

10. For the reasons set forth in my Antitrust Merits Rebuttal Report, Intuitive's conduct has been on-balance procompetitive, and thus SIS's claims lack merit, and no damages are warranted. Notwithstanding this opinion, I evaluate Mr. Bero's damages analysis under the assumption that Plaintiff will prevail on its claims. For the reasons outlined below, I find that Mr. Bero's estimated damages are unreliable and inflated. My analysis focuses on the reliability of many assumptions on which his damages calculations depend. I do not attempt to respond to every claim in the Complaint or in the Bero Report. My lack of response to any particular claim does not indicate agreement.

11. A list of the materials that I considered in forming my opinions in this Report is enclosed as Exhibit B.

12. The work presented in this Report was conducted by me and staff at The Brattle Group working under my direction. The Brattle Group bills my time on this matter at $875 per hour. Neither my compensation nor the compensation of The Brattle Group depends in any way on the outcome of this case.

13. My work in this matter is ongoing. I reserve the right to supplement my analyses and conclusions should any additional information be provided to me after the submission of this report.

C.   SUMMARY OF OPINIONS

14. Based on my analysis of the Bero Report, I find that Mr. Bero's lost profits damages analysis is based on several unsupported assumptions that cause him to significantly overstate any damage to SIS. More specifically, *Mr. Bero's damages analysis fails to consider a proper "but-for" world and suffers from other key methodological flaws*. His damages figures depend on a series of unreliable assumptions, including:

---

[17]   Bero Report, p. 6.

a. ███████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████. It is clear that the components of the da Vinci Surgical System are strong complements—e.g., the da Vinci platform and EndoWrist instruments are not useful for their designed purpose unless used together. If forced to unbundle the components of the da Vinci Surgical System, Intuitive likely would alter its go-to-market strategy. Given Intuitive's history of efforts to maintain da Vinci Surgical System integration, it is plausible that Intuitive's strategy in the relevant "but-for" world would seek to maximize system integration, which would lessen if not eliminate any damage to SIS.

b. █████████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████ Despite experience resetting S/Si instruments and despite significant incentive and effort, no third-party company has yet been able to reset X/Xi EndoWrist instruments. Hence, it is uncertain if or when third-party companies will be able to reset X/Xi EndoWrist instruments, and thus Mr. Bero's damages calculations relating to these instruments are unreliable. ███████████████████████████

████████████████████████████████████

c. Even ignoring the practical and conceptual issues described above, and accepting all of his assumptions, ████████████████████████████████████████

███████████████████████████████████████

d. Finally, ████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████

█████████████████████████████████. As examples:

  i. █████████████████████████████████████████

  ████████████████████████████████████████████

  ████████████████████████████████████████████

  ████████████████████████████████████



ii. ███████████████████████████ ██████████████████████████████ ███████████████ I understand that a single reset recently has been cleared for a single S/Si EndoWrist instrument. ████████ ██████████████████████████ ████████████████

iii. █████████████████████████ ██████████████████████████████ ████████████████████████ ████████████████████████ ████████████████████

e.   Making even a few of these corrections to Mr. Bero's calculations reduces damages by as much as 98.9 percent.

15.   I find that Mr. Bero's disgorgement damages are overstated for at least three reasons. First, I understand that ████████████████████████████ ███████████████████████ ██████████████████████████ ██████████████████████████ ███████████████ Second, Mr. Bero applies the same flawed assumptions ████████████████████████ And third, ██████████████████████████ ████████████████████████████ ████ . Making a few corrections to Mr. Bero's calculations reduces his disgorgement damages by as much as 98.9 percent.



---

[18]   In this Report, I use the term "hospital" as a shorthand to refer to hospitals, ambulatory surgery centers, and other healthcare facilities that may own or lease a da Vinci Surgical System.

## II.   MR. BERO'S LOST PROFITS ANALYSIS SUFFERS FROM CONCEPTUAL AND METHODOLOGICAL FLAWS THAT INFLATE SIS'S PURPORTED DAMAGES

16. Mr. Bero purports to calculate "lost profit damages" estimates across a range of scenarios with varying assumptions about the timing of SIS's sales of reset X/Xi EndoWrist instruments and SIS's cost structure.[19] Mr. Bero's analysis is based on his projection of what "would have otherwise happened in the event the Alleged Wrongdoings had not happened."[20]

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[23]

17. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[19]   Bero Report, pp. 4-6. *See also* ¶ 9 above.

[20]   Bero Report, p. 42.

[21]   Bero Report, pp. 47-53 and Table 5.

[22]   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Bero Report, p. 47. Thus, Mr. Bero's damages analysis also includes a forecast of the "actual" world ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Bero Report, p. 53. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See* Bero Report, p. 53 and Schedules 2.2, 4.2 and 4.5. Unless otherwise indicated, my critiques of Mr. Bero's assumptions apply to both his "but-for" world and forecast of the "actual" world. In my sensitivities analysis, I adjust both Mr. Bero's "but-for" and "actual" worlds.

[23]   Bero Report, Schedules 2.1, 4.1, and 4.4.



18.  As I discuss in more detail in this section, there are numerous assumptions in Mr. Bero's analysis that are unreliable and inflate his lost profits damages estimates. In particular, as described in Sections A and B, ████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████. In Section C, I show the impact on Mr. Bero's damages estimates after correcting for two computational errors in his analysis. Section D discusses ██████ ████████████████████████████████████████████████████ ████████████████████████████████. Section E concludes with a summary of impact on damages after correcting Mr. Bero's errors and assumptions. Although I do not adjust for every error in Mr. Bero's analysis, ████████████████████████████████ ████████████████████████████████████.

---

[24]  Bero Report, p. 47, Table 5. I calculate the average number of reset EndoWrist instruments per year in Mr. Bero's analysis by dividing Table 5's "Would-have-been Lost EndoWrist repair units" row by six years (January 1, 2020 to December 31, 2025). ████████████████ ████████████████████████████

[25]  Smith Counterclaims Damages Report, Table 1. Under the assumption that the Interceptor chip from Rebotix Repairs LLC was the only process to circumvent the use counter for S/Si EndoWrist instruments in the U.S. in 2019, the total number of reset EndoWrist instruments sold in 2019 was likely around 455. *See* Smith Counterclaims Damages Report in *Rebotix*, Table 1 ████████████████████████████

## A.  MR. BERO DOES NOT PROPERLY ANALYZE THE "BUT-FOR" MARKET STRUCTURE AND INTUITIVE'S LIKELY RESPONSE TO THIRD-PARTY SALES OF RESET ENDOWRIST INSTRUMENTS

19. A fundamental problem with Mr. Bero's analysis is that ███████████████ ██████████████████████████████████████████████████████████ ████████████████████████████. In particular, Mr. Bero does not appear to consider the economic logic that if a firm is not free to maintain quality control and foster investment through contractual restrictions, it likely will try to achieve similar goals in less efficient ways.[26] For example, if Intuitive were not free to protect the safety and welfare of patients, and by extension Intuitive's reputation and financial viability, through contractual provisions, a rational response would be to change its pricing strategy to achieve as much system integration as possible (e.g., by increasing its prices for da Vinci platforms and lowering its prices for EndoWrist instruments). If Intuitive were to change its strategy to achieve a higher level of system integration in the relevant "but-for" world, it is likely that fewer customers would choose SIS's reset EndoWrist instruments over Intuitive's instruments than Mr. Bero assumes.

20. █████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ██████████████████████████████████████████████████

---

[26] Jean Tirole, "The Analysis of Tying Cases: A Primer," *Competition Policy International* 1, No. 5 (2005): 16 ("A well-known rationale for tying is that a tie enables the metering of demand and prices to depend on consumer usage… suppose that some consumers use M on a stand-alone basis while others use M in combination with C or C'. Under unbundling, the producer of M is forced to charge a single price for M, even though the two groups' willingness to pay may be quite distinct. For example, if consumers without demand for the complementary product have a low willingness to pay for M, the producer of M may end up charging a high price for M and prevent them from consuming. By contrast, a tie enables the producer of M to charge a low price for the basic good and a high price for the combination, which avoids excluding the first group and raises economic efficiency.") ("Tirole").

