# Cahoy Dec.
# Ex. 4

HIGHLY CONFIDENTIAL

Page 1

1           UNITED STATES DISTRICT COURT

2        FOR THE NORTHERN DISTRICT OF CALIFORNIA

3              SAN FRANCISCO DIVISION

4   IN RE: DA VINCI SURGICAL ROBOT    ) Lead Case No.:

    ANTITRUST LITIGATION,             ) 3:21-cv-03825-VC

5   ----------------------------------)

    THIS DOCUMENT RELATES TO:         )

6   ALL CASES                         )

    ----------------------------------)

7

8   SURGICAL INSTRUMENT SERVICE       )

    COMPANY, INC.,                    ) Case No.

9                                     ) 3:21-cv-03496-VC

                    Plaintiff,        )

10                                    )

            vs.                       )

11                                    )

    INTUITIVE SURGICAL, INC.,         )

12                                    )

                    Defendant.        )

13  ----------------------------------)

14

15     ***HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY***

16

17   REMOTE PROCEEDINGS OF THE VIDEOTAPED DEPOSITION OF

18        GRANT DUQUE, IN HIS PERSONAL CAPACITY

19              TUESDAY, NOVEMBER 8, 2022

20

21

22

23   REPORTED BY NANCY J. MARTIN

24   CSR. NO. 9504, RMR, RPR

25   PAGES 1 - 178

Page 38

1          THE WITNESS:  Yes, I believe so.

2     BY MR. VAN HOVEN:

3          Q.  And in one of -- we'll visit a number of long

4     documents here.  What I'd ask you to do is to take a

5     look at the document generally to make sure that you

6     have an -- understand the context of it.  Then, as I

7     ask you specific questions, feel free to take a step

8     back and, you know, read specifics as we get into it.

9     Does that process sound all right?

10         A.  Yes, that sounds fine.

11         Q.  Okay.  So please take a look at this document

12    and let me know when you're ready to discuss

13    Exhibit 241.

14              (The witness reviewed the document.)

15              THE WITNESS:  Okay.

16    BY MR. VAN HOVEN:

17         Q.  So I'd like to start by talking about there's

18    a section labeled "Drivers for Instrument Life" on the

19    page ending in 299.

20              The first sentence there talks about, "In

21    life testing, and clinical use, instrument end-of-life

22    is gated by cable failures on instruments in both S/SI

23    and XI platforms."

24              Do you see that?

25         A.  I do see that, yes.

HIGHLY CONFIDENTIAL

                                                    Page 39

1          Q.   What is a cable failure in the context of

2     S/SI and XI instruments?

3          A.   So cable failure would be failure for one of

4     the drive cables for one of the wrist joints.  So we

5     have cable-driven joints for grip, yaw, and pitch.

6          Q.   Got it.  So if we're talking about, for

7     example, for roll, there's a cable that connects the

8     input disc via one or more pulleys to a component on

9     the distal end that enables the roll?

10         A.   That's not accurate for roll.

11         Q.   How would you describe it for roll?

12         A.   So for roll, that particular joint at one

13    time was driven by cables.  But on different

14    instruments, and certainly on XI, that's driven by a

15    gear.

16         Q.   And how is the motion transferred from the

17    gear to the distal end of the instrument?

18         A.   We have a series of inline spur gears.  So

19    the rotation at the input disc is translated to the

20    roll joint via two spur gears.

21         Q.   Got it.  And for the -- does the transfer of

22    motion from the input disc of the pitch axis to the

23    distal end of the instrument include a cable for XI?

24         A.   Yes, it does.

25         Q.   And also for S/SI?

HIGHLY CONFIDENTIAL

Page 40

1      A.  Yes, that's correct.

2      Q.  And do the yaw and grip inputs -- do cables

3  couple from the input discs to the distal end of the

4  instrument?

5      A.  Can you rephrase that question?

6      Q.  Sure.  Is it okay to refer to kind of yaw and

7  grip collectively because they function in a

8  complimentary manner?

9      A.  It depends on what you're talking about, but

10  yes.

11      Q.  And are there -- I guess could you describe

12  for the XI the cables that connect from the yaw and

13  grip input discs to the distal end of the instrument.

