# Cahoy Dec. Ex. 5

```
                                                              Page 1

 1              UNITED STATES DISTRICT COURT
 2          FOR THE NORTHERN DISTRICT OF CALIFORNIA
 3                 SAN FRANCISCO DIVISION
 4                        --oOo--
 5    IN RE: DA VINCI SURGICAL ROBOT
 6    ANTITRUST LITIGATION,                    Case No.
 7    THIS DOCUMENT RELATES TO:                3:21-cv-03825-VC
 8    ALL CASES
 9    _____/
10    SURGICAL INSTRUMENT SERVICE
      COMPANY, INC.,
11
                Plaintiff,
12    vs.                                      Case No.
                                                3:21-cv-03496-VC
13    INTUITIVE SURGICAL, INC.,
14              Defendant.
      _____/
15
16
17         HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
18
19    VIDEO-RECORDED DEPOSITION OF MARGARET MARIE NIXON
20                    VERITEXT VIRTUAL
21               FRIDAY, OCTOBER 7, 2022
22
23    Reported by:
24    Anrae Wimberley, CSR No. 7778
25    Job No.  5507214
```

1       technology?
2               MS. CAHOY:  Objection to form.
3               THE WITNESS:  From the clinical development
4       perspective, not in the physical design.
5       BY MR. SINDONI:
6            Q.   And what was your involvement from the
7       clinical development perspective?
8            A.   My involvement was ensuring that the
9       instruments were being registered accordingly and --
10      when they were being used in clinically
11      representative scenarios.
12           Q.   Do you know who at Intuitive was primarily
13      responsible for developing that technology from an
14      engineering perspective?
15           A.   Oh, man, I don't know the primary.  There
16      was a dozen.
17           Q.   A dozen.
18               Any of that dozen that you recall today?
19           A.   Not that I recall.
20           Q.   Do you have any understanding of why
21      Intuitive switched the technology that limits the
22      uses of instruments in the Si instruments to the
23      different RF chip in the Xi instruments?
24           A.   Are you asking why we changed from the
25      electrical chip interface into the radio frequency?

Page 28

1      Q.   Yes, that is a better question than I
2  asked, and that is what I'm asking.
3      A.   It was -- it was my recollection that we
4  did that to ensure we had good consistency.  When
5  you rely on electrical contacts, sometimes you could
6  have inconsistencies on detection.  And the radio
7  frequency intent was that we would have a more
8  reliable communication.
9      Q.   Besides the technology we've discussed so
10  far, do you have knowledge of whether Intuitive has
11  considered implementing other technological means to
12  prevent EndoWrist from being used beyond the use
13  limits set by Intuitive?
14      MS. CAHOY:  Objection to form.
15      THE WITNESS:  I'm sorry, I'm not sure I
16  understood that question.
17  BY MR. SINDONI:
18      Q.   Sure.
19          We've discussed the RF technology used in
20  the Xi instruments; correct?
21      A.   Yes.
22      Q.   And we discussed the physical chip used in
23  the Si instruments; correct?
24      A.   Yes.
25      Q.   Beyond those two chips, has Intuitive

1       Q.   Putting the clip appliers aside, are there
2   other instruments you're aware of that did not have
3   a 10-use limit?
4       A.   At the time they were launched?
5       Q.   Yes.
6       A.   I don't recall the details of exactly how
7   many lives each of the instruments had.  There was
8   just such a wide variety.
9       Q.   Do you have an understanding of how
10  Intuitive set the use limit for EndoWrist
11  instruments at 10 uses?
12          MS. CAHOY:  Objection to form.
13          THE WITNESS:  What time frame are you referring
14  to?
15  BY MR. SINDONI:
16      Q.   Fair enough.  Going back -- let's go back
17  to the Si instruments.
18          Do you have an understanding of how those
19  instruments were set at a 10-use limit?
20          MS. CAHOY:  Objection to form.
21          THE WITNESS:  Yes.
22  BY MR. SINDONI:
23      Q.   And what's your general understanding of
24  how those use limits were set?
25      A.   So for each of the instruments, there is

Page 32

```
 1    an instrument architecture associated with it.
 2    There is a -- control parameters, how the instrument
 3    is driven, and a clinical use scenario that goes
 4    with each of the instruments, because they complete
 5    different surgical tasks.
 6             And so the combination of those three
 7    things were assessed to determine how we can ensure
 8    kind of consistent safety and efficacy of the
 9    instrument over the course of the lives of the
10    instrument.  And those came together to determine
11    the lifes [sic] that came on the instrument.
12        Q.   And did Intuitive do any testing of the
13    expected life of the instruments?
14        A.   Yes.
15        Q.   And were you involved in that testing?
16        A.   Yes.
17        Q.   In your role as an engineer; correct?
18        A.   Yes.
19        Q.   If you can turn to -- you have a folder of
20    exhibits with you; correct?
21        A.   Yes.
22        Q.   I'm going to --
23        THE WITNESS:  Are these both the same?
24        MS. CAHOY:  Yes.
25        THE WITNESS:  Okay.
```

