# Cahoy Dec. Ex. 66

Page 1

1              UNITED STATES DISTRICT COURT
2         FOR THE NORTHERN DISTRICT OF CALIFORNIA
3                  SAN FRANCISCO DIVISION
4                         --oOo--
5    IN RE: DA VINCI SURGICAL ROBOT
6    ANTITRUST LITIGATION,                    Case No.
7    THIS DOCUMENT RELATES TO:            3:21-cv-03825-VC
8    ALL CASES
9    _____/
10   SURGICAL INSTRUMENT SERVICE
     COMPANY, INC.,
11
             Plaintiff,
12   vs.                                      Case No.
                                          3:21-cv-03496-VC
13   INTUITIVE SURGICAL, INC.,
14           Defendant.
     _____/
15
16
17       HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
18
19      VIDEO-RECORDED DEPOSITION OF DISHA PESWANI
20                   VERITEXT VIRTUAL
21              THURSDAY, OCTOBER 6, 2022
22
23   Reported by:
24   Anrae Wimberley, CSR No. 7778
25   Job No.  5507105

Page 97

1      Q.   And you believed in June 2019 that certain
2   8-millimeter instruments might be able to be able to
3   use -- to be able to withstand more uses; is that
4   right?
5           MS. CAHOY:  Objection to form.
6           THE WITNESS:  So based on -- based on like the
7   reliability data from the field and based on like
8   design improvements that were made on 8-millimeter
9   Xi instruments over a number of years, there was a
10  hypothesis that some of our 8-millimeter Xi
11  instruments might be able to withstand more lives
12  and therefore, the program to really test that
13  hypothesis.
14  BY MR. GLUBIAK:
15     Q.   And so the next line just underneath that
16  reads, "This project will determine how many lives
17  can be supported through testing."
18          Do you see that?
19     A.   Yes, I see that.
20     Q.   And "testing" here refers to life testing;
21  is that right?
22          MS. CAHOY:  Objection to form.
23          THE WITNESS:  So it refers to the testing that
24  was on the top level test plan, but the number of
25  lives -- one of the testing that is used for

1    A.   Yes.  As a project manager, I do prepare
2    these slides, with inputs from other core team
3    members.
4        Q.   On the bottom left corner, do you see
5    where it says "Methodology"?
6        A.   Yeah, I see that section.
7        Q.   And do you see the first bullet point,
8    which reads, "Test existing designs to support
9    increased lives"?
10       A.   Yes, I see that.
11       Q.   Is it correct that Intuitive did not make
12   design changes before testing the first wave of
13   EndoWrist for the instrument life extension project?
14       MS. CAHOY:  Objection to form.
15       THE WITNESS:  No.  As I said, there were
16   multiple other MCF forms that were driving design
17   changes, and that -- those design changes were used
18   to test this increased -- to support these increased
19   lives testing.
20   BY MR. GLUBIAK:
21       Q.   And which design changes are you referring
22   to in that answer?
23       A.   So in the candidate instruments, the first
24   one, for example, large needle driver, we had an MCF
25   project where we were changing the cable, the cable

Page 114

1   material or process.
2           So that was one design change that was
3   linking into, like, this instrument lives.  That is
4   one example of a design change.
5       Q.  And was that change sometimes referred to
6   as the "electro-polish cable"?
7       A.  Yes, electro-polish cable is what I was
8   talking about.
9       Q.  Are there any other changes -- any other
10  design changes that you're referring to when you say
11  that there were design changes as part of the
12  instrument life extension project?
13      A.  Yeah, there were other design changes, in
14  general, to improve reliability of instruments.
15          So Cadiere had one design change on grips,
16  so, you know, most -- some of these instruments did
17  have some changes on some components before we were
18  able to test them for increased lives.
19      Q.  And how was the grip changed on the
20  Cadiere?
21      MS. CAHOY:  Objection to form.
22      THE WITNESS:  I don't recall the exact
23  specifics of, like, what the grip change was.  I
24  remember that -- what I recall is there was an MCF
25  for grip improvement.  So I don't really remember

