Pages 1 - 85

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE ARACELI MARTÍNEZ-OLGUÍN, JUDGE

| | |
|---|---|
| SURGICAL INSTRUMENT SERVICE COMPANY, INC., | ) )<br>) |
| Plaintiff, | )<br>) |
| VS. | ) NO. 21-cv-03496-VC-AMO<br>) |
| INTUITIVE SURGICAL, INC., | )<br>) |
| Defendant. | )<br>) |
| ———————————————————— | ) |
| IN RE DA VINCI SURGICAL ROBOT ANTITRUST LITIGATION | )<br>) NO. 21-cv-03825-AMO-LB |
| ———————————————————— | ) |

San Francisco, California
Thursday, September 7, 2023

**<u>TRANSCRIPT OF PROCEEDINGS</u>**

**<u>APPEARANCES</u>**:

For Plaintiffs:

           SPECTOR ROSEMAN & KODROFF, P.C.
           2001 Market Street
           Suite 3420
           Philadelphia, Pennsylvania  19103
    **BY:  JEFFREY J. CORRIGAN, ESQ.**
         **JEFFREY L. SPECTOR, ESQ.**


           ROPES GRAY, LLP
           191 North Wacker Drive
           32nd Floor
           Chicago, Illinois  60606
    **BY:  RICHARD T. MCCAULLEY, JR., ESQ.**

Reported By:  **BELLE BALL, CSR 8785, CRR, RDR**
        Official Reporter, U.S. District Court

    (Appearances continued, next page)

**APPEARANCES, CONTINUED**:

For Plaintiffs:

        COHEN MILSTEIN
        88 Pine Street
        14th Floor
        New York, New York  10005
   BY:  **CHRISTOPHER J. BATEMAN, ESQ.**

        HALEY GUILIANO LLP
        111 Market Street
        Suite 900
        San Jose, California  95113
   BY:  **JOSHUA VOIGHT VANHOVEN, ESQ.**

        HAUSFELD LLP
        888 16th Street, NW
        Suite 300
        Washington, D.C.  20006
   BY:  **REENA A. GAMBHIR, ESQ.**

For Defendant Intuitive Surgical, Inc.:

        COVINGTON & BURLING LLP
        Salesforce Tower
        415 Mission Street
        54th Floor
        San Francisco, California  94105
   BY:  **SONYA DIANE WINNER, ESQ.**

        COVINGTON & BURLING LLP
        One CityCenter
        850 10th Street NW
        Washington, D.C.  20001
   BY:  **ASHLEY E. BASS, ESQ.**

        COVINGTON & BURLING LLP
        3000 El Camino Real
        5 Palo Alto Square
        Palo Alto, California  94306
   BY:  **KATHRYN CAHOY, ESQ.**

        HOWREY LLP
        1299 Pennsylvania Avenue
        Washington, D.C.  20004
   BY:  **ANDREW DAVID LAZEROW, ESQ.**

PROCEEDINGS

1    **Thursday, September 7, 2023**                        **2:04 p.m.**

2                        P R O C E E D I N G S

3           **THE COURTROOM DEPUTY:**  Calling Case No. 21-cv-3496 and

4    21-cv-3825, Surgical Instrument Service Company, Incorporated

5    v. Intuitive Surgical, Incorporated, and In Re Da Vinci

6    Surgical Robot Antitrust Litigation.

7           Counsel, please come up to the podiums to state your

8    appearances for the record, starting with the plaintiffs.

9           **THE COURT:**  Counsel, if you will give me just a

10   moment, please feel free to come to the lecterns.  It's not my

11   usual courtroom, so I'm taking just a minute to put everything

12   where I need it.

13          **MR. CORRIGAN:**  Good afternoon, Your Honor.  Jeff

14   Corrigan for the hospital plaintiffs.

15          **MR. MCCAULLEY:**  Good afternoon, Your Honor.  Richard

16   McCaulley on behalf of SIS.

17          **THE COURT:**  Good afternoon.

18          **MR. BATEMAN:**  Good afternoon, Your Honor.  Chris

19   Bateman for the hospital plaintiffs.

20          **MS. WINNER:**  Good morning, Your Honor.  Sonya Winner

21   for defendant Intuitive.  And I have with me my colleagues,

22   Ashley Bass, Andrew Lazerow, and Kate Cahoy.

23          **THE COURT:**  All right.  Counsel -- again, getting

24   everything situated.  Can we recess for a moment?

25          **THE COURTROOM DEPUTY:**  Yes.  The Court is now in

 1    recess.

 2        (A pause in the proceedings)

 3            **THE COURTROOM DEPUTY:**  Be seated.  Court is back in

 4    session.

 5            **THE COURT:**  Okay.  Now that we have had our false

 6    start, and also, before we get started, I just wanted to start

 7    by asking you all -- and you are going to get these handed out

 8    to you -- I want to ask for some help with some of the

 9    evidence.

10        What we need from you all is some help locating certain

11    things in the record.  And what we specifically need are

12    citations from -- for both the redacted and unredacted versions

13    of things.  So what we want from you all is the ECF docket

14    number and the ECF page number.

15        In your demonstratives, the demonstrative from the

16    hospital plaintiffs is a good start, that chart, but it doesn't

17    have the ECF page numbers, which is what would help us

18    tremendously.  So you are going to get passed out to you, from

19    Ms. Solorzano, a short list of things where we would appreciate

20    these citations from you.

21        If some of you here want to work on it now, sure.  No

22    need, but I would like those things from you, if not tomorrow,

23    no later than Monday, say, noon.  So that's the first thing.

24        With that, I thank you all for having provided

25    Ms. Solorzano a proposal about how to proceed in terms of the

1   argument.  I think it makes sense, and should work fine.

2        So as I understand it, right, just to make sure we are all

3   on the same page, we are going to spend about 90 minutes

4   together this afternoon.  Eighty of those will be on the

5   motions for summary judgment.  Ten on the *Daubert* -- on one

6   particular *Daubert* motion.  And as I understand it, right, it's

7   44 plaintiffs on the motion for summary judgment, 40 for

8   defendant.

9        And then as relates to the *Daubert* motion, even though I

10  think we have counsel assigned from each party, or from each

11  set -- for each of the plaintiffs and for the defendant for the

12  *Daubert*, I have only -- I believe that your proposal was only

13  for the hospital plaintiffs, so for defendant to speak.  And I

14  see some of you all nodding along.

15       So, assuming that no one has different thoughts about how

16  we will proceed this afternoon, we'll just go ahead and start

17  there.  Okay.  Please, come on up.

18       **MR. CORRIGAN:**  Your Honor, before I get started, I

19  just wanted to let you know, we've broken it down -- we're

20  going to do 20 minutes hospital plaintiffs, five minutes SIS.

21  Then I've reserved ten minutes hospital plaintiffs on rebuttal,

22  and SIS has reserved five.  That will comprise our 40.

23       **THE COURT:**  And is someone keeping time for you?

24       **MR. CORRIGAN:**  I think so, yes.

25       **THE COURT:**  Let's pin that down just a little bit

1   more.  Who is keeping time for you?

2       (A hand is raised)

3           **MR. CORRIGAN:**  Mr. Spector.

4           **THE COURT:**  Thank you.  I appreciate that.

5       I saw you glance, I thought, at my CRD, and I'm like, oh,

6   no, no.

7           **MR. CORRIGAN:**  No, we got it, yes.

8           **THE COURT:**  All right.  Continue.

9           **MR. CORRIGAN:**  Good afternoon, Your Honor.  And

10  welcome to the case.  My name is Jeff Corrigan and I will be

11  handing the summary judgment argument for the hospital

12  plaintiffs, which does not mean that we ignored your standing

13  order.  We have four younger and less experienced attorneys who

14  are prepared to handle the *Daubert* motions, and my colleague,

15  Chris Bateman, will handle the Elhauge *Daubert* motion, later in

16  this hearing.

17      As you know, I'll be using a PowerPoint today.  And I

18  thought you'd appreciate I came in comfortably under 206

19  slides.  That being said, I know you've read the briefs, and I

20  won't attempt to regurgitate them, but I'm just going to tell

21  you our story, and try to hit some high points along the way.

22          **THE COURT:**  Does anyone not know the story of the

23  206-page PowerPoint?

24          **MR. CORRIGAN:**  My side does.  I told them.

25          **THE COURT:**  All right.  Short version, someone handed

PROCEEDINGS

1  me 206 pages showing up for nothing this complex.  So, they got

2  a stern talking-to.

3          **MR. CORRIGAN:**  I made a mental note, Judge:  Less than

4  206.  See, I'm pretty sharp that way.

5      So Your Honor, defendants, as a matter of routine,

6  generally file summary-judgment motions as well as *Daubert*

7  motions, but plaintiffs rarely do.  As a matter of fact, this

8  is my first summary-judgment motion I've filed in 23 years on

9  the civil side.

10     (Document displayed)

11         **MR. CORRIGAN:**  And the reason, of course, is there

12  were usually so many factual disputes it doesn't make sense.

13  It's not that clear cut.  But there are two issues in this case

14  where it is that clear cut.

15     Oh.

16         **THE COURT:**  If it doesn't advance, I will let you know

17  that I have them on my iPad.

18         **MR. CORRIGAN:**  Yes.

19     (Document displayed)

20         **THE COURT:**  Oh, beautiful.

21         **MR. CORRIGAN:**  All right.  Your Honor, our first issue

22  there is Intuitive has monopoly power in these separate

23  markets.  The minimally-invasive soft tissue -- MIST --

24  surgical robot, and the EndoWrist repair and replacement.

25     Now, I'm not going to say much about this issue, but I

 1    have one slide on it which I think drives the point home.  It's

 2    a series of quotes, all of which are contained in Professor

 3    Elhauge's reports, and all of which support his opinion that

 4    indeed, Intuitive is a monopoly -- a monopolist, and facing no

 5    competition.

 6         (Document displayed)

 7         **MR. CORRIGAN:**  The first two quotes are from

 8    Intuitive, itself.  They're calling Intuitive a monopoly.

 9         The second two quotes are from neutral third parties.  One

10    is a surgeon, and one is an article.

11         (Reporter clarification)

12         **MR. CORRIGAN:**  Sorry.  One is an article.  And they

13    both refer to Intuitive as a monopoly as well.

14         The last click are three series -- series of three quotes,

15    all from Intuitive, all of which are referring to the fact that

16    Intuitive faces no competition.  Including the gem that's the

17    third from the bottom, Intuitive CFO Marshall Mohr, 9/20

18    (As read):

19              "We are sitting at a point where competition

20              isn't here yet."

21         So in September of 2020, for a company that's been in

22    business since late 1990s, he's saying competition isn't here

23    yet.  Our case is that these people are right.  Their case is

24    that these people are wrong.

25         Their economic expert, his opinion that this company has

1   no market power, he has to ignore all these quotes.  And he

2   does.  But who are you going to believe?  This group

3   (Indicating) that lives and works in this industry?  Or their

4   litigation consultant?

5       (Document displayed)

6       **MR. CORRIGAN:**  The next issue that we filed on is the

7   FDA issue.  I'll spend most of my time on that.

8       The IRCs -- they're independent third parties -- would not

9   have been blocked by FDA from competing in the EndoWrist repair

10  and replacement market in the but-for world.

11      There is zero record evidence that the FDA would have

12  blocked these IRCs in the but-for world.  The same way they did

13  not block them in the actual world.

14      That's why this neat visual here:  IRCs were not blocked

15  by FDA from competing in the EndoWrist repair and replacement

16  market, in the actual world.

17      (Document displayed)

18      **MR. CORRIGAN:**  Now, I want to spend a couple of

19  minutes -- interestingly, both sides filed for summary judgment

20  on the same issue.  It's got to be somewhat unusual.  So for a

21  minute I'll play offense; then I'll play some defense.  But

22  here's kind of a summary of our case right here.

23      The alleged need for FDA clearance did not shut down IRCs.

24  Here's the first point.  FDA has never, never determined that

25  510(k) clearance was necessary.  And I'll talk about that one a

1    little bit more in a minute.

2        Number two:  Absent such an FDA determination, IRCs would

3    have and did continue competing in the EndoWrist market.

4        Number three:  IRCs, in fact, entered the market without

5    such clearance, and were driven out by Intuitive's

6    anti-competitive conduct, not by their lack of FDA clearance.

7        And number four:  If FDA clearance were ultimately found

8    to be necessary, IRCs could have obtained it in the but-for

9    world.  And in fact, Restore/Iconocare has already obtained FDA

10   clearance.

11       Now I'll play defense -- and there are no questions of

12   material fact on any of those issues.

13       Number two, I'm going to play a little defense here.  This

14   is why Intuitive cannot win its regulatory bar argument.  To

15   win that argument, Intuitive must show -- and there's some

16   overlap here -- that the FDA would have blocked IRCs from the

17   EndoWrist repair activities, absent 510(k) clearance.

18       Now, Intuitive has to show that 510(k) clearance was

19   required.  But, also, that the FDA would have blocked them,

20   when there is no evidence in the record that would have

21   happened.  So that's what they have to show.  However, the FDA

22   did not block IRCs from their EndoWrist repair activities,

23   absent a 510(k) clearance, in the actual world.

