UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SURGICAL INSTRUMENT SERVICE COMPANY, INC., et al.,

Plaintiffs,

v.

INTUITIVE SURGICAL, INC.,

Defendant.

Case No.  21-cv-03496-AMO

**ORDER RE: MOTIONS TO EXCLUDE EXPERT WITNESSES**

Re: Dkt. Nos. 117, 118, 119, 120, 121, 126, 129

**FILED UNDER SEAL**

This is an antitrust case involving a surgical robot system.  The Court heard Defendant Intuitive Surgical, Inc.'s ("Intuitive") motions to exclude the expert testimony of Jean Sargent (ECF 117), Kurt Humphrey (ECF 118), Dr. Amandeep Mahal (ECF 119), Dr. T. Kim Parnell, (ECF 120), Philip J. Phillips (ECF 121), Richard Bero (ECF 126), and Dr. Russell Lamb (ECF 129) on September 7, 2023.  Having read the papers filed by the parties and carefully considered their arguments therein and those made at the hearing, as well as the relevant legal authority, the Court hereby **GRANTS in part and DENIES in part** Defendants' motions, for the reasons herein.

Today, the Court issues this order, in addition to one resolving the parties' pending motions for summary judgment.  Below the Court assumes familiarity with the case's facts, which are more fully fleshed out in the summary judgment order.  After setting forth the legal standard for motions to exclude expert testimony, the Court addresses each *Daubert* challenge in turn.

**A.      Legal Standard**

Federal Rule of Evidence 702 allows a qualified expert to testify "in the form of an opinion or otherwise" when: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is

based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case. Fed. R. Evid. 702. Expert testimony is admissible under Rule 702 if it is both relevant and reliable. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). "Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry. And it is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013) (quoting *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010)).

"Under *Daubert*, the trial court must act as a 'gatekeeper' to exclude junk science that does not meet Federal Rule of Evidence 702's reliability standards by making a preliminary determination that the expert's testimony is reliable." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 145, 147-49 (1999)). "A trial court has broad latitude not only in determining whether an expert's testimony is reliable, but also in deciding how to determine the testimony's reliability." *Id.* (citing *Kumho Tire*, 526 U.S. at 152). The trial court's gatekeeping function under Rule 702 centers "not [on] the correctness of the expert's conclusions but the soundness of his methodology." *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1024 (9th Cir. 2022) (citation omitted). For example, courts routinely exclude expert testimony where the expert's opinion is not within the scope of his expertise. *See, e.g.*, *Avila v. Willits Envt'l Remediation Trust*, 633 F.3d 828, 839 (9th Cir. 2011). "The district court is not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury." *Alaska Rent-A-Car*, 738 F.3d at 969-70. Courts should screen "unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." *Id.* at 969; *see also City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1049 (9th Cir. 2014) ("A factual dispute is best settled by a battle of the experts before the fact finder, not by judicial fiat."). The Ninth Circuit has placed great emphasis on *Daubert*'s admonition that a district court should conduct this analysis "with a 'liberal thrust' favoring admission." *Messick v. Novartis Pharms. Corp.*, 747 F.3d 1193, 1196 (9th Cir. 2014).

In general, flaws in a proffered expert's analysis typically go to the weight, rather than the

2

admissibility, of the expert's testimony. *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1188 (9th Cir. 2002) ("In most cases, objections to the inadequacies of a study are more appropriately considered an objection going to the weight of the evidence rather than its admissibility. Vigorous cross-examination of a study's inadequacies allows the jury to appropriately weigh the alleged defects and reduces the possibility of prejudice." (internal citation omitted)). "In some cases, however, the analysis may be 'so incomplete as to be inadmissible as irrelevant.'" *Id.* (quoting *Bazemore v. Friday*, 478 U.S. 385, 400 n.10 (1986)).

## B. Jean Sargent

Plaintiff Surgical Instrument Services, Inc. ("SIS") proffers Jean Sargent as an expert to opine on "procurement of instrument repair services" from group purchasing organizations ("GPOs") and "hospital practices regarding Food and Drug Administration ('FDA') approvals and clearance for instrument repair services." Lazerow Decl. Ex. 1 (Sargent Report) ¶ 19. Sargent is a consultant with several decades of experience in healthcare materials and supply chain management. *Id.* ¶¶ 1-15. Intuitive moves to dismiss Sargent's opinions that (1) hospitals do not consider whether FDA device approvals and clearances such as those under Section 510(k) have been obtained for servicing and repair services of instruments that are owned by the hospital; (2) hospitals participating in SIS's EndoWrist reset program would collect expired instruments to be reset at a rate of approximately 75%; and (3) SIS would have achieved customer "conversion" and "penetration" rates among member hospitals of "30% by the end of the first year [of offering its EndoWrist reset service], 70% by the end of the second year after the service is introduced, and 70% to 80% thereafter." Mot. Exclude Sargent at 11.

First, Intuitive argues that Sargent's opinion regarding hospitals' interests in whether a company "servicing" or "repairing" an instrument has FDA clearance is irrelevant to this case – Intuitive contends that what SIS does to the Endo Wrists amounts to "remanufacturing." Plaintiffs concede in response that Sargent does not offer an opinion regarding whether the activity offered by SIS constituted "repair" or "remanufacturing." Rather, Sargent's testimony offers opinions about how hospitals view the services offered by SIS and hospital practices with respect to servicing of instruments. *See, e.g.*, Sargent Report ¶¶ 122-39 (describing how hospitals do not

typically inquire about the need for FDA approval with respect to the type of services provided by companies such as SIS). That Sargent does not opine on the distinction between repair and remanufacture does not render her opinion irrelevant. Rather, her opinion is relevant at least to inform the jury's understanding of how hospitals might have engaged the market for repaired instruments absent 510(k) clearance in the "but for" world absent anticompetitive interference from Intuitive, a meaningful contention in the scope of this antitrust case. Sargent's opinion is relevant and need not be excluded on this basis.

Second, Intuitive challenges Sargent's opinion that hospitals participating in SIS's proposed repair program would have collected "approximately 75%" of the expired EndoWrist instruments to be reset. Sargent provides this testimony based on her years of experience with collection rates for instrument repairs within hospital systems. Lazerow Decl. Ex. 1 at ¶¶ 9-14, 33, 54-56, 58. Intuitive contends that Sargent's opinions about Endo Wrist collection rate are totally baseless, arguing: "Sargent admits that she considered no industry information literature or facts from the record to support her view that there is such a thing as a 'general industry collection rate' or what any such rate might be." Mot. Exclude Sargent at 5 (citations to report and deposition omitted). But Intuitive ignores Sargent's testimony that she based her collection rate opinions on her relevant experience (Lazerow Decl. Ex. 2 (Sargent Dep.) at 228:20-24), which is substantial. *See* Sargent Report ¶¶ 9-14. Experts may offer testimony based on their knowledge and experience. *See United States v. Holguin*, 51 F.4th 841, 855 (9th Cir. 2022) ("The Rules Advisory Committee has explicitly recognized that 'the application of extensive experience' is a 'method' that can reliably support expert testimony.").

Intuitive further challenges the reliability of Sargent's projection of the penetration rates that SIS would have achieved at hospital members of the GPO Vizient. Sargent formerly worked at Vizient and made purchasing decisions for GPO-approved products on behalf of several hospitals, and she is accordingly well-qualified to make an educated estimation as to how well SIS would have penetrated the Vizient ecosystem, and at what rates. *See, e.g.*, Sargent Report ¶ 12. She bases her opinion on her knowledge of penetration rates for similar types of devices, including electrophysiology diagnostic catheters, cables, endo shears, trocars, and laparoscopic instruments.

4

Sargent Report ¶ 57.  She additionally bases her opinion on her experience and knowledge of how hospitals make decisions concerning using ISOs and GPOs to realize cost savings.  Sargent Report at ¶¶ 9-14, 33, 54-56, 58.  Though Intuitive attempts to poke holes in Sargent's testimony based on her lack of knowledge regarding the full scope of the repair market (*see, e.g.*, Mot. Exclude Sargent at 10), this is not a basis to exclude her testimony as unreliable.  Rather, the Court finds that Sargent provides sufficient description of her experience with hospital supply chains to avoid exclusion.  Intuitive's challenges are more appropriately presented through rigorous cross examination, and the Court DENIES Intuitive's motion to exclude Sargent's testimony.

