1          UNITED STATES DISTRICT COURT
2           NORTHERN DISTRICT OF CALIFORNIA
3
4  IN RE: DA VINCI SURGICAL ROBOT  ) Lead Case No.:
   ANTITRUST LITIGATION            ) 3:21-cv-03825-VC
5  _____ )
                                   )
6  THIS DOCUMENT RELATES TO:       )
   ALL ACTIONS                     )
7                                  )
   _____ )
8  SURGICAL INSTRUMENT SERVICE     ) Case No.
   COMPANY, INC.,                  ) 3:21-CV-03496-VC
9                                  )
          Plaintiff,                )
10                                 )
          vs.                      )
11                                 )
   INTUITIVE SURGICAL, INC.,       )
12                                 )
          Defendant.               )
13 _____ )
14
15       HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
16              UNDER THE PROTECTIVE ORDER
17        VIRTUAL VIDEOCONFERENCE VIDEO-RECORDED
18               DEPOSITION OF DAN JONES
19
20             Thursday, November 10, 2022
21     Remotely Testifying from Alexandria, Virginia
22
23 Stenographically Reported By:
24 Hanna Kim, CLR, CSR No. 13083
25 Job No. 5564633

```
 1              UNITED STATES DISTRICT COURT
 2            NORTHERN DISTRICT OF CALIFORNIA
 3
 4   IN RE: DA VINCI SURGICAL ROBOT  ) Lead Case No.:
     ANTITRUST LITIGATION             ) 3:21-cv-03825-VC
 5   _____  )
                                      )
 6   THIS DOCUMENT RELATES TO:        )
     ALL ACTIONS                      )
 7                                    )
     _____  )
 8   SURGICAL INSTRUMENT SERVICE      ) Case No.
     COMPANY, INC.,                   ) 3:21-CV-03496-VC
 9                                    )
              Plaintiff,              )
10                                    )
              vs.                     )
11                                    )
     INTUITIVE SURGICAL, INC.,        )
12                                    )
              Defendant.              )
13   _____  )
14
15          HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
16   UNDER THE PROTECTIVE ORDER, virtual videoconference
17   video-recorded deposition of DAN JONES remotely
18   testifying from Alexandria, Virginia, on Thursday,
19   November 10 beginning at 12:06 p.m., EST, and
20   concluding at 2:36 p.m., pursuant to the
21   stipulations of counsel thereof, before Hanna Kim,
22   CLR, Certified Shorthand Reporter, No. 13083.
23
24
25
```

```
                                                          Page 3
 1      REMOTE VIDEOCONFERENCE APPEARANCES OF COUNSEL:
 2
 3    For Plaintiff Surgical Instrument Service Company,
 4    Inc:
 5              HALEY GUILIANO
 6              BY:  JOSHUA VAN HOVEN, ESQ.
 7              111 North Market Street, Suite 900
 8              San Jose, California 95113
 9              669.213.1071
10              joshua.vanhoven@hglaw.com
11
12
13    For Hospital Plaintiffs:
14              HAUSFELD LLC
15              BY:  SAMUEL MAIDA, ESQ.
16              600 Montgomery Street, Suite 3200
17              San Francisco, California 94111
18              415.633.1908
19              smaida@hausfeld.com
20
21
22
23
24
25
```


```
                                                           Page 4
 1        REMOTE APPEARANCES OF COUNSEL:  (CONT'D.)
 2
 3   For Hospital Plaintiffs and the Proposed Class:
 4            BONI, ZACK & SNYDER LLC
 5            BY:  JOSHUA D. SNYDER, ESQ.
 6            15 St. Asaphs Road
 7            Bala Cynwyd, Pennsylvania 19004
 8            610.822.0203
 9            jsnyder@bonizack.com
10
11
12   For Defendant Intuitive Surgical:
13            COVINGTON & BURLING LLP
14            BY:  KATHRYN CAHOY, ESQ.
15            3000 El Camino Real
16            5 Palo Alto Square, 10th Floor
17            Palo Alto, California 94306-2112
18            kcahoy@cov.com
19
20
21   Also Present:
22            MICHAEL BARANKOVICH, Videographer
23
24
25
```

