Case 3:21-cv-03496-AMO   Document 222-12   Filed 05/17/24   Page 1 of 14
HIGHLY CONFIDENTIAL

```
                                                              Page 1

 1                UNITED STATES DISTRICT COURT
 2           FOR THE NORTHERN DISTRICT OF CALIFORNIA
 3                    SAN FRANCISCO DIVISION
 4    IN RE: DA VINCI SURGICAL ROBOT     ) Lead Case No.:
      ANTITRUST LITIGATION,              ) 3:21-cv-03825-VC
 5    ------------------------------------)
      THIS DOCUMENT RELATES TO:          )
 6    ALL CASES                          )
      ------------------------------------)
 7
 8    SURGICAL INSTRUMENT SERVICE        )
      COMPANY, INC.,                     ) Case No.
 9                                       ) 3:21-cv-03496-VC
                   Plaintiff,            )
10                                       )
          vs.                            )
11                                       )
      INTUITIVE SURGICAL, INC.,          )
12                                       )
                   Defendant.            )
13    ------------------------------------)
14
15       ***HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY***
16
17     REMOTE PROCEEDINGS OF THE VIDEOTAPED DEPOSITION OF
18                 INTUTITIVE SURGICAL, INC.,
19          BY AND THROUGH ITS 30(B)(6) DESIGNEE,
20                       GRANT DUQUE
21                 TUESDAY, NOVEMBER 8, 2022
22
23    REPORTED BY NANCY J. MARTIN
24    CSR. NO. 9504, RMR, RPR
25    PAGES 1 - 75
```

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

```
 1              UNITED STATES DISTRICT COURT
 2          FOR THE NORTHERN DISTRICT OF CALIFORNIA
 3                  SAN FRANCISCO DIVISION
 4    IN RE: DA VINCI SURGICAL ROBOT   ) Lead Case No.:
      ANTITRUST LITIGATION,            ) 3:21-cv-03825-VC
 5    ------------------------------------)
      THIS DOCUMENT RELATES TO:        )
 6    ALL CASES                        )
      ------------------------------------)
 7
 8    SURGICAL INSTRUMENT SERVICE      )
      COMPANY, INC.,                   ) Case No.
 9                                     ) 3:21-cv-03496-VC
                 Plaintiff,            )
10                                     )
          vs.                          )
11                                     )
      INTUITIVE SURGICAL, INC.,        )
12                                     )
                 Defendant.            )
13    ------------------------------------)
14
15       ***HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY***
16
17                         - - -
18              Tuesday, November 8, 2022
19                         - - -
20       Videotaped Remote Deposition of INTUTITIVE
21    SURGICAL, INC., by and through its 30(B)(6) designee
22    GRANT DUQUE, beginning at 3:15 p.m., before Nancy J.
23    Martin, a Registered Merit Reporter, Certified
24    Shorthand Reporter.  All parties appeared remotely.
25
```

```
 1    A P P E A R A N C E S :
 2
      DANIEL MCCUAIG, ESQ.
 3    COHEN MILSTEIN SELLERS & TOLL PLLC
      1100 New York Avenue NW 5th Floor
 4    Washington, D.C.  20005
      dmccuaig@cohenmilstein.com
 5    (202) 408-4600
      Counsel for the hospital plaintiffs
 6
 7
      KATHRYN E. CAHOY, ATTORNEY AT LAW
 8    COVINGTON & BURLING LLP
      3000 El Camino Real
 9    5 Palo Alto Square
      Palo Alto, California  94306
10    (650) 632-4735
      kcahoy@cov.com
11    Counsel for Intuitive Surgical Inc.
12
13    JOSHUA VAN HOVEN, ESQ.
      HALEY GUILIANO LLP
14    111 North Market Street
      Suite 900
15    San Jose, California  95113
      (669) 213-1080
16    joshua.vanhoven@hglaw.com
      Counsel for Surgical Instrument Service, Incorporated
17
18    ALSO PRESENT:
19    BEN PELTA-HELLER, LEGAL VIDEOGRAPHER
20
21
22
23
24
25
```

