*Contains Nonbinding Recommendations*

*Draft – Not for Implementation*

# Remanufacturing of Medical Devices

# Draft Guidance for Industry and Food and Drug Administration Staff

### *DRAFT GUIDANCE*

**This draft guidance document is being distributed for comment purposes only.**

**Document issued on June 24, 2021.**

You should submit comments and suggestions regarding this draft document within 90 days of publication in the *Federal Register* of the notice announcing the availability of the draft guidance. Submit electronic comments to https://www.regulations.gov. Submit written comments to the Dockets Management Staff, Food and Drug Administration, 5630 Fishers Lane, Room 1061, (HFA-305), Rockville, MD 20852. Identify all comments with the docket number listed in the notice of availability that publishes in the *Federal Register*.

For questions about this document regarding CDRH-regulated devices, contact the Regulation, Policy, and Guidance Staff at RPG@fda.hhs.gov. For questions about this document regarding CBER-regulated devices, contact the Office of Communication, Outreach, and Development (OCOD) at 1-800-835-4709 or 240-402-8010, or by email at ocod@fda.hhs.gov.



**U.S. Department of Health and Human Services**
**Food and Drug Administration**
**Center for Devices and Radiological Health**
**Center for Biologics Evaluation and Research**

*Contains Nonbinding Recommendations*

*Draft – Not for Implementation*

# Preface

## Additional Copies

## CDRH

Additional copies are available from the Internet. You may also send an email request to CDRH-Guidance@fda.hhs.gov to receive a copy of the guidance. Please use the document number 17048 and complete title of the guidance in your request.

## CBER

Additional copies are available from the Center for Biologics Evaluation and Research (CBER), Office of Communication, Outreach, and Development (OCOD), 10903 New Hampshire Ave., Bldg. 71, Room 3128, Silver Spring, MD 20993-0002, or by calling 1-800-835-4709 or 240-402-8010, by email, ocod@fda.hhs.gov or from the Internet at https://www.fda.gov/vaccines-blood-biologics/guidance-compliance-regulatory-information-biologics/biologics-guidances.

*Contains Nonbinding Recommendations*

*Draft – Not for Implementation*

# Table of Contents

I. Introduction ................................................................................................................1

II. Background ................................................................................................................2

   A. FDA activities ........................................................................................................2

   B. FDA's current thinking ........................................................................................3

III. Scope ........................................................................................................................3

IV. Definitions ................................................................................................................4

V. Guiding Principles .....................................................................................................5

VI. Relevant considerations to determine if activities are remanufacturing ................7

   A. What is a significant change to device performance or safety specifications? ...............7

   B. Determining whether activities are "remanufacturing" ...................................................8

      A1. Add, remove, or change a component/part/material that directly or indirectly contacts body tissue? ....................................................................................................12

      A1.1 Is there a significant change to device performance or safety specifications? .............12

      A2. Add or remove component/part/material or change the dimensional or performance specifications of a component/part/material? ....................................................................13

      A2.1 Is there a significant change to device performance or safety specifications? .............14

      A3. Is there a new or modified risk or is there a change in the performance or safety specifications? ...................................................................................................................14

      A3.1 Is there a significant change to device performance or safety specifications? .............15

VII. Changes involving software .....................................................................................15

VIII. Considerations for labeling .......................................................................................16

Appendix A. Examples ....................................................................................................18

   (1) Component/part/material activities ..........................................................................18

   (2) Software activities ...................................................................................................28

Appendix B. Documentation examples .............................................................................30

*Contains Nonbinding Recommendations*

*Draft – Not for Implementation*

# Remanufacturing of Medical Devices

# Draft Guidance for Industry and Food and Drug Administration Staff

*This draft guidance, when finalized, will represent the current thinking of the Food and Drug Administration (FDA or Agency) on this topic. It does not establish any rights for any person and is not binding on FDA or the public. You can use an alternative approach if it satisfies the requirements of the applicable statutes and regulations. To discuss an alternative approach, contact the FDA staff or Office responsible for this guidance as listed on the title page.*

## I.   Introduction

Medical devices encompass a vast array of products with different technologies, product lifecycles, complexity, intended users, and environments of use. Many devices are reusable and need preventive maintenance and repair during their useful life. For these devices, proper servicing is critical to their continued safe and effective use. However, there is a lack of clarity regarding the distinction between "servicing" and "remanufacturing" of a device. Most notably, remanufacturing has implications for the regulatory responsibilities of entities performing these activities.[1]

This draft guidance is intended to help clarify whether activities performed on devices are likely "remanufacturing." Such clarification is intended to help provide consistency and better understanding of applicable statutory and regulatory requirements. This draft guidance also includes recommendations for information that should be included in labeling to help assure the continued quality, safety, and effectiveness of devices that are intended to be serviced over their useful life. In drafting this guidance, FDA considered objective evidence and information learned from the Agency's activities discussed in this draft guidance.

For the current edition of the FDA-recognized standard(s) referenced in this document, see the FDA Recognized Consensus Standards Database.[2] For more information regarding use of consensus standards in regulatory submissions, please refer to the FDA guidance titled "Appropriate Use of Voluntary Consensus Standards in Premarket Submissions for Medical

---

[1] FDA's Report on the Quality, Safety, and Effectiveness of Servicing of Medical Devices (FDA Report on Device Servicing) discusses medical device servicing in more detail. Available at https://www.fda.gov/media/113431/download.
[2] Available at https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfStandards/search.cfm.

*Contains Nonbinding Recommendations*

*Draft – Not for Implementation*

32 Devices"[3] and "Standards Development and the Use of Standards in Regulatory Submissions
33 Reviewed in the Center for Biologics Evaluation and Research."[4]
34
35 The contents of this document do not have the force and effect of law and are not meant to bind
36 the public in any way, unless specifically incorporated into a contract. This document is intended
37 only to provide clarity to the public regarding existing requirements under the law. FDA
38 guidance documents, including this guidance, should be viewed only as recommendations, unless
39 specific regulatory or statutory requirements are cited. The use of the word should in Agency
40 guidance means that something is suggested or recommended, but not required.
41

# II.   Background

## A.   FDA activities

44 FDA has been working to gain additional perspectives on the distinction between "servicing"
45 and "remanufacturing" and has undertaken several efforts to help promote clarity. FDA opened a
46 docket for public comment[5] and held a public workshop in 2016.[6] FDA received comments,
47 complaints, and adverse event reports alleging inadequate servicing, which were discussed and
48 analyzed in the FDA Report on Device Servicing,[7] published by FDA in May 2018 in
49 accordance with section 710 of the FDA Reauthorization Act of 2017 (FDARA) (Pub. L. 115-
50 52).[8]
51
52 In the FDA Report on Device Servicing, FDA concluded that a majority of the comments,
53 complaints, and adverse event reports received by the Agency that referred to inadequate
54 "servicing" causing or contributing to adverse events and deaths actually pertained to
55 "remanufacturing." This conclusion was based on FDA's evaluation of the available objective
56 evidence[9] related to the quality, safety, and effectiveness of medical device servicing.
57
58 In 2018, FDA released a white paper, opened a public docket, and held a public workshop to
59 facilitate public discussion on the distinction between servicing and remanufacturing.[10] The

---

[3] Available at https://www.fda.gov/regulatory-information/search-fda-guidance-documents/appropriate-use-voluntary-consensus-standards-premarket-submissions-medical-devices.
[4] Available at https://www.fda.gov/regulatory-information/search-fda-guidance-documents/standards-development-and-use-standards-regulatory-submissions-reviewed-center-biologics-evaluation.
[5] 81 FR 11477. Public comments submitted to the docket are searchable under FDA-2016-N-0436, available at https://www.regulations.gov/docket?D=FDA-2016-N-0436.
[6] 81 FR 46694.
[7] Available at https://www.fda.gov/media/113431/download.
[8] FDA's conclusions in this report were based on the available information, which included but was not limited to the information presented at the 2016 public workshop, responses to the docket request for comments, and evaluation of objective evidence related to the quality, safety, and effectiveness of medical device servicing.
[9] The objective evidence evaluated in the FDA Report on Device Servicing included a numerical estimation of service and repair entities, literature review, ECRI Institute analysis, medical device reports (MDR), and complaints that FDA received.
[10] Available at https://wayback.archive-it.org/7993/20201222125933/https://www.fda.gov/medical-devices/workshops-conferences-medical-devices/public-workshop-medical-device-servicing-and-remanufacturing-activities-december-10-11-2018-12102018. FDA requested comments through docket number FDA-2018-N-3741.

