**MCCAULLEY LAW GROUP LLC**
JOSHUA V. VAN HOVEN, (CSB No. 261815)
E-Mail: josh@mccaulleylawgroup.com
3001 Bishop Dr., Suite 300
San Ramon, California 94583
Telephone: 925.302.5941

RICHARD T. MCCAULLEY (*pro hac vice*)
E-Mail: richard@ mccaulleylawgroup.com
180 N. Wabash Avenue, Suite 601
Chicago, Illinois 60601
Telephone: 312.330.8105

*Attorneys for Plaintiff and Counter-Defendant,*
SURGICAL INSTRUMENT SERVICE COMPANY, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SURGICAL INSTRUMENT SERVICE COMPANY, INC.<br><br>*Plaintiff/Counter-Defendant,*<br><br>v.<br><br>INTUITIVE SURGICAL, INC.,<br><br>*Defendant/Counterclaimant.* | Case No. 3:21-cv-03496-VC<br><br>Honorable Vince Chhabria<br><br>**PLAINTIFF SURGICAL INSTRUMENT SERVICE COMPANY, INC.'S OPPOSITION TO INTUITIVE'S MOTION TO EXCLUDE RICHARD BERO'S EXPERT OPINION TESTIMONY**<br><br>Hearing: June 8, 2023<br>Time: 10:00 AM PT<br>Courtroom: Courtroom 5, 17th Floor<br>Judge: The Honorable Vince Chhabria<br>Complaint Filed: May 10, 2021 |

**TABLE OF CONTENTS**

MEMORANDUM OF POINTS AND AUTHORITIES ........................................................ 1

    I.     Intuitive's "Introduction" and "Factual Background" incorrectly imply that Mr. Bero provides no reliable basis for his opinions and/or relies upon improper facts and data. .............................................................................. 3

    II.    Mr. Bero's lost profits damages model is based upon sufficient data and is the product of reliably applying appropriate principles and methods to the facts of this case. ........................................................................................................ 9

    III.   Mr. Bero's assessment of SIS's Lanham Act damages is based upon sufficient facts and data and is the product of his reliably applying appropriate principles and methods to the facts of this case, which does not conflict with controlling law. ............................................................................................... 14

CONCLUSION ............................................................................................................... 15

## TABLE OF AUTHORITIES

**Cases**

*Brink's Inc. v. City of New York,*
  717 F.2d 700 (2d Cir. 1983) ............................................................................................ 3

*Herman Schwabe, Inc. v. United Shoe Mach. Corp.,*
  297 F.2d 906 (2d Cir. 1962) ............................................................................................ 1

*Southland Sod Farms v. Stover Seed Co.,*
  108 F.3d 1134 (9th Cir. 1997) ......................................................................................... 5

*Story Parchment Co. v. Paterson Parchment Paper Co.,*
  282 U.S. 555 (1931) ......................................................................................................... 1

**Statutes**

Fed.R.Evid. 702 .............................................................................................................. 3, 5, 10
Fed.R.Evid. 703 ..................................................................................................................... 5
Lanham Act ............................................................................................................... 3, 14, 15

# MEMORANDUM OF POINTS AND AUTHORITIES

In its motion to exclude the damages opinions proffered by Mr. Richard Bero, Intuitive does not challenge Mr. Bero's qualifications as a certified public accountant or whether his testimony would be helpful to the jury in understanding the damages issues in this matter. For the most part, the motion to exclude challenges the reliability of his lost profits analyses in various scenarios.

Intuitive urges that the Court's "gatekeeping role is particularly important when assessing expert damages estimates." Dkt. 126 at p. 6[1] (citing and quoting *Herman Schwabe, Inc. v. United Shoe Mach. Corp.*, 297 F.2d 906, 912 (2d Cir. 1962)). Intuitive's principal dispute with Mr. Bero's damages opinions stems from Intuitive's (incorrect) assessment that Mr. Bero does not account for a raft of factors that could impact his calculations and analyses and that the data he did take into account was invalid and flawed. Intuitive asserts that the jury must be protected from Mr. Bero's testimony which raises the risk of juror confusion and therefore, cannot be admitted into evidence. But, as the Second Circuit also stated in *Schwabe*:

> There is no bright line that divides evidence worthy of consideration by a jury, although subject to heavy counterattack, from evidence that is not. Especially because of the guaranty of the Seventh Amendment, a federal court must be exceedingly careful not to set the threshold to the jury room too high.

