**MCCAULLEY LAW GROUP LLC**
JOSHUA V. VAN HOVEN, (CSB No. 261815)
E-Mail: josh@mccaulleylawgroup.com
3001 Bishop Dr., Suite 300
San Ramon, California 94583
Telephone: 925.302.5941

RICHARD T. MCCAULLEY (*pro hac vice*)
E-Mail: richard@mccaulleylawgroup.com
180 N. Wabash Avenue, Suite 601
Chicago, Illinois 60601
Telephone: 312.330.8105

*Attorneys for Plaintiff and Counter-Defendant,*
SURGICAL INSTRUMENT SERVICE COMPANY, INC.

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SURGICAL INSTRUMENT SERVICE COMPANY, INC. | Case No. 3:21-cv-03496-VC |
| *Plaintiff/Counter-Defendant,* | Honorable Vince Chhabria |
| v. | **PLAINTIFF SURGICAL INSTRUMENT SERVICE COMPANY, INC.'S OPPOSITION TO INTUITIVE'S MOTION TO EXCLUDE JEAN SARGENT'S EXPERT OPINION TESTIMONY** |
| INTUITIVE SURGICAL, INC., | |
| *Defendant/Counterclaimant.* | |
| | Hearing: June 8, 2023 |
| | Time: 10:00 AM PT |
| | Courtroom: Courtroom 5, 17th Floor |
| | Judge: The Honorable Vince Chhabria |
| | Complaint Filed: May 10, 2021 |

# **TABLE OF CONTENTS**

MEMORANDUM OF POINTS AND AUTHORITIES............................................................. 1

I.   Ms. Sargent's opinion regarding Hospitals' lack of concern With FDA clearance for hospital-owned medical devices meets the standard for relevance  under Rule 702 and *Daubert*. .......................................... 3

II.   Ms. Sargent's opinion regarding expected rates of collection of used EndoWrists from Hospitals meets the standard for reliability ....................... 5

III.   Section Heading 2 Ms. Sargent's opinion regarding expected conversion of Vizient Member Hospitals to the use of SIS's serviced EndoWrists meets the standard for reliability under Rule 702 and *Daubert*. .................................... 7

CONCLUSION ............................................................................................... 10

1

## TABLE OF AUTHORITIES

2

**Cases**

3

*Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*,
738 F.3d 960 (9th Cir. 2013) ............................................................. 9

*J. Truett Payne Co. v. Chrysler Motors Corp.*,
451 U.S. 557 (1981) ..................................................................... 1, 5

*Kumho Tire*,
526 U.S. ......................................................................................... 5

*Murray v. S. Route Mar. SA* ,
870 F.3d 915 (9th Cir. 2017) .......................................................... 5

*United States v. Ruvalcaba-Garcia*,
923 F.3d 1183 (9th Cir. 2019) ......................................................... 5

4

5

6

7

8

9

**Statutes**

10

Fed.R.Ev. 702 .................................................................................. 4

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

<u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

2

Defendant, Intuitive Surgical, Inc., took affirmative and illegal steps to prevent

3 Plaintiff Surgical Instrument Service Company, Inc. from entering the market to repair

4 EndoWrist instruments. The undisputed evidence in the record demonstrates that SIS's

5 EndoWrist repair service was rapidly accepted by hospitals approached by SIS, including

6 many of the most prominent systems in the country and many of the largest systems in the

7 country. Intuitive moved quickly and effectively to shut down that business with improper

8 threats and disinformation – driving SIS from the market almost immediately because

9 hospitals had no choice in view of Intuitive's monopoly power. Because Intuitive's

10 anticompetitive actions were so effective, SIS is left in the difficult position of having to

11 quantify the impact of Intuitive's illegal actions. Courts have long recognized that the

12 burden associated with proving antitrust injury is necessarily somewhat relaxed given the

13 circumstances that give rise to the claim:

14
15
16
17

> Our willingness to accept a degree of uncertainty in these cases rests in part on the difficulty of ascertaining business damages as compared, for example, to damages resulting from a personal injury or from condemnation of a parcel of land. The vagaries of the marketplace usually deny us sure knowledge of what plaintiff's situation would have been in the absence of the defendant's antitrust violation.

18 *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 566 (1981) (citations omitted).

