1              UNITED STATES DISTRICT COURT
2          FOR THE NORTHERN DISTRICT OF CALIFORNIA
3                   SAN FRANCISCO DIVISION
4    IN RE: DA VINCI SURGICAL ROBOT     ) Lead Case No.:
     ANTITRUST LITIGATION,              ) 3:21-cv-03825-VC
5    ------------------------------------)
     THIS DOCUMENT RELATES TO:          )
6    ALL CASES                           )
     ------------------------------------)
7
8    SURGICAL INSTRUMENT SERVICE        )
     COMPANY, INC.,                     ) Case No.
9                                       ) 3:21-cv-03496-VC
                    Plaintiff,          )
10                                      )
        vs.                             )
11                                      )
     INTUITIVE SURGICAL, INC.,          )
12                                      )
                    Defendant.          )
13   ------------------------------------)
14
15      ***HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY***
16
17    REMOTE PROCEEDINGS OF THE VIDEOTAPED DEPOSITION OF
18          GRANT DUQUE, IN HIS PERSONAL CAPACITY
19                TUESDAY, NOVEMBER 8, 2022
20
21
22
23   REPORTED BY NANCY J. MARTIN
24   CSR. NO. 9504, RMR, RPR
25   PAGES 1 - 178

Page 2

```
 1              UNITED STATES DISTRICT COURT
 2         FOR THE NORTHERN DISTRICT OF CALIFORNIA
 3                  SAN FRANCISCO DIVISION
 4   IN RE: DA VINCI SURGICAL ROBOT    ) Lead Case No.:
     ANTITRUST LITIGATION,             ) 3:21-cv-03825-VC
 5   ------------------------------------)
     THIS DOCUMENT RELATES TO:         )
 6   ALL CASES                         )
     ------------------------------------)
 7
 8   SURGICAL INSTRUMENT SERVICE       )
     COMPANY, INC.,                    ) Case No.
 9                                     ) 3:21-cv-03496-VC
                 Plaintiff,            )
10                                     )
           vs.                         )
11                                     )
     INTUITIVE SURGICAL, INC.,         )
12                                     )
                 Defendant.            )
13   ------------------------------------)
14
15       ***HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY***
16
17                          - - -
18                 Tuesday, November 8, 2022
19                          - - -
20      Videotaped Remote Deposition of GRANT DUQUE,
21   beginning at 9:04 A.M., before Nancy J. Martin, a
22   Registered Merit Reporter, Certified Shorthand
23   Reporter.  All parties appeared remotely.
24
25
```

HIGHLY CONFIDENTIAL

Page 11

1    BY MR. VAN HOVEN:
2        Q.   Are you able to see the document on the Agile
3    Law screen?
4        A.   I see it, yes.
5        Q.   And our --
6        MR. VAN HOVEN:  Kate, will you guys be
7    working with hard copy documents today?
8        MS. CAHOY:  Yes.
9        MR. VAN HOVEN:  Okay.
10       Q.   So primarily I'll be using the Agile Law
11   screen and then for marking documents, Mr. DuQue, and
12   then you can look at the hard copy documents that are
13   available to you.  Okay?
14       A.   Okay.
15       Q.   Mr. DuQue, does Exhibit 238 appear to be a
16   printout of your LinkedIn profile?
17       A.   It does.  It appears to -- I see the contact,
18   that URL is LinkedIn.
19       Q.   And is your current position the director of
20   product engineering at instruments and accessories at
21   Intuitive Surgical?
22       A.   My current position is director, but I'm
23   director of core instruments design engineering, and
24   it includes product engineering.
25       Q.   So you said you're the director of core

1      instruments product engineering?
2          A.   Core instruments design engineering.
3          Q.   Okay.  And that includes product engineering?
4          A.   Correct.
5          Q.   What's the difference between the design
6      engineering function and the product engineering
7      function at Intuitive Instruments?
8          A.   For product engineering, that designation is
9      intended to be for sustaining engineering support for
10     a product already in the field.
11         Q.   Got it.
12              And design engineering is for designing new
13     products; is that right?
14         A.   Not exactly.  It's overall encompassing.  It
15     encompasses both sustaining engineering as well as new
16     products.
17         Q.   So is it -- is the design engineering team
18     the primary engineering team that works on new
19     products?
20              MS. CAHOY:  Objection to form.
21              THE WITNESS:  Can you repeat the question,
22     please.
23     BY MR. VAN HOVEN:
24         Q.   Yeah.  Is the design engineering team the
25     primary engineering team that works on new products?

Page 48

1     A.  It could.

2     Q.  I mean it will be, won't it?

3         MS. CAHOY:  Objection to form.

4         THE WITNESS:  I can't predict it for every

5  instrument.

