UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: DA VINCI SURGICAL ROBOT ANTITRUST LITIGATION, | )LEAD LEAD CASE )NO.: )3:21-cv-03825-VC |
| THIS DOCUMENT RELATES TO: ALL CASES. | ) |
| SURGICAL INSTRUMENT SERVICE COMPANY, INC, Plaintiff, v. INTUITIVE SURGICAL, INC., Defendant. | )CASE NO. )3:21-cv-03496-VC |

DEPOSITION OF ROBERT HOWE
VOLUME I
REMOTELY IN BOSTON, MASSACHUSETTS
FRIDAY, FEBRUARY 24, 2023

REPORTED BY: NATALIE PARVIZI-AZAD, CSR, RPR, RSR
CSR NO. 14125
JOB NO.: 5754439

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

IN RE: DA VINCI SURGICAL ROBOT ANTITRUST LITIGATION, ) LEAD CASE NO.: 3:21-CV-03825-VC

THIS DOCUMENT RELATES TO: ALL CASES.

DEPOSITION OF ROBERT HOWE, VOLUME I TAKEN ON BEHALF OF THE PLAINTIFF REMOTELY VIA ZOOM VIDEOCONFERENCING, IN BOSTON, MASSACHUSETTS, BEGINNING AT 9:24 A.M. AND ENDING AT 4:03 P.M., ON FRIDAY, FEBRUARY 24, 2023, BEFORE NATALIE PARVIZI-AZAD, CERTIFIED SHORTHAND REPORTER NUMBER 14125.

A P P E A R A N C E S

FOR THE PLAINTIFF, SURGICAL INSTRUMENT SERVICE COMPANY, INC.:

HALEY GUILIANO, LLP
BY: JOSH VAN HOVEN, ESQ.
111 NORTH MARKET STREET
SUITE 900
SAN JOSE, CALIFORNIA 95113
(669) 213-1061
JOSHUA.VANHOVEN@HGLAW.COM

- AND -

SPECTOR ROSEMAN & KODROFF, P.C.
BY: JEFFREY R. CORRIGAN, ESQ.
TWO COMMERCE SQUARE
2001 MARKET STREET
SUITE 3420
PHILADELPHIA, PENNSYLVANIA 19103
(215) 496-0300
JCORRIGAN@SRKATTORNEYS.COM.

FOR THE PROPOSED CLASS, HOSPITAL PLAINTIFFS:

BONI, ZACK & SNYDER, LLC
BY: JOSHUA SNYDER, ESQ.
BY: JOHN SINDONI, ESQ.
15 ST. ASAPHS ROAD
BALA CYNWYD, PENNSYLVANIA 19004
(610) 822-0200
JSNYDER@BONIZACK.COM
JSINDONI@BONIZACK.COM

FOR THE DEFENDANTS, INTUITIVE SURGICAL, INC.:

COVINGTON & BURLING, LLP
BY: ISAAC CHAPUT, ESQ.
415 MISSION STREET
FLOOR 54
SAN FRANCISCO, CALIFORNIA 94105
(415) 591-6000
ICHAPUT@COV.COM

A. This data is not associated with the chart on page 12.

Q. And so, from this chart, you're not able to tell what failures happened at which time?

A. This chart does not reveal that.

Q. And you can't figure that out by cross-referencing this with other materials in the report; can you?

MR. CHAPUT: I object to the form.

A. It might be possible. I'll point out that this is broken down by instrument type, and a chart such as the one that we looked at or, for instance, the one on page 16 breaks out failures, so it may be possible to do that. I did not perform that analysis, but it may be -- it may be possible to do that. Excuse me.

Q. And so, how many total failures were considered in this analysis?

MR. CHAPUT: Object to the form.

Q. Sorry, let me rephrase that.

How many total failures were considered in that analysis at page 12 of Rebotix 090164?

A. The lower right corner says the grand total is 61.

Q. Do you consider 61 total failures to be an

adequate basis to make statistical conclusions?

MR. CHAPUT: Object to the form.

A. That depends. If it's a representative sample, it certainly supports the conclusion in my report.

Q. What is your evidence that this is a representative sample?

MR. CHAPUT: Object to the form.

A. It's -- it's from the FDA database, so it's not biased, for instance, from manufacturer biases. It -- it -- it is consistent with the data I've seen in other contexts, and it's consistent with the general principles that wear and tear is cumulative and thus leads to higher failure rates with continued use.

Q. So 61 total samples of failures is adequate to demonstrate to a statistically significant degree that instruments wear and tear -- wear out and show increased failure rates with increased usage?

MR. CHAPUT: Objection. Form.

A. Again, if you under -- if you assume this is a representative sample, then I believe I performed a population proportion T test which showed that it's strongly significant, statistically

significant that early use has a lower failure rate than later use.

Q. So if, for example, we look at nine uses left here, there's four failures; is that right?

A. Yes.

Q. And that's same number as for six and four uses left?

A. Yes.

Q. Eight uses left, there's six failures; is that right?

A. Yes.

Q. Has the same number for two and three uses left?

A. Yes.

Q. Looks like at seven uses left, there's only one failure.

Do you see that?

A. Yes.

Q. What does that demonstrate to you about when there's seven uses left versus eight or nine?

A. Well, it's -- it's clear that this is a noisy process, as are all sampling or are many sampling processes. That's why we do statistics in order that we come up with robust and reliable conclusions, despite variability. And thus, I

performed a population portion T test in order to draw reliable conclusions in the face of this variability.

Q. And what you call a population portion T test, was that adding the number of failures together and then dividing them by the total number of failures?

A. That's correct.

Q. There seem to be a larger set of failures at zero lives.

Do you see that?

A. Yes.

Q. Do you know if any of those failures were due to the instruments not being recognized?

A. From this data, it can't be determined -- from this particular chart, it can't be determined. Again, there's a lot of data in this. It may be possible to correlate this chart with data that's elsewhere in the report.

Q. But you haven't done that in your report; have you?

A. I did not.

Q. Well, I think we're at about another hour now. I need a -- is this a good time for a break?

A. Works for me.