```
 1              UNITED STATES DISTRICT COURT
 2             NORTHERN DISTRICT OF CALIFORNIA
 3
 4   IN RE: DA VINCI SURGICAL ROBOT  ) Lead Case No.:
     ANTITRUST LITIGATION             ) 3:21-cv-03825-VC
 5   _____  )
                                      )
 6   THIS DOCUMENT RELATES TO:        )
     ALL ACTIONS                      )
 7                                    )
     _____  )
 8   SURGICAL INSTRUMENT SERVICE      ) Case No.
     COMPANY, INC.,                   ) 3:21-CV-03496-VC
 9                                    )
             Plaintiff,               )
10                                    )
             vs.                      )
11                                    )
     INTUITIVE SURGICAL, INC.,        )
12                                    )
             Defendant.               )
13   _____  )
14
15      HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
16              UNDER THE PROTECTIVE ORDER
17       VIRTUAL VIDEOCONFERENCE VIDEO-RECORDED
18                DEPOSITION OF DAN JONES
19
20            Thursday, November 10, 2022
21    Remotely Testifying from Alexandria, Virginia
22
23   Stenographically Reported By:
24   Hanna Kim, CLR, CSR No. 13083
25   Job No. 5564633
```

 1              UNITED STATES DISTRICT COURT
 2             NORTHERN DISTRICT OF CALIFORNIA
 3
 4   IN RE: DA VINCI SURGICAL ROBOT  ) Lead Case No.:
     ANTITRUST LITIGATION             ) 3:21-cv-03825-VC
 5   _____ )
                                      )
 6   THIS DOCUMENT RELATES TO:        )
     ALL ACTIONS                      )
 7                                    )
     _____ )
 8   SURGICAL INSTRUMENT SERVICE      ) Case No.
     COMPANY, INC.,                   ) 3:21-CV-03496-VC
 9                                    )
              Plaintiff,              )
10                                    )
              vs.                     )
11                                    )
     INTUITIVE SURGICAL, INC.,        )
12                                    )
              Defendant.              )
13   _____ )
14
15          HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
16   UNDER THE PROTECTIVE ORDER, virtual videoconference
17   video-recorded deposition of DAN JONES remotely
18   testifying from Alexandria, Virginia, on Thursday,
19   November 10 beginning at 12:06 p.m., EST, and
20   concluding at 2:36 p.m., pursuant to the
21   stipulations of counsel thereof, before Hanna Kim,
22   CLR, Certified Shorthand Reporter, No. 13083.
23
24
25

1     REMOTE VIDEOCONFERENCE APPEARANCES OF COUNSEL:
2
3   For Plaintiff Surgical Instrument Service Company,
4   Inc:
5           HALEY GUILIANO
6           BY:  JOSHUA VAN HOVEN, ESQ.
7           111 North Market Street, Suite 900
8           San Jose, California 95113
9           669.213.1071
10          joshua.vanhoven@hglaw.com
11
12
13  For Hospital Plaintiffs:
14          HAUSFELD LLC
15          BY:  SAMUEL MAIDA, ESQ.
16          600 Montgomery Street, Suite 3200
17          San Francisco, California 94111
18          415.633.1908
19          smaida@hausfeld.com
20
21
22
23
24
25

```
 1         REMOTE APPEARANCES OF COUNSEL:  (CONT'D.)
 2
 3    For Hospital Plaintiffs and the Proposed Class:
 4             BONI, ZACK & SNYDER LLC
 5             BY:  JOSHUA D. SNYDER, ESQ.
 6             15 St. Asaphs Road
 7             Bala Cynwyd, Pennsylvania 19004
 8             610.822.0203
 9             jsnyder@bonizack.com
10
11
12    For Defendant Intuitive Surgical:
13             COVINGTON & BURLING LLP
14             BY:  KATHRYN CAHOY, ESQ.
15             3000 El Camino Real
16             5 Palo Alto Square, 10th Floor
17             Palo Alto, California 94306-2112
18             kcahoy@cov.com
19
20
21    Also Present:
22             MICHAEL BARANKOVICH, Videographer
23
24
25
```

Page 12

```
 1   object to my question.  But you will still need to
 2   answer unless she instructs you not to do so.
 3              Do you understand that aspect?
 4        A.    Yes.
 5        Q.    Okay.  I don't plan on taking too much of
 6   your time today, but if you need a break, let me
 7   know.  All I ask is that if there is a question
 8   pending, you please finish your answer before taking
 9   a break.
10              Sounds good?
11        A.    Yes.
12        Q.    Do you work at Intuitive?
13              (Interruption in audio/video.)
14              THE COURT REPORTER:  I'm sorry.  Your
15   audio cut out.
16   BY MR. MAIDA:
17        Q.    Do you work at Intuitive?
18        A.    Yes.
19        Q.    How long have you worked at Intuitive?
20        A.    Fourteen and a half years.
21        Q.    What's your current position?
22        A.    Director of external affairs.
23        Q.    How long have you been in that position?
24        A.    Twelve years, 13 years.
25        Q.    What are your responsibilities in your
```

