ATTACHMENT 15

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1                UNITED STATES DISTRICT COURT

 2             FOR THE NORTHERN DISTRICT OF CALIFORNIA

 3                   SAN FRANCISCO DIVISION

 4

 5

 6

 7                                 )

     SURGICAL INSTRUMENT SERVICE   )

 8   COMPANY, INC.,                )

                                   )

 9                                 )

            Plaintiff,             ) Case No. 3:21-cv-03496-VC

10                                 )

          vs.                      )

11                                 )

     INTUITIVE SURGICAL, INC.,     )

12                                 )

                                   )

13                                 )

            Defendant.             )

14   _____  )

15

16   HIGHLY CONFIDENTIAL, ATTORNEYS' EYES ONLY DEPOSITION OF:

17                    KURT HUMPHREY

18               WEDNESDAY, MARCH 15, 2023

19               10:25 A.M. (MST)

20

21

22

23

24   Reported by:   GINA M. CLOUD

25                  CSR No. 6315
```

Page 1

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        Q.   You mentioned reviewing your reports in this

 2   case.  You've issued two reports in this case; is

 3   that correct?

 4        A.   Yes.  The original expert report and a

 5   rebuttal report.                                    09:37:54

 6        Q.   And that original expert report was

 7   submitted in approximately December of 2022, correct?

 8        A.   Correct.

 9        Q.   If I refer to that report today as your

10   opening reporter, your December report, will you know  09:38:09

11   what I'm talking about?

12        A.   That's fine.

13        Q.   And then you said there is a rebuttal report

14   you submitted on March 1, correct?

15        A.   I believe that's the date, yes.           09:38:24

16        Q.   And if I refer to that as your rebuttal

17   report, or your March report, will you understand

18   what I'm saying?

19        A.   Yes, that's fine.

20        Q.   You also submitted an expert report in the   09:38:38

21   Rebotix matter, correct?

22        A.   That is correct.

23        Q.   And that report is attached to your opening

24   report?

25        A.   Yes, I believe so.                         09:38:53
```

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      Q.   If I refer to that report as your Rebotix

2   Report, will you understand what I'm referring to?

3      A.   Yes.

4      Q.   Mr. Humphrey, what are you an expert in for

5   purposes of this case?                                    09:39:32

6      A.   Reverse engineering of microelectronic

7   devices.

8      Q.   Reverse engineering of microelectronic

9   devices.

10          Anything else, or is that the full scope of       09:39:47

11   the expertise that you're advancing in this case?

12      A.   I certainly have expertise in extensive

13   working knowledge of engineering design, system and

14   component design.

15      Q.   Breaking each of those down, you said you         09:40:25

16   have expertise and extensive working knowledge in

17   engineering design.  What's the basis of your

18   expertise and working knowledge of engineering

19   design?

20      A.   I served as an engineering director for,          09:40:39

21   Taeus, and I spent most of 20-plus years in the

22   industry as a process development engineer or process

23   integration manager managing engineering programs.

24      Q.   When did you work at Taeus?

25      A.   From 1999 to 2005.                                 09:41:19

Page 13

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      Q.    After that did you have any role as an

2    engineering director or in process engineering?

3      A.    Only in my own engineering consulting

4    business.

5      Q.    What experience do you have in your          09:41:45

6    engineering and consulting business relating to

7    engineering design or system and component design?

8      A.    I've assisted some clients in doing

9    characterization of their products and their

10   manufacturing processes.                             09:42:10

11     Q.    What do you mean by "characterization of

12   products and manufacturing processes"?

13     A.    Characterization basically involves

14   recording, monitoring, and specifying parameters that

15   are important in either the manufacture of a given    09:42:37

16   product or in the operation performance reliability

17   of a given product.

18     Q.    So when you're advising a client on

19   characterization, what are the steps that you

20   undertake in advising them on operation performance   09:43:07

21   reliability?

22     A.    Some of the early steps are certainly to

23   understand the nature of the product, the desired

24   product performance, what is the product designed to

25   do, what is the application for the product, and      09:43:30

Page 14

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    keypunch cards and running them as batch jobs on an

2    IBM 360 main frame, so it does not look a like

3    computer sciences of today.

4          But we were writing programs in Fortran, as

5    I recall, maybe a couple other languages at the time.      09:55:21

6          Q.   Now you teach at a university, correct?

7          A.   Yes.  I do adjunct instruction in chemistry

8    for engineers.

9          Q.   Chemistry for engineers?

10         A.   Uh-huh.                                          09:55:47

11         Q.   Is that the specific class name or what is

12   the specific class name that you teach?

13         A.   It's general chemistry.  I say for engineers

14   because my students by and large are engineers.

15         Q.   Is that general chemistry class typically an   09:56:15

16   entry level chemistry class for freshmen or people

17   that are early in their trajectory?

18         A.   Yes.

19         Q.   Do you cover inorganic and organic

20   chemistry, or does it focus on just one of those?          09:56:36

21         A.   It's primarily inorganic chemistry, but we

22   do some sessions on organic chemistry as well.

23         Q.   Have you taught any other classes?

24         A.   No, not at a university level.

25         Q.   Have you ever taught any classes on reverse     09:57:04

Page 21

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1     engineering?

2          A.   Not formal classes outside the organization

3     which I was employed.

4          Q.   Circling back to your educational degrees,

5     you said you have a master's degree in ceramic          09:57:37

6     engineering, correct?

7          A.   Correct.

8          Q.   Did you prepare a thesis or dissertation as

9     part of your master's degree?

10         A.   Yes.                                           09:57:48

11         Q.   What was the topic of your dissertation?

12         A.   Microwave centering of varying titanate

13    ceramics and multilayer capacity.

14         Q.   If you had to describe that, you know, give

15    the elevator pitch of what the focus of that thesis     09:58:06

16    was, how would you describe that at a general level?

17         A.   Finding optimal ways to utilize microwaves

18    in the processing of barium titanate multilayer

19    capacitors.

