# ATTACHMENT 35

```
1    UNITED STATES DISTRICT COURT

2    FOR THE NORTHERN DISTRICT OF CALIFORNIA

3    SAN FRANCISCO DIVISION

4

5     - - - - - - - - - - - - - - - - - - - -x

6    SURGICAL INSTRUMENT SERVICE COMPANY, INC.,

7                        Plaintiff,

8         -against-

9    INTUITIVE SURGICAL, INC.,

10                       Defendant.

11    - - - - - - - - - - - - - - - - - - - -x

12                    Virtual Zoom Deposition

13                    March 10, 2023

                      9:00 a.m.

14

15

16        VIRTUAL VIDEO DEPOSITION of PHILIP J.

17   PHILLIPS, in the above-entitled action, held

18   at the above time and place, taken before

19   Jeremy Richman, a Shorthand Reporter and

20   Notary Public of the State of New York,

21   pursuant to the Federal Rules of Civil

22   Procedure, and stipulations between Counsel.

23

24              *       *       *

25
```

Page 1

```
 1
 2    APPEARANCES:
 3
 4       MCCAULLEY LAW GROUP
                Attorneys for Plaintiff
 5              180 North Wabash Avenue, Suite 601
                Chicago, Illinois 60601
 6
         BY:   RICHARD MCCAULLEY, ESQ.
 7              STEPHEN SHERRY, ESQ.
 8
 9       COVINGTON & BURLING LLP
                Attorneys for Defendant
10              850 Tenth Street, NW
                Washington, D.C. 20001
11
         BY:   ANDREW LAZEROW, ESQ.
12              RACHEL GROSSMAN, ESQ.
                AYANA LINDSEY, ESQ.
13
      PRESENT:
14    NATHANIEL ARMSTRONG, Videographer
      DUANE MILNER, Concierge
15
                    *      *      *
16
17
18
19
20
21
22
23
24
25
```

Page 2

```
 1                P. PHILLIPS
 2   made.  They've issued a number of        09:20:52
 3   documents, including fellow legacy       09:20:54
 4   documents.                               09:20:54
 5           You mentioned the white          09:20:57
 6   paper.  There's a draft guidance         09:20:58
 7   document.  I view those as FDA           09:20:59
 8   statements as well as even requests      09:21:01
 9   that FDA reviewers have made of          09:21:05
10   companies that I've looked at.           09:21:07
11           So I have considered those       09:21:09
12   information, I considered those          09:21:11
13   government statements.                   09:21:13
14      Q.    You did not review any          09:21:15
15   statements by anyone at the FDA on the   09:21:18
16   topic of extending the uses of          09:21:19
17   EndoWrists; isn't that right, when you   09:21:21
18   submitted this opening report?          09:21:24
19      A.    I believe that that's          09:21:25
20   correct.  I mean, keep in mind, when I   09:21:31
21   issued a rebuttal report, and I know    09:21:35
22   we're not talking about the rebuttal    09:21:36
23   report, I did look at some requests for  09:21:38
24   additional information that came from    09:21:40
25   FDA.                                     09:21:42
```

Veritext Legal Solutions
866 299-5127

```
  1                    P. PHILLIPS
  2         Q.    What is that a reference to?      09:29:29
  3         A.    That was just simply FDA's        09:29:31
  4    characterization of the product code       09:29:35
  5    that was created for Intuitive's           09:29:36
  6    surgical devices.                          09:29:38
  7         Q.    Okay.  Were you aware as of       09:29:40
  8    December 2nd, 2022, that there was a       09:29:47
  9    product code QSM for remanufactured        09:29:48
 10    EndoWrists?                                09:29:53
 11         A.    I don't know the answer to       09:29:57
 12    your question.  It could have been just   09:29:59
 13    before the completion of my report or     09:30:02
 14    just after, I do not know precisely.      09:30:04
 15         Q.    You did not view that product    09:30:08
 16    code on the FDA website before you        09:30:09
 17    submitted this report?                    09:30:11
 18         A.    I believe that's correct.        09:30:14
 19    But again, if there's no reference to     09:30:15
 20    that product code in this document,       09:30:17
 21    then the answer would be no, I did not.   09:30:20
 22         Q.    Do you think you learned         09:30:21
 23    about it from the first time when you     09:30:24
 24    read Ms. Foreman's report that she        09:30:25
 25    submitted in this case?                   09:30:32
```

Page 36

```
 1                    P. PHILLIPS
 2     product code for the one that Iconicare    09:37:59
 3     did, we're going to take the exact same    09:38:04
 4     thing, a monopole or a curved scissors,    09:38:07
 5     we're going to extend the lives, what      09:38:10
 6     is your recommendation for what            09:38:11
 7     regulatory pathway, if any, they would     09:38:13
 8     have to follow?                            09:38:15
 9              MR. MCCAULLEY:  Objection to      09:38:16
10        form.                                   09:38:17
11        A.    Well, I believe that SIS          09:38:17
12     would not be subject to much regulation    09:38:19
13     because I would characterize their         09:38:21
14     activities as servicing.  I don't know     09:38:23
15     what is the actual contents of the         09:38:26
16     Iconicare 510(k).                          09:38:28
17              So when you say they're doing     09:38:30
18     what Iconicare is doing, I don't know      09:38:33
19     what Iconicare actually presented to       09:38:35
20     FDA and how that would actually impact     09:38:37
21     my assessment.                             09:38:41
22        Q.    SIS tells you, it says this       09:38:42
23     is what we're going to do.  We're going    09:38:47
24     to open up the EndoWrist, we're going      09:38:49
25     to take off the chip that's there,         09:38:52
```

Page 45

```
 1                    P. PHILLIPS
 2    right, and then we're going to put on      09:38:54
 3    our own chip, right.  You understand       09:38:56
 4    that's the basic process that Rebotix      09:38:58
 5    followed, right?                           09:39:02
 6              MR. MCCAULLEY:  Objection to     09:39:02
 7        form.                                  09:39:04
 8        A.    Well, I understand what          09:39:04
 9    Rebotix followed and what SIS intended     09:39:06
10    to follow.  I don't know what Iconicare    09:39:08
11    actually is doing or intended to do or     09:39:12
12    what they described to the FDA.            09:39:16
13        Q.    So it doesn't matter what        09:39:18
14    they're doing, is that what you're         09:39:19
15    saying?                                    09:39:22
16        A.    No, it matters very much what    09:39:22
17    they're doing.  It's just that SIS is      09:39:24
18    not doing what Iconicare was authorized    09:39:27
19    to do.  It's my understanding that SIS    09:39:31
20    and Rebotix did not completely relabel     09:39:33
21    their devices and offer them for sale      09:39:36
22    in the open market.                        09:39:39
23              Iconicare is perfectly free      09:39:41
24    to do that.  They have a 510(k)            09:39:42
25    clearance for a device.  Whether their     09:39:46
```

