# ATTACHMENT 44

SONYA D. WINNER (SBN 200348)
Email: swinner@cov.com
CORTLIN H. LANNIN (SBN 266488)
Email: clannin@cov.com
ISAAC D. CHAPUT (SBN 326923)
Email: ichaput@cov.com
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, California 94105-2533
Telephone: + 1 (415) 591-6000
Facsimile: + 1 (415) 591-6091

ALLEN RUBY (SBN 47109)
allen@allenruby.com
ALLEN RUBY, ATTORNEY AT LAW
15559 Union Ave. #138
Los Gatos, CA 95032
Tel: (408) 477-9690

*Attorneys for Defendant/Counterclaimant*
*Intuitive Surgical, Inc.*

[Additional counsel listed on the signature page]

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| SURGICAL INSTRUMENT SERVICE COMPANY, INC., <br><br>          Plaintiff/ Counterclaim-Defendant, <br><br> vs. <br><br> INTUITIVE SURGICAL, INC., <br><br>          Defendant/ Counterclaimant. | Case No. 3:21-cv-03496-VC <br><br> **MOTION OF INTUITIVE SURGICAL, INC. TO EXCLUDE TESTIMONY OF RICHARD BERO** <br><br> Hearing Date:  June 8, 2023 <br> Hearing Time: 1:00 PM <br> Hearing Place:  Courtroom 4 <br><br><br> Judge: Hon. Vince Chhabria |

# TABLE OF CONTENTS

NOTICE OF MOTION AND MOTION ........................................................................ 1

MEMORANDUM OF POINTS AND AUTHORITIES ............................................... 1

I.     INTRODUCTION ......................................................................................... 1

II.    FACTUAL BACKGROUND ........................................................................ 3

III.   ARGUMENT ................................................................................................ 5

      A.     Bero's Opinions Are Not Based Upon Reliable Data............................ 6

      B.     Bero's Estimates Are Insufficiently Grounded In The Record............................ 12

      C.     Bero's Lanham Act Damage Estimate Should Be Excluded............................. 14

IV.   CONCLUSION ............................................................................................ 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*3M Innovative Props. Co. v. Dupont Dow Elastomers LLC,*
   361 F. Supp. 2d 958 (D. Minn. 2005) ...................................................................................15

*In re Cathode Ray Tube (CRT) Antitrust Litig.,*
   2017 WL 10434367 (N.D. Cal. Jan. 23, 2017) .....................................................................12

*Clear-View Techs., Inc. v. Rasnick,*
   2015 WL 3509384 (N.D. Cal. June 3, 2015) ..........................................................................8

*Daubert v. Merrell Dow Pharms., Inc.,*
   509 U.S. 579 (1993) ....................................................................................................6, 12, 14

*Gen. Elec. Co. v. Joiner,*
   522 U.S. 136 (1997) ................................................................................................................6

*Grasshopper House, LLC v. Clean & Sober Media, LLC,*
   2021 WL 3702243 (9th Cir. Aug. 20, 2021) .........................................................................14

*Herman Schwabe, Inc. v. United Shoe Mach. Corp.,*
   297 F.2d 906 (2d Cir. 1962) ....................................................................................................6

*Huawei Techs., Co, Ltd v. Samsung Elecs. Co, Ltd.,*
   340 F. Supp. 3d 934, 995 (N.D. Cal. 2018) ............................................................................5

*ID Sec. Sys. Canada, Inc. v. Checkpoint Sys., Inc.,*
   249 F. Supp. 2d 622 (E.D. Pa. 2003) ......................................................................................9

*Ill. Tool Works, Inc. v. Rust-Oleum Corp.,*
   955 F.3d 512 (5th Cir. 2020) .................................................................................................15

*In re Imperial Credit Indus.,*
   252 F. Supp. 2d at 1012–13 & n.5 ...........................................................................................8

*In re Imperial Credit Indus., Inc. Sec. Litig.,*
   252 F. Supp. 2d 1005 (C.D. Cal. 2003) ..................................................................................6

*Kurin, Inc. v. Magnolia Med. Techs., Inc.,*
   473 F. Supp. 3d 1117, 1144–46 (S.D. Cal. 2020) .................................................................15

*In re Live Concert Antitrust Litig.,*
   863 F. Supp. 2d 966 (C.D. Cal. 2012) ..................................................................................12

*In re Live Concert Antitrust Litig.,*
   863 F. Supp. 2d at 973–76 ................................................................................................13, 14

*Magnetar Techs. Corp. v. Intamin, Ltd.,*
   801 F.3d 1150 (9th Cir. 2015) .................................................................................................8

i

*McGlinchy v. Shell Chem. Co.*,
    845 F.2d 802 (9th Cir. 1988) ...............................................................................12

*Mid-Am. Tablewares, Inc. v. Mogi Trading Co.*,
    100 F.3d 1353 (7th Cir. 1996) .............................................................................14

*Mission Viejo Florist, Inc. v. Orchard Supply Co., LLC*,
    2019 WL 13045054 (C.D. Cal. Feb. 28, 2019)................................................8, 9, 10

