ATTACHMENT 46

1

2    UNITED STATES DISTRICT COURT

3    FOR THE NORTHERN DISTRICT OF CALIFORNIA

4    SAN FRANCISCO DIVISION

5     - - - - - - - - - - - - - - - - - - - -x

6    SURGICAL INSTRUMENT SERVICE COMPANY, INC.,

7                         Plaintiff,

8          -against-

9    INTUITIVE SURGICAL, INC.,

10                        Defendant.

11    - - - - - - - - - - - - - - - - - - - -x

12                    Virtual Zoom Deposition

13                    March 8, 2023

                      9:00 a.m. CST

14

15

16     VIRTUAL VIDEO DEPOSITION of RICHARD BERO,

17    in the above-entitled action, held at the

18    above time and place, taken before Jeremy

19    Richman, a Shorthand Reporter and Notary

20    Public of the State of New York, pursuant to

21    the Federal Rules of Civil Procedure, and

22    stipulations between Counsel.

23

24                *      *      *

25

                                          Page 1

```
 1                    R. BERO
 2    considered in your expert reports in        09:15:39
 3    this case?                                   09:15:41
 4         A.    No.                               09:15:41
 5         Q.    So you mentioned in your          09:15:43
 6    reports that you had conversations with      09:15:50
 7    various people in connection with your       09:15:52
 8    drafting of the expert reports in this       09:15:55
 9    case.  I would like to ask you a few         09:15:57
10    questions about those individuals,           09:16:01
11    okay?                                        09:16:03
12         A.    Okay.                             09:16:03
13         Q.    So let's start with the           09:16:03
14    people, I think I have a complete list.      09:16:06
15    We'll make sure I have a complete list.      09:16:08
16    I think you spoke with Mr. Keith            09:16:11
17    Johnson in connection with your expert      09:16:13
18    reports in this case; is that right?         09:16:15
19         A.    I did speak with Mr. Johnson,    09:16:17
20    correct.                                     09:16:20
21         Q.    And who is Mr. Johnson?          09:16:20
22         A.    Mr. Johnson is an employee at     09:16:22
23    SIS.                                         09:16:27
24         Q.    And I believe he's the -- his    09:16:28
25    title is executive vice president,          09:16:31
```

Page 10

```
 1                      R. BERO
 2     sales and clinical programs, does that      09:16:33
 3     sound right?                                09:16:36
 4          A.    If you give me a moment to       09:16:38
 5     grab my report, I believe I identified      09:16:40
 6     his actual title.                           09:16:44
 7          Q.    And I believe it's on page 3     09:16:49
 8     of your report, and we will introduce       09:16:51
 9     your reports as well, but just for your     09:16:53
10     reference, I think it's on page 3.          09:16:55
11          A.    Okay.  So you're referring to    09:16:57
12     my, just to be clear, December 2, 2022,     09:17:00
13     report?                                     09:17:06
14          Q.    Correct.                         09:17:09
15          A.    Yes.  Executive vice             09:17:13
16     president, sales and clinical programs,     09:17:15
17     correct.                                    09:17:17
18          Q.    How many times did you speak     09:17:17
19     with Mr. Johnson, if you can recall, in     09:17:20
20     connection with preparing your expert       09:17:23
21     report in this case?                        09:17:25
22          A.    I don't remember.  A few         09:17:25
23     times.  I don't remember if that was        09:17:33
24     two or five, but it was more than once.     09:17:36
25          Q.    When you spoke with              09:17:42
```

Page 11

```
1                    R. BERO
2   Mr. Johnson, other than attorneys, was      09:17:43
3   there anyone else present during the        09:17:45
4   conversation?                               09:17:47
5        A.    When you say "present," just     09:17:50
6   to be clear, I believe these were Teams     09:17:59
7   calls or, you know, Zoom or whatever.       09:18:09
8   Or phone conferences.  And on those         09:18:17
9   calls, other than attorneys, an             09:18:23
10  attorney and Mr. Johnson, I don't           09:18:30
11  believe anyone else would have been on,     09:18:37
12  although there may have been,               09:18:39
13  Mr. Posdal may have been on one call,       09:18:48
14  or perhaps more than one, but I don't       09:18:52
15  remember exactly.                           09:18:55
16       Q.    Who is Mr. Posdal?               09:18:55
17       A.    He is, as you can see here on    09:19:00
18  page 3 of my December 2, 2022 report,       09:19:03
19  the president and CEO of SIS.               09:19:10
20       Q.    So focusing on your             09:19:12
21  conversations with Mr. Johnson, did you     09:19:15
22  take notes during those calls?              09:19:17
23       A.    I don't know that I took         09:19:20
24  notes, per se.  Typically what we do is     09:19:26
25  we have somebody on our team take           09:19:32
```

Page 12

```
1                        R. BERO
2     drafts in our draft report, whatever       09:19:37
3     report we happen to be working on on       09:19:39
4     that case, so perhaps I did, or perhaps    09:19:42
5     somebody at my firm did.                   09:19:44
6          Q.   Do you know, do you recall       09:19:46
7     that Mr. Johnson took any notes while      09:19:47
8     you were talking?                          09:19:49
9          A.   I have no idea.                  09:19:49
10          Q.   Did you record the              09:19:51
11     conversation --                           09:19:55
12          A.   Well, let me say I doubt it,    09:19:55
13     because my recollection is he may have    09:20:02
14     been in his car, but I don't know for     09:20:08
15     certain one way or the other.             09:20:15
16          Q.   Understood.  Did you record     09:20:17
17     the conversation with Mr. Johnson?        09:20:19
18          A.   No.                             09:20:22
19          Q.   And in terms of the process     09:20:23
20     of when you have these interviews, I      09:20:28
21     think you indicated that the notes        09:20:31
22     would go into the draft report that you   09:20:32
23     were working on; is that right?           09:20:34
24          A.   Typically, that's the way we    09:20:36
25     would do it.  Sometimes we take notes     09:20:37
```

Page 13

```
 1                        R. BERO
 2    separately, but typically, we're taking      09:20:41
 3    them in the draft report.                    09:20:46
 4         Q.    And do you recall in this         09:20:46
 5    case necessarily if the notes were           09:20:48
 6    included in the draft report, or if          09:20:50
 7    they were included in a separate             09:20:51
 8    document?                                    09:20:53
 9         A.    I don't believe we took any       09:20:53
10    notes separately in this case, not that      09:20:58
11    I can recollect certainly.                   09:21:02
12         Q.    You mentioned Mr. Posdal.  Do     09:21:04
13    you recall how many times you spoke          09:21:15
14    with Mr. Posdal in connection with your      09:21:16
15    expert reports in this case?                 09:21:18
16         A.    It was more than once.  It        09:21:20
17    was -- boy, and when you say "in             09:21:30
18    connection with this case," are you          09:21:33
19    talking about my initial report, or          09:21:35
20    through my most recent report?               09:21:44
21         Q.    I would say all of your           09:21:48
22    reports.  It will be important for us        09:21:49
23    to kind of understand when you spoke to      09:21:51
24    Mr. Posdal for all of your reports.          09:21:53
25         A.    Okay.  I would say probably       09:21:55
```

Page 14

```
 1                      R. BERO
 2    somewhere in the range of five to eight      09:22:08
 3    times.  But I don't, I don't know            09:22:11
 4    exactly.  Similar to Mr. Johnson, you        09:22:14
 5    know, I don't know the exact number.         09:22:18
 6         Q.    Similar to Mr. Johnson, when      09:22:20
 7    you spoke with Mr. Posdal, would the         09:22:25
 8    notes of those conversations have been       09:22:29
 9    incorporated into the ongoing draft          09:22:31
10    report?                                      09:22:33
11         A.    Probably with the exception       09:22:37
12    of, I remember talking to Mr. Posdal a       09:22:41
13    year and a half ago, and at that point       09:22:53
14    I don't know that we would have even         09:22:58
15    been talking about a draft report.  So       09:23:00
16    to the extent I spoke with, you know,        09:23:07
17    during that conversation I would not         09:23:12
18    have been taking notes in a draft            09:23:14
19    report, if that answers your question.       09:23:17
20         Q.    Yes, thank you.  And I assume     09:23:24
21    you didn't tape any of the                   09:23:29
22    conversations you had with Mr. Posdal?       09:23:32
23         A.    That's correct.                   09:23:33
24         Q.    And my understanding is you       09:23:34
25    don't have any kind of separate notes        09:23:37
```

Page 15

```
 1                    R. BERO
 2   I know you referenced in your earlier      09:38:01
 3   answer that you discussed the 50,000       09:38:03
 4   chip number with him, and that you said    09:38:06
 5   that he expressed that that seemed on      09:38:08
 6   the low side.  So he didn't, for           09:38:10
 7   example, point you to any, you know,       09:38:13
 8   forecasting documents they had done or     09:38:15
 9   anything like that with respect to that    09:38:18
10   part of the conversation; is that          09:38:20
11   right?                                     09:38:22
12        A.    That's correct.                 09:38:22
13        Q.    So let's talk about your        09:38:27
14   conversation with Ms. Sargent.  Can       09:38:29
15   you, you said it was just once; is that    09:38:32
16   right?                                     09:38:34
17        A.    I know it was at least once.    09:38:34
18   It may have been just once, but I can't    09:38:38
19   remember if we had a follow-up            09:38:43
20   conversation as well.  I just don't, I     09:38:45
21   don't recollect.                          09:38:50
22        Q.    And do you recall              09:38:50
23   approximately how long you spent with     09:38:51
24   Ms. Sargent?                              09:38:54
25        A.    I don't know exactly.  This    09:38:54
```

