# ATTACHMENT 51

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
                    UNITED STATES DISTRICT COURT
                 FOR THE NORTHERN DISTRICT OF CALIFORNIA
                         SAN FRANCISCO DIVISION




                                        )
    SURGICAL INSTRUMENT SERVICE          )
    COMPANY, INC.,                       )
                                         )
                                         )
            Plaintiff,                   ) Case No. 3:21-cv-03496-VC
                                         )
         vs.                             )
                                         )
    INTUITIVE SURGICAL, INC.,            )
                                         )
                                         )
                                         )
            Defendant.                   )
    _____         )


    HIGHLY CONFIDENTIAL, ATTORNEYS' EYES ONLY DEPOSITION OF:
                        KURT HUMPHREY
                    WEDNESDAY, MARCH 15, 2023
                        10:25 A.M. (MST)




    Reported by:   GINA M. CLOUD
                   CSR No. 6315
```

Page 1

**Page 134**

1  straightforward, and maybe I should say the
2  programing of a CryptoRF chip should be
3  straightforward. Maybe that should be expanded to
4  programmable, not just reprogrammable.
5      Q. Go ahead.                              15:33:03
6      A. I'm looking for another reference here. If
7  you look at page 20 from my opening report.
8      Q. What should I be looking at there?
9      A. Paragraph 49, an excerpt from the e-mail --
10 anyway the excerpt from the e-mail says: "The unique   15:34:42
11 ID doesn't prevent reprocessors from putting lives
12 back on our instruments. In principle, you could
13 copy the blob of data off a new instrument, then put
14 the same blob of data back on once it's expired, and
15 it will be good as new. I believe the Dallas          15:35:02
16 implementation uses 'write once' region in the tag to
17 ensure the decremented lives stay decremented."
18     So this is an excerpt from an Intuitive
19 e-mail that basically alerts those in the design --
20 in the engineering community of the potential to just  15:35:28
21 again reprogram or program a same chip with the
22 extracted image and make it appear like a new
23 instrument.
24     Q. Do you think that an internal Intuitive
25 e-mail alerts the engineering community to something?  15:35:52

**Page 135**

1      MR. VAN HOVEN: Objection to form.
2      THE WITNESS: I'm sorry. Can you repeat the
3  question.
4  BY MS. CAHOY:
5      Q. I said you think an internal Intuitive      15:35:59
6  e-mail alerts the engineering community to something?
7      MR. VAN HOVEN: Objection to form.
8  BY MS. CAHOY:
9      Q. I'm just asking about what you said in your
10 answer about basically this e-mail alerts those in    15:36:15
11 the design and the engineering community.
12     A. I believe that's who it was addressed to. I
13 believe it's addressed to the design team.
14     Q. The design team at Intuitive?
15     A. Yes.                                          15:36:31
16     Q. And this paragraph 49 says that the unique
17 ID doesn't prevent reprocessors from putting lives
18 back on the instruments, correct?
19     A. Yes.
20     Q. The last sentence says that "the Dallas      15:36:47
21 implementation uses a 'write once' region in the tag
22 in ensure decremented lives stay decremented"?
23     A. Correct.
24     Q. So putting the use counter in a
25 decrement-only region of the chip provides additional 15:37:05

**Page 136**

1  protections that the unique I.D. doesn't provide,
2  correct?
3      A. Assuming you can't rewrite over it, I
4  believe that would be true.
5      Q. I believe you said something earlier in one  15:37:36
6  of your answers about programing the CryptoRF chip
7  after the image has been extracted, right? Do you
8  recall talking about programing of the RF chip being
9  a simple process?
10     A. Yes.                                         15:38:09
11     Q. Is programing a software function?
12     A. It's both a soft and hardware function.
13     Q. Is programing something that you do, or does
14 that fall under the category of you rely on someone
15 else on your team to do the programing in reverse    15:38:31
16 engineering processes?
17     A. I probably rely on someone else to actually
18 generate the file to be programmed, but certainly the
19 hardware to program the chip, I can certainly operate
20 that.                                                15:38:55
21     Q. You can operate the hardware?
22     A. The programmer for the chip, yes.
23     Q. You would rely on someone else on your team
24 to program the software, though?
25     A. I don't understand your question.            15:39:16

**Page 137**

1      Q. When was the last time that you programmed a
2  chip personally?
3      A. Programmed a chip for, last word?
4      Q. Personally.
5      A. It's probably been five, six years ago.      15:39:44
6      Q. You have someone else on your team that you
7  look to to do the programing of chips?
8      A. No, not necessarily. But this isn't
9  something that we do on a regular basis. We don't
10 program nonvolatile memories on a regular basis.     15:40:22
11 That's probably an unusual thing for us to do.
12     Q. Who is the "we" in that response? Who are
13 you referring to when you say "we"?
14     A. Me and my subject matter experts. My team
15 of experts that I rely on for certain aspects of the 15:40:47
16 reverse engineering work that we do at IP Enginuity.
17     Q. If you turn to page 21 of your report.
18     A. Which report?
19     Q. The same one we're on, the Rebotix Report.
20     A. Okay.                                        15:41:42
21     Q. Do you see the italicized heading in the
22 middle of the page with the small Roman numeral iv
23 before it?
24     A. Yes.
25     Q. Could you read that, please.                 15:41:56

