# ATTACHMENT 52

Highly Confidential – Subject to Protective Order

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: DA VINCI SURGICAL ROBOT ANTITRUST LITIGATION | Lead Case No. 3:21-cv-03825-VC |

**CORRECTED EXPERT REPORT OF PROFESSOR EINER ELHAUGE**

*[signature: Einer Elhauge]*

**January 10, 2023**

**WITH ERRATA INCORPORATED**

i

Highly Confidential – Subject to Protective Order

# Table of Contents

Introduction and Assignment — 1
Qualifications — 3
Executive Summary — 4
I. Industry Background — 6
   A. A Brief History of Surgical Methods — 6
   B. Intuitive's da Vinci Robot and Aftermarket Products and Services — 12
      1. The da Vinci Robot — 12
      2. Instruments and Accessories — 18
      3. Other Products and Services — 22
   C. Third-Party Repair and Service of Medical Devices — 28
      1. Third-Party IRC Industry Overview — 29
      2. FDA Regulation of Remanufacture, Recondition, and Repair — 30
II. Market Definitions, Market Shares, and Market Power — 32
   A. Economic Approach to Market Definition — 32
   B. The U.S. Market for Minimally Invasive Soft-Tissue Surgical Robots Is a Relevant Market — 37
      1. MIST Surgery Robots Provide Benefits to Hospitals that Traditional Surgical Technologies Cannot — 38
      2. Intuitive Does Not Treat MIST Robotic Surgery as Competing with Traditional Procedures — 49
      3. Robotic Surgery Entails Specialized Vendors — 51
      4. The Relevant Market Does Not Include Other Types of Surgical Robots — 51
      5. Other Evidence Also Indicates that Alternatives Do Not Constrain MIST Surgery Robot Prices to Competitive Levels — 52
      6. The Relevant Geographic Market Is the United States — 54
   C. Intuitive Had Market Power and Monopoly Power in the Market for MIST Surgery Robots. — 55
      1. High Market Shares Coupled with High Barriers to Entry and Expansion — 55
      2. Direct Evidence of Power over Price — 64
      3. Direct Evidence of Power to Exclude — 67

4. Intuitive's Monopoly Power Is Corroborated by Industry Participants    67

D. The U.S. Market for EndoWrist Repair and Replacement Is a Relevant Market    68

   1. EndoWrist Repair and Replacement Is a Separate Product from MIST Surgery Robots    70

   2. Replacement with Repaired EndoWrists Is a Substitute for Replacement with New EndoWrists, So the Market Includes Both EndoWrist Replacement and Repair    78

   3. EndoWrist Repair and Replacement Has Had No Other Economic Substitutes    83

   4. Quantitative Analysis Confirms that EndoWrist Repair and Replacement Is a Relevant Market    84

   5. Treating Different EndoWrist Models as Being in One Market    85

   6. The Relevant Geographic Market Is the United States    86

E. Intuitive Had Market Power and Monopoly Power in the Market for EndoWrist Repair and Replacement    87

   1. High Market Shares Coupled with High Barriers to Entry and Expansion  88

   2. Direct Evidence of Power over Price    91

   3. Direct Evidence of Power to Exclude    93

   4. My Conclusions on Monopoly Power Would Not Change If the Relevant Market Were Broadened to Include the Repair and Replacement of Wristed Instruments on Other MIST Surgery Robots or to Include MIST Surgery Robots Themselves    94

F. The US Market for Servicing da Vinci Robots Is a Relevant Market    95

   1. Servicing da Vinci Robots Is an Aftermarket Separate from Sales of da Vinci Robots    95

   2. Servicing da Vinci Robots Is an Aftermarket Separate from Sales of EndoWrist Repair and Replacement    101

   3. The Servicing of da Vinci Robots Has Had No Economic Substitutes    104

   4. Services Contained Within the Relevant Market    105

   5. The Relevant Geographic Market Is the United States    107

G. Intuitive Had Market Power and Monopoly Power in the Market for da Vinci Servicing    108

    1. High Market Shares Coupled with High Barriers to Entry and Expansion ..... 108

    2. Direct Evidence of Power over Price ..... 110

    3. Direct Evidence of Power to Exclude ..... 112

    4. My Conclusions on Monopoly Power Would Not Change If the Relevant Market Were Broadened to Include All MIST Surgery Robot Servicing or to Include MIST Surgery Robots ..... 113

III. Intuitive's Restraints on Using Third-Party Service, Repair, or Replacements Tie Those Products to Da Vinci Robots ..... 115

  A. Intuitive Tied Sales of da Vinci Robots to Restraints Against Buyers Using Rivals to Service Those Robots or to Replace or Repair EndoWrists ..... 115

    1. Existence of Contractual Restraints Against Rival Repair or Replacement of EndoWrists ..... 115

    2. Existence of Contractual Restraints Against Rival Servicing of da Vinci Robots ..... 118

    3. Existence of Contractual Restraints Against Using EndoWrists for More Than the Use Limit Set by Intuitive ..... 120

    4. Intuitive Monitored and Enforced Its Restraints Against Third-Party Repair and Servicing ..... 121

  B. Intuitive's Restraints Against Third-Party da Vinci Servicing and EndoWrist Repair and Replacements Constitute Ties ..... 124

