# ATTACHMENT 53

SONYA D. WINNER (SBN 200348)
Email: swinner@cov.com
CORTLIN H. LANNIN (SBN 266488)
Email: clannin@cov.com
ISAAC D. CHAPUT (SBN 326923)
Email: ichaput@cov.com
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, California 94105-2533
Telephone: + 1 (415) 591-6000
Facsimile: + 1 (415) 591-6091

ALLEN RUBY (SBN 47109)
allen@allenruby.com
ALLEN RUBY, ATTORNEY AT LAW
15559 Union Ave. #138
Los Gatos, CA 95032
Tel: (408) 477-9690

*Attorneys for Defendant/Counterclaimant Intuitive Surgical Inc.*

[Additional counsel listed on signature page]

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF CALIFORNIA
# SAN FRANCISCO DIVISION

| | |
|---|---|
| SURGICAL INSTRUMENT SERVICE COMPANY, INC.,<br><br>       Plaintiff/<br>       Counterclaim-Defendant<br><br>vs.<br><br>INTUITIVE SURGICAL, INC.,<br><br>       Defendant/<br>       Counterclaim-Plaintiff | Case No.: 3:21-cv-03496-VC<br><br>**INTUITIVE SURGICAL INC.'S MOTION TO EXCLUDE TESTIMONY OF DR. RUSSELL LAMB**<br><br>Hearing Date:  June 8, 2023<br>Hearing Time:  1:00 PM PST<br>Hearing Place:  Courtroom 4<br><br>Judge:  The Honorable Vince Chhabria |

## TABLE OF CONTENTS

NOTICE OF MOTION AND MOTION ................................................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ............................................................ 1

I. INTRODUCTION ........................................................................................................ 1

II. FACTUAL BACKGROUND ....................................................................................... 3

III. ARGUMENT ................................................................................................................ 4

    A. Dr. Lamb Has Not Reliably Applied The SSNIP Test. .......................................... 4

    B. Dr. Lamb Has Not Reliably Assessed Whether Intuitive's Prices And Margins Are Indicative Of Monopoly Power. ....................................................... 7

    C. Dr. Lamb Should Not Be Permitted to Offer Opinions About Product Safety That He Is Not Qualified to Offer. ................................................................ 10

IV. CONCLUSION ........................................................................................................... 11

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*In re Aggrenox Antitrust Litig.*,
  199 F. Supp. 3d 662, 667 (D. Conn. 2016) ........................................................................... 9

*Allen v. Dairy Mktg. Servs., LLC*,
  2013 WL 6909953 (D. Vt. Dec. 31, 2013) ............................................................................ 5

*D.F. ex rel. Amador v. Sikorsky Aircraft Corp.*,
  2017 WL 4922814 (S.D. Cal. Oct. 30, 2017) ..................................................................... 10

*Avila v. Willits Env't Remediation Tr.*,
  633 F.3d 828 (9th Cir. 2011) .............................................................................................. 10

*Carpenter Tech. Corp. v. Allegheny Techs. Inc.*,
  2011 WL 4528303 (E.D. Pa. Sept. 30, 2011) ....................................................................... 8

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
  509 U.S. 579 (1993) ..................................................................................................... *passim*

*Fed. Trade Comm'n v. Penn State Hershey Med. Ctr.*,
  838 F.3d 327 (3d Cir. 2016) ................................................................................................. 5

*Gayton v. McCoy*,
  593 F.3d 610 (7th Cir. 2010) .............................................................................................. 10

*Gen. Elec. Co. v. Joiner*,
  522 U.S. 136 (1997) .............................................................................................................. 4

*Geneva Pharms. Tech. Corp. v. Barr Lab'ys Inc.*,
  386 F.3d 485 (2d Cir. 2004) ................................................................................................. 8

*Kaiser Found. v. Abbott Lab'ys*,
  2009 WL 3877513 (C.D. Cal. Oct. 8, 2009) ..................................................................... 7, 8

*Ky. Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*,
  588 F.3d 908 (6th Cir. 2009) ............................................................................................ 4, 5

*Mylan Pharms. Inc. v. Warner Chilcott Pub. Ltd. Co.*,
  838 F.3d 421 (3d Cir. 2016) ................................................................................................. 8

*In re Opana ER Antitrust Litig.*,
  2021 WL 2291067 (N.D. Ill. June 4, 2021) .......................................................................... 9

