# ATTACHMENT 101

Page 1

```
 1
 2   UNITED STATES DISTRICT COURT
 3   FOR THE NORTHERN DISTRICT OF CALIFORNIA
 4   Case No. 3:21-cv-03825-VC
 5   ----------------------------------x
 6   IN RE: DA VINCI SURGICAL ROBOT LITIGATION,
 7   _____
 8   THIS DOCUMENT RELATES TO:
 9   ALL CASES
10   ----------------------------------x
11              November 1, 2022
12              12:45 p.m.
13          HIGHLY CONFIDENTIAL
14          Videotaped deposition of IMRON
15   ZAFAR, pursuant to subpoena, before Jineen
16   Pavesi, a Registered Professional
17   Reporter, Registered Merit Reporter,
18   Certified Realtime Reporter and Notary
19   Public of the State of New York, via Zoom,
20   with all other parties in person at Cohen
21   Milstein, 88 Pine Street, New York, New
22   York.
23
24
25
```

Page 2

```
 1
 2   A P P E A R A N C E S :
 3   COHEN MILSTEIN SELLERS & TOLL PLLC
     88 Pine Street, 14th Floor
 4   New York, New York 10005
          Attorneys for Plaintiffs and Proposed
 5        Class
     BY:   CHRISTOPHER BATEMAN, ESQ.
 6         cbateman@cohenmilstein.com
 7
     HALEY GUILIANO LLP
 8   116 West Hubbard, Unit 20
     Chicago, Illinois 60654
 9        Attorneys for Surgical Instrument
          Service Company
10   BY:   DONNY SAMPORNA, ESQ.
           donny.sampora@ghlaw.com
11             (via telephone)
12
     SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
13   One Manhattan West
     New York, New York 10001
14        Attorneys for Intuitive Surgical,
          Inc.
15   BY:   DOUGLAS DeBAUGH, ESQ.
           douglas.debaugh@skadden.com
16
17   DEUTSCHE BANK AG
     FILIALE NEW YORK LITIGATION & REGULATORY
18   ENFORCEMENT
     1 Columbus Circle
19   New York, New York
          Attorneys for Witness
20   BY:  SARAH SCHOENBACK, ESQ.
21
     ALSO PRESENT:
22   ANTON EVANGELISTA, The Video Technician
23
24
25
```

|   |   |
|---|---|
| 1 | ZAFAR |
| 2 | this meeting today. |
| 3 | Q. Again, without getting into the |
| 4 | contents of what you discussed, did you |
| 5 | review any documents in preparation for |
| 6 | the deposition that refreshed your |
| 7 | recollection of events? |
| 8 | A. I personally did not review any |
| 9 | documents. |
| 10 | The only thing I did was I |
| 11 | looked at my log of research reports in |
| 12 | terms of getting the information to my |
| 13 | attorney, but, no, I did not read any |
| 14 | documents, no. |
| 15 | Q. Who is your current employer? |
| 16 | A. Deutsche Bank. |
| 17 | Q. What is Deutsche Bank? |
| 18 | A. Deutsche Bank is a global |
| 19 | investment bank with businesses across the |
| 20 | board in financial services. |
| 21 | I work in the equity research |
| 22 | division, so I provide institutional |
| 23 | investors with investment research on |
| 24 | publicly-traded companies and, you know, |
| 25 | markets in which these public companies |

Page 12

1                       ZAFAR
2  compete.
3              I focus specifically on medical
4  technology, as I mentioned earlier.
5      Q.     What was the last part, you
6  focus on --
7      A.     Medical technology, medical
8  devices, supplies, equipment.
9      Q.     What's your title at Deutsche
10 Bank currently?
11     A.     I am an equity research analyst
12 with the corporate title of
13 vice-president.
14     Q.     How long have you held that
15 position?
16     A.     My current position at Deutsche
17 Bank?
18     Q.     Yes.
19     A.     You know, I'm going to --  I
20 can give you rough date ranges, but I
21 don't remember exact dates off the top of
22 my head to be honest.
23             But I believe I just
24 celebrated, if I'm not mistaken, my third
25 anniversary at DB.

