UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

_____

```
Surgical Instrument Service      )
Company, Inc.,                    )  No. 3:21-cv-03496-AMO
                                  )
                    Plaintiff,    )
                                  )
            vs.                   )  San Francisco, California
                                  )  September 26, 2024
Intuitive Surgical, Inc.,         )  2:28 p.m.
                                  )
                    Defendant.    )
_____  )
```

BEFORE:  THE HONORABLE ARACELI MARTINEZ-OLGUIN, JUDGE

<u>REPORTER'S TRANSCRIPT OF PROCEEDINGS</u>

<u>VIA HYBRID ZOOM VIDEOCONFERENCE</u>

<u>MOTION HEARING</u>

Official Court Reporter:
**Cathy J. Taylor, RMR, CRR, CRC (By Zoom Videoconference)**
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, SPC 31
Phoenix, Arizona 85003-2151
(602) 322-7249

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1                      **A P P E A R A N C E S**

2    For the Plaintiff:
         ROPES GRAY
3        By:  **Richard T. McCaulley, Esq.**
         191 North Wacker Drive, 32nd Floor
4        Chicago, Illinois  60606

5        HALEY GUILIANO, LLP
         By:  **Joshua Voight Vanhoven, Esq.**
6        111 Market Street, Suite 900
         San Jose, California  95113

7
     For the Defendant:
8        PAUL, WEISS, RIFKIND, WHARTON and GARRISON, LLP
         By:  **William Michael, Esq.**
9              **Kenneth Gallo, Esq. (Washington, DC)**
         1285 Avenue of the Americas
10       New York, New York  10019

11       COVINGTON & BURLING, LLP
         By:  **Isaac Daniel Chaput, Esq.**
12       415 Mission Street, Suite 5400
         San Francisco, California  94105

13

14

15

16

17

18

19

20

21

22

23

24

25

                         UNITED STATES DISTRICT COURT

<u>**P R O C E E D I N G S**</u>

1

2          (Court was called to order by the courtroom deputy.)

3          (Proceedings commence at 2:30 p.m.)

4          THE COURTROOM DEPUTY:  Calling Civil Matter 21-3496,

5     Surgical Instrument Service Company, Incorporated, v. Intuitive

6     Surgical, Incorporated.

7          Counsel, please come up to the podium to state your

8     appearances for the record starting with the plaintiff.

9          MR. MCCAULLEY:  Good afternoon, Your Honor.  Richard

10    McCaulley on behalf of the plaintiff.

11         THE COURT:  Good afternoon.

12         MR. MICHAEL:  Good afternoon, Your Honor.  William

13    Michael on behalf of Intuitive Surgical.

14         THE COURT:  Good afternoon.

15         Folks, I want to start just by talking for a moment

16    about your sealing motions just to say that I'm going to grant

17    253 and 259, ECF 253 and 259, and to ask you all if there are

18    other sealing motions that we need to deal with?

19         And I'm going to add an extra question to that and

20    then stop talking for a moment, which is I'm wondering if you

21    all -- no one has said to me that we need to close the

22    courtroom or do anything like that.  I'm imagining that's

23    because we don't, in fact, need to.

24         So let me ask, first, whether if after granting the

25    motion related to the pending request, and as well as its

1   supplements, if there's anything else that is sort of top of

2   mind for you all in terms of needing to seal anything?

3            MR. MCCAULLEY:  Not from plaintiff's perspective, Your

4   Honor.

5            MR. MICHAEL:  And not from the defense --

6            THE COURT:  Okay.  Great.

7            MR. MICHAEL:  -- perspective.

8            THE COURT:  All right.  And to confirm, we are not --

9   we're not -- you're not asking that this be in closed session?

10  This -- this proceeding, you're not asking for it -- we're not

11  anticipating needing to do any of that?

12           MR. MICHAEL:  We are not, Your Honor.

13           THE COURT:  Okay.

14           MR. MCCAULLEY:  I don't -- and I think there's

15  third-party information that's implicated in some of these

16  motions, but certainly SIS doesn't have any objection.

17           THE COURT:  Okay.

18           MR. MCCAULLEY:  I don't know if someone not here

19  might.

20           THE COURT:  And we discussed them obliquely enough

21  such that we can keep court open?

22           MR. MCCAULLEY:  Certainly from our --

23           THE COURT:  All right.

24           MR. MCCAULLEY:  Certainly from our perspective.

25           MR. MICHAEL:  Yes.  And we don't see that being a

```
 1    problem, Your Honor.  As far as I know, the third parties did
 2    not seek to seal anything that was --
 3              THE COURT:  Right.
 4              MR. MICHAEL:  -- referred to in the briefs, and I
 5    wouldn't anticipate referring to anything else beyond that
 6    here.
 7              THE COURT:  Great.  Then let me tell you what I would
 8    like for us to do today.  I want to give you all a sense of
 9    just sort of how I'm starting to think about it, how I've been
10    thinking about this, and then I can either -- I would like to
11    hear you all either address sort of my thoughts or have -- I do
12    have a handful of questions for you all if -- if -- in case you
13    don't happen to answer them as we're going.
14              But I guess I will tell you all that I'm having a
15    hard -- I've been thinking very hard about this to the extent
16    that I'm sort of trying to figure out -- and maybe this is a
17    question best directed to you, Mr. Michael, which is just where
18    the cutoff is supposed to be for discovery; right?  Because I
19    can imagine that there's a universe in which you -- one could
20    keep requesting the reopening of discovery because more time
21    passes and more time passes.
22              And so the -- the part that I'm struggling with here
23    is I'm having a hard time with the idea -- because while I
24    appreciate that now there's more data, there will always be
25    more data.  Trial isn't for months, and there will always be
```

1    more data.

