Kenneth A. Gallo (*pro hac vice*)
Paul D. Brachman (*pro hac vice*)
**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
2001 K Street, NW
Washington, DC  20006-1047
Telephone:  (202) 223-7300
Facsimile:  (202) 204-7420
Email: kgallo@paulweiss.com
Email: pbrachman@paulweiss.com

*Attorneys for Defendant and Counter-Claimant*
*Intuitive Surgical, Inc.*

**MCCAULLEY LAW GROUP LLC**
Joshua V. Van Hoven, (CSB No. 261815)
E-Mail: josh@mccaulleylawgroup.com
3001Bishop Dr., Suite 300
San Ramon, California 94583
Telephone: 925.302.5941

Richard T. McCaulley (*pro hac vice*)
E-Mail: richard@mccaulleylawgroup.com
180 N. Wabash Avenue, Suite 601
Chicago, Illinois 60601
Telephone: 312.330.8105

*Attorneys for Plaintiff and Counter-Defendant*
*Surgical Instrument Service Company, Inc.*

[Additional counsel listed on signature page]

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| SURGICAL INSTRUMENT SERVICE COMPANY, INC., | Case No. 3:21-cv-03496-AMO |
| *Plaintiff / Counter-Defendant*, | **PARTIES' JOINT PROPOSED JURY INSTRUCTIONS** |
| v. | |
| INTUITIVE SURGICAL, INC., | The Honorable Araceli Martínez-Olguín |
| *Defendant / Counter-Claimant*. | |

## PRELIMINARY, GENERAL, AND CONCLUDING INSTRUCTIONS

Preliminary, general, and concluding instructions from Ninth Circuit Model Jury Civil Case Instructions are referenced by citation to the numbers of the requested instructions in the current edition of the Ninth Circuit Model Jury Instructions (UPDATED JUNE 2024). "Other than citing the numbers, the parties shall not include preliminary, general, or concluding instructions in the packet." Doc 235, Section II.A.2.

1.3 Duty of Jury (Court Reads Instructions at the Beginning of Trial but Does Not Provide Written Copies)

1.4 Duty of Jury (Court Reads and Provides Written Instructions at End of Case)

1.6 Burden of Proof—Preponderance of the Evidence

1.9 What is Evidence

1.10 What is Not Evidence

1.11 Evidence for Limited Purpose

1.12 Direct and Circumstantial Evidence

1.13 Ruling on Objections

1.14 Credibility of Witnesses

1.15 Conduct of the Jury

1.16 Publicity During Trial

1.17 No Transcript Available to Jury

1.18 Taking Notes

1.19 Questions to Witnesses by Jurors During Trial (Option 1)

1.20 Bench Conferences and Recesses

1.21 Outline of Trial

2.0 Cautionary Instructions

2.2 Stipulations of Fact

2.3 Judicial Notice

2.4 Deposition in Lieu of Live Testimony

2.13 Expert Opinion

2.14 Charts and Summaries Not Received in Evidence

2.15 Charts and Summaries Received in Evidence

2.16  Evidence in Electronic Format

3.1 Duty to Deliberate

3.2 Consideration of Evidence—Conduct of the Jury

3.3 Communication with Court

3.4 Readback or Playback

3.5 Return of Verdict

3.9 Post-Discharge Instruction

# SIS'S BRIEF STATEMENT REGARDING ORDER OF INSTRUCTIONS

SIS has objected and continues to object to the order and manner of the presentation of the below Instructions as proposed by Intuitive, both for their presentation to jury and to the Court.  Intuitive's order of presentation buries SIS instructions below numerous Intuitive instructions in a manner that SIS believes creates confusion for the jury and Court.  For example, SIS's third proposed instruction is Instruction 13 below and there are substantial gaps between instructions that should logically be grouped together for each claim.  Accordingly, to aid the Court and avoid further disputes between the parties, SIS submits the below cross reference of Intuitive's order of instructions to SIS's proposed order of instructions:

| No below: | SIS Order | Subject: | Source: |
|---|---|---|---|
| 2 | 1 | Purpose of Antitrust Laws | ABA A-1 |
| 3 | 2 | SIS's Claims and the Antitrust Statutes | *See cited caselaw* |
| 13 | 3 | Definition of Tying | ABA E-84 |
| 14 | 4 | Rationale for Prohibition of Tying Arrangements | ABA E-85 |
| 15 | 5 | Tying – Per Se Violation | ABA E-86 |
| 17 | 6 | Presence of Two Products | ABA E-90 |
| 18 | 7 | Tying – Conditioned Sale | ABA-93 |
| 19 | 8 | Relevant Geographic Market | *See instruction – SIS proposes instruct not disputed* |
| 22 | 9 | Relevant Product Markets | ABA A-108 |
| 23 | 10 | Existence of Market Power With Respect to the Tying Product Offered | ABA E-94 |
| 24 | 11 | Foreclosure of a Substantial Volume of Commerce With Respect to the Tied Product | ABA E-97 |
| 25 | 12 | Interstate Commerce – Tying | *See instruction – SIS proposes instruct not disputed* |
| 26 | 13 | Unlawful Tying under Rule of Reason | ABA E-88 |
| 27 | 14 | Rule of Reason - Overview | ABA C-3 |
| 28 | 15 | Rule of Reason - Proof of Competitive Harm | ABC C-5 |
| 29 | 16 | Rule of Reason -- Evidence of Competitive Benefits | ABA C-6 |
| 30 | 17 | Rule of Reason -- Balancing the Competitive Effects | ABA C-9 |
| 32 | 18 | Elements of Exclusive Dealing | ABA D-71 |
| 34 | 19 | Exclusive Dealing – Agreements that Substantially Foreclose Competition | ABA D-73 |

| No below: | SIS Order | Subject: | Source: |
|---|---|---|---|
| 37 | 20 | Exclusive Dealing – Relevant Market | ABA A-108 (by ref to prior instruction ) |
| 38 | 21 | Exclusive Dealing – Unreasonable Restraint of Trade | ABA C-3, C-5, C-6, C9 (by ref to prior instructions) |
| 39 | 22 | Exclusive Dealing – Market Power | ABA E-94 |
| 41 | 23 | Exclusive Dealing – Interstate Commerce | *See instruction – SIS proposes instruct not disputed* |
| 42 | 24 | Injury | Modern Federal Jury Instructions-Civil, Form 485a-79-23 |
| 44 | 25 | Monopoly and Attempted Monopolization Defined | Modern Federal Jury Instructions-Civil, Form 485a-80-22 |
| 45 | 26 | Elements of Monopolization | ABA A-102 |
| 46 | 27 | Relevant Geographic Market | *See instruction – SIS proposes instruct not disputed* |
| 47 | 28 | Relevant Product Market | ABA A-108 (by ref to prior instructions) |
| 48 | 29 | Monopoly Power Defined | ABA A-104 |
| 49 | 30 | Monopoly Power – Direct Evidence | ABA A-121 |
| 50 | 31 | Monopoly Power – Indirect Evidence | ABA A-115 |
| 51 | 32 | Willful Acquisition or Maintenance of Monopoly Power through Anticompetitive Conduct | ABA A-123 |
| 52 | 33 | Design Changes | *See cited caselaw* |
| 53 | 34 | Monopolization - Interstate Commerce | *See instruction – SIS proposes instruct not disputed* |
| 54 | 35 | Attempt to Monopolize | ABA D-155 |
| 55 | 36 | Attempted Monopolization - Anticompetitive Conduct | ABA D-158 |
| 56 | 37 | Specific Intent to Achieve Monopoly Power | ABA D-160 |
| 57 | 38 | Dangerous Probability of Success | ABA D-164 |
| 58 | 39 | Attempted Monopolization - Interstate Commerce | *See instruction – SIS proposes instruct not disputed* |
| 59 | 40 | Injury – Monopolization and Attempted Monopolization | Modern Federal Jury Instructions-Civil, Form 485a-79-23 |
| 64 | 41 | Antitrust Damages -- Introduction and Purpose | ABA B-304 |
| 67 | 42 | Damages for Competitors--Preparedness to Enter Business | ABA B-321 |

| No below: | SIS Order | Subject: | Source: |
|---|---|---|---|
| 68 | 43 | Basis for Calculating Damages | ABA B-3; Modern Federal Jury Instructions-Civil, Form 485a-79-26 |
| 69 | 44 | Damages for Competitors -- Lost Profits | ABA B-8; Modern Federal Jury Instructions-Civil, Form 485a-79-27 |
| 71 | 45 | Damages for Competitors -- Future Lost Profits | ABA B-9 |

1

2

**INTUITIVE'S RESPONSE TO
SIS'S BRIEF STATEMENT REGARDING ORDER OF INSTRUCTIONS**

3

4

5

6

7

8

9

10

11

12

SIS's objection to the order in which the proposed instructions are presented is entirely unfounded.  While the parties disagree about the substance of many of the instructions herein, each side's proposed instructions are arranged in what it believes to be the "logical sequence." Dkt. 235 at 2:10-11.  If the Court accepts Intuitive's versions of the disputed instructions, and rejects SIS's versions, then it merely needs to delete SIS's disputed instructions from this document; once the Court does so, the remaining instructions will be presented in the sequence proposed by Intuitive.  And the same is true if the Court accepts SIS's versions of the disputed instructions and deletes Intuitive's:  in that event, the remaining instructions will be presented in the sequence proposed by SIS.

13

14

15

16

17

18

19

20

21

22

The crux of SIS's objection to this reasonable ordering system seems to be that SIS wants all of its disputed instructions to be presented to the Court first in this document.  That is both inconsistent with this Court's Order, Dkt. 235, and would only create more, unnecessary work for the Court.  If SIS's proposed ordering were adopted and the Court were to accept Intuitive's versions of the disputed instructions, the Court would then be required to re-order Intuitive's instructions to fit them into their "logical place in the overall sequence."  Dkt. 235 at 2:13-14. By contrast, the ordering of this document, to which SIS objects, is far more efficient.  As noted, each party's instructions are already presented in the order they contend would be a logical sequence, if the other party's disputed instructions were to be removed.

23

24

25

26

27

28

1
2

## PRELIMINARY INSTRUCTIONS

3
4

**Disputed** Instruction No. 1 Re Statements Regarding FDA Clearance Offered by **Intuitive**

5

During the trial, you may hear or see statements by SIS or other third parties that their

6

activities relating to EndoWrists did not constitute remanufacturing and did not require FDA

7

clearance, and statements by Intuitive that such activities did constitute remanufacturing and did

8

require FDA clearance.  I instruct you that there is no claim in this case by SIS that Intuitive's

9

statements in this regard were false or misleading, and no claim by Intuitive that SIS's statements

in this regard were false or misleading.[1]

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

---

[1] Dkt. 204 at 11–13, 15.

1

**Disputed** Instruction No. 1 Re Statements Regarding FDA Clearance Offered by **SIS**

2

3

4

5

6

     SIS does not believe that any instruction on FDA clearances should be given, since matters regarding FDA clearance by any party should not be permitted in this matter in view of the Court's Summary Judgment Order (Dkt. 204) and controlling caselaw.  To the extent that any such evidence is introduced, SIS proposes curative instructions be given during trial before such evidence or testimony will be presented to the jury, as further outlined in SIS's motions in limine.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**CLOSING INSTRUCTIONS**

2

3 **I.       INTRODUCTORY ANTITRUST INSTRUCTIONS**

4 **Disputed** Instruction No. 2 Re Purpose of Antitrust Laws Offered by **SIS**[2]

5          SIS brings this action against Intuitive under a federal antitrust law known as the

6 Sherman Act.  The purpose of the Sherman Act is to preserve free and unfettered competition in

7 the marketplace. The Sherman Act rests on the central premise that competition produces the

8 best allocation of our economic resources, the lowest prices, the highest quality, and the greatest

9 material progress.

10

11 *Source*:  AMERICAN BAR ASSOCIATION

12 Model Jury Instructions in Civil Antitrust Cases A-1, 2016 Edition

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

[2] Model Jury Instructions in Civil Antitrust Cases, Chapter 1 – Sherman Act—General, Instruction 1:  Purpose (Am. Bar Ass'n Antitrust L. Section 2016).

**Disputed** Instruction No. 2 Re Purpose of Antitrust Laws Offered by **Intuitive**[3]

The purpose of the Sherman Act is to preserve free and unfettered competition in the marketplace. The Sherman Act rests on the central premise that competition produces the best allocation of our economic resources, the lowest prices, the highest quality, and the greatest material progress.

The Sherman Act was enacted for the protection of competition, not competitors.  SIS must therefore establish that Intuitive's acts caused injury not only to SIS itself but to competition as a whole in the alleged relevant market.[4]

---

[3] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 1 – Sherman Act—General, Instruction 1:  Purpose (AM. BAR ASS'N ANTITRUST L. SECTION 2016).

[4] The underlined text has been added to the model instruction.  *See Leegin Creative Leather Prods.* v. *PSKS, Inc.*, 551 U.S. 877, 906 (2007) ("The purpose of the antitrust laws . . . is 'the protection of competition, not competitors.'" (citation omitted)); *Brunswick Corp.* v. *Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977) ("The antitrust laws, however, were enacted for 'the protection of competition not competitors.'" (citations omitted)).

**Disputed** Instruction No. 3 Re SIS's Claims and the Antitrust Statutes Offered by **SIS**

SIS claims that Intuitive has violated the Sherman Act, and more specifically, each of Section 1 and Section 2 of the Sherman Act.

SIS also claims under Section 1 of the Sherman Act that Intuitive's agreements with its hospital customers unreasonably restrained trade in the market for replacement and repaired EndoWrist instruments through illegal tying of EndoWrist replacement and repair with Intuitive's da Vinci surgical robots.

SIS claims under Section 1 of the Sherman Act that Intuitive entered into agreements with its hospital customers and engaged in other related conduct that unreasonably restrained trade in the market for replacement and repaired EndoWrist instruments through exclusive dealing in that market.

SIS further claims that Intuitive has unlawfully obtained monopoly power in the market for replacement and repaired EndoWrist instruments in violation of Section 2 of the Sherman Act through a variety of anticompetitive acts.

SIS also claims that Intuitive has unlawfully attempted to obtain monopoly power and has a dangerous probability of obtaining monopoly power in the market for replacement and repaired EndoWrist instruments in violation of Section 2 of the Sherman Act through a variety of anticompetitive acts.

Each of these is a separate claim that has distinct elements that SIS must prove. Thus, you may find that SIS has proved all, none, or only a subset of these claims.

Next, I will be instructing you on the elements required to prove each of these claims.

**Authorities:** *SumoText Corp. v. Zoove, Inc.*. Case No. 5:16-cv-01370, ECF No. 468, Instruction 21 (N.D. Cal. Mar. 4, 2020)*; In re National Football League's "Sunday Ticket" Antitrust Litigation*, Case No. 2:15-ml-02668, ECF No. 1482, Instruction 14 (N.D. Cal. June 27, 2024).

**<u>Disputed</u>** Instruction No. 3 Re SIS's Claims and the Antitrust Statutes Offered by **Intuitive**[5]

    [N/A]

<u>Explanation for Intuitive's Position</u>:  Intuitive objects to SIS's proposed instruction.  SIS's proposed Instruction No. 3 merely lists the claims that SIS has asserted.  Rather than list all of SIS's claims at the outset, Intuitive proposes that SIS's Section 1 claims be described before providing the elements for those claims, *see* Disputed Instruction No. 9, and that SIS's Section 2 claims be described before providing the elements for those claims, *see* Disputed Instruction No. 43.

    If SIS's proposed Instruction No. 3 is given, it should include the following statement: "SIS bears the burden of proof on each of these claims.  Intuitive denies each claim."

---

[5] Manual of Model Civil Jury Instructions for the District Courts of the Ninth Circuit § 1.5 (9th Cir. Jury Instructions Comm. 2017 ed.); Complaint (Dkt. 1) ¶¶ 112, 115, 118, 121; Answer (Dkt. 75) p. 39, Counterclaims ¶¶ 85, 93, 99, 102, 106.

**Disputed** Instruction No. 4 Re Communications with FDA Offered by **Intuitive**[6]

You have heard evidence that Intuitive had certain communications with the FDA regarding the actions of third parties with respect to Intuitive's products.  The Constitution ensures the right of everyone, whether acting alone or with others, to petition or appeal to government for political action, recognizing that when people do so they will naturally seek political action that favors them and also may be unfavorable to others.  The appeal to government may be direct, such as a discussion or meeting with a government official or agency, or it may be indirect, such as a publicity or advertising campaign.

The law provides that the right to petition government for political action is an important right, and the genuine exercise of that right does not violate the antitrust laws.  Efforts genuinely intended to influence public officials to take official action do not violate the antitrust laws, even if the purpose and effect of those efforts is to obtain official action that eliminates or reduces competition.

There is no claim in this case that Intuitive's petitioning of the FDA was unlawful, or that it was not a genuine attempt to influence public officials to take official action.  Accordingly, you must not consider Intuitive's communications with the FDA as unlawful or anticompetitive conduct either on their own or in combination with other acts.

---

[6] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 7 – Miscellaneous A. Certain Defenses and Exemptions, Instruction 3: Noerr-Pennington—Lobbying (AM. BAR ASS'N ANTITRUST L. SECTION 2016).

**Disputed** Instruction No. 4 Re Communications with FDA Offered by **SIS**

SIS objects to Intuitive's proposed Instruction No. 4. There is no need to provide the jury with any instruction on the subject of communications with the FDA. Intuitive's right to contact the FDA is not a disputed fact issue in this case. Subject to SIS's motion in limine, any evidence involving communications with the FDA regarding third-party "remanufacturing" should be excluded from being part of the evidence presented to the jury.

1

**Disputed** Instruction No. 5 Re Right to Repair Offered by **Intuitive**[7]

2

You may have heard about so-called "right to repair" laws in California or

3

elsewhere.  There is no "right to repair" medical devices, and such laws have no application in

4

this case.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

[7] *See* Cal. Pub. Res. Code § 42488; Minn. Stat. § 325E.72; N.Y. Gen. Bus. Law § 399-nn.

1    **Disputed** Instruction No. 5 Re Right to Repair Offered by **SIS**

2

3         SIS objects to Intuitive's proposed Instruction No. 5. There is no need to provide the jury

4    with any instruction on the subject of "right to repair." SIS does not intend to offer any evidence

5    about the so-called right to repair under California or other law.  Further, Intuitive's proposed

6    instruction is likely to mislead the jury, as the absolute statement "[t]here is no 'right to repair'

7    medical devices" can be interpreted to mean that repair of medical devices is unlawful or

8    otherwise improper.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PARTIES' JOINT PROPOSED JURY INSTRUCTIONS
Case No. 3:21-cv-03496-AMO

1   **__Disputed__ Instruction No. 6 Re Unilateral Refusal to Deal Offered by __Intuitive__**

2         Antitrust law imposes no obligation on a defendant to help its competitors.[8]  You should

3   therefore not base any finding of an antitrust violation on the fact that Intuitive did not cooperate

4   with SIS to facilitate the sale of modified EndoWrists.[9]

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

[8] See *FTC v. Qualcomm, Inc.*, 969 F.3d 974, 993–94 (9th Cir. 2020) (citing, *inter alia*, *Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*, 555 U.S. 438, 457, (2009); *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004)).

[9] Jury Instructions at 26, *AngioDynamics, Inc.* v. *C.R. Bard, Inc.*, No. 1:17-cv-00598 (N.D.N.Y. Oct. 6, 2022), ECF No. 472.

1

**Disputed** Instruction No. 6 Re Unilateral Refusal to Deal Offered by **SIS**

2

SIS objects to Intuitive's proposed Instruction No. 6. There is no need to provide the jury

3

with any instruction on the subject of unilateral refusal to deal. SIS does not allege that Intuitive

4

engaged in a unilateral refusal to deal and this is not a disputed fact issue in this case.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    **Disputed** Instruction No. 7 Re Relevant Product Markets Offered by **Intuitive**[10]

2        For each of SIS's antitrust claims, SIS must prove by a preponderance of the evidence

3    that the relevant markets it alleges are valid antitrust markets.

4        Defining the relevant market is essential because you will be required to make a

5    judgment about whether Intuitive has <u>market power or</u> monopoly power in a properly defined

6    economic market.[11]  To make this judgment, you must be able to determine what, if any,

7    economic forces restrain Intuitive's freedom to set prices for or to restrict the production level of

8    the products or services in question.

9        The most likely and most important restraining force will be actual and potential

10   competition from other firms and their products.  This includes all firms and products that act or

11   likely could act as restraints on Intuitive's power to set prices as it pleases because customers

12   could switch to them if Intuitive sets its own prices too high.  All the firms and products that

13   exert such restraining force are within what is called the relevant market.

14       There are two aspects you must consider in determining whether SIS has met its burden

15   to prove the relevant market by a preponderance of the evidence.  The first is the relevant

16   product market.  The second is the relevant geographic market.

17       The basic idea of a relevant product market is that the products within it are reasonable

18   substitutes for each other from the buyer's point of view; that is, the products compete with each

19   other.  In other words, the relevant product market includes the products that a consumer

20   believes are reasonably interchangeable or reasonable substitutes for each other.  This is a

21   practical test with reference to the actual behavior of buyers and marketing efforts of sellers.

22   Products need not be identical or precisely interchangeable as long as they are reasonable

23   substitutes.  Thus, for example, if consumers seeking to cover leftover food for storage

24

25   [10] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 3 – Section 2 of the Sherman
26   Act—Monopolization–General, Instruction 3:  Relevant Market—General (AM. BAR ASS'N
     ANTITRUST L. SECTION 2016); MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter
27   3 – Section 2 of the Sherman Act—Monopolization–General, Instruction 4:  Relevant Product
     Market (AM. BAR ASS'N ANTITRUST L. SECTION 2016).
28   [11] The underlined text has been added to model instruction, as SIS's Section 1 claims only
     require proof of market power, not monopoly power.  *See infra* Disputed Instruction Nos. 16, 32.

considered certain types of flexible wrapping material—such as aluminum foil, cellophane, or even plastic containers—to be reasonable alternatives, then all those products may be in the same relevant product market.

　　　　To determine whether products or services are reasonable substitutes for each other, you must consider whether a small but significant and non-transitory increase in the price of one product would result in enough customers switching from that product to another product such that the price increase would not be profitable.  In other words, will customers accept the price increase or will so many switch to alternative products or services that the price increase will be withdrawn?  Generally speaking, a small but significant and non-transitory increase in price is approximately a 5 percent increase in price not due to cost factors, but you may conclude in this case that some other percentage is more applicable to the products at issue.  If you find that customers would switch and that the price increase would not be profitable, then you must conclude that the products are in the same product market.  If, on the other hand, you find that customers would not switch, then you must conclude that the products are not in the same product market.

　　　　In evaluating whether various products or services are reasonably interchangeable or reasonable substitutes for each other under the price increase test I have just given you, you may also consider:

- customers' views on whether the products are interchangeable;
- the relationship between the price of one product and sales of another;
- the presence or absence of specialized vendors;
- the perceptions of either industry or the public as to whether the products are in separate markets;
- the views of SIS and Intuitive regarding who their respective competitors are; and
- the existence or absence of different customer groups or distribution channels.

1    In this case, SIS alleges there are two separate relevant product markets:  (1) an alleged

2    market for surgical robots used in minimally invasive soft tissue (or "MIST") surgery; and (2) an

3    alleged aftermarket for EndoWrist repair and replacement.

4    Intuitive disputes SIS's definition of the alleged relevant markets.

5    First, Intuitive contends that the relevant product market in which Intuitive's da Vinci

6    system competes includes all types (or "modalities") of surgery available to doctors to treat the

7    conditions that can be treated by the da Vinci.  In particular, Intuitive contends that its da Vinci

8    system competes not just with other MIST surgical robots, but with laparoscopic surgery and

9    open surgery as well.

10   Second, Intuitive contends that the alleged aftermarket for EndoWrist repair and

11   replacement is an improperly defined single-brand aftermarket—that is, a market that is

12   improperly limited to Intuitive's own brand of products.

13   To establish a valid single-brand aftermarket, SIS must prove each of the following four

14   factors by a preponderance of the evidence:

15   (1) the challenged aftermarket restrictions (which, here, are the alleged restrictions that

16   Intuitive places in its contracts on the use with the da Vinci system of unauthorized instruments

17   or instruments that have been modified by unauthorized third parties) are not generally known

18   when hospitals make their "foremarket" purchase of the da Vinci system;

19   (2) significant information costs prevent hospitals from forecasting life-cycle pricing

20   accurately at the time they purchase their da Vinci surgical systems;

21   (3) significant monetary or non-monetary switching costs exist; and

22   (4) general market-definition principles regarding cross-elasticity of demand, like those

23   on which I have instructed you, do not undermine SIS's proposed single-brand market.[12]

24   As I said earlier, the second aspect of the relevant market is the geographic scope of the

25   market.  SIS and Intuitive agree that the relevant geographic market is the United States.

26

27

28

---

[12] The underlined text has been added to the model instruction.  *See Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 976–77 (9th Cir. 2023); *Newcal Indus. Inc. v. Ikon Office Solutions,* 513 F.3d 1038, 1046–51 (9th Cir. 2008).

1        If you find that SIS has failed to prove by a preponderance of the evidence either of the

2    two relevant markets it alleges based on the instructions I have given you, then you must find for

3    Intuitive on all of SIS's claims.[13]  If you find that SIS has proven the relevant markets it alleges,

4    then you should continue to evaluate the remainder of SIS's claims.[14]

---

[13] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 3 – Section 2 of the Sherman Act—Monopolization–General, Instruction 4:  Relevant Product Market (AM. BAR ASS'N ANTITRUST L. SECTION 2016) (modified to apply to all claims).

[14] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 3 – Section 2 of the Sherman Act—Monopolization–General, Instruction 4:  Relevant Product Market (AM. BAR ASS'N ANTITRUST L. SECTION 2016) (modified to apply to all claims).

1    **Disputed** Instruction No. 7 Re Relevant Product Markets Offered by **SIS**

2

3        SIS objects to Intuitive's proposed instruction. The proposed instruction is overly

4    argumentative, misleading and creates a substantial risk of confusing the jury. Further, SIS

5    submits that this instruction is largely repetitive and unnecessary in view of at least previously

6    proposed Instruction No. 22 presented by SIS.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Disputed** Instruction No. 8 Re Relevant Product Markets – Supply Substitutability Offered by **Intuitive**[15]

In deciding whether SIS has proven a relevant product market, you may also consider what the law refers to as "the cross-elasticity of supply" or, in other words, the extent to which the producers of one product would be willing to shift their resources, such as intellectual property, manufacturing facilities, or personnel to producing another product in response to an increase in the price of the other product.  Such producers, to the extent that they exist, can increase supply and, therefore, drive prices back to competitive levels, defeating any effort by a would-be monopolist to charge significantly higher prices.

Take two shoe manufacturers, for example. The first manufacturer produces shoes for women, while the second manufacturer produces shoes for men.  Generally speaking, men's and women's shoes are not reasonably interchangeable and, therefore, might be thought of as being in a separate product markets.  However, it is possible that the men's shoe manufacturer could quickly shift its resources to start producing women's shoes if the women's shoe manufacturer raised its prices significantly and vice versa.  Although women would not buy men's shoes, nor would men buy women's shoes, the ability of each manufacturer to alter its production could prevent the other manufacturer from raising prices significantly.  Thus, in this example, men's and women's shoes would be included in the same market.

If, in determining the products in the relevant product market you find that there are manufacturers that have the ability to alter their production to manufacture products that can be reasonably substituted with Intuitive's—even though they do not presently compete with Intuitive—you may consider whether the existence of these potential alternative suppliers constrain the prices that Intuitive charges for its products.  However, if you find that there are no others who would switch production to products that would compete with Intuitive's, you may define the market solely on your evaluation of whether the existing allegedly competing products are reasonable substitutes for each other.

---

[15] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 3 – Section 2 of the Sherman Act—Monopolization–General, Instruction 5:  Relevant Product Market—Supply Substitutiability (AM. BAR ASS'N ANTITRUST L. SECTION 2016).

1

**Disputed** Instruction No. 8 Re Relevant Product Markets – Supply Substitutability Offered by
**SIS**

2

3

SIS objects to Intuitive's proposed instruction. The proposed instruction is overly

4

argumentative, misleading and creates a substantial risk of confusing the jury. Further, Intuitive

5

has no competitors in the relevant antitrust markets capable of reacting in the manner posed by

6

the hypothetical in the instruction.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## II.     SIS'S CLAIMS UNDER SECTION 1 OF THE SHERMAN ACT

### A.     Sherman Act Section 1 Claims Generally

**Disputed** Instruction No. 9 Re Sherman Act Section 1 Offered by **Intuitive**[16]

SIS brings two claims against Intuitive under Section 1 of the Sherman Act.  Section 1 prohibits contracts, combinations and conspiracies that unreasonably restrain trade.  The first claim is for "tying," and the second claim is for "exclusive dealing."[17]

Section 1 of the Sherman Act prohibits contracts, combinations and conspiracies that unreasonably restrain trade.

To establish a violation of Section 1 of the Sherman Act, SIS must prove the following:

    1.    The existence of a contract, combination, or conspiracy between or among at least two separate entities;

    2.    That the contract, combination, or conspiracy unreasonably restrains trade; and

    3.    That the restraint caused plaintiff to suffer an injury to its business or property.

Both of SIS's claims under Section 1 of the Sherman Act are based on features of Intuitive's contracts with purchasers of da Vinci surgical robots.  While Intuitive does not contest the existence of such contracts, Intuitive denies that such contracts unreasonably restrained trade.

---

[16] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 1 – Sherman Act—General, Instruction 2:  Sherman Act Section 1 (AM. BAR ASS'N ANTITRUST L. SECTION 2016) .  The model instruction has been modified to remove element that the challenged restraint must "affect[] interstate or foreign commerce," which is not contested. *See, e.g.*, Jury Instructions at 43, *In re Google Play Store Antitrust Litig.*, No. 3:21-md-02981-JD (N.D. Cal. Dec. 6, 2023), Dkt. 850 (omitting interstate commerce element from list of elements for tying claim).
[17] Complaint (Dkt. 1) ¶¶ 112, 115.

