1

**MCCAULLEY LAW GROUP LLC**
JOSHUA V. VAN HOVEN (CSB No. 262815)

2   E-Mail: josh@mccaulleylawgroup.com
3001 Bishop Dr., Suite 300

3   San Ramon, California 94583
Telephone: 925.302.5941

4

5   RICHARD T. MCCAULLEY (*pro hac vice*)
E-Mail: richard@mccaulleylawgroup.com

6   180 N. Wabash Avenue, Suite 601
Chicago, Illinois 60601

7   Telephone: 312.330.8105

8   *Attorneys for Plaintiff and Counter-Defendant,*
SURGICAL INSTRUMENT SERVICE COMPANY, INC.

9               **UNITED STATES DISTRICT COURT**

10             **NORTHERN DISTRICT OF CALIFORNIA**

11   SURGICAL INSTRUMENT SERVICE          CASE NO. 3:21-CV-03496-AMO
     COMPANY, INC.
12                                        Honorable Araceli Martínez-Olguín
                 *Plaintiff/Counter-Defendant,*
13                                        **PLAINTIFF SIS's MOTION IN**
            v.                            **LIMINE #1**
14
     INTUITIVE SURGICAL, INC.
15
                 *Defendant/Counterclaimant.*
16

17

18

19

20

21

22

23

24

25

26

27

28

1

## <u>TABLE OF CONTENTS</u>

2

**RELIEF REQUESTED** .................................................................................................... **1**

3

**BACKGROUND** ............................................................................................................... **1**

4

**ARGUMENT** ..................................................................................................................... **5**

5

Legal Standards - Motions in Limine ................................................................................ 5

Admissibility of Relevant Evidence Under Federal Rules of Evidence 401, 402,

6

and 403 ................................................................................................................................ 5

7

Evidence Regarding FDA's 510(k) Framework and the Regulatory Term
"Remanufacturing," whether SIS or others' Activities Constitute

8

Remanufacturing, and Intuitive's Website Statement About FDA-Cleared
Remanufactured EndoWrists Should All be Excluded Under Fed. R. Evid. 402

9

and 403 ................................................................................................................................ 6

Curative Instruction .......................................................................................................... 7

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## TABLE OF AUTHORITIES

2

**Federal Statutes**
Food, Drug, and Cosmetic Act ............................................................................. 2, 3
Lanham Act ................................................................................................................. 2

**Federal Rules**
Federal Rule of Evidence 401 ............................................................................... 1, 5
Federal Rule of Evidence 402 ............................................................................... 5, 6
Federal Rule of Evidence 403 ........................................................................... 1, 5, 6

**Federal Regulations**
21 C.F.R. § 807.81 ....................................................................................................... 3

**United States Supreme Court Cases**
*Buckman Co. v. Plaintiffs' Legal Comm.*,
  531 U.S. 341 (2001) .................................................................................................. 2
*Luce v. United States*,
  469 U.S. 38 (1984) .................................................................................................... 5

**Federal Cases**
*Amarin Pharma, Inc. v. International Trade Commission*,
  923 F.3d 959 (Fed. Cir. 2019) ................................................................................. 2
*Campbell v. Boston Sci. Corp.*,
  882 F.3d 70 (4th Cir. 2018) ...................................................................................... 7
*Kaiser v. Johnson & Johnson*,
  947 F.3d 996 (7th Cir. 2020) .................................................................................... 6
*PhotoMedex, Inc. v. Irwin*,
  601 F.3d 919 (9th Cir. 2010) .................................................................................... 2
*United States v. Heller*,
  551 F.3d 1108 (9th Cir. 2009) .................................................................................. 5
*United States v. Lewis*,
  493 F. Supp. 3d 858 (C.D. Cal. 2020) .................................................................... 5


*Altair Instruments, Inc. v. Telebrands Corp.*,
  2021 WL 5238787 (C.D. Cal. Feb. 18, 2021) ......................................................... 5
*Carter v. Johnson & Johnson*,
  No. 2:20-cv-01232, 2022 U.S. Dist. LEXIS 178596, 2022 WL 4700549 (D. Nev. Sept. 29,
  2022) ........................................................................................................................... 6
*United States v. Holmes*,
  2021 WL 2044470 (N.D. Cal. November 6, 2021) ................................................. 6

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**RELIEF REQUESTED**

2      Plaintiff, Surgical Instrument Service Company, Inc. ("SIS") hereby moves in limine to

3  exclude all testimony[1], documentary evidence, and argument related to (1) the FDA's 510(k)

4  regulatory framework and procedures for clearance of medical devices for commercial

5  marketing, (2) the meaning, scope and application of the regulatory term "remanufacturing",

6  (4) whether SIS or other third parties' EndoWrist activities constitute "remanufacturing" or

7  require 510(k) approval; and (4) the meaning, scope, application and effect of Intuitive's

8  announcement on its website that buying FDA-cleared remanufactured EndoWrists does not

9  violate its contracts.

10     This evidence is irrelevant under Fed. R. Evid. 401 in light of the narrowed counterclaims

11 resulting from the Court's rulings on the parties' cross motions for summary judgment.

12 Moreover, permitting admission of this evidence at trial would be unduly prejudicial, mislead

13 the jury, confuse the issues and be a waste of trial time under Fed. R. Evid. 403. Admitting this

14 evidence would effectively permit Intuitive to invite the jury to hold SIS liable for conduct

15 which, under the Court's determinations regarding unresolved FDA issues, Intuitive has been

16 foreclosed from challenging.

17     To the extent the Court grants Intuitive any leeway to present evidence or testimony

18 mentioning the FDA, or that is used for other purposes and references, SIS requests that the

19 Court direct Intuitive to provide notice at the beginning of the trial day that evidence or

20 testimony related to the FDA will be presented to the jury.  In response to such notice, SIS

21 requests that the Court read the proposed cautionary instruction to the jury before any such

22 evidence is presented. The proposed cautionary instruction accompanies this motion as Van

23 Hoven Exh. 5.

24

**BACKGROUND**

25     Through the presentation of certain testimony and documentary exhibits at trial identified

26 above, Intuitive essentially is asking the jury to determine whether SIS's aftermarket

27

28

---

[1] For purposes of this motion, "testimony" includes lay person and expert testimony
presented at trial either live or through video recordings of deposition testimony.

EndoWrist-related services required Section 510(k) clearance from the FDA. This conflicts with the Court's ruling in the Order Re: Cross Motions for Summary Judgment (Dkt. 204 p. 10):

> "[T]his query is problematic because '[t]he FDCA [(Food, Drug, and Cosmetic Act)] leaves no doubt that it is the Federal Government rather than private litigants who are authorized to file suit for noncompliance with the medical device provisions.' *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 349 n.4 (2001). Indeed, a private action brought under the Lanham Act may not be pursued when it requires litigating an alleged underlying FDCA violation where the FDA has not itself concluded that a violation exists. *PhotoMedex, Inc. v. Irwin*, 601 F.3d 919, 924 (9th Cir. 2010) (affirming grant of summary judgment for defendant on Lanham Act false advertising claim where FDA had not taken a position on defendant's laser's need for Section 510(k) clearance, and claim was based on defendant allegedly misrepresenting that its laser had received FDA clearance). * * * [C]ourts have consistently precluded private actions which require establishing a violation of the FDCA. *See, e.g., Amarin Pharma, Inc. v. International Trade Commission*, 923 F.3d 959, 968 (Fed. Cir. 2019) (citing *PhotoMedex*, 601 F.3d at 924, 928) (finding that Lanham Act claim could not stand where it was "based on proving violations of the FDCA and where the FDA has not taken the position that the articles at issue do, indeed, violate the FDCA.")."

In this case, the Court has considered communications between FDA and third parties Restore, Rebotix, and Iconocare regarding their EndoWrist services (*id.* at 5:11-7:13), ultimately acknowledging that "FDA has expressly disclaimed concluding that a violation exists, and it has taken no final position on the need for 510(k) clearance here." *Id.* at 12:22-23. "The Court, as others before it, declines Intuitive's invitation to step into the FDA's shoes and determine whether SIS's services require 510(k) clearance." *Id.* at 13:4-5. Accordingly, the Court granted summary judgment to SIS on Intuitive's Lanham Act claims and unclean

1  hands defenses related to FDA 510(k) clearance. *Id.* at 11:14-14:28; *see also* Dkt. 240, Exhibit

2  A, Order Clarifying the Scope of the Court's Summary Judgment Order.

3      In its cross motion for summary judgment, Intuitive challenged SIS's antitrust claims on

4  a number of bases. Intuitive's first argument posited that SIS lacked antitrust injury because it

5  lacked 510(k) clearance for its services, and was rejected for the same reasons that SIS's

6  motion was granted, *i.e.*, "this Court will not permit Intuitive to seek private enforcement of

7  the FDCA, an issue upon which Intuitive's argument against injury causation rests." Dkt. 204

8  at 16:23-24.

9      Despite these definitive rulings relating to the FDA, Intuitive is asking the jury to

10  determine whether aftermarket EndoWrist services constitute "remanufacturing" under 21

11  C.F.R. § 807.81 by offering its services to consumers without first obtaining Section 510(k)

12  clearance. For example, **in its exhibit list** Intuitive seeks to introduce communications between

13  FDA and Rebotix, Restore, or Iconocare, the subject matter of which the Court fully considered

14  in its summary judgment ruling. *E.g.*, Van Hoven Ex. 1 at DX0256, DX0257, DX0268,

15  DX1305, DX1308, DX1473, DX1489, DX1516, DX1679. In its **witness list**, three of ten

16  "Intuitive Fact Witnesses" plan to testify about "regulatory issues," "regulatory affairs," or

17  "communications with regulators" and three third parties are proposed to testify regarding

18  "[c]ompetition in the alleged market for the repair and replacement of EndoWrist instruments

19  and regulatory issues." Van Hoven Ex. 2 at pp. 2-4. **Intuitive's FDA expert**, Christy Foreman,

20  further intends to opine that "efforts to remove or extend the usage limitation by companies

21  other than the original equipment manufacturer (OEM) constitute remanufacturing activities"

22  and that "[t]hird parties engaging in extending or resetting the lives of EndoWrist instruments

23  are remanufacturers under existing FDA regulation. Therefore, they were required to obtain

24  510(k) clearance. * * * The third parties' arguments that they are not remanufacturers are

25  incorrect." Van Hoven Ex. 2 at 6 ("Ms. Foreman will testify to matters disclosed in her expert

26  report served in this case"); Van Hoven Ex. 3 at pp. 6-7 (Foreman Report).

27      Intuitive's intended use of these FDA documents and witnesses at trial is clear from **its**

28

**proposed jury instructions** – *i.e.*, Intuitive intends to use lack of FDA approval to short-circuit legitimate proofs of other legitimately contested issues in this case:

- "Intuitive contends . . . the use of EndoWrist instruments beyond the number of lives . . . . cleared by the FDA presents serious risks to health and safety of patients; Intuitive has no way to ensure the safety and effectiveness of unauthorized third-party products and services that have not been cleared by the FDA[.]" *Id.* at p. 34.

- "All computer-controlled surgical instrument systems and the instruments used with them, including those that are remanufactured, are required to be approved or cleared by the FDA. The FDA considers a device to be remanufactured when it has been subject to any act that results in a significant change to the device's performance, safety specifications, or intended use, as compared to the device that was originally approved or cleared by the FDA. If you conclude that the insertion of a memory chip into an EndoWrist to change its usage limit is remanufacturing as defined by the FDA, you must find that SIS could not lawfully perform that operation on an instrument to be used for human surgery unless it obtained 510(k) clearance from FDA to perform that action on that particular EndoWrist." *Id.* at p. 71.

- "Intuitive claims that any profits or sales lost by SIS occurred as a result of other factors that have nothing to do with the alleged antitrust violations. These include SIS's failure to seek and obtain clearance from the FDA[.]" Id. at 74.

Intuitive also seeks to leverage its post-discovery, eve-of-summary judgment briefing announcement that it would not enforce its contracts against hospitals that use FDA-approved third-party instruments to bring demand for "FDA-approved" remanufactured EndoWrists2 inappropriately into the case. See Dkt. 243-1 (seeking discovery as to "how hospitals behaved

---

[2] Intuitive's Executive Vice President and Chief Strategy and Growth Officer, David Rosa, submitted a declaration in this case where he offers testimony about Iconocare Health's FDA-clearance to market a remanufactured S/Si 8mm Monopolar Curved Scissor instrument reset one time with ten additional lives, as well as testimony about Intuitive's website statement. Dkt. 137-2 at ¶¶ 44-46. Intuitive has listed Mr. Rosa as a trial witness and SIS submits that it is reasonable to assume that Mr. Rosa may testify at trial about the subjects in his prior declaration in this case.

1  in the actual world after Intuitive announced that buying FDA-cleared remanufactured
2  EndoWrists does not violate its contracts").

3  **ARGUMENT**

4  Legal Standards - Motions in Limine

5  "A motion in limine is a procedural mechanism to limit in advance testimony or evidence
6  in a particular area." *United States v. Heller*, 551 F.3d 1108, 1111 (9th Cir. 2009). Motions in
7  limine are vehicles by which a court may exclude inadmissible or prejudicial evidence before
8  it is "actually offered." *See Luce v. United States*, 469 U.S. 38, 40 n.2 (1984). Motions in limine
9  "avoid the futile attempt of unringing the bell when jurors have seen or heard inadmissible
10  evidence, even when stricken from the record"; "streamline trials, by settling evidentiary
11  disputes in advance and by minimizing side-bar conferences and other disruptions at trial";
12  and "permit more thorough briefing and argument on evidentiary issues than would be likely
13  during trial." *Altair Instruments, Inc. v. Telebrands Corp.*, 2021 WL 5238787, at *1 (C.D. Cal.
14  Feb. 18, 2021) (cleaned up). "[M]otions in limine must identify the evidence at issue and state
15  with specificity why such evidence is inadmissible." *United States v. Lewis*, 493 F. Supp. 3d
16  858, 861 (C.D. Cal. 2020) (cleaned up) (citation omitted).

17  Admissibility of Relevant Evidence Under Federal Rules of Evidence 401,
     402, and 403
18

19  Federal Rule of Evidence 402 provides that "[r]elevant evidence is admissible" unless
20  the U.S. Constitution, a federal statute, the Federal Rules of Evidence, or "other rules
21  prescribed by the Supreme Court" provide otherwise. Fed. R. Evid. 402. Evidence is "relevant"
22  if: (1) "it has any tendency to make a fact more or less probable than it would be without the
23  evidence"; and (2) "the fact is of consequence in determining the action." Fed. R. Evid. 401.
24  "Irrelevant evidence is not admissible." Fed. R. Evid. 402. Federal Rule of Evidence 403
25  permits a court to exclude relevant evidence "if its probative value is substantially outweighed
26  by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading
27  the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R.

28

1   Evid. 403. Unfair prejudice 'speaks to the capacity of some concededly relevant evidence to

2   lure the factfinder into declaring guilt on a ground different from proof specific to the offense

3   charged.' *United States v. Holmes*, 2021 WL 2044470 at *5 (N.D. Cal. November 6, 2021).

4   <u>Evidence Regarding FDA's 510(k) Framework and the Regulatory Term</u>
    <u>"Remanufacturing," whether SIS or others' Activities Constitute</u>

5   <u>Remanufacturing, and Intuitive's Website Statement About FDA-Cleared</u>
    <u>Remanufactured EndoWrists Should All be Excluded Under Fed. R. Evid.</u>

6   <u>402 and 403</u>

7   Testimony and documentary evidence related to the FDA's 510(k) regulatory framework

8   and procedures to clear medical devices for commercial marketing, as well as the meaning,

9   scope and application of the regulatory term "remanufacturing", do not constitute relevant

10  evidence in this case. Nor does evidence about whether SIS or others' activities constituted

11  "remanufacturing." This is also true regarding the meaning, scope, application and effect of

12  Intuitive's statement on its website that buying FDA-cleared remanufactured EndoWrists does

13  not violate its contracts.

14  The only potential relevance of this evidence – and indeed, the exact reasons Intuitive

15  intends to present this evidence as confirmed by its jury instructions and FDA expert opinions

16  – would be to prove that SIS or its technology partners failed to obtain a required 510(k)

17  clearance. But the Court has already "decline[d] Intuitive's invitation to step into the FDA's

18  shoes and determine whether SIS's services require 510(k) clearance." Dkt. 204 at 13:4-5. A

19  lay jury should not step into the FDA's shoes either. Further, any other potential use of this

20  evidence would invite a "confusing sideshow" and "battle of the experts" for evidence that is

21  tangentially relevant at best. *Carter v. Johnson & Johnson*, No. 2:20-cv-01232, 2022 U.S.

22  Dist. LEXIS 178596 at *7-8, 2022 WL 4700549 (D. Nev. Sept. 29, 2022) ("many hours, and

23  possibly days, of complex testimony about regulatory compliance . . . could lead jurors to

24  erroneously conclude that regulatory compliance proved product safety"); *Kaiser v. Johnson*

25  *& Johnson*, 947 F.3d 996, 1018 (7th Cir. 2020) ("It was reasonable to conclude that the

26  probative value of this evidence was minimal at best and that admitting it would precipitate a

27  confusing sideshow over the details of the § 510(k) process."); *Campbell v. Boston Sci. Corp.*,

28

1    882 F.3d 70, 77 (4th Cir. 2018) ("Admitting the evidence on these grounds would invite a battle

2    of the experts regarding the exact meaning of 510(k) approval in these circumstances, and

3    would risk the same jury confusion we feared in [a prior case.]").

4        Curative Instruction

5        There may be instances – for example, Intuitive's agreements with hospitals – in which

6    statements regarding 510(k) clearance or remanufacturing may be included with other properly

7    presented evidence at trial.  In that case, SIS respectfully requests the Court read a curative

8    instruction as presented in Van Hoven Exhibit 5 to avoid undue prejudice.

9

10

11

12    Dated: <u>October 28, 2024</u>              McCAULLEY LAW GROUP LLC
                                            By:   <u>    /s/ Joshua Van Hoven    </u>
13                                              JOSHUA V. VAN HOVEN

14                                          E-Mail: josh@mccauleylawgroup.com
                                            3001 Bishop Dr., Suite 300
15                                          San Ramon, California 94583
                                            Telephone: 925.302.5941
16
                                            RICHARD T. MCCAULLEY (*pro hac vice*)
17                                          E-Mail: richard@mccauleylawgroup.com
                                            180 N. Wabash Avenue, Suite 601
18                                          Chicago, Illinois 60601
                                            Telephone: 312.330.8105
19
                                            *Attorneys for Plaintiff and Counter-Defendant,*
20                                          SURGICAL INSTRUMENT SERVICE
                                            COMPANY, INC.
21

22

23

24

25

26

27

28

1

## <u>CERTIFICATE OF SERVICE</u>

2    I hereby certify that on October 28, 2024, I caused a copy of the foregoing

3    **PLAINTIFF SIS's MOTION IN LIMINE #1**, to be electronically to be served *via*

4    electronic mail to counsel of record:

5

6    **Crystal Lohmann Parker**
     Paul, Weiss, Rifkind, Wharton & Garrison LLP
7    1285 Avenue of the Americas
     New York, NY 10019
8    212-373-3000
     Email: cparker@paulweiss.com
9
     **Joshua Hill , Jr.**
10   Paul, Weiss, Rifkind, Wharton & Garrison LLP
     535 Mission Street, 24th Floor
11   San Francisco, CA 94105
     (628) 432-5123
12   Email: jhill@paulweiss.com

13   **Kenneth A. Gallo**
     Paul, Weiss, Rifkind, Wharton & Garrison LLP
14   2001 K Street NW
     Washington, DC 20006-104 7
15   202-223-7356
     Fax: 202-204-7356
16   Email: kgallo@paulweiss.com

17   **Paul David Brachman**
     Paul, Weiss, Rifkind, Wharton & Garrison LLP
18   2001 K St., NW
     Washington, DC 20006
19   202-223-7440
     Email: pbrachman@paulweiss.com
20
     **William Michael**
21   Paul, Weiss, Rifkind, Wharton and Garrison LLP
     1285 Avenue of the Americas
22   New York, NY 10019
     212-373-3000
23   Email: WMichael@paulweiss.com

24   **Allen Ruby**
     Attorney at Law
25   15559 Union Ave. #138
     Los Gatos, CA 95032
26   408-4 77-9690
     Email: allen@allenruby.com

27

28

**Andrew David Lazerow**
Covington & Burling LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
202-662-5081
Email: alazerow@cov.com

**Kathryn Elizabeth Cahoy**
Covington & Burling LLP
3000 El Camino Real
5 Palo Alto Square, 10th Floor
Palo Alto, CA 94306
650-632-4700
Email: kcahoy@cov.com

**Sonya Diane Winner**
Covington & Burling LLP
Floor 54
415 Mission Street
San Francisco, CA 94105-2533
(415) 591-6000
Email: swinner@cov.com

Dated: October 28, 2024          By: ____ /s/ Joshua Van Hoven ____
                                        JOSHUA V. VAN HOVEN

**MCCAULLEY LAW GROUP LLC**
JOSHUA V. VAN HOVEN (CSB No. 262815)
E-Mail: josh@mccaulleylawgroup.com
3001 Bishop Dr., Suite 300
San Ramon, California 94583
Telephone: 925.302.5941

RICHARD T. MCCAULLEY (*pro hac vice*)
E-Mail: richard@mccaulleylawgroup.com
180 N. Wabash Avenue, Suite 601
Chicago, Illinois 60601
Telephone: 312.330.8105

*Attorneys for Plaintiff and Counter-Defendant,*
SURGICAL INSTRUMENT SERVICE COMPANY, INC.

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SURGICAL INSTRUMENT SERVICE COMPANY, INC.<br><br>                    *Plaintiff/Counter-Defendant,*<br><br>          v.<br><br>INTUITIVE SURGICAL, INC.<br><br>                    *Defendant/Counterclaimant.* | CASE NO. 3:21-CV-03496-AMO<br><br>Honorable Araceli Martínez-Olguín<br><br>**DECLARATION OF JOSHUA VAN HOVEN IN SUPPORT OF PLAINTIFF SIS's MOTION IN LIMINE #1** |

1    I, JOSHUA VAN HOVEN, declare as follows:

2    I am an attorney at the law firm of MCCAULLEY LAW GROUP LLC, attorneys for

3    Plaintiff SURGICAL INSTRUMENT SERVICE COMPANY, INC. ("SIS") in this matter. I

4    have personal knowledge of the matters set forth herein, unless otherwise noted.

5    I, JOSHUA VAN HOVEN, declare as follows:

6    I am an attorney at the law firm of MCCAULLEY LAW GROUP LLC, attorneys for

7    Plaintiff SURGICAL INSTRUMENT SERVICE COMPANY, INC. ("SIS") in this matter. I

8    have personal knowledge of the matters set forth herein, unless otherwise noted.

9    1.   Attached as Exhibit 1 is a true and correct copy of a document containing

10        Intuitive's List of Trial Exhibits, which is dated September 23, 2024, which was

11        provided by Intuitive in this case.

12   2.   Attached as Exhibit 2 is a true and correct copy of a document containing

13        Intuitive's Preliminary Witness List, which is dated October 8, 2024, which was

14        provided by Intuitive in this case.

15   3.   Attached as Exhibit 3 is a true and correct copy of a redacted version of the Expert

16        Report of Christy Foreman, MBE, an Intuitive expert in this case, which is dated

17        January 18, 2023 - the portions that are attached hereto were previously filed on

18        the public docket at Dkt. 229-37.

19   4.   Attached as Exhibit 4 is a true and correct copy of Intuitive's Draft Proposed Jury

20        Instructions, which is dated September 25, 2024, which was provided by Intuitive

21        in this case.

22   5.   Attached as Exhibit 5 is a true and correct copy of SIS's Proposed

23        Limiting/Cautionary Jury Instructions.

24

25

26

27

28

DECLARATION OF JOSHUA VAN HOVEN ISO SIS MOTION IN LIMINE #1

1

2

3        I declare under the penalty of perjury under the laws of the United States that the

4    foregoing is true and correct.

5    Dated: October 28, 2024        McCAULLEY LAW GROUP LLC
                                    By:    /s/ Joshua Van Hoven
6                                       JOSHUA V. VAN HOVEN

7                                    E-Mail: josh@mccaulleylawgroup.com
                                    3001 Bishop Dr., Suite 300
8                                    San Ramon, California 94583
                                    Telephone: 925.302.5941
9
                                    RICHARD T. MCCAULLEY (*pro hac vice*)
10                                   E-Mail: richard@mccaulleylawgroup.com
                                    180 N. Wabash Avenue, Suite 601
11                                   Chicago, Illinois 60601
                                    Telephone: 312.330.8105
12
                                    *Attorneys for Plaintiff and Counter-Defendant,*
13                                   SURGICAL INSTRUMENT SERVICE
                                    COMPANY, INC.
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## <u>CERTIFICATE OF SERVICE</u>

2

I hereby certify that on October 28, 2024, I caused a copy of the foregoing

3

**DECLARATION OF JOSHUA VAN HOVEN IN SUPPORT OF PLAINTIFF SIS's**

4

**MOTION IN LIMINE #1,** to be electronically to be served *via* electronic mail to counsel of

5

record:

6

7

**Crystal Lohmann Parker**
Paul, Weiss, Rifkind, Wharton & Garrison LLP

8

1285 Avenue of the Americas
New York, NY 10019

9

212-373-3000
Email: cparker@paulweiss.com

10

**Joshua Hill , Jr.**

11

Paul, Weiss, Rifkind, Wharton & Garrison LLP
535 Mission Street, 24th Floor

12

San Francisco, CA 94105
(628) 432-5123

13

Email: jhill@paulweiss.com

14

**Kenneth A. Gallo**
Paul, Weiss, Rifkind, Wharton & Garrison LLP

15

2001 K Street NW
Washington, DC 20006-104 7

16

202-223-7356
Fax: 202-204-7356

17

Email: kgallo@paulweiss.com

18

**Paul David Brachman**
Paul, Weiss, Rifkind, Wharton & Garrison LLP

19

2001 K St., NW
Washington, DC 20006

20

202-223-7440
Email: pbrachman@paulweiss.com

21

**William Michael**

22

Paul, Weiss, Rifkind, Wharton and Garrison LLP
1285 Avenue of the Americas

23

New York, NY 10019
212-373-3000

24

Email: WMichael@paulweiss.com

25

**Allen Ruby**
Attorney at Law

26

15559 Union Ave. #138
Los Gatos, CA 95032

27

408-4 77-9690
Email: allen@allenruby.com

28

DECLARATION OF JOSHUA VAN HOVEN ISO SIS MOTION IN LIMINE #1

1

**Andrew David Lazerow**
Covington & Burling LLP

2

One CityCenter
850 Tenth Street, NW

3

Washington, DC 20001-4956
202-662-5081

4

Email: alazerow@cov.com

5

**Kathryn Elizabeth Cahoy**
Covington & Burling LLP

6

3000 El Camino Real
5 Palo Alto Square, 10th Floor

7

Palo Alto, CA 94306
650-632-4700

8

Email: kcahoy@cov.com

9

**Sonya Diane Winner**
Covington & Burling LLP

10

Floor 54
415 Mission Street

11

San Francisco, CA 94105-2533
(415) 591-6000

12

Email: swinner@cov.com

13

14

Dated: <u>October 28, 2024</u>         By: ____<u>/s/ Joshua Van Hoven</u>____
                                              JOSHUA V. VAN HOVEN

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit 1

*Surgical Instrument Service Company, Inc.* v. *Intuitive Surgical, Inc.* Civ. No. 21-03496 (AMO) (N.D. Cal.)

Defendant's List of Trial Exhibits as of September 23, 2024

**Defendant's Reservation of Rights:** Defendant may introduce some or all of the exhibits on this Exhibit List. Defendant reserves the right to supplement or amend this Exhibit List in light of Plaintiff's objections and Plaintiff's list of exhibits. Defendant specifically reserves the right to supplement or amend this list to incorporate materials identified in Defendant's counter-designations of deposition testimony and completeness objections to Plaintiff's designations and counter-designations of deposition testimony. Defendant also reserves the right to supplement or amend this Exhibit List in light of, among other things, Plaintiff's trial witness list; the Court's pre-trial and trial evidentiary rulings; the arguments and evidence offered by Plaintiff in its case-in-chief; and additional pre-trial discovery in this action, should any be ordered. This Exhibit List does not include all documents that Defendant may use for impeachment, to refresh recollection, or in rebuttal. Defendant reserves the right to offer into evidence summary, demonstrative, blow-up, handout, or composite exhibits. In addition, Defendant reserves the right to introduce any exhibit on Plaintiff's list of exhibits. The inclusion of exhibits on this Exhibit List does not waive any objections available under the Federal Rules of Evidence or otherwise that Defendant may have to the introduction of such exhibit if offered by Plaintiff. Gaps in Defendant's exhibit numbers are the result of Defendant's efforts to match the exhibit number assigned to a document introduced during a deposition.

| Def.'s Temporary Exhibit No. | Description | Date | BegBates | EndBates | Objections |
|---|---|---|---|---|---|
| DX0012 | Franciscan Alliance, Inc. Minutes of The Capital Allocation Committee Meeting. | 09/01/2016 | FRANCISCAN-00055639 | FRANCISCAN-00055648 | |
| DX0030 | Email from S. Sosa-Guerrero to J. Szatkiewicz re contract da Vinci, with attachment. | 06/09/2017 | LARKIN-00025487 | LARKIN-00025500 | |
| DX0034 | Email chain ending with email from S. Sosa-Guerrero to B. Yuen et al. re Robotic Financial Meeting, with attachment. | 11/17/2017 | LARKIN-00026343 | LARKIN-00026346 | |
| DX0054 | Email chain ending with email from J. Wagner to J. Landers et al. re Xi Robot. | 08/23/2019 | VMC-00014375 | VMC-00014380 | |
| DX0056 | Email chain ending with email from J. Wagner to M. Burke re any updates on the robot?, with attachments. | 08/23/2018 | VMC-00015993 | VMC-00016060 | |
| DX0095 | Email from P. Garcia to J. Gonzalez re Meeting with Dr. Estape. | 04/03/2019 | LARKIN-00013651 | LARKIN-00013651 | |
| DX0106 | Email chain ending with email from J. Wagner to L. Dillingham re Xi quote request for Valley Medical Center, with attachments. | 04/06/2018 | VMC-00021270 | VMC-00021281 | |

| Compilation of Intuitive Form 10-K Filings | | | |
|---|---|---|---|
| Def.'s Temporary Exhibit No. | Description | Date | Objections |
| DX1765.01 | Intuitive Surgical Form 10-K - FY 2000 | 3/30/2001 | |
| DX1765.02 | Intuitive Surgical Form 10-K - FY 2001 | 3/30/2002 | |
| DX1765.03 | Intuitive Surgical Form 10-K - FY 2002 | 2/28/2003 | |
| DX1765.04 | Intuitive Surgical Form 10-K - FY 2003 | 2/29/2004 | |
| DX1765.05 | Intuitive Surgical Form 10-K - FY 2004 | 2/28/2005 | |
| DX1765.06 | Intuitive Surgical Form 10-K - FY 2005 | 2/28/2006 | |
| DX1765.07 | Intuitive Surgical Form 10-K - FY 2006 | 1/31/2007 | |
| DX1765.08 | Intuitive Surgical Form 10-K - FY 2007 | 1/31/2008 | |
| DX1765.09 | Intuitive Surgical Form 10-K - FY 2008 | 1/31/2009 | |
| DX1765.10 | Intuitive Surgical Form 10-K - FY 2009 | 1/21/2010 | |
| DX1765.11 | Intuitive Surgical Form 10-K - FY 2010 | 1/20/2011 | |
| DX1765.12 | Intuitive Surgical Form 10-K - FY 2011 | 1/20/2012 | |
| DX1765.13 | Intuitive Surgical Form 10-K - FY 2012 | 1/18/2012 | |
| DX1765.14 | Intuitive Surgical Form 10-K - FY 2013 | 1/17/2014 | |
| DX1765.15 | Intuitive Surgical Form 10-K - FY 2014 | 1/16/2015 | |
| DX1765.16 | Intuitive Surgical Form 10-K - FY 2015 | 1/19/2016 | |
| DX1765.17 | Intuitive Surgical Form 10-K - FY 2016 | 2/3/2017 | |
| DX1765.18 | Intuitive Surgical Form 10-K - FY 2017 | 1/19/2018 | |
| DX1765.19 | Intuitive Surgical Form 10-K - FY 2018 | 1/18/2019 | |
| DX1765.20 | Intuitive Surgical Form 10-K - FY 2019 | 1/17/2020 | |
| DX1765.21 | Intuitive Surgical Form 10-K - FY 2020 | 1/15/2021 | |
| DX1765.22 | Intuitive Surgical Form 10-K - FY 2021 | 1/26/2022 | |
| DX1765.23 | Intuitive Surgical Form 10-K - FY 2022 | 2/7/2023 | |

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | | Compilation of Early Intuitive Customer Contracts. | | | | |
| 2 | Def.'s Temporary Exhibit No. | Description | Date | Beg Bates | End Bates | Objections |
| 3 | DX1766.01 | Sales Agreement between Intuitive Surgical, Inc. and The Ohio State University | 07/01/1999 | Intuitive-01529190 | Intuitive-01529218 | |
| 4 | DX1766.02 | Sales Agreement with Amendment 1, Pitt County Memorial Hospital | 10/20/1999 | Intuitive-01291299 | Intuitive-01291327 | |
| 5 | DX1766.03 | Sales and Service Agreement No 18 between Intuitive Surgical and Providence Health System | 02/10/2000 | Intuitive-01281282 | Intuitive-01281308 | |
| 6 | DX1766.04 | Sales and Service Agreement between Intuitive Surgical and San | 05/04/2000 | Intuitive-01524785 | Intuitive-01524812 | |
| 7 | DX1766.05 | Sales and Service Agreement between Intuitive Surgical, Inc. and | 05/11/2000 | Intuitive-02016009 | Intuitive-02016035 | |
| 8 | DX1766.06 | Sales and Service Agreement between Intuitive Surgical and The Johns Hopkins Hospital | 07/31/2000 | Intuitive-01524624 | Intuitive-01524655 | |
| 9 | DX1766.07 | Sales and Service Agreement between Intuitive Surgical and the Board of Trustees of the University of Illinois | 08/29/2000 | Intuitive-01524477 | Intuitive-01524506 | |
| 10 | DX1766.08 | Sales and Service Agreement between Intuitive Surgical, Inc. and The University of Texas Medical Branch at Galveston | 08/31/2000 | Intuitive-02016152 | Intuitive-02016181 | |
| 11 | DX1766.09 | Sales and Service Agreement between Intuitive Surgical and Ohio State University | 10/20/2000 | Intuitive-01524683 | Intuitive-01524732 | |
| 12 | DX1766.10 | Sales and Service Agreement between Intuitive Surgical and Hackensack University Medical Center | 10/30/2000 | Intuitive-01524570 | Intuitive-01524595 | |
| 13 | DX1766.11 | Sales and Service Agreement between Intuitive Surgical and Maimonides Medical Center | 11/29/2000 | Intuitive-01525071 | Intuitive-01525120 | |
| 14 | DX1766.12 | Sales and Service Agreement between Intuitive Surgical and Valley Hospital | 12/01/2000 | Intuitive-01282449 | Intuitive-01282476 | |
| 15 | DX1766.13 | Sales and Service Agreement between Intuitive Surgical, Inc. and Tenet HealthSystem Hospitals d.b.a. USC University Hospital | 02/12/2001 | Intuitive-02016098 | Intuitive-02016121 | |
| 16 | DX1766.14 | Sales and Service Agreement between Intuitive Surgical, Inc. and The Board of Trustees of the University of Alabama, on behalf of its operating unit, University of Alabama Hospital | 03/15/2001 | Intuitive-01611639 | Intuitive-01611664 | |
| 17 | DX1766.15 | Sales and Service Agreement between Intuitive Surgical, Inc. and The University of Michigan Medical Center | 05/18/2001 | Intuitive-02016068 | Intuitive-02016089 | |
| 18 | DX1766.16 | Sales and Service Agreement between Intuitive Surgical, Inc. and USC University Hospital, Inc. d.b.a. USC University Hospital | 08/14/2001 | Intuitive-02005508 | Intuitive-02005527 | |
| 19 | DX1766.17 | Sales and Service Agreement between Intuitive Surgical and St. Luke's Medical Center | 08/21/2001 | Intuitive-01525269 | Intuitive-01525299 | |
| 20 | DX1766.18 | Sales and Service Agreement between Intuitive Surgical, Inc. and Saint Agnes Medical Center | 08/21/2001 | Intuitive-01612217 | Intuitive-01612234 | |
| 21 | DX1766.19 | Sales and Service Agreement between Intuitive Surgical and St. Luke's Episcopal Hospital | 08/29/2001 | Intuitive-01525233 | Intuitive-01525248 | |
| 22 | DX1766.20 | Sales and Service Agreement between Intuitive Surgical, Inc. and Virginia Mason Medical Center | 08/30/2001 | Intuitive-01291228 | Intuitive-01291245 | |
| 23 | DX1766.21 | Sales and Service Agreement between Intuitive Surgical and Creighton Saint Joseph Regional Healthcare System | 09/07/2001 | Intuitive-01524978 | Intuitive-01524993 | |
| 24 | DX1766.22 | Sales and Service Agreement between Intuitive Surgical, Inc. and Shawnee Mission Medical Center | 09/18/2001 | Intuitive-02015965 | Intuitive-02015980 | |
| 25 | DX1766.23 | Sales and Service Agreement between Intuitive Surgical and New York Presbyterian Hospital | 09/25/2001 | Intuitive-01525160 | Intuitive-01525186 | |
| 26 | DX1766.24 | Sales and Service Agreement between Intuitive Surgical and Walter Reed Army Hospital | 09/30/2001 | Intuitive-01525390 | Intuitive-01525410 | |
| 27 | DX1766.25 | Amendment Number 1 to the Distribution Agreement Between Intuitive Surgical, Inc. and AB Medica S.R.L. | 10/09/2001 | Intuitive-01530721 | Intuitive-01530723 | |
| 28 | DX1766.26 | Amendment Number 1 to the Service Support Agreement between Intuitive Surgical, Inc. and AB Medica S.R.L. | 10/09/2001 | Intuitive-01532513 | Intuitive-01532514 | |
| 29 | DX1766.27 | Sales and Service Agreement between Intuitive Surgical, Inc. and Scottsdale Healthcare Shea Administration | 11/16/2001 | Intuitive-01622889 | Intuitive-01622905 | |
| 30 | DX1766.28 | Master Purchase and Master Service Agreement between Intuitive Surgical and St. Luke's Hospital | 11/19/2001 | Intuitive-01299770 | Intuitive-01299788 | |
| 31 | DX1766.29 | Sales and Service Agreement between Intuitive Surgical and Saint Alphonsus Regional Medical Center | 12/06/2001 | Intuitive-01525214 | Intuitive-01525232 | |
| 32 | DX1766.30 | Sales and Service Agreement No 128-2000 between Intuitive Surgical and Inova Fairfax Hospital | 12/21/2001 | Intuitive-01278261 | Intuitive-01278290 | |
| 33 | DX1766.31 | Sales and Service Agreement between Intuitive Surgical and Fresno Community Hospital | 12/28/2001 | Intuitive-01525017 | Intuitive-01525033 | |
| 34 | DX1766.32 | Sales and Service Agreement between Intuitive Surgical and The Mount Sinai Hospital | 01/17/2002 | Intuitive-01525965 | Intuitive-01525982 | |
| 35 | DX1766.33 | Sales and Service Agreement between Intuitive Surgical and Children's Hospital | 01/23/2002 | Intuitive-01525525 | Intuitive-01525541 | |
| 36 | DX1766.34 | Ethicon Endo-Surgery, Inc Use Agreement between Intuitive Surgical, Inc. and Ethicon Endo-Surgery, Inc. | 01/25/2002 | Intuitive-02021458 | Intuitive-02021465 | |

|    | A | B | C | D | E | F |
|----|---|---|---|---|---|---|
| 37 | DX1766.35 | Assignment and Assumption Agreement between Self Regional Healthcare, North Carolina Baptist Hospital, and Intuitive Surgical, Inc. | 01/25/2002 | Intuitive-02022733 | Intuitive-02022750 | |
| 38 | DX1766.36 | Sales and Service Agreement between Intuitive Surgical and University of California at San Francisco | 02/08/2002 | Intuitive-01525988 | Intuitive-01526004 | |
| 39 | DX1766.37 | Sales and Service Agreement between Intuitive Surgical, Inc. and Baptist Health Systems of South Florida | 02/12/2002 | Intuitive-01611396 | Intuitive-01611413 | |
| 40 | DX1766.38 | Sales and Service Agreement between Intuitive Surgical and Park Place Medical Center | 02/20/2002 | Intuitive-01285756 | Intuitive-01285773 | |
| 41 | DX1766.39 | Sales and Service Agreement between Intuitive Surgical and Catholic Medical Center | 02/20/2002 | Intuitive-01525452 | Intuitive-01525466 | |
| 42 | DX1766.40 | Sales and Service Agreement between Intuitive Surgical and The Mayo Clinic | 03/08/2002 | Intuitive-01525629 | Intuitive-01525653 | |
| 43 | DX1766.41 | Sales and Service Agreement between Intuitive Surgical and University of California Irvine Medical Center | 03/13/2002 | Intuitive-01526045 | Intuitive-01526062 | |
| 44 | DX1766.42 | Sales and Service Agreement between Intuitive Surgical and Central Iowa Hospital Corporation | 03/25/2002 | Intuitive-01525509 | Intuitive-01525524 | |
| 45 | DX1766.43 | Sales and Service Agreement between Intuitive Surgical and St. Joseph's Hospital | 03/25/2002 | Intuitive-01525893 | Intuitive-01525907 | |
| 46 | DX1766.44 | Sales and Service Agreement between Intuitive Surgical and New York University Medical Center | 04/05/2002 | Intuitive-01525734 | Intuitive-01525749 | |
| 47 | DX1766.45 | Sales and Service Agreement between Intuitive Surgical and Alliance Hospital of Odessa Texas | 05/19/2002 | Intuitive-01525434 | Intuitive-01525451 | |
| 48 | DX1766.46 | Sales and Service Agreement between Intuitive Surgical and Memorial Hermann Hospital | 05/20/2002 | Intuitive-01525675 | Intuitive-01525693 | |
| 49 | DX1766.47 | Loan Agreement between Intuitive Surgical, Inc. and University of California at San Francisco | 06/05/2002 | Intuitive-02005250 | Intuitive-02005253 | |
| 50 | DX1766.48 | Sales and Service Agreement between Intuitive Surgical and University of Iowa Hospital and Clinics | 06/20/2002 | Intuitive-01526028 | Intuitive-01526044 | |
| 51 | DX1766.49 | Sales and Service Agreement between Intuitive Surgical, Inc. and Trustees of the University of Pennsylvania | 06/21/2002 | Intuitive-01530011 | Intuitive-01530030 | |
| 52 | DX1766.50 | Sales and Service Agreement between Intuitive Surgical and Peoria Surgical Group | 06/24/2002 | Intuitive-01525774 | Intuitive-01525789 | |
| 53 | DX1766.51 | Sales and Service Agreement between Intuitive Surgical and John Muir/Mt. Diablo Health System | 06/27/2002 | Intuitive-01525717 | Intuitive-01525733 | |
| 54 | DX1766.52 | Sales and Service Agreement between Intuitive Surgical and St. Joseph's Hospital of Atlanta | 07/18/2002 | Intuitive-01525834 | Intuitive-01525852 | |
| 55 | DX1766.53 | Sales and Service Agreement between Intuitive Surgical, Inc. and Hamot Health Foundation | 07/30/2002 | Intuitive-01611414 | Intuitive-01611429 | |
| 56 | DX1766.54 | Sales and Service Agreement between Intuitive Surgical and Memorial Hermann Hospital | 08/30/2002 | Intuitive-01525654 | Intuitive-01525674 | |
| 57 | DX1766.55 | Sales and Service Agreement between Intuitive Surgical, Inc. and Queen of the Valley Hospital | 09/04/2002 | Intuitive-02015843 | Intuitive-02015858 | |
| 58 | DX1766.56 | Master Agreement between Intuitive Surgical, Inc. and HCA Management Services LP | 09/18/2002 | Intuitive-02021376 | Intuitive-02021406 | |
| 59 | DX1766.57 | Amendment Number 1 To The Sales and Service Agreement between Intuitive Surgical, Inc. and CHCA Woman's Hospital, L.P. / dba Woman's Hospital of Texas | 09/25/2002 | Intuitive-01611248 | Intuitive-01611249 | |
| 60 | DX1766.58 | Sales and Service Agreement between Intuitive Surgical, Inc. and Marion Community Hospital, Incorporated, a Florida Corporation, /dba Ocala Regional Medical Center | 09/25/2002 | Intuitive-01622658 | Intuitive-01622679 | |
| 61 | DX1766.59 | Amendment Number 1 To The Sales and Service Agreement between Intuitive Surgical, Inc. and CHCA Woman's Hospital, L.P. / dba Woman's Hospital of Texas | 09/25/2002 | Intuitive-02005356 | Intuitive-02005357 | |
| 62 | DX1766.60 | Sales and Service Agreement between Intuitive Surgical and Cedars Healthcare Group | 09/26/2002 | Intuitive-01525467 | Intuitive-01525486 | |
| 63 | DX1766.61 | Sales and Service Agreement between Intuitive Surgical, Inc. and Sunrise Hospital and Medical Center, LLC /dba Sunrise Hospital and Medical Center | 09/26/2002 | Intuitive-01622700 | Intuitive-01622719 | |
| 64 | DX1766.62 | Sales and Service Agreement between Intuitive Surgical and Medical College of Pennsylvania Hospital | 09/27/2002 | Intuitive-01525875 | Intuitive-01525891 | |
| 65 | DX1766.63 | Sales and Service Agreement between Intuitive Surgical, Inc. and CHCA Woman's Hospital, L.P. /dba Woman's Hospital of Texas | 09/30/2002 | Intuitive-01611226 | Intuitive-01611245 | |
| 66 | DX1766.64 | Sales and Service Agreement between Intuitive Surgical and HCA Health Services of Florida | 10/17/2002 | Intuitive-01285445 | Intuitive-01285464 | |
| 67 | DX1766.65 | Sales and Service Agreement between Intuitive Surgical, Inc. and University Healthcare System, LC, d/d/a Tulane University Hospital and Clinic | 10/22/2002 | Intuitive-02005375 | Intuitive-02005394 | |
| 68 | DX1766.66 | Sales and Service Agreement between Intuitive Surgical, Inc. and Largo Medical Center, Inc., /dba Largo Medical Center | 10/23/2002 | Intuitive-01611448 | Intuitive-01611468 | |
| 69 | DX1766.67 | Sales and Service Agreement between Intuitive Surgical, Inc. and HCA-HealthONE LLC /dba Presbyterian/St. Luke's Medical Center | 10/31/2002 | Intuitive-01622680 | Intuitive-01622699 | |

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 70 | DX1766.68 | Amendment Number 1 To The Sales and Service Agreement Number 091801-SMMM between Intuitive Surgical, Inc. and Shawnee Mission Medical Center | 11/08/2002 | Intuitive-02015981 | Intuitive-02015981 | |
| 71 | DX1766.69 | Sales and Service Agreement between Intuitive Surgical and Columbia Hospital at Medical City Dallas | 12/03/2002 | Intuitive-01525581 | Intuitive-01525600 | |
| 72 | DX1766.70 | Sales and Service Agreement between Intuitive Surgical, Inc. and New York City Health and Hospitals | 12/19/2002 | Intuitive-01612542 | Intuitive-01612572 | |
| 73 | DX1766.71 | Sales and Service Agreement between Intuitive Surgical and Salt Lake Regional Medical Center | 12/20/2002 | Intuitive-01280979 | Intuitive-01280994 | |
| 74 | DX1766.72 | Sales and Service Agreement between Intuitive Surgical and Newark Beth Israel Medical Center | 12/20/2002 | Intuitive-01525750 | Intuitive-01525766 | |
| 75 | DX1766.73 | Sales and Service Agreement between Intuitive Surgical and Children's Hospital | 12/23/2002 | Intuitive-01525542 | Intuitive-01525561 | |
| 76 | DX1766.74 | Sales and Service Agreement between Intuitive Surgical, Inc. and HCA Health Services of Virginia, Inc. D/b/a Henrico Doctors' Hospital | 12/23/2002 | Intuitive-02015755 | Intuitive-02015772 | |
| 77 | DX1766.75 | Sales and Service Agreement between Intuitive Surgical, Inc. and Coliseum Medical Center, LLC /dba Coliseum Medical Centers | 01/24/2003 | Intuitive-01613087 | Intuitive-01613105 | |
| 78 | DX1766.76 | Sales and Service Agreement between Intuitive Surgical, Inc. and BryanLGH Medical Center | 03/07/2003 | Intuitive-01622848 | Intuitive-01622864 | |
| 79 | DX1766.77 | Sales and Service Agreement between Intuitive Surgical and The Children's Hospital Association | 03/24/2003 | Intuitive-01526633 | Intuitive-01526646 | |
| 80 | DX1766.78 | Sales and Service Agreement between Intuitive Surgical and South Broward Hospital District D/B/A Memorial Regional Hospital | 03/27/2003 | Intuitive-01526437 | Intuitive-01526454 | |
| 81 | DX1766.79 | Sales and Service Agreement between Intuitive Surgical and Arkansas Children's Hospital | 03/31/2003 | Intuitive-01526122 | Intuitive-01526136 | |
| 82 | DX1766.80 | Sales and Service Agreement between Intuitive Surgical and Vanderbilt University Medical Center | 03/31/2003 | Intuitive-01526872 | Intuitive-01526888 | |
| 83 | DX1766.81 | Master Group Purchasing Agreement between HealthTrust Purchasing Group and Intuitive Surgical, Inc. | 05/01/2003 | Intuitive-02021318 | Intuitive-02021363 | |
| 84 | DX1766.82 | Rental Agreement between Intuitive Surgical, Inc. and Brigham and Women's Hospital | 05/28/2003 | Intuitive-02016198 | Intuitive-02016199 | |
| 85 | DX1766.83 | Sales and Service Agreement between Intuitive Surgical All Children's Hospital | 06/05/2003 | Intuitive-01526101 | Intuitive-01526119 | |
| 86 | DX1766.84 | Sales and Service Agreement between Intuitive Surgical and University of Virginia | 06/05/2003 | Intuitive-01526811 | Intuitive-01526836 | |
| 87 | DX1766.85 | Business Associate Addendum between Intuitive Surgical, Inc. and The Rector and Visitors of the University of Virginia | 06/05/2003 | Intuitive-02015652 | Intuitive-02015658 | |
| 88 | DX1766.86 | Sales and Service Agreement between Intuitive Surgical and City of Hope National Medical Center | 06/10/2003 | Intuitive-01526216 | Intuitive-01526233 | |
| 89 | DX1766.87 | Loaner Agreement between Intuitive Surgical, Inc. and Ohio State University | 06/10/2003 | Intuitive-02005654 | Intuitive-02005655 | |
| 90 | DX1766.88 | Amendment Number 1 to the Intuitive Surgical Inc. Sales and Service Agreement between Intuitive Surgical and Clarian Health Partners | 06/19/2003 | Intuitive-01285439 | Intuitive-01285439 | |
| 91 | DX1766.89 | Sales and Service Agreement between Intuitive Surgical and Baptist Memorial Hospital | 06/20/2003 | Intuitive-01526142 | Intuitive-01526166 | |
| 92 | DX1766.90 | Sales and Service Agreement between Intuitive Surgical and Saint Thomas Health Services | 06/25/2003 | Intuitive-01284965 | Intuitive-01284982 | |
| 93 | DX1766.91 | Addendum to Sales and Service Agreement between Intuitive Surgical and the Good Samaritan Hospital | 06/25/2003 | Intuitive-01526321 | Intuitive-01526328 | |
| 94 | DX1766.92 | Sales and Service Agreement between Intuitive Surgical and The Good Samaritan Hospital | 06/25/2003 | Intuitive-01526647 | Intuitive-01526671 | |
| 95 | DX1766.93 | Sales and Service Agreement between Intuitive Surgical and Urology Associates of North Texas | 06/26/2003 | Intuitive-01526857 | Intuitive-01526871 | |
| 96 | DX1766.94 | Sales and Service Agreement between Intuitive Surgical and Fairview Health Services | 06/27/2003 | Intuitive-01526286 | Intuitive-01526304 | |
| 97 | DX1766.95 | Fax message from Gulf Medical Co to Intuitive Surgical re: Transaction Agreement | 06/27/2003 | Intuitive-01526335 | Intuitive-01526337 | |
| 98 | DX1766.96 | Sales and Service Agreement between Intuitive Surgical and Saint Joseph's Health System | 06/27/2003 | Intuitive-01526581 | Intuitive-01526599 | |
| 99 | DX1766.97 | Sales and Service Agreement between Intuitive Surgical and Lucile Packard Children's Hospital | 09/09/2003 | Intuitive-01526405 | Intuitive-01526420 | |
| 100 | DX1766.98 | Sales and Service Agreement between Intuitive Surgical and St. John's Mercy Health System | 09/15/2003 | Intuitive-01526600 | Intuitive-01526615 | |
| 101 | DX1766.99 | Sales and Service Agreement between Intuitive Surgical, Inc. and University Hospital, Inc. | 09/21/2003 | Intuitive-02005462 | Intuitive-02005477 | |
| 102 | DX1766.100 | Sales and Service Agreement between Intuitive Surgical and St. Joseph Mercy of Macomb and Trinity Health System | 09/22/2003 | Intuitive-01526616 | Intuitive-01526632 | |
| 103 | DX1766.101 | Sales and Service Agreement between Intuitive Surgical and University of Cincinnati | 09/24/2003 | Intuitive-01526744 | Intuitive-01526759 | |

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 104 | DX1766.102 | Sales and Service Agreement between Intuitive Surgical and Central DuPage Health | 09/25/2003 | Intuitive-01526183 | Intuitive-01526199 | |
| 105 | DX1766.103 | Sales and Service Agreement between Intuitive Surgical, Inc. and Alta Bates Summit Medical Center | 09/25/2003 | Intuitive-01611207 | Intuitive-01611225 | |
| 106 | DX1766.104 | Sales and Service Agreement between Intuitive Surgical and Maine Medical Center | 09/26/2003 | Intuitive-01468748 | Intuitive-01468763 | |
| 107 | DX1766.105 | Sales and Service Agreement between Intuitive Surgical and Regents of the University of California UC Davis Health System | 09/29/2003 | Intuitive-01526527 | Intuitive-01526545 | |
| 108 | DX1766.106 | Sales and Service Agreement between Intuitive Surgical and George Washington University Hospital | 09/30/2003 | Intuitive-01526305 | Intuitive-01526320 | |
| 109 | DX1766.107 | Sales and Service Agreement between Intuitive Surgical, Inc. and TCC Partners d/b/a/ The Cleveland Clinic Hospital | 09/30/2003 | Intuitive-01622814 | Intuitive-01622829 | |
| 110 | DX1766.108 | Sales and Service Agreement between Intuitive Surgical and University of Washington Medical Center | 10/13/2003 | Intuitive-01526837 | Intuitive-01526856 | |
| 111 | DX1766.109 | Sales and Service Agreement between Intuitive Surgical and North Shore University Hospital | 10/14/2003 | Intuitive-01526507 | Intuitive-01526522 | |
| 112 | DX1766.110 | Sales and Service Agreement between Intuitive Surgical and Christus Schumpert Health System | 11/21/2003 | Intuitive-01526200 | Intuitive-01526215 | |
| 113 | DX1766.111 | Amendment No. 1 to the Distribution Agreement between Intuitive Surgical, Inc. and Transmedic Pte, Ltd. | 12/05/2003 | Intuitive-01533794 | Intuitive-01533794 | |
| 114 | DX1766.112 | Intuitive Surgical Training Center Agreement between Intuitive Surgical, Inc. and The Regents of the University of Minnesota | 12/12/2003 | Intuitive-02020198 | Intuitive-02020202 | |
| 115 | DX1766.113 | Sales and Service Agreement between Intuitive Surgical and the Regents of the University of Minnesota | 12/15/2003 | Intuitive-01526672 | Intuitive-01526691 | |
| 116 | DX1766.114 | Sales and Service Agreement between Intuitive Surgical and University of Kentucky | 12/16/2003 | Intuitive-01526776 | Intuitive-01526790 | |
| 117 | DX1766.115 | Transaction Agreement Between Transmedic Pte, Ltd. And Intuitive Surgical, Inc. | 12/17/2003 | Intuitive-01616253 | Intuitive-01616254 | |
| 118 | DX1766.116 | Sales and Service Agreement between Intuitive Surgical and Cedars-Sinai Medical Center | 12/19/2003 | Intuitive-01526167 | Intuitive-01526182 | |
| 119 | DX1766.117 | Sales and Service Agreement between Intuitive Surgical and Rochester General Hospital | 12/19/2003 | Intuitive-01526565 | Intuitive-01526580 | |
| 120 | DX1766.118 | Sales and Service Agreement between Intuitive Surgical and Washington Township Health Care District | 12/19/2003 | Intuitive-01526891 | Intuitive-01526911 | |
| 121 | DX1766.119 | Zeus Technology Agreement between Intuitive Surgical, Inc. and University of Washington | 12/23/2003 | Intuitive-02015558 | Intuitive-02015567 | |
| 122 | DX1766.120 | Sales and Service Agreement between Intuitive Surgical and Mother Frances Hospital Regional Health Care Center | 12/24/2003 | Intuitive-01526473 | Intuitive-01526488 | |
| 123 | DX1766.121 | Amendment Number 1 to the Sales and Service Agreement Between Saint Joseph's Hospital of Atlanta and Intuitive Surgical | 01/16/2004 | Intuitive-01525892 | Intuitive-01525892 | |
| 124 | DX1766.122 | Sales and Service Agreement between Intuitive Surgical, Inc. and St. Peter's Hospital of the city of Albany | 02/13/2004 | Intuitive-01527808 | Intuitive-01527824 | |
| 125 | DX1766.123 | Sales and Service Agreement between Intuitive Surgical and The Mayo Clinic | 2/26/2004 | Intuitive-01527876 | Intuitive-01527891 | |
| 126 | DX1766.124 | Amendment No. 2 to the Distribution Agreement between Intuitive Surgical, Inc. and Transmedic Pte, Ltd. | 03/11/2004 | Intuitive-01533797 | Intuitive-01533800 | |
| 127 | DX1766.125 | Sales and Service Agreement between Intuitive Surgical and St. Mary's/Duluth Clinic Health System | 03/24/2004 | Intuitive-01365260 | Intuitive-01365276 | |
| 128 | DX1766.126 | Sales and Service Agreement between Intuitive Surgical, Inc. and Adventist Health System/Sunbelt, Inc., /dba Florida Hospital | 03/29/2004 | Intuitive-01526932 | Intuitive-01526947 | |
| 129 | DX1766.127 | Terms and Conditions between Intuitive Surgical, Inc. and Riverside Medical Center | 03/29/2004 | Intuitive-02015413 | Intuitive-02015418 | |
| 130 | DX1766.128 | Sales and Service Agreement between Intuitive Surgical, Inc. and Lakeland Regional Medical Center, Inc. | 03/30/2004 | Intuitive-01527329 | Intuitive-01527352 | |
| 131 | DX1766.129 | Sales and Service Agreement between Intuitive Surgical, Inc. and Saint Joseph's Health System | 03/30/2004 | Intuitive-01527599 | Intuitive-01527613 | |
| 132 | DX1766.130 | Sales and Service Agreement between Intuitive Surgical, Inc. and Summa Health System Hospitals | 03/30/2004 | Intuitive-01527825 | Intuitive-01527840 | |
| 133 | DX1766.131 | Sales and Service Agreement between Intuitive Surgical, Inc. and HealthEast St. John's Hospital | 04/22/2004 | Intuitive-01527284 | Intuitive-01527300 | |
| 134 | DX1766.132 | Sales and Service Agreement between Intuitive Surgical and Henrico Doctors' Hospital | 04/28/2004 | Intuitive-01524596 | Intuitive-01524623 | |
| 135 | DX1766.133 | Amendment Number 1 to the Sales and Services Agreement between Intuitive Surgical and Clarian Health Partners Inc - Indiana University Hospital | 4/29/2004 | Intuitive-01285917 | Intuitive-01285917 | |
| 136 | DX1766.134 | Amendment Number 2 to the Sales and Services Agreement between Intuitive Surgical and the Methodist University Hospital | 05/07/2004 | Intuitive-01285444 | Intuitive-01285444 | |
| 137 | DX1766.135 | Sales and Service Agreement between Intuitive Surgical and Clarian Health Partners | 05/12/2004 | Intuitive-01525562 | Intuitive-01525580 | |
| 138 | DX1766.136 | Sales and Service Agreement between Intuitive Surgical, Inc. and David Geffen School of Medicine at UCLA | 05/12/2004 | Intuitive-01527103 | Intuitive-01527119 | |

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 139 | DX1766.137 | Amendment Number 1 to the Sales and Service Agreement between Intuitive Surgical and U of Medicine and Dentistry of New Jersey | 05/19/2004 | Intuitive-01284959 | Intuitive-01284960 | |
| 140 | DX1766.138 | Amendment Number 1 to the Sales and Service Agreement | 05/19/2004 | Intuitive-01526120 | Intuitive-01526121 | |
| 141 | DX1766.139 | Sales and Service Agreement between Intuitive Surgical and University of Medicine and Dentistry of New Jersey | 05/19/2004 | Intuitive-01526711 | Intuitive-01526728 | |
| 142 | DX1766.140 | Sales and Service Agreement between Intuitive Surgical and Centennial Medical Center | 05/21/2004 | Intuitive-01525489 | Intuitive-01525508 | |
| 143 | DX1766.141 | Sales and Service Agreement between Intuitive Surgical and HCA Health Services | 05/21/2004 | Intuitive-01525606 | Intuitive-01525625 | |
| 144 | DX1766.142 | Amendment to the Distribution Agreement Between Intuitive Surgical, Inc. and AB Medica S.p.A. | 05/25/2004 | Intuitive-01530715 | Intuitive-01530720 | |
| 145 | DX1766.143 | Sales and Service Agreement for HPG Participants between Intuitive Surgical, Inc. and VHS San Antonio Partners, L.P. d.b.a. St. Luke's Baptist Health Systems, Baptist Medical Center Campus | 06/17/2004 | Intuitive-01526948 | Intuitive-01526965 | |
| 146 | DX1766.144 | Sales and Service Agreement between Intuitive Surgical, Inc. and City of Hope National Medical Center | 06/17/2004 | Intuitive-01527035 | Intuitive-01527050 | |
| 147 | DX1766.145 | Sales and Service Agreement between Intuitive Surgical, Inc. and Roswell Park Cancer Institute | 06/17/2004 | Intuitive-01527563 | Intuitive-01527577 | |
| 148 | DX1766.146 | Sales and Service Agreement between Intuitive Surgical, Inc. and Poudre Valley Hospital | 06/19/2004 | Intuitive-02015346 | Intuitive-02015363 | |
| 149 | DX1766.147 | Sales and Service Agreement between Intuitive Surgical, Inc. and Hoag Memorial Hospital Presbyterian | 06/22/2004 | Intuitive-01527301 | Intuitive-01527316 | |
| 150 | DX1766.148 | Sales and Service Agreement between Intuitive Surgical, Inc. and Sentara Norfolk General | 06/22/2004 | Intuitive-01527631 | Intuitive-01527648 | |
| 151 | DX1766.149 | Sales and Service Agreement between Intuitive Surgical, Inc. and Fremont Area Medical Center | 06/25/2004 | Intuitive-01527215 | Intuitive-01527232 | |
| 152 | DX1766.150 | Sales and Service Agreement between Intuitive Surgical, Inc. and AHS Hospital Corporation/Morristown Memorial Medical Campus | 06/25/2004 | Intuitive-01527421 | Intuitive-01527436 | |
| 153 | DX1766.151 | Sales and Service Agreement between Intuitive Surgical, Inc. and Sioux Valley Hospital | 06/29/2004 | Intuitive-01527665 | Intuitive-01527680 | |
| 154 | DX1766.152 | Amendment Number 1 To The Master Agreement between Intuitive Surgical, Inc. and HCA Management Services LP | 07/12/2004 | Intuitive-02021407 | Intuitive-02021410 | |
| 155 | DX1766.153 | Amendment No. 3 to the Distribution Agreement between Intuitive Surgical, Inc. and Transmedic Pte, Ltd. | 07/26/2004 | Intuitive-01533801 | Intuitive-01533801 | |
| 156 | DX1766.154 | Sales and Service Agreement between Intuitive Surgical, Inc. and Sun Health Corporation, for its subsidiary W.O. Boswell Hospital | 07/26/2004 | Intuitive-02015315 | Intuitive-02015330 | |
| 157 | DX1766.155 | Sales Agreement between Intuitive Surgical, Inc. and WakeMed | 08/16/2004 | Intuitive-01527951 | Intuitive-01527971 | |
| 158 | DX1766.156 | Assignment and Assumption Agreement between Tenet Health System and Intuitive Surgical, Inc. | 08/17/2004 | Intuitive-02022818 | Intuitive-02022819 | |
| 159 | DX1766.157 | Amendment Number 1 to the Sales and Service Agreement between Intuitive Surgical and U of Texas Medical Branch at Galveston | 08/18/2004 | Intuitive-01283057 | Intuitive-01283057 | |
| 160 | DX1766.158 | Sales and Service Agreement between Intuitive Surgical and Peoria Surgical Group | 08/25/2004 | Intuitive-01525767 | Intuitive-01525769 | |
| 161 | DX1766.159 | Amendment Number 1 to the Sales and Service Agreement between Intuitive Surgical and Hartford Hospital | 08/26/2004 | Intuitive-01285350 | Intuitive-01285353 | |
| 162 | DX1766.160 | Addendum to the Sales and Services Agreement between Intuitive Surgical, Inc. and Columbia/St. David's Healthcare System | 08/30/2004 | Intuitive-01527681 | Intuitive-01527681 | |
| 163 | DX1766.161 | Sales and Service Agreement Between Intuitive Surgical, Inc. and St. David's Medical Center | 08/30/2004 | Intuitive-01527682 | Intuitive-01527701 | |
| 164 | DX1766.162 | Sales and Service Agreement between Intuitive Surgical, Inc. and Eastern Maine Medical Center | 09/03/2004 | Intuitive-01527184 | Intuitive-01527199 | |
| 165 | DX1766.163 | Sales and Service Agreement for HPG Participants between Intuitive Surgical, Inc. and VHS San Antonio Partners, L.P. d.b.a. St. Luke's Baptist Health Systems | 09/03/2004 | Intuitive-01527755 | Intuitive-01527772 | |
| 166 | DX1766.164 | Sales Agreement between Intuitive Surgical, Inc. and Geisinger Medical Center | 09/13/2004 | Intuitive-01527233 | Intuitive-01527260 | |
| 167 | DX1766.165 | Amendment Number 1 To The Sales and Service Agreement between Intuitive Surgical, Inc. and The Ohio State University on behalf of its University Hospitals | 09/14/2004 | Intuitive-02005347 | Intuitive-02005349 | |
| 168 | DX1766.166 | Sales and Service Agreement between Intuitive Surgical and Hartford Hospital | 09/20/2004 | Intuitive-01526340 | Intuitive-01526360 | |
| 169 | DX1766.167 | Service Amendment to the Service Support Agreement between Intuitive Surgical, Inc. and Transmedic Pte, Ltd. | 09/20/2004 | Intuitive-01532924 | Intuitive-01532924 | |
| 170 | DX1766.168 | Amendment No. 4 to the Distribution Agreement between Intuitive Surgical, Inc. and Transmedic Pte, Ltd. | 09/20/2004 | Intuitive-01533802 | Intuitive-01533804 | |
| 171 | DX1766.169 | Business Associate Agreement between The Presbyterian Hospital and Intuitive Surgical, Inc. | 09/28/2004 | Intuitive-02005329 | Intuitive-02005334 | |
| 172 | DX1766.170 | Sales and Service Agreement between Intuitive Surgical, Inc. and University of Pittsburgh Medical Center | 09/29/2004 | Intuitive-01527930 | Intuitive-01527945 | |

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 173 | DX1766.171 | Amendment Number 1 To The Sales and Service Agreement between Intuitive Surgical, Inc. and The Johns Hopkins Hospital | 10/05/2004 | Intuitive-02015942 | Intuitive-02015942 | |
| 174 | DX1766.172 | Amendment Number 1 To The Sales and Service Agreement between Intuitive Surgical, Inc. and Pitt County Memorial Hospital | 10/12/2004 | Intuitive-02022858 | Intuitive-02022858 | |
| 175 | DX1766.173 | Sales and Service Agreement between Intuitive Surgical, Inc. and Covenant Health System | 10/20/2004 | Intuitive-01527083 | Intuitive-01527099 | |
| 176 | DX1766.174 | Sales and Service Agreement between Intuitive Surgical, Inc. and Fort Sanders Regional Medical Center | 10/21/2004 | Intuitive-01527200 | Intuitive-01527214 | |
| 177 | DX1766.175 | Distribution Agreement Between Intuitive Surgical, Inc. And Palex Medical SA | 10/26/2004 | Intuitive-01535611 | Intuitive-01535635 | |
| 178 | DX1766.176 | Sales and Service Agreement between Intuitive Surgical, Inc. and Community Memorial Hospital | 10/28/2004 | Intuitive-01527067 | Intuitive-01527082 | |
| 179 | DX1766.177 | Between Fort Sanders Regional Medical Center and Intuitive Surgical, Inc. | 11/09/2004 | Intuitive-02015190 | Intuitive-02015190 | |
| 180 | DX1766.178 | Sales and Service Agreement between Intuitive Surgical, Inc. and Sharp Memorial Hospital | 12/02/2004 | Intuitive-01527649 | Intuitive-01527664 | |
| 181 | DX1766.179 | Sales and Service Agreement between Intuitive Surgical, Inc. and Boston Medical Center | 12/08/2004 | Intuitive-01526983 | Intuitive-01526998 | |
| 182 | DX1766.180 | Sales and Service Agreement between Intuitive Surgical, Inc. and Norton Hospitals, Inc. | 12/09/2004 | Intuitive-01527472 | Intuitive-01527488 | |
| 183 | DX1766.181 | Sales and Service Agreement between Intuitive Surgical, Inc. and Sutter Health Sacramento Sierra Region | 12/09/2004 | Intuitive-01527858 | Intuitive-01527875 | |
| 184 | DX1766.182 | Sales and Service Agreement between Intuitive Surgical, Inc. and Porter Adventist Hospital | 12/09/2004 | Intuitive-01623877 | Intuitive-01623893 | |
| 185 | DX1766.183 | Sales and Service Agreement between Intuitive Surgical, Inc. and Oaklawn Hospital | 12/13/2004 | Intuitive-01527489 | Intuitive-01527504 | |
| 186 | DX1766.184 | Sales and Service Agreement between Intuitive Surgical, Inc. and Mississippi Baptist Medical Center | 12/21/2004 | Intuitive-01527405 | Intuitive-01527420 | |
| 187 | DX1766.185 | Sales and Service Agreement between Intuitive Surgical, Inc. and Mother Frances Hospital Regional Health Care Center | 12/21/2004 | Intuitive-01527437 | Intuitive-01527453 | |
| 188 | DX1766.186 | Sales and Service Agreement between Intuitive Surgical, Inc. and Scott and White Memorial Hospital and Scott, Sherwood and Brindley Foundation | 12/21/2004 | Intuitive-01527614 | Intuitive-01527630 | |
| 189 | DX1766.187 | Sales and Service Agreement between Intuitive Surgical and Health Care Finance and Construction Corporation | 12/22/2004 | Intuitive-01291728 | Intuitive-01291744 | |
| 190 | DX1766.188 | Amendment between Catholic Health System and Intuitive Surgical | 12/23/2004 | Intuitive-01282331 | Intuitive-01282342 | |
| 191 | DX1766.189 | Sales and Service Agreement between Intuitive Surgical, Inc. and Bellin Memorial Hospital, Inc. | 12/23/2004 | Intuitive-01526968 | Intuitive-01526982 | |
| 192 | DX1766.190 | Sales and Service Agreement between Intuitive Surgical, Inc. and Century City Doctors Hospital, L.P. | 12/23/2004 | Intuitive-01527002 | Intuitive-01527018 | |
| 193 | DX1766.191 | Sales and Service Agreement between Intuitive Surgical, Inc. and Mercy Hospital of Buffalo, Inc. | 12/23/2004 | Intuitive-01527390 | Intuitive-01527404 | |
| 194 | DX1766.192 | Sales and Service Agreement between Intuitive Surgical, Inc. and Ochsner Clinic Foundation on behalf of Ochsner Clinic, LLC | 12/27/2004 | Intuitive-01527507 | Intuitive-01527523 | |
| 195 | DX1766.193 | Sales and Service Agreement between Intuitive Surgical and Carilion Health System | 12/30/2004 | Intuitive-01524891 | Intuitive-01524913 | |
| 196 | DX1766.194 | Sales and Service Agreement between Intuitive Surgical, Inc. and Loma Linda University Medical Center | 12/30/2004 | Intuitive-01527353 | Intuitive-01527368 | |

| | Compilation of Select Intuitive Customer Contracts. | | | | |
|---|---|---|---|---|---|
| Def.'s Temporary Exhibit No. | Description | Date | Beg Bates | End Bates | Objections |
| DX1767.01 | Sales and Service Agreement between Intuitive Surgical and Duke University Medical Center | 10/23/2001 | Intuitive-01524994 | Intuitive-01525016 | |
| DX1767.02 | Amendment Number 1 to the Sales and Service Agreement between Intuitive Surgical and The Johns Hopkins Hospital | 1/5/2005 | Intuitive-01291218 | Intuitive-01291218 | |
| DX1767.03 | Amendment Number 1 to the Sales and Service Agreement between Intuitive Surgical and Duek University Medical Center | 2/16/2005 | Intuitive-02015961 | Intuitive-02015961 | |
| DX1767.04 | Amendment Number 1 to the Sales and Service Agreement between | 3/10/2005 | Intuitive-02016090 | Intuitive-02016090 | |
| DX1767.05 | Sales and Service Agreement between Intuitive Surgical and | 03/30/2005 | Intuitive-01527990 | Intuitive-01528006 | |
| DX1767.06 | Master Purchase and Master Service Agreement between Intuitive Surgical and Beth Israel Medical Center | 04/04/2005 | Intuitive-01524447 | Intuitive-01524476 | |
| DX1767.07 | Amendment Number 1 to the Master Purchase and Master Service Agreement between Intuitive Surgical and Beth Israel Medical Center | 04/04/2005 | Intuitive-01291328 | Intuitive-01291328 | |
| DX1767.08 | Amendment Number 1 to the Sales and Service Agreement between Intuitive Surgical and Providence Health System-Oregon doing business as Providence St. Vincent Medical Center | 4/8/2005 | Intuitive-01291279 | Intuitive-01291279 | |
| DX1767.09 | Sales Agreement between Intuitive Surgical and Northside Hospital | 5/4/2005 | Intuitive-02005750 | Intuitive-02005771 | |
| DX1767.10 | Sales and Service Agreement between Intuitive Surgical and Providence Health System-Washington dba Providence Alaska Medical Center | 6/10/2005 | Intuitive-01529419 | Intuitive-01529434 | |
| DX1767.11 | Amendment to the Sales and Service Agreement between Intuitive Surgical and Advocate Health and Hospitals Corporation dba Advocate Christ Medical Center | 09/02/2004 | Intuitive-02016095 | Intuitive-02016096 | |
| DX1767.12 | Sales and Service Agreement between Intuitive Surgical and Pomona Valley Hospital Medical Center | 9/30/2005 | Intuitive-01529401 | Intuitive-01529417 | |
| DX1767.13 | Sales and Service Agreement between Intuitive Surgical and Advocate Health and Hospitals Corporation dba Advocate Good Shepherd Hospital | 10/28/2005 | Intuitive-01527973 | Intuitive-01527989 | |
| DX1767.14 | Sales and Service Agreement between Intuitive Surgical and Newark Beth Israel Medical Center | 03/22/2006 | Intuitive-01531860 | Intuitive-01531875 | |
| DX1767.15 | Sales and Service Agreement between Intuitive Surgical and Providence Health Care, a Washington Nonprofit Corporation, d/b/a Sacred Heart Medical Center | 3/29/2006 | Intuitive-01532352 | Intuitive-01532372 | |
| DX1767.16 | Sales and Service Agreement between Intuitive Surgical and Lahey Clinic Foundation Inc. | 06/15/2006 | Intuitive-01531253 | Intuitive-01531268 | |
| DX1767.17 | Sales and Service Agreement between Intuitive Surgical and Providence Health System Southern California d/b/a Little Company of Mary Hospital | 6/30/2006 | Intuitive-01531330 | Intuitive-01531344 | |
| DX1767.18 | First Amendment to Terms and Conditions of Purchase of Robotic Surgical Equipment Agreement between Intuitive Surgical and Banner Health | 09/18/2006 | Intuitive-01266395 | Intuitive-01266398 | |
| DX1767.19 | Sales and Service Agreement between Intuitive Surgical and The Mayo Clinic | 11/8/2006 | Intuitive-01531501 | Intuitive-01531534 | |
| DX1767.20 | Amendment to the Sales and Service Agreement between Intuitive Surgical and Johns Hopkins Hospital | 12/1/2006 | Intuitive-01266985 | Intuitive-01266985 | |
| DX1767.21 | Sales and Service Agreement between Intuitive Surgical and Mayo Clinic Hospital | 12/5/2006 | Intuitive-01531439 | Intuitive-01531469 | |
| DX1767.22 | Sales and Service Agreement between Intuitive Surgical and Advocate Health and Hospitals Corporation dba Advocate Lutheran General Hospital | 12/19/2006 | Intuitive-01530288 | Intuitive-01530307 | |
| DX1767.23 | Sales Agreement between Intuitive Surgical and Duke University Health System | 12/20/2006 | Intuitive-01615627 | Intuitive-01615648 | |
| DX1767.24 | Amendment to the Sales and Service Agreement between Intuitive Surgical and the Mayo Clinic | 1/24/2007 | Intuitive-01525626 | Intuitive-01525626 | |
| DX1767.25 | Sales and Service Agreement between Intuitive Surgical and Regents of the University of Michigan | 2/14/2007 | Intuitive-01537818 | Intuitive-01537837 | |
| DX1767.26 | Amendment No. 1 to the Sales and Service Agreement UM --021307 between Intuitive Surgical and Regents of the University of Michigan | 2/27/2007 | Intuitive-01269231 | Intuitive-01269234 | |
| DX1767.27 | Sales and Service Agreement between Intuitive Surgical and University of Illinois at Chicago | 4/23/2007 | Intuitive-01306760 | Intuitive-01306776 | |
| DX1767.28 | Sales Agreement between Intuitive Surgical and Northside Hospital | 5/3/2007 | Intuitive-01615248 | Intuitive-01615268 | |
| DX1767.29 | Sales and Service Agreement for the Purchase of the da Vinci Surgical System between Intuitive Surgical and Kaiser Foundation Health Plan | 7/10/2007 | Intuitive-01536382 | Intuitive-01536400 | |
| DX1767.30 | Master Agreement for the Sale and Service of the da Vinci Surgical System between Intuitive Surgical and Kaiser Foundation Health Plan Inc | 7/17/2007 | Intuitive-01274522 | Intuitive-01274543 | |
| DX1767.31 | Sales and Service Agreement for the Purchase of the da Vinci Surgical System with High Definition Vision between Intuitive Surgical and Winchester Hospital | 08/21/2007 | Intuitive-01539526 | Intuitive-01539543 | |
| DX1767.32 | Purchase and License Agreement between Intuitive Surgical and Northwestern Memorial Healthcare on behalf of  Northwestern Memorial Healthcare | 8/29/2007 | Intuitive-01537281 | Intuitive-01537299 | |
| DX1767.33 | Sales and Service Agreement between Intuitive Surgical and SSM Health Care of Wisconsin, Inc., owning and operating St. Mary's Hospital Medical Center | 9/5/2007 | Intuitive-01349816 | Intuitive-01349832 | |

| DX1767.34 | Sales and Service Agreement for the Purchase of the *da Vinci* Surgical System with High Definition between Intuitive Surgical and Advocate Illinois Masonic Medical Center | 09/13/2007 | Intuitive-01533644 | Intuitive-01533660 | |
|---|---|---|---|---|---|
| DX1767.35 | Sales and Service Agreement for the Purchase of the *da Vinci* Surgical System with High Definition Vision between Intuitive Surgical and Lahey Clinic Foundation | 09/14/2007 | Intuitive-01536454 | Intuitive-01536470 | |
| DX1767.36 | Sales and Service Agreement between Intuitive Surgical and Marin General Hospital | 9/28/2007 | Intuitive-01536645 | Intuitive-01536667 | |
| DX1767.37 | Sales and Service Agreement between Intuitive Surgical and The Mayo Clinic | 12/14/2007 | Intuitive-01536741 | Intuitive-01536758 | |
| DX1767.38 | Sales and Service Agreement between Intuitive Surgical and Clarian Health Partners Inc - Indiana University Hospital | 1/18/2008 | Intuitive-01281894 | Intuitive-01281909 | |
| DX1767.39 | Sales Agreement between Intuitive Surgical and Duke University Health System | 2/14/2008 | Intuitive-01612971 | Intuitive-01612997 | |
| DX1767.40 | Sales and Service Agreement between Intuitive Surgical and The Board of Trustees of the University of Illinois on behalf of the University of Illinois at Chicago | 2/22/2008 | Intuitive-01306811 | Intuitive-01306827 | |
| DX1767.41 | Second Amendment to Terms and Conditions of Purchase of Robotic Surgical Equipment Agreement between Intuitive Surgical and Banner Health | 03/05/2008 | Intuitive-01282263 | Intuitive-01282268 | |
| DX1767.42 | Sales Agreement between Intuitive Surgical and Duke University Health System | 3/19/2008 | Intuitive-01612944 | Intuitive-01612970 | |
| DX1767.43 | Sales and Service Agreement between Intuitive Surgical and Northside Hospital | 6/18/2008 | Intuitive-01615345 | Intuitive-01615366 | |
| DX1767.44 | Sales and Service Agreement between Intuitive Surgical and Northeast Georgia Medical Center | 6/27/2008 | Intuitive-01552433 | Intuitive-01552449 | |
| DX1767.45 | Sales and Service Agreement for the Purchase of the da Vinci Surgical System with High Definition Vision between Intuitive Surgical and Kaiser Foundation Hospitals | 7/14/2008 | Intuitive-01548248 | Intuitive-01548267 | |
| DX1767.46 | Sales and Service Agreement for the Purchase of the *da Vinci* Surgical System with High Definition Vision between Intuitive Surgical and Advocate Health and Hospitals dba Advocate Lutheran General Hospital | 08/21/2008 | Intuitive-01548924 | Intuitive-01548944 | |
| DX1767.47 | Sales and Service Agreement for the Purchase of the *da Vinci* Surgical System with High Definition Vision between Intuitive Surgical and Advocate Health and Hospitals dba Good Shepherd Hospital | 08/22/2008 | Intuitive-01549123 | Intuitive-01549145 | |
| DX1767.48 | Third Amendment to Terms and Conditions of Purchase of Robotic Surgical Equipment Agreement between Intuitive Surgical and Banner Health | 09/24/2008 | Intuitive-01292117 | Intuitive-01292118 | |
| DX1767.49 | Sales and Service Agreement for the Purchase of the *da Vinci* Surgical System with High Definition Vision between Intuitive Surgical and Seton Medical Center | 09/26/2008 | Intuitive-01548706 | Intuitive-01548722 | |
| DX1767.50 | Sales and Service Agreement between Intuitive Surgical and Salinas Valley Memorial Hospital | 9/26/2008 | Intuitive-01548688 | Intuitive-01548704 | |
| DX1767.51 | Sales and Service Agreement between Intuitive Surgical and Conway Regional Medical Center, Inc. d/b/a Conway Regional Health System | 9/30/2008 | Intuitive-00518232 | Intuitive-00518248 | |
| DX1767.52 | Amendment 1 to the Sales and Service Agreement Between Intuitive Surgical Inc and Northeast Georgia Medical Center | 11/12/2008 | Intuitive-01293634 | Intuitive-01293634 | |
| DX1767.53 | Sales and Service Agreement between Intuitive Surgical and The Mayo Clinic | 11/19/2008 | Intuitive-01551359 | Intuitive-01551376 | |
| DX1767.54 | Amendment No.1 to the Sales and Service Agreement between Intuitive Surgical and The Mayo Clinic | 11/20/2008 | Intuitive-02017519 | Intuitive-02017519 | |
| DX1767.55 | Sales, License, and Service Agreement between Intuitive Surgical and Beth Israel Deaconess Medical Center | 12/22/2008 | Intuitive-01420901 | Intuitive-01420920 | |
| DX1767.56 | Sales, License, and Service Agreement between Intuitive Surgical and Beth Israel Deaconess Medical Center | 12/23/2008 | Intuitive-01420921 | Intuitive-01420940 | |
| DX1767.57 | Sales and Service Agreement between Intuitive Surgical and Legacy Health System for its Salmon Creek Hospital | 3/16/2009 | Intuitive-01555678 | Intuitive-01555695 | |
| DX1767.58 | Sales, License and Service Agreement between Intuitive Surgical and Public Hospital District No. 1 of King County, d/b/a Valley Medical Center | 3/25/2009 | Intuitive-01261022 | Intuitive-01261038 | |
| DX1767.59 | Sales, License, and Service Agreement between Intuitive Surgical and Northside Hospital | 3/31/2009 | Intuitive-01295736 | Intuitive-01295750 | |
| DX1767.60 | Addendum to the Sales and Service Agreement between Intuitive Surgical and Legacy Health System for Salmon Creek Hospital | 4/29/2009 | Intuitive-01296296 | Intuitive-01296299 | |
| DX1767.61 | Sales, License and Service Agreement for the Purchase of the  da Vinci Surgical System between Intuitive Surgical and Kaiser Foundation Hospitals | 6/22/2009 | Intuitive-01298745 | Intuitive-01298763 | |
| DX1767.62 | Sales, License, and Service Agreement between Intuitive Surgical and Seton Healthcare dba Seton Medical Center Williamson | 06/29/2009 | Intuitive-01298937 | Intuitive-01298955 | |
| DX1767.63 | Amendment to the Sales and Service Agreement between Intuitive Surgical and Advocate Health Care | 8/13/2009 | Intuitive-02020827 | Intuitive-02020827 | |
| DX1767.64 | Sales, License and Service Agreement between Intuitive Surgical and Providence Health Care, a Washington Nonprofit Corporation, d/b/a Providence Sacred Heart Medical Center | 9/28/2009 | Intuitive-01421484 | Intuitive-01421501 | |
| DX1767.65 | Sales, License and Service Agreement between Intuitive Surgical and SSM Health Care St. Louis owning and operating SSM Health Care St. Louis | 11/4/2009 | Intuitive-01576584 | Intuitive-01576598 | |
| DX1767.66 | Banner Health Fourth Amendment to terms and Conditions of Purchase of Robotic Surgical Equipment Agreement | 11/23/2009 | Intuitive-01300335 | Intuitive-01300338 | |

| DX1767.67 | Sales, License and Service Agreement between Intuitive Surgical and King County Public Hospital District No. 2, d/b/a Evergreen Healthcare | 11/25/2009 | Intuitive-01260726 | Intuitive-01260758 | |
| DX1767.68 | Sales, License and Service Agreement between Intuitive Surgical and Piedmont Healthcare, Inc. on behalf of Piedmont Fayette Hospital and Piedmont Hospital | 12/3/2009 | Intuitive-01303858 | Intuitive-01303875 | |
| DX1767.69 | Sales, License, and Service Agreement between Intuitive Surgical and Seton dba Baptist Hospital | 12/07/2009 | Intuitive-01575747 | Intuitive-01575761 | |
| DX1767.70 | Amendment 1 to the Agreement between Intuitive Surgical and Seton dba Baptist Hospital | 12/07/2009 | Intuitive-02017030 | Intuitive-02017031 | |
| DX1767.71 | Sales, License and Service Agreement between Intuitive Surgical and Mayo Clinic | 12/18/2009 | Intuitive-01573847 | Intuitive-01573860 | |
| DX1767.72 | Amendment to the Sales and Service Agreement between Intuitive Surgical and Legacy Health System for its Good Samaritan Hospital | 12/22/2009 | Intuitive-01575838 | Intuitive-01575838 | |
| DX1767.73 | Banner Health Fifth Amendment to terms and Conditions of Purchase of Robotic Surgical Equiptment Agreement | 12/22/2009 | Intuitive-01303832 | Intuitive-01303837 | |
| DX1767.74 | Seton Medical Center Austin Addendum to the da Vinci Surgical System with Dual Console Sales, License, and Service Agreement between Intuitive Surgical and Seton Healthcare dba Seton Medical Center Austin | 02/23/2010 | Intuitive-01581946 | Intuitive-01581949 | |
| DX1767.75 | Sales, License and Service Agreement between Intuitive Surgical and Legacy Health System for its Emanuel Medical Center | 3/16/2010 | Intuitive-01582401 | Intuitive-01582417 | |
| DX1767.76 | Sales, License, and Service Agreement between Intuitive Surgical and Regents of the University of Michigan | 3/17/2010 | Intuitive-01308750 | Intuitive-01308760 | |
| DX1767.77 | Amendment to the Sales and Service Agreement between Intuitive Surgical and Regents of the University of Michigan | 3/17/2010 | Intuitive-01308772 | Intuitive-01308772 | |
| DX1767.78 | Sales, License and Service Agreement between Intuitive Surgical and Kaiser Permanente Medical Center | 3/22/2010 | Intuitive-01581530 | Intuitive-01581548 | |
| DX1767.79 | Sales, License, and Service Agreement between Intuitive Surgical and Mount Auburn Hospital | 04/12/2010 | Intuitive-01586171 | Intuitive-01586182 | |
| DX1767.80 | Amendment 2 to the Sales and Service Agreement between Intuitive Surgical and The Board of Trustees of the University of Illinois on behalf of the University of Illinois at Chicago | 4/30/2010 | Intuitive-01311880 | Intuitive-01311893 | |
| DX1767.81 | Sales, License and Service Agreement between Intuitive Surgical and Johns Hopkins Bayview Medical Center | 6/29/2010 | Intuitive-01317777 | Intuitive-01317796 | |
| DX1767.82 | Sales, License and Service Agreement between Intuitive Surgical and Lovelace Health System dba Lovelace Medical Center | 10/22/2010 | Intuitive-01585851 | Intuitive-01585864 | |
| DX1767.83 | Service Agreement between Intuitive Surgical and Mayo Clinic | 11/23/2010 | Intuitive-01585602 | Intuitive-01585607 | |
| DX1767.84 | Sales and License Agreement between Intuitive Surgical and Mayo Clinic | 11/23/2010 | Intuitive-01585717 | Intuitive-01585735 | |
| DX1767.85 | Master Lease Agreement between Intuitive Surgical and Kaiser Foundation Health Plan | 12/7/2010 | Intuitive-02034310 | Intuitive-02034343 | |
| DX1767.86 | Sales, License, and Service Agreement between Intuitive Surgical and Beth Israel Medical Center | 12/15/2010 | Intuitive-01586236 | Intuitive-01586246 | |
| DX1767.87 | Amendment No. 1 to the Sales, License and Service Agreement between Intuitive Surgical and Regents of the University of Michigan | 12/15/2010 | Intuitive-01586316 | Intuitive-01586318 | |
| DX1767.88 | Sales, License, and Service Agreement between Intuitive Surgical and Mayo Clinic | 1/6/2011 | Intuitive-01586704 | Intuitive-01586710 | |
| DX1767.89 | Sales and Service Agreement between Intuitive Surgical and Advocate Health and Hospitals dba Advocate Christ Medical Center | 02/01/2011 | Intuitive-01524861 | Intuitive-01524887 | |
| DX1767.90 | Sales, License and Service Agreement between Intuitive Surgical and Legacy Health on behalf of Legacy Mount Hood Medical Center | 3/21/2011 | Intuitive-01586608 | Intuitive-01586627 | |
| DX1767.91 | Amendment No. 1 to Sales and Service Agreement between Intuitive Surgical and SSM Health Care of Wisconsin, Inc., owning and operating St. Mary's Hospital | 3/28/2011 | Intuitive-01587217 | Intuitive-01587219 | |
| DX1767.92 | Addendum to the Sales, License and Service Agreement between Intuitive Surgical and Legacy Health on behalf of Legacy Mount Hood Medical Center | 3/31/2011 | Intuitive-01352025 | Intuitive-01352025 | |
| DX1767.93 | Sales and Service Agreement between Intuitive Surgical and Advocate Health and Hospitals dba Advocate Lutheran General Hospital | 05/17/2011 | Intuitive-01437180 | Intuitive-01437200 | |
| DX1767.94 | Sales and Service Agreement between Intuitive Surgical and Advocate Health and Hospitals Corporation dba Advocate Christ Medical Center | 05/17/2011 | Intuitive-01587457 | Intuitive-01587477 | |
| DX1767.95 | Sales and Service Agreement between Intuitive Surgical and Advocate Health and Hospitals Corporation dba Advocate Lutheran General Hospital | 05/17/2011 | Intuitive-01587478 | Intuitive-01587498 | |
| DX1767.96 | Service Agreement between Intuitive Surgical and Luther Midelfort Hospital - Mayo Health System | 7/8/2011 | Intuitive-01590680 | Intuitive-01590686 | |
| DX1767.97 | Sales, License, and Service Agreement between Intuitive Surgical and Mayo Clinic Health System - Eau Claire Hospital | 7/21/2011 | Intuitive-01590963 | Intuitive-01590969 | |
| DX1767.98 | Service Agreement between Intuitive Surgical and Mayo Clinic Health System Mankato | 8/2/2011 | Intuitive-01590692 | Intuitive-01590697 | |
| DX1767.99 | Amendment to the Sales, License & Service Agreement between Intuitive Surgical and Northside Hospital | 9/12/2011 | Intuitive-01590475 | Intuitive-01590482 | |
| DX1767.100 | Amendment to the Sales, License and Service Agreement between Intuitive Surgical and Northside Hospital | 9/13/2011 | Intuitive-02018587 | Intuitive-02018588 | |
| DX1767.101 | Amendment to the Master Agreement for Sales between Intuitive Surgical and Duke University and Duke University Health System | 9/28/2011 | Intuitive-01612438 | Intuitive-01612444 | |
| DX1767.102 | Amendment to the Service Agreement between Intuitive Surgical and Duke University and Duke University Health System | 9/30/2011 | Intuitive-01599617 | Intuitive-01599618 | |

| DX1767.103 | Amendment 1 to the Sales and Service Agreement between Intuitive Surgical and Duke University Medical Center | 10/24/2011 | Intuitive-02015960 | Intuitive-02015960 | |
| DX1767.104 | Banner Health Eleventh Amendment to terms and Conditions of Purchase of Robotic Surgical Equiptment Agreement | 10/27/2011 | Intuitive-01591423 | Intuitive-01591427 | |
| DX1767.105 | Sales, License, and Service Agreement between Intuitive Surgical and Pullman Regional Hospital | 11/9/2011 | Intuitive-01594302 | Intuitive-01594317 | |
| DX1767.106 | Service Agreement between Intuitive Surgical and Mayo Clinic | 11/17/2011 | Intuitive-01593615 | Intuitive-01593620 | |
| DX1767.107 | Sales, License, and Service Agreement between Intuitive Surgical and Pomona Valley Hospital Medical Center | 12/12/2011 | Intuitive-01594173 | Intuitive-01594186 | |
| DX1767.108 | Sales, License, and Service Agreement between Intuitive Surgical and Lovelace Health System dba Lovelace Medical Center | 12/14/2011 | Intuitive-00159262 | Intuitive-00159281 | |
| DX1767.109 | Sales, License, and Service Agreement between Intuitive Surgical and Hillcrest Healthcare System | 12/14/2011 | Intuitive-01260465 | Intuitive-01260480 | |
| DX1767.110 | Amendment No. 3 to Sales and Service Agreement between Intuitive Surgical and the Board of Trustees of the University of Illinois on behalf of the University of Illinois at Chicago | 12/14/2011 | Intuitive-01594905 | Intuitive-01594910 | |
| DX1767.111 | Amendment 1 to the Sales, License and Service Agreement between Intuitive Surgical and Piedmont Healthcare, Inc. | 12/15/2011 | Intuitive-01593428 | Intuitive-01593432 | |
| DX1767.112 | Sales, License and Service Agreement between Intuitive Surgical and Legacy Health on behalf of Legacy Meridian Park Medical Center | 12/15/2011 | Intuitive-01594133 | Intuitive-01594152 | |
| DX1767.113 | Amendment 1 to the Sales, License and Service Agreement between Intuitive Surgical and Providence Health Care, a Washington Nonprofit Corporation d/b/a Providence Sacred Heart Medical Center | 12/23/2011 | Intuitive-01420779 | Intuitive-01420782 | |
| DX1767.114 | Amendment 1 to the Sales, License, and Service Agreement between Intuitive Surgical and Beth Israel Deaconess Medical Center | 12/27/2011 | Intuitive-01595122 | Intuitive-01595127 | |
| DX1767.115 | Sales, License and Service Agreement between Intuitive Surgical and Kaiser Permanente Medical Center | 1/6/2012 | Intuitive-01595866 | Intuitive-01595886 | |
| DX1767.116 | Franciscan Alliance Amendment No. 2 to the SLSA | 2/27/2012 | Intuitive-01260971 | Intuitive-01260976 | |
| DX1767.117 | Amendment 1 to the Sales, License and Service Agreement between Intuitive Surgical and Kaiser Permanente Medical Center | 3/5/2012 | Intuitive-01428212 | Intuitive-01428216 | |
| DX1767.118 | Use, License & Service Agreement between Intuitive Surgical and Franciscan Health Crown Point | 3/7/2012 | Intuitive-01240524 | Intuitive-01240535 | |
| DX1767.119 | Amendment No. 1 to Sales and Service Agreement between Intuitive Surgical and Indiana University Health | 3/14/2012 | Intuitive-01595320 | Intuitive-01595328 | |
| DX1767.120 | Sales, License, and Service Agreement between Intuitive Surgical and King County Public Hospital District No. 2, d/b/a Evergreen Healthcare | 3/20/2012 | Intuitive-01260759 | Intuitive-01260773 | |
| DX1767.121 | Amendment to the Sales, License & Service Agreement between Intuitive Surgical and Northside Hospital | 3/21/2012 | Intuitive-01595539 | Intuitive-01595547 | |
| DX1767.122 | Sales, License, and Service Agreement between Intuitive and Kaiser Permanente Medical Center | 4/2/2012 | Intuitive-01260599 | Intuitive-01260619 | |
| DX1767.123 | Amendment 1 to the Sales, License, and Service Agreement between Intuitive Surgical and Advocate Health and Hospitals Corporation dba Advocate Lutheran General Hospital | 05/01/2012 | Intuitive-02019459 | Intuitive-02019470 | |
| DX1767.124 | Sales, License, and Service Agreement between Mayo Clinic Health System - Franciscan Medical Center | 5/31/2012 | Intuitive-01260547 | Intuitive-01260569 | |
| DX1767.125 | Amendment 2 to the Sales, License and Service Agreement between Intuitive Surgical and Piedmont Healthcare, Inc. | 9/28/2012 | Intuitive-01597761 | Intuitive-01597764 | |
| DX1767.126 | Amendment to the Sales, License and Service Agreement between Intuitive Surgical and IU Health North Hospital formerly known as Clarion Health Partners Inc - Indiana University Health | 10/8/2012 | Intuitive-01599181 | Intuitive-01599184 | |
| DX1767.127 | Sales, License and Service Agreement between Intuitive Surgical and Kaiser Permanente Medical Center | 10/25/2012 | Intuitive-01599197 | Intuitive-01599215 | |
| DX1767.128 | Sales and Service Agreement between Intuitive Surgical and Advocate Health and Hospitals Corporation dba Advocate Good Shepherd Hospital | 12/07/2012 | Intuitive-01598366 | Intuitive-01598386 | |
| DX1767.129 | Sales and Service Agreement between Intuitive Surgical and Advocate Health and Hospitals Corporation dba Advocate South Suburban Hospital | 12/08/2012 | Intuitive-01598387 | Intuitive-01598406 | |
| DX1767.130 | Sales and Service Agreement between Intuitive Surgical and Advocate Health and Hospitals Corporation dba Advocate Illinois Masonic Medical Center | 12/19/2012 | Intuitive-01598346 | Intuitive-01598365 | |
| DX1767.131 | Amendment 2 to the Master Agreement for Sales and Service between Intuitive Surgical  and Duke University & Duke University Health System | 12/20/2012 | Intuitive-01598410 | Intuitive-01598417 | |
| DX1767.132 | Amendment 3 to the Master Agreement for Sales and Service between Duke University and Duke University Health System | 12/20/2012 | Intuitive-01598990 | Intuitive-01598997 | |
| DX1767.133 | Amendment 4 to the Master Agreement for Sales and Service between Duke University and Duke University Health System | 12/20/2012 | Intuitive-01598998 | Intuitive-01599005 | |
| DX1767.134 | Amendment 5 to the Master Agreement for Sales and Service between Duke University and Duke University Health System | 12/20/2012 | Intuitive-01599006 | Intuitive-01599010 | |
| DX1767.135 | Amendment 6 to the Master Agreement for Sales and Service between Duke University and Duke University Health System | 12/20/2012 | Intuitive-01599011 | Intuitive-01599015 | |
| DX1767.136 | Banner Health Twelth Amendment to terms and Conditions of Purchase of Robotic Surgical Equiptment Agreement | 12/20/2012 | Intuitive-01495630 | Intuitive-01495639 | |
| DX1767.137 | Sales and Service Agreement between Intuitive Surgical and Advocate Health and Hospitals Corporation dba Advocate Condell Medical Center | 12/21/2012 | Intuitive-01598326 | Intuitive-01598345 | |
| DX1767.138 | Sales, License and Service Agreement between Intuitive Surgical and Kaiser Foundation Health Plan of Northwest | 2/21/2013 | Intuitive-01600170 | Intuitive-01600190 | |

| | | | | | |
|---|---|---|---|---|---|
| DX1767.139 | Sales, License, and Service Agreement between Intuitive Surgical and Marin General Hospital | 3/1/2013 | Intuitive-01600811 | Intuitive-01600822 | |
| DX1767.140 | Sales, License and Service Agreement between Intuitive Surgical and Northwestern Memorial Healthcare | 3/14/2013 | Intuitive-01506848 | Intuitive-01506860 | |
| DX1767.141 | Amendment to the Sales, License and Service Agreement between Intuitive Surgical and IU Health | 3/19/2013 | Intuitive-01600264 | Intuitive-01600270 | |
| DX1767.142 | Sales, License and Service Agreement between Intuitive Surgical and Providence Health & Services-Washington dba Providence Sacred Heart Medical Center | 3/26/2013 | Intuitive-01600583 | Intuitive-01600600 | |
| DX1767.143 | Sales, License and Service Agreement between Providence Health System-Southern California dba Providence Saint Joseph Medical Center | 3/26/2013 | Intuitive-01600919 | Intuitive-01600936 | |
| DX1767.144 | Sales, License and Service Agreement between Intuitive Surgical and Providence Health & Services-Montana dba St. Patrick Hospital | 3/26/2013 | Intuitive-01600937 | Intuitive-01600954 | |
| DX1767.145 | Sales, License and Service Agreement between Intuitive Surgical and Kaiser Permanente Medical Center | 5/29/2013 | Intuitive-01604777 | Intuitive-01604797 | |
| DX1767.146 | Sales, License and Service Agreement between Intuitive Surgical and Kaiser Permanente Medical Center | 8/5/2013 | Intuitive-01618040 | Intuitive-01618063 | |
| DX1767.147 | Amendment to the Sales, License and Service Agreement between Intuitive Surgical and Northside Hospital | 9/20/2013 | Intuitive-01621370 | Intuitive-01621375 | |
| DX1767.148 | Amendment 2 to the Sales, License, and Service Agreement between Intuitive Surgical and Advocate Health and Hospitals Corporation dba Advocate Lutheran General Hospital | 11/22/2013 | Intuitive-01634980 | Intuitive-01634984 | |
| DX1767.149 | Amendment 2 to the Sales, License, and Service Agreement between Intuitive Surgical and Beth Israel Deaconess Medical Center Inc. | 12/09/2013 | Intuitive-01636107 | Intuitive-01636114 | |
| DX1767.150 | Sales, License, and Service Agreement between Intuitive Surgical and Northeast Georgia Medical Center | 12/19/2013 | Intuitive-01636942 | Intuitive-01636953 | |
| DX1767.151 | Sales, License, and Service Agreement between Intuitive Surgical and Northeast Georgia Medical Center | 12/19/2013 | Intuitive-02021148 | Intuitive-02021159 | |
| DX1767.152 | Sales, License, and Service Agreement between Intuitive Surgical and Crescent City Surgical Center Operating Company, LLC | 12/24/2013 | Intuitive-00518249 | Intuitive-00518259 | |
| DX1767.153 | Use, License, and Service Agreement between Intuitive Surgical and Providence Health System - Southern California d/b/a Providence Holy Cross Medical Center | 3/24/2014 | Intuitive-01641266 | Intuitive-01641277 | |
| DX1767.154 | Lease Agreement between Intuitive Surgical and Providence Health System - Southern California d/b/a Providence Holy Cross Medical Center | 3/25/2014 | Intuitive-01641259 | Intuitive-01641265 | |
| DX1767.155 | Amendment to the Sales, License and Service Agreement between Intuitive Surgical and Legacy Health | 5/16/2014 | Intuitive-01642269 | Intuitive-01642269 | |
| DX1767.156 | Use, License, and Service Agreement between Intuitive Surgical and Keck Hospital of USC | 6/25/2014 | Intuitive-01644776 | Intuitive-01644786 | |
| DX1767.157 | Amendment to the Sales, and Service Agreement between Intuitive Surgical and Conway Regional Medical Center | 8/26/2014 | Intuitive-00518226 | Intuitive-00518231 | |
| DX1767.158 | Amendment to the Sales, License and Service Agreement between Intuitive Surgical and IU Health | 10/22/2014 | Intuitive-01650366 | Intuitive-01650375 | |
| DX1767.159 | Sales, License and Service Agreement between Intuitive Surgical and Kaiser Permanente Walnut Creek Medical Center | 11/5/2014 | Intuitive-01652385 | Intuitive-01652404 | |
| DX1767.160 | Lease Agreement between Intuitive Surgical and AMISUB of South Carolina, Inc. For the benefit of Piedmont Healthcare System | 11/19/2014 | Intuitive-01651560 | Intuitive-01651563 | |
| DX1767.161 | Use, License, and Service Agreement between Intuitive Surgical and AMISUB of South Carolina, Inc., for the benefit of Piedmont Healthcare System | 11/19/2014 | Intuitive-01651564 | Intuitive-01651576 | |
| DX1767.162 | Amendment Number 1 to the Sales, License and Service Agreement between  Intuitive Surgical and Kaiser Permanente Walnut Creek Medical Center | 12/5/2014 | Intuitive-01652792 | Intuitive-01652793 | |
| DX1767.163 | Banner Health Fourteenth Amendment to terms and Conditions of Purchase of Robotic Surgical Equiptment Agreement | 12/19/2014 | Intuitive-01653105 | Intuitive-01653111 | |
| DX1767.164 | Amendment 1 to the Sales, License & Service Agreement between Intuitive Surgical and Northside Hospital | 2/12/2015 | Intuitive-01662775 | Intuitive-01662778 | |
| DX1767.165 | Sales and Service Agreement between Intuitive Surgical and Advocate Health and Hospitals Corporation dba Good Samaritan Hospital | 03/11/2015 | Intuitive-02006153 | Intuitive-02006175 | |
| DX1767.166 | Amendment 2 to the Sales, License and Service Agreement between Intuitive Surgical and Northwest Georgia Medical Center | 3/12/2015 | Intuitive-01663914 | Intuitive-01663917 | |
| DX1767.167 | Amendment 1 to the Sales, License and Service Agreement between Intuitive Surgical and Northeast Georgia Medical Center | 3/25/2015 | Intuitive-01663918 | Intuitive-01663922 | |
| DX1767.168 | Amendment to the Sales, License and Service Agreement between Intuitive Surgical and Kaiser Foundation Hospitals on behalf of Kaiser Permanente San Francisco Medical Center | 3/27/2015 | Intuitive-01663750 | Intuitive-01663757 | |
| DX1767.169 | Amendment 3 to the Sales, License and Service Agreement between Intuitive Surgical and Northeast Georgia Medical Center | 4/21/2015 | Intuitive-01668960 | Intuitive-01668963 | |
| DX1767.170 | Sales, License, and Service Agreement between Intuitive Surgical and Honor Health Scottsdale Osborn Medical Center | 5/1/2015 | Intuitive-02005587 | Intuitive-02005599 | |
| DX1767.171 | Amendment No. 3 to Sales, License and Service Agreement between Intuitive Surgical and Regents of the University of Michigan | 6/10/2015 | Intuitive-01666805 | Intuitive-01666807 | |
| DX1767.172 | Franciscan Alliance Amendment to the SLSA | 6/17/2015 | Intuitive-01260516 | Intuitive-01260521 | |
| DX1767.173 | Amendment to the Sales, License and Service Agreement between Intuitive Surgical and Northwestern Memorial Healthcare | 6/19/2015 | Intuitive-01667901 | Intuitive-01667904 | |
| DX1767.174 | Amendment 2 to the Sales, License and Service Agreement between Intuitive Surgical and The Johns Hopkins Hospital | 6/26/2015 | Intuitive-00614921 | Intuitive-00614921.0010 | |

| DX1767.175 | Amendment to the Sales Agreement and Services Agreement between Intuitive Surgical and Duke University Health System | 7/14/2015 | Intuitive-01669566 | Intuitive-01669570 |
|---|---|---|---|---|
| DX1767.176 | Amendment to the Sales, License and Service Agreement between Intuitive Surgical and Northside Hospital | 9/17/2015 | Intuitive-01673235 | Intuitive-01673247 |
| DX1767.177 | Sales, License, and Service Agreement between Intuitive Surgical and Universal Health Services on behalf of Northern Nevada Medical Center | 10/28/2015 | Intuitive-01676371 | Intuitive-01676382 |
| DX1767.178 | Sales, License and Service Agreement between Intuitive Surgical and Legacy Health on behalf of Legacy Salmon Creek | 12/8/2015 | Intuitive-01679278 | Intuitive-01679289 |
| DX1767.179 | Use, License & Service Agreement between Intuitive Surgical and Salinas Valley Memorial Healthcare System | 12/10/2015 | Intuitive-01681409 | Intuitive-01681427 |
| DX1767.180 | Sales and Service Agreement between Intuitive Surgical and Advocate Health and Hospitals Corporation dba Advocate Sherman Hospital | 12/15/2015 | Intuitive-01679612 | Intuitive-01679631 |
| DX1767.181 | Sales, License, and Service Agreement between Intuitive Surgical and the University of Illinois Hospital and Health Sciences System | 12/17/2015 | Intuitive-00099486 | Intuitive-00099499 |
| DX1767.182 | Amendment 2 to the Sales and Service Agreement between Intuitive Surgical and Northwestern Memorial Healthcare | 12/17/2015 | Intuitive-01680115 | Intuitive-01680119 |
| DX1767.183 | Amendment to the Sales, License and Service Agreement between Intuitive Surgical and Mayo Clinic | 12/21/2015 | Intuitive-01681074 | Intuitive-01681077 |
| DX1767.184 | Amendment 3 to the Sales, License and Service Agreement between Intuitive Surgical and Johns Hopkins Bayview Medical Center | 12/22/2015 | Intuitive-00614920 | Intuitive-00614920.0006 |
| DX1767.185 | Sales, License, and Service Agreement between Intuitive Surgical and Winchester Medical Center | 12/23/2015 | Intuitive-01681474 | Intuitive-01681486 |
| DX1767.186 | Amendment to the Use, License and Service Agreement & Lease Agreement between Intuitive Surgical and Salinas Valley Memorial Healthcare System | 12/31/2015 | Intuitive-01682776 | Intuitive-01682777 |
| DX1767.187 | Use, License, and Service Agreement between Intuitive Surgical and Lahey Clinic | 02/29/2016 | Intuitive-01684779 | Intuitive-01684800 |
| DX1767.188 | Sales, License, and Service Agreement between Intuitive Surgical and Universal Health Services on behalf of Summerlin Health Medical Center | 3/23/2016 | Intuitive-01685895 | Intuitive-01685906 |
| DX1767.189 | Amendment 3 to the Sales, License and Service Agreement between Intuitive Surgical and Northwestern Memorial Healthcare | 3/28/2016 | Intuitive-01686411 | Intuitive-01686419 |
| DX1767.190 | Sales, License, and Service Agreement between Intuitive Surgical and Legacy Health on behalf of Legacy Emanuel Hospital and Health Center | 3/30/2016 | Intuitive-01687907 | Intuitive-01687920 |
| DX1767.191 | Banner Health Fifteenth Amendment to terms and Conditions of Purchase of Robotic Surgical Equiptment Agreement | 5/20/2016 | Intuitive-01690072 | Intuitive-01690076 |
| DX1767.192 | Sales, License and Service Agreement between Intuitive Surgical and Kaiser Foundation Hospitals - San Diego Medical Center | 7/27/2016 | Intuitive-01694753 | Intuitive-01694773 |
| DX1767.193 | Sales, License and Service Agreement between Intuitive Surgical and SSM-SLUH, Inc., a Missouri nonprofit corporation, d/b/a SSM Health Saint Louis University Hospital | 8/15/2016 | Intuitive-01697507 | Intuitive-01697519 |
| DX1767.194 | Sales, License, and Service Agreement between Intuitive Surgical and Conway Community Services d/b/a Baptist Health Medical Center - Conway | 8/29/2016 | Intuitive-01695405 | Intuitive-01695417 |
| DX1767.195 | Franciscan Alliance Amendment to the SLSA | 9/13/2016 | Intuitive-01253296 | Intuitive-01253305 |
| DX1767.196 | Amendment to the Sales and License Agreement and to the Service Agreement between Intuitive Surgical and Mayo Clinic | 10/17/2016 | Intuitive-01704677 | Intuitive-01704682 |
| DX1767.197 | Amendment to the Sales and License Agreement and to the Service Agreement between Intuitive Surgical and Mayo Clinic | 11/15/2016 | Intuitive-01704705 | Intuitive-01704709 |
| DX1767.198 | Amendment to the Sales and License Agreement and to the Service Agreement between Intuitive Surgical and Mayo Clinic | 11/15/2016 | Intuitive-01704800 | Intuitive-01704805 |
| DX1767.199 | Sales and License Agreement between Intuitive Surgical and Universal Health Services on behalf of Aiken Regional Medical Centers | 12/21/2016 | Intuitive-01707120 | Intuitive-01707135 |
| DX1767.200 | Sales, License, and Service Agreement between Intuitive Surgical and Universal Health Services on behalf of Desert Springs Hospital | 12/21/2016 | Intuitive-01708233 | Intuitive-01708244 |
| DX1767.201 | Amendment to the Sales, License, and Service Agreement between Intuitive Surgical and Advocate Health and Hospitals Corporation | 12/22/2016 | Intuitive-01707153 | Intuitive-01707155 |
| DX1767.202 | Sales, License, and Service Agreement between Intuitive Surgical and Piedmont Healthcare, Inc. | 12/23/2016 | Intuitive-00299311 | Intuitive-00299326 |
| DX1767.203 | Lease Agreement between Intuitive Surgical and Beth Israel Deaconess Hospital Milton | 12/27/2016 | Intuitive-01708557 | Intuitive-01708576 |
| DX1767.204 | Amendment 1 to the Sales, License and Service Agreement between Intuitive Surgical and Northside Hospital, Inc. | 1/18/2017 | Intuitive-01709362 | Intuitive-01709367 |
| DX1767.205 | Amendment Number 1 to the Lease Agreement between Intuitive Surgical and Piedmont Athens Regional Medical Center f/k/a Athens Regional Medical Center, Inc. | 1/19/2017 | Intuitive-01709360 | Intuitive-01709361 |
| DX1767.206 | Amendment to the Sales, License and Service Agreement between Intuitive Surgical and University of Illinois Hospital and Health Science System | 2/7/2017 | Intuitive-01711539 | Intuitive-01711542 |
| DX1767.207 | Franciscan Health Crown Point Lease Agreement | 3/7/2017 | Intuitive-01240518 | Intuitive-01240523 |
| DX1767.208 | Service Agreement between Intuitive Surgical and Providence St. Joseph Health | 4/21/2017 | Intuitive-00019174 | Intuitive-00019180 |
| DX1767.209 | Sales, License, and Service Agreement between Intuitive Surgical and Universal Health Services on behalf of Henderson Hospital | 5/15/2017 | Intuitive-00300051 | Intuitive-00300062 |
| DX1767.210 | Use, License & Service Agreement between Intuitive Surgical and CHI Franciscan Health on behalf of St. Joseph Medical Center | 5/19/2017 | Intuitive-00300071 | Intuitive-00300093 |
| DX1767.211 | Use, License & Service Agreement between Intuitive Surgical and Larken Community Hospital | 6/9/2017 | Intuitive-00300421 | Intuitive-00300445 |

| DX1767.212 | Sales, License and Service Agreement between Intuitive Surgical and Kaiser Foundation Hospitals - Oakland Medical Center | 6/16/2017 | Intuitive-01722041 | Intuitive-01722061 |
|---|---|---|---|---|
| DX1767.213 | Banner Health Sixteenth  Amendment to terms and Conditions of Purchase of Robotic Surgical Equipment Agreement | 7/14/2017 | Intuitive-01722308 | Intuitive-01722313 |
| DX1767.214 | Banner Health Seventeenth Amendment to terms and Conditions of Purchase of Robotic Surgical Equipment Agreement | 7/14/2017 | Intuitive-01751728 | Intuitive-01751732 |
| DX1767.215 | Amendment to the Sales, License, and Service Agreement between Intuitive Surgical and Lovelace Women's Hospital | 07/21/2017 | AHS_MGMT-INTUITIVE_0000201 | AHS_MGMT-INTUITIVE_0000206 |
| DX1767.216 | Amendment to the Sales, License, and Service Agreement between Intuitive Surgical and Lovelace Health System dba Lovelace Women's Hospital | 07/21/2017 | Intuitive-01722215 | Intuitive-01722220 |
| DX1767.217 | Banner Health Eighteenth Amendment to terms and Conditions of Purchase of Robotic Surgical Equipment Agreement | 7/31/2017 | Intuitive-01751723 | Intuitive-01751727 |
| DX1767.218 | Lease Agreement between Intuitive Surgical and Providence Health & Services-Washington, dba Providence Sacred Heart Medical Center | 9/1/2017 | Intuitive-00301736 | Intuitive-00301754 |
| DX1767.219 | Master Agreement for the Da Vinci Surgical System and Related Products and Services between Intuitive and Kaiser Foundation Health Plan | 9/1/2017 | Intuitive-01024554 | Intuitive-01024608 |
| DX1767.220 | Service Agreement between Intuitive Surgical and Northwestern Memorial Healthcare | 9/11/2017 | Intuitive-00061183 | Intuitive-00061190 |
| DX1767.221 | Use, License & Service Agreement between Intuitive Surgical and Providence Health System-Southern California d/b/a Providence Little Company of Mary Medical Center Torrance | 9/21/2017 | Intuitive-00301811 | Intuitive-00301830 |
| DX1767.222 | Sales, License, and Service Agreement between Intuitive Surgical and Good Samaritan Regional Health Center, d/b/a SSM Health Good Samaritan Hospital - Mt. Vernon | 9/25/2017 | Intuitive-00167226 | Intuitive-00167238 |
| DX1767.223 | Amendment to the Sales and License Agreement and to the Service Agreement between Intutive Surgical and Mayo Clinic | 9/28/2017 | Intuitive-00343746 | Intuitive-00343750 |
| DX1767.224 | Sales License and Service Agreement between Intuitive Surgical and The Johns Hopkins Hospital | 9/29/2017 | Intuitive-00614922 | Intuitive-00614922.0019 |
| DX1767.225 | Loan Agreement between Banner University Medical Center Phoenix and Intuitive Surgical | 10/5/2017 | Intuitive-00006283 | Intuitive-00006285 |
| DX1767.226 | Sales, License and Service Agreement between Intuitive Surgical and Kaiser Foundation Hospitals - Moanalua Medical Center | 10/20/2017 | Intuitive-01758798 | Intuitive-01758818 |
| DX1767.227 | Sales, License, and Service Agreement between Intuitive Surgical and University of Southern California on behalf of its Keck Hospital of USC | 10/23/2017 | Intuitive-00302196 | Intuitive-00302208 |
| DX1767.228 | Loan Agreement between Intuitive Surgical and Keck School of Medicine of USC | 11/3/2017 | Intuitive-01801217 | Intuitive-01801219 |
| DX1767.229 | Amendment to the Sales and License Agreement and to the Service Agreement between Intutive Surgical and Mayo Clinc | 11/10/2017 | Intuitive-00344477 | Intuitive-00344482 |
| DX1767.230 | Amendment to the Sales and License Agreement & to the Service Agreement between Intutive Surgical and Mayo Clinic | 11/17/2017 | Intuitive-00344392 | Intuitive-00344396 |
| DX1767.231 | Sales, License, and Service Agreement between Intuitive Surgical and Exeter Hospital | 11/22/2017 | Intuitive-00302518 | Intuitive-00302529 |
| DX1767.232 | Sales, License and Service Agreement between Intuitive Surgical and Kaiser Foundation Hospitals - Panorama City Medical Center | 11/30/2017 | Intuitive-01763529 | Intuitive-01763549 |
| DX1767.233 | Sales, License, and Service Agreement between Intuitive Surgical and Beth Israel Deaconess Hospital-Milton | 12/11/2017 | Intuitive-00061804 | Intuitive-00061814 |
| DX1767.234 | Amendment to the Sales, License, and Service Agreement between Intuitive Surgical and Advocate Health and Hospitals Corporation on behalf of BroMenn Medical Center | 12/20/2017 | Intuitive-01764701 | Intuitive-01764705 |
| DX1767.235 | Use, License and Service Agreement between Intuitive Surgical and The Johns Hopkins Health System Corporation | 12/28/2017 | Intuitive-00227564 | Intuitive-00227622 |
| DX1767.236 | Loan Agreement between Intuitive Surgical and Keck School of Medicine of USC | 1/23/2018 | Intuitive-01767352 | Intuitive-01767354 |
| DX1767.237 | Equipment Loan and Pilot Agreement between Intuitive Surgical and Advocate Health and Hospitals Corporation | 2/7/2018 | Intuitive-00064174 | Intuitive-00064187 |
| DX1767.238 | Sales, License, and Service Agreement between Intuitive Surgical and SSM Health Care of Oklahoma, Inc., an Oklahoma nonprofit corporation, owning and operating St. Anthony Hospital | 2/8/2018 | Intuitive-00303601 | Intuitive-00303613 |
| DX1767.239 | Lease and Transaction Agreement between Intuitive Surgical and Seton Northwest Hospital | 02/09/2018 | Intuitive-00449341 | Intuitive-00449350 |
| DX1767.240 | Sales, License, and Service Agreement between Intuitive Surgical and SSM Health Care of Wisconsin, Inc. on behalf of St. Mary's Hospital | 2/20/2018 | Intuitive-00303895 | Intuitive-00303906 |
| DX1767.241 | Amendment 1 to The Lease Agreement between Intuitive Surgical and Franciscan Alliance, Inc | 3/15/2018 | Intuitive-00601480 | Intuitive-00601481 |
| DX1767.242 | Use, License & Service Agreement between Intuitive Surgical and Northside Hospital Inc. | 3/29/2018 | Intuitive-01774459 | Intuitive-01774479 |
| DX1767.243 | Use, License and Service Agreement between Intuitive Surgical and Northside Hospital-Cherokee | 3/29/2018 | Intuitive-00304138 | Intuitive-00304158 |
| DX1767.244 | Amendment to the Sales, License and Service Agreement between Intuitive Surgical and Scottsdale Healthcare Hospitals doing business as HonorHealth on behalf of HonorHealth Scottsdale Shea Medical Center and HonorHealth Deer Valley Medical Center | 4/23/2018 | Intuitive-01776135 | Intuitive-01776140 |
| DX1767.245 | Loan Agreement between Intuitive Surgical and University of Southern California | 5/17/2018 | Intuitive-01757103 | Intuitive-01757104 |
| DX1767.246 | Use, License & Service Agreement between Intuitive Surgical and Northside Hospital-Forsyth | 6/14/2018 | Intuitive-01780950 | Intuitive-01780971 |

| DX1767.247 | Use, License and Service Agreement between Intuitive Surgical and Northside Hospital-Forsyth | 6/14/2018 | Intuitive-00305265 | Intuitive-00305286 |
|---|---|---|---|---|
| DX1767.248 | Sales, License, and Service Agreement between Intuitive Surgical and Regents of the University of Michigan | 6/20/2018 | Intuitive-00063874 | Intuitive-00063884 |
| DX1767.249 | Sales, License and Service Agreement between Intuitive Surgical and Winchester Hospital | 06/25/2018 | Intuitive-00063892 | Intuitive-00063903 |
| DX1767.250 | Use, License & Service Agreement between Intuitive Surgical and Pomona Valley Hospital Medical Center | 7/6/2018 | Intuitive-00305910 | Intuitive-00305929 |
| DX1767.251 | Amendment to the Sales, License and Service Agreement between Intuitive Surgical and Memorial Health Services dba Memorical Care on behalf of Memorial Care Long Beach Medical Center | 7/20/2018 | Intuitive-01785187 | Intuitive-01785194 |
| DX1767.252 | Use, License and Service Agreement between Intuitive Surgical and Mayo Foundation for Medical Education and Research | 8/31/2018 | Intuitive-00098723 | Intuitive-00098742 |
| DX1767.253 | Amendment to the Sales, License and Service Agreement between Intuitive Surgical and Memorial Health Services dba Memorical Care on behalf of Orange Coast Memorial Medical Center | 8/31/2018 | Intuitive-00307312 | Intuitive-00307317 |
| DX1767.254 | Amendment to the Sales, License and Service Agreement between Intuitive Surgical and Memorial Health Services dba Meorical Care on behalf of Saddleback Memorial Medical Center | 8/31/2018 | Intuitive-01791589 | Intuitive-01791595 |
| DX1767.255 | Sales, License, and Service Agreement between Intuitive Surgical and Valley Medical Center | 8/31/2018 | Intuitive-00306656 | Intuitive-00306671 |
| DX1767.256 | Banner Health Nineteenth  Amendment to terms and Conditions of Purchase of Robotic Surgical Equiptment Agreement | 8/31/2018 | Intuitive-01788399 | Intuitive-01788403 |
| DX1767.257 | Banner Health Twenieth Amendment to Terms and Conditions of Purchase of Robotic Surgical Equiptment Agreement | 9/5/2018 | Intuitive-01789163 | Intuitive-01789167 |
| DX1767.258 | Use, License, and Service Agreement between Intuitive Surgical and Banner University Medical Center Phoenix | 09/21/2018 | Intuitive-00307425 | Intuitive-00307444 |
| DX1767.259 | Amendment to the Use, License, and Service Agreement and Lease Agreement between Banner University Medical Center Phoenix | 09/21/2018 | Intuitive-01848686 | Intuitive-01848689 |
| DX1767.260 | Sales, License, and Service Agreement between Intuitive Surgical and Ardent Health Services on behalf of UT Health Tyler | 09/25/2018 | Intuitive-00065047 | Intuitive-00065059 |
| DX1767.261 | Sales, License, and Service Agreement between Intuitive Surgical and Beth Israel Deaconess Medical Center | 09/25/2018 | Intuitive-00308581 | Intuitive-00308593 |
| DX1767.262 | Use, License & Service Agreement between Intuitive Surgical and The Board of Trustees of the University of Illinois on behalf of the University of Illinois Hospital and Health Sciences System | 9/28/2018 | Intuitive-00099466 | Intuitive-00099485 |
| DX1767.263 | Amendment 4 to the Sales, License and Service Agreement between Intuitive Surgical and Northwestern Memorial Healthcare | 11/29/2018 | Intuitive-00324111 | Intuitive-00324120 |
| DX1767.264 | Amendment 4 to the Sales, License and Service Agreement between Intuitive Surgical and Northwestern Memorial Healthcare | 11/29/2018 | Intuitive-01802724 | Intuitive-01802733 |
| DX1767.265 | Sales, License, and Service Agreement between Intuitive Surgical and The Children's Hospital Corporation dba Boston Children's Hospital | 12/05/2018 | Intuitive-00066202 | Intuitive-00066214 |
| DX1767.266 | Amendment to the Sales, License, and Service Agreement between Intuitive Surgical and The Children's Hospital Corporation dba Boston Children's Hospital | 12/05/2018 | Intuitive-02010557 | Intuitive-02010560 |
| DX1767.267 | Transcation Agreement between Intuitive Surgical and Advocate Aurora Health Inc. dba Advocate Lutheran General Hospital | 12/14/2018 | Intuitive-01809774 | Intuitive-01809779 |
| DX1767.268 | Transcation Agreement between Intuitive Surgical and Advocate Aurora Health Inc. dba Condell Medical Center | 12/14/2018 | Intuitive-01809859 | Intuitive-01809864 |
| DX1767.269 | Use, License and Service Agreement between Intuitive Surgical and Lahey Clinic Hospital | 12/19/2018 | Intuitive-00066639 | Intuitive-00066650 |
| DX1767.270 | Lease Agreement between Intuitive Surgical and Lahey Clinic Hospital | 12/19/2018 | Intuitive-01814033 | Intuitive-01814049 |
| DX1767.271 | Amendment to the Lease Agreement between Intutive Surgical and Banner University Medical Center Phoenix | 12/27/2018 | Intuitive-01027017 | Intuitive-01027021 |
| DX1767.272 | Amendment to the Transaction Agreement between Intuitive Surgical and Advocate Aurora Health Inc. dba Advocate Lutheran General Hospital | 01/18/2019 | Intuitive-01814258 | Intuitive-01814258 |
| DX1767.273 | Lease and Transaction Agreement between Intuitive Surgical and Seton Family of Hospitals on behalf of Seton Medical Center Highland Lakes | 02/01/2019 | Intuitive-01815307 | Intuitive-01815315 |
| DX1767.274 | Amendment to the Loan Agreement between Intuitive Surgical and Keck School of Medicine of USC | 2/6/2019 | Intuitive-01826956 | Intuitive-01826956 |
| DX1767.275 | Sales, License, and Service Agreement between Intuitive Surgical and Lovelace Women's Hospital | 03/05/2019 | Intuitive-00563372 | Intuitive-00563386 |
| DX1767.276 | Use, License, and Service Agreement between Intuitive Surgical and Duke University Health System Inc. | 03/07/2019 | Intuitive-00313235 | Intuitive-00313262 |
| DX1767.277 | Lease Agreement between Intuitive Surgical and Franciscan Alliance, Inc | 3/7/2019 | Intuitive-00059668 | Intuitive-00059685 |
| DX1767.278 | Banner Desert Medical Center Twenty-second amendment to the Terms and conditions of purchase of robotic surgical equiptment agreement | 3/22/2019 | Intuitive-01819854 | Intuitive-01819858 |
| DX1767.279 | Sales, License, and Service Agreement between Intuitive Surgical and Northside Hospital Inc. | 3/29/2019 | Intuitive-01822081 | Intuitive-01822099 |
| DX1767.280 | Lease and Transaction Agreement between Intuitive Surgical and Ascension Seton | 05/08/2019 | Intuitive-00321730 | Intuitive-00321739 |
| DX1767.281 | Amendment No. 2 to the Sales, License and Service Agreement between Intuitive Surgical and Scottsdale Healthcare Hospitals d/b/a HonorHealth on behalf of HonorHealth Scottsdale Thompson Peak Medical Center | 5/16/2019 | Intuitive-00321850 | Intuitive-00321854 |

| | | | | |
|---|---|---|---|---|
| DX1767.282 | Lease and Transaction Agreement between Intuitive Surgical and Ascension Seton | 05/24/2019 | Intuitive-01827075 | Intuitive-01827084 |
| DX1767.283 | Lease and Transaction Agreement between Intuitive Surgical and Ascension Seton | 06/07/2019 | Intuitive-00321961 | Intuitive-00321970 |
| DX1767.284 | Master Sales, License, and Service Agreement between Intuitive Surgical and Piedmont Healthcare, Inc. | 6/10/2019 | Intuitive-01828755 | Intuitive-01828779 |
| DX1767.285 | Amendment to the Lease Agreement between Intuitive Surgical and Pomona Valley Hospital Medical Center | 6/10/2019 | Intuitive-01830579 | Intuitive-01830580 |
| DX1767.286 | Franciscan Health Lafayette Amendment to the SLSA | 6/12/2019 | Intuitive-01250362 | Intuitive-01250364 |
| DX1767.287 | Sales, License, and Service Agreement between Intuitive Surgical and Winchester Medical Center | 06/20/2019 | Intuitive-00315215 | Intuitive-00315230 |
| DX1767.288 | Master Lease Agreement between Intuitive Surgical and Kaiser Foundation Hospitals | 7/15/2019 | Intuitive-01837384 | Intuitive-01837420 |
| DX1767.289 | Amendment to the Sales, License and Service Agreement between Intuitive Surgical and Northeast Georgia Medical Center | 7/22/2019 | Intuitive-00016624 | Intuitive-00016629 |
| DX1767.290 | Sales, License, and Service Agreement between Intuitive Surgical and Winchester Medical Center | 07/30/2019 | Intuitive-00323384 | Intuitive-00323401 |
| DX1767.291 | Amendment to the Sales, License and Service Agreement between Intuitive Surgical and Franciscan Alliance Inc., d/b/a Franciscan Health Lafayette East | 8/5/2019 | Intuitive-01250366 | Intuitive-01250368 |
| DX1767.292 | Sales, License, and Service Agreement between Intuitive Surgical and Conway Regional Medical Center, Inc. d/b/a Conway Regional Health System | 8/15/2019 | Intuitive-00067540 | Intuitive-00067547 |
| DX1767.293 | Lease Agreement between Intuitive Surgical and AMISUB of South Carolina, Inc.dba Piedmont Medical Center | 8/30/2019 | Intuitive-00939596 | Intuitive-00939603 |
| DX1767.294 | Amendment to the Sales, License and Service Agreement between Intuitive Surgical and Valley Medical Center | 9/4/2019 | Intuitive-00313873 | Intuitive-00313878 |
| DX1767.295 | Franciscan Alliance Second Amendment to the SLSA | 9/12/2019 | Intuitive-01120451 | Intuitive-01120452 |
| DX1767.296 | Sales, License, and Service Agreement between Intuitive Surgical and Conway Hospital | 9/17/2019 | Intuitive-00067924 | Intuitive-00067935 |
| DX1767.297 | MDA Agreement 5060012030 Lease Agreement between Intuitive Surgical and University of Texas MD Anderson Cancer Center | 09/24/2019 | Intuitive-00068430 | Intuitive-00068461 |
| DX1767.298 | Amendment 5 to the Sales, License and Service Agreement between Intuitive Surgical and Northwestern Memorial Healthcare on behalf of Northwestern Memorial Hospital | 9/24/2019 | Intuitive-01845987 | Intuitive-01845992 |
| DX1767.299 | Sales, License and Service Agreement between Intuitive Surgical and Franciscan Alliance | 9/25/2019 | Intuitive-00314658 | Intuitive-00314672 |
| DX1767.300 | Use, License and Service Agreement between Intuitive Surgical and Legacy Health | 9/26/2019 | Intuitive-01846832 | Intuitive-01846849 |
| DX1767.301 | True Lease Schedule No. 3 to Master Lease Agreement between Intuitive Surgical and Kaiser Foundation Hospitals | 9/30/2019 | Intuitive-00316818 | Intuitive-00316823 |
| DX1767.302 | Amendment No. 3 to the Sales, License and Service Agreement between Intuitive Surgical and Scottsdale Healthcare Hospitals d/b/a HonorHealth on behalf of HonorHealth Scottsdale Shea Medical Center | 11/8/2019 | Intuitive-00316801 | Intuitive-00316805 |
| DX1767.303 | Master Sales, License, and Service Agreement between Intuitive Surgical and Northside Hospital | 11/13/2019 | Intuitive-00160663 | Intuitive-00160690 |
| DX1767.304 | Amendment to the Lease Agreement between Intuitive Surgical and AMISUB of South Carolina, Inc. | 11/26/2019 | Intuitive-02012183 | Intuitive-02012185 |
| DX1767.305 | Use, License and Service Agreement between Intuitive Surgical and Scottsdale Healthcare Hospitals d/b/a Honor Health John C. Lincoln Medical Center | 12/2/2019 | Intuitive-00316743 | Intuitive-00316761 |
| DX1767.306 | Use, License and Service Agreement between Intuitive Surgical and Advocate Aurora Health dba Advocate Christ Medical Center | 12/09/2019 | Intuitive-00094417 | Intuitive-00094428 |
| DX1767.307 | Lease Agreement between Intuitive Surgical and  Advocate Aurora Health dba Advocate Christ Medical Center | 12/09/2019 | Intuitive-00094429 | Intuitive-00094434 |
| DX1767.308 | Use, License and Service Agreement between Intuitive Surgical and Kaiser Permanente San Jose Medical Center | 12/10/2019 | Intuitive-01857701 | Intuitive-01857708 |
| DX1767.309 | Use, License and Service Agreement between Intuitive Surgical and Kasier Permanente Santa Clara Medical Center | 12/10/2019 | Intuitive-01858610 | Intuitive-01858617 |
| DX1767.310 | Use, Licesne and Service Agreement between Intuitive Surgical nad Kaiser Permanente Modesto Medical Center | 12/10/2019 | Intuitive-01859110 | Intuitive-01859117 |
| DX1767.311 | Sales, License, and Service Agreement between Intuitive Surgical and Northwestern Memorial Healthcare | 12/16/2019 | Intuitive-01862315 | Intuitive-01862329 |
| DX1767.312 | Sales, License, and Service Agreement between Intuitive Surgical and Northeast Georgia Medical Center | 12/20/2019 | Intuitive-01863179 | Intuitive-01863190 |
| DX1767.313 | Transaction Agreement between Intuitive Surgical and Advocate Aurora Health Inc. dba Advocate Christ Medical Center | 12/24/2019 | Intuitive-01867911 | Intuitive-01867916 |
| DX1767.314 | Banner Health Twenty-third amendment to the Terms and conditions of purchase of robotic surgical equipment agreement | 12/26/2019 | Intuitive-00936158 | Intuitive-00936166 |
| DX1767.315 | Sales, License, and Service Agreement between Intuitive Surgical and Indiana University Health d/b/a IU Health Ball Memorial Hospital | 12/27/2019 | Intuitive-00935569 | Intuitive-00935582 |
| DX1767.316 | Sales, License, and Service Agreement between Intuitive Surgical and Indiana University Health dba IU Health Arnett Hospital | 12/27/2019 | Intuitive-01030081 | Intuitive-01030094 |
| DX1767.317 | Loan Agreement between Intuitive Surgical and University of Southern California on behald of Keck School of Medicine USC | 12/31/2019 | Intuitive-01849868 | Intuitive-01849869 |
| DX1767.318 | Service Renewal Addendum between Intuitive Surgical and Hillcrest Hospital South - OK | 01/15/2020 | Intuitive-00606709 | Intuitive-00606710 |
| DX1767.319 | Sales, License, and Service Agreement between Intuitive Surgical and Mayo Clinic Hospital-Saint Mary's Campus | 1/24/2020 | Intuitive-01882252 | Intuitive-01882262 |

| DX1767.320 | Sales, License, and Service Agreement between Intuitive Surgical and Mayo Clinic-Jacksonville | 1/24/2020 | Intuitive-01882263 | Intuitive-01882273 |
|---|---|---|---|---|
| DX1767.321 | Amendment to the Master Sales, License, and Service Agreement between Intuitive Surgical and Piedmont Healthcare, Inc. | 2/18/2020 | Intuitive-01883098 | Intuitive-01883107 |
| DX1767.322 | Master Sales, License, and Service Agreement between Intuitive Surgical and Providence Health & Services | 4/6/2020 | Intuitive-01886224 | Intuitive-01886246 |
| DX1767.323 | Use, License and Service Agreement between Intuitive Surgical and Marin General Hospital | 4/30/2020 | Intuitive-01889952 | Intuitive-01889962 |
| DX1767.324 | Lease Agreement between Intuitive Surgical and Marin General Hospital | 4/30/2020 | Intuitive-01889963 | Intuitive-01889968 |
| DX1767.325 | Service Agreement between Intuitive Surgical and Ardent Health Services | 06/04/2020 | Intuitive-00563783 | Intuitive-00563787 |
| DX1767.326 | Service Renewal Addendum between Intuitive Surgical and AHS Management Company | 06/18/2020 | Intuitive-00564032 | Intuitive-00564037 |
| DX1767.327 | Use, License & Service Agreement between Intuitive Surgical and The Board of Trustees of the University of Illinois on behalf of the University of Illinois Hospital and Health Sciences System | 6/22/2020 | Intuitive-01895728 | Intuitive-01895746 |
| DX1767.328 | Amendment No.1 to Amendment No.3 to Sales, License, and Service Agreement between Intuitive Surgical and Honor Health fka Scottsdale Healthcare Hospitals on behalf of HonorHealth Scottsdale Shen Medical Center | 6/29/2020 | Intuitive-00936941 | Intuitive-00936942 |
| DX1767.329 | Amendment to the Use, License and Service Agreement between Intuitive Surgical and The Johns Hopkins Health System Corporation | 7/1/2020 | Intuitive-01897944 | Intuitive-01897949 |
| DX1767.330 | Use, License, and Service Agreement between Intuitive Surgical and Lovelace Women's Hospital | 07/21/2020 | Intuitive-00564485 | Intuitive-00564498 |
| DX1767.331 | Lease Agreement between Intuitive Surgical and Lovelace Women's Hospital | 07/21/2020 | Intuitive-00564499 | Intuitive-00564504 |
| DX1767.332 | Lease Agreement between Intuitive Surgical and Kaiser-San Leandro Medical Center | 7/23/2020 | Intuitive-01898984 | Intuitive-01898990 |
| DX1767.333 | Lease Agreement between Intuitive Vurgical and Kaiser-Hospital and Rehabilitation Center | 7/23/2020 | Intuitive-01899164 | Intuitive-01899170 |
| DX1767.334 | Sales, License, and Service Agreement between Intuitive Surgical and Lovelace Women's Health System | 08/05/2020 | Intuitive-01260436 | Intuitive-01260450 |
| DX1767.335 | Use, License & Service Agreement between Intuitive Surgical and Northwestern Memorial Healthcare | 8/21/2020 | Intuitive-01900884 | Intuitive-01900902 |
| DX1767.336 | Amendment to the Loan Agreement between Intuitive Surgical and Keck School of Medicine of USC | 9/11/2020 | Intuitive-01903708 | Intuitive-01903708 |
| DX1767.337 | Amendment 2 to the Loan Agreement between Intuitive Surgical and Keck School of Medicine of USC | 9/11/2020 | Intuitive-01903709 | Intuitive-01903709 |
| DX1767.338 | Master Sales, License, and Service Agreement between Intuitive Surgical and Franciscan Alliance, Inc | 9/28/2020 | Intuitive-01255224 | Intuitive-01255248 |
| DX1767.339 | Transaction Agreement between Intuitive Surgical and Franciscan Alliance, Inc., d/b/a Franciscan Health Crawfordsville | 9/28/2020 | Intuitive-01121443 | Intuitive-01121447 |
| DX1767.340 | Use, License, and Service Agreement between Intuitive Surgical and Banner Health | 10/20/2020 | Intuitive-01911721 | Intuitive-01911737 |
| DX1767.341 | Transaction Agreement between Intuitive Surgical and Banner Ocotillo Medical Center | 10/20/2020 | Intuitive-01911738 | Intuitive-01911740 |
| DX1767.342 | Transaction Agreement between Banner University Medical Center Tucson | 11/9/2020 | Intuitive-01912685 | Intuitive-01912689 |
| DX1767.343 | Transaction Agreement between Intuitive Surgical and Banner University Medical Center South | 11/9/2020 | Intuitive-01916270 | Intuitive-01916272 |
| DX1767.344 | Transaction Agreement between Intuitive Surgical and Banner University Medical Center Phoenix | 11/9/2020 | Intuitive-01916281 | Intuitive-01916284 |
| DX1767.345 | Transaction Agreement between Intuitive Surgical and Banner Thunderbird Medical Center | 11/9/2020 | Intuitive-01916285 | Intuitive-01916289 |
| DX1767.346 | Transaction Agreement between Intuitive Surgical and Banner North Colorado Medical Center | 11/9/2020 | Intuitive-01916300 | Intuitive-01916303 |
| DX1767.347 | Transaction Agreement between Intuitive Surgical and Banner McKee Medical Center | 11/9/2020 | Intuitive-01916304 | Intuitive-01916307 |
| DX1767.348 | Transaction Agreement between Intuitive Surgical and Banner Ironwood Medical Center | 11/9/2020 | Intuitive-01916308 | Intuitive-01916311 |
| DX1767.349 | Transaction Agreement between Intuitive Surgical and Banner Goldfield Medical Center | 11/9/2020 | Intuitive-01916312 | Intuitive-01916315 |
| DX1767.350 | Transaction Agreement between Intuitive Surgical and Banner Estrella Medical Center | 11/9/2020 | Intuitive-01916316 | Intuitive-01916319 |
| DX1767.351 | Transaction Agreement between Intuitive Surgical and Banner Desert Medical Center | 11/9/2020 | Intuitive-01916320 | Intuitive-01916324 |
| DX1767.352 | Transaction Agreement between Intuitive Surgical and Banner Casa Grande Medical Center | 11/9/2020 | Intuitive-01916330 | Intuitive-01916332 |
| DX1767.353 | Transaction Agreement between Intuitive Surgical and Banner Baywood Medical Center | 11/9/2020 | Intuitive-01916333 | Intuitive-01916336 |
| DX1767.354 | Transaction Agreement between Intuitive Surgical and Banner Gateway Medical Center | 11/9/2020 | Intuitive-01916341 | Intuitive-01916344 |
| DX1767.355 | Lease Agreement between Intuitive Surgical and King County Public Hospital District No. 2 d/b/a Evergreen Health | 12/10/2020 | Intuitive-01921735 | Intuitive-01921742 |
| DX1767.356 | Use, License, and Service Agreement between King County Public Hospital District | 12/10/2020 | Intuitive-01921743 | Intuitive-01921757 |
| DX1767.357 | Use, License & Service Agreement between Intuitive Surgical and The Board of Trustees of the University of Illinois on behalf of the University of Illinois Hospital and Health Sciences System | 12/11/2020 | Intuitive-01919284 | Intuitive-01919302 |
| DX1767.358 | Transaction Agreement between Intuitive Surgical and Advocate Aurora Health Inc. dba Advocate Christ Medical Center | 12/23/2020 | Intuitive-01924369 | Intuitive-01924372 |

| DX1767.359 | Transaction Agreement between Intuitive Surgical and Advocate Aurora Health Inc. dba Advocate Good Samaritan Hospital | 12/23/2020 | Intuitive-01924373 | Intuitive-01924376 |
|---|---|---|---|---|
| DX1767.360 | Transaction Agreement between Intuitive Surgical and Advocate Aurora Health Inc. dba Aurora St. Luke's Medical Center | 12/23/2020 | Intuitive-01924377 | Intuitive-01924380 |
| DX1767.361 | Transaction Agreement between Intuitive Surgical and Advocate Aurora Health Inc. dba Advocate Illinois Masonic Medical Center | 12/23/2020 | Intuitive-01924381 | Intuitive-01924384 |
| DX1767.362 | Transaction Agreement between Intuitive Surgical and Advocate Aurora Health Inc. dba Advocate Lutheran General Hospital | 12/23/2020 | Intuitive-01924385 | Intuitive-01924388 |
| DX1767.363 | Transaction Agreement between Intuitive Surgical and Advocate Aurora Health Inc. dba Advocate South Suburban Hospital | 12/23/2020 | Intuitive-01924389 | Intuitive-01924394 |
| DX1767.364 | Amendment No. 1 to the Use, License and Service Agreement & Lease Agreement between Intuitive Surgical and USC Verdugo Hills Hospital | 12/28/2020 | Intuitive-01927498 | Intuitive-01927499 |
| DX1767.365 | Use, License and Service Agreement between Intuitive Surgical and HonorHealth dba HonorHealth Scottsdale Shen Medical Center | 12/31/2020 | Intuitive-01926982 | Intuitive-01926999 |
| DX1767.366 | Sales, License, and Service Agreement between Intuitive Surgical and Conway Hospital | 12/31/2020 | Intuitive-01927099 | Intuitive-01927109 |
| DX1767.367 | Kaiser Foundation hospitals True Lease Schedule to Master Lease Agreement Contract Reference Number 441034 | 12/31/2020 | Intuitive-01926834 | Intuitive-01926840 |
| DX1767.368 | Loan Agreement between Intuitive Surgical and Banner University Medical Center Phoenix | 1/19/2021 | Intuitive-01929027 | Intuitive-01929029 |
| DX1767.369 | Loan Agreement between Intuitive Surgical and Banner Thunderbird Medical Center | 1/19/2021 | Intuitive-01929030 | Intuitive-01929032 |
| DX1767.370 | Loan Agreement between Intuitive Surgical and Banner McKee Medical Center | 1/19/2021 | Intuitive-01929033 | Intuitive-01929035 |
| DX1767.371 | Loan Agreement between Intuitive Surgical and Banner Gateway Medical Center | 1/19/2021 | Intuitive-01929036 | Intuitive-01929038 |
| DX1767.372 | Loan Agreement between Intuitive Surgical and Banner Estrella Medical Center | 1/19/2021 | Intuitive-01929039 | Intuitive-01929041 |
| DX1767.373 | Loan Agreement between Intuitive Surgical and Banner Desert Medical Center | 1/19/2021 | Intuitive-01929042 | Intuitive-01929044 |
| DX1767.374 | Loan Agreement between Intuitive Surgical and Banner Del Webb Medical Center | 1/19/2021 | Intuitive-01929045 | Intuitive-01929047 |
| DX1767.375 | Loan Agreement between Intuitive Surgical and Banner University Medical Center Tucson | 1/19/2021 | Intuitive-01929048 | Intuitive-01929050 |
| DX1767.376 | Consolidated Services Agreement between Intuitive Surgical and Banner Health | 1/19/2021 | Intuitive-01929318 | Intuitive-01929320 |
| DX1767.377 | Amendment to the Sales, License and Service Agreement between Intuitive Surgical and University of Southern California on behalf of Keck Hospital of USC | 2/15/2021 | Intuitive-01931949 | Intuitive-01931956 |
| DX1767.378 | Amendment to the Sales, License and Service Agreement between Intuitive Surgical and University of Southern California on behalf of Keck Hospital of USC | 2/15/2021 | Intuitive-01931957 | Intuitive-01931961 |
| DX1767.379 | Amendment to the Sales, License and Service Agreement between Intuitive Surgical and SSM Health Care of Oklahoma, Inc., an Oklahoma nonprofit corporation, owning and operating St. Anthony Hospital | 2/19/2021 | Intuitive-01932359 | Intuitive-01932363 |
| DX1767.380 | Sales, License, and Service Agreement between Intuitive Surgical and AHS Hillcrest Medical Center | 03/10/2021 | Intuitive-00795203 | Intuitive-00795217 |
| DX1767.381 | Sales, License, and Service Agreement between Intuitive Surgical and AHS Hillcrest Medical Center | 03/10/2021 | Intuitive-01934389 | Intuitive-01934403 |
| DX1767.382 | Lease and Transaction Agreement between Intuitive Surgical and Ascension Seton Highland Lakes | 03/20/2021 | Intuitive-01937214 | Intuitive-01937221 |
| DX1767.383 | Amendment to the Lease Agreement between Intuitive Surgical and USC Verdugo Hills Hospital | 3/20/2021 | Intuitive-01934959 | Intuitive-01934959 |
| DX1767.384 | Loan Agreement between Intuitive Surgical and Banner Casa Grande Medical Center | 3/23/2021 | Intuitive-01936873 | Intuitive-01936874 |
| DX1767.385 | Loan Agreement between Intuitive Surgical and Banner Boswell Medical Center | 3/23/2021 | Intuitive-01936875 | Intuitive-01936876 |
| DX1767.386 | Loan Agreement between Intuitive Surgical and Banner Estrella Medical Center | 3/23/2021 | Intuitive-01936877 | Intuitive-01936878 |
| DX1767.387 | Loan Agreement between Intuitive Surgical and Banner Gateway Medical Center | 3/23/2021 | Intuitive-01936879 | Intuitive-01936880 |
| DX1767.388 | Master Sales, License, and Service Agreement between Intuitive Surgical and Indiana University Health | 3/30/2021 | Intuitive-01940975 | Intuitive-01941005 |
| DX1767.389 | Sales, License, and Service Agreement between Intuitive Surgical and AHS Hillcrest Medical Center | 04/15/2021 | Intuitive-02011886 | Intuitive-02011900 |
| DX1767.390 | Sales, Lease, and Service Agreement between Intuitive Surgical and Beth Israel Deaconess Medical Center Inc. | 05/14/2021 | Intuitive-01946359 | Intuitive-01946370 |
| DX1767.391 | Amendment to the Transaction Agreement between Intuitive Surgical and Banner Thunderbird Medical Center | 5/19/2021 | Intuitive-01946693 | Intuitive-01946694 |
| DX1767.392 | Transaction Agreement between Intuitive Surgical and Banner McKee Medical Center | 5/19/2021 | Intuitive-01946695 | Intuitive-01946697 |
| DX1767.393 | Lease Agreement between Intuitive Surgical and Regents of the University of Michigan | 6/11/2021 | Intuitive-01950164 | Intuitive-01950181 |
| DX1767.394 | Sales, License, and Service Agreement between Intuitive Surgical and Regents of the University of Michigan | 6/11/2021 | Intuitive-01950182 | Intuitive-01950192 |
| DX1767.395 | Lease Transaction Agreement between Intuitive Surgical and Aurora Health Care Southern Lakes Inc. dba Aurora Medical Center - Kenosha | 06/15/2021 | Intuitive-01950863 | Intuitive-01950871 |
| DX1767.396 | Lease Agreement between Intuitive Surgical and University of Southern California on behalf of Keck Hospital of USC | 6/15/2021 | Intuitive-01950496 | Intuitive-01950501 |

| DX1767.397 | Use, License & Service Agreement between Intuitive Surgical and University of Southern California on behalf of Keck Hospital of USC | 6/15/2021 | Intuitive-01950502 | Intuitive-01950514 |
|---|---|---|---|---|
| DX1767.398 | Amendment to the Master Sales, License and Service Agreement between Providence Health & Services | 6/18/2021 | Intuitive-01950836 | Intuitive-01950839 |
| DX1767.399 | Kaiser Foundation hospitals True Lease Schedule to Master Lease Agreement Contract Reference Number 405806 | 6/18/2021 | Intuitive-01951989 | Intuitive-01951995 |
| DX1767.400 | Use, License, and Service Agreement between Intuitive Surgical and Winchester Medical Center | 06/23/2021 | Intuitive-01952308 | Intuitive-01952324 |
| DX1767.401 | Lease Agreement between Intuitive Surgical and Providence Health & Services on behalf of Providence Health St. John's Hospital & Health Center | 6/25/2021 | Intuitive-01952786 | Intuitive-01952791 |
| DX1767.402 | Amendment to the Lease Agreement between Intuitive Surgical and Marin General Hospital | 6/29/2021 | Intuitive-01953854 | Intuitive-01953854 |
| DX1767.403 | Amendment 3 to the Loan Agreement between Intuitive Surgical and Keck School of Medicine of USC | 7/15/2021 | Intuitive-01957604 | Intuitive-01957604 |
| DX1767.404 | Lease Agreement between Intuitive Surgical and HonorHealth dba John C. Lincoln Medical Center | 7/26/2021 | Intuitive-01959894 | Intuitive-01959911 |
| DX1767.405 | Loan Agreement between Intuitive Surgical and Banner Gateway Medical Center | 8/18/2021 | Intuitive-01963679 | Intuitive-01963683 |
| DX1767.406 | Amendment to the Master Sales, License and Service Agreement between Intuitive Surgical and Northside Hospital, Inc. | 8/26/2021 | Intuitive-01962868 | Intuitive-01962871 |
| DX1767.407 | Use, License and Service Agreement between Intuitive Surgical and Conway Regional Medical Center | 8/31/2021 | Intuitive-01962773 | Intuitive-01962791 |
| DX1767.408 | Amendment to the Lease Agreement between Intuitive and Lahey Clinic Hospital Inc. | 09/15/2021 | Intuitive-01966439 | Intuitive-01966439 |
| DX1767.409 | Sales, License, and Service Agreement between Intuitive Surgical and Northwestern Memorial Healthcare on behalf of Central DuPage Hospital | 9/15/2021 | Intuitive-01964622 | Intuitive-01964638 |
| DX1767.410 | Sales, License, and Service Agreement between Intuitive Surgical and Northwestern Memorial Healthcare on behalf of Delnor-Community Hospital | 9/15/2021 | Intuitive-01964639 | Intuitive-01964655 |
| DX1767.411 | Amendment to the Use, License and Service Agreement & Lease Agreement between Intuitive Surgical and Providence Health & Services-Washington, dba Providence Sacred Heart Medical Center | 9/17/2021 | Intuitive-01967697 | Intuitive-01967698 |
| DX1767.412 | Transaction Agreement between Intuitive Surgical and Advocate Aurora Health Inc. dba Advocate Christ Medical Center | 09/29/2021 | Intuitive-01970128 | Intuitive-01970131 |
| DX1767.413 | Lease Transaction Agreement between Intuitive Surgical and Aurora Health Care Southern Lakes Inc. dba Aurora St. Luke's Medical Center | 10/01/2021 | Intuitive-01974345 | Intuitive-01974354 |
| DX1767.414 | First Amendment to Master Sales, License, and Service Agreement between Franciscan Alliance, Inc. and Intuitive Surgical | 10/27/2021 | Intuitive-01260395 | Intuitive-01260399 |
| DX1767.415 | First Amendment to Master Sales, License, and Service Agreement between Franciscan Alliance, Inc. and Intuitive Surgical | 10/29/2021 | FRANCISCAN-00000423 | FRANCISCAN-00000427 |
| DX1767.416 | Amendment to the Amendment to the Master Sales, License and Service Agreement between Intuitive Surgical and Providence Health & Services | 10/31/2021 | Intuitive-01973995 | Intuitive-01973996 |
| DX1767.417 | Sales, License, and Service Agreement between Intuitive Surgical and Northwestern Memorial Healthcare on behalf of Northwestern Medicine McHenry Hospital | 11/24/2021 | Intuitive-01978623 | Intuitive-01978639 |
| DX1767.418 | Amendment 4 to the Loan Agreement between Intuitive Surgical and Keck School of Medicine | 12/2/2021 | Intuitive-01990115 | Intuitive-01990115 |
| DX1767.419 | Use, License, and Service Agreement between Intuitive Surgical and Lahey Clinic Hospital Inc. | 12/10/2021 | Intuitive-01981958 | Intuitive-01981976 |
| DX1767.420 | Use, License, and Service Agreement between Intuitive Surgical and Beth Israel Lahey Health Inc. | 12/16/2021 | Intuitive-01984147 | Intuitive-01984163 |
| DX1767.421 | Amendment to the Sales, License and Service Agreement between Intuitive Surgical and Good Samaritan Regional Health Center, a Missouri nonprofit corporation, d/b/a SSM Health Good Samaritan Hospital - Mt. Vernon | 12/16/2021 | Intuitive-01983447 | Intuitive-01983448 |
| DX1767.422 | Use, License and Service Agreement between Intuitive Surgical and HonorHealth dba HonorHealth Deer Valley Medical Center | 12/16/2021 | Intuitive-01987353 | Intuitive-01987370 |
| DX1767.423 | Lease Agreement between Intuitive Surgical and Providence Health & Services on behalf of Providence Alaska Medical Center | 12/17/2021 | Intuitive-01988288 | Intuitive-01988294 |
| DX1767.424 | Sales, License, and Service Agreement between Intuitive Surgical and Lovelace Health System LLC dba Lovelace Medical Center | 12/21/2021 | Intuitive-01984735 | Intuitive-01984749 |
| DX1767.425 | Crescent City Surgical Center Operating Company ULSA | 12/28/2021 | Intuitive-01987738 | Intuitive-01987756 |
| DX1767.426 | Lease Agreement between Intuitive Surgical and Providence Health & Services on behalf of Covenant Medical Center-19th Street Camput | 12/30/2021 | Intuitive-01989055 | Intuitive-01989060 |
| DX1767.427 | Amendment to the Use, License and Servie Agreement & Lease Agreement between Intuitive Surgical and University of Southern California on behalf of Keck Hospital of USC | 12/30/2021 | Intuitive-01990306 | Intuitive-01990307 |
| DX1767.428 | Loan Agreement between Intuitive Surgical and Keck Hospital of USC | 2/9/2022 | Intuitive-01993179 | Intuitive-01993183 |
| DX1767.429 | Sales, License, and Service Agreeement between Intuitive Surgical and Northwestern Memorial Healthcare | 2/17/2022 | Intuitive-01993658 | Intuitive-01993673 |
| DX1767.430 | Sales, License, and Service Agreement between Intuitive Surgical and Banner Boswell Medical Center | 03/18/2022 | Intuitive-02000683 | Intuitive-02000694 |
| DX1767.431 | Sales, License, and Service Agreement between Intuitive Surgical and Northwestern Memorial Healthcare on behalf of Northwestern Medicine Grayslake Outpatient Center | 3/24/2022 | Intuitive-01999030 | Intuitive-01999045 |

| DX1767.432 | Sales, License, and Service Agreement between Intuitive Surgical and Pullman Regional Hospital | 3/31/2022 | Intuitive-02000753 | Intuitive-02000763 |
|---|---|---|---|---|
| DX1767.433 | Amendment to the Use, License, and Service Agreement and Lease Agreement between Banner Health | 04/06/2022 | Intuitive-02001281 | Intuitive-02001281 |
| DX1767.434 | Transaction Agreement between Intuitive Surgical and Banner Fort Collins Medical Center | 4/6/2022 | Intuitive-02001278 | Intuitive-02001280 |
| DX1767.435 | Sales and Service Agreement between Intuitive Surgical and Newwark Beth Israel Medical Center | `12/19/2022 | Intuitive-01525750 | Intuitive-01525766 |

| Def.'s Temporary Exhibit No. | Description | Date | Beg Bates | End Bates | Objections |
|---|---|---|---|---|---|
| | **Compilation of Intuitive Communications re Patient Safety.** | | | | |
| DX1768.01 | Letter from Intuitive to Eastbourne District General Hospital | 02/27/17 | Intuitive-01019584 | Intuitive-01019585 | |
| DX1768.02 | Letter from Hogan Lovells, on behalf of Intuitive, to Rebotix-Panama | 04/21/2017 | REBOTIX140044 | REBOTIX140053 | |
| DX1768.03 | Letter from Hogan Lovells, on behalf of Intuitive, to Rebotix-Panama | 05/10/2017 | REBOTIX140654 | REBOTIX140662 | |
| DX1768.04 | Letter from Intuitive to Eastbourne District General Hospital | 06/15/17 | Intuitive-00367722 | Intuitive-00367723 | |
| DX1768.05 | Letter from Intuitive to Northwest Medical Center (draft) | 05/10/2018 | Intuitive-01020024 | Intuitive-01020025 | |
| DX1768.06 | Letter from Intuitive to Clinique Charcol | 06/04/18 | Intuitive-01020229 | Intuitive-01020230 | |
| DX1768.07 | Letter from Intuitive to Panama City Surgical Center | 07/26/2018 | Intuitive-00040125 | Intuitive-00040127 | |
| DX1768.08 | Letter from Intuitive to Northfield | 08/28/2018 | REBOTIX144751 | REBOTIX144756 | |
| DX1768.09 | Letter from Intuitive to Surgical Direct | 08/28/2018 | Restore-00086086 | Restore-00086092 | |
| DX1768.10 | Letter from Intuitive to Conway Regional Medical Center | 10/25/18 | Intuitive-00032916 | Intuitive-00032917 | |
| DX1768.11 | Letter from Intuitive to NCH North Naples Hospital | 10/30/2018 | Intuitive-01020935 | Intuitive-01020936 | |
| DX1768.12 | Letter from Intuitive to Restore Robotics LLC | 11/15/2018 | Intuitive-00478439 | Intuitive-00478444 | |
| DX1768.13 | Email from J. Watson to L. Otradovec re Follow up to our discussion this morning for a meeting regarding service & instrumentation | 02/08/19 | Intuitive-00153466 | Intuitive-00153469 | |
| DX1768.14 | Letter from Intuitive to Restore Robotics LLC | 02/12/2019 | Restore-00025577 | Restore-00025584 | |
| DX1768.15 | Letter from Intuitive to Baylor Scott and White | 02/22/19 | Intuitive-01072592 | Intuitive-01072594 | |
| DX1768.16 | Letter from Intuitive to Baylor Scott and White | 03/19/19 | Intuitive-01119149 | Intuitive-01119152 | |
| DX1768.17 | Letter from Intuitive to Conway Regional Medical Center | 04/02/19 | Intuitive-00157064 | Intuitive-00157065 | |
| DX1768.18 | Letter from Intuitive to Northfield | 04/16/2019 | Rebotix145274 | Rebotix145279 | |
| DX1768.19 | Letter from Intuitive to Conway Regional Medical Center | 05/06/19 | Intuitive-00446769 | Intuitive-00446771 | |
| DX1768.20 | Letter from Intuitive to Baptist Health Medical Center Little Rock | 05/07/19 | Intuitive-00032950 | Intuitive-00032951 | |
| DX1768.21 | Letter from Intuitive to Pacific Coast Surgical Center | 05/07/2019 | Intuitive-00019774 | Intuitive-00019775 | |
| DX1768.22 | Letter from Intuitive to Jackson-Madison County General Hospital | 05/09/19 | Intuitive-00157093 | Intuitive-00157094 | |
| DX1768.23 | Email from R. Bair to J. Cooley fw Instrument Report: 6/18/19 | 06/19/2019 | Intuitive-00361133 | Intuitive-00361136 | |
| DX1768.24 | Email from M. Davis to J. Blodgett re Reprogrammed da Vinci Instruments - Conway Regional Health System | 07/02/19 | Intuitive-00157210 | Intuitive-00157211 | |
| DX1768.25 | Letter from Intuitive to McLaren Health Management Group | 07/17/2019 | Intuitive-00478591 | Intuitive-00478592 | |
| DX1768.26 | Letter from Intuitive to White County Medical Center | 07/17/2019 | Intuitive-00341389 | Intuitive-00341390 | |
| DX1768.27 | Email from A. Inacay to R. Bair re da Vinci System and 3rd Party Resetting I&A Lives | 07/29/2019 | Intuitive-00009500 | Intuitive-00009502 | |
| DX1768.28 | Letter from Intuitive to Genesis Medical Center-Davenport | 08/15/19 | Intuitive-00048788 | Intuitive-00048788 | |
| DX1768.29 | Email from B. Partridge to E. Grinberg fw da Vinci / Legacy Health - reprogrammed instrumentation concern | 09/03/2019 | Intuitive-01031534 | Intuitive-01031535 | |
| DX1768.30 | Letter from Intuitive to Pullman Regional Hospital | 09/09/19 | Intuitive-00569245 | Intuitive-00569247 | |
| DX1768.31 | Letter from Intuitive to Crescent City Surgical Center | 09/11/19 | Intuitive-00044524 | Intuitive-00044526 | |
| DX1768.32 | Letter from Intuitive to New Hanover Regional Medical Center | 10/01/2019 | Intuitive-00048815 | Intuitive-00048817 | |
| DX1768.33 | Email from G. Papit to G. Fiegel re Intuitive Follow up | 10/06/19 | REBOTIX17421 | REBOTIX17426 | |
| DX1768.34 | Letter from Intuitive to Panama City Surgical Center | 10/10/2019 | PANAMA0000064 | PANAMA0000066 | |
| DX1768.35 | Letter from Intuitive to Evergreen Healthcare | 10/15/19 | Intuitive-00048911 | Intuitive-00048913 | |
| DX1768.36 | Letter from Intuitive to San Martin Surgery Center LLC | 10/28/2019 | Intuitive-00048920 | Intuitive-00048922 | |
| DX1768.37 | Email from A. Inacay to J. Menold re Evergreen | 10/31/19 | Intuitive-00049029 | Intuitive-00049032 | |
| DX1768.38 | Letter from Intuitive to The Jackson Madison County General Hospital District | 11/04/2019 | Intuitive-00049014 | Intuitive-00049016 | |
| DX1768.39 | Email from J. Menold to A. Inacay re Evergreen | 11/07/19 | Intuitive-01032682 | Intuitive-01032684 | |
| DX1768.40 | Letter from Intuitive to Norman Regional Hospital Authority, d/b/a Normal Regional Health System | 11/11/2019 | Intuitive-00049026 | Intuitive-00049028 | |
| DX1768.41 | Letter from Intuitive to Thomas Memorial Hospital | 11/19/2019 | Intuitive-00373856 | Intuitive-00373858 | |
| DX1768.42 | Letter from Intuive to Marin General Hospital | 11/26/2019 | Intuitive-00049154 | Intuitive-00049156 | |
| DX1768.43 | Letter from Intuitive to North Oaks Medical Center explaining service authorization | 12/19/2019 | Intuitive-00165844 | Intuitive-00165844 | |
| DX1768.44 | Letter from Intuitive to Ardent Health Services | 01/17/20 | Intuitive-00562856 | Intuitive-00562858 | |
| DX1768.45 | Letter from Intuitive to Ardent Health Services | 01/17/20 | Intuitive-00562853 | Intuitive-00562855 | |
| DX1768.46 | Letter from Intuitive to Elite Robotic Surgery Center | 02/12/20 | Intuitive-01035008 | Intuitive-01035011 | |
| DX1768.47 | Letter from Intuitive to Banner Health | 02/14/2020 | Intuitive-00986535 | Intuitive-00986537 | |
| DX1768.48 | Letter from Intuitive to Indiana University Health Bloomington Hospital | 02/25/20 | Intuitive-00569308 | Intuitive-00569310 | |
| DX1768.49 | Letter from Intuitive to King's Daughter Medical Center | 02/26/2020 | Intuitive-00674309 | Intuitive-00674311 | |
| DX1768.50 | Letter from Intuitive to St. Vincent's Hospital | 05/04/2020 | Intuitive-00980925 | Intuitive-00980927 | |
| DX1768.51 | Letter from Intuitive to Lowell General Hospital | 05/14/2020 | Intuitive-00569180 | Intuitive-00569182 | |
| DX1768.52 | Letter from Intuitive to Abrazo Arrowhead Campus | 05/21/20 | Intuitive-00986752 | Intuitive-00986754 | |
| DX1768.53 | Letter from Intuitive to Ballad Health | 5/22/2020 | Intuitive-00569252 | Intuitive-00569254 | |

| Compilation of Data Files | | | | | |
|---|---|---|---|---|---|
| Def.'s Temporary Exhibit No. | Description | Date | BegBates | EndBates | Objections |
| DX1769.01 | Annual dV Procedure Datasets for Economic Team 4.29.22 | 04/29/2022 | Intuitive-00706097 | Intuitive-00706097 | |
| DX1769.02 | Procedure IQVIA Datasets for Economic Team 4.29.22 | 04/29/2022 | Intuitive-00706098 | Intuitive-00706098 | |
| DX1769.03 | Intuitive Sales data | n/a | Intuitive-00595406 | Intuitive-00595406 | |
| DX1769.04 | Intuitive Sales data | n/a | Intuitive-00595407 | Intuitive-00595407 | |
| DX1769.05 | Intuitive Sales data | n/a | Intuitive-00595408 | Intuitive-00595408 | |
| DX1769.06 | Intuitive Sales data | n/a | Intuitive-00595409 | Intuitive-00595409 | |

| Compilation of K990144 Intuitive PMA Application Files. | | | | | |
|---|---|---|---|---|---|
| Def.'s Temporary Exhibit No. | Description | Date | Beg Bates | End Bates | Objections |
| DX1770.01 | Volume 1: K990144 Intuitive PMA Application | 11/26/1999 | Intuitive-00692611 | Intuitive-00692642 | |
| DX1770.02 | Volume 2: K990144 Intuitive PMA Application | 11/26/1999 | Intuitive-00692643 | Intuitive-00692821 | |
| DX1770.03 | Volume 3: K990144 Intuitive PMA Application | 11/26/1999 | Intuitive-00692822 | Intuitive-00692911 | |
| DX1770.04 | Volume 4: K990144 Intuitive PMA Application | 11/26/1999 | Intuitive-00692912 | Intuitive-00693153 | |
| DX1770.05 | Volume 5: K990144 Intuitive PMA Application | 11/26/1999 | Intuitive-00693154 | Intuitive-00693534 | |
| DX1770.06 | Volume 6: K990144 Intuitive PMA Application | 11/26/1999 | Intuitive-00693535 | Intuitive-00694042 | |

| Def.'s Temporary Exhibit No. | Description | Date | Beg Bates | End Bates | Objections |
|---|---|---|---|---|---|
| colspan-title: Compilation of Intuitive Traditional 510(k) Submission K24095 |

| Def.'s Temporary Exhibit No. | Description | Date | Beg Bates | End Bates | Objections |
|---|---|---|---|---|---|
| DX1771.01 | K214095 - Table of Contents | 12/27/2021 | Intuitive-02053643 | Intuitive-02053645 | |
| DX1771.02 | K214095 - Section 1: Traditional 510(k) Acceptance Checklist | 12/27/2021 | Intuitive-02053729 | Intuitive-02053742 | |
| DX1771.03 | K214095 - Section 2: Medical Device User Fee Cover Sheet | 12/27/2021 | Intuitive-02051528 | Intuitive-02051529 | |
| DX1771.04 | K214095 - Section 3: CDRH Cover Sheet | 12/27/2021 | Intuitive-02053670 | Intuitive-02053677 | |
| DX1771.05 | K214095 - Section 4: Cover Letter | 12/27/2021 | Intuitive-02053785 | Intuitive-02053788 | |
| DX1771.06 | K214095 - Section 5: Indications for Use Statement | 12/27/2021 | Intuitive-02051550 | Intuitive-02051552 | |
| DX1771.07 | K214095 - Section 6: 510(k) Summary | 12/27/2021 | Intuitive-02054131 | Intuitive-02054139 | |
| DX1771.08 | K214095 - Section 7: Truthful and Accuracy Statement | 12/27/2021 | Intuitive-02054114 | Intuitive-02054115 | |
| DX1771.09 | K214095 - Section 8: Class III Summary and Certification | 12/27/2021 | Intuitive-02051563 | Intuitive-02051563 | |
| DX1771.10 | K214095 - Section 9: Financial Certification or Disclosure Statement | 12/27/2021 | Intuitive-02051568 | Intuitive-02051568 | |
| DX1771.11 | K214095 - Section 10: Voluntary Consensus Standards | 12/27/2021 | Intuitive-02051573 | Intuitive-02051573 | |
| DX1771.12 | K214095 - Section 11: Executive Summary | 12/27/2021 | Intuitive-02051577 | Intuitive-02051584 | |
| DX1771.13 | K214095 - Section 12: Device Description | 12/27/2021 | Intuitive-02051698 | Intuitive-02051703 | |
| DX1771.14 | K214095 - Section 13: Substantial Equivalence | 12/27/2021 | Intuitive-02051609 | Intuitive-02051617 | |
| DX1771.15 | K214095 - Section 14: Proposed Labeling | 12/27/2021 | Intuitive-02052342 | Intuitive-02052347 | |
| DX1771.16 | K214095 - Section 15: Reprocessing | 12/27/2021 | Intuitive-02054100 | Intuitive-02054102 | |
| DX1771.17 | K214095 - Section 16: Biocompatibility | 12/27/2021 | Intuitive-02051651 | Intuitive-02051651 | |
| DX1771.18 | K214095 - Section 17: Software and Cybersecurity | 12/27/2021 | Intuitive-02051655 | Intuitive-02051655 | |
| DX1771.19 | K214095 - Section 18: Electromagnetic Compatibility (EMC) and Electrical Safety | 12/27/2021 | Intuitive-02051723 | Intuitive-02051723 | |
| DX1771.20 | K214095 - Section 19: Performance Testing - Bench | 12/27/2021 | Intuitive-02053816 | Intuitive-02053830 | |
| DX1771.21 | K214095 - Section 20: Performance Testing - Animal | 12/27/2021 | Intuitive-02051659 | Intuitive-02051662 | |
| DX1771.22 | K214095 - Section 21: Performance Testing Clinical | 12/27/2021 | Intuitive-02051663 | Intuitive-02051663 | |
| DX1771.23 | K214095 - Section 22: Human Factors | 12/27/2021 | Intuitive-02052318 | Intuitive-02052323 | |
| DX1771.24 | K214095 - Appendix A1: Reprocessing Appendices, IS4000/IS4200, US (552246-07) | 12/27/2021 | Intuitive-02046437 | Intuitive-02046478 | |
| DX1771.25 | K214095 - Appendix A2: Reprocessing Instructions, Instruments, IS4000/IS4200, US (551490-09) | 12/27/2021 | Intuitive-02046653 | Intuitive-02046772 | |
| DX1771.26 | K214095 - Appendix A3: Addendum, Reprocessing Instructions, Instruments, IS4000/IS4200, US (554324-01) | 12/27/2021 | Intuitive-02047253 | Intuitive-02047300 | |
| DX1771.27 | K214095 - Appendix A4: da Vinci X/Xi Instruments and Accessories User Manual Addendum (PN 554349-01) | 12/27/2021 | Intuitive-02047493 | Intuitive-02047496 | |
| DX1771.28 | K214095 - Appendix B: Justification, Cleaning Efficacy for 18 Clinical Uses (PN 1070933) | 12/27/2021 | Intuitive-02052366 | Intuitive-02052374 | |
| DX1771.29 | K214095 - Appendix C1: Reliability Verification Protocol for Fenestrated Bipolar Forceps (PN 862223-03P) | 12/27/2021 | Intuitive-02048083 | Intuitive-02048115 | |
| DX1771.30 | K214095 - Appendix C2: Reliability Verification Report for Fenestrated Bipolar Forceps (PN 862223-03R) | 12/27/2021 | Intuitive-02047561 | Intuitive-02047647 | |
| DX1771.31 | K214095 - Appendix C3: Reliability Verification Protocol for Force Bipolar (PN862225-02P) | 12/27/2021 | Intuitive-02048248 | Intuitive-02048281 | |
| DX1771.32 | K214095 - Appendix C4: Reliability Verification Report for Force Bipolar (PN 862225-04R) | 12/27/2021 | Intuitive-02051749 | Intuitive-02051859 | |
| DX1771.33 | K214095 - Appendix C5: Reliability Verification Protocol for Large Needle Driver (PN 862211-04P) | 12/27/2021 | Intuitive-02048418 | Intuitive-02048448 | |

| Def.'s Temporary Exhibit No. | Description | Date | Beg Bates | End Bates | Objections |
|---|---|---|---|---|---|
| colspan header: Compilation of Select SIS Customer Contracts. |

| Def.'s Temporary Exhibit No. | Description | Date | Beg Bates | End Bates | Objections |
|---|---|---|---|---|---|
| DX1772.01 | Rigid/Semi-Rigid Endoscope Repair Agreement between Surgical Instrument Service Company and Banner Health System | 01/15/1999 | SIS298505 | SIS298508 | |
| DX1772.02 | Surgical Instrument Repair/Restore Agreement between Surgical Instrument Service Company and Advocate Trinity Hospital | 06/01/2001 | SIS343473 | SIS343474 | |
| DX1772.03 | Services Agreement between  Surgical Instrument Service Company and Banner Health System | 05/01/2002 | SIS100789 | SIS100807 | |
| DX1772.04 | Rigid/Semi-Rigid Endoscope Repair Agreement between Surgical | 05/01/2002 | SIS100808 | SIS10081 | |
| DX1772.05 | No-Risk Service Agreement between Surgical Instrument Service | 09/05/2007 | SIS006291 | SIS006307 | |
| DX1772.06 | No-Risk Service Agreement between Surgical Instrument Service Company and Advocate Health and Hospitals Corp. DBA Advocate Trinity Hospital | 02/27/2008 | SIS101274 | SIS101290 | |
| DX1772.07 | Service and Repair of Medical Devices Agreement between Surgical Instrument Service Company and Alexian Brothers Corporate Materials Management | 01/01/2009 | SIS004867 | SIS004868 | |
| DX1772.08 | Capitated Agreement for the Service and Repair of Medical Devices between Surgical Instrument Service Company and Advocate Lutheran General Hospital | 01/01/2009 | SIS004892 | SIS004894 | |
| DX1772.09 | Capitated Agreement for the Service and Repair of Flexible Endoscopes between Surgical Instrument Service Company and Advocate Health and Hospital Corp. DBA Advocate Lutheran General Hospital | 01/01/2009 | SIS005993 | SIS005997 | |
| DX1772.10 | Flexible Endoscope Service Agreement between Surgical Instrument Service Company and Advocate Lutheran General Hospital | 01/01/2009 | SIS101065 | SIS101071 | |
| DX1772.11 | Capitated Agreement for the Service and Repair of Medical Devices between Surgical Instrument Service Company and Advocate Lutheran General Hospital | 01/01/2009 | SIS101072 | SIS101074 | |
| DX1772.12 | Capitated Agreement for the Service and Repair of Flexible Endoscopes (GI) between Surgical Instrument Service Company and Advocate Health and Hospital Corp. DBA Advocate Lutheran General Hospital | 01/01/2009 | SIS101078 | SIS101082 | |
| DX1772.13 | Capitated Agreement for the Service and Repair of Flexible Endoscopes between Surgical Instrument Service Company and Advocate Trinity Hospital | 02/01/2009 | SIS005880 | SIS005881 | |
| DX1772.14 | Capitated Agreement for the Service and Repair of Flexible Endoscopes (GI) between Surgical Instrument Service Company and Advocate Illinois Masonic Medical Center | 02/01/2009 | SIS101050 | SIS101052 | |
| DX1772.15 | Capitated Agreement for the Service and Repair of Flexible Endoscopes (GI) between Surgical Instrument Service Company and Advocate Health and Hospital Corp. DBA Advocate Trinity Hospital | 02/01/2009 | SIS101291 | SIS101295 | |
| DX1772.16 | Capitated Agreement for the Service and Repair of Flexible Endoscopes (GI) between Surgical Instrument Service Company and Advocate Health and Hospital Corp. DBA Advocate Christ Hospital | 03/01/2009 | SIS100823 | SIS100827 | |
| DX1772.17 | Capitated Agreement for the Service and Repair of Flexible Endoscopes (GI) between Surgical Instrument Service Company and Advocate Health and Hospital Corp. DBA Advocate Illinois Masonic Hospital | 03/15/2009 | SIS101083 | SIS101087 | |
| DX1772.18 | Capitated Agreement for the Service and Repair of Flexible Endoscopes (GI) between Surgical Instrument Service Company and Advocate Health and Hospital Corp. DBA Advocate Christ Hospital | 04/01/2010 | SIS122139 | SIS122143 | |
| DX1772.19 | Capitated Agreement for the Service and Repair of Flexible Endoscopes (GI) between Surgical Instrument Service Company and Advocate Health and Hospital Corp. DBA Advocate Christ Hospital | 04/10/2010 | SIS100828 | SIS100832 | |
| DX1772.20 | Agreement for the Service and Repair of Medical Equipment and Devices between Surgical Instrument Service Company and Providence Health & Services | 10/01/2010 | SIS004789 | SIS004790 | |
| DX1772.21 | Agreement for the Service and Repair of Medical Equipment and Devices between Surgical Instrument Service Company and Providence Health & Services | 10/01/2010 | SIS006070 | SIS006073 | |
| DX1772.22 | Capitated Agreement for the Service and Repair of Flexible Endoscopes (GI) between Surgical Instrument Service Company and Advocate Health and Hospital Corp. DBA Advocate Trinity Hospital | 03/01/2011 | SIS006588 | SIS006592 | |
| DX1772.23 | Capitated Agreement for the Service and Repair of Flexible Endoscopes (GI) between Surgical Instrument Service Company and Advocate Health and Hospital Corp. DBA Advocate Christ Hospital | 05/01/2011 | SIS006564 | SIS006569 | |
| DX1772.24 | Capitated Agreement for the Service and Repair of Flexible Endoscopes between Surgical Instrument Service Company and Advocate Trinity Hospital | 03/01/2012 | SIS008931 | SIS008932 | |
| DX1772.25 | Service Agreement between Surgical Instrument Service Company and Advocate Health Care | 07/01/2012 | SIS006447 | SIS006456 | |
| DX1772.26 | Service Agreement between Surgical Instrument Service Company and Advocate Health Care | 07/02/2012 | SIS006514 | SIS006524 | |
| DX1772.27 | Standard Agreement between Yankee Alliance, LLC and Surgical Instrument Service Company | 11/01/2012 | SIS143367 | SIS143374 | |

| DX1772.28 | Capitated Agreement for the Service and Repair of General and Specialty Surgical Instruments between Surgical Instrument Service Company and Alexian Brothers Medical Center | 02/01/2013 | SIS008910 | SIS008912 | |
| DX1772.29 | Pricing Agreement for the Service and Repair of Medical Equipment and Devices between Surgical Instrument Service Company and Alexian Brothers Medical Center | 02/02/2013 | SIS008916 | SIS008917 | |
| DX1772.30 | Service Agreement between Surgical Instrument Service Company and Banner Health | 03/01/2013 | SIS008846 | SIS008855 | |
| DX1772.31 | Products and Services Agreement between Surgical Instrument Service Company and Kaiser Foundation Health Plan of the Northwest | 04/01/2013 | SIS040537 | SIS040566 | |
| DX1772.32 | Products and Services Agreement between Surgical Instrument Service Company and Kaiser Foundation Health Plan of the Northwest | 04/02/2013 | SIS033812 | SIS033840 | |
| DX1772.33 | Agreement for the Service and Repair of Flexible Endoscopes between Surgical Instrument Service Company and Banner Health Urology Clinic | 06/01/2013 | SIS008842 | SIS008843 | |
| DX1772.34 | Agreement for the Service and Repair of Flexible Endoscopes between Surgical Instrument Service Company and Banner Health Urology Clinic | 06/02/2013 | SIS008844 | SIS008845 | |
| DX1772.35 | Capitated Agreement for the Service and Repair of Flexible Endoscopes between Surgical Instrument Service Company and Advocate Good Samaritan Hospital | 09/01/2013 | SIS032394 | SIS032397 | |
| DX1772.36 | Products and Services Agreement between Surgical Instrument Service Company and Kaiser Foundation Health Plan of the Northwest | 10/11/2013 | SIS091395 | SIS091421 | |
| DX1772.37 | Capitated Agreement for the Repair, Maintenance and Refurbishment of Medical Devices and Instrumentation between Surgical Instrument Service Company and Johnson Memorial Hospital, Advanced Wound Center, and Surgery Center | 02/01/2014 | SIS080681 | SIS080685 | |
| DX1772.38 | Capitated Agreement for the Repair, Maintenance and Refurbishment of Medical Devices and Instrumentation between Surgical Instrument Service Company and Johnson Memorial Hospital, Advanced Wound Center, and Surgery Center | 02/01/2014 | SIS330343 | SIS330346 | |
| DX1772.39 | Capitated Agreement for the Service and Repair of Surgical Equipment, Devices, and Instrumentation between Surgical Instrument Service Company and Winchester Hospital | 03/01/2015 | SIS086962 | SIS086968 | |
| DX1772.40 | Agreement for the Service and Repair of Endoscopic Video Equipment between Surgical Instrument Services and Advocate Good Samaritan Hospital | 01/01/2016 | SIS040777 | SIS040781 | |
| DX1772.41 | Supplier Services Agreement for Instrument Repair between Vizient Supply, LLC and Surgical Instrument Service Company | 09/01/2016 | SIS330591 | SIS330634 | |
| DX1772.42 | Fixed Spend Agreement for the Service and Repair of Medical Equipment and Devices  between Surgical Instrument Service Company and Lahey Hospital & Medical Center | 02/01/2017 | SIS112474 | SIS112482 | |
| DX1772.43 | Fixed Spend Agreement for the Service and Repair of Medical Equipment Devices between Surgical Instrument Service Company and Lahey Hospital & Medical Center | 03/01/2017 | SIS076346 | SIS076354 | |
| DX1772.44 | Agreement for the Service and Repair of Medical Equipment and Devices between Surgical Instrument Service Company and Lahey Clinic Hospital | 03/10/2017 | SIS082407 | SIS082407 | |
| DX1772.45 | Fixed Spend Agreement for the Service and Repair of Medical Equipment and Devices between Surgical Instrument Service Company and Lahey Clinic Hospital | 04/01/2017 | SIS033794 | SIS033802 | |
| DX1772.46 | Fixed Spend Agreement for the Service and Repair of Medical Equipment and Devices between Surgical Instrument Service Company and Lahey Clinic Hospital | 04/01/2017 | SIS327546 | SIS327558 | |
| DX1772.47 | Fixed Spend Agreement for the Service and Repair of Medical Equipment and Devices Addendum D between Surgical Instrument Service Company and Lahey Clinic Hospital | 07/01/2017 | SIS076345 | SIS076345 | |
| DX1772.48 | Fixed Spend Agreement for the Service and Repair of Medical Equipment and Devices Addendum D between Surgical Instrument Service Company and Lahey Clinic Hospital | 09/01/2017 | SIS033793 | SIS033793 | |
| DX1772.49 | Agreement for the Service and Repair of Medical Equipment and Devices between Surgical Instrument Service Company and Lahey Hospital & Medical Center | 09/01/2017 | SIS075313 | SIS075342 | |
| DX1772.50 | Flexible Endoscope Service Agreement between Surgical Instrument Service Company and Advocate Health and Hospitals Corp. | 11/01/2017 | SIS100774 | SIS100788 | |
| DX1772.51 | Agreement for the Service and Repair of Medical Equipment and Devices Surgical Instrument Service Company between Lahey Hospital & Medical Center | 11/01/2017 | SIS330566 | SIS330586 | |
| DX1772.52 | Fixed Spend Agreement for the Service and Repair of Handheld Surgical Instruments and Devices between Surgical Instrument Service Company and Kaiser Permanente San Diego Medical Center | 04/01/2018 | SIS336220 | SIS336226 | |
| DX1772.53 | Fixed Spend Agreement for the Service and Repair of Handheld Surgical Instruments and Devices between Surgical Instrument Service Company and Kaiser Permanente Zion Medical Center | 01/01/2019 | SIS064623 | SIS064632 | |

| | | | | | |
|---|---|---|---|---|---|
| DX1772.54 | Amendment to the Yankee Alliance Supply Chain Solutions, LLC's and Yankee Alliance, LLC's Standard Agreement between Yankee Alliance Supply Chain Solutions, LLC and Yankee Alliance, LLC and Surgical Instrument Service Company Inc. | 01/01/2019 | SIS093184 | SIS093184 | |
| DX1772.55 | Master Services Agreement between Piedmont Healthcare, Inc. and Surgical Instrument Service Company | 06/01/2019 | SIS063463 | SIS063492 | |
| DX1772.56 | Master Services Agreement between Surgical Instrument Service Company and Methodist Hospital of Southern California | 09/01/2019 | SIS009856 | SIS009870 | |
| DX1772.57 | Master Services Agreement between Surgical Instrument Services Company and Methodist Hospital of Southern California | 09/01/2019 | SIS038509 | SIS038522 | |
| DX1772.58 | Master Services Agreement between Surgical Instrument Service Company and Methodist Hospital of Southern California | 09/01/2019 | SIS070480 | SIS070494 | |
| DX1772.59 | Master Services Agreement between Surgical Instrument Service Company and Methodist Hospital of Southern California | 09/01/2019 | SIS071064 | SIS071080 | |
| DX1772.60 | Master Services Agreement between Surgical Instrument Service Company and Methodist Hospital of Southern California | 09/01/2019 | SIS106403 | SIS106418 | |
| DX1772.61 | Master Services Agreement between Surgical Instrument Service Company and Methodist Hospital of Southern California | 09/01/2019 | SIS106422 | SIS106435 | |
| DX1772.62 | Master Services Agreement between Surgical Instrument Service Company and Methodist Hospital of Southern California | 09/01/2019 | SIS106439 | SIS106453 | |
| DX1772.63 | Amendment to Agreement between Vizient Supply, LLC and Surgical Instrument Service Company | 09/15/2019 | SIS047433 | SIS047435 | |
| DX1772.64 | Statement of Work One between Surgical Instrument Service Company and Legacy Health | 11/01/2019 | SIS010981 | SIS010983 | |
| DX1772.65 | Statement of Work One between Surgical Instrument Service Company and Legacy Health | 11/01/2019 | SIS038186 | SIS038188 | |
| DX1772.66 | Master Services Agreement between Surgical Instrument Service Company and Legacy Health | 01/01/2020 | SIS330378 | SIS330413 | |
| DX1772.67 | Statement of Work Three-Fixed Cost Flexible Endoscope Repairs between Surgical Instrument Service Company and Legacy Health | 03/01/2020 | SIS037925 | SIS037928 | |
| DX1772.68 | Statement of Work -Fixed Cost Surgical Device and Instrument Services between Surgical Instrument Service Company and Salinas Valley Memorial Healthcare System | 05/01/2020 | SIS097220 | SIS097231 | |
| DX1772.69 | Master Services Agreement between Surgical Instrument Service Company and Salinas Valley Memorial Healthcare System | 05/01/2020 | SIS097232 | SIS097244 | |
| DX1772.70 | Supplier Services Agreement for Third Party Instrument and Scope Repair between Vizient Supply, LLC and Surgical Instrument Service Co. | 08/01/2020 | SIS169233 | SIS169280 | |
| DX1772.71 | Vizient Amendment to Agreement with SIS | 11/15/2020 | SIS116933 | SIS116940 | |
| DX1772.72 | Exhibit 1 Palos Community Hospital Statement of Work #1 Fixed Cost Instrument Maintenance and Device Repair between Surgical Instrument Service Company and Northwestern Memorial HealthCare | 04/01/2021 | SIS029675 | SIS029693 | |
| DX1772.73 | Master Services Agreement between Surgical Instrument Service Company and Northwestern Memorial HealthCare | 04/01/2021 | SIS045720 | SIS045736 | |
| DX1772.74 | Statement of Work Two Fixed Cost Endoscope Repair and Maintenance Silverton GI Department between Surgical Instrument Service Company and Legacy Health | 05/01/2021 | SIS045336 | SIS045339 | |
| DX1772.75 | Statement of Work Three Fixed Cost Endoscope Repair and Maintenance Good Samaritan GI Department between Surgical Instrument Service Company and Legacy Health | 05/01/2021 | SIS045341 | SIS045344 | |
| DX1772.76 | Statement of Work Four Pay Per Service Repair and Maintenance between Surgical Instrument Service Company and Legacy Health | 05/01/2021 | SIS045346 | SIS045350 | |
| DX1772.77 | Master Services Agreement between Surgical Instrument Service Company and Legacy Health | 05/01/2021 | SIS047556 | SIS047570 | |
| DX1772.78 | Statement of Work One Fixed Cost Instrument Maintenance between Surgical Instrument Service Company and Legacy Health | 05/01/2021 | SIS069048 | SIS069051 | |
| DX1772.79 | Statement of Work Four Fixed Cost Endoscope Repair and Maintenance Meridian Park GI Department between Surgical Instrument Service Company and Legacy Health | 06/01/2021 | SIS045117 | SIS045121 | |
| DX1772.80 | Amendment to Agreement between Vizient Supply, LLC and Surgical Instrument Service Company | 06/01/2021 | SIS045231 | SIS045232 | |
| DX1772.81 | Master Services Agreement between Surgical Instrument Service Company and Lahey Hospital & Medical Device Center | 07/22/2021 | SIS044362 | SIS044398 | |
| DX1772.82 | Master Services Agreement between Surgical Instrument Service Company and Lahey Hospital & Medical Device Center | 07/22/2021 | SIS044418 | SIS044443 | |
| DX1772.83 | Amendment between Vizient Supply, LLC and Surgical Instrument Service Company | 10/08/2021 | SIS075744 | SIS075746 | |
| DX1772.84 | Standard Agreement Contract # - YA-OR-146 between Yankee Alliance Supply Chain Solutions, LLC and Surgical Instrument Service Company | 02/01/2022 | SIS163317 | SIS163341 | |
| DX1772.85 | Statement of Work One between Surgical Instrument Service Company and Salinas Valley Memorial Healthcare System | n/a | SIS032556 | SIS032558 | |
| DX1772.86 | Agreement for the Service and Repair of Medical Equipment and Devices between Surgical Instrument Service Company and Advocate Good Samaritan Hospital | n/a | SIS037016 | SIS037021 | |

| DX1772.87 | Yankee Alliance Members Capitated-Guaranteed Savings Program Contract #YA-MM-014 between Surgical Instrument Service Company and Yankee Alliance Members | n/a | SIS064237 | SIS064237 | |
| DX1772.88 | Agreement for the Service and Repair of Medical Equipment and Devices between Surgical Instrument Service Company and Advocate Good Samaritan Hospital | n/a | SIS080643 | SIS080648 | |
| DX1772.89 | Agreement for the Service and Repair of Medical Equipment and Devices between Surgical Instrument Service Company and Advocate Good Samaritan Hospital | n/a | SIS080650 | SIS080655 | |
| DX1772.90 | Agreement for the Service and Repair of Medical Equipment and Devices between Surgical Instrument Service Company and Advocate Good Samaritan Hospital | n/a | SIS080660 | SIS080665 | |
| DX1772.91 | Statement of Work: Fixed Cost Device Repairs between Surgical Instrument Service Company and Salinas Valley Memorial Healthcare System | n/a | SIS081069 | SIS081083 | |
| DX1772.92 | Statement of Work One Pay Per Service Repair and Maintenance between Surgical Instrument Repair Company and Lahey Hospital & Medical Center | n/a | SIS126987 | SIS126992 | |
| DX1772.93 | Service and Repair of Medical Equipment and Devices between Surgical Instrument Service Company and Advocate Good Samaritan Hospital | n/a | SIS335982 | SIS335987 | |
| DX1772.94 | Statement of Work One Pay Per Service Repair and Maintenance between Surgical Instrument Repair Company and Lahey Hospital & Medical Center | n/a | SIS044581 | SIS044585 | |

| Compilation of SIS to Vizient Line-Item Sales Detail Reports. | | | | | |
|---|---|---|---|---|---|
| Def.'s Temporary Exhibit No. | Description | Date | BegBates | EndBates | Objections |
| DX1773.01 | 09012016 SIS TO Vizient.xlsx | 10/2016 | SIS280464 | SIS280464 | |
| DX1773.02 | 11012016 SIS TO Vizient.xlsx | 12/2016 | SIS333117 | SIS333117 | |
| DX1773.03 | 01012017 SIS TO Vizient.xlsx | 2/2017 | SIS333128 | SIS333128 | |
| DX1773.04 | 02012017 SIS TO Vizient.xlsx | 3/2017 | SIS333126 | SIS333126 | |
| DX1773.05 | 03012017 SIS TO Vizient.xlsx | 4/2017 | SIS333133 | SIS333133 | |
| DX1773.06 | 04012017 SIS TO Vizient.xlsx | 5/2017 | SIS333121 | SIS333121 | |

# Exhibit 2

***Surgical Instrument Service Company, Inc.* v. *Intuitive Surgical, Inc.***
**No. 3:21-cv-03496-AMO**

**Intuitive Surgical, Inc.'s Preliminary Witness List**

Pursuant to the parties' agreement, Intuitive Surgical, Inc. ("Intuitive" or "Defendant") hereby serves its preliminary list of witnesses it intends to call or may call at trial in the above-captioned matter. This list is preliminary and Intuitive reserves the right to modify, supplement, or otherwise amend its witness list, including to add or withdraw any witness that Surgical Instrument Service Company, Inc. ("SIS") identifies on its witness list or fails to identify on its witness list, or to add or withdraw any witness that SIS calls during trial, and/or to rely on any deposition testimony designated by SIS in whole or in part.

Intuitive's inclusion of any witness on this preliminary witness list does not waive any objections Intuitive may have to the introduction of that witness's testimony if offered by SIS, and is without prejudice to Intuitive's right to move to strike witnesses from SIS's list who were not properly disclosed.

The descriptions of testimony listed below are not intended to be exhaustive and Intuitive reserves the right to amend these descriptions of testimony and/or present testimony from these witnesses on topics that are not specifically listed below, or testimony that is responsive to testimony presented during SIS's case-in-chief. The estimates of time listed below are estimates only; Intuitive reserves the right to present testimony from these witnesses that exceeds the estimates of time listed below.

**I.    Intuitive Fact Witnesses**

| Name | Affiliation | Presentation | Description of Testimony | Time |
|------|-------------|--------------|--------------------------|------|
| Ron Bair | Intuitive | Live | The use of da Vinci surgical systems in the field, Intuitive's response to EndoWrists reset by third parties, and the feasibility of refurbishing EndoWrist instruments. | 1 hour or less |
| Myriam Curet | Intuitive | Live | The design, features, and performance of the da Vinci surgical system, and her role and responsibilities as Intuitive's Chief Medical Officer. Ms. Curet may also testify regarding her personal experience using the da Vinci system as a surgeon, her | 1-2 hours |

| | | | personal experience using open and laparoscopic surgical techniques, and certain communications with regulators and/or customers. | |
|---|---|---|---|---|
| Bob DeSantis | Intuitive | Live | The development, design, and testing of EndoWrist instruments, the EndoWrist Extended Use program and/or the feasibility of refurbishing EndoWrist instruments, and EndoWrists reset by third parties. | 1 hour or less |
| Grant Duque | Intuitive | Live | The development, design, and testing of EndoWrist instruments (including but not limited to the development, design, and testing of the X/Xi EndoWrist instruments), and the EndoWrist Extended Use program. | 1-2 hours |
| Mark Johnson | Former Intuitive | Live or by deposition | Regulatory issues and communications with regulators. | 1 hour or less |
| Anthony McGrogan | Intuitive | Live | The development, design, and testing of EndoWrist instruments (including but not limited to the development, design, and testing of the X/Xi EndoWrist instruments), the EndoWrist Extended Use program and/or the feasibility of refurbishing EndoWrist instruments, and EndoWrists reset by third parties. | 1-2 hours |
| Maggie Nixon | Former Intuitive | Live or by deposition | The development, design, and testing of EndoWrist instruments. | 1 hour or less |
| Dave Rosa | Intuitive | Live | All relevant aspects of Intuitive's business, including the development, design, and testing of the da Vinci surgical system and EndoWrist instruments; Intuitive's efforts to compete and sources of competition; Intuitive's research and development efforts; Intuitive's marketing, sales, and pricing; regulatory | 3-4 hours |

| | | | affairs; Intuitive's Extended Use program and the feasibility of refurbishing EndoWrist instruments; and EndoWrists reset by third parties. | |
|---|---|---|---|---|
| Jeff Smith | Intuitive | Live | The development, design, and testing of the da Vinci surgical system and EndoWrist instruments | 1-2 hours |
| Glenn Vavoso | Intuitive | Live | Intuitive's marketing, sales, and pricing, and Intuitive's efforts to compete and sources of competition. | 1-2 hours |

## II.    SIS Fact Witnesses

| Name | Affiliation | Presentation | Summary | Time |
|---|---|---|---|---|
| Keith Johnson | SIS | Live | If not called by SIS, Mr. Johnson will be called to testify regarding all aspects of SIS's claims and defenses. | 3-4 hours |
| Gregory Posdal | SIS | Live | If not called by SIS, Mr. Posdal will be called to testify regarding all aspects of SIS's claims and defenses. | 3-4 hours |

## III.    Non-Party Fact Witnesses

| Name | Affiliation | Presentation | Description of Testimony | Time |
|---|---|---|---|---|
| Ronald Arkin | Arkin Consulting | By deposition | Competition in the alleged market for the repair and replacement of EndoWrist instruments and regulatory issues. | 1 hour or less |

| Rafal Chudzik | Alliance/Iconocare | By deposition | Competition in the alleged market for the repair and replacement of EndoWrist instruments and regulatory issues. | 1 hour or less |
|---|---|---|---|---|
| Ricardo Estape | Larkin | By deposition | The da Vinci surgical system from the perspective of a surgeon, and EndoWrists reset or reprogrammed by third parties. | 1 hour or less |
| Rick Ferreira | Alliance/Iconocare | By deposition | Competition in the alleged market for the repair and replacement of EndoWrist instruments and regulatory issues. | 1-2 hours |
| John Francis | Franciscan | By deposition | The da Vinci surgical system from the perspective of a surgeon, and EndoWrists reset or reprogrammed by third parties. | 1 hour or less |
| Dipien Maun | Franciscan | By deposition | The da Vinci surgical system from the perspective of a surgeon, and EndoWrists reset or reprogrammed by third parties. | 1 hour or less |
| Liz Nolan | Valley Medical | By deposition | Marketing of da Vinci surgery. | 1 hour or less |
| Paul Plomin | Franciscan | By deposition | Hospital purchases of da Vinci surgical systems and EndoWrist instruments. | 1 hour or less |
| Michael Shepherd | Franciscan | By deposition | Marketing of da Vinci surgery. | 1 hour or less |
| John Wagner | Valley Medical | By deposition | Hospital purchases of da Vinci systems and EndoWrist instruments. | 1 hour or less |

| Chris Gibson | Rebotix | By deposition | If not called by SIS, Mr. Gibson may be called to authenticate and lay the foundation for the admission of documents, if necessary. | 1 hour or less |
|---|---|---|---|---|
| Stan Hamilton | Rebotix | By deposition | If not called by SIS, Mr. Hamilton may be called to authenticate and lay the foundation for the admission of documents, if necessary. | 1 hour or less |
| David Mixner | Rebotix | By deposition | If not called by SIS, Mr. Mixner may be called to authenticate and lay the foundation for the admission of documents, if necessary. | 1 hour or less |
| Joe Morrison | Rebotix | By deposition | If not called by SIS, Mr. Morrison may be called to authenticate and lay the foundation for the admission of documents, if necessary. | 1 hour or less |
| Glenn Papit | Rebotix | By deposition | If not called by SIS, Mr. Papit may be called to authenticate and lay the foundation for the admission of documents, if necessary. | 1 hour or less |
| West Gordon | Restore | By deposition | If not called by SIS, Mr. Gordon may be called to authenticate and lay the foundation for the admission of documents, if necessary. | 1 hour or less |
| Kevin May | Restore | By deposition | If not called by SIS, Mr. May may be called to authenticate and lay the foundation for the admission of documents, if necessary. | 1 hour or less |
| Clif Parker | Restore | By deposition | If not called by SIS, Mr. Parker may be called to authenticate and lay the foundation for the admission of documents, if necessary. | 1 hour or less |

## IV.    Expert Witnesses

| Name | Affiliation | Presentation | Description of Testimony | Time |
|------|-------------|--------------|--------------------------|------|
| Christy Foreman | Biologics Consulting Group | Live | Ms. Foreman will testify to matters disclosed in her expert report serviced in this case, and in response to testimony from SIS's experts. | 1-2 hours |
| Jason Goodwin | Sacramento City College | Live | Prof. Goodwin will testify to matters disclosed in his expert report served in this case, and in response to testimony from SIS's experts. | 1-2 hours |
| Robert Howe | Harvard University | Live | Dr. Howe will testify to matters disclosed in his expert reports served in this case, and in response to testimony from SIS's experts. | 2-3 hours |
| Paul Martin | Harbor Labs, Inc. | Live | Mr. Martin will testify to matters disclosed in his expert report served in this case, and in response to testimony from SIS's experts. | 1-2 hours |
| Maxwell Meng | University of California, San Francisco | Live | Dr. Meng will testify to matters disclosed in his expert report served in this case, and in response to testimony from SIS's experts. | 1-2 hours |
| Loren Smith | University of Virginia | Live | Prof. Smith will testify to matters disclosed in his expert reports in this case, and in response to testimony from SIS's experts. | 3-4 hours |

Exhibit 3

ATTACHMENT 37

HIGHLY CONFIDENTIAL  ATTORNEYS' EYES ONLY

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SURGICAL INSTRUMENT SERVICE COMPANY, INC., | |
| Plaintiff/Counterclaim Defendant, | Case No. 3:21-cv-03496-VC |
| v. | |
| INTUITIVE SURGICAL, INC., | |
| Defendant/Counterclaim Plaintiff. | |

# EXPERT REPORT OF CHRISTY FOREMAN, MBE

**Senior Consultant, Biologics Consulting Group**

**January 18, 2023**

This report contains confidential material and is subject to the order governing the production, exchange and filing of confidential information in this matter.

HIGHLY CONFIDENTIAL  ATTORNEYS' EYES ONLY

# Table of Contents

I.      Qualifications ................................................................................................ 1

II.     Assignment, Summary of Opinions and Materials Considered ........................... 5

III.    Medical Device Regulatory Overview ............................................................. 8

        A.      FDA Regulatory Authority .................................................................. 8

                1.      Statutory Authority .................................................................. 8

                2.      Regulation .............................................................................. 9

                3.      Guidance Documents ............................................................ 10

        B.      Medical Device Classification ........................................................... 12

        C.      Premarket (510(k)) Notification ....................................................... 17

                1.      Background on 510(k) Notification ......................................... 18

                2.      Substantial Equivalence ........................................................ 20

                3.      Deficiency Letters ................................................................. 23

IV.     Opinions and Bases for Opinions ................................................................. 23

        A.      Opinion 1 – Remanufacturing medical devices is a manufacturing activity,
                which is subject to FDA regulatory requirements, including premarket
                notification, registration, recall, medical device reporting, unique device
                identification, and postmarket surveillance among others. ............................... 24

        B.      Opinion 2 – EndoWrist instruments were cleared by FDA as limited use
                devices, and efforts to remove or extend the usage limitation by
                companies other than the original equipment manufacturer (OEM)
                constitute remanufacturing activities ................................................... 27

                1.      FDA cleared EndoWrist instruments as limited use devices. ................. 27

                2.      FDA has acknowledged the limited use nature of EndoWrist
                        instruments in communications to third parties. .......................... 47

                3.      Objective and publicly available evidence demonstrates that FDA
                        has determined that removing or extending the usage limitation

HIGHLY CONFIDENTIAL  ATTORNEYS' EYES ONLY

on EndoWrist instruments is a remanufacturing activity, and as such, it requires 510(k) clearance. ........................................................... 48

4.     Third parties engaging in extending or resetting the lives of EndoWrist instruments are remanufacturers under existing FDA regulation.  Therefore, they were required to obtain 510(k) clearance. ................................................................................ 55

C.     Opinion 3 – FDA communicated to certain third parties that their activities constituted remanufacturing. ............................................. 68

D.     Opinion 4 – Intuitive has acted in accordance with FDA's requirements for the marketing and sale of its devices and has not unreasonably interpreted FDA's existing regulations and guidance. .......................................... 75

1.     Intuitive's marketing and sale of EndoWrist instruments with usage limits is consistent with FDA's regulatory requirements. .............. 75

2.     Intuitive's cybersecurity measures are consistent with FDA expectations for devices that are vulnerable to cybersecurity threats. ........................................................................................ 78

3.     Intuitive's internal conduct does not contradict applicable FDA regulations and guidance, nor does it negate the duty of third-party companies to comply with existing FDA regulations and guidance. .................................................................................... 81

V.     Conclusion ........................................................................................... 86

Appendices ...................................................................................................... 88

Appendix A – Curriculum Vitae of Christy Foreman ........................................ 89

Appendix B  – Materials Considered ................................................................. 94

Appendix C - QSM and NAY Premarket Submissions ...................................... 102

HIGHLY CONFIDENTIAL  ATTORNEYS' EYES ONLY

# I.   Qualifications

1.      I graduated from The Catholic University of America with Bachelor's and Master's degrees in Biomedical Engineering. While I was pursuing my undergraduate degree, I began working at the Naval Medical Research Institute (NMRI). There, I supported the research activities designed to evaluate the physiologic effects of non-freezing cold injury as well as the research activities evaluating short term memory decrements in cold weather operations in humans and animals. I worked there for a total of seven years before I departed to work for the US Food and Drug Administration (FDA) in 1996.

2.      I started at FDA as a reviewer in the Center for Devices and Radiological Health (CDRH), Office of Device Evaluation (ODE), Division of Cardiovascular, Respiratory, and Neurological Devices in the Anesthesiology and Defibrillator Devices Group. While working as a reviewer, I reviewed a wide variety of devices including ventilators, hyperbaric chambers, multi-parameter monitors, pulse oximeters, automated external defibrillators and implantable defibrillators, including the biventricular (cardiac resynchronization therapy) defibrillators designed to treat heart failure, a novel, brand-new indication at the time.

3.      As a lead reviewer, I reviewed hundreds of 510(k) submissions, Investigational Device Exemption (IDE) Submissions, and Premarket Approval (PMA) Application Submissions. I also served as a signatory reviewer, reviewing the work of others as a technical expert. I was appointed as the FDA representative on voluntary consensus standards such as the National Fire Protection Association (NFPA) standard on Hyperbaric and Hypobaric Facilities, American Society of Mechanical Engineers (ASME) standard on Pressure Vessels for Human Occupancy, and the American Society for Testing and Materials (ASTM) G175 Standard

1

HIGHLY CONFIDENTIAL  ATTORNEYS' EYES ONLY

Test Method for Evaluating the Ignition Sensitivity and Fault Tolerance of Oxygen Pressure Regulators Used for Medical and Emergency Applications. These standards are developed in conjunction with industry, academia, and health care providers to set forth requirements for safe design practices as well as test methods for evaluating medical device designs.

        4.      In 2000, I was selected for a highly competitive FDA Leadership Development Program. Over the course of the program, in addition to training opportunities, I completed several detail assignments further expanding my FDA knowledge base. The detail assignments included a branch chief position in the Minnesota District Office, where I oversaw the Import Operation activities as well as participated in inspections of drug, device, and food manufacturers as well as bioresearch monitoring inspections. I also had an assignment at Health Canada in the Medical Devices Bureau to compare and contrast the different regulatory processes between the US and Canada. I also completed an assignment in the Office of Science, Communication and Coordination in the Office of the Commissioner where I served as the executive secretary for the Science Board, an advisory committee designed to advise the Commissioner of various scientific topics.

        5.      My final detail assignment was in CDRH's Office of Compliance (OC) in the Division of Enforcement B as the Deputy Division Director. The division was responsible for the compliance oversight of cardiovascular, neurology, orthopedic, physical medicine, anesthesiology, and radiology devices, as well as electronic products. This detail lasted 10 months until I accepted a permanent position as the branch chief for the Orthopedic, Physical Medicine, and Anesthesiology Devices Branch in OC in 2001. After a year in the position, I was

HIGHLY CONFIDENTIAL  ATTORNEYS' EYES ONLY

selected in 2002 for the permanent Deputy Division Director position in OC where I had previously served on detail.

6. While working in OC, I was responsible for the oversight of inspection reviews, PMA quality system reviews, 30-day notice reviews, recalls, warning letters, seizures, injunctions, and civil money penalties. In this position, I not only oversaw the review activities, but developed policy in these areas as well. I routinely provided training for industry at AdvaMed workshops, AAMI Quality System Training Courses as well as participated in numerous conferences where I was invited to speak. I was responsible for overseeing many enforcement actions including civil money penalties for mammography facilities, a seizure, and injunction for a tissue-based heart valve and valve conduit as well as injunctions for an automated external defibrillator, an orthopedic implant, and x-ray surgical imaging systems. I also served as an FDA expert witness in a criminal case against an implantable defibrillator and pacemaker manufacturer.

7. In 2008, I returned to ODE as the Deputy Office Director for Science and Engineering reviews. In this role I served as the chief scientific officer for ODE and oversaw the regulatory policies associated with 510(k), PMA, HDE, IDE, de novo and 513(g) programs as well as combination products as well as provided office- level review and sign-off for guidance documents, de novo submissions and 513(g) submissions. In this role, the area of oversight included surgical devices including surgical robots.

8. In 2010, I began serving as the Office Director for ODE. In that role, I oversaw a staff of 500+ scientists and clinicians conducting the regulatory review of applications including 510(k)s, PMAs, IDEs, HDEs, pre- submissions, Product Development

HIGHLY CONFIDENTIAL  ATTORNEYS' EYES ONLY

Protocols, De Novos and 513(g)s, as well as consults for combination products in NDAs and

BLAs and decided all office level appeals. I provided the final sign-off for first of a kind

Premarket Approval Applications. I also participated in user fee negotiations with industry,

implemented the user fee commitments into the regulatory review programs and implemented

new legislation (FDASIA). In this role, the area of oversight included surgical devices including

surgical robots.

9.      In 2014, I joined the FDA's newest Center, the Center for Tobacco

Products to help develop new regulations and regulatory programs to help implement the

Family Smoking Prevention and Tobacco Control Act (FSPTCA), also known as the Tobacco

Control Act which gave FDA the authority to regulate tobacco. The law was largely based on the

medical device provisions of the Federal Food, Drug, and Cosmetic Act. I was recruited for my

significant experience with the medical device programs. There, I worked on foundation

regulations such as the tobacco product manufacturing regulation as well as implemented new

enforcement programs such as the No-Tobacco-Sale Order (NTSO) program. I participated in

inspections of tobacco product manufacturers as a subject matter expert. I also developed and

oversaw enforcement actions for egregious violators of the Tobacco Control Act. I was involved

in the pursuit of thousands of civil money penalty cases and over 100 NTSO cases during my

time at CTP. My experience with these cases affords my expertise in the type and quality of

evidence that is needed to support an FDA enforcement action.

10.      In 2018, I left CTP to join Biologics Consulting as a Senior Consultant. In

my role as a Senior Consultant, I advise clients on short and long term regulatory strategies for

medical devices and combination products, assist in the development of Quality Systems,

4

prepare medical device regulatory submissions, including 510(k)s, PMAs, HDEs, RFDs, 513(g)s, pre-submissions, and IDEs, represent clients in interactions with FDA, assist clients in the preparation for Advisory Panel meetings and provide in-house training on FDA regulatory issues and new policy developments. I also provide expert services to litigants.

11.     Additionally, I am an adjunct lecturer at The Catholic University of America, where I teach a graduate level course entitled Medical Device Design and Regulation in the Biomedical Engineering Department.

12.     A copy of my curriculum vitae is attached as Appendix A.

## II.    Assignment, Summary of Opinions and Materials Considered

13.     I have been retained by defendant Intuitive Surgical, Inc. ("Intuitive") to provide my expert opinions on certain FDA-related matters in this litigation.

14.     The professional fee charged for my consulting time by my employer, Biologics Consulting, is $525 per hour. I am a salaried employee of Biologics Consulting. My compensation is not dependent on my opinions in, or the outcome of, this litigation. I have testified as an expert in the preceding four years in the following matters: *Tonya Brand v. Cook Medical, Inc.*, Deposition: July 2018; Trial: January 2019, Southern District of Indiana No. 1:14-cv-06018-RLY-TAB; *Karen Richards v. Ethicon, Inc. and Johnson & Johnson*, Trial: October 2022, Eastern District of Texas No. 5:21-cv-92-RWS; *Selex Galileo, Inc. v. Nomir Medical Technologies, Inc.*, International Center for Dispute Resolution, No. 01-17-0003-0930.

15.     My opinions and analyses in this report are based on my review and evaluation of the materials listed in Appendix B. In addition, my opinions are based on my knowledge and experience of FDA regulation of medical devices, including all applicable laws,

HIGHLY CONFIDENTIAL  ATTORNEYS' EYES ONLY

regulations, guidance, and policies. I reviewed and assessed the documents in a similar manner as I would have while employed at the FDA and as I do now as a medical device consultant. I did not rely on any commercial, confidential, or trade secret information obtained during my employment at FDA in forming my opinions.

16.     Based on the analyses developed in the body of my report, I conclude:

a.  Remanufacturing medical devices is a manufacturing activity, which is subject to FDA regulatory requirements, including premarket notification, registration, recall, medical device reporting, unique device identification, and postmarket surveillance among others.

b.  EndoWrist instruments were cleared by FDA as limited use devices, and efforts to remove or extend the usage limitation by companies other than the original equipment manufacturer (OEM) constitute remanufacturing activities.

i.  FDA cleared EndoWrist instruments as limited-use devices.

ii.  FDA has acknowledged the limited use nature of EndoWrist instruments in communications to third parties.

iii.  Objective and publicly available evidence demonstrates that FDA has determined that removing or extending the usage limitation on EndoWrist instruments is a manufacturing activity, and as such, it requires 510(k) clearance.

1.  FDA has classified remanufactured EndoWrists as Class II devices, assigned them a unique procode, and indicated that they require 510(k) clearance.

HIGHLY CONFIDENTIAL  ATTORNEYS' EYES ONLY

2.   Congress also reached the same conclusion for a similar industry and activity – reprocessing – and amended FDA's governing statute to define premarket requirements for the reprocessors of devices labeled for single use.

iv.   Third parties engaging in extending or resetting the lives of EndoWrist instruments are remanufacturers under existing FDA regulation. Therefore, they were required to obtain 510(k) clearance.

1.   The activities that the third parties undertake to extend the usage limits significantly change the performance specifications of EndoWrist instruments.

2.   The activities that the third parties undertake to extend the usage limits significantly change the safety specifications of EndoWrist instruments.

3.   The third parties are introducing new devices into interstate commerce, which makes their activity subject to FDA requirements.

4.   The third parties' arguments that they are not remanufacturers are incorrect.

c.   FDA communicated to certain third parties that their activities constituted remanufacturing.

7

HIGHLY CONFIDENTIAL  ATTORNEYS' EYES ONLY

d.  Intuitive has acted in accordance with FDA's requirements for the marketing and sale of its devices and has not unreasonably interpreted FDA's existing regulations and guidance.

    i.  Intuitive's marketing and sale of EndoWrist instruments with usage limits is consistent with FDA's regulatory requirements.

    ii.  Intuitive's cybersecurity measures are consistent with FDA expectations for devices that are vulnerable to cybersecurity threats.

    iii.  Intuitive's internal conduct does not contradict applicable FDA regulations and guidance, nor does it negate the duty of third-party companies to comply with existing FDA regulations and guidance.

# III.  Medical Device Regulatory Overview

## A.  FDA Regulatory Authority

### 1.  Statutory Authority

17.  The Food and Drug Administration (FDA) is responsible for protecting the public health by ensuring the safety, efficacy, and security of human and veterinary drugs, biological products, and medical devices, and by ensuring the safety of our nation's food supply, cosmetics, and products that emit radiation.[1]

18.  FDA is responsible for advancing the public health by helping to speed innovations that make medical products more effective, safer, and more affordable and by

---

[1] FDA Mission Statement, available at https://www.fda.gov/about-fda/what-we-do (last accessed Jan. 17, 2023).

HIGHLY CONFIDENTIAL  ATTORNEYS' EYES ONLY

helping the public get the accurate, science-based information they need to use medical products and foods to maintain and improve their health.[2]

19.     The mission of FDA is to enforce laws enacted by Congress and regulations established by the Agency to protect the consumer's health, safety, and pocketbook. Its primary focus is the enforcement of the Federal Food, Drug, and Cosmetic Act (the "FD&C Act" or "Act"), the basic food and drug law of the U.S. The law is intended to, in part, assure, that drugs and devices are safe and effective for their intended uses and that all labeling and packaging is truthful, informative, and not deceptive.[3]

20.     As such, the FDA is the federal entity responsible for providing regulatory oversight of the manufacturing, sale, and distribution of medical devices in the United States. FDA's authority comes from the Act, as amended by the Medical Device Amendments of 1976 and subsequent amendments. The Center for Devices and Radiological Health (CDRH), a Center located within the FDA, has primary responsibility for implementing these authorities.

    2.     Regulation

21.     The scope of FDA's regulatory authority is very broad, and its responsibilities are closely related to those of several other government agencies.[4] Federal regulations are either required or authorized by statute.

---

[2] Ibid.

[3] FDA, FDA Related Laws, Regulations, and Guidances, https://www.fda.gov/drugs/cder-small-business-industry-assistance-sbia/fda-related-laws-regulations-and-guidances (last accessed Jan. 17, 2023); FDA, Federal Food, Drug, and Cosmetic Act (FD&C Act), https://www.fda.gov/regulatory-information/laws-enforced-fda/federal-food-drug-and-cosmetic-act-fdc-act (last accessed Jan. 17, 2023).

[4] FDA, Regulatory Information, https://www.fda.gov/regulatory-information (last accessed Jan. 17, 2023).

HIGHLY CONFIDENTIAL  ATTORNEYS' EYES ONLY

22.     FDA enacts regulations that interpret the FD&C Act and related statutes. FDA regulations are collected in the Code of Federal Regulations (CFR), Section 21, and published in the Federal Register, as required by law.

### 3.     Guidance Documents

23.     FDA's regulatory authority begins with the law or statute that is passed by Congress, which is then refined and expanded upon in regulation. FDA also issues "guidance documents," which are intended to provide FDA's current thinking on a topic.

24.     In 1997, FDA published its policy on ''Good Guidance Practices'' (GGP's), which sets forth the agency's policies and procedures for the development, issuance, and use of guidance documents.[5] As to the legal effect of guidance documents, the policy noted that while guidance does not bind the agency or the industry:

> [T]hey explain how the agency believes the statutes and regulations apply to certain regulated activities. However, because a guidance document represents the agency's current thinking on the subject addressed in the document, FDA's decision makers will take steps to ensure that their staff do not deviate from the guidance document without appropriate justification and appropriate supervisory concurrence.[6]

25.     The policy provided some standard language that is included at the beginning of all subsequently issued FDA guidance:

> This guidance represents the Food and Drug Administration's (FDA's) current thinking on this topic. It does not create or confer any rights for or on any person and does not operate to bind FDA or the public. You can use an alternative approach if the approach satisfies the requirements of the applicable statutes and

---

[5] 62 Fed. Reg. 8961 (Feb. 27, 1997).

[6] Ibid. at 8963.

HIGHLY CONFIDENTIAL  ATTORNEYS' EYES ONLY

> *regulations. If you want to discuss an alternative approach,*
> *contact the FDA staff responsible for implementing this guidance.*
> *If you cannot identify the appropriate FDA staff, call the*
> *appropriate number listed on the title page of this guidance.*[7]

26.    In 2000, this policy was formalized into regulation.[8]

27.    Guidance documents are a critical part of the premarket review program,

including the 510(k) program. Example of the types of guidance documents that FDA issues

include:

- program specific guidance documents, such as the 510(k) Program which described how to evaluate substantial equivalence,[9] the 510(k) Format which discusses the format and content for 510(k) submissions,[10] and the Modifications guidance document which describes when modifications require the need for a new 510(k) submission[11] as well as a specific modifications guidance for software changes;[12]

---

[7] For example, this language appears in the FDA guidance document, "Factors to Consider When Making Benefit-Risk Determinations in Medical Device Premarket Approval and De Novo Classifications" (Aug. 30, 2019) (originally issued Mar. 28, 2012), available at https://www.fda.gov/media/99769/download (last accessed Jan. 17, 2023).

[8] 21 CFR § 10.115.

[9] FDA, "The 510(k) Program: Evaluating Substantial Equivalence in Premarket Notifications [510(k)]" (July 28, 2014), available at https://www.fda.gov/media/82395/download (last accessed Jan. 17, 2023).

[10] FDA, "Format for Traditional and Abbreviated 510(k)s" (Sept. 13, 2019) (originally issued Aug. 12, 2005), available at https://www.fda.gov/media/130647/download (last accessed Jan. 17, 2023).

[11] FDA, "Deciding When to Submit a 510(k) for a Change to an Existing Device" (Oct. 25, 2017) (originally issued Jan. 10, 1997), available at https://www.fda.gov/media/99812/download (last accessed Jan. 17, 2023).

[12] FDA, "Deciding When to Submit a 510(k) for a Software Change to an Existing Device" (Oct. 25, 2017), available at https://www.fda.gov/media/99785/download (last accessed Jan. 17, 2023).

HIGHLY CONFIDENTIAL  ATTORNEYS' EYES ONLY

- device specific guidance documents, such as the guidance for Intravascular Filters.[13]; and

- cross-cutting guidance documents. The 510(k) Format guidance recommends that a 510(k) submission contain standardized sections on the following topics: Labeling, Sterilization and Shelf Life, Biocompatibility, Software, and Electromagnetic Compatibility and Electrical Safety. These sections have one or more cross-cutting guidance documents associated with it that apply equally to 510(k)s as well as PMAs.

28.     While adherence to the recommendations in guidance documents is not strictly required, in practice FDA expects manufacturers to follow them closely or to have a very good justification or rationale for not following the identified recommendations.[14]

## B.     Medical Device Classification

29.     FDA, by law, uses a risk-based classification scheme for products that meet the legal definition of a medical device.

30.     The Act defines a device[15] as:

an instrument, apparatus, implement, machine, contrivance, implant, in vitro reagent, or other similar or related article, including any component, part, or accessory, which is—

(A) recognized in the official National Formulary, or the United States Pharmacopeia, or any supplement to them,

(B) intended for use in the diagnosis of disease or other conditions, or in the cure, mitigation, treatment, or prevention of disease, in man or other animals, or

---

[13] Due to the large number of device types, FDA has not issued device specific guidance documents for the majority of device types.

[14] Similarly, while draft guidance documents do not have the force of final guidance documents, draft guidance documents are instructive and, when finalized, would represent FDA's current thinking on a topic.

[15] FD&C Act, 21 U.S.C. § 321(h)(1).

HIGHLY CONFIDENTIAL  ATTORNEYS' EYES ONLY

(C) intended to affect the structure or any function of the body of man or other animals, and

which does not achieve its primary intended purposes through chemical action within or on the body of man or other animals and which is not dependent upon being metabolized for the achievement of its primary intended purposes.

31.     The Act establishes three classes of medical devices based on the risk of the device and provides for regulatory controls that are commensurate with the risk and the ability to control that risk.[16]

32.     Class I devices are the lowest risk devices, for which "general controls" are adequate to provide a reasonable assurance of safety and effectiveness.[17]

33.     General controls include a prohibition against adulteration or misbranding, registration of device manufacturing facilities, listing of the device types, records and reports (including adverse event reports, device tracking, if ordered, unique device identification and reports of corrections or removals), repair, replacement and refund, as well as provisions regarding banned devices and compliance with good manufacturing practices (unless exempt by regulation). Most Class I devices are exempt from any premarket notification requirements.[18]

34.     Examples of Class I devices include canes, crutches, patient exam gloves, bandages and scalpels.

---

[16] 21 U.S.C. § 360c(a).

[17] 21 U.S.C. § 360c(a)(1)(A).

[18] FDA, Regulatory Controls, https://www.fda.gov/medical-devices/overview-device-regulation/regulatory-controls (last accessed Jan. 17, 2023).

HIGHLY CONFIDENTIAL  ATTORNEYS' EYES ONLY

35.     <u>Class II</u> devices are moderate risk devices, for which there is sufficient information to establish special controls to provide a reasonable assurance of safety and effectiveness. These devices cannot be classified into Class I because general controls by themselves are insufficient to provide such an assurance.[19]

36.     Special controls can include performance standards, postmarket surveillance, patient registries, special labeling requirements, premarket data requirements and guidelines.[20]

37.     Class II devices are generally subject to FDA review and clearance through the submission of a "premarket notification," also known as a 510(k).[21] The 510(k) notification for a Class II device must demonstrate that the device to be marketed is as safe and effective, that is, substantially equivalent in terms of intended use and technological characteristics to another Class II (moderate risk) device and comply with any special controls, if promulgated. This process is sufficient, in the FDA's view, to provide a reasonable assurance of safety and effectiveness for that device type.[22] Therefore, each substantially equivalent decision, while not an independent determination of reasonable assurance of safety and effectiveness like that which is required for a premarket approval for a Class III device (discussed below), can still be considered a determination of reasonable assurance of safety and effectiveness because it

---

[19] 21 U.S.C. § 360c(a)(1)(B).

[20] FDA, Regulatory Controls, https://www.fda.gov/medical-devices/overview-device-regulation/regulatory-controls (last accessed Jan. 17, 2023).

[21] 21 U.S.C. § 360c(a)(1)(B).

[22] FDA, Premarket Notification 510(k), https://www.fda.gov/medical-devices/premarket-submissions-selecting-and-preparing-correct-submission/premarket-notification-510k (last accessed Jan. 17, 2023).

HIGHLY CONFIDENTIAL  ATTORNEYS' EYES ONLY

leverages the body of knowledge that allowed for the device to be classified as Class II. The

510(k) notification is discussed in more detail in Section III.C.

38.     Examples of Class II devices include ventilators, hip implants with

metal/polymer bearing surfaces, soft contact lenses, X-ray equipment, MRI devices, infusion

pumps, biopsy devices, and surgical instruments for use with specific devices such as surgical

mesh for stress urinary incontinence.

39.     <u>Class III</u> devices are the highest risk or most novel device types, for which

general and special controls are not adequate to provide a reasonable assurance of safety and

effectiveness.[23]

40.     Because they present the highest risk, they are generally subject to FDA

review and approval of a premarket approval application, commonly referred to as a PMA,

which requires an independent demonstration of a reasonable assurance of safety and

effectiveness, based on valid scientific evidence.[24]

41.     Examples of Class III devices include implantable defibrillators, drug-

eluting coronary stents, implantable diaphragmatic/phrenic nerve stimulators, and mechanical

heart valves.

42.     FDA, with the assistance of Congressionally mandated medical advisory

panels, has established classifications for approximately 1,700 different generic types of devices

and grouped them into 16 medical specialties referred to as panels.[25] Each of these generic

---

[23] 21 U.S.C. § 360c(1)(C).

[24] Ibid.

[25] FDA, Classify Your Medical Device, https://www.fda.gov/medical-devices/overview-device-regulation/classify-your-medical-device (last accessed Jan. 17, 2023).

HIGHLY CONFIDENTIAL  ATTORNEYS' EYES ONLY

types of devices is assigned to one of the three regulatory classes based on the level of control

necessary to reasonably assure the safety and effectiveness of the device. Information about

the device types that have been classified can be found in 21 Code of Federal Regulations (CFR)

§§ 862 – 892, or by searching FDA's classification database.[26]

43.     In addition to the classifications in the Act and the regulations, FDA also

identifies device types using product codes (also known as "procodes"). FDA assigns a unique 3-

letter product code for each generic type of device, whether it has been formally classified by

FDA or not. One classification regulation may include multiple procodes.[27]

44.     For all classes, FDA's standard is the same: there must be "reasonable

assurance" that the device is safe and effective. For class I devices, general controls alone

provide a reasonable assurance of safety and effectiveness; for Class II devices, general plus

special controls provide a reasonable assurance of safety and effectiveness; for class III devices,

premarket approval provides a reasonable assurance of safety and effectiveness. While 510(k)

clearance is a less rigorous process than premarket approval, that is because it only applies to

device types that the FDA and its medical panels have found to present moderate risks.

45.     It is important to note that FDA is responsible for assigning the

appropriate regulatory classification and regulatory submission type. FDA selects an

appropriate pathway after the agency reviews the relevant known risks and benefits and

determines if those known risks can be adequately controlled by regulatory tools such as

---

[26] https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfPCD/PCDSimpleSearch.cfm

[27] FDA, "Medical Device Classification Product Codes" (Apr. 11, 2013), available at
https://www.fda.gov/media/82781/download (last accessed Jan. 17, 2023).

16

HIGHLY CONFIDENTIAL  ATTORNEYS' EYES ONLY

general and special controls. Based on that review, FDA then establishes the regulatory

classification, which determines the required regulatory pathway that manufacturers must

follow.

46.     The use of the 510(k) pathway as dictated by FDA is not a "bypass" of the

premarket approval process nor is it a temporary status. It is what FDA requires for device types

that present a moderate risk.

47.     You would not have a circumstance where a high-risk device has been

placed into Class III by FDA and requires the submission of a PMA, yet a manufacturer would

opt to submit a 510(k) rather than a PMA, or vice versa.

48.     FDA decides whether the manufacturer must use 510(k) clearance or

must instead seek premarket approval. The manufacturer does not get to choose the

application pathway that it prefers but must adhere to the regulatory pathways that FDA

establishes for each device type.

### C.     Premarket (510(k)) Notification

49.     A 510(k) is a premarket submission made to FDA to demonstrate that the

device to be marketed is as safe and effective, that is, substantially equivalent, to a legally

marketed device. Each person who wants to market in the U.S., a Class I, II, and III device

intended for human use, for which a Premarket Approval application (PMA) is not required,

must submit a 510(k) to FDA unless the device is exempt from 510(k) requirements of the

Federal Food, Drug, and Cosmetic Act (the FD&C Act) and does not exceed the limitations of

exemptions in .9 of the device classification regulation chapters (e.g., 21 CFR 862.9, 21 CFR

864.9). Before marketing a device, each submitter must receive an order, in the form of a letter,

HIGHLY CONFIDENTIAL  ATTORNEYS' EYES ONLY

from FDA which finds the device to be substantially equivalent (SE) and states that the device can be marketed in the U.S. This order "clears" the device for commercial distribution.

   1. Background on 510(k) Notification

  50. As discussed in Section III.B., certain devices (Class II) are subject to the premarket (510(k)) notification requirement.

  51. Devices that are subject to the premarket notification requirement cannot be legally marketed in the United States until FDA has issued an order finding that the device is "substantially equivalent (SE)" to a "predicate" device.

  52. Under the FD&C Act, "each person who is required to register under this section and who proposes to begin the introduction or delivery for introduction into interstate commerce for commercial distribution of a device intended for human use shall, at least ninety days before making such introduction or delivery, report to the Secretary . . . (in such form and manner as the Secretary shall by regulation prescribe)-—

   (1) the class in which the device is classified under section 360c of this title or if such person determines that the device is not classified under such section, a statement of that determination and the basis for such person's determination that the device is or is not so classified, and

   (2) action taken by such person to comply with requirements under section 360d or 360e of this title which are applicable to the device."[28]

  53. A predicate device is a legally marketed device to which a new device may be compared for a determination regarding substantial equivalence.  It could be a device

---

[28] 21 U.S.C. § 360(k).

HIGHLY CONFIDENTIAL  ATTORNEYS' EYES ONLY

that was legally marketed prior to May 28, 1976, or a device which has been reclassified from

Class III to Class II or Class I, or a device which has been found to be substantially equivalent

through the 510(k) premarket notification process.[29]

54.    A premarket notification submission is also required when a

manufacturer makes significant changes or modifications to a device that it has already

introduced or plans to reintroduce into commercial distribution.[30]

55.    21 CFR 807.81(a)(3) states that a premarket notification 510(k)

submission is required when the device "is one that the person currently has in commercial

distribution or is reintroducing into commercial distribution, that is about to be significantly

changed or modified in design, components, method of manufacture, or intended use. A

significant change or modification requiring a premarket notification includes "a change or

modification in the device that could significantly affect the safety or effectiveness of the

device, e.g., a significant change or modification in design, material, chemical composition,

energy source, or manufacturing process."[31]

56.    FDA notes in the 510(k) Modifications guidance: "To determine whether

a change or modification could significantly affect the safety or effectiveness of a device, the

manufacturer should first conduct a risk-based assessment, using the guidance below, of

whether the change could significantly affect the device's safety or effectiveness, either

positively or negatively. This risk-based assessment should identify and analyze all new risks

---

[29] 21 CFR § 807.92(a)(3).

[30] 21 CFR § 807.81(a)(3).

[31] 21 CFR § 807.81(a)(3)(i).

HIGHLY CONFIDENTIAL  ATTORNEYS' EYES ONLY

and changes in existing risks resulting from the device change, and lead to an initial decision whether or not submission of a new 510(k) is required."[32]

2.   Substantial Equivalence

57.     FDA has issued regulations[33] and guidance[34] specifying the contents of a 510(k) notification. The 510(k) submission is not a form, but a compilation of specific information regarding a medical device to demonstrate the equivalence of the new device to a predicate device. In brief, the submitter must provide a description of the device, a comparison to the predicate device(s), and data that demonstrate that the device is substantially equivalent. The data can include bench testing as well as animal or clinical data.

58.     For FDA to determine that a new device is substantially equivalent to a predicate device, FDA must determine that the device:

> (i) has the same technological characteristics as the predicate device, or
>
> (ii)(I) has different technological characteristics and the information submitted that the device is substantially equivalent to the predicate device contains information, including appropriate clinical or scientific data if deemed necessary by the Secretary that demonstrates that the device is as safe and effective as a legally marketed device, **AND**

---

[32] FDA, "Deciding When to Submit a 510(k) for a Change to an Existing Device," at 8.

[33] 21 CFR § 807.87.

[34] FDA, "Format for Traditional and Abbreviated 510(k)s" (Sept. 13, 2019) (originally issued Aug. 12, 2005), available at https://www.fda.gov/media/130647/download (last accessed Jan. 17, 2023).

HIGHLY CONFIDENTIAL  ATTORNEYS' EYES ONLY

(II) does not raise different questions of safety and effectiveness than the predicate device.[35]

59.    The term "different technological characteristics" means, with respect to a device being compared to a predicate device, that there is a significant change in the materials, design, energy source, or other features of the device from those of the predicate device.[36]

60.    The same definitions of safety and effectiveness apply to all devices, regardless of class:

> There is reasonable assurance that a device is safe when it can be determined, based upon valid scientific evidence, that the probable benefits to health from use of the device for its intended uses and conditions of use, when accompanied by adequate directions and warnings against unsafe use, outweigh any probable risks.[37]
>
> . . .
>
> There is reasonable assurance that a device is effective when it can be determined, based upon valid scientific evidence, that in a significant portion of the target population, the use of the device for its intended uses and conditions of use, when accompanied by adequate directions for use and warnings against unsafe use, will provide clinically significant results.[38]

61.    As explained earlier, for both safety and effectiveness, the regulatory standard is "reasonable assurance." At the time of the initial Medical Device Amendments, it

---

[35] 21 U.S.C. § 360c(i)(1)(A) (emphasis added).

[36] 21 U.S.C. § 360c (i)(1)(B).

[37] 21 CFR § 860.7(d)(1).

[38] 21 CFR § 860.7(e)(1).

HIGHLY CONFIDENTIAL  ATTORNEYS' EYES ONLY

was noted that this standard is "*predicated upon the recognition that no regulatory mechanisms can guarantee that a product will never cause injury, or will always produce effective results. Rather, the objective of the legislation is to establish a mechanism in which the public is afforded reasonable assurance that medical devices are safe and effective.*"[39]

62.     FDA issued a final guidance entitled "*The 510(k) Program: Evaluating Substantial Equivalence in Premarket Notifications [510(k)] Guidance for Industry and Food and Drug Administration Staff*" on July 28, 2014.[40] This guidance superseded FDA's longstanding "*Guidance on the CDRH Premarket Notification Review Program, 510(k) Memorandum K86-3,*" dated June 30, 1986. Both guidance documents provided guidance on how to determine if a medical device is substantially equivalent. The same logic and questions apply in both guidance documents. A main difference in the newer guidance is that it provides greater clarity on the appropriate use of multiple predicates by including the concept of a reference device. This difference between the two guidance documents has no bearing on this case. A flowchart was also included to serve as an aid in making the SE determination.

63.     If FDA determines that a new device is substantially equivalent to a predicate device, it will issue a letter known as a "Substantially Equivalent" or "SE" Letter allowing the device to be marketed. The device is then said to be "cleared."[41]

---

[39] H.R. Rept. 94-853, at 15 (Feb. 29, 1976).

[40] Available at https://www.fda.gov/media/82395/download (last accessed Jan. 17, 2023).

[41] There is a regulatory distinction between "clearance" and "approval", but people commonly confuse the two terms because "clearance" today requires that FDA grant permission to market the device. It is not uncommon to see references to devices cleared through the 510(k) process as being "FDA Approved." 21 CFR § 807.97 indicates that any representation that creates an impression of official approval of a device because of complying with the premarket

HIGHLY CONFIDENTIAL  ATTORNEYS' EYES ONLY

64.    FDA will post the clearance and provide a copy of the "SE Letter,"

"Indications for Use Form" and "510(k) Summary" (if available) on the FDA website.[42]

### 3.    Deficiency Letters

65.    During the course of a review, when FDA has questions or concerns about

an application, it can ask for additional information. This is done typically in one of two ways.

FDA can ask interactive questions by email where the FDA review clock is not stopped and the

sponsor has a short time to respond or FDA can send a deficiency letter that places the

submission on hold and the sponsor has a longer timeframe to respond. FDA typically issues

only one deficiency letter during the review process, however, certain circumstances may allow

for the issuance of a second letter.

66.    In a deficiency letter, FDA will distinguish between major deficiencies,

which, if not adequately resolved, may preclude a favorable decision on the marketing

application, and minor deficiencies, which can be resolved in a straightforward manner but

need to be addressed to meet regulatory requirements or to prevent potential misbranding or

adulteration.

## IV.  Opinions and Bases for Opinions

67.    In formulating my opinions, which apply the appropriate regulatory

framework as discussed above, I have reviewed publicly available information as well as the

documents produced through discovery. I conducted a thorough review of relevant information

---

notifications regulations is misleading and constitutes misbranding. However, FDA currently
does not routinely enforce this regulation absent other violations.

[42] Available at http://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpmn/pmn.cfm.

HIGHLY CONFIDENTIAL  ATTORNEYS' EYES ONLY

necessary to develop my opinions regarding the activities at issue. The methods that I used are similar to the methods that I have employed throughout my career, including those methods that I used as a reviewer, manager and senior manager at the Food and Drug Administration and as a consultant to medical device companies.

A.   Opinion 1 – Remanufacturing medical devices is a manufacturing activity, which is subject to FDA regulatory requirements, including premarket notification, registration, recall, medical device reporting, unique device identification, and postmarket surveillance among others.

68.   Remanufacturing is clearly defined by FDA in existing regulations.

69.   Plaintiff and the relevant third parties in this case have suggested that the definition of "remanufacturing" is a "murky area" because FDA has not published final guidance on all distinctions between remanufacturing and servicing.[43] But FDA's definition of remanufacturing has been clear since the promulgation of 21 CFR 820 in 1996,[44] and there is no doubt that a party that engages in the activities described in the regulation is a remanufacturer.

70.   21 CFR Part 820 (the Quality System Regulation) (the "QSR") provides the FDA regulatory requirements for good manufacturing practices for medical devices. FDA explained: "The provisions of this part shall be applicable to any finished device as defined in this part, intended for human use, that is manufactured, imported, or offered for import in any State or Territory of the United States, the District of Columbia, or the Commonwealth of Puerto Rico."[45]

---

[43] Intuitive-00706083, at -6086.

[44] 61 Fed Reg. 52602 (Oct. 7, 1996).

[45] 21 CFR § 820.1(a)(2).

HIGHLY CONFIDENTIAL  ATTORNEYS' EYES ONLY

71.     The QSR defines both "manufacturer" and "remanufacturer":

(o) A manufacturer is any person who designs, manufactures, fabricates, assembles, or processes a finished device. Manufacturer includes but is not limited to those who perform the functions of contract sterilization, installation, relabeling, remanufacturing, repacking, or specification development, and initial distributors of foreign entities performing these functions.

. . .

(w) A remanufacturer is any person who processes, conditions, renovates, repackages, restores, or does any other act to a finished device that significantly changes the finished device's performance or safety specifications, or intended use.[46]

72.     When FDA proposed its revisions to 21 CFR 820,[47] it solicited comments on the definitions published in the proposed rule.  The preamble to the final rule (Medical Devices; Current Good Manufacturing Practice (CGMP) Final Rule; Quality System Regulation[48]), specifically the Agency's Response 28, discusses those comments as well as the Agency response to those comments:

> Several comments in response to the proposed definition of "manufacturer" stated that refurbishers and servicers should be added to the definition of a "manufacturer." Other comments recommended adding the term "remanufacturer." Other comments requested deletion of contract sterilizers, installers,

---

[46] 21 CFR § 820.3.

[47] Under Section 520(f) of the Act, FDA issued a final rule in the Federal Register of July 21, 1978 (43 FR 31 508), prescribing Current Good Manufacturing Practice (CGMP) requirements for the methods used in, and the facilities and controls used for the manufacture, packing, storage, and installation of medical devices. This regulation became effective on December 18, 1978, and is codified under 21 CFR part 820.  In November 1993, the agency issued its proposed revisions to the regulation. 58 Fed. Reg. 61952 (Nov. 23, 1993).

[48] 61 Fed. Reg. 52602 (Oct. 7, 1996).

HIGHLY CONFIDENTIAL  ATTORNEYS' EYES ONLY

specification developers, repackagers, relabelers, and initial distributors from the definition.

One comment stated that the phrase ''processes a finished device'' should be explained in the definition of manufacturer.

FDA's Compliance Policy Guide (CPG) 7124.28 contains the agency's policy regarding the provisions of the act and regulations with which persons who recondition or rebuild used devices are expected to comply. This CPG is in the process of being revised in light of FDA's experience in this area. . . . Because of a number of competitive and other issues, including sharply divided views by members of the GMP Advisory Committee at the September 1995 meeting, FDA has elected to address application of the CGMP requirements to persons who perform servicing and refurbishing functions outside the control of the original manufacturer in a separate rulemaking later this year, with another opportunity for public comment.

FDA agrees that the term ''remanufacturing'' should be added to the definition of ''manufacturer'' and has separately defined the term. A remanufacturer is defined as ''any person who processes, conditions, renovates, repackages, restores, or does any other act to a finished device that significantly changes the finished device's performance or safety specifications, or intended use.'' [49]

73.     This discussion in the preamble signifies that thought was specifically given to the inclusion of remanufacturing as part of the definition of "manufacturer," including developing a separate definition for the new term "remanufacturer," and that this was supported by comments that were received on the proposed rule.

---

[49] 61 Fed. Reg. 52602 at 52609 (Oct. 7, 1996).  FDA solicited public comments on the proposed rule until October 23, 1995.  Approximately 280 separate individuals or groups commented on the proposal published in the Federal Register of November 23, 1993, and approximately 175 separate individuals or groups commented on the Working Draft that was announced in a notice of availability published in the Federal Register on July 24, 1995.

HIGHLY CONFIDENTIAL  ATTORNEYS' EYES ONLY

74.    Phillips suggests that the supposed "lack of clarity" related to FDA's definition of "refurbishing" or "servicing" is of import in this case.[50] However, where a party engages in the activities listed in the definition of "remanufacturer," there can be no doubt that the party is a remanufacturer and is subject to the associated regulatory requirements.

B.    Opinion 2 – EndoWrist instruments were cleared by FDA as limited use devices, and efforts to remove or extend the usage limitation by companies other than the original equipment manufacturer (OEM) constitute remanufacturing activities.[51]

1.    FDA cleared EndoWrist instruments as limited use devices.

75.    The usage limitation is an essential safety and performance specification for the EndoWrist instruments. Intuitive engaged in extensive life and performance testing, which was submitted to FDA, to provide FDA a reasonable assurance of the safety and the effectiveness of the device.

76.    The device descriptions in both K965001 and K990144, the earliest 510(k) submissions for the da Vinci Surgical System and its instruments, state that the instruments are "resposable" and "limited use."[52] The fact that the "indications for use" in the 510(k) summaries do not specifically state that EndoWrist instruments are subject to limited use makes no difference, as the usage limitations were clearly indicated in the device descriptions and elsewhere in the 510(k) submission.

---

[50] Opening Expert Report of Philip J. Phillips (Dec. 2, 2022) ("Phillips Report") § III.F, ¶ 114.

[51] Efforts to remove or extend the usage limitation by the OEM, Intuitive, constitute manufacturing and are also subject to premarket requirements.

[52] Intuitive-00691660; Intuitive-00692314.

HIGHLY CONFIDENTIAL  ATTORNEYS' EYES ONLY

77.     In order to understand FDA's clearance of EndoWrist instruments as limited use devices, it is helpful to look at certain premarket submissions for EndoWrist instruments.

a)     K990144

78.     The original 510(k) for Intuitive's EndoWrist family of instruments as well as subsequent 510(k)s demonstrate that the instruments were cleared by FDA as limited use devices.

79.     On January 18, 1999, Intuitive submitted a 510(k) for additional instruments to be used with the Intuitive Surgical Endoscopic Instrument Control System (Model IS1000), including scissors, scalpels, forceps, clip applier, electrocautery and accessories, pick-ups and needle drivers/holder.[53] The trade name listed for the instruments in this 510(k) was Intuitive Surgical™ Instruments/Accessories: "Resposable" (limited reuse) Endoscopic Instruments.

80.     In its Substantial Equivalence Comparison/Rationale, Intuitive explained: "Intuitive Surgical has worked hard to reduce risks associated with the use of the Endoscopic Instrument Control System to an absolute minimum. This has been done through extensive failure modes effects and criticality analysis (FMECA) . . . and extensive fail-safe and redundant design assuring no uncontrolled instrument movement. This fail-safe design has been verified and validated through both in vitro and in vivo testing including more than 170 clinical procedures to date."[54]

_____

[53] Intuitive-00692310.

[54] Intuitive-00692321, at -2324-25.

28

HIGHLY CONFIDENTIAL  ATTORNEYS' EYES ONLY

81.     Intuitive provided the instrument and accessory physical specifications to FDA, and explained that "Tool ID electronics . . . provide electronic recognition of the tool, and store number of uses remaining in memory."[55]

82.     Furthermore, "[t]he system electronics is responsible for performing all telepresence control functions and video processing functions of a sophisticated electro-mechanical system in a surgical environment. Additionally, and of at least equal importance, it is responsible for detecting system faults and taking such protective actions as necessary so as to ensure both patient and operating room staff safety under all conceivable failure conditions."[56]

83.     FDA solicited additional information from Intuitive on the limited use nature of its instruments as part of the 510(k) review. Among FDA's requests was a "summary of your validation of the reuse instructions for the 'resposables'" and "a mechanism for assuring that single use instruments such as scalpels and electrocautery will not be confused with 'resposable' and will not be reused."[57]

84.     Intuitive explained in Section 3.8 of the Device Description, "Summary of Pre-Clinical Studies," the testing done to ensure mechanical reliability. Intuitive explained, "*In vitro* component and sub-system cycle life and durability testing has been performed. This work has included mechanical arms and instruments and has demonstrated reliability consistent with product labeling and use recommendations. Instruments are programmed to "expire" and not

---

[55] Intuitive-00692451, at -2454.

[56] Intuitive-00692433, at -2436.

[57] Intuitive-00692185, at -2205-06.

be useable after a predetermined amount of usage in order to assure reliable operation and the absence of "wear out."[58]

85.    On July 11, 2000, FDA cleared the instruments, writing, "Based upon the product technical information, intended use, and performance information provided in the pre-market notification, the Intuitive Surgical Endoscopic Instrument Control System has been shown to be substantially equivalent to currently marketed predicate devices."[59]

b)    K013416

86.    On October 12, 2001, Intuitive submitted another 510(k) for certain EndoWrist instruments, including endoscopic forceps, graspers, needle drivers, scissors, scalpels (K013416). In the 510(k) Summary, Intuitive explained: "The subject device(s) consist of a family of endoscopic instruments with either grasping or cutting and effectors to be used with the Intuitive Surgical da Vinci Endoscopic Instrument Control System. . . . The instruments are re-usable (for a limited number of uses), are provided non-sterile, and must be cleaned and sterilized before use (pre-vacuum autoclave). . . . The instruments are provided for a limited number of uses to ensure reliability and consistent performance, and have non-volatile 'add-only' memory that the Instrument Control System decrements after each use."[60]

87.    Intuitive also provided testing data in this submission. It explained that standard bench testing data was performed for each of the subject EndoWrists as part of

---

[58] Intuitive-00692611, at -2634.

[59] Intuitive-00691203, at -1204.

[60] Intuitive-00515501, at -5508-09.

HIGHLY CONFIDENTIAL  ATTORNEYS' EYES ONLY

standard verification and validation testing conducted prior to commercial introduction.[61] The testing included a life cycle test: "Perform range of motion cycles on each wrist axis based on expected range of motion during surgical procedures to determine that the cables don't derail or fray, that the pulley turns, and that the wrist unit functions correctly after the test."[62] Intuitive also noted that there were no FDA performance standards for these devices, but the EndoWrists were "designed, manufactured, and tested in accordance with voluntary safety standards."[63]

88.     On December 12, 2001, the FDA sent a deficiency letter to Intuitive regarding the K013416 filing, requesting that Intuitive address the identified deficiencies related to usage limits, biocompatibility, and Ultrasonic Shears.[64]  Specifically, the FDA wrote, "On page 12, you state that the instruments are re-usable for a limited number of uses. The instruments are programmed for a limited number of uses to ensure reliability and consistent performance, and have non volatile 'add-only' memory that the system decrements after each use. Please specify the number of uses for each instrument and describe how the numbers were determined. Please provide data to support the claim."[65]

89.     Intuitive explained to FDA that the "number of uses is determined by testing instruments under conditions that replicate actual clinical use, and cycling these

---

[61] Ibid. at -5519.

[62] Ibid. at -5521.

[63] Ibid. at -5527.

[64] Intuitive-00481165.

[65] Ibid. at -1166.

HIGHLY CONFIDENTIAL  ATTORNEYS' EYES ONLY

instruments for wear expected during the specified number of procedures. . . . Performance measurements are made periodically (e.g., at the end of each cycle or set of cycles) to confirm that the instrument is still performing as intended, and the life testing is continued until failure or a specified number of cycles are successfully completed."[66]

90.   On January 10, 2002, FDA granted clearance for the K013416 510(k).[67]

c)   K131861

91.   On June 19, 2013, Intuitive submitted a 510(k) for its Model IS4000 Da Vinci Xi surgical system and EndoWrist instruments (K131861).

92.   As with the earlier submissions, Intuitive submitted performance testing data, including life testing data, demonstrating that the EndoWrist instruments had been validated for a certain number of uses.[68]

93.   On March 28, 2014, FDA granted clearance for the K131861 510(k) submission.[69]

d)   K170644

94.   This 510(k) applies to multiple instruments and accessories that have been cleared through a number of 510(k) Premarket Notifications, including the 8mm Si Monopolar Curved Scissors. It concerns the Reprocessing Instructions provided to users for reprocessing of instruments and accessories intended for multiple usage.

---

[66] Ibid. at -1168.

[67] Intuitive-00481176.

[68] Intuitive-00493612.

[69] Intuitive-00861667.

HIGHLY CONFIDENTIAL  ATTORNEYS' EYES ONLY

95.     This device was also listed as a predicate device for the K210478 510(k), discussed below in Section IV.B.1(h), in which Iconocare sought clearance for an additional 10 uses beyond what was originally cleared by FDA for the 8mm Si Monopolar Curved Scissors.

96.     This submission validated the devices for the labeled number of reprocessing cycles for the instruments establishing that the device meets performance specifications after a representative number of uses.

e)     K180033

97.     This 510(k) was submitted by Intuitive Surgical for the EndoWrist 8mm Monopolar Curved Scissors instrument used with the Intuitive Surgical IS2000 da Vinci S Surgical System or IS3000 da Vinci Si Surgical System for cutting, cauterizing, coagulation, manipulating and blunt dissection of tissue.

98.     This device was listed as one of the predicate devices for K210478. Specifically, Iconocare submitted the K210478 510(k) to seek clearance for an additional 10 uses beyond what was cleared in this 510(k) for the Si 8mm Monopolar Curved Scissors.

f)     K214095

99.     In December 2021, Intuitive submitted a 510(k) to FDA for "extended lives" on certain instruments intended for use with the X and Xi da Vinci Surgical Systems.[70]

---

[70] Intuitive-02054168.

HIGHLY CONFIDENTIAL  ATTORNEYS' EYES ONLY

100.    The submission included testing data demonstrating that the X/Xi EndoWrist instruments could be used for a greater number of lives than the number for which they were originally cleared.[71]

101.    On August 15, 2022 FDA notified Intuitive that clearance was granted for K214095.[72]

g)    K143619

102.    I am aware of two manufacturers other than Intuitive who have submitted 510(k)s seeking clearance to extend the usage limits on EndoWrist instruments: Rebotix, LLC and Iconocare Health.

103.    Rebotix submitted K143619 on December 18, 2014 for "re-manufactured EndoWrists."[73] According to Rebotix:

> Re-manufactured EndoWrists are intended to be used in the same manner as their OEM counterparts. The conditions of use and operating principle are identical. The re-manufactured EndoWrists described above can only be used with the da Vinci S and da Vinci Si Systems, in accordance with the indication of these host systems.
>
> Specifications and allowable tolerances have been established for each of the remanufactured EndoWrists, in order to ensure that they maintain OEM-equivalent safety and performance throughout the intended extended use cycles.[74]

---

[71] K214095 510(k) Summary, available at: https://www.accessdata.fda.gov/cdrh_docs/pdf21/K214095.pdf.  This 510(k) is discussed in further detail in Section IV.D.3.

[72] Ibid.

[73] REBOTIX170421, at -0424.

[74] REBOTIX131433 at -1436.

HIGHLY CONFIDENTIAL  ATTORNEYS' EYES ONLY

104.    Following review of the submission and months of communications with Rebotix regarding the submission,[75] FDA issued a deficiency letter to Rebotix on June 23, 2015 that identified 51 deficiencies with the submission.[76] The deficiencies related to the device description, remanufacturing, labeling, cleaning validation, sterilization validation, biocompatibility, electromagnetic compatibility and electrical safety, and performance testing.[77]

105.    It is worth noting that Phillips suggests that FDA's review of a 510(k) is not an affirmation that the subject of the 510(k) submission is "necessary."[78] However, in my experience, FDA does not devote the necessary resources to identify and describe deficiencies at this level of detail where FDA considers the 510(k) "unnecessary."

106.    The term "remanufacture" (or a version of it) was used 84 times in the deficiency letter. The letter includes a specific section of deficiencies under the heading "Remanufacturing." It states:

Remanufacturing

The following deficiencies refer to the procedures you have identified to collect used devices from users, and modify those devices to accommodate additional uses (defined as "remanufacturing" for the purpose of this letter).

2. Although the subject device is not a "single-use device" (defined as a device used only once and then discarded), it has

---

[75] See, e.g., REBOTIX131417; REBOTIX077440; REBOTIX077545; REBOTIX077617; REBOTIX077671.

[76] REBOTIX171030.

[77] Ibid. at -1030-57.

[78] Phillips Report, ¶ 37.

HIGHLY CONFIDENTIAL  ATTORNEYS' EYES ONLY

> many aspects in common with third party reprocessed single-use
> devices. Therefore, it is recommended that you review and
> provide the following items described in FDA's Guidance "Medical
> Device User Fee and Modernization Act of 2002, Validation Data
> in Premarket Notification Submissions (510(k)s) for Reprocessed
> Single-Use Medical Devices"[79] . . .

107.    It is clear from the content of the 510(k) and from FDA's deficiency letter

that both Rebotix and FDA considered the activities described in this submission, which would

extend the use of the EndoWrist devices for an additional 11 uses over the original clearance, to

be remanufacturing.

108.    FDA never cleared Rebotix's "re-manufactured EndoWrists." In the

deficiency letter, FDA made clear: "You may not market this device until you have received a

letter from FDA allowing you to do so. If you market the device without FDA clearance, you will

be in violation of the Federal Food, Drug, and Cosmetic Act."[80]  Again, the Phillips report tries to

downplay this language by describing it as "boilerplate." In my opinion, whether it is

"boilerplate" or not, FDA expects a company intending to market a new device to abide by the

regulatory requirements, and would not tell a company that marketing a device would be a

violation of the FD&C Act if FDA did not believe that to be the case.[81]

---

[79] REBOTIX171030; The guidance FDA recommended is available at
https://www.fda.gov/media/71482/download (last accessed Jan. 17, 2023).

[80] REBOTIX171058.

[81] FDA may apply enforcement discretion in cases where a company made a good faith
determination that a 510(k) was not needed and is actively working towards bring a product
into compliance.  The language in the letter indicates to me that FDA was not applying
enforcement discretion here.

HIGHLY CONFIDENTIAL  ATTORNEYS' EYES ONLY

109.     Rebotix attempted to cure the deficiencies in its submission and engaged with FDA on various calls and e-mails to gain clarity on the required activities Rebotix would need to undertake.[82] FDA explained to Rebotix that certain deficiencies stemmed "from the fact that the device is not simply a reusable device, but is a third party reprocessed/remanufactured device."[83]

110.     Ultimately, Rebotix notified FDA of its intent to "formally withdraw the K143619 submission" and withdrew the submission on December 17, 2015, citing "the nature of the testing and information requested."[84] Rebotix indicated that it intended to resubmit the 510(k) at a later date, but I have seen no evidence that they did.

h)     K210478

111.     K210478 is the other non-OEM 510(k) submission I am aware of that seeks to extend the useful life of EndoWrist instruments.

112.     It too illustrates the applicable regulatory requirements. This 510(k) was submitted by Iconocare Health in February 2021, specifically seeking clearance to add 10 uses to another manufacturer's legally marketed device.

(1)     Background

113.     This 510(k) is for the 8mm Monopolar Curved Scissors Instrument used with the Intuitive Surgical IS3000 da Vinci Si Surgical System for cutting, cauterizing, coagulation, manipulating and blunt dissection of tissue. The instrument consists of the

---

[82] REBOTIX077729; REBOTIX077735.

[83] REBOTIX077729, at -7733.

[84] REBOTIX171076.

HIGHLY CONFIDENTIAL  ATTORNEYS' EYES ONLY

housing, shaft, wrist, and tip. The shaft and wrist allow for different axes of rotation, and the instrument tip is used to interact with the patient tissue. This instrument is reusable and is provided non-sterile. [85]

114.    The 8mm Monopolar Curved Scissor Instruments are designed by Intuitive to provide surgeons with natural dexterity and a greater range of motion than even the human hand. This allows for greater precision when operating in a minimally invasive environment. EndoWrist 8mm Monopolar Curved Scissor Instruments, when used with the IS3000 system, are designed to support rapid and precise suturing, dissection and tissue manipulation in surgical procedures.[86]

115.    In the Summary of Technological Characteristics section, which is drafted by submitter, Iconocare explained that the design, materials, and intended use of the 8mm Monopolar Curved Scissor Instruments, after an additional ten (10) reuse cycles, are equivalent to the predicate device. It submitted to FDA that the mechanism of action of the subject device is identical to the predicate device in that the same standard mechanical design, materials, and sizes are utilized. Finally, Iconocare explained that the change in device specifications is to extend the useful life of the 8mm Monopolar Curved Scissor Instruments.[87]

116.    In accordance with the FD&C Act and the related FDA regulations, Iconocare submitted performance data as part of its 510(k).[88] Iconocare represented to FDA

---

[85] SIS357813, at -7817.

[86] Ibid.

[87] Ibid.

[88] In accordance with 21 CFR 807.92(b), the 510(k) Summary for K210478 discusses the performance data submitted to support substantial equivalence.
https://www.accessdata.fda.gov/cdrh_docs/pdf21/K210478.pdf

that it conducted a risk analysis to evaluate the impact of modifications to the predicate device.

This included the following tests:

- Biocompatibility

- Validation of Reprocessing

- Functional Performance Testing

- Electrical Safety Testing.[89]

117.    Iconocare had to submit data sufficient to allow FDA to determine whether its remanufactured device is as safe and effective as the predicate and operates as originally intended.

(2)    Deficiencies



118.    ██████████████████████████████████████████████████████

████████████████████████████████████████████████.[90]

119.    █████████████████████████████████████ ██████████████████████

████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████:

███████████████████████████████████

████████████████████████████████████████

█████████████████.[92]

---

[89] Ibid.

[90] AHP000527.

[91] Ibid. at -0528-36.

[92] Ibid. at -0528.

HIGHLY CONFIDENTIAL  ATTORNEYS' EYES ONLY

120.     As I explained above in Section IV.B.1(g), in my experience, especially
under the current user fee performance goal structure,[93] FDA does not devote the resources
required to identify and describe deficiencies at this level of significant detail when FDA
considers the 510(k) "unnecessary."



121.

122.

123.

_____

[93] The performance goal system establishes a target for FDA to reach a final decision on 95% of
510(k) submissions within 90 FDA days.

[94] AHP000527, at -0528.

[95] Ibid.

[96] Ibid.

HIGHLY CONFIDENTIAL  ATTORNEYS' EYES ONLY

███████████████████████████████████████████████████████

████████████████████[97]

124.   ████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

███████████████████  █████████████████████████████

███████████████████████████████████████████.[99]

125.   ████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████  ████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████.″[101]

---

[97] Ibid. at -0534.

[98] Ibid. at -0528.

[99] Available at: https://www.fda.gov/media/80265/download

[100] AHP000527 at -0531.

[101] Ibid.

HIGHLY CONFIDENTIAL  ATTORNEYS' EYES ONLY

126.  ██████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

████████████████████████. "[102]

127.  ███████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

██████████████████████████████

████████." [103]

128.  ██████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

█████████████████████████████████. [104]

████████████████████. [105]

---

[102] Ibid.

[103] Ibid. at -0534. (emphasis added)

[104] Available at https://www.fda.gov/media/71482/download (last accessed Jan. 17, 2023).

[105] AHP000527, at -0534.

HIGHLY CONFIDENTIAL  ATTORNEYS' EYES ONLY

129. 

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

████████████████████."

130.     Labeling[106] is defined as all labels and other written, printed or graphic matter (1) upon any article or any of its containers or wrappers, or (2) accompanying such article.  Additionally, label is defined in Section 201(k) of the FDCA as a display of written, printed, or graphic matter upon the immediate container of any article. [107] General labeling requirements for medical devices have been established in 21 CFR Part 801.

131.     ██████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████     ██████████████████████████████████████

███████████████████████████████████████████████████████████████████

█████████████████████████████████████████████."[109]

---

[106] 21 U.S.C. §321(m).

[107] 21 U.S.C. §321(k).

[108] AHP000527, at -0536.

[109] FDA, UDI Basics, https://www.fda.gov/medical-devices/unique-device-identification-system-udi-system/udi-basics (last accessed Jan. 17, 2023); FDA, "Compliance with Section 301 of the Medical Device User Fee and Modernization Act of 2002, as amended – Prominent and Conspicuous Mark of Manufacturers on Single-Use Devices" (May 1, 2006), available at https://www.fda.gov/media/71187/download (last accessed Jan. 17, 2023).

43

HIGHLY CONFIDENTIAL  ATTORNEYS' EYES ONLY



132. ████████████████████████████

████████████████████████████████

████████████████████████████████████

██████████████.[110]

133. ███████████████████████████████

██████████████████████████████████████

███████████████████████████████

██████████████████████."[111]

134. ████████████████████████████

██████████████████████████████████████

████████████████████████████████

██████████████████.[112]

135. ██████████████████████████████

███████████████████████████████

████████████████████████████████████

███████████████████████████████████

██████████████████."[113]

---

[110] 21 CFR § 801.20(a).

[111] Restore-00086093, at -6100.

[112] Ibid. at -6096-6100.

[113] Ibid. at -6107–08.  This appears to contradict Kevin May's recent representation that as long as a hospital "continues to own" an EndoWrist instrument, it can send it to Restore, who

HIGHLY CONFIDENTIAL  ATTORNEYS' EYES ONLY

 (3)   Clearance

136.   ███████████████████████████████  █████  ████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████. ."[115]

137.   Upon clearing the device, FDA assigned this instrument the product

codes NAY and QSM. See **Figure 1**.

---

expects to be purchasing the K210478 clearance from Iconocare and remanufacturing EndoWrists according to Iconocare's cleared process, to have the usage limits reset as many times as "we're willing to reset it."  May Tr. 17:21-18:25; 137:23-140:4.

[114] K210478 510(k) Summary, available at:
https://www.accessdata.fda.gov/cdrh_docs/pdf21/K210478.pdf (last accessed Jan. 17, 2023).

[115] Restore-00086093 (emphasis added).

HIGHLY CONFIDENTIAL  ATTORNEYS' EYES ONLY

**Figure 1**

| | |
|---|---|
| Device Classification Name | system, surgical, computer controlled instrument, remanufactured |
| 510(k) Number | K210478 |
| Device Name | 8mm Monopolar Curved Scissors |
| Applicant | Iconocare Health
7825 East Redfield Rd.
Suite 103
Scottsdale, AZ  85260 |
| Applicant Contact | Rick Ferreira |
| Correspondent | Iconocare Health
7825 East Redfield Rd.
Suite 103
Scottsdale, AZ  85260 |
| Correspondent Contact | Rick Ferreira |
| Regulation Number | 876.1500 |
| Classification Product Code | QSM |
| Subsequent Product Code | NAY |
| Date Received | 02/19/2021 |
| Decision Date | 09/30/2022 |
| Decision | Substantially Equivalent (SESE) |
| Regulation Medical Specialty | Gastroenterology/Urology |
| 510k Review Panel | General & Plastic Surgery |
| Statement | Statement |
| Type | Traditional |
| Reviewed by Third Party | No |
| Combination Product | No |

138.    As discussed further in Section IV.B.3(a), the NAY product code refers to a

"System, Surgical, Computer Controlled Instrument."[116] The QSM code, which was created as a

result of this initial clearance for a device cleared as a remanufactured NAY instrument—refers

to a "System, Surgical, Computer Controlled Instrument, *Remanufactured*."[117]  The physical

state of a device with the QSM code is described by FDA:

> A surgical instrument for a computer controlled system. The
> instrument has been *remanufactured to extend its use life* as

---

[116] Product Classification, NAY, available at:
https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfPCD/classification.cfm?ID=NAY (last accessed Jan. 17, 2023).

[117] Product Classification, QSM, available at:
https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpcd/classification.cfm?id=5726 (last accessed Jan. 17, 2023) (emphasis added).

HIGHLY CONFIDENTIAL  ATTORNEYS' EYES ONLY

compared to what was originally defined by the original
equipment manufacturer."[118]

2.  FDA has acknowledged the limited use nature of EndoWrist instruments in
communications to third parties.

139.  ███████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████."[119]

140.  FDA acknowledged in its 2015 deficiency letter to Rebotix that the

EndoWrists could only be validated for a certain number of lives ("[P]lease provide all details

regarding the device description, remanufacturing process, validated reprocessing instructions

for users, and validated number of use lives . . .").

141.  █████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████ █████████████████

██████████████.[121]

---

[118] Ibid. (emphasis added)

[119] Restore-00001248, at -1256; REBOTIX146948, at -6954-55.

[120] REBOTIX171030.

[121] AHP000527, at -0534.

HIGHLY CONFIDENTIAL  ATTORNEYS' EYES ONLY

142. 

[124]

3. <u>Objective and publicly available evidence demonstrates that FDA has determined that removing or extending the usage limitation on EndoWrist instruments is a remanufacturing activity, and as such, it requires 510(k) clearance.</u>

   a) <u>FDA has classified remanufactured EndoWrists as Class II devices, assigned them a unique procode, and indicated that they require 510(k) clearance.</u>

143.   FDA's classification of EndoWrist instruments as Class II devices and the assignment of two product codes for the devices demonstrates that FDA views extending the usage limitation on EndoWrist instruments as a remanufacturing activity requiring 510(k) clearance.

144.   FDA considers EndoWrist instruments to be robotically-assisted surgical (RAS) devices.

145.   RAS devices are a type of computer-assisted surgical system. Sometimes referred to as robotic surgery, RAS devices enable the surgeon to use computer and software

---

[122] Ibid. at -0528; REBOTIX171030, at -1034.

[123] "Reprocessing Medical Devices in Health Care Settings: Validation Methods and Labeling (June 9, 2017), at 20.

[124] Intuitive-00705778, at -5779.

HIGHLY CONFIDENTIAL  ATTORNEYS' EYES ONLY

technology to control and move surgical instruments through one or more tiny incisions in the patient's body (minimally invasive) for a variety of surgical procedures.[125]

146.    In FDA's view, the benefits of a RAS device may include its ability to facilitate minimally invasive surgery and assist with complex tasks in confined areas of the body. The device itself is not actually a robot because it cannot perform surgery without direct human control.[126]

147.    RAS devices generally have several components, which may include a:

- Console: Where the surgeon sits during surgery. The console is the control center of the device and allows the surgeon to view the surgical field through a three-dimensional endoscope and control movement of the surgical instruments;

- Bedside cart: Includes three or four hinged mechanical arms, camera (endoscope) and surgical instruments that the surgeon controls during surgical procedures;

- Separate cart: Contains supporting hardware and software components, such as an electrosurgical unit (ESU), suction/irrigation pumps, and light source for the endoscope.[127]

148.    FDA classifies RAS devices as Class II devices. Manual surgical instruments for general use (non-powered, hand-held devices) are Class I, exempt from 510(k) under 21 CFR 878.4800. In comparison, because of the risk profile, RAS devices are classified by FDA as Class 2

---

[125] FDA, Computer-Assisted Surgical Systems, https://www.fda.gov/medical-devices/surgery-devices/computer-assisted-surgical-systems (last accessed Jan. 17, 2023).

[126] Ibid.

[127] Ibid.

HIGHLY CONFIDENTIAL  ATTORNEYS' EYES ONLY

and require a 510(k) before the device may be marketed.[128] Specifically, FDA has determined that RAS devices require both general and special controls in order to provide a reasonable assurance of safety effectiveness, while traditional surgical tools require only general controls.

149.     FDA has created two product codes under the regulation 21 CFR § 876.1500 for the instruments that are used with robotically-assisted surgical systems.[129]

150.     One product code (NAY) is for what FDA would consider original equipment. See **Figure 2**. NAY refers to "System, Surgical, Computer Controlled Instrument," and devices with this product code are Class 2. Such a device requires 510(k) clearance to be legally marketed. The product code includes the following statement:

> *If the device is reusable, validated reprocessing instructions and reprocessing validation data for this device type must be included in a 510(k) submission.*

---

[128] FDA's classification of traditional and robotic surgical devices in different classes pertains to FDA's assessment of the risk profile and the controls necessary to provide reasonable assurance of safety and effectiveness.

[129] A summary of relevant premarket submissions with the NAY and QSM product codes that have been reviewed and cleared by FDA are summarized in Appendix C.

HIGHLY CONFIDENTIAL  ATTORNEYS' EYES ONLY

**Figure 2**



| | |
|---|---|
| **Device Definition** | System, Surgical, Computer Controlled Instrument |
| | If the device is reusable, validated reprocessing instructions and reprocessing validation data for this device type must be included in a 510(k) submission (82 FR 26807, available at https://www.gpo.gov/fdsys/pkg/FR-2017-06-09/pdf/2017-12007.pdf). |
| **Regulation Medical Specialty** | Gastroenterology/Urology |
| **Review Panel** | General & Plastic Surgery |
| **Product Code** | NAY |
| **Premarket Review** | Surgical and Infection Control Devices (OHT4) General Surgery Devices (DHT4A) |
| **Submission Type** | 510(k) |
| **Regulation Number** | 876.1500 |
| **Device Class** | 2 |
| **Total Product Life Cycle (TPLC)** | TPLC Product Code Report |
| **GMP Exempt?** | No |
| **Summary Malfunction Reporting** | Ineligible |
| **Implanted Device?** | No |
| **Life-Sustain/Support Device?** | No |
| **Recognized Consensus Standard** | • 12-292 IEEE Std 3333.2.1-2015 IEEE Recommended Practice for Three-Dimensional (3D) Medical Modeling |
| **Third Party Review** | Not Third Party Eligible |

151.    The second product code (QSM) was specifically created for

remanufactured products. See **Figure 3.** QSM refers to "System, Surgical, Computer Controlled

Instrument, Remanufactured," and devices with this product code are Class 2. Such a device

requires 510(k) clearance to be legally marketed. The product code includes the following

statement:

> *The instrument has been remanufactured to extend its use life as
> compared to what was originally defined by the original
> equipment manufacturer.*

HIGHLY CONFIDENTIAL  ATTORNEYS' EYES ONLY

**Figure 3**

| | |
|---|---|
| Device Definition | System, Surgical, Computer Controlled Instrument, Remanufactured |
| | As intended with the originally cleared instrument. |
| Physical State | A surgical instrument for a computer controlled system. The instrument has been remanufactured to extend its use life as compared to what was originally defined by the original equipment manufacturer. |
| Technical Method | Instrument is attached and manipulated from a primary computer controlled system. |
| Target Area | Where applicable in accordance to the indications for use. |
| Regulation Medical Specialty | Gastroenterology/Urology |
| Review Panel | General & Plastic Surgery |
| Product Code | QSM |
| Premarket Review | General Surgery Devices (DHT4A) General Surgery Devices (DHT4A) |
| Submission Type | 510(k) |
| Regulation Number | 876.1500 |
| Device Class | 2 |
| Total Product Life Cycle (TPLC) | TPLC Product Code Report |
| GMP Exempt? | No |
| Summary Malfunction Reporting | Ineligible |
| Implanted Device? | No |
| Life-Sustain/Support Device? | No |
| Third Party Review | Not Third Party Eligible |

152.    As discussed in Section IV.B.1(h), FDA granted clearance to Iconocare for a remanufactured EndoWrist (8mm Monopolar Curved Scissors) and classified the instrument as: "system, surgical, computer controlled instrument, remanufactured."

153.    FDA created the QSM product code as a result of the clearance of the Iconocare-remanufactured EndoWrist. The product code for the cleared Iconocare technology states: "The instrument has been remanufactured to extend its use life as compared to what was originally defined by the original equipment manufacturer."

154.    From an FDA regulatory perspective, the creation of the QSM code – and classification as a Class II device – by FDA means that FDA has determined that the extension of the use life for a surgical instrument for a computer controlled system, as compared to what was originally defined by the original manufacturer, requires 510(k) clearance. FDA would not

52

HIGHLY CONFIDENTIAL  ATTORNEYS' EYES ONLY

create a new product code for an "unnecessary" 510(k); doing so requires extra administrative effort and levels of approval. This is further evidence that FDA requires 510(k) clearance to extend the use life for any EndoWrists.

> b) Congress also reached the same conclusion for a similar industry and activity – reprocessing – and amended FDA's governing statute to define premarket requirements for the reprocessors of devices labeled for single use.

155.    FDA's regulation of reprocessing is informative to the issues here, particularly with respect to the reprocessing of single-use devices.

156.    Extending the usage limit of EndoWrists beyond their intended limits is an activity very similar to SUD reprocessing. SUD reprocessors facilitate the reuse of instruments labeled for a single use to extend their "life" for additional uses.

157.    Even FDA has identified EndoWrists as having similar characteristics to single-use devices and indicated that certain reprocessing guidance documents are relevant to the premarket notification requirements for a "reset" EndoWrist instrument.[130]

158.    "Reprocessing" refers to cleaning and sterilization of medical devices — for example, cleaning and sterilizing reusable medical devices between uses, consistent with the FDA cleared or approved instructions for use for the device, and cleaning or sterilizing devices originally labeled for single use only, i.e. single-use devices ("SUDs").

159.    Congress has addressed reprocessing with respect to single-use devices. Reprocessing a single-use device refers to reprocessing a device that is labeled by the OEM for single use for an additional use.

---

[130] REBOTIX155894 (Deficiency #2).

160.     In 2002, Congress passed the Medical Device User Fee and Modernization Act of 2002 (MDUFMA) to address reprocessing of SUDs.[131] The MDUFMA legislation amended the FD&C Act, establishing new statutory requirements applicable to reprocessed SUDs, including labeling identifying the devices as reprocessed,[132] submission of validation data in premarket notifications (510(k)s), as well as a submission like a PMA for Class III SUDs known as Premarket Report (PMR).[133]

161.     FDA defined the policy that firms and hospitals that are reprocessing SUDs are considered by FDA to be manufacturers and as such must comply with all of the following statutory and regulatory requirements, where applicable:[134]

- Quality System Regulation (Section 520(f) of the Act; 21 CFR Part 820)

- Medical Device Reporting (Section 519 (a), (b) and (c) of the Act; 21 CFR Part 803)

- Registration and Listing (Section 510 of the Act; 21 CFR Part 807)

- Labeling (Section 502 of the Act; 21 CFR Part 801)

- Premarket Approval (including Premarket Reports for reprocessed single-use devices) Section 515 of the Act; 21 CFR Part 814)

- Premarket Notification (510(k)) (Sections 510, 513 ; 21 CFR Part 807 )

- Medical Device Corrections and Removals (Section 519(f) of the Act; 21 CFR Part 806)

---

[131] Medical Device User Fee and Modernization Act of 2002, PL 107–250, October 26, 2002, 116 Stat 1588; 21 U.S.C. § 360(o).

[132] 21 U.S.C. § 352(u)(2).

[133] 21 U.S.C. § 360(o); FDA, Summary of the Medical Device User Fee and Modernization Act of 2002, https://www.fda.gov/industry/medical-device-user-fee-amendments-mdufa/summary-medical-device-user-fee-and-modernization-act-2002 (last accessed Jan. 18, 2023).

[134] CPG § 300.500 (Reprocessing of Single Use Devices), available at: https://www.fda.gov/media/71769/download (last accessed Jan. 17, 2023).

HIGHLY CONFIDENTIAL  ATTORNEYS' EYES ONLY

- Medical Device Tracking (Section 519(e) of the Act; 21 CFR Part 821).

162.    Because FDA considers reprocessors of SUDs to be manufacturers, those reprocessors are subject to premarket and postmarket requirements, such as 510(k) notification. The applicability of the 510(k) requirement to reprocessed single-use devices is codified at 21 U.S.C. § 360(o), which specifies the type of data that must be included in the 510(k) for reprocessed devices:

> (1) With respect to reprocessed single-use devices for which reports are required under subsection (k):

> (A) The Secretary shall identify such devices or types of devices for which reports under such subsection must, in order to ensure that the device is substantially equivalent to a predicate device, include validation data, the types of which shall be specified by the Secretary, regarding cleaning and sterilization, and functional performance demonstrating that the single-use device will remain substantially equivalent to its predicate device after the maximum number of times the device is reprocessed as intended by the person submitting the premarket notification.

163.    It should be noted that Congress did not *need* to revise the governing statute in order to impose premarket requirements on the SUD reprocessors. However, Congress amended the regulation to define the requirements.

164.    Here, Congress does not need to step in. As explained in Section IV.A, remanufacturing is already clearly defined in the regulations, which have the same force of law as the governing statute, and is subject to the premarket requirements.

4.    Third parties engaging in extending or resetting the lives of EndoWrist instruments are remanufacturers under existing FDA regulation. Therefore, they were required to obtain 510(k) clearance.

HIGHLY CONFIDENTIAL  ATTORNEYS' EYES ONLY

a)      The activities that the third parties undertake to extend the usage limits significantly change the performance specifications of EndoWrist instruments.

165.    An essential part of the design for the EndoWrist instruments is the limitation on the number of times each instrument may be used for surgical procedures. As I understand, the limitation is implemented through an integrated circuit that tracks the number of times an instrument is used by a da Vinci robot.[135]

166.    As I understand, during manufacturing, the chip is programmed with the total number of allowed uses; for most S and Si EndoWrist instruments, this usage limit is ten surgical procedures. When an instrument is connected to the robot, the chip in the instrument communicates with the robot, and a use is decremented. Once the uses have been decremented to zero, the robot will not activate the instrument.[136]

167.    As explained above in Section IV.B.1(a)-(f), this information was provided to and evaluated by FDA, which cleared the EndoWrist as a limited use device.

168.    As I understand, the change that third parties are making or attempting to make is to the number of uses as specified in the labeling for the devices from the OEM by modifying or replacing the OEM counter to allow uses beyond the OEM limit.

169.    There are two technologies that I am aware of that have been developed in order to remove and/or extend the usage limitation on EndoWrist instruments.

---

[135] Expert Report of Dr. Robert D. Howe (Aug. 20, 2021) (*Restore Robotics LLC et al. v. Intuitive Surgical, Inc.*) ("Howe Report (*Restore*)") ¶ 25.

[136] Howe Report (*Restore*) ¶ 25.

HIGHLY CONFIDENTIAL  ATTORNEYS' EYES ONLY

170.    It is my understanding that in order to bypass the usage counter on EndoWrist instruments, SIS facilitated a "reset" service involving technology from Rebotix Repair LLC ("Rebotix") called the "Interceptor." SIS has not performed the reset process itself, but instead relied entirely on Rebotix to actually perform the reset.[137] SIS intends to begin resetting instruments pursuant to the Rebotix process at some point in the future.[138]

171.    It is my understanding that SIS's facilitation involved collecting from hospitals used EndoWrist instruments and sending them to Rebotix in Florida to perform the "reset" process.[139] I also understand that, for a period, Restore Robotics Repair also performed the reset on behalf of Rebotix out of a facility in Anaheim, CA.[140]

172.    As I understand, Rebotix's method intercepts communication between the robot and the instrument. During the process, the device is opened by brute force, the original circuit board is removed, the OEM chip is desoldered to remove it, and then it is soldered onto the Interceptor board. The Interceptor technology allows the third party to substitute an altered number of uses to allow the instrument to exceed the original, cleared usage limit.[141]

---

[137] Expert Report of Dr. Robert D. Howe (Dec. 2, 2022) *(Surgical Instrument Service Company, Inc. v. Intuitive Surgical, Inc.)* ("Howe Report (*SIS*)") ¶¶ 8, 34; 30(b)(6) Deposition of Greg Posdal (Nov. 1, 2022), Tr. 21:17-24, 22:10-12; 30(b)(6) Deposition of Keith Johnson (Oct. 27, 2022), Tr. 33:22-34:4.

[138] Phillips Report ¶ 94.

[139] Howe Report (*SIS*) ¶ 8.

[140] Deposition of Kevin May (Nov. 3, 2022), Tr. 105:14-22.

[141] Howe Report (*SIS*), ¶¶ 35-36.

HIGHLY CONFIDENTIAL  ATTORNEYS' EYES ONLY

173.    This process for resetting the usage counter has never been cleared by FDA.  As discussed above in Section IV.B.1(g), Rebotix sought out 510(k) clearance but later abandoned such an effort.

174.    ███████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████.[142]

175.    As discussed above in Section IV.B.1(h), FDA reviewed this process as it is applied to Si 8mm Monopolar Curved Scissors and granted 510(k) clearance to Iconocare for remanufactured Si 8mm Monopolar Curved Scissors.  FDA cleared Iconocare to only perform the reset process once on any given instrument, and this process has not been cleared by FDA to be used to reset any other instrument.

176.    The third parties do not "return[ the finished device] to the safety and performance specifications established by the OEM and to meet its original intended use."[143] Because their activities significantly change the device's performance specifications, their activities are considered by the FDA to be remanufacturing.

177.    As discussed above, the Rebotix (and Iconocare) processes include a method that alters the performance specifications of the EndoWrists. The Rebotix

---

[142] Restore-00089490, at -9495, -9498; Supplemental Expert Report of Dr. Robert D. Howe (Dec. 23, 2022) (*Restore*) ("Howe Supplemental Report (*Restore*)"), ¶¶ 144-45.

[143] FDA, "White Paper: Evaluating Whether Activities are Servicing or Remanufacturing" (December 2018), at 19, available at https://www.fda.gov/media/117238/download (last accessed Jan. 17, 2023); 21 CFR 820.3(w) (defining remanufacturer as a person who "dos any . . . act to a finished device significantly changes the finished device's performance or safety specifications, or intended use"); Phillips ¶¶ 84, 96.

HIGHLY CONFIDENTIAL  ATTORNEYS' EYES ONLY

"Interceptor," which replaces the original circuit board in the instrument and manipulates the data on the original chip, intercepts communication between the robot and the instrument and extends the performance of an EndoWrist beyond the original specified uses. The Iconocare process similarly changes the performance specifications through a process which replaces both the circuit board and the Dallas chip in order to bypass the originally-specified usage limits.

178.     It is beyond dispute that the EndoWrist instruments sold by Intuitive are designed and manufactured to perform for the specified number of uses, which have been reviewed and cleared by FDA. By removing or extending the usage limitation, the third parties are significantly changing the performance of the instrument.

179.     Such an activity constitutes remanufacturing and is therefore subject to the 510(k) premarket requirements.

> b)     The activities that the third parties undertake to extend the usage limits significantly change the safety specifications of EndoWrist instruments.

180.     The third parties' processes also significantly change the safety specifications. The EndoWrist instruments were evaluated by Intuitive to determine the bounds of safe and reliable use and reprocessing of each instrument and assigned the usage limitations accordingly. By extending the usage limits, the third parties are changing the safety specifications beyond what was originally validated by the original equipment manufacturer.

181.     FDA has explained that changes to the reprocessing of the EndoWrist devices require a 510(k) because a System, Surgical, Computer controlled Instrument (product code NAY), which is how FDA classifies EndoWrists, poses a greater likelihood of microbial transmission and represents a high risk of infection if it is not adequately reprocessed.

HIGHLY CONFIDENTIAL  ATTORNEYS' EYES ONLY

Extending the lives of an EndoWrist instrument necessarily involves changing the reprocessing

instructions (by allowing additional reprocessing cycles beyond what was validated). "A 510(k)

to change the reprocessing instructions of a cleared EndoWrist requires a new 510(K)

submission for FDA to evaluate substantial equivalence."[144]

182.    As such, by removing or extending the usage limitation, the third parties

are significantly changing the safety specifications of the instrument.

183.    Phillips seems to draw conclusions from the fact that there are no

adverse events reported in the MAUDE database involving EndoWrist devices that include

references to the third parties.[145] However, this has no relevance to FDA's evaluation of

whether an activity "significantly changes the finished device's . . . safety specifications," and

Phillips's argument is misleading.

184.    First, it is important to understand FDA's adverse event reporting

requirements. FDA uses Medical Device Reporting (MDR) as a postmarket surveillance tool to

"monitor device performance, detect potential device-related safety issues, and contribute to

benefit-risk assessments of these products."[146]

185.    Certain entities are mandatory reporters. For example, "device user

facilities" are required to report a suspected medical device-related death to both the FDA and

---

[144] Intuitive-00705778, at -5779.

[145] Phillips Report ¶ 112.

[146] FDA, Medical Device Reporting (MDR): How to Report Medical Device Problems,
https://www.fda.gov/medical-devices/medical-device-safety/medical-device-reporting-mdr-
how-report-medical-device-problems (last accessed Jan. 17, 2023).

HIGHLY CONFIDENTIAL  ATTORNEYS' EYES ONLY

the manufacturer and serious injuries to the manufacturer.[147] A device user facility is a hospital, ambulatory surgical facility, nursing home, outpatient diagnostic facility, or outpatient treatment facility, which is not a physician's office.[148]

186.    Manufacturers are also "mandatory reporters." They are required to submit to FDA certain types of reports for adverse events and malfunctions associated with medical devices. Specifically, manufacturers are required to report to FDA when they learn that any of their devices "may have caused or contributed to a death or serious injury" and when they become aware that their device has malfunctioned and "would be likely to cause or contribute to a death or serious injury if the malfunction were to recur."[149]

187.    Because remanufacturers are considered by FDA to be manufacturers, they are fully responsible for compliance with all FDA requirements for manufacturers, including submitting MDRs to inform FDA of adverse events and malfunctions with the potential to cause harm associated with their remanufactured devices.[150]

188.    FDA records mandatory reports filed by manufacturers and importers from August 1996 to present on the Manufacturer and User Facility Device Experience (MAUDE) database. The MAUDE database houses MDRs submitted to the FDA by mandatory

---

[147] 21 CFR § 803.10(a).

[148] 21 CFR § 803.3(d).

[149] 21 CFR § 803.10(c); 21 CFR § 803.3(o); 21 CFR § 803.50.

[150] 21 CFR § 803.50.

HIGHLY CONFIDENTIAL  ATTORNEYS' EYES ONLY

reporters (manufacturers, importers and device user facilities) and voluntary reporters such as health care professionals, patients and consumers.[151]

189.    If a manufacturer does not comply with its duty to report or believes it has no duty to report, then no reports would appear in the MAUDE database.

190.    Similarly, if an entity is remanufacturing the original manufacturer's devices without complying with FDA's requirements for manufacturers, including registration, premarket notification, and reporting, then any adverse events associated with the remanufactured instrument would only appear as associated with the original manufacturer.

191.    Even where a remanufacturer has complied with FDA's regulatory requirements, users, including hospitals, may continue to report reportable events to the original manufacturer.

192.    Second, the absence of reported safety issues associated with a device does not affect the FDA's determination of whether an activity being performed on the device significantly affects the safety *specifications* of the device.

193.    As discussed above in Section III.C.1, FDA's focus is on whether the activity in question *could* significantly affect the safety or effectiveness of the device. The absence of adverse events doesn't necessarily have a direct bearing on this assessment in my experience. But the presence of adverse events could have an impact.

        c)    The third parties are introducing new devices into interstate commerce, which makes their activity subject to FDA requirements.

---

[151] FDA, Medical Device Reporting (MDR): How to Report Medical Device Problems, https://www.fda.gov/medical-devices/medical-device-safety/medical-device-reporting-mdr-how-report-medical-device-problems (last accessed Jan. 17, 2023).

HIGHLY CONFIDENTIAL  ATTORNEYS' EYES ONLY

194.    It is worth also noting that FDA regulatory requirements apply where the product has been introduced into interstate commerce. In my experience preparing cases for FDA, interstate commerce could be established by the transport of a finished device across state boundaries or it could be established by the transport of components or products across state boundaries that are then used in the finished device.

195.    Section 201(b) of the FD&C Act [21 U.S.C. 321(b)] tells what circumstances place a product in interstate commerce:

> "(1) commerce between any State or Territory and any place outside thereof, and
>
> (2) commerce within the District of Columbia or within any other Territory not organized with a legislative body."

196.    According to the FDA website:[152]

> "Interstate commerce" applies to all steps in a product's manufacture, packaging, and distribution. It is very rare that a cosmetic product on the market is not in "interstate commerce" under the law. For example, at least some of your ingredients or packaging most likely originate from out of state, or even out of the country. Likewise, it is foreseeable that your products will leave the state.

197.    While the above paragraph speaks to cosmetic products, FDA uses the same definition for interstate commerce for all of its regulated products (drugs, devices, biologics, foods, etc.).

---

[152] FDA, Key Legal Concepts for Cosmetics Industry: Interstate Commerce, Adulterated, and Misbranded, https://www.fda.gov/cosmetics/cosmetics-laws-regulations/key-legal-concepts-cosmetics-industry-interstate-commerce-adulterated-and-misbranded (last accessed Jan. 17, 2023); 21 U.S.C. § 321(b).

HIGHLY CONFIDENTIAL  ATTORNEYS' EYES ONLY

198.    Utilizing these principles, the activities conducted would meet FDA's definition of interstate commerce in my experience and opinion.

199.    There is evidence that SIS, Rebotix, and Restore have all introduced these remanufactured devices into interstate commerce. The third parties have shipped or facilitated the shipping of remanufactured EndoWrists to hospitals in Texas, New York, Massachusetts, Arkansas, and other states from their locations in California and Florida.[153]

> d)    The third parties' arguments that they are not remanufacturers are incorrect.

200.    What the third parties do is in fact remanufacturing. There is no ambiguity on this point, and Intuitive was correct in its belief that the third parties' activities violated FDA regulations. Moreover, SIS's decision to engage in these activities without 510(k) clearance was unreasonable.

201.    As explained above, a remanufacturer is a person who engages in acts "to a finished device that significantly changes the finished device's performance or safety specifications, or intended use." And as demonstrated in Sections IV.A.B.4(a) and (b),the activities at issue here significantly change the device's performance and safety specifications.

202.    FDA's Center for Devices and Radiological Health (CDRH) is "responsible for regulating firms who manufacture, repackage, relabel, and/or import medical devices sold in the United States." CDRH's focus is on the underlying activity, not who the firm is.

203.    Whether an entity self-describes as a "repair" company does not change the nature of their activities.

---

[153] REBOTIX175326; Restore-00055935; Restore-00055937.

HIGHLY CONFIDENTIAL  ATTORNEYS' EYES ONLY

204.    Similarly, whether or not a "repair" company takes title of the instrument or sells the instrument to a different hospital is not relevant to a determination that the activity is remanufacturing. Under FDA's existing regulations, ownership of a medical device does not impact a regulatory determination. That determination is driven by the particular activity being performed on the device.

205.    ███████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████  ██████████████████████████

████████████████████████████████████████.

206.    Any entity that engages in the activities described in FDA's definition of remanufacturing is a remanufacturer, regardless of title, ownership, or whether that entity identifies as a repairer or servicer.

---

[154] Phillips Report ¶ 82.  Restore's Kevin May testified that the "repair" and "remanufacturing" processes expected to be employed by Iconocare are the same activity.  He testified that the difference between the two is that Iconocare will comply with FDA's labeling requirements when Iconocare sells the instruments but will not comply if Iconocare does not take ownership of the device.  May Tr. 80:8-14; 102:4-7. Moreover, he testified that Iconocare could use the process to reset *any* instrument any number of times for the same reasons. May Tr. 137:23-140:4. This is in direct violation of FDA's regulations and FDA's own directive to Restore. K210478 510(k) Summary ("Please be advised that FDA's issuance of a substantial equivalence determination does not mean that FDA has made a determination that your device complies with other requirements of the Act or any Federal statutes and regulations administered by other Federal agencies. You must comply with all the Act's requirements, including, but not limited to: registration and listing (21 CFR Part 807); labeling (21 CFR Part 801); medical device reporting (reporting of medical device-related adverse events) (21 CFR 803) for devices . . .").

HIGHLY CONFIDENTIAL  ATTORNEYS' EYES ONLY

207.    In 1998, FDA revoked Compliance Policy Guide (CPG) 7124.28,

Reconditioners/Rebuilders of Medical Devices,[155] "because application of [then-]current good

manufacturing practice (CGMP) requirements to 'reconditioners/rebuilders' of used medical

devices [did] not comport with definitions in the quality system (QS) regulation or guidance in

the final rule that applies CGMP requirements to 'manufactures' and 'remanufacturers.'"[156]

208.    Before the revocation, CPG 7124.28 interpreted Section 510 of the Act

and defined a "reconditioner/rebuilder"' as a "person or firm that acquires ownership of a used

device and, for purposes of resale or commercial distribution, ''restores'' or ''refurbishes'' the

device to the manufacturer's original or current specifications, or new specifications."[157]

209.    However, after the new term "remanufacturer" was added to 21 CFR 820

and defined, as above, in 21 CFR 820.3(w), FDA determined that the guidance in CPG 7124.28

had become obsolete because its terminology and application of CGMP requirements no longer

conformed with the terms and applicability of the regulations.[158]

210.    FDA explained: "FDA no longer believes that the processing, remarketing,

or servicing of used devices should be characterized in terms of whether or not the processor

acquires ownership of the device for purposes of resale or remarketing."[159] FDA indicated that

this decision was made "on the basis of industry concerns raised during CGMP rulemaking,

---

[155] CPG 7124.28 was issued on December 29, 1987 and revised in March 1995.

[156] 63 Fed. Reg. 67076 (Dec. 4, 1998).

[157] Ibid.

[158] Ibid. at 67077.

[159] Ibid.

FDA's knowledge of changes in the used-device market, and information on used-device 'remarketers' and 'servicers' obtained through the International Association of Medical Equipment Remarketers."[160]

211.    FDA explained that the more important distinction was "between the types of processing conducted on used devices *on the basis of whether or not significant changes occur, or are made, in the performance or safety specifications or intended use of the finished device, as a result of the processing.*"[161]

212.    Notably, FDA's revocation of this distinction came after advocacy from SUD reprocessors, who argued that reprocessors "differ significantly" from refurbishers, "as is" remarketers, services, and reconditioners/rebuilders in part *because* "the hospital retains ownership," and reprocessors never "acquire ownership of medical devices" or "resell or commercially distribute devices."[162]

213.    Despite this advocacy, FDA rejected this argument, deciding that its focus was on "used-device processors making significant modifications to finished devices," regardless of whether the entity held title or acquired ownership to the device.[163]

214.    FDA has not revoked or changed this guidance.

215.    Phillips points out that FDA anticipated issuance of a rule or further guidance setting forth the agency's current position on the applicability of regulatory

---

[160] Ibid.

[161] Ibid. (emphasis added)

[162] See, e.g., Letter from Counsel to the Association of Medical Device Reprocessors to FDA (Mar. 23, 1998)

[163] 63 Fed. Reg. 67076 at 67077.

requirements to "reconditioners/rebuilders" of used devices[164] but "has not promulgated a regulation pertaining to the 'used device market' and no guidance document outlining the Agency's thinking on the matter is in effect."[165] However, the lack of a final rule or further guidance on "reconditioners/rebuilders" is irrelevant to FDA's conclusion that entities whose activities significantly change the performance or safety specifications, or intended use of a finished device are remanufacturers (and therefore manufacturers), subject to applicable regulatory requirements, including premarket notification, regardless of whether they take ownership of the subject device.

216.     Because the third parties were remanufacturing EndoWrist instruments, a 510(k) clearance was required, and SIS's decision to not pursue 510(k) clearance for these activities had no basis in a reasonable interpretation of the law.

C.     Opinion 3 – FDA communicated to certain third parties that their activities constituted remanufacturing.

217.     FDA has told Iconocare, Restore, and Rebotix that resetting or extending the usage limits beyond their cleared limit constitutes remanufacturing.

218.     First, as explained in Section IV.B.1(g), Rebotix applied for 510(k) clearance in 2014 and later withdrew that application after receiving a 51-item deficiency letter from FDA, indicating that FDA required additional information and data from Rebotix before it could determine that Rebotix's "re-manufactured" EndoWrists could be safely used. Rebotix

---

[164] Ibid. at  67078.

[165] Phillips Report ¶ 59.

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

cited the nature of the testing and information requested" by FDA as the reason for its decision to withdraw the submission.[166]

219.    In the June 2015 deficiency notification to Rebotix, FDA stated clearly that the remanufactured EndoWrists could not be marketed until Rebotix had received a letter allowing it to do so: "If you market the device without FDA clearance, you will be in violation of the Federal Food, Drug, and Cosmetic Act."[167]

220.    Phillips suggests that this boilerplate language "means nothing" when a 510(k) is "unnecessary." As I explained above in Section IV.B.1(g), FDA does not make a practice of investing the time and resources required to identify 51 deficiencies in a 510(k) submission it considers "unnecessary." And more importantly, whether or not the language in the deficiency that Rebotix may not market the remanufactured EndoWrists without a 510(k) is "boilerplate" does not diminish its weight as a determination by FDA. FDA expects that its determinations will be complied with and would not include such language if it did not.

221.    Second, on May 21, 2018, Bob Overmars, President and CEO at BPI Medical, e-mailed Dr. Cal F. Rabang, a biomedical engineer who works at FDA in [CDRH/ODE/DSD/GSDB2] inquiring (on behalf of Rebotix) why FDA was "concerned" about the so-called repair companies having a 510(k), arguing that BPI "repair[s] 1000's of reusable Endoscopic Instruments and the FDA does not require a 510K to repair those."[168] Dr. Rabang responded on June 6, 2018:

---

[166] REBOTIX171076.

[167] REBOTIX171058.

[168] BPI000331, at BPI000336.

HIGHLY CONFIDENTIAL  ATTORNEYS' EYES ONLY

§ Specifically for the reusable Endowrist Instruments, if the use-
life counter is reset or extended past the number of available use
lives, then the device specifications are changed.  As such, you
would be considered a remanufacturer per 21 CFR 820.3(w).  In
addition, if during the repair process the device is cleaned,
disinfected and/or sterilized, then you would be considered a 3rd
party reprocessor.

§ Remanufacturers and 3rd Party Processors meet the definition
of "manufacturer" specified in 21 CFR 820.3(o) and are required
to register and list according to 21 CFR 807.20.  In addition,
Endowrist Instruments are classified as Class II devices per 21 CFR
876.1500, Product Code NAY.  As such, you would be subject to
premarket notification (510(k)) requirements defined in 21 CFR
807.81.

I hope this provides enough explanation regarding the 510(k)
requirements for repair of da Vinci reusable Endoscopic
Instruments.[169]

222.    Overmars forwarded this e-mail to Glenn Papit at Rebotix, who
forwarded the same to Chris Gibson and Stan Hamilton, who I understand to have been
employees at Rebotix.[170] In response, Hamilton explained that there was "no need to respond"
to FDA because it would be "revisiting the path that Rebotix went down in some agonizing
detail over 2 years ago."[171]

223.    ███████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

---

[169] Ibid. at BPI000335.

[170] Ibid. at BPI000334.

[171] Ibid. at BPI000333.

HIGHLY CONFIDENTIAL  ATTORNEYS' EYES ONLY

███████████████████████████████████████████

████████."[172]

      224.    █████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████  ███████████████████████████:



---

[172] REBOTIX146948, at -6955; Restore-00001248, at -1256.

[173] Restore-00001248, at -1254 (emphasis added)

[174] Ibid (emphasis added).

225.    Rebotix made the same argument to FDA and received the same response and list of questions.[175] FDA clearly communicated its position to both Restore and Rebotix that FDA was concerned that the underlying activity constituted remanufacturing without clearance, regardless of the ownership of the device.

226.    FDA told Rebotix in November 2021 again that its activities constituted remanufacturing. On November 16, 2021, Intuitive sent a "It Has Come To Our Attention" letter, explaining that FDA received information that Rebotix "may be remanufacturing the da Vinci S EndoWrist Instruments."[176]

227.    In certain situations, CDRH may become aware that regulated industry may be promoting a medical device in a manner that potentially violates the Federal Food, Drug, and Cosmetic Act and its implementing regulations. CDRH may issue an "It Has Come to Our Attention" Letter (IHCTOA Letter) to regulated industry as an early communication to gather additional information. An ICHTOA Letter can be a precursor to an enforcement action if FDA does not obtain a response that alleviates FDA's concerns.[177]

228.    In this letter, FDA explained that it conducted a review of its file and had "been unable to identify any Food and Drug Administration (FDA) clearance approval number

---

[175] REBOTIX146948, at -6952-6954.  Rebotix responded to FDA's e-mail with responses on March 19, 2020. Ibid. at -6948-6952.  Restore never provided any responses to FDA's questions but instead represented that it had ceased all activity on EndoWrist instruments.  Restore-00001248, at -1249.

[176] REBOTIX175417.

[177] FDA, Letters to Industry, https://www.fda.gov/medical-devices/industry-medical-devices/letters-industry (last accessed Jan. 17, 2023).

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

for the da Vinci S EndoWrist Instruments to support the services described on your website . . . and described in a prior email communication to the Agency dated March 19, 2020."[178]

229.    FDA continued: "Specifically, the da Vinci S EndoWrist Instruments were cleared for a set number of uses.  By extending the number of uses, your activities may be altering the intended use of the subject device."[179]

230.    Rebotix responded to FDA's letter on January 13, 2022, reiterating its argument that it does not take ownership of the devices and therefore cannot be a remanufacturer, and that it had not sought FDA clearance or approval "because it is not required to do so."[180]

231.    On April 6, 2022, Anthony Lee, a Team Lead on the Robotic-Assisted Surgery Devices Team in CDRH at FDA, informed Rebotix that a decision had been made in relation to the It Has Come To Our Attention letter. On April 8, Lee e-mailed Rebotix, writing, "As mentioned during our call, the Agency believes that the activities of Rebotix constitute remanufacturing and would require FDA review and clearance (e.g. 510(k) / de Novo). We therefore request that Rebotix stop engaging in the current activities until an application is reviewed and cleared/granted."[181]

232.    Lee explained, "The instruments in question no longer maintain the same safety and effectiveness profile as cleared with the original manufacturer's own submission. During premarket review, FDA reviews test data to the labeled number of reuse cycles. . . . **By**

---

[178] REBOTIX175417.

[179] Ibid.

[180] REBOTIX175468.

[181] REBOTIX175710, at -5726-28.

HIGHLY CONFIDENTIAL  ATTORNEYS' EYES ONLY

*extending the number of uses and modifying the instrument with a new chip, the prior*

*information is no longer valid and requires additional review to the new labeled usage limit in*

*order to establish safety and effectiveness.* **This is therefore different than returning the**

**device to its original condition.**"[182]

233. 

[183]

234.     However, it is my opinion that the information was being communicated

by the reviewer. The reviewer offers opinions. It appears from the documents that Rebotix was

contemplating appealing FDA's decision, and it is my opinion that the reviewer was trying to

indicate that this opinion was not subject to a supervisory appeal under 21 CFR 10.75.

Moreover, the communication ended with a suggestion that, if Rebotix wanted to take this

further, they should submit a 510(k). Rebotix's other option would have been a 513(g), which

they did not pursue. All of this indicates that FDA had not deviated from its position that a

510(k) was needed, and Rebotix never took any formal steps to seek a final, different decision

on that.

---

[182] Ibid. at -5727 (emphasis added)

[183] Ibid. at -5839.

HIGHLY CONFIDENTIAL  ATTORNEYS' EYES ONLY

235.    It is my opinion that the reviewer's opinion is consistent with the review practices observed from the 510(k) reviews that did receive management sign-off as well as the creation of the product code which would have required even more levels of management sign-off.

### D.    Opinion 4 – Intuitive has acted in accordance with FDA's requirements for the marketing and sale of its devices and has not unreasonably interpreted FDA's existing regulations and guidance.

#### 1.    Intuitive's marketing and sale of EndoWrist instruments with usage limits is consistent with FDA's regulatory requirements.

236.    First, FDA's 510(K) clearance of EndoWrist instruments requires Intuitive to market and sell those instruments in a manner consistent with the 510(k) including the usage limits identified in the submission and ultimately cleared by FDA.

237.    A manufacturer is required to market and sell its device as it was cleared by FDA.[184] FDA recognizes, however, that medical devices undergo frequent modifications to their design and materials due to many things; changes in the supply chain, continuous process improvement, or to keep pace with technological innovations that can improve how these devices work in a clinical setting. Major modifications to the device likely require premarket review by the FDA, while minor changes likely do not.[185]

238.    As explained above in Section III.C.1, in accordance with 21 CFR § 807.81(a)(3), a premarket submission is required for a device that has been cleared, when a

---

[184] 21 CFR § 807.81(3); 21 U.S.C. § 352(o).

[185] FDA, Is A New 510(k) Required for a Modification to the Device?, https://www.fda.gov/medical-devices/premarket-notification-510k/new-510k-required-modification-device (last accessed Jan. 17, 2023).

HIGHLY CONFIDENTIAL  ATTORNEYS' EYES ONLY

change or modification in the device that could significantly affect the safety or effectiveness of the device, e.g., a significant change or modification in design, material, chemical composition, energy source, or manufacturing process, is made, or there is a major change or modification in the intended use of the device.

239.    Therefore, Intuitive must market and sell its EndoWrist instruments with the usage limits that were validated for FDA clearance, or, if it chooses to make a change or modification for the device that could significantly affect the safety or effectiveness of the device, such as extending the number of lives for which an EndoWrist may be used, Intuitive must submit a new 510(k) for the changed or modified device.

240.    As discussed further below, FDA has confirmed that it believes a new 510(k) is required for modifying the usage limits on EndoWrist instruments by requiring Intuitive to submit a "catch-up" 510(k) for extending the lives of certain X/Xi instruments beyond their cleared limits.[186]

241.    Additionally, FDA's view is that the EndoWrist instruments have many aspects in common with third party reprocessed single-use devices.

242.    As discussed above, in its June 2015 deficiency letter to Rebotix, FDA explained that EndoWrists are not single-use devices, but because they have many "aspects in common with third party reprocessed single-use devices,"[187] Rebotix should review and provide

---

[186] Consistent with my experience, FDA does not take enforcement action against a company who is actively making an effort to bring a product into regulatory compliance after being informed of a non-compliance.

[187] REBOTIX171030.

HIGHLY CONFIDENTIAL  ATTORNEYS' EYES ONLY

the items described in FDA's guidance, "Medical Device User Fee and Modernization Act of 2002, Validation Data in Premarket Notification Submissions (510(k)s) for Reprocessed Single-Use Medical Devices."[188]

243.    FDA has also explained that extending the usage limits on EndoWrist instruments requires changes to the reprocessing instructions for the device and therefore recommended (to both Intuitive and Iconocare[189]) reviewing FDA's March 2015 guidance document, "Reprocessing Medical Devices in Health Care Settings: Validation Methods and Labeling Guidance for Industry and Food and Drug Administration Staff."[190]

244.    This final guidance explains recommendations for the formulation and scientific validation of reprocessing instructions for reusable medical devices. This guidance document also provides recommendations for the content and review of premarket notification submissions [510(k)], premarket approval (PMA) applications, humanitarian device exemption (HDE) applications, de *novo* requests and investigational device exemption (IDE) applications, concerning the labeling instructions for reprocessing reusable medical devices.

245.    As mentioned in Section IV.B.2, this guidance also includes the recommendation that reuse life may also be addressed by validating the number of times the product can be reprocessed and reused, and providing this specification in the labeling. If the reuse life of a device is limited to a specific number of use/reprocessing cycles, the labeling

---

[188] REBOTIX171030. This guidance is available at https://www.fda.gov/media/71482/download (last accessed Jan. 17, 2023).

[189] Intuitive-00705778, at -5779; AHP000527, at -0528.

[190] This guidance is available at https://www.fda.gov/media/80265/download (last accessed Jan. 17, 2023).

HIGHLY CONFIDENTIAL  ATTORNEYS' EYES ONLY

should also describe a specific tracking method for the number of reuse cycles.[191]  In my

opinion, the counter that is included as part of the EndoWrist and similar devices would meet

this recommendation.

> 2.   _Intuitive's cybersecurity measures are consistent with FDA expectations for devices that are vulnerable to cybersecurity threats._

246.   The expert report provided by Kurt Humphrey suggests that the sole

purpose for Intuitive's cybersecurity security protocols is to "thwart efforts by third-parties to

reset the instrument's use counter."[192]

247.   In my experience submitting recent marketing applications to FDA,

cybersecurity is an area of increased focus during the review of submissions.

248.   If Intuitive did not have cybersecurity measures, FDA would generate

major deficiencies that would need to be resolved.

249.   Specifically, FDA did in fact raise cybersecurity questions during the

review of K131861.  This included a request for "_Cyber and Information security_

> _You mention network communications as part of this system._
> _There is not a separate Section addressing the CyberSecurity_
> _issues. Please review the Management of Cybersecurity Guidance_
> _issued 6/14/13 and provide information, as appropriate, on the_
> _Cybersecurity aspects of your device._'

250.   FDA specifically instructed Intuitive to review the following software

guidance documents:[193]

---

[191] FDA, "Reprocessing Medical Devices in health Care Settings: Validation Methods and Labeling Guidance for Industry and Food and Drug Administration Staff," at 20.

[192] Expert Report of Kurt Humphrey (Dec. 2, 2022) ¶ 60.

[193] Intuitive-00499468, at -9499-9500.

HIGHLY CONFIDENTIAL  ATTORNEYS' EYES ONLY

- May 11, 2005 "Guidance for the Content of Premarket Submissions for Software Contained in Medical Devices", which is intended to provide information to industry regarding the documentation that FDA recommends entities include in premarket submissions for software devices, including standalone software applications and hardware-based devices that incorporate software.;[194]

- September 9, 1999 "Guidance for Industry, FDA Reviewers and Compliance on Off-The-Shelf Software Use in Medical Devices," which represents the agency's current thinking on the documentation that should be provided in premarket submissions for medical devices using off-the-shelf software;[195]

- January 11, 2002 "General Principles of Software Validation; Final Guidance for Industry and FDA Staff," which outlines general validation principles that FDA considers applicable to the validation of medical device software or software used to design, develop, or manufacture medical devices;[196]

- January 14, 2005 "Guidance for Industry, Cybersecurity for Networked Medical Devices Containing Off-The-Shelf (OTS) Software," which outlines general principles that FDA considers to be applicable to software maintenance actions required to address cybersecurity vulnerabilities for networked medical devices;[197] and

---

[194] Available at https://www.fda.gov/media/73065/download (last accessed Jan. 17, 2023).

[195] Available at https://www.inea.com/PDF/otssguid.pdf (last accessed Jan. 17, 2023). This guidance has since been superseded by the guidance document, "Off-The-Shelf Software Use in Medical Devices," which FDA issued on September 27, 2019, available at https://www.fda.gov/media/71794/download (last accessed Jan. 17, 2023).

[196] Available at https://www.fda.gov/media/73141/download (last accessed Jan. 17, 2023).

[197] Available at https://www.fda.gov/media/72154/download (last accessed Jan. 17, 2023).

HIGHLY CONFIDENTIAL  ATTORNEYS' EYES ONLY

- June 14, 2013 "Content of Premarket Submissions for Management of Cybersecurity in Medical Devices - Draft Guidance for Industry and Food and Drug Administration Staff," which was developed to assist industry by identifying issues related to cybersecurity that FDA believes manufacturers should consider in the design and development of medical devices, as well as in preparing premarket submissions for those devices.[198]

251.    In accordance with the June 2013 draft guidance on Management of Cybersecurity in Medical Devices, Intuitive responded with a cybersecurity hazard analysis, traceability matrix, maintenance plan, malware certification and device instructions. Additionally, they provided a cybersecurity and penetration validation protocol that evaluated the effectiveness of the company's mitigations identified as part of the cybersecurity risk analysis.

252.    According to the FDA website,  Medical Device Manufacturers (MDMs) are responsible for remaining vigilant about identifying risks and hazards associated with their medical devices, including risks related to cybersecurity. Both MDMs and health care delivery organizations (HDOs) are responsible for putting appropriate mitigations in place to address patient safety risks and ensure proper device performance.[199]

---

[198] Available at https://www.regulations.gov/document/FDA-2013-D-0616-0002 (last accessed Jan. 17, 2023). The final version of this guidance was issued on October 2, 2014, and is available at https://www.fda.gov/media/86174/download (last accessed Jan. 17, 2023).

[199] FDA, Cybersecurity, https://www.fda.gov/medical-devices/digital-health-center-excellence/cybersecurity (last accessed Jan. 17, 2023).

HIGHLY CONFIDENTIAL  ATTORNEYS' EYES ONLY

253. Since December 2016, FDA has issued three guidance documents related to cybersecurity, with the requirements for premarket data supporting the mitigation of cybersecurity risks increasing in each version.[200]

254. The most recent draft issued on April 8, 2022 indicates that this draft guidance replaces the 2018 draft version and is "intended to further emphasize the importance of ensuring that devices are designed securely, are designed to be capable of mitigating emerging cybersecurity risks to be mitigated throughout the [Total Product Lifecycle], and to more clearly outline the FDA's recommendations for premarket submission information to address cybersecurity concerns."[201]

    3.    Intuitive's internal conduct does not contradict applicable FDA regulations and guidance, nor does it negate the duty of third-party companies to comply with existing FDA regulations and guidance.

255. I understand that Intuitive told customers and FDA that the activities of these third parties were remanufacturing EndoWrist instruments in violation of FDA regulations and guidance. As explained above, this was based on a reasonable interpretation of existing FDA regulations and guidance.

---

[200] FDA, "Postmarket Management of Cybersecurity in Medical Devices" (Dec. 27, 2016), available at https://www.fda.gov/media/95862/download (last accessed Jan. 18, 2023); FDA, "Content of Premarket Submissions for Management of Cybersecurity in Medical Devices" (Oct. 18, 2018) (draft guidance superseded by April 2022 draft guidance); FDA, "Cybersecurity in Medical Devices: Quality System Considerations and Content of Premarket Submissions" (Apr. 8, 2022), available at https://www.fda.gov/media/119933/download (last accessed Jan. 18, 2023).

[201] FDA, "Cybersecurity in Medical Devices: Quality System Considerations and Content of Premarket Submissions," at 3.

HIGHLY CONFIDENTIAL  ATTORNEYS' EYES ONLY

256.    Phillips suggests that Intuitive "addressed the question" of whether extending the usage limit of an EndoWrist instrument beyond what was cleared by FDA required submission of a 510(k) and concluded that it did not.[202] However, Phillips is wrong, and his argument misstates the underlying reality: it is FDA who determines whether 510(k) clearance is needed, and FDA has determined that 510(k) clearance is required to extend the lives of EndoWrist instruments that were cleared with prescribed usage limits.

257.    Phillips points to Intuitive's determination that Intuitive, as the original equipment manufacturer, could extend lives without 510(k) clearance using a non-filing justification (NFJ).[203]

258.    As discussed above in Section III.C.1, a manufacturer who has a device in commercial distribution that is about to be significantly changed or modified must submit a new 510(k). To assist manufacturers in determining whether a new 510(k) is required for a change, FDA has released certain guidance documents.[204]

259.    Intuitive's decision to not file a new 510(k) for the extended lives instruments was based on the FDA guidance document, "Deciding When to Submit a 510(k) for a Change to an Existing Device."[205] This guidance applies to "manufacturers of medical devices

---

[202] Phillips Report ¶¶ 105–06.

[203] Ibid. ¶ 106.

[204] FDA, "Deciding When to Submit a 510(k) for a Change to an Existing Device" (Oct. 25, 2017) (originally issued Jan. 10, 1997), available at https://www.fda.gov/media/99812/download (last accessed Jan. 17, 2023); FDA, "Deciding When to Submit a 510(k) for a Software Change to an Existing Device" (Oct. 25, 2017), available at https://www.fda.gov/media/99785/download (last accessed Jan. 17, 2023).

[205] Intuitive-00705587.

subject to premarket notification requirements who intend to modify a 510(k)-cleared device (or group of devices) or other device subject to 510(k) requirements."[206] Notably, this guidance applies only to Intuitive as the manufacturer, not to remanufacturers such as Restore, Rebotix, SIS, or Iconocare Health.

260.    Intuitive applied the existing guidance to the changes it, as the original equipment manufacturer, made to the EndoWrist instruments and concluded that a NFJ was appropriate and that a 510(k) submission was not necessary. This was not an unreasonable conclusion under the applicable guidance.

261.    The 510(k) modifications guidance utilizes flowcharts to aid in the decision making process. The Flowcharts most applicable to this circumstance would be Flowchart A (Labeling Changes) and B (Technology, Engineering, and Performance Changes). A specific consideration in Flowchart A includes:

> *Changes in frequency or duration of use: Changes in the frequency or duration of use of a device include changes indicating that a device can or should be used more or less often, changes indicating that a device can perform a task or treat a condition in or for a different duration of time, or changes between periodic and continuous monitoring. Manufacturers should evaluate the effect such changes could have on the performance of a device, and whether such changes significantly affect the device's risk profile.*

---

[206] "Deciding When to Submit a 510(k) for a Change to an Existing Device," at 6.

HIGHLY CONFIDENTIAL  ATTORNEYS' EYES ONLY

262.    However, what is more relevant to this case is that FDA determined that even Intuitive could not extend lives without seeking 510(k) clearance. FDA informed Intuitive that it would need to submit a "catch-up" 510(k) to continue marketing and selling X/Xi instruments with extended lives.[207]

263.    FDA specifically informed Intuitive of the following major deficiency in an additional information request letter for K212101[208]:

> "You replied that these changes were made between K173906 and the current submission without 510(k) clearance on the basis of FDA guidance "Deciding When to Submit a 510(k) for a Change to an Existing Device" and internally documented Non-Filing Justifications 1048606-02 (endoscope version -41),  1048620-01 (reprocessing instructions - sterilization trays), and 1048620-02 (reprocessing instructions - number of uses).
>
> However, we believe that changes to the reprocessing of your device require a 510(k). Your device falls under the Endoscope and Accessories regulation (21 CFR 876.1500). Per Appendix E of FDA's guidance "Reprocessing Medical Devices in Health Care Settings: Validation Methods and Labeling," a System, Surgical, Computer Controlled Instrument (product code NAY) poses a greater likelihood of microbial transmission and represents a high risk of infection if it is not adequately reprocessed. Because of the greater risks to the public health posed by these devices, 510(k) submissions should include protocols and complete test reports of the validation of the reprocessing instructions for us to evaluate substantial equivalence. Therefore, even if the endoscope validation testing was performed using similar test methodology as described in a previous 510(k) submission, the new

---

[207] Consistent with my experience, FDA does not take enforcement action against a company who is actively making an effort to bring a product into regulatory compliance after being informed of a non-compliance.

[208] Intuitive-00705778, at 5779–81.

HIGHLY CONFIDENTIAL  ATTORNEYS' EYES ONLY

reprocessing validation information needs to be included in a 510(k) submission for FDA review.

Please provide the testing and data requested below:"

264.    The deficiency letter continued to list five related topics that the company should address or alternatively revise the labeling to reflect the number of uses and reprocessing instructions that have been previously cleared.

265.    FDA continues on to state that "this is needed to ensure that the system instruments, cameras and sterilization trays can be used safely and effectively for the number of uses proposed in Appendix A of your reprocessing instructions."

266.    It is worth noting that FDA would not require only the original equipment manufacturer, who has the complete Device History Record and access to the original validation data, to submit a 510(k) to extend the usage limits beyond the cleared limits on its own devices but then *not* require a wholly independent third party performing the same actions to comply with those same requirements for a device it did not originally manufacture. Such a double standard would be untenable.

267.    Phillips suggests that because Intuitive concluded in the NFJs for extending the lives of certain X/Xi EndoWrist instruments that the extension did not "significantly change the finished device's performance or safety specifications, or intended use,"[209] it was reasonable for SIS to believe that its resetting the usage counter to increase the

---

[209] Phillips Report ¶¶ 105-06.

number of lives does not significantly affect the safety or effectiveness of the EndoWrist.[210] This is false.

268.    Intuitive's determination that the extension of usage limits on the selected instruments did not involve any design changes that significantly affected the device's performance or safety specifications, or intended use, because Intuitive had made several incremental design changes prior to this NFJ that led the engineers to conclude that was safe to extend the lives.[211] Each of those NFJs and accompanying changes is reflected in the extended lives NFJs.[212]

269.    Finally, I understand that at the point that Intuitive determined it could extend the lives on the EndoWrists (and still today), third parties did not have the capability to extend lives of X/Xi instruments. [213] Intuitive never concluded that it was safe to extend the lives of S/Si instruments, which is the activity the third parties engaged in.

## V.   Conclusion

270.    Based on my review of the activities conducted on the Intuitive Surgical EndoWrist devices, I believe those activities meet the definition of remanufacturing as defined by FDA. Additionally, based on Agency actions as well as the descriptions provided in submitted 510(k)s, FDA considers these activities to be remanufacturing, as do the submitters of the 510(k)s who clearly describe the practice of extending the life of the instruments as

---

[210] Phillips Report §§ V.A.–B.

[211] Deposition of Disha Peswani (Oct. 6, 2022), Tr. 113:11-116:13.

[212] E.g. Intuitive-00552632, at -2641–51.

[213] Deposition of Stan Hamilton (Nov. 4, 2022), Tr. 14:25-15:6, 38:9-15; Deposition of Kevin May (Nov. 3, 2022), Tr. 40:21-23.

HIGHLY CONFIDENTIAL  ATTORNEYS' EYES ONLY

remanufacturing. I believe that these activities are permissible provided there is a valid 510(k)

with supporting data to demonstrate that the remanufactured devices are substantially

equivalent to the predicate Intuitive devices FDA has cleared.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  January 18, 2023

_____

Christy Foreman, MBE

HIGHLY CONFIDENTIAL  ATTORNEYS' EYES ONLY

# Appendices

HIGHLY CONFIDENTIAL  ATTORNEYS' EYES ONLY

# Appendix A – Curriculum Vitae of Christy Foreman

**Christy Foreman, MBE Senior Consultant**

Biologics Consulting Group, Inc.

1555 King Street, Suite 300 • Alexandria, VA 22314

Phone: 703.739.5695 • Fax 703.548.7457

Email: cforeman@biologicsconsulting.com

**PROFESSIONAL SUMMARY**

More than 30 years experience as a biomedical engineer with over 28 years of federal experience and 22 years of FDA experience, including experience with premarket submissions (510(k)s, PMAs, IDEs, HDEs, de novos, preSubs and 513(g)s as well as cGMP/Quality Systems for medical devices.

**EXPERIENCE**

Biologics Consulting Group, Inc., Senior Consultant, Alexandria, VA (Apr 2018 – Present)

- Advises clients on short and long term regulatory strategies for medical devices and combination products
- Assists in the development of Quality Systems
- Prepares medical device regulatory submissions, including 510(k), PMA, HDE, RFD, 513(g), preSub, and IDE
- Represents clients in interactions with FDA; assists clients in the preparation for Advisory Panel meetings
- Provides in-house training on FDA Regulatory issues and new policy developments

Food and Drug Administration (FDA)/Center for Tobacco Products Office of Compliance and Enforcement, Associate Director for Regulatory Programs, Silver Spring, MD (Sept 2014 – Apr 2018)

- Developed foundational regulations, including manufacturing practice regulations for tobacco products Developed and established novel regulatory programs for the newest FDA center, including the No-Tobacco Sale Order Program, a novel enforcement tool for egregious violators of the Food, Drug

89

HIGHLY CONFIDENTIAL  ATTORNEYS' EYES ONLY

and Cosmetic Act
- Developed guidance documents, webinars and training programs


## FDA/Center for Devices and Radiological Health (CDRH) Office of Device Evaluation (ODE), Office Director, Silver Spring, MD (Mar 2010 – Sept 2014)

- Oversaw a staff of 500+ scientists and clinicians conducting the regulatory review of applications including 510(k)s, PMAs, IDEs, HDEs, preSubs, PDPs, De Novos and 513(g)s, as well as consults for combination products in NDAs and BLAs and decided all office level appeals
- Participated in user fee negotiations with industry, implemented the user fee commitments into the regulatory review programs and implemented new legislation (FDASIA)
- Instrumental in developing regulatory improvements through the 510(k) Plan of Action


## FDA/CDRH/ODE, Deputy Office Director for Science and Review Policy, Silver Spring, MD (June 2008 – Mar 2010)

- Served as the chief scientific officer for the office
- Oversaw the regulatory policies associated with 510(k), PMA, HDE, IDE, de novo and 513(g) programs as well as combination products
- Provided office-level review and sign-off for guidance documents, de novo submissions and 513(g)s


## FDA/CDRH/Office of Compliance (OC)/Division of Enforcement B, Deputy Division Director, Silver Spring, MD (Dec 2002 – Dec 2008)

- Planned, organized, developed, and evaluated programmatic operations supporting the enforcement of the Federal Food, Drug and Cosmetic Act related to cardiovascular, neurology, orthopedic, physical medicine, anesthesiology and radiology devices and radiological health products such as microwaves and laser products
- Oversaw significant enforcement actions, including a seizure, several injunctions and supported criminal cases and served as an FDA expert witness for failures to comply with the Quality System Regulations Developed guidance documents for requirements for manufacturing information for PMAs

HIGHLY CONFIDENTIAL  ATTORNEYS' EYES ONLY

FDA/CDRH/OC/Division of Enforcement B/ Orthopedic, Physical Medicine and Anesthesiology Device Branch, Branch Chief, Silver Spring, MD (Dec 2001 – Dec 2002)

- Supervised and coordinated activities associated with regulatory actions such as seizures, injunctions, civil money penalties, recalls and warning letters
- Supervised and coordinated reviews of premarket approval applications and establishment inspections and establishment inspection reports to ensure compliance with the Quality System Regulations

FDA/CDRH/ODE/Division of Cardiovascular and Respiratory Devices/Anesthesiology and Defibrillator Devices Group, Biomedical Engineer, Silver Spring, MD (May 1996 – Dec 2001)

- Served as a scientific reviewer specializing in ventilators, oxygen therapy devices, hyperbaric chambers, CPAP devices, anesthesia workstations, pulse oximeters, multi-parameter monitors, defibrillators and cardiac resynchronization therapy
- Participated in the highly competitive FDA Leadership Development program (April 2000 – December 2001) which included leadership training as well as details to: Health Canada, Minnesota District Office, Office of Science Coordination and Communication, Office of the Commissioner and CDRH, Office of Compliance

Naval Medical Research Institute, Biomedical Engineer, Bethesda MD (June 1989 – May 1996)

- Supported military research activities in areas of thermal stress, including assessing the pathophysiology of non-freezing cold injury as well as assessing cognitive decrements induced by cold weather operations

**EDUCATION**

M.B.E. Biomedical Engineering, The Catholic University of America, Washington, DC (2000)

B.B.E. Biomedical Engineering, The Catholic University of America, Washington, DC (1993)

HIGHLY CONFIDENTIAL  ATTORNEYS' EYES ONLY

**MEMBERSHIPS**

Regulatory Affairs Professional Society

**SELECTED RELEVANT TRAINING**
AAMI GMP Quality System Requirements and Industry Practice
AAMI Deign Control Requirements and Industry Practice
AAMI Process Validation Requirements and Industry Practice AAMI CAPA Requirements and Industry Practice
Process Validation in Biotechnology Manufacturing Process Validation: Concepts and Applications
ASQ Introduction to Quality Engineering Food and Drug Law
Biostatistics
Maryland Emergency Medical Technician – B (expired)

**PUBLICATIONS**
- Book chapter on the regulation of hyperbaric chambers as medical devices. Hyperbaric Facility Safety: A Practical Approach 2nd Edition; 2020, edited by W.T. Workman and J. Steven Wood

- RM Kretzer, CL Foreman, JE Shuren (2010) Modernizing Device Regulation - Letter to the Editor, NEJM Jul 8;363(2):196-7; author reply 197.

- Book chapter on the regulation of hyperbaric chambers as medical devices. Hyperbaric Facility Safety: A Practical Approach; 1999, edited by W.T. Workman

**SELECTED PRESENTATIONS/INVITED SPEAKER**

- Instructor for RAPS European Workshop on 510(k) Basics and Working with FDA (10-11 October 2019)
- Testimony before the Subcommittee on Oversight and Investigations Committee on Energy and Commerce U.S. House of Representatives "Health Information Technologies: Administration Perspectives on Innovation and Regulation" March 21, 2013
- Presentation to the Institute of Medicine - Reviewing a 510(k), March 1, 2010
- Drug Information Association (DIA) CDRH Town Hall – June 2014
- MDMA FDA Forum: PMA/510(k) Workshop & FDA Reform – March 2014
  - o  Recent Trends in Device Review Process
  - o  Navigating Today's 510(k) Program
  - o  Clinical Trial Considerations
  - o  New World of DeNovo
  - o  PMA Review Considerations

HIGHLY CONFIDENTIAL  ATTORNEYS' EYES ONLY

- o   CDRH Update
- Complex Issues in Developing Medical Devices for Pediatric Patients Affected By Rare Diseases Workshop – Engineering Considerations for Pediatric Devices, January 2014
- Transcatheter Cardiovascular Therapeutics (TCT) FDA Town Hall, Oct 2013
- DIA 2013 49th Annual Meeting: Advancing Therapeutic Innovation and Regulatory Science – June 2013
- FDA/Xavier University Medcon Conference , April 2013
- MDMA's FDA Forum – PMA/510(k) Workshop, March 2013
  - o   An Overview of Current Device Regulation
  - o   Applying Lessons Learned – Illustrations
  - o   CDRH Update
  - o   Adapting to FDA's Newest Guidance Documents
  - o   Clinical Trials & IDE Decisions
- FDA/Xavier University Medcon Conference , May 2011
- IN3/Gray Sheet conference – 510(k) Program, October 2010
- RAPS Annual Conference 2010 – 510(k) Program, September 2010
- CDRH 510(k) Public Workshop – Use of Predicates, Feb 2010
- Organization of Regulatory and Clinical Associates, ODE Program Updates, Nov 2008
- USPHS Leadership Development Seminar – Strategic Thinking
- AdvaMed PMA Submissions Workshops – regular presenter
- AdvaMed Annual Meetings


**ADDITIONAL INFORMATION**
Adjunct Faculty

Biomedical Engineering, The Catholic University of America,

Washington, DC

Medical Device Design and Regulation, 2015- Present

HIGHLY CONFIDENTIAL  ATTORNEYS' EYES ONLY

# Appendix B  – Materials Considered

Pleadings

- Complaint, Surgical Instrument Service Co., Inc. v. Intuitive Surgical, Inc., No. 3:21-cv-03496-VC (ECF 1) (May 10, 2021)

- Consolidated Amended Class Action Complaint, In re: da Vinci Surgical Robot Antitrust Litigation, Lead Case No. 3:21-cv-03825-VC (ECF 52) (Sept. 9, 2021)

- Defendant Intuitive Surgical, Inc.'s Answer, Affirmative Defense and Counterclaims, Surgical Instrument Service Co., Inc. v. Intuitive Surgical, Inc., No No. 3:21-cv-03496-VC (ECF 75) (Dec. 14, 2021)

Expert Reports

- Expert Report of Philip J. Phillips (Dec. 2, 2022) (*Surgical Instrument Service Company, Inc. v. Intuitive Surgical, Inc.*)

- Expert Report of Dr. Robert D. Howe (Aug. 20, 2021) (*Restore Robotics LLC et al. v. Intuitive Surgical, Inc.*)

- Supplemental Expert Report of Dr. Robert D. Howe (Dec. 23, 2022) (*Restore Robotics LLC et al. v. Intuitive Surgical, Inc.*)

- Expert Report of Dr. Robert D. Howe (Dec. 2, 2022) (*Surgical Instrument Service Company, Inc. v. Intuitive Surgical, Inc.*)

- Expert Report of Kurt Humphrey (Dec. 2, 2022) (*Surgical Instrument Service Company, Inc. v. Intuitive Surgical, Inc.*)

Deposition Transcripts and Exhibits (*SIS* and *Larkin*)

- Deposition of Clifton Parker (Oct. 25, 2022) and Exhibits

- Deposition of Disha Peswani (Oct. 6, 2022) and Exhibits

- Deposition of Grant Duque (30(b)(1)) (Nov. 8, 2022) and Exhibits

- Deposition of Grant Duque (30(b)(6)) (Nov. 8, 2022) and Exhibits

- Deposition of Greg Posdal (30(b)(1)) (Nov. 1, 2022) and Exhibits

- Deposition of Greg Posdal (30(b)(6)) (Nov. 1, 2022) and Exhibits

- Deposition of Greta Bernier (Nov. 7, 2022) and Exhibits

- Deposition of John Sampson (Nov. 3, 2022) and Exhibits

- Deposition of Jose Gonzalez (30(b)(1)) (Oct. 17, 2022) and Exhibits

- Deposition of Jose Gonzalez (30(b)(6)) (Oct. 17, 2022) and Exhibits

HIGHLY CONFIDENTIAL  ATTORNEYS' EYES ONLY

- Deposition of Keith Johnson (30(b)(1)) (Oct. 27, 2022) and Exhibits
- Deposition of Keith Johnson (30(b)(6)) (Oct. 27, 2022) and Exhibits
- Deposition of Kevin May (Nov. 3, 2022) and Exhibits
- Deposition of Nicky Goodson (Oct. 27, 2022) and Exhibits
- Deposition of Ricardo Estape, M.D. (Oct. 22, 2022) and Exhibits
- Deposition of Rick Ferreira (Nov. 10, 2022) and Exhibits
- Deposition of Sharathchandra "Shark" Somayaji (Nov. 4, 2022) and Exhibits
- Deposition of Stan Hamilton (Nov. 4, 2022) and Exhibits

Deposition Transcripts and Exhibits (*Restore*)

- Deposition of Clifton Parker (30(b)(6)) (May 4, 2021) and Exhibits
- Deposition of Eugene Dickens, M.D. (May 27, 2021) and Exhibits
- Deposition of Kevin May (May 6, 2021) and Exhibits
- Deposition of Kevin May (June 8, 2021) and Exhibits
- Deposition of Rafal Chudzik (June 7, 2021) and Exhibits
- Deposition of Ricardo Ferreira (June 7, 2021) and Exhibits
- Deposition of Ronald Arkin (June 9, 2021) and Exhibits

Deposition Transcripts and Exhibits (*Rebotix*)

- Deposition of David Mixner (June 10, 2021) and Exhibits
- Deposition of Edward Harrich (May 24, 2021) and Exhibits
- Deposition of Stan Hamilton (Sept. 20, 2021) and Exhibits

**Produced Documents**

| | | |
|---|---|---|
| ACG000006 | AHP000708 | AHP002130 |
| AHP000369 | AHP000729 | AHP002395 |
| AHP000373 | AHP000732 | AHP002448 |
| AHP000404 | AHP000803 | AHP002623 |
| AHP000525 | AHP000832 | AHP002680 |
| AHP000527 | AHP000928 | AHP003709 |
| AHP000658 | AHP000939 | AHP005099 |
| AHP000706 | AHP002062 | BPI000331 |

HIGHLY CONFIDENTIAL  ATTORNEYS' EYES ONLY

- Intuitive-00481165
- Intuitive-00481167
- Intuitive-00481176
- Intuitive-00491017
- Intuitive-00492705
- Intuitive-00493504
- Intuitive-00493612
- Intuitive-00499468
- Intuitive-00515501
- Intuitive-00552632
- Intuitive-00552682
- Intuitive-00552744
- Intuitive-00552745
- Intuitive-00552993
- Intuitive-00691203
- Intuitive-00691613
- Intuitive-00691658
- Intuitive-00691660
- Intuitive-00691710
- Intuitive-00691802
- Intuitive-00691837
- Intuitive-00691847
- Intuitive-00691857
- Intuitive-00692185
- Intuitive-00692310
- Intuitive-00692314
- Intuitive-00692321
- Intuitive-00692433
- Intuitive-00692451
- Intuitive-00692611

- Intuitive-00692643
- Intuitive-00693535
- Intuitive-00694043
- Intuitive-00705537
- Intuitive-00705538
- Intuitive-00705540
- Intuitive-00705587
- Intuitive-00705777
- Intuitive-00705778
- Intuitive-00706011
- Intuitive-00706083
- Intuitive-00861667
- Intuitive-01019873
- Intuitive-02054168
- Intuitive-02067581
- Intuitive-02067582
- Intuitive-02067588
- Intuitive-02068246
- REBOTIX077238
- REBOTIX077440
- REBOTIX077446
- REBOTIX077536
- REBOTIX077545
- REBOTIX077549
- REBOTIX077597
- REBOTIX077601
- REBOTIX077611
- REBOTIX077617
- REBOTIX077671
- REBOTIX077729

- REBOTIX077735
- REBOTIX077440
- REBOTIX131417
- REBOTIX131427
- REBOTIX131433
- REBOTIX131437
- REBOTIX131480
- REBOTIX131488
- REBOTIX131493
- REBOTIX131501
- REBOTIX131514
- REBOTIX146948
- REBOTIX155894
- REBOTIX169168
- REBOTIX169588
- REBOTIX169683
- REBOTIX169926
- REBOTIX169947
- REBOTIX170053
- REBOTIX170421
- REBOTIX171030
- REBOTIX171058
- REBOTIX171073
- REBOTIX171076
- REBOTIX175326
- REBOTIX175327
- REBOTIX175417
- REBOTIX175419
- REBOTIX175468
- REBOTIX175710

HIGHLY CONFIDENTIAL  ATTORNEYS' EYES ONLY

- Restore-00001248
- Restore-00007128
- Restore-00009030
- Restore-00010132
- Restore-00034134
- Restore-00055573
- Restore-00055935
- Restore-00055937
- Restore-00060739
- Restore-00060741
- Restore-00062443
- Restore-00062688
- Restore-00063245
- Restore-00063246
- Restore-00063284
- Restore-00063474
- Restore-00063595
- Restore-00063598
- Restore-00064367
- Restore-00064369
- Restore-00064384
- Restore-00064401
- Restore-00064403
- Restore-00064407
- Restore-00064566
- Restore-00086093
- Restore-00086121
- Restore-00086179
- Restore-00086192
- Restore-00086401

- Restore-00086586
- Restore-00086681
- Restore-00086828
- Restore-00086846
- Restore-00086859
- Restore-00086866
- Restore-00086873
- Restore-00086891
- Restore-00086907
- Restore-00087401
- Restore-00089490
- Restore-00089718
- Restore-00089994
- Restore-00090004
- Restore-00090030
- Restore-00090136
- Restore-00090149
- Restore-00090617
- Restore-00091087
- Restore-00091138
- Restore-00091141
- Restore-00091153
- Restore-00091157
- Restore-00091171
- Restore-00091178
- Restore-00091185
- Restore-00091193
- Restore-00091202
- Restore-00091218
- Restore-00091222

- Restore-00091253
- Restore-00091261
- Restore-00091314
- Restore-00091328
- Restore-00091362
- Restore-00091363
- Restore-00091364
- Restore-00091434
- Restore-00091459
- Restore-00091468
- Restore-00094345
- Restore-00094450
- Restore-00094476
- Restore-00094486
- Restore-00094488
- Restore-00094491
- Restore-00094517
- Restore-00094561
- Restore-00094567
- Restore-00094588
- Restore-00094610
- Restore-00094721
- Restore-00094779
- Restore-00094987
- Restore-00095021
- Restore-00095027
- Restore-00095069
- Restore-00095075
- Restore-00095127
- Restore-00095226

HIGHLY CONFIDENTIAL  ATTORNEYS' EYES ONLY

- Restore-00095250
- Restore-00095266
- Restore-00095284
- Restore-00095300
- Restore-00095403
- Restore-00095481
- Restore-00095491
- Restore-00095533
- Restore-00095583
- Restore-00095585
- Restore-00095608
- Restore-00095616
- Restore-00095678
- Restore-00095704
- Restore-00096294
- Restore-00096301
- Restore-00098415
- Restore-00099136
- Restore-00099137
- Restore-00099139
- Restore-00102436
- Restore-00102495
- Restore-00102835
- Restore-00103167
- Restore-00103331
- Restore-00104982
- Restore-00104984
- Restore-00105001
- Restore-00105466
- Restore-00106446
- Restore-00107476
- Restore-00107513
- Restore-00108307
- Restore-00109056
- Restore-00109203
- Restore-00112001
- Restore-00112022
- Restore-00112595
- Restore-00112674
- Restore-00113239
- Restore-00114323
- Restore-00117633
- Restore-00117692
- Restore-00122811
- Restore-00131763
- Restore-00132592
- Restore-00134924
- SIS357813
- VMC-00018032

## **Publications**

- "Device Ownership Should Not Be Criterion for Regulation of Reprocessors," The Gray Sheet, Vol. 24, No. 27 (July 6, 1998)

- FDA, "Compliance with Section 301 of the Medical Device User Fee and Modernization Act of 2002, as amended – Prominent and Conspicuous Mark of Manufacturers on Single-Use Devices" (May 1, 2006), available at https://www.fda.gov/media/71187/download (last accessed Jan. 17, 2023)

- FDA, "Content of Premarket Submissions for Management of Cybersecurity in Medical Devices - Draft Guidance for Industry and Food and Drug Administration Staff" (June 14, 2013), available at https://www.regulations.gov/document/FDA-2013-D-0616-0002 (last accessed Jan. 17, 2023)

- FDA, Content of Premarket Submissions for Management of Cybersecurity in Medical Devices - Draft Guidance for Industry and Food and Drug Administration Staff" (Oct. 2, 2014), available at https://www.fda.gov/media/86174/download (last accessed Jan. 17, 2023)

98

HIGHLY CONFIDENTIAL  ATTORNEYS' EYES ONLY

- FDA, "CPG § 300.500 (Reprocessing of Single Use Devices)", available at: https://www.fda.gov/media/71769/download (last accessed Jan. 17, 2023)

- FDA, "Deciding When to Submit a 510(k) for a Change to an Existing Device" (Oct. 25, 2017) (originally issued Jan. 10, 1997), available at https://www.fda.gov/media/99812/download (last accessed Jan. 17, 2023)

- FDA, "Deciding When to Submit a 510(k) for a Software Change to an Existing Device" (Oct. 25, 2017), available at https://www.fda.gov/media/99785/download (last accessed Jan. 17, 2023)

- FDA, "Factors to Consider When Making Benefit-Risk Determinations in Medical Device Premarket Approval and De Novo Classifications)" (Aug. 30, 2019) (originally issued Mar. 28, 2012), available at https://www.fda.gov/media/99769/download (last accessed Jan. 17, 2023)

- FDA, "General Principles of Software Validation; Final Guidance for Industry and FDA Staff" (Jan. 11, 2002), available at https://www.fda.gov/media/73141/download (last accessed Jan. 17, 2023)

- FDA, "Guidance for the Content of Premarket Submissions for Software Contained in Medical Devices" (May 11, 2005), available at https://www.fda.gov/media/73065/download (last accessed Jan. 17, 2023)

- FDA, "Guidance for Industry, Cybersecurity for Networked Medical Devices Containing Off-The-Shelf (OTS) Software" (Jan. 14, 2005), available at https://www.fda.gov/media/72154/download (last accessed Jan. 17, 2023)

- FDA, "Guidance for Industry, FDA Reviewers and Compliance on Off-The-Shelf Software Use in Medical Devices" (Sept. 9, 1999), available at https://www.inea.com/PDF/otssguid (last accessed Jan. 17, 2023)

- FDA, K210478 510(k) Summary, available at: https://www.accessdata.fda.gov/cdrh_docs/pdf21/K210478 (last accessed Jan. 17, 2023)

- FDA, "Format for Traditional and Abbreviated 510(k)s" (Sept. 13, 2019) (originally issued Aug. 12, 2005), available at https://www.fda.gov/media/130647/download (last accessed Jan. 17, 2023)

- FDA, "Medical Device Classification Product Codes" (Apr. 11, 2013), available at https://www.fda.gov/media/82781/download (last accessed Jan. 17, 2023)

- FDA, "Medical Device User Fee and Modernization Act of 2002, Validation Data in Premarket Notification Submissions (510(k)s) for Reprocessed Single-Use Medical Devices" (Sept. 25, 2006) (originally issued June 1, 2004), available at https://www.fda.gov/media/71482/download (last accessed Jan. 17, 2023)

- FDA, "Off-The-Shelf Software Use in Medical Devices" (Sept. 27, 2019), available at https://www.fda.gov/media/71794/download (last accessed Jan. 17, 2023)

HIGHLY CONFIDENTIAL  ATTORNEYS' EYES ONLY

- FDA, "Reprocessing Medical Devices in Health Care Settings: Validation Methods and Labeling Guidance" (Mar. 17, 2015), available at https://www.fda.gov/media/80265/download (last accessed Jan. 17, 2023)

- FDA, "The 510(k) Program: Evaluating Substantial Equivalence in Premarket Notifications [510(k)]" (July 28, 2014), available at https://www.fda.gov/media/82395/download (last accessed Jan. 17, 2023)

- FDA, "White Paper: Evaluating Whether Activities are Servicing or Remanufacturing" (December 2018), available at https://www.fda.gov/media/117238/download (last accessed Jan. 17, 2023)

- FDA Report on the Quality, Safety and Effectiveness of Servicing of Medical Devices (May 2018), available at https://www.fda.gov/media/113431/download (last accessed Jan. 17, 2023)

## Other Documents

- Code of Federal Regulations

  - 21 CFR § 10

  - 21 CFR § 801

  - 21 CFR § 803

  - 21 CFR § 806

  - 21 CFR § 807

  - 21 CFR § 814

  - 21 CFR § 820

  - 21 CFR § 821

  - 21 CFR § 860

  - 21 CFR § 862

  - 21 CFR § 864

  - 21 CFR § 876

  - 21 CFR § 878

- Federal Food, Drug, and Cosmetic Act (21 U.S.C. 301 *et seq.*)

- Federal Register

100

HIGHLY CONFIDENTIAL  ATTORNEYS' EYES ONLY

- 58 Fed. Reg. 61952 (Nov. 23, 1993)

- 61 Fed Reg. 52602 (Oct. 7, 1996)

- 62 Fed. Reg. 8961 (Feb. 27, 1997)

- 63 Fed. Reg. 67076 (Dec. 4, 1998)

- H.R. Rept. 94-853, at 15 (Feb. 29, 1976)
- Letter from Counsel to the Association of Medical Device Reprocessors to FDA (Mar. 23, 1998)
- Letter from Johnson & Johnson to FDA (Mar. 23, 1998)
- Letter from Ronald E. Eames, President and Managing Director, Medical Devices Services, Inc. to FDA (Mar. 21, 2000)
- Medical Device User Fee and Modernization Act of 2002, PL 107–250, October 26, 2002, 116 Stat 1588.
- Plaintiff Rebotix Repair, LLC's Disclosure Pursuant to Fed. R. Civ. P. 26(a)(2)(c) (Stan Hamilton (Aug. 30, 2021) (*Rebotix Repair LLC v. Intuitive Surgical, Inc.*)
- Prepared Testimony of Vern Feltner, President of Alliance Medical Corporation, on behalf of the Association of Medical Device Reprocessors (June 27, 2000)

HIGHLY CONFIDENTIAL  ATTORNEYS' EYES ONLY

# Appendix C - QSM and NAY Premarket Submissions

| Device Name | Applicant | 510(K) Number | Decision Date |
|---|---|---|---|
| Da Vinci X Surgical System (Is4200), Da Vinci Xi Surgical System (Is4000) | Intuitive Surgical, Inc | K223080 | 11/22/2022 |
| Da Vinci Firefly Imaging System | Intuitive Surgical Inc. | K222827 | 10/20/2022 |
| 8mm Monopolar Curved Scissors | Iconocare Health | K210478 | 09/30/2022 |
| Da Vinci X/Xi (Is4200/Is4000) 8mm Reusable Instruments | Intuitive Surgical, Inc. | K214095 | 08/15/2022 |
| Senhance Surgical System | Asensus Surgical, Inc. | K220889 | 05/27/2022 |
| Da Vinci Fluorescence Imaging Vision System, Da Vinci Firefly Imaging System | Intuitive Surgical, Inc. | K213710 | 02/17/2022 |
| 8mm Monopolar Curved Scissors | Intuitive Surgical, Inc. | K220023 | 01/31/2022 |
| 8 Mm Sureform 30 Curved-Tip Stapler, 8 Mm Sureform 30 Stapler, Sureform 30 Reloads | Intuitive Surgical, Inc. | K211997 | 12/10/2021 |
| Da Vinci Sp Firefly Imaging System | Intuitive Surgical, Inc. | K212101 | 11/23/2021 |
| Da Vinci Sp Surgical System | Intuitive Surgical, Inc. | K212747 | 09/29/2021 |
| Handx | Human Xtensions Ltd. | K212214 | 09/13/2021 |
| Senhance Surgical System | Asensus Surgical, Inc. | K212054 | 08/30/2021 |
| Da Vinci Xi Surgical System (Is4000), Da Vinci X Surgical System (Is4200) | Intuitive Surgical, Inc. | K211784 | 08/06/2021 |
| Senhance Surgical System | Asensus Surgical, Inc. | K211325 | 07/27/2021 |
| Da Vinci Sp Surgical System (Sp1098) | Intuitive Surgical, Inc. | K211316 | 07/23/2021 |
| Stitchkit | Origami Surgical Inc . | K211792 | 07/16/2021 |
| Da Vinci Sp Surgical System (Sp1098) | Intuitive Surgical, Inc. | K211595 | 06/23/2021 |
| Da Vinci Fluorescence Imaging Vision System, Da Vinci Firefly Imaging System | Intuitive Surgical, Inc. | K210918 | 04/26/2021 |
| Senhance Surgical System | TransEnterix, Inc. | K202166 | 03/02/2021 |
| Stitchkit Combo | Origami Surgical | K202950 | 02/23/2021 |
| Da Vinci S/Si (Is2000/Is3000) 5mm And 8mm Reusable Instruments, Da Vinci Xi/X (Is4000/Is4200) 8mm Reusable Instruments | Intuitive Surgical, Inc. | K203632 | 02/10/2021 |
| Soloasisst Ii, Voice Control | AKTORmed GmbH | K200473 | 12/22/2020 |
| Da Vinci Sp Surgical System | Intuitive Surgical, Inc. | K202968 | 12/22/2020 |

HIGHLY CONFIDENTIAL  ATTORNEYS' EYES ONLY

| Device Name | Applicant | 510(K) Number | Decision Date |
|---|---|---|---|
| Da Vinci Xi Surgical System (Is4000), Da Vinci X Surgical System (Is4200) | Intuitive Surgical, Inc. | K202834 | 12/10/2020 |
| Da Vinci Sp Surgical System, Model Sp1098, Endowrist Sp Instruments, And Accessories | Intuitive Surgical, Inc. | K202571 | 11/12/2020 |
| Da Vinci Sp Surgical System | Intuitive Surgical Inc. | K192717 | 09/28/2020 |
| Da Vinci Xi Surgical System, Da Vinci X Surgical System | Intuitive Surgical | K192803 | 04/29/2020 |
| Da Vinci X And Xi Surgical System | Intuitive Surgical, Inc | K183086 | 03/31/2020 |
| Senhance Surgical System | TransEnterix, Inc. | K200049 | 03/09/2020 |
| Da Vinci Xi Surgical System, Da Vinci X Surgical System | Intuitive Surgical | K191529 | 02/06/2020 |
| Senhance Surgical System | TransEnterix, Inc. | K192877 | 11/22/2019 |
| E-100 Electrosurgical Generator, Synchroseal | Intuitive Surgical, Inc. | K191280 | 11/14/2019 |
| Da Vinci X/Xi 8mm Endoscope Plus, 0, Da Vinci X/Xi 8mm Endoscope Plus, 30 | Intuitive Surgical | K191736 | 07/26/2019 |
| Stitchkit | Origami Surgical | K191317 | 07/12/2019 |
| Sureform 45 Curved Tip, Sureform 45 Gray Reload | Intuitive Surgical, Inc. | K190999 | 07/12/2019 |
| Senhance Surgical System | TransEnterix Inc. | K191482 | 07/11/2019 |
| Da Vinci Sp Surgical System, Endowrist Sp Instruments, And Accessories | Intuitive Surgical, Inc. | K182371 | 03/14/2019 |
| Sureform 45, Sureform 45 Reloads | Intuitive Surgical | K183224 | 01/18/2019 |
| Senhance Ultrasonic System | TransEnterix, Inc. | K182421 | 01/11/2019 |
| Intuitive Surgical Vessel Sealer Extend | Intuitive Surgical, Inc. | K183107 | 12/11/2018 |
| Senhance Surgical System | TransEnterix, Inc. | K183098 | 12/06/2018 |
| Da Vinci Xi Surgical System, Da Vinci X Surgical System | Intuitive Surgical, Inc | K182140 | 10/24/2018 |
| Senhance Surgical System | TransEnterix, Inc. | K181517 | 10/09/2018 |
| Soloassist Ii | AKTORmed GmbH | K171947 | 09/21/2018 |
| Endowrist Mercury Bipolar Grasper | Intuitive Surgical, Inc. | K180351 | 08/07/2018 |
| Da Vinci Xi Surgical System, Da Vinci X Surgical System | Intuitive Surgical, Inc. | K173585 | 07/19/2018 |
| Sureform 60 And Sureform 60 Reloads | Intuitive Surgical | K173721 | 07/05/2018 |
| Da Vinci Sp Surgical System, Endowrist Sp Instruments, And Accessories | Intuitive Surgical, Inc. | K173906 | 05/31/2018 |
| Endowrist 5mm Thoracic Grasper | Intuitive Surgical, Inc. | K173415 | 05/31/2018 |

HIGHLY CONFIDENTIAL  ATTORNEYS' EYES ONLY

| Device Name | Applicant | 510(K) Number | Decision Date |
|---|---|---|---|
| Transenterix Senhance Surgical System | TransEnterix, Inc. | K180163 | 05/25/2018 |
| Stitchkit V-Loc 90, Stitchkit V-Loc 180, Stitchkit Quill Pdo | Origami Surgical LLC | K173874 | 05/04/2018 |
| Intuitive Surgical Endowrist Vessel Sealer Extend | Intuitive Surgical, Inc. | K173337 | 04/26/2018 |
| Da Vinci Xi Surgical System, Da Vinci X Surgical System | Intuitive Surgical, Inc | K173842 | 04/23/2018 |
| 8mm Monopolar Curved Scissors | Intuitive Surgical, Inc | K180033 | 04/06/2018 |
| Hx Device | Human Extension Ltd. | K173919 | 03/20/2018 |
| Da Vinci Xi Surgical System; Da Vinci X Surgical System | Intuitive Surgical, Inc. | K172643 | 01/31/2018 |
| Senhance Surgical Robotic System | TransEnterix, Inc. | K171120 | 10/13/2017 |
| Da Vinci S/Si Endoscopes, Da Vinci Xi Endoscopes | Intuitive Surgical, Inc. | K170641 | 09/21/2017 |
| Is4000 Stapler 45 Instrument And Its Reusable Accessories, Is4000 Endowrist Stapler 30 Instrument, Is3000 Stapler 45 Instrument And Its Reusable Accessories | Intuitive Surgical, Inc. | K170879 | 09/21/2017 |
| Da Vinci Xi Surgical System | Intuitive Surgical, Inc | K171632 | 09/19/2017 |
| Da Vinci Si Single-Site Instruments And Accessories, Da Vinci Xi Single-Site Instruments And Accessories | Intuitive Surgical, Inc. | K170875 | 09/12/2017 |
| Da Vinci S/Si Endowrist Instruments And Accessories, Harmonic Ace Curved Shears (5mm & 8mm) | Intuitive Surgical, Inc. | K170644 | 09/11/2017 |
| Da Vinci Xi Endowrist Instruments And Accessories | Intuitive Surgical, Inc. | K170645 | 09/11/2017 |
| Da Vinci Xi Surgical System, Da Vinci Si Surgical System, Da Vinci X Surgical System | Intuitive Surgical, Inc. | K171699 | 07/28/2017 |
| Da Vinci Xi 8mm Endoscope, 0 Degree, Da Vinci Xi 8mm Endoscope, 30 Degree | Intuitive Surgical, Inc. | K171426 | 06/13/2017 |
| Da Vinci Xi Surgical System | Intuitive Surgical, Inc | K170713 | 06/13/2017 |
| Endowrist Stapler 45 System And Stapler 45 Reloads | Intuitive Surgical, Inc. | K171388 | 05/31/2017 |
| Da Vinci X Surgical System | Intuitive Surgical, Inc. | K171294 | 05/26/2017 |
| Endowrist Vessel Sealer, 8 Mm Harmonic Ace Curved Shears, Da Vinci Single-Site Instruments And Accessories | Intuitive Surgical, Inc. | K170865 | 04/21/2017 |
| Endowrist Stapler 45 Instrument, Endowrist Stapler 45 Reloads, Endowrist Stapler 30 Instrument, Endowrist Stapler 30 Reloads | Intuitive Surgical, Inc. | K170508 | 03/10/2017 |
| Endowrist Suction Irrigator | Intuitive Surgical, Inc. | K162973 | 02/06/2017 |
| Da Vinci Xi Surgical System | Intuitive Surgical, Inc. | K161178 | 01/19/2017 |

HIGHLY CONFIDENTIAL  ATTORNEYS' EYES ONLY

| Device Name | Applicant | 510(K) Number | Decision Date |
| --- | --- | --- | --- |
| Da Vinci Xi 12 – 8 Mm Reducer | Intuitive Surgical, Inc. | K162411 | 09/21/2016 |
| Da Vinci Xi Surgical System | INTUITIVE SURGICAL, INC. | K153276 | 08/07/2016 |
| Da Vinci Xi Surgical System | Intuitive Surgical, Inc. | K161271 | 07/11/2016 |
| Da Vinci Xi Surgical System | INTUITIVE SURGICAL | K152892 | 04/29/2016 |
| Da Vinci Surgical System, Model Is4000 | INTUITIVE SURGICAL, INC. | K152578 | 03/30/2016 |
| Da Vinci Single-Site Instrument And Accessories | INTUITIVE SURGICAL, INC. | K152448 | 03/09/2016 |
| Is4000 Stapler 30 Instrument And Stapler 30 Reloads | INTUITIVE SURGICAL, INC. | K152421 | 03/04/2016 |
| Da Vinci Xi Surgical System | Intuitive Surgical, Inc. | K151794 | 01/15/2016 |
| Is4000 Da Vinci Endowrist Instruments | INTUITIVE SURGICAL, INC. | K150284 | 05/15/2015 |
| Is4000 Small Clip Applier, Is4000 Long Bipolar Forceps | INTUITIVE SURGICAL, INC. | K150837 | 04/29/2015 |
| Is4000 8mm Harmonic Ace Curved Shears | INTUITIVE SURGICAL, INC. | K143132 | 04/02/2015 |
| Stitchkit | ORIGAMI SURGICAL LLC | K142639 | 12/16/2014 |
| 12 Mm Endoscopes And Accessories | INTUITIVE SURGICAL, INC. | K142683 | 12/10/2014 |
| 12 Mm & Stapler Bladeless Obturators | INTUITIVE SURGICAL, INC. | K143217 | 12/03/2014 |
| Single-Site Wristed Needle Driver | INTUITIVE SURGICAL | K141075 | 09/26/2014 |
| Da Vinvi Surgical System | INTUITIVE SURGICAL, INC. | K123329 | 09/17/2014 |
| Da Vinci Firefly Imaging System | INTUITIVE SURGICAL, INC. | K141077 | 08/12/2014 |
| Endowrist Stapler 45 And Stapler 45 Reloads | INTUITIVE SURGICAL, INC. | K140553 | 07/25/2014 |
| Endowrist Vessel Sealer | INTUITIVE SURGICAL, INC. | K140189 | 06/05/2014 |
| Single-Site Port | INTUITIVE SURGICAL, INC. | K133203 | 05/09/2014 |
| Da Vinci Sp Surgical System, Endowrist Sp Instruments, And Accessories | INTUITIVE SURGICAL, INC. | K131962 | 04/17/2014 |
| Da Vinci Surgical System, Endowrist Instruments And Accessories | INTUITIVE SURGICAL, INC. | K131861 | 03/28/2014 |
| Stitchkit | ORIGAMI SURGICAL LLC | K123811 | 09/05/2013 |
| Endowrist One Vessel Sealer | INTUITIVE SURGICAL, INC. | K130266 | 08/29/2013 |
| Da Vinci Single-Site Instruments And Accessories | INTUITIVE SURGICAL, INC. | K122532 | 07/30/2013 |
| Da Vinci Single-Site Permanent Cautery Hook | INTUITIVE SURGICAL, INC. | K130726 | 06/07/2013 |

HIGHLY CONFIDENTIAL  ATTORNEYS' EYES ONLY

| Device Name | Applicant | 510(K) Number | Decision Date |
|---|---|---|---|
| Connect For Da Vinci Surgical System(S) | INTUITIVE SURGICAL, INC. | K123840 | 02/14/2013 |
| Intuitive Surgical Da Vinci Si Surgical System Smartpedals | INTUITIVE SURGICAL, INC. | K123463 | 12/03/2012 |
| Intuitive Surgical Onsite For Da Vinci Surgical Systems | INTUITIVE SURGICAL, INC. | K121921 | 10/25/2012 |
| Endowrist Stapler System | INTUITIVE SURGICAL, INC. | K113706 | 10/17/2012 |
| Single-Site Medium-Large Clip Applier, Single-Site Cadiere Grasper, Single-Site Fundus Grasper, Single-Site Crocodile | INTUITIVE SURGICAL, INC. | K120215 | 04/30/2012 |
| Endowrist One Vessel Sealer | INTUITIVE SURGICAL, INC. | K110639 | 12/28/2011 |
| Intutive Surgical Da Vinci Single Site Instruments And Accessories | INTUITIVE SURGICAL, INC. | K112208 | 12/08/2011 |
| Monopolar Curved Scissors Tip Cover Accessory | INTUITIVE SURGICAL, INC. | K112263 | 10/07/2011 |
| 5mm/8mm Harmonic Ace(Tm) Curved Shears, Disposable Harmonic Ace(Tm) Insert, Disposable Harmonic(Tm) Curved Shears Insert | INTUITIVE SURGICAL, INC. | K112584 | 09/29/2011 |
| Endowrist One Suction/Irrigator | INTUITIVE SURGICAL, INC. | K110451 | 08/26/2011 |
| Intuitive Surgical Da Vinci S Surgical System With Da Vinci Connect & Da Vinci Onsite, Model Is2000 | INTUITIVE SURGICAL, INC. | K101581 | 04/08/2011 |
| 5mm Flared Cannula Model 420262, 8mm Flared Cannula Model 420319 | INTUITIVE SURGICAL, INC. | K101743 | 02/04/2011 |
| Da Vinci Fluorescence Imaging Vision System, Model Ff 100 | INTUITIVE SURGICAL, INC. | K101077 | 02/04/2011 |
| 5 Mm Harmonic Ace Instrument (Used With Da Vinci Is1200 & Is2000/Is3000 System) | INTUITIVE SURGICAL, INC. | K093217 | 01/21/2010 |
| Intuitive Surgical Endoscopic Instrument Control Systems, Models Is1200, Is2000 And Is3000 | INTUITIVE SURGICAL, INC. | K090993 | 12/16/2009 |
| Intuitive Surgical Endowrist One Hot Shears Instrument | INTUITIVE SURGICAL, INC. | K082497 | 05/07/2009 |
| Intuitive Surgical Da Vinci Si Surgical System: Model Is3000 | INTUITIVE SURGICAL, INC. | K081137 | 02/18/2009 |
| Intuitive Surgical Da Vinci S Surgical System, Model Is2000, With Da Vinci Connect And Onsite | INTUITIVE SURGICAL, INC. | K081207 | 12/19/2008 |
| Intuitive Surgical Da Vinci Endoscopic Instruments And Control System And Endowrist Stabilizer | INTUITIVE SURGICAL, INC. | K080291 | 03/19/2008 |
| Intuitive Surgical Da Vinci Surgical System And Endoscopic Instruments And Endowrist Cardiac Probe Grasper | INTUITIVE SURGICAL, INC. | K070947 | 02/14/2008 |
| Intuitive Surgical Da Vinci And Da Vinci S Surgical System And Endoscopic Instruments And Endowrist Introducer | INTUITIVE SURGICAL, INC. | K072627 | 02/07/2008 |

HIGHLY CONFIDENTIAL  ATTORNEYS' EYES ONLY

| Device Name | Applicant | 510(K) Number | Decision Date |
|---|---|---|---|
| Da Vinci S Surgical System-V1.1, Model Is2000 | INTUITIVE SURGICAL, INC. | K063220 | 12/01/2006 |
| Intuitive Surgical Endowrist Pk Dissecting Forceps, Models 400214 & 420214 | INTUITIVE SURGICAL, INC. | K061260 | 05/18/2006 |
| Intuitive Surgical Endowrist Stabilizer, Model 420182 | INTUITIVE SURGICAL, INC. | K060391 | 04/10/2006 |
| Modification To Intuitive Surgical Da Vinci Surgical System And Endoscopic Instruments | INTUITIVE SURGICAL, INC. | K050802 | 06/29/2005 |
| Intuitive Surgical Da Vinci Surgical System, Model Is2000 | INTUITIVE SURGICAL, INC. | K050369 | 04/29/2005 |
| Modification To Intuitive Surgical Da Vinci Surgical System And Endoscopic Instruments | INTUITIVE SURGICAL, INC. | K043288 | 03/03/2005 |
| Intuitive Surgical Monopolar Curved Scissors, Model 400179; Tip Cover Accessory, Model 400180 | INTUITIVE SURGICAL, INC. | K050005 | 01/25/2005 |
| Intuitive Surgical Da Vinci Surgical System And Endoscopic Instruments, Models Is1200 & Is1000 | INTUITIVE SURGICAL, INC. | K043153 | 12/15/2004 |
| Intuitive Surgical Harmonic Curved Shears Instrument | INTUITIVE SURGICAL, INC. | K042855 | 11/12/2004 |
| Intuitive Surgical Da Vinci Endoscopic Instrument Control System And Endoscopic Instruments | INTUITIVE SURGICAL, INC. | K040237 | 07/07/2004 |
| Intuitive Surgical Endopass Endoscopic Delivery Instrument, Model P/N 400170 | INTUITIVE SURGICAL, INC. | K040948 | 05/05/2004 |
| Bipolar Grasper And Bipolar Scissors For The Zeus Microwrist Surgical System | COMPUTER MOTION, INC. | K030578 | 06/24/2003 |
| Intuitive Surgical Endoscopic Instrument Control System & Endoscopic Instruments, Model Da Vinci Isi 1000/1200 | INTUITIVE SURGICAL, INC. | K022574 | 11/12/2002 |
| Zeus Microwrist Robotic Surgical System And Accessories | COMPUTER MOTION, INC. | K021152 | 09/24/2002 |
| Intuitive Surgical Da Vinci Surgical System, Model Is1000 | INTUITIVE SURGICAL, INC. | K021036 | 06/26/2002 |
| Intuitive Surgical Bipolar Forceps | INTUITIVE SURGICAL, INC. | K012833 | 11/16/2001 |
| Intuitive Surgical Ultrasonic Shears | INTUITIVE SURGICAL, INC. | K011281 | 07/24/2001 |
| Intuitive Surgical Da Vinci Surgical System, Model Isi 1000 | INTUITIVE SURGICAL, INC. | K011002 | 05/30/2001 |
| Intuitive Surgical Da Vinci Endoscopic Control System | INTUITIVE SURGICAL, INC. | K002489 | 03/02/2001 |
| Intuitive Surgical Endoscopic Instruments, Intuitive Surgical Endoscopic Instrument Control System | INTUITIVE SURGICAL, INC. | K990144 | 07/11/2000 |

Exhibit 4

Kenneth A. Gallo (*pro hac vice*)
Paul D. Brachman (*pro hac vice*)
**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
2001 K Street, NW
Washington, DC 20006-1047
Telephone: (202) 223-7300
Facsimile: (202) 204-7420
Email: kgallo@paulweiss.com
Email: pbrachman@paulweiss.com

William B. Michael (*pro hac vice*)
Crystal L. Parker (*pro hac vice*)
Daniel A. Crane (*pro hac vice*)
**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
Email: wmichael@paulweiss.com
Email: cparker@paulweiss.com
Email: dcrane@paulweiss.com

Joshua Hill Jr. (SBN 250842)
**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
535 Mission Street, 24th Floor
San Francisco, CA 94105
Telephone: (628) 432-5100
Facsimile: (628) 232-3101
Email: jhill@paulweiss.com
*Attorneys for Defendant Intuitive Surgical, Inc.*
[Additional counsel listed on signature page]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| SURGICAL INSTRUMENT SERVICE COMPANY, INC.,<br>　　　　　　*Plaintiff*,<br>v.<br>INTUITIVE SURGICAL, INC.,<br>　　　　　　*Defendant*. | Case No. 3:21-cv-03496-AMO<br><br>**DEFENDANT'S PROPOSED JURY INSTRUCTIONS**<br>The Honorable Araceli Martínez-Olguín |

1         **PRELIMINARY, GENERAL, AND CONCLUDING INSTRUCTIONS**

2  1.3 Duty of Jury (Court Reads Instructions at the Beginning of Trial but Does Not Provide

3  Written Copies)

4  1.4 Duty of Jury (Court Reads and Provides Written Instructions at End of Case)

5  1.6 Burden of Proof—Preponderance of the Evidence

6  1.9 What is Evidence

7  1.10 What is Not Evidence

8  1.11 Evidence for Limited Purpose

9  1.12 Direct and Circumstantial Evidence

10  1.13 Ruling on Objections

11  1.14 Credibility of Witnesses

12  1.15 Conduct of the Jury

13  1.16 Publicity During Trial

14  1.17 No Transcript Available to Jury

15  1.18 Taking Notes

16  1.19 Questions to Witnesses by Jurors During Trial (Option 1)

17  1.20 Bench Conferences and Recesses

18  1.21 Outline of Trial

19  2.0 Cautionary Instructions

20  2.2 Stipulations of Fact

21  2.3 Judicial Notice

22  2.4 Deposition in Lieu of Live Testimony

23  2.13 Expert Opinion

24  2.14 Charts and Summaries Not Received in Evidence

25  2.15 Charts and Summaries Received in Evidence

26  2.16 Evidence in Electronic Format

27

28

3.1 Duty to Deliberate

3.2 Consideration of Evidence—Conduct of the Jury

3.3 Communication with Court

3.4 Readback or Playback

3.5 Return of Verdict

3.9 Post-Discharge Instruction

Instruction No. 1 Re Overview of Claims and Defenses[1]

To help you follow the evidence, I will give you a brief summary of the positions of the parties:

The plaintiff in this case is a company called Surgical Instrument Service Company (or "SIS"), based in Glendale Heights, Illinois.  The defendant is a company called Intuitive Surgical, based in Sunnyvale, California.

Intuitive invented a device called "da Vinci" which is used by surgeons around the world.  The da Vinci allows a surgeon sitting at a console to operate on patients by controlling surgical instruments called EndoWrists, also invented by Intuitive.  EndoWrists are attached to mechanical arms suspended above the patient, and inserted into the patient's body through small incisions.  As controlled by a surgeon, EndoWrists can perform movements such as cutting, grasping, suturing, etc., allowing surgery to be done in a minimally invasive manner.  EndoWrists include fine wire cables that thread through a complex pulley system, allowing the surgeon to move the surgical instruments easily inside the patient's body to desired angles with great precision, mimicking and even exceeding the range of motion of the human wrist.  EndoWrists are designed to be replaced after a specified number of uses,  The Food and Drug Administration (FDA) has granted clearance to Intuitive to market and sell the da Vinci and EndoWrist instruments as safe and effective.

SIS acted as a distributor for a third-party that sought to modify EndoWrists for the purpose of permitting them to be reused for more than the number of uses specified by Intuitive.   SIS alleges that Intuitive's contracts with its customers prevented customers from purchasing the modified EndoWrist instruments distributed by SIS, and that Intuitive enforced those contractual restrictions by sending cease and desist letters to customers who used modified EndoWrists distributed by SIS.  SIS alleges that Intuitive is able to force customers to accept these contractual restrictions because it is a monopolist in what SIS contends is a  market for

---

[1] MANUAL OF MODEL CIVIL JURY INSTRUCTIONS FOR THE DISTRICT COURTS OF THE NINTH CIRCUIT § 1.5 (9th Cir. Jury Instructions Comm. 2017 ed.); Complaint (Dkt. 1) ¶¶ 112, 115, 118, 121; Answer (Dkt. 75) p. 39, Counterclaims ¶¶ 85, 93, 99, 102, 106.

soft-tissue surgical robots.  SIS claims that Intuitive uses its alleged monopoly power to contractually condition the sale and servicing of da Vinci surgical robots on customers' agreement not to purchase EndoWrist instruments that have been modified by a third-party.  SIS claims that Intuitive's contracts have allowed Intuitive to monopolize an alleged market for the repair and replacement of EndoWrist instruments.

Intuitive denies these claims.  Intuitive asserts that customers choose its da Vinci surgical systems over other competing alternatives because Intuitive offers a superior combination of product quality, service and price.  Intuitive contends that its customers are highly sophisticated buyers who understand the contract terms and costs associated with da Vinci systems, including EndoWrists, understand that EndoWrists are designed for a limited number of uses, and knowingly and expressly agree not to use EndoWrists that have been modified by any unauthorized third party when they make the choice to buy or lease a da Vinci system.  Intuitive asserts that the contractual provisions that SIS challenges were put in place for legitimate and procompetitive reasons, at a time when Intuitive had no significant sales or share of any market.  Those reasons include protecting patient safety, ensuring product quality, promoting innovation, and protecting Intuitive's reputation and brand.  Intuitive contends that its contracts have not harmed competition or excluded competitors.  Intuitive maintains that its contracts restrict only the use of unauthorized third-party products and services, and that SIS chose not to seek authorization for its products and services.  Intuitive disputes that it has the power to force customers to accept its contractual terms.  Intuitive contends that the da Vinci surgical system competes against other products and methods of performing surgery, and that customers can elect to use those alternative products and surgical methods if they do not wish to accept Intuitive's products, prices, or contract terms.

Intuitive also asserts counterclaims against SIS arising out of SIS's marketing, advertising and related activities.  *First*, Intuitive alleges that in its marketing materials and communications, SIS made false and misleading statements and engaged in unfair competition.  *Second*, Intuitive alleges that SIS engaged in deceptive and fraudulent conduct with the intent to confuse and deceive the public into using its service and purchasing modified EndoWrists.

1    *Third*, Intuitive alleges that SIS was aware of Intuitive's contractual relationships with its

2    customers that contain limitations concerning the modification or alteration of Intuitive

3    EndoWrists by unauthorized third-parties, and that SIS undertook intentional acts to disrupt

4    and/or induce Intuitive customers to breach those contractual relationships.  SIS denies these

5    counterclaims.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## I.    INTRODUCTORY ANTITRUST INSTRUCTIONS

2

Instruction No. 2 Re Purpose of Antitrust Laws[2]

3

        The purpose of the Sherman Act is to preserve free and unfettered competition in

4

the marketplace. The Sherman Act rests on the central premise that competition produces the

5

best allocation of our economic resources, the lowest prices, the highest quality, and the greatest

6

material progress.

7

        The Sherman Act was enacted for the protection of competition, not competitors.[3]

8

SIS must therefore establish that Intuitive's acts caused injury not only to SIS itself but to

9

competition as a whole in the alleged relevant market.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

[2] Model Jury Instructions in Civil Antitrust Cases, Chapter 1 – Sherman Act—General, Instruction 1:  Purpose (Am. Bar Ass'n Antitrust L. Section 2016).

27

[3] *Leegin Creative Leather Prods. v. PSKS, Inc.*, 551 U.S. 877, 906 (2007) ("The purpose of the antitrust laws . . . is 'the protection of competition, not competitors.'" (citation omitted));

28

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977) ("The antitrust laws, however, were enacted for 'the protection of competition not competitors.'" (citations omitted)).

1    Instruction No. 3 Re Communications with FDA[4]

2          You have heard evidence that Intuitive had certain communications with the FDA

3    regarding the actions of third parties with respect to Intuitive's products.  The Constitution

4    ensures the right of everyone, whether acting alone or with others, to petition or appeal to

5    government for political action, recognizing that when people do so they will naturally seek

6    political action that favors them and also may be unfavorable to others.  The appeal to

7    government may be direct, such as a discussion or meeting with a government official or agency,

8    or it may be indirect, such as a publicity or advertising campaign.

9          The law provides that the right to petition government for political action is an

10    important right, and the genuine exercise of that right does not violate the antitrust laws.  Efforts

11    genuinely intended to influence public officials to take official action do not violate the antitrust

12    laws, even if the purpose and effect of those efforts is to obtain official action that eliminates or

13    reduces competition.

14          There is no claim in this case that Intuitive's petitioning of the FDA was

15    unlawful, or that it was not a genuine attempt to influence public officials to take official action.

16    Accordingly, you must not consider Intuitive's communications with the FDA as unlawful or

17    anticompetitive conduct either on their own or in combination with other acts.

18

19

20

21

22

23

24

25

26

27

28

---

[4] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 7 – Miscellaneous A. Certain Defenses and Exemptions, Instruction 3: Noerr-Pennington—Lobbying (AM. BAR ASS'N ANTITRUST L. SECTION 2016).

1    <u>Instruction No. 4 Re Right to Repair</u>[5]

2              You may have heard about so-called "right to repair" laws in California or

3    elsewhere.  There is no "right to repair" medical devices, and such laws have no application in

4    this case.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

[5] *See* Cal. Pub. Res. Code § 42488; Minn. Stat. § 325E.72; N.Y. Gen. Bus. Law § 399-nn.

1  Instruction No. 5 Re Unilateral Refusal to Deal

2         Antitrust law imposes no obligation on a defendant to help its competitors.[6]  You

3  should therefore not base any finding of an antitrust violation on the fact that Intuitive did not

4  cooperate with SIS to facilitate the sale of modified EndoWrists.[7]

---

[6] See *FTC v. Qualcomm, Inc.*, 969 F.3d 974, 993–94 (9th Cir. 2020) (citing, *inter alia*, *Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*, 555 U.S. 438, 457, (2009); *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004)).
[7] Jury Instructions at 26, *AngioDynamics, Inc.* v. *C.R. Bard, Inc.*, No. 1:17-cv-00598 (N.D.N.Y. Oct. 6, 2022), ECF No. 472.

1    Instruction No. 6 Re Relevant Product Markets[8]

2         For each of SIS's antitrust claims, SIS must prove by a preponderance of the

3    evidence that the relevant markets it alleges are valid antitrust markets.

4         Defining the relevant market is essential because you will be required to make a

5    judgment about whether Intuitive has market power or monopoly power in a properly defined

6    economic market.[9]  To make this judgment, you must be able to determine what, if any,

7    economic forces restrain Intuitive's freedom to set prices for or to restrict the production level of

8    the products or services in question.

9         The most likely and most important restraining force will be actual and potential

10   competition from other firms and their products.  This includes all firms and products that act or

11   likely could act as restraints on Intuitive's power to set prices as it pleases because customers

12   could switch to them if Intuitive sets its own prices too high.  All the firms and products that

13   exert such restraining force are within what is called the relevant market.

14        There are two aspects you must consider in determining whether SIS has met its

15   burden to prove the relevant market by a preponderance of the evidence.  The first is the relevant

16   product market.  The second is the relevant geographic market.

17        The basic idea of a relevant product market is that the products within it are

18   reasonable substitutes for each other from the buyer's point of view; that is, the products

19   compete with each other.  In other words, the relevant product market includes the products that

20   a consumer believes are reasonably interchangeable or reasonable substitutes for each other.

21   This is a practical test with reference to the actual behavior of buyers and marketing efforts of

22   sellers.  Products need not be identical or precisely interchangeable as long as they are

23

---

24   [8] Model Jury Instructions in Civil Antitrust Cases, Chapter 3 – Section 2 of the Sherman Act—
     Monopolization–General, Instruction 3:  Relevant Market—General (Am. Bar Ass'n Antitrust L.
25   Section 2016); Model Jury Instructions in Civil Antitrust Cases, Chapter 3 – Section 2 of the
     Sherman Act—Monopolization–General, Instruction 4:  Relevant Product Market (Am. Bar
26   Ass'n Antitrust L. Section 2016).

27   [9] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 3 – Section 2 of the Sherman
     Act—Monopolization–General, Instruction 3:  Relevant Market—General (AM. BAR ASS'N
28   ANTITRUST L. SECTION 2016) (modified to add "market power," as the Section 1 claims only
     require proof of market power, not monopoly power).

reasonable substitutes.  Thus, for example, if consumers seeking to cover leftover food for storage considered certain types of flexible wrapping material—such as aluminum foil, cellophane, or even plastic containers—to be reasonable alternatives, then all those products may be in the same relevant product market.

To determine whether products or services are reasonable substitutes for each other, you must consider whether a small but significant and non-transitory increase in the price of one product would result in enough customers switching from that product to another product such that the price increase would not be profitable.  In other words, will customers accept the price increase or will so many switch to alternative products or services that the price increase will be withdrawn?  Generally speaking, a small but significant and non-transitory increase in price is approximately a 5 percent increase in price not due to cost factors, but you may conclude in this case that some other percentage is more applicable to the products at issue.  If you find that customers would switch and that the price increase would not be profitable, then you must conclude that the products are in the same product market.  If, on the other hand, you find that customers would not switch, then you must conclude that the products are not in the same product market.

In evaluating whether various products or services are reasonably interchangeable or reasonable substitutes for each other under the price increase test I have just given you, you may also consider:

- customers' views on whether the products are interchangeable;
- the relationship between the price of one product and sales of another;
- the presence or absence of specialized vendors;
- the perceptions of either industry or the public as to whether the products are in separate markets;
- the views of SIS and Intuitive regarding who their respective competitors are; and
- the existence or absence of different customer groups or distribution channels.

- 11 -

1    In this case, SIS alleges there are two separate relevant product markets:  (1) an

2    alleged market for surgical robots used in minimally invasive soft tissue (or "MIST") surgery;

3    and (2) an alleged aftermarket for EndoWrist repair and replacement.

4    Intuitive disputes SIS's definition of the alleged relevant markets.

5    First, Intuitive contends that the relevant product market in which Intuitive's da

6    Vinci system competes includes all types (or "modalities") of surgery available to doctors to treat

7    the conditions that can be treated by the da Vinci.  In particular, Intuitive contends that its da

8    Vinci system competes not just with other MIST surgical robots, but with laparoscopic surgery

9    and open surgery as well.

10    Second, Intuitive contends that the alleged aftermarket for EndoWrist repair and

11    replacement is an improperly defined single-brand aftermarket—that is, a market that is

12    improperly limited to Intuitive's own brand of products.

13    To establish a valid single-brand aftermarket, SIS must prove each of the

14    following four factors by a preponderance of the evidence:

15    (1) the challenged aftermarket restrictions (which, here, are the alleged

16    restrictions that Intuitive places in its contracts on the use with the da Vinci system of

17    unauthorized instruments or instruments that have been modified by unauthorized third parties)

18    are not generally known when hospitals make their "foremarket" purchase of the da Vinci

19    system;

20    (2) significant information costs prevent hospitals from forecasting life-cycle

21    pricing accurately at the time they purchase their da Vinci surgical systems;

22    (3) significant monetary or non-monetary switching costs exist; and

23    (4) general market-definition principles regarding cross-elasticity of demand, like

24    those on which I have instructed you, do not undermine SIS's proposed single-brand market.[10]

25    As I said earlier, the second aspect of the relevant market is the geographic scope

26    of the market.  SIS and Intuitive agree that the relevant geographic market is the United States.

27

28    [10] *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 976–77 (9th Cir. 2023); *Newcal Indus. Inc. v. Ikon Office Solutions,* 513 F.3d 1038, 1046–51 (9th Cir. 2008).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

       If you find that SIS has failed to prove by a preponderance of the evidence either of the two relevant markets it alleges based on the instructions I have given you, then you must find for Intuitive on all of SIS's claims.[11]  If you find that SIS has proven the relevant markets it alleges, then you should continue to evaluate the remainder of SIS's claims.[12]

---

[11] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 3 – Section 2 of the Sherman Act—Monopolization–General, Instruction 4:  Relevant Product Market (AM. BAR ASS'N ANTITRUST L. SECTION 2016) (modified to apply to all claims).

[12] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 3 – Section 2 of the Sherman Act—Monopolization–General, Instruction 4:  Relevant Product Market (AM. BAR ASS'N ANTITRUST L. SECTION 2016) (modified to apply to all claims).

1    <u>Instruction No. 7 Re Relevant Product Markets – Supply Substitutability[13]</u>

2           In deciding whether SIS has proven a relevant product market, you may also

3    consider what the law refers to as "the cross-elasticity of supply" or, in other words, the extent to

4    which the producers of one product would be willing to shift their resources, such as intellectual

5    property, manufacturing facilities, or personnel to producing another product in response to an

6    increase in the price of the other product.  Such producers, to the extent that they exist, can

7    increase supply and, therefore, drive prices back to competitive levels, defeating any effort by a

8    would-be monopolist to charge significantly higher prices.

9           Take two shoe manufacturers, for example. The first manufacturer produces shoes

10   for women, while the second manufacturer produces shoes for men.  Generally speaking, men's

11   and women's shoes are not reasonably interchangeable and, therefore, might be thought of as

12   being in a separate product markets.  However, it is possible that the men's shoe manufacturer

13   could quickly shift its resources to start producing women's shoes if the women's shoe

14   manufacturer raised its prices significantly and vice versa.  Although women would not buy

15   men's shoes, nor would men buy women's shoes, the ability of each manufacturer to alter its

16   production could prevent the other manufacturer from raising prices significantly.  Thus, in this

17   example, men's and women's shoes would be included in the same market.

18          If, in determining the products in the relevant product market you find that there

19   are manufacturers that have the ability to alter their production to manufacture products that can

20   be reasonably substituted with Intuitive's—even though they do not presently compete with

21   Intuitive—you may consider whether the existence of these potential alternative suppliers

22   constrain the prices that Intuitive charges for its products.

23

24

25

26

27   [13] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 3 – Section 2 of the Sherman
     Act—Monopolization–General, Instruction 5:  Relevant Product Market—Supply
28   Substitutiability (AM. BAR ASS'N ANTITRUST L. SECTION 2016) (modified to reflect the particular
     products and services at issue).

## II.    ANTITRUST - SECTION 1 OF THE SHERMAN ACT

### A.    Sherman Act Section 1 Claims Generally

Instruction No. 8 Re Sherman Act Section 1[14]

SIS brings two claims against Intuitive under Section 1 of the Sherman Act. Section 1 prohibits contracts, combinations and conspiracies that unreasonably restrain trade. The first claim is for "tying," and the second claim is for "exclusive dealing."[15]

Section 1 of the Sherman Act prohibits contracts, combinations and conspiracies that unreasonably restrain trade.

To establish a violation of Section 1 of the Sherman Act, SIS must prove the following:

1.    The existence of a contract, combination, or conspiracy between or among at least two separate entities;

2.    That the contract, combination, or conspiracy unreasonably restrains trade; and

3.    That the restraint caused plaintiff to suffer an injury to its business or property.

Both of SIS's claims under Section 1 of the Sherman Act are based on features of Intuitive's contracts with purchasers of da Vinci surgical robots.  While Intuitive does not contest the existence of such contracts, Intuitive denies that such contracts unreasonably restrained trade.

---

[14] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 1 – Sherman Act—General, Instruction 2:  Sherman Act Section 1 (AM. BAR ASS'N ANTITRUST L. SECTION 2016) (modified to remove element that the challenged restraint must "affect[] interstate or foreign commerce," which is not contested); *see also* 15 U.S.C. § 1.

[15] Complaint (Dkt. 1) ¶¶ 112, 115.

1    Instruction No. 9 Re Rule of Reason Overview[16]

2              Under Section 1 of the Sherman Act, a restraint of trade is illegal only if it is

3    found to be unreasonable.  You must determine, therefore, whether the restraints challenged by

4    SIS here—namely, the alleged restrictions that Intuitive places in its contracts on the use with the

5    da Vinci system of unauthorized instruments or instruments that have been modified by

6    unauthorized third parties —are unreasonable.  In making this determination, you must first

7    determine whether SIS has proven that the challenged restraint has resulted in a substantial harm

8    to competition in a relevant product and geographic market.  If you find that SIS has proven that

9    the challenged restraint results in a substantial harm to competition in a relevant market, then you

10   must consider whether Intuitive has shown that the restraint produces countervailing competitive

11   benefits.

12

13

14

15

16

17

18   ───────────────

19   [16] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 1 – Sherman Act—General, Instruction 3A:  Rule of Reason – Overview (AM. BAR ASS'N ANTITRUST L. SECTION 2016)

20   (modified to remove final instruction that "The challenged restraint is illegal under Section 1 of the Sherman Act only if you find that the procompetitive efficiencies substantially outweighs the competitive benefit," as this balancing is not an element supported by Supreme Court precedent.

21   *See, e.g.*, *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018) ("To determine whether a restraint violates the rule of reason, the parties agree that a three-step, burden-shifting framework

22   applies. Under this framework, the plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market. . . .

23   If the plaintiff carries its burden, then the burden shifts to the defendant to show a procompetitive rationale for the restraint. . . . If the defendant makes this showing, then the burden shifts back to

24   the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means." (citations omitted)); *Nat'l Collegiate Athletic Ass'n v.*

25   *Alston*, 141 S. Ct. 2141, 2160, 2162 (2021) (endorsing the *American Express* burden-shifting framework); *FTC v. Qualcomm Inc.*, 969 F.3d 974, 99192 (9th Cir. 2020) (adopting the

26   *American Express* burden-shifting framework))  The Court in this case likewise adopted the three-step burden shifting framework of *American Express* in its opinion regarding the parties'

27   cross-motions for summary judgment, and nowhere mentioned a fourth step requiring a balancing analysis.  *See* Dkt. 204 at 17.).

28

1   Instruction No. 10 Re Rule of Reason Proof of Competitive Harm[17]

2            As I mentioned, to prove that the challenged restraints are unreasonable, SIS first

3   must demonstrate that the restraints have resulted in a substantial harm to competition. Although

4   it may be relevant to the inquiry, harm that occurs merely to the individual business of SIS is not

5   sufficient, by itself, to demonstrate harm to competition generally.  Harm to competition is to be

6   distinguished from harm to a single competitor or group of competitors, which does not

7   necessarily constitute harm to competition.

8            Furthermore, SIS must show that the harm to competition occurred in an

9   identified market, known as a relevant market.  There are two aspects to a relevant market.  The

10  first aspect is known as the relevant product market. The second aspect is known as the relevant

11  geographic market.  It is SIS's burden to prove the existence of a relevant market.  I instructed

12  you earlier on how to make this assessment.  In this case, SIS alleges competitive harm only in

13  one market:  the alleged aftermarket for EndoWrist replacement or repair; SIS does not allege

14  any competitive harm in the alleged market for surgical robots used in MIST surgery.

15           If you find that SIS has proven the existence of a relevant market, then you must

16  determine whether SIS also have proven that the challenged restraints have a substantial harmful

17  effect on competition in that market.  A harmful effect on competition, or competitive harm,

18  refers to a reduction in competition that results in the loss of some of the benefits of competition,

19  such as lower prices, increased output, or higher product quality.  It is not enough that the

20  conduct at issue has the effect of reducing consumers' choices or increasing prices to

21  consumers.[18]  If the challenged conduct has not resulted in higher prices, decreased output, lower

22  quality, or the loss of some other competitive benefit, then there has been no competitive harm,

23  and you should find that the challenged conduct was not unreasonable.

24

25

26  _____

27  [17] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 1 – Sherman Act—General,
    Instruction 3B:  Rule of Reason – Proof of Competitive Harm (AM. BAR ASS'N ANTITRUST L.
    SECTION 2016).

28  [18] Dkt. 204 at 17 (quoting *FTC* v. *Qualcomm, Inc.*, 969 F.3d 974, 993–94 (9th Cir. 2020)
    (quoting *Brantley* v. *NBC Universal, Inc.*, 675 F.3d 1192, 1202 (9th Cir. 2012))).

1    In determining whether the challenged restraint has produced competitive harm,

2    you may look at the following factors:

3    • the effect of the restraint on prices, output, product quality, and service;

4    • the purpose and nature of the restraint;

5    • the nature and structure of the relevant market;

6    • the number of competitors in the relevant market and the level of

7       competition among them, both before and after the restraint was imposed;

8       and

9    • whether the defendant possesses market power.

10    The last factor mentioned, market power, has been defined as an ability to

11    profitably raise prices, for a sustained period of time, above those that would be charged in a

12    competitive market. A firm that possesses market power generally can charge higher prices for

13    the same goods or services than a firm in the same market that does not possess market power.

14    The ability to charge higher prices for better products or services, however, is not market power.

15    An important factor in determining whether Intuitive possesses market power is Intuitive's

16    market share, that is, its percentage of the products or services sold in the relevant market by all

17    competitors. Other factors that you may consider in determining whether Intuitive has market

18    power include  market share trends, the existence of barriers to entry (that is, how difficult is it

19    for other producers to enter the market and begin competing with defendant for sales), the entry

20    and exit by other companies, and the number and size of actual competitors or potential

21    competitors. If Intuitive does not possess a substantial market share, it is less likely that Intuitive

22    possesses market power. If Intuitive does not possess market power, it is less likely that the

23    challenged restraints have resulted in a substantial harmful effect on competition in the market.

24

25

26

27

28

DEFENDANT'S PROPOSED JURY INSTRUCTIONS
Case No. 3:21-cv-03496-AMO

1    Instruction No. 11 Re Rule of Reason Evidence of Competitive Benefits[19]

2    　　　　If you find that SIS has proven that the challenged restraints resulted in

3    substantial harm to competition in a relevant market, then you next must determine whether next

4    must determine whether the restraint also benefits competition in other ways.  If you find that the

5    challenged restraints do result in competitive benefits, then you also must consider whether the

6    challenged restraints were reasonably necessary to achieve the benefits.  If SIS proves that the

7    same benefits could have been readily achieved by other, reasonably available alternative means

8    that create substantially less harm to competition, then they cannot be used to justify the

9    challenged restraints.

10   　　　　Antitrust law does not require businesses like Intuitive to use the least restrictive

11   means of achieving a legitimate business purpose.  Any alternative to the challenged conduct

12   presented by SIS must be a substantially—not marginally—less restrictive means for achieving

13   the same procompetitive rationales.  A procompetitive rationale is a nonpretextual claim that a

14   defendant's conduct is indeed a form of competition on the merits because it involves, for

15   example, greater efficiency or enhanced consumer appeal.[20]  To qualify as substantially less

16   restrictive, an alternative means must be virtually as effective in serving the Intuitive's

17   procompetitive purposes without significantly increased cost.[21]

18

19

20

21

---

22   [19] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 1 – Sherman Act—General, Instruction 3C:  Rule of Reason – Evidence of Competitive Benefits (AM. BAR ASS'N ANTITRUST

23   L. SECTION 2016).

24   [20] Dkt. 204 at 17 (quoting *FTC v. Qualcomm Inc.*, 969 F.3d 974, 991 (9th Cir. 2020)).

[21] *Epic Games, Inc.* v. *Apple, Inc.*, 67 F.4th 946, 990 (9th Cir. 2023) ("When evaluating proposed

25   alternative means, courts must give wide berth to defendants' business judgments and must resist the temptation to require that enterprises employ the least restrictive means of achieving their

26   legitimate business objectives. . . . As such, this circuit's test—which the Supreme Court approved in *Alston*—requires a substantially less restrictive alternative." (quotations omitted)

27   (citing *Alston*, 141 S. Ct. at 2161, 2163 (2021); *id.* ("To qualify as "substantially less restrictive," an alternative means "must be 'virtually as effective' in serving the [defendant's] procompetitive

28   purposes . . . without significantly increased cost." (citing *Cnty. of Tuolumne* v. *Sonora Cmty. Hosp.*, 236 F.3d 1148, 1159 (9th Cir. 2001))).

DEFENDANT'S PROPOSED JURY INSTRUCTIONS
Case No. 3:21-cv-03496-AMO

1

**B.    SIS's Tying Claim**

2

<u>Instruction No. 12 Re Definition of Tying Arrangements</u>[22]

3

          SIS claims that Intuitive engaged in an unlawful tying arrangement. Intuitive

4

denies this claim.

5

          A tying arrangement is one in which the seller will sell one product (referred to as

6

the tying product) only on the condition that buyers also purchase a different product (referred to

7

as the tied product) from the seller, or at least agrees that he will not purchase the tied product

8

from any other supplier. In this case, SIS claims that the da Vinci surgical robot is the tying

9

product and EndoWrist repair and replacement is the tied product.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

─────────────

28

[22] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 2 – Section 1 of the Sherman Act—Tying Arrangements, Instruction 1:  Definition (AM. BAR ASS'N ANTITRUST L. SECTION 2016).

1    Instruction No. 13 Re Rationale for Prohibition of Tying Arrangements[23]

2            Not all tying arrangements are unlawful. The essential characteristic of an invalid

3    tying arrangement is a seller's exploitation of its market power over the tying product (here, the

4    da Vinci surgical robot) to force buyers to purchase a tied product (here, EndoWrist repair or

5    replacement) that buyers might have preferred to purchase elsewhere. However, the law also

6    recognizes that tying arrangements may have legitimate justifications that benefit buyers.[24]

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27    [23] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 2 – Section 1 of the Sherman
      Act—Tying Arrangements, Instruction 2:  Rationale for Prohibition of Tying Arrangements

28    (AM. BAR ASS'N ANTITRUST L. SECTION 2016).
      [24] Ill. Tool Works Inc. v. Independent Ink, Inc., 547 U.S. 28, 35–36 (2006).

DEFENDANT'S PROPOSED JURY INSTRUCTIONS

1    Instruction No. 14 Re Elements of Unlawful Tying[25]

2    　　　　　　To prevail on its tying claim, SIS must prove each of the following elements by a

3    preponderance of the evidence:

4    　　　　　1.　　MIST surgical robots and EndoWrist repair and replacement are separate

5    　　　　　　　　and distinct products;

6    　　　　　2.　　Intuitive will sell da Vinci surgical robots only on the condition that the

7    　　　　　　　　buyer also purchase replacement EndoWrists from Intuitive, or that the

8    　　　　　　　　buyer not purchase repaired or replacement EndoWrists from any other

9    　　　　　　　　supplier;

10   　　　　　3.　　Intuitive has sufficient market power with respect to MIST surgical robots

11   　　　　　　　　to enable it to restrain competition as to EndoWrist repair and

12   　　　　　　　　replacement;

13   　　　　　4.　　the alleged tying arrangement has foreclosed a substantial volume of

14   　　　　　　　　commerce as to EndoWrist repair and replacement;

15   　　　　　5.　　the alleged tying arrangement has unreasonably restrained trade in that it

16   　　　　　　　　had a substantial adverse effect on competition as to EndoWrist repair and

17   　　　　　　　　replacement; and

18   　　　　　6.　　SIS was injured in its business or property because of the alleged tying

19   　　　　　　　　arrangement.[26]

20   　　　　　　If you find that the evidence is sufficient to prove all six of these elements, then

21   you must find for SIS and against Intuitive on SIS's tying claim.  If you find that the evidence is

22

23   ─────────────
     [25] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 2 – Section 1 of the Sherman
24   Act—Tying Arrangements, Instruction 4:  Elements – Unlawful Tying Under Rule of Reason
     (AM. BAR ASS'N ANTITRUST L. SECTION 2016).
25   [26] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 2 – Section 1 of the Sherman
     Act—Tying Arrangements, Instruction 4:  Elements – Unlawful Tying Under Rule of Reason
26   (AM. BAR ASS'N ANTITRUST L. SECTION 2016) (modified to remove elements that the conduct
     must have "occurred in or affected interstate commerce" and that the defendant "has a financial
27   interest" in the tied product, which are not contested); *see also Aerotec Int'l, Inc. v. Honeywell
     Int'l, Inc.*, 836 F.3d 1171, 1178–1180 (9th Cir. 2016); *Epic Games v. Apple, Inc.*, 67 F.4th 946,
28   995 (9th Cir. 2023).

DEFENDANT'S PROPOSED JURY INSTRUCTIONS
Case No. 3:21-cv-03496-AMO

1  insufficient to prove any one of these elements, then you must find for Intuitive and against SIS

2  on SIS's tying claim.

1   Instruction No. 15 Re Presence of Two Products[27]

2          The first element of its tying claim that SIS must prove by a preponderance of the

3   evidence is that the da Vinci surgical robot is a separate and distinct product from the repair and

4   replacement of EndoWrists.

5          To determine whether the da Vinci surgical robot and EndoWrist repair and

6   replacement are separate and distinct products, you should consider whether there would be

7   demand for each of them if they were offered separately. If enough customers would want to

8   purchase the da Vinci surgical robot alone and EndoWrist repair or replacement alone, then they

9   are separate products.  On the other hand, if there is very little demand for one of the products by

10  itself, that is, without purchasing the other product at the same time, then the da Vinci surgical

11  robot and EndoWrist repair and replacement are not two separate products for the purposes of

12  the tying claim, even if they are sometimes sold separately.

13         Products may be separate products even if one of them is useless without the

14  other. The relevant issue is whether there is sufficient demand from customers to induce sellers

15  to provide them separately, even if the customer needs to obtain both products from one or more

16  suppliers.

17         If you determine that MIST surgical robots are not a separate product from

18  EndoWrist repair and replacement, then you must find for Intuitive on SIS's tying claim.  If you

19  determine that MIST surgical robots are a separate product from EndoWrist repair and

20  replacement, then you must go on to assess the other elements of SIS's tying claim.

21

22

23

24

25

26

27

---

[27] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 2 – Section 1 of the Sherman
28  Act—Tying Arrangements, Instruction 5:  Presence of Two Products (AM. BAR ASS'N
ANTITRUST L. SECTION 2016).

1  Instruction No. 16 Re Proof of Coercion[28]

2     The second element of its tying claim that SIS must prove by a preponderance of

3  the evidence is that Intuitive will sell da Vinci surgical robots only on the condition that the

4  buyer also purchase replacement EndoWrists from Intuitive, or that the buyer not purchase

5  repaired or replacement EndoWrists from any other supplier.

6     You may find that a tying arrangement exists between da Vinci surgical robots

7  and EndoWrist repair and replacement if SIS proves that Intuitive either refused to sell da Vinci

8  surgical robots unless purchasers also agreed not to buy EndoWrist repair or replacement from

9  another supplier, or effectively coerced purchasers into buying replacement EndoWrists in

10  addition to da Vinci surgical robots from Intuitive. To prove coercion, SIS must prove by a

11  preponderance of the evidence that Intuitive exploited its control over da Vinci surgical robots to

12  force buyers into the purchase of replacement EndoWrists, which the buyers either did not want

13  at all, or might have preferred to purchase elsewhere on different terms, and that any appearance

14  of choice was illusory.  Mere sales pressure or persuasion is not coercion.

15     If Intuitive has made the purchase of da Vinci surgical robots and replacement

16  EndoWrists together the only viable economic option, you may find that Intuitive has effectively

17  tied daVinci surgical robots to EndoWrist repair and replacement.  However, there is no coercion

18  if da Vinci surgical robots and EndoWrist repair and replacement are offered separately for sale

19  and separate purchase is economically feasible.

20     If you determine that SIS has not proven by a preponderance of the evidence that

21  Inutitive effectively coerced buyers of da Vinci surgical robots to purchase EndoWrist repair and

22  replacement solely from Intuitive, then you must find for Intuitive on SIS's tying claim.  If you

23  determine that SIS has proven such coercion by a preponderance of the evidence, then you must

24  go on to assess the other elements of SIS's tying claim.

25

26

27

28  ───────────

[28] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 2 – Section 1 of the Sherman Act—Tying Arrangements, Instruction 7:  Proof of Conditioning (AM. BAR ASS'N ANTITRUST L. SECTION 2016).

1

<u>Instruction No. 17 Re Restrictions on Unauthorized Third-Party Products and Services Are Not Coercion</u>

2

3

SIS challenges provisions of Intuitive's contracts with customers that restrict the

4

use of unauthorized third-party products and services in connection with the da Vinci system as

5

an unlawful tie. If the seller of a product or service contractually requires its customers to buy

6

another product or service either from the seller or from third parties that seller authorizes, such a

7

contractual provision is not a tying arrangement unless third parties cannot realistically obtain

8

such authorization from the seller. SIS bears the burden of demonstrating that third parties could

9

not realistically obtain authorization from Intuitive and hence that third-party authorization was

10

illusory. If you find that SIS fails to meet this burden, then you must find that SIS has failed to

11

meet its burden of proving coercion and, accordingly, you must find in favor of Intuitive on

12

SIS's tying claim.[29]

13

14

15

16

17

18

19

20

21

[29] *Mozart* v. *Mercedes-Benz*, 593 F. Supp. 1506, 1517 (N.D. Cal. 1984) (citing *United States* v.

22

*Mercedes-Benz of N. Am., Inc.*, 517 F. Supp. 1369, 1383–84 (N.D. Cal. 1981)) (where the defendant asks customers only to work with "authorized" third parties, there is no forcing or

23

coercion unless the option for third parties to become authorized is "illusory"); *see also Ford Motor* v. *GMB Universal Joints*, 1988 WL 82826, at *3 (9th Cir. 1988) ("[a]n approval

24

mechanism must not be illusory") (unpublished disposition) (citing *Mozart*, 593 F. Supp. at 1517); *Photovest* v. *Fotomat*, 606 F.2d 704, 722 (7th Cir. 1979) ("Given the contractual

25

language, which at least provides for the possibility of purchasing processing from non-Fotomat sources, we are reluctant to find a tying arrangement without some evidence that Fotomat

26

applied the contract language so restrictively as to constitute a de facto tying clause. The presence of the illegal condition may be inferred from an extrinsic course of conduct

27

supplementing the written contract, but in the present case Photovest has failed to provide evidence of any conduct from which to infer the tie." (quotation marks and internal citation

28

omitted)).

1    Instruction No. 18 Re Voiding a Warranty Is Not Coercion

2              You have heard testimony that Intuitive's contracts with its hospital customers

3    provide that Intuitive's warranties on its products are voided if the customer uses an

4    unauthorized third-party product or service in connection with the da Vinci system.  Contractual

5    provisions such as these—which existed at the time the customer chose to purchase the product,

6    and which provide that the manufacturer may not honor a warranty if the customer uses

7    unauthorized service providers or unauthorized parts or accessories with the equipment—are not

8    considered to be so coercive to create a tying arrangement.[30]  Thus, you may not consider as

9    evidence of coercion any provision in Intuitive's contracts that would void a warranty if the

10   customer uses an unauthorized third-party product or service.

11

12

13

14

15

16

17

18

---

19   [30] *Virginia Panel Corp.* v. *MAC Panel Co.*, 133 F.3d 860, 870 (Fed. Cir. 1997) ("Voiding a
     warranty on a product already sold, while possibly a breach of warranty, cannot be a tying
20   arrangement because the purchaser is not deciding whether to buy a product."); *Marts* v. *Xerox,
     Inc.*, 77 F.3d 1109, (8th Cir. 1996) ("Although the warranty does condition its continuation on
21   the use of Xerox cartridges, a warranty is only one way of receiving service for a new Xerox
     copier. . . . An owner of a new Xerox copier could forego the benefits of the warranty, buy
22   service from Xerox or an independent provider, and purchase cartridges from the vendor of its
     choice."); *General Motors* v. *Gibson Chem. & Oil Co.*, 786 F.2d 105, 110 (2d Cir. 1986) ("[T]he
23   sale of a GM automobile is not conditioned on the purchase of Dexron II. GM simply
     recommends use of the fluid in its automatic transmissions and cautions that damage to
24   transmissions caused by the use of other fluids may not be covered by the automobile warranty.
     This manufacturer's recommendation is not the degree of coercion necessary to a tying
25   arrangement."); *DSM Desotech Inc.* v. *3D Sys. Corp.*, 2009 WL 174989 (N.D. Ill. Jan. 26, 2009)
     (allegations of enforcing a warranty provision "do not amount to a tie-in" because customers had
26   already purchased their machines "at the time the alleged tie-in was executed"); *Fido's Fences* v.
     *Canine Fence Company.*, 672 F. Supp. 2d 303, 312 (E.D.N.Y. 2009) (holding that "it is well
27   settled that warranties that are not sold as a separate product do not result in consumer coercion
     if the warranty sets forth requirements").
28

Instruction No. 20 Re Existence of Market Power With Respect to the Tying Product[31]

The third element of its tying claim that SIS must prove by a preponderance of the evidence is that Intuitive has sufficient market power in the alleged market for MIST surgical robots to enable Intuitive to restrain competition as to the alleged aftermarket for EndoWrist repair and replacement.

You may find that Intuitive has market power with respect to MIST surgical robots if, by reason of some advantage, Intuitive has the power to raise its prices for MIST surgical robots without losing an appreciable amount of its business, or otherwise has the power to force a purchaser of MIST surgical robots to do something that the purchaser would not do in a more competitive market. The ability to charge higher prices for better products or services, however, is not market power.[32]

SIS may prove power over price with respect to MIST surgical robots by establishing that the price of the tied package is higher than the price of components sold in competitive markets.

In the alternative, you may determine whether Intuitive has market power with respect to MIST surgical robots by considering whether Intuitive has a high share of that market for MIST surgical robots such that purchasers do not have alternative sources of minimally invasive surgical robots or a reasonably interchangeable substitute readily available. If Intuitive's market share of the market for minimally invasive surgical robots is below 30 percent, Intuitive does not have market power. But if Intuitive's market share of the market for MIST surgical robots is above 30 percent, you may consider that in determining whether Intuitive has market power. Whether a high market share is an indicator of Intuitive's power to raise prices without loss of appreciable business is a function of numerous market conditions, including the uniqueness of the product, the ability of existing competitors to expand production, and the ease

---

[31] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 2 – Section 1 of the Sherman Act—Tying Arrangements, Instruction 8: Existence of Market Power with Respect to the Tying Product (AM. BAR ASS'N ANTITRUST L. SECTION 2016).

[32] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 1 – Sherman Act—General, Instruction 3B: Rule of Reason – Proof of Competitive Harm (AM. BAR ASS'N ANTITRUST L. SECTION 2016).

1    (or difficulty) with which new competitors can enter the market and make a price increase

2    unprofitable.  If you find that purchasers of MIST surgical robots do not have readily available

3    alternative sources of supply and are forced as a practical matter to buy MIST surgical robots,

4    you may find that Intuitive has market power.  You may also consider in your market power

5    determination the presence of any unique features or costs associated with MIST surgical robots

6    that effectively prevent others from offering a comparable product

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANT'S PROPOSED JURY INSTRUCTIONS
Case No. 3:21-cv-03496-AMO

Instruction No. 21 Re Foreclosure of a Substantial Volume of Commerce With Respect to the Tied Product[33]

      If you determine that da Vinci surgical robots and EndoWrist repair and replacement are separate products that have been tied to one another, and that Intuitive has market power for MIST surgical robots, then you must determine whether SIS has proven that Intuitive has foreclosed a substantial amount of interstate commerce with respect to EndoWrist repair and replacement.

      In determining whether Intuitive has foreclosed a substantial amount of commerce with respect to EndoWrist repair and replacement, you should first consider the total dollar amount of Intuitive's sales of repaired and replacement EndoWrists achieved by the tying arrangement in absolute terms.

      If the dollar amount of Intuitive's sales of repaired and replacement EndoWrists was substantial, you should next consider whether there has been a substantial adverse effect on competition with respect to EndoWrist repair and replacement due to the tying arrangement. If there was not a substantial adverse effect on competition with respect to EndoWrist repair and replacement due to the tying arrangement, then you must find in favor of Intuitive on the tying claim.

      There is no substantial foreclosure if only a small percentage of sales in the alleged aftermarket for EndoWrist repair and replacement were affected by the tying arrangement. There also is no substantial foreclosure if you find that purchasers would not have bought EndoWrist repair or replacement at all in the absence of the tying arrangement. If you determine that SIS has failed to prove by a preponderance of the evidence that Intuitive foreclosed a substantial amount of commerce with respect to EndoWrist repair and replacement, then you must find for Intuitive on SIS's tying claim. If you determine that SIS has proved foreclosure of a substantial amount of commerce, then you must go on to assess the other elements of SIS's tying claim.

---

[33] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 2 Section 1 of the Sherman Act—Tying Arrangements, Instruction 9: Foreclosure of a Substantial Volume of Commerce with Respect to the Tied Product (AM. BAR ASS'N ANTITRUST L. SECTION 2016).

<u>Instruction No. 24 Re Substantial Harm to Competition[34]</u>

As I mentioned, to prove that the alleged tie is unreasonable, SIS first must demonstrate that the tie has resulted in a substantial harm to competition. Although it may be relevant to the inquiry, harm that occurs merely to the individual business of SIS is not sufficient, by itself, to demonstrate harm to competition generally. That is, harm to a single competitor or group of competitors does not necessarily mean that there has been harm to competition.

Furthermore, SIS must show that the harm to competition occurred in the alleged aftermarket for EndoWrist repair and replacement.  It is SIS's burden to prove the existence of a relevant market.  I instructed you earlier on how to make this assessment.

If you find that SIS has proven the existence of a relevant market, then you must determine whether SIS also has proven that the challenged restraints have had a substantial harmful effect on competition in that market. A harmful effect on competition, or competitive harm, refers to a reduction in competition that results in the loss of some of the benefits of competition, such as lower prices, increased output, or higher product quality.  It is not enough that the conduct at issue has the effect of reducing consumers' choices or increasing prices to consumers.[35]  If the challenged conduct has not resulted in higher prices, decreased output, lower quality, or the loss of some other competitive benefit, then there has been no competitive harm, and you should find that the challenged conduct was not unreasonable.

In determining whether the challenged restraints have produced competitive harm, you may look at the following factors:

- the effect of the restraints on prices, output, product quality, and service;

- the purpose and nature of the restraint;

- the nature and structure of the relevant market;

---

[34] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 1 – Sherman Act—General, Instruction 3B:  Rule of Reason – Proof of Competitive Harm (AM. BAR ASS'N ANTITRUST L. SECTION 2016).
[35] Dkt. 204 at 17 (quoting *FTC*  v. *Qualcomm, Inc.*, 969 F.3d 974, 993–94 (9th Cir. 2020) (quoting *Brantley* v. *NBC Universal, Inc.*, 675 F.3d 1192, 1202 (9th Cir. 2012))).

1

2

3

4

5

6

7

8

9

10

- the number of competitors in the relevant market and the level of competition among them, both before and after the restraint was imposed; and

- whether Intuitive possesses market power (a concept on which I have previously instructed you).

If you find that SIS has failed to prove a substantial competitive harm by a preponderance of the evidence, then you must find for Intuitive on SIS's tying claim. If you find that SIS has proved substantial competitive harm, then you must go on to assess the other elements of SIS's tying claim.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANT'S PROPOSED JURY INSTRUCTIONS
Case No. 3:21-cv-03496-AMO

1    Instruction No. 25 Re Evidence of Competitive Benefits[36]

2           If you find that SIS has proven that the challenged restraints resulted in

3    substantial harm to competition in a relevant market, then you next must determine whether

4    Intuitive has proven that the restraints also benefit competition in other ways. If you find that the

5    challenged restraints do result in competitive benefits, then you also must consider whether the

6    restraint was reasonably necessary to achieve the benefits. If SIS proves that the same benefits

7    could have been readily achieved by other, reasonably available alternative means that create

8    substantially less harm to competition, then they cannot be used to justify the restraint.

9           Antitrust law does not require businesses like Intuitive to use the least restrictive

10   means of achieving a legitimate business purpose.  Any alternative to the challenged conduct

11   presented by SIS must be a substantially—not marginally—less restrictive means for achieving

12   the same procompetitive rationales.  A procompetitive rationale is a nonpretextual claim that a

13   defendant's conduct is indeed a form of competition on the merits because it involves, for

14   example, greater efficiency or enhanced consumer appeal.[37]  To qualify as substantially less

15   restrictive, an alternative means must be virtually as effective in serving the Intuitive's

16   procompetitive purposes without significantly increased cost.[38]

17

18

19

20

21

---

22   [36] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 1 – Sherman Act—General,
     Instruction 3C:  Rule of Reason – Evidence of Competitive Benefits (AM. BAR ASS'N ANTITRUST
23   L. SECTION 2016).
     [37] Dkt. 204 at 17 (quoting *FTC v. Qualcomm Inc.*, 969 F.3d 974, 991 (9th Cir. 2020)).
24   [38] *Epic Games, Inc.* v. *Apple, Inc.*, 67 F.4th 946, 990 (9th Cir. 2023) ("When evaluating proposed
     alternative means, courts must give wide berth to defendants' business judgments and must resist
25   the temptation to require that enterprises employ the least restrictive means of achieving their
     legitimate business objectives. . . . As such, this circuit's test—which the Supreme Court
26   approved in *Alston*—requires a substantially less restrictive alternative." (quotations omitted)
     (citing *Alston*, 141 S. Ct. at 2161, 2163 (2021); *id.* ("To qualify as "substantially less restrictive,"
27   an alternative means "must be 'virtually as effective' in serving the [defendant's] procompetitive
     purposes . . . without significantly increased cost." (citing *Cnty. of Tuolumne* v. *Sonora Cmty.*
28   *Hosp.*, 236 F.3d 1148, 1159 (9th Cir. 2001))).

1    Instruction No. 26 Re Business Justification Defense[39]

2           Intuitive contends that the alleged tying arrangement is justified. If you find that

3    SIS has proven all elements of a tying claim, then you should consider whether Intuitive has

4    proven, by a preponderance of the evidence, a business justification for the tying arrangement.

5    Intuitive has the burden of proof on this issue.

6           Intuitive contends that its contractual restrictions on the unauthorized

7    modification of EndoWrists by third parties are justified by procompetitive patient safety as well

8    as business reasons including, for example, that:  Intuitive's da Vinci system was designed to

9    work with Intuitive's proprietary EndoWrist instruments; the use of EndoWrist instruments

10   beyond the number of lives specified in their Instructions for Use and cleared by the FDA

11   presents serious risks to health and safety of patients; Intuitive has no way to ensure the safety

12   and effectiveness of unauthorized third-party products and services that have not been cleared by

13   the FDA; by posing risks to patient health and safety, the use of unauthorized third-party

14   products and services with the da Vinci surgical system also poses a risk to Intuitive's reputation

15   in the marketplace and would expose Intuitive to additional costs and liability that Intuitive's

16   contracts help to avoid; and allowing unauthorized third parties to modify Intuitive's EndoWrists

17   would permit such third parties to "free ride" on Intuitive's goodwill and the substantial

18   investments Intuitive has made in developing and creating the da Vinci surgical system.[40]

19           In determining whether the tying arrangement is justified, you must decide

20   whether it serves a legitimate business purpose of Intuitive.  In making this determination, you

21

22   [39] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 2  Section 1 of the Sherman
     Act—Tying Arrangements, Instruction 11:  Business Justification Defense (AM. BAR ASS'N
23   ANTITRUST L. SECTION 2016).
     [40] *See Cont'l T. V., Inc.* v. *GTE Sylvania Inc.*, 433 U.S. 36, 55 n.23 (1977) (recognizing
24   legitimate justifications arising from federal and state laws requiring "that manufacturers assume
     direct responsibility for the safety and quality of their products"); *Hobart-Mayfield, Inc.* v.
25   *National Operating Commission on Standards for Athletic Equipment*, 48 F.4th 656, 669–70 (6th
     Cir. 2022) (because helmet manufacturer served a "market that places high regard on the safety
26   and warranty of its products," it had a "legitimate business interest" in "desir[ing] to protect their
     reputations and sell safe products"); *HDC Medical Inc.* v. *Minntech Corporation*, 474 F.3d 543,
27   549–50  (8th Cir. 2007) (since manufacturer could not "predict how its machines would react" to
     competitors' solutions, it was right to "believe[] that it could not feasibly warrant the
28   performance of the product").

should consider whether the justification Intuitive offers is the real reason that it imposed the tying arrangement.  A legitimate business purpose is one that benefits the actor regardless of any harmful effect on competitors, such as a purpose to promote efficiency or quality, offer a better product or service, or increase short-run profits. This inquiry does not turn on an assessment of Intuitive's subjective intent, but instead whether Intuitive's policies and practices have an objective justification.

You must also consider whether Intuitive's claimed objective could reasonably have been realized through substantially less restrictive means.[41]  Even if some type of constraint is necessary to promote a legitimate business interest, Intuitive must not adopt a constraint that is more restrictive than reasonably necessary to achieve that interest.

In determining whether Intuitive's claimed objective could reasonably have been achieved through substantially less restrictive means, you may assess such factors as whether other means to achieve Intuitive's objective were more or less expensive and more or less effective than the means chosen by Intuitive.

If you find that Intuitive could reasonably have achieved its legitimate business purpose by substantially less restrictive means, then you may find that there was no business justification and find for SIS on the tying claim.  If you find that the alleged tying arrangement serves a legitimate business purpose of Intuitive, and that there are not substantially less restrictive means reasonably available to achieve that purpose, then you must find for Intuitive and against SIS on the tying claim.

---

[41] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 2  Section 1 of the Sherman Act—Tying Arrangements, Instruction 11:  Business Justification Defense (AM. BAR ASS'N ANTITRUST L. SECTION 2016) (modified to add the word "substantially" before "less restrictive means," *see Nat'l Collegiate Athletic Ass'n* v. *Alston*, 594 U.S. 69, 100–101 (2021) ("In this suit, as in any, the district court had to determine whether the defendants' agreements harmed competition and whether any procompetitive benefits associated with their restraints could be achieved by 'substantially less restrictive alternative' means."); *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 985–86, 990 (9th Cir. 2023) ("[T]his circuit's test—which the Supreme Court approved in *Alston*—requires a '*substantially* less restrictive' alternative." (emphasis in original; citation omitted)).

## C.    SIS's Exclusive Dealing Claim

Instruction No. 28 Re Elements of Exclusive Dealing[42]

SIS also claims that Intuitive engaged in unlawful exclusive dealing.  Intuitive denies this claim.

Exclusive dealing arrangements require a buyer of a product or service to obtain that product or service exclusively from one supplier for a period of time. Exclusive dealing arrangements are analyzed under the rule of reason to determine if they result in a substantial and unreasonable harm to competition in a relevant market.  From the standpoint of either the buyer or the seller, exclusive dealing arrangements may have potential procompetitive effects that benefit consumers and that need to be weighed against the potential anticompetitive effects of foreclosing competing suppliers' access to the buyer and the buyer's access to competing suppliers' products and services.

To establish that an exclusive dealing arrangement violates the Sherman Act, SIS must establish each of the following elements by a preponderance of the evidence:

(1) agreements between Intuitive and its customers that totally foreclose customers from purchasing EndoWrist repair or replacement from competing suppliers;

(2) the agreements were an unreasonable restraint of trade that resulted in a substantial adverse effect on competition in the alleged aftermarket for EndoWrist repair and replacement;

(3) Intuitive had substantial market power in the alleged aftermarket for EndoWrist repair and replacement;

and

(4) SIS was injured in its business or property because of the agreements.

---

[42] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 2 – Section 1 of the Sherman Act—Vertical Restraints, Instruction 5:  Elements of Exclusive Dealing (AM. BAR ASS'N ANTITRUST L. SECTION 2016) (modified to remove instructions regarding there being "several forms" of exclusive dealing arrangements, because the particular alleged exclusive dealing arrangement has been defined by SIS and thus other examples of exclusive dealing arrangements are irrelevant in this case).

1

2

3

4

If you find that the evidence is insufficient to prove any one or more of these elements, then you must find for Intuitive and against SIS on SIS's exclusive dealing claim. If you find that the evidence is sufficient to prove all four elements, then you must find for SIS and against Intuitive on SIS's exclusive dealing claim.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANT'S PROPOSED JURY INSTRUCTIONS
Case No. 3:21-cv-03496-AMO

1

<u>Instruction No. 29 Re Restrictions on Unauthorized Third-Party Products and Services Are Not Exclusive Dealing</u>

2

3    SIS challenges provisions of Intuitive's contracts with customers that restrict the

4    use of unauthorized third-party products and services in connection with the da Vinci system as

5    unlawful exclusive dealing. If the seller of a product or service contractually requires its

6    customers to buy another product or service either from the seller or from third parties that seller

7    authorizes, such a contractual provision is not an exclusive dealing arrangement unless third

8    parties cannot realistically obtain such authorization from the seller. SIS bears the burden of

9    demonstrating that third parties could not realistically obtain authorization from Intuitive and

10   hence that third-party authorization was illusory. If you find that SIS fails to meet this

11   burden, then you must find in favor of Intuitive on SIS's tying claim.[43]

12

13

14

15

16

17

18

19

20

21   ─────────────────
[43] *See Mozart* v. *Mercedes-Benz*, 593 F. Supp. 1506, 1517 (N.D. Cal. 1984) (citing *United States*

22   v. *Mercedes-Benz of N. Am., Inc.*, 517 F. Supp. 1369, 1383–84 (N.D. Cal. 1981)) (where the
     defendant asks customers only to work with "authorized" third parties, there is no forcing or

23   coercion unless the option for third parties to become authorized is "illusory"); *see also Ford Motor* v. *GMB Universal Joints*, 1988 WL 82826, at *3 (9th Cir. 1988) ("[a]n approval

24   mechanism must not be illusory") (unpublished disposition) (citing *Mozart*, 593 F. Supp. at
     1517); *Photovest* v. *Fotomat*, 606 F.2d 704, 722 (7th Cir. 1979) ("Given the contractual

25   language, which at least provides for the possibility of purchasing processing from non-Fotomat
     sources, we are reluctant to find a tying arrangement without some evidence that Fotomat

26   applied the contract language so restrictively as to constitute a de facto tying clause. The
     presence of the illegal condition may be inferred from an extrinsic course of conduct

27   supplementing the written contract, but in the present case Photovest has failed to provide
     evidence of any conduct from which to infer the tie." (quotation marks and internal citation

28   omitted)).

Instruction No. 30(a) Re Substantial Adverse Effect on Competition[44]

In determining whether Intuitive's agreements with its customers had a substantially harmful effect on competition in the alleged aftermarket for EndoWrist repair and replacement, you should consider the nature and history of the use of exclusive dealing contracts in the industry, whether buyers of Intuitive's products have independent reasons for entering into exclusive dealing contracts or were coerced into entering into them, whether other competing suppliers also offer exclusive dealing contracts, the extent of competition among competing suppliers for exclusive dealing contracts with buyers, Intuitive's position in the marketplace, the competitive alternatives to Intuitive's products, the reasons Intuitive and its customers entered into the contracts at issue, and the effect of the use of exclusive dealing contracts on the ability of new firms to enter the market and on price and other competition in the market.  It is not enough that the conduct at issue has the effect of reducing consumers' choices or increasing prices to consumers.[45]

You also should consider whether the buyer is the final end user of the product.  If the buyer is the final end user, the exclusive dealing contract forecloses competitors from that portion of the market represented by the buyer's purchases and makes it more likely that competition may be harmed if the buyer represents a substantial portion of the market.  On the other hand, if the buyer is a distributor or reseller, and there are other alternatives for competing sellers to market their products to end users, then an exclusive dealing arrangement may not foreclose competitors' access to the market and, thus, not substantially harm competition.

If you find that Intuitive's contracts did not have a substantial adverse effect on competition in the alleged aftermarket for EndoWrist repair and replacement, then you must find for Intuitive on SIS's exclusive dealing claim.  If you find that Intuitive's contracts did have a

---

[44] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 2 – Section 1 of the Sherman Act—Vertical Restraints, Instruction 6:  Exclusive Dealing – Additional Considerations (AM. BAR ASS'N ANTITRUST L. SECTION 2016).
[45] Dkt. 204 at 17 (quoting *FTC* v. *Qualcomm, Inc.*, 969 F.3d 974, 993–94 (9th Cir. 2020) (quoting *Brantley* v. *NBC Universal, Inc.*, 675 F.3d 1192, 1202 (9th Cir. 2012))).

substantial adverse effect on competition in the alleged aftermarket for EndoWrist repair and

replacement, then you must assess the other elements of SIS's exclusive dealing claim.

Instruction No. 30(b) Re Substantial Foreclosure of Competition[46]

In determining the extent to which Intuitive's exclusive dealing contracts foreclosed competition on the merits, it is relevant to consider the percentage of the market foreclosed and the length of the foreclosure. Where the exclusive dealing contracts foreclosed less than 30–40 percent of the market, this indicates that the harm from the foreclosure of competition was not substantial because there are alternatives available. Similarly, the shorter the duration of the contract, the less likely it is to harm competition. The longer the contract's duration, the more likely that the harm to competition will be greater, unless it is clear that there was vigorous competition on the merits to win the longer contract or the buyer as a practical matter can terminate the agreement on short notice without cause and without significant penalty. In such a case, the stated length of the exclusive contract is not the period in which it has a competitive effect.

---

[46] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 2  Section 1 of the Sherman Act—Vertical Restraints, Instruction 6:  Exclusive Dealing – Additional Considerations (AM. BAR ASS'N ANTITRUST L. SECTION 2016) (modified to change the threshold from "20 percent" to "30–40 percent," which is consistent with prevailing caselaw, *see, e.g.*, *Omega Env't, Inc.* v. *Gilbarco, Inc.*, 127 F.3d 1157, 1162–65 (9th Cir. 1997) ("Although 38% [foreclosure] appears significant, . . . we conclude that it considerably overstates the size of the foreclosure and its likely anticompetitive effect for several reasons." (citation and internal quotation marks omitted)); *Sterling Merchandising, Inc.* v. *Nestle, S.A.*, 656 F.3d 112, 123–24 (1st Cir. 2011) ("[I]n applying the rule of reason calculus to exclusive dealing arrangements, foreclosure levels are unlikely to be of concern where they are less than 30 or 40 percent, and while high numbers do not guarantee success for an antitrust claim, low numbers make dismissal easy."); *Valley Prods. Co.* v. *Landmark*, 128 F.3d 398, 402 n.3 (6th Cir. 1997) (federal courts "hav[e] repeatedly held that a 30 percent market share is insufficient to confer . . . market power"); *United States* v. *Microsoft Corp.*, 87 F. Supp. 2d 30, 52–53 (D.D.C. 2000) (foreclosure rate closer to 40 percent is required before an exclusive contract raises competitive concerns); *Union Carbide Corp.* v. *Montell N.V.*, 27 F. Supp. 2d 414, 417 (S.D.N.Y. 1998) (foreclosure percentage in the 30 percent range is the point at which firms are "presumptively incapable of exercising market power"); ABA, 1 ANTITRUST LAW DEVELOPMENTS, ch. 1 § D.2 (Vertical Restraints on Interbrand Competition) at n.1432 & accompanying text ("Although foreclosure of 20 to 30 percent was a gray area before *Jefferson Parish* [*Hospital District No. 2* v. *Hyde*, 466 U.S. 2 (1984)], the concurring opinion in *Jefferson Parish*, which found exclusive dealing lawful without detailed analysis when 30 percent of the market was foreclosed, has led many courts to hold that higher market share thresholds are a prerequisite to finding exclusive dealing unlawful--and even then, a finding that the arrangement is anticompetitive is not a foregone conclusion.").

1   Instruction No. 32 Re Market Power[47]

2           To prevail on its exclusive dealing claim, SIS must prove by a preponderance of

3   the evidence that Intuitive had substantial power in the alleged aftermarket for EndoWrist repair

4   and replacement.  If Intuitive does not possess market power, then there cannot be substantial

5   harm to competition from Intuitive's contracts, and you must find for Intuitive on this claim.

6           A firm that possesses market power generally can charge higher prices for the

7   same goods or services that a firm in the same market that does not possess market power.  The

8   ability to charge higher prices for better products or services, however, is not market power.  An

9   important factor in determining whether Intuitive possesses market power is its market share,

10  that is, its percentage of the products or services sold in the relevant market by all competitors.

11  Other factors that you may consider in determining whether Intuitive has market power include

12  market share trends, the existence of barriers to entry (that is, how difficult is it for other

13  producers to enter the market and begin competing with defendant for sales), the entry and exit

14  by other companies, and the number and size of actual competitors or potential competitors.

15          If you decide that the buyers are sophisticated businesses themselves which had

16  countervailing power in negotiating contracts, this may offset any market power Intuitive might

17  otherwise have.  If SIS cannot show that Intuitive had the power to force buyers to enter into

18  exclusive contracts they did not want, this would be an indication that Intuitive lacks market

19  power.

20          If you find that SIS has not proved by a preponderance of the evidence that

21  Intuitive possesses substantial market power in the alleged aftermarket for EndoWrist repair and

22  replacement, then you must find for Intuitive on SIS's exclusive dealing claim.  If you do find

23  that SIS has proved that Intuitive possesses substantial market power in the alleged aftermarket

24

25

26  ───────────────────────
    [47] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 2 – Section 1 of the Sherman

27  Act—Vertical Restraints, Instruction 6:  Exclusive Dealing – Additional Considerations (AM.
    BAR ASS'N ANTITRUST L. SECTION 2016); MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST

28  CASES, Chapter 1  Sherman Act—General, Instruction 3B:  Rule of Reason – Proof of
    Competitive Harm (AM. BAR ASS'N ANTITRUST L. SECTION 2016).

1  for EndoWrist repair and replacement, then you must go on to assess the other elements of SIS's

2  exclusive dealing claim.

1  Instruction No. 33 Re Evidence of Competitive Benefits[48]

2          If you find that SIS has proven that Intuitive's agreements with its customers

3  constitute exclusive dealing arrangements that resulted in substantial harm to competition in the

4  alleged aftermarket for EndoWrist repair and replacement, then you next must determine

5  whether Intuitive's agreements also benefit competition in other ways.  If you find that the

6  exclusive dealing arrangements do result in competitive benefits, then you also must consider

7  whether those restraints were reasonably necessary to achieve the benefits.  If SIS proves that the

8  same benefits could have been readily achieved by other, reasonably available means that create

9  substantially less harm to competition, then they cannot be used to justify the restraint.

10          Antitrust law does not require businesses like Intuitive to use the least restrictive

11  means of achieving a legitimate business purpose.  Any alternative to the challenged conduct

12  presented by SIS must be a substantially—not marginally—less restrictive means for achieving

13  the same procompetitive rationales.  A procompetitive rationale is a nonpretextual claim that a

14  defendant's conduct is indeed a form of competition on the merits because it involves, for

15  example, greater efficiency or enhanced consumer appeal.[49]  To qualify as substantially less

16  restrictive, an alternative means must be virtually as effective in serving the Intuitive's

17  procompetitive purposes without significantly increased cost.[50]

18

19

20

21

---

22  [48] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 1  Sherman Act—General, Instruction 3C:  Rule of Reason – Evidence of Competitive Benefits (AM. BAR ASS'N ANTITRUST L. SECTION 2016).

23  [49] Dkt. 204 at 17 (quoting *FTC v. Qualcomm Inc.*, 969 F.3d 974, 991 (9th Cir. 2020)).

24  [50] *Epic Games, Inc.* v. *Apple, Inc.*, 67 F.4th 946, 990 (9th Cir. 2023) ("When evaluating proposed alternative means, courts must give wide berth to defendants' business judgments and must resist the temptation to require that enterprises employ the least restrictive means of achieving their

25  legitimate business objectives. . . . As such, this circuit's test—which the Supreme Court approved in *Alston*—requires a substantially less restrictive alternative." (quotations omitted)

26  (citing *Alston*, 141 S. Ct. at 2161, 2163 (2021); *id.* ("To qualify as "substantially less restrictive," an alternative means "must be 'virtually as effective' in serving the [defendant's] procompetitive

27  purposes . . . without significantly increased cost." (citing *Cnty. of Tuolumne* v. *Sonora Cmty.*

28  *Hosp.*, 236 F.3d 1148, 1159 (9th Cir. 2001))).

- 44 -

1

## III.    ANTITRUST SECTION 2 OF THE SHERMAN ACT

2

Instruction No. 34 Re Sherman Act Section 2 Claims

3

SIS asserts that Intuitive violated Section 2 of the Sherman Act by monopolizing

4

or attempting to monopolize the alleged aftermarket for EndoWrist repair and replacement.[51]  I

5

will now instruct you on the elements of each of these claims.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

[51] 15 U.S.C. § 2; Complaint (Dkt. 1) ¶¶ 118, 121.

1

**A.      Section 2 Monopolization**

2

Instruction No. 35 Re Elements of Monopolization[52]

3

SIS alleges that it was injured by Intuitive's unlawful monopolization of the

4

alleged aftermarket for EndoWrist repair and replacement. To prevail on this claim, SIS must

5

prove each of the following elements by a preponderance of the evidence:

6

(1)      the alleged aftermarket for EndoWrist repair and replacement is a valid

7

antitrust market;

8

(2)      Intuitive possessed monopoly power in the alleged aftermarket for

9

EndoWrist repair and replacement;

10

(3)      Intuitive willfully acquired or maintained monopoly power in the alleged

11

aftermarket for EndoWrist repair and replacement by engaging in

12

anticompetitive conduct; and

13

(4)      SIS was injured in its business or property because of Intuitive's

14

anticompetitive conduct.

15

If you find that SIS has failed to prove any of these elements, then you must find

16

for Intuitive and against SIS on this claim. If you find that SIS has proved each of these elements

17

by a preponderance of the evidence, then you must find for SIS against Intuitive on this claim.

18

19

20

21

22

23

24

25

26

27

28

---

[52] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 3 – Section 2 of the Sherman Act—Monopolization–General, Instruction 1:  Elements (AM. BAR ASS'N ANTITRUST L. SECTION 2016) (modified to remove the element that the alleged anticompetitive conduct "occurred in or affected interstate commerce," which is not contested).

1  Instruction No. 36 Re Monopolization – Relevant Product Market

2  I have previously instructed you on the standards for identifying a relevant

3  market.  For its monopolization claim, SIS contends that the relevant product market is

4  EndoWrist repair and replacement, while Intuitive contends that SIS has failed to allege the

5  proper relevant product market.  If you find that SIS has proven its proposed relevant product

6  market, then you should continue to evaluate the remainder of SIS's monopolization claim.

7  However, if you find that SIS has failed to prove such a market, then you must find in Intuitive's

8  favor on this claim.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  Instruction No. 37 Re Monopoly Power Defined

2        To prove its monopolization claim, SIS must prove that Intuitive has monopoly

3  power in the alleged aftermarket for EndoWrist repair and replacement.

4        Monopoly power is the power to control prices, restrict output, and exclude

5  competition in a relevant antitrust market.  More precisely, a firm is a monopolist if it can

6  profitably raise prices substantially above the competitive level for a significant period of time.

7  However, possession of monopoly power, in and of itself, is not unlawful.[53]  Monopoly power

8  can be lawfully acquired and maintained through growth or development as a consequence of a

9  superior product, business acumen, or historic accident.[54]

10        I will now provide further instructions about how you may determine whether SIS

11  has met its burden of proving monopoly power in the alleged aftermarket for EndoWrist repair

12  and replacement.  There are two ways for SIS to prove that Intuitive had monopoly power in a

13  relevant market.  SIS may prove monopoly power through direct evidence of restricted output

14  and supracompetitive prices, or through indirect evidence that Intuitive has a dominant market

15  share in the relevant antitrust market and consideration of other characteristics of the relevant

16  market.  I will explain these in turn.[55]

17        If, after considering the direct and indirect evidence, you find SIS has failed to

18  prove by a preponderance of the evidence that Intuitive has monopoly power in the alleged

19  aftermarket for EndoWrist repair and replacement, then you must find for Intuitive on SIS's

20  monopolization claim.  If you find that SIS has proved that Intuitive has monopoly power in the

21  alleged aftermarket for EndoWrist repair and replacement, then you must assess the other

22  elements of SIS's monopolization claim.

23

24  [53] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 3 Section 2 of the – Sherman
    Act—Monopolization-General, Instruction 2:  Monopoly Power Defined (AM. BAR ASS'N
25  ANTITRUST L. SECTION 2016).
    [54] *Epic Games* v. *Apple, Inc.*, 67 F.4th 946, 998 (9th Cir. 2023) ("A Section 2 monopolization
26  claim 'has two elements: (1) the possession of monopoly power in the relevant market and (2)
27  the willful acquisition or maintenance of that power as distinguished from growth or
    development as a consequence of a superior product, business acumen, or historic accident.'"
28  (quoting *United States* v. *Grinnell Corp.*, 384 U.S. 563, 570–71 (1966)).
    [55] *See infra* Stipulated Jury Instruction No. 34; Stipulated Jury Instruction No. 35.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1    Instruction No. 38 Re Monopoly Power – Direct Evidence[56]

2            One way that SIS may prove monopoly power to control prices and exclude

3    competition  is through direct evidence that Intuitive has the ability to raise or maintain the prices

4    that it charges for goods or services in the alleged aftermarket for EndoWrist repair and

5    replacement substantially above the competitive levels for a significant period of time.

6            SIS has the burden of proving that Intuitive has the ability to raise or maintain the

7    prices that it charges for goods or services in the alleged aftermarket for EndoWrist repair and

8    replacement above competitive levels, and to restrict output in that market.[57] SIS must prove that

9    Intuitive has the power to do so by itself—that is, without the assistance of, and despite

10   competition from, any existing or potential competitors.

11           SIS must also prove that Intuitive has the power to maintain prices above a

12   competitive level and restrict output for a significant period of time. If Intuitive attempted to

13   maintain prices above competitive levels, but would lose so much business to other competitors

14

15

---

16   [56] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 3  Section 2 of the Sherman
     Act—Monopolization–General, Instruction 8:  Existence of Monopoly Power – Direct Proof
17   (AM. BAR ASS'N ANTITRUST L. SECTION 2016).
     [57] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 3  Section 2 of the Sherman
18   Act—Monopolization–General, Instruction 8:  Existence of Monopoly Power – Direct Proof
     (AM. BAR ASS'N ANTITRUST L. SECTION 2016) (modified to specify that direct proof requires
19   showing supracompetitive prices and restricted output, *see, e.g.*, *Rebel Oil Co., Inc.* v. *Atl.
     Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995) ("Market power may be demonstrated through
20   either of two types of proof. One type of proof is direct evidence of the injurious exercise of
     market power. If the plaintiff puts forth evidence of restricted output and supracompetitive
21   prices, that is direct proof of the injury to competition which a competitor with market power
     may inflict, and thus, of the actual exercise of market power." (citing *FTC v. Ind. Fed'n of
22   Dentists*, 476 U.S. 447, 460–61 (1986))); *Forsyth* v. *Humana, Inc.*, 114 F.3d 1467, 1475 (9th Cir.
23   1997) ("Direct proof of market power may be shown by evidence of restricted output and
     supracompetitive prices."); *Theme Promotions, Inc.* v. *News Amer. Mktg. FSI*, 546 F.3d 991,
24   1001 (9th Cir. 2008) ("Evidence of restricted output and supracompetitive prices is direct
     evidence of market power . . ."); *Safeway Inc.* v. *Abbott Lab'ys*, 761 F. Supp. 2d 874, 887 (N.D.
25   Cal. 2011) ("To prove monopoly power directly, supracompetitive pricing must be accompanied
26   by restricted output. . . .  Both are required to prove monopoly power directly."); *CoStar Grp.,
     Inc.* v. *Com. Real Est. Exch. Inc.*, 2023 WL 2468742, at *5 (N.D. Cal. Feb. 23, 2023) ("[D]irect
27   evidence of the injurious exercise of market power . . . is evidence of restricted output and
     supracompetitive prices."); *Epic Games, Inc.* v. *Apple Inc.*, 559 F. Supp. 3d 898, 1031 (N.D. Cal.
28   2021) (lack of evidence of restricted output "fatal in demonstrating monopoly power")).

1  that the price increase would become unprofitable and would have to be withdrawn, then

2  Intuitive does not have monopoly power.

3          Similarly, SIS must prove that Intuitive has the ability to exclude competition. For

4  example, if Intuitive attempted to maintain prices above competitive levels, but new competitors

5  could enter the market for EndoWrist repair and replacement or existing competitors could

6  expand their sales and take so much business that the price increase would become unprofitable

7  and would have to be withdrawn, then Intuitive does not have monopoly power. The ability to

8  earn high profit margins or a high rate of return does not necessarily mean that Intuitive has

9  monopoly power. Other factors may enable a company without monopoly power to sell at higher

10  prices or earn higher profit margins than its competitors, such as superior products or services,

11  low costs, or superior advertising or marketing. In analyzing whether supracompetitive pricing

12  was present, you may also consider Intuitive's total fixed costs, including capital costs and

13  research and development.[58]  However, an ability to sell at higher prices or earn higher profit

14  margins than other companies for similar goods or services over a long period of time may be

15  evidence of monopoly power. By contrast, evidence that Intuitive would lose a substantial

16  amount of sales if it raised prices substantially, or that Intuitive's profit margins were low

17  compared to its competitors, or that Intuitive's margins go up and down or are steadily

18  decreasing, might be evidence that Intuitive does not have monopoly power.

19

20

21

---

22  [58] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 3  Section 2 of the Sherman
   Act—Monopolization–General, Instruction 8:  Existence of Monopoly Power – Direct Proof
23  (AM. BAR ASS'N ANTITRUST L. SECTION 2016) ("expand or contract list as appropriate"); *In re
   Remeron Direct Purchaser Antitrust Litig.*, 367 F. Supp. 2d 675, 681 n.10 (D.N.J. 2005)
24  ("[W]ithout evidence that sheds light on material factors such as [defendant's] price relative to
   its total costs (marginal and fixed) . . . , monopoly power cannot be found as a matter of law.");
25  *United States v. Eastman Kodak Co.*, 63 F.3d 95, 109 (2d Cir. 1995) ("Certain deviations
   between marginal cost and price, such as those resulting from high fixed costs, are not evidence
26  of market power."); 2B Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of
   Antitrust Principles and Their Application* ¶516g (4th ed. 2014 & Supp. 2021) ("No matter how
27  accurately measured, of course, a substantial excess of price over marginal cost does not
   necessarily bring excess returns on investment.  A firm generates excess profit only if price
28  exceeds its average total cost, including its cost of capital.").

Instruction No. 39 Re Monopoly Power – Indirect Evidence[59]

Another way that SIS may prove monopoly power in the alleged aftermarket for EndoWrist repair and replacement is through indirect evidence of monopoly power such as Intuitive's market share, market share trends, barriers to entry, entry and exit by other companies, and the number and size of other competitors.  If this evidence establishes that Intuitive has the power to control prices and exclude competition in the alleged aftermarket for EndoWrist repair and replacement, then you may conclude that Intuitive has monopoly power in the market.

*Market Share*

The first factor that you should consider is Intuitive's share of the alleged aftermarket for EndoWrist repair and replacement. Based on the evidence that you have heard about Intuitive's market share, you should determine Intuitive's market share as a percentage of total sales in the alleged aftermarket for EndoWrist repair and replacement. Intuitive must have a significant share of the market in order to possess monopoly power.

In evaluating whether the percentage of market share supports a finding of monopoly power, you also should consider other aspects of the alleged aftermarket for EndoWrist repair and replacement, such as market share trends, the existence of barriers to entry (that is, how difficult is it for other producers to enter the market and begin competing with Intuitive for sales), the entry and exit by other companies, and the number and size of competitors. Along with Intuitive's market share, these factors should inform you as to whether Intuitive has monopoly power.  The higher the company's share, the higher the likelihood that a company has monopoly power.

A market share below 50 percent is ordinarily not sufficient to support a conclusion that Intuitive has monopoly power. However, if you find that the other evidence

---

[59] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 3  Section 2 of the Sherman Act—Monopolization–General, Instruction 7:  Existence of Monopoly Power – Indirect Proof (AM. BAR ASS'N ANTITRUST L. SECTION 2016).

demonstrates that Intuitive does, in fact, have monopoly power despite having a market share below 50 percent, you may conclude that Intuitive has monopoly power.

*Market Share Trends*

The trend in Intuitive's market share is something you may consider. An increasing market share may strengthen an inference that a company has monopoly power, particularly where that company has a high market share, while a decreasing share might show that a company does not have monopoly power.

*Barriers to Entry*

You may also consider whether there are barriers to entry into the alleged aftermarket for EndoWrist repair and replacement. Barriers to entry make it difficult for new competitors to enter the market in a meaningful and timely way. Barriers to entry might include intellectual property rights (such as patents or trade secrets), the large financial investment required to build a plant or satisfy governmental regulations, specialized marketing practices, and the reputation of the companies already participating in the market (or the brand name recognition of their products).

Evidence of low or no entry barriers may be evidence that Intuitive does not have monopoly power, regardless of Intuitive's market share, because new competitors could enter easily if Intuitive attempted to raise prices or restrict output for a substantial period of time. By contrast, evidence of high barriers to entry along with high market share may support an inference that Intuitive has monopoly power.

*Entry and Exit by Other Companies*

The history of entry and exit in the alleged aftermarket for EndoWrist repair and replacement may be helpful to consider. Entry of new competitors or expansion of existing competitors may be evidence that Intuitive lacks monopoly power.  On the other hand, departures from the market, or the failure of firms to enter the market, particularly if prices and profit margins are relatively high, may support an inference that Intuitive has monopoly power.

DEFENDANT'S PROPOSED JURY INSTRUCTIONS
Case No. 3:21-cv-03496-AMO

*Number and Size of Competitors*

You may consider whether Intuitive's competitors are capable of effectively competing. In other words, you should consider whether the financial strength, market shares, and number of competitors act as a check on Intuitive's ability to price its products.  If Intuitive's competitors are vigorous or have large or increasing market shares this may be evidence that Intuitive lacks monopoly power.  On the other hand, if you determine that Intuitive's competitors are weak or have small or declining market shares, this may support an inference that Intuitive has monopoly power.

*Conclusion*

If you find that SIS has not proved by a preponderance of the evidence, whether through direct evidence or indirect evidence, that Intuitive has monopoly power in the alleged aftermarket for EndoWrist repair and replacement, then you must find for Intuitive and against SIS on SIS's monopolization claim.  If you find that SIS has proven by a preponderance of the evidence that Intuitive has monopoly power in the alleged aftermarket for EndoWrist repair and replacement, then you must consider the remaining elements of this claim.

DEFENDANT'S PROPOSED JURY INSTRUCTIONS
Case No. 3:21-cv-03496-AMO

Instruction No. 40 Re Willful Acquisition or Maintenance of Monopoly Power through Anticompetitive Conduct[60]

The next element SIS must prove is that Intuitive willfully acquired or maintained monopoly power through anticompetitive acts or practices.  Anticompetitive acts are acts, other than competition on the merits, that have the effect of preventing or excluding competition or frustrating the efforts of other companies to compete for customers within the alleged aftermarket for EndoWrist repair and replacement. Harm to competition is to be distinguished from harm to a single competitor or group of competitors, which does not necessarily constitute harm to competition.  Some examples of harm to competition include increased prices, decreased production levels, and reduced quality.

Mere possession of monopoly power, if lawfully acquired, does not violate the antitrust laws.  The acquisition or maintenance of monopoly power by supplying better products or services, possessing superior business skills, or because of luck, is not unlawful.

A monopolist may compete aggressively without violating the antitrust laws, and a monopolist may charge monopoly prices without violating the antitrust laws.  It is not enough that the conduct at issue has the effect of reducing consumers' choices or increasing prices to consumers.[61]  A monopolist's conduct only becomes unlawful where it involves anticompetitive acts.

The difference between anticompetitive conduct and conduct that has a legitimate business purpose can be difficult to determine. This is because all companies have a desire to increase their profits and increase their market share. These goals are an essential part of a competitive marketplace, and the antitrust laws do not make these goals—or the achievement of these goals—unlawful, as long as a company does not use anticompetitive means to achieve these goals.

---

[60] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 3  Section 2 of the Sherman Act—Monopolization–General, Instruction 9:  Willful Acquisition or Maintenance of Monopoly Power (AM. BAR ASS'N ANTITRUST L. SECTION 2016).

[61] Dkt. 204 at 17 (quoting *FTC*  v. *Qualcomm, Inc.*, 969 F.3d 974, 993–94 (9th Cir. 2020) (quoting *Brantley* v. *NBC Universal, Inc.*, 675 F.3d 1192, 1202 (9th Cir. 2012))).

1    In determining whether Intuitive's conduct was anticompetitive or whether it was

2    legitimate business conduct, you should determine whether the conduct is consistent with

3    competition on the merits, whether the conduct provides benefits to consumers, and whether the

4    conduct would make business sense apart from any effect it has on excluding competition or

5    harming competitors.

6    For example, suppose there are five firms that make printers for home computers

7    and that these printers comprised a relevant product market. Suppose also that Firm A developed

8    a more efficient manufacturing process that allowed it to sell profitably at a lower price than its

9    competitors. If Firm A grew its market share and achieved monopoly power by selling

10   profitably at a lower price, it would not be unlawful for Firm A to achieve monopoly power in

11   this way. Developing more efficient processes and developing the ability to sell profitably at

12   lower prices is competition on the merits and benefits consumers, and it therefore is not

13   anticompetitive conduct even if it has a negative effect on competitors.

14   Similarly, in the same example, suppose Firm B developed and patented a

15   revolutionary new printer and consumers so preferred Firm B's printer that Firm B achieved

16   monopoly power. It would not be unlawful for Firm B to achieve monopoly power in printers in

17   this way. Firm B "built a better mousetrap," which is competition on the merits and benefits

18   consumers, and it therefore is not anticompetitive conduct.

19   By contrast, in the same example, suppose that Firm C makes printers, but Firm C

20   is the world's only manufacturer of computers and that there are barriers to entry into the

21   computer market such that no other firm will be able to enter that market. Suppose also that Firm

22   C altered its computers in such a way that only Firm C's printers would work with its computers,

23   and that the alteration does not improve the design of Firm C's computers or provide any

24   benefits to competition or consumers. The only effect of the alteration is to exclude competing

25   printer makers from the marketplace. It would be unlawful for Firm C to achieve monopoly

26   power in the printer market in this way.

27   As the example shows, the acts or practices that result in the acquisition or

28   maintenance of monopoly power must represent something more than the conduct of business

that is part of the normal competitive process or commercial success. They must represent conduct that has made it very difficult or impossible for competitors to compete and that was taken for no legitimate business reason. You may not find that a company willfully acquired or maintained monopoly power through anticompetitive means if it has acquired or maintained that power solely through the exercise of superior foresight and skill; or because of natural advantages such as unique geographic access to raw materials or markets; or because of economic or technological efficiency, including efficiency resulting from scientific research; or by obtaining a lawful patent; or because changes in cost or consumer preference have driven out all but one supplier.

If you find that SIS has failed to prove by a preponderance of the evidence that Intuitive willfully acquired or maintained monopoly power in the alleged aftermarket for EndoWrist repair and replacement through anticompetitive acts, then you must must find for Intuitive on SIS's monopolization claim. If, however, you find that SIS has proven this element by a preponderance of the evidence, then you must consider whether SIS has proved the remaining elements of this claim. .

1    Instruction No. 41 Re Design Changes

2            Intuitive had no duty to design or redesign its products in a way that made it

3    easier for third parties to provide their services, and the antitrust laws allow Intuitive to introduce

4    legitimate design changes in its products and phase out older models in favor of new models.[62]

5    A design change that improves a product by providing a benefit to consumers does not violate

6    the antitrust laws absent some other anticompetitive conduct.[63]  The antitrust laws necessarily

7    tolerate product improvements, as such improvements serve the very purpose of the antitrust

8    laws, which is to foster and ensure competition on the merits.[64]  An antitrust challenge to a

9    product design change therefore must fail if the design change is an improvement, unless the

10   monopolist abuses or leverages its monopoly power in some other way when introducing the

11   product.[65]

12           SIS contends that Intuitive violated the antitrust laws by introducing new versions

13   of its da Vinci systems, the X and Xi, that require use of X/Xi EndoWrists with wireless chip

14   technology.  Intuitive contends that the switch from S/Si to X/Xi technology improved its

15   products and provides numerous benefits to surgeons and patients.  If you find that Intuitive's

16

17

---

18   [62] *Cal. Comp. Prods., Inc. v. Int'l Bus. Machs. Corp.*, 613 F.2d 727, 744 (9th Cir. 1979) ("IBM,

19   assuming it was a monopolist, had the right to redesign its products to make them more attractive
     to buyers whether by reason of lower manufacturing cost and price or improved performance. It

20   was under no duty to help CalComp or other peripheral equipment manufacturers survive or
     expand. IBM need not have provided its rivals with disk products to examine and copy, nor have

21   constricted its product development so as to facilitate sales of rival products. The reasonableness
     of IBM's conduct in this regard did not present a jury issue.").

22   [63] *Allied Orthopedic Appliances, Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 998–1002 (9th

23   Cir. 2010) ("If a monopolist's design change is an improvement, it is necessarily tolerated by the
     antitrust laws, unless the monopolist abuses or leverages its monopoly power in some other way

24   when introducing the product.  To hold otherwise would be contrary to the very purpose of the
     antitrust laws, which is, after all, to foster and ensure competition on the merits." (citations

25   omitted))

26   [64] *Allied Orthopedic Appliances*, 592 F.3d at 998–1002.

     [65] *Allied Orthopedic Appliances*, 592 F.3d at 998–1002; *Foremost Pro Color, Inc. v. Eastman*
27   *Kodak Co.*, 703 F.2d 534, 545–46 (9th Cir. 1983) ("[P]roduct introduction must be alleged to

28   involve some associated conduct which constitutes an anticompetitive abuse or leverage of
     monopoly power, or a predatory or exclusionary means of attempting to monopolize the relevant
     market, rather than aggressive competition on the merits.").

1   introduction of X and Xi systems was a product improvement, then you cannot consider that to

2   be unlawful or anticompetitive conduct.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**B.    Section 2 Attempted Monopolization**

2

<u>Instruction No. 42 Re Attempted Monopolization – Elements[66]</u>

3

In addition to alleging monopolization, SIS also alleges that it was injured by Intuitive's unlawful

4

attempt to monopolize the alleged aftermarket for EndoWrist repair and replacement. To prevail

5

on its claim of attempted monopolization, SIS must prove each of the following elements by a

6

preponderance of the evidence:

7

(1) Intuitive engaged in anticompetitive conduct;

8

(2) Intuitive had a specific intent to achieve monopoly power in the alleged aftermarket for

EndoWrist repair and replacement;

9

(3) there was a dangerous probability that Intuitive would achieve its goal of monopoly power in

10

the alleged aftermarket for EndoWrist repair and replacement; and

11

(5) SIS was injured in its business or property by Intuitive's anticompetitive conduct.

12

If you find that the evidence is insufficient to prove any one or more of these elements, then you

13

must find for Intuitive and against SIS on SIS's claim of attempted monopolization. If you find

14

that the evidence is sufficient to prove all four elements as to Intuitive, then you must find for SIS

and against Intuitive on SIS's claim of attempted monopolization.

15

16

17

18

19

20

21

22

23

24

25

26

---

27

[66] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 3 – Section 2 of the Sherman

28

Act—Attempt to Monopolize, Instruction 1:  Elements (AM. BAR ASS'N ANTITRUST L. SECTION 2016) (modified to remove the element that the alleged anticompetitive conduct "occurred in or affected interstate commerce," which is not contested).

1    Instruction No. 43 Re Attempted Monopolization - Anticompetitive Conduct[67]

2          It is not sufficient for SIS to prove that Intuitive intended to monopolize the

3    alleged aftermarket for EndoWrist repair and replacement. SIS must also show that Intuitive

4    engaged in anticompetitive conduct, coupled with an intent to monopolize and a dangerous

5    probability that Intuitive would succeed. Generally, a firm engages in anticompetitive conduct

6    when it attempts to exclude rivals without an efficiency-enhancing justification for its conduct.

7          I have already instructed you on the standards for determining whether Intuitive

8    engaged in anticompetitive conduct in the context of SIS's monopolization claim.  You should

9    apply that same instruction here in the context of determining whether Intuitive engaged in

10   anticompetitive conduct in connection with SIS's allegations that Intuitive attempted to

11   monopolize the alleged aftermarket for EndoWrist repair and replacement.

12         If you find SIS has failed to prove by a preponderance of the evidence that

13   Intuitive engaged in anticompetitive conduct in the alleged aftermarket for EndoWrist repair and

14   replacement, then you must find for Intuitive on SIS's monopolization claim.  If you find that

15   SIS has proved that Intuitive engaged in anticompetitive conduct, then you must assess the other

16   elements of SIS's attempted monopolization claim.

17

18

19

20

21

22

23

24

25

26

27

28

---

[67] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 3 – Section 2 of the Sherman Act—Attempt to Monopolize, Instruction 2:  Anticompetitive Conduct (AM. BAR ASS'N ANTITRUST L. SECTION 2016).

1    Instruction No. 44 Re Specific Intent to Achieve Monopoly Power[68]

2          SIS must prove that Intuitive had a specific intent to monopolize a relevant

3    market. To do so, SIS must first prove that the aftermarket SIS is talking about—EndoWrist

4    repair and replacement–is a relevant market for antitrust purposes. SIS must then prove that

5    Intuitive had a specific intent to monopolize that market.

6          The court has already provided you with instructions on determining whether the

7    alleged aftermarket for EndoWrist repair and replacement is a relevant market.  If SIS proves

8    that the aftermarket for EndoWrist repair and replacement is a relevant market, you must then

9    decide whether Intuitive had the specific intent to monopolize that market. In other words, you

10   must decide if the evidence shows that Intuitive acted with the conscious aim of acquiring the

11   power to control prices and to exclude or destroy competition in the aftermarket for EndoWrist

12   repair and replacement.

13         There are several ways in which SIS may prove that Intuitive had the specific

14   intent to monopolize.  There may be evidence of direct statements of Intuitive's intent to obtain a

15   monopoly in the aftermarket for EndoWrist repair and replacement. Such proof of specific intent

16   may be established by documents prepared by responsible officers or employees of Intuitive at or

17   about the time of the conduct in question or by testimony concerning statements made by

18   responsible officers or employees of Intuitive. Y ou must be careful, however, to distinguish

19   between a defendant's lawful intent to compete aggressively, which may be accompanied by

20   aggressive language, and a true intent to acquire monopoly power by using anticompetitive

21   means.

22         Even if you decide that the evidence does not prove directly that Intuitive actually

23   intended to obtain a monopoly, specific intent may be inferred from what Intuitive did.  For

24   example, if the evidence shows that Intuitive lacked a legitimate business justification and the

25   natural and probable consequence of Intuitive's conduct in the aftermarket for EndoWrist repair

26

27   ───────────────────────

28   [68] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 3 – Section 2 of the Sherman
     Act—Attempt to Monopolize–Instruction 3:  Specific Intent (AM. BAR ASS'N ANTITRUST L.
     SECTION 2016).

1   and replacement was to give Intuitive control over prices and to exclude or destroy competition,

2   and that this was plainly foreseeable by Intuitive, then you may (but are not required to) infer

3   that Intuitive specifically intended to acquire monopoly power.

4           In this case, SIS argues that the conduct underlying the claim of attempt to

5   monopolize also constitutes an unreasonable restraint of trade under Section 1 of the Sherman

6   Act. If you find on that SIS has proven Intuitive restrained trade in the aftermarket for EndoWrist

7   repair and replacement under the instructions you have received pertaining to Section 1 of the

8   Sherman Act, then you may infer from such conduct that Intuitive had the specific intent to

9   achieve monopoly power.

10          If you find that SIS failed to prove by a preponderance of the evidence either that

11  the alleged aftermarket for EndoWrist repair and replacementis not a relevant market, or that

12  Intuitive did not have a specific intent to monopolize that market, then you must find for

13  Intuitive on SIS's attempted monopolization claim. If you find that SIS has proved by a

14  preponderance of the evidence both the existence of the relevant market and Intuitive's specific

15  intent to monopolize that market, then you must go on to assess the other elements of SIS's

16  attempted monopolization claim.

Instruction No. 45 Re Dangerous Probability of Success[69]

If you find that Intuitive had the specific intent to achieve a monopoly in the alleged aftermarket for EndoWrist repair and replacement and engaged in significant anticompetitive conduct, you also must determine if the evidence shows the next element of attempt to monopolize: namely, that there was a dangerous probability that Intuitive would succeed in achieving monopoly power if it continued to engage in the same or similar conduct.

I have already defined monopoly power for you in Instruction No. 37. You should use that same instruction to evaluate this element of SIS's attempted monopolization claim. In determining whether there was a dangerous probability that Intuitive would acquire the ability to control price in the market, you should consider such factors as:

- Intuitive's market share;

- the trend in Intuitive's market share;

- whether the barriers to entry into the market made it difficult for competitors to enter the market;

- the likely effect of any anticompetitive conduct on Intuitive's share of the market.

Again, the purpose of looking at these and other factors is to determine whether there was a dangerous probability that Intuitive would ultimately acquire monopoly power. A dangerous probability of success need not mean that success was nearly certain, but it does mean that there was a substantial and real likelihood that Intuitive would ultimately acquire monopoly power. Thus, even if you find that Intuitive intended to create a monopoly, you may not find that Intuitive attempted to monopolize if you find that it was not possible for Intuitive to achieve its goal.

If you find that SIS failed to prove by a preponderance of the evidence that there was a dangerous probability that Intuitive would succeed in achieving monopoly power in the

---

[69] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 3  Section 2 of the Sherman Act—Attempt to Monopolize–Instruction 4:  Dangerous Probability of Success (AM. BAR ASS'N ANTITRUST L. SECTION 2016).

1  alleged aftermarket for EndoWrist repair and replacement, then you must find for Intuitive on

2  SIS's attempted monopolization claim.  If, however, you find that SIS proved by a

3  preponderance of the evidence that there was a dangerous probability that Intuitive would

4  succeed in achieving monopoly power, then you must go on to assess the other elements of SIS's

5  attempted monopolization claim.

## IV.     ANTITRUST INJURY & DAMAGES

Instruction No. 46 Re Injury[70]

        If you find that SIS has met its burden on each of the other elements of any of its claims, as I have described them to you, then you must finally decide if SIS is entitled to recover damages from Intuitive.

        SIS is entitled to recover damages for an injury to its business or property if it can establish three elements of injury and causation:

    (1)    SIS was in fact injured as a result of Intuitive's alleged violation of the antitrust laws;

    (2)    Intuitive's alleged illegal conduct was a material cause of SIS's injury; and

    (3)    SIS's injury is an injury of the type that the antitrust laws were intended to prevent.

---

[70] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 6  Causation and Damages Clayton Act Section 4 Requirements, Instruction 1:  Injury and Causation (AM. BAR ASS'N ANTITRUST L. SECTION 2016).

1  Instruction No. 47 Re Injury in Fact[71]

2          The first element is sometimes referred to as "injury in fact" or "fact of damage."

3  For SIS to establish that it is entitled to recover damages, it must prove that it was injured as a

4  result of Intuitive's alleged violation of the antitrust laws.  Proving the fact of damage does not

5  require SIS to prove the dollar value of its injury.  It requires only that SIS prove that it was in

6  fact injured by Intuitive's alleged antitrust violation.

---

[71] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 6 – Causation and Damages – Clayton Act Section 4 Requirements, Instruction 1:  Injury and Causation (AM. BAR ASS'N ANTITRUST L. SECTION 2016).

1   Instruction No. 48 Re Causation[72]

2          SIS must also offer evidence that establishes by a preponderance of the evidence

3   that Intuitive's alleged illegal conduct was a material cause of SIS's injury.  This means that SIS

4   must have proved that some damage occurred to it as a result of Intuitive's alleged antitrust

5   violation, and not some other cause.  SIS is not required to prove that Intuitive's alleged antitrust

6   violation was the sole cause of its injury; nor need SIS eliminate all other possible causes of

7   injury.  It is enough if SIS has proved that the alleged antitrust violation was a material cause of

8   its injury.  However, if you find that SIS's injuries were caused primarily by factors other than

9   the alleged antitrust violation, then the causation element is not satisfied.[73]

---

26  [72] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 6 – Causation and Damages

27  – Clayton Act Section 4 Requirements, Instruction 1:  Injury and Causation (AM. BAR ASS'N
ANTITRUST L. SECTION 2016).

28  [73] *Discover Fin. Servs.* v. *Visa U.S.A., Inc.*, 582 F. Supp. 2d 501, 504–05 (S.D.N.Y. 2008) (citing
ABA Section of Antitrust Law, Model Jury Instructions in Civil Antitrust Cases (2005) at F–3)

1   Instruction No. 49 Re Antitrust Injury[74]

2          Finally, SIS must establish that its injury is the type of injury that the antitrust

3   laws were intended to prevent.  This is sometimes referred to as "antitrust injury."  If SIS's

4   injuries were caused by a reduction in competition, acts that would lead to a reduction in

5   competition, or acts that would otherwise harm consumers, then SIS's injuries are antitrust

6   injuries.  On the other hand, if SIS's injuries were caused by heightened competition, the

7   competitive process itself, or by acts that would benefit consumers, then SIS's injuries are not

8   antitrust injuries and SIS may not recover damages for those injuries under the antitrust laws.

9          You should bear in mind that businesses may incur losses for many reasons that

10  the antitrust laws are not designed to prohibit or protect against—such as where a competitor

11  offers better products or services, or where a competitor is more efficient and can charge lower

12  prices and still earn a profit.  The antitrust laws do not permit SIS to recover damages for losses

13  that were caused by the competitive process or conduct that benefits consumers.

14         In summary, if SIS can establish that it was in fact injured by Intuitive's conduct,

15  that Intuitive's conduct was a material cause of SIS's injury, and that Intuitive's injury was the

16  type that the antitrust laws were intended to prevent, then SIS is entitled to recover damages for

17  the injury to its business or property.

18

19

20

21

22

23

24

25

26

27

28

---

[74] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 6 – Causation and Damages – Clayton Act Section 4 Requirements, Instruction 1:  Injury and Causation (AM. BAR ASS'N ANTITRUST L. SECTION 2016).

Instruction No. 50 Re Damages for Competitors--Preparedness to Enter Business[75]

SIS claims that it was harmed because Intuitive's alleged antitrust violation prevented it from entering a new line of business: repair of EndoWrists. To recover damages, it is not necessary that SIS actually have entered into this business if you find that Intuitive's alleged antitrust violation prevented SIS from entering into this business. SIS must prove, however, that it had an intention to enter into this business and that it had taken concrete steps to prepare to do so.

In determining whether or not SIS has demonstrated the intention and preparedness to enter this new business, you may consider such elements as the following: the background and experience of the principals and employees of SIS; the ability of SIS to finance the new line of business and to purchase the necessary facilities and equipment; and concrete and discernible steps taken by SIS to enter into this new line of business. Ultimately, to award SIS damages related to its failure to enter this business, you must determine that had it not been for Intuitive's alleged antitrust violation, SIS would have entered that business of repairing EndoWrists.

---

[75] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 6 – Causation and Damages – Clayton Act Section 11 Damages for Competitors—Preparedness to Enter Business (AM. BAR ASS'N ANTITRUST L. SECTION 2016).

Instruction No. 51 Re FDA Clearance

You have heard testimony in this case about FDA 510(k) clearance. I will now instruct you on the law that applies to this subject. Medical devices are regulated under the Food, Drug, and Cosmetic Act, which Congress enacted to protect consumers from harmful products.[76] The products at issue in this case are considered to be medical devices.[77] The FDA has identified these medical devices and the surgical instruments used with them as "computer-controlled surgical instrument systems."[78] All computer-controlled surgical instrument systems and the instruments used with them, including those that are remanufactured, are required to be approved or cleared by the FDA.[79] The FDA considers a device to be remanufactured when it has been subject to any act that results in a significant change to the device's performance, safety specifications, or intended use, as compared to the device that was originally approved or cleared by the FDA.[80] If you conclude that the insertion of a memory chip into an EndoWrist to change its usage limit is remanufacturing as defined by the FDA, you must find that SIS could not lawfully perform that operation on an instrument to be used for human surgery unless it obtained 510(k) clearance from FDA to perform that action on that particular EndoWrist.

---

[76] *Wyeth v. Levine*, 555 U.S. 555, 574 (2009); FDCA § 301(a)-(c), 21 U.S.C. § 331(a)-(c).
[77] 21 C.F.R. § 876.1500 (product code NAY).
[78] 21 C.F.R. § 876.1500 (product code NAY).
[79] FDCA § 510(k), 21 U.S.C. § 360(k); FDCA § 301(p), 21 U.S.C. § 331(p); FDCA § 502(o), 21 U.S.C. § 352(o); 21 C.F.R. § 807.81.
[80] 21 C.F.R. § 820.3(w) ("Remanufacturer means any person who processes, conditions, renovates, repackages, restores, or does any other act to a finished device that significantly changes the finished device's performance or safety specifications, or intended use.").

1    Instruction No. 52 Re Antitrust Damages -- Introduction and Purpose[81]

2            If you find that Intuitive violated the antitrust laws and that this violation caused

3    injury to SIS, then you must determine the amount of damages, if any, SIS is entitled to recover.

4            The fact that I am giving you instructions concerning the issue of SIS's damages

5    does not mean that I believe SIS should, or should not, prevail in this case. If you reach a verdict

6    for Intuitive on the issue of liability, you should not consider the issue of damages, and you may

7    disregard the damages instruction that I am about to give.

8            The law provides that SIS should be fairly compensated for all damages to its

9    business or property that were a direct result or likely consequence of the conduct that you have

10   found to be unlawful.

11           Antitrust damages are only compensatory, meaning their purpose is to put an

12   injured plaintiff as near as possible in the position in which it would have been had the alleged

13   antitrust violation not occurred. The law does not permit you to award damages to punish a

14   wrongdoer—what we sometimes refer to as punitive damages—or to deter particular conduct in

15   the future. Furthermore, you are not permitted to award to SIS an amount for attorneys' fees or

16   the costs of maintaining this lawsuit.

17

18

19

20

21

22

23

24

25

26

27

---

[81] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 6 – Causation and Damages – Damages, Instruction 1:  Antitrust Damages – Introduction and Purpose (AM. BAR ASS'N ANTITRUST L. SECTION 2016).

28

1    Instruction No. 53 Re Basis for Calculating Damages[82]

2            You are permitted to make just and reasonable estimates in calculating SIS's

3    damages.  You are not required to calculate damages with mathematical certainty or precision.

4    However, the amount of damages must have a reasonable basis in the evidence and must be

5    based on reasonable, non-speculative assumptions and estimates.  Damages may not be based on

6    guesswork or speculation.  SIS must prove the reasonableness of each of the assumptions upon

7    which the damages calculation is based.

8            If you find that SIS has provided a reasonable basis for determining damages,

9    then you may award damages based on a just and reasonable estimate supported by the evidence.

10           If you find that SIS has failed to carry its burden of providing a reasonable basis

11   for determining damages, then you may not award damages, or you may award nominal damages

12   not to exceed one dollar.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

[82] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 6 – Causation and Damages – Damages, Instruction 3:  Basis for Calculating Damages (AM. BAR ASS'N ANTITRUST L. SECTION 2016).

DEFENDANT'S PROPOSED JURY INSTRUCTIONS

1    Instruction No. 54 Re Causation and Disaggregation[83]

2        If you find that Intuitive violated the antitrust laws and that SIS was injured by

3    that violation, SIS is entitled to recover for such injury that was the direct result or likely

4    consequence of the unlawful acts of Intuitive.  SIS bears the burden of showing that its injuries

5    were caused by Intuitive's antitrust violation, as opposed to any other factors.  If you find that

6    SIS's alleged injuries were caused in part by Intuitive's alleged antitrust violation and in part by

7    other factors, then you may award damages only for that portion of SIS's alleged injuries that

8    was caused by Intuitive's alleged antitrust violation.

9        SIS claims that it suffered injury because it lost sales and profits as a result of

10   Intuitive's alleged violations of the antitrust laws.  Intuitive claims that any profits or sales lost

11   by SIS occurred as a result of other factors that have nothing to do with the alleged antitrust

12   violations.  These include SIS's failure to seek and obtain clearance from the FDA or

13   authorization from Intuitive to sell modified EndoWrists; SIS's reliance on Rebotix to provide

14   parts and services, rather than developing its own processes; SIS's lack of preparedness to launch

15   a business based on "resetting" X/Xi EndoWrists, as opposed to S/Si EndoWrists; and preference

16   by customers for purchasing EndoWrists from the original manufacturer for patient safety,

17   regulatory, and liability concerns.  SIS is not entitled to recover for lost profits that resulted

18   solely from these or other causes arising from the normal course of business activity.[84]  The

19   presence of these factors does not mean SIS did not suffer antitrust injury, but SIS is not entitled

20   to recovery for damages caused by them.  SIS only may recover for damages caused by the

21   alleged antitrust violations.

22        SIS bears the burden of proving damages by a preponderance of the evidence,

23   including apportioning damages between lawful and unlawful causes.  If you find that SIS has

---

[83] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 6 – Causation and Damages – Damages, Instruction 4:  Causation and Disaggregation (AM. BAR ASS'N ANTITRUST L. SECTION 2016).

[84] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 6 – Causation and Damages – Damages, Instruction 4:  Causation and Disaggregation (AM. BAR ASS'N ANTITRUST L. SECTION 2016) ("list, as appropriate, defendant's examples of ways plaintiff could lose sales in the normal course of competitive business activity").

1    not established a reasonable basis to apportion its alleged injuries between lawful and unlawful

2    causes, or that apportionment can only be accomplished through speculation or guesswork, then

3    you may not award any damages at all.  If you find that the SIS was injured by Intuitive's alleged

4    antitrust violations, and there is a reasonable basis to apportion its alleged injuries between

5    lawful and unlawful causes, then you may award damages.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    <u>Instruction No. 55 Re Damages for Competitors -- Lost Profits</u>[85]

2              SIS claims that it was harmed because it lost profits as a result of Intuitive's

3    alleged antitrust violation. If you find that Intuitive committed an antitrust violation and that this

4    violation caused injury to SIS, you now must calculate the profits, if any, that SIS lost as a result

5    of Intuitive's antitrust violation.  To calculate lost profits, you must calculate net profit: the

6    amount by which plaintiff's gross revenues would have exceeded all of the costs and expenses

7    that would have been necessary to produce those revenues.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27    _____

28    [85] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 6 – Causation and Damages – Damages, Instruction 8:  Damages for Competitors – Lost Profits (AM. BAR ASS'N ANTITRUST L. SECTION 2016).

Instruction No. 56 Re Damages for Competitors -- Future Lost Profits[86]

SIS claims that it was harmed because, had it not been for Intuitive's alleged antitrust violation, SIS would have earned profits into the future, through 2025. If you find that Intuitive committed an antitrust violation and that this violation caused injury to SIS, you now must calculate the future profits, if any, that SIS lost as a result of Intuitive's antitrust violation.

To calculate future lost profits, you must make a reasonable estimate of (1) the amount of profits, if any, that SIS would have earned in future years, and (2) the length of time for which it would have earned those profits. In making this calculation, you are not required to calculate future lost profits with absolute mathematical certainty or precision, but you must not engage in guesswork or speculation. In making this determination, you must consider the various factors that could affect the future success of SIS's business, such as general market or economic conditions, lawful competition SIS would face in the future, SIS's management of business, changes in technology or other business conditions, and other factors affecting SIS's future performance.

Your determination of future lost profits must have a reasonable basis in the evidence and cannot be speculative. If there is no evidence from which you can make a reasonable estimate of lost future profits, you may not award damages for future lost profits.

In calculating future lost profits, you must calculate net profit. In simple terms, net profit is gross revenues minus all of the costs and expenses that would be necessary to produce those revenues.

If you award damages for future lost profits, you must discount the amount to its present value, using a discount rate of interest that you find reasonable. This is because the right to receive a certain sum of money at a future date is worth less than the same amount of money in hand today—this is known as the time value of money. For example, if you had a choice to receive $1,000 today or a year from now, you would be better off receiving the money today and

---

[86] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 6 – Causation and Damages – Damages, Instruction 9: Damages for Competitors – Future Lost Profits (AM. BAR ASS'N ANTITRUST L. SECTION 2016).

1    earning interest on it for a year—you would then have something more than $1,000 in a year

2    from now.  Similarly, if you had a right to $1,000 a year from now and you asked for the money

3    today, the person owing you the money a year from now could properly give you a lower

4    amount, reflecting the value that could be earned on that money over the next year.  This lower

5    amount is known as an amount discounted to present value.  The rate of return to be applied in

6    determining present value should be the interest that can reasonably be expected from safe

7    investments that can be made by a person of ordinary prudence, who has ordinary financial

8    experience and skill.[87]

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

[87] MANUAL OF MODEL CIVIL JURY INSTRUCTIONS FOR THE DISTRICT COURTS OF THE NINTH
CIRCUIT § 5.4 (9th Cir. Jury Instructions Comm. 2017 ed.).

1    Instruction No. 57 Re Mitigation of Damages[88]

2        SIS may not recover damages for any portion of its injuries that it could have

3    avoided through the exercise of reasonable care and prudence.  SIS is not entitled to increase any

4    damages through inaction.  The law requires an injured party to take all reasonable steps it can to

5    avoid further injury and thereby reduce its loss.  If SIS failed to take reasonable steps available to

6    it, and the failure to take those steps resulted in greater harm to SIS than it would have suffered

7    had it taken those steps, then SIS may not recover any damages for that part of the injury it could

8    have avoided.

9        Intuitive has the burden of proof on this issue.  Intuitive must prove by a

10    preponderance of the evidence that SIS:

11        (1)    acted unreasonably in failing to take specific steps to minimize or limit its

12            losses;

13        (2)    that the failure to take those specific steps resulted in its losses being

14            greater than they would have been had it taken such steps; and

15        (3)    the amount by which SIS's loss would have been reduced had SIS taken

16            those steps.

17        In determining whether SIS failed to take reasonable measures to limit its

18    damages, you must remember that the law does not require SIS to take every conceivable step

19    that might reduce its damages.  The evidence must show that SIS failed to take commercially

20    reasonable measures that were open to it.  Commercially reasonable measures mean those

21    measures that a prudent businessperson in SIS's position would likely have adopted, given the

22    circumstances as they appeared at that time.  SIS should be given wide latitude in deciding how

23    to handle the situation, so long as what SIS did was not unreasonable in light of the existing

24    circumstances.

25

26

27

28    ───────────────
[88] MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES, Chapter 6 – Causation and Damages
– Damages, Instruction 14:  Mitigation (AM. BAR ASS'N ANTITRUST L. SECTION 2016).

1    **V.    INTUITIVE'S COUNTERCLAIMS**

2    Instruction No. 58 Re Intuitive's Counterclaims

3    Now, I will instruct you on the law regarding Intuitive's counterclaims against

4    SIS.

5    Intuitive brings a claim against SIS under the federal Lanham Act, 15 U.S.C. §

6    1125, based on false advertising unfair competition.[89]

7    Intuitive also brings two claims against SIS under California law:  one for unfair

8    competition under California's common law, and one for intentional interference with

9    contractual relations under California's common law.[90]

10    I will discuss each of these claims in turn.

28    [89] Answer (Dkt. 75) p. 39, Counterclaims ¶ 85.
     [90] Answer (Dkt. 75) p. 39, Counterclaims ¶¶ 102, 106.

1

**A.     Lanham Act**

2

Instruction No. 59 Re Lanham Act – Elements of False Statement Claim

3

Intuitive claims that SIS is liable for false advertising under the Lanham Act, 15

4

U.S.C. § 1125.   Specifically, Intuitive alleges that in its marketing materials and

5

communications disseminated to potential and actual customers, SIS has made numerous false

6

and misleading statements,  including but not limited to statements that misrepresent:  (i) the

7

nature, efficacy, and/or safety of the service SIS coordinates; (ii) that "repaired" EndoWrists

8

meet applicable quality and functional requirements; (iii) that devices "serviced" through SIS

9

had been repaired to meet "original specifications" of EndoWrists and are safe to use; (iv) that

10

SIS itself developed, has tested and conducts the "repairs;" (v) that use of the service will result

11

in substantial cost savings; (vi) that use of the service does not carry any adverse financial, legal

12

or other consequences (*e.g.*, voiding Intuitive customers' warranties); (vii) that use limits built

13

into EndoWrists are "arbitrary" or Intuitive otherwise is not trustworthy; and (viii) that SIS

14

and/or the "repair" service is authorized, approved, or endorsed by Intuitive.[91]  Intuitive further

15

alleges that customer confusion as to the source or affiliation of the "repaired" instruments is

16

exacerbated by SIS's communications that misinform customers that "a repaired EndoWrist® is

17

not an alternative or replacement device," but rather "an original da Vinci® manufactured device

18

that has been repaired to original specifications."[92]

19

To prevail on its claim for false advertising under the Lanham Act, Intuitive must

20

prove by a preponderance of the evidence:

21

1.     SIS' advertisements were false or misleading;

22

2.     SIS's advertisements deceived, or had the capacity to deceive, customers;

23

3.     The deception had a material effect on purchasing decisions, meaning that

24

it was likely to influence customers' purchasing decisions;

25

4.     The misrepresentation affected interstate commerce; and

26

27

28

---

[91] Answer (Dkt. 75) Counterclaims ¶ 85.
[92] Answer (Dkt. 75) Counterclaims ¶ 86.

DEFENDANT'S PROPOSED JURY INSTRUCTIONS
Case No. 3:21-cv-03496-AMO

1      5.      Intuitive has been injured as a result of the false advertising.[93]

2      If you find that the evidence is insufficient to prove any one or more of these

3  elements, then you must find for SIS and against Intuitive on Intuitive's false advertising claim.

4  If you find that the evidence is sufficient to prove all of the elements, then you must find for

5  Intuitive and against SIS on Intuitive's false advertising claim.

---

[93] *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1136 (9th Cir. 1997); *Newcal Indus., Inc.* v. *Ikon Office Solution*, 513 F.3d 1038, 1052 (9th Cir. 2008); FED. CIVIL JURY INSTRUCTIONS OF THE SEVENTH CIRCUIT § 13.3.1 (Committee on Pattern Civil Jury Instructions 7th Cir. 2017 ed.); PATTERN JURY INSTRUCTIONS OF THE ELEVENTH CIRCUIT § 10.8 (Committee on Pattern Jury Instructions 11th Cir. 2024 ed.); MANUAL OF MODEL CIVIL JURY INSTRUCTIONS FOR THE DISTRICT COURTS OF THE EIGHTH CIRCUIT § 21.43 (Committee on Model Jury Instructions 8th Cir. 2023 ed.).

DEFENDANT'S PROPOSED JURY INSTRUCTIONS
Case No. 3:21-cv-03496-AMO

1  <u>Instruction No. 60 Re False or Misleading</u>

2       There are two ways in which SIS's advertisements may be false or misleading:

3  they may be literally false, or they may be literally true but misleading.  If an advertisement is

4  literally false, then it is presumed to deceive, or to have the capacity to deceive, customers, and

5  Intuitive need not prove that deception.[94]  When evaluating whether an advertising statement is

6  literally false, the statement must be analyzed in its full context.[95]

7       If you find that Intuitive has proved that SIS made false or misleading statements,

8  then you must assess the other elements of Intuitive's false advertising claim.  If you find that

9  Intuitive has not proved that SIS made false or misleading statements, then you must find for SIS

10 on Intuitive's false advertising claim.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26  [94] *Appliance Recycling Ctrs. of Am., Inc.* v. *JACO Environmental, Inc.*, 378 F. App'x 652, 655 (9th Cir. 2010) (citing *Southland Sod Farms* v. *Stover Seed Co.*, 108 F.3d 1134, 1140 (9th Cir. 1997)) (endorsing presumption of deception for literally false statements); *AECOM Energy & Constr., Inc.* v. *Morrison Knudsen Corp.*, 748 F. App'x 115, 119 (9th Cir. 2018) ("Because [the statements] are literally false, we need not consider the impact on the buying public.").

27

28

[95] *Southland Sod Farms* v. *Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997).

1  <u>Instruction No. 61 Re Commercial Advertisement or Promotion</u>

2        To constitute commercial advertising or promotion, a statement of fact must have

3  been commercial speech, by SIS, for the purpose of influencing consumers to buy SIS's goods or

4  services.[96]  While the statement need not be made in a classic advertising campaign, but may

5  consist instead of more informal types of promotion, the statement must have been disseminated

6  sufficiently to the potential customers to constitute advertising or promotion within that

7  industry.[97]

8        If you find that Intuitive has proved that SIS's false or misleading statements were

9  made in a commercial advertisement or promotion, then you must assess the other elements of

10  Intuitive's false advertising claim.  If you find that Intuitive has not proved that SIS's false or

11  misleading statements were made in a commercial advertisement or promotion, then you must

12  find for SIS on Intuitive's false advertising claim.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

---

27  [96] *Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1054 (9th Cir. 2008) (citing
*Coastal Abstract Service, Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 735 (9th Cir. 1999)).
28  [97] *Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1054 (9th Cir. 2008) (citing
*Coastal Abstract Service, Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 735 (9th Cir. 1999)).

1    Instruction No. 62 Re Lanham Act Injury

2            Intuitive must prove by a preponderance of the evidence that it has suffered injury

3    to a commercial interest in sales or business reputation as a result of SIS's statement, either by a

4    direct loss of sales or a lessening of the goodwill associated with its products.[98]  This can be

5    proved in a number of ways.  For example, injury can be proved by showing that SIS having

6    made false statements induced customers to switch their purchasing decisions, and purchase

7    replacement or repaired EndoWrists from SIS instead of from Intuitive.[99]  Injury could also be

8    proved by showing that SIS cast aspersions on Intuitive's business or damaged Intuitive's

9    products' reputation.[100]  Injury could also be proved if SIS's false or misleading statements

10    reduced Intuitive's business by causing customers to demand fewer EndoWrists.[101]

11            If you find that Intuitive has proved that SIS's false or misleading statements

12    caused injury to Intuitive, then you should assess the other elements of Intuitive's false

13    advertising claim.  If you find that Intuitive has not proved that SIS's false or misleading

14    statements caused injury to Intuitive, then you must find for SIS on Intuitive's false advertising

15    claim.

16

17

18

19

20

21

22

23

24

25

26

27

28

---

[98] *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1136 (9th Cir. 1997); *Newcal Indus., Inc.* v. *Ikon Office Solution*, 513 F.3d 1038, 1052 (9th Cir. 2008); FED. CIVIL JURY INSTRUCTIONS OF THE SEVENTH CIRCUIT § 13.3.1 (Committee on Pattern Civil Jury Instructions 7th Cir. 2017 ed.); PATTERN JURY INSTRUCTIONS OF THE ELEVENTH CIRCUIT § 10.8 (Committee on Pattern Jury Instructions 11th Cir. 2024 ed.);  MANUAL OF MODEL CIVIL JURY INSTRUCTIONS FOR THE DISTRICT COURTS OF THE EIGHTH CIRCUIT § 21.43 (Committee on Model Jury Instructions 8th Cir. 2023 ed.).
[99] *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 137–40 (2014).
[100] *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 137–40 (2014).
[101] *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 137–40 (2014).

Instruction No. 63 Re Willfulness for False Advertising

   If you have determined that SIS engaged in false advertising, you must also determine whether such conduct was willful on the part of SIS. SIS's actions may be considered willful if SIS knew that it was engaging in false advertising, or if it acted with indifference to Intuitive's rights.[102]

---

[102] *Romag Fasteners, Inc. v. Fossil, Inc.*, 590 U.S. 212, 219 (2020).

**B.    Common Law Unfair Competition**

Instruction No. 64 Re Common Law Unfair Competition

   Intuitive claims that SIS's conduct constitutes unfair competition under California's common law.  The essence of the tort of unfair competition is the inequitable pirating of the fruits of another's labor and then either "palming off" those fruits as one's own through deception, or simply gaming from them an unearned commercial benefit.[103]

   To prevail on this claim, Intuitive must prove that:

  1. SIS subjectively and knowingly intended to confuse buyers of EndoWrists by passing off its products in such manner as to induce those customers to believe that SIS's repaired EndoWrists were identical to original EndoWrists sold by Intuitive;

  2. Customers for EndoWrists were likely to be confused, meaning they were misled into thinking that SIS's repaired EndoWrists were actually identical to original EndoWrists sold by Intuitive; and

  3. SIS thereby caused Intuitive a competitive injury, meaning that Intuitive must have suffered some actual economic harm to its business that was caused by SIS's deception of Intuitive's actual and potential customers.[104]

   If you find that Intuitive has proved each of these elements by a preponderance of the evidence, then you must find for Intuitive and against SIS on Intuitive's common law unfair competition claim.  If you find that Intuitive has not proved each of these elements by a preponderance of the evidence, then you must find for SIS and against Intuitive on Intuitive's common law unfair competition claim.

---

[103] *Rider Clothing LLC* v. *Boardriders, Inc.*, 2019 WL 8163813, at *5 (C.D. Cal. Nov. 26, 2019).
[104] *Rider Clothing LLC* v. *Boardriders, Inc.*, 2020 WL 4578700, at *3 (C.D. Cal. Aug. 7, 2020); *Fisher* v. *Dees*, 794 F.2d 432, 440 (9th Cir. 1986); *TMC Aerospace, Inc.* v. *Elbit Sys. of Am. LLC*, 2016 WL 3475322, at *8 (C.D. Cal. Jan. 29, 2016).

**C.    Intentional Interference with Contractual Relations**

Instruction No. 65 Re Tortious Interference with Contract[105]

Intuitive claims that SIS intentionally interfered with the  contracts between it and certain customers.  To establish this claim, Intuitive must prove all of the following:

(1)    That there was a contract between Intuitive and each of its customers at issue;

(2)    That SIS knew of such contracts;

(3)    That SIS's conduct prevented performance of the contract by Intuitive or made performance more expensive or difficult;

(4)    That SIS intended to disrupt the performance of the contracts between Intuitive and its customers, or knew that disruption of performance was certain or substantially certain to occur;

(5)    That Intuitive was harmed; and

(6)    That SIS's conduct was a substantial factor in causing Intuitive's harm.

If you find that Intuitive has proved each of these elements by a preponderance of the evidence, then you must find for Intuitive and against SIS on Intuitive's tortious interference with contract claim.  If you find that Intuitive has not proved each of these elements by a preponderance of the evidence, then you must find for SIS and against Intuitive on Intuitive's tortious interference with contract claim.

---

[105] Judicial Council of California Civil Jury Instructions 2201 – Intentional Interference with Contractual Relations – Essential Factual Elements (2024 ed.); *Pacific Gas & Electric Co. v. BearStearns & Co.*, 50 Cal.3d 1118, 1126 (1990).

**D.    Damages on Intuitive's Counterclaims**

Instruction No. 66 Re Lost Profit Damages on Intuitive Counterclaims

If you decide for Intuitive on the question of liability on its counterclaims, then you should consider the amount of money to award to Intuitive as damages.  This should include damages that Intuitive sustained, and profits that SIS made, because of SIS's conduct.[106]  By instructing you on damages, the Court does not mean to suggest for which party your verdict should be rendered.

Damages consist of the amount of money required to compensate Intuitive for the injury caused by SIS's conduct.[107]  Plaintiff must prove its damages by a preponderance of the evidence.[108]

For the claims of unfair competition, false advertising, or tortious interference with contracts, Intuitive asks to be awarded lost profit damages.  That is, Intuitive asks to be awarded the lost profits that it would have earned but for SIS's unfair competition, false advertising, or tortious interference with contracts.

To decide the amount of damages for lost profits, you must determine the gross amount Intuitive would have received but for SIS's conduct and then subtract from that amount the expenses Intuitive would have had if SIS's conduct had not occurred.[109]  The amount of the lost profits need not be calculated with mathematical precision, but there must be a reasonable basis for computing the loss.[110]

---

[106] FED. CIVIL JURY INSTRUCTIONS OF THE SEVENTH CIRCUIT § 13.6.1 (Committee on Pattern Civil Jury Instructions 7th Cir. 2017 ed.).

[107] FED. CIVIL JURY INSTRUCTIONS OF THE SEVENTH CIRCUIT § 13.6.3 (Committee on Pattern Civil Jury Instructions 7th Cir. 2017 ed.).

[108] FED. CIVIL JURY INSTRUCTIONS OF THE SEVENTH CIRCUIT § 13.6.3 (Committee on Pattern Civil Jury Instructions 7th Cir. 2017 ed.).

[109] Judicial Council of California Civil Jury Instructions 3903N – Lost Profits (2024 ed.); *see also* FED. CIVIL JURY INSTRUCTIONS OF THE SEVENTH CIRCUIT § 13.6.3 (Committee on Pattern Civil Jury Instructions 7th Cir. 2017 ed.) ("You may consider the following types of damages: Plaintiff's lost profits on lost sales, which consists of the revenue Plaintiff would have earned but for Defendant's infringement, less the expenses Plaintiff would have sustained in earning those revenues.").

[110] Judicial Council of California Civil Jury Instructions 3903N – Lost Profits (2024 ed.).

1

2   Dated:  September 25, 2024                    By: /s/ DRAFT

3                                                    Kenneth A. Gallo

4                                              Kenneth A. Gallo (*pro hac vice*)
                                               Paul D. Brachman *(pro hac vice)*
5                                              **PAUL, WEISS, RIFKIND, WHARTON &**
                                               **GARRISON LLP**
6                                              2001 K Street, NW
                                               Washington, DC  20006-1047
7                                              Telephone:  (202) 223-7300
                                               Facsimile:  (202) 204-7420
8                                              Email: kgallo@paulweiss.com
9                                              Email: pbrachman@paulweiss.com

10                                             William B. Michael (*pro hac vice*)
                                               Crystal L. Parker (*pro hac vice*)
11                                             Daniel A. Crane (*pro hac vice*)
                                               **PAUL, WEISS, RIFKIND, WHARTON &**
12                                             **GARRISON LLP**
13                                             1285 Avenue of the Americas
                                               New York, NY 10019-6064
14                                             Telephone:  (212) 373-3000
                                               Facsimile:  (212) 757-3990
15                                             Email: wmichael@paulweiss.com
16                                             Email: cparker@paulweiss.com
                                               Email: dcrane@paulweiss.com
17

18                                             Joshua Hill Jr. (SBN 250842)
                                               **PAUL, WEISS, RIFKIND, WHARTON &**
19                                             **GARRISON LLP**
                                               535 Mission Street, 24th Floor
20                                             San Francisco, CA 94105
                                               Telephone:  (628) 432-5100
21                                             Facsimile:  (628) 232-3101
                                               Email: jhill@paulweiss.com
22

23                                             Sonya D. Winner (SBN 200348)
                                               **COVINGTON & BURLINGTON LLP**
24                                             415 Mission Street, Suite 5400
                                               San Francisco, California 94105-2533
25                                             Telephone:  (415) 591-6000
                                               Facsimile:  (415) 591-6091
26                                             Email: swinner@cov.com

27

28                                             Kathryn E. Cahoy (SBN 298777)

DEFENDANT'S PROPOSED JURY INSTRUCTIONS
Case No. 3:21-cv-03496-AMO

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**COVINGTON & BURLINGTON LLP**
3000 El Camino Real
5 Palo Alto Square, 10th Floor
Palo Alto, California 94306-2112
Telephone: (650) 632-4700
Facsimile: (650) 632-4800
Email: kcahoy@cov.com

Andrew Lazerow (*pro hac vice*)
**COVINGTON & BURLINGTON LLP**
One City Center 850 Tenth Street NW
Washington DC 20001-4956
Telephone: (202) 662-6000
Facsimile: (202) 662-6291
Email: alazerow@cov.com

Allen Ruby (SBN 47109)
**ALLEN RUBY, ATTORNEY AT LAW**
15559 Union Ave. #138
Los Gatos, California 95032
Telephone: (408) 477-9690
Email: allen@allenruby.com

*Attorneys for Defendant
Intuitive Surgical, Inc.*

DEFENDANT'S PROPOSED JURY INSTRUCTIONS
Case No. 3:21-cv-03496-AMO

Exhibit 5

**EXHIBIT 5 -- PROPOSED LIMITING / CAUTIONARY JURY INSTRUCTION**

You may hear testimony and see documents related to obtaining FDA clearance to market certain EndoWrist instruments. Such testimony and related documents have very limited relevance to the issues of this case. The Court previously ruled that the FDA has not determined whether 510(k) clearance is necessary for SIS's aftermarket EndoWrist services. Additionally, the Court previously ruled that it is the Federal Government, rather than private litigants, who are authorized to file suit for noncompliance with the medical device provisions. Intuitive, as a private party, has no authority to enforce the Food, Drug, and Cosmetic Act or its implementing regulations in this case. Whether SIS's aftermarket EndoWrist-related services require Section 510(k) clearance from the FDA is not an issue in this trial or something you should decide. Instead, for purposes of this trial, you must assume that FDA clearance is not required to reset the usage counter in an EndoWrist instrument owned by one of Intuitive's customers and that SIS did nothing wrong by providing aftermarket EndoWrist services to Intuitive's customers.

Kenneth A. Gallo (*pro hac vice*)
Paul D. Brachman (*pro hac vice*)
**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
2001 K Street, NW
Washington, DC  20006-1047
Telephone:  (202) 223-7300
Facsimile:  (202) 204-7420
Email: kgallo@paulweiss.com
Email: pbrachman@paulweiss.com

William B. Michael (*pro hac vice*)
Crystal L. Parker (*pro hac vice*)
Daniel A. Crane (*pro hac vice*)
**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone:  (212) 373-3000
Facsimile:  (212) 757-3990
Email: wmichael@paulweiss.com
Email: cparker@paulweiss.com
Email: dcrane@paulweiss.com

Joshua Hill Jr. (SBN 250842)
**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
535 Mission Street, 24th Floor
San Francisco, CA 94105
Telephone:  (628) 432-5100
Facsimile:  (628) 232-3101
Email: jhill@paulweiss.com

*Attorneys for Defendant Intuitive Surgical, Inc.*

[Additional counsel listed on signature page]

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| SURGICAL INSTRUMENT SERVICE COMPANY, INC., | Case No. 3:21-cv-03496-AMO |
| *Plaintiff,* | **DEFENDANT INTUITIVE SURGICAL INC.'S OPPOSITION TO PLAINTIFF SURGICAL INSTRUMENT SERVICE, INC.'S MOTION *IN LIMINE* #1** |
| v. | |
| INTUITIVE SURGICAL, INC., | Date:  November 25, 2024 |
| *Defendant.* | Time:  11:00 a.m. |
| | Courtroom:  10 |
| | The Honorable Araceli Martínez-Olguín |

FDA-related evidence goes to the heart of key factual disputes on SIS's antitrust claims. SIS wrapped itself in the language of the FDA in its Complaint and its communications with customers. SIS told the marketplace that it could extend the "safe and effective life" of EndoWrists by resetting the use counter. *See, e.g.*, Ex. 1 at -127.[1]  SIS also told customers it could restore EndoWrists to their "original specifications," without changing their "intended use, method of use, functionality, or performance." *Id.*; Dkt. 1 ¶¶ 5, 8, 33–34, 78–79.  SIS lay and expert witnesses will testify that Intuitive harmed competition by excluding these modified EndoWrists that were allegedly as "safe and effective" as original EndoWrists.  Two SIS experts rely on the FDA's clearance of a ***different*** modified EndoWrist, made and sold by a ***different*** company, as evidence that modified EndoWrists sold by SIS were safe.

The evidence that SIS is trying to keep from the jury undercuts this story.  The modified EndoWrists that SIS marketed were "repaired" and tested exclusively by a third party, Rebotix. But, when Rebotix applied for FDA clearance on its modified EndoWrists, the FDA rejected its application, citing 51 deficiencies in its safety data.  SIS told its customers none of this.  SIS marketing does not even mention Rebotix or its failed quest for FDA clearance.  Instead, SIS falsely alleges in its Complaint, like it falsely told customers, that SIS itself safety-tested the devices.  In reality, SIS did ***no*** testing to support its baseless safety claims.  Intuitive responded by telling hospitals it was concerned about uncleared EndoWrists being used on patients, and reminded hospitals that their warranty could be voided if they used unapproved, modified instruments.  When a different company, Restore/Iconocare, obtained FDA clearance, Intuitive responded differently.  It publicly announced that its contracts would not restrict hospitals from buying FDA-cleared instruments.

These facts bear directly on whether Intuitive had legitimate reasons for not warrantying or servicing devices that had been modified by unauthorized third parties, such as Rebotix, while authorizing other products, like Iconocare's, that had been cleared by the FDA.  These facts also bear directly on whether SIS marketed a safe and commercially viable product, or whether it misled

---

[1] "Ex." refers to the exhibits attached to the Declaration of Andrew Lazerow in Support of Intuitive Surgical Inc.'s Opposition to SIS's Motion *in Limine* #1.

its customers.  With its motions *in limine* ("MILs") Nos. 1 and 5, SIS seeks to hide all of this relevant and probative evidence from the jury.[2]

SIS bases its arguments entirely on the Court's summary judgment order that "narrowed" the parties' Lanham Act claims.  Mot. at 1.  Nothing in that order compels or supports the relief SIS seeks.  At summary judgment, the Court held that Intuitive could not proceed with its Lanham Act claim to the extent it required proving that SIS violated the Food, Drugs & Cosmetics Act ("FDCA").  Dkt. 204 at 13.  Intuitive will not offer any evidence for that purpose.  And the Court's *Daubert* rulings confirm that FDA-related evidence is admissible at trial.  The Court excluded ***legal*** opinions of ***SIS's*** FDA expert about whether SIS violated the FDCA.  Dkt. 203 at 20–21.  But the Court recognized that both parties' FDA experts should ***not*** be excluded in their entirety because evidence about the "FDA's practices and procedures" would "aid the fact finder."  *Id.*  Nothing has changed.  FDA-related evidence will aid the jury in resolving the merits of SIS's antitrust claims and should not be excluded.

## I.    FDA-RELATED EVIDENCE IS RELEVANT TO SIS'S ANTITRUST CLAIMS.

### A.    FDA-Related Evidence Is Relevant To The Rule Of Reason Analysis.

From the start of this case, SIS has claimed that Intuitive's contracts were anticompetitive, and that Intuitive's patient safety justifications should be rejected, because SIS's modified EndoWrists were safe and effective.  In its Complaint, SIS repeatedly invoked FDA lexicon by alleging, e.g., that SIS "demonstrated [the] safety and efficacy of its EndoWrist repair process" and that an "EndoWrist serviced by SIS . . . would be equally safe for the same number of subsequent uses" as one manufactured by Intuitive.  Dkt. 1 ¶¶ 78–79.  SIS claimed its "services ensure that the inspected or repaired EndoWrists meet all original specifications," *id.* ¶ 8, and "[i]ndications for use are not affected, and the surgical device or instrument is returned to its original safety and effectiveness."  *Id.* ¶ 33.  It even alleged that SIS "develops inspection and

---

[2] SIS's two motions *in limine* totaling 13 pages on the topic of FDA-related evidence violate the Court's Pretrial Order permitting one motion of up to seven pages on "a single, separate topic." *See* Dkt. 235 at 3, § II.B.  Indeed, SIS seeks to exclude the same evidence about the FDA's 510(k) "regulatory framework and procedures" in both motions.  MIL Nos. 1 and 5 at 1.  The Court should deny MIL Nos. 1 and 5 on this ground alone.  *See* Fed. R. Civ. P. 16(f)(1)(C).

1  repair processes" based on the FDA's Quality System Regulation. *Id.* ¶ 19. In effect, SIS has

2  claimed that its modified EndoWrists meet all the standards for safety and effectiveness that the

3  FDA applied in clearing Intuitive's original EndoWrists. *See id.* ¶ 27.

4        What SIS now wants to do with this motion is to hide from the jury—just like it hid from

5  its customers—what SIS ***did not do*** and what the FDA ***actually did*** with respect to safety and

6  effectiveness. It is undisputed that SIS had no process of its own for modifying or "repairing"

7  EndoWrists—it relied entirely on Rebotix. Ex. 2 at 47:4–6, 47:18–23, 49:23–50:3. SIS also

8  admitted that it did no safety testing of its own. *Id.* at 22:24–24:1, 24:13–16. Yet, SIS told

9  customers it had done extensive safety testing of EndoWrists to assure their reliability, safety, and

10  performance. Ex. 1 at -125, -132, -135–38. In reality, those claims came from Rebotix marketing

11  materials that SIS pawned off as its own. Ex. 2 at 65:16–67:23.

12        SIS did not disclose these admitted facts to its customers. Nor did SIS disclose that Rebotix

13  had previously applied to the FDA for 510(k) clearance, and that the FDA ***rejected*** that

14  application—identifying ***51 separate deficiencies*** that prevented a finding that Rebotix's modified

15  instruments were as safe and effective as the predicate devices and operate as originally intended.

16  Ex. 3. FDA specifically asked Rebotix to repeat its "***safety testing*** on end-of life devices." *Id.* at

17  23 (emphasis added). Rebotix did not address those deficiencies or honor that request; instead, it

18  abandoned its FDA application. It then partnered up with SIS to offer modified EndoWrist to

19  customers, and SIS continued passing off Rebotix's safety claims to customers.

20        This evidence is relevant for reasons that have nothing to do with whether FDA clearance

21  was legally required. It is purely factual. SIS claimed its product was safe and effective and would

22  function as originally intended, even though Rebotix did not convince the FDA of those claims.

23  Those facts bear directly on whether SIS offered a safe and commercially viable product, and

24  whether Intuitive acted reasonably to protect the quality of its product and patient safety. *See, e.g.*,

25  *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 983, 987–88 (9th Cir. 2023) (product quality relevant

26  to rule of reason analysis); *Sumotext Corp. v. Zoove, Inc.*, 2020 WL 533006, at *4 (N.D. Cal. Feb.

27  3, 2020) (denying motion *in limine* to exclude evidence of legitimate business justification).[3]

28

---

[3] This evidence also is relevant to Intuitive's counterclaims that have *not* been dismissed.

1      The opinions proffered by SIS's own experts confirm why this evidence is relevant. In the

2  section of his report on "harm to competition," SIS's economist, Dr. Lamb, argued that Intuitive's

3  safety justification should be rejected because "reprocessed devices are as safe and effective as the

4  predicate devices and operate as originally intended." Ex. 4 ¶ 130. Dr. Lamb based his opinions

5  on those of another SIS expert, Philip Phillips, who concluded that modified EndoWrists were safe

6  because of "***the FDA's recent clearance of reprocessed EndoWrist instruments***"—*i.e.*, the

7  Iconocare product. *Id.* But SIS did not market Iconocare's FDA-cleared modified EndoWrist.

8  Ex. 5 at 5. ████████████████████████████████████████████████████

9  ████████████████████    ████████████    Instead, SIS partnered with Rebotix—which, unlike

10  Iconocare, did ***not*** have FDA clearance, and which had its application rejected by the FDA. SIS

11  cannot be permitted to mislead the jury into thinking that the FDA has cleared all modified

12  EndoWrists when the FDA ***rejected*** the modified EndoWrists sold by SIS.

13      Further, SIS's experts are correct that the FDA's decision to clear Iconocare/Restore's

14  modified EndoWrist in 2022 is highly relevant—they just draw the wrong conclusion from it. In

15  the wake of the Iconocare FDA clearance, Intuitive clarified for its customers—via a public

16  announcement that SIS also seeks to keep out of evidence—that they were free, and authorized

17  under Intuitive's contracts, to buy FDA-cleared, remanufactured EndoWrists. That was fully

18  consistent with Intuitive's position that its contracts are necessary to ensure product safety, as were

19  Intuitive's actions with respect to ***unauthorized*** third-party products that had ***not*** received FDA

20  clearance. As Phillips writes (and Lamb echoes), "Iconocare Health provided performance data

21  to FDA that demonstrated that '. . . the reprocessed devices are as safe and effective as the predicate

22  and operate as originally intended.'" Ex. 7 ¶ 121; Ex. 4 ¶ 130. SIS, by contrast, ***did not***, and the

23  data that SIS's partner Rebotix submitted to the FDA was rejected as ***insufficient***.

24      It is obvious why SIS would try so hard to keep these facts from the jury—they destroy the

25  credibility of SIS's witnesses, along with the underpinnings of its antitrust case. But that is why

26  this evidence is so relevant and probative. SIS cannot claim that evidence relating to its own

27  allegations is irrelevant. *See, e.g.*, *S.S. ex rel. Stern v. Peloton Interactive, Inc.*, 2023 WL 7135265,

28

at *4 (S.D. Cal. Oct. 27, 2023) (testimony bearing on allegations in the complaint admissible).[4]

## B. FDA-Related Evidence Is Relevant To Causation And Damages.

Evidence about the impact of FDA clearance on hospitals' purchasing decisions is also probative of causation and damages. SIS must show that Intuitive's unlawful conduct was a material cause of its injury. *Catlin v. Wash. Energy Co.*, 791 F.2d 1343, 1347 (9th Cir. 1986). "The defendant's ability to present alternate causes is of paramount importance in allowing for an adequate defense." *Aycock v. R.J. Reynolds Tobacco Co.*, 769 F.3d 1063, 1069–70 (11th Cir. 2014). The jury should hear that the lack of FDA clearance, rather than Intuitive's conduct, impacted SIS's ability to compete. In other words, regardless of whether FDA clearance was legally required, at least some hospitals viewed FDA clearance as a proxy for safety. For example, some hospitals, including witnesses SIS intends to call, testified that they believed, wrongly, that Rebotix had FDA clearance, and this was an important factor in their decision to purchase modified EndoWrists. *E.g.*, Ex. 8 at 151:17–22, 153:13–154:11, 157:19–158:9.

Consistent with that hospital testimony, Iconocare witnesses testified that even though ***they*** did not believe that FDA clearance was legally required, they chose to seek it anyway ***for marketing reasons***. Ex. 9 at 47:18–22, 193:3–6, 195:7–10. SIS, by contrast, chose not to seek the FDA's "Good Housekeeping Seal of Approval" for ***its*** products, and Rebotix tried but failed to achieve it. The extent to which that ***choice*** suppressed demand for SIS's products in the real world, and would have impacted its ability to compete with third parties like Iconocare in the "but-for" world, is centrally relevant to SIS's ability to show causation of injury and damages.[5]

---

[4] SIS's Rule 403 argument that FDA-related evidence would create a "confusing sideshow," Mot. at 6–7, is wrong, and its reliance on products liability cases is misplaced. Unlike those cases, there is no debate here about the meaning of FDA clearance: SIS and its experts ***agree*** that the FDA's clearance of Intuitive's products as well as the Iconocare/Restore product means that the FDA determined those products to be as safe and effective as the relevant predicate devices. The FDA made no such determination with respect to SIS and Rebotix. SIS repeats the same arguments in its MIL No. 5, and Intuitive addresses them in more detail in response to that motion.

[5] Evidence tending to show that Intuitive's contract provisions were responsive to consumer demand is also relevant to the competitive effects analysis. *See Epic Games*, 67 F.4th at 987 (Apple's goal of "tapping into consumer demand" was a "plainly procompetitive rationale[].");  *Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 991 (9th Cir. 2020) (describing "'*enhanced consumer appeal*'" as a procompetitive justification (emphasis added) (quoting *United States v. Microsoft Corp.*, 253 F.3d 34, 59 (D.C. Cir. 2001))).

1
2

## II.    FDA EVIDENCE IS INDEPENDENTLY RELEVANT BECAUSE, CONSISTENT WITH THE *RESTORE* COURT, THE JURY SHOULD DECIDE AS A MATTER OF FACT WHETHER SIS WAS ENGAGED IN REMANUFACTURING.

3    For the reasons discussed above (and in response to SIS's MIL No. 5), the FDA evidence

4    that SIS seeks to exclude is relevant and probative *regardless* of any legal question about whether

5    SIS's activities required FDA clearance.  That evidence, however, is also independently relevant

6    because whether SIS's activities required FDA clearance is dispositive of the *factual* question of

7    antitrust injury.  There can be no antitrust injury if the regulatory scheme—not the alleged antitrust

8    violator—caused the alleged injury.  Dkt. 204 at 16.  FDA regulations describe what

9    remanufacturing of medical devices means and proscribe remanufacturing without 510(k)

10    clearance.  There is no dispute that neither SIS nor Rebotix had 510(k) clearance.  The only

11    question is whether their EndoWrist modifications constituted remanufacturing.

12    SIS complains that Intuitive proposed a jury instruction on the meaning of remanufacturing

13    and impact of engaging in remanufacturing without 510(k) clearance.  Mot. at 3–4.  Intuitive

14    proposed that instruction because it is consistent with the Court's reliance on the decisions in

15    *Restore Robotics, LLC v. Intuitive Surgical, Inc.*, No. 5:19-cv-55-TKW-MJF (N.D. Fla.).  *See* Dkt.

16    204 at 13 & n.8 (The Court "is in good company" with the *Restore* court on the issue of whether

17    SIS's services require 510(k) clearance.); *see also Restore Robotics, LLC v. Intuitive Surgical,*

18    *Inc.*, 2022 WL 1495005, at *3–4 (N.D. Fla. Apr. 11, 2022) (finding genuine dispute as to whether

19    Restore's injury was caused by Intuitive's conduct or Restore's lack of FDA clearance); *Restore*

20    *Robotics, LLC v. Intuitive Surgical, Inc.*, 2022 WL 19408080, at *3–4 (N.D. Fla. Feb. 7, 2022)

21    (precluding FDA expert from offering legal conclusions on the scope or meaning of FDA

22    regulations).

23    The *Restore* court viewed Restore's lack of 510(k) clearance as "the critical issue in this

24    case."  *See Restore*, 2022 WL 1495005, at *3.  Even though it was of the view that FDA clearance

25    is required, the *Restore* court, like this Court, declined to say that "in the first instance."  Ex. 10 at

26    94:2–6.  Instead, that court planned to let the jury "make a determination" as to whether Restore

27    was engaged in remanufacturing:  "The role of the Court is to determine the law regarding 510(k)

28    clearance and instruct the jury what was required of Plaintiffs under the law, and the role of the

1   jury is to resolve any disputed questions of fact bearing on Plaintiffs' compliance (or not) with the

2   law with the aid of any pertinent expert testimony regarding the complex regulatory scheme."

3   *Restore*, 2022 WL 19408080, at *3. The *Restore* court thus planned to allow the parties to

4   introduce testimony about the FDA's practices and procedures and the significance of FDA

5   actions, to "help the jury understand the complex regulatory scheme and determine the facts

6   bearing on Plaintiffs' compliance therewith." *Id.*[6]

7           The *Restore* court explained that the jury would decide (i) whether the FDA has decided

8   that the third party activities constituted "remanufacturing"; or, in the alternative, (ii) whether the

9   activities constituted remanufacturing. *See* Ex. 10 at 90:5–10, 90:25–91:15, 94:7–17, 94:25–95:2.

10  The court expected to give a jury instruction—like the one Intuitive has proffered here, Dkt. 266

11  at 160—on the relevant regulations that the jury would apply to the evidence. Ex. 10 at 91:9–15

12  ("[W]e tell them what the law is in the remanufacturing context. We've got [the expert] and

13  whatever they're going to bring forward, lay witnesses or experts, to articulate what -- how the

14  process works and what their particular devices are and where they fit in, and the jury then will

15  ultimately have to make that determination[.]"); *see also id.* 94:11–14 ("[T]hat was the essence of

16  what I expected to instruct the jury on. There's a requirement. It depends on whether you're

17  remanufacturing or not."). Respectfully, this Court should do the same.

18                                          **CONCLUSION**

19          For the foregoing reasons, the Court should deny SIS's MIL No. 1.

20

21

22

23

---

[6] The *Restore* court did not view the FDCA as precluding this defense in federal antitrust cases.
24  Unlike the plaintiffs in *Buckman* and *PhotoMedex*, Intuitive did not bring suit seeking to enforce
    the FDCA "for noncompliance with the medical device provisions." *See* Mot. at 2 (citing
25  *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 349 n.4 (2001); *PhotoMedex, Inc.* v.
    *Irwin*, 601 F.3d 919, 924 (9th Cir. 2010)). Nothing in the FDCA expressly prohibits a defendant
26  from arguing that the FDCA creates a regulatory bar to antitrust injury under the Sherman Act;
    the two statutes "complement each other." *Cf. POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S.
27  102, 115 (2014). Courts recognize that the FDCA does not relieve an antitrust plaintiff from
    showing that its injury was not caused by a regulatory bar. *See, e.g.*, *In re Canadian Imp.*
28  *Antitrust Litig.*, 470 F.3d 785, 791–92 (8th Cir. 2006).

Dated:  November 7, 2024

By: */s/ Kenneth A. Gallo*
    Kenneth A. Gallo

Kenneth A. Gallo (*pro hac vice*)
Paul D. Brachman (*pro hac vice*)
**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
2001 K Street, NW
Washington, DC  20006-1047
Telephone:  (202) 223-7300
Facsimile:  (202) 204-7420
Email: kgallo@paulweiss.com
Email: pbrachman@paulweiss.com

William B. Michael (*pro hac vice*)
Crystal L. Parker (*pro hac vice*)
Daniel A. Crane (*pro hac vice*)
**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone:  (212) 373-3000
Facsimile:  (212) 757-3990
Email: wmichael@paulweiss.com
Email: cparker@paulweiss.com
Email: dcrane@paulweiss.com

Joshua Hill Jr. (SBN 250842)
**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
535 Mission Street, 24th Floor
San Francisco, CA 94105
Telephone:  (628) 432-5100
Facsimile:  (628) 232-3101
Email: jhill@paulweiss.com

Sonya D. Winner (SBN 200348)
**COVINGTON & BURLINGTON LLP**
415 Mission Street, Suite 5400
San Francisco, California 94105-2533
Telephone:  (415) 591-6000
Facsimile:  (415) 591-6091
Email: swinner@cov.com

Kathryn E. Cahoy (SBN 298777)
**COVINGTON & BURLINGTON LLP**
3000 El Camino Real

- 8 -

5 Palo Alto Square, 10th Floor
Palo Alto, California 94306-2112
Telephone: (650) 632-4700
Facsimile: (650) 632-4800
Email: kcahoy@cov.com

Andrew Lazerow (*pro hac vice*)
**COVINGTON & BURLINGTON LLP**
One City Center 850 Tenth Street NW
Washington DC 20001-4956
Telephone: (202) 662-6000
Facsimile: (202) 662-6291
Email: alazerow@cov.com

Allen Ruby (SBN 47109)
**ALLEN RUBY, ATTORNEY AT LAW**
15559 Union Ave. #138
Los Gatos, California 95032
Telephone: (408) 477-9690
Email: allen@allenruby.com

Attorneys for *Defendant*
*Intuitive Surgical, Inc.*

Defendant's Opposition to Plaintiff's Motion *In Limine* #1
3:21-cv-03496-AMO

1

## CERTIFICATE OF SERVICE

2

On November 7, 2024, I caused a copy of Intuitive's Opposition to SIS's Motion *In Limine*

3

No. 1 to be served via electronic e-mail on counsel of record for Surgical Instrument Service Company, Inc. pursuant to the Court's Schedule and Pretrial Order in this case, ECF No. 235.

4

Dated: November 7, 2024                              By:  */s/ Kenneth A. Gallo*

5

Kenneth A. Gallo

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1   Kenneth A. Gallo (*pro hac vice*)
    Paul D. Brachman (*pro hac vice*)
2   **PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
    2001 K Street, NW
3   Washington, DC  20006-1047
    Telephone:  (202) 223-7300
4   Facsimile:  (202) 204-7420
    Email: kgallo@paulweiss.com
5   Email: pbrachman@paulweiss.com

6   William B. Michael (*pro hac vice*)
    Crystal L. Parker (*pro hac vice*)
7   Daniel A. Crane (*pro hac vice*)
    **PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
8   1285 Avenue of the Americas
    New York, NY 10019-6064
9   Telephone:  (212) 373-3000
    Facsimile:  (212) 757-3990
10  Email: wmichael@paulweiss.com
    Email: cparker@paulweiss.com
11  Email: dcrane@paulweiss.com

12  Joshua Hill Jr. (SBN 250842)
    **PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
13  535 Mission Street, 24th Floor
    San Francisco, CA 94105
14  Telephone:  (628) 432-5100
    Facsimile:  (628) 232-3101
15  Email: jhill@paulweiss.com

16  *Attorneys for Defendant Intuitive Surgical, Inc.*

17  [Additional counsel listed on signature page]

18                    **UNITED STATES DISTRICT COURT**

19              **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

20                      **SAN FRANCISCO DIVISION**

21  SURGICAL INSTRUMENT SERVICE          Case No.:  3:21-cv-03496-AMO
    COMPANY, INC.,
22                                       **DECLARATION OF ANDREW LAZEROW**
                    *Plaintiff,*         **IN SUPPORT OF INTUITIVE SURGICAL**
23        v.                             **INC.'S OPPOSITION TO SIS'S MOTION** *IN*
                                         *LIMINE* **#1**
24  INTUITIVE SURGICAL, INC.,

25                  *Defendant.*         Date:  November 25, 2024
                                         Time:  11:00 a.m.
26                                       Courtroom:  10

27
                                         Judge:  The Honorable Araceli Martínez-Olguín
28

---

I, ANDREW LAZEROW, declare as follows:

1.     I am an attorney licensed to practice in the District of Columbia and Maryland and am admitted to practice *pro hac vice* before this Court. I am a partner with the law firm of Covington & Burling LLP, counsel for Intuitive Surgical, Inc. ("Intuitive") in this matter. I have personal knowledge of the facts set forth herein, and if called to testify, I could and would testify competently thereto.

2.     Attached to this declaration as **Exhibit 1** is a true and correct copy of Defendant's Exhibit 136, a series of emails culminating in a September 25, 2019 email from Keith Johnson to Timothy P. Brooks and Perry Kirwan, attaching marketing materials for SIS's EndoWrist repair program, produced by Plaintiff Surgical Instrument Services Company, Inc. ("SIS") as SIS095115 – SIS095139.

3.     Attached to this declaration as **Exhibit 2** is a true and correct copy of excerpts of the transcript of the deposition of Greg Posdal, 30(b)(6) representative for SIS, taken in this litigation on November 1, 2022.

4.     Attached to this declaration as **Exhibit 3** is a true and correct copy of Defendant's Exhibit 256, a letter from FDA to Rebotix LLC on June 23, 2015, produced by third party Rebotix Repair LLC as REBOTIX171030 – REBOTIX171057.

5.     Attached to this declaration as **Exhibit 4** is a true and correct copy of excerpts of the Expert Report of Dr. Russell Lamb that SIS served in this litigation on December 2, 2022.

6.     Attached to this declaration as **Exhibit 5** is a true and correct copy of SIS's Responses to Intuitive's Second Set of Requests for Admission and Third Set of Interrogatories, dated October 16, 2024.

7.     Attached to this declaration as **Exhibit 6** is a true and correct copy of Defendant's Exhibit 266, a letter from FDA to Iconocare Health on March 30, 2021, produced by third party Alliance Healthcare Partners as AHP000527 – AHP000537.

8.     Attached to this declaration as **Exhibit 7** is a true and correct copy of excerpts of the Expert Report of Philip J. Phillips that SIS served in this litigation on December 2, 2022.

DECLARATION OF ANDREW LAZEROW IN
SUPPORT OF INTUITIVE SURGICAL INC.'S
OPPOSITION TO SIS'S MOTION IN LIMINE #1

Case No. 3:21-cv-03496-AMO

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

9.      Attached to this declaration as **Exhibit 8** is a true and correct copy of excerpts of the transcript of the deposition of Edward W. Harrich, 30(b)(6) representative for Pullman Regional Hospital, taken in the matter of *Rebotix Repair LLC v. Intuitive Surgical, Inc.*, No. 8:20-cv-2274 (M.D. Fla.), on May 24, 2021.

10.     Attached to this declaration as **Exhibit 9** is a true and correct copy of excerpts of the transcript of the deposition of Rick Ferreira taken in this litigation on November 10, 2022.

11.     Attached to this declaration as **Exhibit 10** is a true and correct copy of excerpts of the transcript of the final pretrial conference in the matter of *Restore Robotics, LLC et al. v. Intuitive Surgical, Inc.*, No. 5:19-cv-55-TKW-MJF (N.D. Fla.), conducted on January 13, 2023.

I declare under the laws of the United States that the foregoing is true and correct.

DATED:      November 7, 2024

_____

ANDREW LAZEROW

3

**EXHIBIT 1**

**to**

**DECLARATION OF ANDREW LAZEROW IN
SUPPORT OF INTUITIVE SURGICAL INC.'S
OPPOSITION TO SIS'S MOTION IN LIMINE #1**

Message
_____

**From**:           Keith Johnson [krjohnson@sis-usa.com]
**Sent**:           9/25/2019 7:47:21 PM
**To**:             Brooks, Timothy P. [Timothy.Brooks@bannerhealth.com]; Kirwan, Perry [Perry.Kirwan@bannerhealth.com]
**Subject**:        Re: UMC Tucson
**Attachments**:    da Vinci EndoWrist Repair_2019 copy.pdf; da Vinci EndoWrist Process_2019.pdf; SIS Summary of Quality
                    Regulatory.pdf; EndoWrist FAQs.pdf


HI Tim,  I have attached the documents we have put together to support this program.

Please let me know if this helps,  if we need to create any new documents, let's do it.  I will need to have our
corporate compliance and legal sign off on it prior to publication.

Excited to work on this project with you.

Keith

**Keith Johnson**  |  EVP, Sales and Clinical Programs
**Surgical Instrument Service Co., Inc.**
Corp: 800.747.8044  |  Cell: 623.687.5056
**www.sis-usa.com**

_____

**From:** Brooks, Timothy P. <Timothy.Brooks@bannerhealth.com>
**Sent:** Wednesday, September 25, 2019 4:20 PM
**To:** Kirwan, Perry <Perry.Kirwan@bannerhealth.com>; Keith Johnson <krjohnson@sis-usa.com>
**Subject:** RE: UMC Tucson

Anything you have that I can build a process to a competency to will help.

Tim Brooks, BS, CSPM,
Director – Banner Health Systems CSPD Program
Office - 520-694-6106
Cell – 520-400-6790
Banner University Medicine
SPD exists to make a difference in people's lives through excellent service to our patient care providers!!!
Be Bold – Be Kind – Be Awesome

_____

**From:** Kirwan, Perry <Perry.Kirwan@bannerhealth.com>
**Sent:** Wednesday, September 25, 2019 4:12 PM
**To:** Keith Johnson <krjohnson@sis-usa.com>; Brooks, Timothy P. <Timothy.Brooks@bannerhealth.com>
**Subject:** RE: UMC Tucson

Keith – if you have some process docs that we worked on as well – please send those to Tim as well

_____

**From:** Keith Johnson <krjohnson@sis-usa.com>
**Sent:** Wednesday, September 25, 2019 3:35 PM
**To:** Kirwan, Perry <Perry.Kirwan@bannerhealth.com>; Brooks, Timothy P. <Timothy.Brooks@bannerhealth.com>
**Subject:** [EXTERNAL] Re: UMC Tucson

Hi Tim,  great to connect again.

**Exhibit
Defs 0136**

CONFIDENTIAL - ATTORNEYS' EYES ONLY

I have attached the document in word format.

Please take a look and let me know your thoughts and recommended changes.

Looking forward to speaking with you soon.

Keith

**Keith Johnson** | EVP, Sales and Clinical Programs
**Surgical Instrument Service Co., Inc.**
Corp: 800.747.8044 | Cell: 623.687.5056
**www.sis-usa.com**

---

**From:** Kirwan, Perry <Perry.Kirwan@bannerhealth.com>
**Sent:** Wednesday, September 25, 2019 10:42 AM
**To:** Keith Johnson <krjohnson@sis-usa.com>; Brooks, Timothy P. <Timothy.Brooks@bannerhealth.com>
**Subject:** FW: UMC Tucson

Morning Keith

I think you two have met before so pass on the introductory formalities

We're looking to gear up for Si program at BUMCT/S.    I shared with Tim the documentation that I've been working on with you regarding process/procedure as well as supplementing your FAQs on the program as a whole.   Can you reach out directly to Tim and share the docs that you have thus far?   Tim has agreed to review, edit and also make additional comments if warranted to these documents.   I believe this input will prove to be key to the success at Banner however I also believe it will have utility outside of the Banner system as you look to further market this program nationwide.

Tim and I also discussed putting a competency program together for this which I think is a great idea since it's been recommended in other areas that we do the same for central sterile processing.   This would just fall in line with those other recommendations.

I believe that we are very close to actual kick-off which is awesome.   I'm looking forward to realizing the gains that we believe that this program is going to provide to both of us.

Thanks much!

Perry

---

**From:** Brooks, Timothy P. <Timothy.Brooks@bannerhealth.com>
**Sent:** Wednesday, September 25, 2019 10:35 AM
**To:** Kirwan, Perry <Perry.Kirwan@bannerhealth.com>
**Subject:** RE: UMC Tucson

Sounds good, look forward to speaking to him

---

**From:** Kirwan, Perry <Perry.Kirwan@bannerhealth.com>
**Sent:** Wednesday, September 25, 2019 10:18 AM

CONFIDENTIAL - ATTORNEYS' EYES ONLY

**To:** Brooks, Timothy P. <Timothy.Brooks@bannerhealth.com>
**Subject:** RE: UMC Tucson

Yes – we have been working on documentation for this.  That said, I think a review and any suggested edits from your perspective would be awesome.  As you alluded to – we want this to be super crisp and eliminate any variables that we can from the process.

I think you're' suggestion of competency requirement is also a good one.  Just strengthens the precision of what we're doing.

Ok for me to have Keith Johnson reach out to you directly and he can share where we are so far with our documentation.   He will be very receptive to edits and even additional information requirements.   This is just as much of a learning experience for them as it is us (on process that is – not the actual service).

Thanks Tim for the valuable input

Perry

---

**From:** Brooks, Timothy P. <Timothy.Brooks@bannerhealth.com>
**Sent:** Wednesday, September 25, 2019 10:13 AM
**To:** Kirwan, Perry <Perry.Kirwan@bannerhealth.com>
**Subject:** RE: UMC Tucson

Perfect, sounds doable!
We should put this into a competency format that we can get education signoff from staff in both SPD and PeriOp.  I am sure IP would like to see that.

Did SIS provide anything that we could formalize into a one or two page competency?  I can create the competency, just need their requirements.

---

**From:** Kirwan, Perry <Perry.Kirwan@bannerhealth.com>
**Sent:** Wednesday, September 25, 2019 10:01 AM
**To:** Brooks, Timothy P. <Timothy.Brooks@bannerhealth.com>
**Subject:** RE: UMC Tucson

Not exactly.   Once we get down to one (1) use on the instrument and that's key - because we need that last count to pull off all the identifying information that's associated with the arm -, we pull the arm out of service and send it to SIS.  SIS will use that last count to read the information off and then they will load a full complement of use back on the counter associated with that instrument.

The process would be something like this.   As arms come down to central processing, we would use the SIS provided reader to read the arm.   If it has two more uses on it – we would process as normal and put it back into circulation.   If it has one use on it – we would clean it and then put it into a receptacle (we already have these) for collection.   SIS will collect the instruments in the bins and then reload the counters.   If an arm say is rated for 10 uses – we would get 10 new uses once it returns from SIS.   If the arm has 15 – then it would come back with 15.   It is actually important that we don't receive an instrument back with less or more than the intended design otherwise we get into FDA issues because we would be re-manufacturing the device and we obviously don't want that.

Also important is that is we receive an instrument from the OR with zero uses left – it's important to collect those as well.  We simply use them for parts and we get repair credit from SIS.  So, we never want to toss any of them away as they are no value to use in landfill.

Does that make sense?

**From:** Brooks, Timothy P. <Timothy.Brooks@bannerhealth.com>
**Sent:** Wednesday, September 25, 2019 9:36 AM
**To:** Kirwan, Perry <Perry.Kirwan@bannerhealth.com>
**Subject:** RE: UMC Tucson

Hi Perry
So the arm would have to be reset after every use?
If so we will have to discuss who is doing this.  My preference would be in SPD.
Nick is on vacation this week returning Tuesday next.  I spoke to him before going on PTO, he seemed to believe that it would not be a problem.
Tim

**From:** Kirwan, Perry <Perry.Kirwan@bannerhealth.com>
**Sent:** Wednesday, September 25, 2019 9:09 AM
**To:** Brooks, Timothy P. <Timothy.Brooks@bannerhealth.com>
**Subject:** FW: UMC Tucson

Morning Tim

We have ordered a device from SIS that will allow us to get a 'count' on the Si Robotic arms without having to connect it to the full robot – should make workflow in central processing (or elsewhere) a little easier in terms of tracking the counters.

I'm wondering if we are at a point where we're ready to conduct our pilot at BUMCT/S.

Let me know your thoughts

Thx
Perry

**From:** Keith Johnson <krjohnson@sis-usa.com>
**Sent:** Wednesday, September 25, 2019 6:34 AM
**To:** Kirwan, Perry <Perry.Kirwan@bannerhealth.com>
**Subject:** [EXTERNAL] UMC Tucson

Are we good to schedule the install and training on the counter for next Tuesday?

**Keith Johnson** | **Executive Vice President**
Sales and Clinical Programs
**Surgical Instrument Service Co., Inc.**
Corp: 800.747.8044  |  Cell: 623.687.5056
www.sis-usa.com

CONFIDENTIAL - ATTORNEYS' EYES ONLY                                                                    SIS095118



# Surgical Instrument Service Co., Inc.

# da Vinci® EndoWrist® Repair FAQs

CONFIDENTIAL - ATTORNEYS' EYES ONLY

### Can you send me your certification / FDA approval?

The FDA does not regulate, nor certify, repairs. The FDA regulates third party reprocessing companies and single-use devices only.

## What does your service provide?

SIS's service is a complete repair of the da Vinci® EndoWrist® instruments. The instruments are sold with a use counter which limits the life of the instrument. Upon reaching a zero count the instruments are "expired" and rendered useless.

This service includes resetting the use counter via a replacement chip as well as a complete evaluation and repair of the distal/tool end of the instrument. The replacement chips, as well as the service process, were designed and developed under a formal quality system ensuring the serviced instruments meet the quality and functional requirements of a new device. Formal, independent testing and validation on the replacement chips were conducted to ensure the intended use and performance are equivalent to that of the new OEM device.

## What do we need to know to collect instruments for service?

Upon receiving an instrument for the initial repair, the instrument must have at least one use left on the counter. If the original instrument reaches zero (0) it cannot be serviced. In order for the reset to be performed, the data must be retained on the initial repair. However, once the reset has been performed once, the instrument can be used up to expiration (zero) and still retain its original data and the ability to be reset.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

## *What instrument models are supported?*

**Compatible EndoWrist® Instruments**
420001 Potts Scissors
420003 Small Clip Applier
420006 Large Needle Driver
420007 Round Tip Scissors
420033 Black Diamond Micro Forceps
420036 DeBakey Forceps
420048 Tip Forceps
420049 Cadiere Forceps
420093 ProGrasp Forceps
420110 PreCise Bipolar Forceps
420121 Fine Tissue Forceps
420157 Snap-fit™ Scalpel Instrument
420171 Micro Bipolar Forceps
420172 Maryland Bipolar Forceps
420178 Curved Scissors
420179 Hot Shears (Monopolar Curved Scissors)
420181 Resano Forceps
420183 Permanent Cautery Hook
420184 Permanent Cautery Spatula
420189 Double Fenestrated Grasper
420190 Cobra Grasper
420192 Valve Hook
420194 Mega Needle Driver (Tapered)
420203 Pericardial Dissector
420204 Atrial Retractor
420205 Fenestrated Bipolar Forceps
420207 Tenaculum Forceps
420215 Cardiac Probe Grasper
420227 PK® Dissecting Forceps
420230 Large Clip Applier
420246 Atrial Retractor Short Right
420249 Dual Blade Retractor
420278 Graptor (Grasping Retractor)
420296 Large SutureCut™ Needle Driver
420309 Mega™ SutureCut™ Needle Driver
420318 Small Graptor (Grasping Retractor)
420327 Medium-Large Clip Applier
420344 Curved Bipolar Dissector

*Can you describe your service process?*



EndoWrists® Service Process Flowchart

SIS095122

## *Additional information:*

- EndoWrist® functionality and safety are not affected by the repair
  - o Extensive analysis and formal testing were performed to ensure the proper function and performance
  - o Repaired instruments have been subjected to, and passed, all appropriate ISO 10993 biocompatibility tests (by a certified independent test laboratory)
  - o Electrical and electrosurgical safety have been carefully considered per the expectations in the safety standards, and special fixtures are used during service to retest the instrument to a production equivalent qualification

- Service components are built to medical device quality standards, including:
  - o ISO 9001: Quality Systems Model for QA in Design/Development, Production, Installation, and Servicing
  - o ISO 9002: Quality Systems Model for QA in Production and Installation
  - o ISO 9003: Quality Systems Model for QA in Final Inspection and test
  - o ISO 9001: Quality Management Systems

- The service process is performed under a formal quality control system certified per ISO 9001, with all assembly operations and testing performed per formal procedures

- SIS provides continuing technical support to assure the final quality of the serviced instruments, and will monitor and respond to any reported field issues using a formal surveillance system

- Validated fixtures and tools can be provided to repeat safety testing in the hospital, if desired

CONFIDENTIAL - ATTORNEYS' EYES ONLY

**da Vinci® EndoWrist® Repairs**

**Stop throwing away money on your da Vinci® EndoWrist® devices!**

SIS can now service your da Vinci® devices including repair and use counter reset.

Important facts:

- The da Vinci® EndoWrist® is a "multi-use" medical device. Multi-use devices, such as endoscopic instruments, have always been eligible for repair.

- The repair of da Vinci® EndoWrist® does not alter the intended use, method of use, functionality or performance of the device in any way.

- The da Vinci® Robot interacts with the repaired EndoWrist® identically and the robot <u>cannot</u> be affected by the repaired device in any way.

- The robot communicates with the EndoWrist® prior to surgery <u>only</u>. Prior to surgery, the robot confirms the serial number, model number and remaining uses. The repaired device will function identically to the new OEM EndoWrist®.

- A repaired EndoWrist® is not an alternative or replacement device. It is an original da Vinci® manufactured device that has been repaired to original specifications.

## It's time to challenge the status quo

SIS da Vinci® EndoWrist® repair services will boost your bottom line and help provide the prompt and tailored responses your OR demands.

Call your local SIS representative or our Corporate Office at 800.747.8044.

CONFIDENTIAL - ATTORNEYS' EYES ONLY



## da Vinci® EndoWrist® Repair Process

When sending in your DaVinci EndoWrist® devices to SIS for repair, it is important to follow all the instructions below.

**All devices must go through the decontamination process before they are collected for service by SIS.** The devices do not need to be sterile.

### Initial Service on an EndoWrist® (Si & S) Device

- The EndoWrist® must be sent in with one click remaining. This is only required for the initial service of the EndoWrist®. Once the device has been serviced by SIS, the counter can be run to zero.
- If an EndoWrist® is being sent for its initial service with SIS, place a red sticker on the body of the device.
- Place EndoWrist® into the SIS collection container
- Devices will be collected by your local SIS representative and shipped to the SIS National Service Center.
- Devices will be tested, refurbished to OEM performance specifications, and reset for 10 additional uses. During the refurbishment process, a code will be etched on the device.
- Once repaired, the device will be returned to your facility by your local SIS representative.

### Ongoing Service of EndoWrist® (Si & S) Devices (applies only to devices that have been previously serviced by SIS)

- Device to be collected with zero clicks remaining (device is "expired")
- Place EndoWrist® into the SIS collection container
- Devices will be collected by your local SIS representative and shipped to the SIS National Service Center.
- Devices will be tested, refurbished to OEM performance specifications, and reset for 10 additional uses.
- Once repaired, the device will be returned to your facility by your local SIS representative.

### EndoWrist® (Xi, Si & S) Device Collection for Parts and Testing

- All Xi devices
- Si and S devices that have zero clicks or have expired and not been serviced prior by SIS (not etched)
- Place devices in the SIS collection container
- Devices will be collected by your local SIS representative and shipped to the SIS National Service Center.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

SIS095125



# Surgical Instrument Service Co., Inc.

# Summary of Quality and Reliability Measures

CONFIDENTIAL - ATTORNEYS' EYES ONLY

## BACKGROUND

SIS da Vinci® repair is a specialized process for the EndoDevice® instruments of the da Vinci® surgical robot to extend their safe and effective life beyond the uses recommended by the original equipment manufacturer. SIS services the devices by installing a resettable use counter while maintaining the ability of the da Vinci™ Surgical Robot to access all data in the OEM memory and to count uses as usual.

These devices are not single use devices. The materials in the instruments are durable and commonly used in other reusable medical devices. Testing of the instruments after many additional usage cycles indicated no trend of material deterioration beyond normal tool wear.

The intended use, method of use, functionality, or performance of the instrument are not changed by this service. The original data required by the machine to communicate with the instrument is not altered in any way. The machine will still recognize the model number, serial number, and instrument being used. Additionally, the data read from the instrument is clearly displayed and verified by the user and robot prior to surgery. Data is not read during surgery.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

# QUALITY SYSTEM INFORMATION

The quality management system has been approved by the notified body DQS Medizinprodukte GmbH according to ISO 13485:2003 and MDD 93/42/EEC MOD 5 compliant system.

The quality management system has been approved and is currently certified by the notified body Global Group according to ISO 9001:2015.

# SERVICE PROCESS DEVELOPMENT

The da Vinci® S/Si instruments are sold with an arbitrary use counter, which limits usage to a certain number of procedures. Upon reaching zero, the instruments are considered "expired" and must be discarded. Our service provides the ability to extend the useful life of the instrument. The service process involves a complete evaluation, repair, and test of the instrument.

The SIS EndoWrist® service was designed for the da Vinci® S/Si Device Instruments, the OEM chip, and robot interface to perform in the same manner as the OEM original. This service does not affect the instruments form, fit or function.

The applicable products are outlined on the following pages (this list may be updated as new products are approved for repair):

| REF | USES | DESCRIPTION |
|-----|------|-------------|
| 420001 | 10 | Potts Scissors |
| 420003 | 100 | Small Clip Applier |
| 420006 | 10 | Large Needle Driver |
| 420007 | 10 | Round Tip Scissors |
| 420033 | 15 | Black Diamond Micro Forceps |
| 420036 | 10 | DeBakey Forceps |
| 420048 | 10 | Long Tip Forceps |
| 420049 | 10 | Cadiere Forceps |
| 420093 | 10 | ProGrasp Forceps |
| 420110 | 10 | PreCise Bipolar Forceps |
| 420121 | 15 | Fine Tissue Forceps |
| 420157 | 30 | Snap-fit™ Scalpel Instrument |

CONFIDENTIAL - ATTORNEYS' EYES ONLY

SIS095129

| 420171 | 10 | Micro Bipolar Forceps |
|--------|-----|------------------------|
| 420172 | 10 | Maryland Bipolar Forceps |
| 420178 | 10 | Curved Scissors |
| 420179 | 10 | Hot Shears (Monopolar Curved Scissors ) |
| 420181 | 10 | Resano Forceps |
| 420183 | 10 | Permanent Cautery Hook |
| 420184 | 10 | Permanent Cautery Spatula |
| 420189 | 10 | Double Fenestrated Grasper |
| 420190 | 10 | Cobra Grasper |
| 420192 | 15 | Valve Hook |
| 420194 | 10 | Mega Needle Driver (Tapered) |
| 420203 | 10 | Pericardial Dissector |
| 420204 | 10 | Atrial Retractor |

CONFIDENTIAL - ATTORNEYS' EYES ONLY

| 420205 | 10 | Fenestrated Bipolar Forceps |
|--------|-----|------------------------------|
| 420207 | 10 | Tenaculum Forceps |
| 420215 | 10 | Cardiac Probe Grasper |
| 420227 | 10 | PK® Dissecting Forceps |
| 420230 | 100 | Large Clip Applier |
| 420246 | 10 | Atrial Retractor Short Right |
| 420249 | 10 | Dual Blade Retractor |
| 420278 | 10 | Graptor (Grasping Retractor) |
| 420296 | 10 | Large SutureCut™ Needle Driver |
| 420309 | 10 | Mega™ SutureCut™ Needle Driver |
| 420318 | 10 | Small Graptor (Grasping Retractor) |
| 420327 | 100 | Medium-Large Clip Applier |
| 420344 | 10 | Curved Bipolar Dissector |

CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Risk Management

Risk management activities per ISO 14971 standard were performed during the development, verification and validation of service processes. Post-production monitoring of the devices serviced by SIS will ensure this service remains free from safety concerns. The risk management process identifies, estimates, and evaluates the serviced product's safety risks, methods to control these risks, and to verify the effectiveness of these controls. A detailed FMEA (Failure Modes and Effects Analysis) was performed covering the service process.

# Development Process

Extensive validation and safety testing occurred during the development of the service process (see below). Both the development of the service process and the ongoing repair operations are performed under the appropriate certified quality systems. A complete technical file describing qualification activities and independent testing was created and informed the development of formal procedures to guide the service operations performed.

The following list of standards was considered and applied to the development process:

| Standard # | Year | Title |
|---|---|---|
| EN 980 | 2008 | Symbols for use in the labeling of medical devices |
| EN 1041 | 2008 | Information supplied by the manufacturer of medical devices |
| EN ISO 10993-1 | 2009 | Biological evaluation of medical devices – Part 1: Evaluation and testing within a risk management process |
| EN ISO 10993-4 | 2009 | Biological evaluation of medical devices – Part 4: Selection of tests for interactions with blood |
| EN ISO 10993-5 | 2009 | Biological evaluation of medical devices – Part 5: Tests for in vitro cytotoxicity |
| EN ISO 10993-10 | 2010 | Biological evaluation of medical devices – Part 10: Tests for Irritation and Skin Sensitization |
| EN ISO 10993-11 | 2009 | Biological evaluation of medical devices – Part 11: Tests for systemic toxicity |

CONFIDENTIAL - ATTORNEYS' EYES ONLY

| EN ISO 10993-12 | 2012 | Biological evaluation of medical devices – Part 12: Sample preparation and reference materials |
|---|---|---|
| EN ISO 13485 | 2012 & AC: 2012 | Medical devices – Quality management systems – Requirements for regulatory purposes |
| EN ISO 14971 | 2012 | Application of risk management to medical devices |
| EN ISO 14937 | 2009 | Sterilization of health care products – General requirements for characterization of a sterilizing agent and the development, validation and routine control of a sterilization process for medical devices |
| EN ISO 17664 | 2004 | Sterilization of medical devices – Information to be provided by the manufacturer for the processing of re-sterilizable medical devices |
| EN ISO 17665-1 | 2006 | Sterilization of health care products – Moist Heat – Part 1: Requirements for the development, validation and routine control of a sterilizer for medical devices (reference only) |
| EN ISO 17665-2 | 2009 | Sterilization of health care products – Moist Heat – Part 2: Guidance on the application of ISO 17665-1 (reference only) |
| EN 60601-1 | 2006 | Medical electrical equipment – Part 1: General requirements for basic safety and essential performance |
| EN 60601-1-2 | 2007 | Medical electrical equipment – Part 1-2: General requirements for basic safety and essential performance – Collateral standard: Electromagnetic compatibility – Requirements and tests |
| EN 60601-2-2 | 2009 | Medial electrical equipment – Part 2-2: Particular requirements for the basic safety and essential performance of high frequency surgical equipment and high frequency surgical accessories |
| EN 62304 | 2006 | Medical device software – Software life-cycle processes |
| EN 62366 | 2008 | Medical devices – Application of usability engineering to medical devices |

SIS095133

# BIOLOGICAL EVALUATION

The material and microbiological characteristics of devices that have been serviced have been evaluated to determine whether they demonstrate any biocompatibility risk. It has been assumed that the OEM devices were marketed as biocompatible.

Tests were conducted with devices serviced to demonstrate compliance to the following standards:

| Test | Standard | Report # |
|------|----------|----------|
| ISO MEM Elution Assay with L-929 Mouse Fibroblast Cells | • ISO 10993-5: 2009 Biological Evaluation of Medical Devices, Part 5: Tests for In Vitro Cytotoxicity<br>• ISO 10993-12: 2012 Biological Evaluation of Medical Devices, Part 12: Sample Preparation and Reference Materials | 5107 and 5109 |
| ASTM Hemolysis – Extract Method (GLP) | • ASTM Guideline F619-03, reapproved 2008. Standard Practice for Extraction of Medical Plastics. 2012. Annual Book of ASTM Standards, Volume 13.01:223-226<br>• ISO 10993-4: 2002 and Amendment 1, 2006. Biological Evaluation of Medical Devices, Part 4: Selection of Tests for Interaction with Blood<br>• ISO 10993-12: 2012 Biological Evaluation of Medical Devices, Part 12: Sample Preparation and Reference Materials | 4349 and 4350 |
| ISO Guinea Pig Maximization Sensitization Test (GLP-2 Extracts) | • ISO 10993-10: 2010 Biological Evaluation of Medical Devices, Part 10: Tests for Irritation and Skin Sensitization, pp. 18-26<br>• ISO 10993-12: 2012 Biological Evaluation of Medical Devices, Part 12: Sample Preparation and Reference Materials | 5003 and 4981 |
| ISO Acute Systemic Injection Test (GLP-2 Extracts) | • ISO 10993-11: 2006 Biological Evaluation of Medical Devices, Part 11: Tests for Systemic Toxicity<br>• ISO 10993-12: 2012 Biological Evaluation of Medical Devices, Part 12: Sample Preparation and Reference Materials | 4498 and 4501 |

SIS095134

| ISO Intracutaneous Irritation Test (GLP-2 Extracts) | • ISO 10993-10: 2010 Standard, Biological Evaluation of Medical Devices, Part 10: Tests for Irritation and Skin Sensitization, pp. 11-14 | 4316 and 4317 |
| | • ISO 10993-12: 2012 Biological Evaluation of Medical Devices, Part 12: Sample Preparation and Reference Materials | |

The test results revealed no unacceptable levels of toxicity or irritation. All test samples demonstrated the necessary biocompatibility characteristics.

# Cleaning and sterilization

The serviced devices are not provided in a sterile condition. However, they do require cleaning and sterilization prior to clinical use per the OEM IFU. There are no changes to these processes, which are performed between surgeries at the hospital. In order to ensure that sterilization instructions remain valid for the devices serviced, they have completed both cleaning and sterilization qualification studies. These studies were performed by a third party specializing in the cleaning and sterilization processes. The final results demonstrate that the recommended procedures ensure adequate cleaning and sterilization for end users of the devices.

# ELECTRICAL AND ELECTROSURGICAL SAFETY

Electrical/Electrosurgical safety testing has been conducted using a third party independent test lab to verify serviced devices meet applicable environmental, safety and labeling requirements.

Tests were performed using devices serviced to demonstrate compliance to the standards listed on the following page:

CONFIDENTIAL - ATTORNEYS' EYES ONLY

| Standard Document | Description |
|---|---|
| IEC 60601-1: 2005 & A1: 2012 | Medical Electrical Equipment – Part 1: General requirements for basic safety and essential performance |
| IEC 60601-2-2: 2009 | Medical Electrical Equipment – Part 2-2: Particular requirements for the basic safety and essential performance of high frequency surgical equipment and high frequency surgical accessories |
| EN 60601-1-2: 2007 | Medical Electrical Equipment: General requirements for basic safety and essential performance. Collateral standard. Electromagnetic compatibility. Requirements and tests. |

The results demonstrate compliance with the applicable requirements of the aforementioned safety standards for medical devices.

# USABILITY ENGINEERING

The services have been designed to maintain the exterior specification, connection, use application, user profile, or frequently used functions, when compared to the original devices produced by the OEM. We have considered the impact of the safety and labeling requirements for the end users. One additional challenge to the labeling integrity was conducted during the electrical safety testing by SGS. Those results demonstrated legibility following an intentional rub down test.

# RELIABILITY/PERFORMANCE TEST SUMMARY

A worst-case analysis was carried out to determine which models should be used during performance and life testing. Although each tool is unique, there are four basic mechanical function/tool end designs: Scissors, Graspers, Needle Drivers and Non-Opening (tool ends that do not open and close).

In addition, certain models deliver RF energy ("Energized Device"). Energized Devices are either Monopolar, Bipolar or PlasmaKinetic™ (PK™). For each Tool End Design, an Energized Device is considered worst case because RF energy represents a greater stress/challenge to the tool end. Representative models

were chosen based on Tool End Design, Energized Device models and general market popularity.

Initially, a quantity of each representative model was characterized by their mechanical and functional properties. New OEM instruments were analyzed to provide baseline statistics and information. Examples of such statistics include, but were not limited to:

- Tool end range of motion
- Tool end functional performance (e.g. grasping performance and cutting performance)
- RF energy effectiveness
- Electrical safety testing
- General instrument condition
- Effective communication and use counting on the host system

Following the OEM characterization, instruments with one remaining use underwent the repair process. Immediately following the repair process, the instruments were subjected to the same baseline testing in order to establish equivalence. Formal life-testing was then conducted to simulate an additional 10 uses. The life testing subjected the instrument to 10 simulated surgical environments to test each aspect of the individual instrument's functional capabilities. After each of the simulated uses, the instruments were subjected to the normal cleaning and sterilization procedures provided by the OEM. At different intervals, and at end-of-life, the instrument was subjected to the same battery of testing. The testing showed no degradation in performance or condition of the instruments. The formal protocols executed reside in the technical file per the ISO 13485 quality system used for development; these files were independently reviewed by DQS, a certified EU notified body assessor for medical devices.

Additionally, this repair process was repeated and a battery of tests was performed on the same batch of instruments. This brought the total number of uses experienced by the instruments to 29. This includes the 9 original uses on the OEM device, 10 additional uses following first repair service, and another 10 uses following the second repair process. The reliability testing following two repair services showed no trend of degradation in the performance or condition

of the instruments, therefore no further cycles under this formal protocol were conducted.

The test results revealed that all acceptance criteria have been achieved and the sample devices demonstrate sufficient performance and safety characteristics in order to confidently release the devices to distribution. Also, a worst-case verification test has been performed on the flush tube, a component of all devices, to ensure it has been adequately challenged in an effort to confirm the environmental conditions of use do not adversely affect the component and related performance expectations.

During further analysis for reliability, disassembled OEM instruments and their components underwent material analysis by experts in medical device design and construction. The instruments' materials were surgical grade metals or well-established thermoplastics already being utilized in other multiple-use surgical instruments.

Following the formal testing described above, a smaller batch of representative models were subjected to over 50 cleaning and sterilization cycles to demonstrate the robust nature of the instrument's design. Similar inspection and testing was carried out on these devices, and, as expected, no indications of material degradation were
observed.

# FUNCTIONAL VERIFICATION AND VALIDATION

## Approach

Several compatibility and functional validations were conducted of the replacement chip for use with the da Vinci® S and da Vinci® Si Surgical Systems. Such validations included utilizing OEM instruments to characterize the timing and types of communications between the instrument and the host system. These same instruments were then repaired, and the replacement chip installed. The repaired instruments were then subjected to the same characterization on the same host systems to validate their equivalence. These validations showed equivalence in all instrument models and on both the S and Si Surgical Systems.

Functional testing included extensive formal protocols following regulatory expectations for medical device software testing (there is no software inside the instrument, but it interfaces to the software inside the robot itself via a simple data bus). Reputable third-party experts were utilized to ensure rigorous and independent validation.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

**EXHIBIT 2**

**to**

**DECLARATION OF ANDREW LAZEROW IN
SUPPORT OF INTUITIVE SURGICAL INC.'S
OPPOSITION TO SIS'S MOTION IN LIMINE #1**

```
 1            UNITED STATES DISTRICT COURT
 2            NORTHERN DISTRICT OF CALIFORNIA
 3
 4   SURGICAL INSTRUMENT SERVICE      )
     COMPANY, INC.,                   )
 5                                    )
          Plaintiff,                  )
 6                                    )
          vs.                         ) Case No.
 7                                    ) 3:21-CV-03496-VC
     INTUITIVE SURGICAL, INC.,        )
 8                                    )
          Defendant.                  )
 9   _____ )
10
11
12        VIRTUAL VIDEOCONFERENCE VIDEO-RECORDED
13             DEPOSITION OF GREG POSDAL
14      30(B)(6), SURGICAL INSTRUMENT SERVICE COMPANY
15
16             Tuesday, November 1, 2022
17        Remotely Testifying from Phoenix, Arizona
18
19
20
21
22
23   Stenographically Reported By:
24   Hanna Kim, CLR, CSR No. 13083
25   Job No. 5541334-A
```

Page 1

1    that what SIS calls the recovery program?

2        A.    It is.

3        Q.    What is the -- how -- how does the

4    resetting program work?

5        A.    To my understanding -- and this goes back        09:18:52

6    to probably the middle of 2019, I visited Rebotix at

7    their location.  And Chris Gibson walked me through

8    the process of adding an electronic device that

9    would allow the -- the addition of ten more uses.

10       Q.    SIS does not itself perform the resetting        09:19:22

11   process; correct?

12       A.    It -- that is correct.

13       Q.    When's the last time SIS facilitated a

14   chip reset for one of its customers?

15       A.    I couldn't be sure, but it was probably        09:19:39

16   2019 or '20, that that whole issue was shut down

17   pretty quickly.

18       Q.    How does the recovery program work?

19       A.    The recovery program is simply getting the

20   device from the customer, attaching a device that        09:20:08

21   could read only the number of lives left on it, and

22   returning it to the customer.

23       Q.    I'll focus first on the reset program.

24             Did SIS perform any testing of its own

25   regarding the reset program before SIS first        09:20:30

Page 22

```
 1   marketed it?
 2       A.   No.  We were in a partnership with Rebotix
 3   for a number of -- Benjamin Biomedical and Rebotix,
 4   they do some repairs and some components for us,
 5   harmonic scalpels and Phaco handpieces and video      09:20:49
 6   cameras, which are considerably more complex in the
 7   EndoWrist we're speaking about, and they have --
 8   they had done a great job of those over the number
 9   of years.
10           We saw their test results and -- and as I     09:21:05
11   had mentioned prior, the visit to Rebotix where we
12   walked through the process, and we were satisfied
13   that the testing they'd done -- they had done was
14   adequate, especially with regard to our expertise
15   in -- in regular instrument device repair for the    09:21:22
16   last 50 years.  The only thing that's really
17   different about this process is the chip counter
18   itself.
19       Q.   Okay.  So I -- I understand that SIS may
20   have had a partnership with Rebotix.  But my          09:21:38
21   question was -- was focused solely on testing that
22   SIS did itself.
23           And I'm -- I'm correct in understanding
24   that SIS did not perform any of its own testing for
25   the reset process; correct?                           09:21:50
```

Page 23

```
 1        A.    That is correct.

 2        Q.    Did SIS itself engage any third parties to

 3   perform testing regarding the reset process

 4   before --

 5        A.    Only --                                    09:22:00

 6        Q.    -- marketing it --

 7              (Simultaneous speaking.)

 8              (Interruption in audio/video.)

 9              THE COURT REPORTER:  I'm sorry.  There was

10   a word that got cut out.  Please repeat.              09:22:04

11              MR. CHAPUT:  Yes.

12   BY MR. CHAPUT:

13        Q.    Did SIS itself engage any third parties to

14   perform testing regarding the reset process before

15   marketing it?                                         09:22:12

16        A.    No.  Only Rebotix.

17        Q.    What testing did Rebotix perform before

18   SIS started marketing the reset process?

19        A.    I -- I don't have any of that information

20   in front of me.  But it was fairly extensive, a       09:22:32

21   bunch of ISO certifications, reprocessing tests

22   through, I think, up to 50 uses or more.  I think

23   that was about -- I -- I'm sure they -- they did

24   more testing to get that product finished, but I'm

25   not privy to that information.                        09:22:53
```

Page 24

```
 1              Are you prepared to testify regarding

 2    Topic 4?

 3         A.   Yes, I am.

 4         Q.   So focusing on the reset process, what are

 5    SIS's procedures for performing the reset of          09:52:30

 6    EndoWrist instruments?

 7              MR. McCAULLEY:  Objection.  Form.  Beyond

 8    the scope of the topic.

 9              THE WITNESS:  Do I answer that one?

10              MR. CHAPUT:  So, I mean, Rick, I -- I       09:52:44

11    cannot imagine how you think that that question is

12    beyond the topic, which is specifically about SIS's

13    procedures and practices relating to inspection and

14    repair of EndoWrist instruments.

15              MR. McCAULLEY:  You can answer the          09:53:00

16    question.

17              THE WITNESS:  Okay.

18              To date, we didn't have our own processes.

19    Again, going back to some of the previous

20    questioning, we were working with re -- Rebotix.      09:53:07

21    And they -- we were using all -- they were

22    performing all the repairs, and it was all their

23    testing.

24    BY MR. CHAPUT:

25         Q.   What are Rebotix' repair procedures --      09:53:20
```

                                                    Page 47

1    excuse me.

2          What are Rebotix' procedures for

3    performing the reset of EndoWrist instruments?

4          A.   Whatever their process was at the time.   I

5    don't have that in front of me or -- or know what          09:53:33

6    that is, but they had developed a process for the

7    complete inspection and replacement of that chip and

8    repair.   And they simply performed all of that

9    service.

10         Q.   Okay.   So SIS had no process for              09:53:49

11   disassembling the EndoWrist instruments; correct?

12         A.   That is correct.

13         Q.   SIS had no process for inspecting

14   EndoWrist instruments; correct?

15         A.   That is correct.                               09:54:05

16         Q.   SIS had no process for checking the

17   mechanical operation of an EndoWrist; correct?

18         A.   That is correct.

19         Q.   SIS had no process for checking the

20   integrity of the mechanical components of the            09:54:15

21   EndoWrist; correct?

22         A.   That is correct.

23         Q.   SIS had no process for performing an

24   electrical integrity check on the EndoWrist;

25   correct?                                                  09:54:27

                                                    Page 48

```
 1          A.    That is correct.

 2          Q.    SIS did not clean EndoWrist instruments?

 3          A.    Correct.

 4          Q.    SIS did not sharpen EndoWrist instruments?

 5          A.    Correct.                                    09:54:37

 6          Q.    SIS did not align EndoWrist instrument

 7     tips?

 8          A.    Correct.

 9          Q.    The reset process on the EndoWrist

10     instrument required opening the instrument; correct?  09:54:58

11          A.    Correct.

12          Q.    When opening the instrument, did SIS or

13     Rebotix have to shave down pins on the instrument?

14          A.    No.

15          Q.    When opening the instrument, did SIS or    09:55:14

16     Rebotix have to forcibly remove pins from the

17     instrument?

18          A.    No.

19          Q.    When opening the EndoWrist instrument, did

20     SIS or Rebotix have to forcibly remove screws from    09:55:22

21     the instrument?

22          A.    No.

23          Q.    What testing did SIS or Rebotix perform to

24     ensure that the process of opening the instrument

25     did not affect -- affect its function?               09:55:36
```

Page 49

```
 1        A.    I can't answer that for Rebotix.

 2        Q.    And for SIS?

 3        A.    We did not perform that.  I -- I can say

 4   that I -- as part of the meeting with Chris Gibson,

 5   they had a device that, without getting too        09:56:00

 6   technical, stop me if I'm going down a path that --

 7   that I shouldn't be going down.  But the two halves

 8   of the instrument are held together with locking

 9   tabs.  They're made to deflect out of position

10   and then -- and then lock into place, once the two  09:56:20

11   sides are pressed together.  The device merely moved

12   those tabs as they would when they were being

13   inserted to slide them out.  Nothing was damaged,

14   nothing was shaved on, nothing was removed.

15        Q.    How do you know that was the process that  09:56:37

16   took place?

17        A.    I believe I visually saw it while I was at

18   Rebotix' lab.

19        Q.    When's the last time you saw that process

20   performed?                                          09:57:07

21        A.    That would have been the only time.

22   When -- mid 2019.

23        Q.    Have you spoken with anyone about that

24   process since?

25        A.    No.                                      09:57:19
```

Page 50

1      Q.    136.  This is page 10 out of 25 in the

2   PDF.

3      A.    Sorry.  The page number again?  '124 --

4      Q.    '124, 10 out of 25.

5      A.    Okay.                                  10:35:22

6      Q.    Okay.  And so this document has the title

7   on the left-hand side, "da Vinci EndoWrist Repairs"?

8      A.    Yes.

9      Q.    Do you see that?

10         And then the -- the first or -- or the    10:35:31

11   second -- second sentence says:  "SIS can now

12   service your da Vinci devices including repair and

13   use counter reset"?

14      A.    Correct.

15      Q.    All right.                             10:35:39

16         And then looking at the second bullet

17   point in the list of "Important facts," that bullet

18   reads:  "The repair of da Vinci EndoWrist does not

19   alter the intended use, method of use, functionality

20   or performance of the device in any way."           10:35:52

21         Is that correct?

22      A.    That is correct.

23      Q.    Okay.  And this da Vinci EndoWrist Repairs

24   document is a document that SIS gave to customers in

25   marketing the EndoWrist reset process; correct?    10:36:04

Page 65

```
 1        A.   I -- I would imagine that's accurate, yes.

 2        Q.   Okay.  So looking again at -- at that

 3   bullet that we just read, what did SIS do to confirm

 4   the accuracy of that statement?

 5        A.   This, again, much like some of the earlier    10:36:19

 6   discussion, was generated by Rebotix, our partner at

 7   the time, that it had gone through the testing, that

 8   was their statement.  We simply rebranded it.

 9        Q.   SIS did not do anything to confirm that it

10   was accurate, that "The repair of da Vinci EndoWrist    10:36:46

11   does not alter the intended use, method of use,

12   functionality or performance of the device in any

13   way"; correct?

14        A.   That is correct.

15             MR. McCAULLEY:  Objection to form.            10:36:57

16   BY MR. CHAPUT:

17        Q.   Let's look, now, at the fourth bullet.  In

18   the third sentence of that bullet it states:  "The

19   repaired device will function identically to the new

20   OEM EndoWrist."                                         10:37:10

21             Do you see that statement?

22        A.   I do.

23        Q.   Okay.  What did SIS do to confirm the

24   accuracy of that statement?

25        A.   Nothing more than rely on Rebotix and         10:37:20
```

Page 66

1    their testing and process and procedures.

2        Q.   Okay.  So SIS did not do anything to

3    confirm that it was accurate that the repaired

4    device will function identically to the new OEM

5    EndoWrist; correct?                                10:37:38

6             MR. McCAULLEY:  Ob- -- objection to form.

7             THE WITNESS:  Correct.

8    BY MR. CHAPUT:

9        Q.   Now, looking at the fifth bullet, this

10   says that the repaired EndoWrist is, quote, "an    10:37:50

11   original da Vinci manufactured device that has been

12   repaired to original specifications"; is that

13   correct?

14       A.   Yes.

15       Q.   What is the basis for that statement?      10:38:06

16       A.   Again, this was directly out of the

17   Rebotix documentation and simply rebranded.

18       Q.   So SIS did not do anything to confirm that

19   it was accurate that a repaired EndoWrist is an

20   original da Vinci manufactured device that has been 10:38:23

21   repaired to original specifications; correct?

22             MR. McCAULLEY:  Objection.  Form.

23             THE WITNESS:  That's correct.

24   BY MR. CHAPUT:

25       Q.   We can move on to Topic 9.  This is:  "The 10:38:44

Page 67

**EXHIBIT 3**

**to**

**DECLARATION OF ANDREW LAZEROW IN
SUPPORT OF INTUITIVE SURGICAL INC.'S
OPPOSITION TO SIS'S MOTION IN LIMINE #1**



Exhibit
DX 256

DEPARTMENT OF HEALTH & HUMAN SERVICES          Public Health Service

Food and Drug Administration
10903 New Hampshire Avenue
Document Control Center - WO66-G609
Silver Spring, MD  20993-0002

K143619/S002                                           June 23, 2015
Rebotix, LLC
Remanufactured EndoWrists

Device Description

1. You state that the subject device is reusable (for 11 additional uses), is provided non-sterile to the user, and must be cleaned and sterilized before the first and each subsequent use.  However, there is no description of any of the cables used with the electrosurgical devices.  We note that page 24 of the Instructions for Use states, "The PK Instrument Cords are reusable for a maximum of twenty (20) reuse cycles.  Therefore, it is not clear if any of the cords for the electrosurgical instruments are included in the submission and, if so, how they are remanufactured or reprocessed by Rebotix, how they will be supplied to the end user, and how they will be reprocessed by the end user.  If the cords are included in the submission, please provide all details regarding the device description, remanufacturing process, validated reprocessing instructions for users, and validated number of use lives, or a method to assess the cord's end of life based on simulated use/reprocessing followed by performance testing.

Remanufacturing
The following deficiencies refer to the procedures you have identified to collect used devices from users, and modify those devices to accommodate additional uses (defined as "remanufacturing" for the purpose of this letter).

2. Although the subject device is not a "single-use device" (defined as a device used only once and then discarded), it has many aspects in common with third party reprocessed single-use devices.  Therefore, it is recommended that you review and provide the following items described in FDA's Guidance "Medical Device User Fee and Modernization Act of 2002, Validation Data in Premarket Notification Submissions (510(k)s) for Reprocessed Single-Use Medical Devices," (available at http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/ucm071434):

   a. Cleaning Agent Characterization

   b. Process and Equipment Characterization

      i. Cleaning process tolerances have not been described, nor have quality control tests or equipment specifications.  It is recommended that the tolerances for each cleaning process be provided in a tabular format that

HIGHLY CONFIDENTIAL                                    REBOTIX171030

lists the minimum, maximum, and nominal values for each relevant parameter.

   c.  Risk Analysis

   d.  Process Validation that includes Installation Qualification (IQ), Operational Qualification (OQ) and Performance Qualification

       i.  It does not appear that the cleaning processes described in the remanufacturing procedures have been validated.

      ii.  In addition, the IQ and OQ for the sterilization process have not been provided.

   e.  Routine Monitoring and Control

   f.  Assessment of Change

       i.  Procedures to track changes that occur with the original equipment manufacturer (OEM) device as well as OEM reprocessing changes should be implemented. Please refer to Deficiencies 3b, 35a, 39, and 42b for more information.

3.  In Attachment D of Supplement 2, you provide the protocols for your remanufacturing procedures. Please revise the protocols as described below and provide a copy with your response.

   a.  Protocol PR3034, Autoclave Sterilization, appears to include non-discrete temperatures and times (e.g., temperature ranges, minimum exposure times) for steam sterilization. Please revise the procedures under PR3034 to include discrete temperatures and times that match your sterilization validation activities. Please also see Deficiency 14h below for similar issues regarding non-discrete values in the reprocessing instructions.

   b.  Protocol PR3043, Incoming Evaluation, states that candidates for remanufacture are evaluated for acceptance. Please address the following concerns regarding this protocol:

       i.  There is no explanation of how clinical soil on the received devices will be assessed and any related acceptance criteria. It is not clear if devices shipped from the health care facilities will be reprocessed before shipping or if they are shipped dirty. Please clarify these issues and revise your Incoming Evaluation protocol to include inspection criteria related to soil. The incoming acceptance criteria should be based on the results from your cleaning and sterilization validation studies, which should demonstrate that clinically used devices with worst case soiling (as

HIGHLY CONFIDENTIAL

REBOTIX171031

determined from a Native Soil Characterization Study) can be effectively cleaned and sterilized.  Please see related Deficiencies 18 and 19 regarding the Native Soil Characterization Study for more information.

ii.  It does not appear that you have methods in place to track OEM device and reprocessing changes.  Please revise your Incoming Evaluation protocol to include acceptance criteria for OEM device changes and reprocessing changes that are acceptable or not acceptable.  FDA expects that you collect and track information from the health care facilities and only accept devices that fit within the scheme of devices that were validated for remanufacturing; this information should also be stated in the labeling (please see related Deficiency 5 below).  For example, if OEM devices that were reprocessed by cleaning, disinfection AND sterilization were not included in your verification and validation testing, then these devices should not be accepted for remanufacturing since it could affect the use life, safety, and effectiveness of the device.  It is also expected that this tracking be an ongoing monitoring procedure that is in place.

iii.  Please revise your Incoming Evaluation protocol to include a criterion for previously remanufactured devices, including an explanation for how these devices are identified and that they will not be forwarded to the next remanufacturing step.

c.  Protocol PR3033, Disassembly and Salvage, states that the small bearing and large bearing should be re-lubricated if necessary.  However, it is not clear what these components are and if they are patient-contacting (including indirect patient contact due to cleaning fluid contact and travel down the instrument).  In addition, it is not clear what lubricant is applied and what tolerance ranges apply to the application of the lubricant.  Finally, it is not clear if this lubricant was accounted for in the cleaning and sterilization validation studies.  Step 6.12 of PR3033 states, "Place the EndoWrist in the ultrasonic bath; refer to PR3036 In-Process U/S Cleaning SOP." Review of PR3036 does not clarify what part of the device is subjected to the cleaning or why this cleaning is performed.  Again, it is not clear if these procedures have been accounted for in the cleaning validation studies.  Please revise your protocol to clarify these issues, and provide an explanation of whether these lubrication steps have been included in your cleaning and sterilization validation studies.  If this lubrication step was not included in your cleaning and sterilization validation studies, please repeat the validation studies to demonstrate that the presence of lubricant does not affect the ability to effectively clean and sterilize the device.

d.  Protocol PR3025, Scissors Sharpen and Refurbishment, states that TheraBand is inserted to remove burs from the cutting blades. However, it is not clear what TheraBand is. Please provide a comprehensive description of TheraBand, including its material composition.

    e. Protocol PR3050, Final Test, includes visual inspection along with a series of functional tests. However, it does not appear to include a final inspection for visible soil. Please revise the protocol to include a final visual inspection step before component reassembly to assess for any visible soil or other extraneous materials with defined acceptance criteria (e.g., "no visible soil", etc.).

4. In Attachment C of Supplement 2, you provide a table describing the purpose, acceptance criteria, and product specifications for each procedure. However, it does not appear that the cleaning processes have adequate tolerances established. For example, the "Ultrasonic Cleaning & Flush" states a minimum power density of 48 watts/gallon, ultrasonic frequency of 38 kHz or greater, and solution temperature as close to 45°C. Please revise your remanufacturing procedures to have defined tolerance ranges with minimum, maximum, and nominal values for all applicable processes. Also, many of the acceptance criteria listed in Attachment C state that the device must pass a visual inspection. However, it is not clear what the actual pass/fail criteria are for these tests. Please revise Attachment C to explain what the acceptance criteria are for each visual inspection performed.

5. Although you have provided reprocessing instructions to the user, it does not appear that you have provided any instructions on how to ship the used OEM device to you, including whether the user should reprocess the device before shipping or send the device dirty. We note that on page 42 of Module J it is stated, "…the end user is supposed to return equipment sterilized." In addition, the labeling should state which devices are candidates for remanufacture. For example, devices must have one use life remaining, and only devices subjected to a validated list of reprocessing methods should be returned for remanufacturing. Please revise your labeling to include instructions on preparing devices for shipment and which devices are candidates for remanufacture.

6. Numerous recalls for the Intuitive Surgical da Vinci EndoWrists have been identified in the FDA Recalls database (available at http://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfRES/res.cfm). Please examine all reports in the FDA Recalls database regarding the da Vinci EndoWrists, and provide a risk analysis to address the issues identified in these recalls. In your risk analysis, please address the risk mitigation measures you have in place for addressing the issues in each recall. Please provide a copy of your risk analysis in your response. In addition, please specifically address the following issues:

    a. You provide a description of the remanufacturing process in Supplement 2, Attachment B. However, it is unclear if or how recalled devices are identified and rejected during the incoming evaluation phase of your remanufacturing process. Please clarify any methods by which recalled devices are identified and rejected as unacceptable candidates for remanufacture.

    b. Numerous reports in the Recalls database (e.g., Z-0435-2015, Z-0439-2015, etc.) describe EndoWrist products that were recalled since "Deviations in reprocessing

REBOTIX171033

steps from those stated in the reprocessing instructions can cause surface degradation of the housing and/or accelerate mechanical wear of the instrument." These recalls underscore the importance of tracking the reprocessing history of all incoming devices (i.e., tracking how these devices were reprocessed by the previous end user prior to re-manufacture). Please see Deficiency 3b for more information regarding this matter.

c. Several reports in the Recalls database (e.g., Z-1965-2014, Z-0258-2008, etc.) describe products that were recalled due to incorrect labeling (e.g., either on the device housing or in the User Manual). These recalls led to changes to the device labeling. Please describe any methods you have in place for tracking changes to the OEM labeling and incorporating these changes into the subject device labeling.

d. Several reports in the Recalls database (e.g., Z-0520-2014, Z1442-2013, etc.) describe products that were recalled due to potential for device failure (e.g., potential for jaw detachment or device cracks, etc.). These "potential failures" may not be evident in new devices; rather, the probability of these failures increases over the course of the device's lifetime as the number of uses increases. Please identify any methods you have in place for identifying and mitigating the risk of these potential device failures following remanufacture of your subject devices.

Labeling
The following deficiencies refer to the proposed labeling you have provided, and include general labeling concerns along with concerns regarding your proposed reprocessing instructions. Please refer to "Device Labeling" (available at http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/Overview/DeviceLabeling/ucm2005422.htm) for general labeling concerns, and the guidance document, "Reprocessing Medical Devices in Health Care Settings: Validation Methods and Labeling Guidance for Industry and Food and Drug Administration Staff" (available at http://www.fda.gov/downloads/medicaldevices/deviceregulationandguidance/guidancedocuments/ucm253010.pdf), for concerns regarding reprocessing information.

7. You provide the Instructions for Use (IFU) for the subject device through email on May 22, 2015. However, the Indications for Use in the subject IFU differs slightly from the Indications for Use in the 510(k) Summary and the Indications for Use Form. The following sentence is omitted from the Indications for Use in the subject IFU, but is present in the 510(k) Summary and Indications for Use Form:

"The Instrument is for use only with the Intuitive da Vinci S and da Vinci Si Systems (Endoscopic Instrument Control System)."

Please revise the Indications for Use so that it is identical across the labeling, 510(k) Summary, and Indications for Use Form and provide a copy of the revised documents in your response.

HIGHLY CONFIDENTIAL

REBOTIX171034

8.  Protocol PR3027, Housing Labeling, states that Rebotix branding will be laser engraved onto the housing of all remanufactured instruments.  However, you have not provided any images of how the engraving will appear.  Please provide images of all laser engravings that will be added to the device housing. Please also see related Deficiency 11c below.

9.  In the cleared predicate IFU in K063220, the following contraindication is listed as a general contraindication for all EndoWrist devices:

> "This instrument may only be used on soft tissue. Do not use it on cartilage, bone or hard objects. Doing so may damage the instrument and make it impossible to remove it from the cannula."

However, in the subject IFU, this contraindication is only listed for the PK Dissecting Forceps. Please provide a rationale for why this contraindication is only listed for the PK Dissecting Forceps in the subject IFU and not the other device models. Alternatively, please revise the subject IFU so that this contraindication is listed for all EndoWrist devices. Please provide a copy of your revised labeling in your response.

10. The following warning was removed from the subject IFU with respect to the cleared predicate IFU in K063220:

> "Do not remove the cannula and [EndoWrist] instrument simultaneously as this may damage the surrounding tissues and the instrument."

Since this warning was present in the predicate IFU, please provide a rationale for why it was removed. Alternatively, please add this warning back to the subject IFU, and provide a copy of your revised labeling in your response.

11. You provide the IFU for the subject device through email on May 22, 2015. You state that the IFU was formatted to "…align with the content organization of the OEM IFU." However, the differences identified below were noted between your subject IFU and the OEM IFU.  Please provide revised labeling to address these concerns.

    a.  Unlike the OEM IFU, the subject IFU does not contain a Table of Contents. Due to the large quantity of information present in the subject IFU, we recommend you to include a Table of Contents in the subject IFU so that the end user can readily access important information.

    b.  Page 13 of the OEM IFU contains safety and compatibility information regarding the EndoWrist ProGrasp Forceps. This information includes a list of devices that can be used safely with the ProGrasp Forceps. However, this information is not included in the subject IFU. Since the subject device includes Remanufactured ProGrasp Forceps, please add this information to the subject IFU so that the user can understand how to safely use the Remanufactured ProGrasp Forceps.

HIGHLY CONFIDENTIAL

REBOTIX171035

c.  Page 4 of the subject IFU states, "The remanufactured EndoWrist instruments have a blue housing with the instrument description. They also have the da Vinci S logo prominently displayed on the housing." However, unlike the OEM IFU, a picture of the device housing is not provided in the subject IFU. Furthermore, in Attachment B of Supplement 2, you state, "'Remanufactured By,' the Rebotix Logo, and 'Not Affiliated with Original Manufacturer' are added to the Instrument housing." However, this information is not mentioned in the device housing description provided in the subject IFU. In order to help the user distinguish between remanufactured devices and OEM EndoWrist devices, please provide a picture and description of the Remanufactured device housing in the subject IFU.

d.  Page 21 of the OEM IFU contains a list of electrosurgical units (ESUs) and energy activation cables that can be used with the subject device, along with the following associated notes regarding use of the EndoWrist instruments:

  i.  "Note: Not all da Vinci and da Vinci S surgical systems are equipped with a bipolar connection and will not be compatible with the above bipolar energy activation cables. Contact your local Intuitive Surgical representative to confirm your system's configuration."

  ii.  "Note: The da Vinci S and Si instruments have been evaluated for use only with the above ESU generators, and are compatible only with interconnecting cords and ESU generators that are in compliance with IEC 60601-2-2: 1998, IEC 60601-2-2: 2006, or IEC 60601-2-2: 2009."

However, this information is not included in the subject IFU. Please note that you provide instructions regarding specific ESUs (e.g., Covidien Force FX-C, ConMed 5000, etc.) in the subject IFU, and this information may appear out of context to the user since a list of compatible ESUs and cables is not provided. Since knowledge of compatible ESUs and cables is necessary for safe and proper use of the subject device, please provide a list of ESUs and energy activation cables that can be used with the subject device, along with their associated warnings.

e.  Page 37 of the OEM IFU contains instructions and figures regarding proper installation of the Tip Cover Accessory on the Monopolar Curved Scissors. While the subject IFU contains most of these instructions, it omits the following instruction along with the corresponding figure illustrating this instruction:

"[The Tip Cover Accessory] is not properly installed beyond the orange surface and over the shaft. This causes a bulge on the shaft and may prevent it fitting through the cannula."

HIGHLY CONFIDENTIAL                                                          REBOTIX171036

Since this information is essential to safe use of the Monopolar Curved Scissors, please add this instruction to the subject IFU, along with a corresponding figure illustrating this instruction.

   f.  The following instructions regarding energy activation cables are present in the OEM Manual:

      i.  "Note: Energy activation cables are non-sterile and do not require sterilization before use." (page 20 of OEM IFU)

      ii.  Cleaning and Storage instructions regarding use of the energy activation cable (pages 31 – 32 of OEM IFU)

   It appears you may have chosen to omit these instructions since energy activation cables do not appear to be part of the subject device. Nonetheless, proper handling of the activation cable is necessary for proper functioning of the subject device. As such, we recommend providing a statement in your IFU referring the user to the OEM IFU for instructions regarding the energy activation cables.

12. You provide the IFU for the subject device through email on May 22, 2015. This IFU contains the following sections:

   Section 1.  General Information
   Section 2.  Remanufactured EndoWrist Instruments
   Section 3.  ESU Settings and Energy Activation Cables
   Section 4.  Remanufactured Monopolar Curved Scissors
   Section 5.  Remanufactured Permanent Cautery Instruments
   Section 6.  Remanufactured Bipolar Instruments
   Section 7.  Remanufactured PK Dissecting Forceps
   Section 8.  Cleaning and Sterilization of Remanufactured EndoWrist Instruments

   Several of these sections (e.g., Sections 2, 4, 5, 6, 7) include instructions for specific categories of devices. However, since a list of applicable device models is not provided for each section, it is not readily apparent which sections apply to each device model. For example, Section 6 provides instructions for the Remanufactured Bipolar Instruments, but a list of bipolar device models is not provided. Furthermore, it is unclear which sections of the IFU apply to non-energized device models, since the IFU does not include a specific section on remanufactured non-energized devices. It is also unclear if Section 2 only applies to non-energized devices, or if it applies to all EndoWrist models. Please provide a list of applicable device models for each section 2, 4, 5, 6, and 7, so that the user can clearly understand how to use each device model. Please provide a revised copy of your labeling in your response.

13. On pages 1 – 50 of Module D, you provide package labels for the subject device. The symbols utilized in these package labels are defined in the IFU, but not defined in the package labels. Please note that the FDA does not recognize any standalone symbols

except for the "Rx only" symbol. Therefore, please revise your package labels to include textual descriptions for these symbols, placing this description near each symbol as it appears in the labels. Please note that any definitions for symbols used on the package label should be present on the package label and not in the IFU. Please provide a copy of your revised labeling with your response.

For more information on the recognition of symbols in labeling, please see the proposed rule that was issued in the Federal Register on April 19, 2013. This proposed rule may be found online at http://www.gpo.gov/fdsys/pkg/FR-2013-04-19/html/2013-09175.htm.

14. In your email dated May 22, 2015, you provide an IFU for the subject device that includes reprocessing instructions for the end user. In general, it appears that the instructions follow FDA's Guidance Document "Reprocessing Medical Devices in Health Care Settings: Validation Methods and Labeling" issued on March 17, 2015, with the following exceptions noted. Please revise your reprocessing instructions as described below, and provide a clean and redlined (tracked changes) copy of the revised IFU with your response.

   a. Page 6 states, "Clean the instruments immediately after each use. Do not allow debris to dry on or inside the instrument intraoperatively *before* instrument processing. In order to keep the instrument from drying when soiled, keep the instrument in water or an enzymatic bath between the surgical procedure and instrument processing. The instrument may also be flushed through the main flush port with sterile water during use to minimize buildup of internal deposits of bio-material." However, it is not clear if these instructions have been validated, in terms of the number of use lives, based on performance or appearance of corrosion, etc. It is recommended that you revise the instructions in accordance with your validation activities. Please also revise the wording, "water" and "enzymatic bath," to clarify the quality of water and pH of cleaning agent that should be used.

   b. Page 24 states, "The PK Instrument Cords are reusable for a maximum of twenty (20) reuse cycles. Mark the usage tracker on the cord label after each use." If the PK Instrument Cords are not considered part of your submission, please revise the labeling to recommend that the user refer to the OEM labeling for these cables. If they are part of your submission, additional reprocessing instructions should be provided for the PK instrument cord. Please include reprocessing instructions for the end user and also provide a description and image of the usage tracker. Finally, please explain if the tracking marks are able to be removed by reprocessing and whether any special instructions should be provided on what type of marker should be used to mark the usage tracker.

   c. Page 25 contains the following statements that are not adequate in relation to the manufacturer's responsibility to provide validated reprocessing instructions to the user. Please note that validation of the reprocessing instructions is the responsibility of the device manufacturer and not the end user (see Section VII of

HIGHLY CONFIDENTIAL

REBOTIX171038

the above referenced Reprocessing Guidance). Therefore, please remove the following statements from your labeling:

    i.    "Cleaning, disinfection, and sterilization of reusable devices are the responsibility of the hospital or site performing the process."

    ii.    "These steps may need to be adjusted or repeated depending on soiling conditions or specific cleaning equipment used."

d.    Page 25 mentions "endoscopes" in the statement, "The process and parameters listed are recommendations for cleaning, disinfecting, and sterilizing the remanufactured EndoWrist instruments, accessories, and endoscopes and have been validated…" However, endoscopes are not included in your current submission. Therefore, please remove this reference to endoscopes from your IFU. In addition, your reprocessing instructions do not appear to include disinfection; therefore, please also remove the reference to "disinfecting" in the referenced statement.

e.    Page 25 states, "Examine the device before and after each use. If any abnormality is found, do not use the device." Please revise these instructions to include a description of an "abnormality."

f.    Page 25 states, "Note: If Electro Lube anti-charring solution for cautery instruments is improperly applied, those instruments may require additional scrubbing and high-pressure water spray." It is not clear what instructions this note applies to, since the use of Electro-Lube does not appear in the remainder of your reprocessing instructions. The referenced note also does not describe how to properly apply the lubricant or how the user can know the lubricant is "improperly applied." Furthermore, the Electro-Lube lubricant is not mentioned in the predicate reprocessing instructions. Finally, it is does not appear that the referenced note or the general use of Electro-Lube lubricant have been accounted for as part of your "worst case" reprocessing validation protocol design. Please also note that the lubricant manufacturer (Mectra Labs, Inc.) received a warning letter from the FDA on November 14, 2013 warning them that there is no approved pre-market approval application for the Electro-Lube product for the intended use with robotic instruments (http://www.fda.gov/iceci/enforcementactions/warningletters/2013/ucm375446.htm). For these reasons, it is recommended that you remove all references to Electro-Lube lubricant from your labeling.

g.    Page 25 states, "Note: Remanufactured EndoWrist instruments have not been validated for compatibility with the optional thermal disinfection cycle on the Medisafe SI PCF system." However, thermal disinfection does not appear to be a step in your reprocessing instructions, and the Medisafe SI PCF is not cleared for the intended use mentioned in your IFU. Therefore, please remove this note from your labeling.

HIGHLY CONFIDENTIAL    REBOTIX171039

h.  Your instructions include temperature ranges and minimum exposure times for
your steam sterilization parameters, rather than discrete times and temperatures.
For example, page 27 lists the pre-vacuum steam sterilization temperature as
"270-272°F (132-134°C)" and lists a "Minimum exposure time for the U.S.: 4
min." Page 27 also includes the warning "Do not sterilize at temperatures over
285°F or 140°C."  Please note that the Reprocessing Guidance states "FDA
recommends that 'ranges' not be used for defining sterilization cycles (for
example, 121°C-132°C and greater or lesser than 4 minutes exposure time), as
this implies that all intermediate values have been validated, and that there are
FDA-cleared accessories for all intermediate cycles."  Please revise your
sterilization instructions to include one discrete temperature and exposure time, in
accordance with your validation activities.  Please note that FDA recommends
that steam sterilization cycle parameters be consistent with those listed in
Appendix C of the Reprocessing Guidance and ANSI/AAMI ST79:2010 &
A1:2010, "Comprehensive Guide to Steam Sterilization and Sterility Assurance in
Health Care Facilities."

i.  Your instructions include multiple Flush and Rinse steps.  Please revise the
instructions to include the type/quality and temperature of rinse water to be used
in these steps, in accordance with your validation activities.  Please note that
AAMI TIR34, "Water for the Reprocessing of Medical Devices," recommends
that the final rinse water for devices that will contact sterile areas of the body,
such as the subject device, use critical water.  For "Step 6: Rinse" on page 27,
please also revise your instructions to include the duration of rinse and, in
particular, how long the user should "…rinse into the area where the instrument
shaft enters the housing."

j.  "Step 1: Scrub" on page 26 states, "Repeat scrubbing as needed."  It is
recommended that you revise this statement to specify how the end user is to
know that repeated scrubbing is necessary.

k.  "Step 8: Lubricate" on page 27 states, "Lubricate the tip and wrist mechanism
with a pH-neutral, steam-permeable instrument lubricant per the manufacturer's
instructions."  Please revise these instructions to include the general type of
lubricant the user should use, in accordance with your cleaning and sterilization
validation studies (e.g., "water soluble lubricant").  Otherwise, please remove this
instruction from the labeling if it has not been validated.

l.  It does not appear that your instructions include the number of reuse lives that are
validated for each of the device models.  FDA is aware that your devices include
an Interceptor chip for tracking the number of device uses.  However, it may be
useful to the end user to include in your Reprocessing Instructions how many
times the reusable devices can be reused and a description of the chip tracking
mechanism.

HIGHLY CONFIDENTIAL

REBOTIX171040

m. Your instructions list multiple accessories (e.g., syringe, soft nylon brush) that do not include adequate descriptions such as size/diameter and type of syringe (e.g., Luer). The instructions also list pressure specifications for flushing the flush ports with pressurized water (i.e., "minimum of 30 psi"), but it is not clear how the pressurized water should be introduced into the flush port (e.g., is a type of Luer fitting or other accessory to be used?). Furthermore, it is not clear if you provide these accessories with the device or if the user needs to purchase these supplies themselves. Please revise your instructions to include a complete description of all cleaning accessories and how the user is to obtain these items. Please also include comprehensive instructions on how the user should introduce the pressurized water into the flush ports. Including images of these steps and accessories may be helpful to the user.

Cleaning Validation

The following deficiencies refer to the cleaning validation activities that you have proposed as part of your remanufacturing process and that you are recommending to users in the reprocessing instructions. Please refer to the guidance document, "Reprocessing Medical Devices in Health Care Settings: Validation Methods and Labeling Guidance for Industry and Food and Drug Administration Staff" (available at http://www.fda.gov/downloads/medicaldevices/deviceregulationandguidance/guidancedocuments/ucm253010.pdf), for additional information.

15. In Attachments B and C of Module E, you provide your justification for the "worst case" device models chosen for cleaning validation (i.e., the Monopolar Curved Scissors, Permanent Cautery Spatula, Fenestrated Bipolar Forceps, PK Dissecting Forceps, Large Needle Driver, and ProGrasp Forceps). Your "worst case" analysis outlines a brief description of the tool end design, materials, surface area, and worst case conclusion based on "risk." It appears that the analysis included consideration of the design configuration, number of components, materials of construction, size and density, surface are and porosity, need for disassembly, surface finish or texture, cannulations or lumens, presence of mated surfaces, and ability to be sterilized in a routine cycle. However, your analysis is not sufficient to determine if your justification for the chosen "worst case" models is appropriate in terms of cleaning validation and difficulty of cleaning the device over other models. Please repeat the analysis by including parameters such as the following: instruments that would collect the highest amount of soil in the inner shaft and on the tip, hardest to reach areas to remove soil, smallest spaces between components, and lowest flushing efficiency (e.g., number of cables in the inner shaft, distance between the distal seal and the termination of the flush tube). If any new "worst case" models are identified due to the new analysis, please provide results from cleaning validation performed using these additional models.

16. You provided "Medisafe Cleaning Process Validation" test reports in Attachments E-4 and E-5 of the original submission for analysis of residual protein and total organic carbon (TOC), respectively. It appears that the Medisafe PCF system and the Medisafe 3 E-zyme Triple Enzyme Cleaner were used in the testing. However, it is not clear why

HIGHLY CONFIDENTIAL

REBOTIX171041

these reports are provided since no automated washer-disinfector, including the Medisafe PCF system is mentioned in your reprocessing instructions.  In addition, as noted in the related Deficiency 14g, the Medisafe is not cleared for this intended use.  Please explain the purpose of these test reports provided in Attachments E-4 and E-5.

17. On page 7 of Module E, you state that you have utilized 48 test samples (8 of each of the worst case models) in your cleaning validation studies.  However, from Table 2 in the cleaning validation test reports, it appears that 18 samples were used in the tests.  From Table 2, it also does not appear that each worst case device model was used in each of the three test cycles. It further appears that the control device models did not match the test sample device models.  Finally, it is not clear how many and what type of samples were used for the cleaning efficacy study versus the extraction/recovery efficiency study.  Please note that FDA expects all worst case device models to be tested in all cleaning cycles and matched with the same model for all controls.  In addition, FDA expects the following controls to be included in the study:

  a.  Negative device controls should be unsoiled and undergo the same cleaning and extraction as the test devices; the amount of residual soil should be at or slightly above the negative control.

  b.  Positive device controls should be soiled with a known amount of soil, but not cleaned, and residual soil extracted; the amount of residual soil should be equivalent to or slightly lower than the amount of soil placed.  Soil recovery efficiencies should be calculated and used during the calculations.

  c.  Negative sample control in which "extraction" is conducted with no device.  This sample is used as a blank.

  d.  Positive sample control in which a known amount of soil (at or slightly above the limit of quantitation) is added to an "extraction" with no device; this control addresses interference of the extraction fluid and extraction method with soil detection.

Please repeat your cleaning validation study with all worst case device models and using appropriate controls.  Please also provide a statistical rationale for the sample size chosen in your cleaning validation studies.

18. Your cleaning validation protocol did not explain how the devices were selected for the study.  Please revise your protocol to explain how the devices were selected for the study, including their clinical use, remanufacturing and reprocessing.  FDA's expectation would be that the devices used in your study are clinically used devices that were found to have worst case native soiling based on your conduction of a Native soil Characterization Study (see below for more information on this suggested study).  Please also explain how the clinically used devices were reprocessed, since changes in the OEM's reprocessing instructions could be implemented differently at the health care facilities and have a

HIGHLY CONFIDENTIAL

REBOTIX171042

significant effect on the validated use lives.  Please repeat your cleaning validation study taking into account these issues, and provide detailed methods in your revised test report.

19. Your cleaning validation protocols state that "…the artificial test soil used to inoculate the devices mimicked worst case contaminants (blood and proteins that may come in contact with the devices and remain on the devices after clinical use)." The test devices were soiled using the artificial test soil in order to obtain an average minimum protein level of 115 µg/cm$^2$ and an average minimum TOC level of 39.1 µg/cm$^2$ over the soiled surface area of the devices.  You further state that "…this protein level is based on study data which quantified worst case soil levels of medical instruments after patient use (Alfa et al., 1999)," and that the "…TOC level is based on a study which quantified worst case soil levels of medical instruments after patient use (Lappalainen, SK; Gomatam SV; and Hichins V. Residual total protein and total organic carbon levels on reprocessed gastrointesntinal (GI) biopsy forceps. J Biomed Mater Res B Appl Biomater 89B:172-176, 2009)."

Please perform a Native Soil Characterization Study to investigate the amount of soiling present on clinically used EndoWrist devices to determine that the soil constituents and amount of soil are indeed worst case compared to what would be expected clinically. The study should include a quantitative scale to evaluate native soil as well as images of all soiled surfaces (including internal components).  It is recommended that only worst case natively soiled devices be used in your cleaning and sterilization validation studies, and that this information then be used to develop your incoming device acceptance criteria.  If worst case natively soiled devices were not used in your cleaning and sterilization validation studies, please repeat the studies using worst case soiled devices. Please provide the completely study protocols and reports for the Native Soil Characterization Study and any repeated validation studies with your response.

20. In Figure 1 of your cleaning validation test reports, you provide an image of the device soiling locations.  However, the image is not legible.  The caption, which is legible, states that the tip of the device was dipped into soil to point A (which appears to be just above the wrist of the instrument) and actuated to the full range of motion. It further states that a lumen cleaning brush was dipped into soil and then threaded into the main flush ports as far as possible.  From this limited description, the test soil does not appear to be applied to the devices in a "worst case" simulated use manner, since it did not include injection of artificial soil into inner lumens, handling with soiled and gloved hands, or inoculation of the outer shaft, which would be expected to be soiled by user handling.  Please revise your test reports to provide clearer images of all soiling and a comprehensive description of soil inoculation.  Please also repeat the cleaning validation with worst case soiling of the device.  It may be necessary to extract different parts of the device separately (e.g., tip vs. inner lumen) and calculate the results separately, since the extraction methods may differ, and since including the surface areas of each device component may lead to lowering the calculated residual soil per surface area.  For example, including the higher surface areas of the outer shaft that is easier to clean with the harder-to-clean areas may negatively impact the results.  Please provide the complete protocol and test reports of any repeated testing with your response, including raw data generated.

HIGHLY CONFIDENTIAL

REBOTIX171043

21. Your cleaning validation protocols do not appear to include simulated use of the instruments. For the electrosurgical devices, this is especially important since the soil can be baked onto the device, making it harder to clean. Please repeat your cleaning validation studies using devices that were subjected to a series of simulated use and "worst case" reprocessing (i.e., minimum conditions) over the proposed number of use lives at the health care facility, as well as any additional remanufacturing/reprocessing performed at your facility. With your response, please provide a detailed protocol of the methods used for simulated use, along with complete test reports with raw data.

22. In Table 1 of your cleaning validation test reports, you provide the surface area of the device models used in your cleaning validation studies. However, it is not clear how these surface areas were calculated, and which part of the devices were included in the calculation. You state in the Discussion section of the test reports, "Due to large amounts of the Da Vinci Endowrist surface area not making patient contact, only the surface areas of the device that would come in contact with the soil were used in the calculations…[for residual soil]." However, it is not clear what is classified as the patient vs. non-patient contacting portions of the device. In addition, please note that certain non-patient contacting parts of the device may become soiled from user handling. It should also be noted that if the interior of the device is soiled (e.g., the lumen or flush ports), the internal surface area of that device component should be used in the calculations. Please provide a comprehensive description of the surface area calculation and determination of soiled areas. It may be helpful to provide images with your explanation.

23. Your cleaning validation protocols state that the inoculated test samples and positive controls were allowed to dry at room temperature for a minimum of two hours to simulate worst case conditions. Although this treatment appears to be worst case compared to that specified in the Reprocessing Instructions (which state to clean the device "immediately after procedure" and "keep the device in water or an enzymatic bath between the surgical procedure and reprocessing"), it is not clear how this timeframe would be considered "worst case" for the timeframe of soiled instruments being shipped from the health care facility to the Rebotix facility. Please clarify how this timeframe is considered "worst case" with respect to soiled instruments being shipped to the Rebotix facility. If applicable, please provide repeat cleaning validation to reflect a revised "worst case" timeframe with respect to soiled instruments being shipped to the Rebotix facility.

24. Your cleaning validation test reports state, "Worst case cleaning procedures and conditions were used throughout the validation. For example, cleaners and detergents were prepared according to the manufacturer's instructions using the lowest range of concentration recommended (minimum effective concentration). The least effective (lowest) cleaning temperatures, within recommendations, were used for the rinsing and cleaning steps." The cleaning procedures used in your cleaning validation study were compared to the proposed reprocessing instructions, as well as your remanufacturing procedures. However, key details are missing, such that we are unable to determine if "worst case" conditions were used in your validation studies over those specified in your reprocessing instructions and in your remanufacturing procedures. Please provide a

HIGHLY CONFIDENTIAL

REBOTIX171044

tabular comparison of the cleaning parameters used in their cleaning validation study versus those in the reprocessing instructions and remanufacturing procedures, in order to demonstrate that "worst case" parameters were used in your cleaning validation studies. The comparison should include all relevant cleaning parameters, such as water quality, water pressure, time, temperatures, concentrations, any repeated scrub/rinse steps, detergent type, lubricants, ultrasonic cleaning parameters, etc.

In addition, please provide an explanation of the worst case temperature conditions used for the cleaning agents used in your cleaning validation studies. For example, your protocol states that you used an enzymatic detergent solution of Steris Prolystica 2X Concentrate Enzymatic Cleaner prepared at the lowest recommended concentration of detergent (1/8 oz. per gallon) and temperature (cold water). However, you have not provided information to demonstrate that "cold water" is considered worst case for this cleaning agent nor have you defined "cold water." Please provide a definition of "cold water" along with your explanation of worst case temperature conditions for the cleaning agents used in your cleaning validation studies.

25. It does not appear that the cleaning methods used in your cleaning validation protocols included a lubrication step, which is recommended in your reprocessing instructions, and which appear as part of your remanufacturing procedures. However, it is noted that page 43 (Attachment E: Parts and Materials) of Module E, Sterilization, from your original submission lists "Steris Hinge Free Lubricant." Since there is no further explanation provided with Attachment E, it is not clear what the purpose of this lubricant is, or whether it was included in the cleaning validation studies. Attachment E also lists "Ruhof Surgistain Rust Remover" and many other unknown materials. Please provide a comprehensive explanation of each of these materials and a flow chart of how the device is treated or used with each. Finally, please repeat your cleaning validation studies to ensure that all treatments the device is subjected to during your remanufacturing procedures, or will be subjected to by end-user reprocessing, are accounted for in your studies.

26. From Section 3.0 "Equipment and Materials" of your test reports, it appears that the extraction fluid used in your cleaning validation studies was distilled water, but there is no description of the extraction container. The Agency is concerned that using water as an extraction medium would not adequately extract residual soil from the surface of a complicated device such as the subject device. For example, the tip and lumen contain multiple coiled wires that could trap soil and be difficult to extract. It is suggested that you consider using a surfactant, such as sodium dodecyl sulfate, as an extraction medium, provided that it does not interfere with your endpoint assays. It appears that you have used an exhaustive extraction method for calculating recovery efficiency; however, it is not clear if this method is adequate for this complicated device, especially if the soil is not easily removed by the extraction medium. It also does not appear that your extraction method allows for sampling of the internal structures of the device (e.g., inside the flush ports and tubes and internal lumen).

**HIGHLY CONFIDENTIAL**

**REBOTIX171045**

Please repeat your cleaning validation studies using an extraction method that can adequately extract all complex internal structures that are exposed to soil. Please also perform an additional test to (1) validate your extraction methods by inoculating a known amount of soil in the hardest to reach areas of the device at a low volume/dilute amount below the endpoint acceptance criterion, (2) extract and quantify the soil, and (3) determine how much soil was able to be removed from the device. Finally, please revise all test reports to include a description of the extraction container, extraction temperature, and extraction volume (and device surface area to extraction volume ratio) used in your cleaning validation studies, as well as the raw results for the extraction/recovery efficiency study, including the number of extractions performed in the exhaustive recovery and calculation of the correction factors. It is recommended that the surface area to extraction volume ratios listed in ISO 10993-12:2012 be used in your studies or that you provide a rationale for other ratios used.

27. From the "Equipment and Materials" list in your cleaning validation test reports, it appears that the assay used to detect residual protein was the MicroBCA assay, and that the Hach Reagent Kit and "DRB reactor" were used to detect total organic carbon (TOC). However, you have not provided the assay methods, mechanism of action for detection, the limit of detection, limit of quantitation, or characterization of any interfering substances for either assay. Please revise your cleaning validation test protocols and reports to include this information.

28. In Step 5.15 of your cleaning validation protocol, you state that "…the test samples were visually inspected to ensure the complete removal of soil." However, it is not clear if visual inspection for visible soil was an explicit acceptance criterion for your studies, or what the results of visual inspection were for the test samples and positive and negative controls. Since the subject device has a complicated design that can make cleaning difficult, it is recommended that you use methods to visually inspect all soiled areas of the device, including internal surfaces. To assess whether any visible soil remains on the internal surfaces, it may be possible to use a borescope. It is also recommended to use microscopic visualization of debris on all areas where it is possible to do so. Please repeat your cleaning validation studies, as applicable, to generate this data, and revise all of your cleaning validation protocols and test reports to include your visual inspection acceptance criteria and results.

29. In your cleaning validation test reports, you provide tables to summarize the data for each cleaning cycle. However, no results are provided for several of the test cycles for each assay test method, with no explanation for this missing data. Please revise your test reports to include data for each cleaning cycle to demonstrate reproducibility, and please also explain whether any deviations or failures occurred in any of the cleaning validation testing. In addition, please revise your test reports to include both the corrected (based on % recovery efficiency and related correction factor) and uncorrected raw data from your cleaning validation studies.

30. In the discussion section of your TOC cleaning validation test reports, you provide the following note: "Due to the elevated TOC levels of the negative controls, a baseline

HIGHLY CONFIDENTIAL

REBOTIX171046

TOC level was used by subtracting the negative control TOC values from the test sample and positive control TOC values. This was done to assure that measurement of the effectiveness of the cleaning process was based only on the reductions in the TOC levels contributed by the test soil applied to the challenged devices and not from interfering substances such as residual detergent or leaching chemicals. After applying the baseline TOC level, all test samples met the acceptance criteria." However, the TOC results from your negative controls are not adequate; neither is the subtraction of these results from the test samples and positive control results. The Agency considers this an inappropriate adjustment of the data and, therefore, it appears that the negative controls and test samples do not meet the acceptance criterion of $< 2.2$ $\mu g/cm^2$ for TOC. It appears that the TOC endpoint assay used in your studies may not be appropriate, or there may be interfering substances present. Please revise your cleaning validation methods to obtain acceptable results that meet at least two quantitative acceptance criteria for residual soil.

<u>Sterilization Validation</u>
The following deficiencies refer to the sterilization activities that you have proposed as part of your remanufacturing process and that you are recommending to users in the reprocessing instructions. Please refer to the guidance document, "Reprocessing Medical Devices in Health Care Settings: Validation Methods and Labeling Guidance for Industry and Food and Drug Administration Staff" (available at http://www.fda.gov/downloads/medicaldevices/deviceregulationandguidance/guidancedocuments/ucm253010.pdf), for additional information.

31. In Attachments B and C of Module E, you provide your justification for the "worst case" device models chosen for sterilization validation (i.e., the Monopolar Curved Scissors, Permanent Cautery Spatula, Fenestrated Bipolar Forceps, PK Dissecting Forceps, Large Needle Driver, and ProGrasp Forceps). Your "worst case" analysis outlines a brief description of the tool end design, materials, surface area, and worst case conclusion based on "risk." It appears that the analysis included consideration of the design configuration, number of components, materials of construction, size and density, surface are and porosity, need for disassembly, surface finish or texture, cannulations or lumens, presence of mated surfaces, and ability to be sterilized in a routine cycle. However, your analysis is not sufficient to determine if your justification for the chosen "worst case" models is appropriate in terms of sterilization validation and difficulty of sterilizing the device over other models. Please repeat the analysis by including parameters such as the following: hard to reach spaces that do not allow for easy steam access, presence of any additional cables that provide crowding for most difficult to reach small spaces and most difficult air removal from the internal shaft, and interfaces of different materials that affect moisture elimination. If any new "worst case" models are identified due to the new analysis, please provide results from sterilization validation performed using these additional models.

32. You provided a sterilization efficacy report in Attachment E-6 of the original submission. However, the following items identified in the test report require additional information:

HIGHLY CONFIDENTIAL

REBOTIX171047

a.  You state in Section 5.0, Validation of Spores, of the test report, "The D-value was no less than 1.0 minute and the population no less than $1.0 \times 10^6$." However, the biological indicator (BI) does not appear to comply with ISO 11138-3: 2006, "Sterilization of health care products – Biological indicators – Part 3: Biological indicators for moist heat sterilization processes." Clause 9.5 of the standard states, "Suspensions, inoculated carriers or biological indicators containing Geobacillus stearothermophilus spores shall have a $D_{121}$ value of $\geq 1.5$ minutes when tested according to the conditions given in Annex A." Please repeat the sterilization validation using an appropriate BI. In addition, please provide the actual results from the BI validation results since they are not provided in the test report.

b.  It appears from your sterilization validation report that the devices were placed into pouches (i.e., "SPSmedical Self-Seal Pouches") and not a sterilization wrap, as recommended in the reprocessing instructions. Please either revise your reprocessing instructions to recommend that an FDA-cleared sterilization pouch be used (in accordance with your sterilization validation study), or provide results from sterilization validation using an FDA-cleared sterilization wrap.

c.  Section 7.12 of the test report states that "positive and negative controls were set up"; however, there is no description of the test methods used for the various controls. Please revise the test report to include comprehensive methods for what the controls entailed and how the controls were handled.

d.  You perform a "Negative Verification Test" using samples inoculated with $\leq 100$ spores of *Geobacillus stearothermophilus* and "incubated per USP." The test methods are not entirely clear, and it does not appear that the recommendations in USP <71> "Sterility Tests" were followed. USP <71> states to use a variety microbes that include aerobic bacteria (*Staphylococcus aureus, Bacillus subtilis, Pseudomonas aeruginosa*), anaerobic bacterium (*Clostridium sporogenes*), and fungi (*Candida albicans* and *Aspergillus brasiliensis* (*Aspergillus Niger*)). Please repeat the "Negative Verification Test" using the test methods outlined in USP <71>, and provide a complete description of your test methods in your test report.

e.  Your test report does not state how the devices (test samples and controls) were treated prior to the sterilization validation study. Please revise your test report to include this information. Please ensure that all devices used in your sterilization validation studies included all steps in your remanufacturing procedures and all steps in your reprocessing instructions up to the sterilization instruction. For example, it is not evident that "Step 8: Lubricate" in your reprocessing instructions has been validated. Please repeat your sterilization validation, if necessary, to validate all steps in your reprocessing instructions. Please ensure that you have used proper controls in your study to account for the presence of lubricant and potential false negative results.

HIGHLY CONFIDENTIAL

REBOTIX171048

    f.  It does not appear that you have validated the drying time for the steam sterilization method recommended in your reprocessing instructions. Please perform a sterilization validation study to validate the drying time by evaluating the dryness of the product by mass change and perceptible moisture, as described in ISO 17665-1:2006, "Sterilization of health care products—Moist heat—Part 1: Requirements for the development, validation, and routine control of a sterilization process for medical devices."

    g.  It does not appear that you have provided the results from bioburden enumeration and resistance or a description of your routine bioburden monitoring with action/alert limits. Please perform and provide results, including % recovery efficiency and recorded colony forming units per device, from a bioburden validation study in which the bioburden is enumerated on heavily soiled, clinically used devices after exposure to minimum cleaning parameters. Please also develop methods and alert limits for routine bioburden monitoring, and provide a description of these methods and alert limits with your response. Finally, please perform a bioburden resistance study using a fractional sterilization cycle to confirm that natural bioburden contained on the reprocessed device is less resistant that the biological indicators used in the sterilization validation and those used for routine cycle monitoring. Please reference and cite applicable standards where appropriate (e.g., ISO 11737-1:2006 /(R)2011, "Sterilization of health care products—Microbiological methods—Part 1: Determination of the population of microorganisms on product").

Biocompatibility

The following deficiencies refer to the biocompatibility testing that you have conducted to validate your remanufacturing process. Please refer to the Blue Book Memorandum #G95-1, "Use of International Standard ISO-10993, 'Biological Evaluation of Medical Devices Part 1: Evaluation and Testing'" (available at http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/ucm080735.htm ), for additional information.

33. On page 2 of Module G, you state that the Remanufactured Fenestrated Bipolar Forceps and Remanufactured Monopolar Curved Scissors were selected as the two representative device models for Biocompatibility testing. Through email on May 15, 2015, you state:

    "Each device did not contain all patient-contacting materials, but full coverage of added or modified material for all models was achieved by testing both of them. The table below outlines which materials are represented by each device tested. It should be noted that the ceramic heat sink that is present on the hook of one device model (420183) and spatula of another (420184) is never modified (polished or otherwise) or replaced during the remanufacturing process. As such, this component was judged not to pose any biocompatibility risk, as the stable ceramic material was clearly qualified as biocompatible as part of the OEM device, and is not later modified."

HIGHLY CONFIDENTIAL

REBOTIX171049

However, we do not agree with your rationale that the ceramic heat sink does not pose any biocompatibility risk. Although you claim that the ceramic heat sink is "…never modified (polished or otherwise) or replaced during the remanufacturing process," the heat sink is reprocessed multiple times throughout the lifetime of the device. Due to the harsh nature of reprocessing agents, repeated reprocessing and use cycles may cause the ceramic to degrade or exhibit other adverse effects over the course of the device's lifetime. In addition, an aspect of the biocompatibility testing for a reusable device is to evaluate residual cleaning agents used during reprocessing.

Therefore, please perform testing on either the Remanufactured Permanent Cautery Hook (420183) or Remanufactured Permanent Cautery Spatula (420184) to demonstrate the biocompatibility of the ceramic heat sink. As noted in Deficiency 35 below, this testing should be performed at the end of the remanufactured device's use life (i.e., after being subjected to all remanufacturing procedures performed under worst case conditions, followed by worst case reprocessing for at least 11 cycles). In your response, please provide a complete description of the methods used to prepare the test samples prior to biocompatibility testing. Please also provide the full biocompatibility test reports for these devices, including a description of the test article, methods, pass/fail criteria, and results for each completed test.

34. The list of "Parts and Materials" on page 43 of Module E, Sterilization, lists "Steris Hinge Free Lubricant."  As also stated in Deficiency 25, there is no further explanation provided with Attachment E; therefore, it is not clear how this lubricant is used or if it is applied onto a patient-contacting portion of the subject device. Please clarify if this lubricant is used on any patient-contacting portions of the subject device, and clarify if this lubricant is present on the devices used in your biocompatibility testing.

Furthermore, it appears that the Steris Hinge Free lubricant contains dimethylol-5,5-dimethylhydantoin (DMDMH), an antimicrobial preservative agent that is a formaldehyde releaser. If this lubricant is used on your subject device, please provide an MSDS and toxicology information to demonstrate the safety of this antimicrobial-containing lubricant. FDA is concerned that the presence of this antimicrobial lubricant on a patient-contacting portion of the device may lead to transfer of the lubricant to the surgical site where it could be in contact with tissue for longer than the 24 hours used to establish your biocompatibility testing. In addition, the presence of DMDMH raises concerns about potential genotoxicity and carcinogenicity. Please individually assess each of the chemical components in the lubricant used on your device and provide a toxicological risk assessment in accordance with ISO 10993-17, "Biological evaluation of medical devices – Part 17: Methods for the establishment of allowable limits for leachable substances." Please provide a tolerable intake analysis based on: (1) published no observed adverse effect level, (2) lowest observed adverse effect, and (3) an adequate safety margin as specified in ISO 10993-17. This information is necessary to establish substantial equivalence, in terms of safety, to the predicate device.

HIGHLY CONFIDENTIAL

REBOTIX171050

35. Through email on May 15, 2015, you describe the selection and preparation of the Remanufactured Bipolar Forceps and Remanufactured Monopolar Curved Scissors for Biocompatibility testing. You state:

> "Worst case devices chosen for biocompatibility testing were those devices that collectively contained all patient contacting materials that were added or modified by the remanufacturing process, and were exposed to all remanufacturing processes that would be relevant to any individual model."

> You further state, "Previously used, expired devices were chosen for the testing, meaning that the device had been reprocessed a minimum of 10 times by the end-user. The devices were then subjected to our remanufacturing process which includes 2 additional reprocessing cycles (scrub, flush, ultrasonically clean and autoclave) for a total of 12 reprocessing cycles."

However, sufficient descriptive information is not provided for FDA to fully understand how the devices were prepared prior to biocompatibility testing. Although you provide a rationale for selecting the types of devices used for biocompatibility testing, you do not describe the criteria by which the individual test samples were selected for the study. Please explain how the test samples were selected for the study, and address the following items in your response:

    a. A description of the reprocessing of the test samples by the end user prior to biocompatibility testing is not provided. Please provide a description of the reprocessing steps used on the test samples by the previous end user. This information is requested since changes in the OEM's reprocessing instructions could be implemented differently at the health care facilities and have a significant effect on the device's validated number of use lives.

    b. The remanufacturing procedures in Attachment B of Supplement 2 describe the use of multiple agents (e.g., TheraBand, lubricants, rust remover etc.) that may contact patient-contacting portions of the subject device. Please clarify if the test samples were subjected to ALL of the remanufacturing procedures in Attachment B of Supplement 2, including all of the remanufacturing agents described therein. In your response, it would be helpful to provide a list of agents used during the remanufacturing process that contact patient-contacting portions of the subject device, and to describe any assurances for removing residuals from these agents remaining on the device after remanufacture. Please additionally see Deficiency 34 regarding use of the Steris Hinge-Free lubricant on the subject device.

Finally, according to your email on May 15, 2015, it appears that subject devices were tested for biocompatibility immediately following the remanufacturing process. It appears that the devices were not subjected to biocompatibility testing at the end of their remanufactured use life (i.e., after 11 additional cycles of worst case reprocessing.) Please be advised that the devices should be tested for biocompatibility after being

HIGHLY CONFIDENTIAL

REBOTIX171051

subjected to all of the remanufacturing procedures (following worst case tolerance parameters) in addition to worst case reprocessing for at least 11 cycles.

Therefore, in order to demonstrate that the subject device remains biocompatible throughout its entire use life, please perform biocompatibility testing on the remanufactured devices after at least 11 additional cycles of worst case reprocessing. In your response, please provide a complete description of the methods used to prepare the test samples prior to biocompatibility testing. Please also provide the full biocompatibility test reports for these devices, including description of the test article, methods, pass/fail criteria, and results for each completed test.

36. In Attachments G-9 and G-10 of Module G, you provide test reports for hemolysis testing on the Remanufactured Fenestrated Bipolar Forceps and Monopolar Curved Scissors. However, only extract testing was performed on these devices; direct contact testing was not performed. Please note that ASTM F756-08 states, "It is recommended that both tests (extract and direct contact) be performed unless the material application or contact time justifies the exclusion of one of the tests." Therefore, please perform direct contact testing on your subject devices, or provide a valid scientific rationale for why this testing is not needed.

37. In Module G, You provide biocompatibility test reports for the Remanufactured Fenestrated Bipolar Forceps and Monopolar Curved Scissors. However, the normal saline extracts for both devices were described as being pale red in color, turbid, and containing red flake particulates in the Irritation, Sensitization, and Acute Systemic Toxicity tests. Please provide evidence to demonstrate that the presence of color, turbidity, and particulates in the extracts are not indicative of problems with product manufacturing, and/or inappropriate extraction conditions that may invalidate the findings of the study. Information regarding the chemistry of the product may be helpful in your response.

Electromagnetic Compatibility (EMC) and Electrical Safety
The following deficiencies refer to the EMC and electrical safety testing that you have conducted to validate your remanufacturing process.

38. In Module I, EMC and Electrical Safety, it is stated that devices were cleaned and autoclaved a total of 11 times prior to testing, in accordance with the reprocessing instructions provided in Attachment F of Module I.  Although the reprocessing instructions provided in Module I appear consistent with the reprocessing instructions provided to the user, it is not clear if worst case parameters were used to prepare the test samples (e.g., longest exposure times, highest chemical concentrations, and shortest rinse durations) in terms of the remanufacturing procedures, but also the simulation of reprocessing that the end user would perform.  The instructions also do not include discrete temperatures and times for sterilization.  Please repeat your EMC and electrical safety testing on end-of-life devices that were remanufactured and reprocessed under worst case conditions.

HIGHLY CONFIDENTIAL

REBOTIX171052

39. Although you provide a rationale for selecting the types of devices used for electrical safety testing, your electrical safety testing protocol does not explain how the individual test samples were selected for the study. Please revise your protocol to explain how the test samples were selected for the study, including their clinical use and reprocessing by the end user. This is information is requested since changes in the OEM's reprocessing instructions could be implemented differently at the health care facilities and have a significant effect on the device's validated number use lives (which in part is determined by the electrical safety testing performed on end of use life devices). This information should also be used to help develop your incoming device inspection criteria.

<u>Performance Testing</u>
The following deficiencies refer to the general performance testing that you have conducted to validate your remanufacturing process.

40. In Attachment E of Supplement 2, you state, "OEM-equivalent specifications have been derived from published OEM product information, in-house 'reverse engineering' activities, and the relevant requirements of applicable consensus standards." Since it does not seem possible to identify exact device specifications using these methods, please perform side-by-side comparative testing with the subject device and the matching OEM device model, and use a statistical comparison between the two devices to evaluate substantial equivalence. Please provide a copy of the full side-by-side performance testing report with your response.

41. In Module J of your original submission, you state that simulated use exercises were performed on the devices, and that each "exercise" was performed 72 times per simulated use cycle. You further state that the number 72 was derived from a survey of current users of the da Vinci system, including urologic, gynecologic, and thoracic surgeons. 60 was determined to be the high end number of manipulations/activations for any given function and a 20% safety margin (i.e., 12) was added to ensure each function would be exercised significantly more than would be expected in the field. Please provide a copy of the survey protocol and report, including the methods and full results for FDA review.

42. In Module J of your original submission, you provide protocols for the simulated use and reprocessing cycles that were performed on the device prior to each performance test. You state that "…each use cycle consisted of ultrasonic cleaning and steam sterilization according to OEM parameters…"

    a. From review of the protocols, it does not appear that defined or worst case parameters were used for the device remanufacturing or reprocessing performed on the test samples. For example, the steam sterilization parameters are listed as a temperature range, minimum exposure time, and minimum pressure, rather than discrete values. The ultrasonic cleaner temperature is also listed as a range. It is not clear why "OEM parameters" were followed rather than your own "worst case" parameters. All process tolerances for your own remanufacturing and reprocessing procedures should be defined, and treatment of the test devices should be based on the worst case tolerances (not the OEM parameters). FDA

HIGHLY CONFIDENTIAL

REBOTIX171053

recommends that worst case conditions in this case include longest exposure times, highest exposure temperatures, highest chemical concentrations, and shortest rinse durations; note that these worst case conditions are different than what would be expected for worst case conditions used for preparing test samples for cleaning validation studies. Please revise your protocol to have defined worst case parameters for the remanufacturing and reprocessing procedures, and provide results from a new study performed following this revised protocol.

b.  Although you provide a rationale for selecting the types of devices used for performance testing, your performance testing protocol does not explain how the individual test samples were selected for the study. Please revise your protocol to explain how the test samples were selected for the study, including their clinical use and reprocessing by the end user. This is information is requested since changes in the OEM's reprocessing instructions could be implemented differently at the health care facilities and have a significant effect on the device's validated number use lives. This information should also be used to help develop your incoming device inspection criteria.

c.  It is stated on page 42 of Module J that two deviations occurred during the performance testing following your protocol. Sterilization was performed by gravity displacement rather than pre-vacuum steam sterilization method, and the ultrasonic cleaner was maintained between 45-50°C.

    i.  It is not entirely clear what deviation occurred regarding the ultrasonic cleaner (it is presumed that the temperature was maintained incorrectly, but it is not explicitly stated what the temperature was intended by the protocol). Please revise your protocol to provide a comprehensive description of the ultrasonic cleaner procedure and its effect on the results of the study, with the consideration that the conditions used in the study should be "worst case." If "worst case" conditions were not used, please repeat the study using all "worst case" conditions.

    ii.  You justify the deviation that resulted in the use of a different sterilization method (i.e., gravity displacement rather than pre-vacuum steam sterilization) by stating that the device is not shipped sterile and the only need at Rebotix is for decontaminating units upon arrival. You also discuss the fact that less steam may penetrate the flush tube inside the shaft with the gravity displacement compared to pre-vacuum. Consequently, you repeated the flush tube testing with pre-vacuum steam sterilization; however, all other testing was performed after gravity displacement steam sterilization. You further state that this deviation "…is only an issue if Rebotix was claiming sterility after being subjected to the life testing." However, FDA does not agree with this conclusion. Please note that it is your responsibility to validate not only the remanufacturing and reprocessing performed at your facility, but also the reprocessing instructions provided to the end user. Part of this validation

HIGHLY CONFIDENTIAL

REBOTIX171054

includes validating the number of use lives stated in the labeling if the user is to follow the provided reprocessing instructions. Therefore, it does not appear that the number of use lives has been properly validated, since the steam sterilization method used in your protocols is not what is used in your own remanufacturing procedures or what is recommended in your labeling. Please repeat all use life testing using defined, worst case parameters for the sterilization method that will be used in your remanufacturing procedures and in your reprocessing instructions for users.

d. Section 9.10 of your performance test reports states, "On the 11th cycle step 4 of 9.8 will not utilize a Steam Autoclave cycle." However, there is no step 4 related to sterilization in Section 9.8 of the test reports, and it is not clear why the protocol will not include sterilization during that step. Please revise your reports to clearly explain the referenced statement.

43. In Module B, Device Description, you state that the remanufactured device shall harvest the original DS2505 memory device for use on the interceptor printed circuit board (PCB) assembly, Rebotix P/N PR1110-002. It is not clear if there are acceptance criteria to determine if the DS2050 memory device can be reused. Please describe your acceptance criteria for determining if the DS2050 memory device can be reused.

44. In Module J, Performance Data, Attachment J-1, the Monopolar Curved Scissors Cuts Test procedure describes cutting on chicken breast. However, in Supplement 2 Attachment C, PR3037 and PR3038, the Cutting Efficiency Test states that scissors are subjected to a cut test using TheraBand (simulated tissue) per DIN 58298. Please provide justification for this deviation from your SOP for the cutting performance tests. Please provide data to show that the use of chicken breast represents the worst case challenge for the Monopolar Curved Scissors. Furthermore, please provide a copy of the methods used in DIN 58298 so that we may fully understand your cutting protocol.

45. In Module J, Performance Data, Attachment J-1, Monopolar Curved Scissors Simulated Life testing appears to have been conducted without the use of the tip cover accessory. It is our understanding that in clinical practice, the Monopolar Curved Scissors must be used with the tip cover accessory. Please repeat the simulated life testing for the Monopolar Curved Scissors with a tip cover accessory in place, and provide the verification report.

46. In Module J, Performance Data, Attachment J-4, 13 Permanent Cautery Spatula (420184) and 5 Permanent Cautery Hook (420183) were used in simulated life testing. A total of 18 samples were tested to provide the level of statistical significance at 85% confidence of 90% reliability. However, this is a departure from the other simulated life testing, where a total of 22 samples were tested to provide the level of statistical significance at 90% confidence of 90% reliability. Please provide your justification for this departure (i.e., for using 18 samples instead of 22, and for accepting a lower level of statistical significance at 85%) for the Permanent Cautery Spatula and Permanent Cautery Hook.

HIGHLY CONFIDENTIAL                                                                        REBOTIX171055

47. In Module J, Performance Data, Attachment J-7, Life Testing Worst Case Analysis, you describe your use of 3 criteria in guiding the selection of 6 representative models for Rebotix Life Testing. When we reviewed the number of malfunction reports in FDA's Medical Device Reporting (MDR) Database, the Mega Suturecut Needle Driver was among the top 5 EndoWrist Instruments with the greatest number of malfunctions. Furthermore, it appears that your current Life Testing does not include an evaluation of suturing performance. Therefore, we recommend that you perform additional simulated life testing using the Mega SutureCut Needle Driver (420309). Please include an evaluation of suturing performance as part of this testing, and provide the verification report for Simulated Life Testing for the Mega SutureCut Needle Driver in your response.

48. In Module J, Performance Data, it is not clear how the RF activations parameters of Power Setting and Duration for energized instruments were selected in the RF Activation (9.7) and Post Testing/Inspection (9.11) procedures. Please provide a rationale to demonstrate that these RF Activation parameters represent worst case conditions for the simulated uses.

49. In Module J, Performance Data, it is not clear if jaw alignments are checked for graspers, forceps, needle drivers, and scissors during Post Testing/Inspection (9.11). We believe jaw alignments are critical performance characteristics for these instruments and should be evaluated following simulated life testing to verify that the jaw mechanism can withstand all additional remanufacturing, reprocessing, and reuse cycles. Please address the following issues:

    a. Please incorporate a jaw alignment inspection step during Post Testing/Inspection (After 11 Simulated Uses) for graspers, forceps, needle drivers, and scissors.

    b. Please provide objective acceptance criteria for jaw alignment inspection. A subjective criterion, such as "The jaw must be correctly aligned" in SOP PR3024, is not adequate.

    c. Please repeat the simulated life testing for the Monopolar Curved Scissors, the Fenestrated Bipolar Forceps, and the Mega SutureCut Needle Driver, and provide the full verification reports in your response.

50. In Attachment J-9 of Module J, you perform shipping validation on the subject device in accordance with ISTA 6 FED EX, "FedEx Procedures for Testing Packaged Products weighing up to 150 lbs." You further state, "Since three samples are required, 3 different models will be tested; the Monopolar, Bipolar and PK models, all of which are energized."

However, ISTA 6 FED EX is not an FDA-recognized standard. Furthermore, a sample size of n = 3 devices does not appear to be statistically justifiable. Please perform packaging validation on a statistically justifiable number of samples. We recommend the use of FDA-recognized consensus standards for this validation testing. (A current list of these standards is available at

HIGHLY CONFIDENTIAL

REBOTIX171056

http://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfStandards/search.cfm). We have found that the FDA-recognized standard, ASTM D4169-09, "Standard Practice for Performance Testing of Shipping Containers and Systems," includes distribution cycles that provide sufficient rigor for a variety of shipping and handling situations. In addition, we have accepted successful test data from packages subjected to Distribution Cycle 13 with testing at Assurance Level 1, as we believe this to be sufficiently rigorous.

51. You provide the IFU for the subject device through email on May 22, 2015. On page 3 of this IFU, Table 1-1 provides a list of environmental conditions for the subject device. This table specifies the temperature and humidity ranges for operating, storage, and transport of the subject device. However, testing to support the specified temperature and humidity ranges does not appear to be provided in the submission. Please provide a copy of the validation report to support the environmental conditions specified in the IFU. Alternatively, please remove this information from the subject IFU.

**HIGHLY CONFIDENTIAL**

**REBOTIX171057**

# EXHIBIT 4

## to

## DECLARATION OF ANDREW LAZEROW IN SUPPORT OF INTUITIVE SURGICAL INC.'S OPPOSITION TO SIS'S MOTION IN LIMINE #1

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

## HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

|  |  |
|---|---|
| SURGICAL INSTRUMENT SERVICE COMPANY, INC., | ) ) ) ) |
|  | ) Case No. 5:21-cv-03496. |
| Plaintiff, | ) ) |
| vs. | ) ) |
| INTUITIVE SURGICAL, INC., | ) ) |
| Defendant. | ) ) |

## EXPERT REPORT

**Dr. Russell L. Lamb**
**President**
Monument Economics Group, LLC
1000 Wilson Boulevard
Suite 2650
Arlington, VA 22209

December 2, 2022

Accessories."[303]  The Intuitive Service Agreement also stated that the license to use an EndoWrist instrument with the da Vinci surgical robot purchased by the hospital "expires once an Instrument or Accessory is used up to its maximum number of uses, as is specified in the Documentation accompanying the Instrument or Accessory."[304]  At deposition, Mr. Vavoso testified that he understood this term of the Intuitive Service Agreement to mean that the EndoWrist "instruments have a designated number of lives. And once those lives are used, then the license has expired."[305]  I understand that Intuitive claims that this requirement was necessary due to patient safety concerns associated with allowing third parties to repair its EndoWrist surgical instruments.[306]

129.    I understand that, in his expert report in this matter, Plaintiff's regulatory expert, Mr. Philip J. Phillips, addresses a recent action taken by the FDA with respect to 510(k) clearance for the marketing of reprocessed Intuitive Surgical da Vinci model S/Si EndoWrist instruments by a company called Iconocare Health ("Iconocare").[307]  In its September 2022 letter to Iconocare, the FDA concluded:

> The design, materials, and intended use of the 8mm Monopolar Curved
> Scissor Instruments, after an additional ten (10) reuse cycles are
> equivalent to the predicate device. The mechanism of action of the subject
> device is identical to the predicate device in that the same standard
> mechanical design, materials, and sizes are utilized. There are no changes
> to the claims, intended use, clinical applications, patient population, or
> method of operation. The change in device specifications is to extend the
> useful life of the 8mm Monopolar Curved Scissor Instruments.[308]

---

[303] Vavoso Deposition at 194:11-195:11, Exhibit 24 at Intuitive-00067540.  Glenn Vavoso of Intuitive testified that he was not "aware of any contract with any hospital that does not include this use of system term."  See Vavoso Deposition at 195:4-11.

[304] Vavoso Deposition at 195:17-196:14, Exhibit 24 at Intuitive-00067542.  At deposition, Glenn Vavoso of Intuitive was unable to "identify any sales contract with the hospital that does not include the language in paragraph 8."  See Vavoso Deposition at 198:24-199:2.

[305] Vavoso Deposition at 196:15-197:6.

[306] See, for example, Deposition of Myriam Curet MD, May 7, 2021 (hereafter "Curet Deposition") at 107:7-25.

[307] Telephone conversation with Mr. Philip J. Phillips, dated December 1, 2022.

[308] FDA, Letter to Iconocore Health, "RE: K210478," dated November 15, 2022.  Available at https://www.accessdata.fda.gov/cdrh_docs/pdf21/K210478.pdf.

I understand that Mr. Phillips opines that Iconocare demonstrated to FDA's satisfaction that modifying and relabeling each presumably-used Intuitive device to create a reprocessed device, with an additional 10 uses, is substantially equivalent to the predicate devices.[309] I understand that, in Mr. Phillip's opinion, this establishes that the "intended use" of Intuitive's marketed EndoWrist device is the same as the intended use of Iconocare Health's newly-cleared device.[310]

130.    I understand Mr. Phillips concludes that Iconocare provided performance data to the FDA that demonstrated that the reprocessed devices are as safe and effective as the predicate devices and operate as originally intended.[311] I also understand that Mr. Phillips further asserts that it is not surprising that FDA determined the Iconocare EndoWrist device to be substantially equivalent, as it is virtually identical to the predicate devices in all respects and one would anticipate that they are as safe and effective.[312] Based on Mr. Phillip's analysis of the FDA's recent clearance of reprocessed EndoWrist instruments, I understand Mr. Phillips has concluded that Intuitive's claims that it is unsafe to use EndoWrist surgical instruments more than the maximum number of times imposed by Intuitive appears to be inconsistent with the determination made recently by the FDA.

131.    For the purposes of my analysis contained in this Expert Report, I rely on the opinions of Mr. Philip Phillips regarding the FDA's assessment of the safety of reprocessed EndoWrist surgical instruments as compared to Intuitive's newly manufactured replacement EndoWrist surgical instruments.  Additional evidence I have reviewed is consistent with Mr. Phillips' conclusions regarding the FDA's assessment of the safety of reprocessed EndoWrist instruments.  For example, at deposition, Nicky Goodson, Senior Director for Service Operations at Intuitive, testified that Intuitive has not done testing of any kind to determine whether refurbished or repaired EndoWrists

---

[309] Telephone conversation with Mr. Philip J. Phillips, dated December 1, 2022.
[310] Telephone conversation with Mr. Philip J. Phillips, dated December 1, 2022.
[311] Telephone conversation with Mr. Philip J. Phillips, dated December 1, 2022.
[312] Telephone conversation with Mr. Philip J. Phillips, dated December 1, 2022.

**EXHIBIT 5**

**to**

**DECLARATION OF ANDREW LAZEROW IN
SUPPORT OF INTUITIVE SURGICAL INC.'S
OPPOSITION TO SIS'S MOTION IN LIMINE #1**

**MCCAULLEY LAW GROUP LLC**
JOSHUA V. VAN HOVEN, (CSB No. 262815)
E-Mail: josh@mccaulleylawgroup.com
3001Bishop Dr., Suite 300
San Ramon, California 94583
Telephone: 925.302.5941

RICHARD T. MCCAULLEY (*pro hac vice*)
E-Mail: richard@mccaulleylawgroup.com
180 N. Wabash Avenue, Suite 601
Chicago, Illinois 60601
Telephone: 312.330.8105

*Attorneys for Plaintiff and Counter-Defendant,*
SURGICAL INSTRUMENT SERVICE COMPANY, INC.

### UNITED STATES DISTRICT COURT

### NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| SURGICAL INSTRUMENT SERVICE COMPANY, INC. | Case No. 3:21-cv-03496-AMO<br>Honorable Araceli Martínez-Olguín |
| *Plaintiff/Counter-Defendant,* | **PLAINTIFF SIS's RESPONSES TO DEFENDANT INTUITIVE SURGICAL, INC.'S SECOND SET OF REQUESTS FOR ADMISSION AND THIRD SET OF INTERROGATORIES** |
| v. | |
| INTUITIVE SURGICAL, INC., | |
| *Defendant/Counterclaimant.* | |

PROPOUNDING PARTY:    Defendant Intuitive Surgical, Inc.

RESPONDING PARTY:    Plaintiff Surgical Instrument Service Co., Inc.

SET NUMBER:    Two of Requests for Admission

Three of Interrogatories

    Pursuant to Rules 26 and 36 of the Federal Rules of Civil Procedure Plaintiff Surgical Instrument Service Co., Inc. ("Plaintiff" or "SIS"), by and through the undersigned counsel, hereby responds to Defendant Intuitive Surgical, Inc.'s ("Defendant" or "Intuitive") Second Set of Requests for Admission and Third Set of Interrogatories as follows:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **GENERAL OBJECTIONS**

Plaintiff makes the following general responses and objections ("General Objections") to each definition, instruction, and request propounded in Defendant's second set of requests for admission. These General Objections are hereby incorporated into each specific response. The assertion of the same, similar, or additional objections or partial responses to individual requests does not waive any of Plaintiff's General Objections.

Plaintiff reserves its right to and will supplement its responses to Defendant's second set of requests for admission in accordance with Fed. R. Civ. P. 26(e) and the objections as set forth herein are made without prejudice to Plaintiff's right to assert any additional or supplemental objections pursuant to Fed. R. Civ. P. 26(e).

1.      Plaintiff objects to Defendant's definition of "EndoWrist Instruments" as vague and ambiguous, and further on the basis that determining the scope of "Intuitive's patented 'EndoWrist' technology" necessarily requires legal opinion and testimony.

2.      Plaintiff objects to the definitions and instructions accompanying Defendant's Requests to the extent they seek to impose duties or obligations upon Plaintiff greater than required by the Federal Rules of Civil Procedure and Local Rules for the Northern District of California.

3.      Plaintiff objects to each request to the extent that it seeks information that is protected from disclosure by the attorney-client privilege, the attorney work product doctrine or any other applicable privilege, doctrine, or discovery immunity. Plaintiff's answers do not waive any attorney client privilege and Defendant may not use Plaintiff's answers to support an argument or a further line of questioning regarding the legal conclusion a request calls for.

4.      Plaintiff objects to Defendant's requests to the extent that they are vague, ambiguous, or seek to impose obligations on Plaintiff that are broader than, or inconsistent with,

the Federal Rules of Civil Procedure or the local rules of this Court. Unless indicated otherwise, Plaintiff shall give the terms of these requests their ordinary and plain meanings. If Defendant subsequently assert an interpretation of any request that differs from Plaintiff's understanding, Plaintiff reserves the right to amend or supplement its objections and/or responses.

5.    Plaintiff objects to Defendant's definition of "Customer" as vague and ambiguous. Plaintiff objects to "Customer" including any person who was "marketed" any "SIS services," as such definition is vague, ambiguous, and potentially covers any person who has seen marketing materials of Plaintiff, without regard to whether Plaintiff has engaged with or even knows of such person. Plaintiff further objects to Defendant's definition of "Customer" as including any person who has "inquired about" any "SIS services," as such definition is vague and ambiguous, for example, by lacking any limitation as to whether such person has made an inquiry to Plaintiff, whether Plaintiff has any knowledge of such inquiry, or whether such inquiry is made for the purpose of potentially purchasing SIS services. Plaintiff further objects to "Customers" as being vague and ambiguous in view of Plaintiff and Defendant both being in a market in which the party making a purchasing decision may range from individual surgeons or surgical centers, to hospitals, to entire hospital systems or purchasing organizations.

**SPECIFIC OBJECTIONS AND RESPONSES**

**REQUEST FOR ADMISSION NO. 16:**    Admit that SIS did not, after November 2022, whether alone or with a third party, seek FDA clearance for any service, procedure, or technology for resetting or reprogramming the use counter on any EndoWrist Instrument.

**Response:**

Plaintiff objects to this Request because it implies that FDA clearance is required for any service, procedure, or technology for resetting or reprogramming the use counter on any EndoWrist

Instrument. That is not the case. As the Court stated in the Order Re: Cross Motions for Summary Judgment (Doc. 204 p. 10):

> "[T]his query is problematic because '[t]he FDCA [(Food, Drug and Cosmetic Act)] leaves no doubt that it is the Federal Government rather than private litigants who are authorized to file suit for noncompliance with the medical device provisions.' *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 349 n.4 (2001). Indeed, a private action brought under the Lanham Act may not be pursued when it requires litigating an alleged underlying FDCA violation where the FDA has not itself concluded that a violation exists. *PhotoMedex, Inc. v. Irwin*, 601 F.3d 919, 924 (9th Cir. 2010) (affirming grant of summary judgment for defendant on Lanham Act false advertising claim where FDA had not taken a position on defendant's laser's need for Section 510(k) clearance, and claim was based on defendant allegedly misrepresenting that its laser had received FDA clearance). * * * [C]ourts have consistently precluded private actions which require establishing a violation of the FDCA. *See, e.g., Amarin Pharma, Inc. v. International Trade Commission*, 923 F.3d 959, 968 (Fed. Cir. 2019) (citing *PhotoMedex*, 601 F.3d at 924, 928) (finding that Lanham Act claim could not stand where it was "based on proving violations of the FDCA and where the FDA has not taken the position that the articles at issue do, indeed, violate the FDCA.")."

The Court ruled that "SIS has not clearly engaged in unlawful conduct and accordingly may still seek to prove that Intuitive's anticompetitive conduct caused its antitrust injury at trial." Doc. 204 p. 16.

    Subject to the foregoing objection, Admitted.

**REQUEST FOR ADMISSION NO. 17:**     Admit that SIS did not, after November 2022, whether alone or with a third party, develop any service, procedure, or technology for resetting or reprogramming the use counter on X/Xi EndoWrist Instruments.

    **Response:**

    Subject to the foregoing General Objections, Admitted.

**REQUEST FOR ADMISSION NO. 18:**     Admit that SIS took no steps, after November 2022, whether alone or with a third party, to sell, distribute, or market any EndoWrist Instruments with reset and/or reprogrammed use counters, or any service for resetting or reprogramming the use counter on EndoWrist Instruments.

    **Response:**

    Subject to the foregoing General Objections, Admitted.

**REQUEST FOR ADMISSION NO. 19:**     Admit that SIS has continued, since November 2022, to offer its EndoWrist "recovery service" to customers.

    **Response:**

    Subject to the foregoing General Objections, Admitted.

### INTERROGATORY

    19.     If You answer any of Requests for Admission 16 through 19 with anything other than an unqualified admission, state in detail the factual basis for Your answer.

    **No Response Required**

1   Dated: October 16, 2024                    McCAULLEY LAW GROUP LLC

2                                              By: */s/ Richard T. McCaulley*

3                                              RICHARD T. MCCAULLEY (pro hac vice)

4                                              E-Mail: richard@mccaulleylawgroup.com
                                               180 N. Wabash Avenue, Suite 601
5                                              Chicago, Illinois 60601
                                               Telephone: 312.330.8105
6

7                                              JOSHUA V. VAN HOVEN
                                               E-Mail: josh@mccaulleylawgroup.com
8                                              3001 Bishop Dr., Suite 300
                                               San Ramon, California 94583
9                                              Telephone: 925.302.5941

10

11                          Attorneys for SURGICAL INSTRUMENT SERVICE COMPANY, INC.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**CERTIFICATE OF SERVICE**

2

3

I hereby certify that on October 16, 2024, I caused a copy of the foregoing **PLAINTIFF**

**SIS's RESPONSES TO DEFENDANT INTUITIVE SURGICAL, INC.'S SECOND SET OF**

4

**REQUESTS FOR ADMISSION AND THIRD SET OF INTERROGATORIES**, to be

5

electronically to be served *via* electronic mail to counsel of record:

6

7

**Crystal Lohmann Parker**
Paul, Weiss, Ritkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019
212-373-3000
Email: cparker@paulweiss.com

8

9

10

**Joshua Hill , Jr.**
Paul, Weiss, Ritkind, Wharton & Garrison LLP
535 Mission Street, 24th Floor
San Francisco, CA 94105
(628) 432-5123
Email: jhill@paulweiss.com

11

12

13

14

**Kenneth A. Gallo**
Paul, Weiss, Ritkind, Wharton & Garrison LLP
2001 K Street NW
Washington, DC 20006-104 7
202-223-7356
Fax: 202-204-7356
Email: kgallo@paulweiss.com

15

16

17

18

19

**Paul David Brachman**
Paul, Weiss, Ritkind, Wharton & Garrison LLP
2001 K St., NW
Washington, DC 20006
202-223-7440
Email: pbrachman@paulweiss.com

20

21

22

23

**William Michael**
Paul, Weiss, Rifkind, Wharton and Garrison LLP
1285 Avenue of the Americas
New York, NY 10019
212-373-3000
Email: WMichael@paulweiss.com

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Allen Ruby**
Attorney at Law
15559 Union Ave. #138
Los Gatos, CA 95032
408-4 77-9690
Email: allen@allenruby.com

**Andrew David Lazerow**
Covington & Burling LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
202-662-5081
Email: alazerow@cov.com

**Kathryn Elizabeth Cahoy**
Covington & Burling LLP
3000 El Camino Real
5 Palo Alto Square, 10th Floor
Palo Alto, CA 94306
650-632-4700
Email: kcahoy@cov.com

**Sonya Diane Winner**
Covington & Burling LLP
Floor 54
415 Mission Street
San Francisco, CA 94105-2533
(415) 591-6000
Email: swinner@cov.com

Dated: October 16, 2024          /s/ Joshua Van Hoven
                                 Joshua Van Hoven

**EXHIBIT 6**

**to**

**DECLARATION OF ANDREW LAZEROW IN
SUPPORT OF INTUITIVE SURGICAL INC.'S
OPPOSITION TO SIS'S MOTION IN LIMINE #1**

**EXHIBIT 7**

**to**

**DECLARATION OF ANDREW LAZEROW IN
SUPPORT OF INTUITIVE SURGICAL INC.'S
OPPOSITION TO SIS'S MOTION IN LIMINE #1**

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

SURGICAL INSTRUMENT SERVICE
COMPANY, INC.,

     *Plaintiff/Counter-Defendant,*

  v.

INTUITIVE SURGICAL, INC.,

     *Defendant/Counter-Claimant.*

Case No. 3:21-cv-03496-VC

Honorable Vince Chhabria

Complaint filed: May 10, 2021

## <u>OPENING EXPERT REPORT OF PHILIP J. PHILLIPS</u>

## <u>HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY</u>

## <u>DECEMBER 2, 2022</u>

Accessories[47], although details of the activity that were revealed to FDA in the 510(k) submission are unknown. The following FDA conclusion is very insightful and requires analysis:

> "The design, materials, and intended use of the 8mm Monopolar Curved Scissor Instruments, after an additional ten (10) reuse cycles are equivalent to the predicate device. The mechanism of action of the subject device is identical to the predicate device in that the same standard mechanical design, materials, and sizes are utilized. There are no changes to the claims, intended use, clinical applications, patient population, or method of operation. The change in device specifications is to extend the useful life of the 8mm Monopolar Curved Scissor Instruments."

121.    First, it is obvious that Iconocare Health has extended the useful life of an Intuitive Surgical device beyond the 10-use limit imposed by Intuitive Surgical. Iconocare Health demonstrated to FDA's satisfaction that modifying and relabeling each "presumably used" Intuitive Surgical device to create a "new" device, with an additional 10 uses, is SE to the predicate devices. This clearly establishes that the "intended use" of the Intuitive Surgical's legally marketed EndoWrist device is the same as the intended use of Iconocare Health's newly cleared device. Second, it is clear that FDA considered the extension of the useful life of the 8mm Monopolar Curved Scissor Instruments by 10 uses as a change in "device specifications" and not a change in intended use.   In this regard, even though the specifications are identical, it appears that Iconocare Health provided performance data to FDA that demonstrated that "... the reprocessed devices are as safe and effective as the predicate and operate as originally intended." Furthermore, the company convinced FDA that testing each individual device before release establishes the "… appropriate function of its components prior to packaging and labeling operations."   It is not surprising that FDA determined the device to be SE as it is virtually identical to the predicate devices in all respects and one would anticipate that they are as safe and effective.  The result of this SE determination is that FDA expects that Iconocare Health will fulfill all medical device

---

[47]    Five Intuitive Surgical 510(k) clearances are identified as predicate devices, specifically, K180033, K050369, K081177, K123329, and K170644

requirements, including registration and listing as required by 21 § CFR 807, filing 510(k)s for future changes and modifications to the device as required by 21 CFR § 807.81(a)(3), properly labeling their devices for commercial distribution as required by 21 CFR § 801 and meeting quality system requirements in accordance with 21 CFR § 820. In its 510(k) summary, FDA did not refer to Iconocare Health as a "remanufacture", but rather as a "reprocessor." On the basis of the information that is publicly available, it is not obvious that FDA made a legal or regulatory decision that Iconocare Health's activities constituted "remanufacturing" and that a 510(k) was required. Furthermore, there is no reason to believe that this 510(k) clearance has any relevance to SIS' situation except in one respect; SIS cannot remanufacture, relabel and repackage Intuitive Surgical EndoWrist instruments and commercially distribute them on the open market under its own name. Iconocare Health can do so. The regulatory status of any other activities undertaken by Iconocare Health are uncertain.

122.    In December 2021, Intuitive Surgical submitted a 510(k) for changes to the da Vinci X/Xi 8mm Reusable Instruments to increase the number of lives (uses) and reprocessing cycles. [Intuitive 02053646] Intuitive Surgical had concluded that the change did not require FDA premarket authorization and the change had already been implemented with modified devices being placed in commercial distribution. According to Intuitive Surgical employee Thomas E. Claiborne, Ph.D., the 510(k) was submitted at the verbal request of an FDA employee with the understanding that the Agency would exercise "enforcement discretion," i.e., not take an enforcement action against the company for marketing an illegal device, while the 510(k) was under review. As discussed in paragraph 38, the submission of this 510(k) is not evidence that the change was of a nature that "could significantly affect safety and effectiveness" and required a 510(k) clearance. Based on the deposition of Dr. Claiborne, there was a disagreement between Intuitive Surgical and an FDA employee regarding the significance of the change and the 510(k) was submitted to avoid any conflict.

**EXHIBIT 8**

**to**

**DECLARATION OF ANDREW LAZEROW IN
SUPPORT OF INTUITIVE SURGICAL INC.'S
OPPOSITION TO SIS'S MOTION IN LIMINE #1**

Page 1

1          UNITED STATES DISTRICT COURT

2            MIDDLE DISTRICT OF FLORIDA

3                 TAMPA DIVISION

4    REBOTIX REPAIR LLC,              )
                                      )
5              Plaintiff,             )
                                      )
6         vs.                        ) Case No.
                                      ) 8:20-cv-02274
7    INTUITIVE SURGICAL, INC.,        )
                                      )
8              Defendant.             )
     _____)

9

10

11      VIDEO DEPOSITION OF PULLMAN REGIONAL HOSPITAL

12     BY AND THROUGH ITS DESIGNATED REPRESENTATIVE

13                EDWARD W. HARRICH

14                 MAY 24, 2021

15      CONDUCTED REMOTELY VIA VIDEOCONFERENCE

16

17

18

19

20

21

22

23   Reported by Cynthia J. Vega

24   RMR, RDR, CA CSR 6640, WA CSR 21001436, CCRR 95

25   Job No.  194419

Page 150

1 different tiers of service that Intuitive offers to
2 da Vinci customers?
3    A.  You know, those are conversations we might
4 have had in 2010, '11, but we haven't changed them or
5 done that since.  Our reps have been a spinning door
6 on -- consistent.  When we first started using
7 Intuitive, our reps were in the building all the time,
8 every case for about the first two to three years.
9        As the years have gone on, I can't even tell
10 you the last time -- it was probably 2019 that Jason
11 Snyder has been here.  We don't need them as much, but
12 they've been here less and there has been less
13 conversation.
14        So to answer your question, I don't know.  I
15 don't know what the tiers are or what they even look
16 like.  I don't recall anyone bringing that to my
17 attention.
18    Q.  And you're not aware of the tier that Pullman
19 is purchasing from Intuitive changing at any point in
20 time?
21    A.  I'm not aware of that.
22    Q.  So I want to shift gears.  I want to ask
23 about some of the work you did with -- some of the
24 work that Pullman did with Rebotix and some of the
25 interactions you had.

Page 151

1    A.  Okay.
2    Q.  Did Pullman ever receive any marketing
3 materials related to Rebotix?
4    A.  Not that I recall.  You mean like a -- not
5 marketing outside the hospital, but like a pamphlet?
6    Q.  Any -- well, that's a great clarification.
7 You know, any form of information about Rebotix's
8 services in a -- you know, in a written medium.
9    A.  Yeah, I'm sure that we got -- I got some of
10 that from Jason -- not Jason -- the Boyette -- the guy
11 with Rebotix.  I'm sure I got all that stuff up front.
12 It had like the 510(k) approval.
13    Q.  And by "the 510(k) approval," what do you
14 mean by that?
15    A.  That they're approved to reprogram the
16 EndoWrist.
17    Q.  So was it your understanding before you
18 started using Rebotix's services that Rebotix had
19 obtained clearance from the FDA to perform services on
20 EndoWrist instruments?
21    MR. LYON:  Objection to form.
22    THE WITNESS:  Yes.
23 BY MR. MENITOVE:
24    Q.  And was it Mr. Boyette who told you that
25 Rebotix had obtained 510(k) clearance to perform

Page 152

1 service on EndoWrist instruments?
2    MR. LYON:  Objection to form.
3    THE WITNESS:  He would be the only one that I
4 can recall I would have talked to about that.  I can't
5 remember specifics of our conversation.
6 BY MR. MENITOVE:
7    Q.  Okay.  And was it your understanding that
8 Mr. Boyette was working on behalf of Rebotix?
9    A.  Correct.
10    Q.  Okay.  I've also seen in some of the
11 documents that Pullman produced references to other
12 companies that Mr. Boyette seems to be affiliated
13 with.  One of them, I think, is Stone Mountain.  Do
14 you know what that is?
15    A.  No.  But that's not uncommon for our reps to
16 be supporting multiple different products.  That's
17 just the standard and the practice.  They have
18 different service lines for multiple different kinds
19 of companies.  Might sell Band-Aids.  He might sell
20 sutures and instruments, you know.
21    Q.  Okay.  So do you have any understanding as to
22 what the relationship is between Stone Mountain and
23 Rebotix?
24    A.  I don't recall I've ever heard the name Stone
25 Mountain.

Page 153

1    Q.  And what about McCaleb Medical, I think
2 that's in Mr. Boyette's email address.  Do you know
3 what McCaleb Medical is?
4    A.  I don't recall it.  I'm wondering if they
5 sell trays, instrument trays, but I don't recall.
6    MR. MENITOVE:  Okay.  If we can -- Griff, can
7 we mark as our exhibit -- or introduce as our
8 Exhibit 2 and share Tab 18?
9    MR. ALMY:  Sure.  Give me one moment.
10    MR. MENITOVE:  While you do that, I'll ask
11 another question.
12 BY MR. MENITOVE:
13    Q.  When Pullman was considering purchasing
14 services from Rebotix, was the fact that you'd heard
15 that Rebotix had 510 clearance from the FDA -- 510(k)
16 clearance -- I'm sorry -- from the FDA something that
17 was important to your analysis?
18    MR. LYON:  Objection.  Form.
19    THE WITNESS:  That would be -- that would be
20 part of the conversation.
21 BY MR. MENITOVE:
22    Q.  So if you had thought that Rebotix didn't
23 have 510(k) clearance to perform service on EndoWrist
24 instruments, is there any possibility that you still
25 would have allowed Rebotix to perform service on

Page 154

1 EndoWrist instruments used at Pullman?

2    A.  Having --

3       MR. LYON:  Objection to form.

4       THE WITNESS:  Sorry for not waiting.

5       Having the FDA backing to reprocess or

6 reprogram those chips is an important factor for us.

7 BY MR. MENITOVE:

8    Q.  And why was that an important factor for

9 Pullman?

10    A.  Well, we like to stay with FDA approval on

11 everything we're using and doing.

12       MR. ALMY:  Tab 18 should be available in the

13 shared folder and in the chat.

14 BY MR. MENITOVE:

15    Q.  Do you ever remember anyone from Rebotix

16 telling you that, you know, FDA clearance was

17 unnecessary for someone to perform repairs on

18 EndoWrist instruments?

19    A.  I don't recall that.

20    Q.  Okay.  So let's take a look at what we'll

21 mark as Exhibit 2, which is the document that should

22 be Bates-stamped Pullman-75 to 76.  The Bates numbers

23 are the little numbers in the bottom right corner.

24 And this is an email exchange from June 2019 between

25 yourself and James Boyette.

Page 155

1       (Defendant's Exhibit 2 was marked for

2       identification.)

3 BY MR. MENITOVE:

4    Q.  Do you have that open?

5    A.  Yes, I do.

6    Q.  Okay.  So at the bottom of the first page of

7 this email exchange, there is an email from

8 Mr. Boyette.  It's dated June 24, 2019.

9    A.  Okay.

10    Q.  And the text reads, "Good afternoon Ed, I

11 just wanted to touch base to ensure that you had

12 received the literature that I had sent you over --

13 that I sent over to you a little while back regarding

14 the da Vinci instruments from Rebotix."

15       Do you see that?

16    A.  Yes.

17    Q.  And do you know what the literature was that

18 he's referring to here?

19    A.  Well, I know we were talking about prices and

20 the price analysis sheet that we went over earlier

21 where we did the 300 cases.  That very well could be

22 it.  I really can't -- I can't recall what exactly

23 we're talking about or what he sent over at that time.

24    Q.  And do you recall seeing any -- I don't

25 know -- flyers, presentations, brochures, any kind of

Page 156

1 written materials like that describing Rebotix's

2 services to you?

3    A.  Yeah, I do recall, you know, having some

4 literature that I did read over about what their

5 services are and processing the instruments and -- but

6 I can't give you any specifics.  It was way too long

7 ago.

8    Q.  Okay.  Do you know if you shared any of those

9 materials with anyone else at Pullman?

10    A.  At the time I may have.  If I did, it

11 probably would have been with Steve Cromer, my

12 assistant director, through the discussions of it.

13 But other than him, I don't think I would share -- I

14 don't think I would send it to anybody else.

15    Q.  So at the time that Pullman engaged Rebotix

16 back in 2019, what was Pullman's understanding of

17 Rebotix generally?

18    A.  Our understanding was that the instruments

19 still had life left on them unless you used it the

20 tenth time, which would clear the chip and make it

21 completely blank.

22       Rebotix would take the instrument back,

23 inspect it, make sure that the pulleys and the cables

24 and everything are still up to speed, and then,

25 providing it passed its standards inspection, it would

Page 157

1 be reprogrammed for an additional nine lives.

2    Q.  Back at the time that you engaged Rebotix,

3 did you know anything else about the company, like

4 where it was based, who its principals were, that type

5 of information?

6    A.  That was something I might have asked James

7 at the time, but I don't recall any details.

8    Q.  And did you know at that time whether Rebotix

9 was registered with the FDA?

10       MR. LYON:  Objection to form.

11       THE WITNESS:  I don't recall.

12 BY MR. MENITOVE:

13    Q.  Was that something important to Pullman at

14 the time, whether or not Rebotix was registered with

15 the FDA?

16       MR. LYON:  Objection to form.

17       THE WITNESS:  That would have been important.

18 BY MR. MENITOVE:

19    Q.  So the record is clear, it was important to

20 Pullman back in 2019 that Rebotix be registered with

21 the FDA; right?

22    A.  I don't know --

23       MR. LYON:  Objection.  Form.

24       THE WITNESS:  I don't know -- sorry.  I

25 didn't wait again.  It's just -- it's abnormal for me

Page 158

1  to wait after someone asks a question. So I apologize
2  for interrupting, but it's the nature of the
3  conversation.
4       I don't know what you mean by exactly
5  "registered," but, you know, having FDA approval to
6  use products in the hospital is an important --
7       (Reporter clarification.)
8       THE WITNESS: Would be an important factor
9  for us.
10 BY MR. MENITOVE:
11   Q.  And is Pullman familiar with something called
12 ISO standards, International Organization for
13 Standardization?
14   A.  Yes, I'm familiar with that. I'm familiar
15 with that term.
16   Q.  Okay. And are ISO certifications important
17 to Pullman when it's evaluating whether to purchase
18 products or services from a company?
19   A.  I have never based anything that I recall off
20 of an ISO.
21   Q.  So back when --
22   A.  OME would be an important term. Is that
23 similar?
24   Q.  And by -- oh, so did you say OME or OEM?
25   A.  OEM. Excuse me.

Page 159

1   Q.  And by "OEM," do you mean original equipment
2  manufacturer?
3   A.  Yeah. Yeah.
4   Q.  And what do you mean by OEM standards?
5   A.  Made with the same standards.
6   Q.  So before Pullman started working with
7  Rebotix, did Pullman have any understanding as to how
8  many times an EndoWrist instrument could be used
9  safely?
10   A.  Well, safely can be one use. The instruments
11 can fail at any time. So it's based off the physician
12 whether the instrument is operating appropriately or
13 not.
14       We did know that Intuitive had set a ten-job
15 limit on the majority of the instruments. Some are
16 used more, but ten is their standard number.
17   Q.  Before Pullman started working with Rebotix
18 in 2011 -- strike that.
19       Before Pullman started working with Rebotix
20 in 2019, did Rebotix explain to Pullman how it
21 performed services on EndoWrist instruments?
22   A.  I know we had a discussion and we went
23 through all that. I can't remember the specifics of
24 the details or where we sent it, how they did it. I
25 know that was a discussion, but I can't -- I can't

Page 160

1  recall.
2   Q.  And did you have that discussion with
3  Mr. Boyette?
4   A.  Yes, I did.
5   Q.  Did you have that discussion with anyone else
6  at --
7   A.  Nobody else.
8   Q.  -- Rebotix?
9   A.  No, nobody else.
10   Q.  And when Pullman started working with
11 Rebotix, did it have any understanding of how Rebotix
12 would reset the usage counter on the EndoWrist
13 instruments?
14   A.  Did you say did I know how -- did they say
15 how they would do it?
16   Q.  Yes.
17   A.  I know that was also discussed, but I can't
18 recall any of the details how they did it.
19   Q.  Would you agree that how Rebotix performed
20 service on EndoWrist instruments, it would be
21 important for Pullman to understand that before
22 allowing Rebotix to service its instruments; right?
23   A.  Would it be an important factor to understand
24 what they were doing and how they were doing it?
25 There -- yeah, there would have definitely been a

Page 161

1  conversation related to that topic.
2   Q.  And you've said today that, you know, absent
3  contractual provisions -- excuse me -- absent
4  contractual prohibitions from Intuitive, you would be
5  willing to have Pullman start working with Rebotix
6  today; right?
7   A.  Correct.
8   Q.  So before you started working with Rebotix
9  again, would you want to talk to them about how
10 exactly they're servicing EndoWrist instruments?
11   A.  Well, if I was starting all over again today,
12 I would start just like anything. It's been too long.
13 And we'd have to go back in to: What are you doing
14 and how do you do it? What are the costs? What are
15 the benefits? What are the downfalls?
16   Q.  So one of the factors that led you to
17 contract with Rebotix was the potential for -- I think
18 it's around $62,400 a year in cost savings on
19 EndoWrist instruments; is that right?
20   A.  Yeah, so that would have been one of the
21 factors.
22       And the other factor would have been that,
23 you know, the instruments are still in good shape.
24 They look like they still have plenty of life left on
25 them. To get them inspected and recalibrated, that

**EXHIBIT 9**

**to**

**DECLARATION OF ANDREW LAZEROW IN
SUPPORT OF INTUITIVE SURGICAL INC.'S
OPPOSITION TO SIS'S MOTION IN LIMINE #1**

OUTSIDE ATTORNEYS EYES ONLY

```
 1              UNITED STATES DISTRICT COURT
 2         FOR THE NORTHERN DISTRICT OF CALIFORNIA
 3                 SAN FRANCISCO DIVISION
 4    IN RE:  DA VINCI SURGICAL
      ROBOT ANTITRUST LITIGATION,   Lead Case No.:
 5                                   3:21-cv-03825-VC
      _____
 6    THIS DOCUMENT RELATES TO:
      ALL CASES
 7    _____
 8    SURGICAL INSTRUMENT SERVICE
      COMPANY, INC.,
 9
                Plaintiff,
10
          vs.                       Case No. 3:21-cv-03496
11                                              VC
      INTUITIVE SURGICAL, INC.,
12
                Defendant.
13    _____
14           **OUTSIDE ATTORNEYS' EYES ONLY**
15           ZOOM DEPOSITION OF RICK FERREIRA
16    (Reported Remotely via Video & Web Videoconference)
17      Lighthouse Point, Florida (Deponent's location)
18              Thursday, November 10, 2022
19                      Volume 1
20
      STENOGRAPHICALLY REPORTED BY:
21    REBECCA L. ROMANO, RPR, CSR, CCR
      California CSR No. 12546
22    Nevada CCR No. 827
      Oregon CSR No. 20-0466
23    Washington CCR No. 3491
24    JOB NO. 5541217
25    PAGES 1 - 211
```

                                                    Page  1

OUTSIDE ATTORNEYS EYES ONLY

```
 1        A.   So... -- so -- so if you are buying a        10:44:31

 2   reusable instrument that has cleaning instructions

 3   with it, your SPD department must file that in

 4   their -- in their documents to show that they --

 5   that they're following -- at UHS, that they're        10:44:46

 6   following the procedure, because at UHS we can't do

 7   anything in SPD without instructions for use from

 8   the manufacturer.

 9        Q.   In your experience, is that typical of

10   other hospitals as well?                              10:45:02

11        A.   I hadn't heard that anywhere else.  Kelly

12   was the first one.  Again, I only spoke to a

13   handful of customers.  He was the only one that

14   raised that issue to me.

15        Q.   Was this a motivating factor in the         10:45:17

16   decision to obtain a 510(k) for the Si EndoWrist

17   usage counter reset?

18        A.   No.  The real issue for me was to be able

19   to have -- to really to use as a marketing tool to

20   see what Intuitive would do when I actually had       10:45:32

21   clearance from FDA that FDA said that this is safe

22   and effective but you can re-use the instrument.

23        Q.   And when you're talking about the

24   marketing that you would be doing there, you're

25   talking about two hospitals that would have their     10:45:49
```

Page 47

OUTSIDE ATTORNEYS EYES ONLY

```
 1    to show that the product is safe and effective          03:34:56

 2    as -- as a new one from -- from -- from Intuitive.

 3         Q.   So the 510(k) clearance was important

 4    primarily for -- from the marketing perspective; is

 5    that -- is that your view?                               03:35:09

 6         A.   Absolutely.

 7              MS. LENT:  Object to the form.

 8              THE DEPONENT:  Sorry.

 9              Absolutely, because once I've got that

10    510(k), this text is meaningless to the customer,        03:35:15

11    because I've got -- I've got FDA saying -- the same

12    body that approves their new devices is approving

13    this submission.

14         Q.   (By Ms. Kenney)  And was an additional

15    benefit of --                                            03:35:28

16              Well, do you recall in your June 2021

17    testimony that another benefit -- that you

18    testified that another benefit of obtaining a

19    510(k) was that it gave you more flexibility with

20    your business model?                                     03:35:48

21              Do you recall that?

22              MS. LENT:  Object to the form.

23              THE DEPONENT:  Well -- on a -- so our

24    belief is that once we have the 510(k) and we're

25    the manufacturer of record, I don't have to             03:35:59
```

Veritext Legal Solutions
866 299-5127

OUTSIDE ATTORNEYS EYES ONLY

```
 1    long-term sell the same devices back to the same          03:36:02

 2    hospital, because I am now the manufacturer of

 3    record.

 4              And the same thing played out in the

 5    disposable reprocessing business.  Up until we had        03:36:10

 6    510(k)s, I resent the same catheters back to the

 7    same hospital, because I didn't -- I wasn't the

 8    manufacturer of record, so the manufacturer -- the

 9    hospital maintained title to the product.

10              Once you've got the 510(k) and you're the        03:36:26

11    manufacturer of record, I really become the

12    titleholder of the product when I sell -- you know,

13    when I'm selling it back to the customer, and then

14    they -- when they pay me, they -- they own title

15    back to that product.                                     03:36:38

16              That's what I meant by the flexible

17    business model.

18       Q.   (By Ms. Kenney)  All right.  So the

19    510(k) clearance allows you to resell Da Vinci

20    EndoWrist instruments after you have repaired them        03:36:50

21    and reset the usage counter, correct, yes?

22              MS. LENT:  Object to the form.

23              THE DEPONENT:  Sorry.

24              The distinction really is I've got the

25    right to sell it back to the hospital.  Now I've          03:37:03
```

Page 194

OUTSIDE ATTORNEYS EYES ONLY

```
1    got the right to sell it back to any hospital.          03:37:06

2            So I could take it from hospital B, and

3    then I could sell that product to hospital B and to

4    hospital B.  It doesn't have to go back to the same

5    hospital.  That's what I mean about flexible model.      03:37:16

6        Q.  (By Ms. Kenney)  Right.  Right.

7            So was that an additional benefit to the

8    primary benefit of having -- the primary benefit in

9    marketing?

10       A.  Yes.                                              03:37:32

11           MS. LENT:  Object to the form.

12           THE DEPONENT:  Sorry.

13           Yes.

14           MS. KENNEY:  Okay.  I don't think have

15   any questions, but I'd like to just take a quick        03:37:46

16   break to confer with my colleagues.

17           THE DEPONENT:  Okay.

18           THE VIDEOGRAPHER:  All right.  I'll take

19   us off.

20           And going off the record at 3:37 p.m.           03:37:55

21           (Recess taken.)

22           THE VIDEOGRAPHER:  And going back on the

23   record at 3:48 p.m.

24       Q.  (By Ms. Kenney)  Welcome back,

25   Mr. Ferreira.  I just have a couple of quick            03:48:57
```

Page 195

**EXHIBIT 10**

**to**

**DECLARATION OF ANDREW LAZEROW IN
SUPPORT OF INTUITIVE SURGICAL INC.'S
OPPOSITION TO SIS'S MOTION IN LIMINE #1**

1              **UNITED STATES DISTRICT COURT**
            **NORTHERN DISTRICT OF FLORIDA**
2               **PANAMA CITY DIVISION**

3
   RESTORE ROBOTICS, LLC,          )
4  RESTORE ROBOTICS REPAIRS, LLC,  )
   and CLIF PARKER ROBOTICS, LLC,  )
5                                  )
           Plaintiffs,             )
6                                  )
       v.                          )
7                                  )
                                   )
8  INTUITIVE SURGICAL, INC.,       )  Case No: 5:19-CV-55/TKW-MJF
                                   )
9           Defendant.             )  Pensacola, Florida
   ────────────────────────────────)  January 13, 2023
10                                 )
   INTUITIVE SURGICAL, INC.,       )  2:02 p.m.
11                                 )
           Counterclaimant,        )
12     v.                          )
                                   )
13 RESTORE ROBOTICS, LLC,          )
   RESTORE ROBOTICS REPAIRS, LLC,  )
14 and CLIF PARKER ROBOTICS, LLC,  )
                                   )
15         Counterclaim            )
           Defendants.             )
16 ────────────────────────────────)

17

18          **TRANSCRIPT OF PRETRIAL CONFERENCE**
       **BEFORE THE HONORABLE T. KENT WETHERELL, II**
19            **UNITED STATES DISTRICT JUDGE**
                **(Pages 1 through 108)**
20

21

22

23

24          *Julie A. Wycoff, RMR, CRR*
         *Official United States Court Reporter*
25        *(850) 470-8196 * julieawycoff@gmail.com*

```
1    it's further than I think she should be permitted to go.  I
2    don't have a problem with her describing that -- what I just
3    said, that on the newfangled Xi version, Intuitive submitted a
4    request, or whatever they did, and the FDA sent it back and said
5    they have to go through 510.  I mean, that fact could be
6    evidence from which the jury could infer that the FDA has
7    decided that it's required.
8          Similarly with the QSM code, the fact that they have
9    created a new code could be evidence from which the jury could
10   infer that 510 clearance is required.
11         Finally, this whole run-it-up-the-chain process,
12   again, is evidence from which the jury could infer that that
13   statement from the team lead is wrong, right -- I don't remember
14   exactly what it was.
15         But I think all of those facts, I don't have a problem
16   with her coming in and telling the jury what happened in the
17   context in which it happened, but taking that next step, which I
18   read that last sentence to do, to say, "Jury, I'm now telling
19   you what -- the answer to the question, and you've got an
20   instruction in there on it.  I'm telling you what the answer to
21   that question is," I have a little bit of concern with that,
22   because while it's not specifically saying Restore needed one,
23   for all intents and purposes, it is.
24         And so maybe I'm drawing too fine of a distinction in
25   my mind, but that's kind of how I see it.  Because ultimately,
```

1    what I anticipated in this whole thing was that we would do

2    something very similar to what you've proposed -- y'all had

3    proposed, or somebody's proposed in their instructions, which is

4    to say, "The FDA regulates medical devices.  Some devices that

5    are comparable to other devices can be approved through or

6    cleared through the 510(k) process.  Devices that are

7    remanufactured can't.  A remanufactured device is this, that, or

8    the other."

9           And essentially, that's kind of -- we tell them what

10   the law is in the remanufacturing context.  We've got

11   Ms. Rosecrans and whatever they're going to bring forward, lay

12   witnesses or experts, to articulate what -- how the process

13   works and what their particular devices are and where they fit

14   in, and the jury then will ultimately have to make that

15   determination, is how I see it.  Maybe I'm just completely

16   missing something, or the hour has gotten to me, but...

17          MS. LENT:  Well, Your Honor, your prior ruling said

18   that she couldn't espouse a personal interpretation that

19   differed from the FDA's public interpretations, and these are

20   the FDA's public interpretations which specifically says to

21   Iconocare, "When you extend the number of uses of these

22   EndoWrist instruments, that is remanufacturing."  And that --

23          THE COURT:  And again, I think she can come in and

24   explain what the significance of this new QSM code is and the

25   fact that it was given to the folks that they now own, and --

1    but again, I think there's still a line that gets her to the

2    point of instructing the jury about the law, and I'm not sure

3    that's her job.

4              MS. LENT:  I'm not sure where that line begins and

5    ends.  Because --

6              THE COURT:  Right.

7              MS. LENT:  -- the documents say, literally, when you

8    extend the usage, the use -- the number of uses in these

9    instruments, it is remanufacturing.  So why couldn't she say

10   that?

11             THE COURT:  Mr. Berhold.

12             MR. BERHOLD:  I'm not familiar with that quote

13   actually.  One, I agree with the Court that the line was drawn

14   in the first place.  I agree that she's gone over the line.  I

15   think it's important to say -- I mean, that's the whole debate,

16   right, is the FDA itself has never -- even the FDA, after

17   four years, has never taken a clearer position.

18             They're saying, "We can interpret from a product code

19   this," or "We can interpret from the boilerplate from a 510(k)

20   that."  So, so long as the FDA hasn't made a decision on that

21   point that a 510(k) is required, we don't think it's -- if that

22   was the case, that would be evidence in and of itself.  It would

23   speak for itself.

24             In the meantime, it's not Ms. Rosecrans' position to

25   say one way or the other.  In fact, we know the FDA has never

1    stopped anyone from repairing these instruments.  That's the
2    issue of fact.
3           THE COURT:  And their argument on that was they
4    told -- I don't know if it was you or Rebotix -- to stop,
5    definitively, through -- or at least some email, whatever that
6    was.  I remember that email in the record saying, "We think this
7    is remanufacturing.  You need to submit a 510(k)."  So I guess
8    it didn't tell you to stop, but it sent the message that you
9    need to go through their process.
10          And the response back was, "We're doing other things
11   right now, so put a pin in it."
12          And so semantics, maybe, but it may be significant.  I
13   mean, they're going to argue that their last definitive
14   statement was telling y'all that you needed one.  You're going
15   to argue that the last definitive statement was this team lead
16   saying, "We haven't decided."  And they're going to then say,
17   "Well, maybe they haven't specifically decided, but the team
18   lead has said nobody's run that up the flagpole; and that, thus,
19   is the last statement, coupled with the fact that they made us
20   go get one, coupled with the fact that they created this new
21   product code."
22          Again, to me, it's all argument for counsel to make in
23   closing or wherever.  And it's Ms. Rosecrans' function to
24   explain the process and what happened, not to then make what I
25   think is a legal assessment, which I read her last thing -- last

```
1    sentence of that report to be, ipso facto, 510(k) is required.

2    And I don't think -- I think you're right.  I think it is

3    required.  I think the FDA is sending the message that it's

4    required, but they haven't said it, and I'm not going to say it

5    in the first instance.  And I know you want me to, and we've had

6    that debate.  We're past that.

7         But the fact remains, I don't -- and because we're

8    simply giving the jury in the instruction -- maybe it's not

9    going to be these exact words, I haven't found it, but page 99,

10   your FDA clearance, that was, in essence, what I expect -- and I

11   know we'll have argument on it at the appropriate time, but that

12   was the essence of what I expected to instruct the jury on.

13   There's a requirement.  It depends on whether you're

14   remanufacturing or not.  They will have heard evidence, and they

15   can decide using Ms. Rosecrans' assessment of things, the

16   plaintiff's assessment of things whether that's remanufacturing

17   or not and make a determination.

18        So all that being said, I'm -- the ultimate ruling is

19   that I'm denying the motion, the Daubert motion or whatever it

20   was called, in large part with that clarification that

21   Ms. Rosecrans cannot provide that ultimate opinion that she

22   seems to want to provide, that FDA has now definitively

23   determined that 510 clearance is required for this type of

24   activity.

25        So she can take the jury up to that point, and it will
```

```
 1    be up to the jury to make that last inference, if that's the

 2    inference they want to make.  Well, in the order that comes out

 3    of today, we'll try to articulate that in a slightly better way.

 4            But is there any confusion on that, or do you get the

 5    gist of what I'm saying?

 6            MR. BERHOLD:  Restore gets the gist of it.

 7            THE COURT:  Ms. Lent?

 8            MS. LENT:  I understand what you're saying.

 9            THE COURT:  Okay.  All right.  We'll try to articulate

10    that, and the same rule will apply that in the event that we

11    don't articulate it in a way that makes sense or creates more

12    problems or goes beyond what you think we said and what you

13    think you understand, we'll entertain clarification, but

14    certainly not reargument because I think we've hashed and

15    rehashed pretty well.

16            So I think we've gotten to most everything.

17            Mr. Ruby, you had mentioned something about jury

18    instructions, and I know we're not going to go through the

19    instructions as a whole.

20            One thing I did want to specifically speak to -- and I

21    know the parties just gave me -- on a lot of the preliminary

22    instructions, just gave them to me not knowing whether we're

23    going to use depositions or interrogatories and admissions and

24    things like that, but we've got the language if we need it.

25            Jury questions, my understanding is that there's no
```

1

**<u>FILER'S ATTESTATION</u>**

2

I, Joshua Van Hoven, am the ECF User whose ID and password are being used to file this

3

document. In compliance with Civil Local Rule 5-1(i)(3), I hereby attest that the signatories

4

identified above have concurred in this filing.

5

6

7

8

Dated: November 11, 2024                    McCAULLEY LAW GROUP LLC

9

By: *<u>/s/ Joshua Van Hoven</u>*

10

JOSHUA V. VAN HOVEN (CSB#262815)

11

E-Mail: josh@mccaulleylawgroup.com
3001 Bishop Dr., Suite 300

12

San Ramon, California 94583
Telephone: 925.302.5941

13

14

Attorney for SURGICAL INSTRUMENT SERVICE COMPANY, INC.

15

16

17

18

19

20

21

22

23

24

25

26

27

28