1  Kenneth A. Gallo (*pro hac vice*)
   Paul D. Brachman (*pro hac vice*)
2  **PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
   2001 K Street, NW
3  Washington, DC  20006-1047
   Telephone:  (202) 223-7300
4  Facsimile:  (202) 223-7420
   Email: kgallo@paulweiss.com
5  Email: pbrachman@paulweiss.com

6  William B. Michael (*pro hac vice*)
   Crystal L. Parker (*pro hac vice*)
7  Daniel A. Crane (*pro hac vice*)
   **PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
8  1285 Avenue of the Americas
   New York, NY  10019-6064
9  Telephone:  (212) 373-3000
   Facsimile:  (212) 757-3990
10 Email: wmichael@paulweiss.com
   Email: cparker@paulweiss.com
11 Email: dcrane@paulweiss.com

12 Joshua Hill Jr. (SBN 250842)
   **PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
13 535 Mission Street, 24th Floor
   San Francisco, CA 94105
14 Telephone:  (628) 432-5100
   Facsimile:  (628) 232-3101
15 Email: jhill@paulweiss.com

16 *Attorneys for Defendant Intuitive Surgical, Inc.*

17 [Additional counsel listed on signature page]

18                **UNITED STATES DISTRICT COURT**

19              **NORTHERN DISTRICT OF CALIFORNIA**

20                  **SAN FRANCISCO DIVISION**

21

22 SURGICAL INSTRUMENT SERVICE           Case No. 3:21-cv-03496-AMO
   COMPANY, INC.,
23                                       **DEFENDANT'S NOTICE OF MOTION**
                     *Plaintiff*,        **AND MOTION IN LIMINE NO. 1 TO**
24          v.                           **EXCLUDE OUT-OF-COURT**
                                         **HOSPITAL STATEMENTS**
25 INTUITIVE SURGICAL, INC.,
                                         Date:  November 25, 2024
26                   *Defendant*.        Time:  11:00 a.m.
                                         Courtroom:  10
27

28                                       The Honorable Araceli Martínez-Olguín

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## NOTICE OF MOTION AND MOTION

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on November 25, 2024 at 11:00 a.m., or as soon thereafter as this matter may be heard before the Honorable Araceli Martínez-Olguín, District Judge in the United States District Court for the Northern District of California, at 450 Golden Gate Avenue, Courtroom 10, 19th Floor, San Francisco, CA 94102, Defendant Intuitive Surgical, Inc. ("Intuitive") will and hereby does move the Court for an order prohibiting Plaintiff Surgical Instrument Service Co., Inc. ("SIS") from introducing into evidence any: (1) testimony from live witnesses referencing or purporting to repeat or convey out-of-court statements made by representatives of hospitals or group purchasing organizations ("hospital declarants"); (2) deposition testimony from non-party witnesses referencing or purporting to repeat or convey out-of-court statements made by hospital declarants; or (3) documents containing out-of-court written statements by hospital declarants or written statements referencing or purporting to convey out-of-court statements made by hospital declarants.

The relief Intuitive seeks through this Motion is authorized by the Federal Rules of Evidence, including but not limited to Rules 403, 701, 801, 802, and 805, and by applicable case law. This Motion is based upon this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities in support thereof, the accompanying Declaration of Paul D. Brachman and attached exhibits, other filings in this matter, and the oral argument of counsel.

**PRELIMINARY STATEMENT**

SIS disclosed in written discovery 54 representatives of non-party hospitals and group purchasing organizations (together, "hospitals") that purportedly refused to work with SIS due to Intuitive's allegedly anticompetitive conduct. Ex. 1, Response to Interrogatory Nos. 2 & 3, at 5–9.[1] Only *one* of those individuals was deposed,[2] and SIS has made the strategic choice to put none on its witness list for trial.

Instead, it appears that SIS will attempt to build its case at trial using several categories of inadmissible hearsay: (1) testimony from SIS witnesses Greg Posdal and Keith Johnson purporting to convey what they were told in out-of-court statements by hospital declarants; (2) deposition testimony from non-party witnesses purporting to relay out-of-court statements made by hospital declarants; and (3) documents containing out-of-court written statements by hospitals or surgeons or written statements purporting to convey what hospital employees or surgeons said to someone else. Such statements, a non-exhaustive list of which are compiled in **Appendix A** hereto, are inadmissible hearsay without exception and should be excluded. Fed. R. Evid. 801, 802, 805. To promote the orderly and efficient presentation of evidence at trial, the Court should make clear before trial that SIS cannot attempt to portray the supposed views of hospitals through out-of-court statements that will not be tested through cross-examination.

**ARGUMENT**

**I.    SIS WITNESSES CANNOT TESTIFY ABOUT OUT-OF-COURT STATEMENTS PURPORTEDLY MADE BY HOSPITAL REPRESENTATIVES**

SIS will not present at trial any testimony from a single hospital to which it sold modified EndoWrist instruments. Instead, it appears that SIS will try to present the views of its customers, or would-be customers, by having its own fact witnesses, Posdal and Johnson, testify about what they were supposedly told by hospital representatives. For example, Johnson testified in his deposition that all or nearly all of the hospital representatives he met with told him that they "hemorrhage money to Intuitive Surgical" and were "looking for ways to reduce costs." Ex. 2 at

---

[1] All references to "Ex." refer to exhibits to the Declaration of Paul D. Brachman in Support of Defendant's Motion in Limine No. 1 to Exclude Out-of-Court Hospital Statements.

[2] Cairo Wasfy of Ardent Health was deposed in *Restore Robotics LLC* v. *Intuitive Surgical, Inc.*, No. 5:19-cv-00055 (N.D. Fla.), but was asked no questions about Ardent's dealings with SIS.

50:19–51:24.  Johnson likewise testified about feedback from customers indicating that there was great demand for modified EndoWrists, Ex. 3 at 44:7-45:22, but that he was told by hospitals that they would not do business with SIS because of Intuitive, Ex. 4 at 53:21-54:5.  Posdal's testimony was even one or two layers further removed.  He testified, for example, that "customers said they were concerned about moving forward [with modified EndoWrists] because of what they were told by Intuitive."  Ex. 5 at 19:5–25.  But Posdal did not speak to these customers himself about this issue—he based his testimony either on what Johnson purportedly told him or what he saw in documents (hearsay) about what hospitals purportedly said (double hearsay) about what Intuitive purportedly told hospitals (triple hearsay), *id.* at 20:2–21:2.  Such out-of-court statements are not admissible at trial to prove that hospitals were in fact losing money on robotic surgery or looking for ways to reduce costs, nor are those statements admissible to prove that hospitals would have purchased modified EndoWrists from SIS but-for Intuitive.  Fed. R. Evid. 801, 802.  And Posdal's testimony would be doubly inadmissible because it contains multiple levels of hearsay.  Fed. R. Evid. 805.  If SIS wanted to present such evidence to the jury, it should have deposed the hospitals it marketed to or identified them as trial witnesses.  SIS did neither.  The Court should not permit Johnson or Posdal to turn this trial into a game of telephone about what hospitals supposedly told them.

SIS bears the burden of establishing an exception to the hearsay rule.  *See Los Angeles News Serv.* v. *CBS Broad., Inc.*, 305 F.3d 924, 934 (9th Cir. 2002).  SIS may argue, for example, that second-hand accounts of hospital statements are admissible under Rule 803(3) as statements of hospitals' motives for not dealing with a supplier.  *Herman Schwabe, Inc.* v. *United Shoe Mach. Corp.*, 297 F.2d 906, 914 (2d Cir. 1962); *Consol. Credit Agency* v. *Equifax, Inc.*, 2005 WL 6218038, at *2 (C.D. Cal. Jan. 26, 2005).  That exception does not apply.[3]  Some out-of-court statements may be admissible under certain circumstances to prove what a customer ***said*** about its motives for not dealing with a supplier, but such statements are ***not*** admissible "***as evidence of the facts recited as furnishing the motives***."  *Schwabe*, 297 F.2d at 914;[4] *Equifax, Inc.*, 2005 WL

---

[3] Intuitive reserves the right to respond to any other exception SIS may argue is applicable here.
[4] Unless otherwise indicated, all citations are omitted and all emphasis is added.

6218038, at *2 (same).  In other words, SIS cannot use what hospital declarants supposedly told Johnson or Posdal (if Posdal talked to hospitals) to prove there was demand for SIS's modified EndoWrists or that Intuitive squelched that demand.  *Schwabe*, 297 F.2d at 913 n.9, 914 (letters stating that customers did not purchase plaintiff's product due to lease agreement with defendant inadmissible); *see also Buckeye Powder Co.* v. *E.I. Dupont de Nemours Powder Co.*, 248 U.S. 55, 65 (1918) (customer statements properly excluded when offered "not as evidence of the motives of the speakers but as evidence of the facts recited as furnishing the motives"); *Stelwagon Mfg. Co.* v. *Tarmac Roofing Sys., Inc.*, 63 F.3d 1267, 1274–75 (3d Cir. 1995) (out-of-court customer statements inadmissible to prove "antitrust damages, in the form of lost sales"); *Amerisource Corp.* v. *RxUSA Int'l Inc.*, 2009 WL 235648, at *2 (E.D.N.Y. Jan. 30, 2009) (customer statements inadmissible to prove injury or damages).

Further, out-of-court statements of customer motive are only potentially admissible under limited conditions.  For starters, the offering party must make a proffer of independently admissible evidence sufficient to show the reliability of the customer statement.  SIS must proffer (among other things) evidence showing that the out-of-court statement was a  "contemporaneous reaction to the alleged event that gave rise to the sentiment," *Amerisource*, 2009 WL 235648, at *2, and that it was made by a declarant who had sufficient control over the customer's purchasing decisions.  *AngioDynamics, Inc.* v. *C.R. Bard, Inc.*, 2022 WL 4333555, at *3–5 (N.D.N.Y. Sept. 19, 2022); *see also  Discover Fin. Servs.* v. *Visa U.S.A. Inc.*, 2008 WL 4560707, at *1 (S.D.N.Y. Oct. 9, 2008) (requiring "a proffer of the otherwise admissible proof that business was lost").  We respectfully submit that SIS cannot make these necessary proffers.

Even if SIS could do so, the Court should nevertheless exclude out-of-court hospital statements relayed through Johnson or Posdal because they are unreliable on their face.  The Court has discretion to exclude evidence of customer motive "in view of the risk of insincerity in a potential customer's statement why products were not being ordered." *Herman Schwabe*, 297 F.2d at 914 n.10.  That risk is acute here because the supposed hospital statements are not contained in contemporaneous written statements, but instead would be relayed by, and filtered through, SIS witnesses—each of whom has an interest in attributing SIS's failures to Intuitive. *AngioDynamics,*

*Inc.* v. *C.R. Bard, Inc.* is instructive. There, as here, the plaintiff sought to present testimony about out-of-court statements made by hospital customers to plaintiff's sales representatives, in which the out-of-court declarants purportedly said they would have purchased plaintiff's product but-for the defendant's allegedly anticompetitive conduct. 2022 WL 4333555, at *4. The court held that such testimony was "not sufficiently reliable for admission under" Rule 803(3) because it was "self-serving" and the defendant "had no opportunity to cross-examine any of the relevant [declarants]." *Id.*; *see also Amerisource*, 2009 WL235648, at *2–3 (excluding "particularly troublesome" statements "offered to prove the elements of the" claim because opposing party would have "no way of cross-examining the declarants or their sources"). For the same reasons, the Court should bar Johnson and Posdal from relaying or referencing in their trial testimony out-of-court statements by hospital declarants who have not been, and will not be, cross-examined.

## II.    NON-PARTY DEPONENTS CANNOT TESTIFY ABOUT OUT-OF-COURT STATEMENTS MADE BY OTHER HOSPITAL REPRESENTATIVES

SIS likewise should not be permitted to play deposition testimony from non-party witnesses relaying out-of-court statements purportedly made by hospital representatives who were *not* deposed.

For example, SIS has indicated on its trial witness list that it will call by deposition Edward Harrich, a representative from Pullman Regional Hospital who was deposed in *Rebotix Repair LLC* v. *Intuitive Surgical, Inc.*, No. 20-cv-02274 (M.D. Fla.). The parties have not yet exchanged deposition designations. But we are concerned that SIS will attempt to play statements in which Harrich claimed that remanufactured EndoWrists "worked just like the nonrepaired ones" based on "interview[s] [he indicated he conducted with] surgeons and the technicians . . . involved in [a] trial of the Rebotix-repaired EndoWrists." Ex. 6 at 39:24-40:8.

Such testimony referencing or relaying out-of-court statements allegedly made by surgeons and technicians at Pullman will not be offered to show the hospital's state of mind or motive for doing, or not doing, business with SIS. Pullman was not a hospital that SIS tried to do business with. Ex. 1, Response to Interrogatory No. 2, at 5–9. Rather, it appears that SIS will attempt to use Harrich's testimony about what he was purportedly told by unidentified surgeons and

technicians—who were themselves not disclosed as fact or expert witnesses—to prove the truth of what those other individuals supposedly told Harrich—*i.e.*, that modified EndoWrists function just like Intuitive EndoWrists.  Such out-of-court statements are inadmissible hearsay.

## III.    OUT-OF-COURT STATEMENTS MADE BY OR ATTRIBUTED TO HOSPITAL REPRESENTATIVES IN DOCUMENTS ARE INADMISSBILE HEARSAY

It appears that SIS also intends to place before the jury out-of-court statements of hospital declarants contained or recounted in documents, even though the declarants will not testify at trial. These statements, too, constitute hearsay that does not fall within any exception.

For example, the document identified as Trial Ex. No. 510 on the parties' Joint Exhibit List, Dkt. 278-2, Ex. 7, is an email chain containing an email from a hospital declarant, Dawn Watkins, to Intuitive asking Intuitive whether allowing SIS to modify its EndoWrist instruments would void the instrument warranty. Ms. Watkins' email forwards another out-of-court statement by Manuela Cassidy, a representative from the GPO Vizient, stating that Kaiser Permanente and Legacy Health System were "capturing savings" by purchasing SIS's modified EndoWrists. Neither statement falls under the Rule 803(3) exception.

SIS cannot use Ms. Watkins' *question* to insinuate that the hospital did not do business with SIS because of concerns over voiding Intuitive's warranty. Her out-of-court statement is not admissible under Rule 803(3) because it does not include any statement of the hospital's reasons for refusing to deal with SIS.  Even if it did, the statement would not be admissible because SIS will not be able to "lay a foundation at trial regarding [her] role in the decision" whether to do business with SIS.  *AngioDynamics*, 2022 WL 4333555, at *5 (statements of motive must be "made by a declarant with a sufficient role in the hospital's [] purchasing decision-making process").  For the same reasons, Ms. Cassidy's statement is inadmissible to prove that Kaiser or Legacy did business with SIS because of "savings" described in her email.  Ms. Cassidy is associated with Vizient, not the hospitals in question, and SIS has not established that Ms. Cassidy was a decisionmaker for either hospital.  Moreover, out-of-court statements written by sales intermediaries (like Vizient) are "not reliable statements of [a] customer's then-existing state of mind."  *Alarm Fin. Enterprises, LP* v. *Alarm Prot. Tech., LLC*, 743 F. App'x 786, 788 (9th Cir.

2018).

Other documents likewise contain no statement of customers' motives for refusing to deal with SIS, but *do* contain multiple levels of hearsay on various subjects:

- Ex. 8 (Trial Ex. No. 355) is an op-ed by a non-testifying surgeon stating that: "Intuitive reps often encourage trainees to switch out instruments and select higher-cost instruments," *id.* at 5, and referencing yet another surgeon's out-of-court statement describing the da Vinci as "driving a Ferrari versus the laparoscopic '57 Chevy," *id.* at 3.

- Ex. 9 (Trial Ex. No. 844) is a presentation by a non-testifying surgeon referencing "the [da Vinci] 'monopoly' issue."

- Exs. 10-12 (Trial Ex. No. 343; Trial Ex. No. 535; and Trial Ex. No. 717) are articles and reports quoting hospital executives and surgeons.

These statements are not statements of hospital motive for dealing, or not dealing, with SIS, so they cannot be admitted under Rule 803(3). Nor are they admissible under the business records exception. That "exception applies only if the person furnishing the information to be recorded is 'acting routinely, under a duty of accuracy, with employer reliance on the result.'" *United States* v. *Pazsint*, 703 F.2d 420, 424 (9th Cir. 1983) (citation omitted). SIS has not—and cannot—establish that any of the out-of-court statements identified above were made under any duty of accuracy. *See In re Cypress Semiconductor Sec. Litig.*, 891 F. Supp. 1369, 1374 (N.D. Cal. 1995) (newspaper articles inadmissible hearsay), *aff'd sub nom. Eisenstadt* v. *Allen*, 113 F.3d 1240 (9th Cir. 1997); *Shimozono* v. *May Dep't Stores Co.*, 2002 WL 34373490, at *13 (C.D. Cal. Nov. 20, 2002) (excluding survey responses); *Low* v. *Trump Univ., LLC*, 2016 WL 6647793, at *9 (S.D. Cal. Nov. 10, 2016) (customer evaluations not business records). And finally, even if the types of documents described above were business records, they contain inadmissible hearsay-within-hearsay for which there is no independent exception. *United States* v. *Holmes*, 2021 WL 2044470, at *25 (N.D. Cal. May 22, 2021) ("Articles that feature quotations from people other than their authors constitute hearsay within hearsay.").

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## IV.    OUT-OF-COURT HOSPITAL STATEMENTS ARE INADMISSIBLE FOR ADDITIONAL REASONS

Many of the examples of out-of-court statements identified above are inadmissible for additional reasons.  For example, statements by out-of-court declarants describing Intuitive as a "monopolist," *e.g.*, Ex. 9, Trial Ex. No. 844, are improper lay opinion, Fed. R. Evid. 701, and any (slight) probative value such statements may have is substantially outweighed by the undue prejudice Intuitive would suffer if SIS were permitted to use out-of-court statements of non-witnesses to address a central legal issue in this case, Fed. R. Evid. 403.

Nor should SIS's experts be permitted to use Rule 703 as a backdoor to testify about these otherwise inadmissible hearsay statements.  "Rule 703 does not authorize admitting hearsay on the pretense that it is the basis for expert opinion when, in fact, the expert adds nothing to the out-of-court statements other than transmitting them to the jury."  Charles Alan Wright & Arthur R. Miller, 29 *Fed. Prac. & Proc. Evid.* § 6273 (2d ed. 2024).

### <u>CONCLUSION</u>

For the foregoing reasons, Intuitive respectfully requests that the Court grant this motion.

`

- 7 -

1    Dated:  October 28, 2024                    By: /s/ *Kenneth A. Gallo*
                                                      Kenneth A. Gallo
2
                                                 Kenneth A. Gallo (*pro hac vice*)
3                                                Paul D. Brachman (*pro hac vice*)
                                                 **PAUL, WEISS, RIFKIND, WHARTON &**
4                                                **GARRISON LLP**
                                                 2001 K Street, NW
5                                                Washington, DC  20006-1047
                                                 Telephone:  (202) 223-7300
6                                                Facsimile:  (202) 223-7420
                                                 Email: kgallo@paulweiss.com
7                                                Email: pbrachman@paulweiss.com
8
                                                 William B. Michael (*pro hac vice*)
9                                                Crystal L. Parker (*pro hac vice*)
                                                 Daniel A. Crane (*pro hac vice*)
10                                               **PAUL, WEISS, RIFKIND, WHARTON &**
                                                 **GARRISON LLP**
11                                               1285 Avenue of the Americas
12                                               New York, NY  10019-6064
                                                 Telephone:  (212) 373-3000
13                                               Facsimile:  (212) 757-3990
                                                 Email: wmichael@paulweiss.com
14                                               Email: cparker@paulweiss.com
15                                               Email: dcrane@paulweiss.com
16
                                                 Joshua Hill Jr. (SBN 250842)
17                                               **PAUL, WEISS, RIFKIND, WHARTON &**
                                                 **GARRISON LLP**
18                                               535 Mission Street, 24th Floor
19                                               San Francisco, CA 94105
                                                 Telephone:  (628) 432-5100
20                                               Facsimile:  (628) 232-3101
                                                 Email: jhill@paulweiss.com
21
                                                 Sonya D. Winner (SBN 200348)
22                                               **COVINGTON & BURLINGTON LLP**
23                                               415 Mission Street, Suite 5400
                                                 San Francisco, California 94105-2533
24                                               Telephone:  (415) 591-6000
                                                 Facsimile:  (415) 591-6091
25                                               Email: swinner@cov.com
26
                                                 Kathryn E. Cahoy (SBN 298777)
27                                               **COVINGTON & BURLINGTON LLP**
                                                 3000 El Camino Real
28

Defendant's Motion in Limine No. 1 to Exclude Out-of-Court Hospital Statements
3:21-cv-03496-AMO

5 Palo Alto Square, 10th Floor
Palo Alto, California 94306-2112
Telephone: (650) 632-4700
Facsimile: (650) 632-4800
Email: kcahoy@cov.com

Andrew Lazerow (*pro hac vice*)
**COVINGTON & BURLINGTON LLP**
One City Center 850 Tenth Street NW
Washington DC 20001-4956
Telephone: (202) 662-6000
Facsimile: (202) 662-6291
Email: alazerow@cov.com

Allen Ruby (SBN 47109)
**ALLEN RUBY, ATTORNEY AT LAW**
15559 Union Ave. #138
Los Gatos, California 95032
Telephone: (408) 477-9690
Email: allen@allenruby.com

Attorneys for *Defendant*
*Intuitive Surgical, Inc.*

Defendant's Motion in Limine No. 1 to Exclude Out-of-Court Hospital Statements
3:21-cv-03496-AMO

**CERTIFICATE OF SERVICE**

On October 28, 2024, I caused a copy of Intuitive's Motion in Limine No. 1 to Exclude Out-of-Court Hospital Statements to be electronically served via email on counsel of record for Surgical Instrument Service Company, Inc.

Dated:  October 28, 2024                    By:  */s/ Kenneth A. Gallo*
                                                Kenneth A. Gallo

**APPENDIX A**[1]

| Category | Relevant Documents and Deposition Testimony |
|---|---|
| Examples of Anticipated Testimony from SIS Witnesses Relaying Out-of-Court Hospital Statements | • Ex. 2, 10/27/2022 Keith Johnson 30(b)(1) Dep. Tr., at 51:14-24 (hospital representatives stated that they "hemorrhage money to Intuitive Surgical" and were "looking for ways to reduce costs")<br><br>• Ex. 3, 10/27/2022 Keith Johnson 30(b)(6) Dep. Tr., at 44:7-45:22 (hospital representatives stated they were interested in SIS's modified EndoWrist)<br><br>• Ex. 4, 10/27/2022 Keith Johnson 30(b)(6) Dep. Tr., at 50:25-51:22 (hospital representatives stated they feared "retaliation" from Intuitive); *id.* at 53:21-54:5 (hospital representatives stated they would not do business with SIS because of Intuitive)<br><br>• Ex. 5, 5/10/2021 Greg Posdal Dep. Tr. at 19:21-25 ("customers said they were concerned about moving forward [with modified EndoWrists] because of what they were told by Intuitive") |
| Examples of Anticipated Non-Party Deposition Testimony Relaying Out- | • Ex. 6, Edward Harrich (Pullman Hospital) Dep. Tr., at 39:24-40:8 ("surgeons and the technicians . . . involved in [a] trial of the Rebotix-repaired EndoWrists" stated |

---

[1] This is a non-exhaustive list of testimony and documents that SIS has indicated it intends to offer at trial, *see* Joint Proposed Final Pretrial Order, App. E, Parties' Witness Lists, Dkt. 278-3; *id.*, App. D, Joint Exhibit List, Dkt. 278-2, and that includes hearsay by hospital declarants of the type discussed in this motion in limine. Intuitive reserves all rights to object to any and all hearsay statements in SIS's forthcoming deposition designations and that may be presented at trial.

| | | |
|---|---|---|
| of-Court Hospital Statements | | "repaired" EndoWrists "worked just like the nonrepaired ones") |
| | | • Ex. 13, Mike Madewell (Panama City Surgical Center) Dep. Tr., at 24:16-25:3 (surgeons said that if Restore's modified EndoWrists "worked fine" then they were "happy with it") |
| | | • Ex. 14, 5/4/2021 Clif Parker (Restore) Dep. Tr., at 99:22-104:1 (distributors that dealt with numerous potential customers, including Indiana University and West Virginia University, indicated that those customers were interested in EndoWrist "repair"); 150:4-151:2 (surgeons and other hospital personnel said that "EndoWrist scissor blades can become too dull to operate effectively before their 10th use"); |
| | | • Ex. 15, 10/25/2022 Clif Parker Dep. Tr. at 139:23-140:23 (prospective customers using X/Xi da Vinci systems said "they would sign contracts with [Restore] tomorrow and do business with [Restore] tomorrow" if Restore could "repair" X/Xi EndoWrists) |
| | | • Ex. 16, 11/03/2022 Kevin May (Restore) Dep. Tr. 74:10-75:16, 140:6-142:10 (hospital representatives and/or sales representatives that spoke to hospital representatives stated that hospitals that had been interested would not use modified EndoWrists after receiving "cease and desist" letters from Intuitive) |
| | | • Ex. 17, Chris Gibson (Rebotix) Tr. 159:24-161:17 (SIS stated that several large potential customers in Arizona |

| | |
|---|---|
| | would not move forward with SIS or Rebotix modified EndoWrists because Intuitive had "threaten[ed]" to stop servicing their da Vinci robot)<br><br>• Ex. 18, Jake Colletti (Medline) Tr. 10:14-12:18, 19:12-17, 20:3-16 (potential customers pitched on modified EndoWrists expressed concerns about contractual obligations and Intuitive interference as well as clinical objections) |
| Examples of Documents Containing Out-of-Court Statements by or Attributed to Hospital Representatives | Ex. 7 (Trial Ex. No. 510); Ex. 8 (Trial Ex. No. 355); Ex. 9 (Trial Ex. No. 844); Ex. 10 (Trial Ex. No. 343); Ex. 11 (Trial Ex. No. 535); Ex. 12 (Trial Ex. No. 717) at 6-9; Ex. 19 (Trial Ex. No. 136); Ex. 20 (Trial Ex. No. 430); Ex. 21 (Trial Ex. No. 470); Ex. 22 (Trial Ex. No. 479); Ex. 23 (Trial Ex. No. 509); Ex. 24 (Trial Ex. No. 517); Ex. 25 (Trial Ex. No. 519); Ex. 26 (Trial Ex. No. 528); Ex. 27 (Trial Ex. No. 539), at -8204, -8220-21; Ex. 28 (Trial Ex. No. 390) at 2-4; Ex. 29 (Trial Ex. No. 840). |

Appendix A to Defendant's Motion in Limine No. 1 to Exclude Out-of-Court Hospital
Statements
3:21-cv-03496-AMO

1

## CERTIFICATE OF SERVICE

2

3          On October 28, 2024, I caused a copy of Appendix A to Intuitive's Motion in

4   Limine No. 1 to Exclude Out-of-Court Hospital Statements to be electronically served via email

5   on counsel of record for Surgical Instrument Service Company, Inc.

6   Dated:  October 28, 2024                    By:  */s/ Kenneth A. Gallo*
                                                     Kenneth A. Gallo
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Kenneth A. Gallo (*pro hac vice*)
Paul D. Brachman (*pro hac vice*)
**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
2001 K Street, NW
Washington, DC  20006-1047
Telephone:  (202) 223-7300
Facsimile:  (202) 223-7420
Email: kgallo@paulweiss.com
Email: pbrachman@paulweiss.com

William B. Michael (*pro hac vice*)
Crystal L. Parker (*pro hac vice*)
Daniel A. Crane (*pro hac vice*)
**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone:  (212) 373-3000
Facsimile:  (212) 757-3990
Email: wmichael@paulweiss.com
Email: cparker@paulweiss.com
Email: dcrane@paulweiss.com

Joshua Hill Jr. (SBN 250842)
**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
535 Mission Street, 24th Floor
San Francisco, CA 94105
Telephone:  (628) 432-5100
Facsimile:  (628) 232-3101
Email: jhill@paulweiss.com

*Attorneys for Defendant Intuitive Surgical, Inc.*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| SURGICAL INSTRUMENT SERVICE COMPANY, INC.,<br>    *Plaintiff*,<br>  v.<br><br>INTUITIVE SURGICAL, INC.,<br>    *Defendant*. | Case No. 3:21-cv-03496-AMO<br><br><br>**DECLARATION OF PAUL D. BRACHMAN IN SUPPORT OF DEFENDANT'S MOTION IN LIMINE NO. 1 TO EXCLUDE OUT-OF-COURT HOSPITAL STATEMENTS**<br><br>The Honorable Araceli Martínez-Olguín |

I, PAUL D. BRACHMAN, declare as follows:

1.     I am an attorney licensed to practice in New York and the District of Columbia, and am admitted *pro hac vice* to practice before this Court.  I am a partner with the law firm of Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul, Weiss"), counsel for Intuitive Surgical, Inc. ("Intuitive") in this matter.  I have personal knowledge of the facts set forth herein, and if called to testify, I could and would testify competently hereto.

2.     Attached to this declaration as **Exhibit 1** is a true and correct copy of Plaintiff Surgical Instrument Service Company, Inc.'s Answers and Objections to Defendant's Interrogatories First Set – Nos. 1-3 dated May 20, 2022.

3.     Attached to this declaration as **Exhibit 2** is a true and correct copy of excerpts of the transcript of the 30(b)(1) deposition of Keith Johnson taken in this matter, on October 27, 2022, which was previously filed on the docket at Dkt. 127-20.

4.     Attached to this declaration as **Exhibit 3** is a true and correct copy of excerpts of the transcript of the 30(b)(6) deposition of Keith Johnson taken in this matter, on October 27, 2022, which was previously filed on the docket in this matter at Dkt. 127-21.

5.     Attached to this declaration as **Exhibit 4** is a true and correct copy of excerpts of the transcript of the 30(b)(6) deposition of Keith Johnson taken in this matter on October 27, 2022.

6.     Attached to this declaration as **Exhibit 5** is a true and correct copy of excerpts of the transcript of the 30(b)(6) deposition of Greg Posdal taken in *Restore Robotics LLC* v. *Intuitive Surgical, Inc.*, No. 19-cv-00055 (N.D. Fla.) on May 10, 2021.

7.     Attached to this declaration as **Exhibit 6** is a true and correct copy of excerpts of the transcript of the 30(b)(6) deposition of Edward Harrich taken in *Rebotix Repair LLC* v. *Intuitive Surgical, Inc.*, No. 20-cv-02274 (M.D. Fla.) on May 24, 2021.

8.     Attached to this declaration as **Exhibit 7** is a true and correct copy of an email thread identified on the Joint Proposed Final Pretrial Order, App. D, Joint Exhibit List, Dkt. 278-2, as Trial Ex. No. 510 and produced at Intuitive-00110255-58.

- 1 -

9.      Attached to this declaration as **Exhibit 8** is a true and correct copy of an article titled "Op-Ed: Addressing Our Da Vinci Addiction" identified on the Parties' Joint Exhibit List as Trial Ex. No. 355.  The article is available at

https://www.medpagetoday.com/surgery/generalsurgery/89175.

10.      Attached to this declaration as **Exhibit 9** is a true and correct copy of a screenshot of a presentation titled "Robotic Surgical Systems in Urology" identified on the Parties' Joint Exhibit List as Trial Ex. No. 844.

11.      Attached to this declaration as **Exhibit 10** is a true and correct copy of an article titled "Technology Widens Care Options for Rural Hospitals" identified on the Parties' Joint Exhibit List as Trial Ex. No. 343.  The article is available at

https://www.ruralhealthinfo.org/rural-monitor/technology-widens-care-

options#:~:text=In%20Washington%20state%2C%20medical%20robots,Lincoln%20Hospital%20in%20Davenport%2C%20Wash.

12.      Attached to this declaration as **Exhibit 11** is a true and correct copy of a report titled "Surgical Needs Exploration: Qualitative IDI Research Report" identified on the Parties' Joint Exhibit List as Trial Ex. No. 535 and produced at Intuitive-00246469-91.

13.      Attached to this declaration as **Exhibit 12** is a true and correct copy of a report titled "Digital Health: Robotic Surgery and the OR of the Future" identified on the Parties' Joint Exhibit List as Trial Ex. No. 717.

14.      Attached to this declaration as **Exhibit 13** is a true and correct copy of excerpts of the transcript of the deposition of Mike Madewell taken in *Restore Robotics LLC* v. *Intuitive Surgical, Inc.*, No. 19-cv-00055 (N.D. Fla.) on June 11, 2021.

15.      Attached to this declaration as **Exhibit 14** is a true and correct copy of excerpts of the transcript of the deposition of Clif Parker taken in *Restore Robotics LLC* v. *Intuitive Surgical, Inc.*, No. 19-cv-00055 (N.D. Fla.) on May 4, 2021.

16.      Attached to this declaration as **Exhibit 15** is a true and correct copy of excerpts of the transcript of the deposition of Clif Parker taken in this matter on October 25, 2022.

17.    Attached to this declaration as **Exhibit 16** is a true and correct copy of excerpts of the transcript of the deposition of Kevin May taken in this matter on November 3, 2022.

18.    Attached to this declaration as **Exhibit 17** is a true and correct copy of excerpts of the transcript of the deposition of Chris Gibson taken in *Rebotix Repair LLC* v. *Intuitive Surgical, Inc.*, No. 20-cv-02274 (M.D. Fla.) on June 22, 2021.

19.    Attached to this declaration as **Exhibit 18** is a true and correct copy of excerpts of the transcript of the deposition of Jake Colletti taken in *Restore Robotics LLC* v. *Intuitive Surgical, Inc.*, No. 5:19-cv-00055 (N.D. Fla.) on May 7, 2021.

20.    Attached to this declaration as **Exhibit 19** is a true and correct copy of an email thread identified on the Parties' Joint Exhibit List as Trial Ex. No. 136 and produced at SIS095115-39.

21.    Attached to this declaration as **Exhibit 20** is a true and correct copy of an email thread identified on the Parties' Joint Exhibit List as Trial Ex. No. 430 and produced at Intuitive-00214231-34.

22.    Attached to this declaration as **Exhibit 21** is a true and correct copy of an email identified on the Parties' Joint Exhibit List as Trial Ex. No. 470 and produced at Intuitive-00011487.

23.    Attached to this declaration as **Exhibit 22** is a true and correct copy of an email thread identified  on the Parties' Joint Exhibit List as Trial Ex. No. 479 and produced at Intuitive-00029346-47.

24.    Attached to this declaration as **Exhibit 23** is a true and correct copy of an email thread identified on the Parties' Joint Exhibit List as Trial Ex. No. 509 and produced at Intuitive-00110252-54.

25.    Attached to this declaration as **Exhibit 24** is a true and correct copy of an email identified on the Parties' Joint Exhibit List as Trial Ex. No. 517 and produced at Intuitive-00133628-30.

26.     Attached to this declaration as **Exhibit 25** is a true and correct copy of a document identified on the Parties' Joint Exhibit List as Trial Ex. No. 519 and produced at Intuitive-00141567-68.

27.     Attached to this declaration as **Exhibit 26** is a true and correct copy of an email thread identified on the Parties' Joint Exhibit List as Trial Ex. No. 528 and produced at Intuitive-00214231-34.

28.     Attached to this declaration as **Exhibit 27** is a true and correct copy of an article titled "Intuitive Surgical: What do experts think about J&J's new surgical robot?" identified on the Parties' Joint Exhibit List as Trial Ex. No. 539 and produced at Intuitive-00278203-34.

29.     Attached to this declaration as **Exhibit 28** is a true and correct copy of an article titled "Surgical-robot costs put small hospitals in a bind" identified on the Parties' Joint Exhibit List as Trial Ex. No. 390.

30.     Attached to this declaration as **Exhibit 29** is a true and correct copy of an email thread identified as Trial Ex. No. 840 and produced at Restore-00030379-84.

I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated:  October 28, 2024                    By: /s/ *Paul D. Brachman*

PAUL D. BRACHMAN

Brachman Declaration in Support of Defendant's Motion In Limine No. 1 To Exclude Out-Of-Court Hospital Statements
3:21-cv-03496-AMO

# **FILER'S ATTESTATION**

I, Kenneth A. Gallo, am the ECF User whose ID and password are being used to file this document.  In compliance with Civil Local Rule 5-1(i)(3), I hereby attest that the signatory identified above has concurred in this filing.

Dated:  October 28, 2024

By: /s/ *Kenneth A. Gallo*
Kenneth A. Gallo

Kenneth A. Gallo (*pro hac vice*)
**PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP**
2001 K Street, NW
Washington, DC  20006-1047
Telephone:  (202) 223-7300
Facsimile:  (202) 223-7420
Email: kgallo@paulweiss.com

*Attorney for Defendant
Intuitive Surgical, Inc.*

Brachman Declaration in Support of Defendant's Motion In Limine No. 1 To Exclude Out-Of-Court Hospital Statements
3:21-cv-03496-AMO

**EXHIBIT 1**

**to**

**PAUL D. BRACHMAN DECLARATION IN SUPPORT
OF DEFENDANT'S MOTION IN LIMINE NO. 1
TO EXCLUDE OUT-OF-COURT HOSPITAL
STATEMENTS**

**HALEY GUILIANO LLP**
JOSHUA V. VAN HOVEN (CSB No. 262815)
    E-Mail: joshua.vanhoven@hglaw.com
GREGORY J. LUNDELL (CSB No. 234941)
    E-Mail: greg.lundell@hglaw.com
111 N Market Street, Suite 900
San Jose, California 95113
Telephone: 669.213.1050
Facsimile: 669.500.7375

RICHARD T. MCCAULLEY  (*pro hac vice*)
    E-Mail: richard.mccaulley@hglaw.com
116 W. Hubbard, Suite 20
Chicago, Illinois 60654
Telephone: 312.330.8105

Attorneys for Plaintiff,
SURGICAL INSTRUMENT SERVICE COMPANY, INC.

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SURGICAL INSTRUMENT SERVICE COMPANY, INC., <br><br> Plaintiff, <br><br> vs. <br><br> INTUITIVE SURGICAL, INC., <br><br> Defendant. | CASE NO. 3:21-cv-03496-VC <br><br> Honorable Vince Chhabria <br><br> **PLAINTIFF SURGICAL INSTRUMENT SERVICE COMPANY, INC.'S ANSWERS AND OBJECTIONS TO DEFENDANT'S INTERROGATORIES FIRST SET - NOS. 1-3** |

## PLAINTIFF'S ANSWERS AND OBJECTIONS TO DEFENDANT'S INTERROGATORIES

Plaintiff Surgical Instrument Service Company, Inc. ("SIS"), by and through its attorneys,

and pursuant to Rule 33 of the Federal Rules of Civil Procedure and the Local Rules of this

Court, answers and objects to Defendant Intuitive Surgical, Inc.'s ("Intuitive") First Set of

Interrogatories as follows:

## PRELIMINARY STATEMENT

1. Plaintiff's investigation and development of all facts and circumstances relating to this

action is ongoing. These answers and objections are made without prejudice to, and are not a

waiver of, Plaintiff's right to rely on other facts or documents at trial.

2. By making the accompanying answers and objections to Defendant's interrogatories,

Plaintiff does not waive, and hereby expressly reserves, its right to assert any and all objections

as to the admissibility of such responses into evidence in this action, or in any other proceedings,

on any and all grounds including, but not limited to, competency, relevancy, materiality, and

privilege. Further, Plaintiff makes the answers and objections herein without in any way

implying that it considers the interrogatories, and answers to the interrogatories, to be relevant or

material to the subject matter of this action.

3. A response to an interrogatory stating that objections and/or indicating that documents

will be produced shall not be deemed or construed that there are, in fact, responsive documents,

that Plaintiff performed any of the acts described in the interrogatory, or definitions and/or

instructions applicable to the interrogatory, or that Plaintiff acquiesces in the characterization of

the conduct or activities contained in the interrogatory, or definitions and/or instructions

applicable to the interrogatory.

4. Plaintiff expressly reserves the right to supplement, clarify, revise, or correct any or all

of the responses and objections herein, and to assert additional objections or privileges, in one or

more subsequent supplemental response(s).

5. Plaintiff will make available for inspection at Plaintiff's offices responsive documents. Alternatively, Plaintiff will produce copies of the documents.

## GENERAL OBJECTIONS

1. Plaintiff objects to each instruction, definition, and interrogatory to the extent that it purports to impose any requirement or discovery obligation greater than or different from those under the Federal Rules of Civil Procedure and the applicable Rules and Orders of the Court.

2. Plaintiff objects to each interrogatory that is overly broad, unduly burdensome, or not reasonably calculated to lead to the discovery of admissible evidence.

3. Plaintiff objects to each instruction, definition, and interrogatory to the extent that it seeks information protected from disclosure by the attorney- client privilege, deliberative process privilege, attorney work product doctrine, or any other applicable privilege. Should any such disclosure by Plaintiff occur, it is inadvertent and shall not constitute a waiver of any privilege.

4. To the extent any of Defendant's interrogatories seek answers that include expert material, including but not limited to survey materials, Plaintiff objects to any such interrogatories as premature and expressly reserves the right to supplement, clarify, revise, or correct any or all answers to such interrogatories, and to assert additional objections or privileges, in one or more subsequent supplemental response(s) in accordance with the time period for exchanging expert reports set by the Court.

5. Plaintiff incorporates by reference every general objection set forth above into each specific response set forth below. A specific response may repeat a general objection for emphasis or some other reason. The failure to include any general objection in any specific response does not waive any general objection to that request. Moreover, Plaintiff does not waive its right to amend its responses.

## ANSWERS AND OBJECTIONS TO INTERROGATORIES

INTERROGATORY NO.1

Identify, and describe the role of, all of Your Personnel involved in decisions regarding or evaluations or analyses of the repair or replacement of da Vinci Surgical Systems, EndoWrist Instruments, or any other robotic-assisted surgical technology, including with respect to the following areas: research and development, regulatory clearance, pricing, business strategy, marketing, sales, maintenance, testing, safety, efficacy or any other area in which You evaluated or analyzed the repair or replacement of da Vinci Surgical Systems, EndoWrist Instruments, or any other robotic-assisted surgical technology.

RESPONSE TO INTERROGATORY NO. 1

Plaintiff objects to this interrogatory as vague and ambiguous to the extent that it relies on the terms "role," "involved in," "decisions regarding," "evaluations," or "analyses," none of which are defined in Defendant's First Set of Interrogatories. Further, Plaintiff objects to this interrogatory as vague, ambiguous, and/or overbroad to the extent that it calls for information about "any other robotic-assisted surgical technology." Plaintiff also objects to this interrogatory as vague, ambiguous, overbroad and/or burdensome to the extent it calls for information with respect to the general categories of: "research and development, regulatory clearance, pricing, business strategy, marketing, sales, maintenance, testing, safety, efficacy or any other area." Providing such information in answering this interrogatory would be oppressive, unduly burdensome and unnecessarily expensive.

Subject to and without waiver of the foregoing objections, Plaintiff responds as follows to this interrogatory: Keith Johnson, Executive Vice President, Sales and Clinical Programs Greg Posdal, President and CEO.

INTERRROGATORY NO. 2

Identify all persons and/or entities You have contacted to sell or promote Your purported da Vinci and EndoWrist repair and refurbishment offering.

RESPONSE TO INTERROGATORY NO. 2

Plaintiff objects to this interrogatory as overbroad and burdensome to the extent it calls for the "identity" of persons and/or entities as that term is defined in Definition No. 6 of Defendant's First Set of Interrogatories. Plaintiff also objects to this interrogatory as vague, ambiguous, overbroad and/or burdensome to the extent it calls for information about persons or entities "contacted" to "sell" or "promote" services offered by Plaintiff. Providing such information in answering this interrogatory would be oppressive, unduly burdensome and unnecessarily expensive.

Subject to and without waiver of the foregoing objections, Plaintiff responds as follows to this interrogatory:

1.    Banner Health System (33 hospitals)

    a.    Perry Kirwan, VP of Clinical Engineering

    b.    Tim Brooks, System Director Sterile Processing

2.    Legacy Health (6 hospitals)

    a.    Raymond Mackay, Director of Supply Chain

    b.    Jerry Hutchison, Clinical Director

3.    Providence Health System (53 hospitals)

    a.    Christopher Phan, Client Executive

    b.    John Harper, System Director Sterile Processing

4.    MarinHealth

    a.    John Ayers, Peri-Operative Business Manager

    b.    Johanna Torres, SPD Manager

5.      Honor Health (6 hospitals)

      a.     Tim Miller, VP of Supply Chain

      b.     Mark Dozier, Associate VP of Supply Chain

6.      Methodist Hospital of Southern California

      a.     Daniel Shay, Director of Materials

      b.     Roxanne Contreras, SPD Manager

7.      Memorial Care (3 Hospitals)

      a.     Becky Klungrester, Clinical Director

      b.     Mary Beth Joiner, Clinical Manager

8.      University Medical Center Irvine

      a.     Charles Adams, Director of Clinical Management

      b.     Gene Abad, Director of Sourcing/Contracting

9.      Kaiser Permanente (50+ hospitals)

      a.     Nestor Jarquin, System Sourcing Director

      b.     Donald Cabrera, System SPD

10.     USC Medical Center

      a.     Jesse Lopez, Director Clinical Engineering

11.     University of Illinois Medical Center

      a.     Kendra Pitts, Director Value Analysis

      b.     Maggie Popek, SPD Manager

12.     Johns Hopkins MC

      a.     Jennifer Stevens, Clinical Support

      b.     Rudy Martinez, Clinical Support

13.     Advocate Aurora Health System (24 hospitals)

      a.     Brian Mirsburger, Clinical Sourcing Manager

      b.     Thomas Lubotsky, Chief Supply Chain Officer

14.     Ardent Health (33 hospitals)

      a.     Cairo Wasfy, VP of Supply Chain

      b.     William Manning, Sourcing Manager

15.     University of Michigan Medical Center

      a.     Paul Helm, Client Support

16.     Duke University Medical Center

      a.     Kevin Strong, Senior Client Manager

      b.     Jennifer Stickler, Senior Client Manager

17.     Piedmont Healthcare (17 hospitals)

      a.     Ben Haygood, Sourcing Manager

      b.     Matt Lee, Manager Materials Management

18.     Salinas Valley Medical Center

      a.     Melissa Aylard, Operations Manager

      b.     Juan Gomez, SPD Manager

19.     Pomona Valley Medical Center

      a.     Michelle Medel, Director of Materials Management

      b.     Rich Santala, Director of Supply Chain

20.     UHS (33 hospitals)

      a.     Christopher Nowak, Senior Director Technology Management

21.     SSM (23 hospitals)

     a.       Brad Forth, VP of Supply Chain

     b.       Serina Seward, Senior Director

22.     Redland Community Hospital

     a.       Bo Aceto, Director of Perioperative Services

     b.       Danny Avina, Materials Management

23.     Northside Health (6 hospitals)

     a.       Randy Eccleston, SPD Director

     b.       Latasha Hall, Materials Management

24.     Northeast Georgia Health (6 hospitals)

     a.       Barry Bryant, SPD Manager

25.     Mayo Clinic

     a.       Kyle Shonley, Clinical Operations Administrator

26.     Beth Israel Lahey Health (13 hospitals)

     a.       Ryan Furtado, Director SPD

     b.       Ralph Gibbs, Director SPD

27.     Boston Children's Medical Center

     a.       Christine L'Heureux, Director of Supply Chain

     b.       Scott McLeod, Sourcing Manager

28.     Indiana University Health

     a.       Andrew Rago, Senior Manager

29.     Northwestern Memorial Healthcare

     a.       Kyle Shulfer, Strategic Sourcing Manager

30.     Yankee Alliance (200+ facilities)

      a.      Tom Kennedy, Contracting Manager

31.    Vizient, Inc. (2,000+ facilities)

      a.      Rand Ballard, Chief Customer Officer

      b.      Ryan Gay, Contracting


INTERROGATORY NO. 3

Identify all persons that refused to work with You due to Intuitive's purportedly anticompetitive conduct, including all persons You referred to in paragraphs 36 and 92 of the Complaint.

RESPONSE TO INTERROGATORY NO. 3

Plaintiff objects to this interrogatory as overbroad and burdensome to the extent it calls for the "identity" of persons and/or entities as that term is defined in Definition No. 6 of Defendant's First Set of Interrogatories.

Subject to and without waiver of the foregoing objections, Plaintiff responds to this interrogatory as follows: The requested persons are listed above in response to Interrogatory No. 2. Plaintiff believes no customer would work with it because of Intuitive's anticompetitive conduct.

Dated: May 20, 2022                    **HALEY GUILIANO LLP**

By: */s/* Richard T. McCaulley

JOSHUA V. VAN HOVEN
joshua.vanhoven@hglaw.com
GREGORY J. LUNDELL
greg.lundell@hglaw.com
111 N. Market Street, Suite 900
San Jose, California 95113
Telephone: 669.213.1050
Facsimile: 669.500.7375

RICHARD T. MCCAULLEY (*pro hac vice*)
richard.mccaulley@hglaw.com
8 E. Huron, 1004
Chicago, Illinois 60661
Telephone: 312.330.8105

*Attorneys for Plaintiff*
SURGICAL INSTRUMENT SERVICE
COMPANY, INC.

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on May 20, 2022, I caused a copy of the foregoing **PLAINTIFF SURGICAL INSTRUMENT SERVICE COMPANY, INC.'S ANSWERS AND OBJECTIONS TO DEFENDANT'S INTERROGATORIES FIRST SET - NOS. 1-3** to be served *via* electronic mail to counsel of record:

Allen Ruby
Attorney at Law
15559 Union Ave. #138
Los Gatos, CA 95032
allen@allenruby.com

Karen Hoffman Lent
Michael Menitove
Skadden Arps Slate Meagher and Flom LLP
One Manhattan West
New York, NY 10001
karen.lent@skadden.com
michael.menitove@skadden.com

Andrew David Lazerow
Ashley E. Bass
John Foster Kendrick
Covington & Burling LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
alazerow@cov.com
abass@cov.com
jkendrick@cov.com

Michael S. Bailey
Skadden Arps Slate Meagher and Flom LLP
1440 New York Avenue, NW
Washington, DC 20005
michael.bailey@skadden.com

Kathryn Elizabeth Cahoy
Matthew Erik Delgado
Covington & Burling LLP
3000 El Camino Real
5 Palo Alto Square, 10th Floor
Palo Alto, CA 94306
kcahoy@cov.com
mdelgado@cov.com

Isaac Daniel Chaput
Sonya Diane Winner
Covington & Burling LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105
ichaput@cov.com
swinner@cov.com

*Attorneys for Defendant,*
INTUITIVE SURGICAL, INC.

By: */s/ Karleigh Nguyen*

**EXHIBIT 2**

**to**

**PAUL D. BRACHMAN DECLARATION IN SUPPORT
OF DEFENDANT'S MOTION IN LIMINE NO. 1
TO EXCLUDE OUT-OF-COURT HOSPITAL
STATEMENTS**

*** CONFIDENTIAL ATTORNEYS EYES ONLY ***

```
 1              UNITED STATES DISTRICT COURT
 2          FOR THE NORTHERN DISTRICT OF CALIFORNIA
 3                 SAN FRANCISCO DIVISION
 4
      SURGICAL INSTRUMENT SERVICE     )
 5    COMPANY, INC.,                  ) Case No.:
                                      ) 3:21-cv-03496-VC
 6              Plaintiff,            )
                                      ) Lead Case No.:
 7          vs.                       ) 3:21-cv-03825-VC
                                      )
 8    INTUITIVE SURGICAL, INC.,       ) Pages 1 to 65
                                      )
 9              Defendant             )
      _____ )
10    IN RE: DA VINCI SURGICAL ROBOT  )
      ANTITRUST LITIGATION            )
11    _____ )
      THIS DOCUMENT RELATES TO:       )
12    ALL ACTIONS                     )
      _____ )
13
14         *** CONFIDENTIAL ATTORNEYS EYES ONLY ***
15                     DEPOSITION OF:
16                  KEITH ROBERT JOHNSON
17                IN HIS PERSONAL CAPACITY
18               THURSDAY, OCTOBER 27, 2022
19                       1:27 p.m.
20
21    REPORTED BY:
22    Vickie Blair
23    CSR No. 8940, RPR-CRR
24    JOB NO. 5539883
25    PAGES 1 - 68
```

                                                    Page 1

```
 1      Deposition of KEITH ROBERT JOHNSON, the witness, taken
 2      on behalf of the Defendant, on Thursday,
 3      October 27, 2022, 1:27 p.m., before VICKIE BLAIR,
 4      CSR No. 8940, RPR-CRR.
 5
 6      APPEARANCES OF COUNSEL VIA ZOOM:
 7
 8      FOR PLAINTIFF/COUNTER-DEFENDANT SURGICAL INSTRUMENT
        SERVICE CO. INC.:
 9
                HALEY GUILIANO LLP
10              BY JOSHUA VAN HOVEN, Partner
                111 North Market Street
11              Suite 900
                San Jose, California  95113
12              +1 669 213 1061
                joshua.vanhoven@hglaw.com
13
        FOR DEFENDANT INTUITIVE SURGICAL, INC.:
14
                COVINGTON & BURLING LLP
15              BY ISAAC D. CHAPUT, Associate
                415 Mission Street
16              Suite 5400
                San Francisco, California  94105-2533
17              +1 415 591 7020
                ichaput@cov.com
18
                COVINGTON & BURLING LLP
19              BY AUSTIN S. MARTIN, Associate
                One CityCenter
20              850 Tenth Street, NW
                Washington, D.C.  20001-4956
21              +1 202 662 5094
                amartin@cov.com
22
23
24
25
```

Page 2

*** CONFIDENTIAL ATTORNEYS EYES ONLY ***

```
 1      APPEARANCES OF COUNSEL VIA ZOOM: (Continued)
 2      FOR THE PROPOSED CLASS:
 3              BONI, ZACK & SNYDER LLC
                BY JOSHUA D. SNYDER, Partner
 4              15 St. Asaphs Road
                Bala Cynwyd, Pennsylvania  19004
 5              (610) 822-0203
                (610) 822-0206
 6              jsnyder@bonizack.com
 7      ALSO PRESENT:
 8              RAMON A. PERAZA, Videographer
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Veritext Legal Solutions
866 299-5127

```
 1                        I N D E X

 2

 3     WITNESS              EXAMINATION                PAGE

 4       KEITH ROBERT JOHNSON

 5                          (MR. CHAPUT)                 6

 6                          (MR. SNYDER)                47

 7                          (MR. CHAPUT)                58

 8

 9                    INFORMATION REQUESTED

10                          None

11      QUESTIONS INSTRUCTED BY COUNSEL NOT TO ANSWER

12                          None

13

14                      E X H I B I T S

15      EXHIBIT NO.  PAGE   DESCRIPTION

16     Exhibit 141    25  Email chain, Bates numbers

17                        SIS000366 and SIS000367

18     Exhibit 142    27  Spreadsheet, Bates number

19                        SIS000167

20     Exhibit 143    35  Si Recycling Program form, Bates

21                        number SIS196367

22     Exhibit 144    40  EndoWrist Recycling Program form,

23                        Bates numbers SIS146976 through

24                        SIS146978

25
```

                                        Page 4

```
 1        Q     And what is SIS's annual net profit?        13:31:44

 2        A     I'm not privy to that number.               13:31:54

 3        Q     Who owns SIS?                               13:31:58

 4        A     Greg Posdal.                                13:32:07

 5        Q     You mentioned also earlier that SIS is one  13:32:07

 6   of three main competitors in its business.  Am I      13:32:19

 7   recalling that correctly?                             13:32:23

 8        A     Yes.                                        13:32:24

 9        Q     Who are SIS's main competitors?             13:32:24

10        A     STERIS IMS and AgilityHealth.               13:32:30

11        Q     And are both STERIS and Agility national    13:32:38

12   ISOs?                                                 13:32:50

13        A     The IMS division of STERIS is an ISO, but   13:32:51

14   STERIS is an $8 billion global sterilization company. 13:32:58

15        Q     Do any of SIS's customers also have         13:33:03

16   contracts at the same time with either STERIS IMS or  13:33:16

17   Agility or do customers typically contract only with  13:33:23

18   one of the three organizations?                       13:33:25

19        A     I think typically -- typically it would be  13:33:26

20   one, but there is a lot of scenarios where two or three 13:33:30

21   organizations work with a -- any given hospital or    13:33:36

22   hospital system.                                      13:33:38

23        Q     Does SIS compete at all with companies      13:33:38

24   like Benjamin Biomedical or Restore Robotics or       13:33:47

25   MediVision?                                           13:33:56
```

Page 9

```
 1    your answers about that timeline be roughly the same?   14:52:00

 2               MR. CHAPUT:  Object to the form.            14:52:06

 3               THE WITNESS:  Yes, I'm -- I'm -- I'm a      14:52:09

 4    sales guy, I'm looking for opportunities to sell.  This 14:52:11

 5    robotic program created an opportunity for SIS to      14:52:15

 6    substantially increase the revenue of our organization, 14:52:18

 7    a great opportunity, and that was what I -- I was -- I  14:52:20

 8    was pumped about the opportunity.                      14:52:24

 9    BY MR. SNYDER:                                         14:52:25

10        Q    Let's -- let's go -- let's go there next.    14:52:29

11    I just have a few questions.                           14:52:33

12               This morning I believe you used the word    14:52:35

13    "monumental" in connection with the level of interest  14:52:41

14    in EndoWrist repair.                                   14:52:43

15               Is that a word that you used in that        14:52:44

16    context, Mr. Johnson?                                  14:52:46

17        A    I believe I did, and I don't use that word   14:52:48

18    very often.                                            14:52:50

19        Q    And are -- are there -- are there key --     14:52:53

20    key moments or key events that you have in mind when   14:53:01

21    you refer to the monumental level of interest in       14:53:05

22    EndoWrist repair?                                      14:53:08

23               MR. CHAPUT:  Object to the form.            14:53:11

24               THE WITNESS:  Yeah, there's -- there's a    14:53:12

25    couple very distinct meetings that stick out in my     14:53:16
```

Page 50

| | | |
|---|---|---|
| 1 | head, yes. | 14:53:18 |
| 2 | BY MR. SNYDER: | 14:53:20 |
| 3 | Q     And what -- what are those -- those | 14:53:20 |
| 4 | meetings that stick out? | 14:53:26 |
| 5 | A     One of the biggest ones was the meeting | 14:53:27 |
| 6 | that we had with Advocate Aurora in Wisconsin.  I'll | 14:53:35 |
| 7 | just say this, in -- in -- in every meeting that I had, | 14:53:46 |
| 8 | and I'm not saying some of them, I'm saying all of | 14:53:50 |
| 9 | them, the -- the level of interest from the people that | 14:53:52 |
| 10 | I met with, which was always usually the C-suite, VP of | 14:53:58 |
| 11 | supply chain, VP of perioperative services, chief | 14:54:02 |
| 12 | robotic surgeon, one of those groups, every single one | 14:54:07 |
| 13 | of them was absolutely excited about this program. | 14:54:10 |
| 14 | Every one of them used the word | 14:54:15 |
| 15 | "hemorrhage;" almost all -- I won't say every one, a | 14:54:17 |
| 16 | majority of the people I meet with said "We hemorrhage | 14:54:23 |
| 17 | money to Intuitive Surgical.  We are looking for ways | 14:54:28 |
| 18 | to reduce costs." | 14:54:30 |
| 19 | They love the robot.  They do.  They all | 14:54:31 |
| 20 | love it.  They understand what it does. | 14:54:34 |
| 21 | It's -- it's the -- the lack of being able | 14:54:36 |
| 22 | to bring these other services that we were offering to | 14:54:37 |
| 23 | the table to help them reduce their costs, and that was | 14:54:41 |
| 24 | what they were excited about. | 14:54:44 |
| 25 | Q     A couple other names that came up earlier | 14:54:51 |

Page 51

```
 1    today I wanted to ask about.                    14:54:54

 2            You testified about Vizient.            14:54:56

 3            Do you recall that?                     14:54:57

 4    A      Uh-huh.                                  14:54:58

 5    Q      And what -- what is Vizient?             14:54:58

 6    A      So Vizient is the largest health care GPO  14:55:01

 7    in the country.                                 14:55:09

 8    Q      What was Vizient's level of interest in   14:55:10

 9    EndoWrist repair?                               14:55:12

10    A      I have met with the CEO of Vizient, the   14:55:18

11    chief customer officer of Vizient, in fact, the chief  14:55:21

12    customer officer of Vizient scheduled a meeting with  14:55:26

13    his six high level people that run the entire country  14:55:28

14    because that's how excited they were about this  14:55:32

15    program.                                        14:55:35

16            They don't -- Vizient doesn't get any   14:55:36

17    value from Intuitive Surgical, they don't get admin  14:55:38

18    fees from Intuitive Surgical, they don't get anything  14:55:43

19    from Intuitive Surgical.                        14:55:47

20            So the fact that SIS had a program that  14:55:50

21    could reduce costs to health care, help the hospitals  14:55:52

22    reduce their cost for robotic surgery, and they could  14:55:55

23    bring value to their customers in the robotic space was  14:55:58

24    an absolute home run for them.                  14:56:01

25    Q      And could -- can you describe generally  14:56:05
```

Page 52

```
 1    how large Vizient is?  I mean, you said they're the      14:56:11

 2    largest, but what does that mean?                        14:56:15

 3         A     Yeah, they represent, don't quote me          14:56:16

 4    specifically, but they represent somewhere between       14:56:19

 5    2,500 and 3,000 hospitals.                               14:56:22

 6         Q     And what -- what's Vizient's geographic        14:56:24

 7    scope?                                                   14:56:29

 8         A     National, every state in the union.           14:56:29

 9         Q     Another -- another name that I believe        14:56:36

10    came up earlier today was Johns Hopkins.                 14:56:37

11         Did you mention Johns Hopkins?                      14:56:41

12         A     Yes.                                          14:56:43

13         Q     What do you recall about -- did you meet      14:56:43

14    with Johns Hopkins at any point?                         14:56:45

15         A     Yes.                                          14:56:48

16         Q     What do you recall about that meeting?        14:56:48

17         A     I could describe the gentleman to you         14:56:56

18    because I remember specifically what he looked like, I   14:56:57

19    believe he was the director of sourcing or the VP of     14:57:00

20    supply chain, and forgive me for not remembering his    14:57:04

21    title specifically, that meeting was teed up by the     14:57:08

22    Vizient director that -- the client executor that       14:57:13

23    managed that relationship with Johns Hopkins, and they  14:57:17

24    told them that they had a vendor that had a cost         14:57:19

25    savings program around robotic surgery.                 14:57:21
```

Page 53

```
 1              So me and one of my people spent an hour    14:57:24

 2     on the phone with him, he was all about it, he loved  14:57:26

 3     it, he -- we ended that call with him saying, "Keith,  14:57:32

 4     let me talk to legal and supply chain, we'll look over  14:57:37

 5     our contract, and we'll get back with you."           14:57:40

 6        Q    Now, you -- you've been in the -- in the      14:57:45

 7     industry about 25 years or so.                        14:57:48

 8              Do I have that about right?                  14:57:50

 9        A    Yes, since about late '99.                    14:57:52

10        Q    Okay.  So since -- since '99, you've          14:57:54

11     gained a lot of experience.                           14:58:01

12              Is that fair to say?                         14:58:02

13              MR. CHAPUT:  Objection to form.              14:58:04

14     BY MR. SNYDER:                                        14:58:08

15        Q    Is it fair to say you're experienced in       14:58:08

16     the industry, Mr. Johnson?                            14:58:10

17        A    I would say yes.                              14:58:11

18        Q    And what's your view of Johns Hopkins'        14:58:12

19     level of sophisticated when it comes to patient safety?  14:58:17

20              MR. CHAPUT:  Object to the form.             14:58:21

21              THE WITNESS:  I don't think you would get    14:58:25

22     any higher.                                           14:58:26

23     BY MR. SNYDER:                                        14:58:30

24        Q    Move on to another name.                      14:58:32

25              Another one I believe that came up is Mayo   14:58:33
```

Page 54

*** CONFIDENTIAL ATTORNEYS EYES ONLY ***

| | | |
|---|---|---|
| 1 | Clinic. | 14:58:33 |
| 2 | Did I get that right? | 14:58:37 |
| 3 | A    Yes, sir. | 14:58:38 |
| 4 | Q    And did you ever talk with or meet with | 14:58:39 |
| 5 | the Mayo -- representatives of the Mayo Clinic? | 14:58:41 |
| 6 | A    Yes. | 14:58:44 |
| 7 | Q    And what -- was it an in-person meeting? | 14:58:44 |
| 8 | A    They all took place over Zoom. | 14:58:50 |
| 9 | Q    Okay.  This is during the -- during the | 14:58:52 |
| 10 | pandemic? | 14:58:54 |
| 11 | A    Yes, sir. | 14:58:54 |
| 12 | Q    And what -- what do you recall about that | 14:58:56 |
| 13 | Zoom meeting with the Mayo Clinic? | 14:58:58 |
| 14 | A    The meetings have all gone the same, and I | 14:59:07 |
| 15 | say that with all honestly, they -- they have a vested | 14:59:09 |
| 16 | interest in finding ways to reduce costs on their | 14:59:14 |
| 17 | robotic surgery.  We explained to them the program, | 14:59:17 |
| 18 | they're excited about it. | 14:59:21 |
| 19 | And I didn't finish my statement before | 14:59:22 |
| 20 | about Johns Hopkins. | 14:59:24 |
| 21 | "Keith, this sounds great, let us do our | 14:59:28 |
| 22 | due diligence and we'll get back to you."  Every single | 14:59:31 |
| 23 | one of those groups have come back, either via email or | 14:59:35 |
| 24 | a phone call saying, "Keith, Intuitive does not allow | 14:59:39 |
| 25 | us, they will not allow us to do your program, our | 14:59:44 |

Page 55

```
 1    contracts won't allow us to do it.  We're being told    14:59:47
 2    that this is void our warranty, we're being told this   14:59:51
 3    will void our service agreement.  As much as we want to 14:59:53
 4    do it, we -- we can't take the risk of being penalized  14:59:55
 5    or "being" -- I'm trying to think of the word they      14:59:58
 6    always use -- or -- "or the pressure we would get from  15:00:02
 7    Intuitive Surgical."                                    15:00:05
 8         Q    Okay.  And I want to come back to that in     15:00:08
 9    a -- in the next question, the question after this one. 15:00:11
10         But my first question is:  What, given            15:00:14
11    your several decades of experience in this industry,    15:00:17
12    what's your view of the Mayo Clinic's level of          15:00:22
13    sophistication when it comes to patient safety?         15:00:26
14              MR. CHAPUT:  Object to the form.              15:00:28
15              THE WITNESS:  I would say there's four        15:00:29
16    hospital systems in the U.S. that kind of standalone,   15:00:34
17    and I think if you asked anybody in health care, they   15:00:38
18    would say the Mayo Clinic, the Cleveland clinic, Johns  15:00:41
19    Hopkins, and Cedars-Sinai are probably the four most    15:00:46
20    renowned teaching, quality of care, standard of care    15:00:54
21    organizations in the U.S.                               15:00:59
22    BY MR. SNYDER:                                          15:01:07
23         Q    And it's fair to say the Mayo Clinic          15:01:07
24    was -- was interested in EndoWrist repair?              15:01:10
25              MR. CHAPUT:  Object to the form.              15:01:13
```

Page 56

**EXHIBIT 3**

**to**

**PAUL D. BRACHMAN DECLARATION IN SUPPORT
OF DEFENDANT'S MOTION IN LIMINE NO. 1
TO EXCLUDE OUT-OF-COURT HOSPITAL
STATEMENTS**

*** CONFIDENTIAL ATTORNEYS EYES ONLY ***

```
 1                UNITED STATES DISTRICT COURT
 2            FOR THE NORTHERN DISTRICT OF CALIFORNIA
 3                   SAN FRANCISCO DIVISION
 4
      SURGICAL INSTRUMENT SERVICE    )
 5    COMPANY, INC.,                 ) Case No.:
                                     ) 3:21-cv-03496-VC
 6               Plaintiff,          )
                                     ) Lead Case No.:
 7          vs.                      ) 3:21-cv-03825-VC
                                     )
 8    INTUITIVE SURGICAL, INC.,      )
                                     )
 9               Defendant          )
      _____ )
10    IN RE: DA VINCI SURGICAL ROBOT )
      ANTITRUST LITIGATION           )
11    _____ )
      THIS DOCUMENT RELATES TO:      )
12    ALL ACTIONS                    )
      _____)
13
14
15         *** CONFIDENTIAL ATTORNEYS EYES ONLY ***
16                30(b)(6) DEPOSITION OF:
17                KEITH ROBERT JOHNSON
18              THURSDAY, OCTOBER 27, 2022
19           9:06 a.m. Mountain Standard Time
20
21    REPORTED BY:
22    Vickie Blair
23    CSR No. 8940, RPR-CRR
24    JOB NO. 5539883
25    PAGES 1 - 122
```

Page 1

*** CONFIDENTIAL ATTORNEYS EYES ONLY ***

```
 1      Deposition of KEITH ROBERT JOHNSON, the witness, taken
 2      on behalf of the Defendant, on Thursday,
 3      October 27, 2022, 9:06 a.m. Mountain Standard Time,
 4      before VICKIE BLAIR, CSR No. 8940, RPR-CRR.
 5
 6      APPEARANCES OF COUNSEL VIA ZOOM:
 7
 8      FOR PLAINTIFF/COUNTER-DEFENDANT SURGICAL INSTRUMENT
        SERVICE CO. INC.:
 9
                HALEY GUILIANO LLP
10              BY JOSHUA VAN HOVEN, Partner
                111 North Market Street, Suite 900
11              San Jose, California  95113
                +1 669 213 1061
12              joshua.vanhoven@hglaw.com
13
14      FOR DEFENDANT INTUITIVE SURGICAL, INC.:
                COVINGTON & BURLING LLP
15              BY ISAAC D. CHAPUT, Associate
                415 Mission Street
16              Suite 5400
                San Francisco, California  94105-2533
17              +1 415 591 7020
18              ichaput@cov.com
                COVINGTON & BURLING LLP
19              BY AUSTIN S. MARTIN, Associate
                One CityCenter
20              850 Tenth Street, NW
                Washington, D.C.  20001-4956
21              +1 202 662 5094
22              amartin@cov.com
23
24
25
```

Page 2

```
1     APPEARANCES OF COUNSEL VIA ZOOM: (Continued)
2     FOR THE PROPOSED CLASS:
3              BONI, ZACK & SNYDER LLC
               BY JOSHUA D. SNYDER, Partner
4              15 St. Asaphs Road
               Bala Cynwyd, Pennsylvania  19004
5              (610) 822-0203
               (610) 822-0206
6              jsnyder@bonizack.com
7
8     ALSO PRESENT:
9              RAMON A. PERAZA, Videographer
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1                        I N D E X

 2

 3    WITNESS              EXAMINATION                PAGE

 4     KEITH ROBERT JOHNSON

 5                      (MR. CHAPUT)                    7

 6

 7

 8                    INFORMATION REQUESTED

 9                         None

10

11

12      QUESTIONS INSTRUCTED BY COUNSEL NOT TO ANSWER

13                         None

14

15                      E X H I B I T S

16     EXHIBIT NO.  PAGE   DESCRIPTION

17    Exhibit 135    10  Defendant Intuitive Surgical,

18                       Inc.'s Notice of Deposition of

19                       Plaintiff Surgical Instrument

20                       Service Company, Inc., Pursuant to

21                       Fed. R. CIV. P. 30(b)(6)

22    Exhibit 136    57  Email chain with attachments,

23                       Bates numbers SIS095115 through

24                       SIS095139

25
```

Page 4

| | | |
|---|---|---|
| 1 | information did SIS have about Rebotix's capabilities | 09:29:34 |
| 2 | when SIS started its relationship with Rebotix? | 09:29:41 |
| 3 | MR. VAN HOVEN:  Objection to form. | 09:29:45 |
| 4 | THE WITNESS:  Can you ask that again, I | 09:29:46 |
| 5 | apologize. | 09:29:51 |
| 6 | BY MR. CHAPUT? | 09:29:52 |
| 7 | Q    Sure.  Maybe I can make it a little more | 09:29:52 |
| 8 | straightforward. | 09:29:56 |
| 9 | What did SIS know about Rebotix's | 09:29:57 |
| 10 | capabilities when it entered into the EndoWrist repair | 09:29:59 |
| 11 | business? | 09:30:05 |
| 12 | MR. VAN HOVEN:  Objection to form. | 09:30:05 |
| 13 | THE WITNESS:  So, based on our | 09:30:05 |
| 14 | longstanding relationship with Benjamin Biomedical, and | 09:30:11 |
| 15 | the quality products that they had been providing to us | 09:30:16 |
| 16 | for, like I said, over 25 years, we had every belief | 09:30:19 |
| 17 | that the products and services they were providing were | 09:30:24 |
| 18 | quality, and we went down, visited the lab, made sure | 09:30:27 |
| 19 | that we understood and saw the product that they were | 09:30:32 |
| 20 | developing and the service that they were providing, | 09:30:36 |
| 21 | felt really good about it, and were excited about it, | 09:30:39 |
| 22 | and learned everything we could about their testing | 09:30:42 |
| 23 | practices and what they were doing, and really pretty | 09:30:45 |
| 24 | much everything inside and out about that program | 09:30:49 |
| 25 | before we took it to market. | 09:30:52 |

Page 23

*** CONFIDENTIAL ATTORNEYS EYES ONLY ***

| | | |
|---|---|---|
| 1 | BY MR. CHAPUT: | 09:30:52 |
| 2 |     Q    Have you ever observed the entirety of | 09:30:56 |
| 3 | what Rebotix calls a repair of an EndoWrist? | 09:31:01 |
| 4 |     A    Yes. | 09:31:07 |
| 5 |         MR. VAN HOVEN:  Object to form. | 09:31:08 |
| 6 |         THE WITNESS:  Yes. | 09:31:08 |
| 7 | BY MR. CHAPUT: | 09:31:09 |
| 8 |     Q    When did you observe that repair? | 09:31:11 |
| 9 |     A    I don't remember the specific dates, but | 09:31:15 |
| 10 | if I remember correctly, it was in the fall of '19. | 09:31:24 |
| 11 |     Q    And would you describe for me the repair | 09:31:30 |
| 12 | process that Rebotix performed that you observed? | 09:31:42 |
| 13 |     A    We observed the complete incoming | 09:31:48 |
| 14 | inspection process; we observed the chip replacement | 09:31:55 |
| 15 | process; and we also observed the complete outgoing | 09:32:03 |
| 16 | safety and function test of those devices. | 09:32:08 |
| 17 |     Q    Starting with the complete incoming | 09:32:12 |
| 18 | inspection that you observed, what steps were involved | 09:32:24 |
| 19 | in that incoming inspection? | 09:32:27 |
| 20 |     A    Being that that device is a very simple | 09:32:33 |
| 21 | laparoscopic instrument, we observed the functionality | 09:32:39 |
| 22 | of that device, the strength of the pulleys, the | 09:32:43 |
| 23 | sharpness of the scissors, the -- the grasping strength | 09:32:48 |
| 24 | of the forceps, all of those safety and function to | 09:32:53 |
| 25 | make sure that those devices met the original intended | 09:32:57 |

Page 24

```
 1    did not take any other steps to confirm that the chip      09:44:47

 2    replacement process did not impact the EndoWrist's         09:44:51

 3    safety?                                                    09:44:53

 4         A    Not that I'm aware of.                           09:45:01

 5         Q    Did SIS ever enter into a written               09:45:06

 6    agreement with Rebotix regarding this EndoWrist            09:45:09

 7    service?                                                   09:45:12

 8         A    I believe that we did.                          09:45:21

 9         Q    And when -- when would that have happened?      09:45:22

10         A    If I remember correctly, it was October of      09:45:30

11    '19.                                                       09:45:32

12         Q    Apart from the EndoWrist business that          09:45:50

13    you've been describing, has SIS had any other business     09:45:53

14    relationship with Rebotix specifically?                    09:45:55

15         A    Not that I know of.                             09:46:01

16         Q    Can you -- can you walk me through how the      09:46:04

17    Rebotix Repair service worked from the SIS customer's      09:46:14

18    perspective, please.                                       09:46:18

19         A    Can -- can you elaborate what you mean?         09:46:19

20         Q    Sure.                                           09:46:26

21              So how did a customer go about having a --       09:46:26

22    an EndoWrist repaired through this SIS Rebotix program     09:46:30

23    that you've described?                                     09:46:36

24         A    So the nature of our business, we're a          09:46:36

25    national company, so we work in all the regions around     09:46:44
```

Page 32

| | | |
|---|---|---|
| 1 | the country, so we have team members and reps on the | 09:46:48 |
| 2 | ground, and we work with hospitals on a daily basis | 09:46:51 |
| 3 | picking up items and devices in need of service, | 09:46:54 |
| 4 | getting those to one of our labs, they are serviced and | 09:46:57 |
| 5 | then returned to the facility. | 09:47:02 |
| 6 | So this Rebotix program that we were | 09:47:03 |
| 7 | providing fell right in line with what we were doing | 09:47:05 |
| 8 | every day. | 09:47:10 |
| 9 | Q    Was the service performed at one of SIS's | 09:47:10 |
| 10 | labs? | 09:47:16 |
| 11 | MR. VAN HOVEN:  Objection to form. | 09:47:18 |
| 12 | THE WITNESS:  We were -- every discussion | 09:47:19 |
| 13 | we had was about bringing it in-house and doing it | 09:47:27 |
| 14 | ourselves.  In fact, a couple members of their team | 09:47:29 |
| 15 | came to Chicago and worked in our lab with us, and | 09:47:37 |
| 16 | our -- some of our technicians that were going to be | 09:47:41 |
| 17 | involved in this program were part of that, so we were | 09:47:44 |
| 18 | absolutely going to be doing this service in-house. | 09:47:48 |
| 19 | BY MR. CHAPUT: | 09:47:51 |
| 20 | Q    Okay.  So you said that you were "going to | 09:47:51 |
| 21 | be doing it in-house." | 09:47:53 |
| 22 | My question was:  Did SIS ever actually | 09:47:54 |
| 23 | perform the service in-house? | 09:47:57 |
| 24 | A    No. | 09:47:58 |
| 25 | Q    So for all of the EndoWrist repairs that | 09:48:00 |

Page 33

*** CONFIDENTIAL ATTORNEYS EYES ONLY ***

```
1    testing process?                                    10:06:18

2         A    I'm not involved in the engineering and   10:06:18

3    the technical side of that, so what I'm personally  10:06:26

4    providing is more of a customer feedback, customer  10:06:29

5    thoughts, customer interest in that program, and what 10:06:35

6    it would mean to health care.                       10:06:38

7         Q    Describe for me the customer feedback and 10:06:39

8    customer thoughts, customer interests in that program, 10:06:47

9    please.                                             10:06:50

10        A    How much time do we have?                 10:06:50

11        Q    Describe it at a high level to start with, 10:06:54

12   and we can --                                       10:06:58

13        A    Since this program started, the interest  10:07:01

14   from the hospital is monumental, through the roof.  10:07:03

15   The -- the interest in saving and reducing costs on 10:07:11

16   robotic surgery in the industry is something I've never 10:07:15

17   seen before in my 25 years of being in the surgical 10:07:17

18   business.                                           10:07:22

19        Q    What hospitals have you spoken with about 10:07:23

20   the Xi program?                                     10:07:27

21        A    Would you like me to list them?           10:07:29

22        Q    Yes, please.                              10:07:35

23        A    This will be from the top of my head, so  10:07:36

24   I'll do the best I can, but well over -- the meetings 10:07:40

25   that we've had represent well over a thousand       10:07:46
```

Page 44

```
1    hospitals, probably.                        10:07:48

2            Facility level, I'll just start to kind of   10:07:53

3    name them off regionally.  Legacy Health system in   10:07:56

4    Portland, Oregon; Providence health system in the West   10:08:00

5    Coast; Sutter Health; Kaiser Permanente; memorial care;   10:08:04

6    the UC system in California; Banner Health System;   10:08:16

7    Honor Health; Baylor Scott & White in Texas; the   10:08:21

8    university health systems across the country, from   10:08:31

9    Michigan to Duke to North Carolina; Mayo Clinic;   10:08:35

10   Cleveland Clinic; Advocate Aurora; Lahey Health System;   10:08:50

11   Boston Children's Medical Center.             10:08:55

12           I can't believe I'm remembering all this   10:08:57

13   off the top of my head.                       10:09:00

14           Piedmont health system, Grady in Atlanta,   10:09:02

15   Johns Hopkins.                               10:09:13

16           That's the bulk of the direct hospitals   10:09:14

17   that I can recall having direct conversations with;   10:09:25

18   there's obviously much more than that.        10:09:27

19           And then, in addition to that, all the   10:09:29

20   Vizient conversations we've had, I've presented to all   10:09:33

21   four regions of Vizient, which basically covers well   10:09:41

22   over 2,000 hospitals in the United States.    10:09:45

23       Q    Have you spoken with any of those   10:09:48

24   hospitals about the need for an EndoWrist repair   10:10:09

25   program to have FDA clearance?                10:10:11
```

Veritext Legal Solutions
866 299-5127

```
 1           A     I don't know if I understand what you're      10:10:20

 2     asking me.                                                10:10:21

 3           Q     Have any of those hospitals told you that     10:10:22

 4     they would be willing to purchase EndoWrist repair        10:10:29

 5     services that were not cleared by the FT -- FDA?          10:10:33

 6                 MR. VAN HOVEN:  Objection to form.            10:10:40

 7                 MR. SNYDER:  Objection to form.               10:10:42

 8                 THE WITNESS:  So I've been in the repair      10:10:42

 9     business for well over 20 years, repairs don't require    10:10:44

10     FDA clearance, and to my recollection, nobody in any of   10:10:49

11     my conversations every brought up FDA clearance on the    10:10:58

12     repair.                                                   10:11:01

13     BY MR. CHAPUT:                                            10:11:02

14           Q     Does the Xi -- maybe let's -- let's step      10:11:02

15     back.                                                     10:11:05

16                 Does the Xi repair business that SIS is       10:11:06

17     exploring with Restore involve extending the number of    10:11:12

18     lives that an EndoWrist can be used for?                  10:11:18

19           A     We are currently working on developing a      10:11:20

20     program to extend the life of Xi instruments.             10:11:31

21           Q     And is that the program that you have         10:11:34

22     spoken with hospitals about?                              10:11:36

23           A     The initial conversations we had with         10:11:47

24     hospitals was around the repair program of Si.            10:11:49

25                 We then went to our recovery program,         10:11:57
```

Page 46

| | | |
|---|---|---|
| 1 | BY MR. CHAPUT: | 11:47:09 |
| 2 | Q    And this is an email from you to a couple | 11:47:09 |
| 3 | folks at Vizient; is that right? | 11:47:13 |
| 4 | A    Yes. | 11:47:16 |
| 5 | Q    And what is Vizient? | 11:47:21 |
| 6 | A    The largest GPO in the United States. | 11:47:26 |
| 7 | Q    SIS has a relationship with Vizient; is | 11:47:28 |
| 8 | that right? | 11:47:33 |
| 9 | A    Correct. | 11:47:33 |
| 10 | Q    How does that -- how does the Vizient | 11:47:33 |
| 11 | relationship work for SIS? | 11:47:42 |
| 12 | A    What -- what do you mean? | 11:47:46 |
| 13 | Q    So what I'm trying to get at is how does | 11:47:47 |
| 14 | SIS end up performing services for specific customers | 11:47:55 |
| 15 | in the -- who -- who rely on Vizient for -- as a GPO? | 11:48:02 |
| 16 | A    So Vizient -- Vizient contracts with | 11:48:07 |
| 17 | vendors from all aspects in a hospital, from toilet | 11:48:12 |
| 18 | paper to X-ray machines and security, they vet their | 11:48:16 |
| 19 | vendors, they go through a huge vetting process. | 11:48:23 |
| 20 | We are one of three vendors on Vizient | 11:48:25 |
| 21 | national contract in the instrument repair space, and | 11:48:29 |
| 22 | what they basically do is work with hospitals to find | 11:48:35 |
| 23 | ways to streamline services, reduce costs, and a lot of | 11:48:38 |
| 24 | other things, but that's really their main goal. | 11:48:45 |
| 25 | Q    Okay.  So a Vizient member can choose to | 11:48:49 |

Page 87

```
 1    enter into a contract with SIS for repair services or    11:48:51

 2    it could choose another one of the Vizient service       11:48:55

 3    providers; is that right?                                11:48:59

 4              MR. VAN HOVEN:  Objection to form.             11:49:00

 5              THE WITNESS:  As far as I understand,           11:49:00

 6    correct.                                                 11:49:05

 7    BY MR. CHAPUT:                                           11:49:06

 8         Q    What was the -- what was the reason for        11:49:10

 9    your June 2020 email to Vizient that we're seeing in     11:49:13

10    Exhibit 137?                                             11:49:19

11         A    I was given the opportunity present to the     11:49:20

12    national committee -- if I remember correctly, this was  11:50:00

13    a presentation to the national Vizient consultants that  11:50:05

14    bring cost savings opportunities to their members.       11:50:13

15         Q    Got it.                                        11:50:19

16              If you would turn, please, to the first        11:50:20

17    attachment to the email, which is the -- a one-page      11:50:21

18    document ending 140, and this has the title "Beyond      11:50:25

19    Repair Double Check."                                    11:50:25

20              Do you recognize this document?                11:50:34

21         A    Yes.                                           11:50:39

22         Q    Does the beyond repair double check            11:50:39

23    program have anything to do with either da Vinci         11:50:41

24    surgical systems or EndoWrists?                          11:50:44

25         A    No.                                            11:50:50
```

Page 88

```
 1                 for identification and is attached        12:24:02

 2                 hereto.)                                  12:24:02

 3       BY MR. CHAPUT:                                      12:24:02

 4            Q     And this is an email chain between you and   12:24:06

 5       John Ayers and others at MarinHealth; is that right?   12:24:09

 6            A     Yes.                                      12:24:13

 7            Q     Who is John Ayers?                        12:24:13

 8            A     John Ayers is the OR business manager at    12:24:16

 9       MarinHealth.                                        12:24:24

10            Q     Did SIS market its ability to perform    12:24:28

11       endo -- repairs on EndoWrist instruments to        12:24:31

12       MarinHealth?                                        12:24:35

13            A     Yes.                                      12:24:36

14            Q     Did MarinHealth and Mr. Ayers ultimately    12:24:37

15       agree to use SIS to perform repairs on EndoWrist    12:24:44

16       instruments?                                        12:24:48

17            A     Yes, we did a lot of EndoWrists for      12:24:49

18       MarinHealth.                                        12:24:53

19            Q     Over what period?                         12:24:53

20            A     I don't remember specifically, but I would   12:24:55

21       say 90 days-ish.                                    12:25:02

22            Q     And how many instruments did you service   12:25:05

23       for MarinHealth?                                    12:25:07

24            A     I would guess in the range of 50 to 60.    12:25:08

25            Q     Did you have a signed agreement with Marin   12:25:15
```

Page 109

*** CONFIDENTIAL ATTORNEYS EYES ONLY ***

```
1    for that business?                              12:25:21

2         A     Not initially, no, it was kind of a trial,   12:25:21

3    we were doing a trial to make sure they liked it.   12:25:25

4         Q     And you said "not initially."         12:25:28

5               Was there an agreement for that business   12:25:30

6    that you entered into with MarinHealth later?   12:25:32

7         A     There would have absolutely been an   12:25:35

8    agreement in place until Intuitive shut us down.   12:25:37

9         Q     If you would turn to the page ending 545,   12:25:40

10   there's an email in the middle of this page from you to   12:26:05

11   Mr. Ayers dated November 19, 2019.             12:26:07

12        A     Okay.                                 12:26:16

13        Q     And in the middle of that email, you say   12:26:16

14   (as read):                                      12:26:16

15               We are working with a large -- a    12:26:20

16               number of the largest health care   12:26:22

17               organizations in the U.S.           12:26:23

18               And then you list Banner Health, Kaiser   12:26:24

19   Permanente, Legacy Health, Advocate Aurora Health, and   12:26:28

20   Piedmont Healthcare.                            12:26:32

21               As of November 2019, was SIS providing   12:26:33

22   services to any of those organizations relating to   12:26:37

23   EndoWrist instruments?                          12:26:43

24        A     All of them.                         12:26:50

25        Q     And, in response, on Monday, November 25,   12:26:51
```

Page 110

```
 1    2019, Mr. Ayers wrote to you -- oh, I apologize, I was    12:27:06

 2    looking at the wrong email.                               12:27:16

 3            If you would turn to page ending 544, I'm         12:27:18

 4    looking at the email from Mr. Ayers on November 25,       12:27:22

 5    2019, at 1:43 p.m. where he asks (as read):               12:27:26

 6                Keith, how do the other hospitals             12:27:30

 7            get past the Intuitive contract language          12:27:32

 8            regarding proprietary instruments?                12:27:34

 9            Do you see that question?                         12:27:37

10    A     What page was that again?                           12:27:38

11    Q     544.                                                12:27:47

12    A     Okay, yes, I see it.                                12:27:50

13    Q     And you responded in an email that same            12:27:53

14    day at 1:07 p.m. (as read):                               12:27:57

15                Our service is, quote, repairing,             12:28:01

16            unquote, an Intuitive instrument.  We are         12:28:04

17            not changing the instrument in any way            12:28:06

18            from its intended use or designed                 12:28:09

19            functionality.                                    12:28:11

20            Do you see that statement?  This is on            12:28:13

21    543.                                                      12:28:19

22    A     Okay.  I was going the wrong direction.            12:28:20

23            Yes, I see it.                                     12:28:23

24    Q     Okay.  And what was the basis for your             12:28:24

25    statement that SIS was not changing the instrument in     12:28:27
```

Page 111

*** CONFIDENTIAL ATTORNEYS EYES ONLY ***

```
 1        Q     Did SIS ever facilitate any EndoWrist        12:34:41

 2   repair services for Vizient members?                    12:34:45

 3        A     Absolutely.                                  12:34:47

 4        Q     Which -- which Vizient members were those?   12:34:47

 5        A     Legacy, Legacy Health, Kaiser Permanente,    12:34:52

 6   Piedmont, most of the our other big clients are         12:35:06

 7   Premiere, they're not Vizient, so -- if you want -- if  12:35:20

 8   you're asking me actual repairs done, I think those are 12:35:24

 9   the three big ones.                                      12:35:28

10        MR. CHAPUT:  Okay.  So, Mr. Johnson, I             12:35:39

11   don't have any more questions at this point on the      12:35:41

12   30(b)(6) notice.  We are going continue with your       12:35:42

13   deposition in your personal capacity, but we can go     12:35:45

14   ahead and take a break before we do that.               12:35:48

15        MR. SNYDER:  Isaac, Josh Snyder, I do have         12:35:55

16   a few questions, very few, but I'm happy to save them   12:35:58

17   all till the end in the interest of efficiency.  You    12:36:01

18   may cover them in the next part anyway.                 12:36:06

19        MR. CHAPUT:  Sure, that's fine, Josh.              12:36:08

20        MR. SNYDER:  Thank you.                            12:36:11

21        VIDEOGRAPHER PERAZA:  This is the end of           12:36:12

22   today's deposition of SIS by Mr. Keith Johnson.  We are 12:36:14

23   off the record at 12:36 p.m.                            12:36:17

24        The total number of media used was four,           12:36:21

25   and will be retained by Veritext.                       12:36:25
```

Page 116

**EXHIBIT 4**

**to**

**PAUL D. BRACHMAN DECLARATION IN SUPPORT
OF DEFENDANT'S MOTION IN LIMINE NO. 1
TO EXCLUDE OUT-OF-COURT HOSPITAL
STATEMENTS**

*** CONFIDENTIAL ATTORNEYS EYES ONLY ***

```
 1              UNITED STATES DISTRICT COURT
 2          FOR THE NORTHERN DISTRICT OF CALIFORNIA
 3                 SAN FRANCISCO DIVISION
 4
     SURGICAL INSTRUMENT SERVICE    )
 5   COMPANY, INC.,                 ) Case No.:
                                    ) 3:21-cv-03496-VC
 6              Plaintiff,          )
                                    ) Lead Case No.:
 7        vs.                       ) 3:21-cv-03825-VC
                                    )
 8   INTUITIVE SURGICAL, INC.,      )
                                    )
 9              Defendant           )
     _____ )
10   IN RE: DA VINCI SURGICAL ROBOT )
     ANTITRUST LITIGATION            )
11   _____ )
     THIS DOCUMENT RELATES TO:      )
12   ALL ACTIONS                    )
     _____)
13
14
15        *** CONFIDENTIAL ATTORNEYS EYES ONLY ***
16              30(b)(6) DEPOSITION OF:
17              KEITH ROBERT JOHNSON
18             THURSDAY, OCTOBER 27, 2022
19          9:06 a.m. Mountain Standard Time
20
21   REPORTED BY:
22   Vickie Blair
23   CSR No. 8940, RPR-CRR
24   JOB NO. 5539883
25   PAGES 1 - 122
```

                                          Page 1

1  Deposition of KEITH ROBERT JOHNSON, the witness, taken
2  on behalf of the Defendant, on Thursday,
3  October 27, 2022, 9:06 a.m. Mountain Standard Time,
4  before VICKIE BLAIR, CSR No. 8940, RPR-CRR.
5
6  APPEARANCES OF COUNSEL VIA ZOOM:
7
8  FOR PLAINTIFF/COUNTER-DEFENDANT SURGICAL INSTRUMENT
   SERVICE CO. INC.:
9
       HALEY GUILIANO LLP
10     BY JOSHUA VAN HOVEN, Partner
       111 North Market Street, Suite 900
11     San Jose, California  95113
       +1 669 213 1061
12     joshua.vanhoven@hglaw.com
13
14  FOR DEFENDANT INTUITIVE SURGICAL, INC.:
       COVINGTON & BURLING LLP
15     BY ISAAC D. CHAPUT, Associate
       415 Mission Street
16     Suite 5400
       San Francisco, California  94105-2533
17     +1 415 591 7020
18     ichaput@cov.com
       COVINGTON & BURLING LLP
19     BY AUSTIN S. MARTIN, Associate
       One CityCenter
20     850 Tenth Street, NW
       Washington, D.C.  20001-4956
21     +1 202 662 5094
22     amartin@cov.com
23
24
25
                                              Page 2

1  APPEARANCES OF COUNSEL VIA ZOOM: (Continued)
2  FOR THE PROPOSED CLASS:
3       BONI, ZACK & SNYDER LLC
        BY JOSHUA D. SNYDER, Partner
4       15 St. Asaphs Road
        Bala Cynwyd, Pennsylvania  19004
5       (610) 822-0203
        (610) 822-0206
6       jsnyder@bonizack.com
7
8  ALSO PRESENT:
9       RAMON A. PERAZA, Videographer
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                              Page 3

1                    I N D E X
2
3  WITNESS       EXAMINATION          PAGE
4  KEITH ROBERT JOHNSON
5       (MR. CHAPUT)            7
6
7
8       INFORMATION REQUESTED
9          None
10
11
12  QUESTIONS INSTRUCTED BY COUNSEL NOT TO ANSWER
13          None
14
15       E X H I B I T S
16  EXHIBIT NO.  PAGE  DESCRIPTION
17  Exhibit 135   10  Defendant Intuitive Surgical,
18                   Inc.'s Notice of Deposition of
19                   Plaintiff Surgical Instrument
20                   Service Company, Inc., Pursuant to
21                   Fed. R. CIV. P. 30(b)(6)
22  Exhibit 136   57  Email chain with attachments,
23                   Bates numbers SIS095115 through
24                   SIS095139
25
                                              Page 4

1       E X H I B I T S (Continued)
2  EXHIBIT NO.  PAGE   DESCRIPTION
3  Exhibit 137    86  Email with attachments, Bates
4                    numbers SIS097139 through
5                    SIS097187
6  Exhibit 138   100  Si EndoWrist Inspection and
7                    Recovery Program, Bates number
8                    SIS003937
9  Exhibit 139   106  Email, Bates number SIS096568
10  Exhibit 140   108  Email chain, Bates numbers
11                   SIS000542 through SIS000547
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                              Page 5

2 (Pages 2 - 5)

*** CONFIDENTIAL ATTORNEYS EYES ONLY ***

1 the Rebotix EndoWrist repair business?                    09:55:02
2    A    We had, I'm sure, some box -- some costs    09:55:06
3 for boxes for shipping materials and things like that.    09:55:25
4    Q    Anything else apart from boxes and    09:55:28
5 shipping materials?                    09:55:32
6    A    Not that I recall.                    09:55:39
7    Q    So you mentioned a few times SIS's    09:55:40
8 long-standing business relationship with Benjamin    09:55:44
9 Biomedical, so I'd like to turn next and talk a little    09:55:48
10 bit about that company.                    09:55:51
11        What -- what is the nature of SIS's    09:55:57
12 relationship with Benjamin Biomedical?            09:56:03
13    A    We purchase a number of different items    09:56:07
14 from them; they manufacture them for us.            09:56:11
15    Q    Does SIS ever outsource services to    09:56:13
16 Benjamin Biomedical?                    09:56:24
17    A    Yes.                        09:56:31
18    Q    What types of services does SIS outsource    09:56:31
19 to Benjamin Biomedical?                    09:56:34
20    A    The repair of Phaco handpieces and    09:56:35
21 harmonic scalpels.                    09:56:41
22    Q    What are Phaco handpieces?            09:56:43
23    A    It is a medical device used in cataract    09:56:45
24 surgery.                        09:56:57
25    Q    Does Benjamin Biomedical manufacture --    09:56:57

Page 38

1 excuse me, does Benjamin Biomedical manufacture Phaco    09:57:03
2 handpieces and harmonic scalpels or are those    09:57:09
3 manufactured by other companies?                09:57:12
4        MR. VAN HOVEN: Objection to form.        09:57:16
5        THE WITNESS: They are manufactured by    09:57:16
6 other companies.                        09:57:18
7 BY MR. CHAPUT:                        09:57:19
8    Q    Apart from repair of Phaco handpieces and    09:57:19
9 harmonic scalpels, does SIS outsource any other    09:57:25
10 services to Benjamin Biomedical?            09:57:31
11    A    Not that I'm aware of.                09:57:32
12    Q    Does SIS have any relationship with    09:57:35
13 Benjamin Biomedical apart from purchasing devices    09:57:44
14 manufactured by Benjamin Biomedical and outsourcing the    09:57:47
15 services we just discussed to Benjamin Biomedical?    09:57:50
16        MR. VAN HOVEN: Objection to form.        09:57:56
17        THE WITNESS: I'm sure there's some other    09:58:05
18 things they do for us, for SIS, on the repair side, I    09:58:07
19 just am not familiar with what they would be.        09:58:11
20 BY MR. CHAPUT:                        09:58:13
21    Q    Who would be familiar?                09:58:13
22    A    Greg Posdal.                    09:58:15
23    Q    Does any aspect of Benjamin Biomedical's    09:58:18
24 business relate to robotic surgeries?            09:58:29
25        MR. VAN HOVEN: Object to form.        09:58:33

Page 39

1        THE WITNESS: Not that I'm aware of.        09:58:37
2 BY MR. CHAPUT:                        09:58:38
3    Q    Does any aspect of SIS's relationship with    09:58:38
4 Benjamin Biomedical relate to robotic surgeries?    09:58:41
5    A    Not that I'm aware of.                09:58:51
6    Q    I'd like to focus next on Restore    09:58:53
7 Robotics, LLC.                        09:59:04
8        Does SIS currently have a business    09:59:05
9 relationship with Restore?                09:59:07
10    A    Yes.                        09:59:11
11    Q    And what's the nature of that    09:59:11
12 relationship?                        09:59:16
13    A    Our robotic program.                09:59:23
14    Q    What is your robotic program?            09:59:25
15        MR. VAN HOVEN: Objection to form.        09:59:31
16        THE WITNESS: We currently are providing a    09:59:31
17 recovery program through Restore Robotics.        09:59:41
18 BY MR. CHAPUT:                        09:59:45
19    Q    What is SIS's recovery program?            09:59:45
20    A    We're helping hospitals find dollars that    09:59:48
21 are being thrown away on robotic devices.        09:59:57
22    Q    How do you do that?                10:00:01
23    A    We work with the hospitals to stop    10:00:04
24 throwing away and disposing of EndoWrists.  We collect    10:00:13
25 those EndoWrists for them, we test them, and help them    10:00:18

Page 40

1 understand that they've thrown away perfectly    10:00:23
2 functioning EndoWrists, and we return those EndoWrists    10:00:27
3 back to the hospital so that they can collect and    10:00:30
4 ultili- -- and get that money that they've paid for    10:00:34
5 those devices that was not captured.            10:00:36
6    Q    Does any aspect of the recovery program    10:00:38
7 involve circumventing the usage counter on the    10:00:47
8 EndoWrist?                        10:00:51
9    A    No.                        10:00:52
10    Q    Does SIS have the ability to check the    10:00:52
11 remaining lives on an EndoWrist without attaching it to    10:00:58
12 a da Vinci surgical system?                10:01:02
13    A    Yes.                        10:01:05
14    Q    How does SIS do that?                10:01:09
15    A    In a partnership with Restore Robotics,    10:01:11
16 we've created a counter that allows us to test and    10:01:18
17 check those arms for remaining lives.            10:01:29
18    Q    You've mentioned that SIS is providing    10:01:29
19 this recovery program through Restore Robotics.        10:01:32
20        What did you mean by that?            10:01:35
21    A    Currently Restore Robotics is providing    10:01:36
22 the technical aspect of that service.            10:01:43
23    Q    What is the technical aspect of that    10:01:48
24 service?  Is that checking the lives or -- or is there    10:01:51
25 more involved in that?                    10:01:54

Page 41

11 (Pages 38 - 41)

**Page 42**

1    A    They are doing the three steps, they are    10:01:58
2  checking the EndoWrists for remaining lives, they were    10:02:01
3  function testing, and safety testing those devices.    10:02:04
4    Q    Prior to entering into this recovery    10:02:08
5  program relationship with Restore, did SIS have any    10:02:18
6  previous relationship with Restore?    10:02:26
7    A    Yes.    10:02:35
8    Q    What was the previous relationship with    10:02:37
9  Restore?    10:02:40
10    A    We were involved with Restore in    10:02:40
11  developing their repair program.    10:02:46
12    Q    What is Restore's repair program?    10:02:51
13    A    Restore has the capability to extend the    10:03:05
14  lives of EndoWrists on Si EndoWrists.    10:03:07
15    Q    Does SIS play any role in offering that    10:03:15
16  repair program to customers?    10:03:20
17    A    Based on the practices, like we spoke    10:03:22
18  about before, of Intuitive Surgical, we are no longer    10:03:34
19  providing or offering the Si repair program in the    10:03:39
20  United States.    10:03:42
21    Q    Was SIS previously offering an EndoWrist    10:03:42
22  repair program in partnership with Restore?    10:03:50
23    A    Our relationship with Restore started    10:03:57
24  after we had already stopped doing the repair program    10:04:03
25  in the U.S.    10:04:05

**Page 43**

1    Q    Does SIS have plans to work with Restore    10:04:06
2  on a repair program in the future?    10:04:13
3    A    Yes.    10:04:15
4    Q    Under what circumstances does SIS plan to    10:04:17
5  work with Restore program -- excuse me.    10:04:25
6         Under what circumstances does SIS plan to    10:04:27
7  work with Restore on a repair program in the future?    10:04:30
8    A    We are working with Restore to develop a    10:04:34
9  repair program for the Xi instruments.    10:04:41
10    Q    Does SIS plan to work with Restore on a    10:04:45
11  repair program for Si instruments at any point in time?    10:04:50
12    A    Based on the current status of Si robots    10:05:04
13  in the United States, we don't see a huge value in    10:05:06
14  continuing that endeavor.    10:05:08
15    Q    And, when you say "the current status,"    10:05:10
16  are you referring to the number of Si robots that are    10:05:18
17  currently in service?    10:05:21
18    A    Correct.    10:05:24
19    Q    What role does SIS play in developing a    10:05:24
20  repair program for Xi instruments with Restore?    10:05:38
21    A    We are providing financial support in the    10:05:51
22  R&D, we are also providing help in the testing process,    10:05:53
23  bringing customer opinions and expertise to help in    10:06:07
24  that process.    10:06:13
25    Q    What sort of help is SIS providing in the    10:06:14

**Page 44**

1  testing process?    10:06:18
2    A    I'm not involved in the engineering and    10:06:18
3  the technical side of that, so what I'm personally    10:06:26
4  providing is more of a customer feedback, customer    10:06:29
5  thoughts, customer interest in that program, and what    10:06:35
6  it would mean to health care.    10:06:38
7    Q    Describe for me the customer feedback and    10:06:39
8  customer thoughts, customer interests in that program,    10:06:47
9  please.    10:06:50
10    A    How much time do we have?    10:06:50
11    Q    Describe it at a high level to start with,    10:06:54
12  and we can --    10:06:58
13    A    Since this program started, the interest    10:07:01
14  from the hospital is monumental, through all of it.    10:07:07
15  The -- the interest in saving and reducing costs on    10:07:11
16  robotic surgery in the industry is something I've never    10:07:15
17  seen before in my 25 years of being in the surgical    10:07:17
18  business.    10:07:22
19    Q    What hospitals have you spoken with about    10:07:23
20  the Xi program?    10:07:27
21    A    Would you like me to list them?    10:07:29
22    Q    Yes, please.    10:07:35
23    A    This will be from the top of my head, so    10:07:36
24  I'll do the best I can, but well over -- the meetings    10:07:40
25  that we've had represent well over a thousand    10:07:46

**Page 45**

1  hospitals, probably.    10:07:48
2         Facility level, I'll just start to kind of    10:07:53
3  name them off regionally. Legacy Health system in    10:07:56
4  Portland, Oregon; Providence health system in the West    10:08:00
5  Coast; Sutter Health; Kaiser Permanente; memorial care;    10:08:04
6  the UC system in California; Banner Health System;    10:08:16
7  Honor Health; Baylor Scott & White in Texas; the    10:08:21
8  university health systems across the country, from    10:08:31
9  Michigan to Duke to North Carolina; Mayo Clinic;    10:08:35
10  Cleveland Clinic; Advocate Aurora; Lahey Health System;    10:08:50
11  Boston Children's Medical Center.    10:08:55
12         I can't believe I'm remembering all this    10:08:57
13  off the top of my head.    10:09:00
14         Piedmont health system, Grady in Atlanta,    10:09:02
15  Johns Hopkins.    10:09:13
16         That's the bulk of the direct hospitals    10:09:14
17  that I can recall having direct conversations with;    10:09:25
18  there's obviously much more than that.    10:09:27
19         And then, in addition to that, all the    10:09:29
20  Vizient conversations we've had, I've presented to all    10:09:33
21  four regions of Vizient, which basically covers well    10:09:41
22  over 2,000 hospitals in the United States.    10:09:45
23    Q    Have you spoken with any of those    10:09:48
24  hospitals about the need for an EndoWrist repair    10:10:09
25  program to have FDA clearance?    10:10:11

12 (Pages 42 - 45)

| | |
|---|---|
| 1    A    I don't know if I understand what you're    10:10:20 | 1    specific date.  I will say that we feel good about it,    10:13:51 |
| 2    asking me.    10:10:21 | 2    and we feel we are close.    10:13:54 |
| 3    Q    Have any of those hospitals told you that    10:10:22 | 3    BY MR. CHAPUT:    10:13:55 |
| 4    they would be willing to purchase EndoWrist repair    10:10:29 | 4    Q    And what does "close" mean from your    10:13:57 |
| 5    services that were not cleared by the FT -- FDA?    10:10:33 | 5    perspective?    10:13:57 |
| 6    MR. VAN HOVEN:  Objection to form.    10:10:40 | 6    A    Based of doing it for the Si, based off    10:14:04 |
| 7    MR. SNYDER:  Objection to form.    10:10:42 | 7    what that time took and what it took to do it, we feel    10:14:11 |
| 8    THE WITNESS:  So I've been in the repair    10:10:42 | 8    that we're close on developing that technology.    10:14:16 |
| 9    business for well over 20 years, repairs don't require    10:10:44 | 9    Q    Right, but what -- my question is what    10:14:19 |
| 10    FDA clearance, and to my recollection, nobody in any of    10:10:49 | 10    does "close" mean to you?  Does that mean within the    10:14:25 |
| 11    my conversations every brought up FDA clearance on the    10:10:58 | 11    next few months?  Does that mean within the next few    10:14:31 |
| 12    repair.    10:11:01 | 12    years?    10:14:33 |
| 13    BY MR. CHAPUT:    10:11:02 | 13    A    I don't know that I -- I don't know that I    10:14:34 |
| 14    Q    Does the Xi -- maybe let's -- let's step    10:11:02 | 14    can answer that question, but I'll tell you that I    10:14:37 |
| 15    back.    10:11:05 | 15    think it's years.    10:14:38 |
| 16    Does the Xi repair business that SIS is    10:11:06 | 16    Q    You mentioned that this is based off doing    10:14:39 |
| 17    exploring with Restore involve extending the number of    10:11:12 | 17    it for the Si.    10:14:47 |
| 18    lives that an EndoWrist can be used for?    10:11:18 | 18    Was SIS involved in developing a    10:14:48 |
| 19    A    We are currently working on developing a    10:11:20 | 19    EndoWrist life extension program for Si instruments?    10:14:54 |
| 20    program to extend the life of Xi instruments.    10:11:31 | 20    A    No.    10:15:05 |
| 21    Q    And is that the program that you have    10:11:34 | 21    Q    Apart from the Xi initiative you've    10:15:06 |
| 22    spoken with hospitals about?    10:11:36 | 22    described and the recovery business, does SIS have any    10:15:18 |
| 23    A    The initial conversations we had with    10:11:47 | 23    other services or programs that it offers with Restore?    10:15:23 |
| 24    hospitals was around the repair program of Si.    10:11:49 | 24    A    Outside of the EndoWrist programs, no.    10:15:31 |
| 25    We then went to our recovery program,    10:11:57 | 25    Q    And those two EndoWrist programs that I    10:15:34 |
| Page 46 | Page 48 |

| | |
|---|---|
| 1    which does not extend the life of the device, and we    10:12:00 | 1    just mentioned, those are the only EndoWrist programs    10:15:41 |
| 2    have not talked about the Xi repair program because we    10:12:03 | 2    that SIS has with Restore?    10:15:44 |
| 3    do not have those capabilities as of today.    10:12:08 | 3    A    And you're referring to the Si repair    10:15:46 |
| 4    Q    So when you're describing the    10:12:10 | 4    program and the Xi recovery program?    10:15:49 |
| 5    conversations that you've had with that -- that long    10:12:12 | 5    Q    So I thought that you had told me that    10:15:57 |
| 6    list of hospitals, were those conversations specific to    10:12:15 | 6    Si -- that SIS didn't have any involvement in Restore's    10:15:59 |
| 7    the Si repair program or the recovery program?    10:12:20 | 7    Si repair program, that it was only involved in the    10:16:02 |
| 8    A    A little of both.  Over the last 18 months    10:12:26 | 8    recovery program and the Xi program, so those are --    10:16:05 |
| 9    or so, all the conversations are around recovery and,    10:12:31 | 9    A    You're correct.    10:16:12 |
| 10    like we had said, before there's not a lot of Si robots    10:12:38 | 10    Q    Okay.  And so apart from the recovery    10:16:12 |
| 11    in the U.S., as you know, so that conversation is    10:12:42 | 11    program and the Xi program, is there anything else that    10:16:16 |
| 12    pretty much expired.    10:12:45 | 12    SIS is working on Restore with for EndoWrist    10:16:19 |
| 13    MR. VAN HOVEN:  Counsel, we're at about a    10:13:00 | 13    instruments?    10:16:24 |
| 14    little over an hour, maybe a break in the -- now or the    10:13:03 | 14    A    Not that I know of.    10:16:25 |
| 15    next few minutes.    10:13:08 | 15    Q    Does SIS have any written agreements with    10:16:32 |
| 16    MR. CHAPUT:  Yeah, a few minutes we should    10:13:09 | 16    Restore?    10:16:36 |
| 17    be able to take one.    10:13:13 | 17    A    We have an Si agreement with Restore, and    10:16:43 |
| 18    BY MR. CHAPUT:    10:13:14 | 18    we do not currently have a signed agreement for Xi with    10:16:49 |
| 19    Q    So, Mr. Johnson, with respect to SIS's    10:13:19 | 19    Restore.    10:16:54 |
| 20    efforts with Restore to develop this Xi extended life    10:13:28 | 20    Q    Is the Si agreement for the recovery    10:16:54 |
| 21    program, what is the timeline on that effort?  When    10:13:32 | 21    program or something else?    10:17:00 |
| 22    does SIS expect for that to be available to provide to    10:13:37 | 22    A    Let me step back for a second.    10:17:01 |
| 23    customers?    10:13:41 | 23    To my recollection, we have an -- we have    10:17:13 |
| 24    MR. VAN HOVEN:  Objection to form.    10:13:43 | 24    an Si agreement -- this has been so long ago that this    10:17:18 |
| 25    THE WITNESS:  I don't know that I have a    10:13:49 | 25    stuff was signed -- with Rebotix, and I do believe, to    10:17:23 |
| Page 47 | Page 49 |

13 (Pages 46 - 49)

1  my best recollection, we have an Si repair agreement    10:17:26
2  with Restore, even though we haven't necessarily done    10:17:31
3  any business with that program because of what we said    10:17:37
4  before.    10:17:47
5       MR. CHAPUT:  We can go ahead and take a    10:17:47
6  short break now.  We can go off the record.    10:17:48
7       VIDEOGRAPHER PERAZA:  We are off the    10:17:52
8  record at 10:17 a.m.    10:17:53
9       (Recess taken.)    10:17:54
10      VIDEOGRAPHER PERAZA:  We are back on the    10:27:18
11 record at 10:27.    10:27:23
12 BY MR. CHAPUT:    10:27:26
13      Q    Mr. Johnson, focusing specifically on the    10:27:29
14 EndoWrist recovery business, does SIS think that    10:27:33
15 Intuitive has done anything to in any way hinder the    10:27:39
16 EndoWrist recovery business?    10:27:44
17      A    My opinion is that Intuitive may not have    10:27:47
18 specifically threatened the recovery business, but    10:27:59
19 based on previous practices around the repair program,    10:28:04
20 there definitely is some fear and hesitation from    10:28:11
21 hospitals that Intuitive would retaliate and do some    10:28:14
22 things, so, because of that, it sometimes makes those    10:28:18
23 conversations difficult because of things that have    10:28:22
24 happened previously.    10:28:27
25      Q    Has any hospital declined to use SIS's    10:28:28

Page 50

1  EndoWrist recovery business based on those fears or    10:28:36
2  hesitations?    10:28:42
3       A    Yes.    10:28:42
4       Q    Which hospitals?    10:28:42
5       A    All of them.    10:28:43
6       Q    So --    10:28:47
7       A    In -- in all honesty -- I take that back.    10:28:48
8       We -- we have -- we probably have 30,    10:28:50
9  30-ish hospitals right now fully engaged in the    10:29:02
10 recovery program, but to answer your question    10:29:06
11 specifically, over 95 percent of the conversations    10:29:09
12 we've had, the reason they are not currently in that    10:29:11
13 program is because of the fear of retaliation from    10:29:15
14 in- -- from Intuitive.    10:29:21
15      Q    Has any customer expressed that opinion in    10:29:22
16 an email or in writing in any way or are those only    10:29:35
17 oral communications?    10:29:38
18      A    Both.  I'm trying to remember some    10:29:50
19 specific emails, but I -- there have been emails with    10:29:53
20 customers saying that, because of contract restrictions    10:29:58
21 or because of the fear of -- of Intuitive retaliating,    10:30:02
22 they are -- they're not able to do the program.    10:30:10
23      Q    How many customers did SIS have who    10:30:13
24 actually participated in the EndoWrist repair program    10:30:20
25 back in 2019?    10:30:25

Page 51

1       A    Do you mean hospitals that we actually    10:30:30
2  generated revenue from by repairing instruments, is    10:30:35
3  that what you're asking?    10:30:39
4       Q    Maybe I can -- I can make it a little more    10:30:40
5  precise.    10:30:44
6       For how many customers did SIS facilitate    10:30:44
7  EndoWrist repairs in 2019?    10:30:47
8       A    From my recollection, I would say    10:31:12
9  somewhere between 25 and 50.    10:31:19
10      Q    So the -- the number of customers who    10:31:30
11 actually participated in that program is far less than    10:31:32
12 the number of customers who -- who you are saying are    10:31:34
13 afraid of retaliation from Intuitive around the    10:31:37
14 recovery program; isn't that right?    10:31:40
15      MR. VAN HOVEN:  Objection to form.    10:31:42
16      THE WITNESS:  Can you phrase that again    10:31:53
17 one time, I'm sorry?    10:31:54
18 BY MR. CHAPUT:    10:31:55
19      Q    Sure.    10:31:56
20      I'm trying to understand the number of    10:31:58
21 customers who actually participated in SIS's EndoWrist    10:32:00
22 repair program seems a lot smaller than the number of    10:32:04
23 customers who you claim have been deterred from    10:32:08
24 participating in the recovery program, and I just want    10:32:11
25 to make sure I'm perceiving that difference correctly.    10:32:14

Page 52

1       MR. VAN HOVEN:  Objection to form.    10:32:20
2       THE WITNESS:  So when we started having    10:32:20
3  conversations around the Si repair program, that had    10:32:23
4  just got rolling, we started to have conversations, we    10:32:29
5  got the Vizient contract in place, started having those    10:32:31
6  conversations, and then people's and hospital's focuses    10:32:35
7  went in other directions.    10:32:44
8       As we got the -- the conversations back    10:32:47
9  up, we just have a much broader reach, we're having    10:32:50
10 much more conversations with people about this program,    10:32:52
11 but if we still -- if there were still a good amount of    10:33:00
12 Si robots in the United States, we would be having    10:33:04
13 repair conversations about Si EndoWrists.    10:33:07
14 BY MR. CHAPUT:    10:33:16
15      Q    So perhaps I can -- I can frame this    10:33:17
16 question a little bit differently.    10:33:19
17      Is it the case that many of the customers    10:33:21
18 who have declined to participate in SIS's recovery    10:33:24
19 program never sought out Si repair services from SIS?    10:33:30
20      MR. VAN HOVEN:  Objection to form.    10:33:36
21      THE WITNESS:  I don't think I agree with    10:33:46
22 that statement because I think what I understand is    10:33:47
23 there's some clauses in the Intuitive agreements that    10:33:49
24 forbid hospitals from utilizing any companies to repair    10:33:52
25 their instruments or devices.    10:33:56

Page 53

14 (Pages 50 - 53)

1    So there were a number of original          10:34:01
2    conversations that people would say, "We are not    10:34:04
3    allowed to repair our instruments, Intuitive does not    10:34:08
4    allow us to do that, even though we own the devices,    10:34:11
5    our contract does not allow us to repair them."    10:34:13
6        So we were working through a lot of that    10:34:20
7    with legal and risk at a lot of these big    10:34:22
8    organizations.                  10:34:24
9        The recovery program, people are willing    10:34:24
10   to talk about because it doesn't -- like, it doesn't    10:34:27
11   affect -- it's not a repair.          10:34:31
12   BY MR. CHAPUT:                10:34:42
13   Q    And even though the recovery program is    10:34:43
14   not a repair, there are still customers who have    10:34:46
15   decided not to use that program; is that -- is that    10:34:50
16   correct? Am I understanding that correctly?    10:34:55
17   A    I would say that's correct.        10:34:57
18   Q    Is SIS seeking damages for its recovery    10:35:07
19   program in this case?            10:35:15
20   A    I don't know the specifics of the damages,    10:35:26
21   but I would say that our interest is -- is the lack of    10:35:30
22   business across all of our robotic programs against    10:35:36
23   Intuitive.                  10:35:43
24   Q    Does SIS have any robotic programs, other    10:35:47
25   than those that we've already discussed today?    10:35:53

Page 54

1    A    No.                  10:35:59
2    Q    Does SIS have any sort of business      10:35:59
3    relationship with MediVision, Inc.?        10:36:09
4    A    We did.                10:36:15
5    Q    What was SIS's with MediVision?      10:36:16
6    A    MediVision is owned -- the ownership of    10:36:20
7    MediVision is the same ownership of Restore, MediVision    10:36:31
8    is a repair company, so they did some work for us on    10:36:35
9    our core business on the repair of flexible and rigid    10:36:38
10   endoscopes.                  10:36:43
11   Q    Did that work have anything to do with    10:36:44
12   da Vinci assisted surgeries?          10:36:50
13   A    Just to clarify, did our -- does our    10:36:59
14   MediVision relationship have anything to do with    10:37:04
15   robots?                    10:37:06
16   Q    Yes, I can make the question more clear.    10:37:06
17       Did SIS's work with MediVision have    10:37:11
18   anything to do with robotic assisted surgeries?    10:37:14
19   A    Outside of the relationship? I think, if    10:37:19
20   I understand your question correctly, the answer would    10:37:23
21   be no.                    10:37:25
22   Q    Right. So setting aside SIS's      10:37:25
23   relationship with Restore, and it's just focused    10:37:31
24   exclusively on MediVision --          10:37:35
25   A    Okay.                10:37:35

Page 55

1    Q    -- any aspect of the MediVision        10:37:37
2    relationship have anything to do with robotic assisted    10:37:40
3    surgeries?                  10:37:43
4    A    No.                  10:37:43
5    Q    Okay. Does SIS have any business      10:37:43
6    relationship with Clif Parker Robotics, LLC?    10:37:53
7    A    Not that I know of.          10:38:00
8    Q    We've been talking about Restore Robotics.    10:38:07
9        Does SIS have any relationship with      10:38:10
10   Restore Robotics Repairs, LLC?          10:38:12
11   A    Not that I know of.          10:38:14
12   Q    So I'd like to move on to topic number    10:38:19
13   two, which is (as read):            10:38:32
14       SIS's advertising, promotional,      10:38:34
15       marketing, and other informational      10:38:36
16       materials and communications relating to    10:38:38
17       the services, SIS markets, or performs on    10:38:41
18       or in connection with EndoWrist        10:38:43
19       instruments.              10:38:45
20       And I'd like to mark as Exhibit 136 tab    10:38:48
21   three, Austin, this is SIS095115, which is an email    10:38:55
22   dated September 25, 2019, from Keith Johnson, and this    10:39:04
23   has four attachments to the email, as well.    10:39:10
24       That should be available for you now on    10:39:41
25   Exhibit Share, Mr. Johnson.          10:39:44

Page 56

1        MR. VAN HOVEN: I don't see it.      10:39:45
2        THE WITNESS: I got it. It's up.      10:39:46
3        MR. VAN HOVEN: Is it?          10:39:48
4        (Deposition Exhibit 136 was marked    10:39:52
5        for identification and is attached      10:39:52
6        hereto.)                10:39:52
7    BY MR. CHAPUT:                10:39:52
8    Q    Mr. Johnson, do you recognize Exhibit 136?    10:39:53
9    A    Yes.                  10:40:01
10   Q    And this is an email exchange between you    10:40:05
11   and a number of folks from Banner Health; is that    10:40:08
12   right?                    10:40:12
13   A    Yes.                  10:40:12
14   Q    Is Banner Health an SIS customer?      10:40:12
15   A    Yes.                  10:40:19
16   Q    Was Banner Health an SIS customer prior to    10:40:20
17   SIS starting its robotics business?        10:40:28
18   A    No.                  10:40:30
19   Q    How long has SIS been working with Banner    10:40:30
20   Health?                    10:40:39
21   A    Over 20 years.            10:40:39
22   Q    If you would turn forward to the -- the    10:40:41
23   third page of the document, this has the number in the    10:40:50
24   bottom right-hand corner ending 117, there's an email    10:40:52
25   in the bottom of that page from Perry Kirwan to Timothy    10:40:55

Page 57

15 (Pages 54 - 57)

**EXHIBIT 5**

**to**

**PAUL D. BRACHMAN DECLARATION IN SUPPORT
OF DEFENDANT'S MOTION IN LIMINE NO. 1
TO EXCLUDE OUT-OF-COURT HOSPITAL
STATEMENTS**



Deposition of:

**Greg Posdal**

*May 10, 2021*

In the Matter of:

**Restore Robotics LLC v Intuitive Surgical**

Veritext Legal Solutions

800.808.4958 | calendar-atl@veritext.com | 770.343.9696

Page 1

1              IN THE UNITED STATES DISTRICT COURT
               FOR THE NORTHERN DISTRICT OF FLORIDA
2                     PANAMA CITY DIVISION
3       RESTORE ROBOTICS LLC,         )
        RESTORE ROBOTICS REPAIRS      )
4       LLC, and CLIF PARKER          )
        ROBOTICS LLC,                 )
5                                     )
         Plaintiffs,                  )
6                                     )
        vs.                           )      CIVIL ACTION NO.
7                                     )
        INTUITIVE SURGICAL, INC.,     )      5:19-CV-55-TKW-MJF
8                                     )
         Defendant.                   )
9
        INTUITIVE SURGICAL, INC.,     )
10                                    )
         Counterclaimant,             )
11                                    )
        vs.                           )
12                                    )
        RESTORE ROBOTICS LLC,         )
13      RESTORE ROBOTICS REPAIRS      )
        LLC,                          )
14                                    )
         Counterclaim Defendants.     )
15
16
17
18          VIDEOTAPED DEPOSITION OF GREG POSDAL
19                 (Taken by Defendant)
20                   May 10, 2021
21                   10:00 a.m.
22
23
24
25      Reported by:   Debra M. Druzisky, CCR-B-1848

Greg Posdal                              May 10, 2021
Restore Robotics LLC v Intuitive Surgical

Page 2

1        APPEARANCES OF COUNSEL
2  On behalf of the Plaintiffs/Counterclaim
   Defendants:
3
     JEFFREY L. BERHOLD, Esq.
4    Jeffrey L. Berhold, P.C.
     1230 Peachtree Street, Suite 1050
5    Atlanta, Georgia  30309
     (404) 872-3080
6    jeff@berhold.com
7
   On behalf of the Defendant/Counterclaimant:
8
     MICHAEL S. BAILEY, Esq.
9    TAYLOR DOW, Esq.
     Skadden, Arps, Slate, Meagher & FLom
10   One Manhattan West
     New York, New York  10001
11   (202) 371-7391
     michael.bailey@skadden.com
12
13 On behalf of the Deponent:
14   RICHARD T. MCCAULLEY, Esq.
     Haley Guiliano
15   111 North Market Street, Suite 900
     San Jose, California  95113
16   (669) 213-1050
     richard.mccaulley@hglaw.com
17
18 Also Present:
19   Alan Pokotilow, videographer
     Chris McMillan, concierge
20
          --oOo--
21
22
23
24
25

Page 3

1        INDEX TO EXAMINATION
2  Witness Name:                    Page
3  GREG POSDAL
4    By Mr. Berhold                    5
5    By Mr. Bailey                     27
6
7
8
9       INDEX TO POSDAL EXHIBITS
10  No.        Description          Page
11 Exhibit 1   SIS 205 thru 208, Spreadsheet    7
             re: Instruments and sums.
12
     Exhibit 2  SIS 47 thru 49, 9-15-19,       16
13            Amendment to Agreement between
             Vizient Supply and Surgical
14            Instrument Service Company.
15 Exhibit 3   SIS 167, 11-14-18 thru 12-10-19,  25
             Spreadsheet re: Equipment
16            serviced.
17 Exhibit 4   SIS 35 thru 46, 8-22-19, E-mail   52
             from Chris Gibson to Greg Posdal
18            re: Agreement, attached.
19 Exhibit 5   Restore 58241 thru 248, 8-26-20,  55
             E-mail from Greg Posdal to Clif
20            Parker re: Revised NDA attached.
21 Exhibit 6   Restore 57179 thru 182, 9-14-20,  68
             E-mail from Clif Parker to Keith
22            Johnson re: NDA attached.
23              - - -
24
25

Page 4

1        THE VIDEOGRAPHER:  We're on the
2  record.  The time is now 10:01 a.m.  Today
3  is Monday, May 10th of 2021.  We're here
4  today in Glendale Heights, Illinois at
5  Surgical Instrument Service Company for
6  the video recorded deposition of Greg
7  Posdal in the matter of Restore Robotics,
8  L.L.C.; Restore Robotics Repairs, L.L.C.;
9  and Clif Parker Robotics, L.L.C., versus
10 Intuitive Surgical, Incorporated;
11 Intuitive Surgical, Incorporated as
12 counterclaimant versus Restore Robotics,
13 L.L.C. and Restore Robotics Repairs,
14 L.L.C., Civil Case Number
15 5:19-CV-55-TKW-MJF, to be heard before the
16 United States District Court for the
17 Northern District of Florida, Panama City
18 Division.
19       I'm Alan Pokotilow, a legal
20 videographer, here today on behalf of
21 Veritext Legal Solutions.  Our court
22 reporter today is Debra Druzisky, also
23 here today on behalf of Veritext Legal
24 Solutions.
25       Will counsel please state your name

Page 5

1  and affiliation for the record, after
2  which our court reporter will swear the
3  witness and we can proceed?
4        MR. BERHOLD:  Jeff Berhold for
5  plaintiffs Restore Robotics, L.L.C.,
6  Restore Robotics Repairs, L.L.C., and Clif
7  Parker Robotics, L.L.C.
8        THE CONCIERGE:  Mr. Bailey, you're
9  muted.
10       MR. BAILEY:  My apologies.  My name
11 is Michael Bailey.  I am here on behalf of
12 Intuitive Surgical, Inc.  I'm here with my
13 colleague Taylor Dow.
14       MR. MCCAULLEY:  Richard McCaulley on
15 behalf of the witness.
16       GREG POSDAL,
17 having been first duly sworn, was examined and
18 testified as follows:
19       EXAMINATION
20 BY MR. BERHOLD:
21 Q.  Good morning, Mr. Posdal.
22 A.  Morning.
23 Q.  Are you currently employed?
24 A.  I am.
25 Q.  Where are you employed?

2 (Pages 2 - 5)

Greg Posdal                                    May 10, 2021
Restore Robotics LLC v Intuitive Surgical

Page 14

1    Q.  Do you have any sense of the size of
2  Vizient or the -- let me ask it a different way.
3      Do you have a sense of how many members or
4  how many -- do you have a sense of how many
5  hospitals participate in the group purchasing
6  organization at Vizient?
7    A.  I believe it's somewhere in the
8  neighborhood of 2,500 acute care facilities.  And
9  that -- they have tens of thousands of group
10  members, but a lot of them are not acute centers,
11  so hos -- doctors' offices and a whole host of
12  other things that don't touch on the services that
13  we provide.  So.
14      But I think about 2,500 that would have
15  the instrumentation and needs that would use our
16  services.
17    Q.  Let me ask a different question.  Let me
18  go back.  You testified earlier that you had
19  entered a contracting relationship with a third
20  party for the repair of da Vinci instruments; is
21  that right?
22    A.  Yes.
23    Q.  Who was that company?
24    A.  That was Rebotix, R-E-B-O-T-I-X.
25    Q.  And was there an agreement in place for

Page 15

1  Rebotix to conduct the repairs of da Vinci
2  instruments on behalf of S.I.S.?
3    A.  We had been working with them.  There was
4  no formally signed agreement.  We were working on
5  putting together the negotiation for pricing,
6  et cetera, but were -- had already begun working
7  with them on an agreed-on price list.
8    Q.  At some point did S.I.S. reach an
9  agreement with Rebotix?
10    A.  Not a signed agreement.  We had just
11  started -- in terms of an agreement, we were
12  working with them.  So if that qualifies as
13  reaching an agreement or understanding, then yes.
14    Q.  Okay.  Now, at some point did S.I.S. enter
15  discussions with Vizient about offering da Vinci
16  instrument repair services to Vizient members?
17    A.  We did.
18      MR. BAILEY:  Objection to the form.
19  BY MR. BERHOLD:
20    Q.  At some point did S.I.S. reach an
21  agreement with Vizient?
22    A.  Yes.
23      MR. BAILEY:  Objection to the form.
24      MR. BERHOLD:  Chris, can we get SIS
25  47, please?

Page 16

1      THE CONCIERGE:  Sure.  Please stand
2  by.
3      (Whereupon, Posdal Exhibit 2
4        was marked for
5        identification.)
6      MR. MCCAULLEY:  And Greg, I'll just
7  note, maybe pause a heartbeat before you
8  answer, give Mike a chance to interpose
9  objections.
10      THE WITNESS:  Okay.
11      MR. MCCAULLEY:  It just makes it very
12  hard for Debra if we talk at the same
13  time.
14      THE WITNESS:  Perfect.
15      THE CONCIERGE:  SIS 47 has been
16  introduced as Posdal Exhibit 2 and is now
17  on the screen.
18  BY MR. BERHOLD:
19    Q.  Mr. Posdal, do you want to take a minute
20  to review Exhibit 2?
21    A.  Sure.  I'm aware of the agreement.
22    Q.  So you recognize Exhibit 2, Mr. Posdal?
23    A.  Yes.
24    Q.  And what is Exhibit 2?
25    A.  An agreement to work with Vizient and all

Page 17

1  of their hospitals -- all of their members,
2  basically, but obviously it would be limited to
3  those acute care facilities that I mentioned
4  earlier, to provide them service for the da Vinci
5  EndoWrist instrumentation.
6      MR. BERHOLD:  Chris, can we scroll to
7  the last page?
8      THE CONCIERGE:  Sure.
9  BY MR. BERHOLD:
10    Q.  And is that your signature on the last
11  page of Exhibit 2?
12    A.  It is.
13    Q.  Did S.I.S. undertake any informal or
14  formal analysis of the potential for sales under
15  this agreement before signing the agreement?
16      MR. BAILEY:  Objection to the form.
17      THE WITNESS:  I guess informal.  I
18  mean, we knew that, especially with access
19  and help and assistance of Vizient staff,
20  that this could be a huge opportunity and
21  undertaking for us here.
22      The size and the scale of what was
23  out there and the number of member
24  hospitals and the excitement of everyone
25  that we had spoken to with regard to these

5 (Pages 14 - 17)

Greg Posdal                                May 10, 2021
Restore Robotics LLC v Intuitive Surgical

Page 18

1    certainly pointed us in the direction of
2    this being an enormous opportunity.
3    BY MR. BERHOLD:
4        Q.  What did "huge" mean to you?
5        A.  Huge to us was tens of millions or even
6    hundreds of millions of dollars over the course of
7    probably just a couple of years.
8        Q.  Did S.I.S. also have conversations with
9    specific hospital systems or hospital facilities
10   about providing da Vinci instrument repair?
11       MR. BAILEY:  Objection to form.
12       THE WITNESS:  We did.
13   BY MR. BERHOLD:
14       Q.  Do you recall the names of any of those
15   hospitals or hospital systems?
16       MR. BAILEY:  Objection to form.
17       THE WITNESS:  I do.
18   BY MR. BERHOLD:
19       Q.  And could you run through those names,
20   Mr. Posdal?
21       A.  Off the top of my head, we spoke to Banner
22   Health Systems; Kaiser; Legacy; Advocate Aurora, it
23   was just Advocate at the time, but now it's
24   Advocate Aurora; Marin General; I mean, and then
25   probably some more that I'm not thinking of right

Page 19

1    now, but.
2        And Keith Johnson had most of those
3    conversations.  He could probably fill in whoever
4    else he had talked to regarding Intuitive repair.
5        Q.  So what happened with this huge business
6    opportunity for S.I.S.?
7        MR. BAILEY:  Objection to form.
8        THE WITNESS:  It started very well,
9    and it was very well received at all the
10   places that we had contacted.
11       Most had actually given us
12   instruments, and we had actually gone
13   through the process and reprogrammed and
14   sent these instruments back to these
15   facilities, a handful, probably 30 or 40.
16   I think there's a form in evidence here
17   that kind of explains who we did that
18   service to.
19       But either it was quickly put down,
20   or before we even got started the
21   customers said they were concerned about
22   moving forward because of what they were
23   told by Intuitive about using third
24   parties for repairing or having any other
25   effect on their instruments.

Page 20

1    BY MR. BERHOLD:
2        Q.  Do you recall what any of the customers
3    said was specifically a concern coming from
4    Intuitive?
5        A.  Yes.  I'll -- their main concerns were
6    that Intuitive had sent letters -- it was a
7    combination, that their representatives were saying
8    to them specifically that they should be not --
9    should not be using a third party to repair the
10   instruments, that there is specific language in
11   their agreements that prohibit them sending any of
12   these instruments out to third parties for repair,
13   and that there was the threat that they would stop
14   selling them new equipment or servicing the
15   existing robotics for these pieces of equipment.
16       Q.  Do you personally recall hearing from any
17   of your hospital customers that Intuitive referred
18   to contractual restrictions?
19       MR. BAILEY:  Objection to --
20       THE WITNESS:  I --
21       MR. BAILEY:  -- form.
22       THE WITNESS:  I did not have those
23   conversations personally.  Again, that
24   would be a Keith Johnson question.
25       But I was privy to the E-mails going

Page 21

1    back and forth with notes directed at
2    that, specifically from the customers
3    saying, yeah, Intuitive gave us a letter,
4    the hospital is spooked by this, and
5    they're not sure if they can move on
6    regardless of whether they wanted to or
7    not.
8    BY MR. BERHOLD:
9        Q.  How unusual is it for S.I.S. to see those
10   kinds of communications from original equipment
11   manufacturers regarding third-party service?
12       MR. BAILEY:  Objection to form.
13       THE WITNESS:  It's unusual now, but
14   historically not.  We've been through it
15   before with other manufacturers of rigid
16   endoscopes, flexible endoscopes,
17   et cetera.
18       It's kind of been a time tested way
19   of the manufacturing kind of -- the
20   manufacturer steering their customers away
21   from third parties.  But it's largely died
22   down because it's such an accepted
23   practice in our -- across our field.
24   BY MR. BERHOLD:
25       Q.  Mr. Posdal, did you observe any difference

6 (Pages 18 - 21)

Greg Posdal                                              May 10, 2021
Restore Robotics LLC v Intuitive Surgical

Page 22

1   in the -- well, let me think for a second.
2        Mr. Posdal, did you notice any -- did you
3   observe any difference in the ability of Intuitive
4   to persuade its customers to stop using third-party
5   service compared with prior experiences with
6   original equipment manufacturers?
7        MR. BAILEY:  Objection to form.
8        THE WITNESS:  I did.  Should I expand
9   on that?
10  BY MR. BERHOLD:
11       Q.  Please do.
12       A.  Historically, with just about any other
13  piece of equipment, whether it's stainless steel
14  instrumentation or rigid endoscopes or flexible
15  endoscopes or video equipment, any of the items
16  that we'd worked with prior to this, the customer
17  always had a choice.  They could switch
18  manufacturers.
19       For the most part, things like rigid
20  endoscopes are interchangeable.  They do have some
21  specific ancillary equipment and locking systems
22  that you need to mate up, but the customer could
23  always say, look, I'll just, I'll change from
24  Stryker to Storz or Storz to Wolf if you're going
25  to give me this -- if you're going to, you know,

Page 23

1   push this.
2        With Intuitive and the EndoWrist it's
3   different, obviously, because they attach to the
4   robot, and the customer simply has no choice but to
5   continue -- let me rephrase that.
6        The threats are that either Intuitive
7   would stop selling them the instrumentation they
8   need, the additional instrumentation, or that they
9   could possibly and potentially stop servicing their
10  robot systems themselves, which would obviously
11  shut down the robotics program at that facility.
12  There just simply aren't any other options.
13       Q.  At some point did S.I.S. stop offering
14  repair services for the da Vinci instruments?
15       MR. BAILEY:  Objection to form.
16       THE WITNESS:  We never stopped
17  offering, but we were waiting for this
18  potentially to play itself out, for some
19  hospital to step forward and really push
20  the issue with Intuitive.
21       And there were several, not customers
22  of ours, but several that did push it and
23  got their service cut off.  And so we are
24  cognizant and aware of that and didn't
25  want to put our customers in a position

Page 24

1   where they may no longer have been able to
2   provide robotic surgeries for their
3   patients.
4        So we never stopped offering it, but
5   we were kind of trying to work through the
6   process with our customers to see if we
7   can get by those threats, real and
8   implied, from Intuitive.
9        MR. BERHOLD:  Chris, you can take
10  down Exhibit 2, please.
11       Thank you.
12  BY MR. BERHOLD:
13       Q.  And Mr. Posdal, do you have any prior
14  experience in observing what happens to pricing for
15  the original equipment when third parties begin to
16  repair those devices?
17       A.  Sure.
18       MR. BAILEY:  Objection to form.
19       THE WITNESS:  Sorry.  I didn't wait.
20  Yes.
21  BY MR. BERHOLD:
22       Q.  What's been your experience in that regard
23  as far as the effect of third-party servicing on
24  the pricing of the new instrument or device?
25       MR. BAILEY:  Continuing objection to

Page 25

1   this line of questioning based upon the
2   original improper questioning.  Objection
3   to form.
4        THE WITNESS:  Typical of any
5   industry, the pricing generally decreases
6   over time with more competition.
7   BY MR. BERHOLD:
8        Q.  Let me check real quick to see if I need
9   to introduce one more exhibit.
10       MR. BERHOLD:  Chris, can we introduce
11  SIS 167, please?
12       THE CONCIERGE:  Sure.  Please stand
13  by.
14       (Whereupon, Posdal Exhibit 3
15       was marked for
16       identification.)
17       THE CONCIERGE:  SIS 167 has been
18  introduced as Posdal Exhibit 3 and is now
19  on the screen.  And I can rotate this page
20  if need be.
21       MR. BERHOLD:  Sure.  Let's do that
22  and make it easier on everyone.  And is it
23  possible to zoom?
24  BY MR. BERHOLD:
25       Q.  Mr. Posdal, do you recognize Exhibit 3?

7 (Pages 22 - 25)

**EXHIBIT 6**

**to**

**PAUL D. BRACHMAN DECLARATION IN SUPPORT
OF DEFENDANT'S MOTION IN LIMINE NO. 1
TO EXCLUDE OUT-OF-COURT HOSPITAL
STATEMENTS**

1                UNITED STATES DISTRICT COURT

2                MIDDLE DISTRICT OF FLORIDA

3                     TAMPA DIVISION

4   REBOTIX REPAIR LLC,              )
                                     )
5             Plaintiff,             )
                                     )
6         vs.                        ) Case No.
                                     ) 8:20-cv-02274
7   INTUITIVE SURGICAL, INC.,        )
                                     )
8             Defendant.             )
    _____ )

9

10

11      VIDEO DEPOSITION OF PULLMAN REGIONAL HOSPITAL

12      BY AND THROUGH ITS DESIGNATED REPRESENTATIVE

13                  EDWARD W. HARRICH

14                    MAY 24, 2021

15       CONDUCTED REMOTELY VIA VIDEOCONFERENCE

16

17

18

19

20

21

22

23   Reported by Cynthia J. Vega

24   RMR, RDR, CA CSR 6640, WA CSR 21001436, CCRR 95

25   Job No.  194419

Page 2

```
1
2
3
4              May 24, 2021
5              10:11 a.m. Pacific Daylight Time
6
7
8
9        The remote video deposition of Pullman
10  Regional Hospital through its designated
11  representative Edward W. Harrich, a Witness herein,
12  located in the City of Pullman, State of Washington,
13  taken on behalf of Plaintiff, reported remotely before
14  Cynthia J. Vega, California Certified Shorthand
15  Reporter 6640, Washington Certified Shorthand Reporter
16  21001436, Registered Merit Reporter, Registered
17  Diplomate Reporter, California Certified Realtime
18  Reporter 95, located in the City of Carlsbad, County
19  of San Diego, State of California.
20
21
22
23
24
25
```

Page 3

```
1              REMOTE APPEARANCES
2  For the Plaintiff:
3  DOVEL & LUNER
4  By:  Richard Lyon, III, Esq.
5  201 Santa Monica Boulevard
6  Santa Monica, California  90401
7
8
9
10  For the Defendant:
11  SKADDEN, ARPS, SLATE, MEAGHER & FLOM
12  By:  Michael Menitove, Esq.
13       Griff Almy, Esq.
14  One Manhattan West
15  New York, New York  10001
16
17
18
19
20  For Pullman Regional Hospital and the Witness:
21  IRWIN, MYKLEBUST, SAVAGE & BROWN
22  By:  Robert Rembert, Esq.
23  1230 SE Bishop Boulevard
24  Pullman, Washington  99163
25
```

Page 4

```
1  Also in Attendance:
2  Naomi Caldwell
3
4  The Videographer:
5  Manuel Garcia
6
7              * * * * *
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
1                    INDEX
2  WITNESS
3  Edward W. Harrich
4
5  EXAMINATION                                 PAGE
6  By Mr. Lyon                                    9
7  By Mr. Menitove                               90
8  By Mr. Lyon                                  186
9
10
11                  EXHIBITS
12  PLAINTIFF'S  DESCRIPTION                     PAGE
13  Exhibit 1   Pullman Regional Hospital Website  17
14              Printout
15  Exhibit 2   Email chain, August 6, 2019        64
16  Exhibit 3   Savings Spreadsheet, Yearly        66
17              Breakdown Chart
18  Exhibit 4   Email, August 15, 2019             69
19  Exhibit 5   Email chain, June and August 2019  73
20  Exhibit 6   Letter to Scott Adams, CEO, from   74
21              Intuitive, September 9, 2019
22  Exhibit 7   Email, September 13, 2019, with    78
23              attachment
24  Exhibit 8   Email, September 16, 2019          80
25  Exhibit 9   Email chain, October 18, 2019      84
```

1 this area.

2    Q.   Based on the hospitals you know, it is

3 standard procedure to repair and reuse traditional

4 laparoscopic devices that are similar to the EndoWrist

5 used in da Vinci surgeries; is that right?

6         MR. MENITOVE:  Object to the form.

7         THE WITNESS:  That's correct.

8 BY MR. LYON:

9    Q.   Are you familiar with Rebotix Repair?

10    A.   Yes.

11    Q.   When did you first learn of Rebotix Repair?

12    A.   Probably about two years ago.

13    Q.   And how did you learn of Rebotix Repair?

14    A.   A rep for Rebotix gave me a call, told me

15 about Rebotix, asked if he could set up a meeting.  I

16 scheduled a meeting with him.  We sat down and chatted

17 for a couple of hours and then proceeded forward from

18 there.

19    Q.   When you first learned that there was a

20 company performing repairs for EndoWrists, what was

21 your reaction?

22    A.   I was pleased.

23    Q.   Why?

24    A.   Well, for years, I thought the robot -- the

25 robotic instrument arms had additional lives on them,

1 other than they have a chip on them that only allow

2 you ten uses.  At the end of the tenth use, it becomes

3 a disposable.  I was glad to see that we could stop

4 after nine uses --

5         (Reporter clarification.)

6    A.   So I was pleased to see that we could use the

7 instruments for a longer duration and have them

8 reprogrammed with a cost savings.

9    Q.   You stated that you believed EndoWrists had

10 additional lives on them before you had to dispose of

11 them when they reached their maximum use restrictions;

12 is that right?

13    A.   That's correct.

14    Q.   Why did you believe that EndoWrists had

15 additional lives on them?

16    A.   Well, on the end of the tenth life, it wasn't

17 working any different than it had been on the first

18 life.  There was no complaints by the physicians.  If

19 there were any, we'd take the instrument out of

20 service or send it back in to Intuitive for repair if

21 it still had lives left on it.

22         So if it's a grasper, it's a grasper.  Is it

23 grabbing the tissue like you think it should?  As the

24 physician says, it's feeling that tactile touch.  You

25 can't actually feel the touch, but on a console.

1         But it's grabbing the tissue.  They're liking

2 what they're seeing.  They're liking what they're

3 feeling.  So the instrument can still continue to be

4 used.

5    Q.   Is that how you determine whether a

6 traditional laparoscopic device should continue to be

7 used as well?

8    A.   Yes, the functionality of it.

9    Q.   Is your hospital aware of any other companies

10 other than Rebotix Repair that repairs and services

11 EndoWrists?

12    A.   I'm not aware of anybody else.

13    Q.   Is your hospital aware of any companies other

14 than Rebotix Repair that can reset the usage counter

15 on EndoWrists beyond the limit imposed by Intuitive?

16    A.   I'm not aware of anybody else.

17    Q.   Would your hospital have agreed to use

18 EndoWrists repaired by Rebotix if the repaired

19 EndoWrists were unsafe?

20    A.   No, never.

21         MR. MENITOVE:  Object to the form.

22 BY MR. LYON:

23    Q.   Did you do any testing or trials of

24 Rebotix-repaired EndoWrists?

25    A.   We did.

1    Q.   What did you do to test or try out

2 Rebotix-repaired EndoWrists?

3    A.   We had three or four samples that we were

4 given by Rebotix, and informed the physician that it

5 was a reprocessed robotic instrument for the cases,

6 made everybody in the room aware that it was a

7 reprocessed instrument, and gave it a whirl.

8         There were no complaints.  Everybody said

9 they worked just fine.  There was no difference than

10 the non-reprocessed instruments.  So we did -- we made

11 some purchases.  And then when we made our first

12 purchases -- you had to get down to one life left

13 before you could send them in.  So once we got some

14 instruments and we were able to send them in, got them

15 back from Rebotix.

16         Myself and my assistant director, Steve

17 Cromer, the only two that knew that those were the

18 reprocessed instruments that came back in, we used

19 them in a case.  I asked the first assist, the

20 surgeon, and the scrub tech in the room if there were

21 any issues, complications, or problems about the

22 instruments, and there were no issues.  They --

23 actually, one of them on one of the cases says the

24 scissors seemed extremely sharp.

25         So we didn't have any issues and we were

1  going to continue to proceed forward using them.
2      Q.  There is a lot there.  I'm going to try to --
3      A.  Yes.
4      Q.  -- break down and unpackage that as well.
5          When you tested out the EndoWrists, was it
6  during an actual surgery with a patient?
7      A.  Yes.
8      Q.  In the -- withdrawn.
9          Were the surgeons who used the
10  Rebotix-repaired EndoWrists able to discern any
11  difference between those EndoWrists and EndoWrists
12  that had not been repaired or serviced by Rebotix?
13      A.  No.
14          MR. MENITOVE:  Objection.  Foundation.
15  BY MR. LYON:
16      Q.  Were the first assists able to discern any
17  differences between the Rebotix-repaired EndoWrists
18  and the EndoWrists that had not been repaired or
19  serviced by Rebotix?
20          MR. MENITOVE:  Same objection.
21          THE WITNESS:  No.
22  BY MR. LYON:
23      Q.  Were the scrub assists able to discern any
24  difference between the Rebotix-repaired EndoWrists and
25  EndoWrists that had not been repaired or serviced by

1  Rebotix?
2          MR. MENITOVE:  Same objection.
3          THE WITNESS:  No.
4  BY MR. LYON:
5      Q.  Other than the first assists, the surgeons,
6  and the scrub assists, did anyone else test or
7  perceive the Rebotix-repaired EndoWrists in use?
8          MR. MENITOVE:  Object to the form.
9          THE WITNESS:  No.
10  BY MR. LYON:
11      Q.  What is a first assist?
12      A.  A first assist is the surgeon's assistant.
13  They stay at the patient's bedside the entire time
14  when the surgeon goes to the console.  The first
15  assist will help guide the instruments in, use the
16  suction, an extra set of hands.  They have their own
17  laparoscopic equipment.
18      Q.  What is a scrub assist?
19      A.  Scrub assist is -- they will be responsible
20  for the instrumentations, loading the clips, or
21  handing the instruments off to the first assist and
22  load it in the da Vinci.  The scrub may also load the
23  instrument themselves.
24      Q.  Did you personally interview the surgeons and
25  the technicians who were involved in the surgery --

1  withdrawn.
2          Did you personally interview the surgeons and
3  the technicians who were involved in the trial of the
4  Rebotix-repaired EndoWrists?
5      A.  Yes.
6      Q.  What did you learn from those interviews?
7      A.  That the instruments still worked just like
8  the nonrepaired ones.  There was no difference.
9      Q.  Does your hospital undertake any inspection
10  efforts of an EndoWrist before it's used in a surgery?
11      A.  Absolutely.
12      Q.  What process does your hospital undertake to
13  inspect an EndoWrist from Intuitive before it's used
14  in a surgery?
15      A.  So the inspection process will start in
16  central sterile processing.  There is multiple steps
17  on processing and packaging those instrumentations,
18  protecting the tips on them.
19          Once they're packaged, sent through sterile
20  processing, they come into the room.  The scrub tech,
21  when they open the trays, will examine them on the
22  field, make sure that the jaws are open and close,
23  that the -- you know, everything is clean, that there
24  is no dried blood, that the ports are working.
25          And then the first assist will do that also.

1      Q.  Are traditional laparoscopic instruments used
2  in nonrobotic surgeries inspected in the same way as
3  the EndoWrists are?
4      A.  Yeah, there is a little bit of different
5  process.  Some of the robotic instruments are a little
6  bit more complicated with their flushing ports or how
7  they're loaded, but, yes, all of our instruments are
8  inspected.
9      Q.  Do the EndoWrists sometimes fail the
10  inspection?
11      A.  Yes.
12      Q.  Does Pullman Regional sometimes use
13  EndoWrists for less than a maximum number of uses?
14      A.  Yes.
15      Q.  Do EndoWrists sometimes fail before they
16  reach their maximum usage limit?
17      A.  Yes.
18      Q.  What are some of the ways an EndoWrist might
19  fail before it reaches its maximum number of uses?
20      A.  So -- okay.  So they -- the teeth might
21  misalign.  They'll get shifted so that they don't
22  close completely lined up.  They'll get a little bit
23  offset.
24          The -- there is like wires, the bands.  They
25  fray, so there may be a frayed wire on them.

Page 42

1        They roll on a roller, a track, and that
2 track may get chipped or the wire may come over the
3 top of the roller.  It's like a pulley.  Or the
4 scissors are dull and so they'll gnaw through the
5 tissue instead of making a clean cut.
6     Q.   Has your hospital ever rejected an EndoWrist
7 because the surgeon perceived it to have dull or
8 damaged scissor plates?
9     A.   Yes.
10    Q.   Has your hospital ever rejected an EndoWrist
11 because a surgeon perceived it to have unintuitive
12 motion?
13    A.   Yes.
14    Q.   Has your hospital ever rejected an EndoWrist
15 because a surgeon perceived it to have insufficient
16 grip force?
17    A.   Yes.
18    Q.   Has your hospital ever rejected an EndoWrist
19 because the wires were frayed?
20    A.   Yes.
21    Q.   In any of these instances where you rejected
22 an EndoWrist, for example, for unintuitive motion,
23 dull or damaged scissors, insufficient grip force, or
24 any other reason, had the EndoWrist been used beyond
25 the maximum number of uses imposed by Intuitive?

Page 43

1     A.   No.
2     Q.   Had any of these rejected EndoWrists been
3 serviced by Rebotix?
4     A.   No.
5     Q.   Did your hospital or your surgeons ever
6 reject a Rebotix-repaired EndoWrist because of
7 perceived unintuitive motion?
8     A.   No.
9     Q.   Did your hospital or surgeons ever reject a
10 Rebotix-repaired EndoWrist because of perceived dull
11 or damaged scissor blades?
12    A.   No.
13    Q.   Did your hospital or your surgeons ever
14 reject a Rebotix-repaired EndoWrist because of
15 insufficient grip force?
16    A.   No.
17    Q.   Did your hospital or surgeons ever reject a
18 Rebotix-repaired EndoWrist for any reason?
19    A.   No.
20    Q.   In the instances where one of Intuitive's
21 EndoWrists did not perform properly, for example,
22 unintuitive motion, insufficient grip force, or dull
23 blades, was the patient's safety put at risk?
24        MR. MENITOVE:  Object to the form.
25        THE WITNESS:  No.  We -- when we're

Page 44

1 experiencing problems like that -- I think only once
2 we've had it where actually the teeth on a grasper
3 were locked on some tissue.  But prior to that, other
4 than that one incident, no.  If the instrument is not
5 operating as it is supposed to, it's taken out and
6 it's replaced.
7 BY MR. LYON:
8     Q.   When an EndoWrist is not performing properly,
9 for example -- withdrawn.
10        If an EndoWrist is not performing properly,
11 for example, it's showing unintuitive motion,
12 insufficient grip force, or dull blades, is it your
13 hospital's practice to simply replace that EndoWrist?
14    A.   Yes.
15    Q.   Similarly, if a traditional nonrobotic
16 laparoscopic instrument is not performing properly, is
17 it your hospital's practice to simply replace that
18 instrument?
19    A.   Yes.
20    Q.   Are traditional, nonrobotic laparoscopic
21 instruments also sometimes rejected by surgeons?
22    A.   Yes.
23    Q.   Are traditional, nonrobotic laparoscopic
24 instruments sometimes rejected by surgeons because of
25 dull or damaged scissor blades?

Page 45

1     A.   Yes.
2     Q.   Are traditional, nonrobotic laparoscopic
3 instruments sometimes rejected by surgeons because of
4 insufficient grip force?
5     A.   Yes.
6     Q.   Are traditional, nonrobotic laparoscopic
7 instruments sometimes rejected by surgeons because of
8 unintuitive motion?
9     A.   Yes.
10    Q.   When a traditional instrument is rejected,
11 does your hospital repair or hire a service to repair
12 the instrument?
13    A.   I do have a company that comes in, and we'll
14 put them aside.  If you're talking on a laparoscopic
15 instrument, most of the time he can do the repairs
16 on-site.  Sometimes we'll have to send it out to his
17 repair facility.
18    Q.   Can you sharpen the scissors of a traditional
19 laparoscopic device if they're dull?
20    A.   Yes.
21        MR. MENITOVE:  Object to the form.
22 BY MR. LYON:
23    Q.   Are you permitted to sharpen the scissors of
24 an EndoWrist if they're dull?
25        MR. MENITOVE:  Object to the form.

**EXHIBIT 7**

**to**

**PAUL D. BRACHMAN DECLARATION IN SUPPORT
OF DEFENDANT'S MOTION IN LIMINE NO. 1
TO EXCLUDE OUT-OF-COURT HOSPITAL
STATEMENTS**

| From: | Woody Groves [Woody.Groves@intusurg.com] |
|---|---|
| Sent: | 9/14/2019 9:22:33 AM |
| To: | Matt Heick [Matt.Heick@intusurg.com] |
| CC: | AJ Inacay [aj.inacay@intusurg.com]; Jennifer Scott [Jennifer.scott@intusurg.com] |
| Subject: | Re: [EXTERNAL] FW: da Vinci EndoWrist Savings Opportunity (MS4788 - Surgical Instrument Repair) |

Thanks Matt.   AJ, call me on Monday if you get a minute.

Sent from my iPhone
Woody Groves

On Sep 14, 2019, at 10:14 AM, Matt Heick <Matt.Heick@intusurg.com> wrote:

AJ,

Can you provide my team with assistance on dealing with SIS.  They are attempting to reprocess instruments at UF Shands.

Thank you,

Matt Heick
Clinical Sales Director
GA-SC-North FL

Direct: 678.938.0102
Matt.heick@intusurg.com

Intuitive Surgical
5655 Spalding Drive
Peachtree Corners, GA 30092

<image002.jpg>

**From:** Woody Groves <Woody.Groves@intusurg.com>
**Sent:** Friday, September 13, 2019 6:09 PM
**To:** Matt Heick <Matt.Heick@intusurg.com>
**Subject:** Re: [EXTERNAL] FW: da Vinci EndoWrist Savings Opportunity (MS4788 - Surgical Instrument Repair)

Thanks Matt.  Who do I need to talk to? I'm on vacation next week.

Sent from my iPhone
Woody Groves

On Sep 13, 2019, at 5:46 PM, Matt Heick <Matt.Heick@intusurg.com> wrote:

Woody,

Thanks for brining to my attention.  We have a formal internal process for these situations.  Let me know if you have further issues after connecting with our internal folks or if you see this surface in other accounts.

This would void their current warranty and creates patient safety issues.   Happy to discuss next week upon my return from vacation...

Confidential

Matt Heick
Clinical Sales Director
GA-SC-North FL

Direct: 678.938.0102
Matt.heick@intusurg.com

Intuitive Surgical
5655 Spalding Drive
Peachtree Corners, GA 30092

<image003.jpg>

---

**From:** Woody Groves <Woody.Groves@intusurg.com>
**Sent:** Friday, September 13, 2019 8:04 AM
**To:** Anna Samples <Anna.Samples@intusurg.com>; Jennifer Scott <Jennifer.scott@intusurg.com>; Matt Heick <Matt.Heick@intusurg.com>
**Subject:** Fwd: [EXTERNAL] FW: da Vinci EndoWrist Savings Opportunity (MS4788 - Surgical Instrument Repair)

FYI.    I'm researching our answer and response now.

Sent from my iPhone
Woody Groves

Begin forwarded message:

**From:** "Watkins, Dawn E." <WATKID@shands.ufl.edu>
**Date:** September 12, 2019 at 6:25:19 PM EDT
**To:** Woody Groves <Woody.Groves@intusurg.com>
**Cc:** "Wigglesworth, Susan J." <wiggsj@shands.ufl.edu>
**Subject: [EXTERNAL] FW: da Vinci EndoWrist Savings Opportunity (MS4788 - Surgical Instrument Repair)**

Hi Woody,

Who needs a sales force when you're on a GPO contract?  ☺

Can you help us confirm if the use of a refurbished EndoWrist would have a negative impact on our warranty?

A quick response would be great.  At this rate, we'll be asked again by Monday.

Best regards,
Dawn

Dawn Watkins, MBA, CMRP
Director of Strategic Sourcing
UF Health Shands
watkid@shands.ufl.edu
Cell: 352-246-2500

---

**From:** Cassidy,Manuela <manuela.cassidy@vizientinc.com>
**Sent:** Thursday, September 12, 2019 4:37 PM
**To:** Carroll-Mazeli, Andy <Andy.Carroll-Mazeli@jax.ufl.edu>; Wigglesworth, Susan J. <wiggsj@shands.ufl.edu>
**Cc:** Alltop, Shirley <alltos@shands.ufl.edu>; Watkins, Dawn E. <WATKID@shands.ufl.edu>; Mele, Christopher <Christopher.Mele@jax.ufl.edu>; Story,Vicky <Vicky.Story@vizientinc.com>; Price,John <john.price@vizientinc.com>
**Subject:** RE: da Vinci EndoWrist Savings Opportunity (MS4788 - Surgical Instrument Repair)

**CAUTION! This email came from outside UF or UF Health. Exercise extra caution clicking links and opening attachments from any and all senders.**

Hi Andy and Susan,

Julie Birdsong, Implementation Services, Senior Director would like to know if you have any interest in setting-up a call with SIS to learn more about his category? She is looking at setting-up a time for next week. Can you please provide me your feedback?

Many thanks,
Manuela

**From:** Cassidy,Manuela
**Sent:** Monday, September 9, 2019 3:47 PM
**To:** 'Carroll-Mazeli, Andy' <Andy.Carroll-Mazeli@jax.ufl.edu>; Wigglesworth, Susan J. <wiggsj@shands.ufl.edu>
**Cc:** 'Alltop, Shirley' <alltos@shands.ufl.edu>; 'Watkins, Dawn E.' <WATKID@shands.ufl.edu>; Mele, Christopher <Christopher.Mele@jax.ufl.edu>; Story,Vicky <Vicky.Story@vizientinc.com>; Price,John <john.price@vizientinc.com>
**Subject:** da Vinci EndoWrist Savings Opportunity (MS4788 - Surgical Instrument Repair)

Andy and Susan,

Two of our members, Kaiser Permanente and Legacy Health System are capturing savings by using Intuitive Surgical Endowrist refurbishment products. Surgical Instrument Service Company (SIS) is now the only supplier providing refurbishment to Intuitive Surgical's da Vinci EndoWrist. SIS offers a refurbished da Vinci EndoWrist at approximately 40% savings.

Since Intuitive Surgical is an off contract vendor, there's incremental GPO volume associated with moving that spend to SIS for refurbishment in addition to over 40% on line item savings.

Please see attached initial proposed savings. Please let me know if I can schedule an onsite presentation to learn more about this category and clarify additional questions.

Thanks,

Manuela Cassidy, MBA
Enterprise Client Manager
M (904) 608-7831
manuela.cassidy@vizientinc.com

E-MAIL CONFIDENTIALITY NOTICE: The information transmitted in this e-mail and in any replies and forwards are for the sole use of the above individual(s) or entities and may contain proprietary, privileged and/or highly confidential information. Any unauthorized dissemination, review, distribution or copying of these communications is strictly prohibited. If this e-mail has been transmitted to you in error, please notify and return the original message to the sender immediately at the above listed address. Thank you for your cooperation.

NOTE THAT THIS EMAIL ORIGINATED FROM OUTSIDE OF INTUITIVE SURGICAL..
Be alert for fraudulent emails that spoof internal "@intusurg.com" email addresses. Report these or other security threats to:
ITHelpNow@intusurg.com.

Intuitive-00110258

**EXHIBIT 8**

**to**

**PAUL D. BRACHMAN DECLARATION IN SUPPORT
OF DEFENDANT'S MOTION IN LIMINE NO. 1
TO EXCLUDE OUT-OF-COURT HOSPITAL
STATEMENTS**

Surgery  >  General Surgery

# Op-Ed: Addressing Our Da Vinci Addiction
— A call to action for everyone in healthcare

by Eve Cunningham, MD, MBA
October 17, 2020



It's no secret that financial analysis comparing the costs of surgery performed via different approaches has shown that robotic surgery is more expensive. Some healthcare systems even report a net negative margin for robotic procedures when compared with open and laparoscopic approaches. While we expect to have winners and losers in the world of healthcare economics, the prospect of losing money on a surgical approach that continues to increase in volume and popularity is unsustainable.

My background as a gynecologist turns my focus to use in hysterectomy, the second most common gynecologic surgical procedure.

My initial reaction is to question the data comparing the costs of surgery by approach.

Robotic gynecologic surgeons anecdotally report that they are being funneled more challenging cases from their non-robotic surgeon colleagues. As a former high-volume robotic gyn surgeon myself, I can attest to being on the receiving end of referrals from my non-robotic surgeon colleagues to operate on patients with high body mass index, large uterine size, severe endometriosis, and history of multiple abdominal surgeries -- all characteristics that can lead to longer case times and higher costs.

My second reaction is one of fear.

Mass exodus of surgeons or recruitment challenges are a risk if robots are restricted or removed from facilities. A 2011 study from the *Journal of Minimally Invasive Gynecology* demonstrated that 58% of ob-gyn residency programs were training their residents in robotics. As a physician leader tasked with hiring a physician workforce, my observation is that new surgeon graduates are making career choices based on their ability to access the tool, a situation also reported in this 2014 article.

Trying to "force" the existing active robotic surgeons to use an alternative approach to hysterectomy wouldn't go over well, either, especially when many of our active robotic surgeons now lack the confidence and skills to perform complex hysterectomy via alternative approaches.

I can attest to that evolution. Fresh out of training, I performed all my hysterectomies laparoscopically and vaginally, because that was how I was trained. Living the

straight stick" life was fun for a few years.

Eventually, I demoed the Intuitive Surgical da Vinci robot console. Ten minutes into my demo and the Intuitive rep had me booked for a training session in Sunnyvale, California. There I got my chops operating on a pig, and I never looked back.

**Medical News from Around the Web** ————————————

**USA TODAY**

This FDA-approved drug promises a new way to treat schizophrenia

**CBS NEWS**

Free COVID tests are back. But there are more accurate tests for sale.

**BECKER'S HOSPITAL REVIEW**

MRIs cut overdiagnosis in prostate cancer screening: Study

————————————

Laparoscopic surgery was a gateway drug. Robotic surgery was hardcore. Four years later, my advanced laparoscopic and vaginal surgery skills had atrophied and were rusty, at best.

My story is typical. I have a distinct memory circa 2014 of sitting in the surgeon lounge with a group of my other gyn-robotic colleagues and listening to them marvel about the robot.

One surgeon reported that the robot extended her career as her back and hip no longer bother her as they did with laparoscopic cases, a finding that was validated in this study.

Another surgeon shared how she was able to operate up to her due date for her current pregnancy, all because of the robot. A third surgeon compared the robot to driving a Ferrari versus the laparoscopic '57 Chevy.

Here we are in 2020, and an entire generation of gyn surgeons have adopted and trained on the da Vinci. Robotic surgery now generates an annual $3 billion dollars in revenue and is expected to grow by 15% per year until 2022.

The deeper question for health systems is how to address the economics of the situation.

Below is a stakeholder assessment and proposed contributions to forge a path to a high-value hysterectomy clinical pathway.

**Healthcare Systems and Surgeons**

Healthcare systems are bearing the brunt of the economic loss and expense related to the explosion of robotic surgery. Surgeons often lack awareness and understanding of what we can do to reduce costs.

I recall a dialogue with my colleagues several years ago in which we compared the costs of various hemostatic agents we routinely used in the operating room. We were surprised to learn that the cost varied from $13 to $250 per case. This discussion pushed us to create an equipment and supply scorecard that compared our supply chain patterns with a focus on value, best practices, and evidence-based medicine.

The concept of a surgeon scorecard is not unique and has been well documented as an effective intervention in a recent *JAMA* article in which a 7.4% cost reduction was realized.

Another article highlighting a similar intervention for orthopedic procedures demonstrated an 8.7% reduction in cost when surgeons were given a monthly "Surgeon Value Scorecard" over a 9-month period.

In order to support opportunities like these, health systems need to invest in technology and analytic solutions to engage and influence physician behaviors that offer real-time feedback and empower physician leaders with the tools and resources they need to make value-based choices in the operating room.

Approaching a high-value hysterectomy clinical pathway by focusing on four areas of opportunity in a continuous fashion -- supply costs, length of stay, surgeon efficiency, and route selection -- is a great starting point. Individual surgeon and institutional scorecards that drill down into these factors can be leveraged to identify mentorship opportunities, potential behavior changes, and most importantly, best practices.

**Intuitive Surgical and Device Manufacturers**

Aligned incentives between medical device representatives is critical to our success. As we introduce technology solutions into our healthcare systems, we need to ensure that a value prospect is included in the contracting process.

In my experience, the Intuitive reps often encourage trainees to switch out instruments and select higher-cost instruments as they are incentivized to maximize surgeon utilization.

A 2010 *ACOG Green Journal* article identified disposable equipment cost opportunities in robotic surgery. Healthcare systems and training programs should demand that device manufacturers develop the highest value training program for adoption of their device and respect the clinical pathways and best practices within an institution for utilization of the device.

**Residency Training Programs**

Non-academic health systems should work collaboratively with graduate medical education programs, sharing their challenges, and influencing curriculum and training that promotes value in surgeon development. A 2013 *AJOG* article emphasized the importance of surgeon efficiency in robotic surgery cost management.

Integrating an efficiency assessment and cost management into surgical training is described in this article as part of the robotic credentialing pathway.

**Academies and Society Consensus Statements**

In 2009, ACOG reinforced their recommendation that vaginal hysterectomy was the preferred route of hysterectomy via a Committee Opinion, yet despite this statement, vaginal hysterectomy rates continued to decline. This is a testament to the fact that an academy, college, or society statement alone cannot influence the tide of change.

That being said, they can lead the charge in engaging the above stakeholders to develop high-value clinical pathways that incorporate emerging technologies.

In conclusion, the impact of the COVID-19 global pandemic has placed significant financial pressure on healthcare systems, making opportunities to identify value in care delivery ever more relevant and urgent.

The use of a high-value hysterectomy clinical pathway that provides real-time and transparent feedback to surgeons is an approach that can address factors related to cost and quality and integrate value into surgical care.

*Eve Cunningham, MD, is the chief medical officer of Providence Medical Group.*

2 Comments

**Recommended For You**

**Public Health & Policy**

## COVID Drug Recall; Update on Nurse Struck by Lightning; Surrogates' Pregnancy Risks

---

**Infectious Disease**

## Pope's Illness; Docs Against Trump; Another Contact of Missouri H5N1 Case Fell Ill

---

**Endocrinology**

## One-Year CGM Cleared; Osteoporosis Lawsuits Revived; Chemicals and Early Puberty

---

**Infectious Disease**

## COVID Czar's 'Sex Parties'; Nationwide Drug Recall; Steward CEO Held in Contempt

---

**Public Health & Policy**

## EPA Scientists Say They Were Pressured to Downplay Health Harms From Chemicals

---

**Infectious Disease**

## 'Sex Party' COVID Czar Fired; Undiagnosed Iron Deficiency; Many Papers Partly Fake?

### Medical News From Around the Web

**USA TODAY**

This FDA-approved drug promises a new way to treat schizophrenia

**CBS NEWS**

Free COVID tests are back. But there are more accurate tests for sale.

**BECKER'S HOSPITAL REVIEW**

MRIs cut overdiagnosis in prostate cancer screening: Study

**CLINICAL ADVISOR**

Sleep and Nighttime Agitation in Older Adults with Cognitive Decline

**CIRCULATION**

Sacubitril/Valsartan in Pediatric Heart Failure (PANORAMA-HF): A Randomized, Multicenter, Double-Blind Trial.

**BRAIN**

Plasma metabolomic signature of healthy lifestyle, structural brain reserve and risk of dementia.

About    Help Center    Terms of Use    Privacy Policy    Do Not Sell My Personal Information    Advertise With Us    AdChoices ▷    Accessibility Statement

The material on this site is for informational purposes only, and is not a substitute for medical advice, diagnosis or treatment provided by a qualified health care provider.

© 2005–2024 MedPage Today, LLC, a Ziff Davis company. All rights reserved.

MedPage Today is among the federally registered trademarks of MedPage Today, LLC and may not be used by third parties without explicit permission.

**EXHIBIT 9**

**to**

**PAUL D. BRACHMAN DECLARATION IN SUPPORT
OF DEFENDANT'S MOTION IN LIMINE NO. 1
TO EXCLUDE OUT-OF-COURT HOSPITAL
STATEMENTS**

# The "monopoly" issue

- As of December 2015, 3597 da Vinci surgical systems installed in the world

- Intuitive Surgical has built high barriers to new entry of surgical robots by:
  - superior product offerings
  - intellectual property protection
  - multiple regulatory clearances
  - large installation base
  - worldwide training centres
  - strong customer relationships





@ricautor @VCUUrology #JHUroSeminars18



**EXHIBIT 10**

**to**

**PAUL D. BRACHMAN DECLARATION IN SUPPORT
OF DEFENDANT'S MOTION IN LIMINE NO. 1
TO EXCLUDE OUT-OF-COURT HOSPITAL
STATEMENTS**

Feb 12, 2014

# Technology Widens Care Options for Rural Hospitals

*by Candi Helseth (https://www.ruralhealthinfo.org/rural-monitor/author/candi-helseth)*

Rapidly advancing technological developments are helping rural hospitals save patients—and themselves. Throughout the country, hospital leaders are looking at ways they can strengthen their bottom line using technologies that better serve their communities and keep patients closer to home.

In Michigan, urban surgeons perform complex procedures at small Critical Access Hospitals (CAHs). Robotic surgery expands physician and hospital capabilities in Minnesota. And in Washington, medical robots place remote physician specialists at the bedside of critically ill patients.

"Ten years ago, what we're doing wouldn't have been possible," asserts Michigan Rural Healthcare Preservation (MRHP) CEO Ethan Lipkind. "There have been astronomical strides in medical technology that have improved engineering, and advancements that have made it possible to provide sophisticated procedures in settings that were previously impossible. And we can do all of it in an exceptionally safe environment that benefits both patient and hospital."

Today's patients are smart and savvy, and they request best practice options such as robotic surgery, according to Joy Johnson, chief operating officer at Sanford Bemidji Medical Center (https://www.sanfordhealth.org/locations/sanford-bemidji-medical-center) (SBMC) in Bemidji, Minn. Patients want to stay close to home for care but they will travel long distances for best practice surgical options, Johnson said, adding that rural hospitals must be proactive technologically to maintain a solid bottom line.

"The old paradigm was that a hospital's purpose was to aggregate all the professionals in one place and bring patients there," says Tom Martin, CEO at Lincoln Hospital (https://www.lincolnhospital.org/) in



*In Washington state, medical robots place remote physician specialists at the bedside of critically ill patients. Here "Hawkeye" the robot is set to visit a patient in his room at Lincoln Hospital in Davenport, Wash.*

Davenport, Wash. "Now that ability is changing to us bringing the professionals to where the patients are."

## Increasing Treatment Access

Lipkind knows of no organization similar to MRHP, a nonprofit network created in 2010 to help remote rural hospitals remain operational by developing environments that offer patients the advantages of the latest technologies. MRHP collaborates with CAHs in Deckerville (https://aspirerhs.org/locations/deckerville-community-hospital/) and West Branch to operate a surgical program where four urban surgeons travel to the CAHs to do neurosurgery, complex urology, spine and orthopedic surgeries, fusion procedures and advanced pain care management.

"The traveling surgeons are the lifeline of this arrangement," Lipkind commented. "Patient outcomes have been stellar. In these small rural hospitals, the focus is on one individual patient at a time. So these patients get more individualized care."



*Dr. Gerald Schell, a board certified neurosurgeon, is one of four urban surgeons who travel to Critical Access Hospitals in Michigan, offering patients the option of local care.*

Mary Ann*, a patient with a lumbar disk injury, terms her surgical experience "fantastic." Dr. Gerald Schell, a board certified neurosurgeon with Michigan Clinic Neurosurgery (https://schellspinal.com/) in Saginaw, performed Mary Ann's multilevel spinal fusion in the Operating Room of the 15-bed Deckerville Community Hospital (DCH).

"I was treated like family from walking in the door until being discharged," Mary Ann said. "The staff went above and beyond the call of duty."

According to DCH Chief Financial Officer Valerie Bryant, the surgical program has stabilized DCH financially, improved employee morale and been embraced by patients. DCH's upfront investments included equipment upgrades and staff training.

"It takes additional nursing and clinical staff because we need all hands on deck the days these surgeons come in," Bryant said. "We have to take care of our patients in the hospital and put more staff in the OR. But the benefit has definitely outweighed our additional expenses."

MRHP is expanding surgical options at these network hospitals and has begun working with two more rural hospitals to develop programs specific to their needs. Lipkind said MRHP is also affiliated with physician offices, the Field Neurosciences Institute (https://www.fni.org/) and Central Michigan University College of Medicine (https://www.cmich.edu/academics/colleges/college-of-medicine).

## Robotic Surgery Offers New Options for Rural Patients

Sanford Bemidji Medical Center (https://www.sanfordhealth.org/locations/sanford-bemidji-medical-center) in Bemidji and Essentia Health-St. Joseph's Medical Center (https://www.essentiahealth.org/find-facility/profile/essentia-health-st-josephs-medical-center-brainerd/) in Brainerd are two rural Minnesota hospitals that have installed the da Vinci Surgical System, the first robotic surgical system approved in 2000 by the FDA. The system has a camera that provides a multi-dimensional view inside the patient's body and a minimally invasive robotic arm with a pivoting wrist that can manipulate microscopic instruments in tiny areas inside the body. The surgeon navigates all aspects of the surgery from an exterior panel.



*Dr. Benjamin Roy, a board certified general surgeon trained in robotic surgery at Sanford Bemidji Medical Center in Bemidji, Minn., shows a potential patient how the robotic system gives a view inside the body.*

Currently, both hospitals are offering robotic procedures in the areas of general surgery, urology and gynecology. Difficult surgeries that couldn't have been done in the past at Essentia Health have become common procedures because of the minimally invasive technology using the robot, according to Essentia Health Urologist Dr. Scott Wheeler.

"Robotics take the minimally invasive world one step further," commented Dr. Hal Leland, an Essentia Health obstetrician/gynecologist who performs robotic surgery.

"Robotic surgery is significantly less invasive with less trauma to the body than there is even with minimally invasive surgeries," Johnson concurred. "Patients want robotic surgery because it means shorter hospital stays and faster recoveries for them. New physician surgical grads are trained in robotic surgery and they want to use those skills. If patient retention and physician recruitment are negatively impacted, that can impact a hospital's bottom line."

SBMC, which has 90 acute care beds, is at least 150 miles from the nearest tertiary centers so patients were traveling or being transferred long distances for critical services. Four years ago the board of directors adopted a strategic plan to improve patient care and safety by developing SBMC as a regional referral center. In addition to the robotic program, other high-tech improvements since then include a new cardiac program with 24-hour STEMI (https://www.heart.org/en/professional/quality-improvement/mission-lifeline/systems-of-care-overview-and-implementation-strategies) service, and a cardiac catheterization laboratory and a chronic wound program that includes hyperbaric oxygen therapy and advanced wound care.

## "Hawkeye" the Robot Brings Specialty Care to Local Hospitals

According to the Washington State Hospital Association (https://www.wsha.org/our-members/rural-hospitals/), the state's 38 CAHs are the healthcare cornerstone in rural communities, and their viability is threatened. Among the CAHs implementing innovative approaches to stabilize their operations is Lincoln Hospital (https://www.lincolnhospital.org/), the first Washington CAH to use a robot (https://vimeo.com/69120526) to manage care for patients who have had strokes. Lincoln soon extended the program to include hospitalist management for all complex care patients. Within the first year of Lincoln Hospital adding the robot (which they call "Hawkeye") to its staff in 2010, patient transfers decreased by 24 percent and admissions increased by 21 percent, representing a $1 million increase in revenue. Martin said other benefits include shorter patient hospital stays, fewer patient hospital readmissions and improved post-discharge patient management.

Contrary to the administration's fears that patients and staff might react negatively to a robot, Hawkeye was an immediate hit. "It's really amazing to watch Hawkeye at work," Martin commented. "These remote specialists basically see everything in the patient that a doctor in our hospital does. And the stethoscope quality is so good that there isn't any deterioration transmitting heart and lung sounds."

A 25-bed critical access hospital in a CMS-designated frontier location, Lincoln Hospital simply didn't have high enough patient volumes to justify hiring a full-time critical care specialist. But an outside review indicated that 38 percent of patients transferred to Spokane over a six-month period could have remained at Lincoln if critical care management was available.



*A remote physician talks to a patient in his room via a medical robot at Lincoln Hospital.*

"Our doctors are very competent but they weren't getting that inpatient exposure and skills usage that urban specialty doctors do, so they didn't always feel comfortable keeping complex patients here," Martin explained. "As they started using Hawkeye, they agreed it was extremely beneficial to have another set of eyes on their patients. With this additional clinical support, they have the ability to care for more patients here."

Currently, 14 rural hospitals in Washington state use TeleStroke, and three are developing TeleHospitalist. Critical care specialists or hospitalists at Providence Health Care (https://www.providence.org/locations?postal=99207&latlng=47.674,-117.375&radius=1500&page=1) (PHC) in Spokane provide 24-hour support to the rural physicians and hospitals. According to PHC Telehealth Program Coordinator Denny Lordan, PHC is developing TelePediatrics, TeleMental Health and TeleCritical Care. PHC also assists the rural hospitals with implementation to assure adherence to standard practice guidelines.

"Having subspecialists that we can make available to partner hospitals in the region elevates the level of care that rural patients receive in their own communities and helps to keep care local," Lordan said. "When we keep appropriate patients in their own communities, we also free up higher acuity beds at Providence for patients that need that level of care."

While these administrators are enthusiastic about high-tech solutions, they also agree that success won't happen without community education and support, a financial investment, and willingness to partner or network with other healthcare providers.

"I think as rural hospitals we have to realize if we are going to grow and use our facilities to the fullest extent, it's essential that we bring specialists into that mix," Martin said. "Newer technologies offer opportunities that rural hospitals should be evaluating. Clearly, we have to be willing to become part of a system of care where integrating clinically with large systems using this technology affords us the ability to remain independent. Technology affords us a new perspective. We've stopped looking at our feet and started looking at the sky."

*\* To ensure patient privacy, the Rural Monitor only uses patients' first names.*

---

**Back to:** Winter 2014 Issue (https://www.ruralhealthinfo.org/rural-monitor/winter-2014)

This article was posted in Features (https://www.ruralhealthinfo.org/rural-monitor/category/features) and tagged Cardiovascular disease (https://www.ruralhealthinfo.org/rural-monitor/topics/cardiovascular-disease) · Critical Access Hospitals (https://www.ruralhealthinfo.org/rural-monitor/topics/critical-access-hospitals) · Health conditions (https://www.ruralhealthinfo.org/rural-monitor/topics/health-conditions) · Hospitals (https://www.ruralhealthinfo.org/rural-monitor/topics/hospitals) · Michigan (https://www.ruralhealthinfo.org/rural-monitor/states/michigan) · Minnesota (https://www.ruralhealthinfo.org/rural-monitor/states/minnesota) · Service delivery models (https://www.ruralhealthinfo.org/rural-monitor/topics/service-delivery-models) · Specialty care (https://www.ruralhealthinfo.org/rural-monitor/topics/specialty-care) · Surgery (https://www.ruralhealthinfo.org/rural-monitor/topics/surgery) · Technology for health and human services (https://www.ruralhealthinfo.org/rural-monitor/topics/technology-for-health-and-human-services) · Telehealth (https://www.ruralhealthinfo.org/rural-monitor/topics/telehealth) · Washington (https://www.ruralhealthinfo.org/rural-monitor/states/washington)

---

◀ Previous Article: Patient Simulators Sharpen Skills of Rural Practitioners (https://www.ruralhealthinfo.org/rural-monitor/patient-simulators-sharpen-skills)

Next Article: Winter 2014 ▶ (https://www.ruralhealthinfo.org/rural-monitor/winter-2014)

**EXHIBIT 11**

**to**

**PAUL D. BRACHMAN DECLARATION IN SUPPORT
OF DEFENDANT'S MOTION IN LIMINE NO. 1
TO EXCLUDE OUT-OF-COURT HOSPITAL
STATEMENTS**



Attorneys' Eyes Only



Attorneys' Eyes Only

Intuitive-00246470



Attorneys' Eyes Only



Attorneys' Eyes Only



Attorneys' Eyes Only



Attorneys' Eyes Only

Intuitive-00246474



Attorneys' Eyes Only



Attorneys' Eyes Only

Intuitive-00246476



Attorneys' Eyes Only

Intuitive-00246477



Attorneys' Eyes Only



Attorneys' Eyes Only



Attorneys' Eyes Only



Attorneys' Eyes Only



Attorneys' Eyes Only



Attorneys' Eyes Only



Attorneys' Eyes Only

Intuitive-00246484



Attorneys' Eyes Only



Attorneys' Eyes Only



Attorneys' Eyes Only



Attorneys' Eyes Only



Intuitive-00246489



Attorneys' Eyes Only



Attorneys' Eyes Only

Intuitive-00246491

**EXHIBIT 12**

**to**

**PAUL D. BRACHMAN DECLARATION IN SUPPORT
OF DEFENDANT'S MOTION IN LIMINE NO. 1
TO EXCLUDE OUT-OF-COURT HOSPITAL
STATEMENTS**

**Goldman Sachs** | Equity Research

15 November 2018 | 4:59AM EST

*The following is a redacted version of the original report. See inside for details.*

**Americas Healthcare: Medical Technology**

# Digital Health: Robotic Surgery and the OR of the Future



*We are initiating a new series of reports that cover the convergence of Healthcare and Technology, a topic we label Digital Health. To bring focus to this expansive topic, these reports will aim to identify specific areas where the convergence is tangible, significant, and actionable for investors. We start by exploring the future of robotic surgery. Future reports will address topics that include genomics, wearables, and digital therapeutics.*

**Isaac Ro**
+1(212)902-6393 | isaac.ro@gs.com
Goldman Sachs & Co. LLC

**Veronika Dubajova, CFA**
+44(20)7774-1901 |
veronika.dubajova@gs.com
Goldman Sachs International

**Akinori Ueda, Ph.D.**
+81(3)6437-9910 | akinori.ueda@gs.com
Goldman Sachs Japan Co., Ltd.

**Ziyi Chen**
+852-2978-0526 | ziyi.chen@gs.com
Goldman Sachs (Asia) L.L.C.

**Jack O'Connell**
+1(212)357-4810 | jack.oconnell@gs.com
Goldman Sachs & Co. LLC

**Sara Silverman**
+1(212)357-3292 |
sara.silverman@gs.com
Goldman Sachs & Co. LLC

**Frits Jonker**
+1(801)884-4709 | frits.jonker@gs.com
Goldman Sachs & Co. LLC

## Introducing Digital Health

**Introducing Digital Health.** With this report, we are initiating a new series that covers the convergence of Healthcare and Technology – a topic we label Digital Health. The implications of this megatrend are vast as **we estimate 26% of the market cap in the S&P is somehow exposed**. In addition, the landscape between incumbents and disruptors is rapidly evolving as **32% of VC dollars in Healthcare was allocated to Digital Health** companies in 2018 (vs 15% five years ago).

**Why is this important to investors?** Global demand for Healthcare continues to rise thanks to demographics, economic growth and innovation. At the same time, current Healthcare systems increasingly look inefficient and unsustainable. As these systems reach new tipping points, we think disruptive forces will be increasingly driven by technology-driven advances (i.e., compute power, storage, mobility) that have already swept across other major industries such as retail, transportation and manufacturing. We also see the potential for newer emerging technologies (blockchain, 3D printing and augmented reality) to play a disruptive role in Healthcare. Taken together, we think these secular forces and disruptive technologies will have a meaningful impact to existing profit pools and earnings growth for incumbents.

Goldman Sachs does and seeks to do business with companies covered in its research reports. As a result, investors should be aware that the firm may have a conflict of interest that could affect the objectivity of this report. Investors should consider this report as only a single factor in making their investment decision. For Reg AC certification and other important disclosures, see the Disclosure Appendix, or go to www.gs.com/research/hedge.html. Analysts employed by non-US affiliates are not registered/qualified as research analysts with FINRA in the U.S.

**Our goal with these reports.** To bring focus to this expansive topic, this report series will aim to identify specific areas where the convergence is tangible, significant, and actionable for investors. These areas include genomics (diagnostic testing, gene therapy), wearables (patient monitoring), imaging (MRIs, pathology), and digital therapeutics (software-based treatment of disease).

**Our approach.** In this report series, we will evaluate disruptive technologies from both public and private companies, track regulatory catalysts, apply a global perspective when relevant, and be opportunistic in the topics we cover.

**Deep dive on robotic surgery.** In this report, we attempt to frame the outlook for the next decade in robotic surgery. We evaluate the competitive landscape, consider new therapeutic markets where robotic surgery is taking off, and discuss key trends with a handful of key opinion leaders (KOLs).

*Note: The following is a redacted version of "Digital Health: Robotic Surgery and the OR of the Future" originally published Nov. 15, 2018 [30pgs]. All company references in this note are for illustrative purposes only and should not be interpreted as investment recommendations.*

# Our Report in Pictures

**Exhibit 1: Digital Health touches roughly 26% of the S&P**
% of S&P 500 Market Cap Impacted by Digital Health



Impacted firms are defined as companies in the Healthcare sector and large cap Technology companies with substantial investments in Digital Health.

Source: Company data, Goldman Sachs Global Investment Research

**Exhibit 2: VC funding for Digital Health is rapidly increasing**
$13bn+ in FY18, >30% of all Healthcare deals



Source: National Venture Capital Association, Rock Health, Goldman Sachs Global Investment Research

# Robotic Surgery Is a Global Theme

### Europe

The developed markets are the areas at the forefront of focus for robotic surgery entrants. Though markets within the continent have idiosyncrasies, an obstacle we believe worth noting is the push by surgeon societies, and not manufacturers, to administer training. Conversely, any momentum towards outpatient care should be constructive for robotic surgery. Having said that, companies like CMR Surgical have noted they are intent on capitalizing on home field advantage and incremental improvements such as mobility to penetrate a virtually untapped market in Europe.

### China

China, a less developed market, is seeing a spike in interest among patients in the field of robotic surgery. Based on our conversations with industry participants, there is a real market for affluent Chinese patients who wish to pay out-of-pocket for robotic procedures. Having said that, the market is less accessible than it otherwise could be due to political factors. In recent weeks, China's National Health Commission announced a new quota allowing for the placement of an incremental 154 surgical robots at state hospitals through the end of CY20. The move comes several years after the previous quota was filled and expired in 2015, leading to several years of pent-up demand in the Chinese market.

We believe the current general trade environment to be disadvantageous to those seeking to grow the use of surgical robots in Chinese markets. Chinese surgeons often have cited cost as a major constraint, as reimbursement for robotics is not as established as it is in the United States. Surgeons therefore are more likely to perform a higher volume of surgeries and be part of system in which the large capital outlay of a robot could be justified by a steady flow of well-to-do patients.

**Exhibit 3: China largely untapped, nearly as big as the US**
China Tier 3 hospitals vs US short-term acute care hospitals



Source: American Hospital Directory, National Health and Family Planning Commission, Company data, Goldman Sachs Global Investment Research

Another dynamic to keep in view is the push within China to develop robotic surgery supply from the country as part of the "Made in China 2025" initiative announced in

2015.  As part of a broader push to modernize China's manufacturing capabilities to allow for the production of higher value goods, the government plans to support research into medical robotics, both in design and manufacturing capabilities. A number of smaller players within the country are developing platforms to bring to market bolstered by this program, though few are close to commercialization.

# Conversations with KOLs

### General Surgery

In the past decade, robotics have begun to supplant open and some laparoscopic procedures. Robot assisted surgery has proven itself to be a challenger to both open and laparoscopic procedures, displacing open procedures in colectomy, cholcystectomy, and bariatric surgery; conversely, it has challenged laparoscopic methods for procedures like inguinal hernia repair and ventral hernia repair. Several general surgeries have seen considerable uptake in robotics in the past decade.

## An interview with **Dr. Jay Redan of Celebration Health**



*To provide more color, we document our conversation with **Dr. Jay Redan** of Celebration Health.*

**Q. What is Celebration Health, what is your role and what role do surgical robotics currently play at your institution?**

**A.** I am the Chief of Surgery at Florida Hospital-Celebration Health and serve as President of the Society of Laparoendoscopic Surgeons. Celebration Health is a "Living Laboratory" that brings the best technology to not only Central Florida, but to the world. Of the 8,000+ surgical procedures we perform in our 11 Operating Rooms annually, approximately **1/3 involve surgical robotics**. We use this technology in a variety of categories that include **orthopedics, head and neck surgery, general surgery, thoracic, colorectal, GYN, and urology**. We have 5 surgical robots and 1 orthopaedic robot.

**Q. What are the biggest benefits of using surgical robotics today?**

**A.** The benefit to the doctor and patient is better visualization, more precise surgery and fewer complications that can hopefully be better outcomes (yet to be proven). The benefits of being an early adopter of successful technology is a benefit to the hospital.

**Q. How do you see these benefits evolving over the next 5 years?**

**A.** There are a number of new features and technologies that could enhance the utility of robotic surgery in the coming years. For example, integration of **artificial intelligence, image guided surgery, and sensor technology** that can be built into the robot will lead to more robotic surgical autonomy and leave the human factors out of surgical skills and level the playing field. As you know, there are good mechanics and bad ones, good plumbers and bad ones, good doctors and bad ones. Hopefully, robotic technology will assist in preventing errors by preventing injury to normal organs while removing disease.

**Q. Imaging and sensor technologies still play a limited role in robotic surgery – how will that change?**

**A.** A few examples include the potential to adjust energy levels depending on tissue density, evaluating the margins of cancer in a patient's body by scientifically "seeing" where the tumor ends and normal tissue begins. The latter will help to avoid over-excising normal tissue in order to eradicate cancerous tissue.

**Q. What about 3D printing, is there a role there to customize treatment for the individual?**

**A.** Absolutely!! Being able to **"print" your own customized replacement parts** will definitely occur. Orthopedics, Dental, Craniofacial replacements are already being done. Meshes for hernia repair and possibly organ replacement are already in development.

**Q. How about artificial intelligence, do you see a future where surgeries can be semi-autonomous or even fully autonomous in some cases?**

**A.** Absolutely too! As images are able to be imported into the robot, **the surgeon of the future will essentially be a computer programmer**. He/she will program the robot to excise the disease and replace the diseased part with a 3D printed replacement and the robot with excise and replace with fewer errors, more precision, and faster OR times than any human could ever do!!!! Sorry Medical Schools and training programs…have you ever heard of cars being assembled by robots???

**Q. The market is currently dominated by one big player – how do you see the competitive landscape evolving over the next 5 years?**

**A.** Over the next 5 years there will probably be 10 players in the surgical robotics market. Once this happens and the price of robotic surgery will equal laparoscopy. Laparoscopy will go away and become a thing of the past for historians only performing lectures on the "History of Minimally Invasive Surgery."

### Orthopaedics

In the realm of orthopaedics, robotic technology has gained traction in recent years, as surgeons are using robots in some of the most common surgeries among the U.S. patient population – knee and hip replacements. We have previously <u>highlighted</u> that we see a compelling value proposition for robotics in the hip and knee replacement markets: in a number of clinical studies, robotic orthopaedic procedures have been shown to allow for shorter postoperative stays and improved alignment vs. conventional approaches (see our deep-dive for more information). While this has not yet been demonstrated to deliver significant long-term functional improvements, we believe that there is sufficient evidence to suggest that robotic orthopaedic surgery will likely deliver reduced hospitalization costs and reduced post-surgery complications in the medium term.

---

**An interview with Dr. Michael Mont**



*For expert opinion on orthopaedics, we spoke with **Dr. Michael Mont***

**Q. Thank you for joining us, Michael. Why don't you start off by telling us about your background?**
**A.** Thank you for having me. I am an orthopaedic surgeon and was Chairman of the Cleveland Clinic up until April last year and still participate with them in a research role as Associate Staff. I am currently at Lenox Hill Hospital in New York City and System Chief of Joint Replacement and Vice Chair of Strategic Operations of Orthopedics at Northwell Health.

**Q. Can you tell us a bit about your involvement and general perspectives regarding orthopaedic robotics?**
**A.** I was the Principal Investigator of the Cleveland Clinic arm of a multicenter prospective study of knee replacements, which so far has had extremely positive early results. In addition, I have been involved in multiple basic science (cadaver) and human clinical studies utilizing robotics **for both hip and knee replacements**. I believe robotic surgery is presently enhancing the field and has much more tremendous potential. It can help with pre-operative planning of cases, allow the performance of more accurate surgery, and aid surgeons in achieving **more accurate radiographic alignment**. By pre-operative help, I mean using x-rays and CT scans that help individualize surgery, and establish haptic boundaries intra-operatively, that the robotic-assistive device I use allows; the bone-cutting blades are contained and in, my opinion, this **reduces error and allows for safer surgery**. In addition, not to be minimized, these robotically-assisted surgeries are great research and **educational tools**.

**Q. With all this progress, where do you think technological applications in surgery will be in 5 years?**
**A.** I think procedures will be more individualized than they already are. At this pace, it is feasible to believe that technologies like **artificial intelligence**, further **advanced imaging**, and **3D printing** will start taking off in orthopaedics in the next 2 or 3 years, and by 5 years from now, we will certainly be in a landscape that is very different from what we are seeing today. We will see **AI in diagnostics, better feedback, cost-efficient 3D printing**, among other advancements.

**Q. What will be the key competitive factors that separate winners from losers?**
**A.** It all comes down to the level of evidence we have supporting quality. The robots that can build a strong case for their superiority for patients, surgeons, and hospitals will win out.

**Q. How should we think about the role robotics can play in driving orthopaedic procedures from hospitals to outpatient settings?**
**A.** Outpatient surgery is an existing and increasing trend in hip and knee replacement surgery –robotics will only help that. This technology is simply making things **more reliable, efficient, reproducible, and easier.**

**Q. What would it take for a hospital administrator to overrule a physician's aversion to robotics in the decision to buy a robot?**
**A.** At the end of the day, **higher quality, improved outcomes**—which will lead to lower costs, will win out. Things can change rapidly in healthcare and I believe that improved patient-outcomes will always drive the acquisition of new technologies.

---

We estimate that there are approximately 700-800 orthopaedic robotic systems globally. We believe that robotics account for c.20% of all partial knee replacement procedures in the US, up from c.16% in 2015; however, penetration in total knee and total hip replacements still remains low – likely in the low-single digits – though we expect it to

increase over the next 5-7 years, in particular as more companies bring solutions to market, and as the industry expands the range of procedures available on the robot.

**Exhibit 4: US and Global orthopedics markets are likely candidates for significant displacement by robotic surgery**
US and Global Orthopaedics Market Sizes (Billions)



**Exhibit 5: Hip and knee replacements are poised to benefit from an aging US population**
% of US Procedures by Age Range



Source: Company data, Goldman Sachs Global Investment Research

Source: company data, Company data, Goldman Sachs Global Investment Research

## Spine

Current robotic surgery systems for spinal implants are very nascent with just a couple of entrants with first generation systems on the market that offer limited functionality. Key benefits currently include more accurate placement of pedicle screws, reduced pain for the patient, and real time verification of goals throughout the procedure. To date, the accuracy related benefits have been well documented but there is still insufficient clinical data that show the use of robotics in spinal surgery lead to improved outcomes. Future opportunities include "no-fly-zones" for surgeons, motion sensors, follower robots, and automation of simpler procedures.

### An interview with **Dr. Kade Huntsman**



*To learn more about spine and robotics, we invoke the insights of **Dr. Kade Huntsman**.*

**Q. Tell us about your practice and what role surgical robotics currently play at your institution?**
**A.** My practice is a Private practice, all orthopaedic surgeon partners and a few physiatrists, 16 MD's total, including 2 Spine surgeons. We have about **5 surgeons** working in the hospital that perform spinal surgery. 3 of us use robotics and or guidance when instrumenting. St Marks is an HCA facility, part of the MountainStar system in Utah, Idaho and Alaska.

**Q. What are the biggest benefits of using surgical robotics for spine today?**
**A.** I have used stealth occasionally for many years, then the hospital purchased me a Globus Excelsius GPS system in October of 2017, and I have completed about 125 surgeries using this system. I trialed the Mazor around the time Medtronic made their first big investment in Mazor. Was not impressed because the Mazor product did not include navigation, ie stealth, and Medtronic has been attempting to get the 2 to communicate for the past 18 months.

I recently completed a study looking at speed and accuracy of me using **fluoroscopy alone versus Excelsius**. I was **more accurate and averaged 7 minutes faster** with Excelsius.

Biggest benefit is accuracy, particularly in my practice where I do a lot of single position lateral surgery cases. It is beneficial in **almost all pedicle screw cases**.

**Q. How do you see these benefits evolving over the next 5 years?**
**A.** In the next 5 years we should be able to advance the technology to place inter body cages, remove bone and soft tissue, and assist in all areas of spinal surgery, not just pedicle screw placement. I have reviewed the Nuvasive Pulse platform and will be moving from Globus to Pulse due to the ability to incorporate the Siemens Cios and neuromonitoring all into one platform. I love the concept, I also think they will be the leader in this area very soon, due to the software developments in Pulse that allow **neuromonitoring, navigation, robotics (coming soon), and preoperative and intraoperative spinal alignment, all in a single platform.**

**Q. How do you see the competitive landscape evolving over the next 5 years?**
**A.** Globus is a great system, and is the current leader, but is limited in the ability to move forward with procedures that are more complex than simple screw placement. Table mounted systems have serious limitations that cannot be overcome. The simplest is the table maximum weight is about 500 pounds, with obese patients using the 250 plus pounds of that, not much technology nor rigidity can be built into that system. They will all have to convert to floor mounted systems soon in order to maintain rigidity and increases the complexity of the procedures they can do.

# Background

**Background:** Successful treatment was often dependent on selection of a "good surgeon" which is a highly qualitative and subjective process. With the advent of robotic surgery, surgical procedures have become more minimally invasive, more closely linked to technological advances in imaging/novel design of end effectors, and seen improved precision and patient outcomes. As a result, **robotic surgery has begun to democratize patient outcomes** particularly in routine categories such as prostatectomy and hysterectomy. While the magnitude of patient benefit and

cost-effectiveness remains a hotly debated topic, we think these technologies will only improve over time both in terms of performance and cost-effectiveness.

Equally important, **robotic surgery has become a very effective marketing tool for hospitals** who adopt the technology. Many surgical procedures are important profit centers to a hospital which in turn created an incentive for early adopters to advertise these capabilities directly to patients in an attempt to portray the institution as a leading center of excellence for complex illnesses such as cancer.

We therefore believe the continued adoption of these technologies will have far-reaching implications for the business model around general surgery. For hospitals, **general surgery procedures are likely to remain key profit centers, making capital spending for value-add technologies a continued priority**. For physicians, the rise of robotics has **significant implications for hospital recruitment** of new physicians as training on these technologies now begins in medical school. For Med Tech companies, increased market **adoption of robotics also puts pressure on legacy business models** that are based on manual laparosopic devices and commodity implants (knees/spine). These products are high margin and historically not linked to capital equipment. Robotic surgery systems generally have "razor/razorblade" based business models that threaten to capture these annuity streams.

**Where we are today**:

**Exhibit 6: Robotics have penetrated just 3% of procedures in the US**



**Exhibit 7: Opportunities for new US placements are still vast**
Roughly 10,000 US hospitals do not have a surgical robot



Source: US Census Bureau, Company data, Goldman Sachs Global Investment Research, National Center for Health Statistics

Source: Titan Medical, American Hospital Association, Advanced Surgical Care, Goldman Sachs Global Investment Research

**Exhibit 8: Robotic Surgery Penetration in General Surgery**



Source: Company data, Goldman Sachs Global Investment Research, National Center for Biotechnology Information, University of Nebraska Medical Center

# Appendix

**Exhibit 9: Many of the largest Tech companies have expressed or launched Digital Health initiatives**
Sample of high profile announcements from major Tech companies

| Company | Product/Service | Launched? | Description |
|---------|-----------------|-----------|-------------|
| AAPL | Apple Watch | Y | Includes FDA-approved electrocardiogram apps that allow for irregular heart rhythms that may not show up in a traditional medical exam. |
| AMZN | Genomics in the Cloud | Y | AWS offers an ecosystem for genomic data that allows for storage, collaboration, and analytics. |
| INTC | Echopixel | Y | Renders anatomy of patients using virtual reality formatting for the goal of increased clinical knowledge and faster operations. |
| GOOGL | Verily Life Science Algorithm | N | According to a study recently published in the Nature Biomedical Engineering Journal, a Google AI algorithm has predictive capability for cardiac events. |
| GOOGL | Verb Surgical (JNJ Collaboration) | N (Expected 2020) | A strategic partnership to advance surgical robotics to benefit patients, surgeons, and healthcare systems. JNJ has emphasized that this launch will be as much about "digital surgery" as robotics, distinguishing the terms as cognitive versus physical. |
| IBM | IBM Watson Care Manager | Y | Designed to help healthcare teams parse patient data, regulatory requirements, and create individualized healthcare plans. |
| MSFT | Airband Initiatve (Radwin Partnership) | N (Expected 2019) | Initiative designed to address the "broadband gap" in rural communities, largely motivated by the desire to administer healthcare using telemedicine. |
| ORCL | Clear Trial Coud Service | Y | Software that uses industry intelligence and clinical knowledge to optimize clinical study planning, sourcing, and deployment for R&D. |

Source: Company data, Goldman Sachs Global Investment Research

**Exhibit 10: VC deal size and frequency are increasing in Digital Health**

Roughly 600 deals, nearly $20mn on average



Source: Rock Health

# Disclosure Appendix

## Reg AC

We, Isaac Ro, Veronika Dubajova, CFA, Akinori Ueda, Ph.D., Ziyi Chen, Jack O'Connell, Sara Silverman and Frits Jonker, hereby certify that all of the views expressed in this report accurately reflect our personal views about the subject company or companies and its or their securities. We also certify that no part of our compensation was, is or will be, directly or indirectly, related to the specific recommendations or views expressed in this report.

Unless otherwise stated, the individuals listed on the cover page of this report are analysts in Goldman Sachs' Global Investment Research division.

## GS Factor Profile

The Goldman Sachs Factor Profile provides investment context for a stock by comparing key attributes to the market (i.e. our coverage universe) and its sector peers. The four key attributes depicted are: Growth, Financial Returns, Multiple (e.g. valuation) and Integrated (a composite of Growth, Financial Returns and Multiple). Growth, Financial Returns and Multiple are calculated by using normalized ranks for specific metrics for each stock. The normalized ranks for the metrics are then averaged and converted into percentiles for the relevant attribute. The precise calculation of each metric may vary depending on the fiscal year, industry and region, but the standard approach is as follows:

**Growth** is based on a stock's forward-looking sales growth, EBITDA growth and EPS growth (for financial stocks, only EPS and sales growth), with a higher percentile indicating a higher growth company. **Financial Returns** is based on a stock's forward-looking ROE, ROCE and CROCI (for financial stocks, only ROE), with a higher percentile indicating a company with higher financial returns. **Multiple** is based on a stock's forward-looking P/E, P/B, price/dividend (P/D), EV/EBITDA, EV/FCF and EV/Debt Adjusted Cash Flow (DACF) (for financial stocks, only P/E, P/B and P/D), with a higher percentile indicating a stock trading at a higher multiple. The **Integrated** percentile is calculated as the average of the Growth percentile, Financial Returns percentile and (100% - Multiple percentile).

Financial Returns and Multiple use the Goldman Sachs analyst forecasts at the fiscal year-end at least three quarters in the future. Growth uses inputs for the fiscal year at least seven quarters in the future compared with the year at least three quarters in the future (on a per-share basis for all metrics).

For a more detailed description of how we calculate the GS Factor Profile, please contact your GS representative.

## M&A Rank

Across our global coverage, we examine stocks using an M&A framework, considering both qualitative factors and quantitative factors (which may vary across sectors and regions) to incorporate the potential that certain companies could be acquired. We then assign a M&A rank as a means of scoring companies under our rated coverage from 1 to 3, with 1 representing high (30%-50%) probability of the company becoming an acquisition target, 2 representing medium (15%-30%) probability and 3 representing low (0%-15%) probability. For companies ranked 1 or 2, in line with our standard departmental guidelines we incorporate an M&A component into our target price. M&A rank of 3 is considered immaterial and therefore does not factor into our price target, and may or may not be discussed in research.

## Quantum

Quantum is Goldman Sachs' proprietary database providing access to detailed financial statement histories, forecasts and ratios. It can be used for in-depth analysis of a single company, or to make comparisons between companies in different sectors and markets.

## GS SUSTAIN

GS SUSTAIN is a global investment strategy focused on the generation of long-term alpha through identifying high quality industry leaders. The GS SUSTAIN 50 list includes leaders we believe to be well positioned to deliver long-term outperformance through superior returns on capital, sustainable competitive advantage and effective management of ESG risks vs. global industry peers. Candidates are selected largely on a combination of quantifiable analysis of these three aspects of corporate performance.

## Disclosures

### Coverage group(s) of stocks by primary analyst(s)

Isaac Ro: America-Medical Technology. Veronika Dubajova, CFA: Europe-Medical Technology. Akinori Ueda, Ph.D.: Japan-Medical Equipment, Japan-Pharmaceuticals. Ziyi Chen: A-share Pharmaceuticals, China Healthcare.

A-share Pharmaceuticals: Betta Pharmaceuticals Co., Chengdu Kanghong Pharmaceutical, Huadong Medicine Co., Hualan Biological Engineering, Jiangsu Hengrui Medicine Co., Jiangsu Nhwa Pharmaceutical Co., Livzon Pharmaceutical Group (A), Shanghai Fosun Pharma (A), Sichuan Kelun Pharmaceutical Co., Tigermed, Tonghua Dongbao, Zhejiang Huahai Pharmaceutical.

America-Medical Technology: Abbott Laboratories, Abiomed Inc., Baxter International Inc., Becton Dickinson & Co., Boston Scientific Corp., Dexcom Inc., Edwards Lifesciences Corp., Hill-Rom Holdings, Hologic Inc., Inspire Medical Systems Inc., Intuitive Surgical Inc., Medtronic Plc, Nevro Corp., NuVasive Inc., Penumbra Inc., Stericycle Inc., Steris Plc, Stryker Corp., Teleflex Inc., The Cooper Co., Varian Medical Systems Inc., Zimmer Biomet Holdings.

China Healthcare: 3SBio Inc., AK Medical Holdings, Ascletis Pharma Inc., Baiyunshan (H), BeiGene Ltd., China Biologic Products Inc., China Medical System Holdings, China Resources Pharmaceuticals, CSPC Pharmaceutical Group, Hua Medicine, Livzon Pharmaceutical Group (H), Luye Pharma Group, Shandong Weigao Group, Shanghai Fosun Pharma (H), Shanghai Pharma (H), Sino Biopharmaceutical, Sinopharm Group, United Laboratories Intl.

Europe-Medical Technology: Amplifon, Coloplast, ConvaTec Plc, Elekta AB, EssilorLuxottica, Fresenius Medical Care, Fresenius SE, Gerresheimer AG, GN Store Nord, Grifols, Grifols, Philips, Siemens Healthineers AG, Smith & Nephew, Sonova Holdings, Straumann AG, William Demant Holding.

Japan-Medical Equipment: Olympus, Sysmex, Terumo.

Japan-Pharmaceuticals: Astellas Pharma, Chugai Pharmaceutical, Daiichi Sankyo, Eisai, Healios, Kyowa Hakko Kirin, Ono Pharmaceutical, Otsuka Holdings, PeptiDream Inc., ReproCELL Inc., Santen Pharmaceutical, Sawai Pharmaceutical, Shionogi & Co., Taisho Pharmaceutical Holdings, Takeda Pharmaceutical.

## Company-specific regulatory disclosures

The following disclosures relate to relationships between The Goldman Sachs Group, Inc. (with its affiliates, "Goldman Sachs") and companies covered by the Global Investment Research Division of Goldman Sachs and referred to in this research.

Goldman Sachs has received compensation for investment banking services in the past 12 months: Intuitive Surgical Inc. ($513.64)

Goldman Sachs expects to receive or intends to seek compensation for investment banking services in the next 3 months: Intuitive Surgical Inc. ($513.64)

Goldman Sachs had an investment banking services client relationship during the past 12 months with: Intuitive Surgical Inc. ($513.64)

Goldman Sachs had a non-securities services client relationship during the past 12 months with: Intuitive Surgical Inc. ($513.64)

Goldman Sachs makes a market in the securities or derivatives thereof: Intuitive Surgical Inc. ($513.64)

Goldman Sachs is a specialist in the relevant securities and will at any given time have an inventory position, "long" or "short," and may be on the opposite side of orders executed on the relevant exchange: Intuitive Surgical Inc. ($513.64)

## Distribution of ratings/investment banking relationships

Goldman Sachs Investment Research global Equity coverage universe

|  | Rating Distribution | | | | Investment Banking Relationships | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
|  | Buy | Hold | Sell | | Buy | Hold | Sell |
| Global | 35% | 54% | 11% | | 64% | 57% | 55% |

As of October 1, 2018, Goldman Sachs Global Investment Research had investment ratings on 2,814 equity securities. Goldman Sachs assigns stocks as Buys and Sells on various regional Investment Lists; stocks not so assigned are deemed Neutral. Such assignments equate to Buy, Hold and Sell for the purposes of the above disclosure required by the FINRA Rules. See 'Ratings, Coverage groups and views and related definitions' below. The Investment Banking Relationships chart reflects the percentage of subject companies within each rating category for whom Goldman Sachs has provided investment banking services within the previous twelve months.

## Price target and rating history chart(s)



The price targets shown should be considered in the context of all prior published Goldman Sachs research, which may or may not have included price targets, as well as developments relating to the company, its industry and financial markets.

## Regulatory disclosures

### Disclosures required by United States laws and regulations

See company-specific regulatory disclosures above for any of the following disclosures required as to companies referred to in this report: manager or co-manager in a pending transaction; 1% or other ownership; compensation for certain services; types of client relationships; managed/co-managed public offerings in prior periods; directorships; for equity securities, market making and/or specialist role. Goldman Sachs trades or may trade as a principal in debt securities (or in related derivatives) of issuers discussed in this report.

The following are additional required disclosures: **Ownership and material conflicts of interest:** Goldman Sachs policy prohibits its analysts, professionals reporting to analysts and members of their households from owning securities of any company in the analyst's area of coverage. **Analyst compensation:** Analysts are paid in part based on the profitability of Goldman Sachs, which includes investment banking revenues. **Analyst as officer or director:** Goldman Sachs policy generally prohibits its analysts, persons reporting to analysts or members of their households from serving as an officer, director or advisor of any company in the analyst's area of coverage. **Non-U.S. Analysts:** Non-U.S. analysts may not be associated persons of Goldman Sachs & Co. LLC and therefore may not be subject to FINRA Rule 2241 or FINRA Rule 2242 restrictions on communications with subject company, public appearances and trading securities held by the analysts.

**Distribution of ratings:** See the distribution of ratings disclosure above. **Price chart:** See the price chart, with changes of ratings and price targets in prior periods, above, or, if electronic format or if with respect to multiple companies which are the subject of this report, on the Goldman Sachs website at http://www.gs.com/research/hedge.html.

### Additional disclosures required under the laws and regulations of jurisdictions other than the United States

The following disclosures are those required by the jurisdiction indicated, except to the extent already made above pursuant to United States laws and regulations. **Australia:** Goldman Sachs Australia Pty Ltd and its affiliates are not authorised deposit-taking institutions (as that term is defined in the Banking Act 1959 (Cth)) in Australia and do not provide banking services, nor carry on a banking business, in Australia. This research, and any access to it, is intended only for "wholesale clients" within the meaning of the Australian Corporations Act, unless otherwise agreed by Goldman Sachs. In producing research reports, members of the Global Investment Research Division of Goldman Sachs Australia may attend site visits and other meetings hosted by the companies and other entities which are the subject of its research reports. In some instances the costs of such site visits or meetings may be met in part or in whole by the issuers concerned if Goldman Sachs Australia considers it is appropriate and reasonable in the specific

circumstances relating to the site visit or meeting. To the extent that the contents of this document contains any financial product advice, it is general advice only and has been prepared by Goldman Sachs without taking into account a client's objectives, financial situation or needs. A client should, before acting on any such advice, consider the appropriateness of the advice having regard to the client's own objectives, financial situation and needs. **Brazil:** Disclosure information in relation to CVM Instruction 598 is available at http://www.gs.com/worldwide/brazil/area/gir/index.html. Where applicable, the Brazil-registered analyst primarily responsible for the content of this research report, as defined in Article 20 of CVM Instruction 598, is the first author named at the beginning of this report, unless indicated otherwise at the end of this report. **Canada:** Goldman Sachs Canada Inc. is an affiliate of The Goldman Sachs Group Inc. and therefore is included in the company specific disclosures relating to Goldman Sachs (as defined above). Goldman Sachs Canada Inc. has approved of, and agreed to take responsibility for, this research report in Canada if and to the extent that Goldman Sachs Canada Inc. disseminates this research report to its clients. **Hong Kong:** Further information on the securities of covered companies referred to in this research may be obtained on request from Goldman Sachs (Asia) L.L.C. **India:** Further information on the subject company or companies referred to in this research may be obtained from Goldman Sachs (India) Securities Private Limited, Research Analyst - SEBI Registration Number INH000001493, 951-A, Rational House, Appasaheb Marathe Marg, Prabhadevi, Mumbai 400 025, India, Corporate Identity Number U74140MH2006FTC160634, Phone +91 22 6616 9000, Fax +91 22 6616 9001. Goldman Sachs may beneficially own 1% or more of the securities (as such term is defined in clause 2 (h) the Indian Securities Contracts (Regulation) Act, 1956) of the subject company or companies referred to in this research report. **Japan:** See below. **Korea:** Further information on the subject company or companies referred to in this research may be obtained from Goldman Sachs (Asia) L.L.C., Seoul Branch. **New Zealand:** Goldman Sachs New Zealand Limited and its affiliates are neither "registered banks" nor "deposit takers" (as defined in the Reserve Bank of New Zealand Act 1989) in New Zealand. This research, and any access to it, is intended for "wholesale clients" (as defined in the Financial Advisers Act 2008) unless otherwise agreed by Goldman Sachs. **Russia:** Research reports distributed in the Russian Federation are not advertising as defined in the Russian legislation, but are information and analysis not having product promotion as their main purpose and do not provide appraisal within the meaning of the Russian legislation on appraisal activity. **Singapore:** Further information on the covered companies referred to in this research may be obtained from Goldman Sachs (Singapore) Pte. (Company Number: 198602165W). **Taiwan:** This material is for reference only and must not be reprinted without permission. Investors should carefully consider their own investment risk. Investment results are the responsibility of the individual investor. **United Kingdom:** Persons who would be categorized as retail clients in the United Kingdom, as such term is defined in the rules of the Financial Conduct Authority, should read this research in conjunction with prior Goldman Sachs research on the covered companies referred to herein and should refer to the risk warnings that have been sent to them by Goldman Sachs International. A copy of these risks warnings, and a glossary of certain financial terms used in this report, are available from Goldman Sachs International on request.

**European Union:** Disclosure information in relation to Article 4 (1) (d) and Article 6 (2) of the European Commission Directive 2003/125/EC is available at http://www.gs.com/disclosures/europeanpolicy.html which states the European Policy for Managing Conflicts of Interest in Connection with Investment Research.

**Japan:** Goldman Sachs Japan Co., Ltd. is a Financial Instrument Dealer registered with the Kanto Financial Bureau under registration number Kinsho 69, and a member of Japan Securities Dealers Association, Financial Futures Association of Japan and Type II Financial Instruments Firms Association. Sales and purchase of equities are subject to commission pre-determined with clients plus consumption tax. See company-specific disclosures as to any applicable disclosures required by Japanese stock exchanges, the Japanese Securities Dealers Association or the Japanese Securities Finance Company.

## Ratings, coverage groups and views and related definitions

**Buy (B), Neutral (N), Sell (S) -**Analysts recommend stocks as Buys or Sells for inclusion on various regional Investment Lists. Being assigned a Buy or Sell on an Investment List is determined by a stock's total return potential relative to its coverage. Any stock not assigned as a Buy or a Sell on an Investment List with an active rating (i.e., a  stock that is not Rating Suspended, Not Rated, Coverage Suspended or Not Covered), is deemed Neutral. Each regional Investment Review Committee manages various regional Investment Lists to a global guideline of 25%-35% of stocks as Buy and 10%-15% of stocks as Sell; however, the distribution of Buys and Sells in any particular analyst's coverage group may vary as determined by the regional Investment Review Committee. Additionally, each Investment Review Committee manages Regional Conviction lists, which represent investment recommendations focused on the size of the total return potential and/or the likelihood of the realization of the return across their respective areas of coverage.  The addition or removal of stocks from such Conviction lists do not represent a change in the analysts' investment rating for such stocks.

**Total return potential** represents the upside or downside differential between the current share price and the price target, including all paid or anticipated dividends, expected during the time horizon associated with the price target. Price targets are required for all covered stocks. The total return potential, price target and associated time horizon are stated in each report adding or reiterating an Investment List membership.

**Coverage groups and views:** A list of all stocks in each coverage group is available by primary analyst, stock and coverage group at http://www.gs.com/research/hedge.html. The analyst assigns one of the following coverage views which represents the analyst's investment outlook on the coverage group relative to the group's historical fundamentals and/or valuation. **Attractive (A).** The investment outlook over the following 12 months is favorable relative to the coverage group's historical fundamentals and/or valuation. **Neutral (N).** The investment outlook over the following 12 months is neutral relative to the coverage group's historical fundamentals and/or valuation. **Cautious (C).** The investment outlook over the following 12 months is unfavorable relative to the coverage group's historical fundamentals and/or valuation.

**Not Rated (NR).** The investment rating and target price have been removed pursuant to Goldman Sachs policy when Goldman Sachs is acting in an advisory capacity in a merger or strategic transaction involving this company and in certain other circumstances. **Rating Suspended (RS).** Goldman Sachs Research has suspended the investment rating and price target for this stock, because there is not a sufficient fundamental basis for determining, or there are legal, regulatory or policy constraints around publishing, an investment rating or target. The previous investment rating and price target, if any, are no longer in effect for this stock and should not be relied upon. **Coverage Suspended (CS).** Goldman Sachs has suspended coverage of this company. **Not Covered (NC).** Goldman Sachs does not cover this company. **Not Available or Not Applicable (NA).** The information is not available for display or is not applicable. **Not Meaningful (NM).** The information is not meaningful and is therefore excluded.

## Global product; distributing entities

The Global Investment Research Division of Goldman Sachs produces and distributes research products for clients of Goldman Sachs on a global basis. Analysts based in Goldman Sachs offices around the world produce equity research on industries and companies, and research on macroeconomics, currencies, commodities and portfolio strategy. This research is disseminated in Australia by Goldman Sachs Australia Pty Ltd (ABN 21 006 797 897); in Brazil by Goldman Sachs do Brasil Corretora de Títulos e Valores Mobiliários S.A.; Ombudsman Goldman Sachs Brazil: 0800 727 5764 and / or ouvidoriagoldmansachs@gs.com. Available Weekdays (except holidays), from 9am to 6pm. Ouvidoria Goldman Sachs Brasil: 0800 727 5764 e/ou ouvidoriagoldmansachs@gs.com. Horário de funcionamento: segunda-feira à sexta-feira (exceto feriados), das 9h às 18h; in Canada by either Goldman Sachs Canada Inc. or Goldman Sachs & Co. LLC; in Hong Kong by Goldman Sachs (Asia) L.L.C.; in India by Goldman Sachs (India) Securities Private Ltd.; in Japan by Goldman Sachs Japan Co., Ltd.; in the Republic of Korea by Goldman Sachs (Asia) L.L.C., Seoul Branch; in New Zealand by Goldman Sachs New Zealand Limited; in Russia by OOO Goldman Sachs; in Singapore by Goldman Sachs (Singapore) Pte. (Company Number: 198602165W); and in the United States of America by Goldman Sachs & Co. LLC. Goldman Sachs International has approved this research in connection with its distribution in the United Kingdom and European Union.

**European Union:** Goldman Sachs International authorised by the Prudential Regulation Authority and regulated by the Financial Conduct Authority and the Prudential Regulation Authority, has approved this research in connection with its distribution in the European Union and United Kingdom; Goldman Sachs AG and Goldman Sachs International Zweigniederlassung Frankfurt, regulated by the Bundesanstalt für Finanzdienstleistungsaufsicht, may also distribute research in Germany.

## General disclosures

This research is for our clients only. Other than disclosures relating to Goldman Sachs, this research is based on current public information that we consider reliable, but we do not represent it is accurate or complete, and it should not be relied on as such. The information, opinions, estimates and forecasts contained herein are as of the date hereof and are subject to change without prior notification. We seek to update our research as appropriate, but various regulations may prevent us from doing so. Other than certain industry reports published on a periodic basis, the large majority of reports are published at irregular intervals as appropriate in the analyst's judgment.

Goldman Sachs conducts a global full-service, integrated investment banking, investment management, and brokerage business. We have investment banking and other business relationships with a substantial percentage of the companies covered by our Global Investment Research Division. Goldman Sachs & Co. LLC, the United States broker dealer, is a member of SIPC (http://www.sipc.org).

Our salespeople, traders, and other professionals may provide oral or written market commentary or trading strategies to our clients and principal trading desks that reflect opinions that are contrary to the opinions expressed in this research. Our asset management area, principal trading desks and investing businesses may make investment decisions that are inconsistent with the recommendations or views expressed in this research.

The analysts named in this report may have from time to time discussed with our clients, including Goldman Sachs salespersons and traders, or may discuss in this report, trading strategies that reference catalysts or events that may have a near-term impact on the market price of the equity securities discussed in this report, which impact may be directionally counter to the analyst's published price target expectations for such stocks. Any such trading strategies are distinct from and do not affect the analyst's fundamental equity rating for such stocks, which rating reflects a stock's return potential relative to its coverage group as described herein.

We and our affiliates, officers, directors, and employees, excluding equity and credit analysts, will from time to time have long or short positions in, act as principal in, and buy or sell, the securities or derivatives, if any, referred to in this research.

The views attributed to third party presenters at Goldman Sachs arranged conferences, including individuals from other parts of Goldman Sachs, do not necessarily reflect those of Global Investment Research and are not an official view of Goldman Sachs.

Any third party referenced herein, including any salespeople, traders and other professionals or members of their household, may have positions in the products mentioned that are inconsistent with the views expressed by analysts named in this report.

This research is not an offer to sell or the solicitation of an offer to buy any security in any jurisdiction where such an offer or solicitation would be illegal. It does not constitute a personal recommendation or take into account the particular investment objectives, financial situations, or needs of individual clients. Clients should consider whether any advice or recommendation in this research is suitable for their particular circumstances and, if appropriate, seek professional advice, including tax advice. The price and value of investments referred to in this research and the income from them may fluctuate. Past performance is not a guide to future performance, future returns are not guaranteed, and a loss of original capital may occur. Fluctuations in exchange rates could have adverse effects on the value or price of, or income derived from, certain investments.

Certain transactions, including those involving futures, options, and other derivatives, give rise to substantial risk and are not suitable for all investors. Investors should review current options disclosure documents which are available from Goldman Sachs sales representatives or at http://www.theocc.com/about/publications/character-risks.jsp. Transaction costs may be significant in option strategies calling for multiple purchase and sales of options such as spreads. Supporting documentation will be supplied upon request.

**Differing Levels of Service provided by Global Investment Research:** The level and types of services provided to you by the Global Investment Research division of GS may vary as compared to that provided to internal and other external clients of GS, depending on various factors including your individual preferences as to the frequency and manner of receiving communication, your risk profile and investment focus and perspective (e.g., marketwide, sector specific, long term, short term), the size and scope of your overall client relationship with GS, and legal and regulatory constraints. As an example, certain clients may request to receive notifications when research on specific securities is published, and certain clients may request that specific data underlying analysts' fundamental analysis available on our internal client websites be delivered to them electronically through data feeds or otherwise. No change to an analyst's fundamental research views (e.g., ratings, price targets, or material changes to earnings estimates for equity securities), will be communicated to any client prior to inclusion of such information in a research report broadly disseminated through electronic publication to our internal client websites or through other means, as necessary, to all clients who are entitled to receive such reports.

All research reports are disseminated and available to all clients simultaneously through electronic publication to our internal client websites. Not all research content is redistributed to our clients or available to third-party aggregators, nor is Goldman Sachs responsible for the redistribution of our research by third party aggregators. For research, models or other data related to one or more securities, markets or asset classes (including related services) that may be available to you, please contact your GS representative or go to http://360.gs.com.

Disclosure information is also available at http://www.gs.com/research/hedge.html or from Research Compliance, 200 West Street, New York, NY 10282.

**© 2018 Goldman Sachs.**

**No part of this material may be (i) copied, photocopied or duplicated in any form by any means or (ii) redistributed without the prior written consent of The Goldman Sachs Group, Inc.**

**EXHIBIT 13**

**to**

**PAUL D. BRACHMAN DECLARATION IN SUPPORT
OF DEFENDANT'S MOTION IN LIMINE NO. 1
TO EXCLUDE OUT-OF-COURT HOSPITAL
STATEMENTS**



Deposition of:
# Michael Madewell

*June 11, 2021*

In the Matter of:

# Restore Robotics LLC v Intuitive Surgical

Veritext Legal Solutions

800.808.4958 | calendar-atl@veritext.com  | 770.343.9696

Page 1

1          IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF FLORIDA
2                    PANAMA CITY DIVISION

3

    RESTORE ROBOTICS LLC,
4   RESTORE ROBOTICS REPAIRS LLC,
    and CLIF PARKER ROBOTICS LLC,

5

        Plaintiffs,
6                                    CIVIL ACTION FILE
    vs.                          NO. 5:19-cv-55-TKW-MJF

7

8   INTUITIVE SURGICAL, INC.,
9       Defendant.
    ************************
10  INTUITIVE SURGICAL, INC.,
11      Counterclaimant,
12  vs.
13  RESTORE ROBOTICS LLC,
    RESTORE ROBOTICS REPAIRS LLC,

14

        Counterclaim Defendants.

15

16

17              HIGHLY CONFIDENTIAL
18      VIDEO DEPOSITION OF MICHAEL MADEWELL
19       Taken by Remote Video Conference
20              June 11, 2021
21          1:00 P.M. Central Time

22

23      Laura M. MacKay, CCR-B-1736, RPR

24

25

HIGHLY CONFIDENTIAL                          June 11, 2021
Restore Robotics LLC v Intuitive Surgical

Page 2

1                INDEX TO EXHIBITS
2
3  EXHIBIT       DESCRIPTION              PAGE
4  Exhibit 1    Website home page         10
5  Exhibit 2    Web page describing robotic    11
6         surgery program
7  Exhibit 3    Sales, License and Service    15
8         Agreement
9  Exhibit 4    Inventory of purchase     17
10 Exhibit 5    Invoice for prepaid service   19
11 Exhibit 6    E-mail re DaVinci, 5/16/18    22
12 Exhibit 7    Warning letter            26
13 Exhibit 8    Contract termination letter   27
14 Exhibit 9    E-mail chain re Contract      28
15         Cancellation, 11/18/19
16 Exhibit 10   E-mail re Reprogrammed instrument   30
17         request
18 Exhibit 11   Subpoena to Produce Documents,    48
19         Information, Or Objects Or to
20         Permit Inspection of Premises in a
21         Civil Action
22 Exhibit 12   E-mail re DaVinci, 5/16/18        88
23
24
25

Page 4

1                INDEX TO EXAMINATION
2
3  BY MR. BERHOLD                           8
4  BY MR. BAILEY                           31
5  BY MR. BERHOLD                         174
6  BY MR. BAILEY                          176
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1            INDEX TO EXHIBITS (Con't)
2
3  EXHIBIT       DESCRIPTION             PAGE
4  Exhibit 13   Letter dated 10/29/19 re       121
5         termination agreement
6  Exhibit 14   E-mail re Panama City Surgery,    124
7         11/27/19
8  Exhibit 15   E-mail re Panama City Surgical    127
9         Center, 2/21/19
10 Exhibit 16   Proposal from Restore re servicing   140
11 Exhibit 17   E-mail re da Vinci surgery     143
12         follow-up for Panama City Surgical
13         Center, 4/25/19
14 Exhibit 18   E-mail to Clif Parker re       154
15         Intuitive, 8/20/19
16 Exhibit 19   Unauthorized Reprogrammed     156
17         Instrument FAQs
18 Exhibit 20   E-mail re Intuitive communication,   163
19         10/18/19
20 Exhibit 21   Restore Robotics reference sheet   172
21
22
23
24
25

Page 5

1  APPEARANCES OF COUNSEL:
2  On behalf of the Plaintiffs:
3      JEFFREY L. BERHOLD, ESQ.
4      JEFFREY L. BERHOLD, P.C.
5      1230 Peachtree Street
6      Suite 1050
7      Atlanta, Georgia 30309
8      404.872.3800 (telephone)
9      jeff@berhold.com
10 On behalf of the Defendants:
11     MICHAEL S. BAILEY, ESQ.
12     TAYLOR DOW, ESQ.
13     SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
14     One Manhattan West
15     New York, NY 10001-8602
16     212.735.3517
17     michael.bailey@skadden.com
18     taylor.dow@skadden.com
19 On behalf of the Witness:
20     MICHAEL P. DICKEY, ESQ.
21     DUNLAP & SHIPMAN P.A.
22     2063 County Highway 395
23     Santa Rosa Beach, FL 32459
24     Mdickey@dunlapshipman.com
25

Page 18

1    A. That's correct.
2    Q. During -- during the almost five years of
3 using the robots, have the uses on those instruments
4 ever changed?
5    A. That's the uses that they -- they have not.
6 That's how they come from the manufacturer.
7    Q. So let me ask it a different way. During
8 your almost four years of using the da Vinci SI, has
9 Intuitive ever changed the number of uses for those
10 instruments?
11    A. Not on these, no.
12    Q. And has Intuitive changed the price for any
13 of these instruments during your almost four years
14 of using the da Vinci SI?
15    A. No not on these.
16    Q. Do you have a sense of how much that Panama
17 City Surgery Center spends per year on the EndoWrist
18 instruments?
19    A. I don't. I would have to pull invoices.
20 Probably 100,000.
21    Q. Other than the --
22    A. I would have to pull invoices. But we
23 probably spend about $100,000 a year.
24    Q. Other than the --
25       MR. BERHOLD: Let's take down Exhibit 4,

Page 19

1 please, Bailey. Can we pull up the document
2 labelled "Service Invoice."
3       CONCIERGE TECH: This is Exhibit 5.
4       (Exhibit 5 marked.)
5 BY MR. BERHOLD:
6    Q. Mr. Madewell, can you see Exhibit 5 on your
7 screen?
8    A. I can.
9    Q. Do you happen to recognize Exhibit 5?
10    A. I do.
11    Q. What is Exhibit 5?
12    A. It's an invoice for prepaid service. It's
13 like a warranty plan.
14    Q. And generally speaking, what are the terms
15 for the service plan in this invoice?
16    A. Well, for us, after the service on the
17 machine for the first year was covered. After that,
18 we had agreed on $100,000 per year, which would
19 cover two annual service inspections. And then
20 certain -- certain repairs were covered under that
21 if we had to have repairs for the machine.
22    Q. Is Panama City Surgery Center still on a
23 service plan?
24    A. No, we are not.
25    Q. Why not?

Page 20

1    A. We couldn't afford it.
2    Q. So you've gone to time and materials?
3    A. We have.
4    Q. Do you have a sense of how much that Panama
5 City Surgery Center is now spending on time and
6 materials for service for the da Vinci SI per year?
7    A. So we -- we spend $10,000 for the -- we
8 have to have the PMs done twice a year, and that
9 costs us $10,000 for the technician to come out and
10 do the -- basically go through it and do a six-month
11 inspection.
12       And then we've -- we haven't had to use
13 service until just this last year. We had to have a
14 technician come out of Tallahassee just to drive
15 over and set up a new IP address to go through our
16 new security system that we got. And so we were --
17 we were invoiced for that.
18    Q. Oh, and how much did that cost?
19    A. Well, they quoted us $5,000. $995 per hour
20 travel time and then -- which was two hours over and
21 two hours back. So $4,000 for the technician to
22 drive over. And an estimated $995 per hour for him
23 to change the IP address in the system so that we
24 could route it through our security plan.
25       Now, we negotiated that down, but that was

Page 21

1 the initial offer -- or the initial quote for the
2 service.
3    Q. What was the final price?
4    A. I would have to go back and look at the
5 invoice. It was about half that.
6       MR. BERHOLD: Bailey, can you take down
7 Exhibit 5.
8 BY MR. BERHOLD:
9    Q. Mr. Madewell, do you know someone by the
10 name of Clif Parker?
11    A. I do.
12    Q. How long have you known Mr. Parker?
13    A. Six or seven years.
14    Q. How did you first meet Mr. Parker?
15    A. I think I first met Mr. Parker when he --
16 we had scheduled a meeting. He's got a 3D scope
17 that -- that his company was working on. And he
18 brought it over to demo it for a few of our
19 physicians. I think that was the first time.
20    Q. Has Panama City Surgery Center had any
21 business dealings with Mr. Parker or any of his
22 companies?
23    A. We have.
24    Q. And for what have you -- for what has
25 Panama City Surgery Center done business with

6 (Pages 18 - 21)

HIGHLY CONFIDENTIAL                          June 11, 2021
Restore Robotics LLC v Intuitive Surgical

Page 22

1 Mr. Parker or any of his companies?
2      A. Primarily we have used Restore Robotics to
3 repair the Endo instruments for the da Vinci robot.
4      MR. BERHOLD: Bailey, can we pull up a
5 document entitled "First Repair."
6      CONCIERGE TECH: This is Exhibit 6.
7      (Exhibit 6 marked.)
8 BY MR. BERHOLD:
9      Q. Mr. Madewell, can you see Exhibit 6 on your
10 screen?
11      A. I can.
12      Q. Do you recognize Exhibit 6?
13      A. Looks like an e-mail that I sent to
14 Clif Parker.
15      Q. Do you have any recollection of sending the
16 e-mail?
17      A. Yes.
18      Q. And, generally, what was the purpose of the
19 e-mail?
20      A. To see if his company was going to be able
21 to reprocess or repair this instrument.
22      Q. Was this the first time that you had
23 requested that Mr. Parker repair one of the
24 EndoWrists?
25      A. I don't know if this was the first time.

Page 23

1 It looks like it, since I'm asking him what the
2 process is for sending it in.
3      Q. And why were you considering having Panama
4 City Surgery Center repair EndoWrist instruments?
5      MR. BAILEY: Objection to form. Misstates
6 testimony and the document.
7 BY MR. BERHOLD:
8      Q. You can answer the question if you
9 understand it, Mr. Madewell.
10      A. I understand the question. I don't
11 understand that -- what was just said.
12      But the reasons? Primarily because we had
13 instruments that -- you know, in our line of work,
14 you don't throw out something that works perfectly
15 fine. You just can't afford to.
16      And the second thing is, as we looked at
17 the viability of our da Vinci program, for the same
18 reason that we chose to go on time and materials,
19 because we could not afford -- when you break down
20 the volume we were doing and what we get paid per
21 patient to do robotic surgery, we were looking at
22 our margins are in the tens to hundreds of dollars,
23 not the thousands of dollars. And so we were
24 looking at every opportunity we could find to lower
25 the cost of doing these surgeries. And so if we

Page 24

1 could reprocess or repair these instruments and save
2 money on those, then -- much like a lot of
3 instruments that we send out for reprocessing,
4 whether they're single use or multi-use, if they can
5 be reprocessed and used again at a lower cost, then
6 we do that.
7      And so we do that with at a lot of our
8 instruments. Just like if we need instruments that
9 need repair, we send them out for repair versus
10 throwing them out and buying a new one. So that was
11 the idea behind using Clif's company to repair or
12 reprocess these instruments.
13      MR. BERHOLD: Bailey, can you pull down
14 Exhibit 6.
15 BY MR. BERHOLD:
16      Q. Mr. Madewell, did you consult with any of
17 the robotic surgeons before you started to repair
18 EndoWrist instruments with Restore Robotics?
19      A. I did.
20      Q. Okay. And what did they tell you?
21      A. They said if the instruments worked fine,
22 they were happy with it. My surgeons know that we
23 have reprocessed instruments in the building, and
24 their attitude has always been if the instrument
25 works, we'll use it.

Page 25

1      Q. And did the repaired EndoWrist instruments
2 work fine?
3      A. Yes.
4      MR. BAILEY: Objection to form.
5 BY MR. BERHOLD:
6      Q. Did you ever get any complaints from
7 doctors about the functioning of the repaired
8 EndoWrist instruments?
9      MR. BAILEY: Objection to form.
10      A. No.
11 BY MR. BERHOLD:
12      Q. Are you still using -- are you still using
13 Restore Robotics repairs to repair EndoWrist
14 instruments for Panama City Surgery Center?
15      A. No.
16      Q. Why not?
17      A. I was served a notice by Intuitive that I
18 was in violation of the licensing agreement. And if
19 I continued to do that, then they would cancel that
20 licensing agreement. And cancellation of the
21 licensing agreement meant no longer supporting the
22 software that runs the robot, which at some point
23 would -- the robot would not work.
24      MR. BERHOLD: Bailey, can we pull up a
25 document titled "Warning Letter."

7 (Pages 22 - 25)

HIGHLY CONFIDENTIAL                    June 11, 2021
Restore Robotics LLC v Intuitive Surgical

Page 26

1      CONCIERGE TECH:  This is Exhibit 7.
2      (Exhibit 7 marked.)
3  BY MR. BERHOLD:
4      Q.  Mr. Madewell, can you see Exhibit 7 on your
5  screen?
6      A.  I can.
7      Q.  Can you take a look at Exhibit 7 to see if
8  you recognize it?
9      A.  Yeah, it looks like the letter that I was
10  sent.
11      Q.  And who sent the letter?
12      A.  Intuitive.
13      Q.  And what was your understanding of what
14  Intuitive is saying in this letter in a nutshell?
15      A.  Stop -- stop reprocessing the instruments
16  or I would be in violation of the licensing
17  agreement and they could turn the machine off.
18      Q.  And did Intuitive eventually terminate its
19  agreement with Panama City Surgery Center?
20      A.  They did.
21      MR. BAILEY:  Object to form.
22      MR. BERHOLD:  Bailey, can you take down
23  Exhibit 7 and pull up document titled "Contract
24  Termination."
25      CONCIERGE TECH:  This is Exhibit 8.

Page 27

1      (Exhibit 8 marked.)
2  BY MR. BERHOLD:
3      Q.  Mr. Madewell, can you see Exhibit 8 on your
4  screen?
5      A.  I can.
6      Q.  Do you recognize Exhibit 8?
7      A.  Yes.
8      Q.  What is Exhibit 8?
9      A.  It's the letter notifying me that our
10  agreement with Intuitive had been terminated.
11      Q.  And what was your understanding of why
12  Intuitive had terminated the agreement?
13      A.  Because I was sending off the instruments
14  to be reprocessed or to have the chip reset so we
15  could use them more than ten times.
16      MR. BERHOLD:  Bailey, can you take down
17  Exhibit 8, and can you pull up the document entitled
18  "Dialog."
19      CONCIERGE TECH:  This is Exhibit 9.
20      (Exhibit 9 marked.)
21  BY MR. BERHOLD:
22      Q.  Mr. Madewell, can you see Exhibit 9 on your
23  screen?
24      A.  Yes.
25      Q.  Can you take a look at Exhibit 9 and let me

Page 28

1  know if you recognize it?
2      A.  I do.
3      Q.  Can you just walk us through the sequence
4  of e-mails in Exhibit 9.
5      A.  It was the communication that I had with --
6  I guess I'm not sure exactly what Matt's title was,
7  the regional guy about the cancellation letter that
8  I got reaching out to their reps and to Matt, who is
9  the -- say look, you guys have known our issue,
10  we've had -- we've used a few reprocessed
11  instruments and tiny compared to all of the new ones
12  we bought but we did get the letter of cancellation
13  and so I was basically saying, look, you got me over
14  a barrel here.  I agree to quit using it.  I don't
15  want the machine to be turned off.  We certainly
16  don't want the patients to go back to the hospital
17  to have these cases done.  And, you know, let's get
18  a new contract in place.
19      And I copied my physicians so that they
20  were aware of all of these communications.  Those
21  are the extra names you see in the e-mails.
22      Q.  And did Panama City Surgery Center agree
23  that it would not repair any more EndoWrist
24  instruments?
25      A.  We did.

Page 29

1      Q.  And has Panama City Surgery Center abided
2  by that agreement with Intuitive not to repair the
3  EndoWrist instruments?
4      A.  We have.
5      MR. BERHOLD:  Bailey, can you take down the
6  exhibit.
7  BY MR. BERHOLD:
8      Q.  Mr. Madewell, did you have any
9  understanding of how Intuitive knew that Panama City
10  Surgery Center was repairing its EndoWrist
11  instruments in the first place?
12      A.  The robot is connected to wifi and sends
13  out signals, or reports I guess, up to Intuitive
14  where they monitor -- monitoring error codes.  It's
15  also a way for them to be able to log in and
16  troubleshoot the software.
17      And it was through those reports that I
18  guess the serial numbers on those individual
19  instruments, when they were in their eleventh or
20  twelfth use, I'm sure it raised a red flag somewhere
21  and that's how they found out.
22      MR. BERHOLD:  Bailey, can we pull up the
23  document labelled -- let me give you the Bates
24  number.  It's HC_000021.
25      CONCIERGE TECH:  This is Exhibit 10.

8 (Pages 26 - 29)

**EXHIBIT 14**

**to**

**PAUL D. BRACHMAN DECLARATION IN SUPPORT
OF DEFENDANT'S MOTION IN LIMINE NO. 1
TO EXCLUDE OUT-OF-COURT HOSPITAL
STATEMENTS**



Deposition of:

**AEO 30(b)(6) Clifton Earl Parker**

*May 4, 2021*

In the Matter of:

**Restore Robotics LLC v Intuitive Surgical**

Veritext Legal Solutions

800.808.4958 | calendar-atl@veritext.com | 770.343.9696

Page 1

ATTORNEYS' EYES ONLY

1

1          IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF FLORIDA
2                   PANAMA CITY DIVISION
3
4     RESTORE ROBOTICS LLC and
      RESTORE ROBOTICS REPAIRS
5     LLC,
                                    CIVIL ACTION FILE
6              Plaintiffs,
                              NO. 5:19-cv-55-TKW-MJF
7          vs.
8     INTUITIVE SURGICAL, INC.,
9              Defendant.
      ~~~~~~~~~~~~~~~~~~~~~~~~~
10
11
              REMOTE VIDEO 30(b)(6) DEPOSITION OF
12                 RESTORE ROBOTICS LLC
                           and
13          RESTORE ROBOTICS REPAIRS LLC
                        THROUGH
14          CLIFTON "CLIF" EARL PARKER
                          AND
15      CLIFTON "CLIF" EARL PARKER, INDIVIDUALLY
16
17
                      May 4, 2021
18
                      9:59 a.m.
19
20
                   7506 Holly Circle
21          Panama City Beach, Florida
22
23
24          S. Julie Friedman, CCR-B-1476
25

AEO 30(b)(6) Clifton Earl Parker                May 4, 2021
Restore Robotics LLC v Intuitive Surgical

---

Page 2

ATTORNEYS' EYES ONLY
2

1          APPEARANCES OF COUNSEL
2  On behalf of the Plaintiffs:
3          JEFFREY L. BERHOLD, P.C.
           JEFFREY L. BERHOLD, ESQ.
4          Suite 1050
           1230 Peachtree Street NE
5          Atlanta, Georgia  30309
           404.872.3800
6          678.868.2021 Fax
           jeff@berhold.com
7
   On behalf of the Defendant:
8
           ALLEN RUBY LAW OFFICES
9          ALLEN RUBY, ESQ.
           Suite 138
10         15559 Union Avenue
           Los Gatos, California  95032
11         408.477.9690
           allen@allenruby.com
12
           SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
13         DOUGLAS J. DEBAUGH,  ESQ.
           1440 New York Ave, NW
14         Washington, D.C.  20005
           202.371.7592
15         202.661.0592 Fax
           douglas.debaugh@skadden.com
16
17  Also Present:
           Chris McMillan, Concierge Tech
18         Alan Pokotilow, Videographer
19
20
21
22
23
24
25

---

Page 3

1          INDEX OF EXAMINATIONS
2  WITNESS:
   Clifton "Clif" Earl Parker
3                                          Page
4  CROSS-EXAMINATION                        6
   By Mr. Ruby
5
6          INDEX TO EXHIBITS
7
   Exhibit        Description         Page
8
   Exhibit 1  6/20/2019 9:06:26 AM E-mail, from    67
9      Parker, to Colletti and Sheehy,
       Subject: FAQ doc, HIGHLY
10     CONFIDENTIAL,
       Restore-00002649-2653
11
   Exhibit 2  11/30/2018 11:53:54 AM E-mail,       75
12     from Parker, to Winkler, Subject:
       Restore Robotics, CONFIDENTIAL,
13     Restore-00022922-22927
14 Exhibit 3  Sunday, June 23, 2019 9:11 PM       86
       E-mail, from Colletti, to Parker,
15     Czajka, Subject: Ac promo
       2019_momentumsRobotics2.pptx,
16     HIGHLY CONFIDENTIAL - ATTORNEYS'
       EYES ONLY, 0040518-40544
17
   Exhibit 4  8/11/2019 1:46:00 PM E-mail, from   147
18     Hansen, to Vautrot and Parker,
       Subject: Preowned EndoWrist
19     Discrepancies, CONFIDENTIAL,
       Restore-00030210-30215
20
   Exhibit 5  10/12/2018 8:28:24 AM E-mail, from  161
21     Parker, to billing@reach3d.net,
       Subject: Brochures, CONFIDENTIAL,
22     Restore-00018745-18746
23 Exhibit 6  5/14/2019 7:12:27 PM E-mail, from   189
       Parker, to Mixner, Subject:
24     Restore Robotics Repairs response,
       CONFIDENTIAL,
25     Restore-00005217-5219

---

Page 4

1          INDEX TO EXHIBITS
2
   Exhibit        Description         Page
3
   Exhibit 7  E-mail Chain Ending with 2/22/2020  244
4      7:14:49 PM E-mail, from Parker, to
       Cordially, Bruce McDaniel,
5      Subject: Re: Davinci Si and
       DaVinci S services, CONFIDENTIAL,
6      Restore-00056351
7
8  (Original Exhibits 1 through 7 have been
   attached to the original transcript.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 5

1          THE VIDEOGRAPHER:  We're on the record.
2      The time is now 9:59 a.m.  Today is Tuesday,
3      May 4th of 2021.  We're here today at Restore
4      Robotics, LLC, located at 7506 Holly Circle in
5      Panama City Beach, Florida, for the videotape
6      deposition of Clifton Parker, in the Matter of
7      Restore Robotics LLC and Restore Robotics
8      Repairs LLC versus Intuitive Surgical,
9      Incorporated, counterclaim, Intuitive Surgical,
10     Incorporated versus Restore Robotics LLC and
11     Restore Robotics Repairs LLC, Civil Case
12     No. 519-cv-55-TKW-MJF, to be heard In the United
13     States District Court, For the Northern District
14     of Florida, Panama City Division.
15         Our court reporter today is Julie Friedman
16     here today on behalf of Veritext Legal
17     Solutions.  I'm Alan Pokotilow, a legal
18     videographer, also here today on behalf of
19     Veritext Legal Solutions.
20         Our court reporter will read a brief
21     stipulation, and then swear the witness; and we
22     can proceed.
23         THE COURT REPORTER:  Due to the need for
24     this deposition to take place remotely because
25     of the Government's order for social distancing,

2 (Pages 2 - 5)

AEO 30(b)(6) Clifton Earl Parker         May 4, 2021
Restore Robotics LLC v Intuitive Surgical

Page 94

1 requisite tests.
2      Q.    And were these tests that you referred to
3 tests that were developed by whom?
4      A.    I don't know who physically developed
5 them.
6      Q.    Well, did you have any idea -- Well,
7 strike that.
8           Did Restore Robotics develop tests for the
9 efficacy of the software on the da Vinci surgical
10 system?
11      A.    No.
12      Q.    The tests you're referring to were tests
13 developed by Intuitive; isn't that right?
14      A.    I'm assuming so, but I -- I'm not aware
15 of who actually developed the test.  Was it a third
16 party, or was it Intuitive directly, Intuitive
17 employees?
18           I don't know.
19      Q.    Well, did you have any belief one way or
20 the other whether Restore Robotics could lawfully
21 gain access to the testing methods developed by
22 Intuitive Surgical once you hired a -- a former
23 Intuitive Surgical employee?
24      A.    I mean, you -- Are you asking me for a
25 legal conclusion, 'cause I don't think I'm prepared

Page 95

1 to -- to do that.
2      Q.    No.  I would -- I -- I have not asked you
3 for a legal conclusion.
4      A.    Okay.  Can you restate the question then.
5      Q.    Sure.  At the time that Restore Robotics
6 was apparently conducting some tests on the da Vinci
7 surgical system using tests, testing methods
8 developing by Intuitive, did you have in your mind
9 any idea whether it was lawful for Restore to do
10 that?
11      A.    To perform tests on a robot owned by a
12 hospital that they asked us to do, yeah.  That's
13 totally lawful.
14      Q.    I'm asking you about whether you had an
15 opinion.  Maybe you did.  Maybe you didn't.  That's
16 why I'm asking.
17           Did you have an opinion at the time
18 whether Restore Robotics could lawfully use and
19 charge for the use of testing methods developed by
20 Intuitive Surgical?
21      A.    Again, I think you're asking me for a
22 legal conclusion.  I -- I personally believe that by
23 hiring those former Intuitive engineers, they were
24 using what they learned.  I do not believe that that
25 would be against the law for them to use what they

Page 96

1 learned to perform preventative maintenance on a
2 robot owned by a hospital.
3      Q.    Oh.  In -- in -- In all the time that
4 Restore Robotics and -- and its affiliated companies
5 offered the service of preventive maintenance as set
6 out in the slide, how much money came into your
7 companies as a result of that service?
8      A.    Just for preventive maintenance?
9      Q.    Yes.
10      A.    600.  Between 600- and $700,000.
11      Q.    And then how much -- The next item, the
12 next bullet point is "Surgical robot repair."
13           Did -- Did your company and affiliated
14 companies working with you actually repair some
15 da Vinci surgical systems?
16      A.    We did.
17      Q.    Did you ever need spare parts in order to
18 accomplish these repairs?
19      A.    Yes.
20      Q.    Where did you get them?
21      A.    Some of them, we were able to obtain
22 directly from the original manufacturers, so
23 Intuitive did not manufacture every component.  They
24 purchased components from other manufacturers, and so
25 we were able to purchase those from those companies.

Page 97

1      Q.    But not from Intuitive?
2      A.    No.
3      Q.    And how much money came into your company
4 or companies from the surgical robot repair?
5      A.    I don't recall the -- the amount.  I would
6 say less than a million dollars, but I don't know the
7 exact amount.
8      Q.    Well, can you approximate without guessing
9 how much money came into your company or companies
10 for surgical robot repair?
11      A.    No.  I cannot approximate without
12 guessing.  That -- I think that is a guess.
13           I would -- I would say between a hundred
14 and 300,000, but I don't know.
15      Q.    The next bullet point on here is "On-site
16 time guarantees."
17           What -- What does that mean?
18      A.    A minimum amount of time before a
19 technician will arrive on time -- on site, so
20 basically, we said, you know, we'll provide you
21 24-hour response or 48-hour response, that a
22 technician will be on site within that amount of
23 time.
24      Q.    The next item is "Technical help desk."
25           Do you see that?

25 (Pages 94 - 97)

Page 98

1  A.  Yes.
2  Q.  What does that refer to?
3  A.  I'm sorry.  Repeat the question.
4  Q.  What does "Technical help desk" refer to?
5  A.  Oh, the ability for the hospital to call
6  and to speak directly with one of our field service
7  engineers.
8  Q.  And what was the days and hours of access
9  to the technical help desk that was provided by
10 Restore?
11 A.  It depended on the contract.  I'd have to
12 see each individual contract.  It was a negotiated
13 process.
14 Q.  Did you charge for this service?
15 A.  Yes.  We did.
16 Q.  How much?
17 A.  For -- For phone support, I believe it
18 was $350 an hour.  For on-site support, was $450 per
19 hour.
20 Q.  Did -- Wait.  We withdraw that.
21     Then the next section on here is "Parts
22 inventory."
23     Do you see that?
24 A.  Yes.
25 Q.  What does that refer to?

Page 99

1  A.  We maintained a number of parts in stock.
2  Q.  And -- And where did you get them from?
3  A.  Some of them, we purchased directly from
4  the original equipment manufacturer.  Some of them,
5  we purchased from other hospitals.
6  Q.  Did you purchase any of them from
7  Intuitive?
8  A.  No.
9  Q.  The last item on here is -- is "Clinical
10 support training."
11     What -- What does that refer to?
12 A.  Oh, basically, it's training their
13 clinical staff on the use of the -- the robot by our
14 field service engineers.  Not on -- on medical
15 procedures, but on the use of the robot.
16 Q.  And -- And you charged for that service;
17 is that right?
18 A.  Yes.
19 Q.  How -- How much money came into your
20 companies all told from your clinical support
21 training?
22 A.  I don't know that we ever did that.
23 Q.  So it was -- it was a service you offered,
24 but nobody took you up on the offer; is that true?
25 A.  A couple were interested in that offer;

Page 100

1  but when Intuitive started putting up severe
2  roadblocks, they were unable to continue doing
3  business with us, so we were never able to continue
4  those programs.
5  Q.  And -- And who were those prospective
6  customers you say were -- were -- that were going to
7  sign but didn't because of something Intuitive did?
8  A.  Oh, there were lots of them.  The -- The
9  first one was Baylor Scott & White.  Panama City
10 Surgery Center.
11     They were numerous, numerous.  I'd have to
12 look at a list to -- to tell you who all they were.
13     Indiana University.
14 Q.  We're not in a hurry, Mr. Parker.  I'd
15 like to know please the names of companies or
16 institutions, businesses which you say would have
17 signed up for one or more of these products or
18 services from Restore or its affiliated companies
19 if -- if Intuitive had not done something.
20     And we've got Baylor, et cetera, Panama
21 City, Indiana University.  Who else is there?
22 A.  There's literally dozens and dozens.  I
23 have to go look at a list, so I'd have to pull up a
24 list of those potential customers.  I don't have that
25 in front of me.

Page 101

1      I can gather it, if you'd like.
2  Q.  Well, I'd like you to answer my question.
3  If you tell me you can't beyond Baylor -- and I know
4  there were some other names after Baylor in that same
5  cohort -- Panama City, and Indiana University.
6      Sitting here now, can you tell me any
7  others?
8  A.  Pacific Coast Surgery Center.
9      Lowell.  Of --
10     There's some in Louisiana and New Orleans.
11 Conway Regional Medical Center.
12     There's one in Jackson, Tennessee.  I
13 think it's Jackson General Hospital.
14     West Virginia University.
15     I have to look at a list, or I can keep
16 thinking about it.
17 Q.  What product or service do you say that
18 Indiana University was likely to sign up for with
19 Restore?
20 A.  Instrument repair, as well as robotic
21 service.
22 Q.  Instrument repair was the installation of
23 the interceptor technology?
24 A.  That's correct.
25 Q.  And -- And what else did you say that

26 (Pages 98 - 101)

AEO 30(b)(6) Clifton Earl Parker          May 4, 2021
Restore Robotics LLC v Intuitive Surgical

Page 102

1  Indiana University was ready to sign up for?
2      A.   Robotic preventative maintenance and
3  service of the Si robots.
4      Q.   And who were you dealing with at Indiana
5  University?
6      A.   This was done through a distributor, but
7  the gentleman there was the -- I can't remember his
8  name off the top of my head.  I can't remember his
9  name.
10     Q.   What product or service do you say that
11  West Virginia University was ready to sign up for?
12     A.   I know it was instrument repair; and then,
13  also, when they made a decision to go to Xi, they
14  were interested in selling us their Si instruments.
15     Q.   Who were you dealing with at West Virginia
16  University?
17     A.   I didn't deal directly with West Virginia.
18  I dealt with a distributor, OCS.
19     Q.   So you don't know who -- who it was at
20  West Virginia University that was interested in -- in
21  your offerings?
22     A.   No.  I did not have a personal
23  conversation.
24     Q.   At any time that Restore Robotics was
25  offering the -- to install the interceptor

Page 103

1  technology, did Restore Robotics have any sales
2  personnel on its payroll?
3      A.   Not as payrolled employees.  No.
4      Q.   No full-time salespeople employed by the
5  company; is that right?
6      A.   Not employees.  So myself and Mills and
7  Kevin May performed some of those functions, the
8  majority of them by me; but our main focus was to
9  bring on distributors to do the selling.
10     Q.   Okay.  And -- And I'll be asking about
11  distributors; but for now, I just want to be sure I
12  understand.  There were no salespeople whose job was
13  just to sell the products and services of Restore
14  Robotics on the payroll, the W-2 payroll; is that
15  right?
16     A.   That's correct.  That's correct.
17     Q.   Were there any sales personnel whose job
18  it was to sell the products and services of Restore
19  Robotics or Restore Robotics Repair on the payroll of
20  any affiliated company with Restore Robotics?
21     A.   Not as employees.  No.
22     Q.   Okay.  Was the business model that you
23  wanted to pursue a business model where the sales
24  effort would be carried out principally by what
25  you're calling reps?

Page 104

1      A.   Distributors and representatives, yes.
2      Q.   And for purposes of the vocabulary you use
3  in this regard, is a distributor and a rep the same
4  thing?
5      A.   No.
6      Q.   How are they different?
7      A.   The rep would sell the product and service
8  to the hospital through Restore Robotics, so Restore
9  Robotics would bill the end customer and pay the rep
10  a commission; whereas the distributor, we would
11  provide them a transfer price; and they would mark it
12  up and sell directly to the customer.  They would
13  bill the customer.
14     Q.   Did Restore Robotics utilize the -- the
15  sales and marketing services of both reps and
16  distributors, as you've defined them?
17     A.   Yes.
18     Q.   Was there a -- a -- a greater number of
19  one or the other; that is, did -- Were there more
20  reps than distributors or more distributors than rep,
21  or were they about the same in terms of utilization
22  by Restore?
23     A.   There were physically more separate rep
24  entities.  The distributors, I believe there were
25  only two of those; but they employed many

Page 105

1  salespeople.
2      Q.   How many reps were there?
3      A.   Between 75 and 85.
4      Q.   Was that -- Did you have reps both in the
5  United States and in Europe?
6      A.   Well, Europe was a distributor as well --
7  as well as other countries, so outside the U.S. was
8  strictly distributors.  Inside the U.S. was a
9  combination of reps and distributors.
10     Q.   What was the largest amount that was paid
11  for sale -- goods or services connected with the
12  da Vinci system to any rep?
13     A.   Oh, I don't -- I don't know.
14     Q.   Was it more or less than a million
15  dollars?
16     A.   Less.
17     Q.   Is it more or less than half a million
18  dollars?
19     A.   Less.  I'm sure.
20     Q.   Was it more or less than a hundred
21  thousand dollars?
22     A.   I don't know the answer.
23     Q.   All told, how much were paid in
24  commissions to all the reps total that were deployed
25  by Restore and its affiliated companies to sell

27 (Pages 102 - 105)

Page 106

1 products and services related to the da Vinci robotic
2 system?
3     A.   I don't have that number handy.
4     Q.   Can you estimate.
5     A.   With -- No.  I -- I just don't know.
6     Q.   You -- You used the figure of 75 reps, I
7 think, earlier.  Were there as many as 75 reps
8 deployed by Robotics -- Robotics -- Strike that.
9          Were there as many as 75 reps deployed by
10 Restore Robotics at any one time?
11     A.   Probably.
12     Q.   Was it your experience that reps would
13 come and go?  Some would sign on for a while; and
14 then either because they weren't productive or for
15 some other reason, would sort of drop out?
16     A.   Well, the reason we lost reps was due to
17 the actions of Intuitive Surgical, which is the
18 reason we're here today.
19          So they would approach the hospitals.  The
20 hospitals would be very excited.  Very interested in
21 the program.  Want to pursue things.
22          And then they started getting threats and
23 pushback from Intuitive, you know, telling them that
24 they would lose access to service.  They would not be
25 able to buy, you know, disposables.  They would not

Page 107

1 be able to buy instruments.  They would lose, you
2 know, surgeon training, that sort of thing.
3          So when those things are piled on, that
4 made it very difficult, if not impossible, to
5 continue sales efforts and -- And they would receive
6 threatening letters from Intuitive, both the hospital
7 and sometimes the distributors would receive letters
8 from Intuitive threatening them, and so that caused
9 them to continue to drop off.
10     Q.   Oh.  Do you attribute the attrition of all
11 of the reps and all of the distributors who did cease
12 working on the store account to the conduct of
13 Intuitive?
14     A.   At least 99 percent.  I haven't looked at
15 each one to see what the reason, but that is by far
16 the overwhelming reason.  There may be one or two for
17 some other reason that I don't recall at the time;
18 but by far, almost all of them were because of the
19 actions of Intuitive.
20     Q.   Did the -- Did the reps, did they have a
21 quota as part of their financial arrangements
22 with Restore?
23     A.   They had designated customers and
24 timelines that they had to both make contact with
25 those hospitals, as well as a timeline to have them

Page 108

1 become customers; or they would lose them as a
2 protected account.
3     Q.   Did the distributors have quotas?
4     A.   No.  It was the same model of not a quota
5 per se, but here's your --  We worked together to
6 come up with a protected customer list, and it's
7 typically ones they had great relationships with.
8 They're already communicating with, already selling
9 them the products; and so they, you know, have those
10 relationships.
11          And they had the same situation where they
12 had to make contact with the -- with the customer,
13 provide some sort of proposal, and close the sale
14 within a period of time before losing them as a
15 protected customer.
16          It doesn't mean they couldn't sell to
17 them.  They just --  They would not be dedicated to
18 them.
19     Q.   Did you tell me you had -- that your
20 companies had two distributors in the United States?
21     A.   Correct.
22     Q.   Who were they?
23     A.   Medline and Alliance HealthCare.
24          It's technically Medline ReNewal.  It's a
25 division of Medline.

Page 109

1     Q.   And Alliance was the other one?
2     A.   Correct.
3     Q.   And --  And what were the total sales
4 generated by your two American United States
5 distributors?
6     A.   I don't know.
7     Q.   No idea?
8     A.   I don't know off the top of my head.  No.
9     Q.   More or less than a hundred dollars?
10     A.   Did you say a hundred dollars or a hundred
11 thousand?
12     Q.   Hundred dollars.
13     A.   Oh, yeah.  Much --  Much more.  Less than
14 a million.  I don't know if it's more than a hundred
15 thousand.  I have to look and see.
16     Q.   Somewhere between a hundred thousand and a
17 million dollars total sales generated by your two
18 United States distributors -- yes?
19     A.   That's a fair guess.
20     Q.   And --  And do you attribute the --
21 those -- those sales numbers to what you say are --
22 that conduct by Intuitive?
23     A.   Absolutely.
24     Q.   No other cause?
25     A.   I'm not aware of any at the moment.  No.

28 (Pages 106 - 109)

Page 134

1  that, in fact, there had been nine procedures
2  previously done, use -- at least nine procedures
3  previously done, including that instrument?
4      A.   So the hospitals track all of that data,
5  so that's -- That's information that -- that a
6  hospital will have access to, as well as that's --
7          You know, you'll have to ask the -- a
8  surgeon; but, typically, in most, instruments are
9  used hundreds and hundreds of times, so to have an
10 instrument that's only used 9 times or 20 times or 40
11 times is exceedingly rare in the medical device
12 space, other than single-use instruments, which are
13 designed to be used one time, but still are --
14 Sometimes they're used multiple times.
15         But in the multi-use arena, instruments
16 are used typically hundreds of times before they're
17 discarded; and so that's not anything unusual in the,
18 you know, laparoscopic or -- or endoscopic space.
19     Q.   Yes.  But my question is:  How would the
20 surgeon know how many uses -- how many uses a
21 particular instrument had been used in once the
22 interceptor was installed?
23     A.   They track those instruments by serial
24 number, and they have that data in their system.
25     Q.   They being the surgeons?

Page 135

1      A.   No.  The hospital.
2      Q.   So in -- in your long study of surgical
3  practice and all the operating rooms you've been in,
4  how many times have you seen a surgeon about to
5  commence a surgery call up Hospital Records and ask
6  them to run the serial numbers on a particular piece
7  of equipment to find out what its history was?
8          Is that something you saw very often?
9      A.   I -- I can't say that I've seen that.  I
10 can't say that I've ever seen a surgeon ask how many
11 times has any instrument been used ever.
12     Q.   Who is Ben Lipson?
13     A.   He's a former Intuitive engineer.
14     Q.   A friend of yours?
15     A.   No.
16     Q.   In -- In approximately the summer of
17 2019, did you call Mr. Lipson?
18     A.   I did.
19     Q.   Where -- Where was he when you -- you --
20 Well, strike that.
21         Did you reach him by telephone?
22     A.   I did.  I think it was through WhatsApp,
23 'cause he was on the other side of the world in
24 Macao.
25     Q.   And had somebody given you his phone

Page 136

1  number?
2      A.   Yes.
3      Q.   Who gave you his phone number?
4      A.   I think -- I think it was William
5  Hufstetler or Matt Roberts, one of those two
6  gentlemen.  I don't recall a hundred percent.
7      Q.   Where were you when you -- you placed your
8  call to Mr. Lipson?
9      A.   In the Restore Robotics office in Suwanee,
10 Georgia.
11     Q.   Why did you call him?
12     A.   Because a customer had asked me if there
13 was a way to remove the preventative -- preventive
14 maintenance message on the robot, and I was told that
15 he was involved with Intuitive back when that was
16 being developed, and he may know how it worked and if
17 it was possible to do that.
18     Q.   Who told you that?
19     A.   It was either Mr. Hufstetler or Mr.
20 Roberts.
21     Q.   Who was the customer?
22     A.   Baylor Scott & White, I think.
23         It was either Baylor Scott & White or
24 Heart & Health.  I think it was -- it was one of
25 those two.  Both of them have asked us to do that.

Page 137

1  I'm not sure which one preceded the -- the other.
2      Q.   How long did you talk with Mr. Lipson?
3      A.   About 15 minutes.
4      Q.   Was there anything about the call that
5  sticks out in your memory?
6      A.   Yeah.  I asked him if it was, you know,
7  possible to remove the -- the message.
8          And short answer was no.
9          And then he explained, you know, the
10 process that you had to have access to the software
11 on a laptop.  It had to connect to like 11 different
12 boards throughout the systems, the surgeon's console,
13 and the robot.  And had to check and make sure
14 certain, you know, actions had taken place over a
15 certain period of time.
16         Each board would be reset, and then you
17 had to have the -- the software on the laptop go
18 through and check each one of those, and then the
19 message would be removed if all those conditions were
20 met.
21     Q.   Did you say anything in this conversation
22 with Mr. Lipson about hacking into a system?
23     A.   Never.
24     Q.   Did Mr. Lipson say anything about hacking?
25     A.   No.

35 (Pages 134 - 137)

AEO 30(b)(6) Clifton Earl Parker                    May 4, 2021
Restore Robotics LLC v Intuitive Surgical

Page 138

1    Q.   Did either of you say anything where
2 somebody might have misinterpreted the use of the
3 word "hacking," like somebody said I have a hacking
4 cough, or I just went to the hardware store, and I
5 bought a hacksaw?
6         Was there any use of the word "hack" in
7 any context in your -- your conversation?
8    A.   I'm not aware of that word being used at
9 all.
10    Q.   Did you ask Mr. Lipson if he could help
11 you by gaining entry to the Intuitive system?
12    A.   No.  Once he told --
13         MR. BERHOLD:  Objection.
14         THE WITNESS:  What?
15         MR. BERHOLD:  Sorry.  Objection.
16         MR. RUBY:  What's the --
17         THE WITNESS:  Once he told us --
18         MR. RUBY:  -- objection?
19         What's the objection?  If it's to form,
20 maybe I'll rephrase.  So what's the objection?
21         MR. BERHOLD:  Oh, sorry, Allen.  Are you
22 referring to the -- When you say system, are you
23 referring to the da Vinci surgical system?
24         MR. RUBY:  I'm not -- I'm not answering
25 questions.  I'm just trying to do my job.

Page 139

1         I asked the question.  You made an
2 objection.  I want to understand what the
3 objection is, so maybe I'll rephrase it.  I
4 don't know what I'll do, but I need -- I want
5 to respect you sufficiently to understand what
6 your objection is.
7         MR. BERHOLD:  Well, let me be more blunt.
8 The phrase -- Objection.  The phrase "Intuitive
9 system" is vague and ambiguous.
10         MR. RUBY:  I withdraw the question.
11    Q.   (By Mr. Ruby)  Did you ask Mr. Parker
12 (sic) if he would be willing to hack into whatever
13 computer system was responsible for this PMD -- PM
14 due message?
15    A.   You said Mr. Parker.  So you want to
16 restate the question with the right --
17    Q.   Sure.
18    A.   -- name?
19    Q.   Sure.  Did you ask Mr. Lipson if he would
20 help you by hacking into the system which was showing
21 the message PM due?
22    A.   So no, at any time did the word "hack"
23 ever come up.  And I did not even ask him for his
24 help once he described what was required, because it
25 was it was a futile effort; and he said it -- it

Page 140

1 couldn't be done.
2         I took it that it couldn't be done; and
3 there was no more discussion about that, that
4 particular subject.
5    Q.   Did you talk about other subjects?
6    A.   We talked about the reusing of the
7 instruments and resetting the counter.
8    Q.   What did you say about that?
9    A.   I think he asked us what, you know, what
10 all were we doing.
11         And I just explained to him that we were
12 installing a interceptor system that prevented the
13 instruments from expiring where they could be reused
14 to save the hospital money.
15    Q.   Was there any discussion between the two
16 of you about the difference between training
17 instruments and instruments that were meant to be
18 used in surgery with humans?
19    A.   Oh, that's possible.
20    Q.   What do you remember?
21    A.   I don't remember that, but I'm sure that's
22 likely.
23    Q.   What prompts you to think that that was
24 likely when you don't remember what was said?
25    A.   Because I've had that conversation with

Page 141

1 other people multiple times.
2    Q.   What did he tell you?
3    A.   He was under the impression that the FDA
4 required -- there was an FDA mandate that the
5 instruments only be used ten times.
6    Q.   Did you have any expectation one way or
7 the other as to whether that the phone conversation
8 you had with Mr. Lipson was being recorded by
9 anybody?
10    A.   No.
11    Q.   Did -- In this conversation, did Mr.
12 Lipson tell you that he thought you were being
13 unethical in your approach to him?
14    A.   I don't recall that at all.  No.
15    Q.   Did you tell Mr. Lipson that you had a
16 materials expert study the standard instruments and
17 the training instruments to see whether there were
18 differences between them?
19    A.   Probably.  Yes.
20    Q.   Do you remember?
21    A.   I don't remember exactly; but, vaguely, as
22 part of that same conversation, you know, dealing
23 with, you know, what's the difference between a
24 training instrument that can be used a hundred times
25 versus a nontraining instrument?  Are they made from

36 (Pages 138 - 141)

Page 142

1 the same materials?
2         Rebotix had a materials analysis
3 completed, and they appeared to all be the same
4 materials.
5    Q.   Before the lunch break, I was asking you
6 about -- excuse me -- reps and distributors.  Did
7 your companies have an employee whose title was sales
8 manager or international sales manager or global
9 sales -- sales manager?
10        Was there anybody whose job it was to
11 manage overall the sales effort that was going on for
12 the companies' products and services?
13   A.   Not employees.  But myself and Mills
14 Vautrot handled most of those duties.
15   Q.   Were you in -- function in -- in the
16 job that you did essentially the salesperson in chief
17 for the products and services of Restore Robotics and
18 Restore Robotics Repair?
19   A.   Yes.
20   Q.   And were you, as the salesperson in chief,
21 closely connected to the -- the sales efforts that
22 were going on, on behalf of the companies by both of
23 reps and distributors?
24   A.   I was familiar with most of them; but, you
25 know, with that many, I was not in touch with all of

Page 143

1 them on a day-to-day basis, but on a -- an occasional
2 basis; and Mills handles a lot more of the day-to-day
3 interaction with those reps and distributors.
4    Q.   Did your companies, did Restore Robotics
5 and Restore Robotics Repair, provide sales materials
6 to be used by the distributors and reps?
7    A.   Yes.
8    Q.   And did you mainly -- Not always, but
9 mainly, when you could, approve or disapprove the
10 content of the sales materials that were being sent
11 out to the people in the field?
12   A.   Yes.
13   Q.   Was it very important to you at all, the
14 sales materials that the company furnished to the
15 reps and distributors were accurate?
16   A.   Yes.
17   Q.   And then you personally would not tolerate
18 any inaccurate information going out to the reps and
19 distributors or to anybody if it pertained to the
20 goods and services offered by Restore Robotics; is
21 that true?
22   A.   Well, I would, obviously, love to have,
23 you know, everything to be exact all the time.  When
24 you're dealing with, you know, a fast-moving
25 organization, you know, that becomes your -- your

Page 144

1 challenge, is to make sure everybody's doing the best
2 they can to provide the right information to the
3 right people.
4         Keep in mind, too, that most of the
5 salespeople and distributors either have their own
6 information or didn't use any at all; and in this
7 business, the relationship is the most important
8 thing, so, you know, brochures and that sort of thing
9 is -- is almost irrelevant.  I don't think we ever
10 got any customer from a brochure or a website.  It's
11 all about those personal relationships.
12        You know, every sale that I made, you
13 know, was because I either went to meet with them or
14 talked to them over the phone; and it was, you know,
15 discussions, long discussions.
16        This is not something they decide to do,
17 you know, on a whim and -- And they vet, you know,
18 the process.  They want to see samples.  They want to
19 have, you know, some testing done.  They want to do
20 whatever they want to do.
21        And, of course, we, you know, give them
22 that opportunity and ability to -- to look at
23 everything and make their decisions.  I mean,
24 they're -- they're the arbiters of what's safe and
25 what's an acceptable risk.  So the hospitals and the

Page 145

1 doctors, typically, that's a multi-pronged approach.
2 It's not just, hey, look, there's a cool brochure.
3 Let's do this.  It didn't work that way.
4         It's a -- It's a long process for them to
5 make that decision, and they ask a lot of questions
6 and -- And they want to see things and make those
7 decisions for themselves.
8    Q.   Well, for the reasons you just indicated,
9 did you try to provide information to the potential
10 decision makers in hospitals?
11   A.   Sure.  If they requested, absolutely.
12   Q.   And did you try to provide information to
13 surgeons who might be users of the da Vinci surgical
14 system?
15   A.   Yes.
16   Q.   And did you want to be sure that the
17 information you provided to the executives and
18 hospitals and -- and to doctors was accurate?
19   A.   Of course.
20   Q.   And -- and is it a -- a -- Strike that.
21        Now was your company sometimes asked by
22 prospective customers and/or reps, distributors to
23 furnish estimates or proposals regarding the -- the
24 price, the cost of the interceptor system?
25   A.   Certainly.  So that was, you know, part of

37 (Pages 142 - 145)

AEO 30(b)(6) Clifton Earl Parker                        May 4, 2021
Restore Robotics LLC v Intuitive Surgical

Page 146

1 our process, which was to, you know, start with that
2 universe of, you know, here's all the robots out
3 there; and then it's, you know, them analyzing their
4 existing usage of the instruments; and then we would
5 generate a proposal. Sometimes written.
6        Sometimes they would just tell us, hey, we
7 use about 150 instruments a year. You know, what's
8 that look like? Sometimes it's more detailed, and so
9 that would whittle down to the next level of, you
10 know, potential customer.
11        And then some of those would become
12 customers. Some of those did not become customers.
13 Because as they started having conversations with
14 Intuitive, they would tell them, you know, things
15 like if you do that, you know, you're -- you're
16 cutting yourself off. We're not going to provide you
17 any support. We're not going to train your doctors.
18 We're not going to sell you any more equipment.
19 We're abandoning you. We're going to, you know, try
20 to convince the doctors to go to other hospitals.
21        So lots of tactics and techniques to try
22 to prevent people from taking that -- that next step
23 to -- to actually doing business with us.
24        MR. RUBY: Could we have please Bates Nos.
25 30213 to 30215 marked as the -- an exhibit.

Page 147

1        THE CONCIERGE TECH: Sure. Please stand
2 by.
3        MR. RUBY: We got it or -- or --
4        THE CONCIERGE TECH: It's in the process
5 of introducing now.
6        MR. RUBY: All right.
7        THE CONCIERGE TECH: I've got to put a
8 stamp on it, though.
9        And, Doug, it looks like it starts with
10 3 -- with number 10 on the end, the 30210.
11        MR. DeBAUGH: Yeah.
12        THE CONCIERGE TECH: And it's a six-page
13 document?
14        MR. DeBAUGH: Yeah.
15        THE CONCIERGE TECH: Okay. Just wanted to
16 make sure.
17        (Exhibit 4 was marked for identification.)
18        THE CONCIERGE TECH: All right. And the
19 document is now up.
20        Q. (By Mr. Ruby) All right. Let's go to
21 Page 30213.
22        I'm sorry. Let's -- Let's back up one to
23 Page 212.
24        This page we're looking at now has a
25 picture of some portions of some instruments on it;

Page 148

1 is -- is that right?
2        A. Yes.
3        Q. And those were da Vinci instruments. Is
4 that so?
5        A. I don't know that they were all da Vinci
6 instruments. Probably, but I -- I don't --
7        Now I don't know where that graphic came
8 from.
9        Q. Was this graphic we're looking at a -- an
10 advertising brochure for Restore Robotics?
11        A. Yes.
12        Q. Did anybody from da Vinci ever, to your
13 knowledge -- Strike that.
14        Did anyone from Intuitive Surgical, to
15 your knowledge, ever give permission to Restore
16 Robotics to use images of Intuitive products in
17 advertising brochures?
18        A. I'm not aware of that.
19        Q. Did you ever ask for that permission?
20        A. I did not.
21        Q. Did you ever instruct anyone in your
22 organization who asked for that permission?
23        A. I did not.
24        Q. Let's go now to Page 30213.
25        Now it says right at the top that this was

Page 149

1 a confidential proposal.
2        Do you see that?
3        A. Yes.
4        Q. Did -- The fact that it was a
5 confidential proposal, does this tell us in and of
6 itself whether the recipient of the proposal was
7 already a customer of -- of Restore Robotics or was
8 not a customer or you can't tell from that
9 designation?
10        A. I can't tell from that designation. I'm
11 assuming from the word "proposal" it means they're
12 not a customer at this time.
13        Q. All right. Now would you look at the --
14 the first paragraph that begins, "This Confidential
15 Proposal..."
16        Did you approve this language in order to
17 give the impression that the services of Restore
18 Robotics would be taking -- taking place in a
19 facility that was built or owned or managed by
20 Restore Robotics?
21        A. That's not what that first sentence means
22 at all.
23        MR. RUBY: Could you go down, please.
24        Q. (By Mr. Ruby) Beneath that, there's some
25 Letters A, B, C, D and so forth. Could you look at

38 (Pages 146 - 149)

AEO 30(b)(6) Clifton Earl Parker                    May 4, 2021
Restore Robotics LLC v Intuitive Surgical

Page 150

1 B, please. It says, "Sharpening of EndoWrist
2 Instruments."
3    A.  Yes.
4    Q.  And it says, "EndoWrist scissor blades can
5 become too dull to operate effectively before their
6 10th use." And then there's another sentence.
7       But stopping after "10th use," do you see
8 that?
9    A.  I do.
10    Q.  Who told you that?
11    A.  Surgeons --
12    Q.  Did they tell you once or were --
13    A.  -- and other hospital personnel.
14    Q.  Excuse me. I didn't mean --
15    A.  I heard that multi --
16    Q.  Have you --
17    A.  I heard that multiple times.
18    Q.  Have -- Have you finished your answer?
19    A.  Yes.
20    Q.  All right. So you've been told numerous
21 times by, I -- I think you said, surgeons and
22 hospital personnel that "EndoWrist scissor blades can
23 become too dull to operate effectively before their
24 10th use," closed quote.
25       That was what you'd been told over the

Page 151

1 years many times -- yes?
2    A.  Yes.
3    Q.  What, if anything, were the installers of
4 the interceptor technology telling you about whether
5 or not the instruments that they were installing the
6 interceptor on appeared to be too dull to operate
7 effectively?
8    A.  I did not have conversations directly with
9 the employees about that subject. Kevin May would
10 have had those conversations.
11       MR. RUBY:  You -- If you'd turn the page,
12    please.
13    Q.  (By Mr. Ruby) It says, "PRICING AND
14 TERMS."
15       Do you see that?
16    A.  Yes.
17    Q.  And the first item under that is, quote,
18 "Sharpening of EndoWrist Instrument."
19       Do you see that?
20    A.  Yes.
21    Q.  And this offers to provide sharpening,
22 including a rigorous inspection and testing and
23 aligning and tightening for $375 per instrument.
24       Do you see that?
25    A.  Yes.

Page 152

1    Q.  Did -- Did you get any takers? Did --
2 Did any hospitals take you up on that?
3    A.  I'm not sure. I don't think we had the
4 opportunity. I'm not sure the date of this, you
5 know, document; but like I said earlier, we didn't
6 get very far into the business before everyone was,
7 you know, shut down.
8       I'm sure there were sharpening of
9 instruments. You have to verify it with Mr. May. I
10 don't know if that was done as a separate service
11 or -- or as part of -- just as part of a resetting of
12 the instrument during that testing and inspection
13 process.
14    Q.  Well, was the sharpening of instruments by
15 Restore done in accordance with any specifications
16 for sharpness that were associated with a particular
17 type of instrument?
18    A.  That'd be a question for Mr. May.
19    Q.  You don't know?
20    A.  I believe it was, but I don't know the --
21 the exact specifications.
22    Q.  Well, I didn't ask you for exact
23 specifications.
24       My question is:  Were the sharpening of
25 instruments, when it happened, undertaken by Restore

Page 153

1 Robotics according to some specifications?
2    A.  Yes.
3    Q.  And whose specifications were those?
4    A.  That'd be a question for Mr. May.
5    Q.  Do you know?
6    A.  I do not.
7    Q.  Now would you look please at Page 30215.
8 You see that?
9    A.  Yes.
10    Q.  Does this appear to you to be part of a
11 confidential proposal to a prospective customer?
12    A.  Yes.
13    Q.  Now it -- it -- Help me to understand
14 this, please. Across the top, there are column
15 headings -- model number, usages.
16       The model numbers were Intuitive's model
17 number associated with a particular instrument; is
18 that true?
19    A.  That's correct.
20    Q.  And the usages were the usage limitations
21 that Intuitive had established for these particular
22 instruments. Is that so?
23    A.  Correct.
24    Q.  And then there's something called the "Da
25 Vinci Published Price." Yes?

39 (Pages 150 - 153)

AEO 30(b)(6) Clifton Earl Parker          May 4, 2021
Restore Robotics LLC v Intuitive Surgical

Page 154

1    A.   Yes, sir.
2    Q.   And -- And is that what it sounds like.
3  Da Vinci had published the -- the price for
4  acquisition of -- the unit price for acquisition of
5  these particular instruments -- yes?
6    A.   Yes.
7    Q.   To your knowledge, were these instruments
8  also available in 1918, (sic) 1990 (sic) at lesser
9  prices from other sources?
10   A.   I don't know that I understand the
11  question.  Are you saying did someone offer --
12        Well, restate the question.
13   Q.   Well, to your knowledge, weren't these
14  particular instruments available from sources other
15  than Intuitive at a lower price?
16   A.   Occasionally.
17   Q.   Well, you're in the parts business now,
18  aren't you?
19   A.   Yes.
20   Q.   Does your company which bears your name
21  sell some or all of these instruments at prices less
22  than what's on here as the da Vinci published price?
23   A.   Yes.  I thought you meant in -- in --
24  outside of our companies.
25   Q.   Oh.  Your -- Your companies had sources

Page 155

1  and means by which you were able to offer these
2  instruments, at -- at least most of them, if not all,
3  at a lower than da Vinci's published price; is that
4  true?
5    A.   Yes.
6    Q.   And -- And then the next column is
7  "Restore Robotics Repair Fee."  What -- What is
8  that?
9    A.   That's how much Restore Robotics would
10  charge to repair the instrument.
11   Q.   And repair is your description of the
12  installation of the interceptor technology; is that
13  right?
14   A.   Correct.
15   Q.   And -- And then there's a column it calls
16  dollar --  It's called "Dollar Savings"; is that
17  right?
18   A.   Yes.
19   Q.   Now the dollars savings number is not an
20  accurate number if you assume that the customer
21  actually will go ahead and buy an instrument from one
22  of the sources other than da Vinci, right?
23   A.   You're making a -- a leap there.  This is
24  talking about doing a repair, and you're conflating
25  that with someone buying an instrument from somewhere

Page 156

1  else.
2        This dollar savings is reflective of just
3  what it says.  The da Vinci published price is 2,000.
4  If you do a Robotic -- Restore Robotics' repair, it's
5  1500.  That's --  You'll save $500, if you do the
6  repair --
7    Q.   Well, was the --
8    A.   -- through Restore Robotics.
9    Q.   Excuse me.  I'm sorry to interrupt you.
10   A.   I'm sorry.
11   Q.   Have you finished?
12   A.   Yeah.  I'm finished.
13   Q.   The 25-percent figure, using the first row
14  in -- in this little chart, 25 percent represents the
15  difference between what you're calling the da Vinci
16  published price and the Restore Robotics repair fee
17  and the difference between $2,000 and $1500 is indeed
18  25 percent, right?
19   A.   Correct.
20   Q.   If the customer decided that it wanted to
21  see if it could get a better price for a particular
22  da Vinci procedure or a instrument and located the
23  instrument maybe from you for the -- a price of,
24  let's say, $1900, then the percentage saving would be
25  less than 25 percent, wouldn't it?

Page 157

1    A.   But you're again conflating two different
2  things, that one has nothing to do with the other.
3        This is strictly talking about repairs.
4  This is not talking about how much can you save if
5  you did something totally different.  This is talking
6  about how much can you save if you did the repair
7  fee.
8    Q.   But save from what?
9    A.   From --  Every customer thought it was
10  pretty self-explanatory that that dollar savings is
11  how much they would save if they use Restore Robotics
12  Repairs versus buying a new da Vinci instrument.
13   Q.   Okay.  Now percentage saved, we -- we
14  touched on that.  Dollar savings, I understand what
15  you're saying.
16        "Units Ordered," do you see that?
17   A.   Yes.
18   Q.   What does that signify?
19   A.   That's the number of instruments that
20  either the salesperson put in the system or the
21  customer told them to put in the system to see how
22  many they potentially wanted to have done over X
23  period of time, so we don't know what --  I don't
24  know what that particular conversation was like.
25        If they put in, you know, we're going to

40 (Pages 154 - 157)

**EXHIBIT 15**

**to**

**PAUL D. BRACHMAN DECLARATION IN SUPPORT
OF DEFENDANT'S MOTION IN LIMINE NO. 1
TO EXCLUDE OUT-OF-COURT HOSPITAL
STATEMENTS**

```
1                UNITED STATES DISTRICT COURT
2            FOR THE NORTHERN DISTRICT OF CALIFORNIA
3                  SAN FRANCISCO DIVISION
4
     IN RE: DA VINCI SURGICAL        )
5    ROBOT ANTITRUST LITIGATION      ) Case No.:
     _____  ) 3:21-cv-03825-VC
6    THIS DOCUMENT RELATES TO:       )
     ALL CASES                       ) Pages 1 to 205
7    _____  )
     SURGICAL INSTRUMENT SERVICE     )
8    COMPANY, INC.,                  )
                                     )
9             Plaintiff,             )
                                     )
10        vs.                        )
                                     )
11   INTUITIVE SURGICAL, INC.,       )
                                     )
12        Defendant.                 )
     _____  )
13
14
15                    DEPOSITION OF:
16             CLIFTON EARL PARKER, VOLUME I
17              TUESDAY, OCTOBER 25, 2022
18            9:08 a.m. Eastern Daylight Time
19
20   REPORTED BY:
21   Vickie Blair
22   CSR No. 8940, RPR-CRR
23   JOB NO. 5541122
24
25   PAGES 1 - 207
```

Page 1

1   Deposition of CLIFTON EARL PARKER, the witness, taken on
2   behalf of the Defendant, on Tuesday, October 25, 2022,
3   9:08 a.m. Eastern Daylight Time, before VICKIE BLAIR,
4   CSR No. 8940, RPR-CRR.
5
6   APPEARANCES OF COUNSEL VIA ZOOM:
7
8   FOR THE WITNESS:
9       JEFFREY L. BERHOLD, P.C.
        BY JEFF L. BERHOLD, Partner
10      1230 Peachtree Street
        Suite 1050
11      Atlanta, Georgia  30309
        404-872-3800
12      jeff@berhold.com
13   FOR PLAINTIFF/COUNTER-DEFENDANT SURGICAL INSTRUMENT
     SERVICE CO. INC.:
14
        HALEY GUILIANO LLP
15      BY RICHARD T. MCCAULLEY, Partner
        111 North Market Street
16      Suite 900
        San Jose, California  95113
17      +1 669 213 1071
        richard.mccaulley@hglaw.com
18
        HALEY GUILIANO LLP
19      BY DONNY K. SAMPORNA, Associate
        111 North Market Street
20      Suite 900
        San Jose, California  95113
21      +1 669 213 1080
        donny.samporna@hglaw.com
22
23
24
25
                                                    Page 2

1   APPEARANCES OF COUNSEL VIA ZOOM:  (Continued)
2   FOR DEFENDANT INTUITIVE SURGICAL, INC.:
3       COVINGTON & BURLING LLP
        BY SONYA D. WINNER, Partner
4       415 Mission Street
        Suite 5400
5       San Francisco, California  94105-2533
        +1 415 591 7072
6       swinner@cov.com
7       COVINGTON & BURLING LLP
        BY ANNA BOBROW, Associate
8       850 Tenth Street, NW
        Washington, D.C.  20001-4956
9       +1 202 662 5948
        abobrow@cov.com
10
     INTERIM CO-LEAD COUNSEL FOR THE PROPOSED CLASS:
11
        SPECTOR ROSEMAN & KODROFF, P.C.
12      BY JEFFREY L. SPECTOR, Partner
        2001 Market Street
13      Suite 3420
        Philadelphia, Pennsylvania  19103
14      P: 215-496-0300
        jspector@srkattorneys.com
15
        SPECTOR ROSEMAN & KODROFF, P.C.
16      BY JEFFREY J. CORRIGAN, Partner
        2001 Market Street
17      Suite 3420
        Philadelphia, Pennsylvania  19103
18      P: 215-496-0300
        jcorrigan@srkattorneys.com
19
     ALSO PRESENT:
20
        RAMON A. PERAZA, Videographer
21
22
23
24
25
                                                    Page 3

1                   I N D E X
2
3   WITNESS        EXAMINATION          PAGE
4   CLIFTON EARL PARKER
5               (MS. WINNER)        8
6               (MR. CORRIGAN)      128
7               (MR. McCAULLEY)     172
8               (MS. WINNER)        175
9               (MR. CORRIGAN)      193
10              (MS. WINNER)        197
11
12          LUNCH RECESS
13          Page 127
14
15          INFORMATION REQUESTED
16          None
17   QUESTIONS INSTRUCTED BY COUNSEL NOT TO ANSWER
18          None
19
20              E X H I B I T S
21   EXHIBIT NO.  PAGE  DESCRIPTION
22   Exhibit 121    19  Email with attachments, Bates
23               numbers Restore-00094918 through
24               Restore-00094956
25
                                                    Page 4

1           E X H I B I T S (Continued)
2   EXHIBIT NO.  PAGE   DESCRIPTION
3   Exhibit 122    56  Email with attachments, Bates
4               numbers Restore-00094567 through
5               Restore-00094586
6   Exhibit 123    63  Email with attachment, Bates
7               numbers Restore-00010131 through
8               Restore-00010137
9   Exhibit 124    81  Email chain, Bates numbers
10              Restore-00091370 through
11              Restore-00091410
12  Exhibit 125    84  Letter to Rick Ferreira from Mark
13              Trumbore dated September 30, 2022,
14              with attachment titled
15              "Indications for Use"
16  Exhibit 126    92  Email chain with attachments,
17              Bates numbers Restore-00094344
18              through Restore-00094351
19  Exhibit 127    94  Email chain with attachments,
20              Bates numbers Restore-00091178
21              through Restore-00091184
22  Exhibit 128    96  Email, Bates number
23              Restore-00091362
24
25
                                                    Page 5

                                          2 (Pages 2 - 5)

1       The only difference between the Si and the   11:38:34
2   Xi is that housing, the Xi is rotated 90 degrees. The   11:38:37
3   Si instrument connects to the robot with four contact   11:38:46
4   pins, whereas the Xi connects via RFID, so the only   11:38:50
5   real difference is the difference between four pogo   11:38:58
6   connector pins and RFID for communication between the   11:39:00
7   counter and the robot arm.   11:39:07
8       Q   What, if any, affirmative actions did   11:39:10
9   Restore take to engage in the repair of the X and Xi   11:39:14
10  EndoWrists?   11:39:18
11      A   We started in 2020, I believe.  The first   11:39:18
12  thing we did is we hired Marcus Engineering, through   11:39:25
13  Innovative, to -- to go to a robot at a hospital and do   11:39:33
14  an analysis to see if they were able to capture that   11:39:39
15  RFID communication between the instrument and the   11:39:48
16  robot, and that was the first element, and that was   11:39:52
17  successful.   11:39:53
18      Then the -- the next project was to start   11:39:55
19  developing the reader to be able to read how many lives   11:40:03
20  and to read all the data about that instrument, which   11:40:06
21  was the model number, the serial number, the version   11:40:09
22  number, and how many lives it had, so we were able to   11:40:13
23  decrypt that data and -- and read that data, which is   11:40:19
24  the next step to being able to now change that data and   11:40:22
25  put it back on the instrument.   11:40:28

1       Q   How much money did it take you to develop,   11:40:31
2   and when I say "you," I meant Restore, how much money   11:40:34
3   did it take Restore to develop the Xi reader?   11:40:37
4       A   Oh, gosh, I don't recall exactly, but I   11:40:42
5   want to say greater than $50,000.   11:40:53
6       Q   I believe earlier with -- oh, I'm sorry, I   11:40:57
7   believe earlier with -- in response to Ms. Winner, you   11:41:00
8   mentioned that you -- Restore had bought an Xi robot;   11:41:03
9   is that correct?   11:41:06
10      A   Yes.   11:41:06
11      Q   Would that have been another --   11:41:06
12      A   Let me rephrase that.   11:41:10
13      We did not outright purchase it, but in   11:41:11
14  exchange for ownership and the value of that is in   11:41:15
15  excess of a million dollars.   11:41:18
16      Now let me get you to restate the question   11:41:25
17  so I understand.  Are you asking for the reader   11:41:28
18  specifically or all the develop efforts to get to the   11:41:30
19  point of the reader?   11:41:35
20      Q   Well, the overall theme of my question in   11:41:37
21  this area are affirmative acts that you took to enter   11:41:40
22  the Xi repair business, so I think that, to answer your   11:41:46
23  question, everything that went into your -- anything   11:41:49
24  that went into your ability to enter the X and Xi   11:41:57
25  business, including the development of the Xi reader,   11:42:01

1   so if it includes more than just the -- end piece   11:42:03
2   of the development of the Xi reader, then please   11:42:06
3   describe that.   11:42:09
4       A   Okay.   11:42:11
5       MS. WINNER:  Object.  Object to the form.   11:42:11
6   If there is a question in there.   11:42:13
7       MR. CORRIGAN:  I said to please describe,   11:42:17
8   so you asked me a question, you just want to talk about   11:42:18
9   the ultimate, sort of last end change development of   11:42:23
10  the Xi reader, and I'd asked you if you could, could   11:42:26
11  you please describe the entirety of the development of   11:42:31
12  the Xi reader, including the last piece.   11:42:35
13      MS. WINNER:  Object to the form.   11:42:37
14      THE WITNESS:  So basically the first step   11:42:38
15  was hiring Marcus Engineering to do the analysis to see   11:42:40
16  if the data could be collected between the instrument   11:42:44
17  and the reader.   11:42:51
18      The second was there was some additional   11:42:52
19  analysis on what's the -- best approach to go about   11:42:58
20  doing that.   11:43:01
21      Then the robot, it -- the actual   11:43:02
22  acquisition of the robot itself.   11:43:09
23      And then paying for the -- the -- the   11:43:10
24  development of the product that we call the reader.   11:43:14
25      And then the -- what we're calling the --   11:43:19

1   the Xi development, that's been multiple phases, so I   11:43:26
2   don't have the numbers in front of me, but you're   11:43:30
3   talking 1.3 million, 1.4 million, in that range.   11:43:34
4   BY MR. CORRIGAN:   11:43:38
5       Q   Would that include the purchase of the   11:43:39
6   robot?   11:43:41
7       A   Yes.   11:43:41
8       That does not include any of our personal   11:43:42
9   time, that's just either our money out of pocket and/or   11:43:45
10  the -- the equity for the robot.   11:43:51
11      Q   Why did you purchase the Xi robot?   11:43:56
12      A   So we needed to be able to utilize the   11:44:00
13  robot for a couple things, number one, to make sure   11:44:03
14  that what we're doing actually works, and -- and works   11:44:05
15  safely, and part of the 510K process, you have to   11:44:11
16  utilize the instrument on the robot, so there's a lot   11:44:19
17  of testing, utilizing the instrument on the robot   11:44:23
18  and -- and electrical safety testing with the   11:44:29
19  instrument connected to the robot.   11:44:33
20      Q   Do you know what an Xi cap removal machine   11:44:35
21  is?   11:44:38
22      A   Yes.   11:44:38
23      Q   What is that?   11:44:38
24      A   That's a -- a device that was developed to   11:44:41
25  remove the outer cover or cap to be able to get access   11:44:46

1 to the inside.                          11:44:53
2    Q    Does Restore have one of those?    11:44:55
3    A    I think we have two.              11:44:58
4    Q    How did you come across -- how did you    11:45:00
5 come to acquire those?                   11:45:03
6    A    Kevin was involved in that process, and I    11:45:04
7 think that one of -- I'm not a hundred percent sure,    11:45:12
8 but I think Rick's team, Alliance Healthcare, had the    11:45:19
9 resource to have that developed.          11:45:23
10    Q    Did you secure any additional facilities    11:45:24
11 or space in order to repair X and Xi EndoWrists?    11:45:31
12    A    We did.  We bought a building in Las    11:45:37
13 Vegas.                                    11:45:40
14    Q    How many square feet is that?  Do you    11:45:40
15 know?                                     11:45:42
16    A    I don't know, I'm going to guess 3200,    11:45:42
17 that's a guess, I don't re-- I don't remember.    11:45:49
18    Q    Approximately how much money would you say    11:45:52
19 that you spent on developing the technology to enter    11:45:57
20 the Xi -- the X and Xi repair business?    11:46:02
21    A    Well, if you count the building, if you    11:46:06
22 count all the different components, it's going to be    11:46:08
23 two million plus.                         11:46:16
24    Q    Please describe -- you've already sort of    11:46:18
25 covered it, but please describe Restore's ability to    11:46:21
                                          Page 138

1 finance the business of repairing X and Xi EndoWrists.    11:46:26
2    A    Well, all the money so far that's gone --    11:46:30
3 gone into the development has been investment by myself    11:46:38
4 and Kevin May mostly.                     11:46:42
5         So we've purchased the building; we've    11:46:46
6 paid Alliance; we've paid Marcus Engineering; we've    11:46:49
7 paid attorneys to do legal analysis, both on the    11:46:53
8 digital copyrights, we've filed for patents, paid    11:47:00
9 patent attorneys, and that's been money out of pocket.    11:47:05
10        So we have not brought in any investors    11:47:10
11 for the cash portion of the business, so I have the    11:47:13
12 funds and Kevin has the funds to do so.    11:47:18
13    Q    Please describe any actual prospective    11:47:20
14 signing of contracts in connection with engaging in the    11:47:24
15 repair -- the X and Xi EndoWrists repair business?    11:47:29
16        MS. WINNER:  Objection to form.    11:47:34
17        THE WITNESS:  Hmm.               11:47:39
18        MS. WINNER:  Vague and ambiguous.    11:47:39
19        THE WITNESS:  Are you asking about    11:47:40
20 contracts with customers or development contracts or    11:47:43
21 all of the above?                         11:47:47
22 BY MR. CORRIGAN:                          11:47:49
23    Q    Oh, let's start with customers, do you    11:47:50
24 have any prospective customers that you can sign    11:47:51
25 contracts with engaged in the X and Xi business?    11:47:55
                                          Page 139

1    A    We have lots of prospective customers that    11:47:58
2 we could sign contracts with, but we have not done so    11:48:01
3 at this point cause it's futile until we get some sort    11:48:04
4 of relief from Intuitive blocking.        11:48:07
5    Q    What makes you think you could sign    11:48:10
6 contracts with those customers if it weren't futile?    11:48:12
7    A    They've told us they would sign contracts    11:48:15
8 with us tomorrow and do business with us tomorrow.    11:48:17
9         And some of -- some of the hospitals,    11:48:20
10 there's no -- they don't sign contracts, they just    11:48:22
11 issue work.  This is a -- it's not like you're buying a    11:48:26
12 $4 million, you know, MRI machine, they say, "Hey, can    11:48:30
13 you repair this instrument?"  It -- you know, we say    11:48:35
14 it's $1,800 to repair this instrument, we send them an    11:48:39
15 invoice, they pay us, or they send us a purchase order,    11:48:43
16 we send them an invoice, and they pay us.  So it's    11:48:49
17 not -- there's not a need for a big long contract    11:48:51
18 typically.                               11:48:53
19        Some hospitals do want an overarching    11:48:54
20 contract, if they have multiple facilities, to be able    11:48:57
21 to maintain consistent pricing, which is not an issue    11:49:03
22 with us because we have consistent pricing no matter    11:49:07
23 who the hospital facility is.            11:49:11
24    Q    And you mentioned a moment ago other types    11:49:12
25 of contracts with other types of entities other than    11:49:14
                                          Page 140

1 customers; correct?                       11:49:19
2    A    Yes.                             11:49:20
3    Q    What types of contracts are those?    11:49:20
4    A    All we have right now is verbal agreements    11:49:21
5 with Alliance Healthcare.                 11:49:26
6         We do have a written statement of work,    11:49:27
7 SOWs with Marcus Engineering to do development work, so    11:49:34
8 those are signed agreements.              11:49:38
9         We -- we have a distribution agreement    11:49:41
10 with Medline that covers both the Si and Xi sales and    11:49:49
11 distribution.                            11:49:55
12    Q    Uh-huh.                          11:49:59
13    A    That's currently in place right now.    11:50:01
14    Q    How confident are you that, you being    11:50:04
15 Restore, and its tech partners will be able to come up    11:50:07
16 with the technology to bypass the X and the Xi chip?    11:50:10
17    A    Extremely.                       11:50:13
18        MS. WINNER:  Objection.  Form.  Lack of    11:50:14
19 foundation.                              11:50:21
20        THE WITNESS:  I'm extremely confident, I'm    11:50:21
21 a hundred percent confident.              11:50:25
22 BY MR. CORRIGAN:                          11:50:26
23    Q    Where does that confidence come from?    11:50:26
24    A    Our partners have been in this business    11:50:29
25 for 20 some odd years, they've done much more    11:50:30
                                          Page 141

36 (Pages 138 - 141)

1 complicated systems by Johnson & Johnson, Bausch +    11:50:33
2 Lomb, Webster, and many other large companies that have    11:50:39
3 more complicated technology, and they've been able to    11:50:46
4 defeat those technologies and reprocess, remanufacture    11:50:53
5 those devices, and so --    11:50:59
6        And then, secondarily, the Xi is extremely    11:51:02
7 similar to the Si with one exception, and that's RFID    11:51:07
8 versus direct contact, so everything else is pretty    11:51:14
9 simple, it's just a -- you know, taking the time,    11:51:17
10 putting the manpower on it.    11:51:22
11        So we're extremely, extremely confident we    11:51:23
12 can do it, and they've told us as much.    11:51:27
13    Q    When did Restore first consider repairing    11:51:30
14 Xi and X compatible EndoWrists, roughly?    11:51:33
15    A    We were first contacted by Rebotix, or    11:51:38
16 Kevin and Rebotix met, and I believe it was -- it was    11:51:44
17 April of 2018, and then sometime between April 2018 and    11:51:48
18 October '18, we had the discussions with Rebotix to be    11:51:53
19 their repair center.    11:52:01
20        So we were doing -- we started doing the    11:52:02
21 repairs for their customers, our customers, and any    11:52:04
22 other distributors starting in October of 2018.    11:52:09
23        And then December of 2019, I think, is    11:52:14
24 when we undertook our development efforts to develop    11:52:21
25 our technology. I think we got our first chips, our    11:52:25

Page 142

1 first boards developed and completed in June -- I    11:52:35
2 believe June of 2020.    11:52:39
3    Q    Uh-huh.    11:52:41
4        MS. WINNER: Could I ask to have that    11:52:43
5 question reread, please.    11:52:44
6        MR. CORRIGAN: Why is that?    11:52:48
7        MS. WINNER: I -- I think you may have    11:52:50
8 misheard it, I could be wrong, but I'd like to hear it    11:52:53
9 back, maybe I misheard it.    11:52:55
10        MR. CORRIGAN: I guess go ahead and read    11:53:01
11 the question, please, although it's already been    11:53:03
12 answered.    11:53:06
13        (Record read as follows:    11:53:06
14        "Q  When did Restore first consider    11:53:06
15        repairing Xi and X compatible EndoWrists,    11:53:06
16        roughly?")    11:53:28
17 BY MR. CORRIGAN:    11:53:28
18    Q    Mr. Parker, when would Restore have begun    11:53:29
19 to repair X and Xi compatible EndoWrists in a world    11:53:31
20 without Intuitive's anticompetitive behavior?    11:53:34
21        MS. WINNER: Object to form and lack of    11:53:37
22 foundation.    11:53:41
23        THE WITNESS: So we -- we started in 2020,    11:53:41
24 I guess we, in a -- in a but-for world, if that's what    11:53:52
25 you want to call it, we would have started in 2019, we    11:53:55

Page 143

1 felt that, you know, we would have easily met the --    11:53:57
2 January 2022 as a -- the time frame when we would be    11:54:05
3 able to be in the market and have the chip completed    11:54:07
4 and ready to go.    11:54:17
5 BY MR. CORRIGAN:    11:54:18
6    Q    I asked you a similar question, but this    11:54:18
7 one's a little different: How much do you estimate it    11:54:20
8 cost Restore to develop the technology to bypass the S    11:54:22
9 and Si chip?    11:54:26
10    A    I think we're in the $1.2 million range.    11:54:27
11    Q    And is it fair to say that you would have    11:54:33
12 spent or you have spent an extra two plus million    11:54:35
13 dollars in addition to that to develop capabilities for    11:54:39
14 the X and Xi chip? Is that right?    11:54:43
15        MS. WINNER: Object -- objection. Form of    11:54:44
16 the question. Leading.    11:54:47
17        THE WITNESS: I wouldn't say it exactly    11:54:49
18 that way because like a -- you know, we spent $400,000    11:54:55
19 to buy a building, and that building will be used for    11:55:00
20 both Xi and Si. Now, I didn't count that, the    11:55:02
21 building, in the Si development costs, so that -- but    11:55:07
22 easily $3 million for both Xi and Si combined.    11:55:17
23 BY MR. CORRIGAN:    11:55:24
24    Q    Now, you -- you were asked this in some    11:55:25
25 respects by Ms. Winner earlier, but I'm going to try to    11:55:28

Page 144

1 ask it again: How long did it take, roughly, for    11:55:33
2 Restore to develop the technology to bypass the S and    11:55:35
3 Si chip?    11:55:41
4    A    A few months, so I think we started in    11:55:42
5 early 2022 and we were done by mid 2022.    11:55:48
6    Q    Are you planning to license your    11:55:52
7 technology in that respect as did Rebotix?    11:55:57
8    A    Not in the same manner. So we're    11:56:01
9 primarily utilizing very large distributors, so we    11:56:06
10 haven't finalized what that looks like yet, so we're    11:56:16
11 waiting, you know, on a number of things, what's our    11:56:21
12 actual costs, our arrangement with Alliance, et cetera,    11:56:23
13 but -- but our plan is not to do like Rebotix and have    11:56:30
14 a lot of little mom and pops out there being    11:56:37
15 distributors.    11:56:41
16    Q    Who owns the technology that allows the    11:56:41
17 EndoWrist usage counter to be reset?    11:56:46
18        MS. WINNER: Objection to form. Vague.    11:56:48
19        THE WITNESS: Restore Robotics Repair --    11:56:53
20 Restore Robotics Repairs and Restore Robotics have    11:56:58
21 founded all those efforts. Right now, the 510K is in    11:57:01
22 the name of Iconocare, but all the development efforts,    11:57:10
23 at least for the Si, were all paid for by Restore    11:57:15
24 Robotics.    11:57:22
25    ///            ///    Page 145

37 (Pages 142 - 145)

**EXHIBIT 16**

**to**

**PAUL D. BRACHMAN DECLARATION IN SUPPORT
OF DEFENDANT'S MOTION IN LIMINE NO. 1
TO EXCLUDE OUT-OF-COURT HOSPITAL
STATEMENTS**

```
 1              UNITED STATES DISTRICT COURT
 2             NORTHERN DISTRICT OF CALIFORNIA
 3
 4   IN RE: DA VINCI SURGICAL ROBOT  ) Lead Case No.:
     ANTITRUST LITIGATION            ) 3:21-cv-03825-VC
 5   _____  )
                                     )
 6   THIS DOCUMENT RELATES TO:       )
     ALL ACTIONS                     )
 7                                   )
     _____  )
 8   SURGICAL INSTRUMENT SERVICE     ) Case No.
     COMPANY, INC.,                  ) 3:21-CV-03496-VC
 9                                   )
             Plaintiff,             )
10                                   )
             vs.                     )
11                                   )
     INTUITIVE SURGICAL, INC.,       )
12                                   )
             Defendant.             )
13   _____  )
14
15       VIRTUAL VIDEOCONFERENCE VIDEO-RECORDED
16              DEPOSITION OF KEVIN MAY
17
18            Thursday, November 3, 2022
19    Remotely Testifying from Yorba Linda, California
20
21
22
23   Stenographically Reported By:
24   Hanna Kim, CLR, CSR No. 13083
25   Job No. 5541214
```

                                                    Page 1

**Page 2**

```
1          UNITED STATES DISTRICT COURT
2          NORTHERN DISTRICT OF CALIFORNIA
3
4  IN RE: DA VINCI SURGICAL ROBOT  ) Lead Case No.:
   ANTITRUST LITIGATION          ) 3:21-cv-03825-VC
5  _____)
                                  )
6  THIS DOCUMENT RELATES TO:      )
   ALL ACTIONS                    )
7  _____)
                                  )
8  SURGICAL INSTRUMENT SERVICE    ) Case No.
   COMPANY, INC.,                 ) 3:21-CV-03496-VC
9                                 )
       Plaintiff,                 )
10                                )
       vs.                        )
11                                )
   INTUITIVE SURGICAL, INC.,      )
12                                )
       Defendant.                 )
13 _____)
14
15      Virtual videoconference video-recorded
16 deposition of KEVIN MAY remotely testifying from
17 Yorba Linda, California, on Thursday, November 3,
18 2022, beginning at 7:34 a.m., PDT, and concluding at
19 12:35 p.m., pursuant to the stipulations of counsel
20 thereof, before Hanna Kim, CLR, Certified Shorthand
21 Reporter, No. 13083.
22
23
24
25
```

**Page 4**

```
1     REMOTE APPEARANCES OF COUNSEL: (Continued)
2
3  For Hospital Plaintiffs:
4     SPECTOR ROSEMAN & KODROFF P.C.
5     BY:  JEFFREY J. CORRIGAN, ESQ.
6     2001 Market Street, Suite 3420
7     Philadelphia, Pennsylvania 19103
8     215.496.0300
9     jcorrigan@srkattorneys.com
10
11 For Defendant Intuitive Surgical:
12    ALLEN RUBY LAW OFFICES
13    BY:  ALLEN RUBY, ESQ.
14    15559 Union Avenue, Suite 138
15    Los Gatos, California 95032
16    allen@allenruby.com
17    -and-
18    COVINGTON & BURLING LLP
19    BY:  ANDREW LAZEROW, ESQ.
20    BY:  AYANA LINDSEY, ESQ.
21    Salesforce Tower
22    415 Mission Street, Suite 5400
23    San Francisco, California 94105-2533
24    415.591.7020
25    alazerow@cov.com
```

**Page 3**

```
1  REMOTE VIDEOCONFERENCE APPEARANCES OF COUNSEL:
2
3  For Plaintiff Surgical Instrument Service Company,
4  Inc:
5     HALEY GUILIANO
6     BY:  RICHARD T. McCAULLEY, ESQ.
7     111 North Market Street, Suite 900
8     San Jose, California 95113
9     669.213.1071
10    richard.mccaulley@hglaw.com
11
12 For Hospital Plaintiffs:
13    HAUSFELD LLC
14    BY:  SAMUEL MAIDA, ESQ.
15    BY:  JEANNINE KENNEY, ESQ.
16    600 Montgomery Street, Suite 3200
17    San Francisco, California 94111
18    415.633.1908
19    smaida@hausfeld.com
20    jkenney@hausfeld.com
21
22
23
24
25
```

**Page 5**

```
1     REMOTE APPEARANCES OF COUNSEL:  (Continued)
2
3  For Witness:
4     JEFFREY L. BERHOLD, P.C.
5     BY:  JEFFREY BERHOLD, ESQ.
6     1230 Peachtree St., Suite 1050
7     Atlanta, Georgia 30309
8     404.872.3800
9     jeff@berhold.com
10
11 Also Present:
12    RAMON PERAZA, Videographer
13
14
15
16
17
18
19
20
21
22
23
24
25
```

2 (Pages 2 - 5)

INDEX OF EXAMINATION

WITNESS: KEVIN MAY

| EXAMINATION | PAGE |
|---|---|
| BY MR. RUBY: | 10 |
| BY MR. LAZEROW: | 64, 117, 147 |
| BY MR. MAIDA: | 73, 144 |
| BY MR. McCAULLEY: | 108 |

Page 6

INDEX OF EXHIBITS

| MAY DEPOSITION EXHIBITS | PAGE |
|---|---|
| Exhibit 154  E-mail dated 5/26/2022, and attachment, "Restore Robotics Repairs Investor deck"; Bates nos. Restore-00094918 through '94956 | 42 |
| Exhibit 155  E-mail set, with top e-mail from Dana Gunn, 6/28/2022; Bates nos. Restore-00091199 through '00091202 | 52 |
| Exhibit 156  E-mail set, with top e-mail to Jitendra Virani, 7/21/2020; Bates nos. Restore-00001248 through '1256 | 68 |
| Plaintiffs' E-mail from James Rowley, 9/1/2022; Bates nos. Restore-00091362 | 93 |
| Exhibit 1 | |

--o0o--

Page 7

Remotely Testifying Yorba Linda, California

Thursday, November 3, 2022; 7:34 a.m., PDT

--o0o--

THE VIDEOGRAPHER: Good morning. We are on the record at 7:34 a.m. on November 3rd, 2022.          07:34:54

This is the video-recorded deposition of Kevin May in the matter of Surgical Instrument Service Company, Inc. versus Intuitive Surgical, Inc. This case was filed in the United States District Court for the Northern District of          07:35:14 California. Case Number 3:21-CV-03496-VC.

Please note that this deposition is being conducted virtually. Quality of the recording depends on the quality of the camera and internet connection of participants. Audio and video          07:35:33 recording will take place unless all parties have agree to go off the record.

My name is Ramon Peraza, here with our court reporter, Hanna Kim. We're here from Veritext Legal Solutions at the request of counsel for the          07:35:49 Defendant.

At this time, Counsel, please identify yourselves for the record and state whom you represent.

MR. RUBY: My name is Allen Ruby. I          07:35:53

Page 8

represent Intuitive Surgical.

MR. LAZEROW: Andrew Lazerow, Intuitive -- for Covington & Burling on behalf of Intuitive Surgical with my colleague, Ayana Lindsey.

MR. MAIDA: Samuel Maida on behalf of the          07:36:23 Hospital Plaintiffs from Hausfeld LLC.

MR. McCAULLEY: Richard McCaulley on behalf of Plaintiff SIS.

MR. MAIDA: I'm joined by my colleagues Jeff Corrigan and Jeannine Kenney.          07:36:31

THE COURT REPORTER: Mr. Berhold?

MR. BERHOLD: Jeff Berhold for witness, Clif Parker [verbatim].

I understood there were other plaintiffs in attendance on the call.          07:36:45

THE WITNESS: For Kevin May, Jeff.

THE COURT REPORTER: Excuse me.

THE VIDEOGRAPHER: The court reporter may now swear in the witness.

MR. BERHOLD: Well, I'm sorry.          07:36:54

That's -- sorry. Jeff Berhold for Kevin May.

///
///
///

Page 9

3 (Pages 6 - 9)

1    A.  Yes.

2    Q.  Okay.  So in that conversation, you told

3  her that you believed you did not need a 510(k)

4  because Restore did not take ownership of the

5  instruments; is that right?                09:38:16

6    A.  Yes.  And I told her that I've been in the

7  business of 30 -- 30-plus years of servicing medical

8  devices, and that I'm very familiar with what the

9  requirements are for repair versus remanufacturing

10  because I'm also -- have six 510(k)s, so I'm very    09:38:33

11  familiar with the reman- -- with the manufacturing

12  process.  And that -- I explained all that to her.

13       And I told her that I had extensive in- --

14  knowledge in the repair business.  And she said that

15  she didn't have any experience in the repair       09:38:53

16  business at all.  She only had experience in the

17  robotic space for manufacturing.

18    Q.  Okay.  And so after you told her all of

19  that, she wrote this e-mail where she told you that

20  FDA believes that a 510(k) needed -- is needed       09:39:13

21  before you continue your operation; right?

22    A.  No.  She stipulated that based on what was

23  said on the e- -- on the website, she -- she based

24  her decision on what she read on the website as

25  opposed to what I told her.                09:39:29

Page 70

1    Q.  And did -- has FDA ever told you -- agreed

2  with you, that -- that as long as you don't take

3  ownership of the instruments, that you do not need a

4  510(k) clearance?

5    A.  I have been informed that they refuse to    09:39:49

6  make a decision on that.  So they have decided not

7  to make a decision on that.  And that was in

8  reference to, I believe, Rebotix.

9    Q.  Okay.  I'm -- I'm asking you just, has FDA

10  ever told you that as long as you maintain -- you    09:40:11

11  don't own the instrument, then you don't need a

12  510(k) in order to extend the li- -- the lives of an

13  EndoWrist instrument?

14    A.  They haven't told us, one way or another.

15  And Dr. -- Dr. An is not part of the enforcement    09:40:26

16  division of the FDA.

17    Q.  Has -- has FDA ever told you you don't

18  need a 510(k) clearance in order to extend the

19  li- -- the lives of an EndoWrist instrument?

20    A.  That's not the way the FDA works, no.       09:40:44

21  They've never told us, one way or another.

22    Q.  Has Re- -- has Restore or any Restore

23  entity, whether it's Restore Robotics or Restore

24  Robotics Repair [verbatim] reset the EndoWrist

25  instruments -- sorry, let me start over.       09:41:19

Page 71

1       Has any entity relating to Restore,

2  whether it's Restore Robotics or Restore Robotics

3  Repair [verbatim], sold an EndoWrist that has been

4  reset since February 20th, 2020?

5       MR. MAIDA:  Object to form.       09:41:41

6       THE WITNESS:  Not where we've taken

7  ownership; only repairs.

8  BY MR. LAZEROW:

9    Q.  And has -- since February 20th, 2020, the

10  e-mail we're looking at, has any entity related to    09:41:56

11  Restore reset the use counter for an EndoWrist that

12  it does not own?

13    A.  No, we have not.  I believe we've stopped.

14  Intuitive had stopped us from repairing anything by

15  keeping us out of the market.  So I believe we --    09:42:18

16  we'd lost most of our customers by November --

17  October/November of 2019.

18    Q.  Have you ever talked directly to Intuitive

19  about the resetting activities that Restore has

20  engaged in?                09:42:45

21    A.  No.

22    Q.  Have you ever worked at FDA?

23    A.  No.

24    Q.  Have you ever submitted an expert report

25  in ligation where your expert report gave opinions    09:42:58

Page 72

1  about FDA regulatory matters?

2    A.  No.

3       MR. LAZEROW:  I'm going to pass the

4  witness and reserve the rest of my time, if

5  necessary, for later.  Thank you.  I don't have any    09:43:18

6  questions at this time, but I'll reserve for after

7  the Plaintiffs, if necessary.

8       Thank you for your time.

9       THE COURT REPORTER:  May we go off the

10  record to do an audio check, please.       09:43:30

11       THE VIDEOGRAPHER:  Are we closing this

12  deposition, though?

13       MR. LAZEROW:  No.  No, I don't think so.

14       THE VIDEOGRAPHER:  No?  All right.

15       We're off the record at 9:43 a.m.       09:43:39

16       (Short recess taken.)

17       THE VIDEOGRAPHER:  We are back on the

18  record at 10:07 a.m.

19            EXAMINATION

20  BY MR. MAIDA:                10:07:49

21    Q.  Hello, Mr. May.

22    A.  Hello.

23    Q.  My name is Sam Maida, and I represent the

24  Hospital Plaintiffs.  We have a case that is

25  substantially similar to Restore's case, and I have    10:08:03

Page 73

19 (Pages 70 - 73)

1 a few more questions for you. But I hope that I
2 won't take more of your time -- too much more of
3 your time.
4     Do you believe Restore's business has been
5 harmed by Intuitive?                    10:08:21
6     MR. LAZEROW: Objection.
7     THE WITNESS: Yes. It's been harmed
8 significantly.
9 BY MR. MAIDA:
10     Q. Please tell me how did Intuitive harm    10:08:30
11 Restore's business.
12     MR. LAZEROW: Objection.
13     THE WITNESS: As soon as we were able to
14 land an account, shortly thereafter, we were told by
15 the hospital that the Intuitive rep would come in    10:08:45
16 and tell them that they couldn't work with us.
17 BY MR. MAIDA:
18     Q. Anything else?
19     A. Clif is a better person to discuss that
20 with. He's had more -- he has more direct contacts    10:09:05
21 with the hospitals and whatnot. There have been a
22 few cases, so, for instance, I was in discussion
23 with some people from Memorial Care, and I asked
24 them -- I told them about what our service was. And
25 they said that they would look into it. They looked    10:09:25

Page 74

1 into it, and they said that it was risky for them
2 because they were really concerned that Intuitive
3 was going to cut off their business, and they didn't
4 want to be involved with that. That was a phone
5 call.                                  10:09:43
6     And then there was a company, this was
7 through our rep, Scott. He talked to Pacific, and
8 and -- and Pacific said that Intuitive said that
9 they could not use our services. So those are some
10 examples that I had some fairly direct contacts    10:10:02
11 with. So there were several instances.
12     Then there was also a cease and desist
13 letter that we received from Intuitive Surgical.
14 And then I had heard that there were other cease and
15 desist letters to Rebotix and to other customers.    10:10:18
16     Q. Thank you.
17     Did that harm cause any delay to Restore's
18 business?
19     MR. LAZEROW: Objection. Speculation.
20     THE WITNESS: Well, it absolutely caused    10:10:34
21 delays and harm to our business. We had been
22 counting on the revenues that we were generating
23 from the repair business to fund being able to do
24 additional R&D efforts, to grow the business, and to
25 grow the Xi business and to do the research and    10:10:57

Page 75

1 development for the Xi.
2 BY MR. MAIDA:
3     Q. I'd like to talk to you a bit about
4 Restore's EndoWrist business. Can you please
5 describe the type of Xi EndoWrist that Restore has    10:11:14
6 been able to repair?
7     A. Yes. There is -- there is a list that we
8 had from Rebotix that we've been trained on, how to
9 repair the instruments. And there was 38 Si
10 instruments that we were able to repair.        10:11:33
11     Q. Is there a common theme linking the
12 EndoWrists that Restore has been able to repair?
13     MR. LAZEROW: Objection. Vague.
14     THE WITNESS: Yes. Multiuse instruments.
15 So instruments that are able to be used at least ten    10:11:49
16 times. And I think there was a couple of them -- a
17 couple instruments that had higher usages. I
18 believe they were clip appliers. We were able to --
19 to repair all of those.
20 BY MR. MAIDA:                          10:12:17
21     Q. You -- you went into my next question a
22 bit. But I'd like to know, can all or only a subset
23 of EndoWrist models be repaired?
24     A. Only a subset. So all of the Si
25 instruments, all -- all of the 8 millimeters, except    10:12:31

Page 76

1 for a few of the devices. Like we do not do the
2 staplers. We did not repair the -- the staplers.
3 And we did not repair any of the disposable devices.
4     Q. Are there any EndoWrists that could not be
5 repaired?                              10:12:55
6     A. You mean, particular reference numbers or?
7     Q. Any EndoWrists, generally, that could not
8 be repaired.
9     A. There were EndoWrists that were the
10 reusable type that we -- we did not repair. But in    10:13:10
11 the future, we could have, if we did some R&D
12 efforts.
13     Q. Okay. You testified a bit earlier about
14 when Restore stopped the -- their EndoWrist repairs.
15     Was that in 2019?                    10:13:32
16     A. Yes.
17     Q. Okay. And since 2019, Restore has not
18 done any EndoWrist repair; is that correct?
19     A. We have done repairs that did not require
20 resetting the counter.                    10:13:52
21     Q. Okay. Was there any repairs that required
22 resetting the counters?
23     A. No.
24     Q. Was there any repairs that Restore
25 actually sent back to the hospitals for use?    10:14:10

Page 77

20 (Pages 74 - 77)

1    A.  No.
2    Q.  And why is that?
3    A.  Our customers were too afraid to send us
4  the business.
5    Q.  Would the scope of reparable Si EndoWrists   10:14:26
6  have extended in -- overall without Intuitive's
7  anticompetitive conduct?
8        MR. LAZEROW:  Objection.
9        THE WITNESS:  Yes.  We would have -- we
10  would have expanded few more of the 8-millimeter and   10:14:38
11  5-millimeter EndoWrists.
12  BY MR. MAIDA:
13    Q.  And go back about -- to your answer that
14  customers were afraid.  Why were they afraid?
15        MR. LAZEROW:  Objection.         10:14:56
16        THE WITNESS:  Because they received cease
17  and desist letters from Intuitive, was one of the
18  things.  Another thing was is that our understanding
19  from the information from the hospitals was is that
20  the Intuitive reps were coming in -- as soon as they   10:15:12
21  figured out that there was a particular serial
22  number that had been used more than the maximum
23  number of uses on the device, the Intuitive rep
24  would come in and tell the hospital that they were
25  under contract and they could not use any other   10:15:31

Page 78

1  third parties.
2  BY MR. MAIDA:
3    Q.  And those hospitals told you or someone at
4  Restore that; is that correct?
5    A.  Either directly or through one of our   10:15:43
6  reps.
7    Q.  How long did it take for Restore to
8  develop the technology to bypass the S and Si chip?
9    A.  We started work on that in January 2020, I
10  believe it was.  And we had our first usage counters   10:16:11
11  samples by, I believe it was June of 2020.  So about
12  six months or so.
13    Q.  Now, I'd like to talk to you a bit about
14  Restore's 510(k) clearance.  You testified earlier
15  that Restore currently does have 510(k) clearance   10:16:39
16  for the Si EndoWrist remanufacturing?
17        MR. LAZEROW:  Objection.  Mischaracterizes
18  testimony.
19  BY MR. MAIDA:
20    Q.  Does Restore currently have the 510(k) --   10:16:50
21  510(k) clearance for EndoWrist remanufacturing?
22    A.  We have 510(k) for the 420179 EndoWrist.
23    Q.  Okay.  Does Restore believe it needs
24  510(k) clearance to repair EndoWrists?
25    A.  No, we do not.            10:17:11

Page 79

1    Q.  And what do you base that belief on?
2    A.  The repair aspect is very defined.  And it
3  has do with ownership of the device.  So the device,
4  if it's owned by the hospital, if it comes to us as
5  a third party and the hospital creates a PO and     10:17:31
6  requests us to repair the device, we repair the
7  device and return it back to the hospital.
8        We do not -- there's no change of
9  ownership, so there's no labeling requirements,
10  there's no remanufacturing requirements as of today.   10:17:50
11  And so, we could go through and repair all of the
12  instruments without having any -- any requirements
13  of -- to get a 510(k) for the repair process, where
14  we do not take ownership.
15    Q.  Does your experience in the repair      10:18:06
16  industry also plays [verbatim] a role in your belief
17  that there is no necessity for 510(k) clearance to
18  repair EndoWrists?
19        MR. LAZEROW:  Objection.
20        THE WITNESS:  Yes.  So I have been in the   10:18:23
21  medical repair device industry since 1989.  So I've
22  been doing this for 33 years.
23        And we have been doing repair, as well as
24  manufacturing.  I currently have six 510(k)s so I'm
25  well aware of the manufacturing process, as well as   10:18:49

Page 80

1  the repair process, and also the repair of third
2  parties.
3        So, for instance, where you have an
4  instrument -- let me take a -- a rigid scope, for
5  example.  You have a Karl Storz rigid scope, and   10:19:04
6  then you repair it, and then -- the hospital sends
7  it to you.  The hospital owns it.  You do the
8  repair.  And then you send it back to the hospital.
9  That is a repair, and it's not regulated by the FDA.
10        I've been doing that for 33 years.      10:19:18
11        The devices that I've been working on for
12  the last 33 years are much more complex than the
13  current EndoWrist device.  And so, based on 33 years
14  of -- of knowledge, I've been through at least four
15  FDA audits where the aud- -- where the FDA has     10:19:40
16  audited our third-party servicing business.  I've
17  been through California FDB audits where they have
18  audited our servicing.  I've been through multiple
19  vendor audits such as Johnson and Johnson, Richard
20  Wolf, Medtronic.             10:20:05
21        Many, many large companies have done
22  audits of our facility and audited our quality
23  system and our practices, and we've had zero
24  complaints for -- zero -- zero MAUDE events and zero
25  recalls and zero MAUDE events in the 33 years that   10:20:24

Page 81

21 (Pages 78 - 81)

1   A.  I'm not sure I understand the question.
2   Q.  Do I understand correctly that the Si
3  process that is used in order to reset an Si
4  instrument involves Restore adding a -- a circuit
5  board?                              12:05:52
6   A.  If we are resetting the counter or
7  replacing the counter, yes.
8   Q.  Yeah.  I'm -- I'm focused on the resetting
9  of the counter, for sure.  So let me see if I can
10  ask it again.                       12:06:10
11      For the Xi process that Restore intends to
12  use to reset the lives of an Xi instrument, does
13  Restore anticipate that it will be adding a circuit
14  board?
15      MR. MAIDA:  Object to form.     12:06:25
16      THE WITNESS:  We will be replacing the
17  circuit board, so we will be removing the original
18  and replacing it with ours.
19  BY MR. LAZEROW:
20   Q.  Okay.  You're -- you're clearer than I was  12:06:34
21  able to ask the question.  Thank you.
22      You said that you have, I think you own
23  six 510(k)s; is that right?
24   A.  That's correct.
25   Q.  Are those -- are any of those for    12:06:50

Page 134

1  remanufacturing of -- of devices that were
2  originally manufactured by another entity?
3   A.  No.
4   Q.  So of the six 510(k)s you have, none are
5  for remanufacturing; is that fair?     12:07:07
6   A.  That's correct.
7   Q.  Has the FDA done an audit of your Las
8  Vegas facility?
9   A.  No.
10   Q.  Has the FDA done an audit of the Arizona   12:07:15
11  facility?
12   A.  Yes.
13   Q.  When was that?
14   A.  They had one a couple months ago.  I
15  believe it was an NSAP audit by the FDA.     12:07:37
16   Q.  What -- did you say MSAP [verbatim]?
17   A.  I believe it's what it's called.
18   Q.  What is -- whether -- what is -- what
19  is -- what is your understanding of what that kind
20  of audit is?                         12:07:43
21   A.  So the FDA has a new program that allows
22  you to have a multi-jurisdictional audit.  So it --
23  it's been tricky when you manufacture a device.  And
24  so, when you manufacture a device and you want to
25  sell it in Canada, you then have to get the Canadian  12:08:00

Page 135

1  government to come in and audit your facility.  Or
2  if you want to sell your product in Korea, you have
3  to have the Korean equivalent of the FDA come in and
4  audit your facility.
5      And it was a -- it's a program put     12:08:18
6  together by the FDA where it's one audit.  I believe
7  it's done by the FDA.  But it's one program, so that
8  once you pass it, the other countries recognize it,
9  so they don't have to have an additional audit at
10  your facility.                       12:08:35
11   Q.  And remind me, is the Arizona facility
12  owned by Iconocare?
13   A.  That is Innovative Health.
14   Q.  Oh, I'm sorry.
15      The Arizona facility -- facility is owned    12:08:45
16  by Innovative Health; is that right?
17   A.  That is correct.
18   Q.  Was -- do -- to your knowledge, was that
19  audit -- did that audit come about as a result of
20  the 510(k) application for the Si MCS by Iconocare?   12:08:55
21   A.  No.
22      MR. MAIDA:  Object to form.
23  BY MR. LAZEROW:
24   Q.  So it's unrelated, to your knowledge?
25   A.  It's unrelated.                  12:09:05

Page 136

1   Q.  Am I right that if Restore receives an
2  EndoWrist from a hospital with a purchase order to
3  repair the EndoWrist, as you have described the
4  repair process that you're talking about, Restore
5  is -- is permitted to reset the lives of     12:09:31
6  that EndoWrist as many -- to as many lives as it
7  wants; is that right?
8   A.  The FDA does not regulate the -- the
9  repairs.
10   Q.  So Restore could reset an EndoWrist     12:09:45
11  instead of ten more lives, it could reset it to 25;
12  correct?
13   A.  That's not our process.  But
14  theoretically, it could, but that's not what we do.
15   Q.  Right.                         12:10:01
16      From your perspective, you wouldn't be --
17  you would -- you would not be violating any FDA
18  regulations or guidelines were Restore to do that;
19  is that fair?
20   A.  Well, the -- the robot wouldn't recognize   12:10:11
21  it if you -- if you set it for more than ten lives,
22  so we would never do that.
23   Q.  Okay.  And am I right that as long as the
24  hospital continues to own it, own -- own an
25  instrument, they can send that instrument back to     12:10:22

Page 137

35 (Pages 134 - 137)

1 Restore as many times as they want for a reset to
2 ten lives?
3     A.  Yes, depending on what policy we establish
4 as to what we decide how many times we're willing to
5 reset it as a -- as a repair company.        12:10:37
6     Q.  Does -- does Restore currently have such a
7 policy?
8     A.  When we were doing the work for Rebotix,
9 the -- the policy was they had done testing up to, I
10 believe, 29 verifications, verification and        12:10:56
11 validation.  So that would be three -- that would be
12 two additional resets.  And then they did additional
13 cleaning and sterilization validation for at least
14 50 uses.
15         And so, we felt comfortable doing two.    12:11:15
16 But we never did enough business to where we had
17 repeat -- we had repeats, so -- repeat business.  So
18 we never did that.  We never executed on any of
19 that.
20     Q.  What about sitting here today, does      12:11:27
21 Restore have a policy for how many times it will
22 reset the life of a -- of an instrument -- of an
23 En- -- EndoWrist instrument?
24     A.  Well, currently, the decision is is that
25 we're going to be remanufacturing through the      12:11:39
                                                Page 138

1 facility at Scottsdale, Arizona.  And the clearance
2 is only for one additional reset.
3     Q.  So were -- is -- is what you're saying,
4 were Restore to take an EndoWrist that has already
5 been remanufactured once and do it a second time,    12:12:03
6 that would be in violation of that -- of its 510(k)
7 clearance with the FDA; is that what you're saying?
8         MR. MAIDA:  Object to form.
9         THE WITNESS:  Without any additional
10 testing; correct.                              12:12:17
11 BY MR. LAZEROW:
12     Q.  And -- but -- but as long as the hospital
13 owns a -- owns an EndoWrist, they can send it to you
14 for as many resets as -- as Restore is willing to
15 do?                                           12:12:31
16     A.  Theoretically, yes.
17     Q.  Well, not theoretically; actual; correct?
18     A.  Well, we haven't done any more than one
19 reset.
20     Q.  Right.  I -- I -- and I understand.      12:12:43
21         You -- what -- but I'm based on -- based
22 on what you know and all you've been talking about
23 today, you -- Restore actually could reset them as
24 many times as they wanted without running afoul with
25 the FDA based on your view of -- of what you're      12:12:54
                                                Page 139

1 doing; correct?
2         MR. MAIDA:  Object.
3         THE WITNESS:  After they've been properly
4 inspected and tested, yes.
5 BY MR. LAZEROW:                               12:13:09
6     Q.  You talked, I think at the very beginning
7 of -- of -- of the -- of the Plaintiffs'
8 examination, about cease and desist letters that had
9 been sent to hospitals.  You said you had heard that
10 there have been hospitals that have received cease    12:13:21
11 and desist letters from Intuitive.
12         Do you remember that?
13     A.  Yes.
14     Q.  Have you ever actually seen the one that
15 was sent by Intuitive to a hospital?             12:13:29
16     A.  I have not seen the actual letter, no.
17     Q.  You were told that -- that -- that -- you
18 were told by folks at hospitals that they received
19 such a letter?
20     A.  Yes.                                  12:13:53
21     Q.  Which hospital told you that -- that they
22 had received a letter from Intuitive?
23     A.  I never spoke to a hospital directly.  It
24 was either through a rep or it was through somebody
25 else at Restore.                               12:14:19
                                                Page 140

1     Q.  And then you talked about -- one of the
2 hospitals that you talked about was Mem- -- Memorial
3 Care.
4         Did I hear that right?
5     A.  Yes.                                   12:14:30
6     Q.  Did you talk to Memorial Care directly?
7     A.  Yes.
8     Q.  Okay.  Who was it at Memorial Care who you
9 talked to about whether they were going to use
10 Restore's repair business?                      12:14:43
11     A.  Aaron Coley.
12         THE COURT REPORTER:  Can you say that
13 again, please.
14         THE WITNESS:  Aaron Coley.
15 BY MR. LAZEROW:                               12:15:00
16     Q.  And I think in sum or substance, you said
17 that -- that Mr. Coley conveyed to you that it was
18 risky for Memorial to do that because Intuitive
19 would cut off their business.  Is that fair?
20     A.  There was strong concern as to the       12:15:13
21 aggressiveness of Intuitive and that they would cut
22 their business off and that would be unacceptable
23 risk to them.
24     Q.  And did you explain to -- to Mr. Coley
25 that Restore was engaged in repairs that it was      12:15:30
                                                Page 141

                                        36 (Pages 138 - 141)

1 permitted to do?

2    A.  Yes.

3    Q.  And -- and you still were unable to

4 convince him to -- to use your repair business; is

5 that right?                          12:15:42

6    A.  He was too afraid of the repercussions

7 from Intuitive.

8    Q.  Was there anyone from Intuitive present

9 for that conversation?

10    A.  No.  It was via phone call.     12:15:51

11    Q.  Did you follow up with Intuitive to find

12 out if they had said anything to Memorial Care?

13    A.  I did not.

14    Q.  Do you know if anyone at Restore did?

15    A.  Nobody did.                    12:16:03

16    Q.  Okay.  And then there was a -- there was

17 another hospital you mentioned, Pacific.  Do you

18 remember mentioning that one?

19    A.  Yes.

20    Q.  And I think you said that there was a rep  12:16:11

21 by the name of Scott, who had -- who had conveyed to

22 folks at Restore something about Intuitive and

23 Pacific?  Did I hear --

24    A.  Yes.

25    Q.  -- that right?                 12:16:23

Page 142

1      Who -- do you remember the last name of

2 that person?

3    A.  Lewis.

4    Q.  And is that a person who works for

5 Restore?                          12:16:32

6    A.  He was an independent distributor.

7    Q.  And -- and he had talked to someone at

8 Pacific?

9    A.  Yes.

10    Q.  Do -- do you know who?          12:16:39

11    A.  I can't remember the name.

12    Q.  And do you recall what Mr. Lewis told you

13 that Pacific told him?

14    A.  They -- they were told that they could not

15 use any third party, and I believe that was a    12:16:57

16 hospital that said they received a cease and desist

17 letter, but I can't be a hundred percent certain on

18 that.

19    Q.  Did anyone from Restore, to your

20 knowledge, follow up with Intuitive to find out what  12:17:15

21 Intuitive had said, if anything, to Pacific?

22    A.  No.

23    Q.  Did I miss any other hospitals that you've

24 talked about, that Restore had heard either directly

25 or through a representative about Intuitive    12:17:29

Page 143

1 discussions?

2      MR. MAIDA:  Object to form.

3      THE WITNESS:  Not that I can think of, no.

4      MR. LAZEROW:  Okay.  Can we take a

5 five-minute break so I can just look at my notes,    12:17:44

6 and then I'm hoping I'm done.

7      THE VIDEOGRAPHER:  We are off the record

8 at 12:17 p.m.

9      (Short recess taken.)

10      THE VIDEOGRAPHER:  We are back on the    12:31:17

11 record at 12:31 p.m.

12      MR. LAZEROW:  Mr. May, I don't have any

13 more questions at this time.  Unfortunately for you,

14 I still have a little bit of time reserved.  And so,

15 if the plaintiffs ask further questions, I may have  12:31:41

16 more questions.  But at this time, I am -- I will

17 pass the witness.

18      FURTHER EXAMINATION

19 BY MR. MAIDA:

20    Q.  Mr. May, this is Sam Maida again.  I only    12:31:49

21 have a few more questions for you.

22      Is it fair to say that if there was a

23 complaint for an EndoWrist repair by Restore, that

24 would be on the MAUDE database?

25    A.  Yes, if there was a formal complaint made    12:32:01

Page 144

1 by a hospital or the manufacturer or us, it would be

2 on the MAUDE database.

3    Q.  And you testified earlier that Restore

4 used to check the MAUDE database every six months;

5 is that correct?                    12:32:22

6    A.  Yes, while we were doing the repair

7 business, yes.

8    Q.  Has anybody at Restore checked the MAUDE

9 database after the end of repairs in approximately

10 the end of 2019?                    12:32:33

11    A.  Not that I know of.

12    Q.  Are you aware of when the last time anyone

13 at Restore checked the MAUDE database?

14    A.  I don't know off the top of my head.  It

15 was usually done at the beginning of the year and    12:32:49

16 in, like, June.

17    Q.  The last time that anybody at Restore

18 checked the MAUDE database, were there any

19 reports --

20    A.  No.                          12:33:08

21    Q.  -- filed for the EndoWrists repaired by

22 Restore?

23    A.  No.

24    Q.  In your experience, would a hospital not

25 let Restore know if it had a problem with its    12:33:20

Page 145

37 (Pages 142 - 145)

1 repaired EndoWrists?

2      MR. LAZEROW:  Objection.

3      THE WITNESS:  The hospitals keep control

4 of the serial numbers.  So they would -- part of

5 their process is, they would go back and they would    12:33:34

6 look at the last purchase order associated with the

7 serial number of a device.  And they would contact

8 us in normal course.  That's -- that's the

9 experience I've had in the endoscope business and

10 the other medical devices that I've been doing    12:33:49

11 business with in the last 30 plus years.

12 BY MR. MAIDA:

13      Q.  Have you or anyone at Restore ever seen a

14 complaint at any time on the MAUDE database for the

15 EndoWrists repaired by Restore?    12:34:04

16      A.  No.

17      Q.  You testified earlier that Restore

18 specifically does not have 510(k); correct?  Is

19 that --

20      A.  Its own -- it's technically registered to    12:34:18

21 Iconocare currently.

22      Q.  Okay.  And is Iconocare working under the

23 direction of Restore?

24      A.  Yes.

25      Q.  Has Iconocare's efforts to obtain 510(k)    12:34:32

Page 146

---

1 been funded by Restore?

2      A.  Yes.

3      Q.  Does Restore's repair process returns

4 [verbatim] the EndoWrist to the same function --

5 functional equivalency as new EndoWrists?    12:34:48

6      A.  Yes.

7      MR. MAIDA:  I don't have any further

8 questions at this time.  Thank you, Mr. May.

9           FURTHER EXAMINATION

10 BY MR. LAZEROW:    12:34:57

11      Q.  How much has Restore paid Iconocare as

12 part of its effort to receive -- as part of

13 Iconocare's effort to get 510(k) clearance for the

14 Si MCS?

15      A.  I believe all of the funding and payments    12:35:14

16 have gone to either Alliance or Innovative Health,

17 not directly to Iconocare.

18      Q.  And how much have those payments been for

19 the effort for Iconocare to get 510(k) clearance for

20 the Si MCS?    12:35:38

21      A.  I do not know those numbers.  Clif was

22 responsible for paying them.

23      MR. LAZEROW:  Thank you for your time.

24      MR. MAIDA:  I don't have anything further.

25      MR. McCAULLEY:  Nothing from me.    12:35:54

Page 147

---

1      THE VIDEOGRAPHER:  This is the end of

2 today's deposition of Mr. Kevin May.  We are off the

3 record at 12:35 p.m.  The total number of media used

4 was six, and it will be retained by Veritext.  Thank

5 you.

6      (Proceedings concluded, 12:35 p.m., PDT,

7 on November 3, 2022.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 148

---

1           JURAT

2

3      I, KEVIN MAY, do hereby certify under

4 penalty of perjury that I have read the foregoing

5 transcript of my deposition taken remotely via

6 videoconference on Thursday, November 3, 2022; that

7 I have made such corrections as appear noted herein

8 in ink, initialed by me; that my testimony as

9 contained herein, as corrected, is true and correct.

10

11      Dated this _____ day of _____, 2022,

12 at _____.

13

14

15

16      _____

        KEVIN MAY

17

18

19

20

21

22

23

24

25

Page 149

38 (Pages 146 - 149)

**EXHIBIT 17**

**to**

**PAUL D. BRACHMAN DECLARATION IN SUPPORT
OF DEFENDANT'S MOTION IN LIMINE NO. 1
TO EXCLUDE OUT-OF-COURT HOSPITAL
STATEMENTS**



Deposition of:
# Highly CONF Chris Gibson

*June 22, 2021*

In the Matter of:

# Rebotix Repair LLC v Intuitive Surgical, Inc.

Veritext Legal Solutions

800.808.4958 | calendar-atl@veritext.com  | 770.343.9696

Page 1

1                UNITED STATES DISTRICT COURT
                  MIDDLE DISTRICT OF FLORIDA
2                      TAMPA DIVISION
             CIVIL CASE NO. 8:20-cv-2274-T-33TGW
3
4

    REBOTIX REPAIR LLC,

5
              Plaintiff,

6
    -vs-

7

    INTUITIVE SURGICAL, INC.,

8
              Defendant.

9                                        /

10

11   * * * * * * * * * * * * * * * * * * * * * * * * *
                    HIGHLY CONFIDENTIAL
12

13   VIDEOTAPED
     DEPOSITION OF:      CHRIS GIBSON
14
     DATE TAKEN:         TUESDAY, JUNE 22, 2021
15
     TIME:               10:04 A.M. - 6:15 P.M.
16
     PLACE:              BY VIDEOCONFERENCE
17
     REPORTED BY:        CARMEN THOMAS, REGISTERED
18                       PROFESSIONAL REPORTER AND
                         NOTARY PUBLIC
19
20   * * * * * * * * * * * * * * * * * * * * * * * * *
21
22
23
24
25

Highly CONF Chris Gibson                      June 22, 2021
Rebotix Repair LLC v Intuitive Surgical, Inc.

Page 2

1  APPEARANCES:
2     Appearing on Behalf of the Plaintiff:
      ALEXANDER ERWIG, ESQUIRE
3     alexander@dovel.com
      Dovel & Luner
4     201 Santa Monica Boulevard, Suite 600
      Santa Monica, California 90401
5
6
      Appearing on Behalf of the Defendant:
7     KAREN M. LENT, ESQUIRE
      karen.lent@skadden.com
8     DOUGLAS DEBAUGH, ESQUIRE
      douglas.debaugh@skadden.com
9     WILLIAM DARIO, ESQUIRE
      william.dario@skadden.com
10    Skadden, Arps, Slate, Meagher & Flom LLP
      One Manhattan West
11    New York, New York 10001-8602
12
      Appearing on Behalf of Restore Robotics,
13    Restore Robotics Repairs and Clif Parker
      Robotics, LLC:
14    JEFFERY BERHOLD, ESQUIRE
      jeff@berhold.com
15    Jeffrey L. Berhold, P.C.
      1230 Peachtree Street, Suite 1050
16    Atlanta, Georgia 30309
17
      ALAN POKOTILOW, VIDEOGRAPHER
18
      CHRIS MCMILLAN, CONCIERGE
19
20
21
22
23
24
25

Page 4

1  Exhibit 11  E-mail dated February 4, 2019;       137
      Subject, RE:  Premier Custom Contract
2     - RFP, with attachment
3  Exhibit 12  E-mail dated October 8, 2019; Subject,  149
      Re:  EndoWrist Agreement
4
   Exhibit 13  E-mail dated August 22, 2019; Subject,   159
5     Agreement, with attachment
6  Exhibit 14  E-mail dated January 24, 2020;       164
      Subject, FW:  REB Memorandum of
7     Understanding (002), with attachment
8  Exhibit 15  E-mail dated August 5, 2019; Subject,   168
      Rebotix Repair, with attachment
9
   Exhibit 16  Rebotix Video                     174
10
   Exhibit 17  Rebotix Comprehensive Remanufacturing   181
11    Process
12 Exhibit 18  Estimated Annual Cost document       185
13 Exhibit 19  E-mail dated April 17, 2018; Subject,   187
      Paces info, with attachment
14
   Exhibit 20  E-mail dated May 2, 2018; Subject,    195
15    EndoWrist Technical File Final Report
      for Customer Use, with attachment
16
   Exhibit 21  E-mail dated May 31, 2018; Subject,   209
17    Rebotix Meeting, with attachment
18 Exhibit 22  E-mail dated May 1, 2019; Subject, Re:  213
      Checking in, with attachment
19
20
21
22
23
24
25

Page 3

1          I N D E X
2                          Page
3  TESTIMONY OF CHRIS GIBSON
   Direct Examination by Ms. Lent           6
4  Certificate of Reporter           218
   Certificate of Oath               219
5  Errata Sheet                      220
6
       E X H I B I T S
7
   No.       Description           Page
8
   Exhibit 1  E-mail dated July 1, 2013; Subject,    44
9     Killing the Robot
10 Exhibit 2  E-mail dated February 8, 2013;       47
      Subject, RE:  G-5 Questions
11
   Exhibit 3  E-mail dated June 14, 2013; Subject,   53
12    FW:  Software description and
      requirement documents, with attachment
13
   Exhibit 4  E-mail dated December 24, 2013;       78
14    Subject, da Vinci certification -
      confidential documents enclosed, with
15    attachment
16 Exhibit 5  E-mail dated July 24, 2014; Subject,   83
      FW:  Update survey, with attachment
17
   Exhibit 6  E-mail dated August 1, 2017; Subject,   89
18    EndoWrist counter resets, with
      attachment
19
   Exhibit 7  Invoice dated 9/5/2018, to BPI Medical  95
20
   Exhibit 8  Document Bates labeled REBOTIX143306 -  113
21    143309
22 Exhibit 9  E-mail dated June 20, 2019; Subject,   121
      RE:  Rebotix Repair
23
   Exhibit 10  E-mail dated June 25, 2020; Subject,   125
24    FW:  Request for More Information on
      Rebotix Repair Repairing/Servicing
25    Activities, with attachment

Page 5

1          THE VIDEOGRAPHER:  We're on the record.  The
2  time is now 10:04 a.m.  Today is Tuesday, June 22,
3  2021.
4          We're here today at Rebotix Repair LLC,
5  located in St. Petersburg, Florida, for the
6  video-recorded deposition of Chris Gibson in the
7  matter of Rebotix Repair LLC versus Intuitive
8  Surgical, Incorporated, case number 8:20-cv-02274,
9  to be heard before the United States District
10 Court, Middle District of Florida, Tampa Division.
11         I'm Alan Pokotilow, a legal videographer,
12 here today on behalf of Veritext Legal Solutions.
13 Our court reporter today is Carmen Thomas, also
14 here today on behalf of Veritext Legal Solutions.
15         Will counsel please state your name and
16 affiliation for the record, after which our court
17 reporter will swear the witness and we can proceed.
18         MR. ERWIG:  Alexander Erwig on behalf of the
19 Plaintiff, Rebotix Repair LLC.
20         MS. LENT:  Karen Lent on behalf of Defendant,
21 Intuitive Surgical, from Skadden Arps.
22         MR. BERHOLD:  Jeff Berhold for Restore
23 Robotics, Restore Robotics Repairs, and Clif
24 Robotics -- Clif Parker Robotics LLC.
25         MR. DEBAUGH:  Doug DeBaugh on behalf of

2 (Pages 2 - 5)

Highly CONF Chris Gibson                    June 22, 2021
Rebotix Repair LLC v Intuitive Surgical, Inc.

Page 154

1  entity we were operating as at that time. And I thought
2  I had said Rebotix Repair, but it wouldn't have been
3  Rebotix Repair. It would have been Rebotix LLC.
4      Q    Again, at -- at what time?
5      A    In that 2015 time frame. At the time of that
6  e-mail.
7      Q    Right. Are you -- I just want to make sure
8  again. Are you trying to tell me that, when the
9  conversations with STERIS and Stryker occurred, that was
10  Rebotix LLC; is that what you're -- are you trying to go
11  back to that? I just don't want to misunderstand what
12  you're trying to say.
13      A    Yes. Yes, that is what I mean.
14      Q    Okay. That -- because that was not -- that
15  was separate from 8.
16      A    Oh, sorry.
17      Q    So how did you come to understand that it was
18  Rebotix LLC and not Rebotix Repair that was having those
19  discussions with STERIS and Stryker?
20      A    Based on that e-mail date.
21      Q    That e-mail date had nothing to do with
22  STERIS or Stryker.
23      A    No, but it said 2015, and then it had some
24  calculations on one of the pages.
25      Q    Yeah. I'm not sure what that page had to do

Page 155

1  with the e-mail other than it was a bunch of jumbled
2  documents produced together.
3          Is this something you talked about with
4  counsel during the break?
5      MR. ERWIG: Objection to form. Instruct the
6  witness not to reveal any sort of communications
7  between --
8      MS. LENT: Actually, when you talk to your
9  client during the break, I am entitled to ask if
10  that was a cause of a change in the answer to a
11  question.
12      THE WITNESS: No. That was something I
13  reviewed on my own.
14  BY MS. LENT:
15      Q    And so based on the two unrelated e-mails in
16  Exhibit 8, you now believe that the conversations with
17  STERIS and Stryker occurred in 2014 and 2015; is that
18  your testimony?
19      MR. ERWIG: Objection to form.
20      THE WITNESS: Yes.
21  BY MS. LENT:
22      Q    I'm sorry. The -- your answer was -- came at
23  the same time as the objection, and I couldn't hear it.
24      A    Yes.
25      Q    Is there any other basis for your

Page 156

1  understanding that those conversations with STERIS and
2  Stryker occurred in 2014 and 2015 other than Exhibit 8?
3      A    No.
4      Q    So you -- you have no idea in your mind as to
5  when those conversations occurred, whether it was two
6  years ago or six years ago?
7      MR. ERWIG: Objection to form.
8      THE WITNESS: I'm confused by that question.
9  BY MS. LENT:
10      Q    I'm confused by -- by your answer.
11      I -- I'm -- I'm confused as to what basis you
12  have to say that the conversations with STERIS and
13  Stryker occurred in 2014 and 2015.
14      A    Based on that e-mail date and the
15  calculations that are on that same exhibit.
16      Q    Did that refresh your recollection about when
17  they occurred?
18      A    Yes. Based on that date, Rebotix Repair was
19  not a company at that time.
20      Q    No, I -- I understand the timing of Rebotix
21  Repair as a company.
22      The questions that I was asking you about
23  when those conversations occurred were based on what
24  your recollection was of when it happened.
25      So whether it was -- you know, was it -- was

Page 157

1  it two years ago or six years ago, do you have any basis
2  other than Exhibit 8 to say whether they occurred two
3  years ago or six years ago?
4      A    No.
5      Q    Okay. Okay. Let's go look at the exhibit
6  that's on-screen right now, which is Exhibit C of
7  Exhibit 11.
8      Before we took a break, we talked about these
9  ten distributors.
10      And I wanted to ask you, other than Restore
11  Robotics, were any of these distributors listed on
12  Exhibit C companies that had the ability themselves to
13  repair and reset the usage counter on EndoWrists?
14      A    No.
15      Q    And other than Restore Rebotix and the
16  attempt to set up Baker Scott and White [sic], did
17  Rebotix Repairs provide any other company with the
18  ability to repair and reset the usage counter on
19  EndoWrist?
20      A    No.
21      Q    Are you familiar with a company called
22  Surgical Instrument Service, or SIS?
23      A    Yes.
24      Q    Did Rebotix Repairs use SIS as a distributor?
25      A    Yes.

40 (Pages 154 - 157)

Highly CONF Chris Gibson                    June 22, 2021
Rebotix Repair LLC v Intuitive Surgical, Inc.

Page 158

1    Q    Can you describe the business relationship
2  between Rebotix Repairs an SIS?
3    A    Yes.  SIS has been a longtime customer of
4  Benjamin Biomedical.  And as I discussed before, that we
5  utilized our distributor base of Benjamin Biomedical to
6  offer the repair service that Rebotix Repairs was
7  offering, and so we engaged SIS to begin selling the
8  Rebotix Repair repair process and service to their
9  customers, which are the end-user hospitals.
10    Q    Did Rebotix Repairs ever provide information
11  to SIS regarding the method for extending usage limits
12  on EndoWrists?
13    A    I believe some information was shared, yes.
14    Q    What information was shared?
15    A    I don't know.  That would have come from Stan
16  and Greg.
17    Q    Do you know whether Rebotix informed SIS
18  about any regulatory approval sought by Rebotix for
19  extending usage limits on EndoWrists?
20    A    I don't know.
21    Q    Do you know whether Rebotix informed SIS that
22  Rebotix had withdrawn its application for FDA approval
23  to extend the usage life -- the usage limits on
24  EndoWrists?
25        MR. ERWIG:  Objection to form.

Page 159

1        THE WITNESS:  I don't know.
2        MS. LENT:  Let's introduce as the next
3    exhibit tab 45.
4        (Exhibit 13 was marked for identification.)
5        MR. MCMILLAN:  Sure.  Please stand by.
6        Tab 45 has been introduced as Gibson
7    Exhibit 13.
8  BY MS. LENT:
9    Q    Exhibit 13 is an e-mail from Chris G to Greg
10  Posdal and David, with the subject line "Agreement,"
11  dated August 22, 2019.
12        Mr. Gibson, can you take a look at this
13  exhibit and let me know if you recognize it?
14    A    Sure.  Just give me a minute.
15        Okay.  I've reviewed it.
16    Q    What -- who's Greg Posdal?
17    A    Greg, is the -- I believe the president of
18  SIS.
19    Q    And who's David who's BCC'd?
20    A    I assume that's probably David Mixner.
21    Q    Any idea why you BCC'd him here?
22    A    Probably just so he saw that there's an
23  agreement going out to SIS.
24    Q    And why were you sending this draft agreement
25  to SIS?

Page 160

1    A    We had discussed with SIS that they wanted to
2  become their own service center.  And they were going to
3  set up in Arizona a facility they were already occupying
4  and doing repairs at because they had two very large
5  customers in Arizona.
6    Q    Was this agreement ever executed?
7    A    No.
8    Q    Why not?
9    A    So I believe because of Intuitive.  Their
10  customer was pressured -- they -- they were open and had
11  multiple discussions with their customer and their
12  customer's legal team, and they determined that
13  Intuitive was threatening them and said they would not
14  repair their robot.  They would no longer service it if
15  they started using SIS or Rebotix Repair for the
16  servicing of their EndoWrist.  And so without their
17  large customers coming on board, there was no reason for
18  them to sign the agreement.
19    Q    What customer are you referring to?
20    A    I knew you were going to ask me that, and I
21  don't remember.  There was two of them out in Arizona.
22  If you give me a minute to -- to think about it.
23    Q    Uh-huh.
24    A    I -- I'm sorry.  I'm drawing a blank right
25  now.  I know it will come to me.  But it is two very

Page 161

1  large customers in Arizona.
2    Q    And you learned about that through
3  discussions with SIS?
4    A    I'm -- I'm sorry.  Say that one more time.
5    Q    All of this information that you just
6  testified to about these two large customers in Arizona,
7  how did you learn that information?
8    A    Actually, previously to that -- to this
9  agreement, Glenn and I had presented the repair service
10  process at one of the hospital systems, and so we knew
11  it was a large system.  SIS, however, had been servicing
12  this hospital system for a long time and for many years.
13  For like 20 years.  And so they actually had the
14  relationship there.  And then, yes, then the
15  conversation was then relayed to us through SIS that the
16  hospital system was not going to move forward working
17  with SIS or Rebotix Repairs.
18    Q    Well, was -- did -- did you have an
19  understanding that SIS was unhappy with Rebotix for
20  going after one of its customers -- longstanding
21  customers?
22        MR. ERWIG:  Objection to form.
23        THE WITNESS:  No.
24  BY MS. LENT:
25    Q    Did SIS -- do you know whether SIS knew that

41 (Pages 158 - 161)

Highly CONF Chris Gibson                              June 22, 2021
Rebotix Repair LLC v Intuitive Surgical, Inc.

Page 162

1  Rebotix went and pitched one of its longstanding
2  customers?
3          MR. ERWIG:  Objection to form.
4          THE WITNESS:  I believe they did.
5  BY MS. LENT:
6      Q    Did you discuss that with SIS?
7      A    I don't know.  I don't recall.
8      Q    Did Rebotix Repairs require any minimum
9  payment?
10     A    I'm sorry.  I just remembered the names of
11 the two hospital systems.
12     Q    Okay.
13     A    It's HonorHealth and Banner Health.
14     Q    And which is the one that Rebotix pitched to?
15     A    Actually, we pitched to both of them.  But I
16 think -- well, see, now I'm confused.  I would
17 probably Banner was the one that SIS had the better
18 relationship at.
19     Q    In exchange for providing SIS with the
20 technology to reset the usage counter on EndoWrists, was
21 Si -- sorry -- was Rebotix Repairs requiring any minimum
22 payment from SIS?
23     A    I would have to look at the agreement, but
24 typically yes, we did -- yes, I can see right here.  The
25 initial quantity was they had to buy, looks like, 50

Page 163

1  Interceptor boards from us.
2      Q    And where are you looking at for that?
3      A    Under "Scope of Work."
4      Q    So that was for the initial setup, that this
5  draft agreement would require SIS to purchase 50
6  components; is that right?
7      A    Correct.  That's the way I'm reading it.
8      Q    And each Interceptor component price,
9  according to section three of the agreement, would be
10 not to exceed $800; is that right?
11     A    Correct.
12     Q    So the initial investment for SIS would be up
13 to $40,000 if they executed this agreement?
14     A    I believe that would be right.
15     Q    Were there any other initial costs -- strike
16 that.
17          Were there any other initial amounts that
18 Rebotix Repair was requesting to be paid by SIS in order
19 to enter into a service center agreement?
20     A    Not that I recall.
21     Q    And, again, your understanding is that a
22 service center agreement was never executed with SIS,
23 correct?
24     A    Correct.
25          MS. LENT:  Let's introduce tab 52 as the next

Page 164

1  exhibit.
2          (Exhibit 14 was marked for identification.)
3          MR. MCMILLAN:  Please stand by.
4          Tab 52 has been introduced as Gibson
5  Exhibit 14.
6  BY MS. LENT:
7      Q    Exhibit 14 is an e-mail from Chris G to Glenn
8  P on January 24, 2020.  The subject is "REB Memorandum
9  of Understanding."
10          Can you take a look at this document and let
11 me know if you recognize it?
12     A    Sure.  Just give me a second.
13          Okay.  Yes.
14     Q    Do you recognize this document?
15     A    Yes.  I've seen it before.
16     Q    And what is it?
17     A    It's a memorandum of understanding that
18 SIS -- I believe they wrote this and sent it to us and
19 wanted us to agree to these terms, which we never did
20 and never would.
21     Q    And this was subsequent to the last exchange
22 we saw about entering into a -- a servicing agreement?
23     A    I don't remember.  What was the date on that
24 service agreement I sent?  I'm sorry.  I can go back
25 through here and look.

Page 165

1      Q    August 2019.
2      A    Yeah.  So this was after.  The memorandum of
3  understanding came after we sent over our agreement, our
4  agreement.  Sorry.
5      Q    And why do you say that Rebotix Repairs never
6  would agree to these terms?
7      A    Well, when I look at the pricing, that's not
8  something that we would ever agree to -- where they say
9  for the first 100, it's $200, and then 350, and then
10 450, based on steps of how many they do.
11     Q    So let's look at that.  This is number two in
12 that memorandum of understanding.  The first bullet
13 says, "For the first 100 (combination
14 Interceptors/repairs) the discount from current pricing
15 per Interceptor or repair shall be $200."
16          Do you see that?
17     A    Yes.
18     Q    So does that mean it's -- they're charging
19 $200 or it's $200 off of some other price?
20     A    The way I understand that is if they were
21 buying boards at no more than $800, and then for the
22 first 100, they want a volume discount of $200 off each
23 $800 board.  So they would be paying 600.  And then as
24 you go forward in the next bullet point, the next 200
25 would be 350 off.  And then the next 300, it would be

42 (Pages 162 - 165)

**EXHIBIT 18**

**to**

**PAUL D. BRACHMAN DECLARATION IN SUPPORT
OF DEFENDANT'S MOTION IN LIMINE NO. 1
TO EXCLUDE OUT-OF-COURT HOSPITAL
STATEMENTS**



Deposition of:

# AEO John "Jake" Joseph Colletti , Jr.

*May 7, 2021*

In the Matter of:

# Restore Robotics LLC v Intuitive Surgical

Veritext Legal Solutions

800.808.4958 | calendar-atl@veritext.com | 770.343.9696

Page 1

1          IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF FLORIDA
2                  PANAMA CITY DIVISION

3

4

   RESTORE ROBOTICS LLC AND
5  RESTORE ROBOTICS REPAIRS
   LLC,
6                              CIVIL ACTION FILE
          Plaintiffs,
7                              NO. 5:19-cv-55-TKW-MJF
          vs.
8
   INTUITIVE SURGICAL, INC.,
9
          Defendant.
10 ~~~~~~~~~~~~~~~~~~~~~~~~~

11

12

13          REMOTE VIDEO DEPOSITION OF
14     JOHN "JAKE" JOSEPH COLLETTI, JR.
15

16
               May 7, 2021
17
                1:04 p.m.
18

19
            753 Longwood Drive
20         Lake Forest, Illinois
21

22

23
       S. Julie Friedman, CCR-B-1476
24

25

AEO John "Jake" Joseph Colletti , Jr.                    May 7, 2021
Restore Robotics LLC v Intuitive Surgical

Page 2

1          APPEARANCES OF COUNSEL
2  On behalf of the Plaintiffs:
3  JEFFREY L. BERHOLD, P.C.
   JEFFREY L. BERHOLD, ESQ.
4  Suite 1050
   1230 Peachtree Street NE
5  Atlanta, Georgia  30309
   404.872.3800
6  678.868.2021 Fax
   jeff@berhold.com
7
   On behalf of the Defendant:
8
   SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
9  MICHAEL W. FOLGER, ESQ.
   ANISA A. SOMANI, ESQ.
10 One Manhattan West
   New York, New York 10001-8602
11 212.735.2157
   917.777.2157 Fax
12 michael.folger@skadden.com
13 SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
   ANISA A. SOMANI, ESQ.
14 1440 New York Avenue, N.W.
   Washington, D.C. 20005
15 202.371.7509
   202.661.8209
16 anisa.somani@skadden.com
17
   Also Present:
18 Chris McMillan, Concierge Tech
   Alan Pokotilow, Videographer
19
20
21
22
23
24
25

Page 3

1          INDEX OF EXAMINATIONS
2  WITNESS:
   John "Jake" Joseph Colletti, Jr.
3                                        Page
4  CROSS-EXAMINATION                       7
   By Mr. Berhold
5
   CROSS-EXAMINATION                      16
6  By Mr. Folger
7
          INDEX TO EXHIBITS
8
   Exhibit    Description    Page
9
   Exhibit 1  E-mail Chain Ending with Friday,    13
10   January 10, 2020 3:38 PM E-mail,
     from Klinefelter, to Colletti and
11   Therrien, Subject: RE: Da Vinci
     Service contract Language, HIGHLY
12   CONFIDENTIAL -- ATTORNEYS' EYES
     ONLY 0041672-41676
13
   Exhibit 2  Wednesday, July 8, 2020 1:26 PM    15
14   E-mail, from Colletti, to Sheehy,
     et al., Subject: SI Endowrist,
15   HIGHLY CONFIDENTIAL – ATTORNEYS'
     EYES ONLY, 0040639
16
   Exhibit 3  Wednesday, May 15, 2019 8:22 AM    27
17   E-mail, from
     cparker@restorerobotics.com, to
18   Czajka and Colletti
19 Exhibit 4  Friday, June 7, 2019 10:03 AM    33
     E-mail, from
20   cparker@restorerobotics.com, to
     Colletti, Subject: 008__RESTORE
21   ROBOTICS__INTRODUCTION •]
     Q1•]19.pptx, HIGHLY
22   CONFIDENTIAL -- ATTORNEYS' EYES
     ONLY 0005717-0005728
23
24
25

Page 4

1          INDEX TO EXHIBITS
2  Exhibit    Description    Page
3  Exhibit 5  Sunday, June 23, 2019 9:11 PM    46
     E-mail, from Colletti, to Parker,
4    Subject: Ac promo
     2019_momentumsRobotics2.pptx,
5    HIGHLY CONFIDENTIAL – ATTORNEYS'
     EYES ONLY 0040518--0040544
6
   Exhibit 6  E-mail Chain Ending with Tuesday,    52
7    October 15, 2019 4:10 PM E-mail,
     from cparker@restorerobotics.com,
8    to Colletti, Subject: RE: Letter,
     HIGHLY CONFIDENTIAL – ATTORNEYS'
9    EYES ONLY 0007161-0007162
10 Exhibit 7  E-mail Chain Ending with    56
     Wednesday, May 1, 2019 3:30 PM
11   E-mail, from Greeson, to May and
     Parker, Subject: RE: Meeting with
12   Medline QA, HIGHLY CONFIDENTIAL –
     ATTORNEYS' EYES ONLY
13   0007881-0007884
14 Exhibit 8  E-mail Chain Ending with    59
     Thursday, May 9, 2019 11:11 AM
15   E-mail, from Allegretti, to
     Greeson, et al., Subject: RE:
16   Restore Robotics Meeting, HIGHLY
     CONFIDENTIAL – ATTORNEYS' EYES
17   ONLY 0009643-0009644
18 Exhibit 9  E-mail Chain Ending with Tuesday,    61
     June 18, 2019 12:11 PM E-mail,
19   ,from Zeman, to Parker, Subject:
     RE: Pre•]Submission, HIGHLY
20   CONFIDENTIAL – ATTORNEYS' EYES
     ONLY 0041564-0041565
21
   Exhibit 10  Thursday, June 20, 2019 9:06 AM    64
22   E-mail, from Parker, to Colletti
     and Sheehy, Subject: FAQ doc,
23   HIGHLY CONFIDENTIAL – ATTORNEYS'
     EYES ONLY 0005838-0005842
24
25

Page 5

1          INDEX TO EXHIBITS
2  Exhibit    Description    Page
3  Exhibit 11  E-mail Chain Ending with    73
     Wednesday, May 13, 2020 10:30 AM
4    E-mail, from Parker, to Colletti
     and Sheehy, Subject: RE: Sales
5    only -DaVinci, HIGHLY
     CONFIDENTIAL – ATTORNEYS' EYES
6    ONLY 0005393 -0005394
7  Exhibit 12  Maintenance and Private Label    76
     Repair Agreement, ATTORNEYS' EYES
8    ONLY, Restore-00018643-00018667
9  Exhibit 13  Tuesday, February 25, 2020 11:20    80
     AM E-mail, from Parker, to
10   Colletti and Sheehy, Subject:
     Restore numbers for 2019, HIGHLY
11   CONFIDENTIAL – ATTORNEYS' EYES
     ONLY 0004329-4332
12
13
   (Original Exhibits 1 through 13 have been
14 attached to the original transcript.)
15
16
17
18
19
20
21
22
23
24
25

AEO John "Jake" Joseph Colletti , Jr.                    May 7, 2021
Restore Robotics LLC v Intuitive Surgical

Page 6

1     THE VIDEOGRAPHER: We're on the record.
2  The time is now 1:04 p.m. Today is Friday,
3  May 7th of 2021.
4     We're here today at the Colletti residence
5  located at 753 Longwood Drive in Lake Forest,
6  Illinois, for the media-recorded deposition of
7  John Joseph Colletti, Jr., in the matter of
8  Restore Robotics LLC, Restore Robotics Repairs
9  LLC, and Clif Parker Robotics LLC versus
10  Intuitive Surgical Incorporated; and
11  Counterclaimant Intuitive Surgical Incorporated
12  versus Restore Robotics LLC and Restore Robotics
13  Repairs LLC, Civil Case No. 5:19-cv-55-TKW-MJF,
14  to be heard before The United States District
15  Court, For The Northern District of Florida,
16  Panama City Division.
17     Our court reporter today is Julie
18  Friedman, here today on behalf of Veritext Legal
19  Solutions. I'm Alan Pokotilow, a legal
20  videographer, also here today here on behalf of
21  Veritext Legal Solutions.
22     Will counsel please state your name and
23  affiliation the record, after which our
24  court reporter will read a brief stipulation and
25  then swear the witness, and we can proceed.

Page 7

1     MR. BERHOLD: Jeff Berhold for Plaintiffs
2  Restore Robotics LLC, Restore Robotics Repairs
3  LLC, and Clif Parker Robotics LLC.
4     MR. FOLGER: Folger for Defendant
5  Intuitive Surgical on behalf of Skadden Arps.
6     MS. SOMANI: Anisa Somani on behalf of --
7  behalf of -- Anisa Somani from Skadden Arps for
8  Intuitive Surgical.
9     THE COURT REPORTER: Due to the need for
10  this deposition to take place remotely because
11  of the Government's order for social distancing,
12  the parties will stipulate that the court
13  reporter may swear in the witness over the
14  Veritext virtual videoconference and that the
15  witness has verified that he is, John Joseph
16  Colletti, Jr.
17     JOHN "JAKE" JOSEPH COLLETTI, JR., having
18  been first duly sworn, was examined and
19  testified as follows:
20  CROSS-EXAMINATION
21  BY MR. BERHOLD:
22  Q.  Good afternoon, Mr. Colletti.
23  A.  Good afternoon.
24  Q.  Are you currently employed?
25  A.  I am.

Page 8

1  Q.  What do you do?
2  A.  My title is national sales director for
3  Medline Industries.
4  Q.  And what are your responsibilities in that
5  capacity?
6  A.  I oversee the sales for our reprocessing
7  division. It's a -- the sale of single-use devices
8  back in for healthcare use.
9  Q.  Does your division also sell repaired
10  devices?
11  A.  We do.
12  Q.  Do you a sales staff?
13  A.  We do. I have six -- six regional
14  directors, and then it's about 34 renewal sales
15  specialists throughout the country.
16  Q.  Does your sales staff have a sales
17  approach generally?
18  A.  They are dedicated -- They are dedicated
19  access to -- specifically to the division's need to
20  sell reprocessing. We work relationships through our
21  acute care sales force through Medline, which about
22  700 folks nationwide, so leveraging supply chain
23  relationships we have through our distribution arm.
24  Q.  At some point, did Medline look at
25  starting a relationship with Restore Robotics?

Page 9

1  A.  Yes.
2  Q.  Were you involved in that process?
3  A.  Yes. I was involved in the initial
4  conversations and commitment.
5  Q.  What is your recollection of what Medline
6  did in that process?
7  A.  We actually went to their physical site in
8  Anaheim, California, visited what exactly the
9  mechanisms they would do in order to repair an
10  EndoWrist device. We also have relationships in
11  repair already in place with Restore prior to.
12  Q.  Did Medline undertake any assessment of
13  whether a -- it believed that a 510(k) was necessary
14  for selling the repaired instruments?
15  A.  For repair, you know, due to ISO
16  certification and what we were -- for what we've done
17  historically, we restore, the 510(k) was not
18  necessary.
19  Q.  At some point did Medline enter a
20  distribution agreement for buying and reselling the
21  repaired EndoWrist instruments?
22  A.  Yes.
23  Q.  And did your sales staff pitch the restair
24  (ph.) -- repaired instruments to their -- your
25  customers?

3 (Pages 6 - 9)

Page 10

1    A.  We did.
2    Q.  Do you recall how many customers were
3  pitched on the repaired instruments?
4    A.  I don't have an exact number, but I would
5  say at least a minimum of a hundred.
6    Q.  Do you recall the response generally from
7  your customers?
8        MR. FOLGER: Objection. Form.
9    Q.  (By Mr. Berhold)  You can answer, Mr.
10 Colletti.
11   A.  We -- We had several customers interested
12 in the endeavor, in -- in tackling the repairs of
13 EndoWrist.
14   Q.  Were there -- Did you observe different
15 types of responses to the sales pitch?
16   A.  We did.  Yes.  Responses range from
17 contractual obligations, contractual restrictions,
18 interference from the -- I would say, the Intuitive
19 sales force and -- and some clinical objection.
20   Q.  Do you recall generally how many of the or
21 what percentage --
22        Do you recall what percentage of the
23 customers pitched had clinical objections?
24   A.  Clinical was actually one of the smaller.
25 Probably only about 5 or 10 percent was the clinical

Page 11

1  objection to a repaired EndoWrist.
2        The majority, vast majority was --  You
3  know, I would say 65, 70 percent would be the -- the
4  contractual piece, what any type of use of a repaired
5  instrument would mean towards a -- a service
6  agreement or anything already in place the customer
7  had with Intuitive.
8    Q.  And could you describe a little more about
9  what you mean by clinical objections.
10   A.  So what we do, what I do for -- for
11 Medline is we sell remanufactured single-use devices,
12 so there's a lot of what historically thought of as a
13 secondhand device, so similar to a repair, thinking
14 it would be a secondhand device.
15       For the clinical folks, they're not
16 educated on what actually we go through to -- to
17 either repair or reprocess something.
18   Q.  And what was the percentage of customers
19 pitched that had the clinical objections?
20   A.  Yeah.  I'd say probably like that 5- to
21 10-percent range.
22   Q.  And another 65 to 70 percent of customers
23 pitched had concerns about contractual restrictions
24 with Intuitive?
25   A.  Correct.  What it would mean to a

Page 12

1  warranty, what it would mean to their service
2  agreements, things of that nature.
3    Q.  And the balance --  Well, and then another
4  20 percent had mentioned interference from Intuitive
5  representatives?
6        MR. FOLGER: Objection.  Form.
7        THE WITNESS:  A lot of times, at certain
8    locations -- it can vary across the country --
9    the sales team could be involved in actually
10   case coverage, actually helping operate the
11   robot itself or managing inventory for the
12   staff.
13       When it came into play of using a repaired
14   device or nothing that Intuitive was making,
15   well, made -- they made originally, anything
16   that would -- involved with a repaired device,
17   they would not, you know, not cover that type of
18   case.
19   Q.  (By Mr. Berhold)  And would that include
20 providing field service on the robot?
21        MR. FOLGER: Objection to form.
22        THE WITNESS:  Correct.
23   Q.  (By Mr. Berhold)  At some point, did
24 Medline stop pitching the repaired instruments --
25   A.  Yes.

Page 13

1    Q.  -- to the customers?
2    A.  Yes.
3    Q.  Do you recall why?
4    A.  It was due to this lawsuit.
5    Q.  Can you explain a little further what you
6  mean by due to the lawsuit.
7    A.  We were informed by Restore Robotics that
8  they would no longer be able to repair any of the
9  EndoWrists we were -- collected or worked with our
10 customers, so we had to take a pause in the program.
11   Q.  Was it your understanding that Restore
12 Robotics was waiting to get some sort of relief
13 through the lawsuit?
14        MR. FOLGER: Objection to form.
15        THE WITNESS:  In my opinion, I know
16   Restore Robotics was looking to see if they
17   could continue to -- the practice of -- of
18   repairing EndoWrists.
19        MR. BERHOLD:  Concierge, can we get 41672.
20        THE CONCIERGE TECH:  Sure.  Please stand
21   by.
22       (Exhibit 1 was marked for identification.)
23        THE CONCIERGE TECH:  41672 has been
24   introduced as Colletti Exhibit 1 and is now on
25   the screen.

4 (Pages 10 - 13)

AEO John "Jake" Joseph Colletti , Jr.                    May 7, 2021
Restore Robotics LLC v Intuitive Surgical

Page 14

1    Q.    (By Mr. Berhold)  Mr. Colletti, can you
2  see Exhibit 1 on your screen?
3    A.    I can.
4    Q.    Would you like a minute to review it?  The
5  concierge can -- can scroll through it, if that helps
6  your recollection.
7          THE WITNESS:  Can you scroll to the
8  bottom, please.
9          THE CONCIERGE TECH:  Yes.  It's a
10  five-page document, just so you know.
11          THE WITNESS:  Okay.
12          THE CONCIERGE TECH:  Just tell me when to
13  stop, if you want.
14          THE WITNESS:  Yeah.  Just start from the
15  bottom, please.
16          THE CONCIERGE TECH:  Okay.
17          THE WITNESS:  Can you stop there real
18  quick.
19          Please proceed to move up.
20          You can keep going.
21          You can keep going.
22          You can stop there.
23          You can move up.
24          You can stop there.
25    Q.    (By Mr. Berhold)  So Mr. -- So,

Page 15

1  Mr. Colletti, would Exhibit 1 be an example of a
2  customer that pointed to contractual restrictions --
3    A.    Yes.
4    Q.    -- regarding --
5          MR. FOLGER:  Objection.
6    Q.    (By Mr. Berhold)  -- repaired instruments?
7          MR. FOLGER:  Objection to form.
8          THE WITNESS:  Yes.  It would be.
9          MR. BERHOLD:  Can we turn to -- Chris,
10  can we turn to the second exhibit in the Exhibit
11  Share.
12          THE CONCIERGE TECH:  Sure.
13          MR. BERHOLD:  The 040639.
14          THE CONCIERGE TECH:  Sure.  Please stand
15  by.
16          (Exhibit 2 was marked for identification.)
17          THE CONCIERGE TECH:  40639 has been
18  introduced as Colletti Exhibit 2 and is now on
19  the screen.
20    Q.    (By Mr. Berhold)  Mr. Colletti, have you
21  had a chance to review Exhibit 2?
22    A.    I'm reading it right now.
23          I'm finished, Jeff.
24    Q.    Thank you.
25          Mr. Colletti, do you recognize Exhibit 2?

Page 16

1    A.    It's been a long time, but sure.  Yes.
2    Q.    And was it your impression that Restore
3  Robotics was waiting for the outcome of the lawsuit
4  to turn back on the repaired instrument business?
5          MR. FOLGER:  Objection to form.
6          THE WITNESS:  That's correct.
7          MR. BERHOLD:  Well, thank you, Mr.
8  Colletti.  I don't have any further questions.
9          Mr. Folger may have some questions for
10  you.
11          MR. FOLGER:  Yeah.  I -- I will have some
12  questions.
13          Mr. Colletti, do you want to take maybe a
14  five-minute break while we organize some
15  thoughts, and then we'll jump in?
16          Does that work for you?
17          THE WITNESS:  Sure.
18          THE VIDEOGRAPHER:  The time is now
19  1:23 p.m.  We're going off the record.
20          (Recess from 1:23 p.m. to 1:30 p.m.)
21          THE VIDEOGRAPHER:  The time is now
22  1:30 p.m.  We're back on the record.
23          Please continue.
24  CROSS-EXAMINATION
25  BY MR. FOLGER:

Page 17

1    Q.    Hey, Mr. Colletti.  I'm going to ask you a
2  few questions now; and, you know, the same
3  instructions as -- as Jeff just gave you.
4          Answer honestly.
5          If you don't understand my question,
6  please feel free to ask me to restate it.  I'll do my
7  best to get it in a way that's understandable.
8          Does that work for you?
9    A.    Sure.
10    Q.    Great.
11          And, you know, I think we did a pretty
12  good job of this so far; but we'll try our best not
13  to speak over each other.  So I'll try and take a
14  pause after I answer (sic) my question; and if you're
15  in the middle of answering, I'll try to make sure
16  that you get a chance to fully answer the question
17  without doing anything.
18          If I accidentally interrupt you, just let
19  me know; and I'll make sure you have the opportunity
20  to finish your -- your thought.
21          Is that okay?
22    A.    Yeah.  Thank you, Mike.
23    Q.    Yeah.  And then the other thing is, you
24  know, I think I have a little more questioning than
25  we just sort of had from the other side, so if at any

5 (Pages 14 - 17)

AEO John "Jake" Joseph Colletti , Jr.                    May 7, 2021
Restore Robotics LLC v Intuitive Surgical

Page 18

1 point you would like to take a break for any reason,
2 please just let me know. We can go off the record
3 and grab food or water or whatever.
4         I just ask that if a question is pending
5 to you, if you could answer first; and then we can
6 take a break at whatever time would work.
7         Is that okay?
8     A.    Sounds good.
9     Q.    Great. Okay. So when Mr. Berhold was
10 questioning you, I -- I think you said that you had
11 made or Medline had made an assessment about whether
12 Restore needed a 510(k); is that accurate?
13    A.    Yes.
14    Q.    And who performed that assessment?
15        Did you perform it?
16    A.    Medline did not.
17    Q.    Medline did not perform an assessment on
18 whether a 510(k) repair was needed?
19    A.    That's correct.
20    Q.    Okay. So -- So perhaps I misunderstood.
21 When there was a determination made that a 510(k) was
22 not necessary, who made that determination?
23    A.    A determination was made by Restore of
24 whether or not a 510(k) was necessary for a repair
25 product.

Page 19

1     Q.    Okay. And I believe that you had said
2 that Medline had attempted to sell Restore services
3 to approximately 100 customers; is that correct?
4     A.    At minimum, yes. We -- We pitched the
5 program for EndoWrist repair.
6     Q.    Okay. So it was pitched to about a
7 hundred customers, is that fair?
8     A.    At minimum.
9     Q.    And you said several were interested in
10 the services. Do you know how many?
11    A.    More than 80 percent.
12    Q.    Okay. And you had noted that some folks
13 expressed clinical objections is that accurate?
14    A.    That's correct.
15    Q.    And what were those clinical objections,
16 if you remember?
17    A.    Thinking it would be a secondhand product.
18    Q.    Okay. And was it your position that
19 this -- that the repair services were not secondhand
20 product?
21    A.    That's correct.
22    Q.    So what -- how would you -- Scratch that.
23        Well, if not a secondhand product, what
24 type of product would it be?
25    A.    It -- It's just a repair service like any

Page 20

1 other device or piece of equipment in the hospital.
2 So why would it be -- be different?
3     Q.    Okay. You also, I think, stated that you
4 believe that there was interference from the
5 Intuitive sales force. Is that accurate?
6     A.    That's correct.
7     Q.    What specifically do you mean by
8 interference from the Intuitive sales force?
9     A.    Sure. After pitching some of the programs
10 to clinical and supply chain staff, their further
11 investigation, their return response to us was --
12 would be, well, then our rep would not cover any
13 cases using a repaired device or a situation where
14 the Intuitive rep actually physically manages either
15 inventory or actual -- the actual function of the
16 da Vinci robot during the procedure.
17    Q.    I'm sorry. I don't think I quite
18 understood what you meant by manages the inventory.
19 Could you just perhaps clarify that.
20    A.    Sure. Several -- Several locations will
21 have actually the Intuitive rep manage the devices
22 in -- in and out of the institution, so if more of a
23 certain version of the -- an EndoWrist is needed,
24 they would perform the ordering, the -- the intake,
25 stocking.

Page 21

1         Those devices also are used more than
2 once, so registering them if they're, you know, put
3 back into a set for a -- a future case. Managing the
4 inventory.
5         MR. FOLGER: Okay. Can I ask the
6 concierge to pull back up Exhibit 1 to the
7 deposition.
8         THE CONCIERGE TECH: Sure. Please stand
9 by.
10        Exhibit 1 is now back on the screen.
11        MR. FOLGER: Thank you.
12    Q.    (By Mr. Folger) And, Mr. Colletti, you
13 remember looking at this a few minutes ago, correct?
14    A.    That's correct.
15        MR. FOLGER: Can I ask to scroll, if the
16 Concierge would scroll down to the page ending
17 in 41674.
18        If you could, pause right there.
19    Q.    (By Mr. Folger) Do you see there's an
20 e-mail from Eric Therrien, sent to Justin Kingfeller
21 (ph.), Christopher Sahagun, and Brian Harty on
22 December 6, 2019?
23    A.    I see that here. Yes.
24    Q.    And are you familiar Eric Therrien?
25    A.    Yes. Eric's on -- part of our staff.

6 (Pages 18 - 21)

AEO John "Jake" Joseph Colletti , Jr.                    May 7, 2021
Restore Robotics LLC v Intuitive Surgical

Page 22

1    Q.    Okay.  Does he report to you?
2    A.    Not directly.  No.
3    Q.    Okay.  And do you see he writes to Justin
4  that is correct, but we don't really replace
5  anything.  Most of the repair is more of a design
6  check to see if it's operational, check cables are
7  not frayed, scissors are sharpened, et cetera.
8  Anything too detrimental, we will not replace and
9  offer a replacement at the repair price.
10        Do you see that?
11   A.    Yes.  I do.
12   Q.    And does this comport with your
13  understanding of Restore's offerings regarding
14  EndoWrist instruments?
15   A.    Their offering included, you know,
16  cosmetic repair such as a sharpening of the scissor
17  as -- as part of the repair process.
18   Q.    And if you know, is it accurate that
19  Restore doesn't really replace anything on the
20  EndoWrist instrument?
21   A.    I've never actually seen one under repair;
22  but to my knowledge, yes.
23   Q.    Okay.  And Mr. Therrien also writes,
24  "Anything too detrimental, we will not replace and
25  offer a replacement at the repair price."

Page 23

1        Do you see that?
2    A.    I do.
3    Q.    And do you know what Mr. Therrien meant by
4  that?
5    A.    I can't speak for Eric.
6    Q.    Okay.  Let me -- Let me ask differently
7  then.  If a -- an EndoWrist was sent by a customer
8  and it was damaged in some way, do you know if
9  Restore would offer a replacement at the repair
10  price?
11   A.    We had the ability to sell -- sell an
12  EndoWrist that was available from -- from the market,
13  so yes.
14   Q.    Okay.  So you had -- Or apologies.
15       Restore had an inventory of EndoWrist that
16  it would sell.  Were these -- did -- Did Restore
17  perform any servicing on these replacement
18  EndoWrists, if you know?
19   A.    I'm not sure, Mike, on that.
20   Q.    That's fine.  Thanks.
21       MR. FOLGER:  We -- We can pull down this
22  exhibit now.
23   Q.    (By Mr. Folger)  Okay.  I wanted to speak
24  a little bit more generally.
25       So you had said that Medline pitches

Page 24

1  Restore's services to potential customers, I believe.
2  Is that accurate?
3    A.    We did.  Yes.  Still do.
4    Q.    And -- And you -- you still do.  So
5  you're still doing that today?
6    A.    Under Restore Robotics, no.
7    Q.    Okay.
8    A.    I thought you meant Restore.  We do a lot
9  of business with MediVision and Restore.
10   Q.    Thanks.  That's a helpful clarification.
11  I appreciate that.
12       What -- what did -- did -- Did Medline
13  provide any materials to prospective customers?
14   A.    We might have had a couple of pieces of
15  collateral to explain what the program was about.
16   Q.    Okay.  And would Medline from worked on
17  drafting those materials in any way?
18   A.    We would have -- Anything with a Medline
19  logo, we would have had gone through our division
20  before distribution.  Yes.
21   Q.    Okay.  And when you say "gone through our
22  division," what does that process entail?
23   A.    Reviewed with our internal marketing team.
24   Q.    Okay.  Great.  Were -- Were there any
25  specific types of hospitals that were targeted as

Page 25

1  prospective customers?
2    A.    Only those that owned the da Vinci Si
3  robot.
4    Q.    Okay.  And was there any specific
5  geography that Medline focused on?
6    A.    No.
7    Q.    And who would be the -- the audience for
8  these materials at a hospital?
9    A.    Typically, supply chain or -- or head of
10  OR would be typically the folks we were trying to
11  communicate with.
12   Q.    Okay.  Would you ever communicate with
13  surgeons that use the da Vinci system?
14   A.    On the -- On certain situations where the
15  conversation evolved, yes.
16   Q.    Okay.  Do you remember any specific
17  hospitals that you spoke with surgeons about?
18   A.    I don't.
19   Q.    Okay.  Did you have any communications
20  with anyone at Restore about which hospitals to
21  target for these collateral materials?
22   A.    No.  We -- We're pretty embedded into --
23  We're pretty embedded into the healthcare system
24  as -- as the largest med-surge distributor in the
25  country, so we have pretty extensive relationships

7 (Pages 22 - 25)

**EXHIBIT 19**

**to**

**PAUL D. BRACHMAN DECLARATION IN SUPPORT
OF DEFENDANT'S MOTION IN LIMINE NO. 1
TO EXCLUDE OUT-OF-COURT HOSPITAL
STATEMENTS**

Message

| | |
|---|---|
| **From:** | Keith Johnson [krjohnson@sis-usa.com] |
| **Sent:** | 9/25/2019 7:47:21 PM |
| **To:** | Brooks, Timothy P. [Timothy.Brooks@bannerhealth.com]; Kirwan, Perry [Perry.Kirwan@bannerhealth.com] |
| **Subject:** | Re: UMC Tucson |
| **Attachments:** | da Vinci EndoWrist Repair_2019 copy.pdf; da Vinci EndoWrist Process_2019.pdf; SIS Summary of Quality Regulatory.pdf; EndoWrist FAQs.pdf |

HI Tim, I have attached the documents we have put together to support this program.

Please let me know if this helps, if we need to create any new documents, let's do it. I will need to have our corporate compliance and legal sign off on it prior to publication.

Excited to work on this project with you.

Keith

**Keith Johnson** | EVP, Sales and Clinical Programs
**Surgical Instrument Service Co., Inc.**
Corp: 800.747.8044 | Cell: 623.687.5056
www.sis-usa.com

---

**From:** Brooks, Timothy P. <Timothy.Brooks@bannerhealth.com>
**Sent:** Wednesday, September 25, 2019 4:20 PM
**To:** Kirwan, Perry <Perry.Kirwan@bannerhealth.com>; Keith Johnson <krjohnson@sis-usa.com>
**Subject:** RE: UMC Tucson

Anything you have that I can build a process to a competency to will help.

Tim Brooks, BS, CSPM,
Director – Banner Health Systems CSPD Program
Office - 520-694-6106
Cell – 520-400-6790
 Banner
University Medicine
SPD exists to make a difference in people's lives through excellent service to our patient care providers!!!
Be Bold – Be Kind – Be Awesome

---

**From:** Kirwan, Perry <Perry.Kirwan@bannerhealth.com>
**Sent:** Wednesday, September 25, 2019 4:12 PM
**To:** Keith Johnson <krjohnson@sis-usa.com>; Brooks, Timothy P. <Timothy.Brooks@bannerhealth.com>
**Subject:** RE: UMC Tucson

Keith – if you have some process docs that we worked on as well – please send those to Tim as well

---

**From:** Keith Johnson <krjohnson@sis-usa.com>
**Sent:** Wednesday, September 25, 2019 3:35 PM
**To:** Kirwan, Perry <Perry.Kirwan@bannerhealth.com>; Brooks, Timothy P. <Timothy.Brooks@bannerhealth.com>
**Subject:** [EXTERNAL] Re: UMC Tucson

Hi Tim, great to connect again.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

I have attached the document in word format.

Please take a look and let me know your thoughts and recommended changes.

Looking forward to speaking with you soon.

Keith

**Keith Johnson** | EVP, Sales and Clinical Programs
**Surgical Instrument Service Co., Inc.**
Corp: 800.747.8044 | Cell: 623.687.5056
www.sis-usa.com

---

**From:** Kirwan, Perry <Perry.Kirwan@bannerhealth.com>
**Sent:** Wednesday, September 25, 2019 10:42 AM
**To:** Keith Johnson <krjohnson@sis-usa.com>; Brooks, Timothy P. <Timothy.Brooks@bannerhealth.com>
**Subject:** FW: UMC Tucson

Morning Keith

I think you two have met before so pass on the introductory formalities

We're looking to gear up for Si program at BUMCT/S.    I shared with Tim the documentation that I've been working on with you regarding process/procedure as well as supplementing your FAQs on the program as a whole.   Can you reach out directly to Tim and share the docs that you have thus far?  Tim has agreed to review, edit and also make additional comments if warranted to these documents.   I believe this input will prove to be key to the success at Banner however I also believe it will have utility outside of the Banner system as you look to further market this program nationwide.

Tim and I also discussed putting a competency program together for this which I think is a great idea since it's been recommended in other areas that we do the same for central sterile processing.   This would just fall in line with those other recommendations.

I believe that we are very close to actual kick-off which is awesome.   I'm looking forward to realizing the gains that we believe that this program is going to provide to both of us.

Thanks much!

Perry

**From:** Brooks, Timothy P. <Timothy.Brooks@bannerhealth.com>
**Sent:** Wednesday, September 25, 2019 10:35 AM
**To:** Kirwan, Perry <Perry.Kirwan@bannerhealth.com>
**Subject:** RE: UMC Tucson

Sounds good, look forward to speaking to him

**From:** Kirwan, Perry <Perry.Kirwan@bannerhealth.com>
**Sent:** Wednesday, September 25, 2019 10:18 AM

CONFIDENTIAL - ATTORNEYS' EYES ONLY

**To:** Brooks, Timothy P. <Timothy.Brooks@bannerhealth.com>
**Subject:** RE: UMC Tucson

Yes – we have been working on documentation for this.  That said, I think a review and any suggested edits from your perspective would be awesome.  As you alluded to – we want this to be super crisp and eliminate any variables that we can from the process.

I think you're' suggestion of competency requirement is also a good one.  Just strengthens the precision of what we're doing.

Ok for me to have Keith Johnson reach out to you directly and he can share where we are so far with our documentation.   He will be very receptive to edits and even additional information requirements.   This is just as much of a learning experience for them as it is us (on process that is – not the actual service).

Thanks Tim for the valuable input

Perry

**From:** Brooks, Timothy P. <Timothy.Brooks@bannerhealth.com>
**Sent:** Wednesday, September 25, 2019 10:13 AM
**To:** Kirwan, Perry <Perry.Kirwan@bannerhealth.com>
**Subject:** RE: UMC Tucson

Perfect, sounds doable!
We should put this into a competency format that we can get education signoff from staff in both SPD and PeriOp.  I am sure IP would like to see that.

Did SIS provide anything that we could formalize into a one or two page competency?  I can create the competency, just need their requirements.

**From:** Kirwan, Perry <Perry.Kirwan@bannerhealth.com>
**Sent:** Wednesday, September 25, 2019 10:01 AM
**To:** Brooks, Timothy P. <Timothy.Brooks@bannerhealth.com>
**Subject:** RE: UMC Tucson

Not exactly.   Once we get down to one (1) use on the instrument and that's key - because we need that last count to pull off all the identifying information that's associated with the arm -, we pull the arm out of service and send it to SIS.  SIS will use that last count to read the information off and then they will load a full complement of use back on the counter associated with that instrument.

The process would be something like this.   As arms come down to central processing, we would use the SIS provided reader to read the arm.   If it has two more uses on it – we would process as normal and put it back into circulation.  If it has one use on it – we would clean it and then put it into a receptacle (we already have these) for collection.  SIS will collect the instruments in the bins and then reload the counters.   If an arm say is rated for 10 uses – we would get 10 new uses once it returns from SIS.  If the arm has 15 – then it would come back with 15.   It is actually important that we don't receive an instrument back with less or more than the intended design otherwise we get into FDA issues because we would be re-manufacturing the device and we obviously don't want that.

Also important is that is we receive an instrument from the OR with zero uses left – it's important to collect those as well.  We simply use them for parts and we get repair credit from SIS.  So, we never want to toss any of them away as they are no value to use in landfill.

Does that make sense?

CONFIDENTIAL - ATTORNEYS' EYES ONLY

**From:** Brooks, Timothy P. <Timothy.Brooks@bannerhealth.com>
**Sent:** Wednesday, September 25, 2019 9:36 AM
**To:** Kirwan, Perry <Perry.Kirwan@bannerhealth.com>
**Subject:** RE: UMC Tucson

Hi Perry
So the arm would have to be reset after every use?
If so we will have to discuss who is doing this.  My preference would be in SPD.
Nick is on vacation this week returning Tuesday next.  I spoke to him before going on PTO, he seemed to believe that it would not be a problem.
Tim

**From:** Kirwan, Perry <Perry.Kirwan@bannerhealth.com>
**Sent:** Wednesday, September 25, 2019 9:09 AM
**To:** Brooks, Timothy P. <Timothy.Brooks@bannerhealth.com>
**Subject:** FW: UMC Tucson

Morning Tim

We have ordered a device from SIS that will allow us to get a 'count' on the Si Robotic arms without having to connect it to the full robot – should make workflow in central processing (or elsewhere) a little easier in terms of tracking the counters.

I'm wondering if we are at a point where we're ready to conduct our pilot at BUMCT/S.

Let me know your thoughts

Thx
Perry

**From:** Keith Johnson <krjohnson@sis-usa.com>
**Sent:** Wednesday, September 25, 2019 6:34 AM
**To:** Kirwan, Perry <Perry.Kirwan@bannerhealth.com>
**Subject:** [EXTERNAL] UMC Tucson

Are we good to schedule the install and training on the counter for next Tuesday?

**Keith Johnson** | **Executive Vice President**
Sales and Clinical Programs
**Surgical Instrument Service Co., Inc.**
Corp: 800.747.8044 | Cell: 623.687.5056
www.sis-usa.com

# Surgical Instrument Service Co., Inc.

# da Vinci® EndoWrist® Repair FAQs

CONFIDENTIAL - ATTORNEYS' EYES ONLY

## Can you send me your certification / FDA approval?

The FDA does not regulate, nor certify, repairs. The FDA regulates third party reprocessing companies and single-use devices only.

## What does your service provide?

SIS's service is a complete repair of the da Vinci® EndoWrist® instruments. The instruments are sold with a use counter which limits the life of the instrument. Upon reaching a zero count the instruments are "expired" and rendered useless.

This service includes resetting the use counter via a replacement chip as well as a complete evaluation and repair of the distal/tool end of the instrument. The replacement chips, as well as the service process, were designed and developed under a formal quality system ensuring the serviced instruments meet the quality and functional requirements of a new device. Formal, independent testing and validation on the replacement chips were conducted to ensure the intended use and performance are equivalent to that of the new OEM device.

## What do we need to know to collect instruments for service?

Upon receiving an instrument for the initial repair, the instrument must have at least one use left on the counter. If the original instrument reaches zero (0) it cannot be serviced. In order for the reset to be performed, the data must be retained on the initial repair. However, once the reset has been performed once, the instrument can be used up to expiration (zero) and still retain its original data and the ability to be reset.

SIS095120

## What instrument models are supported?

**Compatible EndoWrist® Instruments**
420001 Potts Scissors
420003 Small Clip Applier
420006 Large Needle Driver
420007 Round Tip Scissors
420033 Black Diamond Micro Forceps
420036 DeBakey Forceps
420048 Tip Forceps
420049 Cadiere Forceps
420093 ProGrasp Forceps
420110 PreCise Bipolar Forceps
420121 Fine Tissue Forceps
420157 Snap-fit™ Scalpel Instrument
420171 Micro Bipolar Forceps
420172 Maryland Bipolar Forceps
420178 Curved Scissors
420179 Hot Shears (Monopolar Curved Scissors)
420181 Resano Forceps
420183 Permanent Cautery Hook
420184 Permanent Cautery Spatula
420189 Double Fenestrated Grasper
420190 Cobra Grasper
420192 Valve Hook
420194 Mega Needle Driver (Tapered)
420203 Pericardial Dissector
420204 Atrial Retractor
420205 Fenestrated Bipolar Forceps
420207 Tenaculum Forceps
420215 Cardiac Probe Grasper
420227 PK® Dissecting Forceps
420230 Large Clip Applier
420246 Atrial Retractor Short Right
420249 Dual Blade Retractor
420278 Graptor (Grasping Retractor)
420296 Large SutureCut™ Needle Driver
420309 Mega™ SutureCut™ Needle Driver
420318 Small Graptor (Grasping Retractor)
420327 Medium-Large Clip Applier
420344 Curved Bipolar Dissector

CONFIDENTIAL - ATTORNEYS' EYES ONLY

## Can you describe your service process?



EndoWrists® Service Process Flowchart

## Additional information:

- EndoWrist® functionality and safety are not affected by the repair
  - Extensive analysis and formal testing were performed to ensure the proper function and performance
  - Repaired instruments have been subjected to, and passed, all appropriate ISO 10993 biocompatibility tests (by a certified independent test laboratory)
  - Electrical and electrosurgical safety have been carefully considered per the expectations in the safety standards, and special fixtures are used during service to retest the instrument to a production equivalent qualification

- Service components are built to medical device quality standards, including:
  - ISO 9001: Quality Systems Model for QA in Design/Development, Production, Installation, and Servicing
  - ISO 9002: Quality Systems Model for QA in Production and Installation
  - ISO 9003: Quality Systems Model for QA in Final Inspection and test
  - ISO 9001: Quality Management Systems

- The service process is performed under a formal quality control system certified per ISO 9001, with all assembly operations and testing performed per formal procedures

- SIS provides continuing technical support to assure the final quality of the serviced instruments, and will monitor and respond to any reported field issues using a formal surveillance system

- Validated fixtures and tools can be provided to repeat safety testing in the hospital, if desired

CONFIDENTIAL - ATTORNEYS' EYES ONLY



## da Vinci® EndoWrist® Repairs

**Stop throwing away money on your da Vinci® EndoWrist® devices!**

SIS can now service your da Vinci® devices including repair and use counter reset.

Important facts:

- The da Vinci® EndoWrist® is a "multi-use" medical device. Multi-use devices, such as endoscopic instruments, have always been eligible for repair.

- The repair of da Vinci® EndoWrist® does not alter the intended use, method of use, functionality or performance of the device in any way.

- The da Vinci® Robot interacts with the repaired EndoWrist® identically and the robot <u>cannot</u> be affected by the repaired device in any way.

- The robot communicates with the EndoWrist® prior to surgery <u>only</u>. Prior to surgery, the robot confirms the serial number, model number and remaining uses. The repaired device will function identically to the new OEM EndoWrist®.

- A repaired EndoWrist® is not an alternative or replacement device. It is an original da Vinci® manufactured device that has been repaired to original specifications.

### It's time to challenge the status quo
SIS da Vinci® EndoWrist® repair services will boost your bottom line and help provide the prompt and tailored responses your OR demands.

Call your local SIS representative or our Corporate Office at 800.747.8044.

CONFIDENTIAL - ATTORNEYS' EYES ONLY



da Vinci® EndoWrist® Repair Process

When sending in your DaVinci EndoWrist® devices to SIS for repair, it is important to follow all the instructions below.

**All devices must go through the decontamination process before they are collected for service by SIS.** The devices do not need to be sterile.

### Initial Service on an EndoWrist® (Si & S) Device

- The EndoWrist® must be sent in with one click remaining. This is only required for the initial service of the EndoWrist®. Once the device has been serviced by SIS, the counter can be run to zero.
- If an EndoWrist® is being sent for its initial service with SIS, place a red sticker on the body of the device.
- Place EndoWrist® into the SIS collection container
- Devices will be collected by your local SIS representative and shipped to the SIS National Service Center.
- Devices will be tested, refurbished to OEM performance specifications, and reset for 10 additional uses. During the refurbishment process, a code will be etched on the device.
- Once repaired, the device will be returned to your facility by your local SIS representative.

### Ongoing Service of EndoWrist® (Si & S) Devices (applies only to devices that have been previously serviced by SIS)

- Device to be collected with zero clicks remaining (device is "expired")
- Place EndoWrist® into the SIS collection container
- Devices will be collected by your local SIS representative and shipped to the SIS National Service Center.
- Devices will be tested, refurbished to OEM performance specifications, and reset for 10 additional uses.
- Once repaired, the device will be returned to your facility by your local SIS representative.

### EndoWrist® (Xi, Si & S) Device Collection for Parts and Testing

- All Xi devices
- Si and S devices that have zero clicks or have expired and not been serviced prior by SIS (not etched)
- Place devices in the SIS collection container
- Devices will be collected by your local SIS representative and shipped to the SIS National Service Center.

151 N Brandon Drive · Glendale Heights, IL 60139 · 800.747.8044 · www.sis-usa.com

CONFIDENTIAL - ATTORNEYS' EYES ONLY



# Surgical Instrument Service Co., Inc.

# Summary of Quality and Reliability Measures

CONFIDENTIAL - ATTORNEYS' EYES ONLY

SIS095126

# BACKGROUND

SIS da Vinci® repair is a specialized process for the EndoDevice® instruments of the da Vinci® surgical robot to extend their safe and effective life beyond the uses recommended by the original equipment manufacturer. SIS services the devices by installing a resettable use counter while maintaining the ability of the da Vinci™ Surgical Robot to access all data in the OEM memory and to count uses as usual.

These devices are not single use devices. The materials in the instruments are durable and commonly used in other reusable medical devices. Testing of the instruments after many additional usage cycles indicated no trend of material deterioration beyond normal tool wear.

The intended use, method of use, functionality, or performance of the instrument are not changed by this service. The original data required by the machine to communicate with the instrument is not altered in any way. The machine will still recognize the model number, serial number, and instrument being used. Additionally, the data read from the instrument is clearly displayed and verified by the user and robot prior to surgery. Data is not read during surgery.

SIS095127

# QUALITY SYSTEM INFORMATION

The quality management system has been approved by the notified body DQS Medizinprodukte GmbH according to ISO 13485:2003 and MDD 93/42/EEC MOD 5 compliant system.

The quality management system has been approved and is currently certified by the notified body Global Group according to ISO 9001:2015.

# SERVICE PROCESS DEVELOPMENT

The da Vinci® S/Si instruments are sold with an arbitrary use counter, which limits usage to a certain number of procedures. Upon reaching zero, the instruments are considered "expired" and must be discarded. Our service provides the ability to extend the useful life of the instrument. The service process involves a complete evaluation, repair, and test of the instrument.

The SIS EndoWrist® service was designed for the da Vinci® S/Si Device Instruments, the OEM chip, and robot interface to perform in the same manner as the OEM original. This service does not affect the instruments form, fit or function.

The applicable products are outlined on the following pages (this list may be updated as new products are approved for repair):

CONFIDENTIAL - ATTORNEYS' EYES ONLY

SIS095128

| REF | USES | DESCRIPTION |
|---|---|---|
| 420001 | 10 | Potts Scissors |
| 420003 | 100 | Small Clip Applier |
| 420006 | 10 | Large Needle Driver |
| 420007 | 10 | Round Tip Scissors |
| 420033 | 15 | Black Diamond Micro Forceps |
| 420036 | 10 | DeBakey Forceps |
| 420048 | 10 | Long Tip Forceps |
| 420049 | 10 | Cadiere Forceps |
| 420093 | 10 | ProGrasp Forceps |
| 420110 | 10 | PreCise Bipolar Forceps |
| 420121 | 15 | Fine Tissue Forceps |
| 420157 | 30 | Snap-fit™ Scalpel Instrument |

CONFIDENTIAL - ATTORNEYS' EYES ONLY

| 420171 | 10 | Micro Bipolar Forceps |
| 420172 | 10 | Maryland Bipolar Forceps |
| 420178 | 10 | Curved Scissors |
| 420179 | 10 | Hot Shears (Monopolar Curved Scissors ) |
| 420181 | 10 | Resano Forceps |
| 420183 | 10 | Permanent Cautery Hook |
| 420184 | 10 | Permanent Cautery Spatula |
| 420189 | 10 | Double Fenestrated Grasper |
| 420190 | 10 | Cobra Grasper |
| 420192 | 15 | Valve Hook |
| 420194 | 10 | Mega Needle Driver (Tapered) |
| 420203 | 10 | Pericardial Dissector |
| 420204 | 10 | Atrial Retractor |

CONFIDENTIAL - ATTORNEYS' EYES ONLY

| 420205 | 10 | Fenestrated Bipolar Forceps |
|---|---|---|
| 420207 | 10 | Tenaculum Forceps |
| 420215 | 10 | Cardiac Probe Grasper |
| 420227 | 10 | PK® Dissecting Forceps |
| 420230 | 100 | Large Clip Applier |
| 420246 | 10 | Atrial Retractor Short Right |
| 420249 | 10 | Dual Blade Retractor |
| 420278 | 10 | Graptor (Grasping Retractor) |
| 420296 | 10 | Large SutureCut™ Needle Driver |
| 420309 | 10 | Mega™ SutureCut™ Needle Driver |
| 420318 | 10 | Small Graptor (Grasping Retractor) |
| 420327 | 100 | Medium-Large Clip Applier |
| 420344 | 10 | Curved Bipolar Dissector |

CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Risk Management

Risk management activities per ISO 14971 standard were performed during the development, verification and validation of service processes. Post-production monitoring of the devices serviced by SIS will ensure this service remains free from safety concerns. The risk management process identifies, estimates, and evaluates the serviced product's safety risks, methods to control these risks, and to verify the effectiveness of these controls. A detailed FMEA (Failure Modes and Effects Analysis) was performed covering the
service process.

# Development Process

Extensive validation and safety testing occurred during the development of the service process (see below). Both the development of the service process and the ongoing repair operations are performed under the appropriate certified quality systems. A complete technical file describing qualification activities and independent testing was created and informed the development of formal procedures to guide the service operations performed.

The following list of standards was considered and applied to the development process:

| Standard # | Year | Title |
|---|---|---|
| EN 980 | 2008 | Symbols for use in the labeling of medical devices |
| EN 1041 | 2008 | Information supplied by the manufacturer of medical devices |
| EN ISO 10993-1 | 2009 | Biological evaluation of medical devices – Part 1: Evaluation and testing within a risk management process |
| EN ISO 10993-4 | 2009 | Biological evaluation of medical devices – Part 4: Selection of tests for interactions with blood |
| EN ISO 10993-5 | 2009 | Biological evaluation of medical devices – Part 5: Tests for in vitro cytotoxicity |
| EN ISO 10993-10 | 2010 | Biological evaluation of medical devices – Part 10: Tests for Irritation and Skin Sensitization |
| EN ISO 10993-11 | 2009 | Biological evaluation of medical devices – Part 11: Tests for systemic toxicity |

SIS095132

| EN ISO 10993-12 | 2012 | Biological evaluation of medical devices – Part 12: Sample preparation and reference materials |
|---|---|---|
| EN ISO 13485 | 2012 & AC: 2012 | Medical devices – Quality management systems – Requirements for regulatory purposes |
| EN ISO 14971 | 2012 | Application of risk management to medical devices |
| EN ISO 14937 | 2009 | Sterilization of health care products – General requirements for characterization of a sterilizing agent and the development, validation and routine control of a sterilization process for medical devices |
| EN ISO 17664 | 2004 | Sterilization of medical devices – Information to be provided by the manufacturer for the processing of re-sterilizable medical devices |
| EN ISO 17665-1 | 2006 | Sterilization of health care products – Moist Heat – Part 1: Requirements for the development, validation and routine control of a sterilizer for medical devices (reference only) |
| EN ISO 17665-2 | 2009 | Sterilization of health care products – Moist Heat – Part 2: Guidance on the application of ISO 17665-1 (reference only) |
| EN 60601-1 | 2006 | Medical electrical equipment – Part 1: General requirements for basic safety and essential performance |
| EN 60601-1-2 | 2007 | Medical electrical equipment – Part 1-2: General requirements for basic safety and essential performance – Collateral standard: Electromagnetic compatibility – Requirements and tests |
| EN 60601-2-2 | 2009 | Medial electrical equipment – Part 2-2: Particular requirements for the basic safety and essential performance of high frequency surgical equipment and high frequency surgical accessories |
| EN 62304 | 2006 | Medical device software – Software life-cycle processes |
| EN 62366 | 2008 | Medical devices – Application of usability engineering to medical devices |

CONFIDENTIAL - ATTORNEYS' EYES ONLY

# BIOLOGICAL EVALUATION

The material and microbiological characteristics of devices that have been serviced have been evaluated to determine whether they demonstrate any biocompatibility risk. It has been assumed that the OEM devices were marketed as biocompatible.

Tests were conducted with devices serviced to demonstrate compliance to the following standards:

| Test | Standard | Report # |
|---|---|---|
| ISO MEM Elution Assay with L-929 Mouse Fibroblast Cells | • ISO 10993-5: 2009 Biological Evaluation of Medical Devices, Part 5: Tests for In Vitro Cytotoxicity<br>• ISO 10993-12: 2012 Biological Evaluation of Medical Devices, Part 12: Sample Preparation and Reference Materials | 5107 and 5109 |
| ASTM Hemolysis – Extract Method (GLP) | • ASTM Guideline F619-03, reapproved 2008. Standard Practice for Extraction of Medical Plastics. 2012. Annual Book of ASTM Standards, Volume 13.01:223-226<br>• ISO 10993-4: 2002 and Amendment 1, 2006. Biological Evaluation of Medical Devices, Part 4: Selection of Tests for Interaction with Blood<br>• ISO 10993-12: 2012 Biological Evaluation of Medical Devices, Part 12: Sample Preparation and Reference Materials | 4349 and 4350 |
| ISO Guinea Pig Maximization Sensitization Test (GLP-2 Extracts) | • ISO 10993-10: 2010 Biological Evaluation of Medical Devices, Part 10: Tests for Irritation and Skin Sensitization, pp. 18-26<br>• ISO 10993-12: 2012 Biological Evaluation of Medical Devices, Part 12: Sample Preparation and Reference Materials | 5003 and 4981 |
| ISO Acute Systemic Injection Test (GLP-2 Extracts) | • ISO 10993-11: 2006 Biological Evaluation of Medical Devices, Part 11: Tests for Systemic Toxicity<br>• ISO 10993-12: 2012 Biological Evaluation of Medical Devices, Part 12: Sample Preparation and Reference Materials | 4498 and 4501 |

SIS095134

| ISO Intracutaneous Irritation Test (GLP-2 Extracts) | • ISO 10993-10: 2010 Standard, Biological Evaluation of Medical Devices, Part 10: Tests for Irritation and Skin Sensitization, pp. 11-14 | 4316 and 4317 |
|---|---|---|
| | • ISO 10993-12: 2012 Biological Evaluation of Medical Devices, Part 12: Sample Preparation and Reference Materials | |

The test results revealed no unacceptable levels of toxicity or irritation. All test samples demonstrated the necessary biocompatibility characteristics.

# Cleaning and sterilization

The serviced devices are not provided in a sterile condition. However, they do require cleaning and sterilization prior to clinical use per the OEM IFU. There are no changes to these processes, which are performed between surgeries at the hospital. In order to ensure that sterilization instructions remain valid for the devices serviced, they have completed both cleaning and sterilization qualification studies. These studies were performed by a third party specializing in the cleaning and sterilization processes. The final results demonstrate that the recommended procedures ensure adequate cleaning and sterilization for end users of the devices.

# ELECTRICAL AND ELECTROSURGICAL SAFETY

Electrical/Electrosurgical safety testing has been conducted using a third party independent test lab to verify serviced devices meet applicable environmental, safety and labeling requirements.

Tests were performed using devices serviced to demonstrate compliance to the standards listed on the following page:

SIS095135

| Standard Document | Description |
|---|---|
| IEC 60601-1: 2005 & A1: 2012 | Medical Electrical Equipment – Part 1: General requirements for basic safety and essential performance |
| IEC 60601-2-2: 2009 | Medical Electrical Equipment – Part 2-2: Particular requirements for the basic safety and essential performance of high frequency surgical equipment and high frequency surgical accessories |
| EN 60601-1-2: 2007 | Medical Electrical Equipment: General requirements for basic safety and essential performance. Collateral standard. Electromagnetic compatibility. Requirements and tests. |

The results demonstrate compliance with the applicable requirements of the aforementioned safety standards for medical devices.

## USABILITY ENGINEERING

The services have been designed to maintain the exterior specification, connection, use application, user profile, or frequently used functions, when compared to the original devices produced by the OEM. We have considered the impact of the safety and labeling requirements for the end users. One additional challenge to the labeling integrity was conducted during the electrical safety testing by SGS. Those results demonstrated legibility following an intentional rub down test.

## RELIABILITY/PERFORMANCE TEST SUMMARY

A worst-case analysis was carried out to determine which models should be used during performance and life testing. Although each tool is unique, there are four basic mechanical function/tool end designs: Scissors, Graspers, Needle Drivers and Non-Opening (tool ends that do not open and close).

In addition, certain models deliver RF energy ("Energized Device"). Energized Devices are either Monopolar, Bipolar or PlasmaKinetic™ (PK™). For each Tool End Design, an Energized Device is considered worst case because RF energy represents a greater stress/challenge to the tool end. Representative models

were chosen based on Tool End Design, Energized Device models and general market popularity.

Initially, a quantity of each representative model was characterized by their mechanical and functional properties. New OEM instruments were analyzed to provide baseline statistics and information. Examples of such statistics include, but were not limited to:

- Tool end range of motion
- Tool end functional performance (e.g. grasping performance and cutting performance)
- RF energy effectiveness
- Electrical safety testing
- General instrument condition
- Effective communication and use counting on the host system

Following the OEM characterization, instruments with one remaining use underwent the repair process. Immediately following the repair process, the instruments were subjected to the same baseline testing in order to establish equivalence. Formal life-testing was then conducted to simulate an additional 10 uses. The life testing subjected the instrument to 10 simulated surgical environments to test each aspect of the individual instrument's functional capabilities. After each of the simulated uses, the instruments were subjected to the normal cleaning and sterilization procedures provided by the OEM. At different intervals, and at end-of-life, the instrument was subjected to the same battery of testing. The testing showed no degradation in performance or condition of the instruments. The formal protocols executed reside in the technical file per the ISO 13485 quality system used for development; these files were independently reviewed by DQS, a certified EU notified body assessor for medical devices.

Additionally, this repair process was repeated and a battery of tests was performed on the same batch of instruments. This brought the total number of uses experienced by the instruments to 29. This includes the 9 original uses on the OEM device, 10 additional uses following first repair service, and another 10 uses following the second repair process. The reliability testing following two repair services showed no trend of degradation in the performance or condition

SIS095137

of the instruments, therefore no further cycles under this formal protocol were conducted.

The test results revealed that all acceptance criteria have been achieved and the sample devices demonstrate sufficient performance and safety characteristics in order to confidently release the devices to distribution. Also, a worst-case verification test has been performed on the flush tube, a component of all devices, to ensure it has been adequately challenged in an effort to confirm the environmental conditions of use do not adversely affect the component and related performance expectations.

During further analysis for reliability, disassembled OEM instruments and their components underwent material analysis by experts in medical device design and construction. The instruments' materials were surgical grade metals or well-established thermoplastics already being utilized in other multiple-use surgical instruments.

Following the formal testing described above, a smaller batch of representative models were subjected to over 50 cleaning and sterilization cycles to demonstrate the robust nature of the instrument's design. Similar inspection and testing was carried out on these devices, and, as expected, no indications of material degradation were
observed.

# FUNCTIONAL VERIFICATION AND VALIDATION

## Approach

Several compatibility and functional validations were conducted of the replacement chip for use with the da Vinci® S and da Vinci® Si Surgical Systems. Such validations included utilizing OEM instruments to characterize the timing and types of communications between the instrument and the host system. These same instruments were then repaired, and the replacement chip installed. The repaired instruments were then subjected to the same characterization on the same host systems to validate their equivalence. These validations showed equivalence in all instrument models and on both the S and Si Surgical Systems.

SIS095138

Functional testing included extensive formal protocols following regulatory expectations for medical device software testing (there is no software inside the instrument, but it interfaces to the software inside the robot itself via a simple data bus). Reputable third-party experts were utilized to ensure rigorous and independent validation.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

**EXHIBIT 20**

**to**

**PAUL D. BRACHMAN DECLARATION IN SUPPORT
OF DEFENDANT'S MOTION IN LIMINE NO. 1
TO EXCLUDE OUT-OF-COURT HOSPITAL
STATEMENTS**

| From: | Lindsey Otradovec [Lindsey.Otradovec@intusurg.com] |
|---|---|
| Sent: | 2/13/2019 10:44:57 AM |
| To: | Chace Rawls [Chace.Rawls@intusurg.com]; Ron Bair [Ron.Bair@intusurg.com] |
| CC: | Shelton Sykes [Shelton.Sykes@intusurg.com] |
| Subject: | FW: Si service and Instrument reprocessing |
| Attachments: | K182140.Letter.SE.FINAL_Sent001.pdf; K182140.IFU.FINAL_Sent001.pdf |

This tells me.. that they are being coached by restore robotics or whoever the company is – to say… "give me the proof you can't use the instruments more than x lives".
This is why regulatory needs to be in the room to talk through why there are a specific number of lives based on testing, patient safety, etc…

Thanks.  LO

**From:** Mario Lowe <Mario.Lowe@intusurg.com>
**Sent:** Wednesday, February 13, 2019 10:31 AM
**To:** Lindsey Otradovec <Lindsey.Otradovec@intusurg.com>; Mark Johnson <Mark.Johnson@intusurg.com>
**Cc:** Chace Rawls <Chace.Rawls@intusurg.com>; Katie Scoville <Katie.Scoville@intusurg.com>
**Subject:** RE: Si service and Instrument reprocessing

Hi Lindsey:

We can certainly provide the latest FDA 510(k) Clearance letters.  But this will not provide the information requested in Item 1 below.  See attached for an example of an Xi Clearance letter.

The request in item 1 - required limitation of the number of uses per Endo-Wrist Instrument

Can you provide more clarification on what the hospital is looking for?

Just so you know, FDA does not require nor limit the number of uses for our EW instruments.  During the 510(k) submission process, we provide data to FDA that supports the stated number of lives for a particular instrument that we state in our labeling.

Mario

Mario Lowe
Sr. Director, Regulatory Affairs

Mobile:  (408) 410-1480
Direct:   (408) 523-2314
Fax:      (408) 523-8907
Mario.Lowe@intusurg.com

INTUITIVE.

1020 Kifer Rd
Sunnyvale, CA 94086-5304 USA
Intuitive.com

**From:** Lindsey Otradovec <Lindsey.Otradovec@intusurg.com>
**Sent:** Wednesday, February 13, 2019 7:26 AM

Attorneys' Eyes Only                                                    Intuitive-00214231

**To:** Mark Johnson <Mark.Johnson@intusurg.com>; Mario Lowe <Mario.Lowe@intusurg.com>
**Cc:** Chace Rawls <Chace.Rawls@intusurg.com>; Katie Scoville <Katie.Scoville@intusurg.com>
**Subject:** FW: Si service and Instrument reprocessing

Mark and Mario,
Can you provide me with any of the documentation for #1 below.  The Baylor Health system is being very difficult as of
late and we are trying to secure a live meeting to discuss things further.  I assume you have a pdf file of the Xi and Si
certification letters that we can send to them?  Need your guidance here.
Any help you can provide would  be helpful.


Thank you.  Lindsey

---

**From:** Johnson, Tony <TONY.JOHNSON@BSWHEALTH.ORG>
**Sent:** Tuesday, February 12, 2019 2:03 PM
**To:** Chace Rawls <Chace.Rawls@intusurg.com>; Watson, Janet L <JANET.WATSON@BSWHEALTH.ORG>; Koreneff, Alan
<ALAN.KORENEFF@BSWHEALTH.ORG>
**Cc:** John Wagner <John.Wagner@intusurg.com>; Lindsey Otradovec <Lindsey.Otradovec@intusurg.com>; Shelton Sykes
<Shelton.Sykes@intusurg.com>
**Subject:** [EXTERNAL] RE: Si service and Instrument reprocessing

Chase,

We look forward to meeting again, however, we feel the meeting will not be productive until we receive the information
we have repeatedly requested from Intuitive.   Please provide the information below that we have been requesting and
we will be happy to meet:

**Information requested by BSWH:**
1.      Provide documentation of the latest FDA certifications for Xi and SI robots and proving the FDA granted the
510K based on a required limitation of the number of uses per Endo-Wrist Instrument.

2.      Provide documentation proving an FDA requirement to perform a preventative maintenance service to remove
the PM recommended notification light.

3.      Provide documented scope of what is included in a preventative maintenance service and what is specifically
excluded.  BSWH does not find any transparency in past and current contracts for Service that define what is included vs
excluded.

4.      Request for "Distributor Toolkit".  Informed by Jason Cooley, Field Service Senior Manager, that it is
"Unavailable", although we understand it is available in Europe.

5.      Need actual documents noted as "Documentation" in the Master Agreement terms and conditions to be
included with the Master Agreement.

6.      Provide data pertaining to BSWH cases including surgeon specific data, length of surgery, instruments used and
other technical factors to allow BSWH to assess outcomes, efficiencies, etc.

7.      Records of maintenance performed to date on all Si and Xi systems.  Records should include specific description
of preventative maintenance, corrective maintenance and/or any other maintenance performed on each unit including
dates of service.

Requests pertaining to Information Services Agreement:

Attorneys' Eyes Only                                                                                            Intuitive-00214232

8.    Provide documentation showing an express requirement by the FDA that the Si and Xi robots must be re-certified with a security, vulnerability or other software patch before the patch is made available to Intuitive's customers or applied in a production setting

9.    A copy of Intuitive's latest independent audit report – (i.e., with regarding to information security on controls within Vendor's organization concerning the privacy, confidentiality, security, processing integrity, and availability of the Products and Services made pursuant to standards established by an authorized or recognized standards setting organization (e.g., International Auditing and Assurance Standards Board; Statement on Standards for Attestation Engagements (SSAE) SOC 1 report;  SSAE SOC 2 report; ISO/IEC 27000 series) and prepared by a reputable independent auditing firm)

10.    A detailed description and screen capture showing the complete English-language translation of the binary data feed from the robots to Intuitive

Thanks in advance for your prompt response.

Tony W. Johnson
Senior Vice President and Chief Supply Chain Officer
Baylor Scott & White Health

Office: (214) 820-8336
Cell: (336) 409-6756

---

**From:** Chace Rawls [mailto:Chace.Rawls@intusurg.com]
**Sent:** Tuesday, February 12, 2019 11:31 AM
**To:** Johnson, Tony <TONY.JOHNSON@BSWHEALTH.ORG>; Watson, Janet L <JANET.WATSON@BSWHEALTH.ORG>; Koreneff, Alan <ALAN.KORENEFF@BSWHEALTH.ORG>
**Cc:** John Wagner <John.Wagner@intusurg.com>; Lindsey Otradovec <Lindsey.Otradovec@intusurg.com>; Shelton Sykes <Shelton.Sykes@intusurg.com>
**Subject:** {EXTERNAL} Re: Si service and Instrument reprocessing

All,

I just wanted to follow up and see if there is a time we could meet next week with our Service leadership as requested below.  We continue to have a lot of issues being bubbled up to our Field Service team, and I just want to ensure we are all aligned appropriately.  Let me know if there is a date/time that works for you all.

Thanks so much!

Chace Rawls
Director, Academic Key Accounts
South Central United States
*Intuitive Surgical, Inc*
Cell:  469-223-8350
E-mail:  Chace.Rawls@intusurg.com

On Feb 6, 2019, at 4:33 PM, Chace Rawls <Chace.Rawls@intusurg.com> wrote:

All,

I hope this e-mail finds you all doing well.

During our meeting on Jan 15th, where we discussed the service contracts, we agreed to have some follow up discussions around our role in servicing your Si's. Since that time, it has also been brought to our attention that there have been some decisions made around reprocessing the instruments and replacing the chips that limit instrument lives.

While we understand that there is a need to control cost as much as possible, there are also some risks that should be considered. This topic has also come up as we negotiate the Master Agreement as there is language in that agreement specific to instrument usage. Given the critical nature and potential risk implications in these scenarios, I wanted to see if we could schedule a meeting to bring our VP of Field Service to Baylor and talk through all of these issues together. At the end of the day, our goal is to ensure that all considerations are being factored into the decision and that BSWH isn't exposed to unforeseen risks.

John Wagner is our VP of Field Service, based out of California. He is available to come to Dallas between Feb 19-21. Let me know if there is a time on any of those days that you all would be available to meet, and I will coordinate on our end

Thanks so much!

Chace Rawls
Director, Academic Key Accounts
South Central United States
*Intuitive Surgical, Inc*
Cell: 469-223-835●
E-mail: Chace.Rawls@intusurg.com

The information contained in this e-mail may be privileged and/or confidential, and protected from disclosure, and no waiver of any attorney-client, work product, or other privilege is intended. If you are the intended recipient, further disclosures are prohibited without proper authorization. If you are not the intended recipient (or have received this e-mail in error) please notify the sender immediately and destroy this e-mail. Any unauthorized copying, disclosure or distribution of the material in this e-mail is strictly forbidden and possibly a violation of federal or state law and regulations. The sender and Baylor Scott & White Health, and its affiliated entities, hereby expressly reserve all privileges and confidentiality that might otherwise be waived as a result of an erroneous or misdirected e-mail transmission. No employee or agent is authorized to conclude any binding agreement on behalf of Baylor Scott & White Health, or any affiliated entity, by e-mail without express written confirmation by the CEO, the Senior Vice President of Supply Chain Services or other duly authorized representative of Baylor Scott & White Health.

NOTE THAT THIS EMAIL ORIGINATED FROM OUTSIDE OF INTUITIVE SURGICAL..
Be alert for fraudulent emails that spoof internal "@intusurg.com" email addresses. Report these or other security threats to: ITHelpNow@intusurg.com.

**EXHIBIT 21**

**to**

**PAUL D. BRACHMAN DECLARATION IN SUPPORT
OF DEFENDANT'S MOTION IN LIMINE NO. 1
TO EXCLUDE OUT-OF-COURT HOSPITAL
STATEMENTS**



Confidential

**EXHIBIT 22**

**to**

**PAUL D. BRACHMAN DECLARATION IN SUPPORT
OF DEFENDANT'S MOTION IN LIMINE NO. 1
TO EXCLUDE OUT-OF-COURT HOSPITAL
STATEMENTS**

| From: | Ralph Wadensweiler [Ralph.Wadensweiler@intusurg.com] |
|---|---|
| Sent: | 11/30/2018 3:12:14 PM |
| To: | Grant Duque [Grant.Duque@intusurg.com] |
| Subject: | FW: ISI Competition Slides |

fyi

---

**From:** Maximillian Reese
**Sent:** Friday, November 30, 2018 12:14 PM
**To:** Ralph Wadensweiler; Anne Narimatsu; Ed Yeh; Lewis Isbell; Chrissy Shuh
**Subject:** RE: ISI Competition Slides

Hi Ralph,

Very interesting, thanks for sharing the competition summary!

You can get a bit of insight on what Verb is doing by quickly going through their job listings. Here are some things that come up frequently:

-        "Build models which can describe scenes, actions and decisions critical to the surgical procedure."
-        "There comes a time in a commercial endeavor when you have to draw a line in order to get "Gen 1" to the market."
-        "Work closely with Hardware Engineering and external partners to provide feedback on the design by evaluating the robotic instruments."
-        "5+ years of proven record of SW development in one of the following areas: Robotics, Controls and Motion Planning, VR/AR, Physics Simulations, SLAM, Mapping and Localization or Sensor Fusion."
-        "Blending robotics, imaging systems, user interface / user experience requires a talented team of engineers with strong system integration experience."

From these it's pretty apparent they're doing something with VR/AR display system that has some kind of integrated machine learning to provide real-time data/advice to a surgeon. Also motion planning, SLAM, localization, mapping, and sensor fusion are all topics that are typically associated with autonomous robotics systems (like autonomous cars) so that would imply that they are developing non-teleoperated use modes. The mention of a "Gen 1" product implies that they have moved out of R&D and into a NPD/NPI phase for releasing a system. And finally the last bullet sounds like an overall description of their product which includes a lot of focus on user interface and experience so I wouldn't put it past them to release a phone app or something gimmicky as well.

Oh and just looking at who they're hiring, it's basically all software and controls people so I'm guessing Ethicon is the complete owner for all instrument hardware development. The last quote is pulled from Ethicon's job listings:
-        "Contribute to architecting and implementing Ethicon's vision for smart/connected operating rooms, including digital/robotic surgery, advanced surgical instruments employing smart/adaptive algorithms to improve patient outcomes, and a connected IoT infrastructure for data analytics and machine learning."

-Max

---

**From:** Ralph Wadensweiler
**Sent:** Friday, November 30, 2018 11:14 AM
**To:** Anne Narimatsu; Ed Yeh; Lewis Isbell; Maximillian Reese; Chrissy Shuh
**Subject:** ISI Competition Slides

Team,
If you have 18 minutes to spare, this presentation from Riccardo Autorino (Urologist) is very interesting.  Grant provided a link in his weekly meeting a few weeks back but here is the link again:

https://grandroundsinurology.com/robotic-surgical-systems-in-urology/

In the slide presentation video, he discusses robotic surgical systems for Urological procedures.  The section on the competition is interesting:

- Surgeons don't like the ISI monopoly
- Interesting MCS tip cover on a competitor MCS (may be similar to something Ed is considering)
- Amazingly similar systems and even instruments (a bipolar instrument looked like our older Ultem covered bipolar instruments)
- I didn't see anything too threatening yet but he didn't have information on Verb's system.

-Ralph

Attorneys' Eyes Only                                                                                              Intuitive-00029347

**EXHIBIT 23**

**to**

**PAUL D. BRACHMAN DECLARATION IN SUPPORT
OF DEFENDANT'S MOTION IN LIMINE NO. 1
TO EXCLUDE OUT-OF-COURT HOSPITAL
STATEMENTS**

| | |
|---|---|
| **From:** | Matt Heick [Matt.Heick@intusurg.com] |
| **Sent:** | 9/14/2019 9:14:22 AM |
| **To:** | AJ Inacay [aj.inacay@intusurg.com] |
| **CC:** | Woody Groves [Woody.Groves@intusurg.com]; Jennifer Scott [Jennifer.scott@intusurg.com] |
| **Subject:** | FW: [EXTERNAL] FW: da Vinci EndoWrist Savings Opportunity (MS4788 - Surgical Instrument Repair) |

AJ,

Can you provide my team with assistance on dealing with SIS.  They are attempting to reprocess instruments at UF Shands.

Thank you,

Matt Heick
Clinical Sales Director
GA-SC-North FL

Direct: 678.938.0102
Matt.heick@intusurg.com

Intuitive Surgical
5655 Spalding Drive
Peachtree Corners, GA 30092

INTUITIVE™

**From:** Woody Groves <Woody.Groves@intusurg.com>
**Sent:** Friday, September 13, 2019 6:09 PM
**To:** Matt Heick <Matt.Heick@intusurg.com>
**Subject:** Re: [EXTERNAL] FW: da Vinci EndoWrist Savings Opportunity (MS4788 - Surgical Instrument Repair)

Thanks Matt.  Who do I need to talk to? I'm on vacation next week.

Sent from my iPhone
Woody Groves

On Sep 13, 2019, at 5:46 PM, Matt Heick <Matt.Heick@intusurg.com> wrote:

Woody,

Thanks for brining to my attention.  We have a formal internal process for these situations.  Let me know if you have further issues after connecting with our internal folks or if you see this surface in other accounts.

This would void their current warranty and creates patient safety issues.   Happy to discuss next week upon my return from vacation...

Matt Heick
Clinical Sales Director
GA-SC-North FL

Direct: 678.938.0102
Matt.heick@intusurg.com

Intuitive Surgical
5655 Spalding Drive

Intuitive-00110252

Peachtree Corners, GA 30092

<image003.jpg>

---

**From:** Woody Groves <Woody.Groves@intusurg.com>
**Sent:** Friday, September 13, 2019 8:04 AM
**To:** Anna Samples <Anna.Samples@intusurg.com>; Jennifer Scott <Jennifer.scott@intusurg.com>; Matt Heick <Matt.Heick@intusurg.com>
**Subject:** Fwd: [EXTERNAL] FW: da Vinci EndoWrist Savings Opportunity (MS4788 - Surgical Instrument Repair)

FYI.   I'm researching our answer and response now.

Sent from my iPhone
Woody Groves

Begin forwarded message:

**From:** "Watkins, Dawn E." <WATKID@shands.ufl.edu>
**Date:** September 12, 2019 at 6:25:19 PM EDT
**To:** Woody Groves <Woody.Groves@intusurg.com>
**Cc:** "Wigglesworth, Susan J." <wiggsj@shands.ufl.edu>
**Subject:** [EXTERNAL] FW: da Vinci EndoWrist Savings Opportunity (MS4788 - Surgical Instrument Repair)

Hi Woody,

Who needs a sales force when you're on a GPO contract?  ☺

Can you help us confirm if the use of a refurbished EndoWrist would have a negative impact on our warranty?

A quick response would be great.  At this rate, we'll be asked again by Monday.

Best regards,
Dawn

Dawn Watkins, MBA, CMRP
Director of Strategic Sourcing
UF Health Shands
watkid@shands.ufl.edu
Cell: 352-246-2500

---

**From:** Cassidy,Manuela <manuela.cassidy@vizientinc.com>
**Sent:** Thursday, September 12, 2019 4:37 PM
**To:** Carroll-Mazeli, Andy <Andy.Carroll-Mazeli@jax.ufl.edu>; Wigglesworth, Susan J. <wiggsj@shands.ufl.edu>
**Cc:** Alltop, Shirley <alltos@shands.ufl.edu>; Watkins, Dawn E. <WATKID@shands.ufl.edu>; Mele, Christopher <Christopher.Mele@jax.ufl.edu>; Story,Vicky <Vicky.Story@vizientinc.com>; Price,John <john.price@vizientinc.com>
**Subject:** RE: da Vinci EndoWrist Savings Opportunity (MS4788 - Surgical Instrument Repair)

**CAUTION! This email came from outside UF or UF Health. Exercise extra caution clicking links and opening attachments from any and all senders.**

---

                                                                Intuitive-00110253

Hi Andy and Susan,

Julie Birdsong, Implementation Services, Senior Director would like to know if you have any interest in setting-up a call with SIS to learn more about his category?  She is looking at setting-up a time for next week. Can you please provide me your feedback?

Many thanks,
Manuela

---

**From:** Cassidy,Manuela
**Sent:** Monday, September 9, 2019 3:47 PM
**To:** 'Carroll-Mazeli, Andy' <Andy.Carroll-Mazeli@jax.ufl.edu>; Wigglesworth, Susan J. <wiggsj@shands.ufl.edu>
**Cc:** 'Alltop, Shirley' <alltos@shands.ufl.edu>; 'Watkins, Dawn E.' <WATKID@shands.ufl.edu>; Mele, Christopher <Christopher.Mele@jax.ufl.edu>; Story,Vicky <Vicky.Story@vizientinc.com>; Price,John <john.price@vizientinc.com>
**Subject:** da Vinci EndoWrist Savings Opportunity (MS4788 - Surgical Instrument Repair)

Andy and Susan,

Two of our members, Kaiser Permanente and Legacy Health System are capturing savings by using Intuitive Surgical Endowrist refurbishment products. Surgical Instrument Service Company (SIS) is now the only supplier providing refurbishment to Intuitive Surgical's da Vinci EndoWrist. SIS offers a refurbished da Vinci EndoWrist at approximately 40% savings.

Since Intuitive Surgical is an off contract vendor, there's incremental GPO volume associated with moving that spend to SIS for refurbishment in addition to over 40% on line item savings.

Please see attached initial proposed savings. Please let me know if I can schedule an onsite presentation to learn more about this category and clarify additional questions.

Thanks,

Manuela Cassidy, MBA
Enterprise Client Manager
M (904) 608-7831
manuela.cassidy@vizientinc.com

---

E-MAIL CONFIDENTIALITY NOTICE: The information transmitted in this e-mail and in any replies and forwards are for the sole use of the above individual(s) or entities and may contain proprietary, privileged and/or highly confidential information. Any unauthorized dissemination, review, distribution or copying of these communications is strictly prohibited. If this e-mail has been transmitted to you in error, please notify and return the original message to the sender immediately at the above listed address. Thank you for your cooperation.

---

NOTE THAT THIS EMAIL ORIGINATED FROM OUTSIDE OF INTUITIVE SURGICAL..
Be alert for fraudulent emails that spoof internal "@intusurg.com" email addresses. Report these or other security threats to: ITHelpNow@intusurg.com.

**EXHIBIT 24**

**to**

**PAUL D. BRACHMAN DECLARATION IN SUPPORT
OF DEFENDANT'S MOTION IN LIMINE NO. 1
TO EXCLUDE OUT-OF-COURT HOSPITAL
STATEMENTS**



Attorneys' Eyes Only



Attorneys' Eyes Only



Attorneys' Eyes Only

**EXHIBIT 25**

**to**

**PAUL D. BRACHMAN DECLARATION IN SUPPORT
OF DEFENDANT'S MOTION IN LIMINE NO. 1
TO EXCLUDE OUT-OF-COURT HOSPITAL
STATEMENTS**

# ::: Wellstar

*"As a final note, the capital and carrying costs are still extremely high for Intuitive Surgical products. This has been tolerated (and I do not use the term lightly) in a monopoly marketplace.  Demonstration of value at the hospital level under our current circumstances is challenging. Although the business principles of margins and return to investors is "standard in the industry", as I described to you, the current business model of medical technology companies is unsustainable on a global scale. Our rising surgical supply costs are incompatible with the value delivered or return obtained. Competition in your space will have some effect on your business, and I urge you to stay ahead of the curve. There may be some pent up emotional backlash reflected in future sales when competition appears. "*

- Dr. William Mayfield – Chief of Surgery, Wellstar – November 2016

INTUITIVE

Intuitive-00141567


# Wellstar



1. Small eight hospital IDN with local champion surgeons and executives; challenges with senior management

2. Multiple alignment meetings; willingness to share data

3. Key relationship established between Greg/Jonathan and Dr. Mayfield



4. Sylvia presented their data ?

5. Agreed to attend VIP

6. Much more aligned customer; xx systems; xx procedure growth; xx surgeons trained; open communication with Dr. Mayfield



INTUITIVE

Intuitive-00141568

**EXHIBIT 26**

**to**

**PAUL D. BRACHMAN DECLARATION IN SUPPORT
OF DEFENDANT'S MOTION IN LIMINE NO. 1
TO EXCLUDE OUT-OF-COURT HOSPITAL
STATEMENTS**

| From: | Lindsey Otradovec [Lindsey.Otradovec@intusurg.com] |
|---|---|
| Sent: | 2/13/2019 10:44:57 AM |
| To: | Chace Rawls [Chace.Rawls@intusurg.com]; Ron Bair [Ron.Bair@intusurg.com] |
| CC: | Shelton Sykes [Shelton.Sykes@intusurg.com] |
| Subject: | FW: Si service and Instrument reprocessing |
| Attachments: | K182140.Letter.SE.FINAL_Sent001.pdf; K182140.IFU.FINAL_Sent001.pdf |

This tells me.. that they are being coached by restore robotics or whoever the company is – to say… "give me the proof you can't use the instruments more than x lives".
This is why regulatory needs to be in the room to talk through why there are a specific number of lives based on testing, patient safety, etc…

Thanks.  LO

**From:** Mario Lowe <Mario.Lowe@intusurg.com>
**Sent:** Wednesday, February 13, 2019 10:31 AM
**To:** Lindsey Otradovec <Lindsey.Otradovec@intusurg.com>; Mark Johnson <Mark.Johnson@intusurg.com>
**Cc:** Chace Rawls <Chace.Rawls@intusurg.com>; Katie Scoville <Katie.Scoville@intusurg.com>
**Subject:** RE: Si service and Instrument reprocessing

Hi Lindsey:

We can certainly provide the latest FDA 510(k) Clearance letters.  But this will not provide the information requested in Item 1 below.  See attached for an example of an Xi Clearance letter.

The request in item 1 - required limitation of the number of uses per Endo-Wrist Instrument

Can you provide more clarification on what the hospital is looking for?

Just so you know, FDA does not require nor limit the number of uses for our EW instruments.  During the 510(k) submission process, we provide data to FDA that supports the stated number of lives for a particular instrument that we state in our labeling.

Mario

Mario Lowe
Sr. Director, Regulatory Affairs

Mobile:   (408) 410-1480
Direct:    (408) 523-2314
Fax:        (408) 523-8907
Mario.Lowe@intusurg.com

INTUITIVE™

1020 Kifer Rd
Sunnyvale, CA 94086-5304 USA
Intuitive.com

**From:** Lindsey Otradovec <Lindsey.Otradovec@intusurg.com>
**Sent:** Wednesday, February 13, 2019 7:26 AM

Attorneys' Eyes Only

Intuitive-00214231

**To:** Mark Johnson <Mark.Johnson@intusurg.com>; Mario Lowe <Mario.Lowe@intusurg.com>
**Cc:** Chace Rawls <Chace.Rawls@intusurg.com>; Katie Scoville <Katie.Scoville@intusurg.com>
**Subject:** FW: Si service and Instrument reprocessing

Mark and Mario,
Can you provide me with any of the documentation for #1 below. The Baylor Health system is being very difficult as of late and we are trying to secure a live meeting to discuss things further. I assume you have a pdf file of the Xi and Si certification letters that we can send to them? Need your guidance here.
Any help you can provide would be helpful.


Thank you. Lindsey

---

**From:** Johnson, Tony <TONY.JOHNSON@BSWHEALTH.ORG>
**Sent:** Tuesday, February 12, 2019 2:03 PM
**To:** Chace Rawls <Chace.Rawls@intusurg.com>; Watson, Janet L <JANET.WATSON@BSWHEALTH.ORG>; Koreneff, Alan <ALAN.KORENEFF@BSWHEALTH.ORG>
**Cc:** John Wagner <John.Wagner@intusurg.com>; Lindsey Otradovec <Lindsey.Otradovec@intusurg.com>; Shelton Sykes <Shelton.Sykes@intusurg.com>
**Subject:** [EXTERNAL] RE: Si service and Instrument reprocessing

Chase,

We look forward to meeting again, however, we feel the meeting will not be productive until we receive the information we have repeatedly requested from Intuitive. Please provide the information below that we have been requesting and we will be happy to meet:

**Information requested by BSWH:**

1.      Provide documentation of the latest FDA certifications for Xi and SI robots and proving the FDA granted the 510K based on a required limitation of the number of uses per Endo-Wrist Instrument.

2.      Provide documentation proving an FDA requirement to perform a preventative maintenance service to remove the PM recommended notification light.

3.      Provide documented scope of what is included in a preventative maintenance service and what is specifically excluded. BSWH does not find any transparency in past and current contracts for Service that define what is included vs excluded.

4.      Request for "Distributor Toolkit". Informed by Jason Cooley, Field Service Senior Manager, that it is "Unavailable", although we understand it is available in Europe.

5.      Need actual documents noted as "Documentation" in the Master Agreement terms and conditions to be included with the Master Agreement.

6.      Provide data pertaining to BSWH cases including surgeon specific data, length of surgery, instruments used and other technical factors to allow BSWH to assess outcomes, efficiencies, etc.

7.      Records of maintenance performed to date on all Si and Xi systems. Records should include specific description of preventative maintenance, corrective maintenance and/or any other maintenance performed on each unit including dates of service.

Requests pertaining to Information Services Agreement:

Attorneys' Eyes Only

8.     Provide documentation showing an express requirement by the FDA that the Si and Xi robots must be re-certified with a security, vulnerability or other software patch before the patch is made available to Intuitive's customers or applied in a production setting

9.     A copy of Intuitive's latest independent audit report – (i.e., with regarding to information security on controls within Vendor's organization concerning the privacy, confidentiality, security, processing integrity, and availability of the Products and Services made pursuant to standards established by an authorized or recognized standards setting organization (e.g., International Auditing and Assurance Standards Board; Statement on Standards for Attestation Engagements (SSAE) SOC 1 report;  SSAE SOC 2 report; ISO/IEC 27000 series) and prepared by a reputable independent auditing firm)

10.     A detailed description and screen capture showing the complete English-language translation of the binary data feed from the robots to Intuitive

Thanks in advance for your prompt response.

Tony W. Johnson
Senior Vice President and Chief Supply Chain Officer
Baylor Scott & White Health

Office: (214) 820-8336
Cell: (336) 409-6756

---

**From:** Chace Rawls [mailto:Chace.Rawls@intusurg.com]
**Sent:** Tuesday, February 12, 2019 11:31 AM
**To:** Johnson, Tony <TONY.JOHNSON@BSWHEALTH.ORG>; Watson, Janet L <JANET.WATSON@BSWHEALTH.ORG>; Koreneff, Alan <ALAN.KORENEFF@BSWHEALTH.ORG>
**Cc:** John Wagner <John.Wagner@intusurg.com>; Lindsey Otradovec <Lindsey.Otradovec@intusurg.com>; Shelton Sykes <Shelton.Sykes@intusurg.com>
**Subject:** {EXTERNAL} Re: Si service and Instrument reprocessing

All,

I just wanted to follow up and see if there is a time we could meet next week with our Service leadership as requested below.  We continue to have a lot of issues being bubbled up to our Field Service team, and I just want to ensure we are all aligned appropriately.  Let me know if there is a date/time that works for you all.

Thanks so much!

Chace Rawls
Director, Academic Key Accounts
South Central United States
*Intuitive Surgical, Inc*
Cell:  469-223-8350
E-mail:  Chace.Rawls@intusurg.com

On Feb 6, 2019, at 4:33 PM, Chace Rawls <Chace.Rawls@intusurg.com> wrote:

All,

Attorneys' Eyes Only                                                                                              Intuitive-00214233

I hope this e-mail finds you all doing well.

During our meeting on Jan 15th, where we discussed the service contracts, we agreed to have some follow up discussions around our role in servicing your Si's. Since that time, it has also been brought to our attention that there have been some decisions made around reprocessing the instruments and replacing the chips that limit instrument lives.

While we understand that there is a need to control cost as much as possible, there are also some risks that should be considered. This topic has also come up as we negotiate the Master Agreement as there is language in that agreement specific to instrument usage. Given the critical nature and potential risk implications in these scenarios, I wanted to see if we could schedule a meeting to bring our VP of Field Service to Baylor and talk through all of these issues together. At the end of the day, our goal is to ensure that all considerations are being factored into the decision and that BSWH isn't exposed to unforeseen risks.

John Wagner is our VP of Field Service, based out of California. He is available to come to Dallas between Feb 19-21. Let me know if there is a time on any of those days that you all would be available to meet, and I will coordinate on our end

Thanks so much!

Chace Rawls
Director, Academic Key Accounts
South Central United States
*Intuitive Surgical, Inc*
Cell: 469-223-8350
E-mail: Chace.Rawls@intusurg.com

The information contained in this e-mail may be privileged and/or confidential, and protected from disclosure, and no waiver of any attorney-client, work product, or other privilege is intended. If you are the intended recipient, further disclosures are prohibited without proper authorization. If you are not the intended recipient (or have received this e-mail in error) please notify the sender immediately and destroy this e-mail. Any unauthorized copying, disclosure or distribution of the material in this e-mail is strictly forbidden and possibly a violation of federal or state law and regulations. The sender and Baylor Scott & White Health, and its affiliated entities, hereby expressly reserve all privileges and confidentiality that might otherwise be waived as a result of an erroneous or misdirected e-mail transmission. No employee or agent is authorized to conclude any binding agreement on behalf of Baylor Scott & White Health, or any affiliated entity, by e-mail without express written confirmation by the CEO, the Senior Vice President of Supply Chain Services or other duly authorized representative of Baylor Scott & White Health.

NOTE THAT THIS EMAIL ORIGINATED FROM OUTSIDE OF INTUITIVE SURGICAL..
Be alert for fraudulent emails that spoof internal "@intusurg.com" email addresses. Report these or other security threats to: ITHelpNow@intusurg.com.

**EXHIBIT 27**

**to**

**PAUL D. BRACHMAN DECLARATION IN SUPPORT
OF DEFENDANT'S MOTION IN LIMINE NO. 1
TO EXCLUDE OUT-OF-COURT HOSPITAL
STATEMENTS**

For the exclusive use of CALVIN DARLING at INTUITIVE SURGICAL INC on 08-Sep-2019

 **BERNSTEIN**

6 September 2019

**U.S. Medical Devices**

**Intuitive Surgical Inc**

Rating
**Outperform**

Target Price

ISRG                635.00 USD

**Lee Hambright**
+1-212-823-3557
lee.hambright@bernstein.com

**John Rogers**
+1-212-756-4333
john.rogers@bernstein.com

# Intuitive Surgical: What do experts think about J&J's new surgical robot?

Medtronic and J&J have been pouring resources into their surgical robotics programs and are now within 1-2 years from market entry. We recently published a review of MDT's soft-tissue surgical robot (see link), which will be unveiled at an analyst day on September 24th.

Today, we perform a similar review on Verb Surgical, the joint venture between JNJ and Alphabet. JNJ has committed to commercialization of a general surgery robot in 2020.

In this note, we take the opportunity to (1) review robot-related commentary from JNJ management in recent years, (2) summarize of our conversations with robotics experts (surgeons, hospital administrators, engineers) who have first-hand experience with JNJ's robot, and (3) provide our key takeaways as JNJ prepares to launch the robot next year.

### Investment Implications

**We rate ISRG Outperform with a target price of $635.** Penetration of the addressable market for robotic surgery is very low, and we forecast robust growth. Competition is beginning to enter, but Intuitive has built a strong moat over the last 20 years. We see multiple catalysts that can drive the stock in 2019, including new systems (SP and Ion), high-growth geographies (Japan and China), and new technologies (augmented reality and informatics). For more on why Intuitive Surgical is one of our top picks, see our recent "best ideas" presentation, our valuation deep-dives (Part 1 and Part 2), and our 2Q19 recap. Model: ISRG

**We rate JNJ Market-Perform with a target price of $148.** We continue to warm up to JNJ. Our neutral rating balances our bullish view on the Pharma business with our cautious view on Devices and more negative view of Consumer. In spite of ongoing litigation concerns, we believe JNJ can be a dependable safe haven during periods of market turbulence. For more on JNJ, see our recent thesis review, our SDC takeaways note, and our 2Q19 recap. Model: JNJ

| | |
|---|---|
| Close Date | 5-Sep-2019 |
| ISRG Close Price (USD) | 508.17 |
| Target Price (USD) | 635.00 |
| Upside/(Downside) | 25% |
| 52-Week Low | 430.24 |
| 52-Week High | 589.32 |
| SPX | 2,976.00 |
| FYE | Dec |
| Indicated Div Yield | NA |
| Market Cap (USD) (M) | 58,568 |
| EV (USD) (M) | 55,939 |

| Performance | YTD | 1M | 6M | 12M |
|---|---|---|---|---|
| Absolute (%) | 6.1 | 3.4 | (7.0) | (5.3) |
| SPX (%) | 18.7 | 4.6 | 6.7 | 3.0 |
| Relative (%) | (12.6) | (1.2) | (13.7) | (8.3) |

 Analyst Page       Financials

Bernstein Events      Company Page

| EPS Reported | F18A | F19E | F20E |
|---|---|---|---|
| ISRG (USD) | 10.99 | 12.23 | 14.39 |
| SPX | 159.61 | 162.91 | 179.71 |

| Financials | F18A | F19E | F20E | CAGR |
|---|---|---|---|---|
| Operating Earnings (M) | 1,537 | 1,691 | 1,985 | 13.6% |
| Net Earnings (M) | 1,305 | 1,464 | 1,742 | 15.5% |
| Adj. Op. Margin (%) | 41.28 | 38.56 | 38.86 | |
| ROIC (%) | 19.54 | 16.39 | 15.80 | |
| Organic Sales Grwth (%) | 18.67 | 17.75 | 16.49 | |

| Valuation Metrics | F18A | F19E | F20E |
|---|---|---|---|
| P/E Reported (x) | 46.26 | 41.56 | 35.32 |
| P/E Adjusted (x) | | | |
| PEG Adjusted (x) | | | |
| EV/EBITDA (x) | 33.99 | 30.40 | 25.99 |
| Div Yield (%) | 0.00 | 0.00 | 0.00 |

See Disclosure Appendix of this report for important disclosures and analyst certifications

Published 06-Sep-2019 06:58 UTC

Confidential

Intuitive-00278203

For the exclusive use of CALVIN DARLING at INTUITIVE SURGICAL INC on 08-Sep-2019

Lee Hambright  +1-212-823-3557  lee.hambright@bernstein.com                                      6 September 2019

## DETAILS

We recently published a review of Medtronic's soft-tissue surgical robot, which will be unveiled at an analyst day on Sept 24th. We thought it would be valuable to perform a similar exercise for the general surgery robot from Verb Surgical, the joint venture between JNJ and Alphabet Inc's Verily Life Sciences. JNJ management has committed to commercialization in 2020.

Mirroring our note on the MDT robot, this note includes the following three pieces:

+ Synthesis of robot-related **commentary from JNJ management** over the past few years, including insights regarding tech/features, target procedure sets, potential commercial strategy, etc.

+ Summary of our recent **conversations with key opinion leaders** who have first-hand experience operating with JNJ's robot

+ Our **key takeaways** as JNJ prepares to launch the robot in some capacity next year

### Summary views

Our ongoing discussions with key opinion leaders continue to validate the notion that customers are eager for competition in surgical robotics. Surgeons and hospital administrators agree that competition will be a good thing for the market. But merely coming to market won't be enough; to make a difference, we believe the competition needs to be compelling. Surgeons do not like to change if they can avoid it, and they have invested a lot of time and effort in building skills on da Vinci.

Ultimately, we expect both MDT's and JNJ's entry into surgical robotics will be market-expanding. We believe this is a highly attractive market with room for a few players. With that said, we do expect to see market segmentation based largely on cost and procedural complexity. Our research suggests MDT's robot may have some material shortcomings relative to ISRG's da Vinci platform, indicating that MDT may carve out a niche specializing in more cost-sensitive hospitals/geographies and in relatively simple (i.e., inexpensive) procedures. On the other hand, KOLs are generally impressed with JNJ/Verb's prototype, which many users believe comes closer to equal footing with da Vinci.

Recall that MDT has made a number of design trade-offs with its robot in an effort to prioritize (1) reducing cost as a barrier to robotics adoption (by achieving cost parody with laparoscopy), and (2) getting to market before the Verb rollout (by incorporating a number of off-the-shelf components into the robot's design). Meanwhile, JNJ has taken a different approach. Commentary from management makes it clear that the company's value proposition in robotics will be part of a broader "digital surgery" platform—which refers to the integration of surgical robotics, supporting software, and a smart/interconnected operating room. JNJ plans to "dramatically revolutionize surgery" by leveraging Alphabet's expertise in big data and AI to make surgery more predictable and more replicable—thereby improving patient outcomes. Meanwhile, many of the secondary and tertiary aspects of JNJ's strategy are similar to what we've heard from MDT, including: increased affordability, differentiated end effectors, a smaller footprint in the OR, etc.

It's easy—and understandable—to get caught up in all ways that MDT and JNJ could potentially leverage their late-mover advantage to target Intuitive where the company is most vulnerable. But it's important to remember that ISRG is not standing still. Management has been preparing for competitive entry for years, so we anticipate the company has formulated competitive responses. We have seen some of these materialize already (e.g., shift to operating leases and usage-based arrangements), and we expect Intuitive has a few more tricks up their sleeves (e.g., augmented reality, machine learning, maybe a new low-cost system?).

We believe that Intuitive has built strong barriers to entry during the 20 years of market leadership in robotic surgery. That said, we are intrigued by JNJ's digital surgery strategy. And Auris brings a strong set of assets to JNJ's program. JNJ management has repeatedly indicated that being "right" is more important than being "fast" in this case, and we expect management to take their time developing a differentiated robotic surgery platform. We see upside to JNJ numbers once more is known about the company's digital surgery platform.

Whatever happens, we continue to have conviction that it will take multiple years for a legitimate competitive threat to ISRG to materialize. Initiating a limited commercial rollout is just the first step for MDT and JNJ, and many investors underestimate the time required to build out procedures, gather evidence, gain international approvals, train surgeons, etc. Intuitive has built a formidable competitive moat over the last two decades, and we expect the company to maintain its leadership position in the robotic surgery market for the foreseeable future.

Confidential                                                                                                      Intuitive-00278204

For the exclusive use of CALVIN DARLING at INTUITIVE SURGICAL INC on 08-Sep-2019

Lee Hambright   +1-212-823-3557   lee.hambright@bernstein.com                                          6 September 2019

## SYNTHESIS OF JNJ MANAGEMENT COMMENTARY

### ROBOTICS TIMELINE: FROM DISMISSAL AND SKEPTICISM TO STRATEGIC PRIORITIZATION

Surgery is the largest business within JNJ's Medical Devices segment, accounting for 37% of device sales (and 12% of overall corporate sales) in 2018. Like MDT Covidien, JNJ Ethicon is a market leader in traditional open and laparoscopic (i.e., non-robotic) surgery. For both companies, entry into the soft-tissue robotics market will entail heavy cannibalization of existing procedure volumes. It therefore comes as little surprise that both have been late to the party. Over time, however, the messaging from both companies around surgical robotics has evolved from dismissal and skepticism, to limited acceptance, to what today can be safely described as strategic prioritization.

During the early days of Intuitive's rise, JNJ (like MDT) largely dismissed the mainstream potential of robotics in general surgery. But after watching ISRG steadily take share from open surgery and laparoscopy for the better part of two decades, both companies eventually threw in the towel. They are now racing to catch up.

While MDT and JNJ dithered, ISRG rolled out four generations of the da Vinci platform—and the company continues to drive innovation in the field and extend its lead with new instruments (e.g., stapling), robotic systems (e.g., SP, Ion), and enabling technologies (e.g., Iris augmented reality technology).

JNJ management first began to acknowledge the potential viability of robotics in general surgery in the early 2010s (Exhibit 1).

EXHIBIT 1:  **JNJ management hinted at a potential interest in robotic surgery as far back as 2010**

+ *"Certainly, there are lot of new [surgical] modalities out in the marketplace today, a lot of them are very early… [including the] next generation [of] minimally invasive surgery… We're excited by all the innovation that's being done in that area, because I think it helps to grow the market faster…" – K. Licitra 6/3/10*

+ *"Our focus is to really invest across the broad spectrum of the possible solutions [in minimally invasive surgery]… We continue to look at all the different modalities that are out there and different technologies that are out there. I'm not going to get into specific detail today in terms of exactly what we're investing in, but we're certainly well aware of all of the different ones out there, and whether or not they might have a play in our portfolio in the future." – K. Licitra 6/3/10*

Source: JNJ 2010 Investor Day

As of 3Q 2012, management was emphasizing the strategic importance of (1) cost, (2) end effector technology, and (3) external partnerships (Exhibit 2).

EXHIBIT 2:  **Initially, management emphasized the importance of cost, end effector technology, and external partnerships**

+ *"So, our approach [to robotics] is a three-pronged approach. So, first… there is a natural balance around where a laparoscopic versus robotics fits in… [Robotics] enables [surgeons] to do more procedures that may not have as strong laparoscopic skills, but at the same time there is more data coming out to say where is it cost effective and where is it not cost effective?... Two is what we call our… end effectors strategy, which is, if you think about the devices that are actually doing the tissue effect, so whether it's an energy device that's doing cutting and sealing, a stapling device, or a suturing device, we feel that we can do that better than the competition… And then third is we're looking at let's explore opportunities and partnerships in robotics, because we do think that there may be some opportunities for disruptive plays." – G. Pruden 9/10/12*

Source: 2012 Morgan Stanley HC Conference

After a few years of internal development and limited robotics-related news flow, JNJ announced the formation of Verb Surgical Inc. in collaboration with Alphabet Inc's Verily Life Sciences in December 2015. The announcement was a major step for JNJ, and it put an exclamation mark on the "partnerships" prong of the company's strategy in surgical robotics. It was also a strong signal to the market that management was finally serious about prioritizing the robotics program and competing with Intuitive.

Confidential                                                                                    Intuitive-00278205

For the exclusive use of CALVIN DARLING at INTUITIVE SURGICAL INC on 08-Sep-2019

Lee Hambright   +1-212-823-3557   lee.hambright@bernstein.com                                      6 September 2019

**EXHIBIT 3: The formation of Verb (in collaboration with Alphabet Inc's Verily Life Sciences) gives JNJ access to world-class data analytics capabilities**

+ *"Johnson & Johnson today announced that Ethicon, a medical device company in the Johnson & Johnson family of companies, has executed a definitive agreement to enter into a strategic collaboration with Google, Inc., working with the Life Sciences team on advancing surgical robotics to benefit surgeons, patients and health care systems… The companies seek to develop new robotic tools and capabilities for surgeons and operating room professionals that integrate best-in-class medical device technology with leading-edge robotic systems, imaging and data analytics." – JNJ press release 3/26/15*

+ *"[Our collaboration with Google] is a continuation of what we discussed at the MD&D Business Review Day a year ago… And I think that's going to provide us some acceleration to the plans we were already anticipating… We would expect this collaboration would take I would say several years for us to come to market with the new type of robotic surgery that we think will dramatically revolutionize surgery. So, I think it'll take some time to do that. But we're accelerating our efforts there, and I'd say it's a couple of years away." – D. Caruso 4/14/15*

Source: JNJ press release archives, JNJ 1Q15 Earnings Call

After the Verb announcement in 2015, JNJ management initially guided to being "a couple of years away" from launch (see Exhibit 4).

**EXHIBIT 4: After the formation of Verb in 2015, JNJ initially guided to launching the robot in 2017-2018…**

+ *"We see [the general surgery robotics platform] as really not something to have an impact, where I would say over the next six months to 12 months. This is likely more over a two- to three-year-plus timeframe." – A. Gorsky 7/14/15*

+ *"In terms of the development stage, yes, we're in the phase where we are integrating… our technology with the Google technology… from a systems-engineering perspective, and integrating informatics into the design of our robot. So, we're looking, I would say…on the earlier side of [a 1-5 year] range… I would say it's the next couple years. We'd obviously like to accelerate that, but we want to make sure that we stay true to our value proposition." – G. Pruden 10/13/15*

+ *"[The robot is] in research and development, there's prototypes developed. I would say it's a couple years away from actually hitting the market." – D. Caruso 2/23/16*

+ *"With the transition from concept development to product development with the creation of Verb, we're in full swing in terms of product development. We're scaling up in terms of capabilities in hiring… We have an important milestone at the end of the year, when we transition from concept development to full product development…And at the end of the year, our critical milestone is to put the system together that feels like, looks like, works like a prototype." – M. del Prado 5/18/16*

+ *"We still hope to be the second robotics player in the marketplace. But more importantly [our focus is on] really transforming the offering. There's not only the extension of the human hands, which is what we have today. But how do we transform the marketplace to add data analytics to add decision-making tools, to be able to make the surgeries more democratized, more reproducible, and better outcomes?" – M. del Prado 5/18/16*

+ *"Verb Surgical Inc. announced today that the company has demonstrated its first digital surgery prototype… The digital surgery platform included all elements of the company's five technology pillars: robotics, visualization, advanced instrumentation, data analytics, and connectivity – developed by Verb and its collaboration partners." – Verb Surgical press release 1/26/17*

Source: JNJ 2Q15 Earnings Call, JNJ 3Q15 Earnings Call, 2016 RBC Healthcare Conference JNJ 2016 Investor Day, Verb Surgical press release archives

However, in 2017 JNJ's launch guidance was revised to 2020, and since then, management has been generally consistent in targeting an initial rollout at some point in 2020 (see Exhibit 5).

Confidential                                                                                      Intuitive-00278206

For the exclusive use of CALVIN DARLING at INTUITIVE SURGICAL INC on 08-Sep-2019

Lee Hambright   +1-212-823-3557   lee.hambright@bernstein.com                                              6 September 2019

EXHIBIT 5:  **...but in 2017, JNJ's launch guidance was revised to 2020**

+ *"[The general surgery robot] probably won't be in your model until 2020, to be honest with you, because the reality is that – that particular deployment, but we're going to be doing that work with and we will have systems deployed in hospitals before then, but it won't move the needle [until 2020]." – S. Peterson 6/15/17*

+ *"The working prototype was already available at the end of last year. And in fact, I know Alex [Gorksy] actually tried it out. So, we're not behind there, we're actually on track with that working prototype." – D. Caruso 7/18/17*

+ *"Capitalizing on the unique strengths of Johnson & Johnson, of Alphabet and Verb, we are designing a best-in-class differentiated at launch and we are on track to be in market by 2020." – M. del Prado 5/16/18*

+ *"2020 is, we're going to be in market, in major market globally… We're now in conversations with both the FDA and the notifying bodies of Europe… We're also engaging the regulatory authorities of the major markets in Asia. So, we now understand 'what will it take from a clinical perspective, regulatory perspective to get there' and we will be in one of those markets by 2020." – M. del Prado 5/16/18*

Source: 2017 Goldman Sachs Healthcare Conference, JNJ 2Q17 Earnings Call, JNJ 2018 Investor Day

Over the last year, JNJ management has been clear that the company is playing the "long game" in robotics, having referred to robotics as a "midterm play" and as just one component of a broader "digital surgery" platform that is expected to evolve over the course of "the next 5, 10, 15 years" (see Exhibit 6).

EXHIBIT 6:  **JNJ management expects the digital surgery revolution to extend through the 2020's and beyond**

+ *"Materiality is tough within a $27 billion business. But rather than give you a specific date of when we can hang our hat on it, I think what we're doing is we're playing for the long game. So, we see this at the end of the next decade. Nothing is going to take that long to be material to J&J. But that's how we're thinking about this, how can you have an integrated network that's much more impactful on the healthcare system overall that leads to better efficacy at lower cost." – J. Wolk 12/5/18*

+ *"We believe we continue to be on track [with Verb] going forward… You're going to see continued news about our robotics platform over the course of 2020 and beyond, but what's so important about this is we're taking an outlook that digital surgery will be an important dynamic for the next 5, 10 and 15 years. And what we want to make sure is that we get out in a timely manner but that we're also out in a manner that ensures we're competitive and ensures, ultimately, that we're making an even bigger difference in this area as we go forward." – A. Gorksy 1/22/19*

+ *"Innovation is really the core of our plan in terms of getting to those above-market levels in 2020. Robotics, we remain very excited about. I would say that's more of a midterm play. It's not as significant as it relates to that 2020 [growth] objective." – C. DelOrefice 3/14/19*

Source: JNJ 4Q18/1Q19 Earnings Calls, 2019 Barclays Healthcare Conference

More recently, we sense some expectations management from JNJ, as the company has begun to emphasize that it's not about getting to market fast, it's about getting to market with the right robot (see Exhibit 7). Along these lines, JNJ management have repeatedly mentioned ongoing work by Dr. Fred Moll to reassess broader robotic programs at JNJ and ensure the company is maximizing the value of the cards they are holding. Dr. Moll co-founded Intuitive and came to JNJ via the Auris acquisition. Some investors believe the work Fred is doing to reassess programs (e.g., to integrate concepts/technologies from Auris into the Verb platform) may lead to a better robot but may also delay the timeline.

Our conversations with JNJ support this view that the 2020 timeline may slip. The company emphasizes that it "would be a waste not to step back and reassess" given new assets from the Auris acquisition. To questions about timeline, management notes that while a major-market launch in 2020 is still the "official" timeline, they are "looking at this now and looking to provide an update later this year or early next year."

Confidential                                                                                                    Intuitive-00278207

For the exclusive use of CALVIN DARLING at INTUITIVE SURGICAL INC on 08-Sep-2019

Lee Hambright   +1-212-823-3557   lee.hambright@bernstein.com                                         6 September 2019

Though it's possible it will come sooner, we currently expect JNJ to initiate limited launch of the Verb platform beginning in 1H 2021 (i.e., about a year after MDT initiates the first phase of its limited OUS rollout). We do not expect meaningful revenue contribution until later in 2022.

EXHIBIT 7:  **Over the past couple of months, JNJ has emphasized that getting the platform "right" is more important than getting to market quickly, suggesting the timeline may slip past the 2020 launch target**

+ *"So, as I mentioned earlier on the call, we're real pleased with the Auris Health acquisition. It's off to a great start. Not only did we get some great products there and some great technology, but we secured one of the pioneers with respect to robotic surgery in Dr. Fred Moll and his team. So, they're currently looking at and assessing all of our platforms. We think it's prudent of us to utilize that expertise to look at not just what we're doing for the Monarch Platform in lung cancer and bronchoscopies, but also take a look at Orthotaxy, as well as our partnership with Verily to see how we can make sure that* **it's not a matter of coming to market fast, but coming to market best.** *And so, we want to make sure that we've got a differentiated product, one that competes with the current product offerings that are out in the marketplace for the next three, five, 10 years down the road. So, that's how we're approaching it." –J. Wolk 7/16/19*

+ *"We would be fools to not take full advantage of what Fred's mind [in terms of] getting him to look at our partnership with Verily, looking at everything we're doing in orthopedics, working with our lung cancer initiative. So we're in keeping all of the teams very focused on milestone attainment, and we have a very small team assessing how do we create more collective value together. So it's not a distraction or we're progressing milestones. I mean, we just had over the past 60 days, we've had over 35 different surgeons from around the world working on our Auris platform, working on our Verb Verily platform, doing end-to-end procedures in general surgery, in urology, in thoracic with very positive results. We've been actively engaged with the FDA authorities on both platforms. We are advancing full steam ahead on the development programs… I get asked a lot of questions around 2020 right now.* **We're not changing from that date, but we are going through a thorough assessment to see how do we create the most amount of value, not just in year one, but quite frankly, this is about the next 10, 20, 30 [years] – decades of really changing the standard of care.***" –A McEvoy, 9/6/19*

Source: JNJ 2Q19 Earnings Call, 2019 Wells Fargo Healthcare Conference (emphasis added)

Note that while the Verb collaboration was an important first step in JNJ's attempt to develop a truly differentiated robotics platform, it hardly guarantees success—even with a partner as capable as Alphabet. In our view, barriers to entry in robotic surgery are formidable given ISRG's first-mover advantage and 20-year head start. Despite JNJ's history of leadership and innovation in open and laparoscopic surgery, robotics is a fundamentally different arena, and one that requires fundamentally different expertise. In our view, MDT and JNJ have a lot of ground to make up, and both will need to work hard for the right to compete in this market. Intuitive has been singularly focused on soft-tissue robotic surgery for twenty years.

Fortunately for JNJ shareholders, we believe management recognizes that the only way to take meaningful share from ISRG is to offer surgeons a clearly differentiated value proposition—rather than merely developing a "me too" robot to check the box. The trade-off, naturally, is speed to market. And MDT now looks poised to commercialize their robotics platform before JNJ.

## JNJ INTENDS TO TRANSFORM ROBOTIC SURGERY INTO DIGITAL SURGERY

As was hinted at in the inaugural Verb press release, JNJ has bigger aspirations than simply launching a general surgery robot. In fact, robotics is just one facet of JNJ's ambitious plan to revolutionize surgery over the coming years and decades. Specifically, management believes that JNJ can offer compelling value proposition in robotics as part of a broader "digital surgery" platform—which refers to the integration of surgical robotics, supporting software, and a smart/interconnected operating room.

Confidential                                                                                                Intuitive-00278208

For the exclusive use of CALVIN DARLING at INTUITIVE SURGICAL INC on 08-Sep-2019

Lee Hambright   +1-212-823-3557   lee.hambright@bernstein.com                                6 September 2019

EXHIBIT 8:  **In the company's Digital Surgery strategy, JNJ is focused on improving surgical outcomes by leveraging data pre-operatively, during procedures, and post-operatively**



Source: JNJ May 2018 Investor Day

EXHIBIT 9:  **Management views robotic surgery as a "bridge" between lap and "Digital Surgery"**



Source: JNJ May 2018 Investor Day

We are intrigued by JNJ's vision of digital surgery, and we agree that leveraging AI and informatics has the potential to improve patient outcomes beyond what robotics alone can achieve. Some early examples of JNJ's efforts in this area include:

(1) **C-SATS** (i.e., Crowd-Sourced Assessment of Technical Skill): a cloud-based, AI-enabled surgical skills assessment system that allows for best practice sharing among surgeons

(2) **Health Partner** platform: a digital ecosystem (i.e., website, mobile app, care portal) that helps guide patients through surgical preparation and recovery, while also enabling real-time interaction with care providers

(3) **SPI** (Surgical Process Institute): provides digital, standardized workflows and checklists for surgeons to reduce variability and improve patient outcomes

JNJ has not been shy about setting high expectations for its digital surgery platform. Management have called it a "true quantum leap in surgery", a "superior surgical experience", and have compared its disruptive potential to the evolution from "the mainframe computer to mobile digital devices" (see Exhibit 10).

Confidential                                                                              Intuitive-00278209

For the exclusive use of CALVIN DARLING at INTUITIVE SURGICAL INC on 08-Sep-2019

Lee Hambright  +1-212-823-3557  lee.hambright@bernstein.com

6 September 2019

**EXHIBIT 10:  JNJ's robotic surgery platform is part of a grander vision of "Digital Surgery"—which refers to the integration of surgical robotics, supporting software, and a smart/interconnected operating room**

- *"We can see a future in which the surgeon is no longer isolated in the OR, but through our system, we'll be able to connect to critical data, imaging and diagnostic information; information that will help the surgeon make the best, most accurate decisions as and when they're needed." – G. Pruden 10/13/15*

- *"We think what's available today is really the model that's more like the main frame computer 50 years ago. We intend to go to the iPad version, and that's what we want to launch. With a more integrated informatics [and] diagnostics…that are available for the surgeon around the world at a lower cost to serve." – G. Pruden 10/13/15*

- *"The key differentiator of our robotics platform is in fact this partnership with Google that allows the robotic platform to have navigation techniques and data capture and algorithms that make the robots smarter and smarter and smarter each time a surgery is performed—and the data can be shared." – D. Caruso 2/23/16*

- *"We believe that we understand technology better than our competitors do, because of all the work that we do and how we partner with tech companies. And we believe that we actually can, therefore, do this in a different way and be more successful over time." – S. Peterson 6/15/17*

- *"We intend to transform robotic surgery into digital surgery… If I only have one analogy for you, I would say it's like going from the mainframe computer to mobile digital devices. So, we're going…from simply enabling surgical jobs, to building an intelligent connected operating room environment. We are poised to disrupt the fast-growing robotics market. The Verb platform represents a true quantum leap in surgery." – M. del Prado 5/16/18*

- *"Robotics was really an extension of your human arms to be able to perform task that you could not do, because of the limited spaces. However, digital is all about capturing the information that goes on in the operating room, take advantage of the pre-operative information to be able to guide the procedure more precisely and be able to analyze information after the procedure and feed it back to make surgeons better, who are they on their best day and within healthcare systems also improve that." – M. del Prado 5/16/18*

- *"We also have a partnership with Verily to really create kind of an unparalleled connected system that will allow this image-guided, smart digital surgery platform that really changes how surgeons do pre-surgical planning, intraoperative surgical planning and then post-op planning to really make the surgery safer, more efficient and to really improve the experience." – A. McEvoy 2/28/19*

Source: JNJ 3Q15 Earnings Call, 2016 RBC Healthcare Conference, 2016 UBS Healthcare Conference, 2017 Goldman Sachs Healthcare Conference, JNJ 2018 Investor Day, 2019 SVB Leerink Healthcare Conference

Importantly, however, JNJ does not yet possess the requisite data to execute on this vision of digital surgery, so it will not be a competitive advantage right off the bat. In effect, JNJ will be asking customers to sign up for a robot so that the company can start the process of collecting data. However, the robot is being designed from the ground up to eventually integrate into JNJ's digital ecosystem. We believe this is a superior design decision than accelerating the development timeline and later retrofitting the robot, but we also acknowledge that this may be the difference between JNJ being the second or the third market entrant.

Notably, Intuitive has been collecting data on procedures since it began placing robots twenty years ago, and the company has various amounts of data on over six million procedures. Intuitive has already begun to use data to help hospitals identify best practices and improve outcomes. JNJ's vision for Digital Surgery is clearly more expansive than the scope of Intuitive's current data-related offerings. But it remains to be seen whether JNJ can build data collection capability and useful applications that can overcome Intuitive's current advantage (i.e., procedure database and applications).

Confidential

For the exclusive use of CALVIN DARLING at INTUITIVE SURGICAL INC on 08-Sep-2019

Lee Hambright  +1-212-823-3557  lee.hambright@bernstein.com                                   6 September 2019

**EXHIBIT 11:  JNJ's data analytics capabilities won't be a competitive advantage right off the bat; the company will effectively be asking hospitals to sign up for a robot so they can start the data collection process**

　　⊕  *"We're not just creating a robot, we're creating systems integration for the future. Because if you want to deliver against that capability, we have to have an integrated plan to deliver against machine learning, all that information management. If you don't do that… from the beginning, you can't do that at the end." – M. del Prado 5/18/16*

　　⊕  *"At launch, there will be limited clinical information. However, because of this digital ecosystem that we're building, our ability to capture information, be able to analyze that do real world evidence immediately, will be harnessed and will move very rapidly." – M. del Prado 5/16/18*

　　⊕  *"[Robotics] enables surgery, but I don't know that it leads to a better outcome. There's no data that suggests that. We want to have platforms that generate data that suggests it's a better outcome for the patient. There's better visual acuity. It becomes part of an integrated network. So, each surgery that's performed learns and informs the next surgery in that network." – J. Wolk 12/5/18*

Source: JNJ 2016 Investor Day, JNJ 2018 Investor Day, Citi 2018 Healthcare Conference

## A SMALLER FOOTPRINT IS INTENDED TO INCREASE UTILIZATION—AND DECREASE PER-PROCEDURE COST

JNJ management has repeatedly emphasized affordability as a key pillar of the company's differentiated strategy in robotic surgery. In fact, before the formation of Verb in late 2015 (and the resulting emphasis on digital surgery), most of JNJ's robotics commentary was centered around improving per-procedure economics. Management sees an opportunity to lower hospitals' costs "in terms of disposables as well as capital".

**EXHIBIT 12:  From the beginning, JNJ has identified cost as a barrier to robotics adoption**

　　⊕  *"I think [robotics] is going to have to also be more cost-effective than it is today, because if you look kind of the installed base for robotics, it's really very developed market focus. I mean, I think 80% of the all the installations are in both U.S. and Western Europe. And that's for a reason… Longer term, we will be looking at an opportunity to enter the market where we can create value for our shareholders." – G. Pruden 1/22/13*

　　⊕  *"I'm not sure [robotics] is the right answer for all procedures, because we are getting into a very cost-effective modality right now, based on procedures. And… I think our customers are really asking for value, which is don't just show me that you have a good outcome, show me that you add value to our system, as well." – G. Pruden 1/22/13*

　　⊕  *"I think there is still a lot of unmet need based on the current model of robotics. It has enabled minimally invasive surgery to be done where penetration has been low, prostatectomy, hysterectomy. We believe that it can enable difficult surgeries, cancer surgeries for example. But in the general surgery space will it replace base laparoscopic surgery in cholecystectomy of appendectomy? I don't think the cost will justify it, quite frankly." – M. del Prado 5/22/14*

Source: JNJ 2013 Investor Day, JNJ 2014 Investor Day

It is clear that a reduced footprint in the OR will be a key component of this strategy. JNJ is betting that improvements with respect to ease-of-use and mobility within the OR will help increase robot utilization—thereby decreasing per procedure cost (as the capital equipment charge is amortized across a larger number of procedures).

Confidential                                                                  Intuitive-00278211

For the exclusive use of CALVIN DARLING at INTUITIVE SURGICAL INC on 08-Sep-2019

Lee Hambright   +1-212-823-3557   lee.hambright@bernstein.com                                          6 September 2019

**EXHIBIT 13:  A smaller footprint within the OR will be a key component of JNJ's strategy to improve per-procedure economics in robotic surgery**

+ *"I do think that there are opportunities [in robotics], not just for lower cost… but [for] improvements in functionality, ease-of-use and movement within the OR, right?… The analogy that people have said to me is where we are in robotics today is where we were 50 years ago with computers that took up the entire room. You are going to get to a point where it's going to be a laptop size sometime in the future."* – G. Pruden 5/22/14

+ *"We also think there is some inherent limitations to today's robotic surgery environment. When you frankly look at the size and the scale of some of the existing innovation and if you look at what's happened with other technology platforms, as they have become smaller, more flexible, more mobile, and frankly, have a better ability to integrate various activities around the OR, that's where we think we can really make a difference." – A. Gorsky 7/14/15*

+ *"If you look at the robotics installed base as it is today, it's very much focused on the developed markets versus the emerging markets and that's because cost to serve is disproportionately out of balance. And we think that there are opportunities to have a much smaller footprint in terms of a technology, a lower cost to serve in terms of disposables as well as capital that we think can play across a broader range of surgical procedures in a cost-effective way." – G. Pruden 10/13/15*

+ *"We don't believe the capital play here for our innovation is going to be $2 million per hospital. So, we're going to provide a lot more flexibility in terms of that… We have decided that the terms of our value proposition, which will be a lower cost to serve, [and] a smaller footprint." – G. Pruden 10/13/15*

+ *"As the largest surgery business in the world and with our unique smaller footprint, more flexible design than system on the market, we aim to drive greater global access to hospital operating rooms."* – P. Shen 5/16/18

+ *"The robots of today are large. They're very expensive. They take a tremendous amount of training to be able to deal with them. They don't shorten the procedure; they lengthen the procedure. Clinical outcomes have not been demonstrated to be better; and more importantly they're also mobile from one operating room to the other operating room." – C. Roemer 12/12/18*

Source: JNJ 2014 Investor Day, JNJ 2Q15 Earnings Call, JNJ 3Q15 Earnings Call, 2016 RBC Healthcare Conference, JNJ 2018 Investor Day, BMO 2018 Healthcare Conference

## JNJ'S VALUE PROPOSITION IN ROBOTICS IS HEAVILY TIED TO THE QUALITY OF ITS END EFFECTORS

Like MDT, JNJ management has indicated that differentiated end effectors will be central to the company's value proposition in robotic surgery. Covidien and Ethicon are market leaders in end effector innovation, and both MDT and JNJ like to emphasize the barriers (e.g., years of investment, resources, know-how, etc.) faced by competitors—ISRG included—attempting to build a competitive end effector portfolio from the ground up. While ISRG's end effectors have improved considerably in recent years, da Vinci users still point to the company's end effectors as a potential area of vulnerability.

Confidential                                                                                        Intuitive-00278212

For the exclusive use of CALVIN DARLING at INTUITIVE SURGICAL INC on 08-Sep-2019

Lee Hambright   +1-212-823-3557   lee.hambright@bernstein.com                                            6 September 2019

EXHIBIT 14:  **Like MDT, JNJ is expected to leverage its strength in end-effector technology**

+ *"Our plan right now in terms of robotics is kind of two-step and twofold. So first and foremost, it's around we're looking at opportunities to partner with robotics in what we do best, and where our capabilities are, and where we can bring value. And that is what we call the end effectors. So, on the end of the robots, we have devices that create a tissue effect. They seal tissue, they cut tissue, they bring tissue together. That's the business that we're essentially in, in producing both staplers, endocutters, energy devices, sutures — that's our world… That is what we do best, and that's the end of the market where we're going to lead and we're going to drive." — G. Pruden 1/22/13*

+ *"One [prong of our strategy in general surgery robotics] is an end effector strategy…I am really interested in the aspect of the tissue effects of the business—so cutting, sealing, dissecting, stapling, sewing tissue. We actually have a partnership with the Intuitive team on certain aspects of that, which is really good. But we're also going to pursue our own de novo approach…" — G. Pruden 5/22/14*

+ *"We're already in the market for robotics… in terms of particular procedures where our Ethicon products are used at the end of the robot, at the actual procedure end of the robot. So, we'll continue to do that [as we develop our own robotics program internally]." — D. Coruso 4/14/15*

+ *"With our proven capability in advanced instrument, in combination with 3D HD visualization, our system is being designed with aim of increasing surgical efficiency and confidence across surgical procedures." — P. Shen 5/16/18*

+ *"[We're addressing common complains re] advanced instrumentation, because the magic moment is when an endocutter is fired or an energy device is fired. And you've heard from customers that they're making compromises today because of the lack of availability of advanced instrumentation. We're going to deliver those as well." — M. del Prado 5/16/18*

Source: JNJ 2013 Investor Day, JNJ 2014 Investor Day, JNJ 1Q15 Earnings Call, JNJ 2018 Investor Day,

## ACCESS/REACH & TARGET PROCEDURES

While JNJ has not been particularly specific about procedural targets for the robot, management commentary has touched on a broad array of potential procedure sets. What the initial focus looks like when the robot first launches is unclear, but we get the sense that JNJ's long-term goal is to be able to do any procedure that Intuitive can do.

On one hand, JNJ's end-effector-focused strategy seems to suggest the company could create an advantage in more complex procedures where complex instruments are necessary (e.g., staplers, vessel sealers). On the other hand, JNJ's cost-focused strategy suggests the company's greatest advantage may be on simpler procedures, where Intuitive may be unlikely to match JNJ's lower per-procedure prices.

We believe JNJ is more likely to focus on more complex procedures at the outset to demonstrate the capability of their system. But we would anticipate rapid expansion to broader sets of procedures.

Confidential                                                                            Intuitive-00278213

For the exclusive use of CALVIN DARLING at INTUITIVE SURGICAL INC on 08-Sep-2019

Lee Hambright   +1-212-823-3557   lee.hambright@bernstein.com                                                6 September 2019

**EXHIBIT 15:  JNJ's robot will provide surgeons with multi-quadrant access, and management has highlighted a wide range of potential target procedures**

+ *"I think there is still a lot of unmet need based on the current model of robotics. It has enabled minimally invasive surgery to be done where penetration has been low—prostatectomy, hysterectomy. We believe that it can enable difficult surgeries, cancer surgeries for example. But in the general surgery space will it replace base laparoscopic surgery in cholecystectomy of appendectomy? I don't think the cost will justify it, quite frankly." – M. del Prado 5/15/14*

+ *"The unique workflow, advanced imaging, data analytics, [and] expanded reach to all four quadrants of the body along with an advanced instrumentation has the potential to advance robotic minimally invasive surgery with great benefit for patients." – M. Fitchet 5/18/16*

+ *"We are creating a platform with the potential we can give every patient access to the outcomes of the best surgeon. Our focus will be to help drive complex surgical oncology procedures to minimally invasive approaches and to help improve and standardize the outcomes in challenging procedures, such as thoracic lobectomy, gastrectomy and low anterior resection." – M. Fitchet 5/18/16*

+ *"I think the sweet spot for really transforming surgery is in areas where it's deep, it's confined, it's inaccessible like the thoracic cavity, like low anterior resection. These are two areas where the penetration of minimally invasive surgery has not been as good as the other areas. So, this is where we believe that with the better surgical platform robotics capabilities that we will be able to penetrate." – M. del Prado 5/18/16*

+ *"Our system is being designed to provide multi-quadrant access to enable broader range of surgical procedures beyond the prostate surgery to colon, gastric, thoracic surgeries." – P. Shen 5/16/18*

+ *"Importantly, are we able to address the unmet needs that continue to persist in the current robotic system? Firstly, reach and access, very important, multi-quadrant reach, being able to have the capability of reaching every part of the anatomy. We're going to deliver that." – M. del Prado 5/16/18*

+ *"We recently successfully completed a series of end-to-end procedures, engaging a group of global KOLs across a subset of target specialties, including general and with hernia, colorectal and bariatrics, in gynecologic, and thoracic surgery." – P. Stoffels 7/17/19*

Source: JNJ 2014 Investor Day, JNJ 2016 Investor Day, JNJ 2018 Investor Day, 2018 Citi Healthcare Conference, JNJ 2Q19 Earnings Call

## AURIS ACQUISITION

In January 2019, Verb CEO Scott Huennekens left the company. Less than two months later, JNJ announced the acquisition of Auris Health for $3.4B (with additional milestone-based payments up to $2.35B) on February 13, 2019 (see our initial reaction here). The $3.4B upfront payment is largely about Auris's Monarch lung biopsy platform, but much of the contingent payment is based on milestones related to a pipeline of products beyond Monarch. Specifically, Auris has several patents related to the use of robotics in general surgery – see the 294 patent, the 371 patent, and Exhibit 16.

Confidential                                                                          Intuitive-00278214

For the exclusive use of CALVIN DARLING at INTUITIVE SURGICAL INC on 08-Sep-2019

Lee Hambright   +1-212-823-3557   lee.hambright@bernstein.com                                                                    6 September 2019

EXHIBIT 16:  **Image of "Surgical system with configurable rail-mounted mechanical arms" from Auris patent**



FIG. 4

Source: US Patent Office; US 2016/0296294

On JNJ's 1Q19 earnings call, management seemed to confirm the notion Auris IP could potentially be leveraged by either Verb or Orthotaxy at some point down the road. In our view, the Auris acquisition highlights management's desire to have a presence in robotics as soon as possible (and, potentially, management's dissatisfaction with the rate of progress at Verb under Mr. Huennekens). We also see the Auris acquisition as further validation that J&J management views surgical robotics as a foundational long-term growth driver.

Ultimately, Auris is expected to contribute to JNJ's broader digital surgery strategy alongside Verb, Orthotaxy, and several enabling technologies. In our discussions with the company, JNJ management has talked about Auris as separate, sitting alongside ongoing work at Verb and Orthotaxy. While management talks about their intention to "leave Auris alone, so they can do what they do best", they have also hinted at the idea that Auris technology could help improve the Verb platform in some meaningful ways. Longer-term, management envisions synergies across multiple robotics platforms, with additional synergies provided by some of the enabling technologies in which J&J has invested (e.g., Health Partner, C-SATS, SPI, etc.)

EXHIBIT 17:  **Auris is expected to contribute to JNJ's broader digital surgery strategy alongside Verb, Orthotaxy, and several enabling technologies**

+   *"We're very pleased to welcome Auris to the J&J family. Just spent some time with them last week at close and to really welcome Dr. Fred Moll, who many of you know is a true pioneer in the field of robotics. And we view the acquisition of Auris as highly complementary to our Verb program as well as our Orthopedics program and Orthotaxy…We plan to take advantage of the world-class robotics expertise, advanced instrumentation, our partnership with Verily of creating a connected experience and then clearly, our very robust global infrastructure to have a very competitive value proposition in the field of digital surgery." – A. McEvoy 4/16/19*

+   *"We view the Auris acquisition as highly complementary to our Verb program. I was at Verb just last week, and I'm very pleased with how they're knocking down risk every day. They have completed all preclinical, procedural developments for several procedures. They've engaged with hundreds of surgeons. They're engaging right now with notified bodies on the regulatory pathways so I would say, stay tuned. We're going to take the best insight from Dr. Fred Moll and really have him and assess both of these programs and make sure that we have a highly differentiated value proposition at launch." – A. McEvoy 4/16/19*

Source: JNJ 1Q19 Earnings Call, JNJ 2Q19 Earnings Call

Confidential                                                                                                                    Intuitive-00278215

For the exclusive use of CALVIN DARLING at INTUITIVE SURGICAL INC on 08-Sep-2019

**Lee Hambright**   +1-212-823-3557   lee.hambright@bernstein.com                                     6 September 2019

## WHAT WE'RE HEARING FROM KEY OPINION LEADERS

Our ongoing discussions with key opinion leaders continue to validate the notion that customers are eager for competition in surgical robotics (Exhibit 18). Generally, surgeons and hospitals agree that competition is good for medical device markets. It keeps market participants honest, helps customers hold them accountable, stimulates innovation, and can lead to more favorable pricing.

In our experience, some surgeons are particularly receptive to competitive pitches. For all the surgeons who love Intuitive's technology and testify that the da Vinci has changed their lives for the better, there are others who feel snubbed by Intuitive. Perhaps they have sought speaking engagements that were never granted, or their custom instrument requests were ignored. The TransEnterix case is interesting. Buyers of the TransEnterix robots were eager to get out from "under the thumb" of Intuitive. But when they realized the technology was inferior, they quickly abandoned it for the devil they knew.

EXHIBIT 18: **Surgeons and hospitals are thirsty for competition… but that doesn't necessarily mean that new entrants will be successful**

+ *"We were excited to buy a TransEnterix robot a couple years ago after suffering under the Intuitive monopoly for many years. We were excited to see a competitor, and the system looked promising. It has some nice features like the eye-catching camera. But it does not stack up to da Vinci – not even close. It's worse than lap, and now it's in storage."*

Source: Bernstein expert interviews

While surgeons and hospitals are excited by the prospect of competitive entry by MDT and JNJ, competition will need to be compelling in order to make a real difference. Surgeons do not like to change if they can avoid it, and they have invested a lot of effort in building skills on da Vinci.

Based on our recent discussions with KOLs, feedback regarding JNJ's general surgery robotic has been generally quite positive. Most experts believe that JNJ's robotic is superior to Medtronic's, and some believe that it could become a viable competitor to da Vinci in the long-run. In fact, several KOLs have gone so far as to call JNJ's robot a "game-changer". Unsurprisingly, it is JNJ's vision for "digital surgery"—of which robotics is just one component—that has key stakeholders most excited. However, there are also some aspects of the robot itself that surgeons find particularly compelling—most notably the heads-up, glasses-free, 3-D display screen.

EXHIBIT 19: **Experts are generally impressed by JNJ's robotics platform, and most believe that JNJ's entry will be market expanding**

+ *"JNJ's prototype is highly sophisticated. The company has all the requisite skills and technology. I think it's going to be a major game changer."*

+ *"JNJ's and Medtronic's entry will be market expanding. I expect we'll see an explosion of new procedures as the new systems roll out."*

Source: Bernstein expert interviews

EXHIBIT 20: **Most experts agree that JNJ's long-term value proposition in robotics is tied to management's larger plan to digitize surgery**

+ *"What's going to be particularly intriguing is the AI and machine learning aspect [of JNJ's robotic platform]. Eventually, the robot will be able to recognize the anatomy and think like a surgeon. It will even be able to learn the procedure and perform certain steps automatically—with better outcomes than a surgeon. It's absolutely realistic to expect this to be the next big step in robotics."*

Source: Bernstein expert interviews

Below, we share a sampling of recent commentary we have heard on JNJ's tech and strategy in robotic surgery.

## TECHNOLOGY: HARDWARE

To reiterate, experts are particularly excited about JNJ's vision of a fully integrated "digital surgery" ecosystem. Importantly, however, most surgeons who have already used JNJ's robot are also impressed by the robot itself. Echoing our discussions with

Confidential                                                                                             Intuitive-00278216

For the exclusive use of CALVIN DARLING at INTUITIVE SURGICAL INC on 08-Sep-2019

Lee Hambright   +1-212-823-3557   lee.hambright@bernstein.com                                                6 September 2019

experts about MDT's surgical robot, JNJ's emphasis on differentiated end effectors, visualization, and arm architecture all emerged as important themes (see Exhibit 21).

EXHIBIT 21:  **JNJ/Verb's robot scores high marks with KOLs, particularly for 1.) its differentiated 3-D display screen, and 2.) it's smooth and precise controls (which appear to be superior to MDT's robot and on par with da Vinci's)**



Instruments

+ *"End effectors are a common element of JNJ's and MDT's value proposition. Both companies will use their robot as a platform to push their instruments."*

+ *"Instruments are more of a core competency for JNJ than for ISRG. The da Vinci instrument portfolio is less than ideal. They have the old Harmonic shears, only one vessel sealer, limited advanced energy options, etc. The lack of advanced instrumentation has limited ISRG's penetration of more complex procedures."*

+ *"Having wristed instruments is very important for a soft tissue robot. And JNJ is planning to develop wristed instruments for the robot. But developing adequate quality of the movement is quite challenging. Da Vinci has very precise, smooth, fine movements. It's totally exact. If you move just 0.5mm with your hands, the robot will move the same amount. The level of precision with JNJ's robot is very impressive. The movements with Medtronic's robot aren't as smooth."*



Visualization

+ *"JNJ's robot has a fantastic curved display screen, which provides a totally 3-D impression."*

+ *"The heads up display means the surgeons can still look around the OR and communicate with their team. It's a really fantastic solution."*

+ *"The Verb screen looks great. I've never seen this display technology before. Every pixel on the screen moves with your eyes. There is a small camera targeting your eyes, and pixels on screen change their position as you move. This enables continuous 3-D vision without glasses in an open console."*



Robotic Arms

+ *"The robotic arms are very small, similar to the CMR robot and slimmer than da Vinci's arms —which allows the staff to easily access the patient and to communicate with each other in the OR."*

+ *"In terms of patient access, JNJ's robot is comparable to da Vinci. Medtronic's robot has inferior accessibility, but it's still manageable."*

+ *"The robotic arms are integrated into the table —they come out from under the table. It's an interesting solution, but may negatively impact the ability to reduce the time between patients. The arm architecture could be particularly problematic for European surgeons who have relatively fewer hours in the OR. But Verb is a well-managed company with a lot of resources. They'll come up with a solution."*

Source: Bernstein expert interviews

While ISRG end effectors have improved considerably in recent years, da Vinci users still point to the company's instruments as a potential area of vulnerability. For the last two decades, ISRG's monopoly position has generally insulated the company from this relative weakness. In our view, it makes perfect sense for MDT and JNJ to draw the battle lines around the quality of their end effectors (an area where they have an advantage over ISRG) rather than around the quality of their robot per se (an area where ISRG has considerably more experience and know-how).

The logic of this end effector strategy notwithstanding, it will be far easier said than done for both MDT and JNJ. Retrofitting an instrument for robotic compatibility is considerably more involved than simply taking the end effector from a laparoscopic instrument and sticking it onto a robotic arm. In reality, instruments will need to be reengineered to be made fully wristed, since the vast majority of laparoscopic instruments are straight (i.e., not wristed).

Most notably, surgeons are very intrigued by JNJ's differentiated display screen. Like MDT and ISRG, JNJ's robot will have a 3-D display screen. However, unlike MDT, JNJ's 3-D technology does not require the use of 3-D glasses. And, unlike da Vinci, JNJ has designed a heads-up display that is less stressful on surgeons' eyes while also better enabling communication among team members in the OR. JNJ has employed a curved screen and eye-tracking technology to make this combination of features possible, and early feedback has been very positive.

Confidential                                                                                                    Intuitive-00278217

For the exclusive use of CALVIN DARLING at INTUITIVE SURGICAL INC on 08-Sep-2019

Lee Hambright   +1-212-823-3557   lee.hambright@bernstein.com                                                6 September 2019

With respect to the robotic arms, experts indicated that they will be attached to the bed and will "come out from under the bed." This is consistent with management commentary regarding plans to reduce the system's footprint relative to da Vinci. However, some European users expressed concern that the bed-mounted arm design could negatively impact their ability to optimize operating room utilization given pre- and post-procedure workflow differences between the U.S. and Europe.

In terms of the size, JNJ's robotic arms are substantially smaller than MDT's robot. Surgeons seem to appreciate the improved patient access that this design choice affords vs. MDT's robot, which is designed with each robotic arm mounted to its own standalone column/cart.

## TECHNOLOGY: DIGITAL SURGERY

JNJ management aims to offer a compelling value proposition in robotics as part of a broader "digital surgery" platform—which refers to the integration of surgical robotics, supporting software, and a smart/interconnected operating room. Based on our recent expert interviews, we believe most surgeons are both excited and optimistic about JNJ's potential for success on this front. We are similarly intrigued by JNJ's strategy around digital surgery, and we agree that AI and informatics have the potential to improve patient outcomes beyond what robotics alone can achieve.

That said, we believe it is also important to acknowledge that JNJ will not be able to offer this capability immediately; JNJ will not be a meaningful competitive advantage until the company is able to collect (and analyze) a critical mass of relevant data. In effect, JNJ will be asking customers to sign up for a robot so that the process of data generation can begin in earnest.

EXHIBIT 22:  **Experts are intrigued by JNJ's vision of "digital surgery" and are encouraged by the Alphabet partnership, but they acknowledge that Intuitive is also investing in this area**

- *"Intuitive has a very solid and robust working system [in da Vinci]. It's like a Mercedes: extremely reliable, extremely low malfunction rate, extremely intuitive and easy to use. In terms of engineering, da Vinci is really good. But like a Mercedes, it is hardware engineering. There is room for the next step in surgery, which is the data part of it. There hasn't been a lot of development pressure on Intuitive historically, and da Vinci doesn't help surgeons make decisions as well as it could. The market needs to move from Mercedes to Tesla. There is a big opportunity for a competitor to enter the robotic surgery market with a value proposition built around digital technologies."*

- *"JNJ has a very strong partner in Google. Google has experience generating data, experience with machine learning, and experience with AI. I suspect they'll start with relatively low hanging fruit. It can be simple stuff such as instrument utilization, feedback loops on relatively easy parameters—which instruments did you use? how long did it take?—metrics to increase OR efficiency, etc. Eventually, JNJ can go a long way in providing surgeons with data to improve their decision-making."*

- *"Both JNJ and Intuitive are headed in very similar directions with their digital strategies. I'm convinced it will be a game changer in surgery. Connecting procedural data to clinical outcomes is the big vision in the end. Right now, we are capturing no data, and the surgeons just writes up a short and biased report. We need to make the computer understand what's going on during surgery. Ethicon started that conversation, but Intuitive was smart and quickly jumped on. The real question is: 'Who has the best resources to execute on this vision? And who will be able to plug their robot into an entire software system?' That company will be the long-term winner."*

Source: Bernstein expert interviews

Confidential                                                                                              Intuitive-00278218

For the exclusive use of CALVIN DARLING at INTUITIVE SURGICAL INC on 08-Sep-2019

Lee Hambright   +1-212-823-3557   lee.hambright@bernstein.com                                                        6 September 2019

EXHIBIT 23:  **One theory is that JNJ's video feed technology will enable surgeons to compare intraoperative data across open, laparoscopic, *and* robotic procedures**

⊹ *"The digitization strategy is very much a core design element. JNJ recognizes that this isn't about robotics vs. laparoscopy vs. open [surgery]. Digital surgery is an umbrella for everything. That gives JNJ an advantage over ISRG in the digital game. The video feed is the common denominator connecting [the different modalities]. If you look at the video feed, that opens up minimally invasive and open surgery for digital analysis."*

Source: Bernstein expert interviews

Some experts we spoke to believe that JNJ may leverage its video technology – paired with AI-enabled technology akin to facial recognition capability – to generate intraoperative data (e.g., instrument tracking, instrument-tissue interaction, etc.) across robotic, laparoscopic, *and* open procedures (see Exhibit 23). This data would then be cross-referenced against patient outcomes to inform best practices, increase procedural replicability, and potentially offer intra-operative decision-making support.

With its Digital Surgery strategy, JNJ is betting that it can (1) find ways to collect meaningful data across robotic, lap and open procedures and (2) develop applications for those data that are compelling for hospitals and surgeons. Success here could change the basis for competition in the market and create an advantage over ISRG by leveraging JNJ's leadership in lap and open procedure volumes.

We expect JNJ's digital surgery platform to be rollout out in phases, starting with relatively low-hanging fruit (e.g., data collection on instrument utilization, operating time, clinical outcomes, etc.) and building towards more advanced capabilities. Eventually, some experts envision a world in which certain steps of a procedure are automated—though they acknowledge that this is still many years away from becoming a reality.

EXHIBIT 24:  **JNJ's "digital surgery" platform will likely start by collecting relatively simple data, but the end-game could include intra-operative decision support and even autonomous completion of certain steps**

⊹ *"The ultimate goal [with digital surgery] is to make surgery safer. Take the evolution of commercial aviation as an example. If you had asked a pilot 40 years ago whether autopilot technology was possible, they would have all said no. They would have pointed to the number of variables that must be accounted for in support of their answer. Many surgeons might say the same thing now. But surgery can be standardized and made safer in a similar way. Achieving partial automation will be the goal, but it's going to take a long time to get there."*

Source: Bernstein expert interviews

### ECONOMICS & PROCEDURE FOCUS

While it's clear that JNJ intends to make per procedure economics an important part of its value proposition in robotic surgery, management has been significantly less clear about the details of the economic model than MDT. However, JNJ management has talked enough about price over the years to give key opinion leaders confidence that the4 company's robot will be less expensive than da Vinci. Experts also expect JNJ to compete with ISRG on instrument affordability. If JNJ is able to significantly extend the useful lives of its robotic instruments (i.e., if JNJ successfully disrupts ISRG's razor-razorblade model), then per-procedure cost could come down meaningfully.

EXHIBIT 25:  **Experts believe JNJ's economic strategy will combine a less expensive robot with instruments that have longer useful lives than da Vinci's**

⊹ *"JNJ's robot will be cheaper than da Vinci."*

⊹ *"Intuitive's 10-use instrument life is unnecessary and arbitrary. And it presents a real opportunity [for JNJ and MDT]."*

Source: Bernstein expert interviews

Confidential                                                                                                    Intuitive-00278219

For the exclusive use of CALVIN DARLING at INTUITIVE SURGICAL INC on 08-Sep-2019

Lee Hambright   +1-212-823-3557   lee.hambright@bernstein.com                                                        6 September 2019

JNJ is playing the long game in robotic surgery, and experts do not expect management to prioritize maximizing systems revenue in the near-term. Like MDT, JNJ is expected to leverage its surgical robot to lock-in end effector volume—rather than recovering as much as possible on the capital sale. Longer-term, experts believe that JNJ's real priority is collecting surgical information, which is consistent with management commentary around revolutionizing digital surgery.

EXHIBIT 26:  **Experts believe that JNJ is more focused on locking in end effector volume and collecting surgical information, rather than maximizing revenue from systems sales**

+ *"End effectors are a common element of JNJ's and MDT's value proposition. Both companies will use their robot as a platform to push their instruments."*

+ *"JNJ isn't so keen on selling robots. They are much more interested in collecting surgical information and data. It's not so much about selling the product, but more about how to collect information."*

Source: Bernstein expert interviews

From a procedure standpoint, experts seemed to suggest JNJ would focus on more complex procedures initially. For example, one KOL called out "complex GI procedures: rectum, pancreas, esophagus."

**TIMELINE**

After the Auris acquisition in 1Q19, some investors worried that JNJ's launch date for the surgical robot might be pushed back. So far, JNJ has not moved off its 2020 commitment, and many of the experts we've spoken with believe the program remains on-track. Per our discussions with management and as noted above, we believe limited launch in early 2021 appears more likely at this point.

EXHIBIT 27:  **Experts believe that JNJ will adhere to its 2020 launch guidance, and do not believe the Auris acquisition will result in a delay**

+ *"I've already seen enough to have confidence [in the launch timeline]."*

+ *"JNJ seems to be on a good path, and they're not moving the launch date. There is no indication that there is any problem with the hardware [that could delay the launch timeline]."*

+ *"There is no indication that the Auris acquisition will delay JNJ's commercial timeline."*

+ *"With each new robot [that comes to market], surgeons will have to reinvent each procedure. Most people—even [those] in the industry—don't understand this and often and underestimate it. It will take a long time for both JNJ and MDT [to develop these procedures]. As soon as surgeons find a way to use the robots appropriately, we will be able to use them in a similar way to da Vinci for certain procedures. But only time will tell whether we will be able to perform complex procedures with these robots."*

Source: Bernstein expert interviews

**SUMMARY VIEW FROM EXPERTS**

In short, most experts agree that JNJ's robot is superior to Medtronic's, and some believe it approaches equal footing with Intuitive's da Vinci platform. The surgeons we interviewed are particularly intrigued by JNJ's "digital surgery" strategy, but they are also encouraged by the robot's design from a hardware perspective.

Specifically, JNJ's unique visualization solution (glasses-free, heads-up, 3-D display) could be an important source of differentiation during the initial phase of the robot's rollout—since the data required to execute on the "digital surgery" strategy will take a nontrivial amount of time to collect (to say nothing of the time needed to analyze the data and then integrate it into a continuous feedback loop to improve surgeon performance).

Despite the optimism around JNJ's robotics program, experts generally agree that Intuitive will continue to be a major player in the long-run. This outcome is not mutually exclusive with a successful entry by JNJ. There are room for multiple players in this market, and most surgeons believe that competitive entry will be market expanding.

Confidential                                                                                                        Intuitive-00278220

For the exclusive use of CALVIN DARLING at INTUITIVE SURGICAL INC on 08-Sep-2019

Lee Hambright  +1-212-823-3557  lee.hambright@bernstein.com                                          6 September 2019

**EXHIBIT 28:  Experts generally agree that Intuitive will continue to be a major player in the long-run, and they expect JNJ's entry to be market expanding**

+ *"Intuitive is being clever about placing as many systems as they can ahead of the competition, like the shift towards an operating lease model. Being the second system on the market [and not the third] is therefore important."*

+ *"Intuitive is unlikely to deviate from their platform too much just to offer a cheaper version of da Vinci. A full redesign is doubtful. It's more likely that management invests the incremental dollars in data analytics capabilities."*

+ *"We could see Intuitive partner with someone on data analytics, such as Apple or IBM Watson. Data analytics capabilities are hard to develop from the ground up, and Intuitive can't expect to compete with Google without outside help."*

+ *"Intuitive's long-term market share is unclear, but there's no doubt they will continue to be a major player in this market. [Share shift] is going to be highly dependent on how good the new systems are. Substantial market segmentation is the most likely long-term outcome."*

+ *"As the market grows, a lot of hospitals will probably have multiple robots. But it's unclear if surgeons will be able and/or willing to jump from one to another. Will this be like driving a car, where you can easily switch between different models, or more like flying a plane, where a pilot is licensed for one specific model? In the end, the offerings will likely be fairly similar, and it will largely come down to personal preference. Hospitals will probably end up with two systems, one for the central OR, and one for the outpatient setting."*

Source: Bernstein expert interviews

## KEY TAKEAWAYS

In our recently published review of MDT's soft-tissue surgical robot (see link), we offered six key takeaways based on our review of management commentary and interviews with key opinion leaders, and we add three additional points here re: JNJ's robot. First, we recap takeaways we noted in our MDT note:

### (1) Customers are eager to see competition in surgical robotics...

Many surgeons *love* da Vinci and believe the technology has improved their lives by offering a better way to do their jobs. Others resent the company for perceived monopolistic behavior over the years. Where surgeons agree is in the view that competition will be a good thing for the surgical robotics market. Hospital administrators and CFOs are even more eager to explore alternatives in hopes of gaining some negotiating leverage.

### (2) ...but to make a difference, the competition needs to be compelling

Surgeons do not like change. If a surgical approach is creating good patient outcomes, it is very difficult to convince a surgeon to consider a new approach. Intuitive has spent 20 years working hard to drive adoption of robotic surgery. Over that time, the company has placed over 5,300 robots and trained over 44,000 surgeons on the da Vinci. And surgeons have invested significant time and energy to learn procedures and build skills on the platform, with over 6 million procedures performed to date and over 14,000 peer-reviewed papers published.

As much as surgeons may welcome an alternative to Intuitive, inertia will be an important barrier to switching. Given the time and energy surgeons have invested in building skills on da Vinci, many will resist considering a new, untested platform. And as much as administrators would love to drive costs down, they will struggle to convert ISRG programs to MDT programs without surgeon support. The new competition will have to be really compelling to make a difference. They will need to earn their right to compete.

### (3) Competition will fundamentally change the surgical robotics market over time

Intuitive has held a monopoly position for the last two decades. MDT and JNJ are pouring resources into their programs. It's clear that competition is coming. Even if we are not bowled over by what we have heard about the MDT robot so far, we do believe MDT will find success – if not with all customers, certainly with some – and if not with its first-generation robot, certainly with

Confidential                                                                                          Intuitive-00278221

For the exclusive use of CALVIN DARLING at INTUITIVE SURGICAL INC on 08-Sep-2019

some iteration. When competition begins to break through, it will have an impact on Intuitive. Capital sales cycles may lengthen. Procedure growth rates may modulate in certain segments. There will be pressure on pricing.

### (4) We believe MDT entry will be market-expanding

In our view, the bull case on ISRG is not dependent on maintaining the company's historic monopoly position. There is room for multiple participants in this market given that fewer than 5% of eligible procedures are currently penetrated by robotic surgery, coupled with the clear value proposition of the modality relative to both open surgery and other MIS techniques. We see this as an attractive growth market for many years to come.

Medtronic's robot seems likely to increase the range of procedures that can move from open and lap approaches to robotic approaches. As medtech markets mature, often we see competitors carve out certain niches, and we believe that's a likely outcome here.

### (5) Don't forget, ISRG is not standing still

It's easy to get lost pondering all the possible ways in which Medtronic could have impact on Intuitive's business. But it's also important to remember that Intuitive has been in the war room for years contemplating scenarios and formulating responses.

Shifting capital placements to operating leases and usage-based deals, for example, has helped the company prepare for Medtronic's per-procedure pricing model. The SP launch helps Intuitive extend the distinctiveness of its 4th generation platform, moving the goalposts for MDT and JNJ. Intuitive has experimented with multiple system designs over the years – some speculate the company may have a slimmed-down, less expensive robot ready to fight Medtronic for lower-priced procedures and ASC business. Efforts in augmented reality and machine learning have the potential to strengthen the value of ISRG's installed base. And the company's clean balance sheet gives ISRG some flexibility to act quickly on various competitive responses.

### (6) Whatever happens, it's going to take multiple years to materialize

Even if MDT's unveiling of its prototype in September makes legitimate competition to ISRG seem imminent, we are still multiple years away from full-fledged competition on a meaningful scale. Management has guided to commencement of the initial phase of the rollout to begin in FY20 (i.e., before 4/30/20), and most investors are expecting sometime in the first half of CY20. That MDT has opted to launch exclusively in OUS markets at this stage seemingly indicates that the company may have work to do to generate the quality and volume of clinical data needed for FDA approval.

We expect Medtronic to execute a controlled launch in 1H 2020 in select markets outside the U.S. to help validate the technology and begin to build clinical evidence. We anticipate a controlled U.S. launch will be staged at least 12-18 months post OUS launch. Given the time required to build out procedures, train surgeons, etc., we do not expect to see material revenue contribution for MDT until FY23 (2H CY22).

Having now spent some more time researching JNJ's general surgery robot, we add the following three additional takeaways:

### (7) Experts are generally more excited by JNJ's robotic surgery platform than by MDT's

Experts generally believe that JNJ's robot is superior to Medtronic's from a tech perspective – at least, superior to the "v1" robot Medtronic is likely to have at launch – and some believe that it could eventually become a viable competitor to da Vinci. Multiple KOLs have gone so far as to call JNJ's robot a "game-changer".

While JNJ's vision of "digital surgery" is what excited surgeons most in the long-run, JNJ also has a differentiated design with respect to the robot itself. Most notably, surgeons are very intrigued by JNJ's differentiated display screen. Like MDT and ISRG, JNJ's robot will have a 3-D display screen. However, unlike MDT, JNJ's 3-D technology does not require the use of 3-D glasses. And, unlike da Vinci, JNJ has designed a heads-up display that is less stressful on surgeons' eyes while also better enabling communication among team members in the OR. JNJ has employed a curved screen and eye-tracking technology make this combination of features possible, and early feedback has been very positive.

### (8) Being second to market might not be as advantageous as MDT hopes

We believe that there are some particularly loyal Medtronic/Covidien users who will want to test the MDT robot as soon as possible. These surgeons won't feel the need to wait around for JNJ's launch. But there are many users who are either more loyal

Confidential                                                                                    Intuitive-00278222

For the exclusive use of CALVIN DARLING at INTUITIVE SURGICAL INC on 08-Sep-2019

**Lee Hambright**  +1-212-823-3557  lee.hambright@bernstein.com                                         6 September 2019

to JNJ Ethicon than to Covidien, or who are heavy users of both surgical tools vendors. For these surgeons, it might be worth it to wait and see just how exciting JNJ's platform is before making a decision to purchase a JNJ robot, a MDT robot, both, or neither.

MDT has made the strategic decision to incorporate a substantial number of off-the-shelf components into the robot's design with the intent to get market before JNJ. However, on the whole experts seem to be more excited about JNJ's robot, and we would expect a large portion of users to wait to see what both MDT and JNJ has before committing to one platform or the other.

### (9) "Digital surgery" is exciting, and JNJ may have some differentiated capabilities – but it's not clear ISRG is behind

Commentary from JNJ management makes it clear that the company's value proposition in robotics will be part of a broader "digital surgery" platform. JNJ plans to "dramatically revolutionize surgery" by leveraging Alphabet's expertise in big data and AI to make surgery more predictable and more replicable—and ultimately to improve patient outcomes. We are intrigued by JNJ's vision of digital surgery, and strongly believe that incorporating AI and informatics at the pre- and post-op stage has the potential to improve patient outcomes beyond what robotics alone can achieve.

Our KOL interviews suggest that JNJ is developing some interesting capabilities on the digital front, but it is not clear that JNJ will have an advantage over Intuitive. JNJ does not yet have the data it needs to execute on its vision, and its digital capabilities will be quite limited until a critical mass of data has been collected. In effect, JNJ will be asking customers to sign up for a robot so that the process of data generation can begin in earnest. However, if JNJ management successfully finds a way to leverage the company's scale advantage over ISRG, that could potentially change the whole basis of competition in this market.

Confidential                                                                                              Intuitive-00278223

For the exclusive use of CALVIN DARLING at INTUITIVE SURGICAL INC on 08-Sep-2019

Lee Hambright  +1-212-823-3557  lee.hambright@bernstein.com

6 September 2019

+

## APPENDIX - FINANCIAL FORECASTS

EXHIBIT 29: **ISRG Financial Statements**

| Adjusted Income Statement | 2016 | 2017 | 2018 | 2019E | 2020E | 2021E | 2022E | 2023E | | 1Q 18 | 2Q 18 | 3Q 18 | 4Q 18 | 1Q 19 | 2Q 19 | 3Q 19E | 4Q 19E |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Instruments & Accessories | 1,396 | 1,637 | 1,962 | 2,358 | 2,790 | 3,264 | 3,787 | 4,393 | | 460 | 476 | 486 | 539 | 552 | 579 | 581 | 646 |
| Systems | 800 | 928 | 1,127 | 1,306 | 1,509 | 1,720 | 1,920 | 2,119 | | 235 | 277 | 275 | 341 | 248 | 344 | 315 | 400 |
| Services | 511 | 573 | 635 | 721 | 810 | 907 | 1,015 | 1,137 | | 153 | 156 | 160 | 167 | 174 | 177 | 181 | 189 |
| Sales | 2,707 | 3,138 | 3,724 | 4,385 | 5,108 | 5,891 | 6,711 | 7,649 | | 848 | 909 | 921 | 1,047 | 974 | 1,099 | 1,078 | 1,235 |
| COGS (adj) | 768 | 881 | 1,062 | 1,274 | 1,535 | 1,823 | 2,118 | 2,452 | | 241 | 263 | 263 | 295 | 281 | 315 | 316 | 362 |
| Gross profit (adj) | 1,938 | 2,257 | 2,663 | 3,111 | 3,573 | 4,067 | 4,594 | 5,197 | | 607 | 646 | 658 | 751 | 693 | 784 | 762 | 873 |
| SG&A (adj) | 594 | 682 | 807 | 991 | 1,129 | 1,279 | 1,450 | 1,653 | | 188 | 185 | 187 | 247 | 231 | 233 | 232 | 296 |
| R&D (adj) | 186 | 259 | 319 | 429 | 459 | 482 | 529 | 588 | | 73 | 73 | 81 | 92 | 100 | 95 | 109 | 125 |
| Operating income (adj) | 1,158 | 1,316 | 1,537 | 1,691 | 1,985 | 2,307 | 2,614 | 2,957 | | 346 | 389 | 391 | 412 | 362 | 455 | 421 | 453 |
| Interest and other income, net | 36 | 42 | 80 | 131 | 160 | 236 | 298 | 361 | | 13 | 18 | 22 | 27 | 28 | 33 | 32 | 40 |
| Earnings before taxes | 1,194 | 1,358 | 1,618 | 1,822 | 2,145 | 2,543 | 2,912 | 3,318 | | 360 | 407 | 413 | 439 | 389 | 488 | 453 | 492 |
| Taxes (adj) | 313 | 301 | 317 | 355 | 403 | 470 | 524 | 597 | | 72 | 80 | 76 | 88 | 77 | 98 | 84 | 96 |
| Net income (adj) | 881 | 1,057 | 1,305 | 1,464 | 1,742 | 2,072 | 2,388 | 2,721 | | 288 | 327 | 337 | 353 | 312 | 388 | 369 | 396 |
| | | | | | | | | | | | | | | | | | |
| Diluted EPS (adj) | $7.47 | $9.09 | $10.99 | $12.23 | $14.39 | $16.99 | $19.50 | $22.19 | | $2.44 | $2.76 | $2.83 | $2.96 | $2.61 | $3.25 | $3.08 | $3.29 |
| | | | | | | | | | | | | | | | | | |
| Avg Diluted Shares (M) | 117.9 | 116.3 | 118.8 | 119.8 | 121.0 | 121.9 | 122.5 | 122.6 | | 118.0 | 118.5 | 119.2 | 119.2 | 119.6 | 119.3 | 119.8 | 120.3 |
| | | | | | | | | | | | | | | | | | |
| EBITDA (adj) | 1,232 | 1,402 | 1,646 | 1,840 | 2,153 | 2,495 | 2,830 | 3,203 | | 370 | 415 | 418 | 444 | 393 | 492 | 460 | 495 |

| Growth Rates (YoY) | 2016 | 2017 | 2018 | 2019E | 2020E | 2021E | 2022E | 2023E | | 1Q 18 | 2Q 18 | 3Q 18 | 4Q 18 | 1Q 19 | 2Q 19 | 3Q 19E | 4Q 19E |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Reported Growth | | | | | | | | | | | | | | | | | |
| Instruments & Accessories | 18.5% | 17.3% | 19.9% | 20.2% | 18.3% | 17.0% | 16.0% | 16.0% | | 20.9% | 19.7% | 21.2% | 18.0% | 20.0% | 21.5% | 19.5% | 19.8% |
| Systems | 10.8% | 16.1% | 21.4% | 15.9% | 15.5% | 14.0% | 11.0% | 11.0% | | 45.8% | 25.5% | 4.8% | 19.7% | 5.5% | 23.9% | 14.8% | 17.4% |
| Services | 9.9% | 12.2% | 10.9% | 13.5% | 12.3% | 12.0% | 12.0% | 12.0% | | 10.7% | 11.4% | 10.7% | 10.8% | 13.9% | 13.4% | 13.4% | 13.4% |
| Total | 13.5% | 16.0% | 18.7% | 17.7% | 16.5% | 15.3% | 13.9% | 14.0% | | 24.7% | 19.8% | 14.0% | 17.3% | 14.9% | 20.9% | 17.0% | 18.0% |
| | | | | | | | | | | | | | | | | | |
| EBITDA | 21.9% | 13.8% | 17.4% | 11.8% | 17.0% | 15.9% | 13.5% | 13.2% | | 29.9% | 23.6% | 12.6% | 8.0% | 6.2% | 18.5% | 10.3% | 11.7% |
| EBIT (adj) | 22.4% | 13.6% | 16.8% | 10.0% | 17.4% | 16.2% | 13.3% | 13.1% | | 30.3% | 23.4% | 11.9% | 6.7% | 4.4% | 17.1% | 7.9% | 9.9% |
| EPS (adj) | 18.3% | 21.6% | 20.9% | 11.3% | 17.7% | 18.1% | 14.7% | 13.8% | | 42.8% | 38.4% | 1.6% | 14.1% | 7.1% | 17.6% | 8.8% | 11.1% |

| Key ratios | 2016 | 2017 | 2018 | 2019E | 2020E | 2021E | 2022E | 2023E | | 1Q 18 | 2Q 18 | 3Q 18 | 4Q 18 | 1Q 19 | 2Q 19 | 3Q 19E | 4Q 19E |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Gross margin | 71.6% | 71.9% | 71.5% | 70.9% | 69.9% | 69.0% | 68.4% | 67.9% | | 71.6% | 71.1% | 71.5% | 71.8% | 71.2% | 71.3% | 70.7% | 70.7% |
| SG&A | 22.0% | 21.7% | 21.7% | 22.6% | 22.1% | 21.7% | 21.6% | 21.6% | | 22.2% | 20.3% | 20.3% | 23.6% | 23.7% | 21.2% | 21.5% | 23.9% |
| R&D | 6.9% | 8.3% | 8.6% | 9.8% | 9.0% | 8.2% | 7.9% | 7.7% | | 8.6% | 8.0% | 8.8% | 8.8% | 10.3% | 8.7% | 10.1% | 10.1% |
| EBITDA | 45.5% | 44.7% | 44.2% | 42.0% | 42.1% | 42.3% | 42.2% | 41.9% | | 43.7% | 45.6% | 45.3% | 42.4% | 40.4% | 44.7% | 42.7% | 40.1% |
| Operating margin (adj) | 42.8% | 41.9% | 41.3% | 38.6% | 38.9% | 39.2% | 39.0% | 38.7% | | 40.9% | 42.7% | 42.4% | 39.4% | 37.1% | 41.4% | 39.1% | 36.7% |
| Incremental adj. operating margin | 65.9% | 36.6% | 37.8% | 23.2% | 40.7% | 41.1% | 37.5% | 36.5% | | 47.9% | 49.0% | 36.7% | 16.6% | 12.0% | 35.1% | 19.6% | 21.6% |
| Tax rate, % EBT | 26.2% | 22.2% | 19.6% | 19.5% | 18.8% | 18.5% | 18.0% | 18.0% | | 20.1% | 19.7% | 18.5% | 20.0% | 19.8% | 20.0% | 18.6% | 19.5% |
| Net income (adj) | 32.6% | 33.7% | 35.0% | 33.4% | 34.1% | 35.2% | 35.6% | 35.6% | | 33.9% | 36.0% | 36.6% | 33.8% | 32.0% | 35.3% | 34.2% | 32.1% |

| Cash Flow | 2016 | 2017 | 2018 | 2019E | 2020E | 2021E | 2022E | 2023E | | 1Q 18 | 2Q 18 | 3Q 18 | 4Q 18 | 1Q 19 | 2Q 19 | 3Q 19E | 4Q 19E |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| FCF | 980 | 953 | 982 | 1,260 | 1,776 | 2,206 | 2,399 | 2,740 | | 240 | 187 | 273 | 283 | 218 | 234 | 508 | 299 |
| FCF, % sales | 37% | 30% | 26% | 29% | 35% | 37% | 36% | 36% | | 28% | 21% | 30% | 27% | 22% | 21% | 47% | 24% |
| FCF/adj. NI | 112% | 90% | 75% | 86% | 102% | 106% | 100% | 101% | | 84% | 57% | 81% | 80% | 70% | 60% | 138% | 76% |
| FCF/share | $8.39 | $8.20 | $8.27 | $10.52 | $14.68 | $18.09 | $19.58 | $22.35 | | $2.03 | $1.58 | $2.29 | $2.37 | $1.83 | $1.96 | $4.24 | $2.49 |
| | | | | | | | | | | | | | | | | | |
| Cash from Operations | 1,043 | 1,144 | 1,170 | 1,625 | 2,079 | 2,552 | 2,812 | 3,198 | | 280 | 232 | 320 | 338 | 333 | 316 | 558 | 345 |
| Cash from Investing | (1,279) | 379 | (1,050) | (627) | (303) | (346) | (413) | (458) | | 54 | (44) | (573) | (486) | (309) | (223) | (49) | (46) |
| Cash from Financing | 559 | (1,913) | 126 | (107) | (280) | (561) | (910) | (1,371) | | (8) | 43 | 58 | 34 | (42) | (179) | 57 | 57 |
| Change in cash | 322 | (391) | 246 | 892 | 1,487 | 1,645 | 1,489 | 1,369 | | 326 | 230 | (195) | (115) | (18) | (85) | 565 | 356 |
| | | | | | | | | | | | | | | | | | |
| Capex | (54) | (191) | (187) | (292) | (303) | (346) | (413) | (458) | | (40) | (45) | (47) | (56) | (115) | (82) | (49) | (46) |
| Buy backs | (43) | (2,274) | 0 | (200) | (493) | (745) | (1,075) | (1,520) | | 0 | 0 | 0 | 0 | 0 | (200) | 0 | 0 |

| Balance Sheet | 2016 | 2017 | 2018 | 2019E | 2020E | 2021E | 2022E | 2023E | | 1Q 18 | 2Q 18 | 3Q 18 | 4Q 18 | 1Q 19 | 2Q 19 | 3Q 19E | 4Q 19E |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Assets | 6,487 | 5,758 | 7,847 | 9,559 | 11,395 | 13,360 | 15,352 | 17,277 | | 6,426 | 6,850 | 7,319 | 7,847 | 8,235 | 8,532 | 9,007 | 9,559 |
| Current Assets | 3,250 | 2,811 | 4,333 | 5,094 | 6,815 | 8,641 | 10,454 | 12,188 | | 3,382 | 3,886 | 4,333 | 4,333 | 4,025 | 4,072 | 4,542 | 5,094 |
| LT Assets | 3,237 | 2,947 | 3,514 | 4,465 | 4,263 | 4,333 | 4,233 | 4,125 | | 3,045 | 2,864 | 3,066 | 3,514 | 4,210 | 4,460 | 4,465 | 4,465 |
| Book Value of Equity | 5,778 | 4,727 | 6,688 | 8,330 | 10,144 | 12,079 | 14,044 | 15,942 | | 5,506 | 5,869 | 6,289 | 6,688 | 7,040 | 7,280 | 7,785 | 8,330 |
| Total Liabilities | 709 | 1,031 | 1,159 | 1,229 | 1,251 | 1,281 | 1,307 | 1,335 | | 920 | 980 | 1,030 | 1,159 | 1,195 | 1,252 | 1,222 | 1,229 |
| | | | | | | | | | | | | | | | | | |
| Cash | 1,037 | 648 | 858 | 1,712 | 3,199 | 4,844 | 6,333 | 7,701 | | 975 | 1,204 | 1,008 | 858 | 876 | 790 | 1,356 | 1,712 |
| Total Debt | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Net Debt (cash) | (1,037) | (648) | (858) | (1,712) | (3,199) | (4,844) | (6,333) | (7,701) | | (975) | (1,204) | (1,008) | (858) | (876) | (790) | (1,356) | (1,712) |
| Net Debt (cash): EBITDA | -0.8x | -0.5x | -0.5x | -0.9x | -1.5x | -1.9x | -2.2x | -2.4x | | 0.7x | 0.7x | 0.6x | 0.5x | 0.6x | 0.4x | 0.7x | 0.9x |
| Total Debt (cash): EBITDA | 0.0x | 0.0x | 0.0x | 0.0x | 0.0x | 0.0x | 0.0x | 0.0x | | 0.0x | 0.0x | 0.0x | 0.0x | 0.0x | 0.0x | 0.0x | 0.0x |
| NOPAT (All in) | 855 | 1,024 | 1,237 | 1,361 | 1,612 | 1,880 | 2,144 | 2,425 | | 277 | 312 | 318 | 329 | 290 | 364 | 343 | 364 |
| ROIC (All in) | 15.9% | 17.9% | 19.5% | 16.4% | 15.8% | 15.6% | 15.3% | 15.2% | | 19.3% | 19.9% | 19.1% | 18.5% | 15.3% | 18.4% | 17.4% | 17.4% |
| ROIC (Tangible) | 16.9% | 19.0% | 21.0% | 17.6% | 16.8% | 16.4% | 15.9% | 15.7% | | | | | | | | | |

Source: Company reports; Bernstein estimates & analysis

U.S. MEDICAL DEVICES

BERNSTEIN    22

For the exclusive use of CALVIN DARLING at INTUITIVE SURGICAL INC on 08-Sep-2019

Lee Hambright  +1-212-823-3557  lee.hambright@bernstein.com

6 September 2019

EXHIBIT 30: **JNJ Financial Statements**

| Adjusted Income | 2017 | 2018 | 2019E | 2020E | 2021E | 2022E | 2023E | 1Q 18 | 2Q 18 | 3Q 18 | 4Q 18 | 1Q 19 | 2Q 19 | 3Q 19E | 4Q 19E |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Consumer | 13,602 | 13,853 | 13,958 | 14,383 | 14,648 | 15,320 | 15,608 | 3,398 | 3,504 | 3,415 | 3,536 | 3,318 | 3,544 | 3,463 | 3,634 |
| M&D | 26,592 | 26,994 | 25,708 | 26,451 | 27,506 | 28,631 | 29,831 | 6,767 | 6,972 | 6,587 | 6,668 | 6,458 | 6,491 | 6,141 | 6,618 |
| Pharma | 36,256 | 40,734 | 42,005 | 44,879 | 47,496 | 48,064 | 49,498 | 9,844 | 10,354 | 10,346 | 10,190 | 10,244 | 10,529 | 10,497 | 10,735 |
| Sales (adj) | 76,450 | 81,581 | 81,671 | 85,713 | 89,850 | 92,015 | 95,137 | 20,009 | 20,830 | 20,348 | 20,394 | 20,020 | 20,564 | 20,101 | 20,987 |
| COGS (adj) | 21,729 | 22,521 | 22,991 | 23,963 | 24,941 | 25,451 | 26,220 | 5,416 | 5,768 | 5,481 | 5,856 | 5,462 | 5,784 | 5,656 | 6,089 |
| Gross profit (adj) | 54,721 | 59,060 | 58,681 | 61,750 | 64,909 | 66,564 | 68,916 | 14,593 | 15,062 | 14,867 | 14,538 | 14,558 | 14,780 | 14,445 | 14,898 |
| SG&A (adj) | 21,420 | 22,540 | 21,935 | 22,726 | 23,420 | 23,893 | 24,610 | 5,263 | 5,743 | 5,543 | 5,991 | 5,219 | 5,546 | 5,214 | 5,955 |
| R&D (adj) | 10,554 | 10,775 | 11,210 | 11,421 | 11,703 | 11,894 | 12,202 | 2,404 | 2,639 | 2,508 | 3,224 | 2,858 | 2,666 | 2,578 | 3,108 |
| Operating income (adj) | 22,747 | 25,745 | 25,536 | 27,603 | 29,786 | 30,777 | 32,104 | 6,926 | 6,680 | 6,816 | 5,323 | 6,481 | 6,568 | 6,653 | 5,834 |
| Interest expense (adj) | 549 | 394 | 50 | 264 | 178 | 195 | 186 | 145 | 127 | 68 | 54 | 3 | -5 | 37 | 15 |
| Other expense (income) (adj) | -2,015 | -1,347 | -2,751 | -1,800 | -1,400 | -1,300 | -1,300 | -77 | -461 | -32 | -777 | -388 | -2,043 | -160 | -160 |
| Earnings before taxes (adj) | 24,212 | 26,698 | 28,237 | 29,139 | 31,008 | 31,881 | 33,118 | 6,858 | 7,014 | 6,780 | 6,046 | 6,866 | 6,616 | 6,776 | 5,979 |
| Taxes (adj) | 4,172 | 4,383 | 5,084 | 4,808 | 5,116 | 5,260 | 5,464 | 1,223 | 1,296 | 1,190 | 674 | 1,206 | 1,664 | 1,287 | 927 |
| Net income (adj) | 20,040 | 22,315 | 23,153 | 24,331 | 25,891 | 26,621 | 27,654 | 5,635 | 5,718 | 5,590 | 5,372 | 5,660 | 6,952 | 5,488 | 5,053 |
| | | | | | | | | | | | | | | | |
| Diluted EPS (adj) | $7.30 | $8.18 | $8.62 | $9.16 | $9.79 | $10.11 | $10.55 | $2.06 | $2.10 | $2.05 | $1.97 | $2.10 | $2.58 | $2.05 | $1.89 |
| | | | | | | | | | | | | | | | |
| Avg Diluted Shares (M) | 2,745.3 | 2,728.7 | 2,685.6 | 2,654.9 | 2,643.8 | 2,632.2 | 2,620.7 | 2,731.9 | 2,721.3 | 2,727.6 | 2,724.0 | 2,698.8 | 2,691.7 | 2,680.5 | 2,671.2 |
| | | | | | | | | | | | | | | | |
| EBITDA | 25,426 | 28,317 | 28,435 | 31,566 | 34,673 | 36,564 | 38,637 | 7,557 | 7,353 | 7,462 | 5,985 | 7,112 | 7,217 | 7,370 | 6,736 |

| Growth Rates (YoY) | 2017 | 2018 | 2019E | 2020E | 2021E | 2022E | 2023E | 1Q 18 | 2Q 18 | 3Q 18 | 4Q 18 | 1Q 19 | 2Q 19 | 3Q 19E | 4Q 19E |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Organic | | | | | | | | | | | | | | | |
| Consumer | -0.5% | 3.2% | 1.7% | 3.1% | 3.2% | 3.2% | 3.2% | 2.0% | 0.9% | 6.1% | 3.8% | 0.7% | 2.3% | 1.7% | 2.2% |
| M/D&D | 1.9% | 2.6% | 3.1% | 3.9% | 4.0% | 4.1% | 4.2% | 1.1% | 2.9% | 2.9% | 3.3% | 4.3% | 3.2% | 2.1% | 2.8% |
| Pharma | 4.2% | 8.4% | 5.1% | 6.9% | 5.8% | 1.2% | 3.0% | 7.5% | 11.0% | 8.2% | 7.2% | 7.9% | 4.4% | 2.7% | 5.6% |
| Total | 2.4% | 5.5% | 3.9% | 5.3% | 4.8% | 2.4% | 3.4% | 4.3% | 6.3% | 6.1% | 5.3% | 5.5% | 3.7% | 2.3% | 4.1% |
| Currency | 0.4% | 0.3% | -2.0% | 0.0% | 0.0% | 0.0% | 0.0% | 4.2% | 1.9% | -1.9% | -2.3% | -3.9% | -2.9% | -1.0% | -0.2% |
| M&A | 3.6% | 0.9% | -1.8% | -0.3% | 0.0% | 0.0% | 0.0% | 4.1% | 2.4% | -0.6% | -2.0% | -1.6% | -2.1% | -2.5% | -1.0% |
| Reported Growth | 6.3% | 6.7% | 0.1% | 4.9% | 4.8% | 2.4% | 3.4% | 12.6% | 10.6% | 3.6% | 1.0% | 0.1% | -1.3% | -1.2% | 2.9% |
| | | | | | | | | | | | | | | | |
| EBITDA | 0.2% | 11.4% | 0.4% | 11.0% | 9.8% | 5.5% | 5.7% | 16.1% | 9.0% | 9.4% | 11.2% | -5.9% | -1.3% | -1.2% | 12.6% |
| Operating income (adj) | -0.7% | 13.2% | -0.8% | 8.1% | 7.9% | 3.3% | 4.3% | 16.9% | 10.6% | 10.2% | 15.9% | -6.4% | -1.7% | -2.4% | 9.6% |
| EPS (adj) | 8.5% | 12.0% | 5.4% | 6.3% | 6.9% | 3.3% | 4.3% | 12.8% | 14.5% | 8.0% | 13.1% | 1.7% | 22.9% | -0.1% | -4.1% |

| Key ratios | 2017 | 2018 | 2019E | 2020E | 2021E | 2022E | 2023E | 1Q 18 | 2Q 18 | 3Q 18 | 4Q 18 | 1Q 19 | 2Q 19 | 3Q 19E | 4Q 19E |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Gross margin | 71.6% | 72.4% | 71.8% | 72.0% | 72.2% | 72.3% | 72.4% | 72.9% | 72.3% | 73.1% | 71.3% | 72.7% | 71.9% | 71.9% | 71.0% |
| SG&A | 28.0% | 27.6% | 26.9% | 26.5% | 26.1% | 26.0% | 25.9% | 26.3% | 27.6% | 27.2% | 29.4% | 26.1% | 27.0% | 25.9% | 28.4% |
| R&D | 13.8% | 13.2% | 13.7% | 13.3% | 13.0% | 12.9% | 12.8% | 12.0% | 12.7% | 12.3% | 15.8% | 14.3% | 13.0% | 12.8% | 14.8% |
| EBITDA | 33.3% | 34.7% | 34.8% | 36.8% | 38.6% | 39.7% | 40.6% | 37.8% | 35.1% | 36.7% | 29.3% | 35.5% | 35.1% | 36.7% | 32.1% |
| Operating margin (adj) | 29.8% | 31.6% | 31.3% | 32.2% | 33.2% | 33.4% | 33.7% | 34.6% | 32.1% | 33.5% | 26.1% | 32.4% | 31.9% | 33.1% | 27.8% |
| Tax rate, % EBT | 17.2% | 16.4% | 18.0% | 16.5% | 16.5% | 16.5% | 16.5% | 17.8% | 18.5% | 17.6% | 11.1% | 17.6% | 19.3% | 19.0% | 15.5% |
| Net income (adj) | 26.2% | 27.4% | 28.3% | 28.4% | 28.8% | 28.9% | 29.1% | 28.2% | 27.5% | 27.5% | 26.3% | 28.3% | 33.8% | 27.3% | 24.1% |

| Cash Flow | 2017 | 2018 | 2019E | 2020E | 2021E | 2022E | 2023E | 1Q 18 | 2Q 18 | 3Q 18 | 4Q 18 | 1Q 19 | 2Q 19 | 3Q 19E | 4Q 19E |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| FCF | 17,777 | 18,531 | 20,297 | 29,633 | 32,153 | 33,919 | 35,716 | 2,948 | 5,204 | 5,453 | 4,926 | 2,887 | 4,829 | 6,666 | 5,895 |
| FCF, % sales | 23% | 23% | 25% | 35% | 36% | 37% | 38% | 15% | 25% | 27% | 24% | 14% | 23% | 33% | 28% |
| FCF:Adj. NI | 89% | 83% | 88% | 122% | 124% | 127% | 129% | 52% | 91% | 98% | 92% | 51% | 69% | 122% | 117% |
| FCF/share | $6.48 | $6.79 | $7.56 | $11.16 | $12.16 | $12.89 | $13.63 | $1.08 | $1.91 | $2.00 | $1.81 | $1.07 | $1.79 | $2.49 | $2.21 |
| | | | | | | | | | | | | | | | |
| Cash from Operations | 21,056 | 22,201 | 23,584 | 33,407 | 36,151 | 37,991 | 39,930 | 3,606 | 6,079 | 6,272 | 6,244 | 3,543 | 5,648 | 7,502 | 7,199 |
| Cash from Investing | (14,868) | (3,167) | (10,327) | (10,506) | (10,730) | (10,804) | (10,946) | (925) | (201) | (4,269) | 2,228 | (1,417) | (2,502) | (2,499) | (2,987) |
| Cash from Financing | (7,673) | (18,510) | (17,919) | (18,899) | (14,715) | (14,688) | (14,538) | (5,970) | (2,674) | (3,477) | (6,389) | (5,516) | (4,528) | (4,521) | (4,362) |
| Change in cash | (1,148) | 283 | (4,662) | 4,002 | 10,706 | 12,499 | 14,446 | (3,185) | 2,930 | (1,513) | 2,051 | (3,373) | (1,382) | 482 | (150) |
| | | | | | | | | | | | | | | | |
| Capex | (3,279) | (3,670) | (3,595) | (3,774) | (3,998) | (4,072) | (4,214) | (658) | (875) | (819) | (1,318) | (656) | (819) | (816) | (1,304) |
| Acquisitions, net | (35,151) | (899) | (6,732) | (6,732) | (6,732) | (6,732) | (6,732) | (82) | (140) | (675) | (2) | (1,683) | (1,683) | (1,683) | (1,683) |
| Buy backs | (6,358) | (5,868) | (8,824) | (9,415) | (5,380) | (5,380) | (5,380) | (1,444) | (145) | (471) | (3,808) | (2,206) | (2,206) | (2,206) | (2,206) |

| Balance Sheet | 2017 | 2018 | 2019E | 2020E | 2021E | 2022E | 2023E | 1Q 18 | 2Q 18 | 3Q 18 | 4Q 18 | 1Q 19 | 2Q 19 | 3Q 19E | 4Q 19E |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Assets | 157,303 | 152,954 | 148,945 | 156,418 | 169,517 | 182,884 | 197,700 | 156,625 | 155,365 | 155,703 | 152,954 | 150,027 | 146,221 | 146,903 | 148,945 |
| Current Assets | 43,088 | 46,033 | 38,428 | 43,868 | 55,853 | 69,044 | 84,453 | 42,768 | 45,438 | 47,194 | 46,033 | 41,987 | 37,410 | 37,367 | 38,428 |
| LT Assets | 114,215 | 106,921 | 110,517 | 112,550 | 113,665 | 113,840 | 113,248 | 113,857 | 109,927 | 108,509 | 106,921 | 108,040 | 108,811 | 109,536 | 110,517 |
| Book Value of Equity | 60,160 | 59,752 | 63,597 | 69,797 | 81,769 | 94,525 | 108,489 | 63,255 | 62,889 | 64,626 | 59,752 | 58,955 | 61,565 | 62,715 | 63,597 |
| Total Liabilities | 97,143 | 93,202 | 85,348 | 86,620 | 87,748 | 88,359 | 89,212 | 93,370 | 92,476 | 91,077 | 93,202 | 91,072 | 84,656 | 84,187 | 85,348 |
| | | | | | | | | | | | | | | | |
| Cash + Marketable Securities | 18,296 | 19,687 | 14,286 | 18,288 | 28,994 | 41,493 | 55,939 | 15,204 | 18,139 | 19,364 | 19,687 | 15,336 | 13,954 | 14,436 | 14,286 |
| Total Debt | 34,581 | 30,480 | 29,368 | 29,368 | 29,368 | 29,368 | 29,368 | 32,533 | 32,083 | 31,253 | 30,480 | 29,368 | 29,368 | 29,368 | 29,368 |
| Net Debt | 16,285 | 10,793 | 15,082 | 11,080 | 374 | (12,125) | (26,571) | 17,329 | 13,944 | 11,889 | 10,793 | 14,032 | 15,414 | 14,932 | 15,082 |
| Net Debt:EBITDA | 0.6x | 0.4x | 0.5x | 0.4x | 0.0x | -0.3x | -0.7x | 0.6x | 0.5x | 0.4x | 0.5x | 0.5x | 0.5x | 0.5x | 0.5x |
| Total Debt:EBITDA | 1.4x | 1.1x | 1.0x | 0.9x | 0.8x | 0.8x | 0.8x | 1.1x | 1.1x | 1.0x | 1.3x | 1.0x | 1.0x | 1.0x | 1.1x |
| NOPAT (All in) | 18,827 | 21,518 | 20,937 | 23,049 | 24,871 | 25,699 | 26,807 | | | | | | | | |
| ROIC (All in) | 20% | 20% | 19% | 20% | 21% | 22% | 23% | | | | | | | | |
| ROIC (Tangible) | 68% | 80% | 65% | 56% | 52% | 48% | 46% | | | | | | | | |

Source: Company reports; Bernstein estimates & analysis

U.S. MEDICAL DEVICES

BERNSTEIN    23

For the exclusive use of CALVIN DARLING at INTUITIVE SURGICAL INC on 08-Sep-2019

Lee Hambright  +1-212-823-3557  lee.hambright@bernstein.com

6 September 2019

EXHIBIT 31: **MDT Financial Statements**

**Adjusted Income**

| | 2017 | 2018 | 2019 | 2020E | 2021E | 2022E | 2023E | 2024E | 1Q 19 | 2Q 19 | 3Q 19 | 4Q 19 | 1Q 20 | 2Q 20E | 3Q 20E | 4Q 20E |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cardiac & Vascular | 10,498 | 11,354 | 11,505 | 11,921 | 12,188 | 12,688 | 13,188 | 13,709 | 2,811 | 2,858 | 2,786 | 3,050 | 2,790 | 2,867 | 2,868 | 3,165 |
| Minimally Invasive Therapies | 9,910 | 8,716 | 8,478 | 8,794 | 9,178 | 9,547 | 9,932 | 10,333 | 2,052 | 2,047 | 2,124 | 2,255 | 2,100 | 2,127 | 2,212 | 2,355 |
| Restorative Therapies | 7,366 | 7,743 | 8,183 | 8,512 | 8,916 | 9,278 | 9,631 | 9,966 | 1,949 | 1,993 | 2,026 | 2,215 | 2,012 | 2,071 | 2,110 | 2,318 |
| Diabetes | 1,927 | 2,140 | 2,391 | 2,521 | 2,697 | 2,886 | 3,088 | 3,305 | 572 | 583 | 610 | 626 | 592 | 593 | 656 | 679 |
| Sales (adj) | 29,710 | 29,953 | 30,557 | 31,518 | 32,980 | 34,399 | 35,839 | 37,312 | 7,384 | 7,481 | 7,546 | 8,146 | 7,494 | 7,659 | 7,847 | 8,518 |
| COGS (adj) | 9,233 | 8,982 | 9,057 | 9,613 | 10,042 | 10,457 | 10,877 | 11,305 | 2,187 | 2,179 | 2,243 | 2,448 | 2,328 | 2,315 | 2,380 | 2,580 |
| Gross profit (adj) | 20,477 | 20,971 | 21,500 | 21,905 | 22,938 | 23,942 | 24,962 | 26,007 | 5,197 | 5,302 | 5,303 | 5,698 | 5,166 | 5,344 | 5,468 | 5,928 |
| R&D | 2,193 | 2,256 | 2,330 | 2,337 | 2,380 | 2,448 | 2,514 | 2,580 | 565 | 590 | 561 | 594 | 582 | 583 | 588 | 604 |
| SG&A | 8,711 | 9,947 | 10,157 | 10,230 | 10,606 | 11,011 | 11,436 | 11,868 | 2,538 | 2,554 | 2,500 | 2,565 | 2,485 | 2,561 | 2,553 | 2,631 |
| Other operating expense, net | 222 | -444 | 141 | 56 | 69 | 82 | 96 | 95 | 60 | 73 | 38 | -30 | -18 | 25 | 24 | 26 |
| Operating income (adj) | 9,351 | 8,324 | 8,872 | 9,282 | 9,853 | 10,402 | 10,916 | 11,464 | 2,014 | 2,085 | 2,204 | 2,569 | 2,117 | 2,175 | 2,324 | 2,668 |
| Other non-operating (inc) expense | | -425 | -311 | -377 | -425 | -555 | -689 | -827 | -76 | -77 | -64 | -94 | -102 | -95 | -85 | -95 |
| Net interest expense | 728 | 1,108 | 959 | 722 | 709 | 709 | 709 | 709 | 242 | 241 | 243 | 233 | 196 | 175 | 175 | 175 |
| Earnings before taxes (adj) | 7,623 | 7,641 | 8,223 | 8,938 | 9,569 | 10,248 | 10,896 | 11,581 | 1,847 | 1,921 | 2,025 | 2,430 | 2,023 | 2,095 | 2,234 | 2,587 |
| Taxes (adj) | 1,229 | 1,108 | 1,133 | 1,431 | 1,483 | 1,558 | 1,634 | 1,737 | 245 | 261 | 274 | 353 | 319 | 340 | 357 | 414 |
| Net income (adj) | 6,394 | 6,533 | 7,089 | 7,507 | 8,086 | 8,690 | 9,262 | 9,844 | 1,601 | 1,660 | 1,751 | 2,077 | 1,704 | 1,754 | 1,876 | 2,173 |
| Diluted EPS (adj) | 4.60 | 4.77 | 5.22 | 5.58 | 6.11 | 6.71 | 7.31 | 7.95 | 1.17 | 1.22 | 1.29 | 1.54 | 1.26 | 1.30 | 1.40 | 1.62 |
| Avg Diluted Shares (M) | 1,391 | 1,368 | 1,358 | 1,346 | 1,322 | 1,294 | 1,266 | 1,238 | 1,365 | 1,361 | 1,353 | 1,351 | 1,352 | 1,348 | 1,344 | 1,340 |
| EBITDA | 9,288 | 9,145 | 9,767 | 10,176 | 10,807 | 11,398 | 11,966 | 12,562 | 2,234 | 2,291 | 2,443 | 2,799 | 2,327 | 2,398 | 2,554 | 2,898 |

**Growth Rates (YoY)**

| | 2017 | 2018 | 2019 | 2020E | 2021E | 2022E | 2023E | 2024E | 1Q 19 | 2Q 19 | 3Q 19 | 4Q 19 | 1Q 20 | 2Q 20E | 3Q 20E | 4Q 20E |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Organic Growth | | | | | | | | | | | | | | | | |
| Cardiac & Vascular | 3.0% | 6.0% | 2.9% | 2.7% | 4.2% | 4.1% | 3.9% | 3.9% | 5.0% | 4.4% | 1.6% | 1.1% | 1.4% | 1.4% | 3.6% | 4.3% |
| Minimally Invasive Therapies | 4.0% | 4.0% | 5.8% | 5.0% | 4.4% | 4.0% | 4.0% | 4.0% | 4.9% | 6.8% | 6.6% | 5.1% | 4.8% | 5.2% | 4.9% | 5.0% |
| Restorative Therapies | 2.0% | 4.0% | 6.8% | 4.7% | 4.8% | 4.1% | 3.8% | 3.5% | 6.8% | 7.8% | 5.5% | 8.5% | 4.8% | 4.6% | 4.5% | 5.0% |
| Diabetes | 4.0% | 9.0% | 13.4% | 6.4% | 7.0% | 7.0% | 7.0% | 7.0% | 26.3% | 27.5% | 6.5% | 6.5% | 5.4% | 2.8% | 8.0% | 9.0% |
| Total Organic Growth | 3.0% | 5.0% | 5.5% | 4.1% | 4.6% | 4.3% | 4.2% | 4.1% | 6.8% | 7.5% | 4.4% | 3.6% | 3.5% | 3.4% | 4.5% | 5.0% |
| FX | -0.1% | 1.7% | -1.5% | -1.0% | 0.0% | 0.0% | 0.0% | 0.0% | 1.1% | -1.3% | -2.0% | -3.5% | -2.0% | -1.0% | -0.5% | -0.5% |
| M&A | 0.2% | -5.8% | -2.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | -7.9% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Reported Growth | 3.0% | 0.8% | 2.0% | 3.1% | 4.6% | 4.3% | 4.2% | 4.1% | -0.1% | 6.1% | 2.4% | 0.0% | 1.5% | 2.4% | 4.0% | 4.6% |
| EBITDA | 3.0% | -1.5% | 6.8% | 4.2% | 6.2% | 5.5% | 5.0% | 5.0% | 4.7% | 9.5% | 8.5% | 4.9% | 4.2% | 4.7% | 4.5% | 3.5% |
| EBIT (adj) | 2.8% | -0.3% | 6.6% | 4.6% | 6.2% | 5.6% | 4.9% | 5.0% | 3.2% | 11.3% | 7.7% | 4.8% | 5.1% | 4.3% | 5.4% | 3.8% |
| EPS (adj) | 5.2% | 3.9% | 9.4% | 6.8% | 9.6% | 9.8% | 8.9% | 8.7% | 4.7% | 14.4% | 10.0% | 8.2% | 7.5% | 6.7% | 7.9% | 5.5% |

**Key ratios**

| | 2017 | 2018 | 2019 | 2020E | 2021E | 2022E | 2023E | 2024E | 1Q 19 | 2Q 19 | 3Q 19 | 4Q 19 | 1Q 20 | 2Q 20E | 3Q 20E | 4Q 20E |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Gross margin | 68.9% | 70.0% | 70.4% | 69.5% | 69.6% | 69.6% | 69.7% | 69.7% | 70.4% | 70.9% | 70.3% | 69.9% | 68.9% | 69.8% | 69.7% | 69.6% |
| SG&A | 32.7% | 33.2% | 33.2% | 32.5% | 32.2% | 32.0% | 31.9% | 31.8% | 34.4% | 34.1% | 33.1% | 31.5% | 33.2% | 33.4% | 32.5% | 30.9% |
| R&D | 7.4% | 7.5% | 7.6% | 7.4% | 7.2% | 7.1% | 7.0% | 6.9% | 7.9% | 7.9% | 7.4% | 7.3% | 7.8% | 7.6% | 7.5% | 7.1% |
| EBITDA | 31.3% | 30.5% | 32.0% | 32.3% | 32.8% | 33.1% | 33.4% | 33.7% | 30.2% | 30.6% | 32.4% | 34.4% | 31.0% | 31.3% | 32.5% | 34.0% |
| Operating margin (adj) | 28.1% | 27.8% | 29.0% | 29.5% | 29.9% | 30.2% | 30.5% | 30.7% | 27.3% | 27.9% | 29.2% | 31.5% | 28.2% | 28.4% | 29.6% | 31.3% |
| Incremental adj. operating margin | 25.5% | -11.1% | 90.7% | 42.7% | 39.1% | 38.6% | 35.7% | 37.2% | -1043% | 49.0% | 88.7% | 5850.0% | 94% | 50.4% | 30.7% | 26.5% |
| Tax rate, % EBT | 16.1% | 14.5% | 13.8% | 16.0% | 15.5% | 15.2% | 15.0% | 15.0% | 13.3% | 13.6% | 13.5% | 14.5% | 15.8% | 16.3% | 16.0% | 16.0% |
| Net income (adj) | 21.5% | 21.8% | 23.2% | 23.8% | 24.5% | 25.3% | 25.8% | 26.4% | 21.7% | 22.2% | 23.2% | 25.5% | 22.7% | 22.9% | 23.9% | 25.5% |

**Cash Flow**

| | 2017 | 2018 | 2019 | 2020E | 2021E | 2022E | 2023E | 2024E | 1Q 19 | 2Q 19 | 3Q 19 | 4Q 19 | 1Q 20 | 2Q 20E | 3Q 20E | 4Q 20E |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| FCF | 5,626 | 3,616 | 5,873 | 6,938 | 8,264 | 8,856 | 9,497 | 10,108 | 1,411 | 957 | 1,753 | 1,752 | 1,209 | 1,609 | 1,835 | 2,286 |
| FCF, % sales | 19% | 12% | 19% | 22% | 25% | 26% | 26% | 27% | 19% | 13% | 23% | 22% | 16% | 21% | 23% | 27% |
| FCF/Adj. NI | 88% | 55% | 83% | 92% | 102% | 103% | 103% | 103% | 88% | 58% | 100% | 84% | 71% | 92% | 98% | 105% |
| FCF/share | $4.04 | $2.64 | $4.33 | $5.15 | $6.25 | $6.92 | $7.50 | $8.16 | $1.03 | $0.70 | $1.30 | $1.30 | $0.89 | $1.18 | $1.37 | $1.71 |
| Cash from Operations | 6,880 | 4,684 | 7,007 | 8,097 | 9,476 | 10,214 | 10,811 | 11,474 | 1,702 | 1,163 | 2,055 | 2,087 | 1,510 | 1,848 | 2,126 | 2,614 |
| Cash from Investing | (1,571) | 5,858 | (774) | (1,409) | (1,212) | (1,258) | (1,314) | (1,368) | 643 | 121 | (1,009) | (520) | (551) | (239) | (239) | (328) |
| Cash from Financing | (3,283) | (11,954) | (5,431) | (3,016) | (4,963) | (5,447) | (5,868) | (6,349) | (1,573) | (1,730) | (1,268) | (860) | (274) | (907) | (914) | (921) |
| Change in cash | 2,091 | (1,298) | 724 | 3,674 | 3,301 | 3,509 | 3,628 | 3,759 | 711 | (469) | (208) | 690 | 687 | 702 | 921 | 1,365 |
| Capex | (1,254) | (1,068) | (1,134) | (1,159) | (1,212) | (1,258) | (1,314) | (1,366) | (291) | (206) | (302) | (335) | (301) | (239) | (291) | (328) |
| Acquisitions, net | (1,324) | (1,317) | (1,827) | (145) | 0 | 0 | 0 | 0 | (104) | (15) | (1,496) | (212) | (145) | 0 | 0 | 0 |
| Buy backs | (3,544) | (2,171) | (2,877) | (1,446) | (2,782) | (3,012) | (3,260) | (3,529) | (824) | (1,223) | (681) | (149) | (333) | (384) | (371) | (378) |

**Balance Sheet**

| | 2017 | 2018 | 2019 | 2020E | 2021E | 2022E | 2023E | 2024E | 1Q 19 | 2Q 19 | 3Q 19 | 4Q 19 | 1Q 20 | 2Q 20E | 3Q 20E | 4Q 20E |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Assets | 89,816 | 91,383 | 89,694 | 94,939 | 99,043 | 103,234 | 107,614 | 112,108 | 89,721 | 88,150 | 88,730 | 89,694 | 91,268 | 92,109 | 93,234 | 94,939 |
| Current Assets | 24,873 | 22,980 | 21,987 | 27,545 | 33,169 | 38,884 | 44,782 | 50,793 | 22,460 | 21,653 | 20,877 | 21,987 | 22,705 | 23,982 | 25,515 | 27,545 |
| LT Assets | 74,943 | 68,413 | 67,727 | 67,395 | 65,874 | 64,350 | 62,832 | 61,315 | 67,261 | 66,497 | 67,853 | 67,727 | 68,562 | 68,127 | 67,739 | 67,395 |
| Book Value of Equity | 50,418 | 50,822 | 50,212 | 53,787 | 57,223 | 60,762 | 64,525 | 68,375 | 50,326 | 49,714 | 49,941 | 50,212 | 50,407 | 51,417 | 52,454 | 53,787 |
| Total Liabilities | 49,400 | 40,571 | 39,482 | 41,152 | 41,820 | 42,442 | 43,089 | 43,733 | 39,382 | 38,436 | 38,789 | 39,482 | 40,771 | 40,692 | 40,800 | 41,152 |
| Cash + Marketable Securities | 13,708 | 11,227 | 9,848 | 15,014 | 20,093 | 25,388 | 30,799 | 36,342 | 11,004 | 10,133 | 9,142 | 9,848 | 10,683 | 11,837 | 13,206 | 15,014 |
| Total Debt | 33,441 | 25,757 | 25,324 | 26,262 | 26,262 | 26,262 | 26,262 | 26,262 | 25,223 | 25,016 | 25,030 | 25,324 | 26,262 | 26,262 | 26,262 | 26,262 |
| Net Debt | 19,733 | 14,530 | 15,476 | 11,248 | 6,169 | 874 | (4,537) | (10,080) | 14,219 | 14,883 | 15,888 | 15,476 | 15,579 | 14,425 | 13,056 | 11,248 |
| Net Debt:EBITDA | 2.1x | 1.6x | 1.6x | 1.1x | 0.6x | 0.1x | -0.4x | -0.8x | 1.6x | 1.6x | 1.6x | 1.4x | 1.7x | 1.5x | 1.3x | 1.0x |
| Total Debt:EBITDA | 3.6x | 2.8x | 2.6x | 2.6x | 2.4x | 2.3x | 2.2x | 2.1x | 2.8x | 2.7x | 2.6x | 2.3x | 2.8x | 2.7x | 2.6x | 2.3x |
| NOPAT (All in) | 4,471 | 5,687 | 6,128 | 6,260 | 6,823 | 7,306 | 7,763 | 8,228 | | | | | | | | |
| ROIC (All in) | 5.6% | 7.5% | 8.5% | 8.7% | 9.5% | 10.4% | 11.3% | 12.2% | | | | | | | | |
| ROIC (Tangible) | 25.6% | 52.3% | 52.4% | 47.3% | 49.5% | 51.7% | 53.3% | 55.0% | | | | | | | | |

Source: Company reports, Bernstein estimates & analysis

For the exclusive use of CALVIN DARLING at INTUITIVE SURGICAL INC on 08-Sep-2019

**Lee Hambright**  +1-212-823-3557  lee.hambright@bernstein.com

6 September 2019

DISCLOSURE APPENDIX

## TICKER TABLE

| Ticker | Rating | | 5 Sep 2019 Closing Price | Target Price | TTM Rel. Perf. | | EPS Reported | | | P/E Reported | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | 2018A | 2019E | 2020E | 2018A | 2019E | 2020E |
| ISRG | O | USD | 508.17 | 635.00 | (8.3)% | USD | 10.99 | 12.23 | 14.39 | 46.26 | 41.56 | 35.32 |
| JNJ | M | USD | 128.58 | 148.00 | (8.4)% | USD | 8.18 | 8.62 | 9.16 | 15.72 | 14.91 | 14.03 |
| MDT | M | USD | 107.72 | 114.00 | 9.1% | USD | 5.22 | 5.58 | 6.11 | 20.63 | 19.31 | 17.62 |
| SPX | | | 2,976.00 | | | | 159.61 | 162.91 | 179.71 | 18.65 | 18.27 | 16.56 |

O - Outperform, M - Market-Perform, U - Underperform, N – Not Rated

MDT base year is 2019.

## VALUATION METHODOLOGY

**Intuitive Surgical Inc**

ISRG: Our target price for ISRG is based on a 40.5x target P/E multiple, applied to our next twelve months' estimates, twelve months hence. The P/E target reflects observed absolute and relative historical multiples and our outlook for forward growth.

**Johnson & Johnson**

JNJ: Our target price for JNJ is based on a 15.5x target P/E multiple, applied to our next twelve months' estimates, twelve months hence. The P/E target reflects observed absolute and relative historical multiples and our outlook for forward growth. We also use current EV/EBITDA vs. history and DCFs as secondary inputs to our valuation.

**Medtronic PLC**

MDT: Our target price for MDT is based on a 17x target P/E multiple, applied to our next twelve months' estimates, twelve months hence. The P/E target reflects observed absolute and relative historical multiples and our outlook for forward growth.

## RISKS

**Intuitive Surgical Inc**

Downside risks include: Major product recall, earlier than expected introduction of surgical robots from major competitors, changes in treatment guidelines for critical procedures (prostatectomy, hysterectomy, etc.), changes to the economic environment that significantly reduce healthcare spending levels.

**Johnson & Johnson**

Downside risks include: A major product recall; the risk that certain important brands face generic competition earlier than we currently model or erosion rates are faster than anticipated; the risk that key pipeline products fail; the risk that the company will overpay for acquisitions to make up for sluggish revenue growth throughout the portfolio; and / or market-wide deceleration across JNJ's end markets.

Upside risks include: The risk that JNJ has more pipeline success than what we forecast (Pharma and/or Devices); faster than expected growth in specific large verticals (notably Surgery, Orthopedics, or consumer health); and / or specific major product recalls at competitors.

**Medtronic PLC**

Downside risks include: A major product recall; the risk that key products fail to grow as expected; the risk that the company will overpay for acquisitions to make up for sluggish revenue growth throughout the portfolio; and / or market-wide deceleration across MDT's end markets.

Upside risks include: The risk that MDT has more success with the product pipeline than we forecast; faster than expected growth in specific large verticals (notably Surgery, DES, or Rhythm); and / or specific major product recalls at competitors. We

Confidential                                                                                                      Intuitive-00278227

For the exclusive use of CALVIN DARLING at INTUITIVE SURGICAL INC on 08-Sep-2019

**Lee Hambright**  +1-212-823-3557  lee.hambright@bernstein.com

6 September 2019

also acknowledge the risk that economic value / bundling could become a more important factor in hospital purchasing decisions than we anticipate, which could benefit MDT.

Confidential

Intuitive-00278228

For the exclusive use of CALVIN DARLING at INTUITIVE SURGICAL INC on 08-Sep-2019

# REQUIRED REGULATORY DISCLOSURES

- References to "Bernstein" relate to Sanford C. Bernstein & Co., LLC, Sanford C. Bernstein Limited, Sanford C. Bernstein (Hong Kong) Limited 盛博香港有限公司, Sanford C. Bernstein (Canada) Limited, Sanford C. Bernstein (India) Private Limited (SEBI registration no. INH000006378) and Sanford C. Bernstein (business registration number 53193989L), a unit of AllianceBernstein (Singapore) Ltd. which is a licensed entity under the Securities and Futures Act and registered with Company Registration No. 199703364C, collectively. On and as of April 1, 2019, AllianceBernstein L.P. acquired Autonomous Research. As a result of the acquisition, the research activities formerly conducted by Autonomous Research US LP have been assumed by Sanford C. Bernstein & Co., LLC, which will continue to publish research under the Autonomous Research US brand and the research activities formerly conducted by Autonomous Research Asia Limited have been assumed by Sanford C. Bernstein (Hong Kong) Limited 盛博香港有限公司, which will continue to publish research under the Autonomous Research Asia brand.

- References to "Autonomous" in these disclosures relate to Autonomous Research LLP and, with reference to dates prior to April 1, 2019, to Autonomous Research US LP and Autonomous Research Asia Limited, and, with reference to April 1, 2019 onwards, the Autonomous Research US unit and separate brand of Sanford C. Bernstein & Co., LLC and the Autonomous Research Asia unit and separate brand of Sanford C. Bernstein (Hong Kong) Limited 盛博香港有限公司, collectively.

- References to "Bernstein" or the "Firm" in these disclosures relate to Sanford C. Bernstein & Co., LLC, Sanford C. Bernstein Limited, Sanford C. Bernstein (Hong Kong) Limited 盛博香港有限公司, Sanford C. Bernstein (Canada) Limited, Sanford C. Bernstein (India) Private Limited (SEBI registration no. INH000006378), Sanford C. Bernstein (business registration number 53193989L), a unit of AllianceBernstein (Singapore) Ltd. which is a licensed entity under the Securities and Futures Act and registered with Company Registration No. 199703364C and, with reference to April 1, 2019 onwards, Autonomous Research LLP, collectively.

- Bernstein analysts are compensated based on aggregate contributions to the research franchise as measured by account penetration, productivity and proactivity of investment ideas. No analysts are compensated based on performance in, or contributions to, generating investment banking revenues.

- Bernstein rates stocks based on forecasts of relative performance for the next 6-12 months versus the S&P 500 for stocks listed on the U.S. and Canadian exchanges, versus the MSCI Pan Europe Index for stocks listed on the European exchanges (except for Russian companies), versus the MSCI Emerging Markets Index for Russian companies and stocks listed on emerging markets exchanges outside of the Asia Pacific region, and versus the MSCI Asia Pacific ex-Japan Index for stocks listed on the Asian (ex-Japan) exchanges - unless otherwise specified. We have three categories of ratings:

  Outperform: Stock will outpace the market index by more than 15 pp in the year ahead.

  Market-Perform: Stock will perform in line with the market index to within +/-15 pp in the year ahead.

  Underperform: Stock will trail the performance of the market index by more than 15 pp in the year ahead.

  Not Rated: The stock Rating, Target Price and/or estimates (if any) have been suspended temporarily.

- As of 09/05/2019, Bernstein's ratings were distributed as follows: 285 Outperform - 49.9% (0.0% banking clients) ; 232 Market-Perform - 40.6% (0.0% banking clients); 54 Underperform - 9.5% (0.0% banking clients); 0 Not Rated - 0.0% (0.0% banking clients). The numbers in parentheses represent the percentage of companies in each category to whom Bernstein provided investment banking services. All figures are updated quarterly and represent the cumulative ratings over the previous 12 months. These ratings relate solely to the investment research ratings for companies covered under the Bernstein brand and do not include the investment research ratings for companies covered under the Autonomous brand. This information is provided in order to comply with Article 6 of the Commission Delegated Regulation (EU) 2016/958.

- Accounts over which Bernstein and/or their affiliates exercise investment discretion own more than 1% of the outstanding common stock of the following companies ISRG / Intuitive Surgical Inc, JNJ / Johnson & Johnson, MDT / Medtronic PLC.

**12-Month Rating History as of 09/05/2019**

| Ticker | Rating Changes |
|--------|----------------|
| ISRG | O (IC) 06/26/18 |
| JNJ | M (IC) 06/26/18 |
| MDT | M (IC) 06/26/18 |

Rating Guide: O - Outperform, M - Market-Perform, U - Underperform, N - Not Rated
Rating Actions: IC - Initiated Coverage, DC - Dropped Coverage, RC - Rating Change

For the exclusive use of CALVIN DARLING at INTUITIVE SURGICAL INC on 08-Sep-2019

### ISRG / Intuitive Surgical Inc

| Date | Rating | Target(USD) |
|---|---|---|
| 06/26/18 | O (IC) | 560.00 |
| 07/20/18 | O | 600.00 |
| 10/04/18 | O | 625.00 |

IC - Initiated Coverage



O - Outperform  M - Market-Perform  U - Underperform  N - Not Rated

### JNJ / Johnson & Johnson

| Date | Rating | Target(USD) |
|---|---|---|
| 06/26/18 | M (IC) | 129.00 |
| 11/14/18 | M | 148.00 |
| 01/14/19 | M | 142.00 |
| 04/17/19 | M | 148.00 |

IC - Initiated Coverage



O - Outperform  M - Market-Perform  U - Underperform  N - Not Rated

### MDT / Medtronic PLC

| Date | Rating | Target(USD) |
|---|---|---|
| 06/26/18 | M (IC) | 88.00 |
| 11/14/18 | M | 97.00 |
| 11/30/18 | M | 103.00 |
| 01/14/19 | M | 97.00 |
| 02/20/19 | M | 99.00 |

IC - Initiated Coverage



O - Outperform  M - Market-Perform  U - Underperform  N - Not Rated

## OTHER IMPORTANT DISCLOSURES

Bernstein produces a number of different types of research products including, among others, fundamental analysis and quantitative analysis. In addition, Sanford C. Bernstein & Co., LLC, Sanford C. Bernstein (Hong Kong) Limited 盛博香港有限公司, and Bernstein's affiliate, Autonomous Research LLP, each issue research products under the "Autonomous" publishing brand independently of the "Bernstein" publishing brand. Recommendations contained within one type of research product may differ from recommendations contained within other types of research products, whether as a result of differing time horizons, methodologies or otherwise. Furthermore, views or recommendations within a research product issued under the Autonomous brand may differ from views or recommendations under the same type of research product issued under the Bernstein brand.

Where this material contains an analysis of debt product(s), such material is intended only for institutional investors and is not subject to the independence and disclosure standards applicable to debt research prepared for retail investors. Please contact Bernstein to request that such institutional debt research not be provided.

This document may not be passed on to any person in the United Kingdom (i) who is a retail client (ii) unless that person or entity qualifies as an authorised person or exempt person within the meaning of section 19 of the UK Financial Services and Markets Act 2000 (the "Act"), or qualifies as a person to whom the financial promotion restriction imposed by the Act does not apply by virtue of the Financial Services and Markets Act 2000 (Financial Promotion) Order 2005, or is a person classified as an "professional client" for the purposes of the Conduct of Business Rules of the Financial Conduct Authority.

This document may not be passed onto any person in Canada unless that person qualifies as "permitted client" as defined in Section 1.1 of NI 31-103.

For the exclusive use of CALVIN DARLING at INTUITIVE SURGICAL INC on 08-Sep-2019

**To our readers in the United States:** Sanford C. Bernstein & Co., LLC, a broker-dealer registered with the U.S. Securities and Exchange Commission ("SEC") and a member of the U.S. Financial Industry Regulatory Authority, Inc. ("FINRA") is distributing this publication in the United States and accepts responsibility for its contents. Any U.S. person receiving this publication and wishing to effect securities transactions in any security discussed herein should do so only through Sanford C. Bernstein & Co., LLC.  Where this report has been prepared by research analyst(s) employed by a non-US affiliate (such analyst(s), "Non-US Analyst(s)") of Sanford C. Bernstein & Co., LLC, such Non-US Analyst(s) is/are (unless otherwise expressly noted) not registered as associated persons of Sanford C. Bernstein & Co., LLC or any other SEC-registered broker-dealer and are not licensed or qualified as research analysts with FINRA or any other US regulatory authority.  Accordingly, reports prepared by Non-US Analyst(s) are not prepared in compliance with FINRA's restrictions regarding (among other things) communications by research analysts with a subject company, interactions between research analysts and investment banking personnel, participation by research analysts in solicitation and marketing activities relating to investment banking transactions, public appearances by research analysts, and trading securities held by a research analyst account.

**To our readers in the United Kingdom:** This publication has been issued or approved for issue in the United Kingdom by Sanford C. Bernstein Limited, authorised and regulated by the Financial Conduct Authority and located at 50 Berkeley Street, London W1J 8SB, +44 (0)20-7170-5000.

**To our readers in member states of the EEA (except Ireland):** This publication is being distributed in the EEA (except Ireland) by Sanford C. Bernstein Limited, which is authorised and regulated in the United Kingdom by the Financial Conduct Authority and holds a passport under the Markets in Financial Instruments Directive.

**To our readers in Ireland:** This publication is being distributed in Ireland by Sanford C. Bernstein Ireland Limited, which is authorised and regulated by the Central Bank of Ireland.

**To our readers in Hong Kong:** This publication is being distributed in Hong Kong by Sanford C. Bernstein (Hong Kong) Limited 盛博香港有限公司, which is licensed and regulated by the Hong Kong Securities and Futures Commission (Central Entity No. AXC846).  This publication is solely for professional investors only, as defined in the Securities and Futures Ordinance (Cap. 571).

**To our readers in Singapore:** This publication is being distributed in Singapore by Sanford C. Bernstein, a unit of AllianceBernstein (Singapore) Ltd., only to accredited investors or institutional investors, as defined in the Securities and Futures Act (Chapter 289). Recipients in Singapore should contact AllianceBernstein (Singapore) Ltd. in respect of matters arising from, or in connection with, this publication. AllianceBernstein (Singapore) Ltd. is a licensed entity under the Securities and Futures Act and registered with Company Registration No. 199703364C. It is regulated by the Monetary Authority of Singapore and located at One Raffles Quay, #27-11 South Tower, Singapore 048583, +65-62304600. The business name "Bernstein" is registered under business registration number 53193989L.

**To our readers in the People's Republic of China:** The securities referred to in this document are not being offered or sold and may not be offered or sold, directly or indirectly, in the People's Republic of China (for such purposes, not including the Hong Kong and Macau Special Administrative Regions or Taiwan), except as permitted by the securities laws of the People's Republic of China.

**To our readers in Japan:** This document is not delivered to you for marketing purposes, and any information provided herein should not be construed as a recommendation, solicitation or offer to buy or sell any securities or related financial products.

For the institutional client readers in Japan who have been granted access to the Bernstein website by Daiwa Securities Group Inc. ("Daiwa"), your access to this document should not be construed as meaning that Bernstein is providing you with investment advice for any purposes. Whilst Bernstein has prepared this document, your relationship is, and will remain with, Daiwa, and Bernstein has neither any contractual relationship with you nor any obligations towards you

**To our readers in Australia:** Sanford C. Bernstein & Co., LLC, Sanford C. Bernstein Limited and Sanford C. Bernstein (Hong Kong) Limited 盛博香港有限公司 are exempt from the requirement to hold an Australian financial services licence under the Corporations Act 2001 in respect of the provision of the following financial services to wholesale clients:

- providing financial product advice;
- dealing in a financial product;
- making a market for a financial product; and
- providing a custodial or depository service.

**To our readers in Canada:** If this publication is pertaining to a Canadian domiciled company, it is being distributed in Canada by Sanford C. Bernstein (Canada) Limited, which is licensed and regulated by the Investment Industry Regulatory Organization of Canada ("IIROC"). If the publication is pertaining to a non-Canadian domiciled company, it is being distributed by Sanford C. Bernstein & Co., LLC, which is licensed and regulated by both the SEC and FINRA into Canada under the International Dealers Exemption.  This publication may not be passed onto any person in Canada unless that person qualifies as a "Permitted Client" as defined in Section 1.1 of NI 31-103.

**To our readers in India:** This publication is being distributed in India by Sanford C. Bernstein (India) Private Limited (SCB India) which is licensed and regulated by Securities and Exchange Board of India ("SEBI") as a research analyst entity under the SEBI (Research Analyst) Regulations, 2014, having registration no. INH000006378 and as a stock broker having registration no. INZ000213537. SCB India is currently engaged in the business of providing research and stock broking services.

SCB India is a private limited company incorporated under the Companies Act, 2013, on April 12, 2017 bearing corporate identification number U65999MH2017FTC293762, and registered office at Level 6, 4 North Avenue, Maker Maxity, Bandra Kurla Complex, Bandra (East), Mumbai 400051 , Maharashtra, India (Phone No: +91-22-68421401).

SCB India does not have any disciplinary history as on the date of this report.

The associates of SCB India or their relatives may have financial interest(s) in the subject company.

SCB India or its associates do not have actual/beneficial ownership of one percent or more securities of the subject company. SCB India is not engaged in any investment banking activities, as such, SCB India has not managed or co-managed a public offering in the past twelve months.  In addition, neither SCB India nor any of its associates have received any compensation for investment banking services or merchant banking services from the subject company in the past 12 months.

SCB India or its associates may have received compensation for brokerage services from the subject company in the past twelve months.

SCB India or its associates may have received compensation for products or services other than investment banking or merchant banking or brokerage services from the subject company in the past twelve months.

SCB India and its associates have not received any compensation or other benefits from the subject company or third party in connection with the research report.

The principal research analysts who prepared this report, a member of his or her team, are not (nor are any members of their household) an officer, director, employee or advisory board member of the companies covered in the report.

SCB India and its associate company(ies) may act as a market maker in the financial instruments of the companies covered in the report.

Sanford C. Bernstein & Co., LLC., Sanford C. Bernstein Limited, Sanford C. Bernstein (Hong Kong) Limited 盛博香港有限公司, Sanford C. Bernstein (Canada) Limited and AllianceBernstein (Singapore) Ltd., Sanford C. Bernstein (India) Private Limited are regulated, respectively, by the Securities and Exchange Commission under U.S. laws, by the Financial Conduct Authority under U.K. laws, by the Hong Kong Securities and Futures Commission under Hong Kong laws, by the Investment Industry Regulatory Organization of Canada, by the Monetary Authority of Singapore under Singapore laws, and Securities and Exchange Board of India, all of which differ from Australian laws.

One or more of the officers, directors, or employees of Sanford C. Bernstein & Co., LLC, Sanford C. Bernstein Limited, Sanford C. Bernstein (Hong Kong) Limited 盛博香港有限公司, Sanford C. Bernstein (India) Private Limited, Sanford C. Bernstein (Canada) Limited, Sanford C. Bernstein (business registration number 53193989L), a unit of AllianceBernstein (Singapore) Ltd. which is a licensed entity under the Securities and Futures Act and registered with Company Registration No. 199703364C, and/or their affiliates may at any time hold, increase or decrease positions in securities of any company mentioned herein.

Bernstein or its affiliates may provide investment management or other services to the pension or profit sharing plans, or employees of any company mentioned herein, and may give advice to others as to investments in such companies. These entities may effect transactions that are similar to or different from those recommended herein.

All Bernstein branded research publications are disseminated to our clients through posting on the firm's password protected website, www.bernsteinresearch.com.  Certain, but not all, Bernstein branded research publications are also made available to clients through third-party vendors or redistributed to clients through alternate electronic means as a convenience.  For access to all available Bernstein branded research publications, please contact your sales representative or go to http://www.bernsteinresearch.com

Bernstein and/or its affiliates do and seek to do business with companies covered in its research publications. As a result, investors should be aware that Bernstein and/or its affiliates may have a conflict of interest that could affect the objectivity of this publication. Investors should consider this publication as only a single factor in making their investment decisions.

This publication has been published and distributed in accordance with Bernstein's policy for management of conflicts of interest in investment research, a copy of which is available from Sanford C. Bernstein & Co., LLC, Director of Compliance, 1345 Avenue of the Americas, New York, N.Y. 10105, Sanford C. Bernstein Limited, Director of Compliance, 50 Berkeley Street, London W1J 8SB, United Kingdom, or Sanford C. Bernstein (Hong Kong) Limited 盛博香港有限公司, Director of Compliance, 39th Floor, One Island East, Taikoo Place, 18 Westlands Road, Quarry Bay, Hong Kong, or Sanford C. Bernstein (business registration number 53193989L) , a unit of AllianceBernstein (Singapore) Ltd. which is a licensed entity under the Securities and Futures Act and registered with Company Registration No. 199703364C, Director of Compliance, One Raffles Quay, #27-11 South Tower, Singapore 048583, or Sanford C. Bernstein (India) Private Limited, Chief Compliance Officer, Level 6, 4 North Avenue, Maker Maxity, Bandra Kurla Complex, Bandra (East), Mumbai 400051. Additional disclosures and information regarding Bernstein's business are available on our website www.bernsteinresearch.com.

This report has been produced by an independent analyst as defined in Article 3 (1)(34)(i) of EU 296/2014 Market Abuse Regulation ("MAR").

This publication is not directed to, or intended for distribution to or use by, any person or entity who is a citizen or resident of, or located in any locality, state, country or other jurisdiction where such distribution, publication, availability or use would be contrary to law or regulation or which would subject Bernstein or any of their subsidiaries or affiliates to any registration or licensing requirement within such jurisdiction. This publication is based upon public sources we believe to be reliable, but no representation is made by us that the publication is accurate or complete. We do not undertake to advise you of

For the exclusive use of CALVIN DARLING at INTUITIVE SURGICAL INC on 08-Sep-2019

any change in the reported information or in the opinions herein. This publication was prepared and issued by Bernstein for distribution to eligible counterparties or professional clients. This publication is not an offer to buy or sell any security, and it does not constitute investment, legal or tax advice. The investments referred to herein may not be suitable for you. Investors must make their own investment decisions in consultation with their professional advisors in light of their specific circumstances. The value of investments may fluctuate, and investments that are denominated in foreign currencies may fluctuate in value as a result of exposure to exchange rate movements. Information about past performance of an investment is not necessarily a guide to, indicator of, or assurance of, future performance.

## CERTIFICATIONS

- I/(we), Lee Hambright, Senior Analyst(s)/Analyst(s), certify that all of the views expressed in this publication accurately reflect my/(our) personal views about any and all of the subject securities or issuers and that no part of my/(our) compensation was, is, or will be, directly or indirectly, related to the specific recommendations or views in this publication.

*Approved By: NK*

Copyright 2019, Sanford C. Bernstein & Co., LLC, Sanford C. Bernstein Limited, Sanford C. Bernstein (Hong Kong) Limited 盛博香港有限公司, and AllianceBernstein (Singapore) Ltd., subsidiaries of AllianceBernstein L.P. ~1345 Avenue of the Americas ~ NY, NY 10105 ~212/756-4400.  All rights reserved.

For the exclusive use of CALVIN DARLING at INTUITIVE SURGICAL INC on 08-Sep-2019

# [ AHEAD OF TOMORROW ]

**EXHIBIT 28**

**to**

**PAUL D. BRACHMAN DECLARATION IN SUPPORT
OF DEFENDANT'S MOTION IN LIMINE NO. 1
TO EXCLUDE OUT-OF-COURT HOSPITAL
STATEMENTS**



Home    Finance

April 19, 2014 01:00 AM

# Surgical-robot costs put small hospitals in a bind

AIMY LEE



REPRINTS



OB-GYN Dr. Brian Retherford recently operated on a patient who traveled six hours to Memorial Hospital, a critical-access hospital in Douglas, Wyo., because the 25-bed facility offered da Vinci robotic surgery as an option for a routine hysterectomy.

Memorial Hospital of Converse County last year purchased a $2 million da Vinci Surgical System, the second hospital in Wyoming to do so. Memorial executives said they expect their facility to perform about 100 robotic surgeries a year. That's far below the estimated volume experts say is needed to produce a viable financial return within six years on the robotic system, whose average cost ranges from $1.5 million to $2 million.

Memorial, which reported an operating loss of $2.2 million in the first half of fiscal 2014, used cash reserves to buy the da Vinci system, manufactured by Sunnyvale, Calif.-based Intuitive Surgical. Memorial said 40% of its cost will be reimbursed by Medicare as a capital expense because it is a critical-access hospital.

Ryan Smith, the hospital's CEO, said he doesn't mind if it takes awhile for the pricey new piece of equipment to pay off because it's already attracting patients who previously would have traveled to other hospitals in Colorado or Utah to get robotic surgery. Also, it helps his hospital recruit and retain surgeons, and is expected to reduce surgical complications and lengths of stay. "We did not buy the da Vinci system to get a very high return on investment," Smith said. "It was the right thing to do for our patients."

While overall sales of da Vinci systems are on the decline, a number of small and rural hospitals are considering following in Memorial Hospital's footsteps, believing it will help them attract and retain surgeons and appeal to patients. The government system for financing critical-access hospitals helps underwrite some of the costs.

But small hospitals going down that path will face the same issues now confronting major systems that have installed surgical robots. Some studies have raised doubts about whether robotic surgery offers better outcomes than standard laparoscopic procedures. And Intuitive Surgical faces dozens of product liability lawsuits across the country filed by patients who claim injuries from the device.

**Daily Finance Newsletter:** Sign up to receive daily news and data that has a direct impact on the business and financing of healthcare.

EMAIL ADDRESS

[                    ]   SUBMIT

[  ] 'm not a robot

reCAPTCHA
Privacy - Terms

---

## The effect on marketing

"It's not just the clinical benefit or the bottom line," said Dr. Martin Makary, surgical director at Johns Hopkins Pancreas Multidisciplinary Cancer Clinic. Hospital CEOs "also look at the power to market the entire hospital."

There are no available statistics on how many critical-access hospitals and other small hospitals have purchased a da Vinci Surgical System. Cost is certainly an issue. In addition to the purchase price, the system has an annual service contract that costs between $100,000 and $170,000, and each procedure costs about $1,200 to $2,000 more than a laparoscopic operation because of the need for single-use tools. Insurers, however, pay the same rates for robotic and laparoscopic procedures.

For critical-access hospitals, Medicare helps subsidize the purchase as a capital expenditure on a depreciated basis, calculated by what percentage of patients are Medicare beneficiaries. But "it's a big question in terms of priorities and where your scarce resources are best used," said Brock Slabach, senior vice president of the National Rural Health Association. "Patients perceive it to be better. But is the cost worth the benefit?"

To make buying a da Vinci financially viable, hospitals generally need to perform 150 to 300 procedures annually for six years to offset the upfront and ongoing costs of acquiring t, said Vijay Kumar, associate managing director for ISI Group.

Intuitive Surgical, which declined to comment for this article, no longer reports a breakdown of the types of hospitals that own and operate its systems. But a 2010 Wall Street Journal article reported that 131 hospitals that had installed da Vinci systems had 200 or fewer beds. Overall, about 1,500 U.S. hospitals have installed the da Vinci Surgical System since it came to market in 2000. Intuitive offers the only robotic surgical system approved by the Food and Drug Administration.

MH TAKEAWAYS

Analysts say younger surgeons want to work at hospitals that have a da Vinci, and patients may prefer a hospital that has one because they see it as a state-of-the-art facility.

## A recruiting tool

Market analysts say smaller hospitals face pressure to buy the da Vinci system because many new surgeons in training, particularly those in urology and gynecology, receive robotic surgical training as residents and want to work at hospitals that have the technology. And patients may choose a hospital with a da Vinci system based on the perception that it's a state-of-the-art facility.

More small hospitals view the da Vinci system "as a tool they need to recruit and retain surgeons and to stay viable," said Liz Tiernan, a consultant in the Advisory Board Co.'s research and insights groups. "It is considered a standard of care …. but it's rarely financially viable for them."

Hospitals of all sizes say they are developing credentialing programs and limiting access to the system to the most experienced and skilled surgeons. Training and credentialing are a big concern because there is a steep learning curve in using the da Vinci system, with a risk of serious injuries to patients if surgical mistakes are made. Experts say surgeons need experience with 20 to 30 robot-assisted procedures before they are adequately trained.

Memorial Hospital acquired a simulator to help train its surgeons. "We are not concerned about the proficiency of our surgeons," a Memorial spokesman said. "We owned the robot for six months before any surgeries were performed. During that time, the surgeons trained on the simulator and traveled to other active da Vinci sites to work with surgeons."

But when surgeons at a smaller hospital don't reach the estimated proficiency threshold, that raises questions about the adequacy of their experience. "It becomes even more difficult to justify this decision," Tiernan said.

North Valley Hospital, a 25-bed critical-access hospital in Whitefish, Mont., has 11 surgeons trained in robotic surgery, including seven surgeons recruited since the hospital implemented the robotics program in 2010, according to a hospital spokeswoman. It performed about 250 robot c procedures last year. When it bought the system, it was the only hospital in northwest Montana to have a da Vinci, though Kalispell Regional Healthcare has since acquired two da Vincis.

RELATED CONTENT

Looking for an oasis: Large sections of rural America continue to suffer from a drought of general surgeons

A high-tech advantage: Rural hospitals hope offering latest technology keeps patients close to home

## Consider all variables

"If a hospital makes that decision, they need to consider all of the variables, which ncludes taking a look at efficacy and cost-effectiveness and really make sure they hammer out their training programs," said Chris Schabowsky, senior project officer for health devices at the ECRI Institute.

Meanwhile, Intuitive Surgical is facing pressure to pump up sales. In an April 8 preview of ts first-quarter results, company officials braced investors for a 24% decline in revenue as fewer hospitals invest in robotic surgery systems.

Intuitive said it sold only 45 da Vinci systems in the U.S. in the first quarter of 2014, compared with 115 during the same period in 2013. Full company earnings are scheduled for release April 22.

There were 240,000 robot-assisted gynecologic procedures in 2013, compared with 222,000 in 2012 and 170,000 in 2011. Nearly 80% of prostatectomies performed in the U.S. now use the da Vinci system. The company attributed lower gynecological-procedure growth rates last year to market saturation, pressure on hospital admissions, negative media attention and insurers pushing for conservative treatments and more treatments in outpatient settings.

This month, the company said it would book a $67 million pre-tax charge related to an expected product liability settlement that will resolve claims that patients suffered complications from its monopolar curved scissors, which were recalled in 2013, and the scissors' first-generation tip covers, which were withdrawn from the market in 2012.

The American College of Obstetricians and Gynecologists issued a strongly worded statement last year urging women to separate "marketing hype from the reality" when choosing a surgical approach to hysterectomy. "There (are) no good data proving that robotic hysterectomy is even as good as—let alone better—than existing, and far less costly, minimally invasive alternatives," ACOG President Dr. James Breeden said in a March 2013 statement.

While some small hospitals see strong reasons for buying a da Vinci, it's not going to be viable for many others, including most critical-access hospitals, said Slabach of the National Rural Health Association. "I don't think we should look any time soon for da

Vincis to be placed in every single critical-access hospital in the country," he said. "Though I'm sure the manufacturer would love that."

—with Harris Meyer

*Follow Jaimy Lee on Twitter: @MHjlee*

*Follow Harris Meyer on Twitter: @MHHmeyer*

*Letter — to the — Editor*

**Send us a letter**
**Have an opinion about this story? Click here to submit a Letter to the Editor, and we may publish it in print.**

RECOMMENDED FOR YOU

Hospital 'trauma centers' charge enormous fees to treat minor injuries and send people home

UnitedHealth raises outlook after strong second quarter

SPONSORED CONTENT

## Opportunities for ICU improvement in a post-pandemic world



The COVID-19 pandemic has put the spotlight on the need for outstanding clinical and operational performance in critical care services.

Read More

## Patients appreciate the convenience of telehealth, but fraud is a concern



Although telehealth offers many benefits for patients, it introduces operational complexities for providers and it also creates legitimate concerns about fraud for payers.

Read More

## Healthcare cybersecurity challenges continue as the COVID-19 pandemic subsides



Healthcare organizations are major targets for cyber-criminals—a threat that increased during the global COVID-19 pandemic and continues to be a challenge.

Read More

## Right Care, Right Place, Right Cost: Creating a Data-Driven Strategy for Service Line Success



Learn how market data and a personalized strategy can help you find opportunities to allocate quality, cost-effective consistency.

Download



**4 Comments**     **Modern Healthcare**     🔒 **Privacy Policy**     🔵 **Login**

♡ **Recommend**     🐦 Tweet     f Share     **Sort by Best**

Join the discussion…

LOG IN WITH          OR SIGN UP WITH DISQUS ⑦

Name

**Anna Arsenous** • 4 years ago

Surgical robot costs put small hospitals in a bind



ne hidden great value of the Da Vinci system is in providing comfort, precision and excellent assistance to the operating surgeon- hich ultimately translate into excellent care and outcome for the patient.
A Da Vinci system is not a vehicle of financial investment or marketing, despite possessing such potential .

 t's utilization will decrease the burden of inavailability of adequate operative assistance at a smaller or rural hospital. (Another  mportant limiting factor in retaining a surgeon in smaller hospitals)

Laparoscopic surgery is very harsh on the joints of the surgeon; hence the availability of the Da Vincci system will enables experienced surgeons to continue performing complex surgeries ,  hich latter in term may provide better training for
Residents being trained at smaller hospitals .

Partially this over sight is consequence of "replace/don't fix " sociatal culture which prevails currrently- latter manifesting in instances as disregard for value of the doctors as the prime assets of the hospital.  t should be noted - administrator of no hospital can treat the ailment of any patient .
But perhaps a good administrator will negotiate higher reimbursement for a robotic surgery
Than a laparoscopic procedure.

︿ | ﹀ • Reply • Share ›



**Paul Sherman** • 7 years ago
Another challenge mentioned above is the cost of the annual service contract. Intuitive provides no other service option, even though many hospitals have in-house staff fully capable of maintaining and repairing the daVinci. In house service typically costs 1/2 of a service contract and has a response time of minutes, rather than hours. This  s particularly vital if the systems fails during a procedure.

By requiring a service contract, Intuitive is focusing on their revenue to the detriment of the hospital and the patient.

︿ | ﹀ • Reply • Share ›

**Claudio Teri** • 7 years ago
Great article.
Mr Lancey thanks for your comment. I agree on the concept of  value for money".

All those small hospitals that have purchased these expensive robots could receive funds from my company, which is supplying a free online service and funds non-profit, research, small healthcare facilities.

A more efficient, sustainable, healthcare is achieveable. Only a
mindset change for a larger perspective is required.

## GET NEWSLETTERS

Sign up for enewsletters and alerts to receive breaking news and in-depth coverage of healthcare events and
trends, as they happen, right to your inbox.

Email Address

SIGN UP

## SUBSCRIBE TODAY

MH magazine offers content that sheds light on healthcare leaders' complex choices and touch points—from
strategy, governance, leadership development and finance to operations, clinical care, and marketing.

SUBSCRIBE

## CONNECT WITH US

    

Our Mission
*Modern Healthcare empowers industry leaders to succeed by providing unbiased reporting of the news, insights,
analysis and data.*

# Modern Healthcare

**CONTACT US**

(877) 812-1581

Email us

**RESOURCES**

Contact Us                                    Ad Choices ▷

Advertise with Us                              Sitemap

**EDITORIAL DEPT**

Submission Guidelines

Code of Ethics

Awards

About Us

**LEGAL**

Terms and Conditions

Privacy Policy

Privacy Request

# CRAIN

Copyright © 1996 2021 Crain Communication  Inc All Right  Re erved

**EXHIBIT 29**

**to**

**PAUL D. BRACHMAN DECLARATION IN SUPPORT
OF DEFENDANT'S MOTION IN LIMINE NO. 1
TO EXCLUDE OUT-OF-COURT HOSPITAL
STATEMENTS**

Message

| | |
|---|---|
| **From:** | cparker@restorerobotics.com [cparker@restorerobotics.com] |
| **Sent:** | 9/17/2019 11:49:47 AM |
| **To:** | 'Mills Vautrot' [mvautrot@restorerobotics.com]; 'Kmay_restorerobotics' [kmay@restorerobotics.com] |
| **Subject:** | FW: 3x robotic inst |

See below. I wonder if Intuitive has done something?

**Clif Parker**
Restore Robotics
850-832-2834

**From:** Kamberov, Steven [mailto:SKamberov@medline.com]
**Sent:** Tuesday, September 17, 2019 12:28 PM
**To:** cparker@restorerobotics.com
**Subject:** Fwd: 3x robotic inst

Hello Clif,

Please see below. How is this normally handled ?

> **Steven Kamberov**
> ReNewal Program Specialist
> Field Sales - Michigan
> Medline Industries, Inc.
> www.medline.com
>
> (734)355-7717 (Phone)
> SKamberov@medline.com
>
> (866)866-7477 (ReNewal Customer Service)

Begin forwarded message:

> **From:** "Barber-Walker, Stacey" <sbarberwalker@mhc.net>
> **Date:** September 17, 2019 at 12:19:55 PM EDT
> **To:** "'Kamberov, Steven'" <SKamberov@medline.com>
> **Subject: RE: 3x robotic inst**
>
> Thanks.
> On another note: Late yesterday afternoon during a Robotics case, a monopolar scissor that just went into service that has been repaired through this program, sn n10190201-249 ver 22, would not work in the arm. Staff loaded and unloaded it multiple times and the system said 'instrument un-recognized'. What is the process of sending it back and getting credit?
>
>
> *Stacey Barber-Walker, MM, CBSPM*
> *Munson, Otsego Memorial Hospital*
> *Periop Equipment, Inventory & Project Manager*
> *O.989.731.2120*
> *M.989.731.6154*

ATTORNEYS' EYES ONLY                                                  Restore-00030379

sbarberwalker@mhc.net

*"When you are enthusiastic about what you do, you feel this positive energy. It's very simple."*

**From:** Kamberov, Steven <SKamberov@medline.com>
**Sent:** Tuesday, September 17, 2019 11:38 AM
**To:** Barber-Walker, Stacey <sbarberwalker@mhc.net>
**Subject:** Re: 3x robotic inst

**\*\*WARNING:** This email originated from outside of Munson Healthcare \*\*
**DO NOT CLICK** on any links or open any attachments unless you recognize the sender and are expecting the message.
**NEVER** provide your login or password

Stacey,

I should have this list later today or early tomorrow.

> **Steven Kamberov**
> ReNewal Program Specialist
> Field Sales - Michigan
> Medline Industries, Inc.
> www.medline.com
>
> (734)355-7717 (Phone)
> SKamberov@medline.com
>
> (866)866-7477 (ReNewal Customer Service)

On Sep 16, 2019, at 1:02 PM, Barber-Walker, Stacey <sbarberwalker@mhc.net> wrote:

> Steven, another thing: I believe I asked for a list of current customers early when this was presented to me in July. If you already sent it to me I apologize because I can't locate it. Can you please send/resend to me a list of current customers that is using this 'Renewal' process for Robotics. thanks
>
>
> *Stacey Barber-Walker, MM, CBSPM*
> *Munson, Otsego Memorial Hospital*
> *Periop Equipment, Inventory & Project Manager*
> *O.989.731.2120*
> *M.989.731.6154*
> sbarberwalker@mhc.net
>
> *"When you are enthusiastic about what you do, you feel this positive energy. It's very simple."*
>
>
> **From:** Barber-Walker, Stacey
> **Sent:** Monday, September 16, 2019 10:45 AM
> **To:** 'Kamberov, Steven' <SKamberov@medline.com>
> **Subject:** RE: 3x robotic inst

ATTORNEYS' EYES ONLY                                          Restore-00030380

Yes please cancel the order and call tag.

I was off Thur and Fri and I guess they sent a letter and called Munson main, And in return called OMH senior leadership. Not sure what the letter says other than something like the use of $3^{rd}$ party repaired instruments will void any service and warranty to our Robot. So I guess our senior leadership is working with our legal team on it and for now I have been told to stop sending them

*Stacey Barber-Walker, MM, CBSPM*
*Munson, Otsego Memorial Hospital*
*Periop Equipment, Inventory & Project Manager*
*O.989.731.2120*
*M.989.731.6154*
sbarberwalker@mhc.net

*"When you are enthusiastic about what you do, you feel this positive energy. It's very simple."*

**From:** Kamberov, Steven <SKamberov@medline.com>
**Sent:** Monday, September 16, 2019 10:33 AM
**To:** Barber-Walker, Stacey <sbarberwalker@mhc.net>
**Subject:** Re: 3x robotic inst

**\*\*WARNING:** This email originated from outside of Munson Healthcare \*\*
**DO NOT CLICK** on any links or open any attachments unless you recognize the sender and are expecting the message.
**NEVER** provide your login or password

Hello Stacey,

Thank you for reaching out. Would you be able to provide me with more information on the backlash from Intuitive and what they stated? Anything you may be able to tell me would be very helpful.

In regards to the PO below, I have the call tag ready - I wanted to clarify you wanted the order canceled entirely and the call tag discarded before I removed anything in the system.

Best,

**Steven Kamberov**
ReNewal Program Specialist
Field Sales - Michigan
Medline Industries, Inc.
www.medline.com

(734)355-7717 (Phone)
SKamberov@medline.com

(866)866-7477 (ReNewal Customer Service)

On Sep 16, 2019, at 10:26 AM, Barber-Walker, Stacey <sbarberwalker@mhc.net> wrote:

> <image001.gif>
> Steven, due to some backlash from Intuitive, senior administration
> at this time has decided to way the pros and cons of servicing our
> SI robotic instruments. Please continue repairing the ones that may
> still be at the lab, but I will be cancelling the PO below and not
> sending in any more instruments for repair at this time. Sorry for
> this.
>
>
>
> *Stacey Barber-Walker, MM, CBSPM*
> *Munson, Otsego Memorial Hospital*
> *Periop Equipment, Inventory & Project Manager*
> *O.989.731.2120*
> *M.989.731.6154*
> sbarberwalker@mhc.net
>
> *"When you are enthusiastic about what you do, you feel this positive*
> *energy. It's very simple."*
>
>
> **From:** Barber-Walker, Stacey
> **Sent:** Monday, September 16, 2019 8:23 AM
> **To:** 'Kamberov, Steven' <SKamberov@medline.com>
> **Cc:** Franckowiak, Cindy <cfranckowiak@mhc.net>
> **Subject:** RE: 3x robotic inst
>
> Please also add: Mega suture cut NH
> #420309      n10180412  759 ver 06.
>                 MONO scissor,
> cvr  #420179      n10181113  746 ver 22
>
> Use PO#0059143
>
>
>
> *Stacey Barber-Walker, MM, CBSPM*
> *Munson, Otsego Memorial Hospital*
> *Periop Equipment, Inventory & Project Manager*
> *O.989.731.2120*
> *M.989.731.6154*
> sbarberwalker@mhc.net
>
> *"When you are enthusiastic about what you do, you feel this positive*
> *energy. It's very simple."*

ATTORNEYS' EYES ONLY

**From:** Kamberov, Steven <SKamberov@medline.com>
**Sent:** Thursday, September 12, 2019 10:36 AM
**To:** Barber-Walker, Stacey <sbarberwalker@mhc.net>
**Cc:** Franckowiak, Cindy <cfranckowiak@mhc.net>
**Subject:** RE: 3x robotic inst

**\*\*WARNING:** This email originated from outside of Munson Healthcare \*\*
**DO NOT CLICK** on any links or open any attachments unless you
recognize the sender and are expecting the message.
**NEVER** provide your login or password

Hello Stacey,

I just need a PO and I can get this going!

<image002.png>    **Steven Kamberov**
ReNewal Program Specialist
Field Sales - Michigan
Medline Industries, Inc.
www.medline.com

(734)355-7717 (Phone)
SKamberov@medline.com

(866)866-7477 (ReNewal Customer Service)
<image004.png>

**From:** Barber-Walker, Stacey <sbarberwalker@mhc.net>
**Sent:** Wednesday, September 11, 2019 5:10 PM
**To:** Kamberov, Steven <SKamberov@medline.com>
**Subject:** 3x robotic inst
**Importance:** High

Hello Steven I have 4 robotic instruments that I need an RMA to
send in for repair:

- Prograspx2        420093          ver14  lot
  N10190221 444

                                    Ver14  lotN10

  190221 454
- Cadier fcp        420049          ver09  lot
  N10180126 327
- Cautery hook      420183          ver12  lot
  N10180510 297

*Stacey Barber-Walker, MM, CBSPM*
*Munson, Otsego Memorial Hospital*
*Periop Equipment, Inventory & Project Manager*
*O.989.731.2120*
*M.989.731.6154*

ATTORNEYS' EYES ONLY                                    Restore-00030383

sbarberwalker@mhc.net

"When you are enthusiastic about what you do, you feel this positive energy. It's very simple."

ATTORNEYS' EYES ONLY

1  **MCCAULLEY LAW GROUP LLC**
   JOSHUA V. VAN HOVEN (CSB No. 262815)
2  E-Mail: josh@mccaulleylawgroup.com
   3001 Bishop Dr., Suite 300
3  San Ramon, California 94583
   Telephone: 925.302.5941
4
5  RICHARD T. MCCAULLEY (*pro hac vice*)
   E-Mail: richard@mccaulleylawgroup.com
6  180 N. Wabash Avenue, Suite 601
   Chicago, Illinois 60601
7  Telephone: 312.330.8105

8  *Attorneys for Plaintiff and Counter-Defendant,*
   SURGICAL INSTRUMENT SERVICE COMPANY. INC.

9            **UNITED STATES DISTRICT COURT**

10          **NORTHERN DISTRICT OF CALIFORNIA**

11            **SAN FRANCISCO DIVISION**

12  SURGICAL INSTRUMENT SERVICE          CASE NO. 3:21-CV-03496-AMO
    COMPANY, INC.
13                                        Honorable Araceli Martínez-Olguín
              *Plaintiff/Counter-*
14            *Defendant,*               **PLAINTIFF SIS's OPPOSITION TO**
                                         **INTUITIVE'S MOTION IN LIMINE**
15       v.                              **#1**

16  INTUITIVE SURGICAL, INC.

17            *Defendant/Counterclaimant.*

18

19

20

21

22

23

24

25

26

27

28

1

## **TABLE OF CONTENTS**

2

3

**BACKGROUND** ....................................................................................................... **1**

4

**ARGUMENT**.............................................................................................................. **3**

    1.    A Blanket Ruling on These Statements Is Inappropriate at this Time..................... 3

5

    2.    Many or Most Statements Would not Be Offered For the Truth of the Matter
        Asserted............................................................................................................... 4

6

    3.    The Statements Are Admissible as State of Mind Evidence ................................... 5

7

**CONCLUSION** ........................................................................................................ **7**

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SIS OPPOSITION TO INTUITIVE'S MOTION IN LIMINE #1

1

## <u>TABLE OF AUTHORITIES</u>

2

3

**Federal Rules**
Federal Rule of Evidence 801(c) ............................................................................. 4
4
Federal Rule of Evidence 803(3) ................................................................... 4, 5, 6, 7

**United States Supreme Court Cases**
5
*Buckeye Powder Co. v. E.I. DuPont de Nemours Powder Co.*,
   248 U.S. 55 (1918) ................................................................................................. 6
6

**Federal Cases**
7
*Callahan v. A.E.V., Inc.*,
   182 F.3d 237 (3d Cir. 1999) ................................................................................. 5
8
*McConnell v. Wal-Mart Stores, Inc.*,
   995 F. Supp. 2d 1164 (D. Nev. 2014) ................................................................... 3
9
*Packgen v. Berry Plastics Corp.*,
   847 F.3d 80 (1st Cir. 2017) ................................................................................... 6
10
*Stelwagon Mfg. Co. v. Tarmac Roofing Systems, Inc.*,
   63 F.3d 1267 (3d Cir. 1995) ................................................................................. 6
11
*United States v. Cardascia*,
   951 F.2d 474 (2d Cir. 1991) ................................................................................. 6
12
*United States v. Coplan*,
   703 F.3d 46 (2d Cir. 2012) ................................................................................... 5
13
*United States v. Oguns*,
   921 F.2d 442 (2d Cir. 1990) ................................................................................. 5
14
*United States v. Pac. Gas & Elec. Co.*,
   178 F. Supp. 3d 927 (N.D. Cal. 2016) ................................................................. 3
15

**Cases**
16
*Consol. Credit Agency v. Equifax, Inc.*,
   2005 WL 6218038 (C.D. Cal. Jan. 26, 2005) ...................................................... 5
17
*Discover Fin. Servs. v. Visa U.S.A. Inc.*,
   2008 WL 4560707 (S.D.N.Y. Oct. 9, 2008) ........................................................ 6
18
*Marjam Supply Co. v. Firestone Bldg. Prod. Co., LLC*,
   No. 11- CV-7119(WJM), 2019 WL 1451105 (D.N.J. Apr. 2, 2019) ................... 5

19

20

21

22

23

24

25

26

27

28

Defendant, Intuitive Surgical, Inc. ("Intuitive") claims that "SIS will attempt to build its case at trial using [three] categories of inadmissible hearsay." Intuitive appears to suggest that any and all live testimony from SIS witnesses, any and all deposition testimony from non-party witnesses, and any and all documents dealing with the various out-of-court statements made by hospital customer representatives are categorically inadmissible evidence which the jury may not consider at trial. Intuitive's Motion in Limine No. 1 at p. 1:7-14 ("Mtn"). Without any rational basis, Intuitive asserts that SIS will "turn this trial into a game of telephone about what hospitals supposedly told them." Mtn. at 2:16-17. Intuitive's claims are unfounded, its suppositions are inaccurate, its legal arguments are inapplicable, and the motion should be denied.

## BACKGROUND

There is ample evidence that Intuitive's threats were the direct cause of the complete shutdown of the market for repaired EndoWrists, including for SIS customers. ███████████

███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ [2]

Intuitive's overall process in response to learning of a hospital refurbishing its EndoWrist surgical instruments through a third-party repairer generally took a short period of time: ten business days for the conversation phase, ten business days for the customer letter, and five business days for account termination.[3] At some point, if hospitals didn't accede to Intuitive's demands, they would encounter a service message on the da Vinci robot, and without Intuitive providing service, that da Vinci robot would be unusable for surgery.[4] As Intuitive's Ron Bair

---

[1] *E.g.*, Van Hoven Ex. 1 (Trial Exh. 560), at Intuitive-00439335 ███████████
███████████████████████████████████████████████████████ *Id.*
[2] *E.g.*, *id.* at Intuitive-00439337, -00439345-46.
[3] *E.g.*, *id.* at Intuitive-00439336; Van Hoven Ex. 2 (AJ Inacay Deposition) at 163:1-164:3.
[4] *E.g.*, Van Hoven Ex. 3 (Vavoso Deposition) at 227:13-228:18.

SIS OPPOSITION TO INTUITIVE'S MOTION IN LIMINE #1

explained, "if Intuitive doesn't service [a da Vinci] robot and the robot fails, it means the hospital can no longer do surgeries with that robot."[5] Following through on its "cease and desist" strategy, Intuitive terminated four customer accounts who refused to comply with its demands: Conway Regional Medical Center; Pacific Coast Surgical Center; White County Medical Center; and Panama City Surgery. ███████████████████

███████████████████████████████████████████

███████████████[6]

Because Intuitive's threats were so effective, most hospitals never got to the final stage of shutdown of their robot program. Intuitive's Glenn Vavoso testified that after receiving these cease-and-desist letters from Intuitive, many hospitals stopped using third-party services to repair their EndoWrist surgical instruments.[7] **Q. Is there any instance that you can identify, as Intuitive's 30(b)(6) witness, where a hospital continued using Rebotix's services after receiving these letters from Intuitive? A. Not -- not at this time."[8]** Vavoso Deposition at 226:18-22 (emphasis added). As an example, following its standard operating procedure, Intuitive sent a cease and desist letter to one of SIS's EndoWrist repair customers, Marin General Hospital on October 26, 2019.[9] In November 2019, executives at Intuitive were concerned about the competitive threat posed by SIS based on the fact that Marin General Hospital had been using SIS repaired EndoWrist instruments.[10] Erin Grinberg of Intuitive noted that Marin General Hospital was "very proud of this and celebrated the cost savings."[11] In devising a plan for how to address the ongoing competitive threat posed by SIS at Marin General Hospital, Adam Clark of Intuitive noted that it was "important for MG [Marin General] to understand that we will be canceling their SLSA in short order if this keeps happening."[12]

---

[5] Van Hoven Ex. 4 (Bair Deposition) at 136:2-5.
[6] Van Hoven Ex. 1 at Intuitive-00439338.
[7] Van Hoven Ex. 3 (Vavoso Deposition) at 225:24-226:22.
[8] *Id.* at 226:18-22 (emphasis added).
[9] Van Hoven Ex. 5 at Intuitive-00373885-00373887 (Trial Ex. 556).
[10] Van Hoven Ex. 6 at Intuitive-00049108-112 (Trial Ex. 489).
[11] *Id.* at Intuitive-00049112.
[12] Van Hoven Ex. 7 (Intuitive-00110473-0478) at -0474 (Trial Ex. 511).

SIS OPPOSITION TO INTUITIVE'S MOTION IN LIMINE #1

Intuitive's enforcement of its sales agreement succeeded in preventing rival third-party repairers/refurbishers (such as SIS) from competing effectively in the EndoWrist repair and replacement market. SIS's Greg Posdal will testify at trial that SIS's EndoWrist refurbishment service started very well and was very well received by all the potential hospital customers that were approached. Keith Johnson will testify about his presentations to prospective hospital customers regarding SIS's EndoWrist refurbishment services, the monumental interest in that service shown by the hospitals, and the resulting sales SIS was able to achieve before Intuitive's intimidation campaign shut down SIS's business. Mr. Johnson will testify that after SIS's customers received the Intuitive cease and desist letters, SIS was not able to make any more sales for the refurbishment of EndoWrist instruments. Keith Johnson will also testify that decision makers at various hospitals told him that they would no longer be using or would not consider using SIS to refurbish their EndoWrist instruments.

Intuitive has made clear that it intends to attack SIS's claims based on the limited number of SIS hospital customers who actually received repaired EndoWrists from SIS before Intuitive's complete shutdown of the market. *See, e.g.*, Dkt. 230-7 at pp. 9-10 (public version of Intuitive Opposition and Cross-Motion re Summary Judgment). Intuitive has also made clear that it intends to argue that SIS should have pursued 510(k)s and sales of "remanufactured" EndoWrist's after Intuitive's self-serving and post-discovery announcement of March, 2023 that it would not enforce its contractual restrictions against 510(k) approved EndoWrists. Dkt. 243-1 at pp. 4-5.

**ARGUMENT**

1.  <u>A Blanket Ruling on These Statements Is Inappropriate at this Time</u>

In many instances, evidentiary rulings "should be deferred until trial, so that questions of foundation, relevancy, and potential prejudice may be resolved in proper context." *United States v. Pac. Gas & Elec. Co. ("PG&E")*, 178 F. Supp. 3d 927, 941 (N.D. Cal. 2016). For example, in order to exclude evidence on a motion in limine, "the evidence must be inadmissible on all potential grounds." *McConnell v. Wal-Mart Stores, Inc.*, 995 F. Supp. 2d 1164, 1167 (D. Nev. 2014). These principles apply to many, if not all, of the issues Intuitive

1   has raised regarding possible deposition testimony and documentary evidence that may be

2   offered at trial, as explained further below. Accordingly, SIS submits that ruling on such

3   matters should be deferred until trial. While it is impossible to predict every scenario that may

4   arise, there will certainly be instances where evidence will be proffered that relates to matters

5   that were relayed to SIS and Intuitive by third parties (including hospitals). There are two

6   primary reasons that the Court may decide to  let such evidence into the record. First, the

7   evidence is offered to explain, for example, SIS's attitude toward the market (Fed. R. Evid.

8   801(c)). Second, the evidence is admissible for the purposes of showing the customers' motives

9   and perceptions, consumer demand, and Intuitive's coercion through its unremitting policy of

10  enforcing unlawful contract terms pursuant to Fed. R. Evid. 803(3).

2.   Many or Most Statements Would not Be Offered For the Truth of
          the Matter Asserted

13  Some of the out-of-court statements by hospital representatives are not hearsay because

14  they are "not offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c).

15  For example, if Keith Johnson testifies that all or nearly all of the hospital representatives he

16  met with told him that they "hemorrhage money to Intuitive Surgical" and were "looking for

17  ways to reduce costs", those out-of-court statements would not be offered to prove the truth of

18  the matter being asserted. The same would be true if Johnson testifies that "customers said

19  they were concerned about moving forward [with modified EndoWrists] because of what they

20  were told by Intuitive."  These statements are admissible at trial because they would not be

21  offered to prove the matters asserted, *i.e.*, that hospitals were in fact losing money on robotic

22  surgery or looking for ways to reduce costs, or to prove that hospitals would have purchased

23  modified EndoWrists from SIS but-for Intuitive. Rather, such statements would be offered to

24  show that the communication occurred, which is indisputably relevant to multiple issues

25  including customer demand and coercion by Intuitive, and to show why SIS did not pursue

26  EndoWrist repair after Intuitive shut down the market or after Intuitive's self-serving

27  announcement that it would not enforce its contractual restrictions for 510(k) approved repair.

28  SIS may also testify regarding questions that hospital customers asked them. As an

example, SIS may seek to introduce an email chain where a hospital declarant asks Intuitive whether allowing SIS to modify its EndoWrist instruments would void the instrument warranty.[13] Intuitive argues that this documentary evidence is inadmissible. Mtn. 5:9-11. It is well-established, however, that questions are not hearsay because they do not assert the truth of anything. *See, e.g., United States v. Coplan*, 703 F.3d 46, 84 (2d Cir. 2012) ("questions are not 'assertions' within meaning of Rule 801) (citing *United States v. Oguns*, 921 F.2d 442, 449 (2d Cir. 1990) ("An inquiry is not an 'assertion,' and accordingly is not and cannot be a hearsay statement.")).

### 3. The Statements Are Admissible as State of Mind Evidence

Additionally, out-of-court statements by SIS hospital customers are relevant and admissible for the purposes of showing the customers' and SIS's motives and perceptions, consumer demand, Intuitive's coercion through its unremitting policy of enforcing unlawful contract terms, and others' state of mind in response to that coercion. The out-of-court statements by SIS hospital customers are admissible under Federal Rule of Evidence 803(3) (excluding from hearsay rule "[a] statement of the declarant's then-existing state of mind (such as motive, intent, or plan)"). *See also Callahan v. A.E.V., Inc.*, 182 F.3d 237, 252 (3d Cir. 1999) (holding customers' statements concerning why they no longer purchased from plaintiffs' beer distributorships were admissible to prove customers' motives for no longer purchasing from plaintiffs); *Marjam Supply Co. v. Firestone Bldg. Prod. Co., LLC*, No. 11-CV-7119(WJM), 2019 WL 1451105, at *4 (D.N.J. Apr. 2, 2019) (holding customers' out-of-court statements were "admissible to evidence [plaintiff's] customers' motives for switching distributors" where plaintiff "offer[ed] other admissible evidence of actual diverted sales in the form of an expert report") (citations omitted).

*Consol. Credit Agency v. Equifax, Inc.*, 2005 WL 6218038, at *2 (C.D. Cal. Jan. 26, 2005) (cited by Intuitive) explains that the state of mind exception requires: (1) the statement was made contemporaneously with the mental state to be proven; (2) circumstances do not suggest a motive for the declarant to fabricate or misrepresent his or her thoughts; and (3) the

---

[13] *E.g.*, Van Hoven Ex. 8 (Intuitive-00110255) at -0256 (Trial Ex. No. 510).

1    declarant's state of mind is relevant to an issue in the case. Here, those assessments can be

2    made as evidence are presented, without a blanket preclusion of evidence that satisfies these

3    requirements.

4        Two cases cited by Intuitive are not pertinent to the actual issues presented in its motion.

5    In *Buckeye Powder Co. v. E.I. DuPont de Nemours Powder Co.*, 248 U.S. 55, 65 (1918),

6    statements of reasons for refusing to do business with plaintiff were excluded because they

7    were proffered for the truth of the matter. *Id.* In *Stelwagon Mfg. Co. v. Tarmac Roofing

8    Systems, Inc.*, 63 F.3d 1267 (3d Cir. 1995), the appellate court ruled that the district court's

9    reliance on the statements admitted under Rule 803(3) as proof of actual antitrust damages, in

10    the form of lost sales, was error. *Id.* at 1274-75. In both cases, the statements were used for

11    purposes other than state of mind.

12        "[T]he reasons for the state of mind exception focus on the contemporaneity of the

13    statement and the unlikelihood of deliberate or conscious misrepresentation." *United States v.

14    Cardascia*, 951 F.2d 474, 487 (2d Cir. 1991). What is important is the likelihood that the

15    declarants' statements are trustworthy and that the declarants were privy to or influenced the

16    customer's decision-making process. For example, in *Packgen v. Berry Plastics Corp.,* 847

17    F.3d 80, 91 (1st Cir. 2017), the district court permitted the plaintiff's "president and its sales

18    manager to testify that decision-makers at the thirty-seven refineries had told them" that they

19    intended to purchase a certain type of container. On appeal, the First Circuit agreed that such

20    testimony was admissible because the plaintiffs' "witnesses knew the declarants and testified

21    that all declarants were decision-makers at their respective refineries." *Id.* Similarly, in this

22    case, SIS will introduce testimony at trial that will establish that declarants of out-of-court

23    hospital statements were involved in the decision-making process at their respective hospitals.

24        In another case cited by Intuitive, *Discover Fin. Servs. v. Visa U.S.A. Inc.*, 2008 WL

25    4560707, at *1 (S.D.N.Y. Oct. 9, 2008), the court ruled that testimony concerning the

26    motivation of customers for ceasing to deal with a business **was** admissible under the "state of

27    mind" exception, provided that there is otherwise admissible proof that business was lost. *Id.*

28    Intuitive's motion fails to identify how the declarants at issue here were remote from the

-6-

SIS OPPOSITION TO INTUITIVE'S MOTION IN LIMINE #1

1  decision-making process such that the inclusion of their statements would not have any

2  tendency to make it more or less probable that the hospital did not use SIS's refurbishment

3  services because of Intuitive's threats.

4                                    **CONCLUSION**

5       SIS will proffer substantial evidence at trial sufficient to establish the actual lost sales for

6  each hospital where it may also introduce out-of-court customer statements under Rule 803(3).

7  It may also offer hospital statements for proper purposes such as establishing motive for these

8  actual lost sales and rebutting claims that it should have persisted after shut down of the repair

9  market.

10      For the foregoing reasons, SIS respectfully requests that the Court deny Intuitive's

11 Motion in Limine No. 1.

12

13 Dated: <u>November 7, 2024</u>                McCAULLEY LAW GROUP LLC
                                             By:    */s/ Joshua Van Hoven*
14                                              JOSHUA V. VAN HOVEN

15                                           E-Mail: josh@mccaulleylawgroup.com
                                             3001 Bishop Dr., Suite 300
16                                           San Ramon, California 94583
                                             Telephone: 925.302.5941
17
                                             RICHARD T. MCCAULLEY (*pro hac vice*)
18                                           E-Mail: richard@mccaulleylawgroup.com
                                             180 N. Wabash Avenue, Suite 601
19                                           Chicago, Illinois 60601
                                             Telephone: 312.330.8105
20
                                             *Attorneys for Plaintiff and Counter-Defendant,*
21                                           SURGICAL INSTRUMENT SERVICE
                                             COMPANY, INC.
22

23

24

25

26

27

28

1

## <u>CERTIFICATE OF SERVICE</u>

2

I hereby certify that on November 7, 2024, I caused a copy of the foregoing

3

**PLAINTIFF SIS's OPPOSITION TO INTUITIVE'S MOTION IN LIMINE #1**, to be

4

electronically to be served *via* electronic mail to counsel of record:

5

6

**Crystal Lohmann Parker**
Paul, Weiss, Rifkind, Wharton & Garrison LLP

7

1285 Avenue of the Americas
New York, NY 10019

8

212-373-3000
Email: cparker@paulweiss.com

9

**Joshua Hill , Jr.**

10

Paul, Weiss, Rifkind, Wharton & Garrison LLP
535 Mission Street, 24th Floor

11

San Francisco, CA 94105
(628) 432-5123

12

Email: jhill@paulweiss.com

13

**Kenneth A. Gallo**
Paul, Weiss, Rifkind, Wharton & Garrison LLP

14

2001 K Street NW
Washington, DC 20006-104 7

15

202-223-7356
Fax: 202-204-7356

16

Email: kgallo@paulweiss.com

17

**Paul David Brachman**
Paul, Weiss, Rifkind, Wharton & Garrison LLP

18

2001 K St., NW
Washington, DC 20006

19

202-223-7440
Email: pbrachman@paulweiss.com

20

**William Michael**

21

Paul, Weiss, Rifkind, Wharton and Garrison LLP
1285 Avenue of the Americas

22

New York, NY 10019
212-373-3000

23

Email: WMichael@paulweiss.com

24

**Allen Ruby**
Attorney at Law

25

15559 Union Ave. #138
Los Gatos, CA 95032

26

408-4 77-9690
Email: allen@allenruby.com

27

28

-8-

1  **Andrew David Lazerow**
   Covington & Burling LLP
2  One CityCenter
   850 Tenth Street, NW
3  Washington, DC 20001-4956
   202-662-5081
4  Email: alazerow@cov.com

5  **Kathryn Elizabeth Cahoy**
   Covington & Burling LLP
6  3000 El Camino Real
   5 Palo Alto Square, 10th Floor
7  Palo Alto, CA 94306
   650-632-4700
8  Email: kcahoy@cov.com

9  **Sonya Diane Winner**
   Covington & Burling LLP
10 Floor 54
   415 Mission Street
11 San Francisco, CA 94105-2533
   (415) 591-6000
12 Email: swinner@cov.com

13

14  Dated: November 7, 2024        By:  ___/s/ Joshua Van Hoven___
                                        JOSHUA V. VAN HOVEN
15

16

17

18

19

20

21

22

23

24

25

26

27

28

SIS OPPOSITION TO INTUITIVE'S MOTION IN LIMINE #1

1  **MCCAULLEY LAW GROUP LLC**
   JOSHUA V. VAN HOVEN (CSB No. 262815)
2  E-Mail: josh@mccaulleylawgroup.com
   3001 Bishop Dr., Suite 300
3  San Ramon, California 94583
   Telephone: 925.302.5941
4
   RICHARD T. MCCAULLEY (*pro hac vice*)
5  E-Mail: richard@mccaulleylawgroup.com
   180 N. Wabash Avenue, Suite 601
6  Chicago, Illinois 60601
   Telephone: 312.330.8105
7
   *Attorneys for Plaintiff and Counter-Defendant,*
8  SURGICAL INSTRUMENT SERVICE COMPANY. INC.

9              **UNITED STATES DISTRICT COURT**

10           **NORTHERN DISTRICT OF CALIFORNIA**

11  SURGICAL INSTRUMENT SERVICE          CASE NO. 3:21-CV-03496-AMO
    COMPANY, INC.
12                                        Honorable Araceli Martínez-Olguín
              *Plaintiff/Counter-Defendant,*
13                                        **DECLARATION OF JOSHUA VAN**
        v.                                **HOVEN IN SUPPORT OF**
14                                        **PLAINTIFF  SIS's OPPOSITION TO**
    INTUITIVE SURGICAL, INC.              **INTUITIVE'S MOTION IN LIMINE**
15                                        **#1**
              *Defendant/Counterclaimant.*
16

17

18

19

20

21

22

23

24

25

26

27

28

I, JOSHUA VAN HOVEN, declare as follows:

I am an attorney at the law firm of MCCAULLEY LAW GROUP LLC, attorneys for Plaintiff SURGICAL INSTRUMENT SERVICE COMPANY, INC. ("SIS") in this matter. I have personal knowledge of the matters set forth herein, unless otherwise noted.

1. Attached as Exhibit 1 is a true and correct copy of Intuitive's Unauthorized Remanufactured Instructions Overview, which was produced by Intuitive in this case and bates-labeled Intuitive-00439333-Intuitive-00439355.

2. Attached as Exhibit 2 is a true and correct copy of excerpts of the Deposition of Antonio (AJ) Inacay, which was taken on June 8, 2021 in Rebotix Repair LLC v. Intuitive Surgical, Inc., Case No. 8:20-CV-02274 (M.D. Fla).

3. Attached as Exhibit 3 is a true and correct copy of excerpts of the Deposition of Glenn Vavoso, which was taken on May 14, 2021 in Rebotix Repair LLC v. Intuitive Surgical, Inc., Case No. 8:20-CV-02274 (M.D. Fla).

4. Attached as Exhibit 4 is a true and correct copy of excerpts of the Deposition of Ronald Lee Bair, Jr., which was taken on May 24, 2021 in Rebotix Repair LLC v. Intuitive Surgical, Inc., Case No. 8:20-CV-02274 (M.D. Fla).

5. Attached as Exhibit 5 is a true and correct copy of an Intuitive Letter to Marin General Hospital relating to refurbished EndoWrist instruments, which is dated November 26, 2019, which was produced by Intuitive in this case and bates-labeled Intuitive-00373885-Intuitive-00373887.

6. Attached as Exhibit 6 is a true and correct copy of e-mail correspondence between Intuitive employees, starting on November 22, 2019, which was produced by Intuitive in this case and bates-labeled Intuitive-00049108-Intuitive-00049112.

7. Attached as Exhibit 7 is a true and correct copy of e-mail correspondence between Intuitive employees, starting on November 22, 2019, which was produced by Intuitive in this case and bates-labeled Intuitive-00110473-Intuitive-00110478.

8. Attached as Exhibit 8 is a true and correct copy of e-mail correspondence between Vizient, Inc., UF Health Shands, and Intuitive employees, starting on September

9, 2019, which was produced by Intuitive in this case and bates-labeled Intuitive-00110255-Intuitive-00110258.

I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated: <u>November 7, 2024</u>

McCAULLEY LAW GROUP LLC
By: _____*/s/ Joshua Van Hoven*_____
     JOSHUA V. VAN HOVEN

E-Mail: josh@mccaulleylawgroup.com
3001 Bishop Dr., Suite 300
San Ramon, California 94583
Telephone: 925.302.5941

RICHARD T. MCCAULLEY (*pro hac vice*)
E-Mail: richard@mccaulleylawgroup.com
180 N. Wabash Avenue, Suite 601
Chicago, Illinois 60601
Telephone: 312.330.8105

*Attorneys for Plaintiff and Counter-Defendant,*
SURGICAL INSTRUMENT SERVICE
COMPANY, INC.

1

**CERTIFICATE OF SERVICE**

2

I hereby certify that on November 7, 2024, I caused a copy of the foregoing

3

**DECLARATION OF JOSHUA VAN HOVEN IN SUPPORT OF PLAINTIFF SIS's**

4

**OPPOSITION TO INTUITIVE'S MOTION IN LIMINE #1**, to be electronically to be

5

served *via* electronic mail to counsel of record:

6

7

**Crystal Lohmann Parker**
Paul, Weiss, Rifkind, Wharton & Garrison LLP

8

1285 Avenue of the Americas
New York, NY 10019

9

212-373-3000
Email: cparker@paulweiss.com

10

**Joshua Hill , Jr.**

11

Paul, Weiss, Rifkind, Wharton & Garrison LLP
535 Mission Street, 24th Floor

12

San Francisco, CA 94105
(628) 432-5123

13

Email: jhill@paulweiss.com

14

**Kenneth A. Gallo**
Paul, Weiss, Rifkind, Wharton & Garrison LLP

15

2001 K Street NW
Washington, DC 20006-104 7

16

202-223-7356
Fax: 202-204-7356

17

Email: kgallo@paulweiss.com

18

**Paul David Brachman**
Paul, Weiss, Rifkind, Wharton & Garrison LLP

19

2001 K St., NW
Washington, DC 20006

20

202-223-7440
Email: pbrachman@paulweiss.com

21

**William Michael**

22

Paul, Weiss, Rifkind, Wharton and Garrison LLP
1285 Avenue of the Americas

23

New York, NY 10019
212-373-3000

24

Email: WMichael@paulweiss.com

25

**Allen Ruby**
Attorney at Law

26

15559 Union Ave. #138
Los Gatos, CA 95032

27

408-4 77-9690
Email: allen@allenruby.com

28

1

**Andrew David Lazerow**
Covington & Burling LLP

2

One CityCenter
850 Tenth Street, NW

3

Washington, DC 20001-4956
202-662-5081

4

Email: alazerow@cov.com

5

**Kathryn Elizabeth Cahoy**
Covington & Burling LLP

6

3000 El Camino Real
5 Palo Alto Square, 10th Floor

7

Palo Alto, CA 94306
650-632-4700

8

Email: kcahoy@cov.com

9

**Sonya Diane Winner**
Covington & Burling LLP

10

Floor 54
415 Mission Street

11

San Francisco, CA 94105-2533
(415) 591-6000

12

Email: swinner@cov.com

13

14

Dated: November 7, 2024          By:    /s/ Joshua Van Hoven

15

JOSHUA V. VAN HOVEN

16

17

18

19

20

21

22

23

24

25

26

27

28

-4-
VAN HOVEN DECLARATION ISO SIS OPP TO INTUITIVE'S MOTION IN LIMINE #1

# Exhibit 1



Attorneys' Eyes Only

Intuitive-00439333



Attorneys' Eyes Only

Intuitive-00439334



Attorneys' Eyes Only



Attorneys' Eyes Only



Attorneys' Eyes Only

Intuitive-00439337



Attorneys' Eyes Only



Attorneys' Eyes Only



Attorneys' Eyes Only

Intuitive-00439340



Attorneys' Eyes Only



Attorneys' Eyes Only



Attorneys' Eyes Only



Attorneys' Eyes Only

Intuitive-00439344



Attorneys' Eyes Only



Attorneys' Eyes Only



Attorneys' Eyes Only



Attorneys' Eyes Only



Attorneys' Eyes Only

Intuitive-00439349



Attorneys' Eyes Only



Attorneys' Eyes Only



Attorneys' Eyes Only



Attorneys' Eyes Only

Intuitive-00439353



Attorneys' Eyes Only

Intuitive-00439354



Attorneys' Eyes Only

Intuitive-00439355

Exhibit 2

1       IN THE UNITED STATES DISTRICT COURT

2          MIDDLE DISTRICT OF FLORIDA

3             TAMPA DIVISION

4

5   REBOTIX REPAIR, LLC

6        Plaintiff,

7   vs.              Case No. 8:20-CV-02274

8   INTUITIVE SURGICAL, INC.,

9        Defendant.

10  ----------------------------/

11

12

13          REMOTELY CONDUCTED

14  VIDEOTAPED DEPOSITION OF ANTONIO (AJ) INACAY

15  Pleasanton, California (Witness's location)

16          Tuesday, June 8, 2021

17

18

19

20

21  Stenographically reported by:
     LORRIE L. MARCHANT, RMR, CRR, CCRR, CRC
22  California CSR No. 10523
     Washington CSR No. 3318
23  Oregon CSR No. 19-0458
     Texas CSR No. 11318
24

25  Job No. 194227

1          June 8, 2021

2          9:09 a.m. PDT

3

4    Remotely conducted videotaped deposition

5    of ANTONIO (AJ) INACAY, before Lorrie L.

6    Marchant, a Certified Shorthand Reporter,

7    Registered Merit Reporter, Certified

8    Realtime Reporter, California Certified

9    Realtime Reporter, Certified Realtime

10    Captioner.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      A P P E A R A N C E S

2      (All appearances remotely via Zoom)

3

4    APPEARING ON BEHALF OF THE PLAINTIFF:

5        DOVEL & LUNER

6        BY:  JULIEN ADAMS, ESQ.

7            LORENZO LAMO, LEGAL ASSISTANT

8            NAOMI CALDWELL, LEGAL ASSISTANT

9        201 Santa Monica Boulevard

10        Santa Monica, CA 90401

11

12   APPEARING ON BEHALF OF THE DEFENDANT:

13        SKADDEN, ARPS, SLATE, MEAGHER & FLOM

14        BY:  KAREN LENT, ESQ.

15            ALENA PERSZYK, ESQ.

16        One Manhattan West

17        New York, NY 10001

18

19   ALSO PRESENT:

20        Chris Jordan, Videographer

21            ---oOo---

22

23

24

25

1    PLEASANTON, CALIFORNIA  (Witness's location)

2         TUESDAY, JUNE 8, 2021

3            9:09 a.m. PDT

4         THE VIDEOGRAPHER:  Good morning.  My name

5    is Chris Jordan, and I'm the legal videographer in

6    association with TSG Reporting.

7         Due to the severity of COVID-19 and

8    following the practice of social distancing, I will

9    not be in the same room with the witness.  Instead,

10   I will record this videotaped deposition remotely.

11        The reporter, Lorrie Marchant, also will

12   not be in the same room and will swear the witness

13   in remotely.

14        Do all parties stipulate to the validity of

15   this video recording and remote swearing and that it

16   will be admissible in the courtroom as if it had

17   been taken following Rule 30 of the Federal Rules of

18   Civil Procedure and the state's rules where this

19   case is pending?

20        MR. ADAMS:  Yes, on the plaintiff.

21        MS. LENT:  Defendant stipulates.

22        THE VIDEOGRAPHER:  Thank you.

23        This marks the beginning of the videotaped

24   deposition of AJ Inacay being taken in the matter of

25   Rebotix Repair, LLC, v. Intuitive Surgical, Inc.,

Page 5

1  being held in the United States District Court,

2  Middle District of Florida, Tampa Division.  This

3  deposition is being taken on June 8th, 2021, at

4  approximately 9:09 a.m.

5         My name is Chris Jordan with TSG Reporting.

6  The court reporter is Lorrie Marchant with TSG

7  Reporting.

8         Will counsel please state your name for the

9  record.

10        MR. ADAMS:  This is Julien Adams.  I'm

11  representing the plaintiff.

12        MS. LENT:  Karen Lent from Skadden Arps on

13  behalf of Intuitive.

14        THE VIDEOGRAPHER:  Thank you.  Would --

15        MS. PERSZYK:  Alena Perszyk from

16  Skadden Arps attending on behalf of defendant

17  Intuitive Surgical.

18        THE VIDEOGRAPHER:  My apologies.  Thank

19  you.

20        Will the court reporter please swear in the

21  witness.

22              ANTONIO INACAY,

23  FIRST DULY SWORN/AFFIRMED, TESTIFIED AS FOLLOWS:

24              EXAMINATION BY MR. ADAMS

25  ///

Page 6

1        BY MR. ADAMS:

2     Q.  Can you state your name for the record.

3     A.  My real name is Antonio Inacay.  My

4  nickname is AJ.

5     Q.  Where do you work?

6     A.  I'm not sure -- can you rephrase that

7  question?

8     Q.  Sure.  Where do you -- where do you work?

9     A.  Where do I work?

10    Q.  Yes.

11    A.  I would have to look up the address, to be

12  frank.  We have multiple buildings.  So I just moved

13  into a new building.

14    Q.  Do you have a job?

15    A.  Yes.

16    Q.  What is your job?

17    A.  I'm a product manager for Intuitive.

18    Q.  For whom do you work as a product --

19  project manager?  Is it Intuitive?

20    A.  Yes.

21    Q.  So you work at Intuitive?

22    A.  Yes.

23    Q.  When did you start working at Intuitive?

24    A.  I don't remember the exact date, to be

25  honest.  I want to say it was around January 2019,

1  but I'm not completely sure.

2      Q.   Before you worked at Intuitive, did you

3  work somewhere else?

4      A.   Yes.

5      Q.   Where did you work before you worked at

6  Intuitive?

7      A.   Roche Sequencing Solutions.

8      Q.   How long had you worked at Roche Sequencing

9  Solutions before you started working at Intuitive?

10     A.   I would say around four to five years.

11     Q.   When did you stop working at Roche

12  Sequencing Solutions?

13     A.   I don't recall the date, to be honest.  It

14  was -- yeah.  I don't recall the exact date.

15     Q.   Do you recall the year?

16     A.   I want to say it's 2017 or 2018.

17     Q.   Between the time that you stopped working

18  at Roche Sequencing Solutions and you started

19  working at Intuitive -- withdrawn.  Let me ask a

20  better question.

21         How long -- well, when you stopped working

22  at Roche Sequencing Solutions, did you immediately

23  get the job at Intuitive, or was there a period of

24  time that transpired between the two jobs?

25     A.   There was a period of time that transpired

1  between the two jobs.

2    Q.  How much time transpired between the two

3  jobs?

4    A.  I don't recall the times.  Sorry.

5    Q.  What did you do between the time that you

6  worked at Roche Sequencing Solutions and starting

7  your work at Intuitive with respect to employment?

8    A.  I was in bed.  I got into a car accident.

9    Q.  When did you get into the car accident?

10    A.  I don't recall the exact date.  It was in

11  December of that year.

12    Q.  December of what year?

13    A.  I don't recall the actual year, so ...

14    Q.  Was the car accident a bad accident?

15    A.  I don't know what you mean by "bad."  What

16  does "bad" mean?

17    Q.  What was -- did you consider it a bad

18  accident?

19    A.  I mean, that's kind of, like, subjective;

20  right?  I don't really know what -- can you rephrase

21  what "bad" means?

22    Q.  I'm trying to figure out whether or not you

23  considered it a bad accident.

24    A.  In my opinion, yes, it was a bad accident.

25    Q.  Why do you think it was a bad accident?

Page 9

1    A.   Because there were multiple cars involved,

2   and my car got spun around.

3    Q.   Where did this accident take place?

4    A.   On the 680, Highway 680.

5    Q.   What city did this accident take place?

6    A.   Sorry.  I don't recall the actual city.

7    Q.   Where in the country is Highway 680 where

8   the accident took place?

9    A.   The country is the United States.

10    Q.   In what state?

11    A.   California.

12    Q.   What part of California?  Northern

13   California?  Southern California?

14    A.   I would say it's Northern California in the

15   Bay Area.

16    Q.   When you were in the accident on

17   Highway 680 in the Bay Area, were you traveling

18   some -- to a particular place?

19    A.   Yes.

20    Q.   Where were you going to?

21    A.   I was going back home.

22    Q.   You were traveling home from where?

23    A.   The rock climbing gym.

24    Q.   From a rock climbing trip?

25    A.   Rock climbing gym.

1    Q.   Where was the rock climbing gym located?

2    A.   In Fremont.

3    Q.   And where did you live at the time?

4    A.   In Pleasanton, California.

5    Q.   How far from your home in Pleasanton was

6   the rock climbing gym in Fremont?

7    A.   I'm not sure, to be honest.  Sorry.

8    Q.   How long did it take you to get from the

9   rock climbing gym in Fremont to your home in

10  Pleasanton?

11    A.   I don't recall how long it would take.

12    Q.   Tell me everything you can recall about how

13  the accident happened.

14    A.   I actually don't know like the root cause

15  of it.  I can tell you from what I recall.  My car

16  being hit from behind.  I spun around.  They had to

17  use the -- I'm not sure what the actual tool is

18  called, but like the jaws of life to get me out.

19  And I went to an ambulance, and I went to the

20  hospital.

21    Q.   Did you suffer injuries?

22    A.   Can you define "injuries" for me?

23    Q.   I cannot.

24         Were you injured?

25    A.   Yes.

1    Q.  How were you injured?

2    A.  My neck was injured.

3    Q.  Any other injuries?

4    A.  Not that I recall, no.

5    Q.  Did you suffer any injuries to your brain?

6    A.  No.

7    Q.  Did you suffer any injuries from that

8  accident that would cause you to forget things?

9    A.  Can you -- can you repeat that, please?

10  Sorry.

11    Q.  Sure.

12        Any injuries from that accident that would

13  cause you to forget things?

14    A.  I'm not a medical doctor, so I can't -- I'm

15  not really sure I can answer that appropriately.

16    Q.  Has anyone, including a doctor, diagnosed

17  with you any injuries from that accident that would

18  cause you to not have a clear recollection of

19  things?

20    A.  No.

21    Q.  How long were you in the hospital?

22    A.  I don't -- I don't recall the dates, or the

23  hours, but it was definitely a few hours.

24    Q.  After you were discharged, did you go home?

25    A.  Yes.

1    Q.   And then at the time that you got into the

2   accident -- withdrawn.  Better question.

3        When you were traveling from the rock

4   climbing gym when you got into the accident on

5   Highway 680, were you employed at that time?

6    A.   Yes.

7    Q.   Where were you working at that time?

8    A.   Roche Sequencing Solutions.

9    Q.   After the accident and you went to the

10  hospital and then you were discharged after a couple

11  of hours and you went home, were you bedridden for a

12  period of time?

13   A.   Yes.

14   Q.   How long were you bedridden?

15   A.   I don't recall.

16   Q.   Were you bedridden for a matter of days or

17  weeks or months?

18   A.   Days.

19   Q.   Now, did you at some point stop being

20  bedridden and then -- withdrawn.  Better question.

21       Did you go back to work after the accident

22  at Roche Sequencing Solutions?

23   A.   I don't recall, honestly.

24   Q.   You don't remember whether or not, after

25  your accident and after you stopped being bedridden

1  for a few days, if you were still working at Roche

2  Sequencing Solutions.

3      Is that what your testimony is?

4   A.  Yes.

5   Q.  Did you lose -- were you fired from Roche

6  Sequencing, or did you quit?

7   A.  I quit.

8   Q.  Why did you quit?

9   A.  To work at Intuitive.

10   Q.  You quit Roche Sequencing Solutions to work

11  at Intuitive; correct?

12   A.  I was offered a position at Intuitive.  I

13  applied to there, so yes.

14   Q.  Did you apply to Intuitive before or after

15  your accident?

16   A.  Before.

17   Q.  And when did you get offered the position

18  at Intuitive; before or after your accident?

19   A.  I don't recall.

20   Q.  On the day that you had your accident, did

21  you have the offer from Intuitive?

22   A.  I don't recall.

23   Q.  On the day that you stopped being

24  bedridden, did you have an offer from Intuitive?

25   A.  I don't recall.

Page 14

1    Q.   How did you get the offer from Intuitive?

2   Was it made to you orally? in person? in writing?

3   Any of those?

4    A.   Yes.

5    Q.   Which one?

6    A.   Orally at first and then written.

7    Q.   When it was made to you orally, was it in

8   an in-person conversation, or was it in writing?

9    A.   Neither.

10   Q.   Wait.  I'm sorry.  That was horrible.

11        When you got the oral offer, was it in

12   person or on the telephone?

13   A.   On the telephone.

14   Q.   And where were you located when you got the

15   telephonic offer from Intuitive?

16   A.   I was at a restaurant.

17   Q.   What restaurant, sir?

18   A.   I don't recall the name.

19   Q.   Where was the restaurant located?

20   A.   In Dublin.

21   Q.   Were you at the restaurant during the

22   morning, the afternoon, or the evening?

23   A.   Afternoon.

24   Q.   Was it the afternoon for lunch, or was it

25   the afternoon for dinner?

Page 15

1    A.  Lunch.

2    Q.  Were you at this restaurant for lunch by

3  yourself, or were you there with other people?

4    A.  With other people.

5    Q.  Were these persons coworkers or

6  non-coworkers?

7    A.  Coworkers.

8    Q.  At the time that you got the offer from

9  Intuitive, you were at lunch with coworkers from

10  Roche Sequencing Solutions?

11    A.  Yes.

12    Q.  How long after you got that oral offer on

13  the telephone did you have your car accident?

14    A.  I don't recall.

15    Q.  Was it a matter of months?

16    A.  No.

17    Q.  Was it a matter of weeks?

18    A.  I don't recall.

19    Q.  Was it a matter of days?

20    A.  Yes.

21    Q.  Did you get the offer more than -- more

22  than four days before -- more than five days before

23  your accident?

24    A.  I don't recall.

25    Q.  Did you get the offer the day before your

Page 16

1  accident?

2    A.  I don't recall.

3    Q.  Did you get the offer on the same day of

4  your accident?

5    A.  No.

6    Q.  Now, did Intuitive follow up that oral

7  offer with a written offer?

8    A.  Yes.

9    Q.  Was that sent you to by e-mail or was it

10  mailed to you through the postal service, or some

11  other written method?

12    A.  E-mail.

13    Q.  How long after your oral offer did you get

14  the written e-mail offer from Intuitive?

15    A.  I don't recall.

16    Q.  Now, you were offered a job at Intuitive

17  while you were working at Roche Sequencing.  At some

18  point thereafter, you got into this accident and you

19  were bedridden for a couple of days.

20       Do you -- I don't remember, can you tell us

21  how long you were bedridden?

22    A.  I don't remember the exact duration, but it

23  was days.

24    Q.  Was it a week?

25    A.  I don't recall.

1    Q.  Was it two weeks?

2    A.  No.

3    Q.  At some point, you were able to move around

4  after your accident; right?

5    A.  Yes.

6    Q.  You were no longer bedridden; right?

7    A.  Yes.

8    Q.  Did you have people come and help you while

9  you were -- withdrawn.

10        When you were bedridden, did you live by

11  yourself, or did you live with others?

12    A.  I lived with others -- other.

13    Q.  And were you assisted by this other person

14  that you lived with so that you can do different

15  things in the home while you were bedridden, like

16  eat and bathe or other things?

17    A.  I don't recall.

18    Q.  Did someone have to help you get out of bed

19  to go to the bathroom, for example?

20    A.  No.

21    Q.  When did you start working at Intuitive?

22  What year?

23    A.  I don't recall the year.

24    Q.  It was sometime in 2019; right?

25    A.  I was working at Intuitive in 2019.  Or I'm

1  still working at Intuitive, but ...

2    Q.  Mr. Inacay, have you ever been diagnosed

3  with any type of ailment that affects your ability

4  to recall events?

5    A.  Not that I'm aware of, no.

6    Q.  Do you consider yourself to have a good

7  memory?

8    A.  What does "good memory" mean?

9    Q.  Well, I want to know from you whether or

10  not you consider yourself to have a good memory.

11    A.  Sorry.  That -- I still don't understand

12  what you mean.  Are you asking for my opinion or ...

13    Q.  I want to know from you whether or not you

14  consider yourself to have a good memory.

15    A.  In my opinion, I can remember, not the

16  detailed pieces, but I can remember vaguely events.

17    Q.  Is there a reason why you can't recall the

18  year that you started working at Intuitive?

19    A.  I don't remember it off the top of my head.

20  It's been however many years now.  If you would like

21  me to check, I could check.

22    Q.  Well, no.  When you say "it's been many

23  years now," what do you mean by "many years"?

24    A.  I would say it's going on to three years

25  now.

1    Q.  So is it your -- is it the case that things

2   that occurred three years in the past become fuzzy

3   in your mind?

4    A.  Can you rephrase that?  Sorry.

5    Q.  Is it the case that things that occurred,

6   events that occurred, three years in the past, are

7   those things fuzzy in your memory in your mind?

8    A.  Sorry, what does "fuzzy" mean?

9    Q.  Unclear.

10    A.  So can you repeat that one more time,

11   please.

12    Q.  Is it the case that things that occurred

13   three years in the past, those things become

14   unclear, fuzzy, in your mind?

15    A.  They could, yes.

16    Q.  The date -- withdrawn.

17       The month that you started working at

18   Intuitive, that month is fuzzy and unclear in your

19   mind.  Is that your testimony, sir?

20    A.  No.  I remember the month was in January.

21    Q.  So you are clear in your mind that you

22   started working at Intuitive in January; right?

23    A.  Yes.

24    Q.  Now, is the year that you started working

25   at Intuitive, is that fuzzy in your mind?

1    A.   Currently, yes.  If I look at the calendar,

2  I can tell you.

3    Q.   You know that you started working at

4  Intuitive in the month of January; right?

5    A.   Yes.

6    Q.   Did you start working at Intuitive in the

7  month of January 2021?

8    A.   Nope.

9    Q.   Did you start working at Intuitive in month

10  of January 2020?

11    A.   Nope.

12    Q.   Did you start working at Intuitive in the

13  month of January 2019?

14    A.   Yes.

15    Q.   Did you have to look at a calendar to give

16  me that answer?

17    A.   No.

18    Q.   Did you have to look at any documents to

19  give me that answer?

20    A.   No.

21    Q.   Explain why it took me so long to get you

22  to testify that you started working at Intuitive in

23  January 2019.

24        MS. LENT:  Object to the form.

25        You can answer.

Page 21

1          THE WITNESS:  Answer?  Because I don't know

2   it off the top of my head.  I want to be clear when

3   I give the year.

4          BY MR. ADAMS:

5      Q.   Well, when you say you don't know it off

6   the top of your head, what is it that you didn't

7   know off the top of your head?  The year and the

8   month that you started working at Intuitive, or the

9   exact date that you started?

10     A.   The year.

11     Q.   You did not know off the top of your head

12   that you started working at Intuitive in 2019; is

13   that your testimony, Mr. Inacay?

14         MS. LENT:  Objection.

15         You can answer unless I tell you not to,

16   AJ.

17         THE WITNESS:  Can you repeat the question,

18   please.

19         BY MR. ADAMS:

20     Q.   Is it your testimony, sir, that you did not

21   know off the top of your head that you worked -- you

22   started working at Intuitive in the year 2019?

23         MS. LENT:  Objection.

24         THE WITNESS:  Yes.

25   ///

1        BY MR. ADAMS:

2    Q.   And in order for you to get that

3  recollection, we have to sort of work through the

4  different years in which you did not work at

5  Intuitive; right?

6    A.   Yes.

7    Q.   When you started working at Intuitive in

8  January 2019, did you have a title?

9    A.   Yes.

10    Q.   What was your title when you started

11  working at Intuitive?

12    A.   Instrument and accessories product manager.

13    Q.   Your testimony sort of broke up there for

14  me.  Can you repeat that?

15    A.   From what I recall, the title was

16  instrument and accessories product manager,

17  services.

18    Q.   The first word there still is unclear to

19  me.

20    A.   Instrument and accessories services product

21  manager.

22    Q.   To the extent that I see the acronym

23  I&A Services in the documents, I&A stands for

24  instrument and accessories?

25    A.   Yes.

1    Q.   When you started working at Intuitive and

2   you were given that title, did it come with some job

3   responsibilities?

4    A.   Yes.

5    Q.   What were your job responsibilities?

6    A.   I primarily supported the instrument and

7   accessories support team and their initiatives.

8    Q.   What did the I&A support team do?

9    A.   I'm not an I&A specialist, but from my

10   understanding, they would go on to accounts,

11   customer accounts, and educate them on cleaning and

12   sterilizing and disinfecting our instruments.

13    Q.   When you say "they go to customer

14   accounts," who are the customers that they would go

15   to?

16    A.   I don't know their specific accounts, sir.

17    Q.   Generally, what customers did they support?

18    A.   Hospital accounts.

19    Q.   When you say that you supported the I&A

20   support team, in what way did you support the I&A

21   support team?

22    A.   They had initiatives that they wanted to

23   start, and projects, and I would work on them from

24   the global end.

25    Q.   When you started working at Intuitive, what

1  initiative did the I&A support team have?

2    A.  There were many initiatives.  Some were

3  validating trays.  Some were improving our

4  instruments for -- to make it cleanable and able to

5  disinfect easier, those types of things.

6    Q.  You said you worked from the "global end."

7  What did you mean by you worked from the global end?

8    A.  The corporate end.  So we support all of

9  the global teams, so ...

10    Q.   In what way did you support those

11  initiatives?

12    A.  Can you repeat that?  Sorry.

13    Q.   In what way did you support those

14  initiatives?

15    A.  So I was a product manager for those

16  projects.  So made sure that the products that we

17  were helping to create were in line with what the

18  I&A support team were envisioning.

19    Q.  Before you started working at Intuitive,

20  did you work as a project manager doing the same

21  type of things that you would be doing at Intuitive?

22    A.  Sorry, can you repeat that?

23    Q.  Sure.

24      Before you started working at Intuitive,

25  did you work at any other job in which you had a

Page 25

1  similar title and role?

2      A.  Yes.

3      Q.  And was that the work -- was that at the

4  job that you worked at just before, which was Roche

5  Sequencing Solutions?

6      A.  Yes.

7      Q.  Did you report to anyone as a project

8  manager?

9      A.  A project manager, sir?

10     Q.  Did you -- as the project manager at

11  Intuitive, did you report to anyone?

12     A.  Sorry, sir, I wasn't ever a project manager

13  at Intuitive.  "Project."

14     Q.  Your title was -- oh, I'm sorry.  I'm

15  saying "project."

16         In your role as product marketing

17  manager -- let me make sure I got that right here.

18         In your role as the product marketing

19  manager, did you report to anyone?

20     A.  Yes.

21     Q.  Who did you report to?

22     A.  Patrick Swindon.

23     Q.  Spell his last name for me.

24     A.  S-W-I-N-D-O-N.

25     Q.  Do you still report to Mr. Swindon?

1    A.   No.

2    Q.   Do you -- are you still a product marketing

3   manager supporting the I&A servicing team?

4    A.   No.

5    Q.   When did you stop in that role?

6    A.   I don't recall.

7    Q.   What is your current role?  What is your

8   current title?

9    A.   Product manager customer experience.

10    Q.   Did that change in title come with a change

11   in responsibilities?

12    A.   Yes.

13    Q.   What was the change?

14    A.   I no longer supported the I&A support team.

15   I support the other services teams.

16    Q.   What services teams do you support

17   currently?

18    A.   Our technical support teams, our customer

19   success teams, our customer service teams, field

20   service teams.

21    Q.   Did the change in your title come with a

22   change in salary?

23    A.   Yes.

24    Q.   Did your salary go up or down when you

25   became product manager customer experience -- for

1  customer experience?

2  A.  Up.

3  Q.  You got a raise?

4  A.  Yes, sir.

5  Q.  Was it a significant raise to you?

6  A.  In my opinion, no.

7  Q.  Tell me what your salary was and what it

8  was raised to.

9  A.  I don't recall off the top of my head what

10  the salary is, sir.

11  Q.  You don't know how much money you're

12  making?

13  A.  No, sir.

14  Q.  Do you get paid -- well, are you paid

15  hourly?

16  A.  No.

17  Q.  Is your salary a yearly salary?  That is

18  you get paid X amount of dollars per year?

19  A.  Yes.

20  Q.  When you were the product marketing manager

21  supporting the I&A team, how much money did you make

22  per year?

23  A.  I don't recall the exact figure, but it was

24  anywhere between 118- to, I want to say, 125,000 per

25  year.

1    Q.   When your salary was increased, how much

2  was it increased per year?

3    A.   Again, I don't recall the exact figure, but

4  it's more than 125,000.  Around 130,000.

5    Q.   In what year did you start earning $130,000

6  a year?  Withdrawn.  Let me ask a better question.

7         In what year did you start making around

8  $130,000 per year?

9    A.   130,000, sir?  Is that what you said?

10   Q.   Yes.

11   A.   This year.

12   Q.   I missed the answer.

13   A.   This year, sir.

14   Q.   You started making around $30,000 per year

15  in be 2021?

16   A.   No, sir.  You said 30,000.

17   Q.   No.  What I'm trying to get from you,

18  Mr. Inacay, is I'm trying to figure out when it was

19  that you got the promotion to product manager

20  customer experience.

21        Was it in 2020?  Was it in 2019?  Was it in

22  2021?

23   A.   I'm sorry, sir, it wasn't a promotion.  It

24  was just a change in title.

25   Q.   That came with an increase in salary?

1    A.  Yes, sir.

2    Q.  When was it that you got the change in

3  title and increase in salary?

4        Was it in 2020? 2019? 2021?

5    A.  2021.

6    Q.  Between January of 2019 and 2021 when you

7  got the change in title, you reported to Mr. Patrick

8  Swindon; correct?

9    A.  Yes, sir.

10    Q.  During the time that you were the product

11  marketing manager supporting the I&A team, did you

12  have people that reported to you?

13    A.  No.

14    Q.  During that time, was there any other

15  person at Intuitive that had the same title and job

16  responsibilities that you had?

17    A.  Not that I'm aware of, no.

18    Q.  When you started working at Intuitive in

19  2019 and you were supporting the I&A team, what

20  instruments did you help that team fulfill their

21  initiatives for?

22    A.  Sorry, can you repeat that one more time?

23    Q.  Sure.

24        When you started working at Intuitive when

25  you were supporting the I&A team, you said that

1  they -- their initiatives included education and

2  cleaning and sterilizing, disinfecting instruments.

3  And I want to know what you meant by "instruments."

4      What instruments were you talking about

5  there?

6    A.  So it was in general instruments.  It was

7  mostly cleaning and sterilization of those

8  instruments.  They're not -- there wasn't any

9  specific instruments that I worked on, sir.

10   Q.  Yeah, I'm trying to get a sense of what

11  instruments you're talking about.  When you said

12  "cleaning and sterilizing instruments," what are

13  these instruments that you're referring to?

14   A.  The da Vinci instruments.

15   Q.  What da Vinci instruments are you referring

16  to?

17   A.  I'm not sure -- I'm not sure what you mean.

18  Do you need specific instruments, sir, or ...

19   Q.  Yes.  Give me whatever instruments that you

20  are aware of that you were supporting as a product

21  manager.

22   A.  So sorry.  Again, I didn't work

23  specifically on instruments development.  It was

24  primarily, okay, how do we -- how do we make it so

25  that these instruments in general are able to be

1  cleaned, sterilized, and disinfected easily.  So I'm

2  not sure if that's clear or not.

3      Q.  That's very clear to me.  What's unclear is

4  what instruments you're talking about when you said

5  that we have to make sure that these instruments are

6  able to be cleaned, sterilized, and disinfected.

7      A.  It's the reposable instruments.

8      Q.  That first word that you said there, can

9  you spell it?

10     A.  R-E-P-O-S-A-B-L [sic].

11     Q.  I'm hearing reposable?

12     A.  Reposable, R-E-P-O-S-A-B-L [sic].

13     Q.  And what type of instruments did you

14  support that were reposable instruments?

15         Were there model numbers for them?  Were

16  there names for those instruments?

17     A.  I don't recall all the projects, but they

18  were primarily the Gen 4.  So da Vinci X/Xi

19  instruments.

20     Q.  Were these instruments instruments that

21  were being used at hospitals to do surgeries?

22     A.  Yes.

23     Q.  Were these instruments instruments that

24  were being used at hospitals in connection with

25  robots?

1    A.   Yes.

2    Q.   Before you started working at Intuitive,

3  did you ever work at any other company where you

4  were overseeing a marketing or supporting a team

5  that involved robots that were used in surgeries?

6    A.   No.

7    Q.   In order for you to do your job as the

8  product marketing manager supporting the I&A team,

9  did you have to get -- did you have to learn about

10  any aspects of the instruments that that team was

11  supporting?

12    A.   Yes.

13    Q.   Describe that learning process for me.

14    A.   Sure.

15       So initially when I started working, I

16  received clinical sales training for our systems;

17  how they're used, and how are our instruments used

18  in cases.

19    Q.   How long did you train with respect to

20  learning how the instruments were used?

21    A.   I don't recall the -- like the specific

22  amount of months, but it was anywhere between three

23  to five months.

24    Q.   Where did that clinical sales training take

25  place?

1    A.   Remotely and in Sunnyvale.

2    Q.   Were those clinical sales training sessions

3  being run by one person, or was it a group of people

4  that trained you?

5    A.   Group of people.

6    Q.   Give me a sense of how that training --

7  well, give me a sense of the things that you were

8  trained on that's more specific than just being

9  trained on how the instruments were used?

10    A.   So initially we would get trained on in

11  general surgery and all the different types of

12  surgery.  And then we would go on-site to learn

13  about the systems themselves and how to properly set

14  them up and some of the features that they have.

15         And then we would go into the details of

16  the instruments and how they are used in surgery,

17  and specifically what instruments are used in

18  specific procedures.

19    Q.   Have you told me everything you can think

20  of regarding the type of training you received when

21  you first started at Intuitive regarding -- with

22  respect to the instruments that you were supporting

23  as a product marketing manager?

24    A.   So after that training, I received another

25  training from our instrument and accessories support

1  teams on how to clean, disinfect and sterilize our

2  instruments.

3      Q.  One level of training you received was on

4  general surgery; right?

5      A.  Yes, sir.

6      Q.  Then you then went on-site to learn about

7  the actual da Vinci systems themselves; how to set

8  them up and the features of those systems.  Is that

9  true?

10     A.  Yes.

11     Q.  Then you also trained on how those

12  instruments were used in surgery; right?

13     A.  Yes.

14     Q.  Then you also received training from the

15  I&A team on how to clean, disinfect, and sterilize

16  instruments; right?

17     A.  Yes.

18     Q.  To do your job as a product marketing

19  manager supporting the I&A team, was there any other

20  training that you received?

21     A.  In general, we get a bunch of internal

22  trainings, internal training modules.  That's

23  online.

24     Q.  And what topics do those internal online

25  training modules cover?

1    A.   Just general, like, work instructions

2  for -- for the company.  So it was just generic

3  training modules.  I don't recall the specific

4  subjects.

5    Q.   Have you exhausted your memory with respect

6  to the training that you received in connection with

7  your role as the product marketing manager

8  supporting the I&A team?

9    A.   Yes.  Those two trainings I specified were

10  the main pillars.

11    Q.   You just said they were the main pillars.

12  I want to make sure that you've told me, as specific

13  as you can, the type of training that you received

14  that would allow you to do your job as a product

15  marketing manager supporting the I&A team.

16        Have you given me as much -- given me

17  everything you can recall, as you sit here today?

18    A.   Yes.

19    Q.   As part of your job as a product marketing

20  manager supporting the I&A team, did you have to

21  reach out to or communicate with hospitals?

22    A.   Yes.

23    Q.   Your title has the word "marketing" in it.

24  And can you describe or tell me the aspect of your

25  job that would help me understand the marketing

1  component of what you did?

2    A.  Sure.

3        So for the most part, the projects I worked

4  on were -- okay.  We wanted to validate a certain

5  tray or a peel pouch, and usually these validations

6  were performed -- or these peel pouches are from a

7  third party.  So then I would work with these third

8  parties to make sure that these pill pouches and

9  trays meet the guidance and standards that we have.

10       And once they do, then we can educate our

11 internal teams to say, okay, these -- these trays

12 are -- these peel pouches are now compatible with

13 our devices and they can now be used with our

14 devices.

15       So a lot of it is mostly internal

16 awareness.  That's the downstream marketing piece,

17 is making sure that our internal teams are aware of

18 the -- of how we did the validations, and why we did

19 the validations, and how does it help their

20 customers.

21   Q.   So you said two words at the beginning.

22 You said the word "trays."  And then there's a word

23 that has two words; the second word is "pouches."  I

24 don't remember or can't understand what the first

25 word is.

1    A.   No worries.  Peel pouches.

2    Q.   How do you spell the word "peel" in this

3    context?

4    A.   P-E-E-L.

5    Q.   What is a peel pouch?

6    A.   A peel pouch is a container for

7    sterilization.  So there are different methods for

8    doing sterilization and peel pouch is one of them.

9    Q.   And a tray is a what?

10    A.   A tray is another place that you can place

11    your devices.  And the difference is, for a peel

12    pouch, typically, you only pouch one instrument

13    versus, in a tray or a container, you can pouch

14    multiple instruments.

15    Q.   A peel pouch, you can only put in one

16    instrument to sterilize, but in a tray, you can have

17    multiple instruments to sterilize?

18    A.   Typically, yes.  And the trays are specific

19    for -- the trays need to be compatible with these

20    instruments.

21        So that's what we were -- that was the

22    majority of our projects, making sure that these

23    peel pouches and trays are compatible with our

24    instruments.

25        MR. ADAMS:  All right.  Let's take a short

1  break.  We've been going for about an hour.  Go off

2  the record.

3        THE VIDEOGRAPHER:  Off the record.  The

4  time is 10:07.

5        (Recess taken from 10:07 to 10:20.)

6        THE VIDEOGRAPHER:  Back on the record.  The

7  time is 10:20.

8        BY MR. ADAMS:

9   Q.   Mr. Inacay, when we left, we were talking

10  about the marketing component of your job, and I

11  want to try to figure out how that marketing

12  component relates in any way to your communication

13  with hospitals.

14        Is there a connection between what you

15  described to me as the things that you did that were

16  part of your marketing hat and the communications

17  that you had with hospitals?

18   A.   To be honest, for the most part, I -- I

19  didn't have direct communications with the

20  hospitals.  It's mostly for our internal teams.  And

21  then they would use that information to work with

22  their accounts to say, okay, is this product that we

23  validated for -- is this something my customers

24  would like?  Right.  Whether that's the tray or peel

25  pouch or any sort of that matter.

1    So, for me, I was marketing to our internal

2  teams.

3    Q.  So far, you've described the internal

4  marketing that you did as the validation of certain

5  trays or peel pouches; right?

6    A.  Yes.

7    Q.  When you say "validation," what did you

8  mean by "validation" in this context?

9    A.  Again, I'm not a validation expert, so I

10  really leave those validation requirements to them.

11  But it's really working with our validations team to

12  say, okay, do we have to perform any validations

13  tests?  Or if not, then how do we help these third

14  parties to validate their products to be compatible

15  with ours?  So ...

16    Q.  I'm still trying to understand what you

17  mean by "validate" in this context.  You just said

18  how to test to validate their products -- to

19  validate their products compatible with yours.

20    What do you mean by "validate" in that

21  context?

22    A.  Again, I'm not a validation expert.  But in

23  this context, it's making sure that the -- the --

24  for example, for peel pouches, we want to make sure

25  that once our instruments are in these peel pouches,

Page 40

1  they are actually sterilized with these peel

2  pouches.  Like, it gets to a certain sterilization

3  level and it can be used in procedures.

4      Q.  Does Intuitive make peel pouches?

5      A.  To my understanding, no.

6      Q.  Does Intuitive make the trays that are the

7  sterilization trays?

8      A.  For certain products, yes.

9      Q.  With respect to the peel pouches, is it the

10  case that what you're doing is trying to make sure

11  that the peel pouch that is being made by some other

12  company is compatible with the -- your Intuitive

13  instrument that would be put in that peel pouch to

14  be sterilized properly?

15      A.  Yes.

16      Q.  So to the extent that you were dealing

17  internally with your folks and you were -- and you

18  were talking about the process of whether products

19  are validated, what you're saying is, internally,

20  you would be working with your team so that when

21  they go out into the field, they are able to

22  adequately determine if third-party products that

23  are being used with your products are compatible

24  with your products.  Is that safe to say?

25          MS. LENT:  Objection.

1      You can answer.

2      THE WITNESS:  So can you repeat that?  I'm

3   not sure what you're trying to get at.

4      BY MR. ADAMS:

5   Q.   When you were internally talking with your

6   team, is it fair to say that what you were doing was

7   talking to them so that they -- and dealing, and

8   communicating with them in support of their efforts

9   to go out into the field to then ensure that

10   third-party products that were being used with your

11   products worked or were compatible with your

12   products?

13      MS. LENT:  Objection.

14      THE WITNESS:  I don't -- I'm not -- again,

15   I'm not sure of what the question is.

16      But for the most part, our customers have a

17   certain problem and, for this instance, they don't

18   want to use trays or containers for whatever reason.

19   And we want to get them a product that can help

20   them.  And the current peel pouches that they use,

21   there are some problems with those.

22      So for this instance, we helped -- we

23   worked with a third party to design a peel pouch

24   that works and is compatible with our instruments

25   and those specification -- those specs are mainly

1  driven by our internal team saying like, okay, here

2  are some of the requirements that we have; please

3  meet them.  And then we would help them perform some

4  of the testing or we would do the testings

5  ourselves.

6        And then my job is to say, okay, I know

7  what problem this solves.  So I will message it out

8  to our internal teams to say this product may be --

9  may be something your customer would like because of

10  X, Y, and Z.

11        And then those teams are then -- can make

12  the decision whether they reach out to their

13  customers to say, This product is great for you

14  because of X, Y, and Z.

15        And, of course, we would have to update

16  documents and all of that stuff as well.  And for

17  me, it would -- I would potentially create a

18  customer letter informing customers, too, right,

19  that this product is available once our documents

20  are updated.

21        So I hope that provides a little bit more

22  clarity.

23        BY MR. ADAMS:

24  Q.  Yes.  That's very helpful.

25        So what you've described to me as part of

1  your marketing component is internal communications

2  to address a -- that's designed to address a problem

3  that your customers are having; right?

4      A.  Yes.

5      Q.  An example of a problem is if a customer is

6  having a problem with the use of a particular peel

7  pouch; right?

8      A.  Right.  In this scenario, there are

9  off-the-shelf peel pouches they can use, but there

10  are problems inherently with those peel pouches with

11  our instruments.  So we wanted to provide a product

12  that can help them.  And in this case, it's a more

13  customized peel pouch for them.

14      Q.  And in this case, what Intuitive would do

15  is Intuitive would work with a third party to design

16  a peel pouch that you determined is compatible with

17  your products; right?

18      A.  For this scenario, yes, we decided that.

19      Q.  And then you would -- in designing the peel

20  pouch, the specs for that pouch would be driven by

21  Intuitive; right?

22      A.  The -- we would work with the third party,

23  but I'm not completely sure if the specifications

24  are completely Intuitive versus -- because we're not

25  peel pouch experts; right?  We would simply work

1  with them.

2        So we could, for example, provide them

3  instrument dimensions.

4    Q.   And then, in order for you to be

5  comfortable in suggesting to your customer that they

6  use this peel pouch, you then have to do testing on

7  that peel pouch to make sure that it is compatible

8  with your products; right?

9    A.   Yes.  Or to be clear, again, the third

10  party can test it and then they would provide us the

11  test results, and then we could make that decision.

12  Or we can do internal testing.  So I'm not sure, in

13  this case, which one we did.

14    Q.   So in your job as the marketing -- the

15  product marketing manager supporting the I&A

16  services team, one of the things you did during that

17  time was to work internally with your team with

18  respect to projects, the validation of certain trays

19  or peel pouches; right?

20    A.   Yes.  That was some of my projects, yes.

21    Q.   Were there any other projects that you

22  worked on during that time?

23    A.   There was an internal effort to create

24  training kits for our teams because, again, they

25  educate accounts.  So there was that project.

1          Is there a specific project that you're

2  looking for?

3      Q.  I'm trying to get from you all you can

4  recall about the projects that you worked on during

5  that time.

6      A.  Okay.  So just can you tell me when I can

7  stop, then?  I'll just say the projects that I

8  remember.  Is that what you would like?

9      Q.  Yes.

10     A.  Okay.  So for that instance, we were

11  creating internal training kits for our I&A support

12  teams.  That's one project.

13         There's -- we worked with a third party to

14  track -- to help our customers track reprocessing

15  cycles.

16     Q.  To track what?

17     A.  Reprocessing cycles of our instruments.

18         There's a project that my -- again, this

19  wasn't my project, but my manager had a project for

20  device reclamation.  So it was obtaining

21  instruments, working with a third party to obtain

22  our expired instruments from the field.

23         There was another project to -- to -- so

24  our instruments are cleaned manually.  So we had a

25  project to have an automated cleaning cycle for our

1  instruments.

2       Those were the official projects I was on.

3    Q.   Were there unofficial projects that you

4  were on?

5    A.   So, yes.  I was working on -- so there were

6  accounts that were using adulterated da Vinci

7  instruments, and we were educating our -- our

8  customer accounts on why they shouldn't be using

9  those instruments.

10   Q.   Any other unofficial projects that you were

11  on?

12   A.   Not that I recall.

13   Q.   Why did you describe the last project that

14  you just told me about as an unofficial project that

15  you were on?

16   A.   For example, there wasn't like a project

17  manager on there.  It was -- it was just mostly my

18  manager asked me to monitor accounts that are using

19  these devices and here's our process.

20   Q.   And Mr. Swindon is the manager that told

21  you to do that?

22   A.   Yes.

23   Q.   Tell me everything Mr. Swindon told you

24  about with respect to this unofficial project

25  related to accounts that you were using adulterated

1  da Vinci instruments.

2      A.   Again, I don't remember all the details.

3  But for the most part, my understanding was there

4  are these adulterated instruments.  The way that

5  they are adulterated, you have to physically open

6  them up, and then there are lives added back to

7  these instruments when these instruments should be

8  expired.

9          And our process is to really educate -- so,

10  again, this is really internal education to our

11  customer-facing teams as to why these are -- these

12  instruments should not be used beyond their intended

13  life count.  And the primary reason for that is the

14  patient-safety aspect.

15      Q.   The information that you just gave me, is

16  this information that you received from Mr. Swindon?

17      A.   Yes.

18      Q.   Did he tell you this in writing, or was it

19  related to you orally?

20      A.   I don't recall writing, but definitely

21  orally.

22      Q.   When did Mr. Swindon talk to you

23  about -- withdrawn.

24          When were you assigned this unofficial

25  project of dealing with accounts that were being

1  adulterated, that were using adulterated da Vinci

2  instruments?

3      A.  I don't recall the exact day, but I want to

4  say it was somewhere between June 2019, around that

5  time frame.

6      Q.  When you spoke with Mr. Swindon on this

7  project, was it just you and him talking, or were

8  there other people as part of the conversation?

9      A.  Just me and him talking.

10     Q.  What, if anything, did you have to do to

11  get up to speed on this issue?  The issue of using

12  adulterated -- or accounts using adulterated

13  da Vinci instruments in order for you to effectively

14  do your job.

15     A.  For one, it was understanding all of the

16  internal teams that are currently involved.  And,

17  again, this process has changed over time.  But

18  initially, it was, here are the current team members

19  that are involved, and what is our process for it.

20          So for me, it was, we have this tableau

21  report that monitors the accounts that are using

22  these instruments.  We worked with the regulatory

23  and legal teams.

24          And, yeah, that was it, for the most part,

25  that was the first step.  I don't recall what are

1  the following steps at the moment.

2    Q.   You said you worked with regulatory and

3  legal teams.  What do you mean by "regulatory team"?

4    A.   The primary contact was the post-market

5  team.  So I'm not -- I'm not completely familiar

6  with their process, but they -- to my understanding,

7  they worked on some of the complaints, so ...

8    Q.   How did you work with the regulatory team?

9    A.   There was a team, a regulatory team member.

10  We would meet every week as a first process to go

11  over all of these accounts.  And she would take that

12  information back to her regulatory team.

13    Q.   Who was the regulatory team member that you

14  met with?

15    A.   Emily Renuart.

16    Q.   Can you say that slower, please?

17    A.   Emily Renuart.

18    Q.   Can you spell her last name?

19    A.   R-E-N-U-A-R-T.

20    Q.   When you say "regulatory," how are you

21  using that word in this context?  What do you mean

22  by "regulatory"?

23    A.   It's my -- again, she's my regulatory

24  contact.  So we just wanted to make sure the

25  regulatory teams are aware.  So Emily is that

1  contact, for me, anyway.  She's my primary

2  regulatory contact.

3       Again, I'm not sure how -- how she uses

4  this information from the regulatory aspect.

5     Q.  But when you're using the word

6  "regulatory," what are you referring to here?

7       Are you referring to a team that interfaces

8  with, for example, the FDA?

9     A.  Again, I don't know -- I don't know that

10  team very well.  So, again, I just -- I really just

11  interfaced with her, and it's up to her to work with

12  her team.

13     Q.  Well, when you were "interfacing," what

14  does that mean?  You spoke to her; right?

15     A.  Correct.  So this meeting we have, to go

16  over the accounts.

17     Q.  So you have a meeting with Ms. Renuart;

18  right?

19     A.  Yes.

20     Q.  And you were going over the customer

21  accounts; right?

22     A.  Yes.

23     Q.  And these are accounts that you've learned

24  are using what you consider to be adulterated

25  da Vinci instruments; true?

1    A.  Yes.

2    Q.  And Ms. Renuart works with a -- the

3  regulatory team; right?

4    A.  Yes.

5    Q.  What is your understanding as to what

6  "regulatory" means in this context?  What is she

7  regulating?

8    A.  Again, I don't know what she uses this

9  information for, so ...

10      THE STENOGRAPHER:  Ms. Lent, did you lodge

11  an objection there?  I thought you said something.

12      MS. LENT:  I did not.

13      THE STENOGRAPHER:  Okay.  Thank you.

14      BY MR. ADAMS:

15    Q.  Mr. Inacay, as the product marketing

16  manager, did you have any sense as to what the

17  regulatory team did?

18      MS. LENT:  Objection.

19      Go ahead.

20      THE WITNESS:  For the most part, I

21  understand their process has to do with complaints

22  and inquiries coming from customers.  Right?  So I'm

23  not sure like it's -- I'm not an expert.  So my

24  guess is, really, there are complaints or inquiries

25  involved, and she's putting comments in there,

1  according to this.  Again, you would have to ask

2  her.

3      BY MR. ADAMS:

4    Q.  You also said that you worked with the

5  legal team; right?

6    A.  Yes.

7    Q.  What do you mean by that?

8      MS. LENT:  AJ, you can answer the question

9  generally.  I just caution you to not reveal the

10  contents of any specific discussions you had with

11  the legal team that would be privileged.

12      THE WITNESS:  The primary way we've worked

13  with legal is requesting hospital letters from them.

14      BY MR. ADAMS:

15    Q.  Okay.  So -- and these letters are letters

16  that are then ultimately being sent out to the

17  customers that you determine were using adulterated

18  instruments?

19    A.  Yes.

20    Q.  One of the things you said earlier,

21  Mr. Inacay, is that you were -- your job involved

22  working with the internal teams at Intuitive so that

23  they can -- well, let me ask a better question.

24      Was your job in this context to work with

25  the internal team who were responsible for accounts

1   that you determined were using adulterated

2   instruments so that you could craft a way to address

3   that issue with those customers?

4       A.   I worked with our internal teams to make

5   them aware their accounts are using adulterated

6   instruments and to educate them on the

7   patient-safety risks of using these instruments.

8   That was our first step.

9       Q.   When you use the word "adulterated," what

10  do you mean by "adulterated"?

11      A.   To my understanding, in order to add lives

12  to these instruments, you have to physically open

13  these instruments.  And that's not how these

14  instruments were intended to be used.

15      Q.   So "adulterated," in this sense from you,

16  means that somebody is taking one of your

17  instruments, and they're opening the instrument to

18  add lives to the instrument?

19      A.   Can you -- can you repeat that one more

20  time?  Sorry about that.

21      Q.   Your use of "adulterated" means that

22  there's a company or a person that is physically

23  opening up a da Vinci instrument and adding lives to

24  that instrument?

25      A.   Again, adulterated is a -- to my

1  understanding, a regulatory or a legal use -- legal

2  use.

3      And, yes, for me, it's when these

4  instruments are being used in a way that they're not

5  intended to be used.  And in this case, they are

6  being used past their validated amount of lives.

7    Q.  When did you first learn about the company

8  Rebotix?

9    A.  I don't recall the specifics.  If I had to

10  guess, it would be in that year, 2019.

11    Q.  How did you first learn about Rebotix?

12    A.  I don't remember the first -- the first

13  time.  I don't recall off the top of my head.

14    Q.  What were you first told about Rebotix?

15    A.  I don't recall the first -- first thing I

16  was told.

17    Q.  Tell me everything you can recall about

18  what you were told about Rebotix.

19    A.  In general, they're a third party.  And,

20  again, this is from what I remember, I was told that

21  they're a third party that adds lives to our

22  instruments, and they may be performing other tasks

23  besides that.  So they were selling instruments that

24  are past their intended lives.

25    Q.  Have you told me everything that you can

1  recall about what you were told about Rebotix?

2     A.  Yes.  From what I recall, that's what I was

3  told.

4     Q.   What you were told about Rebotix is that

5  Rebotix was a third party that added lives to the

6  da Vinci instruments; right?

7     A.  Yes.

8     Q.   You were also told that they may be

9  performing other tasks besides adding lives to the

10  instruments; right?

11     A.  Yes.

12     Q.   And you were also told that Rebotix was a

13  company that was selling instruments that are past

14  their intended lives; right?

15     A.  Yes.

16     Q.   You can't recall being told anything else

17  about Rebotix?

18     A.  I mean, for the most part, they're

19  approaching our customers and offering these --

20  these instruments that are past their intended life

21  count to our customers.  That's how we were

22  primarily made aware of, because customers reached

23  out to our internal teams, and then our -- our

24  customer-facing teams would reach out to corporate.

25  So in this case, it's the product management team or

1  so forth.

2      Q.   And one of the things that you said there

3  was that they were poaching your customers.  What

4  did you mean by "poaching"?

5      A.   Approaching.

6      Q.   Oh, I see.  I misheard you.

7           So they were approaching your customers and

8  they were offering instruments that were past their

9  use counts.  Is that what you were told?

10     A.   Yes, and -- yes.

11     Q.   You also mentioned that you were told that

12 Rebotix may be performing other tasks besides adding

13 lives to the instruments.

14          What other tasks were you told that Rebotix

15 may be performing?

16     A.   Again, I can't recall the specifics, but I

17 was told that they offer to sharpen the scissors,

18 the monopolar curved scissors.

19     Q.   Were you told about any other tasks that

20 they were performing other than adding lives to the

21 instruments?

22     A.   I can't recall.

23     Q.   Did you consider what you learned about

24 Rebotix, what Rebotix was doing to be a problem?

25     A.   In my opinion --

1        MS. LENT:  Objection.

2        THE WITNESS:  In my opinion -- can you

3   repeat that, actually?

4        BY MR. ADAMS:

5    Q.   Yeah.  Did you consider what you learned

6   about Rebotix and what they were doing to be a

7   problem?

8        MS. LENT:  Objection.

9        THE WITNESS:  Can you rephrase that?  What

10  do you mean by "problem"?

11       BY MR. ADAMS:

12   Q.   Did you consider it to be a problem that

13  Rebotix was doing what you were told they were

14  doing?

15       MS. LENT:  Objection.

16       THE WITNESS:  Again, can you rephrase that?

17  I don't understand what you mean by "problem."

18       BY MR. ADAMS:

19   Q.   Well, what about the word "problem" is

20  causing you confusion?

21   A.   I mean, again, my opinion is these

22  instruments are a patient-safety risk and shouldn't

23  be used in surgery.

24   Q.   Did you conclude that what Rebotix was

25  doing created a risk to patient safety?

1    A.   In my opinion, yes.

2    Q.   What is that opinion based on?

3    A.   The internal teams and the testings that

4    they performed, and what I was told were potential

5    for patient-safety risks.

6    Q.   You formed your opinion that what Rebotix

7    was doing posed a safety risk to patients based on

8    things you were told by your internal team?

9    A.   Yes.

10   Q.   You also formed that opinion that what

11   Rebotix was doing posed a safety risk to patients

12   based on testing that your internal team performed?

13   A.   Yes.

14   Q.   Now, when you say that you were told things

15   by the internal team, what internal team were you

16   referring to?

17   A.   Sorry, can you say that one more time?

18   Q.   When you said that you were told things by

19   your internal team that lead you to conclude that

20   things Rebotix was doing posed a safety risk to

21   patients, what internal team are you referring to?

22   A.   The -- at least one team would be the

23   regulatory team.

24   Q.   And this is a team who your contact was

25   Ms. Renuart?

Page 59

1    A.  Yes.

2    Q.  Is Ms. Renuart the only person from the

3  regulatory team that you spoke to with respect to

4  this issue?

5    A.  No.

6    Q.   Who else from the regulatory team did you

7  talk to that lead you to conclude that what Rebotix

8  was doing posed a risk to patient safety?

9    A.   To be clear, she was my primary contact,

10  but I was asked by regulatory teams, on ad hoc

11  basises [sic], random questions.  So I just want it

12  to be clear.  But, again, Emily Renuart is my

13  primary contact.

14    Q.   Did someone, including Ms. Renuart, tell

15  you that what was being done by Rebotix posed a

16  safety risk to patients?

17    A.   Sorry, can you repeat that question one

18  more time.

19    Q.   Did Ms. Renuart, or anyone else from the

20  internal team, tell you that what Rebotix was doing

21  posed a safety risk to patients?

22    A.   I don't recall all of the teams, but

23  Ms. Renuart is my primary contact, and she would

24  interface with the other internal teams.  So she's

25  the technical expert on that.  So I'm not sure whom

1  else she interfaced with.

2      Q.  My question wasn't about who she interfaced

3  with.  It's about what she told you.

4          Do you remember my question?

5      A.  I believe you asked me if there were other

6  regulatory team members.  So can you please ask the

7  question one more time, then?

8      Q.  That wasn't my question.

9          My question is this:  Did Ms. Renuart tell

10  you that the things that Rebotix was doing posed a

11  risk of -- a safety risk to patients?

12      A.  Yes.

13      Q.  Did she tell you how it is that she thought

14  that what Rebotix was doing posed a safety risk to

15  patients?

16      A.  Yes.

17      Q.  What did she tell you?

18      A.  The way our instruments are designed,

19  they're intended to be used up to a certain amount

20  of times, a validated amount of times.  Past that,

21  there are -- there are risks involved, which is

22  outlined in our customer letter.

23      Q.  So one of the things that Ms. Renuart told

24  you was that the instruments that you sold were

25  intended to be used up to a certain amount of times;

Page 61

1  right?

2    A.  Yes.

3    Q.  And she also told you that past -- uses of

4  that instrument past that intended -- withdrawn.

5       She also told you that using the

6  instruments past that certain amount of times posed

7  some risks; right?

8    A.  Yes.

9    Q.  Did she tell you anything else?

10   A.  Not that I recall, no.

11   Q.  You also said that you formed your opinion

12  that what Rebotix was doing posed a safety risk to

13  patients based on testing that the internal team

14  performed.

15      Do you remember that testimony, sir?

16   A.  Yes.

17   Q.  What testing are you referring to here?

18   A.  The testing -- so, again, Emily -- Emily

19  would be the one to give you specifics on that.  But

20  from my understanding, we performed internal

21  testings to make sure that our instruments can be

22  used up to a certain amount of lives.  And within

23  those testings, we understand that there are risks

24  if used beyond those lives.

25   Q.  That's information that Ms. Renuart told

1  you; right?

2  A.  Yes.

3  Q.  Did you base your opinion on you looking at

4  or validating any of the testing that she said was

5  performed?

6  MS. LENT:  Objection.

7  THE WITNESS:  Sorry.  I don't understand

8  the question.

9  BY MR. ADAMS:

10  Q.  Did you see the results of the testing that

11  she said was performed?

12  A.  No.

13  Q.  Did you, in any way, ask for data to

14  support the statement that she made about the

15  testing that was performed?

16  A.  No.

17  Q.  In forming your opinion regarding the

18  safety risks, you relied solely on the statements

19  that you were getting from Ms. Renuart and/or other

20  people from the regulatory team; right?

21  A.  Yes.

22  Q.  You didn't do any of your own investigating

23  or research; right?

24  A.  No.

25  Q.  Based on the opinion that you formed, did

1  you then instruct the folks at Intuitive to reach

2  out to their customers and tell them that their use

3  of instruments that were repaired by Rebotix pose a

4  safety risk to their patients?

5        MS. LENT:  Objection.

6        THE WITNESS:  I'm sorry.  Can you rephrase?

7  I don't quite understand.

8        BY MR. ADAMS:

9    Q.  Sure.

10       Based on the opinion that you formed about

11  Rebotix's actions, did you instruct the internal

12  people at Intuitive to reach out to their customers

13  to tell them that their use of products that were

14  being repaired by Rebotix posed a safety risk to

15  their patients?

16       MS. LENT:  Objection.

17       THE WITNESS:  Again, I'm not sure I quite

18  understand.

19       BY MR. ADAMS:

20   Q.  Have you ever communicated to a hospital

21  that an EndoWrist that is repaired by Rebotix is

22  unsafe for use?

23   A.  I myself -- are you asking me?

24   Q.  Yes.

25   A.  Repeat the question one more time, please.

1    Q.   Have you ever communicated to a hospital

2   that an EndoWrist that is repaired by Rebotix is

3   unsafe for use?

4    A.   To my recollection, I did not, no.

5    Q.   Have you ever instructed someone from

6   Intuitive to reach out to hospitals to tell them

7   that an EndoWrist that is repaired by Rebotix is

8   safe for them to use -- is unsafe for them to use?

9    A.   What do you mean by "instructed"?

10    Q.   One of the things you do is you communicate

11   internally to your customer-facing coworkers; right?

12    A.   Yes.

13    Q.   Part of that communication with them is to

14   talk to them about how they are going to now

15   communicate with their customers; right?

16    A.   Yes.

17    Q.   In doing that, did you at any point

18   communicate to them that -- about things that you

19   wanted them to tell their customers about Rebotix?

20    A.   The main communication is these instruments

21   have patient safety risks.  And from what I recall,

22   we didn't mention anything about Rebotix.

23    Q.   All right.  Did you ever communicate to --

24   well, withdrawn.

25        At some point, did the customers -- did you

1  learn that your customers were using instruments

2  repaired by Rebotix?

3    A.  Sorry, can you repeat that question one

4  more time?

5    Q.  You knew internally that Rebotix was a

6  company that was reaching out to your customers;

7  right?

8    A.  Yes.

9    Q.  You knew that Rebotix was a third-party

10  company that was repairing EndoWrists; right?

11    A.  Yes.

12    Q.  And internally you had to figure out a way

13  to address this problem that existed with respect to

14  Rebotix's repairing of your instruments; right?

15    MS. LENT:  Objection.

16    THE WITNESS:  Yeah.  I'm not sure.  Again,

17  it's -- it doesn't really matter -- it doesn't

18  really matter about the third party.  It's more we

19  want to make sure that our instruments are used up

20  to a certain amount of lives because that's what

21  they're validated to, because we make sure that

22  those instruments are safe.

23    BY MR. ADAMS:

24    Q.  And this is a case in which Rebotix is

25  suing Intuitive for; right?

1    A.   I'm not sure like what this case -- like

2  all the details for this case, sir.

3    Q.   I wasn't asking about all of the details.

4  I was asking about one specific detail.

5        Do you understand that this is a case in

6  which Rebotix has brought a lawsuit against your

7  company, Intuitive?

8    A.  Yes.

9    Q.   Do you understand that it's based on, in

10  part, Rebotix's repairing of EndoWrists?

11    A.  Yes.

12    Q.   Did you, when you were communicating

13  internally with your coworkers, discuss the fact

14  that Rebotix was a third party that was repairing

15  your devices?

16    A.   The education piece was about adding lives

17  to these instruments.  I don't recall mentioning

18  repairing.

19    Q.   Is it your testimony that you were never

20  told that one of the things Rebotix did was that it

21  repaired the EndoWrists instruments?

22    A.   Can you repeat that one more time?

23    Q.   Is it the case that you do not recall ever

24  being told that one of the things that Rebotix did

25  was that it would repair the EndoWrist instruments?

1    A.   If you're saying that resharpening scissors

2  accounts for repair, then, yes, I've heard of a

3  third party, potentially Rebotix, repairing

4  instruments, yes.  If resharpening scissors is that,

5  then, yes.

6    Q.   One of the things you were told internally

7  was that Rebotix would resharpen EndoWrist scissors;

8  right?

9    A.  Yes.

10    Q.   Now, did you internally conclude that

11  Rebotix's practice of sharpening the scissors posed

12  a safety risk to patients?

13    A.   Can you repeat that one more time?  Sorry.

14    Q.   Did you conclude that Rebotix's acts of

15  resharpening scissors posed a safety risk to

16  patients?

17    A.  Yes.

18    Q.   Did you ever communicate to your coworkers

19  that they should reach out to their customers and

20  tell them that the use of a device that was

21  repaired, whether it's resharpening or whatever, by

22  Rebotix posed a risk of safety to their customers --

23  to their patients?

24       MS. LENT:  Objection.

25       THE WITNESS:  Again, I don't recall

1 mentioning repair.  Again, it's mostly, from what I

2 recall, these instruments are intended to be used up

3 to a certain amount of lives.  And adding lives

4 is -- can have patient safety risks.

5      BY MR. ADAMS:

6   Q.  So there are two aspects of this that I

7 want to get into regarding the third

8 party -- withdrawn.

9      One of the things, Mr. Inacay, that you

10 were told posed a safety risk was that Rebotix would

11 add lives to an EndoWrist that had reached its

12 maximum amount of lives based on the uses of that

13 device; right?

14   A.  Yes.

15   Q.  Another thing that we talked about is that

16 Rebotix may also be -- in adding lives, it may be

17 resharpening the scissors; right?

18   A.  Yes.

19   Q.  Did you consider both of those two things

20 to be safety risks, or just one of the two?

21      MS. LENT:  Objection.

22      THE WITNESS:  Again, for me primary is

23 the -- is the adding of lives.  The resharpening of

24 scissors I was told could be a risk because they are

25 not intended to be resharpened, from my

1  understanding.

2       MR. ADAMS:  Let's take a short break.

3  We're up against an hour.

4       THE VIDEOGRAPHER:  Off the record.  The

5  time is 11:15.

6       (Recess taken from 11:15 to 11:29.)

7       THE VIDEOGRAPHER:  Back on the record.  The

8  time is 11:29.

9       MR. ADAMS:  I'm going to mark Exhibit 1.

10  It is a document that's in the folder that's titled

11  8/15/19 Bair to Inacay.

12       (Marked for identification purposes,

13        Exhibit 1.)

14       MR. ADAMS:  And I'm going to screen-share.

15       BY MR. ADAMS:

16  Q.  Do you recognize on your screen,

17  Mr. Inacay, a document that has at the top an e-mail

18  from Ron Bair to you dated August 15, 2019?

19  A.  Yes.

20  Q.  And it says "FYI"; right?

21  A.  Yes.

22  Q.  I'm going to scroll down.

23       Now, can you tell based on this that

24  Mr. Bair is making you aware of or providing you

25  with information that is included in the e-mail

1  chain that follows?

2      A.   Sorry, what is the question?

3      Q.   When Mr. Bair sent you an e-mail that says

4  "FYI," do you understand that what he's doing is

5  he's forwarding to you, for your information,

6  statements that are being made or things that are

7  being said in the e-mail chain that follows -- that

8  comes after that e-mail?

9      A.  Yes.

10     Q.   Who's Ron Bair?

11     A.   He's the -- or he was at the time a field

12  service director.

13     Q.   What did he do as a field service director?

14     A.   I'm not a field service director.  But if I

15  had to guess, I know he manages field service

16  managers.

17     Q.   And what do the field service managers do?

18     A.   They -- again, I'm not a field service

19  manager, but they manage their field service

20  engineers.

21     Q.   What do field service engineers do?

22     A.   Also not a field service engineer, but one

23  aspect they do is they service the robots.  Our

24  field service engineers service Intuitive systems,

25  which many people know as "robots."

1    Q.   I'm going to scroll down to the very last

2  e-mail in this document.  It's the e-mail that has

3  the date on August 5, 2019.

4        Do you see that?

5    A.  Yes.

6    Q.   It says that -- and you wrote this e-mail;

7  right?

8    A.  Yes.

9    Q.   And it's being sent to somebody named Alan;

10  right?

11    A.  Yes.

12    Q.   And Alan Wyles -- is Alan the Alan Wyles

13  that is in the e-mail just above that who is a

14  senior clinical sales representative?

15    A.  Yes.

16    Q.   And Mr. Wyles worked at Intuitive; right?

17    A.  Yes.

18    Q.   And this e-mail to Mr. -- Mr. Wyles you

19  write:

20        "We wanted to make you aware that

21        Citizens Medical Center has been

22        approached by a third-party company to

23        provide them unauthorized reprogrammed

24        da Vinci instruments."

25        Do you see that?

1    A.  Yes.

2    Q.  Who was the third-party company that had

3  approached Citizens Medical Center?

4    A.  I don't recall.

5    Q.  When you write "unauthorized reprogrammed

6  da Vinci instruments," what do you mean by that?

7    A.  Da Vinci devices that are being used past

8  their intended life count.

9    Q.  Now, one of the things you write in this is

10  "The attached FAQ highlights the patient safety

11  risks"; right?

12    A.  Yes.

13    Q.  And then one of the things you want

14  Mr. Wyles to do is to reach out to his customers and

15  to emphasize that the patient safety risks involved

16  with programmed instruments -- or reprogrammed

17  instruments.

18      Do you see that?

19    A.  Yes.

20      MR. ADAMS:  Let's stop screen-sharing.

21      I'm going to mark next Exhibit No. 2.  It's

22  the document in the folder that is titled

23  912 Inacay.

24      (Marked for identification purposes,

25       Exhibit 2.)

1          MR. ADAMS:  I'll go ahead and screen-share

2  that.

3          BY MR. ADAMS:

4     Q.  Do you see on the screen, Mr. Inacay, I've

5  got a document that has at the top Inacay -- or AJ

6  Inacay.  It's dated 9/12/2019?

7     A.  Yes.

8     Q.  It's being sent to somebody named Dave

9  Woodward; right?

10    A.  Yes.

11    Q.  I'm going to scroll down a little bit.

12         On September 4, 2019, Mr. Woodward --

13  actually that's the wrong document.

14         On September 12th, 2019, Mr. Woodward asked

15  you to send the referenced FAQ for this.

16         Do you see that?

17    A.  Yes.

18    Q.  And then, in your response, you say:

19         "Technically we have two, but we've

20         haven't been using the internal FAQ for a

21         while now."

22         Do you see that?

23    A.  Yes.

24    Q.  And you attached to the e-mail two FAQ

25  documents; one external, one internal.  Right?

1    A.  Yes.

2    Q.  You write in this e-mail:

3        "I think the concern was that it

4        would get leaked to the third-party

5        companies."

6        And this is with respect to the internal

7  FAQ.

8        Do you see that?

9    A.  Yes.

10   Q.  What was your concern with respect to those

11  documents being leaked -- or at least -- withdrawn.

12       What was concern with respect to the

13  internal FAQ being leaked to third companies?

14   A.  I honestly don't recall what's on the

15  internal FAQ, what are the differences, so ...

16   Q.  Well, when you wrote here that I think the

17  concern was that it would get leaked to the

18  third-party companies, why did you have that

19  concern?

20   A.  It's an internal-facing document.  So it's

21  not meant to be shown externally.

22   Q.  At some point prior to this e-mail, did you

23  become aware of the fact that somebody was leaking

24  your internal documents to third-party companies?

25   A.  I'm not sure what you mean.  Can you

1  rephrase?

2    Q.  In the e-mail, you write:

3        "Technically, we have two, but we

4      haven't been using the internal FAQ for a

5      while now."

6      Do you see that?

7    A.  Yes.

8    Q.  And when you write the next sentence, is

9  that explaining why the internal FAQ had not been

10  used for a while?

11    A.  I don't recall, to be honest.

12    Q.  Well, take a look at the words that you

13  wrote.

14    A.  Okay.

15    Q.  Looking at the words, do you understand

16  now?

17    A.  I understand the -- these words at this

18  moment.  I just don't recall what the intention was

19  at this -- the time of this e-mail.

20    Q.  I'm pausing only because it -- Karen may

21  have been disconnected for a while.

22      MS. LENT:  My Wi-Fi went down.  I don't

23  know if you kept going, but I've been off for like

24  three minutes.

25      MR. ADAMS:  We did absolutely keep going,

1  and I did not realize that you had disappeared.

2      MS. LENT:  Sorry.  I tried to e-mail Alena.

3      Can you just give me a second to check the

4  transcript?

5      MR. ADAMS:  Sure.

6      MS. LENT:  Thank you.  Apologies.  School

7  ended this week, so I've got kids that I just had to

8  kick off devices.  One of the challenges of remote

9  work.

10      Okay.  I'm fine.

11      BY MR. ADAMS:

12   Q.  Mr. Inacay, what I'm trying to get at is

13  this:  When you now look at the first sentence and

14  you look at the second sentence that you write in

15  context, would you agree that what you were telling

16  Mr. Woodward is that the internal FAQ had not been

17  used for a while because there was concern that it

18  would get leaked to the third-party companies?

19   A.  Again, as I'm reading this now, it seems

20  like the concern is just that internal FAQ would --

21  would be, I guess, quote-unquote, leaked to the

22  third-party company.

23   Q.  What caused that concern?

24   A.  I don't recall.

25      MR. ADAMS:  I'm going to stop

1  screen-sharing.  And I'm going to mark next

2  Exhibit 3.  It's the document that's titled Internal

3  FAQ.

4       (Marked for identification purposes,

5        Exhibit 3.)

6       MR. ADAMS:  Screen-share.

7       BY MR. ADAMS:

8    Q.  I've put on the screen what I've marked as

9  Exhibit 3.  At the top it says Unauthorized

10  Reprogrammed Instrument FAQs, and it says internal

11  use only.  Do you see that?

12    A.  Yes.

13    Q.  Do you recognize this document, sir?

14    A.  I vaguely remember it, yes.

15    Q.  Is this an internal FAQ that you referenced

16  in the e-mail to Mr. Woodward?

17    A.  I believe so.

18    Q.  I'm going to see if I can blow this up just

19  a little bit more.  This is as good as it's going to

20  get for now.

21       If we look at the first question, "What is

22  an unauthorized reprogrammed instrument," the last

23  sentence that is written here is:

24            "Rebotix is the name of one company

25            that we are aware of reprogramming

1        instruments, but there may be others."

2        Do you see that?

3    A.  Yes.

4    Q.  As of this date, you were aware of Rebotix

5  and the fact that they were one of the companies

6  that you said was reprogramming your instruments;

7  right?

8    A.  Yes.

9    Q.  Were you aware of any other names, of any

10  other companies?

11    A.  I've only heard from our customer-facing

12  teams, but there were -- I recall at least one name,

13  Restore Robotics.  From what I remember, maybe

14  Medline was mentioned as well, but I honestly don't

15  remember all of them.

16    Q.  Was -- now, you've got this internal FAQ.

17  Was there an external FAQ that you made available to

18  the -- your customers?

19    A.  From what I recall, we did have an external

20  FAQ.  Again, I joined -- as the processes evolved

21  over time and I joined, now I remember,

22  January 2019.  But prior to that, I am not -- I'm

23  not sure how this external FAQ was being used.

24        So yeah.  I'm not aware of how this

25  external FAQ was being used prior to me joining the

1   company.

2      Q.   One of the things I asked you about was

3   whether or not you instructed any of your internal

4   people to reach out to their customers to talk to

5   them about the safety risks that are being posed by

6   the companies that were either repairing or

7   refurbishing your products.

8        Do you remember that line of questions?

9   A.   Yes, I remember it.

10       MR. ADAMS:  Let's mark as Exhibit 4 a

11   document that's titled 10/16/19 Inacay to Menold on

12   the Intuitive.

13       (Marked for identification purposes,

14        Exhibit 4.)

15       MR. ADAMS:  I'm going to screen-share.

16       I can't tell if I'm screen-sharing the

17   right document.  There you go.

18       BY MR. ADAMS:

19      Q.   Do you see on your screen, sir, there's an

20   e-mail at the top from you dated 10/16/2019 to Jeff

21   Menold.

22        Do you see that?

23   A.   Yes.

24   Q.   Who is Jeff Menold?

25   A.   I don't recall who Jeff Menold is.

1    Q.   I'm going to scroll down.  And I stopped at

2   part of the screen in this e-mail exchange where

3   there's an e-mail from you that's dated October 3rd,

4   2019, to Jeff Menold.

5        Do you see that?

6   A.  Yes.

7    Q.   And in this e-mail, you write:

8        "Thanks for reaching out.  Yes, it

9      looks like Evergreen has one refurbished

10      ProGrasp forceps."

11        Do you see that?

12   A.  Yes.

13    Q.   When you write the word "Evergreen," there

14   what is that referring to?

15   A.  It looks like Evergreen is the hospital, so

16   the customer account.

17   Q.   You then write:

18        "Please reach out to the account and

19      reiterate the patient safety risks

20      involved with using these refurbished

21      instruments."

22        Do you see that, sir?

23   A.  Yes.

24   Q.   Now, is this an instance of you telling

25   your coworker at Intuitive that they are to reach

1  out to one of the hospitals and to talk to them

2  about your view that using refurbished instruments

3  posed a safety risk?

4        MS. LENT:  Objection.

5        THE WITNESS:  Can you repeat that one more

6  time?

7        BY MR. ADAMS:

8    Q.  One of the things we talked about earlier

9  was whether or not you instructed your coworkers to

10  reach out to their customers to talk to them about

11  the potential risk of using third-party repaired or

12  refurbished instruments.

13        Do you remember that?

14    A.  Yes.

15    Q.  Is this an example of you doing that?

16    A.  Can you -- what does "instructed" mean?

17    Q.  Asking them to do something.

18    A.  Well, again, I don't recall this e-mail

19  very well.  But as I read this now, it looks like

20  I'm asking them to reach out to the customer and

21  reiterate the patient-safety risks involved with

22  using these refurbished instruments, so ...

23    Q.  One of the things you did as the product

24  marketing manager with respect to these -- this

25  issue was you would ask your coworkers to reach out

1  to their customers and to reiterate to them your

2  view that using repaired or refurbished instruments

3  posed a safety risk; right?

4        MS. LENT:  Objection.

5        THE WITNESS:  Can you repeat that one more

6  time, please?

7        BY MR. ADAMS:

8    Q.   Sure.  One of the things you did as project

9  manager was that you would tell your coworkers that

10  they should reach out to their customers to let them

11  know about the safety risks that you believed

12  existed with respect to their use of either repaired

13  or refurbished Intuitive instruments; right?

14        MS. LENT:  Objection.

15        THE WITNESS:  So we would educate accounts

16  about the patient safety risk with using instruments

17  that were being used beyond their validated

18  instrument counts.

19        BY MR. ADAMS:

20    Q.   And part of your job was to make sure that

21  your coworkers communicated to their customers about

22  what you believed to be the safety risks; right?

23        MS. LENT:  Objection.

24        THE WITNESS:  Can you repeat that one more

25  time?  Sorry.

Page 83

1          BY MR. ADAMS:

2      Q.   Part of your job was to talk to your

3   coworkers and ask them to reach out to their

4   customers to talk to them about what you perceived

5   to be the safety risks that were -- that existed

6   based on their use of either repaired or refurbished

7   instruments; right?

8          MS. LENT:  Objection.

9          THE WITNESS:  Again -- so, again, I don't

10  recall what the context is for refurbished

11  instruments in this e-mail, but for me, it's

12  instruments that are being used past their validated

13  instrument lives.  So that's all I can remember.

14          BY MR. ADAMS:

15     Q.   What I'm trying to just get is this:  Was

16  part of your job, when you learned about hospitals

17  that were using or potentially using repaired or

18  refurbished instruments, to instruct your coworkers

19  that they are supposed to talk to them about that?

20     A.   Sorry.  I'm just -- it's the same answer;

21  right?  It's instruments.  And, again, I don't

22  recall the context of this.  So, for me, I can only

23  tell you right now it's about instruments that are

24  used past their validated instrument lives.  That's

25  all --

Page 84

1    Q.  All right.  Let's go down to the very first

2  e-mail in this chain, sir.  It is dated July 2nd,

3  2019.

4       Do you see that?

5    A.  Yes.

6    Q.  It's from you to somebody named Jarrod

7  Bowers and Jeff Menold.

8       Do you see that?

9    A.  Yes.

10   Q.  Now, do you know who Jarrod Bowers is?

11   A.  I don't recall, no.

12   Q.  Do you know if Jarrod Bowers worked for

13  Intuitive, or did Jarrod Bowers work for Evergreen

14  Hospital in Seattle?

15   A.  I don't recall.  Can you scroll down?

16  Maybe there's a title in there or ...

17   Q.  I'm showing you right now the bulk of your

18  e-mail.  It starts "Hi, Jarrod and Jeff."

19       Do you see that?

20   A.  Right, yes.

21   Q.  "I am part of the services product

22  marketing team that's overlooking the use of

23  unauthorized reprogrammed instruments on your

24  da Vinci systems."

25       Do you see that?

1    A.  Yes.

2    Q.  "I was forwarded your e-mail in regards to

3  Evergreen Hospital in Seattle."

4        Do you see that?

5    A.  Yes.

6    Q.  Did Jarrod -- now, if we scroll up just a

7  little bit, you'll see that Jeff Menold has an

8  Intuitive e-mail address there; right?

9    A.  Right.

10    Q.  That will tell that you Jeff Menold was

11  working for Intuitive?

12    A.  Yes.

13    Q.  Was Jarrod Bowers working for Intuitive?

14    A.  Again, I'm not sure.  Usually they would

15  have their titles at the bottom.  So I don't

16  remember.

17    Q.  Well, it would have the title of -- hold

18  on.  Let me see if I have an e-mail from him.

19        In this chain, there doesn't appear to be

20  an e-mail directly from Mr. Bowers, so it doesn't

21  show.

22        But in this context, can you tell us

23  whether or not you were sending an e-mail to two

24  Intuitive people?  Or are you sending it to one

25  Intuitive and another external person?  Just from

1  this e-mail.

2    A.   Again, I don't recall this e-mail, but if I

3  had to guess today, I would -- I would think, yes,

4  he's internal.  He's Intuitive internal.

5    Q.   One of the questions you asked is this:

6         "How did you come across the Si

7          EndoWrist repair process paper

8          instructions?  Was it attached on the

9          system?"

10         Do you see that?

11   A.   Yes.

12   Q.   Is that a question you would be asking one

13  of your internal people, or would you be asking that

14  of an external person?

15   A.   I -- as of today, I would say that would be

16  an internal question.

17   Q.   Now, what do you mean by "the EndoWrist

18  repair process paper instructions"?

19   A.   I don't recall.

20   Q.   Now, I was scrolling through this to see

21  when the first use of the word "refurbished" comes

22  up.  And it appears from this e-mail chain that the

23  first time it appears is when you write the words in

24  quotes.

25         And if you want, I can scroll again, to see

1   if you can double-check on that.

2        Do you want to look through the entire

3   chain, sir, to confirm that?

4     A.  Yeah, sure.

5     Q.  All right.  So let's do it.  Let's start

6   with the first e-mail in the bottom.  This is the

7   e-mail that we talked about dated July 2nd.

8        Will you agree that the use of the word

9   "refurbished" doesn't appear?

10    A.  M-hm.

11    Q.  "Yes"?

12    A.  Yes.

13    Q.  And if I scroll up a little bit, there's a

14  response from Mr. Menold that same day.  It doesn't

15  appear that Mr. Menold raises -- or uses the term

16  "refurbished" in his e-mail; right?

17    A.  Yes.

18    Q.  He doesn't use it; right?

19    A.  He does not use it in this chain.

20    Q.  And the next in the chain is July 3rd.

21  It's from you back to Mr. Menold and Mr. Bowers.

22        Can you confirm that you don't use the word

23  "refurbished" in this e-mail; correct?

24    A.  Yes.

25    Q.  "Yes" you do, or you don't?

1    A.  I don't see "refurbished" in this part of

2  the e-mail chain.

3    Q.  And then next in the chain is July 16 from

4  Mr. Menold to you.

5        Do you see that?

6    A.  Yes.

7    Q.  Does Mr. Menold use the word "refurbished"?

8    A.  He has not used the word "refurbished."

9    Q.  Next in the chain is, again, an e-mail from

10  you to Mr. Menold dated July 16.

11        Do you see that?

12    A.  Yes, I see the e-mail.

13    Q.  And do you use the word "refurbished" in

14  this e-mail?

15    A.  No, I do not.

16    Q.  Next in the chain is from Mr. Menold to you

17  dated October 2nd; right?

18    A.  Yes.

19    Q.  And does Mr. Menold use the word

20  "refurbished"?

21    A.  No "refurbished" in this e-mail chain.

22    Q.  And now we're next in line.  This is that

23  October 3rd e-mail from you to Mr. Menold, again.

24        Do you see that, sir?

25    A.  Yes.

1    Q.   Now, again, that sentence that we

2   highlighted there says:

3        "Please reach out to the account and

4        reiterate the patient safety risks

5        involved with using these 'refurbished'

6        instruments."

7        Do you see that?

8   A.   Yes, I see had.

9   Q.   Why did you put that word in quotes?

10   A.   I don't recall.

11    Q.   What did you mean by the use of the word

12   "refurbished" here?

13   A.   I don't recall.

14    Q.   Would you agree that the use of the word

15   "refurbished" is a different word than

16   "reprogrammed"?

17   A.   Yes.

18    Q.   Based on the fact that you used a different

19   word in quotes, would you agree that you mean to

20   talk about a process that's being used with your

21   instruments that's different than a reprogrammed

22   instrument?

23   A.   Can you repeat that one more time?

24    Q.   Would you agree, sir, that -- well, let's

25   do this.

1        In the e-mail that you sent on July 16, you

2   use the word "reprogrammed instruments" there.

3        Do you see that, sir?

4   A.   Yes.

5   Q.   And that's -- when you use the word

6   "reprogrammed," that's meant to talk about a device

7   in which some third party has gone in and they've

8   changed the use counter; right?  They've

9   reprogrammed it; right?

10       MS. LENT:  Objection.

11       THE WITNESS:  Can you repeat the question,

12   please?

13       BY MR. ADAMS:

14   Q.   When you use the word "reprogram," are you

15   using it to describe the situation where a third

16   party has taken your instrument and changed the use

17   counter on the instrument in some way?

18       MS. LENT:  Objection.

19       THE WITNESS:  I don't recall what the

20   context is for reprogram, for this instance.  Again,

21   if I had to -- if I had to guess, we would have to

22   check what the customer's letter says or what the

23   FAQ says for what's reprogrammed.

24       BY MR. ADAMS:

25   Q.   Well, when I'm looking through your

1  documents, sir, to the extent that you're using the

2  word "reprogrammed," what did you intend to impart

3  with the use of that word?

4     A.   Again, I don't recall what it was at the

5  time.  But as I read it now, if I had to guess, it

6  would encompass everything that was being done to

7  our instruments.  And that means, yes, one of it

8  being adding lives, but it could potentially be

9  other -- other things.  I'm not -- I'm not fully

10  sure.

11    Q.   Now, you changed the word "reprogrammed" --

12  withdrawn.

13        In your e-mail on October 3rd, you don't

14  use the word "reprogrammed"; right?

15    A.   Yes.  I don't use the word "reprogrammed."

16    Q.   You used the word "refurbished"; right?

17    A.   Yes.

18    Q.   You put it in quotes?

19    A.   Yes.

20    Q.   Why did you quote it?

21    A.   I don't know, sir.

22    Q.   What did you mean by the use of the word

23  "refurbished"?

24    A.   I don't recall.

25    Q.   Is it possible, sir, that as of this time,

Page 92

1   you understood that one of the things that was being

2   done to your devices was that the company was in

3   some way repairing them?

4       MS. LENT:  Objection.

5       THE WITNESS:  I'm sorry.  I don't -- I

6   don't recall.

7       BY MR. ADAMS:

8    Q.  Did you ever learn at any point that

9   Rebotix or any third party was actually doing

10  repairs to your instruments?

11   A.  Again, I don't -- I don't know what you

12  mean by "repair."  If it's the resharpening like

13  that instance, okay, I've heard of that, but I don't

14  know what you mean by "repair."

15   Q.  Could you have meant by "refurbishing" the

16  instance in which a party is taking one of your

17  instruments and sharpening the scissors?

18   A.  Can you rephrase the question?  I'm sorry.

19  I don't understand.

20   Q.  Did you mean, by "refurbish," the situation

21  in which a third party was sharpening the scissors

22  of one of your instruments?

23   A.  I'm sorry.  I don't know what "refurbished"

24  is in this context.  I really don't.

25   Q.  Did you have a concern about the fact that

1  companies that allowed a -- that allowed Rebotix to

2  repair your EndoWrists would be doing so to save

3  themselves money?

4      A.  I'm sorry.  I don't understand the

5  question.  Can you rephrase?

6      Q.  Did you have a concern -- did you have --

7  yes.

8          Did you have a concern that one of the

9  reasons companies would use Rebotix to repair the

10  EndoWrist is that the company wanted to save

11  themselves money?

12      A.  There was a concern for any use of

13  unauthorized instruments that are used past their

14  amount of lives, their intended amount of lives.  So

15  if you're asking me like specifically for Restore

16  Robotics, I don't recall that.

17      Q.  Did you have a concern that your customer

18  was refurbishing instruments to simply save on

19  costs?

20      A.  Again, I don't know what you mean by

21  "refurbished."  Are you saying sharpening scissors

22  is refurbishment?  I don't know.

23      Q.  Let's look at Exhibit 4, again, sir.

24          Do you have it in front of you?

25      A.  Yes, I see the e-mail.

1    Q.   All right.  The third sentence that you

2   write in your October 3rd e-mail reads:

3         "Has the customer resorted to using

4         'refurbished,'" and it's in quotes,

5         "instruments to simply save on costs?"

6         Do you see that?

7   A.  Yes, I see that.

8   Q.  That's a sentence that you wrote.

9   A.  Yes.

10   Q.   And you put the word "refurbished" in

11   quotes?

12   A.  Yes.

13   Q.   As of this time, did you have a concern

14   that customers were resorting to using refurbished

15   instruments to simply save on costs?

16   A.   Again, I don't know what you mean by

17   "refurbished," but if you're asking me at this

18   time -- I mean, I can only read what's on this

19   e-mail.  I don't -- I don't know what you mean by

20   "refurbished."

21   Q.   You keep saying you don't know what I mean

22   by "refurbished"; right?

23   A.   Or even myself at this time.  I don't know

24   what you mean by "refurbished."

25   Q.   Well, it's more accurate for you to tell me

1  that you don't know what you meant by "refurbished"

2  when you wrote these words; right?

3     A.  Yes.  When I put "refurbished" -- like, as

4  I read it right now, I don't recall what is

5  refurbished in this context.

6     Q.  Do you recall having a concern that

7  whatever the customer was doing, that they were

8  doing it to simply save on costs?

9     A.  What do you mean by "whatever the customer

10  is doing"?

11     Q.  At some point you learned that this

12  customer was -- Evergreen had a ProGrasp forcep that

13  was either reprogrammed or refurbished in some way;

14  right?

15     A.  Yes.

16     Q.  All right.  That's what I mean by "whatever

17  they were doing."

18     A.  Okay.

19     Q.  Did you have a concern that whatever the

20  Evergreen customer was doing, they were doing it

21  simply to save on costs?

22     A.  Again, I don't know what the context is for

23  this, but the way I read it now is we wanted to help

24  our customers with their problems; right?  So if --

25  whatever we can do to help solve that, we will.  But

Page 96

1    I don't -- I honestly don't know what you mean.

2        Q.   When you wrote the words "has the customer

3    resorted to using refurbished instruments to simply

4    save on costs," at the time you wrote those words,

5    you understood what you meant by those words; right?

6        A.   No.  I don't -- I don't recall what --

7        Q.   Mr. Inacay, I'm not asking you if you

8    recall it now.  I appreciate that you probably don't

9    remember what you meant by it now.

10        What I'm trying to understand is when you

11    wrote the words as of October 3rd, 2019, would you

12    agree with me that you had an understanding as to

13    why you were writing the words you were writing;

14    right?

15        A.   Sorry.  That's still unclear to me.

16        Q.   When you wrote the word "refurbished" in

17    this e-mail on October 3rd, 2019, would you agree

18    that you, at that time, understood what you meant by

19    the word "refurbished"?

20        A.   I don't know.

21        Q.   Let me ask you this question:  When you

22    wrote the word "customer" in that sentence -- take a

23    look at the sentence, sir.

24        A.   Yes.

25        Q.   You wrote "has the customer."

1        Do you see that?

2     A.  Yes.  Yes.

3     Q.  As of that time when you wrote the word

4  "customer," you understood in your mind what you

5  meant by "customer"; right?

6     A.  Yes.

7     Q.  You understood what you meant by

8  "resorted"; right?

9     A.  Yes.

10     Q.  You understood what you meant by "using";

11  right?  "Resorted to using."  You understood what

12  you meant by that word; right?

13     A.  Yes.

14     Q.  When you wrote the word "instruments," you

15  understood what you meant by "instruments" at that

16  time; right?

17     A.  Yes.

18     Q.  Meaning today you may not recall what

19  instruments you really were talking about, but as of

20  October 3rd, when you wrote the words, you had an

21  understanding as to what instruments you were

22  talking about; right?

23     A.  Yes.

24     Q.  Following that logic, Mr. Inacay, would you

25  not agree with me that when you put the words

1  "refurbished" in quotes in this e-mail, as of

2  October 3rd, 2019, you had an understanding as to

3  what you meant by "refurbished," even though you may

4  not recall today what you meant?

5       MS. LENT:  Objection.

6       THE WITNESS:  I'm sorry.  I'm uncomfortable

7  answering when I really don't understand the

8  question.  Like --

9       BY MR. ADAMS:

10  Q.  You were able to very clearly answer my

11  questions about your understanding as to certain

12  words in this e-mail as of the time that you wrote

13  them; right?

14  A.  So is the question, like, do I understand

15  what "customer" is, or "resorted" is, or

16  "instruments" is?  Like --

17  Q.  No, that's not my question.

18  A.  I don't -- I don't -- yeah.

19  Q.  That's not my question, Mr. Inacay.  Let's

20  slow down, take it a little slower.  And it's

21  actually a simple concept.

22       The concept is this:  At the time that you

23  wrote the words in this e-mail, did you have an

24  understanding as to what you meant by the words you

25  wrote?

Page 99

1    A.   Like, the way you're asking that makes me

2   like -- like I would have to like time travel back

3   into time and be in that -- like when I wrote this

4   e-mail is how you're asking the question.  I can

5   guess, yes.

6    Q.   And why is it that you think you can guess

7   that you understood the words that you wrote?

8    A.   Because I don't remember this e-mail.

9    Q.   So you don't remember writing the e-mail;

10  right?

11   A.   Yes, sir.

12   Q.   Would you agree with me that when you wrote

13  the words, you remembered it at the time; right?

14   A.   At the time --

15      MS. LENT:  Objection.

16      THE WITNESS:  Can you rephrase?

17      BY MR. ADAMS:

18   Q.   Mr. Inacay, as of October 3rd, 2019, when

19  you wrote the e-mail to Mr. Menold, did you have an

20  understanding as to all of the words that you were

21  writing in that e-mail, and what they meant to you?

22   A.   I don't know.

23   Q.   It's possible that when you wrote words in

24  that e-mail as of that time, October 3rd, you were

25  writing words that you did not have any

Page 100

1  understanding as to what those words meant to you?

2      A.   For the, quote-unquote, "refurbished"

3  piece, again, I don't recall what I meant by

4  "refurbished."

5      Q.   But at some point, you meant something by

6  it; right?

7          Well, withdrawn.  Let me ask a better

8  question.

9          As of October 3rd, 2019, you did mean to

10  impart some sort of meaning to the word

11  "refurbished"; right?

12     A.   Yes.

13     Q.   Would you agree that, as of that time, you

14  understood in your own mind what you were trying to

15  impart with respect to using that word?

16     A.   I don't know.

17     Q.   As of the time that you wrote this e-mail,

18  when you wrote the words "to simply save on costs,"

19  you understood what those words meant to you; right?

20     A.   Yes.

21     Q.   Now, what I'm trying to do here is this:

22  I'm trying to work with you, understanding that you

23  currently don't know what you meant by

24  "refurbished."  Okay?

25     A.   Okay.

1    Q.  Would you agree that whatever you meant by

2  "refurbished," one of the things that you were

3  concerned about was, was the customer doing whatever

4  that meant to simply save on cost?

5        Would you agree that that was -- that was

6  in your mind?

7    A.  As of today, I could say -- I could guess

8  that, yeah.

9    Q.  You guess that because that's a fair

10  reading of those words; right?

11    A.  Yes.

12    Q.  So my question is this, sir:  As of that

13  time frame, did you have any concern about the fact

14  that these customers were using instruments that

15  were being changed in some way, whether it's

16  reprogrammed or resharpened by Rebotix or other

17  third parties, simply to save themselves some money?

18    A.  I don't recall.  And if I had to take a

19  guess, it was we wanted to understand why they're

20  using anything besides the validated instruments

21  from Intuitive.

22    Q.  And when you were trying to understand

23  that, sir, did you ever come to the understanding

24  that these companies were telling you, look, you

25  know, we would rather not have to spend the amount

1  of money that you are charging them to replace those

2  instruments after ten uses?

3       MS. LENT:  Objection.

4       THE WITNESS:  Yeah, can you rephrase that?

5  I'm not sure I understand.

6       BY MR. ADAMS:

7    Q.  Were you told by customers that they did

8  not want to have to spend the amount of money that

9  you were charging them to replace instruments after

10  ten uses?

11    A.  I don't recall.

12    Q.  Were customers telling you in any way that

13  their use of Rebotix to repair instruments was based

14  on their desire to save money?

15    A.  I don't recall.

16    Q.  Do you recall at any point having internal

17  discussions about the fact that customers were

18  turning to Rebotix and/or other third parties

19  because they didn't want to have to pay the amount

20  of money that you were charging them to replace the

21  instruments?

22    A.  I'm sorry.  Can you rephrase that?  I'm not

23  quite sure I understand the question.

24    Q.  One second.

25       At any point, were you being told by your

1  customers that they were unwilling to pay for the

2  cost of replacing an instrument that they thought

3  they could repair and safely use?

4        MS. LENT:  Objection.

5        THE WITNESS:  I don't recall.

6        BY MR. ADAMS:

7    Q.   At any point, were customers telling you

8  that they thought that it was not unsafe for them to

9  repair instruments rather than replacing them after

10  ten uses?

11        MS. LENT:  Objection.

12        THE WITNESS:  I don't understand your

13  question.

14        BY MR. ADAMS:

15    Q.   At any point, did any of your customers say

16  to you, look, we don't believe it's unsafe for us to

17  repair and refurbish these instruments after ten

18  uses?

19    A.   I don't recall.

20    Q.   At any point -- well, if a customer had

21  expressed to you that they felt like they could do

22  this, that is if they felt like they could repair

23  safely these instruments, would you try to work with

24  them on that?

25        MS. LENT:  Objection.

1       THE WITNESS:  Again, I don't recall

2   customers asking about repairs or any of that

3   nature.  So I don't want to speculate.

4       BY MR. ADAMS:

5    Q.   So your current understanding is you never

6   had any discussions with customers in which the

7   concept of them repairing or -- and then reusing

8   your instruments came up?

9    A.   Can you rephrase, again?  Sorry.  I'm

10  really sorry.  I don't quite understand.

11      Q.   Are you aware of any situations in which

12  the discussions between Intuitive and the customer

13  was that the customer was explaining to you that

14  they felt it was safe for them to repair and reuse

15  your instruments?

16      MS. LENT:  Objection.

17      THE WITNESS:  I don't recall.

18      BY MR. ADAMS:

19      Q.   If that had happened, if you were aware

20  that there were customers out there that were saying

21  to you, look, we've got this problem; the problem is

22  that we have these counters that tell us that we

23  should only use these for ten lives but, you know,

24  we have found a way to safely repair and reuse

25  these, and we believe it's safe, would you try to

1  work with them to figure out whether or not, in

2  fact, it is safe for them to do that?

3          MS. LENT:  Objection.

4          THE WITNESS:  Are you asking me as of right

5  now, or like -- are you asking me like a

6  hypothetical question at the moment?

7          BY MR. ADAMS:

8    Q.  Yes.  I'm asking you a hypothetical

9  question.

10   A.  So you're asking me --

11         MS. LENT:  Objection.

12         THE WITNESS:  I mean, I'm kind of

13  uncomfortable, like, giving a response to a

14  hypothetical.

15         BY MR. ADAMS:

16   Q.  I appreciate your discomfort, but I'm

17  entitled to my answer.

18         MS. LENT:  Objection.

19         THE WITNESS:  I'm sorry.  I prefer not to

20  answer a hypothetical.  I'm simply uncomfortable

21  answering that.

22         BY MR. ADAMS:

23   Q.  Mr. Inacay, I appreciate it, but I'm

24  entitled to an answer.

25         MS. LENT:  Objection.

1          THE WITNESS:  Can you repeat the question,

2    then?

3          BY MR. ADAMS:

4     Q.  I'm going to actually repeat it, but I'm

5    going to repeat it by putting it into context for

6    you.  Okay?

7     A.  Sure.

8     Q.  Earlier in this deposition, you described

9    for me a process that would occur if a customer had

10   a problem with a peel pouch; right?

11    A.  Yes.

12    Q.  And one of the things you said is that if

13   you learned that a customer had a problem with a

14   peel pouch, you would try to help them solve that

15   problem; right?

16    A.  Yes.

17    Q.  One of the ways you could help them solve

18   that problem was you could go to a third party and

19   have them design a peel pouch that would be

20   compatible with your instruments; right?

21    A.  Yes.

22    Q.  You would go through that process by either

23   designing or participating in the design of the peel

24   pouch; right?

25    A.  Yes.

1    Q.  You would do so to ensure that the peel

2  pouch met specifications that were agreeable to you;

3  right?

4        MS. LENT:  Objection.

5        THE WITNESS:  Not to me --

6        BY MR. ADAMS:

7    Q.  To Intuitive.

8    A.  For -- as long as Intuitive, yes, deems

9  these specifications are correct and it's safe,

10  then, yes.

11    Q.  And one of the ways that you would ensure

12  that the specs were correct and safe is you would

13  engage in testing to make sure that they were

14  correct and they were safe; right?

15    A.  Yes, that is one way.

16    Q.  So in that context, you were -- you would

17  be willing to work with your customers to try to

18  come up with a solution to their problem; right?

19        MS. LENT:  Objection.

20        THE WITNESS:  Can you -- can you restate

21  the question, please?

22        BY MR. ADAMS:

23    Q.  In that context, you would work with

24  customers to try to come up with a solution to their

25  problem; right?

1          MS. LENT:  Objection.

2          THE WITNESS:  Can you rephrase?  What do

3   you mean by "work with customers"?

4          BY MR. ADAMS:

5     Q.   In that context, you would try to solve the

6   customer's problem by proposing that they use a peel

7   pouch that Intuitive determined was compatible with

8   the Intuitive devices; right?

9          MS. LENT:  Objection.

10         THE WITNESS:  Again, if you're asking me a

11  hypothetical, in that case, I would say -- I would

12  consult with internal teams; right?  Like, it's

13  not -- it's not my decision to be like, this is it.

14  I would -- I mean, I would primarily call a meeting

15  with our customer-facing teams and see if this is a

16  solution that works for the customer.

17         BY MR. ADAMS:

18    Q.   When you were describing for me earlier the

19  situation with respect to the peel pouch, were you

20  describing a hypothetical situation, or were you

21  describing an instance in which you, in fact, solved

22  a problem with a customer?

23         MS. LENT:  Objection.

24         THE WITNESS:  So I -- if you're saying I

25  solved this problem, I did not.  It's the company

1  that I simply get the problem that the customer has,

2  and we, as a company, looks for solutions.  Whether

3  a solution is appropriate for the customer, that's

4  up to a lot of different teams, including the

5  customer-facing teams.

6       BY MR. ADAMS:

7    Q.   When you were describing for me the

8  situation about the customer with the peel pouch

9  problem, was that a hypothetical situation, or was

10  that an actual situation that occurred in which

11  Intuitive as a team solved that problem for the

12  customer?

13    A.   That was a real problem that a customer

14  had.

15    Q.   In that context, as part of your job, you

16  assisted in solving that customer's problem; right?

17    A.   I could say, yes, I assisted in helping the

18  customer.

19    Q.   That was your job; right?

20    A.   My job is to listen to customers and act

21  appropriately.

22    Q.   Part of your job is to try to assist and

23  help customers that come to you with problems;

24  right?

25       MS. LENT:  Objection.

1          THE WITNESS:  Again, my job is to listen to

2   not only customers but our internal-facing teams,

3   because they may know the customer better than I do.

4   So --

5          BY MR. ADAMS:

6     Q.   Part of your -- part of your job is to

7   listen to customers and your customer-facing team;

8   right?

9     A.   Yes.

10     Q.   And you listen to them to learn if they

11  have any problems; right?

12          MS. LENT:  Objection.

13          THE WITNESS:  To their problems.  What do

14  you mean by "their problems"?

15          BY MR. ADAMS:

16     Q.   What I mean is you listen to see whether or

17  not there's any problem that they may have with

18  using your devices.

19     A.   Yes, we listen to that, yes.  If they have

20  issues with their devices, they -- we have channels

21  to -- to help them.

22     Q.   Now, with respect to customers that come to

23  you and say, look, we don't understand why we can't

24  use a refurbished or repaired device, did you

25  consider that to be the customer telling you that

1  they had a problem with something that you wanted

2  them to do?

3          MS. LENT:  Objection.

4          THE WITNESS:  Again, this is a

5  hypothetical.  But, again, most of this information,

6  whether if a customer has a problem with refurbished

7  or reprogrammed instruments, it goes to our

8  customer-facing team.

9          So are you asking me like hypothetically if

10  they asked me, what I would do, or ...

11          BY MR. ADAMS:

12    Q.  Well, does that problem -- it goes to

13  the -- withdrawn.  Let me ask a better question.

14          To the extent that a customer raises a

15  concern about the use of your position regarding the

16  use of either a repaired or refurbished instrument,

17  that customer's concern goes first to your

18  interfacing -- your customer-interfacing team;

19  right?

20          MS. LENT:  Objection.

21          THE WITNESS:  Can you rephrase that?  I'm

22  not sure I understand.

23          BY MR. ADAMS:

24    Q.  Let's take it this way:  As of that time

25  frame, which is in the period between January of

1  2019 and up through the time when you moved on to a

2  new post, you became aware of certain customers that

3  were using Rebotix and other third parties to

4  repair, refurbish, reprogram your instruments;

5  right?

6     A.  Yes.

7     Q.  When you learned about that, you set in

8  place a process to handle that situation; right?

9     A.  We've -- so, again, we've had -- the

10  process has been evolving, and I'm not aware of what

11  the process was.  I can only tell what you the

12  process was when I was involved.

13     Q.  One part of the process involved reaching

14  out to the customer; right?

15     A.  For internal facing -- so customer-facing

16  teams, is that what you're asking or me?  Again,

17  I -- I don't recall like talking to a customer

18  versus educating our customer teams on these

19  instruments.

20     Q.  But whether it's you or your

21  customer-facing team, part of the process when you

22  learn about the situation was to reach out to the

23  customer; right?  Either you or your internal

24  customer-facing team; right?

25     A.  Yes.

1    Q.  In doing that outreach, there were times

2  where the customer would then respond to your

3  outreach; right?

4    A.  Yes.

5    Q.  In response to your outreach, there were

6  certain customers that were pushing back on your

7  position that their use of these repaired and

8  refurbished instruments were unsafe; right?

9    A.  I'm sorry.  Can you repeat that?  I don't

10  quite understand what you said.

11    Q.   In response to your outreach to these --

12  withdrawn.  Let me ask a better question.

13        As part of your outreach, one of the things

14  that you consistently told your customers was that

15  their use of a third party to either refurbish or to

16  repair the instruments or reprogram them was unsafe

17  for -- from a patient perspective; right?

18    A.  Say that -- sorry, one more time, please.

19    Q.  One of the things that you communicated to

20  your customers was that the use of the companies to

21  either refurbish or repair the instruments was

22  unsafe; right?

23    A.  The use of instruments that are past their

24  clinical lives poses a patient-safety risk.

25    Q.  Some customers push back on that; right?

1    A.  From what I remember, yes.

2    Q.  And in pushing back, you understood that,

3  at least with respect to those customers, they were

4  telling you, look, you know, we believe that it's

5  fine; it's safe for us to do this -- to use these --

6  these companies to either repair, refurbish, or

7  reprogram these instruments; right?

8    A.  From what I recall, yes.

9    Q.  What, if anything, did Intuitive do to try

10  to work with those customers to determine whether or

11  not their belief that it was safe for them to do so

12  was a valid belief?

13    A.  One more time.  Can you -- are you -- can

14  you repeat that?

15    Q.  What did you do with respect to a customer

16  that was telling you, look, it's safe for us to do

17  this, to try to figure out whether or not it, in

18  fact, was safe for them to do it?

19      MS. LENT:  Objection.

20      THE WITNESS:  Can you rephrase that?

21      BY MR. ADAMS:

22    Q.  What, if anything, did you do with respect

23  to a customer's statements to you that it was safe

24  for them to use these third-party companies to

25  repair or refurbish your instruments?

1        MS. LENT:  Objection.

2        BY MR. ADAMS:

3    Q.   Withdrawn.  Let me ask a better question.

4        When a company told you that they thought

5   it was safe for them to repair or refurbish your

6   instruments, what, if anything, did you do to work

7   with them to try to determine if it, in fact, was

8   safe for them to do so?

9    A.   I can only tell you what I know, and I'm

10  not sure what our customer-facing teams would do if

11  there was push back from customers.  But on my end,

12  I understand that the process -- the next steps is

13  to provide a customer letter that explicitly calls

14  out every single patient safety and, in general,

15  risk into using instruments past their validated

16  lives.

17        So to my understanding, the customer letter

18  would be the next step in the process.  I'm not sure

19  what our customer-facing teams would do.

20    Q.   At any point, do you know if Intuitive ever

21  took it upon themselves to try to determine the

22  safety of using an instrument that was repaired by

23  Rebotix?

24        MS. LENT:  Objection.

25        THE WITNESS:  Can you repeat real quick?

1          BY MR. ADAMS:

2     Q.   At any point, did you -- did Intuitive do

3   anything to determine whether or not it was safe to

4   use an instrument that was repaired by Rebotix?

5          MS. LENT:  Objection.

6          THE WITNESS:  I'm not sure.

7          BY MR. ADAMS:

8     Q.   When you say you're "not sure," is it

9   because you think it could have been done?

10     A.   I'm just one person.  So internal teams

11   could do other actions that I'm not aware of.  So I

12   just don't know.

13     Q.   Have you ever been told by anyone at

14   Intuitive that they had done testing to try to

15   figure out if a Rebotix-repaired instrument was safe

16   for patient use?

17          MS. LENT:  Objection.

18          THE WITNESS:  Can you rephrase that?

19          BY MR. ADAMS:

20     Q.   Were you told by anyone at Intuitive that

21   Intuitive had done testing to determine whether or

22   not it was safe to use a Rebotix instrument -- a

23   Rebotix-repaired instrument?

24          MS. LENT:  Objection.

25          THE WITNESS:  I don't -- I don't recall --

1  sorry.  One -- one more time.  I'm sorry, like --

2  can you rephrase one more time?  I'm not sure I

3  understand.

4       BY MR. ADAMS:

5    Q.  Well, you didn't at any point -- what I'm

6  trying to figure out is whether or not there was any

7  attempt by Intuitive to try to work with its

8  customers to see whether or not its use of

9  instruments that were repaired by Rebotix was a safe

10  use, or safe practice.  That's what I'm trying to

11  understand.

12       And my question to you was:  Did anyone at

13  Intuitive of tell you that they, in fact, had tested

14  to see whether or not it was safe for hospitals to

15  use instruments or EndoWrist instruments that had

16  been repaired by Rebotix?

17       MS. LENT:  Objection.

18       THE WITNESS:  I'm not sure.

19       BY MR. ADAMS:

20    Q.  And when you say "I am not sure," what do

21  you mean by that?

22    A.  Well, again, I'm only one person; right?  I

23  only know what I know.  I don't know what other

24  teams have done in the past.  I don't know.  They

25  could have done testing in the past and they simply

1  didn't tell me.

2     Q.  My question was designed to try to figure

3  out whether or not you were ever informed of that,

4  were you ever told either orally or in writing.

5         So I understand you're one person.  I

6  understand that you only know what you know.  So I'm

7  trying to sort of hone in on this specific thing.

8         Were you ever told, either orally or in

9  writing, that someone at Intuitive or a team or

10  anyone had done testing to try to figure out whether

11  or not it was safe to use an instrument that had

12  been repaired by Rebotix?

13         MS. LENT:  Objection.

14         THE WITNESS:  From what I recall, I don't.

15         MR. ADAMS:  Let's take a short break.

16         THE VIDEOGRAPHER:  Off the record.  The

17  time is 12:50.

18         (Recess taken from 12:51 to 1:31.)

19         THE VIDEOGRAPHER:  Back on the record.  The

20  time is 1:32.

21         MR. ADAMS:  I'm going to mark next

22  Exhibit 5.  It's the document in the folder that's

23  titled 8/13/19 Harvey.

24         (Marked for identification purposes,

25          Exhibit 5.)

1        MR. ADAMS:  I'm going to screen-share.

2        BY MR. ADAMS:

3    Q.   I put on the screen in front of you a

4    document.  At the top it says 9/3/2019 e-mail

5    from -- it's to Matt Davis.

6        Do you see that?

7    A.   Yes.

8        MS. LENT:  Julian, what were you calling

9    this one?  8/13/19 Harvey, is that what you said?

10       MR. ADAMS:  It's Exhibit 5, but it's

11   dated -- the document is 8/13/19 Harvey.

12       MS. LENT:  Thank you.  I found it.

13       BY MR. ADAMS:

14   Q.   If you scroll down to the second e-mail

15   from the top, it's an e-mail from Matt Davis and

16   it's sent to you, Mr. Inacay.

17       Do you see that?

18   A.   I do.

19   Q.   Who is Matt Davis, again?

20   A.   It looks like he's the field service

21   manager for Central Region, according to his title.

22   Q.   Now, it says here from him, "Good morning,

23   AJ.  Please see below the questions from Jennifer

24   Harris, CSM."

25       Do you see that?

1    A.  Yes.

2    Q.  So what he's doing here is he's directing

3   you some questions from somebody named Jennifer

4   Harris; right?

5    A.  Yep.

6    Q.  If you scroll down one e-mail, it says

7   September 3rd, 2019, Jennifer Harris to Mr. Davis:

8        "I think this is something that needs

9        to be discussed with the surgeons.  Can

10       we move forward with that?"

11       Do you see that?

12   A.  Yes.

13   Q.  And when we scroll further, to the last

14  e-mail in this chain -- or not the last one but --

15  let's go to the last one in the chain, which may be

16  the first in order.

17       There's an e-mail from Matt Davis dated

18  August 8, 2019.  And it's to somebody named

19  JShopfor@ccsurg.com, and also to Erin Young and

20  Sherry Harvey.

21       Do you see that?

22   A.  I do see that, yeah.

23   Q.  Now, in the e-mail from Mr. Davis,

24  Mr. Davis says that he is the field services manager

25  for Intuitive; right?

1    A.  Yes.

2    Q.  And he wants to set up a meeting to discuss

3   their system service and recent usage of

4   unauthorized instrument on July 15th and July 22nd.

5        Do you see that?

6    A.  Yes, I can read that.

7    Q.  Do you have a recollection of learning

8   about this hospital's use of what you were

9   considering to be an unauthorized instrument?

10    A.  Not -- I don't, no.

11    Q.  Would this have been something that would

12   have been shared with you and discussed internally

13   with you before an e-mail was sent out to a

14   customer?

15    A.  I don't recall speaking with Matt prior to

16   reaching out.  I don't recall.

17    Q.  It appears as though, if you look at the

18   e-mail that's just above this, there's an e-mail

19   dated August 13, 2019, from Ms. Harvey to Mr. Dais.

20        Do you see that?

21    A.  Okay.  Yeah.

22    Q.  And the first sentence, it says, "Thank you

23   for your phone call and e-mail"; right?

24    A.  M-hm.

25    Q.  Yes?

1    A.   I see it, yes.

2    Q.   So that sentence would suggest to you that

3  Mr. Davis both spoke to Ms. Harvey on the phone and

4  also sent you an e-mail; right?

5    A.   So -- sorry, what was your question?

6    Q.   That first sentence would suggest to you --

7  well, withdrawn.

8        That first sentence tells you that

9  Mr. Davis spoke to Ms. Harris on the phone, and he

10  also sent an email; right?

11       MS. LENT:  Objection.

12       THE WITNESS:  Sent me an e-mail?

13       BY MR. ADAMS:

14    Q.  Say that, again.

15    A.  Sent me an e-mail?

16    Q.  No.  The first sentence of Ms. Harris's

17  e-mail tells you that Mr. Davis spoke to Ms. Harris

18  on the phone and also sent her an e-mail.

19    A.  And sent her an e-mail, yes.

20    Q.  Now, Ms. Harris then writes:

21        "In order to reduce the cost of

22        running Intuitive Surgical robots, we are

23        starting a cost reduction program with

24        Restore Robotics."

25        Do you see that?

1    A.   Yes, I see that.

2    Q.   Do you remember reading this e-mail around

3   this time frame when you were sent the e-mail chain?

4    A.   I don't remember this e-mail.

5    Q.   Do you have any questions about the fact

6   that at least this customer was telling you,

7   Intuitive, through Mr. Davis, that they were

8   concerned about costs?

9    A.   Again, I don't remember this e-mail.  But

10  as I read it now, it looks like they are -- they're

11  looking to reduce the cost of running Intuitive

12  Surgical robots.  That's what it reads.

13   Q.   Ms. Harvey then says that:

14         "This company called Restore Robotics

15        safely repairs robot instruments after

16        their initially recommended usage and

17        return instruments to us."

18        Do you see that?

19   A.   Yes.  I could see it.

20   Q.   "So that -- so we can extend their use and

21  realize important cost savings."

22        Do you see that?

23   A.   I see it, yes.

24   Q.   At the time that you were the program

25  marketing manager that was involved in dealing with

1  issues about -- with respect to customers' use of

2  third-party companies to refurbish or reprogram or

3  repair instruments, did you ever understand that one

4  of the reasons they were doing so was to safely

5  of -- was to recognize or realize important cost

6  savings?

7        MS. LENT:  Objection.

8        THE WITNESS:  Can you rephrase the

9  question?

10        BY MR. ADAMS:

11    Q.   During the time that you were the manager,

12  either overseeing or involved in the process of

13  dealing with third parties refurbishing or repairing

14  of your instruments, did you ever learn that

15  customers, that is the hospitals, were using those

16  third parties in order to realize important cost

17  savings?

18        MS. LENT:  Objection.

19        THE WITNESS:  I don't remember, no.

20        BY MR. ADAMS:

21    Q.   When you got this e-mail on September 3rd,

22  2019, it's fair to say that you got the e-mail from

23  Mr. Davis and then you scrolled down and you read

24  what this -- why he was sending you this

25  information; right?

1    A.   Yes.

2    Q.   It's likely that you read the e-mail that

3   Ms. Harris sent to Mr. Davis dated August 13, 2019;

4   right?

5    A.   If I had to guess, yes.

6    Q.   And that's because part of your job is to

7   listen to your -- to the customer; right?

8    A.   Yes.

9    Q.   Listening to the customer includes when

10  they send e-mails like the one Ms. Harvey sent,

11  reading that e-mail; right?

12   A.   Yes.

13    Q.   It is highly unlikely that you would be

14  sent an e-mail from a customer like this and you

15  chose not to read it; right?

16   A.   Yes.

17    Q.   In this e-mail, Ms. Harvey is asking that

18  Intuitive not interfere with their program; right?

19   A.   Yes.

20   Q.   She says that:

21       "This program is important in our

22        efforts to provide the best possible care

23        for our patients."

24        Right?

25   A.   Yes, I see that.

1    Q.  When you read that, did you listen to those

2  words?

3         MS. LENT:  Objection.

4         THE WITNESS:  I see those words.

5         BY MR. ADAMS:

6    Q.  You read them; right?

7    A.  Yes, we read them.

8    Q.  Did you consider them?

9    A.  What do you mean "consider"?

10    Q.  Well, did you -- did you read the words and

11  then, in any way, consider those words in any of

12  your future actions with this customer?

13    A.  Are you asking me or -- because this was to

14  Matt.  So are you saying did I do anything with

15  these words?

16    Q.  Mr. Inacay, let me ask you this question:

17  To the extent that a customer had a question about

18  this that they raised with the internal -- the

19  external-facing person like Matt, Matt was directed

20  to bring those issues to you; right?

21    A.  Yes.

22    Q.  Okay.  So when it was brought to you, it

23  was brought to you for a reason; right?

24    A.  Yes.

25    Q.  It was brought to you to try to now work

1  with Matt or somebody at Intuitive to try to figure

2  out how to deal with this issue; right?

3      A.  Yes.

4      Q.   And trying to figure out how to deal with

5  this issue, my question is did you in any way

6  consider what this customer was telling you?  That

7  is that their program was important in their efforts

8  to provide the best possible care for our patients,

9  or did you just disregard that?

10     A.  I don't recall at this time what

11  specifically I did, but, again, I'm not a one-man

12  team.  If this is the feedback -- and, again, I

13  don't recall -- if this is the feedback we received,

14  I'm not going to -- I'm not going to not tell

15  anyone.  I would say this is what I've -- this is

16  what I received and we would discuss, as a team,

17  like, what is the best path forward.

18     Q.   What --

19     A.   So I don't recall what did -- how did Matt

20  use this or what -- how did I use this at that time,

21  so ...

22     Q.   Let me ask you a question, Mr. Inacay.

23         If Matt were to then go back to talk to

24  Ms. Harvey or anyone at this Crescent City Surgical

25  Center about this, would he be doing so on his own,

1  or would he be doing so based on input that he

2  received from you?

3      A.   It would depend on where we are in the

4  process.  We have a process for this.

5      Q.   Right.  And based on the process, what

6  you've got is you've got -- from what we can tell,

7  you've got Mr. Davis reaching out to the folks at

8  the surgical center there on August 8, 2019; right?

9      A.   Yes.

10     Q.   You've got Mr. Davis saying that you've

11 learned about their use of an unauthorized

12 instrument; right?

13     A.   Yes.

14     Q.   You've then got a follow-up responsive

15 e-mail sent a few days later, right, that we've

16 looked at, dated August 13, 2019; correct?

17     A.   Yes.

18     Q.   Now, part of your process after you

19 received an e-mail like this is to do what?

20     A.   We would reiterate what are the

21 patient-safety risks for our instruments if they're

22 used beyond the validated amount of lives on them.

23 We firmly believe that.

24     Q.   So part of your --

25     A.   And --

1    Q.   Part of your process is to receive feedback

2  from your customer like this, and then to respond

3  with just reiterating what your position is on their

4  use of these -- these instruments that have been

5  repaired; right?

6        MS. LENT:  Objection.

7        THE WITNESS:  Sorry.  Can you repeat that

8  question?

9        BY MR. ADAMS:

10    Q.   Part of your process is to receive input or

11  response from a customer like this and then -- to

12  then respond by reiterating what your position is

13  regarding their use of repaired Rebotix instruments;

14  right?

15        MS. LENT:  Objection.

16        THE WITNESS:  So, again, I don't recall how

17  we use this information; right?  Like, customers can

18  give us a ton of information and feedback, and we

19  collect that and we discuss it as a team; right?  So

20  I don't know in this instance what he did with this;

21  right?

22         So for me, in the process that we had at

23  that time, the next step would be to reiterate the

24  patient-safety implications for using instruments

25  that are beyond their validated instrument lives.

1  And, if needed, we would have a customer letter that

2  would be physically within the hands of the customer

3  that provides clarification of some of those risks.

4      BY MR. ADAMS:

5   Q.  In Ms. Harvey's letter, she asks a few

6  questions of Intuitive; right?

7   A.  Yes.

8   Q.  You would have read these questions; right?

9   A.  I would likely have read them, yes.

10   Q.  I want to scroll down to the second bullet

11  point.  She says in the second bullet point:

12      "You also point out the need to

13      discuss how to ensure ongoing patient

14      safety at the highest levels of product

15      performance."

16      Right?  Do you see that?

17   A.  Yes.

18   Q.  Then she says:

19      "We assume you're referring to the

20      use of robotic instruments."

21      Right?

22   A.  Yes, I see that.

23   Q.  Then she asks:

24      "Please provide data that

25      demonstrates the patient safety is

1          impacted by the safe and controlled reuse

2          of robotic instruments."

3              Do you see that?

4     A.   I see that.

5     Q.   You read that at the time?

6     A.   Likely read it, yes.

7     Q.   Did you consider it?

8     A.   What do you mean by "consider"?

9     Q.   Well, did you read and it ignore it, or did

10   you read and it consider it in formulating what your

11   response was going to be to her?

12    A.   I read it, most likely.  And then I most

13   likely brought it to a team that collects a bunch of

14   feedback on this.  Right?

15        So if there is a request like this, I don't

16   know what you expect from me.  It's not likely that

17   I would send out data like on -- it's not -- I don't

18   have that jurisdiction.  I would have to go to the

19   team and be like, here's what we're hearing.  What

20   should we do?  Right.  So ...

21    Q.   Well, at any point, did you ever go to the

22   team and talk to the team about the fact that a

23   customer was requesting that you provide them with

24   data that demonstrates that patient safety was

25   impacted by the safe, controlled repair and reuse of

1  robotic instruments?

2     A.  I don't recall.  I can probably tell you

3  what may have happened, but I don't recall

4  specifically what I -- what I did with this e-mail,

5  so ...

6     Q.  What can you tell me may have happened?

7     A.  I mean, if I had to guess, I would have

8  brought it up first off to my manager and said,

9  here's feedback that we received.  And then he would

10  provide me guidance on who should get their eyes on

11  this.  Right?  I mean, that's most likely what -- if

12  I had to guess what I would do.

13     Q.  And you would have followed the advice

14  and/or counsel of your manager; right?

15     A.  I mean, I would -- we would have a

16  discussion, but like if he told me to do something

17  odd, I would have a discussion with him.

18     Q.  Did you or anyone at Intuitive ever provide

19  data to Ms. Harvey that demonstrated that patient

20  safety was impacted by the safe, controlled repair

21  and reuse of robotic instruments?

22     A.  I don't know.

23     Q.  At any point during the time that you've

24  worked at Intuitive, that you've worked there, have

25  you ever seen any data that demonstrated that

1  patient safety was impacted by the safe, controlled

2  repair and reuse of robotic instruments?

3      A.   If you're asking me if I looked at the data

4  as a product marketing manager and I can understand

5  what that data meant then, no.  I haven't seen that

6  data.

7      Q.   Have you ever asked for it?

8      A.   No.

9      Q.   One way that you could understand it is if

10  you asked for it and you had somebody explain it to

11  you; right?

12     A.   Is that like a -- hypothetically, I guess?

13     Q.   One way for you to be able to understand

14  that data, if it existed, was to ask someone provide

15  it to you and have that person explain it to you;

16  right?

17         MS. LENT:  Objection.

18         THE WITNESS:  Can you rephrase that?

19         BY MR. ADAMS:

20     Q.   I'm sort of responding to part of your

21  answer about not being able to understand that data.

22  And so I'm trying to figure this out from you.

23         If you were interested in getting that

24  information, one thing you could have done is you

25  could have asked for the data, and if you didn't

1  understand it, have somebody explain it to you;

2  right?

3          MS. LENT:  Objection.

4          THE WITNESS:  I mean, again,

5  hypothetically, I guess.

6          BY MR. ADAMS:

7    Q.   And at any point while you worked at

8  Rebotix, did you ever ask anyone for data that

9  demonstrated the patient safety -- that patient

10  safety as impacted by the safe, controlled repair

11  and reuse of robotic instruments, and to the extent

12  that you got that data, you then asked them to

13  explain it to you?

14          MS. LENT:  Objection.

15          THE WITNESS:  I don't recall, but I would

16  say no.

17          BY MR. ADAMS:

18    Q.   Now, why is it that you never either asked

19  for or received data that demonstrated that patient

20  safety was impacted by the safe, controlled repair

21  and reuse of robotic instruments?

22    A.   Again, if I had to guess at this time, it's

23  because I wouldn't understand it; right?  And I

24  wouldn't -- it's Intuitive; right?  If they -- if

25  the team states this, I mean why would I -- why

1  would I refute that; right?  I trust my teammates.

2      Q.  Well, one of the things that Ms. Harvey

3  writes here is this, last sentence:

4          "Patient safety is our first concern,

5          but we do not act on vendor statements

6          about safety; we act on science."

7          Do you see that?

8  A.  Yes, I see it.

9      Q.  You think that's a reasonable statement for

10  Ms. Harvey to make?

11          MS. LENT:  Objection.

12          THE WITNESS:  I mean, I don't know who

13  Ms. Harvey is and what their definition of "patient

14  safety" is, or like -- I don't know what she meant

15  by this.  She wrote this, not me.

16          BY MR. ADAMS:

17      Q.  Do you think it's reasonable for

18  Ms. Harvey, who is a chief nursing officer at

19  Crescent City Surgical Center, to tell you that with

20  respect to patient safety, they don't act on vendor

21  statements, but they act on science?

22          Is that a reasonable statement for her to

23  make?

24          MS. LENT:  Objection.

25          THE WITNESS:  I don't know.  I don't know

1  Ms. Harvey and, like, their program.  I'm sorry.  I

2  don't know.

3          BY MR. ADAMS:

4    Q.  Do you think it's reasonable when we're

5  trying to figure out with respect to whether or not

6  the reuse of EndoWrists that have been repaired is

7  safe for patients that you should look to science to

8  determine that?

9          MS. LENT:  Objection.

10         THE WITNESS:  Can you rephrase that?

11  Sorry.

12         BY MR. ADAMS:

13   Q.  Do you think that it's reasonable to look

14  to science to determine whether or not it is safe to

15  use repaired robotic instruments?

16         MS. LENT:  Objection.

17         THE WITNESS:  I don't really know what

18  you're trying to ask.  Sorry.

19         BY MR. ADAMS:

20   Q.  One of the things that you do to make sure

21  that your products are safe is you test them; right?

22         MS. LENT:  Objection.

23         THE WITNESS:  I mean, again, I'm not a

24  testing expert, so ...

25  ///

1        BY MR. ADAMS:

2     Q.   One of the things that Intuitive does to

3  make sure its instruments are safe is that it tests

4  those instruments; right?

5     A.   Yes.

6     Q.   It gathers data based on those testing;

7  right?

8     A.   Yes.

9     Q.   Would you agree that the use of data to

10  determine safety is relying upon science as opposed

11  to just random statements?

12        MS. LENT:  Objection.

13        THE WITNESS:  Again, that's up for --

14  that's up for the teams to decide.  I mean, I'm not

15  a data expert.  I don't know what else needs to be

16  done besides data.  Right?  Like, that's -- that's

17  for them to decide on what makes -- when is the

18  instrument safe.  Right?  So those are up to the

19  engineers.

20        BY MR. ADAMS:

21     Q.   And you understand that your engineers and

22  your team members, in determining when an instrument

23  is safe, is that they rely on the science; right?

24        MS. LENT:  Objection.

25        THE WITNESS:  I don't know what they rely

1  on.  It's up to them.  Right?  Like I don't know

2  what their criterias are, requirements.  That's

3  their expertise, not mine.

4        BY MR. ADAMS:

5    Q.   Well, you know that they rely on the

6  testing that they do; right?

7    A.   Yes.

8    Q.   And they rely on the data that they get

9  from the testing; right?

10   A.   Yes.

11   Q.   Can we come to some agreement in this

12  deposition that relying on data from testing is the

13  same as saying that you're relying on the science?

14        MS. LENT:  Objection.

15        THE WITNESS:  Again, that's not my call.

16  It's really up to the engineers to decide that.

17  Like, I don't -- I honestly don't know ...

18        BY MR. ADAMS:

19   Q.   What don't you know?  You can finish that

20  sentence.

21   A.   There are going to be requirements that I'm

22  not aware of.  Right?  And so it's up to the teams

23  to ensure that those requirements are made to ensure

24  that our instruments are safe.  I don't know all of

25  those requirements and how they are decided upon.

1    Q.  Would you agree that, in part, that they

2  rely on the science to tell them whether or not a

3  device is safe?

4        MS. LENT:  Objection.

5        THE WITNESS:  What do you mean "science"?

6  Can you give me an example?  What do you define

7  "science" as?

8        BY MR. ADAMS:

9    Q.  "Science," in this context, would be

10  testing and data that's derived from the testing.

11  That's what I mean by "the science."

12        MS. LENT:  Objection.

13        THE WITNESS:  Again, I don't know.  You

14  would have to ask the engineers on that, right, and

15  our regulatory teams.  They would know better than I

16  would.

17        BY MR. ADAMS:

18    Q.  They may know better than you, but you also

19  have some understanding as to what they rely on;

20  right?

21    A.  Yes.

22    Q.  You know that in determining whether or not

23  your devices are safe they do tests; right?

24        MS. LENT:  Objection.  Asked and answered,

25  twice.

1         MR. ADAMS:  I'm not sure what's happening

2   here.

3         BY MR. ADAMS:

4     Q.   Are you going to answer it, or do you want

5   me to restate it?  Or are you just going to ignore

6   the question?

7     A.   Sorry.  I didn't get what --

8         THE WITNESS:  Can you repeat what you said,

9   Karen?

10        MS. LENT:  I just said that the question

11  had been asked and answered twice, and I objected to

12  it being repeatedly asked.

13        But if you can answer it or you have

14  anything else to add, you can do that.

15        THE WITNESS:  I have nothing else to add.

16  I can reiterate my answer.

17        BY MR. ADAMS:

18    Q.   What's your answer, again, sir?

19        MS. LENT:  Can you ask the question, again,

20  please.

21        MR. ADAMS:  I will.

22        BY MR. ADAMS:

23    Q.   You know that, at least in part, your

24  engineers rely upon tests and data derived from the

25  tests in determining whether or not your instruments

1  are safe; right?

2      A.    Again, it's really up to the engineers and

3  our regulatory teams to decide what constitutes as

4  when our instruments are safe for patients.  I don't

5  make that call.  It's likely part of it is data, but

6  there could be a slew of other things.  I don't

7  know.

8      Q.    It's likely that part of what they relied

9  upon is data derived from tests that they do; right?

10     A.    It's likely, yes.

11     Q.    It wouldn't be unreasonable for a customer

12  to try to get you from the data that may support

13  your position that what they were doing was unsafe;

14  right?

15         MS. LENT:  Objection.  Asked and answered.

16         THE WITNESS:  That's not my call.  Like if

17  the customer asked me for X, Y, and Z, I'm not just

18  going to be like, yes, here it is.  Especially when

19  I don't know all of the answers.  Right?  I have to

20  go back to the team and we decide.  Right?  Like ...

21         BY MR. ADAMS:

22     Q.    My question wasn't about whether or not it

23  was your call, or whether or not the team decided.

24  It was more about whether or not it's unreasonable

25  for a customer to ask you for that information.

1        You would agree that when a customer is

2  being told that what they're doing is not safe, it's

3  reasonable for them to push back and say, well, show

4  me the data that demonstrates that it's not safe?

5  That's reasonable; right?

6        MS. LENT:  Objection.

7        THE WITNESS:  I don't know.

8        BY MR. ADAMS:

9    Q.  You do know that you never provided that

10  data to any of your customers; right?

11        MS. LENT:  Objection.  Asked and answered.

12        THE WITNESS:  That I provided data?

13        BY MR. ADAMS:

14    Q.  You do know that you nor anyone that worked

15  with you or for you provided any data to any of your

16  customers to demonstrate that their use of robotic

17  instruments that were repaired by Rebotix was unsafe

18  for patient use; right?

19        MS. LENT:  Objection.  Asked and answered.

20        THE WITNESS:  Can you rephrase?

21        MR. ADAMS:  No, I can't.  Can I have it

22  reread, please?

23        (Record read as follows:  "You do know that

24          you nor anyone that worked with you or for

25          you provided any data to any of your

1          customers to demonstrate that their use of

2          robotic instruments that were repaired by

3          Rebotix was unsafe for patient use;

4          right?")

5          MS. LENT:  Same objections.

6          THE WITNESS:  So you --

7          MS. LENT:  You can answer.

8          THE WITNESS:  Sorry.  Can you repeat one

9   more time, then?

10          THE STENOGRAPHER:  Would you like me to

11   read it back, again?

12          THE WITNESS:  Yes, please.  Sorry about

13   that.

14          (Record read as follows:  "You do know that

15          you nor anyone that worked with you or for

16          you provided any data to any of your

17          customers to demonstrate that their use of

18          robotic instruments that were repaired by

19          Rebotix was unsafe for patient use;

20          right?")

21          THE WITNESS:  I don't know.

22          BY MR. ADAMS:

23   Q.   In her e-mail, Ms. Harvey then writes, in

24   the third bullet point:

25          "We have audited the quality system

1        and testing protocols of our robotics

2        instrument repair partner as well as

3        several independent reports about

4        materials degradation, and we find no

5        indication that the functionality of

6        robotic instruments is compromised when

7        re-using the instruments beyond the

8        limited number of times suggested by

9        Intuitive Surgical."

10        Do you see that?

11   A.   Yes, I see it.

12   Q.   Now, what, if anything, did you do with

13   that information when you received it?

14   A.   I don't recall.

15   Q.   Did you ignore it?

16   A.   I don't recall.

17   Q.   Did you or anyone at Intuitive ever ask to

18   see from your customers any information that they

19   had uncovered to show that there was no material

20   degradation or functionality in your instruments

21   that had been repaired and reused?

22        MS. LENT:  Objection.

23        THE WITNESS:  I'm not sure.  Can you

24   rephrase that?  I don't understand.

25   ///

1          BY MR. ADAMS:

2      Q.   Did you ever ask any of your customers to

3   provide you with information that they had uncovered

4   that showed that there was no materials degradation

5   or indication that any functionality of the

6   instruments were compromised when the instruments

7   were repaired?

8      A.   I don't recall.

9      Q.   Is that information that would have been

10  important to any decision that you made with respect

11  to how you responded to this issue?

12     A.   I'm sorry.  Can you rephrase that?

13     Q.   Yes.

14          Did Intuitive, at any point, care about

15  figuring out whether or not the repair of the

16  instruments actually caused -- actually posed a

17  safety risk?

18          MS. LENT:  Objection.

19          THE WITNESS:  I mean, I don't know.  Like,

20  I'm one person.  You're asking me for Intuitive?  I

21  don't know.

22          BY MR. ADAMS:

23     Q.   Well, on behalf of Intuitive, you were

24  responsible for how you -- your company was relating

25  and communicating to its hospital customers; right?

1        MS. LENT:  Objection.

2        THE WITNESS:  I'm not sure I understand

3   what your question is.

4        BY MR. ADAMS:

5    Q.   Part of your job at Intuitive was to

6   participate in the process of communicating with

7   hospitals that were using repaired EndoWrists;

8   right?

9        MS. LENT:  Objection.

10        THE WITNESS:  I mean, for this instance?

11   Again, I don't recall what I did with this

12   information, but I could say, like, my job was to

13   educate our internal teams on the patient safety

14   risks of using instruments that are past their

15   validated instrument lives.

16        BY MR. ADAMS:

17    Q.   In order to determine whether or not the

18   use of a Rebotix repaired instrument was unsafe,

19   would you agree that Intuitive could have conducted

20   its own testing of those repaired instruments?

21        MS. LENT:  Objection.

22        THE WITNESS:  I don't know what Intuitive

23   would have -- like, again, I'm only one person.

24        BY MR. ADAMS:

25    Q.   As part of your job, was it important to

1  you when you were representing to customers, or at

2  least instructing or requesting that your other

3  coworkers respond to customers, that you were giving

4  them information that was truthful?

5    A.  Can you rephrase?

6    Q.  Was it important to you that in addressing

7  customers with respect to this issue, that you were

8  giving them information that was truthful?

9    A.  Sorry.  I still don't quite understand.

10  What are you trying to say?

11    Q.  Is it important for you to tell the truth?

12    A.  Yes.

13    Q.  When Intuitive responded to customers, they

14  were doing so based on either your direction or with

15  your guidance; right?

16      MS. LENT:  Objection.

17      THE WITNESS:  Can you repeat that?

18      BY MR. ADAMS:

19    Q.  When Intuitive was responding to its

20  hospital customers, with respect to this issue, they

21  were doing so either based on your direction or with

22  your guidance; right?

23      MS. LENT:  Objection.

24      THE WITNESS:  I mean, I can say -- again,

25  my role was to educate our internal teams on this

1  issue and what does it mean from the patient --

2  patient-risk perspective.

3        So, again, I don't know what is the

4  question you're trying to ask.

5        BY MR. ADAMS:

6    Q.  Well, you were part of the team that

7  crafted what the response was going to be to

8  customers on this issue; right?

9    A.  So if -- so you're saying for this

10  specific -- this specific e-mail?  Is that what

11  you're asking?  If ...

12    Q.  Well, either this e-mail or any

13  communication that you were having with hospitals on

14  what you were considering to be an unauthorized use

15  of your instruments.

16        You were a part of the team that crafted

17  whatever your response to the hospital would have

18  been; right?

19    A.  Yes.

20    Q.  In crafting that response, was it important

21  to you that you were providing them with truthful

22  information?

23    A.  Yes.

24    Q.  One of the things that you were telling

25  them in your response to them was that you believed

1  it was unsafe for them to be using instruments that

2  were repaired or refurbished or reprogrammed by

3  companies like Rebotix; right?

4     A.   Again, I would have to -- I would have to

5  go back to our customer letter, right, that states

6  in general the risks involved.

7     Q.   Right.  And in that customer letter, you

8  were saying to them that it's risky for them to do

9  that; right?

10    A.   It's risky to use instruments that are

11  beyond the validated uses -- the validated lives.

12  Right?  So that's -- from what I recall, that is

13  what's written in our customers letters and in our

14  communications.

15    Q.   You didn't do anything to try to figure out

16  whether or not those customers could safely repair

17  those instruments and use them without any risk to

18  patient safety; right?

19       MS. LENT:  Objection.  Asked and answered.

20       THE WITNESS:  Can you repeat that, please?

21       BY MR. ADAMS:

22    Q.   You didn't do anything to determine whether

23  or not it was safe for your hospital customers to

24  repair your EndoWrists and use them in their

25  surgeries; right?

1          MS. LENT:  Objection.  Asked and answered.

2          THE WITNESS:  I don't recall what I did

3   with this e-mail.  And, again, it's likely that I

4   took this e-mail and brought it up to a team to go

5   through it.  So I don't know what else to say beyond

6   that.

7          BY MR. ADAMS:

8     Q.   Ms. Harvey asked Intuitive to provide test

9   results, studies of data that documented why

10  instruments should be limited to 10 or 15 uses.

11         Do you see that?

12    A.   Yes, I see that.

13    Q.   Do you know whether or not you provided

14  that information to Ms. Harvey?

15    A.   Sorry.  Can you repeat the question?

16    Q.   Did you provide that information to

17  Ms. Harvey?

18    A.   From what I recall, no.

19    Q.   Why not?

20    A.   I mean, again, I'm just one person.  And if

21  she asked for this, then I would bring it up to the

22  team and we would decide on an appropriate response.

23  And, again, like, I wouldn't know where the results

24  would be or how to interpret them.  Like, I'm not --

25  I'm not equipped to do that.  So I would have to

1  discuss with the internal team on this.  Right?

2  So --

3     Q.  From what you recall, you did discuss with

4  them whether or not you should provide this data to

5  Ms. Harvey; right?

6     A.  I don't recall.  Again, I don't recall how

7  we used this e-mail.

8     Q.  But you do know that you never provided

9  that data to her, though; right?

10    A.  I can recall that I did not provide any

11  data to Ms. Harvey.

12    Q.  Did you ask any of the people that worked

13  for you -- withdrawn.  I'm going to ask a better

14  question.

15       Did you ask any of the external facing

16  Intuitive people that were part of your team to

17  provide that information to Ms. Harvey?

18    A.  I don't recall.

19    Q.  Do you know whether or not anyone else at

20  Intuitive asked that that information be provided to

21  Ms. Harvey?

22    A.  I don't know.

23    Q.  Did you -- withdrawn.

24       Did you participate in crafting the process

25  by which -- withdrawn.

1          Did you participate in determining the

2  process that would be used to address the situation

3  where you learned of a customer that was using an

4  instrument that was repaired or refurbished by a

5  company like Rebotix?

6     A.   What do you mean "crafted"?

7     Q.   Created, drafted, wrote.

8     A.   I was part of the team.

9          MR. ADAMS:  I'll mark as Exhibit 6.  It is

10  a document that is titled "Inacay Slide Unauthorized

11  IA remanufactured."

12          I'm going to screen-share this.

13          (Marked for identification purposes,

14           Exhibit 6.)

15          BY MR. ADAMS:

16     Q.   Screen-shared for you a slide that on the

17  first page it says Unauthorized I&A Remanufacturing.

18          Do you see that?

19     A.   Yep.

20     Q.   And then it has your name on it, AJ Inacay?

21     A.   Yes.

22     Q.   Did you create this slide, sir?

23     A.   From what I remember -- can I see the rest

24  of this presentation?

25     Q.   Scroll through.  The first and second page.

1    A.  Okay.

2    Q.  This is the third page of the slide.

3    A.  Okay.

4    Q.  Have you seen enough to tell me whether or

5  not you created this, or do you need to see more?

6    A.  Can I see more, please, if that's okay?

7    Q.  Sure.  This is the fourth page.

8    A.  Okay.  Is there any more?

9    Q.  Fifth page?

10   A.  Okay.

11   Q.  Sixth page.  Seventh page.

12   A.  Yes.  So I can say this is -- I likely

13  created this slide, yes.

14   Q.  In the last slide -- I want to point you to

15  the last part, this last bullet point.  It says:

16        "A patient safety implications letter

17        may be created for you by reaching out to

18        AJ Inacay."

19        Do you see that?

20   A.  Yes.

21   Q.  What does that mean?

22   A.  So internal -- our customer-facing teams

23  would reach out to me.  And then I would -- I would

24  request a customer letter to be created, a patient

25  safety implications letter to be created to our

1  legal team.

2      Q.   The words on this slide says:

3          "The patient safety implications

4      letter may be created for you by reaching

5      out to AJ Inacay."

6          Do you see that?

7      A.   Yes.

8      Q.   And what that's saying is that one of your

9  field people could reach out to you and then you

10  would facilitate the creation of that letter; right?

11      A.   Yes.

12      Q.   That was your role?

13      A.   Yes.  That was my role.  For this patient

14  safety implications letter, that was my role, yes.

15      Q.   If you go up to the slide to slide 3,

16  slide 3 of this slide says "How do we address

17  accounts using remanufactured I&A?"

18          Do you see that?

19      A.   Yes.

20      Q.   And then there are four boxes that run in

21  the second row here.

22          Do you see that?

23      A.   Yes.

24      Q.   First says "Internal Review."  Then it says

25  "Educate Account."  Then it says "Patient Safety

1  Implications Letter."  And then it says "Terminate

2  Agreement."

3       Do you see that?

4  A.  Yes.

5  Q.  Now, this third part that says "Patient

6  Safety Implications Letter," that's the letter that

7  we just talked about that you would work with legal

8  to create and send to the customer; right?

9  A.  Yes.

10  Q.  Now, if we back up to the second part, it

11  says, "Field teams with affected customer accounts

12  are made aware by internal team via e-mail"; right?

13       And then it says, "Commercial team

14  coordinates efforts to educate the customer

15  account."

16       Do you see that?

17  A.  Yes.

18  Q.  Now, that part of the -- that part of the

19  process would -- is demonstrated by the last e-mail

20  that we just looked at where Mr. Davis reached out

21  to Ms. Harvey; right?

22  A.  Yes.

23  Q.  Now, was this a process that you created,

24  or was this something that existed before you got

25  there?

1    A.  So, again, the process has changed over

2    time.  I'm not sure when we had this process in

3    place, but this is the process that we created --

4    yeah, as a -- from all of the core team, the

5    internal teams on this.

6    Q.   Internally, did you make the decision that

7    when you were confronted with a customer that was

8    repairing your instruments that you were to ignore

9    all of the reasons for doing so and to simply

10   reiterate that you believe that they were engaging

11   in behavior that was not safe and that if they

12   didn't stop you would terminate the agreement with

13   them?

14        MS. LENT:  Objection.

15        THE WITNESS:  Can you rephrase that?

16        BY MR. ADAMS:

17   Q.   As part of the process, did Intuitive

18   deliberately decide to ignore any of the reasons why

19   customers were using the repaired devices and,

20   instead, continued to press your view that the

21   customer was engaging in unsafe practices, and that

22   if they didn't stop, you would terminate the

23   agreement?

24        MS. LENT:  Objection.

25        THE WITNESS:  Sorry.  I still don't quite

1    understand what you're trying to ask.

2        BY MR. ADAMS:

3    Q.   The process that you lay out here includes,

4    number one, learning about customers that are

5    repairing your instruments; right?

6    A.   That are using instruments that are past

7    their validated lives, yes.

8    Q.   And at this stage, you learned and you knew

9    that customers were doing that because they felt

10   that they could safely repair them; right?

11   A.   I -- I don't know why they would choose to

12   use them.  We just know that they were using them,

13   according to the tableau report.

14   Q.   All right.  Then, after you got this

15   report, you then spoke to the customers and learned

16   why they were doing it right?

17   A.   Well, no.  So, again, for me the next step

18   would be to engage the field teams on this.  Right?

19   And we would say -- we would educate them on, hey,

20   here's what's happening at the account and here are

21   the risks involved.

22   Q.   So you would talk to your field team, and

23   you would give them your talking points about all of

24   the risks that are involved in that activity; right?

25   A.   For using, yes, instruments past their

1  validated lives.

2    Q.  You would then have those field team people

3  communicate with the customer and share with them

4  your views about the risks associated with using

5  those refinished -- those repaired devices; right?

6      MS. LENT:  Objection.

7      THE WITNESS:  Can you repeat that?

8      BY MR. ADAMS:

9    Q.  After you talked to your field team

10  individuals, you then had them go and talk to their

11  customer; right?

12    A.  Yes, we have asked them to speak to their

13  affected customers.

14    Q.  And in speaking to the customers, they were

15  told to provide them with either the FAQs or provide

16  them with your position that what they were doing

17  was not safe from a patient perspective; right?

18      MS. LENT:  Objection.

19      THE WITNESS:  Say that one more time.

20      BY MR. ADAMS:

21    Q.  In talking to the customer, they were told

22  to share either the FAQ or in some way communicate

23  with them that they were engaging in activity that

24  you thought was unsafe; right?

25      MS. LENT:  Objection.

1        THE WITNESS:  I mean, the customer didn't

2   speak with me.  Spoke to our field teams, but I

3   would have to look at previous e-mails on those

4   types of reasons, I guess.

5        BY MR. ADAMS:

6    Q.  Well, what you do know, Mr. Inacay, is that

7   when you talked to your field team, you told them to

8   then go talk to the customer; right?

9    A.  Yes.

10    Q.  And as you wrote here, commercial team

11  coordinates efforts to educate the customer account;

12  right?

13    A.  Yes.

14    Q.  And part of that education is to educate

15  them on the implications of using remanufactured

16  instruments; right?

17    A.  Yes.

18    Q.  And those implications are the implications

19  that you would either have on your FAQ or -- you

20  would have on your FAQ so that they could -- they

21  could, either in writing or on-site on the phone,

22  communicate that information to the customer; right?

23        And by "they," I mean your field managers.

24    A.  So the purpose of the Patient Safety

25  Implication letter, again, is, in general, to

1  provide this information so they can actually walk

2  the customer through all of these different things

3  and they can visually see everything.  Right?

4      Q.   Well, the Patient Safety Implication

5  letter, sir, based on your little flow chart here,

6  comes after -- that comes after you have identified

7  who is using these devices, you have spoken with --

8  you have spoken with your field team, and you have

9  then had your field team reach out to the customer

10  either on-site or on the phone; right?

11      A.   Yes, and let me --

12      Q.   Let me ask the question.

13          This third part -- this third part is

14  where -- this third part comes before you send out

15  the Patient Safety Implication letter; right?

16      A.   Yes.

17      Q.   Now, at what point, between number three

18  and number four, do you go back to the customer and

19  say, hey, you know what, I've heard what you said.

20  I've really considered it and, here, let me try to

21  explain to you -- or let me provide you with the

22  data that demonstrates why it is that what you're

23  doing is unsafe?

24          MS. LENT:  Objection.

25          THE WITNESS:  I don't know what you mean.

1  Like, are you asking where in this process would we

2  provide data to customers?  Is that what you're

3  asking?

4       BY MR. ADAMS:

5    Q.   Yeah.  To respond to their request that

6  you've explained why it is that what they're doing

7  is unsafe.

8    A.   So, again, the patient safety implications

9  letter was intended to be used to explain all of the

10  risks involved, in general all of the risks involved

11  with using these remanufactured instruments; right?

12  It would also -- it would have further discussions

13  on top -- so we wouldn't just deliver this patient

14  safety implications letter to them; right?  We would

15  send it and it walk them through it.  And to give --

16  to provide more clarity now that they have a

17  physical copy of this.

18    Q.   Well --

19    A.   If you're asking for when our field

20  engineers provide data, from my understanding or

21  from what I recall, I don't remember field engineers

22  providing data to customers on remanufactured

23  instruments.

24       MR. ADAMS:  I'm going to stop

25  screen-sharing this, and I'm going to mark next

1  Exhibit No. 7.

2      (Marked for identification purposes,

3       Exhibit 7.)

4      MR. ADAMS:  It's the one titled "Slide

5  Unauthorized Remanufacture."

6      I'll screen-share this.

7      BY MR. ADAMS:

8   Q.  Mr. Inacay, this is another version of what

9  appears to be a similar slide deck.  I want to focus

10  on one particular page of this deck.  It's on

11  slide 4.

12      Have you ever seen this slide before, sir?

13   A.  Yes.

14   Q.  And tell me how -- when did you see it?

15  Were you part of creating it?  How do you know about

16  this?

17   A.  I was a part of creating this slide deck.

18   Q.  Was this --

19   A.  I don't recall --

20   Q.  Go ahead.  You can go ahead.

21   A.  I don't recall specifically when we used

22  this.

23   Q.  Was this before or after the deck that we

24  just looked at, Exhibit 6?

25   A.  I don't know.

Page 163

1    Q.  All right.  One of the differences between

2  the two slides and this is -- withdrawn.

3        You see that there's this first event that

4  says "Trend Analysis" there, and then it says

5  "Educate Account."  It says "Customer Letter" and

6  then it says "Terminate Agreement."

7        Do you see that?

8    A.  Yes, I see that.

9    Q.  And the bullet points sort of match up with

10  what we talked about earlier, about the four-part

11  process that you used; right?

12    A.  Yes.

13    Q.  One difference here is that it assigns

14  these timelines this -- five business days, ten

15  business days, ten business days, five business

16  days.

17        Do you see that?

18    A.  Yes.

19    Q.  Why was that included in this deck?

20    A.  I don't recall.

21    Q.  What is it telling us?

22      MS. LENT:  Objection.

23      BY MR. ADAMS:

24    Q.  As you read this, what do you understand it

25  to be telling you?

1    A.   As I read it now, it looks like these are

2   how many days we stay in each phase of the process,

3   it looks like.

4    Q.   Who created this deck?

5    A.   I don't recall.  If I had to guess, I

6   probably put an outline to this and then it was

7   created in conjunction with all of the internal

8   teams.

9    Q.   This deck -- right.

10        With respect to this timeline and the

11   amount of time that you spend in each phase, this

12   was information that you included in a deck because

13   this is the amount of time that you -- as a team you

14   agreed you would spend in each phase; right?

15    A.   Again, I don't recall.  But I would say, I

16   looked at this now, that seems like what it would

17   be, yeah.

18    Q.   That's the process that you implemented at

19   Intuitive; right, with respect to this issue

20   timeline-wise?

21    A.   Again, I didn't -- I wasn't the person that

22   implemented this process.  It was a team effort;

23   right?  So ...

24    Q.   Right.  As the process was actually

25   practiced at Intuitive with respect to this issue

1  the timeline that we have here for the time spent in

2  each of the phases was the timeline that you

3  actually implemented; right?

4      MS. LENT:  Objection.

5      THE WITNESS:  From what I recall -- sorry.

6  Again, this would be a guess, but I would think this

7  is the days that we abide to or we tried to work

8  within for each step of the process.

9      BY MR. ADAMS:

10   Q.  I'm not really interested in your guess on

11  this one.  I kind of want to know what your best

12  recollection is about what these words mean to me.

13       So taking a look at this slide, the amount

14  of days that was included for each phase was, to the

15  best of your recollection, the amount of time that

16  you, in fact, spent in each phase with respect to

17  the customers that you identified were using the --

18  either refurbished or repaired or reprogrammed

19  EndoWrists; right?

20      MS. LENT:  Objection.

21      THE WITNESS:  From the best of my

22  recollection, yes, this is the -- the amount time we

23  would like to spend within each phase of the

24  process.

25      MR. ADAMS:  Okay.  At this time, let me go

1  off the record.  I may be done.

2      THE VIDEOGRAPHER:  Off the record.  The

3  time is 2:41.

4      (Recess taken from 2:41 to 2:46.)

5      THE VIDEOGRAPHER:  Back on the record.  The

6  time is 2:46.

7      MR. ADAMS:  I have no further questions of

8  Mr. Inacay at this time.

9      MS. LENT:  Thank you.  I don't have any

10  questions.

11      THE VIDEOGRAPHER:  Off the record, Counsel?

12      MR. ADAMS:  Yep.

13      MS. LENT:  Yes.

14      THE VIDEOGRAPHER:  This concludes today's

15  deposition.  We're off the record.  The time is

16  2:46.

17      (Deposition concluded at 2:46 p.m. PDT.)

18          ---oOo---

19

20

21

22

23

24

25

1        CERTIFICATE OF WITNESS

2

3

4

5         I, the undersigned, declare under penalty

6   of perjury that I have read the foregoing

7   transcript, and I have made any corrections,

8   additions or deletions that I was desirous of

9   making; that the foregoing is a true and correct

10   transcript of my testimony contained therein.

11

12      EXECUTED this _____ day of _____,

13   20_____ at _____,_____.

14

15

16         _____

17         ANTONIO (AJ) INACAY

18

19

20

21

22

23

24

25

1                    STENOGRAPHER'S CERTIFICATE

2            I, LORRIE L. MARCHANT, Certified Shorthand

3     Reporter, Certificate No. 10523, for the State of

4     California, hereby certify that ANTONIO (AJ) INACAY

5     was by me duly sworn/affirmed to testify to the

6     truth, the whole truth and nothing but the truth in

7     the within-entitled cause; that said deposition was

8     taken at the time and place herein named; that the

9     deposition is a true record of the witness's

10    testimony as reported to the best of my ability by

11    me, a duly certified shorthand reporter and a

12    disinterested person, and was thereafter transcribed

13    under my direction into typewriting by computer;

14    that request [  ] was [X] was not made to read and

15    correct said deposition.

16           I further certify that I am not interested

17    in the outcome of said action, nor connected with,

18    nor related to any of the parties in said action,

19    nor to their respective counsel.

20           IN WITNESS WHEREOF, I have hereunto set my

21    hand this 9th day of June, 2021.

22

23    _____
      LORRIE L. MARCHANT, RMR, CRR, CCRR, CRC
24       Certified Shorthand Reporter #10523

25

1          I N D E X

2          INDEX OF EXAMINATION

3   EXAMINATION BY                    PAGE

4   MR. ADAMS                         5

5             ---oOo---

6     INDEX OF EXHIBITS MARKED FOR IDENTIFICATION

7   EXHIBIT     DESCRIPTION           PAGE

8   Exhibit 1   e-mail correspondence, dated    69
            8/15/2019, subject: Assistance
9            with Citizens Medical Center
            (Intuitive-00569289 -
10            Intuitive-00569291)

11   Exhibit 2   e-mail correspondence, dated    72
            9/12/2019, subject: Unauthorized
12            Instrument Reprogramming
            Presentation (Intuitive-00110246
13            - Intuitive-00110247)

14   Exhibit 3   Intuitive document entitled    77
            "Unauthorized Reprogrammed
15            Instrument FAQ"
            (Intuitive-00110250 -
16            Intuitive-00110251)

17   Exhibit 4   e-mail correspondence, dated    79
            10/16/2019, subject: Evergreen
18            Hospital (Intuitive-00372987 -
            Intuitive-00372992)
19
    Exhibit 5   e-mail correspondence, dated    118
20            9/3/2019, subject: Meeting
            Request regarding your daVinci
21            Surgical System
            (Intuitive-00048799 -
22            Intuitive-00048802)

23             ---oOo---

24

25

1    INDEX OF EXHIBITS MARKED FOR IDENTIFICATION

2    EXHIBIT    DESCRIPTION                    PAGE

3    Exhibit 6    Intuitive document entitled      152
              "Unauthorized I&A
4              Remanufacturing"
              (Intuitive-00478736 -
5              Intuitive-00478742)

6    Exhibit 7    Intuitive document entitled      162
              "Unauthorized Remanufactured
7              Instruments Overview"
              (Intuitive-00439333 -
8              Intuitive-00439355)

9                ---oOo---

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   NAME OF CASE:  Rebotix Repair v. Intuitive Surgical

2   DATE OF DEPOSITION:  6/8/2021

3   NAME OF WITNESS:  Antonio Inacay

4   Reason Codes:

5        1.  To clarify the record.
         2.  To conform to the facts.
6        3.  To correct transcription errors.

7   Page _____ Line _____ Reason _____
    From _____ to _____
8
    Page _____ Line _____ Reason _____
9   From _____ to _____

10   Page _____ Line _____ Reason _____
    From _____ to _____
11
    Page _____ Line _____ Reason _____
12   From _____ to _____

13   Page _____ Line _____ Reason _____
    From _____ to _____
14
    Page _____ Line _____ Reason _____
15   From _____ to _____

16   Page _____ Line _____ Reason _____
    From _____ to _____
17
    Page _____ Line _____ Reason _____
18   From _____ to _____

19   Page _____ Line _____ Reason _____
    From _____ to _____
20
    Page _____ Line _____ Reason _____
21   From _____ to _____

22   Page _____ Line _____ Reason _____
    From _____ to _____
23
                    _____
24                   ANTONIO (AJ) INACAY

25

Exhibit 3

1　　　IN THE UNITED STATES DISTRICT COURT

2　　　　MIDDLE DISTRICT OF FLORIDA

3　　　　　TAMPA DIVISION

4　　　　　---oOo---

5　REBOTIX REPAIR LLC,　　　:
　　　　　　　　　　　　　　　:
6　　　　Plaintiff,　　:
　　　　　　　　　　　　　　　:
7　　　vs.　　　　　: No. 8:20-CV-02274
　　　　　　　　　　　　　　　:
8　INTUITIVE SURGICAL, INC.,　　:
　　　　　　　　　　　　　　　:
9　　　　　　　　　　　:
　　　　Defendant.　　:
10　_____ :

11

12

13　　　　HIGHLY CONFIDENTIAL

14　　REMOTE DEPOSITION OF GLENN VAVOSO

15　　　　May 14, 2021

16

17

18

19

20

21

22　Job No. 194104

23　Stenographically reported by:

24　LAURA AXELSEN, CSR NO. 6173

25　　RMR, CCRR, CRR, CRC

1          IN THE UNITED STATES DISTRICT COURT

2            MIDDLE DISTRICT OF FLORIDA

3               TAMPA DIVISION

4               ---oOo---

5   REBOTIX REPAIR LLC,          :
                                 :
6          Plaintiff,        :
                                 :
7        vs.              : No. 8:20-CV-02274
                                 :
8   INTUITIVE SURGICAL, INC.,      :
                                 :
9                          :
           Defendant.        :
10   _____ :

11

12        BE IT REMEMBERED THAT, pursuant to Notice and

13   on Friday, May 14, 2021, 9:05 a.m., with all

14   participants being present via Zoom

15   videoconference  before me, LAURA AXELSEN, a

16   Certified Shorthand Reporter, remotely appeared

17            GLENN VAVOSO,

18   called as a witness by the plaintiff.

19            ---oOo---

20

21

22

23

24

25

Highly Confidential

1              APPEARANCES

2

3   FOR THE PLAINTIFF:

4

5        DOVEL & LUNER

6        BY:  ALEXANDER ERWIG, ESQ.

7           JULIEN ADAMS, ESQ.

8        201 Santa Monica Boulevard

9        Santa Monica, California  90401

10

11   FOR THE DEFENDANT:

12

13        SKADDEN, ARPS, SLATE, MEAGHER & FLOM

14        BY:  KAREN LENT, ESQ.

15           ALENA PERSZYK, ESQ.

16        One Manhattan West

17        New York, New York  10001

18

19        There being also present Thomas D'Anieri,

20   Naomi Caldwell, and Jacob Arvold, videographer.

21

22              ---oOo---

23

24

25

Highly Confidential

1                         INDEX

2

3                                     PAGE

4    EXAMINATION BY MR. ERWIG                     8

5    EXAMINATION BY MS. LENT                    281

6

7                ---oOo---

8

9            INDEX OF EXHIBITS

10

11   EXHIBIT      DESCRIPTION                    PAGE

12

13   Exhibit 1    Handwritten notes              12

14   Exhibit 2    4/1/21, Rebotix's Notice of     13

15            30(b)(6) Deposition

16   Exhibit 3    12/6/19 Cesnik to Domondon.     22

17   Exhibit 4    12/6/19 Attach to Cesnik to     24

18            Domondon

19   Exhibit 5    Handwritten notes              48

20   Exhibit 6    Value and Barriers             60

21   Exhibit 7    8/3/17 Stoffel to Bischoff and  64

22            Vavoso

23   Exhibit 8    Attach to Stoffel to Bischoff and  65

24            Vavoso

25   Exhibit 9    Final Attach to Stoffel to      68

1          Bischoff

2  Exhibit 10  2/20/17 Rosa to Vavoso          89

3  Exhibit 11  2/20/17 Attach to Rosa to Vavoso    91

4  Exhibit 12  Handwritten notes          104

5  Exhibit 13  6/4/18 Bradshaw to Rosa and Vavoso  110

6  Exhibit 14  Handwritten notes          119

7  Exhibit 15  Handwritten notes          143

8  Exhibit 16  6/8/17 Mohr to Vavoso          152

9  Exhibit 17  6/8/17 Attach to Mohr to Vavoso,    154

10          et al.

11  Exhibit 18  8/24/19 Darling to Vavoso, et al.   164

12  Exhibit 19  8/24/19 Attach to Darling to      166

13          Vavoso

14  Exhibit 20  This will be 1/24/17 Child to      177

15          Vavoso, et al.

16  Exhibit 21  Proprietary Rights and        178

17          Non-competition Agreement dot

18          Non-sales.

19  Exhibit 22  Proprietary Rights Agreement FAQ    180

20  Exhibit 23  March 2017 SAB Recap          181

21  Exhibit 24  SLSA Conway          192

22  Exhibit 25  Pullman Regional Letter      213

23  Exhibit 26  Handwritten notes          224

24  Exhibit 27  Handwritten notes          235

25  Exhibit 28  4/20/17 Vavoso to Tourand and      244

Highly Confidential

1           Boeschenstein

2   Exhibit 29   4/20/17 Attach to Vavoso to        247

3           Tourand

4   Exhibit 30   6/26/17 Okafor to Scoville and      253

5           Vavoso

6   Exhibit 31   1/15/20 Clingan to Rosa and Vavoso  265

7   Exhibit 32   1/15/20 Attach to Clingan to Rosa   271

8           and Vavoso

9   Exhibit 33   4/15/20 Life Extension for Bob's    272

10          Staff

11   Exhibit 34   3/6/17 Desdmet to Vavoso, et al.    274

12   Exhibit 35   3/6/17 Attach to Desmedt to Vavoso  274

13   Exhibit 36   2/28/20 Alter to Alter and Kim      275

14   Exhibit 37   DB Feb 20 Pre-call Note            277

15   Exhibit 38   5/6/18 Clingan to Mohr and Vavoso  278

16   Exhibit 39   CCR 8 year lrmv11.xlxs            279

17

18               ---oOo---

19

20

21

22

23

24

25

Highly Confidential

1           VIDEOGRAPHER:  Good morning.  My name is

2    Jacob Arvold.  I'm a certified legal videographer in

3    association with TSG Reporting, Inc.

4           Due to the severity of COVID-19 and

5    following the practice of social distancing, I will

6    not be in the same room with the witness.  Instead,

7    I will record this video deposition remotely.  The

8    reporter, Laura Axelsen, also will not be in the

9    same room and will swear the witness remotely.

10          Do all parties stipulate to the validity of

11   this video recording and remote swearing and that it

12   will be admissible in the courtroom as if it had

13   been taken following Rule 30 of the Federal Rules of

14   Civil Procedures and the State's rules where this

15   case is pending?

16          MR. ERWIG:  Plaintiff stipulates.

17          MS. LENT:  Defendant stipulates.

18          VIDEOGRAPHER:  Thank you.  This is the

19   start of the Media 1 of the video deposition of

20   Glenn Vavoso in the matter of Rebotix Repair versus

21   Intuitive Surgical, Inc. in the United States

22   District Court Middle District of Florida, Tampa

23   Division, Case No. 8:20-CV-02274.

24          This deposition is being held remotely on

25   May 14th, 2021, at approximately 9:07 a.m.  Will

Highly Confidential

1   counsel please introduce yourselves?

2        MR. ERWIG:  On behalf of plaintiff,

3   Alexander Erwig of Dovel & Luner.

4        MS. LENT:  Karen Lent from Skadden on

5   behalf of Intuitive and the witness.

6        VIDEOGRAPHER:  Also present.

7        MS. PERSZYK:  Hi, Alena Perszyk from

8   Skadden on behalf of defendants is also attending.

9        MR. ERWIG:  I have with me a legal

10  assistant from my firm as well, Thomas D'Anieri.

11       VIDEOGRAPHER:  Will the court reporter

12  please swear in the witness?

13            GLENN VAVOSO

14        having been duly sworn/affirmed

15          under penalty of perjury

16           testified as follows:

17        EXAMINATION BY MR. ERWIG

18      MR. ERWIG:   Q.  Good morning, Mr. Vavoso.

19   A.  Good morning.

20   Q.  Could you please state your full name for

21  the record?

22   A.  Glenn Robert Vavoso.

23   Q.  Where do you work?

24   A.  Work at Intuitive Surgical.

25   Q.  What is your position at Intuitive?

Highly Confidential

1      A.  I'm the senior vice president general

2   manager for Asia and our indirect global markets.

3      Q.  What are your responsibilities in that

4   position?

5      A.  Broadly, to manage the commercial endeavors

6   in the -- in the geographies of Asia where we have

7   distribution partners around the globe.

8      Q.  Can you explain to me a little bit more

9   what you mean by manage endeavors around the globe?

10     A.  I -- we have teams in place that report in

11  to me that provide sales and marketing support into

12  those markets.  Sales support could be clinical

13  support for hospitals that have da Vinci systems,

14  teams of people that work with hospitals as they're

15  evaluating the technology, and, you know, variety of

16  marketing roles.

17     Q.  Do your responsibilities include working

18  with teams in the United States?

19     A.  In -- in part.  I've got -- some of my

20  responsibilities are associated with training our

21  commercial employees, which are generally sales and

22  marketing employees.  And so a part of that

23  responsibility is to train the new employees that

24  would join our -- our team.

25     Q.  How long have you worked in your position

Highly Confidential

1  as the senior V.P.?

2      A.  For the last six years.  A variety of roles

3  in that senior vice president role, uhm, over that

4  six years.  But for the past three or four years,

5  associated with our Asian markets.

6      Q.  So would that be since 2015?

7      A.  2015, yes.

8      Q.  I want to get a little bit of a sense of

9  your familiarity with the da Vinci surgical robot.

10  Can you describe to me how your position relates to

11  the da Vinci surgical robot?

12      A.  When you say relates, meaning?

13      Q.  Well, how, if at all, is your position in

14  your -- withdrawn.

15        How -- how in your position do you interact

16  with the da Vinci surgical robot?

17        MS. LENT:  Object to the form.

18        THE WITNESS:  Can you repeat the question,

19  Alexander?

20        MR. ERWIG:  Q.  Sure.  Let me rephrase it.

21  Do you have some familiarity with the da Vinci

22  surgical robot?

23      A.  Yes.

24      Q.  Can you describe what that familiarity is?

25      A.  As I said, I've been with -- maybe I didn't

Highly Confidential

1  say this.  I've been with the organization for 15

2  years, uhm -- variety of roles around the selling

3  and marketing of the da Vinci system.

4      Q.  You mentioned you've been involved in the

5  selling and marketing of the da Vinci system.  Can

6  you explain to me a little bit more what you mean by

7  that?

8      A.  In a -- in a variety of roles over that 15

9  years.  It is leading and managing teams, myself

10  interacting with hospital executives, surgeons, in

11  the sales and support of the da Vinci system.

12      Q.  Are you involved in the marketing and sale

13  of the da Vinci system in the United States?

14      A.  In previous roles, yes.

15      Q.  What previous roles?

16      A.  I've held roles as a clinical sales

17  manager, an area sales director, and ecology sales

18  director, a clinical sales director, an area vice

19  president, vice president sales operations.

20      Q.  I'm going to screen share some notes that

21  I've taken of the testimony that we just had.

22  You've been with Intuitive as the senior V.P. for

23  Asia since 2015?

24      A.  Yes.

25      Q.  And overall you've been with Intuitive for

1   15 years; is that right?

2       A.  Yes.

3          MR. ERWIG:  Mark as Exhibit 1 handwritten

4   notes that I've taken.

5          (EXHIBIT 1 WAS MARKED FOR IDENTIFICATION.)

6          MS. LENT:  Objection.

7          MR. ERWIG:   Q.  Stop the screen share.

8   Mr. Vavoso, have you been deposed before?

9       A.  I have.

10      Q.  How many times?

11      A.  How many times with Intuitive?  In my life?

12      Q.  Well, let's start with Intuitive.

13      A.  Probably three times, two or three times.

14      Q.  You've been deposed in your personal

15  capacity or as a 30(b)(6) witness?

16      A.  I don't -- I don't recall the prior

17  depositions of how -- how it was classified.

18      Q.  How many times have you been deposed in

19  your life?

20      A.  Maybe four or five.

21      Q.  Do you understand that you're here today

22  testifying on behalf of Intuitive?

23      A.  Yes.

24      Q.  And that the answers that you give are

25  binding on Intuitive, the company?

Highly Confidential

1    A.  Yes.

2    Q.  So your understanding that you had a

3  responsibility -- withdrawn.

4        You understand that you had a

5  responsibility to conduct a good faith search for

6  all relevant information known or reasonably

7  available to Intuitive?

8        MS. LENT:  Objection to the form.  You can

9  answer, though.

10        THE WITNESS:  Can you repeat the question,

11  please?

12        MR. ERWIG:   Q.  You understand that you

13  had a responsibility to conduct a good faith search

14  for all relevant information known or reasonably

15  available to Intuitive on the topics for which you

16  were designated?

17    A.  Yes.

18    Q.  Did you conduct that search?

19    A.  Through our -- through our legal team.

20  With the assistance of the legal team.

21        (EXHIBIT 2 WAS MARKED FOR IDENTIFICATION.)

22        MR. ERWIG:  Q.   I'm going to screen share

23  our next exhibit.  This will be 4/1/21, Rebotix's

24  Notice of 30(b)(6) Deposition.  It appears in

25  Folder 1 in the private folder.  Move it to the

Highly Confidential

1  submitted folder.

2      Mr. Vavoso, have you seen this document

3  before?

4      A.  I -- can we -- can you move through it so I

5  can see the contents?  Is that the last page?  I

6  have not seen this specific document.

7      Q.  Do you see --

8      MS. LENT:  Alexander.  I'm sorry,

9  Alexander.  Is someone putting the marked exhibits

10  into the submitted folder?  It's not there yet.

11      MR. ERWIG:  I believe TSG should be

12  handling that.

13      MS. LENT:  Okay.  It's not critical for

14  that one, but I don't -- it's not being done.  So I

15  just want to make sure that that starts to happen as

16  we proceed.

17      MR. ERWIG:   Q.  Mr. Vavoso, have you seen

18  this document before?

19      A.  No.

20      Q.  Do you see this is titled plaintiff

21  Rebotix's Notice of Deposition of Intuitive under

22  rule 30(b)(6)?

23      A.  I see that.

24      Q.  Do you understand that you're here today

25  testifying on behalf of Intuitive pursuant to this

Highly Confidential

1  Notice of Deposition?

2      A.  Yes.

3      Q.  Have you reviewed the topics on which

4  Intuitive has designated you to testify?

5      A.  Yes.

6      Q.  You understand that you are -- withdrawn.

7          You understand that you are designated to

8  testify on Topics 1 through 4, 7, 11, 14, 16 through

9  18, 25, 31, and 33.  Is that right?

10         MS. LENT:  Objection.  I don't think he was

11  designated for 11, Alexander.

12         THE WITNESS:  Can you repeat those sections

13  again?

14         MR. ERWIG:  Q.  Sure.  Topics 1 through 4,

15  you see those topics in front of you?

16      A.  Yes.

17      Q.  Are you prepared to testify on behalf of

18  Intuitive on those topics?

19      A.  Yes.

20      Q.  Topic 7, you understand that you've been

21  designated to testify on behalf of Intuitive?

22      A.  Yes.

23      Q.  Are you fully prepared to testify on

24  Topic 7?

25      A.  Yes.

Highly Confidential

1      Q.  Is it your understanding that you were

2   designated on Topic 11?

3           MS. LENT:  Objection.

4           THE WITNESS:  No.

5           MR. ERWIG:   Q.  So you're not prepared to

6   testify on Topic 11 today?

7           MS. LENT:  Objection.  Mr. Vavoso was not

8   designated to testify on Topic 11.

9           THE WITNESS:  No.

10           MR. ERWIG:   Q.  You understand that you've

11   been designated by Intuitive on Topic 14?

12      A.  Yes.

13      Q.  And you're fully to prepared to testify on

14   Topic 14?

15      A.  Yes.

16      Q.  You understand that you've been designated

17   by Intuitive to testify on Topics 16, 17, and 18?

18      A.  Yes.

19      Q.  And you're fully prepared to testify on

20   those topics?

21      A.  Yes.

22      Q.  You understand you've been designated by

23   Intuitive to testify on Topic 25?

24      A.  Yes.

25      Q.  And you're fully prepared to testify on

Highly Confidential

1  Topic 25?

2    A.  Yes.

3    Q.  You understand that you've been designated

4  by Intuitive for Topic 31?

5    A.  Yes.

6    Q.  You're fully prepared to testify on Topic

7  31 today?

8    A.  Yes.

9    Q.  You also understand that you've been

10  designated by Intuitive to testify on Topic 33?

11    A.  Yes.

12    Q.  Are you fully prepared to testify on Topic

13  33 today?

14    A.  Yes.

15    Q.  How did you gather information to testify

16  on these topics?

17    A.  What do you mean by how?  Like --

18    Q.  What process did you use to gather

19  information to testify on behalf of Intuitive on

20  these topics?

21    A.  With the assistance of the legal team, I

22  did a search of documents relative to those topics.

23    Q.  How else did you prepare for the deposition

24  today?

25    A.  Reviewed that documentation that was

Highly Confidential

1  collected.

2      Q.  Did you do anything else?

3      A.  No.

4      Q.  Did you speak to anyone at Intuitive?

5      A.  Legal team.

6      Q.  Anyone outside of the legal team?

7      A.  No.

8      Q.  Do you feel confident that you've gathered

9  all relevant information such that you can

10  competently testify on the topics you've been

11  designated for today?

12      MS. LENT:  Objection.

13      THE WITNESS:  To the extent of the

14  documents that have been collected through that

15  search, yes.

16      MR. ERWIG:  Q.  Do the documents collected

17  in that search reflect all relevant information

18  known or reasonably available to Intuitive?

19      MS. LENT:  Objection.

20      THE WITNESS:  Yes.

21      MR. ERWIG:  Q.  And that's the case for

22  each of the topics on which you're prepared to

23  testify today; is that right?

24      A.  Yes.

25      Q.  And you feel confident that you're fully

Highly Confidential

1 prepared to testify on each of these topics on

2 behalf of Intuitive as a 30(b)(6) witness today?

3       MS. LENT:  Objection; asked and answered.

4       THE WITNESS:  To the best of my abilities,

5 yes.

6       MR. ERWIG:  Q.  Do you have any documents

7 in front of you that are not visible to the camera?

8    A.  No.

9    Q.  Mr. Vavoso, what is Intuitive?

10    A.  Can you be more clear on that -- the

11 question what is Intuitive?

12    Q.  Well, sure.  I just want to get a sense

13 from you what -- what the company, Intuitive

14 Surgical -- what it is or what it does?

15    A.  We are a medical device company that

16 designs, manufactures medical equipment for use in

17 surgical treatment and for diagnostics.

18    Q.  One of the things Intuitive sells is the

19 da Vinci surgical robot; is that right?

20    A.  The robot itself, yes.

21    Q.  What is a da Vinci surgical robot?

22    A.  It is the -- it is part of the system that

23 allows a surgeon to perform a minimally invasive

24 surgical procedure.

25    Q.  The da Vinci robot is part of a system

1  that's used for minimally invasive soft tissue

2  robotic surgery; is that right?

3      A.  Yes.

4      Q.  What minimally invasive soft tissue

5  surgeries can the da Vinci robot be used for?

6      A.  In the United States?

7      Q.  Correct.

8      A.  Applications include urologic procedures,

9  treatment of cancer and other benign conditions.

10  Can be used in gynecology surgical procedures.

11  Variety of general surgery procedures.  Thoracic

12  surgery.  Cardiac surgery.  Can be used in a number

13  of applications.  Those are the ones that come to

14  mind.

15      Q.  And in each application it's used for a

16  minimally invasive surgery; is that right?

17      A.  Yes.

18      Q.  What is a minimally invasive surgery?

19      A.  One where you're doing surgery through

20  small access ports where instrumentation can be

21  inserted through those ports as compared to what we

22  would describe as traditional open surgery where it

23  would be large incision.  These are small incision

24  surgeries.

25      Q.  What is a soft tissue surgery?

1      A.  Really describes the system application to

2  organs, tissue within the body, fatty layers versus

3  a -- an application that would be for, say,

4  orthopedics, which is bone, which is not soft

5  tissue.

6      Q.  So the da Vinci surgical robot can only be

7  used for minimally invasive soft tissue robotic

8  surgery; is that right?

9      A.  That is -- that is the current application,

10  yes.

11      Q.  And that's the application for which

12  Intuitive has FDA approval; is that right?

13      A.  Yes.

14      Q.  I'm going to stop screen sharing this

15  exhibit.

16      MS. LENT:  Alexander, there are no exhibits

17  in the exhibit share folder.  I'm not sure who on

18  the deposition you're expecting to move them in once

19  they're marked.  But I don't see anyone from TPG

20  [sic] that would be playing that role.  There's no

21  concierge on the call.  So could you please --

22      MR. ERWIG:  Let's go off the record and

23  figure it out.

24      MS. LENT:  Okay.

25      VIDEOGRAPHER:  Off the record.  The time is

Highly Confidential

1  9:27.

2      (The deposition was in recess from 9:27 to

3      9:33.)

4      VIDEOGRAPHER:  We're back on the record.

5  The time is 9:34.

6      MS. LENT:  For the record, I wanted to

7  state that we did indicate in correspondence with

8  the plaintiffs that Mr. Vavoso would cover Topic 11,

9  but that was an oversight on our part.  That Topic

10  will be covered by another witness at a later date.

11      MR. ERWIG:  Thank you, Ms. Lent.

12      I'm going to screen share our next exhibit.

13  This will be from Folder 1.  This is 12/6/19, Cesnik

14  to Domondon.  Do you see this on the screen in front

15  of you, Mr. Vavoso?

16      (EXHIBIT 3 WAS MARKED FOR IDENTIFICATION.)

17      THE WITNESS:  Yes.

18      MR. ERWIG:  Q.  Who is Larry Cesnik?

19      A.  He's one of our employees that does market

20  research.

21      Q.  Who is Philip Domondon or Domondon?

22      A.  I do not know.

23      Q.  Do both Mr. Cesnik and Mr. Domondon appear

24  to have Intuitive Surgical e-mail addresses?

25      A.  Yes.

Highly Confidential

1      Q.  Does this appear to be an e-mail from Larry

2  Cesnik to Philip Domondon?

3      A.  It appears to be.

4      Q.  And there's a --

5         MS. LENT:  Alexander, I'm sorry to

6  interrupt.  But that's not the document that was

7  loaded to the -- the portal.

8         MR. ERWIG:  Maybe it will be the next one.

9         MS. LENT:  Uhm, okay.  Okay.  It will be

10  the attachment?

11         MR. ERWIG:  The next one will be the

12  attachment.  That's right.  Maybe the attachment

13  just uploaded.

14         MS. LENT:  Yeah, it would be great if they

15  can up -- put in the folder everything that we're

16  using.  I mean, the exhibit that's in the folder is

17  not exactly what you're putting on the screen.

18         MR. ERWIG:  No problem.  Sure.  It was a

19  one time oversight.

20         MS. LENT:  No, no, I just want to make sure

21  we get it cleared up because it could be a big

22  problem going forward if we don't fix that.

23         MR. ERWIG:  Q.  Sure.  Now, Mr. Vavoso, on

24  the bottom right corner of this e-mail there's a

25  label Intuitive dash and some numbers.  Do you see

Highly Confidential

1  that?

2     A.  Yes.

3     Q.  Do you have an understanding of what that

4  means.

5     A.  No.

6     Q.  Is it your understanding that Intuitive

7  produced this document to the plaintiff in this

8  litigation?

9     A.  I -- I see you showing it as some sort of

10  document that was produced for this.

11        MR. ERWIG:  I'm going to take this exhibit

12  down.  That was Exhibit 3.  Our next exhibit will be

13  Exhibit 4, that will be 12/6/19 Attach to Cesnik to

14  Domondon.

15        (EXHIBIT 4 WAS MARKED FOR IDENTIFICATION.)

16        MR. ERWIG:  Q.  I'll screen share.  Can

17  you see this on the screen in front of you,

18  Mr. Vavoso?

19     A.  Yes.

20     Q.  I'll represent to you that this is the

21  attachment to that e-mail that we just looked at.  I

22  want to -- well, withdrawn.

23        Does this appear to be a slide deck labeled

24  U.S. patient messaging study results?

25     A.  The title states that.

1     Q.  And there's a line on the first slide that

2  states Intuitive market intelligence group.  Do you

3  see that?

4     A.  I do see that.

5     Q.  I want to turn to Slide 18 with you.  Does

6  this appear to be a slide labeled appendix?

7     A.  Slide says appendix.

8     Q.  And there's an image here of a -- what

9  looks to me like a kind of a four armed robot.  What

10  is that an image of?

11    A.  That is one component of the da Vinci --

12  one of the da Vinci systems.

13    Q.  When you say one component, is this the

14  component that actually performs the surgery on the

15  patient?

16    A.  Well, it's the entire integrated system

17  that performs and that executes the surgery, if you

18  will, through the surgeon.  But this would be what

19  we would call a patient side cart.

20    Q.  Want to move to Slide 19 with you.  See

21  this appears to be a picture of a surgeon, and

22  there's text on this slide that says, "Surgery can

23  be performed either as traditional open surgery or

24  as minimally invasive surgery."

25        Do you see that?

Highly Confidential

1    A.  I do.

2       Q.  Can you explain to the jury the difference

3    between traditional open surgery and minimally

4    invasive surgery?

5       A.  Traditional open surgery would be where

6    the -- you have a -- usually a large incision.

7    Surgeon is at the patient side.  Surgeon would have

8    their hands inside the body to perform that surgery,

9    either removing tissue or removing organs, as

10   compared to a minimally invasive procedure, where

11   the procedure is done through small port access

12   incisions.  Surgeon would not have their hands

13   inside the patient.

14      Q.  Now, the next slide, Slide 19, says that

15   the incisions for open surgery can range from three

16   to four inches to very large depending on the

17   procedure being performed.

18        Do you see that?

19   A.  Yes.

20      Q.  Can you give me some sort of a -- some sort

21   of a benchmark or a yardstick as to how -- how large

22   the large end of incisions would be for open

23   surgery?

24        MS. LENT:  Object to the form.

25        THE WITNESS:  Can you -- can you restate

Highly Confidential

Page 27

1  the question, Alexander?

2      MR. ERWIG:  Q.  Sure.  Well, standard

3  ruler has 12 inches.  About how long are the

4  incisions for open surgery compared to, say, a

5  standard one-foot ruler?

6      MS. LENT:  Object to the form.

7      THE WITNESS:  You know, open surgery can

8  vary greatly on size of that incision depending on

9  the type of procedure that you're talking about.

10  It's really, uhm, procedure-specific.

11      MR. ERWIG:  Q.  Sure.  The slide says that

12  there's a range, right, from three to four inches to

13  very large.  I just want to get a sense with you of

14  what that very large incision looks like.  What --

15  what is the largest incision that you're aware of

16  that can be made during open surgery?

17      MS. LENT:  Object to the form.

18      THE WITNESS:  Take a cardiac surgery as an

19  example, you could see an incision that runs from

20  the base of the neck all the way to just above the

21  belly button and chest is cracked.  And that would

22  be a pretty large incision.

23      MR. ERWIG:  Q.  Would that be about a foot

24  or a little bit more, or about how big would that

25  be?

1        MS. LENT:  Object to the form.

2        THE WITNESS:  It can vary.  Depends on the

3   size of the patient.  Uhm, some patients it might

4   be, uhm, 18 inches.  Other patients it might be

5   30 inches depending on the size of the patient.

6        MR. ERWIG:  Q.  So 30 inches, that might

7   be a little more than kind of two rulers stacked

8   together, right?  A standard ruler would be

9   12 inches; two of those, 24.  So it's a pretty big

10  incision, right, depending on the patient?

11    A.  Yes.

12        MS. LENT:  Object to the form.

13        MR. ERWIG:  Q.  Now, for -- withdrawn.

14        And that big incision, that can leave a

15  pretty sizable scar on the patient, right?

16        MS. LENT:  Objection.

17        THE WITNESS:  What do you mean by big scar?

18        MR. ERWIG:  Q.  Well, I mean if you have a

19  30-inch incision, when that heals you would have

20  potentially a 30-inch or a large scar on your chest

21  taking the cardiac surgery example, right?

22        MS. LENT:  Objection.

23        THE WITNESS:  Yes, possible.

24        MR. ERWIG:  Q.  Now, I want to turn to the

25  next slide with you.  Says that minimally invasive

Highly Confidential

1  surgery involves one to five small incisions

2  typically less than an inch in length made to access

3  the inside of your body with a camera and other

4  instruments.

5      Do you see that?

6  A.  Yes.

7  Q.  Now, less than an inch in length, is

8  that -- can you give me some sort of a benchmark as

9  to how small those incisions would be?  Is it the

10  very tip of your pinky?  Is it a 50-cent piece?

11  About how big are those incisions?

12      MS. LENT:  Objection.

13      THE WITNESS:  It could be 10 millimeters.

14  It could be up to 3 millimeters -- or

15  30 millimeters.

16      MR. ERWIG:  Q.  What's the largest

17  incision that's made in minimally invasive surgery,

18  to your knowledge?

19      MS. LENT:  Objection.

20      THE WITNESS:  It could vary.  In -- in --

21  some surgeons might describe a -- even a hand assist

22  surgery where they might be removing an organ and

23  they make an incision, that might be three inches to

24  remove that organ.  But they would define that as

25  minimally invasive surgery.

Highly Confidential

1          MR. ERWIG:   Q.  The slide says that

2    typically the one to five small incisions made in

3    minimally invasive surgery, those are less than an

4    inch in length, right?

5          MS. LENT:  Objection; asked and answered.

6          THE WITNESS:  That's what it says on the

7    slide, yeah.

8          MR. ERWIG:  Now, if a surgeon's removing an

9    organ, is the surgeon actually reaching their hand

10   inside the patient and taking the organ out, or are

11   they doing that with minimally invasive type of

12   equipment?

13          MS. LENT:  Objection; vague.

14          THE WITNESS:  It can depend on -- on the

15   procedure itself.  Generally, they're not putting

16   their hand in the patient if it's classified as a

17   minimally invasive procedure.

18          MR. ERWIG:   Q.  Now, the next slide has

19   two segments, one a laparoscopy, and the other one

20   is robotic assisted surgery.  You see that?

21      A.  I see the picture, yes.

22      Q.  And you see that on the left side of the

23   picture there's a -- an image with a caption

24   laparoscopy, right?

25      A.  Yes.

Highly Confidential

1      Q.  On the right side of this image there's

2   picture of a surgeon and the caption robotic

3   assisted surgery.  You see that?

4      A.  Yes.

5      Q.  And, in fact, there's a line of text on

6   this slide that says, "There are two types of

7   minimally invasive surgery, laparoscopy and robotic

8   assisted surgery."

9        Do you see that?

10     A.  Yes.

11     Q.  What is laparoscopy?

12     A.  Laparoscopy is considered to be, again,

13  port access, small incision.  It would be considered

14  minimally invasive -- a minimally invasive

15  procedure.  Surgeon in typical laparoscopy is using

16  handheld instrumentation, typically straight rigid

17  instruments inserted through a port access through a

18  body wall.  And the surgeon has a monitor that she

19  could be looking at to do that procedure, and there

20  would be a video or endoscope inserted through

21  another port access that would give that camera view

22  on the monitor.

23     Q.  About how many -- well, withdrawn.

24        In laparoscopy the surgeon manipulates

25  instruments directly with their hands; is that

1  right?

2     A.  Yes.

3     Q.  And the -- the instruments used in a

4  traditional laparoscopy, what -- what are those

5  instruments called?

6        MS. LENT:  Objection.

7        THE WITNESS:  Can you be more specific?

8        MR. ERWIG:  Q.  Sure.  Let me back up.

9  Let me ask a better question.  Can you describe for

10  me the instruments that are used in a traditional

11  laparoscopy?

12       MS. LENT:  Objection.

13       THE WITNESS:  Many different types of

14  instruments used.  They could be graspers.  They

15  could be needle drivers, could be cautery devices.

16  There's a variety of different cautery devices that

17  could be used.  Just to name a few.

18       MR. ERWIG:  Q.  Now, I want to talk to you

19  about robotic assisted surgery.  In robotic assisted

20  surgery from a da Vinci robot there's four arms on

21  the robot that can perform the surgery; is that

22  right?

23    A.  When you say four arms performing the

24  surgery, are you referring to a particular robotic

25  system?

Highly Confidential

1    Q.  Uhm, well, the da Vinci SI and the XI, for

2  example, those each have four arms to perform the

3  surgery; is that right?

4    A.  They -- they have four arms, but those arms

5  function slightly different between da Vinci SI and

6  da Vinci XI.

7    Q.  They're still four arms that are involved

8  in the surgery -- in a surgery with the da Vinci SI,

9  right?

10    A.  There can be.

11      MS. LENT:  Object to the form.

12      MR. ERWIG:  Q.  There can also be four

13  arms involved in a surgery with a da Vinci XI as

14  well, right?

15    A.  It can be up to four arms.  Yes.

16    Q.  And does the surgeon directly manipulate

17  those arms with their hands, or how does that work?

18      MS. LENT:  Objection.

19      THE WITNESS:  At what -- at what point in

20  the procedure?

21      MR. ERWIG:  Q.  Well, when you're -- you

22  mentioned that in a traditional laparoscopy the

23  surgeon is inserting instruments directly into

24  the -- into the patient, right?

25    A.  Yes.

1    Q.  In the robotic assisted surgery, is the

2   surgeon sitting in a console manipulating the

3   robotic arms?

4    A.  Procedure has a beginning and an end.  And

5   in the beginning set up of that system, the surgeon

6   or an assistant would be inserting and setting up

7   the orientation of those arms and the instrument

8   within the body.  Once that's done, the surgeon

9   would, for the remainder of the procedure, operate

10  from what we call a surgeon console and is

11  manipulating those remotely from that surgeon

12  console within the operating room.

13    Q.  Can you describe for me what that surgeon

14  console looks like?

15    A.  It has a left and right manipulator, which

16  allows the surgeon to put their hands on the

17  manipulator and fingers in essentially a sort of a

18  grasper or forcep type finger grips.  And the system

19  has a viewer that the surgeon can put their head

20  into and then view the endoscopic view, which one of

21  those arms would be controlling that endoscope slash

22  camera view.

23        And on the -- the surgeon would be seated

24  at that console and on the floor are a set of pedals

25  that allow a variety of different movements and

1  manipulations of those arms on the robotic system

2  and the instruments themselves.

3      Q.  During a traditional procedure, is the

4  surgeon standing or is the surgeon seated?

5      A.  During a --

6          MS. LENT:  Objection.

7          THE WITNESS:  Tra- -- during a traditional

8  procedure, can you be more specific?

9          MR. ERWIG:  Q.  In a normal laparoscopy,

10  traditional laparoscopy, the surgeon's using the

11  traditional instruments.  Is the surgeon standing or

12  is the surgeon seated when he's operating on the

13  patient?

14         MS. LENT:  Objection.

15         THE WITNESS:  Typically they would be

16  standing.

17         MR. ERWIG:  Q.  Then the da Vinci surgery,

18  the surgeon would be seated at a console; is that

19  right?

20     A.  Yes.

21     Q.  It's one of the advantages of that approach

22  that the da Vinci surgery reduces surgeon fatigue?

23     A.  Some surgeon might describe that it reduces

24  fatigue.

25     Q.  Intuitive itself markets the da Vinci as

1    reducing surgeon fatigue, right?

2        A.  I think there's a number of publications

3    that have addressed physician fatigue and have

4    measured that.  We certainly do discuss those.

5        Q.  And about how long is a laparoscopy or a

6    robotic assisted surgery?

7            MS. LENT:  Objection.

8            THE WITNESS:  It can vary greatly.  Again,

9    depending on the type of procedure, the patient

10   themselves, the state of disease.  Might be as short

11   as 20 minutes.  Some surgeries could be long as five

12   hours.

13           MR. ERWIG:   Q.  In a five-hour surgery, if

14   the surgeon has to stand for that whole time, that

15   can get pretty tiring, right?

16           MS. LENT:  Objection.

17           THE WITNESS:  You'd have to ask the surgeon

18   their fatigue level.

19           MR. ERWIG:   Q.  Well, it's standing for

20   five hours, that's certainly more fatiguing than

21   sitting down for five hours, right, just in terms of

22   strain on the body?

23           MS. LENT:  Objection.

24           THE WITNESS:  Can you repeat the question?

25           MR. ERWIG:   Q.  Sure.  Standing for five

1  hours, that's certainly more fatiguing than sitting

2  down for five hours for that same time period,

3  right, in terms of physical strain on the body?

4       MS. LENT:  Objection.

5       THE WITNESS:  I think some -- some surgeons

6  would describe it as more fatiguing.

7       MR. ERWIG:   Q.  Well, how about you, sir?

8  How would you describe it?

9       MS. LENT:  Objection.

10       THE WITNESS:  I've never done surgery, so

11  I -- hard to say.  I can answer if I were at my desk

12  standing or if I was at my desk sitting.  I do both,

13  and often stand for five hours and sometimes sit for

14  five hours.

15       MR. ERWIG:   Q.  And sitting for five

16  hours, that's generally less fatiguing than standing

17  for five hours, right?

18       MS. LENT:  Objection.

19       THE WITNESS:  It depends on the person,

20  situation, what you're doing.

21       MR. ERWIG:   Q.  I'm going to scroll to the

22  next slide with you.  This says, "In laparoscopy,

23  the surgeon uses instruments to perform the surgery,

24  including a thin lighted tube with a small video

25  camera at the end called a laparoscope to see inside

Highly Confidential

Page 38

1  the abdomen."

2      Do you see that?

3      A.  Yes.

4      Q.  How does the surgeon view the image from

5  the camera at the end of the laparoscope?

6      A.  The laparoscope is wired to a monitor that

7  would be in the operating room.  And they're viewing

8  that monitor.

9      Q.  So that would be like kind of looking at a

10  T.V. a little bit off to the side that's showing

11  sort of the camera picture of the laparoscope; is

12  that right?

13      A.  Yes.

14      Q.  Next slide says, "Special long rigid

15  instruments with tools at the end called straight

16  sticks used to perform the surgery."

17      Do you see that?

18      A.  I see that.

19      Q.  Does this appear to be a -- an instrument

20  that would be used for traditional laparoscopic

21  surgery?

22      A.  It appears to be.

23      Q.  This slide, Slide 25, says that the surgeon

24  and team view the procedure on a monitor usually in

25  2D similar to a normal television.  Do you see that?

Highly Confidential

1    A.  Yes.

2    Q.  In A traditional laparoscopy the surgeon is

3  looking at kind of a 2D image of the surgery as it's

4  progressing, right?

5    A.  Yes.

6    Q.  Now, the next slide says that in robotic

7  assisted surgery the surgeon uses the da Vinci

8  surgical system.  See that?

9    A.  Yes.

10    Q.  And the slide after that says that he or

11  she sits at a console during the procedure, views

12  anatomy in high definition 3D vision, and controls

13  the instruments.  Do you see that?

14    A.  Yes.

15    Q.  Can you explain what is meant by views

16  anatomy in high definition 3D vision?

17    A.  The high definition is considered to be a

18  1080 resolution signal and defined as high

19  definition, greater than the standard definition.

20  And the 3D vision comes from the viewer left and

21  right, and there are two different viewing channels

22  through that endoscope, a left channel and a right

23  channel.  And those images are left and right

24  brought together in a stereoscopic view, which

25  allows the surgeon to see depth.

Highly Confidential

1      Q.  Can the surgeon see depth in the same way

2   with the traditional 2D laparoscopic monitor?

3      A.  No.

4      Q.  That's unique to a surgery performed using

5   the da Vinci console, right?

6         MS. LENT:  Objection.

7         THE WITNESS:  No.

8         MR. ERWIG:  Q.  In what way -- withdrawn.

9         Why is the answer no?

10      A.  It's not unique to da Vinci.  There are

11   other 3D vision systems out there that are used in

12   laparoscopic surgery.

13      Q.  Well, in traditional laparoscopic surgery

14   the image is 2D, right?

15      A.  I think it depends -- depends on the time

16   period you're talking.  You said 15 years ago what

17   was the vision, likely two dimensions.  Today, there

18   are other options out there around vision that are

19   used in laparoscopy that provide three-dimensional

20   viewing on the monitor.

21      Q.  Well, this slide deck's from

22   December 6th, 2019, right?

23         MS. LENT:  Objection.

24         THE WITNESS:  I didn't see the date on the

25   slide.

Highly Confidential

1          MR. ERWIG:   Q.  One of the advantages of a

2    da Vinci surgery relative to a traditional 2D

3    laparoscopy is that uses 3D vision and lets the

4    surgeon see depth rather than just a flat monitor

5    screen, right?

6          MS. LENT:  Objection.

7          THE WITNESS:  As compared to 2D, yes.

8          MR. ERWIG:   Q.  Scroll to the next slide

9    which says, "The instruments bend and rotate further

10   than a human hand."

11          Do you see that?

12    A.  I do.

13     Q.  Now, the instruments in a traditional

14    laparoscopy, those are those straight stick

15    instruments that we looked at a little bit earlier,

16    right?

17    A.  Yes.

18     Q.  And the surgeon manipulates those from the

19    outside of the body and can turn them or move them

20    forward and backward, right?

21    A.  And grasp or not grasp, yes.

22     Q.  One of the advantages of the da Vinci

23    system is that the instruments themselves can rotate

24    and bend more than the human hand outside of a human

25    body can; is that right?

1    A.  It -- it -- again, moment in time.  There

2   are now laparoscopic instruments that have bending

3   motion to them.  And so compared to a straight

4   stick, which is what -- a rigid instrument that you

5   showed on the prior slides, that would be an

6   advantage.  But there are laparoscopic instruments

7   now that can bend and be manipulated in a -- in a

8   bending fashion by the surgeon at the patient side.

9    Q.  Well, they certainly don't have the same

10   range of motion that the instrument used by the

11   da Vinci XI, for example, that those instruments

12   would, right?

13       MS. LENT:  Objection.

14       THE WITNESS:  I don't know.

15       MR. ERWIG:  Q.  Intuitive aware of any

16   instruments that have the same range of motion as

17   the EndoWrists on the da Vinci XI?

18       MS. LENT:  Objection.

19       THE WITNESS:  I don't know the range of

20   motion of those other instruments, but the general

21   motion that you had described now exists.

22       MR. ERWIG:  Q.  Now, the next slide says

23   that the instruments are attached to a patient side

24   cart and mimic every hand movement made by the

25   surgeon at the console.  Do you see that?

Highly Confidential

1    A.  I do.

2    Q.  So when the surgeon is sitting at the

3  console, can you explain for me how the surgeon's

4  movements translate into the robotic arms of the

5  da Vinci system?

6    A.  You have a -- for the full integrated

7  system, the patient cart is connected to the surgeon

8  cart -- or the surgeon console where the surgeon is

9  seated.  There's also a vision cart, also one of the

10  components of the system.  And those are all

11  connected via fiberoptics.

12       And so the motion of the surgeon's hands at

13  the console as she moves her wrists or moves her

14  arms, that is replicated through lots of algorithms

15  that control the instrument insertion, rotation,

16  flex of that instrument within the body.

17    Q.  And in contrast to a traditional surgery,

18  where the surgeon's actually physically manipulating

19  each instrument, in the case of a da Vinci surgery,

20  the surgeon's doing that remotely from a console,

21  right?

22    A.  When you say traditional surgery, what do

23  you mean?

24    Q.  A tradition laparoscopy.

25    A.  Traditional laparoscopy with a straight

1  stick or a flexible laparoscopy?

2      Q.  Well, either one, right?

3      A.  I'm sorry.  Can you repeat the question?

4      Q.  Sure.  In a traditional laparoscopy, the

5  surgeon's directly manipulating the instruments,

6  right?

7      A.  Yes, at the patient side.

8      Q.  And the -- in the da Vinci robotic assisted

9  surgery, the surgeon is manipulating those

10  instruments from afar, from a console, right?

11      A.  Yes.

12      Q.  Stop screen sharing this exhibit.  Screen

13  share with you some notes that I've taken during our

14  discussion.  See on the left-hand side there's a

15  column titled laparoscopy.  You see that?

16      A.  I see that.

17      Q.  On the right-hand side there's a column

18  labeled robotic assisted surgery.  You see that?

19      A.  Yes.

20      Q.  And the da Vinci -- for the da Vinci XI and

21  SI, there's four robotic arms involved in that

22  surgery, right?

23      MS. LENT:  Objection; misstates the

24  testimony.

25      THE WITNESS:  It doesn't have to be four

Highly Confidential

1  arms.  It could be up to four arms.

2      MR. ERWIG:  Q.  Well, the da Vinci robot

3  certainly has four arms that are available during a

4  surgery, right?

5      A.  Capable of being available.  Up to four

6  arms.

7      Q.  And the surgeon only has two arms available

8  at any time, right, in a traditional laparoscopy?

9      A.  Alongside their usually assistant, yes.

10     Q.  But the surgeon himself can't -- you know,

11  can't grow more arms to be involved in the surgery,

12  right?

13     A.  No, but they can add more assistants to the

14  procedure.

15     Q.  Now, in a traditional laparoscopy, the

16  surgeon manipulates the instruments with their hands

17  directly and they're usually standing, right?

18     A.  Yes.

19     Q.  In a robotic assisted surgery with a

20  da Vinci, the surgeon, for large part of the

21  procedure, operates the da Vinci robot from a

22  surgeon console and is seated during that process,

23  right?

24     A.  Yes.

25     Q.  Now, in a traditional laparoscopy, there's

1   a camera that's on the actual ends of the

2   laparoscopic instruments, right?

3       A.  It depends on what kind of camera and

4   endoscope we're talking about.

5       Q.  Well, in a traditional laparoscopic

6   surgery, there would be a camera on the end of an

7   endoscope, and it would transfer a signal to a

8   monitor, right?

9       MS. LENT:  Objection.

10      THE WITNESS:  It would transfer it to a 3D

11   or 2D monitor, yes.

12      MR. ERWIG:  Q.  Well, typically it would

13   transfer to a 2D monitor, right?

14      MS. LENT:  Objection.

15      THE WITNESS:  Can you define typically?

16      MR. ERWIG:  Q.  Well, sure.  In the -- in

17   traditional laparoscopic surgery, the image that's

18   appearing on a normal kind of T.V. screen monitor,

19   that would be a 2D image, right?

20      MS. LENT:  Objection.

21      THE WITNESS:  It could be either a 3D or 2D

22   vision system.

23      MR. ERWIG:  Q.  Well, how can you display

24   a 3D image on a -- just a normal monitor, normal

25   T.V. screen?

Highly Confidential

1    A.  The technology exists to do that or the

2    surgeon can wear 3D glasses or wear a headset at the

3    patient side.

4    Q.  Typically when the endoscope -- when it's

5    the actual endoscope that's transmitting a signal to

6    another monitor, that signal would be 2D, right?

7         MS. LENT:  Objection.

8         THE WITNESS:  It depends, as we discussed.

9    It -- it could be -- it could be a 3D signal, or it

10   can be a 2D signal.

11        MR. ERWIG:   Q.  Are you aware of the

12   general split in the market as to 2D and 3D signals

13   sent from traditional endoscopes?

14   A.  I'm aware.

15        MS. LENT:  Objection.

16        MR. ERWIG:   Q.  Can you give me a general

17   estimate of what percentage of traditional

18   laparoscopies are performed with the 2D vision

19   endoscope camera to monitor system?

20   A.  I would be guessing.

21   Q.  Do you have a best guess?

22   A.  No.

23   Q.  Now, the robotic assisted surgery from the

24   da Vinci SI and XI, the surgeon always sees high

25   definition 3D vision at the console, right?

Highly Confidential

1    A.  Typically, yes.

2    Q.  Another difference between traditional

3  laparoscopy and the robotic assisted surgery is that

4  typically the normal laparoscopy, that's done with

5  straight stick instruments, right?

6    MS. LENT:  Object to the form.  Misstates

7  the testimony.

8    THE WITNESS:  In laparoscopy, there are now

9  many choices of whether it could be straight sticks.

10  It could be instruments that have flexible wrists.

11    MR. ERWIG:   Q.  Now, one advantage of the

12  da Vinci system is that the actual instruments that

13  are used for the surgery, those can bend and rotate

14  further than the normal human hand can, right?

15    A.  Yes.

16    MR. ERWIG:  I'm going to mark as -- I

17  believe this is Exhibit 5, handwritten notes.

18    (EXHIBIT 5 WAS MARKED FOR IDENTIFICATION.)

19    MS. LENT:  While you're taking that down, I

20  object, for the record, to Exhibit 4 as not

21  reflecting the witness's testimony.

22    MR. ERWIG:  I believe Exhibit 4 was the

23  attachment to the PowerPoint.  So if you --

24    MS. LENT:  Oh --

25    MR. ERWIG:  Exhibit 5?

1         MS. LENT:  I will say I object to Exhibit 5

2    because it doesn't accurately reflect the witness's

3    testimony, and I don't have these exhibits on the

4    exhibit share.  So I continue to object that you're

5    not putting all the exhibits in the exhibit share

6    folder the way we are supposed to.

7         MR. ERWIG:  Q.  I'll get those scanned in

8    at the next break.  Stop screen sharing.

9         Now, Mr. Vavoso, for the actual surgical

10   robot, I understand there's instruments called

11   EndoWrists; is that right?

12      A.  Yes.

13      Q.  What is an EndoWrist?

14      A.  EndoWrist would be a brand name, but what

15   that -- those instruments -- what's described are

16   instruments that are part of a da Vinci system.  Can

17   be attached to the patient's cart and can have a

18   variety of motion.  Some instruments bend.  Some are

19   straight stick.  But those instruments are

20   controlled by the surgeon at the surgeon console.

21      Q.  Those EndoWrists, they have a number of

22   different attachments, right?  There's a forceps,

23   for example, right?

24      A.  Forceps would be one of the types of

25   instruments.

Highly Confidential

1      Q.  There can be some -- some Potts scissors,

2   right?

3      A.  Potts scissors would be another.

4      Q.  Those would all be different types of

5   EndoWrists that attach to the Intuitive surgical

6   robot; is that right?

7      A.  Yes.

8      Q.  And those EndoWrists are sold separately

9   from the da Vinci surgical robot; is that right?

10      A.  As separately, meaning -- can you define

11   that?

12      Q.  Well, sure.  If a customer wants to operate

13   a da Vinci surgical system, that customer first has

14   to purchase the da Vinci surgical robot, right?

15      MS. LENT:  Objection.

16      THE WITNESS:  The -- the customer does

17   purchase the system, uhm, and then the agreement

18   part of that purchase includes instruments or

19   accessories.

20      MR. ERWIG:  Q.  The customer has to

21   purchase instruments and accessories separately from

22   the actual da Vinci robot, right?

23      MS. LENT:  Objection.

24      THE WITNESS:  Over time, after they've made

25   the initial da Vinci purchase, they're -- ongoing

Highly Confidential

1  they're purchasing instruments to be used with the

2  system.

3         MR. ERWIG:  Q.  So the purchase of those

4  ongoing instruments, you're not buying an additional

5  robot each time, right?  You're just buying new

6  EndoWrists for the robot that you already own; is

7  that right?

8      A.  You're not buying a robot each time,

9  correct.

10     Q.  Does Intuitive make profits from the sale

11  of its da Vinci surgical robots?

12     A.  Yes.

13     Q.  About how much is Intuitive's profit for

14  da Vinci robots sold?

15     A.  It can vary depending on what is purchased,

16  what kind of system is purchased.  Variety of

17  factors go into what would be -- what would be the

18  profit on a sale.

19     Q.  Well, let's -- let's break it down.  For

20  the da Vinci SI, what's the general profit on a --

21  the sale of a da Vinci SI system to a hospital, for

22  example?

23     A.  Profit as measured by what measure?

24     Q.  Well, the cost of goods to make the

25  da Vinci robot and the sale price of the da Vinci

Highly Confidential

1  robot to the hospital.  Let's use that measure.

2       MS. LENT:  Objection.

3       THE WITNESS:  Yeah, I -- so, you know, as

4  you describe cost of goods sold versus the price,

5  again, it can vary because hospitals buy system.

6  Those prices are negotiated.  The profit can vary

7  customer to customer.

8       MR. ERWIG:  Q.  But Intuitive makes a

9  profit on all of their sales, right?

10      A.  They do.

11      Q.  And Intuitive also makes a profit on all of

12  the sales of the XI da Vinci robot, right?

13      A.  Yes.

14      Q.  Intuitive also makes profits from the sale

15  of its EndoWrists; is that right?

16      A.  Yes.

17      Q.  About how much profit does Intuitive make

18  from the sale of a single EndoWrist?

19      A.  Again, sort of depends on the definition of

20  profit versus operating income.  It can -- it can

21  vary by instrument or instrument type.

22      Q.  There's some different pricing for

23  different types of EndoWrists; is that right?

24      A.  There's -- say that question again?

25      Q.  Well, so there's a number of different

1  types of EndoWrists that Intuitive sells, right?

2      A.  Yes.

3      Q.  Some are of the graspers that we talked

4  about earlier, right?

5      A.  Yes.

6      Q.  Or another one would be the Potts scissors,

7  right?

8      A.  Potts scissors could be one.

9      Q.  Those different types of instruments, they

10  might have different prices that Intuitive charges,

11  right?

12      A.  They would.

13      Q.  Now, for each instrument that Intuitive

14  sells, Intuitive makes a profit on the sale of that

15  instrument, right?

16      A.  Yes.

17      Q.  Now, traditional laparoscopic instruments,

18  those can't be used with -- withdrawn.

19          Traditional laparoscopic instruments can't

20  be used with the da Vinci surgical system, right?

21      A.  Not -- they can't be used as attached to

22  the da Vinci system.  They may, in many procedures,

23  be used alongside of the da Vinci system.

24      Q.  Well, let me back up and just make sure

25  that we have the EndoWrists and the actual system

Highly Confidential

Page 54

1  clear.  Now, how does the EndoWrist attach to the

2  da Vinci surgical system?

3      A.  The -- there's a patient side cart that has

4  a number of arms.  There's a carriage mechanism on

5  the -- on the arm of that patient side cart, and the

6  instrument is put into that carriage and engages

7  with the patient side cart.

8      Q.  So kind of, in simple terms, you would take

9  an instrument and you would attach it to each

10  individual arm of the da Vinci so you could have,

11  for example, four different types of EndoWrists on

12  each of the four different arms, right?

13      A.  You would have the instruments attached.

14  Though one of those arms is holding the camera, not

15  an instrument.

16      Q.  I understand.  So you would have one arm

17  with a camera that's providing that 3D vision to the

18  surgeon, right?

19      A.  Yes.

20      Q.  And then the other three arms, those can be

21  outfitted with different types of EndoWrists, right?

22      A.  Up to three arms could be outfitted with

23  those EndoWrist instruments, yes.

24      Q.  You could have different EndoWrists on each

25  one of those arms, right?

Highly Confidential

Page 55

1    A.  Yes.

2    Q.  And if you want to swap out an EndoWrist

3  how does -- how does that process work?

4    A.  There is an assistant at the patient side

5  that would do the instrument exchange.

6    Q.  And when you're swapping out an EndoWrist,

7  you would swap that out for another EndoWrist,

8  right?

9    A.  Yes.

10    Q.  You wouldn't, for example, take a

11  traditional laparoscopic straight stick instrument

12  and swap it out with the EndoWrist, right?

13      MS. LENT:  Objection.

14      THE WITNESS:  Yeah, you would not attach

15  the laparoscopic instrument to the patient's side

16  cart.

17      MR. ERWIG:   Q.  And, in fact, you wouldn't

18  attach anything other than an EndoWrist to the

19  patient side cart besides the camera, right?

20    A.  Uhm, there are other third-party devices

21  that could get attached.  I just want to be clear on

22  the question.

23    Q.  Well, from Intuitive's perspective only --

24  only approved thing to attach to a -- to a da Vinci

25  robot would be an EndoWrist that Intuitive has sold

1  to the customer, right?

2      MS. LENT:  Objection.

3      THE WITNESS:  Again, I want to be specific

4  on the question.  Uhm, on the instrument attaching

5  to the arm of the system, that would be an

6  EndoWrist.  But I want to be clear that there are

7  other devices that attach to the instrument that is

8  now attached to the patient side cart.

9      MR. ERWIG:  Q.  Well, the four arms that

10  are on the patient side cart, let's just focus in on

11  those.  Those are the four arms we talked about.

12  One of those arms holding the camera for the

13  surgeon, right?

14      A.  Yes.

15      Q.  And then there's three other arms that are

16  available to have EndoWrists attached to them,

17  right?

18      A.  Yes.

19      Q.  Now, is there any other brand of attachment

20  that can be attached to those arms other than

21  EndoWrists?

22      A.  Some of those instruments have a -- other

23  company's brand associated with it.

24      Q.  What do you mean by that?

25      A.  For example, we have a harmonic instrument

Highly Confidential

1  that is -- part of that instrument is designed by

2  another company and, in fact, the name harmonic is

3  not a da Vinci branded item.  It's another company's

4  branded item, but it is designed into that harmonic

5  EndoWrist -- it's not an EndoWrist -- considered to

6  be an EndoWrist because it does not flex.  That's

7  the rigid instrument that is attached to the

8  da Vinci system.

9      Q.  And that would be one of the EndoWrists

10  that Intuitive would sell to its customers, right?

11      MS. LENT:  Objection.

12      THE WITNESS:  That particular one is not

13  called an EndoWrist because it doesn't have a

14  flexible wrist.  But, yes, we would take that

15  instrument, that harmonic instrument, and we would

16  sell that to the customer.

17      MR. ERWIG:  Q.  Where can hospitals that

18  have a da Vinci surgical robot -- let's just focus

19  in on the SI and the XI, where can they buy

20  EndoWrists from?

21      A.  They can buy those instruments from

22  Intuitive Surgical.

23      Q.  Anywhere else?

24      A.  In the United States, right?

25      Q.  Correct.

Highly Confidential

1    A.  No, Intuitive Surgical.

2    Q.  Now, there's separate demand for EndoWrists

3  and for da Vinci surgical robots, right?

4        MS. LENT:  Objection.

5        THE WITNESS:  Can you describe separate

6  demand?

7        MR. ERWIG:  Q.  Sure.  Let me ask a better

8  question.  When the hospital is looking at buying a

9  da Vinci surgical robot, they're not deciding

10  between, let's say, a da Vinci surgical robot and

11  buying an EndoWrist, right?

12    A.  No.

13        MS. LENT:  Objection.

14        THE WITNESS:  They're -- they're buying

15  into the full da Vinci system.

16        MR. ERWIG:  Q.  So the first step for the

17  customer is they'll buy a da Vinci surgical robot,

18  like the SI or XI, right?

19        MS. LENT:  Objection; asked and answered.

20  Misstates his testimony.

21        THE WITNESS:  No.

22        MR. ERWIG:  Q.  Are there any competitors

23  that manufacture EndoWrists that can be used with

24  Intuitive's da Vinci robots?

25    A.  I'll go back, you know, there are --

Highly Confidential

Page 59

1  there's an example of -- there are components that

2  are manufactured and then integrated into a da Vinci

3  instrument sold through Intuitive to the end user.

4      Q.  Is there any other company that sells --

5  withdrawn.

6        Is there, to Intuitive's knowledge, any

7  company other than Intuitive that sells devices that

8  can be used with the da Vinci XI or SI?

9      A.  Not directly sold to an end user.

10     Q.  In fact, the only entity that sells

11  EndoWrists to hospitals is Intuitive Surgical,

12  right?

13        MS. LENT:  Objection.

14        THE WITNESS:  Yes.

15        MR. ERWIG:  And just under an hour, but I

16  think it's a good time for a break.  So let's go off

17  the record.

18        VIDEOGRAPHER:  Off record.  The time is

19  10:30.

20        (The deposition was in recess from 10:29 to

21        10:40.)

22        VIDEOGRAPHER:  This is the beginning of

23  Media No. 2 in the deposition of Glenn Vavoso.  We

24  are back on the record.  The time is 10:41.

25        MR. ERWIG:  I'm going to screen share the

Page 60

1   next exhibit.  This will be Exhibit 6.  In Folder 1,

2   it's titled Value and Barriers.

3        (EXHIBIT 6 WAS MARKED FOR IDENTIFICATION.)

4        MR. ERWIG:   Q.  Can you see this on the

5   screen in front of you, Mr. Vavoso?

6        A.  I do.

7        Q.  Does this appear to be an Intuitive

8   Surgical PowerPoint presentation entitled value and

9   barriers?

10       A.  It does.

11       Q.  I want to talk to you about the second

12   slide, which reads, "Current procedure penetration

13   in U.S."

14        Do you see that?

15       A.  Are you able to zoom in a little on it?

16       Q.  Just about to ask you.  Yes, I can make

17   that bigger for you.  How's that?

18       A.  Thank you.  Yes.  And what's the date of

19   this document?

20       Q.  Uhm, it's 5/18.  So -- so my guess that

21   would be -- I'm not sure if that's May 18th or --

22   but my -- my question is, in -- do you see there's a

23   list of procedures here, including a colon

24   resection, a lobectomy, a hysterectomy, and so

25   forth?

Highly Confidential

1    A.  I see that.

2    Q.  Are there any procedures out of the ones --

3  withdrawn.

4        Are there any procedures other than the

5  ones listed on this slide that the da Vinci SI or XI

6  can perform?

7    A.  Yes.

8    Q.  What are those procedures?

9    A.  I think there's a number of -- the ones

10  that I can recall, uhm, beyond this list would be

11  mitral valve repair, uhm, cholecystectomy.

12    Q.  Now, there's a slide here later on that's

13  labeled Slide 3 that says, "Procedures where we have

14  proven interest."

15        Do you see that?

16    A.  I see the slide.  It's hard to read.

17    Q.  Sure.  I can zoom in again.  Do these

18  appear to be all the procedures that Intuitive is

19  aware of that the da Vinci SI and XI can be used

20  for?

21        MS. LENT:  Going to object to the form.

22        THE REPORTER:  (Clarification.)

23        THE WITNESS:  There are several other

24  procedures that are not on here that da Vinci can

25  perform.

Highly Confidential

1          MR. ERWIG:   Q.  Has the FDA authorized the

2   da Vinci SI or the da Vinci XI to perform any

3   procedure other than minimally invasive soft tissue

4   surgery?

5          A.  Yeah, that, again, that's a -- it's a --

6   soft tissue surgery is a very broad -- the FDA will

7   approve specific indications even under that soft

8   tissue surgery broad category.

9          Q.  As Intuitive's 30(b)(6) witness, are you

10   able to identify the surgeries that Intuitive's

11   da Vinci SI has FDA approval for?

12          MS. LENT:  Objection; not --

13          THE WITNESS:  There are --

14          MS. LENT:  -- one of the topics.

15          THE WITNESS:  Can you repeat the question,

16   please?

17          MR. ERWIG:   Q.  Well, let me -- let me ask

18   it slightly differently.  The da Vinci SI and XI has

19   FDA approval to perform set of minimally invasive

20   soft tissue robotic surgeries, right?

21          A.  Yes.

22          Q.  Stop screen sharing this exhibit.  What

23   other -- withdrawn.  And the da Vinci robot has some

24   differences from a traditional -- withdrawn.

25          The da Vinci SI and XI have some

Page 63

1  differences from traditional laparoscopic surgery,

2  right?

3        MS. LENT:  Objection; vague.

4        THE REPORTER:  (Clarification.)

5        THE WITNESS:  Can you -- can you be

6  specific on the differences?

7        MR. ERWIG:  Q.  Well, first I want to --

8  at a general level, there's differences between

9  the -- a traditional laparoscopic surgery and the

10  da Vinci -- and a laparoscopy performed by a

11  da Vinci robot, right?  Well -- withdrawn.

12        There's differences in surgery that uses a

13  da Vinci robot and a minimally invasive soft tissue

14  surgery that does not use a da Vinci robot, right?

15        MS. LENT:  Objection; vague.

16        THE WITNESS:  Can you restate the question,

17  please?

18        MR. ERWIG:  Q.  Well, we talked earlier,

19  sir, about traditional laparoscopy, right?

20    A.  Yes.

21    Q.  And we also discussed the way in which

22  surgery with a da Vinci robot is performed, right?

23    A.  Yes.

24    Q.  Specifically the da Vinci SI and XI, right?

25    A.  Yes.

Highly Confidential

Page 64

1      Q.  Now, there's some differences between the

2   way that surgery is performed in the traditional

3   manner and the way that it's performed with a da

4   Vinci SI and XI, right?

5          MS. LENT:  Objection.

6          THE WITNESS:  There are differences.

7          MR. ERWIG:  I'm going to screen share our

8   next exhibit.  This will be from Folder 2.  This

9   will be 8/3/17 Stoffel to Bischoff and Vavoso.  Mark

10  this as Plaintiff's Exhibit 7.

11          (EXHIBIT 7 WAS MARKED FOR IDENTIFICATION.)

12          MR. ERWIG:  Q.  You see this on the screen

13  in front of you?

14      A.  Yes.

15      Q.  Do you recognize this?

16      A.  It's -- it's been some time.  Sort of the

17  context of it, I recognize it.  Can't say I recall

18  the specific e-mail directly, but the context.

19      Q.  Sure.  Does this appear to be an e-mail

20  from David Stoffel at Intuitive Surgical and Paige

21  Bischoff and copying yourself and Gary Guthart and

22  others from Intuitive?

23      A.  Yes.

24      Q.  And this e-mail was sent on

25  August 3rd, 2017.  You see that?

Highly Confidential

Page 65

1    A.  Yes.

2    Q.  And there's an attachment to this that's

3  labeled preparation for industry panel discussion

4  V3.docX.

5      Do you see that?

6    A.  Yes.

7    Q.  Did you receive this e-mail and the

8  attachment to this e-mail?

9    A.  Likely did, yes.

10    MR. ERWIG:  I'm going to stop screen

11  sharing this exhibit.  Our next exhibit will be

12  Exhibit 8.  That will be the attachment to that

13  e-mail.  It's labeled Attach to Stoffel to Bischoff

14  and Vavoso.  Screen share this with you.

15    (EXHIBIT 8 WAS MARKED FOR IDENTIFICATION.)

16    MR. ERWIG:  Q.  Do you recognize this

17  document?

18    A.  Yes.

19    Q.  How do you recognize it?

20    A.  I -- this was a -- I recognize that this

21  was a preparation document for a panel discussion at

22  a society surgeon led meeting.

23    Q.  And you're listed under the Intuitive

24  Surgical -- well, withdrawn.

25      Your name's listed next to Intuitive

Highly Confidential

Page 66

1  Surgical, can you explain what that means?

2     A.  This was a -- this was for a meeting hosted

3  by a surgeon and a society of -- I believe it was

4  Bariatrics conference in Texas, and I was due to be

5  a part of an industry panel.  That surgeon had

6  invited a number of companies to participate at, and

7  those are the list of the companies and the -- and

8  those that were to present in.

9     Q.  What was the purpose of that industry

10  panel?

11     A.  It was going to be facilitated by the

12  physician just to get dialogue, uhm, about robotic

13  surgery.

14     Q.  And when you were preparing for that panel,

15  can you describe to me how -- what your preparation

16  involved?

17     A.  It was one or two meetings of, you know,

18  what was the intent of that panel discussion.  This

19  document was a prep document for that, so going

20  through the various questions and what questions

21  could be asked.  It was a prep to think about what

22  might the dialogue be, and if that were the

23  dialogue, then how might -- might I answer that if I

24  were on the panel.

25     Q.  And you wanted to be sure that you prepared

Highly Confidential

1  to give answers to specific questions so that you

2  could represent sort of Intuitive's position on

3  things?

4       MS. LENT:  Objection.

5       THE WITNESS:  Yes.

6       MR. ERWIG:   Q.  Scroll down to one of the

7  questions.  You see question 12 is "Will Intuitive

8  ever go into laparoscopic surgery?"

9    A.  I see that.

10    Q.  And the answer that's on this document is

11  "We do not see ourselves in competition with

12  laparoscopy.  It's about the right tool for the

13  right job."

14       Do you see that?

15    A.  I see that.

16    Q.  Was it your understanding, as of this time,

17  that this reflected an accurate statement?

18    A.  I'm looking at the document.  It is a very

19  draft document that I'm -- I don't remember who

20  actually put the words down.  In fact, it looks like

21  it's being edited there just within this document.

22  Uhm, so I, you know -- I don't -- I don't recall

23  that as a --

24    Q.  It looks like there's some edits in the

25  margins on the right-hand side, right?

Highly Confidential

1      A.  Yes.  Hard to read, but I see the edits.

2      Q.  I can zoom in on them for you.  There's one

3   comment about that very sentence that we do not see

4   ourselves in competition with laparoscopy, right, by

5   PB6.  Do you see that?

6      A.  I do.

7      Q.  That Paige Bischoff?

8      A.  I -- unless there's another PB on the

9   e-mail, I would assume it to be.

10     Q.  And Paige writes, "Do we want to say this

11   first sentence or just go with the second," right?

12     A.  That's what it says.

13        MR. ERWIG:  And you mentioned that this was

14   still a work in progress.  So let's go ahead and

15   stop screen sharing this and take a look at the

16   final.  Exhibit 9 is going to be Final Attach to

17   Stoffel to Bischoff.

18        (EXHIBIT 9 WAS MARKED FOR IDENTIFICATION.)

19        MR. ERWIG:  Q.  See this on the screen in

20   front of you?

21     A.  Yes.

22     Q.  Does this appear to be the same document

23   minus the track changes on the right-hand side?

24     A.  Could you scroll through --

25        MS. LENT:  Objection.

Highly Confidential

1        MR. ERWIG:  Q.  You can scroll down and

2   take a look.  Looks like there's a page break that's

3   been removed as well, right?

4        MS. LENT:  Objection.

5        THE WITNESS:  Can you scroll to the end?

6        MR. ERWIG:  Q.  Sure.

7     A.  Appears to be a similar document --

8     Q.  The question -- I'm sorry.  I missed the

9   last part of that answer.

10     A.  I said it appears to be similar to the

11   draft that we just looked at with the exception of

12   the comments removed.

13     Q.  And --

14     A.  Edits.

15     Q.  Do you recognize this document as well?

16     A.  I recognize, yeah, the contents of the

17   document, yes.

18     Q.  Is it, again, the same -- withdrawn.

19        Is the document, again, titled preparation

20   for industry panel discussion?

21     A.  Yes.

22     Q.  And you're, again, listed as the

23   representative from Intuitive Surgical, right?

24     A.  I was supposed to be, yes.

25     Q.  Like we discussed with the other document,

Highly Confidential

1  you were preparing to give some remarks at an

2  industry panel discussion, right?

3      A.  I was supposed to, yes.

4      Q.  Now, question 12 on this document is "Will

5  Intuitive ever go into laparoscopic surgery," right?

6      A.  Yes.  That's what it says.

7      Q.  And will you read the answer for me that's

8  on that document?

9      A.  "We do not see ourselves in competition

10  with laparoscopy.  It is about the right tool for

11  the right job."

12      Q.  Anything else under that answer to question

13  12 on this document?

14      A.  No.

15      Q.  When you were attending that industry

16  meeting, were you intending to lie or misstate the

17  truth to anyone?

18          MS. LENT:  Objection.

19          THE WITNESS:  I didn't attend the meeting.

20          MR. ERWIG:   Q.  Did someone from Intuitive

21  attend the meeting?

22      A.  I believe so.

23      Q.  Who from Intuitive attended that meeting?

24      A.  Can you go back up to the list again?

25  David Stoffel.

1    Q.  David Stoffel have a -- well, withdrawn.

2        This document, this was sent to -- both to

3   David Stoffel and to you as well, right?

4        MS. LENT:  Objection; lacks foundation.

5        THE WITNESS:  Repeat the question, please?

6        MR. ERWIG:  Q.  Well, we looked earlier at

7   an e-mail from -- well, withdrawn.

8        Stop screen sharing this exhibit.  Now, the

9   document we've just looked at, the answer to will

10  Intuitive ever go into laparoscopy was we do not see

11  ourselves in competition with laparoscopy, right?

12       MS. LENT:  Objection; asked and answered.

13       THE WITNESS:  The document stated that.

14       MR. ERWIG:  Q.  As of that time, did you

15  have a different view?

16    A.  Stepped on you.  Please repeat.

17    Q.  As of the time of that document, as you

18  were putting together those prep notes for the

19  industry meeting, did you have a different belief on

20  that question?

21    A.  Different that -- can you be more specific

22  on what you're referring to as difference?

23    Q.  Well, sure.  The question -- question 12

24  asks does Intuitive see itself in competition or --

25  withdrawn.

Highly Confidential

1          Question 12 asked if Intuitive would ever

2   go into the laparoscopy, right?

3      A.  That was the prep question, yes.

4      Q.  And there were some comments on the answer

5   to that question that appeared in the document,

6   right?

7      A.  There was -- there was an answer that was

8   written as a talking point.

9      Q.  We looked at an earlier copy of that

10  document and there was some comments in the margins,

11  right?

12     A.  Correct.

13         MS. LENT:  Objection to the earlier

14  characterization.

15         MR. ERWIG:   Q.  Now, at any point did you

16  make a comment that says, hey, look, I really think

17  we need to take out that particular line.  I don't

18  think that I can say, that we don't see ourselves as

19  not in competition with traditional laparoscopy?

20     A.  I don't recall.

21     Q.  I'm sorry.  I missed the answer.

22     A.  I don't recall saying one way or the other.

23  I don't recall making specific comments about that

24  question or that answer.

25     Q.  Do you recall anyone at Intuitive saying,

1  hey, we just really can't put that answer under

2  question 12?

3      A.  Only what you just showed me from the draft

4  document that had PB6 comment on there, but I don't

5  recall that as a point of discussion at the time.

6      Q.  I want to talk a little bit about the cost

7  to a patient of surgeries.  Okay?  Now, the cost to

8  a patient of a surgery performed using a da Vinci SI

9  or XI, that's higher than the cost of traditional

10  surgery, right?

11      MS. LENT:  Objection.

12      THE WITNESS:  Can you repeat?  I lost

13  the -- how many costs you had in there, if you can

14  repeat that, please?

15      MR. ERWIG:  Q.  Yeah, no problem.  We can

16  break it down so it's a nice easy question.  If a

17  patient's considering a procedure, they might have

18  the choice between a traditional laparoscopy and a

19  surgery using a da Vinci robot, right?

20      A.  Yes, or open procedure, yes.

21      Q.  So --

22      A.  Or other -- there's lots of -- depends on

23  the patient and the disease and their discussion

24  with the physician.  And there's lots of other

25  choices that disease or an issue can be dealt with.

Highly Confidential

1  Could be surgical.  Could be other -- other

2  treatment methodologies.

3      Q.  Sure.  Yeah, let's break that down.  So

4  patient has a disease that might need surgery, one

5  thing the patient can do is decide not to get

6  surgery at all, right?

7      A.  Right.  And choose some other way of

8  treating their -- their disease.

9      Q.  Now, once the patient's made a decision to

10  get surgery, then patient could decide between an

11  open surgery or a minimally invasive surgery, right?

12     A.  Yes.

13     Q.  The open surgery would be a surgery where

14  there's a large incision, like we talked about

15  earlier, right, or there's a potential for a large

16  incision?

17     A.  Yes.

18     Q.  Minimally invasive surgery, that would be

19  the type of surgery where there's very small, you

20  know, less than an inch sometimes cuts that has

21  then -- withdrawn.

22          Minimally invasive surgery, that would be

23  one where there's smaller incisions and there's

24  instruments that are inserted into the patient's

25  body through those small incisions, right?

Highly Confidential

1    A.  Yes.

2    Q.  Now, once -- if the patient's made the

3  decision to go with the minimally invasive surgery,

4  and the patient can either have a traditional

5  surgery or a robotic assisted surgery, right?

6      MS. LENT:  Objection.

7      THE WITNESS:  Yes.

8      MR. ERWIG:  Q.  When the patient then

9  chooses to -- that's -- that's really kind of what

10  we're focusing in on.  Withdrawn.

11      What's the cost difference if the patient

12  opts for a traditional surgery versus a robotic

13  assisted surgery.  Is one more expensive than the

14  other, to Intuitive's knowledge?

15      MS. LENT:  Objection.

16      THE WITNESS:  You're asking more expensive

17  to the patient?

18      MR. ERWIG:  Q.   Correct.

19    A.  I think the -- the answer can vary greatly,

20  and it varies greatly whether you're talking about

21  how that patient is insured.  It could be the

22  institution they're in.  It could be what the

23  hospital might pass onto the patient or not.  It --

24  in many situations, the cost to the patient may not

25  be different at all.

Highly Confidential

1      Q.  Well, let's talk about the cost involved in

2   the actual surgical procedure, maybe that will help.

3   What's the cost for a da Vinci XI system to a

4   hospital?

5      A.  The -- the -- the system itself, the

6   up-front, it could vary depending on how that system

7   is configured.

8      Q.  Well, how about a range for the XI?

9      A.  Could be ████████████████████

10  depending on how many consoles are added and

11  other -- other accessories that are purchased at

12  that time.

13     Q.  The low end price of a da Vinci XI, that

14  would be about ████████; is that right?

15     A.  Again, depending on what is actually

16  purchased.

17     Q.  And how about the da Vinci SI?  What's the

18  price range for a da Vinci SI?

19     A.  At the time that it was being sold?

20     Q.  Yes.

21     A.  Because currently not -- not sold.  It --

22  roughly same range at the time -- you know, at the

23  time that SI was the platform.

24     Q.  So there's been some --

25     A.  Iterations to that -- innovation, yes.

1    Q.  Thank you.  Yeah, there's been some

2  different iterations of the da Vinci robot over the

3  years, right?

4    A.  Yes.

5    Q.  And the SI, that was priced at around, you

6  know, ███████████████████████; is that

7  right?

8    A.  Approximate range, yeah.

9    Q.  Now, the -- what's the cost for the --

10  withdrawn.

11      What's the cost for all of the equipment in

12  a tradition laparoscopic surgery?

13    MS. LENT:  Objection.

14    THE WITNESS:  I could tell you the

15  categories of costs.  I -- I -- it would be

16  difficult to pinpoint all the -- because different

17  companies, different vendors, different

18  applications.  But --

19    MR. ERWIG:   Q.  Sure.  Let me ask -- let

20  me ask a better question.  What's the -- what's the

21  average cost per procedure for traditional

22  laparoscopic surgery?

23    MS. LENT:  Objection.

24    THE WITNESS:  Again, this is an area where

25  it can vary greatly depending on what kind of

1  procedure you're talking about, how many instruments

2  in the procedure are used, what accessories are used

3  in the procedure.

4       MR. ERWIG:  Q.  So the cost for each

5  individual procedure, that can -- that can vary,

6  right?

7     A.  Yes.

8     Q.  And it's possible to take all of those

9  procedures and come up with a rough average of the

10  cost per procedure for traditional laparoscopic

11  surgery, right?

12     A.  Not how I would -- not how I would think of

13  it.

14     Q.  Well, do you have an estimate of the

15  average cost per procedure for traditional

16  laparoscopic surgery?

17       MS. LENT:  Objection.

18       THE WITNESS:  What would be the

19  application?

20       MR. ERWIG:  Q.  Well, just traditional

21  laparoscopic surgeries.  So that's non-robotic

22  laparoscopic surgery.  Just the cost for performing

23  a procedure?

24       MS. LENT:  Objection.

25       THE WITNESS:  Well, if you were to say for

Highly Confidential

1  cardiac procedure that was done with laparoscopic

2  instruments versus a general surgery procedure,

3  again, that -- that range can vary greatly.  I

4  wouldn't average those -- those two.  I wouldn't

5  average across the spectrum of applications.  It

6  wouldn't -- it wouldn't -- wouldn't be reality.

7         MR. ERWIG:  Q.  Now, in general, the

8  average cost per procedure for robotic surgery,

9  that's higher than the average cost per procedure

10  for traditional laparoscopic surgery, right?

11         MS. LENT:  Objection; asked and answered.

12         THE WITNESS:  Restate the question, please?

13         MR. ERWIG:  Q.  Well, sure.  There's the

14  same procedure, and you can do it either with

15  traditional laparoscopy or you can do it using a

16  robotic -- using, let's say, the da Vinci XI.  The

17  cost for that procedure is generally higher using

18  the da Vinci machine than it would be with the

19  traditional instruments, right?

20         MS. LENT:  Objection.

21         THE WITNESS:  First, cost is pretty

22  ambiguous.  There are instruments costs, staffing

23  costs, OR time costs, uhm, cost of that patient in

24  the hospital.  What accessories might get used in a

25  laparoscopic procedure that are not used in the

Highly Confidential

Page 80

1    da Vinci or vice versa.  So, you know, again, if it

2    were at a particular procedure, you could -- you

3    could compare and contrast.

4          MR. ERWIG:   Q.  And that's what I'm

5    talking about.  At a procedure-to-procedure level,

6    your -- Intuitive is aware that surgeries performed

7    using the da Vinci have a higher price point than

8    surgeries that are performed using traditional

9    laparoscopic methods, right?

10         MS. LENT:  Objection.

11         THE WITNESS:  Higher price point for -- for

12   what?  I'm trying to understand.

13         MR. ERWIG:   Q.  Well, we can take the

14   average cost per procedure, the cost for the actual

15   procedure in terms of the equipment that's used,

16   surgery that's performed using a da Vinci XI or SI

17   is more expensive than surgery performed using

18   traditional laparoscopic instruments, true?

19         MS. LENT:  Objection.

20         THE WITNESS:  Would you -- again, it

21   depends on the -- the application.  There -- there

22   are some procedures where da Vinci would be more

23   cost-effective.  And there are others -- in a direct

24   comparison of if you looked at just direct costs or

25   whether you looked at direct cost plus operating

1  cost plus patient stay costs, you know, depends on

2  that -- how broad you go with the definition of

3  cost.  Uhm, and there are some procedures where the

4  direct cost of da Vinci could be greater than a

5  laparoscopic cost --

6        MR. ERWIG:  Q.  Has Intuitive --

7     A.  -- or open --

8     Q.  I'm sorry.  I didn't mean to cut you off.

9     A.  Or open surgery.

10     Q.  Has Intuitive performed research on the

11  price per procedure for surgeries -- withdrawn.

12        Has Intuitive performed research on

13  minimally invasive surgeries performed using a

14  da Vinci robot and the price of that surgery?

15     A.  Yes.

16     Q.  Has Intuitive also compared that number to

17  the general price for the same surgery performed

18  using traditional laparoscopic instruments?

19     A.  On a surgery by surgery -- on a procedure

20  type by procedure type basis, yes.

21     Q.  And on a procedure type by procedure type

22  basis, are the costs of the robotic surgery

23  generally higher, the same, or lower than

24  traditional laparoscopic surgery?

25     A.  It depends.  Sometimes -- sometimes lower

1 from a direct cost.  Sometimes higher.  Sometimes --

2 sometimes equivalent.

3     Q.  You understand that there's some instances

4 where a surgery with a da Vinci surgical robot would

5 be more expensive than surgery using traditional

6 laparoscopic instruments, right?

7     A.  For direct costs in procedure to procedure,

8 or are you talking about a cost that continuing care

9 for that patient.  Just trying to understand the

10 specificity.

11     Q.  Sure.  Let's look at -- let's look at a

12 patient perspective who is considering a minimally

13 invasive surgery.  Okay.  And the patient has the

14 choice between a surgery using traditional

15 laparoscopic instruments and the choice using the

16 da Vinci surgical robot.  With me so far?

17     A.  Yes.

18     Q.  Now, that patient has a -- can either

19 choose the -- withdrawn.

20         There's a -- there's some situations where,

21 for that patient, the da Vinci surgery is more

22 expensive than the traditional surgery, right?

23     A.  More expensive --

24         MS. LENT:  Objection.

25         THE WITNESS:  When you say more expensive,

1  more expensive to who?

2      MR. ERWIG:  Q.  To the patient.

3      A.  Again, it goes back to the earlier question

4  that if a patient has insurance and the insurance

5  covers, it may be no cost efforts to the patient

6  between open laparoscopic or robotic surgery.

7      Q.  Well, the total cost -- let's take

8  insurance out of the picture.  The situations where

9  the total cost that has to be paid, whether that's

10  by the patient or by insurance, is higher for

11  surgery performed using the da Vinci than it is for

12  surgery performed using traditional laparoscopic

13  methods, right?

14      MS. LENT:  Objection.

15      THE WITNESS:  Not universal.

16      MR. ERWIG:  Q.  But in many instances,

17  true?

18      MS. LENT:  Objection.

19      THE WITNESS:  In some instances, again,

20  procedure by procedure, uhm, it could be -- direct

21  cost could be more expensive.

22      MR. ERWIG:  Q.  Intuitive is aware that

23  patients choose to pay more for the da Vinci

24  surgical robot -- withdrawn.

25      Intuitive is aware that patients, in many

Highly Confidential

1  situations, pay more to have a surgery conducted by

2  a surgeon using the da Vinci robot than using

3  traditional laparoscopic instruments, right?

4      A.  Am I aware or is Intuitive aware that the

5  patient is paying more?  Again, in most situations,

6  patients have insurance and those procedures,

7  whether it's laparoscopic or robotic or open, are

8  covered by their insurance.  So I don't know that --

9  in those cases, I don't know that -- what the true

10  cost might be to that patient.  It -- it likely

11  varies.

12      Q.  Well, sir, Intuitive is certainly aware

13  that there are procedures where the cost of surgery

14  with the da Vinci is higher than the cost of surgery

15  with traditional laparoscopic instruments, right?

16      MS. LENT:  Objection; vague.

17      THE WITNESS:  You know -- again, you're

18  asking from the patient perspective.  Hospitals have

19  all kinds of billing rates.  We -- we sell our

20  product to the hospital.  The hospital charges that

21  patient, and then that patient, if they have

22  insurance, seeks reimbursement for that.  And I

23  can't tell you what hospitals charge patients.  It

24  would vary greatly by hospital -- by hospital

25  system, by procedure type.

Highly Confidential

1          MR. ERWIG:   Q.  Now, sir, Intuitive's done

2  market research, right?

3      A.  We do -- we do all kinds of market

4  research, yes.

5      Q.  Part of that market research is figuring

6  out the price that consumers are willing to pay for

7  surgeries using different types of methods, right?

8      A.  But our -- our -- our customer that

9  purchases our equipment, our systems, is a hospital

10  customer.  So the market research is primarily

11  around their alternatives, what other technologies

12  that they buy and treat similar conditions.

13      Q.  So your understanding that Intuitive

14  performs no market research on the consumers

15  willingness to pay for robotic surgeries versus

16  traditional surgeries?

17          MS. LENT:  Objection.

18          THE WITNESS:  I'm not aware of specific

19  market research around patients willingness to pay.

20          MR. ERWIG:   Q.  To Intuitive's knowledge,

21  what companies in the United States currently have

22  FDA approval in the area of minimally invasive soft

23  tissue robotic surgery?

24      A.  I believe there's a -- a number -- couple

25  that come to mind are TransEnterix and Medrobotics.

Highly Confidential

1  And -- but they're, you know, they may not be as

2  broadly indicated as what da Vinci is because it's

3  procedure by procedure approval.

4      Q.  So the -- when you say indicated, what do

5  you mean by that?

6      A.  It's that you receive a -- an approval to

7  apply that technology to a given procedure type.  So

8  not every system out there can be compared to every

9  system in terms of its applicability.  One might

10  have a more narrow applicability based on FDA

11  approval.  One might have a broader.

12      Q.  So there's a number -- I want to unpack

13  kind of what you said.  There's a number of

14  different systems, right?

15      A.  Yes.

16      Q.  And those systems have differing levels of

17  applicability, that is they're approved for

18  different types of procedures by the FDA; is that

19  right?

20      A.  Yes.

21      Q.  There's some that have very narrow

22  approval, maybe for one or two procedures.

23      A.  Some -- some -- it will a spectrum.  Some

24  were approved for a number of procedures.  Some may

25  be approved for more than a handful of procedures.

Highly Confidential

1    Q.  And how many procedures is the da Vinci SI

2  approved for?

3    A.  It is many.  Uhm, it would be a relatively

4  long list.  I can give you some of those procedures.

5    Q.  Well, don't need to get into the specifics

6  because I understand that would be a long list.  But

7  how about just a general ballpark.  You know, is it

8  a hundred procedures?  Is it 200 procedures?  About

9  how many?

10    A.  I would -- I would have to list them out

11  rather than guessing the number.

12    Q.  More than 20?

13    A.  I'd say more than 20.

14    Q.  More than 50?

15    A.  Probably not more than 50 types.  It

16  depends on where you categorize type because they're

17  variants of a given procedure that could be

18  indicated.

19    Q.  Is there any surgical robot other than the

20  da Vinci that's received FDA approval for that same

21  swath of procedures that the da Vinci has FDA

22  approval for?

23    A.  They received -- TransEnterix system, that

24  is fairly broad in its application, approved for

25  general surgery laparoscopic procedures.

Highly Confidential

1    Q.  Is that the TransEnterix Senhance?

2    A.  Yes.

3    Q.  Any other robotic surgery devices -- well,

4  withdrawn.

5        Any other robots like the da Vinci that

6  have received FDA approval for as broad of a

7  spectrum of procedures as the da Vinci has received?

8    A.  Yeah --

9      MS. LENT:  Objection.

10      THE WITNESS:  Restate the question, please?

11      MR. ERWIG:  Q.  Sure.  You mentioned that

12  the -- one of the robots that has relatively broad

13  approval is the TransEnterix Senhance, right?

14    A.  Yes.

15    Q.  And that robot received FDA approval on

16  those procedures, right?

17    A.  Yes.

18    Q.  Are there some procedures that the da Vinci

19  performs that the TransEnterix can't perform?

20    A.  I don't recall the overlap or non-overlap

21  of their broad procedures and our procedure set that

22  is indicated.

23    Q.  Are there any other surgical robots besides

24  the Intuitive da Vinci and the TransEnterix Senhance

25  that have FDA approval on the broad range of

Highly Confidential

1  procedures that the da Vinci is approved on?

2     A.  Not to my knowledge.

3     Q.  Is Intuitive aware of any other robots?

4        MS. LENT:  Objection.

5        THE WITNESS:  Uhm, let me clarify.  In the

6  United States?

7        MR. ERWIG:  Q.  Sorry.  Yeah, I should --

8  let me ask a clean question so we have a good

9  record.  Withdrawn.

10        Is Intuitive aware of any robots, other

11  than the Intuitive da Vinci and the TransEnterix

12  Senhance, that have received FDA approval for the

13  broad swath of procedures that the da Vinci has

14  received FDA approval for?

15        MS. LENT:  Objection.

16        THE WITNESS:  I'm aware of other systems.

17  Maybe not that breadth of product application -- or

18  procedure application.

19        MR. ERWIG:  Which -- well, withdrawn.

20        I'm going to screen share our next exhibit.

21  This will be Plaintiff's Exhibit 10.  Make sure to

22  get it in the share file.  This is 220 Rosa to

23  Vavoso.  2/20/17 Rosa to Vavoso.  Will be

24  Plaintiff's Exhibit 10.  Screen share.

25        (EXHIBIT 10 WAS MARKED FOR IDENTIFICATION.)

Highly Confidential

1        MR. ERWIG:   Q.  See this on the screen in

2   front of you?

3        A.  Yes.

4        Q.  Do you recognize this document?

5        A.  I don't recall the document specifically,

6   but I -- I understand the context.

7        Q.  Does this appear to be an e-mail from Dave

8   Rosa to yourself and Marshall Mohr at Intuitive

9   Surgical?

10       A.  Yes.

11       Q.  Who is Dave Rosa?

12       A.  He's Intuitive chief business officer.

13       Q.  What are his responsibilities as a chief

14   business officer of Intuitive?

15       A.  He has commercial responsibility for global

16   sales, marketing, business development.

17       Q.  And you see the subject line of this e-mail

18   is, "Forward 2/21 meeting."

19         Do you see that?

20       A.  Yes.

21       Q.  And that would be -- given that this e-mail

22   was sent on 2/20/2017, safe to say that that's a

23   meeting the next day on February 21st, 2017?

24       A.  It indicates a 2/21 meeting.

25       Q.  The attachments to that e-mail are

1  Intuitive agenda.PDF and competitive landscape.PDF.

2      Do you see that?

3      A.  I see those words called out next to

4  attachment, yes.

5      Q.  Did you receive those attachments from Dave

6  Rosa on February 20th, 2017?

7      A.  I don't recall.

8      Q.  Was -- any reason to believe you didn't

9  receive those attachments based on this e-mail?

10     A.  Well, only under -- it could be Dave just

11  indicating that he's getting ready to meet with Raj

12  Vattikuti.  So I don't know if it was a reply or if

13  it was forwarded as -- with attachments.  If they

14  were, then they were.  I just -- I don't recall

15  the -- I'd have to see the attachments to recall

16  whether -- whether I recognize it.

17      MR. ERWIG:  It's okay.  We can look at the

18  attachment next.  This will be Exhibit 11.  This

19  will be 2/20/17 Attach to Rosa to Vavoso.  And this

20  is the attachment titled competitive landscape.

21      (EXHIBIT 11 WAS MARKED FOR IDENTIFICATION.)

22      MR. ERWIG:  Q.  Do you see that?

23      A.  I see that.

24      Q.  Does this appear to be a document titled

25  competitive landscape?

1      A.  It's labeled on the top competitive

2   landscape.

3      Q.  Did you receive this document?

4      A.  Can you page down so I can see the second

5   page, please?

6      Q.  Sure.

7      A.  I don't recall this specific document.

8      Q.  I want to draw your attention to 0.4 on

9   this document under a section labeled price of

10  surgery.  Do you see that?

11     A.  Yes.

12     Q.  I'm actually going to start with question

13  2.  There's a question labeled capital costs.  Do

14  you see that?

15     A.  Yes.

16     Q.  And it writes, "No one has any real clue on

17  the pricing."

18        Do you see that?

19     A.  Yes.

20     Q.  And then the fourth bullet point under this

21  is, "Medtronics is likely to price it."  It being --

22  does that refer to the Medtronics robot?

23     A.  I don't know.

24     Q.  "Medtronics is likely to price it, not only

25  keeping in mind the ISI monopoly, but also the

Highly Confidential

Page 93

1  likely future entrance."

2      Do you see that?

3      A.  It's what it says.

4      Q.  ISI, is that Intuitive?

5      A.  I assume it's referring to Intuitive.

6      Q.  What does ISI stand for?

7      A.  Intuitive Surgical Incorporated.  This

8  is --

9      Q.  I want to turn to question one where it

10  says area of -- well, withdrawn.

11      I want to turn to 0.1 where it reads "area

12  of surgery."  Do you see that?

13      A.  Yes.

14      Q.  The first bullet point says, "Medtronics is

15  a company, believes to have its surgical robots

16  cater to those areas of surgery where Intuitive has

17  least or no presence."

18      Do you see that?

19      A.  I see that.

20      Q.  What was your understanding of Medtronics's

21  robot design as of February 20th, 2017?

22      MS. LENT:  Objection; vague.

23      THE WITNESS:  Can you define understanding?

24      MR. ERWIG:  Well, were you aware that in

25  2017 there was a discussion about a potential robot

1  being developed by Medtronics.

2      A.  In 2017, likely aware that they were

3  developing a robot.

4      Q.  Can you --

5      A.  I don't know the exact timing of -- sort of

6  when I became aware of that, but it -- 2017 seems

7  reasonable.

8      Q.  Can you explain to me what you -- what you

9  mean by you have some awareness of it?

10      A.  I've been with the company for 15 years.

11  And every year I've been with the company I have

12  heard that competition is coming with a robot, and

13  so -- and likely players in that were going to be

14  Medtronic amongst other companies.  So -- but now

15  it's a lot more specificity than that over the

16  years.  And likely not a lot of specificity of what

17  they were going to do in 2017.

18      Q.  When you say since you've been with the

19  company, is that the 15 years that you've been with

20  Intuitive or is that the six -- five, six years that

21  you've been as a -- as a senior vice president of

22  Asia?

23      A.  Yeah, I was referring to 15 years of being

24  with the company.

25      Q.  So that would be as earlier as 2006.  Is

Highly Confidential

1  that when you joined?

2    A.  Correct.

3    Q.  You mentioned that every year that you've

4  been with the company you heard, you know,

5  competition is coming or someone's developing a

6  robot, right?

7    A.  You would hear -- you would hear that sort

8  of rumor in the -- in the market.

9    Q.  Since you've started in 2006, until 2020 --

10  well, withdrawn.

11      When was the TransEnterix Senhance granted

12  FDA approval for the broad range of applications

13  that the da Vinci has FDA approval for?

14      MS. LENT:  Objection.

15      THE WITNESS:  I don't know the date.

16      MR. ERWIG:  Q.  Was it after 2015?

17    A.  I don't know.  Going to have to go back and

18  understand it.

19    Q.  In 2000 -- well, withdrawn.

20      You mentioned that since you'd started

21  Intuitive, you would hear that competition was

22  coming every year.  Now, in 2006 did any competitor

23  develop a robot that was competitive with the

24  da Vinci?

25      MS. LENT:  Objection.

Highly Confidential

1          THE WITNESS:  Not -- not that I recall.

2          MR. ERWIG:  Q.  How about in the period

3    between 2006 and 2010?  Any competitor develop a

4    robot that was competitive with the da Vinci in the

5    area of minimally invasive soft tissue surgery?

6          A.  In -- can you define in the question --

7    when you refer to competitive --

8          Q.  Well, for a robot to be competitive with a

9    da Vinci system in the United States, has to have

10   FDA approval to perform similar procedures, right?

11         MS. LENT:  Objection.

12         THE WITNESS:  If it's a technology that is

13   an alternative choice, uhm, it would be at the

14   procedure level.  It would have to be approved for

15   that procedure.

16         MR. ERWIG:  Q.  And so that's -- that's

17   kind of the scope that I'm asking about is.  In the

18   period between 2006 and 2010, were there any robots

19   that received FDA approval to perform the same

20   procedures that the da Vinci surgical robot could

21   perform?

22         A.  Not that I can recall.

23         Q.  How about between 2010 and 2015, any robots

24   in the United States that received FDA approval to

25   perform the same procedures that the da Vinci

1   surgical robot can recall -- can perform?

2      A.  I don't know.

3      Q.  Well, as Intuitive's 30(b)(6) witness, are

4   you aware of any robots that received FDA approval

5   between 2010 and 2015 for the same procedures that

6   the da Vinci surgical robot has FDA approval for?

7         MS. LENT:  Objection; vague.

8         THE WITNESS:  I'm aware of the two

9   companies I mentioned.  I just do not recall when

10  did they receive their FDA approval.

11        MR. ERWIG:   Q.  Well, in this document, at

12  least, it says that the Medtronics CEO announced

13  that it expects to see material revenue from its

14  surgical robots in fiscal year 2019.  It is expected

15  to be launched in the first half of 2018.

16        Do you see that?

17     A.  Given this document is likely not even an

18  Intuitive document, so I don't know where -- I don't

19  know the basis for it.  I don't know where it came

20  from.

21     Q.  Well, it's certainly Bates-stamped with an

22  Intuitive Bates label, right?

23     A.  I don't know what that number means.

24     Q.  It was a document that was sent as an

25  attachment in an e-mail from Dave Rosa to you,

1  right?

2     A.  I don't know where it originated from

3  because before that the e-mail showed that the prior

4  e-mail came from Raj Vattikuti, who is not an

5  Intuitive employee.

6     Q.  Let's take this exhibit down and go back to

7  the prior e-mail.  Actually, I'll ask more

8  generally.  Since 2017, what companies have received

9  FDA approval to market and sell robots that can

10  perform minimally invasive soft tissue surgeries?

11     A.  Again, I can't answer the question relative

12  to the specificity of the date.  I -- within the

13  last four years -- sometime in the last four years,

14  there are two companies that I'm aware of that have

15  come to market in the U.S.

16     Q.  Who are those companies?

17     A.  Medrobotics and TransEnterix.

18     Q.  Let's talk about the specific robots that

19  each one of those companies manufactured.

20  TransEnterix manufactures the Senhance, right?

21     A.  Yes.

22     Q.  And what procedures does the Senhance have

23  FDA clearance to perform?

24     A.  I believe they have a broad general surgery

25  laparoscopic indication and gynecology application.

Highly Confidential

1    Q.  And how about the -- what's the Medrobotics

2   robot called?

3    A.  I refer to it as the Medrobotic.  I

4   don't -- I don't recall if they've got a specific

5   name for that or if it's the med robotic.  I think

6   Flex is the name that's typically associated with

7   it.

8    Q.  And what FDA approval does the Medrobotics

9   Flex have?

10    A.  Transoral surgery and colorectal.

11    Q.  Is that -- now, explain to me what you mean

12   by that?

13    A.  Transoral would be in the application to

14   operate through the natural orifice of the mouth.

15   So transoral, for a variety of procedures, uhm,

16   at -- basically, tongue, typically cancer

17   procedures -- cancer removal procedures.  Colorectal

18   surgery is on the other end of that.  Colon surgery

19   or rectal resection, so portions of your bowel

20   system are removed.

21    Q.  And that -- those procedures the chol-oral

22   and colorectal, those aren't performed by making

23   incisions in the patient's body; is that right?

24    A.  I think considered to be a -- what's called

25   natural orifice, so either through the mouth or the

Highly Confidential

1    anus.

2        Q.  And that's a different type of FDA approval

3    than, for example, the da Vinci robot has, right?

4            MS. LENT:  Objection.

5            THE WITNESS:  It would be considered in the

6    realm of minimally invasive surgery.

7            MR. ERWIG:   Q.  Well, the da Vinci --

8        A.  Again -- but again, the FDA approves

9    indication by procedure by procedure.

10       Q.  Is the da Vinci SI or the da Vinci XI, are

11   those approved for colo-oral [sic] or colorectal

12   surgeries?

13       A.  They are.

14       Q.  What is the procedure for -- well,

15   withdrawn.

16           You mentioned that the TransEnterix

17   Senhance has a general -- well, can you mention to

18   me again what you described the clearance for the

19   FDA approval for the TransEnterix Senhance has?

20       A.  General surgery and gynecology laparoscopic

21   surgery.

22       Q.  Does the Medrobotics Flex have that same

23   clearance from the FDA?

24       A.  I don't believe so.

25       Q.  Is there any surgical robot that has that

1  clearance of -- withdrawn.  The TransEnterix

2  Senhance has -- is there any robots -- withdrawn.

3        Other than the da Vinci SI and XI and the

4  TransEnterix Senhance, do any robots have clearance

5  from the FDA to perform those two areas of surgery?

6        A.  Can you repeat the question, please?

7        Q.  Well, sure.  You mentioned there's two

8  areas of surgery that the TransEnterix Senhance is

9  generally cleared for, right?

10       A.  Yes.

11       Q.  I want to make sure I have those exactly

12  accurate because they're a little bit long.  So can

13  you just restate them for me one more time?

14       A.  General surgery and gynecologic

15  laparoscopic surgery.

16       Q.  There any other areas that you're aware of

17  that the TransEnterix Senhance has FDA approval for?

18       A.  Not that I'm aware.

19       Q.  And do those two areas -- are those all of

20  the areas that the da Vinci surgical robot has FDA

21  clearance for?

22       A.  The -- the broad areas of general surgery

23  application and gynecology application, uhm, we have

24  indications within that, within those spaces, yes.

25       Q.  There are other broad spaces that the

1  da Vinci has indications for it, other than general

2  surgery and gynecological laparoscopic?

3      A.  Urologic procedures.  Number of procedures

4  within that area of practice.  Number of procedures

5  within thoracic.  Number of procedures within

6  cardiac.

7      Q.  So just to make sure that we get it clear,

8  the da Vinci has clearance in general surgery; is

9  that right?

10     A.  Yes.

11     Q.  When I say clearance, I mean has FDA

12  approval in.  Do you understand that?

13     A.  Yes.

14     Q.  The da Vinci has approval in gynecological

15  or gynecologic laparoscopic surgery?

16     A.  In the areas of gynecology, there are

17  approvals, yes.

18     Q.  And then you mentioned thoracic surgery, I

19  believe?

20     A.  Thoracic surgery would be another area of

21  approval.

22     Q.  Does the TransEnterix Senhance have any

23  approval in the area of thoracic surgery?

24     A.  Not that I'm aware of.

25     Q.  Another category that you mentioned for the

1  da Vinci robot is -- was it urologic surgery?

2      A.  I mentioned cardiac and urologic.

3      Q.  Are those two separate categories, or are

4  those one category?

5      A.  Two separate.

6      Q.  So for cardiac surgery, is the TransEnterix

7  Senhance have FDA approval for cardiac surgery?

8      A.  Not that I'm aware of.

9      Q.  You also mentioned urologic surgery as a

10  category; is that correct?

11      A.  I did.

12      Q.  The TransEnterix Senhance, are you --

13  withdrawn.

14          Does the TransEnterix Senhance have FDA

15  approval for urologic surgeries?

16      A.  It might be contained under the general

17  surgery indication.  I don't know how broad exactly

18  that was.

19      Q.  For the -- I'm sorry.  I didn't mean to cut

20  you off.

21      A.  In -- in some academic circles, urologic

22  can fit in general surgery.  So I just don't know

23  the specific group for the urologic procedures.

24      Q.  Now, so for the da Vinci, are there any

25  indications outside of general surgery, gynecologic

Highly Confidential

1  laparoscopic, thoracic, cardiac, and urologic, or

2  does that the cover the range of FDA?

3      A.  Head and neck.

4      Q.  I'm sorry.  What --

5      A.  Head and neck.  That would be the specialty

6  area where transoral robotic surgery.

7      Q.  Does Senhance -- the TransEnterix Senhance

8  have FDA approval for head and neck surgery?

9      A.  I don't believe so.

10      MR. ERWIG:  I'm going to screen share our

11  next exhibit.  Some handwritten notes that I've

12  taken as we've discussed.  So on the left-hand side,

13  there's the da Vinci robot.  You see that?  Now you

14  can.  Centered it.  See that?

15      (EXHIBIT 12 WAS MARKED FOR IDENTIFICATION.)

16      THE WITNESS:  Yes.

17      MR. ERWIG:  Q.  On the right-hand side,

18  there's the Senhance.  That's from TransEnterix,

19  right?

20      A.  Yes.

21      Q.  And I've reflected here that the da Vinci

22  has clearances for general surgery, gynecologic

23  laparoscopic or subset of that, thoracic surgery,

24  cardiac surgery, urologic surgical, and specialty

25  head and neck surgery from the FDA.

Highly Confidential

1        Do you see that?

2        A.  Yes.

3        Q.  Does that accurately reflect the FDA

4    clearances for the da Vinci surgical robot?

5            MS. LENT:  Object to the form.  And object

6    to the handwritten exhibit.

7            THE WITNESS:  Could you repeat the

8    question, please?

9            MR. ERWIG:  Q.    Sure.  My question is

10   just are there any other areas of clearance that the

11   da Vinci has outside of the ones that I've listed on

12   this page?

13       A.  Not outside the ones that are mentioned.

14       Q.  Then on the right-hand side of --

15       A.  That I recall.

16       Q.  I'm sorry.

17       A.  Not outside the ones I mentioned that I can

18   recall.  But --

19       Q.  On the right-hand side, I've made a column

20   labeled Senhance.  Do you see that?

21       A.  Yes.

22       Q.  You mentioned that the Senhance has

23   clearance for general surgery, which might include

24   urologic surgery clearance as well, right?

25       A.  Correct.

Highly Confidential

1    Q.  And the Senhance also has clearance for

2  gynecologic laparoscopic surgery, right?

3    A.  I believe so.

4    Q.  Are you aware of any other areas that the

5  TransEnterix Senhance has FDA clearance for?

6    A.  I'm not aware.

7    Q.  I'm going to mark this as Exhibit 12.

8      MS. LENT:  I'm going to restate my

9  objection to using handwritten documents like this

10  to summarize much more lengthy and detailed

11  testimony of the witness.

12      MR. ERWIG:  Let's go off the record.  We'll

13  take a break and talk about timing.

14      MS. LENT:  How much -- go ahead.  Just

15  don't leave, Glenn.

16      MR. ERWIG:  I was going to say --

17      THE REPORTER:  (Clarification.)

18      VIDEOGRAPHER:  We're off the record.

19      (The deposition was in recess from 11:49 to

20      12:00.)

21      VIDEOGRAPHER:  We are back on the record.

22  The time is 12:01.

23      MR. ERWIG:   Q.  Mr. Vavoso, are there any

24  robots, other than the da Vinci and the TransEnterix

25  Senhance, that have FDA clearance in the area of

Highly Confidential

1  general surgery?

2      A.  Well, general surgery is a broad category

3  and oftentimes colorectal surgery is -- would be

4  under that category.  So the Medrobotic Flex system,

5  for that indication, could be considered a general

6  surgery procedure -- general by its very nature,

7  category.

8      Q.  Any others, other than the Senhance, the da

9  Vinci, and the Medrobotics Flex, in that category

10  that have FDA approval?

11      A.  Not that I'm aware of.

12      Q.  In the area of gynecologic laparoscopic

13  surgery, are there any robots that have FDA approval

14  for minimally invasive surgery for gynecologic

15  laparoscopic surgery, other than the da Vinci and

16  the Senhance?

17      A.  Not that I'm aware of.

18      Q.  Are there any robots that have FDA approval

19  in the area of thoracic surgery other than the

20  da Vinci robot?

21      A.  No.

22      Q.  Are there any robots that have FDA approval

23  for procedures in the area of cardiac surgery other

24  than the da Vinci robot?

25      A.  No.

1      Q.  Are there any robots that have FDA approval

2   in the area of urologic surgery other than the

3   da Vinci robot?

4      A.  I don't know the general surgery indication

5   that TransEnterix has, if it's considered to be in

6   there.  I don't think --

7      Q.  Are there any robots, other than the

8   Intuitive da Vinci, that have FDA clearance for

9   procedures in the head and neck area?

10     A.  You said besides the Medrobotic?

11     Q.  I said other than the Intuitive da Vinci.

12     A.  Uhm, the Medrobotic system is indicated in

13  head and neck area for transoral robotic surgery.

14     Q.  Can the Medrobotics Flex perform all of the

15  same procedures in the head and neck area that the

16  Intuitive da Vinci can?

17     A.  I don't know.

18     Q.  Are there procedures that the da Vinci has

19  FDA approval for in the head and neck area that

20  the -- that no other robot has FDA approval for?

21     A.  I don't believe so.  But --

22     Q.  What other robot has approval in those

23  areas?

24     A.  The Medrobotic Flex system.

25     Q.  Any others?

Highly Confidential

1    A.  Not that I'm aware of.

2    Q.  Now, the Medrobotics Flex system doesn't

3  have clearance in gynecologic laparoscopic surgery;

4  is that right?

5    A.  Correct.

6    Q.  Doesn't have clearance in the area of

7  thoracic surgery, right?

8    A.  Right.

9    Q.  Doesn't have clearance in the area of

10  cardiac surgery, right?

11    A.  Yes.

12    Q.  And it doesn't have any clearance in the

13  area of urologic surgery either, right?

14    A.  Yes.

15    Q.  To Intuitive's knowledge, are there any

16  other companies that have FDA approval in the area

17  of minimally invasive soft tissue robotic surgery

18  other than Intuitive, TransEnterix, and Medrobotics?

19    A.  In the U.S., not -- not -- no.

20    Q.  For a robot to be used for a surgery in the

21  United States, it has to have FDA approval; is that

22  right?

23    A.  Yeah, I'm sorry.  I missed that part of

24  your question.  Correct.

25    Q.  Well, I was just -- I was clarifying.  It

Highly Confidential

1  may not have been clear in the question.  But --

2  let's make sure we have a clean record.  So --

3  withdrawn.

4        For a robot to be used for a surgery in the

5  United States, it needs to have FDA approval for the

6  procedure it's being used for, right?

7     A.  Yes.

8     Q.  So to the extent that there's robots for

9  surgeries that exist outside of the United States,

10  those can't be used for surgeries inside the United

11  States, right?

12    A.  Without FDA approval, correct.

13       MR. ERWIG:  And there are no robots that

14  have FDA approval in the United States for the areas

15  that we've been talking about other than the --

16  well, withdrawn.

17       I'm going to screen share our next exhibit.

18  This will be Plaintiff's Exhibit 13.

19       (EXHIBIT 13 WAS MARKED FOR IDENTIFICATION.)

20       MR. ERWIG:  Q.  It's going to be 6/4/18

21  Bradshaw to Rosa and Vavoso.  Screen share.

22       Can you see this on the screen in front of

23  you, Mr. Vavoso?

24    A.  Yes.

25    Q.  Do you recognize this?

Highly Confidential

1    A.  I don't recall it.

2    Q.  Does this appear to be an e-mail from Phil

3  Bradshaw at Intuitive Surgical to Dave Rosa,

4  yourself, and others at Intuitive?

5    A.  Yes.

6    Q.  Now, Mr. Bradshaw writes that "What I think

7  we should do behind the scenes is develop a

8  competition talk tracker of all the areas they

9  mention then train our people, most of which have

10  not come across any competition in their time at

11  ISI."

12       Do you see that?

13    A.  I see that.

14    Q.  This e-mail was sent on June 4th, 2018,

15  right?

16    A.  Yes.

17    Q.  Now, Mr. Bradshaw -- who is Phil Bradshaw?

18    A.  He was the general manager for United

19  Kingdom.

20    Q.  Mr. Bradshaw mentions that most Intuitive

21  people have not come across any competition in their

22  time at ISI.  Do you see that?

23    A.  I see what he wrote, yes.

24    Q.  Take this exhibit down.  I want to get a

25  sense of the current market share in the area of

Highly Confidential

1  minimally invasive soft tissue robotic surgery.  We

2  talked about how in that area there's various

3  categories of procedures that robots can be approved

4  for, right?

5      A.  Yes.

6      Q.  And it sounds like the da Vinci robot has

7  the broadest level of clearance, including general

8  surgery, gynecologic laparoscopic, thoracic,

9  cardiac, urologic, and head and neck, right?

10     A.  In those areas, yes.

11     Q.  Are there any other robots that are

12  approved by the FDA in all of those areas?

13     A.  No.

14     Q.  And the only robots that have clearance in

15  any of those areas would be the TransEnterix

16  Senhance, Medrobotic Flex, and the da Vinci as well,

17  right?

18     A.  Yes.

19         MS. LENT:  Objection; asked and answered.

20         MR. ERWIG:   Q.  The Senhance, that has a

21  smaller approved procedure base than the da Vinci,

22  right?

23         MS. LENT:  Objection; asked and answered.

24         THE WITNESS:  At a category level.  Many

25  procedures that they have underneath that level,

1  specific procedures.

2      MR. ERWIG:  Q.  Well, the da Vinci is FDA

3  approved for a far greater number of procedures than

4  either the TransEnterix Senhance or Medrobotics

5  Flex, right?

6      MS. LENT:  Objection.

7      THE WITNESS:  At the procedure level, it's

8  hard to answer without going side by side in the

9  general surgery because it is such a big category.

10  But, yes, there are other categories that da Vinci

11  is approved for that are not -- are not indicated

12  for the Senhance system.

13      MR. ERWIG:  Q.  Or for the Medrobotics

14  Flex, right?

15      A.  Or the Medrobotics Flex, yes.

16      Q.  What was the total number of installed

17  da Vinci robots in the United States as of 2019?

18      A.  I don't have that exact figure.  About --

19      Q.  Do you have a ballpark?

20      A.  Greater than 3,000, 3500.

21      Q.  And how about in 2020?  How many installed

22  da Vinci robots were there in the U.S. as of 2020?

23      A.  35 to -- 3500 to 4,000.  But I'd have to

24  check our -- check our records on that.

25      Q.  What were the total numbers of installed

1  TransEnterix Senhance robots in the U.S. as of 2019?

2    A.  I don't remember an exact figure.

3    Q.  How about a general estimate?

4    A.  Maybe 15 or less.

5    Q.  That's 15 or less TransEnterix Senhance

6  robots installed in the United States, right?

7    A.  Yes.

8    Q.  How about the Medrobotics Flex?  How many

9  Medrobotics Flex robots were installed in the United

10  States in 2019?

11    A.  Difficult to say in that time period.  I

12  don't have -- I don't have an exact number.

13    Q.  How about an estimate?

14    A.  Say in total now -- uhm, again, hard to peg

15  to that, but I'd estimate 7 to 10.

16    Q.  So taking the Senhance and the Medrobotics

17  Flex together, there's maybe 25 or less installed

18  Senhance and Medrobotics robots and over 3500

19  installed da Vinci robots; is that right?

20    MS. LENT:  Objection; vague.

21    THE WITNESS:  Would you please repeat that

22  question, please?

23    MR. ERWIG:  Q.  Yeah, sure.  And let's

24  break it down in terms of timing because that may

25  help.  So in 2019, there were approximately 3500

1  installed da Vinci robots in the United States and

2  less than 25 installed Senhance and Medrobotics

3  robots in the United States, right?

4        MS. LENT:  Objection; misstates the

5  testimony.

6        THE WITNESS:  Could you just rephrase that,

7  please?

8        MR. ERWIG:  Q.  Sure.  You mentioned the

9  Senhance, that your estimate was under 15 are

10  installed in the United States and were installed in

11  the United States in 2019, right?

12     A.  Yes.

13     Q.  How about the Medrobotics Flex?  How many

14  were installed in the United States in 2019?

15     A.  Again, hard for me to say what was in '19.

16  I have a general number for how many they have

17  today.  I don't know the sequence of that, when they

18  were installed.

19     Q.  What's the general number today?

20     A.  7 to 10.  Somewhere in that range.

21     Q.  So if we take the top range of both of

22  those numbers together, that would be 10 Medtronics

23  [sic] Flexes and 15 TransEnterix Senhances, right?

24     A.  Yes.

25     Q.  That would be 25 robots that are not the

Highly Confidential

Page 116

1    da Vinci surgical robot from Intuitive, right?

2        A.  As of today, yes.

3        Q.  And then 2019, is that -- were there fewer

4    Medrobotics Flexes installed, or were there more

5    than there are today?  How does -- how does that

6    compare?

7        A.  It would not be more.  At least that I'm

8    aware of it wouldn't be more.

9        Q.  It would be seven or less installed in 2019

10   of the Medrobotics Flex, right?

11          MS. LENT:  Objection.

12          THE WITNESS:  I would say it's somewhere

13   less than 10 or -- or at 10.

14          MR. ERWIG:  Q.  Sorry.  The range I had in

15   mind was a little different.  So you're right.  You

16   mentioned 10 or less is a range.  So --

17       A.  Yes.

18       Q.  Let's say 10 Medrobotics Flexes, 15

19   TransEnterix Senhance, that's about the high end of

20   your estimate, right?

21       A.  Yes.

22       Q.  So that's 25 robots for a minimally

23   invasive soft tissue surgery in the United States,

24   right?

25       A.  Yes.

1      MS. LENT:  Objection; vague.

2      MR. ERWIG:  Q.  And that number -- that

3  number reflects the 10 Medrobotics Flexes that are

4  potentially available today, right?

5      A.  Can you restate the question, please?

6      Q.  What I'm getting at is in the year of 2019,

7  you mentioned there were 35 around 3500 installed

8  da Vinci surgical robots in the United States,

9  right?

10      MS. LENT:  Objection; misstates the

11  testimony.

12      THE WITNESS:  In that time period,

13  somewhere between 3,000, 3500.

14      MR. ERWIG:  Q.  So in 2019, between 3,000,

15  3500, da Vinci robots installed, right?

16      A.  Yes.

17      Q.  So let's take the low end of that.  That's

18  3,000 installed da Vinci robots in 2019, right?

19      A.  Yes.

20      Q.  And of the Senhances in 2019, about how

21  many Senhance robots were installed in the United

22  States?

23      A.  15 or less.

24      Q.  And how many of the Medrobotics Flex robots

25  were installed in 2019?

Highly Confidential

Page 118

1    A.  10 or less.

2    Q.  How about in 2020?  How many da Vinci

3  robots were installed in the United States

4  approximately?

5    A.  Between 3500 and 4,000.

6    Q.  How many Senhances were installed in the

7  United States?

8    A.  15 or less.

9    Q.  So that's the same number as in 2019,

10  right?  It's the same estimate as in 2019, right?

11  May have added a robot or lost a robot, but

12  certainly less than 15 still, right?

13      MS. LENT:  Objection.

14      THE WITNESS:  Yeah, again, hard to peg 2019

15  and know what the competitive installs for those two

16  companies were.  Uhm, my -- the range I gave was --

17  was applicable to my understanding today.

18      MR. ERWIG:  Q.  You mentioned competitive

19  installs.  Can you describe what you mean by that?

20    A.  Where technologies that are on the market

21  that can be applied to the procedures that we

22  also -- our technology can be applied to.  We

23  compete for that customer to -- of their choice to

24  choose which technology they're going to purchase.

25    Q.  And in 2020, what was the install base of

Highly Confidential

1  the Medrobotics Flex?

2      A.  My estimate was 7 to 10 systems.

3          MR. ERWIG:  Screen share next exhibit.

4  This will be Exhibit 14.

5          (EXHIBIT 14 WAS MARKED FOR IDENTIFICATION.)

6          MR. ERWIG:  Q.  I've created a page of

7  notes labeled competitive installs.  And in 2019 the

8  da Vinci had an install base of between 3,000 and

9  3500 da Vincis; is that right?  That's your

10  estimate.

11      A.  Yes.

12      Q.  And the TransEnterix Senhance had about 15

13  or less installed, right?

14          MS. LENT:  I object to the introduction of

15  your handwritten notes as an exhibit in the

16  deposition.  You can answer the question.

17          THE WITNESS:  Yeah, I can't recall the

18  install estimate in 2019, but I was referencing the

19  installs that I know in roughly the range they're in

20  today.

21          MR. ERWIG:  Q.  So it's certainly not more

22  than 15 in 2019, to your knowledge, right?

23      A.  Not that I -- not that I'm aware of.

24      Q.  Medrobotics Flex, you said that had an

25  install base of about 10 or less, right?

Highly Confidential

1     A.  Today.  So it wasn't more than 10, 10 or

2  less.

3     Q.  And then down here I have a section labeled

4  2020.  And in 2020 you mentioned that the da Vinci

5  had an install base between roughly 3500 and 4,000,

6  right?

7     A.  Yes.

8     Q.  That would be a growth of about maybe 500

9  systems, around there?

10    A.  Yes.

11    Q.  In that same time period, the Senhance

12  stayed at 15 or less, right?

13    A.  Yeah, I don't know if it stayed at or --

14  stayed at sounds like it was a really specific

15  number.

16    Q.  Sure.  May have added a couple robots, but

17  it certainly didn't get more than 15 in your

18  estimate, right?

19    A.  In my estimate, yes.

20       MS. LENT:  Objection.

21       MR. ERWIG:  Q.  Now, the Medrobotics Flex,

22  you said in 2019 that was 10 or less.  And your

23  estimate for 2020 was 7 to 10, right?

24    A.  Yes.

25    Q.  So that would -- neither of these robots --

Highly Confidential

1  there were not more than -- withdrawn.

2       The Senhance didn't have 20 new installs in

3  2020, right?

4     A.  Repeat the question, please?

5     Q.  The TransEnterix Senhance did not have 20

6  installs in 2020, right?

7     A.  I don't believe so.

8     Q.  Medrobotics Flex, that didn't have 20

9  installs either, right?

10    A.  No.

11    Q.  So when customers are making a choice,

12  they're overwhelmingly choosing the da Vinci

13  surgical robot over the Senhance and the Flex,

14  right?

15       MS. LENT:  Objection.

16       THE WITNESS:  What do you mean by

17  overwhelmingly?

18       MR. ERWIG:  Q.  Well, sir, there were 500

19  or more da Vincis installed between 2019 and 2020,

20  right?

21    A.  Yes.

22    Q.  And there were a handful -- you know, less

23  than 20 total installs of the Senhance and the Flex,

24  right?

25    A.  Yes.

1    Q.  That means in the context of competitive

2  installs, between 2019 and 2020, customers

3  overwhelmingly chose the da Vinci system over the

4  Senhance and the Flex, right?

5        MS. LENT:  Objection.

6        THE WITNESS:  I would say they chose

7  da Vinci over those other alternatives to that

8  degree.  Whether you describe it as overwhelming, I

9  don't -- I don't know what that -- what is that

10  relative to?

11        MR. ERWIG:   Q.  Well, it's not a small

12  margin, right?  It's not like there's 500 installed

13  da Vincis and 490 installed TransEnterix and Flexes,

14  right?  It's 500 against maybe 20, but definitely

15  less than 20, right?

16    A.  But as we talked they're -- they're --

17  they're two different or three different

18  applications of the system.  So they're -- depending

19  on the customers' requirements and what they were

20  looking for, it may not have been even a head to

21  head comparison.  So I can't comment on that.

22    Q.  There's situations where the customer would

23  not do a head to head comparison between the

24  da Vinci surgical robot and the Senhance; is that

25  right?

Highly Confidential

1      A.  Depending on their requirements, that could

2  be true.

3      Q.  There are situations where a customer

4  wouldn't do a head to head comparison between a

5  da Vinci robot and a Medtronic's [sic] Flex, right?

6      MS. LENT:  Objection.

7      THE WITNESS:  There would be situations

8  where they would -- depending on their requirement,

9  it may not be a head to head comparison in their

10  mind.  But --

11      MR. ERWIG:  I'm going to mark this as

12  Exhibit 14.  We'll get it scanned in at the next

13  break.  I'll stop screen sharing.  What's the cost

14  of a TransEnterix Senhance robot?

15      MS. LENT:  Objection.

16      THE WITNESS:  What do you mean?  Can you be

17  specific as to the -- what you mean by cost?

18      MR. ERWIG:  Q.  Well, let's say a hospital

19  is considering purchasing a da Vinci robot or a

20  TransEnterix Senhance.  What are the price points

21  like?

22      A.  I don't have their specifics.

23      Q.  Well, is the Senhance more expensive than

24  the da Vinci?

25      MS. LENT:  Objection.

Highly Confidential

1          THE WITNESS:  More expensive than da Vinci

2  in -- in what aspect?

3          MR. ERWIG:   Q.  Well, let's focus in on

4  two models of the da Vinci robot, the SI and the XI.

5  Okay?  Now, looking at the TransEnterix Senhance and

6  comparing it to the da Vinci SI, you mentioned

7  earlier that the SI had a price range of maybe

8  between 1.6 million up to a little over 2.

9          Do you remember that?

10     A.  Yes.

11     Q.  Is the TransEnterix Senhance -- how does

12  the TransEnterix Senhance compare, in terms of

13  pricing, to that price range?

14     A.  I believe it's less.

15     Q.  How much less?

16     A.  I don't have a specific range, but it's

17  less.

18     Q.  How about an estimate?

19     A.  Again, in the U.S., right?

20     Q.  In the U.S., yeah.

21     A.  Again, it goes -- in terms of -- this is

22  where the specificity of the question in terms of

23  cost for -- what are we comparing it to?  Well, it

24  comes with the system, different configurations.

25     Q.  Well, you mentioned that for about

Page 125

1    ███████████████    the hospital could

2    purchase a da Vinci and use it for surgeries

3    potentially, right?

4        A.  Yes.

5        Q.  There's some other bundles or packages that

6    can add on to that and that would increase the cost,

7    right?

8        A.  Yes.

9        Q.  Now, I'm trying to get a sense of what the

10   lowest level for the TransEnterix Senhance would be

11   where you could get the Senhance into a hospital.

12   You can start doing a surgery with it.  Do you have

13   a sense of where that price point is?

14       MS. LENT:  Objection.

15       THE WITNESS:  I -- I don't particularly.

16   Because it's -- they require other third-party

17   equipment to -- in order to have a functioning

18   robot.  So I don't know what those costs are to the

19   customer in trying to compare it to da Vinci, could

20   be, you know, apples to orange comparison.

21       MR. ERWIG:   Q.  How about the Medrobotics

22   Flex.  Do you have a sense of how expensive that

23   robots is to start it up on surgeries?

24       MS. LENT:  Object to the form.

25       THE WITNESS:  I -- I don't have an exact

Highly Confidential

1  figure.  I don't know.

2       MR. ERWIG:   Q.  Estimate?

3       A.  I don't have a good estimate.

4       Q.  Does Intuitive -- withdrawn.

5           Does Intuitive do research on how

6  Medrobotics and TransEnterix price their robots?

7       A.  We do.  I'd have to go back and look at

8  that research to understand specifically where it

9  is.

10      Q.  You didn't look at that in preparation to

11  testify today?

12      A.  I -- I don't recall what that number was.

13      Q.  Now, for robotic surgeries, is there some

14  training that's required before a surgeon can use a

15  da Vinci surgical robot?

16      A.  Yes.

17      Q.  Can you describe that training to me?

18      A.  For the surgeon?

19      Q.  Yes.

20      MS. LENT:  Again, just one second.  I'm not

21  going to stop Mr. Vavoso from answering the

22  question, but I think you're aware that we had a

23  30(b)(6) witness on this topic last weekend or last

24  week on Friday.  So this testimony wouldn't be on

25  behalf of the company.  This is just his personal

Highly Confidential

1  testimony.

2       MR. ERWIG:   Q.  You can still answer it.

3       A.  Okay.  You know, in general, I'll give you

4  overview.  Surgeons, uhm, go through a -- several

5  different levels of their training, including

6  on-line orientation into the system, application in

7  terms how it's applied, what -- what -- the various

8  ways in which it is operated.  Once they go through

9  that on-line training, there's a orientation

10  training with the system that is at their hospital

11  so they get familiarity with it.

12       They then come to a training center

13  separate from their hospital that would include

14  either cadaver or porcine model lab environment,

15  where they spend the day getting hands-on and have

16  to pass a series of technical skill sets.  And then

17  once they are back to their hospital, it's up to the

18  hospital credentialing requirements as to whether

19  that surgeon has to be proctored in -- you know, in

20  a already operating robotic surgeon would oversee

21  that procedure and how many of those procedures

22  might need to be proctored.  And that's a hospital

23  by hospital basis.

24       Q.  Does Intuitive invest money in this

25  training of surgeons on the da Vinci surgical robot?

Highly Confidential

1      A.  Yes.

2      Q.  How much?

3      A.  I don't have a figure on what the total

4   investment is there.

5      Q.  Well, how about in 2019?  How much money

6   did Intuitive spend to train and maintain a training

7   program for doctors on the da Vinci surgical system?

8      A.  I don't know.

9      Q.  How about an estimate?

10      A.  I couldn't provide one.

11      Q.  You understand that you are designated on

12   Topic 2, which includes Intuitive's investment in

13   patent protection and Intuitive's investment to

14   teach medical students and practicing doctors to use

15   the da Vinci medical system, right?

16      A.  Yes.

17      Q.  Are you unable to provide an answer as to

18   Intuitive's investment to teach medical students and

19   practicing doctors to use the da Vinci medical

20   system?

21      A.  I would have to go back and look at what

22   the facts and figures were for 2019.

23      Q.  Does Intuitive spend tens of millions each

24   year on training surgeons to use the da Vinci

25   robotic surgery system?

Highly Confidential

1      A.  I don't know.  I wouldn't want to guess.

2  I'd have to go back and look at -- give you a

3  specific answer.

4      Q.  Why are surgeons trained on the da Vinci

5  surgical robot?

6      A.  It's a complex system that they have to

7  integrate with in their operating room with staff.

8  Uhm, it is an alternate technology to the other

9  technologies that we talked about.  So they have to

10  be trained on that.  The FDA requires that we offer

11  training for that.  But it's up to the hospital or

12  the academic program whether they have to attend

13  that training.

14      Q.  The training that's performed for the

15  da Vinci robot, that -- that training's specific to

16  the da Vinci robot, right?

17      A.  It is.

18      Q.  In other words --

19      A.  Technology itself.

20      Q.  In other words, a surgeon who has gone

21  through this training process for the da Vinci robot

22  can't just transfer that training and be comfortable

23  using the TransEnterix Senhance, right?

24      A.  Could you restate that question, please?

25      Q.  Well, sure.  You mentioned there's a --

Highly Confidential

1  there's a training process for surgeons to go

2  through before they can use the da Vinci robot in

3  surgeries, right?

4      A.  We -- we have a process that we offer for

5  surgeons, if they choose to go through it or are

6  required to go through it at their hospitals.

7      Q.  And that also involves the hospital --

8  involves hospital credentialing whether the -- if

9  surgeon's capable of using the da Vinci surgical

10  robot, right?

11     A.  The hospital --

12         MS. LENT:  Uhm --

13         THE WITNESS:  -- does --

14         MS. LENT:  I'm going to object.  And,

15  Alexander, I just want to make sure that you

16  understand the correspondence that we've sent you.

17  Dr. Myriam Curet was designated for the portion of

18  Topic 2 that relates to investment in training

19  surgeries, not Mr. Vavoso.  And she was deposed a

20  week ago.  Again, your -- I won't stop him from

21  answering the questions, but he is not the 30(b)(6)

22  deponent on this topic.

23         THE WITNESS:  Could you ask the question

24  again, please?

25         MR. ERWIG:   Q.  Sure.  If a surgeon is

Highly Confidential

1  trained on the da Vinci surgical robot, can the

2  surgeon just go and safely perform surgeries using

3  the TransEnterix Senhance, or is there some another

4  training that's required?

5          MS. LENT:  Object to the form.

6          THE WITNESS:  You're asking about Senhance

7  training?

8          MR. ERWIG:   Q.  Well, we can -- we can

9  make it specific to the da Vinci robot.  If a

10  surgeon goes through the profession of being trained

11  on the da Vinci robot, are there any other robots

12  that that surgeon is competent to perform surgeries

13  on just based on that training alone?

14          MS. LENT:  Object to the form.

15          THE WITNESS:  I don't know.  I don't know

16  other companies' requirements for training or

17  whether there would be an equivalency there.  But I

18  know we train our surgeons on our product, and it's

19  up to someone else to decide whether that training

20  translates to other products or not.

21          MR. ERWIG:   Q.  I want to talk about the

22  process for entering into the market for minimally

23  invasive soft tissue robotic surgery.  And I

24  understand there's some steps that a company might

25  have to go through if they want to develop a --

Highly Confidential

1  develop a robot that might have some of the

2  capabilities of the da Vinci; is that right?

3      A.  I lost the question in that.  Sorry.

4      Q.  Well, sure.  The -- can you describe for me

5  the process by which Intuitive brought the da Vinci

6  robot to market?

7      A.  I -- I can -- can you be more specific?  I

8  want to make sure I'm answering the right question.

9      Q.  Well, sure.  There's a period of research

10  and development, right?

11      A.  There is, yes.

12      Q.  There was -- there's some expenses that,

13  you know, Intuitive spends money on that research

14  and development -- spent money on that research and

15  development for the da Vinci robot, right?

16      A.  Yes.

17      Q.  And Intuitive has to -- had to fulfill

18  certain regulatory requirements and obtain FDA

19  approval, right?

20      A.  Yes.

21      Q.  Is that kind of a lengthy process or is

22  that short?

23      MS. LENT:  Objection.

24      THE WITNESS:  You know, what I would say is

25  that the entire development process to achieving FDA

Highly Confidential

1  approval, then being able to market a system -- or a

2  system could be up to, you know, a 10-year journey.

3  So if you consider 10 years to be lengthy, uhm, that

4  would be a lengthy process.

5       MR. ERWIG:   Q.  You mentioned a 10-year

6  journey, would that be from the first stage of

7  research and development to ultimately obtaining FDA

8  approval?

9     A.  Uhm, by the time you complete all of the

10  development work, which might require some research

11  depending on the evolution of the system or the

12  technology that is evolving, it could be clinical

13  trials, which take time.  It does entail human

14  factors testing.  So how does our system interface

15  with surgeons and staff?  And that is usually a

16  requirement of the FDA process that we have to go

17  through.  That could be a large chunk of that

18  lengthy process.

19       And you have to submit to the FDA.  They

20  evaluate that submission.  Uhm, there's back and

21  forth and what the iterations to that and -- you

22  know, over the course of that from concept all the

23  way through design, to -- to marketing could be

24  upwards of 10 years.

25     Q.  During that time period, there's some costs

Highly Confidential

Page 134

1  that have to be expended, right?

2      A.  Yes.

3      Q.  Intuitive also obtained patent protection

4  for it's da Vinci surgical robots; is that right?

5      A.  Yes.

6      Q.  Also invested money in training for

7  surgeons, right?

8      A.  Yes.

9      Q.  So a new company that wanted to enter this

10  field, they would potentially face some barriers to

11  entry; is that right?

12      MS. LENT:  Objection; calls for a legal

13  conclusion.

14      THE WITNESS:  What do you mean barriers to

15  entry?

16      MR. ERWIG:   Q.  Well, coming up with a new

17  surgical robot, that takes a lot of time, right?

18      A.  Takes a lot of knowhow and time and

19  intellectual horsepower.  And, as I said, it

20  takes -- could take up to 10 years to bring it

21  about.  And presumably others that wanted to bring a

22  product, they would go through a similar process.

23      Q.  One of the things --

24      A.  But no different than what that process has

25  been for us.

Highly Confidential

Page 135

1      Q.  Well, one of the things you mentioned is

2   a -- potentially up to a 10-year development for

3   someone that wanted to bring a similar product to

4   market, right?

5      A.  Yes.

6      Q.  Another thing that might be -- might be

7   challenging for someone trying to make a robot would

8   be fulfilling the regulatory requirements and

9   obtaining FDA approval, right?

10         MS. LENT:  Objection.

11         THE WITNESS:  Said it could be a challenge?

12         MR. ERWIG:   Q.  Yes.

13      A.  What do you mean by challenge?  It's a

14   process you have to follow.

15      Q.  Well, it's a lengthy -- it's not just a

16   simple process, right?  There's a lot of work

17   involved in submitting something to the FDA, right?

18         MS. LENT:  Objection.

19         THE WITNESS:  There's -- there's work

20   involved and you have to have the technical knowhow.

21   You have to do research and development.

22         MR. ERWIG:   Q.  Another thing that could

23   be a challenge for a company seeking to develop a

24   surgical robot would be the capital expenditures for

25   research and development, right?

Highly Confidential

1          MS. LENT:  Objection.

2          THE WITNESS:  Again, I'm not sure what you

3    mean by challenge.  I think, yes, you have to fund

4    all of that.  I -- I don't -- hard to characterize

5    it as a challenge.  You know, it's -- there's work

6    and investment that's involved.

7          MR. ERWIG:   Q.  You have to invest a lot

8    of money to try to bring a robot that competes with

9    a da Vinci to market, right?

10         MS. LENT:  Objection.

11         THE WITNESS:  Can you restate the question,

12   please?

13         MR. ERWIG:   Q.  Well, Intuitive had to

14   invest a lot of money to bring the da Vinci to

15   market, right?

16         MS. LENT:  Objection.

17         THE WITNESS:  We -- we had to -- we had to

18   and have to go through that process that you

19   described, and, yes, it requires investment.

20         MR. ERWIG:   Q.  And it's not a small

21   investment, right?  That's a tens or hundreds of

22   millions of dollars of potential investment, right?

23         MS. LENT:  Objection.

24         THE WITNESS:  I don't know the -- I don't

25   know the exact cost of what that investment looks

Highly Confidential

1    like.

2        MR. ERWIG:   Q.  Well, do you have an

3    estimate of the amount of money that Intuitive spent

4    from start of the da Vinci program to getting FDA

5    approval?

6        A.  I don't have an estimate.

7        Q.  Tens of millions?

8        A.  I -- I -- I couldn't guess.

9        Q.  Now, in today's market there's a

10   significant -- well, there's -- withdrawn.

11       In today's market there's somewhere between

12   3500 and 4,000 installed da Vinci in hospitals

13   around the U.S., right?

14       A.  Yes.

15       Q.  And so any new entrant into that market

16   would have to deal with that existing adoption of

17   da Vinci robots, right?

18       MS. LENT:  Objection.

19       THE WITNESS:  What do you mean deal with

20   that existing?

21       MR. ERWIG:   Q.  Well, many hospitals have

22   invested time and money into training programs for

23   the da Vinci robot, right?

24       A.  Yes.

25       Q.  Their surgeons are trained on and

Highly Confidential

1  comfortable with the da Vinci robot, right?

2      A.  Yes.

3      Q.  And so any new company with a new robot,

4  they would have to -- you know, that would be an

5  obstacle to getting their robot widely adopted,

6  right?

7          MS. LENT:  Objection.

8          THE WITNESS:  What do you mean by obstacle?

9          MR. ERWIG:   Q.  Well, a competitor

10  couldn't just come in and suddenly have a robot in

11  every hospital, right?

12          MS. LENT:  Objection.

13          THE WITNESS:  They -- they would go through

14  the process of showing why their technology is

15  better and what problems is it trying to solve.

16  They would have to go through that process.

17          MR. ERWIG:   Q.  In that process, one of

18  the things they would be contending with would be

19  the 3500 to 4,000 already installed da Vinci robots,

20  right?

21          MS. LENT:  Objection.

22          THE WITNESS:  What do you mean by

23  contending?

24          MR. ERWIG:   Q.  Well, you know, when

25  they're trying to show off their product, a lot of

Highly Confidential

1   those hospitals already have da Vinci robots

2   installed, right?

3       A.  Depends on what hospital they go to, but

4   yeah, there could be a da Vinci installed there,

5   right.

6       Q.  The surgeons at that hospital are already

7   likely to be familiar with the da Vinci, right?

8       A.  Some surgeons.

9       Q.  Now, that company might also have to

10   contend with the patent protection that Intuitive

11   has for the da Vinci robot, right?

12       MS. LENT:  Objection.

13       THE WITNESS:  What do you mean by contend

14   with?

15       MR. ERWIG:   Q.  Well, a company that's

16   trying to develop a new robot, they would have to be

17   mindful of Intuitive's patent protection on its own

18   robot, right?

19       A.  They would have to be mindful like anyone

20   else would have to be mindful about encroaching on

21   somebody's intellectual property, yes.

22       Q.  And hospitals that already have a da Vinci

23   installed, they might be hesitant to completely

24   switch over to another type of technology, right?

25       MS. LENT:  Objection.

Highly Confidential

Page 140

1          THE WITNESS:  What do you mean by hesitant?

2          MR. ERWIG:   Q.  Well, hospital has a

3   surgeon that's already been trained on the da Vinci

4   for a long period of time.  And they have a da Vinci

5   installed and there's comfort there.  That might be

6   a factor in the hospital's decision of whether to

7   choose to add a different robot, right?

8          MS. LENT:  Objection.

9          THE WITNESS:  Yeah, I -- I view it as

10  the -- you know, there's 65,000 surgeons in the

11  United States and maybe 20,000 have been trained on

12  da Vinci.  So just because there's a da Vinci in the

13  hospital doesn't -- doesn't mean that you can't add

14  other technology that brings value to their

15  hospital.

16         MR. ERWIG:   Q.  You mentioned --

17     A.  In -- in several cases, they have multiple

18  different ways of treating a disease within their --

19  within their hospital.  So I see it similarly.

20     Q.  You mentioned there's around 60,000

21  surgeons in the United States and around 20,000 of

22  those have been trained on da Vinci; is that right?

23     A.  65,000 surgeons in the United States.

24     Q.  65,000 surgeons.  And of those 65,000,

25  around 20,000 have been trained on da Vinci, right?

Highly Confidential

1      A.  Approximately.

2      Q.  How many have received training on the

3  TransEnterix Senhance?

4          MS. LENT:  Objection.

5          THE WITNESS:  I don't know.

6          MR. ERWIG:   Q.  Any estimate?

7      A.  No.

8      Q.  Is it likely to be more than 30?

9          MS. LENT:  Objection; lack of foundation.

10         THE WITNESS:  I -- I -- I have no basis to

11  know.

12         MR. ERWIG:   Q.  Well, does Intuitive do

13  any sort of market research about what sorts of

14  equipment surgeons are training on?

15     A.  I'm not aware of market research around

16  what technology they've been trained on.

17     Q.  Would it be important for Intuitive to keep

18  tabs on what sorts of robotic instruments surgeons

19  are training on?

20     A.  Yes.

21     Q.  Why?

22     A.  We would want to know why customers or

23  potential customers choose one technology over

24  another and what value those customers see.  And

25  we'd like to earn that choice -- you know, to be

Highly Confidential

1  able to earn that right or at least to be considered

2  a new choice.  So to understand that would be

3  important.

4      Q.  Are you familiar with the concept of a

5  barrier to entry in general speak?

6          MS. LENT:  Objection.

7          THE WITNESS:  In -- in general speak -- or

8  what is meant by general speech -- speak?

9          MR. ERWIG:   Q.  Well, do you understand --

10  what's your understanding of the words barrier to

11  entry?

12      A.  That there's some challenge.  That there's

13  some process that you have to go through, and -- in

14  order to bring a product to market, in general

15  speak.

16      Q.  You mentioned some challenge or process.

17  Can there be multiple challenges to bringing a

18  product to market?

19      A.  Sure.  There are many.

20      Q.  And those might include long development

21  times, right?

22          MS. LENT:  Object to the form.

23          THE WITNESS:  What long development times,

24  in what way?

25          MR. ERWIG:   Q.  Well, that might be a

Highly Confidential

1    challenge in bringing a product to market, right?

2    There's a really long development time in the

3    development cycle of that product, right?

4        MS. LENT:  Objection.

5        THE WITNESS:  I think the long development

6    time is an outcome of the various process points

7    that you need to bring a medical device product to

8    market that is safe for physicians to use with their

9    patients.  So I -- that's the process.

10        MR. ERWIG:  I'm going to screen share

11    another exhibit.  This will be -- well, first I'm

12    going to screen share a set of notes that I've

13    taken.  Set of notes, at the top there, labeled

14    barriers to entry with some challenges below that.

15        (EXHIBIT 15 WAS MARKED FOR IDENTIFICATION.)

16        MR. ERWIG:  Q.    Do you see that?

17    A.  I do.

18        MS. LENT:  I'm going to object to, again,

19    to your continued use of your notes as exhibits.

20    They are completely inappropriate and do not

21    represent the sum and substance of the witness's

22    testimony.

23        MR. ERWIG:  Q.  Now, Mr. Vavoso, you

24    mentioned your understanding of the phrase barriers

25    to entry was -- included some challenges in the

Highly Confidential

Page 144

1   development process for a product, right?

2        MS. LENT:  Objection; misstates his

3   testimony.  Incomplete.

4        THE WITNESS:  You didn't write the words

5   general speak down.

6        MR. ERWIG:  Q.  I'm happy to.

7        MS. LENT:  My objection remains.

8        MR. ERWIG:  Q.  Is that better?

9        MS. LENT:  I still object.

10       MR. ERWIG:  Q.  Now, Mr. Vavoso, one of

11   the things we discussed was that it can be up to a

12   10-year development time for a new entrant into the

13   surgical robot space, right?

14    A.  Says that, yes.

15       MS. LENT:  I object to you characterizing

16   that as a barrier to entry, which is not what

17   Mr. Vavoso testified to.

18       MR. ERWIG:  Q.  We also discussed that

19   another challenge could be fulfilling regulatory

20   requirements for a company seeking to bring a robot

21   to market, right?

22       MS. LENT:  Objection.  That is not what the

23   witness testified to.  That's what you wanted him to

24   say and that's why you wrote it down.  I'm objecting

25   to this whole line of testimony.  It's

Highly Confidential

1  inappropriate.

2      You can answer the question, Mr. Vavoso,

3  but it's inappropriate.

4      THE WITNESS:  Sorry.  I lost the question.

5  Could you restate it, please?

6      MR. ERWIG:  Q.  No problem.  One of the

7  challenges to bringing a robot to market, surgical

8  robot to market, would be fulfilling regulatory

9  requirements, right?

10      MS. LENT:  Objection; misstates his

11  testimony.

12      THE WITNESS:  Fulfilling the FDA mandated

13  requirements is part of the process.

14      MR. ERWIG:  Q.  Now, one other thing that

15  we discussed was -- well, another potential barrier

16  or another -- withdrawn.

17      Another potential challenge that company

18  might face in bringing a surgical robot to market

19  would be significant capital expenditures for

20  research and development, right?

21      MS. LENT:  Objection; misstates his

22  testimony.

23      THE WITNESS:  Yeah, I didn't say -- I

24  didn't say that.

25      MR. ERWIG:  Q.  Well, sure.  I'm just

Highly Confidential

1  trying to get a sense if you -- if that's true.  If,

2  you know, company's trying to develop a new surgical

3  robot, one of the potential challenges that they

4  might face is that that development process costs a

5  lot of money, right?

6       MS. LENT:  Can we be clear what you're

7  trying to do is to get a list of what you're going

8  to call barriers to entry and put words in his

9  mouth.  So let's ask a question that is appropriate

10  as opposed to trying to force words in his mouth

11  that are contrary to what he already testified to.

12      MR. ERWIG:  Ms. Lent, the speaking

13  objections are inappropriate.  If you can keep your

14  objection to form, you can preserve it for the

15  record.  But anything beyond that is not appropriate

16  in terms of deposition testimony, as you know.

17      MS. LENT:  What you're doing is

18  inappropriate, but I will object to form and

19  Mr. Vavoso can try and answer the question to the

20  extent you ask an appropriate one.

21      MR. ERWIG:   Q.  Great.  Thank you.  Now,

22  Mr. Vavoso, one of the challenges that a company

23  trying to develop a surgical robot might face is

24  there is some significant capital expenditure that's

25  required to bring a new robot to market, right?

Highly Confidential

1          MS. LENT:  Object to the form.

2          THE WITNESS:  There's investments that you

3    have to make as part of this process.

4          MR. ERWIG:   Q.  They're not insubstantial,

5    right?  Those can be significant investments, right?

6          MS. LENT:  Objection.

7          THE WITNESS:  They're investments in the

8    process, sir.  Gauge if they're significant or

9    non-significant is --

10          MR. ERWIG:   Q.  We also talked about how

11    there's a -- an install base of 3500 to around 4,000

12    of installed da Vinci robots, right?

13      A.  Not -- not relative to a challenge.  We

14    didn't talk about that.

15      Q.  We discussed that there's a current install

16    base of around 3500 to 4,000 installed da Vinci

17    robots in the United States, right?

18      A.  We discussed it.

19      Q.  That might be a challenge to a new company

20    seeking to develop a new surgical robot, right?

21          MS. LENT:  Objection.

22          THE WITNESS:  In that context, what's

23    the -- define challenge?

24          MR. ERWIG:   Q.  Well, a lot of hospitals

25    already have a surgical robot.  They've already

1  invested a lot of time into a surgical robot, right?

2  They might have some reluctance to just switch to a

3  different one, right?

4        MS. LENT:  Objection; asked and answered.

5        THE WITNESS:  There -- there -- every day

6  they're free to make a choice on what they invest

7  in.  Uhm, they can add other technologies and they

8  do every day.

9        MR. ERWIG:   Q.  Well, let's be clear.  Is

10  it your position that the install base of 3500 to

11  4,000 installed da Vinci robots presents no

12  challenge to a competitor seeking to enter the

13  market.  Is that your testimony?

14        MS. LENT:  Objection.

15        THE WITNESS:  What do you mean by no

16  challenge?

17        MR. ERWIG:   Q.  Well, when discussing some

18  challenges that a developer of a robot might face,

19  right, and I want to know if it's your testimony, on

20  behalf of Intuitive, that the install base of 3500

21  to 4,000 installed da Vinci robots poses no

22  challenge at all to a manufacturer of a competing

23  surgical robot?

24        MS. LENT:  Object.

25        THE WITNESS:  It is -- whoever is bringing

Highly Confidential

1  technology to market has to show that their

2  alternative is better than the current set of

3  alternatives out there.  And I don't see the size of

4  install base as being a barrier to that.

5        MR. ERWIG:   Q.  Well, the current size of

6  the install base is 3500 to 4,000 installed da Vinci

7  robots, right?

8     A.  Yes.

9     Q.  And there's -- whatever competitor would

10  have install base of zero, right?

11       MS. LENT:  Objection.

12       THE WITNESS:  What competitor?

13       MR. ERWIG:   Q.  Well, a new competitor

14  trying to bring a new robot to the market.  They'd

15  start with an install base of zero, right?

16     A.  They would.

17     Q.  And Intuitive -- Intuitive's not starting

18  from an install base of zero, right?

19       MS. LENT:  Objection.

20       THE WITNESS:  What do you mean started?  I

21  don't understand your question.

22       MR. ERWIG:   Q.  Well, as of today,

23  Intuitive has an install base of between 3500 and

24  4,000 da Vinci surgical robots, right?

25     A.  There is 3500 to 4,000 da Vinci systems in

Highly Confidential

1  hospitals, yes.

2      Q.  For a new company entering into that space,

3  they would have an install base of zero in

4  hospitals, right?

5      A.  Yes.

6      Q.  Another issue -- another potential

7  challenge for a company might be patent protection,

8  right?  It's complicated --

9          MS. LENT:  Object --

10         MR. ERWIG:   Q.  -- intellectual property

11  issues, right?

12         MS. LENT:  Objection; asked and answered.

13  Compound.

14         THE WITNESS:  Say the question again,

15  please?

16         MR. ERWIG:   Q.  Well, for a company

17  developing a new surgical robot, one challenge would

18  be Intuitive's patent protection on its technology,

19  right?

20         MS. LENT:  Objection; asked and answered.

21         THE WITNESS:  Company bringing new

22  technology has to be mindful of the intellectual

23  property that belongs to another company, yes.

24         MR. ERWIG:   Q.  And we also talked

25  about -- you mentioned that there's 65,000 surgeons

Highly Confidential

1   and that 20,000 of those are already trained on the

2   da Vinci surgical robot, right?

3       A.  Approximately.

4       Q.  So that might be a challenge for a new

5   company is getting surgeons trained on their new

6   surgical robot, right?

7           MS. LENT:  Objection; asked and answered.

8           THE WITNESS:  No.

9           MR. ERWIG:   Q.  It's your position that

10  existing -- withdrawn.

11          Is it Intuitive's position that the

12  existing training of surgeons has no impact on

13  potential competitors' ability to enter the market?

14          MS. LENT:  Objection; outside the scope of

15  the 30(b)(6).  You can ask him in his individual

16  capacity.

17          MR. ERWIG:   Q.  Sorry.  I didn't get the

18  answer?

19      A.  Yes.

20      Q.  Going to mark this as Exhibit 15.  We can

21  go off the record.

22          VIDEOGRAPHER:  Excuse me.

23          MS. LENT:  And I continue to object to that

24  being an exhibit.

25          VIDEOGRAPHER:  Is this a good time to

Highly Confidential

1  change out the video?

2       MR. ERWIG:  I was just suggesting we take a

3  break.

4       VIDEOGRAPHER:  All right.  This is the end

5  of Media 2.  We're off the record at 1:02.

6       (The deposition was in recess from 1:02 to

7       1:35.)

8       VIDEOGRAPHER:  Here's the beginning of

9  Media No. 3 in the deposition of Glenn Vavoso.  We

10  are back on the record at 1:35.

11       MR. ERWIG:  I'm going to screen share our

12  next exhibit.  This will be Exhibit 16.  It says

13  6/8/17 Mohr to Vavoso, et al.

14       (EXHIBIT 16 WAS MARKED FOR IDENTIFICATION.)

15       MR. ERWIG:   Q.  Can you see this on the

16  screen in front of you, Mr. Vavoso?

17     A.  Yes.

18     Q.  Does this appear to be -- well, withdraw.

19       Do you recognize this?

20     A.  I'm just reading through it.  All right.  I

21  don't recognize it.

22     Q.  Well, you notice that you're listed in the

23  to column, right?

24     A.  Yes.

25     Q.  The from column, that's from Catherine Mohr

Highly Confidential

1  at Intuitive surgical; is that right?

2      A.  Yes.

3      Q.  Who is Catherine Mohr?

4      A.  She is president of the Intuitive

5  Foundation.

6      Q.  And it says down here in the e-mail footer

7  that she's the vice president of strategy Intuitive

8  Surgical, Inc.  Was that her position as of

9  June 8th, 2017?

10     A.  Yes.

11     Q.  Does this appear to be an e-mail from

12  Catherine Mohr to yourself and others at Intuitive

13  Surgical with the subject LRM meeting?

14     A.  Yes.

15     Q.  Looks like there's an attachment that's

16  called U.S. scenarios and brainstorming.docx.  Do

17  you see that?

18     A.  I see that label, yes.

19     Q.  And Ms. Mohr writes, "The attached Word

20  document has the notes from the assumptions slash

21  forces and factors slash indicators record as well

22  as the scenarios idea generation slash ranking and

23  workshop topics."

24         You see that?

25     A.  Uh-huh, yes.

Highly Confidential

Page 154

1          MR. ERWIG:  Stop screen sharing this

2   exhibit.  Our next exhibit is going to be

3   Exhibit 6 -- Exhibit 17.  Sorry.

4          (EXHIBIT 17 WAS MARKED FOR IDENTIFICATION.)

5          MR. ERWIG:   Q.  That will be the labeled

6   attach -- 6/8/17 Attach to Mohr to Vavoso, et al.

7   Share this with you.  Can you see this on the screen

8   in front of you?

9      A.  Yes.

10     Q.  Do you recognize this document?

11     A.  No.

12     Q.  Any reason to believe that this isn't the

13   attachment to Ms. Mohr's e-mail?

14     A.  No.

Highly Confidential







Highly Confidential



Highly Confidential







Highly Confidential



Highly Confidential



Highly Confidential

7        MR. ERWIG:  Stop screen sharing this

8    exhibit.  Now, our next exhibit is going to be

9    Exhibit 18.

10        (EXHIBIT 18 WAS MARKED FOR IDENTIFICATION.)

11        MR. ERWIG:   Q.  This will be 8/24/19

12    Darling to Vavoso, et al.  I'm going to screen share

13    this with you.  You see this on the screen in front

14    of you?

15      A.  Yes.

16        MR. ADAMS:  You can't say that because

17    you -- I don't know what you're asking.

18        MR. ERWIG:  You're not muted.  Let's go off

19    the record.

20        MR. ADAMS:  You want to know what's the

21    bus?  If there's less work on the bus.  I don't

22    think so.

23        VIDEOGRAPHER:  We're off record at 1:53.

24        (The deposition was in recess from 1:52 to

25        1:53.)

Highly Confidential

1        VIDEOGRAPHER:  We're back on the record.

2  The time is 1:53.

3        MR. ERWIG:   Q.  Zoom screen sharing

4  Exhibit 18.  Who is Calvin Darling?

5      A.  Can you scroll down?  Senior director of

6  finance investor relations.

7      Q.  Does he work for Intuitive?

8      A.  Yes.

9      Q.  And you're also copied on this e-mail,

10  right?

11      A.  Yes.

12      Q.  Does this appear to be an e-mail from

13  Calvin Darling to you and others from Intuitive sent

14  on August 24th, 2019?

15      A.  Yes.

16      Q.  And the subject is investor news 8/19 to

17  8/23.  Do you see that?

18      A.  Yes.

19      Q.  And there's some attachments, including

20  Piper robotic surgery.pdf.  Do you see that?

21      A.  I see the attachment names, looks like from

22  outside analysts.

23      Q.  You received these attachments along with

24  this e-mail, right?

25      A.  It would appear, yes.

Highly Confidential

1       MR. ERWIG:  I'm going to stop screen

2   sharing this exhibit.  Next exhibit is going to be

3   Exhibit 19.

4       (EXHIBIT 19 WAS MARKED FOR IDENTIFICATION.)

5       MR. ERWIG:   Q.  And it will be one of the

6   attachments labeled as 8/24/19 Attach to Darling to

7   Vavoso.  Do you see this on the screen in front of

8   you?

9   A.  Yes.

10   Q.  Do you recognize this?

11   A.  No.

12   Q.  Does this appear to be to the Bernstein

13   report that was attached to the e-mail that we just

14   referenced?

15   A.  Is that a question?

16   Q.  That is a question.

17   A.  It appears to be, yes.

18   Q.  Now, I want to talk with you about some

19   parts of this report.  The title is Intuitive

20   Surgical, what do experts think about Medtronics'

21   new surgical robot.

22       Do you see that?

23   A.  Yes.

24   Q.  It says, "This week Medtronic announced

25   plans to unveil the company's long anticipated soft

1  tissue surgical robot at an analyst day on

2  September 24th, 2019."

3       Do you see that?

4    A.  Yes.

5    Q.  Then I want to draw your attention to the

6  next couple of sentences where it reads, "This is a

7  major development after years of speculation.

8  Intuitive Surgical has held a monopoly position in

9  the soft tissue robotic surgery market for the last

10  two decades."  See that?

11   A.  Yes.

12   Q.  Did Intuitive Surgical hold a monopoly

13  position in the soft tissue robotic surgery market

14  in the two decades prior to 2019?

15       MS. LENT:  Objection.

16       THE WITNESS:  Define monopoly.

17       MR. ERWIG:  Q.  Well, I want to know, when

18  you're reading this, you agree with this statement

19  or you disagree with this statement that's in this

20  analyst report?

21   A.  I neither agree or dis -- I don't know what

22  the statement -- not -- not a company statement.

23  It's from an outside analyst.

24   Q.  Right.  I want to get your take on this

25  particular sentence.  And so reading this now, the

Highly Confidential

1  sentence, "Intuitive Surgical has held a monopoly

2  position in the soft tissue robotic surgery market

3  for the last two decades."

4       You agree with that statement, disagree

5  with it, or what's your position on that statement?

6       MS. LENT:  Objection.

7       THE WITNESS:  I would disagree with it as a

8  statement.

9       MR. ERWIG:  Q.  On what basis?

10      A.  On the basis of the market in which we

11  serve.

12      Q.  Well, let's talk about the market that's

13  referenced here, which is the soft tissue robotic

14  surgery market.  Okay?

15      A.  That's one of the reasons why I disagree

16  with the statement.

17      Q.  Well, the statement says, "Intuitive

18  Surgical has held a monopoly position in the soft

19  tissue robotic surgery market," right?

20      A.  It's what it says, yes.

21      Q.  Doesn't say Intuitive Surgical has held a

22  monopoly position, for example, in the open robotic

23  surgery market, right?

24      A.  It does not say that.

25      Q.  And so just want to focus in on the soft

Highly Confidential

1  tissue robotic surgery market, which -- to clarify,

2  which companies have FDA approval to operate in the

3  soft tissue robotic surgery market?

4      MS. LENT:  Objection.

5      THE WITNESS:  The FDA doesn't grant

6  approval to operate in a market.  So I don't quite

7  understand your question.

8      MR. ERWIG:  Q.  Well, the soft tissue

9  robotic surgery market, that may include a number of

10  potential soft tissue surgeries, right?

11      MS. LENT:  Objection.

12      THE WITNESS:  Please ask the question

13  again?

14      MR. ERWIG:  Q.  Well, the -- let's just

15  make it simpler.  Is the da Vinci robot capable of

16  performing soft tissue robotic surgery with FDA

17  approval?

18      A.  It's capable of doing surgery, and it

19  happens to be a robotic system, yes.

20      Q.  Well, and the surgeries that it's capable

21  of performing, those are soft tissue surgeries,

22  right?

23      A.  They are soft tissue surgeries.

24      Q.  And those soft tissue surgeries, they're

25  not done using tradition laparoscopic instruments.

Highly Confidential

1  They're performed using robotic surgery, right?

2      MS. LENT:  Objection.

3      THE WITNESS:  Can you restate the question,

4  please?

5      MR. ERWIG:  Q.  Sure.  The Intuitive --

6  when Intuitive does a -- withdrawn.

7      When there's a soft tissue surgery done

8  with the da Vinci robot, that's a soft tissue

9  robotic surgery, right?

10    A.  It is.

11    Q.  And you're familiar with that phrase as it

12  relates to surgeries performed with the da Vinci

13  robot, right?

14      MS. LENT:  Objection; vague.

15      THE WITNESS:  But it's not like that

16  patient came from the soft tissue robotic surgery

17  market.  That patient came from a choice decision of

18  whether they're going to have open laparoscopic or

19  robotic.  And so the soft tissue market is open

20  robotic and laparoscopic because those are the three

21  modalities you --

22      MR. ERWIG:  Q.  Well, sir, I understand

23  that -- so it's a perspective that you have.  But

24  really focus in on the exact question that I'm

25  asking, which is there's surgeries -- so patient may

Highly Confidential

1  have a choice initially between an open surgery and

2  minimally invasive surgery, right?  That's one type

3  of choice that a patient might have, right?

4      A.  Lots of choices along the patient

5  continuum.  Could be one choice they've got to make.

6      Q.  When a patient is considering a type of

7  surgery, one of the choices they have to make is, am

8  I going to have an open surgery.  I'm going to have

9  a minimally invasive surgery, right?

10     A.  Yes.

11     Q.  Then the patient's got another choice to

12  make after that, right, which is am I going to have

13  a tradition laparoscopic surgery?  I'm going to have

14  a robotic soft tissue surgery, right?

15     A.  Yes.

16         MS. LENT:  Objection.

17         MR. ERWIG:  Q.  And now I just want to

18  focus in -- I understand that there's other, you

19  know, if you start at the very top level, there

20  might be other elements.  But I just want to focus

21  in on that soft tissue robotic surgery component.

22  In that soft tissue robotic surgery component, once

23  the patient's made that choice, da Vinci's the only

24  option, right?

25         MS. LENT:  Objection.

Highly Confidential

1      THE WITNESS:  We talked earlier that the

2   other robotic systems, depending on the indication,

3   could also serve as a choice.

4      MR. ERWIG:  Q.  So once you're in that

5   market, it would be da Vinci.  It would be the

6   TransEnterix Senhance, and the Medrobotics Flex,

7   right?

8      MS. LENT:  Objection; mischaracterizes his

9   testimony.

10      THE WITNESS:  And what are you defining as

11   market?

12      MR. ERWIG:  Q.   Well, if that word

13   bothers you, we can just use a different term, which

14   is once a patient's made a choice to get a minimally

15   invasive robotic surgery, the options there are, you

16   know, the da Vinci robot, the TransEnterix, the

17   Medtronics, right?

18      A.  Medrobotics.

19      Q.  Medrobotics.  I'm sorry.

20      A.  Yeah, those would be -- those would be the

21   choices.

22      Q.  For some surgeries you can't use either the

23   Medrobotics or the Senhance, right?

24      MS. LENT:  Objection.

25      THE WITNESS:  For some surgeries.

1          MR. ERWIG:  Q.  Let's use a specific

2  category.  For cardiac surgeries, for example, if a

3  patient's decided they want a minimally invasive

4  robotic surgery for a cardiac procedure, the

5  da Vinci is approved for that procedure.  Neither

6  the Medrobotics or the Senhance, neither of those

7  robots can perform that procedure, right?

8      A.  Well, there's a difference between they

9  could perform the procedure, whether they're

10  approved to perform it.  And surgeons can follow

11  what they want.  So just kind of be clear on that.

12  If a surgeon wanted to take a Senhance and try a

13  cardiac operation, they have the authority to do

14  that.  Whether it was --

15      Q.  So --

16      A.  -- it was approved or not.  But if the

17  patient wanted an approved FDA procedure for

18  cardiac, the da Vinci would be their -- would be

19  their choice in that situation.

20      Q.  And it would be their only choice, right?

21      A.  It -- it would be the choice as you've

22  narrowed that down.

23      Q.  Now, just talking about that market, which

24  is -- or we don't have to use market if it makes you

25  uncomfortable.  We can say that segment of minimally

Highly Confidential

1  invasive soft tissue robotic surgery where we've got

2  the da Vinci, TransEnterix Senhance, Medrobotics

3  Flex.  That statement -- in that segment, Intuitive

4  has a monopoly position, right?

5        MS. LENT:  Objection.

6        THE WITNESS:  Define monopoly.

7        MR. ERWIG:   Q.  Has over 98 percent market

8  share, right?

9        MS. LENT:  Objection.

10        THE WITNESS:  So are we talking segment or

11  are we talking market?

12        MR. ERWIG:   Q.  That segment.  Market

13  share?

14        MS. LENT:  Objection.

15        THE WITNESS:  If you narrowed the choice

16  down to cardiac surgery that's robotic, and you said

17  well, what is the segment share, it would be

18  da Vinci is the --

19        MR. ERWIG:   Q.  Da Vinci would have

20  100 percent of that market share, correct?

21        MS. LENT:  Objection.

22        THE WITNESS:  They would have that segment

23  share.  That's the applicability of the system.

24        MR. ERWIG:   Q.  And how about for the

25  system where there's some overlap.  One of the ones

Highly Confidential

1  we talked was general surgery, right, where there's

2  the Senhance and there's the Medrobotics Flex,

3  potentially, and then there's the da Vinci.  How

4  about in that segment?

5        MS. LENT:  Objection; vague.

6        THE WITNESS:  Yeah, define the segment?

7        MR. ERWIG:  Q.  Well, it's general

8  surgeries for which the da Vinci, the Senhance, and

9  the Flex all have FDA approval.  What's the

10  Intuitive share of that segment?

11        MS. LENT:  Objection.

12        THE WITNESS:  Don't have an exact number of

13  that.

14        MR. ERWIG:  Q.  How about an estimate?

15        MS. LENT:  Objection.

16        THE WITNESS:  The segment that you've

17  narrowed to say there's a general surgery procedure,

18  and it's only done robotically, uhm, so is it

19  Senhance, Medrobotics, or Intuitive, it greater than

20  90 percent?

21        MR. ERWIG:  Q.  Greater than 95 percent?

22     A.  I don't know.

23     Q.  After you take the segment of the

24  procedures that the da Vinci is authorized to

25  perform, compare that to the procedures that the

Highly Confidential

1  TransEnterix and the Medrobotics are authorized to

2  perform, the da Vinci performs in a greater range of

3  categories, right?

4         MS. LENT:  Objection.

5         THE WITNESS:  There are more categories

6  that are approved for da Vinci than TransEnterix or

7  Medrobotics.

8         MR. ERWIG:  Q.  Now, if you layer those

9  across and we look at number of surgeries performed

10  by da Vinci robot against number of surgeries

11  performed by Senhance robot, number of surgeries

12  performed by Medrobotics robot, can you give me a

13  sense of how those numbers compare in -- let's say

14  in 2020?

15         MS. LENT:  Objection.

16         THE WITNESS:  Again, you know, it's not a

17  number that we measure.  I don't have an exact

18  number.  It's not something that we look at.

19         MR. ERWIG:  Q.  Intuitive doesn't look at

20  the number of surgeries performed by the Senhance or

21  by the Medrobotics?

22      A.  We -- not information that is readily

23  available.  We make estimates as to the market of

24  surgery and modality of which the approach is for a

25  given procedure, procedure by procedure.

Highly Confidential

1    Q.  Does Intuitive make its U.S. based

2  employees sign non-compete agreements?

3    A.  Yes.

4       MR. ERWIG:  I'm going to screen share our

5  next exhibit.  This will be Exhibit 20.

6       (EXHIBIT 20 WAS MARKED FOR IDENTIFICATION.)

7       MR. ERWIG:   Q.  This will be 1/24/17 Child

8  to Vavoso, et al.  Can you see this on the screen in

9  front of you, Mr. Vavoso?

10    A.  Yes.

11    Q.  Who is Craig Child?

12    A.  Head of HR.

13    Q.  You see you're copied on this e-mail?

14    A.  Yes.

15    Q.  The subject line of this e-mail is

16  proprietary rights agreement please do not forward.

17     Do you see that?

18    A.  Yes.

19    Q.  It's dated 1/24/2017.  You see that?

20    A.  Yes.

21    Q.  There's some attachments including

22  proprietary rights agreement FAQ and proprietary

23  rights agreement.ca.pdf.  Do you see that?

24    A.  Yes.

25    Q.  Does this appear to be an e-mail from Craig

Highly Confidential

1  Child to you and others at Intuitive sent on

2  January 1st -- 24th, 2017 attaching proprietary

3  rights agreement FAQ and proprietary rights

4  non-competition agreement?

5     A.  Yes.

6        MR. ERWIG:  Stop screen sharing this

7  document.  And we'll take a look at some of the

8  attachments.  First attachment we'll take a look at

9  is the Proprietary Rights and Non-competition

10  Agreement dot Non-sales.

11        Do you have this on the screen in front of

12  you.

13        (EXHIBIT 21 WAS MARKED FOR IDENTIFICATION.)

14        THE WITNESS:  Yes.

15        MR. ERWIG:   Q.  I'm going to scroll

16  down -- well, withdrawn.

17        Does this appear to be a proprietary rights

18  and non-competition agreement issued by Intuitive

19  Surgical?

20     A.  It does.

21     Q.  I'm going to scroll down with you to -- too

22  far.  Section 9.3.  Section 9 is titled

23  non-competition.  Do you see that?

24     A.  I see that.

25     Q.  There's a section labeled -- or there's a

1  part of that paragraph that says, "Employee agrees

2  that during the period of employee's employment and

3  for 12 months thereafter employee will not directly

4  or indirectly engage in any of the activities

5  described in sections 9.1, 9.2, or 9.3 below."

6      Do you see that?

7    A.  Yes.

8    Q.  And I want to go to section 9.3 which

9  reads, "Perform any job function on behalf of any

10  competitor defined below the company."

11      Do you see that?

12    A.  Yes.

13    Q.  And then it defines competitor in that

14  term.  Do you see that?

15    A.  Yes.

16    Q.  Can you read the definition of competitor

17  in that section 9.3?

18    A.  It means any -- competitor means any

19  business which directly competes or plans to compete

20  with the company at any of the following areas,

21  robotic assisted surgery, robotic assisted catheter

22  control, augmented reality surgery.

23    Q.  Is there any mention in that definition of

24  traditional hospital services?

25      MS. LENT:  Objection; vague.

Highly Confidential

1        THE WITNESS:  I may not have heard the

2  question right.  Can you restate?

3        MR. ERWIG:   Q.  Is there any mention in

4  this section of United States based hospitals?

5     A.  There is no -- there is no mention of

6  hospitals there.

7     Q.  Is there any mention of a business that

8  develops traditional laparoscopic instruments?

9     A.  Does not state laparoscopic instruments in

10  that paragraph.

11        MR. ERWIG:  Can take this exhibit down.

12  We're going to -- next Exhibit 22 will be

13  Proprietary Rights Agreement FAQ.

14        (EXHIBIT 22 WAS MARKED FOR IDENTIFICATION.)

15        MR. ERWIG:   Q.  Screen share.  Do you see

16  this on the screen in front of you?

17     A.  Yes.

18     Q.  Does this appear to be an Intuitive

19  Surgical document titled FAQs regarding new

20  proprietary rights agreements for U.S. employees

21  dated January 31st, 2017?

22     A.  Yes.

23     Q.  Scroll to Section 5, which is titled what

24  is a non-compete obligation and why do only some

25  proprietary rights agreement include them.

Highly Confidential

1       Do you see that?

2    A.  Yes.

3    Q.  I want to draw your attention to the second

4  paragraph here that starts with -- where there's a

5  section that starts with "to that end."

6       Do you see that?  Highlight it for you.

7    A.  Yep, I see that.

8    Q.  And it reads, "To that end we're permitted

9  by law, our proprietary rights agreements include

10  non-compete language that prohibits employees from

11  working in competitive businesses narrowly defined

12  as a business that directly competes with Intuitive

13  or plans to compete with Intuitive in the areas of

14  robotic assisted surgery, robotic assisted catheter

15  control, or augmented reality surgery."

16       Do you see that?

17    A.  I do.

18       MR. ERWIG:  Is it your understanding that

19  a -- well, withdrawn.

20       Take this exhibit down.  Screen share our

21  next exhibit.

22       (EXHIBIT 23 WAS MARKED FOR IDENTIFICATION.)

23       MR. ERWIG:   Q.  This will be Exhibit 23.

24  This will be March 2017 SAB Recap.

25       Can you see this on the screen in front of

Highly Confidential

1  you?

2      A.  Yes.

3      Q.  Does this appear to be a document from

4  March 21st, 2017, titled Intuitive Surgical sales

5  advisory board?

6      A.  Yes.

7      Q.  What is the Intuitive Surgical sales

8  advisory board?

9      A.  It is a collection of -- a variety of roles

10  within the U.S. sales organization that are, uhm,

11  called as advisory board to allow kind of free flow

12  of information from senior leadership to -- to sales

13  representation in the U.S.

14      Q.  There's a bullet labeled SD -- well,

15  withdrawn.

16      There's a bullet labeled SFDC team.  Do you

17  see that?

18      A.  I do.

19      Q.  What is the SFDC team?

20      A.  It's sales force dot-com.

21      Q.  Are you a member of that team?

22      A.  Not currently, but it is in my purview.  So

23  it depends how you define team.  I think in the

24  context of 2017, I was there based on -- it's a

25  system that we have, and it's in my purview today.

Highly Confidential

1    Q.  So as of March 21st, 2017, you were

2    involved on the SFDC team; is that right?

3    A.  Yeah, I think that just characterized who

4    was in attendance.

5    Q.  So you were in attendance at this meeting

6    on March 21st, 2017?

7    A.  I don't know that for sure, but --

8    Q.  Was it likely that you were in attendance

9    if you're listed here under the SFDC team?

10    A.  Can you scroll down through the document?

11    Just want to see the contents.

12    Q.  Well, here's -- there's a section that

13    starts, "Discussion with Glenn Vavoso."

14        Does that help refresh your --

15    A.  It would appear I was there, yes.

16    Q.  And I want to ask you a couple of questions

17    about this document.  One is number 10, where it

18    reads proprietary rights agreement.

19        Do you see that?

20    A.  Yes.

21    Q.  And bullet point E under that is, "Only

22    applies to other robotic slash computer assisted

23    surgery companies that compete with ISI."

24        Do you see that?

25    A.  Yes.

Highly Confidential

1    Q.  As of this time, did you have an

2  understanding of what this proprietary rights

3  agreement would extend to.  That is, who the robotic

4  computer assisted companies were that the

5  proprietary rights agreement applied to?

6    A.  Can you restate the question, please?

7    Q.  Well, as of this time -- well, withdrawn.

8      Did you sign a proprietary rights

9  agreement?

10    A.  I believe I did.

11    Q.  When you signed it, do you have an

12  understanding of what robotic slash computer

13  assisted surgery companies that proprietary rights

14  agreement applied to?

15    A.  There's a -- there's a proprietary right

16  agreement and then there's a non-compete.  They're

17  two separate, and the non-compete doesn't apply in

18  California of which I reside.

19    Q.  So -- sorry.  I didn't mean to cut off.

20    A.  No, I'm done.

21    Q.  For employees residing outside of

22  California, did you have any idea about the robotic

23  slash computer assisted surgery companies that

24  competed with ISI as of March 2017?

25    A.  I don't know the specific list that that

Highly Confidential

1  covered.  Uhm, there's variety of companies that we

2  would have considered as robotic computer assisted

3  surgery companies at that time.

4      Q.  I want to scroll down to page 5 and ask you

5  about question 4.  See if there's a point here

6  listed, "Competition is coming."

7        Do you see that?

8    A.  Yes.

9      Q.  And there's a little Sub-point A that says,

10  "Discussion on what ISI needs to do to prepare for

11  competition."

12        Do you see that?

13    A.  Yes.

14      Q.  What do you understand is meant by that?

15    A.  It was a -- addressing preparation for do

16  you understand the value of those products that are

17  coming.  How might our product be positioned

18  relative to that value?  Understand why customers

19  would want to choose that product over our product.

20  Uhm, discussion of a variety of features, advantages

21  relative to our features, advantages.

22      Q.  Now, Sub-point B under that lists hospital

23  decision making, what is the risk of change, is

24  change worth the effort?

25        Do you see that?

Highly Confidential

1    A.  I do.

2    Q.  What does that relate to?

3    A.  State the question, please?

4    Q.  Well, you've talked about what bullet point

5  A reflected.  I want to get a sense of what bullet

6  point B reflects since you were in attendance at

7  this meeting.  So what light can you shed on what's

8  meant by hospital decision making, what is the risk

9  of change, is change worth the evidence?

10    A.  Yep.  Similar to the preparation part of

11  that, which is -- is the change worth the effort in

12  terms of the value.  If customers are making a

13  choice between one product or the other,

14  understanding what is the hospitals decision

15  criteria for how they determine value and how

16  they're going to make that decision.

17    Q.  When it says change worth the effort,

18  what's meant by that?

19    A.  Is the -- is that technology -- is that

20  value going to deliver on -- relative to what their

21  expectation is.

22    Q.  Well, worth the effort.  It doesn't say,

23  you know, will -- will hospitals switch over.  It

24  talks about is change worth the effort, right?

25    A.  I don't know the context of the -- is

Highly Confidential

1  change worth the effort.  They have to evaluate

2  those technologies and make a decision whether

3  they're going to purchase that or not.  And there's

4  a process those customers have to go through.

5  They'll go through that process if there's high

6  value that that technology brings.

7      Q.  At least as it's listed here, it reflects

8  that a changeover from Intuitive's products to

9  another competitor, that would take some effort,

10  right?  It certainly wouldn't be an effortless

11  process, right?

12      MS. LENT:  Objection; lacks foundation.

13      THE WITNESS:  The context, you know, it's

14  not stated there.  Hospitals make an effort to take

15  on new technology all the time.  And there are

16  hospitals that don't have a da Vinci.  So hospitals

17  decision making to buy another robotic technology,

18  they're going to make that relative to what they

19  already have, how they do surgery.  They may

20  evaluate that against da Vinci, uhm, but, you know,

21  effort is they've got to go down the path of

22  bringing that technology in.

23      MR. ERWIG:  Q.  So -- want to make sure

24  that we capture some parts of that answer.  One of

25  the things you mentioned was that hospitals that

Highly Confidential

1  already have a da Vinci they may -- they may

2  evaluate -- have -- the fact that they have that

3  da Vinci when they're making a decision to purchase

4  a different product; is that right?

5     A.  No.  I can restate that.  What I said was

6  that they're making -- they're making a comparative

7  decision.  That -- what is the value that -- if they

8  have a da Vinci system, again, not every hospital

9  has a da Vinci.  But they're making -- if they do

10  have a da Vinci, they're making a decision, the

11  value that is provided by da Vinci system relative

12  to an alternative technology.

13     Q.  Now, the alternative technologies to the

14  da Vinci system would be the TransEnterix Senhance

15  and the Medrobotics Flex, right?

16        MS. LENT:  Object to the form.

17        THE WITNESS:  I think in the context of

18  this, yes.  But they -- they evaluate new

19  technologies all the time to -- how to treat

20  disease.  They're not always surgical technologies.

21        MR. ERWIG:  Q.  So in the context of

22  robotic surgery technologies, they'd be potentially

23  evaluating the TransEnterix Senhance and the

24  Medrobotics Flex, right?

25     A.  As well as other competitors, but -- for

Highly Confidential

1  companies looking to come.

2     Q.  There's certainly no others competitors

3  today that have FDA approval for a minimally

4  invasive surgical robot, right?

5     A.  Doesn't mean that they're not evaluating

6  that and talking to those companies about timing or

7  whether they want to consider making that purchase.

8     Q.  One of the things that the hospital's

9  considering is they already have a da Vinci, they're

10  looking at can that other system do something else

11  or something additional, right?

12     MS. LENT:  Objection.

13     THE WITNESS:  I -- you know, again, with

14  technology, they're going to evaluate what value

15  does that bring, and it will be relative to lots of

16  current technologies or approaches they have.  One

17  of which would be da Vinci.

18     MR. ERWIG:  Q.  Now, for a hospital to be

19  using the da Vinci in surgery, one of the things

20  they have to do is they have to buy the da Vinci

21  robot, right?

22     A.  They do.

23     Q.  And they have to buy EndoWrists and

24  equipment for that robot as well, right?

25     A.  They have to buy a whole system, EndoWrists

Highly Confidential

1    instruments, accessories.

2        Q.  And as part of that, maintaining a da Vinci

3    robot, they have to keep buying EndoWrists over

4    time, right?

5        A.  If they choose to continue to do da Vinci

6    surgery, they would, yes.

7        Q.  Another thing hospitals have to do is make

8    sure their surgeons are trained on the da Vinci

9    robot, right?

10        A.  They have to credential their surgeons --

11    or the medical community of that hospital has to

12    credential their surgeons to perform procedures.

13        Q.  That takes some time, right?

14        A.  I -- some amount of time to do that, yes.

15        Q.  And there's some money involved too in

16    sending surgeons off to do training, right?

17        MS. LENT:  Objection.

18        THE WITNESS:  Maybe money for the surgeon,

19    not every surgeon is employed by the hospital.  So

20    I'm not sure who pays the cost of the -- of that

21    training.  It would vary.

22        MR. ERWIG:   Q.  Intuitive often pays for

23    training, right?

24        A.  I --

25        MS. LENT:  Objection.

1          THE WITNESS:  Can you be specific on what

2  you mean by pays for training?

3          MR. ERWIG:  Q.  Well, to train a surgeon

4  on a da Vinci robot, Intuitive will pay for that in

5  many instances, correct?

6      A.  We will cover the cost of the lab and the

7  travel to get to that lab.

8      Q.  When the surgeon's there, the surgeon's in

9  the training program for the Intuitive da Vinci

10  robot, right?

11      A.  Yes.

12      Q.  Now, all those things -- withdrawn.

13          The hospital -- the hospital goes through

14  all that effort, that might be something they

15  consider when they're looking at other products like

16  the TransEnterix Senhance, right?

17          MS. LENT:  Objection; hypothetical.

18          THE WITNESS:  I think it's one of the many

19  things they would look at if they -- if they're

20  going to evaluate the value of whatever that new

21  technology is, they're evaluating relative to what

22  they do today and all that goes along with them.

23          MR. ERWIG:  Stop screen sharing this

24  exhibit.  It's been a little under an hour, but I

25  think this is a good time for a break.  So let's go

1  ahead and go off the record.

2      VIDEOGRAPHER:  Off record.  The time is

3  2:30.

4      (The deposition was in recess from 2:30 to

5      2:41.)

6      VIDEOGRAPHER:  We are back on the record.

7  The time is the 2:42.

8      MR. ERWIG:  Q.  I want to shift gears a

9  little bit with you, Mr. Vavoso, and talk about the

10  sales contracts that Intuitive requires hospitals

11  who purchase the da Vinci robot to sign.  Okay?

12     A.  Okay.

13     Q.  Are you aware that Intuitive requires

14  hospitals who purchase the da Vinci robot in the

15  United States to sign a sales contract?

16     A.  Yes.

17     Q.  You have general familiarity, as

18  Intuitive's 30(b)(6), witness with the contents of

19  those sales contracts?

20     A.  Yes.

21     MR. ERWIG:  We're going to look at the

22  document on the document camera together, but I'm

23  going to mark as an exhibit SLSA Conway, which is a

24  going to be Exhibit 24.

25     (EXHIBIT 24 WAS MARKED FOR IDENTIFICATION.)

Highly Confidential

1          MR. ERWIG:   Q.  I'm going to screen share

2   that document.  See this on the screen in front of

3   you?

4      A.  I do.  It's a little fuzzy, but I can make

5   it out.

6      Q.  Part of that is just the text on the

7   document is a little bit fuzzy.  Now, does this

8   appear to be a sales license and service agreement

9   between Intuitive Surgical and Conway Regional

10  Medical Center?

11     A.  Yes.  Can you -- can you just page through

12  the exhibit?

13     Q.  Sure.

14     A.  Unless we have it in the -- do we have it

15  in document folder?  I can pull it up.

16     Q.  It's in the document folder.  So you can

17  reference any part of it.  I just want to point you

18  to some moments.  If you want a moment to review it,

19  that's fine.

20     A.  Did you say it was in the document folder

21  or it was not?

22     Q.  I think it should be.  If you refresh, it

23  should appear there.

24         MS. LENT:  Yeah, I've got it.  You should

25  be able to find it if you refresh.

Highly Confidential

1          MR. ERWIG:   Q.  Just let me know when

2    you're ready to talk about the document.

3          A.  Okay.  I'm ready.

4          Q.  Does this appear to be a sales license and

5    service agreement?

6          A.  Yes.

7          Q.  Does Intuitive require each hospital that

8    purchases a da Vinci surgical robot to sign one of

9    these sales license and service agreements?

10         A.  Yes.

11         Q.  I want to talk about some of the terms in

12   that agreement with you.  Zoom in so we can see it

13   more clearly.  See there's a section labeled Section

14   3, system use and disposal?

15         A.  Yes.

16         Q.  And here there's a paragraph labeled 3.2

17   that's titled use of system.  Do you see that?

18         A.  Yes.

19         Q.  One of the parts of that paragraph reads,

20   "Customer will not nor will customer permit any

21   third party to modify, disassemble, reverse

22   engineer, alter, or misuse the system or instruments

23   and accessories.  Prohibited actions include, but

24   are not limited to, adding or subtracting any

25   customer or third-party equipment, hardware,

Highly Confidential

1  firmware, or software to or from the system."

2      Do you see that?

3      A.  Yes.

4      Q.  Does Intuitive include that term in each of

5  the sales contracts that it requires hospitals to

6  sign?

7      A.  Yes.

8      Q.  Are you aware of any contract with any

9  hospital that does not include this use of system

10  term?

11      A.  Not that I'm aware of.

12      Q.  And it's your understanding that paragraph

13  3.2 prohibits hospitals from using robotics repair

14  to service EndoWrists for the Intuitive da Vinci

15  surgical robots, true?

16      A.  Yes.

17      Q.  Go to a different portion of this with you.

18  I'll scroll out so you can see where I am in the

19  document.  I've turned to page 2.  Now, I'm going to

20  turn to page 3 where there's a paragraph titled

21  instrument and accessories, which I'll make bigger.

22      Do you see this on the screen in front of

23  you?

24      A.  Yes, can you shift to the left just

25  slightly?

Highly Confidential

1      Q.  Just wanted to make sure that you can see

2   that it's paragraph 8.  Do you see that?

3      A.  Yes.

4      Q.  Now, paragraph 8, I've highlighted a

5   section here that reads, "Any other use is

6   prohibited, whether before or after the instrument

7   or accessories license expiration, including repair,

8   refurbishment, or reconditioning not approved by

9   Intuitive.  This license expires once an instrument

10  or accessory is used up to its maximum number of

11  uses as is specified in the documentation

12  accompanying the instrument or accessory."

13        Do you see that?

14     A.  Yes.

15     Q.  What is your understanding of that term in

16  the sales agreement?

17        MS. LENT:  Objection; vague.

18        THE WITNESS:  You know, as we were talking

19  earlier, the complexity of the system and the full

20  integration of all the components, that you do not

21  want to have adulterated instruments or accessories

22  or other things that are modified that could make

23  that system either not work or unsafe for use.

24        MR. ERWIG:  Q.  Now, this talks about a

25  license that expires once an instrument is used up

Highly Confidential

1  to its maximum number of uses.  Do you see that?

2      A.  Yes.

3      Q.  What do you understand that to mean?

4      A.  The instruments have a designated number of

5  lives.  And once those lives are used, then the

6  license has expired.

7      Q.  Is it your understanding that hospitals can

8  repair, refurbish, or recondition an EndoWrist prior

9  to its use counter expiring?

10     A.  My understanding, that occurs, yes.

11     Q.  Well, it's not a question of if it occurs.

12  My question right now is just about the words in

13  this contract.  And it reads, Any other use is

14  prohibited whether before or after the instrument or

15  accessories license expiration, including repair,

16  refurbishment, so forth.

17         Do you see that?

18     A.  I do.

19     Q.  Is it your understanding that this sales

20  contract prohibits hospitals from repairing,

21  refurbishing, or reconditioning their EndoWrists

22  regardless of how many uses are remaining?

23     A.  Yes.

24     Q.  So, for example, if there's some uses left

25  on the use counter and some graspers have become

Highly Confidential

1  misaligned, the hospital is not permitted, under

2  this sales contract, to realign those graspers,

3  true?

4      A.  It says that they would be prohibited from

5  modifying or repairing that instrument.

6      Q.  And realigning graspers, that would be --

7  would that be a repair of the instrument?

8      A.  Could fall in the definition of repair.

9      Q.  I want to get a sense of it.  I'm not too

10  concerned of whether it falls under the definition

11  of repair or refurbishment.  I just want to get a

12  sense of if a hospital realigns the graspers on an

13  EndoWrist after they become misaligned, that's

14  something that's prohibited by Section 8 of this

15  sales contract, right?

16      A.  It would be.

17      MS. LENT:  Objection.

18      MR. ERWIG:  Q.  This paragraph, paragraph

19  8, does this appear in each of the sales contracts

20  that Intuitive has with hospitals who purchase the

21  da Vinci surgical robot?

22      A.  To my knowledge, yes.

23      Q.  Is it your understanding, is -- withdrawn.

24          As Intuitive's 30(b)(6) witness, can you

25  identify any sales contract with the hospital that

Highly Confidential

1   does not include the language in paragraph 8?

2      A.  No.

3      Q.  Now, the reason that this term is included

4   is so that customers will not use EndoWrists beyond

5   the usage counter limit prescribed by Intuitive,

6   true?

7      A.  No.

8      Q.  Well, this mentions a license expiring,

9   right?

10     A.  It does.

11     Q.  The license expires when the instruments

12  reach their number of uses, right?

13     A.  Yes.

14     Q.  And when the instrument reaches its number

15  of uses, what are hospitals, according to Intuitive,

16  required to do under this sales contract?

17     A.  To dispose of that instrument

18  appropriately.

19     Q.  By dispose of that instrument, you mean --

20  you don't mean to repair or refurbish it, right?

21  You mean throw it away?

22     A.  You -- correct.

23     Q.  I --

24     A.  I --

25     Q.  -- specific medical procedures to get rid

Highly Confidential

1  of certain instruments, but it's not to reuse or

2  refurbish those instruments, correct?

3      A.  Correct.

4      Q.  In fact, if the instruments break prior to

5  the use counter being used up, Intuitive also

6  requires, under this sales contract, that the

7  hospitals dispose of those instruments and throw

8  them away, right?

9      A.  No.

10      Q.  Why is the answer no?

11      A.  If -- if the customer had an instrument

12  that was broken, a grasper with jaws misaligned, we

13  would want them to report that as we have to

14  report -- part of our quality management system is

15  we have to understand what has occurred and will

16  issue a return material authorization.  They will

17  receive credit for the remaining number of lives,

18  and we'll send them the new replacement instrument.

19          And that way our team can take that

20  instrument that has -- where the jaws have been

21  misaligned, and understand how that happened within

22  the set number of lives that that instrument was

23  based and understand if there's any kind of

24  manufacturing change that needs to be made.  Uhm,

25  and not just understand root cause for why the

Highly Confidential

1  instrument failed because it's not designed to fail

2  within those -- within those lives that are

3  designated.

4     Q.  Does Intuitive repair the instruments that

5  it receives back from customers prior to the uses

6  expiring?

7     A.  No.

8     Q.  What does Intuitive do with those

9  instruments?

10    A.  We -- we analyze them.  In some cases, the

11  process of analyzing and understanding root cause

12  further makes them un-useable.  And then they're

13  disposed of.

14    Q.  Has Intuitive conducted any testing after

15  receiving an EndoWrist that did not meet the use

16  counter as to whether that EndoWrist could be safely

17  repaired?

18    A.  Restate the question again, please?

19    Q.  Well, you mentioned that Intuitive receives

20  back some EndoWrists that have failed to meet the

21  use counter; is that correct?

22       MS. LENT:  Objection.

23       THE WITNESS:  No, what I said was that we

24  will receive instruments back that have had some

25  failure or some issue and the customer has processed

Highly Confidential

1  an RMA.  And then our -- our RMA team will look at

2  that and understand why did the instrument fail.

3        MR. ERWIG:  Q.  And when the team is

4  looking at that RMA'd instrument, is there any

5  testing conducted as to whether that instrument can

6  be repaired or refurbished?

7     A.  We don't repair or refurbish.  So we

8  wouldn't do that --

9     Q.  Has Intuitive --

10    A.  -- in the course of that process.

11    Q.  Sorry.  I didn't mean to cut off.

12    A.  I said we wouldn't do that in the course of

13  that process.

14       Q.  Has Intuitive ever considered repairing or

15  refurbishing used EndoWrists?

16    A.  I don't know if that has been contemplated.

17       Q.  One of the things I want to ask you about,

18  turning back to the document, when an EndoWrists use

19  counter is up, Intuitive wants the customer to

20  dispose of that EndoWrist and purchase a new one

21  from Intuitive, true?

22    A.  That we want them to?  What does that mean

23  we want them to?

24       Q.  Well, the agreement says that's what the

25  customer has to do, right, to comply with the sales

Highly Confidential

1  agreement, right?

2      MS. LENT:  Objection.

3      THE WITNESS:  The customers replenish their

4  stock as they use up the instrument.

5      MR. ERWIG:  Q.  By replenish their stock,

6  you mean they throw away EndoWrist whose use

7  counters have expired and they buy new EndoWrists

8  from Intuitive, right?

9    A.  Yes.

10    Q.  And paragraph 8 of this contract, that's

11  establishing that hospitals are not prohibited to do

12  anything other than that -- well, withdrawn.  Let me

13  ask a better question -- withdrawn.

14      Paragraph 8 of this sales agreement does

15  not allow customers to take any other action than

16  the one we just talked about, right?

17      MS. LENT:  Objection.

18      THE WITNESS:  Any -- any other action is

19  pretty broad.

20      MR. ERWIG:  Q.  Let me narrow it down.

21  When a customer's EndoWrist reaches its number of

22  uses that Intuitive has set, under the terms of this

23  agreement, the customer is required to throw that

24  EndoWrist away, right?

25    A.  They're required to dispose of it

Highly Confidential

1  appropriately.

2      Q.  And then if they want to continue --

3      A.  Certainly not -- certainly not use it

4  again.

5      Q.  That was going to be my next question.

6  When the -- after the hospital, the customer, has

7  thrown away the EndoWrist, they will need to

8  purchase a new one from Intuitive in order to

9  continue performing surgeries with the da Vinci

10  surgical robot, right?

11      A.  Yes.

12         MS. LENT:  Objection.

13         MR. ERWIG:   Q.  Turn back to paragraph 3.

14  Now, this sales license and service agreement,

15  Intuitive enforces this agreement if it believes

16  there have been violations, right?

17      A.  It -- yes.  If there's contract, yes.

18      Q.  And then, particular, the use of system.

19  If a hospital chooses to use the services of a third

20  party to refurbish or repair its instruments,

21  Intuitive considers that a breach of this contract,

22  true?

23      A.  Yes.

24      Q.  And for paragraph 8, which we'll turn back

25  to, the hospital repairs, refurbishes, or

1  reconditions an instrument at any time, Intuitive

2  considers that a breach of the contract with the

3  hospital, true?

4      A.  Yes, and we would go through a resolution

5  process with them.

6      Q.  But Intuitive considers it a breach, right?

7      A.  Yes.

8      Q.  In fact, the contract is written in such a

9  way that customers are -- they're not supposed to do

10  anything other than throw away EndoWrists, purchase

11  new EndoWrists from Intuitive, right?

12      MS. LENT:  Objection; misstates the

13  testimony.

14      THE WITNESS:  At the end of those useful

15  lives, they have to dispose of the instrument.

16      MR. ERWIG:  Q.  If the instrument breaks

17  before the number of useful lives, it gets sent back

18  to Intuitive and they buy another instrument from

19  Intuitive, right?

20      MS. LENT:  Objection; misstates the

21  testimony.

22      THE WITNESS:  They send -- just to restate.

23  They send the instrument back to us.  There's a

24  evaluation of why that instrument failed.  There's a

25  credit that's given back to the customer for the

Highly Confidential

1  remaining lives of that instrument that weren't

2  used.  And that goes into our -- that learning and

3  understanding goes into our quality management

4  system.

5        MR. ERWIG:  Q.   Now, when you talk about

6  failure of an instrument, I want to learn a little

7  bit more about what you mean by that.  What is a

8  failure of an instrument mean?

9      A.  You were just describing a jaw that could

10  become misaligned.  We would like to know --

11  understand why that is.  So -- and if it's not

12  performing as the customer's expecting, and that

13  would be -- that would be a good example.  There are

14  cables and pulleys within the instrument.

15  Occasionally those cables will break.  Uhm, and

16  we'll want to evaluate that.  Just a couple of

17  examples of many.

18      Q.  Now, I understand that there's actual uses

19  and then there's something called reprocessing

20  cycles.  Could you explain to the jury what a

21  reprocessing cycle is?

22      A.  Reprocessing cycle is where that instrument

23  was unpacked, maybe used in the -- in the procedure,

24  meaning, you know, in the patient, but may not have

25  been used in the patient because it could have been

Highly Confidential

1  opened but not used.  And therefore no life

2  decremented.  And that instrument goes through a

3  cleaning, decontamination, and sterilization

4  process.  So that would be a reprocessing site.

5      Q.  Is it possible that an instrument's --

6  graspers become misaligned during their reprocessing

7  cycle?

8      A.  Depending on how it was handled by the

9  personnel, potential.

10      Q.  Someone could -- after single use of a

11  device, they could mishandle it and a grasper could

12  become misaligned, right?  That's possible for an

13  EndoWrist?

14      A.  And we would take it back and give them the

15  credit for the remaining lives on that instrument.

16      Q.  How many instruments that failed before

17  their useful lives has Intuitive received back from

18  customers?

19      A.  I don't know that number off the top of my

20  head.  I would have to research that.

21      Q.  Well, how about an estimate, be percentage,

22  be number, whatever you're comfortable with?

23      A.  I wouldn't want to guess at it.

24      Q.  Well, has it happened often?  Is there a

25  big RMA department?

Highly Confidential

1        MS. LENT:  Object to the form.  Compound.

2        THE WITNESS:  Can you define big RMA

3    department?

4        MR. ERWIG:  Q.  Well, sure.  I'm just

5    trying to get a sense of how many times is it that

6    an EndoWrist lasts all the way up to its use counter

7    and how many times is it that you have to RMA an

8    instrument from a hospital?

9        A.  Again, I would -- I would -- we have an RMA

10   department.  Occasionally the instruments fail.  On

11   the -- as a percent, I would have to research that

12   to tell you what that percent is.

13       Q.  Used that word occasional.  Occasionally

14   they fail.  Is that less than -- less than half?

15       MS. LENT:  Objection.  It's vague.

16       THE WITNESS:  I don't -- I don't have a bar

17   to compare the occasional.

18       MR. ERWIG:  Q.  Well, Intuitive rates its

19   instruments for a certain number of uses, right?

20       A.  Yes.

21       Q.  And it rates it for a certain number of

22   reprocessing cycles, right?

23       A.  Yes.

24       Q.  How many instruments fail before they use

25   up their entire reprocessing cycle?

1    A.  Again, I could research that.  I don't know

2  off the top of my head.

3    Q.  That's something pretty important for

4  Intuitive to know, right?

5    MS. LENT:  Objection.

6    THE WITNESS:  It is important, and we do

7  know that.

8    MR. ERWIG:  Q.  Have you ever changed the

9  life of an instrument downwards based on RMAs

10  received from a customer?

11    A.  Can you be more clear on that question,

12  please?

13    Q.  Certain instruments, they have a use

14  counter, might have 10 uses on it, right?

15    A.  Okay.

16    Q.  Might have 15 reprocessing cycles, right?

17    A.  Yes.

18    Q.  Has Intuitive ever received enough RMA'd

19  instruments that it said, hey, look, that 10 life

20  use counter, that should really be seven; need to

21  adjust it downwards?

22    A.  I don't know the situation where we lowered

23  that number of lives upon an issue.

24    Q.  The instruments fail early, that would be a

25  safety concern, right?

Highly Confidential

1      A.  It is, which is why we request the

2  customers to send the instrument back so we can do

3  failure analysis of that instrument.

4      Q.  If it fails during a surgery, it's not

5  good, right?  It's not good for the patient.  It's

6  not good for the doctor.  It's not good for anyone,

7  right?

8      MS. LENT:  Objection.

9      THE WITNESS:  We take it very seriously

10  which is why we ask the customers to return those

11  instruments so we can do the failure analysis, make

12  improvements, evaluate that relative to -- through

13  our statistical analysis of the trends on that.  It

14  is all part of our quality management system.

15      MR. ERWIG:  Q.  Can you name a design

16  improvement that Intuitive implemented in response

17  to RMAs from its customers?

18      MS. LENT:  Just want to note for the

19  record, we've gone pretty far beyond the 30(b)(6)

20  Topics.  So I'm fine with you asking the questions,

21  but it's clearly in his personal capacity.

22      THE WITNESS:  I can't give you a specific,

23  but we are constantly innovating, looking to make

24  those instruments more robust.  Uhm, constant

25  innovation goes on with the instrument.

Highly Confidential

1        MR. ERWIG:  Q.  How about one specific

2    change to an EndoWrist?  Can you give me that?

3        MS. LENT:  Objection; vague.

4        THE WITNESS:  We've done material changes,

5    as an example.  Uhm, we've -- we -- we've looked at

6    different strength of -- of the wrist and improved

7    on that.  Those are two examples.

8        MR. ERWIG:  Q.  Does Intuitive engage in

9    price discrimination between hospitals that use

10   robotics and hospitals that don't?

11       MS. LENT:  Objection.

12       THE WITNESS:  Can you define price

13   discrimination?

14       MR. ERWIG:  Q.  Well, does Intuitive's

15   pricing, when Intuitive learns that a hospital is

16   using Rebotix's services, does Intuitive charge that

17   customer more?

18    A.  Charge them more --

19       MS. LENT:  Objection.

20       THE WITNESS:  Charge them more for what?

21       MR. ERWIG:  Q.  EndoWrists, for example.

22    A.  No.

23    Q.  Does Intuitive charge that customer less

24   for EndoWrists?

25    A.  Which customer?

Highly Confidential

1    Q.  Well, customer that's using Rebotix Repair.

2  Does Intuitive lower its prices on EndoWrists to

3  that customer?

4    MS. LENT:  Objection; robotics repair?

5  Rebotix repair?

6    MR. ERWIG:  Rebotix repair.

7    MS. LENT:  With an E?

8    MR. ERWIG:  Correct.

9    MS. LENT:  Okay.  Thank you.

10    MR. ERWIG:  Q.  Does it maintain the same

11  pricing for EndoWrists regardless of whether a

12  hospital is using Rebotix Repair or is not using

13  Rebotix Repair?

14    A.  Yes, but, as we've discussed, they're in

15  breach of the contract.  And we work through how to

16  resolve that with the customer.

17    Q.  We'll talk about that in just a moment.

18  The contract that we looked at just a moment ago --

19  and I can screen share it again if that's helpful --

20  but is that contract representative of the sales

21  contracts that Intuitive and its hospital customers

22  signs?

23    MS. LENT:  Objection; asked and answered.

24    THE WITNESS:  Yes.

25    MR. ERWIG:  Q.  Let's talk about the ways

1  that Intuitive responds to hospitals that have been

2  using -- well, withdrawn.

3       Intuitive wants customers to purchase

4  replacement EndoWrists instead of servicing or

5  repairing them, right?

6       MS. LENT:  Objection.

7       THE WITNESS:  Per the terms of the contract

8  that we -- instruments that fail before the end of

9  the useful lives, we would want that back.  Once the

10  useful lives are used, we have agreement that they

11  will dispose of those instruments or the --

12       MR. ERWIG:  Q.  Disposing of those

13  instruments, that doesn't include repairing or

14  refurbishing those instruments, right?

15    A.  Yes.

16       MR. ERWIG:  Our next exhibit is going to be

17  Exhibit 25.

18       (EXHIBIT 25 WAS MARKED FOR IDENTIFICATION.)

19       MR. ERWIG:  Q.  This will be Pullman

20  Regional Letter.  Before I screen share this, I want

21  to get a general sense of how Intuitive responds to

22  hospitals who use Rebotix Repair services.  Again,

23  that's Rebotix with an R-e.

24       What does Intuitive do when it learns that

25  a hospital is using Rebotix's services?

Highly Confidential

1    A.  Uhm, usually it will start with

2   conversation that -- often at the operation --

3   operating room level, OR director, VP of bariatric

4   services.  That we understand that adulterated

5   instruments are being used on the system and that,

6   for patient safety, ensuring that the system can

7   continue to operate properly, we ask them to not do

8   that.  Starts with that discussion.

9        If they continue to be in breach of that

10  and continue to use adulterated instruments, we will

11  then follow with a letter to either -- to chief

12  nursing officer.  It could be a -- some hospitals

13  have a chief -- patient or quality chief, and it

14  could ultimately escalate to -- we will choose to

15  say they're in violation to stop service and stop

16  supplying instrumentation.

17    Q.  I'm going to screen share -- withdrawn.  Is

18  that the response that Intuitive took in response to

19  each -- withdrawn.

20        Is that how Intuitive responded to each

21  hospital that it learned was using Rebotix Repair

22  services?

23    A.  I don't know the answer to that.  It is the

24  general process that we follow.

25    Q.  By that general process, you mean that you

Highly Confidential

1  would have a conversation with the hospital and if

2  the hospital stopped using the services of Rebotix,

3  it would end there, right?

4      A.  State the question again, please?

5      Q.  Well, I just want to get a sense of the way

6  that the response progresses.  So you mentioned the

7  first step is a conversation, right?

8      A.  Correct.

9      Q.  Then there would be a formal letter to the

10  hospital, right?

11     A.  Yes.

12     Q.  Would that formal letter generally include

13  an explanation of why Intuitive believes the

14  hospital is in breach of the contract?

15     A.  It would.

16     Q.  And if the hospital continued using

17  Rebotix's services after that point, then what would

18  happen?

19     A.  It could end at the point in which we will

20  no longer service that system or supply

21  instrumentation for that adulterated system.

22     Q.  And if Intuitive no longer services a

23  system, then that system can't be used for surgery,

24  right?

25     A.  They --

1          MS. LENT:  Object to the form.

2          THE WITNESS:  Not necessarily.

3          MR. ERWIG:   Q.  What do you mean by that?

4      A.  Our -- our service -- if -- our service is

5   preventive and periodic.  We would say we would stop

6   servicing that system, no longer supply.  But if

7   they were to continue to use instruments that were

8   adulterated from another company, they could go on

9   and continue to use that system.  It's not --

10      Q.  Well --

11      A.  It's in their purview to do that.

12      Q.  When a da Vinci robot indicates that it

13  needs service, it can't be used for a surgery,

14  right?

15      A.  No.

16      Q.  And when the needs service sign pops up,

17  where the hospital needs to turn to, that's

18  Intuitive, right?

19      A.  If it requires service, then we would

20  provide service if they're under a service agreement

21  and not in breach of their contract.

22      Q.  So to the extent that a hospital had a

23  robot that needed service but was using Rebotix's

24  services, Intuitive would no longer service that

25  hospital's da Vinci robot; is that right?

Highly Confidential

1      MS. LENT:  Objection.

2      THE WITNESS:  In going through that

3  resolution process with them and if we're all the

4  way through that, yes.

5      MR. ERWIG:  Q.  That would mean that the

6  hospital could no longer do surgeries using a robot

7  that needs service, right?

8    A.  At that point, yes.

9    Q.  I'm going to now screen share the exhibit

10  that I previously marked.  This will be the Pullman

11  Regional letter.  This will be Exhibit 25.  Should

12  be in the shared folder, if you would prefer to look

13  at it there.  But we can also -- we're also going to

14  just look at it under the document camera together.

15  Share my screen.  I'm sorry.  I shared the wrong

16  screen.

17      Do you see this on the screen in front of

18  you?  I'll make it bigger in just a moment.

19    A.  Yes.

20    Q.  Are you aware that Intuitive sent letters

21  to hospitals that utilized refurbished EndoWrist

22  systems obtained from Rebotix?

23    A.  Yes.

24      MS. LENT:  Objection.

25      MR. ERWIG:  Q.  You see that this is a

Highly Confidential

1  letter to Scott Adams, CEO, Pullman Regional

2  Hospital.  You see that?

3      A.  Yes.

4      Q.  And it writes, "We understand that Pullman

5  Regional Hospital is using refurbished EndoWrist

6  instruments obtained from and or modified by a third

7  party, Rebotix, for use beyond the program number of

8  uses."

9          Do you see that?

10     A.  Yes.

11     Q.  How can Intuitive determine when a hospital

12  is utilizing refurbished EndoWrist instruments?

13     A.  We have the ability as part of the service

14  agreement.  This is part of that maintenance or

15  service capability to evaluate what -- a variety of

16  different parameters on the system.  And one of

17  those, as you can understand -- I don't know that

18  technical aspect of it -- but it can be determined

19  that an adulterated instrument was used on the

20  system.

21     Q.  I want to turn to the second page of this

22  letter where it says, "Your contract with

23  Intuitive."

24          Do you see that?

25     A.  Yes.

Highly Confidential

1      Q.  And here the letter states, "We presume

2   that you are aware that in connection with Pullman

3   Regional Hospital's purchase of da Vinci surgical

4   products, Pullman Regional Hospital entered into a

5   sales license and service agreement.  Using

6   instruments beyond the program number of uses is a

7   material breach of the agreement."

8        Do you see that?

9      A.  Yes.

10      Q.  Does Intuitive consider using EndoWrists

11   beyond the program number of uses a material breach

12   of the sales agreement with hospitals?

13      A.  Yes.

14      Q.  And then the section goes on to cite parts

15   of the agreement, including paragraph 8.  You see

16   that?

17      A.  Yes.

18      Q.  Were similar letters -- well, withdrawn.

19        You mentioned that the first step when

20   Intuitive learns that a customer is using a

21   refurbished EndoWrist is a conversation, right?

22      A.  Yes.

23      Q.  After that point, for all customers who

24   continued using refurbished EndoWrists, did they

25   receive a letter similar to this one?

Highly Confidential

1    A.  I don't know.

2    Q.  Well, you mentioned that the general

3  process of escalation was conversation, a letter,

4  and then ultimately stopping service, right?

5    A.  Yes.

6    Q.  Now, after that initial conversation, if

7  hospitals didn't stop using Rebotix's services,

8  Intuitive would send them a letter informing them

9  about their breach of the contractual agreement,

10  right?

11    MS. LENT:  Asked and answered.

12    THE WITNESS:  Yes.

13    MR. ERWIG:  Q.  You understand you've been

14  designated by Intuitive as the 30(b)(6) witness on

15  the Topic that says Intuitive's enforcement of the

16  terms of its standard sales, license, and service

17  agreements, which is Topic 17, right?

18    A.  Yes.

19    Q.  You understand you've also been designated

20  on Topic 18, which is Intuitive's communications

21  concerning its customers purported non-compliance

22  with Intuitive's contracts.  This Topic includes any

23  communications concerning or constituting threats

24  from Intuitive to withhold contractual maintenance

25  services.  See that?  Is that the case?

1    A.  It's called out in the first letter we

2  looked at.  I've -- I've lost the question in there.

3    Q.  You understand that you're here testifying

4  on behalf of Intuitive on communications with

5  customers that Intuitive considers to be in breach

6  of the sales agreement, right?

7    A.  Yes.

8    Q.  Does Intuitive send this form of letter to

9  each customer who it believes is in breach of the

10  sales agreement for using Rebotix's services?

11        MS. LENT:  Objection; asked and answered.

12        THE WITNESS:  To my understanding, yes.

13        MR. ERWIG:  Q.  I want to look at another

14  part of this letter, which is the last page.  I'll

15  zoom in for you.  Just want to read the highlighted

16  part with you.  "Should Intuitive or its personnel

17  determine, after having accepted a service call or a

18  purchase order for a service call, that the system

19  has been used with instruments refurbished or

20  modified by an unauthorized third party, Intuitive

21  may not provide service for such a system."

22        Do you see that?

23    A.  Yes.

24    Q.  Would Intuitive communicate this to each

25  customer that it sent a letter to that was using

Highly Confidential

1  Rebotix's services?

2    A.  We would.

3    Q.  Are you aware of any letters sent to a

4  hospital that used Rebotix's services that did not

5  include the statement about potentially withholding

6  service?

7    A.  Not that I'm aware of.

8    Q.  Are you aware of any letter sent to a

9  hospital that used Intuitive -- withdrawn.

10      Are you aware of any letter sent to a

11  hospital that used Rebotix Repair services that did

12  not include a section that Intuitive believed the

13  hospital to be in breach of its standard sales

14  agreement?

15    A.  Not that I'm aware of.

16    Q.  As Intuitive's 30(b)(6) witness, can you

17  identify any letter that does not include those two

18  terms?

19      MS. LENT:  Objection; beyond the scope of

20  what a 30(b)(6) witness is reasonably expected to

21  do.  But you can answer.

22      THE WITNESS:  Not to my knowledge.

23      MR. ERWIG:  Q.  I'm going to stop screen

24  sharing this exhibit.  Now, if a hospital repairs

25  its EndoWrists instead of buying replacements from

1  Intuitive, then Intuitive will first have a

2  conversation with that hospital, right?

3          MS. LENT:  Objection; asked and answered.

4          THE WITNESS:  Yes.

5          MR. ERWIG:  Q.  And Intuitive will write a

6  letter to that customer, right?

7          MS. LENT:  Objection; asked and answered.

8          THE WITNESS:  Yes.

9          MR. ERWIG:  Q.  And then if -- after that

10  letter the customer keeps using Rebotix's services,

11  Intuitive will stop service or void the customer's

12  warranty, right?

13          MS. LENT:  Objection; compound.

14          MR. ERWIG:  Q.  Well, let's break it up.

15  After -- if the customer continues using --

16  withdrawn.

17          The customer continues using Rebotix's

18  services after receiving the letter, Intuitive will

19  stop servicing that customer's robot, right?

20      A.  Yes.

21      Q.  Another thing that Intuitive will do is it

22  will void the warranty on the customer's robot,

23  right?

24          MS. LENT:  Objection.

25          THE WITNESS:  What do you mean void the

Highly Confidential

1  warranty?  It's associated with service.  So we

2  would stop servicing.  Essentially, that is the --

3  the warranty.

4      MR. ERWIG:  Q.  Well, what I mean by void

5  warranty is the customer would no longer have a

6  warranty on the machine such that Intuitive would be

7  willing to provide service, right?

8    A.  We would no longer provide service under

9  the terms of the contract.

10   Q.  That would involve -- well, withdrawn.

11      Intuitive issues a warranty with its da

12  Vinci surgical robots, right?

13      MS. LENT:  Objection.

14      THE WITNESS:  Yes.

15      MR. ERWIG:  Q.  And if a hospital

16  refurbishes EndoWrists using Rebotix, then Intuitive

17  will ultimately void that warranty, right?

18      MS. LENT:  Objection.

19      THE WITNESS:  Yes.

20      MR. ERWIG:  I'm going to screen share our

21  next exhibit.  This will be Exhibit 26.

22      (EXHIBIT 26 WAS MARKED FOR IDENTIFICATION.)

23      MR. ERWIG:  Q.  Handwritten notes that

24  I've taken reflecting the conversation with

25  hospitals, the letter, and then potentially stopping

Highly Confidential

1  service and voiding the warranty.

2      Do you see that, Mr. Vavoso?

3      MS. LENT:  Can you please pull the page

4  down?  It's -- we can't see the top.

5      MR. ERWIG:  Q.  I've labeled this page

6  response to hospitals.  Do you see that?

7    A.  I see that.

8      MS. LENT:  I'm going to object to you using

9  a handwritten document again as an exhibit that

10  reflects your notes.

11      MR. ERWIG:  Q.  To be clear, this is a

12  response to hospitals using Rebotix, just so that's

13  clear, right?

14    A.  What was the question?

15    Q.  Does this reflect the steps that Intuitive

16  takes in response to hospitals who are using Rebotix

17  Repair services?

18      MS. LENT:  Same objection to the document.

19      THE WITNESS:  In general, it outlines the

20  steps.

21      MR. ERWIG:  We'll mark this as Exhibit 26.

22      MS. LENT:  Objection to marking your

23  handwritten notes as a document in the deposition.

24      MR. ERWIG:  Q.  Stop the screen share.

25  Now, the letters that Intuitive sent to its

Highly Confidential

1  customers, those were effective in stopping --

2  withdrawn.

3      The letters that Intuitive sent to

4  hospitals that used Rebotix's Repair services, those

5  were effective in getting hospitals to stop using

6  Rebotix's services, right?

7      MS. LENT:  Objection.

8      THE WITNESS:  When you say effective,

9  meaning that customers followed the contract as we

10  agreed upon?

11      MR. ERWIG:  Q.  Well, what I mean by

12  effective is customers stopped using Rebotix's

13  services, right?

14      MS. LENT:  Objection.

15      THE WITNESS:  It can -- in many of those

16  instances, yes, that they abided by the terms of the

17  original contract.

18      MR. ERWIG:  Q.  Is there any instance that

19  you can identify, as Intuitive's 30(b)(6) witness,

20  where a hospital continued using Rebotix's services

21  after receiving these letters from Intuitive?

22      A.  Not -- not at this time.

23      Q.  Intuitive wanted hospitals to stop using

24  Rebotix's services, right?

25      MS. LENT:  Objection.

1       THE WITNESS:  We wanted them to follow the

2   terms of the agreement that we had with them as to

3   operation of the robotics system.

4       MR. ERWIG:  Q.  The terms of that

5   agreement, the way you read them, that meant that

6   you wanted the hospitals to stop using Rebotix's

7   services, right?

8       MS. LENT:  Objection.

9       THE WITNESS:  Again, we wanted to have them

10  follow terms of the agreement not to adulterate

11  instruments or any portion of the system.  That was

12  the intent.

13      MR. ERWIG:  Q.  Ultimately, if a hospital

14  uses EndoWrists beyond their maximum use

15  restrictions, by repairing this with Rebotix,

16  Intuitive would render that hospital's da Vinci

17  robot non-useable, true?

18      MS. LENT:  Objection.

19      THE WITNESS:  Only to the point of -- the

20  system fails and it's not going to be repaired, or

21  that would be the situation.

22      MR. ERWIG:  Q.  The system reads a needs

23  service message and Intuitive won't service it, that

24  system can't be used for surgeries, right?

25      A.  That adulterated system would not be used,

Highly Confidential

1  yeah, after that point.

2      MR. ERWIG:  Let's go off the record, and

3  we'll take a break.

4      VIDEOGRAPHER:  At the end of Media 3 at

5  3:31.

6      (The deposition was in recess from 3:31 to

7      3:41.)

8      VIDEOGRAPHER:  This is the beginning of

9  Media No. 4 in the deposition of Glenn Vavoso.  We

10  are back on the record at 3:43.

11      MR. ERWIG:   Q.  Now, Mr. Vavoso, if an

12  Intuitive da Vinci robot can't be used for surgery,

13  what else can it be used for?

14      A.  It's used for surgery.

15      Q.  So if a da Vinci robot says needs service

16  and Intuitive doesn't provide service, what can a

17  hospital use that robot for?

18      A.  They wouldn't be able to use it.

19      Q.  I mean, they could -- they wouldn't be able

20  to use it for surgery certainly, right?

21      A.  Correct.  I suppose it could be used for

22  training.

23      Q.  When you say training, it won't even -- the

24  instruments won't even operate if it says needs

25  service, right?

Highly Confidential

1    A.  Right.  Depends on what the service issue

2  is.

3    Q.  Well, if the robot reads needs service,

4  what situations can a surgeon continue to do

5  surgeries with that robot?

6    A.  Well, the system can alert our technicians

7  that there's a -- there's an issue.  It may not be

8  one that stops the robot.  It could be predictive in

9  that, if it continues, it will lead to it not

10  functioning.  Usually that triggers a service

11  engineer to go out and then make a repair, perform

12  some corrective maintenance.

13    Q.  But you can't use a robot for actual

14  surgery on a patient when it says needs service,

15  right?

16    MS. LENT:  Objection; misstates the

17  testimony.

18    THE WITNESS:  Again, it depends on the

19  condition.  There's all different levels of service

20  alerts that you might get, not everyone means that

21  the system doesn't operate.

22    MR. ERWIG:  Q.  At some point, when

23  Intuitive doesn't provide service to a robot, that

24  robot can no longer be used for surgeries, true?

25    A.  Eventually, it might reach a condition

1  where it would not operate.

2      Q.  Well, it certainly reaches the condition

3  where it's not safe to be used for surgeries, right?

4      MS. LENT:  Object to the form.

5      THE WITNESS:  Depending on the service

6  level of alert, it may not be used for surgery nor

7  would you want it to be used for surgery.

8      MR. ERWIG:  Q.  If it can't be used for

9  surgeries and it doesn't operate, what else can a

10  hospital do with it?

11      MS. LENT:  Object to the form.  Asked and

12  answered.

13      THE WITNESS:  I -- I don't know what else

14  they would use it for.

15      MR. ERWIG:  Q.  It's got four arms, right?

16      A.  It has four arms, yes.

17      Q.  You could extend those arms out and hang

18  coats on it, for example, right?

19      MS. LENT:  Object to the form.

20      THE WITNESS:  You could hang items on it,

21  yes.

22      MR. ERWIG:  Q.  Use it to prop open a

23  door?

24      A.  It's fairly large.  But you could prop open

25  a door.  It might block the doorway.

1    Q.  Could you use to it hold a stack of papers

2  in place?

3        MS. LENT:  Object to the form.

4        THE WITNESS:  Can you be more specific?

5        MR. ERWIG:  Q.  Sure.  If you had some

6  papers on the ground that you didn't want a nearby

7  fan to blow away, you could position the robot on

8  top of those papers and then those papers wouldn't

9  be blown away by the fan, right?

10        MS. LENT:  Object.

11        THE WITNESS:  I'm not sure how you get it

12  on top of the papers.

13        MR. ERWIG:  Q.  Is it too heavy to do

14  that?

15    A.  Fairly large.

16    Q.  Surgeons move it around the operating lab

17  though, right?

18    A.  They do.

19        MS. LENT:  Objection.

20        MR. ERWIG:  Q.  You could move it over

21  some papers on the ground and hold them there,

22  right?

23        MS. LENT:  Objection; asked and answered.

24        THE WITNESS:  Yes.

25        MR. ERWIG:  Q.  I want to talk a little

Highly Confidential

1  bit more about the EndoWrists.  EndoWrists have a

2  lot of similarities to traditional laparoscopic

3  instruments, right?

4      MS. LENT:  Objection.

5      THE WITNESS:  Can you be specific on

6  similarities?

7      MR. ERWIG:  Q.  Well, sure.  You're

8  familiar with traditional instruments used in

9  laparoscopic surgery, right, like forceps or

10  scissors or things like that, right?

11      A.  Yes.

12      Q.  And you're aware that hospitals in the

13  United States repair, sharpen, service those

14  traditional instruments as they become dull or

15  become misaligned, right?

16      A.  I understand that practice goes on, yes.

17      Q.  And they do that so that they don't have to

18  buy a lot of additional laparoscopic instruments,

19  right?  It's so they can keep using the instruments

20  that they've already purchased, right?

21      MS. LENT:  Objection.

22      THE WITNESS:  I don't know their exact

23  reasons why they do it.  Might be a variety of

24  reasons, but that would be speculating.

25      MR. ERWIG:  Q.  Well, one reason certainly

1  would be that you could keep using an existing

2  instrument and you wouldn't need to buy a new

3  instrument when scissors became dull, for example,

4  right?

5      MS. LENT:  Objection.

6      THE WITNESS:  Okay.  That could be one

7  reason.

8      MR. ERWIG:  Q.  And if a grasper, for

9  example, became misaligned, that grasper could be

10  realigned.  The instrument could continue to be used

11  in surgery for -- a traditional laparoscopic

12  instrument, right?

13      MS. LENT:  Objection.

14      THE WITNESS:  I suppose it could be.

15      MR. ERWIG:  Q.  And you're aware that

16  that -- that practice happens at hospitals around

17  the United States, right?

18    A.  I'm aware of that practice.

19    Q.  Now, I just want to focus in on one

20  particular type of laparoscopic instrument, which is

21  the grasper.  So it would be two -- two grasping --

22  well, can you describe for me what a grasper looks

23  like?

24    A.  A variety of different graspers, but at the

25  basic level, it is -- looks like a pair of forceps

Highly Confidential

1  at the end of the instrument.  You can open and

2  close.  It will have knurled ridges so that you can

3  grasp tissue.  There are traumatic tissue graspers

4  and atraumatic tissue graspers.  They can be

5  pointed.  They can be blunt.

6      Q.  So at a very simple level, it's an

7  instrument that has sort of two prongs on it that

8  you can use to grasp things, right?

9      A.  Yes.

10      Q.  And the tips of those instruments, they're

11  similar between traditional instruments and

12  EndoWrists, right?

13      MS. LENT:  Objection.

14      THE WITNESS:  Similar in that they grasp.

15  Similar in that they have essentially two -- two

16  pedals, but different in the flex, the range,

17  different in that ours are attached to a robotic

18  system that has to know in 3D space exactly where

19  the tip of that grasper is.  The system has to

20  understand exactly how the grasper is aligned.  The

21  grasper has to know whether it's fully closed or

22  fully open.  The system has to sense all of that.  A

23  laparoscopic instrument does not.

24      MR. ERWIG:  Q.  So there's some

25  differences between a -- an EndoWrist and a

Highly Confidential

1    traditional laparoscopic instrument, right?

2        A.  Yes.

3        Q.  There's also some similarities, right?

4    Both the traditional laparoscopic instrument and the

5    EndoWrist can have some misalignment in the forceps,

6    right?

7        A.  You could.  The repercussions are greater

8    with the robotic instrument than the consequences of

9    the misaligned grasper in a laparoscopic instrument.

10       Q.  For the traditional laparoscopic

11   instrument, the misaligned forceps, those can be

12   realigned, right?

13       A.  I don't know.  I understand the practice

14   goes on, but I -- I'm not familiar with it.

15       Q.  Has Intuitive tested whether it's possible

16   to safely repair or realign the forceps on an

17   EndoWrist?

18       A.  Not that I'm aware of.

19       MR. ERWIG:  And I just want to make this a

20   little bit more concrete.  So I'm going to screen

21   share our next exhibit.  So it will be Exhibit 27.

22       (EXHIBIT 27 WAS MARKED FOR IDENTIFICATION.)

23       MR. ERWIG:   Q.  I'm going to screen share

24   with you.  Can you see this on the screen in front

25   of you?

Highly Confidential

1    A.  Yes.

2    Q.  Can you tell me anything you can -- what --

3  what do these appear to be pictures of?

4    A.  Graspers.

5    Q.  And it looks like there's seven pictures of

6  graspers on this page; is that right?

7    A.  Can you zoom out?

8    Q.  I can't, unfortunately.  This is the

9  furthest that it goes.  But I can show you from the

10  top to the bottom.  So there's two, four, six, and

11  then seven down here.  Do you see that?  And that's

12  the extent of the page.

13    A.  Okay.  I see seven.

14    MS. LENT:  Can you please load this to the

15  share file?

16    MR. ERWIG:  Yeah, I'll upload it -- I can

17  scan it in as soon as it's presented.

18    MS. LENT:  It would be great if you could

19  put documents in when you are using them so that we

20  can have access to them.  That's the reason for the

21  share file.  Thanks.

22    MR. ERWIG:  Q.  There's a little bit of

23  delay on the scanner, so I can't just scan it in

24  live.  But I'll get it scanned in as soon --

25    MS. LENT:  I understand.  It's just that we

Highly Confidential

1  have a share file, and there's a procedure for using

2  it so that we have access to the documents as if we

3  were in a regular deposition and we haven't

4  necessarily had that.  So I'd like you to try and do

5  that simultaneously with when you're introducing a

6  document, please.

7      MR. ERWIG:  Q.  Sure.  Would you like me

8  to scan this one in before I ask some questions

9  about it?

10     MS. LENT:  Sure.  That would be great.

11  Thank you.

12     MR. ERWIG:  Okay.  Let's go off the record.

13     MS. LENT:  I don't think we should be going

14  off the record if you're going to introduce

15  documents.

16     VIDEOGRAPHER:  Off -- okay.  We're still on

17  the record.

18     MR. ERWIG:  Well --

19     VIDEOGRAPHER:  I need both parties to

20  agree.

21     MR. ERWIG:  Takes some -- takes some time

22  to scan documents in.  So if you would like it now,

23  I'm happy to go scan it in, or we can wait until the

24  next break.  It's this one page.

25     MS. LENT:  I'll skip this -- I'll skip it

Highly Confidential

1  for this one, but for any more I would like it to be

2  scanned in while we're asking questions, please.

3      MR. ERWIG:  Sounds good.  To the extent

4  that I can do that, I'll accommodate.

5      VIDEOGRAPHER:  All right.  We're still on

6  the record.

7      MR. ERWIG:  Q.  Now returning back to --

8  I'm going to mark this -- what -- these are -- you

9  mentioned these are pictures of graspers.  Is that

10  what you referred to them as?

11     A.  Variety of graspers.

12     Q.  That will be Exhibit 27, will be a variety

13  of graspers.

14      MS. LENT:  Object to writing on exhibits

15  again.

16      MR. ERWIG:  Q.  Now, Mr. Vavoso, can you

17  identify all of the EndoWrists that appear on

18  Exhibit 27?

19     A.  It's hard to clearly make out the pictures.

20  I'd like to see the document.

21     Q.  Sure.  Would you like me to zoom in?

22     A.  Sure.  That doesn't look like an EndoWrist.

23  Doesn't it look like an EndoWrist.  No.  The quality

24  of the picture is poor, so it's a little difficult

25  to tell there.

Highly Confidential

Page 239

1     Q.  So that ones a -- picture quality not

2   great?

3     A.  Yes.  Not an EndoWrist.  Not an EndoWrist.

4   It's really hard to tell.  That one could be.

5         MS. LENT:  I'm going to object again to

6   this Exhibit to the extent it's not clear enough to

7   answer the questions that you're posing to the

8   witness.

9         MR. ERWIG:  Q.  Well, Mr. Vavoso, there

10  were some where you said the pictures were, you

11  know, a little hard to read.  And I've indicated

12  that on these exhibits.  I just want to indicate, so

13  we're clear, that these two are the EndoWrist that

14  appear in this exhibit.  I'll mark this as

15  Exhibit 27, and we'll get it scanned in at the

16  break.

17        MS. LENT:  Are we supposed to take your

18  word for that?  Is that the testimony you're giving?

19        MR. ERWIG:  Correct.  I can represent to

20  you that those are pictures of EndoWrists, Intuitive

21  EndoWrists.

22        MS. LENT:  I object to the document and

23  your characterization of it.  I think it's entirely

24  inappropriate.

25        MR. ERWIG:  Q.  I'll stop screen sharing.

Highly Confidential

1  I want to talk to you a little bit about what

2  constitutes failure in testing for EndoWrists.  Do

3  you have any familiarity with that, Mr. Vavoso?

4       MS. LENT:  Objection; vague.

5       THE WITNESS:  Can you restate the question?

6       MR. ERWIG:  Q.  Well, sure.  There's some

7  testing that Intuitive does of its EndoWrists,

8  right?

9    A.  We do.

10    Q.  And there's certain situations where

11  Intuitive determines that an EndoWrist has reached

12  failure, right?

13       MS. LENT:  Objection; vague.

14       THE WITNESS:  Not clear on the question.

15  Has reached failure?  What does that mean?

16       MR. ERWIG:  Q.  Well, there's certain

17  instances where Intuitive deems that the EndoWrist

18  is not -- is no longer safe to use, right?

19    A.  Is this -- is this an instrument that is

20  returned from the customer?

21    Q.  I'm just talking about Intuitive's internal

22  testing of EndoWrists, when it's testing a device.

23  So I want to get a sense of how that testing

24  operates.

25    A.  Okay.  And what was the question again?

Highly Confidential

1    Q.  Do you have a general sense of what it

2   means for a -- an EndoWrist to fail a specific life

3   cycle?

4    A.  No.

5    Q.  If an EndoWrists graspers become

6   misaligned, for example, would that be a failure of

7   that EndoWrist?

8    A.  In what situation?  You just described a

9   situation of life testing an instrument.  In that

10  scenario or --

11   Q.  Well, Intuitive conducts some testing on

12  its EndoWrist before it ships them to customers,

13  right?

14      MS. LENT:  Objection.  This is outside the

15  scope of the 30(b)(6).  You're asking him in his

16  personal capacity.

17      THE WITNESS:  There is testing that goes on

18  and all kinds of specifications of the instruments

19  have to be met before that is shipped to -- to a

20  customer.

21      MR. ERWIG:   Q.  What specific companies

22  does Intuitive compete with for sales of EndoWrist

23  devices in the United States?

24      MS. LENT:  Objection.

25      THE WITNESS:  Can you repeat the question,

Highly Confidential

1  please?

2      MR. ERWIG:  Q.  What companies does

3  Intuitive compete with -- the market for EndoWrist

4  sales?

5      MS. LENT:  Objection.  Objection.

6      THE WITNESS:  Intuitive is the supplier of

7  EndoWrist instruments.

8      MR. ERWIG:  Q.  That means it has no

9  competitors in the EndoWrist market, right?

10      MS. LENT:  Objection.

11      THE WITNESS:  What is the EndoWrist market?

12      MR. ERWIG:  Q.  Well, customer wants to

13  buy an EndoWrist, they have one option.  It's

14  Intuitive, right?

15      A.  They would buy from us, yes.

16      Q.  Can't go buy an EndoWrist from

17  TransEnterix, right?

18      A.  Correct.

19      Q.  Can't go buy one from Medtronic?

20      A.  Correct.

21      Q.  They have to purchase their EndoWrists from

22  Intuitive Surgical, right?

23      A.  Yes.

24      Q.  So Intuitive has a hundred percent of that

25  market, right?

Highly Confidential

1          MS. LENT:  Objection.

2          THE WITNESS:  Of what market?

3          MR. ERWIG:   Q.  The market for EndoWrists?

4          MS. LENT:  Objection; calls for a legal

5   conclusion.

6          MR. ERWIG:   Q.  I need an answer,

7   Mr. Vavoso?

8       A.  Can you --

9          MS. LENT:  I --

10         THE WITNESS:  -- restate the question,

11   please?

12         MR. ERWIG:   Q.  Intuitive has 100 percent

13   of the market for EndoWrists, true?

14         MS. LENT:  Objection.

15         THE WITNESS:  We make and manufacture

16   EndoWrist instruments.  Nobody else does.  And we

17   supply those to customers.

18         MR. ERWIG:   Q.  Nobody else does that

19   either, right?

20       A.  Nobody else manufactures unadulterated

21   EndoWrist instruments, right.

22       Q.  No one else sells unadulterated --

23   withdrawn.  No one else sells EndoWrists to

24   customers, right -- withdrawn.

25         Let me ask a better question.  Intuitive is

Highly Confidential

1  the only company that manufactures EndoWrists,

2  right?

3      A.  Yes.

4      Q.  Intuitive is the only company that sells

5  EndoWrists, right?

6      A.  Yes.

7      Q.  The only instruments that are capable of

8  being used with a da Vinci surgical robot, those are

9  EndoWrists, right?

10     A.  Yes.

11         MR. ERWIG:  Screen share our next exhibit.

12  This will be Exhibit 28.

13         (EXHIBIT 28 WAS MARKED FOR IDENTIFICATION.)

14         MR. ERWIG:  Q.  This will be in Folder 4.

15  This will be 4/20/17 Vavoso to Tourand and

16  Boeschenstein.

17         You see this on the screen in front of you,

18  Mr. Vavoso?

19     A.  I do.

20     Q.  Want to draw your attention to the bottom

21  e-mail on this first page.  Does that appear to be

22  -- withdrawn.

23         Do you recognize that e-mail?

24     A.  I -- I mean, clearly, I wrote it.  It's

25  been a while.  I don't particularly remember the

Highly Confidential

1  e-mail, but --

2      Q.  Does this appear to be an e-mail from

3  yourself to Todd Tourand and Curt Boeschenstein.  Am

4  I saying that right?

5      A.  Boeschenstein, yep.

6      Q.  And the subject is re the offering

7  refurbished.  Do you see that?

8      A.  I see that.

9      Q.  What is the offering refurbished?

10     A.  I'm just reading the e-mail.

11     Q.  That's fine.  Take your time.  You can

12  scroll down, if you need me too as well.  It should

13  be in the share file, though.

14     A.  Scroll down.  Scroll down.  And scroll back

15  to the top.  Top of the e-mail that I sent.  I think

16  this is looking at a process of -- for European

17  markets where if you collected disposed instruments,

18  were there components that could be reclaimed in

19  that process.

20     Q.  I want to ask you about this e-mail.

21  There's an e-mail from Todd Tourand to yourself and

22  Curt with the subject re the offering refurbished

23  sent on the April 10th, 2017.

24         Do you see that?

25     A.  I do.

Highly Confidential

1    Q.  Todd writes, "Glenn, per our conversations

2  last week, attached is the updated deck for

3  remanufactured instruments."

4        Do you see that?

5    A.  Yes.

6    Q.  And then you respond, "Todd, deck slash

7  research is coming along.  In reviewing slide 5, I'm

8  not clear on the discount levels."

9        Do you see that?

10   A.  Yes.

11   Q.  Did you review the PowerPoint that Todd

12  Tourand sent you as part of this e-mail chain?

13   A.  I don't recall it.  Was there -- was there

14  a PowerPoint?

15   Q.  We're about to go to the attachment.  I

16  just want to get a sense of whether your statement

17  that, you know, you write here -- withdrawn.

18        You write, "In reviewing slide 5, I'm not

19  clear on the discount levels."

20   A.  It's what it states.  I'd have to look at

21  the PowerPoint -- understand.

22   Q.  Does that seem to indicate that you looked

23  at an attached PowerPoint and reviewed at least

24  slide 5?

25   A.  It does.

Highly Confidential

1        MR. ERWIG:  Stop screen sharing.  This

2   exhibit -- I believe I marked it, but if not, it's

3   Exhibit 28.

4        Next Exhibit will be 4/20/17 Attach to

5   Vavoso to Tourand.

6        (EXHIBIT 29 WAS MARKED FOR IDENTIFICATION.)

7        MR. ERWIG:  Q.   See this on the screen in

8   front of you, Mr. Vavoso?

9    A.  Yes.

10    Q.  Do you recognize this?

11    A.  I -- can the -- context of it, the

12   PowerPoint, kind of just look through, if you can do

13   that.

14    Q.  Sure.  Slide 2 is a slide titled instrument

15   refurbishment program benefits.  Do you see that?

16    A.  Uh-huh.

17    Q.  Is that a yes?

18    A.  Yes.

19    Q.  Instrument remanufactured positioning, do

20   you see that?

21    A.  Yes.

22    Q.  Does seeing these first few slides refresh

23   your recollection on whether you reviewed this

24   PowerPoint?

25    A.  Likely reviewed, yes.

Highly Confidential

1    Q.  I'm going to just talk to you about some

2  parts of this.  Starting with slide 2, which is

3  labeled instrument refurbishment program benefits.

4       Do you see that?

5    A.  Yes.

6    Q.  And the description is, "Reclaim expired

7  instruments for the purpose of remanufacturing and

8  recertifying to original performance

9  specifications."

10      Do you see that?

11   A.  Yes.

12      MS. LENT:  Alexander, can we get this in

13  the share file?  It's not there yet.

14      MR. ERWIG:  I think if you reload it, it

15  should be there.

16      MS. LENT:  I've been reloading

17  consistently.  Still not there.

18      MR. ERWIG:  It's a slightly larger document

19  so it may just be taking a second to upload.  I'm

20  happy to wait.

21      MS. LENT:  Okay.  I think it's there now.

22  It's just loading.

23      MR. ERWIG:  Great.  I can wait until you

24  have it pulled up, if you want.

25      MS. LENT:  Thank you.  Okay.  I got it.

Highly Confidential

1  Thanks.

2       MR. ERWIG:  Q.  Great.  No problem.  Now,

3  do you see, Mr. Vavoso, that here -- withdrawn.

4  There's a section title description -- well,

5  withdrawn.  We just went over that.  Can we --

6  withdrawn.

7       There's a section on this slide labeled

8  clinical performance.  Do you see that?

9    A.  Yes.

10    Q.  And under that it reads equivalent

11  performance.  Do you see that?

12    A.  Yes.

13    Q.  And 10 lives per instrument.  Do you see

14  that?

15    A.  Yes.

16    Q.  And equivalent cleaning and sterilization

17  process.  Do you see that?

18    A.  Yes.

19    Q.  Was it your understanding that refurbished

20  instruments would have equivalent performance to new

21  EndoWrists?

22    A.  Based on this PowerPoint, the thought would

23  be that if you have a refurbished instrument that

24  you would sell, it would be at the same

25  specification level of a newly built instrument.

Highly Confidential

1    Q.  And that's -- that means equivalent

2  performance, right?  So it can -- a remanufactured

3  instrument could perform at the exact same level as

4  a new instrument, right?

5        MS. LENT:  Objection.

6        THE WITNESS:  When integrating with the

7  system, that it would perform equivalently.

8        MR. ERWIG:  Q.  And looking at slide 3,

9  there's a section on this slide labeled brand

10  position.  Do you see that?

11    A.  Yes.

12    Q.  First bullet reads, "EndoWrist RM,

13  remanufactured, will be positioned as equal to

14  EndoWrist, equal number of lives, performance, and

15  reprocessing."

16        Do you see that?

17    A.  Yes.

18    Q.  Was it your understanding that

19  remanufactured EndoWrists would be able to deliver

20  an equal number of lives, performance, and

21  reprocessing as new EndoWrists?

22    A.  That would be the goal.  This was a

23  scenario plan with a goal requirement.

24    Q.  Actually, I want to ask you about that.  I

25  can stop screen sharing this exhibit.  What sorts of

Highly Confidential

1  testing did Intuitive conduct to determine whether

2  this refurbishment project was feasible?

3      A.  I wasn't involved in the testing criteria.

4      Q.  Well, when you received the slide deck --

5  withdrawn.

6          You reviewed that slide deck, right?

7      A.  Yes.

8      Q.  And what was your understanding of why

9  Intuitive was exploring a refurbished EndoWrist

10  program?

11      A.  One of the key reasons were -- customers

12  were asking about -- particularly in Europe, because

13  there were requirements in order to operate in the

14  European Union that you have some green initiatives.

15  And are there ways that we could take some of that

16  component, reclaim, and build to original

17  specification in that, which is in part why that

18  slide had sort of a gray eco symbol to it.

19      Q.  Would Intuitive engage in a green eco

20  program if it didn't believe that the remanufactured

21  and refurbished EndoWrists could operate at the same

22  level of safety as new EndoWrists?

23      A.  We would want whatever instrument goes out

24  to be equivalent performance to the instrument that

25  was -- that would be equivalent to a newly built

1  instrument.

2    Q.  And after you -- withdrawn.

3      After you received this slide deck, did you

4  ever receive any indication from anyone at Intuitive

5  that it was simply not possible to offer refurbished

6  instruments that would offer the same level of

7  performance as new EndoWrists?

8    A.  I don't recall that.

9    Q.  Do you have any memory of anyone saying,

10  hey, look, this refurbishment program, it's -- can't

11  do it.  Can't make EndoWrists that are the same as

12  new EndoWrists that are also refurbished.

13    MS. LENT:  Objection.

14    THE WITNESS:  I don't recall that.

15    MR. ERWIG:  Q.  Were there any studies

16  that Intuitive conducted comparing the performance

17  of refurbished versus new EndoWrists?

18    A.  I'm sure there were.  I don't -- I don't

19  recall seeing those specific -- that specific

20  research.

21    Q.  What -- the process of refurbishing and --

22  withdrawn.

23      What does the process of refurbishing an

24  instrument look like?

25    A.  Beyond my technical capability.

Highly Confidential

1     Q.  It's okay.  Do you have a general sense

2  of -- is it trying to put together an EndoWrist from

3  a lot of discarded parts?  Is it taking an EndoWrist

4  that's slightly damaged and changing it?  Kind of

5  any sort of general sense about that, or is that

6  just out of your technical scope?

7         MS. LENT:  Objection.

8         THE WITNESS:  Out of my -- out of my

9  technical scope.

10        MR. ERWIG:  Q.  No problem.  Have you ever

11  heard of Project Dragon?

12     A.  Don't recall hearing Project Dragon.

13        MR. ERWIG:  I'm going to screen share our

14  next exhibit.  This will be Exhibit 30.  This will

15  be 6/26/17 Okafor to Scoville and Vavoso.

16        (EXHIBIT 30 WAS MARKED FOR IDENTIFICATION.)

17        MR. ERWIG:  Q.  Screen share.  You see

18  this on the screen in front of you?

19     A.  I do.

20     Q.  Who is Cyprian Okafor?

21     A.  One of our attorneys.

22     Q.  Does this appear -- withdrawn.

23        Does this appear to be an e-mail from

24  Cyprian Okafor to Katie Scoville and yourself?

25     A.  To Katie, cc'ing me.

1        MS. LENT:  Alexander, as I'm looking at

2   this document here, I think that this contains at

3   least some attorney-client privileged information.

4   And I'm going to ask you to not inquire about it

5   anymore.  We'll take a close look at it and

6   reproduce it with redactions, if necessary.  But on

7   its face, this is -- there is at least some

8   privileged information in here.

9        MR. ERWIG:  Well, I'm not sure it's

10  entirely appropriate to halt a line of questioning

11  in a deposition based on a document that you

12  produced.

13        MS. LENT:  I absolutely think it's entirely

14  appropriate to halt a line of questioning on

15  document that was -- a privileged document that was

16  inadvertently produced.  And, in fact, that's the

17  way an ESI protocol works.  When there's a

18  privileged document and you inadvertently produce

19  it, the other side respects that and allows you to

20  take a closer look at it.

21        MR. ERWIG:  Okay.  I'll stop asking

22  questions about this document and reserve our right

23  to re-open the deposition to ask Mr. Vavoso about

24  this document.

25        Ms. Lent, I've looked through the

Highly Confidential

1  attachment to that e-mail, and it does not, to me,

2  appear to reflect any attorney-client privileged

3  communication.  If you want me to refrain from

4  asking about it now, I will.  But I will reserve our

5  right to reopen Mr. Vavoso's deposition to ask him

6  about that document.

7       MS. LENT:  So I can't make that

8  determination right now on the fly.  I will note for

9  the record, Alexander, that the -- despite the fact

10  that we inadvertently produced this document, the

11  subject line has three asterisks and says

12  confidential attorney-client privileged

13  communication, which is a tip to you that this is a

14  privileged document that you're attempting to use in

15  a deposition.

16       Uhm, so, you know, we're going to take a

17  closer look at it, including an attachment to it.

18  But I'm not going to let you ask questions about it

19  in the deposition.

20       MR. ERWIG:  So, just to be clear, you're

21  not going to let me ask questions about an

22  attachment to that document that's titled dragon

23  marketing background; is that right?

24       MS. LENT:  That's correct.  The document

25  that's entitled dragon marketing background, and

Highly Confidential

1  then it says attorney-client privileged

2  communication.  Uhm, I'm telling you that we need to

3  take a closer look.  Clearly, this is at least

4  partially privileged and on the fly, in this

5  deposition, I'm not going to make privilege calls to

6  let you ask questions.

7          MR. ERWIG:  Well, the attachment certainly

8  doesn't include a label about --

9          MS. LENT:  Yeah, I'm not going to let you

10  ask questions, so we don't have to keep arguing

11  about it.  Okay.  I understand you're reserving your

12  rights.  And it's your obligation pursuant to our

13  agreement with respect to producing documents that

14  you stop asking questions.

15          MR. ERWIG:  Sure.  We'll just note that --

16  we'll reserve our rights to re-open the deposition

17  and add the specific attachments or any portions of

18  this e-mail.  So I just want to make sure that's the

19  way you want to go.  That's totally fine.

20          MS. LENT:  You may reserve your rights to

21  ask questions about any portions of this document

22  and its attachment that we determine are not

23  privileged.

24          MR. ERWIG:  Okay.

25          MS. LENT:  So let's move on.

1          MR. ERWIG:  Q.  Is Intuitive aware of any

2  -- withdrawn.

3          Are you, Mr. Vavoso, aware of any medical

4  opinions that EndoWrists are only safe to be used

5  for 10 to 12 uses?

6          MS. LENT:  Object to the form.

7          THE WITNESS:  There are medical opinions?

8          MR. ERWIG:  Q.  Correct.

9      A.  Can you define medical opinion?

10     Q.  Well, for example, is there a study that

11  says there's no way to use EndoWrists safely after

12  10 to 12 uses, for example?

13     A.  Not aware of a study, no.

14     Q.  I want to ask you about the TransEnterix

15  Senhance.  Are you familiar with any usage counter

16  on the TransEnterix Senhance robot?

17     A.  No.

18     Q.  Can you describe for me the instruments

19  that are used on the TransEnterix Senhance?

20     A.  I don't know all the instruments, but they

21  have a variety of cutting tools like scissors, Potts

22  scissors or graspers, forceps, amongst probably more

23  than that.  But those are the ones that I do recall

24  right now.

25     Q.  So TransEnterix's Senhance robot has

Highly Confidential

1  instruments including graspers, forceps, and

2  scissors, right?

3     A. I believe so.

4     Q. I'm sorry. I didn't quite get that answer.

5     A. I believe so, yes.

6     Q. Those -- none of those TransEnterix

7  instruments have use counters on them; is that

8  right?

9     A. I don't believe so.

10    Q. You don't believe that they have use

11  counters? Just want to be clear.

12    A. Yes.

13    Q. So to your knowledge, the TransEnterix

14  Senhance robot, its instruments do not have use

15  counters on them, correct?

16       MS. LENT: Objection; asked and answered.

17       THE WITNESS: Yes.

18       MR. ERWIG: Q. It's your understanding

19  that the TransEnterix Senhance robot and its

20  assorted instruments received FDA approval with no

21  use counter; is that right?

22    A. Yes.

23    Q. Now, how about the Medtronics Flex? Are

24  you aware of any use counter on the Medtronics Flex?

25    A. Medrobotics.

Highly Confidential

1    Q.  I'm sorry.  Yes.  The Medrobotics Flex,

2  yes.

3    A.  I'm not aware of any use counter.

4    Q.  What sorts of instruments are used with the

5  Medrobotics Flex?

6    A.  I'm less familiar with the instruments on

7  Medrobotics Flex.  So it's hard for me to answer.

8    Q.  The Flex received FDA approval without any

9  use counters on it, right?

10    A.  That's my understanding, yes.

11    Q.  Has Intuitive, at any point, done any

12  research on the safety of Rebotix's remanufactured

13  -- withdrawn.

14       Has Intuitive, at any point, done any

15  research on the quality of EndoWrists repaired by

16  Rebotix Repair?

17    A.  I don't know.

18    Q.  Are you aware of any?

19    A.  I'm not aware of any.  I don't know if it's

20  been done or not done.

21       MR. ERWIG:  Let's go off the record, and

22  we'll take a short break.

23       THE WITNESS:  Okay.

24       VIDEOGRAPHER:  Off record.  The time is

25  4:28.

Highly Confidential

1      (The deposition was in recess from 4:27 to

2      4:39.)

3      VIDEOGRAPHER:  We're back on the record.

4  The time is 4:40.

5      MR. ERWIG:  Q.  Mr. Vavoso, what is an

6  extended life EndoWrist?

7      A.  It is a instrument that, after evaluating

8  the capability of that number of innovations around

9  the instrument, we're able to extend the number of

10  lives and the use of that instrument.

11      Q.  And how do you determine which instrument

12  will have -- withdrawn.

13      How do you determine the increase in the

14  number of lives for a given EndoWrist?

15      A.  It's really more of an engineering

16  question.  But there's work done by the engineering

17  and design team looking at all kinds of previous

18  performance that we talked about earlier.

19  Innovations made, which we had talked about

20  iterations of those issues, to where you feel like

21  it will continue to operate under the -- operate

22  within specification for the full use of those

23  lives.

24      And there was a -- there are a number of

25  instruments that were able, through that process,

Highly Confidential

1  have the number of lives increased for those issues.

2      Q.  Does marketing play any role in the process

3  of setting the number of uses for extended use

4  EndoWrist instruments?

5          MS. LENT:  Objection.

6          THE WITNESS:  It play -- can you be more

7  specific on what role?

8          MR. ERWIG:  Q.  Well, sure.  When

9  Intuitive makes a determination as to how many

10  additional lives an extended use instrument has, is

11  that decision solely made by engineering, or does

12  marketing play a role in determining where that

13  extended use instrument's life counter should be

14  set?

15      A.  It would be based on engineering and

16  statistical analysis in the improvements that are

17  made on the instrument.  So an engineering

18  determination.

19      Q.  Is it your testimony that it's exclusively

20  based on engineering determinations?

21      A.  It's my understanding, yes.

22      Q.  So it's your testimony that Intuitive only

23  considers the life of the instrument and doesn't

24  consider any sort of marketing or revenue split with

25  customers or anything like that?

Highly Confidential

1          MS. LENT:  Object to the form.

2          THE WITNESS:  Not -- ask the question

3  again, please?

4          MR. ERWIG:  Q.  Well, sure.  What I'm

5  trying to understand is -- maybe we can back up and

6  talk about how the extended use instruments are

7  tested.

8          How is the determination made as to what

9  number of extended uses is appropriate for an

10  instrument by Intuitive?

11         A.  Given my understanding, is that the

12  specifications as to which that instrument should

13  operate, uhm, are -- then determine the number of

14  lives.  And over time, through data analysis,

15  looking at RMA returns, looking at performance in

16  real world coupled with the innovations and the

17  iterations that go on over the years of that

18  instrument, it can then be evaluated to say those

19  specifications can be met with an increased number

20  of lives.

21         Q.  Did Intuitive raise the prices of extended

22  use EndoWrists relative to non-extended use

23  EndoWrists?

24         A.  On a per procedure basis?

25         Q.  Well, on just a per EndoWrist basis?

Highly Confidential

1     A.  Well, the instrument may cost more because

2   the life is priced at a different level.

3     Q.  So when a customer is considering

4   purchasing an extended use EndoWrist versus a

5   regular EndoWrist, extended use EndoWrist has a

6   higher sticker price on it, right?

7        MS. LENT:  Objection.

8        THE WITNESS:  Not -- not on a per procedure

9   basis.

10        MR. ERWIG:  Q.  I understand you're saying

11   per procedure basis, but I want to get a sense of

12   just the -- the up-front pricing to a hospital.

13   Hospitals pay for EndoWrists up front from

14   Intuitive, right?

15     A.  They do.

16     Q.  And so if a customer is purchasing an

17   EndoWrist -- well, give me -- do you have a sense of

18   what a normal EndoWrist might cost?

19        MS. LENT:  Object to the form.  And I'll

20   note that this is not within the topics that

21   Mr. Vavoso has been designated for.  So this is

22   individual testimony.

23        THE WITNESS:  The question was -- again?

24        MR. ERWIG:  Q.  I just want to use -- it

25   doesn't have to be an exact price.  I just want to

Highly Confidential

1  use a baseline to just discuss the concept.  So how

2  much -- so what is -- what is a traditional --

3  withdrawn.

4       What does an EndoWrist cost?

5       MS. LENT:  Objection.

6       THE WITNESS:  You might have a 10-life

7  instrument that might cost $2200 for those 10 lives.

8       MR. ERWIG:  Q.  Okay.  So for that 10-life

9  instrument that costs $2200, the hospital would

10  purchase that instrument and would pay Intuitive

11  $2200 up front, right?

12     A.  Yes.

13     Q.  Wouldn't, for example, pay it in like a

14  subscription model where each life that's used there

15  is -- $220 are subtracted from the customer's

16  account, right?

17     A.  Yes.

18     Q.  Yes, there would be no subscription model?

19     A.  Yes, there would be no subscription model.

20     Q.  And so that 10 life instrument that costs

21  $2200, what would a 15-life extended instrument

22  cost?

23       MS. LENT:  Objection.

24       THE WITNESS:  It could vary.  Uhm, based on

25  the instrument and based on how we wanted to price

Highly Confidential

1  that.  In general, with the extended use

2  instruments -- and there are limited number.  I want

3  to say 13 or 14 instruments that had lives extended.

4  The per -- per unit cost went down.  The -- but with

5  more lives, this instrument did cost more up front.

6      MR. ERWIG:  Q.  And when you say cost more

7  up front, can you give me sort of a general sense of

8  how much more?  I mean, was it twice as expensive or

9  about how much more expensive would an extended use

10  instrument be?

11     A.  I have to go -- I have to go to the price

12  list and pull up those instruments and walk through

13  that.

14     Q.  Okay.  But on the up-front basis, those

15  instruments would be more expensive; is that right?

16     MS. LENT:  Objection.

17     THE WITNESS:  The singular instrument up

18  front would generally be more than it was with less

19  lives.  On a per procedure basis, it would be less.

20     MR. ERWIG:  I'm going to screen share our

21  next exhibit.  This will be 1/15/20 Clingan to Rosa

22  and Vavoso.  This is in folder 6.  Say the name of

23  exhibit again.  1/15/20 Clingan to Rosa and Vavoso.

24     (EXHIBIT 31 WAS MARKED FOR IDENTIFICATION.)

25     MR. ERWIG:  Q.  Screen share this exhibit

Highly Confidential

1  with you.  Who is Patrick Clingan?

2      A.  Would you scroll down, please?  V.P. of

3  finance and sales operations.

4      Q.  Does this appear to be -- withdrawn.

5          Are you in the to line on this e-mail?

6      A.  Yes.

7      Q.  The title of this e-mail is pricing slash

8  extended life instruments follow-up notes and

9  actions.  Do you see that?

10     A.  Yes.

11     Q.  Was sent on January 15th, 2020; is that

12  right?

13     A.  Yes.

14     Q.  Does this appear to be an e-mail from

15  Patrick Clingan to yourself and Dave Rosa on

16  January 15th, 2020?

17     A.  And others, yes.

18     Q.  I want to ask you about one of the -- well,

19  withdrawn.

20         Mr. Clingan writes, "Team, here are our

21  collective notes and actions from our meeting on

22  extended life instruments in Dallas least week,

23  including the deck we reviewed.  Please let us know

24  if anything is missing.  Thanks."

25         Do you see that?

Highly Confidential

1    A.  Yes.

2    Q.  Then one of the -- withdrawn.

3        What do these bullet points reflect that

4  start with comments slash perspectives?

5    A.  What do you mean by what do they represent?

6    Q.  Well, Mr. Clingan writes, "Team, here are

7  our collective notes and actions."

8        And my question is are these bullet points

9  the collective notes from the meeting on extended

10  life instruments in Dallas?

11    A.  They're snapshot bullets from a meeting

12  that was held.  So it's hard to say what they say

13  collectively.

14    Q.  I want to get a sense of some of the other

15  people on this e-mail.  You mentioned Patrick

16  Clingan was a V.P. of finance and sales, right?

17    A.  Yes.

18    Q.  Who is Dave Rosa?

19    A.  Chief business officer.

20    Q.  Who was Marshall Mohr?

21    A.  Chief financial officer.

22    Q.  Jamie Samath?

23    A.  Senior vice president for finance.

24    Q.  Henry Charlton?

25    A.  Senior vice president for U.S. commercial.

1    Q.  And there's you, what was your title as of

2  this time?

3    A.  Title I have now.

4    Q.  And there's Bob Desantis.  Who is Bob

5  Desantis?

6    A.  Executive vice president product

7  operations.

8    Q.  There's some others cc'd underneath this.

9  Who is Tina Todasco?

10    A.  The V.P. of financial planning analysis.

11    Q.  Mark Veeh?

12    A.  He's in finance.

13    Q.  Brandon Lamm?

14    A.  Finance.

15    Q.  Daniel Baker?

16    A.  Product marketing.

17    Q.  Andrea Morokutti?

18    A.  Finance.

19    Q.  Eddie Sarrine?

20    A.  Finance sales operations.

21    Q.  And Ryan Colwell?

22    A.  Pricing.

23    Q.  So we just discussed a long list of people

24  that are copied on this e-mail.  Is there anything

25  else that you can recall at the meeting on extended

1  life instruments in Dallas in January of 2020?

2      MS. LENT:  Objection; lacks foundation.

3      THE WITNESS:  Nobody I can recall.

4      MR. ERWIG:  Q.  Now, were you in

5  attendance at that meeting in Dallas?

6   A.  Yes.

7   Q.  Describe to me what that meeting was about?

8   A.  I'm just reading through the bullets.

9   Q.  Sure.  Take your time.

10   A.  To refresh my memory.  In -- I'll give you

11  sort of at the high level, it was a planning meeting

12  for launching extended use instruments.  So there's

13  commentary around as price on procedures went down,

14  would that drive more demand.  There's discussions

15  about considerations on future products.  That's the

16  force sensing instrument bullet discussion and how

17  that future product might play in context to the

18  extended use instruments.

19   Q.  Were there any product engineers present at

20  that meeting in Dallas?

21   A.  Yeah, Bob Desantis, who is -- who's an

22  engineer -- he's an engineer by training.  But

23  he's -- he was the head of the -- he's head of the

24  design team.

25   Q.  What's Bob Desantis' exact job title?

Page 270

1    A.  Now it's chief product officer.  In 2020,

2  it was senior V.P. of instruments and accessories.

3    Q.  I want to draw your attention to the fourth

4  bullet point from the bottom which reads, "Consider

5  life extensions into logical buckets.  Example 10,

6  15, 20, that share a rationale to ease sales slash

7  customer interaction."

8      Do you see that?

9    A.  Yes.

10    Q.  What is meant by "logical buckets"?

11    A.  If you had a set of instruments that sort

12  of -- how a customer uses these instruments in a

13  given procedure.  So there are 50 plus different

14  types of instruments, but maybe five that get used

15  in a prostatectomy, another five get used in

16  hysterectomy.  Some might be the same.  Some might

17  be different.

18      And as they came back and said, okay.  Here

19  are the instruments that can go from 10 lives to 15,

20  or here are the ones that could go to 20, is there

21  an opportunity, as we take this to market, that it

22  makes sense how we would communicate the savings the

23  customer would realize at the procedure level.

24      MR. ERWIG:  Now, are there -- when you're

25  testing instruments for life extension, do all of

Highly Confidential

1   the instruments -- well, withdrawn.

2        We can take this exhibit down.  We'll share

3   the attachment.  So it will be Exhibit 32.

4        (EXHIBIT 32 WAS MARKED FOR IDENTIFICATION.)

5        MR. ERWIG:  Q.  So this will be 1/15/20

6   Attach to Clingan to Rosa and Vavoso.  See this on

7   the screen in front of you, Mr. Vavoso?

8      A.  Yeah.

9      Q.  Do you recognize this?

10     A.  Not particularly.  But you said it was the

11  attachment that was part of that e-mail.

12     Q.  Correct.  Does this appear to be the

13  attachment to that e-mail that you received from

14  Mr. Clingan?

15     A.  Appears to be.

16     Q.  This is a PowerPoint titled I&A pricing

17  architecture 2020?

18     A.  That's what it says.

19     Q.  Any reason to believe that that's not what

20  this is?

21     A.  Can you go back?  Is this on the folder

22  share?

23     Q.  Should be.

24        MS. LENT:  Yes.

25        MR. ERWIG:  It's a little bit of a --

1          MS. LENT:  Yes.

2          MR. ERWIG:  -- so it might take a second.

3          MS. LENT:  Yeah, it's up.  You just have to

4    refresh.

5          THE WITNESS:  Just give me a sec.

6          MR. ERWIG:   Q.  Let me know when you're

7    ready to answer a question about it.

8      A.  Okay.

9      Q.  This appear to be that PowerPoint that you

10   received from Mr. Clingan?

11     A.  Yes.

12         MR. ERWIG:  Stop screen sharing this

13   exhibit.  Our next exhibit is going to be

14   Exhibit 33.

15         (EXHIBIT 33 WAS MARKED FOR IDENTIFICATION.)

16         MR. ERWIG:   Q.  This will be 4/15/20 Life

17   Extension for Bob's Staff.

18         Mr. Vavoso, do you see this document on the

19   screen in front of you?

20     A.  Yes.

21     Q.  Does this appear to be a document titled

22   core life extension program strategy from

23   April 15th, 2020?

24     A.  That's what it says.

25     Q.  There's an Intuitive label on the bottom

1 left-hand corner of that slide; is that right?

2    A.  Yes.

3    Q.  There's a slide, slide 3, that's labeled

4 executive steering committee, includes Bob

5 Desantis and yourself and others on that.

6       Do you see that?

7    A.  Can you just expand that?  Yep.

8    Q.  Then there's some details about a broad

9 cross functional product team and an agenda.

10       Do you see that?

11    A.  I do.

12    Q.  Do you recognize this document?

13    A.  No.

14    Q.  Appear to be a PowerPoint -- withdrawn.

15       Does this appear to be an Intuitive

16 PowerPoint with the title core life extension

17 program strategy?

18    A.  That's what it appears -- I mean, it's what

19 it's labeled as on the page.

20    Q.  Any reason to believe that this is not a --

21 an Intuitive PowerPoint?

22    A.  No.

23       MR. ERWIG:  Stop Screen sharing this

24 exhibit.  Next exhibit is going to be in folder 5.

25 This will be Exhibit No. 34.  This will be 3/6/17

1  Desdmet to Vavoso, et al.

2       (EXHIBIT 34 WAS MARKED FOR IDENTIFICATION.)

3       MR. ERWIG:   Q.  Screen share this.  See

4  this on the screen in front of you, Mr. Vavoso?

5       A.  Yes.

6       Q.  Do you recognize this?

7       A.  No.

8       Q.  Was -- who is Damien Desmedt?

9       A.  General manager for France.

10      Q.  You're copied on this e-mail, right?

11      A.  Yes.

12      Q.  Is this an e-mail from Damien Desmedt to

13  you and others with the subject confidential re Q1

14  business update, sent on March 6, 2017; is that

15  right?

16      A.  Yes.

17      Q.  Any reason to believe this isn't an e-mail

18  from Damien Desmedt to yourself and others at

19  Intuitive?

20      A.  No.

21      MR. ERWIG:  Going to look at one of the

22  attachments.  We can take this down.  Next exhibit

23  will be Exhibit 35.  This will be 3/6/17 Attach to

24  Desmedt to Vavoso.

25      (EXHIBIT 35 WAS MARKED FOR IDENTIFICATION.)

Highly Confidential

1          MR. ERWIG:   Q.  Screen share this document

2   with you.  See this on the screen in front of you?

3     A.  Yes.

4     Q.  This appear to be one of the attachments to

5   the e-mail that you were sent by Mr. Desmedt?

6     A.  Labeled as such, yes.

7     Q.  Any reason to believe it's not the

8   attachment to the e-mail sent from Mr. Desmedt?

9     A.  No.

10         MR. ERWIG:  Stop screen sharing this

11   exhibit.  I'm going to screen share our next

12   exhibit.  This will be Exhibit No. 36.  This will be

13   2/28/20 Alter to Alter and Kim.

14         (EXHIBIT 36 WAS MARKED FOR IDENTIFICATION.)

15         MR. ERWIG:   Q.  Screen share this with

16   you.  Can you see this on the screen in front of

17   you, Mr. Vavoso?

18     A.  Give me a minute, yep.

19     Q.  Who is Nick Alter?

20     A.  I know who Nick Alter is.  I don't know

21   exactly what he does.  Part of the finance

22   organization.

23     Q.  We can scroll down.

24     A.  Finance sales operations.

25     Q.  Is he an Intuitive Surgical employee?

Highly Confidential

1    A.  Yes.

2    Q.  Do you recognize his e-mail domain as --

3  e-mail domain of Intuitive Surgical?

4    A.  Yes.

5    Q.  Does this appear to be an e-mail from Nick

6  Al- -- withdrawn.

7      Who is Philip Kim?

8    A.  Manager of investor relations.

9    Q.  He also work for Intuitive Surgical?

10   A.  Yes.

11   Q.  Does this appear to be an e-mail from Nick

12  Alter at Intuitive Surgical to Nick Alter at

13  Intuitive Surgical copying Philip Kim at Intuitive

14  Surgical?

15   A.  Appears so.

16   Q.  And there's some attachments here,

17  including UBS doc panel with highlight.docx, RJ

18  2.17.20 coronavirus note.pdf, and DB Feb 20 pre-call

19  note.pdf.  You see that?

20   A.  Yes.

21   Q.  Then there's a segment in Mr. Alter's email

22  where he writes, "Deutsche Bank deeper dive on

23  third-party risk to I&A segment."

24      Do you see that?

25   A.  Yes.

1        MR. ERWIG:  Stop screen sharing this

2   exhibit.  Next exhibit is going to be one of the

3   attachments.  This will be DB -- this will be

4   Exhibit 37, DB Feb 20 Pre-call Note.

5        (EXHIBIT 37 WAS MARKED FOR IDENTIFICATION.)

6        MR. ERWIG:   Q.  You see this on the screen

7   in front of you, Mr. Vavoso?

8   A.  Yes.

9   Q.  Now, at the very top, there's a line that

10  says, "Provided for the exclusive use of

11  philip.kim2@intosurge.com on 2020/02/20."

12       Do you see that?

13  A.  Yes.

14  Q.  Is that February 20th, 2020?

15  A.  Appears to be.  A little hard to read.

16  Q.  Can zoom in.  Also a little bit choppy just

17  in the way that the graphic exists.  So can you see

18  that okay?

19  A.  Yes.  2/20 and 2020.

20  Q.  And Philip Kim is an Intuitive Surgical

21  employee; is that right?

22  A.  Yes.

23  Q.  What does this document appear to be?

24  A.  Some outside bank analyst report.  Somebody

25  that follows the -- the company.

Highly Confidential

1    Q. This document is titled DB Feb 20 Pre-call

2  Note. See that?

3    A. Where are you reading? Oh, up there. I

4  see that title, yeah.

5    Q. Does this appear to be an attachment to the

6  e-mail sent by Mr. Alter to Mr. Alter and Mr. Kim?

7    A. Appears to be.

8      MS. LENT: I'm going to object to questions

9  about this document. You haven't even established

10  if the witness ever saw it.

11      MR. ERWIG: Stop screen sharing this

12  exhibit. I'm going to screen share our next

13  exhibit. This will be Exhibit No. 38.

14      (EXHIBIT 38 WAS MARKED FOR IDENTIFICATION.)

15      MR. ERWIG:  Q. This will be 5/6/18

16  Clingan to Mohr and Vavoso. Can you see this on the

17  screen in front of you, Mr. Vavoso?

18    A. Yes.

19    Q. Who is Patrick Clingan?

20    A. V.P. finance sales operations.

21    Q. Do you see this top e-mail is an e-mail

22  from Patrick Clingan at Intuitive Surgical to

23  Marshall Mohr, yourself, and others at Intuitive?

24    A. Yes.

25    Q. Then there is an attachment that's CCO 8

Highly Confidential

1  year LRMV11.xlsx.  Do you see that?

2    A.  Yes.

3    Q.  Did you receive this e-mail from

4  Mr. Clingan?

5    A.  It indicates I did.

6    Q.  Any reason to believe that you didn't

7  receive this e-mail from Mr. Clingan?

8    A.  No.

9    Q.  Screen share next exhibit -- well,

10  withdrawn.

11      Does this appear to be an e-mail from

12  Patrick Clingan to Marshall Mohr, yourself, and

13  others at Intuitive Surgical sent on May 6th,

14  2018?

15    A.  Yes.

16      MR. ERWIG:  Stop screen sharing this

17  exhibit.  Next exhibit will be 5/6/18 Attach to

18  Clingan to Mohr and Vavoso.  This is the CCR 8 year

19  LRM v11.xlxs document.  Screen share this with you.

20      (EXHIBIT 39 WAS MARKED FOR IDENTIFICATION.)

21      MR. ERWIG:   Q.  You see this on the screen

22  in front of you, Mr. Vavoso?

23    A.  Yes.

24    Q.  I just have a couple of questions.  Does

25  this appear to be the attachment to the e-mail sent

Highly Confidential

1  from Mr. Clingan to yourself and others at

2  Intuitive?

3      A.  Yes.

4      Q.  It lists some years.  You see that?

5      A.  I do.

6      Q.  It lists some procedures in those years.

7  Do you see that?

8      A.  Yes.

9      Q.  It lists some assumptions next to those

10  years, right?

11      A.  Yes.

12      Q.  Any reason to believe this isn't the

13  document that was sent to you on May 6th, 2018, by

14  Mr. Clingan?

15      A.  No.

16      Q.  Does this appear to be an Excel spreadsheet

17  that reflects a number of years and projections on

18  procedures, revenue, and various assumptions?

19      MS. LENT:  Objection.

20      THE WITNESS:  Yes.

21      MR. ERWIG:  Stop screen sharing this

22  exhibit.  Mr. Vavoso, I have no further questions at

23  this time subject to our right to re-open the

24  deposition to ask about some of the earlier

25  documents that we discussed.  Thank you very much

Highly Confidential

1  for your time today.

2        EXAMINATION BY MS. LENT

3        MS. LENT:  Q.    I just have a couple of

4  questions.  Okay.  Can we pull up Exhibit 10, which

5  is the February 20th, 2017, e-mail from Dave Rosa

6  to Glenn Vavoso and Marshall Mohr.

7        Alena, is that something you can do?  We

8  usually have a concierge in our depositions to take

9  care of that, but apparently there's no one here.

10        MS. PERSZYK:  Yeah, sure.  Give me one

11  second to figure it out.  Apologies.

12        MS. LENT:  Thank you.  No problem.

13        MS. PERSZYK:  Karen, do you remind

14  restating the Bates number?  These aren't labeled in

15  the folder.

16        MS. LENT:  Absolutely.  It is Intuitive

17  00139157.

18        MS. PERSZYK:  Great.  Thanks.  One second.

19  Is this the correct document, Karen?

20        MS. LENT:  Q.    It is.  Thank you.

21        Mr. Vavoso, who is Raj Vattikuti.

22        A.  This is 2017.  At the time, he was the

23  owner of the distributor in India for da Vinci

24  products.

25        Q.  And was he an Intuitive employee?

Highly Confidential

Page 282

1    A.  No.

2         MS. LENT:  All right.  Let's pull up

3    Exhibit 11, which is the attachment to that e-mail.

4    The Bates number starts with 00139159.

5         MS. PERSZYK:  I believe you should be able

6    to see it now.

7         MS. LENT:  Q.   Yes, thank you.  That's

8    it.  Mr. Vavoso, is this a document that Raj sent to

9    Dave Rosa?

10        MR. ERWIG:  Object to the form.

11        THE WITNESS:  It -- it is.  Because he

12   called out this competitive -- in his e-mail to

13   Dave, which Dave then forwarded to myself and

14   Marshall, Raj said here are the documents attached,

15   which would be agenda for the meeting and the

16   competitive landscape or competitive update.

17        MS. LENT:  Q.   And do you have any

18   understanding about whether this competitive

19   landscape relates to any particular geographic area?

20        A.  Raj's only area of expertise would be

21   India.  So it was directly about competitive

22   landscaping in India.  So this is -- these are his

23   note and his summary of that, not -- not

24   particularly a company view of that.  It's his

25   assessment.

Highly Confidential

Page 283

1      MS. LENT:  Okay.  Thank you.  That's the --

2  those are the only questions I have.

3      MR. ERWIG:  Nothing further from me either.

4  We can go off the record.

5      MS. LENT:  Before we go off the record, I

6  just want to make sure the transcript is marked

7  highly confidential until we have an opportunity to

8  review it and fully designate, you know, according

9  to the protective order.

10      MR. ERWIG:  That's fine.  And I believe I

11  stated our position with regards to the one document

12  and any further questions.  So just want to make

13  sure that's noted as well.

14      MS. LENT:  Your position on that is noted.

15      VIDEOGRAPHER:  All right.  This marks the

16  end of today's deposition of Glenn Vavoso consisting

17  of four media.  We are off the record at 5:16 p.m.

18      (The deposition was concluded at 5:16 p.m.)

19

20

21

22

23      _____

24           Glenn Vavoso

25

Highly Confidential

1                    CERTIFICATE

2

3        I, the undersigned, a Certified Shorthand

4   Reporter, State of California, hereby certify that

5   the witness in the foregoing deposition was by me

6   first duly sworn to testify to the truth, the whole

7   truth, and nothing but the truth in the

8   within-entitled cause; that said deposition was

9   taken at the time and place therein stated; that the

10  testimony of the said witness was reported by me, a

11  disinterested person, and was thereafter transcribed

12  under my direction into typewriting; that the

13  foregoing is a full, complete, and true record of

14  said testimony; and that the witness was given an

15  opportunity to read it and, if necessary, correct

16  said deposition and to subscribe the same.

17        I further certify that I am not of counsel

18  or attorney for either or any of the parties in the

19  foregoing deposition and caption named, nor in any

20  way interested in the outcome of the cause named in

21  said caption.

22        Executed this 17th day of May, 2021.

23

24        _____

25        LAURA AXELSEN, C.S.R. 6173

Highly Confidential

1  NAME OF CASE:

2  DATE OF DEPOSITION:

3  NAME OF WITNESS:

4  Reason Codes:

5      1. To clarify the record.

6      2. To conform to the facts.

7      3. To correct transcription errors.

8  Page _____ Line _____ Reason _____

9  From _____ to _____

10  Page _____ Line _____ Reason _____

11  From _____ to _____

12  Page _____ Line _____ Reason _____

13  From _____ to _____

14  Page _____ Line _____ Reason _____

15  From _____ to _____

16  Page _____ Line _____ Reason _____

17  From _____ to _____

18  Page _____ Line _____ Reason _____

19  From _____ to _____

20  Page _____ Line _____ Reason _____

21  From _____ to _____

22  Page _____ Line _____ Reason _____

23  From _____ to _____

24

25          _____

# Exhibit 4

1          IN THE UNITED STATES DISTRICT COURT

2             MIDDLE DISTRICT OF FLORIDA

3                TAMPA DIVISION

4

5   REBOTIX REPAIR, LLC

6        Plaintiff,

7   vs.                    Case No. 8:20-CV-02274

8   INTUITIVE SURGICAL, INC.,

9        Defendant.

10   ----------------------------/

11

12

13            REMOTELY CONDUCTED

14   VIDEOTAPED DEPOSITION OF RONALD LEE BAIR, JR.

15     Livermore, California (Witness's location)

16            Monday, May 24, 2021

17

18

19

20

21   Stenographically reported by:
     LORRIE L. MARCHANT, RMR, CRR, CCRR, CRC
22   California CSR No. 10523
     Washington CSR No. 3318
23   Oregon CSR No. 19-0458
     Texas CSR No. 11318
24

25   Job No. 194222

1        May 24, 2021

2        12:39 p.m. PDT

3

4    Remotely conducted videotaped deposition

5    of Ronald Lee Bair, Jr., before Lorrie L.

6    Marchant, a Certified Shorthand Reporter,

7    Registered Merit Reporter, Certified

8    Realtime Reporter, California Certified

9    Realtime Reporter, Certified Realtime

10    Captioner.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        A P P E A R A N C E S

2      (All appearances remotely via Zoom)

3

4    APPEARING ON BEHALF OF THE PLAINTIFF:

5        DOVEL & LUNER

6        BY:  ALEXANDER ERWIG, ESQ.

7            LORENZO LAMO, LEGAL ASSISTANT

8        201 Santa Monica Boulevard

9        Santa Monica, CA 90401

10

11   APPEARING ON BEHALF OF THE DEFENDANT:

12        SKADDEN ARPS SLATE MEAGHER & FLOM

13        BY:  KAREN LENT, ESQ.

14            WILLIAM DARIO, ESQ.

15        One Manhattan West

16        New York, NY 10001

17

18   ALSO PRESENT:

19        Danielle Greene, Videographer

20

21            ---oOo---

22

23

24

25

1    LIVERMORE, CALIFORNIA (Witness's location)

2         MONDAY, MAY 24, 2021

3          12:39 p.m. PDT

4    THE VIDEOGRAPHER:  My name is

5  Danielle Greene.  I am the legal video specialist in

6  association with TSG Reporting.

7         Due to the severity of COVID-19 and

8  following the practice of social distancing, I will

9  not be in the same room with the witness.  Instead,

10  I will record this videotaped deposition remotely.

11  The court reporter is Lorrie Marchant in association

12  also with TSG.

13         Do all parties stipulate to the validity of

14  this video recording and remote swearing and that it

15  will be admissible in the courtroom as if it had

16  been taken following Rule 30 of the Federal Rules of

17  Civil Procedure and the state's rules where this

18  case is pending?

19    MR. ERWIG:  Plaintiff stipulates.

20    MS. LENT:  Defendants do as well.

21    THE VIDEOGRAPHER:  Thank you.

22         This is the start of Media 1 in the

23  videotaped deposition of Ron Bair in the matter of

24  Rebotix Repair LLC v. Intuitive Surgical, Inc.,

25  filed in the district court of Florida.  This

Page 5

1   deposition is being held via Zoom with all

2   participants attending remotely on Monday, May 24th,

3   2021, at around 12:41 p.m.

4         My name is Danielle Greene.  I am the video

5   specialist from TSG Reporting.  The court reporter

6   today is Lorrie Marchant in association with TSG

7   Reporting.

8         Counsel, will you please introduce

9   yourself, state whom you represent, and the court

10  reporter may then swear in the witness.

11         MR. ERWIG:  On behalf of plaintiff, Rebotix

12  Repair, Alexander Erwig of Dovel & Luner.  With me

13  legal assistant, Lorenzo Lamo.

14         MS. LENT:  Karen Lent from Skadden on

15  behalf of Intuitive Surgical.

16         MR. DARIO:  William Dario from Skadden on

17  behalf of Intuitive Surgical.

18         THE STENOGRAPHER:  And I'll go ahead and

19  swear in the witness, then.

20              RONALD LEE BAIR, JR.,

21   FIRST DULY SWORN/AFFIRMED, TESTIFIED AS FOLLOWS:

22            EXAMINATION BY MR. ERWIG

23         BY MR. ERWIG:

24   Q.  Good afternoon, Mr. Bair.

25   A.  Hi.

1    Q.   Could you please state your full name for

2  the record.

3    A.   Sure.  My full legal name is Ronald Lee

4  Bair, Jr.

5    Q.   And I understand you work for Intuitive

6  Surgical.  Is that right?

7    A.   That is correct.

8    Q.   What is your position at Intuitive?

9    A.   I am the senior director of services

10  innovation and product management.

11    Q.   Can you explain to me a little bit what

12  that role entails.

13    A.   Sure.  So the purview includes product

14  management, which is the definition and deployment

15  of service and service lines as a product to support

16  Intuitive's products and their customers.  And it

17  also includes our services business system team and

18  our services analytics team.

19    Q.   When you say services business and services

20  analytics team, what do you mean by that?

21    A.   Services business systems.  So IT-oriented

22  systems.  For example, for order management, our

23  configuration management, field service order

24  management, et cetera, the back-end IT operations

25  side of that.  And then also the analytics side of

1  it, drawing business intelligence from the data

2  captured by our business systems.

3      Q.  What sorts of business intelligence do you

4  draw from analytics captured by business systems?

5      A.  It ranges widely from economic factors,

6  such as cost to serve and support our customers, as

7  well as ensuring that we meet our service-level

8  agreements as it relates to time to respond, time to

9  resolve service orders, the efficiency and

10  effectiveness of our teams, et cetera.

11      Q.  Are you personally involved with -- when

12  you say "customers," some of Intuitive's customers

13  are hospitals; is that right?

14      A.  That is correct.

15      Q.  Are you personally involved in capturing

16  analytics and data from hospitals?

17      A.  I am not personally involved.

18      Q.  How, if at all, are you involved in

19  Intuitive's relationship with its hospital

20  customers?

21      A.  I handle escalations.  For example, if

22  customers have concerns around contract compliance

23  or we have a maintenance issue that may need to be

24  escalated, I am -- that's an element of my role, is

25  to help field those escalations.  And I also lead

1  the team that is involved in the analytics element

2  of our performance against our customers' exception

3  as it relates to their service contracts and

4  service-level agreements.

5      Q.   About how long have you been the senior

6  director for services innovation and product

7  management at Intuitive?

8      A.   For roughly three months now.

9      Q.   What was your role prior to your current

10  role?

11      A.   Starting in July of last year, so July 1st

12  of 2020, I was the senior director of services

13  strategy.

14      Q.   What did you do as a senior director of

15  services strategy?

16      A.   It was a similar function as it relates to

17  the product management element but established more

18  of a long-range plan, three- to five- to eight-year

19  plan as it related to innovation and our global

20  service lines and service as a product.

21      Q.   You mentioned a three-year, a five-year,

22  and eight-year plan.  What are some of the

23  components of that planning?

24      A.   Establishing -- for example, one of our

25  first initiatives was agreeing, as a leadership team

Page 9

1   and with key stakeholders, on what the key strategic

2   breakthroughs were we would need to achieve in order

3   to compete effectively in this -- the

4   robotic-assisted surgery space over the next, for

5   example, three to eight years.

6       Q.   You mentioned competing effectively in the

7   robotic surgery space.

8           Who else is involved in the long-term

9   strategic planning for the robotic surgery space?

10      A.   We have a corporate strategy team, our

11   entire executive management team, and also each

12   product management team within our various product

13   lines is accountable and responsible for

14   establishing and articulating the strategic

15   direction of the company.

16          MR. ERWIG:  I'm going to screen share some

17   notes that were taken.  This will be Plaintiff's

18   Exhibit 1.

19          (Marked for identification purposes,

20           Exhibit 1.)

21          MR. ERWIG:  This is a set of notes titled

22   "Ron Bair."  I've reflected that you're the senior

23   director of services innovation and product

24   management.  Your duties include handling

25   escalations and leading analytics team and that

1  prior to that you were involved in establishing

2  long-term planning and strategic breakthroughs.

3        Mark that as Exhibit 1, and we'll get it

4  scanned in at the next break.

5        MS. LENT:  Is there a question about that

6  document?

7        BY MR. ERWIG:

8    Q.  Mr. Bair, did you prepare to testify today?

9    A.  Yes.

10   Q.  How did you prepare to testify today?

11       MS. LENT:  Can I object for a second?  I

12  object to you introducing an exhibit that you had

13  literally no questions about.

14       THE WITNESS:  Outside of conversations with

15  counsel, I familiarized myself with documentation

16  that may potentially be related to this subject.

17  And I believe that was the extent of the

18  preparation.

19       BY MR. ERWIG:

20   Q.  Do you have any documents in front of you

21  now that are not visible to the camera?

22   A.  I do not.

23   Q.  Which documents did you look at to prepare?

24       MS. LENT:  Objection.  That calls for

25  privileged information.  You haven't established a

1  basis to ask for those outside the attorney-client

2  privilege.

3        MR. ERWIG:  You're instructing him not to

4  answer?

5        MS. LENT:  I am instructing him not to

6  answer.

7        BY MR. ERWIG:

8    Q.  Now, Mr. Bair, do you have some familiarity

9  with the da Vinci surgical system?

10   A.  Yes, I do.

11   Q.  How are you familiar with that surgical

12  system?

13       MS. LENT:  Object to the form.

14       THE WITNESS:  Could you clarify in what

15  capacity?

16       BY MR. ERWIG:

17   Q.  Well, sure.  You've been at Intuitive --

18  withdrawn.

19       How long have you been at Intuitive overall

20  in your various roles?

21   A.  I have been at Intuitive for almost eight

22  years.

23   Q.  During that time you developed some

24  familiarity with the da Vinci surgical system?

25   A.  Yes, I have.  And that familiarity would

1  range from its use on my daughter as a surgical

2  patient when she was two years old up to my

3  experience as a field service director supporting

4  our customers who use the products.

5      Q.   So you're familiar with the way that the

6  da Vinci surgical system works; is that right?

7      A.   I am familiar with the high-level

8  operations of the system, that is correct.

9      Q.   You're generally family with the various

10  components of the da Vinci surgical system; is that

11  right?

12      A.   I do have general familiarity, yes.

13      Q.   You understand that there's a surgical

14  robot that has four arms in the case of the

15  da Vinci Si and Xi; right?

16      A.   That is correct.

17      Q.   You understand that a surgeon who sits at a

18  console manipulates those arms using joy sticks;

19  right?

20      A.   I refer to them as master tool

21  manipulators, but yes.

22      Q.   When you say master tool manipulator, can

23  you give me a description of what those master tool

24  manipulators look like?

25      A.   Sure.  They are multiple-axes gimbals and

1  joints with two graspers for a surgeon to grasp and

2  control, as demonstrated on the video.

3      Q.   So as the surgeon sitting at the console

4  manipulating those multijoint instruments, those

5  movements are mimicked by the da Vinci surgical

6  robot; is that right?

7      A.   That is correct.

8      Q.   Now, the actual -- I want to talk with you

9  a little bit about the actual surgical robot, the

10  da Vinci.

11         Are you familiar with the da Vinci Si

12  surgical robot?

13     A.   Yes.

14     Q.   Now, I understand that the da Vinci Si has

15  four arms and typically one of those arms is holding

16  a camera; is that right?

17     A.   That is correct.

18     Q.   That camera transmits a 3D picture to the

19  surgeon sitting at the surgeon table; right?

20     A.   It is a live video image, yes.

21     Q.   So that live video image is a 3D

22  high-definition image that the surgeon sees as he's

23  manipulating the instruments remotely from the

24  surgeon console; is that right?

25     A.   Yes, as he or she, the surgeon, would.

1  That is correct.

2      Q.   Now, the actual surgical robot itself,

3  there's three arms that can be used in the actual

4  surgery; is that right?

5      A.   I do not believe that to be correct.

6      Q.   The entire robot has four arms; right?

7      A.   That is correct.

8      Q.   One of the arms holds the camera; right?

9      A.   Depending on the generation of the surgical

10  robot, there may be one dedicated camera arm or a

11  camera to be used in any arm or four instruments

12  could be used in arms depending on the model.

13     Q.   Well, let's break it down.  For the

14  da Vinci Si, is one arm dedicated to the camera?

15     A.   Yes.

16     Q.   For the da Vinci Xi, is one arm dedicated

17  to the camera?

18     A.   No.

19     Q.   So the da Vinci Si has one arm dedicated to

20  the camera and three arms that have EndoWrists

21  attached to them that can be used for surgery?

22     A.   That is correct.

23     Q.   And the da Vinci Xi has up to four arms,

24  all of which can be outfitted with EndoWrists that

25  can be used for surgery; correct?

1    A.   That is correct.

2    Q.   What is an EndoWrist?

3    A.   It is, to my understanding, our trademarked

4    name for our suite of the instrument portfolio that

5    is used in conjunction or used on the da Vinci

6    surgical system.

7    Q.   Now, when you say the instrument portfolio,

8    those are instruments that are very similar to

9    traditional laparoscopic instruments; right?

10    MS. LENT:  Object to the form.

11    THE WITNESS:  I do not agree with that

12    statement.

13    BY MR. ERWIG:

14    Q.   Well, certainly, the functions of

15    individual instruments are very similar to the

16    functions performed by traditional laparoscopic

17    instruments; right?

18    MS. LENT:  I'm going to object to the form.

19    THE WITNESS:  I do not agree with that

20    statement.

21    BY MR. ERWIG:

22    Q.   Well, you have some -- withdrawn.

23    Do you have some familiarity with

24    traditional laparoscopic instruments?

25    A.   Yes, I do.

1        MS. LENT:  Object to the form.

2        BY MR. ERWIG:

3    Q.   Traditional laparoscopic instrument, one of

4  the forms of a laparoscopic instrument is a grasper;

5  is that right?

6    A.   That is correct.

7    Q.   Another form of traditional laparoscopic

8  instrument is a Potts scissor; is that right?

9    A.   I am unaware of that type of instrument.

10    Q.   Are you aware that there are some

11  traditional laparoscopic instruments that are --

12  look like little scissors?

13    A.   Yes.

14    Q.   Those little scissors, they're designed to

15  make incisions or to cut inside the patient; right?

16    A.   In addition to other things, yes.

17    Q.   The graspers, those are used to, in some

18  cases, pull apart tissue, for example; right?

19    A.   Or retraction, yes, as an example.

20    Q.   Now, the Intuitive da Vinci EndoWrists

21  perform those same functions; right?  They might

22  have graspers that pull apart tissue; right?

23    A.   They achieve the same intended objective

24  within the context of grasping or dissecting,

25  cutting, et cetera.

1    Q.   Well, let's simplify that.  The graspers,

2   they also grab and potentially pull apart tissue;

3   right?

4    A.   Correct.

5    Q.   And the scissors, they cut tissue too;

6   right?

7    A.   That is correct.

8    Q.   That's similar with all the other types of

9   EndoWrists as well; right?  They are designed to

10  perform functions that are similar to those that

11  traditional laparoscopic instruments perform; right?

12       MS. LENT:  Object to the form.

13       THE WITNESS:  I believe I would articulate

14  it differently.

15       BY MR. ERWIG:

16   Q.   Well, how would you articulate it, sir?

17   A.   I would state that the instruments actually

18  function in a differentiated way in that they are

19  wristed and provide a range of motion that is not

20  provided by traditional laparoscopic instruments.

21   Q.   Right.  There's some important advantages

22  to EndoWrists relative to traditional laparoscopic

23  instruments; right?

24   A.   That is correct.

25   Q.   One of those advantages is that the

1  instruments are wristed and have a wider range of

2  motion; right?

3    A.  That is correct.

4    Q.  But the ultimate function being performed

5  by the instrument, those functions are similar

6  between EndoWrists and traditional laparoscopic

7  instruments; right?

8    A.  They are similar.

9    Q.  In fact, the actual end function, you know,

10  whether tissue is being pulled open with a

11  multiwristed instrument or by a nonmultiwristed

12  instrument, tissue is still being pulled apart;

13  right?

14    A.  Yes.

15    Q.  Tissue is still being cut by a pair of

16  scissors; right?

17    A.  That is correct.

18      MR. ERWIG:  I'm going to screen share our

19  first exhibit.  This will be in Folder 1.  This will

20  be 9'5'19, Rawls to Sykes and Bair.

21      THE STENOGRAPHER:  I thought this was

22  Number 2.  Didn't you mark the notes?

23      MR. ERWIG:  I'm sorry.  You're right.  This

24  will be Exhibit No. 2.

25  ///

1          (Marked for identification purposes,

2          Exhibit 2.)

3          MR. ERWIG:  I'll screen share.

4          BY MR. ERWIG:

5     Q.   Mr. Bair, do you see this document on the

6    screen in front of you?

7     A.   I do.

8     Q.   Do you recognize this document?

9     A.   Allow me a moment to review and refresh,

10   please.

11         MS. LENT:  Alexander, I still don't have

12   this in the exhibit folder.  Have you put it there?

13   Now I have it.  Thank you.

14         THE WITNESS:  I'll refresh as well.

15         Okay.  It doesn't -- the specific contents

16   of it, I don't specifically recall, but, yes, this

17   communication does ring a bell.

18         BY MR. ERWIG:

19    Q.   Does this appear -- withdrawn.

20         Who is Chace Rawls?

21    A.   He is the key accounts director for a

22   couple of our integrated delivery network customers,

23   or IDN customers.

24    Q.   When you say "key accounts director," can

25   you explain to me what you mean by that?

1    A.   Sure.  His title is in the e-mail, director

2  academic key accounts.  So there are certain

3  customers who do not manage their programs at the

4  individual hospital level but rather at an

5  integrated or a network-oriented level.  And we have

6  sales leaders who are assigned to partner with those

7  types of customers to help them optimize their

8  program, for example, from a fleet management

9  perspective versus at individual hospital sites.

10    Q.   Now, Mr. Rawls is sending this e-mail on

11  September 5th, 2019; is that right?

12    A.   It appears so.

13    Q.   And he's sending it to Shelton Sykes,

14  Matthew Thomas, and yourself, all at Intuitive

15  Surgical; right?

16    A.   That is correct.

17    Q.   The subject is 2019-9-5 BSWH QBR.pptx.  Do

18  you see that?

19    A.   Yes.

20    Q.   Mr. Rawls writes:

21         "Fellas, attached is the presentation

22       that Shelton and I put together for a

23       meeting this afternoon with Baylor."

24       Do you see that?

25    A.   Yes.

1    Q.   Why were you meeting with Baylor?

2    A.   The biomedical -- I believe it was the VP

3  of biomedical engineering or the equivalent at the

4  Baylor Scott & White Health system had requested a

5  quarterly review of the -- both the commercial

6  side -- so what we deemed to be the commercial side

7  of their clinical side -- of activities associated

8  with Intuitive.  So, for example, procedures and

9  types of procedures completed, instrument

10  performance and return rates, and then also

11  maintenance activity that we were engaging in.

12        MR. ERWIG:  I'm going to stop screen

13  sharing this exhibit.

14        The next exhibit is going to be Exhibit 3.

15  This will be 9'5'19 Attach to Rawls to Sykes and

16  Bair.  And this is the PowerPoint that's attached to

17  that e-mail.

18        (Marked for identification purposes,

19         Exhibit 3.)

20        MR. ERWIG:  I'll screen share it and give

21  you a minute to pull it up.

22        THE WITNESS:  I will refresh.  Okay.  I've

23  pulled it up.

24        BY MR. ERWIG:

25    Q.   You see the first page of this policy and

1  procedure is BSWH quarterly business review?

2    A.  Yes.

3    Q.  Does this appear to be the PowerPoint

4  that's attached to the e-mail sent from Mr. Rawls to

5  Mr. Sykes and yourself?

6    A.  It does appear to be.

7    Q.  How -- withdrawn.

8      Do you recognize this document generally?

9    A.  May I have a moment to review it?

10   Q.  Sure.  We're going to go through parts of

11  it as well if that will help.

12   A.  Sure.

13      Yes, I do recognize the document.

14   Q.  How do you recognize it?

15   A.  I reviewed it on behalf of Chace's request,

16  to my recollection, and also was likely engaged in

17  the quarterly review meeting with Baylor.

18   Q.  I'm going to scroll to page 25 with you.

19      Before I ask you some questions about this,

20  can you describe to me what the quarterly review

21  meeting with Baylor looked like?

22   A.  Sure.  I believe there is an agenda as part

23  of the presentation.  May I review and provide the

24  summary of that agenda?

25      So I am looking at page 2 of the document.

1  The first item on the agenda was contract review as

2  it related to systems and I&A, the service review,

3  and quality events in general and specifically to

4  Baylor Scott & White, which was one of the requests

5  from their biomedical management team.

6       And should I read the following items on

7  the agenda?

8    Q.  No.  That's okay.  Does this agenda

9  generally reflect the way that the meeting with

10  Baylor Scott & White progressed?

11    A.  According to my recollection, yes.

12    Q.  I'm going to move down to page 25 of this

13  presentation with you.  And you see that this is a

14  page titled "Enabling more minimally invasive

15  procedures, global adoption of da Vinci surgery."

16       Do you see that?

17    A.  One moment.  Yes.

18    Q.  In this slide you can see that minimally

19  invasive procedures performed using the da Vinci

20  robot have grown year over year from 2014 to 2018;

21  right?

22    A.  That is correct.

23    Q.  And specifically there was an 18 percent

24  growth year over year from 2017 to 2018; is that

25  right?

1    A.   It seems to be indicated in the

2  presentation, yes.

3    Q.   And there was also a 33 percent

4  year-over-year growth in the general surgery

5  category.  That's the green category.  Is that

6  right?

7    A.   That is correct.

8    Q.   Now, in 2019 this presentation was given on

9  September 5th, 2019; is that right?

10    A.   I do not recall the date of delivery.  I

11  would have to consult my archived calendar.

12    Q.   Well, the presentation was -- withdrawn.

13        This version of the presentation was sent

14  to you as of September 5th, 2019; right?

15    A.   That is correct.

16    Q.   And at that time all of the surgeries for

17  the year hadn't yet been tabulated or calculated;

18  right?

19    A.   That is correct.

20    Q.   And so this wouldn't reflect a drop from

21  2018 to 2019; this would just reflect that the year

22  2019 was not yet completed.  Right?

23    A.   Correct.  We would commonly call that the

24  year-to-date procedure number.

25    Q.   And it's your understanding that there's

1 been year-over-year growth in minimally invasive

2 procedures performed using the da Vinci robot from

3 2018 to 2019; right?

4     A.   Yes.  I do believe the full-year procedure

5 volume indicated growth from 2018 to 2019.

6     Q.   And there was also year-over-year growth

7 from 2019 to 2020; right?

8     A.   Given the disruption from COVID, I don't

9 recall our specific growth as it related to 2019 to

10  2020.

11    Q.   I'm going to move on to page 27 with you.

12  You see that this slide is titled "da Vinci Xi is

13  helping accelerate hernia MIS adoption"?

14    A.   Yep.

15    Q.   What is MIS?

16    A.   That is the term that we use to indicate

17  minimally invasive surgery.

18    Q.   On this slide it says, "Approximately three

19  in eight hernia surgeons performed a hernia repair

20  using da Vinci systems."

21       Do you see that?

22    A.   I'm zooming in.  Yes, I do see that.

23    Q.   And below that it says, "81 percent of MIS

24  general surgery fellows were trained on da Vinci

25  technology."

1        Do you see that?

2    A.   Yes.

3    Q.   Is it your understanding that over

4    80 percent of general surgery fellows are --

5    withdrawn.

6        Is it your understanding that over

7    80 percent of general surgery fellows are trained on

8    da Vinci technology?

9        MS. LENT:  Objection.  Misstates the

10   document.

11       THE WITNESS:  Yeah, I would say this is

12   outside of my area of expertise, but it seems to

13   indicate so in the document.

14       BY MR. ERWIG:

15   Q.   Do you have a general familiarity with the

16   training that's required for a surgeon to perform a

17   da Vinci surgery?

18   A.   I am not intimately familiar with that.  I

19   am familiar with our various -- high-level

20   familiarity with our various training options

21   provided by Intuitive.

22   Q.   You're aware that surgeons, they need quite

23   a bit of training before they can perform an

24   operation with the da Vinci surgical robot; is that

25   right?

1        MS. LENT:  Object to the form.

2        THE WITNESS:  Could you clarify what you

3  mean by "quite a bit"?

4        BY MR. ERWIG:

5     Q.  Well, sure.  What's your understanding of

6  how much training and time is required before a

7  surgeon can perform a surgery with a da Vinci

8  surgical robot?

9     A.  Traditionally within the scope of what I'm

10  aware of, I do know that getting to 100 cases with

11  the robotic system is an important milestone as it

12  relates to training and use.

13     Q.  100 cases, that would be 100 practice

14  surgeries performed using the da Vinci surgical

15  robot; is that right?

16     A.  That is correct.

17     Q.  So that would be a surgeon doing

18  effectively 100 mock surgeries before they could

19  carry out a real surgery with a da Vinci surgical

20  system; is that right?

21     A.  I'm sorry.  I --

22        MS. LENT:  Objection.

23        THE WITNESS:  If that's your understanding,

24  then I misspoke.  So to clarify, a trained surgeon

25  reaches proficiency generally -- or roughly after

1  100 cases is an important benchmark as it relates to

2  full proficiency, familiarity with the technology,

3  et cetera.

4       BY MR. ERWIG:

5    Q.   Well, my question, sir, was a little bit

6  different.  It was about the training that a surgeon

7  has to perform before they can perform their very

8  first procedure with the da Vinci surgical robot.

9       What's your understanding of the type of

10  training that's required before a surgeon can

11  perform a procedure using the da Vinci surgical

12  robot?

13   A.   I am not familiar with what equips a

14  surgeon to perform a clinically safe surgery with

15  the da Vinci surgical robot.

16   Q.   Are you aware of any other minimally

17  invasive soft tissue surgical robots that surgeons

18  are training on at the same rate that they're

19  training on the da Vinci surgical robot?

20   A.   I am not aware of any others.

21   Q.   I'm going to show you the next slide.  This

22  is Slide Number 28.  It's titled "da Vinci Xi is

23  helping accelerate colorectal MIS adoption."

24       Do you see that?

25   A.   Yes, I see the slide.

1    Q.   I'm actually going to move back to the

2   previous slide really quickly and look at the graph

3   with you.  You see that this graph is titled -- and

4   I can zoom in.

5        This graph is titled, "Hernia procedure

6   growth using da Vinci surgical systems"?

7    A.  Yes.

8    Q.  You see that the hernia procedure growth

9   is -- withdrawn.

10       Do you see that there's been growth in the

11  volume of hernia procedures using da Vinci surgical

12  systems from quarter one of 2013 to quarter two of

13  2018?

14   A.  That is correct.

15   Q.  I'm going to zoom out and go to the next

16  slide with you.

17       Now, on this slide do you see that it

18  reads, "Approximately one in two colorectal surgeons

19  are using da Vinci systems in the United States"?

20   A.  Yes.

21   Q.   Are you aware of any other minimally

22  invasive robotic -- withdrawn.

23       Are you aware of any other minimally

24  invasive surgical robot with that widespread of a

25  level of adoption in the United States?

1    A.  I am not.

2    Q.  Do you see that below -- withdrawn.

3        There's also a portion of this slide where

4  it says, "Approximately 83 percent of 2017 to 2018

5  colorectal fellows were trained on da Vinci

6  systems."

7        Do you see that?

8    A.  Yes, I do.

9    Q.  Then below that it says, "The average

10  colorectal fellow completes 25 da Vinci

11  robotic-assisted cases during their fellowship."

12       Do you see that?

13    A.  I do see that.

14    Q.  Is it your understanding that that means

15  that colorectal fellows have to complete --

16  withdrawn.

17       Are you aware of any other minimally

18  invasive robotic surgery system that has the same

19  level of training for colorectal fellows in the

20  United States?

21    A.  While I'm not deeply familiar with the

22  subject matter and this is outside of my area of

23  expertise, I am not aware.

24    Q.  This slide says, "The average colorectal

25  fellow completes 25 da Vinci robotic-assisted cases

1  during their fellowship."  Does that mean that the

2  average colorectal fellow has to perform 25 da Vinci

3  robotic-assisted surgeries before they can actually

4  use the da Vinci system in surgery?

5    A.  I do not believe that's what that means.

6    Q.  What is your understanding of what that

7  means?

8    A.  My understanding is that it is a data point

9  simply indicating the level of exposure and/or

10  experience during one's fellowship.

11    Q.  And it indicates that there's a high level

12  of exposure during fellowship to da Vinci surgical

13  technology; right?

14      MS. LENT:  Object to the form.

15      THE WITNESS:  Could you clarify what's

16  meant by "a high level"?

17      BY MR. ERWIG:

18    Q.  Well, 83 percent of colorectal fellows,

19  would you call that a high level of exposure to the

20  da Vinci system, a medium level, or a low level?

21      MS. LENT:  Object to the form.

22      THE WITNESS:  I'm not certain I'm equipped

23  to respond to that as it relates to medical school

24  thresholds with technological familiarity.

25  ///

1          BY MR. ERWIG:

2     Q.   Well, sir, are you aware that there are --

3   withdrawn.

4          Are you aware that the TransEnterix

5   Senhance is a surgery robot that has received FDA

6   clearance in some of the areas that the da Vinci Xi

7   has clearance in?

8     A.   I am aware that it is an FDA-cleared

9   medical device.

10    Q.   Do you have any sense of what percentage of

11   colorectal fellows are trained on the TransEnterix

12   Senhance?

13    A.   I would not know.

14    Q.   Is it less than 83 percent?

15         MS. LENT:  Objection.  Lacks foundation.

16         THE WITNESS:  I don't have familiarity with

17   that.

18         BY MR. ERWIG:

19    Q.   I'm going to stop screen sharing this

20   exhibit.

21         Now, sir, I want to talk to you a little

22   bit about the development of the da Vinci surgical

23   robots.  You have some familiarity with the

24   development process of the da Vinci surgical robots

25   before they were brought to market?

1    A.   I have some familiarity with Intuitive's

2  product development process.

3    Q.   Can you just describe in general terms what

4  that product development process looks like?

5    A.   In general terms, it starts with a need or

6  opportunity to develop better tools or technology in

7  furtherance of your mission and explores engineering

8  and technical feasibility of various solutions and

9  then explores the actual pathway for developing the

10  product itself in terms of concepts, beta systems,

11  et cetera, testing and proving claims associated

12  with the benefits of that product, moving into the

13  regulatory environment for clearances and

14  requirements for regulatory approval to market and

15  sell the products.

16    Q.   What is your understanding of how long that

17  process that you just described was for the da Vinci

18  Si robot?

19    A.   The development of the da Vinci Si preceded

20  my employment with Intuitive, and I don't have

21  familiarity with that timeline.

22    Q.   How about the da Vinci Xi?

23    A.   A large portion of that development, I

24  believe, preceded my employment with Intuitive, as

25  it was introduced slightly less than one year

1  following joining the company.

2      Q.   You're aware that the development time for

3  each of those robots was over five years; right?

4      A.   I am not aware that I can commit to that

5  understanding.

6      Q.   Do you have any general sense of the length

7  of time that's required to bring a surgical robot to

8  market?

9      A.   Could you clarify if there is existing

10  technology that the platforms are built off of or if

11  this is from scratch?

12      Q.   Well, I'm just trying to get a sense of

13  your understanding, sir, at your position at

14  Intuitive what the timeline is for developing a new

15  da Vinci surgical system.

16      A.   I believe the timeline could range broadly

17  depending on the scope, function, features, claims,

18  et cetera, of the product.

19      Q.   You imagine there's a broad range.  Can you

20  give me a little bit narrower sense of that range?

21      A.   I would -- I believe, for example, with the

22  da Vinci X product -- I'll provide clarity within

23  that range.

24          The da Vinci X product, which is a

25  fourth-generation platform product, so an additional

1  model within the same generation of robots, as an

2  example, required less time to develop than the

3  da Vinci Xi, which was the first robot within the

4  fourth-generation platform.

5     Q.  Now, you mentioned less time, but I'm just

6  trying to get a little bit concrete when you

7  mention.

8        Less time, is that, you know, two years

9  instead of four years?  Is that three years instead

10 of seven years?  Any sort of a more granular level

11 of detail?

12       MS. LENT:  Object to the form.

13       THE WITNESS:  I don't know that I can

14 provide a more granular level of detail.

15       BY MR. ERWIG:

16    Q.  So the level of detail that you have is

17 that the X, that took less time to develop than the

18 Xi; is that right?

19    A.  That is correct.

20    Q.  Now, before the Xi entered the market,

21 there were some steps that had to be taken; right?

22    A.  Correct.

23    Q.  There was some capital expenditures and

24 money investment involved in the research and

25 development for the Xi; right?

1    A.  That is correct.

2    Q.  There was some testing that was done?

3    A.  That is correct.

4    Q.  And there was some paperwork submitted to

5  the FDA; right?

6    A.  That is correct.

7    Q.  It's not a simple or a straightforward

8  process to get that new robot approved; right?

9        MS. LENT:  Object to the form.

10        THE WITNESS:  I'm not familiar with the

11  extent of the process that regulatory clearance

12  takes either with the FDA or notified bodies, but I

13  do know that the process is extensive.

14        BY MR. ERWIG:

15    Q.  Extensive -- it's extensive -- withdrawn.

16        That process is extensive, and it's

17  challenging as well; right?

18        MS. LENT:  Object to the form.

19        THE WITNESS:  Could you clarify what you

20  mean by "challenging"?

21        BY MR. ERWIG:

22    Q.  Well, it's not easy.  It takes a lot of

23  time, it takes a lot of work, and it takes a lot of

24  effort; right?

25        MS. LENT:  Object to the form.

1      THE WITNESS:  I would state that adhering

2   to the regulatory requirements, generating the

3   appropriate level of data, et cetera, it does take

4   time and effort.

5      BY MR. ERWIG:

6   Q.   And more than just regulatory requirements,

7   the actual development of the surgical robot, that

8   takes a lot of time; right?

9   A.   That would be correct.

10   Q.   It takes a lot of resources too in terms of

11   money that you have to invest into the research and

12   development process; right?

13      MS. LENT:  Object to the form.

14      THE WITNESS:  It does take resources and

15   expertise, correct.

16      BY MR. ERWIG:

17   Q.   A significant amount of resources; right?

18      MS. LENT:  Object to the form.

19      THE WITNESS:  Could you clarify the level

20   of materiality associated with "significant"?

21      BY MR. ERWIG:

22   Q.   Tens of millions of dollars; right?

23   A.   I would estimate yes.

24   Q.   In the upper tens of millions of dollars;

25   right?

1        MS. LENT:  Objection.  Vague.

2        THE WITNESS:  I would say it depends to my

3   previous comments on the scope of the product, the

4   predicate technologies, et cetera.

5        BY MR. ERWIG:

6    Q.   So the whole process of developing and

7   bringing a surgical robot to market, that isn't

8   easy; right?

9        MS. LENT:  Objection.

10        THE WITNESS:  Could you clarify what you

11   mean by "easy"?

12        BY MR. ERWIG:

13    Q.   Well, maybe we can use a document and it

14   will make things a little more concrete.

15        I'm going to screen share our next exhibit.

16   This will be 7'17'20, Bair to others.  So this will

17   be Plaintiff's Exhibit 4.

18        (Marked for identification purposes,

19         Exhibit 4.)

20        BY MR. ERWIG:

21    Q.   You see this on the screen in front of you?

22    A.   Yes, I do.

23    Q.   I'll point your attention to the bottom

24   e-mail.  Do you recognize that e-mail?

25    A.   Yes.

1     Q.   How is it that you recognize it?

2     A.   I authored the e-mail at the bottom.

3     Q.   The -- I'm sorry.  I didn't mean to cut you

4     off.

5     A.   No, I completed my sentence.

6     Q.   Does the bottom e-mail appear to be an

7     e-mail from yourself to others at Intuitive Surgical

8     sent on Friday, July 17th, 2020?

9     A.   Yes, it does.

10    Q.   In that e-mail you write, "Team, in case

11    the news hadn't reached you yet, J&J announced a

12    significant delay in their competitive program, and

13    the FDA apparently plans a much more stringent

14    approval process for new entrants into the robotic

15    space."

16         Do you see that?

17    A.   I do.

18    Q.   What do you mean by "a significant delay in

19    their competitive program"?

20    A.   A delay in the product to pipeline

21    associated with products they are developing which

22    we believe will compete in the same -- continue to

23    compete in the same space.

24    Q.   Well, you link an article in your e-mail;

25    right?

1    A.  That is correct.

2    Q.  That's an article from massdevice.com.  Do

3  you see that?

4    A.  I do.

5    Q.  And it says "Johnson & Johnson to take its

6  time on general surgery robot."

7        Do you see that?

8    A.  Yes.

9    Q.  Is the general surgery robot the

10  competitive program that you're referencing in your

11  e-mail?

12    A.  I wouldn't refer to the Johnson & Johnson

13  robot as necessarily a general surgery robot.  That

14  title was provided by the author of that article.

15  But I was speaking more specifically regarding to

16  surgical robotics or robotic-assisted surgery.

17    Q.  Now, at the bottom of this e-mail you

18  write, "Yet another reminder what we do isn't easy."

19        Do you see that?

20    A.  That is correct.

21    Q.  And when you say "what we do," that means

22  what Intuitive does; right?

23    A.  That is correct.

24    Q.  What Intuitive does is develop and bring to

25  market minimally invasive robots for minimally

1  invasive surgeries; right?

2    A.  Generally, yes, that is the business we are

3  engaged in.

4    Q.  It's not easy to be engaged in that

5  business; right?

6    A.  It is a -- that is correct.

7    Q.  There's difficulties for even a company as

8  big as Johnson & Johnson to enter into that space;

9  right?

10    A.  I would agree that the same difficulties

11  that we encounter are often shared by other

12  companies.

13    Q.  Well, sir, Intuitive has a minimally

14  invasive -- withdrawn.

15       Intuitive has multiple minimally invasive

16  robots on the market with FDA clearance; right?

17    A.  That is correct.

18    Q.  Johnson & Johnson has none; right?

19    A.  I am not certain as I know there are some

20  orthopedic robots.  And Johnson & Johnson, I

21  believe, has also acquired an endoluminal robotic

22  surgery robot as well.

23    Q.  Well, Johnson & Johnson doesn't have a

24  competitive robot with a da Vinci robot in minimally

25  invasive soft tissue surgeries; right?

1        MS. LENT:  Object to the form.

2        THE WITNESS:  I do not believe that they

3   have an approved medical device for soft tissue

4   surgery similar to a da Vinci-type product.

5        BY MR. ERWIG:

6     Q.   And developing a surgical robot like that,

7   that isn't easy; right?

8     A.   I do not believe that to be easy.

9        MR. ERWIG:  Let me stop screen sharing this

10  exhibit.

11        BY MR. ERWIG:

12    Q.   Are you aware, sir, that Intuitive's

13  da Vinci surgical robots make up over 99 percent of

14  the installed minimally invasive soft tissue

15  surgical robots in the United States?

16    A.   I am not aware of that as I do not have an

17  understanding of the installed base for other

18  surgical robots.

19    Q.   Do you have any understanding of any other

20  installed surgical robots?

21    A.   I do have some high-level understanding,

22  yes.

23    Q.   Can you explain to me your high-level

24  understanding?

25    A.   I believe, as I mentioned, there is a

1  Monarch product.  I am familiar with the

2  TransEnterix Senhance, a very high-level

3  familiarity.  It may have recently been renamed.

4        And then I'm familiar with, for example,

5  the Mako robotic platform for non-soft tissue

6  surgery, hips, I think, knees, et cetera.

7    Q.  I want to focus in with you on the

8  minimally invasive soft tissue surgery market.

9        What robots are you aware of that have FDA

10  approval in that area?

11    A.  I am aware --

12        MS. LENT:  Objection.

13        Hold on a second, Ron.

14        Objection.  Legal conclusion.

15        THE WITNESS:  I am aware of -- as I

16  mentioned, I believe that the TransEnterix robot has

17  FDA clearance to be marketed and sold in the United

18  States.

19        BY MR. ERWIG:

20    Q.  Any others that you're aware of?

21    A.  That have clearance?  I do not believe

22  there are others that I'm aware of.

23    Q.  I want to turn to a slightly different

24  topic with you.  I understand that at one point you

25  were involved in studying the feasibility of

1  refurbishing EndoWrist instruments.  Is that right?

2      A.   That is correct.

3      Q.   I just want to get a little bit of a

4  high-level sense of how that refurbishment process

5  works.

6          Now, sir, EndoWrists have something called

7  a use counter; is that right?

8      A.   They do have the ability to register when a

9  surgical procedure life, as we would call it, has

10  been used, that is correct.

11     Q.   And Intuitive refers to -- the counting of

12  surgical procedures, Intuitive refers to that as a

13  use counter; right?

14     A.   I don't generally refer to it as that, but

15  others may.

16     Q.   One of the things that each EndoWrist is

17  capable of doing is, when the use counter hits zero,

18  it won't function with the da Vinci surgical robot

19  anymore; is that right?

20     A.   I believe that to be true.

21     Q.   And in some instances the EndoWrists, they

22  may fail before that use counter is up as well;

23  right?

24     A.   In some instances, that is correct.

25     Q.   And failure of that can be a number of

1  different things; right?

2     A.  That is correct.

3     Q.  One of the reasons an EndoWrist could fail

4  is that the cables might become loose; right?

5     A.  That is correct.

6     Q.  Another way an EndoWrist could fail is if

7  the scissors at the tip of that EndoWrist, if they

8  get dull; right?

9     A.  That is correct.

10    Q.  Another way an EndoWrist could fail is if

11  the graspers on the tip of an EndoWrist, if those

12  become misaligned; right?  That's another way an

13  EndoWrist can fail?

14    A.  Yes.  Bent, which would cause misalignment.

15    Q.  What was the purpose of studying --

16  withdrawn.

17       And a refurbishing program would collect

18  and repair those EndoWrists back to normal

19  specifications; right?

20    A.  I wouldn't use the term "repair" as it

21  relates to our process.

22    Q.  Well, one part of the process was

23  collecting EndoWrists that had failed from

24  customers; right?

25    A.  We explored a potential process as it

1  related, correct, to collecting or reclaiming

2  instrumentation that had reached its useful life.

3     Q.   Right.  As part of that process, you would

4  collect those instruments from customers; right?

5     A.   That is correct.  From customers or another

6  collection process.

7     Q.   And then you wouldn't just throw those

8  instruments away; right?  You would refurbish them

9  to be sold again; right?

10    A.   That is correct.

11    Q.   By refurbishing, that means restoring the

12  instrument to a state as good as new; right?

13    A.   That is correct.

14    Q.   In fact, Intuitive wanted to market the

15  refurbished instruments as equivalent in

16  performance, safety, and efficiency to new

17  EndoWrists; right?

18       MS. LENT:  Object to the form.

19       THE WITNESS:  I believe our intent would

20  have been to ensure that the refurbished

21  instrumentation would be equivalent to new.

22       BY MR. ERWIG:

23    Q.   Well, sir, that wasn't just the intent;

24  right?  There was tests that were performed by

25  Intuitive; right?

Page 47

1          MS. LENT:  Object to the form.

2          THE WITNESS:  I would clarify that the

3    tests were performed pursuant to the intent of the

4    objective.

5          MR. ERWIG:  Well, let's screen share a

6    document and see if we can get a little more

7    specific.

8          The next exhibit will be in Folder 2.  This

9    is 1'30'17, "Instrument Refurbishment Feasibility

10   Update."  I'll screen share with you and give you a

11   second to pull it up.

12         THE STENOGRAPHER:  So this is Exhibit 5?

13         MR. ERWIG:  Exhibit 5, yes.

14         (Marked for identification purposes,

15          Exhibit 5.)

16         THE WITNESS:  Okay.

17         BY MR. ERWIG:

18   Q.  Do you have this on the screen in front of

19   you, Mr. Bair?

20   A.  Yes, I do.

21   Q.  Do you recognize this document?

22   A.  Allow me a moment to refresh, please.

23         Yes, I generally recognize the document.

24   Q.  How do you recognize it?

25   A.  I was present for its presentation, and I

1  helped compile or contribute to certain components

2  of the document.

3      Q.   Did you yourself, in fact, present part of

4  this instrument refurbishment feasibility update?

5      A.   I believe that I did present part of the

6  presentation.

7      Q.   Turn your attention to Slide 2.  This is a

8  slide titled Feasibility Team?  Do you see that?

9      A.   Yes, I do.

10     Q.   And you're listed on that slide; right?

11     A.   That is correct.

12     Q.   What is the feasibility team?

13     A.   It is a cross-functional team that, to my

14  recollection, was formed to evaluate whether or not

15  we could safely rebuild or refurbish instruments

16  that were reclaimed from customers following the

17  expiration of their useful original lives.

18     Q.   The purpose of this instrument

19  refurbishment study was to examine the impact of

20  refurbishing EndoWrists; right?

21     A.   I do not agree with that statement.

22     Q.   Well, sir, you wanted to determine whether

23  it was possible to safely refurbish EndoWrists;

24  right?

25     A.   That is correct.

1    Q.  You wanted to determine what the financial

2  impact would be to Intuitive of refurbishing

3  EndoWrists as well; right?

4    A.  That is correct.

5    Q.  I'm going to turn to Slide 10 with you,

6  which is titled "Instrument Refurbishment Program

7  Benefits."

8        Do you see that?

9    A.  One moment.  Yes.

10    Q.  And there's a description which reads,

11  "Reclaim expired instruments for the purpose of

12  remanufacturing and recertifying to original

13  performance specifications."

14        Do you see that.

15    A.  Yes, I do.

16    Q.  Now, an expired instrument, that would be

17  an instrument whose -- withdrawn.

18        An expired instrument would be an EndoWrist

19  whose use counter has reached zero; right?

20    A.  That is correct.

21    Q.  An expired instrument might also be an

22  instrument that failed before reaching zero on the

23  use counter; right?

24    A.  I do not believe that classifies as an

25  expired instrument.

Page 50

1    Q.   Now, under the first column here, it reads

2  "Clinical Performance."

3        Do you see that?

4    A.   Yes.

5    Q.   And the first bullet says "Equivalent

6  Performance."

7        Do you see that?

8    A.   Yes.

9    Q.   Second bullet reads, "Ten lives per

10  instrument."

11       Do you see that?

12   A.   Yes.

13   Q.   And the third reads, "Equivalent cleaning

14  and sterilization process."

15       Do you see that?

16   A.   Yes.

17   Q.   Was it your understanding that refurbished

18  instruments could offer equivalent performance to

19  new instruments?

20       MS. LENT:  Object to the form.

21       THE WITNESS:  Following certain robust

22  remanufacturing or refurbishment techniques,

23  including the replacement of components, we did deem

24  that it was likely feasible, although we did not

25  undertake a full validation and verification of

1  refurbished or remanufactured instruments.

2      BY MR. ERWIG:

3      Q.   You certainly didn't conclude that

4  refurbishment was not possible; right?

5      A.   That is correct.

6      Q.   I'm going to move to Slide 18 with you.

7  And this is a slide that's titled "Financial and

8  Logistics Assessment."  It has your name on it.

9      Do you see that?

10      A.   Yes, I do.

11      Q.   What is meant by financial and logistics

12  assessment?

13      A.   So you mentioned it previously, but

14  examining the financial impacts as it relates to the

15  cost of the instruments themselves following the

16  refurbishment, as well as the logistics and/or

17  supply chain implications of reclaiming --

18  harvesting components, rebuilding, et cetera.

19      Q.   One thing that a financial assessment

20  includes is whether it's more or less profitable for

21  Intuitive to offer remanufactured or refurbished

22  EndoWrists; right?

23      A.   That is commonly an element of financial

24  analysis, yes.

25      Q.   And that was certainly an element of this

1  financial analysis; right?

2      A.   The focus of this financial analysis was

3  more on the cost element of it and less on

4  profitability.

5      Q.   Well, sir, you certainly wanted to know if

6  Intuitive would gain or would lose money when you

7  were considering whether to refurbish EndoWrists;

8  right?

9      A.   That is correct.

10     Q.   You were interested in whether it was more

11  profitable to offer refurbished EndoWrists or to not

12  offer a program like that at all; right?

13     A.   That is one element of what we were

14  attempting to explore or assess.

15     Q.   That's specifically the element that you

16  were presenting on in this PowerPoint; right?

17     A.   That is one of the elements that we

18  explored, yes.

19     Q.   I'm going to move to Slide 20 with you

20  where it reads "Financial Analysis."

21        Do you see that?

22     A.   That is correct.

███████████████████████████████

████████████████████████████████████

██████████████████████████████████













22    Q.   I'm going to move to Slide 22 with you.

23    You see that this is a slide titled "Technical

24    Assessment"?

25    A.   Yes.

Page 59

1    Q.   And there's a summary listed.  Do you see

2   that?

3    A.   Yes.

4    Q.   That summary lists in the first bullet

5   point "Confirmed feasibility of ten plus lives on

6   FBF, LND, and ProGrasp."

7        Do you see that?

8    A.   Yes.

9    Q.   What does "confirmed feasibility of ten

10   plus lives" mean?

11    A.   With the proposed refurbishment of the

12   instruments.  So the deconstruction and replacement

13   of wear components, retest, et cetera, if certain

14   components were replaced as part of the

15   remanufacturing and certain components were tested

16   and reused, if deemed to be equivalent or better

17   than new, that it was feasible to reuse some

18   components for an additional ten lives within a

19   rebuilt or refurbished instrument.

20    Q.   Well, this doesn't say confirmed

21   feasibility of ten lives.  This says confirmed

22   feasibility of ten plus lives; right?

23    A.   That is correct.

24    Q.   So those refurbished instruments might be

25   capable of being used for more than ten lives;

1  right?

2      A.   It may be possible, but that -- the reason

3  I believe that ten plus lives was put in there is

4  because there are some instruments that have longer

5  than ten lives on their life counter that Intuitive

6  sells.  And then, in addition to that, it would take

7  quite a bit of validation and verification to

8  rebuild the instruments and test them to failure,

9  assess those failure modes, and then discern what

10  the life -- reasonably validated life limit was such

11  that we had a high degree of certainty that within

12  that life limit the instrument would perform

13  clinically as designed and safely.

14      Q.   Now, the process for refurbishing

15  instruments, that might differ from instrument to

16  instrument; right?

17      A.   That is correct.

18      Q.   For one instrument, for example, you might

19  just have to realign graspers and tighten cables for

20  that instrument.  That's one potential way you could

21  refurbish an instrument; right?

22          MS. LENT:  Object to the form.

23          THE WITNESS:  As we did not complete

24  refurbishment, a validation -- full validation and

25  verification, I don't know that I could speak to

1    that.

2        BY MR. ERWIG:

3    Q.   Well, in this technical assessment you

4    certainly looked at whether it was feasible to

5    refurbish instruments such that they could perform

6    equivalent to new instruments; right?

7    A.   That is correct, but I would refer to the

8    previous slide that we were looking at that had

9    various levels of assessment as it related to

10   component reuse ranging from 50 percent of component

11   reuse to 25 percent of component reuse.  And I do

12   not believe that any element of our refurbishment

13   included bending tips to realign them.

14   Q.   Well, at any point -- withdrawn.

15       At any point during the instrument

16   refurbishment feasibility study in 2017, did you

17   conclude that it was not possible to repair or

18   refurbish EndoWrist instruments?

19       MS. LENT:  Object to the form.  Compound.

20       MR. ERWIG:  I'll break it down.

21       BY MR. ERWIG:

22   Q.   Mr. Bair, at any point during the 2017

23   instrument refurbishment feasibility update, did you

24   conclude that it was not possible to refurbish

25   EndoWrists?

Page 62

1    A.   I would speak more narrowly to the

2   EndoWrist instruments that we examined, given that

3   we did not test the -- or experiment as it related

4   to the feasibility for the entire suite of

5   instruments, but we did find as referenced, I

6   believe, previously in this document, including in

7   that top line, that we did confirm that there was

8   a -- that methodologies could be undertaken to

9   replace components and refurbish or remanufacture

10   the instrument.

11    Q.   During this process did you test whether it

12   was possible to repair the EndoWrists that you

13   reclaimed from hospitals?

14    A.   Could you articulate?  I know that the

15   words in this space are challenging, especially as

16   related to the various regulatory definitions for

17   repair, refurbishment, servicing, remanufacturing,

18   et cetera.

19         Would you mind clarifying the scope of the

20   term "repair."

21    Q.   Sure.  Collecting an instrument and not

22   exchanging replacement parts and servicing the

23   instrument.

24    A.   We did not determine that it was feasible

25   to -- given that definition of repair, we did not

1  find feasibility.

2      Q.   Did you do any studies on that at all?

3      A.   We, to my recollection, as part of the

4  initial verification, drove -- or used instruments

5  in excess of their ten-life count.  And I believe in

6  almost all instances, the instruments failed

7  prematurely before they reached an additional ten

8  lives.

9      Q.   When you mentioned "we used instruments in

10  addition to the life count," that's using

11  instruments without any sort of repair or

12  refurbishment after their ten-life use count had

13  expired; right?

14      A.   I believe there were certain servicing

15  activities that were undertaken.  For example, that

16  may include maintenance that a user could perform or

17  might entail lubrication or appropriate cleaning and

18  sterilization, et cetera, in advance of that

19  additional life testing.

20      Q.   Are there any documents that you could

21  point to that would reflect that initial effort of

22  study the continued use of EndoWrists with repairs

23  or servicing?

24      A.   I was not engaged in the technical

25  assessment details, and so I don't know that I would

1  have or could point to that sort of documentation.

2      Q.  Let me go to page 24 with you.  This is a

3  slide that reads "Technical Assessment."

4          Do you see that?

5      A.  Yes.

6      Q.  And then there's a second bullet where it

7  says RMA instruments.  Do you see that?

8      A.  Yes.

9      Q.  What is an RMA instrument?

10     A.  It is a return material authorization

11 instrument.  So that would be an instrument that

12 our -- one of our customers would have logged a

13 complaint against and received a -- what we call an

14 RMA number for us so that we could track the receipt

15 of that instrument, perform failure analysis on the

16 instrument to potentially replicate the complaint,

17 determine if it was reportable or nonreportable, and

18 notify the appropriate bodies as well as inform our

19 quality and manufacturing practices if needed.

20 Ultimately, that would include a credit to the

21 customer if it was found to be a warranty or

22 manufacturing defect that induced the failure in the

23 instrument.

24         MR. ERWIG:  I'll stop screen sharing this

25 exhibit.

Page 65

1          Let's go off the record, and we'll take a

2    quick break.

3          THE WITNESS:  Sure.

4          THE VIDEOGRAPHER:  The time is 1:57 p.m.,

5    and we are off the record.

6          (Recess taken from 1:58 to 2:10.)

7          THE VIDEOGRAPHER:  The time is 2:10 p.m.

8    and we are back on the record.

9          BY MR. ERWIG:

10    Q.   Now, Mr. Bair, what was your understanding

11    of the purpose of studying a refurbished EndoWrist

12    program?

13    A.   I'm aligned to the objectives that were

14    previously stated within the document that we

15    reviewed a moment ago.  And there was an element of

16    environmental and social responsibility as it

17    relates to reusing components to reduce waste, but

18    more so it was to explore if there were

19    opportunities to reduce the costs associated with

20    manufacturing these instruments such that we could

21    potentially provide better solutions for more

22    price-sensitive or cost-sensitive surgical

23    procedures that may be amenable to a

24    robotic-assisted surgical intervention.

25    Q.   Did Intuitive, in fact, bring a refurbished

1   EndoWrist program to market?

2      A.   We did not.

3      Q.   Why not?

4      A.   After following the feasibility assessment

5   that we explored, we determined that that would not

6   be a product priority at that point in time.  And so

7   we stopped for the time being.  I believe that

8   presentation was 2017.  And we didn't pursue that as

9   a component of the portfolio at that time.

10     Q.   Did Intuitive pursue that at any time

11   since?

12     A.   We periodically and regularly reassess our

13   multiyear portfolio and product road map planning,

14   which is the projection of what products should we

15   investigate and/or develop and try to bring to

16   market at what times given that we're working with

17   constrained resources.

18          And so I -- I would expect that a potential

19   feasibility or the subject matter has been explored

20   since then.

21     Q.   You mentioned that refurbished instruments

22   were -- I believe the term you used was product

23   priority.  Is that right?

24     A.   A product development priority for the

25   company at the time, that is correct.

1    Q.    What sort of factors go into determining

2    whether something is a product development priority

3    for Intuitive?

4    A.    I would say a pretty complex conversation

5    that's held largely at levels far above where I am

6    at.  So I don't know that I could articulate or

7    stipulate what each of those requirements would be

8    in terms of what gets funded and what doesn't.  But

9    it has to do with the effective usage of our

10   resources and what can most effectively help us

11   achieve our objectives at the end of the day.

12   Q.    Sir, you understand that lower-priced

13   EndoWrists would be very attractive to hospitals

14   that are using da Vinci surgical robots; right?

15   A.    I don't know that I can speak on behalf of

16   the procurement organizations for hospitals, but I

17   do know that part of our objective was to achieve a

18   lower cost profile so that we could pass -- then

19   pass that lower cost profile on to our customers.

20   Q.    And the point at which the study was at had

21   confirmed the title of refurbished EndoWrists;

22   right?

23   A.    I would not say that it confirmed the

24   feasibility.  It confirmed that we didn't initially

25   through our high-level, very small-scale

1    investigation, we explored or found that it wasn't

2    impossible is what we concluded from that.  But as

3    referred to and mentioned in the financial analysis,

4    as I noted, that there was a range of example

5    material harvesting from instruments, and as such at

6    that time we had not established what exactly it

7    would take to render the instrument clinically safe

8    and equivalent or better than new.

9        Q.   And Intuitive didn't continue with that

10   process of bringing refurbished EndoWrists to

11   market; right?

12       A.   We did not continue at that time, that is

13   correct.

14       Q.   And at any time since; right?  If a

15   hospital wants to buy a refurbished instrument from

16   Intuitive today, they can't do that; right?

17       A.   Not that I am aware of.

18       Q.    So the hospitals, they have to buy

19   full-priced new instruments from Intuitive; right?

20       A.   I'll give you an example of a trade-off

21   related to your earlier question.  So pursuing

22   various routines to reduce the cost implications of

23   robotic-assisted surgery, there is a real-world

24   example of the extended-life instruments that were

25   recently introduced.  And given that we were looking

Page 69

1    to pursue what has the greatest impact, we did not

2    pursue instrument reclamation and refurbishment at

3    the time; however, we did launch an extended-life

4    instrument program.

5        Q.   Sir, that's not quite my question.  So

6    we'll get into extended-use instruments, but right

7    now I'm just looking at refurbished instruments or

8    new instruments.  So withdrawn.

9            In today's marketplace a hospital has to

10   buy a new instrument from Intuitive when its old

11   instruments expire; right?  Can't buy a refurbished

12   one?

13           MS. LENT:  Object to the form.

14           THE WITNESS:  Yeah, could you -- are there

15   two questions there or just one question?

16           BY MR. ERWIG:

17       Q.   Just one question.  Hospitals can't buy

18   refurbished EndoWrists from Intuitive; true?

19       A.   A hospital -- that is true -- cannot buy a

20   refurbished EndoWrist instrument from Intuitive, to

21   my understanding.

22       Q.   And Intuitive hasn't invested in trying to

23   bring less expensive refurbished instruments to

24   market; right?

25           MS. LENT:  Object to the form.

Page 70

1        THE WITNESS:  I no longer have purview to

2   our product development -- excuse me -- product

3   development investments within that organization.

4   And so I don't know that I can speak to that.

5        BY MR. ERWIG:

6   Q.   Well, what's your personal knowledge of any

7   refurbished instrument programs in development by

8   Intuitive?

9   A.   Sure.  So consistent with my previous

10  answer as it relates to the periodic reevaluation of

11  products within our projected road map or pipeline

12  in align -- aligned with our strategic gains, I

13  suspect that refurbishment or reclamation would

14  continue to be a potential matter of discussion

15  within those forums.

16  Q.   Well, you suspect, but my question is do

17  you have any personal knowledge about any current

18  initiatives being undertaken at Intuitive on the

19  specifics?

20  A.   I'm unaware of any current initiatives.  I

21  am aware of the ongoing product road map

22  conversations, as I mentioned.

23       MR. ERWIG:  I'm going to screen share our

24  next exhibit.  This will be Plaintiff's Exhibit 6.

25  This is in Folder 2.  This is 6'21'17 Bair to

1   Rozynski.  Screen share this with you.

2        (Marked for identification purposes,

3         Exhibit 6.)

4        BY MR. ERWIG:

5    Q.   Do you see this on the screen in front of

6   you, Mr. Bair?

7    A.   Yes, I do.

8    Q.   Do you recognize this?

9    A.   I don't know that there's enough detail for

10  me to recall it, but Summit does not ring a bell

11  initially.

12   Q.   Does this appear to be an e-mail from

13  yourself to Daniel Rozynski at Intuitive Surgical

14  and Bastien Thomet at Intuitive Surgical?

15   A.   Yes, it does.

16   Q.   And the subject is Summit - Biz Case

17  Competition.pptx.  Do you see that?

18   A.   Yes, that is correct.

19       MR. ERWIG:  I'm going to stop screen

20  sharing this exhibit.

21       Our next exhibit will be the attachment to

22  that e-mail.  This is 6'21'17 Attach to Bair to

23  Rozynski.  This will be Exhibit 7.

24       (Marked for identification purposes,

25        Exhibit 7.)

1        BY MR. ERWIG:

2    Q.   Do you see this on the screen in front of

3    you?

4    A.   Yes, I do.

5    Q.   Do you recognize this?

6    A.   Potentially.  I probably -- I mean, we --

7    we have a lot of similar cover pages.  So if I could

8    be allowed to review the contents, I might recognize

9    it to a greater extent.

10    Q.   Sure.

11    A.   This is 43051, 6'21'17; is that correct?

12    Q.   That's correct.

13    A.   Yes, I do recall this.

14    Q.   How is it that you recall it?

15    A.   We were having a leader -- to the best of

16    my recollection, knowing that this was several years

17    ago, we did a leadership development or leadership

18    training initiative within the finance team, if I

19    recall correctly.  Allow me a moment to explore a

20    little further.

21        Yes, my recollection is accurate.  We did a

22    business case team-building exercise where various

23    teams within the finance organization were tasked to

24    go and find an experimental or exploratory

25    opportunity to dynamically change the business and

1   make a business pitch similar to what you would do

2   in business school with a business case scenario.

3        Q.   One of the things on page 2 is a

4   document -- withdrawn -- a slide titled "Our Pitch."

5        Do you see that?

6        A.   That is correct.

7        Q.   You tiled this slide "Our Pitch," or did

8   someone else title this slide?

9        A.   I don't recall.  It was a team exercise.  I

10  believe we broke into four or five different teams

11  as part of the training.

12       Q.   Did you participate as part of this team

13  that developed the PowerPoint presentation?

14       A.   Yes, I did.

15       Q.   Now, one of the things that you write in

16  the "Approach -- Flip the Fleet" is there's a bullet

17  point labeled "Phase 1 (years 1-3)."

18       Do you see that?

19       A.   Yes.



16        What do you mean by the word "Dragon"?

17        A.   So Project Dragon was the project name.  We

18   periodically have project names related to new

19   products before they come to market or are assigned

20   a customer-facing name.  Project Dragon was, to my

21   recollection, the general name for the project to

22   explore the viability of refurbishing or exchanging

23   instruments in this example.

██████████████████████████

███████████████████████████

████████████████████

████████████████

5    Q.   I'm going to move on to page 6 of this

6  presentation, which is titled "Future of the

7  Footprint."

8        Do you see that?

9    A.   Yes.

10    Q.   And there's a subheading labeled

11  "Investments."  Do you see that?

12    A.   Sorry.  Where is this?  Oh, here.  Sorry.

13  I'm on the wrong future footprint slide.

14        Which page are you on now?

15    Q.   Page 6.

16    A.   Sure.

17    Q.   Do you see the subheading titled

18  "Investments"?

19    A.   Yes, I do.

20    Q.   One of the bullet points under that is

21  "Remanufactured Instruments."  Is that right?

22    A.   That is correct.

23    Q.   As of this time period, were you

24  considering remanufactured instruments as a part of

25  the footprint for the da Vinci surgical robots in

1  the future?

2      A.   One moment to recall the date of this

3  presentation, again.  It's not on this slide.

4          Could you remind me of the date of that

5  e-mail?

6      Q.   June 6th -- withdrawn.  June 21st, 2017.

7      A.   Okay.  Thank you.  So mid-2017.  At the

8  time I do not believe we were pursuing instrument

9  remanufacturing or refurbishment.

10         And to clarify, again, this was not a

11  formal business proposal.  This was an exercise

12  within the context of a training that we were doing

13  in terms of thinking outside the box, putting

14  together a quick business plan.  There was a mock

15  panel that this was presented to, along with maybe

16  two or three or four other presentations or

17  proposals from the team.  We had a very limited

18  amount of time to put it together.  And then I

19  believe the panel voted on who -- whose presentation

20  they thought was the most thoughtful and made sense.

21         So I don't know that I would use this as

22  evidence of intentional directionality as it relates

23  to decision-making within our traditional Intuitive

24  decision-making frameworks, just to provide the

25  appropriate color and context for this presentation.

8    Q.   So it maintained current margins over the

9   da Vinci surgical systems; right?

10    A.   It would maintain what we estimated, I

11   think at the time, as the group was close to a rough

12   estimate of the margins of the capital equipment.

13   That is correct.

14    Q.   I'm going to stop screen sharing this

15   document.

16         Now, later on in 2017 you did some modeling

17   of what refurbishment would look like as a business

18   model; right?

19    A.   I don't recall the exact dates of that.

20         MR. ERWIG:  Let's take a look at some

21   documents and see if that helps you.  Next exhibit

22   is going to be Plaintiff's Exhibit 8.

23         (Marked for identification purposes,

24          Exhibit 8.)

25         MR. ERWIG:  This will be 7'6'17 Goodson to

1  Bair.

2       BY MR. ERWIG:

3    Q.   Do you see this on the screen in front of

4  you?

5    A.   Yes, I do.

6    Q.   Do you recognize this document?

7    A.   Roughly, yes, I do recall it.

8    Q.   How do you recognize it?

9    A.   I seem to recall that at the time I was

10  transitioning the financial analysis and support

11  work to -- I believe he was a new employee or he was

12  new to the function at the time.  His name is Ben

13  Bedore.  He was on this e-mail.  And so I do recall

14  catching him up to speed on the work that we had

15  done within the context of, as I mentioned, the

16  periodic revisiting of our product development road

17  map and expecting that Ben Bedore would -- as the

18  financial picture changes over time, logistics

19  changes over time, et cetera, that he may have to

20  pick up the modeling or the analysis exercise.

21       If I recall correctly, that was the context

22  of this message.

23    Q.   You see that there's an attachment titled

24  "Refurb Business Model - minimal.xlsx"?

25    A.   Yes.

1          MR. ERWIG:  I'm going to take a look at

2   that now.  The next exhibit will be Plaintiff's

3   Exhibit 9.

4          (Marked for identification purposes,

5           Exhibit 9.)

6          MR. ERWIG:  This will be 7'6'16 Attach to

7   Goodson to Bair.  We'll look at the Excel document

8   in a moment, but I just want to show you the way

9   this was produced.

10          BY MR. ERWIG:

11     Q.   Do you recognize this document?

12     A.   It's too small for me to recognize at face

13   value, but I'm about to pull it up here.

14          Attach to Goodson Bair.  Here we go.  Yes,

15   I do recall.

16     Q.   How do you recognize this?

17     A.   I was one of the contributors to this

18   document.

19          MR. ERWIG:  I'm going to stop screen

20   sharing this exhibit, and we'll took at the native

21   version in Excel.

22          This will be Plaintiff's Exhibit 10.  This

23   will be 7'6'16 Excel attached to Goodson to Bair.

24          (Marked for identification purposes,

25           Exhibit 10.)

1       BY MR. ERWIG:

2    Q.   I'm going to screen share this with you as

3  well.

4       Do you see this on the screen in front of

5  you?

6    A.   Yes, I do.

7    Q.   Does this appear to be the same PDF we just

8  looked at just in --

9       (Stenographer interrupted for clarification

10       of the record.)

11       BY MR. ERWIG:

12    Q.   Just in Excel format.

13    A.   Would you mind scrolling to the very top of

14  it.

15    Q.   This is the top of it.  I'm sorry.  No,

16  it's not.

17    A.   Wow.  I just realized this is 166 pages.

18  I'm not going to scroll through all of that.

19       It seems to be representative, yes, of the

20  PDF that we viewed before.

21    Q.   There's some tabs on the bottom of this

22  Excel document; right?  Including "Consolidated

23  Model," "Instrument Model Est," "Demand Plan," and

24  some others; right?

25    A.   That is correct.

1      Q.    What is the general information that's

2    contained within this Excel sheet?

3      A.    Just this worksheet or all tabs within the

4    workbook?



████████████████████████████████

████████████████████████

███████████████████████████

█████████████

5    Q.   I want to talk about a couple of these

6   other columns.  There's a tab labeled "SV Data."

7   What does that mean?

8    A.   SV would stand for Sunnyvale.  That's our

9   vernacular for the Sunnyvale facility, and this

10  is -- let me see.  This is an estimate, I believe,

11  of the volumes and potential credits and costs at a

12  high level associated with a refurbishment program

13  that was performed out of the Sunnyvale facilities.

14   Q.   And there's a column labeled "Instrument

15  Return Rate."

16     Do you see that?

17   A.   Yes.

███████████████████████████████

19     See that?

20   A.   That is correct.

21   Q.   What does that mean?

22   A.   That was a projection of -- again, I think

23  this was likely a variable input based on an

24  expectation that, if we entered into an arrangement

25  with customers as we referred to in that business

1  pitch as instrument exchange, where, if they return

2  the instrument to us, we would engage in

3  refurbishment or remanufacturing activities and then

4  return that instrument back to them or return an

5  equivalent to new instrument back to them.

██████████████████████████

██████████████████████████

██████████████████████████

██████████████████████████

██████████

11    Q.    Then in return, the customer might have

12  received a refurbished instrument as well; right?

13    A.    That is correct.

14    Q.    I'm going to move to another tab,

15  "Instrument Volume Estimate."

16        What is this tab showing?

17    A.    Would you mind, if you can zoom in.  Can

18  you first zoom into the screenshots over on the

19  right and then -- those look to be SAP screenshots

20  of materials, standard costs, which -- that is

21  correct, from our ECC system.  Thank you.

22        And then can you scroll to the rest of the

23  numbers over to the left?

24    Q.    I want to ask you really quick, if you

25  don't mind, a couple of questions about these

Page 84

1  materials.

2        What do these screenshots -- what do these

3  screenshots show?

4    A.   Sure.  So up close to the top, just below

5  the buttons, you can see -- let's use the top left

6  as an example.  Cost components for materials

7  47006-08 -- excuse me -- 470006-08, Client 3010.  So

8  that reflects one of our manufacturing plants, 3010,

9  and our business system.  And that is a part number.

10  470006-08 is the eighth revision of that part number

11  within our quality system.

12        And this screenshot reflects the standard

13  costs that we update on a periodic basis, knowing

14  that PO costs can change over time and actual labor

15  costs can change over time, but standard costs are

16  what we use within the accounting world to provide a

17  standard margin for the products.

18        And so that top line, "Raw Materials," are

19  the raw components consumed, and then labor charges

20  is the cost of labor that's allocated to the

21  assembly.  And I believe it includes testing,

22  initial testing of those instruments.

23    Q.   When you mention the part, that would be an

24  EndoWrist; is that right?

25    A.   This assessment was related to EndoWrist

1  instruments.  I don't recall part numbers as it

2  relates to the names of the components.  But I

3  suspect that, yes, that refers to EndoWrist.  There

4  may be a translation of that part number to the

5  EndoWrist instrument name elsewhere in the document.

6     Q.   And you see there's a column labeled "Part

7  Number," and the very first part number is 470006,

8  and that corresponds to a large needle drive.

9        Do you see that?

10    A.   That is correct, which we would refer to as

11 an LND.

12    Q.   What do these totals represent for the

13 large needle driver in the second row, Columns C, D,

14 E, F, and G?

15    A.   Would you mind clicking on cell C2 so that

16 I can see where it's generated from?  It doesn't

17 look to come from somewhere.

18        There's a way to audit this sheet to see

19 where this goes to.  Let me see if I can ask you.  I

20 want to make sure that I appropriately answer your

21 question.

22    Q.   Well, I just want to get a sense of what's

23 generally being shown on this tab for "Instrument

24 Volume Est."

25    A.   What I'm trying to establish for myself is

1  is this in the expected volume of instruments sent

2  or the expected volume of instruments consumed or

3  the expected volume of instruments returned?

4       I am not equipped at this point in time to

5  specifically answer that question given the age of

6  this document.

7    Q.   Well, there's one figure here that says

8  "annual total procedures" in parentheses.

9       Do you see that?

10   A.   That is correct.

11   Q.   Then the total next to that is 210,116;

12 right?

13   A.   Yes.  So these would seem to indicate that

14 these are procedure counts in which those EndoWrist

15 instruments are used based on region within the

16 United States.

17   Q.   You can take this exhibit down.

18       I want to ask you a couple more questions

19 about Project Dragon.  Is Intuitive still

20 considering Project Dragon as of May 24th, 2021?

21   A.   I don't know that that terminology

22 continues to be used, but as mentioned before, as

23 part of our product road map planning, we

24 periodically assess product development

25 opportunities.  And so I would fully expect the

1    instrument refurbishment or reclamation would

2    continue to be a topic that is revisited on a

3    periodic basis.

4         (Stenographer interrupted for clarification

5          of the record.)

6         BY MR. ERWIG:

7    Q.   Now, as part of your role at Intuitive, you

8    evaluated three-year, five-year, and eight-year plan

9    for the company moving forward; right?

10   A.   I would rearticulate that more narrowly

11   within the scope of the business unit within which

12   my role resides, which is the global services

13   business unit, and does not include any longer

14   secondary markets as a component of that business

15   unit.  So, for example, we used to manufacture the X

16   system, which was a remanufactured system.  And thus

17   potential remanufacturing of instruments back in

18   that 2017 time frame, when I was in that finance

19   role, was a part of the business unit.  But going

20   forward, my role is more narrowly focused on

21   services.  So, for example, customer service, field

22   engineering, technical support, et cetera.

23        MR. ERWIG:  I'm going to screen share our

24   next exhibit.  This is I believe Plaintiff's

25   Exhibit 10.

Page 88

1          THE STENOGRAPHER:  I believe it's 11.

2          (Marked for identification purposes,

3           Exhibit 11.)

4          BY MR. ERWIG:

5      Q.   Plaintiff's Exhibit 11 will be 4'19'18 Bair

6   to Davis and Bedore.

7          Do you see this on the screen in front of

8   you, Mr. Bair?

9      A.   Yes, I do.

10     Q.   Do you recognize this?

11     A.   I recognize the context.  It seems to match

12  the previous response I gave as it related to

13  transitioning the financial analysis, the ongoing

14  periodic financial analysis to Ben Bedore, and I

15  recall at the time that Heather Davis worked on Ben

16  Bedore's team.

17     Q.   Do you recognize this as an e-mail that you

18  sent to Heather Davis and Ben Bedore on April 19th,

19  2018?

20     A.   Yes, I do.

21     Q.   The attachments to this e-mail --

22  withdrawn.  The attachment to this e-mail is "Refurb

23  Business Model 7.24.17.xlsx."  Right?

24     A.   That is correct.

25          MR. ERWIG:  Our next exhibit is going to be

1   Plaintiff's Exhibit 12.

2        (Marked for identification purposes,

3         Exhibit 12.)

4        MR. ERWIG:  This is going to be 4'19'18

5   Attach to Bair to Davis.  Screen share with you.

6        BY MR. ERWIG:

7    Q.   This is another long document, and we're

8   just going to look at the PDF form of it first.

9        Do You see this on the screen in front of

10   you.

11    A.   Yes.

12    Q.   Does this look to be the attachment to that

13   e-mail that you sent to?

14    A.   I could certainly see that, yes, it might

15   be.

16        MR. ERWIG:  I'm going to stop screen

17   sharing this exhibit, and Exhibit 13 will be the

18   native Excel version of that same document.  This is

19   4'19'18 EXCEL Attach to Bair to Davis.

20        (Marked for identification purposes,

21         Exhibit 13.)

22        BY MR. ERWIG:

23    Q.   Do you see this in front of you, Mr. Bair?

24    A.   Yes, I do.

25    Q.   Do you recognize this document?

1    A.   Allow me a moment to bring it up on my

2    screen.

3         Yes, I do.

4    Q.   How do you recognize it?

5    A.   I was engaged in crafting and updating

6    parts of the document.

7    Q.   I'm going to -- withdrawn.

8         You see one of the tabs below is

9    "Consolidated Model"?  Do you see that?

10   A.   Yes.

11   Q.   Another tab is "Cowbird Old."

12        Do you see?

13   A.   Yes.  And I'm chuckling to myself because

14   I'm trying to remember why we called it Cowbird.

15   Q.   That was going to be my next question, is

16   what are the tabs labeled "Cowbird - Old" and

17   "Cowbird - New"?

18   A.   I'm trying to think.  When you let finance

19   people name things, normally it's neither funny nor

20   applicable.  And that may have been -- Cowbird may

21   be a victim of that.  I don't specifically recall.

22        I can say that the model -- that the old

23   and new indicators would show a potential pivot in

24   the approach for the business model as it relates to

25   refurbishment and indicating that one model is old

1  and one model is new, is the way that I would expect

2  that.

3      Q.   So looking at the tab labeled "Cowbird -

4  New," what can you tell me about what appears on

5  this tab?

6      A.   One moment.  The objective of this tab was

7  to assess as it related to the volume constraints of

8  establishing a refurbishment instrument line and

9  what the cost curves may look like per instrument as

10  it related to getting the line startup costs secured

11  and established and ensuring that we understood the

12  volume that could be processed on one manufacturing

13  line.

14     Q.   There's a graphic here.  There's a graph

15  with the Y axis as fixed cost and the X axis

16  instrument quantity; right?

17     A.   That is correct.

18     Q.   And it seems to indicate that the costs for

19  refurbishment instruments go down the more of those

20  instruments are produced by Intuitive; right?

21     A.   I'm sorry.  When I hover over it, the color

22  changes.  Startup costs.  Startup costs.

23  Mature/ongoing fixed overhead and mature/ongoing

24  fixed overhead.  So what these indicate, fixed costs

25  do not incorporate materials cost.

1          So fixed cost is one way that we look at --

2    it's an example of the overhead that I referred to

3    previously in the questioning that's not reflected

4    in the contribution margin or the product margin.

5    And so this looked more narrowly at the indirect

6    investment.

7          So we spoke about direct materials and

8    direct labor previously and what those projections

9    looked like.  And so this simply articulates that,

10   as you amortize the startup costs and the fixed

11   overhead over a greater number of instruments, then

12   the cost allocated per instrument declines but only

13   for the fixed costs, not for the direct material and

14   direct labor.

15   Q.   So the total cost for an EndoWrist would be

16   the fixed cost in addition to the other direct costs

17   that we discussed earlier; is that right?

18   A.   That would not be the total cost because

19   there would still be elements that aren't captured

20   as it relates to selling general administrative.

21   For example, commissions, the actual research and

22   development, the verification and validation,

23   et cetera, that I would pull into the total cost of

24   an instrument.





11    Q.   I'm going to stop screen sharing this

12  exhibit.

13         Mr. Bair, are you aware that Intuitive has

14  contracts with hospitals that are its customers?

15    A.   Yes, I am.

16    Q.   Can you describe to me how you're aware of

17  that?

18    A.   I am -- during two functions ago, when I

19  was the director of field service engineering for

20  the western United States, I was charged with

21  ensuring that my team met the service level

22  agreements associated with our obligations under

23  those contracts.

24    Q.   And how did you personally -- withdrawn.

25         Did you ever personally become involved in

1    a -- withdrawn.

2         In your role -- you described a role two

3    functions ago.  What was the exact title of that

4    role?

5       A.   Director US field service west.

6       Q.   Is it your understanding that the contracts

7    that Intuitive has with its hospital customers

8    prohibits those customers from modifying or altering

9    EndoWrists in any way?

10      A.   It is my understanding that the licensing

11   agreement does not allow for alteration of the

12   equipment, that is correct.

13      Q.   The sales contract that Intuitive signs

14   with the hospitals, it prohibits those hospitals

15   from repairing or servicing their EndoWrists as

16   well; right?

17      A.   I could speak to the exact language.  I

18   don't recall the precise words that are used within

19   the standard licensing agreement, but there are some

20   repairs, basic repairs, or trouble shooting as

21   explored in the instructions for use, or the IFU,

22   sold with the robot that -- or with the product that

23   customers can engage in as it relates to

24   lubrication, sterilization, replacing components,

25   for example, stapler inserts or clips, et cetera.

1    Q.   It's your understanding that the sales

2  contract prohibits hospital customers from using a

3  third party to repair or service their EndoWrists;

4  true?

5    A.   I am not certain that I recall the

6  limitations associated with what a hospital may do

7  or what a hospital may permit a third party to do,

8  but I do recall that generally manipulation,

9  adulteration, et cetera, of the equipment is not

10  allowed under the licensing agreement.

11    Q.   And at a high level you certainly

12  understood that Intuitive would react to hospitals

13  that were using third parties to repair their

14  EndoWrists; right?

15    A.   That is correct.

16    Q.   And you knew that Intuitive would

17  ultimately stop serving the da Vinci surgical robots

18  of those customers?

19    A.   If according to our practice as it related

20  to engaging customers that were engaging in

21  activities prohibited by the limited license

22  agreement, yes, I was aware that one implication may

23  be that we do not continue to service their

24  equipment.

25        MR. ERWIG:  I'm going to screen share our

1  next exhibit.  This will be from Folder 3.  I

2  believe this will be Exhibit 14.

3        THE STENOGRAPHER:  I believe so.

4        (Marked for identification purposes,

5         Exhibit 14.)

6        MR. ERWIG:  This will be 6'20'19 Bair to

7  Cooley.

8        BY MR. ERWIG:

9    Q.   Screen share this with you, Mr. Bair.  Do

10  you see this on the screen in front of you?

11    A.   Yes, I do.

12    Q.   I'll draw your attention to an e-mail a

13  little bit lower on this thread.

14        Do you recognize this e-mail from

15  June 20th, 2019?

16    A.   Yes, it does ring a bell.

17    Q.   How do you recognize it?

18    A.   I authored it.

19    Q.   What do you mean by that?

20    A.   I wrote the e-mail from my e-mail address

21  and sent it to a sales representative -- I believe

22  Jack Groner is one of our key accounts directors --

23  and Matt Pate with whom we were working with at

24  USPI, or United Surgical Partners, I believe.

25    Q.   And down below there's an e-mail from Jack

1  Groner to Matt Pate, yourself, and AJ Inacay.

2      Do you see that?

3  A.  Yes.

4  Q.  It mentions a third-party company that's

5  placing nonapproved computer chips back into an

6  instrument; is that right?

7  A.  That is correct.

8  Q.  Your response later up the thread is --

9  well, withdrawn.

10     Matt then sends a question to Jack Groner

11  that asks "What section of the contract prohibits

12  reprocessing?"

13     Do you see that?

14  A.  Yes.

15  Q.  Then you reply, "Hi, Jack/Matt.  It's

16  traditionally in the second sentence of Section 3.4

17  of the sales license and service agreement."

18     Do you see that?

19  A.  Yes.

20  Q.  And you specifically cite something that

21  you refer to as standard language in a section in

22  its entirety.  Do you see that?

23  A.  Yes.

24  Q.  That cited language is "Customer will not

25  nor will customer permit any third party to modify,

1  disassemble, reverse-engineer, alter, or misuse the

2  system or instruments and accessories."

3        Do you see that?

4    A.   That is correct.

5    Q.   Is it your understanding that that's

6  standard language in each sales contract that

7  Intuitive has with its hospital customers?

8    A.   That is my understanding.

9    Q.   And it's your understanding that the

10  standard -- withdrawn.

11        It's your understanding that the sales

12  license and service agreement is meant to stop the

13  hospitals from engaging third parties to repair

14  EndoWrists; right?

15        MS. LENT:  Object to the form.

16        THE WITNESS:  One implication of the

17  limited license would include, as stated here, third

18  parties engaging in activities that would modify,

19  disassemble, reverse-engineer, alter, or misuse the

20  system or instruments and accessories.

21        BY MR. ERWIG:

22    Q.   And it's your understanding that, in the

23  manner in which those terms are written into the

24  contract, that hospitals are not permitted to

25  utilize third parties to perform repairs or services

1  on their EndoWrists; right?

2      A.   Could you clarify what you mean, "service"?

3  As I mentioned, there are user serviceable

4  components, and reprocessing and sterilization --

5  disinfection, cleaning, reprocessing, sterilization,

6  et cetera, could all be considered permissible

7  services under the licensing as long as they do not

8  modify, disassemble, reverse-engineer, alter, or

9  misuse.

10      Q.   Well, let's talk about disassemble.  If a

11  third party inserts a chip into the EndoWrist to

12  reset the use counter, that would constitute a

13  violation of Section 3.4; is that right?

14      A.   That is correct.

15      Q.   And the purpose of the sales license and

16  service agreement is to stop hospitals from using

17  third parties to performance those types of

18  services; right?

19      MS. LENT:  Object to the form.

20      THE WITNESS:  We do not deem what you

21  stated to be a service, as I stipulated in my

22  previous response.

23      BY MR. ERWIG:

24      Q.   Well, it's your understanding that the

25  sales license and service agreement is designed to

Page 102

1    prevent that activity; right?

2        MS. LENT:  Object to the form.

3        THE WITNESS:  Among other things, it is

4    intended to prohibit modifying an FDA-cleared device

5    in a form or fashion that would impact its safety

6    and impact its form and function.

7        BY MR. ERWIG:

8        Q.    Well, sir, those words about safety and

9    form and function, I understand that you're

10   inserting those there, but if we just look at the

11   language of the Section 3.4, it says, "Customer will

12   not, nor will customer permit any third party to

13   modify, disassemble, reverse-engineer, alter, or

14   misuse the system or instruments and accessories."

15       That's what the language says; right?

16       A.    That is correct.

17       Q.    So any sort of alteration would be

18   prohibited under Section 3.4; right?

19       MS. LENT:  Objection.  Asking for a legal

20   conclusion.

21       THE WITNESS:  Physical alteration, I think,

22   against the initial or the design of the medical

23   device, yes, I agree with that.  If one deems to be

24   serving -- so, for example, lubrication as

25   alteration -- then that certainly is not part of the

1   scope.

2        BY MR. ERWIG:

3      Q.   I'm going to stop screen sharing this

4   exhibit.

5        Now, sir, it's your understanding that,

6   when hospitals have utilized third parties, that

7   Intuitive in many instances has terminated the sales

8   license and service agreement; right?

9        MS. LENT:  Object to the form.

10       THE WITNESS:  My understanding is, when

11  customers have used non-FDA approved devices on or

12  in conjunction with the da Vinci system that we are

13  aware of, that we have often detected that and have

14  alerted customers and educated them as it relates to

15  the safety of -- associated with such actions.

16       BY MR. ERWIG:

17     Q.   We'll get to the safety, sir, but right now

18  I just wanted to get a sense of the response that

19  Intuitive has to those situations.  And one of the

20  responses that Intuitive has when hospitals utilize

21  EndoWrists that have been altered, modified, or

22  repaired by a third party is Intuitive will

23  terminate the sales license and service agreement.

24     A.   In some cases that may be the ultimate

25  outcome, but in other cases that is not accurate.

1          MR. ERWIG:  I'm going to screen share our

2    next exhibit.  This will be Plaintiff's Exhibit 15.

3          (Marked for identification purposes,

4           Exhibit 15.)

5          MR. ERWIG:  This will be 7'19'19 Bair to

6    others.

7          BY MR. ERWIG:

8    Q.    Do you see this on the screen in front of

9    you?

10   A.    Yes, I do.

11   Q.    I'm going to scroll down to the first

12   e-mail.  Do you see this first e-mail?

13   A.    One moment, please.

14         Yes, I do recall.

15   Q.    How do you recognize this?

16   A.    I authored it.

17   Q.    Now, in the section you write -- withdrawn.

18         In this e-mail -- withdrawn.

19         Is this an e-mail you sent to Albert Vidal

20   and others at Intuitive Surgical on July 19th, 2019?

21   A.    Yes.

22   Q.    In this e-mail you write, "Gents, we just

23   terminated our first SSA today (Conway Regional) for

24   material breach of the limited use licensing

25   provisions."

Page 105

1          Do you see that?

2     A.    Yes.

3     Q.    Your next sentence says, "After attempting

4  to get them to stop reprogramming instruments over

5  the course of about nine months, we canceled their

6  service contract, and all I&A orders from them are

7  blocked going forward."

8          Do you see that?

9     A.    That is correct.

10    Q.    What are I&A orders?

11    A.    Instrument and accessory orders from

12  Intuitive.

13    Q.    So that would include da Vinci surgical

14  robots; is that right?

15    A.    It would not include new robots.

16    Q.    What does I&A orders include?

17    A.    EndoWrist instruments and accessories sold

18  with the system.  For example, that would include

19  cannula seals, drapes, vision or endoscopic-type

20  equipment, cables.  A whole litany of accessories

21  that are part of our product catalog.

22    Q.    Your next sentence says, "We will decline

23  T&M POs as well."  What does T&M mean?

24    A.    Time and material POs which indicated, if a

25  customer is not covered under a service and support

1    contract, then they engage with us on a time and

2    materials basis, which means they request a repair,

3    we quote the repair, and then they provide a P&O --

4    a PO -- excuse me -- to authorize us to conduct the

5    repair.

6        Q.   So the result of terminating the SSA with

7    Conway Regional was that Conway Regional can no

8    longer purchase instruments or accessories from

9    Intuitive; right?

10       A.   That is correct.

11       Q.   And Conway Regional could no longer obtain

12   any service from Intuitive for its da Vinci robots;

13   is that right?

14       A.   That is correct.

15       Q.   I'm going to stop screen sharing -- well,

16   withdrawn.

17            And the reason that you terminated the

18   agreement with Conway Regional was because Conway

19   Regional was using a third party to reprogram

20   instruments over the course of about nine months;

21   right?

22       A.   Yes.  Conway Regional was using

23   non-FDA-approved devices on the da Vinci system and,

24   following our engagement with them over a period of

25   time, ultimately, terminated the licensing

Page 107

1   agreement.

2       Q.   Well, sir, the -- Conway Regional was using

3   EndoWrists that had been repaired by a third party;

4   right?

5           MS. LENT:  Object to the form.

6           THE WITNESS:  We do not consider the

7   activities that were undertaken to be repair

8   activities.

9           BY MR. ERWIG:

10      Q.   Well, sir, have you personally done any

11  sort of studies on the efficacy of reprogrammed

12  instruments?

13      A.   No, I have not.

14      Q.   Have you instructed any members of your

15  team to do any studies on the efficacy of

16  reprogrammed instruments?

17      A.   Not that I recall.

18      Q.   Before terminating the sales contract with

19  Conway Regional, did you instruct anyone at

20  Intuitive to investigate whether the instruments

21  being used by Conway were safe and reliable?

22      A.   We had explored whether appropriate

23  regulatory clearance had been obtained.  For

24  example, I do believe that we requested evidence of

25  a 510(k) approval from the FDA in advance of this,

1  or the customer had from whomever they were engaging

2  with, and in turn received the regulatory clearance

3  to sell and market Intuitive's EndoWrist devices,

4  which were validated and approved with a life limit

5  of ten.

6      Q.   Well, sir, my question is a little bit more

7  specific, which is did anyone from Intuitive ever

8  take a reprogrammed instrument and do some testing

9  to see how it compared to a new EndoWrist from

10  Intuitive?

11      A.   We, in fact, had a complaint associated

12  with a reprogrammed instrument and would have

13  conducted failure analysis on such an instrument.

14          Is that within the scope of your question?

15      Q.   Well, my question is the instruments

16  specifically used by Conway Regional.  Did anyone

17  from Intuitive look at the reprogrammed instruments

18  and compare them to brand-new EndoWrists sold by

19  Intuitive?

20      A.   I believe that, yes, we had done comparison

21  of example instruments that we had received through

22  the return material authorization program, as

23  previously discussed.

24      Q.   Describe to me that comparison.

25      A.   It was an analysis of the physical

1    characteristics of the instrument.  And I don't have

2    a deep understanding of that other than modification

3    or adulteration had been detected and -- which

4    rendered the instrument different than the

5    instrument that had been cleared by the FDA.

6        Q.   You mentioned that modification and

7    adulteration had been detected.  Was there --

8    withdrawn.

9          You mentioned modification and

10    adulteration.  Was there a safety comparison between

11    a brand-new instrument and an instrument that had a

12    modification or adulteration?

13          MS. LENT:  Object to the form.

14          THE WITNESS:  I recall that, as part of our

15    validation and life limit, we extended the use of

16    instruments to determine at which point they failed.

17    I don't recall those instruments being -- that were

18    tested specifically being instruments that were

19    modified by an unauthorized third party.

20          BY MR. ERWIG:

21        Q.   Well, did you, for example -- well,

22    withdrawn.

23          Are you aware of anyone from Intuitive

24    taking a reprogrammed instrument and testing that

25    instrument to failure?

1    A.   I do not recall an instance.

2    Q.   Are you aware of any instances where

3    Intuitive took -- withdrawn.

4        Are you aware of any instances where

5    someone at Intuitive took a reprogrammed instrument

6    and tested how it performed during a simulated

7    surgery, for example?

8    A.   I'm aware of, if I recall correctly, some

9    testing by customers that we were aware of for

10    reprogrammed or modified instruments.  I'm not aware

11    of internal testing that we'd done with instruments

12    other than our own that had been run past the ten

13    life limit count, at which they failed.

14    Q.   So in terms of the relative performance of

15    reprogrammed instruments and EndoWrists, you're not

16    aware of any studies that have been done by

17    Intuitive on the efficacy of reprogrammed

18    instruments relative to new instruments sold by

19    Intuitive; is that right?

20    A.   I am aware in a limited fashion of the

21    results of our own internal testing as it relates to

22    using instruments beyond their validated lives,

23    which served as a relative proxy for us as it

24    related to modification and extension of the life

25    limits of third-party reprogrammed instruments.

Page 111

1    Q.   Well, let's talk about the using

2  instruments beyond their validated lives.  There's

3  certain things that can happen to instruments over

4  time; right?

5    A.   Yes.

6    Q.   One of the things that could happen is

7  scissors, they can become dull and not able to cut

8  very well anymore; right?

9    A.   That is accurate.

10   Q.   And if that happened at 11 uses, Intuitive

11  would consider that a failure of that instrument;

12  right?

13       MS. LENT:  Object to the form.

14       THE WITNESS:  I am not personally familiar

15  with all of the various failure modes and measures.

16  For example, there are grades of scissor blade

17  sharpness and dullness, and I am unfamiliar with

18  what constitutes the gradient between a sharp blade

19  and a dull blade as such, what we would deem that

20  instrument to be failed.

21       BY MR. ERWIG:

22   Q.   Well, you understand that in some --

23  withdrawn.

24       You understand that at any point, when an

25  instrument is considered not suitable for a given

1  surgery, Intuitive considers that a failure; right?

2    A.   If the instrument is not performing as

3  designed in an intuitive and clinically safe

4  fashion, then yes, we would deem that to be a

5  failure.

6    Q.   Once an instrument is deemed to have

7  failed, then there's no effort made to repair that

8  instrument so it can continue operating by

9  Intuitive; right?

10      MS. LENT:  Object to the form.

11      THE WITNESS:  I am not aware of efforts by

12  Intuitive to repair failed instruments.

13      BY MR. ERWIG:

14    Q.   So when an instrument fails, Intuitive

15  knows that at that point there's some sort of repair

16  that's needed for the instrument; right?

17      MS. LENT:  Object to the form.

18      THE WITNESS:  Could you specify your

19  definition of "repair"?

20      BY MR. ERWIG:

21    Q.   Well, sir, what I'm getting at is when

22  Intuitive -- withdrawn.

23      You mentioned extended-life testing earlier

24  and that in extended-life testing Intuitive tested

25  some instruments beyond their original use limit;

1  right?

2      A.    That is correct.

3      Q.    Now, when an instrument fails in that

4  process, Intuitive records that failure and then

5  disposes of the instrument; right?

6      A.    I'm not certain of the final disposition of

7  the instrument as to whether we retain and store or

8  dispose of instruments that are used in simulated

9  use and validation testing.  I don't know that I can

10  answer that.

11      Q.    When Intuitive tests an instrument and that

12  instrument fails, Intuitive does not make any

13  efforts to repair or refurbish that instrument to

14  continue its testing; right?

15      A.    That is correct.

16      Q.    And so Intuitive does not have any sort of

17  testing or data about whether instruments can last

18  even beyond failure with the appropriate repairs or

19  refurbishment; right?

20          MS. LENT:  Object to the form.

21          THE WITNESS:  What data we may have as it

22  relates to validation and verification for extended

23  lives is outside of the scope of my expertise.

24          MR. ERWIG:  I'm going to stop screen

25  sharing this exhibit.  Let's go off the record, and

1   we'll take a break.

2        THE VIDEOGRAPHER:  The time is 3:18 p.m.,

3   and we are now off the record.

4        (Recess taken from 3:18 until 3:34.)

5        THE VIDEOGRAPHER:  The time is 3:34 p.m.,

6   and we are back on the record.

7        MR. ERWIG:  Our next exhibit is going to be

8   Plaintiff's Exhibit 16.  This will be 10'11'19

9   Carlson to Bair.

10        (Marked for identification purposes,

11         Exhibit 16.)

12        BY MR. ERWIG:

13   Q.   Screen share.

14        Mr. Bair, do you see this on the screen in

15   front of you?

16   A.   Yes, I do.

17   Q.   I want to start on this e-mail from Eric

18   Lashinsky to Grant Peterson, Andrew Coster, copying

19   yourself and others from Intuitive.

20        Do you see that?

21   A.   Yes, I do.

22   Q.   And Mr. Lashinsky writes, "Grant and

23   Andrew, this has occurred at other facilities and it

24   is not advised.  I'm copying my director, Ron Bair,

25   for his input and any documentation that may be

Page 115

1  available for us to present to the customer."

2       Do you see that?

3   A.   Yes.

4   Q.   And earlier down in this e-mail chain Grant

5  Peterson --

6       THE STENOGRAPHER:  Hold on.  It looks like

7  Karen was trying to say something and it wasn't

8  coming through.  Do you want to go off the record?

9       MR. ERWIG:  Let's go off the record.

10      THE VIDEOGRAPHER:  The time is 3:36 p.m.,

11  and we are off the record.

12       (Recess taken from 3:36 to 3:40.)

13      THE VIDEOGRAPHER:  The time is 3:40 p.m.,

14  and we are back on the record.

15      BY MR. ERWIG:

16   Q.   Mr. Bair, I'll resume screen sharing.

17  There's an e-mail from Grant Peterson to Andrew

18  Coster down later in the e-mail thread.

19       Do you see that?

20   A.   Yes.

21   Q.   In that e-mail thread, Mr. Peterson writes,

22  "Apparently, the account is looking to use a third

23  party to repair their system."

24       Do you see that?

25   A.   Yes.

Page 116

1    Q.   What do you understand is meant by that?

2    A.   I understand that to mean a -- an entity

3    that is not authorized to modify or repair the

4    system and that the customer is looking to

5    potentially engage that party.

6    Q.   Higher up you then write on October 11th,

7    2019, "Eric, thanks for looping me in.  Assuming

8    this site is in Mesa."

9        Do you see that?

10   A.   Yes.

11   Q.   And I want to talk with you about the

12   paragraph that starts with "high level."  Do you see

13   that?

14   A.   Yes.

15   Q.   And you write, "High level - if they" --

16   hospital -- "permits a third party to alter/tamper

17   with the system, that's in violation of the limited

18   license and we will decline to service it.  Systems

19   cannot be properly serviced without a proprietary

20   software.  So, ultimately, they will encounter an

21   issue where they will need our assistance."

22       Do you see that?

23   A.   Yes.

24   Q.   Is that generally consistent with the

25   reaction that Intuitive would have to hospitals that

1    used third parties to repair or service their

2    instruments?

3        A.    That is consistent to our response as it

4    relates to violations of the limited licensing

5    agreement.

6        Q.    When you say limited licensing agreement,

7    that's the contract that Intuitive and the hospitals

8    sign when the hospital purchases a da Vinci robotic

9    surgery system; is that right?

10       A.    That is correct.

11       Q.    Now, lower you write, "If they also begin

12   using reprogrammed instrumentation (we often see

13   those go hand in hand), then we will ultimately

14   terminate the license and no longer sell them and

15   I&A or service their system."

16           Do you see that?

17       A.    I do.

18       Q.    Is it your understanding in your role at

19   Intuitive that, if a hospital used reprogrammed

20   instrumentation, that Intuitive would terminate that

21   hospital's sales contract and no longer sell them

22   materials or service their system?

23       A.    That is not fully accurate.

24       Q.    What is inaccurate about that statement?

25       A.    That not each of those or every one of

1  those engagements does not result in termination of

2  the limited licensing agreement.

3      Q.  Well, I understand there's some actions

4  that Intuitive takes first, like sending a letter

5  for example; right?

6      A.  That is correct.  And engaging in

7  conversation.

8      Q.  We'll talk about that later on.  But the

9  thing that you write here is that "we will

10  ultimately terminate the license and no longer sell

11  them or service their system."  Right?

12      A.  It would have been more accurate for me to

13  say then we may ultimately terminate the license.  I

14  think for the sake of brevity or another reason, I

15  said we will ultimately.  And some of these

16  engagements do, ultimately, result in license

17  termination but not all of them do.

18      Q.  Well, when you were writing this e-mail,

19  you had the choice of writing "we will ultimately

20  terminate" or "we may ultimately terminate"; right?

21      A.  That is correct.

22      Q.  The word that you chose here was "we will

23  ultimately terminate the license and no longer sell

24  them an I&A."  Right?

25      A.  That is correct.

1    Q.    In fact, the e-mail that we looked at

2  earlier with Conway, you did, in fact, terminate the

3  contract with Conway and no longer sold Conway

4  instruments and accessories; right?

5    A.    Following a nine-month period of

6  engagement, that is correct.

7    Q.    And you also no longer serviced Conway's

8  da Vinci robot systems; right?

9    A.    That is correct.

10    Q.    And as per this e-mail, if a system isn't

11  serviced by Intuitive without Intuitive's

12  proprietary software, customer ultimately encounters

13  an issue that renders that robot unusable; right?

14    A.    They certainly may.

15    Q.    Without Intuitive there to provide service,

16  then the customer would no longer be able to use

17  that robot for surgeries; right?

18    A.    It depends on the failure mode that's

19  experienced by the customer, if the customer does

20  experience a failure mode.

21    Q.    I'm going to stop screen sharing this

22  exhibit.

23        Are you aware, Mr. Bair, that there were

24  letters sent to hospitals to enforce the contractual

25  terms of the SLSA, the sales license and service

1  agreement?

2      A.   Yes, I am aware.

3          MR. ERWIG:  I'm going to screen share our

4  next exhibit.  This will be Plaintiff's Exhibit 17.

5          (Marked for identification purposes,

6           Exhibit 17.)

7          MR. ERWIG:  This will be 1'30'20 Bair to

8  Lowe.  Do you see this on the screen in front of

9  you?

10          THE WITNESS:  Yes, I do.

11          BY MR. ERWIG:

12      Q.   Do you recognize this?

13      A.   Yes, I do.

14      Q.   On the first bullet point -- withdrawn.

15          How is it that you recognize it?

16      A.   I authored and sent the e-mail.

17      Q.   This is an e-mail that you sent on

18  January 30th, 2020, to Josh Lowe, Lucas Docter, and

19  Matt Davis at Intuitive Surgical?

20      A.   That is correct.

21      Q.   In bullet point 1 you write, "Are they

22  considering" -- "they" mean Cairo -- "third-party

23  service or third-party instruments or both?"

24          Do you see that?

25      A.   I believe "they" referred to the customer

1  as an entity versus an individual.  But, yes, I do

2  see that.

3     Q.   Near the end of that paragraph you write,

4  "There's a letter each for I&A and service, and I

5  think they explain our position fairly well."

6        Do you see that?

7     A.   Yes.

8     Q.   Then there's a couple of attachments to

9  this, the Ardent Health Patient Health Implications

10 Letter and the -- Part 2, and the Ardent Health

11 Patient Safety Implications Letter Part 1.

12       Do you see that?

13    A.   I do.

14       MR. ERWIG:  I'm going to stop screen

15 sharing this exhibit.

16       We'll screen share our next exhibit, which

17 is one of the letters that's attached to this

18 document.  This will be 1'30'20 Attach to Bair to

19 Lowe.  This will be Plaintiff's Exhibit 18.

20       (Marked for identification purposes,

21        Exhibit 18.)

22       BY MR. ERWIG:

23    Q.   Do you see this on the screen in front of

24 you, Mr. Bair?

25    A.   Yes, I do.

1    Q.    Do you recognize this document?

2    A.    Yes, I do.

3    Q.    How do you recognize it?

4    A.    I believe it was prepared in advance of a

5    meeting with -- I believe Cairo and potentially one

6    or two other representatives within Ardent.

7    Q.    You see that the letter starts with "We

8    understand that Ardent Health Services is using or

9    considering using refurbished EndoWrist instruments

10   obtained from and/or modified by a third party for

11   use beyond the programmed number of uses."

12       Do you see that?

13   A.    Yes.

14   Q.    What is the purpose of sending these

15   letters to hospitals?

16   A.    The primary purpose is to educate on the

17   potential safety implications of using nonapproved

18   devices in conjunction with their da Vinci products,

19   and secondarily to inform or remind them of their

20   obligations under the sales licensing and service

21   agreement as established with the customer when they

22   purchased the da Vinci system.

23   Q.    Now, Mr. Bair, it's your understanding that

24   the letters sent to hospitals are designed to have

25   the hospital stop engaging with third-party -- well,

1    withdrawn.

2         Mr. Bair, it's your understanding that the

3    letters sent to hospitals are designed to stop the

4    hospitals from engaging with third parties for

5    repairs of their EndoWrists; right?

6         MS. LENT:  Object to the form.

7         THE WITNESS:  That may be one of the

8    reasons that the letter is crafted, but I believe I

9    stated previously the intention of the letter to

10   convey the potential patient safety implications of

11   engaging in such activities and reminding them of

12   their agreement with Intuitive on the sale of that

13   robot.

14        BY MR. ERWIG:

15   Q.   I want to talk a little bit about the

16   section of this letter labeled "Your contract with

17   Intuitive."

18        Do you see that?

19   A.   Yes.

20   Q.   Now, one of these sentences reads, "Using

21   instruments beyond the programmed number of uses is

22   a material breach of the agreement."

23        Do you see that?

24   A.   Yes, I do.

25   Q.   Is it your understanding that any customer

1  who used an EndoWrist beyond the programmed number

2  of uses would be in breach of the contract that it

3  signed with Intuitive?

4      MS. LENT:  Objection.  Calls for a legal

5  conclusion.

6      THE WITNESS:  My understanding is, if use

7  beyond the programmed number of uses is the result

8  of modification or another violation of the limited

9  licensing agreement, then yes.

10     BY MR. ERWIG:

11     Q.   Well, it's certainly not possible to use

12  instruments beyond the programmed number of uses

13  without some sort of modification or alteration;

14  right?

15     A.   I am not aware of -- of how that may be

16  performed.

17     Q.   Now, is it your understanding that a

18  hospital that utilizes a third-party repair service

19  for an EndoWrist that breaks before its prescribed

20  number of uses is up is also in violation of the

21  contract with Intuitive?

22     A.   I believe --

23     MS. LENT:  Objection.  Calls for a legal

24  conclusion.

25     THE WITNESS:  My layman's understanding is

1  that depends on if the activities engaged in are in

2  violation of the language within the limited

3  licensing agreement.  So, for example, we previously

4  discussed servicing that can be performed by

5  customers that is permissible and allowable, and

6  then there are certain elements of what some would

7  deem to be repair or refurbishment that appear to be

8  in violation of the agreement.

9        BY MR. ERWIG:

10   Q.   The exact way the text is written, it says

11  that "any other use is prohibited, whether before or

12  after the instrument or accessory's license

13  expiration, including repair, refurbishment, or

14  reconditioning not approved by Intuitive."

15        Do you see that?

16   A.   I do.

17   Q.   Now, this doesn't say after the

18  instrument's -- withdrawn.

19        This doesn't say "only after the instrument

20  or accessory's license expiration"; right?

21   A.   That is correct.

22   Q.   It mentions that any repair, refurbishment,

23  or reconditioning not approved by Intuitive before

24  or after the instrument or accessory's use counter

25  expires is prohibited by the sales agreement; right?

1          MS. LENT:  Object to the form.

2          THE WITNESS:  Allow me to read the

3    preceding sentence again.  I am familiar with use

4    that is out of compliance with the limited license

5    agreement -- for example, as we discussed,

6    modification -- which -- whether the modification

7    occurred before or after the instrument reached its

8    number of useful lives, I think is inconsequential.

9          BY MR. ERWIG:

10    Q.   Are you aware of an entity named Rebotix

11    Repair?

12    A.   I am modestly aware of them, yes.

13    Q.   How are you modestly aware of them?

14    A.   I had heard several years ago that they

15    were an entity potentially engaging in

16    modification -- unauthorized modification of our

17    products.  And then, more recently, I became aware

18    that I would be deposed as part of the legal

19    proceedings that Rebotix has engaged in against

20    Intuitive.

21    Q.   Is it your understanding that Intuitive

22    approves Rebotix's services to hospitals?

23          MS. LENT:  Object to the form.

24          THE WITNESS:  Sorry.  Can you rephrase

25    that?

1        BY MR. ERWIG:

2    Q.   Well, sure.  This section reads, "Any other

3    use is prohibited, whether before or after the

4    instrument or accessory's license expiration,

5    including repair, refurbishment, or reconditioning

6    not approved by Intuitive."

7        My question is, is it your understanding

8    that the activities that Rebotix engages in are not

9    approved by Intuitive?

10    A.   It is my understanding that Rebotix has not

11    engaged Intuitive to seek approval and validation in

12    alignment with our third-party product policy and

13    practices.

14    Q.   And Intuitive hasn't separately approved

15    Rebotix's actions; right?

16    A.   Not that I am aware of.

17    Q.    So any sort of repair, refurbishment, or

18    reconditioning performed by Rebotix, that would be a

19    prohibited use as you read this sentence; right?

20    A.   As it relates to my understanding, any

21    repair, refurbishment, et cetera that is in

22    violation of the terminology of the agreement is

23    what is prohibited.  So, by extension, if Rebotix

24    was engaging in those activities as it related to

25    modifying the approved devices, then yes, I agree.

1    Q.    Now, sir, you understand that -- withdrawn.

2         When a customer has an EndoWrist whose uses

3    have expired, you understand that Intuitive wants

4    that customer to then purchase a new instrument from

5    Intuitive; is that right?

6    A.    If the customer is, in fact, in need of

7    instruments, then yes, the expectation would be that

8    they would procure FDA-approved instrumentation or

9    devices for use in conjunction with the da Vinci or

10   on or through the da Vinci.

11   Q.    And let's just be very clear.  The only

12   place where you can buy -- where a customer can buy

13   EndoWrist, that's from Intuitive Surgical or an

14   Intuitive Surgical directly approved distributor;

15   right?

16   A.    I do not believe that to be the case.

17   Q.    Where else can a customer obtain an

18   EndoWrist?

19   A.    I have seen, for example, EndoWrist

20   instruments for sale on eBay, as an example, or

21   potentially other medical supply trade forums.

22   Q.    You understand that it's Intuitive's wish

23   that a customer purchase a new EndoWrist instead of

24   attempting to repair existing EndoWrists that have

25   expired beyond their use counter limit; right?

1    A.    We -- that would be correct.

2    Q.    Now I want to direct your attention to the

3    last paragraph here, which -- and one of the

4    sentences in this last paragraph starts with "Should

5    Intuitive or its personnel determine, after having

6    accepted a service call or a purchase order for a

7    service call, such as after an Intuitive field

8    service engineer arrives at your site for a service

9    call, that the system has been used with instruments

10   refurbished or modified by an unauthorized third

11   party, Intuitive may not provide service for such a

12   system."

13        Do you see that?

14   A.    Yes, I do.

15   Q.    Is it your understanding that, ultimately,

16   if customers continued using third-party repair

17   services, that Intuitive will not provide service

18   for a da Vinci system?

19   A.    In most cases, that is accurate.  But it

20   depends on exactly what activities have been engaged

21   in by the third party as to whether it constitutes a

22   violation of the licensing agreement or not.  For

23   example, we mentioned and discussed repairs -- basic

24   repair, maintenance, troubleshooting, et cetera,

25   that people can engage in through -- or in alignment

1   with the IFU, or instructions for use, for the

2   equipment.

3       Q.   Well, certainly, if a third party adds uses

4   to an EndoWrist, that would not be an approved use;

5   right?

6       A.   Correct.  We would deem that to be

7   modifying the medical device beyond the scope of

8   what was approved by the FDA and -- so that would

9   not be authorized.

10      Q.   Is it your understanding that the FDA

11  requires a certain number of uses for EndoWrist

12  instruments?

13      A.   It is not my understanding --

14          MS. LENT:  Object to the form.

15          BY MR. ERWIG:

16      Q.   I'm sorry.  I didn't get your answer.

17      A.   I said that is not my understanding.

18      Q.   I'm going to take down this exhibit.

19          Now, ultimately, when hospitals utilize

20  third parties to reset the use counter on EndoWrist

21  instruments, Intuitive will take a series of actions

22  against that hospital; right?

23      A.   We would engage in activities with that

24  hospital.  That is correct.

25      Q.   Well, the first thing you'd do is you'd

1  have a conversation with the hospital; right?

2      A.    Generally that has historically been the

3  approach.  That is correct.

4      Q.    You might send the hospital a letter;

5  right?

6      A.    That is correct.

7      Q.    But then, ultimately, if the hospital

8  continues using a third party to add lives to the

9  use counter, then you would terminate that

10  hospital's sales agreement; right?

11      A.    If -- that is correct.  If we engage in the

12  prior activities as you mentioned which ultimately

13  don't yield an alignment with the hospital, then we

14  may ultimately terminate the licensing agreement.

15      Q.    When you say "yield an alignment with the

16  hospital," you mean that the hospital stops using

17  the third party and returns to purchasing EndoWrists

18  from Intuitive; right?

19      A.    I mean that the hospital stops using

20  equipment in conjunction with the da Vinci or on the

21  da Vinci that is not authorized for use on the

22  da Vinci.

23      Q.    And that the hospital stops engaging with a

24  third party that repairs those EndoWrists; right?

25          MS. LENT:  Object to the form.

1          THE WITNESS:  Could you rephrase that?

2    Because we don't prohibit our hospitals from having

3    certain relationships or engaging in certain

4    economic or commercial activity unless it's in

5    violation of the licensing agreement.

6          BY MR. ERWIG:

7      Q.   Well, sir, the sales agreement --

8    withdrawn.

9          Sir, the manner in which Intuitive enforces

10   its sales agreements certainly does restrict its

11   customers' abilities to utilize third parties to

12   repair its EndoWrists; right?

13         MS. LENT:  Object to the form.

14         THE WITNESS:  The licensing agreement

15   prohibits the modification of devices -- of

16   Intuitive's devices that are under a limited

17   license.

18         BY MR. ERWIG:

19     Q.   Well, sir, that's not all it does; right?

20   It prohibits any repair that's not authorized by

21   Intuitive.  True?

22     A.   Could we go back to the language?

23     Q.   We certainly can.

24     A.   I think it speaks to specifically what is

25   allowed and what is not.

1    Q.   I'll highlight this language for you again.

2        And it reads, "Any other use is prohibited,

3    whether before or after the instrument or

4    accessory's license expiration, including repair,

5    refurbishment, or reconditioning not approved by

6    Intuitive."

7        Do you see that?

8    A.   I do.  The request was to go back to the

9    licensing agreement that was signed with the

10   hospital.

11   Q.   I don't believe we've pulled that up.

12   A.   There was an excerpt in the previous

13   that -- it was in the Lashinsky exhibit.  This is

14   not the exact language from the sales, licensing,

15   and service agreement.  So I would have those that

16   authored this letter probably speak more

17   specifically to the language in that letter.

18   Q.   Well, sir, is it your understanding that

19   Intuitive freely permits hospitals to use third

20   parties to reset the use counters on EndoWrists with

21   no consequence?

22   A.   Do I agree that we freely allow them to do

23   that with no consequence?

24   Q.   Well, that you freely allow the hospitals

25   to take that action.

Page 134

1          MS. LENT:  Object to the form.

2          THE WITNESS:  Yeah, could we frame the

3    question differently?

4          Do we discourage them engaging in that

5    activity?  How would you reframe it?

6          BY MR. ERWIG:

7     Q.   Well, sir, we talked about earlier that

8    there's a series of steps that Intuitive takes when

9    it finds out that a hospital is using reprogrammed

10   EndoWrists; right?

11    A.   That is correct.

12    Q.   One of the things that Intuitive does is it

13   might have a conversation with the hospital; right?

14    A.   That is correct.

15    Q.   The next thing it might do is send a

16   letter; right?

17    A.   That is correct.

18    Q.   And then, ultimately, Intuitive will stop

19   servicing the da Vinci robot for the hospital;

20   right?

21    A.   If they do not stop using those devices on

22   the da Vinci, that is correct.

23          I do not know that we are aware of when

24   they may, for example, provide instruments to a

25   third party for repair.  So if that repair isn't

1  something that we become aware of or that registers

2  on a system, that's the limitation to which I think

3  we have visibility to.  And that, I don't know that

4  we could practically control.

5      Q.   As soon as an EndoWrist is used on a

6  robot -- well, withdrawn.

7          The purpose of da Vinci robots is to

8  perform surgeries; right?

9      A.   That is correct.

10     Q.   Hospitals buy those robots in order to

11  perform surgeries; right?

12     A.   That is correct.

13     Q.   And they're a substantial investment in

14  terms of money and training time and things like

15  that as well; right?

16         MS. LENT:  Object to the form.

17         THE WITNESS:  Could you clarify what you

18  mean by "a substantial investment"?

19         BY MR. ERWIG:

20     Q.   Well, the hospital has to spend money to

21  buy a da Vinci robot; right?

22     A.   A hospital traditionally does have to spend

23  money to buy a robot, yes.

24     Q.   It likely has to train surgeons how to use

25  that robot; right?

1    A.   That is correct.

2    Q.   So if Intuitive doesn't service that robot

3   and the robot fails, it means the hospital can no

4   longer do surgeries with that robot; right?

5    A.   That is correct.

6    Q.   So if Intuitive hears that a hospital is

7   using reprogrammed instrumentation on a da Vinci

8   robot, ultimately, Intuitive will not service that

9   da Vinci robot; right?

10    A.   Following the steps that we discussed, we

11   may end up declining to service the robot.  That is

12   correct.

13    Q.   And, ultimately, when hospitals have

14   continued to use these EndoWrists that have been

15   reprogrammed by a third party, Intuitive has, in

16   fact, terminated sales agreements and refused to

17   service da Vinci robots; right?

18    A.   That is correct.

19    Q.   And so it's certainly not true that there's

20   no consequence to a hospital that wants to use

21   reprogrammed EndoWrists on its da Vinci robots;

22   right?

23    A.   That is correct.

24    Q.   In fact, Intuitive aggressively enforces

25   its sales contracts to ensure that hospitals don't

1  engage in that type of activity; right?

2       MS. LENT:  Object to the form.

3       THE WITNESS:  I would say that we

4  aggressively pursue the terms of our agreement with

5  our customers.  That is correct.

6       BY MR. ERWIG:

7    Q.   That agreement that's the sales and

8  licensing agreement, it's a contract with a

9  customer; right?

10   A.   That is correct.

11   Q.   And Intuitive enforces the terms of that

12  contract to stop the customer from using

13  reprogrammed EndoWrists; right?

14   A.   Among other things that we, yeah, pursue

15  contract enforcement for, which may include

16  nonpayment or other recourse as needed.

17   Q.   Now, sir, is there any proof that you can

18  identify that EndoWrist cannot be used beyond the

19  specified number of lives on the use counter?

20   A.   Did we lose Karen?

21       THE STENOGRAPHER:  It looks like it.

22       MR. ERWIG:  Yeah, we did.

23       THE WITNESS:  We'll stop and wait for her

24  to rejoin?

25       MR. ERWIG:  Let's go off the record.

1        THE VIDEOGRAPHER:  The time is 4:07 p.m.,

2   and we are off the record.

3        (Recess taken from 4:08 to 4:12.)

4        THE VIDEOGRAPHER:  The time is 4:12 p.m.,

5   and we are back on the record.

6        BY MR. ERWIG:

7    Q.   Mr. Bair, is there any proof that you can

8   point the jury to that EndoWrists cannot actually be

9   used beyond the specified number of lives on the use

10  counter?

11   A.   I was not involved in the validation of the

12  instruments and the provision of that data to the

13  FDA which predicated their decision related to its

14  authorization to be marketed and sold.  So I don't

15  have access to that information.

16   Q.   Sir, you're aware that hospitals have

17  repeatedly asked Intuitive to provide scientific

18  readout indicating that EndoWrists cannot be safely

19  repaired; right?

20        MS. LENT:  Object to the form.

21        THE WITNESS:  I'm aware of one instance

22  where that information has been requested.

23        MR. ERWIG:  Let's look at a few.  The next

24  one -- exhibit is going to be in Folder 4.  This

25  will be 2'13'19, Otradovec to Bair and Rawls.

Page 139

1          I'll screen share this with you.

2          THE STENOGRAPHER:  And this will be

3   Exhibit 19?

4          MR. ERWIG:  Exhibit 19.  Thank you, Lorrie.

5          (Marked for identification purposes,

6           Exhibit 19.)

7          BY MR. ERWIG:

8      Q.   Mr. Bair, do you see this on the screen in

9   front of you?

10     A.   Yes.

11     Q.   I'll scroll down to an earlier e-mail from

12  Tony Johnson to Chace Rawls, others at

13  bswhealth.org, copying John Wagner and Lindsey

14  Otradovec at Intuitive Surgical.

15         Do you see that?

16     A.   I do.  You did a good job with the

17  pronunciation, Otradovec, initially.  So...

18     Q.   Otradovec.  Thanks.

19         Then it appears that this e-mail chain was

20  ultimately forwarded on to you by Ms. Otradovec; is

21  that right?

22     A.   Yes.  That is correct.

23     Q.   Do you recognize this e-mail chain?

24     A.   I recognize the bottom of the e-mail chain

25  because I was engaged in the response, and so the

1  rest of it is modestly familiar to me.

2      Q.   I want to start, actually, with this first

3  e-mail in the e-mail chain.  You see there's a --

4  withdrawn.

5          Who is Tony Johnson?

6      A.   I recall he was the senior vice president.

7  I don't remember what the aggregated function was,

8  but it included biomedical engineering for Baylor

9  Scott & White.  It may have been the -- a supply

10  chain or something to that effect.

11      Q.   Now, I want to point to the first piece of

12  information requested by BSWH in this e-mail, which

13  is, "Provide documentation of the latest FDA

14  certifications for Xi and SI robots, and proving the

15  FDA granted the 510(k) based on a required

16  limitation of the number of uses per EndoWrist

17  instrument."

18          Do you see that?

19      A.   I do.

20      Q.   Was Intuitive able to provide documentation

21  that proved that the FDA granted a 510(k) based on a

22  required limitation of the number of uses per

23  EndoWrist instrument?

24      A.   If we could pull up the actual response, I

25  would certainly be able to speak to those specifics,

1  but it was crafted by multiple individuals and spoke

2  to or addressed each of those questions articulated

3  under the information requested by BSWH.

4      Q.   Well, we'll look at the rest of the e-mail

5  chain in a minute, sir.  I'm interested right now in

6  your understanding of the FDA's granting of a

7  510(k).  And so I want to just focus in on the

8  specifics of that question.

9          Is it your understanding that the FDA

10  granted the EndoWrist based on a required number of

11  uses?

12          MS. LENT:  Object to the form.

13          THE WITNESS:  It is not my understanding

14  that the FDA specifies the actual functional

15  parameters or limitations of medical devices but

16  rather approves or authorizes them based on the

17  manufacturer's specifications and the data generated

18  and provided to the FDA to support the submission.

19          BY MR. ERWIG:

20      Q.   I'm going to scroll up.  In the next e-mail

21  Ms. Otradovec sends an e-mail to Mark Johnson, Mario

22  Lowe, copying Chace Rawls and Katie Scoville, where

23  she writes, "Mark and Mario, can you provide me with

24  any of the documentation for Number 1 below."  Do

25  you see that?

Page 142

1    A.   Yes.

2    Q.   Who is Mario Lowe?

3    A.   His title is on one of the -- well, at that

4  time he appeared to be the senior director of

5  regulatory affairs.  I believe now he is the vice

6  president of regulatory affairs and quality

7  assurance.

8    Q.   Mr. Lowe replies, "Hi, Lindsey:  We can

9  certainly provide the latest FDA 510(k) clearance

10  letters.  But this will not provide the information

11  requested in Item 1 below."

12        Then -- do you see that?

13    A.   Yes, I do.

14    Q.   Mr. Lowe goes on to say, "Just so you know,

15  FDA does not require nor limit the number of uses

16  for our EndoWrist instruments."

17        Do you see that?

18    A.   I do.

19    Q.   Is it your understanding that the FDA does

20  not require nor limit the number of uses for

21  Intuitive's EndoWrist instruments?

22    A.   That is correct.

23    Q.   Now I want to turn to the e-mail where

24  Ms. Otradovec forwards this e-mail chain to you.

25  And she writes, "This tells me that they are being

1  coached by restore robotics, or whoever the company

2  is, to say, 'Give me the proof you can't use the

3  instruments more than X lives.'"

4       Do you see that?

5  A.  Yes, I do.

6  Q.   Is there a specific piece of proof that you

7  can offer that instruments cannot safely be used

8  more than a certain number of lives after

9  appropriate repairs?

10      MS. LENT:  Object to the form.

11      THE WITNESS:  As mentioned previously, I

12  have not been engaged in the validation and

13  verification of products developed for submission to

14  the FDA for approval, and so I don't know that I

15  could speak to that.

16      Also, the question is somewhat vague as it

17  relates to what repair constitutes.

18      BY MR. ERWIG:

19  Q.   Well, there's certain things that can wear

20  down on EndoWrists over time; right?

21      MS. LENT:  Object to the form.

22      THE WITNESS:  In addition to other things

23  that can happen to instruments over time, yes, they

24  wear.

25  ///

1       BY MR. ERWIG:

2    Q.   Instruments can break; right?

3    A.   That is correct as well.

4    Q.   And you're aware that traditional

5  laparoscopic instruments, those wear and break over

6  time as well; right?

7    A.   I would suspect that that is true, although

8  I don't have experience with traditional

9  laparoscopic instruments.

10    Q.   And you know that traditional laparoscopic

11  instruments have been repaired by hospitals for

12  decades?

13       MS. LENT:  Object to the form.

14       THE WITNESS:  I am not aware of repair for

15  traditional laparoscopic instruments.

16       BY MR. ERWIG:

17    Q.   Now, has Intuitive ever performed any

18  specific testing that would indicate that an

19  EndoWrist that has been safely repaired or

20  refurbished can operate well beyond its use counter?

21    A.   We went over that, I think, close to the

22  beginning of this as it related to our exploration

23  of the viability of refurbishment.

24       Meaning, yes, we have explored if

25  refurbishing -- what we deem to be refurbishment or

1  remanufacturing is safe and economically viable.

2      Q.   The conclusion was that it would likely be

3  safe but would probably not be economically viable

4  for Intuitive at the time; is that right?

5          MS. LENT:  Object to the form.  Asked and

6  answered.

7          THE WITNESS:  The conclusion was not

8  necessarily that it would likely be safe, but not --

9  we did not conclude that it was impossible to render

10  the instrument after being appropriately

11  remanufactured.

12          BY MR. ERWIG:

13      Q.   But you concluded that it was not

14  economically viable for Intuitive at the time;

15  right?

16      A.   The decision as it related to economic

17  viability wasn't something that I was engaged in

18  making.  I did the analysis.  And the decision as to

19  whether to pursue it or not was made based on, I

20  would say, multiple factors, one of which I would

21  anticipate is the economic impact of it, which is

22  why I was engaged to provide that analysis.

23      Q.   And, sir, you certainly understand that

24  it's more profitable for Intuitive to continue

25  selling its customers new EndoWrists than it is to

Page 146

1    refurbish and sell refurbished EndoWrists to

2    customers; right?

3        A.   I do not understand that.

4        Q.   Is it your contention that -- well,

5    withdrawn.

6          Is it your understanding that the

7    refurbishment program would, in fact, be more

8    profitable to Intuitive than selling new

9    instruments?

10       A.   That is not my understanding either.  We

11   did some financial modeling based on potential price

12   points, but the market, the price elasticity, the

13   demand elasticity, all of those things remained

14   unproven from my perspective as it relates to what

15   the projected economic viability is.

12        BY MR. ERWIG:

13        Q.   Well, sir, let's make it simpler and look

14    at what's happened in the real world.

15             Since 2017 Intuitive hasn't offered a

16    refurbished instrument program; right?

17             MS. LENT:  Objection.  Asked and answered.

18             THE WITNESS:  That is correct.

19             BY MR. ERWIG:

20        Q.   Now, if that program had been wildly

21    profitable for Intuitive, you would expect that

22    Intuitive would have brought that to market; right?

23             MS. LENT:  Objection.

24             THE WITNESS:  I don't know that that would

25    be the case.  As I mentioned, the decision, as it

1  relates to the portfolio of products that we would

2  intentionally develop and request approval for and

3  deploy, is well beyond the profitability

4  implications of those products.  The greatest

5  intention is in furtherance of our mission.  And for

6  that reason there are variable price and margin

7  points associated with the products in our

8  portfolio.

9       BY MR. ERWIG:

10  Q.  Sir, Intuitive wants to make money; right?

11      MS. LENT:  Object to the form.

12      THE WITNESS:  Intuitive's mission is not to

13  make money.

14      BY MR. ERWIG:

15  Q.  Is Intuitive a publicly traded company?

16  A.  Intuitive is a publicly traded company.

17  Q.  Is it your understanding that Intuitive has

18  a duty to maximize the value of its stock price for

19  its shareholders?

20      MS. LENT:  Object to the form.

21      THE WITNESS:  I would agree that Intuitive

22  has a duty to -- I don't know the maximized stock

23  price is the intention, but total shareholder return

24  is important as it relates to the investment grade

25  of any equity in the market.

1    BY MR. ERWIG:

2    Q.  To make that simpler, that means that one

3  of the duties that Intuitive has is to deliver

4  returns for its shareholders in terms of money;

5  right?

6        MS. LENT:  Objection.  Calls for a legal

7  conclusion.

8        THE WITNESS:  I don't know that I could

9  speak to the intent of each of the investors in

10  Intuitive.

11        BY MR. ERWIG:

12    Q.  Well, sir, you understand in your role as a

13  product manager you're generally trying to develop

14  products that are going to be profitable for

15  Intuitive; right?

16    A.  I understand in the words of a very wise

17  nun who was working at a nonprofit hospital, no

18  money, no mission.  So I do acknowledge that making

19  money is important as it relates to the development

20  and production of advanced medical devices that can

21  improve care.

22    Q.  We looked at the refurbished EndoWrists as

23  potentially opening up a broader market for some

24  customers to where the normal EndoWrist would

25  normally be cost prohibitive; right?  That was one

1  of the things you examined?

2      MS. LENT:  Object to the form.

3      THE WITNESS:  I believe one of the

4  objectives was potentially as it related to markets

5  or more cost-sensitive procedures.  I don't know

6  that it was specifically related to individual

7  customers.

8      BY MR. ERWIG:

9   Q.  Well, the refurbished instrument program,

10  it was your understanding that that program would

11  potentially expand the range of da Vinci surgeries

12  to other cost-sensitive procedures; right?

13    A.  That may have been one mode or mechanism

14  through which we may have been able to achieve that

15  objective.  That is correct.

16    Q.  Intuitive never adopted a refurbished

17  instrument model despite the potential to impact new

18  markets; right?

19      MS. LENT:  Objection.  Asked and answered.

20      THE WITNESS:  We have not launched a

21  refurbished program.

22      BY MR. ERWIG:

23    Q.  Sir, that's because that refurbished

24  program, that would be a money loser for Intuitive;

25  right?

1        MS. LENT:  Objection.  Asked and answered.

2        THE WITNESS:  As previously stated, there

3   are many reasons why we may decide to engage or not

4   engage in any specific business practices or the

5   development of products within our portfolio and our

6   road map.

7        MR. ERWIG:  I'm going to screen share our

8   next exhibit.  This will be Plaintiff's Exhibit 20.

9   This will be 8'15'19 Bair to Davis.

10        (Marked for identification purposes,

11         Exhibit 20.)

12        BY MR. ERWIG:

13    Q.  Do you see this on the screen in front of

14   you, Mr. Bair?

15    A.  Yes, I do.

16    Q.  Do you recognize this?

17    A.  Yes, I do.

18    Q.  How do you recognize it?

19    A.  It was -- the communication was forwarded

20   to me in advance of a visit that I was making to --

21   I believe it was the New Orleans area where this

22   customer may have been located.

23    Q.  I want to scroll down to the first e-mail.

24   Who is Sherry Harvey?

25    A.  She appears to have been the chief nursing

Page 152

1  officer at Crescent City Surgical Centre.

2      Q.  I want to point to some of the bullet

3  points in Ms. Harvey's e-mail.

4          In the first bullet Ms. Harvey writes,

5  "Please explain the notion that we have engaged in

6  the 'usage of unauthorized instrumentation.'  What

7  gives Intuitive Surgical the right to determine how

8  Crescent City Surgical Centre uses instruments that

9  we own?"

10         Do you see that?

11     A.  I do.

12     Q.  Then in the second bullet point, Ms. Harvey

13  writes, "Please provide data that demonstrates that

14  patient safety is impacted by the safe, controlled

15  repair and reuse of robotic instruments."

16         Do you see that?

17     A.  That is correct.

18     Q.  Then Ms. Harvey goes on to say, "In lieu of

19  data that directly demonstrates this, please provide

20  any indication that patient safety is compromised.

21  Patient safety is our first concern, but we do not

22  act on vendor statements about safety; we act on

23  science."

24         Do you see that?

25     A.  She was saying it a long time before all

1  the people were about COVID.  Yes, I do.

2     Q.  Were you able to provide Ms. Harvey with an

3  indication that patient safety was compromised by

4  the safe, controlled repair and reuse of robotic

5  instruments with the da Vinci surgical system?

6     A.  I don't recall the final disposition of the

7  response to Ms. Harvey, but I am aware that it is

8  not incumbent on Intuitive to prove the safety or

9  efficacy of a third-party device or a device that

10  has been modified by a third party such that it is

11  rendered no longer an approved FDA device.

12     Q.  Well, sir, that wasn't quite my question.

13  So let me reask it and focus on the question itself.

14        Were you able to provide Ms. Harvey with

15  any data that demonstrated that patient safety was

16  impacted by the safe, controlled repair and reuse of

17  robotic instruments?

18        MS. LENT:  Objection to form.

19        THE WITNESS:  I do not recall providing

20  data to Ms. Harvey related to products that have

21  been modified by other entities.

22        BY MR. ERWIG:

23     Q.  Were you able to provide any indication to

24  Ms. Harvey that patient safety is comprised by the

25  safe, controlled repair and reuse of robotic

1  instruments?

2      MS. LENT:  Object to the form.

3      THE WITNESS:  We may have communicated to

4  Ms. Harvey that it was our understanding that these

5  modified devices were not approved by the

6  appropriate regulatory body whose principal aim and

7  objective is to protect patients as it relates to

8  both pharmaceuticals and medical devices.  And so I

9  don't recall providing anything beyond that.

10      BY MR. ERWIG:

11      Q.  I want to go to the next bullet point where

12  Ms. Harvey writes, "How does repair and reuse of

13  robotic instruments compromise 'product

14  performance'?"

15      Do you see that?

16      A.  I do.

17      Q.  Ms. Harvey writes, "We have audited the

18  quality system and testing protocols of our robotic

19  instrument repair partner as well as several

20  independent reports about materials degradation, and

21  we find no indication that the functionality of

22  robotic instruments is compromised when reusing the

23  instruments beyond the limited number of times

24  suggested by Intuitive Surgical."

25      Do you see that?

1    A.   Yes, I do.

2    Q.   Then Ms. Harvey asks, "Please provide test

3   results, studies, or data that document why the

4   instruments should be limited to 10 or 15 uses."

5        Do you see that?

6    A.   I do.

7    Q.   Did Intuitive perform any research as to

8   the functionality of robotic instruments that were

9   repaired by Ms. Harvey's robotics instrument repair

10  partner?

11    A.   I'm not privy to.  We may have engaged in

12  as it relates to testing of those products.  I don't

13  believe that we were provided the opportunity to

14  partner with that organization that was engaging it,

15  and it was outside of my purview to explore those

16  sorts of questions.

17    Q.   Mr. Bair, can you point the jury to any

18  scientific evidence that indicates that repair of

19  robotic instruments cannot safely be used for

20  surgery?

21    A.   That is outside the scope of my

22  responsibilities as I do not engage in verification

23  and validation of our products prior to submission

24  to the FDA.

25    Q.   Well, Ms. Harvey is certainly saying that

1  the robotic repair program is important in her

2  hospital's efforts to provide the best possible care

3  for her patients.

4        Do you see that?

5   A.  I do see that.

6   Q.   Then Ms. Harvey is asking some questions of

7  Intuitive to understand your claims about patient

8  safety.

9        Do you see that?

10   A.  That is -- yes, I do see that.

11   Q.   And were you able to provide any data to

12  Ms. Harvey in response to that request that the

13  safe, controlled repair and reuse of robotic

14  instruments was, in fact, compromising patient

15  safety?

16       MS. LENT:  Objection.  Asked and answered.

17       THE WITNESS:  I believe the intent -- the

18  intent and spirit of our response was as it related

19  to compliance with the contract or the sales

20  licensing and service agreement that we'd engaged in

21  with Crescent City as well as our understanding and

22  awareness that Crescent City was using devices that

23  were not approved by the FDA or other regulatory

24  bodies.

25  ///

1          BY MR. ERWIG:

2     Q.   Hospitals care about patient safety; right?

3          MS. LENT:  Objection.

4          THE WITNESS:  I don't know that I can speak

5     to all of the things that hospitals care about.

6          BY MR. ERWIG:

7     Q.   Well, is it your understanding that

8     hospitals don't care about patient safety?

9     A.   That is generally not my understanding.

10     Q.   Is it generally your understanding that

11    hospitals, in fact, care very deeply for patient

12    safety?

13         MS. LENT:  Objection.

14         THE WITNESS:  I refer to my previous

15    response.

16         BY MR. ERWIG:

17     Q.   Well, it's a question of your

18    understanding, sir, as it relates to hospitals.  And

19    so I'll reask the question.  Withdrawn.

20          Is it your understanding that hospitals

21    care about patient safety?

22     A.   It is my understanding that that is an

23    element of the multitude of things that hospitals

24    care about.

25     Q.   Ms. Harvey is, in fact, asking some

1  questions to determine whether Intuitive has any

2  data about the safety of repair of robotic

3  instruments; right?

4      MS. LENT:  Objection.  Asked and answered.

5      THE WITNESS:  That is what she appears to

6  be asking about.

7      BY MR. ERWIG:

8   Q.  Intuitive didn't provide any such data;

9  right?

10      MS. LENT:  Objection.  Asked and answered.

11      Can we move on?

12      THE WITNESS:  I do not believe that we

13  provided data in response to this.

14      BY MR. ERWIG:

15   Q.  Are you, in fact, aware, Mr. Bair, of any

16  data that was provided to any hospital that asked

17  Intuitive for data on patient safety related to the

18  repair and reuse of robotic instruments?

19   A.  As I mentioned before, that's -- the data

20  related to verification and validation to

21  demonstrate the safe and effective use of these

22  products in the marketplace is outside of my

23  purview.  And so I am not personally aware of any

24  instances where data has been provided, but there

25  certainly may have been as we are a fairly large

1  organization.  And, again, I'm not an expert and/or

2  engaged in that space.

3     Q.  Can you personally point to any data that

4  you've seen that indicates that repaired robotic

5  instruments are not able to be used safely by

6  hospitals?

7        MS. LENT:  Objection.  Asked and answered.

8        THE WITNESS:  There was a reference in one

9  of the exhibits that we explored earlier in the day.

10  For example, the failure modes that were experienced

11  when instruments were attempted to -- where we

12  attempted to use them beyond their validated number

13  of lives.  That's the extent to which that I have

14  personal exposure to anecdotal results of life

15  testing.  But, again, that is outside of my purview

16  and area of responsibility.

17        BY MR. ERWIG:

18  Q.  Now, sir --

19        We can stop screen sharing this exhibit.

20        Now, sir, you personally had communications

21  with hospitals that were using third-party repair

22  services for Intuitive's EndoWrists; is that right?

23  A.  That is correct.

24     Q.  In any of your communications with any of

25  those third-party -- withdrawn.

1          In any of your communications with any of

2   those hospitals that utilized third-party repair

3   services, were you able to provide any data that the

4   patient safety was compromised by safely repaired

5   EndoWrists?

6          MS. LENT:  Objection.  Asked and answered.

7          THE WITNESS:  Would you reframe the

8   question?  I don't know that I agree that there are

9   safely repaired EndoWrist instruments out there as I

10   have not personally had the opportunity to see or

11   validate the safe repair of EndoWrist instruments.

12          BY MR. ERWIG:

13   Q.   Well, my question is when hospitals --

14   withdrawn.

15          You've met with hospitals that utilize

16   third-party repair services for EndoWrist; right?

17   A.   That is correct.

18   Q.   In those meetings were you ever able to

19   provide any of those hospitals with any data

20   indicating that repaired EndoWrists would compromise

21   patient safety?

22   A.   The direction of the conversations given my

23   scope -- the scope of my function and conversations

24   that I am equipped to engage in focused on their

25   compliance or noncompliance with our agreement.

1          Again, data as it relates to the safe

2   functioning of the robots or any instruments and

3   accessories used in conjunction with them is outside

4   of my purview and understanding.

5      Q.   So your role was to interface with the

6   hospital and let them know they were not in

7   compliance with the contract with Intuitive; is that

8   right?

9      A.   That is correct.

10     Q.   You let the hospitals know that Intuitive

11  considered them in violation of their contract for

12  using third-party instruments; right?

13     A.   If, in fact, they were.  In addition to

14  other elements of the Intuitive team, yes, I was

15  engaged in those conversations and partnerships

16  sometimes with sales or the regulatory folks,

17  et cetera.

18         MR. ERWIG:  Let's go off the record.

19         THE VIDEOGRAPHER:  The time is 4:40 p.m.,

20  and we are off the record.

21         (Recess taken from 4:40 to 4:48.)

22         THE VIDEOGRAPHER:  The time is 4:48 p.m.,

23  and we are back on the record.

24         MR. ERWIG:  I'm going to screen share our

25  next exhibit.  This will be in Folder 5.  This is

1  6'14'19 Little to Bair.

2      (Marked for identification purposes,

3       Exhibit 21.)

4      BY MR. ERWIG:

5   Q.   Mr. Bair, do you see this on the screen in

6  front of you?

7   A.   I do.

8   Q.   Do you recognize this?

9   A.   No, I don't yet.

10   Q.   Does this appear to be an e-mail from

11  Rachelle Little to yourself?

12   A.   It does.

13   Q.   Sent on June 14th, 2019?

14   A.   Yes.

15   Q.   There's an attachment that's "DRAFT Finance

16  Quick Start Guide Rev F.docx."

17      Do you see that?

18   A.   Yes.  And now it more so does ring a bell.

19   Q.   And can you explain what you mean by it

20  rings a bell?

21   A.   Meaning I do recall very likely the subject

22  matter.  I don't specifically recall sending this

23  e-mail, but I know Rachelle and her position at that

24  time and likely what the attachment was.

25   Q.   And what was Rachelle's position at that

1  time?

2      A.  She was a rotational finance analyst within

3  the services organization -- or excuse me --

4  supporting the services organization.  She was with

5  the finance organization.

6      Q.  Did you receive this e-mail and the

7  attached draft finance quick start guide?

8      A.  Yes.

9          MR. ERWIG:  I'm going to stop screen

10  sharing this exhibit.  Our next exhibit will be the

11  attachment to this e-mail.  This is 6'14'19 Attach

12  to Little to Bair.

13          THE STENOGRAPHER:  This will be 22.

14          (Marked for identification purposes,

15           Exhibit 22.)

16          BY MR. ERWIG:

17      Q.  Do you see this on the screen in front of

18  you, Mr. Bair?

19      A.  I do.

20      Q.  Do you recognize this document?

21      A.  Yes, I do.

22      Q.  It would appear to be a document titled

23  "ISI's Equation for Employee Success"?

24      A.  That is correct.

25      Q.  I just want to talk about some of the

1  bullet points here with you.  There's a column

2  labeled "Individual Expectations."

3        Do you see that?

4    A.  I do.

5    Q.  One of the bullet points under that is

6  "Integrity - I never bend or wink at the truth."

7        Do you see that?

8    A.  I do.

9        MS. LENT:  Alexander, can you make that a

10  little bit bigger?  It's really hard to see even

11  with my reading glasses on.  Thank you.

12        MR. ERWIG:  How's that?

13        BY MR. ERWIG:

14    Q.  Then there's a column labeled "Character."

15        Do you see that?

16    A.  I do.

17    Q.  And there's a few bullet points.  The first

18  one reads "Will not wink or bend at the truth."

19        Do you see that?

20    A.  That is correct.

21    Q.  And the third bullet point reads, "Answers

22  questions consistently regardless of audience."

23        Do you see that?

24    A.  I do.

25    Q.  Are these all characteristics that

1  Intuitive expects its employees to embody?

2    A.  Yes, they are.

3        MR. ERWIG:  Stop screen sharing this

4  exhibit.

5        I have no further questions at this time.

6        MS. LENT:  I don't have any questions

7  myself.  Thank you.

8        MR. ERWIG:  Thank you, Mr. Bair.

9        We can go off the record.

10        THE VIDEOGRAPHER:  Before we do go off the

11  record, can I have all counsel state copy orders.

12        MS. LENT:  We have a standing order.

13        THE VIDEOGRAPHER:  Okay.  Perfect.

14        MS. LENT:  Thank you.

15        THE VIDEOGRAPHER:  Thank you.

16        This concludes today's deposition given by

17  Rob Bair.  Total media units used, 3 hours and 27

18  minutes.  The time is 4:52 p.m., and we are now off

19  the record.

20        (Deposition concluded at 4:52 p.m. PDT.)

21              ---oOo---

22

23

24

25

1          CERTIFICATE OF WITNESS

2

3

4

5          I, the undersigned, declare under penalty

6   of perjury that I have read the foregoing

7   transcript, and I have made any corrections,

8   additions or deletions that I was desirous of

9   making; that the foregoing is a true and correct

10   transcript of my testimony contained therein.

11

12       EXECUTED this _____ day of _____,

13   20_____ at _____,_____.

14

15

16          _____

17              RONALD LEE BAIR, JR.

18

19

20

21

22

23

24

25

Page 167

1                STENOGRAPHER'S CERTIFICATE

2        I, LORRIE L. MARCHANT, Certified Shorthand

3  Reporter, Certificate No. 10523, for the State of

4  California, hereby certify that RONALD LEE BAIR, JR.

5  was by me duly sworn/affirmed to testify to the

6  truth, the whole truth and nothing but the truth in

7  the within-entitled cause; that said deposition was

8  taken at the time and place herein named; that the

9  deposition is a true record of the witness's

10  testimony as reported to the best of my ability by

11  me, a duly certified shorthand reporter and a

12  disinterested person, and was thereafter transcribed

13  under my direction into typewriting by computer;

14  that request [  ] was [ X ] was not made to read and

15  correct said deposition.

16        I further certify that I am not interested

17  in the outcome of said action, nor connected with,

18  nor related to any of the parties in said action,

19  nor to their respective counsel.

20        IN WITNESS WHEREOF, I have hereunto set my

21  hand this 25th day of May, 2021.

22

23  _____

     LORRIE L. MARCHANT, RMR, CRR, CCRR, CRC
24      Certified Shorthand Reporter #10523

25

1                I N D E X

2            INDEX OF EXAMINATION

3   EXAMINATION BY                          PAGE

4    MR. ERWIG                         5

5              ---oOo---

6    INDEX OF EXHIBITS MARKED FOR IDENTIFICATION

7    EXHIBIT     DESCRIPTION              PAGE

8    Exhibit 1    Copy of handwritten notes        9

9    Exhibit 2   e-mail correspondence, dated      19
            9/5/2019 (Intuitive-00361333)
10
     Exhibit 3   BSWH - Quarterly Business     21
11           Review, dated September 5, 2019
             (Intuitive-00361334 -
12             Intuitive-00361377)

13   Exhibit 4   e-mail correspondence, dated      38
            7/17/2020 (Intuitive-00560866)
14
     Exhibit 5   Intuitive Surgical Instrument    47
15           eX: I&A Refurbishment
             Feasibility Update, dated
16           January 30, 2017
             (Intuitive-00042937 -
17             Intuitive-00042972)

18   Exhibit 6    e-mail correspondence, dated     71
            6/21/2017 (Intuitive-00043050)
19
     Exhibit 7    Intuitive Surgical Future of Si   71
20           & X (Intuitive-00043051 -
             Intuitive-00043057)
21
     Exhibit 8   e-mail correspondence, dated     77
22           7/6/2017 (Intuitive-00098369)

23              ---oOo---

24

25

Page 169

1    INDEX OF EXHIBITS MARKED FOR IDENTIFICATION

2  EXHIBIT     DESCRIPTION          PAGE

3  Exhibit 9   Document produced in native      79
                Format (Intuitive-00098370)
4
    Exhibit 10  Excel document entitled "Attach    79
5          to Goodson to Bair Refurb
            Business Model - minimal"
6
    Exhibit 11   e-mail correspondence, dated      88
7          4/19/2018 (Intuitive-00098680)

8  Exhibit 12   Document produced in native      89
                format (Intuitive-00098681)
9
    Exhibit 13  Excel document entitled "Attach    89
10         to Bair to Davis Refurb Bus.
            Model 7.24.17"
11
    Exhibit 14  e-mail correspondence, dated      98
12         6/20/20 (Intuitive-00361133 -
            Intuitive-00361136)
13
    Exhibit 15  e-mail correspondence, dated      104
14         7/20/2019 (Intuitive-00214396 -
            Intuitive-00214397)
15
    Exhibit 16  e-mail correspondence, dated      114
16         10/11/2019 (Intuitive-00044647 -
            Intuitive-00044649)
17
    Exhibit 17  e-mail correspondence, dated      120
18         1/30/2020 (Intuitive-00562844 -
            Intuitive-00562852)
19
    Exhibit 18   Letter to members of Ardent from  121
20         Intuitive Surgical, dated
            1/17/2020 (Intuitive-00562853 -
21         Intuitive-00562855)

22  Exhibit 19  e-mail correspondence, dated      139
            2/13/2019 (Intuitive-00214231 -
23         Intuitive-00214234)

24          ---oOo---

25

1   INDEX OF EXHIBITS MARKED FOR IDENTIFICATION

2  EXHIBIT    DESCRIPTION              PAGE

3  Exhibit 20   e-mail correspondence, dated     151
           8/15/2019 (Intuitive-00214562 -
4          Intuitive-00214564)

5  Exhibit 22   ISI's Equation for Employee      163
           Success (Intuitive-00360933)
6              ---oOo---

7      QUESTIONS INSTRUCTED NOT TO ANSWER

8          PAGE     LINE

9          10     23

10         ---oOo---

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  NAME OF CASE:  Rebotix Repair v. Intuitive Surgical

2  DATE OF DEPOSITION:  5/24/2021

3  NAME OF WITNESS:  RONALD LEE BAIR, JR.

4  Reason Codes:

5      1.  To clarify the record.
    2.  To conform to the facts.
6      3.  To correct transcription errors.

7  Page _____ Line _____ Reason _____
  From _____ to _____
8
  Page _____ Line _____ Reason _____
9  From _____ to _____

10  Page _____ Line _____ Reason _____
  From _____ to _____
11
  Page _____ Line _____ Reason _____
12  From _____ to _____

13  Page _____ Line _____ Reason _____
  From _____ to _____
14
  Page _____ Line _____ Reason _____
15  From _____ to _____

16  Page _____ Line _____ Reason _____
  From _____ to _____
17
  Page _____ Line _____ Reason _____
18  From _____ to _____

19  Page _____ Line _____ Reason _____
  From _____ to _____
20
  Page _____ Line _____ Reason _____
21  From _____ to _____

22  Page _____ Line _____ Reason _____
  From _____ to _____
23

24      _____
          RONALD LEE BAIR, JR.

25

Exhibit 5

INTUITIVE.

November 26, 2019

Dr. Eric Pifer, Chief Medical Officer
Lee Domanico, Chief Executive Officer
Jon Friedenberg, President & Chief Operations Officer
Marin General Hospital
250 Bon Air Road
Greenbrae, California 94904

Dear Mr. Pifer, Mr. Domanico, and Mr. Friedenberg:

We understand that Marin General Hospital is using or considering using "refurbished" EndoWrist®
instruments, obtained from and/or modified by a third party for use beyond the programmed number of
uses.  The programmed number of uses, as indicated in the product labeling, represents the validated
intended use of the product documented and submitted to authorities. Intuitive strongly discourages the
procuring of its products through unauthorized channels and/or using its products that have been modified
to work beyond the pre-programmed number of uses.

**Extended Instrument Use Can Impact Product Performance and Patient Safety**

All Intuitive products are designed and tested to achieve a targeted level of safety, precision, and dexterity
over the programmed number of instrument uses. Gradual degradation of the instrument occurs both from
use in surgery as well as repeated cleaning and sterilization cycles required between uses.  Examples of
degraded performance may include, but are not limited to:
- Unintuitive motion (i.e. instruments do not track well with master manipulators; unexpected
  motion or stalls);
- Insufficient grip force;
- Dull or damaged scissor blades;
- Worn/damaged cables.

With continued use beyond the instrument's determined useful life, the wear and tear from these additional
uses may reduce these levels of safety, precision and dexterity.

In addition, in light of the prescribed cleaning and sterilization processes for the Intuitive instruments, device
handling and modification by an outside party that deviates from validated processes submitted and
cleared by regulatory authorities may cause instrument damage that could create patient safety issue.
Third party remanufacturers or refurbishers may use non validated or incompatible cleaning agents and/or
disinfection/sterilization processes, which are likely to damage the instruments, negatively affecting
product performance.

Further, third party remanufacturers or refurbishers may damage the instrument's internal mechanisms that
interface with the robotic system and allow Intuitive to monitor the device. In sum, the use of third party
remanufacturers or refurbishers may affect the operation of the Instrument thereby jeopardizing patient
safety.

**Extended Instrument Uses: Impact to Regulatory Clearances and Safety Precautions**

All of Intuitive's medical devices, including EndoWrist®instruments, are evaluated by the United States Food
and Drug Administration ("FDA") and/or other international regulatory agencies to assess the safety and
effectiveness of a device over its intended life and are cleared for use by those regulatory authorities.

Refurbishing activities performed by an unauthorized third party violate the U.S. Federal Food, Drug, and
Cosmetic Act ("FDC Act") and the regulations promulgated and enforced thereunder by the FDA when

Attorneys' Eyes Only

Intuitive-00373885

such activities do not bring products to established specifications or when such activities change intended uses.  Deviation from these specifications might prevent such products from performing properly, thereby subjecting patients to significant risk.  By using a third party remanufacturer or refurbisher, the hospital has no way to know whether the refurbished instrument meets the rigorous specifications as established by Intuitive Surgical and cleared by the FDA or other regulators. Moreover, the regulatory clearance provided to Intuitive by the FDA and other regulatory authorities may not apply to products that have been remanufactured or refurbished by unauthorized third parties.

Refurbishing activities performed by an unauthorized third party that change intended uses or modify the control mechanisms of the device may constitute the entry of adulterated and misbranded products to the marketplace.  Specifically, the manufacture and entry into commerce of a medical device that does not meet specifications renders the product adulterated under 21 U.S.C. § 351.  Moreover, any modification to allow for use of a da Vinci product beyond its labeled useful life exceeds the scope of the original clearance by expanding the FDA cleared indications for use.  Engaging in such activities without first obtaining a new clearance to do so misbrands the product under 21 U.S.C. § 351.  The citied provisions of the FDC Act and FDA's implementing regulations help to protect the public health by ensuring that medical devices are shown to be either safe and effective or substantially equivalent to other devices already legally marketed and that the products were designed, manufactured and serviced in a controlled manner to ensure that they meet designated specifications.

Furthermore, acquiring da Vinci System surgical products through unauthorized channels may violate the hospital's internal policies, which violation may include not obtaining proper patient's and/or surgeon's consent for the use of an altered or adulterated device on the patient.

**Your Contract with Intuitive**

We presume that you are aware that, in connection with Marin General Hospital's purchase of *da Vinci* Surgical products, Marin General Hospital entered into Sales, License, and Service Agreements in 2007 and 2013 (each referred to herein as "Agreement" or collectively as "Agreements").[1]  Using instruments beyond the programmed number of uses is a material breach of the Agreements.  Here are summarized terms of the Agreements that you might wish to consider:

- Instruments and Accessories are subject to a limited license to use those Instruments and Accessories with, and prepare those Instruments and Accessories for use with, the System.  Any other use is prohibited, whether before or after the Instrument or Accessory's license expiration, including repair, refurbishment, or reconditioning not approved by Intuitive.  This license expires once an Instrument or Accessory is used up to its maximum number of uses specified in the documentation accompanying the Instrument or Accessory.  [2007 Agreement § 2.5(b), 2013 Agreement § 8];

- Under the section titled "Use of System", Customer agreed that it will not, nor will Customer permit any third party to, modify, disassemble, reverse engineer, alter, or misuse the System or Instruments and Accessories.  Further, if Customer fails to comply with the requirements of this section, any warranties applicable to the System will become void and Intuitive may terminate the Agreement for material breach.  [2007 Agreement § 2.3(a) and § 5 , 2013 Agreement § 3.4];

- Moreover, Intuitive will not be liable for, and Customer will indemnify and hold Intuitive harmless from and against, any claims or damages caused by Customer's failure to comply with the requirements of the section titled "Use of System".  [2007 Agreement § 2.3(a) and § 6.2, 2013 Agreement § 11.2].

---

1 Capitalized terms in this section have the same meaning as set forth in the Agreement.

Intuitive-00373886

In addition to the above, Intuitive believes that it has important intellectual property rights in the da Vinci system and its instruments.  You may want to be sure that a vendor offering "reprogrammed instruments" is not violating intellectual property rights that belong to Intuitive.

Based on the terms of the Agreement and the patient safety implications of the Systems being used with instruments refurbished by an unauthorized third party, Intuitive may no longer accept your service calls for such Systems.  Should Intuitive or its personnel determine, after having accepted a service call or a purchase order for a service call, such as after an Intuitive Field Service Engineer arrives at your site for a service call, that the System has been used with instruments refurbished or modified by an unauthorized third party, Intuitive may not provide service for such a System.  Please contact Intuitive's Director of External Affairs, Dan Jones (dan.jones@intusurg.com), if you have any further questions.

Sincerely,

**Signature:**  *Romain DENIS*
Romain DENIS (Dec 2, 2019)

**Email:**  romain.denis@intusurg.com

**Title:**  VP, Regulatory Afairs and Quality Assurance

**Company:**  Intuitive Surgical

**Signature:**
Kara Andersen Reiter (Nov 26, 2019)

**Email:**  kara.reiter@intusurg.com

**Title:**  SVP, General Counsel, Chief Compliance Officer

**Company:**  Intuitive Surgical

cc:
Gabrielle Javier, Robotics Coordinator
Michael Geremia, Surgical Services Director
Dr. James Yu, Robotics Medical Director

# Exhibit 6

| | |
|---|---|
| **From:** | Dan Jones [Dan.Jones@intusurg.com] |
| **Sent:** | 11/26/2019 11:06:37 AM |
| **To:** | Becky Cokeley [Becky.Cokeley@intusurg.com] |
| **CC:** | AJ Inacay [aj.inacay@intusurg.com]; Cyprian Okafor [Cyprian.Okafor@intusurg.com] |
| **Subject:** | RE: Marin General- reprocessing Si instruments |
| **Attachments:** | Rebotix Summary of Quality Reliability.pdf |

AJ, Cyprian,
There is a close match between the "SIS" materials and the documents we'd seen earlier from Rebotix (attached).  My guess would be that SIS is working with Rebotix.

Becky,
You seem to have very good relationships at the account and the information you provided is very helpful.  It would be good if we could find out what ECRI's involvement is.  Is it, as you suggest, that the account contacts are mis-interpreting analysis that ECRI did?  Or is ECRI actually encouraging hospitals to utilize adulterated instruments?  We have had on-going exchanges with ECXRI over quite a few years and we might respond differently depending on what we think is the "right" answer.  Thank you for any more insight or help you can provide.

Dan

---

**From:** AJ Inacay <aj.inacay@intusurg.com>
**Sent:** Tuesday, November 26, 2019 7:24 AM
**To:** Cyprian Okafor <Cyprian.Okafor@intusurg.com>; Dan Jones <Dan.Jones@intusurg.com>
**Subject:** FW: Marin General- reprocessing Si instruments

Good Morning,

Please see below and the attached pdfs.

AJ

---

**From:** Becky Cokeley <Becky.Cokeley@intusurg.com>
**Sent:** Monday, November 25, 2019 6:31 PM
**To:** Lucas Docter <Lucas.Docter@intusurg.com>; Bryce Partridge <Bryce.Partridge@intusurg.com>; AJ Inacay <aj.inacay@intusurg.com>; Erin Grinberg <Erin.Grinberg@intusurg.com>; Adam Clark <Adam.Clark@intusurg.com>
**Cc:** Kristin Cooke <Kristin.Cooke@intusurg.com>
**Subject:** RE: Marin General- reprocessing Si instruments

Update on Marin from today:

- Met with OR Director and Director of Purchasing today.  They made the decision about Si instrumentation strictly based on finances following a recommendation from a 3rd party consulting firm, ECRI.
- ECRI told Marin they were spending $294,000 per year on *Si instrument repairs*.  We talked through this in the meeting today and clarified that Intuitive does not repair our Si instruments.  We believe the $294,000 might be the total of Marin's I&A spend for the past year – but I'm waiting on Customer Service to help confirm this.  We also reviewed dollars spent this year on Advanced Exchange.
- The company they are using for the Si instrument remanufacture is **SIS – Surgical Instrument Service Co, Inc.**
- This company claims to have 2 Intuitive engineers working for them and says they are already doing business with Kaiser and Banner.
- I have attached 2 documents I got from the customer today:
  - Summary of Quality and Reliability Measures
  - Da Vinci EndoWrist Repair FAQs

Attorneys' Eyes Only

- I got a brief look at their pricing structure, which appears to be 40-50% discount. The MCS was $1700 on this price list, for example.
- The customer does not want to risk patient safety, and after our dialogue, suggested that perhaps they made this decision based on false information about repairs.
- Once I have a chance to send the follow-up to Marin, we'll give them a day or so to digest and then circle back to see what their decision will be moving forward.

Happy to discuss any specifics or questions live. Have a great night,

_____

Becky Cokeley
Area Sales Manager

Mobile:  707.637.6931
Becky.Cokeley@intusurg.com

INTUITIVE

1020 Kifer Rd.
Sunnyvale, CA 94086-5304 USA
intuitive.com

**From:** Lucas Docter <Lucas.Docter@intusurg.com>
**Sent:** Monday, November 25, 2019 9:29 AM
**To:** Bryce Partridge <Bryce.Partridge@intusurg.com>; Becky Cokeley <Becky.Cokeley@intusurg.com>; AJ Inacay <aj.inacay@intusurg.com>; Erin Grinberg <Erin.Grinberg@intusurg.com>; Adam Clark <Adam.Clark@intusurg.com>
**Cc:** Kristin Cooke <Kristin.Cooke@intusurg.com>
**Subject:** RE: Marin General- reprocessing Si instruments

Agreed, thank you, Becky!!

## Lucas J. Docter
*Regional Vice President, U.S. Key Accounts*
Mobile:  281-639-4897
Lucas.Docter@IntuSurg.com

INTUITIVE

**From:** Bryce Partridge <Bryce.Partridge@intusurg.com>
**Sent:** Friday, November 22, 2019 8:14 PM
**To:** Becky Cokeley <Becky.Cokeley@intusurg.com>; AJ Inacay <aj.inacay@intusurg.com>; Lucas Docter <Lucas.Docter@intusurg.com>; Erin Grinberg <Erin.Grinberg@intusurg.com>; Adam Clark <Adam.Clark@intusurg.com>
**Cc:** Kristin Cooke <Kristin.Cooke@intusurg.com>
**Subject:** RE: Marin General- reprocessing Si instruments

Becky,

I know this has consumed your last couple of days.....thank you on behalf of the team for handling such a sensitive subject and also thinking strategically about leveraging this into an Executive meeting.....who knows, Xi discussion?!?!?

Have a great weekend

Bryce Partridge
Area Sales Director – West

Mobile: 949-287-9272
Bryce.Partridge@intusurg.com

INTUITIVE

1020 Kifer Rd.
Sunnyvale, CA 94086-5304 USA
intuitive.com

---

**From:** Becky Cokeley <Becky.Cokeley@intusurg.com>
**Sent:** Friday, November 22, 2019 4:30 PM
**To:** AJ Inacay <aj.inacay@intusurg.com>; Lucas Docter <Lucas.Docter@intusurg.com>; Erin Grinberg <Erin.Grinberg@intusurg.com>; Adam Clark <Adam.Clark@intusurg.com>
**Cc:** Kristin Cooke <Kristin.Cooke@intusurg.com>; Bryce Partridge <Bryce.Partridge@intusurg.com>
**Subject:** RE: Marin General- reprocessing Si instruments

Thanks AJ.

Quick update for the group:

- I have been in touch with the following individuals by phone:
  o Dr. James Yu, Urologist and Robotics Medical Director
  o Gabrielle Javier, Robotics Coordinator
  o John Ayers, Perioperative Purchasing Director (brief conversation, meeting with him live next week)

- I support proactively sending the letter, and suggest sending it to the following:
  o Robotics Coordinator – Gabrielle Javier
  o Surgical Services Director – Michael Geremia
  o Chief Medical Officer – Dr. Eric Pifer
  o Robotics Medical Director – Dr. James Yu
  o Chief Executive Officer - Lee Domanico
  o President & Chief Operations Officer - Jon Friedenberg

I'm working to get in front of the C-suite next week. Will keep you posted. Please let us know if/when the letter goes out. Will it be mailed, or via email?

Thanks,

_____
Becky Cokeley
Area Sales Manager

Mobile: 707.637.6931
Becky.Cokeley@intusurg.com

INTUITIVE

1020 Kifer Rd.
Sunnyvale, CA 94086-5304 USA
intuitive.com

Attorneys' Eyes Only

**From:** AJ Inacay <aj.inacay@intusurg.com>
**Sent:** Friday, November 22, 2019 12:27 PM
**To:** Lucas Docter <Lucas.Docter@intusurg.com>; Erin Grinberg <Erin.Grinberg@intusurg.com>; Adam Clark <Adam.Clark@intusurg.com>
**Cc:** Becky Cokeley <Becky.Cokeley@intusurg.com>; Kristin Cooke <Kristin.Cooke@intusurg.com>; Bryce Partridge <Bryce.Partridge@intusurg.com>
**Subject:** RE: Marin General- reprocessing Si instruments

Thank you Erin.  I was able to sync up with Becky yesterday over the phone.

I checked our remanufactured instrument dashboard this morning and 3 remanufactured instruments were used at Marin General Hospital as of yesterday night (Nov 21st).

As we mentioned in the call this morning next steps are:

- Review the patient safety, regulatory, and contractual implications internally – Please let me know if you would like to dig into the details over WebEx
- Coordinate which team member/s will reach out to the account
- Reach out to the account over the phone or in person

Given the current situation at this customer account, we wanted to be proactive and send out a patient safety implications letter.  If you agree to create a patient safety implications letter, please provide/confirm the names which the letter will be addressed to:

- Robotics Coordinator – Gabrielle Javier
- Surgical Services - ?
- Lead Surgeons or Chief Medical Officer – Eric Pifer
- C-Suite  - Lee Domanico

We are free to adjust the addressee list accordingly so please let me know if any adjustments need to be made.  Please do not hesitate to contact me if you have any further questions.

AJ Inacay
Product Marketing Manager – I&A Services

Mobile:   1 925 416 9912
Direct:    1 408 523 7973
aj.inacay@intusurg.com

INTUITIVE

3410 Central Expressway
Santa Clara, CA 95051 USA
intuitive.com

---

**From:** Lucas Docter <Lucas.Docter@intusurg.com>
**Sent:** Friday, November 22, 2019 8:31 AM
**To:** Erin Grinberg <Erin.Grinberg@intusurg.com>; Adam Clark <Adam.Clark@intusurg.com>; AJ Inacay <aj.inacay@intusurg.com>
**Cc:** Becky Cokeley <Becky.Cokeley@intusurg.com>; Kristin Cooke <Kristin.Cooke@intusurg.com>; Bryce Partridge <Bryce.Partridge@intusurg.com>
**Subject:** RE: Marin General- reprocessing Si instruments

Thank you, Erin, and we have been made aware and we are in the process with this account. We will be in contact with each of you. Thanks, LD

---

**From:** Erin Grinberg
**Sent:** Friday, November 22, 2019 11:27 AM
**To:** Adam Clark <Adam.Clark@intusurg.com>; AJ Inacay <aj.inacay@intusurg.com>
**Cc:** Lucas Docter <Lucas.Docter@intusurg.com>; Becky Cokeley <Becky.Cokeley@intusurg.com>; Kristin Cooke <Kristin.Cooke@intusurg.com>; Bryce Partridge <Bryce.Partridge@intusurg.com>
**Subject:** Marin General- reprocessing Si instruments

Adam and AJ,

Becky (ASM) was in Marin's robotic steering committee meeting yesterday where it was brought to her attention that they are using reprocessed instruments.

They are very proud of this and celebrated the cost savings.

We need to take the first step in the process of communication with them.

This would be a verbal from the CSM correct?

Also, AJ have you seen this on the on-site system yet?

Thank you,

Erin Grinberg
Clinical Sales Director-
Northern California & Oregon
916-671-2929  erin.grinberg@intusurg.com
Intuitive.com

Attorneys' Eyes Only

Intuitive-00049112

Exhibit 7

| | |
|---|---|
| **From:** | Lucas Docter [Lucas.Docter@intusurg.com] |
| **Sent:** | 12/2/2019 9:17:53 PM |
| **To:** | Becky Cokeley [Becky.Cokeley@intusurg.com] |
| **CC:** | AJ Inacay [aj.inacay@intusurg.com]; Adam Clark [Adam.Clark@intusurg.com]; Bryce Partridge [Bryce.Partridge@intusurg.com]; Erin Grinberg [Erin.Grinberg@intusurg.com]; Kristin Cooke [Kristin.Cooke@intusurg.com] |
| **Subject:** | Re: Marin General- reprocessing Si instruments |

Thank you, Becky!!

Lucas J Docter
Regional Vice President, U.S. Key Accounts
INTUITIVE
281-639-4897


On Dec 2, 2019, at 7:23 PM, Becky Cokeley <Becky.Cokeley@intusurg.com> wrote:


The letter has been communicated to the individuals outlined below.  AJ, I bcc'd you on the communication.  Please let me know if you have any further questions.


Thanks,


Becky Cokeley
Area Sales Manager

Mobile:  707.637.6931
Becky.Cokeley@intusurg.com

INTUITIVE

1020 Kifer Rd.
Sunnyvale, CA 94086-5304 USA
intuitive.com

**From:** AJ Inacay <aj.inacay@intusurg.com>
**Sent:** Monday, December 2, 2019 12:41 PM
**To:** Adam Clark <Adam.Clark@intusurg.com>; Becky Cokeley <Becky.Cokeley@intusurg.com>; Lucas Docter <Lucas.Docter@intusurg.com>; Bryce Partridge <Bryce.Partridge@intusurg.com>; Erin Grinberg <Erin.Grinberg@intusurg.com>
**Cc:** Kristin Cooke <Kristin.Cooke@intusurg.com>
**Subject:** RE: Marin General- reprocessing Si instruments

Hi Becky,

Apologies for the delay.  Please see the attached patient safety implications letter for Marin General.  Please e-mail this letter to Mr. Pifer, Mr. Domanico and Mr. Friedenberg and cc Gabrielle Javier, Michael Geremia, and Dr. Yu.  Please also forward the e-mail to me or you can bcc me on the outgoing e-mail so we can file it into our records.

Note that the letter has been sent to the customer account via USPS or FedEx and should arrive either tomorrow or the follow day.  Thank you and please let me know if you need any further assistance.

Confidential

P.S. The last remanufactured instrument use at this account was on November 26th

AJ

---

**From:** Adam Clark <Adam.Clark@intusurg.com>
**Sent:** Tuesday, November 26, 2019 8:07 AM
**To:** Becky Cokeley <Becky.Cokeley@intusurg.com>; Lucas Docter <Lucas.Docter@intusurg.com>; Bryce Partridge <Bryce.Partridge@intusurg.com>; AJ Inacay <aj.inacay@intusurg.com>; Erin Grinberg <Erin.Grinberg@intusurg.com>
**Cc:** Kristin Cooke <Kristin.Cooke@intusurg.com>
**Subject:** RE: Marin General- reprocessing Si instruments

Also important for MG to understand that we will be canceling their SLSA in short order if this keeps happening.  How did that go over?

---

**From:** Becky Cokeley <Becky.Cokeley@intusurg.com>
**Sent:** Monday, November 25, 2019 6:31 PM
**To:** Lucas Docter <Lucas.Docter@intusurg.com>; Bryce Partridge <Bryce.Partridge@intusurg.com>; AJ Inacay <aj.inacay@intusurg.com>; Erin Grinberg <Erin.Grinberg@intusurg.com>; Adam Clark <Adam.Clark@intusurg.com>
**Cc:** Kristin Cooke <Kristin.Cooke@intusurg.com>
**Subject:** RE: Marin General- reprocessing Si instruments

Update on Marin from today:

- <!--[if !supportLists]--><!--[endif]-->Met with OR Director and Director of Purchasing today.  They made the decision about Si instrumentation strictly based on finances following a recommendation from a 3rd party consulting firm, ECRI.
- <!--[if !supportLists]--><!--[endif]-->ECRI told Marin they were spending $294,000 per year on *Si instrument repairs*.  We talked through this in the meeting today and clarified that Intuitive does not repair our Si instruments.  We believe the $294,000 might be the total of Marin's I&A spend for the past year – but I'm waiting on Customer Service to help confirm this.  We also reviewed dollars spent this year on Advanced Exchange.
- <!--[if !supportLists]--><!--[endif]-->The company they are using for the Si instrument remanufacture is **SIS – Surgical Instrument Service Co, Inc.**
- <!--[if !supportLists]--><!--[endif]-->This company claims to have 2 Intuitive engineers working for them and says they are already doing business with Kaiser and Banner.
- <!--[if !supportLists]--><!--[endif]-->I have attached 2 documents I got from the customer today:
  - <!--[if !supportLists]--><!--[endif]-->Summary of Quality and Reliability Measures
  - <!--[if !supportLists]--><!--[endif]-->Da Vinci EndoWrist Repair FAQs
- <!--[if !supportLists]--><!--[endif]-->I got a brief look at their pricing structure, which appears to be 40-50% discount.  The MCS was $1700 on this price list, for example.
- <!--[if !supportLists]--><!--[endif]-->The customer does not want to risk patient safety, and after our dialogue, suggested that perhaps they made this decision based on false information about repairs.
- <!--[if !supportLists]--><!--[endif]-->Once I have a chance to send the follow-up to Marin, we'll give them a day or so to digest and then circle back to see what their decision will be moving forward.

Happy to discuss any specifics or questions live.  Have a great night,

---

Becky Cokeley
Area Sales Manager

Confidential

Mobile:  707.637.6931
Becky.Cokeley@intusurg.com

INTUITIVE

1020 Kifer Rd.
Sunnyvale, CA 94086-5304 USA
intuitive.com

**From:** Lucas Docter <Lucas.Docter@intusurg.com>
**Sent:** Monday, November 25, 2019 9:29 AM
**To:** Bryce Partridge <Bryce.Partridge@intusurg.com>; Becky Cokeley <Becky.Cokeley@intusurg.com>; AJ Inacay
<aj.inacay@intusurg.com>; Erin Grinberg <Erin.Grinberg@intusurg.com>; Adam Clark <Adam.Clark@intusurg.com>
**Cc:** Kristin Cooke <Kristin.Cooke@intusurg.com>
**Subject:** RE: Marin General- reprocessing Si instruments

Agreed, thank you, Becky!!

## Lucas J. Docter

*Regional Vice President, U.S. Key Accounts*
Mobile:  281-639-4897
Lucas.Docter@IntuSurg.com

INTUITIVE

**From:** Bryce Partridge <Bryce.Partridge@intusurg.com>
**Sent:** Friday, November 22, 2019 8:14 PM
**To:** Becky Cokeley <Becky.Cokeley@intusurg.com>; AJ Inacay <aj.inacay@intusurg.com>; Lucas Docter
<Lucas.Docter@intusurg.com>; Erin Grinberg <Erin.Grinberg@intusurg.com>; Adam Clark <Adam.Clark@intusurg.com>
**Cc:** Kristin Cooke <Kristin.Cooke@intusurg.com>
**Subject:** RE: Marin General- reprocessing Si instruments

Becky,

I know this has consumed your last couple of days.....thank you on behalf of the team for handling such a sensitive
subject and also thinking strategically about leveraging this into an Executive meeting.....who knows, Xi discussion?!?!?

Have a great weekend

Bryce Partridge
Area Sales Director – West

Mobile:  949-287-9272
Bryce.Partridge@intusurg.com

INTUITIVE

1020 Kifer Rd.
Sunnyvale, CA 94086-5304 USA
intuitive.com

Intuitive-00110475

**From:** Becky Cokeley <Becky.Cokeley@intusurg.com>
**Sent:** Friday, November 22, 2019 4:30 PM
**To:** AJ Inacay <aj.inacay@intusurg.com>; Lucas Docter <Lucas.Docter@intusurg.com>; Erin Grinberg <Erin.Grinberg@intusurg.com>; Adam Clark <Adam.Clark@intusurg.com>
**Cc:** Kristin Cooke <Kristin.Cooke@intusurg.com>; Bryce Partridge <Bryce.Partridge@intusurg.com>
**Subject:** RE: Marin General- reprocessing Si instruments

Thanks AJ.

Quick update for the group:

- <!--[if !supportLists]--><!--[endif]-->I have been in touch with the following individuals by phone:
  - <!--[if !supportLists]--><!--[endif]-->Dr. James Yu, Urologist and Robotics Medical Director
  - <!--[if !supportLists]--><!--[endif]-->Gabrielle Javier, Robotics Coordinator
  - <!--[if !supportLists]--><!--[endif]-->John Ayers, Perioperative Purchasing Director (brief conversation, meeting with him live next week)

- <!--[if !supportLists]--><!--[endif]-->I support proactively sending the letter, and suggest sending it to the following:
  - <!--[if !supportLists]--><!--[endif]-->Robotics Coordinator – Gabrielle Javier
  - <!--[if !supportLists]--><!--[endif]-->Surgical Services Director – Michael Geremia
  - <!--[if !supportLists]--><!--[endif]-->Chief Medical Officer – Dr. Eric Pifer
  - <!--[if !supportLists]--><!--[endif]-->Robotics Medical Director – Dr. James Yu
  - <!--[if !supportLists]--><!--[endif]-->Chief Executive Officer - Lee Domanico
  - <!--[if !supportLists]--><!--[endif]-->President & Chief Operations Officer - Jon Friedenberg

I'm working to get in front of the C-suite next week.  Will keep you posted.  Please let us know if/when the letter goes out.  Will it be mailed, or via email?

Thanks,

_____
Becky Cokeley
Area Sales Manager

Mobile:  707.637.6931
Becky.Cokeley@intusurg.com

INTUITIVE

1020 Kifer Rd.
Sunnyvale, CA 94086-5304 USA
intuitive.com

**From:** AJ Inacay <aj.inacay@intusurg.com>
**Sent:** Friday, November 22, 2019 12:27 PM
**To:** Lucas Docter <Lucas.Docter@intusurg.com>; Erin Grinberg <Erin.Grinberg@intusurg.com>; Adam Clark <Adam.Clark@intusurg.com>
**Cc:** Becky Cokeley <Becky.Cokeley@intusurg.com>; Kristin Cooke <Kristin.Cooke@intusurg.com>; Bryce Partridge <Bryce.Partridge@intusurg.com>
**Subject:** RE: Marin General- reprocessing Si instruments

Thank you Erin.  I was able to sync up with Becky yesterday over the phone.

Intuitive-00110476

I checked our remanufactured instrument dashboard this morning and 3 remanufactured instruments were used at Marin General Hospital as of yesterday night (Nov 21st).

As we mentioned in the call this morning next steps are:

- <!--[if !supportLists]--><!--[endif]-->Review the patient safety, regulatory, and contractual implications internally – Please let me know if you would like to dig into the details over WebEx
- <!--[if !supportLists]--><!--[endif]-->Coordinate which team member/s will reach out to the account
- <!--[if !supportLists]--><!--[endif]-->Reach out to the account over the phone or in person

Given the current situation at this customer account, we wanted to be proactive and send out a patient safety implications letter.  If you agree to create a patient safety implications letter, please provide/confirm the names which the letter will be addressed to:

- <!--[if !supportLists]--><!--[endif]-->Robotics Coordinator – Gabrielle Javier
- <!--[if !supportLists]--><!--[endif]-->Surgical Services - ?
- <!--[if !supportLists]--><!--[endif]-->Lead Surgeons or Chief Medical Officer – Eric Pifer
- <!--[if !supportLists]--><!--[endif]-->C-Suite  - Lee Domanico

We are free to adjust the addressee list accordingly so please let me know if any adjustments need to be made.  Please do not hesitate to contact me if you have any further questions.

AJ Inacay
Product Marketing Manager – I&A Services

Mobile:   1 925 416 9912
Direct:   1 408 523 7973
aj.inacay@intusurg.com

INTUITIVE

3410 Central Expressway
Santa Clara, CA 95051 USA
intuitive.com

---

**From:** Lucas Docter <Lucas.Docter@intusurg.com>
**Sent:** Friday, November 22, 2019 8:31 AM
**To:** Erin Grinberg <Erin.Grinberg@intusurg.com>; Adam Clark <Adam.Clark@intusurg.com>; AJ Inacay <aj.inacay@intusurg.com>
**Cc:** Becky Cokeley <Becky.Cokeley@intusurg.com>; Kristin Cooke <Kristin.Cooke@intusurg.com>; Bryce Partridge <Bryce.Partridge@intusurg.com>
**Subject:** RE: Marin General- reprocessing Si instruments

Thank you, Erin, and we have been made aware and we are in the process with this account.  We will be in contact with each of you.  Thanks, LD

---

**From:** Erin Grinberg
**Sent:** Friday, November 22, 2019 11:27 AM
**To:** Adam Clark <Adam.Clark@intusurg.com>; AJ Inacay <aj.inacay@intusurg.com>
**Cc:** Lucas Docter <Lucas.Docter@intusurg.com>; Becky Cokeley <Becky.Cokeley@intusurg.com>; Kristin Cooke

Intuitive-00110477

<Kristin.Cooke@intusurg.com>; Bryce Partridge <Bryce.Partridge@intusurg.com>
**Subject:** Marin General- reprocessing Si instruments

Adam and AJ,

Becky (ASM) was in Marin's robotic steering committee meeting yesterday where it was brought to her attention that they are using reprocessed instruments.

They are very proud of this and celebrated the cost savings.

We need to take the first step in the process of communication with them.

This would be a verbal from the CSM correct?

Also, AJ have you seen this on the on-site system yet?

Thank you,

Erin Grinberg
Clinical Sales Director-
Northern California & Oregon
916-671-2929 erin.grinberg@intusurg.com
Intuitive.com

Confidential

# Exhibit 8

**From**: Woody Groves [Woody.Groves@intusurg.com]
**Sent**: 9/14/2019 9:22:33 AM
**To**: Matt Heick [Matt.Heick@intusurg.com]
**CC**: AJ Inacay [aj.inacay@intusurg.com]; Jennifer Scott [Jennifer.scott@intusurg.com]
**Subject**: Re: [EXTERNAL] FW: da Vinci EndoWrist Savings Opportunity (MS4788 - Surgical Instrument Repair)

Thanks Matt.   AJ, call me on Monday if you get a minute.

Sent from my iPhone
Woody Groves

On Sep 14, 2019, at 10:14 AM, Matt Heick <Matt.Heick@intusurg.com> wrote:

AJ,

Can you provide my team with assistance on dealing with SIS.  They are attempting to reprocess instruments at UF Shands.

Thank you,

Matt Heick
Clinical Sales Director
GA-SC-North FL

Direct: 678.938.0102
Matt.heick@intusurg.com

Intuitive Surgical
5655 Spalding Drive
Peachtree Corners, GA 30092

<image002.jpg>

---

**From:** Woody Groves <Woody.Groves@intusurg.com>
**Sent:** Friday, September 13, 2019 6:09 PM
**To:** Matt Heick <Matt.Heick@intusurg.com>
**Subject:** Re: [EXTERNAL] FW: da Vinci EndoWrist Savings Opportunity (MS4788 - Surgical Instrument Repair)

Thanks Matt.  Who do I need to talk to? I'm on vacation next week.

Sent from my iPhone
Woody Groves

On Sep 13, 2019, at 5:46 PM, Matt Heick <Matt.Heick@intusurg.com> wrote:

Woody,

Thanks for brining to my attention.  We have a formal internal process for these situations.  Let me know if you have further issues after connecting with our internal folks or if you see this surface in other accounts.

This would void their current warranty and creates patient safety issues.   Happy to discuss next week upon my return from vacation...

Confidential

Matt Heick
Clinical Sales Director
GA-SC-North FL

Direct: 678.938.0102
Matt.heick@intusurg.com

Intuitive Surgical
5655 Spalding Drive
Peachtree Corners, GA 30092

<image003.jpg>

---

**From:** Woody Groves <Woody.Groves@intusurg.com>
**Sent:** Friday, September 13, 2019 8:04 AM
**To:** Anna Samples <Anna.Samples@intusurg.com>; Jennifer Scott <Jennifer.scott@intusurg.com>; Matt Heick <Matt.Heick@intusurg.com>
**Subject:** Fwd: [EXTERNAL] FW: da Vinci EndoWrist Savings Opportunity (MS4788 - Surgical Instrument Repair)

FYI.    I'm researching our answer and response now.

Sent from my iPhone
Woody Groves

Begin forwarded message:

**From:** "Watkins, Dawn E." <WATKID@shands.ufl.edu>
**Date:** September 12, 2019 at 6:25:19 PM EDT
**To:** Woody Groves <Woody.Groves@intusurg.com>
**Cc:** "Wigglesworth, Susan J." <wiggsj@shands.ufl.edu>
**Subject: [EXTERNAL] FW: da Vinci EndoWrist Savings Opportunity (MS4788 - Surgical Instrument Repair)**

Hi Woody,

Who needs a sales force when you're on a GPO contract?  ☺

Can you help us confirm if the use of a refurbished EndoWrist would have a negative impact on our warranty?

A quick response would be great.  At this rate, we'll be asked again by Monday.

Best regards,
Dawn

Dawn Watkins, MBA, CMRP
Director of Strategic Sourcing
UF Health Shands
watkid@shands.ufl.edu
Cell: 352-246-2500

---

**From:** Cassidy,Manuela <manuela.cassidy@vizientinc.com>
**Sent:** Thursday, September 12, 2019 4:37 PM
**To:** Carroll-Mazeli, Andy <Andy.Carroll-Mazeli@jax.ufl.edu>; Wigglesworth, Susan J. <wiggsj@shands.ufl.edu>
**Cc:** Alltop, Shirley <alltos@shands.ufl.edu>; Watkins, Dawn E. <WATKID@shands.ufl.edu>; Mele, Christopher <Christopher.Mele@jax.ufl.edu>; Story,Vicky <Vicky.Story@vizientinc.com>; Price,John <john.price@vizientinc.com>
**Subject:** RE: da Vinci EndoWrist Savings Opportunity (MS4788 - Surgical Instrument Repair)

**CAUTION! This email came from outside UF or UF Health. Exercise extra caution clicking links and opening attachments from any and all senders.**

Hi Andy and Susan,

Julie Birdsong, Implementation Services, Senior Director would like to know if you have any interest in setting-up a call with SIS to learn more about his category?  She is looking at setting-up a time for next week. Can you please provide me your feedback?

Many thanks,
Manuela

---

**From:** Cassidy,Manuela
**Sent:** Monday, September 9, 2019 3:47 PM
**To:** 'Carroll-Mazeli, Andy' <Andy.Carroll-Mazeli@jax.ufl.edu>; Wigglesworth, Susan J. <wiggsj@shands.ufl.edu>
**Cc:** 'Alltop, Shirley' <alltos@shands.ufl.edu>; 'Watkins, Dawn E.' <WATKID@shands.ufl.edu>; Mele, Christopher <Christopher.Mele@jax.ufl.edu>; Story,Vicky <Vicky.Story@vizientinc.com>; Price,John <john.price@vizientinc.com>
**Subject:** da Vinci EndoWrist Savings Opportunity (MS4788 - Surgical Instrument Repair)

Andy and Susan,

Two of our members, Kaiser Permanente and Legacy Health System are capturing savings by using Intuitive Surgical Endowrist refurbishment products. Surgical Instrument Service Company (SIS) is now the only supplier providing refurbishment to Intuitive Surgical's da Vinci EndoWrist. SIS offers a refurbished da Vinci EndoWrist at approximately 40% savings.

Since Intuitive Surgical is an off contract vendor, there's incremental GPO volume associated with moving that spend to SIS for refurbishment in addition to over 40% on line item savings.

Please see attached initial proposed savings. Please let me know if I can schedule an onsite presentation to learn more about this category and clarify additional questions.

Thanks,

Manuela Cassidy, MBA
Enterprise Client Manager
M (904) 608-7831
manuela.cassidy@vizientinc.com

---

E-MAIL CONFIDENTIALITY NOTICE: The information transmitted in this e-mail and in any replies and forwards are for the sole use of the above individual(s) or entities and may contain proprietary, privileged and/or highly confidential information. Any unauthorized dissemination, review, distribution or copying of these communications is strictly prohibited. If this e-mail has been transmitted to you in error, please notify and return the original message to the sender immediately at the above listed address. Thank you for your cooperation.

---

Intuitive-00110257

NOTE THAT THIS EMAIL ORIGINATED FROM OUTSIDE OF INTUITIVE SURGICAL..
Be alert for fraudulent emails that spoof internal "@intusurg.com" email addresses. Report these or other security threats to:
ITHelpNow@intusurg.com.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **FILER'S ATTESTATION**

I, Kenneth A. Gallo, am the ECF User whose ID and password are being used to file this document.  In compliance with Civil Local Rule 5-1(i)(3), I hereby attest that the signatories identified above have concurred in this filing.

Dated:  November 11, 2024

By: /s/ *Kenneth A. Gallo*
    Kenneth A. Gallo

Kenneth A. Gallo (*pro hac vice*)
**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
2001 K Street, NW
Washington, DC  20006-1047
Telephone:  (202) 223-7300
Facsimile:  (202) 204-7420
Email: kgallo@paulweiss.com

*Attorney for Defendant*
*Intuitive Surgical, Inc.*