Kenneth A. Gallo (*pro hac vice*)
Paul D. Brachman (*pro hac vice*)
**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
2001 K Street, NW
Washington, DC 20006-1047
Telephone: (202) 223-7300
Facsimile: (202) 223-7420
Email: kgallo@paulweiss.com
Email: pbrachman@paulweiss.com

William B. Michael (*pro hac vice*)
Crystal L. Parker (*pro hac vice*)
Daniel A. Crane (*pro hac vice*)
**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
Email: wmichael@paulweiss.com
Email: cparker@paulweiss.com
Email: dcrane@paulweiss.com

Joshua Hill Jr. (SBN 250842)
**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
535 Mission Street, 24th Floor
San Francisco, CA 94105
Telephone: (628) 432-5100
Facsimile: (628) 232-3101
Email: jhill@paulweiss.com

*Attorneys for Defendant Intuitive Surgical, Inc.*

[Additional counsel listed on signature page]

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| SURGICAL INSTRUMENT SERVICE COMPANY, INC., <br><br> *Plaintiff*, <br><br> v. <br><br> INTUITIVE SURGICAL, INC., <br><br> *Defendant*. | Case No. 3:21-cv-03496-AMO <br><br> **DEFENDANT'S NOTICE OF MOTION AND MOTION IN LIMINE NO. 2 TO EXCLUDE DEUTSCHE BANK ANALYST REPORTS AND RELATED TESTIMONY** <br><br> Date: November 25, 2024 <br> Time: 11:00 a.m. <br> Courtroom: 10 <br><br> The Honorable Araceli Martínez-Olguín |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## NOTICE OF MOTION AND MOTION

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on November 25, 2024 at 11:00 a.m., or as soon thereafter as this matter may be heard before the Honorable Araceli Martínez-Olguín, District Judge in the United States District Court for the Northern District of California, at 450 Golden Gate Avenue, Courtroom 10, 19th Floor, San Francisco, CA 94102, Defendant Intuitive Surgical, Inc. ("Intuitive") will and hereby does move the Court for an order prohibiting: (1) Plaintiff Surgical Instrument Service Co., Inc. ("SIS") from either introducing into evidence or referencing the Deutsche Bank analyst reports dated January 27, 2020 and February 20, 2020 (the "Reports"); and (2) Plaintiff SIS's experts from incorporating the opinions of the Reports' authors as part of those experts' own opinions.

This Motion is made on the grounds that federal statutes and case law, including but not limited to Fed. R. Evid. 403, 701, 702, 801, and 802, authorize the relief that Intuitive seeks. This Motion is based upon this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities in support thereof, the accompanying Declaration of Paul D. Brachman and attached exhibits, any reply or other supplemental briefing, and the oral argument of counsel.

SIS intends to try to prejudice Intuitive at trial by introducing and relying on two Deutsche Bank analyst reports, dated January 27, 2020 and February 20, 2020, Exs. 1-2,[1] that opine, without any reliable basis, on issues such as the "safety risk" posed by unauthorized third-party modification of EndoWrists, the "FDA's stance on third-party servicing of medical devices," and the "implications" of then-ongoing litigation between Intuitive and third-party repair provider Restore. Ex. 1 at -2997, -2999. The lack of reliability of these opinions is apparent on the face of the actual reports. To begin, the reports were authored by financial analysts who plainly have no expertise in matters such as medical device safety and FDA regulations, and were never proffered as experts to testify on those subjects in this case. In addition, each report comes with an express disclaimer that Deutsche Bank "may have a conflict of interest that could affect the objectivity of this report," and each states that "Deutsche Bank makes no representation as to its accuracy or completeness." *See, e.g.*, *id.* at -2993, -3010. For these and other reasons, the court in a substantially similar antitrust lawsuit against Intuitive involving "repaired" EndoWrists precluded the plaintiff and its experts in that case from introducing and relying on the very same Deutsche Bank reports.

Nonetheless, SIS seeks to admit these reports into evidence for the truth of the matters asserted, and its experts seek to incorporate the authors' opinions as part of those experts' own opinions. For example, SIS expert Russell Lamb relies on the January 27, 2020 Deutsche Bank report as "[e]vidence . . . that the EndoWrist surgical instruments repaired by third parties such as SIS were viewed as functionally equivalent to the replacement EndoWrist surgical instruments sold by Intuitive." Ex. 3 at 81. Dr. Lamb also adopts wholesale the Deutsche Bank analyst's opinion that "there was '[n]o evidence that repaired da Vinci instruments specifically pose a risk to patient safety – in fact, au contraire.'" *Id.* He further quotes the January 27 report as the basis for his opinion that "'[b]ottom line regarding safety is that, despite Intuitive's view on this point, any material threat to patient safety would surely have prompted immediate FDA field action to

---

[1] All references to "Ex." refer to exhibits to the Declaration of Paul D. Brachman in Support of Defendant's Motion in Limine No. 2 to Exclude Deutsche Bank Analyst Reports and Related Testimony.

stop their usage, which has not been the case.'" *Id.*  And he quotes and relies on purported "feedback" received from unidentified surgeons. *Id.* at n.323.  In addition, SIS expert Richard Bero relies on the February 20, 2020 Deutsche Bank report for portions of his damages opinion, including the report's assertion that "each [EndoWrist] Instrument could be repaired three times." Ex. 4 at 52.

SIS should be precluded from introducing these analyst reports into evidence because they contain multiple layers of inadmissible hearsay, as well as improper lay and/or expert opinions, and because any probative value they may have is substantially outweighed by the risk of unfair prejudice.[2]  Similarly, SIS's experts should not be permitted to introduce this unsubstantiated hearsay to the jury under the guise of their own opinions because it is inherently unreliable and not of a type reasonably relied upon by experts in forming opinions on the subject.  The use of such opinions at trial by SIS can only confuse, mislead and prejudice the jury.  Thus, the reports, and all related testimony or arguments concerning the opinions in the reports, should be excluded.

## I.  THE REPORTS CONSTITUTE INADMISSIBLE HEARSAY

The Deutsche Bank analyst reports consist entirely of statements made outside of court that are being offered to prove the truth of the matters asserted, and thus are textbook examples of inadmissible hearsay under Federal Rule of Evidence 801/802.  *See, e.g.*, *In re Sybase, Inc. Sec. Litig.*, 48 F. Supp. 2d 958, 960 (N.D. Cal. 1999).  Indeed, the analyst reports are replete with statements purportedly made by unidentified "surgeons and supply chain executives," which constitute inadmissible double-hearsay. Ex. 1 at -2993.  Nor are the reports subject to any hearsay exception.

They do not fall under the exception for "Market Reports and Similar Commercial Publications" (Fed. R. Evid. 803(17)) because they are not "objective compilations of easily ascertainable facts of the sort contemplated by [Rule 803(17)]," but instead consist of subjective opinions and conclusions.  *JIPC Mgmt., Inc.* v. *Incredible Pizza Co.*, 2009 WL 8591607, at *24 (C.D. Cal. July 14, 2009).  As the court noted in *Bianco* v. *Globus Med., Inc.*, although such "stock

---

[2] SIS also should be precluded from entering into evidence any testimony concerning the content of these reports, including but not limited to the deposition testimony of Imron Zafar, the Deutsche Bank analyst who had primary responsibility for preparing the reports.

analyst reports" may "contain some objective information, they [also] contain a substantial amount of subjective analysis of [defendant medical device manufacturer], its prospects, and its position in the market for medical devices," and thus "do not fall within the scope of Rule 803(17)."  2014 WL 119285, at *1-2 (E.D. Tex. Jan. 12, 2014).

The Deutsche Bank analyst reports also are not admissible under the "Business Records" exception (Fed. R. Evid. 803(6)).  Documents are not "business records" merely because they are found in the files of a business entity.  Rather, for a document to qualify as a "business record" under Rule 803(6), it must satisfy each of the following three criteria: (1) it must be the regular practice of the business entity to make such documents, (2) the documents must be made at or near the time by, or from information transmitted by, a person with knowledge, and (3) it must be the regular practice of the business entity to keep such documents.  *See* Fed. R. Evid. 803(6).  Moreover, even where these three criteria are met, if "the source of information or the method or circumstances of preparation indicate lack of trustworthiness," the document still must be precluded.  *See id.*  Based on these factors, it is well-settled that analyst reports do not qualify as business records for purposes of Rule 803(6).  *See, e.g.*, *In re Cirrus Logic Sec. Litig.*, 946 F. Supp. 1446, 1468–69 (N.D. Cal. 1996) (rejecting plaintiffs' argument that analyst reports were admissible under the business records exception to the hearsay rule).

That the Deutsche Bank analyst reports are not sufficiently reliable to be admitted for the truth of the matter asserted is evidenced by the fact that the reports themselves contain disclaimers noting that the information contained in them may not be reliable.  Indeed each report includes an express disclaimer that "Deutsche Bank makes no representation as to [the report's] accuracy or completeness."  *See, e.g.*, Ex. 1 at -3010.  In essence, the reports are marketing tools used to promote the brokerage firm's products.  Marketing tools, by their very nature, lack the level of reliability required to surmount the hearsay rule.

Compounding the unreliability of the reports is the fact that Deutsche Bank (or its analysts) may have an added incentive in rating the stock, either because it may have a long or short position in the security, or because it may have an investment banking relationship with the company—or with a competitor—that it wishes to enhance.  Indeed, each report includes an express disclaimer

that Deutsche Bank "may have a conflict of interest that could affect the objectivity of this report." *See, e.g.*, *id.* at -2993. This potential conflict of interest further renders the analyst reports less than reliable. There simply is no justification for introducing hearsay dripping with such self-motivation.[3]

For these same reasons, the Deutsche Bank reports lack "sufficient guarantees of trustworthiness" to qualify for the residual hearsay exception under Fed. R. Evid. 807. *See, e.g.*, *In re Zetia (Ezetimibe) Antitrust Litig.*, 2023 WL 4156858, at *4 (E.D. Va. Apr. 5, 2023) (finding that "financial analysts' reports . . . prepared as guidance for valuing the company's stock . . . are replete with double hearsay and do not fit within any hearsay exception").

## II.    THE REPORTS CONSTITUTE IMPROPER LAY AND EXPERT TESTIMONY

The Deutsche Bank analyst reports are independently inadmissible under Rules 701 and 702 since they are either improper lay opinion or improper expert opinion. The very fact that SIS's own experts have adopted wholesale certain opinions in the reports—and purport to offer them as evidence in support of those experts' opinions on the same subjects—illustrates that the opinions expressed in the reports require the sort of specialized knowledge reserved for expert testimony. That is why the court in *Zetia*—a case involving claims that two pharmaceutical companies conspired to delay generic competition for the branded cholesterol medication Zetia—found that financial analyst reports opining on the strength and merits of the issues in the litigation not only constitute inadmissible hearsay, but also "constitute undisclosed expert opinion." *Id.* Here, the Deutsche Bank reports opine on, among other things, hospital demand for third-party "repaired" EndoWrists, the safety risk posed by those repairs, and whether FDA approval is required for such

---

[3] In attempting to defend the objectivity of the Deutsche Bank analyst reports, SIS's expert Dr. Lamb provided an additional reason for why they are untrustworthy. Dr. Lamb testified that "at the time that Deutsche Bank wrote its analyst report, its incentives would be in a different position than that of a deponent once a lawsuit has been filed which might be, might create a different outcome for the stock of a company that an analyst had offered an opinion about. . . . [O]ne of the things that's useful about analyst reports like this, that are historical in nature, is that they predate any litigation that we're looking at in a way that makes the, makes the analysis more objective." Ex. 5 at 93:9-23. In fact, both of the Deutsche Bank reports post-date the filing of an antitrust lawsuit against Intuitive by a third-party repair company (Restore Robotics). And, that lawsuit—and its "implications" for Intuitive and its business—are expressly discussed in the reports. *See, e.g.*, Ex. 1 at -2999. According to Dr. Lamb's own reasoning, that causes the reports to be less than objective.

repairs.  *See, e.g.*, Ex. 1 at -2995-98.  Yet the reports do not sufficiently detail the facts, data, principles or methods used to arrive at their conclusions on these subjects, falling well short of Rule 702's requirements.  The reports, in fact, expressly disclaim any objectivity or reliability.  And none of the authors of the reports were ever disclosed as experts under Fed. R. Civ. P. 26(a)(2).  Thus, the reports do not come close to satisfying the stringent requirements of Rule 702.

Nor can SIS disguise the reports as lay opinion under Rule 701.  Lay witnesses may testify as to their opinions only if the testimony is "rationally based on the witness's perception," is "helpful to clearly understanding the witness's testimony or to determining a fact in issue," and is "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."  Fed. R. Evid. 701.  The Deutsche Bank reports fail each prong of this test.  Deutsche Bank purports to reach the opinions in its reports based on "conversations with several da Vinci surgeons and supply chain executives," as well as from their review and interpretation of an "FDA Report on the Quality, Safety, and Effectiveness of Servicing of Medical Devices" and "the FDA's MAUDE database."  Ex. 1 at -2993, -2997-98.  There is no witness whose perception yielded the reports' conclusions because the "da Vinci surgeons and supply chain executives" purportedly interviewed are unidentified and unknown.  Nor does an investment analyst's review of FDA documents and databases help to better understand the meaning of those documents.  Moreover, the reports are replete with opinions that are subject to Rule 702, and SIS cannot use purported lay testimony as an end-run around Rule 702's reliability requirements and the Federal Rules of Civil Procedure's disclosure requirements.  *See Hirst* v. *Inverness Hotel Corp.*, 544 F.3d 221, 227 (3d Cir. 2008).

The deposition testimony of Mr. Zafar, the Deutsche Bank analyst who had primary responsibility for preparing the reports, further confirms these infirmities.  Mr. Zafar conceded that the reports reflect his own "conclusions and opinions" based on interviews with individuals he could not name or identify. Ex. 6 at 39:17-40:4, 85:12-86:2.  And he acknowledged that his "basis for concluding that any material threat to patient safety would have prompted . . . FDA action" was simply his own "logic."  *Id.* at 84:11-85:7.  The mere fact that Mr. Zafar repeated in his deposition testimony many of the same improper opinions as in the reports does not cause those opinions to pass muster under Rules 701 and 702.  His deposition testimony suffers from the same

flaws as the reports themselves and should be excluded for the same reasons. Indeed, in his deposition, Zafar went beyond the opinions set forth in the reports themselves, and opined that Intuitive is a "monopolist." *Id.* at 16:15-21, 17:23-18:6, 28:22-25, 215:20-25. As a research analyst for a financial institution, he plainly does not possess the specialized knowledge necessary to reach such an opinion—which is one of the principal subjects of expert economic testimony in this case, as in nearly every antitrust case—and even if he did, such testimony still would run afoul of Rule 702 and Federal Rule of Civil Procedure 26(a)(2).

## III.   THE REPORTS SHOULD BE EXCLUDED UNDER RULE 403

The Deutsche Bank analyst reports also should be excluded under Rule 403 because whatever probative value they have (which is zero or close to it) is substantially outweighed by the risk of unfair prejudice. The reports have no probative value because they are based on an incomplete record and the "da Vinci surgeons and supply chain executives" purportedly interviewed are unknown and unidentified. Ex. 1 at -2993. The reports do not even include any quotes attributed to those unidentified witnesses, much less any representation—or even suggestion—that the summary of what they said is complete and accurate. And Deutsche Bank does not claim to have spoken to anyone at the FDA before reaching its opinion that the "FDA's comfort around this practice regarding patient safety is quite clear." *Id.*

Despite these fatal infirmities, there is a real risk that the jury will have the misimpression that the reports are authoritative because they come from a well-known financial institution, or are a surrogate for the actual views of surgeons, hospitals and/or the FDA. Indeed, SIS's own experts appear to be under this misimpression, or else are trying to invite it. Dr. Lamb, for instance, testified that "how I view the reports is whoever's name is attached as an author is secondary, to me, to the imprimatur of Deutsche Bank." Ex. 5 at 90:13-16. But the notion that the opinions in these reports carry Deutsche Bank's "imprimatur" is misleading at best. The reports themselves say that they "reflect the personal views of the undersigned lead analyst(s)," and "do not necessarily reflect the opinions of Deutsche Bank." Ex. 1 at -3008, -3010. SIS's intended use of these reports can thus only sow confusion with the jury, as reflected by Dr. Lamb's testimony.

1

2

## IV.  SIS'S EXPERTS SHOULD BE PROHIBITED FROM ACTING AS A MOUTHPIECE FOR THIS INADMISSIBLE EVIDENCE

Finally, SIS's experts should likewise be prohibited from acting as a mouthpiece for this inadmissible evidence.  This is a blatant attempt to introduce hearsay to the jury "under the guise that the testifying expert used the hearsay as the basis of his testimony."  *Malletier* v. *Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 666 (S.D.N.Y. 2007).  Indeed, in *Rebotix Repair, LLC* v. *Intuitive Surgical, Inc.*, the court rejected an attempt by another third-party repair company (Rebotix) to introduce the very same January 27, 2020 Deutsche Bank analyst report through its expert witness.  *See* 2022 WL 3226794, at *5 (M.D. Fla. Aug. 10, 2022).  There, the expert sought to rely on the report for his opinion that "companies like Rebotix do not need Section 510(k) clearance."  *Id.*  The court noted that while "Rule 703 provides that an expert may base his opinion on inadmissible facts or data, including hearsay, it must be of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject," and that although "courts have afforded experts wide latitude in picking and choosing sources on which to base opinions, Rule 703 nonetheless requires courts to examine the reliability of these sources."  *Id.* (citation and internal quotations omitted).  The court found no evidence that "the Deutsche Bank report is of a type reasonably relied upon by experts in the field in forming their opinions," and thus "to the extent [the expert] wishes to rely on the Deutsche Bank document . . . he may not do so."  *Id.* (internal quotations omitted).  The same result is merited here.

For these reasons, SIS should not be permitted to use Rule 703 as a backdoor to disclose otherwise inadmissible hearsay opinions.  *See* 29 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 6273 (2d ed. 2024) ("Rule 703 does not authorize admitting hearsay on the pretense that it is the basis for expert opinion when, in fact, the expert adds nothing to the out-of-court statements other than transmitting them to the jury.").

## CONCLUSION

Intuitive requests that the Court grant this motion.

| | |
|---|---|
| 1 | Dated:  October 28, 2024 |
| 2 | |

By: /s/ *Kenneth A. Gallo*
Kenneth A. Gallo

Kenneth A. Gallo (*pro hac vice*)
Paul D. Brachman (*pro hac vice*)
**PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP**
2001 K Street, NW
Washington, DC  20006-1047
Telephone:  (202) 223-7300
Facsimile:  (202) 223-7420
Email: kgallo@paulweiss.com
Email: pbrachman@paulweiss.com

William B. Michael (*pro hac vice*)
Crystal L. Parker (*pro hac vice*)
Daniel A. Crane (*pro hac vice*)
**PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP**
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone:  (212) 373-3000
Facsimile:  (212) 757-3990
Email: wmichael@paulweiss.com
Email: cparker@paulweiss.com
Email: dcrane@paulweiss.com

Joshua Hill Jr. (SBN 250842)
**PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP**
535 Mission Street, 24th Floor
San Francisco, CA 94105
Telephone:  (628) 432-5100
Facsimile:  (628) 232-3101
Email: jhill@paulweiss.com

Sonya D. Winner (SBN 200348)
**COVINGTON & BURLINGTON LLP**
415 Mission Street, Suite 5400
San Francisco, California 94105-2533
Telephone:  (415) 591-6000
Facsimile:  (415) 591-6091
Email: swinner@cov.com

Kathryn E. Cahoy (SBN 298777)
**COVINGTON & BURLINGTON LLP**
3000 El Camino Real

- 8 -

1      5 Palo Alto Square, 10th Floor
       Palo Alto, California 94306-2112
2      Telephone: (650) 632-4700
       Facsimile: (650) 632-4800
3      Email: kcahoy@cov.com

4
       Andrew Lazerow (*pro hac vice*)
5      **COVINGTON & BURLINGTON LLP**
       One City Center 850 Tenth Street NW
6      Washington DC 20001-4956
       Telephone: (202) 662-6000
7      Facsimile: (202) 662-6291
       Email: alazerow@cov.com
8

9      Allen Ruby (SBN 47109)
       **ALLEN RUBY, ATTORNEY AT LAW**
10     15559 Union Ave. #138
       Los Gatos, California 95032
11     Telephone: (408) 477-9690
       Email: allen@allenruby.com
12

13     Attorneys for *Defendant*
       *Intuitive Surgical, Inc.*
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Defendant's Motion in Limine No. 2 to Exclude Deutsche Bank Analyst Reports
3:21-cv-03496-AMO

1

**CERTIFICATE OF SERVICE**

2

   On October 28, 2024, I caused a copy of Intuitive's Motion in Limine No. 2 to

3

Exclude Deutsche Bank Analyst Reports to be electronically served via email on counsel of

4

record for Surgical Instrument Service Company, Inc.

5

 Dated: October 28, 2024      By: */s/ Kenneth A. Gallo*

6

                    Kenneth A. Gallo

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Kenneth A. Gallo (*pro hac vice*)
Paul D. Brachman (*pro hac vice*)
**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
2001 K Street, NW
Washington, DC  20006-1047
Telephone:  (202) 223-7300
Facsimile:  (202) 223-7420
Email: kgallo@paulweiss.com
Email: pbrachman@paulweiss.com

William B. Michael (*pro hac vice*)
Crystal L. Parker (*pro hac vice*)
Daniel A. Crane (*pro hac vice*)
**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone:  (212) 373-3000
Facsimile:  (212) 757-3990
Email: wmichael@paulweiss.com
Email: cparker@paulweiss.com
Email: dcrane@paulweiss.com

Joshua Hill Jr. (SBN 250842)
**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
535 Mission Street, 24th Floor
San Francisco, CA 94105
Telephone:  (628) 432-5100
Facsimile:  (628) 232-3101
Email: jhill@paulweiss.com

*Attorneys for Defendant Intuitive Surgical, Inc.*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| SURGICAL INSTRUMENT SERVICE COMPANY, INC.,<br>    *Plaintiff*,<br>    v.<br><br>INTUITIVE SURGICAL, INC.,<br>    *Defendant*. | Case No. 3:21-cv-03496-AMO<br><br>**DECLARATION OF PAUL D. BRACHMAN IN SUPPORT OF DEFENDANT'S MOTION IN LIMINE NO. 2 TO EXCLUDE DEUTSCHE BANK ANALYST REPORTS AND RELATED TESTIMONY**<br><br>The Honorable Araceli Martínez-Olguín |

I, PAUL D. BRACHMAN, declare as follows:

      1.      I am an attorney licensed to practice in New York and the District of Columbia, and am admitted *pro hac vice* to practice before this Court.  I am a partner with the law firm of Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul, Weiss"), counsel for Intuitive Surgical, Inc. ("Intuitive") in this matter.  I have personal knowledge of the facts set forth herein, and if called to testify, I could and would testify competently hereto.

      2.      Attached to this declaration as **Exhibit 1** is a true and correct copy of a Deutsche Bank Research report on Intuitive Surgical dated January 27, 2020 and produced at Intuitive-00552993-3014.

      3.      Attached to this declaration as **Exhibit 2** is a true and correct copy of a Deutsche Bank Research report on Intuitive Surgical dated February 20, 2020 and produced at Intuitive-00566055-82.

      4.      Attached to this declaration as **Exhibit 3** is a true and correct copy of the Expert Report of Dr. Russell L. Lamb dated December 2, 2022, which was previously filed on the docket in this matter at Dkt. 230-04.

      5.      Attached to this declaration as **Exhibit 4** is a true and correct copy of the Expert Report of Richard F. Bero dated December 2, 2022, which was previously filed on the docket in this matter with redactions to protect confidential material at Dkt. 229-45.

      6.      Attached to this declaration as **Exhibit 5** is a true and correct copy of excerpts of the transcript of the deposition of Russel Lamb, Ph.D, taken in this matter, on March 20, 2023.

      7.      Attached to this declaration as **Exhibit 6** is a true and correct copy of excerpts of the transcript of the deposition of Imron Zafar taken in the matter of *In re: da Vinci Surgical Robot Antitrust Litigation*, No. 21-cv-03825-AMO (N.D. Cal.), on November 1, 2022.

Dated:  October 28, 2024              By: /s/ *Paul D. Brachman*

                                    PAUL D. BRACHMAN

Brachman Declaration in Support of Defendant's Motion In Limine No. 2 To Exclude Deutsche Bank Analyst Reports and Related Testimony
3:21-cv-03496-AMO

**FILER'S ATTESTATION**

1

2          I, Kenneth A. Gallo, am the ECF User whose ID and password are being used to file this

3   document.  In compliance with Civil Local Rule 5-1(i)(3), I hereby attest that the signatory

4   identified above has concurred in this filing.

5    Dated:  October 28, 2024                    By: /s/ *Kenneth A. Gallo*
                                                     Kenneth A. Gallo
6
                                                  Kenneth A. Gallo (*pro hac vice*)
7                                                 **PAUL, WEISS, RIFKIND, WHARTON &**
                                                  **GARRISON LLP**
8                                                 2001 K Street, NW
                                                  Washington, DC  20006-1047
9                                                 Telephone:  (202) 223-7300
                                                  Facsimile:  (202) 223-7420
10                                                Email: kgallo@paulweiss.com

11                                                *Attorney for Defendant*
                                                  *Intuitive Surgical, Inc.*
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Brachman Declaration in Support of Defendant's Motion In Limine No. 2 To Exclude Deutsche
Bank Analyst Reports and Related Testimony
3:21-cv-03496-AMO

**EXHIBIT 1**

**to**

**PAUL D. BRACHMAN DECLARATION IN SUPPORT OF
DEFENDANT'S MOTION IN LIMINE NO. 2
TO EXCLUDE DEUTSCHE BANK ANALYST REPORTS
AND RELATED TESTIMONY**

Deutsche Bank
Research



Rating
# Hold

North America
**United States**

Health Care
**Medical Supplies & Devices**

Company
# Intuitive Surgical

| Reuters | Bloomberg | Exchange | Ticker |
| ISRG OQ | ISRG US | NMS | ISRG |

Date
27 January 2020

Recommendation Change

| Price at 24 Jan 2020 (USD) | 589.20 |
| Price Target | 595.00 |
| 52-week range | 615.00 - 458.27 |

# New Self-Manufactured Competitive Risk; Downgrade to Hold

**Portfolio Manager Summary**

With impending launch of new surgical robot systems including Medtronic's Hugo, the impact on Intuitive and its ability to sustain growth that has been best-in-class across large cap medtech over the past several years as it faces competition for the first time has been a big area of investor focus. We have remained of the view that Intuitive is well-positioned for sustained leadership in a global surgery market that remains highly underpenetrated and the myriad competitive advantages its decade-plus of market incumbency bestows. However, our work has identified a new competitive threat, one that we expect to effect a an increasingly meaningful headwind to Intuitive's US Instruments & Accessories segment over the next couple years, yet we believe is being fully overlooked by the Street.

Our extensive due diligence spanning several months – including conversations with several da Vinci surgeons and supply chain executives (detailed herein) - yielded confirmation that a growing number of hospital customers, including world-renowned academic centers and even large hospital systems, have begun or are in late stage deliberations/discussions to potentially soon begin using repaired da Vinci instruments supplied by third-parties. Meaningful operating cost savings opportunity is the key driver compelling hospitals to consider using these repaired da Vinci instruments.

Repaired da Vinci instruments were all manufactured by Intuitive and designed to become disabled for use beyond 10x, but third parties like Restore Robotics have developed technologies to repair these used devices, confirm that functionality and condition have been restored to *de novo* specifications, and then ship them back to hospitals for additional use. Notably, these devices are typically reparable up to four times. Third party servicing of medical devices has been ongoing for decades, and FDA's comfort around this practice regarding patient safety is quite clear.

Given the potential impact to its business, not surprisingly Intuitive is pushing back hard against third parties that have now begun engaging in da Vinci instrument repairs. In speaking with Intuitive management, the company posits that device repairing poses a significant risk to patient safety and believes third parties are doing so unlawfully. We heard second-hand accounts from hospitals of Intuitive's commercial team aggressively pushing back including actions to discontinue supplying products and even taking legal action for these customers' engagement

**Valuation & Risks**

Imron Zafar
Research Analyst
+1-212-250-3676

Pito Chickering
Research Analyst
+1-212-250-1245

Justin Bowers
Research Analyst
+1-212-250-2912

| Key changes | | |
| TP | 610.00 to 595.00 ↓ | -2.5% |
| Rating | Buy to Hold ↓ | |
| EPS (USD) | 12.54 to 12.77 ↑ | 1.9% |
| Revenue (USDm) | 4,410 to 4,478 ↑ | 1.6% |
| Source: Deutsche Bank | | |

---

Deutsche Bank Securities Inc.

Deutsche Bank does and seeks to do business with companies covered in its research reports. Thus, investors should be aware that the firm may have a conflict of interest that could affect the objectivity of this report. Investors should consider this report as only a single factor in making their investment decision. DISCLOSURES AND ANALYST CERTIFICATIONS ARE LOCATED IN APPENDIX 1. MCI (P) 066/04/2019.

Distributed on: 27/01/2020 10:03:08 GMT

27 January 2020
Medical Supplies & Devices
Intuitive Surgical



with suppliers of repaired instruments. At the same time, in our conversations with surgeons who have started using repaired instruments, these hospitals have not experienced blowback from Intuitive regarding this.

While the longer term impact will ultimately be dependent to a large extent on outcomes of ongoing litigation, our checks indicate that utilization of repaired robotic instruments is starting to get traction. Having been commercially active in this segment for only about a year, we believe Restore Robotics' customer base currently comprises a few dozen hospitals, which in the context of the US market broadly equates to very modest penetration of Intuitive's installed base.

**However, based on a number of factors we think usage will likely continue to expand at an accelerating pace and thereby become an increasingly material headwind to Intuitive's business over the next couple years. Our top-line impact analysis detailed in this note suggests that, even conservatively assuming just 4-5% unit penetration of *de novo* instruments, this headwind could negatively impact total company top line growth to the tune of 3-4% in 2021.**

**Updating revenue and earnings forecasts; downgrading to Hold.** We have updated our model to account for the impact of this headwind from repaired instruments, specifically by decreasing our presumed revenue per procedure – only slightly for 2020 and more meaningfully in 2021. Our updated revenue and estimates also contemplate 2020 guidance metrics and commentary provided on last week's 4Q earnings call. Notably, the company's outlook on margins and expenses for the year drove some meaningful revisions to our P&L assumptions including tempered GM, higher opex levels than we had previously assumed, and a somewhat higher effective tax rate. All told, our updated 2020 revenue and EPS estimates are $5.028B and $13.58, respectively, versus to $5.041B and $14.35 previously. For 2021, our forecasts go to $5.563B and $15.35, down from $5.703B and $16.50 previously.

Our new price target is $595 (down from $610) and based on a 39x FTM multiple applied to our updated earnings estimate. In light of this emerging new headwind from repaired da Vinci instruments, we are now employing a somewhat lower target multiple versus 42x previously. As such, the shares appear fairly valued at current levels with limited upside potential over the next 12 months, and we are therefore lowering our rating from Buy to Hold. Upside risks include less-than-expected encroachment from repaired instruments on Intuitive's I&A segment, delays in competitor robot launches, and significant upside to procedure forecasts. Downside risks include more significant impact from repaired instruments, greater-than-expected share capture from Medtronic, and slowing procedure growth.

Deutsche Bank Securities Inc.

Confidential

Intuitive-00552994

Provided for the exclusive use of philip.kim2@intuvig.com on 2020-01-27714:45+00:00. DO NOT REDISTRIBUTE

# Adoption likely to accelerate over next couple years



**When asked on the 2Q19 earnings call about the impact of repaired da Vinci instruments on its business, Intuitive noted at that point that it had seen no material impact. However, based on our work, we believe usage of these repaired devices is likely to expand meaningfully across Intuitive's US installed base over the next couple years – thereby having an increasingly negative impact on the company's top line.**

**Expanded offering of repaired instruments.** Instrument repairs are currently limited to products within Intuitive's prior-generation S/Si product family, which based on our analysis address only about a quarter of US I&A segment revenues. However, third-party offerings are expected to be expanded to include corresponding X/Xi devices imminently, thereby increasing the addressable market to over half of the company's business.

Estimated US I&A segment revenues addressable by repaired instruments

|  | 2018 | 2019 |
|---|---|---|
| S/Si instruments | 35% | 23% |
| X/Si instruments | 29% | 35% |
| Total | 64% | 58% |

Our feedback suggests this may compel more hospitals to engage with these third parties given the significantly greater cost-savings opportunity from this higher mix of serviced devices. Notably, Restore management indicated that its facilities are readily scalable so that output of repaired instruments can be expanded fairly quickly should customer demand increase meaningfully over the next couple years as we anticipate.

Source: Global Healthcare Exchange LLC, Deutsche Bank estimates

Deutsche Bank

Research

Confidential

Intuitive-00552995

Provided for the exclusive use of phillip.kim2@bnbnuorg.com on 2025-01-27T14:45+00:00. DO NOT REDISTRIBUTE

# Adoption likely to accelerate over next couple years (2)



**Substantially expanded sales & distribution reach.**  Medline Industries, a major healthcare distributor that generates >$10 billion in annual sales with a well-established and expansive customer network, has entered the fray and is now working with Restore Robotics as a distributor of repaired da Vinci devices. While Restore had already partnered with several other smaller regional distributors, the addition of Medline dramatically expands the commercial reach of these products.

- The secondary market for reprocessed/repaired devices remains a top focus area for Medline, which actually recently established a dedicated business called Renewal to address this large and growing segment.

- In speaking with Medline, the company clearly regards this segment and robotic instruments in particularly as a growth opportunity and is investing accordingly in terms of building out a dedicated sales and marketing group.

- In fact, multiple hospitals we talked to whose robotics programs are not presently using repaired da Vinci instruments indicated that they became aware of this offering only recently from conversations with Medline reps.

**Proof-of-concept: favorable experience amongst early adopters.** Based on the overall positive feedback we've gotten from early adopters – which, as noted, includes highly reputable hospitals – the favorable proof-of-concept experience could compel more hospitals to consider engaging with third-party suppliers of repaired da Vinci instruments.

Confidential

Intuitive-00552996

Provided for the exclusive use of philiplim2@smileysurg.com on 2020-01-27T14:45+00:00. DO NOT REDISTRIBUTE

# FDA and patient safety considerations



**Safety concerns unlikely to be an impediment.**  The key fundamental argument we've heard from Intuitive in objection to third-party repairing of its devices is the safety risk it poses to patients undergoing robotic surgery.  Based on our work, we conclude that this is unlikely to stymie uptake of these instruments for several reasons:

- Third-party servicing of medical devices has been widespread across the industry for many years, including large segments like endoscopes and surgical devices;

- Third parties engaged in this practice are closely regulated and, per figures cited by the FDA, there are close to 20K companies just in the US that are in the business of servicing used medical devices;

- **FDA's stance on third-party servicing of medical devices is clear.**  Not surprisingly, the agency has been scrutinizing this practice for many years, and our examination of the FDA's perspective on this matter shows quite clearly the agency's comfort around the practice with respect to safety.  The agency held a two-day public workshop on this topic in 2016, and in May 2018 released key findings and official stance in its report, *FDA Report on the Quality, Safety, and Effectiveness of Servicing of Medical Devices.*

    The document states that there is insufficient basis to "justify imposing additional/different, burdensome regulatory requirements at this time; rather, the objective evidence indicates that many OEMs and third-party entities provide high quality, safe, and effective servicing of medical devices." In fact, FDA posits that "The continued availability of third party entities to service and repair medical devices is critical to the functioning of the U.S. healthcare system."

Source: FDA.gov, Deutsche Bank estimates

Deutsche Bank

Research

Confidential

Intuitive-00552997

Provided for the exclusive use of philiplwim2@antwuxg.com on 2020-01-27T14:45+00:00. DO NOT REDISTRIBUTE

## FDA and patient safety considerations (2)



- **No evidence that repaired da Vinci instruments specifically pose a risk to patient safety – in fact, au contraire.**  Restore Robotics has been in the business of third-party medical device servicing for well over a decade.  Its production facilities all operate under strict regulatory oversight and have not received any FDA citations for infractions of manufacturing standards.  We confirmed that Restore's production facilities and specifically those where da Vinci instruments are repaired are compliant with regulatory standards including ISO 1245 certification.  In fact, we note that one of its subsidiaries has for several years been an OEM supplier with some of the largest multinational medtech companies among its customers.

- Additionally, clinicians have experienced no known safety issues, with zero MDRs documented in the FDA's MAUDE database from the thousands of repaired instruments that have been used to date.

- All da Vinci instruments being repaired are 510(k) approved, and we would point out that the predicate surgical devices are not bound by any useful limitations and further that serviced instruments are subject to rigorous QC scrutiny by third-party suppliers prior to shipment to hospitals for additional use.

**Bottom line regarding safety is that, despite Intuitive's view on this point, any material threat to patient safety would surely have prompted immediate FDA field action to stop their usage, which has not been the case**.

Source: FDA.gov, Deutsche Bank estimates

Deutsche Bank

Research

Confidential

Intuitive-00552998

Provided for the exclusive use of philip.kim2@anheusg.com on 2020-01-27T14:45+00:00. DO NOT REDISTRIBUTE

# Litigation: Restore Robotics v. Intuitive Surgical



**Developments in ongoing litigation will ultimately have significant implications, though resolution likely years away.**

- In February 2019, Restore Robotics filed an antitrust lawsuit against Intuitive in the US District Court in the Northern District of Florida.

- In response, Intuitive filed a series of motions to dismiss the plaintiff's claims, though notably these efforts to dismiss the case were denied by the presiding District Court judge.

- Intuitive subsequently filed a countersuit against Restore Robotics comprising six counts that include unlawful business practices and fraud.

The case is currently in discovery phase and a jury trial is scheduled to commence in 2022, which barring settlement and potential for either side to appeal the jury's verdict indicates that resolution is likely several years away.  And while we are not lawyers and thus not qualified to opine on the voracity of either party's claims in the lawsuit/countersuit nor handicap the potential outcomes, and despite the fact that final resolution is likely years away, we think investors should be cognizant of the case and developments over the next few years.

**Surprisingly, this litigation has not been disclosed in Intuitive's SEC filings as a risk factor despite the potentially significant ramifications an adverse ruling could ultimately have for the company – including a worst case scenario where an adverse ruling could conceivably result in significant monetary damages owed.**

Source: PACER.gov; Deutsche Bank estimates

Deutsche Bank

Research

Confidential

Provided for the exclusive use of phillip.kim2@dbabroug.com on 2020-01-27T14:45+00:00. DO NOT REDISTRIBUTE

# Due diligence: feedback from da Vinci surgeons



### Surgeon #1 (urologist)

- His hospital (part of a large academic institution) been using repaired da Vinci instruments supplied by Restore Robotics for 7-8 months in a portion of cases on the Si system.

- Initial decision to begin use at this center was spearheaded jointly by clinicians and supply chain personnel.

- Clinical experience to date has been positive, with no reports of device malfunction or adverse events.

- Third-party suppliers have been reliable, with no issues to date

- Repaired instruments being used here are mainly needle drivers and scissors, which are among the most widely utilized devices and therefore offer the biggest cost savings potential

- Surgeons nor hospital administration have gotten any real blowback from Intuitive for engagement with third-party suppliers

- Given positive overall initial experience, he expects usage of repaired instruments to broaden over time – particularly once repaired Xi instruments become commercially available

Confidential

Intuitive-00553000

Provided for the exclusive use of philipkim2@samsung.com on 2020-01-27T14:45+00:00. DO NOT REDISTRIBUTE

# Due diligence: feedback from da Vinci surgeons (2)



## Surgeon #2 (general surgeon)

- His center (suburban for-profit hospital) began usage of repaired instruments late last year.

- Initial decision to begin use at this center was spearheaded by the hospital's purchasing team, motivated by continued efforts to lower operating costs for its robotics program that currently houses two da Vinci systems.

- Legal due diligence was a big part of the hospital's vetting process prior to the decision to begin usage of repaired instruments.

- Despite his financial relationship with Intuitive (mainly paid lectures), he has not experienced any significant pushback from Intuitive to date.

- Clinical experience has been satisfactory, with no reports of device malfunction or adverse events.

- While repaired instruments currently account for a very small mix of total consumable units at his hospital, given the favorable initial experience usage will likely increase over time particularly once third-party suppliers broaden their offerings to include Xi devices.

Confidential

Provided for the exclusive use of phillip.kim2@anboura.com on 2020-01-27T14:45+00:00. DO NOT REDISTRIBUTE

# Due diligence: feedback from da Vinci surgeons (3)



## Surgeon #3 (general surgeon)

- His center (one of seven hospitals in a for-profit system) began usage of repaired instruments late last year.

- Idea of using repaired instruments was actually first presented to administration by a surgeon colleague rather than administration.

- Usage of repaired instruments is still very low due to the decision to initially have a six-month trial phase for risk management purposes.

- Surgeon noted that the hospital has had no cases of device malfunction or adverse events, and based on this favorable trial phase experience usage is likely to expand over the next year or two.

- His usage is exclusively on Si, though the hospital system broadly houses several Xi robots and he suspects usage across the network broadly could expand to Xi devices but could not speak to this point authoritatively.

Confidential

Intuitive-00553002

Provided for the exclusive use of phillip.kim2@intuiusurg.com on 2020-01-27T14:45+00:00. DO NOT REDISTRIBUTE

# Due diligence: feedback from hospital supply chain executives



## Supply chain manager #1

- Oversees purchasing for a nine-hospital network in the Northeast.

- Per C-suite mandate, cost reductions across the board have been an increased focus since 2019 and robotics is among the major areas under scrutiny

- Has been engaged in negotiations with third-party providers (both a distributor and also Restore Robotics) for several months.

- Noted that his team's financial analysis points to "fairly substantial" operating cost savings opportunity with usage of repaired instruments

- Legal considerations were cited as a key factor giving pause for some in senior management.

- With his team now nearing completion of its due diligence, a final decision is expected imminently – with usage of repaired instruments across the hospital network potentially starting later this year.

Confidential

Intuitive-00553003

Provided for the exclusive use of philiadem2@antonsurg.com on 2020-01-27T14:45+00:00. DO NOT REDISTRIBUTE

# Due diligence: feedback from hospital supply chain executives (2)



## Supply chain manager #2

- SVP of purchasing for a major hospital network comprising 28 hospitals across several states.

- Around two dozen da Vinci systems (a majority of which are still Si) housed across the system.

- Has been engaged with third-party providers (both a distributor and also Restore Robotics) since last summer.

- Noted that his team's financial analysis points to "fairly substantial" operating cost savings opportunity with usage of repaired instruments per year with adoption across the hospital network.

- With his team now nearing completion of its thorough due diligence process (financial, legal, clinical, etc.), a final decision is expected by mid-year – with usage of repaired instruments across the hospital network potentially beginning later this year and more earnestly in 2021.

Confidential

Provided for the exclusive use of phillip.kim2@smtxsg.com on 2020-01-27T14:45+00:00. DO NOT REDISTRIBUTE

# Quantifying the Risk to US I&A Revenues



To quantify Intuitive's revenues at risk from inroads by third-party instrument repairs, we queried the DB US Medtech Database which provided us with a meaningful sample size: <u>8.2% of 2019 reported US I&A segment revenues</u>.

We looked at 2019 revenues for all instrument SKUs currently eligible for third-party repair – which, as noted, are currently limited to the da Vinci S/Si product portfolio.

| SKU | Description | % of I&A revenue | SKU | Description | % of I&A revenue |
|---|---|---|---|---|---|
| 420179 | SCISSORS MONOPOLAR STERILE DISPOSABLE 38- D CURVE L55.9 CM L1.3 CM OD8 MM | 6.71% | 420001 | SCISSORS LAPAROSCOPIC POTTS 22- D L54.5 CM L1.1 CM | 0.04% |
| 420006 | DRIVER NEEDLE ENDOWRIST DA VINCI S/SI 30- D LARGE L54.4 CM L1 CM OD8 MM | 3.12% | 420048 | FORCEPS DA VINCI S/SI LONG OD8 MM STERILE | 0.04% |
| 420205 | FORCEPS BIPOLAR LAPAROSCOPIC ENDOWRIST S/SI 45- D MEDIUM L55.9 CM L2.1 CM OD8 MM | 2.98% | 420278 | RETRACTOR LAPAROSCOPIC GRAPTOR 60- D L56.7 CM L5.4 CM OD8 MM | 0.04% |
| 420093 | FORCEPS LAPAROSCOPIC PROGRASP S/SI 38- D L56.2 CM L2.8 CM OD8 MM GRASPER | 2.21% | 420033 | FORCEPS LAPAROSCOPIC DA VINCI S/SI ENDOWRIST 30- D MICRO DIAMOND L54.4 CM L1 CM OD8 MM | 0.03% |
| 420309 | DRIVER NEEDLE SUTURECUT ROBOTIC 23- D MEGA L49.7 CM L1.4 CM OD8 MM | 1.97% | 420007 | SCISSORS LAPAROSCOPIC DA VINCI S/SI ROUND L54.5 CM L1.1 CM OD8 MM | 0.02% |
| 420172 | FORCEPS MARYLAND BIPOLAR 2 CMX8 MM MED | 1.41% | 420178 | SCISSORS LAPAROSCOPIC CURVE STERILE DISPOSABLE L54.7 CM L1.3 CM OD8 MM MEDIUM | 0.02% |
| 420227 | BIPOLAR FORCEPS LAPAROSCOPIC S/SI ENDOWRIST PK 70- D L55.4 CM L2 CM OD8 MM | 1.32% | 420249 | RETRACTOR LAPAROSCOPIC 2 BLADE | 0.01% |
| 420194 | DRIVER NEEDLE MEGA 30-DX54.7CMX1.3CM | 1.27% | 420181 | FORCEPS GRASPING DISPOSABLE RESANO 30- D MEDIUM L54.5 CM L1.1 CM OD8 MM | 0.01% |
| 420049 | FORCEPS LAPAROSCOPIC 38 D L32.77 CM L2 CM OD8 MM | 0.69% | 420246 | RETRACTOR LAPAROSCOPICT RIGHT CURVE OD8 MM | 0.01% |
| 420183 | HOOK DA VINCI S/SI L55.2 CM L1.6 CM OD8 MM | 0.36% | 420036 | FORCEPS LAPAROSCOPIC DAVINCI 30-D MEDIUM L54.6 CM L1.2 CM OD8 MM | 0.01% |
| 420296 | DRIVER NEEDLE SUTURECUT 30- D 54.5 CM X1.1 CMX8 MM LRG | 0.28% | 420157 | BLADE ENDOSCOPIC 8 MM L54.6 CM L1.2 CM OD8 MM | 0.01% |
| 420190 | GRASPER ENDOSCOPIC DA VINCI S 60- D COBRA L55.4 CM L2 CM OD8 MM LOW FORCE | 0.22% | 420171 | FORCEPS LAPAROSCOPIC 45- D MICRO L55.2 CM L1.4 CM STERILE | 0.01% |
| 420207 | FORCEPS LAPAROSCOPIC TENACULUM 75- D L56.4 CM L3 CM OD8 MM | 0.16% | 420215 | FORCEPS GRASPER CARDIAC PROBE DAVINCI S/S OD8 MM | 0.00% |
| 420184 | ELECTRODE CAUTERY SPATULA MONOPOLAR STERILE DISPOSABLE L1.7 CM OD8 MM | 0.11% | 420121 | FORCEPS FINE TISSUE 54.5 CMX8 MM | 0.00% |
| 420189 | GRASPER LAPAROSCOPIC DA VINCI S/SI ENDOWRIST L56.7 CM OD8 MM | 0.08% | 420110 | FORCEPS LAPAROSCOPIC PRECISE BIPOLAR OD8 MM | 0.00% |
| 420318 | RETRACTOR ENDOSCOPIC ENDOWRIST DA VINCI S/SI GRAPTOR SMALL GRASP | 0.07% | 420192 | Valve Hook | 0.00% |
| 420003 | APPLIER CLIP SMALL HEMOCLIP TITANIUM 8 MM | 0.05% | 420203 | Pericardial Dissector | 0.00% |
| 420344 | DISSECTOR BIPOLAR CURVE CAUTERY 8 MM | 0.04% | 420204 | Atrial Retractor | 0.00% |

**In total, we estimate that <u>~23%</u> of Intuitive's US I&A segment revenues are exposed to potential impact from third-party repair.**

- This represents a big decline versus 2018, when these consumable devices accounted to about 35% of segment sales mix, reflecting the continued mix shift toward X/Xi products.

*Source: Global Healthcare Exchange LLC, Deutsche Bank estimates*

Deutsche Bank

Research

Confidential

Intuitive-00553005

Provided for the exclusive use of phillip.kim2@antoburg.com on 2020-01-27T14:45+00:00. DO NOT REDISTRIBUTE

# Quantifying the Risk to US I&A Revenues



It is our understanding that da Vinci instrument repairs are expected to become available for instruments in the X/Xi product suite around mid-2020 – which is significant given the continued mix shift toward the latest-generation instruments and away from the S/Si catalog.

And while it is not yet clear specifically which X/Xi instrument SKUs will be available for third-party repair, our analysis assumes that these will include the corresponding iteration of those currently being serviced within the prior-generation S/Si family.

| SKU | Description | % of I&A revenue | SKU | Description | % of I&A revenue |
|---|---|---|---|---|---|
| 470179 | SCISSORS MONOPOLAR HOT SHEARS ENDOWRIST 38 D CURVE L31.75 CM L1.3 CM OD8 MM | 14.01% | 470033 | FORCEPS LAPAROSCOPIC L1 CM L31.5 CM | 0.06% |
| 470006 | DRIVER NEEDLE ENDOWRIST 30 D LARGE L31.5 CM L1 CM OD8 MM | 4.97% | 470249 | RETRACTOR LAPAROSCOPIC 70 D L33.27 CM L4.8 CM OD8 MM 2 | 0.06% |
| 470309 | DRIVER NEEDLE MEGA SUTURE CUT 0-35 D L1.4 CM | 4.82% | 470246 | RETRACTOR LAPAROSCOPIC 60 D SHORT L33.27 CM L4.8 CM OD8 MM | 0.04% |
| 470172 | FORCEPS LAPAROSCOPIC MARYLAND 45 D L32.77 CM L2 CM OD8 MM | 2.97% | 470171 | FORCEPS BIPOLAR MICRO | 0.04% |
| 470049 | FORCEPS LAPAROSCOPIC CADIERE DA VINCI XI 38 D L32.77 CM L2 CM OD8 MM | 2.81% | 470215 | GRASPER DA VINCI XI 60 D L32.26 CM L1.7 CM OD8 MM | 0.03% |
| 470194 | DRIVER NEEDLE 38 D L31.75 CM L1.3 CM OD8 MM | 1.79% | 470181 | FORCEPS ENDOWRIST L31.75 CM L1.1 CM OD8 MM | 0.02% |
| 470296 | DRIVER NEEDLE SUTURECUT 38 D 31.50 CMX1.1 CMX8 MM LRG | 1.28% | 470190 | GRASPER LAPAROSCOPIC COBRA 68 D L32.51 CM L2 CM | 0.00% |
| 470318 | RETRACTOR LAPAROSCOPIC 0-65 D SMALL L4.5 CM | 0.76% | 470036 | FORCEP ROBOTIC XI DEBAKEY | 0.00% |
| 470205 | FORCEPS BIPOLAR LAPAROSCOPIC 45 D L32.77 CM L2.1 CM | 0.42% | 470093 | FORCEP ROBOT DAVINCI XI PROGRASP | 0.00% |
| 470344 | DISSECTOR LAPAROSCOPIC 45 D | 0.41% | 470183 | ROBOT DAVINCI XI PERMANENT MONOPOLAR CAUTERY HOOK | 0.00% |
| 470001 | SCISSORS POTTS LAPAROSCOPIC 22 D L31.5 CM L1.1 CM OD8 MM | 0.15% | 470184-T | PERMANENT CAUTERY SPATULA | 0.00% |
| 470007 | SCISSORS ROUND TIP 38 D L31.5 CM L1.1 CM | 0.14% | 470207 | FCP TENACULUM XI | 0.00% |
| 470048 | FORCEPS LAPAROSCOPIC 30 D L32.51 CM L2 CM | 0.11% | | | |

**We estimate that the above X/Xi instruments collectively accounted for ~35% of 2019 US I&A segment revenues.  As such, once third-party repairs of them become available, Intuitive's top line exposure will increase dramatically – rendering a majority (~58%) of segment sales "at risk" of competitive pressures.**

| | 2018 | 2019 |
|---|---|---|
| S/Si instruments | 35% | 23% |
| X/Si instruments | 29% | 35% |
| Total | 64% | 58% |

Source: Global Healthcare Exchange LLC, Deutsche Bank estimates

Deutsche Bank

Research

Confidential

Intuitive-00553006

Provided for the exclusive use of philip.kim2@bloomberg.com on 2025-01-27T14:45:00:00. DO NOT REDISTRIBUTE

# Model Ramifications: Revenue & EPS Sensitivity



Our analysis of expected financial impact of third-party instrument repair encroachment presumes 58% of US I&A segment sales are addressable in 2021, per SKU-level analysis.

Based on 2021 consensus US I&A segment revenues of $2.224 billion, this would put $1.290 billion of Intuitive's sales at risk from increased utilization of repaired instruments. This equates to 23% of total company sales.

Based on our conversations with surgeon and hospital customers, we believe 4-6% penetration of Intuitive's *de novo* instruments on a unit basis in 2021 is reasonable and potentially even conservative. And even with this modest unit share capture, the resultant impact to Intuitive's top-line would be amplified given that each instrument can be repaired multiple times.

**As such, our base case scenario of 5% *de novo* unit share capture in 2021 and the assumption that each instrument is repaired 3x on average, our analysis indicates a top-line hit on the order of $193 million or 3.4% of total company sales in 2021.**

The model impact of this manifests on the US revenue per procedure line of our sales build, with zero impact to procedure volume growth.

| 2021E Consensus ($MM) | |
|---|---|
| Total company sales | $5,710 |
| US Instruments & Accessories sales | $2,224 |
| % of US I&A segment revenues at risk | 58% |
| $ at risk | $1,290 |
| % of total company revenues at risk | 23% |

| % capture of addressable revs | Top line impact | | | EPS impact | |
|---|---|---|---|---|---|
| | $MM | % of US I&A sales | % of total sales | $ | % |
| 2.5% | $32 | 1.5% | 0.6% | $0.09 | 0.6% |
| 5.0% | $64 | 2.9% | 1.1% | $0.18 | 1.1% |
| 7.5% | $97 | 4.4% | 1.7% | $0.27 | 1.7% |
| 10.0% | $129 | 5.8% | 2.3% | $0.35 | 2.2% |
| 12.5% | $161 | 7.3% | 2.8% | $0.44 | 2.8% |
| **15.0%** | **$193** | **8.7%** | **3.4%** | **$0.53** | **3.4%** |
| 17.5% | $226 | 10.2% | 4.0% | $0.62 | 3.9% |
| 20.0% | $258 | 11.6% | 4.5% | $0.71 | 4.5% |
| 22.5% | $290 | 13.1% | 5.1% | $0.80 | 5.0% |
| 25.0% | $322 | 14.5% | 5.6% | $0.88 | 5.6% |
| 27.5% | $355 | 16.0% | 6.2% | $0.97 | 6.2% |

Source: Bloomberg Finance LC, Deutsche Bank estimates

Deutsche Bank

Research

Confidential

Intuitive-00553007

27 January 2020
Medical Supplies & Devices
Intuitive Surgical



# Appendix 1

## Important Disclosures

### *Other information available upon request

| Disclosure checklist | | | |
|---|---|---|---|
| Company | Ticker | Recent price* | Disclosure |
| Intuitive Surgical | ISRG.OQ | 589.2 (USD) 24 Jan 2020 | 2, 8, 14, 15 |

*Prices are current as of the end of the previous trading session unless otherwise indicated and are sourced from local exchanges via Reuters, Bloomberg and other vendors . Other information is sourced from Deutsche Bank, subject companies, and other sources. For disclosures pertaining to recommendations or estimates made on securities other than the primary subject of this research, please see the most recently published company report or visit our global disclosure look-up page on our website at https://research.db.com/Research/Disclosures/CompanySearch. Aside from within this report, important risk and conflict disclosures can also be found at https://research.db.com/Research/Topics/Equities?topicId=RB0002. Investors are strongly encouraged to review this information before investing.

### Important Disclosures Required by U.S. Regulators

Disclosures marked with an asterisk may also be required by at least one jurisdiction in addition to the United States.See Important Disclosures Required by Non-US Regulators and Explanatory Notes.

2.      Deutsche Bank and/or its affiliate(s) makes a market in equity securities issued by this company.

8.      Deutsche Bank and/or its affiliate(s) expects to receive, or intends to seek, compensation for investment banking services from this company in the next three months.

14.     Deutsche Bank and/or its affiliate(s) has received non-investment banking related compensation from this company within the past year.

15.     This company has been a client of Deutsche Bank Securities Inc. within the past year, during which time it received non-investment banking securities-related services.

### Important Disclosures Required by Non-U.S. Regulators

Disclosures marked with an asterisk may also be required by at least one jurisdiction in addition to the United States.See Important Disclosures Required by Non-US Regulators and Explanatory Notes.

2.      Deutsche Bank and/or its affiliate(s) makes a market in equity securities issued by this company.

For disclosures pertaining to recommendations or estimates made on securities other than the primary subject of this research, please see the most recently published company report or visit our global disclosure look-up page on our website at https://research.db.com/Research/Disclosures/CompanySearch

### Analyst Certification

The views expressed in this report accurately reflect the personal views of the undersigned lead analyst(s) about the subject issuer and the securities of the issuer. In addition, the undersigned lead analyst(s) has not and will not receive any compensation for providing a specific recommendation or view in this report. Imron Zafar.

Confidential                                                                                             Intuitive-00553008

27 January 2020
Medical Supplies & Devices
Intuitive Surgical





Historical recommendations and target price: Intuitive Surgical (ISRG.OQ)
*(as of 01/24/2020)*



Current Recommendations

Buy
Hold
Sell
Not Rated
Suspended Rating

** Analyst is no longer at
Deutsche Bank

1.  04/02/2019   Buy, Target Price Change USD 630.00 Imron Zafar     2.  04/19/2019   Buy, Target Price Change USD 610.00 Imron Zafar

Equity Rating Key

Buy: Based on a current 12- month view of total share-holder
return (TSR = percentage change in share price from current
price to projected target price plus pro-jected dividend yield ) ,
we recommend that investors buy the stock.

Sell: Based on a current 12-month view of total share-holder
return, we recommend that investors sell the stock.

Hold: We take a neutral view on the stock 12-months out and,
based on this time horizon, do not recommend either a Buy or
Sell.

Newly issued research recommendations and target prices
supersede previously published research.

Equity rating dispersion and banking relationships



Deutsche Bank Securities Inc.

Confidential

Intuitive-00553009

27 January 2020
Medical Supplies & Devices
Intuitive Surgical



## Additional Information

The information and opinions in this report were prepared by Deutsche Bank AG or one of its affiliates (collectively 'Deutsche Bank'). Though the information herein is believed to be reliable and has been obtained from public sources believed to be reliable, Deutsche Bank makes no representation as to its accuracy or completeness. Hyperlinks to third-party websites in this report are provided for reader convenience only. Deutsche Bank neither endorses the content nor is responsible for the accuracy or security controls of those websites.

If you use the services of Deutsche Bank in connection with a purchase or sale of a security that is discussed in this report, or is included or discussed in another communication (oral or written) from a Deutsche Bank analyst, Deutsche Bank may act as principal for its own account or as agent for another person.

Deutsche Bank may consider this report in deciding to trade as principal. It may also engage in transactions, for its own account or with customers, in a manner inconsistent with the views taken in this research report. Others within Deutsche Bank, including strategists, sales staff and other analysts, may take views that are inconsistent with those taken in this research report. Deutsche Bank issues a variety of research products, including fundamental analysis, equity-linked analysis, quantitative analysis and trade ideas. Recommendations contained in one type of communication may differ from recommendations contained in others, whether as a result of differing time horizons, methodologies, perspectives or otherwise. Deutsche Bank and/or its affiliates may also be holding debt or equity securities of the issuers it writes on. Analysts are paid in part based on the profitability of Deutsche Bank AG and its affiliates, which includes investment banking, trading and principal trading revenues.

Opinions, estimates and projections constitute the current judgment of the author as of the date of this report. They do not necessarily reflect the opinions of Deutsche Bank and are subject to change without notice. Deutsche Bank provides liquidity for buyers and sellers of securities issued by the companies it covers. Deutsche Bank research analysts sometimes have shorter-term trade ideas that may be inconsistent with Deutsche Bank's existing longer-term ratings. Some trade ideas for equities are listed as Catalyst Calls on the Research Website (https://research.db.com/Research/) , and can be found on the general coverage list and also on the covered company's page. A Catalyst Call represents a high-conviction belief by an analyst that a stock will outperform or underperform the market and/or a specified sector over a time frame of no less than two weeks and no more than three months. In addition to Catalyst Calls, analysts may occasionally discuss with our clients, and with Deutsche Bank salespersons and traders, trading strategies or ideas that reference catalysts or events that may have a near-term or medium-term impact on the market price of the securities discussed in this report, which impact may be directionally counter to the analysts' current 12-month view of total return or investment return as described herein. Deutsche Bank has no obligation to update, modify or amend this report or to otherwise notify a recipient thereof if an opinion, forecast or estimate changes or becomes inaccurate. Coverage and the frequency of changes in market conditions and in both general and company-specific economic prospects make it difficult to update research at defined intervals. Updates are at the sole discretion of the coverage analyst or of the Research Department Management, and the majority of reports are published at irregular intervals. This report is provided for informational purposes only and does not take into account the particular investment objectives, financial situations, or needs of individual clients. It is not an offer or a solicitation of an offer to buy or sell any financial instruments or to participate in any particular trading strategy. Target prices are inherently imprecise and a product of the analyst's judgment. The financial instruments discussed in this report may not be suitable for all investors, and investors must make their own informed investment decisions. Prices and availability of financial instruments are subject to change without notice, and investment transactions can lead to losses as a result of price fluctuations and other factors. If a financial instrument is denominated in a currency other than an investor's currency, a change in exchange rates may adversely affect the investment. Past performance is not necessarily indicative of future results. Performance calculations exclude transaction costs, unless otherwise indicated. Unless otherwise indicated, prices are current as of the end of the previous trading session and are sourced from local exchanges via Reuters, Bloomberg and other vendors. Data is also sourced from Deutsche Bank, subject companies, and other parties.

The Deutsche Bank Research Department is independent of other business divisions of the Bank. Details regarding our organizational arrangements and information barriers we have to prevent and avoid conflicts of interest with respect to our research are available on our website (https://research.db.com/Research/) under Disclaimer.

Macroeconomic fluctuations often account for most of the risks associated with exposures to instruments that promise to pay fixed or variable interest rates. For an investor who is long fixed-rate instruments (thus receiving these cash flows), increases in interest rates naturally lift the discount factors applied to the expected cash flows and thus cause a loss. The longer the maturity of a certain cash flow and the higher the move in the discount factor, the higher will be the loss. Upside surprises in inflation, fiscal funding needs, and FX depreciation rates are among the most common adverse macroeconomic shocks to receivers. But counterparty exposure, issuer creditworthiness, client segmentation, regulation (including changes in assets holding limits for different types of investors), changes in tax policies, currency convertibility (which may constrain currency conversion, repatriation of profits and/or liquidation of positions), and settlement issues related to local clearing houses are also important risk factors. The sensitivity of fixed-income instruments to macroeconomic shocks may be mitigated by indexing the contracted cash flows to inflation, to FX depreciation, or to specified interest rates – these are common in emerging markets. The index fixings may – by construction – lag or mis-measure the actual move in the underlying variables they are intended to track. The choice of the proper fixing (or metric) is particularly important in swaps markets, where floating coupon rates (i.e., coupons indexed to a typically short-dated interest rate reference index) are exchanged for fixed coupons. Funding in a currency that differs from the currency in which coupons are denominated carries FX risk. Options on swaps (swaptions) the risks typical to options in addition to the risks related to rates movements.

Derivative transactions involve numerous risks including market, counterparty default and illiquidity risk. The appropriateness

Confidential                                                                            Intuitive-00553010

27 January 2020
Medical Supplies & Devices
Intuitive Surgical



of these products for use by investors depends on the investors' own circumstances, including their tax position, their regulatory environment and the nature of their other assets and liabilities; as such, investors should take expert legal and financial advice before entering into any transaction similar to or inspired by the contents of this publication. The risk of loss in futures trading and options, foreign or domestic, can be substantial. As a result of the high degree of leverage obtainable in futures and options trading, losses may be incurred that are greater than the amount of funds initially deposited – up to theoretically unlimited losses. Trading in options involves risk and is not suitable for all investors. Prior to buying or selling an option, investors must review the 'Characteristics and Risks of Standardized Options", at http://www.optionsclearing.com/about/publications/character-risks.jsp. If you are unable to access the website, please contact your Deutsche Bank representative for a copy of this important document.

Participants in foreign exchange transactions may incur risks arising from several factors, including the following: (i) exchange rates can be volatile and are subject to large fluctuations; (ii) the value of currencies may be affected by numerous market factors, including world and national economic, political and regulatory events, events in equity and debt markets and changes in interest rates; and (iii) currencies may be subject to devaluation or government-imposed exchange controls, which could affect the value of the currency. Investors in securities such as ADRs, whose values are affected by the currency of an underlying security, effectively assume currency risk.

Unless governing law provides otherwise, all transactions should be executed through the Deutsche Bank entity in the investor's home jurisdiction. Aside from within this report, important conflict disclosures can also be found at https://research.db.com/Research/ on each company's research page. Investors are strongly encouraged to review this information before investing.

Deutsche Bank (which includes Deutsche Bank AG, its branches and affiliated companies) is not acting as a financial adviser, consultant or fiduciary to you or any of your agents (collectively, "You" or "Your") with respect to any information provided in this report. Deutsche Bank does not provide investment, legal, tax or accounting advice, Deutsche Bank is not acting as your impartial adviser, and does not express any opinion or recommendation whatsoever as to any strategies, products or any other information presented in the materials. Information contained herein is being provided solely on the basis that the recipient will make an independent assessment of the merits of any investment decision, and it does not constitute a recommendation of, or express an opinion on, any product or service or any trading strategy.

The information presented is general in nature and is not directed to retirement accounts or any specific person or account type, and is therefore provided to You on the express basis that it is not advice, and You may not rely upon it in making Your decision. The information we provide is being directed only to persons we believe to be financially sophisticated, who are capable of evaluating investment risks independently, both in general and with regard to particular transactions and investment strategies, and who understand that Deutsche Bank has financial interests in the offering of its products and services. If this is not the case, or if You are an IRA or other retail investor receiving this directly from us, we ask that you inform us immediately.

In July 2018, Deutsche Bank revised its rating system for short term ideas whereby the branding has been changed to Catalyst Calls ("CC") from SOLAR ideas; the rating categories for Catalyst Calls originated in the Americas region have been made consistent with the categories used by Analysts globally; and the effective time period for CCs has been reduced from a maximum of 180 days to 90 days.

**United States**: Approved and/or distributed by Deutsche Bank Securities Incorporated, a member of FINRA, NFA and SIPC. Analysts located outside of the United States are employed by non-US affiliates that are not subject to FINRA regulations.

**Germany**: Approved and/or distributed by Deutsche Bank AG, a joint stock corporation with limited liability incorporated in the Federal Republic of Germany with its principal office in Frankfurt am Main. Deutsche Bank AG is authorized under German Banking Law and is subject to supervision by the European Central Bank and by BaFin, Germany's Federal Financial Supervisory Authority.

**United Kingdom**: Approved and/or distributed by Deutsche Bank AG acting through its London Branch at Winchester House, 1 Great Winchester Street, London EC2N 2DB. Deutsche Bank AG in the United Kingdom is authorised by the Prudential Regulation Authority and is subject to limited regulation by the Prudential Regulation Authority and Financial Conduct Authority. Details about the extent of our authorisation and regulation are available on request.

**Hong Kong SAR**: Distributed by Deutsche Bank AG, Hong Kong Branch except for any research content relating to futures contracts within the meaning of the Hong Kong Securities and Futures Ordinance Cap. 571. Research reports on such futures contracts are not intended for access by persons who are located, incorporated, constituted or resident in Hong Kong. The author(s) of a research report may not be licensed to carry on regulated activities in Hong Kong and, if not licensed, do not hold themselves out as being able to do so. The provisions set out above in the 'Additional Information' section shall apply to the fullest extent permissible by local laws and regulations, including without limitation the Code of Conduct for Persons Licensed or Registered with the Securities and Futures Commission. This report is intended for distribution only to 'professional investors' as defined in Part 1 of Schedule of the SFO. This document must not be acted or relied on by persons who are not professional investors. Any investment or investment activity to which this document relates is only available to professional investors and will be engaged only with professional investors.

**India**: Prepared by Deutsche Equities India Private Limited (DEIPL) having CIN: U65990MH2002PTC137431 and registered office at 14th Floor, The Capital, C-70, G Block, Bandra Kurla Complex Mumbai (India) 400051. Tel: + 91 22 7180 4444. It is registered by the Securities and Exchange Board of India (SEBI) as a Stock broker bearing registration no.: INZ000252437;

Confidential

Intuitive-00553011

27 January 2020
Medical Supplies & Devices
Intuitive Surgical



Merchant Banker bearing SEBI Registration no.: INM000010833 and Research Analyst bearing SEBI Registration no.: INH000001741. DEIPL may have received administrative warnings from the SEBI for breaches of Indian regulations. Deutsche Bank and/or its affiliate(s) may have debt holdings or positions in the subject company. With regard to information on associates, please refer to the "Shareholdings" section in the Annual Report at: https://www.db.com/ir/en/annual-reports.htm.

**Japan**: Approved and/or distributed by Deutsche Securities Inc.(DSI). Registration number - Registered as a financial instruments dealer by the Head of the Kanto Local Finance Bureau (Kinsho) No. 117. Member of associations: JSDA, Type II Financial Instruments Firms Association and The Financial Futures Association of Japan. Commissions and risks involved in stock transactions - for stock transactions, we charge stock commissions and consumption tax by multiplying the transaction amount by the commission rate agreed with each customer. Stock transactions can lead to losses as a result of share price fluctuations and other factors. Transactions in foreign stocks can lead to additional losses stemming from foreign exchange fluctuations. We may also charge commissions and fees for certain categories of investment advice, products and services. Recommended investment strategies, products and services carry the risk of losses to principal and other losses as a result of changes in market and/or economic trends, and/or fluctuations in market value. Before deciding on the purchase of financial products and/or services, customers should carefully read the relevant disclosures, prospectuses and other documentation. 'Moody's', 'Standard Poor's', and 'Fitch' mentioned in this report are not registered credit rating agencies in Japan unless Japan or 'Nippon' is specifically designated in the name of the entity. Reports on Japanese listed companies not written by analysts of DSI are written by Deutsche Bank Group's analysts with the coverage companies specified by DSI. Some of the foreign securities stated on this report are not disclosed according to the Financial Instruments and Exchange Law of Japan. Target prices set by Deutsche Bank's equity analysts are based on a 12-month forecast period.

**Korea**: Distributed by Deutsche Securities Korea Co.

**South Africa:** Deutsche Bank AG Johannesburg is incorporated in the Federal Republic of Germany (Branch Register Number in South Africa: 1998/003298/10).

**Singapore:** This report is issued by Deutsche Bank AG, Singapore Branch (One Raffles Quay #18-00 South Tower Singapore 048583, 65 6423 8001), which may be contacted in respect of any matters arising from, or in connection with, this report. Where this report is issued or promulgated by Deutsche Bank in Singapore to a person who is not an accredited investor, expert investor or institutional investor (as defined in the applicable Singapore laws and regulations), they accept legal responsibility to such person for its contents.

**Taiwan**: Information on securities/investments that trade in Taiwan is for your reference only. Readers should independently evaluate investment risks and are solely responsible for their investment decisions. Deutsche Bank research may not be distributed to the Taiwan public media or quoted or used by the Taiwan public media without written consent. Information on securities/instruments that do not trade in Taiwan is for informational purposes only and is not to be construed as a recommendation to trade in such securities/instruments. Deutsche Securities Asia Limited, Taipei Branch may not execute transactions for clients in these securities/instruments.

**Qatar**: Deutsche Bank AG in the Qatar Financial Centre (registered no. 00032) is regulated by the Qatar Financial Centre Regulatory Authority. Deutsche Bank AG - QFC Branch may undertake only the financial services activities that fall within the scope of its existing QFCRA license. Its principal place of business in the QFC: Qatar Financial Centre, Tower, West Bay, Level 5, PO Box 14928, Doha, Qatar. This information has been distributed by Deutsche Bank AG. Related financial products or services are only available only to Business Customers, as defined by the Qatar Financial Centre Regulatory Authority.

**Russia**: The information, interpretation and opinions submitted herein are not in the context of, and do not constitute, any appraisal or evaluation activity requiring a license in the Russian Federation.

**Kingdom of Saudi Arabia**: Deutsche Securities Saudi Arabia LLC Company (registered no. 07073-37) is regulated by the Capital Market Authority. Deutsche Securities Saudi Arabia may undertake only the financial services activities that fall within the scope of its existing CMA license. Its principal place of business in Saudi Arabia: King Fahad Road, Al Olaya District, P.O. Box 301809, Faisaliah Tower - 17th Floor, 11372 Riyadh, Saudi Arabia.

**United Arab Emirates**: Deutsche Bank AG in the Dubai International Financial Centre (registered no. 00045) is regulated by the Dubai Financial Services Authority. Deutsche Bank AG - DIFC Branch may only undertake the financial services activities that fall within the scope of its existing DFSA license. Principal place of business in the DIFC: Dubai International Financial Centre, The Gate Village, Building 5, PO Box 504902, Dubai, U.A.E. This information has been distributed by Deutsche Bank AG. Related financial products or services are available only to Professional Clients, as defined by the Dubai Financial Services Authority.

**Australia and New Zealand**: This research is intended only for 'wholesale clients' within the meaning of the Australian Corporations Act and New Zealand Financial Advisors Act, respectively. Please refer to Australia-specific research disclosures and related information at https://australia.db.com/australia/content/research-information.html Where research refers to any particular financial product recipients of the research should consider any product disclosure statement, prospectus or other applicable disclosure document before making any decision about whether to acquire the product. In preparing this report, the primary analyst or an individual who assisted in the preparation of this report has likely been in contact with the company that is the subject of this research for confirmation/clarification of data, facts, statements, permission to use company-sourced material in the report, and/or site-visit attendance. Without prior approval from Research Management, analysts may not

Confidential                                                                                      Intuitive-00553012

27 January 2020

Medical Supplies & Devices

Intuitive Surgical



accept from current or potential Banking clients the costs of travel, accommodations, or other expenses incurred by analysts attending site visits, conferences, social events, and the like. Similarly, without prior approval from Research Management and Anti-Bribery and Corruption ("ABC") team, analysts may not accept perks or other items of value for their personal use from issuers they cover.

Additional information relative to securities, other financial products or issuers discussed in this report is available upon request. This report may not be reproduced, distributed or published without Deutsche Bank's prior written consent. Copyright © 2020 Deutsche Bank AG

Confidential

Intuitive-00553013



**David Folkerts-Landau**
Group Chief Economist and Global Head of Research

| Pam Finelli | Anthony Klarman | Michael Spencer | Steve Pollard |
|---|---|---|---|
| Global Chief Operating Officer Research | Global Head of Debt Research | Head of APAC Research | Head of Americas Research Global Head of Company Research |

| Gerry Gallagher | Andreas Neubauer | Peter Milliken |
|---|---|---|
| Head of European Company Research | Head of Germany Research | Head of APAC Company Research |

| Jim Reid | Francis Yared | George Saravelos | Peter Hooper |
|---|---|---|---|
| Global Head of Thematic Research | Global Head of Rates Research | Global Head of FX Research | Global Head of Economic Research |

**International Production Locations**

Deutsche Bank AG
Deutsche Bank Place
Level 16
Corner of Hunter & Phillip Streets
Sydney, NSW 2000
Australia
Tel: (61) 2 8258 1234

Deutsche Bank AG London
1 Great Winchester Street
London EC2N 2EQ
United Kingdom
Tel: (44) 20 7545 8000

Deutsche Bank AG
Equity Research
Mainzer Landstrasse 11-17
60329 Frankfurt am Main
Germany
Tel: (49) 69 910 00

Deutsche Bank Securities Inc.
60 Wall Street
New York, NY 10005
United States of America
Tel: (1) 212 250 2500

Deutsche Bank AG
Filiale Hongkong
International Commerce Centre,
1 Austin Road West, Kowloon,
Hong Kong
Tel: (852) 2203 8888

Deutsche Securities Inc
2-11-1 Nagatacho
Sanno Park Tower
Chiyoda-ku, Tokyo 100-6171
Japan
Tel: (81) 3 5156 6000

Confidential

Intuitive-00553014

**EXHIBIT 2**

**to**

**PAUL D. BRACHMAN DECLARATION IN SUPPORT OF
DEFENDANT'S MOTION IN LIMINE NO. 2
TO EXCLUDE DEUTSCHE BANK ANALYST REPORTS
AND RELATED TESTIMONY**

Provided ... 

# Deutsche Bank
Research



| Rating | Company | Date |
|---|---|---|
| **Hold** | **Intuitive Surgical** | **20 February 2020** |

North America
**United States**

Health Care
**Medical Supplies & Devices**

| | Reuters | Bloomberg | Exchange | Ticker |
|---|---|---|---|---|
| | ISRG.OQ | ISRG US | NMS | ISRG |

## Company Update

| Price at 19 Feb 2020 (USD) | 614.88 |
|---|---|
| Price Target | 595.00 |
| 52-week range | 615.00 - 458.27 |

## Deeper Dive on Third Party Risk to I&A Segment

Our February 3rd downgrade was predicated on our belief that refurbished da Vinci instruments pose a material (and increasing) risk to Intuitive's I&A segment growth over the next couple years. Not surprisingly, pushback has centered largely around two points:

1. the presumed regulatory barriers and the view that third-parties engaged in instrument repair are in violation of FDA regulations;
2. hospitals engaging with these third parties are doing so in violation of their customer supply/service contracts with Intuitive.

**Deeper dive into the threat from refurbished da Vinci instruments.** Over the past few weeks, we consulted with five regulatory and legal experts to gain further clarity on both the regulatory/FDA and service contract angles.

- On the FDA side, while some acknowledged that applicable regulations are somewhat nebulous, a majority of regulatory experts came to the conclusion that Restore Robotics is not in violation of FDA rules as a third-party service provider of refurbished instruments.

- Conversations with both health systems and surgeons since our downgrade have yielded further confirmation that utilization of refurbished robotic instruments is starting to gain traction.

- Intuitive customers also provided additional insights into ISRG's stance and pushback strategy – and importantly, also how hospitals are responding to Intuitive's advisement to cease and desist engagement with service providers.

- Notably, some hospitals are now beginning to push back on restrictions embedded in their service contracts against third party servicing of da Vinci systems and instruments, questioning the legality and enforceability of such terms of service.

**We believe the Street continues to be overly dismissive of the risk of increasing usage of refurbished da Vinci instruments to Intuitive's top line over the next couple years. Given the abundance of first-hand confirmation from hospital customers that are exploring refurbished instruments, the question is not whether – but rather, how much – Intuitive's business will be impacted.**

## Valuation & Risks

Imran Zafar
Research Analyst
+1-212-250-3676

Pito Chickering
Research Analyst
+1-212-250-1245

Justin Bowers
Research Analyst
+1-212-250-2912

Deutsche Bank Securities Inc.

Deutsche Bank does and seeks to do business with companies covered in its research reports. Thus, investors should be aware that the firm may have a conflict of interest that could affect the objectivity of this report. Investors should consider this report as only a single factor in making their investment decision. DISCLOSURES AND ANALYST CERTIFICATIONS ARE LOCATED IN APPENDIX 1. MCI (P) 066/04/2019.

Distributed on: 20/02/2020 10:00:17 GMT

Provided by NAV, Inc.. Contact: ...

20 February 2020
Medical Supplies & Devices
Intuitive Surgical



**Even with modest unit share capture, revenue hit would be meaningful.** We continue to believe 4-6% penetration of Intuitive's *de novo* instruments on a unit basis in 2021 is reasonable and, based on our additional diligence, potentially conservative. And even with this modest unit share capture, the resultant impact to Intuitive's top-line would be amplified given that each instrument can be repaired multiple times. In our base case scenario of 5% *de novo* unit share capture in 2021 and the assumption that each instrument is repaired 3x on average, our analysis indicates a top-line hit on the order of $193 million or 3.4% of total company sales in 2021.

Deutsche Bank Securities Inc.

Confidential

Intuitive-00566056

Provided for the exclusive use of philip.kim@knobbe.com. No redistribution permitted.

# Bottom line: barriers to entry may not be as strong as presumed



**FDA experts concur that FDA action to stymie usage of repaired instruments is highly unlikely.**

• Contrary to the viewpoint that third parties require 510(k), our takeaway from these consultants is that 510(k) clearance does <u>not</u> seem to be required for independent service organizations refurbishing used da Vinci instruments so long as they are returned to that same hospital and not re-sold to other centers.

• Regardless, all experts agreed that any regulatory action/enforcement is highly unlikely given FDA's clear comfort around the safety of refurbished devices broadly and the fact that there has been no signal of incremental patient risk to date with repaired da Vinci instruments.

• In fact, Intuitive acknowledged in a recent cease and desist notice to a hospital customer that "FDA has indicated that it will exercise a certain degree of enforcement discretion from FDA quality system requirements as they apply to third party service providers and refurbishers."

**Contractual terms of agreement may not be an airtight impediment to hospital adoption.**

• As has always been the case, Intuitive's hospital customer contracts include stipulations prohibiting engagement with third parties for servicing of both da Vinci systems and instruments/accessories, and that violation of these clauses could render supply/service contracts null and void

• **However, our work indicates that some hospitals are beginning to push back on these contractual limitations and questioning their legal voracity and enforceability. We have heard firsthand from customers, including large hospital systems, planning to (or considering) pursue legal action against Intuitive within the next 12 months.**

Net-net. We have a high level of evidence-based conviction that repaired da Vinci instruments are beginning to gain traction among hospitals, with usage likely to continue to expand over the next couple years.  We note two potentially meaningful near-term stimulants of increased adoption:

(1) significantly greater commercial distribution (Medline, a major distributor with substantial sales/marketing/distribution footprint, recently became a distributor for Restore Robotics)

(2) expansion of offerings to include repaired X/Xi instruments expected near-term.

Confidential

Intuitive-00566057

Provided for the exclusive use of philip.kim@db.com and Intuitive Surgical, Inc. DC 2/9/2021

# Why printer cartridges could be highly relevant



We highlight later in this note the specific terms of agreement enumerated in Initutive's customer contracts that hospitals are now starting to question, largely on the basis of a precedent legal case - IMPRESSION PRODUCTS, INC. v. LEXMARK INTERNATIONAL, INC. – that legal consultants think could ultimately have huge implications for Intuitive's entire business model

The US Supreme Court issued a ruling on this remarkably analogous case in 2017, with Justice Roberts writing:

*"We conclude that a patentee's decision to sell a product exhausts all of its patent rights in that item, regardless of any restrictions the patentee purports to impose or the location of the sale. In sum, patent exhaustion is uniform and automatic. Once a patentee decides to sell—whether on its own or through a licensee—that sale exhausts its patent rights, regardless of any post-sale restrictions the patentee purports to impose, either directly or through a license.*

Some hospitals we spoke with believe Intuitive's contract terms could be in violation of this USSC ruling in the Lexmark case, thus rendering them invalid and unenforceable.

**Litigation acknowledged as risk factor in latest 10K filing.**  Regarding the antitrust lawsuit filed by Restore Robotics in February 2019 (and countersuit subsequently filed by Intuitive), Intuitive has now acknowledged the litigation as a shareholder risk factor in its 10K filed two weeks ago.

---

*Source: PACER.gov, company filings, Deutsche Bank*

Deutsche Bank

Research

Confidential

Intuitive-00566058

Provided for the exclusive use of philip.kim

# Clarity Around Key Regulatory Considerations



**Insights from four regulatory consultants with experience and expertise specifically in the arena of third party servicing medical devices:**

- Former staffer within the CDRH division of FDA;
- Regulatory expert who has worked with various medtech companies in managing hundreds of 510(k) and PMA submissions over decades of industry experience;
- Two regulatory affairs personnel at large medtech companies with significant presence in device refurbishing/reprocessing.

These consultations provided a lot more clarity around a number of critical points determining the regulatory parameters these serviced instruments are subject to, such as

- Distinction between servicing and marketing of limited-use devices by third parties like Restore Robotics versus single use devices;
- Refurbishing versus remanufacturing and the significant differences in regulatory oversight of one versus the other;
- Sterilization processes, which is closely scrutinized by FDA;
- Regulatory oversight of third party facilities where used instruments are serviced.

**Our takeaway from speaking with these consultants is that 510(k) clearance clearly is not be required for independent service organizations (ISOs) such as Restore Robotics in repairing used limited-use da Vinci instruments for hospitals and returning them to the hospital for continued usage.**

Deutsche Bank

Research

Confidential

Intuitive-00566059

Provided for the exclusive use of philip.kim@...co. bc...

# Servicing versus Remanufacturing: a key distinction



The critical distinction is the categorization of used instruments serviced by third parties for additional use given the significant implications vis-à-vis regulatory oversight.  The FDA defines "service" and "remanufacture" as follows:

➢ **Service:** "Repair and/or preventative or routine maintenance of one or more parts in a finished device, after distribution, <u>for purposes of returning it to the safety and performance specifications established by the OEM and to meet its original intended use. Servicing excludes activities that change the intended use</u> of the device from its original purpose, or change the safety or performance specifications.  <u>However, it is important to note that FDA considers remanufacturing to be a distinct activity from servicing that raises different concerns, and is thus regulated differently</u>. FDA considers servicing to include refurbishing, reconditioning, rebuilding, repairing, and remarketing, but not remanufacturing."

➢ **Remanufacture:** Process, condition, renovate, repackage, restore, or any other act done to a finished device that <u>significantly changes the finished device's performance or safety specifications</u>, or intended use.

We believe da Vinci instruments currently refurbished by Restore Robotics clearly fall under the definition of "service" as the process these used instruments undergo are intended to return them to "the safety and performance specifications established by the OEM and to meet its original intended use" and do not involve "activities that change the intended use."

Importantly, the serviced instruments are always shipped back to the original hospital (i.e. no reselling) and the instruments are shipped back to the hospital only after verification that there has been no deviation from the original "performance or safety specifications."

Simply put, surgical scissors have been serviced by ISOs for decades. So why should scissors affixed to a robotic arm be structurally different?  It is important to keep in mind that repaired instruments are limited to relatively simple devices like scissors and graspers and not advanced instruments like staplers.

*Source: FDA.gov*

Deutsche Bank

Research

Confidential

Intuitive-00566060

Provided for the exclusive use of philip.king... ...co. DC...

# Servicing versus Remanufacturing: a key distinction



**FDA consultant underscored that ownership is a key determinant of regulatory requirements and FDA oversight broadly.**

- When a hospital purchases an instrument from Intuitive, the hospital takes ownership of the device
- So when the hospital sends the instrument to a third party like Restore Robotics for refurbishment, the third party is acting as a contractor providing a service for the hospital
- That is, ownership of the device never actually changes hands.

Another FDA expert we consulted fully concurred, noting that once an instrument is purchased it becomes property of the hospital which is free to "do whatever it wants with it."

- The consultants did however point out that the instrument's warranty from the manufacturer would expire after the 10x uses and the hospital/third party would thereby assume liability.
- In speaking with Restore and Medline, neither disagreed with this point and pointed out that standard insurance policies are in place in acknowledgement of this assumed liability. Medline pointed out that the cost to warranty these type of instruments is fairly immaterial

All of our consultants emphasized that a used instrument that is sent to a third party for repair must be shipped back only to that same hospital such that there is <u>no change in ownership</u>. We confirmed with both hospitals and Restore that such is indeed the case here.

Confidential

Intuitive-00566061

Provided for the exclusive use of philip.kin... ...o, DC...

# 510(k) Premarket Notification does not appear applicable



The immediate feedback to our downgrade note was that Restore Robotics is subject to 510(k) approval requirement, and that because the company does not have 510(k) clearance it is therefore in clear violation of FDA regulations.

**However, most of our regulatory experts we spoke to suggested that this argument is fundamentally misplaced.**

One consultant noted that the non-applicability of 510(k) approval is made quite clear by simply considering the FDA's official definition of this process:

### 510(k) Premarket Notification

FDA Home ◎ Medical Devices ◎ Databases

A 510(K) is a premarket submission made to FDA to demonstrate that the device to be marketed is at least as safe and effective, that is, substantially equivalent, to a legally marketed device (21 CFR §807.92(a)(3)) that is not subject to premarket approval.

The agency's definition explicitly qualifies application of 510(k) standards to devices intended to be <u>marketed</u>.

Because third parties are providing a <u>service</u> to the hospital and not commercially marketing the repaired instruments, by definition this precludes the obligation of having 510(k) clearance.

*Source: FDA.gov*

Deutsche Bank

Research

Confidential

Intuitive-00566062

Provided for the exclusive use of philip.kim@intuitive.com. DO NOT DISTRIBUTE.

# Sterilization processes are highly regulated by FDA



**FDA expert pushback**

- One consultant believed Restore Robotics would need to have 510(k) clearance because these limited use instruments are required to undergo a cleaning and sterilization process prior to initial use and between all subsequent uses, per the 510(k) clearance from the FDA.

- Because sterilization processes are highly scrutinized by the FDA  due to potential public safety risk, she raised the possibility that 510(k) might thus be necessary.

- For example, all single use refurbished equipment that is sterilized REQUIRE 510k approval

- However, post that expert call, we confirmed that the instrument repair process actually does NOT involve sterilization – thus rendering this point moot.

- When the repaired instrument is returned to the hospital, it remains subject to exactly the same cleaning/sterilization requirements outlined in the IFU.

**In other words, there is no disruption to the IFU approved by the FDA as part of the 510(k) clearance vis-à-vis sterilization protocol from the repair of da Vinci instruments.**

*Source: FDA.gov, Deutsche Bank*

Deutsche Bank
Research

Confidential

Intuitive-00566063

Provided for the exclusive use of philip.kim

# Regulatory oversight of facilities: ISO certification is the standard



Companies engaged in servicing of devices for the hospital operate under ISO certification, which are obtained from third parties that inspect all facets of the facility where these repairs happen. This inspection includes quality control to confirm that the repair process restores the device to specifications in line with product labeling and with no changes to intended use or safety profile.  As noted earlier, FDA makes a clear distinction between remanufactured versus serviced devices in terms of regulatory oversight including facilities.

Facilities where third parties service and refurbish instruments are not subject to FDA oversight.  Essentially, these facilities need to operate to the satisfaction of hospitals, and having ISO certification is largely what the vetting process of hospitals centers around.

We were able to review a third party ISO certification received by Restore Robotics for the servicing of endowrist instruments.  We confirmed that the issuer of this certification, a Germany-based company called DQS MED, is reputable and credible in the medtech industry – e.g., just a few months ago, this same organization granted ISO certification to a Medtronic facility.

**Net-net: (1) FDA consultants agree that 510k clearance clearly appears to be not applicable, (2) regardless, given the lack of any signal of incremental patient risk with repaired instruments, any FDA enforcement action to curtail usage is highly unlikely unless the restored equipment causes patient harm.**

**Specifically, Restore has been engaged in refurbishing Intuitives' products for over 18 months. Its safe to believe that Intuitive has brought this to FDA's attention.  Per our consultants, if the FDA doesn't act on this information within 3-6 months, it is unlikely the FDA ever will.**

*Source: FDA.gov, Deutsche Bank estimates*

Deutsche Bank

Research

Confidential

Provided for the exclusive use of philip.kim@intuitivesurgical.com, pc123456789.

# FDA's general comfort around refurbished devices is quite clear…and Intuitive agrees that enforcement activity by FDA is unlikely



- Third-party servicing of medical devices has been widespread across the industry for many years, including large segments like endoscopes and laparoscopic devices;

- Third parties engaged in this practice are closely regulated and, per figures cited by the FDA, there are close to 20K companies just in the US that are in the business of servicing used medical devices;

- **FDA's stance on third-party servicing of medical devices is clear.** In May 2018, the agency published its views in its report, _FDA Report on the Quality, Safety, and Effectiveness of Servicing of Medical Devices_

   The document states that there insufficient basis to "justify imposing additional/different, burdensome regulatory requirements at this time; rather, the objective evidence indicates that many OEMs and third-party entities provide high quality, safe, and effective servicing of medical devices."

   Net/net, FDA posits that "The continued availability of third party entities to service and repair medical devices is critical to the functioning of the U.S. healthcare system."

Intuitive acknowledges that regulatory enforcement actions of third party service providers broadly are unlikely, noting in a written correspondence to a hospital customer that FDA will likely "exercise a certain degree of enforcement discretion from FDA quality system requirements as they apply to third party service providers and refurbishers."

_Source: FDA.gov, Deutsche Bank estimates_

Deutsche Bank

Research

Page 11

Confidential

Intuitive-00566065

Provided for the exclusive use of philip.kim@db.com. bc@db.com.

# Additional insights into Intuitive's stance and points of pushback



In cease-and-desist letters sent to hospitals that have begun (or could soon begin) using refurbished da Vinci instruments, Intuitive justifies its stance on safety, regulatory, and legal/contractual grounds.

➢ **Safety**

- Some of the specific points made by the company regarding risks around servicing of limited-use robot consumables do not seem to be relevant.
- For example, one area of emphasis for Intuitive is sterilization and the significant safety risks deviations from sterilization protocols that were okayed by FDA as part of 510(k) device approval.
- However, the repair processes that these instruments undergo do not actually involve sterilization, and the sterilization process these devices are required to undergo between uses remains exactly the same once the instrument is refurbished.
- In other words, the repaired instrument is sent back must undergo the same pre-operative steps as a de novo instrument shipped from Intuitive prior to the initial use.

➢ **Regulatory considerations.**

- ➢ Intuitive cautions customers that third party repairs of da Vinci instruments are in violation of FDA regulations and specific IFUs included in each device's 510(k) approval.
- ➢ However, our work suggests that there is likely no actual violation of regulatory guidelines by third parties in refurbishing the devices nor by the hospital in utilizing them.

➢ **Legal / Contractual grounds**

- ➢ Customer contracts explicitly prohibit third party servicing of instruments/robots and that violations could render the contract null and void.  Hospitals are now beginning to question Intuitive's ability to enforce this.

Deutsche Bank
Research

Confidential
Intuitive-00566066

Provided for the exclusive use of philip.king@_____ co. _____

# Hospitals starting to pushback on legality/enforceability of terms of service



In no uncertain terms, the standard terms of service outlined in customer contracts state that hospitals are precluded from engaging with third parties as well as the potential consequences of violation – nullification of contracts, product warranties, etc.

> ➢ *Instruments and Accessories are subject to a limited license to use those Instruments and Accessories with, and prepare those Instruments and Accessories for use with, the System. Any other use is prohibited, whether before or after the Instrument or Accessory's license expiration, including repair, refurbishment, or reconditioning not approved by Intuitive, and cleaning and sterilization inconsistent with Documentation. This license expires once an Instrument or Accessory is used up to its maximum number of uses specified in the Documentation accompanying the Instrument or Accessory.*

> ➢ *Customer agreed that it will not, nor will Customer permit any third party to, modify, disassemble, reverse engineer, alter, or misuse the System or Instruments and Accessories. Customer further agreed that if Customer fails to comply with the requirements listed above, Intuitive may terminate the Agreement immediately upon written notice, and any warranties applicable to the System will become void.*

Confidential

Intuitive-00566067

Provided for the exclusive use of philip.kim@deutschebank-dr.com. DO NOT REDISTRIBUTE

# Hospitals starting to pushback on legality/enforceability of terms of service



**What has changed?**  While restrictions around third party servicing of da Vinci instruments and robots have always been a standard part of customer contracts, we have learned that hospitals are now starting to push back on these clauses.

1. Usage of repaired instruments was simply not an option previously.  Hence, there was no pushback from hospitals – but with this option now available from third parties like Restore Robotics, we are starting to see hospitals question the actual legality of these terms.

2. Recent Supreme Court ruling in the IMPRESSION PRODUCTS, INC. v. LEXMARK INTERNATIONAL, INC. case. As highlighted below, the aforementioned terms of agreement stipulated in Intuitive's service contracts could potentially be in conflict with the SCOTUS opinions articulated in this decision.

Confidential

Intuitive-00566068

Provided for the exclusive use of philip.kim...

# SCOTUS docket No 15-1189: Why printer cartridges could be highly relevant



SUPREME COURT OF THE UNITED STATES

Syllabus

IMPRESSION PRODUCTS, INC. v. LEXMARK
INTERNATIONAL, INC.

CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR
THE FEDERAL CIRCUIT

No. 15–1189.   Argued March 21, 2017—Decided May 30, 2017

**This landmark case is highly analogous to the customer restrictions stipulated in the terms of service of Intuitive's customer contracts.**

*When Lexmark sells toner cartridges, it gives consumers two options: One option is to buy a toner cartridge at full price, with no restrictions. The other option is to buy a cartridge at a discount through Lexmark's "Return Program." In exchange for the lower price, <u>customers who buy through the Return Program must sign a contract agreeing to use the cartridge only once and to refrain from transferring the cartridge to anyone but Lexmark</u>.*

*<u>Companies known as remanufacturers acquire empty Lexmark toner cartridges—including Return Program cartridges—from purchasers in the United States, refill them with toner, and then resell them</u>. They do the same with Lexmark cartridges that they acquire from purchasers overseas and import into the United States. Lexmark sued a number of these remanufacturers, including petitioner Impression Products, Inc., for patent infringement with respect to two groups of cartridges.*

Source: PACER.gov, Deutsche Bank estimates

Deutsche Bank

Research

Confidential

# SCOTUS docket No 15-1189: Why printer cartridges could be highly relevant



**The US Supreme Court found the stipulations imposed by Lexmark on its customers restricting what these customers do with printer cartridges they have purchased to be unlawful**

- *When a patentee sells one of its products, the patentee can no longer control that item through the patent laws—its patent rights are said to "exhaust."*
- *The purchaser and all subsequent owners are free to use or resell the product just like any other item of personal property, without fear of an infringement lawsuit.*

*This case presents two questions about the scope of the patent exhaustion doctrine:*

- *First, whether a patentee that sells an item under an express restriction on the purchaser's right to reuse or resell the product may enforce that restriction through an infringement lawsuit.*
- *Second, whether a patentee exhausts its patent rights by selling its product outside the United States, where American patent laws do not apply.* ***We conclude that a patentee's decision to sell a product exhausts all of its patent rights in that item, regardless of any restrictions the patentee purports to impose or the location of the sale.***

*In sum, patent exhaustion is uniform and automatic.* ***Once a patentee decides to sell—whether on its own or through a licensee—that sale exhausts its patent rights, regardless of any post-sale restrictions the patentee purports to impose, either directly or through a license.***

*Source: PACER.gov, Deutsche Bank estimates*

Deutsche Bank
Research

Confidential

Intuitive-00566070

Provided for the exclusive use of philip.kim... Co. DC...

# Quantifying the Risk to US I&A Revenues



To quantify Intuitive's revenues at risk from inroads by third-party instrument repairs, we queried the DB US Medtech Database which provided us with a meaningful sample size: <u>8.2% of 2019 reported US I&A segment revenues</u>.

We looked at 2019 revenues for all instrument SKUs currently eligible for third-party repair – which, as noted, are currently limited to the da Vinci S/Si product portfolio.

| SKU | Description | % of I&A revenue | SKU | Description | % of I&A revenue |
|-----|-------------|------------------|-----|-------------|------------------|
| 420179 | SCISSORS MONOPOLAR STERILE DISPOSABLE 38- D CURVE L55.9 CM L1.3 CM OD8 MM | 6.71% | 420001 | SCISSORS LAPAROSCOPIC POTTS 22- D L54.5 CM L1.1 CM | 0.04% |
| 420006 | DRIVER NEEDLE ENDOWRIST DA VINCI S/SI 30- D LARGE L54.4 CM L1 CM OD8 MM | 3.12% | 420048 | FORCEPS DA VINCI S/SI LONG OD8 MM STERILE | 0.04% |
| 420205 | FORCEPS BIPOLAR LAPAROSCOPIC ENDOWRIST S/SI 45- D MEDIUM L55.9 CM L2.1 CM OD8 MM | 2.98% | 420278 | RETRACTOR LAPAROSCOPIC GRAPTOR 60- D L56.7 CM L5.4 CM OD8 MM | 0.04% |
| 420093 | FORCEPS LAPAROSCOPIC PROGRASP S/SI 38- D L56.2 CM L2.8 CM OD8 MM GRASPER | 2.21% | 420033 | FORCEPS LAPAROSCOPIC DA VINCI S/SI ENDOWRIST 30- D MICRO DIAMOND L54.4 CM L1 CM OD8 MM | 0.03% |
| 420309 | DRIVER NEEDLE SUTURECUT ROBOTIC 23- D MEGA L49.7 CM L1.4 CM OD8 MM | 1.97% | 420007 | SCISSORS LAPAROSCOPIC DA VINCI S/SI ROUND L54.5 CM L1.1 CM OD8 MM | 0.02% |
| 420172 | FORCEPS MARYLAND BIPOLAR 2 CMX8 MM MED | 1.41% | 420178 | SCISSORS LAPAROSCOPIC CURVE STERILE DISPOSABLE L54.7 CM L1.3 CM OD8 MM MEDIUM | 0.02% |
| 420227 | BIPOLAR FORCEPS LAPAROSCOPIC S/SI ENDOWRIST PK 70- D L55.4 CM L2 CM OD8 MM | 1.32% | 420249 | RETRACTOR LAPAROSCOPIC 2 BLADE | 0.01% |
| 420194 | DRIVER NEEDLE MEGA 30-DX54.7CMX1.3CM | 1.27% | 420181 | FORCEPS GRASPING DISPOSABLE RESANO 30- D MEDIUM L54.5 CM L1.1 CM OD8 MM | 0.01% |
| 420049 | FORCEPS LAPAROSCOPIC 38 D L32.77 CM L2 CM OD8 MM | 0.69% | 420246 | RETRACTOR LAPAROSCOPICT RIGHT CURVE OD8 MM | 0.01% |
| 420183 | HOOK DA VINCI S/SI L55.2 CM L1.6 CM OD8 MM | 0.36% | 420036 | FORCEPS LAPAROSCOPIC DAVINCI 30-D MEDIUM L54.6 CM L1.2 CM OD8 MM | 0.01% |
| 420296 | DRIVER NEEDLE SUTURECUT 30- D 54.5 CM X1.1 CMX8 MM LRG | 0.28% | 420157 | BLADE ENDOSCOPIC 8 MM L54.6 CM L1.2 CM OD8 MM | 0.01% |
| 420190 | GRASPER ENDOSCOPIC DA VINCI S 60- D COBRA L55.4 CM L2 CM OD8 MM LOW FORCE | 0.22% | 420171 | FORCEPS LAPAROSCOPIC 45- D MICRO L55.2 CM L1.4 CM STERILE | 0.01% |
| 420207 | FORCEPS LAPAROSCOPIC TENACULUM 75- D L56.4 CM L3 CM OD8 MM | 0.16% | 420215 | FORCEPS GRASPER CARDIAC PROBE DAVINCI S/S OD8 MM | 0.00% |
| 420184 | ELECTRODE CAUTERY SPATULA MONOPOLAR STERILE DISPOSABLE L1.7 CM OD8 MM | 0.11% | 420121 | FORCEPS FINE TISSUE 54.5 CMX8 MM | 0.00% |
| 420189 | GRASPER LAPAROSCOPIC DA VINCI S/SI ENDOWRIST L56.7 CM OD8 MM | 0.08% | 420110 | FORCEPS LAPAROSCOPIC PRECISE BIPOLAR OD8 MM | 0.00% |
| 420318 | RETRACTOR ENDOSCOPIC ENDOWRIST DA VINCI S/SI GRAPTOR SMALL GRASP | 0.07% | 420192 | Valve Hook | 0.00% |
| 420003 | APPLIER CLIP SMALL HEMOCLIP TITANIUM 8 MM | 0.05% | 420203 | Pericardial Dissector | 0.00% |
| 420344 | DISSECTOR BIPOLAR CURVE CAUTERY 8 MM | 0.04% | 420204 | Atrial Retractor | 0.00% |

## In total, we estimate that ~23% of Intuitive's US I&A segment revenues are exposed to potential impact from third-party repair.

- This represents a big decline versus 2018, when these consumable devices accounted to about 35% of segment sales mix, reflecting the continued mix shift toward X/Xi products.

Source: Global Healthcare Exchange LLC, Deutsche Bank estimates

Deutsche Bank

Research

Confidential

Intuitive-00566071

Provided for the exclusive use of philip.kim@intuitive.com. Do not distribute.

# Quantifying the Risk to US I&A Revenues



It is our understanding that da Vinci instrument repairs are expected to become available for instruments in the X/Xi product suite around mid-2020 – which is significant given the continued mix shift toward the latest-generation instruments and away from the S/Si catalog.

And while it is not yet clear specifically which X/Xi instrument SKUs will be available for third-party repair, our analysis assumes that these will include the corresponding iteration of those currently being serviced within the prior-generation S/Si family.

| SKU | Description | % of I&A revenue | SKU | Description | % of I&A revenue |
|---|---|---|---|---|---|
| 470179 | SCISSORS MONOPOLAR HOT SHEARS ENDOWRIST 38 D CURVE L31.75 CM L1.3 CM OD8 MM | 14.01% | 470033 | FORCEPS LAPAROSCOPIC L1 CM L31.5 CM | 0.06% |
| 470006 | DRIVER NEEDLE ENDOWRIST 30 D LARGE L31.5 CM L1 CM OD8 MM | 4.97% | 470249 | RETRACTOR LAPAROSCOPIC 70 D L33.27 CM L4.8 CM OD8 MM 2 | 0.06% |
| 470309 | DRIVER NEEDLE MEGA SUTURE CUT 0-35 D L1.4 CM | 4.82% | 470246 | RETRACTOR LAPAROSCOPIC 60 D SHORT L33.27 CM L4.8 CM OD8 MM | 0.04% |
| 470172 | FORCEPS LAPAROSCOPIC MARYLAND 45 D L32.77 CM L2 CM OD8 MM | 2.97% | 470171 | FORCEPS BIPOLAR MICRO | 0.04% |
| 470049 | FORCEPS LAPAROSCOPIC CADIERE DA VINCI XI 38 D L32.77 CM L2 CM OD8 MM | 2.81% | 470215 | GRASPER DA VINCI XI 60 D L32.26 CM L1.7 CM OD8 MM | 0.03% |
| 470194 | DRIVER NEEDLE 38 D L31.75 CM L1.3 CM OD8 MM | 1.79% | 470181 | FORCEPS ENDOWRIST L31.75 CM L1.1 CM OD8 MM | 0.02% |
| 470296 | DRIVER NEEDLE SUTURECUT 38 D 31.50 CMX1.1 CMX8 MM LRG | 1.28% | 470190 | GRASPER LAPAROSCOPIC COBRA 68 D L32.51 CM L2 CM | 0.00% |
| 470318 | RETRACTOR LAPAROSCOPIC 0-65 D SMALL L4.5 CM | 0.76% | 470036 | FORCEP ROBOTIC XI DEBAKEY | 0.00% |
| 470205 | FORCEPS BIPOLAR LAPAROSCOPIC 45 D L32.77 CM L2.1 CM | 0.42% | 470093 | FORCEP ROBOT DAVINCI XI PROGRASP | 0.00% |
| 470344 | DISSECTOR LAPAROSCOPIC 45 D | 0.41% | 470183 | ROBOT DAVINCI XI PERMANENT MONOPOLAR CAUTERY HOOK | 0.00% |
| 470001 | SCISSORS POTTS LAPAROSCOPIC 22 D L31.5 CM L1.1 CM OD8 MM | 0.15% | 470184-T | PERMANENT CAUTERY SPATULA | 0.00% |
| 470007 | SCISSORS ROUND TIP 38 D L31.5 CM L1.1 CM | 0.14% | 470207 | FCP TENACULUM XI | 0.00% |
| 470048 | FORCEPS LAPAROSCOPIC 30 D L32.51 CM L2 CM | 0.11% | | | |

**We estimate that the above X/Xi instruments collectively accounted for ~35% of 2019 US I&A segment revenues. As such, once third-party repairs of them become available, Intuitive's top line exposure will increase dramatically – rendering a majority (~58%) of segment sales "at risk" of competitive pressures.**

| | 2018 | 2019 |
|---|---|---|
| S/Si instruments | 35% | 23% |
| X/Si instruments | 29% | 35% |
| Total | 64% | 58% |

Source: Global Healthcare Exchange LLC, Deutsche Bank estimates

Deutsche Bank

Research

Confidential

Intuitive-00566072

Provided for the exclusive use of philip.kim...

# Model Ramifications: Revenue & EPS Sensitivity



Our analysis of expected financial impact of third-party instrument repair encroachment presumes 58% of US I&A segment sales are addressable in 2021, per SKU-level analysis.

Based on 2021 consensus US I&A segment revenues of $2.224 billion, this would put $1.290 billion of Intuitive's sales at risk from increased utilization of repaired instruments.  This equates to 23% of total company sales.

Based on our conversations with surgeon and hospital customers, we believe 4-6% penetration of Intuitive's *de novo* instruments on a unit basis in 2021 is reasonable and potentially even conservative.  And even with this modest unit share capture, the resultant impact to Intuitive's top-line would be amplified given that each instrument can be repaired multiple times.

**As such, our base case scenario of 5% *de novo* unit share capture in 2021 and the assumption that each instrument is repaired 3x on average, our analysis indicates a top-line hit on the order of $193 million or 3.4% of total company sales in 2021.**

The model impact of this manifests on the US revenue per procedure line of our sales build, with zero impact to procedure volume growth.

| 2021E Consensus ($MM) | |
|---|---|
| Total company sales | $5,710 |
| US Instruments & Accessories sales | $2,224 |
| % of US I&A segment revenues at risk | 58% |
| $ at risk | $1,290 |
| % of total company revenues at risk | 23% |

| % capture of addressable revs | Top line impact | | | EPS impact | |
|---|---|---|---|---|---|
| | $MM | % of US I&A sales | % of total sales | $ | % |
| 2.5% | $32 | 1.5% | 0.6% | $0.09 | 0.6% |
| 5.0% | $64 | 2.9% | 1.1% | $0.18 | 1.1% |
| 7.5% | $97 | 4.4% | 1.7% | $0.27 | 1.7% |
| 10.0% | $129 | 5.8% | 2.3% | $0.35 | 2.2% |
| 12.5% | $161 | 7.3% | 2.8% | $0.44 | 2.8% |
| **15.0%** | **$193** | **8.7%** | **3.4%** | **$0.53** | **3.4%** |
| 17.5% | $226 | 10.2% | 4.0% | $0.62 | 3.9% |
| 20.0% | $258 | 11.6% | 4.5% | $0.71 | 4.5% |
| 22.5% | $290 | 13.1% | 5.1% | $0.80 | 5.0% |
| 25.0% | $322 | 14.5% | 5.6% | $0.88 | 5.6% |
| 27.5% | $355 | 16.0% | 6.2% | $0.97 | 6.2% |

Source: Bloomberg Finance LC, Deutsche Bank estimates

Deutsche Bank

Research

Confidential

Intuitive-00566073

Provided for the exclusive use of philip.kim@intuitivesurgical.com. DO NOT DISTRIBUTE.

# Mitigants to Third-Party Encroachment



Intuitive expects that these matters will ultimately be resolved in the courts, and barring any unforeseen developments (i.e., settlement) the ongoing litigation with Restore Robotics will surely take several years to play out.  However, in the meanwhile we do note multiple fundamental mitigating factors that will to some extent continue to blunt the impact.

- **Innovation.**  Intuitive's R&D investments remain substantial ($430mm in 2019) with innovation now an even bigger core focus ahead of upcoming competitor system launches.  Launch of new da Vinci platforms and advanced instruments will continue to yield a lower mix of I&A revenues vulnerable to third-party encroachment.

- **Usage based placements.**  An increasing number of hospitals are acquiring new da Vinci systems via usage-based and operating lease arrangements, with systems like Mount Sinai beholden to instrument pricing based on volume thresholds and therefore disincentivized to utilize refurbished instruments.

- **Leveraging its dominant market position.**  While some hospitals are now starting to question the legality/enforceability of contract terms of service, there are also those whose surgeons are simply unwilling to risk losing access to Intuitive's technologies.  We spoke with a supply chain executive of a major academic center that recently began using repaired da Vinci instruments, but upon receipt of an ensuing cease-and-desist notice from the company's lawyers, stopped.

Deutsche Bank
Research

Confidential

Intuitive-00566074

Provided for the exclusive use of philip.kim...........a.......................o. b........o.......

# Litigation: Restore Robotics v. Intuitive Surgical



**Developments in ongoing litigation will ultimately have significant implications, though resolution likely years away.**

- In February 2019, Restore Robotics filed an antitrust lawsuit against Intuitive in the US District Court in the Northern District of Florida.

- Intuitive subsequently filed a countersuit against Restore Robotics comprising six counts that include unlawful business practices and fraud.

The case is currently in discovery phase and a jury trial is scheduled to commence in 2022, which barring settlement and potential for either side to appeal the jury's verdict indicates that resolution is likely several years away.  And while we are not lawyers and thus not qualified to opine on the voracity of either party's claims in the lawsuit/countersuit nor handicap the potential outcomes, and despite the fact that final resolution is likely years away, we think investors should be cognizant of the case and developments over the next few years.

We do note that if hospital systems wanted to pursue legal action of their own against Intuitive, it would be via a separate filling in the state the hospitals operate in – and based on our checks, we would not be surprised to see such lawsuits filed over the next year or two.

_Source: PACER.gov, Deutsche Bank estimates_

Deutsche Bank

Research

Confidential

Intuitive-00566075

20 February 2020
Medical Supplies & Devices
Intuitive Surgical



# Appendix 1

## Important Disclosures

### *Other information available upon request

| Disclosure checklist | | | |
| --- | --- | --- | --- |
| Company | Ticker | Recent price* | Disclosure |
| Intuitive Surgical | ISRG.OQ | 604.67 (USD) 18 Feb 2020 | 2, 8, 14, 15 |

*Prices are current as of the end of the previous trading session unless otherwise indicated and are sourced from local exchanges via Reuters, Bloomberg and other vendors . Other information is sourced from Deutsche Bank, subject companies, and other sources. For disclosures pertaining to recommendations or estimates made on securities other than the primary subject of this research, please see the most recently published company report or visit our global disclosure look-up page on our website at https://research.db.com/Research/Disclosures/CompanySearch. Aside from within this report, important risk and conflict disclosures can also be found at https://research.db.com/Research/Topics/Equities?topicId=RB0002. Investors are strongly encouraged to review this information before investing.

## Important Disclosures Required by U.S. Regulators

Disclosures marked with an asterisk may also be required by at least one jurisdiction in addition to the United States.See Important Disclosures Required by Non-US Regulators and Explanatory Notes.

2.   Deutsche Bank and/or its affiliate(s) makes a market in equity securities issued by this company.

8.   Deutsche Bank and/or its affiliate(s) expects to receive, or intends to seek, compensation for investment banking services from this company in the next three months.

14.   Deutsche Bank and/or its affiliate(s) has received non-investment banking related compensation from this company within the past year.

15.   This company has been a client of Deutsche Bank Securities Inc. within the past year, during which time it received non-investment banking securities-related services.

## Important Disclosures Required by Non-U.S. Regulators

Disclosures marked with an asterisk may also be required by at least one jurisdiction in addition to the United States.See Important Disclosures Required by Non-US Regulators and Explanatory Notes.

2.   Deutsche Bank and/or its affiliate(s) makes a market in equity securities issued by this company.

For disclosures pertaining to recommendations or estimates made on securities other than the primary subject of this research, please see the most recently published company report or visit our global disclosure look-up page on our website at https://research.db.com/Research/Disclosures/CompanySearch

## Analyst Certification

The views expressed in this report accurately reflect the personal views of the undersigned lead analyst(s) about the subject issuer and the securities of the issuer. In addition, the undersigned lead analyst(s) has not and will not receive any compensation for providing a specific recommendation or view in this report. Imron Zafar.

Confidential                                                                              Intuitive-00566076

Provided by Deutsche Bank. Reproduced with the consent of Deutsche Bank. Distribution of this material...

20 February 2020
Medical Supplies & Devices
Intuitive Surgical



Historical recommendations and target price: Intuitive Surgical (ISRG.OQ)
*(as of 02/19/2020)*



Current Recommendations

Buy
Hold
Sell
Not Rated
Suspended Rating

** Analyst is no longer at
Deutsche Bank

| | | | | |
|---|---|---|---|---|
| 1. | 04/02/2019 | Buy, Target Price Change USD 630.00 Imron Zafar | 3. | 01/27/2020 | Downgraded to Hold, Target Price Change USD 595.00 Imron Zafar |
| 2. | 04/19/2019 | Buy, Target Price Change USD 610.00 Imron Zafar | | | |

Equity Rating Key

Buy: Based on a current 12- month view of total share-holder return (TSR = percentage change in share price from current price to projected target price plus pro-jected dividend yield ) , we recommend that investors buy the stock.

Sell: Based on a current 12-month view of total share-holder return, we recommend that investors sell the stock.

Hold: We take a neutral view on the stock 12-months out and, based on this time horizon, do not recommend either a Buy or Sell.

Newly issued research recommendations and target prices supersede previously published research.

Equity rating dispersion and banking relationships



Deutsche Bank Securities Inc.

Confidential                                                                          Intuitive-00566077

20 February 2020
Medical Supplies & Devices
Intuitive Surgical



## Additional Information

The information and opinions in this report were prepared by Deutsche Bank AG or one of its affiliates (collectively 'Deutsche Bank'). Though the information herein is believed to be reliable and has been obtained from public sources believed to be reliable, Deutsche Bank makes no representation as to its accuracy or completeness. Hyperlinks to third-party websites in this report are provided for reader convenience only. Deutsche Bank neither endorses the content nor is responsible for the accuracy or security controls of those websites.

If you use the services of Deutsche Bank in connection with a purchase or sale of a security that is discussed in this report, or is included or discussed in another communication (oral or written) from a Deutsche Bank analyst, Deutsche Bank may act as principal for its own account or as agent for another person.

Deutsche Bank may consider this report in deciding to trade as principal. It may also engage in transactions, for its own account or with customers, in a manner inconsistent with the views taken in this research report. Others within Deutsche Bank, including strategists, sales staff and other analysts, may take views that are inconsistent with those taken in this research report. Deutsche Bank issues a variety of research products, including fundamental analysis, equity-linked analysis, quantitative analysis and trade ideas. Recommendations contained in one type of communication may differ from recommendations contained in others, whether as a result of differing time horizons, methodologies, perspectives or otherwise. Deutsche Bank and/or its affiliates may also be holding debt or equity securities of the issuers it writes on. Analysts are paid in part based on the profitability of Deutsche Bank AG and its affiliates, which includes investment banking, trading and principal trading revenues.

Opinions, estimates and projections constitute the current judgment of the author as of the date of this report. They do not necessarily reflect the opinions of Deutsche Bank and are subject to change without notice. Deutsche Bank provides liquidity for buyers and sellers of securities issued by the companies it covers. Deutsche Bank research analysts sometimes have shorter-term trade ideas that may be inconsistent with Deutsche Bank's existing longer-term ratings. Some trade ideas for equities are listed as Catalyst Calls on the Research Website (https://research.db.com/Research/) , and can be found on the general coverage list and also on the covered company's page. A Catalyst Call represents a high-conviction belief by an analyst that a stock will outperform or underperform the market and/or a specified sector over a time frame of no less than two weeks and no more than three months. In addition to Catalyst Calls, analysts may occasionally discuss with our clients, and with Deutsche Bank salespersons and traders, trading strategies or ideas that reference catalysts or events that may have a near-term or medium-term impact on the market price of the securities discussed in this report, which impact may be directionally counter to the analysts' current 12-month view of total return or investment return as described herein. Deutsche Bank has no obligation to update, modify or amend this report or to otherwise notify a recipient thereof if an opinion, forecast or estimate changes or becomes inaccurate. Coverage and the frequency of changes in market conditions and in both general and company-specific economic prospects make it difficult to update research at defined intervals. Updates are at the sole discretion of the coverage analyst or of the Research Department Management, and the majority of reports are published at irregular intervals. This report is provided for informational purposes only and does not take into account the particular investment objectives, financial situations, or needs of individual clients. It is not an offer or a solicitation of an offer to buy or sell any financial instruments or to participate in any particular trading strategy. Target prices are inherently imprecise and a product of the analyst's judgment. The financial instruments discussed in this report may not be suitable for all investors, and investors must make their own informed investment decisions. Prices and availability of financial instruments are subject to change without notice, and investment transactions can lead to losses as a result of price fluctuations and other factors. If a financial instrument is denominated in a currency other than an investor's currency, a change in exchange rates may adversely affect the investment. Past performance is not necessarily indicative of future results. Performance calculations exclude transaction costs, unless otherwise indicated. Unless otherwise indicated, prices are current as of the end of the previous trading session and are sourced from local exchanges via Reuters, Bloomberg and other vendors. Data is also sourced from Deutsche Bank, subject companies, and other parties.

The Deutsche Bank Research Department is independent of other business divisions of the Bank. Details regarding our organizational arrangements and information barriers we have to prevent and avoid conflicts of interest with respect to our research are available on our website (https://research.db.com/Research/) under Disclaimer.

Macroeconomic fluctuations often account for most of the risks associated with exposures to instruments that promise to pay fixed or variable interest rates. For an investor who is long fixed-rate instruments (thus receiving these cash flows), increases in interest rates naturally lift the discount factors applied to the expected cash flows and thus cause a loss. The longer the maturity of a certain cash flow and the higher the move in the discount factor, the higher will be the loss. Upside surprises in inflation, fiscal funding needs, and FX depreciation rates are among the most common adverse macroeconomic shocks to receivers. But counterparty exposure, issuer creditworthiness, client segmentation, regulation (including changes in assets holding limits for different types of investors), changes in tax policies, currency convertibility (which may constrain currency conversion, repatriation of profits and/or liquidation of positions), and settlement issues related to local clearing houses are also important risk factors. The sensitivity of fixed-income instruments to macroeconomic shocks may be mitigated by indexing the contracted cash flows to inflation, to FX depreciation, or to specified interest rates – these are common in emerging markets. The index fixings may – by construction – lag or mis-measure the actual move in the underlying variables they are intended to track. The choice of the proper fixing (or metric) is particularly important in swaps markets, where floating coupon rates (i.e., coupons indexed to a typically short-dated interest rate reference index) are exchanged for fixed coupons. Funding in a currency that differs from the currency in which coupons are denominated carries FX risk. Options on swaps (swaptions) the risks typical to options in addition to the risks related to rates movements.

Derivative transactions involve numerous risks including market, counterparty default and illiquidity risk. The appropriateness

Confidential

Intuitive-00566078

Provided by Deutsche Bank Securities Inc. ... under the terms and conditions ... and may not be forwarded or redistributed ...

20 February 2020
Medical Supplies & Devices
Intuitive Surgical



of these products for use by investors depends on the investors' own circumstances, including their tax position, their regulatory environment and the nature of their other assets and liabilities; as such, investors should take expert legal and financial advice before entering into any transaction similar to or inspired by the contents of this publication. The risk of loss in futures trading and options, foreign or domestic, can be substantial. As a result of the high degree of leverage obtainable in futures and options trading, losses may be incurred that are greater than the amount of funds initially deposited – up to theoretically unlimited losses. Trading in options involves risk and is not suitable for all investors. Prior to buying or selling an option, investors must review the 'Characteristics and Risks of Standardized Options", at http://www.optionsclearing.com/about/publications/character-risks.jsp. If you are unable to access the website, please contact your Deutsche Bank representative for a copy of this important document.

Participants in foreign exchange transactions may incur risks arising from several factors, including the following: (i) exchange rates can be volatile and are subject to large fluctuations; (ii) the value of currencies may be affected by numerous market factors, including world and national economic, political and regulatory events, events in equity and debt markets and changes in interest rates; and (iii) currencies may be subject to devaluation or government-imposed exchange controls, which could affect the value of the currency. Investors in securities such as ADRs, whose values are affected by the currency of an underlying security, effectively assume currency risk.

Unless governing law provides otherwise, all transactions should be executed through the Deutsche Bank entity in the investor's home jurisdiction. Aside from within this report, important conflict disclosures can also be found at https://research.db.com/Research/ on each company's research page. Investors are strongly encouraged to review this information before investing.

Deutsche Bank (which includes Deutsche Bank AG, its branches and affiliated companies) is not acting as a financial adviser, consultant or fiduciary to you or any of your agents (collectively, "You" or "Your") with respect to any information provided in this report. Deutsche Bank does not provide investment, legal, tax or accounting advice, Deutsche Bank is not acting as your impartial adviser, and does not express any opinion or recommendation whatsoever as to any strategies, products or any other information presented in the materials. Information contained herein is being provided solely on the basis that the recipient will make an independent assessment of the merits of any investment decision, and it does not constitute a recommendation of, or express an opinion on, any product or service or any trading strategy.

The information presented is general in nature and is not directed to retirement accounts or any specific person or account type, and is therefore provided to You on the express basis that it is not advice, and You may not rely upon it in making Your decision. The information we provide is being directed only to persons we believe to be financially sophisticated, who are capable of evaluating investment risks independently, both in general and with regard to particular transactions and investment strategies, and who understand that Deutsche Bank has financial interests in the offering of its products and services. If this is not the case, or if You are an IRA or other retail investor receiving this directly from us, we ask that you inform us immediately.

In July 2018, Deutsche Bank revised its rating system for short term ideas whereby the branding has been changed to Catalyst Calls ("CC") from SOLAR ideas; the rating categories for Catalyst Calls originated in the Americas region have been made consistent with the categories used by Analysts globally; and the effective time period for CCs has been reduced from a maximum of 180 days to 90 days.

**United States**: Approved and/or distributed by Deutsche Bank Securities Incorporated, a member of FINRA, NFA and SIPC. Analysts located outside of the United States are employed by non-US affiliates that are not subject to FINRA regulations.

**Germany**: Approved and/or distributed by Deutsche Bank AG, a joint stock corporation with limited liability incorporated in the Federal Republic of Germany with its principal office in Frankfurt am Main. Deutsche Bank AG is authorized under German Banking Law and is subject to supervision by the European Central Bank and by BaFin, Germany's Federal Financial Supervisory Authority.

**United Kingdom**: Approved and/or distributed by Deutsche Bank AG acting through its London Branch at Winchester House, 1 Great Winchester Street, London EC2N 2DB. Deutsche Bank AG in the United Kingdom is authorised by the Prudential Regulation Authority and is subject to limited regulation by the Prudential Regulation Authority and Financial Conduct Authority. Details about the extent of our authorisation and regulation are available on request.

**Hong Kong SAR**: Distributed by Deutsche Bank AG, Hong Kong Branch except for any research content relating to futures contracts within the meaning of the Hong Kong Securities and Futures Ordinance Cap. 571. Research reports on such futures contracts are not intended for access by persons who are located, incorporated, constituted or resident in Hong Kong. The author(s) of a research report may not be licensed to carry on regulated activities in Hong Kong and, if not licensed, do not hold themselves out as being able to do so. The provisions set out above in the 'Additional Information' section shall apply to the fullest extent permissible by local laws and regulations, including without limitation the Code of Conduct for Persons Licensed or Registered with the Securities and Futures Commission. This report is intended for distribution only to 'professional investors' as defined in Part 1 of Schedule of the SFO. This document must not be acted or relied on by persons who are not professional investors. Any investment or investment activity to which this document relates is only available to professional investors and will be engaged only with professional investors.

**India**: Prepared by Deutsche Equities India Private Limited (DEIPL) having CIN: U65990MH2002PTC137431 and registered office at 14th Floor, The Capital, C-70, G Block, Bandra Kurla Complex Mumbai (India) 400051. Tel: + 91 22 7180 4444. It is registered by the Securities and Exchange Board of India (SEBI) as a Stock broker bearing registration no.: INZ000252437;

Confidential

Intuitive-00566079

Provided by D&B Discovery ...by a third party. Further reproduction or distribution is prohibited without...

20 February 2020
Medical Supplies & Devices
Intuitive Surgical



Merchant Banker bearing SEBI Registration no.: INM000010833 and Research Analyst bearing SEBI Registration no.: INH000001741. DEIPL may have received administrative warnings from the SEBI for breaches of Indian regulations. Deutsche Bank and/or its affiliate(s) may have debt holdings or positions in the subject company. With regard to information on associates, please refer to the "Shareholdings" section in the Annual Report at: https://www.db.com/ir/en/annual-reports.htm.

**Japan**: Approved and/or distributed by Deutsche Securities Inc.(DSI). Registration number - Registered as a financial instruments dealer by the Head of the Kanto Local Finance Bureau (Kinsho) No. 117. Member of associations: JSDA, Type II Financial Instruments Firms Association and The Financial Futures Association of Japan. Commissions and risks involved in stock transactions - for stock transactions, we charge stock commissions and consumption tax by multiplying the transaction amount by the commission rate agreed with each customer. Stock transactions can lead to losses as a result of share price fluctuations and other factors. Transactions in foreign stocks can lead to additional losses stemming from foreign exchange fluctuations. We may also charge commissions and fees for certain categories of investment advice, products and services. Recommended investment strategies, products and services carry the risk of losses to principal and other losses as a result of changes in market and/or economic trends, and/or fluctuations in market value. Before deciding on the purchase of financial products and/or services, customers should carefully read the relevant disclosures, prospectuses and other documentation. 'Moody's', 'Standard Poor's', and 'Fitch' mentioned in this report are not registered credit rating agencies in Japan unless Japan or 'Nippon' is specifically designated in the name of the entity. Reports on Japanese listed companies not written by analysts of DSI are written by Deutsche Bank Group's analysts with the coverage companies specified by DSI. Some of the foreign securities stated on this report are not disclosed according to the Financial Instruments and Exchange Law of Japan. Target prices set by Deutsche Bank's equity analysts are based on a 12-month forecast period.

**Korea**: Distributed by Deutsche Securities Korea Co.

**South Africa:** Deutsche Bank AG Johannesburg is incorporated in the Federal Republic of Germany (Branch Register Number in South Africa: 1998/003298/10).

**Singapore:** This report is issued by Deutsche Bank AG, Singapore Branch (One Raffles Quay #18-00 South Tower Singapore 048583, 65 6423 8001), which may be contacted in respect of any matters arising from, or in connection with, this report. Where this report is issued or promulgated by Deutsche Bank in Singapore to a person who is not an accredited investor, expert investor or institutional investor (as defined in the applicable Singapore laws and regulations), they accept legal responsibility to such person for its contents.

**Taiwan**: Information on securities/investments that trade in Taiwan is for your reference only. Readers should independently evaluate investment risks and are solely responsible for their investment decisions. Deutsche Bank research may not be distributed to the Taiwan public media or quoted or used by the Taiwan public media without written consent. Information on securities/instruments that do not trade in Taiwan is for informational purposes only and is not to be construed as a recommendation to trade in such securities/instruments. Deutsche Securities Asia Limited, Taipei Branch may not execute transactions for clients in these securities/instruments.

**Qatar**: Deutsche Bank AG in the Qatar Financial Centre (registered no. 00032) is regulated by the Qatar Financial Centre Regulatory Authority. Deutsche Bank AG - QFC Branch may undertake only the financial services activities that fall within the scope of its existing QFCRA license. Its principal place of business in the QFC: Qatar Financial Centre, Tower, West Bay, Level 5, PO Box 14928, Doha, Qatar. This information has been distributed by Deutsche Bank AG. Related financial products or services are only available only to Business Customers, as defined by the Qatar Financial Centre Regulatory Authority.

**Russia**: The information, interpretation and opinions submitted herein are not in the context of, and do not constitute, any appraisal or evaluation activity requiring a license in the Russian Federation.

**Kingdom of Saudi Arabia**: Deutsche Securities Saudi Arabia LLC Company (registered no. 07073-37) is regulated by the Capital Market Authority. Deutsche Securities Saudi Arabia may undertake only the financial services activities that fall within the scope of its existing CMA license. Its principal place of business in Saudi Arabia: King Fahad Road, Al Olaya District, P.O. Box 301809, Faisaliah Tower - 17th Floor, 11372 Riyadh, Saudi Arabia.

**United Arab Emirates**: Deutsche Bank AG in the Dubai International Financial Centre (registered no. 00045) is regulated by the Dubai Financial Services Authority. Deutsche Bank AG - DIFC Branch may only undertake the financial services activities that fall within the scope of its existing DFSA license. Principal place of business in the DIFC: Dubai International Financial Centre, The Gate Village, Building 5, PO Box 504902, Dubai, U.A.E. This information has been distributed by Deutsche Bank AG. Related financial products or services are available only to Professional Clients, as defined by the Dubai Financial Services Authority.

**Australia and New Zealand**: This research is intended only for 'wholesale clients' within the meaning of the Australian Corporations Act and New Zealand Financial Advisors Act, respectively. Please refer to Australia-specific research disclosures and related information at https://australia.db.com/australia/content/research-information.html Where research refers to any particular financial product recipients of the research should consider any product disclosure statement, prospectus or other applicable disclosure document before making any decision about whether to acquire the product. In preparing this report, the primary analyst or an individual who assisted in the preparation of this report has likely been in contact with the company that is the subject of this research for confirmation/clarification of data, facts, statements, permission to use company-sourced material in the report, and/or site-visit attendance. Without prior approval from Research Management, analysts may not

Confidential

Intuitive-00566080

Provided by D&B S&P Global Market Intelligence 2020 03 26 00:00. Distribution restricted.

20 February 2020
Medical Supplies & Devices
Intuitive Surgical



accept from current or potential Banking clients the costs of travel, accommodations, or other expenses incurred by analysts attending site visits, conferences, social events, and the like. Similarly, without prior approval from Research Management and Anti-Bribery and Corruption ("ABC") team, analysts may not accept perks or other items of value for their personal use from issuers they cover.

Additional information relative to securities, other financial products or issuers discussed in this report is available upon request. This report may not be reproduced, distributed or published without Deutsche Bank's prior written consent.

Backtested, hypothetical or simulated performance results have inherent limitations. Unlike an actual performance record based on trading actual client portfolios, simulated results are achieved by means of the retroactive application of a backtested model itself designed with the benefit of hindsight. Taking into account historical events the backtesting of performance also differs from actual account performance because an actual investment strategy may be adjusted any time, for any reason, including a response to material, economic or market factors. The backtested performance includes hypothetical results that do not reflect the reinvestment of dividends and other earnings or the deduction of advisory fees, brokerage or other commissions, and any other expenses that a client would have paid or actually paid. No representation is made that any trading strategy or account will or is likely to achieve profits or losses similar to those shown. Alternative modeling techniques or assumptions might produce significantly different results and prove to be more appropriate. Past hypothetical backtest results are neither an indicator nor guarantee of future returns. Actual results will vary, perhaps materially, from the analysis.

Copyright © 2020 Deutsche Bank AG

Confidential

Intuitive-00566081

Provided ...



### David Folkerts-Landau
Group Chief Economist and Global Head of Research

| Pam Finelli | Anthony Klarman | Michael Spencer | Steve Pollard |
|---|---|---|---|
| Global Chief Operating Officer Research | Global Head of Debt Research | Head of APAC Research | Head of Americas Research Global Head of Company Research |

| Gerry Gallagher | Andreas Neubauer | Peter Milliken |
|---|---|---|
| Head of European Company Research | Head of Germany Research | Head of APAC Company Research |

| Jim Reid | Francis Yared | George Saravelos | Peter Hooper |
|---|---|---|---|
| Global Head of Thematic Research | Global Head of Rates Research | Global Head of FX Research | Global Head of Economic Research |

## International Production Locations

Deutsche Bank AG
Deutsche Bank Place
Level 16
Corner of Hunter & Phillip Streets
Sydney, NSW 2000
Australia
Tel: (61) 2 8258 1234

Deutsche Bank AG
Equity Research
Mainzer Landstrasse 11-17
60329 Frankfurt am Main
Germany
Tel: (49) 69 910 00

Deutsche Bank AG
Filiale Hongkong
International Commerce Centre,
1 Austin Road West,Kowloon,
Hong Kong
Tel: (852) 2203 8888

Deutsche Securities Inc.
2-11-1 Nagatacho
Sanno Park Tower
Chiyoda-ku, Tokyo 100-6171
Japan
Tel: (81) 3 5156 6000

Deutsche Bank AG London
1 Great Winchester Street
London EC2N 2EQ
United Kingdom
Tel: (44) 20 7545 8000

Deutsche Bank Securities Inc.
60 Wall Street
New York, NY 10005
United States of America
Tel: (1) 212 250 2500

**EXHIBIT 3**

**to**

**PAUL D. BRACHMAN DECLARATION IN SUPPORT OF
DEFENDANT'S MOTION IN LIMINE NO. 2
TO EXCLUDE DEUTSCHE BANK ANALYST REPORTS
AND RELATED TESTIMONY**

ATTACHMENT 54

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

**HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER**

|  |  |  |
|---|---|---|
| | ) | |
| | ) | |
| SURGICAL INSTRUMENT SERVICE | ) | |
| COMPANY, INC., | ) | Case No. 5:21-cv-03496. |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| INTUITIVE SURGICAL, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**EXPERT REPORT**

**Dr. Russell L. Lamb**
**President**
Monument Economics Group, LLC
1000 Wilson Boulevard
Suite 2650
Arlington, VA 22209

December 2, 2022

**TABLE OF CONTENTS**

I.    Introduction and Summary of Conclusions ................................................................1

    A.    Expert Background and Qualifications.................................................................1

    B.    Summary of Plaintiffs' Allegations ....................................................................2

    C.    Assignment ........................................................................................................4

    D.    Materials Reviewed ...........................................................................................5

    E.    Summary of Conclusions....................................................................................5

II.   Industry Background .................................................................................................6

    A.    Methods of Surgery ..........................................................................................6

    B.    Introduction of Robotic Surgery ........................................................................8

    C.    Intuitive's Da Vinci Surgical Robot ................................................................10

III.  The Market for MIST Surgical Robots in the United States Constitutes a Relevant
Antitrust Market.............................................................................................................17

    A.    The Market for MIST Surgical Robots is a Relevant Antitrust Product Market17

      i.    Traditional Laparoscopic Surgeries are Not an Economic Substitute for
          Minimally Invasive Soft Tissue Surgeries Performed with MIST Surgical
          Robots, and Thus Do Not Discipline Pricing of MIST Surgical Robots............20

        a. Intuitive Acknowledged that it Did Not View Traditional Laparoscopic Surgery
          as Competition for Surgeries performed with MIST Surgical Robots ...............21

        b. MIST Surgical Robots such as Da Vinci Possess Different Features and Benefits
          to Surgeons and Patients Compared to Traditional Laparoscopic Surgeries......22

        c. Non-Clinical Benefits of MIST Surgical Robots Compared to Traditional
          Laparoscopic Surgeries......................................................................................26

      ii.    Non-MIST Surgical Robots are Not Economic Substitutes for MIST Surgical
          Robots and, Therefore, Cannot Be Substituted for MIST Surgical Robots in the
          Performance of Minimally Invasive Soft Tissue Surgeries ................................30

    B.    The Relevant Antitrust Geographic Market with Regards to the Tying Market is
        the United States ...............................................................................................31

IV.   The EndoWrist Repair and Replacement Market in the United States Constitutes a
Relevant Antitrust Market ..............................................................................................33

A. The EndoWrist Repair and Replacement Market is a Relevant Antitrust Product Market ................................................................................................... 33

i. Third-Party Repairs of EndoWrist Surgical Instruments are Part of the Same Relevant Antitrust Product Market as Replacement EndoWrist Surgical Instruments Sold by Intuitive ................................................................. 34

ii. Intuitive Considered Selling Refurbished Endowrist Instruments to Make it More Difficult for Third-Party Repair Companies To Compete Effectively in the EndoWrist Repair and Replacement Market ....................................... 37

iii. Neither Traditional Laparoscopic Surgical Instruments, nor Surgical Instruments Used with Any Other Non-MIST Surgical Robots, are Compatible with Da Vinci Surgical Robots ......................................................................... 39

B. The Relevant Antitrust Geographic Market with Regards to the Tied Market is the United States ................................................................................ 41

C. The EndoWrist Repair and Replacement Market is Distinct from the Market for MIST Surgical Robots ................................................................ 42

V. Evidence Demonstrates that the Alleged Misconduct was Anticompetitive ............ 46

A. Intuitive Posessed Monopoly Power in the Market for MIST Surgical Robots in the United States During the Relevant Period .................................. 48

i. Intuitive Dominated the Market for MIST Surgical Robots in the United States During the Relevant Period ........................................................... 49

ii. There Were Significant Barriers to Entry Into the Market for MIST Surgical Robots in the United States During the Relevant Period .................................... 53

iii. Intuitive's Prices for da Vinci Robots Greatly Exceeded Marginal Costs .......... 60

B. Intuitive Used Its Monopoly Power in the Market for MIST Surgical Robots to Maintain its Monopoly the Market for EndoWrist Surgical Instruments in the United States During the Relevant Period ............................................. 64

i. Intuitive's Restrictive Sales, License, and Service Agreement Allowed Intuitive to Maintain Monopoly Power in the EndoWrist Repair and Replacement Market 65

a. Intuitive Dominated the EndoWrist Repair and Replacement Market in the United States During the Relevant Period ......................................... 67

      b. Intuitive's Conduct Prevented Rivals, Including SIS, from Competing Effectively in the EndoWrist Repair and Replacement Market in the United States During the Relevant Period .......................................................... 68

      c. Intuitive's Exercise of Monopoly Power in the EndoWrist Repair and Replacement Market During the Relevant Period .............................................. 75

C.   Evidence Demonstrates that Intuitive's Alleged Misconduct Caused Harm to Competition in the EndoWrist Repair and Replacement Market ...................... 76

  i.   Intuitive's Patient Safety Claims ....................................................................... 76

  ii.  Intuitive Used its Alleged Misconduct in the EndoWrist Repair and Replacement Market to Continue to Charge Supra-Competitive Prices for the Replacement of EndoWrist Instruments, Causing Harm to Competition ........... 79

VI.  Conclusions .................................................................................................................. 92

## I.    Introduction and Summary of Conclusions

### A.  Expert Background and Qualifications

1.      I am the President and co-founder of Monument Economics Group ("Monument"), an economic consulting firm based in Arlington, VA.  Monument provides economic research and quantitative and statistical analyses to clients in the United States, Canada, and elsewhere internationally.  I have studied the economics of markets and prices and have consulted on these issues for over 30 years.  I have previously been asked to opine on a variety of economic issues, including the existence of monopolization or cartel behavior in various markets, damages arising from anti-competitive conduct, and class-wide impact arising from alleged price-fixing and anticompetitive conduct as well as class-wide injury arising from allegations of consumer fraud or breach of warranty.  A copy of my curriculum vitae, including a list of the matters in which I have submitted expert testimony in the past four years, is attached to this report as Appendix A.

2.      I graduated from the University of Tennessee, Knoxville in 1987 (*summa cum laude*, Phi Beta Kappa) as the top graduate in my class in the College of Arts and Sciences.  I earned a Master's degree in economics from the University of Maryland in 1989.  I received the Doctor of Philosophy degree in economics from the University of Pennsylvania in 1994.  My economic research has been published in peer-reviewed journals such as the *Journal of Econometrics*, *Journal of Development Economics*, *CATO Journal*, *Regulation*, and others.  I have also served as a referee for leading economics journals, including the *International Economic Review*, *Journal of Business and Economic Statistics*, *Journal of Labor Economics*, *American Journal of Agricultural Economics*, and *Contemporary Economic Policy*.

3.      Prior to co-founding Monument, I held a variety of positions in government, academia, and other consulting firms.  From 1994 until 1999, I was an Economist (later Senior Economist) with the Federal Reserve System of the United States in Washington, DC and Kansas City, Missouri.  From 1999 until 2004, I taught economics and agricultural economics at North Carolina State University in Raleigh, North Carolina.  I have also been hired as an economic consultant to the World Bank and the Government

of Peru, in addition to being retained on a wide range of economic consulting projects in a variety of contexts. Courts in the United States and Canada have accepted my economic analyses of the market as evidence in litigation involving allegations of anticompetitive conduct in a number of cases including, for example, *In re: Domestic Drywall Antitrust Litigation, Fond Du Lac Bumper Exchange Inc., et al. v. Jui Li Enterprise Company Ltd. et al., In re: Puerto Rican Cabotage Antitrust Litigation, In re: Aftermarket Auto Lighting Products Antitrust Litigation, In re: Titanium Dioxide Antitrust Litigation, Eugene Allan, et al.* In addition to my consulting activities, I most recently have taught economics at the University of Tennessee, Knoxville, where I am an adjunct faculty member in the Department of Economics in the Haslam College of Business. The hourly rate for my work in this matter is $750 per hour. Monument's compensation in this matter is not contingent upon the content of my testimony or the outcome of this litigation.

### B. Summary of Plaintiffs' Allegations

4.     I understand that a Complaint was filed on May 10, 2021 by Surgical Instrument Service Company, Inc. ("SIS" or "Plaintiff") against Intuitive Surgical, Inc. ("Intuitive" or "Defendant").[1] I understand from Counsel for the Plaintiff that Plaintiff's allegations in this matter relate to Intuitive's dominance of the market for minimally invasive soft tissue surgical robots ("MIST Surgical Robots") with its da Vinci surgical robots, and that, through exclusionary and anticompetitive conduct, Intuitive uses this dominance to maintain its monopoly in a separate market: the market for replacements and repairs of EndoWrists, which are surgical instruments (e.g., graspers, forceps, scissors, etc.) that are used during the da Vinci robotic surgeries ("EndoWrist Repair and Replacement Market"). I further understand Plaintiff alleges that "Intuitive has gone to extraordinary efforts to leverage its monopoly power in robots for use in minimally invasive soft tissue surgery, the repair and support of those robotic systems, and its monopoly power in instruments for use with such robots to foreclose aftermarket repair of those instruments by any competitors. This costs hospitals and patients at least 30-45% per instrument

---

[1] United States District Court Northern District of California, *Surgical Instrument Service Company, Inc., Plaintiff, v. Intuitive Surgical, Inc., Defendant,* Case No.: 5:21-cv-03496, Complaint, May 10, 2021 (hereafter "Complaint").

(which savings would increase over time) or hundreds of millions of dollars a year in a $2.4 billion market, without any safety or technical justification."[2]  I further understand Plaintiff alleges that an "effect of Intuitive's anticompetitive conduct is to generate and sustain unreasonably high, supra-competitive prices for aftermarket EndoWrist instruments" (the "Alleged Misconduct").[3]

5.    In particular, I understand Defendant's alleged anticompetitive conduct to "foreclose aftermarket repair of those [EndoWrist] instruments by any competitors" includes the following:

- Intuitive's standard sales and service agreement for its da Vinci surgical robots "demands that customers further agree to a limited license for the use of EndoWrist instruments," which "expires once an EndoWrist instrument is used up to its maximum number of uses as specified in the documentation accompanying the particular instrument,"[4] and "prohibits customers from engaging any unauthorized third party to repair, refurbish, or recondition EndoWrist instruments, whether before or after the limited use license has expired."[5]

- "Between late 2019 to early 2020, Intuitive sent letters to and had in-person conversations with SIS's customers or potential customers, knowing that they were under contract or in contractual negotiations for repaired EndoWrists.  As a result of the threats and misleading statements in those letters and conversations,

---

[2] Complaint at ¶28.  I further understand Plaintiff alleges that "[w]hen Intuitive discovered that its customers were using SIS's services, it immediately leveraged its anti-competitive agreements and monopoly power to crush this threat to its supra-competitive EndoWrist profitability."  See Complaint at ¶6.

[3] Complaint at ¶24.  "Intuitive leverages its market power in the worldwide and domestic markets for the sale of surgical robots used in minimally invasive soft tissue surgery, and the market for repair services for their robots, to pressure its customers to use supra-competitively priced replacement EndoWrist parts."  See Complaint at ¶65.

[4] Complaint at ¶4.  I understand Plaintiff alleges that "EndoWrists also include an internal memory chip" which "counts the number of times the EndoWrist is attached to a da Vinci robot arm, not an actual measure of usage such as usage time, number of movements, or actuation time."  See Complaint at ¶¶30-31.  Further, I understand that Plaintiff alleges that the "da Vinci robot system queries the memory chip prior to performing any operations with the particular EndoWrist instrument.  After a certain number of uses, usually limited to ten, the EndoWrist instrument is rendered non-operational, based solely on the number of times it is attached to a da Vinci robot arm, without any regard to the actual underlying physical condition of the EndoWrist instrument.  Without the services of providers such as SIS, the hospital has no choice but to buy a brand-new replacement EndoWrist instrument from Intuitive at full price."  See Complaint at ¶32.

[5] Complaint at ¶4.

all of SIS's EndoWrists customers backed out of their contracts or did not sign contracts under negotiation, effectively eviscerating SIS's EndoWrist repair business."[6]

6.      I understand from Counsel for the Plaintiff that the relevant period for my analysis is the date SIS entered into contracts and was in discussion for other contracts to provide EndoWrist repair services to numerous hospitals, health care systems, and GPOs in 2019 and 2020, through the present ("Relevant Period").[7]

   C.  *Assignment*

7.      I have been asked by Counsel for Plaintiff to analyze the following questions:

   a.  The relevant antitrust product and geographic markets within which the existence of Intuitive's monopoly power and the likelihood of success of the Alleged Misconduct may be assessed;

   b.  Whether economic analysis and evidence establishes that Intuitive possessed monopoly power in these relevant antitrust markets; and

   c.  Whether economic analysis and evidence establishes that Intuitive's conduct with respect to the Alleged Misconduct was anticompetitive and resulted in harm to competition.

I discuss my analysis of these questions below.

---

[6] Complaint at ¶92. "Intuitive's letters make its threats explicit—if the hospital uses repaired instruments, Intuitive will render its surgical robot inoperable. Not only will Intuitive seek damages or indemnity from its customer, but if Intuitive discovers 'Systems being used with instruments by an unauthorized third party, Intuitive may no longer accept your service calls for such Systems.' Because Intuitive also refuses to allow any competition in the market for service of its robots, and refuses to make error codes and other critical information available to third parties, failure to provide such service will render a robot that originally cost well over a million dollars inoperable. Many hospitals have multiple such robots that would thus be rendered inoperable. [...] Again, the threat is explicit—if the hospital uses refurbished instruments, Intuitive will render its surgical robot inoperable." See Complaint at ¶¶102-103. Further, in "private conversations, Intuitive representatives have made this threat even more explicit. In response to one hospital's use of third-party repair services, an Intuitive representative stated that Intuitive would turn the surgical robot into a 'paperweight.'" See Complaint at ¶104.
[7] Complaint at ¶5.

*D. Materials Reviewed*

8.     In performing my analyses, I have undertaken economic research and analysis based on publicly available documents, as well as materials produced as part of this litigation, in order to understand the U.S. market for minimally invasive soft tissue surgical robots and the market for the repair and replacement of EndoWrist surgical instruments in the U.S., as well as the prices paid for these products. I have also reviewed documents produced by the parties in this matter, trade press, and academic literature. A complete list of the materials I have relied upon in forming my opinions is contained in Appendix B.

*E. Summary of Conclusions*

9.     Based on my analyses and research into the U.S. market for MIST Surgical Robots and EndoWrist Repair and Replacement Market, as well as my training and experience in economics, I have reached the following conclusions:

a.  The market for MIST Surgical Robots constitutes a relevant antitrust product market. Further, the United States constitutes the relevant antitrust geographic market with respect to the tying market for evaluating the Alleged Misconduct.

b.  The EndoWrist Repair and Replacement Market constitutes a relevant antitrust product market. Further the United States constitutes the relevant antitrust geographic market with respect to the tied market for evaluating the Alleged Misconduct.

c.  Intuitive possessed monopoly power in the U.S. market for MIST Surgical Robots during the Relevant Period. Further, Intuitive possessed monopoly power in the EndoWrist Repair and Replacement Market in the U.S. during the Relevant Period and used its monopoly power in the market for MIST Surgical Robots to maintain its monopoly in the EndoWrist Repair and Replacement Market in the U.S. during the Relevant Period.

      d. Intuitive's Alleged Misconduct was anticompetitive and resulted in harm to competition in that hospitals had little choice but to pay higher prices for replacement EndoWrist surgical instruments from Intuitive in order to use their da Vinci surgical robots than they otherwise would have had they been able to repair their EndoWrist surgical instruments through third-party repair companies such as SIS.

## II.    Industry Background

*A. Methods of Surgery*

10.    In health care practice, there are two primary methods of surgery: open surgery and minimally invasive surgery.[8] Open surgery refers to a procedure that involves "the cutting of skin and tissues so that the surgeon has a full view of the structures or organs involved."[9] Each physical step in such a procedure "is accomplished by natural, intuitive hand movements used to accomplish tasks such as dissection, ligating, and suturing."[10] One example of open surgery is the removal of organs, such as the gallbladder or kidneys.[11]

11.    The other primary method of surgery is minimally invasive surgery, which refers to "any technique involved in surgery that does not require a large incision."[12] Minimally invasive surgery is a method of surgery that "allows the patient to recuperate faster with less pain."[13] Many surgical techniques today fall under minimally invasive surgery, which "can be used to evaluate illnesses and injuries, as well as to obtain tissue samples

---

[8] Stanford Health Care, "General Surgery Types" (hereafter "Stanford Health Care"). Available at: https://stanfordhealthcare.org/medical-treatments/g/general-surgery/types.html.
[9] Stanford Health Care. See, also, John Hopkins Medicine, "Methods of Surgery," (hereafter "John Hopkins Medicine"). Available at: https://www.hopkinsmedicine.org/health/treatment-tests-and-therapies/methods-of-surgery.
[10] Intuitive-00595673-694 at 677.
[11] Stanford Health Care.
[12] Stanford Health Care.
[13] Johns Hopkins Medicine. See, also, Stanford Health Care.

and make repairs."[14]  One minimally invasive surgical technique is laparoscopy, which was first popularized in the United States in the 1930s.[15]

12.     Unlike traditional open surgery, laparoscopic surgery (which is sometimes referred to as "keyhole surgery") does not require a large incision for the surgery to be conducted.[16]  Rather, during the surgery, "the surgeon makes one or more small incisions in the abdomen."[17]  These incisions are then used as an entry point for the surgeon to insert a laparoscope, "a long, thin tube with a high-intensity light and a high-resolution camera at the front," which sends images and video back to a monitor for the surgeon to view.[18]  During the procedure, "[c]arbon dioxide gas is passed into the abdominal cavity in order to move the abdominal wall away from the organs and therefore create a larger area in which to work," while also reducing risk of additional tissue or organ damage.[19]  Various other instruments, such as scissors, dissecting tools, and graspers, may also be inserted through additional "puncture holes" that are made as the surgery is performed.[20]  Today, laparoscopic surgery is most commonly used in gynecology, gastroenterology, and urology.[21]  Because laparoscopic surgeries are not as surgically invasive, laparoscopic surgery has a number of benefits over open surgery, causing laparoscopic surgery to be "routinely performed instead of traditional [open] surgery."[22] Compared to the larger incisions associated with open surgery, the small incisions used in laparoscopic

---

[14] Johns Hopkins Medicine.
[15] William E. Kelley, "The Evolution of Laparoscopy and the Revolution in Surgery in the Decade of the 1990s," *Journal of The Society of Laparoscopic & Robotic Surgery*, 2008 (hereafter "Kelley") 351-357 at p. 351.
[16] National Health Service, "Laparoscopy (keyhole surgery)" (hereafter "NHS"). Available at: https://www.nhs.uk/conditions/laparoscopy/. See, also, John Hopkins Medicine.
[17] NHS; Stanford Health Care.
[18] Andrew Gonzalez, M.D., J.D., MPH and Anna Giorgi, "Laparoscopy," Healthline, October 6, 2018. Available at: https://www.healthline.com/health/laparoscopy.
[19] Midlands Clinic, "General Laparoscopic Procedures." Available at: https://midlandsclinic.com/general-laparoscopic-procedures/. See, also, MUSC Health, "Introduction to Laparoscopic Surgery" (hereafter "MUSC Health"). Available at: https://muschealth.org/medical-services/ddc/patients/gi-surgery/laparoscopic-surgery/introduction.
[20] MUSC Health.
[21] NHS.
[22] Johnson Memorial Health, "Recovery Benefits of Laparoscopic Surgery," August 2015 (hereafter "Johnson Memorial Health"). Available at: http://blog.johnsonmemorial.org/recovery-benefits-of-laparoscopic-surgery.

surgery results in less post-operative discomfort, shorter recovery time, less scarring, less bleeding, and reduced risk of infection.[23]

### B. Introduction of Robotic Surgery

13.     Robotic surgery represents the next step in the evolution of minimally invasive surgeries following the success of laparoscopic surgeries.  In 1986, "a team using a modified UNIMATION PUMA 200 programmable industrial robotic arm performed the very first robotic assisted surgery (RAS). […] Since this first successful use of a robot to assist in a surgical procedure, several RAS systems have been developed, but only few of those systems have been commercialized."[24]  "Robotic procedures are rapidly becoming the new standard of care."[25]  The "first robotic system for laparoscopic surgery became available in 1994. Aesop (formerly Computer Motion, Santa Barbara, CA) directed the laparoscope following the surgeon's voice command. Zeus, a fully integrated surgical system, became available for investigational use in the United States in 1996."[26]  Around the time the Zeus surgical system was launched, "the forerunner to what was eventually to become Intuitive Surgical released the SRI Green Telepresence system, which was later to undergo a radical overhaul before morphing into an early version of the current da Vinci® system."[27]  The "ZEUS and da Vinci® systems were effectively unified when Computer Motion and Intuitive Surgical merged in 2003. As a result, further innovations and improvements were centred [sic] on the da Vinci® platform, which has subsequently dominated the world of robotic surgery for almost a decade."[28]

14.     There are currently three primary types of robotic systems used in the surgical arena: active systems, semi-active systems, and master-slave systems.[29]  Active systems

---

[23] Johnson Memorial Health.
[24] Sally Kathryn Longmore, Ganesh Naik, and Gaetano D. Gargiulo, "Laparoscopic Robotic Surgery: Current Perspective and Future Directions," *Robotics*, Vol. 2, No. 9, 2020 (hereafter "Longmore et al.") at p. 1.
[25] Tim Lane, "A short history of robotic surgery," *Annals of the Royal College of Surgeons of England*, 2018 (hereafter "Lane") at p. 5.
[26] Kelley at p. 355.
[27] Lane at p. 6.
[28] Lane at p. 7.  See, also, Zheng Wang, Sicong Liu, Jing Peng, and Michael Zhiqiang Chen, "The Next-Generation Surgical Robots," Intech Open, 2017, 3-21 at p 4.
[29] Lane at p. 5.  See, also, Jusuf Jamal, Abdulrahman M. Alshahrani, Jamal M. Arif, Feras M. Almarshad, "Robots in Cancer Surgery: A Boon or Bane," *Journal of Cancer Therapy*, Vol. 11, No. 12, December 2020, 803-823 at pp. 805-806.

"essentially work autonomously (while remaining under the control of the operative surgeon) and undertake pre-programmed tasks."[30]  Semi-active systems "allow for a surgeon-driven element to complement the pre-programmed element of these robot systems."[31]  Conversely, "master–slave systems (of which the da Vinci® and ZEUS platforms were the forerunners) lack any of the pre-programmed or autonomous elements of other systems."[32]  Master-slave systems "are entirely dependent on surgeon activity," whereby surgeon "hand movements are transmitted to laparoscopic surgical instruments, which faithfully reproduce surgeon hand activity – but intracorporeally."[33]

15.     Robotic surgery provides a number of benefits to both patients and surgeons as compared to traditional laparoscopic surgeries.  For the patient, these benefits include a more precise surgery, significantly less pain, less risk of infection and blood loss, earlier discharge from the hospital, less scarring and shorter recovery, and, in many cases, better clinical outcomes.[34]  For the surgeon, these benefits include an enhanced visual field, superior dexterity, and access to hard-to-reach places.[35]

16.     According to one developer of robots for minimally invasive surgery, increased adoption has led to "a double-digit annual growth rate over the past five years." [36] One market research report noted that the "rise in demand for minimally invasive technology is driving the robotic surgery devices market."[37]  This same market research report noted

---

[30] Lane at p. 5.  Examples of this include the PROBOT and ROBODOC platforms. See Lane at p. 5. See, also, Katherine Levinson, "Robotic Assisted Surgery," Electrical and Computer Engineering Design Handbook, 2015.

[31] Lane at p. 5.

[32] Lane at pp. 5-6.

[33] Lane at p. 6.

[34] MedStar Health, "Robotic Surgery" (hereafter "MedStar Health"). Available at: https://www.medstarhealth.org/services/robotic-surgery.

[35] MedStar Health.

[36] Rob Surgical, "Top 5 Trends in the Robotic Surgery Market." Available at: https://www.robsurgical.com/market-trends/.

[37] The Business Research Company, "Robotic Surgery Devices Global Market Report 2022 – By Product And Service (Robotic Systems, Instruments & Accessories, Services), By Surgery Type (Urological Surgery, Gynecological Surgery, Orthopedic Surgery, Neurosurgery, Other Surgery Types), By End User (Hospitals, Ambulatory Surgery Centers) – Market Size, Trends, And Global Forecast 2022-2026," October 2022 (hereafter "Business Research Company"). Available at: https://www.thebusinessresearchcompany.com/report/robotic-surgery-devices-global-market-report.

that the "global robotic surgery devices market grew from \$5.21 billion in 2021 to \$6 billion in 2022 at a compound annual growth rate (CAGR) of 15.2%."[38]

### C. Intuitive's Da Vinci Surgical Robot

17.    In 1995, Intuitive was founded by Dr. Frederick Moll, M.D., Rob Younge, and John Freund.[39]  Using technology licensed from another surgical company (SRI), they began development on what would ultimately become the da Vinci surgical robot, which was first installed in late 1998.[40]  The da Vinci "became the first United States FDA-approved integrated robotic surgical system in July 2000," with Drs. William E. Kelley and Craig C. Owens performing the first procedure shortly thereafter.[41]  The da Vinci's "first FDA clearance was for applications in general surgery; however, additional indications for thoracoscopic (chest) and radical prostatectomy procedures followed one year later."[42]  Table 1 below lists each of the surgical procedures for which the da Vinci surgical robot has been "cleared by applicable regulatory agencies."[43]

**Table 1**
**Approved da Vinci**
**Surgical Procedures**

| |
|---|
| Cardiac |
| Colorectal |
| General Surgery |
| Gynecology |
| Head and Neck |
| Thoracic |
| Urology |

Source: Intuitive for Patients.

18.    As illustrated in Figure 1 below, the da Vinci surgical robot is comprised of three separate components: the patient-side cart, the surgeon console, and the vision cart.[44]

---

[38] Business Research Company.
[39] Mahdi Azizian, May Liu, Iman Khalaji, and Simon DiMaio, "Chapter 1: The Da Vinci Surgical System," *The Encyclopedia of Medical Robotics*, Vol. 1, October 2018 (hereafter "Azizian et al.") 3-28 at p. 5.
[40] Azizian et al. at p. 5.
[41] Kelley at p. 355.  See, also, Azizian et al. at p. 5; Longmore et al. at p. 1.
[42] Azizian et al. at p. 5.
[43] Intuitive Surgical, "Intuitive for Patients" (hereafter "Intuitive for Patients"). Available at: https://www.intuitive.com/en-us/patients/patients.
[44] Azizian et al. at p. 8.

Unlike in traditional laparoscopic surgery, the da Vinci is a surgical robot that utilizes a "teleoperation architecture," which allows the surgeon, through the surgeon console, to operate two interfaces that are used to control the manipulators (or arms) that are part of the patient side cart and operate on the patient via this robot.[45]  At the surgeon console, the surgeon is seated and controls the movement of the surgical instruments that are positioned on the patient-side cart, while also using the console to view the patient and surgical field.[46]  "Each manipulator may support either a stereo endoscopic camera or a surgical instrument, such as a grasper, a scissor, or a needle driver."[47]

**Figure 1**
**Illustration of da Vinci Surgical Robot Architecture**

*Surgeon Console*      *Control System*      *Patient-Side Manipulator*



Source: Azizian et al. at p. 8.

19.    At the operating console, the robot translates the surgeon's hand movements, manipulating and rotating the instruments in real time as the surgery is being performed.[48]  In traditional laparoscopic surgery, surgeons are limited by their own anatomy; their wrists and arms can only move so far and in certain directions, and the precision of human movement is limited.  Further, in traditional laparoscopic surgery the

---

[45] Azizian et al. at pp. 7-8.
[46] Longmore et al. at pp. 4, 6; Azizian et al. at p. 7.
[47] Azizian et al. at p. 8.
[48] Intuitive Surgical, "About da Vinci Systems" (hereafter "About da Vinci Systems"). Available at: https://www.davincisurgery.com/da-vinci-systems/about-da-vinci-systems.  See, also, Intuitive Surgical, Inc., SEC Form 10-K, filed February 10, 2021 (hereafter "Intuitive 2020 SEC Form 10-K") at p. 5.

instruments used are "long, rigid levers that rotate around a fulcrum, or pivot point, located at the port created in the body wall."[49] This "fulcrum effect" "reverses movements for the surgeon in laparoscopic surgery;" the instrument tips move in the opposite direction of the surgeon's hand, requiring the surgeon to adjust their hand-eye coordination and compensate for the reversal of directions caused by the pivot.[50] In contrast, the surgical instruments used by the da Vinci surgical robot mirror the surgeon's movement; if the surgeon moves their hand "to the right outside of the body causes the instrument inside the patient to be moved to the right."[51] Furthermore, da Vinci's extended range of motion helps to provide "greater dexterity" than can be achieved with "the human hand on its own."[52]

20.     In addition to the benefits da Vinci's surgical instruments provides, the surgeon console also provides additional benefits to the surgeon. In traditional laparoscopic surgery, "the surgeon must look up and away from the instruments to a nearby 2D video monitor to see an image of the target anatomy."[53] Moreover, the "surgeon must also rely on his/her patient-side assistant to position the camera correctly."[54] In surgeries conducted with the da Vinci surgical robot, surgeons operate the robot and the instruments and reposition the camera while seated at a console ergonomically designed to allow natural hand-eye positioning and comfortable seating.[55]

21.     While the conceptual and operational underpinnings of the da Vinci surgical robot have remained consistent, Intuitive has commercialized a number of different models over the years, as rapid technological development has allowed for more advanced equipment and instrumentation to be integrated into the da Vinci surgical robot. Intuitive

---

[49] Intuitive 2020 SEC Form 10-K at p. 5.
[50] Jaydeep H Palep, "Robotic assisted minimally invasive surgery," *Journal of Minimal Access Surgery*, Vol.5, No.1, January-March 2009, 1-7 at p. 1. See, also, Intuitive 2020 SEC Form 10-K at p. 5.
[51] Intuitive 2020 SEC Form 10-K at p. 5.
[52] UCLA Health, "About Robotic Surgery at UCLA." Available at: https://www.uclahealth.org/robotic-surgery/what-is-robotic-surgery.
[53] UC Health, "About the daVinci Surgical System" (hereafter "UC Health"). Available at: https://www.uchealth.com/services/robotic-surgery/patient-information/davinci-surgical-system/.
[54] UC Health.
[55] UC Health; SofMedica, "DaVinci Surgical System." Available at: https://sofmedica.com/our-portofolio/robotic-surgery/.

commercialized its da Vinci standard surgical robot in 1999.[56]  Since then, it has released
a number of updated models, including the da Vinci S, da Vinci Si, da Vinci Xi, da Vinci
X, and da Vinci SP.[57]  The da Vinci S and da Vinci Si models are no longer sold in the
U.S.[58]  A timeline of the commercialization of Intuitive's various da Vinci surgical robots
is illustrated in Figure 2 below.

**Figure 2**
**Commercialization Timeline of da Vinci Surgical Robots**



| Year | 1999 | 2006 | 2009 | 2014 | 2017 | 2018 |
|------|------|------|------|------|------|------|
| System | Standard[1] | S | Si | Xi | X | SP |

Sources: Intuitive SEC Form 10-Q, filed on July 23, 2020 at p. 26; abex Excelencia Robotica.
[1] Fourth arm introduced in 2003.

22.     In addition to the da Vinci surgical robot, Intuitive also designs and manufactures
the surgical instruments that are attached to the ends of the robotic arms of the da Vinci
robot.  I understand that, "[d]ue to being commercially available for twenty years, the da
Vinci RAS system has the largest library of end effectors available of all RAS
systems."[59]  These instruments, called EndoWrists, have tips that can be customized to
accommodate various surgical procedures.[60]  These surgical instrument attachments "are
offered in a variety of diameters, of which 8mm and 12mm diameter sizes are the most
commonly sold," and include "forceps, scissors, electrocautery tools, scalpels, and other
surgical tools that are familiar to the surgeon from open surgery and conventional
[minimally invasive surgery]."[61]  Today, Intuitive offers approximately 70 different multi-

---

[56] Intuitive Surgical, Inc., SEC Form 10-Q, filed October 21, 2022 (hereafter "Intuitive 2022 SEC Form 10-
Q") at p. 26. See, also, Intuitive Surgical, "Move Surgery Forward. Again. da Vinci SP." Available at:
https://www.intuitive.com/en-us/products-and-services/da-vinci/systems/sp.

[57] Intuitive SEC Form 10-Q, September 2022 at p. 26.  The da Vinci SP surgical system was designed to
perform single port minimally invasive surgery.  See the "da Vinci SP" page of the Intuitive website,
available online at https://www.intuitive.com/en-us/products-and-services/da-vinci/systems/sp.

[58] 30(b)(6) Deposition of Marshall Mohr, November 7, 2022 at 59:22-60:10.

[59] Longmore et al. at p. 13.  "Not only does the da Vinci RAS system have the largest variety of end
effector types, it also has a large variety of each type of end effector."  See Longmore et al. at p. 13.

[60] Intuitive Surgical, Inc., SEC Form 10-K, filed February 3, 2022 (hereafter "Intuitive 2021 SEC Form 10-
K") at p. 7.

[61] Intuitive 2021 SEC Form 10-K at pp. 7-8.

13

port surgical instruments.[62]  Figure 3 below illustrates examples of EndoWrist instruments that can be used in conjunction with Intuitive's da Vinci Xi and da Vinci X surgical robots.

### Figure 3
### Examples of EndoWrist Surgical Instruments

**EndoWrist® Bipolar Cautery Instruments**



| Maryland Bipolar Forceps | |
|---|---|
| Da Vinci Xi, X | 10 Uses |
| Part # | 470172 |

| Fenestrated Bipolar Forceps | |
|---|---|
| Da Vinci Xi, X | 10 Uses |
| Part # | 470205 |

| Curved Bipolar Dissector | |
|---|---|
| Da Vinci Xi, X | 10 Uses |
| Part # | 470344 |

| Micro Bipolar Forceps | |
|---|---|
| Da Vinci Xi, X | 10 Uses |
| Part # | 470171 |

| Long Bipolar Grasper | |
|---|---|
| Da Vinci Xi, X | 10 Uses |
| Part # | 470400 |

| Force Bipolar | |
|---|---|
| Da Vinci Xi, X | 10 Uses |
| Part # | 470405 |

Source: da Vinci Xi/X Instrument & Accessory Catalog, January 2019.

23.     Each EndoWrist surgical instrument comes equipped with a programmed memory chip that helps to determine how the given EndoWrist instrument and the da Vinci surgical robot work together.[63]  Additionally, the memory chip tracks the number of times that each EndoWrist surgical instrument is used in a surgical procedure and will "generally not allow the instrument to be used for more than the prescribed number of procedures."[64]  EndoWrist surgical instruments used on S and Si da Vinci surgical robots operate via hardwire connection, while those used on Xi and X da Vinci surgical robots operate on a radio-frequency identification (RFID) system.[65]  When the EndoWrist instrument reaches this prescribed number of uses, it will stop functioning and must be

---

[62] Intuitive 2021 SEC Form 10-K at p. 55.
[63] Intuitive 2021 SEC Form 10-K at p. 8.
[64] Intuitive 2021 SEC Form 10-K at p. 8.
[65] Deposition of Anthony McGrogan, June 7, 2021 at 77:11-23.

replaced with a new instrument.[66]  The standard number of uses for EndoWrist surgical instruments is ten, however, in October 2020, Intuitive launched an "Extended Use Program" which allows for twelve to 18 uses for select da Vinci Xi and da Vinci X surgical robots.[67]  The fourth generation of da Vinci surgical robots ("da Vinci Xi" and "da Vinci X") utilize different EndoWrist surgical instruments that are not compatible with earlier generations of da Vinci surgical robots.[68]

24.      The number of da Vinci surgical robots installed in hospitals in the U.S. has grown steadily over the last two decades.  In 2005, there were nearly 300 da Vinci surgical robots installed in U.S. hospitals.[69]  By 2010, Intuitive's installed base had grown to 1,285,[70] and by the end of 2021 it had reached more than 4,100.[71]  Figure 4 below illustrates the growth of the da Vinci surgical robot's installed base in the U.S. from 2009 to 2021.

---

[66] Longmore et al. at p. 16.

[67] Longmore et al. at p. 16; Intuitive 2021 SEC Form 10-K at p. 8.

[68] Intuitive 2022 SEC Form 10-Q at p. 27.

[69] Intuitive reported an installed base of 296 da Vinci surgical robots in North America in 2005. See Intuitive Surgical, Inc., SEC Form 10-K, filed March 15, 2006 at p. 33.

[70] Intuitive Surgical, Inc., SEC Form 10-K, filed February 1, 2011 at p. 43.

[71] Intuitive 2021 SEC Form 10-K at p. 12.



Figure 4
Installed Base of da Vinci Surgical Robots in the United States
2009 - 2021

Source: Intuitive SEC Form 10-Ks, 2009 - 2021.

25.     Along with the steady growth in the installed base of da Vinci surgical robots, Intuitive's Instruments and Accessories business segment (which primarily includes its sales of EndoWrist surgical instruments) has also achieved significant growth in recent years. For example, as shown in Table 2 below, from 2017 to 2021, Intuitive's revenues from its Instruments and Accessories business segment in the U.S. increased 76.2 percent. Instruments and Accessories' growth in sales outpaced Intuitive's other business segments, Systems (which primarily consists of sales of da Vinci surgical robots) and Service, whose sales increased 69.8 percent and 43.9 percent, respectively, during this time. The Instruments and Accessories business segment accounts for a significant portion of Intuitive's overall U.S. revenues; in 2021, Instruments and Accessories sales accounted for 57.7 percent of Intuitive's overall revenues in the U.S.

**Table 2**
**Intuitive U.S. Revenue by Business Segment**
**2017 - 2021**

*(in millions $)*

| Business Segment | 2017 | 2018 | 2019 | 2020 | 2021 | % Change |
|---|---|---|---|---|---|---|
| Systems | $ 603.5 | $ 692.2 | $ 830.7 | $ 695.0 | $ 1,024.8 | 69.8% |
| Instruments and Accessories | $ 1,263.1 | $ 1,485.2 | $ 1,790.4 | $ 1,785.1 | $ 2,225.1 | 76.2% |
| Service | $ 419.2 | $ 456.1 | $ 508.4 | $ 482.6 | $ 603.3 | 43.9% |
| **Total** | **$ 2,285.8** | **$ 2,633.5** | **$ 3,129.5** | **$ 2,962.7** | **$ 3,853.2** | |

Source: 2021 Intuitive SEC Form 10-K at p.102, 2020 Intuitive SEC Form 10-K at p. 98; Intuitive Surgical, Inc., SEC Form 10-K, filed on February 7, 2020 at p. 87.

## III.    The Market for MIST Surgical Robots in the United States Constitutes a Relevant Antitrust Market

26.    As I previously discussed, I understand from Counsel for the Plaintiff that Plaintiff's allegations in this matter relate to Intuitive's use of its dominance of the market for minimally invasive soft tissue surgical robots with its da Vinci surgical robots to maintain its monopoly in a separate market: the market for replacements and repairs of EndoWrists, which are surgical instruments (e.g., graspers, forceps, scissors, etc.) that are used during the da Vinci robotic surgeries.  To evaluate Plaintiff's claims in this regard, it is necessary to determine whether the tying market, the market for MIST Surgical Robots in the United States, constitutes a relevant antitrust market.  Based on my analysis of the documents and data produced in this litigation, as well as my training and experience in economics and my research and analysis into the market for MIST Surgical Robots in the United States, I have concluded that the market for MIST Surgical Robots constitutes the relevant antitrust product market in which sales of da Vinci surgical robots occurs. I have also concluded that the United States constitutes the relevant antitrust geographic market with respect to the tying market for evaluating the Alleged Misconduct. I discuss my bases for these conclusions below.

*A. The Market for MIST Surgical Robots is a Relevant Antitrust Product Market*

27.    In economics, a relevant antitrust product market is comprised of the smallest possible set of goods for which a hypothetical monopolist could exercise market power to raise prices on that set of products by a small, but significant, amount without losing so

much in sales volume that the increase in price is unprofitable.[72]  If the analysis

concludes that there are other products which would make such a price increase

unprofitable, the market definition is broadened to include that set of goods, and the

hypothetical monopolist test is applied again.  In general, an economic analysis of the

relevant antitrust product market requires identifying "products that are close demand or

supply substitutes."[73] That is, a relevant market should contain all the products which are

substitutable for each other in the face of small but significant, non-transitory price

increases; an analysis of the relevant market thus necessarily focuses on an analysis of

*economic* substitutability.  Based on my research and analysis into the tying market (the

market for MIST Surgical Robots) and my training and experience in economics, I have

determined that the market for MIST Surgical Robots constitutes a relevant antitrust

product market, and that sales of da Vinci surgical robots occur in this relevant antitrust

product market. I base this conclusion on the fact that there are no economic substitutes

for minimally invasive soft tissue surgeries performed with MIST Surgical Robots and

that MIST Surgical Robots are a necessary input in performance of those surgeries.  In

particular, as I describe below, other forms of minimally invasive soft tissue surgery

(such as traditional laparoscopic surgery) and non-MIST robotic surgeries are not

economic substitutes for robotically assisted minimally invasive soft tissue surgeries.

Therefore, because there are no economic substitutes for robotically assisted minimally

---

[72] One of the tools economists rely upon in defining relevant antitrust product and geographic markets is the so-called "SSNIP" test. A SSNIP test is based upon a hypothetical "small but significant and non-transitory increase in price," as described in the Horizontal Merger Guidelines. The SSNIP test is used by the FTC and the DOJ to define relevant economic markets. The SSNIP test is intended to ascertain whether a hypothetical monopolist can exercise market power in a relevant product or geographic market. If the hypothetical monopolist is able to permanently (that is, in a "non-transitory" way) raise prices for a product or group of products by a "small but significant" amount, usually assumed to be five percent, without losing so much in sales volume that the increase in price is unprofitable, then that product or group of products constitutes a relevant antitrust product market. See U.S. Department of Justice and the Federal Trade Commission, "Horizontal Merger Guidelines," August 19, 2010 (hereafter "Horizontal Merger Guidelines") at § 4.1.1. "Even when the evidence necessary to perform the hypothetical monopolist test quantitatively is not available, the conceptual framework of the test provides a useful methodological tool for gathering and analyzing evidence pertinent to customer substitution and to market definition." See Horizontal Merger Guidelines at § 4.1.3.

[73] Dennis Carlton and Jeffrey Perloff, *Modern Industrial Organization.* Fourth Edition Global, Reading, MA: Addison Wesley, 2015 (hereafter "Carlton & Perloff") at p. 670. "Product B is a *demand substitute* for A if an increase in the price of A causes consumers to use more B instead. Product B is a *supply substitute* for A if, in response to an increase in the price of A, firms that are producing B switch some of their production facilities to the production of A." See Carlton and Perloff at p. 646 (emphasis in original). See, also, Horizontal Merger Guidelines at § 4.

invasive soft tissue surgeries, which are defined by the use of the MIST Surgical Robot (of which da Vinci is the dominant type during the Relevant Period), there are no economic substitutes for MIST Surgical Robots.

28.     Furthermore, evidence demonstrates that the market for MIST Surgical Robots is not part of the same relevant antitrust market as the market for minimally invasive soft tissue surgeries performed with MIST Surgical Robots.  For instance, one market is an input market (the market for MIST Surgical Robots) and the other is an output market (the market for or minimally invasive soft tissue surgeries performed with MIST Surgical Robots).  Further, given this distinction, these two markets have distinct customer bases (MIST Surgical Robots are sold to hospitals, that, in turn, use these surgical robots as a necessary input in the performance of robotically assisted minimally invasive soft tissue surgeries that they sell to their customers, including patients and/or third-party payors such as health insurance companies).  In addition, later in this Expert Report I discuss evidence demonstrating that the market for MIST Surgical Robots is distinct from the EndoWrist Repair and Replacement Market.

29.     A product is an "economic substitute" for another product if a small but significant change in price for that product results in increased demand for the other product.[74]  The change in price necessary to cause consumers to switch to a substitute good is often considered to be around five percent.[75]  I discuss the evidence, both from the public domain and in documents produced in discovery as part of this litigation, demonstrating that there were no available economic substitutes for minimally invasive soft tissue surgeries performed using MIST Surgical Robots during the Relevant Period and thus there are no economic substitutes for MIST Surgical Robots, in greater detail below.

---

[74] Robert S. Pindyck and Daniel L. Rubinfield, *Microeconomics*, Eighth Edition, Upper Saddle River, New Jersey: Pearson Education, 2013 (hereafter "Pindyck & Rubinfeld (8th edition)") at pp. 24-25.
[75] Five percent is the number commonly adopted by the U.S. Department of Justice and the Federal Trade Commission when evaluating the competitive effects of mergers.  See Horizontal Merger Guidelines at § 4.1.2.

i.  Traditional Laparoscopic Surgeries are Not an Economic Substitute for Minimally
Invasive Soft Tissue Surgeries Performed with MIST Surgical Robots, and Thus
Do Not Discipline Pricing of MIST Surgical Robots

30.    Earlier in this Expert Report I discussed traditional laparoscopic surgeries and
how they compared to surgeries performed with MIST Surgical Robots.  While many
surgeries can be performed by use of either a MIST Surgical Robot or by way of a
traditional laparoscopic surgery, meaning that the two may be to some extent *functional*
substitutes, evidence I have reviewed demonstrates that traditional laparoscopic surgeries
are, at best, only limited functional substitutes and not economic substitutes for
minimally invasive soft tissue surgeries performed using MIST Surgical Robots.[76]  For
example, Stacey Donovan, Executive Director of Surgical Services at Evergreen Health
(a hospital located in Kirkland, WA), testified:

> Q. If Intuitive raised the price of the da Vinci robot by 5 to 10 percent, would
> your hospital have looked to perform more traditional nonrobotic surgeries
> instead of acquiring the da Vinci robot? […]
>
> THE WITNESS: No, we would not have. […]
>
> Q. And why not?
>
> A. We would have - - we would have lost business if we chose to not - - if we
> chose to not have a - - the option of minimally invasive robotic surgery at
> Evergreen, we would have surgeons that would leave, and we would lose
> revenue.[77]

Similarly, Edward Harrich, Director of Surgical Services at Pullman Regional Hospital,
testified that Pullman Regional Hospital would not "look to perform more traditional,
nonrobotic surgeries instead of purchasing a da Vinci robot" if faced with a similar "5 to
10 percent" price increase, adding that he did not believe such a price increase "would

---

[76] As a matter of economics, the distinction between functional substitutes and economic substitutes is
important; two goods are only economic substitutes when the price of one disciplines the price of the other.
For example, one could use either drywall or plaster lath to build a house. They are functional substitutes,
but they are not *economic* substitutes as a decrease in the price of plaster lath of a "small but significant"
amount would not have a significant adverse impact on drywall sales.  The key issue in determining
whether two products are economic substitutes is whether customers would switch from one product to the
other *in response to a change in their relative prices*.

[77] Deposition of Stacey Donovan, May 27, 2021 (hereafter "Donovan Deposition") at 9:3-14, 44:20-45:9.

play a factor" in the decision of whether to perform more traditional laparoscopic surgeries in lieu of purchasing a da Vinci surgical robot.[78]

31.     The evidence discussed above demonstrates that a nominal change in price for MIST Surgical Robots (namely, Intuitive's da Vinci robot), which would have resulted in a significant increase in the price of the surgeries performed using those surgical robots, would not result in increased demand for traditional laparoscopic surgeries.  This constitutes one form of evidence demonstrating that traditional laparoscopic surgeries are not economic substitutes for surgeries performed with MIST Surgical Robots and, thus, are not part of the same relevant antitrust product market as MIST Surgical Robots.  I discuss additional evidence that forms the basis of this conclusion in more detail below.

> a.  Intuitive Acknowledged that it Did Not View Traditional Laparoscopic Surgery as Competition for Surgeries performed with MIST Surgical Robots

32.     One form of evidence demonstrating that traditional laparoscopic surgeries did not constitute economic substitutes for minimally invasive soft tissue surgeries performed using MIST Surgical Robots is that Intuitive itself acknowledges that it did not view traditional laparoscopic surgeries as competition for its da Vinci surgical robots.  For example, in a "preparation document for a panel discussion at a society surgeon led meeting,"[79] in response to a potential question about whether it planned to "go into laparoscopic surgery," Intuitive stated: "We do not see ourselves in competition with laparoscopy.  It is about the right tool for the right job."[80]  In response to a July 2017 request from a colleague regarding an analysis of pricing per procedure, Bob DeSantis, Intuitive's Executive Vice President and Chief Product Officer, responded: "Your analysis is grounded on procedure pricing vs competitive lap.   While this is a consideration, I'm not sure it's the primary one.   I think our value proposition vs lap is a winning one today in targeted procedures."[81]  Among the "bigger considerations" noted

---

[78] Deposition of Edward W. Harrich, May 24, 2021 (hereafter "Harrich Deposition") at 9:5-9, 51:7-16.
[79] Deposition of Glenn Vavoso, May 14, 2021 (hereafter "Vavoso Deposition") at 65:16-69:12, Exhibit 8, Exhibit 9.
[80] Vavoso Deposition Exhibit 9 at Intuitive-00269126.
[81] 30(b)(6) Deposition of Bob DeSantis, May 27, 2021 (hereafter "DeSantis Deposition") Exhibit 4 at Intuitive-00147735.

by Mr. DeSantis was "a <u>true robotic competitive threat</u>."[82]  Regarding this statement, Mr. DeSantis testified:

> Q. What did you mean when you said "a true robotic competitive threat"?
>
> A. So my thought here was that robotics is differentiated from lap and its value proposition. So therefore, when we think about our place in the market, we should be thinking about our robotic offering versus other robotic offerings rather than lap.[83]

33.     Further, evidence demonstrates that Intuitive requires many of its employees to sign non-compete agreements.  In those agreements, Intuitive defines competitors as "any business which directly competes, or plans to compete, with the Company in any of the following areas: robotic assisted surgery, robotic assisted catheter control, augmented reality surgery."[84]  Thus, Intuitive's own definition of competitors in these agreements does not make any mention of non-robotic surgery.

34.     The evidence discussed above demonstrates that Intuitive itself did not view traditional laparoscopic surgery as competition for surgeries performed with its da Vinci MIST Surgical Robots.  This constitutes one form of evidence demonstrating that traditional laparoscopic surgeries are not economic substitutes for minimally invasive soft tissue surgeries performed using MIST Surgical Robots, and, thus, are not part of the same relevant antitrust product market as MIST Surgical Robots.

> b.     <u>MIST Surgical Robots such as Da Vinci Possess Different Features and Benefits to Surgeons and Patients Compared to Traditional Laparoscopic Surgeries</u>

35.     Another form of evidence I have reviewed that demonstrates that traditional laparoscopic surgeries are not economic substitutes for minimally invasive soft tissue surgeries performed using MIST Surgical Robots is the different features and benefits that MIST Surgical Robots (such as Intuitive's da Vinci robot) possess compared to

---

[82] DeSantis Deposition Exhibit 4 at Intuitive-00147735 (emphasis in original).
[83] DeSantis Deposition at 29:20-30:2.
[84] Vavoso Deposition Exhibit 21 at Intuitive-00423276.

traditional laparoscopic surgical procedures. As a November 2018 Goldman Sachs report on "Robotic Surgery and the OR of the Future," noted:

> Successful treatment was often dependent on selection of a "good surgeon" which is a highly qualitative and subjective process. With the advent of robotic surgery, surgical procedures have become more minimally invasive, more closely linked to technological advances in imaging/novel design of end effectors, and seen improved precision and patient outcomes. [85]

36. At deposition, Stacey Donovan of Evergreen Hospital testified that the benefits of da Vinci surgery over traditional laparoscopic surgery for surgeons included "greater dexterity, better visualization, easier access to areas inside a body cavity that are difficult to access with traditional laparoscopic instruments. They have 3D vision rather than 2D vision, which you traditionally get with laparoscopic surgery."[86] Edward Harrich of Pullman Regional Hospital testified that, "[w]hen compared to traditional or laparoscopic surgery," da Vinci surgical robots resulted in "patients report[ing] less pain, less scarring, a shorter hospital stay, and a quicker return to their daily activities."[87] When asked in an interview about the "biggest benefits of using surgical robots today," Dr. Jay Redan, Chief of Surgery at Florida Hospital-Celebration Health, responded: "The benefit to the doctor and patient is better visualization, more precise surgery and fewer complications that can hopefully be better outcomes (yet to be proven)."[88]

37. Evidence of da Vinci's different features and benefits that I have reviewed includes acknowledgements of such features and benefits made by Intuitive itself. For example, in its 2020 Form 10-K, Intuitive described its da Vinci surgical robot in the following way:

---

[85] Isaac Ro, Veronika Dubajova, CFA, Akinori Ueda, Ph. D., Ziyi Chen, Jack O'Connell, Sara Silverman, and Frits Jonker, "Digital Health: Robotic Surgery and the OR of the Future," Goldman Sachs: Equity Research, November 15, 2018 (hereafter "November 2018 Goldman Sachs Report") 1-16 at p. 9.
[86] Donovan Deposition at 18:22-19:11. Ms. Donovan added that da Vinci surgery "also, with [the] addition of -- it's a called Firefly or it -- it's a medication that's given that lights up tissues. It provides a better delineation between healthy tissues and tissues that may have cancer involved." Donovan Deposition at 18:22-19:11.
[87] Harrich Deposition at 17:11-20:22.
[88] November 2018 Goldman Sachs Report at p. 6. Dr. Redan also noted that the "benefits of being an early adopter of successful technology is a benefit to the hospital." November 2018 Goldman Sachs Report at p. 6.

Da Vinci Surgical Systems enable surgeons to extend the benefits of MIS
[minimally invasive surgery] to many patients who would otherwise undergo a
more invasive surgery by using computational, robotic, and imaging technologies
to overcome many of the limitations of traditional open surgery or conventional
MIS. Surgeons using a da Vinci Surgical System operate while seated
comfortably at a console viewing a 3D, high-definition image of the surgical
field. This immersive console connects surgeons to the surgical field and their
instruments. While seated at the console, the surgeon manipulates instrument
controls in a natural manner, similar to open surgical technique. Our technology
is designed to provide surgeons with a range of articulation of the surgical
instruments used in the surgical field analogous to the motions of a human wrist,
while filtering out the tremor inherent in a surgeon's hand.[89]

38.     In this same 2020 Form 10-K, Intuitive lists the following "features and benefits
to surgeons" of its da Vinci surgical robot:

- Immersive 3DHD Visualization[90]

- Precise and Tremor-Free Endoscope Control[91]

- Advanced Instruments[92]

---

[89] Intuitive 2020 SEC Form 10-K at p. 52. Intuitive also states: "The da Vinci Surgical System is designed
to enable complex surgery using a minimally invasive approach. It consists of an ergonomic surgeon
console or consoles, a patient-side cart with an interactive arm or arms, a high-performance vision system,
and proprietary instruments and accessories. Surgeons using the da Vinci system operate while seated
comfortably at a console viewing a three-dimensional, high definition ('3D') image of the surgical field.
This immersive visualization connects surgeons to the surgical field and their instruments. While seated at
the console, the surgeon manipulates instrument controls in a natural manner, similar to the open surgery
approach." See Intuitive 2020 SEC Form 10-K at p. 4.
[90] Intuitive 2020 SEC Form 10-K at p. 4. "Our vision system includes a 3DHD endoscope with two
independent vision channels linked to two separate color monitors through sophisticated image processing
electronics. The da Vinci Surgical System provides visualization of the target anatomy with natural depth-
of-field and magnification that is intended to facilitate accurate tissue identification and tissue layer
differentiation. With our Firefly Fluorescence Imaging technology, surgeons can use our specialized
imaging hardware in combination with an injectable fluorescent dye to visualize vasculature, tissue
perfusion, or biliary ducts beneath tissue surfaces in real-time." See Intuitive 2020 SEC Form 10-K at p. 4.
[91] Intuitive 2020 SEC Form 10-K at p. 4. "Our imaging system also incorporates our proprietary camera
control technology that allows the surgeon to easily change, move, zoom, and rotate his or her field of
vision. Surgeons can reposition the surgical camera quickly with foot controls or zoom in, out, up, down,
left, or right by moving their hands while maintaining a stable image." See Intuitive 2020 SEC Form 10-K
at p. 4.
[92] Intuitive 2020 SEC Form 10-K at p. 4. "We offer a comprehensive suite of stapling, energy, and core
instrumentation for our surgical systems. Most of our proprietary instruments feature EndoWrist
technology, incorporating "wrist" joints. Inspired by the human hand, our wristed instruments enable

- Intuitive Instrument Movement[93]

- Scaled, Tremor Filtered Instrument Movement[94]

- Improved Surgeon Ergonomics[95]

- Multi-Specialty Surgical Platform[96]

- Advanced Training Tools[97]

Consistent with the features and benefits discussed above, both Glenn Vavoso (Senior Vice President and General Manager for Asia and Indirect Global markets) and Bob DeSantis (Executive Vice President and Chief Product Officer) of Intuitive testified to the many features and benefits da Vinci surgical robots possess over traditional laparoscopic surgery.[98]

---

surgeons to orient the instruments carefully relative to the tissue and suture with precision, just as they can in open surgery." See Intuitive 2020 SEC Form 10-K at p. 4.

[93] Intuitive 2020 SEC Form 10-K at p. 5. "Our technology is designed to transform the surgeon's natural hand movements outside of the body into corresponding micro-movements inside the patient's body. For example, with the da Vinci Surgical System, a hand movement to the right outside of the body causes the instrument inside the patient to be moved to the right. In contrast, conventional minimally invasive surgery ("MIS") instruments are long, rigid levers that rotate around a fulcrum, or pivot point, located at the port created in the body wall. In conventional MIS, the instrument tip moves in the opposite direction from the surgeon's hand, and surgeons must adjust their hand-eye coordination to compensate for the direction reversal by the pivot." See Intuitive 2020 SEC Form 10-K at p. 5.

[94] Intuitive 2020 SEC Form 10-K at p. 5. "With our technology, a surgeon can also use "motion scaling," a feature that translates, for example, a three-millimeter hand movement outside the patient's body into a one-millimeter instrument movement in the surgical field inside the patient's body. Motion scaling is designed to allow precision and control for delicate tasks. In addition, our technology filters the tremor inherent in a surgeon's hands." See Intuitive 2020 SEC Form 10-K at p. 5.

[95] Intuitive 2020 SEC Form 10-K at p. 5. "The da Vinci Surgical System is designed to allow surgeons to operate while seated, which may be clinically advantageous because of reduced surgeon fatigue. The da Vinci Surgical System's design provides natural hand-eye alignment at the surgeon's console. Because the da Vinci Surgical System's robotic arms hold the camera and instruments steady, there is less surgeon and assistant fatigue." See Intuitive 2020 SEC Form 10-K at p. 5.

[96] Intuitive 2020 SEC Form 10-K at p. 5. "The da Vinci Surgical System is designed to enable surgeons to perform a wide range of surgical procedures within our targeted gynecologic, urologic, general surgery, cardiothoracic, and head and neck specialties. To date, surgeons have used the da Vinci Surgical System to perform dozens of different types of surgical procedures. While we do not expect all of these different types of procedures to become widely adopted, they demonstrate the flexibility of the da Vinci Surgical System." See Intuitive 2020 SEC Form 10-K at p. 5.

[97] Intuitive 2020 SEC Form 10-K at p. 5. "Training technologies include our Simulation program, which provides for independent da Vinci skills development through interactive Virtual Reality ("VR") exercises, and our telementoring program, which provides real-time, surgeon-to-surgeon learning and collaboration during robotic-assisted surgery with a da Vinci Surgical System." See Intuitive 2020 SEC Form 10-K at p. 5.

[98] See, for example, Vavoso Deposition at 32:18-48:15; DeSantis Deposition at 107:12-114:1.

39.     The evidence discussed above demonstrates that MIST Surgical Robots possess different features and benefits to surgeons and patients over traditional laparoscopic surgery.  Consistent with the evidence discussed earlier in this Expert Report, hospitals are unlikely forego these features and benefits of MIST Surgical Robots in response to a small but significant increase in price.  This constitutes one piece of evidence demonstrating that traditional laparoscopic surgeries are not economic substitutes for minimally invasive soft tissue surgeries performed using MIST Surgical Robots and that MIST Surgical Robots constitute a relevant antitrust product market.

### c.     Non-Clinical Benefits of MIST Surgical Robots Compared to Traditional Laparoscopic Surgeries

40.     Additional evidence I have reviewed demonstrating that traditional laparoscopic surgeries are not economic substitutes for surgeries performed with MIST Surgical Robots includes various other non-clinical benefits to hospitals that utilize MIST Surgical Robots.  One such non-clinical benefit is derived from a hospital's marketing of its use of MIST Surgical Robots, such as da Vinci, to increase profits.  For example, a November 2018 Goldman Sachs report on "Robotic Surgery and the OR of the Future" noted:

> **[R]obotic surgery has become a very effective marketing tool for hospitals** who adopt the technology. Many surgical procedures are important profit centers to a hospital which in turn created an incentive for early adopters to advertise these capabilities directly to patients in an attempt to portray the institution as a leading center of excellence for complex illnesses such as cancer.[99]

This report added that, "[f]or hospitals, **general surgery procedures are likely to remain key profit centers, making capital spending for value-add technologies a continued priority.**"[100]  In 2013, Memorial Hospital in Douglass, WY purchased a $2 million da Vinci surgical robot.[101]  Regarding that purchase, Memorial Hospital's CEO,

---

[99] November 2018 Goldman Sachs Report at p. 10 (emphasis in original).

[100] November 2018 Goldman Sachs Report at p. 10 (emphasis in original).  This report further noted: "We therefore believe the continued adoption of these technologies will have far-reaching implications for the business model around general surgery."  See November 2018 Goldman Sachs Report at p. 10.

[101] Jaimy Lee, "Surgical-Robot Costs Put Small Hospitals in a Bind," *Modern Healthcare*, April 19, 2014 (hereafter "Lee").  Available at: https://www.modernhealthcare.com/article/20140419/MAGAZINE/304199985/surgical-robot-costs-put-small-hospitals-in-a-bind.

Ryan Smith, said that he "doesn't mind if it takes awhile for the pricey new piece of equipment to pay off because it's already attracting patients who previously would have traveled to other hospitals in Colorado or Utah to get robotic surgery."[102] One 2004 academic journal article noted:

> In today's competitive healthcare market, many organizations are interested in making themselves "cutting-edge" institutions with the most advanced technological equipment and the very newest treatment and testing modalities. Doing so allows them to capture more of the healthcare market. Acquiring a surgical robot is in essence the entry fee into marketing an institution's surgical specialties as "the most advanced." It is not uncommon, for example, to see a photo of a surgical robot on the cover of a hospital's marketing brochure and yet see no word mentioning robotic surgery inside.[103]

Similarly, a 2014 article regarding the use of technology at rural hospitals noted that "[t]hroughout the country, hospital leaders are looking at ways they can strengthen their bottom line using technologies that better serve their communities and keep patients closer to home."[104] This article discussed two rural Minnesota hospitals (Sanford Bemidji Medical Center ("SBMC") and Essential Health-St. Joseph's Medical Center) that have purchased da Vinci surgical robots, with Joy Johnson, Chief Operating Officer at SBMC, stating about the purchase: "Patients want robotic surgery because it means shorter hospital stays and faster recoveries for them. New physician surgical grads are trained in robotic surgery and they want to use those skills. If patient retention and physician recruitment are negatively impacted, that can impact a hospital's bottom line."[105]

41.    At deposition, Edward Harrich, Director of Surgical Services at Pullman Regional Hospital, testified that if "Pullman Regional did not have a da Vinci surgical robot" that it

---

[102] Lee.

[103] Anthony R. Lanfranco, BAS, Andres E. Castellanos, MD, Jaydev P. Desai, PhD, and William C. Meyers, MD, "Robotic Surgery: A Current Perspective," *Annals of Surgery*, Vol. 239, No. 1, January 2004, 14-21 at p. 19.

[104] Candi Helseth, "Technology Widens Care Options for Rural Hospitals," *The Rural Monitor*, February 12, 2014 (hereafter "The Rural Monitor").

[105] The Rural Monitor. Mr. Johnson further noted that "[p]atients want to stay close to home for care but they will travel long distances for best practice surgical options," adding that "rural hospitals must be proactive technologically to maintain a solid bottom line." See The Rural Monitor.

would lose customers.[106] As Intuitive noted along with an internal da Vinci marketing presentation: "Throughout the country, hospitals are looking to diversify their payor mix in an effort to attract or retain more commercially/privately insured patients. Premier data shows that for the core procedures, da Vinci surgery attracts more commercially insured patients compared to laparoscopic and open surgery."[107]

42.     Furthermore, another non-clinical benefit to hospitals performing robot-assisted minimally invasive soft tissue surgeries is the impact doing so has on those hospitals' overall surgeon recruitment and/or retention efforts.  As noted in the same November 2018 Goldman Sachs report discussed above, "the rise of robotics has **significant implications for hospital recruitment** of new physicians as training on these technologies now begins in medical school."[108]  In an October 2020 op-ed, Eve Cunningham, MD, MBA, the Chief Medical Officer of Providence Medical Group, stated: "Mass exodus of surgeons or recruitment challenges are a risk if robots are restricted or removed from facilities."[109]

43.     At deposition, Stacey Donovan of Evergreen Hospital testified:

> Q. Does the fact that your hospital has da Vinci surgical robots help your hospital attract top surgeons?
>
> A. Yes, it does.
>
> Q. If your hospital no longer had any da Vinci surgical robots, would your hospital lose some top surgeons? […]
>
> THE WITNESS: Yes, we would.[110]

Similarly, Edward Harrich of Pullman Regional Hospital, testified that the "fact that [his] hospital has a da Vinci surgical robot help[s] [his] hospital attract top surgeons," and further that there was a good chance losing its da Vinci robots would cause Pullman

---

[106] Harrich Deposition at 23:3-7.
[107] Intuitive-00001237-1311 at 1283.
[108] November 2018 Goldman Sachs Report at p. 10 (emphasis in original).
[109] Eve Cunningham, MD, MBA, "Op-Ed: Addressing Our Da Vinci Addiction – A call to action for everyone in healthcare," MedPage Today, October 17, 2020 (hereafter "Cunningham"). Available at: https://www.medpagetoday.com/surgery/generalsurgery/89175.
[110] Donovan Deposition at 15:7-16.

Hospital to lose surgeons (as it did once before prior to the time Pullman had plans to purchase its first da Vinci surgical robot).[111]

44.    Further, Intuitive itself noted in a May 2019 corporate marketing presentation that hospital decision makers believe that owning a da Vinci surgical robot "[e]nables hospitals to attract surgeons and their patients."[112]  In a set of notes emailed to Intuitive colleagues regarding a da Vinci marketing campaign, Suresh Sathyamurthy of Intuitive proposed informing "US Hospital Executives and Decision Makers (CEO, CFO)" that owning a da Vinci surgical robot "[a]ttracts surgeons to hospitals (and surgeons bring patients/procedures) to drive business (Aligns with Growth objectives for Hospital executives from decision maker study)."[113]  Another Intuitive internal marketing presentation included a slide that "shows the proliferation of da Vinci surgery in urology, gynecology, and general surgery resident / fellowship programs, and implies growing surgeon interest in having access to a da Vinci Surgical System," adding: "Attracting physicians is among hospital CEOs' top imperatives.  As hospitals evaluate da Vinci surgery and opportunities to attract surgeons, they should consider the proliferation of da Vinci surgery in residency and fellowship programs where physicians are being exposed to robotic-assisted surgery."[114]

45.    The evidence discussed above demonstrates various other non-clinical benefits to hospitals that utilize MIST Surgical Robots compared to traditional laparoscopic surgery. This constitutes another piece of evidence demonstrating that traditional laparoscopic surgeries are not economic substitutes for minimally invasive soft tissue surgeries performed using MIST Surgical Robots and further that MIST Surgical Robots constitute a relevant antitrust product market.

---

[111] Harrich Deposition at 11:21-14:21, 51:18-24, 125:10-126:8.
[112] Intuitive-00073538-559 at 541.
[113] Intuitive-00014395-96 at 95.
[114] Intuitive-00001237-1311 at 1286. Intuitive further noted: "In the case of URO, 96% of hospitals with urology residency programs are performing da Vinci Surgery.  As shown here, da Vinci surgery is being rapidly adopted by residencies and fellowships across specialties.  A successful da Vinci surgery program can help attract top talent."  See Intuitive-00001237-1311 at 1286.

ii.  Non-MIST Surgical Robots are Not Economic Substitutes for MIST Surgical
Robots and, Therefore, Cannot Be Substituted for MIST Surgical Robots in the
Performance of Minimally Invasive Soft Tissue Surgeries

46.    In addition to MIST Surgical Robots, other types of surgical robots have been
approved by the FDA to perform a variety of different surgical procedures. For example,
at deposition, Bob DeSantis, Executive Vice President and Chief Product Officer at
Intuitive, identified other types of surgical robots in the U.S., including surgical robots
that perform orthopedic, endoluminal, and cardiac procedures.[115] Evidence I have
reviewed demonstrates that non-MIST Surgical Robots such as these are not functional
substitutes for MIST Surgical Robots, as they do not perform the same types of surgical
procedures as MIST Surgical Robots. Given that these non-MIST Surgical Robots are
not functional substitutes for MIST Surgical Robots, they therefore are not economic
substitutes for MIST Surgical Robots either. Thus, these other types of surgical robots
are not part of the relevant antitrust product market.

47.    At deposition, Mr. DeSantis testified that orthopedic, endoluminal, and cardiac
surgical robots "aren't soft tissue surgical robots."[116] Mr. DeSantis further testified:

> Q. Is it your understanding that robots that don't perform any of the same
> procedures as the da Vinci robot are in direct competition with the da Vinci soft
> tissue surgical robot?
>
> A. Today, if they're not performing the same procedures that we are performing,
> I think that's a fair statement. Then we're not in competition, by definition.[117]

Mr. DeSantis further testified that there were no other surgical robots that have FDA
clearance to perform all of the same surgical procedures as da Vinci in the United
States.[118] Mr. DeSantis also testified that the only FDA-approved robot that poses a

---

[115] DeSantis Deposition at 38:15-39:19.
[116] DeSantis Deposition at 38:15-39:22.
[117] DeSantis Deposition at 78:17-24.
[118] DeSantis Deposition at 78:25-79:21. See, also, Vavoso Deposition at 111:24-112:13. At his May 2021
deposition, Glenn Vavoso of Intuitive testified that there are only two other surgical robots that had FDA
approval to perform minimally invasive soft tissue surgeries in the U.S.: TransEnterix's Senhance surgical
robot and Medrobotics' Flex surgical robot. See Vavoso Deposition at 85:20-98:5. However, as I discuss
in greater detail later in this Expert Report, neither of these surgical robots is FDA approved for all the
same indications as Intuitive's da Vinci surgical robot. See Vavoso Deposition at 98:18-113:15.

competitive threat is the TransEnterix Senhance.[119]  Glenn Vavoso of Intuitive similarly testified that there were no other FDA-approved surgical robots that performed all of the same surgical procedures as the da Vinci surgical robot.[120]  Similarly, in a January 2019 email to colleagues responding to a question of who he thought "are considered competitors" of Intuitive, Larry Cesnik of Intuitive flagged a handful of surgical robot manufacturers from the list he was given, noting: "I believe the ones in red are not direct competitors, since they do not do SOFT TISSUE robotic surgery."[121]

48.     The evidence discussed above demonstrates that non-MIST Surgical Robots including the ones discussed above do not perform the same surgical procedures as MIST Surgical Robots such as da Vinci and, therefore, cannot be substituted for MIST Surgical Robots in the performance of minimally invasive soft tissue surgeries.[122]  Therefore, given that these non-MIST Surgical Robots are not functional substitutes for MIST Surgical Robots, it is not possible for them to be economic substitutes for MIST Surgical Robots in the performance of minimally invasive soft tissue surgeries.  This constitutes another piece of evidence demonstrating that the tying market, the market for MIST Surgical Robots, constitutes a relevant antitrust product market.

B.  *The Relevant Antitrust Geographic Market with Regards to the Tying Market is the United States*

49.     As part of my analysis of Plaintiff's claims with respect to the tying market, the market for MIST Surgical Robots, I have concluded that the relevant antitrust geographic market was the United States. I discuss the evidence that supports the basis for this conclusion in more detail below.

50.     The U.S. Food & Drug Administration ("FDA") is "responsible for protecting the public health by ensuring the safety, efficacy, and security of human and veterinary drugs, biological products, and medical devices."[123]  The FDA states the following

---

[119] DeSantis Deposition at 64:6-12.

[120] Vavoso Deposition at 102:7-106:6, 112:6-18.

[121] Intuitive-00124485-87 at 85.

[122] For example, Bob DeSantis of Intuitive testified that neither the Stryker Mako orthopedic robot nor the Johnson & Johnson endoluminal platform perform minimally invasive soft tissue surgeries. See DeSantis Deposition at 32:3-33:10.

[123] FDA, "What We Do." Available at: https://www.fda.gov/about-fda/what-we-do.

regarding the sale of medical devices (such as robotically assisted surgical devices): "In the U.S., FDA regulates the sale of medical device products. Before a medical device can be legally sold in the U.S., the person or company that wants to sell the device must seek approval from the FDA. To gain approval, they must present evidence that the device is reasonably safe and effective for a particular use."[124] In its 2021 Form 10-K, Intuitive states: "The FDA regulates the development, design, non-clinical and clinical research, manufacturing, safety, efficacy, labeling, packaging, storage, installation, recordkeeping, complaint and adverse event reporting, clearance, approval, certification, promotion, marketing, export, import distribution, and service of medical devices in the U.S. to ensure that medical devices distributed domestically are safe and effective for their intended uses."[125] Thus, if a medical device, such as a surgical robot, does not have FDA clearance, it cannot be used for surgery in the United States. As Glenn Vavoso of Intuitive testified:

> Q. For a robot to be used for a surgery in the United States, it needs to have FDA approval for the procedure it's being used for, right? […]
>
> A. Yes.
>
> Q. So to the extent that there's robots for surgeries that exist outside of the United States, those can't be used for surgeries inside the United States, right?
>
> A. Without FDA approval, correct.[126]

Thus, the fact that the sale of MIST Surgical Robots is regulated by the United States government, and that manufacturers outside of the United States cannot sell MIST Surgical Robots to hospitals in the United States without approval from the United States government, constitutes evidence demonstrating that the relevant antitrust geographic market is the United States.

51.     The evidence discussed above demonstrates that the market for MIST Surgical Robots in the United States, the tying market in this matter, constitutes a relevant antitrust

---

[124] FDA, "FDA's Role in Regulating Medical Devices" (hereafter "FDA's Role in Regulating Medical Devices"). Available at: https://www.fda.gov/medical-devices/home-use-devices/fdas-role-regulating-medical-devices.
[125] Intuitive 2021 SEC Form 10-K at p. 15.
[126] Vavoso Deposition at 109:20-110:12.

market. In the next section of the Expert Report, I discuss how the EndoWrist Repair and Replacement Market in the United States, the tied market in the matter, also constitutes a distinct relevant antitrust market.

## IV. The EndoWrist Repair and Replacement Market in the United States Constitutes a Relevant Antitrust Market

52. In the previous section I discussed evidence demonstrating that the tying market, the market for MIST Surgical Robots in the United States, constitutes a relevant antitrust market. As part of my analysis of Plaintiff's allegations in this matter, I also analyze the relevant antitrust market with respect to the tied market, which Plaintiff alleges was unlawfully tied to Intuitive's sales of da Vinci surgical robots. Based on my analysis of the documents and data produced in this litigation, as well as my training and experience in economics and my research and analysis into the market for the repair and replacement of EndoWrist surgical instruments, I have concluded that the EndoWrist Repair and Replacement Market constitutes a relevant antitrust product market that is distinct from the market for MIST Surgical Robots. I have also concluded that the United States constitutes the relevant antitrust geographic market with respect to the tied market for evaluating the impact of the Alleged Misconduct. I discuss my bases for these conclusions below.

### A. The EndoWrist Repair and Replacement Market is a Relevant Antitrust Product Market

53. As I noted above, a relevant antitrust product market is comprised of the smallest possible set of goods for which a hypothetical monopolist could exercise market power to raise prices on that set of products by a small, but significant, amount without losing so much in sales volume that the increase in price is unprofitable.[127] Based on my research and analysis into the EndoWrist Repair and Replacement Market, and my training and experience in economics, I have determined that the EndoWrist Repair and Replacement

---

[127] As I explained, in general, an economic analysis of the relevant antitrust product market requires identifying "products that are close demand or supply substitutes." See Carlton and Perloff at p. 670. "Product B is a *demand substitute* for A if an increase in the price of A causes consumers to use more B instead. Product B is a *supply substitute* for A if, in response to an increase in the price of A, firms that are producing B switch some of their production facilities to the production of A." See Carlton and Perloff at p. 670 (emphasis in original). See, also, Horizontal Merger Guidelines at § 4.

Market constitutes a relevant antitrust product market. I base this conclusion on the fact that there are no functional substitutes for the repair and replacement of EndoWrist surgical instruments. Therefore, given that there are no functional substitutes for the repair and replacement of EndoWrist surgical instruments in the applications for which it is sold, it is not possible for there to be economic substitutes for the repair and replacement of EndoWrist surgical instruments. I discuss the evidence that forms the basis of this conclusion in greater detail below.

   i.    Third-Party Repairs of EndoWrist Surgical Instruments are Part of the Same Relevant Antitrust Product Market as Replacement EndoWrist Surgical Instruments Sold by Intuitive

54.    Evidence I have reviewed demonstrates that third-party repairs of EndoWrist surgical instruments (such as those performed by SIS) were viewed by Intuitive and other market participants and analysts as a competitive threat to Intuitive's sales of replacement EndoWrist surgical instruments. For example, Deutsche Bank published an analyst report in February 2020 covering the "third party risk" to Intuitive's Instruments & Accessories business segment (which includes the sale of EndoWrist instruments) following a recent downgrade of Intuitive's stock in which it concluded:

> We believe the Street continues to be overly dismissive of the risk of increasing usage of refurbished da Vinci instruments to Intuitive's top line over the next couple years. Given the abundance of first-hand confirmation from hospital customers that are exploring refurbished instruments, the question is not whether – but rather, how much – Intuitive's business will be impacted.[128]

55.    Deutsche Bank further noted that, based on its research, "FDA action to stymie usage of repaired instruments is highly unlikely," and that Intuitive's justification of its cease-and-desist letters to enforce its service agreements on "safety, regulatory, and

---

[128] DeSantis Deposition Exhibit 11 at Intuitive-00566055. Regarding how hospitals have been dealing with Intuitive's "pushback strategy" via its "advisement to cease and desist engagement with service providers," Deutsche Bank concluded: "Notably, some hospitals are now beginning to push back on restrictions embedded in their service contracts against third party servicing of da Vinci systems and instruments, questioning the legality and enforceability of such terms of service." See DeSantis Deposition Exhibit 11 at Intuitive-00566055. Deutsche Bank also identified the third-party repair of EndoWrist surgical instruments as a "competitive threat" to Intuitive's U.S. Instruments and Accessories business. See Intuitive-00552993-53014 at 52993.

legal/contractual grounds" are largely irrelevant.[129]  Furthermore, Deutsche Bank estimated that, once repairs of EndoWrist instruments used with model X/Xi da Vinci robots become available, "Intuitive's top line exposure will increase dramatically – rendering a majority (~58%) of segment sales 'at risk' of competitive pressures."[130]

56.     Evidence I have reviewed demonstrates that Intuitive itself acknowledged that third-party repairs of EndoWrist surgical instruments (such as those performed by SIS) were a competitive threat to its sales of replacement EndoWrist surgical instruments. At deposition, Katie Scoville, Director of New Product Verification, Packaging, and Product Labeling at Intuitive, testified that the threat of "third-party EndoWrist refurbishers" would "be a factor in our sales numbers for certain third parties."[131]

57.     In a September 2016 internal analysis, Intuitive acknowledged the competitive threat from one such third-party repair company (Rebotix): "Despite the strong technology protections that ISI uses to limit the life of its instruments, there are companies that will attempt to hack that technology and extend instrument life beyond ISI's specs.  There is already one company in Florida (Rebotix) that claims to be able to extend instrument life and is currently attempting to qualify for a CE mark for the life-extended instruments."[132]  In an internal analysis of options for pursuing a "Remanufactured Instruments" program, Intuitive notes as one of the "Pros" of one option that "Rebotix has potential to impact Si sales, an immediate threat."[133]  In an August 2019 analysis of third-party repairs of EndoWrist surgical instruments, Intuitive identified a number of third-party repairers as a competitive threat to their business, and also summarized "rebuttals" to Intuitive's value proposition pertaining to one specific third-party repairer (Rebotix), as well as various responses to those rebuttals.[134]

---

[129] DeSantis Deposition Exhibit 11 at Intuitive-00566057-066.  See, also, Intuitive-00552993-53014 at 52997-52998.
[130] DeSantis Deposition Exhibit 11 at Intuitive-00566072.  See, also, Intuitive-00552993-53014 at 53006.
[131] Deposition of Katie Scoville, May 26, 2021 (hereafter "Scoville Deposition") at 76:19-25.  Ms. Scoville also testified that Intuitive "likely discussed revenue implications of third-party refurbishment."  See Scoville Deposition at 76:1-18.
[132] Intuitive-00102938-989 at 952.
[133] Intuitive-00139149-150 at 150.
[134] Intuitive-00194074-089.

58.     Relatedly, in November 2019, executives at Intuitive discussed the competitive
threat posed by SIS upon learning that Marin General Hospital had been using EndoWrist
instruments that had been repaired by SIS.[135]  In reporting this finding, Erin Grinberg of
Intuitive noted that Marin General Hospital was "very proud of this and celebrated the
cost savings."[136]  In devising a plan for how to respond to the competitive threat posed by
SIS at Marin General Hospital,[137] Dan Jones of Intuitive noted that "[t]here is a close
match between the 'SIS' materials and the documents we'd seen earlier from Rebotix."[138]
Similarly, in September 2019, Intuitive executives discussed how to deal with an inquiry
from University of Florida Health Shands ("UF Shands") regarding the use of SIS's
services to save money by repairing its EndoWrist instruments.[139]  UF Shands had been
alerted to the cost savings by its Group Purchasing Organization, which noted:

> Two of [its] members, Kaiser Permanente and Legacy Health System are
> capturing savings by using Intuitive Surgical Endowrist refurbishment
> products. Surgical Instrument Service Company (SIS) is now the only
> supplier providing refurbishment to Intuitive Surgical's da Vinci
> EndoWrist.[140]

---

[135] Intuitive-00049108-112.

[136] Intuitive-00049108-112 at 112.

[137] As part of this response, Adam Clark of Intuitive noted that it was "important for MG to understand that we will be canceling their SLSA in short order if this keeps happening."  See Intuitive-00110473-0478 at 74.

[138] Intuitive-00049108-112 at 108. Evidence I have reviewed indicates that SIS itself did not perform repairs on EndoWrist instruments on behalf of its hospital customers; rather, it acted as a distributor of such repair services performed by other third-party repairers. See, for example, 30(b)(6) Deposition of Greg Posdal, November 1, 2022 (hereafter "30(b)(6) Posdal Deposition") at 21:16-22:12, 47:4-50:14. Chris Gibson of Rebotix described Rebotix's relationship with SIS in the following way: "SIS has been a longtime customer of Benjamin Biomedical. And as I discussed before, that we utilized our distributor base of Benjamin Biomedical to offer the repair service that Rebotix Repairs was offering, and so we engaged SIS to begin selling the Rebotix Repair repair process and service to their customers, which are the end-user hospitals." See Deposition of Chris Gibson, June 22, 2021 at 158:1-9. Similarly, as Greg Posdal of SIS testified regarding Rebotix: "they actually performed the work for us.  We picked it up, sent it to them, and they did the repairs."  See Deposition of Greg Posdal, May 10, 2021 (hereafter "Posdal Deposition") at 30:17-31:10.  Thus, the evidence discussed throughout this Expert Report regarding how Intuitive's exclusionary conduct prevented Rebotix from competing effectively in the EndoWrist Repair and Replacement Market is also applicable to SIS's efforts to compete effectively in the EndoWrist Repair and Replacement Market. See, for example, 30(b)(6) Deposition of Keith Robert Johnson, October 27, 2022 (hereafter "Johnson Deposition") at 17:22-20:1.

[139] Intuitive-00110252-54.

[140] Intuitive-00110252-54 at 54.  UF Shands was further informed that Kaiser Permanente and Legacy Health system achieved an approximately 40 percent savings by having SIS repair EndoWrist instruments. See Intuitive-00110252-54 at 54.

59.     The evidence discussed above demonstrates that third-party repairs of EndoWrist surgical instruments were viewed as a competitive threat to Intuitive's sales of replacement EndoWrist surgical instruments. This constitutes one piece of evidence demonstrating that third-party repairs of EndoWrist surgical instruments are part of the same relevant antitrust product market as replacement EndoWrist surgical instruments sold by Intuitive.

ii.     Intuitive Considered Selling Refurbished Endowrist Instruments to Make it More Difficult for Third-Party Repair Companies To Compete Effectively in the EndoWrist Repair and Replacement Market

60.     Evidence I have reviewed in the form of Intuitive's own conduct in response to the competitive threat posed by third-party repairs of EndoWrist surgical instruments provides additional evidence that third-party repairs of EndoWrist surgical instruments are part of the same relevant antitrust product market as replacement EndoWrist surgical instruments sold by Intuitive. For example, evidence demonstrates that, in response to the growing competitive threat from lower priced third-party repairers of EndoWrist surgical instruments, Intuitive investigated the possibility of selling refurbished EndoWrist surgical instruments at a discount off of the cost of replacement EndoWrists. For example, beginning in 2017, Intuitive began exploring the possibility of offering refurbished EndoWrist surgical instruments to some hospitals at a discount off of its new, replacement EndoWrist surgical instruments.[141] In a January 2017 presentation, Intuitive described the program, often referred to internally as Project Dragon, in the following way: "Collection of expired *EndoWrist* Instruments at the hospital, return to Intuitive Surgical, and receive a refurbished instrument at a lower cost compared to new."[142] The "Economic Benefits" of the proposed program included "[r]educed per procedure cost;" "[c]ost flexibility options to the surgeon and hospital;" and "[r]educe[d] cost of disposable at the hospital."[143]

---

[141] DeSantis Deposition at 226:23-227:4, Exhibit 33.
[142] DeSantis Deposition Exhibit 33 at Intuitive-00042945 (emphasis in original).
[143] DeSantis Deposition Exhibit 33 at Intuitive-00042946. See, also, DeSantis Deposition Exhibit 38 at Intuitive-00273265.

61.     In a May 2017 internal marketing team update regarding Project Dragon, Intuitive included several "[d]efensive revenue and margin protection" "Company Objectives" for the project, including: "Displace non-validated 3rd party re-programmers where already present," as well as "increase entry barriers for other 3rd party re-programmers."[144]  At deposition, Katie Scoville, Director of New Product Verification, Packaging, and Product Labeling at Intuitive, acknowledged that it was one of Intuitive's "goals" as part of Project Dragon to "displace nonvalidated third-party reprogrammers where already present."[145]  Ms. Scoville also testified that one "side effect" of Project Dragon was the creation of "entry barriers for third-party reprogrammers," and that such a "side effect" would be "advantageous [to Intuitive] to increase entry barriers."[146]  In a 2017 internal presentation analyzing the "Benefits of Secondary Markets" for EndoWrist surgical instruments for both Intuitive and users (hospitals), Intuitive noted that "[m]arket data shows that remanufacturing is only 5% of a given [Instrument & Accessories] market segment," and therefore if "only 5% of accounts are interested in Dragon then 95% of accounts remain exposed to third party collection companies."[147]

62.     Evidence indicates that in August 2017, Intuitive initially decided not to pursue Project Dragon and offer refurbished EndoWrist surgical instruments to hospitals at a lower cost than replacement EndoWrist surgical instruments.[148]  I discuss Intuitive's decision not to pursue its refurbished EndoWrist instrument program in greater detail later in this Expert Report.

63.     The evidence discussed above demonstrates that third-party repairs of EndoWrist surgical instruments are part of the same relevant antitrust product market as replacement EndoWrist surgical instruments sold by Intuitive.  In the next section I discuss evidence

---

[144] DeSantis Deposition Exhibit 37 at Intuitive-00273261.  At deposition, Bob DeSantis of Intuitive acknowledged that offering refurbished EndoWrist surgical instruments would allow Intuitive to compete with, and "increase entry barriers for third-party re-programmers."  See DeSantis Deposition at 254:19-24.
[145] Scoville Deposition at 85:10-23, Exhibit 6 at Intuitive-00273267.
[146] Scoville Deposition at 86:18-87:24, Exhibit 6 at Intuitive-00273267.
[147] DeSantis Deposition Exhibit 38 at Intuitive-00273269.
[148] Intuitive-00601672-75 at 72.  Project Dragon ultimately ended in the second quarter of 2020, and Intuitive is not actively pursuing the possibility of offering refurbished EndoWrist surgical instruments to hospitals at a lower cost than replacement EndoWrist surgical instruments.  See Scoville Deposition at 12:11-13:15, 91:24-92:3. See, also, Individual & 30(b)(6) Deposition of Nicky Goodson, October 27, 2022 (hereafter "Goodson Deposition") at 72:5-74:3.

demonstrating that there are no functional substitutes for the repair and replacement of EndoWrist surgical instruments, thus further demonstrating that the EndoWrist Repair and Replacement Market constitutes a relevant antitrust product market.

iii.   Neither Traditional Laparoscopic Surgical Instruments, nor Surgical Instruments Used with Any Other Non-MIST Surgical Robots, are Compatible with Da Vinci Surgical Robots

64.   Another form of evidence demonstrating that the EndoWrist Repair and Replacement Market constitutes a relevant antitrust product market is the fact that neither traditional laparoscopic surgical instruments, nor surgical instruments used with any other non-MIST Surgical Robots, are compatible with da Vinci surgical robots. First off, evidence I have reviewed indicates that all of Intuitive's EndoWrist surgical instruments have been approved by the FDA for use with a da Vinci surgical robot in a MIST surgical procedure.[149] However, evidence indicates that no other manufacturers sell FDA-approved surgical instruments for use with a da Vinci surgical robot in a MIST surgical procedure. For example, Bob DeSantis of Intuitive testified that there was no other "manufacturer in the United States that sells instruments that can be attached to the da Vinci robot and used for minimally invasive surgery."[150] Similarly, Glenn Vavoso, Senior Vice President and General Manager for Asia and Indirect Global markets at Intuitive, testified that there are no other companies other than Intuitive from which hospitals that own a da Vinci surgical robot can purchase surgical instruments that work with a da Vinci surgical robot.[151]

65.   Furthermore, evidence I have reviewed demonstrates that Intuitive specifically designed its da Vinci surgical robots to only work with its own EndoWrist surgical instruments and, thus, no other surgical instruments (such as traditional laparoscopic surgical instruments) could be used in a da Vinci MIST surgical procedure in place of EndoWrist surgical instruments.[152] Mr. DeSantis testified:

---

[149] See, for example, Intuitive-00552993-53014 at 52998.
[150] DeSantis Deposition at 25:1-19.
[151] Vavoso Deposition at 57:17-59:14, 244:7-10.
[152] In its 2004 Form 10-K, Intuitive described its EndoWrist surgical instruments as "'smart disposables' because they are resterilizable and reusable for a defined number of procedures. A custom computer chip inside each instrument performs several functions that help determine how the system and instruments

Q. […] Is it your understanding that Intuitive designed the da Vinci robots to only function with instruments that are produced by Intuitive?

A. Yes.

Q. And that was an intentional design decision; right?

A. Absolutely.[153]

Mr. DeSantis also noted that the portfolio of patents Intuitive holds regarding the development of surgical instruments for use with the da Vinci surgical robot would make it difficult for another company to manufacture surgical instruments that would be compatible (and work "cleanly") with the da Vinci surgical robot.[154]

66.     Furthermore, additional evidence I have reviewed demonstrates that traditional laparoscopic surgical instruments cannot be attached to a da Vinci surgical robot for use in a MIST surgical procedure.  For example, at deposition, Bob DeSantis of Intuitive testified that neither traditional laparoscopic surgical instruments, nor surgical instruments designed for other surgical robots, can be attached to the da Vinci surgical robot.[155]  Glenn Vavoso of Intuitive similarly testified that traditional laparoscopic surgical instruments cannot be attached to the da Vinci surgical robot for use in a MIST robotic surgery.[156]  Since traditional laparoscopic surgical instruments cannot be attached to a da Vinci surgical robot for use in a MIST surgical procedure, they are therefore not a functional substitute for the repair and replacement of EndoWrist surgical instruments for use in MIST robotic surgeries.

67.     The evidence discussed above demonstrates that there are no viable surgical instrument alternatives to the repair and replacement of EndoWrist surgical instruments for use with the da Vinci surgical robot.  Given that traditional laparoscopic surgical

---

work together. When an *EndoWrist* instrument is attached to an arm of the patient-side cart, the chip performs an 'electronic handshake' that ensures the instrument was manufactured by us and recognizes the type and function of the instrument and number of past uses. For example, the chip distinguishes between scissors and a scalpel and controls the unique functions of different instruments as appropriate. In addition, the chip will not allow the instrument to be used for more than the prescribed number of procedures so that its performance meets specifications during each procedure." See Intuitive Surgical, Inc., SEC Form 10-K, filed March 16, 2005 at p. 7.

[153] DeSantis Deposition at 23:21-24:4. See, also, DeSantis Deposition at 27:5-8.

[154] DeSantis Deposition at 25:20-27:4.

[155] DeSantis Deposition at 139:22-140:9.

[156] Vavoso Deposition at 53:17-55:16.

instruments, as well as surgical instruments used with any other non-MIST Surgical Robots, are not functional substitutes for the repair and replacement of EndoWrist surgical instruments, they therefore are not economic substitutes for the repair and replacement of EndoWrist surgical instruments either. This is, therefore, another form of evidence demonstrating that the tied market (the EndoWrist Repair and Replacement Market) constitutes a relevant antitrust product market.

B. *The Relevant Antitrust Geographic Market with Regards to the Tied Market is the United States*

68.     As part of my analysis of Plaintiff's claims with respect to the tied market, EndoWrist Repair and Replacement Market, I have concluded that the relevant antitrust geographic market was the United States. I discuss the evidence that supports the basis for this conclusion in more detail below.

69.     Evidence I have reviewed indicates that Intuitive's EndoWrist surgical instruments are classified as Class II medical devices.[157] According to Intuitive, "Class II medical devices are those which are subject to general controls, and most require premarket demonstration of adherence to certain performance standards or other special controls, as specified by the FDA, and special controls as deemed necessary by the FDA to ensure the safety and effectiveness of the device."[158] Thus, the fact that the sale of EndoWrist surgical instruments is regulated by the United States government constitutes evidence demonstrating that the relevant antitrust geographic market with regards to the tied market is the United States. Further, while third-party repairs of EndoWrist surgical instruments (such as those performed by SIS) do not require approval from the FDA,[159] evidence indicates that these third-party repairers operate on a national basis. For example, one market research report I have reviewed noted that, as "a service industry, the Medical Equipment Repair and Maintenance Services industry does not participate in

---

[157] Intuitive 2021 SEC Form 10-K at p. 15.
[158] Intuitive 2021 SEC Form 10-K at p. 15. Intuitive also noted that its "current products are subject to premarket notification and clearance under section 510(k) of the FFDCA." See Intuitive 2021 SEC Form 10-K at p. 15.
[159] Scoville Deposition at 51:25-53:3; DeSantis Deposition Exhibit 11 at Intuitive-00566055, 6057, 6059, 6064-6065; Deposition of Bob Overmars, June 15, 2021 (hereafter "Overmars Deposition") at 96:9-97:3.

international trade."[160] Consistent with this, evidence indicates that SIS is a "national company" that works with hospitals in the U.S.[161] Thus, the fact that third-party repairers of EndoWrist surgical instruments operated on a national basis is further evidence that the relevant antitrust geographic market with respect to the tied market is the United States.

### C. The EndoWrist Repair and Replacement Market is Distinct from the Market for MIST Surgical Robots

70.    Earlier in this Expert Report I discussed evidence demonstrating that the tied market (the EndoWrist Repair and Replacement Market) and the tying market (the market for MIST Surgical Robots) each constitute relevant antitrust product markets. Additional evidence I have reviewed demonstrates that MIST Surgical Robots and EndoWrist surgical instruments are separate, distinct products that are inputs into the same product. Thus, the EndoWrist Repair and Replacement Market is distinct from the market for MIST Surgical Robots.

71.    In the context of a tying arrangement, courts have held that products are considered distinct if there is sufficient demand for the tied product separate from the tying product.[162] Evidence I have reviewed demonstrates that hospital demand for EndoWrist surgical instruments is separate and distinct from demand for da Vinci surgical robots. For example, after a hospital first purchases a da Vinci surgical robot, it must then continue to purchase EndoWrist surgical instruments on a recurring basis in order to use its new da Vinci surgical robot.[163] After a hospital has made the decision to purchase a da Vinci surgical robot, it then makes distinct, separate decisions on the replacement (or repair) of EndoWrist surgical instrument purchases, including how many EndoWrists to buy and what type of EndoWrists to buy, and, in a world free of Intuitive's anticompetitive conduct, whether to repair or replace those surgical instruments. Ongoing purchases of EndoWrists are distinct from the purchase of the da Vinci surgical

---

[160] Jack Curran, "Medical Equipment Repair & Maintenance Services," *IBISWorld*, June 2020 at p. 23.
[161] See, for example, 30(b)(6) Johnson Deposition at 32:16-33:8.
[162] U.S. Supreme Court, *Jefferson Parish Hospital District No. 2 et al. v. Hyde*, 466 U.S., No. 82-1031, March 27, 1984 (hereafter "Jefferson Parish").
[163] Vavoso Deposition at 50:20-51:2.

robot; a hospital does not buy a new MIST Surgical Robot for each surgical procedure, for every ten surgical procedures,[164] or every time it replaces or repairs the EndoWrist surgical instruments used in those surgeries.[165] And, as I discuss in greater detail below, depending on the types of surgeries typically performed at a given hospital, hospitals will have demand that covers different mixes of EndoWrist surgical instruments.

72.     Further, to determine whether there is sufficient demand for the tied product that is distinct from demand for the tying products, courts have looked to actual market practices outside of the tying arrangement to determine if customers exhibited a preference for purchasing the tied product separately from the tying product.[166] Later in this Expert Report I discuss extensive evidence demonstrating that, absent Intuitive's tying of the purchase of da Vinci robots from Intuitive to the purchase of replacement EndoWrist surgical instruments exclusively from Intuitive, at least some hospitals would have preferred having their EndoWrist surgical instruments repaired by third-party repairers (such as SIS) at a lower cost than purchasing replacement EndoWrist surgical instruments from Intuitive.  For example, regarding the repair services of another third-party repairer similar to SIS (Rebotix), Edward Harrich of Pullman Regional Hospital testified:

> Q. If it weren't for Intuitive's contractual limitations, would your hospital use Rebotix's services to the full extent that Rebotix was willing to provide them?
>
> A. Yes.[167]

73.  Additional evidence that I have reviewed demonstrating that MIST Surgical Robots and EndoWrist surgical instruments are distinct products includes the fact that these products are not typically sold in fixed proportions.  Rather, hospital demand for the two products is distinct.  For example, after purchasing a da Vinci surgical robot, hospitals' continued purchases of EndoWrist surgical instruments are not made in fixed

---

[164] Evidence indicates that EndoWrist surgical instruments are typically designed to have ten uses before expiration. See, for example, DeSantis Deposition at 137:20-138:6; Intuitive 2021 SEC Form 10-K at pp. 8, 58. I understand that in October 2020, Intuitive introduced its Extended Use Program that allowed select da Vinci Xi and da Vinci X EndoWrist surgical instruments to be used twelve to 18 times, as compared to the typical ten uses. See Intuitive 2021 SEC Form 10-K at pp. 8, 58.

[165] Vavoso Deposition at 51:3-51:9.

[166] Jefferson Parish.

[167] Harrich Deposition at 62:6-10.

proportion to the da Vinci surgical robots it purchases; rather, its continued EndoWrist surgical instrument purchases will be based on the frequency at which it uses its da Vinci surgical robot, or the frequency at which it uses certain types of EndoWrist surgical instruments as compared to other types of EndoWrist surgical instruments.[168] Therefore, the fact that hospitals do not purchase MIST Surgical Robots (such as Intuitive's da Vinci) and EndoWrist surgical instruments in fixed proportions (rather, hospital demand for these products is distinct from one another) constitutes one piece of evidence demonstrating that the EndoWrist Repair and Replacement Market is distinct from the market for MIST Surgical Robots.

74.     In addition to this evidence, Intuitive itself identifies its da Vinci surgical robots and its EndoWrist surgical instruments as separate products that it offers to customers. For instance, one of the "Products" categorizations Intuitive identifies in its 2021 Form 10-K is "da Vinci Surgical systems."[169] The sub-categories Intuitive lists under its da Vinci Surgical Systems product category include: Surgeon's Console, Patient-Side Cart, 3DHD Vision System, Firefly Fluorescence Imaging, and da Vinci Xi Integrated Table Motion.[170] Notably, Intuitive does not include its EndoWrist surgical instruments under the same product category as its da Vinci surgical robot; rather, Intuitive lists its EndoWrist surgical instruments under its "Instruments and Accessories" product category.[171] Intuitive recognizes that the EndoWrist surgical instruments used in combination with its da Vinci surgical robots are not part of the same product as the da Vinci surgical robot.

75.     Further to this point, I have noted that, in its financial statements, Intuitive categorizes and reports revenue for its da Vinci surgical robots and EndoWrist surgical instruments separately.[172] This is consistent with the fact that the revenue streams earned by Intuitive for these products are distinct. For example, as Intuitive noted in its 2021

---

[168] For example, a hospital that specializes in Mitral Valve Repair may purchase Valve Hook at a high frequency, whereas a hospital that specializes in Nephrectomy may purchase Dual Blade Retractor. See Intuitive Surgical, "EndoWrist/Single-Site Instrument & Accessory Catalog," May 2014 at p. 3. Available at: https://www.intuitivesurgical.com/products/871145_Instrument_Accessory_%20Catalog.pdf.
[169] Intuitive 2021 SEC Form 10-K at p. 6.
[170] Intuitive 2021 SEC Form 10-K at pp. 6-7.
[171] Intuitive 2021 SEC Form 10-K at pp. 7-8.
[172] See, for example, Intuitive 2021 SEC Form 10-K at pp. 68-70.

Form 10-K, the majority of da Vinci surgical robots are sold via sales arrangements with hospitals where "revenue is recognized up-front," and "represents a significant capital equipment investment for [its] customers when purchased."[173] Conversely, EndoWrist surgical instruments generate a "recurring revenue" stream for Intuitive since these surgical instruments "have limited lives and will either expire or wear out as they are used in surgery, at which point they need to be replaced," leading "customers [to] place orders to replenish their supplies of instruments and accessories on a regular basis."[174] Thus, the fact that hospitals' purchases of da Vinci surgical robots represent a large capital investment for hospitals, while their required recurring purchases of EndoWrist surgical instruments represent an ongoing operating expense, is further indicative that MIST Surgical Robots (such as Intuitive's da Vinci) and EndoWrist surgical instruments are not part of the same relevant antitrust product market.

76.      Furthermore, Intuitive acknowledges the differences in the sales cycles it engages in with hospitals when selling da Vinci surgical robots and EndoWrist surgical instruments.  For example, Intuitive notes that the "initial system sale into an account is a major capital equipment purchase by our customers and typically has a lengthy sales cycle that can be affected by macroeconomic factors, capital spending prioritization, timing of budgeting cycles, and competitive bidding processes."[175]  However, hospitals' required purchases of the EndoWrist surgical instruments that complement their da Vinci surgical robots are made on a "regular basis" as per the terms of the sales agreement they sign at the time they purchase their da Vinci surgical robot, and "[o]rders received are typically shipped within one business day."[176]

---

[173] Intuitive 2021 SEC Form 10-K at p. 58.
[174] Intuitive 2021 SEC Form 10-K at pp. 13, 58-59.  Intuitive noted that a "large portion of our revenue is generated through our sales of instruments and accessories."  See 2021 Intuitive SEC Form 10-K at p. 35. In the U.S. in 2021, Intuitive's Instruments and Accessories products (which includes EndoWrist surgical instruments) accounted for approximately 58 percent of Intuitive's overall revenue.  See 2021 Intuitive SEC Form 10-K at p. 102.  I understand that approximately one third of da Vinci surgical robots are sold to hospitals in operating lease transactions where revenue is recognized over time and for some of these lease agreements, customers are "provided with the right to purchase the leased system at certain points during and/or at the end of the lease term."  Intuitive 2021 SEC Form 10-K at pp. 57-60, 69.
[175] Intuitive 2021 SEC Form 10-K at p. 13.
[176] Intuitive 2021 SEC Form 10-K at p. 13.

77.     The evidence discussed above demonstrates that MIST Surgical Robots and EndoWrist surgical instruments are separate, distinct products, and that the EndoWrist Repair and Replacement Market is distinct from the market for MIST Surgical Robots.

## V.     Evidence Demonstrates that the Alleged Misconduct was Anticompetitive

78.     As I discussed above, I understand Plaintiff alleges that "Intuitive has gone to extraordinary efforts to leverage its monopoly power in robots for use in minimally invasive soft tissue surgery, the repair and support of those robotic systems, and its monopoly power in instruments for use with such robots to foreclose aftermarket repair of those instruments by any competitors," and that an "effect of Intuitive's anticompetitive conduct is to generate and sustain unreasonably high, supra-competitive prices for aftermarket EndoWrist instruments."[177]   I understand one aspect of Defendant's alleged anticompetitive conduct in this regard includes a standard sales and service agreement that Intuitive required all purchasers of its da Vinci surgical robots to agree to that both expressly "demands that customers further agree to a limited license for the use of EndoWrist instruments," which "expires once an EndoWrist instrument is used up to its maximum number of uses as specified in the documentation accompanying the particular instrument,"[178] and "prohibits customers from engaging any unauthorized third party to repair, refurbish, or recondition EndoWrist instruments, whether before or after the limited use license has expired."[179]   I further understand that Plaintiff alleges that, as part of its alleged misconduct, Intuitive routinely "sent letters to and had in-person conversations with SIS's customers or potential customers, knowing that they were under

---

[177] Complaint at ¶87, 110.  "Intuitive leverages its market power in the worldwide and domestic markets for the sale of surgical robots used in minimally invasive soft tissue surgery, and the market for repair services for their robots, to pressure customers to use supra-competitively priced replacement EndoWrist parts." See Complaint at ¶65.

[178] Complaint at ¶4.  I understand Plaintiff alleges that "EndoWrists also include an internal memory chip" which "counts the number of times the EndoWrist is attached to a da Vinci robot arm, not an actual measure of usage such as usage time, number of movements, or actuation time." See Complaint at ¶¶30-31.  Further, I understand that Plaintiff alleges that the "da Vinci robot system queries the memory chip prior to performing any operations with the particular EndoWrist instrument.  After a certain number of uses, usually limited to ten, the EndoWrist instrument is rendered non-operational, based solely on the number of times it is attached to the da Vinci robot arm, without any regard to the actual underlying physical condition of the EndoWrist instrument.  Without the services of providers such as SIS, the hospital has no choice but to buy a brand-new replacement EndoWrist instrument from Intuitive at full price."  See Complaint at ¶32.

[179] Complaint at ¶4.

contract or in contractual negotiations for repaired EndoWrists. As a result of the threats
and misleading statements in those letters and conversations, all of SIS's EndoWrists
customers backed out of their contracts or did not sign contracts under negotiation,
effectively eviscerating SIS's EndoWrist repair business."[180] Based on my analysis of
the documents and data produced in this litigation, as well as my training and experience
in economics and my research and analysis into the relevant antitrust markets at issue
here, I have concluded that Intuitive's Alleged Misconduct was anticompetitive because
it resulted in higher prices for products in the (tied) market than otherwise would have
prevailed.

79.     According to one standard textbook on antitrust, exclusionary conduct on the part
of a firm (such as the kind being alleged by Plaintiff in this matter) is considered to be
anticompetitive if (i) the firm maintains significant monopoly power (such as Plaintiffs
allege Intuitive did in the tying market, the market for MIST Surgical Robots); (ii) the
exclusionary conduct limits potential new entry and effective competition from
significant rivals (as Plaintiffs allege was the case here in that SIS was forestalled from
competing effectively in the tied market, the EndoWrist Repair and Replacement
Market); and (iii) the exclusionary conduct results in lower market output to customers,
or higher prices paid by customers (as Plaintiffs allege was the case here in that hospitals
paid more to replace their EndoWrist instruments than they otherwise would have had the
option to repair those instruments through third-party repairers such as SIS been available
to them).[181] Evidence I have reviewed demonstrates that Intuitive's Alleged Misconduct

---

[180] Complaint at ¶92. "Intuitive's letters make its threats explicit—if the hospital uses repaired instruments,
Intuitive will render its surgical robot inoperable. Not only will Intuitive seek damages or indemnity from
its customer, but if Intuitive discovers 'Systems being used with instruments by an unauthorized third party,
Intuitive may no longer accept your service calls for such Systems.' Because Intuitive also refuses to allow
any competition in the market for service of its robots, and refuses to make error codes and other critical
information available to third parties, failure to provide such service will render a robot that originally cost
well over a million dollars inoperable. Many hospitals have multiple such robots that would thus be
rendered inoperable. […] Again, the threat is explicit—if the hospital uses refurbished instruments,
Intuitive will render its surgical robot inoperable." See Complaint at ¶¶102-103. Further, in "private
conversations, Intuitive representatives have made this threat even more explicit. In response to one
hospital's use of third-party repair services, an Intuitive representative stated that Intuitive would turn the
surgical robot into a 'paperweight.'" See Complaint at ¶104.
[181] Herbert Hovenkamp, *The Antitrust Enterprise*, Cambridge, MA: Harvard University Press, 2005
(hereafter "Hovenkamp, The Antitrust Enterprise") at p. 206. The DOJ stated the following regarding
circumstances in which exclusive dealing can be considered anticompetitive: "exclusive dealing may allow
one manufacturer, in effect, to monopolize efficient distribution services and thereby prevent its rivals from

was anticompetitive. I discuss the evidence that forms the bases for this opinion in more detail below.

## A. Intuitive Posessed Monopoly Power in the Market for MIST Surgical Robots in the United States During the Relevant Period

80.     As I previously discussed, the first step in determining whether exclusionary conduct on the part of a given firm is anticompetitive is whether that firm maintains significant monopoly power.[182] "Monopoly power" refers to the ability of a single firm to persistently charge a price that is significantly higher than the competitive price. [183] Although the existence of monopoly power is not, by itself, anticompetitive, a firm that engages in exclusionary conduct in an attempt to maintain monopoly power inhibits the competitive process and harms competition. According to the DOJ:

> Monopoly power is conventionally demonstrated by showing that both (1) the firm has (or in the case of attempted monopolization, has a dangerous probability of attaining) a high share of a relevant market and (2) there are entry barriers – perhaps ones created by the firm's conduct itself – that permit the firm to exercise substantial market power for an appreciable period.[184]

81.     In the present matter, Plaintiff alleges that Intuitive used its monopoly power in the market for MIST Surgical Robots to foreclose competition in the EndoWrist Repair and Replacement Market by tying the purchase of da Vinci robots from Intuitive to the purchase of replacement EndoWrist surgical instruments exclusively from Intuitive, thus preventing customers from repairing their EndoWrist surgical instruments through companies such as SIS at a lower cost. Economists typically define the tying of products as occurring when a seller sells a product under the condition that a buyer also purchase a second (tied) product.[185] As Judge Richard Posner described, "the traditional objection to

---

competing effectively. […] [E]xclusive dealing can harm consumers by thwarting entry or inhibiting growth of existing rivals." See United States Department of Justice, *Competition and Monopoly: Single-Firm Conduct Under Section 2 of the Sherman Act*, 2008 (hereafter "DOJ Single-Firm Conduct") at p. 131.
[182] Hovenkamp, The Antitrust Enterprise at p. 206.
[183] DOJ Single-Firm Conduct at pp. 19-20.
[184] DOJ Single-Firm Conduct at p. 21.
[185] Nicholas Economides, "Tying, bundling, and loyalty/requirement rebates," *Research Handbook on the Economics of Antitrust Law*, Einer Elhauge (Ed.), Edward Elgar, 2012 (hereafter "Economides") 121-143 at p. 121.

tying arrangements is that they enable a firm having a monopoly in one market to obtain a monopoly in a second one."[186] This is typically referred to as the "leverage" theory.[187] Tying arrangements can be used by a monopolist in the tying market to foreclose rivals in the tied product market if a "substantial share of the tied product market is foreclosed."[188]

82.     It is my opinion, based on evidence I have reviewed, that Intuitive possessed monopoly power in the market for MIST Surgical Robots during the Relevant Period, which provided Intuitive necessary leverage to foreclose competition and maintain its monopoly in the EndoWrist Repair and Replacement Market. I discuss the evidence that forms the bases for this opinion in more detail below.

i.    Intuitive Dominated the Market for MIST Surgical Robots in the United States During the Relevant Period

83.     According to the DOJ, "courts typically have required a dominant market share before inferring the existence of monopoly power."[189] Evidence I have reviewed demonstrates that Intuitive dominated the market for MIST Surgical Robots during the Relevant Period. For example, a September 2019 Bernstein Research analyst report covering Intuitive and potential competition noted that "Intuitive has held a monopoly position [in the market for surgical robots] for the last two decades."[190] A September

---

[186] Richard A. Posner, *Antitrust Law*. Second Edition, Chicago, IL: The University of Chicago Press, 2001 (hereafter "Posner") at p. 197.
[187] Posner at p. 198.
[188] Economides at p. 130.
[189] DOJ Single-Firm Conduct at p. 21. According to the DOJ: "The Fifth Circuit observed that 'monopolization is rarely found when the defendant's share of the relevant market is below 70%.' Similarly, the Tenth Circuit noted that to establish 'monopoly power, lower courts generally require a minimum market share of between 70% and 80%.' Likewise, the Third Circuit stated that 'a share significantly larger than 55% has been required to establish prima facie market power' and held that a market share between seventy-five percent and eighty percent of sales is 'more than adequate to establish a prima facie case of power.'" See DOJ Single-Firm Conduct at p. 21. The DOJ also noted that the "Eleventh Circuit held that a 'market share at or less than 50% is inadequate as a matter of law to constitute monopoly power.'" See DOJ Single-Firm Conduct at pp. 21-22.
[190] DeSantis Deposition Exhibit 8 at Intuitive-00278221. Similarly, a March 2020 article regarding the robotic surgery market noted: "Intuitive Surgical, manufacturer of the da Vinci Surgical System, has been the uncontested market leader in robotic general surgery for the last two decades. […] Although Intuitive Surgical has long been the only company with a surgical robot cleared for general surgery, the situation could be about to change." See Dr. Ivan De Backer, "Dissecting the Robotic Surgery Market," IDTechEx, March 30, 2020. Available at: https://www.idtechex.com/en/research-article/dissecting-the-robotic-surgery-market/20232. Also, a September 2018 article published in Annals of the Royal College of Surgeons of England noted that "[f]or 20 years Intuitive Surgical's da Vinci system has held a monopoly in minimally invasive robotic surgery." Andrew Brodie and Nikhil Vasdev, "The future of robotic surgery:

2017 study in the *Journal of Minimal Access Surgery* noted that Intuitive's da Vinci surgical robot was the "the only commercially available robotic equipment" at the time.[191]  Similarly, a May 2019 study on the "*Annals of Laparoscopic and Endoscopic Surgery*" noted that Intuitive "[e]ffectively [possessed] a monopoly" in the robotic surgery industry.[192]  An April 2018 article regarding robotic surgery published in the *World Journal of Urology* stated: "For the last 20 years, the predominant robot used in laparoscopic surgery has been [d]a Vinci by Intuitive Surgical. This monopoly situation has led to rising costs and relatively slow innovation."[193]  Under a section titled "Competition A Modest Threat," an April 2019 Bloomberg Intelligence analyst report covering Intuitive stated:

> Intuitive Surgical is unlikely to face significant competition in robotics until
> 2020, when Johnson & Johnson and Medtronic are expected to enter the market.
> Intuitive has a substantial lead being on its fourth-generation platform and having
> over 5,000 systems installed, and remains specialized while peers will be
> conglomerates.[194]

A March 2019 article published in Barrons stated that "[Intuitive] is the only major manufacturer of robotic-surgery equipment, with a monopoly on the market for now."[195] An October 2019 Financiële Diensten Amsterdam bv analyst report noted: "Competition for Intuitive Surgical is still insignificant. While large players, among which Johnson & Johnson and Medtronic, are planning competing systems, Intuitive has a strong competitive position, supported by various elements that are both difficult and time-consuming to replicate or substitute, also for large cash-rich players."[196]  As of late

---

How robotics could help shape the future of surgical care," Annals of the Royal College of Surgeons of England, September 4, 2018.

[191] Ioannis D. Gkegkes, Ioannis A. Mamais, and Christos Iavazzo, "Robotics in general surgery: A systematic cost assessment." *Journal of Minimal Access Surgery*, Vol. 13, No. 4, 2017, 243-255 at p. 243.

[192] Rafael E. Perez and Steven D. Schwaitzberg, "Robotic surgery: finding a value in 2019 and beyond," *Annals of Laparoscopic and Endoscopic Surgery*, Vol. 4., May 30, 2019 (hereafter "Perez et al.").

[193] Pradeep P. Rao, "Robotic surgery: new robots and finally some real competition!," *World Journal of Urology*, Vol. 36, No. 4, April 2018  (hereafter "Rao") 537-541 at p. 537.

[194] Jason McGorman, "Intuitive Surgical Research," Bloomberg Intelligence, April 2019.

[195] Daren Fonda, "Intuitive Surgical Faces New Competition and FDA Concerns," Barrons, March 18, 2019. Available at: https://www.barrons.com/articles/intuitive-surgical-faces-new-competition-and-fda-concerns-51552903200.

[196] Marcel Oomen, "Record High Growth in Surgical Procedures Triggers Upgrade of Guidance," Financiële Diensten Amsterdam, October 18, 2019, 1-4 at p. 1.

February 2022, Johnson & Johnson and Medtronic had yet to achieve FDA approval to market competing systems in the U.S.[197]

84.     In addition, I have reviewed evidence of Intuitive's own acknowledgments of its monopoly in the market for MIST Surgical Robots.  For example, Bob DeSantis of Intuitive testified that, between 1999 and 2019, there were not "any viable alternatives to a surgeon that wanted to perform a minimally invasive soft tissue robotic surgery other than the da Vinci surgical robot."[198]  In a February 2018 email to colleagues regarding strategies for how to address competition with hospital representatives, Joseph Fridlin of Intuitive stated: "Right now many [hospitals] are very happy to have competition because they hate that we are a monopoly."[199]  In a June 2018 email to colleagues, Phil Bradshaw, Intuitive's General Manager in the UK, stated: "What I think we should do behind the scenes is develop a competition talk track around all the areas they mention, and train our people – most of which have not come across any competition in their time at [Intuitive]."[200]  In a February 2018 email to colleagues, Ralph Wadensweiler of Intuitive shared a presentation regarding "Robotic Surgical Systems in Urology," and noted the finding that "[s]urgeons don't like the [Intuitive] monopoly."[201]

85.     As I previously discussed, at his May 2021 deposition, Glenn Vavoso of Intuitive testified that the only surgical robots that have FDA clearance to perform minimally

---

[197] Elizabeth Cairns, "Intuitive faces down the competition," *Evaluate Vantage*, February 22, 2022 (hereafter "Cairns").  Available at: https://www.evaluate.com/vantage/articles/interviews/intuitive-faces-down-competition.  At the time, it was expected that Johnson & Johnson would not achieve FDA approval in the U.S. until 2026, while a competing system from Medtronic was expected to achieve FDA approval in 2022. See Cairns.  However, as of October 2022, Medtronic's Hugo surgical robot was still being studied in the U.S. and was not available for sale in the U.S.  See Conor Hale, "Medtronic's Hugo surgical robot collects green lights in Europe, Canada, Japan," Fierce Biotech, October 19, 2022.  Available at: https://www.fiercebiotech.com/medtech/medtronics-hugo-surgical-robot-collects-green-lights-europe-canada-japan.
[198] DeSantis Deposition at 69:19-24.
[199] Intuitive-00113020.  Mr. Fridlin further noted these hospitals "will use this [competition] to beat us up on price.  Competition will also come in low balling pricing so they can just get a foothold."  See Intuitive-00113020.
[200] Vavoso Deposition Exhibit 13 at Intuitive-00100409.
[201] Intuitive-00029346-47; Riccardo Autorino, MD, PhD, FEBU, "Robotic Surgical Systems in Urology: What's in the Pipeline?," Grand Rounds in Urology, February 7,  2018 (hereafter "GRU Presentation").  Available at: https://grandroundsinurology.com/robotic-surgical-systems-in-urology/.  Regarding the "'Monopoly' Issue," Dr. Autorino states: "Certainly, one big issue with robotic surgery is that we have only one company. So, it's a monopoly that is in charge to control the market, and they--the robotic system installed in the world from Intuitive has been exponentially grown over the years."  See GRU Presentation.

invasive soft tissue surgeries in the U.S. are TransEnterix, Inc.'s ("TransEnterix")[202] Senhance surgical robot and Medrobotics Corporation's ("Medrobotics") Flex surgical robot.[203]  However, evidence demonstrates that these two surgical robots have gained at best a *de minimis* share of the market for MIST Surgical Robots.  For example, Glen Vavoso estimated that in 2019 in the U.S., Intuitive's da Vinci surgical robot had an installed base between 3,000 and 3,500; TransEnterix's Senhance had an installed base of 15 or less; and Medrobotics' Flex had an installed base of 10 or less.[204]  Mr. Vavoso further testified that in 2020 in the U.S., Intuitive's da Vinci had an installed base between 3,500 and 4,000; TransEnterix's Senhance had an installed base of 15 or less; and Medrobotics' Flex had an installed base between seven and ten.[205]  From 2019 to 2020, the da Vinci surgical robot continued to grow and competitors were unable to expand their share of the market, as the installed base of TransEnterix's Senhance and Medrobotics' Flex stayed largely the same, while the Intuitive's da Vinci installed base grew by approximately 500 surgical robots.[206]  Consistent with Mr. Vavoso's testimony, U.S. market share in the market for MIST Surgical Robots in 2020 is shown in Table 3 below.  As shown, in 2020, Intuitive accounted for over 99 percent of the total installed base of MIST Surgical Robots in the U.S.

---

[202] I understand that in February 2021 TransEnterix, Inc. changed its name to Asensus Surgical, Inc. ("Asensus").  See "TransEnterix Announces Name Change to Asensus Surgical and Introduces a New Category of Surgery, Performance-Guided Surgery," Business Wire, February 23, 2021.  Available at: https://www.businesswire.com/news/home/20210223005444/en/TransEnterix-Announces-Name-Change-to-Asensus-Surgical-and-Introduces-a-New-Category-of-Surgery-Performance-Guided-Surgery.  Unless otherwise noted, throughout the remainder of this Expert Report I use the names TransEnterix and Asensus interchangeably.

[203] Vavoso Deposition at 85:20-98:6.  I have noted that an Intuitive September 2018 "Competitive Landscape" analysis notes that Medrobotics' Flex surgical robot has FDA clearance in the U.S. for "[v]isualization only."  See Intuitive-00173706.  Similarly, in a 2017 "competitive overview" analysis, Intuitive notes that the Flex surgical robot is for "[r]obotic access, not surgery."  See Intuitive-00234762-4838 at 4816.

[204] Vavoso Deposition at 117:14-118:1.

[205] Vavoso Deposition at 118:2-119:2, Exhibit 14.

[206] Vavoso Deposition at 120:3-121:10.

## Table 3
## 2020 U.S. MIST Surgical Robot Market Share

| Manufacturer/Robot | Installed Base | Market Share |
|---|---|---|
| Intuitive da Vinci | 3,720 | 99.5% |
| TransEnterix Senhance | 7 | 0.2% |
| Medrobotics Flex | 13 | 0.3% |
| **Total** | **3,740** | **100.0%** |

Source: 2020 Intuitive SEC Form 10-K at p. 10; TransEnterix Inc., SEC
Form 10-K, filed on March 18, 2018 at p. 31; TransEnterix Inc., SEC
Form 10-K, filed on February 27, 2019 at p. 33; Asensus Surgical, Inc.,
SEC Form 10-K, filed on March 11, 2021 at p. 4; Intuitive-00571075.

86.     The evidence discussed above demonstrates that Intuitive dominated the market
for MIST Surgical Robots during the Relevant Period. This constitutes one piece of
evidence demonstrating that Intuitive possessed monopoly power in the tying market (the
market for MIST Surgical Robots) during the Relevant Period.

ii.     There Were Significant Barriers to Entry Into the Market for MIST Surgical
        Robots in the United States During the Relevant Period

87.     As I previously discussed, another important requirement in determining whether
a firm possessed monopoly power is whether there existed barriers to market entry that
would allow the firm to exercise substantial market power for an appreciable period.
According to the DOJ, these barriers to entry could include "ones [that were] created by
the firm's conduct itself."[207]  The DOJ also noted that "circuit courts have found that
firms with dominant market shares lacked monopoly power when their market power was
insufficiently durable."[208]  Evidence I have reviewed demonstrates that there were
significant barriers to entry into the market for MIST Surgical Robots during the
Relevant Period. I discuss this evidence in more detail below.

88.     For example, in a December 2020 Intuitive investment analysis, Enlightened
Capital noted "the robotic surgery market is characterized by high customer switching

---

[207] DOJ Single-Firm Conduct at p. 21.
[208] DOJ Single-Firm Conduct at p. 24.

costs and regulatory barriers. These switching costs are driven by the large capital cost for the robotic systems, and the substantial amount of training surgeons undergo to operate these machines. Furthermore, there are high regulatory barriers to entry, with regulatory approval required for new products to come to market."[209] This investment analysis further noted Intuitive's first-mover advantage in the robotic surgery industry, adding that this "industry is characterized by substantial barriers to entry driven by high customer switching costs, and high regulatory barriers with regulatory approval required for new products to come to market."[210] An April 2020 Informa Pharma Intelligence market research report noted that "barriers to entry are high" in the market for "robotic-assisted [surgical] systems."[211]

89.      With respect to MIST Robotic Surgery specifically, a September 2019 Bernstein Research analyst report covering Intuitive and potential competition stated: "We believe that Intuitive has built strong barriers to entry during the 20 years of market leadership in robotic surgery."[212] This September 2019 report continued:

> Whatever happens, we continue to have conviction that it will take multiple years for a legitimate competitive threat to [Intuitive] to materialize. Initiating a limited commercial rollout is just the first step for [Medtronic] and [Johnson & Johnson], and many investors underestimate the time required to build out procedures, gather evidence, gain international approvals, train surgeons, etc. Intuitive has built a formidable competitive moat over the last two decades, and we expect the company to maintain its leadership position in the robotic surgery market for the foreseeable future.[213]

A February 2020 Goldman Sachs Initiation Report noted the following: "What we cannot underscore enough is how significant we view the moat and technological advantage that [Intuitive] has built to date."[214]

---

[209] Enlightened Capital, "Intuitive Surgical (SRG) Investment Analysis," December 10, 2020 (hereafter "Enlightened"). Available at: https://enlightenedcapital.substack.com/p/intuitive-surgical-isrg-investment?utm_source=profile&utm_medium=reader2.

[210] Enlightened Capital.

[211] Marion Webb, "Market Intel: Medtech Giants Read to Battle Frontrunner Intuitive Surgical in 'Soft Surgery Robotics,'" Pharma Intelligence, April 2020 at p. 3.

[212] DeSantis Deposition Exhibit 8 at Intuitive-00278204.

[213] DeSantis Deposition Exhibit 8 at Intuitive-00278204.

[214] DeSantis Deposition Exhibit 9 at Intuitive-00553113.

90.    In the market for MIST Surgical Robots, one significant barrier to entry is the high capital costs associated with research and development, as well as the length of time necessary to bring a MIST Surgical Robot to the market and compete effectively. For example, Glenn Vavoso of Intuitive testified that "the entire development process to achieving FDA approval, then being able to market a system -- or a system could be up to, you know, a 10-year journey."[215] He added that bringing a surgical robot to the market "[t]akes a lot of knowhow and time and intellectual horsepower."[216] When asked about barriers to entry in the market for MIST Surgical Robots at deposition, Bob DeSantis of Intuitive testified that it "does take a lot of time and investment to bring a soft tissue robot to market."[217] In a December 2020 Intuitive investment analysis, Enlightened Capital noted that Intuitive "continues to invest heavily in R&D and has seen its R&D budget triple over the past 5 years."[218]

91.    Another barrier to entry into the market for MIST Surgical Robots is the extensive portfolio of patents held by Intuitive, which makes it more difficult for potential competitors to design and develop surgical robots of their own and bring them to market. For example, as noted in a December 2020 Intuitive investment analysis from Enlightened Capital:

> From a regulatory standpoint, [Intuitive] has been issued or owns over 2,900 patents and has more than 1,900 active patent applications. Competing products would need to meet the quality standards of [Intuitive's] product offerings to be able to come to market. This represents a substantial hurdle for competitors, as [Intuitive] continually improves its systems.[219]

---

[215] Vavoso Deposition at 132:4-133:4. Mr. Vavoso added: "by the time you complete all of the development work, which might require some research depending on the evolution of the system or the technology that is evolving, it could be clinical trials, which take time. It does entail human factors testing. So how does our system interface with surgeons and staff? And that is usually a requirement of the FDA process that we have to go through. That could be a large chunk of that lengthy process. And you have to submit to the FDA. They evaluate that submission. Uhm, there's back and forth and what the iterations to that and -- you know, over the course of that from concept all the way through design, to -- to marketing could be upwards of 10 years." See Vavoso Deposition at 133:5-24.

[216] Vavoso Deposition at 134:16-22.

[217] DeSantis Deposition at 58:9-17.

[218] Enlightened Capital.

[219] Enlightened Capital.

92.     In its 2021 Form 10-K, Intuitive stated: "We place considerable importance on obtaining and maintaining patent, copyright, trademark, and trade secret protection for significant new technologies, products, and processes," adding that as of December 31, 2021, the company "held ownership or exclusive field-of-use licenses for more than 4,200 U.S. and foreign   and have filed more than 2,100 U.S. and foreign patent applications."[220]  On its website, Intuitive lists 74 and 23 unique patent numbers for various da Vinci surgical robots and EndoWrist surgical instruments, respectively.[221]

93.     At deposition, Bob DeSantis of Intuitive testified that the "intellectual property protections that Intuitive has […] might be a challenge for another company to design around."[222]  Similarly, Glenn Vavoso of Intuitive testified that a company seeking to bring a MIST Surgical Robots to the market would "ha[ve] to be mindful of the intellectual property that belongs to another company," such as the patent portfolio Intuitive holds for its da Vinci surgical robots.[223]

94.     Another barrier to entry into the market for MIST Surgical Robots is the regulatory requirements and approvals necessary to market MIST Surgical Robots in the U.S.  As I discussed above, "[b]efore a medical device can be legally sold in the U.S., the person or company that wants to sell the device must seek approval from the FDA.  To gain approval, they must present evidence that the device is reasonably safe and effective for a particular use."[224]  At deposition, Glenn Vavoso of Intuitive testified that the FDA approval process "could be a large chunk of th[e] lengthy process" of bringing a MIST Surgical Robot to market.[225]  In a December 2020 Intuitive investment analysis, Enlightened Capital noted that "there is an exceptionally high bar to hurdle for competitors to receive FDA approval. Competitor systems would need to be on par if not

---

[220] Intuitive 2021 SEC Form 10-K at p. 14.
[221] See the "Patent Notice" page of the Intuitive website accessed November 28, 2022 (hereafter "Intuitive Patent Notice"), available online at https://www.intuitive.com/en-us/about-us/company/legal/patent-notice. I have noted that, with respect to these patent numbers listed, Intuitive states: "The products and patent numbers shown below may not be all-inclusive. Other patents may protect both the products listed below and other products and services commercialized by Intuitive Surgical, Inc.  Additional patents are pending."  See Intuitive Patent Notice.
[222] DeSantis Deposition at 60:4-7.
[223] Vavoso Deposition at 150:16-23.
[224] FDA's Role in Regulating Medical Devices.
[225] Vavoso Deposition at 133:5-24.

better than existing [d]a Vinci models. Without the clinical data [Intuitive] has, it will be challenging for [Medtronic]/[Johnson & Johnson] to compete on clinical outcomes."[226] Consistent with this outlook, in a July 2020 email to Intuitive colleagues regarding a planned MIST Surgical Robot from Johnson & Johnson, Ron Bair, Senior Director of Services Innovation and Product Management at Intuitive, stated:

> Team – In case the news hadn't reached you yet, J&J announced a significant delay in their competitive program, and the FDA apparently plans a much more stringent approval process for new entrants into the robotic space.[227]

95.     Another significant barrier to entry into the market for MIST Surgical Robots is the large installed base of robots that Intuitive garnered since its da Vinci surgical robots first received FDA approval in 2000.  As I discussed above, the number of da Vinci surgical robots installed in hospitals in the U.S. has grown steadily over the last two decades.  At deposition, Bob DeSantis of Intuitive testified that Intuitive's large installed base of MIST Surgical Robots in the U.S. posed a challenge to competitors trying to break into the market.[228]  In a February 2018 email to Intuitive colleagues regarding his qualitative research into Intuitive's "brand positioning" in the market, Larry Cesnik, Group Manager, Market Research at Intuitive, noted:

> Both [physicians and hospitals] see a multi-pronged **competitive advantage** for Intuitive: pioneer in robotic surgery with a quality/reliable product that has been continually improved over 20 years. (In addition, [Intuitive's] deep penetration into hospitals/medical schools shields it from new competitors in the robotic market.)[229]

96.     Intuitive's large installed base has allowed for a large number of surgeons in the U.S. to be trained on the da Vinci surgical platform, which has created a further barrier to entry for new MIST Surgical Robots.  For example, in a September 2019 analyst report

---

[226] Enlightened Capital.
[227] Deposition of Ronald Lee Bair, Jr., May 24, 2021 (hereafter "Bair Deposition") Exhibit 4.  Mr. Bair added that this development was "[y]et another reminder – what we do isn't easy."  See Bair Deposition Exhibit 4.
[228] "Q. There's some challenges that potential competitors face when they're trying to -- to break into that market or providing care to patients; right?  A. Yes.  Q. One challenge is that there is an already large install[ed] base of da Vinci robots in hospitals around the United States; is that right?  A. Yes."  See DeSantis Deposition at 59:14-21.
[229] Intuitive-00121229-230 at 229 (emphasis in original).

covering Intuitive, Bernstein Research explained how Intuitive's large installed base creates a barrier to entry in the market for MIST Surgical Robots:

> Surgeons do not like change. If a surgical approach is creating good patient outcomes, it is very difficult to convince a surgeon to consider a new approach. Intuitive has spent 20 years working hard to drive adoption of robotic surgery. Over that time, the company has placed over 5,300 robots and trained over 44,000 surgeons on the da Vinci. And surgeons have invested significant time and energy to learn procedures and build skills on the platform, with over 6 million procedures performed to date and over 14,000 peer-reviewed papers published.[230]

Bernstein Research added:

> As much as surgeons may welcome an alternative to Intuitive, inertia will be an important barrier to switching. Given the time and energy surgeons have invested in building skills on da Vinci, many will resist considering a new, untested platform. And as much as administrators would love to drive costs down, they will struggle to convert [Intuitive] programs to [Medtronic] programs without surgeon support. The new competition will have to be really compelling to make a difference. They will need to earn their right to compete.[231]

In an email to Intuitive executives, Katie Anderson of Anderson Qualitative (a market research firm) discussed her conversation with a Vice President of Purchasing at a medium-sized hospital that was considering purchasing a da Vinci surgical robot, noting: "He said what makes Intuitive unique/competitive advantage vs. other companies is that is has **been around for 20 years & it is in the medical schools where the doctors are being trained.**"[232]

97.     Given the large number of surgeons that are trained on the da Vinci surgical platform in the U.S. due to Intuitive's large installed base of MIST Surgical Robots,

---

[230] DeSantis Deposition Exhibit 8 at Intuitive-00278221.
[231] DeSantis Deposition Exhibit 8 at Intuitive-00278221. See, also, DeSantis Deposition Exhibit 8 at Intuitive-00278204. At his May 2021 deposition, Bob DeSantis, Intuitive's Executive Vice President and Chief Product Officer, testified: "Q. Has there been compelling competition such that surgeons have switched away from the da Vinci robot to some other system? A. To date, little." See DeSantis Deposition at 56:19-22.
[232] Intuitive-00011487 (emphasis in original).

evidence demonstrates that hospitals are resistant to switching to alternative MIST Surgical Robots. For example, Edward Harrich of Pullman Hospital testified that surgeons at Pullman have "devoted substantial time and effort learning how to use the da Vinci surgical robot," and further that switching to a competitor surgical robot would entail requiring surgeons to spend valuable time relearning how to use the competitor surgical robot.[233] According to an October 2020 op-ed written by Eve Cunningham, MD, MBA, the Chief Medical Officer of Providence Medical Group:

> Mass exodus of surgeons or recruitment challenges are a risk if robots are restricted or removed from facilities. A 2011 study from the *Journal of Minimally Invasive Gynecology* demonstrated that 58% of ob-gyn residency programs were training their residents in robotics. As a physician leader tasked with hiring a physician workforce, my observation is that new surgeon graduates are making career choices based on their ability to access the tool, a situation also reported in this 2014 article.[234]

Dr. Cunningham added: "Here we are in 2020, and an entire generation of gyn surgeons have adopted and trained on the da Vinci."[235] This is consistent with the evidence discussed earlier in this Expert Report demonstrating that losing a da Vinci surgical robot would have caused hospitals to lose surgeons.[236]

98. The evidence discussed above demonstrates that there are significant barriers to entry into the market for MIST Surgical Robots in the U.S., as hospitals are resistant to

---

[233] Harrich Deposition at 57:4-58:10. Mr. Harrich added that Pullman Hospital had to choose between purchasing the da Vinci robot or a competitor robot, the amount of training the hospital's surgeons have already spent on the Intuitive da Vinci surgical robot and their lack of training on the competitor surgical robot would be a factor in their decision-making. See Harrich Deposition at 57:14-58:23.

[234] Cunningham.

[235] Cunningham.

[236] In the case of Pullman Hospital, back in 2011, the conversation among hospital executives at that time addressed the hospital's potential loss of its entire prostate business if they did not acquire a da Vinci surgical robot. See Harrich Deposition at 124:16-125:9. Further, Pullman's urologist, Dr. John Keizur, informed the hospital that if they were going to keep doing prostate surgeries, they had to get a da Vinci robot. See Harrich Deposition at 124:16-125:9. At deposition, Edward Harrich of Pullman Hospital testified: "Q. Is it fair to say that the prostate surgery was the driver in terms of motivating Pullman to acquire the da Vinci Si in 2011? A. That, and we needed the robot to help land urology-trained surgeons. The ones coming out of school that we talked to, as soon as we said we didn't have a robot, the conversation was over and they moved on." See Harrich Deposition at 125:10-17. Further, Pullman lost a different urologist, Dr. Ullrich, because Pullman did not own a da Vinci surgical robot, and it was only with the later acquisition of a da Vinci robot that they were able to hire his replacement. See Harrich Deposition at 11:21-12:18.

59

seeking out and purchasing alternatives to the da Vinci surgical robot, even if the switch
brings about cost savings to the hospital. As one surgeon explained in an interview for a
September 2019 analyst report covering Intuitive:

> We were excited to buy a TransEnterix robot a couple of years ago after suffering
> under the Intuitive monopoly for many years. We were excited to see a
> competitor, and the system looked promising. It has some nice features like the
> eye-catching camera. But it does not stack up to da Vinci – not even close. It's
> worse than lap, and now it's in storage.[237]

Consistent with this outlook, as Stacey Donovan of Evergreen Health explained, in the
current healthcare market, "the Intuitive da Vinci robot is the standard of care in robotic
surgery."[238] Similarly, Edward Harrich of Pullman Hospital explained that "in this day
and age, […] to be a top-tier hospital, you should have […] a da Vinci robot."[239] This
constitutes another piece of evidence demonstrating that Intuitive possessed monopoly
power in the market for MIST Surgical Robots in the U.S. during the Relevant Period.

   iii.    Intuitive's Prices for da Vinci Robots Greatly Exceeded Marginal Costs

99.     While the control of a large share of sales in the market taken together with the
ability to exclude potential competitors means a firm *could* exercise substantial market
power, another way of determining whether a firm possesses market power is by looking
for the actual *exercise* of market power in the form of higher prices. One measure of
market power is the ability of a firm to price in excess of marginal cost. "For the
competitive firm, price equals marginal cost; for the firm with monopoly power, price
exceeds marginal cost. Therefore, a natural way to measure monopoly power is to
examine the extent to which the profit-maximizing price exceeds marginal cost."[240] In
1934, economist Abba Lerner proposed the price-cost margin as "the index of the degree
of monopoly power," commonly known as the Lerner Index.[241] Economists often use this

---

[237] DeSantis Deposition Exhibit 8 at Intuitive-00278216.
[238] Donovan Deposition at 44:5-19.
[239] Harrich Deposition at 15:4-11.
[240] Pindyck & Rubinfeld (8th edition) at p. 371
[241] "If $P$ = price and $C$ = marginal cost, then the index of the degree of monopoly power is $(P-C)/P$" see
A.P. Lerner, "The Concept of Monopoly and the Measurement of Monopoly Power," *The Review of
Economic Studies*, Vol. 1, No.3, 1934, 157-175 at p. 169.

index to measure market power, where the larger the Lerner Index is, the greater is the degree of monopoly power.[242]

100.    The market power possessed by a monopolist is defined by one standard economic textbook as follows:

> In contrast to a price-taking competitive firm, a monopoly knows that it can set its own price and that the price chosen affects the quantity it sells. A monopoly can set its price above its marginal cost but does not necessarily make a supracompetitive profit. For example, if a monopoly incurs a fixed cost, its profit may be zero (the competitive level) even if its price exceeds its marginal cost. It is common practice to say that whenever a firm can profitably set its price above its marginal cost without making a loss, it has *monopoly power* or *market power*.[243]

101.    Put another way, monopoly power refers to the ability of a firm to persistently price at a level that is significantly higher than the competitive price. I discuss below evidence I have reviewed demonstrating that Intuitive exercised monopoly power in the tying market (the market for MIST Surgical Robots) during the Relevant Period. As I explain, because Intuitive possessed monopoly power in this relevant antitrust market, it was able to price above competitive levels. Thus, this *exercise* of monopoly power constitutes another form of evidence establishing that Intuitive possessed monopoly power in the market for MIST Surgical Robots.

102.    For example, as noted above, one indication of Intuitive's exercise of monopoly power in the market for MIST Surgical Robots is the fact that da Vinci robot prices were set well above marginal costs. For example, in one internal analysis covering 2017 through 2020, Intuitive reported that its global Systems business unit earned contribution margins of 65.1 percent and 60.0 percent in 2019 and 2020, respectively.[244] If Intuitive had not dominated the market for MIST Surgical Robots, it would not have been able to raise prices so far above marginal cost to supra-competitive levels and earn the supra-

---

[242] Pindyck & Rubinfeld (8th edition) at p. 371. By construction, the Lerner Index is always between zero and one; for a perfectly competitive firm, price equals marginal cost; so, the Lerner's index equals zero.
[243] Carlton & Perloff at p. 117.
[244] Intuitive-00595405.

normal profits it earned on its da Vinci surgical robot. Economic theory teaches that in the absence of market power, a firm's prices are driven toward the cost of production.[245] Intuitive's extremely high profit margins on da Vinci surgical robot sales constitutes another piece of evidence indicating that Intuitive possessed market power in the market for MIST Surgical Robots.

103.   Additional evidence that prices for da Vinci robots are set well above marginal costs include acknowledgments from Intuitive itself. For example, in a June 2017 summary of an Intuitive meeting that covered brainstorming scenarios for the U.S. MIST Surgical Robot market (particularly with respect to the competitive landscape) that was circulated to Intuitive executives by Catherine Mohr of Intuitive, Intuitive analyzed three market scenarios: a "Best case" scenario, a "Mid level Scenario," and a "Nightmare Scenario."[246] Notably, under these scenarios, as Intuitive loses market power with the advent of new, viable surgical robots, it assumes that it would need to lower its prices in response to that competition.

104.   For example, under the "Best case" scenario, Intuitive assumes that it faces "low end competition" from potential new entrants into the market for MIST Surgical Robots, which would result in "[s]ome pricing impact" on Intuitive.[247] Under the "Mid level Scenario," Intuitive assumes that Medtronic and J&J would launch MIST Surgical Robots[248] via existing relationships, which would lead Intuitive to "have to discount to be competitive head to head" with these new surgical robots.[249] Furthermore, under the "Nightmare Scenario," Intuitive assumes that there would be a "[r]elease of multiple robots [that] paralyzes the market," which would cause a "[r]ace to the bottom" in terms

---

[245] Carlton & Perloff at pp. 666-667.

[246] Vavoso Deposition Exhibit 16, Exhibit 17.

[247] Vavoso Deposition Exhibit 17 at Intuitive-00362753.

[248] Vavoso Deposition Exhibit 17 at Intuitive-00362752. Intuitive assumes under this scenario that the surgical robot launched by J&J is "good not great," and that the surgical robot launched by Medtronic is "'good enough' to make hospitals feel OK about bundling Medtronic's robot." See Vavoso Deposition Exhibit 17 at Intuitive-00362752.

[249] Vavoso Deposition Exhibit 17 at Intuitive-00362752. Under this scenario, Intuitive assumes (among other things) that these "[n]ew robots successfully interfere/delay [Intuitive's] robot sales, but don't stall completely," and that "Anti [Intuitive] pricing sentiment leads to head to head pricing discounting." See Vavoso Deposition Exhibit 17 at Intuitive-00362752.

of robot pricing.[250]  I have noted too that, under this scenario in which Intuitive loses most, if not all, of its monopoly power, Intuitive assumes that it "bet wrong on a limited instrument set for the low end and lose it entirely to competitors with full suites of low end instruments."[251]  In a set of notes, highlights, and actions following an October 2019 "Quarterly Ops/Strategy Meeting," Intuitive noted that "Intuitive's first phase of business was largely without direct competition," but that the "[n]ext 5-6 years will be bloody. One advantage of competition is that the market will grow faster. Margins will be low until competitors tire of their own low margins."[252]  Intuitive later noted that "[i]n a new competitive environment, market share does trump margin."[253]

105.    Intuitive's assumptions regarding pricing of its da Vinci robots in response to more and more viable competition is consistent with evidence I have reviewed in the form of acknowledgments from industry observers.  For example, a May 2020 study on "Laparoscopic Robotic Surgery" noted: "With competition now in the market for laparoscopic robotic assisted surgery, costs for RAS systems and consumables should start to come down. This in turn should reduce the cost of laparoscopic RAS."[254]  An April 2018 article regarding robotic surgery published in the *World Journal of Urology* noted that Intuitive's "monopoly situation has led to rising costs and relatively slow innovation."[255]

106.    The evidence discussed above demonstrates that Intuitive exercised monopoly power in the market for MIST Surgical Robots during the Relevant Period in that it was

---

[250] Vavoso Deposition Exhibit 17 at Intuitive-00362752.  Under this scenario, Intuitive assumes (among other things) that the "market perceives no differen[ces] in robotic outcomes, negating our technological superiority," "J&J and/or Medtronic manage to leverage their long term relationships to shut us out," and that "[a]nti [Intuitive] pricing sentiment leads to spiteful large buys of competitor products."  See Vavoso Deposition Exhibit 17 at Intuitive-00362752.
[251] Vavoso Deposition Exhibit 17 at Intuitive-00362752.
[252] Intuitive-00366044-053 at 045, 050.
[253] Intuitive-00366044-053 at 051.
[254] Longmore et al. at p. 16.  This study also noted: "Robotic-assisted surgery has seen a slow uptake due to cost and the holding of patents by Intuitive Surgical limiting the number of RAS systems in the market. With the expiration of the patents, we are now seeing a rise in the number of new RAS systems available or soon to be available. Several systems have achieved CE certification and are now available in the European Union, while only the TransEnterix Senhence [sic] has achieved FDA approval, several others are currently undergoing the process for FDA approval. These new robots will lead to competition and reduce the costs of RAS and will lead to an increase in use. Robotic-assisted surgery will become more common than manual laparoscopic surgery in the near future."  See Longmore et al. at p. 17.
[255] Rao at p. 537.

able to price above competitive levels. This exercise of monopoly power constitutes another form of evidence establishing that Intuitive possessed monopoly power in the market for MIST Surgical Robots.

107.    The evidence discussed above demonstrates that Intuitive posessed monopoly power in the tying market (the market for MIST Surgical Robots) in the United States during the Relevant Period. In the next section below, I discuss evidence demonstrating that Intuitive used the leverage its monopoly power in the Market for MIST Surgical Robots in the U.S. afforded them to maintain its monopoly in the tied market (the EndoWrist Repair and Replacement Market) in the United States during the Relevant Period.

B.    *Intuitive Used Its Monopoly Power in the Market for MIST Surgical Robots to Maintain its Monopoly the Market for EndoWrist Surgical Instruments in the United States During the Relevant Period*

108.    As I previously discussed, I understand from Counsel for the Plaintiff that Plaintiff's allegations in this matter relate to Intuitive's dominance of the market for MIST Surgical Robots with its da Vinci surgical robots, and that, through exclusionary and anticompetitive conduct, Intuitive uses this dominance to maintain its monopoly in a separate market: the EndoWrist Repair and Replacement Market. I also discussed above Plaintiff's allegations that "Intuitive has gone to extraordinary efforts to leverage its monopoly power in robots for use in minimally invasive soft tissue surgery, the repair and support of those robotic systems, and its monopoly power in instruments for use with such robots to foreclose aftermarket repair of those instruments by any competitors," and that an "effect of Intuitive's anticompetitive conduct is to generate and sustain unreasonably high, supra-competitive prices for aftermarket EndoWrist instruments."[256]

109.    Having established above that Intuitive possessed market power in the tying market (the market for MIST Surgical Robots), I now demonstrate that Intuitive used that market power to foreclose competition in the tied market (the EndoWrist Repair and

---

[256] Complaint at ¶87, 110. "Intuitive leverages its market power in the worldwide and domestic markets for the sale of surgical robots used in minimally invasive soft tissue surgery, and the market for repair services for their robots, to pressure customers to use supra-competitively priced replacement EndoWrist parts." See Complaint at ¶65.

Replacement Market). As articulated by Dirk Barten of Intuitive upon learning that the company would not be pursuing Project Dragon (offering refurbished EndoWrist instruments at a lower cost than replacement EndoWrist instruments in response to a competitive threat from third-party repairers): "we use our monopol[y] role to keep competition out."[257] I discuss this evidence in greater detail below.

i. Intuitive's Restrictive Sales, License, and Service Agreement Allowed Intuitive to Maintain Monopoly Power in the EndoWrist Repair and Replacement Market

110.  As I previously discussed, I understand Defendant's alleged anticompetitive conduct "to pressure customers to use supra-competitively priced replacement EndoWrist parts"[258] includes Intuitive's standard Sales, License, and Service Agreement (hereafter "Intuitive Service Agreement") for its da Vinci surgical robots, which both expressly "demands that customers further agree to a limited license for the use of EndoWrist instruments," which "expires once an EndoWrist instrument is used up to its maximum number of uses as specified in the documentation accompanying the particular instrument,"[259] and "prohibits customers from engaging any unauthorized third party to repair, refurbish, or recondition EndoWrist instruments, whether before or after the limited use license has expired."[260]

111.  Hospitals were required to sign this standard Intuitive Service Agreement in order to purchase a da Vinci surgical robot.[261] One of the terms included in the Intuitive Service Agreement that each hospital was required to sign prohibited hospitals from permitting "any third party to modify, disassemble, reverse engineer, alter, or misuse the

---

[257] Intuitive-00604054-55 at 54.
[258] Complaint at ¶65.
[259] Complaint at ¶4. I understand Plaintiff alleges that "EndoWrists also include an internal memory chip" which "counts the number of times the EndoWrist is attached to a da Vinci robot arm, not an actual measure of usage such as usage time, number of movements, or actuation time." See Complaint at ¶¶30-31. Further, I understand that Plaintiff alleges that the "da Vinci robot system queries the memory chip prior to performing any operations with the particular EndoWrist instrument. After a certain number of uses, usually limited to ten, the EndoWrist instrument is rendered non-operational, based solely on the number of times it is attached to the da Vinci robot arm, without any regard to the actual underlying physical condition of the EndoWrist instrument. Without the services of providers such as SIS, the hospital has no choice but to buy a brand-new replacement EndoWrist instrument from Intuitive at full price." See Complaint at ¶32.
[260] Complaint at ¶4.
[261] Vavoso Deposition at 194:7-10.

system or instruments and accessories."[262] At deposition in a related matter, Glenn Vavoso of Intuitive testified that this term of the Intuitive Service Agreement "prohibits hospitals from using [Rebotix] [R]epair to service EndoWrists for the Intuitive da Vinci surgical robots."[263] Another of the terms included in the Intuitive Service Agreement that each hospital was required to sign stated that the license to use an EndoWrist instrument with the da Vinci surgical robot purchased by the hospital "expires once an Instrument or Accessory is used up to its maximum number of uses as is specified in the Documentation accompanying the Instrument or Accessory."[264] At deposition, Mr. Vavoso testified that he understood this term of the Intuitive Service Agreement to mean that the EndoWrist "instruments have a designated number of lives. And once those lives are used, then the license has expired."[265] And further, to comply with the Intuitive Service Agreement, Mr. Vavoso testified that hospitals must "throw away EndoWrist[s] whose use counters have expired" and "buy new EndoWrists from Intuitive."[266]

112.    As I previously discussed, the first step in determining whether exclusionary conduct on the part of a given firm is considered to be anticompetitive is whether that firm maintains significant monopoly power, and that, although the existence of monopoly power is not, by itself, anticompetitive, a firm that engages in exclusionary conduct in an attempt to maintain monopoly power inhibits the competitive process and harms competition.[267] Intuitive's exclusionary conduct in the form of its requirement that all

---

[262] Vavoso Deposition at 194:11-195:11, Exhibit 24 at Intuitive-00067540. Glenn Vavoso of Intuitive testified that this term is included in each of the sales contracts that Intuitive requires hospitals to sign and that he was not "aware of any contract with any hospital that does not include this use of system term." See Vavoso Deposition at 195:4-11.

[263] Vavoso Deposition at 195:12-16. Mr. Vavoso further testified that the Intuitive Service Agreement prohibits hospitals from "repairing, refurbishing, or reconditioning their EndoWrists regardless of how many uses are remaining" on the EndoWrist surgical instrument. See Vavoso Deposition at 197:19-23.

[264] Vavoso Deposition at 195:17-196:14, Exhibit 24 at Intuitive-00067542. At deposition, Glenn Vavoso of Intuitive was unable to "identify any sales contract with the hospital that does not include the language in paragraph 8." See Vavoso Deposition at 198:23-199:2.

[265] Vavoso Deposition at 196:24-197:6.

[266] Vavoso Deposition at 203:5-9. According to Mr. Vavoso, under the terms of the Intuitive Service Agreement, hospitals are "required to dispose of [expired EndoWrists] appropriately" and "certainly not use [expired EndoWrists] again." Vavoso Deposition at 203:20-204:4.

[267] Hovenkamp, The Antitrust Enterprise at p. 206. As I discussed above, according to the DOJ: "Monopoly power is conventionally demonstrated by showing that both (1) the firm has (or in the case of attempted monopolization, has a dangerous probability of attaining) a high share of a relevant market and (2) there are entry barriers – perhaps ones created by the firm's conduct itself – that permit the firm to exercise substantial market power for an appreciable period." See DOJ Single-Firm Conduct at p. 21.

hospitals enter into the Intuitive Service Agreement as a condition of their purchase of a da Vinci surgical robot, as well as Intuitive's continued enforcement of the Intuitive Service Agreement, allowed it to maintain monopoly power in the tied market (the EndoWrist Repair and Replacement Market) during the Relevant Period. I discuss the evidence that forms the bases of this conclusion in greater detail below.

> a. Intuitive Dominated the EndoWrist Repair and Replacement Market in the United States During the Relevant Period

113. I discussed above how, according to the DOJ, "courts typically have required a dominant market share before inferring the existence of monopoly power."[268] As I discussed above, Intuitive deliberately designed its da Vinci robots to only work with surgical instruments manufactured by Intuitive (EndoWrists). As a result, "the only entity that sells EndoWrists to hospitals is Intuitive."[269] However, while there were no other entities that competed with Intuitive for the sale of replacement EndoWrist surgical instruments, Intuitive did begin to face a competitive threat recently from third-party repairers of the EndoWrist surgical instruments originally manufactured by Intuitive, as discussed above. However, as a result of Intuitive's Alleged Misconduct, it was able to maintain its dominance of the EndoWrist Repair and Replacement Market during the Relevant Period.

114. For example, in an August 2019 internal analysis of third-party repairs of EndoWrist surgical instruments, Intuitive found that, since 2016, only 18 accounts had been "affected" in that they had EndoWrist surgical instruments repaired by third-party repairers, a fraction of the installed base of 3,531 da Vinci robots Intuitive had in the U.S. in 2019.[270] Intuitive further noted that among the "[a]ccounts affected" worldwide (29 in total), 17 of them were "[n]o longer using reprogrammed instruments" following Intuitive's efforts to enforce the restrictive Intuitive Service Agreement.[271] Similarly, in a February 2020 analyst report in covering the "third party risk" to Intuitive's Instruments & Accessories business segment, Deutsche Bank, having determined that "FDA action to

---

[268] DOJ Single-Firm Conduct at p. 21.
[269] Vavoso Deposition at 59:4-14, 242:2-23.
[270] Intuitive-00194074-089 at 077; Intuitive Surgical, Inc., SEC Form 10-K, filed February 7, 2020 at p. 10.
[271] Intuitive-00194074-089 at 077, 088.

stymie usage of repaired instruments is highly unlikely," and that "[h]ospitals [are] starting to push[ ]back on legality/enforceability of terms of service," forecasted that a "4-6% penetration of Intuitive's *de novo* instruments on a unit basis in 2021 is reasonable and, based on our additional due diligence, potentially conservative."[272]  Based on this forecast, Intuitive would account for the remaining 94 to 96 percent of the EndoWrist Repair and Replacement Market in the U.S.

115.    The evidence discussed above demonstrates that Intuitive dominated the EndoWrist Repair and Replacement Market in the U.S. during the Relevant Period.  This constitutes another piece of evidence demonstrating Intuitive's possession of monopoly power in the tied market (the EndoWrist Repair and Replacement Market) during the Relevant Period.  In the next section, I discuss evidence demonstrating that the restrictive Intuitive Service Agreement that hospitals were required to sign with every purchase of a da Vinci surgical robot created significant barriers to entry in that they limited rivals' (including SIS) ability to compete effectively with Intuitive in the EndoWrist Repair and Replacement Market, allowing Intuitive to maintain its dominance of the EndoWrist Repair and Replacement Market during the Relevant Period.

> b.    Intuitive's Conduct Prevented Rivals, Including SIS, from Competing Effectively in the EndoWrist Repair and Replacement Market in the United States During the Relevant Period

116.    As I previously discussed, one important requirement in determining whether a firm possessed monopoly power is whether barriers to market entry existed that would allow the firm to exercise substantial market power for an appreciable period.  Evidence I have reviewed demonstrates that the restrictive Intuitive Service Agreement that hospitals were required to sign with every purchase of a da Vinci surgical robot created significant barriers to entry in that they limited rivals' (include SIS) ability to compete effectively with Intuitive in the tied market (the EndoWrist Repair and Replacement Market).

117.    In a February 2020 analyst report in covering the "third party risk" to Intuitive's Instruments & Accessories business segment (which includes the sale of EndoWrist

---

[272] DeSantis Deposition Exhibit 11 at Intuitive-00566055-057, 067 (emphasis in original).  Deutsche Bank made a similar assessment in a January 2020 analyst report.  See Intuitive-00552993-53014 at 52994.

instruments), Deutsche Bank noted: "In no uncertain terms, the standard terms of service outlined in customer contracts state that hospitals are precluded from engaging with third parties as well as the potential consequences of violation – nullification of contracts, product warranties, etc."[273]  Evidence demonstrates that Intuitive took a number of steps in order to prevent hospitals that had opted to have its EndoWrist surgical instruments repaired by a third-party repair company such as SIS from doing so.

118.    In particular, following an initial conversation with the hospital in question, Intuitive would send a form letter to the hospital that detailed Intuitive's concerns with the hospital's use of third-party repair companies and highlighted that Intuitive considered the hospital's use of the repair services a breach of Intuitive's contract with the hospital.[274]  Those letters also informed the hospitals that if they continued using repair services, Intuitive would cease servicing their da Vinci robots.[275]  Further, if a hospital continued using third-party repair services after receiving Intuitive's letter, Intuitive would in fact stop servicing the hospital's da Vinci robot.[276]  Intuitive would also void the warranty on da Vinci robots sold to hospitals and refuse to provide any further service under the terms of that warranty.[277]  Evidence I have reviewed establishes that Intuitive's overall process in response to learning of a hospital repairing its EndoWrist surgical instruments through a third-party repairer generally took a short period of time: ten business days for the conversation phase, ten business days for the customer letter, and five business days for account termination.[278]  At some point, hospitals would encounter a service message on the da Vinci robot, and without Intuitive providing service, that da Vinci robot would be unusable for surgery.[279]

119.    As Ron Bair, Senior Director of Services, Innovation, and Product Management at Intuitive, testified, Intuitive enforces the terms of the Intuitive Service Agreement to stop its customers from using reprogrammed EndoWrist surgical instruments.[280]  Mr. Bair

---

[273] DeSantis Deposition Exhibit 11 at Intuitive-00566067.
[274] Vavoso Deposition at 221:3-222:15; DeSantis Deposition at 267:19-269:3.
[275] Vavoso Deposition at 221:3-222:15; DeSantis Deposition at 267:19-269:3.
[276] Vavoso Deposition at 223:14-20; DeSantis Deposition at 262:6-263:3.
[277] Vavoso Deposition at 223:21-224:19.
[278] Deposition of Antonio (AJ) Inacay, June 8, 2021 at 163:1-164:3, Exhibit 7 at Intuitive-00439336.
[279] Vavoso Deposition at 227:13-228:18.
[280] Bair Deposition at 137:11-137:16.

further testified that a hospital's decision to keep using reprogrammed EndoWrist surgical instruments comes with "consequence" imposed by Intuitive: Intuitive will "aggressively pursue the terms" of the Intuitive Service Agreement and, ultimately, will stop servicing hospitals' da Vinci robots if they continue to use third-party repairers such as SIS to repair their EndoWrist surgical instruments.[281] Mr. Bair also testified at deposition that "if Intuitive doesn't service [a da Vinci] robot and the robot fails, it means the hospital can no longer do surgeries with that robot."[282] Edward Harrich of Pullman Hospital agreed, testifying:

> Q. If Intuitive would not perform preventive maintenance on your robot, does your robot have any use at all? […]
>
> THE WITNESS: It would have no use at all. […]
>
> Q. If Intuitive refused to provide maintenance on your da Vinci robot, could the da Vinci robot be used for any surgeries?
>
> A. No. If we couldn't have the preventative maintenance, we'd stop using it.[283]

Similarly, in a related matter, Tyler McDonald of Conway Regional Medical Center testified that Intuitive's unwillingness to continue servicing its da Vinci surgical robot was a factor in its decision to no longer have their EndoWrist surgical instruments repaired by third-party repairers, adding that "[w]ithout ongoing service, the robot could potentially become unusable."[284] As I discuss in greater detail below, for hospitals, the threat of having their da Vinci surgical robots that they invested a significant amount of money and other resources (such as surgeon training) into become inoperable was a threat that hospitals took seriously.[285] As a result, after receiving these cease-and-desist letters from Intuitive, many hospitals stopped using third-party services to repair their EndoWrist surgical instruments.[286]

---

[281] Bair Deposition at 134:18-137:10.

[282] Bair Deposition at 136:2-5.

[283] Harrich Deposition at 77:13-24.

[284] Deposition of Tyler McDonald, May 7, 2021 (hereafter "McDonald Deposition") at 19:10-20.

[285] In 2021, a da Vinci surgical robot cost between $0.5 million and $2.5 million. See Intuitive 2021 SEC Form 10-K at p. 58.

[286] Vavoso Deposition at 225:24-226:22.

120.    Evidence demonstrates that Intuitive's enforcement of its sales agreement was successful at preventing rival third-party repairers (such as SIS) from competing effectively in the EndoWrist Repair and Replacement Market.  For example, at deposition, Greg Posdal, CEO of SIS, testified:

> Q. So what happened with this huge business opportunity for S.I.S.? […]
>
> THE WITNESS: It started very well, and it was very well received at all the places that we had contacted. Most had actually given us instruments, and we had actually gone through the process and reprogrammed and sent these instruments back to these facilities, a handful, probably 30 or 40. I think there's a form in evidence here that kind of explains who we did that service to. But either it was quickly put down, or before we even got started the customers said they were concerned about moving forward because of what they were told by Intuitive about using third parties for repairing or having any other effect on their instruments. […]
>
> Q. Do you recall what any of the customers said was specifically a concern coming from Intuitive?
>
> A. Yes. I'll -- their main concerns were that Intuitive had sent letters -- it was a combination, that their representatives were saying to them specifically that they should be not -- should not be using a third party to repair the instruments, that there is specific language in their agreements that prohibit them sending any of these instruments out to third parties for repair, and that there was the threat that they would stop selling them new equipment or servicing the existing robotics for these pieces of equipment.[287]

121.    Similarly, at deposition in a related matter, Glenn Papit, one of four founding members of third-party repairer Rebotix, explained that Rebotix "is basically not functional at this moment" because the "customers that we gained received notices from Intuitive that if they used us, they would cancel the service contracts on their robots,

---

[287] Posdal Deposition at 19:5-20:15.

which frightened the customers to death."[288]  Mr. Papit described "two contracts in place
that would have led to hundreds of hospitals coming onboard" and getting their
EndoWrists repaired by Rebotix, only to lose those contracts as a result of Intuitive's
conduct.[289]  Mr. Papit further explained: "It was becoming what we would call circular
business.  As soon as we put an account on and the OEM [Intuitive] discovered it, they
would have a management person in there threatening that withdrawal of their service
contract, and so soon as you put a customer on, you'd lose them in 60 days."[290]
Similarly, Bob Overmars of BPI Medical,[291] estimated that BPI Medical contacted all of
its business relationships that owned da Vinci surgical robots (approximately 30 or 40
hospitals) about Rebotix's repair services, but only two decided to use Rebotix's
services.[292]  When asked why only two opted to use Rebotix's repair services for their
EndoWrist surgical instruments, Mr. Overmars testified:

> The Intuitive rep would tell the customer that they would no longer support their
> robotics program or maintenance of their EndoWrists of the robotic devices if
> they used a third party for the repair. That scared the customer away and did not
> give us the opportunity to get those repairs from those other hospitals.[293]

---

[288] 30(b)(6) Deposition of Glenn Papit, June 2, 2021 (hereafter "Papit Deposition") at 33:3-16.
[289] Papit Deposition at 238:2-25. Mr. Papit testified: "Q. What contracts are those? A. Premier GPO and
BayCare Health System. Q. What is it that Intuitive did with respect to the Premier GPO contract? A.
They tied the purchase of EndoWrists to the service contract for the robot, two separate products, and
threatened to remove the service contract if they used our service to repair the EndoWrists. Q. And they
did that with Premier? A. They did that with any hospital that was using us. Q. Well, but Premier isn't a
hospital, right? A. Correct. Q. So what is it that Intuitive did with respect to the Premier agreement that
Rebotix had? […] THE WITNESS: The Premier agreement gave us access to the hospitals, and they went
to the hospitals that we accessed and did what we have discussed at length to stop them from using us. […]
Q. Okay. And what is it that you claim Intuitive did with respect to Rebotix's contract with BayCare Health
System? A. The same thing. They did primarily the same thing at all of the hospitals. They threatened the
service contracts, and they said that we required a 510(k) because we were reprocessing." See Papit
Deposition at 238:17-239:20.
[290] Papit Deposition at 240:11-21.
[291] BPI Medical is a "full service medical equipment company." See BPI Medical, "About Us." Available
at: https://www.bpimedical.com/about-us/. Around mid-2018, BPI Medical had a business relationship
with Rebotix in which BPI Medical would send EndoWrist surgical instruments to Rebotix for repair, as
BPI Medical itself did not repair EndoWrist surgical instruments. See Overmars Deposition at 11:18-13:9.
[292] Overmars Deposition at 116:21-117:5.
[293] Overmars Deposition at 116:21-117:16. Mr. Overmars further testified: "Q. At some point your
relationship with Rebotix Repair came to an end; is that right? A. Correct. Q. And why is that? A. No
hospitals would give us an EndoWrist for repair anymore. Q. Did they tell you why that was? A. Yes.
Because the Intuitive rep threatened to remove the services." See Overmars Deposition at 117:18-118:1.
See, also, Overmars Deposition at 120:2-123:12.

122.    Similarly, evidence in the form of hospitals' acknowledgments that they stopped
having their EndoWrist surgical instruments repaired by third parties following
communications from Intuitive provides additional evidence demonstrating that the
restrictive Intuitive Service Agreement that hospitals were required to sign with every
purchase of a da Vinci surgical robot created significant barriers to entry in that they
limited rivals' (including SIS) ability to compete effectively with Intuitive in the
EndoWrist Repair and Replacement Market.  For example, in a related matter regarding
third-party repairer similar to SIS (Rebotix), Stacey Donovan of Evergreen Hospital
testified:

> Q. Why did Evergreen decide to stop using Rebotix Repair's Services?
>
> A. We made the decision to stop using the repair services based on
> communication from Intuitive -- based on the communication from Intuitive. […]
>
> Q. Did Evergreen stop using Rebotix's services because it could not afford to
> have its da Vinci robots no longer serviced by Intuitive? […]
>
> THE WITNESS: Yes, that's the reason the decision was made to stop.[294]

Similarly, Edward Harrich, Director of Surgical Services at Pullman Regional Hospital,
testified:

> Q. […] Upon receiving the letter from Intuitive about the violation of your
> contract and the statement that it would no longer provide maintenance services,
> did your hospital immediately decide to terminate its relationship with Rebotix
> Repair?
>
> A. Yes.[295]

---

[294] Donovan Deposition at 54:5-10, 58:7-13.  Ms. Donavan also testified: "Q. Do the maximum use
restrictions that Evergreen imposes on EndoWrists and your inability to use repair services to extend the
lives of your EndoWrists force Evergreen to purchase more EndoWrists than it would otherwise purchase
from Intuitive? […] THE WITNESS: I would say yes."  See Donavan Deposition at 26:11-19.
[295] Harrich Deposition at 82:2-8.  Mr. Harrich also testified: "Q. If it weren't for Intuitive's contractual
limitations, would your hospital use Rebotix's services to the full extent that Rebotix was willing to provide
them?  A. Yes."  See Harrich Deposition at 62:6-10.  Mr. Harrich further testified: "Q. "Why did your
hospital stop using Rebotix Repair services?  A. Well, we were informed that our preventative maintenance
contract, that we were in violation of it.  And so we read through the contract, saw that it did say that if we
used an outside vendor for instrumentation, that the preventative maintenance contract could and, after
talking with Intuitive, would be potentially canceled, so we quit using them."  See Harrich Deposition at
69:8-16.  Regarding the loss of Intuitive's maintenance services, Mr. Harrich testified: "Q. When you said
you did not want to get in the bad graces of Intuitive, why not?  A. Because the Intuitive robot, if they stop

Also, in a related matter, Tyler McDonald of Conway Regional Medical Center testified that it is no longer repairing its EndoWrist surgical instruments through third parties because it was informed that continuing to do so would mean it could no longer make purchases of replacement EndoWrist surgical instruments from Intuitive when needed, adding that Conway Regional Medical Center "understood that failure to acquire new instruments and accessories would negatively impact [its] ability to continue operating [its] robot."[296]

123.    Further evidence the restrictive Intuitive Service Agreement (and Intuitive's enforcement of said agreement) successfully created significant barriers to entry that prevented EndoWrist surgical instrument repair companies such as SIS from entering and/or competing effectively in the EndoWrist Repair and Replacement Market includes acknowledgments from Intuitive itself.  For example, regarding the cease-and-desist letters Intuitive sent to hospitals upon learning that the hospital had been using third-party repairer Rebotix to repair EndoWrist surgical instruments rather than having them replaced by Intuitive, Glenn Vavoso of Intuitive testified:

> Q. Is there any instance that you can identify, as Intuitive's 30(b)(6) witness, where a hospital continued using Rebotix's services after receiving these letters from Intuitive?
>
> A. Not -- not at this time.[297]

In response to a June 2019 email alerting Intuitive executives that Evergreen Hospital in Seattle, WA, had a "3rd party company 're-chipping' the arms and resetting I&A lives to save cost," Patrick Swindon of Intuitive noted that Intuitive had "an updated process for handling these sorts of situations that was developed in agreement with regulatory, post market and legal which we've been using for a few months now to great success."[298]

124.    The evidence discussed above demonstrates that the restrictive Intuitive Service Agreement that hospitals were required to sign with every purchase of a da Vinci surgical

---

maintaining it, I would have no one to go to that could come in and maintain our robot.  If my robot is down, I've got seven unhappy surgeons.  I put the hospital in a bad situation."  See Harrich Deposition at 76:22-77:3.

[296] McDonald Deposition at 18:1-25, 34:25-35:9.

[297] Vavoso Deposition at 225:24-226:22.

[298] Intuitive-00106127-28 at 27.

robot created significant barriers to entry in that they limited rivals' (including SIS) ability to compete effectively with Intuitive in the EndoWrist Repair and Replacement Market. This constitutes one piece of evidence demonstrating how Intuitive used the leverage its monopoly in the tying market (the market for MIST Surgical Robots) afforded to maintain its monopoly power in the tied market (the EndoWrist Repair and Replacement Market) during the Relevant Period.

### c. Intuitive's Exercise of Monopoly Power in the EndoWrist Repair and Replacement Market During the Relevant Period

125.    As I noted above, one piece of evidence that a firm possesses market power in a relevant antitrust market is the *exercise* of that power, especially in setting prices. One indication of Intuitive's exercise of monopoly power in the tied market (the EndoWrist Repair and Replacement Market) is the fact that prices for EndoWrist surgical instruments which Intuitive supplied (exclusively during the Relevant Period) were set well above marginal costs. Because Intuitive possessed monopoly power in the EndoWrist, it was able to price above competitive levels. For example, Bob DeSantis of Intuitive testified that the contribution margin[299] earned by Intuitive on sales of new replacement EndoWrist surgical instruments was approximately 89 percent.[300] This is consistent with a financial analysis performed in connection to a pilot program concerning refurbished EndoWrist surgical instruments, which found that the contribution margin for refurbished EndoWrist surgical instruments was 84 percent, a "5 point decrease [(89 percent)] compared to new builds."[301] If Intuitive had not dominated the EndoWrist Repair and Replacement Market, it would not have been able to raise prices so far above marginal cost to supra-competitive levels, and earn the supra-normal profits it earned on EndoWrist surgical instruments. Economic theory teaches that in the absence of market power, a firm's prices are driven toward the cost of production.[302]

---

[299] A firm's contribution margin reflects the amount of revenue earned by a firm above its variable costs. Contribution margins are often used by managers to analyze the profitability of different products manufactured and sold by a given firm. See, for example, Jonathan E. Duchac, James M. Reeve, and Carl S. Warren, *Financial and Managerial Accounting*, Twelfth Edition, Mason, OH: South-Western Cengage Learning, 2014 at pp. 890-892.

[300] DeSantis Deposition at 249:18-22.

[301] Bair Deposition at 52:19-53:11, Exhibit 5 at Intuitive-00042956. See, also, Intuitive-00686068.

[302] Carlton & Perloff at pp. 666-667.

Intuitive's extremely high profit margins on EndoWrist surgical instrument sales constitutes another piece of evidence indicating that Intuitive possessed market power in the EndoWrist Repair and Replacement Market.

126.     The evidence discussed above demonstrates that Intuitive used its monopoly power in the tying market (the market for MIST Surgical Robots) to maintain its monopoly in the tied market (the EndoWrist Repair and Replacement Market) in order to charge supra-competitive prices on the EndoWrist surgical instruments it sold to hospitals. As I discuss in the section below, evidence demonstrates Intuitive's alleged misconduct in this regard caused harm to competition in the EndoWrist Repair and Replacement Market.

### C.  Evidence Demonstrates that Intuitive's Alleged Misconduct Caused Harm to Competition in the EndoWrist Repair and Replacement Market

127.     Earlier in this Expert Report I discussed evidence demonstrating that, during the Relevant Period, (i) Intuitive maintained significant monopoly power in the EndoWrist Repair and Replacement Market; and (ii) Intuitive's exclusionary conduct prevented rivals, including SIS, from competing effectively in the EndoWrist Repair and Replacement Market. As I previously discussed, the third factor in determining whether exclusionary conduct on the part of a firm is considered anticompetitive in that it caused harm to competition is whether the exclusionary conduct results in lower market output to customers, or higher prices paid by customers. Evidence I have reviewed demonstrates that, as a result of Intuitive's Alleged Misconduct, hospitals had little choice but to pay higher prices for replacement EndoWrist instruments from Intuitive in order to use their da Vinci surgical robots than they otherwise would have had they been able to repair their EndoWrist surgical instruments through third-party repair companies such as SIS. I discuss the evidence that forms the basis of this conclusion in greater detail below.

### i.  Intuitive's Patient Safety Claims

128.     As I previously discussed, the restrictive Intuitive Service Agreement that hospitals were required to sign prohibited hospitals from permitting "any third party to modify, disassemble, reverse engineer, alter, or misuse the System or Instruments and

Accessories."[303] The Intuitive Service Agreement also stated that the license to use an EndoWrist instrument with the da Vinci surgical robot purchased by the hospital "expires once an Instrument or Accessory is used up to its maximum number of uses, as is specified in the Documentation accompanying the Instrument or Accessory."[304] At deposition, Mr. Vavoso testified that he understood this term of the Intuitive Service Agreement to mean that the EndoWrist "instruments have a designated number of lives. And once those lives are used, then the license has expired."[305] I understand that Intuitive claims that this requirement was necessary due to patient safety concerns associated with allowing third parties to repair its EndoWrist surgical instruments.[306]

129. I understand that, in his expert report in this matter, Plaintiff's regulatory expert, Mr. Philip J. Phillips, addresses a recent action taken by the FDA with respect to 510(k) clearance for the marketing of reprocessed Intuitive Surgical da Vinci model S/Si EndoWrist instruments by a company called Iconocare Health ("Iconocare").[307] In its September 2022 letter to Iconocare, the FDA concluded:

> The design, materials, and intended use of the 8mm Monopolar Curved Scissor Instruments, after an additional ten (10) reuse cycles are equivalent to the predicate device. The mechanism of action of the subject device is identical to the predicate device in that the same standard mechanical design, materials, and sizes are utilized. There are no changes to the claims, intended use, clinical applications, patient population, or method of operation. The change in device specifications is to extend the useful life of the 8mm Monopolar Curved Scissor Instruments.[308]

---

[303] Vavoso Deposition at 194:11-195:11, Exhibit 24 at Intuitive-00067540. Glenn Vavoso of Intuitive testified that he was not "aware of any contract with any hospital that does not include this use of system term." See Vavoso Deposition at 195:4-11.

[304] Vavoso Deposition at 195:17-196:14, Exhibit 24 at Intuitive-00067542. At deposition, Glenn Vavoso of Intuitive was unable to "identify any sales contract with the hospital that does not include the language in paragraph 8." See Vavoso Deposition at 198:24-199:2.

[305] Vavoso Deposition at 196:15-197:6.

[306] See, for example, Deposition of Myriam Curet MD, May 7, 2021 (hereafter "Curet Deposition") at 107:7-25.

[307] Telephone conversation with Mr. Philip J. Phillips, dated December 1, 2022.

[308] FDA, Letter to Iconocore Health, "RE: K210478," dated November 15, 2022. Available at https://www.accessdata.fda.gov/cdrh_docs/pdf21/K210478.pdf.

I understand that Mr. Phillips opines that Iconocare demonstrated to FDA's satisfaction that modifying and relabeling each presumably-used Intuitive device to create a reprocessed device, with an additional 10 uses, is substantially equivalent to the predicate devices.[309] I understand that, in Mr. Phillip's opinion, this establishes that the "intended use" of Intuitive's marketed EndoWrist device is the same as the intended use of Iconocare Health's newly-cleared device.[310]

130.    I understand Mr. Phillips concludes that Iconocare provided performance data to the FDA that demonstrated that the reprocessed devices are as safe and effective as the predicate devices and operate as originally intended.[311] I also understand that Mr. Phillips further asserts that it is not surprising that FDA determined the Iconocare EndoWrist device to be substantially equivalent, as it is virtually identical to the predicate devices in all respects and one would anticipate that they are as safe and effective.[312] Based on Mr. Phillip's analysis of the FDA's recent clearance of reprocessed EndoWrist instruments, I understand Mr. Phillips has concluded that Intuitive's claims that it is unsafe to use EndoWrist surgical instruments more than the maximum number of times imposed by Intuitive appears to be inconsistent with the determination made recently by the FDA.

131.    For the purposes of my analysis contained in this Expert Report, I rely on the opinions of Mr. Philip Phillips regarding the FDA's assessment of the safety of reprocessed EndoWrist surgical instruments as compared to Intuitive's newly manufactured replacement EndoWrist surgical instruments. Additional evidence I have reviewed is consistent with Mr. Phillips' conclusions regarding the FDA's assessment of the safety of reprocessed EndoWrist instruments. For example, at deposition, Nicky Goodson, Senior Director for Service Operations at Intuitive, testified that Intuitive has not done testing of any kind to determine whether refurbished or repaired EndoWrists

---

[309] Telephone conversation with Mr. Philip J. Phillips, dated December 1, 2022.
[310] Telephone conversation with Mr. Philip J. Phillips, dated December 1, 2022.
[311] Telephone conversation with Mr. Philip J. Phillips, dated December 1, 2022.
[312] Telephone conversation with Mr. Philip J. Phillips, dated December 1, 2022.

performed by third-party repairers similar to SIS would be unsafe to use with the da Vinci surgical robot in MIST surgery.[313] Ms. Goodson further testified:

> Q. Aside from your personal opinion, do you have any evidence that EndoWrists repaired or refurbished by Restore or Rebotix have put patients at risk?
>
> A. No.[314]

Grant Duque, Director of Core Instruments Design Engineering at Intuitive, similarly testified that he was not aware of any testing that had been done on refurbished EndoWrist instruments performed by third-party repairers similar to SIS.[315] Furthermore, at deposition, Dan Jones, Intuitive's Director of External Affairs, testified that when sending letters outlining patient safety claims to hospitals that were using third party repairers to refurbish EndoWrist instruments, he was unaware of the types of tests those third-party repairers were performing to ensure the safety of the EndoWrist instruments they refurbished.[316]

132.   The evidence discussed above is consistent with the opinions contained in Mr. Phillips' expert report that, despite Intuitive's claims to the contrary, EndoWrist instruments repaired or reprocessed by third parties such as SIS were equally as safe as the newly manufactured replacement EndoWrist instruments hospitals were required to purchase directly from Intuitive.

ii.   Intuitive Used its Alleged Misconduct in the EndoWrist Repair and Replacement Market to Continue to Charge Supra-Competitive Prices for the Replacement of EndoWrist Instruments, Causing Harm to Competition

133.   When a firm possesses monopoly (or market) power[317] in a well-defined antitrust market, it is able to raise the price of that good above the marginal cost of production and earn excess (that is, supra-competitive) profits on the sales of that good. The exercise of

---

[313] Goodson Deposition at 243:2-244:6. See, also, DeSantis Deposition at 213:16-216:21, 244:15-245:11.
[314] Goodson Deposition at 257:7-10.
[315] Deposition of Grant Duque, November 8, 2022 at 149:9-151:8.
[316] Deposition of Dan Jones, November 10, 2022 at 73:4-74:7.
[317] The term "monopoly power" is often used interchangeably with "market power" by economists. I view monopoly power as the most extreme version of market power. That is, a firm with a high share of the market may have *market power* even when there are two or more firms in a well-defined antitrust market.

monopoly power results in harm to competition, which reduces consumer welfare and creates inefficiency in the economy. This exercise of monopoly power forms a central focus of antitrust economics. Evidence I have reviewed demonstrates that Intuitive abused its monopoly power in the EndoWrist Repair and Replacement Market (monopoly power it maintained through its allegedly unlawful tying of the purchase of EndoWrist surgical instruments from Intuitive to the purchase of da Vinci surgical robots, as discussed above). Intuitive's abuse of its monopoly power resulted in harm to competition as hospitals had little choice but to pay higher prices for replacement EndoWrist instruments from Intuitive in order to use their da Vinci surgical robots than they otherwise would have had they been able to repair their EndoWrist surgical instruments through third-party repair companies such as SIS. As Edward Harrich of Pullman Regional Hospital testified at deposition in a related matter involving third-party repairer Rebotix, "reducing the costs of EndoWrists by using the Rebotix Repair service improve[s] the hospital's profitability associated with procedures that used the da Vinci system."[318]

134.   As I discussed above, Intuitive earned a contribution margin of approximately 89 percent on sales of new replacement EndoWrist surgical instruments.[319] If Intuitive's allegedly unlawful conduct had not conferred substantial market power in the EndoWrist Repair and Replacement Market, it would not have been able to charge prices so far above marginal cost and earn the supra-normal profits it earned on EndoWrist surgical instruments. As I noted elsewhere, as a matter of economics, in the absence of market power, a firm's prices are driven toward the cost of production.[320] Evidence I have reviewed demonstrates that, had Intuitive not engaged in its Alleged Misconduct and hospitals been able to repair their EndoWrist surgical instruments through third-party repair companies such as SIS, at least some hospitals would have paid lower prices for EndoWrist surgical instruments than they did in the actual world. I discuss this evidence in greater detail below.

---

[318] Harrich Deposition at 63:15-19.
[319] DeSantis Deposition at 249:18-22.
[320] Carlton & Perloff at pp. 666-667.

135.     Evidence I have reviewed indicates that the EndoWrist surgical instruments repaired by third parties such as SIS were viewed as functionally equivalent to the replacement EndoWrist surgical instruments sold by Intuitive.  For example, in a January 2020 analyst report covering Intuitive, Deutsche Bank noted:

> Repaired da Vinci instruments were all manufactured by Intuitive and designed to become disabled for use beyond 10x, but third parties like Restore Robotics have developed technologies to repair these used devices, confirm that functionality and condition have been restored to *de novo* specifications, and then ship them back to the hospitals for additional use.[321]

Consistent with this finding, Deutsche Bank also noted that there was "**[n]o evidence that repaired da Vinci instruments specifically pose a risk to patient safety – in fact, au contraire.**"[322]  Deutsche Bank added: "**Bottom line regarding safety is that, despite Intuitive's view on this point, any material threat to patient safety would surely have prompted immediate FDA field action to stop their usage, which has not been the case.**"[323]

136.     Also consistent with these findings, in a related matter involving another third-party repairer similar to SIS (Rebotix), Edward Harrich, Director of Surgical Services at Pullman Regional Hospital, testified that the surgeons, first assists, and scrub assists that Pullman Hospital that used "Rebotix-repaired EndoWrists" were not able to "discern any differences between the Rebotix-repaired EndoWrists and the EndoWrists that had not been repaired or serviced by Rebotix."[324]  Mr. Harrich further testified that Pullman

---

[321] Intuitive-00552993-53014 at 52993 (emphasis in original). Deutsche Bank added: "Notably, these devices are typically reparable up to four times. Third party servicing of medical devices has been ongoing for decades, and FDA's comfort around this practice regarding patient safety is quite clear." See Intuitive-00552993-53014 at 52993.

[322] Intuitive-00552993-53014 at 52998 (emphasis in original).

[323] Intuitive-00552993-53014 at 52998 (emphasis in original). In this report, Deutsche Bank included due diligence "feedback from da Vinci surgeons" regarding the use of EndoWrist surgical instruments that had been repaired by third-party repairers. See Intuitive-00552993-53014 at 53000-53002. One such surgeon noted that the that the "[c]linical experience to date has been positive, with no reports of device malfunction or adverse events." See Intuitive-00552993-53014 at 53000. Another surgeon noted that the "[c]linical experience has been satisfactory, with no reports of device malfunction or adverse events." See Intuitive-00552993-53014 at 53001. Another "Surgeon noted that the hospital has had no cases of device malfunction or adverse events, and based on this favorable trial phase experience usage is likely to expand over the next year or two." See Intuitive-00552993-53014 at 53002.

[324] Harrich Deposition at 38:8-39:3.

Hospital never "reject[ed] a Rebotix-repaired EndoWrist for any reason."[325]  Similarly, in another related matter, Tyler McDonald of Conway Regional Medical Center testified that a group of surgeons at his hospital conducted a trial of EndoWrist surgical instruments repaired by Restore Robotics,[326] and that, upon completing that trial, those surgeons "couldn't tell any difference between [the repaired EndoWrist surgical instruments] and the other instruments that came directly from Intuitive."[327]

137.    Economic theory demonstrates that in a market for an interchangeable product, competition between two firms would result in lower prices than under a pure monopoly (like the one Intuitive was able to maintain during the Relevant Period as a result of its Alleged Misconduct), as suppliers would have competed with each other to raise their own sales at their competitor's expense.  Indeed, evidence indicates that Intuitive understood that price erosion would have occurred in the EndoWrist Repair and Replacement Market if third-party repair companies such as SIS were able to enter the market and compete effectively.  As I discussed above, evidence I have reviewed demonstrates that Intuitive investigated responding to the growing competitive threat from lower-priced third-party repairers of EndoWrist surgical instruments (such as SIS) by selling refurbished EndoWrist surgical instruments at a discount off of the cost of the replacement EndoWrists it sells to hospitals (often referred to as Project Dragon).[328]  For instance, in July 2017, Intuitive created an internal presentation regarding an update on Project Dragon from earlier in the year "[g]iven the sensitivity to the price and margins of such a large revenue stream."[329]  Regarding the benefits to hospitals of refurbished EndoWrist instruments, Intuitive stated: "A 20% discount is proposed. This discount

---

[325] Harrich Deposition at 42:18-43:19.

[326] I understand Restore Robotics pays "a sizable license fee" to use Rebotix's patented Interceptor "technology to reset the usage counter on EndoWrist instruments for the da Vinci Si robot systems." See United States District Court for the Northern District of Florida, *Restore Robotics LLC and Restore Robotics Repair LLC v. Intuitive Surgical, Inc.,* No, 5:19-cv-00055-MCR-MJF, First Amended Complaint, May 13, 2019 at ¶75; Papit Deposition at 71:21-72:14, 83:1-6; Deposition of David Mixner, June 10, 2021 at 13:23-14:6, 120:17-121:6.

[327] McDonald Deposition at 13:20-17:25, 67:22-68:15.

[328] Intuitive-00103456-478 at 459.  Intuitive noted that these refurbished EndoWrist surgical instruments "will be equally capable to new."  See Intuitive-00103456-478 at 459.

[329] Intuitive-00103456-478 at 457.

balances: RF instrument cost, requested I&A costs in various regions, and our DESIRED LEADERSHIP POSITION in robotics."[330]  Intuitive added:

> As a part of that leadership position, it seems important that Dragon be a tool to demonstrate our commitment to our customers. We have listened to their needs and could provide a solution for reduced pricing. However, the discount of 20% (versus a deeper 30% discount) maintains our position as an equal business partner and does not force us into a commodity position.[331]

Intuitive also noted that the "[d]iscount applies whether they are shipped new or remanufactured instrument."[332]  With regards to how this program would help Intuitive maintain its "leadership position" in the face of the competitive threat from third-party repair companies, Intuitive stated:

> Reprocessing SUD [single-use device] companies are commoditized and centralized with broad offerings. Currently, the closest parallel to our refurbished instrument is the reprocessed SUD market. This market is highly commoditized and centralized. The large players have very wide portfolios spanning EP, cardiac, lap products, etc. Given their broad offering and deep discounts of around 50% we would be challenged to compete should they enter with cleared, refurbished, robotic instruments. Even should they not enter we will be having sales discussions with purchasers who expect a deep discount on refurb or reprocessed devices.... unless we can position it otherwise.[333]

Also, regarding its "leadership position," Intuitive stated that "if someone is going to pursue refurbishing of dV instruments it should be us as the OEM for the patients [sic] sake and for ours.  For revenue reasons and for maintaining our leadership position," adding:

> If a large player were to enter with reprogramming or refurbishing we have lost our leadership position in this segment of robotics. Our users could vilify us for

---

[330] Intuitive-00103456-478 at 458.  Intuitive also noted: "First and foremost, Dragon is an opportunity for our customers to have improved running costs associated with da Vinci procedures."  See Intuitive-00103456-478 at 458.

[331] Intuitive-00103456-478 at 458.  Intuitive added: "we are already seeing 3rd party companies enter with reprogrammed dV instruments.  By offering Dragon we can increase customer confidence in refurb, lower cost instruments as part of our mission to put Patients First."  See Intuitive-00103456-478 at 458.

[332] Intuitive-00103456-478 at 459.

[333] Intuitive-00103456-478 at 459.

not extending lives or refurbishing sooner. And the good will/partnership equity
that we could get for refurbishing is completely diminished. Additionally we lose
the position to set what the discount should be for refurbished robotic
instruments.[334]

138.    Regarding Project Dragon, evidence I have reviewed indicates that, despite the
benefits of the program to hospitals in the form of lower operational costs and to Intuitive
itself in the form of allowing it to protect its "leadership position" from third-party
repairers, Intuitive initially decided in August 2017 not to pursue this plan and offer
refurbished EndoWrist surgical instruments to hospitals at a lower cost than replacement
EndoWrist surgical instruments.  Upon hearing of this decision, Mike Prindiville of
Intuitive remarked that he believed the project was still "a wise strategic investment," but
that the "question is more timing (i.e. when do we really need a lower cost/revenue
product for I&A) rather than any technical concerns."[335]  In response to a September
2017 email from Katie Scoville regarding the decision not to pursue Project Dragon at the
time, Dirk Barton of Intuitive stated:

> I want to remark the following. In case we need to drop I+A pricing in some
> regions – to add the message in volume contracts that those sites would accept
> also partial deliveries based on refurbished material would avoid potential push
> back from competition – telling that we use our monopol[y] role to keep
> competition out.[336]

Mr. Barton added that "[p]otential usage of refurb material allows us to lower pricing."[337]
I understand that, while Intuitive revisited the idea of offering refurbished EndoWrist
surgical instruments at a discount off of replacement EndoWrist surgical instruments, the
project was ultimately "never sellable" in the U.S., and Intuitive ended its refurbished
EndoWrist surgical instrument efforts in the second quarter of 2020.[338]  In May 2021,

---

[334] Intuitive-00103456-478 at 464.

[335] Intuitive-00602576-78 at 76.

[336] Intuitive-00604054-55 at 54.

[337] Intuitive-00604054-55 at 54.

[338] Scoville Deposition at 12:11-13:15, 91:24-92:21.  Following its August 2017 decision not to pursue
Project Dragon, Intuitive briefly revived a version of the project in April 2018 that was "not purely
collections," rather Intuitive was "investigating a partnership with a supplier (medline) who does kitting for
products and can also do collections."  See Intuitive-00604127; Intuitive-00604123.  However, the Project
Dragon phase of Intuitive's proposed refurbishment program ended in 2018. See Intuitive-00594883-4902

Katie Scoville of Intuitive testified that the company was not actively "exploring the possibility of refurbishing EndoWrists."[339]

139.    Consistent with Intuitive's own expectations, evidence I have reviewed indicates that the cost to hospitals associated with repairing their EndoWrist surgical instruments through a third-party repairer such as SIS was significantly lower than the cost to purchase replacement EndoWrist surgical instruments from Intuitive.[340]  For example, upon learning in November 2019 that Marin General Hospital had been using SIS to repair its EndoWrist instruments, Intuitive assessed the competitive threat from SIS and learned that SIS was offering its repair services at a "40-50% discount" off of Intuitive's replacement EndoWrists.[341]  Intuitive further noted that Marin General Hospital was "very proud of this and celebrated the cost savings."[342]  Similarly, in September 2019, Intuitive executives discussed how to deal with an inquiry from UF Shands regarding the use of SIS's services to save money by repairing its EndoWrist instruments, during which time Intuitive learned that UF Shands had been alerted to the cost savings by its Group Purchasing Organization, which noted:

> Two of [its] members, Kaiser Permanente and Legacy Health System are capturing savings by using Intuitive Surgical Endowrist refurbishment products.  Surgical Instrument Service Company (SIS) is now the only supplier providing refurbishment to Intuitive Surgical's da Vinci EndoWrist.  SIS offers a refurbished da Vinci EndoWrist at approximately 40% savings.[343]

---

at 4884.  Further, around June 2019, began a pilot program that, like Project Dragon, "still concern[ed] the potential refurbishment of EndoWrists."  See Scoville Deposition at 116:4-118:5.  This pilot program involved the collection of used EndoWrist surgical instruments to test the refurbishment process on a small scale and to help develop potential business models.  See Intuitive-00594883-4902 at 4884; Scoville Deposition Exhibit 10.  However, this refurbishment pilot program ended in 2020.  See Intuitive-00594883-4902 at 4884.  When asked why the program ended in 2020, Ms. Scoville testified: "We had piloted a sufficient amount -- we had gathered, I should say a sufficient amount of data to do the assessment and technical feasibility.  And based on what we learned, we didn't think that further assessment was a high enough priority project for the company."  See Scoville Deposition at 12:14-13:5. See, also, Goodson Deposition at 72:5-74:3.

[339] Scoville Deposition at 13:10-15.  See, also, Goodson Deposition at 72:5-74:3.
[340] 30(b)(6) Posdal Deposition at 58:4-22.
[341] Intuitive-00110451-55 at 51.
[342] Intuitive-00110451-55 at 55.
[343] Intuitive-00110252-54 at 54.

85

140.     Similarly, at deposition in a related matter, Edward Harrich of Pullman Hospital
testified that the average cost of an EndoWrist surgical instrument purchased from
Intuitive was approximately $2,000, whereas the average cost to have an EndoWrist
surgical instrument serviced by Rebotix was approximately $1,332, which amounted to
annual savings to Pullman Hospital of $62,400.[344] Mr. Harrich further testified that
Rebotix offered Pullman Hospital repaired EndoWrist surgical instruments at a 40
percent discount off of the cost of replacement EndoWrist instruments from Intuitive.[345]
In another related matter, Tyler McDonald of Conway Regional Medical Center testified
that his hospital observed cost savings from using EndoWrist surgical instruments
repaired by third parties, and that "Conway [would] still be refurbishing the instruments
today if it could do so."[346]  In a January 2020 analyst report covering Intuitive, Deutsche
Bank noted that "[m]eaningful operating cost savings opportunity is the key driver
compelling hospitals to consider using these repaired da Vinci instruments."[347]
Relatedly, a letter sent by third-party repairer Rebotix to hospitals around August 2019
noted that using Rebotix to repair EndoWrist surgical instruments would provide "45%
[a]verage saving per instrument," which would amount to "[a]verage [s]avings of over
$200,000 per year, per S or Si robot."[348]

141.     Further, evidence I have reviewed demonstrates that the prices Intuitive charged
for its EndoWrist surgical instruments were significantly higher than the prices charged
by TransEnterix for the surgical instruments used in conjunction with its Senhance
surgical robot.  For example, in a 2017 internal Instruments & Accessories analysis,
Intuitive noted that the "[c]ompetitive [p]osition" of TransEnterix's Senhance core
surgical instruments were that they offered "'[u]nlimited' lives, lower per procedure cost"
as compared to EndoWrist core surgical instruments.[349]  Steven D. Schwaitzberg of

---

[344] Harrich Deposition at 68:8-69:4.
[345] Harrich Deposition at 88:16-89:14.
[346] McDonald Deposition at 17:20-25.
[347] Intuitive-00552993-53014 at 52993.  As part of this analyst report, Deutsche Bank sought feedback
from two hospital supply chain managers (one that oversees purchasing for nine hospitals in the Northeast
and the other that is the "SVP of purchasing for a major hospital network comprising 28 hospitals across
several states"), who both noted that their "team's financial analysis points to 'fairly substantial' operating
cost savings opportunity with usage of repaired instruments."  See Intuitive-00552993-53014 at 53003-
53004.
[348] Intuitive-00372699-2703 at 2702-2703.
[349] Intuitive-00292544-2628 at 2556.

University of Buffalo's Department of Surgery noted in a 2019 interview that a "recent internal review [performed by Kaleida Health in Buffalo, NY] revealed an average instrument cost of $3,400 per *da Vinci* procedure, which is significantly higher than the projected $800–1,600 instrument costs for *Senhance.*"[350] A February 2018 Piper Jaffray analyst report covering Intuitive found that, despite the surgical robots themselves being priced similarly, "[o]f particular interest to hospitals is the lower per procedure cost of Senhance (roughly one-half of what [Intuitive] charges)," adding that one of the pros of TransEnterix's Senhance as compared to Intuitive's da Vinci is that "[c]laims per-procedure pricing similar to current laparoscopic procedures (~$700), mainly driven by reusable instruments with minimal disposables per case (for example, each instrument can be used, according to the company, 150-200 times compared to da Vinci at ~10-20)."[351]

142.    Evidence I have reviewed demonstrates that, had Intuitive not engaged in its Alleged Misconduct and hospitals been able to repair their EndoWrist surgical instruments through third-party repair companies such as SIS, at least some hospitals would have paid lower prices for EndoWrist surgical instruments than they did in the actual world. Evidence I have reviewed also demonstrates that Intuitive's Alleged Misconduct caused harm to competition in the tied market (the EndoWrist Repair and Replacement Market) in that hospitals had little choice but to pay higher prices for replacement EndoWrist instruments from Intuitive in order to use their da Vinci surgical robots than they otherwise would have had they been able to repair their EndoWrist surgical instruments through third-party repair companies such as SIS.

143.    For example, in a February 2020 analyst report in covering the "third party risk" to Intuitive's Instruments & Accessories business segment (which includes the sale of EndoWrist instruments), Deutsche Bank included Intuitive's "[l]everaging its dominant market position" as a "[m]itigant[] to [t]hird-[p]arty [e]ncroachment," adding:

> While some hospitals are now starting to question the legality/enforceability of
> contract terms of service, there are also those whose surgeons are simply

---

[350] Perez et al. at p. 6.
[351] Intuitive-00364420-444 at 423.

> unwilling to risk losing access to Intuitive's technologies. We spoke with a
> supply chain executive of a major academic center that recently began using
> repaired da Vinci instruments, but upon receipt of an ensuing cease-and-desist
> notice from the company's lawyers, stopped.[352]

This assessment of the effect of Intuitive "[l]everaging its dominant market position" is consistent with the evidence discussed earlier in this Expert Report regarding Intuitive's successful efforts to leverage its restrictive Intuitive Service Agreement that hospitals were required to sign with every purchase of a da Vinci surgical robot to prevent hospitals from repairing their EndoWrist surgical instruments through third parties such as SIS, thus leaving hospitals with little choice but to pay higher prices for replacement EndoWrist instruments from Intuitive in order to use their da Vinci surgical robots than they otherwise would have had they been able to repair their EndoWrist surgical instruments through third-party repair companies such as SIS.

144. Further, an October 2018 "Qualitative IDI Research Report" prepared by Advantis for Intuitive found:

> **Cost** is still a concern for users of [robotic assisted surgeries], and this can
> impact the choice of surgical technique (e.g., not using the robot for simple
> cases), but is more often expressed as a frustration felt due to the monopoly
> position that da Vinci has, which requires hospitals to buy equipment and
> maintenance for their da Vinci system directly, with no competition that might
> improve pricing or generate innovation.[353]

A 2013 article titled "The robotic surgery monopoly is a poor deal" noted that "Intuitive Surgical can command high premiums seemingly because of its monopoly position as the sole supplier of soft tissue robotic surgical equipment."[354] Also, in November 2016, Dr. William Mayfield, Chief of Surgery at Wellstar Health System in Georgia, stated the following regarding Intuitive:

---

[352] DeSantis Deposition Exhibit 11 at Intuitive-00566074.
[353] Intuitive 00246469-491 at 489 (emphasis in original).
[354] Abhishek Trehan and Tristan J. Dunn, "The robotic surgery monopoly is a poor deal," *The BMJ*, Vol. 347, December 19, 2013, 1-2 at p. 1.

As a final note, the capital and carrying costs are still extremely high for Intuitive Surgical products. This has been tolerated (and I do not use the term lightly) in a monopoly marketplace. Demonstration of value at the hospital level under our current circumstances is challenging. Although the business principles of margins and return to investors is 'standard in the industry', as I described to you, the current business model of medical technology companies is unsustainable on a global scale. Our rising surgical supply costs are incompatible with the value delivered or return obtained. Competition in your space will have some effect on your business, and I urge you to stay ahead of the curve. There may be some pent up emotional backlash reflected in future sales when competition appears.[355]

145.    In response to a November 2019 request for quotes from customers from a recent Intuitive study regarding the cost associated with Intuitive's products, Kelvin Tsai of Intuitive provided a summary of quotes from surgeons, hospital administrators/executives, OR staff, and robotic coordinators.[356]  One surgeon in Mr. Tsai's summary stated the following regarding Intuitive: "**Market monopoly,** expensive equipment."[357]  One hospital administrator/executive stated: "Their robot products are of great quality, but **they know they don't have any competition** for their disposables. As a result, their prices are expensive."[358]  Similarly, one OR staff member in Mr. Tsai's summary stated that the "**price** of [Intuitive's] instruments and disposables are an **extremely high amount,**" with another OR staff member stating that Intuitive is "[e]xpensive & **had the market cornered for a long time resulting in overpricing**."[359]

---

[355] Intuitive-00141567-68 at 67.
[356] Intuitive-00133628-630.
[357] Intuitive-00133628-630 at 628 (emphasis in original).  Another surgeon in Mr. Tsai's summary said Intuitive "[p]ush[es] their product and **do[es] not allow for other modes such as laparoscopy** and it's not ok as their product is not proven. Despite high usage, **I can't wait for competitors.**" See Intuitive-00133628-630 at 628 (emphasis in original).
[358] Intuitive-00133628-630 at 628 (emphasis in original).  Another hospital administrator/executive in Mr. Tsai's summary described Intuitive in the following way: "Poor partner, lack transparency, **no negotiation on pricing,** poor explanations of defective devices, sales team too forceful, borderline deceptive information." See Intuitive-00133628-630 at 628 (emphasis in original).  Similarly, another hospital administrator/executive in Mr. Tsai's summary was quoted stating that Intuitive is "not easy to work with. **They have a monopoly,** just wait for a competitor to move the business." See Intuitive-00133628-630 at 628 (emphasis in original).
[359] Intuitive-00133628-630 at 628 (emphasis in original).

Also, a robotic coordinator in Mr. Tsai's summary said Intuitive made "[e]xcellent products, but **expensive and have a monopoly** on most robotic supplies."[360]

146.    Further, following the expiration of their EndoWrist surgical instruments,[361] hospitals are required to dispose of expired EndoWrist surgical instruments and, in order to continue using their da Vinci surgical robots, must purchase replacement EndoWrist surgical instruments directly from Intuitive.[362]  However, as noted above, EndoWrist surgical instruments are typically reparable multiple times.[363]

147.    Thus, absent the Alleged Misconduct, each new EndoWrist instrument purchased by a hospital could typically be repaired multiple times by a third-party repairer such as SIS at a lower cost, as opposed to having little choice but to pay a higher price for a new replacement EndoWrist surgical instrument every time a given EndoWrist surgical instrument reached the maximum use limit imposed by Intuitive, as was the case in the actual world.[364]  Therefore, had hospitals been able to extend the useful life of their EndoWrist surgical instruments by having them repaired multiple times through third-party repairers such as SIS, they could have reaped the cost savings of repairing their EndoWrist surgical instruments rather than replacing them several times over before it was necessary to purchase a new replacement EndoWrist surgical instrument from

---

[360] Intuitive-00133628-630 at 628 (emphasis in original).  Another robotic coordinator in Mr. Tsai's summary said Intuitive is "the only company with robotic surgical stuff, but that doesn't mean it's great. It's **super overpriced and hyped up**."  See Intuitive-00133628-630 at 628 (emphasis in original).
[361] Evidence I have reviewed indicates that Intuitive typically set the maximum number of uses for EndoWrist surgical instrument at ten.  See, for example, DeSantis Deposition at 137:20-138:6; Intuitive 2021 SEC Form 10-K at pp. 8, 58.  I understand that in October 2020, Intuitive introduced its Extended Use Program that allowed select da Vinci Xi and da Vinci X EndoWrist surgical instruments to be used twelve to 18 times, as compared to the typical ten uses.  See Intuitive 2021 SEC Form 10-K at pp. 8, 58.
[362] Intuitive-00091257-1351 at 1272, 1274, 1289, 1291; McDonald Deposition at 13:13-19.
[363] See, for example, Intuitive-00552993-53014 at 52993.
[364] At deposition, Edward Harrich of Pullman Regional Hospital testified that Intuitive's maximum use restriction on EndoWrist surgical instruments and an inability to have their EndoWrist surgical instruments repaired by a third-party repair company forced Pullman to "buy additional EndoWrists that [it] otherwise wouldn't purchase," adding: "Well, soon as -- as soon as we hit our ten lives or whatever the limit number is on that instrument, we will have to purchase new ones and we can't use them any further."  See Harrich Deposition at 30:4-18.  Similarly, Stacey Donovan of Evergreen hospital testified: "Q. Do the maximum use restrictions that Intuitive imposes on EndoWrists force Evergreen to purchase more EndoWrists than it otherwise would purchase? […] THE WITNESS: I don't -- I don't know how to answer that because we don't have the option to not -- to continue to use those instruments without purchasing new ones when they reach end of life."  See Donovan Deposition at 24:6-14.  In a related matter, Tyler McDonald of Conway Regional Medical Center testified: "Q. (By Mr. Berhold) When an instrument reaches the usage limit, does Conway have to purchase a new one? A. Yes. Q. And why is that? A. The instrument no longer works with the robot."  See McDonald Deposition at 13:13-19.

Intuitive.  As Deutsche Bank noted in a February 2020 analyst report in covering the "third party risk" to Intuitive's Instruments & Accessories business segment (which includes the sale of EndoWrist instruments), asserted:

> And even with this modest [4-6 percent] unit share capture, the resultant impact to Intuitive's top-line would be amplified given that each instrument can be repaired multiple times. In our base case scenario of 5% *de novo* unit share capture in 2021 and the assumption that each instrument is repaired 3x on average, our analysis indicates a top-line hit on the order of $193 million or 3.4% of total company sales in 2021.[365]

148.    The evidence discussed above demonstrates that Intuitive's Alleged Misconduct caused harm to competition in that, as a result, hospitals had little choice but to pay higher prices for replacement EndoWrist instruments from Intuitive in order to use their da Vinci surgical robots than they otherwise would have had they been able to repair their EndoWrist surgical instruments through third-party repair companies such as SIS.  This evidence is consistent with the evidence I discussed earlier in this Expert Report demonstrating that more hospitals would have had their EndoWrist surgical instruments repaired more often than they otherwise did had it not been for Intuitive's exclusionary conduct in the form of its requirement that all hospitals enter into the Intuitive Service Agreement as a condition of their purchase of a da Vinci surgical robot, as well as Intuitive's continued enforcement of the Intuitive Service Agreement.

---

[365] DeSantis Deposition Exhibit 11 at Intuitive-00566056 (emphasis in original).  See, also, Intuitive-00552993-53014 at 53007.

## VI.   Conclusions

149.   Based on my analyses and research into the U.S. market for MIST Surgical
Robots and EndoWrist Repair and Replacement Market, as well as my training and
experience in economics, I have concluded that the market for MIST Surgical Robots in
the United States constitutes a relevant antitrust market with respect to the tying market
for evaluating the Alleged Misconduct.  I have also concluded that the market for
EndoWrist Repair and Replacement Market in the United States constitutes a separate
relevant antitrust market with respect to the tied market for evaluating the Alleged
Misconduct.  I have also concluded that Intuitive possessed monopoly power in the U.S.
market for MIST Surgical Robots during the Relevant Period.  Based on my training and
experience in economics as well as my research and analysis into the relevant antitrust
markets at issue here, I have also concluded that Intuitive used its monopoly power in the
market for MIST Surgical Robots to maintain its monopoly in the EndoWrist Repair and
Replacement Market in the U.S. during the Relevant Period.  I have also concluded as a
matter of economics that Intuitive's Alleged Misconduct was anticompetitive and
resulted in harm to competition in that hospitals had little choice but to pay higher prices
for replacement EndoWrist surgical instruments from Intuitive in order to use their da
Vinci surgical robots than they otherwise would have paid had they been able to repair
their EndoWrist surgical instruments through third-party repair companies such as SIS.

Russell L. Lamb, Ph.D.

December 2, 2022

# Appendix A



## Russell Lamb, Ph.D.

President
Monument Economics Group
Phone: (703) 615-3474
Email: rlamb@megconsulting.com

**Professional Summary**

Russell Lamb is an expert in antitrust economics and has testified concerning antitrust liability, impact, and damages. He has an extensive background in applied econometrics and has developed econometric models to measure damages in a number of matters involving allegations of horizontal price fixing. He has provided expert testimony in State and Federal Courts in the United States and in Canada on a range of issues including class-certification and economic damages in antitrust, RICO and consumer fraud matters. In addition, he has provided expert advice to client attorneys at all levels of the litigation. Dr. Lamb has an extensive background in the analysis of domestic and international agricultural markets and has authored more than 50 articles in peer-reviewed economics journals, trade press, and major newspapers.

Dr. Lamb's work has been cited by courts in certifying classes in the United States and Canada. For example, in In re Aftermarket Automotive Lighting Products Antitrust Litigation, the court held that his analysis provided "a sufficient basis from which to conclude that Plaintiffs would adduce common proof concerning the effect of Defendants' alleged price-fixing conspiracy on prices class members paid." In certifying the Class in In re: Titanium Dioxide Antitrust Litigation, the Court said, "This Court finds that Dr. Lamb's regression analysis accurately reflects the characteristics of the titanium dioxide industry, and the facts in this case." In In Re: Domestic Drywall Antitrust Litigation, the Court cited extensively to Dr. Lamb's analysis in its decision to certify the Class: "Dr. Lamb's expert opinion fits the facts of the case, is relevant, and is therefore admissible to show classwide injury and measurable damages in support of Plaintiffs' Motion for Class Certification. [...]

1

The Court [...] has thoroughly considered Dr. Lamb's opinion in its decision on the DPPs' Class Certification Motion." In the Canadian LCD Competition Act Class Action, the Court held that Dr. Lamb's analysis provided "evidence of a viable methodology for the determination of loss on a class-wide basis." In In re: Puerto Rican Cabotage Litigation, the Court held that "Dr. Lamb [had] set forth a reputable and workable model for determining damages as to individual class members." In certifying the class in Clarke and Rebecca Wixon, et al. v. Wyndham Resort Development Corp., et al., the Court held that "Dr. Lamb [had] presented a plausible class-wide method of proof." In certifying the class in Eugene Allan, et al., v. Realcomp II, Ltd., et al., the Court held that "the Plaintiffs have produced sufficient evidence that common proofs will yield a finding of class-wide damages that predominates over any specific individualized damages. The Lamb Report and Lamb Reply are sufficient to establish this fact." Furthermore, Dr. Lamb was the Indirect Purchaser Plaintiffs' expert in the In re: Polyurethane Foam Antitrust Litigation matter, which was certified by the Court in April 2014.

With regard to agricultural economics, Dr. Lamb has a particular expertise in agricultural markets and has undertaken extensive original research and econometric analysis on markets for agricultural commodities. His articles on agricultural economics have been published in peer-reviewed journals, trade press, and major newspapers. Dr. Lamb regularly presents at conferences on topics including the state of the U.S. Economy and farm policy.

Prior to co-founding Monument Economics Group, Dr. Lamb was a Senior Vice President at Nathan Associates Inc., where he directed the firm's litigation consulting practice nationally. Dr. Lamb previously served as a Principal at AACG in Arlington, VA, and as Managing Director and DC Office Head at Econ One Research. He earlier served as an Assistant Professor of Agricultural Economics and faculty member of the Graduate Group in Economics at North Carolina State University and as an Economist and Senior Economist in the Federal Reserve System of the United States, at the Federal Reserve Board and the Federal Reserve Bank of Kansas City.

**Education**

- Ph.D., Economics, University of Pennsylvania, 1994
- M.A., Economics, The University of Maryland, 1989
- B.A., Economics, The University of Tennessee, 1987

**Expert Testimony Offered**

**2022**   *Anthony Oliver, et al. v. American Express Company, et al.*

- United States District Court Eastern District of New York
- Case No. 1:19-cv-00566
- Expert Report, September 30, 2022
- Supplemental Expert Report, October 19, 2022
- Opinion concerning class certification and damages issues
- Retained by Berman Tabacco

*Las Vegas Sun, Inc. v. Sheldon Adelson, et al.*

- United States District Court District of Nevada
- Case No. 2:19-cv-01667
- Expert Report, September 19, 2022
- Opinion concerning damages issues
- Retained by Lewis Roca Rothgerber Christie LLP

*Value Drug Company v. Takeda Pharmaceuticals U.S.A., Inc., et al.*

- United States District Court Eastern District of Pennsylvania
- Case No. 21-CV-3500
- Expert Report, July 25, 2022
- Amended Expert Report, July 28, 2022
- Testified at deposition, August 17, 2022
- Testified at deposition, September 15, 2022
- Testified at class certification hearing, November 1, 2022
- Expert Report, November 17, 2022
- Opinion concerning class certification and damages issues
- Retained by Berger & Montague, P.C.

*Serge Asselin v. Ainsi Canada, Inc. et al.*

- Cour Supérieure District de Québec
- Case No. 200-06-000203-169
- Expert Report, May 31, 2022
- Opinion concerning market factors
- Retained by Siskinds LLP, Sotos LLP

*In Re Caustic Soda Antitrust Litigation*

- United States District Court Western District of New York
- Case No. 1:19-cv-00385-EAW-MJR
- Expert Report, April 25, 2022
- Testified at deposition, June 6, 2022
- Expert Reply Report, August 25, 2022
- Testified at deposition, September 23, 2022
- Opinion concerning class certification and damages issues

- Retained by CERA LLP

*Boothe Farms, Inc., et al. v. The Dow Chemical Co., et al.*

- United States District Court Eastern District of Arkansas Northern Division
- Case No. 3:19-cv-00264-DPM
- Expert Report, April 15, 2022
- Supplemental Expert Report, April 20, 2022
- Testified at deposition, May 4, 2022
- Declaration, May 19, 2022
- Opinion concerning damages issues
- Retained by Lieff Cabraser Heimann & Bernstein, LLP

**2021** *In Re: Takata Airbag Product Liability Litigation*

- United States District Court Southern District of Florida Miami Division
- MDL No. 2599
- Expert Report, December 23, 2021
- Testified at deposition, January 25, 2022
- Opinion concerning class certification and damages issues
- Retained by Podhurst Orseck

*In Re: Broiler Chicken Antitrust Litigation*

- United States District Court Northern District of Illinois Eastern Division
- Case No. 1:16-cv-08637
- Expert Report, December 20, 2021
- Testified at deposition, February 8, 2022
- Expert Rebuttal Report, July 29, 2022
- Testified at deposition, September 1, 2022
- Opinion concerning damages issues
- Retained by Polsinelli

*KPH Healthcare Services, Inc. a/k/a Kinney Drugs, Inc. v Gilead Sciences, Inc., et al.*

- United States District Court Northern District of California San Francisco Division
- Case No. 3:20-cv-06961-EMC
- Expert Report, October 19, 2021
- Declaration, February 25, 2022
- Declaration, April 13, 2022
- Declaration, April 26, 2022
- Testified at deposition, May 18, 2022
- Expert Merits Report, June 28, 2022
- Expert Rebuttal Report, June 30, 2022
- Testified at deposition, July 19, 2022
- Testified at deposition, July 25, 2022
- Expert Rebuttal Report, August 12, 2022

- Expert Rebuttal Damages Report, August 16, 2022
- Testified at deposition, August 31, 2022
- Opinion concerning class certification and damages issues
- Retained by Roberts Law Firm, P.A.

*In Re: Mallinckrodt plc, et al.*

- United States Bankruptcy Court District of Delaware
- Case No. 20-12522 (JTD)
- Expert Report, August 13, 2021
- Expert Reply Report, August 26, 2021
- Testified at deposition, September 8, 2021
- Supplemental Expert Report, October 29, 2021
- Testified at trial, November 12 and 15, 2021
- Expert Reply Report, December 1, 2021
- Testified at trial, December 16, 2021
- Opinion concerning damages
- Retained by Eimer Stahl LLP and Willkie Farr & Gallagher LLP

*Rebotix Repair LLC v. Intuitive Surgical, Inc.*

- United States District Court Middle District of Florida Tampa Division
- Case No. 8:20-cv-02274-VMC-TGW
- Expert Report, July 26, 2021
- Testified at deposition, October 19, 2021
- Opinion concerning monopolization issues
- Retained by Dovel & Luner

*Irene Breckon and Gregory Sills v. Alsaker AS, et al.*

- Federal Court of Canada
- Court File No. T-1664-19
- Expert Report, July 1, 2021
- Expert Reply Report, July 5, 2022
- Opinion concerning class certification issues
- Retained by Siskinds LLP, Sotos LLP, and Koskie Minsky LLP

*Gazarek Realty Holdings Ltd., et al. v. Corning Incorporated, et al.*

- Ontario Superior Court of Justice
- Court File No. CV-16-549735-00CP
- Expert Report, April 15, 2021
- Opinion concerning class certification issues
- Retained by Camp Fiorante Matthews Mogerman LLP, Sotos LLP, Siskinds LLP

*Kate O'Leary Swinkels v. ZF Friedrichshafen Ag, et al.*

- Ontario Superior Court of Justice
- Court File No. CV-18-00604648-00CP
- Expert Report, April 15, 2021

- Expert Reply Report, January 19, 2022
- Opinion concerning class certification issues
- Retained by Camp Fiorante Matthews Mogerman LLP, Sotos LLP, Siskinds LLP

*David Regan v. Masonite International Corporation, et al.*

- Federal Court of Canada
- Court File No. T-1049-20
- Expert Report, March 31, 2021
- Opinion concerning class certification issues
- Retained by Siskinds LLP

*In Re: JELD-WEN Holding, Inc. Securities Litigation*

- United States District Court for the Eastern District of Virginia Richmond Division
- Case No. 3:20-CV-00112-JAG
- Expert Declaration, January 4, 2021
- Expert Reply Declaration, February 15, 2021
- Testified at deposition, February 26, 2021
- Opinion concerning anticompetitive conduct issues
- Retained by Labaton Sucharow LLP and Robbins Gellar Rudman & Dowd LLP

**2020** *In Re Namenda Indirect Purchaser Antitrust Litigation*

- United States District Court Southern District of New York
- Case No. 1:15-CV-06549
- Expert Report, July 6, 2020
- Testified at deposition, July 23, 2020
- Expert Reply Report, September 21, 2020
- Opinion concerning class certification and damages issues regarding indirect purchasers
- Retained by Miller Law LLC and Safirstein Metcalf LLP

*In Re: Interior Molded Doors Antitrust Litigation*

- United States District Court for the Eastern District of Virginia Richmond Division
- Case No. 3:18-CV-00718-JAG
- Class Certification and Trial Expert Report, January 31, 2020
- Testified at deposition, March 4, 2020
- Class Certification and Trial Expert Reply Report, June 9, 2020
- Testified at deposition, July 16, 2020
- Opinion concerning class certification and damages issues
- Retained by Spector Roseman Kodroff & Willis, P.C., and Berger & Montague, P.C.

**2019**  *In Re Zetia (Ezetimibe) Antitrust Litigation*

- United States District Court for the Eastern District of Virginia Norfolk Division
- Case No. 2:18-MD-02836-RBS-DEM
- Expert Declaration, November 18, 2019
- Testified at deposition, December 20, 2019
- Expert Trial Declaration, January 13, 2020
- Expert Reply Declaration, February 20, 2020
- Testified at class certification hearing, May 1, 2020
- Expert Trial Reply Declaration, May 8, 2020
- Expert Supplemental Declaration, May 15, 2020
- Testified at deposition, June 9, 2020
- Opinion concerning class certification and damages issues
- Retained by Miller Law LLC and Motley Rice LLC

*GAËTAN ROY c. JTEKT Corporation & al. (Bearings/Roulements)*

- Cour Supérieure District de Québec
- Case No. 200-06-000159-130
- Expert Report, November 12, 2019
- Opinion concerning class certification issues
- Retained by Siskinds LLP, Sotos LLP

*First Impressions Salon, Inc., et al., v. National Milk Producers Federation, et al.*

- United States District Court for the Southern District of Illinois
- Case No. 3:13-cv-00454-NJR-SCW
- Expert Report, January 4, 2019
- Testified at deposition, February 13, 2019
- Expert Reply Report, May 3, 2019
- Testified at deposition, May 17, 2019
- Opinion concerning class certification and damages issues
- Retained by Barrett Law Group, NastLaw LLC, and Roberts Law Firm

*Sheridan Chevrolet Cadillac Ltd., et al., v. JTEKT Corporation, et al.*

- Ontario Superior Court of Justice
- Court File No. CV-13-478644-00CP
- Expert Report, January 2, 2019
- Opinion concerning class certification issues
- Retained by Sotos LLP

**2018**  *Sheridan Chevrolet Cadillac Ltd., et al., v. Hitachi Ltd., et al.*

- Ontario Superior Court of Justice
- Court File No. CV-14-506683-00CP
- Expert Report, October 4, 2018
- Opinion concerning class certification issues
- Retained by Sotos LLP

*In Re Suboxone Direct Purchaser Antitrust Litigation*

- United States District Court for the Eastern District of Pennsylvania
- Case No. 2:13-MD-02445-MSG
- Expert Report, September 18, 2018
- Testified at deposition, October 30, 2018
- Merits Expert Report, November 30, 2018
- Expert Rebuttal Report, January 11, 2019
- Testified at deposition, January 17, 2019
- Expert Merits Rebuttal Report, April 26, 2019
- Testified at deposition, June 12, 2019
- Opinion concerning class certification, merits, and damages issues
- Retained by Berger & Montague, P.C.; Garwin Gerstein & Fisher LLP; and Faruqi & Faruqi LLP

*William Rushing, et al. v. Williams-Sonoma, Inc., et al.*

- United States District Court Northern District of California, San Francisco Division
- Case No. 3:16-cv-01421-WHO
- Expert Report, July 25, 2018
- Opinion concerning class certification issues
- Retained by Rose Law Group, PC

*The Hospital Authority of Metropolitan Government of Nashville and Davidson County, Tennessee, et al. v. Momenta Pharmaceuticals, Inc., et al.*

- United States District Court Middle District of Tennessee Nashville Division
- Civil Action No. 15-cv-1100
- Testified at deposition, October 10, 2018
- Expert Report, June 22, 2018
- Expert Reply Report, September 21, 2018
- Testified at class certification hearing, May 13, 2019
- Declaration, May 21, 2019
- Expert Merits Report, May 24, 2019
- Declaration, June 18, 2019
- Expert Report, July 5, 2019
- Expert Supplemental Reply Report, July 5, 2019
- Testified at hearing, July 12, 2019
- Expert Merits Reply Report, July 29, 2019
- Testified at deposition, August 13, 2019
- Opinion concerning class certification and damages issues regarding indirect purchasers
- Retained by Lieff Cabraser Heimann & Bernstein, LLP

**2017** *Fady Samaha and Urlin Rent a Car Ltd. v. Yamashita Rubber Co., Ltd., et al.*

- Ontario Superior Court of Justice

- Court File No. CV-13-472262-00CP
- Expert Report, December 4, 2017
- Supplemental Report, July 13, 2018
- Expert Reply Report, January 23, 2020
- Testified at deposition, April 20, 2020
- Supplemental Report, September 30, 2020
- Opinion concerning class certification issues
- Retained by Siskinds LLP

*In Re Lamictal Direct Purchaser Antitrust Litigation*

- United States District Court New Jersey
- Case No. 1 2-95 -WHW-MCA
- Expert Report, November 6, 2017
- Revised Expert Reply Report, April 16, 2018
- Testified at deposition, June 6, 2018
- Opinion concerning class certification and damages issues
- Retained by Berger & Montague, P.C.

*In Re Namenda Direct Purchaser Antitrust Litigation*

- United States District Court Southern District of New York
- Case No. 1:15-CV-07488
- Expert Report, September 15, 2017
- Amended Expert Report, September 20, 2017
- Expert Reply Report, October 25, 2017
- Amended Expert Reply Report November 9, 2017
- Testified at deposition, October 6, 2017
- Opinion concerning class certification and damages issues
- Retained by Berger & Montague, P.C.; and Garwin Gerstein & Fisher LLP

*In Re Capacitors Antitrust Litigation*

- United States District Court Northern District of California San Francisco Division
- Case No. 3:14-CV-03264 -JD
- Expert Declaration, February 24, 2017
- Expert Reply Declaration, April 28, 2017
- Testified at deposition, May 17, 2017
- Expert Trial Declaration, November 30, 2018
- Expert Trial Reply Declaration, April 19, 2019
- Testified at deposition, May 23, 2019
- Expert Declaration, July 2, 2021
- Opinion concerning class certification issues regarding indirect purchasers
- Retained by Cotchett, Pitre & McCarthy, LLP

**2016**  *Deere Construction, LLC, v. Cemex Construction Materials Florida, LLC, et al.*

- United States District Court Southern District of Florida
- Case No. 15-24375-CIV-ALTONAGA/O'Sullivan
- Expert Report, September 14, 2016
- Testified at deposition, September 27, 2016
- Opinion concerning class certification issues
- Retained by Kozyak Tropin & Throckmorton, LLP; Harke Clasby & Bushman, LLP; and McCallum, Methvin & Terrell, P.C.

*Luke Begonja v. Wyndham Vacation Resorts, Inc., et al. (Case No. 2015-CA-010943)*

*Gerrit Brouwer, Jr., et al. v. Wyndham Vacation Resorts, Inc., et al. (Case No. 2014-CA-008533)*

*Gary Gottschalk, et al. v. Wyndham Vacation Resorts, Inc., et al. (Case No. 2015-CA-001957)*

*Susan Hatzipetro, et al. v. Wyndham Vacation Resorts, Inc., et al. (Case No. 2014-CA-007996)*

*Shelly Keegan, et al. v. Wyndham Vacation Resorts, Inc., et al. (Case No. 2015-CA-001953)*

*Yvonne Klebba, et al. v. Wyndham Vacation Resorts, Inc., et al. (Case No. 2014-CA-008535)*

*Adriane McConville, et al. v. Wyndham Vacation Resorts, Inc., et al. (Case No. 2015-CA-001960)*

*Ernest W. Yeager Jr., et al. v. Wyndham Vacation Resorts, Inc., et al. (Case No. 2014-CA-008054)*

- In the Circuit Court of the Ninth Judicial Circuit in and for Orange County, Florida
- Expert Report, September 14, 2016
- Testified at deposition, October 27-28, 2016
- Testified at deposition, March 2-3, 2017
- Expert Report, May 19, 2017
- Testified at deposition, August 29, 2017
- Opinion concerning damages issues
- Retained by Badham & Buck, LLC

*In Re: Evanston Northwestern Healthcare Corporation Antitrust Litigation*

- United States District Court for the Northern District of Illinois Eastern Division
- No. 07-C-4446
- Expert Report, July 28, 2016
- Expert Reply Report, January 25, 2017
- Testified at deposition, September 20, 2016
- Testified at deposition, February 22, 2017

- Opinion concerning damages issues
- Retained by Miller Law LLC

*In Re: Ductile Iron Pipe Fittings ("DIPF") Direct Purchaser Antitrust Litigation*

- United States District Court for the District of New Jersey
- Civ. No. 12-711 (AET)(LHG)
- Declaration, May 27, 2016
- Reply Declaration, March 31, 2017
- Testified at deposition, July 8, 2016
- Opinion concerning class certification, merits, and damages issues
- Retained by Cohen Milstein Sellers & Toll PLLC; and Kaplan Fox & Kilsheimer LLP

*Nestlé Purina Petcare Company v. Blue Buffalo Company, Ltd.*

*Blue Buffalo Company, Ltd. v. Nestlé Purina Petcare Company, et al.*

*Blue Buffalo Company, Ltd. v. Wilbur-Ellis Company, et al.*

*Diversified Ingredients, Inc. v. Wilbur-Ellis Company, et al.*

*Diversified Ingredients, Inc. v. Custom AG Commodities, LLC, et al.*

- United States District Court for the Eastern District of Missouri Eastern Division
- Cause No.: 4:14-CV-00859 RWS
- Affidavit, March 17, 2016
- Opinion concerning pricing issues
- Retained by Lashly & Baer, P.C.

*In Re: Cast Iron Soil Pipe and Fittings Antitrust Litigation*

- United States District Court Eastern District of Tennessee at Chattanooga
- Case No.: 1:14-md-2508
- Declaration, March 4, 2016
- Testified at deposition, May 19, 2016
- Opinion concerning class certification and damages issues
- Retained by Cohen Milstein Sellers & Toll PLLC; Cera LLP; and Kaplan Fox & Kilsheimer LLP

*Darren Ewert v. Denso Corporation, et al.*

- Supreme Court of British Columbia
- Case No. S-135610
- Expert Report, February 12, 2016
- Expert Reply Report, January 5, 2017
- Opinion concerning class certification issues
- Retained by Camp Fiorante Matthews Mogerman

*Serge Asselin v. Hitachi, LTD & al.*

- Cour Supérieure Disctirct de Québec

- Case No. 200-06-000180-144
- Expert Report, February 11, 2016
- Opinion concerning class certification issues
- Retained by Siskinds LLP

**2015** *Thomas Mervyn v. Atlas Van Lines, Inc., et al.*

- United States District Court Northern District of Illinois Eastern Division
- Case No. 1:13-CV-03587
- Expert Declaration, September 3, 2015
- Expert Report, February 4, 2016
- Opinion concerning data issues
- Opinion concerning damages issues
- Retained by Miller Law LLC

*Thomas Mervyn v. Nelson Westerberg, Inc.*

- United States District Court Northern District of Illinois Eastern Division
- Case No. 1:11-CV-06594
- Expert Report, July 27, 2015
- Opinion concerning damages issues
- Retained by Miller Law LLC

*Lane's Gifts and Collectibles, LLC v. Microsoft Online, Inc.*

- United States District Court Western District of Washington at Seattle
- No. 2:12-cv-01181-BJR
- Expert Report, March 23, 2015
- Testified at deposition, May 21, 2015
- Opinion concerning damages issues
- Retained by Nix, Patterson & Roach, L.L.P.; and Kessler Topaz Meltzer & Check, LLP

*BlueCross BlueShield of Tennessee, Inc., et al. v. King Pharmaceuticals, Inc., et al.*

- In the Circuit Court for Cocke County, Tennessee
- Civil Action No. 32941-II
- Expert Report, January 23, 2015
- Opinion concerning impact and damages issues
- Retained by Miller Law LLC

*In Re: Domestic Drywall Antitrust Litigation*

- United States District Court for the Eastern District of Pennsylvania
- MDL No. 2437 13-MD-2437
- Trial Expert Report, January 23, 2015
- Reply Expert Report, April 23, 2015
- Expert Report concerning class certification, August 3, 2016
- Expert Reply Report concerning class certification, January 9, 2017
- Affidavit, July 11, 2019

- Testified at deposition, February 25, 2015
- Testified at deposition, August 30, 2016
- Testified at deposition, February 17, 2017
- Testified at class certification hearing, April 27, 2017
- Expert Supplemental Report, July 31, 2017
- Opinion concerning merits issues regarding direct purchasers
- Opinion concerning class certification issues, impact and damages regarding direct purchasers
- Retained by Cohen Milstein Sellers & Toll PLLC; Berger & Montague, P.C.; and Spector Roseman Kodroff & Willis, P.C.

*In Re: Processed Egg Products Antitrust Litigation*

- United States District Court for the Eastern District of Pennsylvania
- MDL No. 2002
- Expert Declaration, January 22, 2015
- Expert Reply Declaration, April 3, 2015
- Testified at deposition, May 7, 2015
- Opinion concerning merits and damages issues regarding indirect purchasers
- Retained by Straus & Boies, LLP

**2014**  *In Re: Class 8 Transmission Indirect Purchaser Antitrust Litigation*

- United States District Court for the District of Delaware
- Civil Action No. 11-cv-00009 (SLR)
- Declaration, November 3, 2014
- Reply Declaration, March 6, 2015
- Trial Declaration, March 27, 2015
- Trial Reply Declaration, July 2, 2015
- Testified at deposition, December 17, 2014
- Testified at deposition, March 16, 2015
- Testified at class certification hearing, March 25, 2015
- Testified at deposition, May 1, 2015
- Opinion concerning class certification issues regarding indirect purchasers
- Opinion concerning merits and damages issues regarding indirect purchasers
- Retained by Glancy Binkow & Goldberg LLP

*Mark S. Wallach, et al., v. Eaton Corporation, et al.*

- United States District Court District of Delaware
- Civil Action No. 10-260-SLR
- Expert Report, November 3, 2014
- Expert Reply Report, March 6, 2015
- Trial Expert Report, March 27, 2015
- Trial Expert Reply Report, July 2, 2015
- Testified at deposition, December 16, 2014
- Testified at deposition, March 16, 2015

- Testified at class certification hearing, March 25, 2015
- Testified at deposition, May 1, 2015
- Opinion concerning class certification issues regarding direct purchasers
- Opinion concerning merits and damages issues regarding direct purchasers
- Retained by Cohen Milstein Sellers & Toll PLLC

*Sheridan Chevrolet Cadillac Ltd., et al., v. Furukawa Electric Co. Ltd., et al.*

*Sheridan Chevrolet Cadillac Ltd., et al., v. Mitsubishi Electric Corporation, et al.*

- Ontario Superior Court of Justice
- Court File Nos. CV-12-446737-00CP / CV-14-496994-00CP
- Expert Report, April 15, 2016
- Expert Report, October 14, 2014
- Opinion concerning class certification issues
- Retained by Siskinds LLP

*Resco Products, Inc., v. Bosai Minerals Group Co., Ltd., et al.*

- United States District Court for the Western District of Pennsylvania
- Civil Action No.: 2:06-cv-235-JFC
- Expert Report, September 24, 2008
- Expert Report, September 29, 2014
- Supplemental Expert Report, December 15, 2014
- Testified at deposition, February 13, 2015
- Opinion concerning damages
- Retained by Boies, Schiller & Flexner LLP

*Fond Du Lac Bumper Exchange Inc., et al. v. Jui Li Enterprise Company Ltd. et al.*

- United States District Court Eastern District of Wisconsin
- Case No.: 2:09-cv-00852-LA
- Affidavit, August 1, 2014
- Affidavit, November 4, 2014
- Declaration, April 24, 2015
- Expert Report, July 15, 2015
- Expert Reply Report, November 24, 2015
- Expert Surreply Report, January 15, 2016
- Expert Trial Report, August 18, 2016
- Expert Trial Reply Report, December 20, 2016
- Testified at deposition, October 1, 2015
- Testified at deposition, February 13, 2017
- Opinion concerning class certification and damages issues
- Opinion concerning Defendants' replacement data
- Opinion concerning Defendant and LKQ transaction-level data
- Opinion concerning merits and damages issues
- Retained by Stueve Siegel Hanson, LLP

*Meredith Corporation, et al., v. SESAC, LLC, et al.*

- United States District Court for the Southern District of New York
- 09 Civ. 9177 (PAE)
- Expert Report, July 10, 2014
- Opinion concerning class certification issues
- Retained by Weil, Gotshal & Manges LLP

*Janet Skold, et al., v. Intel Corporation, et al.*

- Superior Court of the State of California for the County of Santa Clara
- Case No. 1-05-CV-039231
- Expert Report, June 14, 2007
- Testified at deposition, August 31, 2007
- Testified at deposition, January 10, 2014
- Opinion concerning class certification issues
- Opinion concerning damages issues
- Retained by Girard Gibbs LLP

*In Re: Polyurethane Foam Antitrust Litigation*

- United States District Court Northern District of Ohio Western Division 8
- MDL No. 2196
- Declaration, June 11, 2013
- Reply Declaration, October 23, 2013
- Trial Declaration, March 18, 2014
- Reply Trial Declaration, June 30, 2014
- Testified at deposition, August 20, 2013
- Testified at deposition, November 20, 2013
- Testified at class certification hearing, January 15, 2014
- Testified at deposition, April 14, 2014
- Testified at deposition, July 14, 2014
- Opinion concerning class certification issues regarding indirect purchasers
- Opinion concerning merits and damages issues
- Retained by Miller Law LLC

## Professional Experience

### Economic Consulting Positions

**Monument Economics Group**, Oct. 11, 2016 - Present

**Nathan Associates, Inc.**, Arlington, VA, *Senior Vice President*, Jan. 2013 – Sep. 20, 2016

**Advanced Analytical Consulting Group, Inc.**, Washington, DC, *Principal*, Mar. 2011– Jan. 2013

**Econ One Research, Inc.**, Washington, DC, Managing Director and DC Office Head, Jul. 2006 – Mar. 2011

- Opened and staffed the DC office; managed office affairs on a daily basis
- Retained as an expert witness for damages and class certification issues in antitrust, breach of contract, product liability and RICO cases; representative testimony includes determination of liability and damages in a case involving resale price maintenance in consumer products, class certification in a horizontal price-fixing case involving international travel in the airline industry, class certification in a consumer class action involving RICO claims in state court
- Industry pre-litigation analyses for consumer products, chemicals, and other industries

**Navigant Consulting, Inc.**, Washington, DC, *Associate Director*, Feb. 2006 – Jul. 2006

- Case manager for damages analysis in asbestos litigation and personal injury claims

**Nathan Associates, Inc.**, Arlington, VA, *Managing Economist*, Jul. 2004 – Feb. 2006

- Case manager for economic analysis of class certification and damages issues in antitrust and RICO cases involving the chemical, consumer products, and tobacco industries
- Retained as expert on damages for direct purchasers of NBR in the Crompton Global Settlement; submitted an Affidavit on damages and appeared before the Special Master for the Crompton Global Settlement (the Hon. Kenneth Feinberg)

## Board Membership

- Board of Advisors, American Antitrust Institute, Washington, DC
- Department of Economics Advisory Council, University of Tennessee, Knoxville, Chairman, Spring 2006 – April 2011

## Teaching Positions

- The University of Tennessee, Knoxville, *Adjunct Professor*, Spring 2019 – present
- The George Washington University, Washington, DC, *Adjunct Assistant Professor of Economics*, Fall 2004 – present
- North Carolina State University (NCSU), *Assistant Professor* (Department of Agricultural and Resource Economics), Fall 1999 – Spring 2004
- The University of Pennsylvania, *Adjunct Instructor*, Summer 1990 – Spring 1994

## Additional Teaching Experience

- The Wharton School Evening Division, Philadelphia, PA, summer 1993
- Rutgers University, Camden, NJ, summer 1993
- Philadelphia College of Textiles and Science, Philadelphia, PA, fall 1992
- The Pennsylvania State University, Media, PA, 1991
- St. Mary's College of Maryland, St. Mary's City, MD, summer 1989

- The University of Maryland University College, College Park, MD, 1988-1989

**Courses Taught**

- Managerial Economics for MBA students (George Washington University)
- Law and Economics (George Washington University)
- Intermediate Microeconomics – graduate level (George Washington University)
- Latin American Economic Development (George Washington University)
- International Trade: Theory and Policy (George Washington University)
- International Finance: Theory and Policy (George Washington University)
- Agricultural Production and Supply – Ph.D. field course (North Carolina State University)
- U.S. Agricultural Policy (North Carolina State University)
- Microfinance: Theory, Practice and Regulation (Superintendencia de Banca y Seguros)
- Statistical Analysis for Economics (University of Pennsylvania)
- Principles of Microeconomics (University of Maryland, St. Mary's College of Maryland)
- Principles of Macroeconomics (University of Pennsylvania, The Wharton School, Penn State University)
- Fundamentals of Micro/Macro Economics (University of Maryland)
- Environmental and Natural Resource Economics (Rutgers)

**Federal Reserve Experience**

Federal Reserve Bank of Kansas City, *Senior Economist* Jan. 1998 – Aug. 1999; *Economist*, Jan. – Dec. 1997

- Analysis of regional, macroeconomic developments in agriculture, and energy
- Research on public policy towards agriculture in the U.S., especially the impact of farm policy reform
- Briefings to the Bank president and outside groups on the regional economy, agriculture, agricultural trade

Board of Governors of the Federal Reserve System, *Economist*, Jun. 1994 – Dec. 1996

- Analysis of macroeconomic conditions, commodity markets, and prices (CPI, PPI, Core prices)
- Forecasting of agricultural output, prices, and income
- Briefings to the Board of Governors on agriculture and food-price developments

## Other Consulting Experience

World Perspectives, Inc., 2003 - 2004

- Analysis of trade barriers for U.S. exports of feed ingredients, pet food ingredients, and food ingredients
- Analysis of the impact of a Free Trade Area of the Americas on U. S. soybean producers
- Analysis of the potential for U.S. Halal-certified meat exports to the Middle East

Womble Carlyle Sandridge & Rice, LLP, 2003 - 2004

- Provided expert testimony related to the estimation of business profitability Smith-Moore, 2002 - 2003
- Provided economic analysis of the U.S. Tobacco Program

Superintendencia de Banca y Seguros (Lima, Peru), 1998 - 2000

- Developed and taught a class on Microfinance issues (in English) to students enrolled in a training program for bank examiners; the program was sponsored by the Inter-American Development Bank.

World Bank, Africa Technical Department, 1992 – 1993

- Summarized and provided an overview of data available on African economic and social indicators

ACG-Afrique, January 1993

- Provided critical review of a study document outlining the impact of structural adjustment on African agriculture

## Professional Organizations

- National Association for Business Economics
- American Economic Association

## Papers, Publications, and Speeches

## Papers Published in Refereed Journals

- "Losing the Forest for the Trees: On the Loss of Economic Efficiency and Equity in Federal Price-Fixing Class Actions," (with Martin A. Asher and Gregory K. Arenson) *Virginia Law & Business Review*, Vol. 16, No. 2, Spring 2022, 293-325
- "Government Regulation and Quality in the U.S. Beef Market," (with Peyton Ferrier) *Food Policy*, Vol. 32, No. 1, February 2007, 84-97
- "Rent-seeking in U.S.-Mexican Avocado Trade," *Cato Journal*, Vol. 26, No. 1, December 2006, 159-177

- "Consolidation in U.S. Agriculture and the Role of Public Policy," *The ICFAI Journal of Agricultural Economics,* Vol. 1, 2004, 7-16

- "Fertilizer Use, Risk, and Off-farm Labor Markets in the Semi-Arid Tropics of India," *American Journal of Agricultural Economics,* Vol. 85, No. 2, May 2003, 359-371

- "Inverse Productivity: Land Quality, Labor Markets, and Measurement Error," *Journal of Development Economics,* Vol. 71, No. 1, June 2003, 71-95

- "A Market-Forces Policy for the New Farm Economy?" *Review of Agricultural Economics,* Vol. 24, No. 1, 1 March 2002, 15-30

- "Food Crops, Exports, and the Short-run Policy Response of Agriculture in Africa," *Agricultural Economics,* Vol. 22, No. 3, April 2000, 271-298

- "FAIR Act Implications for Land Values in the Corn Belt," (with Jason Henderson) *Review of Agricultural Economics,* Vol. 22, No. 1, Summer – Spring 2000, 102-119

- "Why are Estimates of Agricultural Supply Response So Variable?" (with Francis X. Diebold) *Journal of Econometrics,* Vol. 76, No. 1-2, January – February 1997, 367-373

**Non-refereed Publications, Articles, and Editorials**

- "The Predominance Requirement for Antitrust Class Actions – Can Relevant Market Analysis Help?" (with Jeffrey Leitzinger) American Bar Association – Section of Antitrust Law, *Economics Committee Newsletter,* Vol. 7, No. 1, Spring 2007, 17-22

- "Reform of U.S. Farm Policy in an Integrating World Economy," *Developing Countries in the WTO System,* 2006

- "New Farm Economy," *Regulation,* Winter 2003-2004, Cato Institute for Public Policy Research, 2003

- "What Road Will U.S. Economy Take in 2003?" *Southeast Farm Press,* 5 February 2003

- "Fast Track for the Tax Cuts," guest editorial, *News and Observer,* 18 January 2003

- "The 2002 Farm Bill," (with Blake Brown and Michele Marra) *NC State Economist,* November – December 2002

- "Economy-minded Tax Cuts: Bush's Reductions Provided the Boost to Lift U.S. From Recession," guest editorial, *News and Observer,* 2 July 2002

- "Policy Only Effective if Farm Economy is Recognized," special report to *Feedstuffs,* 5 June 2000

- "Aid During Crisis of Little Long-term Help to Farmers," guest editorial, *Kansas City Star,* 23 August 1999

- "Survey of Agricultural Credit Conditions," Federal Reserve Bank of Kansas City," *Regional Economic Digest,* various issues, 1997-1999

- "U.S. Agriculture at the Crossroads in 1999," *Economic Review,* Federal Reserve Bank of Kansas City, Vol. 84, No. 1, 1999, 73-91

- "Can U.S. Oil Production Survive the 20th Century?" *Economic Review,* Federal Reserve Bank of Kansas City, Vol. 84, Quarter I, 1999

- "Will the Tenth District Catch the Asian Flu?" (with Ricardo Gazel) *Economic Review,* Federal Reserve Bank of Kansas City, Vol. 83, Quarter II, 1998, 9-26

- "From the Plains to the Plate: Can the Beef Industry Regain Market Share?" (with Michelle Beshear) *Economic Review,* Federal Reserve Bank of Kansas City, Vol. 83, Quarter IV, 1998, 49-66

- "U.S. Agriculture: Another Solid Year in 1998?" (with Mark Drabenstott) *Economic Review,* Federal Reserve Bank of Kansas City, Vol. 83, No. 1, Quarter I, 1998, 55-74

- "How Will the 1996 Farm Bill Affect the Outlook for District Farmland Values?" *Economic Review,* Federal Reserve Bank of Kansas City, Vol. 82, Quarter IV, 1997, 85-101

- "Food Prices and the Farm Sector," monthly *Greenbook,* Federal Reserve Board of Governors, various issues 1994-1996

- "Hedge to Arrive Contracts," Memo to the Board of Governors, Federal Reserve Board of Governors, 5 June 1996

- "Prices in the May Greenbook," Federal Reserve Board of Governors, 19 May 1996

- "Prices in the March Greenbook," Federal Reserve Board of Governors, 24 March 1996

- "Commodity Price Developments," Weekly memo to the Board of Governors, Federal Reserve Board of Governors, August 1994 – December 1996

**Conference Presentations**

- "Class Action Developments," panelist at the American Antitrust Institute's 6th Annual Private Antitrust Enforcement Conference, Washington, DC: 4 December 2012

- "Consequences for Antitrust Thought and Practice," presented at the American Antitrust Institute Invitational Symposium: Antitrust Challenge of Multi-Channel Distribution in the Internet Age, Washington, DC: 22 June 2011

- "The U.S. Economy in the Year Ahead," presented at the Long Company Annual Conference, Chicago, IL: 11 September 2009 and 19 September 2008

- "The U.S. Economic Outlook," presented at the Industry Outlook Conference, Chicago, IL: 17 October 2006 and 18 October 2005

- "How Will the Economy Impact Your Business?" presented at the Long Company Annual Conference, Las Vegas, NV: 14 August 2004

- "Focus on The Economy" presented at *Milling and Baking News* Annual Purchasing Managers' Conference, Kansas City, MO: 14 June 2004, 10 June 2003 and 11 June 2002

- "The U.S. Economic Outlook and Agriculture," presented at the Industry Outlook Conference, Chicago, IL: October 2003

- "The U.S. Economic Outlook and Agriculture," presented at the Industry Outlook Conference, Breckenridge, CO: 7 April 2002

- "The U.S. Economic Outlook: The Cost of Terror," presented at the Southern Agricultural Outlook Conference, Atlanta, GA: 24 September 2001

- "The Economy in Focus," presented at *Milling and Baking News* annual purchasing managers' conference, Kansas City, MO: 5 June 2001

- "The Great American Growth Machine," presented at the Southern Agricultural Outlook Conference, Atlanta, GA: 27 September 2000

- "The Economy in Focus," presented at *Milling and Baking News* annual purchasing managers' conference, Kansas City, MO: 6 June 2000

- "The Outlook for the U.S. Pork Sector," presented to the Industry Outlook Conference, Las Vegas, NV: 17 April 2000

- "The National Economic Outlook: The Road Ahead," presented to the Food Industry Outlook Conference, Breckenridge, CO: 11 April 1999

- "Farm Policy for the New Millennium," presented to Federal Reserve Bank of Kansas City, Division of Bank Supervision and Regulation, Bank Examiners' Annual Training Conference, 7 January 1999

- "The Impact of the 1996 Farm Bill on Farmland Values," (with Jason Henderson) first place poster presentation at the annual meetings of the American Agricultural Economics Association, Salt Lake City, UT: 4 August 1998

- "A Note on the Inverse Productivity Relationship," presented at the annual meetings of the Western Economic Association International, Seattle, WA: July 1997

- "Off-farm Labor Supply and Fertilizer Use in the Semi-Arid Tropics of India," presented at the annual meetings of the American Agricultural Economics Association, August 1995

- "Prices for Food-Away-From-Home and Core Inflation: Some Empirical Relationships," (with James E. Kennedy) presented at the Federal Reserve System Committee on Agriculture, Richmond, VA: October 1995

- "Some Simple Dynamics of Farming," presented at the annual meetings of the American Agricultural Economics Association, Orlando, FL: August 1993

- "Structural Adjustment and Food Security," (with W. Graeme Donovan), presented at the annual meetings of the American Agricultural Economics Association, Orlando, FL:  August 1993

- "Structural Adjustment and African Agricultural Supply Response to Exchange Rate and Price Movements," (with W. Graeme Donovan), presented at the annual meetings of the Southern Agricultural Economics Association, Tulsa, OK: January 1993

**Other Presentations**

- Panelist, "Injured V. Non-Injured In Class Actions," American Bar Association, 18 October 2022

- Panelist, "If I Am Uninjured, Do I Not Bleed? The Packaged Seafood Decision," American Bar Association Webinar, 22 June 2022

- Panelist, "Antitrust Class Actions – Where Are We? A 360 Degree Perspective," NYSBA Annual Antitrust Law Section Meeting," 30 January 2014

- Panelist, Retrospective on the Baby Products Litigation, ABA Section of Antitrust Law: Pricing Conduct Committee, 31 July 2013

- Panelist, Economic Forecasting Summit, Northern Indiana Workforce Investment Board, Inc., 29 March 2007

- "The Welfare Benefits of USDA Beef Quality Certification Programs" (with Peyton Ferrier), presentation memo, 2007

- "Reform of U.S. Farm Policy in an Integrating World Economy," presented to the Cordell Hull Institute, Trade Policy Roundtable on Reform of U.S. Farm Policy and the WTO System, Washington, DC: 31 March 2006

- "The Case for a Market-forces Farm Policy in the U.S." presented at the Cordell Hull Institute Trade Policy Roundtable, Washington DC: 26 May 2005

- "How Will the Economy Impact Your Business?" presented at the Apple Processors Association annual meeting, Homewood Resort, 20 June 2004

- "The U.S. and International Economic Outlook," presented at the AgFirst Loan Officer's Seminar, Atlanta, GA: 30-31 October 2002

- "Will the U.S. Economy Bounce or Crawl?" presented to the Eastern Bankruptcy Institute, North Myrtle Beach, SC: 1 June 2002

- "The U.S. Economic Outlook and Agriculture," presented to the National Pork Producers Pork Action Group, Washington, DC: 10 April 2002

- "The U.S. Economic Outlook" presented to the Risk Management Associates, Raleigh, NC: 7 February 2002

- "The U.S. Economic Outlook: The Cost of Terror," presented at the National Pork Producers Pork Action Group, Marco Island, FL: 14 November 2001

- "Consolidation in Agriculture and the Role of Public Policy," paper presented to the Southern Extension Meetings, Williamsburg, VA: 13 June 2000

- "The New Farm Economy," presented at the annual meetings of the National Association of County Agricultural Agents, Omaha, NE: 14 September 1999

- "Regional Economic Update," presented to bankers in Kansas, Nebraska, Missouri, and Oklahoma as part of the Regulatory Update Seminar, Federal Reserve Bank of Kansas City, April 1999

- "The National Economic Outlook," presented to Oklahoma State University Advanced Cattle Management Seminar, Stillwater, OK: 11 March 1999
- "Regional Economic Update," presented to Thomas Hoenig, President, Federal Reserve Bank of Kansas City, 13 November 1998
- "Can the Tenth District Survive the Asian Flu?" The Federal Reserve Bank of Kansas City Economic Forums, nine presentations to bankers in Wyoming, Oklahoma, and New Mexico, 21 September – 21 October 1998
- "The Impact of Asian Economic Developments on Tenth District Agriculture," presented to Thomas Hoenig, President, Federal Reserve Bank of Kansas City, 30 January 1998
- "The Outlook for the Nebraska Economy," The Federal Reserve Bank of Kansas City: Nebraska Economic Forums, six presentations to bankers in Nebraska, 6-15 October 1997
- "Update on the Macroeconomy and Special Briefing on Forecast Performance at the Kansas City Fed," presented to Thomas Hoenig, President, Federal Reserve Bank of Kansas City, 13 August 1997
- "Regional Economic Update," presented to Thomas Hoenig, President, Federal Reserve Bank of Kansas City, 14 May 1997 and 21 March 1997
- "Producer Prices, Retail Sales, and Agricultural Commodity Markets," presented to the Board of Governors of the Federal Reserve System, 15 July 1996

**Referee Experience**

**Referee for the Following Academic Journals**

- World Development, 1993
- Journal of Development Economics, 1994, 1995
- International Economic Review, 1995
- Journal of Human Resources, 1997
- Journal of Business and Economics Statistics, 1997
- American Journal of Agricultural Economics, 1999, 2001, 2002
- Agricultural Economics, 2000, 2001, 2004
- Agricultural Finance Review, 2000, 2004
- Review of Agricultural Economics, 2000, 2002, 2004
- Journal of Agricultural and Resource Economics, 2000, 2001, 2002
- Emerging Markets Review, 2001
- Contemporary Economic Policy, 2004

**Fellowships, Honors, and Awards**

<u>**Fellowships**</u>

- Departmental Fellowship, University of Pennsylvania, 1989-1990
- Dean's Fellowship, University of Pennsylvania, 1991-1992
- Graduate School Fellowship, University of Maryland, College Park, 1987-1989

<u>**Honor Societies and Professional Organizations**</u>

- Phi Eta Sigma National Honor Society
- Mortar Board National Honor Society
- Golden Key National Honor Society
- Vice President for Professional Activities, Delta Sigma Pi

<u>**Awards**</u>

- Top Graduate in Liberal Arts, University of Tennessee, Knoxville, Spring 1987
- Chancellor's Citation for Extraordinary Professional Promise, University of Tennessee, Knoxville
- Chancellor's Citation for Outstanding Academic Achievement, University of Tennessee, Knoxville
- First place poster presentation, American Agricultural Economics Association annual meetings, August 1998 (with Jason Henderson)
- Honorable mention, American Agricultural Economics Association, Essay for the 21st Century, 2001, "A Market Forces Policy for the New Farm Economy"
- Honorable mention, American Antitrust Institute Antitrust Enforcement Awards, Outstanding Antitrust Litigation Achievement in Economics (for work in *In Re Titanium Dioxide Antitrust Litigation*)
- American Antitrust Institute Antitrust Enforcement Awards, Outstanding Antitrust Litigation Achievement in Economics (for work in *In Re Domestic Drywall Antitrust Litigation*)
- American Antitrust Institute Antitrust Enforcement Awards, Outstanding Antitrust Litigation Achievement in Economics (for work in *In Re Namenda Direct Purchaser Antitrust Litigation*)

<u>**External Funding**</u>

- "Unmanufactured Flue-Cured Tobacco Exports and the Export Component of the Quota Formula." $13,890 NC Tobacco Foundation. With Blake Brown 2000 – 2001.

**Professional Activities and Services**

**<u>Graduate Student Advising</u>**

M.A. degree, North Carolina State University

- Joe Weinberg (Political Science)

Master of Economics, North Carolina State University

- William Pole (2000)
- Dwight Wilder (Chairman, 2002)
- Adrian Atkeson (2002)
- Sarah Spivey
- Li Zhang (Chairman, 2003)
- Nia Atmadja (2003)

Doctor of Philosophy, North Carolina State University

- William Deese (2003)
- Peyton Ferrier (Chairman, 2004)
- Yang Wang (2003)
- Bobby Huggett (2003)
- Syed Wadood (Chairman, 2004)
- Henry Kuo

**Economic and Statistical Modeling Skills**

- Experience with all major statistical software including SAS, STATA, LIMDEP and C++; applied econometric modeling skills in damage analysis of consumer industries, chemicals industries, and agricultural markets, correlation analysis for class certification.

# Appendix B

## Materials Relied Upon

### Pleadings and Legal Correspondence

U.S. Supreme Court, *Jefferson Parish Hospital District No. 2 et al. v. Hyde*, 466 U.S., No. 82-1031, March 27, 1984.

United States District Court for the Northern District of Florida, *Restore Robotics LLC and Restore Robotics Repair LLC v. Intuitive Surgical, Inc.,* No, 5:19-cv-00055-MCR-MJF, First Amended Complaint, May 13, 2019.

United States District Court Northern District of California, *Surgical Instrument Service Company, Inc., Plaintiff, v. Intuitive Surgical, Inc.,* Defendant, Case No.: 5:21-cv-03496, Complaint, May 10, 2021.

### Deposition Transcripts and Exhibits

30(b)(6) Deposition of Bob DeSantis, May 27, 2021.

30(b)(6) Deposition of Glen Papit, June 2, 2021.

30(b)(6) Deposition of Greg Posdal, November 1, 2022.

30(b)(6) Deposition of Keith Robert Johnson, October 27, 2022.

30(b)(6) Deposition of Marshall Mohr, November 7, 2022.

Individual & 30(b)(6) Deposition of Nicky Goodson, October 27, 2022.

Deposition of Anthony McGrogan, June 7, 2021.

Deposition of Antonio (AJ) Inacay, June 8, 2021.

Deposition of Bob Overmars, June 15, 2021.

Deposition of Chris Gibson, June 22, 2021.

Deposition of Dan Jones, November 10, 2022.

Deposition of David Mixner, June 10, 2021.

Deposition of Edward W. Harrich, May 24, 2021.

Deposition of Glenn Vavoso, May 14, 2021.

Deposition of Grant Duque, November 8, 2022.

Deposition of Greg Posdal, May 10, 2021.

Deposition of Katie Scoville, May 26, 2021.

Deposition of Myriam Curet, MD, May 7, 2021.

Deposition of Ronald Lee Bair, Jr., May 24, 2021.

Deposition of Stacey Donovan, May 27, 2021.

Deposition of Tyler McDonald, May 7, 2021.

**Bates-Stamped Materials**

Documents

| | | |
|---|---|---|
| Intuitive-00001237 | Intuitive-00110473 | Intuitive-00366044 |
| Intuitive-00011487 | Intuitive-00113020 | Intuitive-00372699 |
| Intuitive-00014395 | Intuitive-00121229 | Intuitive-00552993 |
| Intuitive-00029346 | Intuitive-00124485 | Intuitive-00594883 |
| Intuitive-00049108 | Intuitive-00133628 | Intuitive-00595405 |
| Intuitive-00073538 | Intuitive-00139149 | Intuitive-00595673 |
| Intuitive-00091257 | Intuitive-00141567 | Intuitive-00601672 |
| Intuitive-00102938 | Intuitive-00173706 | Intuitive-00602576 |
| Intuitive-00103456 | Intuitive-00194074 | Intuitive-00604054 |
| Intuitive-00106127 | Intuitive-00234762 | Intuitive-00604123 |
| Intuitive-00110252 | Intuitive-00292544 | Intuitive-00604127 |
| Intuitive-00110451 | Intuitive-00364420 | Intuitive-00686068 |

**Third-Party Materials**

Academic Literature

A.P. Lerner, "The Concept of Monopoly and the Measurement of Monopoly Power," *The Review of Economic Studies*, Vol. 1, No.3, 1934, 157-175.

Abhishek Trehan and Tristan J. Dunn, "The robotic surgery monopoly is a poor deal," *The BMJ*, Vol. 347, December 19, 2013, 1-2.

Andrew Brodie and Nikhil Vasdev, "The future of robotic surgery: How robotics could help shape the future of surgical care," *Annals of the Royal College of Surgeons of England*, September 4, 2018.

Anthony R. Lanfranco, BAS, Andres E. Castellanos, MD, Jaydev P. Desai, PhD, and William C. Meyers, MD, "Robotic Surgery: A Current Perspective," *Annals of Surgery*, Vol. 239, No. 1, January 2004, 14-21.

Dennis Carlton and Jeffrey Perloff, *Modern Industrial Organization*. Fourth Edition Global, Reading, MA: Addison Wesley, 2015.

Herbert Hovenkamp, *The Antitrust Enterprise*, Cambridge, MA: Harvard University Press, 2005.

Ioannis D. Gkegkes, Ioannis A. Mamais, and Christos Iavazzo, "Robotics in general surgery: A systematic cost assessment." *Journal of Minimal Access Surgery*, Vol. 13, No. 4, 2017, 243-255.

Jaydeep H Palep, "Robotic assisted minimally invasive surgery," *Journal of Minimal Access Surgery*, Vol.5, No.1, January-March 2009, 1-7.

Jonathan E. Duchac, James M. Reeve, and Carl S. Warren, *Financial and Managerial Accounting*, Twelfth Edition, Mason, OH: South-Western Cengage Learning, 2014.

Jusuf Jamal, Abdulrahman M. Alshahrani, Jamal M. Arif, Feras M. Almarshad, "Robots in Cancer Surgery: A Boon or Bane," *Journal of Cancer Therapy*, Vol. 11, No. 12, December 2020, 803-823.

Katherine Levinson, "Robotic Assisted Surgery," *Electrical and Computer Engineering Design Handbook*, 2015.

Mahdi Azizian, May Liu, Iman Khalaji, and Simon DiMaio, "Chapter 1: The Da Vinci Surgical System," *The Encyclopedia of Medical Robotics*, Vol. 1, October 2018, 3-28.

Nicholas Economides, "Tying, bundling, and loyalty/requirement rebates," *Research Handbook on the Economics of Antitrust Law*, Einer Elhauge (Ed.), Edward Elgar, 2012, 121-143.

Pradeep P. Rao, "Robotic surgery: new robots and finally some real competition!," *World Journal of Urology*, Vol. 36, No. 4, April 2018, 537-541.

Rafael E. Perez and Steven D. Schwaitzberg, "Robotic surgery: finding a value in 2019 and beyond," *Annals of Laparoscopic and Endoscopic Surgery*, Vol. 4., May 30, 2019.

Richard A. Posner, *Antitrust Law*. Second Edition, Chicago, IL: The University of Chicago Press, 2001.

Robert S. Pindyck and Daniel L. Rubinfield, *Microeconomics*, Eighth Edition, Upper Saddle River, New Jersey: Pearson Education, 2013.

Sally Kathryn Longmore, Ganesh Naik, and Gaetano D. Gargiulo, "Laparoscopic Robotic Surgery: Current Perspective and Future Directions," *Robotics*, Vol. 2, No. 9, 2020.

Tim Lane, "A short history of robotic surgery," *Annals of the Royal College of Surgeons of England*, 2018.

William E. Kelley, "The Evolution of Laparoscopy and the Revolution in Surgery in the Decade of the 1990s," *Journal of The Society of Laparoscopic & Robotic Surgery*, 2008, 351-357.

Zheng Wang, Sicong Liu, Jing Peng, and Michael Zhiqiang Chen, "The Next-Generation Surgical Robots," *Intech Open*, 2017, 3-21.

SEC Filings

Asensus Surgical, Inc., SEC Form 10-K, filed on March 11, 2021.

Intuitive Surgical, Inc., SEC Form 10-K, filed March 16, 2005.

Intuitive Surgical, Inc., SEC Form 10-K, filed March 15, 2006.

Intuitive Surgical, Inc., SEC Form 10-K, filed January 29, 2010.

Intuitive Surgical, Inc., SEC Form 10-K, filed February 1, 2011.

Intuitive Surgical, Inc., SEC Form 10-K, filed February 6, 2012.

Intuitive Surgical, Inc., SEC Form 10-K, filed February 4, 2013.

Intuitive Surgical, Inc., SEC Form 10-K, filed February 3, 2014.

Intuitive Surgical, Inc., SEC Form 10-K, filed February 2, 2016.

Intuitive Surgical, Inc., SEC Form 10-K, filed February 6, 2017.

Intuitive Surgical, Inc., SEC Form 10-K, filed February 2, 2018.

Intuitive Surgical, Inc., SEC Form 10-K, filed February 7, 2020.

Intuitive Surgical, Inc., SEC Form 10-K, filed February 10, 2021.

Intuitive Surgical, Inc., SEC Form 10-K, filed February 3, 2022.

Intuitive Surgical, Inc., SEC Form 10-Q, filed October 21, 2022.

TransEnterix Inc., SEC Form 10-K, filed on March 18, 2018.

TransEnterix Inc., SEC Form 10-K, filed on February 27, 2019.

Correspondence

Telephone conversation with Mr. Philip J. Phillips, dated December 1, 2022.

Press Release

"TransEnterix Announces Name Change to Asensus Surgical and Introduces a New Category of Surgery, Performance-Guided Surgery," *Business Wire*, February 23, 2021. Available at: https://www.businesswire.com/news/home/20210223005444/en/TransEnterix-Announces-

Name-Change-to-Asensus-Surgical-and-Introduces-a-New-Category-of-Surgery-Performance-Guided-Surgery.

Government Agency Publications

FDA, "FDA's Role in Regulating Medical Devices." Available at: https://www.fda.gov/medical-devices/home-use-devices/fdas-role-regulating-medical-devices.

FDA, "What We Do." Available at: https://www.fda.gov/about-fda/what-we-do.

FDA, Letter to Iconocore Health, "RE: K210478," dated November 15, 2022. Available at https://www.accessdata.fda.gov/cdrh_docs/pdf21/K210478.pdf.

U.S. Department of Justice and the Federal Trade Commission, "Horizontal Merger Guidelines," August 19, 2010.

United States Department of Justice, Competition and Monopoly: Single-Firm Conduct Under Section 2 of the Sherman Act, 2008.

Industry Research and Company Materials

Candi Helseth, "Technology Widens Care Options for Rural Hospitals," *The Rural Monitor*, February 12, 2014.

Daren Fonda, "Intuitive Surgical Faces New Competition and FDA Concerns," *Barrons*, March 18, 2019. Available at: https://www.barrons.com/articles/intuitive-surgical-faces-new-competition-and-fda-concerns-51552903200.

Enlightened Capital, "Intuitive Surgical (SRG) Investment Analysis," December 10, 2020. Available at: https://enlightenedcapital.substack.com/p/intuitive-surgical-isrg-investment?utm_source=profile&utm_medium=reader2.

Intuitive Surgical, "da Vinci Xi/X Instrument & Accessory Catalog," January 2019. Available at: https://www.intuitive.com/en-us/-/Media/ISI/Intuitive/pdf/davinci-x-xi-instrument-accessory-us-catalog-1052082.pdf.

Intuitive Surgical, "About da Vinci Systems." Available at: https://www.davincisurgery.com/da-vinci-systems/about-da-vinci-systems.

Intuitive Surgical, "da Vinci SP." Available at: https://www.intuitive.com/en-us/products-and-services/da-vinci/systems/sp.

Intuitive Surgical, "EndoWrist/Single-Site Instrument & Accessory Catalog," May 2014. Available at: https://www.intuitivesurgical.com/products/871145_Instrument_Accessory_%20Catalog.pdf.

Intuitive Surgical, "Intuitive for Patients." Available at: https://www.intuitive.com/en-us/patients/patients.

Intuitive Surgical, "Move Surgery Forward. Again. da Vinci SP." Available at:
https://www.intuitive.com/en-us/products-and-services/da-vinci/systems/sp.

Intuitive, "Patent Notice." Available at: https://www.intuitive.com/en-us/about-us/company/legal/patent-notice.

Isaac Ro, Veronika Dubajova, CFA, Akinori Ueda, Ph. D., Ziyi Chen, Jack O'Connell, Sara Silverman, and Frits Jonker, "Digital Health: Robotic Surgery and the OR of the Future," *Goldman Sachs: Equity Research*, November 15, 2018, 1-16.

Jack Curran, "Medical Equipment Repair & Maintenance Services," *IBISWorld*, June 2020.

Jason McGorman, "Intuitive Surgical Research," *Bloomberg Intelligence*, April 2019.

Marcel Oomen, "Record High Growth in Surgical Procedures Triggers Upgrade of Guidance," *Financiële Diensten Amsterdam*, October 18, 2019, 1-4.

Marion Webb, "Market Intel: Medtech Giants Read to Battle Frontrunner Intuitive Surgical in 'Soft Surgery Robotics,'" *Pharma Intelligence*, April 2020.

The Business Research Company, "Robotic Surgery Devices Global Market Report 2022 – By Product And Service (Robotic Systems, Instruments & Accessories, Services), By Surgery Type (Urological Surgery, Gynecological Surgery, Orthopedic Surgery, Neurosurgery, Other Surgery Types), By End User (Hospitals, Ambulatory Surgery Centers) – Market Size, Trends, And Global Forecast 2022-2026," October 2022. Available at:
https://www.thebusinessresearchcompany.com/report/robotic-surgery-devices-global-market-report.

## News Articles

Conor Hale, "Medtronic's Hugo surgical robot collects green lights in Europe, Canada, Japan," *Fierce Biotech*, October 19, 2022.  Available at:
https://www.fiercebiotech.com/medtech/medtronics-hugo-surgical-robot-collects-green-lights-europe-canada-japan.

Elizabeth Cairns, "Intuitive faces down the competition," Evaluate Vantage, February 22, 2022. Available at: https://www.evaluate.com/vantage/articles/interviews/intuitive-faces-down-competition.

Jaimy Lee, "Surgical-Robot Costs Put Small Hospitals in a Bind," *Modern Healthcare*, April 19, 2014.  Available at:
https://www.modernhealthcare.com/article/20140419/MAGAZINE/304199985/surgical-robot-costs-put-small-hospitals-in-a-bind.

## Websites

Abex Eccelencia Robotica, "Da Vinci Robotic System." Available at:
https://www.abexsl.es/en/da-vinci-robotic-system/what-is-it.

Andrew Gonzalez, M.D., J.D., MPH and Anna Giorgi, "Laparoscopy," *Healthline*, October 6, 2018. Available at: https://www.healthline.com/health/laparoscopy.

BPI Medical, "About Us." Available at: https://www.bpimedical.com/about-us/.

Dr. Ivan De Backer, "Dissecting the Robotic Surgery Market," *IDTechEx*, March 30, 2020. Available at: https://www.idtechex.com/en/research-article/dissecting-the-robotic-surgery-market/20232.

Eve Cunningham, MD, MBA, "Op-Ed: Addressing Our Da Vinci Addiction – A call to action for everyone in healthcare," *MedPage Today*, October 17, 2020. Available at: https://www.medpagetoday.com/surgery/generalsurgery/89175.

John Hopkins Medicine, "Methods of Surgery." Available at: https://www.hopkinsmedicine.org/health/treatment-tests-and-therapies/methods-of-surgery.

Johnson Memorial Health, "Recovery Benefits of Laparoscopic Surgery," August 2015. Available at: http://blog.johnsonmemorial.org/recovery-benefits-of-laparoscopic-surgery.

MedStar Health, "Robotic Surgery." Available at: https://www.medstarhealth.org/services/robotic-surgery.

Midlands Clinic, "General Laparoscopic Procedures." Available at: https://midlandsclinic.com/general-laparoscopic-procedures/.

MUSC Health, "Introduction to Laparoscopic Surgery." Available at: https://muschealth.org/medical-services/ddc/patients/gi-surgery/laparoscopic-surgery/introduction.

National Health Service, "Laparoscopy (keyhole surgery)." Available at: https://www.nhs.uk/conditions/laparoscopy/.

Riccardo Autorino, MD, PhD, FEBU, "Robotic Surgical Systems in Urology: What's in the Pipeline?," *Grand Rounds in Urology*, February 7, 2018. Available at: https://grandroundsinurology.com/robotic-surgical-systems-in-urology/.

Rob Surgical, "Top 5 Trends in the Robotic Surgery Market." Available at: https://www.robsurgical.com/market-trends/.

SofMedica, "DaVinci Surgical System." Available at: https://sofmedica.com/our-portofolio/robotic-surgery/.

Stanford Health Care, "General Surgery Types." Available at: https://stanfordhealthcare.org/medical-treatments/g/general-surgery/types.html.

UC Health, "About the daVinci Surgical System." Available at: https://www.uchealth.com/services/robotic-surgery/patient-information/davinci-surgical-system/.

HIGHLY CONFIDENTIAL                6

UCLA Health, "About Robotic Surgery at UCLA." Available at:
https://www.uclahealth.org/robotic-surgery/what-is-robotic-surgery.

**EXHIBIT 4**

**to**

**PAUL D. BRACHMAN DECLARATION IN SUPPORT OF
DEFENDANT'S MOTION IN LIMINE NO. 2
TO EXCLUDE DEUTSCHE BANK ANALYST REPORTS
AND RELATED TESTIMONY**

ATTACHMENT 45

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

SURGICAL INSTRUMENT SERVICE
COMPANY, INC.,

                    Plaintiff,

        v.                                              Case No.: 3:21-cv-03496-VC

INTUITIVE SURGICAL, INC.,

                    Defendant.

**Expert Report of Richard F. Bero, CPA, CVA**
**December 2, 2022**

*The BERO Group*

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

## TABLE OF CONTENTS

I.   Introduction ........................................................................................................... 1

    A.   Assignment ..................................................................................................... 1

    B.   Alleged Wrongdoings ..................................................................................... 1

    C.   Basis for opinions .......................................................................................... 2

    D.   Expert experience and compensation ............................................................. 3

    E.   Trial ................................................................................................................ 4

    F.   Basic damages assumptions ........................................................................... 4

    G.   Opinions Summary ......................................................................................... 6

II.   Parties in suit ......................................................................................................... 7

    A.   Plaintiff – SIS ................................................................................................. 7

    B.   Defendant – Intuitive ...................................................................................... 8

III.   Additional Parties not in suit – Rebotix and Restore ............................................ 10

    A.   Rebotix .......................................................................................................... 10

    B.   Restore .......................................................................................................... 12

IV.   Intuitive's da Vinci surgical system ...................................................................... 13

    A.   Launched in 1999 .......................................................................................... 13

    B.   da Vinci Products – 5 categories ................................................................... 14

    C.   da Vinci Surgical System Models .................................................................. 14

    D.   Placed primarily in acute care hospitals ........................................................ 15

    E.   da Vinci Surgical System Components ........................................................... 16

        1.   Surgeon's Console ............................................................................... 16

        2.   Patient-Side Cart ................................................................................. 16

        3.   3DHD Vision System .......................................................................... 17

        4.   Firefly Fluorescence Imaging ("Firefly") ........................................... 17

        5.   Da Vinci Xi Integrated Table Motion .................................................. 17

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

F.    U.S. systems sales – 600 and 865 systems placed in 2020 and 2021 .................. 18

G.    Installed U.S. daVinci systems – 3,720 units and 4,139 units as of
      December 31, 2020 and December 31, 2021 ....................................................... 18

H.    Number of daVinci procedures ......................................................................... 18

I.    da Vinci Surgical Systems Sales and Profits .................................................... 19

V.    Intuitive's EndoWrist Instruments and Accessories ...................................................... 19

A.    10 to 18 uses per EndoWrist ............................................................................. 20

B.    S/Si and X/Xi EndoWrists are essentially the same (except for encryption) ....... 21

C.    U.S. S/Si and X/Xi EndoWrist annual unit sales – 2014 through
      annualized 2022 ............................................................................................... 21

D.    EndoWrist sales and profits ............................................................................. 21

E.    Expired and potentially repairable EndoWrists approximate 60% of
      current year units sold ..................................................................................... 22

VI.   SIS's EndoWrist repair service ................................................................................... 23

A.    Monumental Interest in SIS's repair program .................................................. 24

B.    SIS's sales prices ranging from $1,100 to $1,700 per repair, representing
      an average discount of 42% ............................................................................. 25

C.    SIS's estimated repair services applied to all U.S. da Vinci systems'
      installed base equates to more than $800 million potential EndoWrist
      repair service revenue per year ....................................................................... 25

D.    Subcontracted 2019 repair work to Rebotix ..................................................... 26

E.    Initial EndoWrist Repair Sales and Customers ................................................. 27

F.    Intended to repair EndoWrists in-house ........................................................... 27

G.    EndoWrist Recovery (as opposed to repair) Program ......................................... 27

VII.  Intuitive considered its own instrument refurbishment service but decided against it ..... 28

VIII. Rebotix's repair program – working with SIS .............................................................. 29

A.    Would have first begun repairing X/Xi by as early as 2019 ................................ 30

IX.   Restore's repair program – working with SIS ............................................................... 31

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

A.  Expected greater than 70%to 80% of market would use repair services .............. 31

B.  Expected 72% of EndoWrists received would be repairable ................................ 31

C.  Would have first begun repairing X/Xi no later than January 2022 and
potentially as early as January 2021 ................................................................... 31

X.  GPO's ................................................................................................................................. 33

A.  Vizient – more than 60% of U.S. acute care providers in 2022............................ 33

1.  September 2016 Vizient – SIS Agreement ............................................... 33

2.  September 2019 Vizient – SIS Agreement Amendment specific to
EndoWrist repairs ..................................................................................... 34

3.  August 2020 Vizient – SIS Agreement - specific to EndoWrist
recovery (not repairs)................................................................................ 35

4.  Subsequent Vizient – SIS Agreement Amendments – specific to
EndoWrist recovery (not repairs) ............................................................. 36

B.  Premier – 2nd largest GPO in the U.S. .................................................................. 36

C.  HealthTrust .......................................................................................................... 37

XI.  Robotic Surgery Industry ................................................................................................... 37

XII.  Surgical Instruments Industry ............................................................................................ 38

XIII.  Anticompetitive Conduct Damages .................................................................................... 40

XIV.  SIS's Lost Profits Damages ................................................................................................ 41

A.  The 'but for' analysis - difference between 'would-have-been' and 'actual'....... 41

B.  The Alleged Wrongdoings caused SIS's lost revenue and profits....................... 42

C.  Demand – monumental interest ........................................................................... 42

D.  Capacity and capability to perform EndoWrist repairs........................................ 45

E.  Scenario 1 – Illegal Encryption lost profits damages .......................................... 46

1.  Lost EndoWrist repair units ..................................................................... 46

a)  'Would-Have-Been' EndoWrist repair units – through 2025....... 47

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

(i)      EndoWrist instruments potentially repairable by SIS
         – unit sales........................................................................ 47

(ii)     Expiration rate of new sales units – 60%........................... 48

(iii)    Market share rate based on Vizient – 55% ....................... 49

(iv)     Conversion rate – 15%, 50%, 70% ................................... 50

(v)      Collection rate – 70%....................................................... 51

(vi)     Repair yield rate – 72%.................................................... 51

(vii)    'Would-Have-Been' EndoWrist repair units through
         2025.................................................................................. 52

(viii)   'Would-Have-Been' EndoWrist repair units – 2% to
         12% of units sold ............................................................ 52

b)    Actual EndoWrist repair units ...................................................... 53

c)    Lost EndoWrist repair units .......................................................... 53

2.    Lost revenue .......................................................................................... 53

3.    Less: Incremental costs ........................................................................ 54

a)    In-house repair model costs .......................................................... 54

(i)      Repair costs ...................................................................... 54

(ii)     Chip costs .......................................................................... 55

(iii)    Vizient GPO administrative fee ........................................ 55

(iv)     SGA costs .......................................................................... 56

b)    Distributor model costs ................................................................. 56

4.    SIS's In-house model lost profits through 2025 – approximately
      $102.6 million ....................................................................................... 57

5.    SIS's Distributor model lost profits through 2025 – approximately
      $40.9 million ......................................................................................... 57

6.    Annual lost profits per unit ................................................................... 57

F.    Scenario 2 – Unenforceable Contracts lost profits damages .............................. 57

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

XV.   Lanham Act Damages .......................................................................................................... 58

XVI.   Conclusion ........................................................................................................................... 59

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

## I.   Introduction

### A.   Assignment

I have been asked to provide expert opinions on damages on behalf of Surgical Instrument Service Company, Inc. ("SIS") in *Surgical Instrument Service Company, Inc. v. Intuitive Surgical, Inc.,* Case No. 3:21-cv-03496-VC.[1]  SIS has accused Intuitive Surgical, Inc. ("Intuitive" or the "Defendant") of the following five counts: (1) Tying; (2) Exclusive Dealing; (3) Monopolization; (4) Attempted Monopolization; and (5) Unfair Trade Practices – Violation of Lanham Act.[2]  I refer to these counts, collectively, as the "Alleged Wrongdoings."

I have been asked to calculate lost profit damages in two primary alternative scenarios. In the first scenario, I have been asked to assume Intuitive is found liable for at least one of the Alleged Wrongdoings, and, specifically, that its encryption of its X/Xi EndoWrist products is illegal ("Scenario 1 – Illegal Encryption").  These damages are addressed below.

In the second scenario, I have been asked to assume Intuitive is found liable for at least one of the Alleged Wrongdoings, specifically that its hospital contracts which prevent hospitals from using third parties such as SIS from repairing or otherwise servicing EndoWrists are not enforceable ("Scenario 2 – Unenforceable Contracts").  These damages are addressed below.

I have also been asked to address disgorgement of Intuitive's profits damages under the Lanham Act (Count 5).  I have been asked to quantify this amount based on the lost SIS repair units underlying Scenario 2 lost profits damages above.  These damages are addressed below.

### B.   Alleged Wrongdoings

The Alleged Wrongdoings relate to Intuitive's da Vinci S/Si and X/Xi robotic surgical systems and the EndoWrist instruments sold for use with these systems.  Intuitive has dominant economic power for surgical robots for minimally invasive soft tissue surgery, and for servicing, support and repair of those robots as well as the EndoWrist instruments used with the robots.[3] Intuitive has used this economic power to coerce its customers into buying EndoWrists from Intuitive rather than allowing the option of repairing EndoWrists through experienced service

---

[1] Compl.
[2] Compl. ¶¶ 111-126.
[3] Compl. ¶ 112.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

organizations such as SIS.[4]   Intuitive has conditioned the sale and servicing of its da Vinci surgical robots on customers buying replacement EndoWrists from Intuitive instead of permitting customers to use repaired EndoWrists.[5]

Intuitive has entered into agreements requiring its customers to replace their EndoWrist instruments with new Intuitive EndoWrists, on an exclusive basis, thus foreclosing competition for repair and replacement of such instruments for surgical robots for minimally invasive surgery.[6]   Intuitive maintains at least a 99% market share by excluding competitors through exclusionary tactics as tying EndoWrist replacements and repairs to sales and servicing of da Vinci surgical robots, prohibiting customers from having their EndoWrist instruments repaired, sending cease and desist letters when customers attempt to have EndoWrists repaired and employing countermeasures to the X/Xi instrument usage counter to prevent any modification of the usage counter.[7]

As a direct and proximate result of Intuitive's conduct, Intuitive's customers have been forced to purchase new EndoWrists at supra-competitive prices, rather than repairing the existing EndoWrists, resulting in SIS losing customers and incurring lost profits.[8]   As described more below, SIS believes there is and has been "monumental" interest from hospitals in its S/Si and X/Xi repair business.[9]

I have not formed any legal opinions about this matter.  However, for purposes of my analysis, I assume Intuitive will be found liable for at least one of the Alleged Wrongdoings.

### C.    Basis for opinions

My opinions in this matter are based upon analysis of the following information:

- the Complaint, Answer and other legal filings;

- documents produced / provided by the parties;

- depositions and related deposition exhibits;

---

[4] Compl. ¶ 112.
[5] Compl. ¶ 112.
[6] Compl. ¶ 115.  *See, e.g.*, Intuitive-01376477.
[7] Compl. ¶ 118.
[8] Compl. ¶¶ 113, 116 and 119, for example.  The Complaint also addresses damages to SIS's reputation and goodwill, although I have not been asked to quantify damages herein for these two items.
[9] 30(b)(6) Deposition of Keith Johnson 44 (October 27, 2022).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

- the following expert reports:

    o Expert Report of Jean Sargent dated December 2, 2022;

- various legal filings, documents, depositions and related deposition exhibits, and expert reports from the following litigations involving EndoWrists in which Intuitive is also a defendant:[10]

    o *Restore Robotics LLC, et al. v. Intuitive Surgical, Inc.*, No. 5:19-cv-00055-TKW-MJF (N.D. Fla. filed Feb. 27, 2019);

    o *Rebotix Repair LLC v. Intuitive Surgical, Inc.*, No. 8:20-cv-02274-VMC-TGW (M.D. Fla. filed Sept. 28, 2020);

- discussions with the following SIS personnel (in alphabetical order):

    o Keith Johnson, Executive Vice President, Sales and Clinical Programs;

    o Greg Posdal, President and C.E.O.;

- discussion with Jean Sargent, SIS's industry expert;

- discussion with Kurt Humphrey, SIS's technical expert;

- independent research; and

- my skills, knowledge, professional background, education and work experience.

A detailed list of data and other information I have considered at this time in developing my opinions is included as **Attachment 1**. If additional relevant information becomes available after the issuance of my Report, I reserve the right to incorporate such information as necessary. I may also incorporate additional information in response to any expert reports or opinions proffered on behalf of the Defendant.

### D.    Expert experience and compensation

I am a certified public accountant, accredited in business valuation, a certified valuation analyst and the Managing Director of The BERO Group. Since 1987, I have analyzed economic damages and accounting and financial issues in a variety of litigation matters concerning areas

---

[10] I understand the *Rebotix Repair LLC* case has settled.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

such as breach of contract, patent infringement, trademark infringement, copyright infringement, trade secrets, anti-trust, dealership disputes and construction disputes.  I have testified as an expert more than 160 times.  My curriculum vitae, including a list of my testimonial experience in the last four years and publications in the last ten years, is included as **Attachment 2**.

Compensation to The BERO Group for professional services provided in preparing this report is based on our customary hourly fees.  My hourly rate is $675 while the rates for my staff range from $150 – $375.  The BERO Group has no financial interest in the outcome of this litigation.

### E.    Trial

In preparing for trial, I may prepare demonstrative exhibits based upon information included in this Report or additional information that becomes available hereafter.

### F.    Basic damages assumptions

I have been asked to calculate damages assuming a trial date in approximately December 2023 / January 2024.  In this instance, as explained in this report, damages would continue through 2025 as shown on **Schedule 1.0**.

As described above, I have been asked to calculate lost profit damages in two primary alternative scenarios.  In Scenario 1, I have been asked to assume Intuitive is found liable for at least one of the Alleged Wrongdoings, and, specifically, that its encryption of its X/Xi EndoWrist products is illegal.  In Scenario 2, I have been asked to assume Intuitive is found liable for at least one of the Alleged Wrongdoings, specifically that its hospital contracts which prevent hospitals from using third-parties such as SIS from repairing or otherwise servicing EndoWrists are not enforceable.

I have also been asked to calculate disgorgement of Intuitive profits based on the lost SIS repair units underlying Scenario 2 lost profit damages.

In both Scenario 1 and Scenario 2 lost profits and Lanham Act damages, I make the following base assumptions:

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

- I assume the parties' reported revenue, costs and other data are generally accurate and reliable;[11]

- SIS would have had the capability / capacity to make the lost sales;[12]

- Rebotix or Restore would have had the capability and capacity to produce enough chips to be used in SIS's EndoWrist repairs;[13]

- SIS would not need FDA approval to make its repairs;[14]

In Scenario 1, I assume:

- SIS would have been able to repair both S/Si and X/Xi EndoWrist instruments as of January 1, 2020 (I refer to this as the "In-house model");[15]

- Alternatively, Rebotix or Restore would have been able to repair both S/Si and X/Xi EndoWrist instruments as of January 1, 2020 (I refer to this as the "Distributor model");[16]

In Scenario 2, I assume:

- SIS would have been able to repair S/Si EndoWrist instruments as of January 1, 2020 (the In-house model),[17]

- Alternatively, Rebotix or Restore would have been able to repair the S/Si EndoWrist instruments as of January 1, 2020 (the Distributor model);[18]

- SIS (relying on either Rebotix, Restore or another third-party technology provider) would have been able to reset the X/Xi EndoWrist instruments use counter either by January 1, 2021 or January 1, 2022, and SIS, Rebotix or Restore would have been able to repair X/Xi EndoWrist instruments as of either January 1, 2021 or January 1 2022;[19]

---

[11] If the parties' reported information is incorrect, I reserve the right to update my analyses accordingly.
[12] As addressed herein.
[13] Based on SIS's relationships with Rebotix / Restore prior to the Alleged Wrongdoings as addressed herein. Rebotix and Restore are defined below.
[14] Discussions with Keith Johnson and Greg Posdal.  *See also*, Deposition of Imron Zafar (November 1, 2022) Ex. 113 at 3.
[15] As addressed herein.
[16] Based on SIS's relationships with Rebotix / Restore prior to the Alleged Wrongdoings as addressed herein.
[17] As addressed herein.
[18] Based on SIS's relationships with Rebotix / Restore prior to the Alleged Wrongdoings as addressed herein.
[19] Based on SIS's relationships with Rebotix / Restore prior to the Alleged Wrongdoings as addressed herein and discussion with Kurt Humphrey, SIS's technical expert.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

- Either Rebotix, Restore, or another third-party technology company (not SIS), would have incurred the costs associated with circumventing the encryption required to reset the use counter;.[20]

### G.    Opinions Summary

SIS has incurred lost profits damages due to the Alleged Wrongdoings. I have quantified lost profits damages under Scenario 1- Illegal Encryption and Scenario 2 – Unenforceable Contracts. In both scenarios, I determine alternative SIS damages models wherein SIS would have performed the repair services in-house (the "In-house model") or SIS would have acted as a repair service distributor (the "Distributor model").

I have also been asked to damages based on disgorgement of Intuitive profits based on the number of units SIS would have repaired ("Lanham Act damages") under Scenario 2.

Damages are presented using a January 1, 2024 date, assuming trial is in approximately December 2023 / January 2024. Damages are summarized on **Table 1** below:[21]

**Table 1: Damages Summary**

|  | Scenario 1 | | Scenario 2 | | |
|---|---|---|---|---|---|
| **Discounted lost profits** | | | | | |
| In-house model | $102,624,836 | | $56,161,130 | to | $80,610,861 |
| Distributor model | $40,908,930 | | $22,424,938 | to | $32,213,625 |
| | | | | | |
| **Lanham Act** | | | $268,215,839 | to | $385,370,043 |

---

[20] Based on SIS's relationships with Rebotix / Restore prior to the Alleged Wrongdoings as addressed herein.
[21] **Schedule 1.0**. Note: The Lanham Act damages represent Intuitive's sales.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

## II.   Parties in suit

### A.   Plaintiff – SIS

SIS is an Illinois corporation with a principal place of business located in Glendale Heights, IL.[22]  Greg Posdal is SIS's President, CEO and majority owner.[23]  Keith Johnson is SIS's Executive Vice President, Sales and Clinical Programs.[24]

SIS has 50 years of experience servicing surgical instruments and equipment ranging from simple devices such as forceps and scalpels to complex electromechanical devices such as flexible video endoscopes, powered orthopedic devices and surgical video systems.[25]  SIS employs exhaustive inspection and repair procedures to ensure that previously used surgical instruments are only returned to the operating room in accordance with specifications.[26]  SIS's services save healthcare providers and patients millions of dollars a year, reducing the per surgery procedure costs without compromising instrument operation or patient safety.[27]  SIS is a trusted nationwide partner for hospitals, health care systems and group purchasing organizations ("GPOs").[28]  SIS's relationship with Vizient, Inc., the largest GPO in the U.S., provides SIS access to more than 60% of U.S. acute care hospitals as of 2022.[29]

SIS's revenue approximated $7.0 million, $10.7 million and $12.4 million in 2019, 2020 and 2021, respectively.[30]  In 2022, Greg Posdal estimated SIS's revenue is expected to approximate $18 million.[31]  Approximately 85% of SIS's business is from acute care medical centers and hospitals.[32]  The majority of SIS's business is its repair business, including stainless steel instrumentation, rigid endoscopes, flexible endoscopes, orthopedic power instrumentation,

---

[22] Compl. ¶ 12.
[23] 30(b)(1) Deposition of Greg Posdal 16 (November 1, 2022).  Plaintiff's Response to Intuitive's Interrogatory No. 1 (May 20, 2022).
[24] Plaintiff's Response to Intuitive's Interrogatory No. 1 (May 20, 2022).  Discussion with Keith Johnson.
[25] Compl. ¶ 1.
[26] Compl. ¶ 1.
[27] Compl. ¶ 1.
[28] Compl. ¶ 1. I address these "GPO's" in more detail below.
[29] *See, e.g.*, https://www.vizientinc.com.  I address Vizient, Inc. more below.  As addressed below, SIS also has access to the second largest GPO, Premier, Inc., through its relationship with Yankee Alliance.
[30] **Schedule 15.0** and discussion with Greg Posdal.
[31] 30(b)(1) Deposition of Greg Posdal 15 (November 1, 2022).
[32] Deposition of Keith Johnson 14 (October 27, 2022).

video instruments and miscellaneous instruments.[33]  I understand SIS's repair business of hospital-owned instruments (including its EndoWrist repairs) is not regulated by the FDA.[34]

### B.  Defendant – Intuitive

Intuitive is a Delaware corporation with a principal place of business located in Sunnyvale, CA.[35]  Intuitive was founded in 1995.[36]  Since the late 1990's, Intuitive has been the leading provider of robotic surgery systems for minimally invasive soft tissue surgeries.[37]

Intuitive's main product categories are: (1) Systems, including its da Vinci Surgical System and Ion Endoluminal System; (2) Instruments and Accessories; and (3) Services.[38]  As described above, EndoWrists, which are included in Intuitive's Instruments and Accessories category, are the exclusive instruments sold for use with da Vinci Surgical Systems and are at issue in this matter.

Instead of operating directly on a patient, surgeons using Intuitive's da Vinci Surgical Systems remotely operate a multi-arm surgical robot from a console that receives video of the surgical site and includes means for precisely controlling the movement and operation of surgical tools known as EndoWrists.[39]

EndoWrists include traditional surgical tools such as forceps and scalpels and are attached to the robotic arms based on the type of surgery to be performed.[40]  The robotic arms include motors that control cables within the EndoWrist in response to the surgeon's inputs, allowing precise multi-axis movement of the "wrist" of the surgical tool, that is not possible in traditional surgeries.[41]

I understand Intuitive's primary EndoWrists are its Si EndoWrists and X/Xi EndoWrists. I understand Si EndoWrists: 1) Have a "Dallas" chip that has a wired connection to the robot system when attached; 2) The Dallas chip provides protection of data stored on it, including the use counter; 3) The Dallas chip does not monitor or control an EndoWrist's motion; 4)

---

[33] 30(b)(1) Deposition of Greg Posdal 11 (November 1, 2022).
[34] 30(b)(1) Deposition of Greg Posdal 93-94 (November 1, 2022).  Discussions with Keith Johnson and Greg Posdal.
[35] Compl. ¶ 13.
[36] Intuitive Surgical, Inc. Form 10-K for the fiscal year ended December 31, 2021 at 23.
[37] Compl. ¶ 2.
[38] Intuitive Surgical, Inc. Form 10-K for the fiscal year ended December 31, 2021 at 6-10.
[39] Compl. ¶ 2.
[40] Compl. ¶ 2.
[41] Compl. ¶ 2.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

EndoWrist motion is controlled by four motors of robot that control wrist roll, pitch, yaw and grip.[42]

I understand X/Xi EndoWrists: 1) Have an "Atmel" chip that has a wireless connection to the robot system when attached; 2) The Atmel chip encrypts data stored on it, including the use counter; 3) similar to Dallas chip of the Si EndoWrists, the Atmel chip does not monitor or control an EndoWrist's motion; 4) similar to the Si EndoWrists, EndoWrist motion is controlled by four motors of robot that control wrist roll, pitch, yaw and grip; 5) provide more security to the use counter than Si EndoWrists.[43]

Intuitive provides its products through direct sales organizations in the U.S., many European countries, China, Japan, South Korea, India, and Taiwan.[44]  In markets outside the U.S., Intuitive provides its products through distributors.[45]  Intuitive has manufacturing facilities in California, North Carolina, Mexico and Germany.[46]

Intuitive's revenue approximated $4.4 billion and $5.7 billion in its fiscal years ended December 31, 2020 and 2021, respectively.[47]  Intuitive's revenue from instruments and accessories approximated $2.5 billion and $3.1 billion in its fiscal years ended December 31, 2020 and 2021, respectively.[48]  Intuitive had approximately $3.9 billion of gross profit in 2021, approximately $3.3 billion of which was from "Products" and $0.6 billion from "Services."[49] Intuitive's net income approximated $1.1 billion and $1.7 billion in its fiscal years ended December 31, 2020 and 2021, respectively.[50]  For its fiscal years ended December 31, 2020 and December 31, 2021, Intuitive's U.S. revenue approximated 67% - 68% of its total revenue.[51]

Intuitive's revenue, profits and income from 2016 through 2021 are summarized in **Table 2**:[52]

---

[42] *See, e.g.*, 30(b)(6) Deposition of Grant DuQue 11-22 and 59-61 (November 8, 2022).
[43] *See, e.g.*, 30(b)(6) Deposition of Grant DuQue 22-41 (November 8, 2022) and Deposition of Grant DuQue 11-22 and 24-52 (November 8, 2022).
[44] Intuitive Surgical, Inc. Form 10-K for the fiscal year ended December 31, 2021 at 13.
[45] Intuitive Surgical, Inc. Form 10-K for the fiscal year ended December 31, 2021 at 13.
[46] Intuitive Surgical, Inc. Form 10-K for the fiscal year ended December 31, 2021 at 14.
[47] Intuitive Surgical, Inc. Form 10-K for the fiscal year ended December 31, 2021 at 68-69.
[48] Intuitive Surgical, Inc. Form 10-K for the fiscal year ended December 31, 2021 at 69.
[49] Intuitive Surgical, Inc. Form 10-K for the fiscal year ended December 31, 2021 at 68.
[50] Intuitive Surgical, Inc. Form 10-K for the fiscal year ended December 31, 2021 at 68.
[51] Intuitive Surgical, Inc. Form 10-K for the fiscal year ended December 31, 2021 at 13 and 68-69.
[52] Intuitive Surgical, Inc. Form 10-K's for the fiscal years ended December 31, 2018, 2019, 2020 and 2021 at 84, 71, 84 and 84, respectively.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Table 2: Intuitive Surgical, Inc. - Historical Financial Summary (in millions)

|  | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|---|---|
| Revenue | $2,706.5 | $3,138.2 | $3,724.2 | $4,478.5 | $4,358.4 | $5,710.1 |
| Gross Profit | $1,892.9 | $2,202.0 | $2,604.1 | $3,110.2 | $2,861.2 | $3,958.5 |
| *Gross Margin %* | *70%* | *70%* | *70%* | *69%* | *66%* | *69%* |
| Income from Operations | $949.7 | $1,062.9 | $1,199.4 | $1,374.5 | $1,049.8 | $1,821.0 |
| *Income from Operations %* | *35%* | *34%* | *32%* | *31%* | *24%* | *32%* |

## III.    Additional Parties not in suit – Rebotix and Restore

### A.    Rebotix

Rebotix Repair LLC ("Rebotix") is a Florida limited liability company with its principal address in St. Petersburg, Florida.[53]  Rebotix provides service and replacement components that help hospitals get back in control of their robotic surgical instruments, such as repairing EndoWrist instruments used in da Vinci robotic surgeries.[54]

Rebotix also sued Intuitive for issues related to servicing its EndoWrists, in which Rebotix claimed: (1) Tying; (2) Exclusive Dealing; (3) Monopolization; and (4) Attempted Monopolization.[55]  I understand that case has settled.

In the spring / summer of 2019, SIS began working with Rebotix on its EndoWrist repair business.[56]  SIS initially provided the repair business customers while Rebotix provided the "Interceptor chip" (or "repair chip") to reset S / Si EndoWrist counters enabling additional EndoWrist uses as well as the actual repair.[57]

████████████████████████████████████████████████████

████████████████████████████████[58]  The Interceptor was developed for Rebotix by a

---

[53] Compl. ¶ 5 (*Rebotix Repair LLC v. Intuitive Surgical, Inc.*, No. 8:20-cv-02274-VMC-TGW (M.D. Fla. filed Sept. 28, 2020)).

[54] https://rebotixrepair.com.  Compl. ¶ 5 (*Rebotix Repair LLC v. Intuitive Surgical, Inc.*, No. 8:20-cv-02274-VMC-TGW (M.D. Fla. filed Sept. 28, 2020)).

[55] Compl. ¶¶ 62-73 (*Rebotix Repair LLC v. Intuitive Surgical, Inc.*, No. 8:20-cv-02274-VMC-TGW (M.D. Fla. filed Sept. 28, 2020)).

[56] 30(b)(1) Deposition of Greg Posdal 23-25 (November 1, 2022).

[57] 30(b)(1) Deposition of Greg Posdal 25 (November 1, 2022).

[58] Deposition of Chris Gibson 35-38 (June 22, 2021) (*Rebotix Repair LLC v. Intuitive Surgical, Inc.*, No. 8:20-cv-02274-VMC-TGW (M.D. Fla. filed Sept. 28, 2020)).

10

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

third party (G5 Engineering), and it took approximately two years to develop.[59]  The Interceptor chip was used for Si Instruments.[60]

SIS intended to bring the EndoWrist repair work in-house, like it does with its other repair services, while purchasing the Interceptor chip from Rebotix (and/or a similar chip from another company, Restore, addressed below).[61]  In 2019, SIS and Rebotix had a draft agreement, that would have required SIS to purchase 50 Interceptors for up to $800 per interceptor.[62]  This draft agreement was never executed.[63]

While SIS and Rebotix did not have a signed agreement, they had a verbal understanding their relationship would continue.[64]  The parties had begun discussions and plans for Rebotix to assist SIS in setting up its EndoWrist repair servicing process.[65]  During this initial ramp-up period, Rebotix sold the repair chip and service to SIS for prices consistent with those included in the draft distributor agreement.[66]  I understand SIS and Rebotix contemplated volume discounts if the repair business grew.[67]  Repair prices ranged from $750 to $1,300 per EndoWrist.[68]

In January 2020, a Memorandum of Understanding was drafted between SIS and Rebotix, which contained proposed pricing terms for Interceptor chips, including volume discounts up to at $450 per Interceptor chip at 300 units, but like the original draft, this draft agreement was never executed.[69]  Rebotix and SIS stopped working together shortly thereafter.[70]

---

[59] Deposition of Chris Gibson 40 and 59 (June 22, 2021) (*Rebotix Repair LLC v. Intuitive Surgical, Inc.*, No. 8:20-cv-02274-VMC-TGW (M.D. Fla. filed Sept. 28, 2020)).
[60] Deposition of Stan Hamilton 38 (November 4, 2022).
[61] 30(b)(1) Deposition of Greg Posdal 25 (November 1, 2022).
[62] Deposition of Chris Gibson 162-163 (June 22, 2021) and REBOTIX061127-138 at 128-129 (Gibson Dep. Ex. 13) (*Rebotix Repair LLC v. Intuitive Surgical, Inc.*, No. 8:20-cv-02274-VMC-TGW (M.D. Fla. filed Sept. 28, 2020)).
[63] Deposition of Chris Gibson 163 (June 22, 2021) (*Rebotix Repair LLC v. Intuitive Surgical, Inc.*, No. 8:20-cv-02274-VMC-TGW (M.D. Fla. filed Sept. 28, 2020)).  Discussion with Greg Posdal.
[64] 30(b)(1) Deposition of Greg Posdal 41-42 (November 1, 2022).
[65] 30(b)(1) Deposition of Greg Posdal 41-42 (November 1, 2022).
[66] **Schedule 10.1**.  *See also*, REBOTIX162208-162212 at 212.
[67] Discussion with Greg Posdal.
[68] **Schedule 10.1**.
[69] Deposition of Chris Gibson 165-167 (June 22, 2021) and REBOTIX067735-737 (Gibson Dep. Ex. 14) (*Rebotix Repair LLC v. Intuitive Surgical, Inc.*, No. 8:20-cv-02274-VMC-TGW (M.D. Fla. filed Sept. 28, 2020)).  Discussion with Greg Posdal.
[70] Discussion with Greg Posdal.

11

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Rebotix started working with Restore (as addressed below) in 2018.[71]  Originally, Restore was going to be a distributor for Rebotix, meaning they would get the EndoWrists from hospitals, send them to Rebotix for repair and reset, and then deliver them back to hospitals.[72]  Restore then started buying Interceptors from Rebotix, so that Restore  could do the repair and reset.[73]  Rebotix sold the Interceptor to Restore for an average price of approximately $533 per chip.[74]  It appears Restore received a larger discount with higher chip purchases.[75]  Ultimately, Rebotix stopped working with Restore because Restore wasn't doing the volume Rebotix expected them to have.[76]

## B.    Restore

Restore Robotics LLC and Restore Robotics Repair LLC (collectively, "Restore") are Florida limited liability companies with their principal address in Panama City Beach, Florida.[77]  They are sister companies with common ownership having majority control of both companies.[78]  Restore services surgical robots and related instruments, Restore Robotics is the sales arm and Restore Robotics Repairs is the operations arm.[79]

Restore also sued Intuitive for issues related to servicing its EndoWrists, in which Rebotix claimed: (1) Monopolization; (2) Attempted Monopolization; (3) Tying; and (4) Exclusive Dealing.[80]  I understand the case is ongoing.

SIS and Restore are partners in SIS's EndoWrist recovery business.[81]  SIS's EndoWrist recovery business identifies an EndoWrists' available lives remaining and confirms EndoWrist

---

[71] Deposition of Clifton Parker 142 (October 25, 2022).

[72] Deposition of Chris Gibson 143-144 (June 22, 2021) (*Rebotix Repair LLC v. Intuitive Surgical, Inc.*, No. 8:20-cv-02274-VMC-TGW (M.D. Fla. filed Sept. 28, 2020)).

[73] Deposition of Chris Gibson 144 (June 22, 2021) (*Rebotix Repair LLC v. Intuitive Surgical, Inc.*, No. 8:20-cv-02274-VMC-TGW (M.D. Fla. filed Sept. 28, 2020)).

[74] **Schedule 10.0**.

[75] **Schedule 10.0**.

[76] Deposition of Chris Gibson 145-146 (June 22, 2021) (*Rebotix Repair LLC v. Intuitive Surgical, Inc.*, No. 8:20-cv-02274-VMC-TGW (M.D. Fla. filed Sept. 28, 2020)).

[77] Second Am. Compl. ¶ 1 (*Restore Robotics LLC, et al. v. Intuitive Surgical, Inc.*, No. 5:19-cv-00055-TKW-MJF (N.D. Fla. filed Feb. 27, 2019)).

[78] Second Am. Compl. ¶ 1 (*Restore Robotics LLC, et al. v. Intuitive Surgical, Inc.*, No. 5:19-cv-00055-TKW-MJF (N.D. Fla. filed Feb. 27, 2019)).

[79] Second Am. Compl. ¶ 1 (*Restore Robotics LLC, et al. v. Intuitive Surgical, Inc.*, No. 5:19-cv-00055-TKW-MJF (N.D. Fla. filed Feb. 27, 2019)).

[80] Second Am. Compl. ¶¶ 106-129 (*Restore Robotics, LLC, et al. v. Intuitive Surgical, Inc.*, No. 5:19-cv-00055-TKW-MJF (N.D. Fla. filed Feb. 27, 2019)).

[81] 30(b)(6) Deposition of Greg Posdal 51 (November 1, 2022).

12

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

instrument functionality.[82]  SIS essentially is the recovery business sales arm, bringing in recovery business customers, while Restore checks the EndoWrist instruments for remaining lives and checks functionality.[83]  The EndoWrist recovery process involves attaching a reader to an EndoWrist instrument, which reads and notes the number of available lives the instrument has, and the EndoWrist instrument is then returned to its hospital.[84]  SIS had never worked directly with Restore prior to the EndoWrist business, although it had worked with a Restore affiliate on an unrelated product line.[85]



[89]

## IV.  Intuitive's da Vinci surgical system

### A.  Launched in 1999

In 1999, Intuitive launched its first da Vinci surgical system.[90]   In 2000, the U.S. Food and Drug Administration cleared the da Vinci surgical system for general laparoscopic surgery.[91]

---

[82] Discussion with Greg Posdal.  *See also, e.g.*, SIS010151.
[83] 30(b)(6) Deposition of Greg Posdal 51 (November 1, 2022).  Discussion with Greg Posdal.
[84] 30(b)(6) Deposition of Greg Posdal 51-52 (November 1, 2022).
[85] 30(b)(1) Deposition of Greg Posdal 67 (November 1, 2022).
[86] Deposition of Kevin May 79 (November 3, 2022).
[87] Deposition of Clifton Parker 130 (October 25, 2022).  Restore-00027409-00027420 at 411 (Parker Dep. Ex. 130).
[88] Deposition of Kevin May 100-101 (November 3, 2022).
[89] **Schedule 10.0**.
[90] Intuitive Surgical, Inc. Form 10-K for the fiscal year ended December 31, 2021 at 6.
[91] Intuitive Surgical, Inc. Form 10-K for the fiscal year ended December 31, 2021 at 6.

13

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

### B.    da Vinci Products – 5 categories

Intuitive's da Vinci products fall into five categories: (1) da Vinci Surgical Systems; (2) da Vinci instruments and accessories; (3) da Vinci stapling; (4) da Vinci services; and (5) da Vinci Vision, including Firefly Fluorescence imaging systems and da Vinci Endoscopes.[92] Intuitive also provides a comprehensive suite of systems, learning and services options.[93]

### C.    da Vinci Surgical System Models

Intuitive has commercialized the following da Vinci surgical systems: [94]

- Standard – 1999

- da Vinci S – 2006

- da Vinci Si – 2009

- da Vinci Xi – 2014

- da Vinci X – 2017

- da Vinci SP – 2018

The da Vinci SP Surgical System accesses the body through a single incision while the other da Vinci Surgical Systems access the body though multiple incisions.[95]  Intuitive had a "measured launch" of its da Vinci SP Surgical Systems, and, as of December 31, 2021, it had an installed base of 99 da Vinci SP Surgical Systems.[96]

The da Vinci Si is used primarily for single organ surgery, encompassing uterus, prostate, kidney, bladder, lung etc.[97]  The introduction of the Xi model enabled multi-quadrant surgery and was aimed at expanding the target market into general surgery.[98]  As of September 2016, Intuitive projected that, of the over 2,600 then-installed Si systems, between 100 and 350 (with an estimated peak of 347 systems in 2020) would be traded back to Intuitive each year.[99]  It was

---

[92] Intuitive Surgical, Inc. Form 10-K for the fiscal year ended December 31, 2021 at 55.
[93] Intuitive Surgical, Inc. Form 10-K for the fiscal year ended December 31, 2021 at 55.
[94] Intuitive Surgical, Inc. Form 10-K for the fiscal year ended December 31, 2021 at 55.
[95] Intuitive Surgical, Inc. Form 10-K for the fiscal year ended December 31, 2021 at 55.
[96] Intuitive Surgical, Inc. Form 10-K for the fiscal year ended December 31, 2021 at 55.
[97] Intuitive-00102938-00102989 at 942.
[98] Intuitive-00102938-00102989 at 942.
[99] Intuitive-00102938-00102989 at 942.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

also estimated that Si systems would continue to be in active clinical use well past 2027, when there would be over 250 systems installed, representing a very "long tail" of support for an aging, but still very clinically useful, product.[100]  As of September 2019, Intuitive discontinued the sale of certain EndoWrist Instruments on the Si robot.[101]  I understand Intuitive provided incentives for customers to upgrade to the X/Xi and informed its customers that it would not service Si systems or allow purchase of Si instruments past 2024 or whatever was in a customer's contract.[102]

### D.    Placed primarily in acute care hospitals[103]

The da Vinci Surgical Systems (including EndoWrists) are primarily placed (i.e., sold or leased) for use in acute care hospitals.[104]  I understand the number of acute care hospitals in the U.S. changes over time for a variety of reasons, such as how hospitals are categorized and timing.[105]  In 2019, according to the Centers for Medicare and Medicaid, there were approximately 4,749 acute care hospitals in the U.S.[106]  According to the American Hospital Association, in 2022 there were 6,093 hospitals in the U.S., of which 5,139 were community hospitals, which include acute care hospitals.[107]  According to another health care website, there were approximately 4,200 acute health care hospitals in the U.S. as of March 2022.[108]

---

[100] Intuitive-00102938-00102989 at 942.
[101] SIS009443-449 at 444.
[102] *See, e.g.*, Intuitive-00389936; Deposition of Todd Tourand 22-26 (November 4, 2022).
[103] Intuitive uses the word "placement" in its 10-K, presumably because some of its da Vinci Surgical Systems are "placed" under operating leases and not sold.  Intuitive Surgical, Inc. Form 10-K for the fiscal year ended December 31, 2021 at 69.
[104] Discussion with Keith Johnson; I understand invasive procedures that are amenable to the use of robotics in surgeries are also performed as outpatient procedures (Intuitive-00808372-00808551at 388).
[105] Discussion with Jean Sargent.
[106] https://www.carevoyance.com/blog/acute-care-hospitals.
[107] https://www.aha.org/statistics/fast-facts-us-hospitals.
[108] *See, e.g.*, https://www.definitivehc.com/blog/how-many-hospitals-are-in-the-us.  This information was as of March 2022, and this amount consists of 3,822 short-term acute care hospitals and 394 long-term acute care hospitals.

*The BERO Group*

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

### E.  da Vinci Surgical System Components

The da Vinci surgical system is comprised of a surgeon's console, patient-side cart, 3DHD vision system, Firefly fluorescence imaging components and a da Vinci integrated table motion.[109]

#### 1.  Surgeon's Console

The da Vinci Surgical System allows surgeons to operate while comfortably seated at an ergonomic console viewing a 3DHD image of the surgical field.[110]  The da Vinci Surgical System is designed to allow surgeons to operate while seated, which may be clinically advantageous because of reduced surgeon fatigue.[111]  The surgeon's fingers grasp instrument controls below the display with the surgeon's hands naturally positioned relative to his or her eyes.[112]  Using electronic hardware, software, algorithms, and mechanics, the technology translates the surgeon's hand movements into precise and corresponding real-time micro movements of the da Vinci instruments positioned inside the patient.[113]  A second surgeon's console may be used on the da Vinci X, da Vinci Xi, and da Vinci Si models.[114]

#### 2.  Patient-Side Cart

The patient-side cart holds electromechanical arms that manipulate the instruments inside the patient.[115]  Up to four arms attached to the cart can be positioned, as appropriate, and then locked into place.[116]  At least two arms hold surgical instruments, one representing the surgeon's left hand and one representing the surgeon's right hand.[117]  A third arm positions the endoscope, allowing the surgeon to easily move, zoom, and rotate the field of vision.[118]  A fourth instrument arm extends surgical capabilities by enabling the surgeon to add a third instrument to perform

---

[109] Intuitive Surgical, Inc. Form 10-K for the fiscal year ended December 31, 2021 at 6-7.
[110] Intuitive Surgical, Inc. Form 10-K for the fiscal year ended December 31, 2021 at 6.
[111] Intuitive Surgical, Inc. Form 10-K for the fiscal year ended December 31, 2021 at 7.
[112] Intuitive Surgical, Inc. Form 10-K for the fiscal year ended December 31, 2021 at 6.
[113] Intuitive Surgical, Inc. Form 10-K for the fiscal year ended December 31, 2021 at 6-7.
[114] Intuitive Surgical, Inc. Form 10-K for the fiscal year ended December 31, 2021 at 7.
[115] Intuitive Surgical, Inc. Form 10-K for the fiscal year ended December 31, 2021 at 7.
[116] Intuitive Surgical, Inc. Form 10-K for the fiscal year ended December 31, 2021 at 7.
[117] Intuitive Surgical, Inc. Form 10-K for the fiscal year ended December 31, 2021 at 7.
[118] Intuitive Surgical, Inc. Form 10-K for the fiscal year ended December 31, 2021 at 7.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

additional tasks.[119]  The fourth instrument arm is a standard, integrated feature on the da Vinci X, da Vinci Xi, and da Vinci Si Surgical Systems.[120]

### 3.     3DHD Vision System

The vision system includes a 3DHD endoscope with two independent vision channels linked to two separate color monitors through sophisticated image processing electronics and software.[121]  The resulting 3DHD image has high resolution, high contrast, low flicker, and low cross fading.[122]  A digital zoom feature in the 3DHD vision system allows surgeons to magnify the surgical field of view without adjusting the endoscope position and, thereby, reduces interference between the endoscope and instruments.[123]  The 3DHD vision system is a standard, integrated feature on the da Vinci X, da Vinci Xi, da Vinci SP, da Vinci Si, and da Vinci S Surgical Systems.[124]

### 4.     Firefly Fluorescence Imaging ("Firefly")

Firefly is a standard feature of the da Vinci X and da Vinci Xi Surgical Systems and is available as an upgrade on the da Vinci Si Surgical System.[125]  This imaging capability combines an injectable fluorescent dye with a specialized da Vinci camera head, endoscope, and laser-based illuminator to allow surgeons to identify vasculature, tissue perfusion, or biliary ducts in three dimensions beneath tissue surfaces in real-time.[126]  Firefly is typically used in the procedure categories of urology, gynecology, and general surgery.[127]

### 5.     Da Vinci Xi Integrated Table Motion

Integrated Table Motion coordinates the movements of the da Vinci robotic arms with an advanced operating room ("OR") table to enable managing the patient's position in real-time

---

[119] Intuitive Surgical, Inc. Form 10-K for the fiscal year ended December 31, 2021 at 7.
[120] Intuitive Surgical, Inc. Form 10-K for the fiscal year ended December 31, 2021 at 7.
[121] Intuitive Surgical, Inc. Form 10-K for the fiscal year ended December 31, 2021 at 7.
[122] Intuitive Surgical, Inc. Form 10-K for the fiscal year ended December 31, 2021 at 7.
[123] Intuitive Surgical, Inc. Form 10-K for the fiscal year ended December 31, 2021 at 7.
[124] Intuitive Surgical, Inc. Form 10-K for the fiscal year ended December 31, 2021 at 7.
[125] Intuitive Surgical, Inc. Form 10-K for the fiscal year ended December 31, 2021 at 7.
[126] Intuitive Surgical, Inc. Form 10-K for the fiscal year ended December 31, 2021 at 7.
[127] Intuitive Surgical, Inc. Form 10-K for the fiscal year ended December 31, 2021 at 7.

17

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

while the da Vinci robotic arms remain docked.[128]   This gives OR teams the capability to optimally position the operating table during da Vinci Surgical System procedures.[129]   Integrated Table Motion enables surgeons to maximize reach, facilitate access, and choose the angle of approach to target anatomy, as well as reposition the table during the procedure to enhance anesthesiologists' management of the patient.[130]

### F.      U.S. systems sales – 600 and 865 systems placed in 2020 and 2021

Intuitive placed 600 and 865 U.S. da Vinci Surgical Systems in 2020 and 2021, respectively.[131]  Worldwide, Intuitive placed 936 and 1,347 da Vinci Surgical Systems in 2020 and 2021, respectively.[132]

### G.      Installed U.S. daVinci systems – 3,720 units and 4,139 units as of December 31, 2020 and December 31, 2021

Intuitive's installed U.S. daVinci systems base grew from 3,531 units as of December 31, 2019[133] to 3,720 units as of December 31, 2020[134] and 4,139 units as of December 31, 2021.[135] Worldwide, Intuitive's installed base grew from 5,582 units as of December 31, 2019, [136] 5,989 units as of December 31, 2020[137] and 6,730 units as of December 31, 2021.[138]

### H.      Number of daVinci procedures

There are approximately 70 representative clinical uses for da Vinci Surgical Systems.[139] Intuitive uses the number of da Vinci procedures as metrics for financial and operation decision making and to evaluate period-to-period comparisons.[140]   Intuitive believes the number and type

---

[128] Intuitive Surgical, Inc. Form 10-K for the fiscal year ended December 31, 2021 at 7.
[129] Intuitive Surgical, Inc. Form 10-K for the fiscal year ended December 31, 2021 at 7.
[130] Intuitive Surgical, Inc. Form 10-K for the fiscal year ended December 31, 2021 at 7.
[131] Intuitive Surgical, Inc. Form 10-K for the fiscal year ended December 31, 2021 at 69.  Intuitive uses the word "placement" in its 10-K, presumably because some of its da Vinci Surgical Systems are "placed" under operating leases and not sold.
[132] Intuitive Surgical, Inc. Form 10-K for the fiscal year ended December 31, 2021 at 69.
[133] Intuitive Surgical, Inc. Form 10-K for the fiscal year ended December 31, 2019 at 10.
[134] Intuitive Surgical, Inc. Form 10-K for the fiscal year ended December 31, 2020 at 10.
[135] Intuitive Surgical, Inc. Form 10-K for the fiscal year ended December 31, 2021 at 12.
[136] Intuitive Surgical, Inc. Form 10-K for the fiscal year ended December 31, 2019 at 10.
[137] Intuitive Surgical, Inc. Form 10-K for the fiscal year ended December 31, 2020 at 10.
[138] Intuitive Surgical, Inc. Form 10-K for the fiscal year ended December 31, 2021 at 12.
[139] Intuitive Surgical, Inc. Form 10-K for the fiscal year ended December 31, 2021 at 12.
[140] Intuitive Surgical, Inc. Form 10-K for the fiscal year ended December 31, 2021 at 62.

18

of da Vinci procedures provide meaningful information regarding its performance, and that procedure volume is an indicator of the rate of adoption of robotic-assisted surgery and an indicator of future revenue.[141]

Worldwide, approximately 1,229,000, 1,243,000 and 1,594,000 surgical procedures were performed with da Vinci Surgical Systems in 2019, 2020 and 2021, respectively.[142] In the U.S, approximately 883,000, 876,000 and 1,109,000 surgical procedures were performed with da Vinci Surgical Systems in 2019, 2020 and 2021, respectively.[143] General surgery was Intuitive's largest and fastest growing specialty in the U.S. in 2021 with approximately 589,000 procedures, followed by gynecology with approximately 316,000 procedures and urology with approximately 153,000 procedures.[144]

## I.      da Vinci Surgical Systems Sales and Profits

Intuitive does not break out its da Vinci Systems sales and profits on its 10-K's. From 2017 through 2020, Intuitive's "Systems" revenue ranged from approximately $900 million to $1.35 billion per year,[145] the majority of which appears to be revenue for da Vinci Surgical Systems.[146] Intuitive's contribution margins on its "Systems" revenue ranged from approximately 60% to 67% from 2017 through 2020.[147] Intuitive's contribution margin includes direct labor, direct materials, sales commissions and a few other associated costs.[148] Intuitive considers contribution margins to be more meaningful than gross margins.[149]

## V.      Intuitive's EndoWrist Instruments and Accessories

Intuitive offers a comprehensive suite of stapling, energy, and core instrumentation for its surgical systems.[150] Intuitive also sells accessory products and other instruments used in

---

[141] Intuitive Surgical, Inc. Form 10-K for the fiscal year ended December 31, 2021 at 62.
[142] Intuitive Surgical, Inc. Form 10-K for the fiscal year ended December 31, 2021 at 63.
[143] Intuitive Surgical, Inc. Form 10-K for the fiscal year ended December 31, 2021 at 63.
[144] Intuitive Surgical, Inc. Form 10-K for the fiscal year ended December 31, 2021 at 63.
[145] Marshall Mohr Dep. Ex. 234 (Intuitive-00595405).
[146] Based on Intuitive's 10-K's, da Vinci Surgical Systems appear to make up the majority of its "Systems" revenue.
[147] Marshall Mohr Dep. Ex. 234 (Intuitive-00595405).
[148] 30(b)(6) Deposition of Marshall Mohr 34 (November 7, 2022).
[149] 30(b)(6) Deposition of Marshall Mohr 33-34 (November 7, 2022).
[150] Intuitive Surgical, Inc. Form 10-K for the fiscal year ended December 31, 2021 at 7.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

conjunction with daVinci Surgical Systems such as sterile drapes, vision products, camera heads and light guides.[151]

Intuitive's EndoWrist instruments include forceps, scissors, electrocautery tools and other surgical tools that are sold for use with da Vinci Surgical Systems.[152]  EndoWrist instruments are offered in a variety of diameters, of which 8mm and 12mm diameters are the most commonly sold.[153]  A variety of instruments can be selected and used interchangeable during surgery.[154]

### A.      10 to 18 uses per EndoWrist

A programmed memory chip inside each instrument performs several functions that help determine how the da Vinci system and instruments work together.[155]  The memory chip will generally not allow the instrument to be used for more than the prescribed number of procedures.[156]  When the usage counter reaches a specified number of uses, the instrument is rendered unusable with the da Vinci robot.[157]  EndoWrists are sold with a limited number of uses (or "lives"), ranging from 10 to 18 uses, depending on instrument type and whether it is a Si/X/Xi.[158]

In 2020, Intuitive introduced an "Extended Use Program" for select da Vinci X/Xi instruments possessing 12 to 18 uses compared to the previous 10-use limit for these EndoWrist instruments.[159]  I understand the design of the "Extended Use" instruments was similar to 10-use limit instruments and the costs of the "Extended Use" instruments to Intuitive would be "really close" to instruments with 10 uses.[160]

---

[151] Intuitive Surgical, Inc. Form 10-K for the fiscal year ended December 31, 2021 at 8.
[152] Intuitive Surgical, Inc. Form 10-K for the fiscal year ended December 31, 2021 at 8.
[153] Intuitive Surgical, Inc. Form 10-K for the fiscal year ended December 31, 2021 at 7-8.
[154] Intuitive Surgical, Inc. Form 10-K for the fiscal year ended December 31, 2021 at 8.
[155] Intuitive Surgical, Inc. Form 10-K for the fiscal year ended December 31, 2021 at 8.
[156] Intuitive Surgical, Inc. Form 10-K for the fiscal year ended December 31, 2021 at 8.
[157] Intuitive Surgical, Inc. Form 10-K for the fiscal year ended December 31, 2020 at 7.
[158] Intuitive Surgical, Inc. Form 10-K for the fiscal year ended December 31, 2021 at 8.  *See also, e.g.*, Intuitive's October 2021 Instrument and Accessory Catalog X Xi.pdf.  I understand all Si EndoWrists only have 10 uses.
[159] Intuitive Surgical, Inc. Form 10-K for the fiscal year ended December 31, 2021 at 8; *see also*, Intuitive-00004692-00004704 at 695-696.
[160] *See, e.g.*, Deposition of Sharathchandra "Shark" Somayaji 94-103 (November 8, 2022).  I understand Extended Use EndoWrist instruments also sell for more than 10-use EndoWrists.

20

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

### B. S/Si and X/Xi EndoWrists are essentially the same (except for encryption)

I understand Intuitive's S/Si and X/Xi EndoWrist instruments are used for the same applications and essentially perform the same functions.[161]  The primary difference is the encryption for the X/Xi instruments is different than it is for the S/Si instruments.[162]

### C. U.S. S/Si and X/Xi EndoWrist annual unit sales – 2014 through annualized 2022

Intuitive's S/Si and X/Xi EndoWrist unit sales, which were potentially repairable by SIS, from 2014 through annualized 2022 are summarized in **Table 3**:[164]

**Table 3: Intuitive's S/Si and X/Xi EndoWrist unit sales, which were potentially repairable by SIS: 2014 – annualized 2022**

|  | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 (annualized) | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| S/Si | 199,258 | 188,205 | 183,207 | 171,337 | 144,114 | 104,728 | 52,970 | 22,411 | 8,214 | 1,074,444 |
| X/Xi | 10,436 | 42,961 | 78,556 | 128,069 | 189,175 | 266,399 | 299,954 | 346,579 | 365,304 | 1,727,433 |
| Total | 209,694 | 231,166 | 261,763 | 299,406 | 333,289 | 371,127 | 352,924 | 368,990 | 373,518 | 2,801,877 |

### D. EndoWrist sales and profits

Intuitive's "Instruments & Accessories" revenue, the majority of which comes from EndoWrists,[165] increased from approximately $1.6 billion in 2017 to almost $2.5 billion in 2020.[166]  Intuitive's contribution margins on its "Instruments and Accessories" ranged from approximately 72% to 75% between 2017 and 2020.[167]  Intuitive's instruments generally have

---

[161] *See, e.g.*, Deposition of Grant DuQue 25-36, 48-52 and 156-157 (November 8, 2022).
[162] *See, e.g.*, 30(b)(6) Deposition of Grant DuQue 30-41 (November 8, 2022) and Deposition of Sharathchandra "Shark" Somayaji 108-112 and 122-124 (November 8, 2022).
[163] Deposition of Clifton Parker 133-134 (October 25, 2022).
[164] **Schedule 13.0.**
[165] 30(b)(6) Deposition of Marshall Mohr 44-45 (November 7, 2022).
[166] Marshall Mohr Dep. Ex. 234 (Intuitive-00595405).
[167] Marshall Mohr Dep. Ex. 234 (Intuitive-00595405).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

higher margins than its accessories.[168]  For example, Intuitive has sold EndoWrists with gross margins over 90%.[169]

### E.    Expired and potentially repairable EndoWrists approximate 60% of current year units sold

Not all EndoWrists sold would necessarily expire, and inherently there would be some amount of time lag between an initial unit sale and subsequent expiration.  To my knowledge, Intuitive does not publish the number of expired EndoWrist units.  However, based on Intuitive projections, it appears the number of expired EndoWrists was expected to reasonably approximate 60% of EndoWrists sold in the current year.[170]

In approximately August 2017, Intuitive projected 2018 through 2022 annual expirations for the "Top 5" X/Xi EndoWrist instruments and core X/Xi EndoWrist instruments.[171]  As noted above, annual X/Xi EndoWrist sales were increasing and have continued to increase.

The projected 2018 Top 5 X/Xi EndoWrist expired unit sales comprised 60% of the total actual 2018 Top 5 X/Xi EndoWrist unit sales.[172]  **Table 4** below shows Intuitive's projected 2018 and 2019 Top 5 X/Xi EndoWrists expired unit sales as a percentage of the actual 2018 and 2019 2020 EndoWrist sales for those same 5 instruments.[173]

Table 4: Projected Top 5 X/Xi EndoWrist expired units and Actual Top 5 X/Xi EndoWrist units

|  | 2018 | 2019 | Total |
|---|---|---|---|
| Projected Top 5 X/Xi EndoWrists expired units | 73,129 | 100,376 | 173,505 |
| Actual Top 5 X/Xi EndoWrists expired units | 121,440 | 166,666 | 288,106 |
| Projected as a % of actual | 60% | 60% | 60% |

---

[168] 30(b)(6) Deposition of Marshall Mohr 41-42 (November 7, 2022).
[169] Intuitive-00686044.
[170] **Schedule 7.0.**
[171] 30(b)(6) Deposition of Colin Morales 35-43 (November 1, 2022).  *See also*, Morales Dep. Ex.'s 139, 140 and 141 at 1.
[172] **Schedule 7.0.**
[173] **Schedule 7.0.**

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

## VI.    SIS's EndoWrist repair service

In 2019, SIS began selling and promoting its EndoWrist repair service business.[174]  The initial focus of SIS's EndoWrist repair service was for Intuitive's S/Si instruments.[175]  SIS gave multiple EndoWrist repair service presentations to the U.S.'s largest GPO (Vizient, Inc.), and to a division (Yankee Alliance) of the second largest GPO (Premier),[176] who, between them, cover the majority of acute health care providers in the U.S.[177]  As described more below, SIS and Vizient entered into an agreement specific to EndoWrist repairs in September 2019.[178]

SIS also gave EndoWrist repair service presentations and had live or virtual meetings with at least the following 29 health care systems:[179]

1. Banner Health System with 33 hospitals;

2. Legacy Health with 6 hospitals;

3. Providence Health System with 53 hospitals;

4. Marin Health;

5. Honor Health with 6 hospitals;

6. Methodist Hospital of Southern California;

7. Memorial Care with 3 Hospitals;

8. University Medical Center Irvine;

9. Kaiser Permanente with 50 plus hospitals;

10. USC Medical Center;

11. University of Illinois Medical Center;

12. Johns Hopkins MC;

13. Advocate Aurora Health System with 24 hospitals;

14. Ardent Health with 33 hospitals;

15. University Michigan Medical Center;

16. Duke University Medical Center;

17. Piedmont Healthcare with 17 hospitals;

---

[174] Discussions with Keith Johnson and Greg Posdal.
[175] 30(b)(1) Deposition of Greg Posdal 35 (November 1, 2022).  Discussions with Keith Johnson and Greg Posdal.
[176] Plaintiff's Response to Intuitive's Interrogatory No. 2 (May 20, 2022).  Discussion with Keith Johnson.
[177] Discussion with Keith Johnson.  *See, e.g.*, SIS001621-001629 and SIS010691-010707.
[178] SIS000047-000049.
[179] Plaintiff's Response to Intuitive's Interrogatory No. 2 (May 20, 2022).  Discussion with Keith Johnson.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

18. Salinas Valley Medical Center;

19. Pomona Valley Medical Center;

20. UHS with 33 hospitals;

21. SSM with 23 hospitals;

22. Redland Community Hospital;

23. Northside Health with 6 hospitals;

24. Northeast Georgia Health with 6 hospitals;

25. Mayo Clinic;

26. Beth Israel Lahey Health with 13 hospitals;

27. Boston Children's Medical Center;

28. Indiana University Health;

29. Northwestern Memorial Healthcare;

### A.    Monumental Interest in SIS's repair program

Consistent with the many presentations in a short period, the GPO's and hospital systems' interest in SIS's repair program was "monumental."  According to Keith Johnson, SIS's Vice President of Executive Sales and Clinical Programs, SIS had meetings with what probably represented over a thousand hospitals about SIS's Xi repair program.[180]  Keith Johnson also testified he has presented to multiple groups of Vizient regional employees and representatives.[181]

Keith Johnson testified SIS's potential EndoWrist business revenue was somewhere in the range of $250 million to $350 million per year, based on:[182]

> …conversations I had with key customers to understand the number of robotics they had, the number of robots they had, the dollars spent on devices and instrumentation for those robots, and

---

[180] 30(b)(6) Deposition of Keith Johnson 44-45 (October 27, 2022).  Mr. Johnson listed the following hospitals he has spoken to about SIS's Xi repair program: Legacy Health, Providence Health System, Sutter Health, Kaiser Permanente, Memorial Care, the UC California system, Banner Health System, Honor Health, Baylor Scott & White, University health systems across the country from Michigan to Duke to North Carolina, Mayo Clinic, Cleveland Clinic, Advocate Aurora, Lahey Health System, Boston's Children's Medical Center, Piedmont Health System, Piedmont and John Hopkins.

[181] 30(b)(6) Deposition of Keith Johnson 45 (October 27, 2022).  *See also*, SIS343965-343971 at 970, where the four Vizient regions are identified as West, Central, Southeast and Northeast Zones.  Based on discussions with Keith Johnson, I understand he misspoke in his deposition, as he never gave a presentation to Vizient's Northeast Zone.

[182] Deposition of Keith Johnson 17 (October 27, 2022).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

then looking at our global customer list through Vizient and the
opportunities we would have.

Regarding customer demand, Keith Johnson testified:[183]

…Every person I called, every organization I called, took a
meeting.  We sat down with all of them.  They were – they all
wanted it.

The reason that we felt great about scalability is we didn't have
any competition, we were it.  It was a program everybody wanted,
there – we weren't fighting the OEM on the repairs, we weren't
fighting other companies, it was us, so the ability to scale was –
was huge.

While Intuitive's S/Si business was SIS's initial focus, there was "monumental" interest
from hospitals in its X/Xi repair business.[184]  For example, Keith Johnson testified "the interest in
saving and reducing costs on robotic surgery in the industry is something I've never seen before
in my 25 years of being in the surgical business."[185]

### B.   SIS's sales prices ranging from $1,100 to $1,700 per repair, representing an average discount of 42%

SIS's pricing for the EndoWrist products ranged from $1,100 to $1,700 and covered 38
different EndoWrist products.[186]  As shown on **Schedule 12.2** these prices represented an average
discount of 42% off Intuitive's new instrument prices.

### C.   SIS's estimated repair services applied to all U.S. da Vinci systems' installed base equates to more than $800 million potential EndoWrist repair service revenue per year

In December 2019, Keith Johnson estimated that SIS could average $220,000 in gross
revenue per year per Si robot for its services based on discussions with various customers.[187]  The
revenue per robot expectations for X / Xi robots were similar.[188]

---

[183] Deposition of Keith Johnson 20 (October 27, 2022).
[184] 30(b)(6) Deposition of Keith Johnson 44 (October 27, 2022).  Discussion with Keith Johnson.
[185] 30(b)(6) Deposition of Keith Johnson 44 (October 27, 2022).
[186] SIS0000047-0000049.
[187] Discussion with Keith Johnson.
[188] Discussion with Keith Johnson.

25

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

An October 2019 Banner Health presentation noted that Banner Health had spent approximately $8.8 million on EndoWrist instruments in the past 24 months for its 13 Si robots.[189]  This calculates to approximately $338,000 per year per Si robot.[190]

Applying $220,000 to Intuitive's total 3,720 December 31, 2020 U.S. da Vinci systems installed base (all da Vinci systems) equates to a potential $818.4 million annual SIS EndoWrist service revenue in 2021.[191]

### D.  Subcontracted 2019 repair work to Rebotix

At SIS's EndoWrist repair business inception in 2019, SIS subcontracted its repair work to Rebotix.[192]  SIS had long-standing direct relationships and a strong reputation with hospitals, and SIS and Rebotix discussed (but never executed) a distributor agreement.[193]  As addressed above, SIS generated monumental interest and did begin selling and distributing repair services.

Rebotix initially repaired SIS's EndoWrists.  The EndoWrist repair process included initial disassembly and inspection, checking the mechanical operation and integrity of all mechanical components, an electrical integrity check to confirm integrity of electrical insulation, cleaning, sharpening or alignment of the instrument tip, a series of tests to confirm movements of the instrument tip are within original specifications, and setting the counter to a value corresponding to the initial setting of a new EndoWrist instrument.[194]  Under this repair process, third parties such as Rebotix were suppliers to SIS (or SIS was the distributor), which had client contracts.[195]

---

[189] SIS009443-949 at 947-948.  Discussion with Keith Johnson.
[190] $8.8 million / 2 = $4,400,000 per year.  $4,400,000 / 13 robots = approximately $338,000 per Si robot per year.
[191] 3,720 installed base (per above) x $220,000 per robot = approximately $818.4 million.  Using the installed base as an estimate for potential 2021 revenue likely understates this amount, since it does not take into account any other units placed into service during 2021.
[192] Plaintiff's Response to Intuitive's Interrogatory No. 5 (August 8, 2022).  *See also*, 30(b)(1) Deposition of Greg Posdal 23-27 (November 1, 2022).
[193] Plaintiff's Response to Intuitive's Interrogatory No. 5 (August 8, 2022).
[194] Plaintiff's Response to Intuitive's Interrogatory No. 5 (August 8, 2022).
[195] Plaintiff's Response to Intuitive's Interrogatory No. 5 (August 8, 2022).

26

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

### E. Initial EndoWrist Repair Sales and Customers

While SIS's repair business caught Intuitive's attention, SIS's initial EndoWrist repairs were minimal before they were stopped. SIS serviced 49 EndoWrists and had at least $38,900 in total revenue with a price range of $1,100 to $1,700 per EndoWrist repair.[196]

Prior to Intuitive's actions of sending cease and desist letters to SIS's customers and potential customers, SIS's EndoWrist repair customers included Legacy Health System, Marin Health Medical Center, Kaiser Permanente Fontana Medical Center and Advocate Aurora Health System and its potential customers included Banner Health System, Piedmont Healthcare and Vizient, among others.[197]

### F. Intended to repair EndoWrists in-house

SIS intended to bring all EndoWrist repairs in-house to its Glendale Heights facility.[198] SIS began setting up its own repair capabilities at its facilities in Glendale Heights, Illinois, based on the existing Rebotix process.[199]

In February 2020, SIS hosted an EndoWrist repairs meeting at its Glendale Heights facility.[200] Multiple representatives of a large hospital system with tens of millions of dollars in annual EndoWrist costs attended.[201] The attendees discussed SIS performing repairs of EndoWrists, i.e., with third parties such as Rebotix providing the updated chip and SIS performing the underlying repairs at its facilities.[202]

### G. EndoWrist Recovery (as opposed to repair) Program

SIS also offers a Robotic EndoWrist Inspection and Recovery Program wherein SIS recovers and inspects instruments to determine if the instrument(s) have any remaining uses.[203]

---

[196] **Schedule 14.0**.
[197] Plaintiff's Response to Intuitive's Interrogatory No. 4 (August 8, 2022). SIS000167 (Posdal Dep. Ex. 142). Discussion with Keith Johnson.
[198] 30(b)(1) Deposition of Greg Posdal 25-31 (November 1, 2022).
[199] Plaintiff's Response to Intuitive's Interrogatory No. 5 (August 8, 2022). Discussion with Greg Posdal.
[200] Plaintiff's Response to Intuitive's Interrogatory No. 5 (August 8, 2022).
[201] Plaintiff's Response to Intuitive's Interrogatory No. 5 (August 8, 2022).
[202] Plaintiff's Response to Intuitive's Interrogatory No. 5 (August 8, 2022).
[203] SIS003902-003903.

27

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

As of January 2021, an estimated 10% to 23% of disposed EndoWrists still had active uses remaining.[204]

Similar to the repair business opportunities, SIS believes there are great opportunities in its recovery business.[205]  For example, in 2019, Banner Health System estimated it discarded an estimated $8 million worth of unused lives in EndoWrists.[206]

## VII.   Intuitive considered its own instrument refurbishment service but decided against it

Given Intuitive's knowledge regarding hospitals' interest in repair services and its desire to preempt third-party repairs, in 2017 and 2018, Intuitive looked at developing an instrument refurbishment service for core instruments (such as EndoWrists) code-named "Project Dragon," wherein the instruments would be returned to like new condition.[207]  Project Dragon provides Intuitive's insight about repairing / refurbishing EndoWrist instruments.

According to a 2017 Project Dragon presentation, Intuitive considered the reprocessed, SUD market to be the closest parallel to its proposed refurbished instrument plan.[208]  The presentation also stated that the "reprocessed, lap, direct energy market" is the best parallel within that market.[209]

According to this Project Dragon presentation, the customer value of Project Dragon included: 1) an opportunity for Intuitive's customers to have improved running costs associated with da Vinci procedures, which it believed would grow or accelerate growth in procedures.  As part of this, Intuitive proposed a 20% discount (as opposed to a 30% discount), which it believed would maintain its position as a partner and not force it into a commodity position; 2) Increasing customer confidence in refurbished, low cost instruments, as Intuitive expected third party companies would be offering reprogrammed da Vinci instruments; and 3) Benefitting from reduced environmental and economic overhead associated with da Vinci waste.[210]  This

---

[204] SIS003902-003903.
[205] Discussion with Keith Johnson and Greg Posdal.
[206] SIS343965-343971 at 969.
[207] *See, e.g.*, Intuitive-00103407-00103426 and Intuitive-00104182-00104207 (Morales Dep. Ex. 126).
[208] *See, e.g.*, Intuitive-00103407-00103426 at 410 and 413.
[209] *See, e.g.*, Intuitive-00103407-00103426 at 413.
[210] *See, e.g.*, Intuitive-00103407-00103426 at 409 and Intuitive-00104182-00104207 (Morales Dep. Ex. 126) at 185.

28

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

presentation also noted that Intuitive would be challenged to compete if competitors entered the market and offered discounts of approximately 50%.[211]

This presentation also stated that reprocessed SUDs represented 10% and were projected to grow to 15% in the next 10 years.[212]  Later Intuitive Project Dragon presentations in July 2017 and April 2018 considered a 20% penetration rate for refurbished sales.[213]  In August 2019, Intuitive considered penetration rates up to 50%.[214]

I understand Intuitive never went forward with Project Dragon,[215] in part because it was too expensive.[216]

## VIII.      Rebotix's repair program – working with SIS

In the spring / summer of 2019, SIS began working with Rebotix on its EndoWrist repair business.[217]  SIS initially provided the repair business customers while Rebotix provided the Interceptor chip (or "repair chip") to reset S / Si EndoWrist counters enabling additional EndoWrist uses and the actual repair.[218]

SIS intended to bring the EndoWrist repair work in-house, like it does with its other repair services, while purchasing the Interceptor chip from Rebotix and/or a similar chip from Restore.[219]  In 2019, SIS and Rebotix had a draft agreement, that would have required SIS to

---

[211] *See, e.g.*, Intuitive-00103407-00103426 at 410 and Intuitive-00104182-00104207 (Morales Dep. Ex. 126) at 186.
[212] *See, e.g.*, Intuitive-00103407-00103426 at 413.
[213] Intuitive-00098370, Intuitive-00098681 and Deposition of Ronald Blair 81-82 (May 24, 2021) (*Rebotix Repair LLC v. Intuitive Surgical, Inc.*, No. 8:20-cv-02274-VMC-TGW (M.D. Fla. filed Sept. 28, 2020)).  Intuitive-00092805, Intuitive-00098370; see also, 30(b)(6) Deposition of Nickola Goodson 162-165 (October 27, 2022).
[214] *See, e.g.*, Intuitive-00581814-00581883 at 858, 868 and 877.  One estimate shows 59,700 refurbished Xi instruments out of a total 144,985 Xi instruments forecasted in 2020.  The other estimate shows 72,492 refurbished Xi instruments out of a total 144,985 Xi instruments forecasted in 2020.  *See also*, Intuitive-00086011-082 at 054, 064 and 073.
[215] Deposition of Katie Scoville 11-13 (May 26, 2021) (*Rebotix Repair LLC v. Intuitive Surgical, Inc.*, No. 8:20-cv-02274-VMC-TGW (M.D. Fla. filed Sept. 28, 2020)); Deposition of Ron Bair 67-69 and 144-147 (May 24, 2021) (*Rebotix Repair LLC v. Intuitive Surgical, Inc.*, No. 8:20-cv-02274-VMC-TGW (M.D. Fla. filed Sept. 28, 2020)).
[216] Deposition of Margaret Nixon 109-110 (October 7, 2022).
[217] 30(b)(1) Deposition of Greg Posdal 23-25 (November 1, 2022).
[218] 30(b)(1) Deposition of Greg Posdal 25 (November 1, 2022).
[219] 30(b)(1) Deposition of Greg Posdal 25 (November 1, 2022).

29

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

purchase 50 Interceptors for up to $800 per interceptor.[220]

[The remainder of the page body is redacted.][230]

---

[220] Deposition of Chris Gibson 162-163 (June 22, 2021) and REBOTIX061127-138 at 128-129 (Gibson Dep. Ex. 13) (*Rebotix Repair LLC v. Intuitive Surgical, Inc.*, No. 8:20-cv-02274-VMC-TGW (M.D. Fla. filed Sept. 28, 2020)).

[221] Deposition of Chris Gibson 163 (June 22, 2021) (*Rebotix Repair LLC v. Intuitive Surgical, Inc.*, No. 8:20-cv-02274-VMC-TGW (M.D. Fla. filed Sept. 28, 2020)).  Discussion with Greg Posdal.

[222] 30(b)(1) Deposition of Greg Posdal 41-42 (November 1, 2022).

[223] 30(b)(1) Deposition of Greg Posdal 41-42 (November 1, 2022).

[224] **Schedule 10.1**.  *See also*, REBOTIX162208-162212 at 212.

[225] Discussion with Greg Posdal.  REBOTIX067735-737 (Gibson Dep. Ex. 14)

[226] **Schedule 10.1**.

[227] Deposition of Stan Hamilton 15 (November 4, 2022).

[228] Deposition of Stan Hamilton 11-12 and 42-44 (November 4, 2022).

[229] Deposition of Stan Hamilton 15 (November 4, 2022).

[230] 30(b)(6) Deposition of Glen Papit 101 (June 2, 2021) (*Rebotix Repair LLC v. Intuitive Surgical, Inc.*, No. 8:20-cv-02274-VMC-TGW (M.D. Fla. filed Sept. 28, 2020)).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

## IX.    Restore's repair program – working with SIS

SIS and Restore are partners in SIS's EndoWrist recovery business for Si and Xi instruments.[231]  SIS's EndoWrist recovery business identifies the available lives or uses remaining on an EndoWrist and confirms EndoWrist instrument functionality.[232]  SIS essentially is the recovery business sales arm, bringing in recovery business customers, while Restore checks the EndoWrist instruments for remaining lives and checks functionality.[233]  The EndoWrist recovery process involves attaching a reader to an EndoWrist instrument, which reads and notes the number of available lives the instrument has, and the EndoWrist instrument is then returned to its hospital. [234]

### A.    Expected greater than 70% to 80% of market would use repair services

As discussed herein,

### B.

[236]

### C.

---

[231] 30(b)(6) Deposition of Greg Posdal 51 (November 1, 2022).

[232] Discussion with Greg Posdal.  *See also, e.g.*, SIS010151.

[233] 30(b)(6) Deposition of Greg Posdal 51 (November 1, 2022).  Discussion with Greg Posdal.

[234] 30(b)(6) Deposition of Greg Posdal 51-52 (November 1, 2022).

[235] Deposition of Clifton Parker 166-167 (October 25, 2022).

[236]

*The BERO Group*

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY



---

[237] Deposition of Kevin May 75-76 (November 3, 2022).
[238] Deposition of Clifton Parker 144 (October 25, 2022).  Of this amount, approximately $1.2 million was spent on bypassing the S/Si chip.
[239] Deposition of Clifton Parker 172 (October 25, 2022).
[240] Deposition of Clifton Parker 174-175 (October 25, 2022).
[241] Deposition of Clifton Parker 143-144 (October 25, 2022).
[242] Deposition of Kevin May 117-118 (November 3, 2022).
[243] Deposition of Clifton Parker 142 (October 25, 2022).
[244] Deposition of Kevin May 75-76 (November 3, 2022).
[245] Deposition of Kevin May 40 (November 3, 2022).  May Dep. Ex. 155 (Restore-00091199-206 at 199).
[246] Deposition of Kevin May 40 (November 3, 2022).
[247] Deposition of Kevin May 60-61 (November 3, 2022).
[248] Based on discussion with Kurt Humphrey.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

## X.    GPO's

GPO's are entities that help healthcare providers, such as hospitals, nursing homes and home health agencies, realize savings and efficiencies by aggregating purchasing volume and using that leverage to negotiate discounts with manufacturers, distributors and other vendors.[249] The three largest U.S. GPO's are Vizient, Inc., Premier and Health Trust.[250]

### A.    Vizient – more than 60% of U.S. acute care providers in 2022

Vizient, Inc. ("Vizient") is the largest GPO in the U.S., with approximately 449,000 staffed beds.[251]  As of 2019, Vizient served more than 50% of the health care organizations in the U.S.[252]   As of late November 2022, Vizient serves more than 60% of U.S. acute care hospitals, 97% of academic medical centers and more than 20% of ambulatory care providers.[253]  I understand Vizient's core business is larger hospitals or hospital systems, which tend to have at least average size acute care providers.[254]

Vizient provides expertise, analytics and advisory services and has a contract portfolio representing more than $130 billion in annual purchasing volume.[255]  Vizient's solutions and services improve the delivery of high-value care by aligning cost, quality and market performance.[256]  Vizient represents between 3,500 and 4,000 hospitals.[257]

#### 1.    September 2016 Vizient – SIS Agreement

In 2016, Vizient Supply LLC and SIS entered into a Supplier Services Agreement for instrument repair that was effective September 1, 2016 (the "September 2016 Vizient

---

[249] https://supplychainassociation.org/about-us/what-is-gpo/.
[250] Discussion with Keith Johnson and Greg Posdal.  Intuitive-00807510-00807557 at 549.
[251] *See, e.g.*, https://newsroom.vizientinc.com/en-US/releases/vizient-announces-11-member-agreements-for-q1-2022 and https://www.definitivehc.com/blog/top-10-gpos-by-staffed-beds.
[252] https://web.archive.org/web/20191108191050/https://www.vizientinc.com/what-we-do.
[253] *See, e.g.*, https://www.vizientinc.com.
[254] Discussions with Keith Johnson and Jean Sargent.
[255] *See, e.g.*, https://newsroom.vizientinc.com/en-US/releases/vizient-announces-11-member-agreements-for-q1-2022.
[256] *See, e.g.*, https://newsroom.vizientinc.com/en-US/releases/vizient-announces-11-member-agreements-for-q1-2022.
[257] Discussion with Keith Johnson.  In his deposition, Keith Johnson testified he thought Vizient represented between 2,500 and 3,000 hospitals, although he qualified this statement.  30(b)(6) Deposition of Keith Johnson 53 (October 27, 2022).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Agreement").[258]  According to this Agreement, Vizient provided purchasing opportunities to individual entities or groups of entities under various contracts, each of which Vizient referred to as a "Member" or, collectively, as "Members."[259]  I understand these "Members" represent the hospitals Vizient represents, as noted above.  Under this Agreement, SIS agreed to offer certain services defined in Exhibits A, A.1 and B for sale and license to end-use customers, such as these "Members."[260]

This Agreement had an initial 3-year term effective September 1, 2016 and would renew automatically for two additional one-year terms unless Vizient gave adequate notice.[261]  SIS agreed to pay Vizient a GPO administrative fee of 4% of all net sales (as defined in the Agreement) for the services it sold to Members.[262]

## 2. September 2019 Vizient – SIS Agreement Amendment specific to EndoWrist repairs

In 2019, Vizient Supply, LLC and SIS entered into an Amendment to their September 1, 2016 Agreement ("September 2019 Vizient Amended Agreement") that was effective September 15, 2019.[263]  This Amended Agreement addressed SIS's intention to repair EndoWrist products, and included an Exhibit A, a da Vinci EndoWrist Pricing Schedule, for 38 EndoWrist products.[264]  The timing of this Amended Agreement also coincided with Vizient's interest in SIS's EndoWrist repair business and the meetings it helped set up with its members.[265]

The EndoWrist pricing ranged from $1,100 to $1,700.[266]  I understand SIS would have paid Vizient a GPO administrative fee of 4% of net sales on EndoWrist sales made under this Amendment, consistent with the September 2016 Agreement described above.[267]

---

[258] SIS330591-330634.
[259] SIS330591-330634 at 592.
[260] SIS330591-330634 at 592.  The prices for the various services SIS agreed to offer were all on Exhibit A (SIS330591-330634 at 608-623).
[261] SIS330591-330634 at 594.
[262] SIS330591-330634 at 597.
[263] SIS0000047-0000049.
[264] SIS0000047-0000049.  Discussion with Keith Johnson.
[265] Discussion with Keith Johnson.
[266] SIS0000047-0000049.
[267] Discussion with Keith Johnson.

34

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

### 3. August 2020 Vizient – SIS Agreement - specific to EndoWrist recovery (not repairs)

In 2020, Vizient Supply, LLC and SIS entered into a Supplier Services Agreement for third party instrument and scope repair that was effective August 1, 2020.[268]  I understand this Amended Agreement had no effect on any EndoWrist repairs.[269]  I understand this agreement effectively was a renewal of the September 2016 Agreement described above.[270]  I understand this Amended Agreement was specific to EndoWrist recovery, and not repairs.[271]

According to this Agreement, Vizient provided purchasing opportunities to individual entities or groups of entities under various contracts, each of which Vizient referred to as a "Member" or, collectively, as "Members."[272]  I understand these "Members" represent the hospitals Vizient represents, as noted above.  Under this Agreement, SIS agreed to offer certain services defined in Exhibits A, A.1 and B for sale and license to end-use customers, such as these "Members."[273]

This Agreement had an initial 3-year term effective August 1, 2020 and would renew automatically for two additional one-year terms unless Vizient gave adequate notice.[274]  SIS agreed to pay Vizient a GPO administrative fee of 4% of all net sales (as defined in the Agreement) for the services it sold to Members, with the exception of net sales to new customers within the first 12 months of any new customers end user agreement with SIS, for which SIS agreed to pay Vizient a 5% GPO administrative fee.[275]

---

[268] SIS169233-169280.
[269] Discussion with Keith Johnson.
[270] Discussion with Keith Johnson.
[271] Discussion with Keith Johnson.
[272] SIS169233-169280 at 234.
[273] SIS169233-169280 at 234.  The prices for the various services SIS agreed to offer were all on Exhibit A (SIS169233-169280 at 250-264).
[274] SIS169233-169280 at 236.
[275] SIS169233-169280 at 238-239.  These "new customers" were defined as customers who would sign an end user agreement after August 1, 2020, the Agreement's effective date.  After 12 months, SIS would pay a 4% GPO administrative fee on net sales to these "new customers."

35

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

### 4. Subsequent Vizient – SIS Agreement Amendments – specific to EndoWrist recovery (not repairs)

In 2020, Vizient Supply, LLC and SIS entered into an Amendment to their August 1, 2020 Agreement that was effective November 15, 2020.[276]  This Amended Agreement reflected SIS's offering a Flat Capitated Program and a Capitated Risk Share Program for certain services shown on Exhibit A to this Amended Agreement.[277]  I understand this Amended Agreement was specific to EndoWrist recovery, and not repairs.[278]

In 2021, Vizient Supply, LLC and SIS entered into an Amendment to their August 1, 2020 Agreement that was effective June 1, 2021.[279]  This Agreement amended Exhibit A (Services Description and Pricing) to reflect SIS's Inspection and Recovery Program for Si EndoWrists.[280]  I understand this Amended Agreement was specific to EndoWrist recovery, and not repairs.[281]

In 2021, Vizient Supply, LLC and SIS entered into an Amendment to their August 1, 2020 Agreement that was effective October 8, 2021.[282]  This Agreement amended Exhibit A (Services Description and Pricing) to reflect SIS's Inspection and Recovery Program for all EndoWrists (such as X/Xi), not just Si EndoWrists, as the June 1, 2021 Amendment described above did.[283]  I understand this Amended Agreement was specific to EndoWrist recovery, and not repairs.[284]

### B. Premier – 2nd largest GPO in the U.S.

Premier, Inc. ("Premier") is a healthcare improvement company located in Charlotte, North Carolina.[285]  Premier has an alliance of approximately 4,400 U.S. hospitals and health

---

[276] SIS116933-116940.
[277] SIS116933-116940.
[278] Discussion with Keith Johnson.
[279] SIS045231-045232.
[280] SIS045231-045232.
[281] Discussion with Keith Johnson.
[282] SIS075744-075746.
[283] SIS075744-075746.  Discussion with Keith Johnson.
[284] Discussion with Keith Johnson.
[285] https://premierinc.com/about .

36

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

systems and more than 250,000 other providers and organizations.[286]  Premier is the second largest GPO in the U.S., with approximately 342,000 staffed beds.[287]

Yankee Alliance is a Premier Certified Sponsor,[288] which I understand means it's a regional affiliate of Premier.[289]  In 2012, SIS and Yankee Alliance signed an Agreement that was effective from November 1, 2012 through September 30, 2017.[290]  SIS agreed to pay Yankee Alliance an administrative fee of 3% purchases made by participants (as defined in the Agreement).[291]  I understand this Agreement was extended through January 31, 2022.[292]  SIS and Yankee Alliance signed another Agreement that is effective from February 1, 2022 through January 1, 2025.[293]

### C.    HealthTrust

HealthTrust is located in Nashville, Tennessee, and has more than 1,600 hospital partners.[294]  HealthTrust is the third biggest GPO in the U.S., with approximately 174,000 staffed beds.[295]  SIS does not have a relationship with HealthTrust.[296]

## XI.    Robotic Surgery Industry

I understand robotic surgeries involve machines guided by doctors to perform surgical procedures.[297]  Robotic surgeries relieve surgeons of some repetitive labor and require tremendous skills by surgeons performing these surgeries.[298]  Robotic surgeries are used primarily to allow operations to take place through minimally invasive incisions, eliminate

---

[286] https://premierinc.com/about.
[287] https://www.definitivehc.com/blog/top-10-gpos-by-staffed-beds.  Discussion with Keith Johnson.
[288] https://www.yankeealliance.com/content/premier-certified-sponsor-affiliates.
[289] Discussion with Keith Johnson.
[290] SIS319315-319322.
[291] SIS319315-319322 at 316.
[292] SIS143365-143366.  Discussion with Keith Johnson.
[293] SIS163317-163341.  While Greg Posdal signed this Agreement, this copy has some edits on it.
[294] https://healthtrustpg.com/about-healthtrust/.
[295] https://www.definitivehc.com/blog/top-10-gpos-by-staffed-beds.
[296] Discussion with Keith Johnson.
[297] Moore, Eric J., "Robotic Surgery," Britannica (https://www.britannica.com/science/robotic-surgery).
[298] Moore, Eric J., "Robotic Surgery," Britannica (https://www.britannica.com/science/robotic-surgery).

37

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

unwanted motion, improve surgical dexterity and allow remote surgery.[299]  The first robotic surgery was performed in 1985.[300]

Laparoscopic surgery, in which a thin lighted optical instrument, similar to a small telescope, is used to examine abdominal and thoracic (chest) cavities became more popular in the 1980s and 1990s.[301]  With the use of laparoscopes, surgeons found they could perform operations through small incisions and decrease patients' recovery time and hospital stays.[302]  The approach represented a type of minimally invasive surgery.[303]

By the late 1990s, three systems designed for minimally invasive surgeries had been tested: Intuitive's da Vinci surgical system, and the AESOP and Zeus Robotic Surgical systems, both developed by Computer Motion, Inc.[304]  Computer Motion, Inc. was subsequently purchased by Intuitive Surgical, and the da Vinci surgical system became the most widely used robotic surgical system worldwide.[305]

As of June 2019, the medical robotics market for invasive procedures was expected to increase from $4B in 2019 to $17B worldwide by 2030 with procedure penetration increasing from 2% to 12%.[306]  In 2018, there were an estimated 13.1 million robotic eligible procedures.[307]  The three main players for this market were listed as Intuitive, Johnson and Johnson and Medtronics.[308]  As of June 2019, Intuitive had a more than 3,000 unit head start compared to its competition, which was expected to increase in the coming years.[309]

## XII.    Surgical Instruments Industry

I understand surgical instruments can generally be categorized as single-use devices ("SUDs" or "disposable devices") and reusable instruments.[310]  Disposable devices are intended

---

[299] Moore, Eric J., "Robotic Surgery," Britannica (https://www.britannica.com/science/robotic-surgery).
[300] Moore, Eric J., "Robotic Surgery," Britannica (https://www.britannica.com/science/robotic-surgery).
[301] Moore, Eric J., "Robotic Surgery," Britannica (https://www.britannica.com/science/robotic-surgery).
[302] Moore, Eric J., "Robotic Surgery," Britannica (https://www.britannica.com/science/robotic-surgery).
[303] Moore, Eric J., "Robotic Surgery," Britannica (https://www.britannica.com/science/robotic-surgery).
[304] Moore, Eric J., "Robotic Surgery," Britannica (https://www.britannica.com/science/robotic-surgery).
[305] Moore, Eric J., "Robotic Surgery," Britannica (https://www.britannica.com/science/robotic-surgery).
[306] Intuitive-00808372-00808551 at 372.
[307] Intuitive-00808372-00808551 at 390.
[308] Intuitive-00808372-00808551 at 372.
[309] Intuitive-00808372-00808551 at 414.
[310] *See, e.g.*, https://bmpmedical.com/reasons-to-switch-to-single-use-medical-devices-and-disposable-medical-supplies/.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

for use on one patient during a single procedure.[311]  Reusable devices are devices that can be re-processed after use (e.g., cleaned and disinfected or sterilized) and reused for multiple patients and / or procedures.[312]

To avoid any risk of infection by a contaminated device, reusable devices undergo "reprocessing," a detailed, multistep process to clean and then disinfect or sterilize them.[313] When instructions for reprocessing are completely and correctly followed after each use of a device, reprocessing results in a device that can be safely used more than once in the same patient, or in more than one patient.[314]  Adequate reprocessing of reusable medical devices is vital to protecting patient safety.[315]

Some examples of reusable devices include surgical instruments (such as clamps and forceps), endoscopes (such as colonoscopes, used to visualize areas inside the body), endoscope accessories (such as graspers and scissors) and laparoscopic surgery accessories (such as arthroscopic shavers).[316]

When reusable instruments are no longer usable, I understand they can be disposed of, remanufactured, refurbished and / or repaired.  The FDA defines these activities as follows:[317]

- Remanufacture: Process, condition, renovate, repackage, restore, or any other act done to a finished device that significantly changes the finished devices performance or safety specifications, or intended use.

- Recondition / Refurbish / Rebuild: Restores a medical device to the OEM's original specifications or to be "like new."  The device may be brought to current specifications if the change(s) made to the device do not significantly change the finished device's performance or safety specifications, or intended use.  These activities include repair of components, installation of OEM provided updates and upgrades, and replacement of worn parts.

---

[311] https://www.cdc.gov/oralhealth/infectioncontrol/faqs/single-use-devices.html and https://www.fda.gov/medical-devices/products-and-medical-procedures/reprocessing-reusable-medical-devices.
[312] https://www.fda.gov/medical-devices/reprocessing-reusable-medical-devices/what-are-reusable-medical-devices and https://www.fda.gov/medical-devices/products-and-medical-procedures/reprocessing-reusable-medical-devices.
[313] https://www.fda.gov/medical-devices/products-and-medical-procedures/reprocessing-reusable-medical-devices.
[314] https://www.fda.gov/medical-devices/products-and-medical-procedures/reprocessing-reusable-medical-devices.
[315] https://www.fda.gov/medical-devices/products-and-medical-procedures/reprocessing-reusable-medical-devices.
[316] https://www.fda.gov/medical-devices/reprocessing-reusable-medical-devices/what-are-reusable-medical-devices.
[317] https://www.fda.gov/media/150141/download at 4-5.

39

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

- Repair: A type of servicing that returns a component to original specifications, including replacing non-working components or parts outside of routine or periodic upkeep for the current owner of the device.

I understand the service SIS provided would be categorized as a repair since it returned a component (the EndoWrist instruments) to their original specifications, did not significantly change the finished device's performance, safety specifications or intended use, and returned the device to the current owner.[318]

## XIII.    Anticompetitive Conduct Damages

I understand the primary objective of antitrust laws is to promote competition by prohibiting actions that restrain or are likely to restrain competition.  As noted above, Intuitive has been accused of the following four antitrust counts: 1) Tying; 2) Exclusive Dealing; 3) Monopolization; 4) Attempted Monopolization.[319] Intuitive has also been accused of Unfair Trade Practices in violation of the Lanham Act.[320]

Internal Intuitive e-mails from May 2018 addressed how the aftermarket "reprogramming" activity was picking up in the U.S. and Intuitive detected its first United States usage.[321]  At this time, Intuitive considered whether it should investigate software changes to the Xi in response to this market activity.[322]  Intuitive continued to monitor this activity through 2019.[323]  On September 9, 2019, an Intuitive email chain included a forwarded e-mail which noted that Kaiser Permanente and Legacy Health System were using SIS to "refurbish" EndoWrist products, at approximately 40% cost savings.[324]  In an earlier e-mail in the chain, a Vizient Enterprise Client Manager indicated that "Surgical Instrument Service Company (SIS) is now the only supplier providing refurbishment to Intuitive Surgical's da Vinci EndoWrist."[325]

---

[318] Discussion with Jean Sargent.
[319] Compl. ¶¶ 111-121.
[320] Compl. ¶¶ 122-126.
[321] Intuitive-0104535-0104537 at 537.
[322] Intuitive-0104535-0104537.
[323] *See, e.g.,* Intuitive-00110242-00110243; Intuitive-00110255-00110258; Intuitive-00241336-00241370 at 343 and 349-352; Intuitive-00338790-00338805; Intuitive-01024426-01024427; Intuitive-00049128-0049132; Deposition of Dan Jones 74-77 (November 10, 2022); Deposition of Margaret Nixon 143-144 (October 7, 2022).
[324] Intuitive-00110255-00110258 at 258.
[325] Intuitive-00110255-00110258 at 258.

40

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

When addressing antitrust conduct, I understand defining the relevant market or markets can help determine where the competition occurs and in which market the market power is exercised. I understand relevant markets generally include a group of products or services and a geographic area.[326] For purposes of my report, I understand the relevant product markets are the markets for minimally invasive soft tissue surgical robots and the market for repairs of EndoWrist instruments, and I understand the relevant geographic market is the U.S. I understand SIS and Intuitive have competed for sales and / or repairs of EndoWrist instruments in the U.S. market, and SIS intended to still be competing in this market, but for Intuitive's anticompetitive conduct.

## XIV.    SIS's Lost Profits Damages

Damages are typically intended to put the Plaintiff (here, SIS) in the same financial position it would have been in but for the Alleged Wrongdoings.[327] Lost profits are a common damages form a business can recover when a legal wrong has caused it to lose profits.[328]

### A.    The 'but for' analysis - difference between 'would-have-been' and 'actual'

A proper lost profits damages analysis determines the amount necessary to place the plaintiff in a position it would have otherwise been in had the wrongdoing not occurred.[329] Here, the analysis determines the amount necessary to place SIS in a position it would have otherwise been in had the Alleged Wrongdoing not occurred.

A lost profit damages analysis is often referred to as a '*but for*' analysis. The 'but for' analysis compares the 'but for' or 'would-have-been' profits to the 'actual' profits. The difference represents lost profits damages. A lost profits analysis generally can be described as:[330]

> Net lost profits (herein referred to as "lost profits") are generally determined by estimating the lost revenues (gross and net) that would have been earned "but for" the alleged acts…reduced by

---

[326] *See, e.g.*, https://www.justice.gov/atr/horizontal-merger-guidelines-08192010 at 8-15.
[327] The Comprehensive Guide to Economic Damages: Volume One at 239 (2020 6th ed., BVR Publications).
[328] *Id.* at 225.
[329] *Id.* at 239.
[330] The Comprehensive Guide to Economic Damages: Volume One at 239 (2020 6th ed., BVR Publications). *See also*, Association of International Certified Public Accountants (AICPA) Forensic & Valuation Services Practice Aid – Calculating Lost Profits at 8 (2018).

41

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

> avoided costs (or incremental costs) that did not occur because of the subject lost revenues.
>
> From the predetermined "but-for" amounts of lost revenues less associated costs, the actual/projected profits are deducted to determine the resulting economic damages.

Inherent within this analysis is the question of mitigation, the plaintiff's obligation to limit its damages.[331]  Mitigation considers what the plaintiff could have reasonably done to overcome or minimize its damages.[332]

I understand SIS has mitigated its lost profits to the best of its ability.  Here, SIS has mitigated its damages as it has continued to sell its repair services.[333]

### B.    The Alleged Wrongdoings caused SIS's lost revenue and profits

In order to properly determine SIS's lost profits from the Alleged Wrongdoings, this analysis considers what would have otherwise happened in the event the Alleged Wrongdoings had not happened.  As noted above, this is the standard methodology used to determine lost profit damages and is often referred to as a 'but for' analysis.  This analysis considers SIS's lost profits damages 'but for' the Alleged Wrongdoings.

In this matter, but for the Alleged Wrongdoings, SIS would have made additional EndoWrist repair sales and profits.

### C.    Demand – monumental interest

Demand has existed for SIS's EndoWrist repair services.  Keith Johnson, SIS's Executive Vice President of Sales and Clinical Programs, testified "the interest in saving and reducing costs on robotic surgery in the industry is something I've never seen before in my 25 years of being in the surgical business."[334]  He stated there is "monumental" interest from hospitals in its X/Xi

---

[331] The Comprehensive Guide to Economics Damages: Volume One at 233 (2020 6th ed., BVR Publications).  *See also*, Association of International Certified Public Accountants (AICPA) Forensic & Valuation Services Practice Aid – Calculating Lost Profits at 47 (2018).  *See also*, American Institute of Certified Public Accountants (AICPA) Practice 06-4 at 45 (2006).

[332] The Comprehensive Guide to Economics Damages: Volume One at 233 (2020 6th ed., BVR Publications).  *See also*, Association of International Certified Public Accountants (AICPA) Forensic & Valuation Services Practice Aid – Calculating Lost Profits at 47 (2018). *See also*, American Institute of Certified Public Accountants (AICPA) Practice 06-4 at 45 (2006).

[333] Discussions with Keith Johnson and Greg Posdal.  *See also*, SIS003653-3670.

[334] 30(b)(6) Deposition of Keith Johnson 44 (October 27, 2022).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

repair business.[335]  For example, Banner Health System, one of the largest nonprofit health systems, with over 20 hospitals, and a member of the Premier GPO, wanted to proceed with the EndoWrist repair program since they knew it would be a huge cost savings.[336]

As addressed above, Mr. Johnson has presented the EndoWrist repair program to three of Vizient's four regions.[337]   He has had meetings with what probably represents over a thousand hospitals, and listed at least the following hospitals and hospital systems he has spoken to about SIS's Xi program: Legacy Health, Providence Health System, Sutter Health, Kaiser Permanente, Memorial Care, the UC California system, Banner Health System, Honor Health, Baylor Scott & White, University health systems across the country from Michigan to Duke to North Carolina, Mayo Clinic, Cleveland Clinic, Advocate Aurora, Lahey Health System, Boston's Children's Medical Center, Piedmont Health System and John Hopkins.[338]

There was "real excitement" among most SIS customers (both hospitals and hospital systems) who felt Intuitive was taking advantage of them by the preset number of EndoWrist uses, the EndoWrist costs and by Intuitive's threats to shut down their equipment.[339]  These customers included at least Banner Health, Piedmont Health, Kaiser Health, Legacy Health and Advocate Aurora, among others, along with Vizient, the U.S.'s largest GPO.[340]

Keith Johnson testified:[341]

> …Every person I called, every organization I called, took a meeting.  We sat down with all of them.  They were – they all wanted it.
>
> The reason that we felt great about scalability is we didn't have any competition, we were it.  It was a program everybody wanted, there – we weren't fighting the OEM on the repairs, we weren't

---

[335] 30(b)(6) Deposition of Keith Johnson 44 (October 27, 2022).  Discussion with Keith Johnson.
[336] https://investors.premierinc.com/news/press-release-details/2016/Premier-Inc-and-Banner-Health-Expand-Partnership/default.aspx; 30(b)(1) Deposition of Greg Posdal 43-44 (October 27, 2022).
[337] 30(b)(6) Deposition of Keith Johnson 45 (October 27, 2022).  *See also*, SIS343965-343971 at 970, where the four Vizient regions are identified as West, Central, Southeast and Northeast Zones.  Based on discussions with Keith Johnson, I understand he misspoke in his deposition, as he never gave a presentation to Vizient's Northeast Zone.
[338] 30(b)(6) Deposition of Keith Johnson 44-45 (October 27, 2022).
[339] 30(b)(1) Deposition of Greg Posdal 76-77 (November 1, 2022).
[340] 30(b)(1) Deposition of Greg Posdal 78-79 (November 1, 2022).
[341] Deposition of Keith Johnson 20 (October 27, 2022).

43

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

fighting other companies, it was us, so the ability to scale was – was huge.

He also testified the potential revenue from the S/Si EndoWrist business was somewhere in the range of $250 million to $350 million per year, based on:[342]

> …conversations I had with key customers to understand the number of robotics they had, the number of robots they had, the dollars spent on devices and instrumentation for those robots, and then looking at our global customer list through Vizient and the opportunities we would have.

Although it lacks SIS's customer relationships, Restore similarly recognized the demand for repair services. ████████████████████

████████████████████████████████ ███████████████████

█████████████████ ████████████████████████

████████████████████████████████████████

In January 2020, a Deutsche Bank Research article was sent in an email to Philip Kim of Intuitive, which included the following about the demand for using repaired da Vinci instruments:[346]

> Our extensive due diligence spanning several months – including conversations with several da Vinci surgeons and supply chain executives. . . yielded confirmation that a growing number of hospital customers, including world-renowned academic centers and even large hospital systems, have begun or are in late stage deliberations/discussions to potentially soon begin using repaired da Vinci Instruments supplied by third-parties. Meaningful operating cost savings opportunity is the key driver compelling hospitals to consider using these repaired da Vinci instruments.

Overall, it is clear there was demand for SIS's EndoWrist repair services.

---

[342] Deposition of Keith Johnson 17 (October 27, 2022).
[343] Deposition of Kevin May 111 (November 3, 2022).
[344] Deposition of Kevin May 99-101 (November 3, 2022).
[345] Deposition of Clifton Parker 166-167 (October 25, 2022).
[346] Intuitive-00555864-0055866 at 865.

44

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

### D.    Capacity and capability to perform EndoWrist repairs

In order for SIS to make additional sales and profits, SIS would have had to have the capacity and capability to make EndoWrist repair sales.  According to Kevin May, Restore's Operations Officer, based on his 33 years of industry experience, the EndoWrist is the "simplest device we've ever serviced or repaired."[347]

SIS routinely repairs similar and more complex instruments.  As noted above, while Rebotix initially provided the repair services as well as the chip, SIS planned to purchase the chip and repair the EndoWrists in-house.

Intuitive projected refurbishment time less than one hour per instrument.[348]  Similarly, SIS believes one trained employee could complete 20 to 25 repairs per 8-hour shift, meaning it would take approximately 19 minutes to 24 minutes to do one repair.[349]  SIS believes training technicians would take minimal time.[350]

Assuming it takes 30 minutes to do 1 repair (which is longer than Greg Posdal thinks it would take), and applied to the approximate 31,000 lost repair unit sales in 2021 under Scenario 1 below, suggests a required 15,500 repair hours, or about 8 repair technicians at 2,000 hours per year.[351]  SIS planned to hire the necessary personnel.  SIS also has had plenty of repair space available in its Glendale Heights, Illinois facility.[352]

Similarly, I understand Rebotix and Restore have had necessary capacity in the event either or both continued providing the repair services, as representatives from both Rebotix and Restore testified the ramp up period would not be an issue.[353]  I further understand neither Keith Johnson nor Greg Posdal ever questioned Rebotix's or Restore's ability to perform any repairs.[354]

In addition, SIS would have needed less than approximately 50,000 chips per year, at most, to make the repairs quantified in all of my scenarios.  I understand this would not have

---

[347] Deposition of Kevin May 114-115 (November 3, 2022).
[348] Per 30(b)(6) Deposition of Colin Morales (November 1, 2022) at Ex. 143 (Intuitive 00626597-626616 at 626612), manufacturing labor is shown as $33.80 and the labor rate used to calculated manufacturing labor is $39 per hour.  $33.80 / $39.00 = approximately 86% * 60 minutes = approximately 52 minutes.
[349] Discussion with Greg Posdal.
[350] 30(b)(1) Deposition of Greg Posdal 65-66 (November 1, 2022).
[351] 31,000 repairs per year / 2 repairs per hour = 15,500 repair hours.  15,500 repair hours / 2,000 hours per year = 7.75.
[352] Discussion with Greg Posdal.
[353] Deposition of Clifton Parker 149-150, 183-184 (October 25, 2022); Deposition of Kevin May 104-106 (November 3, 2022); Deposition of Stan Hamilton 19 (November 4, 2022).
[354] Discussions with Greg Posdal and Keith Johnson.

45

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

been a problem, especially in comparison to the much larger quantity of chips Intuitive buys every year for its EndoWrists.[355]

### E.   Scenario 1 – Illegal Encryption lost profits damages

Scenario 1 assumes X/Xi encryption is illegal.  It also assumes SIS's capability to repair S/Si EndoWrists would have similarly applied to X/Xi EndoWrists.  I understand SIS would have continued working with Rebotix or worked with Restore, or potentially with both companies.  As noted above, I understand the X/Xi EndoWrists were essentially the same / similar as S/Si EndoWrists and the repairs would be consistent. ███████████████



In order to estimate SIS's lost profits damages 'but for' the Alleged Wrongdoing, I analyze and estimate the following categories:

- Lost EndoWrist repair units
- Lost revenue
- Incremental costs

I first determine SIS's annual lost EndoWrist repair units.  Those units represent the number of EndoWrist repairs SIS would have reasonably sold to customers through 2025.  I estimate lost SIS revenue on those lost EndoWrist repair units based on SIS's pricing.  From those lost revenues, I subtract SIS's incremental costs in order to determine estimated lost profits.

#### 1.   Lost EndoWrist repair units

SIS's lost EndoWrist repair units are the difference between (1) the units they would have repaired (the 'Would-Have-Been' or 'But For' EndoWrist repair units) without the Alleged Wrongdoings and (2) those 'Would-Have-Been' EndoWrist units they will repair (or Actual EndoWrist repair units) regardless of the Alleged Wrongdoings.

---

[355] Discussions with Greg Posdal and Keith Johnson.
[356] Deposition of Kevin May 114-115 (November 3, 2022).
[357] Deposition of Kevin May 114 (November 3, 2022).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

a)      'Would-Have-Been' EndoWrist repair units – through 2025

I estimate SIS's 'Would-Have-Been' EndoWrists repair units starting with Intuitive's annual EndoWrist unit sales data and account for various factors as addressed below.  The analysis starts January 1, 2020, just after the Alleged Wrongdoings began.  The analysis assumes trial is approximately December 2023 / January 2024.  In the event SIS prevails, it would then actually begin selling EndoWrist repairs again in January 2024.  As addressed below, the ramp up process would take some time, and by the end of 2025 (i.e., two years), SIS would get to a position it would have otherwise been.

**Table 5** summarizes the analysis, starting with Intuitive's annual EndoWrist instruments potentially repairable by SIS and the steps to estimate SIS's lost EndoWrist repair units from January 1, 2020 through 2025.

Table 5: 'Would-Have-Been" EndoWrist repair units[358]

|  | Scenario 1 | Scenario 2 | | |
|---|---|---|---|---|
| EndoWrist instruments potentially repairable by SIS - units | 2,418,163 | 1,771,630 | to | 2,118,209 |
| Expired EndoWrist instrument - units | 1,450,896 | 1,062,977 | to | 1,270,924 |
| SIS market share units | 797,993 | 584,637 | to | 699,008 |
| SIS converted units | 470,187 | 303,952 | to | 391,199 |
| SIS collected units | 329,132 | 212,766 | to | 273,840 |
| Would-have-been Lost EndoWrist repair units | 236,975 | 153,191 | to | 197,164 |
| Market penetration (% of total units) | 10% | 9% | to | 9% |

(i)      EndoWrist instruments potentially repairable by SIS –
unit sales

SIS intended to repair most Intuitive EndoWrist instruments (i.e., the instruments potentially repairable by SIS).  Those instruments comprise 38 different S/Si EndoWrist instruments.[359]  I have included those 38 S/Si instruments potentially repairable by SIS in my analysis.  I assume SIS had the capability to provide similar X/Xi EndoWrist instrument repair services to similar X/Xi instruments.

---

[358] **Schedules 2.2, 4.2** and **4.5**.
[359] **Schedule 12.0**.

47

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

I have identified the U.S. sales for those 38 S/Si and corresponding X/Xi U.S. instruments, by EndoWrist instrument (and instrument number) using Intuitive's instrument and accessory sales data summarize on **Schedules 13.0** to **13.2**.

The analysis tabulates the data based on the following steps:

- S/Si instruments were identified by instrument number using a SIS price sheet that was part of its September 2019 Vizient Amended Agreement.[360]
- X/Xi instruments were identified based on similar S/Si instrument numbers and descriptions, along with Intuitive product catalogs.[361]
- U.S. sales were identified using the "Comp Code" data field.
- Net sales were identified using the "Net Sales" data field.
- Sales quantities were identified using the "Sales Qty" data field.

I have summarized the EndoWrist unit data by product type, da Vinci Surgical System and year on **Schedules 13.1** to **13.2**.

To project future Intuitive EndoWrist instrument sales through 2025, I first estimate the percentage breakdown of EndoWrist instrument sales by system, based on Intuitive's historical sales data.[362] I then use Intuitive's expected annual growth rate for surgical procedures in the U.S. to estimate future EndoWrist instrument sales by system.[363]

In order to adjust the EndoWrist instruments potentially repairable by SIS to those instruments SIS reasonably would have (or will) repair but for the Alleged Wrongdoings, I account for numerous factors addressed below.

### (ii)      Expiration rate of new sales units – 60%

The first factor I account for is the likelihood that not all of the EndoWrists instruments sold and potentially repairable by SIS would ultimately expire. Some of the potentially repairable units above may not expire, or may expire in a later time period.

I apply a 60% expired EndoWrist rate to the annual potentially repairable instrument units based on Intuitive's own estimates.

---

[360] SIS000047-000049.
[361] **Schedule 12.1**.
[362] **Schedule 6.0**.
[363] Intuitive-01261766.

48

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

I account for this factor based upon the previously explained August 2017 Intuitive analysis projecting 2018 through 2021 annual expirations of the X/Xi 'Top 5' EndoWrist instruments.[364] Those projected 'Top 5' 2018 and 2019 expired units represented 60% of the actual 2018 and 2019 unit sales for those same EndoWrist instruments.[365] The projected 2020 and 2021 expired units represented higher percentages of the subsequent actual 2020 and 2021 unit sales. The 2020 and 2021 projections, however, would not have accounted for COVID-19 effects.

I note the 60% expired EndoWrist factor rate was projected in 2017, when X/Xi units were growing annually.[366] The expired EndoWrist rate would likely be higher for the S/Si units, which were declining year to year, or for periods when annual units were more stable. If I applied a higher expiration percentage, the number of expired EndoWrist units would be higher.

### (iii)    Market share rate based on Vizient – 55%

The next factor I account for is Vizient's market share within the market EndoWrists are sold. I apply a 55% market share rate.

SIS had an agreement in place with Vizient for EndoWrist repairs. Vizient entering into contracts with healthcare providers, such as SIS, delivers significant benefits to its members.[367] At a minimum, it simplifies the contracting process for its members.[368]

Vizient provided SIS access to its members.[369] In return, Vizient would receive a 4% administrative fee for SIS repair services.[370] Vizient would have promoted SIS repair services to all of its acute care providers with EndoWrists.[371]

---

[364] 30(b)(6) Deposition of Colin Morales (November 1, 2022) Ex. 141 at page 1.
[365] **Schedule 7.0**. I also note the 'Top 5' EndoWrist instrument numbers comprise a large portion of core EndoWrist instrument unit sales, approximately 70% (73,469 expired 'Top 5' / 104,469 expired core) in 2018 and approximately 70% (100,376 expired 'Top 5' / 143,395 expired core) in 2019.
[366] **Schedule 7.0**.
[367] Discussion with Jean Sargent, who is familiar with Vizient and GPO's.
[368] Discussion with Jean Sargent.
[369] Discussion with Keith Johnson and Jean Sargent.
[370] Discussion with Keith Johnson. SIS330591-330634 at 597.
[371] Discussions with Keith Johnson and Jean Sargent. Jean Sargent was aware of the SIS's repair service and the potential cost savings it provided when she was working with Marin County hospital in Fall 2019, a Vizient member, as an independent consultant.

49

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

I understand Intuitive's da Vinci systems and EndoWrist instruments are primarily sold to / used in acute care facilities.[372]  In 2019, Vizient provided services for more than 50% of the U.S. acute care providers.[373]  Vizient currently provides services for more than 60% of the U.S. acute care providers.[374]

SIS had also presented and generated interest with hospital systems beyond Vizient healthcare providers, such as Banner.[375]  Given the interest in SIS's services, it is likely SIS would have had customers in addition to Vizient's members.  Nonetheless, I limit this market share factor to Vizient acute care providers.  I apply 55% (or the mid-point of the 60% and 50% noted above) as the Vizient market share factor.

### (iv)     Conversion rate – 15%, 50%, 70%

The next factor I account for is SIS's and Vizient's customer conversion to SIS repair services.  I apply a 15% conversion rate in Year 1, 50% in Year 2, and 70% in Year 3 and thereafter, based on the expert opinions of Jean Sargent, SIS's industry expert.

As addressed above, there was strong customer demand.  SIS anticipated signing up nearly all of the Vizient acute care providers and others.  According to Jean Sargent, based on her experience with significant cost savings program such as SIS's EndoWrist repair program, more than 70% of the Vizient acute care providers would have participated.[376]

SIS anticipated a quick ramp up in 2020, both in sales and in-house repair capabilities.[377]  According to Jean Sargent there would have been a conversion timeframe to transition for this type of program.   By the end of 2020, or Year 1, 30% of Vizient's acute care providers would have reasonably converted.[378]  By the end of 2021, or Year 2, and thereafter, 70% would have reasonably converted, with a final conversion rate of approximately 75%.[379]

---

[372] Discussions with Keith Johnson and Jean Sargent.  I understand Vizient members are usually larger healthcare providers, suggesting they represent an above average number of acute care facilities.
[373] https://web.archive.org/web/20191108191050/https://www.vizientinc.com/what-we-do.
[374] *See, e.g.*, https://www.vizientinc.com.
[375] Per discussion with Keith Johnson, I understand Banner is a member of Premier.
[376] Discussion with Jean Sargent.
[377] Discussions with Keith Johnson and Greg Posdal.
[378] Discussion with Jean Sargent.
[379] Discussion with Jean Sargent.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Given these considerations, I apply a 15% conversion factor in 2020, or Year 1 (i.e., the mid-point between 0% as of January 1 and 30% as of December 31). I apply a 50% conversion factor in 2021, or Year 2 (i.e., the mid-point between 30% as of January 1 and 70% as of December 31). I apply a 70% conversion factor in 2022, or Year 3, and thereafter.

### (v)    Collection rate – 70%

The next factor I account for is EndoWrist instrument collection. I apply a 70% collection rate.

Despite best intentions, I understand not all expired EndoWrists would necessarily be collected by the acute health care providers. According to Jean Sargent, for an expensive instrument such as the EndoWrist, a 75% collection rate would be reasonable.[380]

Intuitive similarly targeted a greater than 70% collection rate for its contemplated EndoWrist refurbishment program in a September 2020 "Gen4 Instrument Refurbishment Pilot" document.[381]

### (vi)    Repair yield rate – 72%

The next factor I account for is the repair yield. I apply a 72% repair yield rate.

Not all of the collected units would have been repairable. Generally speaking, SIS's reparability yield on its various instruments exceeds 95%.[382]

Intuitive performed an EndoWrist refurbishment pilot on its top six instruments in 2020 and averaged 85% refurbishment yield.[383] It also projected higher future refurbishment rates at 95% refurbishment for two (of the six) instruments, 90% for three, and 85% for one.[384]

SIS's initial (limited) data suggested an 88% repair yield rate.[385]

---

[380] Discussion with Jean Sargent.
[381] 30(b)(6) Deposition of Colin Morales (November 1, 2022) at Ex. 143 (Intuitive 00626597-626616 at 604).
[382] Discussion with Keith Johnson. *See also, e.g.*, SIS003653-0033670 at 661.
[383] Morales 30(b)(6) Dep. at Ex. 143 (Intuitive 00626597-626616 at 609).
[384] Morales 30(b)(6) Dep. at Ex. 143 (Intuitive 00626597-626616 at 612).
[385] **Schedule 14.0**.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Based on data from Restore for instruments that were collected, approximately 72% were repairable.[386]

Given these considerations, and to remain at the conservative end of the repairability range, I apply a 72 % repair yield rate.

### (vii)    'Would-Have-Been' EndoWrist repair units through 2025

I project the 'Would-Have-Been' EndoWrist units through 2025.  As noted earlier, I assume trial is approximately December 2023 / January 2024.  Assuming SIS prevails, SIS would then begin selling in 2024.  A Year 1 conversion would be 2024, Year 2 would be 2025. At the end of Year 2 (i.e., 2025), SIS would achieve its maximum conversion rate.

### (viii)    'Would-Have-Been' EndoWrist repair units – 2% to 12% of units sold

Accounting for the various factors above, the 'Would-Have-Been' EndoWrist repair units approximate a 2%, 8% and 12% penetration rate of Intuitive's 2020, 2021, and 2022 EndoWrist unit sales, respectively.[387]

This Would-have-been penetration rate appears reasonable relative to other available data.  For example, in August 2019, Intuitive analyzed potential Xi refurbishment and estimated penetration of approximately 41% or 50%.[388]

Another contemporaneous document, a February 2020 Deutsche Bank analysis, noted a 4% to 6% 2021 penetration rate was reasonable and potentially conservative.[389]  The analysis also noted each instrument could be repaired three times, suggesting a higher, 12% to 18% penetration rate.[390]

---

[386] Deposition of Clifton Parker 43-45, 178-179 (October 25, 2022).  Per Restore-00094918-00094956 at 922 (Parker Dep. Ex. 121), 215 out of 310 instruments collected in a 2-week sample that had lives on them passed Restore's inspection (i.e., were repairable).
[387] **Schedule 2.2**.
[388] Intuitive-00581814-00581883 at 858, 868 and 877.  One estimate shows 59,700 refurbished Xi instruments out of a total 144,985 Xi instruments forecasted in 2020.  The other estimate shows 72,492 refurbished Xi instruments out of a total 144,985 Xi instruments forecasted in 2020.
[389] Intuitive-00566055-00566082 at 056 (Zafar Dep. Ex. 113).
[390] Intuitive-00566055-00566082 at 056 (Zafar Dep. Ex. 113).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

In 2016, Rebotix and Stryker had discussions about Stryker buying Rebotix.[391]  According to two models Stryker prepared regarding this proposed transaction, it expected penetration rates of 8.5% to 9% for repairing EndoWrists.[392]

### b)   Actual EndoWrist repair units

At this point, none of the 'Would-Have-Been' EndoWrist repair units have been sold.  I understand SIS continued to promote the repair program after the Alleged Wrongdoings, but those efforts were not successful due to Intuitive's actions.[393]  In the event SIS prevails in this matter, I understand it will then begin again to promote the repair program.  Assuming trial is resolved in approximately December 2023 / January 2024, SIS would then begin ramping up its repair services.  For the Actual EndoWrist repair units, I use the Year 1, Year 2 and Year 3 conversion rates addressed above.  Currently, I assume Year 1 is 2024 and the first year SIS will again begin selling its repair program.

### c)   Lost EndoWrist repair units

The difference between the 'Would-Have-Been' and Actual EndoWrist repair units represent SIS's lost EndoWrist repair units.  Those are shown on **Schedules 2.2**.

### 2.   Lost revenue

To calculate SIS's lost revenue, I have multiplied the lost EndoWrist repair units times SIS's average selling price ("ASP").  Lost revenues are shown on **Schedule 2.1**.  In order to calculate SIS's 'Would-Have-Been' ASP, I applied the prices per the September 2019 Vizient Agreement Amendment to the corresponding volumes of EndoWrist instruments Intuitive sold between 2019 and 2022 to calculate a weighted average ASP.[394]

---

[391] Deposition of Stan Hamilton 35-39 and 126 (June 4, 2021) (*Rebotix Repair LLC v. Intuitive Surgical, Inc.*, No. 8:20-cv-02274-VMC-TGW (M.D. Fla. filed Sept. 28, 2020)).
[392] STRREB00001810 and STRREB00001827.
[393] Discussions with Keith Johnson and Greg Posdal.
[394] **Schedule 8.0**.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**3.** **Less: Incremental costs**

In order for SIS to make the lost repairs revenue described above, it would have incurred additional costs. I refer to these additional costs as incremental costs. I have estimated SIS's incremental costs under two models: (1) the in-house repair model, and (2) the distributor model. Incremental costs are shown on **Schedules 2.1** and **3.1.**

**a)** **In-house repair model costs**

SIS intended to purchase the chips and perform the EndoWrist repairs in-house ("In-house model"). Though it had not yet begun in-house repairs, SIS anticipated its in-house repairs to be low cost and profitable.[395] As noted above, SIS has extensive experience providing repair services.

SIS's In-house model incremental costs would have included the following:[396]

- Repair costs
- Chip costs
- 4% paid to Vizient
- SGA costs

**(i)** **Repair costs**

To estimate SIS's repair costs, I use Intuitive's September 2020 refurbishment costs estimates.[397] Intuitive estimated refurbishment costs for its six largest selling EndoWrists.[398] It did so for its South Haven (near Memphis) Tennessee facility as well as its facility in Mexico.[399] SIS intended to repair the EndoWrists in the U.S.[400] I use Intuitive's South Haven estimated refurbishment costs.

---

[395] Discussion with Greg Posdal.
[396] Based on discussions with Greg Posdal and Keith Johnson.
[397] **Schedule 9.0**.
[398] 30(b)(6) Deposition of Colin Morales (November 1, 2022) at Ex. 143 (Intuitive 00626597-626616 at 626612-613).
[399] 30(b)(6) Deposition of Colin Morales (November 1, 2022) at Ex. 143 (Intuitive 00626597-626616 at 626612-613).
[400] Discussion with Greg Posdal.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

I note Intuitive used a higher fully burdened hourly technician cost rate ($39 per hour) than SIS anticipated (approximately $25 per hour).[401]  I also note Intuitive's estimated "Materials needed for Remanufacture"[402] comprised more than half the repair costs for each of the six EndoWrists.[402]  SIS did not expect to incur material costs of any significance.[403]  Rather, it expected to incur minimal or no costs for nearly all of EndoWrist instruments it would repair.[404]

Intuitive's South Haven refurbishment cost (cost of goods sold) estimates, including the material costs, ranged from approximately $107 to $199 per instrument.[405]

### (ii)    Chip costs

To estimate SIS's chip cost, I use Rebotix's average sales price per chip to Restore.[406] SIS anticipated purchasing chips at high volumes from Rebotix and/or Restore for approximately $400 to $450 apiece.[407]  SIS did not purchase chips alone (i.e., not bundled with repair service) directly from Rebotix or Restore.  Restore did purchase chips in small volumes (three orders of 30 or less chips) from Rebotix.[408]  Those chip sales prices averaged approximately $533 per unit.[409]

### (iii)    Vizient GPO administrative fee

To estimate SIS's Vizient GPO administrative fee, I apply the 4% administrative fee SIS agreed to pay Vizient on all net sales for services it sold to Members.[410]

---

[401] Intuitive-00626598 - 00626616 at 626612.  According to Colin Morales testimony, the $39 per hour was fully burdened (30(b)(6) Deposition of Colin Morales 49-57 at 56 (November 1, 2022)).  Discussion with Greg Posdal. SIS356504.
[402] 30(b)(6) Deposition of Colin Morales (November 1, 2022) at Ex. 143 (Intuitive 00626597-626616 at 626612).
[403] Discussion with Greg Posdal.
[404] Discussion with Greg Posdal.
[405] **Schedule 9.0**.  *See also*, 30(b)(6) Deposition of Colin Morales (November 1, 2022) at Ex. 143 (Intuitive 00626597-626616 at 626612).
[406] **Schedule 10.0**.
[407] Discussion with Greg Posdal.
[408] **Schedule 10.0**.
[409] **Schedule 10.0**.
[410] **Schedule 2.1**.  SIS330591-330634 at 597.  SIS0000047-0000049.  Discussion with Keith Johnson.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

### (iv)    SGA costs

The maximum annual lost EndoWrist repair units approximate 50,000 units.[411]  To estimate SIS's variable selling, general and administrative (or "SGA") costs, I use the variable portion of SIS's SGA costs in the event they would have been repairing up to an additional 50,000 EndoWrist instruments annually.[412]  I have analyzed SIS's SGA costs and estimate something less than 9% of sales would have been variable.[413]  I use a 9% variable SGA cost rate.

Applying the 9% variable SGA cost rate to the approximate $71 million of annual lost sales in 2023, for example, equates to more than $6 million of SGA costs.  The $6 million of SGA costs applies to the additional approximate 50,000 EndoWrists instruments.

For comparison, I understand SIS repairs approximately 1,000,000 instruments annually (i.e., multiples of the 50,000 units), and has incurred less than $6 million SGA costs in total for its entire business.[414]  Thus, the maximum additional EndoWrist repairs are a fraction of the volume of instrument repairs SIS already does.

### b)    Distributor model costs

The Distributor model assumes SIS acted essentially as a distributor for the EndoWrist repair services.  Rebotix and/or Restore would have provided the repair services.  While this alternative was not SIS's intention, SIS's initial EndoWrist repair sales consisted of Rebotix performing the repair services.

SIS's Distributor model incremental costs would have included the following:[415]

- Repair services purchase price – prices paid to Rebotix (and/or Restore)
- 4% paid to Vizient (same as In-house model)
- SGA costs (same as In-house model)

**Schedule 3.1** summarizes the Distributor model alternative Scenario 1 – Illegal Encryption lost profits damages.

---

[411] **Schedule 2.2**.
[412] **Schedule 15.1**.
[413] **Schedule 15.1**.
[414] Discussion with Greg Posdal.  **Schedule 15.0**.
[415] Based on discussions with Greg Posdal and Keith Johnson.

56

### 4. SIS's In-house model lost profits through 2025 – approximately $102.6 million

SIS's In-house model lost profits are calculated by subtracting the In-house model incremental costs from lost revenue each year.  To determine SIS's In-house model lost profits damages, I calculated the present value of the lost profits as of January 1, 2024, the approximate trial timeframe.

### 5. SIS's Distributor model lost profits through 2025 – approximately $40.9 million

SIS's Distributor model lost profits are calculated by subtracting the Distributor model incremental costs from lost revenue each year.  SIS's Distributor present value lost profits damages as of January 1, 2024 approximate $40.9 million.

### 6. Annual lost profits per unit

The annual lost profits per unit for the S/Si and X/Xi are reasonably comparable in both the in-house model and distributor model.  For example, in 2020, the annual lost profits per unit approximate $570 for S/Si and $549 for X/Xi in the in-house model, and approximate $214 for S/Si and $204 for X/Xi in the distributor model, respectively.[416]  To the extent the respective share of S/Si and X/Xi units is different than those discussed above,[417] I would use these per-unit values to estimate damages.

## F. Scenario 2 – Unenforceable Contracts lost profits damages

Scenario 2 assumes enforcing the hospital contracts is illegal.  It also assumes SIS's capability to repair S/Si EndoWrists would have similarly applied to X/Xi EndoWrists.  However, it also takes into account that cracking the X/Xi encryption would have taken some period of time. ████████████████████████████████████████
██████████████████████████████████████

---

[416] **Schedules 2.1** and **3.1**.  The annual lost profits per unit amounts for years after 2020 are also shown on these schedules.

[417] For example, I understand SIS has accused Intuitive of taking step to force customer to switch from S/Si da Vinci robots for which EndoWrist repair is possible to X/Xi da Vinci robots for which EndoWrist repair was not possible.  Comp.  ¶¶ 108-109.

[418] Deposition of Clifton Parker 143-144 (October 25, 2022).  Discussion with Kurt Humphrey.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

The Scenario 2 – Unenforceable Contracts analysis employs the same methodology as Scenario 1 – Illegal Encryption.  The difference is the delayed capability to repair the X/Xi until a later date.  Accordingly, the Year 1, Year 2 and Year 3 X/Xi conversion period begins later, in 2021 or 2022 (rather than 2020).

The Scenario 2 – Unenforceable Contracts analysis is summarized on **Schedules 4.0** to **4.5** and **5.0 to 5.3**.  For Scenario 2 – Unenforceable Contracts lost profits damages, I similarly calculate In-house repair model damages and Distributor model damages.[419]

Similar to Scenario 1, the annual lost profits per unit amounts for the S/Si and X/Xi are reasonably comparable in both the in-house model and distributor model.[420]

## XV.     Lanham Act Damages

As described above, SIS has accused Intuitive of unfair trade practices in violation of the Lanham Act.[421]  In addition to SIS's lost profits, I have also been asked to address disgorgement of Intuitive's profits under the Lanham Act.

Under the Lanham Act, I understand a plaintiff is entitled to recover:[422]

> …(1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action.  The court shall assess such profits and damages or cause the same to be assessed under its direction.  In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed.  In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount.  If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case.  Such sum in either of the above circumstances shall constitute compensation and not a penalty.  The court in exceptional cases may award reasonable attorney fees to the prevailing party.

---

[419] **Schedule 1.0**.
[420] **Schedules 4.1** and **5.1**.
[421] Compl. ¶¶ 122-126.
[422] 15 USC 1117: Recovery for violation of rights; (a) Profits; damages and costs; attorney fees (house.gov).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

I understand Lanham Act damages would begin no later than November 26, 2019, when Marin General Hospital, a SIS customer, received a letter from Intuitive about it using a third party (SIS) to reprogram the number of EndoWrist uses.[423]  For purposes of my analysis, I have already quantified the lost profit damages to SIS based on the lost repair units analyses addressed above under lost profits.  Those lost SIS repair units begin in January 2020.

With respect to Intuitive's profits that SIS would be entitled to under the Lanham Act, I have quantified Intuitive's sales on the Scenario 2 – Unenforceable Contracts lost repair units on **Schedule 16.1** and **Schedule 16.2**, with a January 1, 2024 present value.

## XVI.    Conclusion

My opinions and analyses contained herein are based upon information that is presently known and available to me.  As additional information is made available, I may update my opinions and analyses accordingly.  I will provide updated calculations or interest calculations as appropriate.  I also anticipate preparing illustrative trial exhibits based on information contained within this Report as well as any relevant additional information that becomes available hereafter.

Respectfully submitted,

Richard F. Bero, CPA, CVA
December 2, 2022

---

[423] SIS000202-000204.

# Data and Other Information Considered - as of December 2, 2022
# Attachment 1

**LEGAL FILINGS:**

Surgical Instrument Service Company, Inc. v. Intuitive Surgical, Inc. (Case No. 3:21-cv-03496-VC):

Complaint dated May 10, 2021

Defendant Intuitive Surgical, Inc.'s Notice of Motion, Mo ion and Memorandum of Points and Authorities in Support of its Motion to Dismiss the Complaint filed August 6, 2021

Declaration of Karen Hoffman Lent in Support of Defendant's Request for Judicial Notice in Support of Intuitive Surgical, Inc.'s Mo ion to Dismiss the Complaint with Exhibit 1 filed August 6, 2021

Request for Judicial Notice in Support of Intuitive Surgical, Inc.'s Mo ion to Dismiss the Complaint filed August 6, 2021

[Proposed Order] Granting Request for Judicial Notice filed August 6, 2021

Defendant Intuitive Surgical, Inc.'s Notice of Motion, Mo ion and Memorandum of Point and Authorities in Support of Motion to Stay filed August 13, 2021

[Proposed] Order Granting Defendant Intui ive Surgical Inc.'s Stay filed August 13, 2021

Declaration of Karen Hoffman Lent in Support of Defendant's No ice of Motion, Motion, and Memorandum of Points and Authori ies in Support of Motion to Stay wi h Exhibits 1-4 filed August 13, 2021

Plain iff Surgical Instrument Service Company, Inc.'s Opposition to Defendant's Motion to Dismiss filed August 20, 2021

Plain iff's Ini ial Disclosures dated August 26, 2021

Intuitive's Initial Disclosures dated August 26, 2021

Plain iff Surgical Instrument Service Company, Inc.'s Opposition to Defendant's Motion to Stay filed August 27, 2021

Declaration of Joshua Van Hoven in Support of Plaintiff's Opposi ion to Defendant's Mo ion to Stay with Exhibits 1 and 2 filed August 27, 2021

Declaration of Gregory J. Posdal filed August 27, 2021

Defendant Intuitive Surgical, Inc.'s Reply Memorandum of Law in Support of its Motion to Dismiss the Complaint filed September 3, 2021

Defendant Intuitive Surgical, Inc.'s Reply Memorandum of Law in support of its Motion to Stay filed September 3, 2021

Declaration of Karen Hoffman Lent in Support of Defendant's Reply Memorandum of Law in Support of its Motion to Stay with Exhibit 1 filed September 3, 2021

Order Granting in Part and Denying in Party Mo ion to Dismiss filed November 23, 2021

Defendant Intuitive Surgical, Inc.'s Answer, Affirmative Defense and Counterclaims with Exhibits 1-7 filed December 14, 2021

Plain iff/Counterclaim Defendant Surgical Instrument Service Company, Inc.'s Answer to Defendant/Counterclaim Plaintiff's Counterclaims filed January 10, 2022

Stipulated Protective Order filed with Exhibit A signed by Richard Bero, Beth Bergman, Joseph Laur, Ammar Susnerwala and Nick Romans filed March 30, 2022

Joint Stipulation and [Proposed] Order to Modify Schedule filed April 11, 2022

Interrogatories:

Defendant/Counterclaimant Intuitive Surgical, Inc.'s Objections and Responses to Plain iff Surgical Instrument Service Co., Inc.'s First Set of Interrogatories dated April 29, 2022

Plain iff Surgical Instrument Service Company, Inc.'s Answer and Objection to Defendant's Interrogatories First Set - Nos. 1-3 dated May 20,2022

Plain iff Surgical Instrument Service Company, Inc.'s Answer and Objections to Defendant's Interrogatories Second Set - Nos. 4-18 dated August 8, 2022

Restore Robotics, et al. v. Intuitive Surgical, Inc. (Case No. 5:19-cv-00055-TKW-MJF):

Defendant's Answer, Affirmative Defense and Counterclaims filed September 30, 2019

Defendant's First Amended Counterclaims with Exhibits 1-3 filed November 28, 2019

Plain iffs Restore Robotics LLC and Restore Robotics Repairs LLC's Answer to Defendant's Amended Counterclaims filed December 12, 2019

Second Amended Complaint with Exhibits 1-5 filed March 29, 2021

Defendant's Answer and Affirmative Defense filed April 12, 2021

Rebotix Repair LLC v. Intuitive Surgical, Inc. (Case No. 8:20-cv-02274-VMC-TGW):

Complaint filed September 28, 2020

Defendant's Answer, Affirmative Defenses and Counterclaims with Exhibits A-E filed April 2, 2021

Rebotix's Answer and Affirmative Defenses to Intuitive's Counterclaims filed April 23, 2021

**EXPERT REPORTS:**

Surgical Instrument Service Company, Inc. v. Intuitive Surgical, Inc. (Case No. 3:21-cv-03496-VC):

Expert Report of Jean Sargent dated December 2, 2022

Restore Robotics, et al. v. Intuitive Surgical, Inc. (Case No. 5:19-cv-00055-TKW-MJF):

Expert Report of Heather Rosecrans dated August 20, 2021

# Data and Other Information Considered - as of December 2, 2022
# Attachment 1

Expert Report of John Bomalaski dated August 20, 2021
Expert Report of Dr. Robert D. Howe dated August 20, 2021
Expert Report of Sara Parikh, Ph.D. dated August 20, 2021
Expert Report of Professor Christina DePasquale dated August 20, 2021
Expert Report of Loren K. Smith, Ph.D. dated August 20, 2021
Expert Rebuttal Report of Loren K. Smi h, Ph.D. dated September 27, 2021
Rebuttal Expert Report of Chris ina DePasquale dated October 7, 2021
Supplemental Expert Report of Chris ina DePasquale dated October 28, 2021
**Any additional documents cited therein.**

Rebotix Repair LLC v. Intuitive Surgical, Inc. (Case No. 8:20-cv-02274-VMC-TGW):

Expert Report of Dr. John Bomalaski dated July 26 2021
Expert Report of Robert Howe dated July 26, 2021
Expert Report of Kurt Humphrey dated July 26, 2021
Expert Report of Russell Lamb dated July 26, 2021
Expert Report of Gwen Mandel dated July 26, 2021
Expert Report of Robert Mills dated July 26, 2021
Expert Report of Sara Parikh dated July 26, 2021
Expert Report of Heather Rosecrans dated July 26, 2021
Expert Report of Joshua Sharlin dated July 26, 2021
Expert Report of Loren K. Smith, Ph.D. dated July 26, 2021
Amended Expert Report of Sara Parikh dated August 5, 2021
Expert Report of Larry Chiagouris dated August 30, 2021
Rebuttal Report of Robert Mills dated August 30, 2021
Expert Report of Kim Parnell dated August 30, 2021
Rebuttal Expert Report of Hea her Rosecrans dated August 30, 2021
Expert Damages Rebuttal Report of Loren K. Smith, Ph.D. dated August 30, 2021
Expert Antitrust Merits Report of Loren K. Smi h, Ph.D. dated August 30, 2021
Expert Report of Lawrence Stevens dated August 30, 2021
Supplemental Expert Report of Russell Lamb dated September 22, 2021
Supplemental Expert Report of Robert Mills dated September 22, 2021
**Any additional documents cited therein.**

**DEPOSITIONS:**

Restore Robotics, et al. v. Intuitive Surgical, Inc. (Case No. 5:19-cv-00055-TKW-MJF):

Mark Johnson dated April 29, 2021 with Exhibits 0001-0009
Todd Pope dated April 30, 2021 with Exhibits 1-7
30(b)(6) Restore Robotics LLC and Restore Robtics Repairs LLC through Clifton Earl Parker, and Clifton Parker Individually dated May 4, 2021 with Exhibits 1-7
David Robinson dated May 5, 2021
Kevin May dated May 6, 2021 with Exhibits 1-24
John "Jake" Joseph Colletti Jr., dated May 7, 2021 wi h Exhibits 1-13
Greg Posdal dated May 10, 2021 with Exhibits 1-6
Mills Vautrot dated May 11, 2021 with Exhibits 1-12
West E. Gordon dated May 13, 2021 wi h Exhibits 1-17
Sherry Harvey dated May 14, 2021 with Exhibits 1-7
Cario Wasfy dated May 18, 2021 with Exhibits 1-23
Dave Rosa dated May 19, 2021 with Exhibits 1-9

# Data and Other Information Considered - as of December 2, 2022
# Attachment 1

Robert DeSantis dated May 20, 2021 with Exhibits 1-9

Kyle Marks dated May 21, 2021 wi h Exhibits 1-8

Tyler McDonald dated May 21, 2021 with Exhibits 1-17

Ronald Lee Blair Jr. dated May 24, 2021 with Exhibits 1-3

Eugene Otto Dickens M.D., dated May 27, 2021 with Exhibits 1-2

Amie Renee Reed dated May 27, 2021 with Exhibits 1-3

Kevin May (Vol. II) dated June 8, 2021 with Exhibits 1-6

Michael Madewell dated June 11, 2021 with Exhibits 1-21


Rebotix Repair LLC v. Intuitive Surgical, Inc. (Case No. 8:20-cv-02274-VMC-TGW):

Myriam Curet M.D., dated May 7, 2021 with Exhibits 1-6

Glenn Vavoso dated May 14, 2021 with Exhibits 1-39

Ronald Lee Blair, Jr. dated May 24, 2021 with Exhibits 1-22

Edward W. Harrich dated May 24, 2021 wi h Plaintiff's Exhibits 1-9, Defendant's Exhibits DF1-DF5

Katie Scoville dated May 26, 2021 wi h Exhibits 1-13

Robert DeSantis dated May 27, 2021 with Exhibits 1-29

Stacey Donovan dated May 27, 2021 with Exhibits P1-P9, D1-D3

30(b)(6) Rebotix Repair, LLC through Glenn Papit dated June 2, 2021 with Exhibits 1-24

Stan (Lay) Hamilton dated June 4, 2021 with Exhibits 1-10

David Mixner dated June 10, 2021 wi h Exhibits 1-18

Chris Gibson dated June 22, 2021 with Exhibits 1-22


In Re: Da Vinci Surgical Robot Litigation - All Cases:

Judith Schimmel dated September 22, 2022 with Exhibits 1-20

Sandra Guerro dated September 23, 2022 with Exhibits 21-46

Mark Early dated October 6, 2022 with Exhibits 28, 30, 59-81

Disha Peswani dated October 6, 2022 with Exhibits 1-17

Margaret Nixon dated October 7, 2022 wi h Exhibits 18-32

John Wagner dated October 11, 2022 with Exhibits 54, 56, 104-116

Shreya Purohit dated October 12, 2022 with Exhibits 33-53

John Francis M.D. dated October 14, 2022 with Exhibits 54-55

Ryan Shaw dated October 19, 2022 with Exhibits 56-74

Gayle Perry dated October 20, 2022 with Exhibits 75-79, 81-84

Ricardo Estape, M.D. dated October 22, 2022 with Exhibits 118-120, Estape 01, 34, 61, 95

Clifton Parker dated October 25, 2022 with Exhibits 121-134

30 (b)(6) Nickola (Nicky) Goodson dated October 27, 2022 with Exhibits 85-106

30(b)(6) Keith Johnson dated October 27, 2022 with Exhibits 135-140

Keith Johnson (Individually) dated October 27, 2022 with Exhibits 141-144

Imron Zafar dated November 1, 2022 with Exhibits 1-5, 111-113

Mario Lowe dated November 3, 2022 with Exhibits 81-83, 144

Kevin May dated November 3, 2022 with Exhibits 154-156, Plaintiff's Exhibit 1

John Sampson dated November 3, 2022 wi h Exhibits 184-193

Stan Hamilton dated November 4, 2022 with Exhibits 157, 158, 160, 204

Sharathchandra (Shark) Somayaji dated November 4, 2022 with Exhibits 201, 203, 205-208, 211-213, 216-218, 220, 223-224, 227-230

Todd Tourand dated November 4, 2022 wi h Exhibits 39, 200, 202, 209, 210, 214, 215, 219, 221, 222, 225, 226

30 (b)(6) Marshall Mohr dated November 7, 2022 wi h Exhibits 231-236

# Data and Other Information Considered - as of December 2, 2022
## Attachment 1

30(b)(1) Grant DuQue (Personal) dated November 8, 2022 with Exhibits 238, 240-241, 243-244, 246-249, 257-258, 263

30(b)(6) Grant DuQue dated November 8, 2022 with Exhibits 264, 266-269

David Fabricant dated November 8, 2022 with Exhibits 239. 239A-239D, 242, 242A, 245, 245A, 250-253, 253A, 254-256, 259, 261-262

Ca herine Mohr M.D. dated November 9, 2022 with Exhibits 270-285

30(b)(1) Colin Morales (Personal) dated November 9, 2022 wi h Exhibits 120-134

30(b)(6) Colin Morales dated November 9, 2022 with Exhibits 135-143

Dan Jones dated November 10, 2022 wi h Exhibits 286-294

Rick Ferreira dated November 10, 2022 with Exhibits 207-220, 295-296

30 (b)(6) Nickola (Nicky) Goodson dated November 16, 2022 with Exhibit 297

Surgical Instrument Service Company, Inc. v. Intuitive Surgical, Inc.:

30(b)(1) Jose Gonzales (Personal) dated October 17, 2022 with Exhibits 39, 45, 82, 83

30(b)(6) Jose Gonzales dated October 17, 2022 wi h Exhibits 84-99, 117

30(b)(6) Greg Posdal dated November 1, 2022 with Exhibits 145-146, Previously Marked Exhibits 136, 138

30(b)(1) Greg Posdal (Personal) dated November 1, 2022 with Exhibits 147-148, Previously Marked Exhibits 107, 143

**DISCUSSIONS WITH:**

SIS personnel:

Keith Johnson, Executive Vice President, Sales and Clinical Programs
Greg Posdal, President and C.E.O

Jean Sargent, industry expert

**DOCUMENTS WITH BATES STAMPS:**

| | | | | | |
|---|---|---|---|---|---|
| ALPIN00001-00005 | Intuitive-00223902-00223935 | Intuitive-00602325 | Restore-00001939 | SIS091827-091828 | SIS196155 |
| BB001260 | Intuitive-00223937-00223970 | Intuitive-00602576-00602578 | Restore-00002260-00002265 | SIS091833 | SIS196156 |
| BB002642-002644 | Intuitive-00223998-00224033 | Intuitive-00602603 | Restore-00002891-00002915 | SIS091834 | SIS196158 |
| BSWH-0000446-000448 | Intuitive-00230855 | Intuitive-00603164 | Restore-00003932-00003942 | SIS091839 | SIS196159 |
| CCSC-I 000038-000051 | Intuitive-00230856 | Intuitive-00603510 | Restore-00006083-00006084 | SIS091840-091841 | SIS196209 |
| CMR-00001108-00001111 | Intuitive-00231004 | Intuitive-00603990-00603991 | Restore-00009387 | SIS091842-091844 | SIS196210 |
| Intuitive 00398790-00398858 | Intuitive-00234762-00234838 | Intuitive-00604054-00604055 | Restore-00012292 | SIS091846-091913 | SIS196219 |
| Intuitive-00000157-00000209 | Intuitive-00240550-00240638 | Intuitive-00604123 | Restore-00013682-00013692 | SIS092142 | SIS196220 |
| Intuitive-00000256 | Intuitive-00241336-00241370 | Intuitive-00604127 | Restore-00022922 | SIS092353-092356 | SIS196226 |
| Intuitive-00000257 | Intuitive-00246469-00246491 | Intuitive-00604145 | Restore-00055932-00055939 | SIS092357-092359 | SIS196227 |
| Intuitive-00000258 | Intuitive-00254135 | Intuitive-00605636 | SIS000001 | SIS092410-092477 | SIS196228 |
| Intuitive-00000259 | Intuitive-00254875-00254877 | Intuitive-00620200 | SIS000022 | SIS092637-092638 | SIS196230-196231 |
| Intuitive-00000260 | Intuitive-00255397 | Intuitive-00624829 | SIS000023 | SIS092666-092668 | SIS196232 |
| Intuitive-00000261 | Intuitive-00258654 | Intuitive-00626145 | SIS000024 | SIS092675 | SIS196235 |
| Intuitive-00000276 | Intuitive-00261446-00261486 | Intuitive-00646018-00646041 | SIS000025 | SIS092916-092917 | SIS196236 |
| Intuitive-00000316 | Intuitive-00265324-00265336 | Intuitive-00670355 | SIS000026 | SIS093097 | SIS196239 |
| Intuitive-00001087-00001146 | Intuitive-00266133 | Intuitive-00671020-00671035 | SIS000028-000029 | SIS093099-093101 | SIS196240 |
| Intuitive-00001237-00001311 | Intuitive-00268606-00268612 | Intuitive-00674398 | SIS000033-000034 | SIS093168-093170 | SIS196251 |
| Intuitive-00001639 | Intuitive-00268762-00268767 | Intuitive-00685424 | SIS000035-000045 | SIS093171-093176 | SIS196252 |
| Intuitive-00001788-00001851 | Intuitive-00270554-00270572 | Intuitive-00686044 | SIS000047-000049 | SIS093361-093364 | SIS196253 |
| Intuitive-00002050-00002092 | Intuitive-00273157 | Intuitive-00686068 | SIS000050 | SIS093423-093425 | SIS196254 |
| Intuitive-00002138 | Intuitive-00273226-00273228 | Intuitive-00686068 | SIS000051 | SIS093436-093438 | SIS196255 |
| Intuitive-00002937-00002944 | Intuitive-00273229-00273259 | Intuitive-00688902 | SIS000051-000054 | SIS093894 | SIS196256 |
| Intuitive-00003494 | Intuitive-00273264-00273294 | Intuitive-00689957 | SIS000056 | SIS093980-093981 | SIS196258 |
| Intuitive-00003866-00003869 | Intuitive-00273300 | Intuitive-00695006 | SIS000057-000058 | SIS093984 | SIS196259 |
| Intuitive-00004126-00004172 | Intuitive-00273715 | Intuitive-00695144 | SIS000059-000060 | SIS094006-094008 | SIS196260 |

# Data and Other Information Considered - as of December 2, 2022
## Attachment 1

| | | | | | |
|---|---|---|---|---|---|
| Intuitive-00004412-00004420 | Intuitive-00278244-00278245 | Intuitive-00695231-00695234 | SIS000061 | SIS094014-094016 | SIS196273 |
| Intuitive-00004661 | Intuitive-00279920-00279922 | Intuitive-00695236 -00695237 | SIS000097-000112 | SIS094023-094090 | SIS196274 |
| Intuitive-00004692-00004704 | Intuitive-00279923-00279957 | Intuitive-00695243-00695245 | SIS000118-000137 | SIS094101-094103 | SIS196288 |
| Intuitive-00004811 | Intuitive-00279958-00279983 | Intuitive-00700899-00700909 | SIS000138-000157 | SIS094111 | SIS196289-196290 |
| Intuitive-00004968-00004986 | Intuitive-00282732-00282736 | Intuitive-00701320-00701322 | SIS000158-000165 | SIS094176 | SIS196291 |
| Intuitive-00005049 | Intuitive-00285709-00285741 | Intuitive-00701343 | SIS000173-000181 | SIS094245 | SIS196292 |
| Intuitive-00005051-00005067 | Intuitive-00288971-00288972 | Intuitive-00701739 | SIS000183-000198 | SIS094284 | SIS196309 |
| Intuitive-00005135-00005167 | Intuitive-00288975-00288976 | Intuitive-00701743 - 00701744 | SIS000202-000204 | SIS094291 | SIS196310 |
| Intuitive-00005309-00005328 | Intuitive-00292437-00292461 | Intuitive-00702284 | SIS000213-000215 | SIS094448-094450 | SIS196311 |
| Intuitive-00005955-00005989 | Intuitive-00292544-00292628 | Intuitive-00752495 | SIS000216-000217 | SIS094462-094463 | SIS196315 |
| Intuitive-00008839-00008905 | Intuitive-00293271-00293356 | Intuitive-00784942-00784972 | SIS000218-000220 | SIS094498-094501 | SIS196316 |
| Intuitive-00009073-00009076 | Intuitive-00293400-00293606 | Intuitive-00807510-00807557 | SIS000224-000225 | SIS094517-094519 | SIS196317 |
| Intuitive-00009517-00009561 | Intuitive-00296258-00296294 | Intuitive-00808372-00808551 | SIS000226-000227 | SIS094530 | SIS196318 |
| Intuitive-00009716 -00009717 | Intuitive-00296295-00296298 | Intuitive-00810697 | SIS000228-000229 | SIS094531 | SIS196319 |
| Intuitive-00009824-00009880 | Intuitive-00313683-00313684 | Intuitive-00817085-00817118 | SIS000239-000240 | SIS094572-094573 | SIS196320 |
| Intuitive-00010119 | Intuitive-00313685-00313730 | Intuitive-00834771 | SIS000241-000260 | SIS094574 | SIS196321 |
| Intuitive-00010179 | Intuitive-00323352 | Intuitive-00834793 | SIS000261-000268 | SIS094618-094622 | SIS196322-196323 |
| Intuitive-00011483 | Intuitive-00323856-00323930 | Intuitive-00834845 | SIS000274-000282 | SIS094631-094635 | SIS196327 |
| Intuitive-00011487 | Intuitive-00333561-00333572 | Intuitive-00846238 | SIS000293-000294 | SIS094779-094781 | SIS196328 |
| Intuitive-00012397-00012400 | Intuitive-00335054 | Intuitive-00849019 | SIS000302-000317 | SIS094825 | SIS196329 |
| Intuitive-00012401-00012543 | Intuitive-00338790-00338805 | Intuitive-00882424 | SIS000319-000321 | SIS094857-094858 | SIS196330-196332 |
| Intuitive-00014019 | Intuitive-00354548-00354590 | Intuitive-00897681-00897695 | SIS000322-000325 | SIS094955-094969 | SIS196333 |
| Intuitive-00014395-00014396 | Intuitive-00356654-00356715 | Intuitive-00902243 | SIS000355-000357 | SIS095191-095192 | SIS196334-196335 |
| Intuitive-00015314-00015351 | Intuitive-00363883-00363901 | Intuitive-00945455 | SIS000392-000394 | SIS095220-095223 | SIS196336-196337 |
| Intuitive-00015458-00015493 | Intuitive-00363903-00363918 | Intuitive-00958225 | SIS000395-000414 | SIS095278-095280 | SIS196338 |
| Intuitive-00018120 | Intuitive-00364420-00364444 | Intuitive-00986625 | SIS000415-000422 | SIS095294-095296 | SIS196340-196342 |
| Intuitive-00019774-00019775 | Intuitive-00364863-00364874 | Intuitive-01011044-01011053 | SIS000433 | SIS095312 | SIS196343 |
| Intuitive-00019946-00020046 | Intuitive-00365857-00365897 | Intuitive-01024426-01024427 | SIS000437-000439 | SIS095344 | SIS196344 |
| Intuitive-00020363-00020372 | Intuitive-00366044-00366053 | Intuitive-01032092 | SIS000440-000444 | SIS095440 | SIS196362-196366 |
| Intuitive-00021011 | Intuitive-00367019-00367063 | Intuitive-01034247 | SIS000449 | SIS095539-095540 | SIS196367 |
| Intuitive-00024105 | Intuitive-00367171-00367172 | Intuitive-01069706-01069707 | SIS000450-000451 | SIS095555-095622 | SIS196368 |
| Intuitive-00024910-00024941 | Intuitive-00367339 -00367344 | Intuitive-01071172-01071202 | SIS000455 | SIS095665-095666 | SIS196369-196370 |
| Intuitive-00025115-00025121 | Intuitive-00367339-00367344 | Intuitive-01085248 | SIS000459.001 | SIS095669-095725 | SIS235009-235017 |
| Intuitive-00027482-00027488 | Intuitive-00367345 | Intuitive-01087438 | SIS000463-000465 | SIS095923-095928 | SIS235018-235028 |
| Intuitive-00028665-00028668 | Intuitive-00367522-00367534 | Intuitive-01101507 | SIS000473-000476 | SIS095938-095940 | SIS235244-235253 |
| INTUITIVE-00028864 | Intuitive-00367724-00367726 | Intuitive-01101508 | SIS000477 | SIS096017-096021 | SIS235254-235256 |
| Intuitive-00028874-00028963 | Intuitive-00367727 | Intuitive-01115600 | SIS000481-000484 | SIS096161-096164 | SIS235283-235298 |
| Intuitive-00029346-00029347 | Intuitive-00367733-00367790 | Intuitive-01126654-01126655 | SIS000491 | SIS096196-096197 | SIS235301-235305 |
| Intuitive-00030279-00030285 | Intuitive-00367806-00367807 | Intuitive-01132295 | SIS000492-000495 | SIS096225 | SIS236038-236053 |
| Intuitive-00030451-00030517 | Intuitive-00367808-00367812 | Intuitive-01134566 | SIS000506-000525 | SIS096226 | SIS236058-236082 |
| Intuitive-00032916-00032917 | Intuitive-00367902 | Intuitive-01141301-01141305 | SIS000526-000533 | SIS096236-096237 | SIS236083-236088 |
| Intuitive-00033512-00033513 | Intuitive-00367961 | Intuitive-01155852 | SIS000561 | SIS096292 | SIS236829 |
| Intuitive-00033514-00033539 | Intuitive-00369327-00369328 | Intuitive-01156820 | SIS000568 | SIS096296 | SIS236830-236844 |
| Intuitive-00033815-00033870 | Intuitive-00369329-00369347 | Intuitive-01182910 | SIS000569-000570 | SIS096605 | SIS236845-236848 |
| Intuitive-00033957-00034025 | Intuitive-00372053-00372055 | Intuitive-01197005 | SIS000580 | SIS096629-096633 | SIS236911-236957 |
| Intuitive-00034599-00034621 | Intuitive-00372699-00372732 | INTUITIVE-01215093 | SIS000582-000587 | SIS096683-096685 | SIS236958-237033 |
| Intuitive-00034748-00034749 | Intuitive-00373839-00373841 | Intuitive-01219019 | SIS000593.001 | SIS096761 | SIS237071-237074 |
| Intuitive-00034750-00034774 | Intuitive-00373885-00373887 | Intuitive-01236912 | SIS000597 | SIS096786 | SIS237075-237100 |
| Intuitive-00035386 | Intuitive-00376786-00376808 | Intuitive-01240518-01240523 | SIS000598 | SIS096963-096966 | SIS237101-237106 |
| Intuitive-00036783-00036788 | Intuitive-00389936 | Intuitive-01261766 | SIS000600-000604 | SIS097025-097028 | SIS237108-237131 |
| Intuitive-00038260-00038278 | Intuitive-00390869 | Intuitive-01405182-01405188 | SIS000611-000613 | SIS097031 | SIS237186-237204 |
| Intuitive-00040518 | Intuitive-00390870-00390906 | Intuitive-01405189-01405190 | SIS000631-000632 | SIS097037-097041 | SIS237205-237209 |
| Intuitive-00042816-00042851 | Intuitive-00394297 | Intuitive-01740518-01740520 | SIS000633-000634 | SIS097107-097109 | SIS237343-237360 |
| Intuitive-00042937-00042972 | Intuitive-00397354-00397395 | Intuitive-02025757-02025759 | SIS000635-000639 | SIS097110-097112 | SIS237364-237373 |
| Intuitive-00043100 | Intuitive-00412740-00412762 | Intuitive-02026480 | SIS000652-000655 | SIS097113-097114 | SIS250885 |

# Data and Other Information Considered - as of December 2, 2022
## Attachment 1

| | | | | | |
|---|---|---|---|---|---|
| Intuitive-00043101-00043148 | Intuitive-00421009-00421014 | Intuitive-02046270 | SIS000656.001 | SIS097119 | SIS251593 |
| Intuitive-00043879-00043885 | Intuitive-00421106-00421118 | Intuitive-02067634 | SIS000660-000661 | SIS097122-097123 | SIS276305 |
| Intuitive-0044517 | Intuitive-00421796-00421808 | Intuitive-02068980 | SIS000662 | SIS097126-097128 | SIS299535-299561 |
| Intuitive-00044524-00044526 | Intuitive-00423683-00423683 | Intuitive-02069208 | SIS000663 | SIS097139 | SIS299583-299593 |
| Intuitive-00044528-00044530 | Intuitive-00423684-00423736 | Intuitive-02069211 | SIS000663-000664 | SIS097141 | SIS319267 |
| Intuitive-00045350-00045354 | Intuitive-00439319-00439321 | Intuitive-02069286 | SIS000665-000667 | SIS097217-097218 | SIS319315-319322 |
| Intuitive-00045861-00045898 | Intuitive-00439677-00439679 | Intuitive-02069694 | SIS000672 | SIS097220-097231 | SIS319323-19329 |
| Intuitive-0046428 | Intuitive-00463048-00463403 | Intuitive-02069746 | SIS001621 | SIS097269 | SIS320176-320188 |
| Intuitive-0047082 | Intuitive-00465615-00465616 | Intuitive-02069760 | SIS001648 | SIS097270 | SIS320189-320201 |
| Intuitive-00047105-00047314 | Intuitive-0046666 | Intuitive-02069764 | SIS001685 | SIS097273 | SIS320922-320935 |
| Intuitive-00047998-00048207 | Intuitive-00471993-00471997 | Intuitive-02069774 | SIS001685-001690 | SIS097281 | SIS320936-320949 |
| Intuitive-00048514-00048542 | Intuitive-00471998-00472003 | Intuitive-02069795 | SIS001957-001960 | SIS097322 | SIS320950-320963 |
| Intuitive-00049014-00049016 | Intuitive-00473788-00473819 | INTUITIVE-02070399 | SIS003653-003670 | SIS106475 | SIS321287-321299 |
| Intuitive-00049089-00049102 | Intuitive-00478297-00478298 | Intuitive-553115-553161 | SIS003902 | SIS106484 | SIS321300-321312 |
| Intuitive-00050362-00050388 | Intuitive-00478439-00478444 | Intu ive-00028864 | SIS003913 | SIS106485-106486 | SIS327571-327577 |
| Intuitive-0050419 | Intuitive-00478797-00479033 | Intu ive-00049995 | SIS003926 | SIS106491-106492 | SIS327578-327591 |
| Intuitive-00054857-00054896 | Intuitive-00492128-0049132 | Intu ive-00107210 | SIS003937 | SIS106493 | SIS327606-327612 |
| Intuitive-00070364-00070421 | Intuitive-00506505-00506641 | Intu ive-00994761 | SIS000568591-00568634 | SIS106493-106498 | SIS327613-327620 |
| Intuitive-00073538-00073539 | Intuitive-00512348-00512353 | Intu ive-00995697 | SIS007986 | SIS116933-116940 | SIS327621-327628 |
| Intuitive-00075214-00075252 | Intuitive-00515818-00515856 | MEDIVISION001731-001732 | SIS009366 | SIS116993 | SIS327629-327636 |
| Intuitive-0076261 | Intuitive-00519980-00520005 | MEDLINE0040518 - 0040544 | SIS009428 | SIS117733-117749 | SIS327637 |
| Intuitive-00086011-00086082 | Intuitive-00538914-00538929 | REBOTIX000685-000687 | SIS009443 | SIS117894-117911 | SIS328154 |
| Intuitive-00086194-00086283 | Intuitive-00544903-00545124 | REBOTIX000835-000845 | SIS009514 | SIS117912-117929 | SIS328322-328333 |
| Intuitive-0088621 | Intuitive-00552533-00552535 | REBOTIX001387-001425 | SIS009617-009619 | SIS118397-118409 | SIS328334 |
| Intuitive-0089621 | Intuitive-00552745-00552759 | REBOTIX004379-004388 | SIS010151 | SIS118410-118422 | SIS328335 |
| Intuitive-00089767-00089782 | Intuitive-00552993-00553014 | REBOTIX0164822 | SIS010152 | SIS118423-118435 | SIS328336 |
| Intuitive-00091257-00091351 | Intuitive-00553115-00553161 | REBOTIX0173140 | SIS010200 | SIS118436-118448 | SIS328337 |
| Intuitive-0098205 | Intuitive-00553825-00553834 | REBOTIX0173144 | SIS010237 | SIS118449-118461 | SIS328338 |
| Intuitive-0098209 | Intuitive-00554106-00554113 | REBOTIX0173188 | SIS010270 | SIS118462-118474 | SIS328339 |
| Intuitive-00098287-00098354 | Intuitive-0055435 | REBOTIX0173204 | SIS010341 | SIS118878 | SIS328340 |
| Intuitive-0098370 | Intuitive-00555864-00555866 | REBOTIX0174292 | SIS010342 | SIS118879-118880 | SIS328341 |
| Intuitive-0098680 | Intuitive-0055790 | REBOTIX0174307 | SIS010343 | SIS119199-119206 | SIS328342 |
| Intuitive-0098681 | Intuitive-00559343-00559456 | REBOTIX0174757 | SIS010648-010665 | SIS119299 | SIS328343 |
| Intuitive-00100251-00100269 | Intuitive-00559695-00559570 | REBOTIX0174771 | SIS010691-010707 | SIS119300-119310 | SIS328344 |
| Intuitive-0102909 | Intuitive-00559824-00559939 | REBOTIX040273-040276 | SIS010912 | SIS119311 | SIS328345 |
| Intuitive-0102938 | Intuitive-00562853-00562855 | REBOTIX040277 | SIS010923 | SIS119312-119313 | SIS328346 |
| Intuitive-00102938-00102989 | Intuitive-0056345 | REBOTIX040446-040450 | SIS011151-011165 | SIS126698-126705 | SIS328348 |
| Intuitive-00103402-00103405 | Intuitive-00563940-00563948 | REBOTIX041613-041620 | SIS011187-011202 | SIS127642 | SIS329815 |
| Intuitive-00103407-00103426 | Intuitive-00564534-00564535 | REBOTIX045504-045510 | SIS011228-011243 | SIS132796 | SIS329816-329817 |
| Intuitive-0103427 | Intuitive-00565670-00565671 | REBOTIX048125-048125 | SIS011268-011283 | SIS135949-135967 | SIS329827-329828 |
| Intuitive-00103456-00103478 | Intuitive-00566055-00566082 | REBOTIX049817 | SIS032473-032488 | SIS136056-136064 | SIS329829-329830 |
| Intuitive-00103571-00103596 | Intuitive-00566149-00566543 | REBOTIX050132-050133 | SIS032622-032689 | SIS136259-136274 | SIS329848 |
| Intuitive-0103598 | Intuitive-00566507-00566543 | REBOTIX050420 | SIS032716-032718 | SIS136648 | SIS329849 |
| Intuitive-0103786 | Intuitive-00566601-00566643 | REBOTIX050423 | SIS032770 | SIS136691 | SIS329850-329865 |
| Intuitive-00103787-00103836 | Intuitive-0056826 | REBOTIX050721 | SIS032896-032898 | SIS138226-138234 | SIS329885-329893 |
| Intuitive-00104130-00104131 | Intuitive-00569180-00569182 | REBOTIX050854 | SIS032899-032955 | SIS139358-139376 | SIS329894-329900 |
| Intuitive-00104183-00104205 | Intuitive-00569308-00569310 | REBOTIX051079 | SIS032956-032959 | SIS139407-139415 | SIS330591-330634 |
| INTUITIVE-00104210 | Intuitive-00569531-00569541 | REBOTIX051537-051538 | SIS032969-032972 | SIS139456-139464 | SIS336456-336474 |
| Intuitive-00104535-00104537 | Intuitive-0057075 | REBOTIX053473 | SIS033073-033142 | SIS139559-139567 | SIS336744-336759 |
| Intuitive-00104562-00104563 | Intuitive-00571076-00571080 | REBOTIX054164-054165 | SIS033151-033220 | SIS139980-139998 | SIS336761 |
| Intuitive-00104566-00104570 | Intuitive-00578133-00578202 | REBOTIX054166 | SIS033364-033365 | SIS140013-140030 | SIS336984-337014 |
| Intuitive-00104928-00104953 | Intuitive-00579633-00579645 | REBOTIX054249-054249 | SIS033371-033438 | SIS142445 | SIS340585-340599 |
| Intuitive-00105904-00106106 | Intuitive-0058159 | REBOTIX054620-054620 | SIS033590-033593 | SIS142683-142698 | SIS341124 |
| Intuitive-00106127-00106128 | Intuitive-0058161 | REBOTIX054897 | SIS033653 | SIS142726-142742 | SIS341132 |
| Intuitive-00106653-00106658 | Intuitive-00581814-00581883 | REBOTIX055131 | SIS033654 | SIS142766-142782 | SIS343965 |

# Data and Other Information Considered - as of December 2, 2022
## Attachment 1

| | | | | | |
|---|---|---|---|---|---|
| Intuitive-00110242-00110243 | Intuitive-00582105-00582117 | REBOTIX055134 | SIS033655-033660 | SIS142937-142939 | SIS343965-343971 |
| Intuitive-00110255-00110258 | Intuitive-00582618-00582629 | REBOTIX055331 | SIS033663 | SIS143176 | SIS343965-343971 |
| Intuitive-00111192-00111193 | Intuitive-00583337-00583347 | REBOTIX055419 | SIS033664-033665 | SIS143178 | SIS344662-344670 |
| Intuitive-00113020-00113030 | Intuitive-00583659-00583707 | REBOTIX055424 | SIS036554 | SIS143365-143366 | SIS346078-346080 |
| Intuitive-00114808-00114839 | Intuitive-00585561-00585659 | REBOTIX055565 | SIS038107-038109 | SIS143367-143374 | SIS346124-346129 |
| Intuitive-00115483-00115516 | Intuitive-00586241-00586249 | REBOTIX055566 | SIS038110-038112 | SIS143466-143477 | SIS346133 |
| Intuitive-00115576-00115578 | Intuitive-00586668-00586708 | REBOTIX056297 | SIS038113-038169 | SIS143490 | SIS346146 |
| Intuitive-00115682-00115689 | Intuitive-00593443-00593480 | REBOTIX056325 | SIS038223-038290 | SIS143895-143964 | SIS346147 |
| Intuitive-00118636-00118706 | Intuitive-00593897-00593981 | REBOTIX056326 | SIS038293-038362 | SIS145108 | SIS346180-346195 |
| Intuitive-00121229-00121230 | Intuitive-00594517-00594542 | REBOTIX056394 | SIS043777-043778 | SIS146228-146234 | SIS346200-346215 |
| Intuitive-00122488-00122603 | Intuitive-00594883-00594902 | REBOTIX056408 | SIS045193-045194 | SIS146768 | SIS346248 |
| Intuitive-00122485-00124487 | Intuitive-00594904-00594949 | REBOTIX057417-057417 | SIS045195-045198 | SIS146838 | SIS346265 |
| Intuitive-00128685 | Intuitive-00595404 | REBOTIX057473 | SIS045199-045200 | SIS146989 | SIS346266 |
| Intuitive-00128687-00128691 | Intuitive-00595405 | REBOTIX058675 | SIS045201-045203 | SIS148945 | SIS346267 |
| Intuitive-00128700-00128728 | Intuitive-00595406 | REBOTIX059010-059013 | SIS045227 | SIS149741 | SIS346306-346322 |
| Intuitive-00129015 | Intuitive-00595407 | REBOTIX059648-059651 | SIS045231-045232 | SIS158253-158271 | SIS346641-346657 |
| Intuitive-00133628-00133630 | Intuitive-00595408 | REBOTIX059927 | SIS045332-045337 | SIS161609 | SIS346820 |
| Intuitive-00136727-00136727 | Intuitive-00595409 | REBOTIX060483 | SIS045701-045719 | SIS161610 | SIS346866-346874 |
| Intuitive-00136728-00136735 | Intuitive-00595410 | REBOTIX061037 | SIS045720-045736 | SIS161611 | SIS347987 |
| Intuitive-00138863-00138863 | Intuitive-00595411 | REBOTIX062113 | SIS047175-047180 | SIS161612 | SIS347997 |
| Intuitive-00138864-00138892 | Intuitive-00595412 | REBOTIX062114 | SIS047433-047435 | SIS161613 | SIS356339 |
| Intuitive-00138893-00138902 | Intuitive-00595413 | REBOTIX062280 | SIS048559-048561 | SIS161614 | SIS356362-356406 |
| Intuitive-00139149-00139150 | Intuitive-00595414 | REBOTIX062408 | SIS059789 | SIS163317-163341 | SIS356407-356411 |
| Intuitive-00139238 | Intuitive-00595415 | REBOTIX062427 | SIS063100-063101 | SIS166875-166876 | SIS356412-356437 |
| Intuitive-00139709-00139741 | Intuitive-00595416 | REBOTIX062442 | SIS063495 | SIS166877 | SIS356438-356439 |
| Intuitive-00139742 -00139756 | Intuitive-00595417 | REBOTIX063037 | SIS063496-063510 | SIS166890-166892 | SIS356440-356478 |
| Intuitive-00139764 | Intuitive-00595418 | REBOTIX063142 | SIS063511 | SIS166893-166895 | SIS356479-356503 |
| Intuitive-00139765-00139801 | Intuitive-00595419 | REBOTIX063807 | SIS065442-065443 | SIS167696 | SIS356504-356505 |
| Intuitive-00140459 | Intuitive-00595420 | REBOTIX065420 | SIS065604-065606 | SIS167697 | SIS356506-356613 |
| Intuitive-00141202 | Intuitive-00595421 | REBOTIX065762 | SIS065608-065609 | SIS167787-167788 | SIS356614-356735 |
| Intuitive-00141567-00141568 | Intuitive-00595422 | REBOTIX065982 | SIS068983-068985 | SIS167789-167790 | SIS356736-356856 |
| Intuitive-00143279-00143310 | Intuitive-00595423 | REBOTIX067626 | SIS069084-069102 | SIS167798-167800 | SIS356857-356987 |
| Intuitive-00145425-00145437 | Intuitive-00595424 | REBOTIX068401 | SIS069104-069122 | SIS167801-167804 | SIS356988-357133 |
| Intuitive-00146235-00146236 | Intuitive-00595425 | REBOTIX068496 | SIS069981 | SIS167809-167810 | SIS357134-357135 |
| Intuitive-00146237-00146302 | Intuitive-00595426 | REBOTIX068513 | SIS069989-070019 | SIS167815-167816 | SIS357136-357137 |
| Intuitive-00146467-00146480 | Intuitive-00595427 | REBOTIX068620 | SIS070033-070062 | SIS167817 | SIS357138-357139 |
| Intuitive-00146892-00146903 | Intuitive-00595428 | REBOTIX068802 | SIS070291-070306 | SIS167818 | SIS357140-357141 |
| Intuitive-00147161-00147220 | Intuitive-00595429 | REBOTIX068949 | SIS070308-070323 | SIS167819-167821 | SIS357142-357143 |
| Intuitive-00147262-00147271 | Intuitive-00595430 | REBOTIX071552 | SIS070435-070436 | SIS167822-167823 | SIS357144-357145 |
| Intuitive-00147286-00147287 | Intuitive-00595431 | REBOTIX071632 | SIS070437 | SIS168991-169009 | SIS357146-357147 |
| Intuitive-00147459-00147494 | Intuitive-00595432 | REBOTIX071979 | SIS070460 | SIS169233-169280 | SIS357148-357149 |
| Intuitive-00147651-00147662 | Intuitive-00595433 | REBOTIX073495 | SIS070464 | SIS175955-175963 | SIS357150-357151 |
| Intuitive-00154125-00154126 | Intuitive-00595434 | REBOTIX073787 | SIS070473-070475 | SIS175964-175972 | SIS357152-357153 |
| Intuitive-00156362-00156365 | Intuitive-00595435 | REBOTIX078175-078179 | SIS070495-070497 | SIS175973-175981 | SIS357154-357158 |
| Intuitive-00157064-00157065 | Intuitive-00595436 | REBOTIX078553-078574 | SIS070498-070554 | SIS175982-175990 | SIS357159-357176 |
| Intuitive-00157098-00157099 | Intuitive-00595437 | REBOTIX081801-081815 | SIS070555-070558 | SIS175991-175999 | SIS357177-357178 |
| Intuitive-00165844-00165844 | Intuitive-00595438 | REBOTIX081841 | SIS070804 | SIS176000-176008 | SIS357186-357198 |
| Intuitive-00173065 | Intuitive-00595439 | REBOTIX081842-081843 | SIS070870 | SIS191424-191425 | SIS357199-357233 |
| Intuitive-00173701 | Intuitive-00595440 | REBOTIX084000-084002 | SIS070871-070872 | SIS191426 | SIS357234-357261 |
| Intuitive-00173706 | Intuitive-00595441 | REBOTIX101177-101184 | SIS070883 | SIS191465-191466 | SIS357262-357267 |
| Intuitive-00174591-00174604 | Intuitive-00595442 | REBOTIX103066-103075 | SIS070908 | SIS191467 | SIS357268 |
| Intuitive-00185828 | Intuitive-00595443 | REBOTIX140009-140013 | SIS070994 | SIS191494-191495 | SIS357269-357272 |
| Intuitive-00186899 | Intuitive-00595444 | REBOTIX140015-140019 | SIS071129-071130 | SIS191496 | SIS357273 |
| Intuitive-00187238-00187248 | Intuitive-00595445 | REBOTIX143364-143367 | SIS073497 | SIS192056 | SIS357274-357277 |
| Intuitive-00192940-00192960 | Intuitive-00595446 | REBOTIX143532-143533 | SIS075739 | SIS194492-194495 | SIS357278-357279 |

# Data and Other Information Considered - as of December 2, 2022
## Attachment 1

| | | | | | |
|---|---|---|---|---|---|
| Intuitive-00194074-00194089 | Intuitive-00595447 | REBOTIX144717-144721 | SIS075742-075743 | SIS194501-194504 | SIS357280-357283 |
| Intuitive-00194765-00194772 | Intuitive-00595448 | REBOTIX144993-145008 | SIS075744-075746 | SIS195959-195960 | SIS357284-357285 |
| Intuitive-00203904-00203907 | Intuitive-00595449 | REBOTIX145062-145084 | SIS080897 | SIS195961-195963 | SIS357286-357291 |
| Intuitive-00203908-00203910 | Intuitive-00595450 | REBOTIX162208-162212 | SIS081049-081065 | SIS195964-195966 | SIS357292 |
| Intuitive-00203911-00203932 | Intuitive-00595451 | REBOTIX162404-162424 | SIS081069-081083 | SIS195967-195971 | SIS357293-357298 |
| Intuitive-00210269 | Intuitive-00595452 | REBOTIX164558-164560 | SIS081102-081117 | SIS195972-195975 | SIS357299-357301 |
| Intuitive-00211776-00211778 | Intuitive-00595453 | REBOTIX164733-164733 | SIS081197 | SIS196006 | SIS357302-357308 |
| Intuitive-00213893-Intuitive-00213893 | Intuitive-00595454 | REBOTIX165105-165108 | SIS081200 | SIS196007 | STRREB00000187-00000190 |
| Intuitive-00214265-00214265 | Intuitive-00595455 | REBOTIX165260 | SIS081282-081284 | SIS196008 | STRREB00000215-00000217 |
| Intuitive-00214266-00214278 | Intuitive-00595456 | REBOTIX165487-165492 | SIS087771 | SIS196009 | STRREB00000218-00000219 |
| Intuitive-00214279 | Intuitive-00595457 | REBOTIX165540 | SIS088060 | SIS196010-196013 | STRREB00000259 |
| Intuitive-00214280 | Intuitive-00595458 | REBOTIX165571-165573 | SIS088027-088063 | SIS196027-196028 | STRREB00000260-00000273 |
| Intuitive-00215018-00215029 | Intuitive-00595459 | REBOTIX165623 | SIS090681-090683 | SIS196029 | STRREB00000276-00000277 |
| Intuitive-00215503-00215511 | Intuitive-00595460 | REBOTIX165846-165851 | SIS090943-090944 | SIS196055-196056 | STRREB00000278 |
| Intuitive-00215547-00215558 | Intuitive-00595461 | REBOTIX166019 | SIS090945-090952 | SIS196057 | STRREB00001682 |
| Intuitive-00215972-00215983 | Intuitive-00595462 | REBOTIX171110-171113 | SIS090989 | SIS196058 | STRREB00001810 |
| Intuitive-00216481-00216492 | Intuitive-00595463 | REBOTIX174692-174696 | SIS091197 | SIS196059 | STRREB00001827 |
| Intuitive-00216786-00216798 | Intuitive-00595673-00595694 | REBOTIX174971-174976 | SIS091199 | SIS196071 | STRREB00002039 |
| Intuitive-00214280 | Intuitive-00596101 | REBOTIX174977-174982 | SIS091221-091235 | SIS196072-196074 | STRREB00002553-00002555 |
| Intuitive-00218424-00218431 | Intuitive-00596102-00596106 | REBOTIX175080-175083 | SIS091241-091257 | SIS196075 | STRREB00003853 |
| Intuitive-00221189-00221219 | Intuitive-00596789 | REBOTIX175123 | SIS091755 | SIS196084 | STRREB00004528-00004531 |
| Intuitive-00221603-00221626 | Intuitive-00601505-00601511 | REBOTIX175328 | SIS091769 | SIS196085 | |
| Intuitive-00221661-00221669 | Intuitive-00601672-00601675 | Restore-00000970-00001005 | SIS091796-091797 | SIS196086 | |
| Intuitive-00222027-00222038 | Intuitive-00602098 | Restore-00001538-00001578 | SIS091796-091797 | SIS196087-196091 | |

**DOCUMENTS WITHOUT BATES STAMPS:**

SIS Financial Statements:

2019 income statement.xls
Apr 2018 Income Statement.xls

SIS Sales by Customer:

Annual Sales by Hosp.xls

SIS Tax Returns:

Tax Return - Surgical Instrument Service Co. - 2019 Client Copy

Copy of State Tax Research (003)
Dept_Summary (1)
Dept_Summary

Vizient_Membership_Eligibility-2022-11-26T21_40_59
Vizient_Public_Sector_Eligibility-2022-11-26T21_43_04

**INDEPENDENT RESEARCH:**

Intuitive Surgical, Inc. Form 10-K for the fiscal year ended December 31, 2017
Intuitive Surgical, Inc. Annual Report 2018 with Form 10-K for the fiscal year ended December 31, 2018
Intuitive Surgical, Inc. Annual Report 2019 with Form 10-K for the fiscal year ended December 31, 2019
Intuitive Surgical, Inc. Form 10-K for the fiscal year ended December 31, 2020
Intuitive Surgical, Inc. Form 10-K for the fiscal year ended December 31, 2021

# Data and Other Information Considered - as of December 2, 2022
# Attachment 1

New Membership Agreement Between Vizient and  he Children's Hospital Association Expands Services to Include Supply Chain Analy ics Solutions
Vizient Announces 11 Member Agreements for Q1 2022
Vizient Announces 15 New, Renewed or Expanded Member Agreements in Q1
Vizient Announces 21 New, Renewed or Expanded Member agreements in Q2
Vizient Announces 35 New, Renewed or Expanded Member Agreements in Q3 and Q4 of 2020
Vizient Announces 97 New, Renewed or Expanded Member Agreements in 2021
Vizient Announces New Member Agreement with The University of Texas System
Vizient Announces New Membership Agreement with Leading Academic Heal h System
Vizient Announces New Membership Agreement with SSM Health

da Vinci Surgical System EndoWrist/Single-Site Instrument & Accessory Catalog (May 2014)
Da Vinci Xi X Instrument & Accessory Catalog (January 2019)
Da Vinci X/Xi Instrument & Accessory Catalog (October 2021)

WEBSITES:

https://www.aha.org/statistics/fast-facts-us-hospitals
https://bmpmedical.com/reasons-to-switch-to-single-use-medical-devices-and-disposable-medical-supplies/
https://www.carevoyance.com/blog/acute-care-hospitals
https://www.cdc.gov/oralhealth/infectioncontrol/faqs/single-use-devices html
https://www.definitivehc.com/blog/how-many-hospitals-are-in-the-us
https://www.definitivehc.com/blog/top-10-gpos-by-staffed-beds
https://www.fda.gov/media/150141/download
https://www.fda.gov/medical-devices/reprocessing-reusable-medical-devices/what-are-reusable-medical-devices
https://www.fda.gov/medical-devices/products-and-medical-procedures/reprocessing-reusable-medical-devices
https://healthtrustpg.com/about-heal htrust/
https://investors.premierinc.com/events-and-reports/reports/default.aspx?section=report
https://investors.premierinc.com/news/press-release-details/2016/Premier-Inc-and-Banner-Health-Expand-Partnership/default.aspx
https://www.justice.gov/atr/horizontal-merger-guidelines-08192010
https://premierinc.com/about
https://rebotixrepair.com
https://newsroom vizientinc.com/en-US/releases/vizient-announces-11-member-agreements-for-q1-2022
https://supplychainassociation.org/about-us/what-is-gpo
https://web.archive.org/web/20191108191050/https://www.vizien inc.com/what-we-do
https://www.yankeealliance.com/content/premier-certified-sponsor-affiliates
https://www.vizientinc.com
Moore, Eric J., "Robotic Surgery," Britannica (https://www.britannica.com/science/robotic-surgery)
15 USC 1117: Recovery for viola ion of rights (a) Profits; damages and costs; attorney fees (house.gov)

## OTHER:

American Institute of Cer ified Public Accountants (AICPA) Practice 06-4 (2006)
Association of Interna ional Cer ified Public Accountants (AICPA) Forensic & Valua ion Services Practice Aid – Calcula ing Lost Profits (2018)
The Comprehensive Guide to Economic Damages: Volume One (2020 6th ed., BVR Publications)

**Any additional documents, websites, or other information referenced throughout this report.**

ATTACHMENT 2



# RICHARD F. BERO, CPA, CVA

N16 W23217 Stone Ridge Drive, Suite 150, Waukesha, WI 53188
Phone – (262) 522-7922   Fax – (262) 436-2444
rbero@berogroup.com

## *PROFESSIONAL EXPERIENCE:*

**The BERO Group / Corporate Financial Advisors, LLC**
Managing Director
Waukesha, Wisconsin                                          December 1995-Present

Mr. Bero founded Corporate Financial Advisors in 1995 and served as Managing Director. The BERO Group evolved from Corporate Financial Advisors and Mr. Bero serves as Managing Director. Mr. Bero provides financial and accounting consulting services and expert testimony pertaining to valuation issues and financial damages issues.

**Coopers & Lybrand**
Manager – Litigation & Claims Services
Milwaukee, Wisconsin                                          1994-1995

Mr. Bero was the Manager and Practice Leader of the Coopers & Lybrand Milwaukee Litigation & Claims Services practice.

**Peterson Consulting Limited Partnership**
Executive Consultant
Milwaukee, Wisconsin                                          1989-1994
Chicago, Illinois                                          1987-1989

Mr. Bero provided litigation and business dispute support services to trial attorneys and corporate counsel.

## *EDUCATION:*

**University of Wisconsin–Madison**                                          1986
Bachelor of Business Administration
Accounting and Finance

### ACTIVITIES/OTHER:

Intellectual Property Valuation Instructor – National Association of Certified Valuation Analysts

Licensing Executives Society – Co-Chair Wisconsin Chapter – 2006-2008

Intellectual Property Owners Association – Damages Committee Member – 2004-present

National Association of Certified Valuation Analysts, CVA

Wisconsin Institute of Certified Public Accountants:

Board of Directors – 2000-2002

Chairman CPA's In Industry – Committee 1997-1999

Outstanding Committee Chairperson Award – 1997-1998

American Institute of Certified Public Accountants

Becker CPA Review – Instructor 1995-1998

### EXPERT WITNESS TESTIMONY – LAST FOUR YEARS:

*ABC Corporation I et al v. The Partnership and Unincorporated Associations Identified on Schedule "A"*
United States District Court – Northern District of Illinois
Case No. 1:20-cv-04806 (filed 8/17/20)
December 2022 (Hearing Testimony)
February 2022 (Deposition Testimony)

*Condair Group AG v. Dri-Steem Corporation*
United States District Court – U.S. District of Minnesota
Case No. 0:21-cv-00863 (filed 3/29/21)
September 2022 (Deposition Testimony)

*Don Lee Farms, a division of Goodman Food Products, Inc., v. Beyond Meat Inc., et al.*
State of California – Los Angeles County
Case No. BC662838 (filed 5/25/17)
April 2022 (Deposition Testimony)

*G.W. Lisk Company, Inc. v. Power Packer North America, Inc. d/b/a GITS Manufacturing Company*
United States District Court – Southern District of Iowa
Case No. 4:17-cv-00273 (filed 7/21/17)
April 2022 (Deposition Testimony)

*Sartin et al. v. Chula Vista Inc. et al.*
United States District Court – Eastern District of Wisconsin
Case No. 2:18-cv-01890-WED (filed 11/30/18)
October 2021 (Deposition Testimony)

*Cyntec Company, Ltd. v. Chilisin Electronics Corp. and Chilisin America Ltd.*
United States District Court – Northern District of California
Case No. 4:18-cv-00939-PJH (filed 2/14/18)
August 2021 (Trial Testimony)
June 2020 (Deposition Testimony)

*Wudi Industrial (Shanghai) Co., Ltd. v. Wai L. Wong*
United States District Court – Eastern District of Virginia
Case No. 1:20-cv-00908-CMH-MSN (filed 8/7/20)
April 2021 (Deposition Testimony)

*Vermeer Corporation v. The Toro Company*
United States District Court – Southern District of Iowa
Case Nos. 4:17-cv-0076, 4:19-cv-00050 (filed 2/28/17; 2/12/19)
October 2020 (Deposition Testimony)

*AOS Holding Company and A.O. Smith Corporation v. Bradford White Corporation*
United States District Court – District of Delaware
Case No. 1:18-cv-00412-LPS (filed 3/16/18)
August 2020 (Trial Testimony)
November 2019 (Deposition Testimony)

*RAM Group, Inc. v. H5G, LLC*
State of Wisconsin – Milwaukee County
Case No. 2018CV010102 (filed 12/10/18)
June 2020 (Deposition Testimony)

*Dimensions Events LLC v. Danziger USA*
Chicago Rabbinical Council (DT #17-09)
May 2019 (Arbitration Hearing Testimony)
May 2019 (Deposition Testimony)

*Smart Solar, Inc. d/b/a Smart Living Home & Garden v. Sky Billiards, Inc. d/b/a Best Choice Products*
United States District Court – Northern District of Illinois
Case No.: 1:17-cv-04211 (filed 6/2/17)
April 2019 (Deposition Testimony)

*Gold & Levy d/b/a Rosseto v. Cal-Mil Plastic Products, Inc., et al.*
United States District Court – Northern District of Illinois
Case No.: 1:17-cv-00786-JBG-YBK (filed 1/31/17)
December 2018 (Deposition Testimony)

**PUBLICATIONS:**

The Comprehensive Guide to Economic Damages, "Patent Infringement Damages: Lost Profits and Royalties", "Design Patent Damages" and "Trade Secret Damages" (Chapters 28, 29 and 30, 2020 6th ed., Business Valuation Resources, LLC)

Bero, Richard. *The Litigator's Damages Blueprint: The Pragmatic Solution*. Wisconsin: 422 Doty, LLC, 2019

The Comprehensive Guide to Economic Damages, "Patent Infringement Damages: Lost Profits and Royalties" and "Trade Secret Damages" (Chapters 26 and 27, 2018 5th ed., BVR Publications)

The Comprehensive Guide to Economic Damages, "Patent Infringement Damages: Lost Profits and Royalties" (Chapter 26, 2016 4th ed., BVR Publications)

The Comprehensive Guide to Lost Profits and Other Commercial Damages, "Patent Infringement Damages: Lost Profits and Royalties" (Chapter 25, 2014 3rd ed., BVR Publications)

April 2011 – CCH Business Valuation Alert, "The *Uniloc* Case: 25 Percent Rule of Thumb Rejected"

The Comprehensive Guide to Lost Profits, "Lost Profits Damages in Patent Infringement Lawsuits" (Chapter 19, 2011 ed., BVR Publications)

August 2009 – IP Law360 – "Demand for the Patented Product – Lower Bar?"

The Comprehensive Guide to Lost Profits, "Lost Profits Damages in Patent Infringement Lawsuits" (Chapter 12, 2009 ed., BVR Publications)

October 2008 – AIPLA White Paper – "Constructing Royalty Rates"

February 2008 – IP Law360 – "IP Litigation in China and the U.S."

Global Intellectual Property Asset Management Report, "Intellectual Property Metrics Today: It Can Be Done" (June 2005 and July 2005)

Proving and Pricing Construction Claims, "Claims for Lost Profit" (Chapter 14, 2nd ed., 1996, Wiley Law Publications)


### *PRESENTATIONS:*

| | |
|---|---|
| November 2021 | Business Valuation Resources, LLC<br>BVR's Special Series on New Economic Damages Guide<br>Patent Royalty Damages – What's the Approach?<br>Co-Presenter: John L. Abramic, Steptoe & Johnson LLP |
| May 2021 | Business Valuation Resources, LLC<br>National Economic Damages Virtual Conference 2021 (Day 1)<br>Patent Infringement Damages<br>Co-Presenter: Autumn N. Nero, Perkins Coie LLP |
| November 2020 | American Intellectual Property Law Association<br>Damages Subcommittee – Speaker Series Webinar Part II<br>The Pragmatic Solution© |
| May 2020 | American Intellectual Property Law Association<br>Damages Subcommittee – Speaker Series Webinar Part I<br>The Pragmatic Solution© |
| February 2020 | Marquette Law School<br>Guest Instructor – IP Litigation Class<br>Milwaukee, Wisconsin |
| May 2019 | Milwaukee Bar Association<br>The Pragmatic Solution©<br>Co-Presenter: Shane Brunner, Milwaukee Best & Friedrich LLP<br>Milwaukee, Wisconsin |

| July 2018 | Intellectual Property Owners Association – IP Chat Channel Webinar<br>What's Next for Design Patent Damages?  The DOJ Test on Trial<br>Co-Presenters:  James Dottavio, Ford Motor Company and Elizabeth Ferrill,<br>Finnegan, Henderson, Farabow, Garrett & Dunner, LLP |
|---|---|
| September 2016 | Wisconsin Intellectual Property Law Association<br>Patent and IP Damages Update<br>Milwaukee, Wisconsin |
| December 2015 | WestLegalEdcenter Webinar<br>Recent Patent Royalty Damages Decisions – Update & Discussion |
| October 2015 | WestLegalEdcenter Webinar<br>Recent Patent Royalty Damages Decisions – Update & Discussion |
| October 2015 | Milwaukee Bar Association<br>VirnetX and Ericsson – The Latest on Apportionment and Comparable Licenses<br>Milwaukee, Wisconsin |
| July 2015 | Hot Topics in Patent Royalty Damages Webinar<br>Business Valuation Resources' 2015 Special Series on Intellectual Property |
| April 2014 | Michigan Intellectual Property Law Association<br>Hot Topics in Patent Damages<br>Troy, Michigan |
| May 2013 | Hot Topics in Patent Royalty Damages<br>Business Valuation Resources Online Symposium on Economic Damages:<br>Part 3<br>Chicago, Illinois |
| September 2011 | WestLegalEdcenter Webinar<br>Recent Patent Damages Decisions – What is the Effect |
| August 2011 | WestLegalEdcenter Webinar<br>Constructing Royalty Rate Damages |
| January 2011 | The Evolution of the Entire Market Value Rule<br>Business Valuation Resources Webinar Series on Advanced Topics<br>in Lost Profits Damages<br>Chicago, Illinois |
| September 2010 | Patent Damages: Managing the Risks and Contingent Costs<br>Business Valuation Resources / Morningstar Summit on Best Practices<br>in Valuing Intellectual Property<br>Chicago, Illinois |
| March 2010 | Tianjin Bar Association<br>Damage Analysis Techniques and Considerations in U.S. Patent Litigations<br>Tianjin, China |

| | |
|---|---|
| March 2010 | Beijing Lawyers Association<br>Damage Analysis Techniques and Considerations in U.S. Patent Litigations<br>Beijing, China |
| December 2009 | Milwaukee Bar Association<br>Constructing Royalty Rate Damages<br>Milwaukee, Wisconsin |
| October 2009 | Michigan Intellectual Property Law Association<br>Constructing Royalty Rate Damages<br>Detroit, Michigan |
| June 2009 | Licensing Executive Society – Chicago Chapter<br>Constructing Royalty Rates<br>Chicago, Illinois |
| March 2009 | Milwaukee Bar Association<br>Patent Infringement Damages – Working Effectively With Your<br> Damages Expert<br>Milwaukee, Wisconsin |
| January 2009 | Wisconsin Intellectual Property Law Association<br>Constructing Royalty Rates<br>Milwaukee, Wisconsin |
| November 2008 | Licensing Executive Society – Minnesota Chapter<br>Constructing Royalty Rates<br>Minneapolis, Minnesota |
| October 2008 | American Intellectual Property Law Association – Annual Meeting<br>Constructing Royalty Rates<br>Washington, D.C. |
| October 2008 | Minnesota Intellectual Property Law Association<br>Constructing Royalty Rates<br>Minneapolis, Minnesota |
| June 2008 | Presentation to Judges and IP attorneys in China<br>The Development of Patent Damages<br>Shenzhen, China |
| May 2008 | Licensing Executive Society International – Spring Conference<br>Avoiding Intellectual Property Hurdles in the U.S. - The View from China<br>Roundtable Moderator<br>Chicago, Illinois |
| March 2008 | Marquette Law School<br>Royalty Damages in Patent Litigation<br>Guest Instructor – IP Litigation Class<br>Milwaukee, Wisconsin |

| | |
|---|---|
| October 2007 | Guarding the Treasure: IP Valuation & Remedies Panelist<br>Sponsored by Foley & Lardner<br>New York, New York |
| October 2007 | Shanghai Bar Association<br>Patent Litigation & Valuation – Real World Examples in the U.S.<br>Shanghai, China |
| October 2007 | Shenzhen Society of Certified Public Appraisers<br>Intellectual Property, Valuation and Damages Analysis – Real World Examples in the U.S.<br>Shenzhen, China |
| May 2007 | Shanghai Intellectual Property Service Center<br>Intellectual Property in the U.S.: Opportunities, Valuation & Litigation<br>Shanghai, China |
| May 2007 | Shenzhen Bar Association<br>Managing and Understanding the Value of IP – Real World Examples in the U.S.<br>Shenzhen, China |
| October 2006 | China Hi-Tech Fair 2006<br>Protection of Chinese Intellectual Property in the U.S. Patent Damages & Ways to Avoid Infringement<br>Shenzhen, China |
| August 2006 | Nanshan Sub-Bureau of Intellectual Property Administration<br>Intellectual Property Value Issues in the United States an Overview for Chinese Businesses<br>Shenzhen, China |
| March 2006 | Milwaukee Bar Association<br>Hindsight is 20/20: Developing & Presenting Damages in Intellectual Property Litigation and Complex Litigation<br>Milwaukee, Wisconsin |
| December 2005 | Wisconsin Intellectual Property Law Association<br>Intellectual Property Damages Update & Discussion<br>Pewaukee, Wisconsin |
| October 2005 | Licensing Executives Society – Annual Meeting<br>Facilitator: Advanced Practices Working Session III: To Sue or Not? How to Decide<br>Phoenix, Arizona |
| September 2005 | Digital Fabrication 2005 Seminar<br>Panel Discussion: Intellectual Property<br>Baltimore, Maryland |

September 2005   Intellectual Property Owner's Annual Meeting
           Patent Infringement Damages Update and Discussion
           Seattle, Washington

April 2005     Licensing Executives Society – Wisconsin Chapter
           What's Reasonable: Royalty Damages in Patent Litigation
           Fond Du Lac, Wisconsin

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Schedules Index

| Schedule # | Title |
|---|---|
| Schedule 1.0 | Damages Summary |
| Schedule 2.0 | Scenario 1 - Discounted Lost Profits: In-house Model |
| Schedule 2.1 | Scenario 1 - Undiscounted Lost Profits: In-house Model |
| Schedule 2.2 | Scenario 1 - Lost EndoWrist Repair Units |
| Schedule 3.0 | Scenario 1 - Discounted Lost Profits: Distributor Model |
| Schedule 3.1 | Scenario 1 - Undiscounted Lost Profits: Distributor Model |
| Schedule 4.0 | Scenario 2 - Discounted Lost Profits: In-house Model (2 Year X/Xi Delay) |
| Schedule 4.1 | Scenario 2 - Undiscounted Lost Profits: In-house Model (2 Year X/Xi Delay) |
| Schedule 4.2 | Scenario 2 - Lost EndoWrist Repair Units (2 Year X/Xi Delay) |
| Schedule 4.3 | Scenario 2 - Discounted Lost Profits: In-house Model  (1 Year X/Xi Delay) |
| Schedule 4.4 | Scenario 2 - Undiscounted Lost Profits: In-house Model  (1 Year X/Xi Delay) |
| Schedule 4.5 | Scenario 2 - Lost EndoWrist Repair Units  (1 Year X/Xi Delay) |
| Schedule 5.0 | Scenario 2 - Discounted Lost Profits: Distributor Model (2 Year X/Xi Delay) |
| Schedule 5.1 | Scenario 2 - Undiscounted Lost Profits: Distributor Model (2 Year X/Xi Delay) |
| Schedule 5.2 | Scenario 2 - Discounted Lost Profits: Distributor Model  (1 Year X/Xi Delay) |
| Schedule 5.3 | Scenario 2 - Undiscounted Lost Profits: Distributor Model  (1 Year X/Xi Delay) |
| Schedule 6.0 | Intuitive's U.S. EndoWrist Instrument Units - Actual and Forecasted: 2014 - 2025 |
| Schedule 7.0 | Estimated EndoWrist Expiration Rates: 2018 - 2021 |
| Schedule 8.0 | Potential EndoWrist Instrument Units, Net Sales Dollars and Average Selling Price by System (Using Intuitive Sales Volumes and September 2019 Vizient Amended Agreement Prices): 2018 - June 2022 |
| Schedule 8.1 | Potential EndoWrist Instrument Units, Net Sales Dollars and ASP by Product (Instrument Number) - da Vinci S/Si (Using Intuitive Sales Volumes and September 2019 Vizient Amended Agreement Prices): 2018 - June 2022 |
| Schedule 8.2 | Potential EndoWrist Instrument Units, Net Sales Dollars and ASP by Product (Instrument Number) - da Vinci X/Xi (Using Intuitive Sales Volumes and September 2019 Vizient Amended Agreement Prices): 2018 - June 2022 |
| Schedule 9.0 | SIS's Estimated EndoWrist Instrument Repair Cost:2020 - June 2022 |
| Schedule 9.1 | Intuitive's "Top 5" X/Xi EndoWrist Instrument Units:2018 - June 2022 |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Schedules Index

| Schedule # | Title |
|---|---|
| Schedule 10.0 | SIS's Estimated Interceptor Chip Cost (Based on Rebotix's Sales to Restore) |
| Schedule 10.1 | Rebotix Sales to SIS: June 27, 2019 - November 21, 2019 |
| Schedule 11.0 | Potential EndoWrist Instrument Units, Costs and Costs per Unit by System (Using Intuitive Sales Volumes and Rebotix Pricing): 2018 - June 2022 |
| Schedule 11.1 | Potential EndoWrist Instrument Units, Costs and Costs per Unit  by Product (Instrument Number) - da Vinci S/Si (Using Intuitive Sales Volumes and Rebotix Pricing): 2018 - June 2022 |
| Schedule 11.2 | Potential EndoWrist Instrument Units, Costs and Costs per Unit  by Product (Instrument Number) - da Vinci X/Xi (Using Intuitive Sales Volumes and Rebotix Pricing): 2018 - June 2022 |
| Schedule 12.0 | SIS's EndoWrist Instrument Sales Prices and Costs (from Rebotix) - da Vinci S/Si |
| Schedule 12.1 | SIS's EndoWrist Instrument Sales Prices and Costs (from Rebotix) - da Vinci X/Xi |
| Schedule 12.2 | SIS's EndoWrist Instrument Sale Price vs Intuitive Sales Price - da Vinci S/Si |
| Schedule 13.0 | Intuitive's EndoWrist Instrument Units, Net Sales Dollars and Average Selling Price by System: 2014 - June 2022 |
| Schedule 13.1 | Intuitive's EndoWrist Instrument Units and Net Sales Dollars by Product (Instrument Number) - da Vinci S/Si: 2014 - June 2022 |
| Schedule 13.2 | Intuitive's EndoWrist Instrument Units and Net Sales Dollars by Product (Instrument Number) - da Vinci X/Xi:  2014 - June 2022 |
| Schedule 14.0 | SIS's EndoWrist Instrument Repair Summary |
| Schedule 15.0 | SIS's Financial Statements: 2019 - October 2021 |
| Schedule 15.1 | SIS's Detailed SGA: 2019 - October 2021 |
| Schedule 16.0 | Intuitive EndoWrist Instrument Average Selling Price, Units and Net Sales Dollars: 2020 - 2025 |
| Schedule 16.1 | Lanham Act Based on Scenario 2 - Unenforceable Contracts(2 Year X/Xi Delay): 2020 - 2025 |
| Schedule 16.2 | Lanham Act Based on Scenario 2 - Unenforceable Contracts(1 Year X/Xi Delay): 2020 - 2025 |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Damages Summary
# Schedule 1.0

|  | 2020 | 2021 | 2022 | 2023 | 2024 (discounted) | 2025 (discounted) | Total |
|---|---|---|---|---|---|---|---|

## Lost profits

### Scenario 1 - Illegal Encryption

| | | 2020 | 2021 | 2022 | 2023 | 2024 (discounted) | 2025 (discounted) | Total |
|---|---|---|---|---|---|---|---|---|
| [A] | In-house model | $4,861,686 | $16,979,680 | $24,223,614 | $27,662,628 | $22,046,612 | $6,850,616 | $102,624,836 |
| [B] | Distributor model | $1,809,430 | $6,787,198 | $9,680,170 | $11,066,580 | $8,823,417 | $2,742,135 | $40,908,930 |

### Scenario 2 - Unenforceable Contracts

**2 Year X/Xi delay**

| | | 2020 | 2021 | 2022 | 2023 | 2024 (discounted) | 2025 (discounted) | Total |
|---|---|---|---|---|---|---|---|---|
| [C] | In-house model | $752,970 | $1,069,936 | $5,610,902 | $19,830,094 | $22,046,612 | $6,850,616 | $56,161,130 |
| [D] | Distributor model | $282,694 | $417,536 | $2,228,402 | $7,930,754 | $8,823,417 | $2,742,135 | $22,424,938 |

**1 Year X/Xi delay**

| | | 2020 | 2021 | 2022 | 2023 | 2024 (discounted) | 2025 (discounted) | Total |
|---|---|---|---|---|---|---|---|---|
| [E] | In-house model | $752,970 | $5,842,528 | $17,455,507 | $27,662,628 | $22,046,612 | $6,850,616 | $80,610,861 |
| [F] | Distributor model | $282,694 | $2,328,302 | $6,970,497 | $11,066,580 | $8,823,417 | $2,742,135 | $32,213,625 |

## Lanham Act

| | | 2020 | 2021 | 2022 | 2023 | 2024 (discounted) | 2025 (discounted) | Total |
|---|---|---|---|---|---|---|---|---|
| [G] | Scenario 2 - 2 year X/Xi delay | $3,397,612 | $4,956,376 | $26,724,252 | $94,852,384 | $105,499,912 | $32,785,303 | $268,215,839 |
| [H] | Scenario 2 - 1 year X/Xi delay | $3,397,612 | $27,928,798 | $83,416,742 | $132,341,676 | $105,499,912 | $32,785,303 | $385,370,043 |

**NOTES / SOURCES:**

Note:  Any minor differences are due to rounding.

[A]  Per Schedule 2.0.

[B]  Per Schedule 3.0.

[C]  Per Schedule 4.0.

[D]  Per Schedule 5.0.

[E]  Per Schedule 4.3.

[F]  Per Schedule 5.2.

[G]  Per Schedule 16.1.

[H]  Per Schedule 16.2.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Scenario 1 - Discounted Lost Profits: In-house Model
# Schedule 2.0

| | | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | Total |
|---|---|---|---|---|---|---|---|---|
| | **Lost EndoWrist repair units** | | | | | | | |
| [A] | da Vinci S/Si | 1,321 | 1,864 | 956 | 447 | 177 | 36 | 4,801 |
| [B] | da Vinci X/Xi | 7,484 | 28,822 | 42,530 | 49,215 | 41,711 | 14,542 | 184,304 |
| [C] | Total | 8,805 | 30,686 | 43,486 | 49,662 | 41,888 | 14,578 | 189,105 |
| | **Lost revenues** | | | | | | | |
| [A] | da Vinci S/Si | $1,898,277 | $2,704,664 | $1,370,904 | $640,998 | $253,818 | $51,624 | $6,920,285 |
| [B] | da Vinci X/Xi | $10,582,376 | $41,071,350 | $60,902,960 | $70,475,880 | $59,730,152 | $20,824,144 | $263,586,862 |
| [C] | Total | $12,480,653 | $43,776,014 | $62,273,864 | $71,116,878 | $59,983,970 | $20,875,768 | $270,507,147 |
| | **Incremental costs** | | | | | | | |
| [A] | da Vinci S/Si | $1,145,307 | $1,634,728 | $836,500 | $391,125 | $154,875 | $31,500 | $4,194,035 |
| [B] | da Vinci X/Xi | $6,473,660 | $25,161,606 | $37,213,750 | $43,063,125 | $36,497,125 | $12,724,250 | $161,133,516 |
| [C] | Total | $7,618,967 | $26,796,334 | $38,050,250 | $43,454,250 | $36,652,000 | $12,755,750 | $165,327,551 |
| | **Lost profits (undiscounted)** | | | | | | | |
| [A] | da Vinci S/Si | $752,970 | $1,069,936 | $534,404 | $249,873 | $98,943 | $20,124 | $2,726,250 |
| [B] | da Vinci X/Xi | $4,108,716 | $15,909,744 | $23,689,210 | $27,412,755 | $23,233,027 | $8,099,894 | $102,453,346 |
| [C] | Total | $4,861,686 | $16,979,680 | $24,223,614 | $27,662,628 | $23,331,970 | $8,120,018 | $105,179,596 |
| [D] | Discount % | | | | | 12% | 12% | |
| [E] | Discount period | | | | | 0.5 | 1.5 | |
| [F] | Discount factor | 1.00000 | 1.00000 | 1.00000 | 1.00000 | 0.94491 | 0.84367 | |
| [G] | Discounted lost profits | **$4,861,686** | **$16,979,680** | **$24,223,614** | **$27,662,628** | **$22,046,612** | **$6,850,616** | **$102,624,836** |

**NOTES / SOURCES:**

Note:  Any minor differences are due to rounding.

[A] Per Schedule 2.1.

[B] Per Schedule 2.1.

[C] = [A] + [B]

[D] For the GICS 35101010, Health Care Equipment & Supplies, Duff and Phelps - Cost of Capital Composite, September 30, 2022, the average SIC/GICS Composite WACC (weighted average cost of capital) is 9.2% and median WACC is 8.9%.  For the small composite, the WACC is 11.1% to 11.2% (CRSP Decile).  For purposes of my analysis I use 12%, which is conservative.  Note:  The projections after 2022 do not include growth, therefore the discount rate would likely be less.

[E] Calculated using the mid-year convention to January 1, 2024, the approximate date of trial.

[F] = ( 1 + [H] ) ^ - [I], rounded to 5 decimals.

[G] = Lost profits (undiscounted) per [C] * [F]

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Scenario 1 - Undiscounted Lost Profits: In-house Model
# Schedule 2.1

| | | | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | Total |
|---|---|---|---|---|---|---|---|---|---|
| **da Vinci S/Si** | | | | | | | | | |
| [A] | Lost EndoWrist repair units | | 1,321 | 1,864 | 956 | 447 | 177 | 36 | 4,801 |
| | *Per unit* | | | | | | | | |
| [B] | Average selling price | | $1,437 | $1,451 | $1,434 | $1,434 | $1,434 | $1,434 | $1,441 |
| | *Incremental costs per unit* | | | | | | | | |
| [C] | Repair costs | | $148 | $155 | $156 | $156 | $156 | $156 | $153 |
| [D] | Chip costs | | $533 | $533 | $533 | $533 | $533 | $533 | $533 |
| [E] | Vizient admin fees - % of sales | 4% | $57 | $58 | $57 | $57 | $57 | $57 | $57 |
| [F] | Additional SGA - % of sales | 9% | $129 | $131 | $129 | $129 | $129 | $129 | $130 |
| [G] | Total incremental costs | | $867 | $877 | $875 | $875 | $875 | $875 | $874 |
| [H] | Lost profits per unit | | $570 | $574 | $559 | $559 | $559 | $559 | $568 |
| [I] | Lost revenues | | $1,898,277 | $2,704,664 | $1,370,904 | $640,998 | $253,818 | $51,624 | $6,920,285 |
| | *Incremental costs* | | | | | | | | |
| [J] | Repair costs | | $195,508 | $288,920 | $149,136 | $69,732 | $27,612 | $5,616 | $736,524 |
| [K] | Chip costs | | $704,093 | $993,512 | $509,548 | $238,251 | $94,341 | $19,188 | $2,558,933 |
| [L] | Vizient admin fees - 4% of sales | | $75,297 | $108,112 | $54,492 | $25,479 | $10,089 | $2,052 | $275,521 |
| [M] | Additional SGA - % of sales | | $170,409 | $244,184 | $123,324 | $57,663 | $22,833 | $4,644 | $623,057 |
| [N] | Total incremental costs | | $1,145,307 | $1,634,728 | $836,500 | $391,125 | $154,875 | $31,500 | $4,194,035 |
| [O] | **Lost profits - undiscounted** | | **$752,970** | **$1,069,936** | **$534,404** | **$249,873** | **$98,943** | **$20,124** | **$2,726,250** |
| **da Vinci X/Xi** | | | | | | | | | |
| [A] | Lost EndoWrist repair units | | 7,484 | 28,822 | 42,530 | 49,215 | 41,711 | 14,542 | 184,304 |
| | *Per unit* | | | | | | | | |
| [B] | Average selling price | | $1,414 | $1,425 | $1,432 | $1,432 | $1,432 | $1,432 | $1,430 |
| | *Incremental costs per unit* | | | | | | | | |
| [C] | Repair costs | | $148 | $155 | $156 | $156 | $156 | $156 | $156 |
| [D] | Chip costs | | $533 | $533 | $533 | $533 | $533 | $533 | $533 |
| [E] | Vizient admin fees - % of sales | 4% | $57 | $57 | $57 | $57 | $57 | $57 | $57 |
| [F] | Additional SGA - % of sales | 9% | $127 | $128 | $129 | $129 | $129 | $129 | $129 |
| [G] | Total incremental costs | | $865 | $873 | $875 | $875 | $875 | $875 | $874 |
| [H] | Lost profits per unit | | $549 | $552 | $557 | $557 | $557 | $557 | $556 |
| [I] | Lost revenues | | $10,582,376 | $41,071,350 | $60,902,960 | $70,475,880 | $59,730,152 | $20,824,144 | $263,586,862 |
| | *Incremental costs* | | | | | | | | |
| [J] | Repair costs | | $1,107,632 | $4,467,410 | $6,634,680 | $7,677,540 | $6,506,916 | $2,268,552 | $28,662,730 |
| [K] | Chip costs | | $3,988,972 | $15,362,126 | $22,668,490 | $26,231,595 | $22,231,963 | $7,750,886 | $98,234,032 |
| [L] | Vizient admin fees - 4% of sales | | $426,588 | $1,642,854 | $2,424,210 | $2,805,255 | $2,377,527 | $828,894 | $10,505,328 |
| [M] | Additional SGA - % of sales | | $950,468 | $3,689,216 | $5,486,370 | $6,348,735 | $5,380,719 | $1,875,918 | $23,731,426 |
| [N] | Total incremental costs | | $6,473,660 | $25,161,606 | $37,213,750 | $43,063,125 | $36,497,125 | $12,724,250 | $161,133,516 |
| [O] | **Lost profits - undiscounted** | | **$4,108,716** | **$15,909,744** | **$23,689,210** | **$27,412,755** | **$23,233,027** | **$8,099,894** | **$102,453,346** |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Scenario 1 - Undiscounted Lost Profits: In-house Model
# Schedule 2.1

**NOTES / SOURCES:**

Note:  Any minor differences are due to rounding.

[A]  Per Schedule 2.2.

[B]  Per Schedule 8.0.  For purposes of my analysis, the ASP after 2022 is the same as 2022.

[C]  Per Schedule 9.0.  For purposes of my analysis, the cost per unit after 2022 is the same as 2022.

[D]  Per Schedule 10.0.

[E]  = [B] * 4%.  Per SIS169233-169280 at 238-239, SIS would have paid Vizient a GPO administrative fee of 4% of net sales.  Per SIS319315, SIS would have paid Yankee a 3% administrative fee.  SIS would not have paid an administrative fee for non-Vizient and non-Yankee customers.  For purposes of my analysis, I assume all sales would have been subject to a 4% administrative fee, consistent with the Vizient Agreement.

[F]  = [B] * 9% per Schedule 15.1.

[G]  = [C] + [D] + [E] + [F]

[H]  = [B] - [G]

[I]  = [A] * [B]

[J]  = [A] * [C]

[K]  = [A] * [D]

[L]  = [A] * [E]

[M]  = [A] * [F]

[N]  = [J] + [K] + [L] + [M]

[O]  = [I] - [N]

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Scenario 1 - Lost EndoWrist Repair Units
# Schedule 2.2

|  |  | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | Total |
|---|---|---|---|---|---|---|---|---|
| | **EndoWrist instruments potentially repairable by SIS - units** | | | | | | | |
| [A] | da Vinci S/Si | 52,970 | 22,411 | 8,214 | 3,839 | 1,928 | 1,077 | 90,439 |
| [A] | da Vinci X/Xi | 299,954 | 346,579 | 365,304 | 422,719 | 455,982 | 437,186 | 2,327,724 |
| [A] | **Total** | **352,924** | **368,990** | **373,518** | **426,558** | **457,910** | **438,263** | **2,418,163** |
| | | | | | | | | |
| [B] | Expiration rate of new sales units | 60% | 60% | 60% | 60% | 60% | 60% | 60% |
| | | | | | | | | |
| | **Expired EndoWrist instrument  - units** | | | | | | | |
| [C] | da Vinci S/Si | 31,782 | 13,447 | 4,928 | 2,303 | 1,157 | 646 | 54,263 |
| [C] | da Vinci X/Xi | 179,972 | 207,947 | 219,182 | 253,631 | 273,589 | 262,312 | 1,396,633 |
| [C] | **Total** | **211,754** | **221,394** | **224,110** | **255,934** | **274,746** | **262,958** | **1,450,896** |
| | | | | | | | | |
| [D] | SIS market share rate | 55% | 55% | 55% | 55% | 55% | 55% | 55% |
| | | | | | | | | |
| | **SIS market share units** | | | | | | | |
| [E] | da Vinci S/Si | 17,480 | 7,396 | 2,710 | 1,267 | 636 | 355 | 29,844 |
| [E] | da Vinci X/Xi | 98,985 | 114,371 | 120,550 | 139,497 | 150,474 | 144,272 | 768,149 |
| [E] | **Total** | **116,465** | **121,767** | **123,260** | **140,764** | **151,110** | **144,627** | **797,993** |
| | | | | | | | | |
| | **SIS conversion factor** | | | | | | | |
| [F] | da Vinci S/Si | 15% | 50% | 70% | 70% | 70% | 70% | |
| [F] | da Vinci X/Xi | 15% | 50% | 70% | 70% | 70% | 70% | |
| | | | | | | | | |
| | **SIS converted units** | | | | | | | |
| [G] | da Vinci S/Si | 2,622 | 3,698 | 1,897 | 887 | 445 | 249 | 9,798 |
| [G] | da Vinci X/Xi | 14,848 | 57,186 | 84,385 | 97,648 | 105,332 | 100,990 | 460,389 |
| [G] | **Total** | **17,470** | **60,884** | **86,282** | **98,535** | **105,777** | **101,239** | **470,187** |
| | | | | | | | | |
| [H] | Collection rate of SIS converted units | 70% | 70% | 70% | 70% | 70% | 70% | 70% |
| | | | | | | | | |
| | **SIS collected units** | | | | | | | |
| [I] | da Vinci S/Si | 1,835 | 2,589 | 1,328 | 621 | 312 | 174 | 6,859 |
| [I] | da Vinci X/Xi | 10,394 | 40,030 | 59,070 | 68,354 | 73,732 | 70,693 | 322,273 |
| [I] | **Total** | **12,229** | **42,619** | **60,398** | **68,975** | **74,044** | **70,867** | **329,132** |
| | | | | | | | | |
| [J] | Repair yield of SIS would-have-been units | 72% | 72% | 72% | 72% | 72% | 72% | 72% |
| | | | | | | | | |
| | **Would-have-been Lost EndoWrist repair units** | | | | | | | |
| [K] | da Vinci S/Si | 1,321 | 1,864 | 956 | 447 | 225 | 125 | 4,938 |
| [K] | da Vinci X/Xi | 7,484 | 28,822 | 42,530 | 49,215 | 53,087 | 50,899 | 232,037 |
| [K] | **Total** | **8,805** | **30,686** | **43,486** | **49,662** | **53,312** | **51,024** | **236,975** |
| | | | | | | | | |
| [L] | Market penetration (% of total units) | 2% | 8% | 12% | 12% | 12% | 12% | 10% |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Scenario 1 - Lost EndoWrist Repair Units
# Schedule 2.2

|  | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | Total |
|---|---|---|---|---|---|---|---|
| **Actual conversion rate** | | | | | | | |
| [M] da Vinci S/Si | | | | | 15% | 50% | |
| [M] da Vinci X/Xi | | | | | 15% | 50% | |
| **Actual EndoWrist repair units** | | | | | | | |
| [N] da Vinci S/Si | | | | | 48 | 89 | 137 |
| [N] da Vinci X/Xi | | | | | 11,376 | 36,357 | 47,733 |
| [N] **Total** | | | | | **11,424** | **36,446** | **47,870** |
| **Lost EndoWrist repair units** | | | | | | | |
| [O] da Vinci S/Si | 1,321 | 1,864 | 956 | 447 | 177 | 36 | 4,801 |
| [O] da Vinci X/Xi | 7,484 | 28,822 | 42,530 | 49,215 | 41,711 | 14,542 | 184,304 |
| [O] **Total** | **8,805** | **30,686** | **43,486** | **49,662** | **41,888** | **14,578** | **189,105** |

**NOTES / SOURCES:**

Note: Any minor differences are due to rounding.

[A] Per Schedule 6.0.

[B] Per Schedule 7.0.

[C] = [A] * [B]

[D] Per https://web.archive.org/web/20191108191050/https://www.vizientinc.com/what-we-do as of November 8, 2019, "50% of the nation's acute care providers are Vizient members."
Per https://www.vizientinc.com/ as of November 29, 2022, Vizient has ">60% of acute care hospitals in the U.S."
For purposes of my analysis, I use 55%. See discussion in my report.

[E] = [C] * [D]

[F] Per discussion with Keith Johnson and Greg Posdal, SIS anticipated a quick ramp up in 2020, both in sales and in-house repair capabilities. According to Jean Sargent there would have been a transition timeframe conversion for this type of program. In 2020, or Year 1, 30% of Vizient's acute care providers would have reasonably converted. In 2021, or Year 2, and thereafter, 70% would have reasonably converted. I apply a 15% conversion factor in 2020, or Year 1 (i.e. mid-point between 0% January 1 and 30% December 31st). I apply a 50% conversion factor in 2021, or Year 2 (i.e., mid-point between 30% January 1 and 70% December 31st). I apply a 70% conversion factor in 2022, or Year 3, and thereafter.
Per May Dep. 113-114 (November 3, 2022), if the Xi had the same security measures as the Si, Restore would have been able to repair the Xi's as of January 2020.

[G] = [E] * [F]

[H] Per Morales 30(b)(6) Dep. Ex. 143 (Intuitive-00626597-626616 at 604), where Intuitive targets a collection rate of 70%. See also, Intuitive-00620200 where Intuitive assumes a collection rate of 70%. See also, Morales 30(b)(6)Dep. Ex. 141 (at pdf page 1), where Intuitive targets a collection rate of 80%. Per discussion with Jean Sargent, I understand for an expensive instrument such as an EndoWrist, a 75% collection rate would be reasonable.

[I] = [G] * [H]

[J] Deposition of Clifton Parker 43-45, 178-179 (October 25, 2022). Per Restore-00094918-00094956 at 922 (Parker Dep. Ex. 121), 215 out of 310 instruments collected in a 2-week sample that had lives on them passed Restore's inspection (i.e., were repairable). Note: Per Morales 30(b)(6) Dep. Ex. 143 (Intuitive-00626597-626616 at 609), where Intuitive realizes a yield of 85%. See also, Morales 30(b)(6) Dep. Ex. 143 (Intuitive-00626597-626616 at 612), where Intuitive targets a yield of 85% to 95%. Schedule 14.0 shows repair yield of SIS collectable units was approximately 88%. For purposes of my analysis, I use 72%.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Scenario 1 - Lost EndoWrist Repair Units
# Schedule 2.2

| 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | Total |
|------|------|------|------|------|------|-------|

[K]  = [I] * [J]

[L]  = [K] / [A]

[M]  Assuming trial is resolved in or about January 1, 2024, SIS would then begin ramping up.  For the Actual EndoWrist repair units, I use the Year 1, Year 2 and Year 3 market conversion rates addressed at [F] above.  Currently, I assume Year 1 is 2024 and the first year SIS will begin selling its repair program again.  Per May Dep. 60 (November 3, 2022), Restore will have the technical capability to change the usage limitations of the EndoWrist X/Xi's in the third or fourth quarter of 2023.  For purposes of this analysis, I assume the conversion rate for the S/Si and X/Xi would be the same starting January 1, 2024.

[N]  = [E] * [H] * [J] * [M]

[O]  = [K] - [N]

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Scenario 1 - Discounted Lost Profits: Distributor Model
# Schedule 3.0

| | | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | Total |
|---|---|---|---|---|---|---|---|---|
| | **Lost EndoWrist repair units** | | | | | | | |
| [A] | da Vinci S/Si | 1,321 | 1,864 | 956 | 447 | 177 | 36 | 4,801 |
| [B] | da Vinci X/Xi | 7,484 | 28,822 | 42,530 | 49,215 | 41,711 | 14,542 | 184,304 |
| [C] | Total | 8,805 | 30,686 | 43,486 | 49,662 | 41,888 | 14,578 | 189,105 |
| | **Lost revenues** | | | | | | | |
| [A] | da Vinci S/Si | $1,898,277 | $2,704,664 | $1,370,904 | $640,998 | $253,818 | $51,624 | $6,920,285 |
| [B] | da Vinci X/Xi | $10,582,376 | $41,071,350 | $60,902,960 | $70,475,880 | $59,730,152 | $20,824,144 | $263,586,862 |
| [C] | Total | $12,480,653 | $43,776,014 | $62,273,864 | $71,116,878 | $59,983,970 | $20,875,768 | $270,507,147 |
| | **Incremental costs** | | | | | | | |
| [A] | da Vinci S/Si | $1,615,583 | $2,287,128 | $1,174,924 | $549,363 | $217,533 | $44,244 | $5,888,775 |
| [B] | da Vinci X/Xi | $9,055,640 | $34,701,688 | $51,418,770 | $59,500,935 | $50,428,599 | $17,581,278 | $222,686,910 |
| [C] | Total | $10,671,223 | $36,988,816 | $52,593,694 | $60,050,298 | $50,646,132 | $17,625,522 | $228,575,685 |
| | **Lost profits (undiscounted)** | | | | | | | |
| [A] | da Vinci S/Si | $282,694 | $417,536 | $195,980 | $91,635 | $36,285 | $7,380 | $1,031,510 |
| [B] | da Vinci X/Xi | $1,526,736 | $6,369,662 | $9,484,190 | $10,974,945 | $9,301,553 | $3,242,866 | $40,899,952 |
| [C] | Total | $1,809,430 | $6,787,198 | $9,680,170 | $11,066,580 | $9,337,838 | $3,250,246 | $41,931,462 |
| [D] | Discount % | | | | | 12% | 12% | |
| [E] | Discount period | | | | | 0.5 | 1.5 | |
| [F] | Discount factor | 1.00000 | 1.00000 | 1.00000 | 1.00000 | 0.94491 | 0.84367 | |
| [G] | Discounted lost profits | **$1,809,430** | **$6,787,198** | **$9,680,170** | **$11,066,580** | **$8,823,417** | **$2,742,135** | **$40,908,930** |

## NOTES / SOURCES:

Note:  Any minor differences are due to rounding.

[A]  Per Schedule 3.1.

[B]  Per Schedule 3.1.

[C]  = [A] + [B]

[D]  For the GICS 35101010, Health Care Equipment & Supplies, Duff and Phelps - Cost of Capital Composite, September 30, 2022, the average SIC/GICS Composite WACC (weighted average cost of capital) is 9.2% and median WACC is 8.9%.  For the small composite, the WACC is 11.1% to 11.2% (CRSP Decile).  For purposes of my analysis I use 12%, which is conservative.  Note:  The projections after 2022 do not include growth, therefore the discount rate would likely be less.

[E]  Calculated using the mid-year convention to January 1, 2024, the approximate date of trial.

[F]  = ( 1 + [H] ) ^ - [I], rounded to 5 decimals.

[G]  = Lost profits (undiscounted) per [C] * [F]

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Scenario 1 - Undiscounted Lost Profits: Distributor Model
# Schedule 3.1

| | | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | Total |
|---|---|---|---|---|---|---|---|---|
| **da Vinci S/Si** | | | | | | | | |
| [A] | Lost EndoWrist repair units | 1,321 | 1,864 | 956 | 447 | 177 | 36 | 4,801 |
| | *Per unit* | | | | | | | |
| [B] | Average selling price | $1,437 | $1,451 | $1,434 | $1,434 | $1,434 | $1,434 | $1,441 |
| | *Incremental costs per unit* | | | | | | | |
| [C] | Repair costs (including chip costs) | $1,037 | $1,038 | $1,043 | $1,043 | $1,043 | $1,043 | $1,039 |
| [D] | Vizient admin fees - % of sales | 4% | $57 | $58 | $57 | $57 | $57 | $57 | $57 |
| [E] | Additional SGA - % of sales | 9% | $129 | $131 | $129 | $129 | $129 | $129 | $130 |
| [F] | Total incremental costs | | $1,223 | $1,227 | $1,229 | $1,229 | $1,229 | $1,229 | $1,227 |
| [G] | Lost profits per unit | | $214 | $224 | $205 | $205 | $205 | $205 | $215 |
| [H] | Lost revenues | | $1,898,277 | $2,704,664 | $1,370,904 | $640,998 | $253,818 | $51,624 | $6,920,285 |
| | *Incremental costs* | | | | | | | |
| [I] | Repair costs (including chip costs) | | $1,369,877 | $1,934,832 | $997,108 | $466,221 | $184,611 | $37,548 | $4,990,197 |
| [J] | Vizient admin fees - 4% of sales | | $75,297 | $108,112 | $54,492 | $25,479 | $10,089 | $2,052 | $275,521 |
| [K] | Additional SGA - % of sales | | $170,409 | $244,184 | $123,324 | $57,663 | $22,833 | $4,644 | $623,057 |
| [L] | Total incremental costs | | $1,615,583 | $2,287,128 | $1,174,924 | $549,363 | $217,533 | $44,244 | $5,888,775 |
| **[M]** | **Lost profits - undiscounted** | | **$282,694** | **$417,536** | **$195,980** | **$91,635** | **$36,285** | **$7,380** | **$1,031,510** |
| **da Vinci X/Xi** | | | | | | | | |
| [A] | Lost EndoWrist repair units | 7,484 | 28,822 | 42,530 | 49,215 | 41,711 | 14,542 | 184,304 |
| | *Per unit* | | | | | | | |
| [B] | Average selling price | $1,414 | $1,425 | $1,432 | $1,432 | $1,432 | $1,432 | $1,430 |
| | *Incremental costs per unit* | | | | | | | |
| [C] | Repair costs (including chip costs) | $1,026 | $1,019 | $1,023 | $1,023 | $1,023 | $1,023 | $1,022 |
| [D] | Vizient admin fees - % of sales | 4% | $57 | $57 | $57 | $57 | $57 | $57 | $57 |
| [E] | Additional SGA - % of sales | 9% | $127 | $128 | $129 | $129 | $129 | $129 | $129 |
| [F] | Total incremental costs | | $1,210 | $1,204 | $1,209 | $1,209 | $1,209 | $1,209 | $1,208 |
| [G] | Lost profits per unit | | $204 | $221 | $223 | $223 | $223 | $223 | $222 |
| [H] | Lost revenues | | $10,582,376 | $41,071,350 | $60,902,960 | $70,475,880 | $59,730,152 | $20,824,144 | $263,586,862 |
| | *Incremental costs* | | | | | | | |
| [I] | Repair costs (including chip costs) | | $7,678,584 | $29,369,618 | $43,508,190 | $50,346,945 | $42,670,353 | $14,876,466 | $188,450,156 |
| [J] | Vizient admin fees - 4% of sales | | $426,588 | $1,642,854 | $2,424,210 | $2,805,255 | $2,377,527 | $828,894 | $10,505,328 |
| [K] | Additional SGA - % of sales | | $950,468 | $3,689,216 | $5,486,370 | $6,348,735 | $5,380,719 | $1,875,918 | $23,731,426 |
| [L] | Total incremental costs | | $9,055,640 | $34,701,688 | $51,418,770 | $59,500,935 | $50,428,599 | $17,581,278 | $222,686,910 |
| **[M]** | **Lost profits - undiscounted** | | **$1,526,736** | **$6,369,662** | **$9,484,190** | **$10,974,945** | **$9,301,553** | **$3,242,866** | **$40,899,952** |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Scenario 1 - Undiscounted Lost Profits: Distributor Model
# Schedule 3.1

**NOTES / SOURCES:**

Note:  Any minor differences are due to rounding.

[A]  Per Schedule 2.2.

[B]  Per Schedule 8.0.  For purposes of my analysis, the ASP after 2022 is the same as 2022.

[C]  Per Schedule 11.0.  For purposes of my analysis, the cost per unit after 2022 is the same as 2022.

[D]  = [B] * 4%.  Per SIS169233-169280 at 238-239, SIS would have paid Vizient a GPO administrative fee of 4% of net sales.  Per SIS319315, SIS would have paid Yankee a 3% administrative fee.  SIS would not have paid an administrative fee for non-Vizient and non-Yankee customers.  For purposes of my analysis, I assume all sales would have been subject to a 4% administrative fee, consistent with the Vizient Agreement.

[E]  = [B] * 9% per Schedule 15.1.

[F]  = [C] + [D] + [E]

[G]  = [B] - [F]

[H]  = [A] * [B]

[I]  = [A] * [C]

[J]  = [A] * [D]

[K]  = [A] * [E]

[L]  = [I] + [J] + [K]

[M]  = [H] - [L]

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Scenario 2 - Discounted Lost Profits: In-house Model (2 Year X/Xi Delay)
# Schedule 4.0

| | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | Total |
|---|---|---|---|---|---|---|---|
| **Lost EndoWrist repair units** | | | | | | | |
| [A]  da Vinci S/Si | 1,321 | 1,864 | 956 | 447 | 177 | 36 | 4,801 |
| [B]  da Vinci X/Xi | 0 | 0 | 9,114 | 35,153 | 41,711 | 14,542 | 100,520 |
| [C]  Total | 1,321 | 1,864 | 10,070 | 35,600 | 41,888 | 14,578 | 105,321 |
| **Lost revenues** | | | | | | | |
| [A]  da Vinci S/Si | $1,898,277 | $2,704,664 | $1,370,904 | $640,998 | $253,818 | $51,624 | $6,920,285 |
| [B]  da Vinci X/Xi | $0 | $0 | $13,051,248 | $50,339,096 | $59,730,152 | $20,824,144 | $143,944,640 |
| [C]  Total | $1,898,277 | $2,704,664 | $14,422,152 | $50,980,094 | $59,983,970 | $20,875,768 | $150,864,925 |
| **Incremental costs** | | | | | | | |
| [A]  da Vinci S/Si | $1,145,307 | $1,634,728 | $836,500 | $391,125 | $154,875 | $31,500 | $4,194,035 |
| [B]  da Vinci X/Xi | $0 | $0 | $7,974,750 | $30,758,875 | $36,497,125 | $12,724,250 | $87,955,000 |
| [C]  Total | $1,145,307 | $1,634,728 | $8,811,250 | $31,150,000 | $36,652,000 | $12,755,750 | $92,149,035 |
| **Lost profits (undiscounted)** | | | | | | | |
| [A]  da Vinci S/Si | $752,970 | $1,069,936 | $534,404 | $249,873 | $98,943 | $20,124 | $2,726,250 |
| [B]  da Vinci X/Xi | $0 | $0 | $5,076,498 | $19,580,221 | $23,233,027 | $8,099,894 | $55,989,640 |
| [C]  Total | $752,970 | $1,069,936 | $5,610,902 | $19,830,094 | $23,331,970 | $8,120,018 | $58,715,890 |
| [D]  Discount % | | | | | 12% | 12% | |
| [E]  Discount period | | | | | 0.5 | 1.5 | |
| [F]  Discount factor | 1.00000 | 1.00000 | 1.00000 | 1.00000 | 0.94491 | 0.84367 | |
| [G]  Discounted lost profits | **$752,970** | **$1,069,936** | **$5,610,902** | **$19,830,094** | **$22,046,612** | **$6,850,616** | **$56,161,130** |

**NOTES / SOURCES:**

Note:  Any minor differences are due to rounding.

[A]  Per Schedule 4.1.

[B]  Per Schedule 4.1.

[C]  = [A] + [B]

[D]  For the GICS 35101010, Health Care Equipment & Supplies, Duff and Phelps - Cost of Capital Composite, September 30, 2022, the average SIC/GICS Composite WACC (weighted average cost of capital) is 9.2% and median WACC is 8.9%.  For the small composite, the WACC is 11.1% to 11.2% (CRSP Decile).  For purposes of my analysis I use 12%, which is conservative.  Note:  The projections after 2022 do not include growth, therefore the discount rate would likely be less.

[E]  Calculated using the mid-year convention to January 1, 2024, the approximate date of trial.

[F]  = ( 1 + [H] ) ^ - [I], rounded to 5 decimals.

[G]  = Lost profits (undiscounted) per [C] * [F]

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Scenario 2 - Undiscounted Lost Profits: In-house Model (2 Year X/Xi Delay)
# Schedule 4.1

|  |  | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | Total |
|---|---|---|---|---|---|---|---|---|
| **da Vinci S/Si** |  |  |  |  |  |  |  |  |
| [A] Lost EndoWrist repair units |  | 1,321 | 1,864 | 956 | 447 | 177 | 36 | 4,801 |
| _Per unit_ |  |  |  |  |  |  |  |  |
| [B] Average selling price |  | $1,437 | $1,451 | $1,434 | $1,434 | $1,434 | $1,434 | $1,441 |
| _Incremental costs per unit_ |  |  |  |  |  |  |  |  |
| [C] Repair costs |  | $148 | $155 | $156 | $156 | $156 | $156 | $153 |
| [D] Chip costs |  | $533 | $533 | $533 | $533 | $533 | $533 | $533 |
| [E] Vizient admin fees - % of sales | 4% | $57 | $58 | $57 | $57 | $57 | $57 | $57 |
| [F] Additional SGA - % of sales | 9% | $129 | $131 | $129 | $129 | $129 | $129 | $130 |
| [G] Total incremental costs |  | $867 | $877 | $875 | $875 | $875 | $875 | $874 |
| [H] Lost profits per unit |  | $570 | $574 | $559 | $559 | $559 | $559 | $568 |
| [I] Lost revenues |  | $1,898,277 | $2,704,664 | $1,370,904 | $640,998 | $253,818 | $51,624 | $6,920,285 |
| _Incremental costs_ |  |  |  |  |  |  |  |  |
| [J] Repair costs |  | $195,508 | $288,920 | $149,136 | $69,732 | $27,612 | $5,616 | $736,524 |
| [K] Chip costs |  | $704,093 | $993,512 | $509,548 | $238,251 | $94,341 | $19,188 | $2,558,933 |
| [L] Vizient admin fees - 4% of sales |  | $75,297 | $108,112 | $54,492 | $25,479 | $10,089 | $2,052 | $275,521 |
| [M] Additional SGA - % of sales |  | $170,409 | $244,184 | $123,324 | $57,663 | $22,833 | $4,644 | $623,057 |
| [N] Total incremental costs |  | $1,145,307 | $1,634,728 | $836,500 | $391,125 | $154,875 | $31,500 | $4,194,035 |
| **[O] Lost profits - undiscounted** |  | **$752,970** | **$1,069,936** | **$534,404** | **$249,873** | **$98,943** | **$20,124** | **$2,726,250** |
| **da Vinci X/Xi** |  |  |  |  |  |  |  |  |
| [A] Lost EndoWrist repair units |  | 0 | 0 | 9,114 | 35,153 | 41,711 | 14,542 | 100,520 |
| _Per unit_ |  |  |  |  |  |  |  |  |
| [B] Average selling price |  | $1,414 | $1,425 | $1,432 | $1,432 | $1,432 | $1,432 | $1,432 |
| _Incremental costs per unit_ |  |  |  |  |  |  |  |  |
| [C] Repair costs |  | $148 | $155 | $156 | $156 | $156 | $156 | $156 |
| [D] Chip costs |  | $533 | $533 | $533 | $533 | $533 | $533 | $533 |
| [E] Vizient admin fees - % of sales | 4% | $57 | $57 | $57 | $57 | $57 | $57 | $57 |
| [F] Additional SGA - % of sales | 9% | $127 | $128 | $129 | $129 | $129 | $129 | $129 |
| [G] Total incremental costs |  | $865 | $873 | $875 | $875 | $875 | $875 | $875 |
| [H] Lost profits per unit |  | $549 | $552 | $557 | $557 | $557 | $557 | $557 |
| [I] Lost revenues |  | $0 | $0 | $13,051,248 | $50,339,096 | $59,730,152 | $20,824,144 | $143,944,640 |
| _Incremental costs_ |  |  |  |  |  |  |  |  |
| [J] Repair costs |  | $0 | $0 | $1,421,784 | $5,483,868 | $6,506,916 | $2,268,552 | $15,681,120 |
| [K] Chip costs |  | $0 | $0 | $4,857,762 | $18,736,549 | $22,231,963 | $7,750,886 | $53,577,160 |
| [L] Vizient admin fees - 4% of sales |  | $0 | $0 | $519,498 | $2,003,721 | $2,377,527 | $828,894 | $5,729,640 |
| [M] Additional SGA - % of sales |  | $0 | $0 | $1,175,706 | $4,534,737 | $5,380,719 | $1,875,918 | $12,967,080 |
| [N] Total incremental costs |  | $0 | $0 | $7,974,750 | $30,758,875 | $36,497,125 | $12,724,250 | $87,955,000 |
| **[O] Lost profits - undiscounted** |  | **$0** | **$0** | **$5,076,498** | **$19,580,221** | **$23,233,027** | **$8,099,894** | **$55,989,640** |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Scenario 2 - Undiscounted Lost Profits: In-house Model (2 Year X/Xi Delay)
# Schedule 4.1

**NOTES / SOURCES:**

Note:  Any minor differences are due to rounding.

**[A]**  Per Schedule 4.2.

**[B]**  Per Schedule 8.0.  For purposes of my analysis, the ASP after 2022 is the same as 2022.

**[C]**  Per Schedule 9.0.  For purposes of my analysis, the cost per unit after 2022 is the same as 2022.

**[D]**  Per Schedule 10.0.

**[E]**  = **[B]** * 4%.  Per SIS169233-169280 at 238-239, SIS would have paid Vizient a GPO administrative fee of 4% of net sales.  Per SIS319315, SIS would have paid Yankee a 3% administrative fee.  SIS would not have paid an administrative fee for non-Vizient and non-Yankee customers.  For purposes of my analysis, I assume all sales would have been subject to a 4% administrative fee, consistent with the Vizient Agreement.

**[F]**  = **[B]** * 9% per Schedule 15.1.

**[G]**  = **[C]** + **[D]** + **[E]** + **[F]**

**[H]**  = **[B]** - **[G]**

**[I]**   = **[A]** * **[B]**

**[J]**  = **[A]** * **[C]**

**[K]**  = **[A]** * **[D]**

**[L]**  = **[A]** * **[E]**

**[M]**  = **[A]** * **[F]**

**[N]**  = **[J]** + **[K]** + **[L]** + **[M]**

**[O]**  = **[I]** - **[N]**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Scenario 2 - Lost EndoWrist Repair Units (2 Year X/Xi Delay)
# Schedule 4.2

|  |  | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | Total |
|---|---|---|---|---|---|---|---|---|
| | **EndoWrist instruments potentially repairable by SIS - units** | | | | | | | |
| [A] | da Vinci S/Si | 52,970 | 22,411 | 8,214 | 3,839 | 1,928 | 1,077 | 90,439 |
| [A] | da Vinci X/Xi | 0 | 0 | 365,304 | 422,719 | 455,982 | 437,186 | 1,681,191 |
| [A] | **Total** | **52,970** | **22,411** | **373,518** | **426,558** | **457,910** | **438,263** | **1,771,630** |
| | | | | | | | | |
| [B] | Expiration rate of new sales units | 60% | 60% | 60% | 60% | 60% | 60% | 60% |
| | | | | | | | | |
| | **Expired EndoWrist instrument  - units** | | | | | | | |
| [C] | da Vinci S/Si | 31,782 | 13,447 | 4,928 | 2,303 | 1,157 | 646 | 54,263 |
| [C] | da Vinci X/Xi | 0 | 0 | 219,182 | 253,631 | 273,589 | 262,312 | 1,008,714 |
| [C] | **Total** | **31,782** | **13,447** | **224,110** | **255,934** | **274,746** | **262,958** | **1,062,977** |
| | | | | | | | | |
| [D] | SIS market share rate | 55% | 55% | 55% | 55% | 55% | 55% | 55% |
| | | | | | | | | |
| | **SIS market share units** | | | | | | | |
| [E] | da Vinci S/Si | 17,480 | 7,396 | 2,710 | 1,267 | 636 | 355 | 29,844 |
| [E] | da Vinci X/Xi | 0 | 0 | 120,550 | 139,497 | 150,474 | 144,272 | 554,793 |
| [E] | **Total** | **17,480** | **7,396** | **123,260** | **140,764** | **151,110** | **144,627** | **584,637** |
| | | | | | | | | |
| | **SIS conversion factor** | | | | | | | |
| [F] | da Vinci S/Si | 15% | 50% | 70% | 70% | 70% | 70% | |
| [F] | da Vinci X/Xi | | | 15% | 50% | 70% | 70% | |
| | | | | | | | | |
| | **SIS converted units** | | | | | | | |
| [G] | da Vinci S/Si | 2,622 | 3,698 | 1,897 | 887 | 445 | 249 | 9,798 |
| [G] | da Vinci X/Xi | 0 | 0 | 18,083 | 69,749 | 105,332 | 100,990 | 294,154 |
| [G] | **Total** | **2,622** | **3,698** | **19,980** | **70,636** | **105,777** | **101,239** | **303,952** |
| | | | | | | | | |
| [H] | Collection rate of SIS market share units | 70% | 70% | 70% | 70% | 70% | 70% | 70% |
| | | | | | | | | |
| | **SIS collected units** | | | | | | | |
| [I] | da Vinci S/Si | 1,835 | 2,589 | 1,328 | 621 | 312 | 174 | 6,859 |
| [I] | da Vinci X/Xi | 0 | 0 | 12,658 | 48,824 | 73,732 | 70,693 | 205,907 |
| [I] | **Total** | **1,835** | **2,589** | **13,986** | **49,445** | **74,044** | **70,867** | **212,766** |
| | | | | | | | | |
| [J] | Repair yield of SIS would-have-been units | 72% | 72% | 72% | 72% | 72% | 72% | 72% |
| | | | | | | | | |
| | **Would-have-been Lost EndoWrist repair units** | | | | | | | |
| [K] | da Vinci S/Si | 1,321 | 1,864 | 956 | 447 | 225 | 125 | 4,938 |
| [K] | da Vinci X/Xi | 0 | 0 | 9,114 | 35,153 | 53,087 | 50,899 | 148,253 |
| [K] | **Total** | **1,321** | **1,864** | **10,070** | **35,600** | **53,312** | **51,024** | **153,191** |
| | | | | | | | | |
| [L] | Market penetration (% of total units) | 2% | 8% | 3% | 8% | 12% | 12% | 9% |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Scenario 2 - Lost EndoWrist Repair Units (2 Year X/Xi Delay)
# Schedule 4.2

| | | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | Total |
|---|---|---|---|---|---|---|---|---|
| | **Actual conversion rate** | | | | | | | |
| [M] | da Vinci S/Si | | | | | 15% | 50% | |
| [M] | da Vinci X/Xi | | | | | 15% | 50% | |
| | **Actual EndoWrist repair units** | | | | | | | |
| [N] | da Vinci S/Si | | | | | 48 | 89 | 137 |
| [N] | da Vinci X/Xi | | | | | 11,376 | 36,357 | 47,733 |
| [N] | **Total** | | | | | **11,424** | **36,446** | **47,870** |
| | **Lost EndoWrist repair units** | | | | | | | |
| [O] | da Vinci S/Si | 1,321 | 1,864 | 956 | 447 | 177 | 36 | 4,801 |
| [O] | da Vinci X/Xi | 0 | 0 | 9,114 | 35,153 | 41,711 | 14,542 | 100,520 |
| [O] | **Total** | **1,321** | **1,864** | **10,070** | **35,600** | **41,888** | **14,578** | **105,321** |

**NOTES / SOURCES:**

Note:  Any minor differences are due to rounding.

[A] Per Schedule 6.0.  Note:  Per Parker Dep. 143-144 (October 25, 2022),  in a but for world (a world without Intuitive's anticompetitive behaviors), Restore would have begun repairing X/Xi EndoWrists by January 2022.  For purposes of my analysis, I assume X/Xi EndoWrist repairs start on January 1, 2022.

[B] Per Schedule 7.0.

[C] = [A] * [B]

[D] Per https://web.archive.org/web/20191108191050/https://www.vizientinc.com/what-we-do as of November 8, 2019, "50% of the nation's acute care providers are Vizient members."  Per https://www.vizientinc.com/ as of November 29, 2022, Vizient has ">60% of acute care hospitals in the U.S."
For purposes of my analysis, I use 55%.  See discussion in my report.

[E] = [C] * [D]

[F] Per discussion with Jean Sargent, I understand the conversion rate would have been at 30% at the end of year 1, 70% at the end of year 2 and 70% thereafter, recognizing SIS would not have gotten all hospitals.  For purposes of my analysis, I use an average of 15% in year 1, 50% in year 2 and 70% thereafter.  Also, per discussions with Greg Posdal and Keith Johnson, I understand SIS believed its ramp up period would have been one year.

[G] = [E] * [F]

[H] Per Morales 30(b)(6) Dep. Ex. 143 (Intuitive-00626597-626616 at 604), where Intuitive targets a collection rate of 70%.  See also, Intuitive-00620200 where Intuitive assumes a collection rate of 70%.  See also, Morales 30(b)(6)Dep. Ex. 141 (at pdf page 1), where Intuitive targets a collection rate of 80%.  Per discussion with Jean Sargent, I understand for an expensive instrument such as an EndoWrist, a 75% collection rate would be reasonable.

[I] = [G] * [H]

[J] Deposition of Clifton Parker 43-45, 178-179 (October 25, 2022).  Per Restore-00094918-00094956 at 922 (Parker Dep. Ex. 121), 215 out of 310 instruments collected in a 2-week sample that had lives on them passed Restore's inspection (i.e., were repairable).  Note:  Per Morales 30(b)(6) Dep. Ex. 143 (Intuitive-00626597-626616 at 609), where Intuitive realizes a yield of 85%.  See also, Morales 30(b)(6) Dep. Ex. 143 (Intuitive-00626597-626616 at 612), where Intuitive targets a yield of 85% to 95%.  Schedule 14.0 shows repair yield of SIS collectable units was approximately 88%.  For purposes of my analysis, I use 72%.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Scenario 2 - Lost EndoWrist Repair Units (2 Year X/Xi Delay)
# Schedule 4.2

| 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | Total |
|------|------|------|------|------|------|-------|

[K]  = [I] * [J]

[L]  = [K] / [A]

[M]  Assuming trial is resolved in or about January 1, 2024, SIS would then begin ramping up.  For the Actual EndoWrist repair units, I use the Year 1, Year 2 and Year 3 market conversion rates addressed at [F] above.  Currently, I assume Year 1 is 2024 and the first year SIS will begin selling its repair program again.  Per May Dep. 60 (November 3, 2022), Restore will have the technical capability to change the usage limitations of the EndoWrist X/Xi's in the third or fourth quarter of 2023.  For purposes of this analysis, I assume the conversion rate for the S/Si and X/Xi would be the same starting January 1, 2024.

[N]  = [E] * [H] * [J] * [M]

[O]  = [K] - [N]

# Scenario 2 - Discounted Lost Profits: In-house Model  (1 Year X/Xi Delay)
# Schedule 4.3

|  |  | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | Total |
|---|---|---|---|---|---|---|---|---|
| | **Lost EndoWrist repair units** | | | | | | | |
| [A] | da Vinci S/Si | 1,321 | 1,864 | 956 | 447 | 177 | 36 | 4,801 |
| [B] | da Vinci X/Xi | 0 | 8,646 | 30,379 | 49,215 | 41,711 | 14,542 | 144,493 |
| [C] | Total | 1,321 | 10,510 | 31,335 | 49,662 | 41,888 | 14,578 | 149,294 |
| | **Lost revenues** | | | | | | | |
| [A] | da Vinci S/Si | $1,898,277 | $2,704,664 | $1,370,904 | $640,998 | $253,818 | $51,624 | $6,920,285 |
| [B] | da Vinci X/Xi | $0 | $12,320,550 | $43,502,728 | $70,475,880 | $59,730,152 | $20,824,144 | $206,853,454 |
| [C] | Total | $1,898,277 | $15,025,214 | $44,873,632 | $71,116,878 | $59,983,970 | $20,875,768 | $213,773,739 |
| | **Incremental costs** | | | | | | | |
| [A] | da Vinci S/Si | $1,145,307 | $1,634,728 | $836,500 | $391,125 | $154,875 | $31,500 | $4,194,035 |
| [B] | da Vinci X/Xi | $0 | $7,547,958 | $26,581,625 | $43,063,125 | $36,497,125 | $12,724,250 | $126,414,083 |
| [C] | Total | $1,145,307 | $9,182,686 | $27,418,125 | $43,454,250 | $36,652,000 | $12,755,750 | $130,608,118 |
| | **Lost profits (undiscounted)** | | | | | | | |
| [A] | da Vinci S/Si | $752,970 | $1,069,936 | $534,404 | $249,873 | $98,943 | $20,124 | $2,726,250 |
| [B] | da Vinci X/Xi | $0 | $4,772,592 | $16,921,103 | $27,412,755 | $23,233,027 | $8,099,894 | $80,439,371 |
| [C] | Total | $752,970 | $5,842,528 | $17,455,507 | $27,662,628 | $23,331,970 | $8,120,018 | $83,165,621 |
| [D] | Discount % | | | | | 12% | 12% | |
| [E] | Discount period | | | | | 0.5 | 1.5 | |
| [F] | Discount factor | 1.00000 | 1.00000 | 1.00000 | 1.00000 | 0.94491 | 0.84367 | |
| [G] | Discounted lost profits | **$752,970** | **$5,842,528** | **$17,455,507** | **$27,662,628** | **$22,046,612** | **$6,850,616** | **$80,610,861** |

**NOTES / SOURCES:**

Note:  Any minor differences are due to rounding.

[A] Per Schedule 4.4.

[B] Per Schedule 4.4.

[C] = [A] + [B]

[D] For the GICS 35101010, Health Care Equipment & Supplies, Duff and Phelps - Cost of Capital Composite, September 30, 2022, the average WACC (weighted average cost of capital) is 9.2% and median WACC is 8.9%.  For the small composite, the WACC is 11.1% to 11.2% (CRSP Decile).  For purposes of my analysis I use 12%, which is conservative.  Note:  The projections after 2022 do not include growth, therefore the discount rate would likely be less.

[E] Calculated using the mid-year convention to January 1, 2024, the approximate date of trial.

[F] = ( 1 + [H] ) ^ - [I], rounded to 5 decimals.

[G] = Lost profits (undiscounted) per [C] * [F]

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Scenario 2 - Undiscounted Lost Profits: In-house Model  (1 Year X/Xi Delay)
# Schedule 4.4

| | | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | Total |
|---|---|---|---|---|---|---|---|---|
| **da Vinci S/Si** | | | | | | | | |
| [A] Lost EndoWrist repair units | | 1,321 | 1,864 | 956 | 447 | 177 | 36 | 4,801 |
| *Per unit* | | | | | | | | |
| [B] Average selling price | | $1,437 | $1,451 | $1,434 | $1,434 | $1,434 | $1,434 | $1,441 |
| *Incremental costs per unit* | | | | | | | | |
| [C] Repair costs | | $148 | $155 | $156 | $156 | $156 | $156 | $153 |
| [D] Chip costs | | $533 | $533 | $533 | $533 | $533 | $533 | $533 |
| [E] Vizient admin fees - % of sales | 4% | $57 | $58 | $57 | $57 | $57 | $57 | $57 |
| [F] Additional SGA - % of sales | 9% | $129 | $131 | $129 | $129 | $129 | $129 | $130 |
| [G] Total incremental costs | | $867 | $877 | $875 | $875 | $875 | $875 | $874 |
| [H] Lost profits per unit | | $570 | $574 | $559 | $559 | $559 | $559 | $568 |
| [I] Lost revenues | | $1,898,277 | $2,704,664 | $1,370,904 | $640,998 | $253,818 | $51,624 | $6,920,285 |
| *Incremental costs* | | | | | | | | |
| [J] Repair costs | | $195,508 | $288,920 | $149,136 | $69,732 | $27,612 | $5,616 | $736,524 |
| [K] Chip costs | | $704,093 | $993,512 | $509,548 | $238,251 | $94,341 | $19,188 | $2,558,933 |
| [L] Vizient admin fees - 4% of sales | | $75,297 | $108,112 | $54,492 | $25,479 | $10,089 | $2,052 | $275,521 |
| [M] Additional SGA - % of sales | | $170,409 | $244,184 | $123,324 | $57,663 | $22,833 | $4,644 | $623,057 |
| [N] Total incremental costs | | $1,145,307 | $1,634,728 | $836,500 | $391,125 | $154,875 | $31,500 | $4,194,035 |
| [O] **Lost profits - undiscounted** | | **$752,970** | **$1,069,936** | **$534,404** | **$249,873** | **$98,943** | **$20,124** | **$2,726,250** |
| **da Vinci X/Xi** | | | | | | | | |
| [A] Lost EndoWrist repair units | | 0 | 8,646 | 30,379 | 49,215 | 41,711 | 14,542 | 144,493 |
| *Per unit* | | | | | | | | |
| [B] Average selling price | | $1,414 | $1,425 | $1,432 | $1,432 | $1,432 | $1,432 | $1,432 |
| *Incremental costs per unit* | | | | | | | | |
| [C] Repair costs | | $148 | $155 | $156 | $156 | $156 | $156 | $156 |
| [D] Chip costs | | $533 | $533 | $533 | $533 | $533 | $533 | $533 |
| [E] Vizient admin fees - % of sales | 4% | $57 | $57 | $57 | $57 | $57 | $57 | $57 |
| [F] Additional SGA - % of sales | 9% | $127 | $128 | $129 | $129 | $129 | $129 | $129 |
| [G] Total incremental costs | | $865 | $873 | $875 | $875 | $875 | $875 | $875 |
| [H] Lost profits per unit | | $549 | $552 | $557 | $557 | $557 | $557 | $557 |
| [I] Lost revenues | | $0 | $12,320,550 | $43,502,728 | $70,475,880 | $59,730,152 | $20,824,144 | $206,853,454 |
| *Incremental costs* | | | | | | | | |
| [J] Repair costs | | $0 | $1,340,130 | $4,739,124 | $7,677,540 | $6,506,916 | $2,268,552 | $22,532,262 |
| [K] Chip costs | | $0 | $4,608,318 | $16,192,007 | $26,231,595 | $22,231,963 | $7,750,886 | $77,014,769 |
| [L] Vizient admin fees - 4% of sales | | $0 | $492,822 | $1,731,603 | $2,805,255 | $2,377,527 | $828,894 | $8,236,101 |
| [M] Additional SGA - % of sales | | $0 | $1,106,688 | $3,918,891 | $6,348,735 | $5,380,719 | $1,875,918 | $18,630,951 |
| [N] Total incremental costs | | $0 | $7,547,958 | $26,581,625 | $43,063,125 | $36,497,125 | $12,724,250 | $126,414,083 |
| [O] **Lost profits - undiscounted** | | **$0** | **$4,772,592** | **$16,921,103** | **$27,412,755** | **$23,233,027** | **$8,099,894** | **$80,439,371** |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Scenario 2 - Undiscounted Lost Profits: In-house Model  (1 Year X/Xi Delay)
# Schedule 4.4

**NOTES / SOURCES:**

Note:  Any minor differences are due to rounding.

[A]  Per Schedule 4.2.

[B]  Per Schedule 8.0.  For purposes of my analysis, the ASP after 2022 is the same as 2022.

[C]  Per Schedule 9.0.  For purposes of my analysis, the cost per unit after 2022 is the same as 2022.

[D]  Per Schedule 10.0.

[E]  = [B] * 4%.  Per SIS169233-169280 at 238-239, SIS would have paid Vizient a GPO administrative fee of 4% of net sales.  Per SIS319315, SIS would have paid Yankee a 3% administrative fee.  SIS would not have paid an administrative fee for non-Vizient and non-Yankee customers.  For purposes of my analysis, I assume all sales would have been subject to a 4% administrative fee, consistent with the Vizient Agreement.

[F]  = [B] * 9% per Schedule 15.1.

[G]  = [C] + [D] + [E] + [F]

[H]  = [B] - [G]

[I]  = [A] * [B]

[J]  = [A] * [C]

[K]  = [A] * [D]

[L]  = [A] * [E]

[M]  = [A] * [F]

[N]  = [J] + [K] + [L] + [M]

[O]  = [I] - [N]

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Scenario 2 - Lost EndoWrist Repair Units  (1 Year X/Xi Delay)
# Schedule 4.5

| | | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | Total |
|---|---|---|---|---|---|---|---|---|
| | **EndoWrist instruments potentially repairable by SIS - units** | | | | | | | |
| [A] | da Vinci S/Si | 52,970 | 22,411 | 8,214 | 3,839 | 1,928 | 1,077 | 90,439 |
| [A] | da Vinci X/Xi | 0 | 346,579 | 365,304 | 422,719 | 455,982 | 437,186 | 2,027,770 |
| [A] | **Total** | **52,970** | **368,990** | **373,518** | **426,558** | **457,910** | **438,263** | **2,118,209** |
| | | | | | | | | |
| [B] | Expiration rate of new sales units | 60% | 60% | 60% | 60% | 60% | 60% | 60% |
| | | | | | | | | |
| | **Expired EndoWrist instrument  - units** | | | | | | | |
| [C] | da Vinci S/Si | 31,782 | 13,447 | 4,928 | 2,303 | 1,157 | 646 | 54,263 |
| [C] | da Vinci X/Xi | 0 | 207,947 | 219,182 | 253,631 | 273,589 | 262,312 | 1,216,661 |
| [C] | **Total** | **31,782** | **221,394** | **224,110** | **255,934** | **274,746** | **262,958** | **1,270,924** |
| | | | | | | | | |
| [D] | SIS market share rate | 55% | 55% | 55% | 55% | 55% | 55% | 55% |
| | | | | | | | | |
| | **SIS market share units** | | | | | | | |
| [E] | da Vinci S/Si | 17,480 | 7,396 | 2,710 | 1,267 | 636 | 355 | 29,844 |
| [E] | da Vinci X/Xi | 0 | 114,371 | 120,550 | 139,497 | 150,474 | 144,272 | 669,164 |
| [E] | **Total** | **17,480** | **121,767** | **123,260** | **140,764** | **151,110** | **144,627** | **699,008** |
| | | | | | | | | |
| | **SIS conversion factor** | | | | | | | |
| [F] | da Vinci S/Si | 15% | 50% | 70% | 70% | 70% | 70% | |
| [F] | da Vinci X/Xi | | 15% | 50% | 70% | 70% | 70% | |
| | | | | | | | | |
| | **SIS converted units** | | | | | | | |
| [G] | da Vinci S/Si | 2,622 | 3,698 | 1,897 | 887 | 445 | 249 | 9,798 |
| [G] | da Vinci X/Xi | 0 | 17,156 | 60,275 | 97,648 | 105,332 | 100,990 | 381,401 |
| [G] | **Total** | **2,622** | **20,854** | **62,172** | **98,535** | **105,777** | **101,239** | **391,199** |
| | | | | | | | | |
| [H] | Collection rate of SIS market share units | 70% | 70% | 70% | 70% | 70% | 70% | 70% |
| | | | | | | | | |
| | **SIS collected units** | | | | | | | |
| [I] | da Vinci S/Si | 1,835 | 2,589 | 1,328 | 621 | 312 | 174 | 6,859 |
| [I] | da Vinci X/Xi | 0 | 12,009 | 42,193 | 68,354 | 73,732 | 70,693 | 266,981 |
| [I] | **Total** | **1,835** | **14,598** | **43,521** | **68,975** | **74,044** | **70,867** | **273,840** |
| | | | | | | | | |
| [J] | Repair yield of SIS would-have-been units | 72% | 72% | 72% | 72% | 72% | 72% | 72% |
| | | | | | | | | |
| | **Would-have-been Lost EndoWrist repair units** | | | | | | | |
| [K] | da Vinci S/Si | 1,321 | 1,864 | 956 | 447 | 225 | 125 | 4,938 |
| [K] | da Vinci X/Xi | 0 | 8,646 | 30,379 | 49,215 | 53,087 | 50,899 | 192,226 |
| [K] | **Total** | **1,321** | **10,510** | **31,335** | **49,662** | **53,312** | **51,024** | **197,164** |
| | | | | | | | | |
| [L] | Market penetration (% of total units) | 2% | 3% | 8% | 12% | 12% | 12% | 9% |

# Scenario 2 - Lost EndoWrist Repair Units  (1 Year X/Xi Delay)
# Schedule 4.5

| | | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | Total |
|---|---|---|---|---|---|---|---|---|
| | **Actual conversion rate** | | | | | | | |
| [M] | da Vinci S/Si | | | | | 15% | 50% | |
| [M] | da Vinci X/Xi | | | | | 15% | 50% | |
| | **Actual EndoWrist repair units** | | | | | | | |
| [N] | da Vinci S/Si | | | | | 48 | 89 | 137 |
| [N] | da Vinci X/Xi | | | | | 11,376 | 36,357 | 47,733 |
| [N] | **Total** | | | | | **11,424** | **36,446** | **47,870** |
| | **Lost EndoWrist repair units** | | | | | | | |
| [O] | da Vinci S/Si | 1,321 | 1,864 | 956 | 447 | 177 | 36 | 4,801 |
| [O] | da Vinci X/Xi | 0 | 8,646 | 30,379 | 49,215 | 41,711 | 14,542 | 144,493 |
| [O] | **Total** | **1,321** | **10,510** | **31,335** | **49,662** | **41,888** | **14,578** | **149,294** |

**NOTES / SOURCES:**

Note:  Any minor differences are due to rounding.

[A]  Per Schedule 6.0.  Note:  Marcus Engineering proposed a statement of work to Restore in late June 2019 for circumventing the X/Xi encryption and resetting the X/Xi EndoWrist use counter.   I understand Marcus Engineering's efforts "have been successful in many of the aspects" of "reverse engineering on the Xi[.]"   Based on progress as of November 2022, Restore anticipates that it will have the technical ability to reset the X/Xi EndoWrist use counter in "the third and fourth quarter, 2023."  See May Dep. 40 and 60-61 (November 3, 2022) and May Dep. Exhibit 155.  For purposes of my analysis, I assume X/Xi EndoWrist repairs start on January 1, 2021.

[B]  Per Schedule 7.0.

[C]  = [A] * [B]

[D]  Per https://web.archive.org/web/20191108191050/https://www.vizientinc.com/what-we-do as of November 8, 2019, "50% of the nation's acute care providers are Vizient members."
Per https://www.vizientinc.com/ as of November 29, 2022, Vizient has ">60% of acute care hospitals in the U.S."
For purposes of my analysis, I use 55%.  See discussion in my report.

[E]  = [C] * [D]

[F]  Per discussion with Jean Sargent, I understand the conversion rate would have been at 30% at the end of year 1, 70% at the end of year 2 and 70% thereafter, recognizing SIS would not have gotten all hospitals.  For purposes of my analysis, I use an average of 15% in year 1, 50% in year 2 and 70% thereafter.  Also, per discussions with Greg Posdal and Keith Johnson, I understand SIS believed its ramp up period would have been one year.

[G]  = [E] * [F]

[H]  Per Morales 30(b)(6) Dep. Ex. 143 (Intuitive-00626597-626616 at 604), where Intuitive targets a collection rate of 70%.  See also, Intuitive-00620200 where Intuitive assumes a collection rate of 70%.  See also, Morales 30(b)(6)Dep. Ex. 141 (at pdf page 1), where Intuitive targets a collection rate of 80%.  Per discussion with Jean Sargent, I understand for an expensive instrument such as an EndoWrist, a 75% collection rate would be reasonable.

[I]  = [G] * [H]

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Scenario 2 - Lost EndoWrist Repair Units  (1 Year X/Xi Delay)
# Schedule 4.5

| | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | Total |
|---|---|---|---|---|---|---|---|

**[J]**  Deposition of Clifton Parker 43-45, 178-179 (October 25, 2022).  Per Restore-00094918-00094956 at 922 (Parker Dep. Ex. 121), 215 out of 310 instruments collected in a 2-week sample that had lives on them passed Restore's inspection (i.e., were repairable).  Note:  Per Morales 30(b)(6) Dep. Ex. 143 (Intuitive-00626597-626616 at 609), where Intuitive realizes a yield of 85%.  *See also*, Morales 30(b)(6) Dep. Ex. 143 (Intuitive-00626597-626616 at 612), where Intuitive targets a yield of 85% to 95%.  Schedule 14.0 shows repair yield of SIS collectable units was approximately 88%.  For purposes of my analysis, I use 72%.

**[K]**  = [I] * [J]

**[L]**  = [K] / [A]

**[M]**  Assuming trial is resolved in or about January 1, 2024, SIS would then begin ramping up.  For the Actual EndoWrist repair units, I use the Year 1, Year 2 and Year 3 market conversion rates addressed at **[F]** above.  Currently, I assume Year 1 is 2024 and the first year SIS will begin selling its repair program again.  Per May Dep. 60 (November 3, 2022), Restore will have the technical capability to change the usage limitations of the EndoWrist X/Xi's in the third or fourth quarter of 2023.  For purposes of this analysis, I assume the conversion rate for the S/Si and X/Xi would be the same starting January 1, 2024.

**[N]**  = [E] * [H] * [J] * [M]

**[O]**  = [K] - [N]

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Scenario 2 - Discounted Lost Profits: Distributor Model (2 Year X/Xi Delay)
# Schedule 5.0

|  | | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | Total |
|---|---|---|---|---|---|---|---|---|
| **Lost EndoWrist repair units** | | | | | | | | |
| [A] | da Vinci S/Si | 1,321 | 1,864 | 956 | 447 | 177 | 36 | 4,801 |
| [B] | da Vinci X/Xi | 0 | 0 | 9,114 | 35,153 | 41,711 | 14,542 | 100,520 |
| [C] | Total | 1,321 | 1,864 | 10,070 | 35,600 | 41,888 | 14,578 | 105,321 |
| **Lost revenues** | | | | | | | | |
| [A] | da Vinci S/Si | $1,898,277 | $2,704,664 | $1,370,904 | $640,998 | $253,818 | $51,624 | $6,920,285 |
| [B] | da Vinci X/Xi | $0 | $0 | $13,051,248 | $50,339,096 | $59,730,152 | $20,824,144 | $143,944,640 |
| [C] | Total | $1,898,277 | $2,704,664 | $14,422,152 | $50,980,094 | $59,983,970 | $20,875,768 | $150,864,925 |
| **Incremental costs** | | | | | | | | |
| [A] | da Vinci S/Si | $1,615,583 | $2,287,128 | $1,174,924 | $549,363 | $217,533 | $44,244 | $5,888,775 |
| [B] | da Vinci X/Xi | $0 | $0 | $11,018,826 | $42,499,977 | $50,428,599 | $17,581,278 | $121,528,680 |
| [C] | Total | $1,615,583 | $2,287,128 | $12,193,750 | $43,049,340 | $50,646,132 | $17,625,522 | $127,417,455 |
| **Lost profits (undiscounted)** | | | | | | | | |
| [A] | da Vinci S/Si | $282,694 | $417,536 | $195,980 | $91,635 | $36,285 | $7,380 | $1,031,510 |
| [B] | da Vinci X/Xi | $0 | $0 | $2,032,422 | $7,839,119 | $9,301,553 | $3,242,866 | $22,415,960 |
| [C] | Total | $282,694 | $417,536 | $2,228,402 | $7,930,754 | $9,337,838 | $3,250,246 | $23,447,470 |
| [D] | Discount % | | | | | 12% | 12% | |
| [E] | Discount period | | | | | 0.5 | 1.5 | |
| [F] | Discount factor | 1.00000 | 1.00000 | 1.00000 | 1.00000 | 0.94491 | 0.84367 | |
| [G] | Discounted lost profits | **$282,694** | **$417,536** | **$2,228,402** | **$7,930,754** | **$8,823,417** | **$2,742,135** | **$22,424,938** |

**NOTES / SOURCES:**

Note:  Any minor differences are due to rounding.

[A] Per Schedule 5.1.

[B] Per Schedule 5.1.

[C] = [A] + [B]

[D] For the GICS 35101010, Health Care Equipment & Supplies, Duff and Phelps - Cost of Capital Composite, September 30, 2022, the average SIC/GICS Composite WACC (weighted average cost of capital) is 9.2% and median WACC is 8.9%.  For the small composite, the WACC is 11.1% to 11.2% (CRSP Decile).  For purposes of my analysis I use 12%, which is conservative.  Note:  The projections after 2022 do not include growth, therefore the discount rate would likely be less.

[E] Calculated using the mid-year convention to January 1, 2024, the approximate date of trial.

[F] = ( 1 + [H] ) ^ - [I], rounded to 5 decimals.

[G] = Lost profits (undiscounted) per [C] * [F]

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Scenario 2 - Undiscounted Lost Profits: Distributor Model (2 Year X/Xi Delay)
# Schedule 5.1

| | | **2020** | **2021** | **2022** | **2023** | **2024** | **2025** | **Total** |
|---|---|---|---|---|---|---|---|---|
| **da Vinci S/Si** | | | | | | | | |
| [A] | Lost EndoWrist repair units | 1,321 | 1,864 | 956 | 447 | 177 | 36 | 4,801 |
| | _Per unit_ | | | | | | | |
| [B] | Average selling price | $1,437 | $1,451 | $1,434 | $1,434 | $1,434 | $1,434 | $1,441 |
| | _Incremental costs per unit_ | | | | | | | |
| [C] | Repair costs (including chip costs) | $1,037 | $1,038 | $1,043 | $1,043 | $1,043 | $1,043 | $1,039 |
| [D] | Vizient admin fees - % of sales 4% | $57 | $58 | $57 | $57 | $57 | $57 | $57 |
| [E] | Additional SGA - % of sales 9% | $129 | $131 | $129 | $129 | $129 | $129 | $130 |
| [F] | Total incremental costs | $1,223 | $1,227 | $1,229 | $1,229 | $1,229 | $1,229 | $1,227 |
| [G] | Lost profits per unit | $214 | $224 | $205 | $205 | $205 | $205 | $215 |
| [H] | Lost revenues | $1,898,277 | $2,704,664 | $1,370,904 | $640,998 | $253,818 | $51,624 | $6,920,285 |
| | _Incremental costs_ | | | | | | | |
| [I] | Repair costs (including chip costs) | $1,369,877 | $1,934,832 | $997,108 | $466,221 | $184,611 | $37,548 | $4,990,197 |
| [J] | Vizient admin fees - 4% of sales | $75,297 | $108,112 | $54,492 | $25,479 | $10,089 | $2,052 | $275,521 |
| [K] | Additional SGA - % of sales | $170,409 | $244,184 | $123,324 | $57,663 | $22,833 | $4,644 | $623,057 |
| [L] | Total incremental costs | $1,615,583 | $2,287,128 | $1,174,924 | $549,363 | $217,533 | $44,244 | $5,888,775 |
| **[M]** | **Lost profits - undiscounted** | **$282,694** | **$417,536** | **$195,980** | **$91,635** | **$36,285** | **$7,380** | **$1,031,510** |
| **da Vinci X/Xi** | | | | | | | | |
| [A] | Lost EndoWrist repair units | 0 | 0 | 9,114 | 35,153 | 41,711 | 14,542 | 100,520 |
| | _Per unit_ | | | | | | | |
| [B] | Average selling price | $1,414 | $1,425 | $1,432 | $1,432 | $1,432 | $1,432 | $1,432 |
| | _Incremental costs per unit_ | | | | | | | |
| [C] | Repair costs (including chip costs) | $1,026 | $1,019 | $1,023 | $1,023 | $1,023 | $1,023 | $1,023 |
| [D] | Vizient admin fees - % of sales 4% | $57 | $57 | $57 | $57 | $57 | $57 | $57 |
| [E] | Additional SGA - % of sales 9% | $127 | $128 | $129 | $129 | $129 | $129 | $129 |
| [F] | Total incremental costs | $1,210 | $1,204 | $1,209 | $1,209 | $1,209 | $1,209 | $1,209 |
| [G] | Lost profits per unit | $204 | $221 | $223 | $223 | $223 | $223 | $223 |
| [H] | Lost revenues | $0 | $0 | $13,051,248 | $50,339,096 | $59,730,152 | $20,824,144 | $143,944,640 |
| | _Incremental costs_ | | | | | | | |
| [I] | Repair costs (including chip costs) | $0 | $0 | $9,323,622 | $35,961,519 | $42,670,353 | $14,876,466 | $102,831,960 |
| [J] | Vizient admin fees - 4% of sales | $0 | $0 | $519,498 | $2,003,721 | $2,377,527 | $828,894 | $5,729,640 |
| [K] | Additional SGA - % of sales | $0 | $0 | $1,175,706 | $4,534,737 | $5,380,719 | $1,875,918 | $12,967,080 |
| [L] | Total incremental costs | $0 | $0 | $11,018,826 | $42,499,977 | $50,428,599 | $17,581,278 | $121,528,680 |
| **[M]** | **Lost profits - undiscounted** | **$0** | **$0** | **$2,032,422** | **$7,839,119** | **$9,301,553** | **$3,242,866** | **$22,415,960** |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Scenario 2 - Undiscounted Lost Profits: Distributor Model (2 Year X/Xi Delay)
# Schedule 5.1

**NOTES / SOURCES:**

Note:  Any minor differences are due to rounding.

**[A]**  Per Schedule 4.2.

**[B]**  Per Schedule 8.0.  For purposes of my analysis, the ASP after 2022 is the same as 2022.

**[C]**  Per Schedule 11.0.  For purposes of my analysis, the cost per unit after 2022 is the same as 2022.

**[D]**  = **[B]** * 4%.  Per SIS169233-169280 at 238-239, SIS would have paid Vizient a GPO administrative fee of 4% of net sales.  Per SIS319315, SIS would have paid Yankee a 3% administrative fee.  SIS would not have paid an administrative fee for non-Vizient and non-Yankee customers.  For purposes of my analysis, I assume all sales would have been subject to a 4% administrative fee, consistent with the Vizient Agreement.

**[E]**  = **[B]** * 9% per Schedule 15.1.

**[F]**  = **[C]** + **[D]** + **[E]**

**[G]**  = **[B]** - **[F]**

**[H]**  = **[A]** * **[B]**

**[I]**  = **[A]** * **[C]**

**[J]**  = **[A]** * **[D]**

**[K]**  = **[A]** * **[E]**

**[L]**  = **[I]** + **[J]** + **[K]**

**[M]**  = **[H]** - **[L]**

# Scenario 2 - Discounted Lost Profits: Distributor Model  (1 Year X/Xi Delay)
# Schedule 5.2

| | | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | Total |
|---|---|---|---|---|---|---|---|---|
| | **Lost EndoWrist repair units** | | | | | | | |
| [A] | da Vinci S/Si | 1,321 | 1,864 | 956 | 447 | 177 | 36 | 4,801 |
| [B] | da Vinci X/Xi | 0 | 8,646 | 30,379 | 49,215 | 41,711 | 14,542 | 144,493 |
| [C] | Total | 1,321 | 10,510 | 31,335 | 49,662 | 41,888 | 14,578 | 149,294 |
| | **Lost revenues** | | | | | | | |
| [A] | da Vinci S/Si | $1,898,277 | $2,704,664 | $1,370,904 | $640,998 | $253,818 | $51,624 | $6,920,285 |
| [B] | da Vinci X/Xi | $0 | $12,320,550 | $43,502,728 | $70,475,880 | $59,730,152 | $20,824,144 | $206,853,454 |
| [C] | Total | $1,898,277 | $15,025,214 | $44,873,632 | $71,116,878 | $59,983,970 | $20,875,768 | $213,773,739 |
| | **Incremental costs** | | | | | | | |
| [A] | da Vinci S/Si | $1,615,583 | $2,287,128 | $1,174,924 | $549,363 | $217,533 | $44,244 | $5,888,775 |
| [B] | da Vinci X/Xi | $0 | $10,409,784 | $36,728,211 | $59,500,935 | $50,428,599 | $17,581,278 | $174,648,807 |
| [C] | Total | $1,615,583 | $12,696,912 | $37,903,135 | $60,050,298 | $50,646,132 | $17,625,522 | $180,537,582 |
| | **Lost profits (undiscounted)** | | | | | | | |
| [A] | da Vinci S/Si | $282,694 | $417,536 | $195,980 | $91,635 | $36,285 | $7,380 | $1,031,510 |
| [B] | da Vinci X/Xi | $0 | $1,910,766 | $6,774,517 | $10,974,945 | $9,301,553 | $3,242,866 | $32,204,647 |
| [C] | Total | $282,694 | $2,328,302 | $6,970,497 | $11,066,580 | $9,337,838 | $3,250,246 | $33,236,157 |
| [D] | Discount % | | | | | 12% | 12% | |
| [E] | Discount period | | | | | 0.5 | 1.5 | |
| [F] | Discount factor | 1.00000 | 1.00000 | 1.00000 | 1.00000 | 0.94491 | 0.84367 | |
| [G] | Discounted lost profits | **$282,694** | **$2,328,302** | **$6,970,497** | **$11,066,580** | **$8,823,417** | **$2,742,135** | **$32,213,625** |

**NOTES / SOURCES:**

Note:  Any minor differences are due to rounding.

[A] Per Schedule 5.3.

[B] Per Schedule 5.3.

[C] = [A] + [B]

[D] For the GICS 35101010, Health Care Equipment & Supplies, Duff and Phelps - Cost of Capital Composite, September 30, 2022, the average WACC (weighted average cost of capital) is 9.2% and median WACC is 8.9%.  For the small composite, the WACC is 11.1% to 11.2% (CRSP Decile).  For purposes of my analysis I use 12%, which is conservative.  Note:  The projections after 2022 do not include growth, therefore the discount rate would likely be less.

[E] Calculated using the mid-year convention to January 1, 2024, the approximate date of trial.

[F] = ( 1 + [H] ) ^ - [I], rounded to 5 decimals.

[G] = Lost profits (undiscounted) per [C] * [F]

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Scenario 2 - Undiscounted Lost Profits: Distributor Model  (1 Year X/Xi Delay)
# Schedule 5.3

| | | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | Total |
|---|---|---|---|---|---|---|---|---|
| **da Vinci S/Si** | | | | | | | | |
| [A] Lost EndoWrist repair units | | 1,321 | 1,864 | 956 | 447 | 177 | 36 | 4,801 |
| *Per unit* | | | | | | | | |
| [B] Average selling price | | $1,437 | $1,451 | $1,434 | $1,434 | $1,434 | $1,434 | $1,441 |
| *Incremental costs per unit* | | | | | | | | |
| [C] Repair costs (including chip costs) | | $1,037 | $1,038 | $1,043 | $1,043 | $1,043 | $1,043 | $1,039 |
| [D] Vizient admin fees - % of sales | 4% | $57 | $58 | $57 | $57 | $57 | $57 | $57 |
| [E] Additional SGA - % of sales | 9% | $129 | $131 | $129 | $129 | $129 | $129 | $130 |
| [F] Total incremental costs | | $1,223 | $1,227 | $1,229 | $1,229 | $1,229 | $1,229 | $1,227 |
| [G] Lost profits per unit | | $214 | $224 | $205 | $205 | $205 | $205 | $215 |
| [H] Lost revenues | | $1,898,277 | $2,704,664 | $1,370,904 | $640,998 | $253,818 | $51,624 | $6,920,285 |
| *Incremental costs* | | | | | | | | |
| [I] Repair costs (including chip costs) | | $1,369,877 | $1,934,832 | $997,108 | $466,221 | $184,611 | $37,548 | $4,990,197 |
| [J] Vizient admin fees - 4% of sales | | $75,297 | $108,112 | $54,492 | $25,479 | $10,089 | $2,052 | $275,521 |
| [K] Additional SGA - % of sales | | $170,409 | $244,184 | $123,324 | $57,663 | $22,833 | $4,644 | $623,057 |
| [L] Total incremental costs | | $1,615,583 | $2,287,128 | $1,174,924 | $549,363 | $217,533 | $44,244 | $5,888,775 |
| **[M] Lost profits - undiscounted** | | **$282,694** | **$417,536** | **$195,980** | **$91,635** | **$36,285** | **$7,380** | **$1,031,510** |
| **da Vinci X/Xi** | | | | | | | | |
| [A] Lost EndoWrist repair units | | 0 | 8,646 | 30,379 | 49,215 | 41,711 | 14,542 | 144,493 |
| *Per unit* | | | | | | | | |
| [B] Average selling price | | $1,414 | $1,425 | $1,432 | $1,432 | $1,432 | $1,432 | $1,432 |
| *Incremental costs per unit* | | | | | | | | |
| [C] Repair costs (including chip costs) | | $1,026 | $1,019 | $1,023 | $1,023 | $1,023 | $1,023 | $1,023 |
| [D] Vizient admin fees - % of sales | 4% | $57 | $57 | $57 | $57 | $57 | $57 | $57 |
| [E] Additional SGA - % of sales | 9% | $127 | $128 | $129 | $129 | $129 | $129 | $129 |
| [F] Total incremental costs | | $1,210 | $1,204 | $1,209 | $1,209 | $1,209 | $1,209 | $1,209 |
| [G] Lost profits per unit | | $204 | $221 | $223 | $223 | $223 | $223 | $223 |
| [H] Lost revenues | | $0 | $12,320,550 | $43,502,728 | $70,475,880 | $59,730,152 | $20,824,144 | $206,853,454 |
| *Incremental costs* | | | | | | | | |
| [I] Repair costs (including chip costs) | | $0 | $8,810,274 | $31,077,717 | $50,346,945 | $42,670,353 | $14,876,466 | $147,781,755 |
| [J] Vizient admin fees - 4% of sales | | $0 | $492,822 | $1,731,603 | $2,805,255 | $2,377,527 | $828,894 | $8,236,101 |
| [K] Additional SGA - % of sales | | $0 | $1,106,688 | $3,918,891 | $6,348,735 | $5,380,719 | $1,875,918 | $18,630,951 |
| [L] Total incremental costs | | $0 | $10,409,784 | $36,728,211 | $59,500,935 | $50,428,599 | $17,581,278 | $174,648,807 |
| **[M] Lost profits - undiscounted** | | **$0** | **$1,910,766** | **$6,774,517** | **$10,974,945** | **$9,301,553** | **$3,242,866** | **$32,204,647** |

# Scenario 2 - Undiscounted Lost Profits: Distributor Model  (1 Year X/Xi Delay)
# Schedule 5.3

**NOTES / SOURCES:**

Note:  Any minor differences are due to rounding.

**[A]**  Per Schedule 4.5.

**[B]**  Per Schedule 8.0.  For purposes of my analysis, the ASP after 2022 is the same as 2022.

**[C]**  Per Schedule 11.0.  For purposes of my analysis, the cost per unit after 2022 is the same as 2022.

**[D]**  = **[B]** * 4%.  Per SIS169233-169280 at 238-239, SIS would have paid Vizient a GPO administrative fee of 4% of net sales.  Per SIS319315, SIS would have paid Yankee a 3% administrative fee.  SIS would not have paid an administrative fee for non-Vizient and non-Yankee customers.  For purposes of my analysis, I assume all sales would have been subject to a 4% administrative fee, consistent with the Vizient Agreement.

**[E]**  = **[B]** * 9% per Schedule 15.1.

**[F]**  = **[C]** + **[D]** + **[E]**

**[G]**  = **[B]** - **[F]**

**[H]**  = **[A]** * **[B]**

**[I]**  = **[A]** * **[C]**

**[J]**  = **[A]** * **[D]**

**[K]**  = **[A]** * **[E]**

**[L]**  = **[I]** + **[J]** + **[K]**

**[M]**  = **[H]** - **[L]**

# Intuitive's U.S. EndoWrist Instrument Units - Actual and Forecasted: 2014 - 2025
# Schedule 6.0



| | | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2020-2021 decline |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **[A]** | **Actual EndoWrist instrument units** | | | | | | | | | | | | | |
| [A] | da Vinci S/Si | | | | | | | | | | | | | |
| [A] | da Vinci X/Xi | | | | | | | | | | | | | |
| [A] | da Vinci Xi 2.0/Xi R | | | | | | | | | | | | | |
| [A] | Total | | | | | | | | | | | | | |
| | **% share of units by system** | | | | | | | | | | | | | |
| [B] | da Vinci S/Si | 95.0% | 81.4% | 70.0% | 57.2% | 43.2% | 28.2% | 15.0% | 6.1% | 2.2% | | | | |
| [B] | da Vinci X/Xi | 5.0% | 18.6% | 30.0% | 42.8% | 56.8% | 71.8% | 85.0% | 93.9% | 97.8% | | | | |
| [B] | da Vinci Xi 2.0/Xi R | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | | | | |
| [B] | Total | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | | | | |
| | **Projected % of units by system** | | | | | | | | | | | | | |
| [C] | da Vinci S/Si | | | | | | | | | | 0.9% | 0.4% | 0.2% | |
| [C] | da Vinci X/Xi | | | | | | | | | | 99.1% | 94.6% | 81.2% | |
| [C] | da Vinci Xi 2.0/Xi R | | | | | | | | | | 0.0% | 5.0% | 18.6% | |
| | | | | | | | | | | | 100.0% | 100.0% | 100.0% | |
| [D] | Expected growth in procedures | | | | | | | | | | | | | |
| | **Forecasted EndoWrist instrument units** | | | | | | | | | | | | | |
| [E] | da Vinci S/Si | | | | | | | | | | 3,839 | 1,928 | 1,077 | |
| [E] | da Vinci X/Xi | | | | | | | | | | 422,719 | 455,982 | 437,186 | |
| [E] | da Vinci Xi 2.0/Xi R | | | | | | | | | | 0 | 24,101 | 100,144 | |
| [E] | Total | | | | | | | | | | 426,558 | 482,011 | 538,406 | |
| | **Actual & forecasted EndoWrist instrument units** | | | | | | | | | | | | | |
| [F] | da Vinci S/Si | | | | | | | | | | 3,839 | 1,928 | 1,077 | |
| [F] | da Vinci X/Xi | | | | | | | | | | 422,719 | 455,982 | 437,186 | |
| [F] | da Vinci Xi 2.0/Xi R | | | | | | | | | | 0 | 24,101 | 100,144 | |
| [F] | Total | | | | | | | | | | 426,558 | 482,011 | 538,406 | |
| [F] | Sub-total S/Si and X/Xi | | | | | | | | | | 426,558 | 457,910 | 438,263 | |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Intuitive's U.S. EndoWrist Instrument Units - Actual and Forecasted: 2014 - 2025
# Schedule 6.0

**NOTES / SOURCES:**

Note:  Any minor differences are due to rounding.

**[A]**  Per Schedule 13.0.  Note:  Actual unit sales per Schedule 13.0 are through June 2022.  2022 unit sales shown herein are annualized.

**[B]**  Calculated based on the amounts herein.

**[C]**  Units sales of da Vinci S/Si are projected to decline in the future at the same rate that sales declined  (57.7%) between 2020 and 2021.

I understand the next generation da Vinci system could be introduced as some time in 2024 (See Somayaji Dep. 128-130).  For purposes of this analysis, I assume the start of 2024. The share of sales of instruments for that next-generation system (da Vinci Xi 2.0/Xi R) are projected using the same penetration rates experienced by da Vinci X/Xi when it was introduced in 2014 (i.e., 5.0% in first year,18.6% in second year, and so on), which is conservative given the next generation system (da Vinci Xi 2.0/Xi R) will face more legacy da Vinci systems when it is introduced.

Unit sales of da Vinci X/Xi is projected as 100% less the projected shares of da Vinci X/Xi and the next generation system.

**[D]**  Per Intuitive forecasted annual growth rates for da Vinci surgical procedures in the United States.  See Intuitive-01261766.

**[E]**  Total forecast instrument sales calculated each year by applying growth rate **[D]** to total sales during prior year.  Sales are allocated by system using shares from **[C]**.

**[F]**  Calculated based on the amounts herein.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Estimated EndoWrist Expiration Rates: 2018 - 2021
# Schedule 7.0

|  | 2018 | 2019 | 2020 | 2021 | Total | [1] Sub-total 2018 - 2019 |
|---|---|---|---|---|---|---|
| **[A]** Projected X/Xi annual expired EndoWrist units (for "Top 5" instruments) | **73,129** | **100,376** | **129,298** | **157,537** | **460,340** | **173,505** |
| Actual EndoWrist sales units for "Top 5" X/Xi instruments | | | | | | |
| **[B]** 470006 / 471006 (Large Needle Driver) | 22,103 | 29,534 | 31,548 | 30,447 | 113,632 | 51,637 |
| **[B]** 470179 (Hot Shears (Monopolar Curved Scissors)) | 40,602 | 56,056 | 66,281 | 92,091 | 255,030 | 96,658 |
| **[B]** 470205 / 471205 (Fenestrated Bipolar Forceps) | 27,400 | 37,186 | 41,596 | 43,976 | 150,158 | 64,586 |
| **[B]** 470093 / 471093 (ProGrasp Forceps) | 20,431 | 29,629 | 33,746 | 30,716 | 114,522 | 50,060 |
| **[B]** 470172 / 471172 (Maryland Bipolar Forceps) | 10,904 | 14,261 | 15,467 | 16,649 | 57,281 | 25,165 |
| **[B] Actual EndoWrist sales units for "Top 5" X/Xi instruments** | **121,440** | **166,666** | **188,638** | **213,879** | **690,623** | **288,106** |
| **[C]** Expiration rate of total sales units | **60%** | **60%** | **69%** | **74%** | **67%** | **60%** |

**NOTES / SOURCES:**

Note:  Any minor differences are due to rounding.

[1]  Calculated based on the amounts herein

[A]  Per Morales 30(b)(6) Dep. Ex. 141 (at pdf page 1).  As shown on Exhibit 141 (at pdf page 1), for 2018, these "Top 5" X/Xi SKUs represented 73,129 instruments of the 104,469 expired "core" X/Xi instruments, or approximately 70%.

[B]  Per Schedule 9.1.  Instrument numbers and descriptions identified per Morales 30(b)(6) Dep. Ex. 141 (at pdf page 3).

[C]  Calculated based on the amounts herein.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Potential EndoWrist Instrument Units, Net Sales Dollars and Average Selling Price by System (Using Intuitive Sales Volumes and September 2019 Vizient Amended Agreement Prices): 2018 - June 2022

# Schedule 8.0



| | 2018 | 2019 | 2020 | 2021 | 2022 thru June | Total | % |
|---|---|---|---|---|---|---|---|
| **Units** | | | | | | | |
| [A] da Vinci S/Si | | | | | | | |
| [B] da Vinci X/Xi | | | | | | | |
| [C] Total | | | | | | | |
| **Net sales dollars** | | | | | | | |
| [A] da Vinci S/Si | | | | | | | |
| [B] da Vinci X/Xi | | | | | | | |
| [C] Total | | | | | | | |
| **ASP per unit** | | | | | | | |
| [D] da Vinci S/Si | $1,431 | $1,432 | $1,437 | $1,451 | $1,434 | $1,434 | |
| [D] da Vinci X/Xi | $1,418 | $1,411 | $1,414 | $1,425 | $1,432 | $1,420 | |
| [D] **Total** | **$1,424** | **$1,417** | **$1,418** | **$1,427** | **$1,432** | **$1,423** | |

**NOTES / SOURCES:**

Note:  Any minor differences are due to rounding.

[A] Per Schedule 8.1.

[B] Per Schedule 8.2.

[C] = [A] + [B]

[D] Calculated based on the amounts herein.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Potential EndoWrist Instrument Units, Net Sales Dollars and ASP by Product (Instrument Number) - da Vinci S/Si (Using Intuitive Sales Volumes and September 2019 Vizient Amended Agreement Prices): 2018 - June 2022

# Schedule 8.1

| | 2018 | 2019 | 2020 | 2021 | 2022 thru June | Total | % |
|---|---|---|---|---|---|---|---|
| **Units** | | | | | | | |
| [A] | | | | | | | |
| [A] | | | | | | | |
| [A] | | | | | | | |
| [A] | | | | | | | |
| [A] | | | | | | | |
| [A] | | | | | | | |
| [A] | | | | | | | |
| [A] | | | | | | | |
| [A] | | | | | | | |
| [A] | | | | | | | |
| [A] | | | | | | | |
| [A] | | | | | | | |
| [A] | | | | | | | |
| [A] | | | | | | | |
| [A] | | | | | | | |
| [A] | | | | | | | |
| [A] | | | | | | | |
| [A] | | | | | | | |
| [A] | | | | | | | |
| [A] | | | | | | | |
| [A] | | | | | | | |
| [A] | | | | | | | |
| [A] | | | | | | | |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Potential EndoWrist Instrument Units, Net Sales Dollars and ASP by Product (Instrument Number) - da Vinci S/Si (Using Intuitive Sales Volumes and September 2019 Vizient Amended Agreement Prices): 2018 - June 2022
# Schedule 8.1



| | 2018 | 2019 | 2020 | 2021 | 2022 thru June | Total | % |
|---|---|---|---|---|---|---|---|
| [A] | | | | | | | |
| [A] | | | | | | | |
| [A] | | | | | | | |
| [A] | | | | | | | |
| [A] | | | | | | | |
| [A] | | | | | | | |
| [A] | | | | | | | |
| [A] | | | | | | | |
| [A] | | | | | | | |
| [A] | | | | | | | |
| [A] | | | | | | | |
| [A] | | | | | | | |
| [A] Total units | | | | | | | |

# Potential EndoWrist Instrument Units, Net Sales Dollars and ASP by Product (Instrument Number) - da Vinci S/Si (Using Intuitive Sales Volumes and September 2019 Vizient Amended Agreement Prices): 2018 - June 2022

# Schedule 8.1

| | 2018 | 2019 | 2020 | 2021 | 2022 thru June | Total | % |
|---|---|---|---|---|---|---|---|
| **ASP** | | | | | | | |
| [B] 420179 | $1,700 | $1,700 | $1,700 | $1,700 | $1,700 | $1,700 | |
| [B] 420006 | $1,300 | $1,300 | $1,300 | $1,300 | $1,300 | $1,300 | |
| [B] 420093 | $1,300 | $1,300 | $1,300 | $1,300 | $1,300 | $1,300 | |
| [B] 420205 | $1,600 | $1,600 | $1,600 | $1,600 | $1,600 | $1,600 | |
| [B] 420309 | $1,300 | $1,300 | $1,300 | $1,300 | $1,300 | $1,300 | |
| [B] 420194 | $1,300 | $1,300 | $1,300 | $1,300 | $1,300 | $1,300 | |
| [B] 420172 | $1,600 | $1,600 | $1,600 | $1,600 | $1,600 | $1,600 | |
| [B] 420049 | $1,100 | $1,100 | $1,100 | $1,100 | $1,100 | $1,100 | |
| [B] 420227 | $1,600 | $1,600 | $1,600 | $1,600 | $1,600 | $1,600 | |
| [B] 420183 | $1,100 | $1,100 | $1,100 | $1,100 | $1,100 | $1,100 | |
| [B] 420296 | $1,300 | $1,300 | $1,300 | $1,300 | $1,300 | $1,300 | |
| [B] 420230 | $1,100 | $1,100 | $1,100 | $1,100 | $1,100 | $1,100 | |
| [B] 420184 | $1,100 | $1,100 | $1,100 | $1,100 | $1,100 | $1,100 | |
| [B] 420327 | $1,100 | $1,100 | $1,100 | $1,100 | $1,100 | $1,100 | |
| [B] 420207 | $1,300 | $1,300 | $1,300 | $1,300 | $1,300 | $1,300 | |
| [B] 420190 | $1,300 | $1,300 | $1,300 | $1,300 | $1,300 | $1,300 | |
| [B] 420189 | $1,100 | $1,100 | $1,100 | $1,100 | $1,100 | $1,100 | |
| [B] 420110 | $1,600 | $1,600 | $1,600 | $1,600 | $1,600 | $1,600 | |
| [B] 420048 | $1,300 | $1,300 | $1,300 | $1,300 | $1,300 | $1,300 | |
| [B] 420318 | $1,300 | $1,300 | $1,300 | $1,300 | $1,300 | $1,300 | |
| [B] 420003 | $1,300 | $1,300 | $1,300 | $1,300 | $1,300 | $1,300 | |
| [B] 420001 | $1,100 | $1,100 | $1,100 | $1,100 | $1,100 | $1,100 | |
| [B] 420007 | $1,100 | $1,100 | $1,100 | $1,100 | $1,100 | $1,100 | |
| [B] 420278 | $1,300 | $1,300 | $1,300 | $1,300 | $1,300 | $1,300 | |
| [B] 420344 | $1,600 | $1,600 | $1,600 | $1,600 | $1,600 | $1,600 | |
| [B] 420033 | $1,300 | $1,300 | $1,300 | $1,300 | $1,300 | $1,300 | |

# Potential EndoWrist Instrument Units, Net Sales Dollars and ASP by Product (Instrument Number) - da Vinci S/Si (Using Intuitive Sales Volumes and September 2019 Vizient Amended Agreement Prices): 2018 - June 2022
# Schedule 8.1

|  | 2018 | 2019 | 2020 | 2021 | 2022 thru June | Total | % |
|---|---|---|---|---|---|---|---|
| [B] 420036 | $1,100 | $1,100 | $1,100 | $1,100 | $1,100 | $1,100 | |
| [B] 420178 | $1,100 | $1,100 | $1,100 | $1,100 | $1,100 | $1,100 | |
| [B] 420171 | $1,600 | $1,600 | $1,600 | $1,600 | $1,600 | $1,600 | |
| [B] 420246 | $1,600 | $1,600 | $1,600 | $1,600 | $1,600 | $1,600 | |
| [B] 420249 | $1,600 | $1,600 | $1,600 | $1,600 | $1,600 | $1,600 | |
| [B] 420181 | $1,300 | $1,300 | $1,300 | $1,300 | $1,300 | $1,300 | |
| [B] 420157 | $1,300 | $1,300 | $1,300 | $1,300 | $1,300 | $1,300 | |
| [B] 420204 | $1,600 | $1,600 | $1,600 | $1,600 | $1,600 | $1,600 | |
| [B] 420121 | $1,600 | $1,600 | $1,600 | $1,600 | $1,600 | $1,600 | |
| [B] 420215 | $1,300 | $1,300 | $1,300 | $1,300 | $1,300 | $1,300 | |
| [B] 420203 | $1,300 | $1,300 | $1,300 | $1,300 | $1,300 | $1,300 | |
| [B] 420192 | $1,100 | $1,100 | $1,100 | $1,100 | $1,100 | $1,100 | |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Potential EndoWrist Instrument Units, Net Sales Dollars and ASP by Product (Instrument Number) - da Vinci S/Si (Using Intuitive Sales Volumes and September 2019 Vizient Amended Agreement Prices): 2018 - June 2022
## Schedule 8.1

| | 2018 | 2019 | 2020 | 2021 | 2022 thru June | Total | % |
|---|---|---|---|---|---|---|---|

**Net sales dollars**



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Potential EndoWrist Instrument Units, Net Sales Dollars and ASP by Product (Instrument Number) - da Vinci S/Si (Using Intuitive Sales Volumes and September 2019 Vizient Amended Agreement Prices): 2018 - June 2022

## Schedule 8.1



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Potential EndoWrist Instrument Units, Net Sales Dollars and ASP by Product (Instrument Number) - da Vinci S/Si (Using Intuitive Sales Volumes and September 2019 Vizient Amended Agreement Prices): 2018 - June 2022

# Schedule 8.1

| | 2018 | 2019 | 2020 | 2021 | 2022 thru June | Total | % |
|---|---|---|---|---|---|---|---|

**NOTES / SOURCES:**

Note:  Any minor differences are due to rounding.

[A]  Schedule 13.1.

[B]  Schedule 12.0.

[C]  = [A] * [B]

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Potential EndoWrist Instrument Units, Net Sales Dollars and ASP by Product (Instrument Number) - da Vinci X/Xi (Using Intuitive Sales Volumes and September 2019 Vizient Amended Agreement Prices): 2018 - June 2022
## Schedule 8.2



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Potential EndoWrist Instrument Units, Net Sales Dollars and ASP by Product (Instrument Number) - da Vinci X/Xi (Using Intuitive Sales Volumes and September 2019 Vizient Amended Agreement Prices): 2018 - June 2022

## Schedule 8.2



| | 2018 | 2019 | 2020 | 2021 | 2022 thru June | Total | % |
|---|---|---|---|---|---|---|---|
| [A] | | | | | | | |
| [A] | | | | | | | |
| [A] | | | | | | | |
| [A] | | | | | | | |
| [A] | | | | | | | |
| [A] | | | | | | | |
| [A] | | | | | | | |
| [A] | | | | | | | |
| [A] | | | | | | | |
| [A] | | | | | | | |
| [A] | | | | | | | |
| [A] | | | | | | | |
| [A] Total units | | | | | | | |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Potential EndoWrist Instrument Units, Net Sales Dollars and ASP by Product (Instrument Number) - da Vinci X/Xi (Using Intuitive Sales Volumes and September 2019 Vizient Amended Agreement Prices): 2018 - June 2022
# Schedule 8.2

| | 2018 | 2019 | 2020 | 2021 | 2022 thru June | Total | % |
|---|---|---|---|---|---|---|---|
| **ASP** | | | | | | | |
| [B] 470179 | $1,700 | $1,700 | $1,700 | $1,700 | $1,700 | $1,700 | |
| [B] 470205 | $1,600 | $1,600 | $1,600 | $1,600 | $1,600 | $1,600 | |
| [B] 471205 | $1,600 | $1,600 | $1,600 | $1,600 | $1,600 | $1,600 | |
| [B] 470006 | $1,300 | $1,300 | $1,300 | $1,300 | $1,300 | $1,300 | |
| [B] 470093 | $1,300 | $1,300 | $1,300 | $1,300 | $1,300 | $1,300 | |
| [B] 470309 | $1,300 | $1,300 | $1,300 | $1,300 | $1,300 | $1,300 | |
| [B] 471309 | $1,300 | $1,300 | $1,300 | $1,300 | $1,300 | $1,300 | |
| [B] 470183 | $1,100 | $1,100 | $1,100 | $1,100 | $1,100 | $1,100 | |
| [B] 471093 | $1,300 | $1,300 | $1,300 | $1,300 | $1,300 | $1,300 | |
| [B] 471006 | $1,300 | $1,300 | $1,300 | $1,300 | $1,300 | $1,300 | |
| [B] 470194 | $1,300 | $1,300 | $1,300 | $1,300 | $1,300 | $1,300 | |
| [B] 470049 | $1,100 | $1,100 | $1,100 | $1,100 | $1,100 | $1,100 | |
| [B] 470172 | $1,600 | $1,600 | $1,600 | $1,600 | $1,600 | $1,600 | |
| [B] 471049 | $1,100 | $1,100 | $1,100 | $1,100 | $1,100 | $1,100 | |
| [B] 471172 | $1,600 | $1,600 | $1,600 | $1,600 | $1,600 | $1,600 | |
| [B] 470327 | $1,100 | $1,100 | $1,100 | $1,100 | $1,100 | $1,100 | |
| [B] 470230 | $1,100 | $1,100 | $1,100 | $1,100 | $1,100 | $1,100 | |
| [B] 470318 | $1,300 | $1,300 | $1,300 | $1,300 | $1,300 | $1,300 | |
| [B] 470296 | $1,300 | $1,300 | $1,300 | $1,300 | $1,300 | $1,300 | |
| [B] 471296 | $1,300 | $1,300 | $1,300 | $1,300 | $1,300 | $1,300 | |
| [B] 470184 | $1,100 | $1,100 | $1,100 | $1,100 | $1,100 | $1,100 | |
| [B] 470207 | $1,300 | $1,300 | $1,300 | $1,300 | $1,300 | $1,300 | |
| [B] 470001 | $1,100 | $1,100 | $1,100 | $1,100 | $1,100 | $1,100 | |
| [B] 470344 | $1,600 | $1,600 | $1,600 | $1,600 | $1,600 | $1,600 | |
| [B] 470007 | $1,100 | $1,100 | $1,100 | $1,100 | $1,100 | $1,100 | |
| [B] 470190 | $1,300 | $1,300 | $1,300 | $1,300 | $1,300 | $1,300 | |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Potential EndoWrist Instrument Units, Net Sales Dollars and ASP by Product (Instrument Number) - da Vinci X/Xi (Using Intuitive Sales Volumes and September 2019 Vizient Amended Agreement Prices): 2018 - June 2022
# Schedule 8.2

|  | 2018 | 2019 | 2020 | 2021 | 2022 thru June | Total | % |
|---|---|---|---|---|---|---|---|
| [B] 471190 | $1,300 | $1,300 | $1,300 | $1,300 | $1,300 | $1,300 | |
| [B] 471344 | $1,600 | $1,600 | $1,600 | $1,600 | $1,600 | $1,600 | |
| [B] 470048 | $1,300 | $1,300 | $1,300 | $1,300 | $1,300 | $1,300 | |
| [B] 470036 | $1,100 | $1,100 | $1,100 | $1,100 | $1,100 | $1,100 | |
| [B] 471048 | $1,300 | $1,300 | $1,300 | $1,300 | $1,300 | $1,300 | |
| [B] 470033 | $1,300 | $1,300 | $1,300 | $1,300 | $1,300 | $1,300 | |
| [B] 470249 | $1,600 | $1,600 | $1,600 | $1,600 | $1,600 | $1,600 | |
| [B] 470171 | $1,600 | $1,600 | $1,600 | $1,600 | $1,600 | $1,600 | |
| [B] 470246 | $1,600 | $1,600 | $1,600 | $1,600 | $1,600 | $1,600 | |
| [B] 471171 | $1,600 | $1,600 | $1,600 | $1,600 | $1,600 | $1,600 | |
| [B] 470215 | $1,300 | $1,300 | $1,300 | $1,300 | $1,300 | $1,300 | |
| [B] 470181 | $1,300 | $1,300 | $1,300 | $1,300 | $1,300 | $1,300 | |

# Potential EndoWrist Instrument Units, Net Sales Dollars and ASP by Product (Instrument Number) - da Vinci X/Xi (Using Intuitive Sales Volumes and September 2019 Vizient Amended Agreement Prices): 2018 - June 2022
## Schedule 8.2

| | 2018 | 2019 | 2020 | 2021 | 2022 thru June | Total | % |
|---|---|---|---|---|---|---|---|
| **Net sales dollars** | | | | | | | |
| [B] | | | | | | | |
| [B] | | | | | | | |
| [B] | | | | | | | |
| [B] | | | | | | | |
| [B] | | | | | | | |
| [B] | | | | | | | |
| [B] | | | | | | | |
| [B] | | | | | | | |
| [B] | | | | | | | |
| [B] | | | | | | | |
| [B] | | | | | | | |
| [B] | | | | | | | |
| [B] | | | | | | | |
| [B] | | | | | | | |
| [B] | | | | | | | |
| [B] | | | | | | | |
| [B] | | | | | | | |
| [B] | | | | | | | |
| [B] | | | | | | | |
| [B] | | | | | | | |
| [B] | | | | | | | |
| [B] | | | | | | | |
| [B] | | | | | | | |
| [B] | | | | | | | |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Potential EndoWrist Instrument Units, Net Sales Dollars and ASP by Product (Instrument Number) - da Vinci X/Xi (Using Intuitive Sales Volumes and September 2019 Vizient Amended Agreement Prices): 2018 - June 2022

## Schedule 8.2



| | 2018 | 2019 | 2020 | 2021 | 2022 thru June | Total | % |
|---|---|---|---|---|---|---|---|
| [B] | | | | | | | |
| [B] | | | | | | | |
| [B] | | | | | | | |
| [B] | | | | | | | |
| [B] | | | | | | | |
| [B] | | | | | | | |
| [B] | | | | | | | |
| [B] | | | | | | | |
| [B] | | | | | | | |
| [B] | | | | | | | |
| [B] | | | | | | | |
| [B] | | | | | | | |
| [B] Total net sales dollars | | | | | | | |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Potential EndoWrist Instrument Units, Net Sales Dollars and ASP by Product (Instrument Number) - da Vinci X/Xi (Using Intuitive Sales Volumes and September 2019 Vizient Amended Agreement Prices): 2018 - June 2022
## Schedule 8.2

| 2018 | 2019 | 2020 | 2021 | 2022 thru June | Total | % |
|------|------|------|------|------|------|------|

**NOTES / SOURCES:**

Note:  Any minor differences are due to rounding.

[A]  Schedule 13.2.

[B]  Schedule 12.1.

[C]  = [A] * [B]

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# SIS's Estimated EndoWrist Instrument Repair Cost: 2020 - June 2022
# Schedule 9.0

| | 2020 | 2021 | 2022 thru June | Total |
|---|---|---|---|---|
| **Actual Intuitive instrument sales units for "Top 5" X/Xi instruments** | | | | |
| [A] 470006 / 471006 (Large Needle Driver) | | | | |
| [A] 470179 (Hot Shears (Monopolar Curved Scissors)) | | | | |
| [A] 470205 / 471205 (Fenestrated Bipolar Forceps) | | | | |
| [A] 470093 / 471093 (ProGrasp Forceps) | | | | |
| [A] 470172 / 471172 (Maryland Bipolar Forceps) | | | | |
| [B] Total | 188,638 | 213,879 | 113,918 | 516,435 |
| **Intuitive COGS for refurbishment per unit (SIS's estimated repair cost per unit)** | | | | |
| [C] 470006 / 471006 (Large Needle Driver) | | | | |
| [C] 470179 (Hot Shears (Monopolar Curved Scissors)) | | | | |
| [C] 470205 / 471205 (Fenestrated Bipolar Forceps) | | | | |
| [C] 470093 / 471093 (ProGrasp Forceps) | | | | |
| [C] 470172 / 471172 (Maryland Bipolar Forceps) | | | | |
| **Total Intuitive COGS for refurbishment per unit (SIS's estimated repair cost)** | | | | |
| [D] 470006 / 471006 (Large Needle Driver) | | | | |
| [D] 470179 (Hot Shears (Monopolar Curved Scissors)) | | | | |
| [D] 470205 / 471205 (Fenestrated Bipolar Forceps) | | | | |
| [D] 470093 / 471093 (ProGrasp Forceps) | | | | |
| [D] 470172 / 471172 (Maryland Bipolar Forceps) | | | | |
| [E] Total | $27,926,837 | $33,072,546 | $17,812,049 | $78,811,432 |
| [F] SIS's estimated weighted average repair cost per instrument (rounded) | $148.00 | $155.00 | $156.00 | $153.00 |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# SIS's Estimated EndoWrist Instrument Repair Cost:
# 2020 - June 2022
# Schedule 9.0

**NOTES / SOURCES:**

Note:  Any minor differences are due to rounding.

**[A]**  Per Schedule 9.1.

**[B]**  Sum of **[A]**

**[C]**  Intuitive anticipated refurbishment costs are per Morales 30(b)(6) Dep. at Ex. 143 (Intuitive 00626597-626616 at 626612).  For purposes of my analysis, I assume SIS's repair costs per unit would have approximated Intuitive anticipated refurbishment cost per unit.  However, based on discussions with Greg Posdal, I understand SIS's material cost would generally fall below $10 per unit, less than Intuitive's anticipated $48 to $141 per unit.  Instrument numbers identified per comparison of Morales 30(b)(6) Dep. Ex. 141  (at pdf page 3) and Morales 30(b)(6) Dep. at Ex. 143 (Intuitive 00626597-626616 at 626612).  For purposes of my analysis, I assume the Intuitive cost for the "replacement" instrument number is the same as the amount shown for the "original" instrument number.

**[D]**  = **[A]** * **[C]**

**[E]**  Sum of **[D]**

**[F]**  = **[E]** / **[B]**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Intuitive's "Top 5" X/Xi EndoWrist Instrument Units:
# 2018 - June 2022
# Schedule 9.1

| | 2018 | 2019 | 2020 | 2021 | 2022 thru June | Total |
|---|---|---|---|---|---|---|



**NOTES / SOURCES:**

Note:  Any minor differences are due to rounding.

[A] Per Schedule 13.2.  Instrument numbers identified based on Instrument numbers identified per comparison of Morales 30(b)(6) Dep. Ex. 141 (at pdf page 3).  For purposes of this analysis, I also include the "replacement" instrument number.

[B] Calculated based on the amounts herein.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# SIS's Estimated Interceptor Chip Cost (Based on Rebotix's Sales to Restore)
# Schedule 10.0

| | Date | Memo | Item | Quantity | Sale Price | Amount |
|---|---|---|---|---|---|---|
| [A] | 5/15/2019 | Interceptor assembly programmed with 10 Uses | Interceptor-010 (Interceptor assembly programmed with 10 Uses) | 30 | $800 | $24,000 |
| [A] | 5/15/2019 | New Customer Repair Credits | Discount | | ($10,400) | ($10,400) |
| [A] | 9/4/2019 | Interceptor assembly programmed with 10 Uses | Interceptor-010 (Interceptor assembly programmed with 10 Uses) | 25 | $800 | $20,000 |
| [A] | 9/4/2019 | Less Credit for providing 7 free units to new customers | Discount | | ($5,600) | ($5,600) |
| [A] | 10/15/2019 | Interceptor assembly programmed with 10 Uses | Interceptor-010 (Interceptor assembly programmed with 10 Uses) | 5 | $800 | $4,000 |
| [B] | Total | | | 60 | | $32,000 |
| | | | [C] Average cost per Interceptor chip (rounded) | | | $533.00 |

**NOTES / SOURCES:**

Note:  Any minor differences are due to rounding.

[A]  Per REBOTIX175326.  Calculation above is based on Rebotix's sales to Restore.

[B]  Sum of [A]

[C]  = Amount per [B] / Quantity per [B]

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Rebotix Sales to SIS: June 27, 2019 - November 21, 2019
# Schedule 10.1

| | Date | Num | Memo | Item | Quantity | Sale Price | Amount |
|---|---|---|---|---|---|---|---|
| [A] | 6/27/2019 | 26674 | Mega SutureCut Needle Driver EndoWrist Repair Service | 420309-SVC (Mega SutureCut Needle Driver EndoWrist Repair Service) | 1 | $900 | $900 |
| [A] | 6/27/2019 | 26674 | New Customer Discount | Discount | | ($900) | ($900) |
| [A] | 7/17/2019 | 26680 | Mega SutureCut Needle Driver EndoWrist Repair Service | 420309-SVC (Mega SutureCut Needle Driver EndoWrist Repair Service) | 1 | $900 | $900 |
| [A] | 8/8/2019 | 26696 | Monopolar Curved Scissors EndoWrist Repair Service | 420179-SVC (Monopolar Curved Scissors EndoWrist Repair Service) | 1 | $1,300 | $1,300 |
| [A] | 8/8/2019 | 26696 | Fenestrated Bipolar Forceps EndoWrist Repair Service | 420205-SVC (Fenestrated Bipolar Forceps EndoWrist Repair Service) | 1 | $1,200 | $1,200 |
| [A] | 8/8/2019 | 26696 | ProGrasp Forceps EndoWrist Repair Service | 420093-SVC (ProGrasp Forceps EndoWrist Repair Service) | 1 | $900 | $900 |
| [A] | 8/8/2019 | 26696 | Mega Needle Driver EndoWrist Repair Service | 420194-SVC (Mega Needle Driver EndoWrist Repair Service) | 1 | $900 | $900 |
| [A] | 8/8/2019 | 26696 | Trial Wrists | Discount | | ($4,300) | ($4,300) |
| [A] | 9/9/2019 | 26702 | Small Grasping Retractor EndoWrist Repair Service | 420318-SVC (Small Grasping Retractor EndoWrist Repair Service) | 1 | $900 | $900 |
| [A] | 9/9/2019 | 26702 | Small Grasping Retractor EndoWrist Repair Service | 420318-SVC (Small Grasping Retractor EndoWrist Repair Service) | 1 | $900 | $900 |
| [A] | 9/9/2019 | 26702 | Large Needle Driver EndoWrist Repair Service | 420006-SVC (Large Needle Driver EndoWrist Repair Service) | 1 | $900 | $900 |
| [A] | 9/9/2019 | 26702 | Cadiere Forceps EndoWrist Repair Service | 420049-SVC (Cadiere Forceps EndoWrist Repair Service) | 1 | $750 | $750 |
| [A] | 9/9/2019 | 26702 | ProGrasp Forceps EndoWrist Repair Service | 420093-SVC (ProGrasp Forceps EndoWrist Repair Service) | 1 | $900 | $900 |
| [A] | 9/9/2019 | 26702 | Maryland Bipolar Forceps EndoWrist Repair Service | 420172-SVC (Maryland Bipolar Forceps EndoWrist Repair Service) | 0 | $1,200 | $0 |
| [A] | 9/9/2019 | 26702 | Maryland Bipolar Forceps EndoWrist Repair Service | 420172-SVC (Maryland Bipolar Forceps EndoWrist Repair Service) | 0 | $1,200 | $0 |
| [A] | 9/9/2019 | 26702 | Maryland Bipolar Forceps EndoWrist Repair Service | 420172-SVC (Maryland Bipolar Forceps EndoWrist Repair Service) | 1 | $1,200 | $0 |
| [A] | 10/8/2019 | 26738 | Cadiere Forceps EndoWrist Repair Service | 420049-SVC (Cadiere Forceps EndoWrist Repair Service) | 0 | $750 | $0 |
| [A] | 10/8/2019 | 26738 | Cadiere Forceps EndoWrist Repair Service | 420049-SVC (Cadiere Forceps EndoWrist Repair Service) | 1 | $750 | $750 |
| [A] | 10/8/2019 | 26738 | ProGrasp Forceps EndoWrist Repair Service | 420093-SVC (ProGrasp Forceps EndoWrist Repair Service) | 1 | $900 | $900 |
| [A] | 10/18/2019 | 26746 | Maryland Bipolar Forceps EndoWrist Repair Service | 420172-SVC (Maryland Bipolar Forceps EndoWrist Repair Service) | 1 | $1,200 | $1,200 |
| [A] | 10/18/2019 | 26746 | Large SutureCut Needle Driver EndoWrist Repair Service | 420296-SVC (Large SutureCut Needle Driver EndoWrist Repair Service) | 1 | $900 | $900 |
| [A] | 10/18/2019 | 26746 | Mega Needle Driver EndoWrist Repair Service | 420194-SVC (Mega Needle Driver EndoWrist Repair Service) | 1 | $900 | $900 |
| [A] | 10/18/2019 | 26746 | Mega Needle Driver EndoWrist Repair Service | 420194-SVC (Mega Needle Driver EndoWrist Repair Service) | 1 | $900 | $900 |
| [A] | 10/18/2019 | 26746 | DeBakey Forceps EndoWrist Repair Service | 420036-SVC (DeBakey Forceps EndoWrist Repair Service) | 1 | $750 | $750 |
| [A] | 10/25/2019 | 26748 | Large Needle Driver EndoWrist Repair Service | 420006-SVC (Large Needle Driver EndoWrist Repair Service) | 0 | $900 | $0 |
| [A] | 10/25/2019 | 26748 | Used EndoWrist Instrument | EndoWrist (Used EndoWrist Instrument) | 1 | $100 | $100 |
| [A] | 10/25/2019 | 26748 | Large Needle Driver EndoWrist Repair Service | 420006-SVC (Large Needle Driver EndoWrist Repair Service) | 1 | $900 | $900 |
| [A] | 10/25/2019 | 26748 | Estimate 26748: | Discount | | ($100) | ($100) |
| [A] | 10/25/2019 | 26749 | Fenestrated Bipolar Forceps EndoWrist Repair Service | 420205-SVC (Fenestrated Bipolar Forceps EndoWrist Repair Service) | 0 | $1,200 | $0 |
| [A] | 10/25/2019 | 26749 | Used EndoWrist Instrument | EndoWrist (Used EndoWrist Instrument) | 1 | $100 | $100 |
| [A] | 10/25/2019 | 26749 | Fenestrated Bipolar Forceps EndoWrist Repair Service | 420205-SVC (Fenestrated Bipolar Forceps EndoWrist Repair Service) | 1 | $1,200 | $1,200 |
| [A] | 10/25/2019 | 26749 | Estimate 26749: | Discount | | ($100) | ($100) |
| [A] | 10/25/2019 | 26750 | PK Dissecting Forceps EndoWrist Repair Service | 420227-SVC (PK Dissecting Forceps EndoWrist Repair Service) | 1 | $1,200 | $1,200 |
| [A] | 10/25/2019 | 26751 | ProGrasp Forceps EndoWrist Repair Service | 420093-SVC (ProGrasp Forceps EndoWrist Repair Service) | 1 | $900 | $900 |
| [A] | 10/25/2019 | 26752 | ProGrasp Forceps EndoWrist Repair Service | 420093-SVC (ProGrasp Forceps EndoWrist Repair Service) | 1 | $900 | $900 |
| [A] | 10/31/2019 | 26754 | Large SutureCut Needle Driver EndoWrist Repair Service | 420296-SVC (Large SutureCut Needle Driver EndoWrist Repair Service) | 1 | $900 | $900 |
| [A] | 10/31/2019 | 26754 | Cadiere Forceps EndoWrist Repair Service | 420049-SVC (Cadiere Forceps EndoWrist Repair Service) | 1 | $750 | $750 |
| [A] | 10/31/2019 | 26755 | Large Needle Driver EndoWrist Repair Service | 420006-SVC (Large Needle Driver EndoWrist Repair Service) | 1 | $900 | $900 |
| [A] | 10/31/2019 | 26756 | Large Needle Driver EndoWrist Repair Service | 420006-SVC (Large Needle Driver EndoWrist Repair Service) | 1 | $900 | $900 |
| [A] | 11/12/2019 | 26760 | Large Clip Applier EndoWrist Repair Service | 420230-SVC (Large Clip Applier EndoWrist Repair Service) | 1 | $750 | $750 |
| [A] | 11/12/2019 | 26760 | Maryland Bipolar Forceps EndoWrist Repair Service | 420172-SVC (Maryland Bipolar Forceps EndoWrist Repair Service) | 1 | $1,200 | $1,200 |
| [A] | 11/12/2019 | 26760 | Mega SutureCut Needle Driver EndoWrist Repair Service | 420309-SVC (Mega SutureCut Needle Driver EndoWrist Repair Service) | 1 | $900 | $900 |
| [A] | 11/12/2019 | 26760 | Monopolar Curved Scissors EndoWrist Repair Service | 420179-SVC (Monopolar Curved Scissors EndoWrist Repair Service) | 1 | $1,300 | $1,300 |
| [A] | 11/12/2019 | 26760 | Cadiere Forceps EndoWrist Repair Service | 420049-SVC (Cadiere Forceps EndoWrist Repair Service) | 0 | $750 | $0 |
| [A] | 11/12/2019 | 26760 | Monopolar Curved Scissors EndoWrist Repair Service | 420179-SVC (Monopolar Curved Scissors EndoWrist Repair Service) | 0 | $1,300 | $0 |
| [A] | 11/12/2019 | 26760 | Mega Needle Driver EndoWrist Repair Service | 420194-SVC (Mega Needle Driver EndoWrist Repair Service) | 0 | $900 | $0 |
| [A] | 11/12/2019 | 26760 | Large Clip Applier EndoWrist Repair Service | 420230-SVC (Large Clip Applier EndoWrist Repair Service) | 0 | $750 | $0 |
| [A] | 11/12/2019 | 26760 | Used EndoWrist Instrument | EndoWrist (Used EndoWrist Instrument) | 4 | $100 | $400 |
| [A] | 11/12/2019 | 26760 | Cadiere Forceps EndoWrist Repair Service | 420049-SVC (Cadiere Forceps EndoWrist Repair Service) | 1 | $750 | $750 |
| [A] | 11/12/2019 | 26760 | Monopolar Curved Scissors EndoWrist Repair Service | 420179-SVC (Monopolar Curved Scissors EndoWrist Repair Service) | 1 | $1,300 | $1,300 |
| [A] | 11/12/2019 | 26760 | Mega Needle Driver EndoWrist Repair Service | 420194-SVC (Mega Needle Driver EndoWrist Repair Service) | 1 | $900 | $900 |
| [A] | 11/12/2019 | 26760 | Large Clip Applier EndoWrist Repair Service | 420230-SVC (Large Clip Applier EndoWrist Repair Service) | 1 | $750 | $750 |
| [A] | 11/12/2019 | 26760 | New Customer Discount | Discount | | ($400) | ($400) |
| [A] | 11/20/2019 | 26762 | Large Needle Driver EndoWrist Repair Service | 420006-SVC (Large Needle Driver EndoWrist Repair Service) | 1 | $900 | $900 |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Rebotix Sales to SIS: June 27, 2019 - November 21, 2019
## Schedule 10.1

| | Date | Num | Memo | Item | Quantity | Sale Price | Amount |
|---|---|---|---|---|---|---|---|
| [A] | 11/21/2019 | 26763 | Large Clip Applier EndoWrist Repair Service | 420230-SVC (Large Clip Applier EndoWrist Repair Service) | 1 | $750 | $750 |
| [A] | 11/21/2019 | 26763 | Monopolar Curved Scissors EndoWrist Repair Service | 420179-SVC (Monopolar Curved Scissors EndoWrist Repair Service) | 1 | $1,300 | $1,300 |
| [A] | 11/21/2019 | 26763 | Fenestrated Bipolar Forceps EndoWrist Repair Service | 420205-SVC (Fenestrated Bipolar Forceps EndoWrist Repair Service) | 1 | $1,200 | $1,200 |
| [A] | 11/21/2019 | 26763 | Monopolar Curved Scissors EndoWrist Repair Service | 420179-SVC (Monopolar Curved Scissors EndoWrist Repair Service) | 1 | $1,300 | $1,300 |
| [A] | 11/21/2019 | 26763 | Maryland Bipolar Forceps EndoWrist Repair Service | 420172-SVC (Maryland Bipolar Forceps EndoWrist Repair Service) | 1 | $1,200 | $1,200 |
| [A] | 11/21/2019 | 26763 | Tenaculum Forceps EndoWrist Repair Service | 420207-SVC (Tenaculum Forceps EndoWrist Repair Service) | 0 | $900 | $0 |
| [A] | 11/21/2019 | 26763 | Used EndoWrist Instrument | EndoWrist (Used EndoWrist Instrument) | 1 | $100 | $100 |
| [A] | 11/21/2019 | 26763 | New Customer Discount | Discount | | ($100) | ($100) |
| [A] | 11/21/2019 | 26763 | Tenaculum Forceps EndoWrist Repair Service | 420207-SVC (Tenaculum Forceps EndoWrist Repair Service) | 1 | $900 | $900 |
| [B] | **Total** | | | | **49** | | **$35,500** |

**NOTES / SOURCES:**

Note:  Any minor differences are due to rounding.

[A]  Summarized per REBOTIX175326.

[B]  Sum of [A].

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Potential EndoWrist Instrument Units, Costs and Costs per Unit by System (Using Intuitive Sales Volumes and Rebotix Pricing): 2018 - June 2022

## Schedule 11.0



|  | | 2018 | 2019 | 2020 | 2021 | 2022 thru June | Total | % |
|---|---|---|---|---|---|---|---|---|
| **Units** | | | | | | | | |
| [A] | da Vinci S/Si | | | | | | | |
| [B] | da Vinci X/Xi | | | | | | | |
| [C] | **Total** | | | | | | | |
| **Costs** | | | | | | | | |
| [A] | da Vinci S/Si | | | | | | | |
| [B] | da Vinci X/Xi | | | | | | | |
| [C] | **Total** | | | | | | | |
| **Cost per unit** | | | | | | | | |
| [D] | da Vinci S/Si | $1,037 | $1,038 | $1,043 | $1,055 | $1,039 | $1,040 | |
| [D] | da Vinci X/Xi | $1,026 | $1,019 | $1,023 | $1,034 | $1,041 | $1,028 | |
| [D] | **Total** | **$1,031** | **$1,025** | **$1,026** | **$1,035** | **$1,041** | **$1,030** | |

### NOTES / SOURCES:

Note:  Any minor differences are due to rounding.

[A] Per Schedule 11.1.

[B] Per Schedule 11.2.

[C] = [A] + [B]

[D] Calculated based on the amounts herein.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Potential EndoWrist Instrument Units, Costs and Costs per Unit by Product (Instrument Number) - da Vinci S/Si (Using Intuitive Sales Volumes and Rebotix Pricing): 2018 - June 2022

## Schedule 11.1

| | 2018 | 2019 | 2020 | 2021 | 2022 thru June | Total | % |
|---|---|---|---|---|---|---|---|



# Potential EndoWrist Instrument Units, Costs and Costs per Unit by Product (Instrument Number) - da Vinci S/Si (Using Intuitive Sales Volumes and Rebotix Pricing): 2018 - June 2022

## Schedule 11.1



| | 2018 | 2019 | 2020 | 2021 | 2022 thru June | Total | % |
|---|---|---|---|---|---|---|---|
| **[A]** | | | | | | | |
| **[A]** | | | | | | | |
| **[A]** | | | | | | | |
| **[A]** | | | | | | | |
| **[A]** | | | | | | | |
| **[A]** | | | | | | | |
| **[A]** | | | | | | | |
| **[A]** | | | | | | | |
| **[A]** Total units | | | | | | | |

| Cost per unit | | | | | | |
|---|---|---|---|---|---|---|
| **[B]** 420179 | $1,300 | $1,300 | $1,300 | $1,300 | $1,300 | $1,300 |
| **[B]** 420006 | $900 | $900 | $900 | $900 | $900 | $900 |
| **[B]** 420093 | $900 | $900 | $900 | $900 | $900 | $900 |
| **[B]** 420205 | $1,200 | $1,200 | $1,200 | $1,200 | $1,200 | $1,200 |
| **[B]** 420309 | $900 | $900 | $900 | $900 | $900 | $900 |
| **[B]** 420194 | $900 | $900 | $900 | $900 | $900 | $900 |
| **[B]** 420172 | $1,200 | $1,200 | $1,200 | $1,200 | $1,200 | $1,200 |
| **[B]** 420049 | $750 | $750 | $750 | $750 | $750 | $750 |
| **[B]** 420227 | $1,200 | $1,200 | $1,200 | $1,200 | $1,200 | $1,200 |
| **[B]** 420183 | $750 | $750 | $750 | $750 | $750 | $750 |
| **[B]** 420296 | $900 | $900 | $900 | $900 | $900 | $900 |
| **[B]** 420230 | $750 | $750 | $750 | $750 | $750 | $750 |
| **[B]** 420184 | $750 | $750 | $750 | $750 | $750 | $750 |
| **[B]** 420327 | $750 | $750 | $750 | $750 | $750 | $750 |
| **[B]** 420207 | $900 | $900 | $900 | $900 | $900 | $900 |
| **[B]** 420190 | $900 | $900 | $900 | $900 | $900 | $900 |
| **[B]** 420189 | $750 | $750 | $750 | $750 | $750 | $750 |
| **[B]** 420110 | $1,200 | $1,200 | $1,200 | $1,200 | $1,200 | $1,200 |
| **[B]** 420048 | $900 | $900 | $900 | $900 | $900 | $900 |
| **[B]** 420318 | $900 | $900 | $900 | $900 | $900 | $900 |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Potential EndoWrist Instrument Units, Costs and Costs per Unit by Product (Instrument Number) - da Vinci S/Si (Using Intuitive Sales Volumes and Rebotix Pricing): 2018 - June 2022

## Schedule 11.1

| | 2018 | 2019 | 2020 | 2021 | 2022 thru June | Total | % |
|---|---|---|---|---|---|---|---|
| [B] 420003 | $900 | $900 | $900 | $900 | $900 | $900 | |
| [B] 420001 | $750 | $750 | $750 | $750 | $750 | $750 | |
| [B] 420007 | $750 | $750 | $750 | $750 | $750 | $750 | |
| [B] 420278 | $900 | $900 | $900 | $900 | $900 | $900 | |
| [B] 420344 | $1,200 | $1,200 | $1,200 | $1,200 | $1,200 | $1,200 | |
| [B] 420033 | $900 | $900 | $900 | $900 | $900 | $900 | |
| [B] 420036 | $750 | $750 | $750 | $750 | $750 | $750 | |
| [B] 420178 | $750 | $750 | $750 | $750 | $750 | $750 | |
| [B] 420171 | $1,200 | $1,200 | $1,200 | $1,200 | $1,200 | $1,200 | |
| [B] 420246 | $1,200 | $1,200 | $1,200 | $1,200 | $1,200 | $1,200 | |
| [B] 420249 | $1,200 | $1,200 | $1,200 | $1,200 | $1,200 | $1,200 | |
| [B] 420181 | $900 | $900 | $900 | $900 | $900 | $900 | |
| [B] 420157 | $900 | $900 | $900 | $900 | $900 | $900 | |
| [B] 420204 | $1,200 | $1,200 | $1,200 | $1,200 | $1,200 | $1,200 | |
| [B] 420121 | $1,200 | $1,200 | $1,200 | $1,200 | $1,200 | $1,200 | |
| [B] 420215 | $900 | $900 | $900 | $900 | $900 | $900 | |
| [B] 420203 | $900 | $900 | $900 | $900 | $900 | $900 | |
| [B] 420192 | $750 | $750 | $750 | $750 | $750 | $750 | |

| Costs |
|---|



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Potential EndoWrist Instrument Units, Costs and Costs per Unit by Product (Instrument Number) - da Vinci S/Si (Using Intuitive Sales Volumes and Rebotix Pricing): 2018 - June 2022

## Schedule 11.1



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Potential EndoWrist Instrument Units, Costs and Costs per Unit by Product (Instrument Number) - da Vinci S/Si (Using Intuitive Sales Volumes and Rebotix Pricing): 2018 - June 2022

## Schedule 11.1

| 2018 | 2019 | 2020 | 2021 | 2022 thru June | Total | % |
|------|------|------|------|----------------|-------|---|

**NOTES / SOURCES:**

Note:  Any minor differences are due to rounding.

[A]  Schedule 13.1.

[B]  Schedule 12.0.

[C]  = [A] * [B]

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Potential EndoWrist Instrument Units, Costs and Costs per Unit by Product (Instrument Number) - da Vinci X/Xi (Using Intuitive Sales Volumes and Rebotix Pricing): 2018 - June 2022

## Schedule 11.2



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Potential EndoWrist Instrument Units, Costs and Costs per Unit by Product (Instrument Number) - da Vinci X/Xi (Using Intuitive Sales Volumes and Rebotix Pricing): 2018 - June 2022

## Schedule 11.2



| | 2018 | 2019 | 2020 | 2021 | 2022 thru June | Total | % |
|---|---|---|---|---|---|---|---|
| [A] | | | | | | | |
| [A] | | | | | | | |
| [A] | | | | | | | |
| [A] | | | | | | | |
| [A] | | | | | | | |
| [A] | | | | | | | |
| [A] | | | | | | | |
| [A] | | | | | | | |
| [A] Total units | | | | | | | |
| **Cost per unit** | | | | | | | |
| [B] 470179 | $1,300 | $1,300 | $1,300 | $1,300 | $1,300 | $1,300 | |
| [B] 470205 | $1,200 | $1,200 | $1,200 | $1,200 | $1,200 | $1,200 | |
| [B] 471205 | $1,200 | $1,200 | $1,200 | $1,200 | $1,200 | $1,200 | |
| [B] 470006 | $900 | $900 | $900 | $900 | $900 | $900 | |
| [B] 470093 | $900 | $900 | $900 | $900 | $900 | $900 | |
| [B] 470309 | $900 | $900 | $900 | $900 | $900 | $900 | |
| [B] 471309 | $900 | $900 | $900 | $900 | $900 | $900 | |
| [B] 470183 | $750 | $750 | $750 | $750 | $750 | $750 | |
| [B] 471093 | $900 | $900 | $900 | $900 | $900 | $900 | |
| [B] 471006 | $900 | $900 | $900 | $900 | $900 | $900 | |
| [B] 470194 | $900 | $900 | $900 | $900 | $900 | $900 | |
| [B] 470049 | $750 | $750 | $750 | $750 | $750 | $750 | |
| [B] 470172 | $1,200 | $1,200 | $1,200 | $1,200 | $1,200 | $1,200 | |
| [B] 471049 | $750 | $750 | $750 | $750 | $750 | $750 | |
| [B] 471172 | $1,200 | $1,200 | $1,200 | $1,200 | $1,200 | $1,200 | |
| [B] 470327 | $750 | $750 | $750 | $750 | $750 | $750 | |
| [B] 470230 | $750 | $750 | $750 | $750 | $750 | $750 | |
| [B] 470318 | $900 | $900 | $900 | $900 | $900 | $900 | |
| [B] 470296 | $900 | $900 | $900 | $900 | $900 | $900 | |
| [B] 471296 | $900 | $900 | $900 | $900 | $900 | $900 | |
| [B] 470184 | $750 | $750 | $750 | $750 | $750 | $750 | |

# Potential EndoWrist Instrument Units, Costs and Costs per Unit by Product (Instrument Number) - da Vinci X/Xi (Using Intuitive Sales Volumes and Rebotix Pricing): 2018 - June 2022

## Schedule 11.2

| | 2018 | 2019 | 2020 | 2021 | 2022 thru June | Total | % |
|---|---|---|---|---|---|---|---|
| [B] 470207 | $900 | $900 | $900 | $900 | $900 | $900 | |
| [B] 470001 | $750 | $750 | $750 | $750 | $750 | $750 | |
| [B] 470344 | $1,200 | $1,200 | $1,200 | $1,200 | $1,200 | $1,200 | |
| [B] 470007 | $750 | $750 | $750 | $750 | $750 | $750 | |
| [B] 470190 | $900 | $900 | $900 | $900 | $900 | $900 | |
| [B] 471190 | $900 | $900 | $900 | $900 | $900 | $900 | |
| [B] 471344 | $1,200 | $1,200 | $1,200 | $1,200 | $1,200 | $1,200 | |
| [B] 470048 | $900 | $900 | $900 | $900 | $900 | $900 | |
| [B] 470036 | $750 | $750 | $750 | $750 | $750 | $750 | |
| [B] 471048 | $900 | $900 | $900 | $900 | $900 | $900 | |
| [B] 470033 | $900 | $900 | $900 | $900 | $900 | $900 | |
| [B] 470249 | $1,200 | $1,200 | $1,200 | $1,200 | $1,200 | $1,200 | |
| [B] 470171 | $1,200 | $1,200 | $1,200 | $1,200 | $1,200 | $1,200 | |
| [B] 470246 | $1,200 | $1,200 | $1,200 | $1,200 | $1,200 | $1,200 | |
| [B] 471171 | $1,200 | $1,200 | $1,200 | $1,200 | $1,200 | $1,200 | |
| [B] 470215 | $900 | $900 | $900 | $900 | $900 | $900 | |
| [B] 470181 | $900 | $900 | $900 | $900 | $900 | $900 | |

Costs



# Potential EndoWrist Instrument Units, Costs and Costs per Unit by Product (Instrument Number) - da Vinci X/Xi (Using Intuitive Sales Volumes and Rebotix Pricing): 2018 - June 2022

## Schedule 11.2



| | 2018 | 2019 | 2020 | 2021 | 2022 thru June | Total | % |
|---|---|---|---|---|---|---|---|

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Potential EndoWrist Instrument Units, Costs and Costs per Unit by Product (Instrument Number) - da Vinci X/Xi (Using Intuitive Sales Volumes and Rebotix Pricing): 2018 - June 2022

## Schedule 11.2

| 2018 | 2019 | 2020 | 2021 | 2022 thru June | Total | % |
|------|------|------|------|------|------|------|

**NOTES / SOURCES:**

Note:  Any minor differences are due to rounding.

[A] Schedule 13.2.

[B] Schedule 12.1.

[C]  = [A] * [B]

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# SIS's EndoWrist Instrument Sales Prices and Costs (from Rebotix) - da Vinci S/Si Schedule 12.0

| [1] | [1] | [1] | [2] |
|---|---|---|---|
| Instrument Number | Description | SIS sales price | SIS cost from Rebotix |
| 420179 | Hot Shears (Monopolar Curved Scissors) | $1,700 | $1,300 |
| 420110 | PreCise Bipolar Forceps | $1,600 | $1,200 |
| 420121 | Fine Tissue Forceps | $1,600 | $1,200 |
| 420171 | Micro Bipolar Forceps | $1,600 | $1,200 |
| 420172 | Maryland Bipolar Forceps | $1,600 | $1,200 |
| 420204 | Atrial Retractor | $1,600 | $1,200 |
| 420205 | Fenestrated Bipolar Forceps | $1,600 | $1,200 |
| 420227 | PK® Dissecting Forceps | $1,600 | $1,200 |
| 420246 | Atrial Retractor Short Right | $1,600 | $1,200 |
| 420249 | Dual Blade Retractor | $1,600 | $1,200 |
| 420344 | Curved Bipolar Dissector | $1,600 | $1,200 |
| 420003 | Small Clip Applier | $1,300 | $900 |
| 420006 | Large Needle Driver | $1,300 | $900 |
| 420033 | Black Diamond Micro Forceps | $1,300 | $900 |
| 420048 | Long Tip Forceps | $1,300 | $900 |
| 420093 | ProGrasp Forceps | $1,300 | $900 |
| 420157 | Snap-fit™ Scalpel Instrument | $1,300 | $900 |
| 420181 | Resano Forceps | $1,300 | $900 |
| 420190 | Cobra Grasper | $1,300 | $900 |
| 420194 | Mega Needle Driver | $1,300 | $900 |
| 420203 | Pericardial Dissector | $1,300 | $900 |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# SIS's EndoWrist Instrument Sales Prices and Costs (from Rebotix) - da Vinci S/Si Schedule 12.0

| [1] | [1] | [1] | [2] |
|---|---|---|---|
| **Instrument Number** | **Description** | **SIS sales price** | **SIS cost from Rebotix** |
| 420207 | Tenaculum Forceps | $1,300 | $900 |
| 420215 | Cardiac Probe Grasper | $1,300 | $900 |
| 420278 | Graptor (Grasping Retractor) | $1,300 | $900 |
| 420296 | Large SutureCut™ Needle Driver | $1,300 | $900 |
| 420309 | Mega™ SutureCut™ Needle Driver | $1,300 | $900 |
| 420318 | Small Graptor (Grasping Retractor) | $1,300 | $900 |
| 420001 | Potts Scissors | $1,100 | $750 |
| 420007 | Round Tip Scissors | $1,100 | $750 |
| 420036 | DeBakey Forceps | $1,100 | $750 |
| 420049 | Cadiere Forceps | $1,100 | $750 |
| 420178 | Curved Scissors | $1,100 | $750 |
| 420183 | Permanent Cautery Hook | $1,100 | $750 |
| 420184 | Permanent Cautery Spatula | $1,100 | $750 |
| 420189 | Double Fenestrated Grasper | $1,100 | $750 |
| 420192 | Valve Hook | $1,100 | $750 |
| 420230 | Large Clip Applier | $1,100 | $750 |
| 420327 | Medium-Large Clip Applier | $1,100 | $750 |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# SIS's EndoWrist Instrument Sales Prices and Costs (from Rebotix) - da Vinci S/Si Schedule 12.0

| [1] | [1] | [1] | [2] |
|---|---|---|---|
| **Instrument Number** | **Description** | **SIS sales price** | **SIS cost from Rebotix** |

**NOTES / SOURCES:**

[1]  Per SIS000047-49.  *See also,* Keith Johnson Dep. Ex. 137 (at SIS097181), SIS000035-45 at 44 and SIS000024.  Prices shown above are also consistent with prices shown on Schedule 14.0, representing actual sales from SIS to customers.

[2]  Per REBOTIX162208-162212 at 212.  Prices above reflect the distributor price offered by Rebotix to distributors.  *See also* , Schedule 10.1 showing sales from Rebotix to SIS.

# SIS's EndoWrist Instrument Sales Prices and Costs (from Rebotix) - da Vinci X/Xi
# Schedule 12.1

| | | | [1] | [2] |
|---|---|---|---|---|
| Instrument Number | Description | Source of Identification | SIS sales price | SIS cost from Rebotix |
| 470179 | Hot Shears (Monopolar Curved Scissors) | Corresponding Da Vinci S/Si Material Number per Schedule 12.0 - 420179 | $1,700 | $1,300 |
| 470110 | PreCise Bipolar Forceps | Corresponding Da Vinci S/Si Material Number per Schedule 12.0 - 420110 | $1,600 | $1,200 |
| 470121 | Fine Tissue Forceps | Corresponding Da Vinci S/Si Material Number per Schedule 12.0 - 420121 | $1,600 | $1,200 |
| 470171 | Micro Bipolar Forceps | Corresponding Da Vinci S/Si Material Number per Schedule 12.0 - 420171 | $1,600 | $1,200 |
| 471171 | Micro Bipolar Forceps | Da Vinci X/Xi Instrument & Accessory Catalog October 2021 | $1,600 | $1,200 |
| 470172 | Maryland Bipolar Forceps | Corresponding Da Vinci S/Si Material Number per Schedule 12.0 - 420172 | $1,600 | $1,200 |
| 471172 | Maryland Bipolar Forceps | Da Vinci X/Xi Instrument & Accessory Catalog October 2021 | $1,600 | $1,200 |
| 470204 | Atrial Retractor | Corresponding Da Vinci S/Si Material Number per Schedule 12.0 - 420204 | $1,600 | $1,200 |
| 470205 | Fenestrated Bipolar Forceps | Corresponding Da Vinci S/Si Material Number per Schedule 12.0 - 420205 | $1,600 | $1,200 |
| 471205 | Fenestrated Bipolar Forceps | Da Vinci X/Xi Instrument & Accessory Catalog October 2021 | $1,600 | $1,200 |
| 470227 | PK® Dissecting Forceps | Corresponding Da Vinci S/Si Material Number per Schedule 12.0 - 420227 | $1,600 | $1,200 |
| 470246 | Atrial Retractor Short Right | Corresponding Da Vinci S/Si Material Number per Schedule 12.0 - 420246 | $1,600 | $1,200 |
| 470249 | Dual Blade Retractor | Corresponding Da Vinci S/Si Material Number per Schedule 12.0 - 420249 | $1,600 | $1,200 |
| 470344 | Curved Bipolar Dissector | Corresponding Da Vinci S/Si Material Number per Schedule 12.0 - 420344 | $1,600 | $1,200 |
| 471344 | Curved Bipolar Dissector | Da Vinci X/Xi Instrument & Accessory Catalog October 2021 | $1,600 | $1,200 |
| 470003 | Small Clip Applier | Corresponding Da Vinci S/Si Material Number per Schedule 12.0 - 420003 | $1,300 | $900 |
| 470006 | Large Needle Driver | Corresponding Da Vinci S/Si Material Number per Schedule 12.0 - 420006 | $1,300 | $900 |
| 471006 | Large Needle Driver | Da Vinci X/Xi Instrument & Accessory Catalog October 2021 | $1,300 | $900 |
| 470033 | Black Diamond Micro Forceps | Corresponding Da Vinci S/Si Material Number per Schedule 12.0 - 420033 | $1,300 | $900 |
| 470048 | Long Tip Forceps | Corresponding Da Vinci S/Si Material Number per Schedule 12.0 - 420048 | $1,300 | $900 |
| 471048 | Long Tip Forceps | Da Vinci X/Xi Instrument & Accessory Catalog October 2021 | $1,300 | $900 |
| 470093 | ProGrasp Forceps | Corresponding Da Vinci S/Si Material Number per Schedule 12.0 - 420093 | $1,300 | $900 |
| 471093 | ProGrasp Forceps | Da Vinci X/Xi Instrument & Accessory Catalog October 2021 | $1,300 | $900 |
| 470157 | Snap-fit™ Scalpel Instrument | Corresponding Da Vinci S/Si Material Number per Schedule 12.0 - 420157 | $1,300 | $900 |
| 470181 | Resano Forceos | Corresponding Da Vinci S/Si Material Number per Schedule 12.0 - 420181 | $1,300 | $900 |
| 470190 | Cobra Grasper | Corresponding Da Vinci S/Si Material Number per Schedule 12.0 - 420190 | $1,300 | $900 |
| 471190 | Cobra Grasper | Da Vinci X/Xi Instrument & Accessory Catalog October 2021 | $1,300 | $900 |
| 470194 | Mega Needle Driver | Corresponding Da Vinci S/Si Material Number per Schedule 12.0 - 420194 | $1,300 | $900 |
| 470203 | Pericardial Dissector | Corresponding Da Vinci S/Si Material Number per Schedule 12.0 - 420203 | $1,300 | $900 |
| 470207 | Tenaculum Forceos | Corresponding Da Vinci S/Si Material Number per Schedule 12.0 - 420207 | $1,300 | $900 |
| 470215 | Cardiac Probe Grasper | Corresponding Da Vinci S/Si Material Number per Schedule 12.0 - 420215 | $1,300 | $900 |
| 470278 | Graptor (Grasping Retractor) | Corresponding Da Vinci S/Si Material Number per Schedule 12.0 - 420278 | $1,300 | $900 |
| 470296 | Large SutureCut™ Needle Driver | Corresponding Da Vinci S/Si Material Number per Schedule 12.0 - 420296 | $1,300 | $900 |
| 471296 | Large SutureCut™ Needle Driver | Da Vinci X/Xi Instrument & Accessory Catalog October 2021 | $1,300 | $900 |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# SIS's EndoWrist Instrument Sales Prices and Costs (from Rebotix) - da Vinci X/Xi
# Schedule 12.1

|  |  |  | [1] | [2] |
| --- | --- | --- | --- | --- |
| Instrument Number | Description | Source of Identification | SIS sales price | SIS cost from Rebotix |
| 470309 | Mega™ SutureCut™ Needle Driver | Corresponding Da Vinci S/Si Material Number per Schedule 12.0 - 420309 | $1,300 | $900 |
| 471309 | Mega™ SutureCut™ Needle Driver | Da Vinci X/Xi Instrument & Accessory Catalog October 2021 | $1,300 | $900 |
| 470318 | Small Graptor (Grasping Retractor) | Corresponding Da Vinci S/Si Material Number per Schedule 12.0 - 420318 | $1,300 | $900 |
| 470001 | Potts Scissors | Corresponding Da Vinci S/Si Material Number per Schedule 12.0 - 420001 | $1,100 | $750 |
| 470007 | Round Tip Scissors | Corresponding Da Vinci S/Si Material Number per Schedule 12.0 - 420007 | $1,100 | $750 |
| 470036 | DeBakey Forceps | Corresponding Da Vinci S/Si Material Number per Schedule 12.0 - 420036 | $1,100 | $750 |
| 470049 | Cadiere Forceps | Corresponding Da Vinci S/Si Material Number per Schedule 12.0 - 470049 | $1,100 | $750 |
| 471049 | Cadiere Forceps | Da Vinci X/Xi Instrument & Accessory Catalog October 2021 | $1,100 | $750 |
| 470178 | Curved Scissors | Corresponding Da Vinci S/Si Material Number per Schedule 12.0 - 420178 | $1,100 | $750 |
| 470183 | Permanent Cautery Hook | Corresponding Da Vinci S/Si Material Number per Schedule 12.0 - 420183 | $1,100 | $750 |
| 470184 | Permanent Cautery Spatula | Corresponding Da Vinci S/Si Material Number per Schedule 12.0 - 420184 | $1,100 | $750 |
| 470189 | Double Fenestrated Grasper | Corresponding Da Vinci S/Si Material Number per Schedule 12.0 - 420189 | $1,100 | $750 |
| 470192 | Valve Hook | Corresponding Da Vinci S/Si Material Number per Schedule 12.0 - 420192 | $1,100 | $750 |
| 470230 | Large Clip Applier | Corresponding Da Vinci S/Si Material Number per Schedule 12.0 - 420230 | $1,100 | $750 |
| 470327 | Medium-Large Clip Applier | Corresponding Da Vinci S/Si Material Number per Schedule 12.0 - 420327 | $1,100 | $750 |

**NOTES / SOURCES:**

Note:  Per the Deposition of Grant Duque 25-36, 48-52 and 156-157 (November 8, 2022), I understand Intuitive's S/Si and X/Xi EndoWrist instruments are used for the same applications and essentially perform the same functions.

[1]  Per SIS000047-49, pricing was based on the da Vinci S/Si platform.  I assume a similar price for the X/Xi platform.  This appears reasonable, as per Schedules 13.1 and 13.2, the Intuitive average selling price for similar instrument numbers appear to be the approximately the same (i.e., 420179 and 470179).  This would suggest the SIS price to its customers would be approximately the same.

[2]  Per REBOTIX162208-162212 at 212, pricing (cost) was based on the da Vinci S/Si platform.  I assume a similar price (cost) for the X/Xi platform.  This appears reasonable, as per Schedules 13.1 and 13.2, the Intuitive average selling price for similar instrument numbers appear to be the approximately the same (i.e., 420179 and 470179).  This would suggest the price (cost) to SIS would be approximately the same.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# SIS's EndoWrist Instrument Sale Price vs Intuitive Sales Price - da Vinci S/Si
# Schedule 12.2

| [1] | [1] | [1] | [2] | [3] | [4] |
|---|---|---|---|---|---|
| Instrument Number | Description | SIS sales price | Intuitive sales price | Difference | % Discount |
| 420179 | Hot Shears (Monopolar Curved Scissors) | $1,700 | $3,200 | ($1,500) | -47% |
| 420110 | PreCise Bipolar Forceps | $1,600 | $2,708 | ($1,108) | -41% |
| 420121 | Fine Tissue Forceps | $1,600 | $2,864 | ($1,264) | -44% |
| 420171 | Micro Bipolar Forceps | $1,600 | $2,755 | ($1,155) | -42% |
| 420172 | Maryland Bipolar Forceps | $1,600 | $2,705 | ($1,105) | -41% |
| 420204 | Atrial Retractor | $1,600 | $2,964 | ($1,364) | -46% |
| 420205 | Fenestrated Bipolar Forceps | $1,600 | $2,702 | ($1,102) | -41% |
| 420227 | PK® Dissecting Forceps | $1,600 | $2,904 | ($1,304) | -45% |
| 420246 | Atrial Retractor Short Right | $1,600 | $2,963 | ($1,363) | -46% |
| 420249 | Dual Blade Retractor | $1,600 | $2,332 | ($732) | -31% |
| 420344 | Curved Bipolar Dissector | $1,600 | $2,735 | ($1,135) | -41% |
| 420003 | Small Clip Applier | $1,300 | $2,410 | ($1,110) | -46% |
| 420006 | Large Needle Driver | $1,300 | $2,200 | ($900) | -41% |
| 420033 | Black Diamond Micro Forceps | $1,300 | $2,519 | ($1,219) | -48% |
| 420048 | Long Tip Forceps | $1,300 | $2,473 | ($1,173) | -47% |
| 420093 | ProGrasp Forceps | $1,300 | $2,201 | ($901) | -41% |
| 420157 | Snap-fit™ Scalpel Instrument | $1,300 | $3,011 | ($1,711) | -57% |
| 420181 | Resano Forceps | $1,300 | $2,228 | ($928) | -42% |
| 420190 | Cobra Grasper | $1,300 | $2,213 | ($913) | -41% |
| 420194 | Mega Needle Driver | $1,300 | $2,201 | ($901) | -41% |
| 420203 | Pericardial Dissector | $1,300 | $2,221 | ($921) | -41% |
| 420207 | Tenaculum Forceps | $1,300 | $2,221 | ($921) | -41% |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# SIS's EndoWrist Instrument Sale Price vs Intuitive Sales Price - da Vinci S/Si
# Schedule 12.2

| | | [1] | [2] | [3] | [4] |
|---|---|---|---|---|---|
| **Instrument Number** | **Description** | **SIS sales price** | **Intuitive sales price** | **Difference** | **% Discount** |
| 420215 | Cardiac Probe Grasper | $1,300 | $2,248 | ($948) | -42% |
| 420278 | Graptor (Grasping Retractor) | $1,300 | $2,433 | ($1,133) | -47% |
| 420296 | Large SutureCut™ Needle Driver | $1,300 | $2,402 | ($1,102) | -46% |
| 420309 | Mega™ SutureCut™ Needle Driver | $1,300 | $2,405 | ($1,105) | -46% |
| 420318 | Small Graptor (Grasping Retractor) | $1,300 | $2,115 | ($815) | -39% |
| 420001 | Potts Scissors | $1,100 | $1,970 | ($870) | -44% |
| 420007 | Round Tip Scissors | $1,100 | $1,980 | ($880) | -44% |
| 420036 | DeBakey Forceps | $1,100 | $1,866 | ($766) | -41% |
| 420049 | Cadiere Forceps | $1,100 | $2,005 | ($905) | -45% |
| 420178 | Curved Scissors | $1,100 | $2,026 | ($926) | -46% |
| 420183 | Permanent Cautery Hook | $1,100 | $2,008 | ($908) | -45% |
| 420184 | Permanent Cautery Spatula | $1,100 | $2,014 | ($914) | -45% |
| 420189 | Double Fenestrated Grasper | $1,100 | $2,014 | ($914) | -45% |
| 420192 | Valve Hook | $1,100 | $1,799 | ($699) | -39% |
| 420230 | Large Clip Applier | $1,100 | $1,408 | ($308) | -22% |
| 420327 | Medium-Large Clip Applier | $1,100 | $1,410 | ($310) | -22% |
| | | | **Average (simple)** | | **-42%** |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# SIS's EndoWrist Instrument Sale Price vs Intuitive Sales Price - da Vinci S/Si
# Schedule 12.2

| [1] | [1] | [1] | [2] | [3] | [4] |
|---|---|---|---|---|---|
| Instrument Number | Description | SIS sales price | Intuitive sales price | Difference | % Discount |

**NOTES / SOURCES:**

[1]  Per Schedule 12.0.

[2]  Per Schedule 13.1.

[3]  SIS sales price per [1] - [2]

[4]  = [3] / [2]

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Intuitive's EndoWrist Instrument Units, Net Sales Dollars and Average Selling Price by System: 2014 - June 2022
# Schedule 13.0



| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 thru June | Total | % | 2022 Annualized |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Units** | | | | | | | | | | | | |
| [A] da Vinci S/Si | | | | | | | | | | | | |
| [B] da Vinci X/Xi | | | | | | | | | | | | |
| [C] Total units | | | | | | | | | | | | |
| **Net sales dollars** | | | | | | | | | | | | |
| [A] da Vinci S/Si | | | | | | | | | | | | |
| [B] da Vinci X/Xi | | | | | | | | | | | | |
| [C] Total net sales dollars | | | | | | | | | | | | |
| **ASP per unit** | | | | | | | | | | | | |
| [D] da Vinci S/Si | $2,508 | $2,511 | $2,518 | $2,521 | $2,528 | $2,537 | $2,572 | $2,659 | $2,538 | $2,524 | | $2,538 |
| [D] da Vinci X/Xi | $2,417 | $2,453 | $2,477 | $2,486 | $2,499 | $2,491 | $2,542 | $2,657 | $2,666 | $2,557 | | $2,666 |
| [D] Total ASP per unit | $2,503 | $2,500 | $2,506 | $2,506 | $2,512 | $2,504 | $2,546 | $2,658 | $2,663 | $2,544 | | $2,663 |

**NOTES / SOURCES:**

Note:  Any minor differences are due to rounding.

[A] Per Schedule 13.1.

[B] Per Schedule 13.2.

[C] = [A] + [B]

[D] Calculated based on the amounts herein.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Intuitive's EndoWrist Instrument Units and Net Sales Dollars by Product (Instrument Number) - da Vinci S/Si: 2014 - June 2022
# Schedule 13.1



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Intuitive's EndoWrist Instrument Units and Net Sales Dollars by Product (Instrument Number) - da Vinci S/Si: 2014 - June 2022
# Schedule 13.1



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Intuitive's EndoWrist Instrument Units and Net Sales Dollars by Product (Instrument Number) - da Vinci S/Si: 2014 - June 2022
# Schedule 13.1



| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 thru Jun | Total | % |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **ASP** | | | | | | | | | | | |
| [B] Total ASP | $2,508 | $2,511 | $2,518 | $2,521 | $2,528 | $2,537 | $2,572 | $2,659 | $2,538 | $2,524 | |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Intuitive's EndoWrist Instrument Units and Net Sales Dollars by Product (Instrument Number) - da Vinci S/Si: 2014 - June 2022
# Schedule 13.1

| 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 thru Jun | Total | % |
|------|------|------|------|------|------|------|------|------|-------|---|

**NOTES / SOURCES:**

Note:  Any minor differences are due to rounding.

Note:  U.S. sales were identified by using the "Comp Code" field and filtering for "2000" and using the "Unit" field and filtering for "EA."  Each S/Si instrument above was selected based on SIS000047-49 (See also, Schedule 12.0).  Per REBOTIX162208-162212 at 212, I understand all of the S/Si EndoWrists identified above are repairable by Rebotix.

[A]  Summarized per Intuitive-00595406-413, Intuitive-00595415-428, Intuitive-00595434-437, Intuitive-00695231-233, Intuitive-01101508 and Intuitive-02025757-759.

[B]  Calculated based on the amounts herein.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Intuitive's EndoWrist Instrument Units and Net Sales Dollars by Product (Instrument Number) - da Vinci X/Xi:  2014 - June 2022
## Schedule 13.2



| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 thru June | Total | % |
|---|---|---|---|---|---|---|---|---|---|---|---|

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Intuitive's EndoWrist Instrument Units and Net Sales Dollars by Product (Instrument Number) - da Vinci X/Xi:  2014 - June 2022
# Schedule 13.2



| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 thru June | Total | % |
|---|---|---|---|---|---|---|---|---|---|---|---|

Net sales dollars

[A]
[A]
[A]
[A]
[A]
[A]
[A]
[A]
[A]
[A]
[A]
[A]
[A]
[A]
[A]
[A]
[A]
[A]
[A]
[A]
[A]
[A]
[A]
[A]
[A]
[A]
[A]
[A]
[A]
[A]
[A]
[A]
[B] Total net sales dollars

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Intuitive's EndoWrist Instrument Units and Net Sales Dollars by Product (Instrument Number) - da Vinci X/Xi:  2014 - June 2022
# Schedule 13.2



| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 thru June | Total | % |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **ASP** | | | | | | | | | | | |
| **[B] Total ASP** | $2,417 | $2,453 | $2,477 | $2,486 | $2,499 | $2,491 | $2,542 | $2,657 | $2,666 | $2,557 | |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Intuitive's EndoWrist Instrument Units and Net Sales Dollars by Product (Instrument Number) - da Vinci X/Xi:  2014 - June 2022
# Schedule 13.2

| 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 thru June | Total | % |
|---|---|---|---|---|---|---|---|---|---|---|

**NOTES / SOURCES:**

Note:  Any minor differences are due to rounding.

Note:  U.S. sales were identified by using the "Comp Code" field and filtering for "2000"  and using the "Unit" field and filtering for "EA."  Each X/Xi instrument was selected as described on Schedule 12.1.

[A] Summarized per Intuitive-00595406-413, Intuitive-00595415-428, Intuitive-00595434-437, Intuitive-00695231-233, Intuitive-01101508 and Intuitive-02025757-759.

[B] Calculated based on the amounts herein.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# SIS's EndoWrist Instrument Repair Summary
# Schedule 14.0

| [1] | [1] | [1] | [1] | [1] | [2] | [1] | [1] | [1] | [3] | [3] | [3] | [3] | [3] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Order date | Customer | Invoice # | Quantity | Price | Sales | Item (EndoWrist Instrument Number) | Item description | Item comments | Total count | Repaired count | Not repaired count | Expired count | Not supported count |
| 11/14/18 | ALEXIAN BROTHERS MEDICAL CTR | 60576-1 | 1 | $0.00 | N/A | 470001 | DaVinci Potts Scissors | Severely damaged. BEYOND REPAIR. Needs replacement | 1 | | 1 | | |
| 06/28/19 | LEGACY GOOD SAMARITAN | 61059-1 | 1 | $1,300.00 | $1,300.00 | 420309 | Needle Driver, Mega Suture Cut | Refurbish tool end. Clean. Mechanical inspection and testing. Electrical safety testing. Use count reset and test all functions. | 2 | 1 | | | |
| 07/18/19 | LEGACY GOOD SAMARITAN | 61064-1 | 1 | $1,300.00 | $1,300.00 | 420309 | Needle Driver, Mega Suture Cut | Refurbish tool end. Clean. Mechanical inspection and testing. Electrical safety testing. Use count reset and test all functions. | 3 | 2 | | | |
| 08/27/19 | KAISER FONTANA | 95513-1 | 1 | $1,700.00 | $0.00 | 420179 | Monopolar Curved Scissors | Monopolar Curved Scissors EndoWrist Repair Services | 4 | 3 | | | |
| 08/27/19 | KAISER FONTANA | 95513-1 | 1 | $1,600.00 | $0.00 | 420205 | Fenestrated Bipolar Forceps | Fenestrated Bipolar Forceps EndoWrist Repair Services | 5 | 4 | | | |
| 08/27/19 | KAISER FONTANA | 95513-1 | 1 | $1,300.00 | $0.00 | 420093 | ProGrasp Forceps | ProGrasp Forceps EndoWrist Repair Services | 6 | 5 | | | |
| 08/27/19 | KAISER FONTANA | 95513-1 | 1 | $1,300.00 | $0.00 | 420194 | Mega Needle Driver | Mega Needle Driver EndoWrist Repair Services | 7 | 6 | | | |
| 09/09/19 | KAISER FONTANA | 60733-1 | 1 | $1,300.00 | $1,300.00 | 420318 | Small Graptor (Grasping Retractor) | Refurbish tool end. Clean. Mechanical inspection and testing. Electrical safety testing. Use count reset and test all functions. | 8 | 7 | | | |
| 09/09/19 | KAISER FONTANA | 60733-1 | 1 | $1,300.00 | $1,300.00 | 420006 | Needle Driver, Large | Refurbish tool end. Clean. Mechanical inspection and testing. Electrical safety testing. Use count reset and test all functions. | 9 | 8 | | | |
| 09/09/19 | KAISER FONTANA | 60733-1 | 1 | $1,300.00 | $1,300.00 | 420093 | Forceps, ProGrasp | Refurbish tool end. Clean. Mechanical inspection and testing. Electrical safety testing. Use count reset and test all functions. | 10 | 9 | | | |
| 09/09/19 | KAISER FONTANA | 60733-1 | 1 | $1,300.00 | $1,300.00 | 420318 | Small Graptor (Grasping Retractor) | Refurbish tool end. Clean. Mechanical inspection and testing. Electrical safety testing. Use count reset and test all functions. | 11 | 10 | | | |
| 09/09/19 | KAISER FONTANA | 60733-1 | 1 | $1,100.00 | $1,100.00 | 420049 | Forceps, Cadiere | Refurbish tool end. Clean. Mechanical inspection and testing. Electrical safety testing. Use count reset and test all functions. | 12 | 11 | | | |
| 09/09/19 | KAISER FONTANA | 60733-2 | 1 | $0.00 | N/A | 420172 | Bipolar Forceps, Maryland | BEYOND REPAIR. Needs replacement | 13 | | 2 | | |
| 09/09/19 | KAISER FONTANA | 60733-2 | 1 | $0.00 | N/A | 420172 | Bipolar Forceps, Maryland | BEYOND REPAIR. Needs replacement | 14 | | 3 | | |
| 09/09/19 | KAISER FONTANA | 60733-2 | 1 | $0.00 | N/A | 420172 | Bipolar Forceps, Maryland | BEYOND REPAIR. Needs replacement | 15 | | 4 | | |
| 09/09/19 | ADVOCATE GOOD SAMARITAN | 95713-1 | 1 | $0.00 | N/A | 420205 | Fenestrated Bipolar Forceps | Expired. BEYOND REPAIR. SIS is unable to provide a replacement | 16 | | | 1 | |
| 10/29/19 | MARIN HEALTH MEDICAL CENTER | 90009-1 | 1 | $1,300.00 | $1,300.00 | 420296 | Needle Driver, Large Suture Cut | Refurbish tool end. Clean. Mechanical inspection and testing. Electrical safety testing. Use count reset and test all functions. | 17 | 12 | | | |
| 10/29/19 | MARIN HEALTH MEDICAL CENTER | 90009-1 | 1 | $1,300.00 | $1,300.00 | 420194 | Needle Driver, Mega | Refurbish tool end. Clean. Mechanical inspection and testing. Electrical safety testing. Use count reset and test all functions. | 18 | 13 | | | |
| 10/29/19 | MARIN HEALTH MEDICAL CENTER | 90009-1 | 1 | $1,100.00 | $1,100.00 | 420036 | Forceps, DeBakey | Refurbish tool end. Clean. Mechanical inspection and testing. Electrical safety testing. Use count reset and test all functions. | 19 | 14 | | | |
| 10/29/19 | MARIN HEALTH MEDICAL CENTER | 90009-1 | 1 | $1,600.00 | $1,600.00 | 420172 | Bipolar Forceps, Maryland | Refurbish tool end. Clean. Mechanical inspection and testing. Electrical safety testing. Use count reset and test all functions. | 20 | 15 | | | |
| 10/29/19 | MARIN HEALTH MEDICAL CENTER | 90009-1 | 1 | $1,300.00 | $1,300.00 | 420194 | Needle Driver, Mega | Refurbish tool end. Clean. Mechanical inspection and testing. Electrical safety testing. Use count reset and test all functions. | 21 | 16 | | | |
| 10/30/19 | ADVOCATE SOUTH SUBURBAN HOSP | 61148-1 | 1 | $1,600.00 | $1,600.00 | 420205 | Fenestrated Bipolar Forceps | Repair/Exchange. Received SN: N10190207 | 22 | 17 | | | |
| 10/30/19 | ADVOCATE SOUTH SUBURBAN HOSP | 61148-2 | 1 | $1,600.00 | $1,600.00 | 420227 | PK® Dissecting Forceps | Refurbish tool end. Clean. Mechanical inspection and testing. Electrical safety testing. Use count reset and test all functions. | 23 | 18 | | | |
| 10/30/19 | ADVOCATE SOUTH SUBURBAN HOSP | 61148-3 | 1 | $1,300.00 | $1,300.00 | 420093 | Forceps, ProGrasp | Refurbish tool end. Clean. Mechanical inspection and testing. Electrical safety testing. Use count reset and test all functions. | 24 | 19 | | | |
| 10/30/19 | ADVOCATE SOUTH SUBURBAN HOSP | 61148-4 | 1 | $1,300.00 | $1,300.00 | 420093 | Forceps, ProGrasp | Refurbish tool end. Clean. Mechanical inspection and testing. Electrical safety testing. Use count reset and test all functions. | 25 | 20 | | | |
| 10/30/19 | ADVOCATE SOUTH SUBURBAN HOSP | 61148-5 | 1 | $1,300.00 | $1,300.00 | 420006 | Needle Driver, Large | Repair/Exchange. Received SN: N10190327 | 26 | 21 | | | |
| 10/30/19 | ADVOCATE SOUTH SUBURBAN HOSP | 61148-6 | 1 | $1,100.00 | $1,100.00 | 420049 | Forceps, Cadiere | Refurbish tool end. Clean. Mechanical inspection and testing. Electrical safety testing. Use count reset and test all functions. | 27 | 22 | | | |
| 10/30/19 | ADVOCATE SOUTH SUBURBAN HOSP | 61148-7 | 1 | $1,300.00 | $1,300.00 | 420093 | Forceps, ProGrasp | Refurbish tool end. Clean. Mechanical inspection and testing. Electrical safety testing. Use count reset and test all functions. | 28 | 23 | | | |
| 10/29/19 | ADVOCATE SOUTH SUBURBAN HOSP | 61148-8 | 1 | $0.00 | N/A | 420049 | Forceps, Cadiere | Expired and disposed of. BEYOND REPAIR. SIS is unable to provide a replacement. | 29 | | | 2 | |
| 11/06/19 | ADVOCATE SOUTH SUBURBAN HOSP | 61156-1 | 1 | $1,300.00 | $1,300.00 | 420006 | Needle Driver, Large | Refurbish tool end. Clean. Mechanical inspection and testing. | 30 | 24 | | | |
| 11/06/19 | ADVOCATE SOUTH SUBURBAN HOSP | 61156-2 | 1 | $1,300.00 | $1,300.00 | 420006 | Needle Driver, Large | Refurbish tool end. Clean. Mechanical inspection and testing. Electrical safety testing. Use count reset and test all functions. | 31 | 25 | | | |
| 11/14/19 | MARIN HEALTH MEDICAL CENTER | 60137-1 | 1 | $1,300.00 | $1,300.00 | 420296 | Needle Driver, Large Suture Cut | Refurbish tool end. Clean. Mechanical inspection and testing. Electrical safety testing. Use count reset and test all functions. | 32 | 26 | | | |
| 11/14/19 | MARIN HEALTH MEDICAL CENTER | 60137-1 | 1 | $1,100.00 | $1,100.00 | 420049 | Forceps, Cadiere | Refurbish tool end. Clean. Mechanical inspection and testing. Electrical safety testing. Use count reset and test all functions. | 33 | 27 | | | |
| 11/15/19 | MARIN HEALTH MEDICAL CENTER | 90008-1 | 1 | $1,700.00 | N/A | 420179 | Scissors, Curved Monopolar | Refurbish tool end. Clean. Mechanical inspection and testing. | 34 | 28 | | | |
| 11/15/19 | MARIN HEALTH MEDICAL CENTER | 90008-1 | 1 | $1,300.00 | N/A | 420309 | Needle Driver, Mega Suture Cut | Refurbish tool end. Clean. Mechanical inspection and testing. Electrical safety testing. Use count reset and test all functions. | 35 | 29 | | | |
| 11/15/19 | MARIN HEALTH MEDICAL CENTER | 90008-1 | 1 | $1,700.00 | N/A | 420179 | Scissors, Curved Monopolar | Refurbish tool end. Clean. Mechanical inspection and testing. Electrical safety testing. Use count reset and test all functions. | 36 | 30 | | | |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# SIS's EndoWrist Instrument Repair Summary
# Schedule 14.0

| [1] | [1] | [1] | [1] | [1] | [2] | [1]<br>Item<br>(EndoWrist<br>Instrument<br>Number) | [1] | [1] | [3] | [3] | [3] | [3] | [3] |
|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|
| Order date | Customer | Invoice # | Quantity | Price | Sales | | Item description | Item comments | Total count | Repaired count | Not repaired count | Expired count | Not supported count |
| 11/15/19 | MARIN HEALTH MEDICAL CENTER | 90008-1 | 1 | $1,100.00 | N/A | 420049 | Forceps, Cadiere | Repair/Exchange. Received SN: N10180822 | 37 | 31 | | | |
| 11/15/19 | MARIN HEALTH MEDICAL CENTER | 90008-1 | 1 | $1,100.00 | N/A | 420230 | Applier, Large Clip | Refurbish tool end. Clean. Mechanical inspection and testing. Electrical safety testing. Use count reset and test all functions. | 38 | 32 | | | |
| 11/15/19 | MARIN HEALTH MEDICAL CENTER | 90008-1 | 1 | $1,600.00 | N/A | 420172 | Bipolar Forceps, Maryland | Refurbish tool end. Clean. Mechanical inspection and testing. Electrical safety testing. Use count reset and test all functions. | 39 | 33 | | | |
| 11/15/19 | MARIN HEALTH MEDICAL CENTER | 90008-1 | 1 | $1,100.00 | N/A | 420230 | Applier, Large Clip | Repair/Exchange. Received SN: N10170521 | 40 | 34 | | | |
| 11/15/19 | MARIN HEALTH MEDICAL CENTER | 90008-1 | 1 | $1,300.00 | N/A | 420194 | Needle Driver, Mega | Repair/Exchange. Received SN: M10140121 | 41 | 35 | | | |
| 11/15/19 | MARIN HEALTH MEDICAL CENTER | 90008-1 | 1 | $0.00 | N/A | 420275 | Shears, Harmonic Ace Curved | Model number is not supported. NO REPAIR | 42 | | | | 1 |
| | ADVOCATE GOOD SAMARITAN | 96156-1 | 1 | $1,300.00 | N/A | 420006 | Needle Driver, Large | Refurbish tool end. Clean. Mechanical inspection and testing. Electrical safety testing. Use count reset and test all functions. | 43 | 36 | | | |
| 12/10/19 | MARIN HEALTH MEDICAL CENTER | 90010-1 | 1 | $1,100.00 | $1,100.00 | 420230 | Applier, Large Clip | Refurbish tool end. Clean. Mechanical inspection and testing. Electrical safety testing. Use count reset and test all functions. | 44 | 37 | | | |
| 12/10/19 | MARIN HEALTH MEDICAL CENTER | 90010-1 | 1 | $1,300.00 | $1,300.00 | 420207 | Forceps, Tenaculum | Repair/Exchange. Received SN: M10100316 | 45 | 38 | | | |
| 12/10/19 | MARIN HEALTH MEDICAL CENTER | 90010-1 | 1 | $1,600.00 | $1,600.00 | 420172 | Bipolar Forceps, Maryland | Refurbish tool end. Clean. Mechanical inspection and testing. Electrical safety testing. Use count reset and test all functions. | 46 | 39 | | | |
| 12/10/19 | MARIN HEALTH MEDICAL CENTER | 90010-1 | 1 | $1,600.00 | $1,600.00 | 420172 | Bipolar Forceps, Maryland | Refurbish tool end. Clean. Mechanical inspection and testing. Electrical safety testing. Use count reset and test all functions. | 47 | 40 | | | |
| 12/10/19 | MARIN HEALTH MEDICAL CENTER | 90010-1 | 1 | $1,700.00 | $1,700.00 | 420179 | Scissors, Curved Monopolar | Refurbish tool end. Clean. Mechanical inspection and testing. Electrical safety testing. Use count reset and test all functions. | 48 | 41 | | | |
| 12/10/19 | MARIN HEALTH MEDICAL CENTER | 90010-1 | 1 | $1,600.00 | $1,600.00 | 420205 | Fenestrated Bipolar Forceps | Refurbish tool end. Clean. Mechanical inspection and testing. Electrical safety testing. Use count reset and test all functions. | 49 | 42 | | | |
| | | | | | $38,900.00 | | | Total | 49 | 42 | 4 | 2 | 1 |
| | | | | | | | | [A] Repair yield of SIS collectable units | 88% | | | | |

**NOTES / SOURCES:**

Note:  Any minor differences are due to rounding.

Note:  Column headings are based on a review of invoices, for example, SIS000097-112.

[1]  Summarized per SIS000167.

[2]  Summarized per SIS000097-112.  I have indicated "N/A" for records where invoices could not be located.

[3]  Count based on "Item Comments."

[A]  Calculated as Repaired Count / (Repaired Count + Not Repaired Count + Expired Count).

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# SIS's Financial Statements: 2019 - October 2021
# Schedule 15.0

|  | [1] 2019 Amount | [1] 2019 % | [2] 2020 Amount | [2] 2020 % | [3] 2021 (thru Oct) Amount | [3] 2021 (thru Oct) % |
|---|---|---|---|---|---|---|
| Revenue | $6,996,108 | 100.0% | $10,723,980 | 100.0% | $10,092,079 | 100.0% |
| Cost of goods sold | $4,084,286 | 58.4% | $5,863,755 | 54.7% | $5,813,610 | 57.6% |
| Gross profit | $2,911,822 | 41.6% | $4,860,225 | 45.3% | $4,278,469 | 42.4% |
|  |  |  |  |  |  |  |
| Expenses: |  |  |  |  |  |  |
| Selling | $1,415,642 | 20.2% | $1,893,403 | 17.7% | $1,899,002 | 18.8% |
| General and admin | $1,125,420 | 16.1% | $1,224,361 | 11.4% | $1,428,002 | 14.1% |
| Total expenses | $2,541,062 | 36.3% | $3,117,764 | 29.1% | $3,327,004 | 33.0% |
|  |  |  |  |  |  |  |
| Operating income | $370,760 | 5.3% | $1,742,461 | 16.2% | $951,465 | 9.4% |
| Other income and (expense) | ($2,175) | 0.0% | $571,623 | 5.3% | $1,208 | 0.0% |
| **Profit before taxes** | **$368,585** | **5.3%** | **$2,314,084** | **21.6%** | **$952,673** | **9.4%** |

**NOTES / SOURCES:**

Note:  Any minor differences are due to rounding.

[1]  Per SIS320176-188 at 176.

[2]  Per SIS320922-935 at 922.

[3]  Per SIS327629-636 at 629.   Note:  Per discussions with Greg Posdal, SIS's 2021 sales approximated $12.4 million.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# SIS's Detailed SGA: 2019 - October 2021
# Schedule 15.1

| | [1] 2019 | | [2] 2020 | | [3] 2021 (thru Oct) | | Total | | [4] Fixed / Variable | [4] Variable as a % of revenue | [4] Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Amount | % | Amount | % | Amount | % | Amount | % | | | |
| Revenue | $6,996,108 | 100.00% | $10,723,980 | 100.00% | $10,092,079 | 100.00% | $27,812,167 | 100.00% | | | |
| Cost of goods sold | $4,084,286 | 58.38% | $5,863,755 | 54.68% | $5,813,610 | 57.61% | $15,761,651 | 56.67% | | | |
| Gross profit | $2,911,822 | 41.62% | $4,860,225 | 45.32% | $4,278,469 | 42.39% | $12,050,516 | 43.33% | | | |
| Expenses: | | | | | | | | | | | |
| **Selling:** | | | | | | | | | | | |
| Wages - Sales | $611,469 | 8.74% | $732,356 | 6.83% | $688,552 | 6.82% | $2,032,377 | 7.31% | Partially variable | 2.00% | Currently have approximately 10-12 Associate Sales Representatives ("ASRs") managing more than 1 million annual repair units, which approximates 80,000-100,000 repair units per ASR. According to discussion with Greg Posdal, SIS would potentially add up to as many as 10 additional ASRs to sell both EndoWrist repairs and other SIS products/services. New ASRs cost approximately $50,000 in wages annually. Ten ASRs would approximate $500,000 in wages per year, which represents less than 1% of the maximum annual lost EndoWrist repair revenue of approximately $71.2 million as shown on Schedule 2.0. In addition, SIS pays a 1% commission for each EndoWrist sale. For purposes of my analysis, I use 2% as variable. |
| Depreciation | $99,593 | 1.42% | $138,413 | 1.29% | $186,331 | 1.85% | $424,337 | 1.53% | Fixed | | Consists of depreciation for larger equipment, machining center, loaner inventory, vehicles and on-site repair vans. |
| Rent | $132,070 | 1.89% | $138,389 | 1.29% | $125,989 | 1.25% | $396,448 | 1.43% | Fixed | | No need for additional space for EndoWrist repairs. |
| Insurance Group | $110,040 | 1.57% | $151,624 | 1.41% | $123,787 | 1.23% | $385,451 | 1.39% | Partially variable | 1.39% | Consists of employee health insurance premiums. For purposes of my analysis, I treat this as variable. |
| Professional Fees | $76,345 | 1.09% | $101,522 | 0.95% | $134,047 | 1.33% | $311,914 | 1.12% | Fixed | | Consists of attorney and accountant fees and one off fees for consultant and training. |
| Insurance | $61,858 | 0.88% | $87,102 | 0.81% | $86,377 | 0.86% | $235,337 | 0.85% | Partially variable | 0.85% | Consists of life insurance, workers comp, general liability insurance premiums. For purposes of my analysis, I treat this as variable. |
| Outside Services | $40,858 | 0.58% | $80,989 | 0.76% | $90,703 | 0.90% | $212,550 | 0.76% | Fixed | | Consists of IT support and temporary employee labor fees. |
| Sales - Bonus | | 0.00% | $100,000 | 0.93% | $87,386 | 0.87% | $187,386 | 0.67% | Variable | 0.67% | |
| Operating Supplies | $28,480 | 0.41% | $86,029 | 0.80% | $62,804 | 0.62% | $177,313 | 0.64% | Variable | 0.64% | Consists of non-inventory production, lab supplies and small tools. |
| Maintenance & Repair | $33,229 | 0.47% | $69,539 | 0.65% | $47,595 | 0.47% | $150,363 | 0.54% | Fixed | | Fire prevention, janitorial cleaning, small repairs, lawn service and HVAC. |
| Office Expense | $50,009 | 0.71% | $59,239 | 0.55% | $27,090 | 0.27% | $136,338 | 0.49% | Partially variable | 0.49% | For purposes of my analysis, I treat this as variable. |
| Real Estate Taxes | $40,773 | 0.58% | $45,735 | 0.43% | $41,176 | 0.41% | $127,684 | 0.46% | Fixed | | SIS would not require additional space. |
| Entertainment | $47,255 | 0.68% | $40,153 | 0.37% | $32,022 | 0.32% | $119,430 | 0.43% | Variable | 0.43% | |
| Payroll Fees | $10,525 | 0.15% | $17,306 | 0.16% | $56,617 | 0.56% | $84,448 | 0.30% | Variable | 0.05% | Calculated as (0.30% Payroll Fees / (7.31% Wages - Sales + 0.67% Sales - Bonus + 4.10% Salaries/Employees + 2.65% Salaries/Officers + 0.10% Salaries Office AZ ) *(2.00% Wages - Sales + 0.20% Salaries/Employees) as I understand this relates to selling, general and administrative wages and bonuses paid. |
| Interest Expense | $34,572 | 0.49% | $19,034 | 0.18% | $9,679 | 0.10% | $63,285 | 0.23% | Fixed | | Consists of interest on the line of credit which would potentially decrease. |
| Sales & Marketing | $1,827 | 0.03% | $325 | 0.00% | $45,346 | 0.45% | $47,498 | 0.17% | Variable | 0.17% | |
| Dues & Subscriptions | $16,747 | 0.24% | $7,796 | 0.07% | $7,387 | 0.07% | $31,930 | 0.11% | Fixed | | |
| Printing & Advertise | $5,572 | 0.08% | $6,252 | 0.06% | $10,994 | 0.11% | $22,818 | 0.08% | Variable | 0.08% | |
| Meals | | 0.00% | | 0.00% | $22,469 | 0.22% | $22,469 | 0.08% | Variable | 0.08% | |
| Misc Expense | | 0.00% | $5,000 | 0.05% | $6,903 | 0.07% | $11,903 | 0.04% | Variable | 0.04% | |
| Licenses & Permits | $6,550 | 0.09% | $2,562 | 0.02% | $511 | 0.01% | $9,623 | 0.03% | Fixed | | |
| Promotional & Gifts | $1,948 | 0.03% | $1,098 | 0.01% | $3,286 | 0.03% | $6,332 | 0.02% | Variable | 0.02% | |
| Postage | $2,278 | 0.03% | $1,613 | 0.02% | $1,878 | 0.02% | $5,769 | 0.02% | Variable | 0.02% | |
| Amortization | $3,644 | 0.05% | $1,302 | 0.01% | | 0.00% | $4,946 | 0.02% | Fixed | | |
| Professional Mktg Fees | | 0.00% | $25 | 0.00% | $73 | 0.00% | $98 | 0.00% | Fixed | | |
| **Total selling** | $1,415,642 | 20.23% | $1,893,403 | 17.66% | $1,899,002 | 18.82% | $5,208,047 | 18.73% | | 6.93% | |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# SIS's Detailed SGA: 2019 - October 2021
## Schedule 15.1

| | [1] 2019 | | [2] 2020 | | [3] 2021 (thru Oct) | | Total | | [4] Fixed / Variable | [4] Variable as a % of revenue | [4] Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Amount | % | Amount | % | Amount | % | Amount | % | | | |
| **General and admin:** | | | | | | | | | | | |
| Salaries/Employees | $267,488 | 3.82% | $356,501 | 3.32% | $516,607 | 5.12% | $1,140,596 | 4.10% | Essentially fixed | 0.20% | Consists of IT, HR/Payroll, Recruiting, Accounting, COO and Account Managers.  If SIS added approximately 2 Account Managers at approximately $50,000 each, or $100,000 in total wages, this would approximate 0.14% of the maximum annual lost EndoWrist repair revenue of approximately $71.2 million as shown on Schedule 2.0.  For purposes of my analysis, I use 0.20% as variable. |
| Payroll Tax FICA | $192,098 | 2.75% | $272,758 | 2.54% | $273,616 | 2.71% | $738,472 | 2.66% | Variable | 0.40% | Calculated as (2.66% Payroll Tax FICA / (7.31% Wages - Sales + 0.67% Sales - Bonus + 4.10% Salaries/Employees + 2.65% Salaries/Officers + 0.10% Salaries Office AZ ) *(2.00% Wages - Sales + 0.20% Salaries/Employees) as I understand this relates to all selling, general and administrative wages and bonuses paid. |
| Salaries/Officers | $254,886 | 3.64% | $291,238 | 2.72% | $190,923 | 1.89% | $737,047 | 2.65% | Fixed | | |
| Travel | $234,380 | 3.35% | $173,676 | 1.62% | $248,886 | 2.47% | $656,942 | 2.36% | Partially variable | 1.00% | Large portion of current expenses is related to technical assistance or educational travel.  For purposes of my analysis, treat this as variable. |
| Telephone | $30,596 | 0.44% | $38,251 | 0.36% | $31,391 | 0.31% | $100,238 | 0.36% | Fixed | | |
| Seminars/Conferences | $49,859 | 0.71% | $10,400 | 0.10% | $23,376 | 0.23% | $83,635 | 0.30% | Fixed | | |
| Payroll Tax - Other | $18,828 | 0.27% | $24,850 | 0.23% | $33,876 | 0.34% | $77,554 | 0.28% | Variable | 0.04% | Calculated as (0.28% Payroll Tax - Other / (7.31% Wages - Sales + 0.67% Sales - Bonus + 4.10% Salaries/Employees + 2.65% Salaries/Officers + 0.10% Salaries Office AZ ) *(2.00% Wages - Sales + 0.20% Salaries/Employees) as I understand this relates to selling, general and administrative wages and bonuses paid. |
| Utilities | $24,226 | 0.35% | $22,605 | 0.21% | $26,145 | 0.26% | $72,976 | 0.26% | Fixed | 0.26% | For purposes of my analysis, I treat this as variable. |
| Bad Debts | $23,805 | 0.34% | $20,000 | 0.19% | $2,164 | 0.02% | $45,969 | 0.17% | Fixed | | |
| Employee Recruitment | $6,892 | 0.10% | $5,287 | 0.05% | $24,267 | 0.24% | $36,446 | 0.13% | Variable | 0.13% | |
| Moving Expense | $8,590 | 0.12% | | 0.00% | $19,669 | 0.20% | $28,259 | 0.10% | Fixed | | |
| Salaries Office AZ | | 0.00% | | 0.00% | $26,428 | 0.26% | $26,428 | 0.10% | Fixed | | Represents one employee. |
| Medical Reimburse | $5,120 | 0.07% | $1,569 | 0.01% | $7,107 | 0.07% | $13,796 | 0.05% | Fixed | | |
| Credit Card Fees | $5,249 | 0.08% | $5,247 | 0.05% | $3,168 | 0.03% | $13,664 | 0.05% | Fixed | | |
| Vehicle | $2,853 | 0.04% | | 0.00% | ($453) | 0.00% | $2,400 | 0.01% | Fixed | | |
| Bank Charges | $777 | 0.01% | $470 | 0.00% | $825 | 0.01% | $2,072 | 0.01% | Fixed | | |
| Sales Tax | ($227) | 0.00% | $1,509 | 0.01% | $7 | 0.00% | $1,289 | 0.00% | Fixed | | |
| **Sub-total G&A expenses** | **$1,125,420** | **16.09%** | **$1,224,361** | **11.42%** | **$1,428,002** | **14.15%** | **$3,777,783** | **13.58%** | | **2.03%** | |
| **Total expenses** | **$2,541,062** | **36.32%** | **$3,117,764** | **29.07%** | **$3,327,004** | **32.97%** | **$8,985,830** | **32.31%** | | **8.96%** | |
| | | | | | | | | | Rounded to | **9.00%** | |

**NOTES / SOURCES:**

Note:  Any minor differences are due to rounding.

[1]  Per SIS320176-188 at 176.
[2]  Per SIS320922-935 at 922.
[3]  Per SIS327629-636 at 629.  Note:  Per discussions with Greg Posdal, SIS's 2021 sales approximated $12.4 million.
[4]  Per discussions with Greg Posdal.

# Intuitive EndoWrist Instrument Average Selling Price, Units and Net Sales Dollars: 2020 - 2025
# Schedule 16.0

| | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | Total |
|---|---|---|---|---|---|---|---|
| **ASP per unit** | | | | | | | |
| [A] da Vinci S/Si | $2,572 | $2,659 | $2,538 | $2,538 | $2,538 | $2,538 | $2,588 |
| [A] da Vinci X/Xi | $2,542 | $2,657 | $2,666 | $2,666 | $2,666 | $2,666 | $2,649 |
| [A] Total ASP per unit | $2,546 | $2,658 | $2,663 | $2,663 | $2,663 | $2,663 | $2,646 |
| **Units** | | | | | | | |
| [B] da Vinci S/Si | ■■■ | ■■■ | ■■■ | 3,839 | 1,928 | 1,077 | 90,439 |
| [B] da Vinci X/Xi | ■■■ | ■■■ | ■■■ | 422,719 | 455,982 | 437,186 | 2,327,724 |
| [B] Total units | ■■■ | ■■■ | ■■■ | 426,558 | 457,910 | 438,263 | 2,418,163 |
| **Net sales dollars** | | | | | | | |
| [C] da Vinci S/Si | ■■■ | ■■■ | ■■■ | $9,743,382 | $4,893,264 | $2,733,426 | $234,046,893 |
| [C] da Vinci X/Xi | ■■■ | ■■■ | ■■■ | $1,126,968,854 | $1,215,648,012 | $1,165,537,876 | $6,165,398,677 |
| [C] Total net sales dollars | ■■■ | ■■■ | ■■■ | $1,136,712,236 | $1,220,541,276 | $1,168,271,302 | $6,399,445,570 |

**NOTES / SOURCES:**

Note:  Any minor differences are due to rounding.

[A]  Per Schedule 13.0.  ASP per unit after June 2022 is based on Intuitive ASP through June 2022.  Total ASP is calculated based on the amounts herein.

[B]  Per Schedule 6.0.

[C]  = [A] * [B]

# Lanham Act Based on Scenario 2 - Unenforceable Contracts (2 Year X/Xi Delay): 2020 - 2025
# Schedule 16.1

| | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | Total |
|---|---|---|---|---|---|---|---|
| **Intuitive's ASP per unit** | | | | | | | |
| [A] da Vinci S/Si | $2,572 | $2,659 | $2,538 | $2,538 | $2,538 | $2,538 | $2,594 |
| [A] da Vinci X/Xi | $2,542 | $2,657 | $2,666 | $2,666 | $2,666 | $2,666 | $2,666 |
| **Lost EndoWrist repair units** | | | | | | | |
| [B] da Vinci S/Si | 1,321 | 1,864 | 956 | 447 | 177 | 36 | 4,801 |
| [B] da Vinci X/Xi | 0 | 0 | 9,114 | 35,153 | 41,711 | 14,542 | 100,520 |
| [B] Total units | 1,321 | 1,864 | 10,070 | 35,600 | 41,888 | 14,578 | 105,321 |
| **Net sales dollars (undiscounted)** | | | | | | | |
| [C] da Vinci S/Si | $3,397,612 | $4,956,376 | $2,426,328 | $1,134,486 | $449,226 | $91,368 | $12,455,396 |
| [C] da Vinci X/Xi | $0 | $0 | $24,297,924 | $93,717,898 | $111,201,526 | $38,768,972 | $267,986,320 |
| [C] Total net sales dollars | $3,397,612 | $4,956,376 | $26,724,252 | $94,852,384 | $111,650,752 | $38,860,340 | $280,441,716 |
| [D] Discount % | | | | | 12% | 12% | |
| [E] Discount period | | | | | 0.5 | 1.5 | |
| [F] Discount factor | 1.00000 | 1.00000 | 1.00000 | 1.00000 | 0.94491 | 0.84367 | |
| [G] Discounted net sales dollars | $3,397,612 | $4,956,376 | $26,724,252 | $94,852,384 | $105,499,912 | $32,785,303 | $268,215,839 |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Lanham Act Based on Scenario 2 - Unenforceable Contracts (2 Year X/Xi Delay): 2020 - 2025
# Schedule 16.1

**NOTES / SOURCES:**

Note:  Any minor differences are due to rounding.

**[A]**  Per Schedule 13.0.  ASP per unit after June 2022 is based on Intuitive ASP through June 2022.  Total ASP is calculated based on the amounts herein.

**[B]**  Per Schedule 4.2.

**[C]**  = **[A]** * **[B]**

**[D]**  For the GICS 35101010, Health Care Equipment & Supplies, Duff and Phelps - Cost of Capital Composite, September 30, 2022, the average SIC/GICS Composite WACC (weighted average cost of capital) is 9.2% and median WACC is 8.9%.  For the small composite, the WACC is 11.1% to 11.2% (CRSP Decile).  For purposes of my analysis I use 12%, which is conservative.  Note:  The projections after 2022 do not include growth, therefore the discount rate would likely be less.

**[E]**  Calculated using the mid-year convention to January 1, 2024, the approximate date of trial.

**[F]**  = ( 1 + **[H]** ) ^ - **[I]**, rounded to 5 decimals.

**[G]**  = Net sales dollars (undiscounted) per **[C]** * **[F]**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Lanham Act Based on Scenario 2 - Unenforceable Contracts (1 Year X/Xi Delay): 2020 - 2025
# Schedule 16.2

|  |  | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | Total |
|---|---|---|---|---|---|---|---|---|
| | **Intuitive's ASP per unit** | | | | | | | |
| [A] | da Vinci S/Si | $2,572 | $2,659 | $2,538 | $2,538 | $2,538 | $2,538 | $2,594 |
| [A] | da Vinci X/Xi | $2,542 | $2,657 | $2,666 | $2,666 | $2,666 | $2,666 | $2,665 |
| | **Lost EndoWrist repair units** | | | | | | | |
| [B] | da Vinci S/Si | 1,321 | 1,864 | 956 | 447 | 177 | 36 | 4,801 |
| [B] | da Vinci X/Xi | 0 | 8,646 | 30,379 | 49,215 | 41,711 | 14,542 | 144,493 |
| [B] | Total units | 1,321 | 10,510 | 31,335 | 49,662 | 41,888 | 14,578 | 149,294 |
| | **Net sales dollars (undiscounted)** | | | | | | | |
| [C] | da Vinci S/Si | $3,397,612 | $4,956,376 | $2,426,328 | $1,134,486 | $449,226 | $91,368 | $12,455,396 |
| [C] | da Vinci X/Xi | $0 | $22,972,422 | $80,990,414 | $131,207,190 | $111,201,526 | $38,768,972 | $385,140,524 |
| [C] | Total net sales dollars | $3,397,612 | $27,928,798 | $83,416,742 | $132,341,676 | $111,650,752 | $38,860,340 | $397,595,920 |
| [D] | Discount % | | | | | 12% | 12% | |
| [E] | Discount period | | | | | 0.5 | 1.5 | |
| [F] | Discount factor | 1.00000 | 1.00000 | 1.00000 | 1.00000 | 0.94491 | 0.84367 | |
| [G] | Discounted net sales dollars | **$3,397,612** | **$27,928,798** | **$83,416,742** | **$132,341,676** | **$105,499,912** | **$32,785,303** | **$385,370,043** |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Lanham Act Based on Scenario 2 - Unenforceable Contracts (1 Year X/Xi Delay): 2020 - 2025
# Schedule 16.2

**NOTES / SOURCES:**

Note:  Any minor differences are due to rounding.

**[A]**  Per Schedule 13.0.  ASP per unit after June 2022 is based on Intuitive ASP through June 2022.  Total ASP is calculated based on the amounts herein.

**[B]**  Per Schedule 4.5.

**[C]**  = **[A]** * **[B]**

**[D]**  For the GICS 35101010, Health Care Equipment & Supplies, Duff and Phelps - Cost of Capital Composite, September 30, 2022, the average SIC/GICS Composite WACC (weighted average cost of capital) is 9.2% and median WACC is 8.9%.  For the small composite, the WACC is 11.1% to 11.2% (CRSP Decile).  For purposes of my analysis I use 12%, which is conservative.  Note:  The projections after 2022 do not include growth, therefore the discount rate would likely be less.

**[E]**  Calculated using the mid-year convention to January 1, 2024, the approximate date of trial.

**[F]**  = ( 1 + **[H]** ) ^ - **[I]**, rounded to 5 decimals.

**[G]**  = Net sales dollars (undiscounted) per **[C]** * **[F]**

**EXHIBIT 5**

**to**

**PAUL D. BRACHMAN DECLARATION IN SUPPORT OF
DEFENDANT'S MOTION IN LIMINE NO. 2
TO EXCLUDE DEUTSCHE BANK ANALYST REPORTS
AND RELATED TESTIMONY**

1

2  UNITED STATES DISTRICT COURT

3  FOR THE NORTHERN DISTRICT OF CALIFORNIA

4  SAN FRANCISCO DIVISION

5  Case No: 3:21-cv-03496VC

6  - - - - - - - - - - - - - - - - - - - -x

7  SURGICAL INSTRUMENT SERVICE COMPANY, INC.,

8                    Plaintiff,

9      -against-

10  INTUITIVE SURGICAL, INC.,

11                    Defendant.

12  - - - - - - - - - - - - - - - - - - - -x

13                Virtual Zoom Deposition

14                March 20, 2023

                  9:00 a.m.

15

16

17    VIRTUAL VIDEO DEPOSITION of RUSSELL LAMB,

18  Ph.D., in the above-entitled action, held at

19  the above time and place, taken before Jeremy

20  Richman, a Shorthand Reporter and Notary

21  Public of the State of New York, pursuant to

22  the Federal Rules of Civil Procedure, and

23  stipulations between Counsel.

24

25              *      *      *

                                        Page 1

1
2  APPEARANCES:
3
4  MCCAULLEY LAW GROUP
          Attorneys for Plaintiff
5      180 North Wabash Avenue, Suite 601
       Chicago, Illinois 60601
6
   BY:  RICHARD MCCAULLEY, ESQ.
7       STEPHEN SHERRY, ESQ.
8
9  COVINGTON & BURLING LLP
          Attorneys for Defendant
10     850 Tenth Street, NW
       Washington, D.C. 20001
11  BY:  ASHLEY BASS, ESQ.
          -and-
12     3000 El Camino Real 5
       Palo Alto Square
13     Paul Alto Square, California 94306
   BY:  PAUL STRAUCH, ESQ.
14
15  PRESENT:
    CHELSEA GILCHRIST, Videographer
16
           *   *   *
17
18
19
20
21
22
23
24
25

Page 2

1              R. LAMB
2      THE VIDEOGRAPHER:  Good        09:03:47
3  morning.  We are going on the       09:03:49
4  record at 9:03 a.m. on Monday,      09:03:50
5  March 20, 2023.  Please note that    09:03:54
6  this deposition is being           09:03:57
7  conducted virtually.  Quality of recording  09:03:59
8  depends on the quality of camera    09:04:02
9  and internet connection of         09:04:03
10  participants.  What is seen from    09:04:05
11  the witness and what is heard on    09:04:07
12  screen is what will be recorded.    09:04:10
13  Audio and video recording will      09:04:12
14  continue to take place unless all   09:04:12
15  parties agree to go off the record.  09:04:12
16      This is media unit one of the   09:04:12
17  video recorded deposition of       09:04:18
18  Dr. Russell Lamb in the matter of   09:04:18
19  Surgical Instrument Service        09:04:25
20  Company, Incorporated versus       09:04:25
21  Intuitive Surgical, Incorporated,   09:04:27
22  filed in the United States District  09:04:30
23  Court, northern district of        09:04:33
24  California, district of San        09:04:34
25  Francisco, case number           09:04:37

Page 3

1              R. LAMB
2  3:21-cv-03496VC.               09:04:37
3      This deposition is being       09:04:44
4  conducted remotely using virtual    09:04:45
5  technology.  My name is Chelsea     09:04:47
6  Gilchrist, representing Veritext    09:04:51
7  Legal Solutions, and I am the       09:04:54
8  videographer.  The court reporter   09:04:55
9  is Jeremy Richman from the firm     09:04:55
10  Veritext Legal Solutions.  I am not  09:04:57
11  authorized to administer an oath, I  09:05:00
12  am not related to any party in this  09:05:03
13  action, nor am I financially       09:05:06
14  interested in the outcome.         09:05:09
15      All appearances will be noted   09:05:12
16  on the stenographic record.  Will   09:05:14
17  the court reporter please swear in  09:05:16
18  the witness.                    09:05:17
19      RUSSELL LAMB, having been      09:05:22
20  called as a witness, having first   09:05:22
21  been duly sworn by a Notary Public   09:05:22
22  (Jeremy Richman) of the State of    09:05:22
23  New York, was examined and         09:05:22
24  testified as follows:            09:05:23
25      EXAMINATION BY               09:05:23

Page 4

1              R. LAMB
2      MS. BASS:                   09:05:23
3  Q.   Good morning, Dr. Lamb.       09:05:29
4  A.   Good morning.               09:05:32
5  Q.   Could you please state your    09:05:32
6  full name for the record?          09:05:36
7  A.   Russell Lamb.               09:05:37
8  Q.   Is there any reason you       09:05:38
9  cannot testify truthfully and       09:05:40
10  accurately today?               09:05:42
11  A.   No.                      09:05:43
12  Q.   So I would like to go over    09:05:43
13  just a few ground rules before we get  09:05:47
14  started here.  If you don't understand  09:05:49
15  any of my questions today, feel free  09:05:51
16  just to let me know and I'll try to  09:05:52
17  clarify them, okay?              09:05:55
18  A.   Yes.                     09:05:56
19  Q.   The deposition is being      09:05:57
20  recorded, and everything we say is   09:05:59
21  being written down by a court reporter.  09:06:02
22  You understand that, correct?       09:06:04
23  A.   Yes.                     09:06:05
24  Q.   So you'll need to give verbal  09:06:05
25  responses that can be transcribed,   09:06:07

Page 5

2 (Pages 2 - 5)

R. LAMB

1    R. LAMB
2    time to review the paragraph.          10:46:42
3        A.  Okay, yes, I do.              10:46:53
4        Q.  Okay.  And so it seems to be   10:46:54
5    that you're citing this testimony from   10:47:00
6    the notion that these folks couldn't   10:47:03
7    discern any differences between, know,   10:47:05
8    for example, Rebotix repaired           10:47:09
9    EndoWrists and the EndoWrists that were   10:47:10
10   from Intuitive; is that right?          10:47:13
11       A.  Well, you're paraphrasing,      10:47:17
12   and I want to be careful paraphrasing,   10:47:20
13   so I just incorporate my reference to   10:47:23
14   statements that are there.  They say     10:47:26
15   what they say.                          10:47:27
16       But there is a statement with       10:47:28
17   respect to, very similar to what you    10:47:30
18   said from Mr. Harrich on page 81 in     10:47:34
19   paragraph 136.  Mr. McDonald's          10:47:39
20   statement is over on page 82 towards    10:47:45
21   the end of the paragraph, and his       10:47:47
22   statement was that surgeons "couldn't   10:47:49
23   tell any difference between the         10:47:53
24   repaired EndoWrist surgical instruments  10:47:54
25   and other instruments that is came      10:47:56

Page 86

1    R. LAMB
2    directly from Intuitive."  And I just,   10:47:57
3    I would rather let the English plain     10:48:01
4    words speak for themselves.             10:48:03
5        Q.  Okay.  So then my question      10:48:10
6    would be, have you reviewed any          10:48:13
7    evidence that is different from what     10:48:16
8    Mr. Harrich and Mr. McDonald testified   10:48:20
9    to, meaning have you reviewed any, you   10:48:24
10   know, testimony from hospitals or        10:48:26
11   doctors that express concerns about the  10:48:28
12   EndoWrists that were serviced by third   10:48:34
13   parties?                                10:48:37
14       A.  I don't recall whether I've      10:48:37
15   seen that evidence or not.  There may    10:48:40
16   be such evidence in the record.  It      10:48:43
17   wouldn't change the opinions or          10:48:46
18   conclusions that I've reached.  And let  10:48:47
19   me be very clear about those opinions    10:48:49
20   or conclusions, which are with respect   10:48:51
21   to the relevant antitrust product and    10:48:53
22   geographic markets in which the Da       10:48:55
23   Vinci robot is sold; that is, the        10:48:59
24   market for MIST surgical robots in the   10:49:02
25   United States, or the relevant           10:49:05

Page 87

1    R. LAMB
2    antitrust product in geographic markets   10:49:08
3    in which the EndoWrist instruments are    10:49:10
4    sold, that is the market for repair and   10:49:12
5    replacement of EndoWrist instruments.     10:49:16
6    Or the anticompetitive conduct arising    10:49:18
7    from the alleged misconduct here.         10:49:21
8        The fact that other economic         10:49:24
9    agents that operate in those markets     10:49:30
10   may decide that they don't want to       10:49:34
11   purchase EndoWrist's repair or           10:49:37
12   refurbishment reprocessing services,     10:49:44
13   but would rather purchase new            10:49:47
14   replacement EndoWrist instruments,       10:49:49
15   doesn't change the fact that they are    10:49:50
16   both in the same relevant antitrust      10:49:52
17   product market and they are in fact      10:49:55
18   economic substitutes for each other,     10:49:58
19   which is the scope of my opinion.        10:49:59
20       And so, you know, there's a         10:50:01
21   saying in economics that markets        10:50:06
22   operate because of differences of       10:50:08
23   opinion.  In other words, if all        10:50:11
24   consumers and all agents were the same,  10:50:14
25   it would be impossible to have a        10:50:16

Page 88

1    R. LAMB
2    market, because everybody would want to   10:50:18
3    do the same thing, buy or sell at the    10:50:21
4    same time.  So the fact that economic    10:50:23
5    agents have different views doesn't      10:50:25
6    change the fact that the relevant        10:50:28
7    antitrust product market that I defined  10:50:33
8    is correct.                             10:50:34
9        MS. BASS:  We've been going         10:50:41
10   about an hour, can we take a break?      10:50:42
11       THE WITNESS:  Sure, do you          10:50:45
12   want to take 10 minutes, Counselor?     10:50:46
13   Just so I know.                          10:50:48
14       MS. BASS:  Let's go off the         10:50:48
15   record.                                 10:50:50
16       THE VIDEOGRAPHER:  We are           10:50:50
17   going off the record, the time is       10:50:51
18   10:50 a.m.                              10:50:53
19       (Recess.)                           10:50:56
20       THE VIDEOGRAPHER:  We are           11:03:45
21   going back on the record.  The time     11:03:47
22   is 11:03 a.m.                           11:03:49
23       Q.  Dr. Lamb, we were talking       11:03:50
24   about the Deutsche Bank report before    11:03:55
25   we broke, and I think you actually cite  11:03:58

Page 89

23 (Pages 86 - 89)

R. LAMB

1
2    two Deutsche Bank reports in your        11:04:02
3    report. Those were written by a man      11:04:04
4    named Emron Zafar. Does that sound       11:04:09
5    familiar to you?                         11:04:17
6        A.   First, I'm trying to find the   11:04:17
7    report and put it in front of my eyes.   11:04:19
8    There we go. I don't recall the name     11:04:23
9    without looking at the report. I don't   11:04:25
10   believe I give the name in my expert     11:04:33
11   report, but it's possible.               11:04:34
12       Just so the record is clear          11:04:37
13   about how I view the reports is          11:04:39
14   whoever's name is attached as an author  11:04:42
15   is secondary, to me, to the imprimatur   11:04:45
16   of Deutsche Bank. That is because        11:04:51
17   they're the ones that are offering       11:04:54
18   investment advice and have some other    11:04:56
19   legal obligations. But if you            11:04:58
20   represent that's the name of the person  11:05:00
21   who's listed as author, I'll accept      11:05:02
22   that.                                    11:05:04
23       Q.   Okay, thank you. Were you       11:05:04
24   aware that Mr. Zafar was deposed in      11:05:06
25   this case?                               11:05:08

Page 90

R. LAMB

1
2    A.   I was not.                          11:05:09
3        Q.   His testimony wasn't listed     11:05:10
4    on your materials relied upon, so I      11:05:13
5    just wanted to check.                    11:05:15
6        A.   No, I don't believe it was.     11:05:17
7        Q.   Okay, that was going to be my   11:05:20
8    next question. So I assume you haven't   11:05:21
9    reviewed his deposition transcript,      11:05:23
10   correct?                                 11:05:26
11       A.   No.                             11:05:27
12       Q.   If you could look at            11:05:27
13   paragraph 55 of your report.            11:05:38
14       A.   Paragraph 55?                   11:05:43
15       Q.   Yeah, 55.                       11:05:44
16       A.   Okay, give me a second.         11:05:48
17   Okay.                                    11:06:11
18       Q.   Okay, so towards the end of     11:06:11
19   that paragraph there's a sentence that   11:06:13
20   says, Furthermore, Deutsche Bank         11:06:16
21   estimated that once repairs of          11:06:20
22   EndoWrist instruments used with model   11:06:24
23   X/Xi Da Vinci robots become available,  11:06:27
24   "Intuitive's top line exposure will     11:06:34
25   increase dramatically - rendering a     11:06:38

Page 91

R. LAMB

1
2    majority (approximately 58 percent) of  11:06:42
3    segment sales at risk of competitive    11:06:47
4    pressures."                             11:06:52
5        Do you see that sentence?           11:06:53
6        A.   I do.                          11:06:54
7        Q.   And my question for you is if  11:06:55
8    you recall how Deutsche reached that    11:06:58
9    58 percent number.                      11:07:04
10       A.   I would have to go back and     11:07:07
11   look at the document. I don't recall    11:07:10
12   as I sit here today.                    11:07:11
13       Q.   And do you recall, at the      11:07:12
14   time that you saw the document, if you  11:07:13
15   tried to do any sort of checking of the 11:07:15
16   methodology of Deutsche Bank, if that   11:07:21
17   makes sense?                            11:07:23
18       A.   Typically, it wouldn't be      11:07:24
19   possible to check the methodology,      11:07:25
20   because they're not going to disclose   11:07:27
21   the methodology. They'll just disclose  11:07:28
22   the results. They wouldn't want to      11:07:31
23   give their competitors an insight into  11:07:34
24   how they reached opinions about numbers 11:07:37
25   like that.                              11:07:39

Page 92

R. LAMB

1
2        So I doubt it would be              11:07:40
3    possible from the document to check the 11:07:41
4    methodology. It's the number or the    11:07:43
5    opinion. And I just note one thing I    11:07:44
6    want to say about the Deutsche Bank     11:07:48
7    reports. You asked about a deposition   11:07:50
8    from the author of the reports, and I   11:07:51
9    note that at the time that Deutsche     11:07:54
10   Bank wrote its analyst report, its      11:07:58
11   incentives would be in a different      11:08:00
12   position than that of a deponent once a 11:08:03
13   lawsuit has been filed which might be,  11:08:08
14   might create a different outcome for    11:08:10
15   the stock of a company that an analyst  11:08:13
16   had offered an opinion about. So I      11:08:17
17   just note that it typically, one of the 11:08:19
18   things that's useful about analyst      11:08:22
19   reports like this, that are historical  11:08:26
20   in nature, is that they predate any     11:08:28
21   litigation that we're looking at in a   11:08:32
22   way that makes the, makes the analysis  11:08:36
23   more objective.                         11:08:41
24       So I haven't seen the               11:08:42
25   deposition, but I just thought of that  11:08:43

Page 93

24 (Pages 90 - 93)

R. LAMB

1     R. LAMB
2  after you answered the prior question,      11:08:46
3  but I want to make sure my answer is      11:08:48
4  clear with respect to that.      11:08:52
5     Q.   Thank you.  So continuing in      11:08:53
6  that paragraph, but going back to the      11:08:54
7  beginning of it.      11:08:55
8     A.   Uh-huh.      11:08:56
9     Q.   There's a sentence here that      11:08:57
10 says, Deutsche Bank further noted that,      11:08:59
11 based on its research, and there's a      11:09:04
12 quote, "FDA action to stymie usage of      11:09:09
13 repaired instruments is highly      11:09:13
14 unlikely," and the sentence continues.      11:09:15
15        And my question for you is if      11:09:19
16 you're, in the course of your opinion,      11:09:23
17 are you relying on Deutsche Bank for      11:09:24
18 what its view of the, kind of,      11:09:26
19 regulatory landscape was with respect      11:09:31
20 to the services offered by the third      11:09:33
21 parties?      11:09:35
22    A.   I think the answer is it's a      11:09:35
23 piece of evidence.  It's one piece of      11:09:48
24 evidence, certainly Mr. Phillips's      11:09:50
25 report is, to me, more dispositive than      11:09:53
                                    Page 94

1     R. LAMB
2  Deutsche Bank's statements.  But      11:09:58
3  they're consistent, I believe, with the      11:10:02
4  views that Mr. Phillips reached.  So,      11:10:04
5  you know, I come back to the same thing      11:10:07
6  I said earlier today.  You could pick      11:10:09
7  that piece of evidence out of my      11:10:11
8  report, and doing so wouldn't change      11:10:13
9  the opinions or conclusions that I      11:10:16
10 reached.      11:10:20
11        In evaluating the opinion      11:10:20
12 with respect to relevant market here,      11:10:23
13 relevant markets, and the opinions with      11:10:25
14 respect to relevant markets, if that      11:10:27
15 paragraph were removed from my report,      11:10:32
16 I would still reach the same opinion.      11:10:34
17    Q.   And do you have any      11:10:37
18 understanding of how Deutsche Bank      11:10:39
19 reached its ability to have this      11:10:42
20 statement in the report that FDA action      11:10:45
21 to stymie usage of repaired instruments      11:10:48
22 is highly unlikely?      11:10:51
23    A.   I don't have an understanding      11:10:53
24 of how Deutsche Bank operates      11:10:56
25 internally.  It wasn't relevant to      11:10:59
                                    Page 95

1     R. LAMB
2  reaching the opinions or conclusions      11:11:02
3  that I reached.      11:11:04
4     Q.   So for your opinions and      11:11:04
5  conclusions in this case, what role      11:11:07
6  does FDA clearance play in your      11:11:12
7  opinions, so, you know, for example,      11:11:15
8  are you making any assumptions about      11:11:17
9  whether the services of the third      11:11:19
10 parties required FDA clearance?      11:11:22
11        MR. MCCAULLEY:  Objection to      11:11:25
12 form.      11:11:26
13    A.   Am I -- I'm sorry, could you      11:11:26
14 repeat the last sentence in that      11:11:30
15 question?      11:11:32
16    Q.   Sure, are you making any      11:11:32
17 assumptions about whether or not the      11:11:34
18 services of the third parties in      11:11:35
19 resetting EndoWrists required FDA      11:11:38
20 clearance?      11:11:40
21    A.   My understanding is the      11:11:40
22 relevant period here starts in 2019,      11:11:54
23 and continues to the present, so the      11:11:58
24 FDA's regulatory position during the      11:11:59
25 relevant period changed, as you know.      11:12:01
                                    Page 96

1     R. LAMB
2  During a large part of the relevant      11:12:03
3  period, my understanding is there was      11:12:06
4  no FDA conclusion that, to sell the      11:12:06
5  reprocessed, or to provide the repair      11:12:09
6  and refurbishment services and provide      11:12:12
7  the reprocessed EndoWrist instruments,      11:12:15
8  that you needed the FDA clearance, and      11:12:18
9  then later there was.      11:12:21
10        But the fact is that a lot of      11:12:23
11 them were sold by SIS, a lot of the      11:12:25
12 repair and reprocessing, refurbishment      11:12:27
13 services were sold by SIS, And by other      11:12:30
14 third parties.  And so in reaching the      11:12:34
15 opinions or conclusions I've reached      11:12:37
16 here with respect to relevant market      11:12:39
17 and anticompetitive effects, let me be      11:12:43
18 careful.  The opinions I've reached      11:12:47
19 with respect to relevant markets and      11:12:49
20 the anticompetitive effect of the      11:12:51
21 challenged conduct, the actual history      11:12:54
22 of sales in the marketplace is      11:12:57
23 sufficient to establish that the effect      11:13:01
24 of limiting those sales of repair and      11:13:07
25 refurbishment services would have or      11:13:11
                                    Page 97

25 (Pages 94 - 97)

**EXHIBIT 6**

**to**

**PAUL D. BRACHMAN DECLARATION IN SUPPORT OF
DEFENDANT'S MOTION IN LIMINE NO. 2
TO EXCLUDE DEUTSCHE BANK ANALYST REPORTS
AND RELATED TESTIMONY**

Page 1

1

2   UNITED STATES DISTRICT COURT

3   FOR THE NORTHERN DISTRICT OF CALIFORNIA

4   Case No. 3:21-cv-03825-VC

5   ------------------------------------x

6   IN RE: DA VINCI SURGICAL ROBOT LITIGATION,

7   _____

8   THIS DOCUMENT RELATES TO:

9   ALL CASES

10  ------------------------------------x

11            November 1, 2022

12            12:45 p.m.

13         HIGHLY CONFIDENTIAL

14         Videotaped deposition of IMRON

15  ZAFAR, pursuant to subpoena, before Jineen

16  Pavesi, a Registered Professional

17  Reporter, Registered Merit Reporter,

18  Certified Realtime Reporter and Notary

19  Public of the State of New York, via Zoom,

20  with all other parties in person at Cohen

21  Milstein, 88 Pine Street, New York, New

22  York.

23

24

25

HIGHLY CONFIDENTIAL

Page 2

1
2 A P P E A R A N C E S :
3 COHEN MILSTEIN SELLERS & TOLL PLLC
  88 Pine Street, 14th Floor
4 New York, New York 10005
    Attorneys for Plaintiffs and Proposed
5     Class
  BY:   CHRISTOPHER BATEMAN, ESQ.
6     cbateman@cohenmilstein.com
7
  HALEY GUILIANO LLP
8 116 West Hubbard, Unit 20
  Chicago, Illinois 60654
9    Attorneys for Surgical Instrument
     Service Company
10 BY:   DONNY SAMPORNA, ESQ.
    donny.sampora@ghlaw.com
11     (via telephone)
12
  SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
13 One Manhattan West
  New York, New York 10001
14    Attorneys for Intuitive Surgical,
    Inc.
15 BY:   DOUGLAS DeBAUGH, ESQ.
    douglas.debaugh@skadden.com
16
17 DEUTSCHE BANK AG
  FILIALE NEW YORK LITIGATION & REGULATORY
18 ENFORCEMENT
    1 Columbus Circle
19 New York, New York
     Attorneys for Witness
20 BY: SARAH SCHOENBACK, ESQ.
21
  ALSO PRESENT:
22 ANTON EVANGELISTA, The Video Technician
23
24
25

Page 3

1
2    S T I P U L A T I O N S
3
4    IT IS HEREBY STIPULATED AND AGREED by
5 and between the Attorneys for the
6 respective parties hereto that filing and
7 sealing be and the same are hereby waived.
8    IT IS FURTHER STIPULATED AND AGREED
9 that all objections except as to the form
10 of the question, shall be reserved to the
11 time of the trial.
12    IT IS FURTHER STIPULATED AND AGREED
13 that the within examination may be signed
14 and sworn to before any notary public with
15 the same force and effect as though signed
16 and sworn to before this Court.
17
18
19
20
21
22
23
24
25

Page 4

1
2       THE VIDEO TECHNICIAN: Good
3 afternoon, we are going on the record at
4 12:45 p.m. on November 1st, 2022.
5       Please note that the
6 microphones are sensitive and may pick up
7 whispering and private conversations.
8       Please mute your phones at this
9 time.
10       Audio and video recording will
11 continue to take place unless all parties
12 agree to go off the record.
13       This is media unit 1 of the
14 video recorded deposition of Imron Zafar
15 taken by counsel for plaintiffs in the
16 matter of In re Da Vinci Surgical Robot
17 Antitrust Litigation, filed in the United
18 States District Court for the Northern
19 District of California, Case No.
20 3:21-cv-03825-vc.
21       The location of the deposition
22 is Cohen Milstein Sellers & Toll, 88 Pine
23 Street in New York City.
24       My name is Anton Evangelista
25 representing Veritext and I am the

Page 5

1
2 videographer; the court reporter is Jineen
3 Pavesi from the firm Veritext.
4       I am not authorized to
5 administer an oath, I am not related to
6 any party in this action nor am I
7 financially interested in the outcome.
8       If there are any objections to
9 proceeding, please state them at the time
10 of your appearance; counsel will be noted
11 on the stenographic record.
12       Will the court reporter please
13 swear in the witness and counsel may
14 proceed.
15 I M R O N    Z A F A R,
16 having first been duly sworn by a Notary
17 Public of the State of New York, was
18 examined and testified as follows:
19 EXAMINATION BY
20 MR. BATEMAN:
21    Q.    Thank you, Mr. Zafar, for being
22 here today, my name is Chris Bateman, I am
23 an attorney for the hospital plaintiffs,
24 class plaintiffs in this case, against
25 Intuitive Surgical.

2 (Pages 2 - 5)

HIGHLY CONFIDENTIAL

ZAFAR

1
2  all about today's deposition?
3      A.    No.
4      Q.    Did you do anything to prepare
5  for the deposition today?
6      A.    Beyond, you know, having
7  consultation with Sarah, the attorney
8  accompanying me, just, you know, around
9  what to expect.
10         MS. SCHOENBACH:  You don't need
11  to go into specifics.
12     Q.    That's fine, I don't want you
13  to go into specifics of what
14  communications you had with your counsel,
15  just to clarify.
16         But did you meet with your
17  counsel, Sarah, in preparation for the
18  deposition?
19         THE WITNESS:  Do I need to
20  answer that?
21         MS. SCHOENBACH:  Yes.
22     A.    Virtually, telephonically, but
23  not in person.
24     Q.    Okay.
25     A.    Except for a few minutes before

ZAFAR

1
2  this meeting today.
3      Q.    Again, without getting into the
4  contents of what you discussed, did you
5  review any documents in preparation for
6  the deposition that refreshed your
7  recollection of events?
8      A.    I personally did not review any
9  documents.
10         The only thing I did was I
11  looked at my log of research reports in
12  terms of getting the information to my
13  attorney, but, no, I did not read any
14  documents, no.
15     Q.    Who is your current employer?
16     A.    Deutsche Bank.
17     Q.    What is Deutsche Bank?
18     A.    Deutsche Bank is a global
19  investment bank with businesses across the
20  board in financial services.
21         I work in the equity research
22  division, so I provide institutional
23  investors with investment research on
24  publicly-traded companies and, you know,
25  markets in which these public companies

ZAFAR

1
2  compete.
3         I focus specifically on medical
4  technology, as I mentioned earlier.
5      Q.    What was the last part, you
6  focus on --
7      A.    Medical technology, medical
8  devices, supplies, equipment.
9      Q.    What's your title at Deutsche
10  Bank currently?
11     A.    I am an equity research analyst
12  with the corporate title of
13  vice-president.
14     Q.    How long have you held that
15  position?
16     A.    My current position at Deutsche
17  Bank?
18     Q.    Yes.
19     A.    You know, I'm going to --  I
20  can give you rough date ranges, but I
21  don't remember exact dates off the top of
22  my head to be honest.
23         But I believe I just
24  celebrated, if I'm not mistaken, my third
25  anniversary at DB.

ZAFAR

1
2      Q.    In those three or so years,
3  have you had that same title of equity
4  research analyst the whole time?
5      A.    Yes.
6      Q.    Have you been a vice-president
7  that whole time?
8      A.    Yes.
9      Q.    What are your responsibilities
10  --  well, withdrawn.
11         I think you said earlier that
12  you provide institutional investors with
13  research.
14         What kind of research do you
15  provide?
16     A.    That's a broad question.
17         We kind of operate under the
18  mosaic theory, so any intelligence about
19  the healthcare market broadly and then,
20  you know, whether it's Medicare
21  reimbursement policy, FDA approval
22  pathways, things like that, all the way
23  down to quantifying patient populations
24  for a certain disease group and therefore
25  addressable market for certain therapies

4 (Pages 10 - 13)

HIGHLY CONFIDENTIAL

Page 14

ZAFAR

1
2 and devices.
3        And then following down further
4 to mostly focused on public companies that
5 compete in those categories; again, the
6 gamut of implantable devices, commoditized
7 supplies like syringes to imaging
8 equipment to surgical robotics and
9 surgical instruments, and, you know, in
10 addition to the companies formally
11 covered, we obviously keep abreast of the
12 competitive landscape, emerging
13 technologies that would affect the profile
14 and stock performance of companies that I
15 do cover.
16        So kind of pretty broad, what
17 that entails is pretty broad, I would say.
18    Q.    You said that you focus on
19 public companies.
20        Has your focus in your three
21 years at Deutsche Bank, your current
22 employment at Deutsche Bank, has your
23 focus been on U.S. companies?
24    A.    Has my focus -- directly
25 speaking, yes.

Page 15

ZAFAR

1
2        So the way the division of
3 labor works at our firm is we have --
4 yes, my team focuses on officially I think
5 North America broadly, but practically,
6 yes, all of our companies are United
7 States-based.
8        With one exception; Medtronic I
9 believe is officially domiciled in
10 Ireland, it's a P.L.C., they did a --
11 whatever, but I believe with that
12 exception, to my knowledge, they are all
13 U.S. incorporated.
14    Q.    You mentioned surgical robotics
15 as one area that you have covered; what do
16 you mean by surgical robotics?
17    A.    Surgical robotics are
18 technology platforms that assist a surgeon
19 in performing surgeries, soft tissue
20 surgeries and orthopedic surgeries, less
21 invasively.
22        So being able to do, for
23 example, a hysterectomy without making a
24 huge incision in the abdomen, you can do
25 it with, you know, 2 centimeter, a few

Page 16

ZAFAR

1
2 centimeter incisions instead, therefore
3 the obvious benefits of recovery,
4 cosmesis, are better.
5    Q.    You also mentioned surgical
6 instruments earlier.
7        What types of surgical
8 instruments have you covered?
9    A.    Such a broad term, but by
10 surgical instruments that could mean
11 conventional laparoscopic tools, scalpels,
12 vessel sealers, endoscopic staplers,
13 intravascular imaging, navigation, things
14 like that.
15    Q.    For soft tissue minimally
16 invasive robotic surgery, what companies
17 have you covered in that area?
18    A.    Well, there's, you know, really
19 only one company, which is Intuitive
20 Surgical and they have been a monopolist
21 in that space, more or less.
22        There is surgical robotics,
23 people use that term liberally and there
24 are some companies that -- consider
25 themselves robotic companies, I've done

Page 17

ZAFAR

1
2 very little work on those, so they're not
3 really relevant in this conversation, a
4 company like Transenterix that I've looked
5 at very superficially, couldn't tell you
6 much about it at all.
7    Q.    You said there is really only
8 one company and that's a bit of a
9 monopolist and that company is Intuitive
10 Surgical?
11        MR. DeBAUGH:  Objection to
12 form.
13    A.    That is correct and there are
14 other -- well, I'm talking about to date.
15        There is actually a company
16 Medtronic who is doing the requisite
17 clinical and regulatory work right now in
18 the U.S. to garner FDA approval, so they
19 are in development stage.
20        They do have regulatory
21 approvals in Europe, but de minimis work
22 at this point.
23    Q.    What did you mean when you said
24 Intuitive Surgical has been a monopolist
25 in this situation?

5 (Pages 14 - 17)

HIGHLY CONFIDENTIAL

Page 18

ZAFAR

1
2       MR. DeBAUGH:  Objection to the
3  form.
4       A.    In the literal sense of the
5  word, meaning they're the only game in
6  town.
7       Q.    I just want to talk about your
8  educational experience briefly.
9             What's your highest level of
10 education?
11      A.    I have a bachelor of arts.
12      Q.    Where was that from?
13      A.    Amherst College.
14      Q.    When did you graduate from
15 Amherst?
16      A.    1999.
17      Q.    Can you walk me through your
18 employment history since you received that
19 B.A. just briefly.
20      A.    Sure.
21            I am going to not be able to
22 give you specific date ranges because I
23 don't remember offhand, but I can give you
24 the chronology.
25            So out of college I spent

Page 19

ZAFAR

1
2  roughly a year doing clinical research at
3  Harvard Medical School, Children's
4  Hospital in Boston, after which I moved to
5  New York and got a job in equity research
6  at a firm called DLJ, which soon after my
7  joining was acquired by at the time Credit
8  Suisse First Boston.
9             I left that firm involuntarily
10 due to a broad restructuring, the market
11 downturned because of 9/11, and thereafter
12 started as an associate at Deutsche Bank
13 covering healthcare.
14            A few years later my boss left
15 the firm, which compelled me to pursue an
16 opportunity at Jefferies doing the same
17 role in equity research, after which I
18 moved to Suntrust, Suntrust Robinsonn
19 Humphrey, the bank is now called Truist
20 Securities, for what it's worth, spent a
21 year-and-a-half roughly there, which
22 preceded my current stint at Deutsche
23 Bank.
24      Q.    Got it.
25            Have you been an equity analyst

Page 20

ZAFAR

1
2  throughout all that time since you were at
3  DLJ?
4       A.    Yes, with some gaps between
5  jobs.
6             MR. BATEMAN:  I am going to
7  introduce an exhibit here briefly.
8             I'm introducing what I'm going
9  to mark as Exhibit 111.
10            (Plaintiffs' Exhibit 111,
11 LinkedIn page, was marked for
12 identification, as of this date.)
13      Q.    Mr. Zafar, do you recognize
14 this document?
15      A.    I recognize the contents of it,
16 yes.
17      Q.    What is this document?
18      A.    Printout of my LinkedIn page.
19      Q.    Does this look like an accurate
20 copy of your LinkedIn page?
21      A.    Based on a cursory 30-second
22 eyeballing of it, yes.
23      Q.    Feel free to take the time to
24 review the document.
25            (Witness perusing document.)

Page 21

ZAFAR

1
2       A.    Printout pages 1 through 2, to
3  the best of my knowledge, look accurate,
4  dates, et cetera.
5             Page 3, those are Fed, AI, I
6  can't really comment on that.
7       Q.    Sure, let's just focus on pages
8  1 and 2.
9             Is your position at DLJ, is
10 that reflected on here anywhere or no?
11            (Witness perusing document.)
12      A.    It's not, I don't know why.
13            I mean, I told you everything I
14 saw was accurate, but I didn't necessarily
15 say it was comprehensive.
16            That's missing as is my
17 research gig out of college.
18      Q.    How many years of experience do
19 you have as an equity analyst total,
20 approximately?
21      A.    Let's do the math here.
22            It is not shown DLJ, that was,
23 to the best of my knowledge, about a
24 year-and-a-half; 7.2, 7.1, so 9-1/2,
25 14-1/2, 16-1/2; roughly 20 years.

6 (Pages 18 - 21)

HIGHLY CONFIDENTIAL

Page 22

ZAFAR

1
2  Q.    How many years --
3  A.    Hold on; it is actually 18
4  years, to be exact.
5        To the best of my knowledge, 15
6  to 20 years, is what I would say.
7  Q.    Approximately how many years of
8  experience do you have covering the
9  medical device industry as an equity
10 analyst?
11 A.    So the 2003 to 2010 stint at
12 DB, I don't know if this is here, about a
13 year-and-a-half of that was covering
14 nonmedical devices in healthcare, so if I
15 take out a year-and-a-half, you know, a
16 year-and-a-half there, plus my first
17 year -- so three years doing equity
18 research non-medical device, the rest is
19 medical devices.
20       Does that make sense?
21 Q.    Yes, I think so; just doing the
22 math myself, it sounds like you have
23 somewhere between 12 and 17 --
24 A.    Exactly.
25 Q.    -- years of experience

Page 23

ZAFAR

1
2  covering medical device companies as an
3  equity analyst?
4  A.    That is correct.
5  Q.    Is that experience useful to
6  you in analyzing the medical device
7  industry?
8  A.    Of course.
9  Q.    How so?
10 A.    Well, to advance from being an
11 equity research associate to being an
12 equity research analyst with coverage of
13 stocks instead of on a supportive basis,
14 you have to learn how to build financial
15 models, you have to learn, quote/unquote,
16 the science, how these devices work, how
17 these disease states progress, you have to
18 hone your skills on how to write a
19 research report, which is a pretty unique
20 format.
21       You have to learn how to
22 dialogue, interpersonal skills with your
23 clients, which is a significant job, you
24 have to learn how to value companies.
25       But with medical devices

Page 24

ZAFAR

1
2  specifically, you know, it's a dynamic
3  space that's always innovating and you
4  just have to stay up to speed on new
5  clinical data, new clinical trials, new
6  emerging companies that are pursuing these
7  clinical trials and indications.
8        And then looking at kind of the
9  structural things like the macro
10 environment and how that affects hospital
11 spending, for example, you got to look at
12 Medicare reimbursement trends for certain
13 procedures.
14       So I think that gives you a
15 pretty good flavor of what it comprises.
16 Q.    Would you say you developed
17 specialized knowledge in covering the
18 medical device industry?
19       MR. DeBAUGH:  Objection to
20 form.
21 A.    I would wholeheartedly say yes,
22 which is what keeps me employed, this is
23 what I get paid to do, to be an expert on
24 this sector, so I would hope and pray that
25 the answer to that question is yes.

Page 25

ZAFAR

1
2  Q.    Just focusing on the surgical
3  devices industry, would you say that you
4  developed specialized knowledge of that
5  industry?
6        MR. DeBAUGH:  Objection to
7  form.
8  A.    Yes.
9  Q.    Have you developed knowledge of
10 the participants in that industry?
11 A.    Yes.
12 Q.    Have you developed knowledge of
13 the products in that industry?
14 A.    Yes.
15 Q.    Have you developed knowledge of
16 the technologies in that industry?
17 A.    Yes.
18 Q.    Have you developed knowledge of
19 the competitive dynamics in that industry?
20 A.    Yes.
21 Q.    Have you developed knowledge of
22 how to model financial trends in that
23 industry?
24 A.    Yes.
25 Q.    Have you developed knowledge of

7 (Pages 22 - 25)

HIGHLY CONFIDENTIAL

Page 26

ZAFAR

1
2 aspects of FDA regulation in that
3 industry?
4    A.    Yes.
5    Q.    What types of methods do you
6 use as an equity analyst in analyzing
7 companies?
8    A.    Boy, again, going back to the
9 whole mosaic theory concept, anything and
10 everything that I can use as a source to
11 become smarter than my competitors and be
12 most value-added to my clients.
13        That could be going to medical
14 conferences to talk to doctors and learn
15 about new clinical data read-outs, reading
16 up on new technologies, just sort of
17 academically, literally opening up a
18 medical journal and getting smarter,
19 honing my financial skill set.
20        You know, reading -- listening
21 to company public conference calls,
22 interacting with physicians to do my
23 primary due diligence with industry
24 consultants that have expertise in areas
25 relevant to my project at hand.

Page 27

ZAFAR

1
2        Those are the components that
3 come to mind.
4    Q.    Do you interview people
5 sometimes as part of the research you do?
6    A.    Very frequently, yes.
7    Q.    For how many years have you
8 covered Intuitive Surgical as an equity
9 analyst?
10    A.    So this is going to be my best
11 estimate; so I started covering it during
12 my first gig at Deutsche Bank, I would say
13 best guess would be around 2006, so four
14 years, covered it for my guess would
15 be four of the five years at Jefferies, so
16 that's eight, and then I've been covering
17 it for about two-and-a-half years, three
18 years, at DB now.
19        So best guess would be between
20 ten and 12 years in aggregate.
21    Q.    Are you familiar with
22 Intuitive's Da Vinci surgical robots?
23    A.    I am.
24    Q.    What is the Da Vinci, in your
25 understanding?

Page 28

ZAFAR

1
2    A.    Da Vinci is a robotic platform
3 that provides surgical assistance to a
4 soft tissue surgeon in performing surgical
5 procedures across specialties in a less
6 invasive, and this is debateable, more
7 efficacious manner, vis-a-vis outcomes,
8 and then the obvious benefits of cosmesis
9 and blood loss and things like that.
10    Q.    Is it a minimally invasive soft
11 tissue robotic assisted surgery
12 technology, in your understanding?
13        MR. DeBAUGH:  Objection to
14 form.
15    A.    Yes.
16    Q.    And is that the product you had
17 in mind when you said earlier that
18 Intuitive was a monopolist?
19        MR. DeBAUGH:  Objection to the
20 form.
21    A.    Can you repeat the question.
22    Q.    Is the Da Vinci the product you
23 had in mind when you said earlier that
24 Intuitive was a monopolist?
25    A.    Yes.

Page 29

ZAFAR

1
2        MR. DeBAUGH:  Same objection.
3    Q.    I've just handed you a document
4 Bates stamped Restore 00085257, that's
5 just a number in the bottom right that's
6 used in the litigation, and I'm marking
7 this document as Exhibit 112.
8        (Plaintiffs' Exhibit 112, Bates
9 stamped Restore 00085257, was marked for
10 identification, as of this date.)
11    Q.    Do you recognize this document,
12 Mr. Zafar?
13    A.    I do.
14    Q.    It looks like on the first page
15 there is an e-mail at the top from Cliff
16 Parker, it says Restore Robotics at
17 gmail.com, he's sending an e-mail on
18 January 27, 2020, to some other people,
19 including Griffith and Kathryn and Vautrot
20 and kmay at 5485 at gmail.com, the subject
21 says "Forward:  Here is our report from
22 this morning, there is an attachment."
23        And then below that it looks
24 like there is an e-mail from you to Cliff
25 Parker dated Monday, January 27, 2020.

8 (Pages 26 - 29)

HIGHLY CONFIDENTIAL

Page 30

1          ZAFAR
2          Did you send this e-mail to
3 Cliff Parker on January 27, 2020, at 1:36
4 p.m.?
5     A.    I don't specifically recall
6 having done so, but it looks like I did,
7 yes.
8     Q.    It looks like you wrote here,
9 "Apologies for having to run when we were
10 chatting, nonstop client calls on this
11 topic and the madness won't end for
12 another couple of hours.  Talk to you
13 soon."
14          Did you attach this document
15 that's attached here to your e-mail?
16    A.    I did.
17    Q.    What is this document attached?
18    A.    This is a research report that
19 my team and I published on Intuitive
20 Surgical regarding third-party service
21 companies that repair Da Vinci instruments
22 for additional uses in more surgical
23 procedures.
24          This was a culmination of a ton
25 of work that my team and I had done on the

Page 31

1          ZAFAR
2 space and it was an actionable culmination
3 in terms of getting more cautious on the
4 stock.
5     Q.    Is this a report that Deutsche
6 Bank issued?
7     A.    Yes.
8     Q.    Were you sending this report to
9 Mr. Parker?
10    A.    What was the question?
11    Q.    Were you sending this report to
12 Mr. Parker?
13    A.    Again, like I said earlier,
14 that's what it looks like, yeah.
15    Q.    Do you know Cliff Parker?
16    A.    I do.
17    Q.    Who is that?
18    A.    Cliff Parker is the --  he
19 heads up one of these third-party
20 instrument repair companies.
21    Q.    Which company is that?
22    A.    It may have multiple LLC names,
23 but the one that I'm familiar with is
24 Restore Robotics.
25    Q.    Was Restore Robotics a company

Page 32

1          ZAFAR
2 that was seeking to provide third-party
3 repair services for Da Vinci instruments?
4          MS. SCHOENBACH:  Objection to
5 form.
6     A.    Yes.
7     Q.    You said that this report was
8 one that your team and you put together.
9          Who was on your team?
10    A.    So the other --  let me just
11 clarify that.
12          So as a team we publish, you
13 know --  my name along with my two
14 teammate names show up as authors of this
15 report.
16          Mine shows up on top for a
17 reason, because I did the vast majority, I
18 would say 95 percent plus, not saying that
19 self-servingly, but I did almost the
20 entirety of the work on this.
21          Pito Chickering is my boss, he
22 kind of, you know, is my mentor in a lot
23 of ways, so certainly, you know, his input
24 generally in these types of deep dives was
25 a lot more directional than specific, so

Page 33

1          ZAFAR
2 does that answer your question?
3     Q.    You covered Pito; Justin
4 Bowers, I see that name listed here, too,
5 what was his involvement?
6     A.    Our team collectively covers
7 medical technology and we also cover the
8 healthcare provider, so hospitals, surgery
9 centers, et cetera.
10          So those are two distinct
11 verticals within healthcare.
12          I do 0.0 percent of the work on
13 the healthcare provider side; Justin does
14 0.0 work on the medical technology side.
15          Technically we're under the
16 same umbrella under Pito who kind of leads
17 both teams, therefore Justin's name shows
18 up on the report by that association
19 alone, he does not do any work on the
20 medical device part.
21    Q.    Did Justin do any work in
22 connection with this report?
23    A.    Not to my recollection.
24    Q.    Was there anybody else who
25 helped put together this report?

9 (Pages 30 - 33)

HIGHLY CONFIDENTIAL

Page 34

ZAFAR

1
2   A.    No, not to my recollection.
3   Q.    Who wrote the report?
4   A.    I did.
5   Q.    Does this look like the final
6   published version of the report?
7   A.    Based on --  yeah, it looks,
8   yeah, obviously I'm not going to look
9   through --  I have not had a chance to
10  look through it meticulously, but it looks
11  to be the report.
12          Again, with the disadvantage of
13  this being two plus years ago and
14  literally having looked at it for 30
15  seconds, but, yes, it looks like it on
16  that basis.
17  Q.    So in addition to writing this
18  report, did you do research for this
19  report?
20  A.    God, yes.
21          I wasn't trying to be dramatic
22  there.
23  Q.    I am going to introduce another
24  one here.
25          I've just handed you a document

Page 35

ZAFAR

1
2   with Bates No. Intuitive 566055, I skipped
3   the first two zeros, it's marked Exhibit
4   113.
5          (Plaintiffs' Exhibit 113, Bates
6   No. Intuitive 566055, was marked for
7   identification, as of this date.)
8   Q.    Do you recognize this document?
9   A.    I do.
10  Q.    And what is this document?
11  A.    It's another research report we
12  published on this topic of third-party
13  repairs as a followup deeper dive on this
14  topic --  this is a followup report
15  published post our downgrade to reflect
16  additional insights of what we did on the
17  topic.
18  Q.    So was this report focused on
19  Intuitive Surgical's business?
20  A.    Yes.
21  Q.    And was the topic of the
22  third-party instrument repair, did that
23  concern third-party repair of Da Vinci
24  instruments?
25          MR. DeBAUGH:  Objection to

Page 36

ZAFAR

1
2   form.
3   A.    Yes.
4   Q.    What involvement did you have
5   with this report, Exhibit 113, which is
6   dated February 2020?
7   A.    Ditto to what I said about the
8   prior report, I did almost all the work on
9   it, you know, with some editing and
10  guidance on proofreading and editing and
11  things like that, but by and large this
12  was predominantly my work.
13  Q.    By that do you mean did you
14  write it?
15  A.    I wrote it, I had the
16  leadership of, you know, asking the
17  questions in our due diligence calls that
18  we did, for example, and doing the
19  analysis, the analyses, I don't remember
20  if there was quantitative stuff in this
21  one, but, yeah, this work reflects my work
22  for the most part with minor contribution
23  from people.
24  Q.    Does this look like the final
25  version of this report that Deutsche Bank

Page 37

ZAFAR

1
2   issued?
3   A.    I don't see any signs to say
4   otherwise, but, again, based on my
5   ten-second eyeballing of it, yes, it looks
6   familiar.
7   Q.    So taking Exhibits 112 and 113
8   together, the two reports, focusing on the
9   reports, why did Deutsche Bank issue these
10  reports generally?
11  A.    Because Intuitive Surgical is
12  one of the stocks under our coverage and
13  the competitive implications of this, of
14  these emerging third parties, you know,
15  was notable to me.
16          And, you know, given the
17  potential theoretical repercussions for
18  Intuitive and its business model, which
19  relies very heavily on instruments, yeah,
20  I viewed this kind of theme, emerging
21  theme, as being potentially impactful to
22  Intuitive's business and stock price and
23  that is my job, is to, you know, provide
24  intelligence and recommendations around
25  stock price at the end of the day.

10 (Pages 34 - 37)

HIGHLY CONFIDENTIAL

ZAFAR

1
2       If I had to say my job in one
3  sentence, that's what I do, provide stock
4  recommendations.
5       Q.    So the third parties that you
6  mentioned in your answer just now, were
7  those the third parties that were engaging
8  in the Da Vinci instrument repair?
9            MR. DeBAUGH:  Objection to
10  form.
11      A.    Correct.
12      Q.    Who were these reports intended
13  for, generally speaking?
14      A.    Institutional investors, so
15  portfolio managers at mutual funds, hedge
16  funds, et cetera.
17      Q.    Around this time did Deutsche
18  Bank issue company research reports
19  regularly?
20      A.    I don't remember the full of
21  reports, but, again, yes, this specific
22  time period, yes, it's safe to say,
23  yes, that's what we do, we publish
24  regularly and consistently, so, yeah, I
25  would say yes.

ZAFAR

1
2       Again, I'm saying that based on
3  a broader view, I don't know a specific
4  time you're asking about, but, yes,
5  generally speaking.
6       Q.    In terms of the timeline, what
7  I had in mind was the time frame of these
8  reports, when they were published, so
9  January 2020, February 2020, that time
10  frame.
11      A.    Correct.
12      Q.    Okay.
13           Apologies if you said this
14  already, but did you do research for the
15  February 20 report that's Exhibit 113?
16      A.    Did I do research for it, yes.
17      Q.    Do these reports reflect
18  opinions that you reached as a result of
19  your research?
20           MR. DeBAUGH:  Objection to
21  form.
22      A.    What was the question?
23      Q.    Do these reports reflect
24  opinions that you reached as a result of
25  your research?

ZAFAR

1
2            MR. DeBAUGH:  Same objection.
3       A.    Conclusions and opinions, are
4  you using those interchangeably, yes.
5       Q.    Do the reports reflect your
6  genuine beliefs at the times that they
7  were published?
8       A.    Yes.
9       Q.    Does Deutsche Bank strive to
10  make company research reports like these
11  factually accurate?
12      A.    As a rule, yes.
13      Q.    And did you strive to make
14  these reports factually accurate?
15      A.    Yes.
16      Q.    Does Deutsche Bank strive to
17  make the predictions in reports like these
18  accurate?
19      A.    Yes.
20           I don't know if I can speak for
21  my entire firm, but that's my
22  understanding, I should say.
23      Q.    Understood.
24           Did you strive to make the
25  predictions in these two reports accurate?

ZAFAR

1
2       A.    As I always do, yes.
3       Q.    Why is it important to try to
4  make reports like these accurate in terms
5  of their facts and predictions?
6       A.    Because in this business your
7  reputation and credibility is your
8  livelihood; if investors can't trust you,
9  if you have, you know, compromised
10  credibility, if you've published something
11  that's erroneous, we all make human
12  errors, you know, in cases, you would
13  issue a correction, but, yes, to the best
14  of my ability, every report that I've ever
15  published is factually correct to the best
16  of my ability and I make that attestation
17  every time I submit a report to publish.
18      Q.    Just focusing on the January 27
19  report, that's Exhibit 112, was that
20  report created around the time that you
21  did the research for that report?
22      A.    I would think so, but I don't
23  remember what the chronology was, but,
24  yes, naturally the work underlying the
25  report would have preceded the report

HIGHLY CONFIDENTIAL

Page 42

ZAFAR

1
2 itself.
3      Q.     Was the report created around
4 the time that you reached the conclusions
5 that went into it?
6      A.     To the best of our ability; we
7 cover other stocks and have other
8 responsibilities and projects going on,
9 so, yes, we put it out as quickly as was
10 practically possible.
11     Q.     With Exhibit 113, the February
12 20 report, was that report created around
13 the time that you did the research for
14 that report?
15     A.     I don't understand the
16 question.
17     Q.     It is a kind of odd question.
18            Was this report issued shortly
19 after you did the research that went into
20 it?
21     A.     Yes.
22     Q.     And was it issued shortly after
23 you reached the conclusions that are
24 reflected in it?
25     A.     Yeah.

Page 43

ZAFAR

1
2      Q.     Were these reports kept in the
3 ordinary course of Deutsche Bank's
4 business, copies of these reports?
5            MS. SCHOENBACH:  Objection,
6 speculation, not based on the document in
7 front of us.
8      Q.     You can answer to the best of
9 your ability.
10     A.     I don't even understand the
11 question.
12     Q.     Would Deutsche Bank keep
13 reports like these, copies of these
14 reports that it issued, would it keep
15 those in the ordinary course of its
16 business?
17     A.     Do you mean like hard copies
18 laying around, I don't know what you mean.
19     Q.     Any copies, electronic or
20 otherwise.
21     A.     We have a research portal
22 on-line which archives all of our research
23 reports for access by, you know, both
24 internally and by clients, so, yes, in
25 that form, in that context, yes.

Page 44

ZAFAR

1
2      Q.     Would these reports have been
3 on that portal?
4      A.     I haven't checked for sure, but
5 I would assume so.
6      Q.     Just focusing on the January 27
7 report, and let me know if you would like
8 to take a break --
9      A.     I will actually take you up on
10 that, it is not urgent, but --
11     Q.     It's a good time to take a
12 break.
13            THE VIDEO TECHNICIAN: Off the
14 record, the time on the video monitor is
15 1:37 p.m.
16            (Recess taken.)
17            THE VIDEO TECHNICIAN: We are
18 now back on the record, the time on the
19 video monitor is 1:51 p.m.
20 BY MR. BATEMAN:
21     Q.     Mr. Zafar, I would like to
22 focus on the January 27 report, which is
23 Exhibit 112.
24            What would you describe as the
25 main conclusion of this report?

Page 45

ZAFAR

1
2            MR. DeBAUGH:  Objection to
3 form.
4      A.     What would I describe as the
5 main conclusion; I think it's best
6 summarized in the title frankly, that
7 we've identified a potential competitive
8 threat to Intuitive's instruments and
9 accessories business and the appropriate
10 action deemed -- the action deemed
11 appropriate in response to that was to
12 move to the sidelines on the stock, i.e.,
13 go from buy to hold.
14     Q.     Just to clarify, was that
15 threat that you identified the threat of
16 third-party repair of Da Vinci
17 instruments?
18            MR. DeBAUGH:  Objection to
19 form.
20     A.     Yes.
21     Q.     You said that the stock was
22 downgraded to hold in conjunction with
23 this report.
24            Was that Intuitive stock that
25 Deutsche Bank downgraded?

12 (Pages 42 - 45)

HIGHLY CONFIDENTIAL

Page 78

1          ZAFAR
2     Q.    And the supply chain
3  executives, am I right did you interview
4  supply chain executives in connection with
5  this report too?
6     A.    Where are you?
7     Q.    It's just mentioned in the
8  second paragraph there on that same page.
9     A.    I don't recall specifically
10 with respect to this report, but, yes,
11 that would make sense.
12    Q.    Did you speak with people from
13 hospitals in connection with this report?
14    A.    Non-physician people from
15 hospitals?
16    Q.    Correct.
17    A.    I don't recall whether or not,
18 to be honest, in this context.
19    Q.    Okay.
20          If you look at page 4, there's
21 a paragraph at the end that starts with
22 "proof of concept," do you see that?
23    A.    Yes.
24    Q.    It says, "Favorable Experience
25 Amongst Early Adopters: Based on the

Page 79

1          ZAFAR
2  overall positive feedback we've gotten
3  from early adopters, which, as noted,
4  includes highly reputable hospitals,
5  favorable proof of concept experience
6  could compel more hospitals to consider
7  engaging with third-party suppliers of
8  repaired Da Vinci instruments," does this
9  refresh your recollection of whether you
10 spoke with people from hospitals other
11 than surgeons?
12    A.    It doesn't.
13    Q.    If you go back to page 1,
14 another issue I wanted to ask about.
15          The last paragraph there on
16 that page, it says, "Given the potential
17 impact to its business, not surprisingly
18 Intuitive is pushing back hard against
19 third parties that have now begun engaging
20 in Da Vinci instrument repairs," it goes
21 on to say, "In speaking with Intuitive
22 management, the company posits that device
23 repairing poses a significant risk to
24 patient safety and believes third parties
25 are doing so unlawfully.  We heard

Page 80

1          ZAFAR
2  secondhand accounts from hospitals of
3  Intuitive's commercial team aggressively
4  pushing back, including actions to
5  discontinue supplying products and even
6  taking legal action for these customers'
7  engagement with suppliers of repaired
8  instruments."
9          Do you recall talking with
10 hospitals about Intuitive's push-back on
11 the use of third-party repaired
12 instruments?
13          MR. DeBAUGH:  Objection.
14    A.    Again, are you talking
15 specifically about non-surgeon hospital
16 people, because hospital is a euphemism
17 that could mean surgeons, it could mean
18 CEOs, administrators, purchasing people?
19    Q.    Let's just start with
20 non-surgeons.
21    A.    I don't recall whether or not
22 that was part of this due diligence
23 process, I really don't recall.
24    Q.    Was it your understanding at
25 the time that Intuitive was indeed pushing

Page 81

1          ZAFAR
2  back with its customers against
3  third-party repair of its instruments for
4  Da Vinci?
5          MR. DeBAUGH:  Objection.
6     A.    Yes.
7     Q.    If you go to page 3, there's a
8  part that says, the last paragraph, second
9  sentence in that paragraph says, "Notably
10 Restore management indicated that its
11 facilities are readily scalable so that
12 output of repaired instruments can be
13 expanded fairly quickly should customer
14 demand increase meaningfully over the next
15 couple of years as we anticipate," do you
16 see that part?
17    A.    Yes.
18    Q.    Did you talk with Restore for
19 this report?
20    A.    I talked with Restore in
21 conjunction with this project; whether it
22 was for this specific report or the other
23 one -- actually, yes, yes, just a yes.
24    Q.    Do you recall Restore telling
25 you about its ability to expand its

21 (Pages 78 - 81)

HIGHLY CONFIDENTIAL

Page 82

ZAFAR

1
2 output?
3     A.    Not specifically.
4     MR. DeBAUGH:  Objection, sorry,
5 objection
6         THE WITNESS:  I'm sorry.
7     Q.    Based on the fact that you
8 included this language -- withdrawn.
9         Based on the fact that that
10 sentence is here in this report, do you
11 think that you found that assumption
12 reasonable, that Restore could scale its
13 output and expand it fairly quickly?
14         MR. DeBAUGH:  Objection to
15 form.
16     A.    Yes.
17     Q.    If you go to page 5, the first
18 bullet point there, it says, "Third-party
19 servicing of medical devices has been
20 widespread across the industry for many
21 years, including large segments, like
22 endoscopes and surgical devices," do you
23 see that?
24     A.    Yes.
25     Q.    What was that statement based

Page 83

ZAFAR

1
2 on, to the best of your recollection?
3     A.    That was based on what I know,
4 just knowing the medical technology sector
5 as intimately as I do, that's just a
6 statement of fact to me, you know.
7         Just the truth, you know, in
8 terms of sort of more broadly, as the
9 source indicates, you know, there was a
10 lot of deep dive work that went into
11 looking at FDA documentation and kind of
12 predicate examples, such as, you know,
13 that included endoscopes that can provide
14 insight into --
15         How the FDA has ruled in the
16 past on certain things is always a good
17 reliable indicator of how they're going to
18 handle an emerging situation, because, you
19 know, there's a finite explicit policy and
20 FDA is obviously required to be consistent
21 in its enforcement of standards.
22     Q.    If you go to the next page,
23 page 6, bottom of that page, it says,
24 "Bottom line regarding safety is that
25 despite Intuitive's view on this point,

Page 84

ZAFAR

1
2 any material threat to patient safety
3 would surely have prompted immediate FDA
4 field action to stop their usage, which
5 has not been the case," do you see that?
6     A.    Yes.
7     Q.    By "their usage," that's
8 talking about the usage of third-party
9 repaired Da Vinci instruments?
10     A.    Correct.
11     Q.    What was your basis for
12 concluding that any material threat to
13 patient safety would have prompted this
14 kind of FDA action?
15     A.    Logic, because the FDA monitors
16 these instruments, medical devices is such
17 a highly regulated industry, especially
18 with respect to safety.
19         And if there was any even
20 signal, even inaudible signal, of a safety
21 issue with anything, FDA always errs on
22 the side of caution, and that to me was
23 not evident in this case, hence the
24 statement.
25         To me it is a statement of the

Page 85

ZAFAR

1
2 obvious, but I am a -- I realize I'm
3 saying that as a nerd in the industry, but
4 it's just a truism, the truth.
5         That's just based on what I've
6 seen in other cases, that's just a fact, a
7 statement of fact.
8     Q.    So is this observation based on
9 your experience as an equity analyst in
10 the medical device industry?
11     A.    Yes.
12     Q.    If you look at pages 8 through
13 12, it appears to summarize interviews
14 with three surgeons and two supply chain
15 managers.
16         Take the time to review those,
17 I just want to know if it refreshes your
18 recollection as to who those individuals
19 were or what hospitals they were at.
20         (Witness perusing document.)
21     A.    No, I would talk to literally
22 hundreds of hospitals and surgeons since
23 this report was published, so I can't --
24 I am not going to be able to identify it
25 based on this, a specific doctor or

22 (Pages 82 - 85)

HIGHLY CONFIDENTIAL

Page 86

ZAFAR

1
2 institution.
3    Q.    Do you think that the surgeons
4 and the hospital employees you spoke with
5 were based in the U.S. most likely?
6        MR. DeBAUGH:  Objection.
7    A.    Yes.
8    Q.    Why is that?
9    A.    You're asking to the best of my
10 recollection, I thought.
11    Q.    Yeah, yeah.
12    A.    Because as we've seen in the
13 prior charts, this analysis was focused on
14 the U.S. market.
15    Q.    I'm ready to move on to the
16 other report, but if you want to take a
17 break.
18        MS. SCHOENBACH:  If we can go
19 off the record.
20        MR. BATEMAN:  Yes.
21        THE VIDEO TECHNICIAN: Now off
22 the record, the time on the video monitor
23 is 2:46 p.m.
24        (Recess taken.)
25        THE VIDEO TECHNICIAN: We are

Page 87

ZAFAR

1
2 now back on the record, the time on the
3 video monitor is 2:58 p.m.
4 BY MR. BATEMAN:
5    Q.    Mr. Zafar, I would like to now
6 turn to the February 20 report, Exhibit
7 113.
8        What was the main focus of this
9 report?
10    A.    The main focus of this report
11 was to provide additional insights on the
12 topic that precipitated the downgrade.
13        So talking about additional
14 conversations we had with surgeons, for
15 example, essentially what additional
16 valuable color we learned in doing our
17 additional work post the January 27th
18 downgrade.
19    Q.    Did Deutsche Bank do similar
20 types of due diligence for this report as
21 it did for the January 27, 2020, report?
22    A.    By similar, you know, the
23 methodology is generally pretty standard;
24 you find experts on the topic and you
25 consult with them, so, yeah, in that

Page 88

ZAFAR

1
2 respect, yeah, I would say.
3    Q.    Did you essentially reach the
4 same conclusions in this report as you
5 reached in the January 27 report about the
6 predicted impact of third-party Da Vinci
7 instrument repair on Intuitive's business?
8    A.    So the difference being that --
9 again, I don't remember off the top of
10 head, but it looks like --  sorry, one
11 second here.
12        (Witness perusing document.)
13    A.    So both reports -- I was going
14 to say one had the quantification using
15 that GHX stuff we talked about before.
16        But it looks like that was also
17 included in this report, so the
18 conclusions were the same, that this is a
19 real material risk to Intuitive's INA
20 instruments and accessory business.
21        MR. DeBAUGH:  Counsel, just one
22 moment.
23        The court reporter, for the
24 record, before we move on, I just want to
25 make sure there is an objection between

Page 89

ZAFAR

1
2 the last question and answer.
3        Thanks very much.
4    Q.    If you will look at page 19 of
5 this report --
6    A.    The February 20th one?
7    Q.    Yes.
8    A.    Okay.
9    Q.    The one that says "Model
10 Ramifications, Revenue and EPS
11 Sensitivity," do you see that?
12    A.    Yes.
13    Q.    Actually, I am going to ask you
14 to just turn to page 15 of the other
15 report and kind of compare the two.
16        If you look at -- does it look
17 like the bottom line impact that you
18 predicted on Intuitive's business from
19 third-party instrument repairs is the same
20 in these two reports based on these two
21 slides?
22    A.    It does.
23    Q.    On page 19 of the February
24 report, you see in the third paragraph it
25 says, "Based on our conversations with

23 (Pages 86 - 89)

HIGHLY CONFIDENTIAL

ZAFAR

1
2  surgeons and hospital customers, we
3  believe 4 to 6 percent penetration of
4  Intuitive's de novo instruments on a unit
5  basis in 2021 is reasonable and
6  potentially even conservative," do you see
7  that?
8      A.    Yes.
9      Q.    Is that the same penetration
10  rate that you adopted in the January
11  report?
12      A.    It looks to me, yes; as a
13  matter of fact, I think this may have been
14  just a copy and paste job, as a matter of
15  fact.
16      Q.    Does it look like you also
17  adopted the same assumption that each
18  instrument could be repaired three times
19  on average in this report?
20      A.    Just having looked at the text
21  again, yes, that's how it appears,
22  correct.
23      Q.    Going back to page 1 of the
24  February report, and I think now I really
25  will focus on this one for a while,

ZAFAR

1
2  paragraph 1, it says, "Our February 3rd
3  downgrade was predicated on our belief
4  that refurbished Da Vinci instruments pose
5  a material and increasing risk to
6  Intuitive's INA segment growth over the
7  next couple of years.  Not surprisingly,
8  push-back has centered largely around two
9  points," and there are two points under
10  that.
11          The push-back, what was the
12  push-back that is referred to here?
13      A.    The push-back, I don't recall
14  what that specifically refers to, because
15  in this context -- yeah, I don't remember
16  specifically.
17      Q.    Do you remember who pushed
18  back?
19      A.    That's the question, I don't
20  remember if this was in the context of
21  investors or, you know, companies,
22  doctors, whatever, I don't remember the
23  context of that, to be honest.
24      Q.    If you go to paragraph 2 here,
25  it says, "Deeper Dive Into the Threat From

ZAFAR

1
2  Refurbished Da Vinci Instruments:  Over
3  the past few weeks we consulted with five
4  regulatory and legal experts to gain
5  further clarity on both the regulatory/FDA
6  and service contract angles."
7          Who were those five experts
8  that you consulted with?
9          MR. DeBAUGH:  Objection.
10      A.    I don't recall off the top of
11  my head; again, we talked to so many
12  consultants all the time, literally
13  hundreds since this was published, I
14  literally don't remember.
15      Q.    And then if you can go to page
16  8, it is a slide that says "510(k)
17  Premarket Notification Does Not Appear
18  Applicable" at the top.
19          It says, "The immediate
20  feedback to our downgrade note was that
21  Restore Robotics is subject to 510(k)
22  approval requirement and that because the
23  company does not have 510(k) clearance, it
24  is therefore in clear violation of FDA
25  regulations."

ZAFAR

1
2          Do you remember who provided
3  that feedback that's referenced here?
4      A.    Not specifically, no.
5      Q.    If you go to page 10, the one
6  that says "Regulatory Oversight of
7  Facilities, ISO Certification is the
8  Standard," at the top.
9          If you look at the third
10  paragraph, it says, "We were able to
11  review a third-party ISO certification
12  received by Restore Robotics for the
13  servicing of EndoWrist instruments.  We
14  confirmed that the issuer of this
15  certification, a Germany-based company
16  called DQS MED, is reputable and credible
17  in the Medtech industry."
18          Do you recall how you confirmed
19  that DQS MED was reputable and credible?
20      A.    I don't recall for certain, but
21  my recollection is that it was on the
22  website, these types of documentations are
23  generally publicly-available.
24          But I don't remember with
25  certainty, so I will leave that as my

24 (Pages 90 - 93)

HIGHLY CONFIDENTIAL

Page 210

ZAFAR

1       ZAFAR
2 or publication on the website and I went
3 through it and thought -- was trying to
4 figure out, you know, beyond the headline,
5 it just seemed like it could be so
6 relevant and then indeed in looking more
7 closely at it, there were some, you know,
8 I thought healthcare was precluded just
9 for regulatory safety reasons and things
10 like that.
11      I just thought it was something
12 that Intuitive shareholders should be
13 aware of given the potential relevance to
14 their business, specifically the right to
15 get Da Vinci instruments, EndoWrist
16 instruments, repaired by a third party,
17 this whole concept of right to repair.
18      And sort of the exposition on
19 that topic was deliberately more just the
20 facts because I was still digesting it; in
21 this business, when you see a news item,
22 the key is trying to figure out what it
23 means for a company or a stock, but
24 initially just giving investors the
25 heads-up, okay, this is out there, you

Page 211

1       ZAFAR
2 know, worth its weight in gold.
3       So I think this looks like it
4 was kind of at the stage where that news
5 item was vis-a-vis FTC, so I kind of just
6 summarized kind of what's going on there.
7   Q.   I just have maybe one or two
8 questions about this document.
9       Is this a report that you
10 served as the lead analyst for?
11  A.   Yes.
12  Q.   The third paragraph says, "What
13 to Watch For," do you see that?
14  A.   Yes.
15  Q.   The second sentence says, "As
16 we previously noted, a number of hospitals
17 we've spoken with over the past couple of
18 years are increasingly considering pursuit
19 of legal action against Intuitive
20 regarding service and instrument supply
21 contracts," do you see that?
22  A.   Yes.
23  Q.   Who were the hospitals that you
24 and your team have spoken with regarding
25 service and instrument supply contracts?

Page 212

1       ZAFAR
2       MR. BATEMAN:  I really have a
3 problem asking questions about this
4 document which you have not produced, it
5 doesn't matter if it is a public document,
6 you're obligated to produce it, it is
7 clearly responsive to our document
8 request, we have had document requests
9 about this exact thing, so I take issue
10 with asking questions about this document.
11      MR. DeBAUGH:  Can we go off the
12 record momentarily, please.
13      THE VIDEO TECHNICIAN: Off the
14 record, the time on the video monitor is
15 5:45 p.m.
16      (Recess taken.)
17      THE VIDEO TECHNICIAN: We are
18 now back on the record, time on the video
19 monitor is 5:54 p.m.
20      MR. DeBAUGH:  When we went off
21 the record, counsel for hospital
22 plaintiffs, Mr. Bateman, had objected to
23 the use of Zafar Exhibit No. 5 on the
24 basis that it had not been produced in
25 this litigation.

Page 213

1       ZAFAR
2       I explained to Mr. Bateman that
3 this was a publicly-available document.
4       On the basis of Mr. Bateman's
5 objection, I will ask the witness to set
6 aside Zafar Exhibit No. 5, I will be happy
7 to colloquy with counsel off the record on
8 rectifying any type of production concern,
9 whether or not that has occurred in this
10 case, I am not conceding to that actually
11 happening here, but I'm happy to set aside
12 the exhibit and continue forward with the
13 deposition.
14      Mr. Bateman, anything you want
15 to add for the record?
16      MR. BATEMAN: Sure, just having
17 had a chance to review the document, I do
18 think it's responsive to our document
19 requests and that it is a known responsive
20 document in the possession, custody or
21 control of Intuitive lawyers, it should
22 have been produced, especially if it is
23 going to be used at the deposition, so
24 just wanted to state that, but thanks for
25 agreeing to move on.

54 (Pages 210 - 213)

HIGHLY CONFIDENTIAL

Page 214

ZAFAR

1
2      MR. DeBAUGH:  Sure, objection
3  taken under advisement and we can talk
4  about this post deposition.
5  BY MR. DeBAUGH:
6      Q.    Mr. Zafar, at the beginning of
7  my questioning this afternoon, I had asked
8  you about the named hospital plaintiffs in
9  the pending class action.
10         Do you remember that?
11     A.    I do.
12     Q.    There were four hospital
13  systems or healthcare systems that I asked
14  you about and you had said that you had
15  not had a conversation, to your knowledge,
16  with anyone affiliated with those four
17  hospitals, do you recall that?
18     A.    I do.
19     Q.    Have you had a conversation
20  about the pending litigation, the
21  potential class action, against Intuitive
22  Surgical with any other hospital systems?
23     A.    Not to my recollection.
24         MR. DeBAUGH:  I do not have any
25  further questions at this time.

Page 215

ZAFAR

1
2      MR. BATEMAN:  I have a few, not
3  many.
4         THE VIDEO TECHNICIAN: Off the
5  record, time on the video monitor is 5:57
6  p.m.
7      (Pause.)
8         THE VIDEO TECHNICIAN: We are
9  now back on the record, the time on the
10  video monitor is 5:59 p.m.
11  BY MR. BATEMAN:
12     Q.    Just a few followup questions
13  on the questions that Mr. DeBaugh asked
14  you.
15         So I believe you testified
16  earlier that Intuitive competes against
17  laparoscopic surgery and open surgery, do
18  you recall that testimony?
19     A.    I do.
20     Q.    When you testified earlier that
21  Intuitive is a monopolist, what product
22  market is Intuitive a monopolist in, in
23  your view?
24         MR. DeBAUGH:  Objection.
25     A.    Robotic surgery specifically.

Page 216

ZAFAR

1
2      Q.    Do you view that as a distinct
3  market?
4         MR. DeBAUGH:  Objection.
5      A.    For the most part; there's a
6  little bit of gray area when you're
7  talking about what I think about more as
8  like, you know, enhanced, premium lap
9  traditional -- more or less, around the
10  edges there is a little bit of a gray area
11  because there are companies, for example,
12  a company called Transenterix, which may
13  have changed its name since then, but
14  that's what I know it as, they have
15  developed a platform that is ostensibly a
16  robot, but it's really just a fancy
17  laparoscope without really the benefits of
18  robotic assistance.
19         So long-winded answer, for the
20  most part, yes, I see it as distinct, but
21  with some gray area, some consider those
22  types of companies to be robotics as well.
23     Q.    In addition to Transenterix,
24  can you think of any other exceptions to
25  this distinct robotic market?

Page 217

ZAFAR

1
2      A.    I mean, again, Medtronic now
3  has, you know, a viable ready-for-human
4  clinical trial robot that should be
5  entering clinical trials any day now
6  presumably.
7         They do have approval
8  internationally, so they do have a very,
9  very minute presence overseas now, within
10  the last year or so.
11         There's some competitors in
12  Japan and China; frankly, those markets
13  are much harder to monitor.
14         So that's kind of the way I
15  look at the robotic surgery universe.
16     Q.    Why do you view robotic surgery
17  as a distinct market?
18     A.    Technology, having the robotic
19  assistance in multitude of ways, whether
20  it's the robotic arms, like the actual
21  robotic, you know, definitionally, plus
22  the instruments that go along with it that
23  enable imaging and stapling and things
24  like that.
25     Q.    In your experience, is there a

55 (Pages 214 - 217)

Page 218

ZAFAR

1    distinct demand for minimally invasive
2    surgical robots like the Da Vinci compared
3    to laparoscopic instruments and open
4    surgical instruments?
5    A.    Yes --
6        MR. DeBAUGH:  Objection.
7    A.    Yes.
8    Q.    I also just want to revisit a
9    question that was asked about whether you
10   have engineering training, I believe you
11   said no earlier?
12   A.    That's correct.
13   Q.    Do you think you need
14   engineering training to do a good job
15   analyzing the medical device industry as
16   an equity analyst?
17   A.    No.
18   Q.    Why not?
19   A.    I based my answer on, and I say
20   this with humility, with what I believe
21   has been a successful career in medical
22   device equity research without having that
23   type of a technical degree, so based on
24   experience more than anything else, plus

Page 219

ZAFAR

1    looking at peers in the same situation who
2    have been very successful without that
3    type of qualification.
4    Q.    Are you able to rely to some
5    extent on the expertise of people you talk
6    to and also rely on literature for
7    engineering information in the course of
8    your job?
9    A.    Absolutely, yes, essential.
10   Q.    Did you ever lead Deutsche Bank
11   to believe that you had engineering
12   training?
13   A.    No.
14   Q.    And they still hired you to be
15   an equity analyst for the medical device
16   industry, right?
17   A.    That's a true statement.
18       MR. BATEMAN:  I have no further
19   questions.
20       MS. SCHOENBACH:  If we can go
21   off the record for a few minutes.
22       MR. DeBAUGH:  Before we go off
23   the record, I just want to circle back to
24   a promised return to the Bates number of

Page 220

ZAFAR

1    Zafar 1.
2        After quickly speaking with my
3    colleagues, I understand the Bates number
4    to be what I reported it as, and if we
5    need to follow up and clarify the record
6    outside the scope of this deposition, we
7    will.
8        MR. BATEMAN:  Okay.
9        THE VIDEO TECHNICIAN: Now off
10   the record, the time on the video monitor
11   is 6:05 p.m.
12       (Recess taken.)
13       THE VIDEO TECHNICIAN: We are
14   now back on the record, the time on the
15   video monitor is 6:25 p.m.
16   EXAMINATION BY
17   MS. SCHOENBACH:
18   Q.    I am just going to ask you a
19   few questions about your testimony today
20   to clarify a few points for the record, if
21   you don't mind.
22   A.    Sure.
23   Q.    First, could you please
24   identify the specific Deutsche Bank entity

Page 221

ZAFAR

1    with which you're employed?
2    A.    Deutsche Bank Securities
3    Incorporated.
4    Q.    DBSI for short?
5    A.    Yes.
6    Q.    Is it in that context that you
7    were hired as a research analyst?
8    A.    Yes.
9    Q.    Within that context, as a DBSI
10   employee, it is within that context that
11   these reports that we discussed today,
12   particularly those that are Exhibits 112
13   and 113, were prepared?
14   A.    Correct.
15   Q.    I would like to discuss with
16   you some of the questions that Mr. Bateman
17   asked earlier today, counsel for
18   plaintiffs.
19       Do you remember discussing with
20   Mr. Bateman the content of your reports,
21   and particularly whether you and your team
22   endeavored to have the analysis and
23   predictions therein be accurate?
24   A.    Without exception, yes.

56 (Pages 218 - 221)

**MCCAULLEY LAW GROUP LLC**
JOSHUA V. VAN HOVEN (CSB No. 262815)
E-Mail: josh@mccaulleylawgroup.com
3001 Bishop Dr., Suite 300
San Ramon, California 94583
Telephone: 925.302.5941

RICHARD T. MCCAULLEY (*pro hac vice*)
E-Mail: richard@mccaulleylawgroup.com
180 N. Wabash Avenue, Suite 601
Chicago, Illinois 60601
Telephone: 312.330.8105

*Attorneys for Plaintiff and Counter-Defendant,*
SURGICAL INSTRUMENT SERVICE COMPANY, INC.

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| SURGICAL INSTRUMENT SERVICE COMPANY, INC. | CASE NO. 3:21-CV-03496-AMO |
| *Plaintiff/Counter-Defendant,* | Honorable Araceli Martínez-Olguín |
| v. | **PLAINTIFF SIS's OPPOSITION TO INTUITIVE'S MOTION IN LIMINE #2** |
| INTUITIVE SURGICAL, INC. | |
| *Defendant/Counterclaimant.* | |

1

## <u>TABLE OF CONTENTS</u>

**SIS EXPERTS' RELIANCE ON PARTICULAR PASSAGES** ............................................ 1

**FROM THE DEUTSCHE BANK ANALYST REPORTS** ................................................. 1

**ARGUMENT** ...................................................................................................................... 1

    1.    SIS's Experts May Base Opinions On The Deutsche Bank Analyst Reports Pursuant to Federal Rule of Evidence 703 ................................................................. 1

    2.    The Deutsche Bank Analyst Reports Are Not Excluded By The Rule Against Hearsay Pursuant to the Exception in Rule 803(17) ............................................... 4

    3.    The Deutsche Bank Reports Are Admissible As Business Records Under the Hearsay Exception of Rule 803(6) ........................................................................ 5

    4.    The Deutsche Bank Reports Are Admissible Under The State of Mind Hearsay Exception of Rule 803(3) ..................................................................................... 6

    5.    The Deutsche Bank Reports Are Admissible Because They Are Not Hearsay ....... 7

**CONCLUSION** .................................................................................................................. 7

## <u>TABLE OF AUTHORITIES</u>

**Federal Rules**
Federal Rule of Evidence 702.................................................................................3, 4
Federal Rule of Evidence 703.........................................................................1, 2, 3, 4
Federal Rule of Evidence 801.....................................................................................1
Federal Rule of Evidence 802.....................................................................................1
Federal Rule of Evidence 803(17)...........................................................................4, 5
Federal Rule of Evidence 803(3)................................................................................6
Federal Rule of Evidence 803(6)............................................................................5, 6

**United States Supreme Court Cases**
*Anderson v. United States,*
  417 U.S. 211 (1974)...............................................................................................7

**Cases**
*Air Land Forwarders, Inc. v. United States,*
  172 F.3d 1338 (Fed.Cir.1999) ...............................................................................5
*Brawner v. Allstate Indem. Co.,*
  591 F.3d 984 (8th Cir.2010) ..................................................................................5
*Carson Harbor Vill., Ltd. v. Unocal Corp.,*
  270 F.3d 863 (9th Cir. 2001) .................................................................................2
*ConAgra Foods, Inc.,*
  302 F.R.D. 537 (C.D. Cal. 2014)...........................................................................2
*Gardner v. Q.H.S., Inc.,*
  448 F.2d 238 (4th Cir.1971) ..................................................................................7
*Hamilton v. Accu–Tek,*
  32 F.Supp.2d 47 (E.D.N.Y.1998) ..........................................................................5
*Jensen v. EXC, Inc.,*
  82 F.4th 835 (9th Cir. 2023) ..................................................................................1
*Kuper v. Quantum Chemicals Corp.,*
  852 F.Supp. 1389 (S.D.Ohio 1994) .......................................................................5
*Malletier v. Dooney & Bourke, Inc.,*
  525 F. Supp. 2d 558 (S.D.N.Y. 2007) .................................................................2, 3
*Sybase, Inc. Sec. Litig.,*
  48 F. Supp. 2d 958 (N.D. Cal. 1999) ......................................................................1
*United States v. Adefehinti,*
  510 F.3d 319 (D.C.Cir.2007) .................................................................................5
*United States v. Duncan,*
  919 F.2d 981 (5th Cir.1990) ..................................................................................5
*United States v. Given,*
  164 F.3d 389 (7th Cir.1999) ..................................................................................6
*United States v. Macias–Farias,*
  706 F.3d 775 (6th Cir.2013) ..................................................................................7
*United States v. McCollum,*
  732 F.2d 1419 (9th Cir.1984) ................................................................................1
*United States v. Woods,*
  321 U.S. F.3d 361 (3d Cir. 2003) ...........................................................................4

*Avondale Mills, Inc. v. Norfolk Southern Corp.,*
  No. 1:05–2817, 2008 WL 6953956 (D. SC February 21, 2008) ................................4
*Banerji v. Leggett & Platt, Inc.,*
  No. 15-1653, 2016 WL 11759104 (C.D. Cal. Dec. 21, 2016)...................................2
*Berkley Insurance Co. v. Federal Housing Finance Agency,*
  No. 1:13-cv-1053, 2023 WL 4744155 (D. DC July 25, 2023) ...................................7

*Bianco v. Globus Med., Inc.*,
  No. 2:12–CV–00147, 2014 WL 119285 (E.D. Tex. Jan. 12, 2014) .......................................... 4
*Chesapeake Louisiana, L.P. v. Innovative Wellsite Sys., Inc.*,
  No. 12–2963, 2014 WL 4388256 (W.D. La. Sept. 5, 2014)..................................................... 2
*Columbia First Bank, F.S.B. v. United States*,
  58 Fed.Cl. 333 (Fed.Cl.2003) .............................................................................................. 6
*Consol. Credit Agency v. Equifax, Inc.*,
  No. CV-03-1229, 2005 WL 6218038 (C.D. Cal. Jan. 26, 2005) ............................................. 6
*JIPC Mgmt., Inc. v. Incredible Pizza Co.*,
  No. CV 08–04310, 2009 WL 8591607 (C.D. Cal. July 14, 2009) .......................................... 6
*Rebotix Repair, LLC v. Intuitive Surgical, Inc.*,
  2022 WL 3226794 (M.D. Fla. Aug. 10, 2022) ................................................................. 3, 4
*U.S. v. Boyle*,
  No. 08 CR 523, 2010 WL 286624 (S.D.N.Y. Jan. 15, 2010) .................................................. 2

**Other Authorities**
David F. Binder, Hearsay Handbook (4th ed.2015) ................................................................. 7
*Weinstein's Federal Evidence* (4th ed. 1994) ......................................................................... 5

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

SIS OPPOSITION TO INTUITIVE'S MOTION IN LIMINE #2

In its Motion In Limine No. 2 ("Mtn No. 2"), Intuitive Surgical, Inc. ("Intuitive") launches a multipronged assault against Surgical Instrument Service Company, Inc's ("SIS") antitrust and damages experts' reliance on two Deutsche Bank analyst reports, as well as against the independent introduction into evidence or referencing during trial of these reports.

**SIS EXPERTS' RELIANCE ON PARTICULAR PASSAGES**
**FROM THE DEUTSCHE BANK ANALYST REPORTS**

Dr. Russell Lamb is a Ph.D. economist and provides expert opinions and testimony regarding antitrust issues in this case. Mr. Richard Bero is a CPA and provides expert opinions and testimony regarding damages issues. Attached as Van Hoven Exs. 1 - 2 are excerpted Lamb and Bero reports including any references to the Deutsche analyst reports, which were produced from Intuitive's files and are  attached as Brachman Exs. 1-2 to Intuitive's Motion.

**ARGUMENT**

1.  SIS's Experts May Base Opinions On The Deutsche Bank Analyst
    Reports Pursuant to Federal Rule of Evidence 703

Intuitive first argues that the Deutsche Bank analyst reports "consist entirely of statements made outside of court that are being offered to prove the truth of the matters asserted, and thus are textbook examples of inadmissible hearsay under Federal Rule of Evidence 801/802." Mtn No. 2 at p. 2. Intuitive appears to regard this argument as putting an end to the inquiry, citing *In re Sybase, Inc. Sec. Litig.*, 48 F. Supp. 2d 958, 960 (N.D. Cal. 1999). But Intuitive's reliance on *In re Sybase* does not justify its oversimplified conclusion. *See United States v. McCollum,* 732 F.2d 1419, 1422–23 (9th Cir.1984) (applying Rule 703 to affirm the admission of expert testimony based on hearsay). The *In re Sybase* court did not address admissibility of analyst reports under Federal Rule of Evidence ("FRE") 703 or an expert's reliance on inadmissible evidence pursuant to Rule 703.

Setting aside for the moment the question of whether the Deutsche Bank analyst reports are being offered to prove the truth of the matters asserted, FRE 703 allows experts to rely on otherwise inadmissible evidence in formulating their opinions "[i]f experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject." *Jensen v. EXC, Inc.*, 82 F.4th 835, 847 (9th Cir. 2023). "[E]xperts are entitled to rely on hearsay in forming their opinions." *Carson Harbor Vill., Ltd. v. Unocal Corp.*, 270 F.3d

863, 873 (9th Cir. 2001) (en banc). Additionally, under Rule 703, the proponent of the opinion may disclose otherwise-inadmissible "facts or data" to the jury if "their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect." *Id.; see also Banerji v. Leggett & Platt, Inc.,* No. 15-1653, 2016 WL 11759104, at *1 (C.D. Cal. Dec. 21, 2016); *Chesapeake Louisiana, L.P. v. Innovative Wellsite Sys., Inc.*, No. 12–2963, 2014 WL 4388256, *2 (W.D. La. Sept. 5, 2014) (otherwise-inadmissible information may be used by experts at trial where probative value in helping jury evaluate expert opinions substantially outweighs the prejudicial effect); *U.S. v. Boyle*, No. 08 CR 523, 2010 WL 286624, at *2 (S.D.N.Y. Jan. 15, 2010) (expert's opinion admissible where he "[a]pplies his expertise to out-of-court statements and other sources, and synthesizes or analyzes that information, along with other information, in the form of an expert opinion").

Dr. Lamb's and Mr. Bero's references to the Deutsche Bank analyst reports are a legitimate use of that evidence as a basis for their respective, independent expert opinions pursuant to Rule 703. See Exh. 1 & 2. And Intuitive filed Daubert motions challenging both Dr. Lamb's and Mr. Bero's expert testimony, both of which were denied in their entirety (Dkt. 126, Dkt. 129, Dkt. 203). In neither motion, did Intuitive raise any issue with respect to the Deutsche Bank reports or Dr. Lamb's and Mr. Bero's reliance on them. Nevertheless, in what appears to be a veiled collateral attack on the Court's Daubert rulings, Intuitive claims Dr. Lamb's and Mr. Bero's use of the Deutsche Bank reports "is a blatant attempt to introduce hearsay to the jury "under the guise that the testifying expert used the hearsay as the basis of his testimony." Mtn No. 2 at p. 7 (citing *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 666 (S.D.N.Y. 2007)). Intuitive is way off base. An expert can "rely on the opinions of others if other evidence supports his opinion and the record demonstrates that the expert conducted an independent evaluation of that evidence." *In re ConAgra Foods, Inc.*, 302 F.R.D. 537, 556 (C.D. Cal. 2014).

Intuitive's reliance on the *Malletier* case is also misplaced. In that case, the testifying expert based his critical conclusion on a statistical regression analysis that he did not conduct himself. The court noted that the testifying expert "was not presented as and was demonstrably

unqualified to be an expert on statistical analysis." *Malletier*, 525 F. Supp. 2d at 664. "Because [the testifying expert] is not qualified to conduct or interpret statistical analyses, the regression analysis could only be admissible if [the testifying expert] is permitted to give an opinion by relying completely on [the non-testifying expert's] opinion." *Id.* On the facts of *Malletier*, the court held that "testimony from [the testifying expert] about the regression analysis must be excluded under Rule 702 because it is nothing but conduit testimony from an expert on a matter outside his field of expertise". *Id.* at 666. But, the court acknowledged that the testifying expert could rely on the non-testifying expert's opinion if the testifying expert was also giving his own opinion and not simply a conduit for the opinion of an unproduced expert. *Id.* at 664.

Dr. Lamb's and Mr. Bero's expert testimonies in reliance on the Deutsche Bank reports bear no resemblance to the stituation in *Malletier*.  Perhaps recognizing its charge that SIS is using "Rule 703 as a backdoor to disclose otherwise inadmissible hearsay opinions" lacks any persuasive support, Intuitive alternatively invites this Court to grant this motion merely on the basis of the ruling in *Rebotix Repair, LLC v. Intuitive Surgical, Inc.*, 2022 WL 3226794, at *5 (M.D. Fla. Aug. 10, 2022). Mtn. No. 2 at pp. 1, 7. Again, Intuitive's reliance on the decision in *Rebotix* is misplaced and to no avail in this situation. The issue in *Rebotix* was an FDA expert's reliance on one of the Deutsche Bank reports for statements related to regulatory issues. *Rebotix* at *5. The *Rebotix* court stated that "[a]n expert may not present testimony that merely 'parrots' the opinions of others, without providing an independent evaluation of the evidence." *Rebotix*, at *4 (citation omitted). Inappropriate parroting occurs when an expert "simply repeat[s] or adopt[s] the findings of another expert without attempting to assess the validity of the opinions relied upon". *Id.* (citations omitted). The *Rebotix* court found that:

> There is no evidence in the record that analyst reports like the one prepared by Deutsche Bank are relied upon by FDA experts. Stevens even testified that he could not recall whether he had ever relied upon an analyst report to help form his opinion on an FDA issue. Rebotix has not shown how the Deutsche Bank report is "of a type reasonably relied upon by experts in the field" in forming their opinions.

*Rebotix,* at *5. There are no parallels between the situation presented in *Rebotix* and the use of the Deutsche Bank reports by Dr. Lamb and Mr. Bero in this case. Additionally, Intuitive does not assert that the Deutsche Bank reports are not of a type reasonably relied upon by experts

in the fields of economics (Dr. Lamb's field) or damages accounting (Mr. Bero's field). Accordingly, SIS's experts may testify that they used the Deutsche Bank analyst reports in formulating their expert opinions without running afoul of FRE 702 or 703.

### 2. The Deutsche Bank Analyst Reports Are Not Excluded By The Rule Against Hearsay Pursuant to the Exception in Rule 803(17)

The Deutsche Bank analyst reports fall under the exception for "Market Reports and similar Commercial Publications" (FRE 803(17)). The two factors for admissibility under this exception are necessity and reliability. *United States v. Woods*, 321 U.S. F.3d 361, 364 (3d Cir. 2003). Necessity means that, as a practical matter, it would be impossible to present all the witnesses and information in court that went into the report. *Id*. As indicated by the Advisory Committee Note, reliability means that the compilers of the information (here, the Deutsche Bank analyst) have a motive to be accurate. *Id.* Crucial inquiries under this exception are the matters of trustworthiness and the motivation of the author to ensure accuracy. "The basis of trustworthiness is general reliance by the public or by a particular segment of it, and the motivation of the compiler to foster reliance by being accurate." *Avondale Mills, Inc. v. Norfolk Southern Corp.,* No. 1:05–2817, 2008 WL 6953956, *4 (D. SC February 21, 2008) (Motion in limine to exclude Moody, Standard & Poor, and Imperial Capital Financial Reports denied). "In this case, the authors of the reports 'know that their work will be consulted; if it is inaccurate, the public or the trade will cease consulting their product.' " *Id.*; *see also Bianco v. Globus Med., Inc.*, No. 2:12–CV–00147, 2014 WL 119285, at *1 (E.D. Tex. Jan. 12, 2014). The same is true in the case of the Deutsche Bank analyst reports. Intuitive does not appear to dispute that these reports are generally relied upon by the business and financial communities. These reports were generated by one of the world's leading providers of global business information and offered through a subscriber service aimed at the business and financial communities. Indeed, senior Intuitive employees relied on these reports. *See infra* (discussing Van Hoven Exs. 3-5). Further, Intuitive does not appear to allege that the analyst who prepared the Deutsche Bank reports was not trying to be fully accurate to foster reliance by its subscribers and professional readers. Deutsche Bank surely knows that its analyst reports will be consulted as they were by Intuitive, and inaccuracies will reduce demand for those reports.

1   Clearly, the Deutsche Bank reports are the sort of record contemplated by Rule 803(17).

2        Intuitive also argues that the Deutsche Bank "consist of subjective opinions and

3   conclusions" that are purportedly inadmissible under Rule 803(17). Mtn No. 2 at p. 2.

4   Intuitive's "bright line" standard is not the law. Courts have admitted purportedly subjective

5   and evaluative materials under the "market reports" exception in circumstances where there

6   are independent indicia of trustworthiness. *See, e.g., Hamilton v. Accu–Tek*, 32 F.Supp.2d 47,

7   64 n. 11 (E.D.N.Y.1998) (admitting Dun & Bradstreet reports on grounds that those reports

8   were prepared for use in financial industries rather than in anticipation of litigation); *Kuper v.*

9   *Quantum Chemicals Corp.*, 852 F.Supp. 1389, 1398 n. 4 (S.D.Ohio 1994) (admitting third

10  party reports encouraging purchase of stock); *see also Weinstein's Federal Evidence* §

11  803.22[3] (4th ed. 1994) ("Whether each [publication] meets the requisite standard for

12  trustworthiness entitling it to hearsay exemption must be determined on a case by case basis.").

13            3.    The Deutsche Bank Reports Are Admissible As Business Records
                    Under the Hearsay Exception of Rule 803(6)

14       A document prepared by a third party may qualify as another business entity's business

15  record under Rule 803(6) if that entity integrated the third-party record into its records and

16  relied upon it in its day-to-day operations. The proponent also must satisfy the other

17  requirements of Rule 803(6). *See, e.g., Brawner v. Allstate Indem. Co.*, 591 F.3d 984, 987 (8th

18  Cir.2010) ("Several other courts have held that a record created by a third party and integrated

19  into another entity's records is admissible as the record of the custodian entity, so long as the

20  custodian entity relied upon the accuracy of the record and the other requirements of Rule

21  803(6) are satisfied.... We agree with these courts...."); *United States v. Adefehinti*, 510 F.3d

22  319, 326 (D.C.Cir.2007) ("[A] record of which a firm takes custody is thereby 'made' by the

23  firm within the meaning of the rule (and thus is admissible if all the other requirements are

24  satisfied)."); *Air Land Forwarders, Inc. v. United States,* 172 F.3d 1338, 1342–44

25  (Fed.Cir.1999) ("Other courts of appeal have addressed this situation in a number of cases and

26  have generally held that a document prepared by a third party is properly admitted as part of

27  the business entity's records if the business integrated the document into its records and relied

28  upon it."); *United States v. Duncan*, 919 F.2d 981, 986 (5th Cir.1990) (holding that medical

1    records from hospital were the business records of the insurance company and explicitly

2    recognizing that "there is no requirement that the [business] records be created by the business

3    having custody of them"); *see also Columbia First Bank, F.S.B. v. United States*, 58 Fed.Cl.

4    333, 339 (Fed.Cl.2003) (third-party documents can be admitted as business records if they

5    meet the other Rule 803(6) requirements and are "shown to have been received and

6    incorporated, to have been relied upon, and to have indicia of trustworthiness").

7        The record shows that Intuitive subscribed to and kept the Deutsche Bank reports and

8    relied on them in the regular course of business.  Van Hoven Exs. 3-4; *see also* Van Hoven

9    Ex. 5 (DeSantis Deposition) at 80:14-83:3.  Intuitive kept the Deutsche Bank analyst reports

10   in the course of regularly conducted business activity, and it was the regular practice of

11   Intuitive to make such records. *See United States v. Given*, 164 F.3d 389, 394 (7th Cir.1999).

12   Accordingly, the Deutsche Bank analyst reports can be admitted as business records under

13   Rule 803(6). *See JIPC Mgmt., Inc. v. Incredible Pizza Co*., No. CV 08–04310, 2009 WL

14   8591607, at *21-22 (C.D. Cal. July 14, 2009).

15              4.  The Deutsche Bank Reports Are Admissible Under The State of
                    Mind Hearsay Exception of Rule 803(3)
16       The decision in *Consol. Credit Agency v. Equifax, Inc*. explains that the state of mind

17   exception to the hearsay rule requires that: (1) the statement was made contemporaneously

18   with the mental state to be proven; (2) circumstances do not suggest a motive for the declarant

19   to fabricate or misrepresent his or her thoughts; and (3) the declarant's state of mind is relevant

20   to an issue in the case.  No. CV-03-1229, 2005 WL 6218038, at *2 (C.D. Cal. Jan. 26, 2005).

21       Nick Alter, an Intuitive Senior Analyst in Finance & Sales Operations, subscribed to the

22   Deutsche Bank analytical research reports and circulated copies via email to other Intuitive

23   executives such as Philip Kim, commenting that they provided a "Deeper Dive on Third Party

24   I&A [Instrument and Accessories] Risk". Van Hoven Ex. 4; Ex. 5 at 80:14-83:3.  In another

25   instance, Mr. Kim forwarded the report to scores of recipients with commentary that "academic

26   centers and even large hospital systems [may] soon begin using repaired da Vinci instruments

27   supplied by third-parties."  *Id.* a Ex. 3.  SIS intends to proffer these Intuitive emails dealing

28   with the Deutsche Bank reports as proving the mental state of Intuitive's marketing executives

through their contemporaneous statements and will not be offering them to prove the truth of the underlying facts asserted. None of the circumstances surrounding the Deutsche Bank-related emails suggest a motive for the Intuitive executives to fabricate or misrepresent his or her thoughts and the state of mind of Intuitive's marketing executives regarding the competitive threat represented by third-party repair of EndoWrist instruments is relevant to the issues in this case. *See Berkley Insurance Co. v. Federal Housing Finance Agency,* No. 1:13-cv-1053, 2023 WL 4744155, at *3 (D. DC July 25, 2023) ("[T]here there is a clear chain of inferences the jury could draw: that the reports' presence in email chains and meeting notes related to the Third Amendment implies that [individuals] saw and read them, and that after doing so, they considered the reports in the decision making process.").

### 5. The Deutsche Bank Reports Are Admissible Because They Are Not Hearsay

"Out-of-court statements constitute hearsay only when offered in evidence to prove the truth of the matter asserted." *Anderson v. United States*, 417 U.S. 211, 219 (1974). A statement that would otherwise be hearsay may nevertheless be admissible if it is offered to prove something other than its truth, and this includes statements used to charge a party with knowledge of certain information. *Gardner v. Q.H.S., Inc.*, 448 F.2d 238, 244 (4th Cir.1971) (finding out-of-court statements admissible "to show defendants' knowledge of the harm their product could inflict, provided only that [the statements] were brought to the attention of the defendants"); *see United States v. Macias–Farias*, 706 F.3d 775, 781 (6th Cir.2013). "[W]hether an out-of-court assertion is hearsay depends on its use " at trial. David F. Binder, Hearsay Handbook § 1:9 (4th ed.2015).

SIS seeks to introduce the Deutsche Bank reports to show that Intuitive was aware of the issues raised by the competitive threat posed by third-party activities refurbishing EndoWrist instruments discussed in the reports. *See* Van Hoven Exs. 3-5. The Deutsche Bank reports are properly offered and admissible to show where Intuitive focused its responses to the various aspects of the third-party threat in the repair and replacement EndoWrist aftermarket.

### CONCLUSION

For the above reasons, SIS respectfully requests that the Court deny Intuitive's MIL #2.

-7-

1    Dated: <u>November 7, 2024</u>

                            McCAULLEY LAW GROUP LLC

2                                By: <u>   /s/ Joshua Van Hoven   </u>
                                    JOSHUA V. VAN HOVEN

3                                E-Mail: josh@mccaulleylawgroup.com

4                                3001 Bishop Dr., Suite 300
                            San Ramon, California 94583

5                                Telephone: 925.302.5941

6                                RICHARD T. MCCAULLEY (*pro hac vice*)
                            E-Mail: richard@mccaulleylawgroup.com

7                                180 N. Wabash Avenue, Suite 601
                            Chicago, Illinois 60601

8                                Telephone: 312.330.8105

9                                *Attorneys for Plaintiff and Counter-Defendant,*
                            SURGICAL INSTRUMENT SERVICE

10                               COMPANY, INC.

1

## **CERTIFICATE OF SERVICE**

2      I hereby certify that on November 7, 2024, I caused a copy of the foregoing

3  **PLAINTIFF SIS's OPPOSITION TO INTUITIVE'S MOTION IN LIMINE #2**, to be

4  electronically to be served *via* electronic mail to counsel of record:

5

6  **Crystal Lohmann Parker**
   Paul, Weiss, Rifkind, Wharton & Garrison LLP
7  1285 Avenue of the Americas
   New York, NY 10019
8  212-373-3000
   Email: cparker@paulweiss.com
9
   **Joshua Hill , Jr.**
10 Paul, Weiss, Rifkind, Wharton & Garrison LLP
   535 Mission Street, 24th Floor
11 San Francisco, CA 94105
   (628) 432-5123
12 Email: jhill@paulweiss.com

13 **Kenneth A. Gallo**
   Paul, Weiss, Rifkind, Wharton & Garrison LLP
14 2001 K Street NW
   Washington, DC 20006-104 7
15 202-223-7356
   Fax: 202-204-7356
16 Email: kgallo@paulweiss.com

17 **Paul David Brachman**
   Paul, Weiss, Rifkind, Wharton & Garrison LLP
18 2001 K St., NW
   Washington, DC 20006
19 202-223-7440
   Email: pbrachman@paulweiss.com
20
   **William Michael**
21 Paul, Weiss, Rifkind, Wharton and Garrison LLP
   1285 Avenue of the Americas
22 New York, NY 10019
   212-373-3000
23 Email: WMichael@paulweiss.com

24 **Allen Ruby**
   Attorney at Law
25 15559 Union Ave. #138
   Los Gatos, CA 95032
26 408-4 77-9690
   Email: allen@allenruby.com
27

28

1  **Andrew David Lazerow**
   Covington & Burling LLP
2  One CityCenter
   850 Tenth Street, NW
3  Washington, DC 20001-4956
   202-662-5081
4  Email: alazerow@cov.com

5  **Kathryn Elizabeth Cahoy**
   Covington & Burling LLP
6  3000 El Camino Real
   5 Palo Alto Square, 10th Floor
7  Palo Alto, CA 94306
   650-632-4700
8  Email: kcahoy@cov.com

9  **Sonya Diane Winner**
   Covington & Burling LLP
10 Floor 54
   415 Mission Street
11 San Francisco, CA 94105-2533
   (415) 591-6000
12 Email: swinner@cov.com

13

14 Dated: November 7, 2024        By:  ___/s/ Joshua Van Hoven___
                                      JOSHUA V. VAN HOVEN
15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  **MCCAULLEY LAW GROUP LLC**
   JOSHUA V. VAN HOVEN (CSB No. 262815)
2  E-Mail: josh@mccaulleylawgroup.com
   3001 Bishop Dr., Suite 300
3  San Ramon, California 94583
   Telephone: 925.302.5941
4
   RICHARD T. MCCAULLEY (*pro hac vice*)
5  E-Mail: richard@mccaulleylawgroup.com
   180 N. Wabash Avenue, Suite 601
6  Chicago, Illinois 60601
   Telephone: 312.330.8105
7
   *Attorneys for Plaintiff and Counter-Defendant,*
8  SURGICAL INSTRUMENT SERVICE COMPANY, INC.

9              **UNITED STATES DISTRICT COURT**

10           **NORTHERN DISTRICT OF CALIFORNIA**

11              **SAN FRANCISCO DIVISION**

12  SURGICAL INSTRUMENT SERVICE          CASE NO. 3:21-CV-03496-AMO
    COMPANY, INC.
13                                        Honorable Araceli Martínez-Olguín
              *Plaintiff/Counter-Defendant,*
14                                        **DECLARATION OF JOSHUA VAN**
        v.                                **HOVEN IN SUPPORT OF**
15                                        **PLAINTIFF SIS's OPPOSITION TO**
    INTUITIVE SURGICAL, INC.              **INTUITIVE'S MOTION IN LIMINE**
16                                        **#2**
              *Defendant/Counterclaimant.*
17

18

19

20

21

22

23

24

25

26

27

28

VAN HOVEN DECLARATION ISO SIS OPP TO INTUITIVE'S MOTION IN LIMINE #2

I, JOSHUA VAN HOVEN, declare as follows:

I am an attorney at the law firm of MCCAULLEY LAW GROUP LLC, attorneys for Plaintiff SURGICAL INSTRUMENT SERVICE COMPANY, INC. ("SIS") in this matter. I have personal knowledge of the matters set forth herein, unless otherwise noted.

1. Attached as Exhibit 1 is a true and correct copy of excerpts of the Expert Report of Russell L. Lamb, PhD., an SIS expert in this case, which is dated December 2, 2022.

2. Attached as Exhibit 2 is a true and correct copy of excerpts of the Expert Report of Richard F. Bero, CPA, CVA, an SIS expert in this case, which is dated December 2, 2022.

3. Attached as Exhibit 3 is a true and correct copy of e-mail correspondence from Philip Kim, Investor Relations at Intuitive, to Intuitive employees, which is dated January 31, 2020, which was produced by Intuitive in this case and bates-labeled Intuitive-00552990-Intuitive-00552992.

4. Attached as Exhibit 4 is a true and correct copy of e-mail correspondence from Nick Alter, a Senior Analyst – Finance & Sales Operations at Intuitive, to Philip Kim, a Investor Relations at Intuitive, which is dated February 28, 2020, which was produced by Intuitive in this case and bates-labeled Intuitive-00565993-Intuitive-00565994.

5. Attached as Exhibit 5 is a true and correct copy of excerpts of the Deposition of Bob DeSantis, which was taken on May 27, 2021 in Rebotix Repair LLC v. Intuitive Surgical, Inc., Case No. 8:20-CV-02274 (M.D. Fla).

1    I declare under the penalty of perjury under the laws of the United States that the

2    foregoing is true and correct.

3    Dated: <u>November 7, 2024</u>              McCAULLEY LAW GROUP LLC
                                                By:  <u>    /s/ Joshua Van Hoven    </u>
4                                               JOSHUA V. VAN HOVEN

5                                               E-Mail: josh@mccaulleylawgroup.com
                                                3001 Bishop Dr., Suite 300
6                                               San Ramon, California 94583
                                                Telephone: 925.302.5941
7
                                                RICHARD T. MCCAULLEY (*pro hac vice*)
8                                               E-Mail: richard@mccaulleylawgroup.com
                                                180 N. Wabash Avenue, Suite 601
9                                               Chicago, Illinois 60601
                                                Telephone: 312.330.8105
10
                                                *Attorneys for Plaintiff and Counter-Defendant,*
11                                              SURGICAL INSTRUMENT SERVICE
                                                COMPANY, INC.
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I hereby certify that on November 7, 2024, I caused a copy of the foregoing

**DECLARATION OF JOSHUA VAN HOVEN IN SUPPORT OF PLAINTIFF SIS's**

**OPPOSITION TO INTUITIVE'S MOTION IN LIMINE #2**, to be electronically to be

served *via* electronic mail to counsel of record:

**Crystal Lohmann Parker**
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019
212-373-3000
Email: cparker@paulweiss.com

**Joshua Hill , Jr.**
Paul, Weiss, Rifkind, Wharton & Garrison LLP
535 Mission Street, 24th Floor
San Francisco, CA 94105
(628) 432-5123
Email: jhill@paulweiss.com

**Kenneth A. Gallo**
Paul, Weiss, Rifkind, Wharton & Garrison LLP
2001 K Street NW
Washington, DC 20006-104 7
202-223-7356
Fax: 202-204-7356
Email: kgallo@paulweiss.com

**Paul David Brachman**
Paul, Weiss, Rifkind, Wharton & Garrison LLP
2001 K St., NW
Washington, DC 20006
202-223-7440
Email: pbrachman@paulweiss.com

**William Michael**
Paul, Weiss, Rifkind, Wharton and Garrison LLP
1285 Avenue of the Americas
New York, NY 10019
212-373-3000
Email: WMichael@paulweiss.com

**Allen Ruby**
Attorney at Law
15559 Union Ave. #138
Los Gatos, CA 95032
408-4 77-9690
Email: allen@allenruby.com

1   **Andrew David Lazerow**
    Covington & Burling LLP
2   One CityCenter
    850 Tenth Street, NW
3   Washington, DC 20001-4956
    202-662-5081
4   Email: alazerow@cov.com

5   **Kathryn Elizabeth Cahoy**
    Covington & Burling LLP
6   3000 El Camino Real
    5 Palo Alto Square, 10th Floor
7   Palo Alto, CA 94306
    650-632-4700
8   Email: kcahoy@cov.com

9   **Sonya Diane Winner**
    Covington & Burling LLP
10  Floor 54
    415 Mission Street
11  San Francisco, CA 94105-2533
    (415) 591-6000
12  Email: swinner@cov.com

13

14  Dated: November 7, 2024          By:  ___/s/ Joshua Van Hoven___
                                          JOSHUA V. VAN HOVEN
15

16

17

18

19

20

21

22

23

24

25

26

27

28

-4-
VAN HOVEN DECLARATION ISO SIS OPP TO INTUITIVE'S MOTION IN LIMINE #2

# Exhibit 1

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

## HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

|  |  |  |
|---|---|---|
| SURGICAL INSTRUMENT SERVICE COMPANY, INC., | ) ) ) ) | Case No. 5:21-cv-03496. |
| Plaintiff, | ) ) ) |  |
| vs. | ) ) |  |
| INTUITIVE SURGICAL, INC., | ) ) ) |  |
| Defendant. | ) ) |  |

## EXPERT REPORT

**Dr. Russell L. Lamb**
**President**
Monument Economics Group, LLC
1000 Wilson Boulevard
Suite 2650
Arlington, VA 22209

December 2, 2022

# TABLE OF CONTENTS

I.   Introduction and Summary of Conclusions ................................................................1

    A.   Expert Background and Qualifications...............................................................1

    B.   Summary of Plaintiffs' Allegations ....................................................................2

    C.   Assignment .........................................................................................................4

    D.   Materials Reviewed ............................................................................................5

    E.   Summary of Conclusions....................................................................................5

II.   Industry Background .................................................................................................6

    A.   Methods of Surgery ...........................................................................................6

    B.   Introduction of Robotic Surgery ........................................................................8

    C.   Intuitive's Da Vinci Surgical Robot .................................................................10

III.   The Market for MIST Surgical Robots in the United States Constitutes a Relevant

Antitrust Market.............................................................................................................17

    A.   The Market for MIST Surgical Robots is a Relevant Antitrust Product Market 17

       i.   Traditional Laparoscopic Surgeries are Not an Economic Substitute for

           Minimally Invasive Soft Tissue Surgeries Performed with MIST Surgical

           Robots, and Thus Do Not Discipline Pricing of MIST Surgical Robots...........20

         a.  Intuitive Acknowledged that it Did Not View Traditional Laparoscopic Surgery

           as Competition for Surgeries performed with MIST Surgical Robots ...............21

         b.  MIST Surgical Robots such as Da Vinci Possess Different Features and Benefits

           to Surgeons and Patients Compared to Traditional Laparoscopic Surgeries......22

         c.  Non-Clinical Benefits of MIST Surgical Robots Compared to Traditional

           Laparoscopic Surgeries.....................................................................................26

       ii.   Non-MIST Surgical Robots are Not Economic Substitutes for MIST Surgical

           Robots and, Therefore, Cannot Be Substituted for MIST Surgical Robots in the

           Performance of Minimally Invasive Soft Tissue Surgeries ...............................30

    B.   The Relevant Antitrust Geographic Market with Regards to the Tying Market is

         the United States ...............................................................................................31

IV.   The EndoWrist Repair and Replacement Market in the United States Constitutes a

Relevant Antitrust Market .............................................................................................33

A.    The EndoWrist Repair and Replacement Market is a Relevant Antitrust Product Market.............................................................................................................33

i.    Third-Party Repairs of EndoWrist Surgical Instruments are Part of the Same Relevant Antitrust Product Market as Replacement EndoWrist Surgical Instruments Sold by Intuitive...............................................................................34

ii.    Intuitive Considered Selling Refurbished Endowrist Instruments to Make it More Difficult for Third-Party Repair Companies To Compete Effectively in the EndoWrist Repair and Replacement Market .....................................................37

iii.    Neither Traditional Laparoscopic Surgical Instruments, nor Surgical Instruments Used with Any Other Non-MIST Surgical Robots, are Compatible with Da Vinci Surgical Robots...........................................................................................39

B.    The Relevant Antitrust Geographic Market with Regards to the Tied Market is the United States.................................................................................................41

C.    The EndoWrist Repair and Replacement Market is Distinct from the Market for MIST Surgical Robots .......................................................................................42

V.    Evidence Demonstrates that the Alleged Misconduct was Anticompetitive............46

A.    Intuitive Posessed Monopoly Power in the Market for MIST Surgical Robots in the United States During the Relevant Period .....................................................48

i.    Intuitive Dominated the Market for MIST Surgical Robots in the United States During the Relevant Period...................................................................................49

ii.    There Were Significant Barriers to Entry Into the Market for MIST Surgical Robots in the United States During the Relevant Period....................................53

iii.    Intuitive's Prices for da Vinci Robots Greatly Exceeded Marginal Costs..........60

B.    Intuitive Used Its Monopoly Power in the Market for MIST Surgical Robots to Maintain its Monopoly the Market for EndoWrist Surgical Instruments in the United States During the Relevant Period ..........................................................64

i.    Intuitive's Restrictive Sales, License, and Service Agreement Allowed Intuitive to Maintain Monopoly Power in the EndoWrist Repair and Replacement Market 65

a.    Intuitive Dominated the EndoWrist Repair and Replacement Market in the United States During the Relevant Period ..........................................................67

      b. Intuitive's Conduct Prevented Rivals, Including SIS, from Competing Effectively in the EndoWrist Repair and Replacement Market in the United States During the Relevant Period ........................................................................68

      c. Intuitive's Exercise of Monopoly Power in the EndoWrist Repair and Replacement Market During the Relevant Period ............................................75

  C. Evidence Demonstrates that Intuitive's Alleged Misconduct Caused Harm to Competition in the EndoWrist Repair and Replacement Market ......................76

    i. Intuitive's Patient Safety Claims ........................................................................76

    ii. Intuitive Used its Alleged Misconduct in the EndoWrist Repair and Replacement Market to Continue to Charge Supra-Competitive Prices for the Replacement of EndoWrist Instruments, Causing Harm to Competition...........79

VI. Conclusions...............................................................................................................92

Market constitutes a relevant antitrust product market. I base this conclusion on the fact that there are no functional substitutes for the repair and replacement of EndoWrist surgical instruments. Therefore, given that there are no functional substitutes for the repair and replacement of EndoWrist surgical instruments in the applications for which it is sold, it is not possible for there to be economic substitutes for the repair and replacement of EndoWrist surgical instruments. I discuss the evidence that forms the basis of this conclusion in greater detail below.

    i.    Third-Party Repairs of EndoWrist Surgical Instruments are Part of the Same Relevant Antitrust Product Market as Replacement EndoWrist Surgical Instruments Sold by Intuitive

54.    Evidence I have reviewed demonstrates that third-party repairs of EndoWrist surgical instruments (such as those performed by SIS) were viewed by Intuitive and other market participants and analysts as a competitive threat to Intuitive's sales of replacement EndoWrist surgical instruments. For example, Deutsche Bank published an analyst report in February 2020 covering the "third party risk" to Intuitive's Instruments & Accessories business segment (which includes the sale of EndoWrist instruments) following a recent downgrade of Intuitive's stock in which it concluded:

> We believe the Street continues to be overly dismissive of the risk of increasing usage of refurbished da Vinci instruments to Intuitive's top line over the next couple years. Given the abundance of first-hand confirmation from hospital customers that are exploring refurbished instruments, the question is not whether – but rather, how much – Intuitive's business will be impacted.[128]

55.    Deutsche Bank further noted that, based on its research, "FDA action to stymie usage of repaired instruments is highly unlikely," and that Intuitive's justification of its cease-and-desist letters to enforce its service agreements on "safety, regulatory, and

---

[128] DeSantis Deposition Exhibit 11 at Intuitive-00566055. Regarding how hospitals have been dealing with Intuitive's "pushback strategy" via its "advisement to cease and desist engagement with service providers," Deutsche Bank concluded: "Notably, some hospitals are now beginning to push back on restrictions embedded in their service contracts against third party servicing of da Vinci systems and instruments, questioning the legality and enforceability of such terms of service." See DeSantis Deposition Exhibit 11 at Intuitive-00566055. Deutsche Bank also identified the third-party repair of EndoWrist surgical instruments as a "competitive threat" to Intuitive's U.S. Instruments and Accessories business. See Intuitive-00552993-53014 at 52993.

legal/contractual grounds" are largely irrelevant.[129]  Furthermore, Deutsche Bank estimated that, once repairs of EndoWrist instruments used with model X/Xi da Vinci robots become available, "Intuitive's top line exposure will increase dramatically – rendering a majority (~58%) of segment sales 'at risk' of competitive pressures."[130]

56.   Evidence I have reviewed demonstrates that Intuitive itself acknowledged that third-party repairs of EndoWrist surgical instruments (such as those performed by SIS) were a competitive threat to its sales of replacement EndoWrist surgical instruments. At deposition, Katie Scoville, Director of New Product Verification, Packaging, and Product Labeling at Intuitive, testified that the threat of "third-party EndoWrist refurbishers" would "be a factor in our sales numbers for certain third parties."[131]

57.   In a September 2016 internal analysis, Intuitive acknowledged the competitive threat from one such third-party repair company (Rebotix): "Despite the strong technology protections that ISI uses to limit the life of its instruments, there are companies that will attempt to hack that technology and extend instrument life beyond ISI's specs.  There is already one company in Florida (Rebotix) that claims to be able to extend instrument life and is currently attempting to qualify for a CE mark for the life-extended instruments."[132]  In an internal analysis of options for pursuing a "Remanufactured Instruments" program, Intuitive notes as one of the "Pros" of one option that "Rebotix has potential to impact Si sales, an immediate threat."[133]  In an August 2019 analysis of third-party repairs of EndoWrist surgical instruments, Intuitive identified a number of third-party repairers as a competitive threat to their business, and also summarized "rebuttals" to Intuitive's value proposition pertaining to one specific third-party repairer (Rebotix), as well as various responses to those rebuttals.[134]

---

[129] DeSantis Deposition Exhibit 11 at Intuitive-00566057-066.  See, also, Intuitive-00552993-53014 at 52997-52998.
[130] DeSantis Deposition Exhibit 11 at Intuitive-00566072.  See, also, Intuitive-00552993-53014 at 53006.
[131] Deposition of Katie Scoville, May 26, 2021 (hereafter "Scoville Deposition") at 76:19-25. Ms. Scoville also testified that Intuitive "likely discussed revenue implications of third-party refurbishment." See Scoville Deposition at 76:1-18.
[132] Intuitive-00102938-989 at 952.
[133] Intuitive-00139149-150 at 150.
[134] Intuitive-00194074-089.

hospitals enter into the Intuitive Service Agreement as a condition of their purchase of a da Vinci surgical robot, as well as Intuitive's continued enforcement of the Intuitive Service Agreement, allowed it to maintain monopoly power in the tied market (the EndoWrist Repair and Replacement Market) during the Relevant Period. I discuss the evidence that forms the bases of this conclusion in greater detail below.

### a. Intuitive Dominated the EndoWrist Repair and Replacement Market in the United States During the Relevant Period

113.    I discussed above how, according to the DOJ, "courts typically have required a dominant market share before inferring the existence of monopoly power."[268] As I discussed above, Intuitive deliberately designed its da Vinci robots to only work with surgical instruments manufactured by Intuitive (EndoWrists). As a result, "the only entity that sells EndoWrists to hospitals is Intuitive."[269] However, while there were no other entities that competed with Intuitive for the sale of replacement EndoWrist surgical instruments, Intuitive did begin to face a competitive threat recently from third-party repairers of the EndoWrist surgical instruments originally manufactured by Intuitive, as discussed above. However, as a result of Intuitive's Alleged Misconduct, it was able to maintain its dominance of the EndoWrist Repair and Replacement Market during the Relevant Period.

114.    For example, in an August 2019 internal analysis of third-party repairs of EndoWrist surgical instruments, Intuitive found that, since 2016, only 18 accounts had been "affected" in that they had EndoWrist surgical instruments repaired by third-party repairers, a fraction of the installed base of 3,531 da Vinci robots Intuitive had in the U.S. in 2019.[270] Intuitive further noted that among the "[a]ccounts affected" worldwide (29 in total), 17 of them were "[n]o longer using reprogrammed instruments" following Intuitive's efforts to enforce the restrictive Intuitive Service Agreement.[271] Similarly, in a February 2020 analyst report in covering the "third party risk" to Intuitive's Instruments & Accessories business segment, Deutsche Bank, having determined that "FDA action to

---

[268] DOJ Single-Firm Conduct at p. 21.
[269] Vavoso Deposition at 59:4-14, 242:2-23.
[270] Intuitive-00194074-089 at 077; Intuitive Surgical, Inc., SEC Form 10-K, filed February 7, 2020 at p. 10.
[271] Intuitive-00194074-089 at 077, 088.

stymie usage of repaired instruments is highly unlikely," and that "[h]ospitals [are] starting to push[ ]back on legality/enforceability of terms of service," forecasted that a "4-6% penetration of Intuitive's *de novo* instruments on a unit basis in 2021 is reasonable and, based on our additional due diligence, potentially conservative."[272] Based on this forecast, Intuitive would account for the remaining 94 to 96 percent of the EndoWrist Repair and Replacement Market in the U.S.

115.    The evidence discussed above demonstrates that Intuitive dominated the EndoWrist Repair and Replacement Market in the U.S. during the Relevant Period. This constitutes another piece of evidence demonstrating Intuitive's possession of monopoly power in the tied market (the EndoWrist Repair and Replacement Market) during the Relevant Period. In the next section, I discuss evidence demonstrating that the restrictive Intuitive Service Agreement that hospitals were required to sign with every purchase of a da Vinci surgical robot created significant barriers to entry in that they limited rivals' (including SIS) ability to compete effectively with Intuitive in the EndoWrist Repair and Replacement Market, allowing Intuitive to maintain its dominance of the EndoWrist Repair and Replacement Market during the Relevant Period.

> b.    Intuitive's Conduct Prevented Rivals, Including SIS, from Competing
> Effectively in the EndoWrist Repair and Replacement Market in the
> United States During the Relevant Period

116.    As I previously discussed, one important requirement in determining whether a firm possessed monopoly power is whether barriers to market entry existed that would allow the firm to exercise substantial market power for an appreciable period. Evidence I have reviewed demonstrates that the restrictive Intuitive Service Agreement that hospitals were required to sign with every purchase of a da Vinci surgical robot created significant barriers to entry in that they limited rivals' (include SIS) ability to compete effectively with Intuitive in the tied market (the EndoWrist Repair and Replacement Market).

117.    In a February 2020 analyst report in covering the "third party risk" to Intuitive's Instruments & Accessories business segment (which includes the sale of EndoWrist

---

[272] DeSantis Deposition Exhibit 11 at Intuitive-00566055-057, 067 (emphasis in original). Deutsche Bank made a similar assessment in a January 2020 analyst report. See Intuitive-00552993-53014 at 52994.

instruments), Deutsche Bank noted: "In no uncertain terms, the standard terms of service outlined in customer contracts state that hospitals are precluded from engaging with third parties as well as the potential consequences of violation – nullification of contracts, product warranties, etc."[273]  Evidence demonstrates that Intuitive took a number of steps in order to prevent hospitals that had opted to have its EndoWrist surgical instruments repaired by a third-party repair company such as SIS from doing so.

118.    In particular, following an initial conversation with the hospital in question, Intuitive would send a form letter to the hospital that detailed Intuitive's concerns with the hospital's use of third-party repair companies and highlighted that Intuitive considered the hospital's use of the repair services a breach of Intuitive's contract with the hospital.[274]  Those letters also informed the hospitals that if they continued using repair services, Intuitive would cease servicing their da Vinci robots.[275]  Further, if a hospital continued using third-party repair services after receiving Intuitive's letter, Intuitive would in fact stop servicing the hospital's da Vinci robot.[276]  Intuitive would also void the warranty on da Vinci robots sold to hospitals and refuse to provide any further service under the terms of that warranty.[277]  Evidence I have reviewed establishes that Intuitive's overall process in response to learning of a hospital repairing its EndoWrist surgical instruments through a third-party repairer generally took a short period of time: ten business days for the conversation phase, ten business days for the customer letter, and five business days for account termination.[278]  At some point, hospitals would encounter a service message on the da Vinci robot, and without Intuitive providing service, that da Vinci robot would be unusable for surgery.[279]

119.    As Ron Bair, Senior Director of Services, Innovation, and Product Management at Intuitive, testified, Intuitive enforces the terms of the Intuitive Service Agreement to stop its customers from using reprogrammed EndoWrist surgical instruments.[280]  Mr. Bair

---

[273] DeSantis Deposition Exhibit 11 at Intuitive-00566067.
[274] Vavoso Deposition at 221:3-222:15; DeSantis Deposition at 267:19-269:3.
[275] Vavoso Deposition at 221:3-222:15; DeSantis Deposition at 267:19-269:3.
[276] Vavoso Deposition at 223:14-20; DeSantis Deposition at 262:6-263:3.
[277] Vavoso Deposition at 223:21-224:19.
[278] Deposition of Antonio (AJ) Inacay, June 8, 2021 at 163:1-164:3, Exhibit 7 at Intuitive-00439336.
[279] Vavoso Deposition at 227:13-228:18.
[280] Bair Deposition at 137:11-137:16.

135.    Evidence I have reviewed indicates that the EndoWrist surgical instruments repaired by third parties such as SIS were viewed as functionally equivalent to the replacement EndoWrist surgical instruments sold by Intuitive.  For example, in a January 2020 analyst report covering Intuitive, Deutsche Bank noted:

> Repaired da Vinci instruments were all manufactured by Intuitive and designed to become disabled for use beyond 10x, but third parties like Restore Robotics have developed technologies to repair these used devices, confirm that functionality and condition have been restored to *de novo* specifications, and then ship them back to the hospitals for additional use.[321]

Consistent with this finding, Deutsche Bank also noted that there was "**[n]o evidence that repaired da Vinci instruments specifically pose a risk to patient safety – in fact, au contraire.**"[322]  Deutsche Bank added: "**Bottom line regarding safety is that, despite Intuitive's view on this point, any material threat to patient safety would surely have prompted immediate FDA field action to stop their usage, which has not been the case.**"[323]

136.    Also consistent with these findings, in a related matter involving another third-party repairer similar to SIS (Rebotix), Edward Harrich, Director of Surgical Services at Pullman Regional Hospital, testified that the surgeons, first assists, and scrub assists that Pullman Hospital that used "Rebotix-repaired EndoWrists" were not able to "discern any differences between the Rebotix-repaired EndoWrists and the EndoWrists that had not been repaired or serviced by Rebotix."[324]  Mr. Harrich further testified that Pullman

---

[321] Intuitive-00552993-53014 at 52993 (emphasis in original). Deutsche Bank added: "Notably, these devices are typically reparable up to four times. Third party servicing of medical devices has been ongoing for decades, and FDA's comfort around this practice regarding patient safety is quite clear." See Intuitive-00552993-53014 at 52993.

[322] Intuitive-00552993-53014 at 52998 (emphasis in original).

[323] Intuitive-00552993-53014 at 52998 (emphasis in original). In this report, Deutsche Bank included due diligence "feedback from da Vinci surgeons" regarding the use of EndoWrist surgical instruments that had been repaired by third-party repairers. See Intuitive-00552993-53014 at 53000-53002. One such surgeon noted that the that the "[c]linical experience to date has been positive, with no reports of device malfunction or adverse events." See Intuitive-00552993-53014 at 53000. Another surgeon noted that the "[c]linical experience has been satisfactory, with no reports of device malfunction or adverse events." See Intuitive-00552993-53014 at 53001. Another "Surgeon noted that the hospital has had no cases of device malfunction or adverse events, and based on this favorable trial phase experience usage is likely to expand over the next year or two." See Intuitive-00552993-53014 at 53002.

[324] Harrich Deposition at 38:8-39:3.

140.    Similarly, at deposition in a related matter, Edward Harrich of Pullman Hospital testified that the average cost of an EndoWrist surgical instrument purchased from Intuitive was approximately $2,000, whereas the average cost to have an EndoWrist surgical instrument serviced by Rebotix was approximately $1,332, which amounted to annual savings to Pullman Hospital of $62,400.[344] Mr. Harrich further testified that Rebotix offered Pullman Hospital repaired EndoWrist surgical instruments at a 40 percent discount off of the cost of replacement EndoWrist instruments from Intuitive.[345] In another related matter, Tyler McDonald of Conway Regional Medical Center testified that his hospital observed cost savings from using EndoWrist surgical instruments repaired by third parties, and that "Conway [would] still be refurbishing the instruments today if it could do so."[346] In a January 2020 analyst report covering Intuitive, Deutsche Bank noted that "[m]eaningful operating cost savings opportunity is the key driver compelling hospitals to consider using these repaired da Vinci instruments."[347] Relatedly, a letter sent by third-party repairer Rebotix to hospitals around August 2019 noted that using Rebotix to repair EndoWrist surgical instruments would provide "45% [a]verage saving per instrument," which would amount to "[a]verage [s]avings of over $200,000 per year, per S or Si robot."[348]

141.    Further, evidence I have reviewed demonstrates that the prices Intuitive charged for its EndoWrist surgical instruments were significantly higher than the prices charged by TransEnterix for the surgical instruments used in conjunction with its Senhance surgical robot. For example, in a 2017 internal Instruments & Accessories analysis, Intuitive noted that the "[c]ompetitive [p]osition" of TransEnterix's Senhance core surgical instruments were that they offered "'[u]nlimited' lives, lower per procedure cost" as compared to EndoWrist core surgical instruments.[349] Steven D. Schwaitzberg of

---

[344] Harrich Deposition at 68:8-69:4.

[345] Harrich Deposition at 88:16-89:14.

[346] McDonald Deposition at 17:20-25.

[347] Intuitive-00552993-53014 at 52993. As part of this analyst report, Deutsche Bank sought feedback from two hospital supply chain managers (one that oversees purchasing for nine hospitals in the Northeast and the other that is the "SVP of purchasing for a major hospital network comprising 28 hospitals across several states"), who both noted that their "team's financial analysis points to 'fairly substantial' operating cost savings opportunity with usage of repaired instruments." See Intuitive-00552993-53014 at 53003–53004.

[348] Intuitive-00372699-2703 at 2702-2703.

[349] Intuitive-00292544-2628 at 2556.

University of Buffalo's Department of Surgery noted in a 2019 interview that a "recent internal review [performed by Kaleida Health in Buffalo, NY] revealed an average instrument cost of $3,400 per *da Vinci* procedure, which is significantly higher than the projected $800–1,600 instrument costs for *Senhance.* "[350]  A February 2018 Piper Jaffrey analyst report covering Intuitive found that, despite the surgical robots themselves being priced similarly, "[o]f particular interest to hospitals is the lower per procedure cost of Senhance (roughly one-half of what [Intuitive] charges)," adding that one of the pros of TransEnterix's Senhance as compared to Intuitive's da Vinci is that "[c]laims per-procedure pricing similar to current laparoscopic procedures (~$700), mainly driven by reusable instruments with minimal disposables per case (for example, each instrument can be used, according to the company, 150-200 times compared to da Vinci at ~10-20)."[351]

142.    Evidence I have reviewed demonstrates that, had Intuitive not engaged in its Alleged Misconduct and hospitals been able to repair their EndoWrist surgical instruments through third-party repair companies such as SIS, at least some hospitals would have paid lower prices for EndoWrist surgical instruments than they did in the actual world.  Evidence I have reviewed also demonstrates that Intuitive's Alleged Misconduct caused harm to competition in the tied market (the EndoWrist Repair and Replacement Market) in that hospitals had little choice but to pay higher prices for replacement EndoWrist instruments from Intuitive in order to use their da Vinci surgical robots than they otherwise would have had they been able to repair their EndoWrist surgical instruments through third-party repair companies such as SIS.

143.    For example, in a February 2020 analyst report in covering the "third party risk" to Intuitive's Instruments & Accessories business segment (which includes the sale of EndoWrist instruments), Deutsche Bank included Intuitive's "[l]everaging its dominant market position" as a "[m]itigant[] to [t]hird-[p]arty [e]ncroachment," adding:

> While some hospitals are now starting to question the legality/enforceability of
> contract terms of service, there are also those whose surgeons are simply

---

[350] Perez et al. at p. 6.
[351] Intuitive-00364420-444 at 423.

> unwilling to risk losing access to Intuitive's technologies. We spoke with a
> supply chain executive of a major academic center that recently began using
> repaired da Vinci instruments, but upon receipt of an ensuing cease-and-desist
> notice from the company's lawyers, stopped.[352]

This assessment of the effect of Intuitive "[l]everaging its dominant market position" is
consistent with the evidence discussed earlier in this Expert Report regarding Intuitive's
successful efforts to leverage its restrictive Intuitive Service Agreement that hospitals
were required to sign with every purchase of a da Vinci surgical robot to prevent
hospitals from repairing their EndoWrist surgical instruments through third parties such
as SIS, thus leaving hospitals with little choice but to pay higher prices for replacement
EndoWrist instruments from Intuitive in order to use their da Vinci surgical robots than
they otherwise would have had they been able to repair their EndoWrist surgical
instruments through third-party repair companies such as SIS.

144.    Further, an October 2018 "Qualitative IDI Research Report" prepared by
Advantis for Intuitive found:

> **Cost** is still a concern for users of [robotic assisted surgeries], and this can
> impact the choice of surgical technique (e.g., not using the robot for simple
> cases), but is more often expressed as a frustration felt due to the monopoly
> position that da Vinci has, which requires hospitals to buy equipment and
> maintenance for their da Vinci system directly, with no competition that might
> improve pricing or generate innovation.[353]

A 2013 article titled "The robotic surgery monopoly is a poor deal" noted that "Intuitive
Surgical can command high premiums seemingly because of its monopoly position as the
sole supplier of soft tissue robotic surgical equipment."[354]  Also, in November 2016, Dr.
William Mayfield, Chief of Surgery at Wellstar Health System in Georgia, stated the
following regarding Intuitive:

---

[352] DeSantis Deposition Exhibit 11 at Intuitive-00566074.
[353] Intuitive 00246469-491 at 489 (emphasis in original).
[354] Abhishek Trehan and Tristan J. Dunn, "The robotic surgery monopoly is a poor deal," *The BMJ*, Vol.
347, December 19, 2013, 1-2 at p. 1.

Intuitive.  As Deutsche Bank noted in a February 2020 analyst report in covering the "third party risk" to Intuitive's Instruments & Accessories business segment (which includes the sale of EndoWrist instruments), asserted:

> And even with this modest [4-6 percent] unit share capture, the resultant impact to Intuitive's top-line would be amplified given that each instrument can be repaired multiple times. In our base case scenario of 5% *de novo* unit share capture in 2021 and the assumption that each instrument is repaired 3x on average, our analysis indicates a top-line hit on the order of $193 million or 3.4% of total company sales in 2021.[365]

148.   The evidence discussed above demonstrates that Intuitive's Alleged Misconduct caused harm to competition in that, as a result, hospitals had little choice but to pay higher prices for replacement EndoWrist instruments from Intuitive in order to use their da Vinci surgical robots than they otherwise would have had they been able to repair their EndoWrist surgical instruments through third-party repair companies such as SIS.  This evidence is consistent with the evidence I discussed earlier in this Expert Report demonstrating that more hospitals would have had their EndoWrist surgical instruments repaired more often than they otherwise did had it not been for Intuitive's exclusionary conduct in the form of its requirement that all hospitals enter into the Intuitive Service Agreement as a condition of their purchase of a da Vinci surgical robot, as well as Intuitive's continued enforcement of the Intuitive Service Agreement.

---

[365] DeSantis Deposition Exhibit 11 at Intuitive-00566056 (emphasis in original).  See, also, Intuitive-00552993-53014 at 53007.

## VI.   Conclusions

149.   Based on my analyses and research into the U.S. market for MIST Surgical Robots and EndoWrist Repair and Replacement Market, as well as my training and experience in economics, I have concluded that the market for MIST Surgical Robots in the United States constitutes a relevant antitrust market with respect to the tying market for evaluating the Alleged Misconduct.  I have also concluded that the market for EndoWrist Repair and Replacement Market in the United States constitutes a separate relevant antitrust market with respect to the tied market for evaluating the Alleged Misconduct.  I have also concluded that Intuitive possessed monopoly power in the U.S. market for MIST Surgical Robots during the Relevant Period.  Based on my training and experience in economics as well as my research and analysis into the relevant antitrust markets at issue here, I have also concluded that Intuitive used its monopoly power in the market for MIST Surgical Robots to maintain its monopoly in the EndoWrist Repair and Replacement Market in the U.S. during the Relevant Period.  I have also concluded as a matter of economics that Intuitive's Alleged Misconduct was anticompetitive and resulted in harm to competition in that hospitals had little choice but to pay higher prices for replacement EndoWrist surgical instruments from Intuitive in order to use their da Vinci surgical robots than they otherwise would have paid had they been able to repair their EndoWrist surgical instruments through third-party repair companies such as SIS.

Russell L. Lamb, Ph.D.

December 2, 2022

Exhibit 2

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SURGICAL INSTRUMENT SERVICE COMPANY, INC.,<br><br>Plaintiff,<br><br>v.<br><br>INTUITIVE SURGICAL, INC.,<br><br>Defendant. | Case No.: 3:21-cv-03496-VC |

**Expert Report of Richard F. Bero, CPA, CVA**
**December 2, 2022**

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

## TABLE OF CONTENTS

I.    Introduction ........................................................................................................ 1

    A.    Assignment ................................................................................................. 1

    B.    Alleged Wrongdoings .................................................................................. 1

    C.    Basis for opinions ....................................................................................... 2

    D.    Expert experience and compensation ......................................................... 3

    E.    Trial ............................................................................................................. 4

    F.    Basic damages assumptions ........................................................................ 4

    G.    Opinions Summary ...................................................................................... 6

II.   Parties in suit ..................................................................................................... 7

    A.    Plaintiff – SIS .............................................................................................. 7

    B.    Defendant – Intuitive .................................................................................. 8

III.  Additional Parties not in suit – Rebotix and Restore ...................................... 10

    A.    Rebotix ...................................................................................................... 10

    B.    Restore ....................................................................................................... 12

IV.   Intuitive's da Vinci surgical system ................................................................ 13

    A.    Launched in 1999 ...................................................................................... 13

    B.    da Vinci Products – 5 categories ............................................................... 14

    C.    da Vinci Surgical System Models ............................................................. 14

    D.    Placed primarily in acute care hospitals ................................................... 15

    E.    da Vinci Surgical System Components ..................................................... 16

        1.    Surgeon's Console ......................................................................... 16

        2.    Patient-Side Cart ........................................................................... 16

        3.    3DHD Vision System .................................................................... 17

        4.    Firefly Fluorescence Imaging ("Firefly") .................................... 17

        5.    Da Vinci Xi Integrated Table Motion ........................................... 17

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

F.     U.S. systems sales – 600 and 865 systems placed in 2020 and 2021 .................. 18

G.     Installed U.S. daVinci systems – 3,720 units and 4,139 units as of
        December 31, 2020 and December 31, 2021 ........................................................ 18

H.     Number of daVinci procedures ........................................................................... 18

I.      da Vinci Surgical Systems Sales and Profits ...................................................... 19

V.     Intuitive's EndoWrist Instruments and Accessories ..................................................... 19

A.     10 to 18 uses per EndoWrist ............................................................................... 20

B.     S/Si and X/Xi EndoWrists are essentially the same (except for encryption) ....... 21

C.     U.S. S/Si and X/Xi EndoWrist annual unit sales – 2014 through
        annualized 2022 .................................................................................................. 21

D.     EndoWrist sales and profits ................................................................................ 21

E.     Expired and potentially repairable EndoWrists approximate 60% of
        current year units sold ........................................................................................ 22

VI.    SIS's EndoWrist repair service .................................................................................... 23

A.     Monumental Interest in SIS's repair program .................................................... 24

B.     SIS's sales prices ranging from $1,100 to $1,700 per repair, representing
        an average discount of 42% ................................................................................ 25

C.     SIS's estimated repair services applied to all U.S. da Vinci systems'
        installed base equates to more than $800 million potential EndoWrist
        repair service revenue per year .......................................................................... 25

D.     Subcontracted 2019 repair work to Rebotix ....................................................... 26

E.     Initial EndoWrist Repair Sales and Customers .................................................. 27

F.     Intended to repair EndoWrists in-house ............................................................. 27

G.     EndoWrist Recovery (as opposed to repair) Program ......................................... 27

VII.   Intuitive considered its own instrument refurbishment service but decided against it ..... 28

VIII.  Rebotix's repair program – working with SIS ............................................................... 29

A.     Would have first begun repairing X/Xi by as early as 2019 ................................ 30

IX.    Restore's repair program – working with SIS .............................................................. 31

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

A. Expected greater than 70%to 80% of market would use repair services .............. 31

B. Expected 72% of EndoWrists received would be repairable ................................ 31

C. Would have first begun repairing X/Xi no later than January 2022 and potentially as early as January 2021 ................................................................. 31

X. GPO's ......................................................................................................................... 33

A. Vizient – more than 60% of U.S. acute care providers in 2022 ........................... 33

1. September 2016 Vizient – SIS Agreement ................................................ 33

2. September 2019 Vizient – SIS Agreement Amendment specific to EndoWrist repairs ................................................................................... 34

3. August 2020 Vizient – SIS Agreement - specific to EndoWrist recovery (not repairs) ............................................................................... 35

4. Subsequent Vizient – SIS Agreement Amendments – specific to EndoWrist recovery (not repairs) .............................................................. 36

B. Premier – 2nd largest GPO in the U.S. .................................................................. 36

C. HealthTrust ........................................................................................................... 37

XI. Robotic Surgery Industry ............................................................................................ 37

XII. Surgical Instruments Industry ..................................................................................... 38

XIII. Anticompetitive Conduct Damages ............................................................................ 40

XIV. SIS's Lost Profits Damages ......................................................................................... 41

A. The 'but for' analysis - difference between 'would-have-been' and 'actual' ....... 41

B. The Alleged Wrongdoings caused SIS's lost revenue and profits ....................... 42

C. Demand – monumental interest .......................................................................... 42

D. Capacity and capability to perform EndoWrist repairs ........................................ 45

E. Scenario 1 – Illegal Encryption lost profits damages ........................................... 46

1. Lost EndoWrist repair units ...................................................................... 46

a) 'Would-Have-Been' EndoWrist repair units – through 2025 ....... 47

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

(i)     EndoWrist instruments potentially repairable by SIS – unit sales ................................................................... 47

(ii)    Expiration rate of new sales units – 60% ........................... 48

(iii)   Market share rate based on Vizient – 55% ...................... 49

(iv)    Conversion rate – 15%, 50%, 70% ................................. 50

(v)     Collection rate – 70% ...................................................... 51

(vi)    Repair yield rate – 72% ................................................... 51

(vii)   'Would-Have-Been' EndoWrist repair units through 2025 ................................................................................. 52

(viii)  'Would-Have-Been' EndoWrist repair units – 2% to 12% of units sold ................................................................ 52

b)  Actual EndoWrist repair units ........................................ 53

c)  Lost EndoWrist repair units ............................................ 53

2.  Lost revenue ................................................................................. 53

3.  Less: Incremental costs ............................................................... 54

a)  In-house repair model costs ............................................ 54

(i)     Repair costs ..................................................................... 54

(ii)    Chip costs ........................................................................ 55

(iii)   Vizient GPO administrative fee ...................................... 55

(iv)    SGA costs ........................................................................ 56

b)  Distributor model costs ................................................... 56

4.  SIS's In-house model lost profits through 2025 – approximately $102.6 million ............................................................................. 57

5.  SIS's Distributor model lost profits through 2025 – approximately $40.9 million ............................................................................... 57

6.  Annual lost profits per unit .......................................................... 57

F.  Scenario 2 – Unenforceable Contracts lost profits damages ............................... 57

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

XV.    Lanham Act Damages ........................................................................................... 58

XVI.   Conclusion .......................................................................................................... 59

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

fighting other companies, it was us, so the ability to scale was – was huge.

He also testified the potential revenue from the S/Si EndoWrist business was somewhere in the range of $250 million to $350 million per year, based on:[342]

> …conversations I had with key customers to understand the number of robotics they had, the number of robots they had, the dollars spent on devices and instrumentation for those robots, and then looking at our global customer list through Vizient and the opportunities we would have.

Although it lacks SIS's customer relationships, Restore similarly recognized the demand for repair services.  According to Kevin May, Restore's Operations Officer, there was a high marketplace desire for EndoWrist repairs,[343] and "huge demand" for X and Xi EndoWrist repairs.[344]  According to Clifton Parker, Restore's CEO, he expected "70 to 80 plus percent" of hospitals would have used its services to repair EndoWrists.[345]

In January 2020, a Deutsche Bank Research article was sent in an email to Philip Kim of Intuitive, which included the following about the demand for using repaired da Vinci instruments:[346]

> Our extensive due diligence spanning several months – including conversations with several da Vinci surgeons and supply chain executives. . . yielded confirmation that a growing number of hospital customers, including world-renowned academic centers and even large hospital systems, have begun or are in late stage deliberations/discussions to potentially soon begin using repaired da Vinci Instruments supplied by third-parties.  Meaningful operating cost savings opportunity is the key driver compelling hospitals to consider using these repaired da Vinci instruments.

Overall, it is clear there was demand for SIS's EndoWrist repair services.

---

[342] Deposition of Keith Johnson 17 (October 27, 2022).
[343] Deposition of Kevin May 111 (November 3, 2022).
[344] Deposition of Kevin May 99-101 (November 3, 2022).
[345] Deposition of Clifton Parker 166-167 (October 25, 2022).
[346] Intuitive-00555864-0055866 at 865.

44

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Based on data from Restore for instruments that were collected, approximately 72% were repairable.[386]

Given these considerations, and to remain at the conservative end of the repairability range, I apply a 72 % repair yield rate.

### (vii)     'Would-Have-Been' EndoWrist repair units through 2025

I project the 'Would-Have-Been' EndoWrist units through 2025.  As noted earlier, I assume trial is approximately December 2023 / January 2024.  Assuming SIS prevails, SIS would then begin selling in 2024.  A Year 1 conversion would be 2024, Year 2 would be 2025.  At the end of Year 2 (i.e., 2025), SIS would achieve its maximum conversion rate.

### (viii)     'Would-Have-Been' EndoWrist repair units – 2% to 12% of units sold

Accounting for the various factors above, the 'Would-Have-Been' EndoWrist repair units approximate a 2%, 8% and 12% penetration rate of Intuitive's 2020, 2021, and 2022 EndoWrist unit sales, respectively.[387]

This Would-have-been penetration rate appears reasonable relative to other available data.  For example, in August 2019, Intuitive analyzed potential Xi refurbishment and estimated penetration of approximately 41% or 50%.[388]

Another contemporaneous document, a February 2020 Deutsche Bank analysis, noted a 4% to 6% 2021 penetration rate was reasonable and potentially conservative.[389]  The analysis also noted each instrument could be repaired three times, suggesting a higher, 12% to 18% penetration rate.[390]

---

[386] Deposition of Clifton Parker 43-45, 178-179 (October 25, 2022).  Per Restore-00094918-00094956 at 922 (Parker Dep. Ex. 121), 215 out of 310 instruments collected in a 2-week sample that had lives on them passed Restore's inspection (i.e., were repairable).
[387] **Schedule 2.2**.
[388] Intuitive-00581814-00581883 at 858, 868 and 877.  One estimate shows 59,700 refurbished Xi instruments out of a total 144,985 Xi instruments forecasted in 2020.  The other estimate shows 72,492 refurbished Xi instruments out of a total 144,985 Xi instruments forecasted in 2020.
[389] Intuitive-00566055-00566082 at 056 (Zafar Dep. Ex. 113).
[390] Intuitive-00566055-00566082 at 056 (Zafar Dep. Ex. 113).

# Exhibit 3

**From:**     Philip Kim [Philip.Kim2@intusurg.com]
**Sent:**     1/31/2020 4:02:15 PM
**To:**     Dan Jones [Dan.Jones@intusurg.com]; Gary Guthart [Gary.Guthart@intusurg.com]; Glenn Vavoso [Glenn.Vavoso@intusurg.com]; Henry Charlton [Henry.Charlton@intusurg.com]; Jeroen van Heesewijk [Jeroen.Vanheesewijk@intusurg.com]; Marshall Mohr [Marshall.Mohr@intusurg.com]; Myriam Curet [Myriam.Curet@intusurg.com]; Dave Rosa [Dave.Rosa@intusurg.com]; Jamie Samath [Jamie.Samath@intusurg.com]; Andrew Yiu [andrew.yiu@intusurg.com]; Mark Meltzer [Mark.Meltzer@intusurg.com]; Scott Tackett [Scott.Tackett@intusurg.com]; Sal Brogna [Sal.Brogna@intusurg.com]; Brian Miller [Brian.Miller@intusurg.com]; Vincent Delaunay [Vincent.Delaunay@intusurg.com]; Julian Dunnett [Julian.Dunnett@intusurg.com]; Chris Carlson [Chris.Carlson@intusurg.com]; Alexander Roe [Alexander.Roe@intusurg.com]; Kara Andersen Reiter [Kara.Reiter@intusurg.com]; Catherine Mohr [Catherine.Mohr@intusurg.com]; Ryan Shaw [Ryan.Shaw@intusurg.com]; Andrea Miotto [Andrea.Miotto@intusurg.com]; Peper Long [Peper.Long@intusurg.com]; Brent Davidson [Brent.Davidson@intusurg.com]; Jean Yves Raimon [jeanyves.raimon@intusurg.com]; Ben Andrew [Ben.Andrew@intusurg.com]; Jaime Wong [Jaime.Wong@intusurg.com]; Phil Bradshaw [Phil.Bradshaw@intusurg.com]; Aleks Cukic [Aleks.Cukic@intusurg.com]; William Long [william.long@intusurg.com]; Taylor Patton [Taylor.Patton@intusurg.com]; Damien Desmedt [Damien.Desmedt@intusurg.com]; Dirk Barten [Dirk.barten@intusurg.com]; Mandeep Singh Kumar [MandeepSingh.Kumar@intusurg.com]; Austin Kim [Austin.Kim@intusurg.com]; Bob Desantis [Bob.DeSantis@intusurg.com]; Siang Chin [Siang.Chin@intusurg.com]; Heather Drake [Heather.Drake@intusurg.com]; Gina Russo [Gina.Russo@intusurg.com]; Oliver Wagner [Oliver.Wagner@intusurg.com]; Tomer Stavitsky [Tomer.Stavitsky@intusurg.com]; Christina Salys [Christina.salys@intusurg.com]; Scott Mosko [Scott.Mosko@intusurg.com]; Julian Nikolchev [Julian.Nikolchev@intusurg.com]; Peter Arkell [Peter.Arkell@intusurg.com]; Nick Santore [Nick.Santore@intusurg.com]; Calvin Darling [Calvin.Darling@intusurg.com]
**CC:**     Eddie Sarrine [Eddie.Sarrine@intusurg.com]; Brett Kirouac [Brett.Kirouac@intusurg.com]; Patrick Clingan [Patrick.Clingan@intusurg.com]; Fredrik Widman [Fredrik.Widman@intusurg.com]; Kai Lai [Kai.Lai@intusurg.com]; Nick Alter [Nicholas.Alter@intusurg.com]; David Lee [David.Lee2@intusurg.com]; Minal Shah [Minal.Shah@intusurg.com]; Jean Yves Raimon [jeanyves.raimon@intusurg.com]; Rahul Cordeiro [Rahul.Cordeiro@intusurg.com]; Naoko Yasumoto [Naoko.Yasumoto@intusurg.com]; Andy Song [Andy.Song@intusurg.com]; Brian King [Brian.King@intusurg.com]; Mark Hoose [Mark.Hoose@intusurg.com]; Tina Todasco [Tina.Todasco@intusurg.com]; Andy Stone [Andy.Stone@intusurg.com]; Matt Miller [Matt.Miller@intusurg.com]; Mark Veeh [Mark.Veeh@intusurg.com]; Daphne Gulcu [Daphne.Gulcu@intusurg.com]; Christine Doyle [Christine.Doyle@intusurg.com]; Frederic Dubois [Frederic.Dubois2@intusurg.com]; Harrison Miner [Harrison.Miner@intusurg.com]; Victor Chow [Victor.chow@intusurg.com]; Brandon Lamm [Brandon.lamm@intusurg.com]; Sid Nagendraprasad [Sid.Prasad@intusurg.com]; Eric Torbenson [Eric.Torbenson@intusurg.com]; Shaun Fisher [Shaun.Fisher@intusurg.com]; Andrew Boxley [Andrew.boxley@intusurg.com]
**Subject:**     Investor News: 1/25 - 1/31
**Attachments:**     ISRG DB 1.27.20.pdf; ISRG RJ 1.27.20.pdf; ISRG Wells 1.27.20.pdf; jpm election note 1.31.20.pdf; STRYKER_20200129_0000.pdf; ubs hca note 1-29-20.pdf; bernstein miniaturization piece.pdf; wells coronavirus note 1-28-20.pdf

---

## ISRG ANALYST REPORTS

**Deutsche Bank:     ISRG:     New Self-Manufactured Competitive Risk; Downgrade to Hold** "...academic centers and even large hospital systems, have begun or are in late stage deliberations/discussions to potentially soon begin using repaired da Vinci instruments supplied by third-parties."

**Raymond James:     ISRG:     We See a Number of Issues for Refurbished Instruments, Including FDA Clearance** "ISRG shares were under pressure today due to competitor concerns predicated on risks to the business from the emergence of 3rd-party system service and instrument refurbishment from Restore Robotics (RR). We have spoken to Intuitive and have reviewed the litigation between RR and the company. In our opinion, there are a number of issues to consider with RR's services, including: 1) the potential need for a 510(k) for a refurbished instrument; RR is replacing parts and a computer chip is reprogrammed, 2) Intuitive's warranty is explicit that any service provided by an unauthorized provider will void the agreement, and 3) RR is not an authorized service provider for Intuitive, and any representations are misleading.     Should a refurbished instrument not authorized by Intuitive fail and result in patient harm, there could be

significant legal liabilities to a hospital. In turn, refurbishment is likely to be minimal until litigation plays out…in the case of Masimo, while there was a lot of noise initially, it simply became not worthwhile for hospitals to take on the legal liability to use a 3rd-party reprocessed sensor…"

**Wells Fargo:   ISRG:   Refurbished Instrument Usage May Remain Limited** "use of refurbished instruments could be a violation of the FDA standards as instruments are pre-programmed to a specific number of usage for safety reasons…it is likely that use of refurbished instruments would void warranty and put hospitals at risk in case of an adverse event. Thus, we believe that usage will remain limited in the foreseeable future…it is likely that the use of refurbished instruments will remain in limited use due to liability risk…"

<u>**OTHER COMPANY NEWS**</u>
**Wells Fargo:   Potential Impact of Coronavirus In China**   "our contacts are expecting 2-3 times the normal Chinese New Year Effect, since the government is extending the public holiday to take the pressure off employees returning to work… (1) Our contacts are expecting anything 'elective' to see deferred demand (e.g., medical aesthetics and potentially also all the way up to hip and knee procedures) because people just aren't leaving the house unless it's life threatening, and cross-province healthcare demand cannot be served at this time due to the travel bans… (4) There is potential for some re-directed investment within health. For example, there has been a lot of investment flowing into high end oncology resulting from the Healthy China policy (e.g. imaging, radiation oncology, liquid biopsy, etc), but also other chronic health areas (e.g. cardiovascular and diabetes). There is the potential for some of that investment to be re-deployed into Coronavirus research and primary health infrastructure."

**JPM:   2020 Election Update:   Investors Already Looking Well Beyond Iowa** "Current Situation:   Sanders leads in IA (Feb 3rd), maintains a sizeable lead in NH (Feb 11th) but faces a sizeable deficit in both NV (Feb 22nd) and SC (Feb 29th). This week Sanders is polling a new, narrow lead in CA (Mar 3rd) and a shrinking deficit in TX (Mar 3rd). A week ago on Jan 24th, Sanders pulled ahead of Biden for the 1st time in the RealClearPolitics avg. betting odds for the Democratic nomination. We've fielded numerous calls from investors who are becoming more nervous about the odds of Sanders winning the Democratic nomination and the resultant impact on stocks. At this point we can merely say that while we believe Sanders' likely wins in IA and NH are well discounted, the stocks could still trade lower on his improving polling in other states like CA. Of course the markets had a similar "moment" w/ Warren that peaked in Oct'19."

**MS:   Stryker Q419 Earnings Results:   Strong Finish; 2020 Upside Expected** "Mako: 4Q system placements of 89 (+35 y/y) was the strongest robot quarter since launch and materially ahead our 62 estimate. The TKA utilization trends continue to trend higher growing ~15% in 4Q, which bodes well for placements in 2020. Commentary suggested sales strategy/pricing has not changed, although rental mix may have modestly increased. Japan install base grew to 9 in 4Q (vs. 4 in 3Q), and commentary was notably bullish on the future prospects in this market but it was not the driver in the quarter. China TKA approval is expected later this year, further expanding the TAM. Moving forward, Stryker will no longer be providing quarterly Mako numbers likely in response to Zimmer Biomet's practice."

**UBS:   HCA Healthcare Q419 Earnings Recap:   Strong End to 2019 Positive Skew to Guidance in 2020; Out Year EPS too Low** "Quarterly results modestly exceeded Street estimates (+2.5% EBITDA beat) against low expectations w/ a continuation of strengthening end-markets and accelerating volume growth. HCA enters 2020 w/ a strong MDCR pricing backdrop ($200m tailwind), exceptional visibility around cost controls and solid volume momentum. HCA's leverage is oscillating around historically low levels offering up substantial optionality around capital deployment, in our view, which HCA will deploy in time… SS MCO admits increased +4.7% w/ SS MCO AA up +4.8% which was slightly higher vs. 3Q19 trends"

**1/27/20:   Titan Medical Receives ISO 13485 Certification, Provides Update on Fourth Quarter Milestones**
https://titanmedicalinc.com/titan-medical-receives-iso-13485-certification-provides-update-on-fourth-quarter-mileston es/

**Bernstein:   Weekend Pulse:   Miniaturization in Medtech enables what was once unthinkable; what could devices look like by 2050?**   "Engineers believe we can shrink medical devices by 90% again over the next 20 to 30 years while packing even more functionality and connectivity into the technology."

Philip Kim
Investor Relations

Direct:   1 408 523 9667
Mobile:  1 201 264 0490
Philip.Kim2@intusurg.com

INTUITIVE

1020 Kifer Road
Sunnyvale, CA 94086   USA
intuitive.com


ISRG DB
1.27.20.pdf


ISRG RJ
1.27.20.pdf


ISRG Wells
1.27.20.pdf


wells coronavirus
note 1-28-20.pdf


jpm election note
1.31.20.pdf


STRYKER_2020...

ubs hca note
1-29-20.pdf


bernstein
miniaturization pi...

Attorneys' Eyes Only

| From: | Nick Alter [Nicholas.Alter@intusurg.com] |
|---|---|
| Sent: | 2/28/2020 8:02:34 AM |
| To: | Nick Alter [Nicholas.Alter@intusurg.com] |
| CC: | Philip Kim [Philip.Kim2@intusurg.com] |
| Subject: | Weekend Reading: Deeper Dive on Third Party I&A Risk; Notes from UBS Doc Panel |
| Attachments: | UBS doc panel w highlight.docx; JPM Jan Hospital Survey 2.20.20.pdf; RJ 2.17.20 Coronavirus note.pdf; MDT 2.19.20 earnings MS.pdf; DB feb 20 precall note.pdf |

Happy Friday,

Below I've complied the latest articles and analyst reports from last week, and highlighted reports of key interest. *For any questions regarding the equity research reports below, please contact Philip Kim.*

Also – I'd recommend checking out ISI Podcasts here: Intuitive Radio

Battle of the 'bots: 4 robotic surgery rivalries to watch in the year ahead

J&J's Ethicon mostly fends off Intuitive Surgical's robotic surgery patent challenge

FDA pilots new 510(k) submission template for device manufacturers

**ISRG ANALYST REPORTS**
**Deutsche Bank: Deeper Dive on Third Party Risk to I&A Segment** "Medline recently became a distributor for Restore Robotics…expansion of offerings to include repaired X/Xi instruments expected near term."

**OTHER COMPANY NEWS**
**Morgan Stanley: Medtronic Earnings: A Setback Quarter:** "F3Q was a challenging quarter driven by a combination of "transient" issues (ERP implementation across MITG; stalled purchasing in CVG; Infuse order timing in RTG) and weaker isolated segment performance. Organic growth of 2.6% reflected ~5 pts of sequential deceleration on a 2-year stack basis…Geoff Martha becomes CEO in April… we expect Geoff to focus on a higher growth profile at the corporate level, including a new level of focus on Diabetes and greater reliance on M&A which has already begun to pick up (e.g. Digital Surgery)."

**Raymond James: Coronavirus – Worst is yet to come, Sorry Frank** "We increase our likelihood of notable widespread cases in the U.S. from 1 in 7 to **1 in 5**. We note many officials we speak with believe the likelihood is higher. In China, the time from initial virus introduction (we believe probably late November or early December) to reaching epidemic levels took between 7-10 weeks. That means we probably **need to wait another 2-4 weeks** before we can say we will not see a widespread outbreak in the U.S…"

**JP Morgan: January Hospital Volumes Survey** "Our January hospital survey (306 Hospitals) suggests that total inpatient admissions / commercial admissions / outpatient procedures / ER visits improved / (declined) by approximately +1.9/(-1.3)/+2.2/+2.8% yty, respectively. The Southern region represents ~70% of publicly traded hospital revenues. In a reversal of 2019, Southern trends were barely stronger than the overall U.S. with January IP/Comm/OP/ER +2.2/(-0.8)/+3.1/+2.6% yty, respectively…Leap Year will create a material tailwind in February"

**UBS hosted a soft tissue robotics surgeon panel this morning. The panel was constructive for Intuitive and Philip Kim attached his notes (Word doc).**

Below is our latest shareholder listing reflecting positions held as of 12/31/19. Our ownership was mostly stable with Fidelity, Capital World Intl, and Alliance adding to their positions.

| Rank | Firm | % | Shares | Change | Orientation | City | Style |
|---|---|---|---|---|---|---|---|
| **Top Holders** | | | | | | | |
| 1 | T. Rowe Price Associates, Inc | 8.92 | 10,347,449 | -47,713 | Active | Baltimore | GARP |
| 2 | The Vanguard Group, Inc. | 7.77 | 9,008,225 | 98,406 | Passive | Malvern | Index |
| 3 | Fidelity Management & Resea | 5.91 | 6,857,194 | 528,373 | Active | Boston | GARP |
| 4 | BlackRock Institutional Trust ( | 4.59 | 5,324,812 | -128,046 | Passive | San Francisco | Index |
| 5 | State Street Global Advisors | 4.18 | 4,844,141 | 101,876 | Passive | Boston | Index |
| 6 | Morgan Stanley Investment M | 3.36 | 3,902,680 | 62,991 | Active | New York | GARP |
| 7 | Capital World Investors | 2.99 | 3,468,068 | 8,502 | Active | Los Angeles | Growth |
| 8 | Edgewood Management LLC | 2.35 | 2,728,095 | -14,825 | Active | New York | GARP |
| 9 | Jennison Associates LLC | 2.18 | 2,528,399 | 13,527 | Active | New York | Growth |
| 10 | Baillie Gifford & Co. | 1.88 | 2,177,284 | 77,477 | Active | Edinburgh | Core Growth |
| 11 | AllianceBernstein L.P. | 1.56 | 1,808,432 | 289,059 | Active | New York | Core Growth |
| 12 | Janus Henderson Investors | 1.55 | 1,798,160 | -96,075 | Active | London | Core Growth |
| 13 | Walter Scott & Partners Ltd. | 1.51 | 1,755,078 | -11,006 | Active | Edinburgh | Core Growth |
| 14 | Geode Capital Management, | 1.39 | 1,613,934 | -197,685 | Passive | Boston | Index |
| 15 | Nuveen LLC | 1.28 | 1,484,896 | -63,235 | Active | New York | GARP |
| 16 | JP Morgan Asset Managemer | 1.26 | 1,465,888 | -39,505 | Active | New York | GARP |
| 17 | Invesco Capital Management | 1.04 | 1,210,274 | 3,124 | Passive | Downers Grove | Index |
| 18 | Norges Bank Investment Man | 0.94 | 1,094,360 | 57,926 | Active | Oslo | Core Value |
| 19 | Brown Advisory | 0.85 | 987,155 | -7,453 | Active | Baltimore | GARP |
| 20 | American Century Investment | 0.81 | 940,486 | -12,966 | Active | Kansas City | Core Growth |
| **Top Buyers** | | | | | | | |
| 1 | Fidelity Management & Resea | 5.91 | 6,857,194 | 528,373 | Active | Boston | GARP |
| 2 | Capital Research Global Inves | 0.69 | 798,964 | 513,764 | Active | Los Angeles | Growth |
| 3 | AllianceBernstein L.P. | 1.56 | 1,808,432 | 289,059 | Active | New York | Core Growth |
| 4 | Ensign Peak Advisors, Inc. | 0.23 | 271,197 | 271,197 | Active | Salt Lake City | Specialty |
| 5 | Morgan Stanley & Co. LLC | 0.15 | 172,880 | 163,189 | Passive | New York | Broker-Dealer |
| 6 | Morgan Stanley Private Equity | 0.11 | 131,126 | 131,126 | Active | Seoul | VC/Private Equ |
| **Top Sellers** | | | | | | | |
| 1 | Winslow Capital Management, LLC | | 0 | -466,772 | Active | Minneapolis | Aggres. Gr. |
| 2 | Coatue Capital, L.L.C. | 0.24 | 282,798 | -250,456 | Active | New York | Hedge Fund |
| 3 | Geode Capital Management, | 1.39 | 1,613,934 | -197,685 | Passive | Boston | Index |
| 4 | Lazard Asset Management, L | 0.33 | 382,034 | -167,915 | Active | New York | Core Value |
| 5 | HealthCor Management, L.P. | 0.07 | 83,550 | -151,655 | Active | New York | Hedge Fund |
| 6 | Citadel LLC | 0.04 | 47,564 | -135,712 | Active | Chicago | Hedge Fund |

Best,

**Nick Alter**
Sr. Analyst
Finance & Sales Operations

Mobile:   305-804-4813
Direct:   678-291-6167
Nicholas.Alter@intusurg.com

INTUITIVE

5655 Spalding Drive
Norcross, GA 30092
intuitive.com

Exhibit 5

1          IN THE UNITED STATES DISTRICT COURT

2              MIDDLE DISTRICT OF FLORIDA

3                TAMPA DIVISION

4                  ---oOo---

5

6   REBOTIX REPAIR, LLC,

7          Plaintiff,

8   vs.                    Case No. 8:20-CV-02274

9   INTUITIVE SURGICAL, INC.,

10         Defendant.

11   _____/

12

13

14

15        30(b)(6) REMOTE VIDEOTAPED DEPOSITION OF

16              BOB DESANTIS

17            THURSDAY, MAY 27, 2021

18

19

20

21   Stenographically Reported by:

22   ANDREA M. IGNACIO, CSR, RPR, CRR, CCRR, CLR

23   California CSR No. 9830

24   Job No. 194224

25

1           IN THE UNITED STATES DISTRICT COURT

2              MIDDLE DISTRICT OF FLORIDA

3                 TAMPA DIVISION

4                 ---oOo---

5

6   REBOTIX REPAIR, LLC,

7          Plaintiff,

8   vs.                Case No. 8:20-CV-02274

9   INTUITIVE SURGICAL, INC.,

10         Defendant.

11   _____/

12

13

14

15       REMOTE VIDEOTAPED DEPOSITION OF BOB DESANTIS,

16   taken on behalf of the Plaintiff, on Thursday,

17   May 27, 2021, beginning at 6:36 a.m., and ending at

18   2:50 p.m., Pursuant to Notice, and remotely before

19   me, ANDREA M. IGNACIO, CSR, RPR, CRR, CLR ~ License

20   No. 9830.

21

22

23

24

25

1   R E M O T E  A P P E A R A N C E S:

2

3   COUNSEL FOR INTUITIVE SURGICAL INC., AND THE

4   DEPONENT:

5       LAW OFFICES OF ALLEN RUBY

6       By:  ALLEN RUBY, ESQ.

7       15559 Union Avenue, Suite 138

8       Los Gatos, California 95032

9

10      SKADDEN, ARPS, SLATE, MEAGHER & FLOM

11      By:   TAYLOR DOW, ESQ.

12      One Manhatten West

13      New York, New York 10001

14

15

16    COUNSEL FOR REBOTIX REPAIR LLC:

17      DOVEL & LUNER

18      By:  ALEXANDER ERWIG, ESQ.

19        LORENZO LAMO, ESQ.

20        CONNIE CHENG, Summer Associate

21        ALEX WALLACE, Summer Associate

22      201 Santa Monica Boulevard

23      Santa Monica, California 90401

24

25

1   R E M O T E   A P P E A R A N C E S:  (Cont.)

2

3

4      ALSO PRESENT:  Kevin Marth, Videographer

5

6               ---oOo---

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    A   I don't see it in the folder.  Let me

2  refresh.

3        There it is.  Okay.

4        So you can still hear me?

5    Q   Yes.

6    A   Okay.  So one question was, can -- when

7  there's a failure non-related to the PEEK ring or

8  adhesive, and you replace an alternate instrument,

9  does it just carry on at the current number of cycles?

10        And the answer is no.  In 6.5 of the

11  document, the last sentence of the paragraph refers

12  to:

13        "Use cycling must be re-started on the

14  replacement instrument at Life Cycle zero."

15    Q   Great.  Thank for clarifying that.

16    A   Yeah.  And I'm not sure that was the last

17  question, but...

18    Q   Well, I just wanted to get some specifics

19  about the actual way that use testing happens here.

20        So you see this is a page titled:

21        "Test Results for Instrument Sample #10."

22    A   Yes.

23    Q   There's some preconditioning.

24        Do you see that?

25    A   Yes.

1    Q   And then there's ten life cycles.

2        Do you see that?

3    A   I do.

4    Q   Is there any indication that these

5    instruments are tested beyond ten life cycles?

6    A   No.

7        MR. ERWIG:  Stop screen sharing this

8    document.

9        It's a little under an hour, but let's go

10   ahead and take a break.

11       THE WITNESS:  Okay.

12       MR. ERWIG:  Let's go off the record.

13       THE VIDEOGRAPHER:  We are going off the

14   record at 11:02 a.m.

15       (Recess taken.)

16       THE VIDEOGRAPHER:  This marks the start of

17   Media No. 4.  We are back on the record at 11:12 a.m.

18       MR. ERWIG:  Q.  Mr. DeSantis, do you have

19   some familiarity with the Extended Use program?

20   A   I do.

21   Q   What is the Extended Use program?

22   A   It's a instrument development program that we

23   commercialized that allowed us to extend the number of

24   indicated lives in some of our Fourth Gen Xi

25   instruments beyond their previously indicated lives.

1    Q   So the -- do you know when the da Vinci Si

2   was first released to market?

3    A   Did you say Si?

4    Q   The Si, yeah.

5    A   Si.

6        I know approximately when, yes.

7    Q   Can you give me an estimate?

8    A   About 2008, 2009.

9    Q   2008, 2009, that's about -- maybe about

10   12 years ago?

11   A   Yes.

12   Q   At any point in those 12 years, did Intuitive

13   consider extending the lives of the Si EndoWrist

14   instruments?

15   A   I don't know previously, previous to my

16   joining the company in 2013.  We've had -- there were

17   some conversations about it since then, yes.

18   Q   Intuitive concluded that it would not be

19   extending the use counter for the da Vinci Si

20   EndoWrist; is that right?

21   A   Correct.

22   Q   Now, there have been some changes in the Si

23   EndoWrist over the years; right?

24   A   Yes.

25   Q   Some materials have been updated; right?

1    A   Yes.

2    Q   Some parts of the design have made components

3 sturdier, for example, right?

4    A   Yes.  You know, since -- since we lost the

5 Xi, we had focused all of our efforts on the Xi.  But

6 on some things have been back propagated to Si where

7 we could.

8    Q   Well, that was going to be my next question.

9       When was the da Vinci Xi launched?

10    A   March 2014.

11    Q   At any point did Intuitive consider

12 conducting some follow-up testing to determine whether

13 the use counter for the da Vinci Si could be raised

14 from ten uses to an increased number of uses?

15    A   This is Si, again, Sam?

16    Q   Si.

17    A   Yeah.

18       So I -- when we -- when we started talking

19 about could we potentially raise the number of

20 indicated uses on Xi, we had some brief conversations

21 about Si, but not much.

22    Q   One thing Intuitive could have done would be

23 to rerun live testing for the Si instruments as there

24 were some changes made to those instruments over the

25 years; right?

1    A   Well, we do.  Whenever we make a significant

2   impact, we have to revalidate -- or a significant

3   design change, we have to revalidate and we would run

4   live testing on the Si instrument.

5    Q   Well, for the extended use instruments, those

6   didn't involve any -- withdrawn.

7        Adding lives to the use counter on the

8   extended use instrument, that didn't involve any

9   significant changes to the instrument; right?

10   A   No, that's not correct.

11       MR. ERWING:  Let's look at what Intuitive

12  sent to the FDA.  The next exhibit is going to be

13  Exhibit 18.

14       (Document remotely marked Exhibit 18

15        for identification.)

16       MR. ERWIG:  This will be 8/13/20 Intuitive

17  NFJ to FDA.

18   Q   Do you see this on the screen in front of

19  you, Mr. DeSantis?

20   A   Yes.

21   Q   You see that this is a Non-Filing

22  Justification?

23   A   Yes.

24   Q   What is a Non-Filing Justification?

25   A   It's a regulatory document that justifies

1  that you do not have to submit a regulatory clearance

2  application to the FDA to launch a particular product

3  to commercialize a particular product.

4    Q   And Intuitive did not submit a 510(k) to the

5  FDA for extended use instruments; is that right?

6    A   Correct.  We did a Non-Filing Justification.

7    Q   I just want to talk to you a little bit about

8  some of the things that are said in here.

9        So first, you have a table which has

10  "Products and 510(k) Clearance Information"; do you

11  see that?

12    A   Yes.

13    Q   It lists a number of "Product Base PNs and

14  Names"; do you see that?

15    A   Yes.

16    Q   Including the "Curved Bipolar Dissector," the

17  "Fenestrated Bipolar Forceps," and so on?

18    A   Yes.

19    Q   Are those all EndoWrists?

20        I can scroll through the table with you.

21    A   Everything I've seen so far is an EndoWrist.

22    Q   Okay.  On page 4, there's paragraph that's --

23  it has the heading "Description of Proposed

24  Change(s)"; do you see that?

25    A   Yes.

1    Q   Now, midway down this paragraph it reads,

2  quote:

3        "These instruments are currently rated for 10

4  clinical lives, or human uses.  Extending the number

5  of lives does not involve any changes to the intended

6  use(s) or instrument design."

7        Do you see that?

8    A   Yes.

9    Q   So that's a truthful submission for the FDA

10  in its Non-Filing Justification?

11    A   Yes.  And my answer earlier was that we did

12  make significant changes, but those do not happen at

13  the time of the submission.  They happened over the

14  seven years since we launched the -- the instruments.

15    Q   Well, the actual life extension moved from

16  ten lives to 14 lives, that didn't involve any changes

17  to the intended uses or instrument design of the

18  EndoWrist; right?

19    A   At the time we did the final qualification

20  and validation, to prove we can go from ten to 14, we

21  didn't make any significant changes to most of the

22  instruments.  But we had been making changes to

23  improve durability, reliability on these instruments

24  over the course of seven years that got us to this

25  point to be able to do this validation.

1    Q   And for those particular changes, there

2  weren't 510(k)s submitted for those individual

3  changes; right?

4    A   I don't know the answer to that.

5    Q   Well, let's look at paragraph 8.

6       It says "Analysis of Proposed Changes"; do

7  you see that?

8    A   Yes.

9    Q   And then there's a table that asks some

10  questions and seems to ask Intuitive to provide some

11  answers; do you see that?

12   A   Yes.

13   Q   I want to go down to a section titled "Change

14  assessment per FDA Guidance, 'Deciding When to Submit

15  a 510(k) for a Change to an Existing Device.'"

16      Do you see that?

17   A   I do.

18   Q   A.1 asks:

19      "Change in indications for use statement?

20      Do you see that?

21   A   Yes.

22   Q   Intuitive answers "No" to that question;

23  right?

24   A   I see that.

25   Q   Is that true, there's no change in

1  indications for the use statement for the extended use

2  EndoWrist?

3    A  That's correct for this -- this NFJ, this

4  Non-Filing Justification, there was no changes for

5  indications for use which refers to a clinical

6  question.

7    Q  And you're generally familiar with this

8  Non-Filing Justification to the FDA; right?

9    A  At a very high level.

10   Q  Now, there's one question under A.4 that

11  reads:

12      "Could change affect directions for use?"

13      Do you see that?

14   A  Yes.

15   Q  The answer is "No"; do you see that?

16   A  I do.

17   Q  Now, there's "Technology or performance

18  change?"  The answer is "Yes"; do you see that?

19   A  Yes.

20   Q  I'll discuss that a little bit later down in

21  the flowchart.

22      B.2 reads:

23      "Control mechanism, operating principle, or

24  energy type change?"

25      And the answer is "No"; do you see that?

1    A   Yes.

2    Q   The answer would have been yes, a 510(k)

3   would have been required; right?

4    A   Yes.

5    Q   Now B.3 reads:

6        "Change in sterilization cleaning, or

7   disinfection?"

8        And the answer is "No"; right?

9    A   Right.

10   Q   B.4 is:

11       "Change in packaging or expiration dating."

12       No change there; Right?

13   A   Right.

14   Q   Then B.5 asks:

15       "Is it any other change in design (e.g.,

16   dimensions, performance specifications, wireless

17   communications," et cetera.

18       Do you see that?

19   A   Yes.

20   Q   The answer provided is "Yes."

21       Do you see that?

22   A   I do.

23   Q   Then I want to talk with you about the

24   "Note/Clarifications" on the right-hand side.

25       Do you see that column?

1    A   I do.

2    Q   And the first thing that is written there is:

3       "Performance specification changed from 10

4   lives to 14 lives."

5       Do you see that?

6    A   Yes.

7    Q   Does that mean Intuitive has adjusted the

8   usage counter using software to allow extended use

9   instruments to be used for 14 lives instead of 10?

10   A   Yeah, I'm going to take just -- I didn't

11  answer that question.

12      I'm just going take a second to read it a

13  little bit.

14   Q   No problem.

15   A   So the answer is yes to the question.  That

16  means that we changed the indicated lives from ten to

17  14.

18   Q   And the next paragraph reads:

19      "Based on an initial risk analysis,

20  increasing the number of lives for this instruments is

21  not expected to significantly affect the safety or

22  effectiveness of the device."

23      Do you see that?

24   A   I do.  It's part of the paragraph.  The rest

25  of it is "The life testing conducted for this

1  change..."

2    Q   Right.  I was -- I was going to get to that.

3  I just wanted to know if you were with me for the

4  first part of the paragraph.

5    A  I'm with you for the first part.

6    Q   Second part reads:

7      "The life testing conducted for this change,

8  which is identical to the methodology and used the

9  same acceptance criteria to the testing presented to

10  the FDA in the most recent 510(k)s submitted for these

11  instruments."

12      Do you see that?

13    A  Yes.

14    Q   The actual increase of lives from ten to 14,

15  that did not significantly affect the safety or

16  effectiveness of the extended use EndoWrist; true?

17    A   Extending the lives from ten to 14 on -- on

18  these instruments did not change the risk based on

19  live testing we performed, yes.

20    Q   And then there's some other questions,

21  including the "Change significantly affects the use of

22  the device?"  And the answer is "No"; do you see that?

23    A  I do.

24    Q   Any new or modified risks?  The answer is

25  "No"; right?

1    A   Right.

2    Q   "Is clinical data necessary?"  The answer is

3   "No"; right?

4    A   Correct.

5    Q   "Any unexpected issues from V&V activities?"

6        What are V&V activities?

7    A   Verification and validation activities.

8    Q   The answer there is "No" as well; right?

9    A   Right, and refers to the life testing

10   verification.

11   Q   And then Section C is "Materials Changed"; do

12   you see that?

13   A   Yes.

14   Q   The answer is "No"; right?

15   A   Correct.

16   Q   I'm going to stop screen sharing this

17   document.

18       When Intuitive was considering how to extend

19   lives, one factor that Intuitive was considering was

20   what the profit margins would be for different numbers

21   of extended lives; right?

22   A   So I -- yes.

23   Q   So, for example, Intuitive would analyze, Hey

24   is it more profitable to raise the lives of the

25   extended instruments to 12 or to 14; right?

1    A   No, no.  That's why I hesitated to that

2   earlier.

3        So this program was not conceived on let's go

4   raise the number of lives of the instruments.  It was,

5   we've done all this work to improve the performance

6   and reliability of the instruments.  Let's to see if

7   we can or what we can get to for indicated lives.  And

8   once we got good results, we then did analyses to

9   determine the profit margin and revenue sharing,

10  et cetera.

11   Q   Well, sir, one consider -- withdrawn.

12        One set of considerations when you were

13  developing the extended life instruments was how would

14  offering extended life instruments affect Intuitive's

15  revenue stream; right?

16   A   Yeah, the particulars of the question matter

17  to me.  When we were -- we really didn't develop

18  extended use instruments.  We improved the quality and

19  performance of our existing instruments to the point

20  where we tested those instruments.  It's really

21  without any significant change from that point which

22  is why an NFJ and no change to material, et cetera, at

23  that point, was accurate.

24        Once we had the ability to raise the lives,

25  we then made analyses on what's the right financials

1  behind the program

2     Q   And when you say "right financials behind the

3  program," that would be, for example, are we going to

4  rate these instruments at 12 lives, at 14 lives, or at

5  16 lives; right?

6     A   No, no, no.  The life -- the life rating was

7  based on whatever we can get out of them.  We tested

8  them, you know, to the point where we can

9  statistically indicate them.  That's why we ended up

10  with, in my opinion, a sub-optimal stratification:

11  Sum 12, sum 14, sum 18.

12        It was the most we can get out of them at our

13  statistical testing for our specifications and

14  requirements.  That has nothing to do with the

15  financials.  It was after we determined the number of

16  lives that we can confidently statistically claim,

17  then how do we price them.

18     Q   Sir, is it your testimony that marketing

19  played no role in the development of the extended use

20  instruments?

21     A   Not at all, no.

22     Q   Was marketing, in fact, very involved in

23  determining the appropriate level of lives to market

24  to customers and how best to package that life

25  increase?

1    A   I hear two different questions.  One was

2   marketing very involved in determining the number of

3   lives that we would roll out to the field or out to

4   customers?  And then, two, how do we -- how do we

5   package that?

6         The number of lives was determined primarily

7   on a -- on the test results of whatever we can get out

8   of them safely.

9         I'm trying to remember.  There might have

10   been some situations where we bundled them together.

11   BiPolar might have gotten 15.  We said the other three

12   BiPolars were 14, so let's just put them all at 14 for

13   simplicity to the customer.

14         So no, marketing wasn't very involved in

15   establishing the number of lives that we would roll

16   out to the customers.  That's not how I would describe

17   it at all.

18         Were they very involved in the roll out of

19   the program, both promotional, pricing, targeting?

20   Absolutely, yes.

21    Q   Well, sir, at a certain point, you --

22   withdrawn.

23         You mentioned that the da Vinci Si, that came

24   to market around 2008 or 2009; right?

25    A   Yes.

1    Q   And over the years there were some -- some

2   changes to the da Vinci Si instruments; right?

3    A   Yes.

4    Q   And so if you had, at every point, wanted to

5   give the maximum amount of uses to the customer, you

6   would have tested those at various points and seen

7   what the appropriate use limits were; right?

8    A   Not necessarily, no.

9    Q   Well, if there's an improvement from --

10   withdrawn.

11       The Si instruments, they were typically

12   initially set at ten lives; right?

13    A   Yes.

14    Q   Now, there might have been some -- withdrawn.

15       Now, there were some changes and updates to

16   various types of instruments over the years; right?

17    A   Yes.

18    Q   And, for example, in 2012, you could have

19   tested the instruments and seen, Hey, are we seeing a

20   higher number of uses that we can get out of them,

21   right, using our life testing?

22    A   We could have, yes.

23    Q   And if the instruments had gotten better,

24   that might have shown these can now use -- or your

25   testing method be used for 13 or 14 lives; right?

1    A   Yeah, I want to refer back to what I said

2  earlier is that it's not just lives.  That there's

3  other variables in play, like customer satisfaction,

4  quality level, RMA levels, et cetera.

5          So as you make improvements or you make

6  changes, the changes may have been reactive to quality

7  problems.  They may have been improvements to try and

8  improve a, you know, the durability, reliability.  You

9  can either -- you know, that may be intended to drive

10  the quality and customer satisfaction at the currently

11  indicated lives higher.

12          You know, so it's not just making

13  improvement.  It's -- it's more lives on the

14  instrument.

15    Q   Well, you could certainly have tested the Si

16  instruments in 2013 to determine whether additional

17  lives were warranted; right?

18    A   We could have, yes.

19    Q   Did Intuitive, in fact, do any such testing?

20    A   I don't know.

21    Q   Are you aware of any?

22    A   Not off the top of my head.

23          We also changed, because of an audit finding,

24  our statistical-based method and the rigor behind it

25  which made things harder in 2014.  But anyway the

1  answer is not that I'm aware.

2     Q   Now, in 2013, if Intuitive wanted to give

3  hospitals the maximum possible number of uses out of

4  every Si instrument, Intuitive could have tested the

5  Si instruments and seen what the appropriate number of

6  uses was as of that time; right?

7     A   That's -- that's one option, yes.

8     Q   Instead Intuitive left the life counter for

9  the Si instruments at ten uses; right?

10     A   Intuitive was investing heavily in a better

11  platform at that time, so we did not choose to invest

12  in the Si instruments to do a life testing and roll

13  out that program.  Correct, we did not do that.

14     Q   And so Intuitive left the life counter of the

15  Si instruments at ten uses and didn't try to increase

16  it to 12, 13, or anything else; right?

17     A   Correct.

18        MR. ERWIG:  Now, I want to screen share our

19  next exhibit.  This will be from Folder 3.  This will

20  be 9/30/19 DeSantis to Vhee.

21        (Document remotely marked Exhibit 19

22         for identification.)

23        MR. ERWIG:  Q.  Before I screen share this

24  document, as you were considering rolling out the

25  Extended Lives program to customers, you modeled some

1  different ways to approach the Extended Lives rollout;

2  right?

3    A  Yes.

4    Q  One way to do it was to not share all of the

5  lives with customers; right?

6    A  Maybe I should see the document, but I don't

7  believe we ever considered not sharing all of the

8  lives with the customers.

9    Q  Let's take a look at the exhibit.

10    You see this on the screen in front of you?

11    A  I do.

12    Q  Let's start with the bottom part of this

13  e-mail chain, and we'll just go through it together.

14    Do you recognize this?

15    MR. RUBY:  Excuse me.  Excuse me, Counsel.

16    Mr. DeSantis, if you want to look at the

17  whole document before you answer any questions about

18  it, you have that right.  It's up to you.  But if you

19  wanted to look at the whole document, do it now so we

20  don't interrupt the questioning --

21    THE WITNESS:  Okay.

22    MR. RUBY:  -- so...

23    THE WITNESS:  Okay.  Can we scroll up?  Okay.

24  Scroll to the top, please.  Okay.  Thank you.

25    MR. ERWIG:  Sure.  Let me go back to the

1  first e-mail with you.

2  Q  Do you -- who is Mark Veeh?

3  A  He's an Intuitive employee.

4  Q  And what is his role at Intuitive?

5  A  He works in finance.

6  Q  Does this appear to be an e-mail from Mark

7  Veeh to yourself sent on September 30, 2019?

8  A  Yes.

9  Q  The subject is:

10     "Extended Lives Revenue Impact on Core."

11     Do you see that?

12  A  Yes.

13  Q  Mr. Veeh writes:

14     "Hi Bob, wanted to follow up on our" --

15  withdrawn.

16     "Hi Bob, Wanted to follow-up to our

17  discussion about the potential revenue impact if we

18  extended the lives of our core instruments.  We took

19  the current core instrument portfolio and mapped it to

20  Cold Core, Bipolar & Monopolar and applied the LRM

21  volumes @ list price to calc the expected current

22  revenue and then looked at it assuming we extended the

23  lives."

24     Do you see that?

25  A  Yes.

1    Q   Now, can you explain to me what that means?

2    A   Yes.  So this was very early on in the

3  Extended Life program, I believe, where finance was

4  saying, Okay.  If we are able to extend the lives --

5  and I believe this analysis, I'd have to see the

6  attachments -- but I believe this analysis assumed

7  that we kept a list price the same and just extended

8  the lives.  So share 100 percent of the cost reduction

9  with the customers.

10        What the revenue impact would be based on our

11  LRM, the long-range model, is just a forecast for

12  the -- for the instruments.

13    Q   Thanks.  That helpful.

14        And down near the bottom, Mr. Veeh writes:

15        "We can change any of the assumptions" --

16  well withdrawn.

17        Mr. Veeh, near the bottom of this e-mail,

18  writes:

19        "We can change any of the assumptions on

20  lives if needed but was a quick calculation to try and

21  see the potential revenue impact on just the core

22  instruments."

23        Do you see that?

24    A   Yes.

25    Q   So as of the date of this e-mail,

1  September 30, 2019, Intuitive was considering the

2  potential revenue impact of Extended Life instruments;

3  right?

4    A   Absolutely.

5    Q   And the assumptions on lives, those were

6  subject to change; right?

7    A   Yes.  This is a finance person, and that's

8  poorly worded.  He meant change the assumptions in the

9  model on how we would price the lives.  Not the

10  indicated lives.  It needs to be clarified.  I'm not

11  quite sure what the intent was here.

12    Q   Your response, you write back to Mr. Veeh:

13       "Mark, I should have mentioned - we have only

14  proven this on Xi and therefore should limit the

15  savings estimate to X/Xi.  Also, we will keep the

16  Monopolar at 10 lives."

17    A   Yes.

18    Q   As of this time period, could you have tested

19  the Monopolar instruments to increase the number of

20  lives on those instruments as well?

21    A   We could have.  We did not.

22    Q   Why not?

23    A   You know, I mentioned earlier that patient

24  safety, product requirements, our risk analyses go

25  into our specifications, one of which is the number of

1  indicated lives.

2       the Monopolar instrument is our highest risk

3  instrument.  The failure modes are the most severe.

4  They are a scissor.  They are the high -- highest

5  complaint rate.  So there was just -- the risk reward

6  associated with raising the Monopolar instrument lives

7  was -- was not there.  Did not make sense.

8    Q   As of this time, as of September 30, 2019,

9  had you, with certainty, determined what the number of

10  extended lives would be for each instrument?

11    A  I'm sorry.  The question?

12    Q  Well, as of -- as of the date of this e-mail,

13  September 30th, 2019, had Intuitive determined how --

14  by how many lives each instrument's usage counter

15  would be increased?

16    A  I don't know.

17      MR. ERWIG:  I'll take this exhibit down.

18  Screen share our next exhibit.  This will be

19  Exhibit 20.  This will be 11/7/19 da Vinci to Guthart.

20      (Document remotely marked Exhibit 20

21       for identification.)

22      MR. ERWIG:  Q.  Do you see this on the screen

23  in front of you?

24    A  Yes.

25    Q  Who is Gary Guthart?

1    A   Gary is the Chief Executive Officer of

2  Intuitive Surgical.

3    Q   This appears to be an e-mail from yourself to

4  Gary Guthart on November 7, 2019.

5    A   Yes.

6    Q   The subject is "1:1."

7      What does that mean?

8    A   That means we're going to have a meeting,

9  just him and I, one-on-one meeting.

10   Q   Then you have some bullet points.

11      Can you give me a sense of what these bullet

12  points reflect?

13      MR. RUBY:  And Mr. DeSantis, once again, you

14  have the right to review the entire document before

15  you answer any questions about any part of it.

16      So if want to do that, it would be a good

17  idea to do it now, then the questioning doesn't have

18  to be interrupted, so as you wish.

19      THE WITNESS:  Yeah, and if you wouldn't mind

20  just scrolling to the bottom.

21      MR. ERWIG:  Sure.

22      THE WITNESS:  I saw this one last week.  All

23  right oh, okay.  Stop.  Okay.

24      MR. ERWIG:  Q.  You said you saw this

25  document last week.

1      What do you mean by that?

2    A  I was deposed last week.

3    Q   Now, when -- well, can you give me a sense of

4  what these bullet points reflect?

5    A  They're topics, potential topics of

6  conversation between Gary and I, myself.

7    Q   And one of the bullets says "Extended Life";

8  do you see that?

9    A  Yes.

10    Q   And there's a few what look like sub-bullets

11  to me underneath that; do you see that?

12    A  Yes.

13    Q   The first bullet is:

14      "Initial Financial analysis done (will

15  circulate to Jamie/Marshall)."

16      Right?

17    A  Yes.

18    Q   The second one is:

19      "I requested a sensitivity analysis based on

20  price savings share with customer (10%, 20%...)"

21      Do you see that?

22    A  Yes.

23    Q   And the third bullet is:

24      "No demands sensitivity modelled."

25      Do you see that?

1    A   Yes.

2    Q   Now, when you say "A sensitivity analysis

3   based on price savings share with customer," that

4   means -- what does that mean?

5    A   Yeah.  So it's poorly worded actually.  As we

6   were talking earlier, a sensitivity analysis is you

7   adjust one variable and see what affect it has on the

8   other, elasticity.

9         This bullet was a financial analysis, and the

10   second bullet here refers to just the impact to

11   revenue and profit based on what percent of the

12   per-procedure cost savings of the Extended Use program

13   that we would share with the customer.

14         The next bullet talks about what we were

15   talking about earlier, elasticity.  And it says we

16   assumed there was no elasticity, that we would have no

17   increase in volume by cutting the price per procedure.

18    Q   In other words, the price saving share with

19   the customer, that's how much of the value of an

20   decisional use Intuitive would be sharing with a

21   customer and how much it would be keeping for itself;

22   right?

23    A   Yes.

24    Q   And so a 10 percent price saving share with

25   the customer means Intuitive would give customers

1  10 percent of the benefit of an extended life, and it

2  would keep 90 percent of that benefit for itself;

3  right?

4      A   Yes.

5      Q   20 percent would mean that the customer would

6  receive 20 percent of the benefit of an extended life,

7  and Intuitive would keep 80 per of that for itself;

8  correct?

9      A   That's the right interpretation, and Mark's

10  analysis earlier assumed 100 percent.

11     Q   You mentioned that an initial financial

12  analysis had been done as well; right?

13     A   Yes.

14     Q   And the purpose of that initial financial

15  analysis was to determine what sort of revenue impact

16  the extended life instruments would have on

17  Intuitive's revenue streams; true?

18     A   Revenues and profits, yes.

19     Q   Sure.

20         In fact, there was too significant of an

21  impact on -- well, withdrawn.

22         I want to ask you about one other part of

23  this where there's a bullet labeled "Restore Robotics

24  (aka Rebotix)"

25         Do you see that?

Page 183

1    A   Yes.

2    Q   There's a bullet under that that says:

3        "Seeing ramp, but negligible impact on our

4    business."

5        Do you see that?

6    A   I do.

7    Q   What did you mean when you wrote "negligible

8    impact on our business"?

9    A   So the bullet says "seeing ramp."  In other

10   words, the volume was increasing.  But negligible

11   impact on our business means that overall compared to

12   our business it was relatively low.

13       MR. ERWIG:  Let's stop screen sharing this

14   exhibit.

15       Screen share our next document.  This will be

16   Exhibit 21.

17       (Document remotely marked Exhibit 21

18        for identification.)

19       MR. ERWIG:  This will 11/8/19 Baker to

20   DeSantis.

21   Q   You see it on the screen in front of you,

22   Mr. DeSantis?

23   A   I do.

24   Q   We'll go to the e-mail chain together from

25   bottom to start.

1        Does this initial e-mail appear to be an

2   e-mail from Mark Veeh to Marshall Mohr, Jamie Samath,

3   copying yourself and Tina Todasco?

4     A   Yes.

5     Q   Who is more Marshall Mohr?

6        MR. RUBY:  Excuse me, Counsel.

7        Mr. DeSantis, once again, you have the right

8   to look at the whole document, whether it's front to

9   back, back to front.  It doesn't matter.  You're

10  entitled to look at the whole thing before you answer

11  any questions about it.

12       So if want to do that, you might want to do

13  that now, because then the questioning can proceed

14  without interruption.  And make sure that you have

15  seen the whole document to your satisfaction before

16  you answer it, at any part, any questions about part

17  of it, please.

18       THE WITNESS:  Okay.  Just to answer that

19  question.  Marshall Mohr is the Chief Financial

20  Officer of Intuitive Surgical.

21       MR. ERWIG:  Q.  Would you like me to scroll

22  up through the -- through the document?

23     A   Depends on what your next question is.

24     Q   My next question is going to be:  Does this

25  appear to be an e-mail from Mark Veeh to yourself and

1  others at Intuitive?

2  A  Yes.

3  Q  And the subject is:

4     "Extended Lives - Financial Update."

5     Do you see that?

6  A  Yes.

7  Q  And then Mr. Veeh writes:

8     "Hi Marshall/Jamie, I just wanted to give you

9  an update on the financial status of the extended

10  lives analysis."

11     Do you see that?

12  A  Yes.

13  Q  And then Mr. Veeh writes:

14     "Below is a first pass based on the following

15  assumptions I have listed out below.  This analysis

16  assumes we split evenly the upside with the customer,

17  however, I am working on the sensitivity analysis

18  where we can toggle the % we would share with the

19  customer so we can better understand the potential

20  impacts and tradeoffs."

21     Do you see that?

22  A  Yes.

23  Q  What was your understanding of the purpose of

24  modeling the price impact of Extended Life

25  instruments?

Page 186

1    A   Again, I'm going to do the scrolling now.

2   Sorry to --

3    Q   It's no problem.

4        If you'd like me to scroll through there, or

5   would you like to scroll through on your own?

6    A   If you don't mind, you can scroll.  Scratch

7   that.  I'll call it up.

8        I don't see that document in the folder.  Is

9   there an obvious name to it?

10    Q   It would be "11'8'19 Baker to DeSantis."

11    A   Got it.  Okay.  Thank you.

12        Would you repeat the question?

13    Q   This initial e-mail, Mr. Veeh discusses some

14   financial modeling for the impact of Extended Life

15   instruments on Intuitive's business; right?

16    A   Yes.

17    Q   Marshall Mohr responds and asks for some

18   potential additional modeling; right?

19    A   Yes.

20    Q   And then you respond to Mr. Mohr and

21   Mr. Veeh, and write:

22        "Marshall, we're preparing a comprehensive

23   look at the extended lives opportunity to present to

24   OOP."

25        Do you see that?

1    A   Yes.

2    Q   What is OOP?

3    A   The executive team office of the president.

4    Q   Now, the next sentence reads:

5        "I had not heard the question about managing

6    multiple life settings.  They in fact do this now,

7    haven't heard much about it from the field, but we'll

8    look into it."

9        Do you see that?

10    A   Yes.

11    Q   When you were mentioning managing multiple

12    life settings, you mean managing instruments that have

13    different levels of use categories; right?

14    A   Yes.

15    Q   For example, a hospital managing an

16    instrument that has 14 uses, an instrument that has

17    15 uses, and switching that out at appropriate times;

18    right?

19    A   Correct.

20    Q   And then you forward this e-mail to Dan

21    Baker; do you see that?

22    A   Yes.

23    Q   Who is Dan Baker?

24    A   He's an Intuitive employee.

25    Q   And what is his role?

1    A   He was in product management, product

2  marketing is the title here for the instrument

3  business.

4    Q   And can you say a little bit more about his

5  responsibilities in that role?

6    A   So the product management/product marketing

7  are responsible for identifying customer needs, of

8  generating business cases.  To some extent, downstream

9  marketing programs to roll products out to the field.

10    Q   Now, Mr. Baker responds to you in this top

11  e-mail -- well, withdrawn.

12       Does this top e-mail appear to be an e-mail

13  from Daniel Baker to yourself sent on November 8,

14  2019?

15    A   Yes.

16    Q   Mr. Baker writes:

17       "Thank you for forwarding.  I have a few

18  questions regarding some of the greater context for

19  the project during our 1:1 today."

20       Do you see that?

21    A   Yes.

22    Q   Mr. Baker writes:

23       "Marshall's feedback is interesting; also

24  contrary to the some of the previous direction

25  (increase lives because competitors will approach

1  20 lives)."

2      Do you see that?

3    A  Yes.

4    Q  What do you understand that sentence to mean?

5    A  Marshall's insights were trading off

6  simplicity for maximizing lives.  So Marshall said --

7  his comment said, Maybe we just want to set them all

8  at 15 to make that simpler for a customer to manage in

9  the field.  If we did that, we would not be giving the

10  customers all the lives that we could have on some of

11  the configurations.

12      So Dan's comment was -- back was essentially

13  saying, It's interesting, but we know that competitors

14  are talking about more lives, and we should talk about

15  the plus and minus of simplicity versus maximizing

16  lives.

17    Q  Any period between 2008 and 2018, to your

18  knowledge, were there any competitors to Intuitive in

19  the United States market with instruments that had

20  20 lives or more?

21    A  Talking about robotic competitors?

22    Q  Yes.

23    A  No.

24    Q  And during that period of time, Intuitive did

25  not consider raising the use counters on the

1  instruments for its da Vinci surgical robots; right?

2    A  I don't know that it was never talked about.

3  We certainly didn't execute a program to do so.

4    Q  When you said "didn't execute a program,"

5  that means that during that time period before this

6  extended use instrument program came up, Intuitive

7  never extended its use counter on any of its

8  instruments; right?

9    A  True.  Before we extended the use, we -- we

10  never extended the use.

11    Q  Well, let me rephrase it just to be a little

12  bit clearer.

13      The Extended Use program was implemented at

14  some point; right?

15    A  Yes.

16    Q  When was the Extended Use program

17  implemented?

18    A  We rolled it out to the -- it depends on what

19  implemented means.  So what do you mean by

20  implemented?

21    Q  When did Intuitive begin selling extended

22  life instruments in the United States?

23    A  I believe that was Q3 2020.  Third quarter

24  2020.

25    Q  And do you have an estimate around what --

1  what types of months typically are in Q3?

2  A   July through September.

3  Q   So any point before those extended use

4  instruments came to market, did Intuitive ever release

5  a set of extended life instruments for the da Vinci

6  Si?

7  A   Well, we released the 20 life 5 millimeter

8  instruments which is extended compared to the ten life

9  eight-millimeter instruments.

10  Q   That's a different type of instrument; right?

11  A   It is.

12  Q   My question is just specific to the -- to the

13  eight-millimeter instruments.

14      So for --

15  A   So --

16  Q   -- eight-millimeter instruments on the

17  da Vinci Si, from the moment those instruments came to

18  market, Intuitive never offered an extended life

19  version of those instruments; right?

20  A   Correct.

21  Q   Intuitive never went very far in a research

22  and development process to try to develop an extended

23  use of those instruments; right?

24  A   To my knowledge, the company never formed a

25  formal project with the sole objective of extend -- or

1  any objective of extending the lives on the Si

2  instruments.

3      Q   The formal project, that would involve

4  funding; right?

5      A   Yes.

6      Q   And it would involve a team being put

7  together; right?

8      A   Yes.

9      Q   And none of that was ever done to examine

10  whether it was feasible to extend use limits on the Si

11  instruments; true?

12      A   Yes.  To my knowledge, it's true.

13      Q   Mr. Baker goes on to write:

14      "I think that it would be good for us to

15  baseline on the overall strategic objective of life

16  extension, and also how it relates to the multiple

17  other ongoing conversations on price reduction to make

18  sure that we hit the mark as we optimize the

19  messaging/strategy on this one."

20      Do you see that?

21      A   Yes.

22      Q   Mr. Baker refers to the overall strategic

23  objective of life extension.

24      What does he mean by that?

25      A   The statement means that it would be good for

1  finance, product management, general manager, myself

2  to all be on the same page for exactly what the

3  objectives of the program are.

4      Q   Now, a strategic objective, that's one that's

5  related to a company's business plan moving forward;

6  right?

7      A   It would be related to a business plan, yes.

8      Q   What is your understanding of the meaning of

9  the term "strategic objective"?

10     A   It's -- it's part of the company strategy and

11  objectives.

12     Q   The company's strategy, that would include

13  methods for increasing revenue and profits; right?

14     A   Yes.

15     Q   Does it include methods to position relative

16  to anticipated competitors; right?

17     A   Yes.

18     Q   And would strategic objectives involve

19  evaluating what sort of approaches are going to be

20  best from the company -- withdrawn.

21         Strategic objectives involve examining what

22  course of action is going to be best for Intuitive in

23  a financial standpoint; right?

24     A   Financial would be one aspect of the

25  objective, yes.

1    Q   I'm going to stop screen sharing this

2   exhibit.

3        MR. RUBY:  Let's take five minutes.  Shall

4   we?

5        MR. ERWIG:  Let's go off the record.

6        THE VIDEOGRAPHER:  We are going off the

7   record at 12:06 p.m.

8        (Recess taken.)

9        THE VIDEOGRAPHER:  This starts the number of

10  Media No. 5.

11       We're back on the record at 12:18 p.m.

12       MR. ERWIG:  Q.  Mr. DeSantis, did Intuitive

13  study marketing strategies to make the Extended Life

14  program appealing to hospitals?

15   A   Yes.

16   Q   And the reason for that was that Intuitive

17  knew that hospitals might be resistant to the concept

18  of Extended Life EndoWrists; right?

19   A   We -- we never -- we had no inclination that

20  they would be resistant to the concept of extended

21  lives, I don't think.

22   Q   Well certainly one question that a hospital

23  might have is why were the lives for the da Vinci Si

24  never updated; right?

25   A   Yes.  That could be, yes.

1    Q   And the reason that a hospital might have

2  that question is because the da Vinci Si instruments,

3  those have seen various iterations over the years;

4  right?

5    A   We're presuming that they would ask the

6  question and then presuming why they would ask it, so

7  I -- I don't know.

8    Q   Well, I just want to get a sense of your

9  understanding of the -- the situation.

10       You think the hospital might have some

11  concerns based on the fact that there was no extended

12  life testing done for the da Vinci Si instruments?

13    A   We had the best intentions with the Extended

14  Life program.  We tried to optimize it for ourself and

15  for the customers.  Sometimes the best of intentions

16  is not communicated correctly.  Can be interpreted,

17  you know, sub-optimally.  So we considered how to

18  communicate the program properly.

19    Q   You mentioned that it was designed with

20  your -- the best of intentions for -- for yourself, as

21  well as for the customer; right?

22    A   Yes.

23    Q   What -- what advantages would the Extended

24  Life program have for Intuitive?

25    A   So I -- one of the customer needs that --

1  that we hear of is reduce cost per procedure.

2  Satisfying a customer need is -- is good for -- for

3  Intuitive.

4       So you know, addressing the customer need and

5  whatever benefits come along with that.  You know,

6  customer satisfaction, an increased utilization, brand

7  recognition, et cetera, are all potential positives

8  for Intuitive.

9    Q   And continued revenue, that's also a

10  potential positive; right?

11   A   Yes.

12   Q   And Intuitive wanted the extended use

13  instruments to continue to make Intuitive money;

14  right?

15   A   Yes.

16   Q   The extended use instruments, they were --

17  withdrawn.

18       The extended use instruments are designed to

19  be used only with the da Vinci surgical robot;

20  correct?

21       MR. RUBY:  I'll object.  That's been asked so

22  many times.  Really, there comes a point.  You

23  really -- please, so I don't have to do this.

24       So I'll object -- I'll object to it.  It's

25  been asked and answered repeatedly, but the witness

1   can go ahead and answer it again.

2        MR. ERWIG:  Mr. Ruby, the question has not

3   been asked with respect to Extended Life EndoWrist,

4   which is specifically the topic that I'm trying to

5   inquire as to here.

6    Q   Now, Mr. DeSantis -- withdrawn.

7        Mr. DeSantis, are Extended Life EndoWrists

8   only capable of being used with the da Vinci Surgical

9   system?

10       MR. RUBY:  Same objection.

11       You may answer.

12       THE WITNESS:  Yes.

13       MR. ERWIG:  I'll screen share our next

14   exhibit.  This will be 5/10/20 Anderson to Cesnik.

15       (Document remotely marked Exhibit 22

16        for identification.)

17       MR. ERWIG:  Q.  You see this on the screen in

18   front of you, Mr. DeSantis?

19    A   Yes.

20    Q   Who is Larry Cesnik?

21    A   He's an Intuitive employee.

22    Q   What is his role at Intuitive?

23    A   He's -- can you scroll down on the document,

24   please.  Director of market intelligence.

25    Q   You see there's a top e-mail from Katie

1  Anderson at katie@andersonqualitative.com to Larry

2  Cesnik at Intuitive Surgical?

3    A  Yes.

4    Q  And attachment is "EL Market Research Report

5  KA LC.pptx";

6      Do you see that?

7    A  Yes.

8    Q  I'm going to take a look at -- withdrawn.

9      Any reason to believe this isn't an e-mail

10  from Katie Anderson to Larry Cesnik sent on May 10,

11  2020?

12    A  No.

13    Q  Stop screen sharing this exhibit, and we'll

14  screen share the attachment which is "5'10'20 Attach

15  to Anderson to Cesnik."

16      (Document remotely marked Exhibit 23

17       for identification.)

18      MR. ERWIG:  Q.  You see this on the screen in

19  front of you Mr. DeSantis?

20    A  Yes.

21    Q  You recognize this?

22    A  No, not yet.

23    Q  Well, does the first page appear to be the

24  first page of an Intuitive PowerPoint presentation

25  titled:

1    "Extended Life Instruments Messaging

2  Qualitative Key Findings Report"?

3    A  Yes.

4    Q   Then there's a slide labeled "Background."

5       Do you see that?

6    A  Yes.

7    Q   There's a few bullet points herein,

8  including:

9       "To accelerate da Vinci surgery adoption in

10  priority markets and procedures where economics is an

11  adoption barrier, Intuitive will be implementing

12  different strategies to reduce price per case for

13  customers."

14    A  I see that.

15    Q   And then the fourth bullet points:

16       "Three messaging paths have been developed to

17  explain our new Extended Lives program.  As it will be

18  initially launched in the U.S., Intuitive leadership

19  has requested feedback on these messaging narratives

20  from senior key U.S. hospital administrators with whom

21  we have strong relationships."

22       Do you see that?

23    A  I do.

24    Q   Were you aware that messaging paths were

25  being developed as of this time?

1    A  Yes.

2    Q  I'm going to move to Slide 10, and we'll take

3  a look at some of these messaging pads.

4       This is a slide that's entitled:

5       "Reaction to the general idea of increasing

6  instrument lives and reducing price per use is

7  generally positive, but some need to hear reinsurance

8  about instrument durability as the number of lives

9  increase and which instruments for which procedures."

10      Do you see that?

11   A  Yes.

12   Q  And there's some "Strengths" to this

13  approach; right?

14   A  Yes.

15   Q  There's some "Drawbacks" as well; right?

16   A  Yes.

17      Q  I want to point your attention to the second

18  bullet point under "Strengths" which reads:

19      "The instruments are durability - They are

20  not failing at 10 lives now, so it makes sense to

21  extend the lives."

22      Do you see that?

23   A  Yes.

24   Q  Is it generally your understanding that

25  Intuitive EndoWrists generally do not fail at

1  ten lives?

2     A   So I don't know whose statement that is.

3  Unrelated to that statement, your question is -- is do

4  Intuitive's EndoWrists generally not fail at ten

5  lives?

6        And the answer from me is yes, by my

7  definition of "generally" does not fail.  They

8  generally do not fail.  We've got acceptable quality

9  levels at -- at the ten life, had acceptable quality

10  levels at the ten life indication.

11     Q   On the "Drawbacks" part of this slide there's

12  a section labeled "Durability Concerns"; do you see

13  that?

14     A   Yes.

15     Q   And under that, it reads:

16        "Currently, some instruments loss

17  effectiveness over time or break.  We only get 8 or 9

18  uses instead of 10."

19        Do you see that?

20     A   Yes.

21     Q   Is it also your understanding that in many

22  cases Intuitive EndoWrists may fail at eight or nine

23  uses?

24     A   So we're using terms like "many" and

25  "generally."  We have same answer.  We've got

1   acceptable quality levels and, you know, we try -- we

2   try and improve them, so...

3      Q   I'm going to stop screen sharing this

4   exhibit.

5         Now, Intuitive, when it receives --

6   withdrawn.

7         About how many RMA EndoWrists does Intuitive

8   receive back from hospitals each year?

9      A   R -- RMA per procedure is about 2 percent, a

10  little higher.  There are typically three to four

11  instruments used per procedure.  We did about

12  1.5 million procedures.  So 2 percent of 1.5 million

13  would be the way I would estimate it right now which

14  is about 30,000.

15     Q   So about 30,000 instruments were RMAed to

16  Intuitive, and is that in 2020?  2019?

17     A   It -- either one.  It would be close to the

18  year 2019, yes.

19     Q   So taking 2019, there may be around 30,000

20  instruments that were RMAed to Intuitive; right?

21     A   Yeah, let me check my math.

22        It's a reasonable estimate.

23     Q   When an instrument is RMAed, that means that

24  the instrument has experienced some sort of failure

25  before its operational life is -- is up -- well,

1  withdrawn.

2      When an instrument is RMAed, that means it's

3  experienced a failure before its use count is at zero;

4  right?

5    A  Perhaps.

6      More accurately, there's some type of

7  complaint against the instrument.

8    Q  And those complaints might include that the

9  instrument has experienced some sort of failure prior

10  to the use counter expiring; right?

11    A  That's one possibility, yes.

12    Q  There might be an issue with the instrument

13  even before it's ever used for -- for a surgery;

14  right?

15    A  There could be.

16    Q  I want to look at one of those examples with

17  you.  We're going to go to folder two.  The next

18  exhibit is going to be -- I believe it's Exhibit 24.

19  This will be "7'17'17 DeSantis to Gerbi and McGrogan."

20      (Document remotely marked Exhibit 24

21       for identification.)

22      MR. ERWIG:  Q.  You see this on the screen in

23  front of you?

24    A  Yes.

25    Q  I'm going to scroll down to the bottom of the

1  e-mail, and we can look through it together.  Just let

2  me know if you'd like me to scroll.

3      A   Okay.  Scroll.  Okay.  And scroll up.  Okay.

4      Q   Do you recognize this e-mail chain?

5      A   Yes.

6      Q   How is it that you recognize it?

7      A   I'm involved in it.  I remember the

8  conversation.

9      Q   All right.

10         And what do you remember about the

11  conversation?

12     A   That there was a -- a defect on one of our

13  instruments and an associated video that I wanted to

14  look into.

15     Q   Do you remember viewing that video at the

16  time that you were involved in this e-mail

17  conversation?

18     A   Yes.

19     Q   And does this initial e-mail appear to be you

20  forwarding "Hook video from Dr. Dickens" to Craig

21  Gerbi and Anthony Mc McGrogan at Intuitive?

22     A   Yes.

23         (Video remotely marked Exhibit 25

24          for identification.)

25         MR. ERWIG:  I'm going to stop screen sharing

1  this exhibit.

2      Our next exhibit will be that video.  It will

3  be "7'17'17 Attached from DeSantis to Gerbi."  I'm

4  going to do my best with the tech issues and try to

5  watch that issue together.  We likely won't have sound

6  to it.

7      Let me screen share.  I just want to get a

8  view, Mr. DeSantis, if this is the video you recall

9  seeing.  I'm going to press play.

10    Q  Can you see this on the screen in front of

11  you okay?

12    A  Yes.

13    Q  Can you describe to me what you see is

14  happening in this video?

15    A  So someone is manually manipulating the jaw

16  of the hook, Monopolar instrument.  And when they do

17  so, there's a protrusion of the electrical wire.

18    Q  Does this appear to be the video that you

19  remember watching as of date of that e-mail?

20    A  I believe so, yes.

21    Q  I'm going to stop screen sharing this

22  exhibit.

23      That would be an example of an instrument

24  that would be RMAed by a customer; right?

25    A  It should be, yes.

Page 206

1    Q   Now, returning to the extended life,

2   instruments Intuitive ultimately prepared an FAQ to

3   handle common customer objections to the extended life

4   system; is that right?

5    A   I -- I don't know.  If you have something,

6   I'd benefit from looking at it.

7        MR. ERWIG:  Sure.  We'll take a look.  Our

8   next exhibit is going to be -- I believe it's

9   Exhibit 26.  This will be "7'18'20 Mohr to Rosa."

10       (Document remotely marked Exhibit 26

11        for identification.)

12       MR. ERWIG:  Q.  You see this on the screen in

13   front of you, Mr. DeSantis?

14    A   Yes.

15    Q   And there's an e-mail from Daniel Baker to

16   Adelaide Dias, Patrick Clingan, and yourself; do you

17   see that?

18    A   Yes.

19    Q   And that e-mail Mr. Baker writes:

20       "Notes from today's meeting" -- withdrawn.

21       Does there appear to be an e-mail from Daniel

22   Baker to yourself and others at Intuitive sent on

23   July 17, 2020?

24    A   Yes.

25    Q   Now, Mr. Baker writes:

1        "Website is still under development/proposed

2   text is attached (note that language has been informed

3   by the customer letter in addition to the FAQs for

4   consistency)."

5        Do you see that?

6   A  Yes.

7    Q  I'm going to take a look -- and then the

8   e-mail above Mr. Mohr forwards this e-mail to

9   Mr. Rosa; do you see that?

10   A  Yes.

11    Q  I'm going to take a look at the attachment to

12   this.

13   A  Wait.  Can I see the e-mail?

14   Q  Of course.

15   A  I've never seen the e-mail before.

16       Okay.  Thanks.

17    Q  Actually, one more question about this.

18   Mr. Mohr writes:

19       "Dave, As we discussed the other day, I don't

20   think outward marketing is in the sweet spot of the

21   product marketing team."

22       Do you see that?

23   A  Yes.

24    Q  What do you understand "the sweet spot of the

25   product marketing team" to be?

1    A  So earlier I think you asked me about Dan

2  Baker's responsibility, and I said he's product

3  management, product marketing.  And at the end of it,

4  I said he does some downstream marketing in a product

5  out to the field.

6        So this is Marshall talking to Dave and

7  saying that downstream marketing is not the strength

8  of the product management team in the business unit.

9    Q   And when you mentioned downstream marketing,

10  that would be marketing to customers like hospitals,

11  for example; right?

12    A  Customer-facing, collateral material

13  marketing, yes.

14    Q   So there would be some internal discussions

15  about the life extension instruments; right?

16    A  Yes.

17    Q   And you needed to develop a plan to market

18  those instruments to downstream customers like

19  hospitals; right?

20    A  Yes.

21      MR. ERWIG:  I'm going to take a look at the

22  attachment to this.  This will be Exhibit No. 27.

23      (Document remotely marked Exhibit 27

24       for identification.)

25      MR. ERWIG:  This will be 7'18'20 a document

1  Mohr to Rosa.  This document is also called "Objection

2  Handling."

3      Q   You see this on the screen in front of you?

4      A   Yes.

5      Q   Do you recognize document?

6      A   Not yet.

7      Q   Does there appear to be a document titled

8  "Extended Use Program"?

9      A   Yes.

10      Q   And there's three columns.  One is labeled

11  "Objection."  One is labeled "Messaging Components,"

12  and one is labeled "Messaging"; do you see that?

13      A   Yes.

14      Q   Now, I want to go over some of these with

15  you.  On page 3, there's an objection that's titled:

16          "Vendors have re-manufactured your da Vinci

17  Si instruments for years, providing uses beyond 10.

18  Why should I not use their services?"

19          Do you see that?

20      A   Yes.

21      Q   The "Messaging Components" and response are:

22          "Increased use of da Vinci X/Xi instruments

23  are designed and tested to provide decisional uses."

24          Do you see that?

25      A   Yes.

1    Q   The second bullet:

2        "da Vinci Si instrument re-manufactured have

3   not been tested by Intuitive to add uses."

4        Do you see that?

5    A   Yes.

6    Q   Is it your understanding da Vinci Si

7   instruments were not tested by Intuitive to add uses?

8    A   Yes.

9    Q   Not only were da Vinci Si instruments not

10   directly tested by Intuitive, Intuitive never tested

11   the refurbished instruments from third parties either;

12   right?

13    A   No, we have not.

14    Q   So the -- withdrawn.

15        Intuitive has never taken an instrument

16   refurbished by Rebotix and examined whether it

17   effectively operates with a da Vinci surgical system;

18   right?

19    A   Well, we've had a few come back to us.  And

20   in our complaints and RMAs, and just like all others,

21   we take and evaluate whether they're working properly.

22    Q   Intuitive hasn't, for example, taken an

23   instrument that's in use by the hospital that's an

24   instrument that's been refurbished by Rebotix and

25   performs testing to determine whether that instrument

1  operates appropriately during surgery; right?

2       MR. RUBY:  I'm going to object to the form of

3  the question.  It's inherently ambiguous.  Because

4  what you call "refurbishing," and what the witness

5  might call "refurbishing" might very well be

6  different.  And you haven't chosen to define what --

7  you're attaching to the term "refurbishing," and

8  that's where the ambiguity comes in.

9       So my objection is noted.  I think there's a

10  question pending, and -- and then you can go ahead and

11  answer it.

12      THE WITNESS:  So we have not done V&V or life

13  testing on third-party remanufactured instruments, no.

14      MR. ERWIG:  Q.  There's been no testing, in

15  fact, of any kind done by Intuitive to determine the

16  efficacy of -- withdrawn.

17      There's been no testing of any kind by

18  Intuitive to determine the safety of instruments that

19  have been modified by Rebotix Repair; right?

20    A   Well, we -- we can extrapolate, based on our

21  own testing of our instruments which they are

22  modifying and extending beyond their indicated life.

23      There are, you know, millions of procedures

24  with those instruments and their quality level,

25  et cetera.  But have we -- have we done their V&V

1  testing?  No, we have not.

2     Q   I want to actually -- we're going to get to

3  that a little bit later, but just touching on it now,

4  the testing that Intuitive does is to determine

5  initial appropriate set of uses for an instrument;

6  right?

7     A   It depends on what testing we're talking

8  about.

9     Q   Well, when Intuitive is bringing an EndoWrist

10  to market, it does life testing to determine the

11  appropriate number of uses that it's going to offer to

12  a customer; right?

13     A   We -- we set a spec for the number of lives

14  and then test to make sure we can achieve that in most

15  cases.

16     Q   You mentioned you set a spec for a number of

17  lives.

18        That means that Intuitive sets, let's say,

19  the number of times that -- lives desired at 10, and

20  then tests to meet those ten lives; right?

21     A   Yes.  Single use, ten lives, 20 lives we'll

22  put that requirement and try to achieve that.  In

23  other cases, we extend the use.  We've done let's --

24  let's evaluate where these instruments stand today,

25  and -- and then bring those to market.  So it's gone

1  both ways.

2     Q   Now, over time an instrument might experience

3  some -- some wear and tear; right?

4     A   Yes.

5     Q   And without any sort of attention, that

6  instrument might fail; right?

7     A   Potentially.

8     Q   And my question is:  Has Intuitive --

9  withdrawn.

10        Has Intuitive examined whether it's possible

11  to repair an instrument that's experienced some wear

12  and continue such that it continue to -- such that it

13  can continue to be operated safely?

14     A   I'm sorry.  Can you re-ask the question,

15  please?

16     Q   Sure.  Let me ask -- let me ask a better

17  question.  Make it a little bit more concrete for you.

18        One of the types of EndoWrists is an

19  EndoWrist that has a pair of scissors on the end;

20  right?

21     A   Yes.

22     Q   One of the failure conditions for that

23  EndoWrist can be that the scissors become too dull to

24  cut tissue; right?

25     A   Yes.

1    Q   And when the scissors do, in fact, become too

2  dull, Intuitive classifies that as a failure of the

3  EndoWrist; right?

4    A   Yes.  If a customer files a complaint and

5  says it's not cutting, we test it to see if it's

6  cutting to our specs.  If it's not, we classify that

7  as a failure.

8    Q   Well, even before an Intuitive life

9  testing -- dull scissors would constitute a failure of

10  the instrument; right?

11    A   I don't understand the question.

12    Q   Well, Intuitive initially does some -- some

13  life testing.  We discussed that earlier; right?

14    A   Yes.

15    Q   And for a life test to be a success, the

16  instrument has to operate according to specifications;

17  right?

18    A   Yes.

19    Q   And so for an instrument to meet its 10 uses,

20  it would have to operate according to those

21  specification for all ten uses; right?

22    A   You'd have to statistically justify ten uses

23  so you have to test it beyond ten uses, but yes.

24    Q   Now, in the process of testing, if scissors

25  on a pair of EndoWrist that have scissors at the end

1  become dull and they're no longer cutting, that would

2  be a failure; right?

3     A   Yes.

4     Q   And that could occur at nine uses; right?

5     A   Yes.

6     Q   Could occur at five uses; right?

7     A   Well, the failure could occur at any number.

8  That would fail the test, and we wouldn't

9  commercialize that product if it was during our life

10  testing.

11     Q   Well, in fact, Intuitive is aware that some

12  products do, in fact, fail in the market before their

13  use counter has expired; right?

14     A   Yes.

15     Q   Now, my question is just about the initial

16  testing process.

17        If an instrument fails because its scissors

18  are dull at, let's say, eight uses, does Intuitive try

19  to resharpen or in any way repair the scissors to

20  determine whether the instrument can last for

21  additional lives?

22     A   No, I don't believe so.  We don't typically

23  do repairs as part of our life testing.

24     Q   And so if an instrument failed at, say, eight

25  uses because the scissors were dull, Intuitive would

1  consider that a failure under its life testing; right?

2    A  Yes.

3    Q  Intuitive would log that and store or dispose

4  of the instrument; right?

5    A  Yes.

6    Q  Intuitive would not test whether the

7  instrument could continue to operate to 15 or 20 uses

8  with re-sharpened scissors; right?

9    A  Not if our spec was ten and there was a

10  failure prior to ten, no.

11    Q  In fact, in -- if an instrument -- withdrawn.

12      And that's the same for -- for other types of

13  instruments as well, such as graspers or needle

14  drivers; right?  If there's any sort of failure,

15  Intuitive doesn't attempt to repair that failure;

16  right?

17    A  Correct.  As part of our life testing

18  remanufacturing, it's not part of our life testing.

19    Q  In fact, any sort of refurbishing repair is

20  not part of life testing; right?

21    A  Correct.

22    Q  Now, if an instrument -- the desired spec for

23  an instrument is ten uses and the instrument fails at

24  11 uses, Intuitive doesn't also attempt any

25  refurbishment or repair of that instrument at that

1  point; right?

2    A  Correct.

3    Q  So if an instrument, for example, failed at

4  11 uses because the scissors had dulled, Intuitive

5  would not examine whether a repair could let that

6  instrument operate safely; right?

7    A  Not typically, no.

8    Q  I'm going to scroll to the last page of this

9  exhibit.  There's an objection that's entitled:

10      "Why is there no 510(k) letter available for

11  the new Part Number."

12      Do you see that?

13    A  Yes.

14    Q  It mentions "FDA guidance followed"; do you

15  see that?

16    A  Yes.

17    Q  Was it Intuitive's understanding that

18  validating instruments for the Extended Use program

19  did not require a new 510(k) letter?

20    A  Correct.  Our -- our program based on our

21  specs and our instruments extending their use we went

22  over earlier, we filed an NFJ, a Non-Filing

23  Justification.

24    Q  I'm going to stop screen sharing this

25  exhibit.

1        I want to get a sense of the development

2   timeline for the Extended Use program, and we -- and

3   we went over a little bit of this earlier, but it

4   would be helpful if you can give me just a general

5   range of sort of inception of the program, and you

6   mentioned it came to market around the third quarter

7   of 2020.

8        When was the first time you really thought

9   about extending lives on instruments?

10   A   When I think about the Extended Use program

11   and the development time frame, you know, I think

12   about 2014 to 2020 because of all the work that went

13   into continually trying to improve the quality and

14   durability of the instruments.

15        The actual formalization of, Hey, let's --

16   let's see if we actually can extend the lives beyond

17   ten and -- and offer that to customers occurred in

18   early 2019.  So it was a -- once we decided to try and

19   do the test, it took about a year to roll it out to

20   the market.

21   Q   It took Intuitive about a year from the time

22   that it decided it wanted to extend lives on

23   instruments to roll those extended life instruments

24   out to the market; right?

25   A   Yes.

1    Q   Now, Intuitive could have developed a similar

2  program in 2016, for example; right?

3    A   I -- so I think there's a false assumption

4  here which is we don't know that the instruments in

5  2016 would have been -- would have passed the same

6  number of lives, would have the same durability and

7  quality.  So we -- we could have developed a program,

8  done the test, and tried to see what happened.

9    Q   And Intuitive didn't, in fact, test to see if

10  lives could have been extended in 2016; right?

11    A   No.  We were investing in driving up our

12  quality and driving down our complaint rate.

13    Q   And that meant that Intuitive was not

14  investing in developing extended lives for EndoWrists;

15  true?

16    A   So we -- indirectly we were, but that wasn't

17  our purpose.  Our purpose was to improve quality.  We

18  eventually turned that effort into an Extended Use

19  program.

20      MR. ERWIG:  I'm going to screen share our

21  next exhibit.  This will be "11'12'19 Mohr to Rosa."

22  It will be Exhibit No. 28.

23      (Document remotely marked Exhibit 28

24       for identification.)

25      MR. ERWIG:  Q.  You see this on the screen in

1  front of you, Mr. DeSantis?

2    A  Yes.

3    Q  I'm going to scroll down to the bottom of

4  this e-mail chain.

5        And do you see that this is an e-mail that we

6  looked at earlier, right, the "Extended Lives -

7  Financial Update" from Mark Veeh to Mr. Mohr and

8  yourself?

9    A  Yes.

10   Q  We also looked at your response e-mail about

11  managing multiple life settings; right?

12   A  Yes.

13   Q  And then this e-mail from Marshall Mohr, this

14  is new.

15       Does this appear to be an e-mail from

16  Marshall Mohr to yourself, Mark Veeh, and Jamie Samath

17  on November 10, 2019?

18   A  Yes.

19   Q  And the subject is "Extended Lives -

20  Financial Update"; right?

21   A  Yes.

22   Q  Now, in the second to last sentence, Mr. Mohr

23  writes:

24       "I was asked to gather the AMP arrangements

25  to date (which I am doing) and information around what

1  the financial impact of extended lives and collection

2  of instruments would be."

3       Do you see that?

4    A  Yes.

5    Q   What are the AMP arrangements?

6    A  I'm just going to read the e-mail.

7       So "AMP" stands for Advanced Minimally

8  Invasive.  I don't know what it stands for, the

9  acronym.  But basically our different commercial

10  models where we can provide customer access to the

11  system and charge them differently than just selling

12  the system and selling instruments.

13     Q  I'm scrolling up.  There's an e-mail from

14  Mark Veeh to Marshall Mohr, yourself, and Jamie Samath

15  saying:

16       "Hello, attached is a workbook where I have

17  added the ability to toggle the discount as well as we

18  can toggle the # of lives for the major groupings."

19       You see that?

20    A  Yes.

21    Q  Do you recognize that e-mail?

22    A  I don't remember this e-mail, but...

23    Q  Well, does this appear to be an e-mail from

24  Mark Veeh -- withdrawn.

25       Let's look at the attachment to this e-mail,

1 and let's see if you recognize that.

2        Screen share the next exhibit.  This will be

3 attachment to that e-mail chain.  It's, in fact, an

4 Excel document.  So I'm going to screen share.

5 There's the Bates label Intuitive00581597.

6        (Document remotely marked Exhibit 29

7         for identification.)

8        MR. ERWIG:  Q.  Do you see this?

9    A  Yes.

10    Q  At the top, there's a tab labeled

11 "Assumptions"; do you see that?

12    A  Yes.

13    Q  There's a "Price Discount"; right?

14    A  Yes.

15    Q  And there's some tabs with "Number of

16 Extended Lives"; do you see that?

17    A  Yes.

18    Q  There's labels next to those that says "Can

19 adjust these"; right?

20    A  Yes.

21    Q  Meaning the price discount can be adjusted;

22 right?

23    A  Yes.

24    Q  So the number of extended lives could be

25 adjusted; right?

1    A   Yes.

2    Q   And that would affect the different revenue,

3    cost and margin for Intuitive throughout the period

4    between 2019 and 2022; right?

5    A   Yes.

6    Q   I'll stop screen sharing this exhibit --

7    well, withdrawn.

8        Do you recognize this document?

9    A   Not specifically, no.

10    Q   Does it appear to be the Excel workbook

11    that's attached to that e-mail thread?

12    A   I have no way of knowing.

13    Q   Any reason to think that it's not the

14    attachment to that e-mail thread?

15    A   Well, we can look at the file name and look

16    at the attachment name and see if they match.

17    Q   Stop screen sharing this exhibit.

18        Let's go off the record and take a short

19    break.

20    A   How short?  How short?

21    Q   Let's wait to get off the record, and we'll

22    talk about timing.

23        THE VIDEOGRAPHER:  Going off the record at

24    12:58 p.m.

25        (Recess taken.)

1          THE VIDEOGRAPHER:  This marks the start of

2    Media No. 6.  We're back on the record at 1:06 p.m.

3          MR. ERWIG:  I'm going to screen share our

4    next exhibit.  I believe this is Exhibit No. 31.

5          (Document remotely marked Exhibit 31

6           for identification.)

7          MR. ERWIG:  This will be "3'30'20 Baker to

8    Purohit and Tourand."

9      Q   And do you see there on the screen in front

10   of you?

11     A   Yes.

12     Q   Who is Shreya Purohit?

13     A   She's an Intuitive employee.

14     Q   What's her role?

15     A   She reports to Dan Baker in product

16   management.

17     Q   Who is you Todd Tourand?

18     A   Same answers.  He's an Intuitive employee

19   that reports to Dan Baker in product management.

3      Q   During there time period, this e-mail - these

4   e-mails are being sent in March of 2020; right?

5      A   Yes.

6      Q   During that time period, was Intuitive

7   engaged in modeling revenues for different levels of

8   extended lives on its instruments?

9      A   Yes, we were doing financial models of the

10   Extended Use program.

11      Q   And one specific thing that was being modeled

12   was how to set the lives of the extended use

13   instruments and what percentage of the benefit to

14   share with the customers; right?

15      A   No.  Again, we talked about this earlier, and

16   my answer is still the same.

17         So you showed me a couple of brief comments

18   where Marshall had mentioned maybe it would be easier

19   to just, you know set all the lives at 15 for

20   convenience, but that was never really seriously

21   considered.  We had really planned on offering --

22   rolling the program out with all of the lives that we

23   were able to statistically justify and test to.

24         But the second half of your question was yes.

25   How we shared that cost savings benefit with the

1  customer was certainly modeled and discussed.

2     Q   And one option would be to give the customer

3  all of the benefit of the extended lives; right?

4     A   Yes, that's one option.

5     Q   Those ultimately were not the options that

6  Intuitive chose; right?

7     A   Correct.

8     Q   Intuitive determined that it would raise its

9  prices on the extended use EndoWrist; true?

10    A   The instrument itself we raised the price on.

11  The price per procedure was reduced.

12    Q   And so the up-front cost -- we can take this

13  exhibit down -- withdrawn.

14       The up-front cost to a hospital deciding

15  whether to buy a new EndoWrist, that would be higher

16  to purchase than the extended use EndoWrist; true?

17    A   Yes, the up-front cost is higher.

18    Q   In other words, the standard instrument might

19  have been priced at 3,000, and the extended use

20  instrument might be priced at 4,000, for example;

21  right?

22    A   Just for -- for making up numbers, yes.

23    Q   I want to shift gears with you a little bit,

24  Mr. DeSantis, and talk about studies that Intuitive

25  has done in refurbishing and repairing EndoWrists.

1      Are you familiar -- withdrawn.

2      I understand that in 2017 Intuitive

3  considered refurbishing EndoWrists; is that right?

4    A  Yes.

5    Q  I'm going to screen share our first exhibit

6  or our -- not our first -- our 32nd, in fact, exhibit,

7  which will be in Folder 4.  This will be "3'2'17

8  DeSantis to Carlson."

9      (Document remotely marked Exhibit 32

10       for identification.)

11      MR. ERWIG:  Q.  You see this on the screen in

12  front of you, Mr. DeSantis?

13    A  Yes.

14    Q  Do you recognize this?

15    A  I recognize what it is.  I don't remember it.

16    Q  Who is Chris Carlson?

17    A  Chris is a -- an employee of Intuitive

18  Surgical.

19    Q  What is his role at Intuitive Surgical?

20    A  Today, he's general manager for the Multiport

21  Platform.

22    Q  And what was his role in 2017?

23    A  General manager for our Ion Platform.

24    Q  Does this appear to be an e-mail from you to

25  Chris Carlson attaching "Instrument eX Report-Out - 30

1  Jan 2017 Final.pptx"?

2    A  Yes.

3        MR. ERWIG:  I'll stop sharing this exhibit,

4  and we'll take a look at the attachment.  This will be

5  Exhibit 33.  This will be "1'30'17 Instrument

6  Refurbishment Feasibility Update."

7        (Document remotely marked Exhibit 33

8         for identification.)

9        MR. ERWIG:

10    Q  Do you see this on the screen in front of

11  you, Mr. DeSantis?

12    A  Yes.

13    Q  Do you recognize this document?

14    A  I believe so.

15    Q  How is it that you recognize it?

16    A  So it's a typical PowerPoint template that

17  Intuitive uses, and I recall this type of title on a

18  PowerPoint deck.

19    Q  And the title of this PowerPoint is

20  "Instrument eX: I&A Refurbishment Feasibility Update";

21  do you see that?

22    A  Yes.

23    Q  What do you understand is meant by

24  "instrument" -- well, withdrawn.

25        I&A, that stands for instrument and

1  accessory; right?

2    A   Yes.

3    Q   What do you understand is meant by "I&A

4  Refurbishment Feasibility"?

5    A   Just that, that it was an analysis of the

6  ability to refurbish, remanufacture instruments, and I

7  don't know if there's accessories in this deck or not

8  but...

9    Q   And there's some members on this feasibility

10  team here; do you see that?

11    A   Yes.

12    Q   And there's an agenda, including objective

13  summary, "Objective," "Assumptions," "Proposed

14  Strategy," and so on; do you see that?

15    A   Yes.

16    Q   There's a section titled "Regulatory

17  assessment"; do you see that?

18    A   I do.

19    Q   We'll scroll down to that section with you.

20      Does this appear to be a slide titled

21  "Regulatory Assessment"?

22    A   Yes.

23    Q   Who is Pat Flanagan?

24    A   He's a former employee of Intuitive.

25    Q   On the next slide, there's a page labeled

1   "Regulatory assessment"; do you see that?

2       A   Yes.

3       Q   There's a column labeled "Country"; do you

4   see that?

5       A   I do.

6       Q   And there's a few columns next to that that

7   posts some questions; do you sea that?

8       A   Yes.

9       Q   I can make it a little bit bigger so its

10  easier to see.

11      A   Thank you.

12      Q   Now, the first column has a question:

13          "Allows sale of refurbished product made

14  anywhere?"

15          Do you see that?

16      A   Correct, yes.

17      Q   The answer given for the United States is

18  "Yes."

19          Do you see that?

20      A   Yes.

21      Q   The second column is:

22          "Only allow sale of refurbished product if

23  refurbishing done in country."

24          Do you see that?

25      A   Yes.

1    Q   And the answer for the United States is "No";

2  right?

3    A   Correct.

4    Q   And the third column is

5  "Clearance/Registration required?"

6        And the answer for the U.S. is "No"; right?

7    A   Correct.

8    Q   Was it your understanding that refurbished

9  EndoWrists would be permissible in the United States

10  regardless of where those EndoWrists were made?

11    A   Yes.  The underlying assumption behind this

12  slide was that this was our internal program and that

13  we would be doing the refurbishing.

14    Q   And Intuitive concluded that the refurbishing

15  of the EndoWrist would not require clearance or

16  registration in the United States; true?

17    A   True, not if we were doing it.

18        MR. ERWIG:  Stop screen sharing this exhibit.

19        This will be our next exhibit.  This will be

20  "4'11'17 Boeschenstein to DeSantis."

21        Let me know if I'm butchering that

22  pronunciation.

23        THE WITNESS:  He's had worse.

24  ///

25        (Document remotely marked Exhibit 34

1          for identification.)

2          MR. ERWIG:  Q.  Do you see this on the screen

3    in front of you?

4      A  Yes.

5      Q  Do you recognize this e-mail chain?

6      A  Let me start at the bottom, please.  Thanks.

7          I don't remember this e-mail.  I recognize

8    what it is.

9      Q  Well, you're not on the e-mail chain for a

10   while, and then the e-mail that I want to ask you

11   about is this top e-mail from Curt.  Will you

12   pronounce his last name for me, please.

13     A  Boeschenstein.

14     Q  Thank you.

15         The top e-mail is an e-mail from Curt Boeschenstein

16   to yourself sent on April 11, 2017; is that right?

17     A  Yes.

18     Q  And Mr. Boeschenstein writes:

19         "Wanted to make sure you had a copy of

20   ReManufacturing Offering given that it may come up

21   this week at Japan Ops meeting."

22         Do you see that?

23     A  Yes.

24     Q  The attachment is

25   "Refurbishment_Marketing_Jan30_readout.pptx."

1      Do you see that?

2      A  Yes.

3      Q  The subject of the e-mail is "The Offering -

4  Refurbished"; do you see that?

5      A  Yes.

6      Q  I want to talk about a couple of the things

7  lower in the e-mail chain.  They'll relate to a -- I'm

8  going to go to the first e-mail here.  This -- this

9  was forwarded to you; is that right?

10     A  Yes, I believe so.

11     Q  In the initial e-mail, Glenn Vavosa writes:

12        "In addition to researching the opportunity,

13  I think it is important for the product marketing team

14  to be the one who will draft 'the offering'.  It is

15  essentially taking the next step from pricing to

16  promoting the product in a particular market segment."

17        Do you see that?

18     A  Yes.

19     Q  When Mr. Vavosa refers to the offering, do

20  you understand it to be referring to the refurbished

21  EndoWrist?

22     A  It appears that way, yes.

23     Q  Is it your understanding that product

24  marketing would be involved in marketing that

25  particular offering to your customers?

1    A   That's the suggestion that Glenn is making to

2   Todd and Curt here, yes.

3    Q   Do you have a different understanding of

4   product marketing's involvement in the refurbished

5   EndoWrist initiative?

6    A   Well, I'd offer two things.  One, we never

7   did take it to market, so I can't speak to how it

8   would have played out.

9       Two, there's -- maybe you read into some of

10  the questions back and forth earlier.  The role of

11  product management versus downstream marketing is

12  still being clarified in the organization.

13       MR. ERWIG:  I'm going to stop screen sharing

14  this exhibit.

15       Our next exhibit will be the attachment to

16  that e-mail chain.  This will be "4'11'17 Attached to

17  Boeschenstein to DeSantis."

18       (Document remotely marked Exhibit 35

19        for identification.)

20       MR. ERWIG:  Q.  You see this on the screen in

21  front of you, Mr. DeSantis?

22    A   Yes.

23    Q   Do you recognize this document?

24    A   I don't remember it specifically yet.

25    Q   On this first slide, there's a description,

1  and it describes:

2      "Collection of expired EndoWrists Instruments

3  at the hospital, return to Intuitive Surgical, and

4  receive a refurbished instrument at a lower cost

5  compared to new."

6      Right?

7  A  Yes.

8  Q  And it details a number of what looks like

9  EndoWrists; right?

10  A  Yes.

11  Q  "ProGrasp Forceps Refurbished"; right?

12  A  Yes.

13  Q  The Cadiere?

14  A  Cadiere.

15  Q  "Cadiere Forceps Refurbished."

16     Thank you.

17  A  Yes.

18  Q  "Fenestrated Bipolar Forceps Refurbished"?

19  A  Yes.

20  Q  And others on that page as well; right?

21  A  Yes.

22  Q  Now on Slide 2, there's a title labeled:

23     "Instrument Refurbishment Program Benefits."

24     Do you see that?

25  A  I do.

1    Q   And there's a few columns labeled "Clinical

2   Performance," "Economic Benefits" and "Operational

3   Benefits"; do you see that?

4    A   Yes.

5    Q   Under "Clinical Performance," the first

6   bullet point reads "Equivalent performance" right?

7    A   Yes.

8    Q   Do you understand that to mean refurbished

9   instruments would have new equivalent performance to

10  new EndoWrist?

11   A   Yes.  We wouldn't release instruments to the

12  field that had inferior performance than our specs.

13   Q   And the second bullet point is:

14      "10 lives per instrument."

15      Right?

16   A   Yes.

17   Q   That would mean the refurbished instruments

18  would have a 10-life use counter on them as well;

19  right?

20   A   Yes, according to the slide.

21   Q   And was that your understanding in the

22  development of this program that the purpose was to

23  refurbish instruments and resell them to customers

24  with a new 10-life use counter?

25   A   So I'd actually like to take a chance to read

1  the e-mail and the deck, because we looked at this

2  opportunity a few different times, and I need to kind

3  of clarify where we were at this point in time.

4      So I'll go into the folder and grab the

5  e-mail, and can you help me with the e-mail name?

6    Q  Sure.  It's "4'11'17 Boeschenstein to

7  DeSantis."

8    A  That's attached.  Okay.  I'm struggling to

9  download the attachment.  Okay.  Thank you.  I know

10  that took a while.

11    Q  No problem.

12    A  So --

13    Q  I can read the question, if it would be

14  helpful.

15    A  Sure.  Thank you.

16    Q  As of April 11, 2017, was it your

17  understanding that refurbished instruments could

18  provide equivalent performance to new instruments?

19    A  Yes.

20    Q  Is it your understanding that those

21  refurbished instruments would have equivalent cleaning

22  and sterilization processes as new instruments?

23    A  Yes, they would be -- so yeah, this program

24  is why I had to read it.

25      As with our subsequent programs, it involved

1  collecting instruments, disassembling the instruments,

2  harvesting some parts that could be reused,

3  supplementing those parts with new parts, based on our

4  engineering judgment, and life testing and testing the

5  instruments to all of our specifications to ensure

6  that they met our specifications, including the

7  ten lives.

8      Q    At any point during this process, did

9  Intuitive conclude that instrument refurbishment was

10  not possible?

11     A    So according to that process I just

12  described, we had -- we had some success in testing,

13  and I can't recall exactly.  I think we had some

14  challenges also.  But key to it was what parts did we

15  have to or were we -- were we able to reuse versus

16  what parts did we have to provide new.

17         And then, yeah, I'll leave it at that.

18  Sorry.

19     Q    And there were certain other -- withdrawn.

20         During the refurbishment process, did

21  Intuitive examine whether individual parts could be

22  refurbished, that is, a component of an EndoWrist

23  could be brought back to a like-new specification?

24     A    Well, what we did was take the instruments

25  apart and -- and based on, you know, the expertise and

1  knowledge of our instruments, we made engineering

2  judgments on which parts could potentially be reused

3  and which ones did we know should not be reused.  And

4  then we did that development along with V&V.

5        And I believe we adjusted, based on the

6  results, which parts were being reused versus not.

7  But did we try and remanufacture individual

8  components?  I don't believe so.  It was either use

9  them or not.

10   Q   So the process of this program was to take

11  parts of different EndoWrists and effectively cobble

12  them together to create a refurbished EndoWrist;

13  right?

14   A   No, I wouldn't phrase it like that.

15      MR. RUBY:  Wait, wait, wait.  Excuse me.  I'm

16  sorry.  Mr. DeSantis, I had my phone mute.  Sorry to

17  interrupt you.

18      I'll object to that question.  "Cobble

19  together," that's an argumentative question, and I

20  object to it.

21      You may go ahead and answer, subject to

22  objection.

23      THE WITNESS:  Yeah.  Both in the wording and

24  in kind of the intent, that -- that's not how we did

25  it.  We didn't take instruments and take them apart

1  and then take good parts from one and good parts from

2  another and put them together.

3        We were very concerned with obviously quality

4  and performance.  But also traceability, which means,

5  you know, if you have harvests parts that come out in

6  the field and you ship a lot of new instruments out,

7  and you have to be able to record, you know, in our

8  quality records what the pedigree of those instruments

9  are.  In the case of inequality problems or recalls,

10  then we know which instruments to go out and get.

11        So what I'm really saying is, we didn't take

12  different instruments and mix together parts.  We took

13  instruments apart, and we said we're going reuse

14  cables, jaws, tubes, for example.  And we will add new

15  inputs, pulleys, chassis, housings, again, for

16  example, on all of them.

17        So there was we will harvest these certain

18  components from the ones coming back from the field on

19  all of them.  We'll add new components out of -- that

20  we purchased from our suppliers to all of them.  We

21  would maintain our traceability and ship -- ship them

22  out into the field after we did our V&V life testing.

23        MR. ERWIG:  Q.  So to be clear, Intuitive

24  would take certain components from EndoWrists that it

25  collected; correct?

1    A   Yes.

2    Q   It would supplement those components with new

3   components as needed; right?

4    A   Yes.

5    Q   And throughout the process of testing those

6   EndoWrists, the refurbished EndoWrists were equivalent

7   in performance to the brand new EndoWrists that

8   Intuitive would sell to customers; true?

9    A   I don't recall all the test results, but it

10   would have been a requirement.

11    Q   Well, do you recall if during this process

12   there was any sort of test result that indicated that

13   refurbished instruments would not be able to operate

14   at the same level as new instruments?

15    A   Again, I don't remember the results

16   themselves, but what we -- we were doing was is a

17   development program.  So we would have adjusted our

18   mix of harvested parts or reclaimed parts with our new

19   parts until we were able to get instruments that

20   performed at our quality levels and our

21   specifications.

22    Q   Now, the next slide titled -- well,

23   withdrawn.

24        It mentions a section on brand position; do

25   you see that?

1    A   I do.

2    Q   I'm going to stop screen sharing this

3   exhibit.

4        Now, did Intuitive ultimately adopt --

5   withdrawn.

6        That refurbishment program, that's also been

7   referred to as Project Dragon; is that right?

8    A   So I believe we had at least two iterations

9   of programs that looked at remanufacturing,

10  refurbishing.  One of them was certainly called

11  Project Dragon, yeah.  It was the same type of program

12  if it wasn't that one example.

13   Q   You mentioned two different types of --

14  withdrawn.

15       You mentioned two programs.  What can you

16  tell me about each of those programs?

17   A   They were essentially the same program at

18  two different points in time.

19   Q   And what were those two different points in

20  time?

21   A   So 2017 was the initial, and I don't recall

22  when Dragon was, but I don't recall the date of

23  Dragon.

24   Q   At any point since 2017, has Intuitive, in

25  fact, implemented a refurbishment program?

1    A   No, we have not.

2    Q   Why not?

3    A   We determined that the cost to produce

4   remanufactured instruments at the specs and quality

5   levels of a new instrument would be too close to the

6   cost of just manufacturing new instruments with all

7   new parts.  So financially it didn't -- we weren't

8   motivated to develop and implement the program.

9    Q   One of the initial objectives of Project

10  Dragon was to increase entry barriers for third-party

11  re-programmers; right?

12    A   I missed part of the question.  Sorry.

13    Q   One of the objectives of Project Dragon was

14  to increase entry barriers for third-party

15  re-programming of EndoWrist; true?

16    A   It was a -- it was a lower-level

17  consideration.  You know, so we were looking at

18  primarily being able to offer reduced costs to the

19  customers.  And then there were a couple of secondary

20  considerations.  One of them was reducing waste into

21  the environment.  And the other one was, you know,

22  protecting our brand and our quality from, you know,

23  third parties who are remanufacturing adulterating

24  instruments not to our specs.

25    Q   Well, sir, how did you know a third party is

1  not refurbishing to Intuitive's specifications?

2      You haven't tested the instrument; right?

3    A  So two different questions.

4      We have not done V&V testing on a third

5  party.  But our -- our specifications and our

6  requirements are our intellectual property of the

7  company which we've not released.  So I don't know how

8  a third party would be able to ensure and guarantee

9  that their quality system -- that they were developing

10  to our specs, that their quality system was sufficient

11  and on par with us, et cetera, et cetera.

12      That's really, you know, a lot of the

13  investment that we've put in the -- into the company

14  to develop those specific types of things.

15    Q  Well, you certainly don't have -- withdrawn.

16      Intuitive has not performed any sort of

17  testing of third-party instruments that would --

18  withdrawn.

19      Intuitive has not performed any instruments

20  refurbished by Rebotix to determine whether or not

21  they perform to in Intuitive's specifications; right?

22    A  We have not done V&V or life testing on their

23  instruments, no.

24    Q  And in fact, Intuitive has done no testing of

25  any kind on Rebotix 's instruments to determine

1  whether they function safely with da Vinci robots;

2  true?

3     A   For some reason your audio is glitching a

4  little bit.  I missed the word right before robots.

5     Q   Let me re-ask it.  Withdrawn.

6        Intuitive has not done testing of any kind to

7  determine whether Rebotix's refurbished EndoWrists can

8  safely be used with the da Vinci robot in surgery;

9  true?

10    A   True.  We've not done V&V testing, life

11  testing on their instruments, no.

12       MR. ERWIG:  I'm going Screen Share our next

13  exhibit.  This will be "5'23'17 DeSantis to Goodson,

14  et al."

15       (Document remotely marked Exhibit 36

16        for identification.)

17       MR. ERWIG:  This will be, I believe,

18  Exhibit 36.

19    Q   You see this on the screen in front of you,

20  Mr. DeSantis?

21    A   Yes.

22    Q   Do you recognize this document?

23    A   Let me take a look at it.

24    Q   Sure.

25    A   In one doesn't ring a bell off the bat.  Can

1  I see the bottom of it, please.  Okay.

2      Yeah.  Sorry.  I don't really remember this

3  exchange, but I can identify it.

4    Q   Does this appear to be an e-mail sent from

5  yourself to Nicky Goodson, copying Patrick Flanagan,

6  Katie Scoville, and others?

7    A   Yes.

8    Q   The subject is "Instrument eX update for

9  Bob"; do you see that?

10   A   Yes.

11   Q   What is Instrument eX?

12   A   It's the program we were just talking about.

13  The remanufacturing of -- of the Core instruments.

14   Q   So --

15   A   Sorry.  EndoWrist instruments.

16   Q   So Instrument eX, Project Dragon and the

17  refurbishing program, this would all be the same names

18  for the program that we have been discussing about

19  collecting EndoWrists from customers; right?

20   A   Yes.

21   Q   I'm going to open the attachment to this.

22  Well, withdrawn.

23      Do you see this an attachment labeled

24  "Instrument eX update for Bob.docx"?

25   A   Yes.

1        MR. ERWIG:  Screen share that attachment

2   next.

3        This will be Exhibit 37.

4        (Document remotely marked Exhibit 37

5         for identification.)

6        MR. ERWIG:  This will be attach one to

7   DeSantis to Goodson.

8    Q   You see this on the screen in front of you?

9    A   Yes.

10    Q   At the top there's a title:

11        "Instrument eX Update (Code Name: Dragon):

12   As of 23 May 2017."

13        Do you see that?

14    A   Yes.

15    Q   Do you recognize this?

16    A   Again, I don't remember this specific

17   document.

18    Q   Any reason to believe this isn't the

19   attachment to the e-mail?

20    A   No.

21    Q   Now, you'll see there's a PowerPoint embedded

22   in this document labeled "Draft 518 Secondary

23   Markets."  And we'll look at that in a little bit, but

24   do you see that on the screen in front of you?

25    A   Yes.

1    Q  I want to talk about there document itself.

2        The first heading is labeled "Marketing

3   Updates"; do you see that?

4    A  Yes.

5    Q  And there's a few subheadings.  One is

6   labeled "User Needs"; do you see that?

7    A  Yes.

8    Q  Another is labeled "Company Objectives"; do

9   you see that?

10   A  Yes.

11    Q  Now, in the "Company Objectives," the first

12   bullet point is "Create capital Advancement"; do you

13   see that?

14   A  Yes.

15    Q  What do you understand "capital Advancement"

16   to mean?

17   A  So the "Create capital Advancement" means

18   create demand for our robot itself.

19    Q  Creating demand for the robot itself, that

20   would be advantageous for Intuitive; right?

21   A  Yes.

22    Q  It means that Intuitive could sell more

23   da Vinic platforms; right?

24   A  Yes.

25    Q  And make money off of the sales of those

1  robots; right?

2      A   Yes.

3      Q   The next bullet is "Offensive Revenue and

4  Margin Protection"; do you see that?

5      A   I do.

6      Q   It reads:

7          "Create lower pricing option while

8  maintaining acceptable margins."

9          Do you see that?

10     A   Yes.

11     Q   What is an acceptable margin?

12     A   That's a great question.  I mean the

13  definition of the term "acceptable margin," margin are

14  our product margins.  Acceptable, the words, you know

15  what the word mean.  Exactly what an acceptable margin

16  is to Intuitive is the part where it gets really hard

17  to -- to define.



23     Q   And is it your understanding based on the

24  cost of the reclaiming and remake- -- withdrawn.

25          Is it your understanding that the reclaim --

1    withdrawn.



7      Q   It's not on this page.  I was just wondering

8    if you had a general sense of what the margins were on

9    the refurbished instrument program.

10     A   I don't remember.

11     Q   Do you have a ballpark sense?

12     A   As I was saying earlier, financially, the --

13   the program didn't look like a winner for us, so I

14   don't know what that would mean.  I don't remember

15   what the margins were in particular.

16     Q   You mentioned financially the program didn't

17   look like a winner for you.

18         That's why it wasn't implemented; right?

19     A   Right.  We -- as I said, it -- the cost it

20   would take us, the all-in cost it would take us to

21   disassemble, remanufacture instruments, some old, some

22   new parts was about equivalent what it would take us

23   to manufacture instruments with all new parts from

24   scratch because of the work that's required to ship it

25   back and sterilize, clean it, disassemble, et cetera.

1    Q   Now, under the third bullet point under

2   "Company Objectives," there's a section titled

3   "Defensive revenue and margin protection."

4        Do you see that?

5    A   Yes.

6    Q   The first bullet under that is:

7        "Displace non-validated 3rd party

8   re-programmers were already present."

9        Do you see that?

10   A   Yes.

11   Q   Was one of the company objectives for the --

12  withdrawn.

13        Was one of the company objectives for Project

14  Dragon was to displace non-validated third-party

15  re-programmers?

16   A   Again, it was one of the lower-level

17  objectives, and it was concerning the unvalidated

18  part, non-validated part specifically.

19   Q   Well, there's three bullets under "Company

20  Objectives"; right?

21   A   Three main bullets, yes.

22   Q   First one we talked about is cap, "Creating

23  capital Advancement"; right?

24   A   Yes.

25   Q   That means increasing the number of da Vinci

1  robots sold; right?

2    A   Yes.

3    Q   Second one is "Offensive revenue and margin

4  protection."

5        Can you explain to me in general terms

6  what -- what that means?

7    A   Generating more procedures, more growth, and

8  the resulting revenue, and trying to do so at a, you

9  know, quote unquote "acceptable" margin.

10    Q   And "Defensive revenue and margin

11  protection," what does -- what does that refer to?

12    A   So margin production there means the same

13  thing.  Defensive revenue would be not having our

14  revenue decline.

15    Q   Now, these were three company objectives that

16  was important to Intuitive when it was pursuing a

17  refurbished program; right?

18    A   Well, this is one document in many.  A

19  sub-document written to me, you know.  Again, the

20  company stance was is, how do we offer our platform

21  to -- to -- to more surgeons, more patients.  How do

22  we do so in a safe manner?

23        When it came to other people doing the same,

24  you know, our concern was sure.  Dilution of revenue.

25  But dilution of the quality, the brand, and the impact

1  on patients.  Because when it comes to robotic

2  surgery, the trust and quality level to use the

3  platform is paramount.  And if you don't have that, it

4  could destabilize the entire platform.

5       So having somebody else adulterate our

6  instruments to some -- at least to us, unknown specs,

7  was and is a concern

8    Q   Well, so on this slide the bullet point that

9  includes "3rd party re-programmers," that's titled

10  "Defensive revenue and margin protection"; right?

11    A   Yes.

12    Q   It's not titled, for example, safety concerns

13  and brand protection; right?

14    A   On this slide, it only says "non-validated"

15  which would allude to that, but we have seen it on the

16  other slides and decks.

17    Q   Well, sure.  But I'm just generally trying to

18  get a sense of the company objectives as they relate

19  to revenue and margin protection.

20       And that's one of the objectives that's

21  listed on this slide is the defensive revenue and

22  margin protection as it relates to third-party

23  re-programmers; right?

24    A   On this particular document, it talks about

25  defensive revenue and margin protection, and I can't

1  answer the question in isolation.  I mean, if you just

2  took this document as the only thing that we looked at

3  and said, Okay.  What does it mean?  Right.  I would

4  say, Okay.  It means making sure our revenue doesn't

5  go down.  Doesn't gown do to nonvalidated third-party

6  re-programmers.

7       But I have to answer with what our knowledge

8  of what our intent was and what the program was.  It

9  was about more access to our platform which we think

10  is a good thing, more access to the platform at our

11  specs which we they think is a good thing, and not

12  having people to use the platform to un-validate specs

13  which we think is a very dangerous thing.

14   Q   The second bullet point is:

15       "Reclamation removes product from field

16  increase entry barriers for other 3rd party

17  re-programmers."

18   A  I do.

19   Q   One of the benefits of the instrument

20  refurbishment program to Intuitive is that program

21  would increase entry barriers for third-party

22  re-programmers?

23   A  Yes, for all of the reasons I just talked

24  about.

25   Q   And the next bullet point is:

1        "Create more robotic volume for

2   cost-conscious accounts and increase barrier for

3   robotic competition to enter in these accounts."

4        Do you see that?

5   A  Yes.

6    Q   And when it says "Increase barrier for

7   robotic competition to enter," those would be --

8   withdrawn.

9        When that bullet point says "Increase barrier

10  for robotic competition to enter in these accounts,"

11  that would include potential competitors like

12  Johnson & Johnson; right?

13   A   Yes.

14   Q   And one of the things that Intuitive wanted

15  to do with their refurbished instrument program was to

16  increase the barrier for robotic competition to enter;

17  right?

18   A   Again, it was a lower-level consideration to

19  increase our offering versus our competitors', and we

20  knew that the competitors' primary tactic was going to

21  be lower the cost.

22   Q   Now, sir, when you were -- withdrawn.

23        The reason that the Dragon Program --

24  withdrawn.

25        You mentioned that the purpose of the

Page 256

1    Dragon -- withdrawn.

2         You described the purpose of the Dragon

3    Program as expanding Intuitive's services to more

4    areas; is that right?

5        A   Yeah, I don't -- I don't think I limit it to

6    the word "areas."  But providing more access to our

7    platform and to our services, yes.

8        Q   A refurbished product offering would allow

9    for more cost-conscious customers to potentially gain

10   access to the da Vinci robot in the EndoWrist; right?

11       A   Not according to our tests.  Because a

12   refurbished program didn't equate to a reduced cost

13   for us.  I would -- I would say that a lower cost per

14   use has the potential which we don't have any proof

15   yet to provide more access in the marketplace.

21       Q   I'm just asking you about if you know about

22   what the percentage of discounts was that was proposed

23   with Dragon.

24       A   I don't recall.

25         MR. ERWIG:  Let's look at the next exhibit.

1  That will be this PowerPoint that you see embedded in

2  this document here.  I'll take this exhibit down.

3        That will be Exhibit 38.  That will be

4  "Attach 2 DeSantis to Goodson."

5        (Document remotely marked Exhibit 38

6         for identification.)

7        MR. ERWIG:  Q.  You see this on the screen?

8  Well, actually withdrawn.  Let's stop the screen

9  share.

10        Let's go off the record.

11        THE VIDEOGRAPHER:  We are going off the

12  record at 1:58 p.m.

13        (Recess taken.)

14        THE VIDEOGRAPHER:  This marks the start of

15  Media No. 7.

16        We are back on the record at 2:12 p.m.

17        MR. ERWIG:  Q.  Mr. DeSantis, did you take

18  some notes in preparation for this deposition?

19    A   Yes.

20    Q   Did you have those notes up on the screen

21  while I was asking questions earlier?

22    A   Yes.  I'm sorry.  I had them open on the

23  computer up until the point where you asked about

24  them, and then I closed them at that point.

25    Q   When you say up until the point that I asked

1  about them, what do you mean by that?

2    A   So multiple windows open on a computer.  So

3  it was a hidden window behind this full screen here.

4  But when you asked about them, I got the feeling that

5  it shouldn't be open on my screen, so I just closed

6  them.  But at no time did I refer to them.

7    Q   Did you refresh your recollection using those

8  notes prior to this deposition?

9    A   Yes.

10   Q   Did you reference those notes during any

11  breaks during the deposition?

12   A   No.

13      MR. ERWIG:  I'm going to screen share our

14  next exhibit.  This would be the PowerPoint that I

15  believe we previously marked as Exhibit 38.

16   Q   You see this on that screen in front of you?

17   A   Yes.

18   Q   Does this appear to be a PowerPoint titled

19  "Secondary Markets"?

20   A   Yes.

21   Q   You recognize this PowerPoint?

22   A   Not specifically at this point.

23   Q   Let's go through it together.

24      The -- what do you understand is meant by a

25  "Secondary Market"?

Page 259

1    A   People even at Intuitive have used that to

2   mean different things, so I would -- you know, I'd

3   have to see the context for it.

4    Q   Well, scrolling down to Slide 3, where it

5   says "Copy benefits of secondary markets," first

6   bullet point is "Create a lower cost supply chain"; do

7   you see that?

8    A   I do, yes.

9    Q   The second bullet point is:

10       "Combat utilization of 3rd party after market

11   refurb or reprogrammed instrument."

12       Do you see that?

13    A   I do.

14    Q   Refurb; do you understand that to mean

15   refurbished?

16    A   Yes.

17    Q   The third bullet point is "Accelerate capital

18   pipeline"?

19    A   Yes.

20    Q   Can you explain why a secondary market might

21   create a lower cost supply chain for Intuitive?

22    A   So now based on this slide added to the title

23   slide, this definition of secondary markets means

24   reusing something coming back from the field.

25       So could you repeat the question?  Sorry.

1    Q   Well, that's -- that's helpful.  I want --

2  want to clarify that.

3       A secondary market in this context would be

4  an instrument returned to Intuitive and refurbished to

5  be resold to customers; is that right?

6    A   More broader than that.  The reference to

7  "capital" here is even capital coming back from the

8  field and being reused and sold back to customers.

9  But yes, inclusive of really anything that -- that we

10  sell.

11    Q   So the secondary market refers to Intuitive

12  getting back things that it sold to customers; right?

13    A   Yes, I think so.  I think I would say kind of

14  a resell market in one way, shape, or form or another.

15    Q   The second bullet point, why would a

16  secondary market "Combat the utilization of 3rd party

17  after market refurb or reprogrammed instruments"?

18    A   Supply and demand.  You know, so if there is

19  a demand or a need for secondary instruments,

20  remanufactured instruments, us providing them,

21  satisfying that, in our view, would be the optimal way

22  to do that.

23    Q   Ultimately Intuitive did not enter into that

24  market; right?

25    A   Not to date, no.

1    Q   The reason for that is that Intuitive was

2   able to effectively stop Rebotix using letters to

3   hospitals, for example; right?

4    A   No.  The reason we didn't get into it is

5   because it financially didn't just make sense to us.

6    Q   It was also not necessary to combat

7   utilization of third-party aftermarket refurbished

8   instruments; right?

9        MR. RUBY:  I would object to the form of the

10   question.  To me it's unintelligible, but the witness

11   can answer it if he -- if he can.

12       THE WITNESS:  Yeah, if you wouldn't mind

13   rephrasing it or repeating it if you can't rephrase

14   it.

15       MR. ERWIG:  Sure.

16    Q   Intuitive took some actions in response to

17   the services Rebotix was offering to hospitals; true?

18    A   We did, yes.

19    Q   One of those actions was sending letters

20   informing the hospitals they were in breach of the

21   sales agreement they had signed with Intuitive; right?

22    A   That was part of the letter, yes.

23    Q   Now, another action was telling hospitals

24   that if hospitals continues using Rebotix, that

25   Intuitive would no longer service their da Vinci

1  systems?

2     A   We were essentially informing them of, one,

3  what they were engaged in.  Two, what the implications

4  were.  And, you know, three, what that meant for our

5  contractual agreements with them, yes.

6     Q   One of the actions that Intuitive would take

7  if a hospital continued using Rebotix was it would

8  stop servicing that hospital's da Vinci robot; true?

9     A   We would comply with our contract if they

10  were not.

11     Q   Sorry.  I don't think I quite understand that

12  answer.

13     A   So when we sell a system, we basically

14  have -- have a contingency that they will not use

15  third-party service, et cetera, because of the danger

16  of doing it.  And everything I mentioned earlier about

17  the jeopardizing of the company's brand, its quality,

18  image, et cetera.

19        But regardless of the rationale, if they do

20  not comply with that, then we won't have a

21  relationship with them going forward which would

22  include we won't service and we won't provide

23  consumables.

24     Q   If a da Vinci robot is not serviced by

25  Intuitive, it's ultimately unusable for surgery;

1  right?

2     A  I don't know.  I don't -- I believe it can

3  continue to be used.

4     Q  Well, there's certain areas that the robot

5  can generate that only Intuitive can resolve with its

6  proprietary software; true?

7     A  I believe so.  We're in an area that's not --

8  not my expertise.

9     Q  And it's your understanding that certain

10  service issues, if they're not repaired by -- it's

11  your understanding that certain service issues, if

12  they're not addressed by Intuitive representative,

13  they will render the robot unusable for surgery;

14  right?

15     A  I don't know that.

16     Q  Look at Slide 4 with you.  The slide titled

17  "Dragon"; do you see that?

18     A  Yes.

19     Q  There's some "User Focused" and "Company

20  Focused" bullets on this slide; do you see that?

21     A  Yes.

22     Q  User "Focus Bullet" says "Confidence" --

23        THE REPORTER:  Hold on.  Counsel, if you

24  would please, your papers.

25        MR. RUBY:  Sorry.

1      MR. ERWIG:  Withdrawn.

2   Q   One of the bullet points says:

3      "Confidence Displace non-validated 3rd party

4  re-programmers."

5      Is that right?

6   A  Yes.

7   Q   Under the "Company Focused" bullet there's

8  "Advancement," "Offensive" and "Defensive"; do you see

9  that?

10   A  Yes.

11   Q   And the "Offensive" bullet, that reads:

12      "Create lower pricing option while

13  maintaining acceptable margins."

14      Do you see that?

15   A  I do.

16   Q   That's similar to what we saw in the Mohr

17  document that we looked at earlier; right?

18   A  Yes.

19   Q   And the "Defense" bullet says:

20      "Displaced non-validated 3rd party

21  re-programmers where already present."

22      Right?

23   A  Yes.

24   Q   And "Reclamation removes product from field

25  increase entry barriers for other 3rd party

1  reprogrammers."

2       Right?

3    A  Yes.

4    Q  One of the defensive elements of Project

5  Dragon was to "Displace non-validated 3rd party

6  re-programmers"; right?

7    A  So again, I don't want that statement to be

8  too narrow.  This is under the title of "Company

9  Focused."  We feel that defending the quality and the

10  brand and the reputation of our entire platform is

11  paramount to patients/people but also to the company.

12  So when we talk about "Company Focused" on "Defensive"

13  here, this is what's going -- you know, this is the

14  intent, is the non-validation, to stop kind of

15  unauthorized who knows what quality-system level

16  third-party re-programmers of our instrument.

17    Q  The time that this slide deck was created,

18  Intuitive had not tested any third-party reprogramed

19  EndoWrist; true?

20    A  Again, whatever came back through our quality

21  system, did we test it like we test everything else?

22  Yes.  Did we do V&V and life testing on a

23  third-party's product to our specs?  No.

24    Q  I'm going to stop screen sharing this

25  exhibit.

1        Now, ultimately Intuitive did not pursue an

2   instrument refurbishment program for the da Vinci Si

3   or for the da Vinci Xi; right?

4     A   Not to date.

5     Q   It's because instrument refurbishing, that's

6   something that's not profitable for Intuitive; right?

7     A   Yeah.  Financially it turned out to be

8   essentially a wash between building new instruments

9   and going through the entire process of collecting and

10  remanufacturing to original specs, et cetera.

11    Q   And there's no indication that refurbishing

12  would suddenly be profitable and -- in the future;

13  right?

14    A   I don't know that.

15    Q   Well, what's your understanding of the

16  current status of Project Dragon?

17    A   Project Dragon right now is on the shelf.  It

18  is something that we continue to have conversations

19  about different components and parts.  And we look at

20  all ways to kind of satisfy customer needs or

21  perceived needs.  But right now we're not actively

22  pursuing a refurbishing program.

23    Q   And do you understand that one of the reasons

24  hospitals return to Rebotix was because the services

25  offered at a lower price point than purchasing a new

1  EndoWrist from Intuitive?

2    A  I'd say one of the reasons, yes.

3    Q  Is it your understanding that hospitals are

4  concerned about patient safety?

5    A  Yes.

6    Q  Is it your understanding that hospitals are

7  concerned about maximizing good outcomes for their

8  patients?

9    A  Yes.

10    Q  Do you have any reason to believe that a

11  hospital would deliberately use a -- withdrawn.

12      Do you have any reason to believe that a

13  hospital would use an unsafe instrument in a surgery?

14    A  If that hospital -- hospital was

15  well-informed, I -- you know, I don't believe they

16  would use unsafe instruments.  And, in fact, when we

17  inform most of the hospitals of the facts of the

18  matter, they stopped using third parties.

19    Q  When you say you informed the hospitals, one

20  of the things that you've told the hospitals was that

21  Intuitive would cancel the sales contract with the

22  hospitals if they continued using services like

23  Rebotix; right?

24    A  That was usually a third or fourth step.  Our

25  first was just to inform them and clarify, because

1  there was a lot of confusion out there that this was

2  not authorized, and we did not have a relationship

3  with Rebotix, and there was a bunch of other

4  confusions.  But first it was just --

5        THE REPORTER:  I'm sorry.  First it was?  The

6  paper hit the mic.

7        THE WITNESS:  First it was to have a

8  conversation just clarifying the -- the facts of the

9  matter.

10        MR. ERWIG:  Q.  And the letter that was sent

11  to hospitals, you're aware that that included a

12  section about the hospitals being in breach of the

13  contract with Intuitive; right?

14     A  I believe so.  But the letter was not our

15  first step.

16     Q  Right.

17        A first step would be a conversation with a

18  hospital; right?

19     A  Yes.

20     Q   And if the hospital continued using Rebotix,

21  then Intuitive would send a letter; right?

22     A  We laid out a multistep process that would

23  eventually get to the point where we didn't want to

24  get to.  But again, to defend the reputation of the

25  company and our platform.  Then again, if the hospital

1  continued to use something that we felt was

2  unauthorized, unsafe, we would terminate our

3  relationship with the hospital.

4    Q  Sir, are you aware that hospitals frequently

5  asked Intuitive to provide data about why Rebotix's

6  instruments were not safe to be used with the da Vinci

7  robot?

8    A  I've seen a couple of e-mails that stated

9  that, yes.

10    Q  At any point was Intuitive able to provide

11  any data that indicated that refurbished EndoWrists

12  by -- withdrawn.

13      Was Intuitive ever able to provide any data

14  that indicated that EndoWrists refurbished by Rebotix

15  were unsafe?

16    A  So don't we have Rebotix's testing protocols,

17  life testing, quality system, returns, relationship

18  with the FDA.  We don't have any of that data.

19      The data we have is the testing we've done

20  and why we had indicated ten lives, et cetera and that

21  we certainly have provided.

22    Q  In other words Intuitive provided hospitals

23  with some information about its own testing

24  procedures; right?

25    A  Yes.

1    Q   Its own submissions to the FDA?

2    A   I believe so.

3    Q   And some other information about the

4   effective contractual relationship between Intuitive

5   and the hospital going forward; right?

6    A   Yes.

7    Q   Intuitive did not provide any data about the

8   safety of Rebotix's refurbished EndoWrists; right?

9    A   I don't believe so.  We're not in a position

10  to provide Rebotix's data.

11   Q   Well, one -- one thing that Intuitive could

12  have done would be to take an EndoWrist that was

13  refurbished by Rebotix and see whether it meets the

14  specs set by Intuitive; right?

15   A   That would really be meaningless on a one-off

16  basis.  We would -- to properly conduct V&V testing

17  there's a lot of requirements that -- that are

18  involved, and it's more than just taking one

19  instrument and testing it.

20   Q   Well, at this level you could have started

21  with one instrument; right?

22   A   I think --

23      MR. RUBY:  Objection to form of the question.

24      THE WITNESS:  I think that would be

25  continuing to add to the confusion.  I think that

Page 271

1   would be meaningless.

2       MR. ERWIG:  Q.  Well, one thing that would be

3   meaningful would be for Intuitive to have an actual

4   sense of whether the instruments refurbished by

5   Rebotix, whether those were safe; right?

6       A   Intuitive has 20 years and millions of

7   procedures of instrument experience that -- you know,

8   that we -- we know that what we do is safe, and we

9   have a lot of information about ten lives, and quality

10  levels, and the complaints, et cetera.

11      So, you know, if -- I believe when we're

12  dealing with humans, and people and patients, that the

13  onus is on, you know, the company providing to ensure

14  that they're safe.

15      Q   Well, in the 20 years that Intuitive has been

16  in business and of the millions of procedures,

17  Intuitive has never examined whether EndoWrists can be

18  safely repaired; right?

19      A   We have never taken on a project to repair

20  the EndoWrist.  We've evaluated Project Dragon which

21  is a remanufacture.  But as far as just repairing, no.

22  And it's for a good reason.

23      Q   Well, Intuitive has no data on the

24  effectiveness or the -- withdrawn.

25      Intuitive has no data on the safety of

1  repairs of EndoWrists; true?

2     A   No.  I think we're talking past each other a

3  little bit on -- you know, we -- we have a lot of data

4  on how these instruments wear down, how they fail,

5  what they look like after ten lives.  It's why we

6  chose to do what we want, what we -- what we did on

7  Project Dragon which was it throw out things like

8  cables and grips that are the highest failure modes

9  based on lots and lots of data.

10         And, you know, for us to look across it, at

11  somebody else doing that -- so anyway, we made our

12  decisions on our programs based on our judgment, based

13  on our specs, based on our history.  And we feel good

14  about that.

15     Q   And then the span of that time and

16  experience, one of the areas that Intuitive did not

17  explore was whether it was possible to repair an

18  EndoWrist where, for example, the cables had become

19  loose; right?

20     A   We know exactly how cables perform over time.

21  And when cables become loose, there's a lot of things

22  going on there that are dangerous.  So no, we have not

23  tried to repair loose cables.

24     Q   Another thing that might be an issue with an

25  EndoWrist would be misaligning graspers; right?

1    A   Could be, yes.

2    Q   Has Intuitive ever examined whether it's

3  possible to repair misaligned graspers?

4    A   It's the same type of answer.  The failure of

5  the grips is one of our highest failure modes.  They

6  fail usually because they break.  They break of a

7  brittle failure.

8         Realigning graspers means that you are

9  bending back into shape typically, which means you're

10  taking them past their yield point which makes them

11  more brittle, which would add to our failure rate.  So

12  no, we haven't.

13    Q   Another potential failure might be the

14  scissors, even if they're German-manufactured

15  scissors, those might get dull; right?

16    A   Yes.

17    Q   Has Intuitive ever tested whether it's

18  possible to repair those scissors by sharpening them

19  so they cut effectively?

20    A   So scissor performance is more than just the

21  blade.  It's the sharpness, it's the hardness, it's

22  the contact angle.  So the cost involved in doing that

23  is -- for us did not justify the need to do the --

24  the -- you know, the -- the plan to resharpen them.

25    Q   Three things I want to take your through in

1  turn.  Did Intuitive -- you mentioned -- withdrawn.

2       You mentioned sharpness, hardness and contact

3  angle; is that right?

4    A  Yes.

5    Q  Did Intuitive ever test whether it was

6  possible to repair the scissors so that its sharpness

7  was again adequate?

8    A  No.

9    Q  Did Intuitive ever test scissors to determine

10  whether a repair could make the hardness adequate?

11    A  No.  Nor -- nor contact angle, and all three

12  these of those parameters play off of each other, you

13  know.

14    Q  So at no point was there any testing

15  conducted on any of those factors for repairing

16  scissors at Intuitive; true?

17    A  True.  Because based on our engineering

18  judgment and our knowledge, it would not have been

19  fruitful.

20    Q  Another EndoWrist form is a -- is a needle

21  driver; right?

22    A  Yes.

23    Q  My understanding is that a -- withdrawn.

24       We've discussed earlier that a needle driver

25  is a tool that holds the needle in place for a

1  surgeon; right?

2    A  Yes.

3    Q  What's the most common failure mode for

4  needle drivers?  Well, withdrawn.

5    A  Yeah, I don't know.

6    Q  Sorry.  Yeah, let me -- let me ask a better

7  question.  Withdrawn.

8      The -- one of the failure modes for needle

9  drivers is that the -- the graspers no longer hold the

10  needle tightly; right?

11    A  Yeah.  I would have said either grip force or

12  an unintuitive motion.

13    Q  And we'll get to unintuitive motion.  I just

14  want to focus on -- on grip forth -- grip force right

15  now.

16      Has Intuitive formed any testing to see

17  whether it's possible to repair the grip force of a

18  needle driver EndoWrist to adequate specifications?

19    A  So grip force is related to the cables and

20  re-tensioning, et cetera, you know.  I can go back to,

21  you know, what I said earlier about cable and cable

22  life.  Cable stretches.  It's not a good indicator --

23  for future life.  And that's how you lose grip force.

24  Either that or the grips are bent.

25      And then I would go back to the other

1  statement about the brittle failure on the grips.

2    Q   You also mentioned unintuitive -- well,

3  withdrawn.

4      So it's true that Intuitive has not done any

5  testing as to whether grip force can be adequately

6  repaired for a needle driver EndoWrist; right?

7    A   That's right.  We've used our engineering

8  judgment and said it's not fruitful to do that.

9    Q   By "not fruitful to do that," you mean it's

10  not fruitful to test whether that repair is possible;

11  right?

12    A   Meaning that in our judgment it's dangerous.

13    Q   Well, if you're testing whether it could be

14  repaired, that process, there's no harm to human life

15  when you're just testing a repair; right?

16    A   And so everything we've talked about and we

17  do would require that we bring things back to at least

18  our original specs.  We're not going to -- we're not

19  going to compromise on quality or performance when it

20  comes to people.

21      What we know is bending parts back into shape

22  or reusing cables that have stretched and started to

23  fray will -- you know, again based on our engineering

24  judgment, and our experience, it is -- will not bring

25  them back to spec and will not allow them to last the

1  indicated life, and it's dangerous.  They have been

2  moved closer to their failure point.

3     Q   Well, you might have to replace some parts if

4  a cable is fully torn.  For example, that would have

5  to be replaced; right?

6     A   Yes.  And that's why we went about Project

7  Dragon the way we did.

8     Q   But in the -- in the process of Project

9  Dragon, did you test whether the specific grip force

10  for an EndoWrist, whether that could be repaired?

11     A   I'd be surprised if we did, because grip

12  force is related to cable stretch.

13     Q   One of the other things you mentioned was

14  unintuitive motion, and we discussed earlier that

15  sometimes hospitals experience unintuitive motion in

16  EndoWrists before their use counter expires; right?

17     A   It's very rarely.

18     Q   It certainly happens though; right?

19     A   If it does, it's a significant issue for us

20  that we -- we jump over -- all over and fix.

21  Intuitive motion is a pillar of our platform.

22     Q   Has Intuitive tested whether it's possible to

23  repair EndoWrists that are experiencing unintuitive

24  motion?

25     A   So the motion of the grips is dictated by --

1  through a Tele-OP loop dictated by -- by the cables in

2  the drives.

3      So when you start to get unintuitive motion,

4  it's usually bench part or stretched cables.  In

5  either one of those cases, just to get right to the

6  point, we -- the parts are closer to their failure

7  mode.  So it's not a project we would undertake based

8  on our -- on our engineering knowledge and judgment.

9    Q   It's not something that Intuitive ever did,

10  in fact, undertake; right?

11    A   No.

12    Q   To this date, in fact, Intuitive has never

13  studied whether it's possible to repair EndoWrists to

14  their original specifications; right?

15    A   We've done it the way we know best which is

16  to repair them by replacing the parts that need to be

17  replaced.

18    Q   Well, let's -- withdrawn.

19      Are you aware that hospitals report using

20  Rebotix's instruments in surgeries and have no issues

21  with those instruments?

22      MR. RUBY:  I'll object to the form of the

23  question.  It assumes a fact which isn't a fact.  But

24  you may go ahead and answer.

25      THE WITNESS:  I don't know that I've seen

1  reports from hospitals talking about their

2  satisfaction with Rebotix's instruments.

3      MR. ERWIG:  Q.  Intuitive does not want its

4  customers to use Rebotix's to repair their EndoWrists;

5  true?

6    A  Intuitive doesn't want anybody to adulterate

7  our platform in any way that can't be assured that

8  it's a sufficient quality level that we have --

9  that -- that we provide our sales.

10    Q   And that's at a more general level.  But to

11  get specific, that means that Intuitive does not want

12  hospitals to use Rebotix to repair EndoWrists; right?

13    A  True, because we feel it's unsafe.

14    Q   In fact, Intuitive will ultimately stop

15  servicing the da Vinci robots for hospitals if they

16  continue using Rebotix; right?

17    A  As a last resort, yes.

18      MR. ERWIG:  Let's go off the record.

19      THE VIDEOGRAPHER:  We are going off the

20  record at 2:43 p.m.

21      (Recess taken.)

22      THE VIDEOGRAPHER:  We're back on the record

23  at 2:48 p.m.

24      (Document remotely marked 39

25       for identification.)

Page 280

1          MR. ERWIG:  I'll show you our next exhibit.

2    This will be "7'24'17 Attach from Morales to

3    da Vinci."

4      Q   Do you see this on the screen in front of

5    you?

6      A   Yes.

7      Q   Do you recognize this document?  You can

8    scroll through it.

9      A   Yeah, I don't recall the document

10   specifically, but...

11     Q   Does this look a slide titled "Customer Value

12   of Dragon"?

13     A   Yes.

14     Q   And there's some text below here, and it

15   reads:

2     Q   Is that generally consistent with your

3   understanding of what the discount for Project Dragon

4   instruments would have been?

5     A   I really don't have that data point in my

6   head, even a range.

7        MR. ERWIG:  Take this exhibit down.

8        I have no further questions at this time.

9        MR. RUBY:  I have no questions.

10        MR. ERWIG:  Thank you, Mr. DeSantis.

11        Let's go off the record.

12        MR. RUBY:  Thank you.  Thank you, everybody.

13        THE VIDEOGRAPHER:  This concludes the

14   deposition.

15        We are going off the record at 2:50 p.m.

16        (WHEREUPON, the deposition end the

17         at 2:50 p.m.)

18                    ---oOo---

19

20

21

22

23

24

25

1          ERRATA SHEET

2  Case Name:

3  Deposition Date:

4  Deponent:

5  Pg.  No. Now Reads     Should Read  Reason

6  ___  ___ _____    _____  _____

7  ___  ___ _____    _____  _____

8  ___  ___ _____    _____  _____

9  ___  ___ _____    _____  _____
10  ___  ___ _____    _____  _____
11  ___  ___ _____    _____  _____
12  ___  ___ _____    _____  _____
13  ___  ___ _____    _____  _____
14  ___  ___ _____    _____  _____
15  ___  ___ _____    _____  _____
16  ___  ___ _____    _____  _____
17  ___  ___ _____    _____  _____
18  ___  ___ _____    _____  _____
19  ___  ___ _____    _____  _____
20

              _____
21                Signature of Deponent
22  SUBSCRIBED AND SWORN BEFORE ME
23  THIS _____ DAY OF _____, 2021.
24  _____
25  (Notary Public)   MY COMMISSION EXPIRES:_____

Page 283

1              CERTIFICATE OF REPORTER

2

3        I, ANDREA M. IGNACIO, hereby certify that the

4   witness in the foregoing remote deposition was by me

5   remotely sworn to tell the truth, the whole truth, and

6   nothing but the truth in the within-entitled cause;

7           That said deposition was taken in shorthand

8   by me, a disinterested person, at the time and place

9   therein stated, and that the testimony of the said

10  witness was thereafter reduced to typewriting, by

11  computer, under my direction and supervision;

12          That before completion of the deposition,

13  review of the transcript [ ] was [x] was not

14  requested.  If requested, any changes made by the

15  deponent (and provided to the reporter) during the

16  period allowed are appended hereto.

17          I further certify that I am not of counsel or

18  attorney for either or any of the parties to the said

19  deposition, nor in any way interested in the event of

20  this cause, and that I am not related to any of the

21  parties thereto. Dated: May 28, 2021

22

23  _____

24   ANDREA M. IGNACIO, RPR, CRR, CCRR, CLR, CSR No. 9830

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**FILER'S ATTESTATION**

I, Kenneth A. Gallo, am the ECF User whose ID and password are being used to file this document.  In compliance with Civil Local Rule 5-1(i)(3), I hereby attest that the signatories identified above have concurred in this filing.

Dated:  November 11, 2024

By: /s/ *Kenneth A. Gallo*
    Kenneth A. Gallo

Kenneth A. Gallo (*pro hac vice*)
**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
2001 K Street, NW
Washington, DC  20006-1047
Telephone:  (202) 223-7300
Facsimile:  (202) 204-7420
Email: kgallo@paulweiss.com

*Attorney for Defendant*
*Intuitive Surgical, Inc.*