# EXHIBIT 48

to

**Declaration of Kenneth A. Gallo in Support of Defendant's Motion for Reconsideration or, in the Alternative, for Certification of an Interlocutory Appeal**

Page 1

```
 1            UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF CALIFORNIA
 2                  SAN FRANCISCO DIVISION
 3
     IN RE: DA VINCI SURGICAL ROBOT ) Lead Case No.:
 4   ANTITRUST LITIGATION            ) 3:21-cv-03825-VC
     _____)
 5                                   )
     THIS DOCUMENT RELATES TO:       )
 6   ALL CASES                       )
     _____)
 7                                   )
     SURGICAL INSTRUMENT SERVICE     ) Case No.:
 8   COMPANY, INC.,                  ) 3:21-cv-03496-VC
                                     )
 9              Plaintiff,           )
                                     )
10        vs.                        )
                                     )
11   INTUITIVE SURGICAL, INC.,       )
                                     )
12              Defendant.           )
     _____)
13
14
15       VIDEO-RECORDED VIRTUAL REMOTE DEPOSITION OF
16                    DAVID FABRICANT
17
                     Scottsdale, Arizona
18                    November 8, 2022
                       10:20 a.m. MST
19
20
21
22
23
     REPORTED BY:
24   Janice Gonzales, RPR, CRR
     AZ Certified Court
25   Reporter No. 50844
```

```
 1        the commercialization to take an additional year?
 2             A.   We would have found something out that
 3        had a delay in the product being available for sale
 4        and something -- one of the reasons that would cause
 5        it -- of that -- of that delay would be the -- would
 6        be the 510(k) regulatory requirement.
 7             Q.   Okay.  Would it also be the other
 8        potential risks that are listed here on the bottom of
 9        page 2?
10             A.   Those -- those are potential delays to
11        revenue.
12             Q.   Okay.  But also -- so when you say -- is
13        that different than the question I'm asking you, I
14        guess?  I want to understand your answer.
15             A.   There's time to market and then there's
16        the slope of the revenue.  So the first question is
17        when can you get first sale.  The second is how
18        quickly are you able to generate sales.
19             Q.   You're saying the regulatory issue was
20        time to market issue?
21             A.   Yes.
22             Q.   Okay.  And that for the other potential
23        risks here are all just revenue risks, which are
24        different than time to market?
25             A.   So the 510(k), without it you can't sell
```

Page 53

1  it, so that's time to market.  Unwillingness of
2  hospitals.  That's the amount of time it would take
3  to get a hospital to do a contract with us relative
4  to the investigation of their existing contracts.  We
5  can't do that activity with the hospital until the
6  510(k) is clear.  So we can't engage the hospital,
7  but that would affect the -- that steepness that I
8  was saying of the revenue growth.  The next one of
9  Intuitive's reaction is only going to affect the
10 steepness of the revenue growth.  Additional cost for
11 R&D remediations.  R&D remediations, that would most
12 likely prevent us from being able to sell the device.
13 So that goes with the first one of -- until
14 remediations and the Rebotix product is at the
15 Stryker quality standard, Stryker would not be able
16 to do the promotions or the sales process.  So that's
17 time to market, not the steepness of the slope.  And
18 then the pricing pressures are just -- would go with
19 the steepness of the slope of the revenue.
20         Q.   Okay.  So with regard to revenue risk due
21 to potential reaction of Intuitive -- do you see that
22 line?
23         A.   Yes.
24         Q.   Okay.  You see "legal"?  It just says,
25 "i.e., legal."  Do you see that line?  It's not a

1              Q.   And what is the date of that exhibit, if
2       it's in front of you?
3              A.   It is October 19, 2015.
4              Q.   And what does that exhibit tell you about
5       what they told you at the time in terms of whether
6       Rebotix had or had not sought FDA clearance?
7                   THE WITNESS:  John, are you pulling that
8       up or no?
9                   MR. DOMINGUEZ:  Yeah, I'm on it.  I'm on
10      it, yeah.
11                  THE WITNESS:  I didn't know if you were
12      going to share it.
13                  MR. DOMINGUEZ:  I thought you want me to
14      do that hot key control thing, sure.  You want me to
15      show it.
16                  THE WITNESS:  Right below the last bullet
17      point, that paragraph.
18                  MR. DOMINGUEZ:  Where it says "Raptor
19      submitted"?
20                  THE WITNESS:  Yes.
21                  To answer your question, Raptor did
22      submit their 510(k).  The FDA had not cleared a
23      remanufacturer -- a reprocessor for a 510(k), and
24      they were issued a deficiency letter that they needed
25      to utilize the rate framework, forcing these devices