In a draft business plan dated October 29, 1995, Intuitive contemplated that "systems will be placed for little or no charge at sites that sign an annual minimum disposables and [Reposable Transmission Unit] purchase contract" (Intuitive-00595673 at -682-683).

████████████████████████████████████████████████████████

████████████████ .[27] ███████████████████████████████████

████████████████████████████████████████████████████████

███████ .[28] ████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████ .[29]

21.  ████████████████████████████████████████████████████

████████ .[30] First, █████████████████████████████████████

████████████████████████████████████████████████ .

Second, ████████████████████████████████████████████

───────────────────

[27]  Posdal 30(b)(1) (11/1/2022) Dep. Tr. 25:5-19 █████████████████████
█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
████████████ and 28:17-29:15 ████████████████████████████████
█████████████████████████████████████████████████████████
██████████████████████ . *See also* Gibson (6/22/2021) Dep. Ex. 13,
(REBOTIX061127-138 at 128-129).

[28]  Bero Report, p. 55.

[29]  Bero Report, p. 56. *See also* Bero Report, pp. 54-55 (for Mr. Bero's description of "repair costs" in the in-house repair model).

[30]  Keith Johnson, SIS's Executive Vice President of Sales and Clinical Programs, █████
████████████████████████████████████████████████████████
Johnson 30(b)(6) (10/27/2022) Dep. Tr. 21:16-19 ████████████████████
█████████████████████████████████████████████████████████

Mr. Bero does not appear to contemplate a world in which SIS develops its own process to reset the use counter, which would entail additional expenses and increase competition among third parties selling reset EndoWrist instruments that would further reduce profits.

[31]  In his "Distributor model," Mr. Bero assumes that ██████████████████████
█████████████████████████████████████████████████████████
████████ Bero Report, p. 56.



Third, ███████████████████████████████████████████
████████████████████████████████████████████████████
███████.[32] Although contracts or agreements may help to address these issues, ██████
████████████████████████████████████████████████
████████████████

## B. MR. BERO'S DAMAGES ASSOCIATED WITH RESETS OF X/XI ENDOWRIST INSTRUMENTS ARE SPECULATIVE AND CONTRARY TO THE EVIDENCE IN THE CASE

22. In his damages analysis, Mr. Bero assumes that third-party companies would have been able to sell reset X/Xi EndoWrist instruments as early as January 1, 2020 (in Scenario 1) or January 1, 2021 (in Scenario 2 with a 1-year X/Xi delay).[33] ████████████████████████
████████████████████████████████████████████████
████████████████████████████████████.[34]

23. However, Mr. Bero's inclusion of sales of reset X/Xi EndoWrist instruments is speculative because, as of the date of this Report, ████████████████████████████████
████████████████████████████████████████████.██████████
████████████████████████████████████████████
███████████████████████████.[35] Mr. Posdal's testimony is

---

[32] Dennis W. Carlton and Jeffrey M. Perloff, *Modern Industrial Organization*, 4th Edition, (Pearson: 2015), 29 ("A firm that relies on another to supply a factor that is essential to its production process may be exploited because it cannot operate if its supply is stopped. This problem is likely to be important if there are few alternative suppliers.").

[33] Bero Report, pp. 47 and 57. In Scenario 2, Mr. Bero also calculates damages under the assumption that SIS would have begun selling reset X/Xi EndoWrist instruments by January 1, 2022. Bero Report, p. 57.

[34] Bero Report, pp. 30-32.

[35] Posdal 30(b)(1) (11/1/2022) Dep. Tr. 38:13-22 ████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████

confirmed by the testimony of Mr. May and Mr. Hamilton.[36] And, ███████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████ .[37]



─────────────────────

███████████████████████████████████████████████████████████

[36] May (11/3/2022) Dep Tr. 50:8-16 ███████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████ ).; Hamilton (11/4/2022) Dep.

Tr. 38:10-15 ███████████████████████████████████████████████████████

███████████████████████████████████████████████████ ).

[37] ███████████████████████████████████████████████████████

██████████████████ (Parker (10/25/2022) Dep. Tr. 156:14-18, below) ████████████

███████████████████████████████ . *See* May (11/3/2022) Dep. Tr.

118:1-5 ████████████████████████████████████████████████████

███████████ . *See also* Parker (10/25/2022) Dep. Tr. 156:14-18 ███████████

██████████████████████████████████████████████████████████

███████ .

█████ *See* Hamilton (11/4/2022) Dep. Tr. 38:9-39:12 █████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████ ).

Assuming 510(k) clearance would be required to reset X/Xi EndoWrist instruments, I understand that the FDA has not granted 510(k) clearance to any company to reset any X/Xi instruments.

24. As shown in Table 1 below, more than 95 percent of SIS's purported lost revenues across Mr. Bero's scenarios are attributable to sales of reset X/Xi EndoWrist instruments.



25. Mr. Bero's calculations for Scenario 1 assume that Intuitive's X/Xi encryption is illegal and sales of reset X/Xi EndoWrist instruments would have started in January 2020.[38] Scenario 1 appears to be trying to thread a needle where the S/Si use counter and a similar level of "encryption" on X/Xi is legitimate (actually necessary), but a different X/Xi encryption is not legitimate.[39] Threading that needle is crucial to Mr. Bero's damages calculations because, as I

---

[38]   Bero Report, p. 46.

[39]   It is unclear whether Mr. Bero assumes only that the security measures for the X/Xi are illegal or if he assumes any deviation from the S/Si instrument-counter design is illegal.

       *See* May (11/3/2022) Dep. Tr. 113:19-23.

                                        *See* May (11/3/2022) Dep. Tr. 114:12-22

       . Thus, even if Intuitive's "security measures" for its X/Xi EndoWrist instruments were deemed unlawful and thus not part of the but-for world,

discussed in the Smith Antitrust Merits Rebuttal Report, third-party companies—including Restore, Rebotix, and SIS—benefit from "free-riding" on Intuitive's technology and reputation,[40] and ███████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████.[41] Without at least the type of "encryption" in the S/Si EndoWrists to workaround, economic principles indicate that prices in supposed "markets" for third-party reset EndoWrists would significantly decrease and/or Intuitive would change its go-to-market strategy to incentivize hospitals to seek EndoWrist replacements from Intuitive—██████████

█████████████████████████████████████████████.[42] Mr. Bero does not provide a basis for an assumption that Intuitive cannot legitimately use different security protections for its X/Xi EndoWrists than it does for its S/Si EndoWrists, which are designed for two different and non-interchangeable da Vinci Systems.[43]

---



[40] A "free rider" is a "[c]onsumer or producer who does not pay for a nonexclusive good in the expectation that others will." A "nonexclusive good" is a "[g]ood that people cannot be excluded from consuming, so that it is difficult or impossible to charge for its use." *See* Robert S. Pindyck and Daniel L. Rubinfeld, *Microeconomics, Eighth Edition* (New Jersey: Pearson Education, Inc., 2013), pp. 693 and 690.

In the context of the case, third parties may take advantage of (or free ride on) Intuitive's investments without sharing in the costs.

[41] *See* Bero Report, Schedule 3.1 (███████████████████████████████████████

███████). ███████████████████. Expert Report of Robert Mills, *Rebotix Repair LLC vs. Intuitive Surgical, Inc.*, Case No. 8:20-cv-02274, July 26, 2021 (Exhibits 18, 19, 20, 21, 22, 23, 24, and 25; subtract total variable avoided costs divided by total revenue from one).

[42] *See also* Section A above.