14      A.  Okay.  So for yaw and grip, they are cable

15  pulley systems.  And so the input discs are

16  essentially acting as pulleys.  A cable must wrap

17  around those pulleys.

18          So there's a cable section at the back end,

19  proximal end of the instrument.  That then is

20  connected via a hypotube, which is basically a

21  stainless steel, metal tube, for the straight

22  section that -- for the section of cable of the drive

23  train that isn't required to go through a loop.  So

24  it's the straight section.

25          At the distal end, where the cable drive has

HIGHLY CONFIDENTIAL

Page 41

1    to connect through the wrist, there is another section

2    of cable.  That cable is routed through the pitch axis

3    joint and then to a series of eyelet pulleys to route

4    the cables through the wrist in a compact manner and

5    then terminates in a way that's constrained to one of

6    the pulleys on the yaw or grip joints.

7         And then you have a return cable that

8    basically comes back down a similar path back to the

9    other side of the input disc at the back end of the

10   instrument.

11        Q.  Got it.  In that -- when we're talking about

12   the cables for the yaw, grip, and roll, is that what's

13   being referred to here as -- in terms of cable

14   failures?

15        MS. CAHOY:  Objection to form.

16        THE WITNESS:  We have cable failures.  Some

17   of those cable failures could be the cables that we're

18   discussing.  There are other cables in the instrument.

19   So depending on the context.

20   BY MR. VAN HOVEN:

21        Q.  What other cables are there in the

22   instrument?

23        MS. CAHOY:  Objection to form.

24        THE WITNESS:  For some instruments that have

25   cautery energy capability, we have cables -- or wires

Page 42

1      that are sometimes referred to as cables.

2      BY MR. VAN HOVEN:

3          Q.  In addition, are there any other cables that

4      you're aware of in the instruments other than what

5      you've discussed?

6              MS. CAHOY:  Objection to form.

7              THE WITNESS:  Can I hear the question one

8      more time?

9      BY MR. VAN HOVEN:

10         Q.  Sure.  I'll modify it slightly.  Are there

11     any other cables that you're aware of in the XI

12     instruments other than what you've discussed?

13         A.  There are other cables in some of our

14     XI instruments.

15         Q.  And what are those?

16         A.  Some other -- some of our advanced

17     instruments require additional electrical

18     communication to the distal end.  So there will be

19     other conductor or wire or electrical signal wires in

20     the instrument.

21         Q.  Got it.  So I'd like to go back to what

22     you're discussing here.  You're talking about cable

23     failures on instruments.  There's a list of -- there's

24     a numbered list.  One is cable breakage.

25              Do you see that?

HIGHLY CONFIDENTIAL

Page 43

1          A.   I do.

2          Q.   And there it refers to a drive cable breaks.

3     Would a drive cable be referring to the type of cable

4     that's used for transmitting pitch or yaw or grip?

5          A.   Yes.

6          Q.   Not an electrical cable?

7          A.   That's correct.

8          Q.   What is this referring to with the -- under

9     bullet point 1?

10         A.   I'm going to read it.  "Cable breakage.  A

11    drive cable breaks typically at the wrist.  The

12    instrument axis ceases to function."

13              So my understanding of that is a drive cable

14    of the joint breaking at the distal wrist.

15         Q.   What do you understand a break to be?  Does

16    that mean that it snaps altogether?

17         A.   Yes.  It's a full break.  Full separation.

18         Q.   And what happens to a drive axis when the

19    drive cable for that axis breaks?

20         A.   Because it's -- we require that drive cable

21    to be attached to the joint, that joint will no longer

22    function.  You'll lose the ability to control that

23    joint.

24         Q.   So if you turn the associated input disc, no

25    motion will transfer to the wrist at the distal end?