1       Q.   Okay.  And based on your experience as an
2   engineer involved in life testing at Intuitive, is
3   this protocol typical of the protocols used for
4   testing life of EndoWrist instruments?
5       MS. CAHOY:  Objection to form.
6       THE WITNESS:  This protocol is typical of our
7   final V&V test of our instruments.
8   BY MR. SINDONI:
9       Q.   Okay.  If I could direct your attention to
10  Section 5.2 on the first page and the second
11  paragraph in that section.
12           Could you read that first sentence for me.
13      A.   The second paragraph?
14      Q.   Yes, beginning with, "A 'life
15  use' . . . ."
16      A.   [As read]:  "A 'life use' for the
17  instrument is defined by the clinical simulation
18  procedure that was developed by clinical marketing."
19      Q.   And what is clinical marketing?
20      A.   So an interesting time in Intuitive's life
21  cycle.  We were talking earlier today about a
22  clinical development engineering function.  There
23  was a time in Intuitive's history that our clinical
24  development function sat within our marketing
25  organization, and those engineers worked with

1    marketing.  And it's my recollection that this
2    refers to that.
3         Q.   And could you read the first sentence of
4    the paragraph in Section 5.3.
5         A.   [As read]:  "A life rating for each
6    instrument is defined by the Clinical life
7    simulation surgical maneuver tasks that were
8    developed by Marketing and clinical engineering for
9    the instrument type."
10        Q.   And is that consistent with your
11   understanding of how the life rating for the
12   instrument would have been defined in this protocol?
13        MS. CAHOY:  Objection to form.
14        THE WITNESS:  My recollection on how this
15   occurred is the marketing and clinical engineering
16   functions were the ones that were closest to our
17   users.  And they were the ones that were in the
18   field and brought that insight back into -- so that
19   we could optimize the usage of the instrument.
20   BY MR. SINDONI:
21        Q.   And could I turn your attention -- and,
22   again, as I said, as we flip through the document,
23   if you need time, let me know -- to page 4, Section
24   12.1.
25        A.   Yes.

1    A.   That may happen or a problem may arise
2    during the procedure.
3        Q.   And when an EndoWrist is used during a
4    procedure and it doesn't function properly, does it
5    always result in injury to a patient?
6        MS. CAHOY:  Objection to form.
7        THE WITNESS:  No.
8    BY MR. SINDONI:
9        Q.   Under some circumstances, it does,
10   correct, but not always?  Under some circumstances
11   it does, but not always; is that correct?
12       A.   We try -- we look to minimize any
13   potential patient injury.  And so not all of them
14   do, but they could.  And it's why we take instrument
15   failure seriously.
16       Q.   Okay.  And what happens when the
17   instrument fails during a procedure and it results
18   in injury to the patient?
19       MS. CAHOY:  Objection to form.
20       THE WITNESS:  All -- we encourage all of our
21   customers, as well as all of our -- well, Intuitive
22   encourages all of customers, as well as employees,
23   to report any device issues, as well as any patient
24   issues.  And that happens through our complaint
25   process.

1      Are you aware of whether anyone has been
2 able to bypass that usage counter?
3      A.   Yes.
4      Q.   Do you recall when you first became aware
5 that someone was able to bypass that usage counter?
6      A.   If I recall correctly, one of our failure
7 analysis technicians, through the RMA failure
8 analysis process, opened up one of our instruments
9 and found it modified with additional components.
10           And that was one of the initial triggers
11 that had us looking into what may be happening when
12 these instruments were being modified, and that's
13 when we learned about bypassing the instrument
14 counter.
15      Q.   Do you recall when that was?
16      A.   Not a precise date.  It was a few years
17 ago.
18      Q.   Do you recall what position you were in at
19 Intuitive when that occurred?
20      A.   That's a great question.  Probably --
21 probably product quality is what I'm guessing, maybe
22 post-market before product quality.  It was -- yeah,
23 I don't recall exactly.
24      Q.   Prior to encountering that instrument that
25 you referred to, did you personally have any

Page 162

1  I, the undersigned, a Certified Shorthand
2  Reporter of the State of California, do hereby
3  certify:
4  That the foregoing proceedings were taken
5  before me at the time and place herein set forth;
6  that any witnesses in the foregoing proceedings,
7  prior to testifying, were administered an oath; that
8  a record of the proceedings was made by me using
9  machine shorthand which was thereafter transcribed
10  under my direction; that the foregoing transcript is
11  a true record of the testimony given.
12  Further, that if the foregoing pertains to
13  the original transcript of a deposition in a Federal
14  Case, before completion of the proceedings, review
15  of the transcript ( ) was (X) was not requested.
16  I further certify that I am neither
17  financially interested in the action nor a relative
18  or employee of any attorney of any party to this
19  action.
20  IN WITNESS WHEREOF, I have this date
21  subscribed my name.
22  Dated: October 13, 2022
23
24                              _____
25                              ANRAE WIMBERLEY, CSR No. 7778