Page 115

1    the specifics of, like, from a design perspective
2    what were the improvements made.
3    BY MR. GLUBIAK:
4         Q.   Are there any other design changes you can
5    think of as part of the instrument life extension
6    project?
7         A.   I recall that on MSCND, mega suture cut
8    needle driver, there was a design change on that
9    instrument as well.
10        Q.   Do you know what that change was?
11        A.   It was on pitch cable.  That's all I
12   remember, but, again, not the specifics.
13             (Reporter seeks clarification.)
14        A.   Yeah, pitch, p-i-t-c-h.
15        Q.   Any other design changes as part of the
16   instrument life extension project?
17        MS. CAHOY:  Objection to form.
18        THE WITNESS:  There -- as I said, over a number
19   of years, there were multiple design changes made on
20   this group of instruments.
21             The ones that I'm pointing at were
22   directly related to, like -- you know, they were
23   interdependent to those projects.  But over a number
24   of years, there were multiple design improvements
25   made.

Page 116

1    BY MR. GLUBIAK:
2         Q.   And are there any other design
3    improvements that were interrelated or interlinked
4    with the instrument life extension project that you
5    can think of sitting here today?
6         A.   Yeah, I cannot think of, like, a
7    particular one.  But, as I said, over a number of
8    years, you know, we made changes on cables, on, you
9    know, pitch cable, grip cable, on grips.
10             Like, there were changes that were -- just
11   happened year over year, and those were related to
12   improving the product over time in the field, based
13   on field responses.
14        Q.   But there are no other specific examples
15   you can think of today?
16        MS. CAHOY:  Objection to form.
17        THE WITNESS:  No.  I mean, there are multiple
18   ones that I recall, but not -- I can't think of
19   anything that would directly relate to this
20   instrument lives.  That would be something like a
21   design engineering would be able to answer, but I
22   don't recall of any projects top of my head.
23   BY MR. GLUBIAK:
24        Q.   And who specifically within design
25   engineering are you thinking of?

Page 197

1  THE WITNESS: So the bottom -- the second and
2  the third bullet points are basically saying that
3  the changes made as part of this MCF are not major
4  enough to cross the threshold to major CAF and the
5  design history files are transferable to the new
6  base part number.
7      So as I was saying, introducing of new
8  documentation is minimized. And that is what that
9  is being explained in the second bullet point, that
10 the entire design history is transferable from the
11 parent part number to the new base part number;
12 therefore, the case that we can operate under
13 moderate change form is the justification used.
14     (Reporter seeks clarification.)
15 Q.   And what you are referring to there is the
16 part of the second bullet point that says [as read],
17 ". . . the entire design history is transferable
18 from the parent part number to a new base part
19 number"; is that right?
20 A.   Yes, that's what this second bullet point
21 says.
22     And as I was describing, our CAF process,
23 it's not the -- you know, it's not just the design
24 change, but if you're introducing new documents and,
25 you know, the design is completely changing of a

Page 198

1  product, that falls under CAF.

2         In this case, in this particular
3  MCF-19-004 case, where we were extending the life of
4  IS4000 instruments, we were able to maintain most of
5  the design history file.  There were some design
6  changes, but they were not crossing the threshold
7  of, like, going to a major change.

8     Q.  And so as it says in that bullet point,
9  there were no changes to the product design; is that
10 right?

11    MS. CAHOY:  Objection to form.

12    THE WITNESS:  So this bullet point says since
13 there is no change to the product design, the entire
14 design history is transferable from the context of
15 major change.

16        So there -- as I said, there were -- and
17 you looked in my agenda, you know, one of the
18 exhibits, electro-polish LND was a design change
19 which was needed to get the instrument life extended
20 on LND.

21        So as part of this MCF -- this was an
22 overarching MCF, but there were child MCFs, which
23 were doing design changes, which were feeding into
24 this overarching MCF.