24       And even if they showed that 510(k) clearance is required,

25   and that the FDA would have blocked them in the but-for world,

1    they still have to show that IRCs would not have obtained such

2    510(k) clearance in the but-for world.

3         But, Restore/Iconocare did obtain 510(k) clearance in the

4    actual world.  And they or other IRCs could have obtained it

5    earlier, if it hadn't been futile in light of Intuitive's

6    anti-competitive conduct.

7         So I told you I would talk a little bit more about number

8    one, there.  And here's number one:  FDA has never determined

9    that 510(k) clearance was necessary.

10        (Document displayed)

11        **MR. CORRIGAN:**  And here's the famous July 22, 2022

12   email.  And I highlight the title there.  It's from a guy named

13   Anthony Lee that worked at the FDA, and it's dated July 22,

14   2022.  This is the last email in a chain between FDA employees

15   and Rebotix about whether Rebotix needed 510(k) approval.  And

16   in some of the previous emails, Mr. Lee said he thought that

17   Rebotix did need 510(k) appraisal.

18        So Rebotix pushed back and said:  We want to appeal.  We

19   don't agree with that; we want to appeal.

20        So Mr. Lee then sends this letter, this email, on that

21   date.  And he's -- it's almost painful how sheepish this

22   language is.  This guy has to walk back what he's been talking

23   about for a while here (As read):

24             "I used the term 'decision' in a manner that

25             may have incorrectly implied that FDA had

1              made an official regulatory determination

2              related to Rebotix."

3        But in fact, this decision did not bind the FDA.  So if it

4    doesn't bind the FDA, why would it bind the IRCs?

5        Not only that, but there's the punchline:

6              "That is why there is nothing for Rebotix to

7              appeal at this time."

8        So Rebotix pushes back; there's nothing to appeal.

9        (Document displayed)

10       **MR. CORRIGAN:**  Another piece of testimony here.  This

11   is from a deposition from a guy named Stan Hamilton, who was

12   with Rebotix.

13       I was at the deposition.  And Intuitive counsel walked

14   Hamilton through all the previous emails in this chain.  And I

15   thought:  Wonder what he's going to do when he gets to the

16   July 22nd email.  When he got there, he just punted.  No

17   further questions.

18       So me, of course, being the savvy, skilled litigator that

19   I am, I put the email in front of him, and I said,

20   "Mr. Hamilton, in your mind, what does this do to the other

21   prior emails?"  This is what he said.

22       (Document displayed)

23            **MR. CORRIGAN:**

24              "It negates anything that they were appearing

25              to do with..."

**PROCEEDINGS**

1      (Reporter clarification)

2           **MR. CORRIGAN:**  Oh, sorry.

3            "It negates anything that they were appearing

4            to do with respect to a regulatory

5            determination or regulatory enforcement, and

6            that was made clear in the last meeting that

7            the timing was before this, and that included

8            some fairly high people in the FDA."

9            "He was saying a lot of things that then got

10           walked back, and you can see the result."

11     So the way Intuitive handled this deposition is indicative

12     of some of the poor -- some of the damaging facts.  They just

13     pretend it didn't exist.  When you get to that point, just

14     pretend it didn't exist.

15          (Document displayed)

16          **MR. CORRIGAN:**  Now, Intuitive agreed, pre-litigation,

17     that FDA did not require clearance to use EndoWrists.  Matter

18     of fact, multiple internal determination that FDA did not

19     require 510(k) clearance to extend the uses or refurbish

20     EndoWrists.

21          Their extended use program in August of 2020.  They

22     extended the lives on certain Xi EndoWrists.

23          And in their NFJ, which is a non-filing justification,

24     sort of  -- it's something they tell themselves as to why they

25     don't have to file for 510(k)., (a) there (As read):

**PROCEEDINGS**

1              "Does not involve any changes to the intended

2              use or the instrument design."

3      And the second one goes even further:

4              "The changes described in this non-filing

5              justification do not require premarket

6              notification submission before commercial

7              distribution."

8      And the second decision they made internally when they did

9  Project Dragon, which was their program to refurbish and reset

10 instruments:

11             "Clearance/registration required:  No."

12     So, two separate occasions several years apart, they

13 determined internally, before this case started, that 510(k)

14 clearance was not required.

15     Now, the FDA's refused to subject IRCs to remanufacturing

16 requirements.  One of the things we agree about with Intuitive

17 is:  The FDA's looked at this issue for years.

18     Now, did they forget about it?  Why haven't they weighed

19 in?  Did they forget about it?  Of course not.  This has been a

20 hot-button issue for 30 years.  But, they still haven't

21 subjected them to the 510(k) requirement.  And, why?

22     And this is from our FDA expert.  Essentially she says

23 (As read):

24             "Requiring all non-OEM entities...to register

25             as...remanufacturers and abide by relevant

1              regulations would substantially increase the

2              cost to hospitals (and, ultimately, to

3              patients) of reusable devices.  And so, in

4              spite of enormous pressure from OEM lobbying

5              and OEM trade groups," -- like Intuitive --

6              "FDA has steadfastly refused to subject those

7              service providers to remanufacturing

8              requirements."

9         The second bullet is kind of more of the same:  The FDA

10   doesn't see any health problems, so why saddle them with all

11   these costs?  Another point in our brief, where the FDA

12   describes these third parties as critical to the healthcare

13   system.

14        And the third bullet is an interesting one.  In 1998, the

15   FDA revoked the guidance that required reconditioners and

16   rebuilders to seek 510(k) clearance.  And indicated further

17   rulemaking was required.  To this day, they have not put out

18   that further rulemaking.

19        So for 30 years, they've sat on the sideline.  Thirty

20   years, and it goes on today.

21             **THE COURT:**  Let me interrupt for just a moment.

22             **MR. CORRIGAN:**  Sure.

23             **THE COURT:**  I have a question here.  And, you all will

24   get a chance, as well.  But, is your position that if the FDA

25   takes no enforcement action, that means that that action is not

1   violating FDA regulations?

2          MR. CORRIGAN:  No, not necessarily.  I mean, they've

3   looked at it for years, though.  It's not that they don't know

4   it exists.  They've looked at it.  The July 22 email says that.

5   There's a number of emails leading up to that.  So it's not

6   that they just didn't take any enforcement.  They punted, when

7   it was right in their lap.  So it's not just a question of

8   enforcement or not.

9       They knew about it, and they haven't done anything about

10  it.  That's our point.  They've sat on the sidelines not by

11  accident, not by mistake.

12      But, you know, I just showed you the clip from our expert.

13  They have sat on the sidelines, because there were no adverse

14  events, there were no health problems.  And therefore, they

15  don't see the case for saddling them with extra costs on groups

16  that are critical to the healthcare system.

17      Does that answer your question, Your Honor?

18          THE COURT:  It does.

19          MR. CORRIGAN:  Thank you.

20      So the last one there is the punchline:

21          "Intuitive's request that this Court ignore

22          FDA's caution and instead require 510(k)

23          clearance MUST be rejected."

24      Now, we cite the *Nexus Pharmaceutical* case there,

25  Your Honor, which is a 2022 case.  And I'll give you one line

1  from that case which kind of lets you know where it's going

2  (As read):

3          "We have been protective of FDA's statutory

4          monopoly on enforcement authority."

5    So the Ninth Circuit in this case is saying:  We stay out

6  of it.  If it's the FDA's purview, they do it first.

7    (Document displayed)

8    **MR. CORRIGAN:**  Now, I'm going to play defense a little

9  bit here.  And this is from -- this is from Intuitive's brief.

10  Okay?  So, in order -- Intuitive says that we can't show --

11  (As read)

12          "Proximate causation of antitrust injury to

13          these plaintiffs is lacking here for multiple

14          reasons..."

15    And they cite three different reasons, and I'll take them

16  one at a time.  Number one -- this is the main one:

17          "...the governing regulatory scheme precluded

18          the 'competition' through remanufacturing of

19          EndoWrists that plaintiffs claim should have

20          existed;"

21    Now I want to take a clip from their brief.  Now, as you

22  know, in the summary judgment brief you put your facts down.

23  And then you pivot off the facts, and you make your legal

24  arguments.

25    So here's a clip from their facts section (As read):

**PROCEEDINGS**

1          "Rebotix entered into a relationship with

2          Restore..."

3      And I'll skip to the highlighted.

4          "Restore performed these functions for

5          several months, but Rebotix terminated the

6          contract in late 2019."

7      So here's where the IRCs stop.  Stop working.  And they

8   cite Exhibit 20 there.  But, Intuitive says nothing about the

9   FDA stopping them.  Right?  And we'll see why.

10      Intuitive cites to their own Exhibit 20, and that's Glenn

11   Papit's testimony.  He was a Rebotix guy.

12      Papit says:

13          "We discontinued the relationship [with

14          Restore] because of a lack of performance."

15      Well, what caused lack of performance?  There's a clip

16   from the Restore summary-judgment opinion there (As read):

17          "There is evidence...that this 'lack of

18          performance' that led to the termination of

19          the licensing agreement was a direct result

20          of Intuitive's alleged anti-competitive

21          conduct..."

22      So we're talking about Restore and Rebotix.

23      What did Restore and Rebotix do?  They both sued Intuitive

24   for shutting them down, they both survived summary judgment,

25   and they settled their cases on the eve of trial.

 1          And in connection with those settlements, those IRCs are

 2   free to continue repairing and resetting the EndoWrists.  They

 3   didn't stop them.  The settlement allows it to go forward.

 4          **THE COURT:**  Can I pause you there?

 5          **MR. CORRIGAN:**  Sure.

 6          **THE COURT:**  And this'll preview for you all a question

 7   that I would like answered by every party, which is why any of

 8   you think that I should reach a conclusion different than

 9   either of the District Courts in Florida, which essentially

10   denied everyone's summary judgment, and made you all prepare

11   for trial, which, of course, never happened.

12          But I would -- you know, I saw in the May 31st statement

13   that I asked you all to file, the further case-management

14   statement, a short explanation that you think that in your

15   briefing you've given it to me for why the Florida cases aren't

16   dispositive.  But, I would appreciate it if today you could

17   give it to me, sort of short and punchy, what Ninth Circuit

18   precedent is -- I'm assuming that there's something different

19   in the Ninth Circuit, as opposed to the Eleventh, that requires

20   a different result.

21          So as long as we're bringing up the Florida cases, let me

22   tell you --

23          **MR. CORRIGAN:**  Sure.  I'll be very short and punchy,

24   Your Honor.  Let me go back a little ways, to before you were

25   on this case.

1        Intuitive filed a motion to stay in August of 2021.  And

2   Judge Chhabria denied that motion to stay, in one sentence.

3   Okay?  On Page -- it's Document No. 43, and on Page (ii), they

4   said -- oh, sorry about that.

5        Intuitive says, and I quote:

6            "The resolution of those pending actions will

7            necessarily address numerous identical fact

8            and legal issues..."

9        THE COURT:  I've got their -- I've got them on record.

10  I'm curious why you think you are entitled to summary judgment.

11  And I realize that the parties -- you represent the hospital

12  plaintiffs.

13       MR. CORRIGAN:  Yes.

14       THE COURT:  So maybe you are differently situated then

15  the folks there.  But --

16       MR. CORRIGAN:  Well, my question is your question:

17  Are these courts wrong?

18       Now, here's (Indicating) one reason why they're not wrong.

19  They did not cite either opinion in either brief.  So they've

20  made no attempt to show you that they're wrong, they've made no

21  attempt to distinguish those cases, because they necessarily

22  address numerous identical fact and legal issues.

23       So in those cases, the judges, as you know, denied summary

24  judgment for Intuitive.  And that's why they're not in the

25  case.

1    But in the *Rebotix* case, okay, the *Rebotix* court said --
2  and I have the quote here somewhere -- okay.  On Page -- I
3  think it's Page 8, but I'll let you know shortly -- the Court
4  there said: The FDA has not ruled.  They have not made a final
5  official ruling.  So I'm not going to rule on summary judgment
6  for Intuitive.  But, the FDA could still make a ruling before
7  the eve of trial.  And if they don't -- if they do that, we'll
8  deal with it.

9    But if the FDA does not make a final official ruling
10 before the eve of trial, she invited Rebotix to renew their
11 summary-judgment motion.  And she said:  I will grant it.

12   So she's saying a couple things there.  One is she's
13 saying that the FDA has not made a determination.

14   But, two, she's saying:  If they don't come back in time
15 that I rule, plaintiff is going to win.

16   Now, we have seen nothing.  A lot of the citations in
17 these opinions are from the Supreme Court.  They both cite the
18 *Zenith* case on the key issue in this case, which is their harm.
19 How do you prove the harm.

20   So our position is that there was no -- there was no
21 distinguishable.  The facts are the same.  The legal issues in
22 Intuitive's own words are the same.  And the result should be
23 the same, except on this point where, if the FDA still has not
24 -- and to take the mystery out of this, the FDA has still not
25 -- the *Rebotix* opinion was August of 2022.  The FDA has still

1   not spoken on this since July of 2022.  At this point in time,

2   the record is the same as stood before the *Rebotix* judge.  So

3   there should be no difference in the result.