### C.    Kurt Humphrey

SIS proffers Kurt Humphrey as an expert in reverse engineering of microprocessors with 40 years of engineering experience, including more than 20 years of experience as a "process development engineer and process integration manager."  Cahoy Decl. Ex. 9 (Humphrey Report) at 2.  During those 20 years, Humphrey engaged in reverse engineering "a large number and wide variety of semiconductor devices including microprocessors" and "[radio frequency identification ('RFID')] products such as smart EMV smartcards and other proximity integrated circuit cards (PICCs)."  *Id.* at 3.  Humphrey's product design and reverse engineering experience involving RFID products is directly relevant to Intuitive's design of the X/Xi Endo Wrists because "Intuitive upgraded to a [RFID] interface – a form of wireless communication" in its design of the instruments.  Mot. Exclude Humphrey at 3.

Intuitive challenges several aspects of Humphrey's testimony, including (1) his analysis regarding Intuitive's product design changes in adopting RFID encryption for the use counter in the X/Xi EndoWrist instruments; (2) his opinion regarding the feasibility of breaking the X/Xi EndoWrist encryption; (3) his opinion on the ease with which the use counter on the X/Xi instruments may be reset; and (4) his proposed timeframe in which third parties would have reverse engineered a process for successfully resetting the X/Xi use counters but for Intuitive's anticompetitive conduct.  The Court considers these challenges in turn.

//

//

United States District Court
Northern District of California

### 1.    Motivation for Design Changes

In challenging Humphrey's analysis regarding Intuitive's product design changes, Intuitive takes issue with Humphrey's conclusion that Intuitive's primary motive in upgrading to an encrypted RFID communication channel for the use counter on X/Xi EndoWrists was to block independent repair companies ("IRCs") from resetting the use counters. Intuitive argues that Humphrey's opinions in that section of his report should be excluded because (a) corporate motives are an inappropriate subject for expert testimony, and (b) Humphrey merely regurgitates select quotations without applying any methodology.

### a.    Testimony Regarding Corporate Motives

Intuitive avers that Humphrey's opinions regarding corporate motives should be excluded because it reaches beyond the proper scope of expert testimony. While the "opinions of [expert] witnesses on the intent, motives, or states of mind of corporations, regulatory agencies and others have no basis in any relevant body of knowledge or expertise," *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 2020 WL 2553181, at *5-6 (S.D. Cal. May 20, 2020) (quoting *Stone Brewing Co., LLC v. MillerCoors LLC*, 2020 WL 907060, at *4 (S.D. Cal. Feb. 25, 2020)), aff'd, 9 F.4th 1102 (9th Cir. 2021), Humphrey's opinions are distinguishable because Humphrey interprets record evidence to offer an opinion from an engineering design perspective; he does not offer legal interpretation of contracts. *See id.* at *4-5.

The substance of Humphrey's engineering opinion additionally negates Intuitive's broader argument. Intuitive charges that Humphrey offers an opinion about Intuitive's corporate motives in its design of X/Xi EndoWrists, but Humphrey does no such thing. Humphrey details his analysis of the record evidence, specifically discussing relevant engineering documents and communications related to EndoWrists on subjects such as (1) engineering design documents discussing the prior, non-RFID solution as a technically suitable backup (Humphrey Report ¶¶ 38-39); (2) lack of reliability issues with the prior, non-RFID solution (*id.* at ¶¶ 40-42); and (3) product availability and cost (*id.* at ¶¶ 43-47). In light of a lack of documented concerns about the non-RFID solution for these issues, Humphrey further examines the stated concerns of Intuitive lead engineering personnel and finds that their design goal was to ensure the encryption

was such that third parties do not "[t]ake an Expired instrument and restore its available lives." *Id.* at ¶¶ 47-51. Humphrey properly limits his opinion to engineering design changes in the EndoWrist, and the Court finds no reason to exclude his opinion on the basis advanced by Intuitive.

### b. Record Evidence Relied Upon by Humphrey

Intuitive also seeks exclusion of Humphrey's testimony regarding the design choice to adopt RFID encryption in X/Xi EndoWrists on the basis that he does not apply an expert methodology and instead offers his personal interpretation of quotes from Intuitive emails and documents. Intuitive essentially complains about the significance that Humphrey attaches to the various pieces of evidence in the record and charges that Humphrey merely "parrots" the language of Intuitive's documents.

Humphrey examines the X/Xi EndoWrist encryption design choice from an engineering design perspective. His assessment is based on official design documents and communications by Intuitive's engineering group leaders as well as the prior encryption design choice made by Intuitive engineers for the S/Si Endo Wrists. *See* Humphrey Report ¶¶ 37-59. That evidence is relevant to the justification for and factors considered in connection with the RFID chip design switch, and review of technical documentation relevant to a product or process under reverse engineering scrutiny is part of the methodology used by experts in the field. *See Rebotix Repair, LLC v. Intuitive Surgical, Inc.*, 8:20-cv-02274-VMC-TGW, ECF 188 at 12 (M.D. Fla. Aug. 10, 2022) (order filed under seal). Humphrey's analysis of the X/Xi RFID chip design record constitutes admissible expert testimony.

### 2. Feasibility of Breaking X/Xi Encryption

Intuitive seeks exclusion of Humphrey's opinion regarding the feasibility of breaking X/Xi encryption on the basis that Humphrey is not qualified to offer opinions on computer software and cybersecurity, subjects that informed his opinion about the same subject when he offered his testimony in *Rebotix*. Cahoy Decl. Ex. 9, Att. 3 (Humphrey *Rebotix* Report) at ¶¶ 56, 59, 67, 78. Intuitive also challenged Humphrey's opinion on the same substance in *Rebotix*, and Intuitive attributes the survival of his testimony in that case to the engineer's reliance on the opinion of

United States District Court
Northern District of California

1     another expert, a cybersecurity consultant, to opine that reprogramming the X/Xi use counter

2     would prove a "simple process."  Humphrey *Rebotix* Report ¶ 45.  Humphrey does not maintain

3     the same opinion in his report in this case, making clear that he does not rely on the same expert

4     report to form his opinion as in *Rebotix*.  *Compare* Cahoy Decl. Ex. 9 (Humphrey's SIS report not

5     citing software expert within the body of the report at all), with *id.*, Att. 3 ¶¶ 7, 25 (Humphrey's

6     *Rebotix* report citing software expert's report repeatedly).  Indeed, Humphrey's opinion in this

7     case changes in light of the different record – he states that the process of X/Xi reprogramming

8     would prove difficult from a reverse engineering perspective.  Cahoy Decl. Ex. 9 § V.  Intuitive's

9     focus on the inconsistencies between Humphrey's two reports is best explored through cross-

10    examination, not exclusion.

11         Intuitive additionally asserts that simply because Humphrey is "not a software engineer,"

12    he is not qualified to "offer freestanding opinions on the feasibility of or resources involved in

13    breaking the encryption of the X/Xi or re-programming the use counter."  Mot. Exclude

14    Humphrey at 9.  But, as noted above, an expert can testify based on his or her knowledge and

15    experience.  *See Holguin*, 51 F.4th at 855 ("The Rules Advisory Committee has explicitly

16    recognized that 'the application of extensive experience' is a 'method' that can reliably support

17    expert testimony.").  Intuitive's challenge is misplaced in light of Humphrey's experience in

18    reverse engineering RFID products.  The Court declines to exclude Humphrey's opinion on this

19    basis.

20                    **3.        Opinions on the Timing of X/Xi Reset Development**

21         Intuitive claims that Humphrey "offers several [i.e. four] conflicting hypothetical

22    timeframes" for when a fully developed process to successfully reset an X/Xi EndoWrist use

23    counter could have been accomplished, but for Intuitive's anticompetitive conduct in this case.

24    Mot. Exclude Humphrey at 10.  Intuitive identifies these "four different dates" as: "any time in the

25    last five years," "at least as early as 2019," "January 1, 2021," and "January 1, 2022."  *Id.* at 5.