Page 74

1   you didn't know about the sterilization processes
2   that third parties such as Rebotix performed with
3   respect to EndoWrist instruments?
4           MS. CAHOY:  Objection to form.
5           THE WITNESS:  That's correct.  We didn't
6   know specifically what sterilization processes they
7   were using.
8   BY MR. VAN HOVEN:
9       Q.  It -- and I -- I may have this wrong, but
10  did you say that you became aware of these sort of
11  third party instrument companies around 2015 or
12  2016?
13          MS. CAHOY:  Objection to form.
14          THE WITNESS:  I don't recall the specific
15  date, but sometime, I think it was 2015, we saw a
16  patent publication from a company that was trying to
17  patent a hack to da Vinci instruments.
18  BY MR. VAN HOVEN:
19      Q.  And -- and once Intuitive became aware of
20  the potential for third parties to perform those
21  operations, did it do any monitoring of instruments
22  to look for that?
23          MS. CAHOY:  Objection to form.
24          THE WITNESS:  I don't know if we did.
25  What -- there would be different forms of monitoring

Page 75

1   through looking at system logs specifically for
2   that, or whether it was hospitals.  We had heard
3   rumors through hospitals earlier than 2015 that
4   someone might try to do this.
5   BY MR. VAN HOVEN:
6       Q.   And did -- at some point, did this
7   activity seem to increase?
8            MS. CAHOY:  Objection to form.
9            THE WITNESS:  At some point with the
10  introduction into Europe, but it seemed to be the
11  first instances where we knew hospitals were being
12  approached.
13  BY MR. VAN HOVEN:
14      Q.   About when was that?
15      A.   I want -- I want to say it was in the
16  2016, '17 time frame.
17      Q.   And did the activity continue to increase
18  after that 2016 to 2017 time frame?
19           MS. CAHOY:  Objection to form.
20           THE WITNESS:  Did the activity continue --
21  could you repeat your question.
22  BY MR. VAN HOVEN:
23      Q.   Yeah.  And -- and I -- I may be a little
24  unclear.  Let's just think of it in terms of volume
25  of refurbished -- or volume of instruments that

Page 76

1    undergo a Rebotix type process.  Is that an okay way
2    to look at it?
3         A.   Yeah.  I think there might have been a
4    leveling off after the first European customers
5    looked into it.  And I don't recall who else was
6    looking into it there besides customers.  Whether
7    regulatory bodies got involved, I really don't
8    recall.  I wasn't close to that.  I think it
9    actually decreased.  And then, when we saw it emerge
10   in the U.S., it seemed to increase again.
11        Q.   When did it emerge in the U.S.?
12        A.   I think this Panama Surgery Center
13   [verbatim] was one of the earliest instances of use.
14   Again, I don't recall exactly when we detected it.
15   But 2019 was when it seemed like there were several
16   hospitals that we were interacting with about this
17   issue.
18        Q.   And about how long, once that started in
19   2019, did you -- did Intuitive continue to interact
20   with hospitals about this issue?
21        A.   I think even by 2020, the activity
22   seems -- seemed to have lessened, and then COVID
23   hit, and I don't recall it being much of an issue
24   after COVID hit.  I -- I don't know.  I think it's
25   now been two years approximately since we've seen

Page 79

1   I -- I know, in fact, as well that external legal
2   experts were consulted around this time.
3        Q.   So I'm going to bring up as tab 67.  Take
4   a look at this, and let me know when you're ready to
5   discuss what's been labeled as Exhibit 293 as
6   Intuitive-00049154.
7             (Jones Deposition Exhibit 293 was marked
8             electronically.)
9        A.   (Witness reviews document).
10            Okay.  I haven't reread every line, but it
11  looks like it has the three main sections of the
12  template we just looked at, as well as the letter to
13  Evergreen Hospital we looked at earlier.
14       Q.   Yeah, and just -- and just for the record,
15  real quick, I don't think I mentioned it, but the
16  previous Exhibit 292 was Bates Number 0212226
17  [verbatim].
18            Going back to Exhibit 293, are -- are you
19  familiar with Marin General Hospital?
20       A.   I'm seeing that it's in Greenbrae,
21  California.  That's about as familiar as I am with
22  Marin.
23       Q.   And do you have any -- from reviewing this
24  letter, does it appear that it relates to Marin's
25  use of instruments that were -- let me strike that.