Page 53

1    Page 50 and maybe table 3.3 and let me know when
2    you're ready to discuss that.
3        A.  Okay.  Page 50?
4        Q.  I'm sorry.  Why don't we go to -- I misled
5    you.  Could we go to Page 49?  The bottom of that page
6    provides some useful context.  If you start there and
7    read onto Page 50, I think that will make sense.
8        A.  Okay.
9            (The witness reviewed the document.)
10           THE WITNESS:  Okay.  I did read that.
11   BY MR. VAN HOVEN:
12       Q.  Yes.  Do you have a general understanding of
13   what tables 3-3 through 3-10 are supposed to represent
14   in the context of this document?  And maybe just --
15   let's just refer to it in the context of 3-3 and then
16   we can go to any others if we want.
17       A.  I'm familiar with them and am familiar with
18   what's being discussed, yes.
19       Q.  And do these appear to be summaries of
20   previously done reliability testing for XI instruments
21   and in this case, for 3-3, Maryland Bipolar Forceps?
22       A.  I apologize.  Can you repeat your question?
23       Q.  Sure.  Maybe I'll kind of set it up a little
24   bit.  There's a -- this document is referring to
25   predicate devices to the EUP devices?

1      A.   That's right.
2      Q.   And the predicate devices are the originally
3  cleared devices that the EUP devices are based on?
4      A.   That's correct.
5      Q.   Are these tables referring to test results
6  for the predicate devices?
7      A.   Yes, that's correct.
8      Q.   And, for example, we talked a little bit
9  about simulated uses earlier today.  It appears that,
10  if we look at the bottom of Page 50, there's some
11  discussion of simulated surgical use in the context of
12  an 8 mm Maryland Bipolar Forceps?
13      A.   Yes, I see that.
14      Q.   There's a table on the next page.  And do you
15  have an understanding of what this table is
16  representing?
17      A.   I'm reading it now, and this is a summary of
18  the results of that predicate instrument testing.
19      Q.   The predicate instrument life testing?
20      A.   That's right.
21      Q.   There's a column.  Hopefully it's a little
22  better on your printed document, but it looks like
23  it's Performance Requirement/Acceptance Criteria, the
24  second column?
25      A.   I do see that, yes.

1      Q.   I guess that's a high-level listing of the
2   criteria that were tested during the life test?
3      A.   That's accurate, yes.
4      Q.   And then there's -- under that, it says, "A
5   Weibull Design of Reliability analysis with a 90/90
6   reliability and confidence"?
7      A.   I see that, yes.
8      Q.   That would conform to a C2-type criteria; is
9   that right?
10     A.   That's correct.
11     Q.   And it notes that that resulted in 10 human
12  uses as the -- or that's what it says there?
13     A.   That's correct.
14     Q.   Do you have an understanding of what that
15  means in the context of the performance requirement
16  acceptance criteria?
17     A.   I have an understanding of what that means,
18  yes.
19     Q.   What's that?
20     A.   That these predicate devices, the Maryland
21  Bipolar Forceps, that are titled here went through the
22  life testing and satisfied the performance
23  requirements and acceptance criteria to satisfy a
24  90/90 confidence reliability calculation for 10 lives,
25  10 human uses.

HIGHLY CONFIDENTIAL

Page 56

1   Q. And there's a conclusion on the rightmost
2   column.
3   A. I see that.
4   Q. It notes that, "All tests articles completed
5   13 life cycles"?
6   A. That's right.
7   Q. And then it states that, "Since the
8   performance of the instruments was subsequently
9   determined to be acceptable through life testing and
10  achieve 13 life cycles, the resulting number of human
11  uses is 10."
12  A. I see that.
13  Q. Do you have an understanding of what that's
14  referring to?
15  A. I do.
16  Q. What's that?
17  A. For the Weibull calculation, depending on the
18  sample size or number of samples that survived the
19  extent of the test, to substantiate or to qualify for
20  a 90/90 confidence and reliability, you may have to
21  test some of the devices beyond 10.
22      So what I'm seeing here, all of the test
23  articles completed 13 life cycles, but that was in
24  order to satisfy the 90/90 confidence and reliability
25  for a 10-life instrument.