*Contains Nonbinding Recommendations*

*Draft – Not for Implementation*

60  white paper described FDA's initial thoughts about guiding principles, provided a flowchart with
61  accompanying text for understanding the distinctions, and contained a complementary approach
62  for software, as well as considerations for labeling, and examples utilizing the flowchart. FDA
63  also included targeted questions throughout the white paper for which the Agency sought
64  feedback. FDA considered the comments from the public docket and discussions during the
65  public workshop in developing this draft guidance.
66

67  ## B.    FDA's current thinking

68  The distinction between "remanufacturing" and "servicing" is important to understand.
69  Remanufacturing is the processing, conditioning, renovating, repackaging, restoring, or any other
70  act done to a finished device that significantly changes the finished device's performance or
71  safety specifications, or intended use.[11] For the purposes of this guidance, we refer to the original
72  equipment manufacturer's (OEM's) legally marketed finished device as the "legally marketed
73  device."
74

75  Servicing is the repair and/or preventive or routine maintenance of one or more parts in a
76  finished device, after distribution, for purposes of returning it to the safety and performance
77  specifications established by the OEM and to meet its original intended use.[12] As described in
78  the FDA Report on Device Servicing, FDA's authority to regulate the servicing of medical
79  devices by any entity is grounded in the Agency's authority to regulate medical devices and
80  radiation-emitting electronic products under the Federal Food, Drug, and Cosmetic (FD&C) Act.
81

82  Irrespective of an entity's self-identified designation as a "servicer" or "remanufacturer," FDA
83  focuses on the specific activities an entity performs on a particular device.[13] The determination
84  of whether the activities an entity performs are remanufacturing affects the applicability and
85  enforcement of regulatory requirements under the FD&C Act and its implementing regulations.
86  FDA has consistently enforced requirements under the FD&C Act and its implementing
87  regulations on entities engaged in remanufacturing, including but not limited to registration and
88  listing, adverse event reporting, the Quality System (QS) regulation, and marketing submissions.
89

90  # III.  Scope

91  Because of the apparent confusion between servicing and remanufacturing among entities
92  performing these activities, FDA committed in the FDA Report on Device Servicing to issue
93  guidance that clarifies the difference between servicing and remanufacturing activities. To assist

---

[11] See 21 CFR 820.3(w).

[12] For purposes of the report that Congress required FDA to post on its website, section 710(c) of FDARA (Pub. L. 115-52, 131 Stat. 1068) defines servicing to include, "with respect to a device, refurbishing, reconditioning, rebuilding, remarketing, repairing, remanufacturing, or other servicing of the device." However, for purposes other than this report, FDA does not consider remanufacturing to be a type of servicing.

[13] The designations of servicer and remanufacturer are not mutually exclusive. The same entity may meet the definition of either designation based on their activities on one or multiple devices.

*Contains Nonbinding Recommendations*

*Draft – Not for Implementation*

94 with this clarification, FDA focuses this draft guidance on those activities that are likely
95 remanufacturing.
96
97 This draft guidance addresses activities performed on devices that are intended to be reused and
98 maintained. This draft guidance discusses whether activities performed by OEMs and third
99 parties on such devices are likely remanufacturing. This draft guidance is not intended to adopt
100 significant policy changes, but to clarify FDA's current thinking on applicable definitions, and
101 clarify, not change, the regulatory requirements applicable to remanufacturers. The concepts in
102 this draft guidance are also not intended to alter or supersede existing regulations and policies
103 related to the regulatory threshold for submitting a marketing submission for a device.
104
105 The products included within the scope of this guidance are devices as defined in section 201(h)
106 of the FD&C Act, including software and electronic products that meet the definition of a device.
107 In general, the concepts discussed in this guidance are meant to apply to all reusable devices,
108 irrespective of their classification into class I, II, or III, including those subject to premarket
109 approval. This guidance is not intended to address reprocessed single-use devices.
110

# IV. Definitions

112 The following definitions apply for the purposes of this guidance.[14]

- 113 • Manufacturers (Manufacturers, OEMs, or Remanufacturers): A manufacturer is any
  114 person who designs, manufactures, fabricates, assembles, or processes a finished
  115 device.[15] A remanufacturer is any person who processes, conditions, renovates,
  116 repackages, restores, or does any other act to a finished device that significantly
  117 changes the finished device's performance or safety specifications, or intended use.[16]
  118 Remanufacturers are considered to be manufacturers.[17] For electronic products, a
  119 manufacturer is any person engaged in the business of manufacturing, assembling, or
  120 importing electronic products.[18]

- 121 • Intended use: The general purpose of the device or its function, which encompasses
  122 the indications for use.[19]

- 123 • Performance specifications: The performance characteristics of a device established
  124 by the OEM for the device to perform as intended, including those listed in device
  125 labeling or in finished product release specifications. Some examples include
  126 measurement accuracy, output accuracy, energy output level, and stability criteria.

- 127 • Recondition/Refurbish/Rebuild: Restores a medical device to the OEM's original
  128 specifications or to be "like new." The device may be brought to current
  129 specifications if the change(s) made to the device do not significantly change the
  130 finished device's performance or safety specifications, or intended use. These

---

[14] Consistent with FDA's current thinking in this context, some of the definitions that appeared in the FDA Report on Device Servicing have been modified to reflect updated understanding and practice.
[15] 21 CFR 820.3(o).
[16] 21 CFR 820.3(w).
[17] 21 CFR 820.3(o) and 820.3(w).
[18] 21 CFR 1000.3(n).
[19] FDA uses this term consistent with the meaning of intended uses in 21 CFR 801.4.

*Contains Nonbinding Recommendations*

*Draft – Not for Implementation*

131      activities include repair of components, installation of OEM provided updates and
132      upgrades, and replacement of worn parts.

133   •  <u>Remanufacture</u>: Process, condition, renovate, repackage, restore, or any other act
134      done to a finished device that significantly changes the finished device's performance
135      or safety specifications, or intended use.[20]

136   •  <u>Repair</u>: A type of servicing that returns a component to original specifications,
137      including replacing non-working components or parts outside of routine or periodic
138      upkeep for the current owner of the device.

139   •  <u>Reprocessing</u>: With respect to reusable devices, means validated processes used to
140      render a medical device, which has been previously used or contaminated, fit for a
141      subsequent single use on a patient. These processes are designed to remove soil and
142      contaminants by cleaning and to inactivate microorganisms by disinfection or
143      sterilization. [21]

144   •  <u>Safety specifications</u>: The safety characteristics of a device established by the OEM
145      for the safe use of the device, including those incorporated into the device design and
146      finished product release specifications, generally including the device's compensating
147      controls and risk mitigations. Some examples include alarms, sensors, and locking or
148      fail-safe mechanisms.

149   •  <u>Service</u>: Repair and/or preventive or routine maintenance of one or more parts in a
150      finished device, after distribution, for purposes of returning it to the safety and
151      performance specifications established by the OEM and to meet its original intended
152      use. Servicing excludes activities that significantly change the finished device's
153      safety or performance specifications, or intended use.

154   •  <u>Third party servicers and Independent Service Organizations (ISOs)</u>: Entities, other
155      than the OEM or healthcare delivery organizations, that maintain, restore, refurbish,
156      or repair a finished device after distribution, for purposes of returning it to the safety
157      and performance specifications established by the OEM and to meet its original
158      intended use.
159

# V.   Guiding Principles

161 In using this guidance to help determine whether activities are remanufacturing, FDA
162 recommends application of the following guiding principles:
163

164   1.  **Assess whether there is a change to the intended use** – Given that the purpose of
165      servicing is to return the device to the safety and performance specifications established
166      by the OEM and to meet its original intended use, any change to the intended use should

---

[20] 21 CFR 820.3(w).
[21] See the FDA guidance "Reprocessing Medical Devices in Health Care Settings: Validation Methods and
Labeling," available at: https://www.fda.gov/regulatory-information/search-fda-guidance-documents/reprocessing-
medical-devices-health-care-settings-validation-methods-and-labeling.

*Contains Nonbinding Recommendations*

*Draft – Not for Implementation*

167   be evaluated to determine whether the activity is remanufacturing.[22]
168

2. **Determine whether the activities, individually and cumulatively, significantly change the safety or performance specifications of a finished device** – Under 21 CFR 820.3(w), remanufacturing includes activities that significantly change the performance or safety specifications of the finished device. FDA considers "change" to also include activities that improve the device. Activities that are not *intended to* significantly change the performance or safety specifications, however, should still be evaluated to determine whether they *do* significantly change the finished device's performance and safety specifications. Multiple changes, when considered cumulatively, may significantly change the performance or safety specifications of the legally marketed device and should be evaluated.

3. **Evaluate whether any changes to a device require a new marketing submission** – Regardless of whether changes made to a legally marketed device are remanufacturing, such changes should be evaluated to determine whether a premarket notification (510(k)) or other marketing submission is required pursuant to the FD&C Act and applicable regulations, and entities should consult relevant guidance for FDA's recommendations on the topic.[23] For example, a change to a device subject to 510(k) and/or special controls should be considered with respect to the criteria in 21 CFR 807.81 describing when a new 510(k) submission is required and any special controls under the relevant device classification regulation, respectively.