*Schwabe*, 279 F.2d at 912. The Supreme Court addressing the admissibility of damages evidence stated in *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931):

> In such case [where the defendant's act prevents more precise proof], while the damages may not be determined by mere speculation or guess, it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference,

---

[1] References to Intuitive's Motion are to the docket entry of the publicly filed brief at Dkt. 126 and the page number within the brief, while references to exhibits attached to the Motion reference the exhibit numbers of the Bass declaration available at Dkt. 126-1. The under-seal Motion and exhibits are available at Dkt. 130-1-10, with Dkt. 130-2 corresponding to Bass Dec. Ex. 1.  New exhibits are attached to the Van Hoven declaration.

> although the result be only approximate. The wrongdoer is not entitled to complain that they cannot be measured with the exactness and precision that would be possible if the case, which he alone is responsible for making, were otherwise.

Courts have long recognized that the burden associated with proving antitrust injury is necessarily somewhat relaxed given the circumstances that give rise to the claim:

> Our willingness to accept a degree of uncertainty in these cases rests in part on the difficulty of ascertaining business damages as compared, for example, to damages resulting from a personal injury or from condemnation of a parcel of land. The vagaries of the marketplace usually deny us sure knowledge of what plaintiff's situation would have been in the absence of the defendant's antitrust violation.

*J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 566 (1981) (citations omitted). On damage-related issues Intuitive primarily challenges the specificity and nature of the information that the experts rely on in reaching their conclusions. Any challenges to the specificity must be weighed against the fact that any uncertainty is caused by the acts of Intuitive:

> But our willingness [to accept a degree of uncertainty] also rests on the principle articulated in cases such as *Bigelow*, that it does not "come with very good grace" for the wrongdoer to insist upon specific and certain proof of the injury which it has itself inflicted.

*Id.*, at 566-67. Intuitive's *Daubert* challenges must be viewed through the lens of the uncertainty necessarily inherent in a "but for" world where the plaintiff must present analysis of the impact of the defendant's illegal conduct. Here, all of Richard Bero's opinions should be admitted as both relevant and reliable.

Mr. Bero did not determine SIS's lost profit damages by mere speculation or guess. Instead, Mr. Bero's damages calculations are a matter of just and reasonable inference based on extensive documentation from multiple sources on all relevant points, as evidenced in his 50+ page and 400+ footnote opening report, 90+ pages of detailed schedules, and extensive citation to relevant materials from numerous sources within the report and schedules. Intuitive is not entitled to complain that SIS's lost profits damages cannot be measured with

the exactness and precision that would be possible if Intuitive had not engaged in anticompetitive conduct violative of the antitrust laws, along with unfair competition in violation of the Lanham Act, that shut down SIS's EndoWrist business. The very nature of Intuitive's anticompetitive conduct makes the exercise somewhat imprecise.

This case must be examined on its own facts to determine whether Mr. Bero's opinions, and the data and analysis that support those opinions, are appropriate for consideration by a jury. *See Brink's Inc. v. City of New York,* 717 F.2d 700 (2d Cir. 1983). Intuitive essentially argues that if it is able to quibble with any of Mr. Bero's assumptions regarding damages, [2] that is sufficient to preclude the admission of his testimony. Intuitive's disagreements with and criticisms of Mr. Bero's testimony about his damages analyses and calculations, however, are matters that can be addressed through cross examination. Intuitive may introduce its own evidence and present its own damages expert to buttress its claims. But this is not a basis for exclusion and falls well short of the standard for exclusion under Fed.R.Evid. 702 and *Daubert*.

**I.     Intuitive's "Introduction" and "Factual Background" incorrectly imply that Mr. Bero provides no reliable basis for his opinions and/or relies upon improper facts and data.**

In the first paragraph of its *"Introduction"*, Intuitive touches on SIS's relationship with another company, Rebotix, which had developed one process for resetting the EndoWrist use counter for S/Si EndoWrist instruments. Dkt. 126 at p. 1. Intuitive states that the *"Rebotix process has never received FDA clearance[,]"* apparently implying that Mr. Bero was unaware of that fact and its potential impact on SIS. *Id.* However, that is not the case. In his opening report, Mr. Bero identifies and discusses his *"Basic damages assumptions"*, including that *"SIS would not need FDA approval to make its repairs"* to EndoWrist instruments. Bass Dec. Ex. 1 at p. 5. Additionally, Mr. Bero was also well aware of the business relationships between SIS and Rebotix and Restore. *Id.* at pp. 10-13.

---

[2] One prime example of Intuitive's quibbling about issues that do not impact the reliability of Mr. Bero's opinions is its complaint that Mr. Bero refers to the SIS operation performed on EndoWrists as a "repair" process rather than its preferred "remanufacturing."