19

Intuitive challenges *every single expert* offered by SIS. On damage-related issues

20 Intuitive primarily challenges the specificity and nature of the information that the experts

21 rely on in reaching their conclusions. Any challenges to the specificity must be weighed

22 against the fact that any uncertainty is caused by the acts of Intuitive:

23
24
25

> But our willingness [to accept a degree of uncertainty] also rests on the principle articulated in cases such as *Bigelow*, that it does not "come with very good grace" for the wrongdoer to insist upon specific and certain proof of the injury which it has itself inflicted.

26 *Id.*, at 566-67. Intuitive's *Daubert* challenges must be viewed through the lens of the

27 uncertainty necessarily inherent in a "but for" world where the plaintiff must present

28

analysis of the impact of the defendant's illegal conduct. Here, all of Jean Sargent's opinions should be admitted as both relevant and reliable.

Intuitive moves to exclude the opinions offered by Jean Sargent on hospital decision making and market acceptance of EndoWrists serviced by SIS. Ms. Sargent has significant and relevant experience in the field of hospital purchasing and supply chain. Ms. Sargent offers opinions that are based on her years of experience in the healthcare industry since 1976. Ms. Sargent has significant experience in the field, and with the specific issues discussed in her report, such as instrument collection rates, group purchase organization (GPO) practices, and adoption rates for cost-saving repair services. *E.g.*, Lazerow Dec. Ex. 1 at ¶¶ 4-14.[1] She is also familiar with SIS's EndoWrist repair offering through her role as a consultant at one of SIS's customers. *Id.* at ¶ 15.

First, Intuitive argues that the opinions that Sargent offers with respect to "repair" services is not relevant to this matter because Intuitive contends that what SIS does to the EndoWrists amounts to "remanufacturing." Ms. Sargent is not offering an opinion regarding whether or not the activity offered by SIS constituted "repair" or "remanufacturing". Ms. Sargent offers opinions about how hospitals view the services offered by SIS. Intuitive argues, through its own expert, that hospitals would not use the services offered by SIS without FDA approval. Ms. Sargent presents the opposite view.

Second, Intuitive challenges Sargent's opinion that the collection rate that hospitals using the program offered by SIS would have achieved "approximately 75%". Ms. Sargent provides this testimony based on her years of experience with collection rates for instrument repairs within hospital systems. Intuitive does not offer any evidence or argument to challenge the accuracy of the numbers, nor does its proffered expert, Mr. Goodwin, offer any counter argument in his rebuttal report that challenges the accuracy of the

---

[1] References to Intuitive's Motion are to the docket entry of the publicly filed brief at Dkt. 117 and the page number within the brief, while references to exhibits attached to the Motion reference the exhibit numbers of the Lazerow declaration available at Dkt. 117-1. The under-seal Motion and exhibits are available at Dkt. 130-49-55, with Dkt. 130-50 corresponding to Lazerow Dec. Ex. 1.

1  approximation offered by Ms. Sargent. Based on her years of experience with other medical

2  devices, Ms. Sargent offers a reasonable estimation of the collection rate. Mr. Bero, in

3  quantifying damages, relied on Ms. Sargent's opinion as one data point (in addition to

4  Intuitive's own documents) in arriving at the collection rate used to quantify damages.

5        Third, Intuitive challenges the reliability of the penetration rates that SIS would have

6  achieved at hospital members of the GPO Vizient. There is obviously some need for

7  estimates on this matter. Ms. Sargent, who formerly worked at Vizient and made purchasing

8  decisions for GPO-approved products on behalf of hospitals, is well qualified to make an

9  educated estimation as to how well SIS would have penetrated the Vizient ecosystem, and at

10  what rates. She based her opinion on her knowledge of penetration rates for similar types of

11  devices, and her knowledge of how hospitals make decisions concerning using ISOs and

12  GPOs to realize cost savings in hospitals. If SIS successfully establishes the illegality of

13  Intuitive's conduct, then Intuitive must accept that its conduct created the need to estimate

14  what would have happened in the but-for world. This testimony should be allowed.

15

16  **I.**    **Ms. Sargent's opinion regarding Hospitals' lack of concern With FDA clearance for hospital-owned medical devices meets the standard for relevance under Rule 702 and *Daubert*.**

17

18        Intuitive argues that Ms. Sargent's opinions should be excluded because the

19  testimony is not relevant. The argument is based on the fact, according to Intuitive, that Ms.

20  Sargent does not have an opinion on the "key issue" of whether or not the services offered

21  by SIS required FDA approval. It is true that Ms. Sargent does not offer an opinion on that

22  question. It is also true that the question of whether or not the SIS service offered to

23  hospitals required FDA approval is not the only issue for the jury to decide. Ms. Sargent

24  offers opinions on actual hospital practices with respect to servicing of instruments. Ms.