6  BY MR. VAN HOVEN:

7     Q.  For the vast majority of instruments, a cable

8  that's not on the pulley would be a pretty serious

9  degradation of function, wouldn't it?

10        MS. CAHOY:  Objection to form.

11        THE WITNESS:  It depends on the instrument.

12 It depends on the circumstances.

13 BY MR. VAN HOVEN:

14    Q.  What circumstances would it not be a serious

15 degradation of function for a cable to derail off the

16 pulley?

17    A.  So in an instrum- -- if the cable derails, it

18 has the -- it would be significant if it derailed and

19 broke and it resulted in a cable breakage.  But it can

20 derail and not break and it would become slack, but

21 that amount of slack will have different -- can have

22 different effects on its performance.

23    Q.  I'd like to go to the bottom of the page.

24 There's a reference to Instrument Design Similarities.

25    A.  I see it.

Page 49

1    Q.    This document states that, "The materials
2    used in the distal portion of the S/SI 8mm instruments
3    are identical to those used in the equivalent versions
4    of the XI 8mm instruments."
5          Do you see that?
6    A.    I see it.
7    Q.    What are you referring to there?
8    A.    The materials used in the distal portion.  So
9    that would refer to the wrist components, the grip
10   components, the pulleys, pins, and cables and
11   (inaudible).
12   Q.    So as of the time of this document in 2016,
13   are you saying that those components in the S and SI
14   are identical to the components in the XI?
15         MS. CAHOY:  Objection to form.
16         THE WITNESS:  I can't recount that offhand
17   off the top of my head.
18   BY MR. VAN HOVEN:
19   Q.    That's what you were saying in 2016 here?
20         MS. CAHOY:  Objection to form.
21         THE WITNESS:  I'm reading.  "Instruments for
22   SI and XI platforms are similar in many regards.  The
23   materials used in the distal portion of the S/SI 8mm
24   instruments are identical to those used in the
25   equivalent versions of XI 8mm instruments."

1           So this statement is referring to the
2     materials.
3     BY MR. VAN HOVEN:
4           Q.  That those are identical?
5           A.  That's correct.
6           Q.  If we go to the next page, there's a
7     reference to geometric similarities between the S/SI,
8     XI 8mm instruments?
9           A.  I see it.
10          Q.  The next sentence there explains that, "The
11    cable paths through the wrists of the instruments and
12    to the cable attachment points on the various joint
13    output pulleys for yaw, grip, and pitch are designed
14    to be identical."
15          Do you see that?
16          A.  "Are designed to be identical."  I do see
17    that, yes.
18          Q.  What do you mean there?
19          A.  "Cable paths through the wrists of the
20    instruments and to the cable attachment points on the
21    various joint output pulleys for yaw, grip, and pitch
22    are designed to be identical."
23          Um, that the -- I mean, essentially that
24    statement, the cable paths at the joint at the wrists
25    were designed to be identical.

Page 51

1    Q.   What does it mean for something to be
2    designed to be identical?
3    A.   The statement here is to speak to cable path.
4    Q.   And that those are designed to be identical
5    as between the S/SI versus the XI?
6    A.   That's correct.
7    Q.   Then finally it talks -- "Although the
8    proximal cable routing through the back end."
9         Do you see that --
10   A.   I do see that.
11   Q.   -- paragraph?
12   A.   I do.
13   Q.   What's your understanding of what that
14   paragraph was referring to?
15   A.   It speaks to the differences between XI and
16   SI, which are mainly in the cable path in the back end
17   of the instruments.
18   Q.   But by "cable path in the back end," you're
19   talking about the portion of the cable path at the
20   proximal end of the instrument?
21   A.   Yes.
22   Q.   But there are some similarities, including
23   equivalently sized clamping pulley dip -- diameters.
24        Do you see that?
25   A.   I see that, yes.

Page 52

1       Q.  What is that referring to?
2       A.  The clamping pulleys are what the cables
3   spool around on the input discs.
4       Q.  And those are equivalently sized between the
5   S/SI and XI?
6       A.  That's correct.
7       Q.  Why is that?
8       A.  It was -- it was the design intent to keep
9   that Q ratio between the input and the output the
10  same.
11      Q.  There's also a reference to idler pulleys
12  that are comparatively sized.
13          Do you see that?
14      A.  I do.
15      Q.  What is an idler pulley?
16      A.  Sure.  An idler pulley is not acting in the
17  drive train gear ratio.  It is an idler.  Meaning it's
18  there passively, but it's there to re-route the cables
19  for -- to get the cable path onto the important parts
20  of the drive train.
21          MR. VAN HOVEN:  Mr. DuQue, it seems like
22  we've been -- unless you guys want to soldier on
23  through another document, this might be a good time
24  for a 10-minute break.
25          MS. CAHOY:  Yes.