Page 76

1  undergo a Rebotix type process.  Is that an okay way
2  to look at it?
3       A.   Yeah.  I think there might have been a
4  leveling off after the first European customers
5  looked into it.  And I don't recall who else was
6  looking into it there besides customers.  Whether
7  regulatory bodies got involved, I really don't
8  recall.  I wasn't close to that.  I think it
9  actually decreased.  And then, when we saw it emerge
10 in the U.S., it seemed to increase again.
11      Q.   When did it emerge in the U.S.?
12      A.   I think this Panama Surgery Center
13 [verbatim] was one of the earliest instances of use.
14 Again, I don't recall exactly when we detected it.
15 But 2019 was when it seemed like there were several
16 hospitals that we were interacting with about this
17 issue.
18      Q.   And about how long, once that started in
19 2019, did you -- did Intuitive continue to interact
20 with hospitals about this issue?
21      A.   I think even by 2020, the activity
22 seems -- seemed to have lessened, and then COVID
23 hit, and I don't recall it being much of an issue
24 after COVID hit.  I -- I don't know.  I think it's
25 now been two years approximately since we've seen

1             And so, that -- that discussion of a
2   material breach may be a -- an actual breach or a
3   potential breach; correct?
4         A.   Using --
5              MS. CAHOY:  Objection.
6              THE WITNESS:  -- instruments would be a
7   breach.
8   BY MR. VAN HOVEN:
9         Q.   Is there any other basis in this letter
10  for stating that Marin is breaching or potentially
11  breaching its agreements with Intuitive?
12             MS. CAHOY:  Objection to form.
13             THE WITNESS:  I'd have to reread it that
14  closely.  Again, and I -- I don't know.  That --
15  that -- that section is not saying Marin breached.
16  It is saying use of these adulterated instruments
17  would constitute a breach.  So if you want to repeat
18  the question again, I'd have to reread it.  I'm not
19  a lawyer, a contracts lawyer.  So are you asking if
20  there's something outside of that section --
21        Q.   I'm asking what would --
22        A.   -- that discusses what would be a
23  breach -- that discusses what would be a breach?
24        Q.   Yeah, I'm asking as to what would be a
25  breach.  And -- and one basis that you've stated is

1    using instruments beyond the programmed number of
2    uses; correct?  That's something that would be a
3    breach?
4        A.   Using instruments beyond the programmed
5    number of uses is a material breach of the
6    Agreements.  So, yes, that would be -- would be --
7        Q.   That -- that's one --
8        A.   -- a breach.
9        Q.   That's one thing in this letter that's
10   stated as something that would be a breach; correct?
11       A.   Yeah, I would agree with that.
12       Q.   Is there any -- anything else in this
13   letter as to an activity of Marin that might be a
14   breach of its contracts with Intuitive?
15            MS. CAHOY:  Objection to form.  Outside
16   the scope.
17            THE WITNESS:  I don't know the answer.
18   I'm not a lawyer, so I don't know whether the
19   sub-bullets are included in that "using instruments
20   beyond the programmed number of uses" because that
21   would also violate the license.  And so, I'm not a
22   lawyer.  I don't know whether you want me to -- to
23   distinguish the three bullets as separate ways that
24   the contract would be breached, or if they're part
25   of the overarching introductory paragraph to that

1              electronically.)
2         A.   I've clicked on it.
3         Q.   Okay.  And take a look, let me know when
4    you're ready to discuss this document.
5         A.   (Witness reviews document).
6              Okay.
7         Q.   What does this document appear to be?
8         A.   It is a similar letter to the previous one
9    we looked at.
10        Q.   And -- and this one's to Banner Health?
11        A.   Banner Health in Phoenix, Arizona.
12        Q.   Are you familiar with Banner Health?
13        A.   I think it's a pretty well known hospital
14   system in the Phoenix area.  I don't know if it's
15   part of a larger organization.  I don't know much
16   about the account.
17        Q.   Would -- would it surprise you to hear
18   that Banner Health has over 40 Intuitive robots?
19        A.   No.
20        Q.   About how much does an Intuitive system
21   cost on its initial purchase?
22        A.   It can vary anything -- I -- I haven't
23   looked at the approved price list recently.  But I
24   think we have systems that start around 700,000.
25   And systems that -- with various options can be

Page 89

```
 1     around the $2 million per system level.  You --
 2          Q.   And is --
 3          A.   -- you can look up an average sales price
 4     in our SEC reports.
 5          Q.   Is -- is that purchase typically done as a
 6     capital investment by the hospitals?
 7               MS. CAHOY:  Objection to form.  Outside
 8     the scope.
 9               THE WITNESS:  As -- as opposed to what?
10     BY MR. VAN HOVEN:
11          Q.   As opposed to a -- a monthly rental.
12               MS. CAHOY:  Objection to form.
13               THE WITNESS:  I think --
14               MS. CAHOY:  Outside the scope.
15               THE WITNESS:  I think we report quarterly
16     the number of -- or proportion of our system deals
17     that are leases or are outright acquisitions,
18     purchases by the hospital.  If you want to -- if you
19     want to divide the world into the hospital buying it
20     up front or paying lease agreements, those are the
21     two main arrangements.
22     BY MR. VAN HOVEN:
23          Q.   I'd like to go to the section of your
24     contract with Intuitive, within the Banner letter.
25          A.   Yes.
```