20         Q.   I'm sorry.  I missed one thing you said.       09:58:38

21    Did you say titanium capacitors?

22         A.   Barium titanate.  Titanate, it's a barium

23    titanium oxide.

24         Q.   What is your current role?  Besides adjunct

25    professor, do you have other employment?                09:59:07

Page 22

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          A.    Just my consulting business.

2          Q.    And that's IP Enginuity LLC?

3          A.    Correct.

4          Q.    What is your role at IP Enginuity LLC?

5          A.    I'm the founder, the owner, and the managing          09:59:24

6     director for the company.

7          Q.    Does IP Enginuity LLC have other employees?

8          A.    Not at this time, no.

9          Q.    What kind of services do you provide through

10    IP Enginuity?                                                    09:59:43

11         A.    Basically all technical and engineering

12    services associated with largely -- largely

13    associated with intellectual property matters and

14    consulting on product process design and control.

15         Q.    How long have you been working for or          10:00:19

16    leading IP Enginuity?

17         A.    Since November of 2005.

18         Q.    Focusing on the period between November 2005

19    and the present and setting aside the adjunct

20    professor role, have you had any other employment in          10:00:46

21    that time period besides IP Enginuity?

22         A.    No.

23         Q.    What did you do before you founded

24    IP Enginuity in November of 2005?

25         A.    I was serving as director of engineering for          10:01:07

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    (Partial)."

2        A.   Yes.

3        Q.   What does the "partial" mean?

4        A.   It means that there are pending depositions

5    where the date has not been set necessarily and could      10:12:34

6    be -- could have been prior to or shortly after this

7    edition of my C.V.

8        Q.   So since you submitted this C.V. in December

9    1, 2022, have you testified in any other matters?

10       A.   No.                                                10:13:00

11       Q.   Have you been deposed in any other matters?

12       A.   No.

13       Q.   Have you submitted reports in any other

14   matters?

15       A.   Not beyond the matter that we're engaged in       10:13:17

16   now.

17       Q.   Other than your rebuttal report in this

18   case, you haven't submitted expert reports in any

19   other matters since the time you prepared this C.V.?

20       A.   Yes, I believe that's true.                       10:13:34

21       Q.   So this should be an accurate list of all of

22   your testimony in the last four years?

23       A.   Yes.

24       Q.   And it also should be an accurate list of

25   all of your expert reports that have been issued in        10:13:52

                                                    Page 30

1    the last four years?

2        A.   For those that have been submitted to the

3    court, yes.

4        Q.   What do you mean by "submitted to the

5    court"?                                          10:14:10

6        A.   I think I have written a couple of reports

7    that the client anticipated submitting in a case, but

8    either the case settled and it was not submitted or

9    something along those lines.

10       Q.   A number of these cases, you list IPR cases   10:14:41

11   for Ocean Semiconductor LLC; is that correct?  Ocean

12   Semiconductor was your client in those cases?

13       A.   Yes.

14       Q.   What is Ocean Semiconductor?

15       A.   They are a nonpracticing entity owning a      10:15:17

16   number of patents.

17       Q.   Approximately how long have you been working

18   with Ocean Semiconductor?

19       A.   I'm going to say maybe three years.

20       Q.   So turning back a page to your various jobs   10:16:02

21   after obtaining your degrees, as part of any of those

22   roles, have you ever performed a cybersecurity threat

23   assessment?

24       A.   No.

25       Q.   Have you ever been hired to consult on        10:16:37

                                                     Page 31

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    cybersecurity risks for any client's product?

2         A.   Not that I recall, no.  Not specifically for

3    that purpose.

4         Q.   I want to turn next to Attachment 2 of your

5    report, of your opening report, titled "List of          10:17:10

6    Materials Cited."  Do you see that?

7         A.   I'm sorry.  What page of the report are you

8    referring to?

9         Q.   It says "Attachment 2" at the top right

10   behind your C.V.  I don't see a page number on it.      10:17:32

11        A.   Yes.

12        Q.   Is this an accurate list of all the

13   materials you considered in preparing your opening

14   report in this matter?

15        A.   Yes, I believe so.                            10:17:55

16        Q.   Were there any materials that you asked to

17   review in connection with preparing your opening

18   report?

19        A.   Can you clarify the question, please?  I'm

20   not sure I understand.                                  10:18:27

21        Q.   Did you ask for any materials to use in

22   preparing the opinions that you presented in your

23   opening report?

24        A.   I don't recall making any specific requests.

25        Q.   I think this follows from that answer, but   10:19:10

Page 32

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    just to be clear, was there anything you asked to

2    review in connection with this case, but were not

3    provided?

4         A.   I've asked some questions regarding

5    reliability, information, documentation, and field        10:19:32

6    returns or complaints, customer complaints.  I have

7    not seen any documentation along those lines.

8         Q.   I just want to make sure I got that list

9    down.  You asked some questions about documents

10   relating to reliability?                                  10:19:58

11        A.   Field failures, product returns, customer

12   complaints.

13        Q.   Why would it be of interest in preparing

14   your opinions to see documents relating to

15   reliability?                                              10:20:27

16        A.   To understand some of the design motivations

17   on the part of Intuitive.

18        Q.   What about field failures, why would it

19   matter for purposes of your opinions to see documents

20   about field failures?                                     10:21:00

21        A.   Product failures inform the planning and

22   engineering and design of next generation product.

23        Q.   What do you mean by "failures"?

24        A.   Product in the field that is not performing

25   to specification.                                         10:21:33

Page 33

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      BY MS. CAHOY:

 2          Q.   Who is Gwen Mandel?

 3          A.   She is the software consultant that they

 4      hired to analyze the X/Xi EndoWrist encryption.

 5          Q.   What did you discuss with Ms. Mandel?        10:58:45

 6          A.   Just the approach that she was using in some

 7      of the tools and procedures she was using to

 8      communicate with the EndoWrist and the Atmel CryptoRF

 9      chip.

10          Q.   Was anyone else present during the           10:59:35

11      discussions you had with Ms. Mandel?