Page 46

```
 1                    P. PHILLIPS
 2    activity constitutes remanufacturing or      09:39:48
 3    servicing, I don't know exactly,             09:39:49
 4    because I've not seen the contents of        09:39:52
 5    their 510(k).  But I do know what they       09:39:54
 6    are authorized to do based upon the          09:39:57
 7    order that FDA issued to them in             09:39:59
 8    connection with their 510(k)                 09:40:02
 9    submission.                                  09:40:03
10          Q.    In your work in this case        09:40:04
11    from the beginning when you were             09:40:13
12    engaged until today, have you seen any       09:40:16
13    statement by any FDA official where          09:40:19
14    they have characterized the extension       09:40:22
15    of the lives of an EndoWrist as             09:40:24
16    servicing?                                   09:40:27
17          A.    No.                              09:40:27
18          Q.    Have you seen anywhere in all    09:40:34
19    of the work that you've done in this         09:40:38
20    case from the first day you were             09:40:41
21    retained until today where any FDA           09:40:42
22    official has characterized the               09:40:45
23    extension of lives as repair?                09:40:46
24          A.    No.                              09:40:51
25          Q.    You have seen that a number      09:40:51
```

Page 47

```
 1                    P. PHILLIPS
 2        A.    Yes.                        10:18:02
 3        Q.    Is it your understanding that   10:18:03
 4   the FDA created this product code for      10:18:05
 5   this particular device definition?         10:18:08
 6        A.    Yes.                        10:18:10
 7        Q.    So as of some point in          10:18:11
 8   recently this was a new product code?      10:18:17
 9        A.    Yes.                        10:18:20
10        Q.    Do you know when it was         10:18:20
11   created?                                10:18:22
12        A.    Well, it was in close          10:18:24
13   proximity to the 510(k) clearance with    10:18:27
14   Iconicare.                              10:18:30
15        Q.    And that was in September of   10:18:31
16   2022, correct?                          10:18:34
17        A.    Yes.  I mean typically         10:18:35
18   product codes are created very close to   10:18:37
19   the actual clearance date and before      10:18:39
20   clearance, but very close to the date.    10:18:42
21        Q.    And this is -- what does it    10:18:44
22   mean -- what does it mean in FDA world    10:18:47
23   when they list a product code, what is    10:18:53
24   the device definition mean?              10:18:55
25        A.    It's just, again, in my        10:18:58
```

Page 71

```
1                    P. PHILLIPS
2    I believe that opinion is.              10:37:17
3         Q.    Okay.  And you tell them I am  10:37:18
4    a hundred percent positive that this is  10:37:22
5    a significant change, that's your        10:37:25
6    opinion and you tell them I'm a hundred  10:37:28
7    percent positive of that.                10:37:32
8              Are you with me?               10:37:34
9         A.    Yes.                          10:37:35
10        Q.    And they say okay, what's     10:37:35
11   that mean, Mr. Phillips, what's your     10:37:37
12   response?                                10:37:39
13        A.    If you're 100 percent         10:37:39
14   positive that it is a significant        10:37:41
15   change that you made to the device,      10:37:42
16   then you're likely a remanufacturer.     10:37:44
17        Q.    And at that point you need to  10:37:49
18   have a 510(k) before you can market     10:37:50
19   your device, correct?                    10:37:52
20        A.    Well, again, depending on     10:37:53
21   what the change is, 510(k) may or may    10:37:59
22   not be appropriate.  Most likely I       10:38:04
23   would agree with you, 510(k) is          10:38:06
24   appropriate, but there's a chance it's   10:38:07
25   not.                                     10:38:09
```

Page 91

```
 1                    P. PHILLIPS
 2        Q.    Meaning it could be a PMA?      10:38:09
 3        A.    Could be a PMA or it could be   10:38:11
 4   another de novo request, a de novo        10:38:13
 5   classification request.                   10:38:16
 6        Q.    But they need some clearance    10:38:17
 7   from the FDA before they can market       10:38:18
 8   that device?                              10:38:20
 9        A.    If they conclude that it is a   10:38:21
10   significant change that they made to      10:38:23
11   the device, the answer is yes.            10:38:25
12        Q.    And then at that point          10:38:27
13   they're subject to all the general        10:38:28
14   controls of the device regulations,       10:38:30
15   correct?                                  10:38:33
16        A.    Yes.                            10:38:33
17        Q.    And they would have to          10:38:35
18   relabel, right?                           10:38:36
19        A.    Yes.                            10:38:43
20        Q.    I mean after they get           10:38:43
21   clearance from the FDA, they would have   10:38:44
22   their own label, correct?                 10:38:46
23        A.    That is correct.  Just like     10:38:48
24   Iconicare did.                            10:38:49
25        Q.    Okay.  Let's stay with this     10:38:50
```

Page 92

```
 1                    P. PHILLIPS
 2     510(k) clearances, very few.  Because      10:56:55
 3     510(k)s are generally cleared at lower     10:56:59
 4     levels within the organization.  When      10:57:02
 5     things were brought to my attention,       10:57:05
 6     which was not the norm, then there was     10:57:06
 7     a higher likelihood that there could be    10:57:08
 8     some differences of opinion as to what     10:57:11
 9     the appropriate classification would       10:57:13
10     be.                                        10:57:15
11             So on a whole, I didn't get        10:57:16
12     involved very much.  When I was            10:57:18
13     involved in it and that's generally the    10:57:21
14     review divisions coming to me for          10:57:22
15     advice, then things could go either        10:57:24
16     way.  There were generally more complex    10:57:27
17     situations that were under discussion.     10:57:30
18         Q.    Are you familiar with the FDA    10:57:31
19     guidance for medical device               10:57:33
20     classification product codes?              10:57:35
21         A.    No, not a guide specific to      10:57:37
22     product codes, no.                         10:57:44
23             MR. LAZEROW:  I'm going to         10:57:45
24         mark as DX, I think we're at 252       10:57:47
25         maybe, let me see, make sure I'm       10:57:54
```