*Unwired Planet, LLC v. Apple Inc.*,
    2017 WL 589195 (N.D. Cal. Feb. 14, 2017) (Chhabria, J.) ......................................6

*Zenith Elecs. Corp. v. WH-TV Broad. Corp.*,
    395 F.3d 416 (7th Cir. 2005) (Easterbrook, J.) .......................................................8

**Other Authorities**

Fed R. Civ. P. 26 .............................................................................................................5

Fed R. Civ. P. 37(c)(1) ...................................................................................................5

Fed. R. Evid. 702 .......................................................................................................5, 6

Fed. R. Evid. 703 ...........................................................................................................6

**NOTICE OF MOTION AND MOTION**

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on June 8, 2023, at 1:00 PM, or as soon thereafter as available, in the courtroom of the Honorable Vince G. Chhabria, located at 450 Golden Gate Avenue, Courtroom 4, 17th Floor, San Francisco, CA 94102, Defendant/Counterclaimant Intuitive Surgical, Inc. will and hereby does move for an order excluding the opinions of Richard Bero, proffered as an expert witness for Surgical Instrument Services Company, Inc. ("SIS").

This Motion is based on this Notice of Motion and Memorandum of Points and Authorities, the accompanying Declaration of Ashley Bass and attached exhibits, any reply or other supplemental briefing and/or evidence submitted, and the oral argument of counsel.

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.     INTRODUCTION

SIS is a company in the medical equipment business that offers certain services to hospitals. One of the services SIS at one time offered to its customers was the modification of S/Si EndoWrists to override and reset the usage limits on the instruments. SIS did not undertake this process itself; rather, it served as a distributor to Rebotix, another company that developed a process to hack the EndoWrist use counter for S/Si instruments. The Rebotix process has never received FDA clearance. Through its relationship with Rebotix, SIS had six customers for reset S/Si EndoWrists. For those six customers, SIS provided reset services through Rebotix for 49 S/Si EndoWrist resets. SIS earned $38,900 in total revenue on this business. Bass Dec. Ex. 1 at 27, Schedule 14.0.

SIS has asserted Sherman Act and Lanham Act claims against Intuitive, claiming that SIS's business was harmed because "Intuitive has conditioned the sale and servicing of its da Vinci surgical robots on customers buying replacement EndoWrists from Intuitive instead of permitting customers to use repaired EndoWrists." *Id.* at 2.[1] SIS claims that but-for Intuitive's action, SIS's EndoWrist reset

---

[1] Bero throughout his report uses the incorrect term "repair" to refer to the remanufacturing operation SIS performed on EndoWrists. He does not, however, purport to offer an independent opinion that (continued…)

business would have been larger.  SIS offers the expert opinion of Richard Bero, a CPA, to estimate what SIS's lost profits would have been but for the challenged conduct.

Despite the fact that SIS earned $38,900 on its EndoWrist business, Bero's opening report asserted that SIS should have earned $22,424,938 to $102,624,836 (depending on his scenarios) on this business.  *Id.* at 6, Table 1.  Bero thus posited that at the low end, SIS's business would have grown to **over 500 times** SIS's actual revenues and at the high end **over 2,500 times** SIS's actual revenues.  Bero's analysis suffers from three core flaws:

**First**, although Bero is a CPA, his lost profits damages model includes as inputs unreliable "data" that no reasonable CPA would ever rely upon.  The underlying "data" for his lost profits analysis consists almost exclusively of undocumented "discussions" with SIS's employees and discussions with SIS's experts retained for the purpose of this litigation.  Bero did not consult financial statements or other contemporaneous business documents and did nothing to validate the oral information he received, which is far outside the professional standards as a CPA and leads to a fatally flawed damages analysis where multiple inputs have no reliable basis.  This includes assumptions from SIS's expert Jean Sargent that she admitted cannot be used for the purpose that Bero uses them.

**Second**, Bero's lost profits estimates are not supported by the record.  He ignores facts in the record that have a clear bearing on SIS's alleged lost profits.  He ignores the impact of competition in the but-for world from other competitors like Restore and Rebotix, which he simply does not account for.  He also ignores the impact of the absence of FDA clearance on customer demand for SIS's reset EndoWrist services in the but-for world; he simply assumes such clearance would not be necessary.  And, he gives short shrift to how SIS could zoom from 49 resets in the real world to 50,000 resets in the but-for world, giving no consideration to the considerable barriers and added costs that would inevitably entail.  Ignoring these issues leads to a lost profits damages model that fails to account for critical facts that would have substantially affected SIS's sales in the but-for world.

---

SIS's operations were merely "repairs."  This issue is addressed more fully in motions concerning the opinions of experts who do purport to opine on that point.

*Third*, Bero's estimated Lanham Act damages should be excluded because those estimates suffer from the same flaws as Bero's lost profits analysis and are also contrary to the law.[2]

## II.   FACTUAL BACKGROUND

Bero is a certified public accountant and full-time consultant.  Bass Dec. Ex. 1 at 3–4.  Since he received his CPA license, Bero's jobs have focused on litigation projects.  *Id.* Ex. 2 at 36:14–38:18.  Bero has never worked in the medical industry.  *Id.* at 44:23–45:16.  He only has vague recollections of a handful of cases related to the medical industry in which he provided testimony.  *Id.* at 45:17–52:4.  He has testified in a single antitrust case.  *Id.* at 52:23–55:7.