Page 27

```
 1                    R. BERO

 2    goes back probably to November of 2022        09:39:01

 3    sometime.  I don't -- I mean, as I'm          09:39:11

 4    sitting here, I don't recollect it            09:39:15

 5    being, you know, a real extensive             09:39:17

 6    conversation, but maybe an hour would         09:39:21

 7    be a guesstimate.                             09:39:29

 8         Q.    At a high level, can you           09:39:35

 9    recall what you discussed with                09:39:36

10    Ms. Sargent in this conversation?             09:39:38

11         A.    Yeah, we talked about -- we        09:39:39

12    talked a little bit about her                 09:39:46

13    background and her knowledge in the           09:39:49

14    industry, and I believe she was a             09:39:52

15    consultant to Marin County Hospital,         09:39:57

16    and was aware of this SIS program.  And      09:40:04

17    she worked for an entity, I forget the        09:40:15

18    name of it off the top of my head, that       09:40:18

19    was, is now a part of Vizient.  And           09:40:22

20    these kinds of programs generally, and        09:40:27

21    her expectation, and specifically I           09:40:33

22    recollect we talked about the adoption        09:40:39

23    rate, if you will, of the program             09:40:43

24    within these hospitals that I'm relying       09:40:45

25    on for my calculation, as you are             09:40:54
```

Page 28

```
 1                     R. BERO
 2     undoubtedly aware of.                    09:40:56
 3              But I think those were the      09:40:59
 4     primary things we talked about as I'm    09:41:01
 5     sitting here.  But again the, you know,  09:41:03
 6     the key information would be identified  09:41:05
 7     and sourced in my reports.               09:41:10
 8          Q.    Do you recall if Ms. Sargent  09:41:15
 9     provided any documents to you as a part  09:41:17
10     of that conversation?                    09:41:20
11          A.    I don't recollect any.        09:41:23
12          Q.    With respect to Mr. Humphrey, 09:41:32
13     do you recall how long your              09:41:41
14     conversation with Mr. Humphrey was?      09:41:43
15          A.    Yeah, I, again, I believe it  09:41:46
16     was relatively short.  Perhaps shorter   09:41:50
17     than the other conversations we've been  09:41:53
18     talking about.  I just don't recollect.  09:41:58
19          Q.    What was the high-level topic 09:42:01
20     of the conversation?                     09:42:02
21          A.    I can't, as I'm sitting here, 09:42:07
22     I'm drawing a blank as to what we spoke  09:42:14
23     about.  We maybe talked about the FDA    09:42:20
24     issue, but I just, I don't recollect as  09:42:24
25     I'm sitting here.                        09:42:37
```

Page 29

```
 1                      R. BERO
 2              Perhaps if we looked through      09:42:40
 3      my reports, it would jog my memory.       09:42:44
 4          Q.    Understood, and I'm sure        09:42:47
 5      we'll probably get to it at some point    09:42:48
 6      today.  Do you recall if Mr. Humphrey     09:42:50
 7      gave you any documents during the         09:42:53
 8      conversation?                             09:42:54
 9          A.    Not that I recall, no.          09:42:54
10          Q.    Again, kind of back to the      09:43:02
11      process point of these notes that go      09:43:04
12      into the drafts.  Does there come a       09:43:06
13      point in time, as you continue editing,   09:43:09
14      that some of the information that you     09:43:11
15      learned from these interviews may be      09:43:13
16      removed from the draft, just as you       09:43:15
17      continue the editing process?  Does       09:43:18
18      that make sense?                          09:43:19
19          A.    Well, I wouldn't say it's       09:43:21
20      removed, necessarily, but just the        09:43:24
21      process is where we may have a point      09:43:30
22      addressed in multiple areas, or a         09:43:38
23      similar point, and it may get, maybe be   09:43:39
24      too redundant, if you will, and so        09:43:44
25      while we've already addressed it, we      09:43:48
```

Page 30

```
 1                    R. BERO
 2    rough guess.  But I don't, I don't       09:50:43
 3    know, for example, how many projects     09:50:48
 4    our other experts that are at our firm   09:50:51
 5    are working on, other than really rough  09:50:55
 6    estimates.                               09:50:58
 7          Q.    Do you know, like, for       09:51:00
 8    example what proportion of the Bero      09:51:06
 9    Group's income in 2022 came from this    09:51:08
10    matter?                                  09:51:11
11          A.    I can -- I would say         09:51:13
12    somewhere -- I would guesstimate         09:51:33
13    somewhere between 5 and 10 percent.      09:51:39
14          Q.    And you've been deposed      09:51:42
15    before, correct?                         09:51:47
16          A.    I have.                      09:51:48
17          Q.    Have you testified at trial  09:51:50
18    before?                                  09:51:51
19          A.    Yeah.                        09:51:52
20          Q.    Have you ever worked with SIS 09:51:54
21    before?                                  09:51:57
22          A.    No.                          09:51:59
23          Q.    Have you ever worked with the 09:51:59
24    law firm Haley Guiliano before?          09:52:02
25          A.    I'm not sure.  I don't think 09:52:13
```

Page 36

```
 1                    R. BERO
 2   I have.  Although I may have.  I don't      09:52:19
 3   think so.                                   09:52:24
 4        Q.    So let's talk a little bit       09:52:24
 5   about your background.  In your report,     09:52:31
 6   you say that you're a certified public      09:52:36
 7   accountant, accredited in business          09:52:39
 8   valuation, a certified valuation            09:52:41
 9   analyst, and the managing director of       09:52:45
10   The Bero Group.  That's on page 3 of        09:52:47
11   your original report in December, so I      09:52:50
12   would just like to talk about those         09:52:53
13   things a little bit.                        09:52:54
14            So we've already talked about      09:52:55
15   managing director of The Bero Group.        09:52:57
16   So you're a certified public               09:52:58
17   accountant; is that right?                 09:53:00
18        A.    Yes.                            09:53:01
19        Q.    How long have you been a CPA?   09:53:01
20        A.    Longer than you -- I think I    09:53:07
21   passed my exam in 1987, and so when you    09:53:11
22   say "CPA," there's, you pass your exam,    09:53:20
23   and then you have to get certified, and    09:53:25
24   that's a function of having -- and         09:53:30
25   licensed.  It's a function of having       09:53:34
```

Page 37

```
 1                      R. BERO
 2    the requisite experience.  And I think,    09:53:36
 3    I can't remember if that was at the        09:53:40
 4    same time or around the same time.  And    09:53:41
 5    so it's been since the late '80s.          09:53:51
 6         Q.    When did you form The Bero      09:53:56
 7    Group?                                      09:54:00
 8         A.    Well, I guess without -- I      09:54:00
 9    started the firm, with another             09:54:08
10    individual, called Corporate Financial     09:54:10
11    Advisors in 2005, I think it was -- oh,    09:54:12
12    no, 1995 I think it was.  And an           09:54:17
13    accounting firm as well.  And then that    09:54:23
14    firm that turned into, we sort of          09:54:34
15    separated out our, what we refer to as     09:54:37
16    our litigation services and valuation      09:54:40
17    services capabilities into what we         09:54:42
18    called The Bero Group.                     09:54:44
19              The Bero Group itself became     09:54:47
20    a formal entity, I believe, in 2013, so    09:54:49
21    about 10 years ago.                        09:54:53
22         Q.    And before The Bero Group,      09:55:01
23    based on your CV, it looks like you        09:55:05
24    worked at a place called Coopers &         09:55:08
25    Lybrand; is that right?                    09:55:11
```

Page 38

```
 1                   R. BERO
 2    valuation, under the AICPA.              09:59:20
 3              The AICPA had its own process  09:59:24
 4    for the ABV.  I think it was, quite      09:59:27
 5    frankly, less vigorous than the          09:59:31
 6    NACVA's, or National Association of      09:59:38
 7    Certified Valuation Analysts' process,   09:59:40
 8    and at some point they offered CPAs      09:59:43
 9    that were CVAs as well the ability to    09:59:50
10    obtain the ABV designation with what I   09:59:58
11    would describe as relatively minimal     10:00:08
12    requirements, because in a sense they    10:00:12
13    recognized that if you're a CVA, you     10:00:16
14    would reasonably meet the requirements   10:00:19
15    as under the ABV guidelines.             10:00:21
16              And I think you had to get     10:00:28
17    some recommendations from some other     10:00:29
18    ABVs that you have worked with.          10:00:33
19    Something along those lines.  And this   10:00:36
20    goes back, you know, quite a ways, so I  10:00:38
21    can't remember exactly.                  10:00:42
22         Q.   Understood.  So focusing in    10:00:42
23    on this CVA certification, do you        10:00:45
24    recall what you had to do in order to    10:00:48
25    receive that certification?              10:00:50
```