```
 1     A.  "Several additional factors make the process
 2  of Rebotix's image analysis for the Xi EndoWrist
 3  CryptoRF chip easier than others that I've
 4  encountered in my career."
 5     Q.  What's an example of a chip you were        15:42:33
 6  referencing as one of the others you have encountered
 7  in your career?
 8     A.  We've encountered chips that were physically
 9  rendered very difficult to physically analyze because
10  of protective materials that had been applied to the  15:43:13
11  chips so that deprocessing the chip was extremely
12  difficult, without destroying the chip, without
13  destroying the information you were looking at.  That
14  would be one example.
15     Q.  Are there any other examples that you've    15:43:37
16  encountered in your career that you think would be
17  more difficult?
18     A.  It kind of goes along with what I'm
19  mentioning in paragraph 71, 70 and 71 just below.
20  The fact that third parties like Rebotix have      15:43:57
21  familiarity with the embedded software and the data
22  in the memories of the EndoWrists of the S/Si
23  EndoWrists certainly gives them a leg up on analyzing
24  the images extracted from the X/Xi because they're
25  generally similarities within the same company or  15:44:32
```
Page 138

```
 1  same product line, lines of codes are used and
 2  reused.
 3         It's unusual for software to be totally new,
 4  so there is an advantage that they will have in
 5  analyzing these images since they've already done it  15:44:56
 6  once for the earlier generation tools.
 7     Q.  So that's what you're referencing in
 8  paragraph 76 when you say:  "The similarity between
 9  the data extracted from the Xi EndoWrist and prior
10  data analyzed by Rebotix on the S/Si EndoWrist makes  15:45:15
11  image analysis a straightforward process"?
12         MR. VAN HOVEN:  Objection to form.
13         THE WITNESS:  Yes.  And familiarity with the
14  software in question is certainly an advantage.  It's
15  generally quite helpful.  I've had that experience.  15:45:43
16  BY MS. CAHOY:
17     Q.  It makes it more straightforward to --
18     A.  Yes.  Often that's true.
19     Q.  But also you said here it would make it more
20  straightforward for Rebotix, right?              15:45:58
21     A.  Yes, it should.
22     Q.  Are you aware that SIS has a damages expert
23  in this case who has submitted a few reports?
24     A.  I may have, again, anecdotally heard that
25  there were damage experts that were involved, but  15:46:59
```
Page 139

```
 1  I've not seen any of their work or had any
 2  communication with them.  I don't know who they are.
 3     Q.  You've never spoken with SIS's damages
 4  expert?
 5     A.  No.                                       15:47:19
 6     Q.  Have you heard of a hospital called Larkin
 7  Community Hospital?
 8     A.  I have not.
 9     Q.  What about a hospital called Valley Medical
10  Center?                                          15:47:53
11     A.  No, I'm not familiar with it.
12     Q.  What about Franciscan Hospitals in the
13  Illinois and Indiana area?
14     A.  No, I'm not familiar with them.
15     Q.  Have you ever spoken with anyone from any of  15:48:08
16  those hospitals?
17     A.  No.
18     Q.  Have you ever spoken with Counsel for those
19  hospitals at firms such as Boni & Zach (phonetic),
20  Cohen Milstein or SRK Attorneys?                15:48:24
21     A.  No.
22     Q.  So as far as you're aware, you've never
23  spoken with either the hospitals or their counsel
24  that are suing Intuitive?
25     A.  That's correct.                          15:48:55
```
Page 140