    1. Intuitive Forces da Vinci Users to Stop Using Third Parties for da Vinci Servicing or EndoWrist Repair or Replacement ..... 125

    2. Hospitals' "Agreement" to the Tying Restraint Is Irrelevant ..... 126

IV. Intuitive's Tying and Exclusivity Restraints Foreclosed Rivals from Repairing EndoWrists ..... 127

  A. Actual Third-Party Rivals Were Capable of Repairing EndoWrists ..... 127

  B. Intuitive's Conduct Foreclosed the Entire Market for EndoWrist Repair and Replacement ..... 130

    1. Intuitive's Exclusionary Restraints Drove Rebotix, Restore, and SIS Out of Hospitals that Initially Used Them ..... 131

    2. Rebotix, Restore, and SIS Were Foreclosed from Hospitals that Would Have Used Them But For Intuitive's Exclusionary Restraints ..... 132

3. Potential Entrants to Third-Party EndoWrist Repair Were Foreclosed Due to Intuitive's Exclusionary Restraints ............................................................ 136

C. Intuitive's Tying and Exclusivity Restraints Were a Substantial Cause of Hospitals' Failure to Use Third-Party EndoWrist Repairs ............................ 138

1. The Alleged Need for FDA Clearance Did Not Cause the Exclusion of Third-Party EndoWrist Repair Rivals ............................................................ 138

2. Hospital Perceptions About Repaired EndoWrists Did Not Cause the Exclusion of Third-Party Repair Companies ................................................ 143

3. Capacity Constraints Did Not Exclude Rivals from Repairing EndoWrists ........ 147

D. The Foreclosure of Rival EndoWrist Repair Firms Began Before the Class Period Started in May 2017 ..................................................................... 149

V. Intuitive's Tying and Exclusivity Restraints Foreclosed Rivals From Servicing da Vinci Robots ............................................................................................ 152

A. Actual Rivals Were Capable of Servicing da Vinci Robots ........................ 152

B. Intuitive's Conduct Foreclosed the Entire Market ..................................... 154

C. Direct Evidence of Rival Exclusion Caused by Intuitive's Tying and Exclusivity Restraints ........................................................................... 155

1. Restore Was Driven Out of Hospitals that Initially Used Them ................. 156

2. Restore Was Foreclosed from Hospitals that Would Have Used Them But For Intuitive's Exclusionary Restraints ..................................................... 156

3. Potential Entrants to Third-Party da Vinci Service Were Foreclosed Due to Intuitive's Exclusionary Restraints ........................................................... 157

D. Intuitive's Tying and Exclusivity Restraints Were a Substantial Cause of Hospitals' Failure to Use Third-Party da Vinci Servicing ............................ 158

1. Hospital Perceptions About Third-Party da Vinci Service Did Not Cause the Exclusion of Third-Party IRCs ............................................................ 158

2. Capacity Constraints Did Not Prevent Rivals from Servicing da Vincis ....... 158

3. Lack of Proprietary Tools Did Not Mean Rivals Could Not Have Provided Any da Vinci Servicing ............................................................................... 159

E. The Exclusion of Third Parties from Servicing da Vincis Began Before the Class Period Starts in May 2017 ............................................................... 160

VI. The Exclusion of Intuitive's Rivals Caused Anticompetitive Effects Compared to a But-For World Without Intuitive's Restraints ......................................... 161

A. Economics Indicates that the Exclusion of Innovative Rivals Like Rebotix, Restore, and SIS Through Substantial Foreclosure Creates Anticompetitive Harm ............................................................................................................. 161

    1. Fundamental Economics Predicts Adverse Price and Output Effects ..... 161

    2. Suppressed Use Limits ............................................................................ 166

    3. Loss of Consumer Choice ....................................................................... 167

    4. Reduced Innovation ................................................................................ 168

    5. Environmental Costs ............................................................................... 169

B. Direct Evidence of Anticompetitively Inflated Prices for New and Repaired EndoWrist Replacements ................................................................................. 169

    1. Benchmark for Intuitive Prices—The Price Cuts Intuitive Internally Proposed as Part of Project Dragon When It Feared Effective EndoWrist Repair Entry ........................................................................................................... 170

    2. Yardstick for Intuitive Prices—Rival MIST Surgery Robot Instrument Prices ........................................................................................................... 171

    3. Benchmark for Third-Party IRC Prices and Penetration ........................ 171

C. Direct Evidence of Use Limits Being Suppressed ....................................... 173

    1. Evidence That Use Limits Would Not Have Existed in The But-for World ........................................................................................................... 174