*Rebotix Repair, LLC v. Intuitive Surgical, Inc.*,
  2022 WL 3225366 (M.D. Fla. Aug. 10, 2022) ................................................................. 6, 9

*In re Remeron Direct Purchaser Antitrust Litig.*,
    367 F. Supp. 2d 675 (D.N.J. 2005) ............................................................................................. 7

*Teradata Corp. v. SAP SE*,
    570 F. Supp. 3d 810, 838 (N.D. Cal. 2021) ................................................................................ 4

*United States v. Eastman Kodak Co.*,
    63 F.3d 95 (2d Cir. 1995) ........................................................................................................... 7

*Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.*,
    254 F.3d 706 (8th Cir. 2001) ................................................................................................... 10

**Other Authorities**

Federal Rules of Evidence Rule 702 .................................................................................................. 1, 4

Rule 702(d) ............................................................................................................................................ 5

NOTICE OF MOTION AND MOTION

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on June 8, 2023, at 1:00 PM, or as soon thereafter as available, in the courtroom of the Honorable Vince G. Chhabria, located at 450 Golden Gate Avenue, Courtroom 4, 17th Floor, San Francisco, CA 94102, Defendant/Counterclaim-Plaintiff Intuitive Surgical, Inc. will and hereby does move for an order excluding certain opinions of Dr. Russell Lamb, proffered as an expert witness for Surgical Instrument Services Company, Inc. ("SIS").

This Motion is based on this Notice of Motion and Memorandum of Points and Authorities, the accompanying Declaration of Ashley Bass and attached exhibits, any reply or other supplemental briefing and/or evidence submitted, and the oral argument of counsel.

MEMORANDUM OF POINTS AND AUTHORITIES

Defendant Intuitive respectfully submits this motion pursuant to Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), to exclude certain opinions of Dr. Russell Lamb, an economist proffered by SIS to opine on the relevant antitrust market, whether Intuitive possessed monopoly power in the relevant antitrust market, and whether Intuitive's conduct resulted in harm to competition.[1]

I.   INTRODUCTION

Dr. Lamb claims to undertake certain economic analyses in his expert report that are not reliable. He also opines on certain issues that are outside his area of expertise. These opinions should be excluded, as described further below.

*First*, in support of his assertion that minimally invasive soft tissue surgical robots is a relevant antitrust product market, Dr. Lamb references the so-called "SSNIP" test. He claims the SSNIP test is

---

[1] For the avoidance of doubt, Intuitive reserves the right to raise additional objections to Dr. Lamb's testimony at a later date. This brief focuses on issues fit for resolution at this stage of the case.

one of the tools economists rely upon in defining relevant antitrust product markets.[2]  Although Dr. Lamb identifies the SSNIP test as an economic tool that may assist economists in defining a relevant market, he did not undertake any calculations to apply the test in this case.  He instead claims the test is satisfied based just on his general say so.  *See* Bass Dec. Ex. 1 ¶¶ 39, 53.  In essence, he offers a completely circular argument, claiming that the SSNIP test supports his relevant-market definition because the *other* factors he relies upon for that definition would, hypothetically, be expected to yield a consistent result under the SSNIP test.  *See id.* ¶¶ 27–48, 53–67.  This motion does not offer a *Daubert* challenge to Dr. Lamb's other opinions about relevant markets.[3]  But he should not be permitted to bolster those opinions with a bootstrapped theory about the potential results of an economic test he never actually performed.

   ***Second***, in support of Dr. Lamb's opinion that Intuitive exercised monopoly power, he claims that Intuitive priced above "competitive levels" and achieved "high" margins for da Vincis and EndoWrists.  *See id.* ¶¶ 99–107, 125–26.  These opinions, however, do not properly account for Intuitive's costs.  Bass Dec. Ex. 2 ¶¶ 106–15.  This renders his opinion that Intuitive prices and margins are "high" irrelevant to the question of whether Intuitive exercised monopoly power.  This is especially the case given that Intuitive operates in a technology market requiring continual investment in research and development.