1                    ZAFAR
2      supply chain executives in connection with
3      this report?
4                MR. DeBAUGH:  Objection to
5      form.
6          A.      Yes.
7          Q.      Did you talk to Restore
8      Robotics in connection with this report,
9      in research for the report?
10         A.      Yes.
11         Q.      Did you talk to Intuitive
12     personnel as part of researching this
13     report?
14         A.      What I recall is asking a
15     question about this issue on one of the
16     public conference calls.
17               To the extent I had a
18     one-on-one private conversation with them
19     beyond that, I don't recall to be honest.
20         Q.      If you go to page 5 of the
21     report, this is the one titled "FDA and
22     Patient Safety Considerations."
23               First paragraph says, "Safety
24     concerns unlikely to be an impediment.
25     The key fundamental argument we've heard

Page 91

1              ZAFAR
2    paragraph 1, it says, "Our February 3rd
3    downgrade was predicated on our belief
4    that refurbished Da Vinci instruments pose
5    a material and increasing risk to
6    Intuitive's INA segment growth over the
7    next couple of years.  Not surprisingly,
8    push-back has centered largely around two
9    points," and there are two points under
10   that.
11             The push-back, what was the
12   push-back that is referred to here?
13      A.     The push-back, I don't recall
14   what that specifically refers to, because
15   in this context -- yeah, I don't remember
16   specifically.
17      Q.     Do you remember who pushed
18   back?
19      A.     That's the question, I don't
20   remember if this was in the context of
21   investors or, you know, companies,
22   doctors, whatever, I don't remember the
23   context of that, to be honest.
24      Q.     If you go to paragraph 2 here,
25   it says, "Deeper Dive Into the Threat From

Page 92

1                ZAFAR
2    Refurbished Da Vinci Instruments:  Over
3    the past few weeks we consulted with five
4    regulatory and legal experts to gain
5    further clarity on both the regulatory/FDA
6    and service contract angles."
7            Who were those five experts
8    that you consulted with?
9            MR. DeBAUGH:  Objection.
10      A.      I don't recall off the top of
11   my head; again, we talked to so many
12   consultants all the time, literally
13   hundreds since this was published, I
14   literally don't remember.
15      Q.      And then if you can go to page
16   8, it is a slide that says "510(k)
17   Premarket Notification Does Not Appear
18   Applicable" at the top.
19            It says, "The immediate
20   feedback to our downgrade note was that
21   Restore Robotics is subject to 510(k)
22   approval requirement and that because the
23   company does not have 510(k) clearance, it
24   is therefore in clear violation of FDA
25   regulations."

Page 93

1          ZAFAR
2              Do you remember who provided
3   that feedback that's referenced here?
4       A.      Not specifically, no.
5       Q.      If you go to page 10, the one
6   that says "Regulatory Oversight of
7   Facilities, ISO Certification is the
8   Standard," at the top.
9              If you look at the third
10  paragraph, it says, "We were able to
11  review a third-party ISO certification
12  received by Restore Robotics for the
13  servicing of EndoWrist instruments.  We
14  confirmed that the issuer of this
15  certification, a Germany-based company
16  called DQS MED, is reputable and credible
17  in the Medtech industry."
18             Do you recall how you confirmed
19  that DQS MED was reputable and credible?
20      A.      I don't recall for certain, but
21  my recollection is that it was on the
22  website, these types of documentations are
23  generally publicly-available.
24             But I don't remember with
25  certainty, so I will leave that as my