2           So if you could just start by actually -- by talking

3    with me a little bit about that.  And I would encourage you to

4    tell me why you don't have more case law for me on that.

5    Because if this were common, I feel like you would have more

6    cases to cite me.

7           MR. MICHAEL:  Sure, Your Honor.  Happy to address

8    that.

9           And while I agree that in the abstract, of course, you

10   know, there could always be more information and discovery

11   could go on, that's not really what's going on here.  I --

12   what's happening here, it was -- we have a very concrete

13   situation where SIS has put at issue with its claims the

14   post-fact discovery period, November 2022 through the present.

15   And SIS, in particular, has claimed it is entitled to collect

16   tens of millions of dollars of damages for that particular

17   period, 2022 through the present.

18          SIS has said, and it will presumably argue to the jury

19   at trial in this matter, that it was excluded from the market

20   that it alleges for EndoWrist repair and replacements

21   throughout that period and up to and including the present day.

22   And, yet, in this case there has been no discovery as to what

23   happened during that two-year period that SIS -- that is the

24   subject of SIS's claims.  In particular, there has been no

25   discovery as to what SIS did or did not do to try to compete

1    during that period.  There has been no discovery as to SIS's

2    financial condition during that period.  And there has been no

3    discovery as to what other third parties, like, for example,

4    the third parties that SIS has referred to as its technology

5    partners, including Restore Robotics, were doing during that

6    period.  Nor has there been discovery as to the success or

7    failure of their efforts.

8          And in this case, that puts Intuitive in what we think

9    is really an untenable position at trial, because, as you saw

10   in the opposition to this motion, SIS has responded to us

11   saying we need that discovery that I just described by making

12   arguments from its lawyers about what happened during that

13   period.  And, in all likelihood, they're going to make the same

14   types of arguments to the jury.

15         For example, SIS has said that it did not have the

16   ability to compete in 2023 or 2024 because Intuitive prevented

17   it from doing so.  SIS has said it didn't have the financial

18   resources to invest in competition during that period.  It is

19   argued that other competitors were forced to engage in certain

20   activities and not engage in other activities during that

21   period.  And it is said that if customers did not buy

22   remanufactured EndoWrists that other third parties made

23   available in the real world during 2023 and 2024 that is

24   Intuitive's fault.

25         Those are exactly the things on which we need

1    discovery.  And without discovery, we're completely prejudiced

2    in our ability to respond to those types of arguments at trial.

3    And so that's why in this case the limited discovery that we're

4    seeking for that time period, it's not discovery as to any and

5    all subject matters.  It's not discovery that would go on

6    forever.  But we know that there are things contrary to SIS's

7    claims, material developments that actually happened in the

8    market during that time period, and that's what we need

9    discovery on.  And I think that is supported by the case law

10   that we cited in our motion, like the Geneva Pharmaceuticals

11   case and others.

12          THE COURT:  But Geneva Pharmaceuticals was

13   post-remand.  I guess I -- I have some trouble with Geneva

14   Pharmaceutical as being the one thing you've -- you've cited me

15   that's in an antitrust context.

16          But -- but let me hear from you Mr. McCaulley.

17          MR. MCCAULLEY:  Sure.  I think -- I'll try and be

18   brief in my comments.

19          What we're talking about in this case is actions that

20   were taken by Intuitive in 2019, early 2020 that shut down

21   SIS's practice.  Beyond that point, yes, we are seeking

22   damages.  We're seeking damages for that period in the but-for

23   world.  What would have happened but for Intuitive's

24   interference?

25          And I understand that Intuitive's position is that

1    they didn't interfere, but our position is that they did.  And,

2    Your Honor's dealt with many of these issues in the context of

3    the *Daubert* motions.  And I won't go through all the points I

4    had prepared just responding to these points, but you might

5    recall that Mr. Humphrey put testimony in that this was just a

6    question of legwork, that this was computing resources to crack

7    the X and Xi, which is one of the things that Intuitive wants

8    discovery on.  He said this is just a matter of legwork,

9    computing power, resources, and money.  And Intuitive chose not

10   to respond.  They didn't put any expert testimony on that point

11   implicitly conceding that, yes, with enough time and money

12   someone could have cracked the code on the X and the Xi.

13         Your Honor dealt with this all in the context of

14   *Daubert*.  Their, Intuitive's, strategy/tactics appear to have

15   been to just rely on *Daubert* and get Mr. Humphrey excluded.

16   That didn't work, and now they want to seek discovery about

17   what happened in the real world years later.

18         But if you look more closely -- and I haven't had an

19   opportunity to respond in writing.  And if Your Honor would

20   like me to, I will, on the new Restore case.  But all of that

21   evidence is completely consistent with what Mr. Humphrey and

22   Mr. Bero said once SIS was in a position through the profits

23   they would get --

24         THE COURT:  I'm going to pause you.

25         MR. MCCAULLEY:  Sure.

1          THE COURT:  I'm a little -- I'm not so interested in

2     that piece.  Okay?

3          But the part that -- the part that you've pulled out

4     that I'm now going to ask Mr. Michael to talk about a little

5     bit, because I will share with you that part of what I keep

6     noodling over is that I understand why Intuitive wants the

7     things that have actually happened.  I think the part that I'm

8     having trouble with is that ultimately we're supposed to be in

9     a but-for world, and you seem to want discovery into the actual

10    world at this point.  And I'm -- I -- it -- that's one of the

11    reasons why it seems to me that discovery's supposed to close,

12    and we're supposed to then explore what we have based on the

13    actions that have already taken place.  And to some degree

14    we're not supposed to be worried about what happened in actual

15    2022 to the present, but instead what evidence there is about

16    what might have happened absent the allegedly anticompetitive

17    conduct.