1

**Disputed** Instruction No. 9 Re Sherman Act Section 1 Offered by **SIS**

2

3        SIS objects to Intuitive's proposed instruction. The proposed instruction is overly

4   argumentative, misleading and creates a substantial risk of confusing the jury. Further, SIS

5   submits that this instruction is largely repetitive and unnecessary in view of at least previously

6   proposed Instruction No. 3 above presented by SIS.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1   **Disputed** Instruction No. 10 Re Rule of Reason Overview Offered by **Intuitive**[18]

2       Under Section 1 of the Sherman Act, a restraint of trade is illegal only if it is found to be

3   unreasonable.  You must determine, therefore, whether the restraints challenged by SIS here—

4   namely, the alleged restrictions that Intuitive places in its contracts on the use with the da Vinci

5   system of unauthorized instruments or instruments that have been modified by unauthorized third

6   parties—are unreasonable.  In making this determination, you must first determine whether SIS

7   has proven that the challenged restraint has resulted in a substantial harm to competition in a

8   relevant product and geographic market.  If you find that SIS has proven that the challenged

9   restraint results in a substantial harm to competition in a relevant market, then you must consider

10  whether Intuitive has shown that the restraint produces countervailing competitive benefits.

---

[18] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 1  Sherman Act—General, Instruction 3A:  Rule of Reason – Overview (AM. BAR ASS'N ANTITRUST L. SECTION 2016).  The model instruction has been modified to remove final instruction that "The challenged restraint is illegal under Section 1 of the Sherman Act only if you find that the competitive harm substantially outweighs the competitive benefit," as this balancing is not an element supported by Supreme Court precedent. *See, e.g.*, *Ohio* v. *Am. Express Co.*, 585 U.S. 529, 541–42(2018) ("To determine whether a restraint violates the rule of reason, the parties agree that a three-step, burden-shifting framework applies. Under this framework, the plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market. . . . If the plaintiff carries its burden, then the burden shifts to the defendant to show a procompetitive rationale for the restraint. . . . If the defendant makes this showing, then the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means." (citations omitted)); *Nat'l Collegiate Athletic Ass'n* v. *Alston*, 594 U.S. 69, 96–100 (2021) (endorsing the *American Express* burden-shifting framework); *FTC* v. *Qualcomm Inc.*, 969 F.3d 974, 99192 (9th Cir. 2020) (adopting the *American Express* burden-shifting framework)).  The Court likewise adopted the three-step burden shifting framework of *American Express* in its opinion regarding the parties' cross-motions for summary judgment, and nowhere mentioned a fourth step requiring a balancing analysis.  *See* Dkt. 204 at 17.

1

**Disputed** Instruction No. 10 Re Rule of Reason Overview Offered by **SIS**

2

SIS objects to presenting this instruction before even presenting any of the underlying

3

claims and their elements.  SIS has provided its proposed instruction "Rule of Reason –
Overview" at Disputed Instruction 27.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Disputed** Instruction No. 11 Re Rule of Reason Proof of Competitive Harm Offered by **Intuitive**[19]

As I mentioned, to prove that the challenged restraints are unreasonable, SIS first must demonstrate that the restraints have resulted in a substantial harm to competition. Although it may be relevant to the inquiry, harm that occurs merely to the individual business of SIS is not sufficient, by itself, to demonstrate harm to competition generally.  Harm to competition is to be distinguished from harm to a single competitor or group of competitors, which does not necessarily constitute harm to competition.

Furthermore, SIS must show that the harm to competition occurred in an identified market, known as a relevant market.  There are two aspects to a relevant market.  The first aspect is known as the relevant product market. The second aspect is known as the relevant geographic market.  It is SIS's burden to prove the existence of a relevant market.  I instructed you earlier on how to make this assessment.  In this case, SIS alleges competitive harm only in one market:  the alleged aftermarket for EndoWrist repair and replacement; SIS does not allege any competitive harm in the alleged market for surgical robots used in MIST surgery.

If you find that SIS has proven the existence of a relevant market, then you must determine whether SIS also have proven that the challenged restraints have a substantial harmful effect on competition in that market.  A harmful effect on competition, or competitive harm, refers to a reduction in competition that results in the loss of some of the benefits of competition, such as lower prices, increased output, or higher product quality.  It is not enough that the conduct at issue has the effect of reducing consumers' choices or increasing prices to consumers.[20]  If the challenged conduct has not resulted in higher prices, decreased output, lower quality, or the loss of some other competitive benefit, then there has been no competitive harm, and you should find that the challenged conduct was not unreasonable.

In determining whether the challenged restraint has produced competitive harm, you may look at the following factors:

- the effect of the restraint on prices, output, product quality, and service;
- the purpose and nature of the restraint;

---

[19] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 1  Sherman Act—General, Instruction 3B:  Rule of Reason – Proof of Competitive Harm (AM. BAR ASS'N ANTITRUST L. SECTION 2016).

[20] The underlined text has been added to the model instruction.  *See* Dkt. 204 at 17 ("It is not enough that 'conduct "has the effect of reducing consumers' choices or increasing prices to consumers.'" (quoting *FTC* v. *Qualcomm, Inc.*, 969 F.3d 974, 993–94 (9th Cir. 2020) (quoting *Brantley* v. *NBC Universal, Inc.*, 675 F.3d 1192, 1202 (9th Cir. 2012)))).

1
2
3

- the nature and structure of the relevant market;
- the number of competitors in the relevant market and the level of competition among them, both before and after the restraint was imposed; and
- whether the defendant possesses market power.

4
5
6
7
8
9
10
11
12
13
14
15
16

The last factor mentioned, market power, has been defined as an ability to profitably raise prices, for a sustained period of time, above those that would be charged in a competitive market. A firm that possesses market power generally can charge higher prices for the same goods or services than a firm in the same market that does not possess market power. The ability to charge higher prices for better products or services, however, is not market power. An important factor in determining whether Intuitive possesses market power is Intuitive's market share, that is, its percentage of the products or services sold in the relevant market by all competitors. Other factors that you may consider in determining whether Intuitive has market power include  market share trends, the existence of barriers to entry (that is, how difficult is it for other producers to enter the market and begin competing with defendant for sales), the entry and exit by other companies, and the number and size of actual competitors or potential competitors. If Intuitive does not possess a substantial market share, it is less likely that Intuitive possesses market power. If Intuitive does not possess market power, it is less likely that the challenged restraints have resulted in a substantial harmful effect on competition in the market.

17
18
19
20
21
22
23
24
25
26
27
28

PARTIES' JOINT PROPOSED JURY INSTRUCTIONS
Case No. 3:21-cv-03496-AMO

**Disputed** Instruction No. 11 Re Rule of Reason Proof of Competitive Harm Offered by **SIS**

SIS objects to presenting this instruction before even presenting any of the underlying claims and their elements.  SIS has provided its proposed instruction "Rule of Reason – Overview" at Disputed Instruction 28.

1 **Disputed** Instruction No. 12 Re Rule of Reason Evidence of Competitive Benefits Offered by
2 **Intuitive**[21]

3      If you find that SIS has proven that the challenged restraints resulted in substantial harm

4 to competition in a relevant market, then you next must determine whether next must determine

5 whether the restraint also benefits competition in other ways.  If you find that the challenged

6 restraints do result in competitive benefits, then you also must consider whether the challenged

7 restraints were reasonably necessary to achieve the benefits.  If SIS proves that the same benefits

8 could have been readily achieved by other, reasonably available alternative means that create

9 substantially less harm to competition, then they cannot be used to justify the challenged

10 restraints.

11      Antitrust law does not require businesses like Intuitive to use the least restrictive means

12 of achieving a legitimate business purpose.  Any alternative to the challenged conduct presented

13 by SIS must be a substantially—not marginally—less restrictive means for achieving the same

14 procompetitive rationales.  A procompetitive rationale is a nonpretextual claim that a defendant's

15 conduct is indeed a form of competition on the merits because it involves, for example, greater

16 efficiency or enhanced consumer appeal.  To qualify as substantially less restrictive, an

17 alternative means must be virtually as effective in serving the Intuitive's procompetitive

18 purposes without significantly increased cost.[22]

19

20 [21] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 1 – Sherman Act—General,
Instruction 3C:  Rule of Reason – Evidence of Competitive Benefits (AM. BAR ASS'N ANTITRUST
21 L. SECTION 2016).
22 [22] The underlined text has been added to the model instruction.  *See* Dkt. 204 at 17 ("A
procompetitive rationale is a 'nonpretextual claim that [defendant's] conduct is indeed a form of
23 competition on the merits because it involves, for example, greater efficiency or enhanced
consumer appeal.'" (quoting *FTC* v. *Qualcomm Inc.*, 969 F.3d 974, 991 (9th Cir. 2020))); *Epic
24 Games, Inc.* v. *Apple, Inc.*, 67 F.4th 946, 990 (9th Cir. 2023) ("When evaluating proposed
alternative means, courts must give wide berth to defendants' business judgments and must resist
25 the temptation to require that enterprises employ the least restrictive means of achieving their
legitimate business objectives. . . . As such, this circuit's test—which the Supreme Court
26 approved in *Alston*—requires a substantially less restrictive alternative." (quotations omitted)
(citing *Alston*, 594 U.S. at 100–01)); *id.* ("To qualify as "substantially less restrictive," an
27 alternative means "must be 'virtually as effective' in serving the [defendant's] procompetitive
purposes . . . without significantly increased cost." (citing *Cnty. of Tuolumne* v. *Sonora Cmty.
28 Hosp.*, 236 F.3d 1148, 1159 (9th Cir. 2001))).

1  **Disputed** Instruction No. 12 Re Rule of Reason Evidence of Competitive Benefits Offered by

2  **SIS**

3      SIS objects to Intuitive's proposed instruction. The proposed instruction is overly

4  argumentative, misleading and creates a substantial risk of confusing the jury. Further, SIS

5  submits that this instruction is largely repetitive and unnecessary in view of at least previously

6  proposed Instruction Nos. 27, 29, and 30 *infra* presented by SIS.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**B.      SIS's Tying Claim**

**Disputed** Instruction No.13 Re Definition of Tying Offered by **SIS**

SIS claims that Intuitive engaged in an unlawful tying arrangement. A tying arrangement is one in which the seller will sell one product (referred to as the tying product) only on the condition that buyers also purchase a different product (referred to as the tied product) from the seller, or at least agrees that he will not purchase the tied product from any other supplier. In this case, SIS claims that the da Vinci surgical robot is the tying product and a repaired or replacement EndoWrist instrument is the tied product.

**Authority:** The definition is taken from *Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 461 (1992). It is intended to introduce the jury to the vocabulary of the tying cause of action. The terms "product," "sell," and "purchase" are used in this instruction and the other tying arrangement instructions for simplicity.

**Source**: AMERICAN BAR ASSOCIATION

Model Jury Instructions in Civil Antitrust Cases E-84, 2016 Edition

1   **Disputed** Instruction No. 13 Re Definition of Tying Arrangements Offered by **Intuitive**[23]

2       SIS claims that Intuitive engaged in an unlawful tying arrangement. Intuitive denies this

3   claim.

4       A tying arrangement is one in which the seller will sell one product (referred to as the

5   tying product) only on the condition that buyers also purchase a different product (referred to as

6   the tied product) from the seller, or at least agrees that he will not purchase the tied product from

7   any other supplier. In this case, SIS claims that the da Vinci surgical robot is the tying product

8   and EndoWrist repair and replacement is the tied product.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

[23] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 2 – Section 1 of the Sherman Act—Tying Arrangements, Instruction 1:  Definition (AM. BAR ASS'N ANTITRUST L. SECTION 2016).  The underlined text has been added to the model instruction.

1

**Disputed** Instruction No. 14 Re Rationale for Prohibition of Tying Arrangements Offered by **SIS**

2

3

4

5

　　　Not all tying arrangements are unlawful. The essential characteristic of an invalid tying arrangement is a seller's exploitation of its market power over the tying product (the da Vinci surgical robot) to force buyers to purchase a tied product (EndoWrist repair or replacement) that buyers might have preferred to purchase elsewhere.

6

7

8

9

**Authorities:** The instruction is drawn from *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984), abrogated on other grounds by *Illinois Tool Works Inc. v. Independent Ink, Inc.*, 547 U.S. 28, 31 (2006); *Aerotec International, Inc. v. Honeywell International, Inc.*, 836 F.3d 1171 (9th Cir. 2016).

10

11

12

**Sources**: AMERICAN BAR ASSOCIATION, Model Jury Instructions in Civil Antitrust Cases E-85, 2016 Edition.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**Disputed** Instruction No. 14 Re Rationale for Prohibition of Tying Arrangements Offered by **Intuitive**[24]

2

3  Not all tying arrangements are unlawful. The essential characteristic of an invalid tying

4  arrangement is a seller's exploitation of its market power over the tying product (here, the da

5  Vinci surgical robot) to force buyers to purchase a tied product (here, EndoWrist repair or

6  replacement) that buyers might have preferred to purchase elsewhere.  However, the law also

7  recognizes that tying arrangements may have legitimate justifications that benefit buyers.[25]

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

[24] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 2 – Section 1 of the Sherman Act—Tying Arrangements, Instruction 2:  Rationale for Prohibition of Tying Arrangements (AM. BAR ASS'N ANTITRUST L. SECTION 2016).
[25] The underlined text has been added to the model instruction.  *See Ill. Tool Works Inc.* v. *Independent Ink, Inc.*, 547 U.S. 28, 35–36 (2006).

1

**Disputed** Instruction No. 15 Re Tying – Per Se Violation Offered by **SIS**

2

3

       To prevail on a per se tying claim, SIS must prove each of the following elements by a preponderance of the evidence:

4

    (1) (i) minimally invasive surgical robots and (ii) replacement and repaired EndoWrists are

5

        separate and distinct products;

6

    (2) Intuitive will sell its da Vinci minimally invasive surgical robots only on the condition that

7

        the buyer also purchase replacement and repaired EndoWrists from Intuitive, or that the

        buyer not purchase replacement and repaired EndoWrists from any other supplier;

8

    (3) Intuitive has sufficient market power with respect to minimally invasive surgical robots to

9

        enable it to restrain competition as to replacement and repaired EndoWrists;

10

    (4) the alleged tying arrangement has foreclosed a substantial volume of commerce as to

11

        replacement and repaired EndoWrists;

12

    (5) Intuitive's conduct occurred in or affected interstate commerce; and

    (6) SIS was injured in its business or property because of the tying arrangement.

13

If you find that the evidence is sufficient to prove all six of these elements, then you must find for

14

SIS and against Intuitive on SIS's tying claim. If you find that the evidence is insufficient to prove

15

any one of these elements, then you must find for Intuitive and against SIS on SIS's tying claim.

16

17

**Authorities:** The first four elements are derived from *Jefferson Parish Hosp. Dist. No.2 v. Hyde*,

18

466 U.S. 2, 14-19 (1984) and are expanded on in further instructions below.  *See also Blough v.*

19

*Holland Realty, Inc,* 574 F.3d 1084, 1089 (9th Cir. 2009); *Cascade Health Solutions v.*

*PeaceHealth,* 515 F.3d 883, 912-13 (9th Cir. 2008)).

20

21

**Sources**: AMERICAN BAR ASSOCIATION, Model Jury Instructions in Civil Antitrust Cases E-

22

86, 2016 Edition.

23

24

25

26

27

28

1   **Disputed** Instruction No. 15 Re Tying – Per Se Violation Offered by **Intuitive**

2        [N/A]

3

4   Explanation for Intuitive's Position:   Intuitive objects to SIS's proposed Instruction.  The Court's

5   summary judgment decision forecloses SIS's attempt to belatedly introduce a per se tying theory

6   now: "[T]he parties here do not appear to dispute the market at issue, ***nor does SIS assert that the***

7   ***alleged restraints here are per se unreasonable***.  Their arguments focus on whether the parties

    can satisfy the respective burdens imposed by the rule of reason."  Dkt. 204 at 17 (emphasis added).

8        Further, there is no basis to under controlling Supreme Court and Ninth Circuit law to find

9   that the conduct alleged here is per se illegal. The Ninth Circuit has applied the rule of reason to

10  its most recent tying cases and provided no clear guidance on when, if ever, a per se approach

11  would apply instead.  *See Epic Games, Inc.* v. *Apple, Inc.*, 515 F.3d 883, 997–98 (9th Cir. 2023);

12  *Aerotec Int'l, Inc.* v. *Honeywell Int'l, Inc.*, 836 F.3d 1171, 1178-80 (9th Cir. 2016); *Brantley* v.

13  *NBC Universal, Inc.*, 675 F.3d 1192, 1197 (9th Cir. 2012).  Given that not all tying is per se illegal,

14  there would need to be some trigger to determine when to apply the per se rule, but there is none

15  here.  SIS seems to argue in its proposed instruction 13 that the trigger is market power in the tying

16  market, but that is a non-starter in light of the Supreme Court's *Independent Ink* decision, which

17  holds that "in all cases involving a tying arrangement, the plaintiff must prove that the defendant

18  has market power in the tying product."  *Ill. Tool Works Inc.* v. *Independent Ink, Inc.*, 547 U.S. 28,

    46 (2006) (emphasis added).  If market power in the tying market is required in all tying cases,

    that cannot be what distinguishes between per se and rule of reason cases.

19       Finally, the ABA model instructions make clear that no matter whether a per se or rule of

20  reason instruction is given for the tying claim, in either event the jury must find that the alleged

21  tying arrangement caused a substantial adverse effect on competition in the relevant market.  The

22  Ninth Circuit similarly has made clear that an anticompetitive effect in the tied market is necessary

    for a tie to be illegal.  *See Blough* v. *Holland Realty, Inc.*, 574 F.3d 1084, 1089 (9th Cir. 2009)

23  ("[T]here is no unlawful tying arrangement [if] there is no adverse effect on competition in the tied

24  product market.").   Given this requirement, labeling the claim per se is confusing, unnecessary,

25  and incorrect.

26       Accordingly, Intuitive proposes that the jury be given the standard rule of reason

27  instructions from the ABA model instruction for SIS's tying claim.

28

**Disputed** Instruction No. 16 Re Elements of Unlawful Tying Offered by **Intuitive**[26]

To prevail on its tying claim, SIS must prove each of the following elements by a preponderance of the evidence:

1.      MIST surgical robots and EndoWrist repair and replacement are separate and distinct products;

2.      Intuitive will sell da Vinci surgical robots only on the condition that the buyer also purchase replacement EndoWrists from Intuitive, or that the buyer not purchase repaired or replacement EndoWrists from any other supplier;

3.      Intuitive has sufficient market power with respect to MIST surgical robots to enable it to restrain competition as to EndoWrist repair and replacement;

4.      the alleged tying arrangement has foreclosed a substantial volume of commerce as to EndoWrist repair and replacement;

5.      the alleged tying arrangement has unreasonably restrained trade in that it had a substantial adverse effect on competition as to EndoWrist repair and replacement; and

6.      SIS was injured in its business or property because of the alleged tying arrangement.

If you find that the evidence is sufficient to prove all six of these elements, then you must find for SIS and against Intuitive on SIS's tying claim.  If you find that the evidence is insufficient to prove any one of these elements, then you must find for Intuitive and against SIS on SIS's tying claim.

---

[26] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 2 – Section 1 of the Sherman Act—Tying Arrangements, Instruction 4:  Elements – Unlawful Tying Under Rule of Reason (AM. BAR ASS'N ANTITRUST L. SECTION 2016).  This instruction has been modified to remove elements that the conduct must have "occurred in or affected interstate commerce" and that the defendant "has a financial interest" in the tied product, which are not contested.

1

**Disputed** Instruction No. 16 Re Elements of Unlawful Tying Offered by **SIS**

2

3        SIS objects to Intuitive's proposed instruction. The proposed instruction is overly

4  argumentative, misleading and creates a substantial risk of confusing the jury. Further, SIS submits

5  that this instruction is largely repetitive and unnecessary in view of at least previously proposed

6  Instruction Nos. 13, 15, 18, 23–26 presented by SIS.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Disputed** Instruction No. 17 Re Presence of Two Products Offered by **SIS**

To determine whether the da Vinci minimally invasive surgical robot and repaired and replacement EndoWrist instruments are separate and distinct products, you should consider whether there would be demand for each of them if they were offered separately. If enough customers would want to purchase the da Vinci minimally invasive surgical robot alone and repaired or replacement EndoWrist instruments alone, then they are separate products. On the other hand, if there is very little demand for one of the products by itself, that is, without purchasing the other product at the same time, then the da Vinci minimally invasive surgical robot and repaired or replacement EndoWrist instruments are not two separate products for the purposes of the tying claim, even if they are sometimes sold separately.

Products may be separate products even if one of them is useless without the other. The relevant issue is whether there is sufficient demand from customers to induce sellers to provide them separately, even if the customer needs to obtain both products from one or more suppliers.

**Authorities:** The consumer demand approach is mandated by *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 19-22 (1984); *See also Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 462 (1992) ("For service and parts to be considered two distinct products, there must be sufficient consumer demand so that it is efficient for a firm to provide service separately from parts."); *Northern Pacific Railway Co. v. United States*, 356 U.S. 1, 78 S. Ct. 514, 2 L. Ed. 2d 545 (1958); *United Shoe Machinery Corp. v. United States*, 258 U.S. 451, 42 S. Ct. 363, 66 L. Ed. 708, (1922).

**Sources**: AMERICAN BAR ASSOCIATION, Model Jury Instructions in Civil Antitrust Cases E-90, 2016 Edition.

1    **Disputed** Instruction No. 17 Re Presence of Two Products Offered by **Intuitive**[27]

2           The first element of its tying claim that SIS must prove by a preponderance of the

3    evidence is that the da Vinci surgical robot is a separate and distinct product from the repair and

4    replacement of EndoWrists.

5           To determine whether the da Vinci surgical robot and EndoWrist repair and replacement

6    are separate and distinct products, you should consider whether there would be demand for each

7    of them if they were offered separately. If enough customers would want to purchase the da

8    Vinci surgical robot alone and EndoWrist repair or replacement alone, then they are separate

9    products.  On the other hand, if there is very little demand for one of the products by itself, that

10   is, without purchasing the other product at the same time, then the da Vinci surgical robot and

11   EndoWrist repair and replacement are not two separate products for the purposes of the tying

12   claim, even if they are sometimes sold separately.

13          Products may be separate products even if one of them is useless without the other. The

14   relevant issue is whether there is sufficient demand from customers to induce sellers to provide

15   them separately, even if the customer needs to obtain both products from one or more suppliers.

16

17

18

19

20

21

22

23

24

25

26

27

28

---

[27] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 2 – Section 1 of the Sherman Act—Tying Arrangements, Instruction 5:  Presence of Two Products (AM. BAR ASS'N ANTITRUST L. SECTION 2016).  The underlined text has been added to the model instruction.

**Disputed** Instruction No. 18 Re Tying – Conditioned Sale Offered by **SIS**

You may find that a tying arrangement exists between da Vinci surgical robots and replacement and repaired EndoWrists if Intuitive either refused to sell da Vinci surgical robots unless purchasers also agreed to buy replacement and repaired EndoWrists (or not to buy replacement and repaired EndoWrists from another supplier), or effectively coerced purchasers into buying replacement and repaired EndoWrists in addition to da Vinci surgical robots. To prove coercion, SIS must prove by a preponderance of the evidence that Intuitive exploited its control over da Vinci surgical robots to force the hospital buyers into the purchase of replacement and repaired EndoWrists, which the hospital either did not want at all, or might have preferred to purchase elsewhere on different terms, and that any appearance of choice was illusory.  Mere sales pressure or persuasion is not coercion.

If Intuitive has made the purchase of da Vinci surgical robots and replacement and repaired EndoWrists together the only viable economic option, you may find that Intuitive has effectively tied daVinci surgical robots to replacement and repaired EndoWrists.  However, there is no coercion if da Vinci surgical robots and replacement and repaired EndoWrists are offered separately for sale and separate purchase is economically feasible.

**Authorities:** *Illinois Tool Works Inc. v. Indep. Ink, Inc*., 547 U.S. 28, 34-35 (2006); *Paladin Assocs., Inc. v. Montana Power Co.*, 328 F.3d 1145, 1160 (9th Cir. 2003); *Bob Maxfield, Inc. v. Am. Motors Corp.*, 637 F.2d 1033, 1037 (5th Cir. 1981); *Amerinet, Inc. v. Xerox Corp.*, 972 F.2d 1483, 1500 (8th Cir. 1992); *Monsanto Co. v. Scruggs*, 459 F.3d 1328, 1340-41 (Fed. Cir. 2006); *Marts v. Xerox, Inc.*, 77 F.3d 1109, 1113 (8th Cir. 1996).

**Sources**: AMERICAN BAR ASSOCIATION, Model Jury Instructions in Civil Antitrust Cases E-93, 2016 Edition.

**Disputed** Instruction No. 18 Re Re Proof of Conditioning Offered by **Intuitive**[28]

<u>The second element of its tying claim that SIS must prove by a preponderance of the evidence is that Intuitive will sell da Vinci surgical robots only on the condition that the buyer also purchase replacement EndoWrists from Intuitive, or that the buyer not purchase repaired or replacement EndoWrists from any other supplier</u>.

You may find that a tying arrangement exists between da Vinci surgical robots and EndoWrist repair and replacement if Intuitive either refused to sell da Vinci surgical robots unless purchasers also agreed not to buy EndoWrist repair or replacement from another supplier, or effectively coerced purchasers into buying replacement EndoWrists in addition to da Vinci surgical robots from Intuitive. To prove coercion, SIS must prove by a preponderance of the evidence that Intuitive exploited its control over da Vinci surgical robots to force buyers into the purchase of replacement EndoWrists, which the buyers either did not want at all, or might have preferred to purchase elsewhere on different terms, and that any appearance of choice was illusory.  Mere sales pressure or persuasion is not coercion.

If Intuitive has made the purchase of da Vinci surgical robots and replacement EndoWrists together the only viable economic option, you may find that Intuitive has effectively tied da Vinci surgical robots to EndoWrist repair and replacement.  However, there is no coercion if da Vinci surgical robots and EndoWrist repair and replacement are offered separately for sale and separate purchase is economically feasible.

---

[28] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 2 – Section 1 of the Sherman Act—Tying Arrangements, Instruction 7:  Proof of Conditioning (AM. BAR ASS'N ANTITRUST L. SECTION 2016).  The underlined text has been added to the model instruction.

1   **Disputed** Instruction No. 19 Re Relevant Geographic Market Offered by **SIS**

2         SIS and Intuitive agree that the relevant geographic market is the United States of

3   America.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**Disputed** Instruction No. 19 Re Relevant Geographic Market Offered by **Intuitive**

2

    [N/A]

3

4

Explanation for Intuitive's Position:  Intuitive objects to SIS's proposed instruction.   Intuitive

5

contends that this Instruction need not be given at all, and can instead be omitted, because Intuitive

6

does not contest this element of SIS's tying claim.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

**Disputed** Instruction No. 20 Re Restrictions on Unauthorized Third-Party Products and Services Are Not Coercion Offered by **Intuitive**[29]

3

SIS challenges provisions of Intuitive's contracts with customers that restrict the use of

4

unauthorized third-party products and services in connection with the da Vinci system as an

5

unlawful tie.  If the seller of a product or service contractually requires its customers to buy

6

another product or service either from the seller or from third parties that seller authorizes, such a

7

contractual provision is not a tying arrangement unless third parties cannot realistically obtain

8

such authorization from the seller.  SIS bears the burden of demonstrating that third parties could

9

not realistically obtain authorization from Intuitive and hence that third-party authorization was

10

illusory.  If you find that SIS fails to meet this burden, then you must find that SIS has failed to

11

meet its burden of proving coercion and, accordingly, you must find in favor of Intuitive on

12

SIS's tying claim.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

[29] *Mozart* v. *Mercedes-Benz of N. Am., Inc.*, 593 F. Supp. 1506, 1517 (N.D. Cal. 1984) (citing *United States* v. *Mercedes-Benz of N. Am., Inc.*, 517 F. Supp. 1369, 1383–84 (N.D. Cal. 1981)); *see also Ford Motor Co.* v. *GMB Universal Joints (West), Inc.*, 1988 WL 82826, at *3 (9th Cir. 1988) (unpublished disposition) (citing *Mozart*, 593 F. Supp. at 1517); *Photovest Corp.* v. *Fotomat Corp.*, 606 F.2d 704, 722 (7th Cir. 1979) ("Given the contractual language, which at least provides for the possibility of purchasing processing from non-Fotomat sources, we are reluctant to find a tying arrangement without some evidence that Fotomat applied the contract language so restrictively as to constitute a de facto tying clause.  The presence of the illegal condition may be inferred from an extrinsic course of conduct supplementing the written contract, but in the present case Photovest has failed to provide evidence of any conduct from which to infer the tie."  (quotation marks and internal citation omitted)).

1

2

**Disputed** Instruction No. 20 Re Restrictions on Unauthorized Third-Party Products and Services Are Not Coercion Offered by **SIS**

3

4

5

6

SIS objects to Intuitive's proposed instruction. The proposed instruction is overly argumentative, misleading and creates a substantial risk of confusing the jury. Further, SIS submits that this instruction is inconsistent with the wording of the actual contractual provision that Intuitive seems to rely on here and does not cover the situation described by Intuitive.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  **Disputed** Instruction No. 21 Re Voiding a Warranty Is Not Coercion Offered by **Intuitive**[30]

2          You have heard testimony that Intuitive's contracts with its hospital customers provide

3  that Intuitive's warranties on its products are voided if the customer uses an unauthorized third-

4  party product or service in connection with the da Vinci system.  Contractual provisions such as

5  these—which existed at the time the customer chose to purchase the product, and which provide

6  that the manufacturer may not honor a warranty if the customer uses unauthorized service

7  providers or unauthorized parts or accessories with the equipment—are not considered to be so

8  coercive to create a tying arrangement.  Thus, you may not consider as evidence of coercion any

9  provision in Intuitive's contracts that would void a warranty if the customer uses an unauthorized

10  third-party product or service.