1    for reprocessing.  Therefore, the company had
2    indicated that they lack a fundamental understanding
3    of SDD regulatory framework and then had requested to
4    leverage Sustainability Solutions expertise to
5    facilitate the 510(k) clearance.
6    BY MR. RUBY:
7         Q.   And in what way did they propose to
8    leverage Stryker's regulatory expertise to get
9    Rebotix closer to 510(k) clearance?
10        A.   That was the other document that was
11   referenced, that said that they were at
12   roughly 30 percent to Stryker's standard for being
13   able to go back to the FDA with a response.  So they
14   were looking to leverage at Stryker's R&D for testing
15   and regulatory for FDA engagement, and that's why the
16   timeline got pushed out and that's why the cost was
17   shown.  The original and then the subsequent -- the
18   updated was the incremental.  I think we showed in
19   the exhibit 1.5 million.
20        Q.   Okay.  At the time of your first sequence
21   of contacts with Rebotix, what business model did
22   they say that they intended to pursue once they had
23   regulatory clearance?
24        A.   I don't understand what that means.
25        Q.   Did they talk to you that what they

Page 151

1   wanted to do was open up a store and sell EndoWrists?
2   Did they want to send a technician to places of
3   business and repair EndoWrists if they needed it?
4   Were they proposing to buy -- in some fashion, buy
5   and sell EndoWrists for the purpose of -- EndoWrists
6   for the purpose of replacing the usage indicator?
7   That's what I mean by the business model. At a high
8   level, what kind of business did they say they wanted
9   to be in?
10              MR. DOMINGUEZ: Objection to form.
11   Misstates the evidence.
12              Go ahead.
13              THE WITNESS: They were going to interact
14   directly with the hospitals to have the used devices
15   shipped to them. They would -- they would issue a
16   repair that was not 510(k) and sent back to the
17   hospital at a discount.
18   BY MR. RUBY:
19       Q.   And did they tell you what this repair
20   would consist of?
21       A.   Yes.
22       Q.   What was that?
23       A.   There were several components. One was
24   to reset the counter, another was to re-tension the
25   cable. The third was to ensure the functionality of

1  the distal tip, and the fourth was to resharpen any
2  cutting distal ends.  There may have been others, but
3  that's the high level that I recall.
4       Q.   In the first sequence of contacts, did
5  Mr. Papit and/or Mr. Mixner tell you that Rebotix
6  didn't really need 510(k) clearance for the kind of
7  repair service that they wanted to offer?
8       A.   Yes, that's -- that was the difference
9  between Rebotix being -- going as a repair company
10 and Stryker being a reprocessing company that
11 required a 510(k).
12      Q.   I don't understand what you just told me.
13 What does that mean?
14      A.   Rebotix is part of another company,
15 Benjamin Biomedical, that Mr. Mixner owned.  That was
16 a repair company.  Rebotix provided repair
17 EndoWrists, which was the four, five things I just
18 mentioned, but as a repair device, it did not require
19 a 510(k) from the FDA.  Stryker's quality system and
20 regulatory counsel would not let Stryker go forward
21 with this device unless it received a 510(k) from the
22 FDA.
23      Q.   Did you ever explain to Mr. Mixner and/or
24 Mr. Papit why it was that Stryker was not interested
25 in going ahead with them unless 510 clearance was

1     obtained?
2          A.   Yes.
3          Q.   What did you say to them?
4          A.   I don't recall other -- I don't recall
5     other than our -- we will not go forward unless this
6     is a FDA-cleared device.
7          Q.   Well, did you explain to them whether or
8     not Stryker believed that it was legal to go forward
9     with the business they had in mind without FDA
10    clearance?
11         A.   That, I don't recall, if we gave them any
12    advice on how they wanted to operate Rebotix.
13         Q.   Did you ever discuss with Rebotix, with
14    Mr. Mixner, and/or Mr. Papit what kind of structure
15    there might be to a financial transaction between
16    Stryker and Rebotix if Stryker decided to go ahead
17    with that?
18         A.   Yes.
19         Q.   And what did you say to them about that?
20    What did you tell them?
21         A.   It's the LOI terms -- or IOI terms.
22         Q.   And do you recall in -- approximately
23    what those were?
24              THE WITNESS:  John, if you can pull up
25    document -- or Exhibit 239b, as in boy, and it's the

1      tried to explain to us that they didn't think it was
2      required under the -- under a repair service.
3      BY MR. RUBY:
4           Q.   I'm sorry for talking over you.  I'll try
5      to slow down.
6                After they explained to you they thought
7      that 510(k) clearance wasn't required because this
8      was a repair, did you after that explain to them,
9      well -- I'm para- -- these are my words.  Did you
10     explain to them, Well, that's your opinion, but
11     there's not going to be a deal with Stryker unless
12     510 clearance was obtained, or words to that effect?
13          A.   One of the key considerations for -- for
14     Stryker was the 510(k) clearance.
15          Q.   And you told them that?
16          A.   Yes.
17          Q.   Did you ever tell Mr. Papit and/or
18     Mr. Mixner about any opinion that you personally had
19     as to whether the -- what they described as a repair
20     required 510(k) clearance or not?
21          A.   That, I don't recall, if I gave them my
22     opinion.
23          Q.   Did you ever tell them whether or not you
24     agreed with their opinion, that what they were
25     describing as a repair required 510(k) clearance?