[43] McGrogan (in *Rebotix*) Dep. Tr. 78:19-80:15 ("Q. Now, the actual design of the EndoWrists, the S and Si EndoWrists, those aren't compatible with the da Vinci Xi; is that right? A. That's correct. Q. Why not? A. They're different platforms... the platforms had different surgical goals. The Xi had expanded goals for surgery that the Si platform didn't have. And that drove, amongst other things, a lengthening of the instrument as a primary requirement, which made -- and lengthening means working deeper in the body. So we wanted to enter at one port location and work much deeper or much farther into the body, and that drove for a

### C. CORRECTING THE IDENTIFIED COMPUTATIONAL ERRORS IN MR. BERO'S LOST PROFITS ANALYSIS ALONE LOWERS DAMAGES BY AS MUCH AS 11.2 PERCENT

26. In addition to the conceptual issues in Mr. Bero's analysis as discussed above, Mr. Bero's calculations contain two computational errors that overstate his damages estimates.

27. First, ██████████████████████████████████████████████ ████████████████████████████████.[44] As reflected in his backup materials, ███████████████████████████████████████████████ ████.[45] If Mr. Bero had correctly ████████████████████████ ████████████████████████████████,"[46]

28. Second, ███████████████████████████████████████████████ ████████████████████████████████████████ ████████████. Mr. Bero reports ████████████████████████████ ███████████████████████████████.[47] However, ████████████ ████████████████████████████████████████████████.[48]

29. Correcting both of these computational errors ████████████████████████ ████████, as shown in Table 2 below.



---

longer instrument. And that, among other requirements, made us evolve the platform, the robot, and the instrument to go along with it. Q. In other words, when you say the length of the instrument, the actual length of how -- how far it can reach into the body was different between the S/Si and X/Xi platforms; right? A. Yes, not only that and a whole host of differences. The platforms are substantially different… Q. Did Intuitive conduct any testing to determine whether the S/Si instruments would be compatible with the X/Xi? A. We didn't need to. They're not compatible.").

[44] *See* Bero Report, Schedule 11.0.

[45] *See*, e.g., ████████████████████████████████████████████████

[46] *See* Table 2 below.

[47] Bero Report, p. 52 and fn. 386 ("Per Restore-00094918-00094956 at 922 (Parker (10/25/2022) Dep. Ex. 121), ████████████████████████████████████ ████████████████████████████████████████).

[48] $0.694 = 215 / 310$.



### D. KEY ASSUMPTIONS THAT UNDERPIN MR. BERO'S CALCULATIONS ARE UNRELIABLE AND INCREASE HIS DAMAGES ESTIMATES

30. To estimate lost profits, ███████████████████████████████████
███████████████████████████████████████████████████ In Table 5 of his report,
Mr. Bero refers ███████████████████████████[49] ████████████████████
██████████████████████████ applying a set of assumptions to the total number of
EndoWrist instrument sales in Intuitive's instruments and accessories transaction data:

a. Mr. Bero's analysis focuses on EndoWrist instruments that are eligible for the reset
   "service." ███████████████████████████████████████████████
   ███████████████████████████████████████████████████████
   ████████████████████████.[50] ███████████████████████████



---

[49] Bero Report, p. 47, Table 5 (*see* row "███████████████████████████").
[50] Bero Report, p. 48.



b.

c.

    .[54] This assumption is based on Mr. Bero's claims that:

    i.

    and

    ii.

d.

---

[51] Bero Report, p. 48.

[52] Mr. Bero does not define "expired instrument" in his report. My understanding is that an "expired instrument" is an instrument whose use counter reached zero. Bair (in *Rebotix*) Dep. Tr. 49:18-25 ("Q. …An expired instrument would be an EndoWrist whose use counter has reached zero; right? A. That is correct. Q. An expired instrument might also be an instrument that failed before reaching zero on the use counter; right? A. I do not believe that classifies as an expired instrument.").

[53] Bero Report, p. 48.

[54] Bero Report, p. 49.

[55] Bero Report, p. 49.

[56] Bero Report, p. 50.

[57] Bero Report, p. 50.

[58] Bero Report, p. 50.

e. ███████████████████████████████████
███████████████████████████████████████
████████████[59]

f. ███████████████████████████████████
██████████████████████████.[60]

g. The culmination of the assumptions listed above leads to █████████████████████
█████████████████████████████████████████████.[61]

31. In this section, I discuss ways in which specific assumptions in Mr. Bero's calculation ██████
████████████████████████████████████. As described in
Section 1 below, ████████████████████████████████
████████████████████████████████████████████████
██. In Section 2, I highlight flaws in three specific assumptions in Mr. Bero's analysis; these
three assumptions are not meant to be an exhaustive list but illustrate ████████████████
███████████████████████████.

**1.** ███████████████████████████████
███████████████████████

32. ███████████████████████████████████████████
██████████████████████████.[62] Mr. Bero compares ███
███████████████████████████████████████████████
███████████████████████████."[63] However, as I discuss in more detail

_____

████████████████████████████████████████ and does not cite to any
other sources for this assumption.

[59]   Bero Report, p. 51.
[60]   Bero Report, pp. 51-52.
[61]   Bero Report, p. 47 and Table 5.
[62]   Bero Report, p. 52.████████████████████████████████████
████████████████████████████████ *See also* Bero Report,
Schedule 2.2.
[63]   Bero Report, p. 52.

below, Mr. Bero fails to note that, 

33.

"[65] However, Mr. Bero's reliance on Intuitive's internal projections is

inappropriate for three reasons. He ignores critical components of Intuitive's calculation:
Intuitive's status as the original equipment manufacturer, and whether Intuitive's instrument
refurbishment procedure was more robust than SIS's procedure to reset the use counter. First,
customers likely would prefer to have the original equipment manufacturer, Intuitive, refurbish
an EndoWrist instrument (which Intuitive designed, developed, and manufactured) rather than

---



[64]

*See* Bero Report, pp. 49-50.

*See* Bero Report, p. 50.

*See*, e.g., *id.*

(*see* ¶ 17 and
fn. 25 above), Mr. Bero provides no explanation of why the future would look so much
different than the past.

In addition, I understand that Iconocare has announced that Encore Medical Device Repair
will be their exclusive distributor. PRWeb, "FDA Clearance to Remanufacture Da Vinci
Robotic Instruments Could Present Hospitals with Substantial Savings," November 3, 2022,
accessed on January 17, 2023,
https://www.prweb.com/releases/fda_clearance_to_remanufacture_da_vinci_robotic_instrum
ents_could_present_hospitals_with_substantial_savings/prweb18980465.htm.

[65] Bero Report, p. 52, citing Intuitive-00581814.

a third party.[66] Second, Intuitive's assessment of "[Instrument] Refurbishment Feasibility" contemplated that Intuitive would replace significant portions of the instruments (including the cables, inputs and flush tube) to "survive [additional] lives."[67] ████████████████████████████ ████████████████████████.[68] Hence, Intuitive's internal projections of a "penetration rate" are ███████████████████████████████████ because SIS does not have Intuitive's reputation or status as the original equipment manufacturer, ██████████████ ████████████████████.

34. Mr. Bero's second and third "benchmarks" are based on an analyst report from Deutsche Bank dated February 2020 and █████████████████████████████████████████████ ████████████.[69] ███████████████████████████████████████████████ ██████████████████████████████████:

a. ████████████████████████████████████, Mr. Bero offers little discussion as to the extent to which ██████████████ are reliable proxies for SIS, ████████████████ ██████████████████████████████████████████████████ ████████████████████████.[70] ██████████████████████████ ██████████████████████████████████████████████████ ███████████████████████████████████████████████.[71] ████████

---

[66] Intuitive-00103407 at -410. *See also* Jack Curran, "Medical Equipment Repair & Maintenance Services," IBISWorld, Industry Report OD4964, December 2021 at p. 18 ("Due to the highly-regulated nature of medical equipment and the potential loss of life associated with poor repairs, when the capital is available customers tend to choose OEM services.").

[67] *See* Intuitive-00367019 at -052. Intuitive's assessment provided that between 32-72 percent of instrument components would have been "scrap[ped]." (*Id.* at -056.)