HIGHLY CONFIDENTIAL

Page 44

```
 1          A.  Not necessarily.
 2          Q.  When might motion transfer to the wrist at
 3     the distal end?
 4          A.  It depends on the -- where the cable is
 5     broken.  The mechanism that I described has two
 6     cables.
 7          Q.  Got it.  So if you're -- so if it has two
 8     cables, it might -- there might be some motion that
 9     transfers to the wrist; is that right?
10          A.  That's correct.
11          Q.  Would that motion correspond to I guess the
12     designed motion of the wrist?
13          A.  Not necessarily.
14          Q.  The -- No. 2 refers to cable stretch.
15              Do you see that?
16          A.  I do.
17          Q.  What is cable stretch?
18          A.  Cable stretch -- let me read it here.  "The
19     drive cable overall stretch results in cable tension
20     becoming so slack that the instrument no longer
21     responds intuitively."
22              So what I'm reading there, what's being
23     described there is the drive cables growing in length.
24          Q.  And it says "no longer responds intuitively."
25     What do you understand that to mean?
```

HIGHLY CONFIDENTIAL

Page 45

1          A.   So "intuitive" means that when the user is

2      controlling the masters at the console, that the

3      motion -- that the instrument endofactor, what we call

4      the slave, is responding in a way that is intuitive,

5      meaning it -- it's responsive enough to control.

6               (The Reporter requested clarification.)

7               THE WITNESS:   So the user controls what we

8      call the masters.   So they manipulate with their hands

9      the master, the control, and then the endofactor is

10     what we call the slave.   So the master has to respond

11     intuitively to the slave.   And what I mean by that --

12     and I'm miming here -- is when you control the

13     masters, like open and close the masters, that the

14     slave is responding intuitively.   It's responsive.   If

15     I rotate it, it also rotates.

16     BY MR. VAN HOVEN:

17          Q.   So when you're talking about the console,

18     you're talking about what the -- where the surgeon is

19     controlling movement?

20          A.   That's correct.

21          Q.   And so essentially this -- what it's talking

22     about with "no longer responds intuitively" is that

23     the surgeon's movements are -- no longer accurately

24     occur on the instrument tip?

25          A.   That's correct.

HIGHLY CONFIDENTIAL

Page 46

1      Q.  There's a third one called Cable Derailment

2   here.

3           What's your understanding of what cable

4   derailment is referring to?

5      A.  The cable derailment refers to when a cable

6   comes off of its intended path.  Typically a pulley.

7      Q.  So instead of being in -- my terms might not

8   be right, but instead of being in the groove of the

9   pulley, it's on the outside or edge or something?

10     A.  That's correct.

11     Q.  When that happens the -- it says here "the

12  instrument axis ceases to function."

13     A.  It says that when it derails, it loses cable

14  tension and the instrument axis cease to function.

15     Q.  What's your understanding of what's referred

16  to by the instrument axis ceases to function with a

17  derailment?

18     A.  So with a derailment, the cable is no longer

19  in its path.  So it will typically lose tension

20  because the preferred path keeps the -- it conserves

21  the length of that cable path.  So it would have the

22  similar effect of cable stretch.

23     Q.  And so what will the -- I guess what would

24  the surgeon see who is attempting to operate an

25  instrument in the case of a cable derailment?

Page 47

1          MS. CAHOY:  Objection to form.

2          THE WITNESS:  There are multiple things that

3    can happen.  In the example that I gave with the cable

4    stretch, it will fail to move intuitively.

5    BY MR. VAN HOVEN:

6          Q.  What about in the example of cable

7    derailment?

8          A.  If a cable becomes derailed, it will lose

9    tension.  It will affect its intuitive motion.

10         Q.  So it won't respond the way the doctor

11   expects it to?

12         A.  It will degrade in performance.

13         Q.  Here you refer to cease to function; right?

14         A.  It states that in 3, yes.

15         Q.  What's the difference between ceasing to

16   function and degrading in performance, if there is

17   one?

18         A.  I think it's different levels of degraded

19   performance.  You have degraded performance if it

20   degrades to a certain threshold, then it's no longer

21   functional.

22         Q.  If the cable's on the pulley, that's a pretty

23   serious -- if the cable is not on the pulley, that's

24   going to be a pretty serious degrading in function;

25   right?

HIGHLY CONFIDENTIAL

Page 90

1          Q.  Does that appear to be the RMI [sic] and

2     reliability presentation referenced in the attachment

3     to your E-mail?