25 BY MR. Van HOVEN:

Page 199

1    Q.  But none of those changes to product
2    design were so significant that this had to be
3    classified as a major change; right?
4         MS. CAHOY:  Objection to form.
5         THE WITNESS:  So per our procedure, you know,
6    we have to follow our procedures when we state major
7    change and moderate change.  In the procedures, we
8    don't define significant versus not significant
9    design changes, right?
10             So it's based on the procedure and the
11   judgment of cross-functional.  If it crosses the
12   threshold to invest in resources to do a CAF
13   project, if it's possible to do it as an MCF, which
14   was the moderate change form, you can justify it to
15   do that.
16   BY MR. Van HOVEN:
17        Q.  But here, they said there's no change in
18   the product design; correct?
19             MS. CAHOY:  Objection to form.
20             THE WITNESS:  This is for MCF-19-004, which is
21   the overarching MCF.
22             This particular MCF is talking about in
23   context of major change.  It's in Section 4, right?
24   So as part of Section 4, it is justifying that we
25   are maintaining our design history file, we are able

Page 200

1    to transport most of the documents, and, therefore,
2    we can stay within the moderate change boundaries.
3    BY MR. Van HOVEN:
4         Q.   And the justification is that, as it
5    states, quote, there is no change to the product
6    design; correct?
7         A.   That is not true.  As I said, there were
8    child MCFs, like EP LND, like Cadiere design
9    changes, and MSCND pitch cable changes.  So there
10   were design changes which were child into this
11   overarching MCF.
12        Q.   So you disagreed that there was no change
13   in the product design as stated in Section 4?
14        MS. CAHOY:  Objection to form.
15        THE WITNESS:  What I'm stating is in order to
16   launch extended use program for the listed IS4000
17   instruments, there were product design changes.  We
18   couldn't get there without making those design
19   changes.
20   BY MR. Van HOVEN:
21        Q.   And I'm asking that with that
22   understanding, do you disagree with the statement
23   that there is no change to the product design in
24   Section 4 of MCF-19-004?
25        MS. CAHOY:  Objection to form.

1          THE WITNESS:  As I said, there were product
2     design changes to launch this program, and this is
3     in context of the design history file.
4     BY MR. Van HOVEN:
5          Q.   Do you know who redlined this document?
6          A.   Per this e-mail on 60885, Tim Limon was --
7     had taken the lead to redline the document and he
8     was circulating it for prereview.  So this is --
9     this may not be the released version.
10              (Reporter seeks clarification.)
11         Q.   So you believe that it's Tim Limon who
12    wrote in Section 4 that there is no change to the
13    product design; is that right?
14         MS. CAHOY:  Objection to form.
15         THE WITNESS:  I don't know who specifically
16    wrote that bullet point, but what I'm saying is, Tim
17    was circulating this redline, so he had taken the
18    lead and may have received inputs from other
19    functions.
20    BY MR. Van HOVEN:
21         Q.   And do you understand that another
22    rationale for categorizing that -- a major change as
23    a moderate change was there is no change in the
24    intended use from that bullet point?
25         A.   Yeah.  The last bullet point says that we

1              I, the undersigned, a Certified Shorthand
2       Reporter of the State of California, do hereby
3       certify:
4              That the foregoing proceedings were taken
5       before me at the time and place herein set forth;
6       that any witnesses in the foregoing proceedings,
7       prior to testifying, were administered an oath; that
8       a record of the proceedings was made by me using
9       machine shorthand which was thereafter transcribed
10      under my direction; that the foregoing transcript is
11      a true record of the testimony given.
12             Further, that if the foregoing pertains to
13      the original transcript of a deposition in a Federal
14      Case, before completion of the proceedings, review
15      of the transcript ( ) was (X) was not requested.
16             I further certify that I am neither
17      financially interested in the action nor a relative
18      or employee of any attorney of any party to this
19      action.
20             IN WITNESS WHEREOF, I have this date
21      subscribed my name.
22      Dated:  October 17, 2022
23
24                         _____
25                         ANRAE WIMBERLEY, CSR No. 7778