4        That's our answer to that question, Your Honor.  Is that

5   sufficient?  Or --

6            **THE COURT:**  Yes.

7            **MR. CORRIGAN:**  Okay, thank you.

8            **THE COURT:**  Please proceed.

9            **MR. CORRIGAN:**  So I'll breeze through this one pretty

10  quickly.  And it's -- again, they make the same argument.  They

11  say that Rebotix and SIS stopped working together, but they say

12  nothing about the FDA stopping them.

13       They cite deposition testimony from the SIS exhibit, from

14  the SIS president.  He only talks about why -- what they were

15  doing, not why they stopped.  And of course, why they stopped

16  was Intuitive shut them down.

17       So the first reason there, the main one, is meritless and

18  should be rejected.  All right?

19       Their second reason in their brief:  These plaintiffs had

20  no interest in using manufactured EndoWrists.  That's a

21  head-scratcher.  When I saw that, I thought:  Why would you say

22  something, not just once, but multiple times in multiple

23  briefs, that's so easily disproven?

24       Here's what I mean.

25       (Document displayed)

1          **MR. CORRIGAN:**  Now, first of all, it doesn't even

2    matter, right?  Our damages analysis is that competition would

3    have lowered prices for all plaintiffs.  All plaintiffs.  So

4    that regardless of who is seeking the -- who wants to use the

5    reset EndoWrists, doesn't matter.

6          Number two -- I'm going to skip number two because I have

7    only a brief moment.  All plaintiffs were interested in using

8    repaired EndoWrists.

9          Now, here's Jose Gonzalez.  He was the director of surgery

10   at Larkin.

11         I got about a minute left.

12         **MR. MCCAULLEY:**  You can have two of mine.

13         **MR. CORRIGAN:**  Thanks, Rick.

14   He was the director of surgery at Larkin.  Okay, Larkin

15   Community Hospital.  And I picked them because I worked with

16   them for years.  They're down there in Miami, doing God's work.

17   They deal with prison population; they deal with nursing home

18   population; they got a large percentage of Medicaid population.

19   And they're always up against it, somehow.

20         So Mr. Gonzalez is the director of surgery.  And he was

21   the right-hand man to the CEO, who was Sandy Sosa-Guerrero.

22   And his deposition, almost the entirety of it, was about their

23   interactions with a company called Revanix, who is a

24   distributor for Rebotix.  He talked about his interactions.

25   There were emails, there were price lists, there was testimony.

1   There was an in-person meeting.

2       Here's a clip from his testimony.

3       (Portion of audio recording played in open court, not

4   reported)

5       **MR. CORRIGAN:**  So there, he is talking about their

6   interest in dealing with Revanix on resetting the instruments.

7   So the second -- the second answer there is meritless and

8   should be rejected.

9       And let me just talk about their third reason there

10  (As read):

11          "...insofar as plaintiffs' claims relate to

12          Xi/X EndoWrists, no potential competitor has

13          ever had the ability to re-set those

14          devices."

15      There's another head-scratcher.  That can be disproven

16  with one snippet of deposition testimony.  One snippet.

17      (Document displayed)

18      **MR. CORRIGAN:**  And there it is.  That's, again, Stan

19  Hamilton.  Right after the bolded (As read):

20          "Are you saying that from a technical

21          standpoint, Rebotix has actually reset the

22          usage [counter] on an Xi EndoWrist instrument

23          as of today?

24          **"ANSWER:**  ...I said yes."

25      (Reporter clarification)

1          **MR. CORRIGAN:**  Not at all.  There's the quote right

2    there from Mr. Hamilton:

3              **"QUESTION:**  Are you saying that from a

4              technical standpoint, Rebotix has actually

5              reset the usage [counter] of an Xi EndoWrist

6              instrument as of today?

7              **"ANSWER:**  ...I said yes."

8         So how would they say he doesn't have the ability; nobody

9    had the ability?

10        I'll click through that one.

11        Therefore, the last reason is meritless, and should be

12   rejected.

13        And that's all my time.  Thank you, Your Honor.

14         **THE COURT:**  While you all change up, I will not hold

15   it against you if you speak more slowly so that Ms. Ball can

16   keep up with you.  So while I don't want -- while I don't want

17   you all to think that means we are going to be here an extra

18   half an hour, please --

19         **MR. CORRIGAN:**  No, I was warned a couple times.

20         **THE COURT:**  No, no, you're -- that's why I want -- I

21   would like that to be the last time.

22         **MR. CORRIGAN:**  (Inaudible)

23         **THE COURT:**  So yes, please.  If it -- don't -- there's

24   no red light; I'm not going to turning off the mic.  You may

25   just initially get a stern look.

1      But, take a little extra time.  It's fine.

2         MR. MCCAULLEY:  Thank you, Your Honor.  Mr. Corrigan

3   owes me a few minutes, but we'll figure it out amongst

4   ourselves.  I just want to make a few points, briefly.

5      As Your Honor is aware I represent SIS.  And we're a

6   little bit different case.  We are an IRC.  We're the company

7   that was involved in the process of resetting the counters for

8   the hospitals.  For our friends like the plaintiffs, and

9   Larkin, and the other hospitals that are part of the purported

10  class.  I just want to touch on a few points that are a little

11  bit different from our brief.

12     I join Mr. Corrigan in saying that we believe that the

13  Florida courts got it right, for the reasons that he said.  I'm

14  not aware of anything in the Ninth Circuit law that's more

15  restrictive that than Eleventh Circuit that would make a --

16  that would argue for a different result.  So I think we're in

17  the same spot, and we agree with everything that he said.

18     There's one issue that comes up in the briefing on our

19  case about the change from a pin connection to an RFID chip for

20  the Xi instrument.  And much of the argument that is offered by

21  the defendants relates to the fact that they say we haven't

22  proven a less restrictive alternative.

23     I stand by our briefing on that point, that we have

24  offered both technical and contractual provisions that could be

25  less restrictive.  For example, you could not threaten to shut

1   down somebody's robot if they used a reset counter on an

2   EndoWrist.

3       But the one point that I think gets skipped over is

4   whether or not, in the second prong of the analysis, the

5   defendants have established that they had a non-pretextual

6   pro-competitive reason for making that change.

7       And what we would have expected here, Your Honor, is to

8   see a bunch of contemporaneous emails that talked about the

9   benefits of making that change.  We would have expected to see

10  a bunch of internal discussions, documents, test reports, that

11  led up to making that technical change in the Xi from the pin

12  connection to the wireless.  But we don't see any of that.  And

13  I think it's telling.

14      And I would invite the Court to look at the briefing and

15  look at the evidence that they cite.  They don't cite to

16  contemporaneous documents; they cite to a couple of paragraphs

17  in their expert report that talks about, you know, potential

18  reasons that they might have made the change.

19      But what we would expect to see is what the Court referred

20  to in the *Allied* case at Page 1001:  Substantial

21  contemporaneous documents at the time that the change was made

22  in the product that told the compelling story about why they

23  were making the change.

24      We've got three AmLaw 20 firms against us Your Honor.

25  They've got all the information.  They've got access to the

**PROCEEDINGS**

1    Intuitive employees; they've got access to all the email.  We

2    didn't see any of it.  We didn't find it when we looked in the

3    documents.

4        What we found is what we've attached as Exhibits 33 and 34

5    to the VanHoven declaration, which are contemporaneous emails

6    from the engineers involved in the project in 2011, that said

7    the reason that they were doing this is to keep people from

8    reprogramming those EndoWrists.

9        They don't have any countervailing evidence to support

10   their position.  They have after-the-fact, fig-leaf-like

11   concocted arguments to support a pro-competitive rationale for

12   making the technical change in the EndoWrist.

13       I'd like to speak just briefly about the Lanham Act as

14   well, because they -- and I'll go very quickly, and focus on

15   their statements.

16       We've accused them of a Lanham Act violation, for the

17   letters that they sent out.  And they have come back and said:

18   Well, that's a non-actionable opinion.  But there's an

19   exception to that rule, Your Honor, under Ninth Circuit law.

20   It has to be a genuinely-held belief.

21       And I would refer to the slide that Mr. Corrigan showed

22   up, his Slide No. 8, that talked about when they were looking

23   -- "they" being Intuitive -- were looking internally at doing a

24   similar type of project, they concluded FDA approval wasn't

25   necessary.  Yet, they went out with a scare tactic to the

1   industry, saying it was necessary.

2        So, Your Honor, we have at least a question of fact as to

3   whether or not that was a genuinely-held belief, a

4   genuinely-held opinion, or whether that was just a deceitful

5   statement made to intimidate the market.  And we're entitled to

6   the jury on that.

7        The last point that I'll make is:  That letter was signed

8   by chief of regulatory and legal counsel.  And to say that

9   that's a lay opinion is belied by the fact of who they had sign

10  the letter.

11       I tried to make it brief, and I tried to talk slowly.

12  I'll reserve whatever time I have left for rebuttal.

13       Thank you, Your Honor.

14            **THE COURT:**  Thank you, counsel.

15            **MS. WINNER:**  Good afternoon, Your Honor.

16            **THE COURT:**  Give me one second to get mine.

17            **MS. WINNER:**  Sure.

18            **THE COURT:**  That -- yeah.

19       Go ahead, Ms. Winner.

20            **MS. WINNER:**  Thank you, Your Honor.

21       I do plan to respond briefly to what plaintiffs' counsel

22  have said about their affirmative motion for summary judgment,

23  although I think it was largely answered when counsel had to

24  say:  Who are you going to believe?

25       When you're asking that question, what you're basically

1  saying is that this is something for the jury, as to who is

2  going to be believed on something.

3      But anyway, what I'd like to do is to start today with the

4  first issue that's set out in our own motion for summary

5  judgment.  And that's the question of whether the alleged

6  injury for which plaintiffs seek damages in this case can, as a

7  matter of law, be treated as antitrust injury.  If that issue

8  is resolved in our favor, this issue should make it unnecessary

9  for the Court to address the plaintiffs' motions.

10     Now, the plaintiffs' arguments in their briefs, and again,

11 today, dance around the edges of antitrust injury.  But they

12 never really confront it.  Our basic point is this:  Plaintiffs

13 cannot establish antitrust injury for their claims about

14 EndoWrists, because none of the entities that were involved in

15 modifying EndoWrists to bypass their use counters, including

16 SIS, had a legal right to engage in that business without FDA

17 clearance, which they did not have.

18     Now, plaintiffs' counsel spent a lot of time today on the

19 issue of causation.  What caused those companies to go out of

20 business.  But to state an antitrust claim, it is not enough

21 for the plaintiff to show that it suffered injury that it

22 claims was caused by the challenged conduct.  It must also

23 show, as an independent element of its burden of proof, that

24 the injury is of a kind that the antitrust laws were intended

25 to prevent.

1    For purposes of these motions, the issue of antitrust

2    injury, distinct from causation, presents two questions.

3    First:  Can antitrust injury be shown, based on a plaintiff's

4    inability to engage in a business that the law prohibits,

5    either because the plaintiff doesn't have the necessary

6    regulatory clearance, or for some other reason?

7    Second question, of course, is whether the activity in

8    this case, the remanufacturing of used EndoWrists without FDA

9    clearance, is a lawful one that can provide a basis for

10    antitrust injury.

11    So let me start with the first question, which plaintiffs'

12    counsel did not talk about.  The overwhelming majority of the

13    K courts (Phonetic) that have addressed the question have held

14    that a plaintiff cannot rest a claim of antitrust injury on its

15    inability to pursue business activities that are not

16    permissible under an applicable regulatory regime.

17    **THE COURT:**  I'm going to pause you for just a moment.

18    **MS. WINNER:**  Sure.

19    **THE COURT:**  Because -- well, that feels like the

20    question on the table, though, right?

21    The one thing that you all seem to want is an ultimate

22    resolution, look.  And to my mind, the folks you really want to

23    hear from is the FDA.  And, unable to get them to take -- to

24    give you a final answer, you've come to this district; you've

25    come to the courts in Florida.

1    But I want to push you a little bit, because what I'm

2  gathering the dispute is is ultimately whether the work that's

3  being done by SIS is repair or remanufacturing.  And, like,

4  that feels like the million-dollar question, because that tells

5  us whether what they're doing requires the 510 clearance --

6  510(k) clearance, or not.

7    So I hear you very definitively saying that it was

8  required, and I just want to push back on that.

9         **MS. WINNER:**  Sure.  And that's -- that is the big

10  question here.  Because I -- I don't think it is seriously

11  disputed -- and I could spend more time talking about the

12  cases; I don't think Your Honor needs it.

13    The cases are pretty clear that if it would be required --

14  they didn't have it; it's undisputed they didn't have it --

15  then they cannot prove antitrust injury.  And again, that's

16  different from causation.

17    You asked, by the way, about the Florida decisions.  I

18  think that's one of the reasons that neither side made much of

19  the Florida decisions in our summary judgment papers.