26         Intuitive takes those dates out of context.  As SIS highlights in its opposition, "[a]ny time

27    in the last five years, if not earlier" is Humphrey's assessment of when the reverse engineering of

28    X/Xi Endo Wrist use counter could have been performed had the appropriate funding and

United States District Court
Northern District of California

resources been available to offset the impact of Intuitive's allegedly anti-competitive conduct. Humphrey Report at ¶ 36.  Stating a timeframe that is not inconsistent with this, Humphrey refers to "at least as early as 2019" to describe a possible time frame to achieve X/Xi use counter reset consistent with being compressed through the use of additional computing power and financial resources.  Humphrey Report at ¶ 15.  And finally, the dates "January 1, 2021 or January 1, 2022" are found in the report of Richard Bero, not Humphrey's report.  Bass Decl. Ex. 1 (Bero Report) at 57-58.  Moreover, Bero cites these dates as conservative estimates for when SIS would have been able to reset the X/Xi Endo Wrist use counters in the context of various damages scenarios that he considered, if the reverse engineering efforts had begun at a time certain.  *Id.*  The dates Intuitive plucks are not inconsistent nor arbitrary.  Nonetheless, any purported inconsistency in dates serves as a basis for Intuitive to cross-examine Humphrey, not for the Court to exclude his testimony.

In sum, the Court DENIES Intuitive's motion to exclude Humphrey's testimony.

### D.  Dr. Amandeep Mahal

Dr. Mahal is an obstetrician and gynecologist, as well as a board-certified female pelvic medicine and reconstructive surgeon.  Lannin Decl. Ex. 1 (Mahal Report) ¶ 1.  He employs both "traditional (open) and laparoscopic surgical techniques" in his practice, and he also has extensive experience using the da Vinci surgical system.  *Id.* ¶¶ 4-5.  Intuitive moves to strike only certain portions of his testimony as discussed below.

#### 1.  Opinion that EndoWrist Use Counters do not Provide Relevant Information

Dr. Mahal opines that the "EndoWrist use counter does not provide relevant information about actual use, and is of no value in assessing likely instrument performance."  Mahal Report § IX; *see also id.* ¶¶ 21, 65 ("The use counter of an EndoWrist instrument does not provide a surgeon any practical, relevant information about the instrument's actual usage, whether in a particular surgery or over the life of the instrument.").  Intuitive asserts that Dr. Mahal's opinion about the use counter "rests on nothing but speculation" and complains that he "fails to cite or take account of any of the voluminous evidence that does exist on how the use limits were developed,

the testing on which they rely, and how the FDA cleared them." Mot. Exclude Mahal at 4. Intuitive's arguments fail on both points.

Dr. Mahal's opinion reaches beyond speculation because it is based on having conducted over 1000 surgeries using the various da Vinci surgical robots and their associated EndoWrist instruments. Mahal Report ¶ 5. Moreover, Dr. Mahal identifies information that he considers meaningful in the context of assessing the actual surgical use of an EndoWrist instrument and the quality of its likely further performance, none of which are provided by or available from the EndoWrist use counter, such as the duration of earlier surgical procedures, how the instrument was used in prior surgeries, what types of procedures it was used for, or even if the instrument malfunctioned. Mahal Report ¶¶ 65-66. Dr. Mahal further opines that the number of uses remaining for a particular EndoWrist instrument "does not actually measure any qualitative information about actual instrument usage." *Id.* ¶ 73. Because Dr. Mahal's testimony constitutes a medical opinion based upon sufficient facts and data drawn from his experience as a surgeon, it meets the reliability standard for admissibility.

Intuitive advances its second line of attack based on Dr. Mahal's alleged failure to analyze certain engineering evidence about the development and FDA review of the use counter. Intuitive's argument mischaracterizes the subject for which Dr. Mahal offers his opinion, as a surgeon rather than as an engineer. Disputed opinions from experts in other disciplines about how use limits were developed, the testing on which they rely, and how the FDA reviewed Intuitive's testing data submitted to support use limits are immaterial to Dr. Mahal's opinions as an experienced surgeon as to how the use counter is utilized (or not) in his surgical practice. Consequently, Intuitive's argument does not render Dr. Mahal's opinion unreliable.

### 2. Opinion that Serviced EndoWrists Operate in the Same Manner as Original EndoWrists

Intuitive challenges Dr. Mahal's opinion that "there is no reason to believe that an EndoWrist instrument that has been serviced after expiration of the Intuitive-specified use counter would not operate in the same manner as an EndoWrist whose use counter has not expired." Mahal Report ¶ 62. But in presenting this argument, Intuitive lifts only a portion of the full quote.

United States District Court
Northern District of California

Dr. Mahal opines, based on his medical knowledge and firsthand surgical experience, that

> given the nearly identical operation of EndoWrist instruments having different numbers of uses within the usage limits specified by Intuitive, and that EndoWrist failures I am aware of are easily identifiable, there is no reason to believe that an EndoWrist instrument that has been serviced after expiration of the Intuitive-specified use counter would not operate in the same manner as an EndoWrist whose use counter has not expired.

Mahal Report ¶ 62. This is important context because, rather than opining on engineering and technological aspects of the EndoWrists beyond his expertise, Dr. Mahal based this opinion on his extensive experience, his familiarity with the da Vinci robot and EndoWrists, and his review of the record, including the testimony and expert reports submitted by other experienced surgeons. *See Kumho Tire Co.*, 526 U.S. at 156 ("[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience."). Dr. Mahal's years of experience as a surgeon qualify him to opine on the potential consequences to patient health and safety of using inadequate instruments to perform surgical procedures. Intuitive's arguments regarding Dr. Mahal's opinion regarding serviced EndoWrists are more properly explored through cross examination. The Court will not exclude Dr. Mahal's opinion on this ground.

### 3. Business Implications of the Da Vinci System for Hospitals and Surgeon Preferences

Dr. Mahal offers several opinions about the purported business implications for hospitals if they do or do not possess da Vinci systems. For example, he opines that "Da Vinci robotic-assisted surgery was a significant development in performing minimally invasive surgery and has become an essential 'must-have' feature for hospital and surgical center operations over the last two decades." Mahal Report ¶ 30. According to Dr. Mahal, "there is a sense among both hospital staff and patients that an active da Vinci surgery program is a de facto requirement for a hospital to be up-to-date with current trends." *Id.* ¶ 41. Dr. Mahal opines that "patients consider whether hospitals are keeping up with current trends in technology and medicine when deciding on care." *Id.* Dr. Mahal bases these opinions on his "conversations with patients and [his] general understanding from others in the profession." *Id.*

United States District Court
Northern District of California

11

Intuitive additionally attacks Dr. Mahal's various observations regarding surgeon preferences related to surgical robot use, including (1) "As robotic surgery has become more prevalent at many training centers in the United States, many doctors find that they require a da Vinci system to consistently complete surgeries safely"; (2) "Many smaller hospital systems have at least one da Vinci system, as most surgeons who perform minimally invasive surgery would not consider working in a facility that was not able to perform a da Vinci surgery.  This is particularly true for surgeons who entered the profession within the last 15-20 years"; and (3) "Surgeons in fact regularly demand that a da Vinci system is made available to perform particular surgeries, and in my experience hospitals acquiesce to such demands."  Mahal Report ¶¶ 37, 40.

An expert's testimony must have a sufficiently reliable basis in the knowledge and experience of the relevant discipline.  *United States v. Ruvalcaba-Garcia*, 923 F.3d 1183, 1188-89 (9th Cir. 2019).  The reliability analysis is "a malleable one tied to the facts of each case," and "district courts are vested with 'broad latitude' to 'decide how to test an expert's reliability' and 'whether or not an expert's relevant testimony is reliable.'"  *Murray v. S. Route Mar. SA*, 870 F.3d 915, 922-23 (9th Cir. 2017) (quoting *Kumho Tire*, 526 U.S. at 152-53).

Dr. Mahal's opinion that da Vinci systems have become an essential "must-have" feature for hospital and surgical center operations is reliable.  It is sufficiently drawn from his extensive medical knowledge and firsthand experience conducting surgical procedures with both traditional laparoscopic equipment and techniques, as well as with da Vinci surgical robots.  Mahal Report ¶¶ 5-6.  Dr. Mahal's several years of experience provide him with unique insight to opine on such matters that fall outside common experience.  Similarly, in seeking exclusion of Dr. Mahal's testimony about personal experiences and observations concerning his field of surgical expertise, Intuitive mischaracterizes his testimony as "sweeping opinions about surgeons' views and preferences" and claiming "to speak on behalf of surgeons generally."  Mot. Exclude Mahal at 9. Personal observations, including conversations and interactions that a surgeon has with patients, hospital staff, and other surgeons, is the type of information reasonably relied upon by surgeons in understanding how patients make decisions regarding their medical care.  Based on his knowledge and experience as a surgeon, Dr. Mahal may testify regarding "actual known perceptions" of how

12

1   hospitals with a da Vinci are advantaged in terms of attracting patients.  *See Rebotix Repair, LLC*

2   *v. Intuitive Surgical, Inc.*, No. 8:20-CV-2274-VMC-TGW, 2022 WL 3226769, at *4 (M.D. Fla.