Page 80

1      From reviewing this letter, do you
2  understand that it's referring -- that it's based on
3  Marin's utilizing EndoWrist instruments service
4  by -- by a company such as Rebotix?
5           MS. CAHOY:  Objection to form.
6           THE WITNESS:  It -- it says that we
7  understand that Marin General is using or consider
8  using, so not actual use necessarily.
9  BY MR. VAN HOVEN:
10     Q.   Got it.
11          But of what's referred to in the first
12  sentence as refurbished instru- -- EndoWrist
13  instruments?
14          MS. CAHOY:  Objection to form.
15          THE WITNESS:  Again, it says, "We
16  understand that Marin General Hospital is using or
17  considering using 'refurbished'" -- in parens,
18  excuse me, quote -- "'refurbished' EndoWrist
19  instruments, obtained from and/or modified by a
20  third party for use beyond the programmed number of
21  uses."  [As read]
22  BY MR. VAN HOVEN:
23     Q.   And -- and among other things, does this
24  letter contend that that's a breach or a potential
25  breach of Marin's agreements with Intuitive?

1            MS. CAHOY:  Objection to form.
2            THE WITNESS:  You want to go to the bottom
3    of page 2?  Are you asking a specific question
4    because it's got a whole section about the contract
5    with Intuitive?
6    BY MR. VAN HOVEN:
7        Q.   Yeah, sure.  We can go there.
8             It -- and the -- and the question is
9    whether this letter is contending that use of those
10   types of instruments serviced by third parties is a
11   breach of Marin's contracts with Intuitive?
12            MS. CAHOY:  Objection to form.
13            THE WITNESS:  It says, "Using instruments
14   beyond the programmed number of uses is a material
15   breach of the Agreements."
16            Again, the opening line doesn't say
17   whether they have used or are considering.
18   BY MR. VAN HOVEN:
19       Q.   Is there any other basis within this
20   letter for potentially contending that Marin
21   breached its contracts with Intuitive?
22            MS. CAHOY:  Objection to form.
23            THE WITNESS:  Could you repeat the
24   question.
25   BY MR. VAN HOVEN:

Page 88

1           electronically.)
2      A.   I've clicked on it.
3      Q.   Okay.  And take a look, let me know when
4   you're ready to discuss this document.
5      A.   (Witness reviews document).
6           Okay.
7      Q.   What does this document appear to be?
8      A.   It is a similar letter to the previous one
9   we looked at.
10     Q.   And -- and this one's to Banner Health?
11     A.   Banner Health in Phoenix, Arizona.
12     Q.   Are you familiar with Banner Health?
13     A.   I think it's a pretty well known hospital
14  system in the Phoenix area.  I don't know if it's
15  part of a larger organization.  I don't know much
16  about the account.
17     Q.   Would -- would it surprise you to hear
18  that Banner Health has over 40 Intuitive robots?
19     A.   No.
20     Q.   About how much does an Intuitive system
21  cost on its initial purchase?
22     A.   It can vary anything -- I -- I haven't
23  looked at the approved price list recently.  But I
24  think we have systems that start around 700,000.
25  And systems that -- with various options can be

1    Q.   You'll see that the first paragraph
2    mentions two agreements, one that's in parentheses a
3    sales agreement, and one that's in parentheses a
4    ULSA.
5         Do you see that?
6    A.   Mm-hmm.
7    Q.   What is this sales agreement?
8    A.   I'm not sure I've ever seen one, an
9    actual.
10   Q.   Okay.
11   A.   I imagine it is the terms of the system
12   purchase or lease.  This says -- yeah, this says
13   "sale."  I think the term may cover leases.  I don't
14   know.
15   Q.   And -- and that -- that's for the system,
16   meaning the robot, the console, and the vision cart?
17        MS. CAHOY:  Objection to form.  Outside
18   the scope.
19        THE WITNESS:  I -- I would think it would
20   cover.  And sometimes those also include some
21   initial inventory of instruments as well.  So
22   there's -- there's just an initial investment.  It
23   may not just be the system.  And also -- and also a
24   first year of service is usually provided with a
25   system acquisition whether that's through a --