Page 57

1  Q. What does completed 13 life cycles mean?
2  A. The life cycles, those are SSUs. So those
3  are the simulated surgical uses on a system. That's
4  what that's referring to.
5  Q. And in this example, all the test samples
6  would have made it through 13 simulated surgical uses
7  without failure?
8  A. According to the statement, yes.
9  Q. And would that be examples of samples that
10 are censored?
11     MS. CAHOY: Objection to form.
12     THE WITNESS: For the Weibull calculation, if
13 they are surviving, they would be censored as they
14 would be censored at the number of use cycles that
15 they completed, yes.
16 BY MR. VAN HOVEN:
17 Q. I'd like to go to the table 3-4. If you
18 could take a look at the description, the summary, and
19 the table itself and let me know when you're ready to
20 discuss those.
21 A. I see it. I'm ready.
22 Q. And here there are some -- in the second
23 column, do you see there's a Test Category?
24 A. I do.
25 Q. And one category is Damage Requirements?

1      C1-type failure?
2          A.   That's correct.
3          Q.   I'd like to go to page -- I think it's
4      starting on Page 54.  That's table 3-6.  If you'd take
5      a look at the discussion on Page 54 and the
6      corresponding table on Page 55.
7              (The witness reviewed the document.)
8              THE WITNESS:  Okay.  I've read it, yes.
9      BY MR. VAN HOVEN:
10         Q.   Does this appear to be a life-testing summary
11     for the Large Needle Driver?
12         A.   It does.
13         Q.   I guess the original sub- -- the originally
14     designed Large Needle Driver; is that right?
15         A.   The 10-life, yes.
16         Q.   And I'd like to go to the table on Page 55.
17     The conclusion states that, "All test articles
18     completed 15 cycles."
19              Do you see that?
20         A.   I do.
21         Q.   Does that mean that all the test articles
22     used for the Large Needle Driver life testing
23     completed 15 surgical uses without failure?
24         A.   That looks accurate.
25         Q.   And would those results have been censored

Page 62

1   for the purpose of Weibull analysis?
2        A.  Yes, they would.
3        Q.  At their 15 completed surgical uses?
4        A.  That's correct.
5        Q.  I'd like to take a look at the Mega SutureCut
6   Needle Driver on Page 55 through 56.
7        A.  Okay.
8        Q.  And let me know when you're ready to discuss
9   that.
10       A.  I'm ready.  These are very similar.
11       Q.  And so for the Mega -- I guess for the
12  originally designed Mega SutureCut Needle Driver, did
13  all test articles complete 15 cycles without failure?
14       A.  That looks correct per the conclusion
15  statement.
16       Q.  And all of those test articles then would
17  have been censored for the purpose of Weibull
18  analysis?
19       A.  You have me thinking about that question
20  because -- and if we are calculating -- if there was a
21  need to calculate Weibull -- so this -- and this
22  applies to my previous answer to that.  We would have
23  had to censor those four samples at the 15 lives.
24            But I'm looking at the write-up here, and I'm
25  seeing that the sample size is clearly identified