4. **Assess component/part/material[24] dimensional and performance specifications** – Assessment of changes to dimensional and performance specifications can inform whether the activity performed is remanufacturing. The impact of component/part/material changes can be evaluated by comparison to the OEM components/parts/materials specifications and/or through verification and validation testing. Deviations in component/part/material specifications from the OEM's legally marketed device may result in significant changes to the device's performance or safety specifications, and may necessitate closer evaluation (such as conducting testing or a risk-based assessment) and consideration of the regulatory criteria describing when a new marketing submission is required.

---

[22] Consistent with Guiding Principle 3, any changes that affect or change intended use should be considered pursuant to applicable regulations.

[23] See, e.g., "Deciding When to Submit a 510(k) for a Change to an Existing Device," available at https://www.fda.gov/regulatory-information/search-fda-guidance-documents/deciding-when-submit-510k-change-existing-device, and "Deciding When to Submit a 510(k) for a Software Change to an Existing Device," available at https://www.fda.gov/regulatory-information/search-fda-guidance-documents/deciding-when-submit-510k-software-change-existing-device, for FDA's current thinking on this topic.

[24] 21 CFR 820.3(c) defines a component as any raw material, substance, piece, part, software, firmware, labeling, or assembly which is intended to be included as part of the finished, packaged, and labeled device. In this guidance, "component" and "component/part/material" are used interchangeably. Due to the nature of software and firmware, consideration of whether activities involving them may be remanufacturing is discussed separately from components/parts/materials.

*Contains Nonbinding Recommendations*

*Draft – Not for Implementation*

201  5. **Employ a risk-based approach** – Entities should employ a risk-based approach, such as
202  one that conforms to or is consistent with ISO 14971: *Medical devices – Application of*
203  *risk management to medical devices* when assessing whether an activity they perform is
204  remanufacturing. For the purposes of this guidance, a risk-based assessment is based on
205  the combination of multiple risk concepts that are important for managing the risks of
206  medical devices. Risk estimation, risk acceptability, risk control, benefit/risk analysis,
207  assessment of hazards and hazardous situations, and overall risk evaluation are all
208  concepts that can be applied during these activities. The concept of risk, as defined in
209  ISO 14971, is the combination of the probability of occurrence of harm and the severity
210  of that harm. Although the risk terminology used in this document is primarily derived
211  from ISO 14971, we recognize that an individual entity's terminology may differ.
212
213  For the purposes of this guidance, a new risk is a new hazard or hazardous situation that
214  did not exist for the legally marketed device. An activity performed on a device may
215  introduce a new risk, or may modify the probability or severity of a known risk. An
216  activity is likely remanufacturing when a risk-based assessment identifies any new risks
217  or significant modifications to known risks, as these are likely to significantly change
218  performance or safety specifications, in comparison to the legally marketed device.
219
220  6. **Adequately document decision-making** – When deciding whether an activity is
221  remanufacturing or not, FDA recommends that the rationale for the determination be
222  documented in sufficient detail, including reference to supporting verification and
223  validation data, to explain how the determination was made. Specifically, such
224  documentation should specify why the activities performed on the device do or do not
225  significantly change the performance or safety specifications, or intended use of the
226  legally marketed device. If an entity previously determined that an activity was not
227  remanufacturing, and the same entity is performing the identical activity on the same
228  version or model of a device, such documentation could reference previous
229  determinations. Effective documentation can facilitate sound decision-making and
230  evaluation of relevant factors and information such as adverse events, and provide
231  important information for an entity to help justify their decision-making in the event that
232  an inspection is conducted by FDA or this information is otherwise requested.
233

# VI.   Relevant considerations to determine if activities are remanufacturing

## A.   What is a significant change to device performance or safety specifications?

238  Remanufacturing is the processing, conditioning, renovating, repackaging, restoring, or any other
239  act done to a finished device that significantly changes the finished device's performance or
240  safety specifications, or intended use.[25] For purposes of this draft guidance, FDA generally

---

[25] 21 CFR 820.3(w).

*Contains Nonbinding Recommendations*

*Draft – Not for Implementation*

241    considers a significant change to device performance or safety specifications to be one that,
242    based on verification and validation testing and/or a risk-based assessment, results in a finished
243    device that is outside the OEM's performance or safety specifications or introduces new risks or
244    significantly modifies existing risks. For example, a change to a material that contacts the human
245    body and impacts the adequacy of the OEM's validated reprocessing instructions is likely a
246    significant change to device performance or safety specifications, and therefore, is likely
247    remanufacturing. Conversely, replacing an internal capacitor with one that has the same
248    specifications (e.g., same capacitance, working voltage, temperature range, and footprint) is not
249    likely to significantly change device performance or safety specifications and therefore, is likely
250    not remanufacturing.

252    FDA has identified certain types of activities that, in general, the Agency believes significantly
253    change the legally marketed device's performance or safety specifications:
254       • Changes to the device's sterilization methods;
255       • Changes to the device's reprocessing instructions;[26] and
256       • Changes to the device's control mechanism,[27] operating principle,[28] or energy type.[29]

258    As discussed below in Section VI.B, activities that result in these changes are likely
259    remanufacturing, and evaluation using the flowchart and accompanying text is not
260    recommended.

262    Remanufacturing also includes significant changes to a device's intended use (e.g., changing a
263    single-use device to become reusable, changing the anatomical location of use).[30] Therefore, as
264    discussed in Guiding Principle 1, any change to the intended use should be evaluated to
265    determine whether the activity is remanufacturing.

## B.    Determining whether activities are "remanufacturing"

268    For activities involving components/parts/materials, FDA recommends the use of the flowchart
269    in this section (Figure 1) to help entities determine if their activities are likely remanufacturing.
270    Although the servicing and remanufacturing definitions and guiding principles in this document
271    apply to software, the approach described in this section should not be applied to software due to

---

[26] See the FDA guidance "Reprocessing Medical Devices in Health Care Settings: Validation Methods and Labeling," available at: https://www.fda.gov/regulatory-information/search-fda-guidance-documents/reprocessing-medical-devices-health-care-settings-validation-methods-and-labeling.

[27] For purposes of this guidance, a control mechanism is the manner by which the actions of a device are directed. One example of a control mechanism change would be a change from analog to digital control of a medical device.

[28] For purposes of this guidance, an operating principle is the mode of operation or mechanism of action through which a device fulfills (or achieves) its intended use. An example of a new operating principle would be changing the image reconstruction algorithm used in a computed tomography x-ray system from simple back projection to a new, more radiation-efficient method.

[29] For purposes of this guidance, energy type is the type of power input to or output from the device. These changes include both energy output and input changes. A change from emitting microwave energy to radiofrequency (RF) energy would be an example of an energy output change; this type of change would likely be part of a significant redesign.

[30] 21 CFR 820.3(w).

*Contains Nonbinding Recommendations*

*Draft – Not for Implementation*

272    its nature and the methods used to evaluate changes to software. Instead, see Section VII for a
273    discussion of changes involving software.
274
275    Figure 1 is a visual aid intended to be used in conjunction with the accompanying text in this
276    section and guiding principles. Figure 1 and the accompanying text in this section are intended to
277    address the most common and important considerations that should be evaluated, but is not
278    meant to capture *all* potential considerations that an entity should evaluate to determine if their
279    activities are likely remanufacturing. Rather, they are intended to guide entities in determining
280    when they should further evaluate such activities by conducting testing or a risk-based
281    assessment. Figure 1 and the accompanying text are intended to be consulted after it is
282    determined that there is no significant change to intended use.
283
284    In Figure 1, each change (e.g., physical change or change to safety control) should first be
285    assessed individually to determine whether the activity is likely remanufacturing. After
286    evaluating each change individually, the cumulative effects should be assessed to determine
287    whether the activities resulting in the collective changes are likely remanufacturing. The legally
288    marketed device should be used as the basis for comparison for individual changes and the
289    cumulative effects of such changes. When there are no deviations in component/part/material
290    dimensional or performance specifications, or intended use, from the OEM counterpart, and
291    there are no new or modified risks or change in the performance or safety specifications of the
292    legally marketed device, there would likely be no significant changes to the legally marketed
293    device, in the absence of other changes.
294
295    FDA does not recommend evaluation with Figure 1 when an activity is performed on behalf of,
296    or otherwise explicitly authorized by, the OEM **and** the activity returns the legally marketed
297    device to its original performance and safety specifications, and intended use. FDA believes such
298    activities would likely not be remanufacturing, and the determination should be adequately
299    documented.
300
301    Entities performing activities on devices should make a determination about whether each
302    activity and the cumulative effects of such activities are remanufacturing and document their
303    rationale.[31] When deciding whether an activity is remanufacturing, entities should document the
304    decision-making process and the basis for the determination. The documentation should be
305    prepared in a way that an FDA investigator or other third party can understand what the change
306    was and the rationale underlying the conclusion. For this, we recommend that the documentation
307    include, at a minimum, the following:[32]
308        • Product name (including model number and serial number, if applicable);
309        • Date of activities performed, assessment, and determination;
310        • Description of device;

---

[31] In addition, FDA notes that under 21 CFR Part 820, manufacturers are required to maintain certain records as applicable, e.g., service reports.
[32] Consistent with Guiding Principle 6, if the identical activity was previously determined to not be remanufacturing, is being performed by the same entity, and is being performed on the same version or model of a device, such documentation could reference previous determinations.