Next, Intuitive mentions that, working with Rebotix over a few months in late 2019, SIS had six customers for reset S/Si EndoWrists, for whom 49 resets were provided, generating $38,900 in total revenue for SIS. Dkt. 126 at p. 1. Apparently, Intuitive hopes to create a false impression that there was no actual demand for SIS's EndoWrist repair services, and hints that SIS abandoned any effort to market those services to its customers. The reality is far from what Intuitive attempts to imply. Indeed, as Mr. Bero discusses in his expert report, even prior to Intuitive shutting down its EndoWrist repair business SIS had made substantial progress in capturing a large portion of the national market for EndoWrist repairs. SIS's efforts revealed that demand has always existed for SIS's EndoWrist repair services and there was real and *"monumental"* interest among SIS customers (both hospitals and hospital systems), including the only signed contract to provide EndoWrist repair services to the 2000+ hospitals represented by the nation's largest group purchasing organization. Bass Dec. Ex. 1 at pp. 23-25, 42-44.

Intuitive then alleges that Mr. Bero's lost profits damages model *"includes as inputs unreliable 'data' that no reasonable CPA would ever rely upon."*[3] Dkt. 126 at p. 2. This is based on Intuitive's mischaracterization of the data analyzed and relied on by Mr. Bero as *"almost exclusively of undocumented 'discussions' with SIS's employees and discussions with SIS's experts retained for the purpose of this litigation."* Id. Additionally, Intuitive contends Mr. Bero *"did nothing to validate the oral information he received."*[4] Id. Intuitive's indictment of Mr. Bero does not hold up to even modest scrutiny. As to the materials he considered, the opening report alone includes over 400 footnotes that cite to depositions of numerous witnesses (including many non-SIS witnesses) and dozens of

---

[3] Interestingly, Intuitive's damages expert, Dr. Loren Smith, makes no such allegation in his expert report responding to Mr. Bero's lost profits damages model.

[4] Notably, Intuitive does not cite any legal authority for the proposition that an expert's testimony is per se not reliable unless he independently validates all of the oral information that he considers. Intuitive also asserts that the oral information that Mr. Bero considered is "far outside the professional standards as a CPA." Dkt 126 at p. 2. Again, Mr. Bero is unaware of any "professional standards" addressing oral information and if the so-called standards Intuitive alludes to about reliance on orally conveyed information actually exist, why does Intuitive fail to cite to them or any supporting case law?

documents (including *Intuitive* documents that confirm his opinions), and over 90 pages of detailed schedules that themselves cite to dozens of documents and depositions.

Those materials considered thus include documents in the record from all parties (including financial documents and projections from both SIS and Intuitive)[5], deposition testimony from knowledgeable witnesses, discussions with SIS personnel, and input from other expert witnesses. As an expert, Mr. Bero is permitted to rely on data forming the basis for his opinions that is beyond his personal knowledge and doing so does not render the opinion inadmissible. See Fed.R.Evid. 702, 703. There is no legal prohibition against experts relying on orally conveyed facts and data that the expert has been made aware of or personally observed. *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1142 (9th Cir. 1997) (fact that expert's opinions were based on data collected by others was immaterial to determining whether opinions were admissible). Experts calculating damages routinely and reasonably rely on the kinds of facts and data Mr. Bero cites to in forming an opinion modeling damages in a but-for world. Moreover, Mr. Bero applies his training and experience to those sources of facts and data and arriving at an independent judgment reflected in his expert reports, with confirmatory evidence and multiple reality checks.

Intuitive further accuses Mr. Bero of ignoring *"the impact of competition in the but-for world from other competitors like Restore and Rebotix."* Dkt. 126 at p. 2. Mr. Bero did no such thing. His lost profits model captures the monumental impact of prospective Vizient contracts and customers demanding SIS's repair services for their EndoWrist instruments.[6] Bass Dec. Ex. 1 at pp. 24-25, 42-44. It considers SIS's 50 years working with hospitals in the repair business and its relationships with both Restore and Rebotix to bring the EndoWrist repair service to SIS's hospital and GPO customer base. Id. at pp. 7-8, 10-13,

---

[5] For the portion of his report that addresses financial statements, Mr. Bero reviewed each line item that is reflected in Schedule 15.1 with SIS personnel. Mr. Bero's model is further consistent with multiple reasonableness benchmarks. Bass Dec. Ex. 1 at pp. 48-53; Ex. 5 at pp. 14-21.

[6] Intuitive complains that Mr. Bero "ignores the impact of the absence of FDA clearance on customer demand". Dkt. 126 at p. 2. That, however, is incorrect. Rather than ignoring the issue, Mr. Bero treated the matter in his stated assumption that FDA clearance was not required and therefore, would have no impact on customer demand for SIS's reset EndoWrist services in the but-for world. Bass Dec. Ex. 1 at p. 5.