25  Sargent opines, for example, that:

26      •  Hospitals do not typically inquire about the need for FDA approval with respect to

27        the type of services provided by ISOs such as SIS. Lazerow Ex. 1 at ¶¶ 22-39.

28

1      • Hospitals would expect significant dialogue and notice (with an opportunity for

2        input) if FDA intended to regulate the type of services that SIS performed on

3        EndoWrists, and that absent any such information from FDA, hospitals would not

4        have reservations about doing business with SIS with respect to servicing

5        EndoWrists. Van Hoven Dec. Ex. 1 (Rebuttal Report of Jean Sargent, ¶¶ 13-20).

6           These issues are relevant to Intuitive's arguments that the majority of hospitals

7   would not do business with SIS for its EndoWrist services absent a separate FDA approval.[2]

8   Intuitive's expert, Mr. Jason Goodwin, offers his opinion that "concern about FDA

9   clearance is precisely the reason why many hospitals will not use and EndoWrist beyond the

10  use limit set by Intuitive and cleared by the FDA." Van Hoven Dec. Ex. 2 (Goodwin

11  Report) at ¶ 11.[3] Intuitive's damages expert, Loren Smith, then relies on the Goodwin

12  opinions to attack SIS's damages claims in this action:

13        Mr. Bero's damages calculations do not appear to consider testimony that
          indicates hospitals and surgeons may be reluctant to purchase resets that have
14        not been cleared by the U.S. Food and Drug Administration ("FDA"). I
          understand that a single reset recently has been cleared for a single S/Si
15        EndoWrist instrument. Hence, any reluctance to purchase reset EndoWrists
          that have not been cleared by the FDA may significantly reduce any market
16        penetration and damages.

17  Van Hoven Dec. Ex. 3 (Smith Rebuttal) at p. 7.

18           Intuitive will apparently argue that hospitals would have been reluctant to do

19  business with SIS in the "but for" world because SIS did not have an independent FDA

20  approval for its repair services in addition to the OEM approval. This fact has independent

21  relevance from whether or not the SIS services *actually* required approval by FDA. Intuitive

22  will argue that in the "but for" world – even absent the anticompetitive interference from

23  Intuitive – hospitals would have been hesitant to do business with SIS and would not have

24

25  _____

26  [2] SIS deliberately refers to these activities as "services" to avoid an unnecessary departure
    into a debate as to whether they constitute "repair" or "remanufacturing". The distinction,
    however, underscores the relevance and importance of the Sargent testimony. Hospitals do
27  not, and did not, concern themselves with this distinction as explained in her report.

28  [3] Like Ms. Sargent, Mr. Goodwin offers no opinion as to whether or not SIS's services
    require FDA approval.

done business with SIS. The expert opinions of Ms. Sargent are relevant to *at least* this issue, and admissible under Fed.R.Ev. 702 and *Daubert* on this basis.

**II.     Ms. Sargent's opinion regarding expected rates of collection of used EndoWrists from Hospitals meets the standard for reliability**

Intuitive next challenges Ms. Sargent's opinion that the collection rate that hospitals using the program offered by SIS would have achieved "approximately 75%". Ms. Sargent provides this testimony based on her years of experience with collection and processing of instruments for repair within hospital systems. Lazerow Dec. Ex. 1 at ¶¶ 9-14, 33, 54-56, 58.[4] Intuitive does not offer any evidence or argument to challenge the accuracy of these numbers, nor does the expert proffered by Intuitive to rebut Ms. Sargent's testimony, Mr. Goodwin, offer *any* counter argument in his rebuttal report that challenges the accuracy of the approximation offered by Ms. Sargent.  Van Hoven Dec. Ex. 2

Reliability requires that the expert's testimony have a reliable basis in the knowledge and experience of the relevant discipline. *United States v. Ruvalcaba-Garcia*, 923 F.3d 1183, 1188-89 (9th Cir. 2019). The district court must assess whether the expert has employed in the litigation context the same level of intellectual rigor that characterizes the practice of an expert in the relevant field. *Id.* at 1189. The reliability analysis is "a malleable one tied to the facts of each case," and "district courts are vested with 'broad latitude' to 'decide how to test an expert's reliability' and 'whether or not an expert's relevant testimony is reliable.'" *Murray v. S. Route Mar. SA* , 870 F.3d 915, 922–23 (9th Cir. 2017) (quoting *Kumho Tire*, 526 U.S. at 152–53). Furthermore, as discussed above, courts allow for more flexibility in circumstances where the "but for" analysis requires experts to evaluate market conditions that never occurred because of the illegal conduct of the defendant. *J. Truett*, 451 U.S. at 566.