Page 90

1  Q. You'll see that the first paragraph
2  mentions two agreements, one that's in parentheses a
3  sales agreement, and one that's in parentheses a
4  ULSA.
5      Do you see that?
6  A. Mm-hmm.
7  Q. What is this sales agreement?
8  A. I'm not sure I've ever seen one, an
9  actual.
10 Q. Okay.
11 A. I imagine it is the terms of the system
12 purchase or lease. This says -- yeah, this says
13 "sale." I think the term may cover leases. I don't
14 know.
15 Q. And -- and that -- that's for the system,
16 meaning the robot, the console, and the vision cart?
17     MS. CAHOY: Objection to form. Outside
18 the scope.
19     THE WITNESS: I -- I would think it would
20 cover. And sometimes those also include some
21 initial inventory of instruments as well. So
22 there's -- there's just an initial investment. It
23 may not just be the system. And also -- and also a
24 first year of service is usually provided with a
25 system acquisition whether that's through a --

Page 91

1     arranged in the lease terms or in the sales terms.
2     BY MR. VAN HOVEN:
3          Q.   And in -- in the case of instruments that
4     might come with the sales agreements, once those
5     were used, the customer would have to purchase
6     additional instruments?
7               MS. CAHOY:  Objection to form.  Outside
8     the scope.
9               THE WITNESS:  Generally, I think that's
10    how things would work, yes.
11    BY MR. VAN HOVEN:
12         Q.   And do you have an understanding of what
13    the ULSA is?
14         A.   It says here it's the use license and
15    service agreement.
16         Q.   Do you have any idea how that fits in with
17    the sales agreement?
18              MS. CAHOY:  Objection to form.  Outside
19    the scope.
20              THE WITNESS:  I don't know if they're
21    simultaneous, if it's separate in some cases, if
22    they're together in others.  I don't know.
23    BY MR. VAN HOVEN:
24         Q.   If we go to the second bullet point
25    there -- and actually, before we go there, we'll

1   note that the -- am I correct that the sales
2   agreement and that ULSA are collectively referred to
3   as "the Agreement" in this letter?
4        A.   Yeah, it looks like there should be an
5   open quote, and there's one missing.  But it says,
6   "Each as amended (collectively, 'the Agreement')."
7   And there's a footnote on it as well.
8             Oh, okay.  That's standard legal.  Yes,
9   the footnote goes further to, I think, imply that
10  those two are collectively called "the Agreement."
11       Q.   And the -- I -- I see that there's a
12  double collectively, but almost -- the -- so that --
13  and capital A "Agreement" is referring to the
14  agreement -- to those two agreements together; is
15  that right?
16       A.   Yes.
17       Q.   If we go to the second bullet point, could
18  you take a look at that and let me know when you're
19  ready to discuss it.
20       A.   Okay.
21       Q.   It concludes with a statement that
22  "Intuitive may terminate the Agreement immediately
23  upon written notice, and any warranties applicable
24  to the System will become void."
25            Do you see that?

1    A.    Yes.
2    Q.    I'd -- I'd like to split that up into kind
3    of two portions.
4          What do you understand "Intuitive may
5    terminate the Agreement immediately upon written
6    notice" to mean?
7          MS. CAHOY:  Objection to form.  And I
8    would instruct the witness not to answer to the
9    extent it would reveal privileged information.
10         THE WITNESS:  I'm not a lawyer.  I
11   think -- and so I don't know if there's a -- a
12   period before the other party to -- to, you know,
13   dispute, but it -- it's -- I think it says the
14   arrangement that's established by the agreements
15   would cease.
16   BY MR. VAN HOVEN:
17   Q.    That --
18   A.    Are we -- are we asking what terminate
19   means, or -- I don't --
20   Q.    Sure.
21         Yeah, I -- what's it mean to terminate the
22   agreement?
23   A.    I think that it's no longer binding for
24   the two parties to fulfill their obligations.
25   Q.    And so, Intuitive would no longer have to

1     fulfill any of its obligation with respect to
2     Banner's 40 plus robots?
3              MS. CAHOY:  Objection to form.  Outside
4     the scope.
5              THE WITNESS:  Again, I don't know if the
6     agreements cover all 40 or the specific system.  I
7     don't know that case.
8     BY MR. VAN HOVEN:
9         Q.   But the termination of the agreement is
10    with respect to systems; right?
11        A.   Systems --
12             MS. CAHOY:  Objection to form.  Outside
13    the scope.
14             THE WITNESS:  I don't know if it is plural
15    systems in this case.  I don't know if it was one
16    system or more systems that were being covered by
17    those agreements.
18    BY MR. VAN HOVEN:
19        Q.   Right.
20             So -- but whether it's one or more
21    systems, the agreement is the agreement is for the
22    system; right?
23        A.   I don't know.  I was just saying I didn't
24    know whether it applied to plural systems.
25        Q.   But you do know that the agreement