12          A.   No, I don't believe so.

13          Q.   Did you attempt to replicate any of

14      Ms. Mandel's work on the X/Xi?

15          A.   No.                                          11:00:02

16          Q.   Did you undertake any steps to verify the

17      procedures she was using?

18          A.   No.  There wasn't any real need to verify

19      her work.  The tools she was using and the steps she

20      was using are already known, and I've used those      11:00:26

21      procedures in the past.

22          Q.   When have you used those procedures in the

23      past?

24          A.   When we've been tasked with dumping code

25      from a target product for a client and analyzing that  11:00:45
```

Page 43

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    code and determining and doing software analysis.

 2         Q.   Have you used those procedures specifically

 3    on an Atmel CryptoRF chip?

 4         A.   No.

 5         Q.   Have you used those procedures specifically    11:01:19

 6    on an Intuitive EndoWrist product?

 7         A.   No.

 8         Q.   Did Ms. Mandel disclose any relationship she

 9    had with other employees of Rebotix?

10         A.   No, not at the time we spoke.               11:01:47

11         Q.   Did she disclose that at another time?

12         A.   I do remember later learning that I think

13    she is Stan Hamilton's daughter, but I'm going from

14    memory on that.

15         Q.   Approximately when do you believe you        11:02:07

16    learned that?

17         A.   I would say a month or two later maybe.

18         Q.   How did you come to learn that Ms. Mandel

19    was Stan Hamilton's daughter?

20         A.   I don't even remember.  I think it was in a   11:02:31

21    conversation.  I don't remember whether it came from

22    the attorneys that engaged me or from Stan or Gwen, I

23    don't know.  I don't remember.

24         Q.   Did the fact that Ms. Mandel was Stan

25    Hamilton's daughter affect your reliance on her        11:03:12
```

Page 44

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    procedures in any way?

2        A.   No, none whatsoever.

3        Q.   Is that a fact you would have wanted to know

4    before you put in your opening report?

5            MR. VAN HOVEN:  Objection to form.        11:03:36

6            THE WITNESS:  No, not necessarily.  It's

7    irrelevant to my opinion.

8    BY MS. CAHOY:

9        Q.   I want to turn to Section 3 of your report

10   where it says "Engagement and Compensation."  This is    11:04:02

11   on page 4 and specifically I'm looking at paragraph

12   13 that lists the compensation for times that

13   preparing this report and deposition testimony.

14           So is it accurate that you are being

15   compensated at a rate of $450 per hour for your work     11:04:32

16   in the Surgical Instrument Services case?

17       A.   Yes.

18       Q.   Approximately how long have you -- how much

19   time have you spent working on the case thus far?

20       A.   I don't have an accurate amount of time for     11:04:57

21   that.  I'm going to guess it's in the vicinity of

22   30 hours or so.

23       Q.   And that would be in addition to the time

24   you spent working on the matter in connection with

25   the Rebotix case; is that correct?                       11:05:22

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      Q.   And then can you read the next sentence,

2   please.

3      A.   "Intuitive also states that the 'data on

4   RFID tag are encrypted and password-protected,' close

5   quote, and that the, quote, 'encryption key and use        11:56:19

6   counting data areas on RFID tag are one-time

7   programmable and cannot be modified once written,'"

8   close quote.

9      Q.   Do you have any reason to believe that what

10  you wrote there in paragraph 23 is inaccurate?            11:56:40

11     A.   No.  I believe that is what you find in the

12  Intuitive references that are cited.

13     Q.   Do you have any reason to believe that those

14  Intuitive references are inaccurate?

15     A.   Not beyond what I would say is commonplace      11:57:22

16  in the industry and what Ms. Mandel has observed in

17  analyzing the data from the Atmel chip.

18     Q.   So you believe something that is commonplace

19  in the industry makes this paragraph inaccurate?

20     A.   No.  The paragraph I think is accurate.  I     11:58:07

21  would just question whether the statement made in the

22  Intuitive reference is actually accurate.

23     Q.   And the basis for you questioning that is

24  what Ms. Mandel has told you?

25     A.   Yes.  That's one of the reasons, yes.          11:58:38

Page 69

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    Q.   So would it surprise you to learn that the

2    data on the RFID tag for the X/Xi EndoWrists is

3    encrypted at rest?

4    A.   That would be new evidence that I have not

5    seen.                                              11:59:00

6    Q.   If that were the case, would that change any

7    of your opinions?

8    A.   No, I don't believe so.  To the extent that

9    I have not been asked or opined on the amount of time

10   or resources that it would take to reset the use      11:59:27

11   counter, I think it might make the process more

12   difficult, but I don't think it would change the

13   final conclusion, no.

14   Q.   And if you learned that Ms. Mandel was wrong

15   about the data on the tag being encrypted at rest,    11:59:58

16   would that call into question in your mind any of the

17   procedures she told you she was using?

18   A.   Well, there would need to be additional

19   steps taken to deal with the encrypted data.

20   Q.   Would that call into question in your mind    12:00:32

21   the technical qualifications of Ms. Mandel if she was

22   wrong about whether the data is encrypted at rest?

23   A.   I guess I would have to say I don't feel I

24   can really give you a good answer to that.  I'm not

25   privy to any of the work that she's done for over a    12:01:02

Page 70

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    year and a half, so I don't even know for sure

2    whether she would still maintain that same position

3    or not.

4            MS. CAHOY:  I know we've been going for over

5    an hour, so if now is a good time for a break, that        12:01:23

6    works on my end.

7            MR. VAN HOVEN:  Let's go ahead.

8            MS. CAHOY:  Can we go off the record,

9    please, Scott.

10           THE VIDEOGRAPHER:  We are off the record.        12:01:33

11   The time is 1:01 p.m.

12           (At the hour of 1:01 p.m., a luncheon recess

13   was taken.  The deposition was resumed at 1:30 p.m.,

14   the same persons being present.)

15

16

17

18

19

20

21

22

23

24

25

                                                Page 71

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    Laguna Niguel, California, Wednesday, March 15, 2023

 2                      1:30 p.m.