Page 112

```
 1                    P. PHILLIPS
 2    Administration, document issued on        10:58:56
 3    April 11, 2013."                          10:59:05
 4              Do you see that?                 10:59:06
 5              (Exhibit 251, marked for         10:59:08
 6         identification, Medical Device        10:59:08
 7         Classification Product Codes,         10:59:08
 8         Guidance For Industry at Food and     10:59:08
 9         Drug Administration, document         10:59:08
10         issued on April 11, 2013.)           10:59:09
11         A.    Yes.                            10:59:09
12         Q.    And from your prior answer, I   10:59:09
13    take it you haven't seen this before?      10:59:10
14         A.    No.                             10:59:12
15         Q.    So you didn't view this in      10:59:12
16    preparation of your rebuttal report?       10:59:14
17         A.    No.                             10:59:17
18         Q.    What is your understanding of   10:59:17
19    what a guidance represents from FDA?       10:59:21
20         A.    Well, it's clear it explains    10:59:24
21    what it does not represent, that it is     10:59:33
22    an FDA requirement or it does not have     10:59:34
23    the force of a regulation, so it's         10:59:36
24    generally FDA expectations of a            10:59:38
25    subject.                                   10:59:41
```

Page 114

```
 1                      P. PHILLIPS
 2          Q.    Looking at DX251, do you have    11:02:04
 3     any reason to believe this is not a         11:02:08
 4     guidance that was issued by the FDA?        11:02:10
 5               MR. MCCAULLEY:  Objection to      11:02:15
 6        form, foundation.                        11:02:16
 7          A.    Certainly appears to be a FDA    11:02:17
 8     guidance document.                          11:02:19
 9          Q.    Okay, I'll represent I           11:02:20
10     printed it, we printed it off the FDA       11:02:21
11     website.  But nonetheless, you're           11:02:24
12     welcome to tell me, you know, it's not      11:02:27
13     a guidance if you think it isn't.  I'm      11:02:31
14     on page, what is page 5, I don't think      11:02:34
15     the numbers are numbered, so if we go       11:02:37
16     to PDF page 5, let me see if that's         11:02:41
17     where I want to be.  Yes.                    11:02:45
18               Go to PDF page 5 you'll see       11:02:46
19     right in the middle it says:  Premarket     11:02:49
20     Notification 510(K) Devices.  Do you        11:02:51
21     see that?                                   11:02:52
22          A.    Yes.                             11:02:57
23          Q.    And if you go down to C,         11:02:57
24     Assignment.  Do you see that?               11:03:00
25          A.    Yes.                             11:03:01
```

Page 118

```
 1                    P. PHILLIPS
 2        Q.    On the sixth line there's a      11:03:01
 3   sentence all the way to the right that      11:03:07
 4   starts "However, if."  Let me know when     11:03:09
 5   you're there.                               11:03:11
 6        A.    I'm there.                        11:03:11
 7        Q.    I'm sorry, I screwed up.  Go     11:03:12
 8   one sentence before that, do you see         11:03:17
 9   the sentence that starts "A device"?         11:03:18
10        A.    Yes.                              11:03:21
11        Q.    This guidance says "A device     11:03:21
12   will be assigned an existing                 11:03:24
13   classification product code when it has      11:03:25
14   the same intended use, indications for       11:03:27
15   use, and relies on technology that does      11:03:30
16   not raise new safety and effectiveness       11:03:32
17   questions."                                  11:03:40
18             Do you see that?                   11:03:40
19        A.    Yes.                              11:03:41
20        Q.    "However, if the proposed        11:03:42
21   device differs significantly from the        11:03:43
22   predicate device with respect to             11:03:45
23   technology, intended use or indications      11:03:47
24   for use was not found substantially          11:03:49
25   equivalent (NSE), a new product code         11:03:52
```

Page 119

```
 1                    P. PHILLIPS
 2     should be assigned."                    11:03:58
 3              Do you see that?               11:03:58
 4          A.    Yes.                         11:03:59
 5          Q.    Is that your understanding as  11:03:59
 6     to when a new product code gets        11:04:01
 7     assigned?                              11:04:03
 8              MR. MCCAULLEY:   Objection to 11:04:03
 9          form.                             11:04:04
10          A.    Yes, in general.  I mean this 11:04:04
11     is consistent with what I said before. 11:04:06
12     A reviewer, a reviewer doesn't assign  11:04:07
13     the product code, they have to work    11:04:12
14     with an operations group to create a   11:04:14
15     product code to be able to apply it in 11:04:15
16     the SE letter.                         11:04:18
17              So this isn't exactly         11:04:20
18     precise, but reviewers, as I said      11:04:22
19     before, it's the reviewer that         11:04:23
20     determines the need for a new product  11:04:25
21     code or the desire for a new product   11:04:27
22     code.                                  11:04:29
23          Q.    Does FDA do its best to     11:04:29
24     follow its own guidances?              11:04:32
25          A.    Usually.  In this particular 11:04:34
```

Page 120

```
1                    P. PHILLIPS
2     moving through the process in the major      11:10:28
3     deficiency section, FDA refers to the        11:10:30
4     device as a remanufactured device.           11:10:33
5              Are you with me?                     11:10:36
6         A.    Okay.                               11:10:37
7         Q.    Okay.  Does that change your        11:10:39
8     opinion in this matter?                       11:10:40
9         A.    No.                                 11:10:43
10        Q.    Okay.  Is Christy Foreman an        11:10:43
11    experienced regulatory professional?         11:10:48
12        A.    Yes.                                11:10:50
13        Q.    And so are you absolutely           11:10:51
14    stunned by the fact, by the facts you        11:10:56
15    read in her report and her reliance on       11:10:59
16    this product code?                           11:11:03
17        A.    I was a little surprised,           11:11:04
18    perhaps.  But again, you know,               11:11:08
19    different people have different              11:11:10
20    perspectives based upon their knowledge      11:11:12
21    and experience at FDA.  So it's not          11:11:14
22    unusual to have experienced regulatory       11:11:18
23    affairs people to have disagreements.        11:11:20
24        Q.    So what you're saying is            11:11:22
25    there's a chance she's right?                11:11:26
```