SIS retained Bero to estimate damages.  Bass Dec. Ex. 1 at 1.  His opening report provided three damages estimates:  (1) antitrust damages if Intuitive's X/Xi EndoWrist encryption is deemed illegal ("Scenario 1"), *id.* § XIV.E, (2) antitrust damages if X/Xi EndoWrist encryption is deemed legal but SIS's other antitrust claims succeed ("Scenario 2"), *id.* § XIV.F, and (3) Lanham Act damages, *id.* § XV.

Scenario 1 – X/Xi Encryption Illegal.  Under this scenario, Bero assumes third parties would have begun resetting X/Xi EndoWrists on January 1, 2020.  This scenario is premised on the assumption that it was illegal for Intuitive to use a different encryption method for X/Xi EndoWrists than the method it uses for S/Si EndoWrists.  This scenario thus assumes that Intuitive maintained the same S/Si encryption method for X/Xi EndoWrists in the but-for world.  Ex. 1 at 4–5, 46.

Bero then estimates what he believes SIS's profits would have been absent Intuitive's alleged conduct.  *Id.* at 46-57.  To calculate SIS's asserted lost profits, Bero begins by estimating "[l]ost EndoWrist repair units," meaning "the number of EndoWrist repairs SIS would have reasonably sold to customers through 2025" absent Intuitive's alleged conduct.  *Id.* at 46.  To derive those "lost" units, Bero starts with Intuitive's total sales of new EndoWrists and then estimates the percentage of those units he believes SIS would have later reset, based on a number of assumptions about what that hypothetical world would have looked like.  *Id.* at 46–53.  These assumptions include (1) the number of EndoWrists that expire in a year; (2) the number of customers that would be willing to use SIS's

---

[2] For the avoidance of doubt, Intuitive reserves the right to raise additional objections to Bero's testimony at a later date.  This brief focuses on issues fit for resolution at this stage of the case.

services; (3) the number of expired EndoWrists that would be collected from those customers; and (4) the number of collected EndoWrists that could be reset. Almost all of these assumptions – including those involving specific numbers – are based on Bero's "discussions" with SIS employees and other retained experts. He has not relied upon contemporaneous financial records or other business records.

Bero then takes his "would have been" reset EndoWrists and subtracts from them the 49 EndoWrist resets SIS actually sold in the real world, to derive "[l]ost EndoWrist repair units" – i.e., units supposedly lost because of Intuitive's alleged conduct. *Id.* at 46, 53. After that, he multiplies those "lost" units by SIS's prices to derive "lost" revenues. *Id.* at 53. Finally, he subtracts from those "lost" revenues the costs he claims SIS would have incurred performing those resets in two alternative scenarios: an "in-house" business model (where SIS would have performed EndoWrist resets itself and thereby incurred lower costs) and a "distributor model" (where SIS would have acted as a distributor for Rebotix or Restore, paying one of them to perform the resets and thereby incurring higher costs). *Id.* at 53–56. That calculation yields Bero's estimated profits SIS would have made but-for Intuitive's alleged conduct: $102.6 million if SIS had performed resets in-house, and $40.9 million if it had acted as a distributor for Rebotix or Restore. *Id.* at 57.

<u>Scenario 2 – X/Xi Encryption Legal.</u> In this alternative scenario, Bero assumes that X/Xi EndoWrist encryption was legal, and therefore applies a later start date to account for the time it would have taken for the third parties to hack into X/Xi EndoWrists. *Id.* at 57–58. He calculates damages under two alternative start dates for X/Xi resets: January 1, 2021 or January 1, 2022. *Id.* Bero claims X/Xi reset technology would have been developed and marketed by one of those dates, absent Intuitive's alleged conduct. He employs these dates in his model even though to date, no one has successfully developed a method to reset X/Xi EndoWrists. All of Bero's other assumptions in Scenario 2 remain the same as in Scenario 1. *Id.* at 57–58.

In Scenario 2, damages range from $22 million to $81 million, depending on both SIS's business model (in-house or distributor) and whether X/Xi reset technology would have been available in 2021 or 2022. *Id.* at 6 Table 1.

Lanham Act damages.  Bero separately estimates damages for SIS's Lanham Act claims.  To estimate Lanham Act damages, Bero takes his same number of "would have been" reset EndoWrists he uses for his Scenario 2 and multiplies that quantity by Intuitive's revenue per unit rather than SIS's.  *Id.* at 59.  He ignores, however, the fact that SIS's Lanham Act claim stems from allegedly false statements Intuitive made in letters sent to only *two* of SIS's customers.  *Id.* at 59; *see also id.* Ex. 3  at ¶ 45 n.95. Bero calculates damages based on "lost" sales to *all* potential SIS customers.  His report does not attempt to justify or explain this.  *Id.* Ex. 2 at 58:2–59:20.