Page 42

```
 1                     R. BERO
 2        A.    Yeah, so the CVA, at the time      10:00:53
 3     that I obtained my CVA, there was a         10:00:58
 4     process where you took a course.  I         10:01:05
 5     believe it was a week long course.  You     10:01:11
 6     had to have certain requirements, you       10:01:13
 7     know, background requirements, and          10:01:16
 8     having worked in valuation-related          10:01:18
 9     areas, you had to pass a test and do a      10:01:21
10     valuation, had to do some sort of a         10:01:33
11     valuation that was then reviewed, and I     10:01:42
12     don't want to say graded, but               10:01:51
13     determined as to whether or not you         10:01:55
14     passed.  And I did that, again, this is     10:01:56
15     18 or 20 years ago, something along         10:02:01
16     those lines.                                10:02:03
17        Q.    Once you are certified as a        10:02:09
18     CVA, are there any kind of continuing       10:02:11
19     educational requirements for the            10:02:14
20     certification?                              10:02:15
21        A.    There are.  It's, you know,        10:02:15
22     whether you're a CPA or CVA, there's        10:02:20
23     ongoing requirements.  They're slightly     10:02:23
24     different, but many of the things that      10:02:29
25     I've done over the years would address      10:02:34
```

Page 43

```
 1                    R. BERO
 2    both of those kinds of requirements.      10:02:36
 3    And I don't know, I couldn't tell you     10:02:40
 4    exactly how many hours or years or        10:02:42
 5    whatnot are required.  There's            10:02:47
 6    different things, and there's different   10:02:49
 7    time frames, and so forth.  But yes,      10:02:53
 8    there are.                                10:02:56
 9         Q.   So is it, like, actual          10:02:56
10    trainings you would attend, or how does   10:02:58
11    it work?                                  10:02:59
12         A.   I'm sorry, you cut out.  What   10:03:00
13    was the question?                         10:03:04
14         Q.   Sorry.  I said, are there       10:03:04
15    trainings you would attend as part of     10:03:10
16    this process?                             10:03:11
17         A.   There are trainings that you    10:03:11
18    can attend.  In my case I've gone to      10:03:12
19    some trainings over the years, I've       10:03:17
20    taught quite a bit, and I've written      10:03:21
21    and -- but yes, yeah, similar to CLE,     10:03:37
22    for example.                              10:03:41
23         Q.   Understood.  And you are not    10:03:43
24    a surgeon, correct?                       10:03:46
25         A.   I'm not a surgeon?              10:03:48
```

Page 44

```
 1                      R. BERO
 2        Q.    Correct.                        10:03:50
 3        A.    I am not a surgeon, that is     10:03:51
 4   correct.                                   10:03:53
 5        Q.    And you've never worked in a    10:03:53
 6   hospital, correct?                         10:03:55
 7        A.    That's correct.                 10:03:58
 8        Q.    Have you ever worked in any     10:04:00
 9   business that you would view as being      10:04:05
10   in the medical industry?                   10:04:07
11        A.    Well, I worked on cases, a      10:04:11
12   number of cases over the years, in the     10:04:15
13   medical industry.  But, setting that       10:04:19
14   aside, no, I haven't worked directly in    10:04:26
15   the medical industry as an employee,       10:04:29
16   per se.                                    10:04:38
17        Q.    Before this matter, had you     10:04:39
18   ever worked on a matter involving          10:04:41
19   robotic surgery?                           10:04:43
20        A.    Robotic surgery?                10:04:45
21        Q.    Correct.                        10:04:48
22        A.    I guess it depends on what      10:04:49
23   you consider robotic.  I mean, I've        10:04:55
24   worked on cases involving endoscopies,     10:05:00
25   or AKs involving endoscopies.  And I       10:05:10
```

Page 45

```
1                      R. BERO
2    worked on another case involving -- I        10:05:24
3    can't remember exactly what it was.          10:05:32
4    But I think it had to do with -- it was      10:05:33
5    in the medical field involving, I            10:05:36
6    believe, some moving devices.  Whether       10:05:40
7    you consider those robotics or not, I        10:05:50
8    guess is the question.                       10:05:52
9         Q.    On the endoscopy case, was        10:05:59
10   that a litigation matter?                    10:06:06
11        A.    Yes.                              10:06:07
12        Q.    Do you recall if you offered      10:06:08
13   an expert opinion in the matter?             10:06:12
14        A.    I don't know if I actually        10:06:17
15   submitted a report in that case or not.      10:06:21
16   I know it didn't go to trial, and I          10:06:26
17   can't remember if I submitted a report.      10:06:35
18   I just don't recollect.  When I say          10:06:37
19   "report," I mean expert report.              10:06:41
20        Q.    Understood.  Do you recall,       10:06:43
21   kind of, the general nature of what you      10:06:45
22   were being asked to look at?  Like, for      10:06:48
23   example, was it a lost profits issue?        10:06:50
24        A.    It was either lost profits or     10:06:55
25   a reasonable royalty or both.  But I         10:07:04
```

Page 46

```
 1                      R. BERO
 2     don't remember.                          10:07:10
 3          Q.    Do you recall approximately   10:07:16
 4     the time frame of the case?              10:07:17
 5          A.    It was a long time ago.  It   10:07:19
 6     was probably 20 years ago, would be my   10:07:25
 7     guess.                                   10:07:31
 8          Q.    Another matter that you       10:07:32
 9     mentioned, I think you used the word     10:07:35
10     "devices," but I didn't quite catch how  10:07:37
11     you referred to them.  What kind of a    10:07:40
12     matter was that?                         10:07:42
13          A.    That's what I'm trying to     10:07:43
14     remember.  It had -- I just wish I       10:07:44
15     could remember the technology.  I        10:07:52
16     thought it had to do with, it was some   10:08:00
17     device, I just can't remember exactly    10:08:02
18     what it was used for.  But it was a      10:08:07
19     medical device.  And this one was more   10:08:09
20     recent than the other one, but I don't   10:08:18
21     believe we submitted or I submitted an   10:08:25
22     expert report in that one.               10:08:28
23          Q.    Do you recall the issue that  10:08:30
24     you, again, may have been looking at?    10:08:36
25     Like, for example, was it lost profits?  10:08:38
```

Page 47

```
1                        R. BERO
2         A.    I think it was -- I think it      10:08:39
3    was, I don't remember if it was lost         10:08:55
4    profits -- it would have been, I think       10:08:58
5    it was a patent case, and patent             10:09:00
6    related.  So it likely would have been       10:09:02
7    lost profits, or royalty -- reasonable       10:09:08
8    royalty, or both.  But again, in that        10:09:16
9    one I don't believe I submitted an           10:09:20
10   expert report.                               10:09:21
11        Q.    You used the term "reasonable     10:09:22
12   royalty" a couple of times.  What is a       10:09:26
13   reasonable royalty?                          10:09:28
14        A.    So "reasonable royalty" is a      10:09:29
15   term that's used for a common form of        10:09:35
16   damages in patent litigation, patent         10:09:39
17   infringement, and also is used in trade      10:09:45
18   secrets, copyright, trademarks.  And in      10:09:54
19   some cases, design patents.                  10:09:59
20        Q.    So I know --                       10:10:07
21        A.    I would give you more, but --     10:10:08
22        Q.    No, that's good, thank you.       10:10:11
23   So I know we started out talking about       10:10:13
24   if you ever worked on matters involving      10:10:15
25   robotic surgery, so just to take it out      10:10:19
```

Page 48

```
1                      R. BERO
2    a little broader, I know you mentioned      10:10:21
3    a medical device case, but did you work     10:10:23
4    on any other cases that you can recall      10:10:26
5    that you would think of as a medical        10:10:29
6    device?                                     10:10:32
7         A.    Medical devices.  Yes.  I've     10:10:32
8    worked on a case involving coils in MRI     10:10:47
9    imaging devices.  I've worked on a case     10:10:58
10   in the CT scanner device area.  I guess     10:11:06
11   it depends if you consider those            10:11:14
12   devices or not.                             10:11:16
13              I worked on a case involving     10:11:20
14   bone, egg bone (phonetic) I guess is        10:11:33
15   what you would refer to it as.  I don't     10:11:36
16   know if you would consider that a           10:11:38
17   device, maybe not.  I worked on a case      10:11:39
18   involving bone implants from, I think,      10:11:41
19   cadavers or nonhuman bone sources.          10:11:53
20   Perhaps that's a device.  I worked on       10:12:01
21   cases involving humeral, like shoulder,     10:12:03
22   nails.  I've worked on cases involving      10:12:17
23   spine implant reconstruction devices.       10:12:28
24   And, you know, those come to mind.          10:12:45
25   There's probably more than that, but        10:12:47
```

Page 49

```
 1                    R. BERO
 2    those are a few.                          10:12:50
 3         Q.    And the ones you just listed,  10:12:51
 4    were those patent cases?                  10:12:54
 5         A.    Some, not all.                 10:12:58
 6         Q.    Do you recollect which ones    10:13:00
 7    were not patent cases?                    10:13:03
 8         A.    The CT scanner case, computed  10:13:09
 9    tomography case, that had to do with a    10:13:20
10    contract, I believe.  There was           10:13:27
11    technology, but it was also, I think      10:13:33
12    the dispute was contractual in nature.    10:13:36
13             The spinal implants case,        10:13:47
14    well, it was a variety of things, but     10:13:59
15    then it got whittled down to a fraud      10:14:03
16    issue, I think.  My role was primarily    10:14:11
17    a contract trade secrets kind of an       10:14:13
18    analysis, as I recollect.                 10:14:16
19         Q.    So in the CT scanner case,     10:14:22
20    did you offer an expert opinion in that   10:14:26
21    case?                                     10:14:29
22         A.    I believe so.  I believe so.   10:14:30
23    I testified.                              10:14:33
24         Q.    Do you recall the topic of     10:14:36
25    your testimony?                           10:14:38
```