```
 1     Q.  Who wrote your Rebotix Report?
 2     A.  I wrote it.
 3     Q.  Did you receive input on that report from
 4  Rebotix's counsel?
 5     A.  There was certainly some internal review and  15:49:28
 6  some feedback on it.
 7         MS. CAHOY:  If we could take another break
 8  now, I think I'm close to done.  I just want to look
 9  back through and see if I have any questions left.
10         THE WITNESS:  Sounds good.               15:50:24
11         MR. VAN HOVEN:  Let's go off the record.
12         THE VIDEOGRAPHER:  We are off the record.
13  The time is 4:50 p.m.
14         (Recess taken.)
15         THE VIDEOGRAPHER:  We are back on the    16:09:20
16  record.  The time is 5:09 p.m.
17  BY MS. CAHOY:
18     Q.  Mr. Humphrey, have any of your expert
19  opinions been excluded before?
20     A.  No.                                      16:09:53
21     Q.  Have you ever talked to someone identified
22  to you as an expert in this case by the name of
23  Philip Phillips?
24     A.  No, not that I can recall.
25     Q.  Have you ever talked to someone identified  16:10:14
```
Page 141

36 (Pages 138 - 141)

```
 1  to you as an expert in this case by the name of Jean
 2  Sargeant?
 3      A.  No.
 4      Q.  Have you ever talked to someone identified
 5  to you as an expert in this case by the name of        16:10:28
 6  Amandeep Mahal?
 7      A.  No.
 8      Q.  Have you ever talked to someone identified
 9  to you as an expert in this case by the name of
10  Russell Lamb?                                          16:10:42
11      A.  No.
12      Q.  Have you ever talked to someone identified
13  to you as an expert in this case by the name of
14  Richard Bero?
15      A.  No.                                            16:10:52
16      Q.  Have you ever talked to someone identified
17  to you as an expert in this case by the name of Kim
18  Parnell?
19      A.  No.
20      Q.  Have you ever talked to someone identified    16:11:02
21  to you as an expert by the name of Einer Elhauge?
22      A.  No.
23          MS. CAHOY:  That's all the questions I have
24  today.  I appreciate your time, Mr. Humphrey.
25          I would ask that we designate the transcript  16:11:20
                                                    Page 142
```

```
 1  highly confidential, attorneys' eyes only until we
 2  have a chance to review it under the provision of the
 3  protective order.
 4          MR. VAN HOVEN:  No questions from
 5  Plaintiff's counsel.                                   16:11:33
 6          THE REPORTER:  Kate, do you need this
 7  expedited or normal delivery?
 8          MS. CAHOY:  I'll take a rough and expedited,
 9  please.
10          THE REPORTER:  When would you like it?         16:11:58
11          MS. CAHOY:  Can you get it by Monday?
12          THE REPORTER:  Sure.
13          MR. VAN HOVEN:  Just a copy, normal time.
14          THE VIDEOGRAPHER:  We are off the record.
15  The time is 5:12 p.m. on March 15, 2023.               16:12:26
16          This concludes today's testimony given by
17  Mr. Kurt Humphrey.  The total number of media units
18  used was seven, and will be retained by Veritext
19  Legal Solutions.
20          (The deposition was concluded at 4:12 p.m.)    16:12:54
21
22
23
24
25
                                                    Page 143
```

```
 1              DECLARATION
 2
 3
 4      I hereby declare I am the deponent in the within
 5  matter; that I have read the foregoing deposition and
 6  know the contents thereof, and I declare that the
 7  same is true of my knowledge except as to the matters
 8  which are therein stated upon my information or
 9  belief, and as to those matters, I believe it to be
10  true.
11      I declare under the penalties of perjury of the
12  state of California that the foregoing is true and
13  correct.
14      executed on the _____ day of _____
15  2023, at _____, California.
16
17
18
19
20          _____
                 W I T N E S S
21
22
23
24
25
                                                    Page 144
```

```
 1      I, GINA M. CLOUD, a certified shorthand
 2  reporter for the State of California, do hereby
 3  certify:
 4      that prior to being examined, the witness named in
 5  the foregoing deposition, was by me duly sworn to
 6  testify the truth, the whole truth, and nothing but
 7  the truth pursuant to Section No. 2093 of the Code of
 8  Civil Procedure;
 9      That said deposition was taken before me pursuant
10  to notice, at the time and place therein set forth,
11  and was taken down by me in shorthand and thereafter
12  reduced to typewriting via computer-aided
13  transcription under my direction;
14      I further certify that I am neither counsel for,
15  nor related to, any party to said action, nor in
16  anywise interested in the outcome thereof.
17      IN WITNESS WHEREOF, I have hereunto subscribed my
18  name this 20th day of March, 2023.
19
20
21      [signature: Gina Cloud]
        GINA M. CLOUD
22      CSR No. 6315
23
24
25
                                                    Page 145
```