    2. Intuitive's Extended Use Program .......................................................... 174

    3. Other Evidence on Use Limits Being Suppressed .................................. 177

D. Direct Evidence of Higher da Vinci Servicing Prices and Lower Output ... 178

    1. Direct Evidence on Rival Prices for da Vinci Servicing ........................ 179

    2. Other Medical Service Market Yardsticks for Intuitive da Vinci Servicing Prices ........................................................................................................... 179

E. Intuitive Would Not Have Achieved the Same Effect by Raising Robot Prices in Response to Lower EndoWrist or da Vinci Servicing Prices ........................ 182

    1. Without a Fixed Ratio Between Purchases of the da Vinci Robot and Purchases of Both EndoWrists and da Vinci Servicing, the Single Monopoly Profit Theory Fails ...................................................................................... 183

    2. The Possibility of Increased Competition in EndoWrist Repair and Replacement and da Vinci Servicing Means the Single Monopoly Profit Theory Fails ............................................................................................................. 183

    3. The Possibility of Increased Competition in the Market for MIST Surgery Robots Means the Single Monopoly Profit Theory Fails   184

  F. There Are No Countervailing Procompetitive Justifications for Intuitive's Exclusionary Restraints   184

VII. Plaintiffs Suffered Quantifiable Damages from Overcharges Paid on Intuitive's EndoWrists and da Vinci servicing   192

  A. Quantification of Damages in the Market for EndoWrist Repair and Replacement   193

    1. Damages from the Anticompetitive Price Effect on Repaired and New EndoWrists   193

    2. Damages from the Anticompetitive Effect on Use Limits on EndoWrists   198

    3. Combined Damages from the Anticompetitive Effect on Use Limits and Price Effects on EndoWrists   201

  B. Quantification of Damages for da Vinci Service Overcharge   203

  C. Total Damages Through the End of 2021   206

  D. Plaintiffs Will Continue to Suffer Quantifiable Damages as Long as Intuitive's Tying and Exclusivity Restraints Continue   207

Appendix A: Materials Relied Upon   209

EXHIBIT A   211

EXHIBIT B   225

EXHIBIT C   226

EXHIBIT D   228

CORRECTED EXHIBIT E   230

CORRECTED EXHIBIT F   232

CORRECTED EXHIBIT G   234

CORRECTED EXHIBIT H   236

EXHIBIT I   238

### 3. Potential Entrants to Third-Party EndoWrist Repair Were Foreclosed Due to Intuitive's Exclusionary Restraints

277. There are many third-party medical device repair companies generally, showing that ISO repairs are a thriving part of the medical device sector. Intuitive's own market analysis identified multiple "key players."[655] Many additional companies beyond Rebotix, Restore, and SIS would have had the connections and general expertise to enter the EndoWrist repair market if it were not foreclosed, as described below.

278. As an initial matter, in the absence of Intuitive's exclusionary conduct there would have been a profit motive to enter this market. Intuitive was earning high margins selling EndoWrist replacements (see Section II.E.2 above), and economic theory predicts that high margins generally induce entry.[656]

279. Stryker is an example of a potential entrant that was foreclosed due to Intuitive's exclusionary restraints. In December 2015, Stryker signed a proposal enter the market by acquiring Rebotix's S/SI EndoWrist assets "for a total potential consideration of US $13.5 million."[657] Stryker was and is a large competitor in aftermarkets for medical devices and instruments.[658] However, by March 2016

---

EndoWrists. What about facilities? What facilities does Rebotix have for repairing X and Xi EndoWrists? A. Currently, the facility in Florida, which was used to – to do the Si instruments is capable of also doing Xi instruments. It still exists. The bulkier equipment that I discussed earlier, things like sterilization stations and fixtures for testing and that kind of thing, those still exist.").

[655] Scoville (in *Restore*) Dep., Exhibit 2 at Intuitive-00224006 (Stryker Solutions, IMS Ready – Steris, Stryker Sustainability, SterilMed – J&J, Medline, Aesculap, SpecialtyCare, Northfield – Formerly Prezio Health, Steris Mobile Solutions).

[656] PINDYCK & RUBINFELD, MICROECONOMICS 377 (8th ed. 2013) ("Large short-run profits can induce new firms to enter an industry"); CARLTON & PERLOFF, MODERN INDUSTRIAL ORGANIZATION 116 (4th ed. 2005) ("In most markets, positive economic profits would attract new entrants.").

[657] Mixner (in *Rebotix*) Dep. Ex. 15 at REBOTIX139042 and at 74:22-25 ("Q Did Stryker make an offer to buy something? MR. ERWIG: Objection, form. THE WITNESS: They made a verbal offer to buy something, yes."). See also, Gibson (Rebotix) Dep. at 101:10-21 ("Q What happened with regard to Stryker after that meeting? A They took some time, and I – I assume they discussed the project internally. And they got back to us and said they would like to do some due diligence…. And then eventually, they brought a team in to perform due diligence on our service process. Q When you say they brought a team in, what – where did that team come? A To our office in St. Petersburg, Florida.").

[658] For example, Stryker's "single-use medical device reprocessing and remanufacturing services produced a record-setting $255 million in supply cost savings for its more than 2,500 hospital and