   ***Third***, Dr. Lamb has offered certain opinions in his expert report that are outside his expertise as an economist, which he should not be permitted to proffer.  For example, he opines that the evidence he discusses in his report "is consistent with the opinions contained in Mr. Phillips' expert report that

---

[2] The SSNIP test assesses whether a hypothetical monopolist could impose a "small but significant and non-transitory increase in price," known as a "SSNIP," without losing so much in sales volume that the increase in price is unprofitable; if so, then that product constitutes a relevant antitrust product market. *See* Bass Dec. Ex. 1 ¶ 27 n.72 (citing U.S. Department of Justice and the Federal Trade Commission, "Horizontal Merger Guidelines," August 19, 2010 at § 4.1.1) (hereinafter Horizontal Merger Guidelines)).

[3] Intuitive does dispute Dr. Lamb's conclusions on this subject, for the reasons set out in the reports of its own economic experts.  It also reserves the right to challenge the sufficiency of whatever testimony on the subject he may ultimately offer at trial.

2

. . . EndoWrist instruments repaired or reprocessed by third parties such as SIS were equally as safe as the newly manufactured replacement EndoWrist instruments hospitals were required to purchase directly from Intuitive." Bass Dec. Ex. 1 ¶ 132. Mr. Phillips does *not* offer this opinion in this case, and in any event, Dr. Lamb is not qualified to opine on the safety of medical devices, and his attempt to bolster the opinion of another expert on this subject is improper.

## II. FACTUAL BACKGROUND

Dr. Lamb is an economic consultant. *Id.* ¶ 1. SIS offers Dr. Lamb to opine on various economic issues associated with SIS's antitrust claims. *Id.* ¶ 7. This motion addresses only certain specific opinions offered in his reports.

In support of his opinions on market definition, Dr. Lamb references the SSNIP test. *See id.* ¶¶ 27, 53. He states: "a relevant antitrust product market is comprised of the smallest possible set of goods for which a hypothetical monopolist could exercise market power to raise prices on that set of products by a small, but significant, amount without losing so much in sales volume that the increase in price is unprofitable." *Id.* ¶ 27 (citing Horizontal Merger Guidelines § 4.1.1). He then notes that products are economic substitutes if a "small but significant change in price" for one product results in increased demand for the other. *Id.* ¶ 29. Although Dr. Lamb refers to the SSNIP test and claims that the result of that test would support his proposed market definitions, he has not performed any calculations to determine if in fact a small but significant change in price would cause purchasers to switch away from Intuitive in favor of a competitor in one of his proposed markets. *See id.* ¶¶ 29, 39, 53. Rather, he simply offers his view that a small but significant change in price would not cause hospitals to switch away from Intuitive – essentially because the same factors that led him to define markets as he has done should, he thinks, lead to a SSNIP test result that also supports his conclusions. *See id.* ¶¶ 27–48, 53–67.

In support of his opinions on market power, Dr. Lamb claims that Intuitive's prices for both da Vincis and EndoWrists greatly exceeded their costs. *Id.* ¶¶ 99–102, 125, 134. For example, he opines that "one indication of Intuitive's exercise of monopoly power in the market for MIST Surgical Robots

3

is the fact that da Vinci robot prices were set well above marginal costs." *Id.* ¶ 102. However, his analysis does not address (or even mention) Intuitive's fixed costs, such as R&D spending.

Finally, in opining that Intuitive's conduct caused harm to competition, Dr. Lamb offers his personal assessment of "Intuitive's patient safety claims." *Id.* § V.C.i. Dr. Lamb, who self-describes as an expert in antitrust economics with a background in agricultural markets, *see id.* Appendix A, concludes that EndoWrists reprogrammed by third parties such as SIS "were equally as safe" as new EndoWrists manufactured by Intuitive. *Id.* ¶ 132. He has no qualifications to offer such an opinion.

## III. ARGUMENT

Expert witness testimony must (1) come from a qualified expert; (2) be helpful to the factfinder; (3) be based on sufficient facts or data; (4) use reliable principles and methods; and (5) reliably apply those principles and methods to the facts of the case. Fed. R. Evid. 702. The court's "gatekeeping" role requires evaluating both the reliability of the expert's methods and the connection between their conclusions and the facts on which those conclusions are based. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). The party proffering expert testimony has the burden of showing the testimony is admissible by a preponderance of the evidence. *Daubert*, 509 U.S. at 592 n.10.

### A. Dr. Lamb Has Not Reliably Applied The SSNIP Test.

Dr. Lamb references the SSNIP test in his report, suggesting that he employed such an analysis to reach his conclusions regarding the relevant product markets in this case. His report is devoid of any actual application of the test.