Page 128

1               ZAFAR
2  question.
3      Q.     Sure.
4              I'm wondering if you've ever
5  evaluated in your personal capacity, or in
6  your capacity as a research analyst at
7  Deutsche Bank, whether a medical device
8  required 510(k) clearance?
9              MS. SCHOENBACH:  Objection,
10 legal conclusion.
11             MR. BATEMAN:  Same objection,
12 vague.
13     A.     I don't remember, because if a
14 product is approved, I already know that
15 it is a 510(k) --  I'm not sure I
16 understand the question.
17     Q.     Let's move on.
18             Counsel for plaintiffs asked
19 you about a company by the name of Restore
20 Robotics, do you recall that?
21     A.     I do.
22     Q.     When did you first learn about
23 Restore Robotics?
24     A.     So in normal course of our jobs
25 we were doing a call with a surgeon about,

Page 148

1             ZAFAR
2  interesting tid bit is not worth violating
3  the law.
4            I do remember being very
5  cautious ahead of that conversation with
6  him, because on one hand it was a
7  potential golden opportunity to get some
8  insight, but I also didn't want to, you
9  know, get insight that I wasn't supposed
10 to know.
11           So I remember approaching that
12 discussion enthusiastically but also very
13 cautiously in terms of, you know, not
14 becoming privy to information that I'm not
15 supposed to be privy to.
16    Q.     How many times did you speak
17 with counsel for Restore Robotics?
18    A.     One, that I remember.
19    Q.     When you spoke with counsel for
20 Restore Robotics, do you know whether or
21 not that Restore had filed a lawsuit
22 against Intuitive?
23    A.     Again, I don't know, I don't
24 remember, I don't remember the sequence.
25    Q.     I am going to show you a

Page 194

1  ZAFAR
2  three, four consultants a week, by
3  consultants I mean surgeons, hospital
4  CEOs.
5  If I said literally hundreds,
6  that might have been a little bit
7  hyperbolic, but suffice it to say it's in
8  the dozens.
9  Q. My clarification question,
10 Mr. Zafar, is whether or not you were
11 talking to consultants about Intuitive
12 Surgical in this third-party repair issue
13 or consultants in the normal course of
14 your job?
15 A. In the normal course of my job,
16 sorry for the...
17 Just to clear up the record, if
18 I said hundreds, that was more a figure of
19 speech; if you want -- it was more in the
20 dozens, not hundreds.
21 Q. Apologies, I don't recall your
22 answer to this earlier.
23 Sitting here today, do you
24 recall the experts that you spoke with in
25 connection with this report?

Page 195

1                    ZAFAR
2       A.      I don't.
3       Q.      Turning to the first bullet,
4  which reads, "On the FDA side, while
5  summing knowledge that applicable
6  regulations are somewhat nebulous, the
7  majority of regulatory experts came to the
8  conclusion that Restore Robotics is not in
9  violation of FDA rules as a third-party
10 service provider of refurbished
11 instruments," do you see this?
12      A.      Yes.
13      Q.      Do you know what information
14 those experts that you spoke with had
15 about Restore Robotics in coming to this
16 determination?
17      A.      I don't remember specifically.
18      Q.      Do you know whether the experts
19 that are referred to in this paragraph had
20 spoken to anyone affiliated with Restore
21 Robotics in coming to their conclusion?
22      A.      I don't know.
23      Q.      Do you know whether the experts
24 referred to in this paragraph had observed
25 the process of EndoWrist, quote, repair

Page 227

```
 1
 2         C E R T I F I C A T I O N
 3
 4
 5
 6      I, Jineen Pavesi, a Registered
 7   Professional Reporter, Registered Merit
 8   Reporter, Certified Realtime Reporter and
 9   a Notary Public, do hereby certify that
10   the foregoing witness, IMRON ZAFAR, was
11   duly sworn on the date indicated, and that
12   the foregoing is a true and accurate
13   transcription of my stenographic notes.
14      I further certify that I am not employed
15   by nor related to any party to this
16   action.
17
18
19
20
21   [signature: Jineen Pavesi, RPR, RMR]
22
23
24        JINEEN PAVESI, RPR, RMR, CRR
25
```