18         MR. MICHAEL:  Well, respectfully, Your Honor, I think

19    I disagree with that in concept.  The whole point of a but-for

20    world in an antitrust case and to calculate damages is that

21    it's supposed to isolate the effect of the alleged

22    anticompetitive conduct on the plaintiff.  And the only way you

23    can do that is by comparing the real world to the but-for

24    world.  So you can't just look at one piece of it.  That's what

25    SIS wants to do with respect to this time period.  But that

1    doesn't work, because if what was going on in the real world,

2    as we submit it was, during this time period is that there were

3    available avenues for third parties to compete in the alleged

4    market, as Restore and Iconocare's activities demonstrate, we

5    submit then SIS's but-for world breaks down.  SIS is not able

6    to show that the damages that it claimed were the result of

7    Intuitive's activity as opposed to being the result of SIS's

8    own choices.

9          And that's exactly what was going on, again, in the

10   Geneva Pharmaceuticals case, just to use it as an example.  And

11   setting aside the procedural posture of that case, what was

12   happening there was there -- that a new competitor had entered

13   the market in the real world, had certain successes competing,

14   and that cast doubt on the plaintiff's claim that it was the

15   defendant's conduct that was -- it was preventing it from

16   competing in the actual world and cast doubt on the damages

17   that it was seeking by reference to a but-for world.  So that's

18   exactly what's going on here.

19         And just to return, if I could, for a second to Your

20   Honor's first question.  I'd like to give what I hope will be a

21   very practical answer to the concern.  And I understand it,

22   that, you know, this could go on forever and we could always

23   get new information.  If we are granted the discovery that

24   we're seeking by this motion and we have a trial at some point

25   after that discovery in 2025, we'd be willing to stipulate

1   that's it.  That's the limit.  And we'll place that limit on

2   the discovery that we're seeking.  We're not going to come back

3   to the Court, in other words, and say, now having taken that

4   discovery, we need more discovery about what's happened in --

5   in the interim.

6         THE COURT:  Mr. Michael, can you -- was this

7   foreseeable to you before the motions for summary judgment were

8   briefed?

9         MR. MICHAEL:  It was not, Your Honor, for a couple of

10  reasons.  I mean, obviously we couldn't foresee what was going

11  to happen in the actual world.  And I think the latest Restore

12  complaint and the allegations that Restore makes about very

13  material developments that were happening as recently as a

14  month ago, Restore coming in and actually filing a 510(k),

15  which we didn't know about, in August on the X and Xi

16  EndoWrists and claiming it now has the ability to reset the use

17  counter on those EndoWrists, those were developments that

18  didn't happen until very recently and that we could not have

19  foreseen.

20        And, again, you know, as I thought about this question

21  more practically speaking, I think even if we could have

22  foreseen that there might be some developments in the

23  marketplace, and obviously we didn't know how much time was

24  going to elapse or exactly what was going to happen, I'm not

25  sure there's any practical solution as to what to do about

1    that.  And I think this goes back to where Your Honor started.

2    It wouldn't have worked for us to say when discovery was

3    supposed to close in November of 2022, let's just keep it open

4    indefinitely.  You know, let's just keep discovery open

5    throughout the time that we're briefing summary judgment

6    motions and right up until trial.

7          Obviously, I think SIS would have rejected that, and I

8    think it's safe to say the Court would have rejected that had

9    we asked the Court to do that.  I also don't think it would

10   have made any practical sense or been efficient to ask the

11   Court to reopen discovery midstream while we were briefing and

12   arguing summary judgment.

13         Again, the outcome of the summary judgment motions, we

14   didn't know how those would turn out, but it -- we did know

15   that whatever the Court ruled on the summary judgment motions

16   would inform how the case moved forward or if it moved forward,

17   and so it made sense from that perspective to wait until we

18   received the summary judgment rulings.  And then once we did,

19   essentially immediately after that we raised this issue and

20   began to discuss it with Mr. McCaulley and his team.

21         THE COURT:  Mr. Michael, could you crystallize for me

22   the standard you seem to be suggesting for why discovery should

23   be reopened.  Because I -- I'm still a little stuck on the idea

24   of -- I hear you giving me a very practical solution of, we

25   promise this is the last time we'll ask to reopen it.  Okay.

1    But I'm trying to understand, other than your agreeing to that,

2    other than you're telling me that you're going to agree to

3    that, why what you are arguing wouldn't allow -- absent your

4    agreement, why it wouldn't always be:  There's been a market

5    development.  There's been a market development.  We should

6    reopen discovery.

7            As such, that trial just keeps getting put off.

8            MR. MICHAEL:  Well, there aren't always the kinds of

9    important market developments that we have in this case.  So, I

10   mean, I think we can only react to the record that is before

11   us.  And in this case we know -- we're not speculating.  We

12   know that there were important market developments that took

13   place during this time period, namely Iconocare getting that

14   initial 510(k) clearance with Restore, which we explored as

15   best we could in the time that was remaining at the very end

16   of -- of fact discovery, including deposing the Iconocare

17   witness on the last day of fact discovery about that.

18           But then also what happened after that, Intuitive's

19   announcement that it would -- just to clarify, it would not

20   enforce any of its contract provisions with respect to a

21   customer that chose to use a 510(k) cleared device.  And the

22   facts that we've learned more recently, or the alleged facts

23   from the Restore complaint, that throughout this time period

24   Restore was apparently working on re- -- the ability to reset

25   the X and Xi EndoWrists and on pursuing additional 510(k)

1    clearances.