11

12

13

14

15

16

17

18

19  [30] *Virginia Panel Corp.* v. *MAC Panel Co.*, 133 F.3d 860, 870 (Fed. Cir. 1997) ("Voiding a
warranty on a product already sold, while possibly a breach of warranty, cannot be a tying

20  arrangement because the purchaser is not deciding whether to buy a product."); *Marts* v. *Xerox, Inc.*, 77 F.3d 1109, (8th Cir. 1996) ("Although the warranty does condition its continuation on

21  the use of Xerox cartridges, a warranty is only one way of receiving service for a new Xerox
copier. . . . An owner of a new Xerox copier could forego the benefits of the warranty, buy

22  service from Xerox or an independent provider, and purchase cartridges from the vendor of its
choice."); *General Motors* v. *Gibson Chem. & Oil Co.*, 786 F.2d 105, 110 (2d Cir. 1986) ("[T]he

23  sale of a GM automobile is not conditioned on the purchase of Dexron II. GM simply

24  recommends use of the fluid in its automatic transmissions and cautions that damage to
transmissions caused by the use of other fluids may not be covered by the automobile warranty.

25  This manufacturer's recommendation is not the degree of coercion necessary to a tying
arrangement."); *DSM Desotech Inc.* v. *3D Sys. Corp.*, 2009 WL 174989 (N.D. Ill. Jan. 26, 2009)

26  (allegations of enforcing a warranty provision "do not amount to a tie-in" because customers had

27  already purchased their machines "at the time the alleged tie-in was executed"); *Fido's Fences* v.
*Canine Fence Company.*, 672 F. Supp. 2d 303, 312 (E.D.N.Y. 2009) (holding that "it is well

28  settled that warranties that are not sold as a separate product do not result in consumer coercion
if the warranty sets forth requirements").

1

**Disputed** Instruction No. 21 Re Voiding a Warranty Is Not Coercion Offered by **SIS**

2

3

SIS objects to Intuitive's proposed instruction. The proposed instruction is overly

4

argumentative, misleading and creates a substantial risk of confusing the jury. Further, SIS

5

submits that this instruction is not applicable to the issues and agreements in this case.  SIS bases

6

its claims on many actions taken by Intuitive, which include coupling of the threats to void the

7

warranty and the warranty provisions of the contract with respect to the use of third-party

8

services with other conduct as a concerted course of action. Since SIS bases its antitrust claims

9

10

on many more factors, it would be improper to instruct the jury that it cannot find in SIS's favor

11

based solely on a warranty claim.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    **Disputed** Instruction No. 22 Re Relevant Product Markets Offered by **SIS**

2    The basic idea of a relevant product market is that the products within it are reasonable
3    substitutes for each other from the buyer's point of view; that is, the products compete with each
4    other. In other words, the relevant product market includes the products that a consumer believes
5    are reasonably interchangeable or reasonable substitutes for each other. This is a practical test with
6    reference to the actual behavior of buyers and marketing efforts of sellers. Products need not be
7    identical or precisely interchangeable as long as they are reasonable substitutes. Thus, for example,
8    if consumers seeking to cover leftover food for storage considered certain types of flexible
9    wrapping material--such as aluminum foil, cellophane, or even plastic containers--to be reasonable
     alternatives, then all those products may be in the same relevant product market.

10   To determine whether products are reasonable substitutes for each other, you may consider
11   whether a small but significant and non-transitory increase in the price of one product would result
12   in enough customers switching from that product to another product such that the price increase
13   would not be profitable.  In other words, will customers accept the price increase or will so many
14   switch to alternative products that the price increase will be withdrawn? Generally speaking, a
15   small but significant and non-transitory increase in price is approximately a 5 percent increase in
16   price not due to cost factors. If you find that customers would switch and that the price increase
17   would not be profitable, then you must conclude that the products are in the product market. If, on
     the other hand, you find that customers would not switch, then you must conclude that the products
18   are not in the product market.

19   In evaluating whether various products are reasonably interchangeable or reasonable
     substitutes for each other under the price increase test I have just given you, you may also consider:

20        • consumers' views on whether the products are interchangeable;

21        • the relationship between the price of one product and sales of another;

22        • the presence or absence of specialized vendors;

23        • the perceptions of either industry or the public as to whether the products are in
24          separate markets;

25        • the views of SIS and Intuitive regarding who their respective competitors are; and

26        • the existence or absence of different customer groups or distribution channels.

     For its tying claim, SIS contends that the relevant product market for the tying product is
27   minimally invasive surgical robots and that the relevant product market for the tied product is
28   replacement and repair of EndoWrist instruments, while Intuitive contends that SIS has failed to

allege the proper relevant product markets.  If you find that SIS has proven relevant product markets, then you should continue to evaluate the remainder of SIS's tying claim. However, if you find that SIS has failed to prove such markets, then you must find in Intuitive's favor on this claim.

**Authorities:** *Heerwagen v. Clear Channel Commc'ns.*, 435 F.3d 219, 229 (2d Cir. 2006); *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460-61 (1986); *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 307 & n.3 (3d Cir. 2007); *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 107-08 (2d Cir. 2002); *United States v. Falstaff Brewing Corp.*, 410 U.S. 526, 533-34 (1973).

**Source**: AMERICAN BAR ASSOCIATION

Model Jury Instructions in Civil Antitrust Cases A-108, 2016 Edition.

1   **Disputed** Instruction No. 22 Re Relevant Product Markets Offered by **Intuitive**

2        [N/A]

3

4   Explanation for Intuitive's Position:  Intuitive objects to SIS's proposed instruction.  Intuitive

5   proposes that one instruction on relevant product markets be given at the outset of the antitrust

    instructions, rather than requiring that a relevant product market instruction be given with respect

6   to each individual claim.  *See* Disputed Instruction No. 7.

7        Furthermore, the instruction as presented by SIS is incomplete.  SIS does not propose

8   giving the "Relevant Market – General" instruction that is provided in Chapter 3.A of the ABA

9   model instructions, even though that model instruction provides critical context.  SIS's proposed

10  instruction also provides no guidance to the jury on how to evaluate whether SIS has properly

11  alleged a single-brand aftermarket for EndoWrist repair and replacement.  There are only narrow

12  circumstances in which a single-brand aftermarket can be defined, and the four-factor test that SIS

    must satisfy in order to do so are set out in  the Ninth Circuit's recent decision in *Epic Games, Inc.*

13  v. *Apple, Inc.*, 67 F.4th 946, 976–77 (9th Cir. 2023).  The jury should be instructed on these

14  elements.  As such, Intuitive objects to SIS's proposed relevant market instruction.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PARTIES' JOINT PROPOSED JURY INSTRUCTIONS
Case No. 3:21-cv-03496-AMO

**Disputed** Instruction No. 23 Re Existence of Market Power With Respect to the Tying Product Offered by **SIS**

You may find that Intuitive has market power with respect to minimally invasive surgical robots if, by reason of some advantage, Intuitive has the power to raise its prices for minimally invasive surgical robots without losing an appreciable amount of its business or otherwise to force a purchaser of minimally invasive surgical robots to do something that the purchaser would not do in a more competitive market. SIS may prove power over price with respect to minimally invasive surgical robots by establishing that the price of the tied package is higher than the price of components sold in competitive markets. In the alternative, you may determine whether Intuitive has market power with respect to minimally invasive surgical robots by considering whether Intuitive has a high share of that market for minimally invasive surgical robots such that purchasers do not have alternative sources of minimally invasive surgical robots or a reasonably interchangeable substitute readily available. If Intuitive's market share of the market for minimally invasive surgical robots is below 30 percent, Intuitive does not have market power. But if Intuitive's market share of the market for minimally invasive surgical robots is above 30 percent, you may consider that in determining whether Intuitive has market power. Whether a high market share is an indicator of Intuitive's power to raise prices without loss of appreciable business is a function of numerous market conditions, including the uniqueness of the product, the ability of existing competitors to expand production, and the ease (or difficulty) with which new competitors can enter the market and make a price increase unprofitable. If you find that purchasers of minimally invasive surgical robots do not have readily available alternative sources of supply and are forced as a practical matter to buy minimally invasive surgical robots, you may find that Intuitive has market power. You may also consider in your market power determination the presence of any unique features or costs associated with minimally invasive surgical robots that effectively prevent others from offering a comparable product

**Authorities:** *Fortner Enters. v. United States Steel Corp.*, 394 U.S. 495, 505 (1969); *Parts and Elec. Motors, Inc. v. Sterling Elec., Inc.*, 826 F.2d 712, 720 n.7 (7th Cir. 1987). If market power is shown directly, there is no need to define a relevant market. This instruction is thus consistent with the showing necessary to prove market power with respect to other types of antitrust claims. See FTC v. Ind. Fed'n of Dentists, 476 U.S. 447, 460-61 (1986); *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 307 & n.3 (3d Cir. 2007); *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 107-08 (2d Cir. 2002); *Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 783 n.2 (6th Cir. 2002); *United*

- 57 -

1   *States v. Microsoft Corp.*, 253 F.3d 34, 51 (D.C. Cir. 2001); *RE/MAX Int'l Inc. v. Realty One, Inc.*,

2   173 F.3d 995, 1018 (6th Cir. 1999); *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 26-27

3   (1984); *Thompson v. Metro. Multi-List, Inc.*, 934 F.2d 1566, 1577 (11th Cir. 1991).

4

5   **Sources**: AMERICAN BAR ASSOCIATION, Model Jury Instructions in Civil Antitrust Cases E-

    94, 2016 Edition.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

**Disputed** Instruction No. 23 Re Existence of Market Power With Respect to the Tying Product Offered by **Intuitive**[31]

3

4

5

6

The third element of its tying claim that SIS must prove by a preponderance of the evidence is that Intuitive has sufficient market power in the alleged market for MIST surgical robots to enable Intuitive to restrain competition as to the alleged aftermarket for EndoWrist repair and replacement.

7

8

9

10

11

12

You may find that Intuitive has market power with respect to MIST surgical robots if, by reason of some advantage, Intuitive has the power to raise its prices for MIST surgical robots without losing an appreciable amount of its business, or otherwise has the power to force a purchaser of MIST surgical robots to do something that the purchaser would not do in a more competitive market.  The ability to charge higher prices for better products or services, however, is not market power.[32]

13

14

SIS may prove power over price with respect to MIST surgical robots by establishing that the price of the tied package is higher than the price of components sold in competitive markets.

15

16

17

18

19

20

21

22

23

In the alternative, you may determine whether Intuitive has market power with respect to MIST surgical robots by considering whether Intuitive has a high share of that market for MIST surgical robots such that purchasers do not have alternative sources of MISTsurgical robots or a reasonably interchangeable substitute readily available.  If Intuitive's market share of the market for MIST surgical robots is below 30 percent, Intuitive does not have market power. But if Intuitive's market share of the market for MIST surgical robots is above 30 percent, you may consider that in determining whether Intuitive has market power.  Whether a high market share is an indicator of Intuitive's power to raise prices without loss of appreciable business is a function of numerous market conditions, including the uniqueness of the product, the ability of existing

24

25

26

27

28

---

[31] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 2 – Section 1 of the Sherman Act—Tying Arrangements, Instruction 8:  Existence of Market Power with Respect to the Tying Product (AM. BAR ASS'N ANTITRUST L. SECTION 2016).  The underlined text has been added to the model instruction.

[32] The underlined text has been added to the model instruction.  *See* MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 1 – Sherman Act—General, Instruction 3B:  Rule of Reason – Proof of Competitive Harm (AM. BAR ASS'N ANTITRUST L. SECTION 2016).

1  competitors to expand production, and the ease (or difficulty) with which new competitors can

2  enter the market and make a price increase unprofitable.  If you find that purchasers of MIST

3  surgical robots do not have readily available alternative sources of supply and are forced as a

4  practical matter to buy MIST surgical robots, you may find that Intuitive has market power.  You

5  may also consider in your market power determination the presence of any unique features or

6  costs associated with MIST surgical robots that effectively prevent others from offering a

7  comparable product.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Stipulated Instruction No. 24 Re Foreclosure of a Substantial Volume of Commerce With Respect to the Tied Product

If you determine that da Vinci minimally invasive surgical robots and repaired or replacement EndoWrist instruments are separate products that have been tied to one another, and that Intuitive has market power for MIST surgical robots, then you must determine whether SIS has proven that Intuitive has foreclosed a substantial amount of interstate commerce with respect to EndoWrist repair and replacement.

In determining whether Intuitive has foreclosed a substantial amount of commerce with respect to repaired or replacement EndoWrist instruments, you should first consider the total dollar amount of Intuitive's sales of repaired and replacement EndoWrist instruments in interstate commerce achieved by the tying arrangement in absolute terms.

If the dollar amount of Intuitive's sales of repaired and replacement EndoWrist instruments was substantial, you should next consider whether there has been a substantial adverse effect on competition with respect to EndoWrist repair and replacement due to the tying arrangement. If there was not a substantial adverse effect on competition with respect to repaired or replacement EndoWrist instruments due to the tying arrangement, then you must find in favor of Intuitive on the tying claim.

There is no substantial foreclosure if only a small percentage of sales in the market for repaired or replacement EndoWrist instruments were affected by the tying arrangement.  There also is no substantial foreclosure if you find that purchasers would not have bought EndoWrist repair or replacement at all in the absence of the tying arrangement.

**Source**:

*SIS Citation*: AMERICAN BAR ASSOCIATION

Model Jury Instructions in Civil Antitrust Cases E-97, 2016 Edition

*Intuitive Citation*: MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 2 ¬ Section 1 of the Sherman Act—Tying Arrangements, Instruction 9:  Foreclosure of a Substantial Volume of Commerce with Respect to the Tied Product (AM. BAR ASS'N ANTITRUST L. SECTION 2016).

1    **Disputed** Instruction No. 25 Re Interstate Commerce – Tying Offered by **SIS**

2         The Sherman Act applies only to conduct that affects interstate or foreign commerce.

3    You are instructed that Intuitive's agreements affected interstate commerce.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1   **Disputed** Instruction No. 25 Re Interstate Commerce – Tying Offered by **Intuitive**

2        [N/A]

3

4   Explanation for Intuitive's Position:  Intuitive objects to this instruction.  Intuitive contends that

5   this instruction should not be given because Intuitive does not contest this element of SIS's tying

6   claim.  *See, e.g.*, Jury Instructions at 43, *In re Google Play Store Antitrust Litig.*, No. 3:21-md-

7   02981-JD (N.D. Cal. Dec. 6, 2023), Dkt. 850 (omitting interstate commerce element from list of

8   elements for tying claim).

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**Disputed** Instruction No. 26 Re Elements -- Unlawful Tying under Rule of Reason Offered by **SIS**

2

3          Even if SIS has failed to prove that Intuitive has sufficient market power in the tying

4    product of minimally invasive surgical robots as required for its per se tying claim, SIS may still

5    prove a tying violation by proving all other elements of a per se violation as well as proving that

6    the tying arrangement has unreasonably restrained trade in that it had a substantial adverse effect

7    on competition in the market for repaired and replacement EndoWrist instruments under the rule

     of reason.  I will provide you with instructions on the rule of reason below.

8

9    **Authorities:** *Jefferson Parish Hosp. Dist. No.2 v. Hyde*, 466 U.S. 2, 29-31 (1984); *Ill. Tool Works*

10   *Inc. v. Indep. Ink, Inc*., 547 U.S. 28, 46 (2006).

11

12   **Source**: AMERICAN BAR ASSOCIATION

     Model Jury Instructions in Civil Antitrust Cases E-88, 2016 Edition.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**Disputed** Instruction No. 26 Re Elements -- Unlawful Tying under Rule of Reason Offered by
**Intuitive**

2

3

[N/A]

4

5

Explanation for Intuitive's Position:  Intuitive objects to this instruction.  For the reasons set

6

forth above in connection with Disputed Instruction No. 15, Intuitive contends that a *per se*

7

instruction should not be offered, and thus there is no need to provide a separate rule of reason

8

instruction in connection with the tying claim.  Instead, Intuitive suggests that the general rule of

9

reason instructions be given prior to instructing the jury on both of SIS's Section 1 claims, *see*

10

Instruction Nos. 10–12, and that the instructions for SIS's tying claim be given under the rule of

11

reason, *see* Instruction No. 16.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PARTIES' JOINT PROPOSED JURY INSTRUCTIONS

1    **Disputed** Instruction No. 27 Re Rule of Reason - Overview Offered by **SIS**

2           In order to prove its exclusive dealing claim, SIS must show that Intuitive's agreements

3    and conduct related to those agreements were an unreasonable restraint of trade that resulted in a

4    substantial adverse effect on competition in a relevant market under the so-called rule of reason.

5    In making the determination of whether a restraint on trade is unreasonable, you must first

6    determine whether SIS has proven that the challenged restraints have resulted in a substantial harm

7    to competition in a relevant market. If you find that SIS has proven that the challenged restraints

8    result in a substantial harm to competition in a relevant market, then you must consider whether

9    Intuitive has proven that the restraints produce countervailing competitive benefits and whether

10   those procompetitive benefits could not be achieved through less restrictive alternatives.   If

11   Intuitive makes that showing, then you must balance the competitive harm against the competitive

12   benefit, with the challenged restraints illegal under Section 1 of the Sherman Act only if the

     competitive harm substantially outweighs the competitive benefit.

13          I will now review each step of the analysis in more detail.

14   **Authorities:** *FTC v. Actavis, Inc.*, 133 S. Ct. 2223, 2236 (2013); *Leegin Creative Leather Prods.,*

15   *Inc. v. PSKS, Inc.*, 551 U.S. 877, 885 (2007); *Texaco v. Dagher*, 547 U.S. 1, 5 (2006) (citing

16   State Oil Co. v. Khan, 522 U.S. 3, 10 (1997)); *National Soc'y of Prof'l Eng'rs v. United States*, 435

17   U.S. 679, 691 (1978); *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36 (1977); *California*

18   *Dental Ass'n v. FTC*, 224 F.3d 942, 947-54 (9th Cir. 2000), on remand from 524 U.S. 756 (1999);

19   *Metro Indus. v. Sammi Corp.*, 82 F.3d 839, 843 (9th Cir. 1996).

20   **Source:** AMERICAN BAR ASSOCIATION

21   Model Jury Instructions in Civil Antitrust Cases C-3, 2016 Edition.

**Disputed** Instruction No. 27 Re Rule of Reason Overview Offered by **Intuitive**

[N/A]


Explanation for Intuitive's Position:  Intuitive objects to this instruction.  For the reasons set forth above in connection with Disputed Instruction No. 15, Intuitive contends that a *per se* instruction should not be offered, and thus there is no need to provide a separate rule of reason instruction in connection with the tying claim.  Instead, Intuitive requests that the general rule of reason instructions be given prior to instructing the jury on both of SIS's Section 1 claims, *see* Disputed Instruction Nos. 10–12, and that the rule of reason instructions for SIS's tying claim be given, *see* Disputed Instruction No. 16.

1    **Disputed** Instruction No. 28 Re Rule of Reason - Proof of Competitive Harm Offered by **SIS**

2    As I mentioned, to prove that the challenged restraints are unreasonable, SIS first must

3    demonstrate that the restraints have resulted in a substantial harm to competition. Although it may

4    be relevant to the inquiry, harm that occurs merely to the individual business of SIS is not

5    sufficient, by itself, to demonstrate harm to competition generally. That is, harm to a single

6    competitor or group of competitors does not necessarily mean that there has been harm to

7    competition. Furthermore, SIS must show that the harm to competition occurred in an identified

8    market, known as a relevant market. There are two aspects to a relevant market. The first aspect is

9    known as the relevant product market. The second aspect is known as the relevant geographic

10   market. It is SIS's burden to prove the existence of a relevant market.  Here, the parties agree that

11   the relevant geographic market is the United States of America.  I will provide you with

     instructions for determining a relevant product market.

12   If you find that SIS has proven the existence of a relevant market, then you must determine

13   whether SIS also has proven that the challenged restraints have had a substantial harmful effect on

14   competition in that market. A harmful effect on competition, or competitive harm, refers to a

15   reduction in competition that results in the loss of some of the benefits of competition, such as

16   lower prices, increased output, or higher product quality. If the challenged conduct has not resulted

17   in higher prices, decreased output, lower quality, or the loss of some other competitive benefit,

     then there has been no competitive harm, and you should find that the challenged conduct was not

18   unreasonable.

19   In determining whether the challenged restraints have produced competitive harm, you

     may look at the following factors:

20   - the effect of the restraints on prices, output, product quality, and service;

21   - the purpose and nature of the restraint;

22   - the nature and structure of the relevant market;

23   - the number of competitors in the relevant market and the level of competition among them,

24     both before and after the restraint was imposed; and

25   - whether Intuitive possesses market power.

26   The last factor mentioned, market power, has been defined as an ability to profitably raise

27   prices, for a sustained period of time, above those that would be charged in a competitive market.

28   A firm that possesses market power generally can charge higher prices for the same goods or

     services than a firm in the same market that does not possess market power. The ability to charge

higher prices for better products or services, however, is not market power. An important factor in determining whether Intuitive possesses market power is Intuitive's market share, that is, its percentage of the products or services sold in the relevant market by all competitors. Other factors that you may consider in determining whether Intuitive has market power include the existence of barriers to entry for potential competitors, as well as the absence of economic substitutes for Intuitive's da Vinci surgical robots and EndoWrist instruments. If Intuitive does not possess a substantial market share, it is less likely that Intuitive possesses market power. If Intuitive does not possess market power, it is less likely that the challenged restraints have resulted in a substantial harmful effect on competition in the market.

**Authorities:** *NYNEX v. Discon, Inc.*, 525 U.S. 128, 139 (1998); *Pool Water Prods. v. Olin Corp.*, 258 F.3d 1024, 1036 (9th Cir. 2001); *Indeck Energy Servs. v. Consumers Energy Co.*, 250 F.3d 972, 977 (6th Cir. 2000); *NCAA v. Board of Regents*, 468 U.S. 81, 109 n.38 (1984); *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 27 n.46 (1984).

**Source**: AMERICAN BAR ASSOCIATION

Model Jury Instructions in Civil Antitrust Cases C-5, 2016 Edition.

1   **Disputed** Instruction No. 28 Re Substantial Harm to Competition Offered by **Intuitive**[33]

2   As I mentioned, to prove that the challenged restraints are unreasonable, SIS first must
3   demonstrate that the restraints have resulted in a substantial harm to competition. Although it may
4   be relevant to the inquiry, harm that occurs merely to the individual business of SIS is not
5   sufficient, by itself, to demonstrate harm to competition generally.  That is, harm to a single
    competitor or group of competitors does not necessarily mean that there has been harm to
6   competition.

7   Furthermore, SIS must show that the harm to competition occurred in the alleged
8   aftermarket for EndoWrist repair and replacement.  It is SIS's burden to prove the existence of a
9   relevant market.  I instructed you earlier on how to make this assessment.

10  If you find that SIS has proven the existence of a relevant market, then you must determine
11  whether SIS also have proven that the challenged restraints have a substantial harmful effect on
12  competition in that market.  A harmful effect on competition, or competitive harm, refers to a
    reduction in competition that results in the loss of some of the benefits of competition, such as
13  lower prices, increased output, or higher product quality.  It is not enough that the conduct at issue
14  has the effect of reducing consumers' choices or increasing prices to consumers.[34]  If the
15  challenged conduct has not resulted in higher prices, decreased output, lower quality, or the loss
16  of some other competitive benefit, then there has been no competitive harm, and you should find
17  that the challenged conduct was not unreasonable.

18  In determining whether the challenged restraint has produced competitive harm, you may
    look at the following factors:
19
20   • the effect of the restraint on prices, output, product quality, and service;
     • the purpose and nature of the restraint;
21   • the nature and structure of the relevant market;
     • the number of competitors in the relevant market and the level of competition among
22     them, both before and after the restraint was imposed; and
23   • whether the defendant possesses market power (a concept on which I have previously
       instructed you).

24  
    _____

25  [33] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 1  Sherman Act—General, Instruction 3B:  Rule of Reason – Proof of Competitive Harm (AM. BAR ASS'N ANTITRUST L.
26  SECTION 2016).  The model instruction has been modified to remove the paragraph that explains the concept of market power, which Intuitive proposes be given in Instruction No. 11.
27  [34] The underlined text has been added to the model instruction.  *See* Dkt. 204 at 17 ("It is not enough that 'conduct has the effect of reducing consumers' choices or increasing prices to
28  consumers.'" (quoting *FTC* v. *Qualcomm, Inc.*, 969 F.3d 974, 993–94 (9th Cir. 2020) (quoting *Brantley* v. *NBC Universal, Inc.*, 675 F.3d 1192, 1202 (9th Cir. 2012)))).

**Disputed** Instruction No. 29 Re Rule of Reason -- Evidence of Competitive Benefits Offered by **SIS**

If you find that SIS has proven that the challenged restraints resulted in substantial harm to competition in a relevant market, then you next must determine whether Intuitive has proven that the restraints also benefit competition in other ways. If you find that the challenged restraints do result in competitive benefits, then you also must consider whether the restraint was reasonably necessary to achieve the benefits. If SIS proves that the same benefits could have been readily achieved by other, reasonably available alternative means that create substantially less harm to competition, then they cannot be used to justify the restraint.

**Authorities:** Benefits that are unrelated to competition should be irrelevant to the analysis. *See FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 462 (1986); *National Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679 (1978); *Bhan v. NME Hosps., Inc*., 929 F.2d 1404, 1413 (9th Cir. 1991).

**Source**: AMERICAN BAR ASSOCIATION

Model Jury Instructions in Civil Antitrust Cases C-8, 2016 Edition.

**Disputed** Instruction No. 29 Re Rule of Reason Evidence of Competitive Benefits Offered by **Intuitive**[35]

If you find that SIS has proven that the challenged restraints resulted in substantial harm to competition in a relevant market, then you next must determine whether next must determine whether the restraint also benefits competition in other ways.  If you find that the challenged restraints do result in competitive benefits, then you also must consider whether the challenged restraints were reasonably necessary to achieve the benefits.  If SIS proves that the same benefits could have been readily achieved by other, reasonably available alternative means that create substantially less harm to competition, then they cannot be used to justify the restraint.

Antitrust law does not require businesses like Intuitive to use the least restrictive means of achieving a legitimate business purpose.  Any alternative to the challenged conduct presented by SIS must be a substantially—not marginally—less restrictive means for achieving the same procompetitive rationales.  A procompetitive rationale is a nonpretextual claim that a defendant's conduct is indeed a form of competition on the merits because it involves, for example, greater efficiency or enhanced consumer appeal.  To qualify as substantially less restrictive, an alternative means must be virtually as effective in serving the Intuitive's procompetitive purposes without significantly increased cost.[36]

---

[35] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 1  Sherman Act—General, Instruction 3C:  Rule of Reason – Evidence of Competitive Benefits (AM. BAR ASS'N ANTITRUST L. SECTION 2016).

[36] The underlined text has been added to the model instruction.  *See* Dkt. 204 at 17 ("A procompetitive rationale is a 'nonpretextual claim that [defendant's] conduct is indeed a form of competition on the merits because it involves, for example, greater efficiency or enhanced consumer appeal.'" (quoting *FTC* v. *Qualcomm Inc.*, 969 F.3d 974, 991 (9th Cir. 2020))); *Epic Games, Inc.* v. *Apple, Inc.*, 67 F.4th 946, 990 (9th Cir. 2023) ("When evaluating proposed alternative means, courts must give wide berth to defendants' business judgments and must resist the temptation to require that enterprises employ the least restrictive means of achieving their legitimate business objectives. . . . As such, this circuit's test—which the Supreme Court approved in *Alston*—requires a substantially less restrictive alternative." (quotations omitted) (citing *Alston*, 594 U.S. at 100–01)); *id.* ("To qualify as "substantially less restrictive," an alternative means "must be 'virtually as effective' in serving the [defendant's] procompetitive purposes . . . without significantly increased cost." (citing *Cnty. of Tuolumne* v. *Sonora Cmty. Hosp.*, 236 F.3d 1148, 1159 (9th Cir. 2001))).

1

**Disputed** Instruction No. 30 Re Rule of Reason -- Balancing the Competitive Effects Offered by **SIS**

2

3

    If you find that the challenged restraint resulted in procompetitive benefits in a relevant

4

market that were not achievable through substantially less restrictive means, then you still must

5

balance those procompetitive benefits against the anticompetitive harm resulting from the same

restraint.

6

    If the competitive harm substantially outweighs the competitive benefits, then the

7

challenged restraint is unreasonable. If the competitive harm does not substantially outweigh the

8

competitive benefits, then the challenged restraint is not unreasonable. In conducting this analysis,

9

you must consider the benefits and harm to competition and consumers, not just to a single

10

competitor or group of competitors. SIS bears the burden of proving that the anticompetitive effect

of the conduct substantially outweighs its benefits.

11

12

**Authorities:** *Leegin Creative Leather Prods. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007); *Barry v.*

13

*Blue Cross*, 805 F.2d 866, 872-73 (9th Cir. 1986).

14

15

**Source**: AMERICAN BAR ASSOCIATION

Model Jury Instructions in Civil Antitrust Cases C-9, 2016 Edition.

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**Disputed** Instruction No. 30 Re Rule of Reason -- Balancing the Competitive Effects Offered by **Intuitive**

2

3

[N/A]

4

5

Explanation for Intuitive's Position: Intuitive objects to this instruction.  Although the ABA model instruction suggests a fourth step to the rule of reason analysis, in which the competitive benefit must be weighed against the competitive harm, the Supreme Court has not adopted such a framework; instead, the Supreme Court has endorsed only the standard three-part burden-shifting framework. *See, e.g.*, *Ohio v. Am. Express Co.*, 585 U.S. 529, 541–42 (2018) ("To determine whether a restraint violates the rule of reason, the parties agree that a three-step, burden-shifting framework applies. Under this framework, the plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market. . . . If the plaintiff carries its burden, then the burden shifts to the defendant to show a procompetitive rationale for the restraint. . . . If the defendant makes this showing, then the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means." (citations omitted)); *Nat'l Collegiate Athletic Ass'n* v. *Alston*, 594 U.S. 69, 96–100 (2021) (endorsing the *American Express* burden-shifting framework)). The Ninth Circuit has also adopted the three-part burden shifting framework of *Amex. See FTC* v. *Qualcomm Inc.*, 969 F.3d 974, 991–92 (9th Cir. 2020).  The Court in this case likewise adopted the three-step burden shifting framework of *American Express* in its opinion regarding the parties' cross-motions for summary judgment, and nowhere mentioned a fourth step requiring a balancing analysis.  *See* Dkt. 204 at 17.  Intuitive thus objects to providing this instruction.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1   **Disputed** Instruction No. 31 Re Business Justification Defense Offered by **Intuitive**[37]

2        Intuitive contends that the alleged tying arrangement is justified. If you find that SIS has

3   proven all elements of a tying claim, then you should consider whether Intuitive has proven, by a

4   preponderance of the evidence, a business justification for the tying arrangement.  Intuitive has

5   the burden of proof on this issue.