[68] *See* Posdal 30(b)(6) (11/1/2022) Dep. Ex. 136 (SIS095115-139 at -122). *See also* REBOTIX162404 (Rebotix EndoWrist Service Procedure).

[69] Bero Report, pp. 52-53. Mr. Bero relies on the Deutsche Bank analyst report for a "4% to 6% 2021 penetration rate" as well as a more aggressive "12% to 18% penetration rate." ████ ████████████████████████████████████████████████

[70] *See* ¶¶ 20-21 above (on SIS and ownership of the "intellectual property").

[71] ████████████████████████████████████████████████████ ████████████████████████████████████████████████████



are unreliable as "benchmarks" for Mr. Bero's damages analysis.

b.   Regarding the penetration rate in the Deutsche Bank analyst report, the report offers no specific sources for its assumptions: the "4 to 6 percent capture rate" proposed by the report was apparently based on "conversations with surgeon and hospital customers."[72]

[73]

"[74]

.[75] Additionally, Iconocare's 510(k) clearance for resetting Si

---

puts" tab and assumes a decrease by 5 percentage points in each subsequent year through 2020.

[72]   Intuitive-00566055 at -073. When asked in deposition, Imron Zafar—the primary author of the Deutsche Bank analyst report cited by Mr. Bero—could not remember the sources for the assumptions in the report. *See, e.g.,* Zafar (11/1/2022) Dep. Tr. 73:12-17 ("A. I don't remember the context of these conversations and, you know, what underlied that 4 to 6 percent range that's listed, I don't remember the specific due diligence that went behind that."). *See also* Zafar (11/1/2022) Dep. Tr. 32:12-33:2 (on Mr. Zafar's role on the report).

[73]   Bero Report, p. 52. *See also* Zafar (11/1/2022) Dep. Tr. 184:16-19 ("Q. How did you determine that Da Vinci EndoWrists were repairable up to four times? A. I don't recall.").

[74]   Intuitive-00581814 at -853.

[75]   Papit (in *Rebotix*) Dep. Tr. 74:15-75:1

EndoWrists—the only clearance for resetting I am aware of—is limited to one reset.[76] As with his second "benchmark", Mr. Bero's third "benchmark" lacks reliable support.

35. Setting aside the validity of the ███████ and Deutsche Bank "benchmarks," I show ███



.[77] In addition, ████████████████████████

███████████████████. In Mr. Bero's "but-for" world, ████

████████████████████████████████

████████████████████.[78] ███████████████

████████████████████████████████

███████████████████████████ ████████

█████████████████. ████████████████████ of

11.6 percent ████████████████████████, then—

under the assumption that ████████████████████

██████████ — ███████████████████

██████████████████—21.2 percent.[79] This value is higher than even the upper end of the estimate in the Deutsche Bank report ████████████████

---

[76] "510(k) Premarket Notification Summary, Re: K210478," U.S. Food and Drug Administration, accessed January 18, 2023, https://www.accessdata.fda.gov/cdrh_docs/pdf21/K210478.pdf.

Iconocare received 510(k) clearance for the 8mm Monopolar Curved Scissors Instrument to be used only with the Intuitive Si System ("The design, materials, and intended use of the 8mm Monopolar Curved Scissor Instruments, after an additional ten (10) reuse cycles are equivalent to the predicate device.").

[77] Bero Report, p. 52. As noted above, Mr. Bero describes that the Deutsche Bank analyst report "noted each instrument could be repaired three times, suggesting a higher, 12% to 18% penetration rate"; therefore I include both the higher range assuming three resets as well as the report's primary estimate of 4 percent to 6 percent with one reset.

[78] Bero Report, pp. 49-50 ████████████████████████████

██████████ ████████████████████████████

██████ *ee*, e.g., "Bero Natives.xlsx," tab "2.2," cells E49-H49.

[79] 21.2 percent = 11.64 percent / 55.0 percent (difference due to rounding).



**2.    Mr. Bero's assumptions fail to account for "real world" factors that**

36.

██████████████████████████████████████████████████████

███████████████████████

    a.    ████████████████████████████████████████, *which likely cause Mr. Bero to overstate the expiration rate of all resettable EndoWrist instruments*

37. Mr. Bero claims that the number of instruments that expire in a given year is proportional to the number of instruments sold in a given year, and ███████████████████████████ ████████████████████████[80] ██████████████████████████████████ █████████████████████████████████████████████████████ ██████████████████████████████████[81] ██████████████████ ██████████████████████████████████████████████ ██████████████████████████[82]

38. ████████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███ that inflates his damages estimate when a more appropriate alternative is available within the source that he relies on. █████████████████████████████████████ ████████████████████████████ ██████████████████████████ ████████████████████████████████████, one may expect that the expiration rate for these instruments would be relatively higher than the overall expiration rate across all instruments. Indeed, when I calculate the expiration rate of X/Xi core

---

[80]   Bero Report, Schedule 7.0.

[81]   Bero Report, Schedule 7.0. *See also* Morales 30(b)(6) (11/9/2022) Dep. Ex. 141 (Intuitive-00603992).

[82]   *See*, e.g., Bero Report, Schedule 2.2.

[83]   Bero Report, fn. 365 ████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████.

instruments ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ using Mr. Bero's methodology, I find that the expiration rate would be 50 percent ▮▮▮▮▮▮▮▮▮▮▮.[84]

>     *b.*    *Neither the Bero Report nor the Sargent Report provides a proper analysis of hospitals that likely would take up SIS's reset services*

39. Mr. Bero estimates that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮ and relies on the expert opinions of Jean Sargent.[85] Ms. Sargent's assessment is based on ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and she does not cite to independent sources or present corroborating evidence to support her claim.[86]

40. Evidence in the case indicates that, without 510(k) clearance from the Food and Drug Administration ("FDA"), hospitals and surgeons would be reluctant (or potentially unwilling) to use SIS's reset "services." ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[87] ▮▮▮▮▮▮▮▮▮

---

[84] I divided the projected number of expired X/Xi core instruments from the document cited by Mr. Bero by the total number of Intuitive 2018-2019 sales of core instruments identified in the same exhibit. *See* Morales 30(b)(6) (11/9/2022) Dep. Ex. 141 (Intuitive-00603992, tabs "US X&Xi Only" and "Tools Consumed") for the projected number of X/Xi expired core instruments and list of core instruments. *See also* "Core Instruments" workpaper for calculation of actual core instrument sales.

[85] Bero Report, p. 50. *See also* Expert Report of Jean Sargent, Surgical Instrument Service Company, Inc. v. Intuitive Surgical, Inc., Case No. 3:21-cv-03496-VC, December 2, 2022 ("Sargent Report"), ¶ 57.

[86] Sargent Report, ¶ 57 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, where an ISO repair service provides substantial cost savings such as those offered by SIS's EndoWrist program, the combined efforts of ▮▮▮▮▮ and ISO providing such service would yield an overall conversion rate within ▮▮▮▮▮▮▮▮▮▮▮ that I would anticipate to be about of 30% by the end of the first year, 70% by the end of the second year after the service is introduced, and 70%-80% thereafter. Examples of repair services where I have seen similar penetration rates ▮▮▮▮▮▮ include electrophysiology diagnostic catheters, cables, endo shears, trocars, and laparoscopic instruments. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮, had those services not been shut down by Intuitive.").

[87] *See*, e.g., Teal 30(b)(6) (11/18/2022) Dep. Tr. 37:17-25 ("THE WITNESS: As a practice, we would -- if the FDA requires a device to be cleared, we would -- we would purchase a

███████████████████████████████████████████████████████

████████ [88] Neither Mr. Bero nor Ms. Sargent discuss how FDA clearance would factor into the decisions of hospitals to purchase and surgeons to use SIS's reset EndoWrist instruments,

████████████████████████████████████████████████



cleared device, if that's the question. Q. It -- your word is better than mine, so it is a practice at Valley that if a device requires FDA clearance, that it be cleared before it be purchased? A. Correct."); Early (10/6/2022) Dep. Tr. 58:13-18 ████████████████████████

████████████████████████████ Schimmel 30(b)(6)

(11/16/2022) Dep. Tr. 51:24-52:8 ████████████████

████████████████████████████████████

[88] *See*, e.g., Francis (10/14/2022) Dep. Tr. 23:22-24:10. ████████████

████████████████████████████████████████

████████████████████████ *See*

*also* Estape (10/22/2022) Dep. Tr. 57:18-58:7.