4          A.  RMA Reliability Predictions.  That appears

5     accurate, yes.

6          Q.  Do you see that Page 1 of this presentation

7     is referring to RMA Analysis for possible life

8     extension 27-18 [sic]?

9          A.  Yes, I do.

10          Q.  What's your understanding of what "possible

11     life extension" is referring to?

12          A.  Possible life extension was -- by my

13     recollection would be when we were exploring the idea

14     of doing the EUP program of instruments program that

15     we released a couple years ago.

16          Q.  Sorry.  Did you say "EUP program of

17     instruments"?

18          A.  Correct.  EUP.

19          Q.  What is EUP?

20          A.  The acronym is Extended Use Program.

21          Q.  Is there a particular generation of

22     instruments that the extended use program was

23     implemented on?

24          A.  It was implemented -- the EUP program is

25     implemented on IS4000, a specific set of instruments.

HIGHLY CONFIDENTIAL

Page 91

1        Q.  A specific set of XI or Gen 4 instruments?

2        A.  That's correct.

3        Q.  Was the extended use program implemented on

4    any SI instruments?

5        A.  It was not.

6        Q.  And I'd like to go to the second slide of

7    this presentation.

8        A.  Okay.

9        Q.  So this is titled 218592 Instrument Uses in

10    2018.

11            Do you see that?

12        A.  I see that, yes.

13        Q.  Then under there, it says "For the Top 6

14    Instruments."

15        A.  I see that, yes.

16        Q.  Do you have an understanding of what that's

17    referring to?

18        A.  I'm recollecting now -- I'm trying to

19    recollect.

20        Q.  Do you think that's -- sorry.  Go ahead.  I

21    didn't -- go ahead.

22        A.  I don't remember exactly.  I can't recall,

23    but looking at it now, it looks like a breakup of the

24    different instruments, the Top 6 instruments over the

25    last two years at this point in time.  Uses.

HIGHLY CONFIDENTIAL

Page 134

1     instrument?

2          A.   They're -- you have visual access.  Yes, you

3     do.

4          Q.   And if we go up to your -- the original

5     E-mail, you'll see that in the last paragraph you

6     reference the electropolish cables as visible to

7     customer design change?

8          A.   I do.

9          Q.   What did you mean by that?

10          A.   That the cables on the wrist -- users do have

11     visual access to it, particularly under the endoscopic

12     view when you're under the console, you have

13     magnification 3 to 10 times.  And so it's visible to

14     the customer.

15          Q.   The changed appearance of the electropolish

16     cables?

17          A.   Correct.

18          Q.   Then in the first paragraph you discuss

19     taking the instrument as they are with no changes to

20     their design.

21          Do you see that?

22          A.   "Your assumption below is correct.  Extended

23     life testing currently in process is taking the

24     instruments as they are with no changes to their

25     design."

HIGHLY CONFIDENTIAL

Page 135

1            Then I list ProGrasp, Cadiere, FBF, and

2     MSCND.

3        Q.  Got it.

4            MR. VAN HOVEN:  Could we bring up tab 1.

5     This is Intuitive -- this will be -- sorry -- marked

6     as Exhibit 260.  This is Intuitive-00027622.

7            (Exhibit 260 was marked for

8            identification.)

9     BY MR. VAN HOVEN:

10       Q.  If you could take a look at that and let me

11    know when you're ready to discuss the document.

12       A.  Sure.  I'm reading it now.

13           (The witness reviewed the document.)

14           THE WITNESS:  Okay.  I recognize the E-mail

15    thread.

16    BY MR. VAN HOVEN:

17       Q.  And part of what this is referring to is

18    cracks on input discs; is that right?

19       A.  That's correct.

20       Q.  And, in particular, is it referring to cracks

21    on input discs for XI instruments?

22       A.  That's correct.

23       Q.  Were cracks on input discs more a significant

24    issue for XI instruments than they were for SI

25    instruments?

HIGHLY CONFIDENTIAL

Page 165

1    this removal process you discussed; correct?

2        A.  Correct.

3        Q.  And that's happening within Intuitive's

4    specified 10 uses or otherwise the surgery wouldn't be

5    taking place; right?