20  Although, we did actually cite it.  I think it's in a footnote

21  in our brief, but we did refer to them.

22    One of the reasons is they didn't really talk about --

23  they didn't go really on the issue of antitrust injury, so much

24  as the question of causation.  And they found that on

25  causation, did the lack of FDA -- was the lack of FDA clearance

1  the cause of them going out of business, that that was a

2  disputed issue of fact.

3       That's a different question from the question of whether

4  operating without FDA clearance is something that could be a

5  basis for antitrust injury.  And in this district, and in the

6  Ninth Circuit, the law is much stronger on that subject.

7       You asked about the Ninth Circuit versus the Eleventh

8  Circuit.  There really isn't -- I don't think there actually is

9  any Eleventh Circuit case law on that.

10      There is a law on that in this circuit.  There's numerous

11 decisions from judges in this court, there's language in

12 decisions of the Ninth Circuit, and of course, there are many

13 decisions from other courts all across the country that, on the

14 question of antitrust injury specifically, you know, support

15 our position.

16      But let me get to Your Honor's question, which is:  Did

17 they -- did they need -- is remanufacturing EndoWrist without

18 FDA clearance unlawful, and is that something that we can

19 properly bring to Your Honor.

20      And, and let me just start with the law here.  They --

21 they have offered a lot of discussion in their briefs about how

22 mere service or mere repair of EndoWrists would not require

23 endo- -- FDA clearance.  And that's really a red herring,

24 because that's not the question.  The question is:  Is this

25 remanufacturing?  There is a regulation on that, if we can put

1    it up.

2        (Document displayed)

3        **MS. WINNER:**  We've cited this on our brief.  There's a

4    regulation that defines what remanufacturing is.  And this is

5    definitive from FDA; this is binding law.

6        Now, I want to start with what no -- in talking about

7    this, what nobody disputes here.

8        First, plaintiffs do not dispute that if the modifications

9    we're talking about constitute remanufacturing under this

10   regulation, FDA clearance is required.  No dispute about that.

11   And we said it.  We cite the regulations in our brief that

12   establish that.

13       They argue that other kinds of activities that are not

14   covered by this regulation don't require FDA clearance, but

15   that's not the issue here.

16       Second, it's also undisputed that none of the would-be

17   competitors who Intuitive is alleged to have stymied had FDA

18   clearance for remanufacturing EndoWrists.

19       There's zero evidence in the record that Intuitive ever

20   did anything to interfere with anybody's ability to get FDA

21   clearance, or that anybody was deterred from seeking FDA

22   clearance, as a result of anything Intuitive did.

23       In fact, Rebotix applied for FDA clearance back in 2015.

24   They withdrew that application, but there's no suggestion in

25   the record that it had anything to do with Intuitive.  They

1  withdrew it because FDA found their application deficient, and

2  said they were going to have to develop and provide a lot more

3  expensive safety testing data in order to get clearance.

4       Then, Iconocare sought, and last year, actually obtained

5  FDA clearance.

6       And just so that it was very clear, this was the first

7  time -- when Iconocare got its clearance, that was the first

8  time that ever happened.  Intuitive immediately made public to

9  everyone, very clear, that it had no objection to anybody using

10 FDA-cleared remanufactured EndoWrists.

11      Intuitive's issue has always been -- and it's been very

12 clear, including in the communication counsel was pointing you

13 to a few minutes ago, it's been very clear that the issue is

14 remanufacturing EndoWrists without FDA clearance.

15      The third thing, there's no factual dispute about what

16 they were actually doing here.  They were taking this very

17 delicate surgical instrument.  They were cracking it open,

18 prying the top off it, taking a large piece of it out, prying a

19 chip off a circuit board, soldering it onto a different circuit

20 board that would have another extra component to it that they

21 were adding so it could circumvent the use counter.  Then

22 putting everything back together again, and sending it out to

23 be used on surgical patients.  So there's no dispute about what

24 they were doing.

25      So, back to the regulation.  Again, there's no dispute,

1   this is -- this is the law.  This regulation is the law

2   (Indicating).  And the plaintiffs' briefs offer virtually no

3   discussion of how this regulatory language actually applies to

4   what they were doing here.  They didn't discuss it here today.

5        Instead, what they argue is that there was a general

6   policy debate about -- and this was the quote on their slide

7   from their expert -- whether all non-OEM entities who do

8   anything have to have clearance.

9        Well, that's not what we're talking about.  Non-OEM

10  entities do a lot of things that don't require clearance.  But

11  when they do remanufacturing within the meaning of this

12  regulation, clearance is required.

13       There's been a general policy debate about whether FDA

14  should promulgate additional rules for entities that engage in

15  reconditioning or servicing or repair that is not

16  remanufacturing.  FDA has not issued new regulations about

17  that.  But again, that's not the issue that is before

18  Your Honor here today.

19       So let's look at the regulation.  It says:

20            "*Remanufacturer* means any person who

21            processes, conditions, renovates, repackages,

22            restores, or does any other act to a finished

23            device that significantly changes the

24            finished device's performance or safety

25            specifications, or intended use."

1      The performance and safety specifications of an EndoWrist

2  include a limit on the number of uses, for which there has been

3  a full safety validation done, with extensive testing.  There's

4  no dispute in the record about what has actually been cleared

5  by FDA for these devices.

6      The plaintiffs argue that the usage specifications for an

7  EndoWrist are too strict.  That the use limits are too low.

8  And those are arguments they are perfectly entitled to make to

9  FDA in a 510(k) application for clearance, so that they can add

10  mod- -- add more uses through their modifications.

11      But that doesn't change the fact that the current use

12  limits are what FDA has cleared.  So further clearance is

13  needed, if someone wants to modify an EndoWrist to ask more --

14  add more.

15      So let me talk about what FDA has said about this.  And

16  I'm also going to -- I'm going to circle back to what they say

17  FDA has said.  But let me start with the -- the undisputed

18  record on what FDA has actually said.

19      (Document displayed)

20      **MS. WINNER:**  Going back to 2015, FDA told Rebotix when

21  it was issuing deficiency letter on its 510(k) submission,

22  requiring more testing, this was in part because of the fact

23  that the device that they were creating is not simply a

24  reusable device, but it's a third-party

25  reprocessed/remanufactured device.

1        So FDA back in 2015 was saying:  This is a remanufactured

2   device that you are creating here.

3        (Document displayed)

4        **MS. WINNER:**  And this was in Exhibit 22.

5        In Exhibit 23, then, also in 2015, FDA told Rebotix, in no

6   uncertain terms:

7             "You may not market this device until you

8             have received a letter from FDA allowing you

9             to do so.  If you market the device without

10            FDA clearance, you will be in violation of

11            the Federal Food, Drug and Cosmetic Act."

12       In 2018, in response to an inquiry from a distributor for

13  Rebotix, --

14       (Document displayed)

15       **MS. WINNER:**  -- FDA said:

16            "...if the use-life counter is reset or

17            extended past the number of available use

18            lives, then the device specification are

19            changed.  As such, you would be considered a

20            remanufacturer..."

21       Under the regulation.

22       (Document displayed)

23       **MS. WINNER:**  Then in 2020, after looking at Restore's

24  website and seeing what Restore was doing, FDA said:

25            "Based on this information, we believe that a

 1                510(k) is needed before you continue your

 2                operation."

 3        (Document displayed)

 4        **MS. WINNER:**  Exhibit 35, in 2021, an "It has come to

 5    our attention" letter -- which is a form of letter that experts

 6    on both sides agree is sort of the first step of an enforcement

 7    action -- was sent to Rebotix, saying:

 8                "...the da Vinci S EndoWrist Instruments were

 9                cleared for a set number of uses."

10        Then, in the process of clearing Iconocare's 510(k)

11    application, there was a requirement that FDA specifically

12    imposed on Iconocare -- and this is Exhibit 41 -- saying:

13                "Since your device is considered a

14                remanufactured device, please include the

15                following on your device housing:

16                'Remanufactured By'..."

17        So they were required to put that right on the device that

18    it was remanufactured.

19        (Document displayed)

20        **MS. WINNER:**  And then in 2022 -- this is Exhibit 37 --

21    back to Rebotix (As read):

22                "We...request that Rebotix stop engaging in

23                the current activities until an application

24                is reviewed and cleared or granted."

25        Around the time that the Iconocare application was

1    applied, then, up on the website, the FDA website, they put up

2    an official designation for -- what they call a "product

3    code" -- for a remanufactured instrument -- surgical instrument

4    for a computer-controlled system that has been remanufactured

5    to extend its use life.

6        And this is Exhibit 1, Figure 3, is where this is in the

7    record.

8        Now, you heard about -- there were two pieces of evidence

9    that got cited on all of this by plaintiffs today.  One is this

10   email from Mr. Lee.

11       Now, Mr. Lee did not say: Oh, we've changed our mind.

12       Mr. Lee, in fact, if you saw the whole email -- it wasn't

13   all on the slide -- would say:  We're still encouraging them,

14   actually, to file a 510(k) application.

15       What he was saying is this was -- this was not the kind of

16   official appealable order that they -- that they could appeal

17   at that point.

18       But FDA explained to them that they could get an

19   appealable order that they could appeal, if they wanted to.

20   They chose not to do that.

21       As for the Hamilton testimony that was cited to you,

22   there's a snippet from that testimony.  They didn't give you

23   the whole thing.

24       We actually objected to this testimony in our reply brief,

25   and we restate our objection now.  It's -- it's just -- it was

1    responding to a question basically asking the witness what he

2    thought was his impression of what FDA had in mind.

3         Insofar as it was purporting to offer unattributed hearsay

4    from people he didn't identify, it wouldn't be admissible, on

5    that ground.  And it's certainly not admissible about his

6    opinion about what FDA thought.

7         But, that's basically what they've got.  FDA's actual

8    statements about this have been consistent, over a period of

9    years.

10        Now, to be sure, there has not been an enforcement action.

11   There never needed to be one.  That's the -- that's really the

12   easy answer to that.

13        It warned -- FDA warned both Rebotix and Restore,

14   repeatedly, that what they were doing required FDA clearance.

15   It even went so far as to send that preliminary letter to

16   Rebotix about it.  But the remanufacturers, Rebotix and

17   Restore, back down, and stopped what they were doing.

18        Now, we can go back and forth all day about why they made

19   that decision.  Maybe they were listening to FDA; maybe they

20   were afraid of Intuitive.  Whatever their reason was, the

21   bottom line is they stopped, so there was nothing to enforce.

22        So this is not a situation where we have something that's

23   sitting before FDA, FDA's pondering this, has been pondering it

24   for years.  FDA hasn't been pondering anything at all on this

25   particular question.  FDA has given the same clear answer to

1  the question every single time anybody has asked, and a lot of

2  times when people tried not to ask.

3      These have been -- these may not have been formal

4  regulations.  The formal regulation is what I showed Your Honor

5  earlier.  That's on the books.  That's the law.  But these

6  statements were made by FDA employees, in the course of their

7  ordinary authority, within FDA.  There's no suggestion in the

8  record that any of these were unauthorized, off-the-reservation

9  comments.

10     And so, you know, the enforcement issue really is a red

11  herring.  And for purposes of antitrust injury, it's

12  irrelevant.

13     The *Pharmacychecker*.com case, the *Modesto Irrigation*

14  *District* case, the cases that we cited on antitrust injury in

15  our brief, those cases did not go off on there being

16  enforcement action.  They were based on the court looking at

17  the law; determining that, under the law, the activity at issue

18  was not lawful, in some cases, because required authorization

19  was not provided or was not -- didn't -- the plaintiff didn't

20  have the required authorization, and therefore, antitrust

21  injury could not be shown.

22     The question of whether something constitutes antitrust

23  injury, in other words, does not turn on whether the alleged

24  injury was caused by enforcement action.  It turns on the fact

25  that the antitrust laws do not offer a remedy for an injury to

1    a business activity that the plaintiff did not have a legal

2    right to pursue in the first place.

3         And I think Judge Patel's -- a discussion of this subject

4    in *Modesto Irrigation District*, which was later affirmed by the

5    Ninth Circuit, provides a very good explanation for why this is

6    the case.

7         Now, I'm not going to spend time -- my time is also short,

8    so I'm not going to spend time talking about the *Nexus*

9    *Pharmaceuticals* case.  The main thing I'd just say about that,

10   it was not an antitrust case.  It was not about -- it did not

11   address the question of antitrust injury.  And it certainly did

12   not say that a Federal Court cannot ever decide any issue in a

13   case under a different law by closing its eyes to what FDA

14   regulations or the Food, Drug, and Cosmetic Act require.

15        To the contrary, there are plenty of situations out there

16   every day, including the *Pharmacychecker.com* case that we cite

17   in our brief, where courts have looked to what the established

18   law is, including FDA regulations, and have applied that in

19   determining whether in this case antitrust injury exists.

20             **THE COURT:**  Ms. Winner, may I ask you?

21             **MS. WINNER:**  Yes.