3   Aug. 10, 2022) (declining to exclude expert opinion of surgeon regarding public perception of

4   hospitals with da Vinci systems).  The Court declines to exclude Dr. Mahal's testimony on these

5   bases as well.

### 4.    Opinions as to How the da Vinci Si and Xi Systems Perform for "Most Surgeries"

8       Dr. Mahal offers several opinions that compare the da Vinci Si and Xi systems and their

9   instruments.  For example, he opines that "for most surgeries a da Vinci Si system performs

10  similarly to a da Vinci Xi system, provides similar advantages over traditional laparoscopic

11  surgery, and is equally safe for patients and operation room staff."  Mahal Report ¶ 42; *see also id.*

12  ¶ 17; Lannin Decl. Ex. 2 (Mahal Rebuttal) ¶ 6(d).  In his view, the "vast majority of procedures

13  that are performed with an Xi system and EndoWrists can be performed with an Si system and

14  EndoWrists[.]"  Mahal Report ¶ 52.  Dr. Mahal also opines that "[f]rom a surgeon's perspective,

15  corresponding Si and Xi EndoWrist instruments are equivalent" and that "[m]ost surgeons do not

16  change procedures or surgical plans for EndoWrist usage based on whether the surgeon is using an

17  Si system and EndoWrists or an Xi system and EndoWrists."  Mahal Report ¶¶ 43, 51; *see also id.*

18  ¶ 18; Mahal Rebuttal ¶ 6(e).

19      Intuitive complains that Dr. Mahal does not offer sufficient evidence for his opinions about

20  "most surgeries" or the "vast majority of procedures."  Mot. Exclude Mahal at 10.  Yet Intuitive

21  acknowledges that Dr. Mahal stated that his opinions are drawn from his own clinical experience

22  with the S, Si, X, and Xi platforms in the course of his practice, as well as from personal

23  conversations with other surgeons.  *Id.*  The Court does not find Dr. Mahal to opine

24  inappropriately with broad-brush opinions about the use of the various instruments in surgeries

25  because his opinion is reliably based on his own experience.  Therefore, the Court declines to

26  exclude Dr. Mahal's opinion on this subject as well.

27  //

28  //

United States District Court
Northern District of California

### E.       Dr. T. Kim Parnell

Dr. Parnell is a mechanical engineer who has worked on numerous projects involving an array of medical products, product failures, product design, material selection, and medical device development.  Chaput Decl. Ex. 1 (Parnell SIS Report) ¶¶ 1-13.  Dr. Parnell has over 30 years of experience as a mechanical engineer and is a licensed Professional Mechanical Engineer in California.  *Id.* ¶¶ 1-14.  Plaintiffs tasked Dr. Parnell with responding to several opinions offered by Intuitive's engineering expert, Dr. Robert Howe.  Because Intuitive successfully moved to exclude a portion of Dr. Parnell's opinion on similar subjects in the *Rebotix* case, the Court briefly summarizes that court's order before discussing the five of Dr. Parnell's opinions Intuitive challenges in this case.[1]

#### 1.       Dr. Parnell and the *Rebotix* Case

As Intuitive points out, Dr. Parnell was also retained by Rebotix to offer opinions in its similar case against Intuitive in the Middle District of Florida.  However, contrary to Intuitive's mischaracterizations, the *Rebotix* court largely rejected Intuitive's *Daubert* motion and permitted Dr. Parnell to offer many of the same opinions he is offering in the present case.  For example, the *Rebotix* court found that "Dr. Parnell used sufficiently reliable methodologies to opine on the safety of Rebotix's repair process."  *Rebotix Repair, LLC v. Intuitive Surgical, Inc.*, No. 8:20-CV-2274-VMC-TGW, 2022 WL 3226767, at *4 (M.D. Fla. Aug. 10, 2022).  That court additionally allowed the jury to consider his opinions on, for example, (a) "the FDA's manufacturing guidelines . . . , along with what can generally go wrong in medical-device manufacturing"; (b) "that Intuitive does not adequately address potential manufacturing defects"; (c) "the safety and reliability of repaired versus new EndoWrists"; and (d) "regarding failure-mode testing in general and his conclusions that Intuitive failed to perform such testing adequately."  *Id.* at *4-5.  The *Rebotix* court excluded, however, Dr. Parnell's opinion that the use counter did "not promote

---

[1] In addition to challenging Dr. Parnell's testimony in this case, Intuitive advances identical arguments to exclude Dr. Parnell's testimony in the related antitrust case brought against it by a number of hospitals.  *In Re: Da Vinci Surgical Robot Antitrust Litigation*, N.D. Cal. Case No. 3:21-cv-03825-AMO.  The analysis here is substantially similar to the order resolving the *Daubert* motions in that case.

United States District Court
Northern District of California

patient safety." *Id.* at *4. The court failed to see "how Dr. Parnell's training as a mechanical engineer makes him qualified to opine on patient safety. Most of the facts undergirding this opinion could just as easily be offered by surgeons or surgical technicians who work with the EndoWrists in the operating room." *Id.* In his *Rebotix* report, Dr. Parnell expressly stated, "It is my opinion that Intuitive's use counter does not promote patient safety" (Chaput Decl. Ex. 4 (Parnell *Rebotix* Report) ¶ 20), but that opinion is not being offered in the case at bar (*see* Parnell SIS Report ¶¶ 24, 212-64). In the cases here in the Northern District of California, Intuitive again challenges Dr. Parnell's expert testimony.

### 2. Patient Safety

Intuitive seeks to exclude Dr. Parnell's opinion that the EndoWrist use counter is an "inadequate" method of ensuring patient safety. Intuitive attempts to analogize Dr. Parnell's reports here to portions of his testimony that the court excluded in the *Rebotix* case. The *Rebotix* court granted Intuitive's request to exclude Dr. Parnell's opinions only regarding the inadequacy of the use counter to the extent those opinions reached conclusions explicitly about patient safety, a subject the court viewed as more properly falling within the expertise of others, like surgeons. *See Rebotix*, 2022 WL 3226767, at *4. But Dr. Parnell does not opine on patient safety here; rather, he proffers an opinion regarding the design and efficacy of the EndoWrist use counter from an engineering perspective. Dr. Parnell directly responds to the opinion of Intuitive's engineering expert, Dr. Howe, by explaining what the use counter measures, how it performs those measurements, and how it fails to account for actual usage or wear and tear, mishandling or misuse, or the condition of the instruments. Parnell SIS Report ¶¶ 221-64. All of these inquiries fall within the bounds of an engineer's opinion. Dr. Parnell's perspective on the engineering aspects of the use counter and alternatives therefore does not touch upon patient safety and need not be excluded.

### 3. Alternative Means of Measuring "Wear and Tear"

Intuitive also seeks to exclude Dr. Parnell's opinion concerning the feasibility of alternative means for measuring EndoWrist instrument "wear and tear." Intuitive frames Dr. Parnell's opinion on such alternative means of measuring instrument wear and tear as mere

15

speculation.  In substance, Dr. Parnell opines that the data already collected by Intuitive regarding the amount of time instruments are used and the amount of force to which they are subjected during surgeries is a better way to measure wear and tear.  *See* Parnell SIS Report ¶ 230; *see also* Sindoni Decl. Ex. 3 (Parnell Dep.) at 145:16-146:1 (discussing availability of information on duration of instrument use to surgeons through the "My Intuitive App").   Dr. Parnell's report shows that his opinion flows from his expertise as a mechanical engineer with extensive experience with manufacturing in biomedical and medical device industries, and more specifically product failures, product design, and medical device development.  Parnell SIS Report ¶¶ 1-13, App. A.  Dr. Parnell addresses Intuitive's purported justification for its use limit being supported by testing of the instruments' risk of malfunction across their several uses or "lives" ("life testing") by explaining the deficiencies with Intuitive's life testing process.  Parnell SIS Report ¶¶ 250-61.  He contends that the use counter does not measure how intensely or how long an EndoWrist is used.  Parnell SIS Report, ¶¶ 217-32.[2]  These opinions are both relevant and reliable. *See Kumho Tire*, 526 U.S. at 150 ("Engineering testimony rests upon scientific foundations, the reliability of which will be at issue in some cases. . . .  In other cases, the relevant reliability concerns may focus upon personal knowledge or experience.").  To the extent Intuitive discounts Dr. Parnell's assessment of the da Vinci system as deficiently derived from the deposition testimony of a "single" Intuitive employee, Dr. Parnell makes clear that his assessment relies on binding Rule 30(b)(6) testimony from one of Intuitive's lead engineers on topics related to (a) the electronic components in EndoWrists, (b) the sharing of information between those components, and a compatible da Vinci Surgical Robot, and (c) the mechanical and electrical components of EndoWrists and their functioning.  Chaput Decl. Ex. 11 (Duque 30(b)(6) Dep.) at 13:22-15:15;

---

[2] While Intuitive criticizes Dr. Parnell for ignoring the extensive risk management process and life testing underlying the use counter, the record shows that he considered all the Intuitive data that Dr. Howe considered and specifically analyzed Intuitive's instrument testing.  *See* Parnell SIS Report ¶ 255, App. B.