Page 91

1  arranged in the lease terms or in the sales terms.
2  BY MR. VAN HOVEN:
3       Q.   And in -- in the case of instruments that
4  might come with the sales agreements, once those
5  were used, the customer would have to purchase
6  additional instruments?
7            MS. CAHOY:  Objection to form.  Outside
8  the scope.
9            THE WITNESS:  Generally, I think that's
10 how things would work, yes.
11 BY MR. VAN HOVEN:
12      Q.   And do you have an understanding of what
13 the ULSA is?
14      A.   It says here it's the use license and
15 service agreement.
16      Q.   Do you have any idea how that fits in with
17 the sales agreement?
18           MS. CAHOY:  Objection to form.  Outside
19 the scope.
20           THE WITNESS:  I don't know if they're
21 simultaneous, if it's separate in some cases, if
22 they're together in others.  I don't know.
23 BY MR. VAN HOVEN:
24      Q.   If we go to the second bullet point
25 there -- and actually, before we go there, we'll

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Page 92

1   note that the -- am I correct that the sales
2   agreement and that ULSA are collectively referred to
3   as "the Agreement" in this letter?
4       A.   Yeah, it looks like there should be an
5   open quote, and there's one missing.  But it says,
6   "Each as amended (collectively, 'the Agreement')."
7   And there's a footnote on it as well.
8            Oh, okay.  That's standard legal.  Yes,
9   the footnote goes further to, I think, imply that
10  those two are collectively called "the Agreement."
11      Q.   And the -- I -- I see that there's a
12  double collectively, but almost -- the -- so that --
13  and capital A "Agreement" is referring to the
14  agreement -- to those two agreements together; is
15  that right?
16      A.   Yes.
17      Q.   If we go to the second bullet point, could
18  you take a look at that and let me know when you're
19  ready to discuss it.
20      A.   Okay.
21      Q.   It concludes with a statement that
22  "Intuitive may terminate the Agreement immediately
23  upon written notice, and any warranties applicable
24  to the System will become void."
25           Do you see that?

1          A.    Yes.
2          Q.    I'd -- I'd like to split that up into kind
3    of two portions.
4                What do you understand "Intuitive may
5    terminate the Agreement immediately upon written
6    notice" to mean?
7                MS. CAHOY:  Objection to form.  And I
8    would instruct the witness not to answer to the
9    extent it would reveal privileged information.
10               THE WITNESS:  I'm not a lawyer.  I
11   think -- and so I don't know if there's a -- a
12   period before the other party to -- to, you know,
13   dispute, but it -- it's -- I think it says the
14   arrangement that's established by the agreements
15   would cease.
16   BY MR. VAN HOVEN:
17         Q.    That --
18         A.    Are we -- are we asking what terminate
19   means, or -- I don't --
20         Q.    Sure.
21               Yeah, I -- what's it mean to terminate the
22   agreement?
23         A.    I think that it's no longer binding for
24   the two parties to fulfill their obligations.
25         Q.    And so, Intuitive would no longer have to

1      fulfill any of its obligation with respect to
2      Banner's 40 plus robots?
3              MS. CAHOY:  Objection to form.  Outside
4      the scope.
5              THE WITNESS:  Again, I don't know if the
6      agreements cover all 40 or the specific system.  I
7      don't know that case.
8      BY MR. VAN HOVEN:
9          Q.   But the termination of the agreement is
10     with respect to systems; right?
11         A.   Systems --
12             MS. CAHOY:  Objection to form.  Outside
13     the scope.
14             THE WITNESS:  I don't know if it is plural
15     systems in this case.  I don't know if it was one
16     system or more systems that were being covered by
17     those agreements.
18     BY MR. VAN HOVEN:
19         Q.   Right.
20             So -- but whether it's one or more
21     systems, the agreement is the agreement is for the
22     system; right?
23         A.   I don't know.  I was just saying I didn't
24     know whether it applied to plural systems.
25         Q.   But you do know that the agreement