Page 63

1   here.  For the Mega SutureCut Needle Drivers, it looks
2   like there's a sample size of four.
3           So that -- if they knew the protocol -- if
4   they knew the sample size at the beginning of
5   execution of the protocol, they would know what number
6   of lives without failure the four test units would
7   have to survive to prove the 90/90.  So it would have
8   been a target.
9       Q.  In this case, the target of 10 uses?
10      A.  Correct.  Correct.
11          And so after they meet that target, there
12  wouldn't necessarily be a need to do an explicit
13  Weibull calculation.  They would have achieved what
14  the protocol pass/fail criteria was.
15      Q.  Got it.  Essentially in that case because
16  there were no failures; right?
17      A.  Right.  And they met the protocol pass/fail
18  criteria, assuming that there were four test units.
19      Q.  Got it.  I'd like to go to table 3-10 on
20  Page 59.  This is discussing the original XI design
21  for 8 mm ProGrasp Forceps and 8 mm Long Tip Forceps;
22  is that right?
23      A.  I see that under the bold header.
24      Q.  Could you take a look at the write-up and the
25  table on the following page.

Page 64

1   A.  Yeah.  I'm noticing that it doesn't say
2   ProGrasp and Long Tip.  It says "ProGrasp Forceps and
3   Tenaculum Forceps."  So that looks inconsistent.
4   Q.  So you're saying the types of forceps
5   identified in the conclusion in the right side column
6   are possibly inconsistent with the ones on the title
7   on the previous page; is that right?
8   A.  That's what I'm observing, yes.
9   Q.  So I'll focus on what's in the -- what's in
10  the table.
11  A.  Okay.
12  Q.  First in the conclusion, there's one set of
13  test results for the original XI design of the
14  ProGrasp Forceps.
15      Do you see that?
16  A.  I do see that.
17  Q.  There it says that, "All test articles
18  completed their 13 life cycles"?
19  A.  I see that, yes.
20  Q.  Do you understand that to be an instance in
21  which all of the test articles made it to 13 life
22  cycles without failure?
23  A.  I do.
24  Q.  And Tenaculum Forceps.  Am I saying that
25  right?

Page 65

1     A.   Yes, that's right.
2     Q.   For Tenaculum Forceps, it says, "All test
3  articles complete 15 life cycles, resulting in
4  validation of a" -- something -- "use count of 10"?
5     A.   "Human use count of 10."
6     Q.   Do you understand that to be saying that all
7  of the Tenaculum Forcep articles passed 15 life cycles
8  without failure?
9     A.   Yes, I do.
10    Q.   Do you have an understanding of why, for
11 ProGrasp only, they would only need to meet 13 life
12 cycles without failure while for Tenaculum they would
13 need to meet 15 life cycles without failure?
14    A.   Well, I don't know for certain, but it
15 could -- number of test samples that were under test
16 can influence the target number of uses that need to
17 be satisfied to meet that rated use life target.
18         So I could see that the sample size is
19 identified for ProGrasp.  Clearly it says for ProGrasp
20 Forceps and then it says "and Tenaculums."
21         So without knowing the details, I'm not sure,
22 but that's one potential reason why the number of
23 cycles that had to be completed is different.
24    Q.   And but in each instance -- for ProGrasp, for
25 example, it took 13 cycles to prove the 10-use target;

Page 66

1      right?
2          A.  Right.
3          Q.  For Tenaculum, it took 15 cycles to prove the
4      10-use target; right?
5          A.  If you don't mind, I'm reading this again.
6              (The witness reviewed the document.)
7              THE WITNESS:  Yeah.  I'm unclear on why the
8      difference, but that's what the statement is -- is
9      stating.
10             MR. VAN HOVEN:  I'm going to load as
11     Exhibit 269 tab 74.
12             (Deposition Exhibit 269 was marked for
13             identification.)
14             MR. VAN HOVEN:  This is Intuitive-00290826.
15             THE WITNESS:  I have the hard copy.
16     BY MR. VAN HOVEN:
17         Q.  That's all right.  I'll put it on the screen
18     also.
19             Can you take a look at this document.  And I
20     guess it's a five- or six-page document, but I guess
21     look at it in some detail and let me know when you're
22     ready to discuss it.
23         A.  Okay.
24             (The witness reviewed the document.)
25             THE WITNESS:  Okay.  I've read it or reviewed