*Contains Nonbinding Recommendations*

*Draft – Not for Implementation*

311      •   Description of activities to be performed, including documentation of
312         components/parts/materials involved;
313      •   Determination of whether the activity is remanufacturing (we recommend using the
314         applicable sections of this guidance);
315      •   Reference to related documents supporting the decision-making process; and
316      •   Signature(s).
317
318     FDA has included examples of such documentation in Appendix B.



10

*Contains Nonbinding Recommendations*

*Draft – Not for Implementation*



319   **Figure 1.** Flowchart to help determine whether activities performed are likely remanufacturing.

*Contains Nonbinding Recommendations*

*Draft – Not for Implementation*

## A1. Add, remove, or change a component/part/material that directly or indirectly contacts body tissue?

Consistent with FDA's guidance documents on reprocessing[33] and biocompatibility,[34] respectively, entities should assess how their activities may affect validated reprocessing instructions or cause an unacceptable adverse biological response resulting from device contact with the human body, including both patient and healthcare provider tissue.

Direct contact is when a component/part/material comes into physical contact with body tissue, such as catheter tubing used on a patient. A component/part/material has indirect contact when a fluid or gas passes through it prior to the fluid or gas coming into physical contact with body tissue (i.e., the device or component/part/material itself does not physically contact body tissue). For example, materials in a catheter hub (the part of the catheter that is external to the patient) indirectly contact the patient when fluids or drugs are infused through the hub and into the patient. Both direct and indirect contact with the patient or user of the device should be considered when answering A1.

If there is any addition, removal, or change to a component/part/material on the finished device, and that component/part/material directly or indirectly contacts body tissue, the answer to A1 should be "yes." This includes exposing a previously unexposed component/part/material to direct or indirect contact with body tissue. Additionally, if there is any change in material type, formulation, or chemical composition for a component/part/material that directly or indirectly contacts body tissue, the answer to A1 should be "yes." If the entity is uncertain how to respond to A1, the answer should be "yes." A "yes" answer to A1 does not necessarily mean that the activity is remanufacturing. Rather, when an entity makes such changes, it should analyze the impact of the change on the device's performance and safety specifications using the text in A1.1.

If no component/part/material added, removed, or changed directly or indirectly contacts body tissue, the answer should be "no" and then proceed to A2.

## A1.1 Is there a significant change to device performance or safety specifications?

If the activity adds, removes, or changes a component/part/material that directly or indirectly contacts body tissue (as mentioned above, this includes an activity that exposes a previously unexposed component/part/material to body tissue either directly or indirectly), a risk-based assessment should be conducted. The assessment should be conducted to determine whether there is a significant change to the biocompatibility or the validated reprocessing instructions of

---

[33] See the FDA guidance "Reprocessing Medical Devices in Health Care Settings: Validation Methods and Labeling," available at: https://www.fda.gov/regulatory-information/search-fda-guidance-documents/reprocessing-medical-devices-health-care-settings-validation-methods-and-labeling.

[34] See the FDA guidance "Use of International Standard ISO 10993-1, 'Biological evaluation of medical devices – Part 1: Evaluation and testing within a risk management process,'" available at: https://www.fda.gov/regulatory-information/search-fda-guidance-documents/use-international-standard-iso-10993-1-biological-evaluation-medical-devices-part-1-evaluation-and.

*Contains Nonbinding Recommendations*

*Draft – Not for Implementation*

356 the legally marketed device. An activity that results in such change may be considered
357 remanufacturing.
358
359 Depending on the magnitude of the change and the nature of the component/part/material,
360 reprocessing validation and a comprehensive biocompatibility risk assessment or testing may be
361 necessary. Entities should incorporate factors that affect the reprocessing and biocompatibility of
362 a device in their risk-based assessment and testing where appropriate. These factors may include
363 the materials of construction, the processing of the materials, methods (including the sterilization
364 process), any residuals from aids used during the process, and intended use life of the legally
365 marketed device. Activities that impact the adequacy of the legally marketed device's validated
366 reprocessing instructions are likely remanufacturing.
367
368 If the answer to A1.1 is "yes," then the activity would likely be remanufacturing. If the answer to
369 A1.1 is "no," then proceed to A2.

## A2. Add or remove component/part/material or change the dimensional or
## performance specifications of a component/part/material?

372 *Add or remove component/part/material?* If there is any addition of a component/part/material to
373 a legally marketed device that was not originally part of the legally marketed device, the answer
374 to A2 should be "yes." Examples include adding an adhesive to mend a break in the device or
375 fasteners to secure a component/part/material. If there is any removal of a
376 component/part/material to a legally marketed device that is not replaced in the legally marketed
377 device, the answer to A2 should be "yes." Examples include removing a fastener or barrier
378 without replacement. Add or remove component/part/material also includes replacing an OEM
379 component/part/material with the same OEM component/part/material or a non-OEM
380 component/part/material.[35]
381
382 *Change the dimensional or performance specifications of a component/part/material?* If there is
383 any change to or replacement of a component/part/material of the legally marketed device, which
384 affects the component/part/material's dimensional or performance specifications, the answer to
385 A2 should be "yes."
386
387 If a component/part/material is not being added or removed, or the dimensional or performance
388 specifications of a component/part/material are not being changed, the answer to A2 should be
389 "no." If uncertain, the answer to A2 should be "yes."
390
391 A "yes" answer to A2 does not necessarily mean that the activity is remanufacturing. Rather,
392 when an entity makes such changes, it should analyze the impact of the change on the device's
393 performance and safety specifications using the text in A2.1. If the answer to A2 is "no," then
394 proceed to A3.

---

[35] As discussed above in Section VI.B., FDA does not recommend evaluation with Figure 1 when an activity is
performed on behalf of, or otherwise explicitly authorized by, the OEM and the activity returns the legally marketed
device to its original performance and safety specifications, and intended use. FDA believes such activities would
likely not be remanufacturing, and the determination should be adequately documented.

*Contains Nonbinding Recommendations*

*Draft – Not for Implementation*

## A2.1 Is there a significant change to device performance or safety specifications?

*Does the added or removed component/part/material significantly change the device performance or safety specifications?* When evaluating whether the addition or removal of a component/part/material significantly changes the device's performance or safety specifications, the entity should consider the intended use life of the legally marketed device. For instance, many reusable devices are reprocessed numerous times within their intended use life. Applicable considerations should include an assessment of whether the added component will withstand repeated reprocessing cycles within the device's intended use life or whether the removed component exposes previously unexposed components that will withstand repeated reprocessing cycles within the device's intended use life. Such an assessment can include verification and validation testing or a risk-based assessment describing why such testing is not warranted. If the reusable device will not be able to withstand repeated reprocessing cycles within its intended use life, the addition or removal of the component/part/material may significantly change the legally marketed device's performance or safety specifications.

*Do the changed dimensional specifications of the component/part/material significantly change the device performance or safety specifications?* In determining whether an activity is remanufacturing for these types of changes, the entity should consider not only the magnitude of the dimensional specification change, but the criticality of the modified dimension. The entity should consider whether dimensional specifications meet a minimum or maximum specification (e.g., outer diameter cannot exceed 3.0 mm) or are within a range of acceptable tolerance specifications. If dimensional specifications are within the acceptable range, the answer to A2.1 would likely be "no;" however, for changes that are outside the acceptable range of dimensional specifications, the answer to A2.1 would likely be "yes."

*Do the changed performance specifications of the component/part/material significantly change the device performance or safety specifications?* When evaluating if there is a significant change to performance or safety specifications, the entity should consider whether performance outputs meet a minimum and/or maximum specification (e.g., temperature within chamber cannot exceed 25 ºC and pressure cannot be less than 150 kPa) or are within a range of acceptable tolerance specifications (e.g., pump flowrate must be between 2 and 20 mL/hour). If performance specifications are within the acceptable range, the answer to A2.1 would likely be "no;" however, for changes that result in performance specifications that are outside the acceptable range, the answer to A2.1 would likely be "yes."

If the answer to A2.1 is "yes," then the change would likely be remanufacturing. If the answer to A2.1 is "no," then proceed to A3.