23-24. It also considers that SIS was not only an approved Vizient repair supplier, but had a specific agreement to bring EndoWrist repair to Vizient hospitals and in fact did so through multiple presentations to Vizient employees and hospitals. Id. at pp. 33-34, 42-44.

Intuitive also insinuates that Mr. Bero may not be qualified to testify as an expert stating: *"Bero's jobs have focused on litigation projects"*, *"a handful of cases related to the medical industry in which he provided testimony"*, and *"[h]e has testified in a single antitrust case."* Dkt. 126 at p. 3.[7] In reality, Mr. Bero has testified over a hundred times in damages cases across many industries and has worked on hundreds of cases over his career, many of which were complex ones like this lawsuit. *E.g.*, Bass Dec. Ex. 1 at Attachment 2.

In discussing Mr. Bero's Scenario 1, Intuitive again suggests that Mr. Bero's analysis lacks sufficient evidentiary basis because he relied upon information provided by SIS employees and other retained experts. Dkt. 126 at p. 4. Intuitive charges that Mr. Bero *"has not relied upon contemporaneous financial records or other business records."* Id. But that is not the case. Mr. Bero's consideration of SIS's financial statements is reflected in his Schedule 15.0 and his consideration of SIS's detailed SGA is reflected in his Schedule 15.1, both of which accompany his expert report. Bass Dec. Ex. 1 at Sch. 15.1. Intuitive's damages expert, Dr. Loren Smith, does not identify any contemporaneous financial records or business records that Mr. Bero failed to consider, or that Dr. Smith states contains more significant data than what is reflected in the records Mr. Bero considered and cites to in his Schedules 15.0 and 15.1.

Addressing Mr. Bero's Scenario 2, Intuitive implies that Mr. Bero's model is flawed because *"to date, no one has successfully developed a method to reset X/Xi EndoWrists."*

---

[7] Intuitive reprises its backhanded attack on Mr. Bero's credentials at the start of the argument section in its brief. Dkt. 126 at p. 6. Intuitive boldly (and inaccurately) proclaims: "Bero brings no specialized expertise to this case *apart from* his credentials as an accountant." Id. As shown on Mr. Bero's CV, he does have specialized expertise which is reflected in the fact that he has been an Intellectual Property Valuation Instructor for NAVCA for many years. Bass Dec. Ex. 1, Attachment 2 at p. 2. Additionally, Mr. Bero has authored three chapters on damages in "The Comprehensive Guide to Economic Damages", with a fourth chapter to be published soon in the 2023 edition. Id. at p. 3. Even if Mr. Bero is simply an "accountant," he is well qualified through his extensive experience to qualify as an expert on the issues he opines on here.

1  Dkt. 126 at p. 4. Intuitive totally ignores Mr. Bero's analysis of the factual record which led
2  him to conclude that X/Xi reset technology would have been developed and marketed by
3  either January 1, 2021 or January 1, 2022 had Intuitive not interfered with that effort. Mr.
4  Bero points out in his report such successful real-world efforts were delayed by Intuitive's
5  anti-competitive conduct:



17  Bass Dec. Ex. 1 at pp. 31-32 (citing deposition testimony); *see also* id. at p. 30 (discussing
18  evidence that Rebotix "[w]ould have first begun repairing X/Xi ▮▮▮▮" but for
19  "Intuitive's actions").
20       Turning to its attack on Mr. Bero's Lanham Act damages analysis, Intuitive
21  insinuates that the allegedly false statements were in letters sent to just two of SIS's
22  customers because those are the only letters referenced by Mr. Bero. Intuitive asserts that
23  Mr. Bero does not *"attempt to justify or explain"* how he could reliably calculate damages
24  for lost sales to all potential SIS customers based on just those two letters. Intuitive fails to
25  mention that its counsel never raised this question with Mr. Bero during his deposition. The

1  fact is that Mr. Bero relied on those letters as merely evidencing the date that Intuitive
2  began making false statements to SIS's customers.[8] Bass Dec. Ex. 1 at p. 59.

3        The last nit that Intuitive attempts to pick in the "Factual Background" section
4  concerning Mr. Bero's testimony deals with an update he made to his expert analysis based
5  upon discussions he had with Chris Gibson, a Rebotix employee. Bass Dec. Ex. 5 (Second
6  Rebuttal Expert Report of Richard F. Bero). Intuitive complains about Mr. Bero's use of
7  this new information as follows: "Although Gibson was fully available to Bero at the time
8  of Bero's opening report, Bero did not speak with Gibson until drafting his second rebuttal
9  report." Dkt. 126 at p. 5. Intuitive, however, neglects to provide the complete context
10 regarding the subsequent discussion with Chris Gibson. In fact, Mr. Bero's conversation
11 with Chris Gibson was prompted by criticism from Intuitive's damages expert of Mr. Bero's
12 treatment of "potential costs" SIS would incur from Rebotix in offering its repair services.
13 Bass Dec. Ex. 5 at p. 7. Mr. Bero explains how the information from Chris Gibson helped
14 him better account for the potential costs stemming from the fact, argued by Dr. Smith, that
15 SIS does not own the intellectual property associated with resetting EndoWrist instruments,
16 particularly the chip that would be inserted to reset the use counter:

> The Bero Report properly (and conservatively) considered SIS's
> costs. In response to the Smith Rebuttal Report's criticism, I spoke
> with Chris Gibson ("Mr. Gibson"), Rebotix Repair LLC's COO.
> Mr. Gibson addressed a number of topics associated with Rebotix
> and SIS's relationships, SIS's costs, and the history between the two
> companies. Mr. Gibson confirmed a number of items addressed in
> the Bero Report and also clarified that Rebotix's sales prices to SIS
> under both SIS's In-house model and SIS's Distributor model
> would have been lower than calculated in the Bero Report. In effect,
> rather than understating SIS's costs as suggested by the Smith
> Rebuttal Report, the Bero Report conservatively overestimated
> SIS's costs (and understated lost profits).

Bass Dec. Ex. 5 at pp. 7-12. Mr. Gibson is the best source of this information and it was
reasonable for Mr. Bero to have the conversation in light of the criticism he received.

---

[8] Mr. Bero also explains that Intuitive's conduct, including these letters to major hospital systems, were a "direct and proximate cause" that "result[ed] in SIS losing customers" rather than being able to pursue the "'monumental' interest from hospitals in its S/Si and X/Xi repair business. Bass Dec. Ex. 1 at p. 2.

Intuitive cannot credibly argue otherwise. Presumably Mr. Gibson is available to Intuitive if they wish to speak to him.

### II. Mr. Bero's lost profits damages model is based upon sufficient data and is the product of reliably applying appropriate principles and methods to the facts of this case.

Intuitive alleges that Mr. Bero *"has not relied upon information that CPAs would typically rely upon in performing their duties."* Dkt.126 at p. 7. This allegation is unsubstantiated and refuted by the following facts. For purposes of conducting the analyses for his lost profits damages models, Mr. Bero relied on information typically relied on by experts in his field. In addition to dozens of Intuitive and third party documents and depositions, Mr. Bero also considered information from experts outside his area of expertise and detailed cost information from the client, SIS (the only party who could have such information). Intuitive's expert does not address or criticize Mr. Bero's reliance on the information detailed in his reports as information Mr. Bero could not ethically rely on. Moreover, Intuitive does not allege that any of the specific documents, deposition testimony, oral discussions, or any other data Mr. Bero uses in his analyses are knowing misrepresentations or false information.

Intuitive mentions ethical principles *"specific to the estimation of lost profits"* and just alludes to the use of audited and reviewed financial statements and compiled financial statements. Dkt. 126 at p. 7. Notably, Intuitive's expert, Dr. Loren Smith, does not assert that Mr. Bero unethically relied on inappropriate financial statements in conducting his lost profits damages analyses. Nor could he – Mr. Bero is not submitting financial statements to a tax or regulatory authority, he's estimating but-for damages due to a third-party's antitrust misconduct. In assessing that but-for world, Mr. Bero's consideration of financial statements focused on achieving the best understanding and analysis of relevant costs based upon an exhaustive review with knowledgeable SIS personnel, and reality checks based on third-party (including Intuitive) data. Bass Dec. Ex. 1 at pp. 54-57, Schedules 2.1 & 3.1; Van Hoven Dec. Ex. 1 (Bero Deposition Testimony) at 74:8-21; 201:9-205:15.

Intuitive cites a litany of case law in its brief purportedly demonstrating supposed *"skepticism of relying on projections by self-interested parties."* Dkt. 126 at pp. 8-9. The cited case law is inapplicable to circumstances involving Mr. Bero's assessment of SIS's lost profit damages because nowhere in his analyses does he merely accept the validity of or rely uncritically on projections by *"self-interested parties."* For each issue – from the "monumental" demand for EndoWrist repair from hospitals (Bass Dec. Ex. 1 pp. 42-45), SIS's capacity to meet that demand[9] (id. at p. 45), number of repair units (*id.* at pp. 46-53), lost revenue (*id.* at 53), incremental costs (id. at pp. 54-56), and tabulating lost profits (id. at p. 57) – Mr. Bero uses reliable data sources, with other information functioning as confirmatory and reality checks when available, and supported by detailed schedules.