---

[4] As pointed out in Mr. Bero's report, the collection rate offered by Ms. Sargent is consistent with the collection rate that Intuitive itself used internally to estimate the collection rate for its own EndoWrist refurbishment business. Dkt. 130-2 at p. 51 (version of Bero report filed under seal).

Intuitive implies that Ms. Sargent's opinion regarding the interest of hospitals in saving money with respect to operating their da Vinci surgical robot systems is limited to Vizient member hospitals: "At deposition, Sargent clarified that this opinion only applies to hospitals that are members of a certain GPO: Vizient Inc. Lazerow Dec. Ex. 2 90:3-22." Dkt. 117 at p. 4. In fact, Ms. Sargent testified at her deposition that: "My opinion is that for cost savings measures, that many, if not all, hospitals would welcome the opportunity for cost savings using the Da Vinci robot." Lazerow Dec. Ex. 2 at 90:15-18. Intuitive misleadingly implies that Ms. Sargent's opinions about EndoWrist collection rate is totally baseless: "Sargent admits that she considered no industry information literature or facts from the record to support her view that there is such a thing as a 'general industry collection rate' or what any such rate might be. Lazerow Dec. Ex. 1 ¶ 156: Lazerow Dec. Ex. 2 228:11-229:21." Dkt. 117 at p. 5. Intuitive ignores the fact that Ms. Sargent testified that she based her collection rate opinions on her relevant experience (Lazerow Dec. Ex. 2 at 228:20-24), which is substantial. *E.g.*, Lazerow Dec. Ex. 1 at ¶¶ 9-14.

Intuitive erroneously asserts that Ms. Sargent "has no experience with or knowledge of, collection rates for EndoWrists <u>at any hospital</u>. *Id.* Ex.2 298:19-299:3, 307:11-15." Dkt. 117 at p. 5 (emphasis added). When Intuitive asked Ms. Sargent about this area, the questions specifically excluded her experience with Marin Health. Lazerow Dec. Ex. 2 at 298:21-22. Furthermore, any criticism of Ms. Sargent on this basis ignores the fact that examination of significant data on this point is impossible given the fact that Intuitive's anticompetitive conduct shut this market down in its infancy. Similarly, Intuitive implies that Ms. Sargent was essentially clueless about Marin Health's use of SIS's services to collect and service EndoWrist instruments: "Marin used SIS to modify a handful of its EndoWrists but Sargent never saw the process by which SIS collected Endo Wrists from Marin; nor did she know how many Endo Wrists in Marin's inventory were actually collected by SIS. Lazerow Dec. Ex. 2 215:4-18, 307:5-10." Dkt. 117 at p. 5. In fact, Ms. Sargent testified that she was told SIS had provided collection bins at Marin Health and that about 20 EndoWrists had been collected. Lazerow Dec. Ex. 2 at 215:4-18.

Intuitive erroneously and misleadingly characterizes Ms. Sargent's opinions as failing to consider X/Xi EndoWrist instruments. Intuitive misleadingly claims "Sargent admits that her estimates are limited to hospitals that have S/Si da Vinci systems and do not include X/Xi Endo Wrists. Lazerow Dec. Ex. 2 209:10-211:13 ("Q. So is there any particular time in the future that you assumed that there would be X and Xi Endo Wrists collected? A. No."); id. 232:7-14 ("I would say 70 to 80 percent of the hospitals that have an S or Si would participate.")." Dkt. 117 at p. 6. Ms. Sargent explained at her deposition that her opinions were not specific to Si or Xi. Lazerow Dec. Ex. 2 at 209:10-17. She testified that eventually X and Xi EndoWrist instruments would have been part of the program. *Id.* at 209:18 - 210:4.