 3            THE VIDEOGRAPHER:  We are back at record.

 4    The time is 1:32 p.m.

 5                  EXAMINATION (RESUMED)                  12:32:14

 6    BY MS. CAHOY:

 7        Q.   Good afternoon, Mr. Humphrey.  I'm going to

 8    take us back to your opening report, so Exhibit 316,

 9    and turning back to page 9, so this is of the opening

10    report, not the Rebotix Report.                      12:32:36

11        A.   Yes.  I'm sorry.  This is page 9 of the

12    opening report, correct?

13        Q.   Yep.  Paragraph 27 is what I'm going to ask

14    about next.

15        A.   Okay.

16        Q.   Toward the bottom of that paragraph right

17    after footnote 32, there is a sentence that begins:

18    "Contrary to unencrypted hardwired data

19    communications between the EndoWrist's Dallas chip

20    and the S/Si robot."                                 12:33:21

21            Do you see that?

22        A.   Yes.

23        Q.   Am I understanding correctly there that

24    you're saying the Dallas chip used in the S/Si

25    EndoWrist is not encrypted; is that correct?         12:33:36
```

Page 72

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      "Cleartext data has been extracted from the chip."

2        Q.    And you did not do any independent

3    confirmation that Cleartext data had been extracted

4    from the chip?

5        A.    No.                                          12:58:06

6        Q.    You've never seen that data?

7        A.    No, I don't believe so.

8        Q.    What does Cleartext mean as you understand

9    it in that sentence?

10       A.    Unencrypted.  Cleartext data is unencrypted.    12:58:16

11       Q.    So if either of these point in b or c were

12    untrue, if the data were encrypted at rest, this

13    methodology would not work as described here,

14    correct?

15       A.    It would require that additional decrypting    12:58:44

16    of the extracted data.

17       Q.    In 39c where it says, "Cleartext data has

18    been extracted from the chip," did you confirm that

19    the Cleartext data referenced there is the use

20    counter data?                                          12:59:14

21       A.    No.

22       Q.    So you don't have an understanding of what

23    Cleartext data had been extracted?

24       A.    That is correct.

25       Q.    And then b where it says, "Initial and      12:59:28

Page 83

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    follow-up scans have provided no indication that

2    encryption of the EEPROM data at rest is implemented

3    on all sectors of the chip," do you have an

4    understanding of which sectors of the chip do employ

5    encryption?                                    12:59:51

6        A.   Per the Atmel data sheet, there is no

7    encryption feature associated with the data at rest,

8    only encryption of data that's being transmitted to

9    and from the chip.

10       Q.   So your view is that it's just not possible    13:00:35

11   on the Atmel CryptoRF chip to encrypt any of the data

12   at rest on that chip?

13       A.   No, I didn't say that.  You can program data

14   into the chip in whatever form you like.  The user

15   has the option of writing or programing whatever data    13:01:00

16   they like into the available memory space, and that

17   data can be encrypted or it cannot be encrypted.

18       Q.   So it's possible to program the data onto

19   the Atmel CryptoRF chip such that it will be

20   encrypted at rest?                              13:01:29

21       A.   Yes, I think that's possible.

22       Q.   Have you done any examination of the

23   X/Xi EndoWrist to determine whether the data on the

24   RFID chip is encrypted at rest?

25       A.   I have not.                            13:01:50

Page 84

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1     Q.   So you're relying entirely on Ms. Mandel's

2     observations for your belief that it is not encrypted

3     at rest?

4     A.   That, and the absence of any evidence that

5     I've seen of a decryption of process or algorithm on        13:02:08

6     the robot side, beyond decrypting the Atmel encrypted

7     communication.

8     Q.   Are you familiar with secure personalization

9     of chips?

10    A.   Yes.                                                    13:03:04

11    Q.   What is secure personalization?

12    A.   Can you give me one minute to close my

13    office door, please.

14    Q.   Of course.

15    A.   Thank you.                                              13:03:35

16         Your question was regarding secure

17    personalization and, generally speaking, it's just

18    the protection of data that the user is programing

19    into the memory.

20    Q.   Is secure personalization a type of                    13:04:05

21    encryption?

22    A.   Yes, it can be.

23    Q.   When you say it's the protection of the data

24    that the user is programing into the memory, what

25    type of protection are you referring to?                    13:04:40

                                                        Page 85

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      Q.   And that would have been that interview with

2    Stan Hamilton?

3      A.   Yes.

4      Q.   And you don't recall after that having any

5    communications with anyone at Rebotix?                    13:19:58

6      A.   That is correct.

7      Q.   Including Gwen Mandel?

8      A.   That is correct.

9      Q.   Continuing on to paragraph 35, do you see

10   about midway through the paragraph where you say:         13:20:29

11   "It simply made it much more difficult, expensive and

12   time consuming"?

13     A.   Yes.

14     Q.   You're not offering an opinion on the

15   quantification of how difficult, expensive, or time       13:21:00

16   consuming it would be to reverse engineer the X/Xi

17   EndoWrist interface, correct?

18          MR. VAN HOVEN:   Objection to form.

19          THE WITNESS:   No.   I'm not specifying any

20   quantity of time or resource necessary.                   13:21:20

21   BY MS. CAHOY:

22     Q.   And you haven't been asked in this case to

23   offer an opinion estimating the amount of time,

24   money, or resources it would take to reverse engineer

25   the X/Xi EndoWrist interface, correct?                    13:21:36

                                                     Page 93

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        A.   That's correct.  I have not been asked to

 2   provide that kind of information.

 3        Q.   Turning next to paragraph 36 which starts on

 4   page 14 and continues across to page 15 of your

 5   opening report, I'm going to ask you specifically      13:22:05

 6   about the last full sentence in the paragraph that

 7   appears on the top of page 15.

 8             Could you read that sentence for me.

 9        A.   "This reverse engineering work could have

10   been performed at any time in the last five years, if  13:22:24

11   not earlier, had the appropriate funding and

12   resources been available."

13        Q.   What's the basis for your opinion in this

14   sentence?

15        A.   Just that there is nothing that -- no         13:23:38

16   evidence I've seen that inherently shows this work

17   couldn't have been started much earlier.  The work

18   that's been described in the previous page in the

19   references from the Rebotix and the Restore

20   testimonies, there is nothing obvious that would have   13:24:12

21   inhibited beginning that work and having completed it

22   in the previous five years if the appropriate

23   monetary resources and technical resources had been

24   available.

25        Q.   Any other basis for that sentence?            13:24:39
```

Page 94

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        A.   No, I don't think so.