Page 127

```
 1                    P. PHILLIPS
 2    examples and not answering some of        11:51:03
 3    those examples, I think creates a         11:51:05
 4    tremendous amount of confusion.           11:51:08
 5         Q.    You're talking about the       11:51:09
 6    nondevice, nonspecific device example     11:51:11
 7    involving extending lives; is that what   11:51:15
 8    you're talking about?                     11:51:17
 9         A.    Yes.                           11:51:18
10         Q.    Okay.  And that was in 2018?   11:51:18
11         A.    It was in the white paper, I   11:51:21
12    believe it was 2018, yes.                 11:51:23
13         Q.    Right.  And I want you to      11:51:24
14    assume that every single time any FDA     11:51:31
15    official has been presented with the      11:51:37
16    question about whether extending the      11:51:39
17    lives of EndoWrists is manufacturing --   11:51:43
18    remanufacturing or servicing, every       11:51:47
19    single FDA official has said it's         11:51:50
20    remanufacturing.                          11:51:52
21              Can you assume that with me?    11:51:53
22         A.    Yes.                           11:51:55
23         Q.    I want you to assume that      11:51:56
24    this is the case from 2014 until          11:51:58
25    today -- actually, I'll give it better.   11:52:01
```

Page 158

```
 1                    P. PHILLIPS
 2              Since the day da Vinci was on    11:52:05
 3         the market until today, every single 11:52:07
 4         FDA official and every single time the 11:52:11
 5         FDA is presented with that question,  11:52:13
 6         they said it's remanufacturing.       11:52:15
 7              Are you with me?                  11:52:17
 8         A.    Yes.                             11:52:17
 9         Q.    Under my hypothetical, do you   11:52:17
10         still believe, do you believe that    11:52:19
11         there is ambiguity about whether that 11:52:21
12         activity is remanufacturing?          11:52:23
13         A.    Well, when you say "every       11:52:26
14         individual," that means the           11:52:27
15         Commissioner of FDA would weigh in on 11:52:28
16         that same decision.                   11:52:30
17         Q.    No, every individual who was    11:52:32
18         looked at it, every individual who has 11:52:34
19         communicated with anyone in industry, 11:52:36
20         who has done anything, anyone who has 11:52:39
21         communicated, whether they sent a     11:52:42
22         letter or copied a letter.            11:52:44
23         A.    I think that there's a chance   11:52:47
24         that the individuals could be wrong.  11:52:50
25         Q.    What's your percentage chance   11:52:52
```

Page 159

```
 1                    P. PHILLIPS
 2   everything from that conversation that      13:33:21
 3   you are relying on for your opinions in     13:33:24
 4   this opening report?                        13:33:27
 5        A.    Well, not necessarily for all    13:33:33
 6   of my opinions, but this was pivotal        13:33:35
 7   information that I wanted to glean from      13:33:38
 8   him what his intentions were and what       13:33:40
 9   his perspective was on these issues.        13:33:42
10        Q.    Is there information that         13:33:44
11   Mr. Posdal told you about their             13:33:48
12   activities in this area that is not         13:33:53
13   reflected in Paragraph 76 to 92?            13:33:55
14        A.    I don't believe so.              13:34:01
15        Q.    How long was the                 13:34:02
16   conversation?                               13:34:06
17        A.    I'm going to say maybe an        13:34:07
18   hour, 45 minutes or so, I don't know        13:34:11
19   exactly.                                    13:34:14
20        Q.    Sorry, were you saying that      13:34:14
21   it was one hour and 45 minutes?             13:34:16
22        A.    No, I would say maybe            13:34:18
23   45 minutes, a half hour to 45 minutes       13:34:21
24   is what I was thinking.  It was             13:34:25
25   relatively short.                           13:34:27
```

Page 220

```
 1                    P. PHILLIPS
 2         Q.    Did he suggest that you look      13:36:21
 3    at any documents?                            13:36:23
 4         A.    I don't believe so.  He was       13:36:27
 5    just answering the questions that I had      13:36:28
 6    prepared.                                    13:36:31
 7         Q.    Did -- was there anyone else      13:36:31
 8    involved in the conversation beside          13:36:33
 9    yourself?                                    13:36:36
10         A.    Counsel was involved.  And I      13:36:36
11    think that that was, maybe, I don't          13:36:38
12    remember it was Rick McCaulley or            13:36:43
13    Stephen Sherry.  There was counsel           13:36:47
14    involved as well.                            13:36:48
15         Q.    No one else beside counsel        13:36:49
16    and you and Mr. Posdal?                      13:36:51
17         A.    That's correct.                   13:36:52
18         Q.    Do you know if anyone             13:36:53
19    recorded the conversation?                   13:36:54
20         A.    I do not know.                    13:36:55
21         Q.    One of the topics that was        13:36:56
22    not discussed with Mr. Posdal was any        13:37:09
23    efforts that SIS undertook to                13:37:12
24    understand the applicable FDA                13:37:16
25    regulatory requirements, right?             13:37:18
```

Page 223

```
 1                    P. PHILLIPS
 2          A.    I don't believe I asked that      13:37:20
 3      question, correct.                          13:37:23
 4          Q.    And he didn't provide you any     13:37:24
 5      information about what efforts, if any,     13:37:29
 6      that SIS had taken to understand the       13:37:31
 7      applicable regulatory requirements?        13:37:35
 8          A.    That really wasn't an            13:37:37
 9      interest of mine, it did not come up.      13:37:39
10          Q.    Why not?                         13:37:41
11          A.    Well, I was doing an             13:37:42
12      independent assessment of the             13:37:46
13      situation.  And I really wasn't looking    13:37:47
14      for more of his perspective other than    13:37:50
15      just a description of his activities      13:37:52
16      and what his intent was.                  13:37:54
17          Q.    And so then when you             13:37:56
18      submitted your report in this matter,     13:38:00
19      you did not know what efforts, if any,    13:38:03
20      SIS had taken to conform to applicable    13:38:05
21      regulatory requirements, correct?         13:38:08
22          A.    Yes, correct.                    13:38:09
23          Q.    Can you go into your box and     13:38:13
24      find tab 31.  You'll have it in your      13:38:36
25      box also.  If you rather work off         13:38:50
```