Intuitive submitted a rebuttal to Bero's damages report from Dr. Loren Smith.  In response, Bero updated two calculation errors from his original report.  *Id.* Ex. 4 at 1–2.  Later, Bero submitted a second rebuttal report.  *Id.* Ex. 5.  Bero made a significant change in this report.  Bero reduced his cost estimates for both his in-house model and distributor model significantly based on new discussions he had with Chris Gibson, a Rebotix employee.  *Id.* at 7.  Although Gibson was fully available to Bero at the time of Bero's opening report, Bero did not speak with Gibson until drafting his second rebuttal report.[3]  *Id.* Ex. 2 at 194:11–195:5.  As a result of these conversations, Bero is no longer relying on the lost profits estimates in his opening report and is instead relying on the significantly higher estimates in his second rebuttal report.  *Id.* Ex. 5 at 11–12.

## III.    ARGUMENT

Expert witness testimony must (1) come from a qualified expert; (2) be helpful to the factfinder; (3) be based on sufficient facts or data; (4) use reliable principles and methods; and (5) reliably apply those principles and methods to the facts of the case.  Fed. R. Evid. 702.  The court's "gatekeeping" role requires evaluating both the reliability of the expert's methods and the connection between his

---

[3] Intuitive reserves the right to move to strike this portion of Bero's second rebuttal report and/or to provide responsive opinions from its own experts at the time of trial.  This information was available to SIS at the time of Bero's opening report, and there is no reason the information could not have been included in Bero's opening report.  At a minimum Bero should not be permitted to provide new material from his rebuttal report during SIS's case-in-chief.  "Rebuttal testimony cannot be used to advance new arguments or new evidence."  *Huawei Techs., Co, Ltd v. Samsung Elecs. Co, Ltd.*, 340 F. Supp. 3d 934, 995 (N.D. Cal. 2018) (quotation omitted); *see also* Fed R. Civ. P. 26(a)(2)(B)(i), 37(c)(1).

conclusions and the facts on which those conclusions are based.  *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 143–46 (1997).

The Court's gatekeeping role is particularly important when assessing expert damages estimates. As Judge Friendly explained in upholding the exclusion of an expert's testimony on lost profits, juries must be protected from experts presenting "an array of figures conveying a delusive impression of exactness in an area where a jury's common sense is less available than usual to protect it."  *Herman Schwabe, Inc. v. United Shoe Mach. Corp.*, 297 F.2d 906, 912 (2d Cir. 1962).  This fundamental principle holds true today.  *See, e.g.*, *Unwired Planet, LLC v. Apple Inc.*, 2017 WL 589195, at *2 (N.D. Cal. Feb. 14, 2017) (Chhabria, J.) (rejecting expert model with unsupported assumptions, noting it "shroud[ed] . . . results in an air of legitimacy . . . rais[ing] the risk of juror confusion, making it all the more essential that the Court exercise its gatekeeping function until admission is adequately supported").

Bero has never worked in the medical industry, and he has provided testimony in only a handful of cases related to any part of the medical industry.  Bass Dec. Ex 2 at 44:23–45:16; 45:17–52:4.  And, he has testified in only one antitrust case.  *Id.* at 52:23–53:7.  Bero has received a business valuation certification that was awarded largely based on a week-long course he took twenty years ago.  *Id.* at 42:22–43:16.

In short, Bero brings no specialized expertise to this case *apart from* his credentials as an accountant.  As shown below, he has failed to apply that expertise in a reliable way to generate opinions that satisfy the *Daubert* standard.

### A.     Bero's Opinions Are Not Based Upon Reliable Data.

Rule 703 allows experts to rely on evidence if "experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject," even if such evidence is inadmissible.  Fed. R. Evid. 703; *see also* Fed. R. Evid. 702.  This is permissible in part because the expert's "validation [of the underlying evidence], expertly performed and subject to cross-examination, ought to suffice for judicial purposes."  *In re Imperial Credit Indus., Inc. Sec. Litig.*, 252 F. Supp. 2d 1005, 1012 n.5 (C.D. Cal. 2003) (citing Fed. R. Evid. 703, Advisory Committee Note to 1972 Proposed

Rules), *aff'd sub nom*. *Mortensen v. Snavely*, 145 F. App'x 218 (9th Cir. 2005).  Here, Bero has not relied upon information that CPAs would typically rely upon in performing their duties.

The accounting profession has a number of standards governing what data accountants can rely on and how they should proceed when relying on information provided by others.  First and foremost, accountants relying on the work of others "should use professional judgment" to ensure compliance with rules preventing "knowing misrepresentations."  American Institute of Certified Public Accountants (AICPA) Code of Professional Conduct (2014) § 2.130.010, (hereinafter "AICPA Code").[4]  "Factors to consider in determining whether reliance on others is reasonable include reputation, expertise, objectivity, resources available to the individual or organization, and whether the other individual is subject to applicable professional and ethical standards."  *Id.*  These ethical rules apply to lost profits estimates prepared for litigation as well, according to one of the textbooks Bero cites.  AICPA Calculating Lost Profits, Practice Aid 06-4 at 5 (2006) (hereinafter "AICPA Lost Profits").[5]