Page 50

```
 1                    R. BERO
 2        A.    I don't.  And I don't mean to      10:14:38
 3    chuckle, if you will, but it was an          10:14:44
 4    arbitration, and it was probably             10:14:47
 5    25 years ago.                                10:14:51
 6        Q.    And same question on the           10:14:52
 7    spine implant case.  Did you offer an        10:14:57
 8    expert opinion in that case?                 10:14:59
 9        A.    Did you ask if I offered an        10:15:01
10    opinion?                                     10:15:05
11        Q.    Yes.                               10:15:05
12        A.    I submitted a report and I         10:15:06
13    testified in deposition.  By the time        10:15:10
14    the case went to trial, I didn't             10:15:16
15    testify because there were multiple          10:15:18
16    claims, and they whittled them down to,      10:15:23
17    I believe it was just a fraud issue,         10:15:28
18    which my analysis didn't address.            10:15:32
19        Q.    Do you recall the nature of        10:15:34
20    your analysis in the case?                   10:15:36
21        A.    It was probably, I'm trying        10:15:37
22    to -- I apologize, this goes back a few      10:15:56
23    years.  It was probably lost profits.        10:15:59
24    I think that's what it was.                  10:16:18
25        Q.    About how long ago was that        10:16:19
```

Page 51

```
 1                    R. BERO
 2   case?                                  10:16:22
 3        A.    I don't, maybe eight years  10:16:25
 4   ago.                                   10:16:31
 5             MR. VAN HOVEN:  Guys, I'm not 10:16:35
 6        trying to break up the fun, but we 10:16:37
 7        have been going an hour.  We can  10:16:38
 8        break whenever, just making       10:16:40
 9        Mr. Bero aware of that.  I'll let 10:16:43
10        you let us know if you want to take 10:16:44
11        a break.  Or do you want to go    10:16:47
12        fairly soon?                      10:16:49
13             THE WITNESS:  I'm fine, as    10:16:51
14        long as you guys are fine.        10:16:53
15             MR. VAN HOVEN:  Okay, sounds  10:16:54
16        good.                             10:16:56
17             MS. BASS:  I just have a      10:16:56
18        couple more questions in this     10:16:58
19        section, so maybe we can just do  10:16:59
20        those and then we can take a break, 10:17:01
21        if that works.                    10:17:03
22             THE WITNESS:  Okay.          10:17:04
23        Q.    Have you ever provided an   10:17:05
24   expert opinion in an antitrust case    10:17:07
25   before?                                10:17:09
```

Page 52

```
 1                    R. BERO
 2        A.    Yes.                           10:17:10
 3        Q.    And can you describe for me,   10:17:10
 4   in how many instances have you provided   10:17:16
 5   an expert opinion in an antitrust case?   10:17:18
 6        A.    I'm not sure.  I know of one.  10:17:22
 7   I can recollect one.                      10:17:44
 8        Q.    What was that case about?      10:17:45
 9        A.    That case was about medical    10:17:46
10   software technology, is my               10:18:02
11   recollection.                            10:18:10
12        Q.    And about how long ago was     10:18:18
13   the case?                                10:18:22
14        A.    Four or five years ago.        10:18:22
15        Q.    Do you recall the nature of    10:18:34
16   your opinions in the case?               10:18:37
17        A.    Sort of.  I don't mean to --   10:18:38
18   I believe it had to do with lost         10:18:54
19   profits.  But it may have also had to    10:18:58
20   do with -- there are a multitude of      10:19:03
21   factors and issues and a long period of  10:19:15
22   time in that particular case.  Not that  10:19:19
23   you care about that.  But, so, there     10:19:24
24   were just a lot of different issues in   10:19:28
25   that case.  So my recollection is the    10:19:29
```

Page 53

```
 1                    R. BERO
 2     issue was, perhaps, well, it was lost        10:19:34
 3     profits in part, but it may have also        10:19:39
 4     been other things, too, and I just           10:19:43
 5     don't remember what those are.  Maybe        10:19:45
 6     royalty.  I can't remember.                  10:19:47
 7         Q.    Do you recall if you               10:19:49
 8     testified at trial in the matter?            10:19:51
 9         A.    I did not testify at trial in      10:19:53
10     that matter.  That's my -- I know I          10:20:00
11     didn't.                                      10:20:12
12         Q.    Do you recall if you were          10:20:12
13     qualified by the court as an expert in       10:20:17
14     the matter?                                  10:20:19
15         A.    I don't know.  To the extent       10:20:22
16     it got to that point, I assume I was.        10:20:30
17     But I believe the other expert maybe         10:20:34
18     was excluded ultimately.  But I'm not,       10:20:41
19     I don't remember exactly what happened.      10:20:48
20         Q.    Do you recall the name of the      10:20:50
21     parties in the case?                         10:20:57
22         A.    Yes.  OptumInsight was my          10:20:58
23     client, the client that I was working        10:21:04
24     on behalf of.  Cave Consulting, I            10:21:06
25     believe, was the name of the other          10:21:11
```

Page 54

```
 1                        R. BERO
 2    party.  I think that's what it was        10:21:15
 3    called.                                    10:21:19
 4         Q.   So you said that it was maybe    10:21:20
 5    a lost profits analysis and maybe a        10:21:27
 6    royalty.  So you might not recall this,    10:21:30
 7    but do you recall kind of what the         10:21:33
 8    methodology was for the lost profits       10:21:36
 9    analysis that you may have done?           10:21:38
10         A.   Well, in that particular         10:21:41
11    case, I don't exactly.  I can't            10:21:47
12    recollect -- I mean, there were lots of    10:21:57
13    different layers in that case.  I think    10:22:01
14    -- that's a good question.  I can't        10:22:09
15    remember.  But, you know, what we          10:22:13
16    always do, and I believe we did in that    10:22:17
17    case, is we look at what would have        10:22:18
18    happened, and compared it to what          10:22:22
19    actually has or will likely happen.        10:22:26
20    And that's my recollection of what we      10:22:30
21    did in that case.                          10:22:38
22              MS. BASS:  Can we go off the     10:22:38
23         record?                               10:22:40
24              THE VIDEOGRAPHER:  Sure.  The    10:22:41
25         time is 10:22 a.m., we are now off    10:22:44
```

Page 55

```
 1                    R. BERO
 2    report was meant to respond to the      10:39:05
 3    report of Mr. Smith in the case; is     10:39:07
 4    that right?                             10:39:09
 5        A.    Yeah.                         10:39:13
 6        Q.    And I'll do my best to call   10:39:14
 7    it the second rebuttal report.  At      10:39:21
 8    times I may say the reply report, but   10:39:23
 9    I'll attempt to say the second rebuttal 10:39:25
10    report.                                 10:39:28
11        A.    Yes, the second was meant to  10:39:28
12    reply to Mr. Smith's rebuttal report.   10:39:30
13    That's what you asked me, I think?      10:39:37
14        Q.    Yes.                          10:39:38
15        A.    Yeah.                         10:39:39
16        Q.    Okay, got it.  Okay.  So do   10:39:39
17    your opening and second rebuttal        10:39:42
18    reports contain all of your opinions in 10:39:45
19    this matter?                            10:39:46
20        A.    Well, I also had, we have a   10:39:58
21    -- okay, so my opening, my rebuttal     10:40:01
22    reports contain all the reports I       10:40:11
23    submitted.  So there's the errata,      10:40:12
24    which was dated, let's see,             10:40:24
25    February 25th, the updated errata       10:40:31
```

Page 58

```
 1                    R. BERO
 2    sheet.  Including that, yes, includes      10:40:34
 3    all my opinions.                           10:40:40
 4         Q.    Do your reports contain all     10:40:42
 5    the facts and data that you considered     10:40:46
 6    in forming your opinions?                  10:40:48
 7         A.    Yes, I certainly intended       10:40:54
 8    that to be the case.                       10:40:56
 9         Q.    Does your attachment one to     10:40:57
10    your report include the materials you      10:41:03
11    consulted in forming your opinions?        10:41:09
12         A.    The various attachment ones     10:41:10
13    in my, attached to my various reports      10:41:12
14    capture the data that I considered,        10:41:16
15    and, my team and I considered.             10:41:23
16         Q.    Did you review any other        10:41:27
17    expert reports from this litigation in     10:41:29
18    drafting your reports aside from           10:41:31
19    Dr. Smith's report?                        10:41:36
20         A.    Did I review any other          10:41:42
21    reports?  Well, I don't think I had        10:41:43
22    Dr. Smith -- did I have Dr. Smith?  I      10:41:46
23    don't think I had Dr. Smith's report       10:41:49
24    when I submitted my first report.          10:41:56
25    Other than, I believe -- Dr. Smith,        10:42:02
```