When an expert offers an opinion on market definition, courts routinely exclude expert opinions that do not reliably apply the SSNIP test. *See, e.g.*, *Ky. Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*, 588 F.3d 908, 918 (6th Cir. 2009) (expert's "own version" of SSNIP test not reliable because "it has not been tested; has not been subjected to peer review and publication; there are no standards controlling it; and there is no showing that it enjoys general acceptance within the scientific community"); *Teradata Corp. v. SAP SE*, 570 F. Supp. 3d 810, 838 (N.D. Cal. 2021) (excluding economist testimony because the expert's "quantitative analysis, which he uses to corroborate his

4

qualitative analysis, is flawed because contrary to his claims, [the expert] does not apply a 'hypothetical monopolist' test ('HMT') as contemplated in the Department of Justice and the Federal Trade Commission's ('FTC') Horizontal Merger Guidelines"); *Allen v. Dairy Mktg. Servs., LLC*, 2013 WL 6909953, at *7, 9 (D. Vt. Dec. 31, 2013) (excluding purported SSNIP opinion for failure to perform a critical loss analysis); *cf. Fed. Trade Comm'n v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 342, 344–45 (3d Cir. 2016) (reversing district court for misapplying SSNIP test).  Here, Dr. Lamb has not even attempted to undertake the calculations the SSNIP test requires, let alone applied the methodology in a reliable way.

In *In re Live Concert Antitrust Litigation*, the court confronted a similar issue.  863 F. Supp. 2d 966 (C.D. Cal. 2012).  There, the proffered expert economist chose to apply the SSNIP test, describing the test in his report with citations to the Horizontal Merger Guidelines.  *Id.* at 986–87.  The court "assume[d] that the SSNIP methodology may, under appropriate circumstances, provide an acceptable framework with which to define a relevant product market for purposes of antitrust analysis," but upon review of the expert's report, it was "apparent" that the expert did not reliably apply the methodology to the facts of the case.  *Id.* at 987.  The expert had begun his analysis with his assumed relevant product market and "looked for corroborating evidence without meaningfully testing this assumption." *Id.* at 988.  The court emphasized that it was "focus[ed] . . . exclusively on [the expert's] methodology, not his results," and found that his "failure to analyze, in a meaningful way, the possibility of a narrower or broader product market renders his purported application of the SSNIP methodology unreliable under Rule 702(d)." *Id.* at 988–89.

Dr. Lamb's purported SSNIP analysis suffers from similar methodological deficiencies. Although Dr. Lamb describes the SSNIP test accurately, he did not actually perform it:  in other words, he did not conduct any economic analysis to calculate whether a small but significant price increase on Intuitive's products, such as five percent, would cause a loss in sales volume such that the price increase would be unprofitable.  *See, e.g.*, Bass Dec. Ex. 2 ¶¶ 116-17.  Instead, he simply offers the conclusion that "hospitals are unlikely [to] forego the[] features and benefits of MIST Surgical Robots

in response to a small but significant increase in price," using the *language* associated with the SSNIP test but without actually doing anything to perform the test itself.  *See* Bass Dec. Ex. 1 ¶ 39; *see also id.* ¶ 53.  He offers this opinion based on his view that the evidence "demonstrates that MIST Surgical Robots possess different features and benefits to surgeons and patients over traditional laparoscopic surgery" – factors he relies upon in concluding that MIST Surgical Robots constitute a distinct relevant market.  *Id.* ¶ 39.  Like the expert in *Live Nation*, Dr. Lamb did not reliably apply the SSNIP methodology to *test* his conclusion, instead he just offered circular reasoning that relied on that conclusion as a basis to assume that the SSNIP test would corroborate it.[4]  Without a reliable *application* of the SSNIP test, Dr. Lamb should not be permitted to offer the opinion that the test supports his asserted relevant product markets.

Dr. Lamb's report does not provide a reason why he did not analyze pricing and volume data in the case to properly implement the SSNIP test.  SIS may argue that even without such calculations, "the conceptual framework of the test provides a useful methodological tool for gathering and analyzing evidence pertinent to customer substitution and to market definition."  *See id.* ¶ 27 n.72.  That is true, but it doesn't justify a claim that the results of a SSNIP test would support Dr. Lamb's opinions when he never actually performed the test.  He has done nothing to perform the calculations needed to know how the marketplace would react to "a small but significant increase in price."