2          So we have all of those very material facts.  And I

3    think it's on that record that we're saying discovery is

4    warranted in this case.  It's not just a sort of abstract time

5    has passed and so things have happened.

6          THE COURT:  Thank you.

7          Do you want to jump in there at all, Mr. McCaulley?

8          MR. MCCAULLEY:  Yeah.  Just briefly, Your Honor.

9          You know, I think certainly Intuitive has acknowledged

10   that they knew about all these things in advance.  I want to

11   just briefly comment about their announcement to the world in

12   March of 2023 that they would not enforce their contractual

13   provisions against someone who got FDA approval.

14         I think you're -- the Honor -- Your Honor, the Court's

15   already ruled on the fact that the FDA hadn't prohibited repair

16   services and the fact that Intuitive -- you know, it reinforced

17   the need for FDA approval makes the March announcement

18   irrelevant.  It doesn't really add anything here.  We would

19   argue it's part of their anticompetitive behavior.

20         But, Your Honor, the only thing I would ask is that if

21   there is anything about the Restore case that the Court would

22   like to hear, the recently filed Restore case and how it

23   affects the case, I'm happy to answer as best I can.  Or if the

24   Court thinks it's important, we would ask for leave to file a

25   brief on that topic on Monday.

1           MR. MICHAEL:  Your Honor, if I could just respond

2    briefly to Mr. McCaulley's argument about the Intuitive

3    announcement from March of 2023.

4           This is the argument that they made in their -- their

5    opposition brief as well.  And, respectfully, I think it just

6    doesn't work.  First of all, it doesn't match up with the

7    timing of what actually happened here.  SIS has tried to argue

8    that Intuitive forced third parties down this supposed FDA path

9    by making this announcement.  But we already know from the

10   record that we have that Iconocare and Restore had made the

11   choice to seek FDA clearance for their EndoWrist

12   remanufacturing well before this.  They actually started on

13   that path in 2021 and had received the first 510(k) clearance

14   by September of 2022, well before Intuitive made that

15   announcement.  And we know why they did that, because, again,

16   we deposed Iconocare witness about this, and he testified, and

17   this is at Brachman Exhibit 15, that Iconocare, together with

18   Restore, chose to seek FDA clearance for marketing reasons

19   because, in his words, it was like a Good Housekeeping seal of

20   approval.

21          And far from engaging in any anticompetitive conduct,

22   as Mr. McCaulley suggests, what Intuitive then said was if any

23   third party has that Good Housekeeping seal of approval for its

24   products for any model of EndoWrist -- which before Iconocare

25   and Restore, no one did -- then Intuitive is not going to stand

1  in the way of hospitals using that product.  In other words,

2  Intuitive was saying:  If you go and actually prove to the FDA

3  that your reset process of what you want to do with the

4  EndoWrist devices is safe and effective, then have at it.  Go

5  compete.  Intuitive's contracts are not going to prevent that.

6         And that has nothing to do with the Court's ruling on

7  FDA clearance as a matter of law and what it says about F --

8  SIS's standing.  We're not challenging any aspect of that

9  ruling.  This doesn't have to do with FDA law and regulations.

10 This has to do with what Intuitive said as a matter of contract

11 to the market and with the -- with the opportunities that third

12 parties, including SIS, had to compete by pursuing that avenue,

13 as Restore did.

14        THE COURT:  Mr. McCaulley, let me ask you something

15 that I heard Mr. -- that I think I heard Mr. Michael say.

16 Well, I'll ask you first.

17        And then, Mr. Michael, you can correct me if I'm

18 misstating your point.

19        But I understand the -- the -- I understand you to

20 have said that you need this -- you need this discovery to best

21 defend yourself with regard to the damages that are sought by

22 plaintiff.  Is it just for the damages?

23        MR. MICHAEL:  It's the damages and their claim of

24 exclusion that underlies those damages.  So I think it is a

25 liability issue as well as a damages issue.

1          THE COURT:  I thought so, too, which -- so to the

2    extent that I -- I thought I heard you say it was just to

3    damage, I guess, Mr. McCaulley, I -- I had been toying with the

4    idea of asking you if damages -- if -- if your damages is

5    something you would be -- if it just goes to the damages if

6    it's something that you would be willing to limit to make

7    their -- their discovery less rel- -- seem at least moderately

8    less relevant?

9          MR. MCCAULLEY:  If it -- if the question was, will

10   we -- I mean, I don't think it's relevant.  But the financial

11   condition of SIS, we would produce updated financials if that

12   satis- -- if that was the end of the inquiry.  But I don't

13   think it's really relevant, Your Honor, because what we're

14   talking about is what happened in the market in 2019 and 2020.

15         And, as you've already ruled on on all the *Daubert*

16   motions, our position was, as taken by our experts, is if SIS

17   had had the money to reprogram the X and the Xi in 2019-2020

18   from ongoing operations from S and Si, then it would have taken

19   about a year to do it.

20         And I think that's the only relevant inquiry here.

21   It's not whether we would have had the money to do it in 2023

22   or 2024.  That's not our case.

23         MR. MICHAEL:  And, Your Honor, I -- respectfully, I

24   would suggest it is their case, and they've made it our problem

25   because they're seeking tens of millions of dollars in damages

1   for 2023 and 2024 and claiming -- and this is -- really gets

2   exactly to the point.  What Mr. McCaulley's essentially saying

3   is that nothing changed in the world from 2019 or 2020 to 2023

4   and '24, and that's why they say they're entitled to those

5   damages.  But that's exactly the issue on which we're seeking

6   discovery, and that's exactly the issue that we want to be able

7   to challenge.  And we think that it's clear from the -- just

8   what we know from the public record that things did change in

9   that time period.  And so it's not enough to just say, well,

10  this was the state of the world in 2019 and 2020.  And

11  obviously it suits SIS purpose -- SIS's purposes to say that

12  nothing changed, but that's what we should be entitled to

13  discovery to -- to find out.