6        Intuitive contends that its contractual restrictions on the unauthorized modification of

7   EndoWrists by third parties are justified by procompetitive patient safety as well as business

8   reasons including, for example, that:  Intuitive's da Vinci system was designed to work with

9   Intuitive's proprietary EndoWrist instruments; the use of EndoWrist instruments beyond the

10  number of lives specified in their Instructions for Use and cleared by the FDA presents serious

11  risks to health and safety of patients; Intuitive has no way to ensure the safety and effectiveness

12  of unauthorized third-party products and services that have not been cleared by the FDA; by

13  posing risks to patient health and safety, the use of unauthorized third-party products and

14  services with the da Vinci surgical system also poses a risk to Intuitive's reputation in the

15  marketplace and would expose Intuitive to additional costs and liability that Intuitive's contracts

16  help to avoid; and allowing unauthorized third parties to modify Intuitive's EndoWrists would

17  permit such third parties to "free ride" on Intuitive's goodwill and the substantial investments

18  Intuitive has made in developing and creating the da Vinci surgical system.[38]

19

20

21  [37] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 2  Section 1 of the Sherman
    Act—Tying Arrangements, Instruction 11:  Business Justification Defense (AM. BAR ASS'N

22  ANTITRUST L. SECTION 2016).
    [38] The model instruction has a placeholder for the defendant to provide its contentions as to its

23  business justifications.  The underlined text has been inserted by Intuitive to provide those
    contentions, which are supported by ample case law.  *See, e.g.*, *Cont'l T. V., Inc.* v. *GTE Sylvania*

24  *Inc.*, 433 U.S. 36, 55 n.23 (1977) (recognizing legitimate justifications arising from federal and
    state laws requiring "that manufacturers assume direct responsibility for the safety and quality of

25  their products"); *Hobart-Mayfield, Inc.* v. *National Operating Commission on Standards for
    Athletic Equipment*, 48 F.4th 656, 669–70 (6th Cir. 2022) (because helmet manufacturer served a

26  "market that places high regard on the safety and warranty of its products," it had a "legitimate
    business interest" in "desir[ing] to protect their reputations and sell safe products"); *HDC*

27  *Medical Inc.* v. *Minntech Corporation*, 474 F.3d 543, 549–50  (8th Cir. 2007) (since
    manufacturer could not "predict how its machines would react" to competitors' solutions, it was

28  right to "believe[] that it could not feasibly warrant the performance of the product").

1    In determining whether the tying arrangement is justified, you must decide whether it

2    serves a legitimate business purpose of Intuitive.  In making this determination, you should

3    consider whether the justification Intuitive offers is the real reason that it imposed the tying

4    arrangement.  A legitimate business purpose is one that benefits the actor regardless of any

5    harmful effect on competitors, such as a purpose to promote efficiency or quality, offer a better

6    product or service, or increase short-run profits. This inquiry does not turn on an assessment of

7    Intuitive's subjective intent, but instead whether Intuitive's policies and practices have an

8    objective justification.[39]

9    You must also consider whether Intuitive's claimed objective could reasonably have been

10   realized through substantially less restrictive means.[40]  Even if some type of constraint is

11   necessary to promote a legitimate business interest, Intuitive must not adopt a constraint that is

12   more restrictive than reasonably necessary to achieve that interest.

13   In determining whether Intuitive's claimed objective could reasonably have been

14   achieved through substantially less restrictive means, you may assess such factors as whether

15   other means to achieve Intuitive's objective were more or less expensive and more or less

16   effective than the means chosen by Intuitive.

17   If you find that Intuitive could reasonably have achieved its legitimate business purpose

18   by substantially less restrictive means, then you may find that there was no business justification

19

_____

20   [39] The underlined text has been added to the model instruction.  *See Barry Wright Corp.* v. *ITT*

21   *Grinnell Corp.*, 724 F.2d 227, 232 (1st Cir. 1983) (Breyer, J.) (observing that, though "[s]ome
     courts have written as if one might look to a firm's 'intent to harm' to separate 'good' from 'bad'

22   [conduct]," this search for "improper intent" in reality "refer[s] to a set of objective economic
     conditions"); *see also United States* v. *Microsoft Corp.*, 253 F.3d 34, 59 (D.C. Cir. 2001) ("[I]n

23   considering whether the monopolist's conduct on balance harms competition and is therefore
     condemned as exclusionary for purposes of § 2, our focus is upon the effect of that conduct, not

24   upon the intent behind it.").
     [40] The underlined text has been added to the model instruction.  *See Nat'l Collegiate Athletic*

25   *Ass'n* v. *Alston*, 594 U.S. 69, 100–101 (2021) ("In this suit, as in any, the district court had to
     determine whether the defendants' agreements harmed competition and whether any

26   procompetitive benefits associated with their restraints could be achieved by '*substantially* less
     restrictive alternative' means." (emphasis added)); *Epic Games, Inc.* v. *Apple, Inc.*, 67 F.4th 946,

27   985–86, 990 (9th Cir. 2023) ("[T]his circuit's test—which the Supreme Court approved in

28   *Alston*—requires a '*substantially* less restrictive' alternative." (emphasis in original; citation
     omitted)).

and find for SIS on the tying claim.  If you find that the alleged tying arrangement serves a

legitimate business purpose of Intuitive, and that there are not substantially less restrictive means

reasonably available to achieve that purpose, then you must find for Intuitive and against SIS on the

tying claim.

1

**Disputed** Instruction No. 31 Re Business Justification Defense Offered by **SIS**

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SIS objects to Intuitive's proposed instruction. The proposed instruction is overly argumentative, misleading and creates a substantial risk of confusing the jury. Further, SIS submits that this instruction is largely repetitive and unnecessary in view of at least previously proposed Instruction Nos. 27, 29, and 30 above presented by SIS.

**C.        SIS's Exclusive Dealing Claim**

**Disputed** Instruction No. 32 Re Elements of Exclusive Dealing Offered by **SIS**

Exclusive dealing arrangements require a buyer of a product or service to obtain that product or service exclusively from one supplier for a period of time. There are several forms of exclusive dealing arrangements. The arrangement may take the form of an agreement forbidding the buyer from purchasing the product or service from the supplier's competitors or a requirements contract committing the buyer to purchase all of its requirements of specific products or services from the supplier. Exclusive dealing arrangements are analyzed under the rule of reason to determine if they result in a substantial and unreasonable harm to competition in a relevant market. From the standpoint of either the buyer or the seller, exclusive dealing arrangements may have potential procompetitive effects that benefit consumers and that need to be weighed against the potential anticompetitive effects of foreclosing competing suppliers' access to the buyer and the buyer's access to competing suppliers' products and services.

To establish that an exclusive dealing arrangement violates the Sherman Act, SIS must establish each of the following elements by a preponderance of the evidence:

(1) agreements between Intuitive and hospitals that substantially forecloses the hospitals from purchasing replacement and repaired EndoWrist instruments from competing suppliers;

(2) the agreement was an unreasonable restraint of trade that resulted in a substantial adverse effect on competition in the market for replacement and repaired EndoWrist instruments;

(3) Intuitive had substantial market power in the market for replacement and repair of EndoWrist instruments;

(4) Intuitive's agreements with hospitals occurred in or affected interstate commerce; and

(5) SIS was injured in its business or property because of the agreement.

If you find that the evidence is insufficient to prove any one or more of these elements, then you must find for Intuitive and against SIS on SIS's exclusive dealing claim. If you find that the evidence is sufficient to prove all five elements as to Intuitive, then you must find for SIS and against Intuitive on SIS's exclusive dealing claim.

**Authorities**: Tampa Elec. Co. v. Nashville Coal Co., 365 U.S. 320, 329, 334 (1961); Standard Oil Co. v. United States, 337 U.S. 293, 306-07 (1949).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Source**: AMERICAN BAR ASSOCIATION

Model Jury Instructions in Civil Antitrust Cases D-71, 2016 Edition.

**Disputed** Instruction No. 32 Re Elements of Exclusive Dealing Offered by **Intuitive**[41]

SIS also claims that Intuitive engaged in unlawful exclusive dealing.  Intuitive denies this claim.

Exclusive dealing arrangements require a buyer of a product or service to obtain that product or service exclusively from one supplier for a period of time. Exclusive dealing arrangements are analyzed under the rule of reason to determine if they result in a substantial and unreasonable harm to competition in a relevant market.  From the standpoint of either the buyer or the seller, exclusive dealing arrangements may have potential procompetitive effects that benefit consumers and that need to be weighed against the potential anticompetitive effects of foreclosing competing suppliers' access to the buyer and the buyer's access to competing suppliers' products and services.

To establish that an exclusive dealing arrangement violates the Sherman Act, SIS must establish each of the following elements by a preponderance of the evidence:

(1) agreements between Intuitive and its customers that totally foreclose customers from purchasing EndoWrist repair or replacement from competing suppliers;

(2) the agreements were an unreasonable restraint of trade that resulted in a substantial adverse effect on competition in the alleged aftermarket for EndoWrist repair and replacement;

(3) Intuitive had substantial market power in the alleged aftermarket for EndoWrist repair and replacement;

and

(4) SIS was injured in its business or property because of the agreements.

---

[41] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 2 – Section 1 of the Sherman Act—Vertical Restraints, Instruction 5:  Elements of Exclusive Dealing (AM. BAR ASS'N ANTITRUST L. SECTION 2016).  The model instruction has been modified to remove instructions regarding there being "several forms" of exclusive dealing arrangements, because the particular alleged exclusive dealing arrangement has been defined by SIS and thus other examples of exclusive dealing arrangements are irrelevant in this case.  It has also been modified to remove the element that the conduct must have "occurred in or affected interstate commerce," which is not contested.  *See, e.g.*, Jury Instructions at 43, *In re Google Play Store Antitrust Litig.*, No. 3:21-md-02981-JD (N.D. Cal. Dec. 6, 2023), Dkt. 850 (omitting interstate commerce element from list of elements for tying claim).

1         If you find that the evidence is insufficient to prove any one or more of these elements,

2    then you must find for Intuitive and against SIS on SIS's exclusive dealing claim. If you find that

3    the evidence is sufficient to prove all four elements, then you must find for SIS and against

4    Intuitive on SIS's exclusive dealing claim.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PARTIES' JOINT PROPOSED JURY INSTRUCTIONS
Case No. 3:21-cv-03496-AMO

1    **Disputed** Instruction No. 33 Re Restrictions on Unauthorized Third-Party Products and Services
     Are Not Exclusive Dealing Offered by **Intuitive**[42]

2

3          SIS challenges provisions of Intuitive's contracts with customers that restrict the use of

4    unauthorized third-party products and services in connection with the da Vinci system as

5    unlawful exclusive dealing.  If the seller of a product or service contractually requires its

6    customers to buy another product or service either from the seller or from third parties that seller

7    authorizes, such a contractual provision is not an exclusive dealing arrangement unless third

8    parties cannot realistically obtain such authorization from the seller.  SIS bears the burden of

9    demonstrating that third parties could not realistically obtain authorization from Intuitive and

10   hence that third-party authorization was illusory.  If you find that SIS fails to meet this

11   burden, then you must find in favor of Intuitive on SIS's tying claim.

12

13

14

15

16

17

18

19

20

21   _____

22   [42] *See Mozart* v. *Mercedes-Benz*, 593 F. Supp. 1506, 1517 (N.D. Cal. 1984) (citing *United States*
     v. *Mercedes-Benz of N. Am., Inc.*, 517 F. Supp. 1369, 1383–84 (N.D. Cal. 1981)) (where the
     defendant asks customers only to work with "authorized" third parties, there is no forcing or
23   coercion unless the option for third parties to become authorized is "illusory"); *see also Ford
     Motor* v. *GMB Universal Joints*, 1988 WL 82826, at *3 (9th Cir. 1988) ("[a]n approval
24   mechanism must not be illusory") (unpublished disposition) (citing *Mozart*, 593 F. Supp. at
     1517); *Photovest* v. *Fotomat*, 606 F.2d 704, 722 (7th Cir. 1979) ("Given the contractual
25   language, which at least provides for the possibility of purchasing processing from non-Fotomat
     sources, we are reluctant to find a tying arrangement without some evidence that Fotomat
26   applied the contract language so restrictively as to constitute a de facto tying clause.  The
     presence of the illegal condition may be inferred from an extrinsic course of conduct
27   supplementing the written contract, but in the present case Photovest has failed to provide
     evidence of any conduct from which to infer the tie."  (quotation marks and internal citation
28   omitted)).

**__Disputed__ Instruction No. 33 Re Restrictions on Unauthorized Third-Party Products and Services Are Not Exclusive Dealing Offered by SIS**

SIS objects to Intuitive's proposed instruction. The proposed instruction is overly argumentative, misleading and creates a substantial risk of confusing the jury. The proposed instruction is inapplicable to the language of the agreements at issue in this case or to the facts of this case. Further, SIS submits that this instruction is largely repetitive and unnecessary in view of at least previously proposed Instruction Nos. 27, 32, 34, 37–41 presented by SIS.

1  **Disputed** Instruction No. 34 Re Exclusive Dealing – Agreements that Substantially Foreclose Competition Offered by **SIS**

2

3      In determining whether Intuitive's exclusive dealing contracts had a substantially harmful

4  effect on competition in the relevant market, you should consider the nature and history of the use

5  of exclusive dealing contracts in the aftermarket for EndoWrist repair and replacement, whether

6  buyers of the aftermarket repaired or replacement EndoWrist instruments have independent

7  reasons for entering into exclusive dealing contracts or were coerced into entering into them,

8  whether other competing suppliers also offer exclusive dealing contracts, the extent of competition

9  among competing suppliers for exclusive dealing contracts with buyers, Intuitive's position in the

10 marketplace, the competitive alternatives to Intuitive's products or services, the reasons Intuitive

11 and buyers entered into the exclusive dealing contracts at issue, and the effect of the use of

12 exclusive dealing contracts on the ability of new firms to enter the market and on price and other

13 competition in the market.

14     You also should consider whether the buyer is the final end user of the product. If the buyer

15 is the final end user, the exclusive dealing contract forecloses competitors from that portion of the

16 market represented by the buyer's purchases and makes it more likely that competition may be

17 harmed if the buyer represents a substantial portion of the market.

18     In determining the extent to which Intuitive's exclusive dealing contracts foreclose

19 competition on the merits, it is relevant to consider the percentage of the market foreclosed and

20 the length of the foreclosure. Where the exclusive dealing contracts foreclose less than 20% of the

21 market, this indicates that the harm from the foreclosure of competition is not substantial because

22 there are alternatives available.  Similarly, the shorter the duration of the contract, the less likely it

23 is to harm competition.  The longer the contract's duration, the more likely that the harm to

24 competition will be greater, unless it is clear that there was vigorous competition on the merits to

25 win the longer contract or the buyer as a practical matter can terminate the agreement on short

26 notice without cause and without significant penalty. In such a case, the stated length of the

27 exclusive contract is not the period in which it has a competitive effect.

28     In determining if Intuitive's exclusive dealing contracts substantially harmed competition,

you also should consider Intuitive's market power.  If Intuitive does not possess market power,

then there cannot be substantial harm to competition from an exclusive dealing contract, and you

must find for Intuitive on this claim.  If you decide that the buyers are sophisticated businesses

themselves which have countervailing power in negotiating contracts, this may offset any market

power Intuitive might otherwise have.  If SIS cannot show that Intuitive had the power to force

buyers to enter into exclusive contracts they did not want, this would be an indication that Intuitive lacks market power.

Finally, you should consider whether the process in which Intuitive secured exclusive contracts itself involved competition. If you determine that the buyers formally or informally put their exclusive contracts out for bid, and other competitors had an equal opportunity to compete for the exclusive contracts against Intuitive, this is also evidence that Intuitive does not have market power.

By considering all of these factors, you should determine whether the exclusive dealing contracts adversely affected the price paid by buyers, output, or the quality of products offered in the relevant market. Where a restraint does not adversely affect price, output, or product quality, it is unlikely to substantially harm competition.

**Authorities:** *Valley Prods. Co. v. Landmark*, 128 F.3d 398, 402 n.3 (6th Cir. 1997); *Sewell Plastics, Inc. v. Coca-Cola Co.*, 720 F. Supp. 1196, 1218-19 (W.D.N.C. 1989); *Reazin v. Blue Cross & Blue Shield of Kansas, Inc.*, 663 F. Supp. 1360, 1478 (D. Kan. 1987); *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1056, 1058-61 (8th Cir. 2000); *United States v. Baker Hughes Inc.*, 908 F.2d 981, 986 (D.C. Cir. 1990); *United States v. Hughes Tool Co.*, 415 F. Supp. 637, 644 (C.D. Cal. 1976); *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 13-14 (1984); *Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 464 (1992); *3M Co. v. Appleton Papers, Inc.*, 35 F. Supp. 2d 1138, 1144 (D. Minn. 1999).

**Source**: AMERICAN BAR ASSOCIATION

Model Jury Instructions in Civil Antitrust Cases D-73, 2016 Edition.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Disputed** Instruction No. 34 Re Exclusive Dealing – Agreements that Substantially Foreclose Competition Offered by **Intuitive**

[N/A]

Explanation for Intuitive's Position: Intuitive objects to this instruction. The ABA model instruction regarding exclusive dealing arrangements combines multiple elements into one instruction. For the sake of clarity to the jury, Intuitive proposes breaking it up into multiple instructions, each focused on a single element of the claim. Intuitive has presented its proposed separate instructions in Instruction Nos. 35 and 36, and the final two paragraphs of instruction 38.

1  **Disputed** Instruction No. 35 Re Substantial Adverse Effect on Competition Offered by
2  **Intuitive**[43]

3      In determining whether Intuitive's agreements with its customers had a substantially
4  harmful effect on competition in the alleged aftermarket for EndoWrist repair and replacement,
5  you should consider the nature and history of the use of exclusive dealing contracts in the industry,
6  whether buyers of Intuitive's products have independent reasons for entering into exclusive dealing
7  contracts or were coerced into entering into them, whether other competing suppliers also offer
8  exclusive dealing contracts, the extent of competition among competing suppliers for exclusive
9  dealing contracts with buyers, Intuitive's position in the marketplace, the competitive alternatives
10 to Intuitive's products, the reasons Intuitive and its customers entered into the contracts at issue,
11 and the effect of the use of exclusive dealing contracts on the ability of new firms to enter the
    market and on price and other competition in the market. <u>It is not enough that the conduct at issue</u>
    <u>has the effect of reducing consumers' choices or increasing prices to consumers.</u>[44]

12     You also should consider whether the buyer is the final end user of the product. If the buyer
13 is the final end user, the exclusive dealing contract forecloses competitors from that portion of the
14 market represented by the buyer's purchases and makes it more likely that competition may be
15 harmed if the buyer represents a substantial portion of the market. On the other hand, if the buyer
16 is a distributor or reseller, and there are other alternatives for competing sellers to market their
17 products to end users, then an exclusive dealing arrangement may not foreclose competitors' access
    to the market and, thus, not substantially harm competition.

18     You ultimately should determine whether the exclusive dealing contracts adversely
19 affected the price paid by buyers, output, or the quality of products offered in the relevant market.
20 Where a restraint does not adversely affect price, output, or product quality, it is unlikely to
21 substantially harm competition.

22

23 ───────────────
24 [43] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 2  Section 1 of the Sherman
    Act—Vertical Restraints, Instruction 6:  Exclusive Dealing – Additional Considerations (AM.
25 BAR ASS'N ANTITRUST L. SECTION 2016). The model instruction has been split up into separate
    instructions, so as to separate the elements of substantial adverse effect on competition,
26 substantial foreclosure, and substantial market power into three separate instructions, rather than
    taking the model instruction's approach of combining them all into a single instruction.
27 [44] The underlined text has been added to the model instruction.  *See* Dkt. 204 at 17 (It is not
    enough that 'conduct has the effect of reducing consumers' choices or increasing prices to
28 consumers.'" (quoting *FTC* v. *Qualcomm, Inc.*, 969 F.3d 974, 993–94 (9th Cir. 2020) (quoting
    *Brantley* v. *NBC Universal, Inc.*, 675 F.3d 1192, 1202 (9th Cir. 2012)))).

**Disputed** Instruction No. 35 Re Substantial Adverse Effect on Competition Offered by **SIS**

SIS objects to Intuitive's proposed instruction. The proposed instruction is overly argumentative, misleading and creates a substantial risk of confusing the jury. Further, SIS submits that this instruction is largely repetitive and unnecessary in view of at least previously proposed Instruction Nos. 27,  29, 30, and 34 above presented by SIS.

1  **Disputed** Instruction No. 36 Re Substantial Foreclosure of Competition Offered by **Intuitive**[45]

2    In determining the extent to which Intuitive's exclusive dealing contracts foreclosed
3  competition on the merits, it is relevant to consider the percentage of the market foreclosed and
4  the length of the foreclosure.  Where the exclusive dealing contracts foreclosed less than 30–40
5  percent of the market, this indicates that the harm from the foreclosure of competition was not
6  substantial because there are alternatives available.[46]  Similarly, the shorter the duration of the
7  contract, the less likely it is to harm competition.  The longer the contract's duration, the more
8  likely that the harm to competition will be greater, unless it is clear that there was vigorous
9  competition on the merits to win the longer contract or the buyer as a practical matter can terminate
10  the agreement on short notice without cause and without significant penalty.  In such a case, the
   stated length of the exclusive contract is not the period in which it has a competitive effect.

---

[45] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 2  Section 1 of the Sherman Act—Vertical Restraints, Instruction 6:  Exclusive Dealing – Additional Considerations (AM. BAR ASS'N ANTITRUST L. SECTION 2016).  The model instruction has been split up into separate instructions, so as to separate the elements of substantial adverse effect on competition, substantial foreclosure, and substantial market power into three separate instructions, rather than taking the model instruction's approach of combining them all into a single instruction.

[46] The model instruction has been modified to change the foreclosure threshold from "20 percent" to "30–40 percent," which is consistent with prevailing caselaw.  *See, e.g.*, *Omega Env't, Inc.* v. *Gilbarco, Inc.*, 127 F.3d 1157, 1162–65 (9th Cir. 1997) ("Although 38% [foreclosure] appears significant, . . . we conclude that it considerably overstates the size of the foreclosure and its likely anticompetitive effect for several reasons." (citation and internal quotation marks omitted)); *Sterling Merchandising, Inc.* v. *Nestle, S.A.*, 656 F.3d 112, 123–24 (1st Cir. 2011) ("[I]n applying the rule of reason calculus to exclusive dealing arrangements, foreclosure levels are unlikely to be of concern where they are less than 30 or 40 percent, and while high numbers do not guarantee success for an antitrust claim, low numbers make dismissal easy."); *United States* v. *Microsoft Corp.*, 87 F. Supp. 2d 30, 52–53 (D.D.C. 2000) (foreclosure rate closer to 40 percent is required before an exclusive contract raises competitive concerns); *Union Carbide Corp.* v. *Montell N.V.*, 27 F. Supp. 2d 414, 417 (S.D.N.Y. 1998) (foreclosure percentage in the 30 percent range is the point at which firms are "presumptively incapable of exercising market power"); ABA, 1 ANTITRUST LAW DEVELOPMENTS, ch. 1 § D.2 (Vertical Restraints on Interbrand Competition) at n.1432 & accompanying text ("Although foreclosure of 20 to 30 percent was a gray area before *Jefferson Parish* [*Hospital District No. 2* v. *Hyde*, 466 U.S. 2 (1984)], the concurring opinion in *Jefferson Parish*, which found exclusive dealing lawful without detailed analysis when 30 percent of the market was foreclosed, has led many courts to hold that higher market share thresholds are a prerequisite to finding exclusive dealing unlawful- -and even then, a finding that the arrangement is anticompetitive is not a foregone conclusion.").

1

**Disputed** Instruction No. 36 Re Substantial Foreclosure of Competition Offered by **SIS**

2

3        SIS objects to Intuitive's proposed instruction. The proposed instruction is overly

4    argumentative, misleading and creates a substantial risk of confusing the jury. Further, SIS submits

5    that this instruction is largely repetitive and unnecessary in view of at least previously proposed

     Instruction Nos. 27, 29, 30, and 34 above presented by SIS.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    **Disputed** Instruction No. 37 Re Exclusive Dealing – Relevant Market Offered by **SIS**

2         I have previously instructed you on the standards for identifying a relevant market.  For its

3    exclusive dealing claim, SIS contends that the relevant product market is replacement and repair

4    of EndoWrist instruments, while Intuitive contends that SIS has failed to allege the proper relevant

5    product market.  If you find that SIS has proven its proposed relevant product market, then you

6    should continue to evaluate the remainder of SIS's exclusive dealing claim. However, if you find

     that SIS has failed to prove such a market, then you must find in Intuitive's favor on this claim.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**Disputed** Instruction No. 37 Re Relevant Market Offered by **Intuitive**

2

3

4

5

6

7

      I have previously instructed you on the standards for identifying a relevant market.  For its exclusive dealing claim, SIS contends that the relevant product market is EndoWrist repair and replacement, while Intuitive contends that SIS has failed to allege the proper relevant product market.  If you find that SIS has proven its proposed relevant product market, then you should continue to evaluate the remainder of SIS's exclusive dealing claim. However, if you find that SIS has failed to prove such a market, then you must find in Intuitive's favor on this claim.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**Disputed** Instruction No. 38 Re Exclusive Dealing – Unreasonable Restraint of Trade Offered by
**SIS**

2

3

       I have previously instructed you on the standards for evaluating whether accused conduct

4

is an unreasonable restraint of trade under the rule of reason.  For purposes of SIS's exclusive

5

dealing claims, you must evaluate whether Intuitive's agreements with hospitals amount to an

6

unreasonable restraint of trade that resulted in a substantial adverse effect in the market for

7

replacement and repaired EndoWrists under the rule of reason.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Disputed** Instruction No. 38 Re Exclusive Dealing – Unreasonable Restraint of Trade Offered by **Intuitive**

[N/A]

Explanation for Intuitive's Position: Intuitive objects to this instruction. SIS proposes a general instruction that the jury must determine whether Intuitive's contracts with hospitals constitute an "unreasonable restraint of trade," without any citation to authority for its instruction or any guidance to the jury about how to make that determination.

Intuitive proposes instead providing Disputed Instruction No. 40, which derives from the ABA model instruction, and which actually explains to the jury how to conduct the third step of the rule of reason burden shifting framework by considering the procompetitive benefits of the challenged restraints. The jury would only need to reach this instruction if it has already found there to be an exclusive dealing arrangement that results in substantial harm to competition, thereby following the appropriate three-step burden-shifting framework.

1

**Disputed** Instruction No. 39 Re Exclusive Dealing – Market Power Offered by **SIS**

2

I have previously instructed you on the standards for determining whether a party has

3

market power in a relevant market.  For purposes of SIS's exclusive dealing claim, it is SIS's

4

burden to demonstrate that Intuitive has market power in the market for replacement or repaired

5

EndoWrists.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Disputed** Instruction No. 39 Re Market Power Offered by **Intuitive**[47]

To prevail on its exclusive dealing claim, SIS must prove by a preponderance of the evidence that Intuitive had substantial power in the alleged aftermarket for EndoWrist repair and replacement.  If Intuitive does not possess market power, then there cannot be substantial harm to competition from Intuitive's contracts, and you must find for Intuitive on this claim.

A firm that possesses market power generally can charge higher prices for the same goods or services that a firm in the same market that does not possess market power.  The ability to charge higher prices for better products or services, however, is not market power.  An important factor in determining whether Intuitive possesses market power is its market share, that is, its percentage of the products or services sold in the relevant market by all competitors.  Other factors that you may consider in determining whether Intuitive has market power include  market share trends, the existence of barriers to entry (that is, how difficult is it for other producers to enter the market and begin competing with defendant for sales), the entry and exit by other companies, and the number and size of actual competitors or potential competitors.

If you decide that the buyers are sophisticated businesses themselves which had countervailing power in negotiating contracts, this may offset any market power Intuitive might otherwise have.  If SIS cannot show that Intuitive had the power to force buyers to enter into exclusive contracts they did not want, this would be an indication that Intuitive lacks market power.

You should also consider whether the process in which defendant secured exclusive contracts itself involved competition. If you determine that the buyers formally or informally put their exclusive contracts out for bid, and other competitors had an equal opportunity to compete for the exclusive contracts against defendant, this is also evidence that defendant does not have market power

---

[47] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 2  Section 1 of the Sherman Act—Vertical Restraints, Instruction 6:  Exclusive Dealing – Additional Considerations (AM. BAR ASS'N ANTITRUST L. SECTION 2016) (The model instruction has been split up into separate instructions, so as to separate the elements of substantial adverse effect on competition, substantial foreclosure, and substantial market power into three separate instructions, rather than taking the model instruction's approach of combining them all into a single instruction.); MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 1  Sherman Act—General, Instruction 3B:  Rule of Reason – Proof of Competitive Harm (AM. BAR ASS'N ANTITRUST L. SECTION 2016).

**Disputed** Instruction No. 40 Re Evidence of Competitive Benefits Offered by **Intuitive**[48]

If you find that SIS has proven that Intuitive's agreements with its customers constitute exclusive dealing arrangements that resulted in substantial harm to competition in the alleged aftermarket for EndoWrist repair and replacement, then you next must determine whether Intuitive's agreements also benefit competition in other ways.  If you find that the exclusive dealing arrangements do result in competitive benefits, then you also must consider whether those restraints were reasonably necessary to achieve the benefits.  If SIS proves that the same benefits could have been readily achieved by other, reasonably available means that create substantially less harm to competition, then they cannot be used to justify the restraint.