████████████████████████████████████████

████████████████████████████████████████

Estape (10/22/2022) Dep. Tr. 59:18-22. ████

████████████████████████████████ Maun

(11/8/2022) Dep. Tr. 27:7-28:18.



> c.   *Mr. Bero inflates his damages calculations by* ████████████
> ████████████

41.   ████████████████████████ based on an Intuitive presentation in 2020 that reports results from a "small scale" pilot refurbishment program for 6 Xi instruments.[89] However, ████████████████████████████████, Intuitive assumed a collection rate of 40 percent, which more closely aligns with the realized collection rates from the pilot program.[90] Todd Tourand, Intuitive's Director of Portfolio Management, cited low yield from collection efforts as one of the reasons Intuitive did not pursue the refurbishment program commercially beyond the pilot.[91] Intuitive consistently assumed a 40 percent collection rate in its 2020 "Reclamation and Refurbishment Cost" models that were developed during the pilot.[92]

## E.   IMPLEMENTING CORRECTIONS TO MR. BERO'S ASSUMPTIONS REDUCES DAMAGES BY AS MUCH AS 98.9 PERCENT



42.   Table 3 ████████████████████████ after correcting for some of his methodological and computational errors as discussed above. Correcting his computational errors alone ████████████████████████████████ . Adjusting ████████████████ ████████████████████████ lowers damages by 16.6

---

[89]   Morales 30(b)(6) (11/9/2022) Dep. Ex. 143 (Intuitive 00626597 at -598-599, for details on the pilot, and -604, "Yields – Collection (target > 70%)").

[90]   Morales 30(b)(6) (11/9/2022) Dep. Ex. 143 (Intuitive 00626597 at -604 and -611).

[91]   Tourand (11/4/2022) Dep. Tr. 44:9-20 ("Q. Project Refurbished Instrument never became an actual commercial program at Intuitive; is that right? A. That's correct. Q. Why not? A. During the assessment of reclaiming instruments that were used at the hospital, it was observed that the collection of instruments that were used at the hospital resulted in low yield or low number of used instruments that the program didn't make sense to actually complete.").

[92]   Intuitive-00626145. *See also* Morales 30(b)(6) Dep. Ex. 143 (Intuitive-00626597 at -598). Intuitive had been considering a refurbishment program since at least August 2017 (Morales 30(b)(6) Dep. Ex. 139 (Intuitive-00603990).
Mr. Bero relies on one such model, Intuitive 00626597, to estimate the cost per reset instrument in Schedule 9.0.

percent. Adjusting ███████████████████████████████████████████
███████████████████████████████████████ (while keeping all other
assumptions in Mr. Bero's analysis) reduces damages by 42.9 percent. Implementing all three
corrections decreases damages by 54.1 to 57.5 percent. Furthermore, ██████████████
███████████████████████████████ leads to damages in the range of $0.46
million to $1.25 million, which is nearly 99 percent less than the lost profits damages that Mr.
Bero presents in his report.

43.  The damages estimates in Table 3 do not reflect all of the conceptual and methodological issues
     that I discussed above. SIS's purported lost profits likely would be further reduced (or
     completely eliminated) after accounting for those factors.



## III.   MR. BERO'S DISGORGEMENT DAMAGES PERTAINING TO SIS'S CLAIMS UNDER THE LANHAM ACT ARE OVERSTATED

44.  In his Lanham Act damages calculations, 
).[93]

Specifically, Mr. Bero uses his estimates of SIS's "but-for" reset EndoWrist instruments under his Scenario 2, which assumes either a one- or two-year delay in SIS's ability to begin selling reset X/Xi EndoWrist instruments.[94]

---

[93]   Bero Report, Schedule 16.2.
[94]   Bero Report, pp. 4-5.

45. ███████████████████████████████████████████████████████
████████████████████████████████████████.[95] However, Mr.
Bero does not offer a disgorgement amount associated with sales to only that customer. Instead,
███████████████████████████████████████████████████████
████████████████████████████████.[96] Mr. Bero provides no explanation of how that
single letter that allegedly included a false claim ████████████████████████
████, which seems entirely inconsistent with the assumptions of his lost profits analysis. That
is, Mr. Bero assumes that ██████████████████████████████████████
███████████████████████████ ██████████████████████████████
███████████████

46. Setting aside the absence of a causal relationship between Intuitive's alleged "false advertising"
and ████████████████████████████████, Mr. Bero's analysis of Lanham Act
damages—███████████████████████████████████—is subject to
many of the same methodological critiques as above. In addition, Mr. Bero presents
disgorgement damages █████████████████████████████████████████
███████████████████████████████████.

47. I adjust Mr. Bero's analysis to correct for the same computational and methodological issues
identified in Table 3 above. I also █████████████████████████████████
████████████████████████████████.[98] Just

---

[95] Bero Report, p. 59. I am aware that one other SIS customer received a similar letter. *See* SIS000093. My critique of Mr. Bero's analysis would hold even if he were to rely on this additional letter.

[96] Bero Report, pp. 1, 59. Mr. Bero's Lanham Act calculations are based exclusively on his "Scenario 2," in which he assumes at least a 1-year delay in SIS' ability to reset X/Xi instruments.

[97] Bero Report, p. 1.

[98] "Contribution margin" as used in the ordinary course of business by Intuitive is the ratio of "contribution costs" (including the cost of goods sold as well as associated commissions) to revenue. As I explain in my Antitrust Merits Rebuttal Report (*see* § IV.F), contribution margins do not accurately reflect Intuitive's competitive pricing and investment decisions. Using contribution margins here amounts to assuming the challenged sales could be removed without the need to forgo investments, which is conservative in favor of the Plaintiffs.

applying these adjustments, Mr. Bero's asserted Lanham Act damages would be reduced by up to 98.9 percent.



Loren K. Smith, Ph.D.
January 18, 2023

# EXHIBIT A

# Smith Curriculum Vitae

# Loren K. Smith

Principal and Practice Co-Leader of Global Antitrust & Competition
The Brattle Group
1800 M St NW
Suite 700 North
Washington, DC 20036
202-419-3354

## EDUCATION

| | |
|---|---|
| January 2006 | University of Virginia, Ph.D. in Economics |
| May 2001 | University of Virginia, M.A. in Economics |
| December 1996 | Mississippi State University, B.B.A. in Marketing, *Magna Cum Laude* |

## PROFESSIONAL EXPERIENCE

April 2020–Present       Principal, The Brattle Group, Washington, DC

April 2016–March 2020    Executive Vice President, Compass Lexecon, Washington, DC
Senior Vice President, April 2014 – March 2016
Vice President, April 2013 – March 2014

September 2005–March 2013   Staff Economist, U.S. Federal Trade Commission, Washington, DC

June 2002–May 2005       Instructor, University of Virginia, Charlottesville, VA
*Courses:* Intermediate Microeconomics

September 1999–May 2001   Teaching Assistant, University of Virginia, Charlottesville, VA
*Courses:* Principles of Microeconomics, Principles of
Macroeconomics, Graduate Math-Economics, Graduate
Econometrics, Intermediate Microeconomics
Research Assistant, University of Virginia, Charlottesville, VA
Edgar Olsen, Charles Holt

## FIELDS OF SPECIALIZATION

Antitrust and Competition Economics
Applied Microeconomics
Industrial Organization
Applied Econometrics

**TESTIMONY**

Testimony as Economic Expert on behalf of Intuitive Surgical, In Re: *Rebotix Repair LLC v. Intuitive Surgical, Inc.,* in the United States District Court Middle District of Florida Tampa Division, Case No. 8:20-cv-02274, Deposition: November 3, 2021.