6        A.  Correct.

7        Q.  So is that an acceptable failure mode to

8    Intuitive?

9            MS. CAHOY:  Objection to form.

10           THE WITNESS:  The instance of an instrument

11   not being able to remove from a cannula is assessed

12   within our risk analyses documents.  There is a risk

13   score associated with it.  I don't know what it is

14   offhand, but depending on that risk score, we would

15   have to have certain mitigations in place.

16   BY MR. VAN HOVEN:

17       Q.  And the risk scores are essentially saying

18   that some percentage of the time it's acceptable for

19   that sort of failure to happen?

20       A.  Can you state that one more time because

21   that's a little bit more to unpack.

22       Q.  Sure.  Actually, let's look at it back in the

23   context of Exhibit 263.

24       A.  Okay.

25       Q.  We were looking at the third paragraph of

HIGHLY CONFIDENTIAL

Page 166

1    your E-mail.

2         A.  Yes, I see it.

3         Q.  The second sentence talks about, "For

4    higher-risk failures, the required

5    confidence/reliability will be higher 95/95; and for

6    lower-risk failures, this may be 90/90, and in some

7    cases 85/85."

8              Do you see that?

9         A.  I do.  I do.

10        Q.  Is that what you're talking about when you're

11   talking about risk scores?

12        A.  No.  No, that's not the same thing.

13        Q.  What do you mean by "risk scores" when you

14   were talking before?

15        A.  Oh, sorry.  RPN values.  So when we do our

16   failure modes and effects analysis, I call them RPN

17   scores.  It's the severity of the risk.  It's the

18   occurrence rate of the risk, and the detection rate of

19   the risk.  So there are three separate scores, and we

20   multiply that and we use that to, you know, quantify

21   the level of risk.

22        Q.  And essentially there's a level under which a

23   risk is acceptable to -- for putting an instrument out

24   in the field?

25        A.  That's not accurate.  Can you ask that

HIGHLY CONFIDENTIAL

Page 167

1     question again.

2         Q.  Sure.  You said there are three separate

3     scores that you multiply and quantify the level of

4     risk; right?

5         A.  Right.

6         Q.  So you end up with a number?

7         A.  That's right.

8         Q.  That quantifies the level of risk; right?

9         A.  So that gives an RPN score, is what we call

10    it.  But I'll call it a risk score for our FMEA.

11        Q.  And those -- and those risk scores influence

12    the confidence and reliability numbers you're

13    referring to in Exhibit 263?

14        A.  Yes, they do.

15        Q.  How do they inform those?

16        A.  So if it's -- depending on the -- that risk

17    score, if it's above a certain threshold number, we

18    identify those as high risk.  And then there's a

19    certain threshold for those RPN scores that would be

20    considered lower risk and then there's also ones that

21    the RPN score are even much lower than that.

22             So there are multiple tiers of that RPN

23    score.  And per our operating procedure that defines

24    the reliability testing, high-risk failures have to

25    have a confidence and reliability of this 95/95

Page 168

1    number, and subsequently the other risk categories

2    have a requirement to meet that 90/90, and lastly the

3    85/85 confidence and reliability.

4          Q.  So the 85/85 correspond to the lowest risk

5    level?

6          A.  Amongst these three, yes.

7          Q.  The 95/95 amongst those three is the highest

8    risk level?

9          A.  Yes.

10         Q.  And so if you look at a failure mode and you

11   see that it's tested to 95/95, you know that's a

12   high-risk failure mode; right?

13         A.  You do know that it's of that certain class.

14             I want to retract.  Some of the labeling I've

15   used, high risk versus low risk, that might not be

16   entirely accurate for how they're described in our

17   DOP.

18         Q.  But it's on the highest level of risk testing

19   for confidence reliability testing?