22             **THE COURT:**  The cases that you've just -- I won't say

23   "rattled off," you did that at a very good pace.  But, my

24   question to you is just whether those are the cases that you

25   would point me to concerning -- in instances where agencies

1    have not taken official action, if those are the cases you

2    would point me to in looking for authority to essentially

3    decide that question before the agencies have spoken.

4         **MS. WINNER:**  Well, I would think -- I think certainly

5    the *Pharmacychecker.com* case would say that.  I mean, whether

6    the agency has spoken, of course, we would say the agency has

7    spoken.  The agency promulgated the regulation that we're

8    asking to be recognized here.  And since then, you know, said

9    many things consistent with it.

10        You know, the *Modesto Irrigation District* case, I don't

11   believe there was any enforcement action in that case.  I don't

12   know, you know, what the state regulatory authority may have

13   actually said about the subject.  But they have not filed an

14   enforcement action against anyone.

15        There's a case -- and I'm forgetting the name.  There's a

16   case in the First Circuit that is also cited in our brief that

17   is about somebody who did not have authority to erect

18   billboards.  There was a regulatory agency that required --

19   when I get up again, I'll give that you case.  They had

20   authority to -- they did not have the authority to erect

21   billboards, because they didn't have -- they didn't have the

22   authorization to do that.  And so they couldn't sue because

23   somebody prevented them from erecting billboards.

24        So, again, this was not -- there wasn't the agency coming

25   out and making an announcement, and saying:  You, you can't do

1   this.  Although, here (Indicating), we actually do have that.

2   It was more -- it was just the situation, that's what the law

3   said is they needed the authority.  And they didn't have the

4   authority.  And for purposes of this case, that's all that

5   matters.

6       Now, the one other thing I want to say about this is the

7   extended lives program that was cited, this was not Intuitive

8   ignoring FDA or saying clearance isn't needed if you change the

9   specifications of these devices.

10      There is a separate procedure under the law that -- where

11  the original manufacturer can make certain kinds of changes,

12  through an alternative procedure called the note-to-file

13  procedure.  And Intuitive thought that it was allowed to make

14  some very minor adjustments -- mostly, I think, very minor

15  adjustments; there may have been some that were a little more

16  -- to some of its later-generation devices, not the ones that

17  are at issue here, without going through the whole FDA

18  clearance process again.

19      The most important thing of all of that is Intuitive was

20  wrong about that.  And FDA came in and said: No, Intuitive, you

21  are not -- even you are not allowed to do anything to change

22  the number of uses on one of your devices, without a completely

23  new FDA clearance.

24      I'm always surprised that plaintiffs make such a big deal

25  about that, because that is -- you know, if anything, I think

**PROCEEDINGS**

1   that the most clear proof of what -- how FDA feels about that.

2   It will not allow even the original re- -- the original

3   manufacturer of the devices to make any changes in the use

4   limits, without a new 510(k) clearance from FDA.

5        Now, I'm almost out of time, so I want to talk very

6   briefly about the market power and market definition issue.

7        Again, as I said earlier, I think that the -- I think

8   Mr. Corrigan really answered it, himself, on this issue, when

9   he asked you who you were going to believe.  I mean, what he

10  did there was he recognized that there is competing evidence on

11  that.

12       On both of the -- the market definition issues he talks

13  about -- which are precursors, by the way, to any decision

14  about monopoly power -- they first have to determine, for

15  example, is this MIST surgical systems robot its own relevant

16  market, or does it compete with other forms of surgery?

17       We presented extensive evidence from our expert, who is a

18  respected economist, explaining -- citing to a lot of evidence

19  in the record, and explaining why the relevant market includes

20  other modes of surgery as well.

21       They could -- the plaintiffs could have challenged his

22  testimony on *Daubert* grounds, and they chose not to do that.

23  They have not challenged his qualifications.  They have not

24  challenged his methodology.  And, given that his testimony is

25  admissible, and the admissibility is not contested, it, alone,

 1    is sufficient to defeat summary judgment here.

 2        Now, the plaintiffs may want to argue that their expert is

 3    smarter than ours, or he's more right than our expert is.

 4    Those are arguments that go to a jury.  There are -- there is a

 5    raft of independent evidence, even apart from the expert

 6    testimony.

 7        (Document displayed)

 8        **MS. WINNER:**  And I would point you -- and I don't

 9    really have time to go through these slides, but you know,

10    Dr. Smith pointed to testimony from numerous doctor witnesses,

11    confirming the procedures they perform, sometimes with the

12    da Vinci, or on other occasions, performed through open or

13    laparoscopic surgery.  The same thing.

14        (Documents displayed)

15        **MS. WINNER:**  Sometimes they do it one way; sometimes

16    they do it another way.

17        And this is critical.  The CEO of Larkin, plaintiff

18    Larkin, testified about how they educate their doctors on the

19    relevant costs of these different surgical modes.  So that that

20    can be taken into account in deciding among them.

21        So these are economic -- this is economic competition that

22    is going on here, in deciding how particular surgeries are to

23    be performed.

24        And in fact, the former chairman of the Surgery Department

25    at Valley Medical Center explained how relative cost can

1   influence which form of surgery was used.

2        (Document displayed)

3        **MS. WINNER:**  And, for all gallbladder surgery, they do

4   that laparoscopically at their facility versus robotically,

5   just because of the relative cost.

6        Based on that, you can't -- there -- there clearly is a

7   disputed issue of fact here.  We are not moving for summary

8   judgment on this issue.  We are not asking the Court to decide

9   that Dr. Smith is right.  But you cannot find as a matter of

10  law that Dr. Smith is wrong.

11       And the same thing on the question of whether EndoWrists

12  are a separate product.  There is -- there is extensive

13  testimony and records cited in our briefs, including from our

14  experts relying on other evidence in the record, explaining why

15  applying the relevant legal test, not just ad hoc statements

16  that they pluck out of various company documents, but as --

17  when you apply the actual economic test that the antitrust laws

18  look to, that this is not a separate product.

19       And I would also on this point -- and again, I'm out of

20  time, but I would point Your Honor to the *Epic Games* decision,

21  which is the latest from the Ninth Circuit on this and other

22  important issues in this case.  It came out in the middle of

23  the briefing.  But, it talked at some length about the test

24  that is to be applied in determining.

25       And, I think I am now out of time.

1        **MS. CAHOY:**  Yes, you are.

2        **MS. WINNER:**  Thank you, Your Honor.

3        **THE COURT:**  Thank you, Ms. Winner.

4        **MR. CORRIGAN:**  Your Honor, if I could have a minute to

5   confer with my colleague; thank you.

6        **THE COURT:**  Certainly.

7      (Off-the-Record discussion between counsel)

8        **MR. CORRIGAN:**  I'm going to do better, maybe.  But if

9   I don't, I'm going to hear it.

10        **THE COURT:**  From both of us.

11        **MR. CORRIGAN:**  Your Honor, Ms. Winner did not respond

12   to anything Mr. McCaulley said.  So I'm going to have the full

13   12 minutes that we have left on there.

14      Ms. Winner started by saying that -- no legal right, she

15   mentioned that the law prohibits.  And if legal right was

16   required, we don't have it.  But that's the point.  The FDA has

17   never said that.  There's no indication there's a legal -- that

18   we don't have the legal right.

19      She referred to, in one of her slides, the FDA statute.

20   But if you look at Exhibit 44 in our brief, in our papers, on

21   Page 700 and 715, that exhibit tracks.

22        **THE COURT:**  You know, there's water.

23        **MR. CORRIGAN:**  Um --

24        **THE COURT:**  There's a water cooler there.

25        **MR. CORRIGAN:**  I'll be okay, thanks.

1          **THE COURT:**  Uh-huh.

2          **MR. CORRIGAN:**  The language in Exhibit 44 tracks the

3    language in that FDA statute.  And they're saying: We don't

4    need a 510(k), and this is why.  And they track the language of

5    the statutes.

6          Now, we also talked about the Florida cases.  Very odd.

7    In Footnote 7 in one of their briefs, they do refer to the

8    Florida cases, but they don't cite the cases, which is an odd

9    practice.  Referring, but not citing.

10         And my thinking was they didn't cite the case, because

11   they didn't want you to read it.  I mean, if you read from

12   Paragraph 8 -- Page 8, *Rebotix* -- I'll just read this briefly.

13   From Judge Hernandez Covington (As read):

14              "Intuitive's argument leans on what it paints

15              as the 'undisputed fact' that 'both Rebotix

16              and the FDA recognize that Rebotix's business

17              of installing the Interceptor and EndoWrist

18              require 510(k) clearance.  But this issue is

19              highly disputed.'"

20         They're making the same exact argument there they make

21   here.  Which is:  If we keep saying it enough, it might

22   actually be true.  But it's not true.  The FDA has not said

23   that.  And I spent some time on that, with my earlier slides.

24         Ms. Winner also talked about the *Modesto* case.  And I'll

25   go back to the *Rebotix* case, one more time.  *Rebotix* case, on

 1   Page 8, talks about the *Wellbutrin*, the *Canadian Import*,

 2   *Modesto*; they deal with all those cases on this legal right.

 3   And dismissed them all.

 4        Now, also very briefly, Ms. Winner said that there's no

 5   evidence at all that Intuitive interfered with anybody getting

 6   a 510(k).  But Rick Ferreira, who's the president of Iconocare,

 7   he didn't quite say to evidence, but he strongly hinted that

 8   the FDA had done a lot of different things that he had never

 9   seen before.  They asked him to do a bunch of tests that made

10   no sense, and that he strongly suspected that Intuitive had

11   been involved in giving him a hard time on getting the 510(k).

12   Not saying it's evidence, but he had a strong suspicion, and he

13   talked quite a bit about it.

14        Now, one of the things that they do in their brief, and

15   she did it here today, FDA, FDA, versus FDA employees.  All the

16   communications you see up there are not FDA.  They're

17   unofficial, non-binding communications from FDA.

18        And Ms. Winner said they're not unauthorized.  That's

19   true.  They're not unauthorized.  But, they're not binding.

20   These are unofficial.

21        And the communications she talked about, like the one on

22   April of 2022, that was the one that Mr. Lee walked back in

23   July of 2022.  If it was so clear and the FDA really wanted to

24   rule on this, July of 2022 would have been a good time to do

25   it.  But they punted.  That undermines all their other emails.

1      And I would urge the Court to take a look at the FDA --

2   their FDA expert Christy Foreman's report, Paragraphs 230 and

3   231.  You'll see one more example of how they deal with the

4   7-22 email, which is to ignore it.  Pretend it didn't happen.

5      **THE COURT:**  I hear Ms. Winner saying that the FDA

6   isn't punting, but is, instead, resting on regulation as its

7   final word.  Tell me why that's wrong.

8      **MR. CORRIGAN:**  If you read the July 2022 email,

9   they're not saying that at all.  They're saying:  The FDA -- I

10   improperly used the word "decision" and therefore, you know, I

11   might have given the mistaken...

12      He is walking back what he said.  And they haven't been

13   heard from since.

14      So the FDA has been involved in this.  They have sent

15   emails.  They full-well know what's going on.  They understand

16   what these IRCs are doing.  And they didn't weigh in.  They've

17   had the chance since July, and -- and after that.

18      **THE COURT:**  But the IRCs backed off.  Why would they

19   -- why would the FDA need to continue corresponding with them

20   if -- or tell me that that's incorrect, but --

21      **MR. CORRIGAN:**  Well, the IRCs --

22      **THE COURT:**  -- that's how I understand it.  Or, at

23   least, her presentation of it.

24      **MR. CORRIGAN:**  The IRCs exited the business because

25   they were put out of business.  They didn't say, you know:

1    We're tired of this business.  They put a lot of time and

2    effort into this business.  And ultimately, they backed off

3    because of what Intuitive did.

4         So the FDA -- to say that the FDA hasn't weighed in

5    because they backed off, it's all based on Intuitive's

6    anti-competitive conduct.  And I talked about that this

7    morning.  They didn't back out of these businesses for kicks.

8    They spent a lot of time and effort, getting into this

9    business.

10        Now whether to use laparoscopic or a da Vinci, there was a

11   couple of slides there at the end.  I'll just say, Your Honor,

12   that in Note 7 of our first brief and Page 22 and 23 of our

13   second brief, we deal with that.

14        Also, in Footnote 22 of our second brief, we deal with the

15   issue of the fact that we did not challenge Dr. Smith on

16   *Daubert* grounds, so it's unchallenged (Indicating quotation

17   marks).  But there are a couple cases in that footnote that

18   show that if an expert opinion is not based on any real facts,

19   that it's not enough to prevent summary judgment.

20        And in fact, Intuitive cites the *Brook* case a couple times

21   in their brief, for that very same point.  That if an expert

22   report is not based on sufficient facts, that it's not enough

23   to prevent summary judgment.

24        Now, let me just make a couple other points, Your Honor.

25        It is not correct that a 510(k) is required.  We have no

1  antitrust injury.  That just means that the IRC would need to

2  get 510(k) clearance, which Iconocare did.

3      And second, it is not correct that if EndoWrist repair

4  qualifies as remanufacturing, then 510(k) is required.  There's

5  a second requirement.  The second requirement is whether the

6  device is being introduced into interstate commerce for

7  commercial distribution.  So the question that Ms. Winner posed

8  does not end the inquiry.