United States District Court
Northern District of California

16:6-17:14; 18:25-19:10; Sindoni Decl. Ex. 2 (Duque Ex. 264, 30(b)(6) Notice).[3]  The Court will not exclude this relevant and reliable expert testimony merely because Intuitive disagrees with it. Dr. Parnell's opinion regarding the design of the EndoWrist use counter need not be excluded.

### 4.    Identification of Instruments "Unsuitable for Repair"

Intuitive attacks Dr. Parnell's observations of EndoWrists identified as "unsuitable for repair" while visiting the Rebotix repair facility in 2021.  Chaput Decl. Ex. 1 ¶ 23, ¶¶ 86-92.  Dr. Parnell's report states that he "did not detect damage due to wear on the instrument" when examining EndoWrists at Rebotix's facility that had been deemed "Unsuitable for Repair." Parnell SIS Report ¶ 91.  But Dr. Parnell articulates no methodology he applied to reach a conclusion on the cause of failure for the small subset of instruments he examined.  Plaintiffs appear to concede this point, stating that "[n]o rational reader would interpret" this statement as "an opinion on the cause of failure of those instruments."  Opp. at 11.  In light of this concession, the Court excludes opinions from Dr. Parnell about the cause of failure of the EndoWrists he saw at the Rebotix repair facility.

### 5.    Repairability

Intuitive challenges Dr. Parnell's opinion that EndoWrists can be routinely repaired like traditional laparoscopic instruments.  Intuitive focuses on the term "repair," arguing that Dr. Parnell's description of the Rebotix process as repair is false because Rebotix never fixed broken EndoWrists.  The Court declines to engage with this semantic argument regarding the meaning of "repair" and whether IRCs conducted "repair" rather than "remanufacturing" in the context of a motion to exclude expert testimony.  More importantly, for the reasons discussed in the Court's order on the cross-motions for summary judgment, the Court abstains from finding that the EndoWrist services provided by IRCs constituted a service that required FDA clearance where that agency took no enforcement action.  The Court accordingly declines to exclude Dr. Parnell's opinions about the repairability of EndoWrists and/or laparoscopic instruments.

---

[3] Intuitive additionally attacks Dr. Parnell's proposed alternative to the use counter as insufficient to constitute a "substantially less restrictive alternative" to Intuitive's asserted justification for the Use Counter.  This argument goes to the weight of Dr. Parnell's opinion, not whether it should be excluded.

United States District Court
Northern District of California

**6.     Assessment of Testing Data Utilized by IRCs**

Finally, Intuitive seeks to exclude Dr. Parnell's opinion that "SIS properly relied on the testing of [its] trusted technology partner, Rebotix, regarding the EndoWrist repair process." Parnell SIS Report ¶ 102.  Intuitive argues that Dr. Parnell's opinion improperly relies on business acumen outside his expertise, and the opinion improperly confers credibility in an assessment better left to the factfinder.  Plaintiffs counter that Dr. Parnell's report offers this opinion in response to the opinion of Dr. Howe, Intuitive's engineering expert, who stated that the information provided to Restore and SIS about repaired instruments was insufficient to determine whether the instruments were safe or reliable.  *See* Chaput Decl. Ex. 8 (Howe Report) ¶ 23.

In the challenged part of his report, Dr. Parnell evaluates Rebotix's risk management and life testing data underlying the information that was provided to Restore and SIS to evaluate whether the "information available [to SIS and Restore] was [] sufficient to determine whether the instrument was safe or reliable."  Parnell SIS Report ¶¶ 103-156.  Dr. Parnell's opinion that such information was sufficient to determine instrument safety falls within the scope of his engineering expertise.  Thus, the Court does not exclude this portion of Dr. Parnell's opinion.

In sum, the Court GRANTS in part and DENIES in part Intuitive's motion to exclude the testimony of Dr. Parnell.  The Court only excludes opinions from Dr. Parnell about the cause of failure of the EndoWrists he saw at the Rebotix repair facility.

**F.     Philip J. Phillips**

Philip J. Phillips is an independent regulatory consultant who worked at the FDA Center for Devices and Radiological Health from 1981 to 2005.  Lazerow Decl. Ex. 1 (Phillips Report) ¶¶ 7, 9, 12.  During Phillips's time at the FDA, he was involved in the FDA's evaluation of premarket clearance applications for medical devices in the United States, providing him with familiarity in the Section 510(k) clearance process.  *Id.* ¶¶ 10-11.  SIS retained Phillips to opine on "the reasonableness of SIS's efforts to conform with all applicable FDA regulatory requirements in regard to servicing Intuitive Surgical's EndoWrists."  Phillips Report ¶ 1.  Intuitive moves to exclude all of his opinions.  The Court groups Intuitive's challenges to Phillips's opinions into (1) those Intuitive attacks as improperly opining on the reasonableness of SIS's conduct and (2) those

United States District Court
Northern District of California

Intuitive attacks as improper legal interpretation of the regulatory scheme. The Court considers each challenged group of opinions in turn.

### 1. Reasonableness of SIS's Conduct

Intuitive seeks exclusion of Phillips's opinion that "SIS acted reasonably in its effort to conform with FDA medical device requirements." Phillips Report ¶ 4. Intuitive separately seeks exclusion of Phillips's opinion that "the submission of a 510(k) and an FDA clearance by others does not establish that either is in fact, necessary or required for SIS's repair services." Phillips Report ¶ 4(iii). On both points, Intuitive argues that his opinions regarding regulatory compliance by SIS and another IRC are unreliable because Phillips failed to consider FDA communications, including the FDA's informal correspondence with IRCs and the agency's introduction of a new, internal product code. But Intuitive's arguments regarding the reliability of these opinions fail because, "[t]here is no rule that an expert must consider and discuss all of the evidence on the record in order to proffer admissible testimony." *In re Packaged Seafood Prod. Antitrust Litig.*, No. 15-MD-2670 JLS (MDD), 2020 WL 5739316, at *4 (S.D. Cal. Sept. 24, 2020). The expert's purported failure to address evidence that may undermine his or her opinions serves as grounds for cross examination, not exclusion. *Id.* at *4. Intuitive's argument amounts to a disagreement about Phillips's statements based on his experience in the FDA and accordingly does not require exclusion of his testimony as unreliable. The Court declines to exclude Phillips's testimony on this basis. Intuitive may explore through cross-examination its disagreement with the conclusions Phillips reaches.

To the extent Intuitive argues that Phillips's testimony about FDA's procedure for assessing 510(k) clearance is irrelevant, that argument also fails. Phillips worked in the FDA division focused on evaluating premarket clearance applications for medical devices for over 20 years. Phillips Report ¶¶ 7-11. An expert can testify based on his knowledge and experience. *See Holguin*, 51 F.4th at 855 ("The Rules Advisory Committee has explicitly recognized that 'the application of extensive experience' is a 'method' that can reliably support expert testimony."). The Court declines to exclude Phillips's opinion regarding the procedure for assessing 510(k) clearance.

United States District Court
Northern District of California

## 2.    Regulatory Interpretations

Intuitive additionally seeks to exclude Phillips's opinions that "SIS is not a remanufacturer, as that term is defined by the FDA" (Phillips Report at Conclusion), and that "Intuitive Surgical's customer communications alleged in SIS's complaint and court filings are simply false and misleading," (*id.* ¶ 4(iv)).  Both of these portions of Phillips's testimony must be excluded as legal conclusions.