## A3. Is there a new or modified risk or is there a change in the performance or safety specifications?

The entity should perform a risk-based assessment to identify new or modified risks or a change in the performance or safety specifications of the legally marketed device based on the activity being performed on the device. Both the individual change and cumulative changes performed

14

*Contains Nonbinding Recommendations*

*Draft – Not for Implementation*

438 on the legally marketed device should be considered. While individual changes may not
439 significantly change the legally marketed device's performance or safety specifications, the
440 cumulative changes may do so. The extent of the assessment should be appropriate considering
441 the nature and extent of the activities being performed.
442
443 *Is there a new or modified risk?* A risk-based assessment can identify whether there are new
444 risks or modified existing risks in comparison to the legally marketed device. If a new risk is
445 created or an existing risk has been modified based on the activity being performed, the answer
446 to A3 should be "yes," and this activity should be evaluated using the text in A3.1. If uncertain,
447 the answer to A3 should be "yes."
448
449 *Is there a change in the performance or safety specifications?* A risk-based assessment can also
450 identify whether there is a change in performance or safety specifications. This assessment
451 should consider, for example, how a change could impact a device's continued conformity to a
452 voluntary consensus standard or compliance with a regulation, such as special controls identified
453 in a device classification regulation. This assessment should also consider whether activities that
454 break a seal or barrier can adequately return the device to its legally marketed performance and
455 safety specifications. If a change to performance or safety specifications has been identified, the
456 answer to A3 should be "yes." If uncertain, the answer to A3 should be "yes."
457
458 When an entity makes a change that has a "yes" answer to A3, the entity should analyze the
459 impact of the change on the device's performance and safety specifications using the text in
460 A3.1. If the answer to A3 is "no," then the change is likely not remanufacturing.

## A3.1 Is there a significant change to device performance or safety specifications?

463 If new or modified risks were identified, the entity should evaluate whether they significantly
464 change the legally marketed device's performance or safety specifications using the output of the
465 risk-based assessment performed in A3. Altering or bypassing a safety feature (e.g., fuses, alerts,
466 alarms, interlocks) likely significantly changes the legally marketed device's performance or
467 safety specifications. Changes that impact compliance with a regulation or alter conformity with
468 a voluntary consensus standard would likely significantly change the legally marketed device's
469 performance or safety specifications and may also adulterate and/or misbrand the device.[36]
470
471 If the answer to A3.1 is "yes," then the change would likely be remanufacturing. If the answer to
472 A3.1 is "no," then the change is likely not remanufacturing.
473

# VII. Changes involving software

475 As described in Section VI, Figure 1 and its accompanying text should not be applied to changes
476 involving software. Many software changes are likely remanufacturing because of their impact
477 on a product's software architecture, software requirements specifications, unresolved anomalies,

---

[36] See, e.g., sections 501(e)(2) and 502(o) of the FD&C Act.

*Contains Nonbinding Recommendations*

*Draft – Not for Implementation*

478 and other key characteristics. Further, because the probability of a software failure cannot be
479 determined using traditional statistical methods, the risk-based assessment approach that FDA
480 recommends in Section VI should not be applied to software changes. Instead, FDA has
481 identified certain activities performed on software that are likely not remanufacturing because
482 they generally do not significantly change the performance or safety specifications of the device:

483 • Activities performed on behalf of or otherwise explicitly authorized by the OEM that
484 return the legally marketed device to its performance and safety specifications, and
485 intended use;
486 • Implementing OEM provided updates and upgrades;
487 • Running software-based hardware diagnostics;
488 • Assessing for viruses, malware, and other cybersecurity related issues;
489 • Reinstalling OEM software to restore original performance and safety specifications;
490 • Reverting software to a previous configuration;
491 • Installing cybersecurity updates that are authorized by the OEM;
492 • Turning on or off connectivity features (e.g., Wi-Fi and Bluetooth connections) consistent
493 with OEM intended use;
494 • Performing data backup and recovery operations;
495 • Assessing software inventory;
496 • Collecting system logs;
497 • Managing user accounts; and
498 • Accessing diagnostic and repair information.
499

500 Other activities involving changes to software are likely to significantly change a device's
501 performance or safety specifications, such that the activity is likely remanufacturing. However, if
502 an entity believes that an activity involving a change to software does not significantly change a
503 device's performance or safety specifications, the entity should adequately document its
504 decision-making (see Guiding Principle 6). Any activity involving software changes that
505 significantly modifies a device's intended use would be remanufacturing.[37]
506

507 Entities should also consider the unintended consequences and cumulative effects of any
508 software change(s). Entities performing activities on devices should make a determination about
509 whether each activity and the cumulative effects of the changes resulting from the activities are
510 remanufacturing and document their rationale.
511

512 # VIII.    Considerations for labeling

513 Based on publicly available information and FDA's activities discussed in Section II.A of this
514 draft guidance, FDA believes that OEMs of reusable devices intend for their devices to routinely
515 undergo both preventive maintenance and repair. It is important that such devices include
516 instructions on how to adequately return a device to its performance and safety specifications

---

[37] See 21 CFR 820.3(w).

*Contains Nonbinding Recommendations*

*Draft – Not for Implementation*

established by the OEM.[38] Unintentional remanufacturing can occur when entities do not have the instructions necessary to return a device to its original performance and safety specifications. The lack of adequate servicing instructions can also create challenges in the availability of quality, safe, and effective devices.

Consistent with promoting and protecting the public health, FDA encourages OEMs, as an industry best practice, to provide servicing instructions that facilitate routine maintenance and repair of their reusable devices.[39] FDA recommends that the labeling of reusable devices include the following information, as applicable, to facilitate routine device maintenance and repair:

- A description of the key performance and safety specifications;
- Critical technical or functional specifications, including:
  - Physical dimensions;
  - Electrical characteristics, including batteries (e.g., chemistry, amperage, voltage, rechargeability), internal fuses, and power supply (e.g., voltage, amperage, frequency); and
  - Device-specific performance specifications (e.g., flow rate accuracy or range, humidity, temperature, wavelength).
- The recommended maintenance activities and schedule;
- Recommended routine testing and acceptance criteria to confirm that the device remains within its performance and safety specifications;
- A description of error codes, alerts, and alarm features on the device;
- Precautions and warnings relevant to servicing the device; and
- Version number and release date of software.

---

[38] Section 502(f)(1) of the FD&C Act requires that labeling bear adequate directions for use. For non-prescription devices, adequate directions for use include instructions on preparing a device for use. 21 CFR 801.5(g). Prescription devices are exempt from the adequate directions for use requirement provided certain conditions are met, including that the labeling bear "information for use, including indications, effects, routes, methods, and frequency and duration of administration, and any relevant hazards, contraindications, side effects, and precautions under which practitioners licensed by law to administer the device can use the device safely and for the purpose for which it is intended…" 21 CFR 801.109(c).

[39] FDA's recommendations in this guidance are not intended to encourage the disclosure of trade secrets or confidential commercial information (CCI).

17

*Contains Nonbinding Recommendations*

*Draft – Not for Implementation*

540 # Appendix A.  Examples

541 The following are illustrative examples of activities that may be performed on devices with
542 explanations about why such examples are or are not likely remanufacturing. Note that these
543 generalized examples do not necessarily account for every possible detail, risk, or consideration
544 that a manufacturer should evaluate, and should not be taken to mean that the changes described
545 are or are not definitively remanufacturing. Real-world decisions will depend on the specific
546 facts and circumstances, including the specific details of the changes made to the specific device.
547

548 ## (1)  Component/part/material activities

549 **Example E.1**
550 **Activity:** The door of an infusion pump was bent and now pinches the administration set.
551 The flow rate accuracy fell outside the OEM's specified accuracy range. The door is replaced
552 with a non-OEM door that is marketed as compatible with this infusion pump. It has the
553 same overall dimensions and is made from a similar material of construction. However, the
554 replacement door material is more rigid than the original door.
555

556 **Relevant questions:**
557 *A1. Add, remove, or change a component/part/material that directly or indirectly contacts*
558 *body tissue?*
559 No. The existing and replacement doors do not have direct or indirect contact with the
560 patient's body tissue.
561

562 *A2. Add or remove component/part/material or change the dimensional or performance*
563 *specifications of a component/part/material?*
564 Yes, the old door was removed and replaced. While the new door is marketed as compatible,
565 all dimensions were confirmed through comparative measurement, including the hinges and
566 latch. The specific material of the original door is unknown and there is a noticeable
567 difference in flexibility that may impact the pump's performance specifications.
568

569 *A2.1 Is there a significant change to device performance or safety specifications?*
570 No. Once replaced, the door was confirmed to open and close with similar effort as the
571 original door and it was confirmed that the added rigidity did not significantly change the
572 pump's performance or safety specifications (e.g., flowrate accuracy).
573

574 *A3. Is there a new or modified risk or is there a change in the performance or safety*
575 *specifications?*
576 No. A risk-based assessment determined that there are no new or modified risks and there is
577 no change in performance or safety specifications (e.g., the change does not alter conformity
578 to a voluntary consensus standard or compliance with a regulation).
579