Intuitive challenges Mr. Bero's analysis of penetration rates, alleging that he makes *"problematic assumptions"*. Dkt. 126 at p. 9.[10] Mr. Bero appropriately relies in part on the analysis of another expert, Ms. Jean Sargent, for confirming SIS's expectations about its penetration rate of hospitals affiliated with the Vizient Group Purchasing Organization.[11] Bass Dec. Ex. 1 at pp. 50-51; *see also* id. at pp. 33-36 (discussing Vizient relationship and SIS's signed agreements with Vizient to provide EndoWrist repair and other services). Mr. Bero further confirmed that the overall penetration rates that resulted from this analysis were in fact conservative, including by reference to estimates by Intuitive and multiple independent third parties. Id. at pp. 50, 52-53. Rule 702 and *Daubert* permit an expert to rely upon the conclusions of another expert as to matters within the other expert's

---

[9] "I understand SIS repairs approximately 1,000,000 instruments annually (i.e., multiples of the 50,000 [EndoWrist] units [used in his damages report]) and has incurred less than $6 million SGA costs in total for its entire business. Thus, the maximum additional EndoWrist repairs are a fraction of the volume of instrument repairs SIS already does."

[10] Moreover, Mr. Bero acknowledges that his use of sales to Vizient hospitals provides a conservative estimate, because "SIS had also presented and generated interest with hospital systems beyond Vizient healthcare providers, such as Banner. Given the interest in SIS's services, it is likely SIS would have had customers in addition to Vizient's members." Bass Dec. Ex. 1 at p. 50.

[11] Intuitive challenges the admissibility of Ms. Sargent's independent expert analysis of SIS's penetration rates in a separate motion to exclude her testimony. SIS will respond to Intuitive's challenges in the context of that motion.

discipline, particularly where the results of those calculations are consistent with other evidence as is the case here. Mr. Bero's opinions are not inadmissible merely because he relied in part upon opinions about a topic outside his area of expertise (e.g., hospital penetration/conversion rates).

Intuitive also asserts that Mr. Bero assumes, with no reliable basis, that of the hospitals that would have used SIS's reset service, 70% of the EndoWrists of those hospitals would be collected for reset. Dkt. 126 at p. 9. In addition to the fact that Mr. Bero is permitted to consider information from others outside of his area of direct expertise, Intuitive mischaracterizes Mr. Bero's analysis by incorrectly implying that Bero relies only upon Sargent for this information. Id. Mr. Bero explains his analysis regarding the 70% collection rate relied on available data, including Intuitive's own collection rate expectation of 70% or higher. Using multiple Intuitive documents cited in his report as well as Intuitive testimony, Mr. Bero thus arrived at a conservative estimate of the collection rate. Bass Dec. Ex. 1 at p. 51, n. 381, and Schedule 2.2 n.8. Indeed, the collection rate Mr. Bero ultimately settled upon for his analysis was lower than that provided Ms. Sargent. Id.

Intuitive asserts that Mr. Bero's damages model "relies upon an inflated expiration rate for EndoWrist instruments." Dkt. 126 at p. 10. This factor involves accounting for the likelihood that not all of the EndoWrist instruments sold and potentially repairable by SIS would ultimately expire. Some of the potentially repairable units identified in Mr. Bero's model may not expire or might expire at a later time. Therefore, Mr. Bero applies a 60% expired EndoWrist rate to the annual potentially repairable instrument units based on Intuitive's own estimates. Bass Dec. Ex. 1 at p. 48-49. Despite using Intuitive's own data in his analysis, Intuitive complains that "rather than calculating the average expiration rate across the whole set of instruments, Bero arbitrarily selects the 'top 5' (in sales volume)." Dkt. 126 at p. 10. Intuitive, however, neglects to mention that those projected 'Top 5' 2018 and 2019 expired units represented 60% of the actual 2018 and 2019 unit sales for those same EndoWrist instruments. The projected 2020 and 2021 expired units represented higher percentages of the subsequent actual 2020 and 2021 unit sales. Bass Dec. Ex. 1 at p. 49.

There is nothing *"inflated"*, *"arbitrary"* or unreliable about Mr. Bero's analysis of expiration rate.[12]

Intuitive also charges that Mr. Bero *"has no reasonable basis for his assumptions regarding SIS's costs in the but-for world."* Dkt. 126 at p. 10. Intuitive's allegation is absurd. Mr. Bero did a thorough and detailed analysis of SIS's SGA costs, which is reported in Schedule 15.1. Bass Dec. Ex. 1. Moreover, Mr. Bero's expert report traces in detail how he determined the costs he used in his damages model. Bass Dec. Ex. 1 at pp. 54-56.[13] Mr. Bero provided this cost analysis before he had the conversation with Chris Gibson about the pricing Rebotix would have offered to SIS for chips and as a distributor.[14] Intuitive also appears to criticize SIS's capacity to handle the EndoWrist workload, but ignores an entire section of Mr. Bero's report that addresses this issue in detail, including the number of technicians that would be hired, the ample space in SIS's facilities to perform repairs, component availability, and the fact that the estimated 50,000 EndoWrist units is far less than the 1,000,000+ instruments SIS repairs each year. Id. at pp. 45-46, 56.