Intuitive mischaracterizes and misrepresents the bases for Ms. Sargent's opinions asserting: "Sargent purportedly bases her assertion of a 75% instrument collection rate on experience with 'general industry collection rates for instrument repairs' but she admits that she does not know the collection rates of any instrument collection programs. Lazerow Dec. Ex. 2 228:11 - 229:10, 307:5-15." Dkt. 117 at p. 8. Intuitive's sound bite approach to depositions appears calculated to create a misleading record to attempt to thwart expert testimony. Intuitive, however, did not ask Ms. Sargent any questions about her general knowledge of or experience with collection rates generally and with respect to any instrument collection programs. Lazerow Dec. Ex. 2 at 228:11-229:10; 307:5-15. Ms. Sargent is knowledgeable about those practices and can provide the jury with helpful testimony and provide the jury with helpful testimony on these topics. *E.g.,* Lazerow Dec. Ex. 1 at ¶¶ 9-14, 33, 54-56, 58.

### III. Section Heading 2 Ms. Sargent's opinion regarding expected conversion of Vizient Member Hospitals to the use of SIS's serviced EndoWrists meets the standard for reliability under Rule 702 and *Daubert*.

Finally, Intuitive moves to exclude the testimony of Ms. Sargent with respect to the percentage of eligible hospitals within the Vizient network of hospitals that would have taken advantage of the SIS EndoWrist service. Intuitive argues Sargent offers "no

1    methodology, literature, data, or relevant experience demonstrating why SIS would make

2    any level of sales to any hospital." Dkt. 117 at p. 9. As discussed above, the market for these

3    services was shut down almost immediately by Intuitive's conduct. It is hardly surprising

4    that there is no literature or extensive industry data regarding the market for this service.

5    And under these circumstances courts require a less exacting level of proof to prove

6    elements of the plaintiff's damages case. *J. Truett Payne Co.*, 451 U.S. at 566.

7         Intuitive's criticisms are not well founded in any event. Ms. Sargent has a long

8    career of relevant experience to draw upon to reach conclusions regarding what drives

9    hospitals to make purchasing decisions for services such as the service offered by SIS,

10   including substantial experience working for and purchasing from GPOs on behalf of

11   hospitals. Lazerow Dec. Ex. 1 at ¶¶ 1-15. Ms. Sargent drew her conclusions about how

12   many eligible hospitals in the Vizient system would adopt the SIS service over time.

13   Contrary to the inference raised in Intuitive's briefing, she did not conjure these numbers

14   out of thin air. Rather, she described her knowledge of GPO operations (*e.g.*, Lazerow Dec.

15   Ex. 1 at ¶¶ 23, 34-36, 40-45, 49-52), SIS's status as one of only 3 national Vizient repair

16   suppliers (*id.* at ¶ 45-47), SIS's status as "the only Vizient-approved provider of EndoWrist

17   repair services" (*id.* at ¶ 48), and SIS's interactions with Vizient's regional sales consultants

18   on the EndoWrist program (*id.* at ¶¶ 52-55). She then provided her estimates based on

19   conversion rates of devices that she considered similar to the EndoWrist instruments in

20   question here:

21        In my experience with Vizient and other GPOs, where an ISO repair service
          provides substantial cost savings such as those offered by SIS's EndoWrist
22        program, the combined efforts of the GPO and ISO providing such service
          would yield an overall conversion rate within the GPO member hospitals that
23        I would anticipate to be about of 30% by the end of the first year, 70% by the
          end of the second year after the service is introduced, and 70%-80%
24        thereafter. **Examples of repair services where I have seen similar
          penetration rates within a GPO include electrophysiology diagnostic
25        catheters, cables, endo shears, trocars, and laparoscopic instruments.**
          Based on the substantial demand and combined reach of SIS and
26        Vizient, SIS could have obtained similar penetration rates within Vizient for
          its EndoWrist repair services, had those services not been shut down by
27        Intuitive.

28

Lazerow Dec. Ex. 1 at ¶ 57. Ms. Sargent opines that the savings associated with the service offered by SIS is considered high in the industry (40%), and that the high savings would drive high collection and penetration rates.[5] *Id.* at ¶ 56. While Intuitive's anti-competitive conduct precludes us from knowing the precise level of penetration, Ms. Sargent's methodology of arriving at her estimate is sound and clearly identified in her report. She utilized the penetration rates she knows for comparable devices and extrapolated those known rates to arrive at an approximate penetration rate. Intuitive had this information when Ms. Sargent served her report. If Intuitive feels that this evidence is "shaky" it has all of the information necessary to attack the opinion at trial:

> [T]he court must assess [an expert's] reasoning or methodology, using as appropriate such criteria as testability, publication in peer reviewed literature, and general acceptance, but the inquiry is a flexible one. Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion. In sum, the trial court must assure that the expert testimony "both rests on a reliable foundation and is relevant to the task at hand."

*Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013).