 2             MR. VAN HOVEN:  Again, since you're sort of

 3     at the end of a section, I wouldn't mind a break in

 4     the relatively near future.

 5             MS. CAHOY:  I just have a couple last        13:25:04

 6     questions relating to this section and then we can

 7     take a break, if that's okay with you, Mr. Humphrey.

 8             THE WITNESS:  Yes, go ahead.

 9     BY MS. CAHOY:

10        Q.   So you haven't personally attempted to      13:25:12

11     reverse engineer an X/Xi EndoWrist?

12        A.   That's correct.

13        Q.   And you haven't been asked as part of the

14     opinions you're offering in this case to reverse

15     engineer an X/Xi EndoWrist?                         13:25:26

16        A.   That's correct.

17        Q.   And you were not asked in the Rebotix case

18     to reverse engineer an X/Xi EndoWrist?

19        A.   That is correct.

20        Q.   And you have never successfully reverse      13:25:40

21     engineered an X/Xi EndoWrist?

22        A.   That's correct.

23             MS. CAHOY:  I think we'll move onto the next

24     section after the break, so this would be a good time

25     from my perspective to take a break.  We can go off   13:25:53
```

Page 95

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    record.

2          THE VIDEOGRAPHER:  We are off the record.

3    The time is 2:26 p.m.

4          (Recess taken.)

5          THE VIDEOGRAPHER:  We are back on the          13:46:24

6    record.  The time is 2:46 p.m.

7    BY MS. CAHOY:

8          Q.   Hi, Mr. Humphrey.

9          So before the break we were talking about

10   Section 5 of your opening report, and I want to turn   13:46:48

11   next to Section 6 which should be -- pick up on that

12   page we left off on, page 15 of your opening report.

13         A.   Yes, I'm there.

14         Q.   In that paragraph 37, the last sentence I

15   believe you mentioned this before, but earlier in      13:47:08

16   your testimony you said there that "The key factors

17   in making significant design or component changes to

18   any product are generally associated with

19   performance/reliability, availability, and/or cost,"

20   correct?                                               13:47:24

21         A.   Yes.

22         Q.   What is the basis of your opinion there that

23   those are the key factors in making significant

24   design or component changes?

25         A.   I guess the better part of 40 years in an    13:47:38

Page 96

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1     A.    Okay.  I'm getting there.  This is 92, 94,

2     okay.  094, correct.  Yes.

3     Q.    And just to make sure we're on the same

4     page, it says:  "Instrument Data Chips:  RFID

5     (IS4000) vs. Dallas (IS3000)" at the top.                14:28:48

6           Is that the page you're on?

7     A.    Yes.

8     Q.    Does this look familiar?

9     A.    Yes.

10    Q.    So this is a chart that appears to be              14:28:59

11    comparing the RFID chip in the X/Xi instruments to

12    the Dallas chips in the S/Si instruments, correct?

13    A.    Yes.

14    Q.    And if you look at the middle row that says

15    "Storage Space," do you see that?                        14:29:17

16    A.    Yes.

17    Q.    Under the RFID (IS4000) chip, it says

18    "8k bytes."

19    A.    Yes.

20    Q.    And under the Dallas chip, it says               14:29:27

21    "2k bytes."

22    A.    Yes.

23    Q.    Does that refresh your memory of the memory

24    size difference between the Atmel CryptoRF chip used

25    in the X/Xi EndoWrists and the Dallas chip used in       14:29:48

Page 112

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    the S/Si EndoWrists?

2        A.   Yes, that sounds about right, 4 to 1.

3        Q.   So picking up on the math calculations we

4    performed earlier, so 8,000 bytes would be

5    approximately 64,000 bits, right?                    14:30:06

6        A.   Right.

7        Q.   That would be the memory storage space for

8    the RFID chip in the X/Xi instruments?

9        A.   Correct.

10       Q.   And the Dallas chip has approximately 16,000   14:30:17

11   bits?

12       A.   Correct.

13            MS. CAHOY:  So with that, Miriam, could we

14   pull up -- we can close that exhibit.  Could we mark

15   Exhibit 319, and let's go with tab 12, please.       14:30:59

16            (The document referred to was marked as

17   Exhibit 319 for identification and is attached

18   hereto.)

19            MS. ARGHAVANI:  Should be introduced.

20   BY MS. CAHOY:

21       Q.   So, Mr. Humphrey, I'm marking as Exhibit 319

22   a document that ends in the first page on -- the

23   Bates stamp on the first page is Intuitive-02068686.

24       A.   I'm trying to load it.

25       Q.   This is a document that I'll represent to     14:32:01

Page 113

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    you, it appears that you cite on -- in footnote 52 of

2    your opening report.  So that's in paragraph 51, page

3    21, footnote 52, where it says 30(b)(6) deposition of

4    Grant Duque, Exhibit 266, Intuitive-02068686.

5         A.   Paragraph 51, you say?                    14:32:33

6         Q.   Yes.  Paragraph 51, footnote 52, which is

7    right at the end of that paragraph.

8         A.   Yes, okay.

9         Q.   Has that one loaded for you?

10        A.   Yes, it's loaded.                         14:33:01

11        Q.   Do you recognize this document as a 2011

12   e-mail produced by Intuitive that you reviewed in

13   connection with preparing your report?

14        A.   Yes.

15        Q.   If you look down towards the bottom of that  14:33:20

16   document, the original document says from Thomas

17   Cooper, Monday, May 23, 2011, and then "to" and with

18   some other names.

19             Do you see that?

20        A.   Yes.                                       14:33:35

21        Q.   If you go down almost to the bottom, there

22   is a numbered list and there is a number 5 that says:

23   "Our 64k bit requirement is a bit unusual."

24             Do you see that?

25        A.   Yes, okay.                                 14:34:00

                                                         Page 114

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      Q.   What is your understanding of what the

2    reference to 64k bit requirement means?

3      A.   The size of the memory.

4      Q.   So it's referring to a 64,000 bit

5    requirement, correct?                              14:34:23

6      A.   Yes.

7      Q.   And the CryptoRF Atmel chip has a 64,000 bit

8    memory?

9      A.   Yes, that's correct.

10     Q.   And the Dallas chip that was used in the      14:34:39

11   S/Si instruments does not have a 64,000 bit memory,

12   correct?

13     A.   That's correct.  It's not clear to me in

14   this reference as to what product they're referring

15   to.  The rest of that sentence refers to Ducati and  14:35:09

16   Orion, but I guess I think Orion is their name for

17   one of the X or Xi instruments.

18     Q.   But you're not sure what this e-mail is

19   discussing?

20     A.   I'm not sure what the 64-bit requirement,     14:35:37

21   what's the need for that?  It says it's a bit

22   unusual, but I don't know much or -- I'm not sure why

23   the writer is using that terminology, that

24   description.

25     Q.   So the writer is describing a 64k bit         14:35:58

Page 115

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1      requirement.  You don't know why they had that

 2      requirement?

 3          A.   No.  I'm not sure why or how they're using

 4      the 64 bits, if they're using all 64 bits, and I

 5      guess I'm not sure why they're stating it's unusual.    14:36:17

 6      Unusual because the Dallas chip has a smaller memory

 7      maybe, I don't know.  I'm not sure what the context

 8      is.

 9          Q.   You don't know what the context of this

10      e-mail is?                                               14:36:32

11          A.   Not for that particular statement, the

12      unusual nature of the 64 bit requirement.

13          Q.   You weren't involved in this discussion at

14      Intuitive?

15          A.   No.                                            14:36:45

16          Q.   You don't have any more background on what

17      happened before or after this discussion?

18          A.   That's correct.

19          Q.   Let's turn to the next page of your report,

20      so you can close that one, so page 22.  Actually        14:37:02

21      sorry, let's go -- I gave you the wrong reference.

22      Let's go to -- I'm trying to find the section on the

23      ███████████████████      I just have it written

24      down wrong here in my notes.  I think it's

25      paragraph 56, if you can turn there.                    14:38:46
```