Page 224

```
 1                P. PHILLIPS
 2    what it is that they're currently doing    14:12:14
 3    and maybe what it is that they desire      14:12:16
 4    to do.                                     14:12:18
 5          Q.    FDA looks at the activity      14:12:18
 6    that the entity is engaging in; isn't      14:12:21
 7    that right?                                14:12:24
 8          A.    Yes, they do.                  14:12:24
 9          Q.    FDA does not care what the     14:12:27
10    intent of the company is with respect      14:12:30
11    to how it determines whether a             14:12:31
12    particular activity is servicing or        14:12:35
13    remanufacturing, right?                    14:12:37
14          A.    Well, I believe that FDA just  14:12:39
15    simply assumes that the intent aligns      14:12:41
16    with whatever is included in the           14:12:43
17    submission.                                14:12:44
18          Q.    Well, what if there's no       14:12:45
19    submission and there's a company that's    14:12:48
20    engaged in an activity that it believes    14:12:50
21    is servicing, think about that             14:12:55
22    situation, so there's been no 510(k)       14:12:57
23    and FDA thinks it's remanufacturing,       14:12:59
24    that the activity is remanufacturing.      14:13:04
25              Does it matter to FDA that       14:13:06
```

Page 259

```
 1                    P. PHILLIPS
 2    the company thinks it's servicing?      14:13:08
 3          A.    Yes, absolutely.            14:13:10
 4          Q.    Why?                        14:13:11
 5          A.    Well, as I explained in one 14:13:13
 6    of my previous answers, before FDA      14:13:15
 7    draws any conclusions and draws, and    14:13:18
 8    considers enforcement actions, FDA      14:13:20
 9    virtually in all cases wants to know    14:13:23
10    what the company's perspective is.  If  14:13:27
11    they believe that they are engaging in  14:13:28
12    servicing activities, and they're not   14:13:30
13    remanufacturing, and their changes are  14:13:31
14    not significant changes, according to   14:13:34
15    the remanufacturing definition, FDA     14:13:36
16    would certainly want to know that.      14:13:38
17          Q.    Right.  But FDA would make  14:13:40
18    the determination based on whether the  14:13:41
19    activity are making significant         14:13:44
20    changes, right?                         14:13:50
21          A.    FDA will review the         14:13:50
22    application independent of whether the  14:13:52
23    change is significant or not.           14:13:54
24          Q.    Well, there's no application, 14:13:55
25    so there's no application -- sorry, I   14:13:57
```

Page 260

```
 1                    P. PHILLIPS
 2    then and he does today.              15:08:39
 3         Q.    You can put that aside.   15:08:41
 4              In your opening report you  15:08:52
 5    reference the fact that Intuitive had  15:08:53
 6    made changes to its own EndoWrist to   15:08:54
 7    extend the number of lives without     15:09:02
 8    going to the FDA to get a new 510(k).  15:09:03
 9              Do you remember that?       15:09:05
10         A.    Yes.                       15:09:06
11         Q.    And you did not -- were you  15:09:08
12    aware when you put that in your report,  15:09:12
13    were you aware that the FDA disagreed   15:09:14
14    with Intuitive, that they could follow  15:09:16
15    that pathway of not getting a new       15:09:22
16    510(k) clearance?                       15:09:25
17         A.    Yes.                        15:09:26
18         Q.    And are you aware that what  15:09:27
19    Intuitive did was they documented       15:09:30
20    within their files their decision       15:09:31
21    making around whether they needed to    15:09:34
22    get a 510(k)?                           15:09:36
23              Are you aware of that?       15:09:37
24         A.    Yes.                        15:09:39
25         Q.    Can you, you said your box  15:09:39
```

Page 296

```
 1                    P. PHILLIPS

 2    in Appendix C is provided as 30-50        15:14:57

 3    minutes, compared to 20 minutes in the    15:15:02

 4    previously cleared labelling."            15:15:03

 5             Do you see that?                  15:15:05

 6        A.   Yes.                              15:15:06

 7        Q.   So did you take this as FDA       15:15:06

 8    pointing out to Intuitive that the new    15:15:08

 9    filing has different number of uses and   15:15:10

10    reprocessing cycles from the original     15:15:16

11    device; is that right?                    15:15:19

12        A.   Yes.                              15:15:22

13        Q.   Okay.  And it says, if you        15:15:23

14    keep reading after E, you replied that    15:15:24

15    "These changes were made between          15:15:27

16    K173906 and the current submission        15:15:30

17    without 510(k) clearance on the basis     15:15:34

18    of FDA guidance deciding when to submit   15:15:35

19    a 510(k) for a change to an existing      15:15:39

20    device."                                  15:15:43

21             Do you see that?                  15:15:43

22        A.   Yes.                              15:15:44

23        Q.   And it continues and says         15:15:45

24    "and internally documented nonfiling      15:15:48

25    justifications."                          15:15:53
```

Page 302

```
 1                   P. PHILLIPS
 2            Do you see that?                15:15:53
 3      A.    Yes.                            15:15:53
 4      Q.    And so from this, do you take  15:15:54
 5  that what had happened with this          15:15:56
 6  particular submission is that Intuitive   15:15:58
 7  had documented in its files that          15:16:01
 8  pursuant to the guidance that is          15:16:03
 9  referenced there that it did not need a   15:16:05
10  new 510(k) submission, right?            15:16:09
11      A.    That was Intuitive's           15:16:11
12  decision, yes.                            15:16:12
13      Q.    Right.  FDA didn't agree with  15:16:13
14  that, right?                              15:16:15
15      A.    That's what this suggests,     15:16:16
16  yes.                                      15:16:18
17      Q.    It says "However," if you      15:16:18
18  keep reading, the last paragraph on       15:16:20
19  this page, "However, we believe that     15:16:22
20  changes to the reprocessing of your      15:16:23
21  device require a 510(k).  Your device    15:16:25
22  falls under the endoscope and            15:16:29
23  accessories regulation (21 CFR           15:16:31
24  876.1500).  Per Appendix E of FDA's      15:16:38
25  guidance reprocessing medical devices    15:16:41
```