There are also principles specific to the estimation of lost profits.  Accountants performing a lost profits analysis may reasonably rely on financial statements prepared by other accountants, with increasing levels of confidence depending on the level of assurance provided by the accountant who prepared them.  Audited and reviewed financial statements can be used with "assurance," while "compiled financial statements" (those where the CPA involved does not express an opinion on their accuracy) are the least reliable and should be used "with caution," though "[t]hey generally are better than financial statements which have had no association with a CPA."  Tyler J. Bowles & W. Cris Lewis, *A Note on the Credibility of Financial Data Used in Lost-Profit Appraisals*, Litig. Econ. Dig., Spring 1996, at 51 (Bass Dec. Ex. 10); *see also* AICPA, AR Section 80, *Compilation of Financial*

---

[4] Available at
https://us.aicpa.org/content/dam/aicpa/research/standards/codeofconduct/downloadabledocuments/2014december15contentasof2014june23codeofconduct.pdf.

[5] Available at https://egrove.olemiss.edu/cgi/viewcontent.cgi?article=1026&context=aicpa_guides.

*Statements* (2016) at 2521.[6]  Bero confirmed the distinctions between types of financial statements during his deposition. Bass Dec. Ex. 2 at 64:5–74:7.  Finally, reliability concerns are particularly acute when calculating lost profits for newly established businesses (like SIS's EndoWrist business), because "less data are likely to be available," meaning the accountant may "need to make more assumptions." AICPA Lost Profits, at 51.  But "[a]s in other areas, the practitioner needs to ensure that there is an adequate basis for the assumptions made."  *Id.*

Applying Rules 702 and 703 in light of these accounting principles, courts regularly exclude the opinions of accountants who rely on unreliable evidence to form their opinions.  *See, e.g.*, *Clear-View Techs., Inc. v. Rasnick*, 2015 WL 3509384, at *5 (N.D. Cal. June 3, 2015) (preventing an accountant expert from relying on the opinion of a technical expert because CPAs would not "normally rely" on such information); *In re Imperial Credit Indus.*, 252 F. Supp. 2d at 1012–13 & n.5 (excluding accounting expert's opinion that relied on excerpts "from an opinion given in adversarial litigation" that lacked "independent indicia of reliability" and was "not of a type reasonably relied upon by accountants in forming audit opinions").

In the same vein, courts regularly question damages estimates that simply "assume[]" a plaintiff's business projections are accurate, without any "independent assessment of [their] validity." *Magnetar Techs. Corp. v. Intamin, Ltd.*, 801 F.3d 1150, 1159 (9th Cir. 2015) (criticizing expert damages estimate that "only compared [plaintiff's] actual results versus their business plan, which showed that they did not achieve their business plan," and "did not delve into the merits of the projected results" (quotation and alteration omitted)); *Mission Viejo Florist, Inc. v. Orchard Supply Co., LLC*, 2019 WL 13045054, at *4 (C.D. Cal. Feb. 28, 2019) (rejecting expert damages calculation that "relied solely" on an "unverified estimate" from plaintiff); *cf. Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 420 (7th Cir. 2005) (Easterbrook, J.) (affirming district court's exclusion of corporate plaintiff's sales projections, used to show damages from breach of contract).  Underlying these lines of cases is

---

[6] Available at
https://us.aicpa.org/content/dam/aicpa/research/standards/compilationreview/downloadabledocuments/ar
-00080.pdf.

skepticism of relying on projections by self-interested parties. *See, e.g.*, *ID Sec. Sys. Canada, Inc. v. Checkpoint Sys., Inc.*, 249 F. Supp. 2d 622, 695–96 (E.D. Pa. 2003) (noting that plaintiff's president "had even more of an incentive than an independent expert making a projection, to inflate his own predictions of [product] sales and the ease with which [the products] could be produced and marketed").

In constructing his estimates of SIS's lost profits, Bero relies on "data" that no CPA would ever use. Bero largely based his assumptions on oral information provided to him by SIS and SIS's other experts. No documentary evidence was provided to Bero to support the information he received, and he has taken no steps to confirm the independent reliability of the information. The most problematic assumptions he makes include the following.

**First**, Bero has no reliable basis for the input in his damages model regarding his assumption of the number of hospitals that would have used SIS's reset EndoWrists, which he calls the "penetration rate." Bero's damages model assumes that SIS's penetration rate of hospitals affiliated with the Vizient Group Purchasing Organization is 15% in the first year, 30% in the second year, and 70% in the third year and each year thereafter. Bass Dec. Ex. 1 at 50–51. Bero relies for these penetration numbers solely on opinions offered by another SIS expert, Jean Sargent. *Id.* at 50 nn.376, 378-79.[7] Bero confirmed that Sargent provided no documentary evidence to Bero to support this assertion, and he was simply taking her word for it. *Id.* Ex. 2 at 145:25:–147:21. And as Sargent's deposition testimony revealed, her penetration rate numbers are nothing more than a guess – indeed, she has no idea how many Intuitive systems even exist within Vizient hospitals. *Id.* Ex. 6 at 221:2–20.