Page 59

```
 1                    R. BERO
 2    case, and oftentimes our role as CPAs      10:48:20
 3    is to analyze damages and determine        10:48:28
 4    what damages are.                          10:48:31
 5         Q.   So as part of the overall        10:48:41
 6    role that you just discussed of a CPA,     10:48:43
 7    when a CPA approves certain financial      10:48:45
 8    statements, do they give some sort of,     10:48:47
 9    kind of level of assurance that the        10:48:51
10    statements are accurate?                   10:48:53
11         A.   So if you're talking about a,    10:49:03
12    sort of the auditing function of the       10:49:09
13    CPA, sort of that group, that public       10:49:10
14    accounting service companies provide,      10:49:15
15    they're providing an opinion based on      10:49:20
16    some level of assurance.                   10:49:27
17              However, if you consider the,    10:49:31
18    you know, the ultimate opinion, if you     10:49:38
19    will, it's dependent upon                  10:49:41
20    representations of management.  That's     10:49:45
21    a term, phrase that's often used,          10:49:48
22    whether they're providing a, what's        10:49:53
23    referred to as an unqualified audit        10:49:55
24    opinion or a qualified audited opinion.    10:49:59
25    Whether they're providing a, what's        10:50:04
```

Page 64

```
 1                      R. BERO
 2    referred to as a review, or a          10:50:07
 3    compilation.  They're providing, in    10:50:14
 4    some cases, in different levels,        10:50:24
 5    assurance, to some extent.  However,    10:50:29
 6    it's always dependent upon information  10:50:32
 7    that's provided to them by their        10:50:35
 8    client.                                 10:50:38
 9         Q.   So you heard the term before, 10:50:38
10    "CPA compiled;" is that right?          10:50:44
11         A.   "CPA compiled?"  I'm not sure 10:50:46
12    -- I mean, there's -- I'm not sure I've 10:50:55
13    heard that term specifically, that it   10:51:01
14    has any sort of particular meaning.     10:51:03
15    I've heard of what we have referred to  10:51:07
16    as compilations.                        10:51:10
17         Q.   Okay.  Okay, I'll use that    10:51:12
18    term.  So what are compilations?        10:51:18
19         A.   What's that?                  10:51:20
20         Q.   What are compilations?        10:51:22
21         A.   Well, and it's, bear in mind  10:51:24
22    these are public accounting             10:51:28
23    distinctions that have changed          10:51:32
24    slightly, perhaps, over the years.  And 10:51:36
25    I used to be an instructor for a        10:51:38
```

Page 65

```
 1                    R. BERO
 2   national CPA review course, and I know      10:51:41
 3   some of the terminology has changed         10:51:45
 4   over the course of time.  But generally     10:51:48
 5   speaking, a compilation would be a          10:51:50
 6   situation where a company provides its      10:51:55
 7   data to a CPA, and the CPA puts it in       10:52:03
 8   the form of a set of financial              10:52:08
 9   statements.  Could be a balance sheet,      10:52:12
10   could be cash flow statement, could be      10:52:16
11   an income statement, could be a             10:52:19
12   combination.  Could be a change in cash     10:52:21
13   flow statement.  But it's simply,           10:52:23
14   they're compiling the data that's           10:52:26
15   provided to them.                           10:52:28
16        Q.    Do such statements at times      10:52:29
17   carry any sort of, kind of disclaimer       10:52:36
18   on them?                                    10:52:38
19        A.    A disclaimer?                    10:52:39
20        Q.    Yes.                             10:52:40
21        A.    There used to be specific        10:52:41
22   wording that was common in the big,         10:52:45
23   used to be the Big Eights, now it's the     10:52:50
24   Big Four firms.  And all the local          10:52:54
25   firms had their own sort of twist on        10:52:58
```

Page 66

```
 1                    R. BERO
 2    the wording that's associated with a      10:53:01
 3    compilation.  And yeah, they would have   10:53:04
 4    a certain disclaimer, if you will, on     10:53:10
 5    that data.  Or on those compilations, I   10:53:16
 6    should say.                               10:53:21
 7         Q.    And is the purpose of the      10:53:22
 8    disclaimer to note that the CPA isn't     10:53:27
 9    providing any sort of, kind of            10:53:29
10    assurance about the information in the    10:53:30
11    compilation?                              10:53:32
12         A.    Yeah, I think you could        10:53:41
13    interpret it that way.  It's basically,   10:53:44
14    yeah, on a very high level, it's, Hey,    10:53:49
15    look, we just got this data, and we put   10:53:53
16    it in the form of financial statements.   10:53:58
17    That's all we did.                        10:54:00
18         Q.    The CPA is compiling the       10:54:01
19    information, to use the term, correct?    10:54:03
20         A.    Yeah.                          10:54:06
21         Q.    And not necessarily offering   10:54:07
22    any sort of form of assurance regarding   10:54:12
23    the accuracy of the information,          10:54:13
24    correct?                                  10:54:14
25         A.    Yeah, I think that's correct.  10:54:15
```

Page 67

```
 1                    R. BERO
 2    That's the intent, is so that the CPA      10:54:24
 3    isn't held responsible for the accuracy    10:54:29
 4    of the data.  And to a larger extent,      10:54:33
 5    that holds true in an audit, too,          10:54:36
 6    whether it's an unqualified opinion or     10:54:39
 7    otherwise.                                 10:54:42
 8         Q.    And your prior answer, when     10:54:46
 9    you discussed a compilation, you also      10:54:48
10    mentioned a review.  How would you         10:54:50
11    describe what a review is?                 10:54:52
12         A.    Yes, so a review               10:54:56
13    traditionally, and I'm not sure that       10:54:59
14    they even refer to them as reviews         10:55:03
15    anymore, perhaps they do, but it's a, I    10:55:07
16    guess it's a little bit more guidance      10:55:13
17    or oversight that the CPA provides.        10:55:18
18    And it's, again, whenever financial        10:55:22
19    statements are, or were, presented as a    10:55:27
20    review, there was certain wording that     10:55:33
21    was used to indicate that it was a         10:55:38
22    review.  And it would be beyond a          10:55:44
23    simple compilation.  It might be a         10:55:50
24    consideration of -- it may have some       10:55:56
25    more information on the business           10:56:00
```

Page 68

```
 1                    R. BERO
 2    itself.  It might provide more         10:56:01
 3    footnotes to financial statements.     10:56:05
 4    Describing the operations of the       10:56:07
 5    company.  And it might involve some     10:56:09
 6    additional suggestions and questions   10:56:20
 7    that were presented to or asked of the 10:56:22
 8    management of the entity.              10:56:24
 9        Q.    So the review would provide, 10:56:32
10    I think you said, more of an assurance 10:56:37
11    of the accuracy than just a            10:56:38
12    compilation; is that right?            10:56:40
13        A.    It would provide, I guess, a 10:56:41
14    higher level of, I don't want -- maybe 10:56:47
15    "assurance" is the right word, but it's 10:56:52
16    a higher level of, the CPA is more     10:56:56
17    involved in understanding what the     10:57:02
18    company is, and what it does.  It could 10:57:03
19    uncover things that perhaps weren't    10:57:14
20    otherwise considered in a compilation. 10:57:19
21    It may, it may not.  It really depends 10:57:26
22    on the extent of the process that's    10:57:29
23    employed in the review.                10:57:32
24        Q.    So it sounds like in a       10:57:40
25    review, there's at least some more     10:57:41
```

Page 69

```
 1                    R. BERO
 2      limited inquiry that the CPA does as a      10:57:43
 3      part of a review, versus a compilation;     10:57:46
 4      is that fair?                               10:57:49
 5            A.    Correct, correct.               10:57:49
 6            Q.    And then you've referenced      10:57:51
 7      audited financial statements.  What is      10:57:54
 8      an audited financial statement?            10:57:55
 9            A.    Audited financial statements    10:57:57
10      are, there's a more comprehensive          10:58:04
11      review of the entity, and so for           10:58:08
12      example, public companies have annual      10:58:12
13      audits.  They have to have an annual       10:58:18
14      audit, and so that would involve more      10:58:20
15      review of the company financial data.      10:58:28
16      Perhaps more discussion with the people    10:58:37
17      at the company, issues related to the      10:58:50
18      inventory, what's in inventory, how do     10:58:51
19      you do inventory.  In some cases they      10:58:53
20      would, historically used to, anyway, do    10:58:57
21      physical inventories.  Or on some          10:59:00
22      limited level, they would test data in     10:59:05
23      some cases.  So it's a more, it's a        10:59:13
24      more involved process associated with      10:59:18
25      reviewing the company and data, and        10:59:24
```

Page 70

```
 1                    R. BERO
 2    then ultimately submitting an audit        10:59:27
 3    opinion.  If it's unqualified, the         10:59:32
 4    auditors are, on a material basis, they    10:59:36
 5    found nothing of materiality that is of    10:59:40
 6    concern, they may have a qualified         10:59:48
 7    opinion which points out one or two or     10:59:52
 8    more issues or areas that they haven't     10:59:56
 9    been able to resolve, or maybe some        11:00:05
10    uncertainties associated with the          11:00:07
11    business.                                  11:00:09
12         Q.   And as a CPA does a             11:00:09
13    compilation or a review or an actual       11:00:23
14    audited financial statement, is it         11:00:26
15    important to the CPA to rely upon          11:00:29
16    reliable information from the company?     11:00:31
17         A.   Well, it helps.  Certainly      11:00:37
18    ideally, the information that's            11:00:42
19    provided is accurate and complete.  In     11:00:45
20    some cases, you know, a CPA, in the        11:00:51
21    process of the audit, they'll try to       11:00:57
22    help discern whether or not it is, and     11:01:01
23    that's part of the process of the          11:01:04
24    audit.  In other cases, you know, they     11:01:06
25    just have to rely on representations of    11:01:12
```