In the *Rebotix* case, Intuitive moved to strike Dr. Lamb's market definition opinions, including based on his improper application of the SSNIP test.  The court denied the motion, finding that he merely used the SSNIP analytical framework from which to build his opinions based on *other* evidence.  *Rebotix Repair, LLC v. Intuitive Surgical, Inc.*, 2022 WL 3225366, at *5–6 (M.D. Fla. Aug. 10, 2022).  Intuitive's request here is not inconsistent with that decision.  Intuitive is not asking this Court to strike

---

[4] Dr. Lamb attempts to support his conclusions by referencing testimony from two hospitals stating that if Intuitive raised the price of the da Vinci by five or ten percent, the hospitals would not look to perform more surgeries without a da Vinci.  *See* Bass Dec. Ex. 1 ¶ 30.  This hypothetical testimony from two customers cannot substitute for actual application of the SSNIP test performed by an economist.

Dr. Lamb's market definition opinions on *Daubert* grounds. Intuitive is requesting only a holding that Dr. Lamb may not offer opinions about what he speculates the result of a SSNIP test would have been had he performed one.

> **B.      Dr. Lamb Has Not Reliably Assessed Whether Intuitive's Prices And Margins Are Indicative Of Monopoly Power.**

Dr. Lamb opines that "one indication of Intuitive's exercise of monopoly power in the market for MIST Surgical Robots is the fact that da Vinci robot prices were set well above marginal costs." Bass. Dec. Ex. 1 ¶ 102. He asserts that "Intuitive's extremely high profit margins on da Vinci surgical robot sales" indicates that Intuitive possessed market power in the market for MIST Surgical Robots. *Id.* He makes a similar assertion regarding Intuitive's margins on instruments. *Id.* ¶ 125.

Dr. Lamb's opinions that Intuitive has exercised monopoly power by charging "supracompetitive" prices and by achieving "high" margins for da Vincis and EndoWrists are inadmissible because they are contrary to law and not based on reliable principles. *See* Bass Dec. Ex. 2 ¶¶ 106–15. Analyzing a defendant's prices relative to its marginal costs is insufficient to show monopoly power; rather, the analysis must consider a defendant's total costs, including fixed costs like research and development. This is especially the case for a business that is in a research-intensive technology industry. If Dr. Lamb's analysis of prices and margins were accepted, no company that is required to invest heavily in R&D on an ongoing basis could escape an accusation that it wields monopoly power in charging prices that permit it to do so. The law does not support such an approach.

Courts readily recognize that "[c]ertain deviations between marginal cost and price, such as those resulting from high fixed costs, are not evidence of market power." *United States v. Eastman Kodak Co.*, 63 F.3d 95, 109 (2d Cir. 1995); *see also Kaiser Found. v. Abbott Lab'ys*, 2009 WL 3877513, at *9 (C.D. Cal. Oct. 8, 2009) (recognizing that price difference between a brand drug and generic equivalent reflects the substantial investments by the brand manufacturer, not "supra-competitive pricing"); *In re Remeron Direct Purchaser Antitrust Litig.*, 367 F. Supp. 2d 675, 681 n.10 (D.N.J. 2005) (rejecting plaintiff's economic expert's analysis because "without evidence that sheds

INTUITIVE'S MOTION TO EXCLUDE TESTIMONY OF                                    Case No.: 3:21-cv-03496-VC
DR. RUSSELL LAMB

light on material factors such as [defendant]'s price relative to its total costs (marginal *and* fixed) and whether output was restricted, monopoly power cannot be found as a matter of law"); 2B Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶¶ 504(b), 516(g) (4th ed. 2014 & Supp. 2021) ("No matter how accurately measured, of course, a substantial excess of price over marginal cost does not necessarily bring excess returns on investment. A firm generates excess profit only if price exceeds its average total cost, including its cost of capital.") (hereinafter "Areeda").

This principle was acknowledged in *Kaiser Foundation v. Abbott Laboratories*, 2009 WL 3877513 (C.D. Cal. Oct. 8, 2009). In that case, which involved an alleged relevant product market limited only to the defendant's drug and its corresponding generic (excluding comparable therapeutic substitutes), it was suggested that the defendant's alleged supracompetitive pricing was evidence of monopoly power. But, finding that "the pricing difference between a brand name drug . . . and its generic equivalent does not reflect supra-competitive pricing, but the fact that companies that produce generics do not incur the substantial research and development expenses incurred by companies that develop and produce brand name drugs," the court granted summary judgment for failure to show monopoly power. *Id.* at *9.