14          And just on the -- the damages point, I guess I'll

15  make a couple of points clear in case they weren't.

16          First of all, it's not just some of the damages that

17  SIS is seeking that come from this post-discovery time period.

18  It's actually the majority of the damages they're seeking.  And

19  you can see this in Brachman Exhibit 1, which is Mr. Bero's

20  report at Schedule 1.  He has various scenarios for calculating

21  damages.  In each of them, more than 50 percent of the damages

22  they're claiming come from that later post-November 2022 time

23  period, and some of them it's up to 75 or 80 percent.  And with

24  respect to X and Xi, it's an even greater share of the damages.

25  Over 95 percent of their claimed damages in this case

1    throughout the time period, up to and including the present,

2    are for profits that they say they would have made in resetting

3    the X and Xi.

4         And so these are really central.  These aren't

5    peripheral issues.  These are essential in the case.  Now, if

6    they want to give up those 95 percent of the damages, that's a

7    conversation that we can have, and I think that gets to Your

8    Honor's question, but I don't hear Mr. McCaulley saying that.

9         THE COURT:  But, Mr. Michael, why isn't -- why

10   isn't -- why doesn't it suffice to just cross-examine Mr. Bero

11   about the assumptions that -- I mean, part of what I got from

12   your papers is Mr. Bero's report is based on a number of

13   assumptions.  Those assumptions didn't pan out.  Why isn't that

14   just a subject of cross-examination rather than needing the

15   additional discovery?

16        MR. MICHAEL:  Because to show they didn't pan out we

17   need the discovery, otherwise we're all flying blind.  And

18   they're going to have their own narrative about what happened,

19   but we can't test that without the discovery of what the facts

20   actually are.

21        Again, the Restore complaint gives us some hint at it,

22   but those are allegations.  Obviously, those are going to be

23   subject to discovery in that case.

24        THE COURT:  I guess to the extent that they were

25   the -- that they -- to the extent that the discovery you seek

1    is very closely related to the assumptions made in Bero's

2    report, on some level I then anticipate that what you're asking

3    for would be for him to update them, but -- but you aren't

4    reviving discovery -- existing discovery requests.

5         MR. MICHAEL:  It's new because it's focused on a new

6    time period.  I mean, you're absolutely right that Mr. Bero

7    made assumptions.  He said that what he's -- his argument is

8    about X and Xi, that the inclusion of damages associated with

9    the X and Xi Endo -- EndoWrist is assumed.  He then tried to

10   show, and this is what the Court relied on in its *Daubert*

11   ruling, that that assumption is reasonable by pointing to

12   testimony that Restore witnesses gave, and it was testimony

13   they gave in that last week before fact discovery closed,

14   November 2022.  In particular, he pointed to testimony that

15   Restore had started work on the X and Xi chips in 2020 and that

16   as of 2022 it was supposedly very, very close to having the

17   ability to reset the use counter on those chips.

18        And so when we filed this motion, we said, well, we

19   need discovery to test what happened after that.  Did they

20   actually do it?  How long did it take?  How much did it cost?

21        In the month or so that's passed just most recently,

22   that has only come into sharper relief with the Restore

23   complaint, where Restore actually contradicts what its

24   witnesses said and what Mr. Bero relied on.  Contrary to the

25   testimony that they gave in November of 2022, the Restore

1   complaint says Restore didn't even start considering options

2   for resetting the X and Xi until February of 2023 and didn't

3   start working on that process until September.  It next says

4   that once it did start working on the process, it took just

5   about five months to finish and that by February 2024 it had

6   the ability to bypass the encryption.  And then it says it went

7   to the FDA and sought clearance for reset X and Xi EndoWrists,

8   notwithstanding the fact that, according to Restore, Intuitive

9   had not changed its contracts at all during that time period.

10         And so taken together, that raises several questions

11  that go directly to the discovery that we're seeking in this

12  case.  What process did Restore actually use?  We have no

13  information about that.  What role, if any, did SIS have in

14  that process?

15         Because, again, as of November of 2022, SIS witnesses

16  said:  We're working with Restore.  We're partners with

17  Restore, and we're going to go seek FDA clearances with

18  Restore.

19         Now they're saying something very different, but we

20  don't know what happened.  Did that partnership end?  If so,

21  why?

22         We can't establish any of that through

23  cross-examination because we don't know what the facts are, and

24  that's what we need discovery on.

25         THE COURT:  Could I ask you to address briefly -- and,

1    Mr. McCaulley, I'll give you a chance to -- to speak to those

2    issues addressed by -- by Mr. Michael.

3          But, Mr. Michael, could I ask you to just pivot and

4    talk to me about the prejudice that SIS elaborates on their

5    papers they will suffer if discovery is reopened.

6          MR. MICHAEL:  Sure, Your Honor.

7          As best that I can tell, the primary, if not only,

8    form of prejudice that SIS has pointed to is a cost concern,

9    but they haven't supported that with any evidence.  And, again,

10   this goes to one of the topics on which we're seeking

11   discovery.  So Mr. McCaulley has said that SIS is essentially

12   cash strapped and strapped for resources and this discovery

13   would tax its resources.