Antitrust law does not require businesses like Intuitive to use the least restrictive means of achieving a legitimate business purpose.  Any alternative to the challenged conduct presented by SIS must be a substantially—not marginally—less restrictive means for achieving the same procompetitive rationales.  A procompetitive rationale is a nonpretextual claim that a defendant's conduct is indeed a form of competition on the merits because it involves, for example, greater efficiency or enhanced consumer appeal.  To qualify as substantially less restrictive, an alternative means must be virtually as effective in serving the Intuitive's procompetitive purposes without significantly increased cost.[49]

---

[48] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 1  Sherman Act—General, Instruction 3C:  Rule of Reason – Evidence of Competitive Benefits (AM. BAR ASS'N ANTITRUST L. SECTION 2016).

[49] The underlined text has been added to the model instruction.  *See* Dkt. 204 at 17 ("A procompetitive rationale is a 'nonpretextual claim that [defendant's] conduct is indeed a form of competition on the merits because it involves, for example, greater efficiency or enhanced consumer appeal.'" (quoting *FTC* v. *Qualcomm Inc.*, 969 F.3d 974, 991 (9th Cir. 2020))); *Epic Games, Inc.* v. *Apple, Inc.*, 67 F.4th 946, 990 (9th Cir. 2023) ("When evaluating proposed alternative means, courts must give wide berth to defendants' business judgments and must resist the temptation to require that enterprises employ the least restrictive means of achieving their legitimate business objectives. . . . As such, this circuit's test—which the Supreme Court approved in *Alston*—requires a substantially less restrictive alternative." (quotations omitted) (citing *Alston*, 594 U.S. at 100–01)); *id.* ("To qualify as "substantially less restrictive," an alternative means "must be 'virtually as effective' in serving the [defendant's] procompetitive purposes . . . without significantly increased cost." (citing *Cnty. of Tuolumne* v. *Sonora Cmty. Hosp.*, 236 F.3d 1148, 1159 (9th Cir. 2001))).

1

**Disputed** Instruction No. 40 Re Evidence of Competitive Benefits Offered by **SIS**

2

3          SIS objects to Intuitive's proposed instruction. The proposed instruction is overly

4    argumentative, misleading and creates a substantial risk of confusing the jury. Further, SIS

5    submits that this instruction is largely repetitive and unnecessary in view of at least previously

6    proposed Instruction Nos. 27, 28, and 30 above presented by SIS.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    **Disputed** Instruction No. 41 Re Exclusive Dealing - Interstate Commerce Offered by **SIS**

2        The Sherman Act applies only to conduct that affects interstate or foreign commerce. You

3 are instructed that Intuitive's agreements affected interstate commerce.

1

**Disputed** Instruction No. 41 Re Exclusive Dealing - Interstate Commerce Offered by **Intuitive**

2

[N/A]

3

4

Explanation for Intuitive's Position:  Intuitive objects to this instruction.  Intuitive contends that

5

this instruction should not be given because Intuitive does not contest this element of SIS's

6

exclusive dealing claim.  *See, e.g.*, Jury Instructions at 43, *In re Google Play Store Antitrust Litig.*,

7

No. 3:21-md-02981-JD (N.D. Cal. Dec. 6, 2023), Dkt. 850 (omitting interstate commerce element

from list of elements for tying claim).

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Disputed** Instruction No. 42 Re Injury Offered by **SIS**

If you find that SIS has met its burden on the other elements of its claims, as I have described them to you, then you must finally decide whether SIS has been injured. SIS must prove, by a preponderance of the evidence, that it was injured in its business or property by Intuitive's activities SIS claims are unlawful. That is, SIS must show that it was injured because of the anticompetitive effects of the unlawful agreement among Intuitive and its customers, and/or the anticompetitive effects of Intuitive's attempted monopolization or monopolization of the EndoWrist repair and replacement aftermarket.

"Injury" differs from "damages," which are the means of measuring the injury in dollars and cents. SIS meets its burden of showing injury if it shows some damages from the unlawful activities complained of. Injury beyond this minimum point goes only to the amount of damage and not to the question of injury.

**Authority:** *PLS.com v. National Association of Realtors*, 32 F.4th 824 (9th Cir. 2022); *Blanton v. Mobil Oil Corp.*, 721 F.2d 1207, 1215 (9th Cir. 1983); *Kapp v. National Football League*, 586 F.2d 644, 648 (9th Cir. 1978).

**Source:** Modern Federal Jury Instructions-Civil, Form 485a-79-23
Copyright 2023, Matthew Bender & Company, Inc., a member of the LexisNexis Group.

1

**Disputed** Instruction No. 42 Re Injury Offered by **Intuitive**

2

[NA]

3

4

Explanation for Intuitive's Position: Intuitive objects to this Instruction.  This is the same

5

instruction SIS proposes giving following its Section 2 claims.  Intuitive suggests that all

6

instructions regarding injury and damages be given after the instructions on the other elements of

7

SIS's claims, rather than having the same injury claim be given multiple times.  *See* Disputed

Instruction Nos. 59–71.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**III.    SIS'S CLAIMS UNDER SECTION 2 OF THE SHERMAN ACT**

**A.    Sherman Act Section 2 Claims Generally**

**Disputed** Instruction No. 43 Re Sherman Act Section 2 Claims Offered by **Intuitive**

SIS asserts that Intuitive violated Section 2 of the Sherman Act by monopolizing or attempting to monopolize the alleged aftermarket for EndoWrist repair and replacement.[50]  I will now instruct you on the elements of each of these claims.

---

[50] 15 U.S.C. § 2; Complaint (Dkt. 1) ¶¶ 118, 121.

1  **Disputed** Instruction No. 43 Re Sherman Act Section 2 Claims Offered by **SIS**

2

3          SIS objects to Intuitive's proposed instruction. The proposed instruction is overly

4  argumentative, misleading and creates a substantial risk of confusing the jury. Further, SIS

5  submits that this instruction is largely repetitive and unnecessary in view of at least previously

6  proposed Instruction Nos. 3 and 52 presented by SIS.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Disputed** Instruction No. 44 Re Monopoly and Attempted Monopolization Defined Offered by **SIS**

It is important for you to understand what a monopoly is. A firm has a monopoly when it has the power to dominate or control a market. More specifically, a firm has a monopoly when it has the power to control prices or to exclude competition in the relevant market.

The power to control prices is simply the power of a company to establish significantly higher prices for its goods than those charged by competitors for equivalent goods without suffering a substantial loss of business to competitors. Thus, if a company that has raised prices eventually has to lower its prices to the level charged by its competitors, it may not have a monopoly in the sense of the power to control prices.

The power to exclude competition means the power of a company to dominate a market by eliminating existing competition from the market or by preventing new competition from entering that market. In other words, the power to exclude competition is the power to place major barriers in the way of other companies trying to remain in or enter the particular area of trade and compete for customers. It may be shown by evidence of a company's reducing or restricting the share of the market held by competitors by means other than the normal process of competition.

To prove the charge of attempted monopolization, SIS does not have to show that the Intuitive achieved a monopoly. That is, SIS does not have to prove that Intuitive actually gained the power to control prices or exclude competition. Instead, SIS must show, by a preponderance of the evidence, that Intuitive purposefully attempted to gain such power.

**Source:** Modern Federal Jury Instructions-Civil

Copyright 2024, Matthew Bender & Company, Inc., a member of the LexisNexis Group.

**Disputed** Instruction No. 44 Re Monopoly and Attempted Monopolization Defined Offered by **Intuitive**

[NA]

Explanation for Intuitive's Position: Intuitive objects to this instruction.  SIS and Intuitive both propose later in these instructions giving ABA model instructions regarding the elements of SIS's monopolization and attempted monopolization claims—including instructions on the meaning of monopoly power, on which this instruction is focused.  *See infra* Disputed Instruction Nos. 45, 48, 54.  There is no need to give multiple instructions on these issues, and to potentially confuse the jury given the different articulation of the concepts between the ABA model instruction and this instruction from a different service.

**B.     SIS's Monopolization Claim**

<u>**Disputed**</u> Instruction No. 45 Re Elements of Monopolization Offered by **SIS**

SIS alleges that it was injured by Intuitive's unlawful monopolization of the market for replacement and repaired EndoWrists. To prevail on this claim, SIS must prove each of the following elements by a preponderance of the evidence:

(1) the alleged market is a valid antitrust market;

(2) Intuitive possessed monopoly power in that market;

(3) Intuitive willfully acquired or maintained monopoly power in that market by engaging in anticompetitive conduct;

(4) Intuitive's conduct occurred in or affected interstate commerce; and

(5) SIS was injured in its business or property because of Intuitive's anticompetitive conduct.

If you find that SIS has failed to prove any of these elements, then you must find for Intuitive and against SIS on this claim. If you find that SIS has proved each of these elements by a preponderance of the evidence, then you must find for SIS against Intuitive on this claim.

**Authorities**: See generally *Pacific Bell Tel. Co. v. linkLine Commc'ns.*, 555 U.S. 438 (2009); *Verizon Commc'ns. v. Law Offices of Curtis V. Trinko*, 540 U.S. 398 (2004); *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977); *United States v. Grinnell Corp.*, 384 U.S. 563 (1966); *LePage's Inc. v. 3M*, 324 F.3d 141 (3d Cir. 2003) (en banc); *United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001).

**Sources**: AMERICAN BAR ASSOCIATION Model Jury Instructions in Civil Antitrust Cases A-102, 2016 Edition.

1 **Disputed** Instruction No. 45 Re Elements of Monopolization Offered by **Intuitive**[51]

2      SIS alleges that it was injured by Intuitive's unlawful monopolization of the alleged

3 aftermarket for EndoWrist repair and replacement. To prevail on this claim, SIS must prove each

4 of the following elements by a preponderance of the evidence:

5      (1)   the alleged aftermarket for EndoWrist repair and replacement is a valid

6           antitrust market;

7      (2)   Intuitive possessed monopoly power in the alleged aftermarket for

8           EndoWrist repair and replacement;

9      (3)   Intuitive willfully acquired or maintained monopoly power in the alleged

10          aftermarket for EndoWrist repair and replacement by engaging in

11          anticompetitive conduct; and

12     (4)   SIS was injured in its business or property because of Intuitive's

13          anticompetitive conduct.

14     If you find that SIS has failed to prove any of these elements, then you must find for

15 Intuitive and against SIS on this claim. If you find that SIS has proved each of these elements by

16 a preponderance of the evidence, then you must find for SIS against Intuitive on this claim.

17

18

19

20

21

22

23

24

---

25 [51] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 3 – Section 2 of the Sherman

26 Act—Monopolization–General, Instruction 1:  Elements (AM. BAR ASS'N ANTITRUST L. SECTION 2016).  The model instruction has been modified to remove the element that the alleged

27 anticompetitive conduct "occurred in or affected interstate commerce," which is not contested. *See, e.g.*, Jury Instructions at 20, *In re Google Play Store Antitrust Litig.*, No. 3:21-md-02981-JD

28 (N.D. Cal. Dec. 6, 2023), Dkt. 850 (omitting interstate commerce element from list of elements for monopolization claim).

1

**Disputed** Instruction No. 46 Re Relevant Geographic Market Offered by **SIS**

2

SIS and Intuitive agree that the relevant geographic market is the United States of

3

America

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Disputed** Instruction No. 46 Re Relevant Geographic Market Offered by **Intuitive**

[NA]


Explanation for Intuitive's Position: Intuitive objects to this instruction.  Intuitive contends that this instruction should not be given because Intuitive does not dispute the geographic scope of the alleged relevant market.

**Disputed** Instruction No. 47 Re Monopolization – Relevant Product Market Offered by **SIS**

I have previously instructed you on the standards for identifying a relevant market. For its monopolization claim, SIS contends that the relevant product market is replacement and repair of EndoWrist instruments, while Intuitive contends that SIS has failed to allege the proper relevant product market. If you find that SIS has proven its proposed relevant product market, then you should continue to evaluate the remainder of SIS's monopolization claim. However, if you find that SIS has failed to prove such a market, then you must find in Intuitive's favor on this claim.

1    **Disputed** Instruction No. 47 Re Monopolization – Relevant Product Market Offered by **Intuitive**

2         I have previously instructed you on the standards for identifying a relevant market.  For its

3    monopolization claim, SIS contends that the relevant product market is EndoWrist repair and

4    replacement, while Intuitive contends that SIS has failed to allege the proper relevant product

5    market.  If you find that SIS has proven its proposed relevant product market, then you should

6    continue to evaluate the remainder of SIS's monopolization claim. However, if you find that SIS

7    has failed to prove such a market, then you must find in Intuitive's favor on this claim.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  **Disputed** Instruction No. 48 Re Monopoly Power Defined Offered by **SIS**

2
3  To prove its monopolization claim, SIS must prove by a preponderance of the evidence that Intuitive has monopoly power in the EndoWrist repair and replacement aftermarket.

4  Monopoly power is the power to dominate or control a market, including the power to control prices, restrict output, and exclude competition in a relevant antitrust market.

5  However, possession of monopoly power, in and of itself, is not unlawful.

6  I will provide further instructions about how you may determine whether SIS has met its burden of proving monopoly power in the market for replacement and repaired EndoWrists.  If you find that Intuitive has monopoly power in the market for replacement and repaired EndoWrists, then you must consider the remaining elements of this claim. If you find that Intuitive does not have monopoly power, then you must find for Intuitive and against SIS on this claim.

11
12  **Authorities:** *Verizon Commc'ns. v. Law Offices of Curtis V. Trinko*, 540 U.S. 398, 407 (2004); *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 595-96 (1985); *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 389 (1956).

15  **Sources**: AMERICAN BAR ASSOCIATION Model Jury Instructions in Civil Antitrust Cases A-104, 2016 Edition.

**Disputed** Instruction No. 48 Re Monopoly Power Defined Offered by **Intuitive**[52]

To prove its monopolization claim, SIS must prove by a preponderance of the evidence that Intuitive has monopoly power in the alleged aftermarket for EndoWrist repair and replacement.

Monopoly power is the power to control prices, restrict output, and exclude competition in a relevant antitrust market.  More precisely, a firm is a monopolist if it can profitably raise prices substantially above the competitive level for a significant period of time.  However, possession of monopoly power, in and of itself, is not unlawful.  Monopoly power can be lawfully acquired and maintained through growth or development as a consequence of a superior product, business acumen, or historic accident.[53]

I will now provide further instructions about how you may determine whether SIS has met its burden of proving monopoly power in the alleged aftermarket for EndoWrist repair and replacement.  There are two ways for SIS to prove that Intuitive had monopoly power in a relevant market.  SIS may prove monopoly power through direct evidence of restricted output and supracompetitive prices, or through indirect evidence that Intuitive has a dominant market share in the relevant antitrust market and consideration of other characteristics of the relevant market.  I will explain these in turn.[54]

---

[52] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 3 Section 2 of the Sherman Act—Monopolization-General, Instruction 2:  Monopoly Power Defined (AM. BAR ASS'N ANTITRUST L. SECTION 2016).

[53] The underlined text has been added to the model instruction.  *See Epic Games* v. *Apple, Inc.*, 67 F.4th 946, 998 (9th Cir. 2023) ("A Section 2 monopolization claim 'has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'" (quoting *United States* v. *Grinnell Corp.*, 384 U.S. 563, 570–71 (1966))).

[54] The underlined text has been added to the model instruction to provide a roadmap to the jury.  *See infra* Stipulated Jury Instruction No. 34; Stipulated Jury Instruction No. 35.

**Disputed** Instruction No. 49 Re Monopoly Power – Direct Evidence Offered by **SIS**

One way that SIS may prove monopoly power is through direct evidence that Intuitive has the ability to raise or maintain the prices that it charges for goods or services in the replacement and repaired EndoWrist market above competitive levels, can maintain those prices above a competitive level for a significant period of time, and that Intuitive has the ability to exclude competition.

SIS has the burden of proving that Intuitive has the ability to raise or maintain the prices that it charges for goods or services in the market for replacement and repaired EndoWrists above competitive levels. SIS must prove that Intuitive has the power to do so by itself--that is, without the assistance of, and despite competition from, any existing or potential competitors.

SIS must also prove that Intuitive has the power to maintain prices above a competitive level for a significant period of time. If Intuitive attempted to maintain prices above competitive levels, but would lose so much business to other competitors that the price increase would become unprofitable and would have to be withdrawn, then Intuitive does not have monopoly power.

Similarly, SIS must prove that Intuitive has the ability to exclude competition. For example, if Intuitive attempted to maintain prices above competitive levels, but new competitors could enter the market for replacement and repaired EndoWrists or existing competitors could expand their sales and take so much business that the price increase would become unprofitable and would have to be withdrawn, then Intuitive does not have monopoly power. The ability to earn high profit margins or a high rate of return does not necessarily mean that Intuitive has monopoly power. Other factors may enable a company without monopoly power to sell at higher prices or earn higher profit margins than its competitors, such as superior products or services, low costs, or superior advertising or marketing. However, an ability to sell at higher prices or earn higher profit margins than other companies for similar goods or services over a long period of time may be evidence of monopoly power. By contrast, evidence that Intuitive would lose a substantial amount of sales if it raised prices substantially, or that Intuitive's profit margins were low compared to its competitors, or that Intuitive's margins go up and down or are steadily decreasing, might be evidence that Intuitive does not have monopoly power.

**Authorities:** *United States v. Microsoft*, 253 F.3d 34, 56-57 (D.C. Cir. 2001)*; see also Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric Surgery*, 323 F.3d 366, 369 n.3 (6th Cir. 2003)*.

1

2     **Sources**: AMERICAN BAR ASSOCIATION Model Jury Instructions in Civil Antitrust Cases
      A-121, 2016 Edition.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1   **Disputed** Instruction No. 49 Re Monopoly Power – Direct Evidence Offered by **Intuitive**[55]

2   　　　One way that SIS may prove monopoly power to control prices and exclude competition

3   is through direct evidence that Intuitive has the ability to raise or maintain the prices that it

4   charges for goods or services in the alleged aftermarket for EndoWrist repair and replacement

5   substantially above the competitive levels for a significant period of time.

6   　　　SIS has the burden of proving that Intuitive has the ability to raise or maintain the prices

7   that it charges for goods or services in the alleged aftermarket for EndoWrist repair and

8   replacement above competitive levels, and to restrict output in that market.[56] SIS must prove that

9   Intuitive has the power to do so by itself—that is, without the assistance of, and despite

10  competition from, any existing or potential competitors.

11  　　　SIS must also prove that Intuitive has the power to maintain prices above a competitive

12  level and restrict output for a significant period of time. If Intuitive attempted to maintain prices

13  above competitive levels, but would lose so much business to other competitors that the price

14  increase would become unprofitable and would have to be withdrawn, then Intuitive does not

15  have monopoly power.

16

17

18  [55] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 3  Section 2 of the Sherman
    Act—Monopolization–General, Instruction 8:  Existence of Monopoly Power – Direct Proof
19  (AM. BAR ASS'N ANTITRUST L. SECTION 2016).
    [56] The underlined text has been added to the model instruction.  *See, e.g.*, *Rebel Oil Co., Inc.* v.
20  *Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995) ("Market power may be demonstrated
    through either of two types of proof. One type of proof is direct evidence of the injurious
21  exercise of market power. If the plaintiff puts forth evidence of restricted output and
    supracompetitive prices, that is direct proof of the injury to competition which a competitor with
22  market power may inflict, and thus, of the actual exercise of market power." (citing *FTC v. Ind.
    Fed'n of Dentists*, 476 U.S. 447, 460–61 (1986))); *Forsyth* v. *Humana, Inc.*, 114 F.3d 1467, 1475
23  (9th Cir. 1997) ("Direct proof of market power may be shown by evidence of restricted output
    and supracompetitive prices."); *Theme Promotions, Inc.* v. *News Amer. Mktg. FSI*, 546 F.3d 991,
24  1001 (9th Cir. 2008) ("Evidence of restricted output and supracompetitive prices is direct
    evidence of market power . . ."); *Safeway Inc.* v. *Abbott Lab'ys*, 761 F. Supp. 2d 874, 887 (N.D.
25  Cal. 2011) ("To prove monopoly power directly, supracompetitive pricing must be accompanied
    by restricted output. . . .  Both are required to prove monopoly power directly."); *CoStar Grp.,
26  Inc.* v. *Com. Real Est. Exch. Inc.*, 2023 WL 2468742, at *5 (N.D. Cal. Feb. 23, 2023) ("[D]irect
    evidence of the injurious exercise of market power . . . is evidence of restricted output and
27  supracompetitive prices."); *Epic Games, Inc.* v. *Apple Inc.*, 559 F. Supp. 3d 898, 1031 (N.D. Cal.
28  2021) (lack of evidence of restricted output "fatal in demonstrating monopoly power").

1    Similarly, SIS must prove that Intuitive has the ability to exclude competition. For

2    example, if Intuitive attempted to maintain prices above competitive levels, but new competitors

3    could enter the market for EndoWrist repair and replacement or existing competitors could

4    expand their sales and take so much business that the price increase would become unprofitable

5    and would have to be withdrawn, then Intuitive does not have monopoly power.  The ability to

6    earn high profit margins or a high rate of return does not necessarily mean that Intuitive has

7    monopoly power.  Other factors may enable a company without monopoly power to sell at higher

8    prices or earn higher profit margins than its competitors, such as superior products or services,

9    low costs, or superior advertising or marketing.  In analyzing whether supracompetitive pricing

10   was present, you may also consider Intuitive's total fixed costs, including capital costs and

11   research and development.[57]  However, an ability to sell at higher prices or earn higher profit

12   margins than other companies for similar goods or services over a long period of time may be

13   evidence of monopoly power. By contrast, evidence that Intuitive would lose a substantial

14   amount of sales if it raised prices substantially, or that Intuitive's profit margins were low

15   compared to its competitors, or that Intuitive's margins go up and down or are steadily

16   decreasing, might be evidence that Intuitive does not have monopoly power.

17

18

19

20

---

21   [57] The underlined text has been added to the model instruction.  *See* MODEL JURY INSTRUCTIONS

22   IN CIVIL ANTITRUST CASES, Chapter 3  Section 2 of the Sherman Act—Monopolization–General,
     Instruction 8:  Existence of Monopoly Power – Direct Proof (AM. BAR ASS'N ANTITRUST L.

23   SECTION 2016) ("expand or contract list as appropriate"); *In re Remeron Direct Purchaser
     Antitrust Litig.*, 367 F. Supp. 2d 675, 681 n.10 (D.N.J. 2005) ("[W]ithout evidence that sheds

24   light on material factors such as [defendant's] price relative to its total costs (marginal and
     fixed) . . . , monopoly power cannot be found as a matter of law."); *United States v. Eastman

25   Kodak Co.*, 63 F.3d 95, 109 (2d Cir. 1995) ("Certain deviations between marginal cost and price,
     such as those resulting from high fixed costs, are not evidence of market power."); 2B Phillip E.

26   Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their

27   Application* ¶516g (4th ed. 2014 & Supp. 2021) ("No matter how accurately measured, of course,
     a substantial excess of price over marginal cost does not necessarily bring excess returns on

28   investment.  A firm generates excess profit only if price exceeds its average total cost, including
     its cost of capital.").

**Disputed** Instruction No. 50 Re Monopoly Power – Indirect Evidence Offered by **SIS**

Another way that SIS may prove monopoly power in the market for replacement and repaired EndoWrists is through indirect evidence of monopoly power such as Intuitive's market share, market share trends, barriers to entry, entry and exit by other companies, and the number and size of other competitors.  If this evidence establishes that Intuitive has the power to control prices and exclude competition in the market for replacement and repaired EndoWrists, then you may conclude that Intuitive has monopoly power in the market.

*Market Share*

The first factor that you should consider is Intuitive's share of the market for replacement and repaired EndoWrists. Based on the evidence that you have heard about Intuitive's market share, you should determine Intuitive's market share as a percentage of total sales in the market for replacement and repaired EndoWrists. The Intuitive must have a significant share of the market in order to possess monopoly power.

In evaluating whether the percentage of market share supports a finding of monopoly power, you also should consider other aspects of the market for replacement and repaired EndoWrists, such as market share trends, the existence of barriers to entry (that is, how difficult is it for other producers to enter the market and begin competing with Intuitive for sales), the entry and exit by other companies, and the number and size of competitors. Along with Intuitive's market share, these factors should inform you as to whether Intuitive has monopoly power.  The higher the company's share, the higher the likelihood that a company has monopoly power.

A market share below 50 percent is ordinarily not sufficient to support a conclusion that Intuitive has monopoly power. However, if you find that the other evidence demonstrates that Intuitive does, in fact, have monopoly power despite having a market share below 50 percent, you may conclude that Intuitive has monopoly power.

*Market Share Trends*

The trend in Intuitive's market share is something you may consider. An increasing market share may strengthen an inference that a company has monopoly power, particularly where that company has a high market share, while a decreasing share might show that a company does not have monopoly power.

*Barriers to Entry*

You may also consider whether there are barriers to entry into the market for replacement and repaired EndoWrists. Barriers to entry make it difficult for new competitors to enter the market

for replacement and repaired EndoWrists in a meaningful and timely way. Barriers to entry might include intellectual property rights (such as patents or trade secrets), the large financial investment required to build a plant or satisfy governmental regulations, specialized marketing practices, and the reputation of the companies already participating in the market (or the brand name recognition of their products).

Evidence of low or no entry barriers may be evidence that Intuitive does not have monopoly power, regardless of Intuitive's market share, because new competitors could enter easily if Intuitive attempted to raise prices for a substantial period of time. By contrast, evidence of high barriers to entry along with high market share may support an inference that Intuitive has monopoly power.

*Entry and Exit by Other Companies*

The history of entry and exit in the market for replacement and repaired EndoWrists may be helpful to consider. Entry of new competitors or expansion of existing competitors may be evidence that Intuitive lacks monopoly power. On the other hand, departures from the market, or the failure of firms to enter the market, particularly if prices and profit margins are relatively high, may support an inference that Intuitive has monopoly power.

*Number and Size of Competitors*

You may consider whether Intuitive's competitors are capable of effectively competing. In other words, you should consider whether the financial strength, market shares, and number of competitors act as a check on Intuitive's ability to price its products. If Intuitive's competitors are vigorous or have large or increasing market shares this may be evidence that Intuitive lacks monopoly power. On the other hand, if you determine that Intuitive's competitors are weak or have small or declining market shares, this may support an inference that Intuitive has monopoly power.

*Conclusion*

If, through direct or indirect evidence, you find that Intuitive has monopoly power in the market for replacement and repaired EndoWrists, then you must consider the remaining elements of this claim. If you find that Intuitive does not have monopoly power, then you must find for Intuitive and against SIS on this claim.

**Authorities:** *United States v. Microsoft Corp.*, 253 F.3d 34, 56-57 (D.C. Cir. 2001); *Syufy Enters. v. Am. Multicinema*, 793 F.2d 990, 995-96 (9th Cir. 1986); *Hunt-Wesson Foods v. Ragu Foods*, 627 F.2d 919, 924-25 (9th Cir. 1980); *Greyhound Computer Corp. v. IBM*, 559 F.2d 488, 496-97 (9th Cir. 1977); *Otter Tail Power Co. v. United States*, 410 U.S. 366 (1973); *United States v. Grinnell*

1 | *Corp.*, 384 U.S. 563, 571 (1966); *International Boxing Club v. United States*, 358 U.S. 242 (1959);
2 | *Am. Tobacco Co. v. United States*, 328 U.S. 781, 797-98 (1946).

**Sources**: AMERICAN BAR ASSOCIATION Model Jury Instructions in Civil Antitrust Cases A-115, 2016 Edition.

**Disputed** Instruction No. 50 Re Monopoly Power – Indirect Evidence Offered by **Intuitive**[58]

Another way that SIS may prove monopoly power in the alleged aftermarket for EndoWrist repair and replacement is through indirect evidence of monopoly power such as Intuitive's market share, market share trends, barriers to entry, entry and exit by other companies, and the number and size of other competitors.  If this evidence establishes that Intuitive has the power to control prices and exclude competition in the alleged aftermarket for EndoWrist repair and replacement, then you may conclude that Intuitive has monopoly power in the market.

*Market Share*

The first factor that you should consider is Intuitive's share of the alleged aftermarket for EndoWrist repair and replacement. Based on the evidence that you have heard about Intuitive's market share, you should determine Intuitive's market share as a percentage of total sales in the alleged aftermarket for EndoWrist repair and replacement. Intuitive must have a significant share of the market in order to possess monopoly power.

In evaluating whether the percentage of market share supports a finding of monopoly power, you also should consider other aspects of the alleged aftermarket for  EndoWrist repair and replacement, such as market share trends, the existence of barriers to entry (that is, how difficult is it for other producers to enter the market and begin competing with Intuitive for sales), the entry and exit by other companies, and the number and size of competitors. Along with Intuitive's market share, these factors should inform you as to whether Intuitive has monopoly power.  The higher the company's share, the higher the likelihood that a company has monopoly power.

A market share below 50 percent is ordinarily not sufficient to support a conclusion that Intuitive has monopoly power. However, if you find that the other evidence demonstrates that

---

[58] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 3  Section 2 of the Sherman Act—Monopolization–General, Instruction 7:  Existence of Monopoly Power – Indirect Proof (AM. BAR ASS'N ANTITRUST L. SECTION 2016).

1   Intuitive does, in fact, have monopoly power despite having a market share below 50 percent,

2   you may conclude that Intuitive has monopoly power.

3   *Market Share Trends*

4   The trend in Intuitive's market share is something you may consider. An increasing

5   market share may strengthen an inference that a company has monopoly power, particularly

6   where that company has a high market share, while a decreasing share might show that a

7   company does not have monopoly power.