Testimony as Economic Expert on behalf of Intuitive Surgical, In Re: *Restore Robotics LLC, and Restore Robotics Repair LLC v. Intuitive Surgical, Inc.,* in the United States District Court Northern District of Florida Panama City Division, Case No. 5:19-cv-55, Deposition: October 21, 2021.

Testimony as Economic Expert on behalf of the Federal Trade Commission, In Re: *Federal Trade Commission and Commonwealth of Pennsylvania v. Thomas Jefferson University and Albert Einstein Healthcare Network*, In the Eastern District Court of Pennsylvania, Case No. 2:20-cv-01113-GJP, Deposition: August 26, 2020; Trial: September 15 and 16, and October 1, 2020.

**REPORTS**

Expert Report of Loren K. Smith, In Re: *United States of America, ex. rel. Sarah Behnke v. CVS Caremark Corporation et al.,* in the United States District Court Eastern District of Pennsylvania, Civil Action No. 2:14-cv-00824-MSG, December 9, 2022.

Expert Report of Loren K. Smith, In Re: *Surgical Instrument Service Company, Inc. v. Intuitive Surgical, Inc.*, in the United States District Court Northern District of California, Case No. 3:21-cv-03496-VC, December 2, 2022.

Expert Reports of Loren K. Smith, In Re: *Restore Robotics LLC, and Restore Robotics Repair LLC v. Intuitive Surgical, Inc.,* in the United States District Court Northern District of Florida Panama City Division, Case No. 5:19-cv-55; Counterclaims Damages: August 20, 2021, Rebuttal Antitrust: September 27, 2021, Supplemental Rebuttal Report Antitrust Damages: December 23, 2022.

Expert Reports of Loren K. Smith, In Re: *Rebotix Repair LLC v. Intuitive Surgical, Inc.,* in the United States District Court Middle District of Florida Tampa Division, Case No. 8:20-cv-02274; Counterclaims Damages: July 26, 2021, Rebuttal Antitrust Merits and Rebuttal Antitrust Damages: August 30, 2021.

"Brief of Antitrust Economists as Amici Curiae in Support of Defendants-Appellants Urging Reversal," In the United States Court of Appeals for the Sixth Circuit; *St. Luke's Hospital et al., v. ProMedica Health System, Inc. et al.*; On Appeal from the United States District Court for the Northern District of Ohio; No. 3:20-cv-02533; March 1, 2021.

Expert Reports of Loren K. Smith, In Re: *Federal Trade Commission and Commonwealth of Pennsylvania v. Thomas Jefferson University and Albert Einstein Healthcare Network*, In the Eastern District Court of Pennsylvania, Case No. 2:20-cv-01113-GJP, Report: July 23, 2020, Rebuttal Report: August 20, 2020.

Expert Report of Loren K. Smith, In Re: *United States of America and the State of North Carolina v. The Charlotte-Mecklenburg Hospital Authority, d/b/a Carolinas Healthcare System*, In the District Court of North Carolina, Case No. 3:16-cv-00311-RJC-DCK, October 5, 2018.

Report to Congress Under Section 319 of the Fair and Accurate Credit Transactions Act of 2003, (with Beth Freeborn and Peter Vander Nat), December 2012.

## SELECTED CONSULTING WORK RELATED TO ANTITRUST INVESTIGATIONS

Submitted a co-authored paper to the U.S. Department of Justice on the competitive implications of a vertical acquisition in the productivity software space (2022).

Submitted a co-authored paper to the U.S. Federal Trade Commission on the competitive implications of a merger in the specialty pharmacy services industry (2022).

Presented to the U.S. Department of Justice on the economic implications of a consumer products merger (2021).

Provided written and oral presentations to the U.S. Federal Trade Commission related to a proposed acquisition of a pipeline prescription pharmaceutical product (2020).

Presented and provided multiple written submissions to the U.S. Federal Trade Commission related to a proposed merger of two major hospital systems (2020).

Presented and provided multiple written submissions to the U.S. Federal Trade Commission related to a proposed merger of polyurethane foam manufacturers (2019).

Presented to the U.S. Federal Trade Commission related to a merger that, in part, proposed to combine existing and pipeline branded drugs with similar indications (2019).

Presented and provided a written submission to the U.S. Federal Trade Commission related to the proposed merger of branded pharmaceutical manufacturers (2019).

Presented to the U.S. Federal Trade Commission related to a proposed hospital merger (2018).

Submitted a white paper and gave a presentation to the U.S. Federal Trade Commission related to a proposed merger of factory-built home manufacturers (2018).

Presented to the U.S. Federal Trade Commission related to a proposed merger of food manufacturers (2017).

Presented to the U.S. Federal Trade Commission related to a proposed merger of personal and home cleaning manufacturers (2017).

Presented to the U.S. Department of Justice related to accusations of anticompetitive

exclusionary conduct against a hospital system (2017).

Provided economic and econometric analysis of alleged damages, the results of which were used in a mediation that reached a favorable settlement (2016–2017).

Submitted a coauthored white paper and participated in presentations to the U.S. Federal Trade Commission related to accusations of anticompetitive exclusionary conduct against a manufacturer of medical device inputs (2015-2016).

Gave multiple presentations to the U.S. Federal Trade Commission related to a proposed merger of retail chains (2014).

Provided economic analysis related to the proposed acquisition of two community hospitals. The results were submitted to the U.S. Federal Trade Commission (2014).

Developed empirical analyses that demonstrated a lack of competitive interaction with a proposed merger partner. The results were submitted to the U.S. Federal Trade Commission (2014).

Coauthored two white papers that were submitted to the U.S. Department of Justice related to a proposed hospital acquisition (2013).

Coauthored three white papers that were submitted to the U.S. Federal Trade Commission related to a proposed acquisition in the supermarket industry (2013).

Coauthored a white paper that was submitted to the U.S. Federal Trade Commission related to a proposed acquisition in the retail auto parts industry (2013).

As economic expert for the U.S. Federal Trade Commission, evaluated the likely competitive effects of a merger of data service providers (2011).

## LITIGATION SUPPORT WORK

In support of Robert Willig and Jonathan Orszag, developed economic and econometric evidence, and assisted in the preparation of expert reports and testimony on behalf of the Defendants in Re: *Sidibe, et al. v. Sutter Health*, Case No. 3:12-cv-04854.

In support of Robert Willig and with Bryan Keating, developed economic and econometric evidence, and assisted in the preparation of expert reports and testimony on behalf of the Defendants in Re: *UFCW & Employers Benefit Trust v. Sutter Health, et al.*, Case No. CSG 14-538451.

In support of Mark Israel and with Theresa Sullivan, developed economic and econometric evidence on behalf of the U.S. Federal Trade Commission in Re: *Federal Trade Commission et al. v. Draftkings, Inc. and FanDuel Limited*, Civil Action No. 17-cv-1195 (KBJ).

In support of Jonathan Orszag, developed economic theories and assisted in the preparation of an expert report and deposition testimony on behalf of Plaintiffs in Re: *Innovation Ventures, LLC v. Nutrition Science Laboratories, LLC et al.*, Case No. 2:12-cv-13850.

In support of Mark Israel and with Theresa Sullivan, developed merger simulations and assisted in preparation of expert reports and testimony on behalf of Defendants in Re: *U.S. and Plaintiff States v. Anthem and Cigna*, Civil Action No. 1:16-cv-01493.

In support of Robert Willig, developed economic and econometric evidence, and assisted in preparation of expert reports and testimony on behalf of the Defendants in Re: *Methodist Health Services Corporation v. OSF Healthcare System*, Civil Action No. 1:13-dv-01054-SLD-JEH.

In support of Robert Willig and with Bryan Keating, developed economic and econometric evidence, and assisted in preparation of expert reports and testimony on behalf of the Defendants in Re: *Federal Trade Commission and Commonwealth of Pennsylvania vs. Penn State Hershey Medical Center and PinnacleHealth System*, Civil Action No. 1:15-cv-02362.