20             MS. CAHOY:  Objection to form.

21             THE WITNESS:  As I'm aware, yes.

22   BY MR. VAN HOVEN:

23         Q.  And -- but so that's the way that you would

24   understand those ratings, is to look at the

25   associations between particular failure modes and

HIGHLY CONFIDENTIAL

Page 169

```
 1      these confidence reliability requirements?
 2          A.  When we're establishing the pass/fail
 3      criteria for a liability protocol, we look at the
 4      various failure modes, and they identify them from our
 5      FMEA risk analyses documents as the category that
 6      requires either 95/95 or 99D or the 85/85.  I just --
 7      I want to shy away from the high versus low versus --
 8      I don't think that descriptor is correct.
 9          Q.  Yeah.  I understand you don't want to put
10      absolute labels on them.  But the 95/95 are I guess
11      the higher as compared to 85/85 and 99/90 [sic]; is
12      that right?
13          A.  That's correct.
14          Q.  So do you know someone at Intuitive named
15      Proball Mitra?
16          A.  I know Proball.  I think it's the same
17      person.
18          Q.  What is your understanding of Proball's role
19      at Intuitive?
20          A.  Proball is a systems analyst.  Apparently
21      he's a system analyst manager.  So he manages an SA
22      team.  He works within the single port business unit
23      at Intuitive.
24          Q.  Do you know someone named Josh Radell?
25          A.  I do know Josh Radell.
```

Page 171

1    in his capacity as a systems analyst.

2          Q.  And when did you kind of -- I guess it sounds

3    like you interacted with him to some degree.  When was

4    that?  While he was a systems analyst?

5          A.  I believe so.  I'm not -- I'm not for sure.

6          MR. VAN HOVEN:  All right.  I don't have any

7    further questions on this portion of the deposition.

8    I don't know if Dan has anything.

9          MR. McCUAIG:  No, I do not.

10          MR. VAN HOVEN:  Anything from you, Kate?

11          MS. CAHOY:  Yeah.  I have just one question,

12    which is on Exhibit 258.

13

14                    EXAMINATION

15    BY MS. CAHOY:

16          Q.  Mr. DuQue, do you recall when counsel was

17    asking you about electropolished cables on the large

18    needle driver?

19          A.  I do.

20          Q.  Why did Intuitive incorporate electropolished

21    cables onto the large needle driver for the extended

22    use instruments?

23          A.  As we were aware, and as I actually mentioned

24    in this E-mail, our large needle driver at the point

25    of this E-mail was not -- in various life testing or

HIGHLY CONFIDENTIAL

Page 172

1    reliability tests, was barely reaching 10 lives.

2              When we kicked off the EUP program, large

3    needle driver was one of the desired instruments to

4    add to that portfolio and -- in addition to the other

5    ones.

6              We kicked off life testing on the other

7    instruments, but we -- I told the team, instructed the

8    team that we do not test LND because it would be a

9    waste of time.  Our LND instruments at that point in

10   time would barely be 10.  So we weren't expecting to

11   achieve any additional qualification for additional

12   lives.

13             So we knew that we had to make some specific

14   design changes to explore improving the robustness of

15   that particular instrument.  Electropolish was

16   something that we had been exploring in different --

17   electropolished cables is something we had been

18   exploring on other programs.  So we thought it would

19   be a good, quick effort to try to achieve some extra

20   life.

21             MS. CAHOY:  I don't have any further

22   questions, but I will designate the entire transcript

23   as "Highly Confidential, Attorneys' Eyes Only," and

24   request 30 days for the witness to review the

25   transcript for any errors.

HIGHLY CONFIDENTIAL

Page 175

1                    C E R T I F I C A T E

2          I do hereby certify that the aforesaid testimony

3     was taken before me, pursuant to notice, at the time

4     and place indicated; that said deponent was by me duly

5     sworn to tell the truth, the whole truth, and nothing

6     but the truth; that the testimony of said deponent was

7     correctly recorded in machine shorthand by me and

8     thereafter transcribed under my supervision with

9     computer-aided transcription; that the deposition is a

10    true and correct record of the testimony given by the

11    witness; and that I am neither of counsel nor kin to

12    any party in said action, nor interested in the

13    outcome thereof.

14

15    _____

                Nancy J. Martin, RMR, CSR

16

17    Dated:  November 18, 2022

18

19

20    (The foregoing certification of this transcript does

21    not apply to any reproduction of the same by any

22    means, unless under the direct control and/or

23    supervision of the certifying shorthand reporter.)

24

25