9      Another point, Your Honor, my colleagues helped me on this

10  one.  In the but-for world, we are not limited to Restore and

11  Rebotix.  They're the two IRCs that were sort of out in front.

12      Whether entities such as Stryker -- Stryker's a

13  billion-dollar medical repair company.  And they thought long

14  and hard about getting into this industry as far back as 2015

15  and 2016.  They even went so far as to sign a contract with

16  Rebotix.  They did their due diligence, and they backed off,

17  because they didn't want to deal with Intuitive.  They didn't

18  think -- they didn't think the business was going to work out

19  because of Intuitive's anti-competitive conduct.

20      So Stryker and others could get 510(k) clearance, but they

21  chose not to do it, for fear of Intuitive's interference.

22      Now, one other thing I'll say, Your Honor, and this --

23  Ms. Winner said, and it's a footnote in their brief, that

24  Intuitive has always been very clear, they've always been clear

25  that they had no objection to an IRC doing repairs, if it was

 1 │ pursuant to a 510(k).

 2 │     And this was not in the record.  It was a deposition I

 3 │ took pretty late.

 4 │         **MS. WINNER:**  Your Honor, I object to discussion of

 5 │ material that's not in the record at this point.

 6 │         **MR. CORRIGAN:**  Well, let me say this.  It's certainly

 7 │ in the record, but it's not -- it wasn't as an exhibit for this

 8 │ Court -- in this motion.  But it is directly responding to what

 9 │ Ms. Winner said.

10 │         **THE COURT:**  Share it with Ms. Winter, please.

11 │         **MR. CORRIGAN:**  Sure.

12 │         **THE COURT:**  Winner, I mean.

13 │         **MR. CORRIGAN:**  Before I tell you?

14 │         **THE COURT:**  Yes, please.

15 │         **MR. CORRIGAN:**  Okay.

16 │     (Off-the-Record discussion between counsel)

17 │         **MS. WINNER:**  Well, my objection stands.

18 │         **MR. CORRIGAN:**  This is testimony from David Ro- -- I'm

19 │ sorry, Your Honor.

20 │         **THE COURT:**  Finish your sentence.

21 │         **MR. CORRIGAN:**  Okay.  David Rosa was a high-ranking

22 │ executive in Intuitive.  And he was -- they submitted a

23 │ declaration of his with their summary judgment papers.

24 │     Now, Rosa's declaration was dated April of this year,

25 │ April of this year, with their summary judgment papers.  They

 1   cited Rosa's declaration 46 times in their 29-page brief.

 2       And one of the things they did with his declaration is

 3   they got in this new policy statement, right?  They shoveled in

 4   this new policy statement, in Rosa's declaration.

 5       So I asked Rosa:  When did you issue this statement?

 6       "I don't know."

 7       He didn't know when he did it.  But when she says they're

 8   always clear -- and she has a footnote, they have a footnote in

 9   their brief that says were clear -- here's some Q and A that I

10   had with Mr. Rosa at his --

11           **THE COURT:**  Hold that thought.

12           **MR. CORRIGAN:**  Sure.

13           **THE COURT:**  You're now trying to bring in the evidence

14   that she's objected to, and I'm still trying to just assess

15   whether -- where -- where that fits in.

16       So, as I understand it, this is not something you've cited

17   in your briefs --

18           **MR. CORRIGAN:**  Correct.

19           **THE COURT:**  -- to the motions for summary judgment?

20           **MR. CORRIGAN:**  Correct.

21           **THE COURT:**  Then I'm not going to hear it now.  Since

22   that's what this is about.

23           **MR. CORRIGAN:**  Okay.  This is deposition testimony

24   from a high-ranking executive, in his deposition on his

25   declaration that was submitted with summary judgment.

 1            **THE COURT:**  Ms. Winner, is your point something that

 2     was in your briefing that could have been addressed by them in

 3     some of their briefing?

 4            **MS. BASS:**  Absolutely, it's something, they could have

 5     -- they could have addressed it in their --

 6            **THE COURT:**  Then I'm going to ask you -- this should

 7     have been somewhere in their briefing already.  So I'm going to

 8     uphold --

 9            **MR. CORRIGAN:**  Fair enough, Your Honor.

10            **THE COURT:**  Sustained, sustained.  We move on.  All

11     right.

12            **MR. CORRIGAN:**  And let me -- if I could, could I get

13     slide No. 22 back up?

14        (Document displayed)

15            **MR. CORRIGAN:**  Your Honor, while we do that, let me

16     just say that the *Kaplan* case -- they cite the *Kaplan* case

17     several different times.  The *Kaplan* case is very

18     distinguishable.

19        If you take a look at Footnote 7 of the *Kaplan* case, the

20     *Kaplan* case says:  It was very important to this case that we

21     are talking about a single-use consumable device.

22        Now, as you know, in this case we're not talking about

23     that.  We're talking about reusable durable devices.

24        Footnote 7 of the *Kaplan* case completely distinguishes

25     that case from this.  It says:  We are not going to rule on any

 1    kind of reusable device which has medical durability left after

 2    it's used once.

 3        So in one footnote, that *Kaplan* case is completely

 4    divorced from this case.

 5        (Document displayed)

 6        **MR. CORRIGAN:**  I will end with this one, Your Honor.

 7    This is the last slide of the deck.  And the heading there is

 8    from a 1995 document:

 9            "Number of reuses will be controlled"

10        And then I filled in the blanks:

11            "...to Protect Intuitive's Bottom Line, Not

12            Patients."

13        Their senior director of regulatory affairs, a guy named

14    Mario Lowe, he said (As read):

15            "Just so you know, FDA does not require nor

16            limit the number of uses for our EndoWrist

17            instruments."

18        All right?

19        So, why did Intuitive impose those limits?  Well, here's

20    why.  1995 foundational business plan -- this business plan is

21    long before the FDA is even a twinkle in their eye.  Intuitive

22    would (As read):

23            "...derive its revenues from...high margin

24            'reposable' instruments which can be

25            sterilized and reused only for the number of

1          times allowed by the company."

2      And then the kicker:

3          "Further, the 'number of reuses will be

4          controlled to reflect...the gross margin and

5          the price desired.'"

6      These are not about safety.  These are about making money.

7      Now, one other thing.  We cited this document, Exhibit 9,

8  in both our briefs.  They cited this document in neither of

9  their briefs.  They made no effort to distinguish or explain

10 this document away.

11     And when you look at this, these three -- I'm going to do

12 one more -- look at everything they say and do in the prism of

13 what's on this slide.

14     The third one there was a 30(b)(6) witness, a guy named

15 John McGrogan (Phonetic):

16          "Marketing is involved to the extent that

17          they set [use limit] goals for engineering...

18          **QUESTION:**  And then engineering would try to

19          design an instrument that would meet that

20          10-life goal, right?

21          **ANSWER:**  Yes."

22     We quote that in our papers.  In Footnote 1 of their first

23 brief, they say that is a false statement.  That's not a false

24 statement.  That tracks their 30(b)(6) deposition testimony,

25 directly.  They say it's false, because they have nothing else

1  to say about it.

2      I think my time is up, unless Your Honor has questions.

3  Thank you.

4          **THE COURT:**  It is, it is.

5      And also, I see you, Ms. Winner.  Go ahead.

6          **MR. CORRIGAN:**  Thank you, Your Honor.

7          **MR. MCCAULLEY:**  Your Honor, we are over time, but may

8  I have one moment just to respond --

9          **THE COURT:**  I want to let -- am I right to think that

10  you want to respond just to the *Kaplan* point?  Or something

11  else?

12          **MS. WINNER:**  Well, I want to respond to a number of

13  what he said, but maybe this gentleman can go first, and then

14  we'll --

15          **THE COURT:**  All right.

16          **MS. WINNER:**  I may ask for a couple extra minutes,

17  since they've gone over time.

18          **MR. MCCAULLEY:**  We are over our time, Your Honor.  And

19  I just want to respond to one question that the Court had about

20  the FDA relying on its regulation.

21      And I think the 802.3(w) that Ms. Winner pointed out,

22  that's not a requirement for 510(k).  That's the definition of

23  a remanufacturer.  And the actual authority and the statutory

24  authority comes from 21 U.S.C. Section 360, and then the

25  Regulations 21 CFR 807.81.  And that's the issue of who has to

 1   register.

 2        And as we pointed out in Page 15 of our opening brief, a

 3   lead FDA official makes clear that no IRCs have ever had to

 4   register under that, since that definition was promulgated.

 5   That's because FDA still hasn't said what the definition means,

 6   in 802.3(w).

 7        What is a substantial change?  That's the guidance we

 8   still haven't finalized from the FDA, that FDA has been

 9   promising and revisiting.  But they haven't laid an egg on

10   that, Your Honor.  And that's the point.  FDA hasn't given any

11   guidance in terms of what constitutes a substantial change.

12        And so I would just refer the Court to that portion of our

13   brief that discusses that issue.

14        Thank you for the extra time.  I appreciate it.

15             THE COURT:  Ms. Winner, by my count, you've got about

16   four minutes.

17             MS. WINNER:  I think actually I have, Your Honor --

18             THE COURT:  If someone else has a better count, I'll

19   take it.

20             MS. WINNER:  Yeah, I believe I reserved ten minutes,

21   but maybe I get --

22             THE COURT:  No, no, I'm only counting --

23             MS. WINNER:  I think I get about a few extra minutes,

24   because they went over.  I'm going to still try to be efficient

25   here, Your Honor.

1          **THE COURT:**  My count is the excess.  I'd forgotten

2    about the ten you reserved.

3          **MS. WINNER:**  Oh.  Thank you.

4          **THE COURT:**  Uh-huh.

5          **MS. WINNER:**  Okay.

6      Well, we jumped around a lot.  So, let me try to go

7    through the most significant points that I think I should

8    respond to.

9          First of all, on the Florida cases, certainly there was a

10   -- there's a suggestion that -- and I think in at least one of

11   the decisions, it may have been the *Rebotix* decision -- that

12   the FDA's view was still unclear.

13         But I would point out that at that point, Rebotix was

14   still fighting with FDA.  And it was unclear about whether

15   Rebotix was going to take FDA up on its invitation to seek a --

16   you know, a rule, a formal ruling that it could then appeal and

17   start an appeal process.  And the Court said:  Well, you know,

18   we'll wait and see how that plays out.

19         The suggestion that it might affect summary judgment,

20   depending on how FDA ruled, that was actually in the context of

21   Intuitive's Lanham Act counterclaim, that had nothing to do

22   with any discussion about antitrust injury, in that case.

23         I don't know what to make of this suggestion that

24   Iconocare strongly suspected that Intuitive may have had

25   something to do with the fact that it was hard to get FDA

1   clearance.  There's certainly -- I think it's admitted, there

2   is no evidence of that.  Nobody's ever suggested that Intuitive

3   has any control over FDA.  And, sure, plenty of people at

4   Intuitive can explain how that's definitely not the case.

5        But -- so I think you could -- clearly, should set that to

6   one side.

7        This notion that these are all unofficial, unbinding

8   statements, I think Your Honor really put your finger on it.

9   You don't have to have FDA saying -- you know, making the

10   decision every time about, you know, what -- whether the law

11   applies in a particular circumstance.

12        You know, there's a law on the books that says nobody's

13   allowed to drive more than 25 miles per hour in a school zone.

14   That law applies to me, regardless of whether there is also a

15   law on the books or a regulation or an official ruling

16   (Indicating quotation marks) from some government agency that

17   Sonya Winner can't drive her Prius more than 25 miles per hour

18   in a school zone.  The law says what it is.  And the way our

19   legal system works is that people are expected to comply with

20   the law.

21        And the way the antitrust injury analysis works is that it

22   looks at what the law says, and says that if you don't have a

23   legal right to do something under the law, then you can't claim

24   antitrust injury just because somebody prevented you from doing

25   it.

1      Now, this statement that marketing was involved, we most

2   certainly did respond to that.  We didn't just say that it was

3   false.  What we said is that the -- we pointed to the evidence

4   in the record which talks about how marketing was involved from

5   Intuitive in -- in establishing use limits.

6      And what happened was that the clinical -- and this is the

7   undisputed evidence in the record -- in the very, very early

8   days when they were inventing these things and testing them and

9   refining them and retesting them, the original use limits were

10   even lower.  And the marketing people came in and said:  You've

11   got to redo these instruments; you've got to improve them so

12   that they'll have more uses.  That was the involvement of

13   marketing.  There's nothing nefarious about that, from an

14   antitrust perspective.

15      The -- the notion that FDA hasn't been heard from since

16   they sent their favorite email or the plaintiffs' favorite

17   email, the answer to that is very simple.  There was nothing

18   for them to be heard on -- heard on.  Because there was nothing

19   then pending.

20      Rebotix had the right to go forward under the process that

21   was laid out for them.  There are actually other procedures

22   under the law that they can also follow to request a formal

23   ruling from FDA on something.  They chose not to do that.  So

24   there was nothing for FDA to do.