Phillips's opinion applying the regulatory term "remanufacturing" to the facts of this case invades the legal interpretation province of the Court.  *See Mannick v. Kaiser Found. Health Plan, Inc.*, 2006 WL 1626909, at *17 (N.D. Cal. June 9, 2006); *see also Blair v. Shinseki*, 2015 WL 12743841, at *8 (C.D. Cal. Apr. 29, 2015), aff'd, 685 F. App'x 587 (9th Cir. 2017) (excluding "legal conclusion" testimony because "[i]nterpretation of . . . regulations and policies is a question for the Court").  Phillips's opinions interpreting how the regulatory framework applies to the facts of EndoWrist repair must be excluded.  *See Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1058 (9th Cir. 2008) ("[a]n expert witness cannot give an opinion as to her *legal conclusion*, i.e., an opinion on an ultimate issue of law.") (emphasis in original).

The same reasoning applies to Phillips's labeling of Intuitive's communications to its customers as "false and misleading."  Lazerow Decl. Ex. 1 ¶ 4(iv).  SIS and Phillips aver that Intuitive's communication that SIS needed FDA clearance to conduct its Endo Wrist operations legally was false because the FDA made no such determination.  *Id.*  As explained in the Court's other orders, the classification of conduct as remanufacturing and the necessity of 510(k) clearance are legal conclusions that fall within the sole purview of FDA as the governing agency.  Phillips's opinions offer a legal opinion by reaching these conclusions.  Because Phillips's attribution of falsity advances a legal interpretation, it must be excluded.

Phillips's knowledge and experience with the regulatory framework, however, will "help the trier of fact to understand the evidence or to determine a fact in issue," even if his legal conclusions are excluded.  Fed. R. Evid. 702(a).  Because Phillips's expert testimony will aid the fact finder to understand the regulatory framework, the Court follows the path set by the *Restore* court regarding similar expert testimony.  That is, Phillips will be permitted to offer his insight

United States District Court
Northern District of California

into the FDA's practices and procedures as well as how such practices and procedures influence the parties' arguments regarding the Section 510(k) regulatory framework. However, Phillips "cannot offer an ultimate opinion as to Plaintiffs' compliance or noncompliance with regulatory requirements, because 'an expert may not testify that certain conduct did or did not violate the law.'" *Restore Robotics*, 2022 WL 19408080, at *3.

The parties advance additional arguments regarding how the opinions of Intuitive's competing FDA expert, Christy Foreman, should be considered in light of the conclusions reached above regarding Phillips's opinions. SIS did not file a motion to exclude Foreman's opinions, and her testimony will not be excluded. But Intuitive makes clear that it "would not expect to offer any opinions by Foreman that go beyond explanations of the FDA's own decisions, which are offered to rebut the inadmissible legal opinions of Phillips." Mot. Exclude Phillips at 9 n.4. The Court binds Intuitive to this representation – Intuitive's FDA expert may not offer legal opinions to the jury.

### G.    Richard Bero

SIS offers the expert opinion of Richard Bero, a CPA, to estimate SIS's damages, including what SIS's lost profits would have been but for Intuitive's challenged conduct. Bass Decl. Ex. 1 (Bero Report) at 1, 3-4. Intuitive moves to exclude all of Bero's damages estimates. First, Intuitive moves to exclude the antitrust damage estimates as based upon unreliable data. Second, Intuitive urges exclusion of the antitrust damage estimates as based upon unreliable methodologies. Finally, Intuitive moves to exclude the entirety of Bero's estimate of damages for SIS's Lanham Act claim. The Court takes up these arguments in turn.

#### 1.    Reliable Data

Intuitive challenges Bero's projected profit figures as based on unreliable evidence. Intuitive's arguments misdirect and obfuscate. Bero does not rely on unreliable evidence; rather, Bero relies on evidence with which Intuitive disagrees. For instance, Intuitive argues that Bero's lost profits damages model "includes as inputs unreliable 'data' that no reasonable CPA would ever rely upon." Mot. Exclude Bero at 2. Intuitive mischaracterizes the data on which Bero relied and analyzed as "almost exclusively of undocumented 'discussions' with SIS's employees and

discussions with SIS's experts retained for the purpose of this litigation." *Id.* The materials Bero considered include documents in the record from all parties (including financial documents and projections from both SIS and Intuitive), deposition testimony from knowledgeable witnesses, discussions with SIS personnel, and input from other expert witnesses. *See generally* Bero Report, Att. 1 ("Data and Other Information Considered"). As an expert, Bero is permitted to rely on data forming the basis for his opinions that is beyond his personal knowledge and doing so does not render the opinion inadmissible. *See* Fed. R. Evid. 702, 703. There is no legal prohibition against experts relying on orally conveyed facts and data of which the expert has been made aware or personally observed. *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1142 (9th Cir. 1997) (fact that expert's opinions were based on data collected by others was immaterial to determining whether opinions were admissible).

Intuitive further accuses Bero of ignoring "the impact of competition in the but-for world from other competitors like Restore and Rebotix." Mot. Exclude Bero at 2. Bero did not ignore competition as Intuitive posits. His lost profits model captures the impact of prospective GPO contracts and customers demanding SIS's repair services for their EndoWrist instruments. Bero Report at 24-25, 42-44. The model considers SIS's existing, long-standing relationships with hospitals in the repair business as well as its relationships with both Restore and Rebotix to bring a potential EndoWrist repair service to SIS's hospital and GPO customer base. *Id.* at 7-8, 10-13, 23-24. Intuitive may quibble with Bero's calculations, but it cannot say that he completely omitted the impact of competition from his but-for assessment.

Intuitive implies that Bero's model is flawed because "to date, no one has successfully developed a method to reset X/Xi Endo Wrists." Mot. Exclude Bero at 4. Intuitive ignores Bero's analysis of the factual record, which led him to conservatively conclude that X/Xi reset technology would have been developed and marketed by either January 1, 2021, or January 1, 2022, but-for Intuitive's alleged anticompetitive conduct. *See, e.g.*, Bero Report at 31-32 (citing deposition testimony). Bero points out in his report that such successful real-world efforts were delayed by Intuitive's anti-competitive conduct. *Id.* at 30-32. Though Intuitive disagrees with the premise, Bero relies on record evidence and is sufficiently reliable.

United States District Court
Northern District of California

Intuitive additionally attacks an update Bero made to his expert analysis based upon discussions he had with Chris Gibson, a Rebotix employee. Bass Decl. Ex. 5 (Second Rebuttal Expert Report of Richard F. Bero ("Bero 2d Rebuttal")). Intuitive complains that, "Although Gibson was fully available to Bero at the time of Bero's opening report, Bero did not speak with Gibson until drafting his second rebuttal report." Mot. Exclude Bero at 5. Intuitive neglects that the subsequent discussion with Gibson was prompted by criticism from Intuitive's damages expert regarding Bero's treatment of "potential costs" SIS would incur from Rebotix in offering its repair service. Bero 2d Rebuttal at 7. Bero's report explains how the information garnered from Gibson helped him better account for the potential costs stemming from the fact, argued by Intuitive's expert, that SIS does not own the intellectual property associated with resetting EndoWrist instruments, particularly the chip that would be inserted to reset the use counter. Bero 2d Rebuttal at 7-12. Bero undertook reasonable steps to seek out and rely on available information following the criticism from Intuitive's expert, and this is not a basis to exclude Bero's opinion.

In sum, Intuitive's attack on the factual bases for Bero's expert testimony is misplaced. All of its arguments fail and the Court declines to exclude Bero's testimony on this ground.

### 2. Reliable Methods

Intuitive asserts that Bero "has not relied upon information that CPAs would typically rely upon in performing their duties." Mot. Exclude Bero at 7. For purposes of conducting the analyses for his lost profits damages models, Bero considered information from experts outside his area of expertise and detailed cost information from the client, SIS, in addition to dozens of Intuitive and third-party documents and depositions. Intuitive does not contend that any of the specific documents, deposition testimony, oral discussions, or any other data Bero uses in his analyses are false.

Intuitive mentions ethical principles "specific to the estimation of lost profits" and alludes to the use of audited and reviewed financial statements and compiled financial statements. Mot. Exclude Bero at 7. But Bero's analysis to form his opinion did not involve submission of financial statements to a tax or regulatory authority; rather, he is estimating but-for damages due to a third-party's alleged misconduct, a task for which he is left to rely on limited information

United States District Court
Northern District of California

23

regarding a world that would exist but for Intuitive's alleged malfeasance. In assessing that but-for world, Bero engages in lengthy consideration of financial statements and review with knowledgeable SIS personnel, combined with available real-world data from third parties including Intuitive. Bero Report at 54-57, Schedules 2.1 & 3.1; Van Hoven Decl. Ex. 1 (Bero Dep.) at 74:8-21; 201:9-205:15. This attack on Bero's methods is misplaced.