580 **Decision:** Not Remanufacturing.
581

18

*Contains Nonbinding Recommendations*

*Draft – Not for Implementation*

582 **Example E.2**
583     **Activity:** The rotor within a peristaltic infusion pump no longer functions as intended and is
584     replaced. The subject pump rotor is no longer supported by the OEM, but a comparable off-
585     the-shelf rotor is available. The dimensions of the rotor, including the individual rollers, are
586     the same; however, the material of construction of the rollers, which contact and apply
587     pressure to the administration set, appears to be stainless steel. This is different from the
588     plastic rollers in the legally marketed device.
589
590     **Relevant questions:**
591     *A1. Add, remove, or change a component/part/material that directly or indirectly contacts*
592     *body tissue?*
593     No. Neither the existing or replacement component directly or indirectly contact body tissue.
594     It is only in contact with the outside of the administration set.
595
596     *A2. Add or remove component/part/material or change the dimensional or performance*
597     *specifications of a component/part/material?*
598     Yes. The rotor was removed and replaced. Also, although the dimensional specifications of
599     the non-OEM pump rotor, including the individual rollers, are the same as the OEM rotor,
600     the roller materials are different.
601
602     *A2.1 Is there a significant change to device performance or safety specifications?*
603     Yes. Once the rotor was replaced, the device appears to function adequately. The change in
604     material of the rollers does not significantly change the accuracy of the flowrate across the
605     labeled flowrate range. However, a risk-based assessment identified that the change in
606     material of the rollers can affect the useful life of the administration set. The change in the
607     roller material from plastic to stainless steel increases the administration set wear and/or
608     breakage due to fatigue. Evaluation of this risk concluded that the increased fatigue on the
609     administration set is more likely to lead to patient under-dosing before the administration set
610     is intended to be replaced. This significantly changes the device's performance and safety
611     specifications.
612
613     **Decision:** Remanufacturing.
614
615 **Example E.3**
616     **a.**  **Activity:** The gradient coil of a magnetic resonance (MR) system was damaged during an
617         imaging session and needs to be replaced. The gradient coil is replaced with a non-OEM
618         gradient coil. The maximum slew rate of the coil matches that of the OEM gradient coil;
619         however, the peak gradient strength is larger than the OEM coil.
620
621     **Relevant questions:**
622     *A1. Add, remove, or change a component/part/material that directly or indirectly*
623     *contacts body tissue?*
624     No. The gradient coil does not have direct or indirect contact with body tissue.
625

*Contains Nonbinding Recommendations*

*Draft – Not for Implementation*

626           *A2. Add or remove component/part/material or change the dimensional or performance*
627           *specifications of a component/part/material?*
628           Yes. The gradient coil was removed and replaced, and the new gradient coil has a larger
629           peak gradient strength.
630

631           *A2.1 Is there a significant change to device performance or safety specifications?*
632           Yes. An assessment was performed to determine the significance of the change. A
633           gradient coil with a larger peak gradient strength significantly changes the imaging
634           performance specifications (e.g., slice thickness, spatial resolution).
635

636           **Decision:** Remanufacturing.
637

638     **b.**   **Activity:** The gradient coil of an MR system was damaged during an imaging session and
639           needs to be replaced. It is replaced with a non-OEM gradient coil that has different
640           dimensional specifications and coil design.
641

642           **Relevant questions:**
643           *In this example, the answers to flowchart questions A1 and A2 are the same as Example*
644           *E.3.a. except that for A2, the new gradient coil has different dimensional specifications*
645           *and coil design.*
646

647           *A2.1 Is there a significant change to device performance or safety specifications?*
648           No. The new gradient coil only differs by small changes in design and dimensional
649           specifications. There are no significant changes to the performance and safety
650           specifications (e.g., slew rate, peak gradient strength, power).
651

652           *A3. Is there a new or modified risk or is there a change in the performance or safety*
653           *specifications?*
654           No. A risk-based assessment identified no new or modified risks or change in the
655           performance or safety specifications due to this change because the non-OEM gradient
656           coil has the same hardware performance specifications (e.g., slew rate), equivalent
657           imaging performance, and meets the same safety and performance specifications (e.g.,
658           acoustic output) when compared to the OEM gradient coil.
659

660           **Decision:** Not Remanufacturing.
661

662 **Example E.4**
663      **Activity:** The slide heater pads on an immunohistochemistry (IHC) autostainer are worn out
664      and need to be replaced. They are replaced with an OEM part.
665

666      **Relevant questions:**
667      *A1. Add, remove, or change a component/part/material that directly or indirectly contacts*
668      *body tissue?*
669      No. The slide heater pads do not have direct or indirect contact with body tissue.
670

671     *A2. Add or remove component/part/material or change the dimensional or performance*
672     *specifications of a component/part/material?*
673     Yes. The heater pad components were physically removed and replaced with new pads.
674
675     *A2.1 Is there a significant change to device performance or safety specifications?*
676     No. An assessment was performed to evaluate this replacement and identified no changes to
677     dimensions, materials, or performance or safety specifications of the pads.
678
679     *A3. Is there a new or modified risk or is there a change in the performance or safety*
680     *specifications?*
681     No. A risk-based assessment identified no new or modified risks because the slide heater
682     pads are identical to the original part from the OEM. The device now functions within its
683     functional specifications identified in the labeling. There is no change in the performance or
684     safety specifications.
685
686     **Decision:** Not Remanufacturing.
687
688 **Example E.5**
689     **Activity:** The tubing on a sample processor became kinked from use and needs to be
690     replaced. Tubing was found from the same OEM but the tubing is intended for use with a
691     different sample processor.
692
693     **Relevant questions:**
694     *A1. Add, remove, or change a component/part/material that directly or indirectly contacts*
695     *body tissue?*
696     No. There is no direct or indirect contact between the tubing and body tissue.
697
698     *A2. Add or remove component/part/material or change the dimensional or performance*
699     *specifications of a component/part/material?*
700     Yes. The tubing was removed and replaced with new tubing of a different inner diameter.
701
702     *A2.1 Is there a significant change to device performance or safety specifications?*
703     Yes. The inner diameter of the tubing is different from the legally marketed device.
704     Verification and validation testing was performed to evaluate this replacement and identified
705     significant changes to performance because different fluid characteristics (e.g., flow rate)
706     than those specified for the legally marketed device were noted with the new tubing.
707
708     **Decision:** Remanufacturing.
709
710 **Example E.6**
711     **Activity:** A tissue pre-treatment water bath was updated by replacing the heating chamber
712     with one that has a different temperature range.
713

*Contains Nonbinding Recommendations*

*Draft – Not for Implementation*

714    **Relevant questions:**
715    *A1. Add, remove, or change a component/part/material that directly or indirectly contacts*
716    *body tissue?*
717    No. The tissue specimens have been removed from the human body, are within a sealed
718    container, and neither the water bath nor heating chamber directly or indirectly contacts the
719    tissue.
720
721    *A2 Add or remove component/part/material or change the dimensional or performance*
722    *specifications of a component/part/material?*
723    Yes. The heating chamber was removed and replaced. The heating chamber's performance
724    specifications were changed because the new heating chamber has a different temperature
725    range.
726
727    *A2.1 Is there a significant change to device performance or safety specifications?*
728    Yes. The performance is significantly changed because the heating range extends beyond that
729    of the heating chamber in the legally marketed device.
730
731    **Decision:** Remanufacturing.
732
733  **Example E.7**
734    a.  **Activity:** A stainless steel manual drill is intended to be used in the implantation of
735       orthopedic devices. The drill is intended to be reprocessed and reused for multiple
736       procedures. The drill was sharpened because it is dull and difficult to use. This is the first
737       time the drill has been sharpened.
738
739    **Relevant questions:**
740    *A1. Add, remove, or change a component/part/material that directly or indirectly*
741    *contacts body tissue?*
742    Yes. Sharpening the drill removes material and exposes a fresh surface that directly
743    contacts bone.
744
745    *A1.1 Is there a significant change to device performance or safety specifications?*
746    No. The drill is not coated. The material and structure of the drill that contacts body
747    tissue is uniform. A risk-based assessment concluded that removal of material due to
748    sharpening does not significantly change the biocompatibility or reprocessing.
749
750    *A2. Add or remove component/part/material or change the dimensional or performance*
751    *specifications of a component/part/material?*
752    Yes. Sharpening of the drill removes material changing the dimensions of the drill.
753
754    *A2.1 Is there a significant change to device performance or safety specifications?*
755    No. The drill was returned to its performance and safety specifications because the entity
756    sharpened the device to its labeled outer diameter and original edge profile angle.
757