Lastly, Intuitive alleges that Mr. Bero *"has no reliable basis for the inclusion in his damages model of X/Xi units or the dates he uses to model when the third parties would have had the capability to reset X/Xi EndoWrists."* Dkt. 126 at p. 11. Mr. Bero relies, in part, upon the analysis of another SIS expert, Kurt Humphrey, for the premise that if a company had adequate resources and financial incentives, it would have been technically

---

[12] In fact, in his report Mr. Bero notes that "the 60% expired EndoWrist factor rate was projected in 2017, when X/Xi units were growing annually.³⁶⁶ The expired EndoWrist rate would likely be higher for the S/Si units, which were declining year to year, or for periods when annual units were more stable. If I applied a higher expiration percentage, the number of expired EndoWrist units would be higher." Bass Dec. Ex. 1 at p. 49.

[13] Mr. Bero estimated incremental costs under the in-house repair model and the distributor model. Incremental costs are shown on Schedules 2.1 and 3.1. Bass Dec. Ex. 1 at pp. 54-56.

[14] As discussed above, Mr. Bero was prompted to speak with Chris Gibson after reviewing the criticism of his cost analysis in the report from Intuitive's expert, Dr. Smith. Mr. Bero received updated cost information through his subsequent discussion with Chris Gibson and incorporated that in his rebuttal report. Bass Dec. Ex. 5 at pp. 7-12. Intuitive alleges that Chris Gibson told Mr. Bero information that "directly contradicts" his prior deposition testimony. Dkt. 126 at p. 10. Intuitive arrives at that conclusion by ignoring the context of Chris Gibson's prior testimony. Understanding that context, however, shows that the prior testimony is not inconsistent with what Chris Gibson later told Mr. Bero. *See* discussion in Bass Dec. Ex. 5 at p. 10, n. 47.

1  feasible to circumvent the X/Xi encryption required to reset the use counter in one year, *i.e.*,
2  by January 1, 2021. Bass Dec. Ex. 1 at p. 32, n. 248. As Mr. Bero explained ▮
3  ▮
4  ▮
5  ▮
6  ▮ Id. at pp. 31-32. Despite
7  these Intuitive-imposed delays, ▮
8  ▮ Id. at pp. 31-32. Mr. Bero thus understands based upon
9  ▮, buttressed with the reverse engineering expertise of Mr. Humphrey,[16]
10 that it would have been possible to repair X/Xi EndoWrists either by January 1, 2021 or
11 January 1, 2022 absent Intuitive's anti-competitive conduct. Id. at p. 57, n. 418.
12      In sum, Mr. Bero is a highly qualified expert witness whose expertise includes the
13 preparation of lost profits models to measure but-for damages. Mr. Bero's opinions will be
14 helpful to the jury and Intuitive does not assert otherwise. The facts and data Mr. Bero cites
15 in his multiple expert reports provide more than sufficient support for his opinions. Mr.
16 Bero's principles and methods used in constructing his lost profits damage models are
17 reliable and are reliably applied to the facts of this case. Intuitive's multi-pronged attack on
18 Mr. Bero's damages opinions are nothing more than attempts to impeach Mr. Bero and, as
19 such, are better employed in a vigorous cross-examination at trial, rather than as a supposed
20 justification for excluding his expert opinions from evidence entirely.

---

[15] Mr. Bero also noted that Rebotix believes it would have had its X/Xi chip reset available ▮ absent Intuitive's anti-competitive conduct. Bass Dec. Ex. 1 at p. 30.
[16] Intuitive suggests there's something sinister about Kurt Humphrey stating at his deposition that he had not spoken with Mr. Bero. As Mr. Bero's deposition errata clarifies, Mr. Humphrey spoke with members of Mr. Bero's team, not Mr. Bero. Van Hoven Dec. Ex. 1 at 18:5-16; Ex. 2 at 18:8. Perhaps Kurt Humphrey's deposition testimony reflects a memory lapse on his part or some confusion, but it is hardly something sinister. In any event, as shown in SIS's brief opposing Intuitive's motion to exclude Mr. Humphrey's testimony, Mr. Humphrey does not offer conflicting dates on the topic of when third parties would be able to reset X/Xi EndoWrists and the dates he proffers are based on reliable data and facts which Mr. Humphrey explains in his own expert report.