Here, where Ms. Sargent has stated how she derived her estimate, Intuitive can effectively combat the opinion through cross examination, counter evidence or expert testimony of its own.[6] If Intuitive has evidence that the devices listed have different penetration rates, surely they can use that to cross examine Ms. Sargent. If Mr. Goodson had evidence, or even an opinion, that Ms. Sargent's numbers were wrong he could have presented that evidence or opinion in his expert report. He did not. Van Hoven Dec. Ex. 2 Intuitive knows how Ms. Sargent arrived at her numbers.[7] Intuitive knows the numbers are

---

[5] Ms. Sargent uses the terms "penetration rate" and "conversion rate" interchangeably to refer to the number of available hospitals that would adopt the SIS service.

[6] In this regard, SIS notes that despite knowing for months that the country's largest GPO signed a contract with SIS for EndoWrist repair, that many of the country's most prestigious healthcare facilities would have moved forward with SIS but-for Intuitive's anticompetitive conduct, and that one of its largest customers having dozens of robots would move forward with SIS but-for Intuitive's anticompetitive conduct, Intuitive has made no attempt to counter or discredit any of this direct evidence of "monumental" demand for SIS's EndoWrist repair service. *E.g.*, Dkt. 130-2 at pp. 23-25.

[7] Ms. Sargent provided further information about her conclusions on this opinion during her deposition, where, for example, she provided a detailed discussion of the factors that

1  accurate. It seeks to exclude the opinion because it has no credible way to attack it, not

2  because it is unreliable.

3       In a last-ditch effort to get rid of Ms. Sargent's testimony, Intuitive points to

4  irrelevant information to try and discredit her. They point to her alleged lack of knowledge

5  about facts related to SIS's business. The concise answer is, even if true, so what? None of

6  the alleged deficiencies relates to the substance of the opinions offered on hospital and GPO

7  practices relating to instrument servicing and cost-saving practices, and Intuitive provides

8  no linking argument about why any of the issues relate to the opinions offered in this

9  matter.[8] The citation to the *Redlightning* case adds nothing to the analysis. Incredibly,

10  Intuitive has the temerity to argue that Ms. Sargent's opinions cannot stand in light of the

11  small number of sales SIS made when the program was launched.[9] As noted by the Supreme

12  Court, these criticisms "do not come with very good grace" given that it was Intuitive that

13  cut short this nascent and monumental cost-saving opportunity through its own

14  anticompetitive conduct.

15  **CONCLUSION**

16       For these reasons, the Court should deny Intuitive's motion to exclude Ms. Jean

17  Sargent's testimony.

18

19

20  drive a significant conversion rate for electrophysiology catheters. Van Hoven Dec. Ex. 4 at

21  273:8-275:23. These catheters identified in the Sargent Report are similar in price, with service resulting in similar savings, to the SIS service of EndoWrists. These catheters have a

22  conversion rate of approximately 75% in Ms. Sargent's experience. There is a more than sufficient basis for the conclusion that the SIS service would obtain a similar conversion

23  rate.

24    [8] For example, the identity of SIS's technology suppliers does not impact the subject matter of her opinions regarding the one Vizient-approved repair supplier for EndoWrists.

25  Nor does it have any bearing on her opinions as to how hospitals would view the EndoWrist repair service. The Court must ignore any attempt by Intuitive to cobble together some

26  reason why the alleged deficiencies in Ms. Sargent's specific knowledge about tangential issues is important to the opinions she offers. Such explanation should have been presented

27  in Intuitive's motion so SIS would have an opportunity to adequately respond.

28    [9] As Intuitive is well aware, the only reason that the Vizient program never resulted in a significant number of repairs is due to Intuitive's anticompetitive conduct.

1     Dated: April 20, 2023         **MCCAULLEY LAW GROUP LLC**

2

3                      By: */s/ Joshua Van Hoven*

4                          JOSHUA V. VAN HOVEN

5                          E-Mail: josh@mccaulleylawgroup.com
                         3001 Bishop Dr., Suite 300

6                          San Ramon, California 94583
                         Telephone: 925.302.5941

7                          RICHARD T. MCCAULLEY (*pro hac vice*)
                         E-Mail: richard@mccaulleylawgroup.com

8                          180 N. Wabash Avenue, Suite 601
                         Chicago, Illinois 60601

9                          Telephone: 312.330.8105

10                         *Attorneys for Plaintiff and Counter-Defendant,*
                        SURGICAL INSTRUMENT SERVICE

11                         COMPANY, INC.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28