Page 116

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



1      A.   I'm there.

2      Q.   ████████████████████████

3   ████████████████████

4      A.   Yes.

5      Q.   ████████████████████████████        14:39:11

6      A.   I████████████████████

7   ███████████████████████████

8      Q.   Yes.

9           ██████████████████████

10  ████████████████████████████████,           14:39:34

11  ████

12     A.   Yes.

13     Q.   ████████████████████████████████

14  ███

15     A.   That's correct.                     14:39:57

16     Q.   ██████████████████████████

17  ██████████████████████

18     A.   Yes.  It's ████████████████

19  ██████████████████████████████

20  ████████████████████████████████            14:40:24

21  ██████████████████████████

22  ████████████.

23     Q.   Let's turn to those figures.

24          Are you referencing the ones that come after

25  paragraph 58?                               14:40:51

Page 117

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1     good time for another break if you all want a break.

2            THE WITNESS:  Sounds good.

3            THE VIDEOGRAPHER:  We are off the record.

4     The time is 3:49 p.m.

5            (Recess taken.)                              14:49:40

6            THE VIDEOGRAPHER:  We are back on the

7     record.  The time is 4:07 p.m.

8     BY MS. CAHOY:

9        Q.   Mr. Humphrey, I would like to turn back now

10    to your Rebotix Report or your original report, which    15:07:11

11    appears as Attachment 3 to Exhibit 316.

12           So that's Attachment 3 to your opening

13    report in this case.  I'm going to start on page 14

14    of that report when you're able to get there.

15       A.   Okay.  I'm there.                              15:08:02

16       Q.   And we've discussed at a few points today

17    that a number of your opinions in this Rebotix Report

18    rely on information that you learned from Ms. Mandel;

19    is that correct?

20       A.   Yes.                                           15:08:22

21       Q.   Why did you rely on Ms. Mandel for purposes

22    of developing your opinions in this Rebotix Report?

23       A.   She was boots on the ground.  She was

24    hands-on as far as working directly with the

25    EndoWrist and the Atmel CryptoRF chipping              15:08:52

                                                    Page 123

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    communication.

2        Q.   Did she have any experience or expertise

3    that you didn't with respect to reverse engineering

4    the X/Xi use counter?

5        A.   No.  I don't recall anything specific about    15:09:13

6    that.

7        Q.   So you believe this is something you could

8    have done yourself?

9        A.   Well, it would have taken a team of us to do

10   that.  My expertise tends to be more in the hardware,    15:09:35

11   not the software side of things, so I would have used

12   one of my software experts probably to -- just as I

13   think there are teams of people working for both

14   Rebotix and Restore, as well as even third-party

15   labs, I think working to try and address this issue.    15:09:59

16       Q.   Would the software components include

17   encryption?

18       A.   Yes.

19       Q.   Would the software components also include

20   the data that's stored in the memory of the chip?    15:10:22

21       A.   Possibly some of the decoding of the data or

22   decrypting the data if the data was indeed encrypted.

23       Q.   Did you have any concerns that attempting to

24   replicate Ms. Mandel's methodology could present

25   copyright problems?    15:11:04

Page 124

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  A.   No, I didn't really consider that.

2  Q.   When you attempt to reverse engineer devices

3  as part of your consulting work, do you consider

4  copyright laws?

5  A.   We try to make sure we stay within the law     15:11:41

6  with any of the reverse engineering work we're doing.