Page 303

```
 1                    P. PHILLIPS
 2    but is not limited to items such as        15:48:36
 3    electrical safety, reprocessing,            15:48:38
 4    software and general performance            15:48:40
 5    testing.  By extending the number of        15:48:41
 6    uses and modifying the instrument with      15:48:43
 7    a new chip, the prior information is no     15:48:44
 8    longer valid and requires additional        15:48:46
 9    review to the new labeled usage limit       15:48:48
10    in order to establish safety and            15:48:52
11    effectiveness.  This is therefore           15:48:53
12    different than returning the device to      15:48:57
13    its original condition."                    15:48:59
14            Do you see that?                     15:49:00
15        A.    Yes.                               15:49:01
16        Q.    I take it you did not review       15:49:01
17    the document number CPT2000126 in the       15:49:13
18    course of your work on this manner; is      15:49:20
19    that right?                                 15:49:22
20        A.    I don't believe I did.            15:49:22
21        Q.    And do you have any reason to     15:49:23
22    believe that Mr. Lee did not understand     15:49:25
23    what it was that Rebotix Repair had         15:49:30
24    disclosed to him about their               15:49:34
25    activities?                                 15:49:35
```

Page 337

```
1                    P. PHILLIPS

2        A.    Well, I don't know what        15:49:36

3   Dr. Lee knew, but Dr. Lee doesn't have    15:49:41

4   the authority to take any significant     15:49:44

5   actions by way of a simple email.         15:49:45

6        Q.    Does he have the authority to  15:49:49

7   believe that the activities constitute    15:49:50

8   remanufacturing?                          15:49:51

9        A.    Well, he can believe whatever  15:49:52

10  he wants, but he doesn't necessarily      15:49:54

11  represent the opinion of FDA.  He may     15:49:56

12  suggest that that's the case, but by      15:50:00

13  corresponding informally by way of an     15:50:03

14  email, that is not an appropriate way     15:50:05

15  for FDA to cause any regulated entity     15:50:06

16  to take any kind of a significant         15:50:10

17  action.                                   15:50:11

18       Q.    Well, he asked them to stop,   15:50:12

19  right?                                    15:50:14

20       A.    Yes.                           15:50:14

21       Q.    He didn't dictate that they    15:50:15

22  have to stop, right?                      15:50:18

23       A.    I've had reviewers throughout  15:50:19

24  the years request all kinds of things     15:50:21

25  that upon any kind of a call or           15:50:24
```

Page 338

```
 1              P. PHILLIPS
 2    servicing."                          17:04:17
 3              Do you see that?           17:04:17
 4       A.    Yes.                        17:04:18
 5       Q.    You agree with that         17:04:18
 6    statement, right?                    17:04:19
 7       A.    Yes.                        17:04:20
 8       Q.    The next sentence reads,    17:04:20
 9    "Activities that are not intended to 17:04:22
10    significantly change the performance or 17:04:24
11    safety or specifications or intended 17:04:27
12    use of a device however, should still 17:04:30
13    be evaluated to determine whether the 17:04:34
14    change significantly affects device  17:04:36
15    performance and safety specifications 17:04:39
16    or intended use."                    17:04:40
17              Do you see that?           17:04:41
18       A.    Yes.                        17:04:42
19       Q.    Do you agree with that      17:04:42
20    statement?                           17:04:45
21       A.    I do.  The regulation says  17:04:46
22    just significantly changes the device. 17:04:48
23    But I agree with this statement.     17:04:50
24       Q.    Okay.  So the focus when    17:04:52
25    you're trying to make this evaluation 17:04:54
```

Page 396

```
 1                    P. PHILLIPS
 2    is on whether the activities        17:04:56
 3    significantly affect the device     17:04:59
 4    performance and safety specifications  17:05:02
 5    or intended use, right?             17:05:03
 6         A.    Yes.                      17:05:04
 7         Q.    The focus is not on whether  17:05:04
 8    the activities are intended to      17:05:07
 9    significantly change those items,   17:05:11
10    right?                              17:05:12
11         A.    That's correct.          17:05:13
12         Q.    You can put that one aside.  17:05:17
13               The -- I'm going all the way  17:05:24
14    back to our first document together,  17:05:28
15    which is your opening report.  Do you  17:05:29
16    have that in front of you?          17:05:34
17         A.    Yes, I do.               17:05:39
18         Q.    And I'm looking, when you  17:05:40
19    have it, at page 1 of your report.  17:05:43
20         A.    Yes.                      17:05:50
21         Q.    And page 1, I'm looking at  17:05:50
22    Paragraph 4 and the end of Paragraph 4  17:05:55
23    it says "In particular"?            17:05:58
24         A.    Yes.                      17:05:59
25         Q.    And there you lay out four  17:05:59
```

Page 397

```
 1                    P. PHILLIPS
 2   opinions that you hold in this matter,      17:06:03
 3   right?                                      17:06:07
 4        A.    Yes.                             17:06:07
 5        Q.    And I'm looking at number 4,     17:06:08
 6   which is on the next page, it says          17:06:11
 7   "Intuitive Surgical's customer             17:06:14
 8   communications alleged in SIS's            17:06:16
 9   complaint and court filings are simply      17:06:19
10   false and misleading."                      17:06:21
11              Do you see that?                 17:06:25
12        A.    Yes.                             17:06:26
13        Q.    Now in arriving at that         17:06:26
14   opinion, am I right, you did not review    17:06:32
15   actual communications that FDA sent to     17:06:34
16   customers, right?                          17:06:37
17        A.    That FDA sent to customers?     17:06:38
18        Q.    I'm sorry.  You did not         17:06:41
19   review actual communications that          17:06:42
20   Intuitive sent to customers?               17:06:45
21        A.    I think it was from the         17:06:47
22   complaint itself where these were          17:06:48
23   alleged actions that Intuitive had         17:06:50
24   taken.                                      17:06:53
25        Q.    Okay.  Did you ask to see the   17:06:53
```

Page 398

```
 1                      P. PHILLIPS
 2    actual communications?                    17:06:56
 3         A.    I did not.  I just went with   17:06:58
 4    what was there assuming they were         17:07:01
 5    factual.                                  17:07:03
 6         Q.    And if you turn to Paragraph   17:07:03
 7    99 of this report.  Are you there?        17:07:06
 8         A.    Yes, I am.                      17:07:23
 9         Q.    It's on page 31?                17:07:23
10         A.    Yes.                            17:07:25
11         Q.    Paragraph 99, just tell me if  17:07:25
12    I misunderstood what's here is you have   17:07:27
13    included allegations that were in SIS's   17:07:33
14    complaint and you've included, for        17:07:39
15    example, in their entirety with just      17:07:44
16    quoting directly from Paragraphs 123      17:07:46
17    through 125.                              17:07:49
18              Do I understand that            17:07:51
19    correctly?                                17:07:51
20         A.    Yes.                            17:07:52
21         Q.    And then the next, at the end  17:07:52
22    of page 31, you cite to and quote from    17:07:57
23    other allegations in the complaint; is    17:08:04
24    that right?                               17:08:06
25         A.    That's correct.                17:08:06
```