**Second**, Bero has no reliable basis for his next assumption that of the hospitals that would have used SIS's reset service, 70% of the EndoWrists of those hospitals would be collected for reset. Again, Bero relies upon Sargent for this information. *Id.* Ex. 1 at 51 n.380. And again, Bero confirmed that Sargent provided no documentary evidence to Bero to support this assertion, and he was simply taking her word for it. *Id.* Ex. 2 at 145:25–147:21. As Sargent testified, she actually has no idea how many EndoWrists would be collected from a given hospital. *Id.* Ex. 6 at 224:10–226:15, 307:5–15. She did

---

[7] Intuitive is simultaneously moving to exclude the opinions of Sargent on this and the next topic on which Bero also relies exclusively on her unsupported guesses.

not even investigate what the collection rate was at the one hospital she actually worked with. *Id.* at 215:4–216:4, 307:5–10. She admitted that there is no way based on her report "to determine how many EndoWrists would be collected by SIS from Vizient members." *Id.* at 224:10–18. Yet, that is precisely how Bero has used Sargent's unsupported collection rate assumption in his lost profits model.

**Third**, Bero's damages model relies upon an inflated expiration rate for EndoWrist instruments. The first step in his analysis is to calculate the number of EndoWrist instruments that expire in a given year (and therefore would be potentially candidates for the modifications SIS wished to offer). He uses an Intuitive spreadsheet to do so. But rather than calculating the average expiration rate across the whole set of instruments, Bero arbitrarily selects the "top 5" (in sales volume). *Id.* Ex. 1 at 48–49. Obviously, those instruments are used more frequently and therefore expire at a higher rate. Calculating across a larger set of the X/Xi population (information that was available to Bero) drops the expiration rate from 60% to 50%, and correspondingly drops Bero's damages estimates considerably. *See Id.* Ex. 3 at ¶¶ 37–38.

**Fourth**, Bero has no reasonable basis for his assumptions regarding SIS's costs in the but-for world. After determining the sales he estimates for SIS, he must deduct SIS's costs. Bero had available to him the actual costs SIS paid to Rebotix as a distributor for Rebotix, *id.* Ex. 1 at 56, Schedule 12.0, but Bero chose not to use those actual costs in his distributor model in his second rebuttal report. Similarly, Bero had available to him the actual cost that Rebotix charged Restore for chips, *id.* at 55, Schedule 10.0, but Bero chose not to use those actual costs as the costs Rebotix would have charged SIS in his in-house model in his second rebuttal report. Instead, Bero is now relying on oral information from Gibson claiming that Rebotix would have offered extremely low pricing to SIS, both for chips and as a distributor, which drives up Bero's lost profit damages dramatically. *Compare id.* at 55–-56 *with id.* Ex. 5 at 7–12. Bero relied on this conversation even though it directly contradicts Gibson's deposition testimony, as he admits in his report. *Id.* at 9 n.43, 10 n.47. And, Bero confirmed that there is no contemporaneous documentary evidence to support that Rebotix would have charged SIS these very low amounts (or that Rebotix ever offered such low rates to anyone). *Id.* Ex. 5 at 9 n.43, 10 n.47.

10

**Finally**, Bero has no reliable basis for the inclusion in his damages model of X/Xi units or the dates he uses to model when the third parties would have had the capability to reset X/Xi EndoWrists. This input leads to over 95% of Bero's lost profits damages. *See* Bass Dec. Ex. 3 ¶ 24 Table 1. Although no company has yet to successfully develop the ability to reset X/Xi EndoWrists, Bero cites a discussion with SIS's technical expert, Kurt Humphrey, for the proposition that companies would have been able to do so by January 1, 2021 or January 1, 2022.  Ex. 1 at 32 n.248, 57 n.418.  Bero admits he relies on Humphrey exclusively for this assertion and is not offering any "independent opinion" on any particular date X/Xi technology would have been available. *Id.* Ex. 2 at 113:20–116:14.  Oddly, Humphrey himself does not recall speaking to Bero about this (or anything else), instead stating that he has "anecdotally heard that there were damage experts that were involved but I've not seen any of their work or had any communication with them.  I don't know who they are." *Id.* Ex. 7 at 139:22–140:5, 142:12–15.  Be that as it may, as shown in Intuitive's separate motion to exclude Humphrey's testimony on this subject, he is able to offer no basis for any of the multiple conflicting dates he has offered, including the one Bero claims Humphrey gave him.

As the preceding paragraphs demonstrate, Bero does not rely on anything close to what a reasonable accountant would in forming his opinion.  He does not rely on accountant-prepared financial statements (even "compiled" ones, which accountants still view cautiously).  Nor does he rely on any sort of contemporaneous financial data or sales projections prepared by SIS itself – which are treated cautiously as a potential source for accountants and are viewed skeptically by courts.  *See id.* Ex. 2 at 96:9–15.  Instead, his primary sources are undocumented "discussions" with interested parties.  Indeed, Bero relies on multiple "discussions" with Greg Posdal (SIS CEO), Keith Johnson (SIS employee), Jean Sargent (SIS industry expert), Kurt Humphrey (SIS technical expert), and Chris Gibson (Rebotix employee).  *Id.* Ex. 1 at 3; Ex. 5 at 2.  In total, across his initial and second rebuttal reports, he cites these "discussions" over 100 times.