Page 71

```
 1                    R. BERO
 2    management or whomever at the company      11:01:14
 3    that the information is accurate.  But     11:01:17
 4    that's, you know, a process -- that's      11:01:20
 5    the intent of the audit, is to review      11:01:22
 6    the financial information to ideally       11:01:24
 7    uncover adjustments, or making sure, to    11:01:29
 8    the best of their ability, they can        11:01:32
 9    present accurate financial statements.     11:01:36
10         Q.   So is part of the purpose of     11:01:38
11    an audit of a CPA to kind of try to        11:01:42
12    assess the reliability of the             11:01:45
13    information that's been provided by the    11:01:47
14    company?                                   11:01:48
15         A.   Yes, but the intent is to        11:01:49
16    present reliable financial statements.     11:01:59
17    That's the intent.  And so part of that    11:02:02
18    process is trying to audit and verify,     11:02:05
19    if you will, that the information that     11:02:13
20    flows up into those financial             11:02:17
21    statements is reliable.                    11:02:19
22         Q.   Does a CPA similarly try to      11:02:25
23    verify the information as part of a        11:02:27
24    review, or no?                             11:02:28
25         A.   I'm sorry, you cut out.          11:02:30
```

Page 72

```
 1                        R. BERO
 2         Q.    Sorry.                      11:02:32
 3         A.    That's okay.                11:02:33
 4         Q.    I can repeat.  I said, does a   11:02:34
 5    CPA attempt to verify information as      11:02:37
 6    part of a review?                         11:02:39
 7         A.    I'm not sure.  To be honest,   11:02:40
 8    I don't recollect the rigor, if you       11:03:01
 9    will, that's required or expected in      11:03:04
10    the review.  There could be different     11:03:08
11    levels, and it could be a function of,    11:03:18
12    you know, what specifically the CPA was   11:03:20
13    hired to review, if that helps.           11:03:25
14         Q.    Yes.  Would a CPA typically    11:03:40
15    attempt to verify information from a      11:03:42
16    company as part of a compilation?         11:03:44
17         A.    Well, I don't know that       11:03:46
18    that's necessarily the role of a CPA in   11:03:50
19    that instance, but the CPA is going to    11:03:52
20    compile the information, and ideally is   11:04:07
21    going to be providing guidance.           11:04:09
22              So for example, a company       11:04:11
23    might want to hire a certain CPA for a    11:04:13
24    compilation of their financial            11:04:16
25    statements, because that particular CPA   11:04:20
```

Veritext Legal Solutions
866 299-5127

```
1                        R. BERO
2    or CPA firm has experience in that        11:04:23
3    particular industry or with, you know,    11:04:25
4    whatever, so that the CPA can provide     11:04:30
5    some specific guidance.  Specialized      11:04:35
6    guidance.  Not always, but that could     11:04:39
7    be part of a compilation process.         11:04:44
8         Q.    So in this case, did you       11:04:46
9    review any CPA documents related to       11:04:56
10   SIS, financial statements?                11:05:03
11        A.    What do you mean by "CPA       11:05:06
12   documents"?                               11:05:09
13        Q.    Anything created by a CPA for  11:05:10
14   SIS?                                      11:05:12
15        A.    We reviewed, we have a         11:05:14
16   summary of their financial statements     11:05:22
17   for a few of the years that I             11:05:24
18   summarized on one of my schedules.  I     11:05:28
19   don't recollect if a CPA reviewed that    11:05:33
20   or compiled that or audited that.  I      11:05:36
21   just don't, I don't recollect.            11:05:45
22        Q.    From lost profits             11:05:48
23   methodology, have you ever heard of       11:06:00
24   something called a yardstick approach?    11:06:02
25        A.    Yes.                           11:06:04
```

Page 74

```
 1                      R. BERO
 2    chip, to SIS and its customers.          11:35:35
 3              So that's, I guess,             11:35:40
 4    inherently assuming Rebotix would have    11:35:42
 5    made those sales.  Unless, to the other   11:35:45
 6    extent, Restore was in a position where   11:35:49
 7    it was the one that was supplying the     11:35:51
 8    chips, whether or not it was the X/Xi     11:35:55
 9    or whether it was also the S, Si chip.    11:35:58
10        Q.    So are you assuming that in     11:36:06
11    the but-for world, that Rebotix would     11:36:10
12    only sell to SIS, either through an       11:36:13
13    in-house model or through a distributor   11:36:16
14    model?                                    11:36:18
15        A.    I'm not assuming that they      11:36:18
16    only would have sold to SIS.  But         11:36:20
17    certainly, SIS would have been, likely,   11:36:26
18    the majority of their sales for these     11:36:31
19    kinds of, certain products or services.   11:36:35
20    Essentially, the interceptor chip.        11:36:41
21        Q.    And you haven't, for example,   11:36:43
22    forecasted what the sales of Rebotix      11:36:48
23    might be in the but-for world, correct?   11:36:52
24        A.    I haven't forecasted what       11:36:56
25    Rebotix's sales would have been in the,   11:37:00
```

Page 93

```
 1                         R. BERO
 2      no, other than to the extent, again --      11:37:05
 3      do you mean separate from SIS?              11:37:08
 4           Q.    Yes.                             11:37:10
 5           A.    No, I haven't specifically       11:37:11
 6      done that.  Although my understanding       11:37:14
 7      is that Rebotix would have been making      11:37:17
 8      the majority of their sales through         11:37:21
 9      SIS, simply because of their -- well, I     11:37:24
10      mean, based on my understanding of the     11:37:30
11      relationship and how they were, both       11:37:33
12      parties, were approaching that             11:37:37
13      relationship.                              11:37:38
14           Q.    Are you making any              11:37:38
15      assumptions about what Restore's sales     11:37:43
16      would have been in the but-for world?      11:37:46
17           A.    It would be similar to          11:37:47
18      Rebotix.  So depending on who, whether     11:37:57
19      it was Restore or Rebotix, had the         11:38:05
20      capability for the X and Xi chip, and,     11:38:07
21      you know, also depending upon whether      11:38:13
22      or not the added RFID encryption on the    11:38:17
23      X and Xi EndoWrists was legal or not,      11:38:24
24      that would, perhaps, factor into who       11:38:31
25      was actually, you know, whether it was     11:38:34
```

Page 94

```
 1                      R. BERO
 2    Restore, Rebotix or a combination of      11:38:37
 3    both, making the sales.  So I haven't     11:38:40
 4    specifically tried to parse that out.     11:38:42
 5    We don't know.                            11:38:47
 6         Q.   You're not assuming, though,    11:38:52
 7    that Restore only would have sold, you    11:38:54
 8    know, for example, chips to SIS in the    11:38:58
 9    but-for world, correct?  And had no       11:39:01
10    other sales?                              11:39:07
11         A.   I'm not assuming Restore        11:39:09
12    would have sold just to SIS and had no    11:39:12
13    other sales.  No, I'm not assuming        11:39:16
14    that.  I mean, perhaps they would have,   11:39:20
15    but I'm not assuming that necessarily,    11:39:24
16    no.                                       11:39:27
17              MR. VAN HOVEN:  Ashley,         11:39:32
18         whenever we get to an appropriate    11:39:33
19         time, it would be a good time to     11:39:37
20         take a break.                        11:39:39
21              MS. BASS:  We can take one      11:39:39
22         now, that's good.                    11:39:42
23              MR. VAN HOVEN:  Okay.           11:39:43
24              THE VIDEOGRAPHER:  Time is      11:39:44
25         11:39 a.m. Central time on March 8,  11:39:45
```

Page 95

```
 1                         R. BERO
 2        2023.  This marks the end of unit      11:39:48
 3        two, we are now off the record.        11:39:50
 4              (Recess.)                        11:39:52
 5              THE VIDEOGRAPHER:  The time       11:51:50
 6        is 11:51 a.m. Central time,            11:51:56
 7        March 8, 2023.  Back on the record,    11:51:59
 8        you may proceed.                       11:52:01
 9        Q.    Mr. Bero, when you were          11:52:05
10   writing your report in this case, did       11:52:07
11   you review any sales forecasts that SIS     11:52:09
12   created in the normal course of its         11:52:12
13   business, for example, in 2018, 2019,       11:52:15
14   2020?                                       11:52:19
15        A.    Not that I recollect, no.        11:52:26
16        Q.    So SIS has historically sold     11:52:27
17   less reset EndoWrists than Restore or       11:52:36
18   Rebotix, correct?                           11:52:42
19              MR. VAN HOVEN:  Objection to     11:52:42
20        form.                                  11:52:43
21        A.    I'm sorry, did you ask if SIS    11:52:43
22   has historically sold less?                 11:52:45
23        Q.    Correct.                         11:52:49
24        A.    The, I believe that is true,     11:52:50
25   although I don't remember the exact         11:52:53
```