Consistent with *Kaiser*, courts routinely reject analyses of market power like Dr. Lamb's that do not appropriately consider the full scope of a defendant's costs. *See, e.g.*, *Mylan Pharms. Inc. v. Warner Chilcott Pub. Ltd. Co.*, 838 F.3d 421, 434, 435 (3d Cir. 2016) (rejecting expert reports "devoid of any substantiated quantitative analysis showing that Defendants maintained high price-cost margins or that Defendants markedly restricted output" and holding that a claim that a defendant set supracompetitive prices requires "an analysis of the defendant's costs"); *Geneva Pharms. Tech. Corp. v. Barr Lab'ys Inc.*, 386 F.3d 485, 500 (2d Cir. 2004) ("[A]bsent from plaintiffs' [expert report] is any analysis of [defendant's] costs. Hence, we do not know whether the allegedly elevated prices led to an abnormally high price-cost margin."); *Carpenter Tech. Corp. v. Allegheny Techs. Inc.*, 2011 WL 4528303, at *12 (E.D. Pa. Sept. 30, 2011) ("[plaintiff] has offered no evidence that [defendant] has

achieved an abnormally high price-cost margin . . . . [N]either can [plaintiff] turn to any analysis from its expert: when questioned whether he had calculated the competitive price level in the [relevant market], [the expert] stated that he had not.").[5]

Because Dr. Lamb's expert report provides no analysis of Intuitive's costs, he should not be permitted to point to Intuitive's supposedly "high" prices and margins as showing that it has monopoly power.[6] Nor, relatedly, should he be permitted to offer opinions in his report about the Lerner index, which he says uses the price-cost margin as "the index of the degree of monopoly power."[7] Bass Dec. Ex. 1 ¶ 99. Dr. Lamb's report offers no calculation of the Lerner Index for Intuitive (just like he did not actually apply the SSNIP test), and thus, he should not be permitted to try to bolster his opinions with claims about a measurement – in this case the Lerner Index – that he did not perform.

In *Rebotix*, Intuitive moved to exclude Dr. Lamb's opinion on monopoly power, including because he improperly failed to consider Intuitive's total costs in asserting that its margins demonstrated monopoly power. *See Rebotix*, 2022 WL 3225366, at *7. The *Rebotix* court acknowledged that federal district courts have reached differing conclusions on whether fixed costs should be taken into account in such an assessment. *Id*. The court did not attempt to resolve the issue, however, because Dr. Lamb had in that case attempted to explain in his *Rebotix* deposition why he thought Intuitive's profit margins were high even taking costs like investments into account. *Id.* at *8. He has offered no such opinions or calculations in this case. His report in this case says nothing about Intuitive's total costs or the margins that would be calculated taking those costs into account.

---

[5] *But cf. In re Aggrenox Antitrust Litig.*, 199 F. Supp. 3d 662, 667 (D. Conn. 2016); *In re Opana ER Antitrust Litig.*, 2021 WL 2291067, at *9 (N.D. Ill. June 4, 2021).

[6] Indeed, concluding that a high-fixed cost company has market power based on its margins "would be highly misleading for antitrust purposes." Areeda ¶ 504b. Accordingly, margin measures that do not account for fixed costs "can seldom be used explicitly in antitrust cases." Areeda ¶ 504.

[7] The Lerner Index is a price-cost margin measure, calculating the difference between the output price of a firm and the marginal cost divided by the output price. *See* Bass Dec. Ex. 1 ¶ 99 n.241 (citing A.P. Lerner, *The Concept of Monopoly and the Measurement of Monopoly Power*, 1 Rev. Econ. Stud. 157 (1934)).

C. **Dr. Lamb Should Not Be Permitted to Offer Opinions About Product Safety That He Is Not Qualified to Offer.**

Courts routinely exclude testimony from an expert whose opinion falls outside his or her relevant discipline. *See, e.g.*, *Avila v. Willits Env't Remediation Tr.*, 633 F.3d 828, 839 (9th Cir. 2011); *Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.*, 254 F.3d 706, 715–16 (8th Cir. 2001) (finding reversible error where the district court admitted the testimony of an expert who, while qualified to testify on one topic, "sorely lacked the education, employment, or other practical personal experiences to testify as an expert" on topics outside his expertise); *see also Gayton v. McCoy*, 593 F.3d 610, 617 (7th Cir. 2010) ("[W]e must look at each of the conclusions [the expert] draws individually to see if he has the adequate education, skill, and training to reach them.").