14         Well, first of all, the discovery that we're seeking

15   is a subset of what was previously done in this case, and

16   there's been no showing that it would be unduly burdensome.  We

17   intend to limit it, you know, appropriately and wouldn't have

18   any intention of imposing undo costs on anyone.  But, most

19   importantly, SIS hasn't come forward with any evidence to

20   substantiate that claim, either with respect to the scope of

21   the discovery being sought or the impact on SIS.

22         What we know about SIS from the record that existed as

23   of the close of discovery is that it was a business that was

24   not only, you know, not the verge of exiting, but really

25   thriving.  It was making $18 million a year in revenues.  In

1    the four or five years --

2              THE COURT:  Stop there for a moment.

3              MR. MICHAEL:  Sure.

4              THE COURT:  There are two -- there are two things that

5    I got from -- from SIS papers, which were cost and delay.  I

6    hear you telling me it's not going to cost that much.

7              What would you ballpark that at in terms of -- truly,

8    like, the depositions, the -- I realize -- I -- to the extent

9    that we're sort of just playing with numbers here, let me have

10   yours.

11             What do you think it'll cost to engage in this

12   discovery, just -- just for the cost of the depositions and the

13   like?

14             MR. MICHAEL:  Your Honor, I'd really be hard pressed

15   to give the Court a number.

16             THE COURT:  Okay.

17             MR. MICHAEL:  And I don't want to just make something

18   up.

19             THE COURT:  That's okay.

20             MR. MICHAEL:  And that's essentially --

21             THE COURT:  That's fair.

22             MR. MICHAEL:  -- what I would be doing.

23             THE COURT:  That's fair.  I think you're right.

24             MR. MICHAEL:  But --

25             THE COURT:  I'm asking you to make it up, and you

1  don't have to.

2          So then let's talk about the other thing that they've

3  raised, which is delay.

4          MR. MICHAEL:  Sure.

5          THE COURT:  So what kind of timeline -- assuming that

6  I allow any of it, what kind of timeline?  Because, right,

7  we've got -- you've got pretrial submissions due in four weeks,

8  I think.

9          MR. MICHAEL:  Yes.  So that -- and that I'm acutely

10  aware of.  And just -- just for five seconds on the -- on the

11  cost issue.  While I can't give you, the Court, a number, what

12  I can say is that in terms of the type of discovery we're

13  seeking, it's basically documents and, as far as SIS is

14  concerned, one deposition of a corporate representative, so

15  just to be concrete about that.

16          But in terms of delay, so I'm happy to address that.

17  SIS said in its papers that it believes that it would take

18  roughly two to three months to complete this discovery.  And I

19  think that's a reasonable estimate.  We can't know for sure,

20  obviously, because we don't know how quickly SIS is going to

21  produce the documents, we don't know how quickly they would

22  produce a witness, and perhaps more importantly, we don't know

23  exactly what the response of the non-parties that we would seek

24  discovery from, including Restore, is going to be and how

25  cooperative or not cooperative they would be in getting us that

1    discovery.

2         Now, if -- if the discovery were to take two to

3    three months, I acknowledge, just looking at the calendar, that

4    would run right up to the January trial date, and I understand

5    that.  But what I would submit to the Court is that to the

6    extent that the trial date is a problem here that SIS is

7    concerned about, that is a problem of SIS's own making.

8    Because the fact is that we sought this discovery.  We first

9    raised the issue that we were going to need supplemental

10   discovery with SIS last May.  At the case management conference

11   before Your Honor, we did express concern about this issue,

12   that it was out there, but we were hopeful we were going to be

13   able to work something out with SIS to get the supplemental

14   discovery that we needed.  On June 24th, and this is in the

15   exhibits to the motion, we sent a letter detailing the

16   discovery that we needed.  And June 24th was three months ago.

17        So if SIS had said yes to that discovery instead of

18   refusing, then by their own estimate we would be done by now.

19   We're not.  We are where we are.  Obviously, they have the

20   right to oppose the motion, but that's where we've ended up,

21   and that's how we got here.

22        And so we think, respectfully, that although, you

23   know, we don't take it lightly at all that this would in all

24   likelihood entail moving the trial date if it were to take two

25   to three months to complete this discovery, we think that,

1    given the importance of it to this case, given what's at stake

2    in SIS's claims, that there's no reason to sacrifice having a

3    complete record to present to the jury simply to have a January

4    trial date.  And we would be willing to work with SIS, and, of

5    course, the Court to find a new date, if we needed to, at some

6    later point in 2025, be that April or some other month.

7         THE COURT:  All right.  Mr. McCaulley, please pick it

8    up wherever you would like to.

9         MR. MCCAULLEY:  Thanks, Your Honor.

10        Your Honor, we told the Court, and we told Intuitive

11   in May, on May 7th, I believe, that we opposed any further

12   discovery.  During that conference, we were talking about

13   setting a trial date.  Intuitive was pushing for a trial in May

14   of 2025.  And I think -- just my opinion, but we're at the

15   heart of the issue now.  They're trying to get what they didn't

16   get in May.  They're trying to get this discovery in, push the

17   trial off to the original date that they wanted.

18        And, Your Honor, I think it's kind of arrogant for a

19   multibillion-dollar company to say that my client won't be

20   prejudiced.  I didn't know I needed to come forward with the

21   affidavits talking about the costs and how it would hurt my

22   client, but I think it's self-evident from the relative size of

23   these parties the impact this will have on our case and the

24   delay.  We've been shut out of the market, our opinion, for

25   four to five years.  We don't want to put this trial off for

1    five months.