8   *Barriers to Entry*

9   You may also consider whether there are barriers to entry into the alleged aftermarket for

10  EndoWrist repair and replacement. Barriers to entry make it difficult for new competitors to

11  enter the market in a meaningful and timely way. Barriers to entry might include intellectual

12  property rights (such as patents or trade secrets), the large financial investment required to build

13  a plant or satisfy governmental regulations, specialized marketing practices, and the reputation of

14  the companies already participating in the market (or the brand name recognition of their

15  products).

16  Evidence of low or no entry barriers may be evidence that Intuitive does not have

17  monopoly power, regardless of Intuitive's market share, because new competitors could enter

18  easily if Intuitive attempted to raise prices for a substantial period of time. By contrast, evidence

19  of high barriers to entry along with high market share may support an inference that Intuitive has

20  monopoly power.

21  *Entry and Exit by Other Companies*

22  The history of entry and exit in the alleged aftermarket for  EndoWrist repair and

23  replacement may be helpful to consider. Entry of new competitors or expansion of existing

24  competitors may be evidence that Intuitive lacks monopoly power.  On the other hand,

25  departures from the market, or the failure of firms to enter the market, particularly if prices and

26  profit margins are relatively high, may support an inference that Intuitive has monopoly power.

27

28

*Number and Size of Competitors*

You may consider whether Intuitive's competitors are capable of effectively competing. In other words, you should consider whether the financial strength, market shares, and number of competitors act as a check on Intuitive's ability to price its products. If Intuitive's competitors are vigorous or have large or increasing market shares this may be evidence that Intuitive lacks monopoly power. On the other hand, if you determine that Intuitive's competitors are weak or have small or declining market shares, this may support an inference that Intuitive has monopoly power.

*Conclusion*

If you find that SIS has not proved by a preponderance of the evidence, whether through direct evidence or indirect evidence, that Intuitive has monopoly power in the alleged aftermarket for EndoWrist repair and replacement, then you must find for Intuitive and against SIS on SIS's monopolization claim. If you find that SIS has proven by a preponderance of the evidence that Intuitive has monopoly power in the alleged aftermarket for EndoWrist repair and replacement, then you must consider the remaining elements of this claim.

**Disputed** Instruction No. 51 Re Willful Acquisition or Maintenance of Monopoly Power through Anticompetitive Conduct Offered by **SIS**

The next element plaintiff must prove is that defendant willfully acquired or maintained monopoly power through anticompetitive acts or practices. Anticompetitive acts are acts, other than competition on the merits, that have the effect of preventing or excluding competition or frustrating the efforts of other companies to compete for customers within the market for replacement and repaired EndoWrists. Harm to competition is to be distinguished from harm to a single competitor or group of competitors, which does not necessarily constitute harm to competition. Some examples of harm to competition include increased prices, decreased production levels, and reduced quality.

Mere possession of monopoly power, if lawfully acquired, does not violate the antitrust laws. The acquisition or maintenance of monopoly power by supplying better products or services, possessing superior business skills, or because of luck, is not unlawful.

A monopolist may compete aggressively without violating the antitrust laws, and a monopolist may charge monopoly prices without violating the antitrust laws. A monopolist's conduct only becomes unlawful where it involves anticompetitive acts.

The difference between anticompetitive conduct and conduct that has a legitimate business purpose can be difficult to determine. This is because all companies have a desire to increase their profits and increase their market share. These goals are an essential part of a competitive marketplace, and the antitrust laws do not make these goals--or the achievement of these goals-- unlawful, as long as a company does not use anticompetitive means to achieve these goals.

In determining whether Intuitive's conduct was anticompetitive or whether it was legitimate business conduct, you should determine whether the conduct is consistent with competition on the merits, whether the conduct provides benefits to consumers, and whether the conduct would make business sense apart from any effect it has on excluding competition or harming competitors.

For example, suppose there are five firms that make printers for home computers and that these printers comprised a relevant product market. Suppose also that Firm A developed a more efficient manufacturing process that allowed it to sell profitably at a lower price than its competitors. If Firm A grew its market share and achieved monopoly power by selling profitably at a lower price, it would not be unlawful for Firm A to achieve monopoly power in this way. Developing more efficient processes and developing the ability to sell profitably at lower prices is competition on the merits and benefits consumers, and it therefore is not anticompetitive conduct

even if it has a negative effect on competitors.

Similarly, in the same example, suppose Firm B developed and patented a revolutionary new printer and consumers so preferred Firm B's printer that Firm B achieved monopoly power. It would not be unlawful for Firm B to achieve monopoly power in printers in this way. Firm B "built a better mousetrap," which is competition on the merits and benefits consumers, and it therefore is not anticompetitive conduct.

By contrast, in the same example, suppose that Firm C makes printers, but Firm C is the world's only manufacturer of computers and that there are barriers to entry into the computer market such that no other firm will be able to enter that market. Suppose also that Firm C altered its computers in such a way that only Firm C's printers would work with its computers, and that the alteration does not improve the design of Firm C's computers or provide any benefits to competition or consumers. The only effect of the alteration is to exclude competing printer makers from the marketplace. It would be unlawful for Firm C to achieve monopoly power in the printer market in this way.

As the example shows, the acts or practices that result in the acquisition or maintenance of monopoly power must represent something more than the conduct of business that is part of the normal competitive process or commercial success. They must represent conduct that has made it very difficult or impossible for competitors to compete and that was taken for no legitimate business reason. You may not find that a company willfully acquired or maintained monopoly power through anticompetitive means if it has acquired or maintained that power solely through the exercise of superior foresight and skill; or because of natural advantages such as unique geographic access to raw materials or markets; or because of economic or technological efficiency, including efficiency resulting from scientific research; or by obtaining a lawful patent; or because changes in cost or consumer preference have driven out all but one supplier.

If you find that SIS has proven by a preponderance of the evidence that Intuitive willfully acquired or maintained monopoly power in the EndoWrist aftermarket through anticompetitive acts, then you must consider whether SIS has proved the remaining elements of this claim. If, however, you find that SIS did not prove this element by a preponderance of the evidence, then you must find for Intuitive and against SIS on this claim.

**Authorities:** *Verizon Commc'ns. v. Law Offices of Curtis V. Trinko*, 540 U.S. 398, 407-08 (2004); *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S 585, 105 S. Ct. 2847, 86 L. Ed. 2d 467 (1985); *United States v. United States Gypsum Co.,* 438 U.S. 422, 98 S. Ct. 2864, 57 L. Ed.

2d 854 (1978).*United States v. Grinnell Corp*., 384 U.S. 563, 570-71 (1966); *In re IBM Peripheral EDP Devices Antitrust Litig*., 481 F. Supp. 965, 1005-08 (N.D. Cal. 1979) *aff'd sub nom. Transamerica Computer Co. v. IBM*, 698 F.2d 1377 (9th Cir. 1983).

**Sources**: AMERICAN BAR ASSOCIATION Model Jury Instructions in Civil Antitrust Cases A-123, 2016 Edition.

**Disputed** Instruction No. 51 Re Willful Acquisition or Maintenance of Monopoly Power through Anticompetitive Conduct Offered by **Intuitive**[59]

The next element SIS must prove is that Intuitive willfully acquired or maintained monopoly power through anticompetitive acts or practices.  Anticompetitive acts are acts, other than competition on the merits, that have the effect of preventing or excluding competition or frustrating the efforts of other companies to compete for customers within the alleged aftermarket for EndoWrist repair and replacement. Harm to competition is to be distinguished from harm to a single competitor or group of competitors, which does not necessarily constitute harm to competition.  Some examples of harm to competition include increased prices, decreased production levels, and reduced quality.

Mere possession of monopoly power, if lawfully acquired, does not violate the antitrust laws.  The acquisition or maintenance of monopoly power by supplying better products or services, possessing superior business skills, or because of luck, is not unlawful.

A monopolist may compete aggressively without violating the antitrust laws, and a monopolist may charge monopoly prices without violating the antitrust laws.  It is not enough that the conduct at issue has the effect of reducing consumers' choices or increasing prices to consumers.[60]  A monopolist's conduct only becomes unlawful where it involves anticompetitive acts.

The difference between anticompetitive conduct and conduct that has a legitimate business purpose can be difficult to determine. This is because all companies have a desire to increase their profits and increase their market share. These goals are an essential part of a competitive marketplace, and the antitrust laws do not make these goals—or the achievement of these goals—unlawful, as long as a company does not use anticompetitive means to achieve these goals.

---

[59] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 3  Section 2 of the Sherman Act—Monopolization–General, Instruction 9:  Willful Acquisition or Maintenance of Monopoly Power (AM. BAR ASS'N ANTITRUST L. SECTION 2016).

[60] The underlined text has been added to the model instruction.  *See* Dkt. 204 at 17 (quoting *FTC* v. *Qualcomm, Inc.*, 969 F.3d 974, 993–94 (9th Cir. 2020) (quoting *Brantley* v. *NBC Universal, Inc.*, 675 F.3d 1192, 1202 (9th Cir. 2012))).

1    In determining whether Intuitive's conduct was anticompetitive or whether it was

2    legitimate business conduct, you should determine whether the conduct is consistent with

3    competition on the merits, whether the conduct provides benefits to consumers, and whether the

4    conduct would make business sense apart from any effect it has on excluding competition or

5    harming competitors.

6    For example, suppose there are five firms that make printers for home computers and that

7    these printers comprised a relevant product market.  Suppose also that Firm A developed a more

8    efficient manufacturing process that allowed it to sell profitably at a lower price than its

9    competitors.  If Firm A grew its market share and achieved monopoly power by selling

10   profitably at a lower price, it would not be unlawful for Firm A to achieve monopoly power in

11   this way.  Developing more efficient processes and developing the ability to sell profitably at

12   lower prices is competition on the merits and benefits consumers, and it therefore is not

13   anticompetitive conduct even if it has a negative effect on competitors.

14   Similarly, in the same example, suppose Firm B developed and patented a revolutionary

15   new printer and consumers so preferred Firm B's printer that Firm B achieved monopoly power.

16   It would not be unlawful for Firm B to achieve monopoly power in printers in this way. Firm B

17   "built a better mousetrap," which is competition on the merits and benefits consumers, and it

18   therefore is not anticompetitive conduct.

19   By contrast, in the same example, suppose that Firm C makes printers, but Firm C is the

20   world's only manufacturer of computers and that there are barriers to entry into the computer

21   market such that no other firm will be able to enter that market. Suppose also that Firm C altered

22   its computers in such a way that only Firm C's printers would work with its computers, and that

23   the alteration does not improve the design of Firm C's computers or provide any benefits to

24   competition or consumers.  The only effect of the alteration is to exclude competing printer

25   makers from the marketplace.  It would be unlawful for Firm C to achieve monopoly power in

26   the printer market in this way.

27   As the example shows, the acts or practices that result in the acquisition or maintenance

28   of monopoly power must represent something more than the conduct of business that is part of

the normal competitive process or commercial success. They must represent conduct that has made it very difficult or impossible for competitors to compete and that was taken for no legitimate business reason. You may not find that a company willfully acquired or maintained monopoly power through anticompetitive means if it has acquired or maintained that power solely through the exercise of superior foresight and skill; or because of natural advantages such as unique geographic access to raw materials or markets; or because of economic or technological efficiency, including efficiency resulting from scientific research; or by obtaining a lawful patent; or because changes in cost or consumer preference have driven out all but one supplier.

If you find that SIS has proven by a preponderance of the evidence that Intuitive willfully acquired or maintained monopoly power in the alleged aftermarket for EndoWrist repair and replacement through anticompetitive acts, then you must consider whether SIS has proved the remaining elements of this claim. If, however, you find that SIS did not prove this element by a preponderance of the evidence, then you must find for Intuitive and against SIS on this claim.

**Disputed** Instruction No. 52 Re Design Changes Offered by **SIS**

Changes in product design are not immune from antitrust scrutiny and in certain cases may constitute an unlawful means of maintaining a monopoly under Section 2. A design change that improves a product by providing a new benefit to consumers may violate Section 2 when accompanied by some associated anticompetitive conduct. A product redesign is anticompetitive, in violation of anti-monopolization provisions of Sherman Act, when it coerces consumers and impedes competition.

If the monopolist abuses or leverages its monopoly power in some other way when introducing the product, it may violate Section 2. A monopolist's discontinuation of its old technology may violate Section 2 if it effectively forces consumers to adopt its new technology. When a monopolist combines product withdrawal with some other conduct, the overall effect of which is to coerce consumers rather than persuade them on the merits, and to impede competition, its actions are anticompetitive under the Sherman Act.

Insignificant design changes, combined with other coercive conduct, could establish antitrust liability under the rule of reason. A monopolist's product design decisions are not per se lawful.

Proof of unlawful actions associated with introduction of an "improved" product design constitutes an anticompetitive abuse or leverage of monopoly power, or a predatory or exclusionary means of attempting to monopolize the relevant market can establish a violation of Section 2 of the Sherman Act.

The claim that a product design change constitutes an unlawful means of maintaining a monopoly under Section 2 is bolstered when the defendant fails to provide a "procompetitive justification" for its conduct.

Additionally, evidence of the initial intent motivating the design change may be helpful to the extent that it shows that the product designer knew all along that the new design was no better than the old design, and thus introduced the design solely to eliminate competition.

SIS claims that Intuitive's abandonment of the S/Si wired design and subsequent adoption of a wireless design for the X/Xi the usage counter was not a design change that improved the EndoWrist usage counter, but constitutes and exclusionary restraint prohibited by the Sherman Act. SIS also claims that Intuitive fails to provide a procompetitive justification for its design change. SIS claims that the way the X/Xi usage counter was imposed on hospitals served no apparent competitive purpose. For example, SIS claims that Intuitive has taken steps to force

customers to switch from earlier generation S/Si systems, such as discontinuing sales of S/Si EndoWrists and surgical robots, phasing out technical support for S/Si da Vinci systems, and aggressively pricing to encourage the switch to Xi.

If you find that Intuitive's adoption of a wireless design for the X/Xi usage counter was associated with Intuitive's abuse or leverage of its monopoly power in some other way when introducing the X/Xi usage counter, then you must find that the design change constitutes an exclusionary restraint prohibited by the Sherman Act and violates Section 2.

**Authorities:** *Alivecor, Inc. v. Apple, Inc.*, 2024 WL 591864, *12 (N.D. Cal. February 13, 2024); *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991 (9th Cir. 2010); *Blue Cross and Blue Shield of Vermont v. Teva...*, 2024 WL 323775. *25 (D. Vermont January 22, 2024); *In re Suboxone (Buprenorphine Hydrochloride And Naloxone) Antitrust Litigation*, 622 F.Supp.3d 22 (E.D. Pa. 2022); *In Re: Keurig Green Mountain Single-Serve Coffee Antitrust Litigation,* 383 F.Supp.3d 187 (S.D.N.Y. 2019); *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638 (2nd Cir. 2015).

**Disputed** Instruction No. 52 Re Design Changes Offered by **Intuitive**

Intuitive had no duty to design or redesign its products in a way that made it easier for third parties to provide their services, and the antitrust laws allow Intuitive to introduce legitimate design changes in its products and phase out older models in favor of new models.[61] A design change that improves a product by providing a benefit to consumers does not violate the antitrust laws absent some other anticompetitive conduct.[62] The antitrust laws necessarily tolerate product improvements, as such improvements serve the very purpose of the antitrust laws, which is to foster and ensure competition on the merits.[63] An antitrust challenge to a product design change therefore must fail if the design change is an improvement, unless the monopolist abuses or leverages its monopoly power in some other way when introducing the product.[64]

SIS contends that Intuitive violated the antitrust laws by introducing new versions of its da Vinci systems, the X and Xi, that require use of X/Xi EndoWrists with wireless chip technology. Intuitive contends that the switch from S/Si to X/Xi technology improved its

---

[61] *Cal. Comp. Prods., Inc.* v. *Int'l Bus. Machs. Corp.*, 613 F.2d 727, 744 (9th Cir. 1979) ("IBM, assuming it was a monopolist, had the right to redesign its products to make them more attractive to buyers whether by reason of lower manufacturing cost and price or improved performance. It was under no duty to help CalComp or other peripheral equipment manufacturers survive or expand. IBM need not have provided its rivals with disk products to examine and copy, nor have constricted its product development so as to facilitate sales of rival products. The reasonableness of IBM's conduct in this regard did not present a jury issue.").

[62] *Allied Orthopedic Appliances, Inc.* v. *Tyco Health Care Grp. LP*, 592 F.3d 991, 998–1002 (9th Cir. 2010) ("If a monopolist's design change is an improvement, it is necessarily tolerated by the antitrust laws, unless the monopolist abuses or leverages its monopoly power in some other way when introducing the product. To hold otherwise would be contrary to the very purpose of the antitrust laws, which is, after all, to foster and ensure competition on the merits." (citations omitted))

[63] *Allied Orthopedic*, 592 F.3d at 998–1002.

[64] *Allied Orthopedic*, 592 F.3d at 998–1002; *Foremost Pro Color, Inc.* v. *Eastman Kodak Co.*, 703 F.2d 534, 545–46 (9th Cir. 1983) ("[P]roduct introduction must be alleged to involve some associated conduct which constitutes an anticompetitive abuse or leverage of monopoly power, or a predatory or exclusionary means of attempting to monopolize the relevant market, rather than aggressive competition on the merits.").

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

products and provides numerous benefits to surgeons and patients.  If you find that Intuitive's introduction of X and Xi systems was a product improvement, then you cannot consider that to be unlawful or anticompetitive conduct.

1    **Disputed** Instruction No. 53 Re Monopolization - Interstate Commerce Offered by **SIS**

2          The Sherman Act applies only to conduct that affects interstate or foreign commerce.

3    You are instructed that Intuitive's agreements affected interstate commerce.

PARTIES' JOINT PROPOSED JURY INSTRUCTIONS

**Disputed** Instruction No. 53 Re Monopolization - Interstate Commerce Offered by **Intuitive**

[NA]

Explanation for Intuitive's Position: Intuitive objects to this Instruction.  Intuitive contends that this instruction should not be given because Intuitive does not contest this element of SIS's monopolization claim.  *See, e.g.*, Jury Instructions at 20, *In re Google Play Store Antitrust Litig.*, No. 3:21-md-02981-JD (N.D. Cal. Dec. 6, 2023), Dkt. 850 (omitting interstate commerce element from list of elements for monopolization claim).

**C.     SIS's Attempted Monopolization Claim**

<u>**Disputed**</u> <u>Instruction No. 54 Attempt to Monopolize Offered by</u> <u>**SIS**</u>

In addition to alleging monopolization, SIS also alleges that it was injured by Intuitive's unlawful attempt to monopolize the market for repaired and replacement EndoWrist instruments. To prevail on its claim of attempted monopolization, SIS must prove each of the following elements by a preponderance of the evidence:

(1) Intuitive engaged in anticompetitive conduct to accomplish its intended goal of achieving a monopoly;

(2) Intuitive had a specific intent to achieve monopoly power in the market for replacement and repaired EndoWrists;

(3) there was a dangerous probability that Intuitive would sooner or later achieve its goal of monopoly power in the market for replacement and repaired EndoWrists;

(4) Intuitive's conduct occurred in or affected interstate commerce; and

(5) SIS was injured in its business or property by Intuitive's anticompetitive conduct.

If you find that the evidence is insufficient to prove any one or more of these elements, then you must find for Intuitive and against SIS on SIS's claim of attempted monopolization. If you find that the evidence is sufficient to prove all five elements as to Intuitive, then you must find for SIS and against Intuitive on SIS's claim of attempted monopolization.

**Authorities:** *Spectrum Sports v. McQuillan*, 506 U.S. 447 (1993); *Brooke Grp. v. Brown & Williamson Tobacco Co.*, 509 U.S. 209, 225 (1993); *Lorain Journal Co. v. United States*, 342 U.S. 143, 72 S. Ct. 181, 96 L. Ed. 162 (1951); *Eastman Kodak Co. v. Southern Photo Materials Co.*, 273 U.S. 359, 47 S. Ct. 400, 71 L. Ed. 684 (1927); *Swift & Co. v. United States*, 196 U.S. 375, 25 S. Ct. 276, 49 L. Ed. 518 (1905); *Paladin Assocs. v. Mont. Power Co.*, 328 F.3d 1145, 1163 (9th Cir. 2003); *California Steel & Tube v. Kaiser Steel Corp.*, 650 F.2d 1001, 1004 (9th Cir. 1981); *William Inglis & Sons Baking Co. v. ITT Cont'l Baking Co.*, 688 F.2d 1014, 1028 (9th Cir. 1981); *Blair Foods v. Ranchers Cotton Oil*, 610 F.2d 665, 670 (9th Cir. 1980).

**Sources**: AMERICAN BAR ASSOCIATION Model Jury Instructions in Civil Antitrust Cases D-155, 2016 Edition.

**Disputed** Instruction No. 54 Re Attempted Monopolization – Elements Offered by **Intuitive**[65]

In addition to alleging monopolization, SIS also alleges that it was injured by Intuitive's unlawful attempt to monopolize the alleged aftermarket for EndoWrist repair and replacement. To prevail on its claim of attempted monopolization, SIS must prove each of the following elements by a preponderance of the evidence:

(1) Intuitive engaged in anticompetitive conduct to accomplish its intended goal of achieving a monopoly;

(2) Intuitive had a specific intent to achieve monopoly power in the alleged aftermarket for EndoWrist repair and replacement;

(3) there was a dangerous probability that Intuitive would achieve its goal of monopoly power in the alleged aftermarket for EndoWrist repair and replacement; and

(4) SIS was injured in its business or property by Intuitive's anticompetitive conduct.

If you find that the evidence is insufficient to prove any one or more of these elements, then you must find for Intuitive and against SIS on SIS's claim of attempted monopolization. If you find that the evidence is sufficient to prove all four elements as to Intuitive, then you must find for SIS and against Intuitive on SIS's claim of attempted monopolization.

---

[65] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 3 – Section 2 of the Sherman Act—Attempt to Monopolize, Instruction 1:  Elements (AM. BAR ASS'N ANTITRUST L. SECTION 2016).  The model instruction has been modified to remove the element that the alleged anticompetitive conduct "occurred in or affected interstate commerce," which is not contested. *See, e.g.*, Jury Instructions at 20, *In re Google Play Store Antitrust Litig.*, No. 3:21-md-02981-JD (N.D. Cal. Dec. 6, 2023), Dkt. 850 (omitting interstate commerce element from list of elements for monopolization claim).

1

**Disputed** Instruction No. 55 Re Attempted Monopolization - Anticompetitive Conduct Offered
by **SIS**

2

3       It is not sufficient for SIS to prove that Intuitive intended to monopolize the market for

4    replacement and repaired EndoWrists. SIS must also show that Intuitive engaged in

5    anticompetitive conduct, coupled with an intent to monopolize and a dangerous probability that

6    Intuitive would succeed. Generally, a firm engages in anticompetitive conduct when it attempts to

     exclude rivals without an efficiency-enhancing justification for its conduct.

7       I have already instructed you on the standards for determining whether Intuitive engaged

8    in anticompetitive conduct in the context of the monopolization claims.  You should apply those

9    same instructions here in the context of determining whether Intuitive engaged in anticompetitive

10   conduct in connection with SIS's allegations that Intuitive attempted to monopolize the market for

     replacement and repaired EndoWrists.

11

12   **Authorities:** *Spectrum Sports v. McQuillan*, 506 U.S. 447, 458-59 (1993); *Transamerica*

13   *Computer Co. v. IBM*, 698 F.2d 1377, 1382 (9th Cir. 1983); *Cal. Computer Prods. v. IBM*, 613 F.2d

14   727, 738 (9th Cir. 1979); *West Penn Allegheny Health Sys. v. UPMC*, 627 F.3d 85, (3d Cir. 2010).

15

16   **Sources**: AMERICAN BAR ASSOCIATION Model Jury Instructions in Civil Antitrust Cases D-
     158, 2016 Edition.

17

18

19

20

21

22

23

24

25

26

27

28

**Disputed** Instruction No. 55 Re Attempted Monopolization - Anticompetitive Conduct Offered by **Intuitive**[66]

It is not sufficient for SIS to prove that Intuitive intended to monopolize the alleged aftermarket for EndoWrist repair and replacement. SIS must also show that Intuitive engaged in anticompetitive conduct, coupled with an intent to monopolize and a dangerous probability that Intuitive would succeed. Generally, a firm engages in anticompetitive conduct when it attempts to exclude rivals without an efficiency-enhancing justification for its conduct.

I have already instructed you on the standards for determining whether Intuitive engaged in anticompetitive conduct in the context of SIS's monopolization claim. You should apply that same instruction here in the context of determining whether Intuitive engaged in anticompetitive conduct in connection with SIS's allegations that Intuitive attempted to monopolize the alleged aftermarket for EndoWrist repair and replacement.

---

[66] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 3 – Section 2 of the Sherman Act—Attempt to Monopolize, Instruction 2: Anticompetitive Conduct (AM. BAR ASS'N ANTITRUST L. SECTION 2016).

**Disputed** Instruction No. 56 Re Specific Intent to Achieve Monopoly Power Offered by **SIS**

SIS must prove that Intuitive had a specific intent to monopolize a relevant market. To do so, SIS must first prove that the market it is talking about—replacement and repaired EndoWrist instruments --is a relevant market for antitrust purposes. SIS must then prove that Intuitive had a specific intent to monopolize that market.

The court has already provided you with instructions on determining whether the replacement and repaired EndoWrist market is a relevant market.  If SIS proves that the replacement and repaired EndoWrist market is a relevant market, you must then decide whether Intuitive had the specific intent to monopolize that market. In other words, you must decide if the evidence shows that Intuitive acted with the conscious aim of acquiring the power to control prices and to exclude or destroy competition in the market for replacement and repaired EndoWrists.

There are several ways in which SIS may prove that Intuitive had the specific intent to monopolize. There may be evidence of direct statements of Intuitive's intent to obtain a monopoly in the market for replacement and repaired EndoWrists. Such proof of specific intent may be established by documents prepared by responsible officers or employees of Intuitive at or about the time of the conduct in question or by testimony concerning statements made by responsible officers or employees of Intuitive. You must be careful, however, to distinguish between a defendant's lawful intent to compete aggressively, which may be accompanied by aggressive language, and a true intent to acquire monopoly power by using anticompetitive means.

Even if you decide that the evidence does not prove directly that Intuitive actually intended to obtain a monopoly, specific intent may be inferred from what Intuitive did.  For example, if the evidence shows that Intuitive lacked a legitimate business justification and the natural and probable consequence of Intuitive's conduct in the market for replacement and repaired EndoWrists was to give Intuitive control over prices and to exclude or destroy competition, and that this was plainly foreseeable by Intuitive, then you may (but are not required to) infer that Intuitive specifically intended to acquire monopoly power.

In this case, SIS argues that the conduct underlying the claim of attempt to monopolize also constitutes an unreasonable restraint of trade under Section 1 of the Sherman Act. If you find on that SIS has proven Intuitive restrained trade in the EndoWrist repair and replacement market under the instructions you have received pertaining to Section 1 of the Sherman Act, then you may infer from such conduct that Intuitive had the specific intent to achieve monopoly power.

If SIS proves both that the repaired and replacement EndoWrist aftermarket is a relevant

1    market and that Intuitive had a specific intent to monopolize that market, you must find that SIS

2    has proven this element of its attempted monopolization claim and you should consider the other

3    elements of the claim. If you find that SIS fails to prove either of these points, then you must find

4    for Intuitive on SIS's attempted monopolization claim.

5

6    **Authorities:** *Spectrum Sports v. McQuillan*, 506 U.S. 447, 458-59 (1993); *Eastman Kodak Co. v.*

7    *Image Tech. Servs.*, 504 U.S. 451 (1992); *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472

8    U.S. 585 (1985); *Lorain Journal Co. v. United States*, 342 U.S. 143 (1951); *William Ingliss & Sons*

9    *Co. v. ITT Continental Baking Co.*, 668 F.2d 1014 (9th Cir. 1981); *Vollrath v. Sammi Corp.*, 1989

10   WL 201632, at *7 (C.D. Cal. 1989) (*citing Airweld, Inc. v. Airco, Inc.*, 742 F.2d 1184, 1192-93 (9th

11   Cir. 1984), and cases cited therein).

12   **Sources**: AMERICAN BAR ASSOCIATION Model Jury Instructions in Civil Antitrust Cases D-

13   160, 2016 Edition.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PARTIES' JOINT PROPOSED JURY INSTRUCTIONS

**Disputed** Instruction No. 56 Re Specific Intent to Achieve Monopoly Power Offered by **Intuitive**[67]

SIS must prove that Intuitive had a specific intent to monopolize a relevant market. To do so, SIS must first prove that the aftermarket SIS is talking about—EndoWrist repair and replacement–is a relevant market for antitrust purposes. SIS must then prove that Intuitive had a specific intent to monopolize that market.

The court has already provided you with instructions on determining whether the alleged aftermarket for EndoWrist repair and replacement is a relevant market. If SIS proves that the aftermarket for EndoWrist repair and replacement is a relevant market, you must then decide whether Intuitive had the specific intent to monopolize that market. In other words, you must decide if the evidence shows that Intuitive acted with the conscious aim of acquiring the power to control prices and to exclude or destroy competition in the aftermarket for EndoWrist repair and replacement.

There are several ways in which SIS may prove that Intuitive had the specific intent to monopolize. There may be evidence of direct statements of Intuitive's intent to obtain a monopoly in the aftermarket for EndoWrist repair and replacement. Such proof of specific intent may be established by documents prepared by responsible officers or employees of Intuitive at or about the time of the conduct in question or by testimony concerning statements made by responsible officers or employees of Intuitive. Y ou must be careful, however, to distinguish between a defendant's lawful intent to compete aggressively, which may be accompanied by aggressive language, and a true intent to acquire monopoly power by using anticompetitive means.

Even if you decide that the evidence does not prove directly that Intuitive actually intended to obtain a monopoly, specific intent may be inferred from what Intuitive did. For example, if the evidence shows that Intuitive lacked a legitimate business justification and the natural and probable consequence of Intuitive's conduct in the aftermarket for EndoWrist repair

---

[67] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 3 – Section 2 of the Sherman Act—Attempt to Monopolize–Instruction 3:  Specific Intent (AM. BAR ASS'N ANTITRUST L. SECTION 2016).