In support of Mark Israel, developed economic and econometric evidence, and assisted in the preparation of expert reports and testimony on behalf of the U.S. Federal Trade Commission in Re: *Federal Trade Commission et al. v. Sysco Corporation and USF Holding Corp.*, Civil Action No. 15-cv-00256 (APM).

## PUBLICATIONS AND OTHER PUBLICLY AVAILABLE PAPERS

"Looking Behind the Mask: Economic Analyses of Physician Group Transactions" (with Josephine Duh, Daniel Fanaras, and Bogdan Genchev), 2022, American Health Law Association, available at https://www.americanhealthlaw.org/content-library/publications/briefings/f5e6c787-59d0-4aea-92c0-946ee4de1399/Looking-Behind-the-Mask-Economic-Analyses-of-Physi

"Trends in Consumer Shopping Behavior and their Implications for Retail Grocery Merger Reviews" (with Dimitri Dimitropoulos and Renée Duplantis), 2021, *Competition Policy International*

"4 Economic Takeaways From 6th Circ. ProMedica Decision" (with Josephine Duh), 2021, *Law360*, available at https://www.law360.com/articles/1438179/4-economic-takeaways-from-6th-circ-promedica-decision

"The Other Side of the Coin: Complementarity in Mergers of Multiproduct Firms" (with Craig Minerva and Peter Herrick), 2021, American Bar Association's *Antitrust Magazine*, available at https://www.americanbar.org/groups/antitrust_law/publications/antitrust-magazine-online/2021/october/the-other-side-of-the-coin/

"The Competitive Implications of Private Label Mergers," (with Matt Schmitt), 2021, American Bar Association's *Antitrust Law Journal*, available at https://www.americanbar.org/digital-asset-abstract.html/content/dam/aba/publishing/antitrust_law_journal/alj-833/schmitt-smith.pdf

"Understanding the Econometric Tools of Antitrust – With No Math!" (with Michael Cragg and Charles Gibbons), 2021, American Bar Association's *Antitrust*, available at https://www.americanbar.org/groups/antitrust_law/publications/antitrust_magazine/2021/atmag-spring2021-vol35-no2/
(*Concurrences* and the George Washington University Law School's Competition Law Center 2021 Antitrust Writing Awards Winner – Best Business Articles: Economics)

"Clarifying Bundle Markets and Distinguishing Them from Cluster Markets" (with Kevin Hahm), 2021, American Bar Association's *The Antitrust Source,* available at https://www.americanbar.org/content/dam/aba/publishing/antitrust_source/2021/feb-2021/atsource-feb2021-full.pdf

"The Use of Econometrics in Merger Reviews" (with Christopher R. Rybak), 2020, American Bar Association's *Economics Committee Spring Newsletter*, available at https://www.americanbar.org/digital-asset-abstract.html/content/dam/aba/administrative/antitrust_law/aba-economics-committee-newsletter-spring2020.pdf

"Platforms, Entry, and Innovation,"(with Bryan Keating), 2019, Comment to Federal Trade Commission Hearings Announcement (Docket ID FTC-2019-0032), available at https://www.regulations.gov/document?D=FTC-2019-0032-0016

"Unilateral Effect Analysis of Health Care Markets," *Economics of Health Care Mergers & the Pharmaceutical Industry* (an ALHA Antitrust Practice Group Toolkit), 2019, available at https://www.healthlawyers.org/Members/PracticeGroups/Antitrust/Pages/default.aspx

"Do Retail Mergers Affect Competition? Evidence from Grocery Retailing," (with Dan Hosken and Luke M. Olsen), *Journal of Economics and Management Strategy*, Vol. 27, Iss. 1, pp. 3-22, Spring 2018.

"Toward a More Complete Treatment of Efficiencies in Merger Analysis: Lessons from Recent Challenges," (with Jonathan M. Orszag), *The Antitrust Source*, Vol. 16, No. 1, October 2016.

"The Prominence of Market Definition in Antitrust Evaluation and Litigation," (with Maria Stoyadinova), *Global Antitrust Economics: Current Issues in Antitrust Law and Economics*, Eds. Douglas H. Ginsburg and Joshua D. Wright, New York: Institute of Competition Law, 2016, pp. 103-116.

"Can Entry or Exit Event Studies Inform Horizontal Merger Analysis? Evidence from Grocery Retailing," (with Dan Hosken and Luke M. Olsen), *Economic Inquiry*, Vol. 54, Iss. 1, pp. 342-360, January 2016.

"Dynamics in a Mature Industry: Entry, Exit, and Growth of Big-Box Grocery Retailers," (with Dan Hanner, Dan Hosken, and Luke M. Olsen), *Journal of Economics and Management Strategy,* Vol. 24, Iss. 1, pp. 22-46, Spring 2015.

"Dynamics and Equilibrium in the Market for Commercial Aircraft," *Journal of Applied Econometrics*, Vol. 27, Iss. 1, pp. 1-33, February 2012.

"New Market Policy Effects on Used Markets: Theory and Evidence," *The B.E. Journal of Economic Analysis & Policy*, Vol. 9, Iss. 1 (Topics), Article 32, July 2009.

## AWARDS AND HONORS

Who's Who Legal Thought Leaders – Competition Economists, 2023

Lexology Client Choice Award – Competition Economists, 2022

Who's Who Legal Competition – Competition Economists, 2019 - 2022

Who's Who Legal Competition: Future Leaders – Economists, 2017, 2018 (named one of the four "Most Highly Regarded" competition economists in North America in 2018)

Award for Outstanding Scholarship: for outstanding contributions to the economics literature and to the pursuit of scholarship at the Federal Trade Commission, 2012

Janet D. Steiger Award: for outstanding contributions to the Pay-for-Delay Team, Federal Trade Commission, 2012

Predoctoral Fellowship, Bankard Fund for Political Economy, University of Virginia, 2003-2004

Research Grant, Darden Business School, University of Virginia, 2002

Graduate Fellowship, University of Virginia, 1999–2002

## MISCELLANEOUS

*REFEREE*

*International Journal of Game Theory*

*International Journal of Industrial Organization*

*Economic Theory*

*Journal of Policy Analysis and Management*

*TEACHING*

*Full Courses:*

Econnometrics – Johns Hopkins University, 2008

Intermediate Microeconomics – University of Virginia, 2002–2005

*Mini Courses:*

"Mergers" with Miguel de la Mano, Sean Ennis, and Nicolas Hill – Fordham Law School, 2012

"The Economics of Vertical Restraints" – GHV, Budapest, HU, 2010

"Quantitative Methods for Merger Investigation" with Keith Brand – CADE, Brasilia, BR, 2009

"Quantitative Methods for Antitrust Economists" – Competition Commission, Pretoria, ZA, 2007

"Introduction to Quantitative Methods for Antitrust Lawyers" – FTC, 2006, 2007, and 2008

*PRESENTATIONS AND SEMINARS*

Fordham Competition Law Institute – 49th Annual Conference on International Antitrust Law and Policy and Antitrust Economics Workshops, New York, NY

American Bar Association Antitrust Law Section and Health Law Section 2022 Antitrust in Healthcare Conference – Pharma Conduct Trends: Biosimilars, Generics, Pay-for-Delay, Arlington, VA

Concurrences 6th Global Antitrust Economics Conference – Acquisitions in High-Tech Space: Market Power and Innovation Issues, Webinar

Fordham Competition Law Institute – 48th Annual Conference on International Antitrust Law and Policy and Antitrust Economics Workshops, New York, NY

American Bar Association Antitrust Enforcement Priorities for the Healthcare Industry in 2021 Roundtable

Troutman Pepper – Antitrust Economics – The Building Blocks, Webinar

American Health Law Association Education Center – Antitrust Enforcement Update on Hospital and Health System Mergers, Webinar

Fordham Competition Law Institute – 47th Annual Conference on International Antitrust Law and Policy and Antitrust Economics Workshops, Webinar