25      FDA had a regulation.  FDA had been telling them for

1    years, you know, this regulation doesn't allow them to do what

2    they want to do, without FDA clearance.  And they decided not

3    to go forward.

4         Now, finally, on the commercial distribution point.  I

5    think we addressed this fairly thoroughly in our brief,

6    Your Honor.  The *Kaplan* case is not distinguishable, based on

7    that one footnote.  If you look at -- the *Kaplan* case was

8    analyzing:  What do the words "Held for sale" mean in the

9    statute and regulations?

10        They're actually interpreting language.  Classic work of a

11   court is to decide, you know:  How do you interpret this

12   language.  And it's the same language we have here.

13        And that was a case in which a doctor had been criminally

14   convicted of adulterating -- adulterating a device, because he

15   used it more uses than it was allowed.  That one was only

16   allowed one use, right about that.  And he -- he would dump it

17   into some -- some disinfectant (Indicating), and use it again

18   in his practice.  And he said:  Well, that's not held for sale.

19        And "held for sale," "held or offered for sale" is the

20   language we're interpreting here (Indicating quotation marks).

21   And it's the same language for the adulteration provision as it

22   is for the provisions that we're talking about for the

23   requirement of clearance.

24        And he said: Well, I don't hold -- I wasn't holding it for

25   sale, because I didn't sell it.  All I did was just use it on

1    my patients.  And as long as I continue to own it, that's all I

2    have to do.

3         Well, the Ninth Circuit said: Absolutely no way.  That is

4    not what that means in the Food, Drug, and Cosmetic Act.  In

5    the Food, Drug, and Cosmetic Act, that language applies to any

6    activity that involves commercial use of the device.  And that

7    includes commercial use in a medical practice.

8         Similarly, here, we're talking about these devices being

9    used in commercial medical practice in hospitals.  Being used

10   on patients.  This isn't somebody buying a medical device and

11   just playing with it in their basement, and never doing

12   anything else with it.  This is somebody taking a medical

13   device, and using it on patients.

14        And as the Ninth Circuit made clear, the language of the

15   Food, Drug, and Cosmetic Act, in talking about this kind of

16   scope of where it applies, the language must be applied broadly

17   because -- to be protective of patients.

18        Thank you, Your Honor.

19        **THE COURT:**  Thank you, Ms. Winner.

20        Anyone want a seventh-inning stretch?  I'm going to

21   suggest we take one.  So let's recess for a whole minute or two

22   just to stand up and stretch.  Then we will do the *Daubert*

23   motions.

24        You don't have to.

25        (A pause in the proceedings)

**PROCEEDINGS**

1          **THE COURT:** All right, folks, we're going to get

2    started again.

3          I know that I said we would move on to the *Daubert*, but I

4    have one last question for counsel, for the motions for summary

5    judgment. This is to any and all of you.

6          Is Rebotix or anyone else currently providing EndoWrist

7    modification services?

8          **MR. CORRIGAN:** Not to our knowledge, although

9    Iconocare does have the 510(k) on an Si instrument. So,

10   certainly, these companies are ramping up. Certainly -- I

11   mean, Restore and Rebotix settled their cases. They brought

12   these cases, they litigated hard for years to get to this

13   point. So they're now at this point when they've settled, and

14   they are going to get back up to running. But I'm not sure if

15   that's actually happened yet.

16         But, again, they litigated for years to get to this point

17   to get back into this market. And they've taken a lot of steps

18   to do so.

19         **THE COURT:** Ms. Winner, do you have any better

20   knowledge?

21         **MS. WINNER:** Well, I'd love to be able to take two

22   minutes to answer the same way. But I think, Your Honor, I

23   would just say no.

24         **THE COURT:** Okay.

25         **MR. CORRIGAN:** Well, I'll take -- the reason they're

 1  out of the business is because Intuitive shut them out of the

 2  business.  That's why they're out of the business.

 3          THE COURT:  I very much understand that's your

 4  position.  I do, I do.

 5          MR. CORRIGAN:  Thank you, Your Honor.

 6          THE COURT:  All right.  Thank you both for answering

 7  the additional question.

 8      Let's go ahead and take up the *Daubert* motion.

 9          MS. BASS:  Good afternoon, Your Honor.  Ashley Bass on

10  behalf of defendant Intuitive Surgical.

11      So, based off of the prior argument, obviously, Intuitive

12  has moved for summary judgment in this case.  And we believe it

13  should be granted.  To the extent it is not, we wanted to take

14  just a few minutes to address the damages expert of the

15  hospital plaintiffs, Professor Elhauge.

16      Our motion sets forth multiple grounds where we think

17  Professor Elhauge's opinions have not meet the *Daubert*

18  standard.  We would like to focus on one fundamental flaw that

19  means all of his damages estimates in this case are not

20  reliable, and should be stricken.

21      In particular, Professor Elhauge did nothing to assess

22  what competitive impact the third parties, like Rebotix,

23  Restore, and SIS, would have actually had in the but-for world.

24      So Professor Elhauge's job in this case was to construct a

25  world without the challenged restraints in Intuitive's

1    contracts.  His role is to think about what would the world

2    look like if plaintiffs won their case, and what would the

3    damages then have been to the plaintiff hospitals and the

4    hospitals that are in the class?  We call that "the but-for

5    world."

6        So he's trying to construct a world where he thinks about

7    what would the competitive dynamics have been, and then what

8    was the harm to the hospitals, assuming that liability was

9    established in this case.

10       In assessing that but-for world, the first thing he should

11   have thought about is what sales would these third parties have

12   had.  What hospitals were interested in using their services;

13   how many repaired or remanufactured EndoWrists would the

14   hospitals actually have bought from the third parties.

15       He actually skips this step, entirely.  He makes no effort

16   to make any sort of an assessment of what sales the third

17   parties would have had in the but-for world.

18       He admitted this readily in his deposition, that he does

19   not think about what the sales are, and he doesn't model any

20   sort of market shares or anything of that nature for the third

21   parties.

22       You might say:  Well, why does this matter to a damages

23   estimate?  Well, the reason that it matters is if only a small

24   number of hospitals are interested in using the services of the

25   third parties, then no one would think that anyone could reach

1    the type of astronomical damages numbers that Professor Elhauge

2    reaches.

3         He reaches those damages numbers because he posits that

4    Intuitive would have dropped its prices by 20 percent across

5    the board, in the but-for world.  So basically what he's

6    assuming is so long as the third parties existed, that

7    Intuitive necessarily would have dropped its prices by

8    20 percent.  Even though he makes no assessment of what sort of

9    hospital or customer interest there actually was in using the

10   devices.

11        Now, in the deposition that we took of Professor Elhauge,

12   he admitted that there is obviously a relationship between -- a

13   direct relationship between what the sales of the third parties

14   would have been and what Intuitive's price response would have

15   been.

16        So I said, in the deposition to Professor Elhauge:  What

17   if the interest in the third parties was not that great in the

18   but-for world?  What if they -- their sales were small?  What

19   if their sales were only $2 million a year?  Do you think that

20   Intuitive would have dropped its prices by 20 percent, across

21   the board?

22        And he said no.  Intuitive would not be motivated to drop

23   its prices 20 percent, across the board.

24        That's the point.  That's the question that he should have

25   asked at the beginning of his analysis.  But yet, he skipped it

1    entirely.  He simply said so long as there was some interest in

2    the third parties, Intuitive would have dropped all of its

3    prices by 20 percent.  He treats it like an on/off switch.

4        So there's at least two problems under the case law with

5    Professor Elhauge's approach.  The first is that he finds no

6    grounding in the record.

7        The cases are very clear that an antitrust economic expert

8    needs to be able to ground the damages opinion in the facts of

9    the case.  That's the holding of *McGlinchey* in the Ninth

10   Circuit, that you can't base a damages opinion on unsupported

11   assumptions and unsound extrapolation.

12       Here, Professor Elhauge didn't even make any attempt to

13   look at what the competitive dynamics would be from these third

14   parties.  He simply ignored that step, and doesn't even tie it

15   into the record.

16       The second problem is that it means that he has not

17   offered any sort of a standardized or reliable methodology to

18   calculate damages.  All he has offered is this on/off switch

19   approach for which he gives us no support, no academic

20   articles, nothing to say that this is a reliable methodology.

21       But yet, again, cases regularly strike antitrust economic

22   damages experts that don't set forth a reliable methodology.

23   The cases talk about types of reliable methodologies that can

24   be used:  A regression analysis, a before-and-after approach.

25   He uses none of those methodologies.

1           And that's what the Ninth Circuit *Magnetar* case says.

2      That if you stray from an established methodology, and you

3      don't use that when you're giving an actual antitrust damages

4      opinion, then it is subject to being stricken.

5           Here, Professor Elhauge gives no support for this

6      approach.  And of course, no support could be found in law or

7      economics for the notion that simply because a competitor

8      exists in the but-for world, that it necessarily means that an

9      antitrust defendant drops their prices dramatically on every

10     product, across the board.

11          So what's plaintiffs response to this?  They have no real

12     answer for the fact that Professor Elhauge skipped this first

13     step entirely.  He made no analysis of it.  They offer two

14     legal arguments, in essence, for why we should just let this

15     opinion go on to the jury.

16          The first is that they say:  Well there could be factual

17     disputes, and we should let the jury figure all of this out.

18          Well, again, the cases are very clear that what you need

19     is a sufficient factual foundation in the record before you can

20     submit the damages opinion to the jury.  That's what the *Marion*

21     case (Phonetic) says; that's what the *Voucher* case says.

22          Then they say:  Well, there's some leeway in thinking

23     about what damages would have been, because we don't know what

24     would have happened in the but-for world; we're constructing a

25     world that never existed.

1      And there are cases that talk about that leeway.  But the

2   Ninth Circuit is very clear that the speculation and guesswork

3   cannot be the basis of an antitrust damages opinion that goes

4   to the jury.  Again, that's *McGlinchey*, and that is *Magnetar*.

5   There has to be a reliable basis for that opinion to get before

6   the jury, especially when we're talking about the astronomical

7   damages that are at issue here.

8      So the bottom line here, the conclusion is that

9   Professor Elhauge, to boil it down, has said:  Well, I think

10  that there was sufficient interest in these third parties that

11  Intuitive necessarily would have dropped its prices on all

12  EndoWrists by 20 percent.

13     He offers us no methodology to reach that.  He doesn't

14  tell us what shares or what sales he thinks the third parties

15  would have made.  He gives us his say-so.  That is not a

16  recognized methodology.  And it's not a reliable methodology.

17     Certainly, if the third parties would have sold 5 percent,

18  that's something that he could have said.  Maybe he thinks

19  they'll sell 50 percent.  We don't know.  We don't know what he

20  thinks that the third parties would have necessarily sold, in

21  terms of remanufactured EndoWrists.

22     And there's a big difference between whether they would

23  have sold 5 percent or whether they would have sold 50 percent,

24  as to what Intuitive's price response would be.  He skips that

25  step, that infects his whole analysis, and all of his damages

 1   start from the premise that is absolutely unreliable.

 2        Now, with the Court's indulgence, I would like to point

 3   out one other piece that we did not get to in the summary

 4   judgment argument, but that overlaps with the arguments that we

 5   made in the *Daubert* as to Professor Elhauge.  And that's with

 6   respect to damages on the X and Xi.

 7        We moved, on *Daubert* grounds, on Professor Elhauge, to say

 8   that he doesn't have a reliable basis to estimate damages for

 9   the X and Xi EndoWrists because no company has commercialized a

10   process to reset those EndoWrists.  He generates a substantial

11   amount of damages based off of his X/Xi reset EndoWrists.  So

12   the X/Xi EndoWrists were introduced in 2014.  We stand here

13   today, no one has commercialized a process in order to reset

14   those EndoWrists.

15        Now, in plaintiffs' presentation today, you saw them refer

16   to the testimony of Mr. Hamilton as if that answered all the

17   questions.  So with the Court's indulgence I'm going to read

18   the surrounding Q and As with respect to Mr. Hamilton, because

19   I think once you read the Q and As in context that actually

20   answers the question.

21        Here's the question to Mr. Hamilton, of Rebotix (As read):

22             "QUESTION:  What is missing from the process?

23             What is missing from the process to fully

24             develop and implement the ability to reset

25             the usage of Xi EndoWrist instruments?

1      "**ANSWER:**  Final procedures, testing,

2           validation, same things we had to go through

3           for the Si.  All the testing that has to be

4           done, and is now in progress.  But it takes

5           time.

6      "**QUESTION:**  I want to make sure I understand

7           your testimony.  Are you saying that from a

8           technical standpoint, Rebotix has actually

9           reset the usage counter of an Xi EndoWrist,

10          as of today?

11     "**ANSWER:**  I'm not sure how you're defining

12          that.  Have we done it in the marketplace?  I

13          said no.  Have we done the technical

14          equivalent of that, I said yes.  And there

15          are many steps between the technical

16          equivalent and releasing it into the

17          marketplace."