Intuitive challenges Bero's analysis of penetration rates, alleging that he makes "problematic assumptions." Mot. Exclude Bero at 9. In assessing penetration rates in the but-for world, Bero relies on the testimony of another expert, Jean Sargent, whose opinion on SIS's expected penetration rate of hospitals affiliated with the Vizient GPO is discussed above. Bero Report at 50-51; *see also id.* at 33-36 (discussing Vizient relationship and SIS's signed agreements with Vizient to provide Endo Wrist repair and other services). Rule 702 and *Daubert* permit an expert to rely upon the conclusions of another expert as to matters within the other expert's discipline, particularly where the results of those calculations are consistent with other evidence, as is the case here. *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs., & Prod. Liab. Litig.*, 978 F. Supp. 2d 1053, 1066 (C.D. Cal. 2013) ("expert opinions may find a basis in part 'on what a different expert believes on the basis of expert knowledge not possessed by the first expert.'" (citation omitted)). Further, Bero's report confirms that the overall penetration rates included in his analysis were conservative when compared to estimates by Intuitive and other independent third parties. Bero Report at 50, 52-53. Bero's damages model is not inadmissible because he relied in part upon opinions about a topic outside his area of expertise (e.g., hospital penetration/conversion rates).

Intuitive alleges that Bero "has no reliable basis for the inclusion in his damages model of X/Xi units or the dates he uses to model when the third parties would have had the capability to reset X/Xi Endo Wrists." Mot. Exclude Bero at 11. Bero relies, in part, upon the analysis of another SIS expert, Kurt Humphrey, for the premise that if a company had adequate resources and financial incentives, it would have been technically feasible to circumvent the X/Xi encryption required to reset the use counter in one year, i.e., by January 1, 2021. Bero Report at 32 n.248. Intuitive challenges this portion of Bero's report in part on the basis that it separately seeks

1    exclusion of Humphrey's testimony as unreliable.  Indeed, "[w]here an expert bases her opinion

2    on – or simply repeats – the unreliable opinion of another expert, a district court may properly

3    exclude the first expert's testimony."  *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 2017 WL

4    10434367, at *2 (N.D. Cal. Jan. 23, 2017) (citations omitted).  But Intuitive overstates the

5    unreliability of the other experts.  It is reasonable for experts to rely on the testimony of others,

6    particularly for opinions that lie outside their wheelhouse.  That is what Bero does here, at least in

7    part.  As Bero explained, based on testimony from one of the companies that sought to reset the

8    X/Xi use counters, "Restore started developing the Xi use-counter reset in January 2020 but

9    Intuitive's efforts delayed Restore's development because ███████████████████████

10   ██████████████████████████████████████████████████████████████

11   ██████████."  Bero Report at 31-32.  Despite these Intuitive-imposed delays, ███████

12   ████████████████████████████████████████  *Id.* at 31-32.  Based

13   on ███████████ along with the reverse engineering expertise of Humphrey, Bero had a

14   reliable basis to include in his damages model the estimate that it would have been possible to

15   repair X/Xi Endo Wrists either by January 1, 2021, or January 1, 2022, absent Intuitive's allegedly

16   anti-competitive conduct.  *Id.* at 57, n.418.  His expert testimony is sufficiently reliable.

17          Intuitive asserts that Bero's damages model "relies upon an inflated expiration rate for

18   EndoWrist instruments."  Mot. Exclude Bero at 10.  This aspect of Bero's model involves

19   accounting for the likelihood that not all of the Endo Wrist instruments sold and potentially

20   repairable by SIS would ultimately expire.  Some of the potentially repairable units identified in

21   Bero's model may not expire or might expire at a later time.  Bero applies a 60% expired Endo

22   Wrist rate to the annual potentially repairable instrument units based on Intuitive's own estimate

23   data.  Bero Report at 48-49.   Intuitive complains that "rather than calculating the average

24   expiration rate across the whole set of instruments, Bero arbitrarily selects the 'top 5' (in sales

25   volume)."  Mot. Exclude Bero at 10.  But Intuitive fails to demonstrate how Bero uses an

26   unreliable methodology where he relies on Intuitive's historical sales data and internal estimates to

27   make his own estimate regarding expiration rates of new instruments.  Bero Report at 49.  Bero's

28   estimated expiration rate is based on a sufficiently reliable method.

United States District Court
Northern District of California

Intuitive also charges that Bero "has no reasonable basis for his assumptions regarding SIS's costs in the but-for world." Mot. Exclude Bero at 10. Not so. Bero's expert report traces in detail how he determined the costs he used in his damages model. Bero Report at 54-56. Intuitive complains that Bero "ignores the impact of the absence of FDA clearance on customer demand." Mot. Exclude Bero at 2. That, however, is incorrect. Rather than ignoring the issue, Bero treated the matter in his stated assumption that FDA clearance was not required and therefore, would have no impact on customer demand for SIS's reset Endo Wrist services in the but-for world. Bero Report at 5. Further, Intuitive's argument fails to grapple with the fact that Bero is a damages expert and, thus, is entitled to assume liability in order to model the damages. *See, e.g.*, *Siqueiros v. General Motors LLC*, No. 16-CV-07244-EMC, 2022 WL 74182, at *10 (N.D. Cal. Jan. 7, 2022); *Indect USA Corp. v. Park Assist, LLC*, No. 318CV02409BENDEB, 2021 WL 4311002, at *3 (S.D. Cal. Sept. 22, 2021) ("[I]t is well established that experts on damages can assume causation.").

In sum, Bero's principles and methods used in constructing his lost profits damage models are reliable and are reliably applied to the facts of this case.

### 3. Lanham Act Damages Assessment

Intuitive presses for exclusion of Bero's damages opinion associated with SIS's Lanham Act claim based on a purported a lack of "fit" with the claims and evidence in this case. Mot. Exclude Bero at 14. Intuitive asserts that Bero cannot reliably calculate damages including lost sales for all potential SIS customers because "only two SIS customers received an allegedly false statement from Intuitive" and such a broad damages calculation cannot be based on just two letters. *Id.* at 14. Intuitive's argument misconstrues Bero's reliance on those letters and his overall analysis of damages related to SIS's Lanham Act claim. Intuitive overlooks the substance of Bero's report – Bero relied on those letters as evidence of the date that Intuitive began making the allegedly false statements to SIS's customers for purposes of calculating damages, not as proof of the purported Lanham Act claim. Bero Report at 59. Intuitive's argument misses the mark.

Further, in contrast to Intuitive's argument, Bero addresses the disgorgement of Intuitive's profits under the Lanham Act because the Lanham Act provides that a plaintiff like SIS is entitled

to recover a defendant's profits as well as any damages sustained by the plaintiff. Bero Report at 58. Bero opines that Lanham Act damages would begin no later than November 26, 2019, when the letters were initially dispatched. As for the damages sustained by SIS, Bero used the quantified lost profit damages to SIS based on the lost repair units beginning in January 2020, which he analyzes for the antitrust damages calculation. Bero Report at 59. With respect to Intuitive's profits to which SIS would be entitled to under the Lanham Act, Bero quantifies Intuitive's sales on Schedule 16.1 and Schedule 16.2, with a January 1, 2024, present value. *Id.* In sum, there is no lack of "fit" with the claims and evidence in this case. The Court declines to exclude any of Bero's damages calculations.

### H. Dr. Russell Lamb

Dr. Lamb holds a Doctor of Philosophy in economics from the University of Pennsylvania; has had his economic research published in several peer-reviewed journals; and has held economics positions in government, academia, and consulting for approximately 30 years. Bass Decl. Ex. 1 (Lamb Report) ¶¶ 2-3. SIS retained Dr. Lamb to undertake certain economic analyses related to the markets for the da Vinci surgical robot and EndoWrists. Intuitive moves to exclude Dr. Lamb's opinions on the following bases: (1) he fails to define the relevant antitrust product market because he misapplied the relevant test; (2) he improperly assessed Intuitive's monopoly pricing based on profit margins because he failed to include research and development costs in his calculations, and (3) he is not qualified to opine that EndoWrists repaired by IRCs are equally safe as new instruments because that conclusion reaches beyond his expertise as an economist. The Court considers these contentions in turn.