*Contains Nonbinding Recommendations*

*Draft – Not for Implementation*

758  *A3. Is there a new or modified risk or is there a change in the performance or safety*
759  *specifications?*
760  Yes. Sharpening the drill may change the size of the resulting pilot drill hole. Changing
761  the size of the pilot hole can change the fit of the implant or overall purchase in bone
762  such that the mechanical integrity of the implant is compromised.
763
764  *A3.1 Is there a significant change to device performance or safety specifications?*
765  No. Based on the facility's maintenance record, it was determined that this is the first
766  drill sharpening. The drill produces the same pilot hole size as the legally marketed
767  device after the sharpening has been completed. There is no significant change to the
768  device's performance or safety specifications at this time.
769
770  **Decision:** Not Remanufacturing.
771
772  b.  **Activity:** A stainless steel manual drill with a titanium nitride coating is intended to be
773  used in the implantation of orthopedic devices. The drill is intended to be reprocessed and
774  reused for multiple procedures. The drill was sharpened because it is dull and difficult to
775  use. The drill has been sharpened multiple times.
776
777  **Relevant questions:**
778  *A1. Add, remove, or change a component/part/material that directly or indirectly*
779  *contacts body tissue?*
780  Yes. Sharpening the drill removes material and exposes a fresh surface that directly
781  contacts bone.
782
783  *A1.1 Is there a significant change to device performance or safety specifications?*
784  No. While sharpening the drill exposes the stainless steel surface beneath the coating,
785  both the surface coating and underlying stainless steel have been subjected to a
786  biocompatibility assessment. Additionally, a risk-based assessment concluded that
787  removal of material due to sharpening does not significantly change the biocompatibility
788  or reprocessing.
789
790  *A2. Add or remove component/part/material or change the dimensional or performance*
791  *specifications of a component/part/material?*
792  Yes. Sharpening of the drill removes material changing the dimensions and cutting
793  surface of the drill.
794
795  *A2.1 Is there a significant change to device performance or safety specifications?*
796  Yes. Based on the facility's maintenance record, it was determined that the drill has been
797  sharpened multiple times. While the outer diameter of the drill is not significantly
798  changed from the legally marketed device, the titanium nitride coating is no longer intact
799  on the cutting surface of the drill, causing inefficient or destructive cutting. This activity
800  significantly changes the device's performance and safety specifications.
801
802  **Decision:** Remanufacturing.

*Contains Nonbinding Recommendations*

*Draft – Not for Implementation*

**Example E.8**

a. **Activity:** The lens of an endoscope is cracked. The lens is affixed by an epoxy that is not described in the labeling. The cracked lens was removed and replaced. The epoxy used was purchased from the OEM and is identical to that used in the legally marketed device. The replacement lens was not purchased from the OEM. The lens was tested and demonstrated to have the same optical specifications (e.g., focal length, Abbe number) and materials as the original lens.

**Relevant questions:**

*A1. Add, remove, or change a component/part/material that directly or indirectly contacts body tissue?*
Yes, both the lens and the epoxy directly contact body tissue.

*A1.1 Is there a significant change to device performance or safety specifications?*
No. The epoxy is identical to the epoxy used in the legally marketed device. The replacement lens is the same material as original lens. A risk-based assessment that considered both the individual and cumulative changes was performed to determine if the procedure used to replace the lens affects biocompatibility and reprocessing instructions. A biocompatibility assessment confirmed that there are no new surfaces previously unexposed to body tissue. A comprehensive reprocessing risk assessment and testing demonstrated that the validated reprocessing instructions identified in the labeling of the legally marketed device are not impacted by the replacement parts or the procedure used to replace the parts.

*A2. Add or remove component/part/material or change the dimensional or performance specifications of a component/part/material?*
Yes. The epoxy and lens were replaced.

*A2.1 Is there a significant change to device performance or safety specifications?*
No. The optical performance testing (e.g., resolution and distortion) and reprocessing risk assessment and testing indicated there has been no significant change in performance or safety specifications.

*A3. Is there a new or modified risk or is there a change in the performance or safety specifications?*
No. A risk-based assessment was performed that considered both the individual and cumulative changes that could have affected biocompatibility, reprocessing, and optical performance. This assessment identified that there are no new or modified risks, and there is no change in performance or safety specifications.

**Decision:** Not Remanufacturing.

b. **Activity:** The lens of an endoscope is cracked. The lens is affixed by an epoxy that is not described in the labeling. The cracked lens was removed and replaced. The epoxy used

24

*Contains Nonbinding Recommendations*

*Draft – Not for Implementation*

848    was purchased from the OEM and is identical to that used in the legally marketed device.
849    The replacement lens comes from a different endoscope model from the same OEM; that
850    model was 510(k)-cleared with improved optical performance (e.g., resolution and
851    distortion) relative to the original endoscope. The replacement lens has the same material
852    but different optical specifications (e.g., focal length, Abbe number) from the original.
853
854    **Relevant questions:**
855    *In this example, the answers to flowchart questions A1, A1.1, and A2 are the same as*
856    *Example E.8.a.*
857
858    *A2.1 Is there a significant change to device performance or safety specifications?*
859    Yes. The epoxy is identical to that used in the legally marketed device, but the lens has
860    different optical specifications from the original lens. The endoscope with the
861    replacement lens has different imaging specifications relative to the legally marketed
862    device. While the replacement lens is present on another 510(k)-cleared device, it was not
863    present on the original endoscope and significantly changes the performance
864    specifications of the original endoscope.
865
866    **Decision:** Remanufacturing.
867
868  **Example E.9**
869    **Activity:** An endoscope's connection to the video processor was damaged during use. After
870    repair, it was observed that the endoscope readily disconnected from the video processor. To
871    address this problem, an adapter was added to reduce the probability of a disconnection
872    between the endoscope and video processor. The adapter was found to be capable of
873    connecting to the video processor; however, it is bulkier than the connector.
874
875    **Relevant questions:**
876    *A1. Add, remove, or change a component/part/material that directly or indirectly contacts*
877    *body tissue?*
878    No. The added adapter does not directly or indirectly contact body tissue.
879
880    *A2. Add or remove component/part/material or change the dimensional or performance*
881    *specifications of a component/part/material?*
882    Yes, the adapter has been added to the endoscope.
883
884    *A2.1 Is there a significant change to device performance or safety specifications?*
885    No. The adapter still allows the endoscope to be connected to the video processor and optical
886    performance testing demonstrated the same optical performance as the original endoscope.
887
888    *A3. Is there a new or modified risk or is there a change in the performance or safety*
889    *specifications?*
890    Yes. A risk-based assessment was performed to determine the effects of this added
891    component. Increased risks exist with the added adapter, such as disconnection from the light

25

*Contains Nonbinding Recommendations*

*Draft – Not for Implementation*

892 source, and the potential change to the electrical safety and electromagnetic compatibility
893 (EMC) of the device.
894
895 *A3.1 Is there a significant change to device performance or safety specifications?*
896 Yes. Disconnection from a light source during a procedure could result in a loss of imaging
897 and adverse events such as increased procedure time or other patient injuries such as
898 perforation. Additionally, testing should also be performed for the electrical safety and EMC
899 of the device.
900
901 **Decision:** Remanufacturing.
902
903 **Example E.10**
904 **Activity:** The motor on a powered wheelchair no longer functions and does not propel the
905 wheelchair as intended. The motor was inspected and it was determined that the motor
906 should be replaced. Neither the identical motor nor one with similar specifications could be
907 located. A motor of similar size was inserted with different power and speed specifications.
908
909 **Relevant questions:**
910 *A1. Add, remove, or change a component/part/material that directly or indirectly contacts*
911 *body tissue?*
912 No. The motor does not directly or indirectly contact body tissue.
913
914 *A2. Add or remove component/part/material or change the dimensional or performance*
915 *specifications of a component/part/material?*
916 Yes. The original motor was removed and replaced.
917
918 *A2.1 Is there a significant change to device performance or safety specifications?*
919 Yes. While the motor has the same physical dimensions, the replacement motor has a
920 different power output and maximum speed than the legally marketed device. This
921 significantly changes the device's performance specifications because the wheelchair can go
922 faster than intended. This also significantly changes the device's safety specifications
923 because the controller and software to operate the wheelchair may no longer be compatible
924 with the motor.
925
926 **Decision:** Remanufacturing.
927
928 **Example E.11**
929 a.   **Activity:** The liquid cooling system responsible for maintaining the temperature of a
930 transcranial magnetic stimulation (TMS) coil is malfunctioning and causing the system to
931 overheat. The cooling system was inspected and it was determined that the pump
932 circulating the liquid coolant stopped functioning. A replacement pump was located and
933 installed with no additional changes to the device.
934

26

*Contains Nonbinding Recommendations*

*Draft – Not for Implementation*

**Relevant questions:**

*A1. Add, remove, or change a component/part/material that directly or indirectly contacts body tissue?*

No. The liquid coolant is maintained in the sealed coolant system and neither the liquid coolant nor the pump directly or indirectly contacts body tissue.