### III. Mr. Bero's assessment of SIS's Lanham Act damages is based upon sufficient facts and data and is the product of his reliably applying appropriate principles and methods to the facts of this case, which does not conflict with controlling law.

Intuitive presses for exclusion of Mr. Bero's damages opinion associated with SIS's Lanham Act claim based on the same alleged flaws discussed above. The discussion above addresses each of the supposed flaws recited by Intuitive, demonstrating that they are either non-existent or woefully insufficient to undermine the reliability of Mr. Bero's opinions. This admittedly identical line of attack proffered by Intuitive as to the admissibility of Mr. Bero's calculation of damages stemming from Intuitive's violation of the Lanham Act should likewise be rejected.

Intuitive's second line of attack directed to Mr. Bero's Lanham Act-based damages opinion argues a lack of *"fit"* with the claims and evidence in this case. Dkt. 126 at p. 14. To support this assertion, Intuitive repeats its *"only two SIS customers received an allegedly false statement from Intuitive"* argument. Dkt. 126 at p. 14. Intuitive asserts that Mr. Bero cannot reliably calculate damages including lost sales for all potential SIS customers based on just two letters. Intuitive's argument misconstrues Mr. Bero's reliance on those letters and his overall analysis of damages related to SIS's Lanham Act claim. The fact is that Mr. Bero relied on those letters as evidencing the date that Intuitive began making false statements to SIS's customers. Bass Dec. Ex. 1 at p. 59. Additionally, Mr. Bero quantified the lost profit damages to SIS based on the lost repair units analyses presented in his report, not on just two letters sent by Intuitive to just two customers. Id. If Intuitive had actually sent letters to just two or even some number less than all of SIS's customers, or if those letters were not the cause of Intuitive successfully shutting down SIS's business, then Intuitive's expert, Dr. Loren Smith, could have and surely would have pointed that out and apportioned the damages accordingly, but he did not.[17] There is no lack of *"fit"* with the claims and evidence in this case.

---

[17] Instead of asserting outright that Intuitive did not send letters to all of SIS's customers, Dr. Smith, Intuitive's damages expert, merely repeats Intuitive's strawman argument contending that Mr. Bero's Lanham Act damages proceeds from the assumption that all of SIS's lost profits were caused by a letter to a single hospital. Bass Dec. Ex. 3, ¶45.

|  |  |
|---|---|
| 1 | Mr. Bero addresses the disgorgement of Intuitive's profits under the Lanham Act |
| 2 | because the Lanham Act provides that a plaintiff, such as SIS, is entitled to recover a |
| 3 | defendant's profits, such as Intuitive, as well as any damages sustained by the plaintiff. Bass |
| 4 | Dec. Ex. 1 at p. 58. Mr. Bero opines that Lanham Act damages would begin no later than |
| 5 | November 26, 2019 (*i.e.*, with the Intuitive letters).[18] As for the damages sustained by SIS, |
| 6 | Mr. Bero used the quantified lost profit damages to SIS based on the lost repair units |
| 7 | beginning in January 2020, which he analyzes for the antitrust damages calculation. Bass |
| 8 | Dec. Ex. 1 at p. 59. With respect to Intuitive's profits that SIS would be entitled to under the |
| 9 | Lanham Act, Mr. Bero therefore quantifies Intuitive's sales on the Scenario 2 – |
| 10 | Unenforceable Contracts lost repair units on Schedule 16.1 and Schedule 16.2, with a |
| 11 | January 1, 2024 present value. Id. |

## CONCLUSION

For these reasons, the Court should deny Intuitive's motion to exclude Mr. Bero's testimony regarding SIS's lost profits and Lanham Act damages.

**MCCAULLEY LAW GROUP LLC**

Dated: April 20, 2023

By: /s/ Joshua Van Hoven
JOSHUA V. VAN HOVEN

E-Mail: josh@mccaulleylawgroup.com
3001 Bishop Dr., Suite 300
San Ramon, California 94583
Telephone: 925.302.5941

RICHARD T. MCCAULLEY (*pro hac vice*)
E-Mail: Richard@ mccaulleylawgroup.com
180 N. Wabash Avenue, Suite 601
Chicago, Illinois 60601
Telephone: 312.330.8105

*Attorneys for Plaintiff and Counter-Defendant,*
SURGICAL INSTRUMENT SERVICE
COMPANY, INC.

---

[18] The date used in Mr. Bero's analysis is based on when Marin General Hospital, an SIS customer, received a letter from Intuitive about it using a third party (SIS) to reprogram the number of EndoWrist uses. Bass Dec. Ex. 1 at p. 59.