7  Q.   Have you heard of a law called the Digital

8  Millennial Copyright Act?

9  A.   I've heard of it, yes.

10  Q.   Is that one of the laws that you try to stay    15:11:54

11  within when you're reverse engineering devices?

12  A.   Yes.  We try to observe whatever laws might

13  apply to the work that we're doing.

14  Q.   You try to stay within anti-hacking laws

15  when you're reverse engineering devices?            15:12:28

16  A.   Yes.  We avoid violating any law that we're

17  aware of.

18  Q.   If you look at footnote 46 on page 14 where

19  you're referencing a Proxmark III PM RFID research

20  tool.                                               15:13:04

21       Do you see that?

22  A.   I'm sorry.  Which page?

23  Q.   Page 14 of your Rebotix Report, should be

24  footnote 46.

25  A.   Yes.                                           15:13:23

Page 125

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    Atmel CryptoRF chip or on a nonreprogrammable portion

2    of the Atmel CryptoRF chip?

3         A.   No, I don't know.

4         Q.   Continuing down that page in paragraph 45,

5    here you call the extraction of the image from the          15:26:00

6    chip's memory, speaking here of the Atmel chip, a

7    simple process, correct?

8         A.   Yes.

9         Q.   So it's not just reprograming that you

10   called simple, you also called the extraction of the        15:26:27

11   image simple, right?

12        A.   Yes, it's straightforward.

13        Q.   And that's based on your understanding of

14   what Rebotix had found in its own analyses?

15        A.   No.  That's just based upon dumping the          15:26:45

16   contents of EEPROM memory.

17        Q.   Is it a simple process to dump the contents

18   of EEPROM memory from a read protected portion of a

19   chip?

20        A.   Simple, of course, is a relative term, but      15:27:12

21   yes, given sufficient resources, mapping the contents

22   of memory is doable.  Physical extraction methods are

23   not limited by re-protection.

24        Q.   So here what you mean is that if it can be

25   physically extracted, given sufficient resources, you      15:27:55

Page 131

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    view that as simple?

2        A.   Yes.  It's -- well, not necessarily

3    inexpensive, but it's straightforward.

4        Q.   But it's a simple process to extract the

5    file whether or not it's in a read protected portion      15:28:20

6    of the chip?

7        A.   Yes, it's relatively simple.

8        Q.   So extracting an image of a chip is simple,

9    reprograming a chip is simple, correct?

10           MR. VAN HOVEN:  Objection to form.           15:28:47

11           THE WITNESS:  No.  The reprograming isn't

12   necessarily simple, that could be challenging.  It

13   depends on how you go about it, when you're trying to

14   reprogram or program a new substitute device.

15   BY MS. CAHOY:                                         15:29:22

16       Q.   As long as the data is in a reprogrammable

17   portion of the chip, you think it's significantly

18   simpler than what Rebotix did on the S/Si EndoWrist

19   resets, right?

20       A.   Hypothetically, implementing the method of   15:29:38

21   resetting the counter could be simpler than the

22   interceptor approach used for the Si EndoWrist.

23       Q.   What do you mean by "hypothetically"?

24       A.   I don't know whether anyone has been

25   successful up to this time and actually demonstrating   15:30:19

Page 132

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   the capability.  The deposition from Kevin May and

2   Restore, and Stan Hamilton's testimony indicate that

3   they are extremely close and that they expect to

4   accomplish this by 2023, this year, later this year.

5           So based upon the people who are actually      15:30:53

6   working on it and have seen the data, it certainly

7   sound doable.

8       Q.   Can you turn to paragraph 47 on the next

9   page.

10      A.   Paragraph 47?                                 15:31:14

11      Q.   Yes.

12      A.   Okay.

13      Q.   Can you read the second sentence in that

14  paragraph, please.

15      A.   "After image extraction, the process of       15:31:38

16  resetting the usage counter on the X/Xi EndoWrists

17  will be easier than resetting the usage counter on

18  the S/Si EndoWrists due to the reprogrammable nature

19  of the CryptoRF chip."

20      Q.   So here you're not speaking in                15:32:04

21  hypotheticals, you said it would be than the S/Si

22  EndoWrist process due to the reprogrammable nature of

23  the chip, right?

24      A.   Yes.  Based upon successful image extraction

25  and the reprograming of a CryptoRF chip should be     15:32:24

                                          Page 133

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    straightforward, and maybe I should say the

2    programing of a CryptoRF chip should be

3    straightforward.  Maybe that should be expanded to

4    programmable, not just reprogrammable.

5        Q.   Go ahead.                                    15:33:03

6        A.   I'm looking for another reference here.  If

7    you look at page 20 from my opening report.

8        Q.   What should I be looking at there?

9        A.   Paragraph 49, an excerpt from the e-mail --

10   anyway the excerpt from the e-mail says:  "The unique   15:34:42

11   ID doesn't prevent reprocessors from putting lives

12   back on our instruments.  In principle, you could

13   copy the blob of data off a new instrument, then put

14   the same blob of data back on once it's expired, and

15   it will be good as new.  I believe the Dallas          15:35:02

16   implementation uses 'write once' region in the tag to

17   ensure the decremented lives stay decremented."

18            So this is an excerpt from an Intuitive

19   e-mail that basically alerts those in the design --

20   in the engineering community of the potential to just   15:35:28

21   again reprogram or program a same chip with the

22   extracted image and make it appear like a new

23   instrument.

24       Q.   Do you think that an internal Intuitive

25   e-mail alerts the engineering community to something?   15:35:52

Page 134

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1        A.    "Several additional factors make the process

2    of Rebotix's image analysis for the Xi EndoWrist

3    CryptoRF chip easier than others that I've

4    encountered in my career."

5        Q.    What's an example of a chip you were          15:42:33

6    referencing as one of the others you have encountered

7    in your career?

8        A.    We've encountered chips that were physically

9    rendered very difficult to physically analyze because

10   of protective materials that had been applied to the    15:43:13

11   chips so that deprocessing the chip was extremely

12   difficult, without destroying the chip, without

13   destroying the information you were looking at.  That

14   would be one example.