Page 399

```
 1                    P. PHILLIPS
 2        Q.    And you're writing on the        17:08:07
 3   next page from Paragraphs 97 through --      17:08:08
 4   and 98; is that right?                       17:08:13
 5        A.    Yes.                              17:08:14
 6        Q.    And then the next, the last       17:08:14
 7   paragraph on page 32, you are quoting        17:08:20
 8   from Intuitive -- I'm sorry, from SIS's      17:08:23
 9   opposition to the -- to Intuitive's         17:08:28
10   motion to dismiss, right?                    17:08:31
11        A.    Yes.                              17:08:33
12        Q.    Did you ask to see the actual     17:08:33
13   communications that were sent to            17:08:40
14   customers?                                   17:08:41
15        A.    No.                               17:08:42
16        Q.    Did you do anything to verify     17:08:43
17   that the allegations were -- in the          17:08:47
18   complaint of SIS were correct?               17:08:49
19        A.    Well, I assumed that there        17:08:52
20   are communications between Intuitive        17:08:54
21   and the hospitals or suppliers and that     17:08:56
22   they must be making statements that         17:09:00
23   relate to their position that the           17:09:02
24   activities constitute remanufacturing       17:09:04
25   and are illegal.                             17:09:06
```

Page 400

```
 1                    P. PHILLIPS
 2              I disagree with that.  I        17:09:08
 3    don't think that they are illegal.  So    17:09:09
 4    any communications that would suggest     17:09:11
 5    that, I think are false or misleading.    17:09:12
 6        Q.    Are you taking issue with --    17:09:15
 7    do you think it was false or misleading   17:09:19
 8    for Intuitive to tell customers,          17:09:20
 9    assuming they did, that the activity      17:09:22
10    was remanufacturing?                      17:09:25
11        A.    Yes, I think that's improper.   17:09:27
12        Q.    Was it false and misleading     17:09:29
13    for Intuitive to tell customers that      17:09:33
14    Intuitive viewed the activity as          17:09:35
15    remanufacturing?                          17:09:37
16        A.    Well, I think it is false or    17:09:40
17    misleading.  Now that may be what         17:09:44
18    Intuitive believes or wants to say.       17:09:48
19    But the facts of this case make it very   17:09:49
20    clear that no one knows what              17:09:52
21    constitutes remanufacturing versus        17:09:53
22    servicing.  FDA has not clarified the     17:09:55
23    issue, there's tremendous ambiguity       17:10:00
24    about that.                               17:10:03
25              So any communications that      17:10:03
```

Page 401

```
 1                     P. PHILLIPS
 2     would suggest that there has been some      17:10:05
 3     sort of interpretation I think is false     17:10:07
 4     or misleading under these                   17:10:09
 5     circumstances.                              17:10:10
 6          Q.    You would agree that experts     17:10:11
 7     may look at the specific issue of           17:10:13
 8     whether inserting a chip to reset the       17:10:15
 9     EndoWrist use counter is a significant      17:10:18
10     change that would make SIS a                17:10:21
11     remanufacturer, right?                      17:10:27
12          A.    They have, yes.                  17:10:28
13          Q.    Experts have come to             17:10:28
14     different conclusions on that, right?       17:10:30
15          A.    Yes.                             17:10:31
16          Q.    And so it's your view that       17:10:32
17     even though experts come to different       17:10:36
18     conclusions, Intuitive's not allowed to     17:10:37
19     say its own belief to customers that        17:10:40
20     this is actually remanufacturing?           17:10:46
21          A.    Well, they're expressing         17:10:47
22     their opinion.  I mean, why are they        17:10:49
23     expressing an opinion?  They obviously      17:10:50
24     want to communicate something and           17:10:52
25     elicit some sort of a response.  And to     17:10:53
```

Page 402

```
 1                      P. PHILLIPS
 2     statement, right?                        17:17:10
 3          A.    Yes.                          17:17:11
 4          Q.    And you think the definition  17:17:11
 5     of remanufacturer in the QSR is not      17:17:12
 6     clear, correct?                          17:17:14
 7          A.    I don't believe it's clear    17:17:15
 8     and as I state in Paragraph 11, I think  17:17:17
 9     FDA admits that.                         17:17:19
10          Q.    And you believe, it's your    17:17:20
11     opinion in this matter that SIS's        17:17:24
12     activities were not remanufacturing,     17:17:29
13     right?                                   17:17:32
14          A.    Correct.                      17:17:33
15          Q.    You've come to that           17:17:33
16     conclusion definitively, correct?        17:17:36
17          A.    Yes.                          17:17:38
18          Q.    Zero doubt in your mind       17:17:38
19     whatsoever?                              17:17:41
20          A.    Correct.                      17:17:41
21          Q.    And now when someone          17:17:42
22     concludes that a particular activity,    17:17:45
23     that activity is remanufacturing, you    17:17:47
24     believe it's, that's so clear that it's  17:17:50
25     just wrong?                              17:17:57
```

Page 409

```
 1                      P. PHILLIPS
 2          Q.    In Paragraph 123 that you      17:21:05
 3     quoted from the SIS complaint.            17:21:06
 4          A.    Well, that's not coming from   17:21:11
 5     Intuitive, correct.                       17:21:28
 6          Q.    Yeah, this is a quote that     17:21:28
 7     you lift directly from the SIS            17:21:30
 8     complaint?                                17:21:32
 9          A.    From the complaint, yes.       17:21:32
10          Q.    And my question to you is do   17:21:33
11     you see anything in there where there     17:21:35
12     is a direct quote allegedly from          17:21:41
13     communication by Intuitive?               17:21:43
14          A.    No, there's no level of        17:21:50
15     detail that includes a specific           17:21:51
16     complaint, no.                            17:21:55
17          Q.    And, in fact, Paragraph 123    17:21:56
18     doesn't even reference remanufacturing    17:21:58
19     at all, correct?                          17:22:00
20          A.    That is correct.               17:22:01
21          Q.    Paragraph 124, you don't see   17:22:03
22     any reportedly direct quotes from         17:22:07
23     communications by Intuitive to            17:22:10
24     customers, correct?                       17:22:12
25          A.    That's correct, this is again  17:22:14
```