None of the individuals who spoke with Bero supplied any documents supporting what they told him. *E.g.*, *id.* Ex. 2 at 27:13–30:9.  In fact, we do not even know what they told him, as Bero simply

11

"incorporated" portions of what they said into his report. *Id.* at 15:6–19; *see generally id.* at 10:5–15:19. Bero has not (and indeed could not, given his lack of industry or technical expertise) taken any steps to independently verify the accuracy of these statements, as he himself admitted. For example, when asked if he "under[took] any effort to verify the information that Ms. Sargent was providing" he did not provide any steps he took to do so, and said "ultimately, you're relying on the expertise of others." *Id.* at 146:6–147:4. He gave a similar excuse in his reply report: "Based on my experience, damages experts often rely on assumptions for areas outside their expertise." *Id.* Ex. 5 at 4. Needless to say, reasonable accountants would not rely on unverified, undocumented oral discussions with self-interested individuals, especially for a matter as uncertain as estimating lost profits for a newly-established business. And if any of the expert opinions Bero relies upon from Sargent or Humphrey are excluded, that will independently require exclusion of Bero's damages estimates as well. "Where an expert bases her opinion on – or simply repeats – the unreliable opinion of another expert, a district court may properly exclude the first expert's testimony." *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 2017 WL 10434367, at *2 (N.D. Cal. Jan. 23, 2017) (citations omitted).

Multiple inputs into Bero's damages model are simply unsupported assumptions. If any one of Bero's assumptions lacks a reliable basis, Bero's entire model falls. This requires exclusion of Bero's lost profits damages.

## B.      Bero's Estimates Are Insufficiently Grounded In The Record.

Bero's opinion also fails to account for important aspects of the record that render his damages estimates unreliable. To be admissible, an expert's opinion must be "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591 (1993) (quoting *United States v. Downing,* 753 F.2d 1224, 1242 (3d Cir. 1985)). Accordingly, expert damage estimates not grounded in the real world are "so incomplete as to be inadmissible as irrelevant." *In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 966, 973–74 (C.D. Cal. 2012) (quoting *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1188 (9th Cir. 2002)); *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 806–07 (9th Cir. 1988) (affirming exclusion of two expert damages estimates

that "ha[d] scant basis in the record . . . rest[ing] on unsupported assumptions and unsound extrapolation").  Bero's damages estimates fail to account for the following facts in the record:

**First**, Bero fails to even consider competition – either from Restore or Rebotix themselves or from potential new entrants.  He admitted as much in his deposition.  Bass Dec. Ex. 2 at 93:21–95:16.  Notably, Professor Einer Elhauge (the *Larkin* plaintiffs' economic expert) opines that "[m]any additional companies beyond Rebotix, Restore, and SIS would have had the connections and general expertise to enter the EndoWrist repair market" but-for Intuitive's alleged misconduct.  *Id.* Ex. 8 at ¶ 277.  Competition from others offering EndoWrist resets would have taken SIS's customers and/or forced it to lower its prices, either or both of which would have reduced SIS's profits.  Thus, potential competition is a "major variable" that Bero should have considered in his damages estimates.  *In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d at 973–76.

**Second**, Bero ignores the impact of FDA clearance – or its absence – on customer demand for SIS's reset EndoWrist services.  Bero assumes "SIS would not need FDA approval" based on discussions with SIS employees Keith Johnson and Greg Posdal.  Bass Dec. Ex. 1 at 5 n.14.  Bero confirmed in his deposition that he accepted as an assumption that FDA clearance is not required for SIS's service.  *Id.* Ex. 2 at 123:7–125:24.  Because he simply accepted this assertion, Bero did not investigate or account in his model for the fact that record evidence shows that customers would be reluctant to use devices that have not been cleared by the FDA.  *See Id.* Ex. 3 ¶ 40 & nn.87–88.  Bero does not deny that customers would care about the absence of FDA clearance if it was needed – or if they thought it might be.  He simply assumes that this was not an issue.[8]

**Third**, Bero fails to reasonably assess whether SIS had the capacity to expand from the 49 EndoWrist resets it actually performed to offering near 50,000 resets per year.  *Id.* Ex. 1 at 27, 45–46.  As with many other key assumptions, he largely relies on discussions with SIS employees to substantiate the amount of time it would take for employees to perform resets, SIS's plans and ability to hire such employees, SIS's available space, and its ability to procure the necessary chips.  *Id.* Ex. 1 at 45–46.

---

[8] In his deposition, Bero admitted that he "ha[s] offered no lost profits damages analysis that account for if FDA approval is necessary for SIS."  Bass Dec. Ex. 2 at 126:22–128:10.

Notably, Bero's rosy prediction that each reset would take "30 minutes" conflicts with prior testimony of SIS's engineering expert Dr. T. Kim Parnell, who actually observed the process and said it took "on the order of a few hours." *Compare id.* at 45 *with id.* Ex. 9 at 98:5–16.