Page 96

```
 1                    R. BERO
 2    this scenario.                          12:16:59
 3         A.    As you can see here, I'm     12:17:03
 4    citing to footnote 418, which is the    12:17:14
 5    deposition of Mr. Parker, and I also    12:17:15
 6    spoke with Mr. Humphrey about that.     12:17:17
 7    I'm trying to...                        12:17:30
 8         Q.    Yeah, take your time.        12:17:31
 9         A.    I'm looking back now at my   12:17:38
10    up-front assumptions.  Yeah, I cite to, 12:17:42
11    on page 5, under footnote 19,           12:18:04
12    discussion with Kurt Humphrey, SIS's    12:18:06
13    technical expert for that piece of      12:18:12
14    information.                            12:18:14
15              So you had asked me earlier,  12:18:15
16    right, early in the dep what I remember 12:18:17
17    speaking with Mr. Humphrey about, and   12:18:24
18    that was one of the issues, obviously,  12:18:26
19    as well.                                12:18:27
20         Q.    So here, for this scenario   12:18:28
21    two, for the X and Xi EndoWrists, are   12:18:32
22    you take the January 1, 2021, date and  12:18:39
23    the January 1, 2022, dates as           12:18:43
24    assumptions?                            12:18:45
25         A.    Essentially, yes.  It's not  12:18:50
```

Page 113

```
1                    R. BERO
2    unlike my scenario one, where, you        12:18:55
3    know, I'm not opining per se, that they   12:19:01
4    have the capability of doing it on        12:19:06
5    January 1st, 2020, or 2021 or 2022,       12:19:08
6    depending on whichever scenario you're    12:19:12
7    looking at.                               12:19:17
8              I'm relying on the              12:19:21
9    capabilities and/or testimony or         12:19:23
10   discussion in this case with             12:19:26
11   Mr. Humphrey, in part, on those dates.   12:19:29
12   And of course, we don't have -- it       12:19:32
13   hasn't been done, so we don't have       12:19:36
14   specific known dates.  These are         12:19:38
15   alternative possibilities that I         12:19:41
16   understand are reasonable under the      12:19:45
17   circumstances.                           12:19:48
18              And for the record, I also    12:19:51
19   understand Intuitive's position is       12:19:52
20   probably that they're not reasonable.    12:19:54
21        Q.    So what is your basis for     12:19:56
22   saying that you understand these         12:20:09
23   scenarios to be reasonable under the     12:20:11
24   circumstances?                           12:20:13
25        A.    What's my basis?              12:20:13
```

Page 114

```
 1                    R. BERO
 2      Q.    Yes.                        12:20:17
 3      A.    Well, I think specifically  12:20:18
 4   I'm relying on the cites I got here in  12:20:26
 5   footnote 418 under scenario two.  But   12:20:31
 6   more broadly, I understand that the     12:20:36
 7   X/Xi came out, I believe it was in      12:20:44
 8   2014, platform came out in 2014, or was 12:20:49
 9   it 2017?  I can't remember.  But it had 12:20:53
10   been around, and there was a            12:20:55
11   recognition that the S and Si           12:20:57
12   EndoWrists were going to be likely      12:21:02
13   phased out over time, and that the X/Xi 12:21:06
14   was going to be -- EndoWrists were      12:21:11
15   going to be replacing, in part, those   12:21:19
16   S/Si EndoWrists, and that the volume    12:21:22
17   was going to be geared more towards the 12:21:24
18   X/Xi over time.  And that's where the   12:21:27
19   repair services were going to be going. 12:21:32
20   And that SIS and Rebotix and Restore    12:21:35
21   recognized that, and were working on    12:21:43
22   that encryption as well.  Up until      12:21:51
23   everything sort of came to a halt in,   12:21:59
24   you know, the winter of 2019, '20 time  12:22:04
25   frame.                                  12:22:09
```

Page 115

```
 1                    R. BERO
 2        Q.    So I think you said this        12:22:10
 3   earlier, but just to confirm, you're       12:22:13
 4   not offering an independent kind of        12:22:15
 5   opinion in this case that the ability      12:22:18
 6   to reset X/Xi EndoWrists by these third    12:22:20
 7   parties necessarily would have been        12:22:26
 8   available on January 21, 2021, correct?    12:22:27
 9        A.    Correct.                         12:22:33
10        Q.    And nor are you offering the     12:22:33
11   opinion that the services would have       12:22:35
12   been available as of January 1, 2022,      12:22:36
13   correct?                                    12:22:38
14        A.    Correct.                         12:22:39
15        Q.    So you probably saw in           12:22:46
16   Mr. Smith's report that he recalculated    12:22:48
17   the damages in order to remove the X/Xi    12:22:51
18   volume from them.  And my only question    12:22:54
19   is, if -- I understand you do not agree    12:22:56
20   with that, but did you have any issues     12:23:01
21   with the actual calculations that were     12:23:02
22   done with respect to that analysis?        12:23:04
23             MR. VAN HOVEN:  Objection to     12:23:06
24        form.                                  12:23:06
25        A.    I don't recollect, I don't       12:23:06
```

Page 116

```
 1                    R. BERO
 2    A F T E R N O O N   S E S S I O N      13:01:21
 3            (Time noted:  1:01 p.m.)        13:01:25
 4            THE VIDEOGRAPHER:  This marks   13:01:25
 5    unit three.  The time is 1:01 p.m.      13:01:27
 6    Central time on March 8, 2023.          13:01:35
 7    Back on the record.  You may            13:01:35
 8    proceed.                                13:01:36
 9            RICHARD F. BERO, RESUMED,       13:01:38
10    having been previously and duly         13:01:38
11    sworn, was examined and testified       13:01:38
12    further, as follows:                    13:01:39
13            CONTINUED EXAMINATION           13:01:39
14            BY MS. BASS:                    13:01:40
15       Q.   Mr. Bero, when you were         13:01:40
16    preparing your report in this case, did 13:01:42
17    you speak to anyone at a GPO?           13:01:44
18       A.   No.                            13:01:47
19       Q.   And you understand what I       13:01:47
20    mean when I say GPO, a group purchasing 13:01:49
21    organization, right?                    13:01:52
22       A.   Yeah, other than Jean Sargent   13:01:52
23    who, you know, used to work for a GPO,  13:01:56
24    other than that, no.                    13:02:02
25       Q.   So for example, you didn't      13:02:03
```

Page 123

```
 1                    R. BERO
 2    speak to anyone directly at Vizient,          13:02:04
 3    correct?                                      13:02:06
 4         A.    Right, with the exception of,      13:02:07
 5    as I referenced, Jean Sargent, correct.       13:02:11
 6         Q.    If you can look in your            13:02:13
 7    opening report at page 50.                    13:02:18
 8         A.    Yes.                               13:02:35
 9         Q.    One second, I may be slightly      13:02:35
10    off on the page.                              13:02:39
11         A.    I'm sorry, I didn't catch the      13:02:48
12    beginning of that.                            13:02:50
13         Q.    I said, give me one second.        13:02:51
14    I think I have the wrong page.  Okay?         13:02:54
15         A.    Oh, okay.                          13:02:57
16         Q.    Apologies on that.  It's on        13:03:36
17    page 44.                                      13:03:38
18         A.    Okay.                              13:03:48
19         Q.    Okay.  So you have a quote,        13:03:48
20    it actually carries over from 43, from        13:03:55
21    Mr. Keith Johnson.  And then you say --       13:03:58
22         A.    Yes.                               13:04:03
23         Q.    -- over on 44 he says, He          13:04:03
24    also testified the potential revenue          13:04:07
25    from the S/Si EndoWrist business was          13:04:09
```

Page 124

```
 1                      R. BERO
 2      somewhere in the range of 250 million      13:04:12
 3      to 350 million per year.                   13:04:15
 4               Do you see that sentence?         13:04:17
 5          A.    Yes.                             13:04:21
 6          Q.    Okay.  So my question for you    13:04:22
 7      is, in this case, are you relying on       13:04:25
 8      what Mr. Johnson said as a basis for       13:04:29
 9      your opinions in this case?                13:04:33
10          A.    In that specific quote, or       13:04:36
11      that specific range?                       13:04:40
12          Q.    Yeah, in that specific quote.    13:04:40
13          A.    So let me just read the quote    13:04:43
14      so it's on the record.  He, being          13:04:52
15      Mr. Johnson, also testified that the       13:04:59
16      potential revenue from the S/Si            13:05:01
17      EndoWrist business was somewhere in the    13:05:04
18      range of 250 million to 350 million per    13:05:05
19      year based on, and then it quotes his      13:05:09
20      testimony, "Conversations I had with       13:05:13
21      key customers to understand the number     13:05:16
22      of robotics they had, the number of        13:05:18
23      robots they had, the dollars spent on      13:05:21
24      devices and instrumentation for those      13:05:24
25      robots, and then looking at our global     13:05:26
```