Dr. Lamb is an economist and should not be permitted to offer opinions beyond his expertise. As Dr. Lamb admitted in his deposition, he is not an expert on safety issues with respect to medical devices. Bass Dec. Ex. 3 at 34:15–21. Yet in his report, Dr. Lamb offers the opinion that the evidence he discusses in his report "is consistent with the opinions contained in Mr. Phillips' expert report that, despite Intuitive's claims to the contrary, EndoWrist instruments repaired or reprocessed by third parties such as SIS were equally as safe as the newly manufactured replacement EndoWrist instruments hospitals were required to purchase directly from Intuitive." Bass Dec. Ex. 1 ¶ 132. Dr. Lamb's reference to Phillips is puzzling because he does ***not*** offer the opinion in this case on which Dr. Lamb purports to rely.[8] Even if he did, Dr. Lamb has no expertise to review record evidence on safety issues in the case or to offer an opinion that the evidence is consistent with the opinion offered by Phillips, who is SIS's proffered FDA regulatory expert.[9] This is exactly the kind of "beyond-the-field-of-expertise" testimony that courts routinely preclude. *See D.F. ex rel. Amador v. Sikorsky Aircraft Corp.*, 2017 WL 4922814, at *14–15 (S.D. Cal. Oct. 30, 2017) (collecting cases and distinguishing between an expert's lack of general expertise and particularized expertise).

---

[8] *See* Exhibits 1 and 5 to the Declaration of Andrew Lazerow, submitted in support of Intuitive's Motion To Exclude Testimony Of Philip J. Phillips (Phillips' Expert Reports).

[9] As shown in Intuitive's separate *Daubert* motion to exclude the testimony of Phillips, Phillips' opinion is not reliable and should be excluded on additional grounds.

IV.     **CONCLUSION**

For the reasons set forth above, the Court should not permit Dr. Lamb to offer the opinions that: (1) he applied the SSNIP test to define the purported relevant antitrust product markets or that the result of a SSNIP test would support his opinions; (2) Intuitive's prices and gross profit margins are evidence that Intuitive possessed monopoly power in the purported relevant markets; or (3) EndoWrists modified by third parties were equally as safe as new instruments manufactured by Intuitive.

DATED:  March 23, 2023                                    By: */s/ Kathryn E. Cahoy*
                                                                           KATHRYN E. CAHOY

                                                                           *Attorney for Intuitive Surgical, Inc.*

*Additional Counsel for Intuitive Surgical, Inc.*

ALLEN RUBY (SBN 47109)
allen@allenruby.com
ALLEN RUBY, ATTORNEY AT LAW
15559 Union Ave. #138
Los Gatos, CA 95032
Tel: (408) 477-9690

KAREN HOFFMAN LENT (*Pro Hac Vice*)
Email: karen.lent@skadden.com
MICHAEL H. MENITOVE (*Pro Hac Vice*)
Email: michael.menitove@skadden.com
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
One Manhattan West
New York, NY 10001
Telephone: (212) 735-3000
Facsimile: (212) 735-2040

KATHRYN E. CAHOY (SBN 298777)
Email: kcahoy@cov.com
COVINGTON & BURLING LLP
3000 El Camino Real
5 Palo Alto Square, 10th Floor
Palo Alto, CA 94306-2112
Telephone: + 1 (650) 632-4700
Facsimile: + 1 (650) 632-4800

SONYA WINNER (SBN 200348)
Email: swinner@cov.com
CORTLIN H. LANNIN (SBN 266488)
Email: clannin@cov.com
ISAAC D. CHAPUT (SBN 326923)
Email: ichaput@cov.com
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, California 94105-2533
Telephone: + 1 (415) 591-6000
Facsimile: + 1 (415) 591-6091

ANDREW LAZEROW (*Pro Hac Vice*)
Email: alazerow@cov.com
ASHLEY E. BASS (*Pro Hac Vice*)
Email: abass@cov.com

JOHN KENDRICK (*Pro Hac Vice*)
Email: jkendrick@cov.com
COVINGTON & BURLING LLP
One City Center 850 Tenth Street NW
Washington DC 20001-4956
Telephone: + 1 (202) 662-6000
Facsimile: + 1 (202) 662-6291