2            We exchanged exhibit lists last week.  We've

3    exchanged -- we're -- we're working -- my team is right here,

4    and the rest of the people are from the other side.  We're

5    working diligently to get things done and keep things on

6    schedule, and it will be hugely prejudicial to my client to

7    take this -- this case off and incur all these expenses.  And

8    it's not just going to be their discovery.  We can't have it

9    one way.  We're going to have to take discovery, react to all

10   of this.  It's completely foreseeable.  The need for this was

11   foreseeable.  We sat around for a year and a half.  They could

12   have pursued it if they thought it was important.  I told them

13   in May.  I told --

14           THE COURT:  Let me pause you --

15           MR. MCCAULLEY:  -- you --

16           THE COURT:  Let me pause you there, because I -- I can

17   understand not trying to do additional discovery while you're

18   waiting on the ruling on the motions for summary judgment and

19   then the reconsideration; right?  All of that time, mea culpa,

20   so -- right?

21           So I guess I'm curious.  If -- I would rather -- I

22   would prefer you sort of help me focus; right?  At that point,

23   once the briefing's done and you're waiting to see, there's no

24   point, to my mind, to try and get more discovery from you when,

25   as we all do, you submitted papers and you're hoping that

1    you're going to win; right?

2             So --

3             MR. MCCAULLEY:  Okay.  Right.  But we got those

4    rulings on Easter.

5             THE COURT:  March.

6             MR. MCCAULLEY:  We got those rulings -- we got -- we

7    got the indication that there was a ruling as I sat down for

8    Easter brunch with my family.  We didn't get to see the

9    opinions for the next -- that was -- that was stressful, Your

10   Honor.

11            THE COURT:  You didn't have access -- that's a

12   different conversation --

13            MR. MCCAULLEY:  It is a different --

14            THE COURT:  -- right?

15            MR. MCCAULLEY:  -- conversation.

16            THE COURT:  Keep going.

17            MR. MCCAULLEY:  I'm sorry.  But it was an inside joke,

18   I guess.  We didn't have access to the actual opinions.  We

19   just knew there was an opinion for Easter day.

20            THE COURT:  You didn't have -- no.  This is helpful

21   for me to know; right?

22            We filed them under seal because -- but I assumed that

23   you all -- that was the point --

24            MR. MCCAULLEY:  No.

25            THE COURT:  -- because you were supposed to be able to

1    see them and nobody else.  And you couldn't see them?

2        MR. MICHAEL:  We were not able to access them through

3    the docket, Your Honor.

4        THE COURT:  Okay.  But -- thank you.  I apologize.  I

5    thought that was a favor.  It was clearly not.

6        Sorry.  Keep going.

7        MR. MCCAULLEY:  But, as we negotiated, they -- we

8    didn't have the specifics of what the discovery was that --

9    that Intuitive wanted, but we told them while we were

10   negotiating the statement that we submitted to Your Honor that

11   we oppose any further discovery.  We told the Court, we told

12   Intuitive on May 7th that we oppose any further discovery.  I

13   told you in detail -- which I got made fun of late -- later for

14   calling my client a little David against a big Goliath -- that

15   this would be a problem and this would strain our resources.

16       And if you want declarations on that point, Your

17   Honor, I'm happy to give them to you.

18       But we can't put this trial off.  We've done too much

19   work.  We've adjusted our calendars.  We're ready to go.  And I

20   think, as we set out in our papers, the discovery that they

21   seek was foreseeable, the delay is inexcusable, and the

22   prejudice to my client is real.

23       MR. MICHAEL:  Your Honor, if I may respond.

24       First of all, to the extent Mr. McCaulley is

25   suggesting that there's some pretext involved in this request,

1    that is absolutely false.  We've been transparent with SIS and

2    with the Court from the beginning that this is discovery that

3    we would need in advance of trial and as to why we would need

4    it.  And so I reject any suggestion that this is somehow a ploy

5    to put off the trial date.  That's absolutely not what is

6    happening here.

7           In terms of Mr. McCaulley relying on a claim of burden

8    in order to oppose the discovery but not putting in any

9    evidence, as far as I know the party's always required to

10   submit evidence if they're going to rely on claiming burden in

11   order to oppose discovery.  They haven't done that.  And SIS

12   hasn't actually opposed any of the specific discovery we're

13   seeking.  They haven't said, well, this category or that

14   category is too broad and would require us to produce too many

15   documents.  To the contrary.  What they suggested is they

16   wouldn't have any documents because they haven't actually been

17   doing anything in this business for the last couple of years.

18   And if that's true, then the burden won't be very great.  But,

19   in any event, there's always a requirement to put in evidence,

20   and they failed to do that.  They've just relied on lawyer

21   argument.

22          And -- well, I'll -- I'll leave it there for the

23   moment.

24          THE COURT:  Well, let me -- you've answered the

25   questions that I came with.  Because -- because of the schedule

1    that you all have, I'm hoping that you will actually leave with

2    an answer.  So here's what I'm going to do:  I -- we're going

3    to take a brief recess, and I'm hoping to come back and have an

4    answer for you all.

5            Yes?

6            MR. GALLO:  May I have 30 seconds on this trial date

7    issue?

8            THE COURT:  Well, as long as you make --

9            MR. GALLO:  I'll keep it very short.

10           THE COURT:  -- your appearance for the record.

11           MR. GALLO:  My name's Ken Gallo, and I had the

12    pleasure of appearing before you for the first time at that

13    remote status conference in June.  And I remember it very

14    vividly.  There's no reason the Court should.  But let me -- I

15    think I need to clarify the record.

16           THE COURT:  Oh, you know -- well, go ahead.

17           MR. GALLO:  Very -- my only point is this:  The Court

18    originally talked about an April trial date.  You then later in

19    the conference talked about a January trial date.  And I didn't

20    want to fight about three months if it wasn't important.  And

21    at the time I had said we need supplemental discovery about

22    this two-year period.