1 and replacement was to give Intuitive control over prices and to exclude or destroy competition,

2 and that this was plainly foreseeable by Intuitive, then you may (but are not required to) infer

3 that Intuitive specifically intended to acquire monopoly power.

4      In this case, SIS argues that the conduct underlying the claim of attempt to monopolize

5 also constitutes an unreasonable restraint of trade under Section 1 of the Sherman Act. If you

6 find on that SIS has proven Intuitive restrained trade in the aftermarket for EndoWrist repair and

7 replacement under the instructions you have received pertaining to Section 1 of the Sherman Act,

8 then you may infer from such conduct that Intuitive had the specific intent to achieve monopoly

9 power.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Stipulated Instruction No. 57 Re Dangerous Probability of Success

If you find that Intuitive had the specific intent to achieve a monopoly and engaged in significant anticompetitive conduct, you also must determine if the evidence shows the next element of attempt to monopolize: namely, that there was a dangerous probability that Intuitive would succeed in achieving monopoly power if it continued to engage in the same or similar conduct.

I have already defined monopoly power for you in Instruction No. 48.  You should use that same instruction to evaluate this element of SIS's attempted monopolization claim.

In determining whether there was a dangerous probability that Intuitive would acquire the ability to control price in the market, you should consider such factors as:

- Intuitive's market share;
- the trend in Intuitive's market share;
- whether the barriers to entry into the market made it difficult for competitors to enter the market;
- the likely effect of any anticompetitive conduct on Intuitive's share of the market.

Again, the purpose of looking at these and other factors is to determine whether there was a dangerous probability that Intuitive would ultimately acquire monopoly power.  A dangerous probability of success need not mean that success was nearly certain, but it does mean that there was a substantial and real likelihood that Intuitive would ultimately acquire monopoly power.

**Source**:

*SIS Citation*: AMERICAN BAR ASSOCIATION Model Jury Instructions in Civil Antitrust Cases D-164, 2016 Edition

*Intuitive Citation*: MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 3 ¬ Section 2 of the Sherman Act—Attempt to Monopolize–Instruction 4:  Dangerous Probability of Success (AM. BAR ASS'N ANTITRUST L. SECTION 2016).

1    **Disputed** Instruction No. 58 Re Attempted Monopolization - Interstate Commerce Offered by

2    **SIS**

3            The Sherman Act applies only to conduct that affects interstate or foreign commerce.

4    You are instructed that Intuitive's agreements affected interstate commerce.

PARTIES' JOINT PROPOSED JURY INSTRUCTIONS
Case No. 3:21-cv-03496-AMO

1

**Disputed** Instruction No. 58 Re Attempted Monopolization - Interstate Commerce Offered by
**Intuitive**

2

3

[N/A]

4

5

Explanation for Intuitive's Position: Intuitive objects to this instruction.  Intuitive contends that

6

this instruction should not be given because Intuitive does not contest this element of SIS's

7

attempted monopolization claim.  *See, e.g.*, Jury Instructions at 20, *In re Google Play Store*

8

*Antitrust Litig.*, No. 3:21-md-02981-JD (N.D. Cal. Dec. 6, 2023), Dkt. 850 (omitting interstate

commerce element from list of elements for monopolization claim).

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Disputed** Instruction No. 59 Re Injury – Monopolization and Attempted Monopolization Offered by **SIS**

If you find that SIS has met its burden on the other elements of its claims, as I have described them to you, then you must finally decide whether SIS has been injured. SIS must prove, by a preponderance of the evidence, that it was injured in its business or property by Intuitive's activities SIS claims are unlawful. That is, SIS must show that it was injured because of the anticompetitive effects of the unlawful agreement among Intuitive and its customers, and/or the anticompetitive effects of Intuitive's attempted monopolization or monopolization of the EndoWrist repair and replacement aftermarket.

"Injury" differs from "damages," which are the means of measuring the injury in dollars and cents. SIS meets its burden of showing injury if it shows some damages from the unlawful activities complained of. Injury beyond this minimum point goes only to the amount of damage and not to the question of injury.

**Authority:** *PLS.com v. National Association of Realtors*, 32 F.4th 824 (9th Cir. 2022); *Blanton v. Mobil Oil Corp.*, 721 F.2d 1207, 1215 (9th Cir. 1983); *Kapp v. National Football League*, 586 F.2d 644, 648 (9th Cir. 1978).

**Source:** Modern Federal Jury Instructions, form 485a-79-23 -Civil
Copyright 2023, Matthew Bender & Company, Inc., a member of the LexisNexis Group.

**Disputed** Instruction No. 59 Re Injury – Monopolization and Attempted Monopolization Offered by **Intuitive**

[N/A]

Explanation for Intuitive's Position: Intuitive objects to this instruction. This is the same instruction SIS proposes giving following its Section 1 claims. Intuitive suggests that all instructions regarding injury and damages be given after the instructions on the other elements of SIS's claims, rather than having the same injury claim be given multiple times. *See* Disputed Instruction Nos. 59–71.

IV.    **ANTITRUST INJURY & DAMAGES**

**Disputed** Instruction No. 60 Re Injury Offered by **Intuitive**[68]

      If you find that SIS has met its burden on each of the other elements of any of its claims, as I have described them to you, then you must finally decide if SIS is entitled to recover damages from Intuitive.

      SIS is entitled to recover damages for an injury to its business or property if it can establish three elements of injury and causation:

      (1) SIS was in fact injured as a result of Intuitive's alleged violation of the antitrust laws;

      (2) Intuitive's alleged illegal conduct was a material cause of SIS's injury; and

      (3) SIS's injury is an injury of the type that the antitrust laws were intended to prevent.

---

[68] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 6  Causation and Damages Clayton Act Section 4 Requirements, Instruction 1:  Injury and Causation (AM. BAR ASS'N ANTITRUST L. SECTION 2016).  The model instruction has been modified to split the three elements of injury and causation so that each receives its own instruction, rather than being grouped together in one instruction.

1   **Disputed** Instruction No. 60 Re Injury Offered by **SIS**

2       SIS objects to presenting this instruction in the order proposed by Intuitive, and has
3   provided its instructions on Injury at Disputed Instructions 42 and 59.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    **Disputed** Instruction No. 61 Re Injury in Fact Offered by **Intuitive**[69]

2          The first element is sometimes referred to as "injury in fact" or "fact of damage."  For

3    SIS to establish that it is entitled to recover damages, it must prove that it was injured as a result

4    of Intuitive's alleged violation of the antitrust laws.  Proving the fact of damage does not require

5    SIS to prove the dollar value of its injury.  It requires only that SIS prove that it was in fact

6    injured by Intuitive's alleged antitrust violation.

---

[69] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 6 – Causation and Damages – Clayton Act Section 4 Requirements, Instruction 1:  Injury and Causation (AM. BAR ASS'N ANTITRUST L. SECTION 2016).  The model instruction has been modified to split the three elements of injury and causation so that each receives its own instruction, rather than being grouped together in one instruction.

1    **Disputed** Instruction No. 61 Re Injury in Fact Offered by **SIS**

2

3         SIS objects to Intuitive's proposed instruction. The proposed instruction is overly

4    argumentative, misleading and creates a substantial risk of confusing the jury. Further, SIS

5    submits that this instruction is largely repetitive and unnecessary in view of at least previously

6    proposed Instruction Nos. 3, 42, 59, 60, 67, 70, and 71 presented by SIS.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  **Disputed** Instruction No. 62 Re Causation Offered by **Intuitive**[70]

2          SIS must also offer evidence that establishes by a preponderance of the evidence that

3  Intuitive's alleged illegal conduct was a material cause of SIS's injury.  This means that SIS

4  must have proved that some damage occurred to it as a result of Intuitive's alleged antitrust

5  violation, and not some other cause.  SIS is not required to prove that Intuitive's alleged antitrust

6  violation was the sole cause of its injury; nor need SIS eliminate all other possible causes of

7  injury.  It is enough if SIS has proved that the alleged antitrust violation was a material cause of

8  its injury.  However, if you find that SIS's injuries were caused primarily by factors other than

9  the alleged antitrust violation, then the causation element is not satisfied.[71]

---

[70] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 6 – Causation and Damages – Clayton Act Section 4 Requirements, Instruction 1:  Injury and Causation (AM. BAR ASS'N ANTITRUST L. SECTION 2016).  The model instruction has been modified to split the three elements of injury and causation so that each receives its own instruction, rather than being grouped together in one instruction.

[71] The underlined text has been added to the model instruction.  *See Discover Fin. Servs.* v. *Visa U.S.A., Inc.*, 582 F. Supp. 2d 501, 504–05 (S.D.N.Y. 2008).

1

**Disputed** Instruction No. 62 Re Causation Offered by **SIS**

2

3      SIS objects to Intuitive's proposed instruction. The proposed instruction is overly

4  argumentative, misleading and creates a substantial risk of confusing the jury. Further, SIS

5  submits that this instruction is largely repetitive and unnecessary in view of at least previously

6  proposed Instruction No. 59 above presented by SIS.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1   **Disputed** Instruction No. 63 Re Antitrust Injury Offered by **Intuitive**[72]

2       Finally, SIS must establish that its injury is the type of injury that the antitrust laws were

3   intended to prevent.  This is sometimes referred to as "antitrust injury."  If SIS's injuries were

4   caused by a reduction in competition, acts that would lead to a reduction in competition, or acts

5   that would otherwise harm consumers, then SIS's injuries are antitrust injuries.  On the other

6   hand, if SIS's injuries were caused by heightened competition, the competitive process itself, or

7   by acts that would benefit consumers, then SIS's injuries are not antitrust injuries and SIS may

8   not recover damages for those injuries under the antitrust laws.

9       You should bear in mind that businesses may incur losses for many reasons that the

10  antitrust laws are not designed to prohibit or protect against—such as where a competitor offers

11  better products or services, or where a competitor is more efficient and can charge lower prices

12  and still earn a profit.  The antitrust laws do not permit SIS to recover damages for losses that

13  were caused by the competitive process or conduct that benefits consumers.

14      In summary, if SIS can establish that it was in fact injured by Intuitive's conduct, that

15  Intuitive's conduct was a material cause of SIS's injury, and that Intuitive's injury was the type

16  that the antitrust laws were intended to prevent, then SIS is entitled to recover damages for the

17  injury to its business or property.

18

19

20

21

22

23

24

25

26  ---

[72] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 6 – Causation and Damages

27  – Clayton Act Section 4 Requirements, Instruction 1:  Injury and Causation (AM. BAR ASS'N ANTITRUST L. SECTION 2016).  The model instruction has been modified to split the three

28  elements of injury and causation so that each receives its own instruction, rather than being grouped together in one instruction.

**Disputed** Instruction No. 63 Re Antitrust Injury Offered by **SIS**

SIS objects to Intuitive's proposed instruction. The proposed instruction is overly argumentative, misleading and creates a substantial risk of confusing the jury. Further, SIS submits that this instruction is largely repetitive and unnecessary in view of at least previously proposed Instruction No. 59 above presented by SIS.

1  Stipulated Instruction No. 64 Re Antitrust Damages -- Introduction and Purpose

2
3     If you find that Intuitive violated the antitrust laws and that this violation caused injury to SIS, then you must determine the amount of damages, if any, SIS is entitled to recover.

4
5     The fact that I am giving you instructions concerning the issue of SIS's damages does not mean that I believe SIS should, or should not, prevail in this case. If you reach a verdict for Intuitive
6     on the issue of liability, you should not consider the issue of damages, and you may disregard the damages instruction that I am about to give.

7     The law provides that SIS should be fairly compensated for all damages to its business or
8     property that were a direct result or likely consequence of the conduct that you have found to be
9     unlawful.

10    Antitrust damages are only compensatory, meaning their purpose is to put an injured
11    plaintiff as near as possible in the position in which it would have been had the alleged antitrust
12    violation not occurred. The law does not permit you to award damages to punish a wrongdoer--
      what we sometimes refer to as punitive damages--or to deter particular conduct in the future.
13    Furthermore, you are not permitted to award to SIS an amount for attorneys' fees or the costs of
14    maintaining this lawsuit.

15

16    **Sources**:

17    *SIS* Citation: AMERICAN BAR ASSOCIATION Model Jury Instructions in Civil Antitrust Cases
18    B-304, 2016 Edition.

19
      *Intuitive Citation:* MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 6 –
20    Causation and Damages – Damages, Instruction 1:  Antitrust Damages – Introduction and
      Purpose (AM. BAR ASS'N ANTITRUST L. SECTION 2016).
21

22

23

24

25

26

27

28

PARTIES' JOINT PROPOSED JURY INSTRUCTIONS
Case No. 3:21-cv-03496-AMO

1  **Disputed** Instruction No. 65 Re FDA Clearance Offered by **Intuitive**[73]

2          You have heard testimony in this case about FDA 510(k) clearance.  I will now instruct

3  you on the law that applies to this subject.  Medical devices are regulated under the Food, Drug,

4  and Cosmetic Act, which Congress enacted to protect consumers from harmful products.[74]  The

5  products at issue in this case are considered to be medical devices.[75]  The FDA has identified

6  these medical devices and the surgical instruments used with them as "computer-controlled

7  surgical instrument systems."[76]  All computer-controlled surgical instrument systems and the

8  instruments used with them, including those that are remanufactured, are required to be approved

9  or cleared by the FDA.[77]  The FDA considers a device to be remanufactured when it has been

10  subject to any act that results in a significant change to the device's performance, safety

11  specifications, or intended use, as compared to the device that was originally approved or cleared

12  by the FDA.[78]  If you conclude that the insertion of a memory chip into an EndoWrist to change

13  its usage limit is remanufacturing as defined by the FDA, you must find that SIS could not

14  lawfully perform that operation on an instrument to be used for human surgery unless it obtained

15  510(k) clearance from FDA to perform that action on that particular EndoWrist.

16

17

18  [73] Intuitive proposes giving the same jury instruction that the Northern District of Florida court in

19  *Restore Robotics, LLC* v. *Intuitive Surgical, Inc.*, indicated was the "essence of what [the court] expected to instruct the jury on" had the case proceeded to trial.  *See* Pretrial Conf. Tr. at 93:22–

20  95:5, *Restore Robotics, LLC* v. *Intuitive Surgical, Inc.*, No. 5:19-cv-00055 (N.D. Fla. Jan. 13, 2023), ECF No. 226. The *Restore Robotics* court indicated that although experts could not offer

21  opinions about whether 510(k) clearance is legally required, the jury would be asked to decide as a factual matter whether Restore's activities constituted "remanufacturing."  *See id.*  Its decision

22  to give this instruction was entirely consistent with its summary judgment opinion, which this Court approvingly cited in its own summary judgment opinion on this issue.  *See* Dkt. 204 at 12–

23  13 (citing *Restore Robotics, LLC* v. *Intuitive Surgical, Inc.*, 2019 WL 8063988, at *2–3 (N.D. Fla. Nov. 14, 2019)).  Intuitive respectfully submits that the jury should be similarly instructed

24  here.
[74] *Wyeth* v. *Levine*, 555 U.S. 555, 574 (2009); FDCA § 301(a)-(c), 21 U.S.C. § 331(a)-(c).

25  [75] 21 C.F.R. § 876.1500 (product code NAY).
[76] 21 C.F.R. § 876.1500 (product code NAY).

26  [77] FDCA § 510(k), 21 U.S.C. § 360(k); FDCA § 301(p), 21 U.S.C. § 331(p); FDCA § 502(o), 21 U.S.C. § 352(o); 21 C.F.R. § 807.81.

27  [78] 21 C.F.R. § 820.3(w) ("Remanufacturer means any person who processes, conditions,

28  renovates, repackages, restores, or does any other act to a finished device that significantly changes the finished device's performance or safety specifications, or intended use.").

**Disputed** Instruction No. 65 Re FDA Clearance Offered by **SIS**

SIS objects to this instruction as being completely contrary to the Court's ruling with respect to the FDA made in connection with the parties' summary judgment motions. The presentation of this instruction is indicative of Intuitive's apparent plan to present testimony, documentary evidence, and argument (1) related to the FDA's 510(k) regulatory framework and procedures for clearance of medical devices for commercial marketing, (2) the meaning, scope and application of the regulatory term "remanufacturing", (3) the contention that the FDA required usage limits for EndoWrists such that adherence to use limits are required to ensure patient safety, and (4) the meaning, scope, application and effect of Intuitive's statement on its website that buying FDA-cleared remanufactured EndoWrists does not violate its contracts. Doc. 243-1 pp. 1-2.[79]

All of such evidence is irrelevant under Fed. R. Evid. 401 in light of the narrowed counterclaims resulting from the Court's rulings on the parties' cross motions for summary judgment. Accordingly presenting this instruction to the jury would be misleading, confuse the issues and be a waste of trial time because it would amount to an end-run around the summary judgment rulings. Giving this instruction would effectively permit Intuitive to invite the jury to hold SIS liable for conduct which, under the Court's determinations regarding unresolved FDA issues, Intuitive has been foreclosed from challenging.

---

[79] The wording of Intuitive's March 2023 website statement is: "However, Intuitive will not void its service contract with, cease doing business with, or consider it a breach of contract by a customer in the United States who chooses to purchase remanufactured instruments that have been remanufactured by a third party pursuant to and in compliance with a 510(k) clearance or equivalent granted by the FDA." Dkt. 244-5 at ¶ 45, Dkt. 137-2 at ¶¶ 45-46.

1   **Disputed** Instruction No. 66 Re No Antitrust Injury for Illegal Business Offered by **Intuitive**[80]

2          The antitrust laws do not prevent injury stemming from the inability to sell illegal

3   products.  Thus, in order to establish antitrust injury, SIS must prove by a preponderance of the

4   evidence that its business was lawful.

5          If you conclude, under my prior instruction, that SIS has not proved it could lawfully

6   insert a memory chip into an EndoWrist to change its usage limit without having obtained 510(k)

7   clearance from the FDA to engage in remanufacturing, then you must find that SIS has not

8   proved an antitrust injury, and accordingly must find for Intuitive on all of SIS's claims.

---

[80] Notwithstanding the Court's summary judgment rulings, *see* Dkt. 204 at 12–13, Intuitive respectfully submits that this instruction should be given consistent with prevailing law, and preserves all appellate rights with respect to it.  *See* 3A FED. JURY PRAC. & INSTR., Ch. 150: Introduction § 1.a (6th ed. 2012) ("A private antitrust plaintiff must show not only the violation of an antitrust statute and an injury, but that the injury was an antitrust injury, *i.e.* an 'injury of the type that antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'" (quoting *Atl. Richfield Co.* v. *USA Petroleum Co.*, 495 U.S. 328, 334 (1990))); *PharmacyChecker.com* v. *Nat'l Assoc. of Bds. of Pharmacy*, 2022 WL 347669, at *3 (S.D.N.Y. Feb. 4, 2022) ("Plaintiff bears the burden of proving that its business is legal."); *In re Wellbutrin XL Antitrust Litig. Indirect Purchaser Class*, 868 F.3d 132, 163–65 (3d Cir. 2017) (Plaintiff "must point to evidence affirmatively showing" that it satisfied the legal requirements to engage in the business at issue); *In re Can. Imp. Antitrust Litig.*, 470 F.3d 785, 791 (8th Cir. 2006) (antitrust claim dismissed where claimed injury was caused by FDA import restrictions and not defendants' conduct); *see also RSA Media* v. *AK Media Grp.*, 260 F.3d 10, 15 (1st Cir. 2001) (no antitrust injury where alleged injury stemmed from regulatory scheme that prevented plaintiff's construction of new billboards, rather than defendant's policy of tearing down billboards that were no longer being used).

**Disputed** Instruction No. 66 Re No Antitrust Injury for Illegal Business Offered by **SIS**

SIS objects to this instruction as contrary to well-established law, for example, as detailed in the Court's summary judgment ruling (Dkt. 204).

Stipulated Instruction No. 67 Re Damages for Competitors--Preparedness to Enter Business

SIS claims that it was harmed because Intuitive's alleged antitrust violation prevented it from entering a new line of business: repair of EndoWrist instruments. To recover damages, it is not necessary that SIS actually have entered into this new line of business if you find that Intuitive's alleged antitrust violation prevented SIS from entering into this new business line. SIS must prove, however, that it had an intention to enter into this new line of business and that it had taken concrete steps to prepare to do so.

In determining whether or not SIS has demonstrated the intention and preparedness to enter this new line of business, you may consider such elements as the following: the background and experience of the principals and employees of SIS; the ability of SIS to finance the new line of business and to purchase the necessary facilities and equipment; and concrete and discernible steps taken by SIS to enter into this new line of business. Ultimately, to award SIS damages related to its failure to enter this new business line, you must determine that had it not been for Intuitive's alleged antitrust violation, SIS would have entered that business of repairing EndoWrist instruments.

**Source**:

*SIS Citation:* AMERICAN BAR ASSOCIATION - Model Jury Instructions in Civil Antitrust Cases B-321, 2016 Edition.

*Intuitive Citation:* MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 6 – Causation and Damages – Damages, Instruction 11: Damages for Competitors—Preparedness to Enter Business (AM. BAR ASS'N ANTITRUST L. SECTION 2016).

**Disputed** Instruction No. 68 Re Basis for Calculating Damages Offered by **SIS**

It might be difficult for you to measure SIS's damages in this case. However, the fact that it might be difficult to determine the amount of SIS's damages should not affect SIS's recovery. The law allows a party injured by conduct which violates the Sherman Act to collect damages even if the evidence does not reflect how those damages are to be calculated with mathematical precision.

This does not mean, however, that you may determine SIS's damages on the basis of mere speculation or guesswork. Rather you must look to the evidence presented to you and make a fair and reasonable estimate of SIS's damages based on that evidence.

The amount of damages must have a reasonable basis in the evidence and must be based on reasonable, non-speculative assumptions and estimates. Damages may not be based on guesswork or speculation. SIS must prove the reasonableness of each of the assumptions upon which the damages calculation is based.

If you find that SIS has provided a reasonable basis for determining damages, then you may award damages based on a just and reasonable estimate supported by the evidence.

If you find that SIS has failed to carry its burden of providing a reasonable basis for determining damages, then you may not award damages.

**Authorities:** The Supreme Court has recognized that "[t]he vagaries of the marketplace usually deny us sure knowledge of what plaintiff's situation would have been in the absence of defendant's antitrust violation." *J. Truett Payne Co. v. Chrysler Motors Corp*., 451 U.S. 557, 566 (1981); Accordingly, "a lightened burden of proof is imposed on a plaintiff seeking to prove antitrust damages once violations of the law have been established." *Reid Bros. Logging Co. v. Ketchikan Pulp Co.*, 699 F.2d 1292, 1299 (9th Cir. 1983); *see, e.g., Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433 (2013) (damages calculations "need not be exact" at the class certification stage, but must be consistent with plaintiff's theory of liability); Although there is a relaxed standard of proof as to the amount of damage, the Supreme Court has made clear that a damage award may not be based on "speculation or guesswork." *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264 (1946); *Farley Transp. Co. v. Santa Fe Trail Transp. Co*., 786 F.2d 1342, 1350-51 (9th Cir. 1985) (no damages may be awarded where jury required to speculate).

1
2
3
4

**Sources**: AMERICAN BAR ASSOCIATION Model Jury Instructions in Civil Antitrust Cases

B-3, 2016 Edition; Modern Federal Jury Instructions-Civil Form 485a-79-26, Copyright 2023,

Matthew Bender & Company, Inc., a member of the LexisNexis Group.

5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Disputed** Instruction No. 68 Re Basis for Calculating Damages Offered by **Intuitive**[81]

You are permitted to make just and reasonable estimates in calculating SIS's damages. You are not required to calculate damages with mathematical certainty or precision. However, the amount of damages must have a reasonable basis in the evidence and must be based on reasonable, non-speculative assumptions and estimates. Damages may not be based on guesswork or speculation. SIS must prove the reasonableness of each of the assumptions upon which the damages calculation is based.

If you find that SIS has provided a reasonable basis for determining damages, then you may award damages based on a just and reasonable estimate supported by the evidence.

If you find that SIS has failed to carry its burden of providing a reasonable basis for determining damages, then you may not award damages, or you may award nominal damages not to exceed one dollar.

---

[81] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 6  Causation and Damages Damages, Instruction 3:  Basis for Calculating Damages (AM. BAR ASS'N ANTITRUST L. SECTION 2016).

1   **Disputed** Instruction No. 69 Re Causation and Disaggregation Offered by **Intuitive**[82]

2       If you find that Intuitive violated the antitrust laws and that SIS was injured by that

3   violation, SIS is entitled to recover for such injury that was the direct result or likely

4   consequence of the unlawful acts of Intuitive.  SIS bears the burden of showing that its injuries

5   were caused by Intuitive's antitrust violation, as opposed to any other factors.  If you find that

6   SIS's alleged injuries were caused in part by Intuitive's alleged antitrust violation and in part by

7   other factors, then you may award damages only for that portion of SIS's alleged injuries that

8   was caused by Intuitive's alleged antitrust violation.

9       SIS claims that it suffered injury because it lost sales and profits as a result of Intuitive's

10  alleged violations of the antitrust laws.  Intuitive claims that any profits or sales lost by SIS

11  occurred as a result of other factors that have nothing to do with the alleged antitrust violations.

12  These include SIS's failure to seek and obtain clearance from the FDA or authorization from

13  Intuitive to sell modified EndoWrists; SIS's reliance on Rebotix to provide parts and services,

14  rather than developing its own processes; SIS's lack of preparedness to launch a business based

15  on "resetting" X/Xi EndoWrists, as opposed to S/Si EndoWrists; and preference by customers

16  for purchasing EndoWrists from the original manufacturer for patient safety, regulatory, and

17  liability concerns.  SIS is not entitled to recover for lost profits that resulted solely from these or

18  other causes arising from the normal course of business activity.  The presence of these factors

19  does not mean SIS did not suffer antitrust injury, but SIS is not entitled to recovery for damages

20  caused by them.  SIS only may recover for damages caused by the alleged antitrust violations.

21      SIS bears the burden of proving damages by a preponderance of the evidence, including

22  apportioning damages between lawful and unlawful causes.  If you find that SIS has not

23  established a reasonable basis to apportion its alleged injuries between lawful and unlawful

24  causes, or that apportionment can only be accomplished through speculation or guesswork, then

---

[82] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 6 – Causation and Damages – Damages, Instruction 4:  Causation and Disaggregation (AM. BAR ASS'N ANTITRUST L. SECTION 2016).  The underlined text has been added, in accordance with model instruction's directive to "list, as appropriate, defendant's examples of ways plaintiff could lose sales in the normal course of competitive business activity."

1  you may not award any damages at all.  If you find that the SIS was injured by Intuitive's alleged

2  antitrust violations, and there is a reasonable basis to apportion its alleged injuries between

3  lawful and unlawful causes, then you may award damages.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**Disputed** Instruction No. 69 Re Causation and Disaggregation Offered by **SIS**

2

3

    SIS objects to Intuitive's proposed instruction. The proposed instruction is overly

4

argumentative, misleading and creates a substantial risk of confusing the jury. Further, SIS

5

submits that this instruction is a further attempt by Intuitive to inject into the case matters that are

6

not at issue, such as related to the FDA (see SIS's explanation above with respect to disputed

7

instruction 65 offered by Intuitive).

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Disputed** Instruction No. 70 Re Damages for Competitors -- Lost Profits Offered by **SIS**

SIS claims that it was harmed because it lost profits as a result of Intuitive's alleged antitrust violation. If you find that Intuitive committed an antitrust violation and that this violation caused injury to SIS, you now must calculate the profits, if any, that SIS lost as a result of Intuitive's antitrust violation.

Lost profits for which SIS can recover are the net profits SIS would have earned, both in the past and in the future, had it not suffered injury as a result of the violation of the antitrust laws. Thus your award of lost profits should be your reasonable estimate of the amounts SIS would have earned in the past and in the future less the amount SIS actually earned and can be expected to earn. I remind you that your award of damages must be fairly based on the evidence which has been presented to you. You may not simply speculate as to the past or future profits SIS may have lost.

The fact that SIS's business is new or not yet established does not prevent you from determining its lost earnings. In making this determination, you may consider the risks of the business world, the experience and performance of SIS's officers, the performance of SIS as it conducted its business, the competition which SIS would have encountered in the area, and the general market conditions of the area of business.

**Authorities:** *Pierce v. Ramsey Winch Co.*, 753 F.2d 416, 439 (5th Cir. 1985); *Locklin v. Day-Glo Color Corp.*, 429 F.2d 873, 880 (7th Cir. 1970); *Hobart Bros. Co. v. Malcolm T. Gilliand, Inc.*, 471 F.2d 894, 902-03 (5th Cir. 1973).

**Sources**: AMERICAN BAR ASSOCIATION Model Jury Instructions in Civil Antitrust Cases B-8, 2016 Edition; Modern Federal Jury Instructions-Civil Form 485a-79-27, Copyright 2023, Matthew Bender & Company, Inc., a member of the LexisNexis Group.

1  **Disputed** Instruction No. 70 Re Damages for Competitors -- Lost Profits Offered by **Intuitive**[83]

2    SIS claims that it was harmed because it lost profits as a result of Intuitive's alleged

3  antitrust violation. If you find that Intuitive committed an antitrust violation and that this

4  violation caused injury to SIS, you now must calculate the profits, if any, that SIS lost as a result

5  of Intuitive's antitrust violation.  To calculate lost profits, you must calculate net profit: the

6  amount by which plaintiff's gross revenues would have exceeded all of the costs and expenses

7  that would have been necessary to produce those revenues.

[83] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 6  Causation and Damages Damages, Instruction 8:  Damages for Competitors – Lost Profits (AM. BAR ASS'N ANTITRUST L. SECTION 2016).

1    **Disputed** Instruction No. 71 Re Damages for Competitors -- Future Lost Profits Offered by **SIS**

2    SIS claims that it was harmed because, had it not been for Intuitive's alleged antitrust

3    violation, SIS would have earned profits for 2 years into the future. If you find that Intuitive

4    committed an antitrust violation and that this violation caused injury to SIS, you now must

5    calculate the future profits, if any, that SIS lost as a result of Intuitive's antitrust violation.

6    To calculate future lost profits, you must make a reasonable estimate of (1) the amount of

7    profits, if any, that SIS would have earned in future years, and (2) the length of time for which it

8    would have earned those profits. In making this calculation, you are not required to calculate future

9    lost profits with absolute mathematical certainty or precision, but you must not engage in

10   guesswork or speculation. In making this determination, you must consider the various factors that

11   could affect the future success of SIS's business, such as general market or economic conditions,

12   lawful competition SIS would face in the future, SIS's management of business, changes in

13   technology or other business conditions, and other factors affecting SIS's future performance.

14   Your determination of future lost profits must have a reasonable basis in the evidence and

15   cannot be speculative. If there is no evidence from which you can make a reasonable estimate of

16   lost future profits, you may not award damages for future lost profits.

17   In calculating future lost profits, you must calculate net profit. In simple terms, net profit

18   is gross revenues minus all of the costs and expenses that would be necessary to produce those

19   revenues.

20   If you award damages for future lost profits, you must discount the amount to its present

21   value, using a discount rate of interest that you find reasonable. This is because the right to receive

22   a certain sum of money at a future date is worth less than the same amount of money in hand today-

23   -this is known as the time value of money. For example, if you had a choice to receive $ 1,000

24   today or a year from now, you would be better off receiving the money today and earning interest

25   on it for a year--you would then have something more than $ 1,000 in a year from now. Similarly,

26   if you had a right to $ 1,000 a year from now and you asked for the money today, the person owing

27   you the money a year from now could properly give you a lower amount, reflecting the value that

28   could be earned on that money over the next year. This lower amount is known as an amount

     discounted to present value.

**Authorities:** *St. Louis Southwestern Ry. Co. v. Dickerson*, 470 U.S. 409, 412 (1985); *Zenith Radio Corp. v. Hazeltine Research*, 401 U.S. 321, 338-40 (1971); *Los Angeles Mem'l Coliseum Comm'n*

1    *v. NFL*, 791 F.2d 1356 (9th Cir. 1986).

2

3    **Source**: AMERICAN BAR ASSOCIATION

4    Model Jury Instructions in Civil Antitrust Cases B-9, 2016 Edition.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Disputed** Instruction No. 71 Re Damages for Competitors -- Future Lost Profits Offered by **Intuitive**[84]

SIS claims that it was harmed because, had it not been for Intuitive's alleged antitrust violation, SIS would have earned profits into the future, through 2025.  If you find that Intuitive committed an antitrust violation and that this violation caused injury to SIS, you now must calculate the future profits, if any, that SIS lost as a result of Intuitive's antitrust violation.

To calculate future lost profits, you must make a reasonable estimate of (1) the amount of profits, if any, that SIS would have earned in future years, and (2) the length of time for which it would have earned those profits.  In making this calculation, you are not required to calculate future lost profits with absolute mathematical certainty or precision, but you must not engage in guesswork or speculation.  In making this determination, you must consider the various factors that could affect the future success of SIS's business, such as general market or economic conditions, lawful competition SIS would face in the future, SIS's management of business, changes in technology or other business conditions, and other factors affecting SIS's future performance.

Your determination of future lost profits must have a reasonable basis in the evidence and cannot be speculative.  If there is no evidence from which you can make a reasonable estimate of lost future profits, you may not award damages for future lost profits.

In calculating future lost profits, you must calculate net profit.  In simple terms, net profit is gross revenues minus all of the costs and expenses that would be necessary to produce those revenues.

If you award damages for future lost profits, you must discount the amount to its present value, using a discount rate of interest that you find reasonable.  This is because the right to receive a certain sum of money at a future date is worth less than the same amount of money in hand today—this is known as the time value of money.  For example, if you had a choice to

---

[84] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 6 – Causation and Damages – Damages, Instruction 9:  Damages for Competitors – Future Lost Profits (AM. BAR ASS'N ANTITRUST L. SECTION 2016).

receive $1,000 today or a year from now, you would be better off receiving the money today and

earning interest on it for a year—you would then have something more than $1,000 in a year

from now.  Similarly, if you had a right to $1,000 a year from now and you asked for the money

today, the person owing you the money a year from now could properly give you a lower

amount, reflecting the value that could be earned on that money over the next year.  This lower

amount is known as an amount discounted to present value.  <u>The rate of return to be applied in</u>

<u>determining present value should be the interest that can reasonably be expected from safe</u>

<u>investments that can be made by a person of ordinary prudence, who has ordinary financial</u>

<u>experience and skill</u>.[85]

---

[85] The underlined text, which comes from the Ninth Circuit model jury instructions, has been
added to the model instruction, to explain what rate of return the jury should apply when
discounting future lost profits to present value.  *See* MANUAL OF MODEL CIVIL JURY
INSTRUCTIONS FOR THE DISTRICT COURTS OF THE NINTH CIRCUIT § 5.4 (9th Cir. Jury Instructions
Comm. 2017 ed.).

1    **Disputed** Instruction No. 72 Re Mitigation of Damages Offered by **Intuitive**[86]

2        SIS may not recover damages for any portion of its injuries that it could have avoided

3    through the exercise of reasonable care and prudence.  SIS is not entitled to increase any

4    damages through inaction.  The law requires an injured party to take all reasonable steps it can to

5    avoid further injury and thereby reduce its loss.  If SIS failed to take reasonable steps available to

6    it, and the failure to take those steps resulted in greater harm to SIS than it would have suffered

7    had it taken those steps, then SIS may not recover any damages for that part of the injury it could

8    have avoided.

9        Intuitive has the burden of proof on this issue.  Intuitive must prove by a preponderance

10   of the evidence that SIS:

11       (1)    acted unreasonably in failing to take specific steps to minimize or limit its

12              losses;

13       (2)    that the failure to take those specific steps resulted in its losses being

14              greater than they would have been had it taken such steps; and

15       (3)    the amount by which SIS's loss would have been reduced had SIS taken

16              those steps.

17       In determining whether SIS failed to take reasonable measures to limit its damages, you

18   must remember that the law does not require SIS to take every conceivable step that might

19   reduce its damages.  The evidence must show that SIS failed to take commercially reasonable

20   measures that were open to it.  Commercially reasonable measures mean those measures that a

21   prudent businessperson in SIS's position would likely have adopted, given the circumstances as

22   they appeared at that time.  SIS should be given wide latitude in deciding how to handle the

23   situation, so long as what SIS did was not unreasonable in light of the existing circumstances.

24

25

26

27

28   ---
[86] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 6 – Causation and Damages – Damages, Instruction 14:  Mitigation (AM. BAR ASS'N ANTITRUST L. SECTION 2016).

1

**Disputed** Instruction No. 72 Re Mitigation of Damages Offered by **SIS**

2

      SIS objects to Intuitive's proposed instruction. The proposed instruction is overly

3

argumentative, misleading and creates a substantial risk of confusing the jury. Further, SIS

4

submits that this instruction is unnecessary in view of the fact that mitigation is not at issue

5

because Intuitive has not asserted SIS failed to mitigate its damages.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PARTIES' JOINT PROPOSED JURY INSTRUCTIONS
Case No. 3:21-cv-03496-AMO

1

**INTUITIVE'S COUNTERCLAIMS**

2

Stipulated Instruction No. 73 Re Intuitive's Counterclaims

3

Now, I will instruct you on the law regarding Intuitive's counterclaims against SIS.

4

Intuitive brings a claim against SIS under the federal Lanham Act, 15 U.S.C. § 1125,

5

based on false advertising and unfair competition.[87]

6

Intuitive also brings two claims against SIS under California law:  one for unfair

7

competition under California's common law, and one for intentional interference with

8

contractual relations under California's common law.[88]

9

I will discuss each of these claims in turn.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

[87] Answer (Dkt. 75) p. 39, Counterclaims ¶ 85.
[88] Answer (Dkt. 75) p. 39, Counterclaims ¶¶ 102, 106.

**A.      Intuitive's Lanham Act Claim**

<u>**Disputed**</u> Instruction No. 74 Re Lanham Act – Elements of False Statement Claim Offered by <u>**Intuitive**</u>

Intuitive claims that SIS is liable for unfair competition and false advertising under the Lanham Act, 15 U.S.C. § 1125.   Specifically, Intuitive alleges that in its marketing materials and communications disseminated to potential and actual customers, SIS has made numerous false and misleading statements,  including but not limited to statements that misrepresent:  (i) the nature, efficacy, and/or safety of the service SIS coordinates; (ii) that "repaired" EndoWrists meet applicable quality and functional requirements; (iii) that devices "serviced" through SIS had been repaired to meet "original specifications" of EndoWrists and are safe to use; (iv) that SIS itself developed, has tested and conducts the "repairs;" (v) that use of the service will result in substantial cost savings; (vi) that use of the service does not carry any adverse financial, legal or other consequences (*e.g.*, voiding Intuitive customers' warranties); (vii) that use limits built into EndoWrists are "arbitrary" or Intuitive otherwise is not trustworthy; and (viii) that SIS and/or the "repair" service is authorized, approved, or endorsed by Intuitive.[89]  Intuitive further alleges that customer confusion as to the source or affiliation of the "repaired" instruments is exacerbated by SIS's communications that misinform customers that "a repaired EndoWrist® is not an alternative or replacement device," but rather "an original da Vinci® manufactured device that has been repaired to original specifications."[90]

To prevail on its claim for unfair competition and false advertising under the Lanham Act, Intuitive must prove by a preponderance of the evidence:

   1.      SIS's advertisements were false or misleading;

   2.      SIS's advertisements deceived, or had the capacity to deceive, customers;

   3.      The deception had a material effect on purchasing decisions, meaning that it was likely to influence customers' purchasing decisions;

   4.      The misrepresentation affected interstate commerce; and

---

[89] Answer (Dkt. 75) Counterclaims ¶ 85.
[90] Answer (Dkt. 75) Counterclaims ¶ 86.

1        5.        Intuitive has been injured as a result of the false advertising.[91]

2        If you find that the evidence is insufficient to prove any one or more of these elements,

3   then you must find for SIS and against Intuitive on Intuitive's unfair competition and false

4   advertising claim.  If you find that the evidence is sufficient to prove all of the elements, then

5   you must find for Intuitive and against SIS on Intuitive's unfair competition and false advertising

6   claim.

---

[91] *Southland Sod Farms* v. *Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997); *Newcal Indus., Inc.* v. *Ikon Office Solution*, 513 F.3d 1038, 1052 (9th Cir. 2008); FED. CIVIL JURY INSTRUCTIONS OF THE SEVENTH CIRCUIT § 13.3.1 (Committee on Pattern Civil Jury Instructions 7th Cir. 2017 ed.); PATTERN JURY INSTRUCTIONS OF THE ELEVENTH CIRCUIT § 10.8 (Committee on Pattern Jury Instructions 11th Cir. 2024 ed.);  MANUAL OF MODEL CIVIL JURY INSTRUCTIONS FOR THE DISTRICT COURTS OF THE EIGHTH CIRCUIT § 21.43 (Committee on Model Jury Instructions 8th Cir. 2023 ed.).

**Disputed** Instruction No. 74 Re Lanham Act – Elements of False Statement Claim Offered by **SIS**

Intuitive has claimed that SIS has engaged in unfair competition and false advertising in violation of federal law. To establish this claim, Intuitive has the burden of proving each of the following by a preponderance of the evidence:

1.  SIS used in commerce a false designation of origin, false description of fact, misleading description of fact, false representation of fact, or misleading representation of fact on or in connection with any services;

2.  The use of the false designation of origin or misleading description of fact is likely to cause confusion as to the origin of SIS's goods; the affiliation or association of SIS with Intuitive; or the approval by Intuitive of SIS's sale of services in markets that were not in fact authorized by Intuitive; and

3.  INTUITIVE was and is likely to be damaged by SIS's actions.

**Source/Authority**: 15 U.S.C. 1125(a)(1); 90 Am. Jur. Proof of Facts 3d 95 (Originally published in 2006); BIOTAB NUTRACEUTICALS, INC., v. BEAMONSTAR, LLC,  2011 WL 13006813 (C.D.Cal.)

1  Stipulated Instruction No. 75 Re False or Misleading

2      There are two ways in which SIS's advertisements may be false or misleading:  they may

3  be literally false, or they may be literally true but misleading.  If an advertisement is literally

4  false, then it is presumed to deceive, or to have the capacity to deceive, customers, and Intuitive

5  need not prove that deception.[92]  When evaluating whether an advertising statement is literally

6  false, the statement must be analyzed in its full context.[93]

7      If you find that Intuitive has proved that SIS made false or misleading statements, then

8  you must assess the other elements of Intuitive's false advertising claim.  If you find that

9  Intuitive has not proved that SIS made false or misleading statements, then you must find for SIS

10  on Intuitive's false advertising claim.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

---

26  [92] *Appliance Recycling Ctrs. of Am., Inc.* v. *JACO Environmental, Inc.*, 378 F. App'x 652, 655 (9th Cir. 2010) (citing *Southland Sod Farms* v. *Stover Seed Co.*, 108 F.3d 1134, 1140 (9th Cir. 1997)) (endorsing presumption of deception for literally false statements); *AECOM Energy &*

27  *Constr., Inc.* v. *Morrison Knudsen Corp.*, 748 F. App'x 115, 119 (9th Cir. 2018) ("Because [the statements] are literally false, we need not consider the impact on the buying public.").

28  [93] *Southland Sod Farms* v. *Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997).

1 | **Disputed** Instruction No. 76 Re Commercial Advertisement or Promotion Offered by **Intuitive**[94]

2 |       To constitute commercial advertising or promotion, a statement of fact must have been

3 | commercial speech, by SIS, for the purpose of influencing consumers to buy SIS's goods or

4 | services.  While the statement need not be made in a classic advertising campaign, but may

5 | consist instead of more informal types of promotion, the statement must have been disseminated

6 | sufficiently to the potential customers to constitute advertising or promotion within that industry.

7 |       If you find that Intuitive has proved that SIS's false or misleading statements were made

8 | in a commercial advertisement or promotion, then you must assess the other elements of

9 | Intuitive's unfair competition and false advertising claim.  If you find that Intuitive has not

10 | proved that SIS's false or misleading statements were made in a commercial advertisement or

11 | promotion, then you must find for SIS on Intuitive's unfair competition and false advertising

12 | claim.

---

[94] *Newcal Indus., Inc.* v. *Ikon Office Solution*, 513 F.3d 1038, 1054 (9th Cir. 2008) (citing *Coastal Abstract Service, Inc.* v. *First Am. Title Ins. Co.*, 173 F.3d 725, 735 (9th Cir. 1999)).

**Disputed** Instruction No. 76 Re Commercial Advertisement or Promotion Offered by **SIS**

To constitute commercial advertising or promotion, a statement of fact must have been commercial speech, by SIS, for the purpose of influencing consumers to buy SIS's goods or services. While the statement need not be made in a classic advertising campaign, but may consist instead of more informal types of promotion, the statement must have been disseminated sufficiently to the potential customers to constitute advertising or promotion within that industry. However, a handful of statements to customers does not trigger protection from the Lanham Act unless the potential purchasers in the market are relatively limited in number.

If you find that Intuitive has proved that SIS's false or misleading statements were made in a commercial advertisement or promotion, then you must assess the other elements of Intuitive's false advertising claim.  If you find that Intuitive has not proved that SIS's false or misleading statements were made in a commercial advertisement or promotion, then you must find for SIS on Intuitive's false advertising claim.

*Walker & Zanger, Inc. v. Paragon Indus.*, 465 F. Supp. 2d 956, 969 (N.D. Cal. 2006) --- A handful of statements to customers does not trigger protection from the Lanham Act unless "the potential purchasers in the market are relatively limited in number," *Coastal Abstract Serv, Inc v First Am Title Ins Co*, 173 F3d 725 (9th Cir 1999).

**Disputed** Instruction No. 77 Re Lanham Act Injury Offered by **Intuitive**

Intuitive must prove by a preponderance of the evidence that it has suffered injury to a commercial interest in sales or business reputation as a result of SIS's statement, either by a direct loss of sales or a lessening of the goodwill associated with its products.[95]  This can be proved in a number of ways.  For example, injury can be proved by showing that SIS having made false statements induced customers to switch their purchasing decisions, and purchase replacement or repaired EndoWrists from SIS instead of from Intuitive.[96]  Injury could also be proved by showing that SIS cast aspersions on Intuitive's business or damaged Intuitive's products' reputation.[97]  Injury could also be proved if SIS's false or misleading statements reduced Intuitive's business by causing customers to demand fewer EndoWrists.[98]

If you find that Intuitive has proved that SIS's false or misleading statements caused injury to Intuitive, then you should assess the other elements of Intuitive's unfair competition and false advertising claim.  If you find that Intuitive has not proved that SIS's false or misleading statements caused injury to Intuitive, then you must find for SIS on Intuitive's unfair competition and false advertising claim.

---

[95] *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1136 (9th Cir. 1997); *Newcal Indus., Inc.* v. *Ikon Office Solution*, 513 F.3d 1038, 1052 (9th Cir. 2008); FED. CIVIL JURY INSTRUCTIONS OF THE SEVENTH CIRCUIT § 13.3.1 (Committee on Pattern Civil Jury Instructions 7th Cir. 2017 ed.); PATTERN JURY INSTRUCTIONS OF THE ELEVENTH CIRCUIT § 10.8 (Committee on Pattern Jury Instructions 11th Cir. 2024 ed.);  MANUAL OF MODEL CIVIL JURY INSTRUCTIONS FOR THE DISTRICT COURTS OF THE EIGHTH CIRCUIT § 21.43 (Committee on Model Jury Instructions 8th Cir. 2023 ed.).

[96] *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 137–40 (2014).

[97] *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 137–40 (2014).

[98] *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 137–40 (2014).

**Disputed** Instruction No. 77 Re Lanham Act Injury Offered by **SIS**

SIS objects to Intuitive's proposed instruction. The proposed instruction is overly argumentative, misleading and creates a substantial risk of confusing the jury. Further, SIS submits that this instruction is largely repetitive and unnecessary in view of at least previously proposed Instruction No. 72 above presented by SIS. Subject to the foregoing, SIS offers the following alternative instruction.

Intuitive must prove by a preponderance of the evidence that it has suffered injury to a commercial interest in sales or business reputation as a result of SIS's false or misleading statement, either by a direct loss of sales or a lessening of the goodwill associated with its products. A statement is misleading if it conveys a false impression and actually deceives consumers. This can be proved in a number of ways.  For example, injury can be proved by showing that SIS having made false statements that actually deceived or had the tendency to deceive a substantial segment of SIS's audience, induced customers to switch their purchasing decisions, and purchase replacement or repaired EndoWrists from SIS instead of from Intuitive. Injury could also be proved by showing that SIS cast aspersions on Intuitive's business or damaged Intuitive's products' reputation.  Injury could also be proved if SIS's false or misleading statements reduced Intuitive's business by causing customers to demand fewer EndoWrists.

If you find that Intuitive has proved that SIS's false or misleading statements caused injury to Intuitive, then you should assess the other elements of Intuitive's false advertising claim.  If you find that Intuitive has not proved that SIS's false or misleading statements of fact about its repair service or about Intuitive's products caused injury to Intuitive, then you must find for SIS on Intuitive's false advertising claim.

**B.     Intuitive's Common Law Unfair Competition Claim**

**Disputed** Instruction No. 78 Re Common Law Unfair Competition Offered by **Intuitive**

Intuitive claims that SIS's conduct constitutes unfair competition under California's common law.  The essence of the tort of unfair competition is the inequitable pirating of the fruits of another's labor and then either "palming off" those fruits as one's own through deception, or simply gaming from them an unearned commercial benefit.[99]

To prevail on this claim, Intuitive must prove that:

1.     SIS subjectively and knowingly intended to confuse buyers of EndoWrists by passing off its products in such manner as to induce those customers to believe that SIS's repaired EndoWrists were identical to original EndoWrists sold by Intuitive;

2.     Customers for EndoWrists were likely to be confused, meaning they were misled into thinking that SIS's repaired EndoWrists were actually identical to original EndoWrists sold by Intuitive; and

3.     SIS thereby caused Intuitive a competitive injury, meaning that Intuitive must have suffered some actual economic harm to its business that was caused by SIS's deception of Intuitive's actual and potential customers.[100]

If you find that Intuitive has proved each of these elements by a preponderance of the evidence, then you must find for Intuitive and against SIS on Intuitive's common law unfair competition claim.  If you find that Intuitive has not proved each of these elements by a preponderance of the evidence, then you must find for SIS and against Intuitive on Intuitive's common law unfair competition claim.

---

[99] *Rider Clothing LLC* v. *Boardriders, Inc.*, 2019 WL 8163813, at *5 (C.D. Cal. Nov. 26, 2019).
[100] *Rider Clothing LLC* v. *Boardriders, Inc.*, 2020 WL 4578700, at *3 (C.D. Cal. Aug. 7, 2020); *Fisher* v. *Dees*, 794 F.2d 432, 440 (9th Cir. 1986); *TMC Aerospace, Inc.* v. *Elbit Sys. of Am. LLC*, 2016 WL 3475322, at *8 (C.D. Cal. Jan. 29, 2016).

1

**Disputed** Instruction No. 78 Re Common Law Unfair Competition Offered by **SIS**

2

3

4

5

6

Intuitive contends that SIS has engaged in unfair competition in violation of common law. If you find that SIS has engaged in federal unfair competition, you should also find that they have engaged in California statutory and common law unfair competition.  If you find that SIS has not engaged in federal unfair competition, then you should find that they have not engaged in California statutory and common law unfair competition.

7

8

9

**Source/Authority**: Enesco Corp. v. Price/Costco, Inc., 146 F.3d 1083, 1084 n.1 (9th Cir. 1998); Cal. Bus. & Prof. Code § 17200; Ninth Circuit Manual of Model Jury Instructions: Civil § 15.5 (2024); Cleary v. News Corp., 30 F.3d 1255, 1262-63 (9th Cir. 1994).

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**C.     Intuitive's Tortious Interference with Contract Claim**

**Disputed** Instruction No. 79 Re Tortious Interference with Contract Offered by **Intuitive**[101]

Intuitive claims that SIS intentionally interfered with the  contracts between it and certain customers.  To establish this claim, Intuitive must prove all of the following:

> (1)     That there was a contract between Intuitive and each of its customers at issue;
>
> (2)     That SIS knew of such contracts;
>
> (3)     That SIS's conduct prevented performance of the contract by Intuitive or made performance more expensive or difficult;
>
> (4)     That SIS intended to disrupt the performance of the contracts between Intuitive and its customers, or knew that disruption of performance was certain or substantially certain to occur;
>
> (5)     That Intuitive was harmed; and
>
> (6)     That SIS's conduct was a substantial factor in causing Intuitive's harm.

If you find that Intuitive has proved each of these elements by a preponderance of the evidence, then you must find for Intuitive and against SIS on Intuitive's tortious interference with contract claim.  If you find that Intuitive has not proved each of these elements by a preponderance of the evidence, then you must find for SIS and against Intuitive on Intuitive's tortious interference with contract claim.

---

[101] Judicial Council of California Civil Jury Instructions 2201 – Intentional Interference with Contractual Relations – Essential Factual Elements (2024 ed.); *Pacific Gas & Electric Co. v. BearStearns & Co.*, 50 Cal.3d 1118, 1126 (1990).

**Disputed** Instruction No. 79 Re Tortious Interference with Contract Offered by **SIS**

Intuitive claims that SIS intentionally interfered with the "Sales, License and Service Agreement" contracts between it and certain customers.  To establish this claim, INTUITIVE must prove all of the following:

        (1)  That there was a contract between Intutiive and each of the specifically identified customers;

        (2)  That SIS knew of the contract between Intuitive and each of the specifically identified customers;

        (3)  That SIS's conduct prevented performance of the contract by Intuitive or made performance more expensive or difficult;

        (4)  That SIS intended to disrupt the performance of the contract between Intuitive and each of the specifically identified customers;

        (5)  That Intuitive was harmed; and

        (6)  That SIS's conduct was a substantial factor in causing Intuitive's harm.

**Source**: CACI 2202 (2024).

**D.      Intuitive's Damages**

**Disputed** Instruction No. 80 Re Lost Profit Damages on Intuitive Counterclaims Offered by **Intuitive**

If you decide for Intuitive on the question of liability on its counterclaims, then you should consider the amount of money to award to Intuitive as damages.  By instructing you on damages, the Court does not mean to suggest for which party your verdict should be rendered.

Damages consist of the amount of money required to compensate Intuitive for the injury caused by SIS's conduct.[102]  Plaintiff must prove its damages by a preponderance of the evidence.[103]

For the claims of unfair competition, false advertising, or tortious interference with contracts, Intuitive asks to be awarded lost profit damages.  That is, Intuitive asks to be awarded the lost profits that it would have earned but for SIS's unfair competition, false advertising, or tortious interference with contracts.

To decide the amount of damages for lost profits, you must determine the gross amount Intuitive would have received but for SIS's conduct and then subtract from that amount the expenses Intuitive would have had if SIS's conduct had not occurred.[104]  The amount of the lost profits need not be calculated with mathematical precision, but there must be a reasonable basis for computing the loss.[105]

---

[102] FED. CIVIL JURY INSTRUCTIONS OF THE SEVENTH CIRCUIT § 13.6.3 (Committee on Pattern Civil Jury Instructions 7th Cir. 2017 ed.).
[103] FED. CIVIL JURY INSTRUCTIONS OF THE SEVENTH CIRCUIT § 13.6.3 (Committee on Pattern Civil Jury Instructions 7th Cir. 2017 ed.).
[104] Judicial Council of California Civil Jury Instructions 3903N – Lost Profits (2024 ed.); *see also* FED. CIVIL JURY INSTRUCTIONS OF THE SEVENTH CIRCUIT § 13.6.3 (Committee on Pattern Civil Jury Instructions 7th Cir. 2017 ed.) ("You may consider the following types of damages: Plaintiff's lost profits on lost sales, which consists of the revenue Plaintiff would have earned but for Defendant's infringement, less the expenses Plaintiff would have sustained in earning those revenues.").
[105] Judicial Council of California Civil Jury Instructions 3903N – Lost Profits (2024 ed.).

1

**Disputed** Instruction No. 80 Re Lost Profit Damages on Intuitive Counterclaims Offered by **SIS**

2

3

To recover damages for lost profits, Intuitive must prove it is reasonably certain it would

4

have earned profits but for SIS' conduct. To decide the amount of damages for lost profits, you

5

must determine the gross amount Intuitive would have received but for SIS's conduct and then

6

subtract from that amount the expenses Intuitive would have had if SIS's conduct had not

7

occurred. The amount of the lost profits need not be calculated with mathematical precision, but

8

there must be a reasonable basis for computing the loss.

9

10

CACI 3903N

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PARTIES' JOINT PROPOSED JURY INSTRUCTIONS
Case No. 3:21-cv-03496-AMO

Dated: October 28, 2024

By: */s/ Richard T. McCaulley*

Richard T. McCaulley (*pro hac vice*)
**MCCAULLEY LAW GROUP LLC**
E-Mail: 180 N. Wabash Avenue, Suite 601
Chicago, Illinois 60601
Telephone: (312) 330-8105
richard@mccaulleylawgroup.com

JOSHUA V. VAN HOVEN (CSB No. 262815)
3001 Bishop Dr., Suite 300
San Ramon, California 94583
Telephone: (925) 302-5941
E-Mail: josh@mccaulleylawgroup.com

*Attorneys for Plaintiff Surgical Instrument Service Company, Inc.*

Dated: October 28, 2024

By: */s/ Kenneth A. Gallo*

Kenneth A. Gallo

Kenneth A. Gallo (*pro hac vice*)
Paul D. Brachman (*pro hac vice*)
**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
2001 K Street, NW
Washington, DC 20006-1047
Telephone: (202) 223-7300
Facsimile: (202) 204-7420
Email: kgallo@paulweiss.com
Email: pbrachman@paulweiss.com

William B. Michael (*pro hac vice*)
Crystal L. Parker (*pro hac vice*)
Daniel A. Crane (*pro hac vice*)
**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
Email: wmichael@paulweiss.com
Email: cparker@paulweiss.com
Email: dcrane@paulweiss.com

PARTIES' JOINT PROPOSED JURY INSTRUCTIONS
Case No. 3:21-cv-03496-AMO

Joshua Hill Jr. (SBN 250842)
**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
535 Mission Street, 24th Floor
San Francisco, CA 94105
Telephone: (628) 432-5100
Facsimile: (628) 232-3101
Email: jhill@paulweiss.com

Sonya D. Winner (SBN 200348)
**COVINGTON & BURLING LLP**
415 Mission Street, Suite 5400
San Francisco, California 94105-2533
Telephone: (415) 591-6000
Facsimile: (415) 591-6091
Email: swinner@cov.com

Kathryn E. Cahoy (SBN 298777)
**COVINGTON & BURLING LLP**
3000 El Camino Real
5 Palo Alto Square, 10th Floor
Palo Alto, California 94306-2112
Telephone: (650) 632-4700
Facsimile: (650) 632-4800
Email: kcahoy@cov.com

Andrew Lazerow (pro hac vice)
**COVINGTON & BURLING LLP**
One City Center 850 Tenth Street NW
Washington DC 20001-4956
Telephone: (202) 662-6000
Facsimile: (202) 662-6291
Email: alazerow@cov.com

Allen Ruby (SBN 47109)
allen@allenruby.com
**ALLEN RUBY, ATTORNEY AT LAW**
15559 Union Ave. #138
Los Gatos, California 95032
Telephone: (408) 477-9690

*Attorneys for Defendant*
*Intuitive Surgical, Inc.*

1

**<u>E-Filing Attestation</u>**

2

I, Kenneth A. Gallo, am the ECF User whose ID and password are being used to file this

3

document.  In compliance with Civil Local Rule 5-1(i)(3), I hereby attest that each of the

4

signatories identified above have concurred in this filing.

5

6

*/s/ Kenneth A. Gallo*____

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PARTIES' JOINT PROPOSED JURY INSTRUCTIONS
Case No. 3:21-cv-03496-AMO