Concurrences and Fordham University School of Law – Antitrust in Life Sciences Conference, Webinar

American Bar Association Economics Fundamentals, Webinar

15th Annual Kirkland Antitrust & Competition Institute – Intersection of Antitrust and Everything Else, Washington, DC

Pepper Hamilton's Annual Antitrust CLE Event, Philadelphia, PA

Fordham Competition Law Institute – 44th Annual Conference on International Antitrust Law & Policy, New York, NY

International Industrial Organization Conference, Boston, MA

GCR Live 2nd Annual Antitrust Litigation USA, New York, NY

The Global Antitrust Economics Conference – George Mason School of Law, Arlington, VA

Compass Lexecon – Economics Seminar, Washington, DC

Southern Economic Association – Annual Meeting, New Orleans, LA

University of Maryland – Econometrics Seminar, College Park, MD

Bureau of Labor Statistics – Empirical IO Seminar, Washington, DC

Drexel University – Industrial Organization Seminar, Philadelphia, PA

American Social Sciences Association – Annual Meeting, Philadelphia, PA

Southern Economic Association – Annual Meeting, New Orleans, LA

University of Virginia – Microeconomics Seminar, Charlottesville, VA

International Industrial Organization Conference, Chicago, IL

*COMMUNITY ACTIVITIES*

Tutor, Community Club, Washington, DC, 2007–2011

*CITIZENSHIP*

United States

HIGHLY CONFIDENTIAL–SUBJECT TO PROTECTIVE ORDER

## EXHIBIT B
### Materials Considered

**Bates-Stamped Documents**

[1] Intuitive-00103407
[2] Intuitive-00367019
[3] Intuitive-00566055
[4] Intuitive-00581814
[5] Intuitive-00595673
[6] Intuitive-00603990
[7] Intuitive-00603992
[8] Intuitive-00626145
[9] Intuitive-00626597
[10] REBOTIX061127
[11] REBOTIX162404
[12] REBOTIX175326
[13] Restore-00094918
[14] SIS000093
[15] SIS095115
[16] STRREB00001810
[17] STRREB00001827

**Case Documents**

[18] Complaint, *Surgical Instrument Service Company, Inc. v. Intuitive Surgical, Inc.* , Case No. 5:21-cv-03496-SK, May 10, 2021.

**Expert Reports and Exhibits**

[19] Expert Antitrust Merits Rebuttal Report of Loren K. Smith, Ph.D., *Surgical Instrument Service Company, Inc. v. Intuitive Surgical, Inc.* , Case No. 3:21-cv-03496, January 18, 2023 and materials cited therein.

[20] Expert Antitrust Merits Report of Loren K. Smith, Ph.D., *Rebotix Repair LLC v. Intuitive Surgical, Inc.* , Case No. 8:20-cv-02274, August 30, 2021 and materials cited therein.

[21] Expert Damages Rebuttal Report of Loren K. Smith, Ph.D., *Rebotix Repair LLC v. Intuitive Surgical, Inc.* , Case No. 8:20-cv-02274, August 30, 2021 and materials cited therein.

[22] Expert Rebuttal Report of Loren K. Smith, Ph.D., *Restore Robotics LLC, Restore Robotics Repair LLC, and Clif Parker Robotics LLC v. Intuitive Surgical, Inc.* , Case No. 5:19-cv-55, September 27, 2021 and materials cited therin.

[23] Expert Report of Dr. Russell L. Lamb, *Surgical Instrument Service Company, Inc. vs. Intuitive Surgical, Inc.* , Case No. 5:21-cv-03496, December 2, 2022.

[24] Expert Report of Jean Sargent, *Surgical Instrument Service Company, Inc. v. Intuitive Surgical, Inc.* , Case No. 3:21-cv-03496-VC, December 2, 2022.

[25] Expert Report of Loren K. Smith, Ph.D., Rebotix Repair LLC v. Intuitive Surgical, Inc., Case No. 8:20-cv-02274, July 26, 2021 and materials cited therein.

[26] Expert Report of Loren K. Smith, Ph.D., *Restore Robotics LLC and Restore Robotics Repair LLC v. Intuitive Surgical, Inc.* , Case No. 5:19-cv-55, August 20, 2021 and materials cited therein.

[27] Expert Report of Loren K. Smith, Ph.D., *Surgical Instrument Service Company, Inc. v. Intuitive Surgical, Inc.* , Case No. 3:21-cv-03496-VC, December 2, 2022 and materials cited therein.

[28] Expert Report of Richard F. Bero, CPA, CVA, *Surgical Instrument Service Company, Inc. v. Intuitive Surgical, Inc.* , Case No. 3:21-cv-03496-VC, December 2, 2022 and backup materials.

[29] Expert Report of Robert Mills, *Rebotix Repair LLC vs. Intuitive Surgical, Inc.* , Case No. 8:20-cv-02274, July 26, 2021 and backup materials.

HIGHLY CONFIDENTIAL–SUBJECT TO PROTECTIVE ORDER

## Depositions

[30] Anthony McGrogan (in *Rebotix* ) Deposition Transcript and Exhibits, June 7, 2021

[31] Chris Gibson (in *Rebotix* ) Deposition Transcript and Exhibits, June 22, 2021

[32] Clifton Parker Deposition Transcript and Exhibits, October 25, 2022

[33] Colin Morales 30(b)(6) Deposition Transcript and Exhibits, November 9, 2022

[34] Dipen Maun Deposition Transcript and Exhibits, November 8, 2022

[35] Glenn Papit (in *Rebotix* ) Deposition Transcript and Exhibits, June 2, 2021

[36] Greg Posdal 30(b)(1) Deposition Transcript and Exhibits, November 1, 2022

[37] Greg Posdal 30(b)(6) Deposition Transcript and Exhibits, November 1, 2022

[38] Imron Zafar Deposition Transcript and Exhibits, November 1, 2022

[39] John Francis Deposition Transcript and Exhibits, October 14, 2022

[40] Judith Schimmel 30(b)(6) Deposition Transcript and Exhibits, November 16, 2022

[41] Keith Johnson 30(b)(6) Deposition Transcript and Exhibits, October 27, 2022

[42] Kevin May Deposition Transcript and Exhibits, November 3, 2022

[43] Mark Early Deposition Transcript and Exhibits, October 6, 2022

[44] Ricardo Estape Deposition Transcript and Exhibits, October 22, 2022

[45] Rick Teal 30(b)(6) Deposition Transcript and Exhibits, November 18, 2022

[46] Ron Bair (in *Rebotix* ) Deposition Transcript and Exhibits, May 24, 2021

[47] Stan Hamilton Deposition Transcript and Exhibits, November 4, 2022

[48] Todd Tourand Deposition Transcript and Exhibits, November 4, 2022

## Literature

[49] Carlton, Dennis W., and Jeffrey M. Perloff. *Modern Industrial Organization, Fourth Edition* (Boston: Pearson Education, Inc., 2015)

[50] Curran, Jack. "Medical Equipment Repair & Maintenance Services," IBISWorld, Industry Report OD4964, December 2021

[51] Pindyck, Robert S., and Daniel L. Rubinfeld. *Microeconomics, Eighth Edition* (New Jersey: Pearson Education, Inc., 2013)

[52] Tirole, Jean. "The Analysis of Tying Cases: A Primer," *Competition Policy International 1* , No. 5 (2005)

## Public Sources

[53] "510(k) Premarket Notification Summary, Re: K210478," U.S. Food and Drug Administration, accessed January 18, 2023, https://www.accessdata.fda.gov/cdrh_docs/pdf21/K210478.pdf

## Websites

[54] "FDA Clearance to Remanufacture Da Vinci Robotic Instruments Could Present Hospitals with Substantial Savings," PRWeb, accessed January 17, 2023, https://www.prweb.com/releases/fda_clearance_to_remanufacture_da_vinci_robotic_instruments_could_present_hospitals_with_substantial_savings/prweb18980465.htm