18     The bottom line, as we stand here today, nobody has

19  commercialized an X/Xi reset, and there's no basis for

20  Professor Elhauge to generate substantial damages numbers,

21  based off of the X/Xi EndoWrists.  Thank you, Your Honor.

22          **THE COURT:**  Ms. Bass, before you take your seat, am I

23  right, you -- neither of you are reserving time for rebuttal.

24  So I have one question for you before you go, which is:  Could

25  you please address why it's insufficient for you all to simply

1   cross-examine Mr. Elhauge, to impeach his conclusions.

2        **MS. BASS:**  Absolutely.  And that's why I wanted to

3   talk about -- both about the cases that talk about the

4   sufficient factual basis.  Those cases specifically say that

5   that is not an issue just, then, to reserve to the jury.  If

6   there's not a factual foundation, then you should not simply

7   submit it to the jury to sort it out.

8        That is an issue both -- like I said, in *Marion* and

9   *Voucher*, that specific question was asked.  The plaintiff

10   argued:  Let's just submit this to the jury; surely there's a

11   fact question there.

12        And the court said:  No.  What *Daubert* requires is a

13   sufficient factual foundation in the record before we would

14   submit that to the jury.  And if that factual foundation is

15   lacking, then that isn't simply an issue of cross; it's an

16   issue of not having the foundation for the jury even to hear

17   the testimony.

18        And then relatedly, the second part of that is the

19   reliable methodology.  Again, the jury -- you know, they are

20   not economists.  Professor Elhauge is a law professor, and he

21   is offering an economic opinion here.  And in terms of what he

22   needs to offer to the jury, it has to have a reliable

23   methodological basis before it's allowed to go to the jury.

24        And again, that is what the cases like *Magnetar* and like

25   *McGlinchey* say.  That in the Ninth Circuit, we're going to make

1    sure that before we put something before the jury, that it

2    really has that reliable basis to it.

3        And the Court that I think really best summarized this

4    issue was *Toscano*.  And what the Court in *Toscano* said -- it's

5    a District Court here in California.  It says it's (As read):

6                "...not a prescription for the antitrust

7                plaintiff to shirk his responsibility to

8                present competent and probative evidence from

9                which a jury can reasonably determine

10               damages."

11       So again, without that factual underpinning, without that

12   reliable methodology, then the issue should never reach the

13   jury.

14               **THE COURT:**  Thank you.

15               **MS. BASS:**  Thank you.

16               **MR. BATEMAN:**  Good afternoon, Your Honor.  Chris

17   Bateman for the hospital plaintiffs.

18       The purpose of Rule 702 and *Daubert* is to screen out

19   expert opinions that are nothing more than "nonsense" or "junk

20   science," as the courts have put it.  Not to take up judicial

21   resources generally litigating the merits of expert opinions.

22       Yet, the latter is exactly what Intuitive has done with

23   the 11 *Daubert* motions that it has brought against all ten

24   plaintiff experts across these two cases.  These are meritless

25   blunderbuss motions that ignore the liberal standard favoring

1  admissibility of expert testimony as the Supreme Court and

2  Ninth Circuit have put it.

3      And this is evident with Intuitive's motion to exclude

4  Professor Elhauge's opinions, including his damages estimates,

5  and the motion that it has chosen to prioritize here.

6      And I'll focus on, you know, what Ms. Bass focused on in

7  her comments here largely about the damages estimates.  As

8  noted in our brief, courts have described Professor Elhauge as

9  an antitrust titan, and have found him qualified to opine on

10  economic issues in antitrust cases in all 22 cases in which

11  he's been the subject of a *Daubert* motion.

12      His damages estimates here are based on standard

13  methodologies that are routinely used and upheld in antitrust

14  cases, including yardstick comparisons, and reliance on

15  defendants' own business plans and documents.

16      And here, the latter is particularly helpful, as

17  Intuitive, itself, planned out its own response to the threat

18  of rival EndoWrist repair in the form of Project Dragon, its

19  planned instrument refurbishment program, and the extended-use

20  program, the plan that it actually adopted to extend the uses

21  on certain EndoWrists, in the face of even just limited

22  competition.

23      Intuitive doesn't argue that Professor Elhauge is

24  unqualified.  And they effectively concede that the damages

25  methodologies he uses are commonly accepted.  They just quibble

1   with the details of those estimates, and their factual, you

2   know, basis, raising what are essentially fact disputes that

3   Your Honor is exactly correct are properly the stuff of

4   cross-examination, and not exclusion.

5          And to focus on the issue that Ms. Bass first discussed

6   with the modeling of but-for market share, this is a perfect

7   example of Professor Elhauge's methodologies and how they are

8   commonly accepted and valid.  Professor Elhauge -- it's true he

9   didn't model, himself, the but-for market shares that the

10  repair companies would achieve in a but-for world.  He didn't

11  need to do that.  Intuitive and others did it for him.

12         Professor Elhauge draws in his reports on Intuitive's own

13  projections that EndoWrist repair could obtain substantial

14  market share.  At least 10 to 15 percent, according to

15  Intuitive's own documents.

16         And similar projections by Deutsch Bank and by Stryker,

17  the major medical supply company that was discussed earlier,

18  and that planned to enter the EndoWrist repair market by

19  purchasing Rebotix, but was deterred only by Intuitive's

20  restraints when it turned those up in its due diligence.  And

21  those projections are consistent with and, indeed, based on the

22  very robust demand for EndoWrist repair that's clear from the

23  record, and that Professor Elhauge also cites extensively in

24  his reports.

25         And then the Project Dragon evidence, then, shows

1   Intuitive was planning to respond to that predicted threat with

2   20 to 40 percent price discounts.  So Intuitive, itself,

3   thoroughly gamed out both the threat and the response here,

4   making it unnecessary for Professor Elhauge to do additional

5   modeling like that, himself.

6       And that's an example of that -- one of those valid,

7   commonly-recognized methodologies.  Reliance on the

8   defendant's own documents, the defendant's own projections,

9   which the *ZF Meritor* case (Phonetic) that we cite recognizes as

10  a valid methodology.  And the *Blood Reagents* case also cites.

11      So, so that criticism, you know, simply fails.  Professor

12  Elhauge does have a sufficient factual foundation for those

13  analyses.  And, you know, any questions about the -- you know,

14  those projections are kind of questions that should be left for

15  cross-examination and for a jury, under *Daubert*.

16      And, you know, his analyses are -- in those respects are

17  completely different from the expert opinions that were

18  excluded in the *McGlinchey* case, for example, where one of the

19  two experts was the plaintiff, himself.  And he, you know, was

20  not an economist, and he didn't even document his own

21  projections.  And there were clear factual problems with his

22  analyses that were just, you know, fundamental.  Including, for

23  example, saying that there were -- you know, taking the gross

24  sales, and extrapolating from gross sales, the plaintiffs' own

25  gross sales what the damages would be, when it was only just a

 1  subset of those sales that were affected by the defendant's

 2  anti-competitive conduct.  And the expert wasn't even familiar

 3  with what that anti-competitive conduct really was, and what

 4  effect it had on the plaintiffs' business, as the expert,

 5  himself, admitted in a deposition, if you read that opinion.

 6      And we talk about Professor Elhauge's reliance on the

 7  projections done by Intuitive and by Stryker and Deutsch Bank

 8  in Footnote 10 of our opposition brief.

 9      So it's not true, also, just to revisit one point that she

10  made there, that Professor Elhauge simply treats it as an

11  on/off switch, and as long as there's some tiny amount of

12  demand, you get all these damages.  That's not what Professor

13  Elhauge was saying.  He made that clear in his deposition, in

14  fact.  He, you know, made clear that he was relying on the

15  projections made by these third parties, and that he didn't

16  need to model these things, himself, because Intuitive, itself,

17  again, gamed out the -- you know, the predictions of market

18  share, and then gamed out its own response very specifically

19  with these 20 to 40 percent price discounts, for example.

20      And so in his deposition, he testified about that at Pages

21  207 to 208.  And also Pages 280 to 281.

22      As for the X/Xi damages, so, Ms. Bass, you know, focused

23  on the claim that no company has fully commercialized the

24  process for repairing these X/Xi instruments and resetting

25  their use counter.  But we saw the evidence earlier from Stan

 1   Hamilton of Rebotix, testifying that Rebotix has figured out
 2   how to overcome what is the real key, you know, technical
 3   impediment here, the real, the real obstacle to actually
 4   entering into this market, which is resetting the use counter.
 5   He clearly testified that they have done that.
 6        And he's not the only one to testify that this is
 7   feasible.  Restore's Cliff Parker, for example, testified he
 8   was 100 percent confident that Restore would be able to do the
 9   same.  Restore's Kevin May testified that he was highly
10   confident that Restore would be able to get around the X/Xi use
11   counter.
12        And Professor Elhauge cites all this evidence at
13   Paragraph 275 of his opening report.  Similarly, he also cites
14   Rebotix's engineering firm that it hired in 2016 to analyze
15   this very question of whether it was possible to get around the
16   Xi use counter, the same engineering firm that it hired for --
17   to consult on the X/Xi use counter, which they did successfully
18   circumvent.  And this engineering firm concluded that it should
19   be feasible to do this.  So Professor Elhauge cites that too.
20        Finally, he also cites the expert opinion of SIS's
21   cryptography expert, Kurt Humphrey, testifying that it should
22   be, you know, possible; it would have been feasible at any
23   point in the last five years to get around the X/Xi use
24   counter.
25        So given all of that testimony about the feasibility of

1   doing this, the fact that Rebotix has overcome the key obstacle

2   to doing it, and then the other evidence that Professor Elhauge

3   cites, and economic principles, and namely the obvious one

4   that's the large economics incentive to enter this market --

5   you know, we're talking about hundreds of millions of dollars

6   in possible business, you know, from repairing these X/Xi

7   EndoWrists.  So given all that, and the evidence that the

8   repair companies, including Rebotix and Restore, long planned

9   to enter this market but were deterred by Intuitive's

10  restraints -- and by "this market" I mean the X/Xi EndoWrists

11  part.  And Professor Elhauge cites that evidence at

12  Paragraph 263 of his opening report and Paragraph 416 of his

13  rebuttal report.

14      Given all of this, Professor Elhauge has a reliable basis

15  to offer this as a reasonable scenario to just present it to

16  the jury as a reasonable damages scenario.  He's not saying

17  that this necessarily would have happened in the but-for world.

18  He's just saying that there's sufficient evidence to conclude

19  that it would have been possible.  And that it's a reasonable

20  damages estimate to present to the factfinder.

21      Thank you, Your Honor.  If there are any questions I can

22  answer about this motion, I'm happy to.

23          THE COURT:  No.

24      Counsel, I want to thank you all for your presentations

25  today.  I will take all of these motions under submission.  I

 1   have -- oh, go ahead.

 2         **MS. WINNER:**  Your Honor, I just wanted to say I had

 3   promised Your Honor to identify a particular First Circuit

 4   case.

 5         **THE COURT:**  That's right.

 6         **MS. WINNER:**  Without argument, I just tell you the

 7   case I was referring to is the *RSA Media Inc*. case in the First

 8   Circuit.  It is 260 F.3d, 10.

 9         **THE COURT:**  Thank you, Ms. Winner.

10       I have just one more matter for all of you before we

11   adjourn.  I want to speak with you all about calls placed this

12   morning to the Clerk's office about getting your materials in

13   to the courthouse today.  That call was placed to the main line

14   downstairs.

15       That person, the person who called, didn't have the case

16   number handy, didn't know which judge was in charge of the

17   case, and just kept referring to me as "the Latina judge" in

18   trying to get the materials here.

19       There are three things I want to say to all of you about

20   that, and about my expectations for you all going forward.

21       First:  Inquiries about getting materials to the

22   courthouse should not happen the day of the hearing.  I want

23   all of those to please happen the day before at the latest.

24   And I appreciate tremendously that you all emailed -- I don't

25   even know how long ago because it feels so long ago -- about

**PROCEEDINGS**

1    how this hearing would run.  I appreciate you all doing things

2    with enough time.  So that's the first point.  Calls the day of

3    should not happen.

4        Those queries should not go down to the main clerk.  They

5    go -- they are best directed to my CRD, Ms. Solorzano -- you

6    all have her email address, it's available on my website, it's

7    available all over the place on the Court's website -- because

8    she is, in fact, the best point of contact for anything related

9    to how to get materials in front of me.

10        And third:  No one should be calling this Court without a

11   case number and without knowing something more about the

12   matter.  You are wasting the time of the folks in the Clerk's

13   office.  And it isn't appreciated.

14        So I just want to make sure to say that to all of you.

15   Because I anticipate we'll see -- we may be continuing to do

16   this for some time.  And I would like for none of this to

17   repeat again.

18        Thank you again.  You'll hear from us.  I wish you well.

19   Safe travels home.

20        **MR. CORRIGAN:**  Thank you, Your Honor.

21        **THE COURTROOM DEPUTY:**  This calendar is now concluded.

22        (Proceedings concluded)

23

24

25

CERTIFICATE OF REPORTER

I, BELLE BALL, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_/s/ Belle Ball_

Belle Ball, CSR 8785, CRR, RDR

Sunday, September 10, 2023