#### 1. Reliable Assessment of Product Markets via SSNIP Test

Intuitive challenges Dr. Lamb's analyses, conclusions, and opinions regarding the relevant product markets in this case on the basis that he has not reliably applied the "small but significant and non-transitory increase in price" or "SSNIP" test. More particularly, Intuitive argues that although Dr. Lamb discusses the SSNIP test in his report, "[h]is report is devoid of any actual application of the test" because he "did not conduct any economic analysis to calculate whether a small but significant price increase on Intuitive's products, such as five percent, would cause a

1    loss in sales volume such that the price increase would be unprofitable."  Mot. Exclude Lamb at 4-

2    5.  Intuitive then claims that "Dr. Lamb may not offer opinions about what he speculates the result

3    of a SSNIP test would have been had he performed one."  *Id.* at 7.

4          While Intuitive is correct that Dr. Lamb defines the SSNIP test and then avoids its specific

5    application to the facts of this case, Dr. Lamb does not purport to quantitatively apply the SSNIP

6    test anywhere in his expert report.  *See e.g.*, Lamb Report ¶ 29.  Dr. Lamb only applies the SSNIP

7    qualitatively because, as he explains, this methodology is appropriate even where the evidence or

8    data necessary to perform the test quantitatively is unavailable.  Lamb Report ¶ 27 n.72.  Contrary

9    to Intuitive's argument, Dr. Lamb provides a reason why he did not analyze pricing and volume

10   data – because the evidence necessary to perform the hypothetical monopolist test is unavailable.

11   *Id.*  He explains that sufficient price change data is often unavailable in a market dominated by one

12   company that does not frequently change its prices, such as Intuitive.  *Id.*

13         In the *Rebotix* case, Intuitive moved to strike Dr. Lamb's market definition opinions on the

14   same grounds, arguing that Dr. Lamb improperly applied the SSNIP test because he did not

15   engage in a quantitative assessment.  *Rebotix Repair, LLC v. Intuitive Surgical, Inc.*, 2022 WL

16   3225366, at *5-6 (M.D. Fla. Aug. 10, 2022).  The court denied the motion, finding that he merely

17   used the SSNIP analytical framework from which to build his opinions based on other evidence.

18   *Id.* at *5-6.  The *Rebotix* court declined to exclude Dr. Lamb's opinion regarding the qualitative

19   framework of the SSNAP test because, given the unique facts of the surgical robot market and

20   Intuitive's market share of 99%, it was inappropriate to engage in the quantitative analysis.  *Id.* at

21   *5-6.  This Court agrees that Dr. Lamb's use of the SSNIP analytical framework to form his

22   opinions, given the available testimony and business record evidence, is proper.  Dr. Lamb

23   appropriately applies a methodology generally accepted in the field of economics.  Lamb Report

24   ¶ 27 n.72 (citing U.S. Dept. of Justice and Federal Trade Commission, "Horizontal Merger

25   Guidelines," August 19, 2010 at § 4.1.1).  The Court finds Dr. Lamb's testimony sufficiently

26   reliable and declines to exclude it on this basis.

27   //

28   //

United States District Court
Northern District of California

### 2.    Reliable Assessment of Market Power via Prices and Margins

Dr. Lamb opines that "one indication of Intuitive's exercise of monopoly power in the market for [minimally invasive soft tissue] Surgical Robots is the fact that da Vinci robot prices were set well above marginal costs." Lamb Report ¶ 102.  He asserts that "Intuitive's extremely high profit margins on da Vinci surgical robot sales" indicate that Intuitive possessed market power in the market for minimally invasive surgical robots. *Id.*  He makes a similar assertion regarding Intuitive's margins on instruments. *Id.* ¶ 125.  Intuitive argues that Dr. Lamb's opinions that Intuitive has exercised monopoly power "are inadmissible because they are contrary to law and not based on reliable principles." Mot. Exclude Lamb at 7; *see also id.* at 8 (citing *Mylan Pharms. Inc. v. Warner Chilcott Pub. Ltd. Co.*, 838 F.3d 421, 434, 435 (3d Cir. 2016)).

As with Dr. Lamb's opinion regarding the relevant products market, Intuitive sought to exclude Dr. Lamb's similar opinion on similar grounds in *Rebotix*.  Intuitive argued that Dr. Lamb's assessment of monopoly power based on supracompetitive price and marginal cost was defective because it failed to account for Intuitive's sunk costs in product research and development. *Compare Rebotix*, 2022 WL 3225366, at *7-8, *with* Mot. Exclude Lamb at 7-9. The *Rebotix* court declined to resolve whether fixed costs must be taken into account in such an assessment, finding that Lamb had sufficiently explained that Intuitive's profit margins were "quite high" regardless of whether research and development costs were included in the assessment. *Rebotix*, 2022 WL 3225366 at *8.  Intuitive attempts to distinguish Dr. Lamb's report here, arguing in part that he fails to discuss Intuitive's total costs or margins.  Not so.  Dr. Lamb states in his report, "one indication of Intuitive's exercise of monopoly power in the market for [minimally invasive soft tissue] Surgical Robots is the fact that da Vinci robot prices were set well above marginal costs." Lamb Report ¶ 102.  Dr. Lamb cites to internal Intuitive documents that showed Intuitive's "global Systems business unit earned contribution margins of 65.1 percent and 60.0 percent in 2019 and 2020, respectively." *Id.*   Dr. Lamb's expert report here points out that Intuitive itself acknowledges that the prices for da Vinci robots are set well above marginal costs. *Id.* ¶¶ 103-04.  For purposes of this order, the Court finds Intuitive's profit margins quite high, such that it was not necessary for Dr. Lamb to include research and development costs his

United States District Court
Northern District of California

assessment.  Accordingly, the Court concludes that Dr. Lamb provides a sufficiently reliable assessment of Intuitive's market power to avoid exclusion.

### 3.    Opinions Beyond Expertise

Intuitive argues that Dr. Lamb, as an economist, improperly offers opinions about product safety that he is not qualified to offer.  Mot. Exclude Lamb at 10.  In particular, Intuitive challenges Dr. Lamb's opinion that the evidence he discusses in his report "is consistent with the opinions contained in Mr. Phillips' expert report that, despite Intuitive's claims to the contrary, EndoWrist instruments repaired or reprocessed by third parties such as SIS were equally as safe as the newly manufactured replacement EndoWrist instruments hospitals were required to purchase directly from Intuitive." *Id.* at 11 (quoting Lamb Report ¶ 132).

As discussed above, courts routinely exclude testimony from an expert whose opinion falls outside his or her relevant discipline. *See, e.g.*, *Avila*, 633 F.3d at 839.  Intuitive's challenge on this front, however, is misplaced.  Dr. Lamb does not opine on the patient safety implications of repaired EndoWrists, and Intuitive's contention results from cherry-picking the quote above from several paragraphs that explain Dr. Lamb's assessment.  Dr. Lamb relies on Phillips' opinions and other evidence as support for his opinion regarding the legitimacy of Intuitive's product safety justification for the use counter.  Lamb Report ¶¶ 129-32.  In so citing, Dr. Lamb identifies the sources on which he relies in reaching his economic conclusions and acknowledges their consistency to show that his own reliance on those sources is appropriate.  Dr. Lamb does not offer opinion outside his area of expertise.  The Court declines to exclude his opinion on this basis.

### CONCLUSION

For the foregoing reasons, the Court **GRANTS in part and DENIES in part** Intuitive's several motions to exclude expert testimony.

The Court **DENIES** Intuitive's motion to exclude the testimony of Jean Sargent.

The Court **DENIES** Intuitive's motion to exclude the testimony of Kurt Humphrey.

The Court **DENIES** Intuitive's motion to exclude the testimony of Dr. Amandeep Mahal.

//

//

1      The Court **GRANTS** Intuitive's motion to exclude the portions of Dr. Parnell's testimony

2  about the cause of failure of the EndoWrists he saw at the Rebotix repair facility, but otherwise

3  **DENIES** the motion to exclude Dr. Parnell's testimony.

4      The Court **DENIES** Intuitive's motion to exclude the testimony of Philip J. Phillips.

5      The Court **DENIES** Intuitive's motion to exclude the testimony of Dr. Russell Lamb.

6      **IT IS SO ORDERED.**

7  Dated: March 31, 2024

8

9

10                      **ARACELI MARTÍNEZ-OLGUÍN**
                              **United States District Judge**

United States District Court
Northern District of California