*A2. Add or remove component/part/material or change the dimensional or performance specifications of a component/part/material?*

Yes, the pump was replaced.

*A2.1 Is there a significant change to device performance or safety specifications?*

No. Both the dimensions and performance specifications of the original pump were assessed in comparison to the replacement part. The replacement pump has the same dimensional and performance specifications of the original pump. The overall performance and safety specifications of the TMS coils were verified by testing to be the same.

*A3. Is there a new or modified risk or is there a change in the performance or safety specifications?*

No. A risk-based assessment identified no new or modified risks because the replacement pump is equivalent to that used in the OEM's legally marketed device and there is no change in the device performance or safety specifications.

**Decision:** Not Remanufacturing.

b. **Activity:** The liquid cooling system responsible for maintaining the temperature of a TMS coil is malfunctioning and causing the system to overheat. The cooling system was inspected and it was determined that the pump circulating the liquid coolant stopped functioning. A replacement pump was located with the same size and flow specifications, but it uses a different coolant liquid. The pump was replaced with one that uses a different coolant into the cooling system.

**Relevant questions:**

*In this example, the answer to flowchart question A1 is the same as Example E.11.a.*

*A2. Add or remove component/part/material or change the dimensional or performance specifications of a component/part/material?*

Yes. A replacement pump that uses a different coolant liquid was installed.

*A2.1 Is there a significant change to device performance or safety specifications?*

Yes. Although the pump has the same dimensional and flow specifications as the original pump, the new pump uses a different liquid coolant. The new liquid coolant does not have the same heat capacity as that used in the legally marketed device. Verification and validation testing was performed and it was determined that there was a significant

27

*Contains Nonbinding Recommendations*

*Draft – Not for Implementation*

979    change to cooling effectiveness, which poses a safety hazard when the TMS coil is not
980    properly cooled. This may burn the patient or cause further device malfunctions.
981
982    **Decision:** Remanufacturing.
983
984  **Example E.12**
985    **Activity:** An energy-delivering aesthetic device has multiple compatible handpieces with
986    specific areas of application. Applicator A can only be used for the chin, while Applicator B
987    can only be used on the abdomen. An entity cannibalizes Applicator B and uses those parts to
988    repair Applicator A for use on the chin.

989    **Relevant questions:**
990    *A1. Add, remove, or change a component/part/material that directly or indirectly contacts*
991    *body tissue?*
992    Yes. The distal end of Applicator B is used to reconstruct Applicator A. It directly contacts
993    the patient and delivers the energy.
994
995    *A1.1 Is there a significant change to device performance or safety specifications?*
996    No. The distal end of both applicators has identical materials and the reprocessing
997    instructions provided by the OEM are the same for both applicators. A risk-based assessment
998    was performed to determine the effects of implementing these repairs on the biocompatibility
999    and reprocessing. A biocompatibility assessment and reprocessing risk assessment were used
1000   to determine that the performance and safety specifications of the device were not
1001   significantly changed.
1002
1003    *A2. Add or remove component/part/material or change the dimensional or performance*
1004    *specifications of a component/part/material?*
1005   Yes. The distal end of Applicator B has different dimensional specifications compared to
1006   Applicator A.
1007
1008    *A2.1. Is there a significant change to device performance or safety specifications?*
1009   Yes. The surface area that contacts the patient has increased by 150%. The increase in
1010   surface area changes the energy output delivered to the patient, which significantly changes
1011   both the performance and safety specifications of Applicator A.
1012
1013  **Decision:** Remanufacturing.
1014

1015        **(2)  Software activities**
1016  **Example S.1**
1017    **Activity:** A specular microscope with a camera is intended for examination of corneal
1018    endothelium and for measurement of the thickness of the cornea. The software was updated
1019    to implement an OEM-authorized patch.
1020

*Contains Nonbinding Recommendations*

*Draft – Not for Implementation*

**Relevant analysis:** The installation of this OEM-authorized patch does not significantly change the device performance or safety specifications. See Section VII of this draft guidance for further discussion of changes involving software. The patch is intended to maintain the original specifications.

**Decision:** Not Remanufacturing.

**Example S.2**

**Activity:** A device has the capability of real-time remote customer service where the current status of the device can be accessed. A capability is added so that the customer service technician can access and directly manipulate the device, including changing device settings, resetting the device, delivering energy, and positioning the device.

**Relevant analysis:** The capability of the customer service technician to control the device introduces new risks (e.g., accidental device reset, unintended device movement) and functionality (remote control and access) that significantly changes the finished device's performance and safety specifications.

**Decision:** Remanufacturing.

**Example S.3**

**Activity:** A device that connects to a facility's network has software that was designed to run the Microsoft Windows operating system (OS). Adjustments are made to allow the device to run using a Linux OS.

**Relevant analysis**: This change introduces new risks and may impact mitigations for existing risks that significantly change the finished device's performance and safety specifications. This is a redesign of the product and includes the addition of integration with both device drivers for the target OS as well as specific features of the OS.

**Decision:** Remanufacturing.

*Contains Nonbinding Recommendations*

*Draft – Not for Implementation*

# Appendix B.  Documentation examples

The examples below are to illustrate one possible approach to documentation; other approaches may also be appropriate. Entities are encouraged to use an approach that works for their specific purposes, taking into account the considerations discussed above. The first example demonstrates a simple change that does not necessitate detailed analysis. The second example demonstrates a more complex change for which additional analysis and reference to supporting documentation are warranted. These are generalized examples to demonstrate documentation principles and do not necessarily account for every possible detail, risk, or consideration.

**Remanufacturing Assessment**
**(Example 1)**

**Product:** Pump ABC, Serial# 123-456

**Date of activities performed:** 12/11/2018

**Date assessment performed:** 12/10/2018

**Description of device:** Syringe pump

**Description of activities performed:** Replaced broken door with part #xxx

**Determination of whether the activity is remanufacturing:** While a change to a body contacting component, the door used was OEM-provided and is identical to the broken door. Because it is a replacement of an identical part, there are no changes to performance or safety specifications. This activity is not remanufacturing.

**Reference to related documents supporting the decision-making process:** N/A

**Technician performing service:** xxx

**Reviewed by:** xxx

**Signature(s):** xxx

*Contains Nonbinding Recommendations*

*Draft – Not for Implementation*

**Remanufacturing Assessment**
**(Example 2)**

**Product:** Endoscope Infinity, Serial #4FR992

**Date of activities performed:** 9/24/2018-9/30/2018

**Date assessment performed:** 9/22/2018

**Description of device:** Flexible endoscope

**Description of activities performed:** Repair device; lens, irrigation channel, and shaft exterior replaced. Each change was individually and cumulatively assessed.

**Determination of whether the activity is remanufacturing:**

*Lens Assessment*
- Original lens is cracked and needs replacement; OEM lens and epoxy not available for purchase;
- Equivalent lens with same performance specifications and dimensions used (see biocompatibility assessment (BCA) #EI-001 and Component Comparative Analysis Report (CCAR) #EI-002);
- Epoxy used to secure lens is equivalent to OEM epoxy (see BCA #EI-003 and CCAR #EI-004); and
- Leak, optics, and field of view were verified to be within OEM specifications.

*Irrigation Channel Assessment*
- Irrigation channel is worn and leaking fluid into the device;
- OEM part available for purchase and used (part #XX44); and
- Irrigation channel installed and checked for leaks and functionality.

*Shaft Exterior Assessment*
- Shaft exterior damaged during repair activities and needs replacement;
- OEM part not available for purchase; and
- Equivalent shaft exterior with same performance specifications and dimensions used (see BCA #EI-005 and CCAR #EI-006).

*Cumulative Change Assessment*
- Full device specification list inspected and passed (see Customer Evaluation Report #88239 and OEM specification sheet);
- No change in component exposure to reprocessing when following OEM reprocessing instructions;
- A risk-based assessment was performed in each CCAR report; modified risks were identified with using non-OEM parts but were demonstrated as not significantly changing the device's performance or safety specifications, or intended use; and

31

*Contains Nonbinding Recommendations*

*Draft – Not for Implementation*

1130      •   No other change in the risks, or change in the performance or safety specifications, have
1131            been identified for the cumulative changes made.
1132
1133   This activity is not remanufacturing.
1134
1135   **Reference to related documents supporting the decision-making process:**
1136       1.  BCA #EI-001
1137       2.  CCAR #EI-002
1138       3.  BCA #EI-003
1139       4.  CCAR #EI-004
1140       5.  BCA #EI-005
1141       6.  CCAR #EI-006
1142       7.  Customer Evaluation Report #88239
1143       8.  Endoscope Infinity Specification Sheet
1144
1145   **Technician performing service:** xxx
1146
1147   **Reviewed by:** xxx
1148
1149   **Signature(s):** xxx

32