15       Q.    Are there any other examples that you've       15:43:37

16   encountered in your career that you think would be

17   more difficult?

18       A.    It kind of goes along with what I'm

19   mentioning in paragraph 71, 70 and 71 just below.

20   The fact that third parties like Rebotix have           15:43:57

21   familiarity with the embedded software and the data

22   in the memories of the EndoWrists of the S/Si

23   EndoWrists certainly gives them a leg up on analyzing

24   the images extracted from the X/Xi because they're

25   generally similarities within the same company or       15:44:32

Page 138

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1    same product line, lines of codes are used and

2    reused.

3           It's unusual for software to be totally new,

4    so there is an advantage that they will have in

5    analyzing these images since they've already done it      15:44:56

6    once for the earlier generation tools.

7       Q.   So that's what you're referencing in

8    paragraph 76 when you say:  "The similarity between

9    the data extracted from the Xi EndoWrist and prior

10   data analyzed by Rebotix on the S/Si EndoWrist makes      15:45:15

11   image analysis a straightforward process"?

12          MR. VAN HOVEN:  Objection to form.

13          THE WITNESS:  Yes.  And familiarity with the

14   software in question is certainly an advantage.  It's

15   generally quite helpful.  I've had that experience.       15:45:43

16   BY MS. CAHOY:

17      Q.   It makes it more straightforward to --

18      A.   Yes.  Often that's true.

19      Q.   But also you said here it would make it more

20   straightforward for Rebotix, right?                       15:45:58

21      A.   Yes, it should.

22      Q.   Are you aware that SIS has a damages expert

23   in this case who has submitted a few reports?

24      A.   I may have, again, anecdotally heard that

25   there were damage experts that were involved, but         15:46:59
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1     I've not seen any of their work or had any

 2     communication with them.  I don't know who they are.

 3         Q.   You've never spoken with SIS's damages

 4     expert?

 5         A.   No.                                    15:47:19

 6         Q.   Have you heard of a hospital called Larkin

 7     Community Hospital?

 8         A.   I have not.

 9         Q.   What about a hospital called Valley Medical

10     Center?                                         15:47:53

11         A.   No, I'm not familiar with it.

12         Q.   What about Franciscan Hospitals in the

13     Illinois and Indiana area?

14         A.   No, I'm not familiar with them.

15         Q.   Have you ever spoken with anyone from any of  15:48:08

16     those hospitals?

17         A.   No.

18         Q.   Have you ever spoken with Counsel for those

19     hospitals at firms such as Boni & Zach (phonetic),

20     Cohen Milstein or SRK Attorneys?                15:48:24

21         A.   No.

22         Q.   So as far as you're aware, you've never

23     spoken with either the hospitals or their counsel

24     that are suing Intuitive?

25         A.   That's correct.                        15:48:55
```

Page 140

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      Q.   Who wrote your Rebotix Report?

2      A.   I wrote it.

3      Q.   Did you receive input on that report from

4  Rebotix's counsel?

5      A.   There was certainly some internal review and      15:49:28

6  some feedback on it.

7           MS. CAHOY:  If we could take another break

8  now, I think I'm close to done.  I just want to look

9  back through and see if I have any questions left.

10          THE WITNESS:  Sounds good.                         15:50:24

11          MR. VAN HOVEN:  Let's go off the record.

12          THE VIDEOGRAPHER:  We are off the record.

13 The time is 4:50 p.m.

14          (Recess taken.)

15          THE VIDEOGRAPHER:  We are back on the              16:09:20

16 record.  The time is 5:09 p.m.

17 BY MS. CAHOY:

18     Q.   Mr. Humphrey, have any of your expert

19 opinions been excluded before?

20     A.   No.                                                16:09:53

21     Q.   Have you ever talked to someone identified

22 to you as an expert in this case by the name of

23 Philip Phillips?

24     A.   No, not that I can recall.

25     Q.   Have you ever talked to someone identified       16:10:14

Page 141

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1     to you as an expert in this case by the name of Jean

 2     Sargeant?

 3          A.   No.

 4          Q.   Have you ever talked to someone identified

 5     to you as an expert in this case by the name of         16:10:28

 6     Amandeep Mahal?

 7          A.   No.

 8          Q.   Have you ever talked to someone identified

 9     to you as an expert in this case by the name of

10     Russell Lamb?                                           16:10:42

11          A.   No.

12          Q.   Have you ever talked to someone identified

13     to you as an expert in this case by the name of

14     Richard Bero?

15          A.   No.                                           16:10:52

16          Q.   Have you ever talked to someone identified

17     to you as an expert in this case by the name of Kim

18     Parnell?

19          A.   No.

20          Q.   Have you ever talked to someone identified   16:11:02

21     to you as an expert by the name of Einer Elhauge?

22          A.   No.

23               MS. CAHOY:  That's all the questions I have

24     today.  I appreciate your time, Mr. Humphrey.

25               I would ask that we designate the transcript  16:11:20
```

Page 142

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    highly confidential, attorneys' eyes only until we

2    have a chance to review it under the provision of the

3    protective order.

4            MR. VAN HOVEN:  No questions from

5    Plaintiff's counsel.                              16:11:33

6            THE REPORTER:  Kate, do you need this

7    expedited or normal delivery?

8            MS. CAHOY:  I'll take a rough and expedited,

9    please.

10           THE REPORTER:  When would you like it?    16:11:58

11           MS. CAHOY:  Can you get it by Monday?

12           THE REPORTER:  Sure.

13           MR. VAN HOVEN:  Just a copy, normal time.

14           THE VIDEOGRAPHER:  We are off the record.

15    The time is 5:12 p.m. on March 15, 2023.          16:12:26

16           This concludes today's testimony given by

17    Mr. Kurt Humphrey.  The total number of media units

18    used was seven, and will be retained by Veritext

19    Legal Solutions.

20           (The deposition was concluded at 4:12 p.m.)   16:12:54

21

22

23

24

25

Page 143