Page 413

```
 1                    P. PHILLIPS
 2     from the complaint, it's not Intuitive.    17:22:15
 3          Q.    And that paragraph does not     17:22:19
 4     reference remanufacturing, correct?        17:22:21
 5          A.    That is correct.                17:22:22
 6          Q.    And the same is true for        17:22:25
 7     Paragraph 125, you don't see in that       17:22:27
 8     paragraph from SI's complaint any          17:22:30
 9     purportedly direct quotes from             17:22:33
10     Intuitive's communications to              17:22:35
11     customers, correct?                        17:22:36
12          A.    Correct.                        17:22:37
13          Q.    And you don't see anything      17:22:37
14     about remanufacturing in there,            17:22:39
15     correct?                                   17:22:41
16          A.    Correct.                        17:22:42
17          Q.    Okay.  And looking at           17:22:43
18     paragraph, the next page, you got,         17:22:44
19     you'll see the quote mark is right         17:22:48
20     before 97.  Do you see that?               17:22:53
21          A.    Yes.                            17:22:54
22          Q.    And I take it to mean you're    17:22:54
23     quoting directly from Paragraph 97 of      17:22:57
24     SIS's complaint.  Did I read that          17:23:00
25     correctly?                                 17:23:01
```

Page 414

```
 1                    P. PHILLIPS
 2    clear about this.                        17:24:43
 3         Q.    You can't conclude if this    17:24:48
 4    was false or misleading just based on    17:24:50
 5    this little snippet, you would need      17:24:50
 6    more information.  Is that fair to say?  17:24:52
 7         A.    I want to see the complete    17:24:52
 8    context, yes.                            17:24:54
 9         Q.    Then it says, if you continue 17:24:55
10    in that sentence, "SUCH that FDA and     17:24:56
11    other regulations, quote, may not        17:24:58
12    apply, end quote."                       17:25:01
13              Do you see that?               17:25:02
14         A.    Yes.                          17:25:05
15         Q.    And you would want more       17:25:05
16    context around that little snippet,      17:25:07
17    those three words that are purportedly   17:25:09
18    quoted before you could determine        17:25:12
19    whether that little quote there was      17:25:15
20    false and misleading, right?            17:25:16
21         A.    Well, again, I think in the   17:25:17
22    context of what we're talking about,     17:25:19
23    FDA has not clarified this situation to  17:25:21
24    the point where anyone can draw          17:25:23
25    conclusions about what, from a           17:25:25
```

Page 417

```
 1                     P. PHILLIPS
 2     regulatory perspective how this is          17:25:27
 3     going to be handled by the agency.          17:25:30
 4         Q.    And this -- sorry, were you        17:25:32
 5     done?                                        17:25:34
 6         A.    Yes.                               17:25:35
 7         Q.    And this is saying exactly         17:25:35
 8     what you just said, right, the              17:25:38
 9     regulations may not apply, which by         17:25:39
10     definition means they may apply,            17:25:42
11     correct?                                     17:25:44
12         A.    Yes, that's correct.  But I        17:25:46
13     think, again, the context in which          17:25:48
14     these communications are being made,        17:25:51
15     obviously, they're done for a               17:25:54
16     particular purpose.  What's Intuitive's     17:25:55
17     purpose about communicating these?          17:25:57
18         Q.    The next part of this              17:25:59
19     sentence says "Intuitive states without     17:26:07
20     any basis that, quote, the hospital has     17:26:08
21     no way to know whether the refurbished      17:26:11
22     instrument meets the rigorous               17:26:14
23     specifications, end quote, of Intuitive     17:26:15
24     and the FDA."                                17:26:17
25             Do you see that?                     17:26:18
```

Page 418

```
  1                    P. PHILLIPS
  2        A.    Yes, let me just read that.      17:26:20
  3    Yes.  What was your question?             17:26:35
  4        Q.    Just wanted to make sure you     17:26:37
  5    saw that.                                 17:26:38
  6        A.    Yes, I do see it.               17:26:38
  7        Q.    And you have no basis to say     17:26:40
  8    whether that statement is false or not,   17:26:45
  9    right?                                    17:26:48
 10        A.    That statement can be made       17:26:48
 11    within the context of all servicing      17:26:51
 12    operations, no matter what, whether      17:26:53
 13    they involve significant changes or      17:26:56
 14    not.  I mean that's just the nature of   17:26:58
 15    servicing.                               17:27:00
 16        Q.    Did you investigate in this      17:27:00
 17    matter whether hospitals had any way to  17:27:02
 18    know whether the refurbished instrument  17:27:06
 19    meets the specifications of Intuitive's  17:27:09
 20    EndoWrist?                               17:27:12
 21        A.    No, I don't think they do, I     17:27:13
 22    think it's a truthful statement.  What   17:27:14
 23    I'm saying is that any service           17:27:16
 24    organization that provides instruments   17:27:18
 25    to hospitals, hospitals cannot make      17:27:19
```

Page 419

```
 1                    P. PHILLIPS
 2    any usage limits for these types of          17:29:47
 3    devices.                                      17:29:51
 4          Q.    They've cleared the devices       17:29:51
 5    with the use limits that Intuitive had        17:29:54
 6    provided in their applications?               17:29:56
 7          A.    That's correct.                   17:29:57
 8          Q.    So you don't see any quotes       17:29:58
 9    from, purported quotes from                   17:30:02
10    communications by Intuitive to                17:30:09
11    customers in that Paragraph 98, right?        17:30:10
12          A.    That's right, that is a           17:30:13
13    characterization from the complaint, a        17:30:15
14    SIS characterization from the                 17:30:17
15    complaint.                                     17:30:19
16          Q.    And then if you look at the       17:30:19
17    last paragraph which I think is, I            17:30:21
18    cannot tell what it is, but it looks          17:30:27
19    like you took it from the opposition to       17:30:29
20    defendant's motion to dismiss.                17:30:31
21               Do you see that?                   17:30:32
22          A.    Yes.                              17:30:33
23          Q.    And SIS points to Intuitive       17:30:33
24    Surgical letters to customers that say,       17:30:36
25    for example, "The regulatory clearance       17:30:38
```

Page 422