Taken individually, any of these issues would be sufficient to render Bero's damages estimates inadmissible. Taken collectively, inadmissibility is clear. *See, e.g.*, *Mid-Am. Tablewares, Inc. v. Mogi Trading Co.*, 100 F.3d 1353, 1368 (7th Cir. 1996) (granting a new trial because "[e]ach one of the[] steps in the [expert's] estimation of [plaintiff's] lost profits involve[d] a substantial leap of faith . . . and taken collectively, which they must be to arrive at this sizable award, they render the award unreasonably speculative, excessive and unsupported by the evidence").

### C. Bero's Lanham Act Damage Estimate Should Be Excluded.

Bero's estimated damages for SIS's Lanham Act claim should also be excluded. Those damages are estimated almost exactly the same way as his antitrust damages. Specifically, Bero uses the same "lost repair units" calculated for antitrust damages under his Scenario 2. However, for Lanham Act damages, he multiplies those lost units by Intuitive's revenue per unit, rather than SIS's. Bass Dec. Ex. 1 at 59.

These damages estimates do not satisfy the *Daubert* standard. First, Bero's Lanham Act calculations depend on all of the same assumptions as his "Scenario 2" antitrust calculations. Thus, apart from the per-unit profit figures, all of the flaws discussed in the prior two sections render this opinion inadmissible as well.

Second, Bero's Lanham Act estimates are inadmissible for lack of "fit" with the claims and evidence in this case. Only two SIS customers received an allegedly false statement from Intuitive. (Bero himself cites only one). *See id.* (citing SIS000202–000204); *id.* Ex. 3 ¶ 45, n.95. Yet Bero calculates damages as if *all* customers had received such statements. Bero does not even attempt to explain how letters sent to two customers caused SIS to lose up to $385 million in sales to hundreds of other customers. Under the Lanham Act, "[d]isgorgement is limited to 'the financial benefit [defendant] received because of the advertising.'" *Grasshopper House, LLC v. Clean & Sober Media, LLC*, 2021

14

WL 3702243, at *2 (9th Cir. Aug. 20, 2021); *see also Ill. Tool Works, Inc. v. Rust-Oleum Corp.*, 955

F.3d 512, 514 (5th Cir. 2020) ("Disgorgement of profits is appropriate only if . . . defendant's profits are

attributable to the Lanham Act violation.").  Accordingly, courts reject as insufficient to establish

damages expert damage estimates that fail to attribute a link between claimed damages and the alleged

Lanham Act violation.  *Kurin, Inc. v. Magnolia Med. Techs., Inc.*, 473 F. Supp. 3d 1117, 1144–46 (S.D.

Cal. 2020); *3M Innovative Props. Co. v. Dupont Dow Elastomers LLC*, 361 F. Supp. 2d 958, 973 (D.

Minn. 2005).  The Court should do the same here.

## IV.    CONCLUSION

For the reasons set forth above, the Court should exclude all of Bero's damage estimates.

DATED:  March 23, 2023                              COVINGTON & BURLING LLP


By: */s/  Kathryn E. Cahoy*
        Kathryn E. Cahoy

*Attorney for Intuitive Surgical, Inc.*


*Additional Counsel for Intuitive Surgical, Inc.*

ALLEN RUBY (SBN 47109)
allen@allenruby.com
ALLEN RUBY, ATTORNEY AT LAW
15559 Union Ave. #138
Los Gatos, CA 95032
Tel: (408) 477-9690

KAREN HOFFMAN LENT (*Pro Hac Vice*)
Email: karen.lent@skadden.com
MICHAEL H. MENITOVE (*Pro Hac Vice*)
Email: michael.menitove@skadden.com
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
One Manhattan West
New York, NY 10001
Telephone: (212) 735-3000
Facsimile: (212) 735-2040

KATHRYN E. CAHOY (SBN 298777)
Email: kcahoy@cov.com
COVINGTON & BURLING LLP
3000 El Camino Real
5 Palo Alto Square, 10th Floor
Palo Alto, CA 94306-2112
Telephone: + 1 (650) 632-4700
Facsimile: + 1 (650) 632-4800

SONYA WINNER (SBN 200348)
Email: swinner@cov.com
CORTLIN H. LANNIN (SBN 266488)
Email: clannin@cov.com
ISAAC D. CHAPUT (SBN 326923)
Email: ichaput@cov.com
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Suite 5400

15

San Francisco, California 94105-2533
Telephone: + 1 (415) 591-6000
Facsimile: + 1 (415) 591-6091

ANDREW LAZEROW (*Pro Hac Vice*)
Email: alazerow@cov.com
ASHLEY E. BASS (*Pro Hac Vice*)
Email: abass@cov.com
JOHN KENDRICK (*Pro Hac Vice*)
Email: jkendrick@cov.com
COVINGTON & BURLING LLP
One City Center 850 Tenth Street NW
Washington DC 20001-4956
Telephone: + 1 (202) 662-6000
Facsimile: + 1 (202) 662-6291

MOTION OF INTUITIVE SURGICAL, INC. TO EXCLUDE
TESTIMONY OF RICHARD BERO

CASE NO.: 3:21-cv-03496-VC