Page 125

```
 1                    R. BERO
 2     customer list through Vizient and the       13:05:29
 3     opportunities we would have."               13:05:32
 4             So I'm not relying, per se,          13:05:41
 5     on that quote, and that testimony.          13:05:46
 6     It's consistent with conversations,         13:05:51
 7     generally speaking, I had with              13:05:53
 8     Mr. Johnson.  As you can see in my          13:05:58
 9     various damages claims, I'm not             13:06:12
10     quantifying a level approaching 250         13:06:14
11     million to 350 million per year.  The       13:06:18
12     maximum I have is around 68 million.        13:06:25
13     So I guess my numbers aren't                13:06:33
14     inconsistent with Keith saying there's      13:06:35
15     potential for 250 to 350 million per        13:06:40
16     year.                                       13:06:44
17             Obviously, if you look at my        13:06:46
18     analysis, I make certain adjustments        13:06:49
19     down for various factors, and I guess       13:06:53
20     that's a long-winded answer of, I'm not     13:06:58
21     relying specifically on that statement,     13:07:01
22     but it's not inconsistent.  It's            13:07:08
23     generally consistent with my                13:07:10
24     understanding and analyses.                 13:07:12
25         Q.    Well, based on what you have      13:07:13
```

Page 126

```
 1                      R. BERO
 2    here, he says that the S/Si EndoWrist        13:07:17
 3    business was somewhere in the range of       13:07:22
 4    250 million to 350 million.  So              13:07:24
 5    focusing on the fact that Mr. Johnson        13:07:26
 6    was providing testimony about his view       13:07:28
 7    of the S/Si opportunity, does that           13:07:32
 8    change your answer?  I just want to          13:07:36
 9    make sure we're on the same page.            13:07:38
10         A.    Well, at the time there was a     13:07:46
11    transition that's now become the X/Xi,       13:07:48
12    largely, as we've talked about.  The         13:07:51
13    S/Si testimony that he gave was based        13:07:59
14    on the number of S/Si, S/Si robots that      13:08:01
15    he was aware of based on discussions         13:08:10
16    with one particular client in general,       13:08:12
17    and I believe they had all S/Si robots       13:08:15
18    at the time.                                 13:08:20
19              So I'm, you know, to the           13:08:22
20    extent he's limiting it just to S/Si,        13:08:25
21    obviously I'm not claiming anywhere          13:08:31
22    close to that in terms of my damages         13:08:34
23    calculations.  I had a relatively small      13:08:38
24    amount of S/Si damages, relatively           13:08:41
25    speaking, in my calculation.                 13:08:51
```

Page 127

```
 1                      R. BERO

 2        Q.    In your report, my            13:08:52

 3   understanding is that you are assuming   13:09:11

 4   that SIS would not need FDA approval to  13:09:14

 5   reset the usage counter on EndoWrist     13:09:18

 6   instruments.  Am I right about that      13:09:22

 7   assumption?                              13:09:24

 8        A.    Are you -- that's correct.    13:09:24

 9   Are you referring to a particular page?  13:09:27

10   I see you looking at something.          13:09:29

11        Q.    No, I was not.                13:09:31

12        A.    I have, I think that's one of 13:09:33

13   my assumptions listed up front in my     13:09:35

14   report.                                  13:09:38

15        Q.    If you look at page 5 of your 13:09:46

16   opening report.                          13:09:57

17        A.    Yes, fourth bullet, that's my 13:09:58

18   assumption, correct.                     13:10:01

19        Q.    And you're simply taking that 13:10:01

20   assumption, I assume, from counsel; is   13:10:03

21   that right?                              13:10:05

22        A.    Well, I'm citing here         13:10:06

23   discussions with Mr. Johnson,            13:10:10

24   Mr. Posdal, as well as a deposition of   13:10:13

25   a gentleman from -- a deposition of a    13:10:19
```

Page 128

```
 1                        R. BERO
 2    my recollection is, thought they could      13:36:16
 3    get it up and running faster than what      13:36:18
 4    we show here.  But, you know,               13:36:20
 5    ultimately, I'm relying on Jean Sargent     13:36:25
 6    for that transition.                        13:36:28
 7         Q.    You're not an expert on          13:36:29
 8    conversion rates for medical devices at     13:36:33
 9    hospitals, correct?                         13:36:36
10         A.    Correct.                         13:36:38
11         Q.    And you're not an expert on      13:36:39
12    conversion rates for medical devices at     13:36:41
13    GPOs, correct?                              13:36:43
14         A.    Correct.                         13:36:44
15         Q.    This information, do you         13:36:46
16    recall if it came through a discussion      13:36:52
17    with Ms. Sargent, or is it from her         13:36:54
18    expert report in the case?                  13:36:58
19         A.    I know we talked about this.     13:36:59
20    I believe she also has some information     13:37:07
21    in her expert report on this, but           13:37:10
22    certainly, I remember talking about the     13:37:15
23    motion, this concept, and these             13:37:20
24    percentages with her.                       13:37:22
25         Q.    Did Ms. Sargent provide you      13:37:30
```

Page 145

```
1                     R. BERO
2    with any documents to support the        13:37:32
3    conversion rates that she's included in  13:37:34
4    her expert report in this case?          13:37:38
5         A.    I don't believe so, no.       13:37:43
6         Q.    Did you undertake any effort  13:37:43
7    to verify the information that           13:37:45
8    Ms. Sargent was providing regarding the  13:37:49
9    conversion rates in the case?            13:37:53
10        A.    I'm not -- this is, like,     13:37:59
11   your question earlier related to an      13:38:10
12   audit.  And there are some things that   13:38:12
13   you can check against data that's        13:38:15
14   available.  Accountants, CPAs, to the    13:38:19
15   extent that data is available, will      13:38:26
16   confirm, as you can see, throughout my   13:38:28
17   report.  However, ultimately you're      13:38:30
18   relying on the expertise of others, and  13:38:34
19   I'm not aware of any documents, per se,  13:38:39
20   that would address this kind of an       13:38:44
21   issue.                                   13:38:48
22              And so ultimately, my opinion 13:38:52
23   is reliant upon this component that      13:38:58
24   transition happening over a two-year     13:39:05
25   period, basically, a                     13:39:08
```

Page 146

```
 1                    R. BERO
 2    two-and-a-half-year period.  Well, no,      13:39:09
 3    two-year period.  And that comes from       13:39:14
 4    Ms. Sargent.                                13:39:16
 5         Q.    Do you recall if SIS's           13:39:17
 6    contract with Vizient was an exclusive      13:39:23
 7    relationship?                               13:39:26
 8         A.    I don't recollect that it was    13:39:26
 9    exclusive.  I may have addressed that       13:39:38
10    in my report, but I don't know that it      13:39:40
11    was exclusive, per se.                      13:39:43
12         Q.    If the conversion rates at       13:39:45
13    Vizient would have actually been lower      13:39:53
14    than what Ms. Sargent is offering,          13:39:56
15    would that mean that lost profits           13:39:59
16    damages would have been lower?              13:40:02
17              MR. VAN HOVEN:  Objection to      13:40:04
18         form.                                  13:40:04
19         A.    All else equal, yeah, they       13:40:04
20    would have spread out, or the               13:40:10
21    conversion rates would have been lower.     13:40:12
22    Yeah, that would, that would reduce the     13:40:14
23    lost profits numbers, correct.             13:40:19
24         Q.    And similarly, on our prior      13:40:26
25    conversations about the expiration         13:40:27
```

Page 147

```
 1                        R. BERO
 2     price figures, at least as much as the      14:58:13
 3     discounts shown in the memorandum of        14:58:18
 4     understanding.                              14:58:21
 5              I didn't know that for my          14:58:23
 6     first initial report, but once I           14:58:28
 7     understood that those discounts would      14:58:33
 8     have similarly applied to the              14:58:40
 9     distributor prices, I incorporated         14:58:41
10     those into my analysis.                    14:58:46
11         Q.    So Mr. Gibson existed when       14:58:48
12     you filed, served your original report,    14:58:56
13     correct?                                   14:58:59
14         A.    Did you ask if he existed?       14:59:01
15         Q.    Yes.                             14:59:06
16         A.    He did.                          14:59:06
17         Q.    Yes.  Any reason you couldn't    14:59:06
18     have spoken with him in conjunction        14:59:08
19     with your original report?                 14:59:11
20         A.    I don't know that there was a    14:59:12
21     reason other than, like anything, we're    14:59:17
22     trying to get this stuff done in as        14:59:23
23     quick a period of time with the           14:59:26
24     available information we have, and I       14:59:28
25     thought the basis that we had was         14:59:38
```

Page 194

```
 1                     R. BERO
 2    pretty reasonable.                    14:59:40
 3             And again, from the          14:59:40
 4    plaintiff's perspective, I thought it 14:59:41
 5    was quite conservative.               14:59:43
 6        Q.    And we talked about         14:59:51
 7    Mr. Gibson's testimony earlier.  It was 14:59:53
 8    on your materials considered when you 14:59:54
 9    did your opening report.  And in that 14:59:56
10    testimony, he said he never would have 15:00:01
11    agreed to this memorandum of          15:00:03
12    understanding, but you think it's     15:00:04
13    reasonable now to rely upon the       15:00:05
14    conversation that you had with him two 15:00:08
15    years later regarding what he would   15:00:10
16    have done?                            15:00:11
17             MR. VAN HOVEN:  Objection to 15:00:13
18        form.                             15:00:20
19        A.    Absolutely, because he said 15:00:20
20    he wouldn't have agreed to the        15:00:22
21    memorandum of understanding, and I said 15:00:24
22    there were two primary reasons, and we 15:00:26
23    talked about one.  That was the second, 15:00:26
24    lesser reason.                        15:00:28
25             The primary reason he        15:00:30
```

Page 195