23           And your comment back was:  You guys meet and confer

24    and try to work it out.  If you can't work it out, file a

25    motion.

1              Frankly, in retrospect, had I known we were going to

2    be in motion practice, I -- I should have argued for the April

3    date.  I was hopeful we were going to work it out.  The notion

4    that this was some sort of scheme is really totally untrue.  We

5    were totally transparent about the fact that we needed this

6    discovery when we talked about the possible trial dates, April

7    or January.

8              That's all I wanted to make clear.  Thank you.

9              THE COURT:  Thank you, Mr. Gallo.

10             Before I -- before we recess, can I -- I want to check

11   one thing, because I think -- here are the couple of things I

12   think I have heard:

13             Mr. McCaulley, I think I've -- if nothing else, I've

14   heard you say that in terms of being able to supplement your

15   financials, that's something you're open to at this point.

16             Did I catch that right?

17             MR. MCCAULLEY:  Sure.

18             THE COURT:  Okay.  That might be the only concession I

19   think I've heard while I've been chatting with you all, but I

20   at least wanted to button it up before -- before we recess.

21             Did I miss anything else?  Were there any other

22   concessions made?

23             I don't think so, but --

24             MR. MICHAEL:  I don't think so, Your Honor, other than

25   I guess where we started, which was that we'll make the

1    stipulation that this will be the only time --

2            THE COURT:  Okay.

3            MR. MICHAEL:  -- that we're seeking to --

4            THE COURT:  I appreciate that.

5            MR. MICHAEL:  -- update discovery in advance of trial.

6            THE COURT:  I appreciate you flagging that as well.

7            All right.  Give me -- I'm hoping to make it less than

8    15 minutes, but we're -- we're in recess, and I'll be back.

9            MR. MICHAEL:  Thank you, Your Honor.

10           MR. MCCAULLEY:  Thank you, Your Honor.

11       (Recess from 3:11 p.m. to 3:30 p.m.)

12           THE COURT:  Folks, I want to thank you for waiting

13   and also just for -- for coming.

14           So having considered all of the submissions and

15   everything you all have shared with me today, I'm going to

16   grant defendant's request in part.  I'm going to order that SIS

17   provide you their new financials, and I'm going to allow

18   defendant to issue a couple of requests for admission.

19           I think that you all have made a point that there are

20   something that you need, and I think you can accomplish that

21   through a couple of requests for admission related to SIS,

22   whether SIS entered the X/Xi EndoWrist market and, if so, when

23   and whether SIS or its partners achieved the encryption of the

24   X/Xi EndoWrists and, if so, when.

25           And because -- and I'm denying your -- the rest of

UNITED STATES DISTRICT COURT

1    your request, because I think given the stage that -- given

2    where we are in this case, I think it would prejudice SIS to --

3    to do more or to reopen discovery at this point.

4           I want to flag -- so here's what I'm going to ask you

5    all to do:  Mr. McCaulley, can you get them your financials in

6    14 days?  Or not "your financials."  You know what I mean.

7           Can you get -- can SIS get the -- can you get them

8    your client's financials in 14 days?

9           THE COURT REPORTER:  I'm sorry.  I'm not hearing.

10          THE COURT:  I'm so sorry.  You need to be at any one

11   of those microphones.

12          MR. MCCAULLEY:  I'm sure we can, but I haven't checked

13   with my client.  But I assume that we will be able to, yes.

14          THE COURT:  All right.  So I'm going to say 14 days.

15   And if you need more time, consult with them.  And if you need

16   to come to me, come to me.

17          Same thing.  You all -- my lovely wordsmithing is not

18   what you are bound to.  It's intended in the spirit of those

19   RFAs, but that's the spirit of them.  So you will wordsmith

20   them as you see fit and in a way that will serve you, and get

21   those to plaintiff in the next seven days.  Same thing.  If you

22   need more time, for whatever reason, meet and confer or come

23   back to me.

24          If you should have any other issues, either with the

25   financial or the production or with the RFAs, I'm going to tell

1    you now to engage in a practice that's laid out in my standing

2    order, which is for discovery disputes.  Use letter briefs;

3    right?  Just -- it's a -- it'll be no more than five pages; two

4    and a half pages each.  But I get them, I do them, and we try

5    to get you answers within a day or two.

6            So note by -- one, because I'm not reopening discovery

7    beyond that.  But, as a general matter, just no more notice

8    motions; right?  Like, I want to keep you all on track to

9    January.

10           All right.  Any questions?

11           I loath to ask that, but here I am.  I've already

12   asked it.

13           MR. MICHAEL:  Not from defendants, Your Honor.

14           THE COURT:  Okay.

15           MR. MCCAULLEY:  No, thank you.

16           THE COURT:  All right.  Have a good afternoon.

17           MR. MICHAEL:  Thanks, Your Honor.

18       (Proceedings conclude at 3:33 p.m.)

19                          ---oOo---

20

21

22

23

24

25

1

2

3

4                    **C E R T I F I C A T E**

5

6         I, CATHY J. TAYLOR, do hereby certify that I am duly

7  appointed and qualified to act as Official Court Reporter.

8         I FURTHER CERTIFY that the foregoing pages constitute

9  a full, true, and accurate transcript of all of that portion of

10 the proceedings contained herein, had in the above-entitled

11 cause on the date specified therein, and that said transcript

12 was prepared under my direction and control.

13        DATED this 27th day of September, 2024.

14

15

16

17                    */s/Cathy J. Taylor*
                      _____
18                    Cathy J. Taylor, RMR, CRR, CRC

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT