1
2
3
4                UNITED STATES DISTRICT COURT
5               NORTHERN DISTRICT OF CALIFORNIA
6
7   SURGICAL INSTRUMENT SERVICE            Case No.  21-cv-03496-AMO
    COMPANY, INC.,
8                Plaintiff,                **TENTATIVE JURY CHARGE**
9        v.
10  INTUITIVE SURGICAL, INC.,
11               Defendant.
12
13       Below is the Court's tentative jury charge.  The Court will discuss these instructions,

14  including any objections, with the parties on Monday, January 27, 2025.  The parties should

15  additionally be prepared to discuss Intuitive's proposed verdict form, including any objections or

16  proposed amendments thereto.
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

CONTENTS

I.      Preliminary Instructions ........................................................................... 6

        A.    Duty of Jury [Ninth Circuit Model 1.4] ........................................ 6

        B.    Burden of Proof – Preponderance of the Evidence [Ninth Circuit
              Model 1.6] ...................................................................................... 7

        C.    What is Evidence [Ninth Circuit Model 1.9] ................................ 8

        D.    What is not Evidence [Ninth Circuit Model 1.10] ........................ 9

        E.    Direct and Circumstantial Evidence [Ninth Circuit Model 1.12] ......................... 10

        F.    Credibility of Witnesses [Ninth Circuit Model 1.14].................... 11

        G.    Taking Notes [Ninth Circuit Model 1.18, amended]..................... 12

        H.    Bench Conferences and Recess [Ninth Circuit Model 1.20] ................ 13

        I.    Exhibit Redactions [Court's proposal] .......................................... 14

        J.    Stipulations of Fact [Ninth Circuit Model 2.2] ........................... 15

        K.    Deposition in Lieu of Live Testimony [Ninth Circuit Model 2.4,
              amended] ........................................................................................ 16

        L.    Expert Opinion [Ninth Circuit Model 2.13]................................... 17

        M.    Charts and Summaries Received in Evidence [Ninth Circuit Model
              2.15]................................................................................................ 18

II.     Introductory Antitrust Instructions.......................................................... 19

        A.    Purpose of the Sherman Act [No. 2] ............................................. 19

        B.    SIS's Claims and the Antitrust Statutes Offered by SIS [No. 3]......................... 20

        C.    Relevant Product Markets [No. 7].................................................. 21

        D.    Single-Brand Aftermarket [No. 7] ................................................ 23

III.    SIS'S CLAIMS UNDER SECTION 1 OF THE SHERMAN ACT ..................... 24

        A.    Sherman Act Section 1 Claims Generally [No. 9] ................................. 24

              1.    Rule of Reason Overview [No. 10]....................................... 25

              2.    Rule of Reason Proof of Competitive Harm [No. 11]............................ 26

              3.    Rule of Reason Evidence of Competitive Benefits [No. 12] ................... 28

2

B.    SIS's Tying Claim ....................................................................... 29

    1.    Tying Overview ................................................................ 29

    2.    Rationale for Prohibition of Tying Arrangements [No. 14].................... 30

    3.    Elements of Unlawful Tying [No. 16] ................................ 31

    4.    Presence of Two Products [No. 17] ............................... 32

    5.    Tying – Conditioned Sale [No. 18] ............................... 33

    6.    Existence of Market Power With Respect to the Tying Product [No. 23] .................... 34

    7.    Foreclosure of a Substantial Volume of Commerce With Respect to the Tied Product [No. 24] ................ 35

    8.    Rule of Reason – Proof of Competitive Harm [No. 28]........................... 36

    9.    Rule of Reason – Evidence of Competitive Benefits [No. 29] ................ 37

    10.    Business Justification Defense [No. 31] .................................. 38

C.    SIS's Exclusive Dealing Claim ........................................... 39

    1.    Elements of Exclusive Dealing [No. 32]............................ 39

    2.    Restrictions on Unauthorized Third-Party Products and Services Are Not Exclusive Dealing [No. 33] ........................... 40

    3.    Exclusive Dealing – Agreements that Substantially Foreclose Competition [No. 34] ........................ 41

    4.    Exclusive Dealing – Relevant Market [No. 37] ........................ 43

    5.    Exclusive Dealing – Market Power [No. 39] ........................ 44

    6.    Evidence of Competitive Benefits [No. 40] ........................ 45

IV.    SIS'S CLAIMS UNDER SECTION 2 OF THE SHERMAN ACT ...................... 46

A.    Sherman Act Section 2 Claims Generally ........................... 46

    1.    Sherman Act Section 2 Overview [No. 43]............................ 46

    2.    Elements of Monopolization Offered by SIS [No. 45] ........................ 47

    3.    Monopolization – Relevant Product Market [No. 47].......................... 48

    4.    Monopoly Power Defined [No. 48]........................................ 49

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

3

5.    Monopoly Power – Direct Evidence [No. 49]...........................................50

6.    Monopoly Power – Indirect Evidence [No. 50] ........................................51

7.    Willful Acquisition or Maintenance of Monopoly Power
      through Anticompetitive Conduct [No. 51] ..............................................54

8.    Attempt to Monopolize [No. 54].............................................................57

9.    Attempted Monopolization - Anticompetitive Conduct [No.
      55].........................................................................................................58

10.   Specific Intent to Achieve Monopoly Power [No. 56]..............................59

11.   Dangerous Probability of Success [No. 57] .............................................61

V.    ANTITRUST INJURY & DAMAGES ..................................................................... 62

      A.    Injury & Causation ........................................................................................ 62

            1.    Injury [No. 60]........................................................................................ 62

            2.    Causation [No. 62] .................................................................................. 63

            3.    Antitrust Injury [No. 63] ........................................................................ 64

      B.    Damages ......................................................................................................... 65

            1.    Antitrust Damages – Introduction and Purpose [No. 64]....................... 65

            2.    Damages for Competitors – Preparedness to Enter Business
                  [No. 67] .................................................................................................. 66

            3.    Basis for Calculating Damages [No. 68]................................................. 67

            4.    Causation and Disaggregation [No. 69] .................................................. 68

            5.    Damages for Competitors – Lost Profits [No. 70] .................................. 69

            6.    Damages for Competitors – Future Lost Profits [No. 71]........................ 70

            7.    Mitigation of Damages [No. 72] ............................................................. 72

VI.   INTUITIVE'S COUNTERCLAIMS ........................................................................ 73

      A.    Intuitive's Counterclaims Overview [No. 73] ............................................... 73

      B.    Intuitive's Lanham Act Claim ....................................................................... 74

            1.    Lanham Act – Elements of False Statement Claim [No. 74] ................... 74

            2.    False or Misleading [No. 75]................................................................... 75

3.     Commercial Advertisement or Promotion [No. 76]...................................76

4.     Lanham Act Injury [No. 77]...................................................................77

C.    Intuitive's Common Law Unfair Competition Claim [No. 78]............................78

D.    Intuitive's Tortious Interference with Contract Claim [No. 79] .........................79

E.    Intuitive's Damages.....................................................................................80

1.     Lost Profit Damages on Counterclaims [No. 80] ......................................80

VII.    Guidance Regarding Deliberations ........................................................................81

A.    Duty to Deliberate [Ninth Circuit Model 3.1].................................................81

B.    Consideration of Evidence—Conduct of the Jury [Ninth Circuit Model 3.2].......................................................................................................82

C.    Communication with Court [Ninth Circuit Model 3.3]........................................84

D.    Return of Verdict [Ninth Circuit Model 3.5] .................................................85

E.    Post-Discharge Instruction [Ninth Circuit Model 3.9].........................................86

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

# I.    PRELIMINARY INSTRUCTIONS

## A.    Duty of Jury [Ninth Circuit Model 1.4]

Members of the Jury: Now that you have heard all of the evidence it is my duty to instruct you on the law that applies to this case.  Thereafter, the attorneys will have a final opportunity to address you and make closing arguments.

A copy of these instructions will be sent to the jury room for you to consult during your deliberations.

It is your duty to find the facts from all the evidence in the case.  To those facts you will apply the law as I give it to you.  You must follow the law as I give it to you whether you agree with it or not.  And you must not be influenced by any personal likes or dislikes, opinions, prejudices, or sympathy.  That means that you must decide the case solely on the evidence before you.  You will recall that you took an oath to do so.

Please do not read into these instructions or anything that I may say or do or have said or done that I have an opinion regarding the evidence or what your verdict should be.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

**B.** **Burden of Proof – Preponderance of the Evidence [Ninth Circuit Model 1.6]**

When a party has the burden of proving any claim by a preponderance of the evidence, it means you must be persuaded by the evidence that the claim is more probably true than not true.

You should base your decision on all of the evidence, regardless of which party presented it.

**C.    What is Evidence [Ninth Circuit Model 1.9]**

The evidence you are to consider in deciding what the facts are consists of:

(1)    the sworn testimony of any witness;

(2)    the exhibits that are admitted into evidence;

(3)    any facts to which the lawyers have agreed; and

(4)    any facts that I may instruct you to accept as proved.

**D.      What is not Evidence [Ninth Circuit Model 1.10]**

In reaching your verdict, you may consider only the testimony and exhibits received into evidence.  Certain things are not evidence, and you may not consider them in deciding what the facts are.  I will list them for you:

(1)      Arguments and statements by lawyers are not evidence.  The lawyers are not witnesses.  What they have said in their opening statements, closing arguments and at other times is intended to help you interpret the evidence, but it is not evidence.  If the facts as you remember them differ from the way the lawyers have stated them, your memory of the facts control.

(2)      Questions and objections by lawyers are not evidence.  Attorneys have a duty to their clients to object when they believe a question is improper under the rules of evidence.  You should not be influenced by the objection or by the court's ruling on it.

(3)      Testimony that is excluded or stricken, or that you have been instructed to disregard, is not evidence and must not be considered.  In addition, some evidence was received only for a limited purpose; when I have instructed you to consider certain evidence only for a limited purpose, you must do so, and you may not consider that evidence for any other purpose.

(4)      Anything you may have seen or heard when the court was not in session is not evidence.  You are to decide the case solely on the evidence received at the trial.

United States District Court
Northern District of California

### E.     Direct and Circumstantial Evidence [Ninth Circuit Model 1.12]

Evidence may be direct or circumstantial.  Direct evidence is direct proof of a fact, such as testimony by a witness about what that witness personally saw or heard or did.  Circumstantial evidence is proof of one or more facts from which you could find another fact.  You should consider both kinds of evidence.  The law makes no distinction between the weight to be given to either direct or circumstantial evidence.  It is for you to decide how much weight to give to any evidence.

**F.    Credibility of Witnesses [Ninth Circuit Model 1.14]**

In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe.  You may believe everything a witness says, or part of it, or none of it.

In considering the testimony of any witness, you may take into account:

(1)    the opportunity and ability of the witness to see or hear or know the things testified to;

(2)    the witness's memory;

(3)    the witness's manner while testifying;

(4)    the witness's interest in the outcome of the case, if any;

(5)    the witness's bias or prejudice, if any;

(6)    whether other evidence contradicted the witness's testimony;

(7)    the reasonableness of the witness's testimony in light of all the evidence; and

(8)    any other factors that bear on believability.

Sometimes a witness may say something that is not consistent with something else he or she said. Sometimes different witnesses will give different versions of what happened.  People often forget things or make mistakes in what they remember.  Also, two people may see the same event but remember it differently.  You may consider these differences, but do not decide that testimony is untrue just because it differs from other testimony.

However, if you decide that a witness has deliberately testified untruthfully about something important, you may choose not to believe anything that witness said.  On the other hand, if you think the witness testified untruthfully about some things but told the truth about others, you may accept the part you think is true and ignore the rest.

The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify.  What is important is how believable the witnesses were, and how much weight you think their testimony deserves.

United States District Court
Northern District of California

**G.      Taking Notes [Ninth Circuit Model 1.18, amended]**

Several of you have taken notes to help you remember the evidence.  Whether or not you took notes, you should rely on your own memory of the evidence.  Notes are only to assist your memory.  You should not be overly influenced by your notes or those of other jurors.

When you leave, please leave your notes in the jury room.  No one will read your notes.

United States District Court
Northern District of California

**H.     Bench Conferences and Recess [Ninth Circuit Model 1.20]**

From time to time during the trial, it became necessary for me to speak with the attorneys out of the hearing of the jury, either by having a conference at the bench when the jury was present in the courtroom or by calling or recess.  Please understand that while you were waiting, we were working.  The purpose of those conferences was not to keep relevant information from you, but to decide how certain evidence is to be treated under the rules of evidence and to avoid confusion and error.

Of course, we have done what we could to keep the number and length of these conferences to a minimum.  I did not always grant an attorney's request for a conference. Do not consider my granting or denying a request for a conference as any indication of my opinion of the case or what your verdict should be.

United States District Court
Northern District of California

1    I.    **Exhibit Redactions [Court's proposal]**

2         The Court has admitted exhibits with redactions into evidence.  You must not speculate as

3    to what was redacted in those exhibits or why those redactions were made.

1    **J.**    **Stipulations of Fact [Ninth Circuit Model 2.2]**

2    The parties have agreed to certain facts.  You must therefore treat the following facts as

3    having been proved:

4    (1)    The relevant geographic market for the antitrust claims in this action is the United

5    States.

6    (2)    SIS filed suit against Intuitive on May 1, 2021.

7    (3)    SIS began offering reset S/Si EndoWrists to its customer base in fall of 2019.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

**K.      Deposition in Lieu of Live Testimony [Ninth Circuit Model 2.4, amended]**

The depositions of several witnesses[1] were presented through video designations of prior depositions.  A deposition is the sworn testimony of a witness taken before trial.  The witness is placed under oath to tell the truth and lawyers for each party may ask questions.  The questions and answers are recorded.  Insofar as possible, you should consider deposition testimony, presented to you in court in lieu of live testimony, in the same way as if the witness had been present to testify.

---

[1] David Rosa, Glen Vavoso, Bob DeSantis, Anthony McGrogan, Grant Duque, Nikola Goodson, Katie Scoville, Sharathchandra "Shark" Somayaji, Daniel Jones, Colin Morales, Ronald Bair, Kevin May, Edward Harrich, Clif Parker, Stan Hamilton, Glenn Papit, and Chris Gibson

1

**L.     Expert Opinion [Ninth Circuit Model 2.13]**

You have heard testimony from experts who testified to opinions and the reasons for their opinions.  This opinion testimony is allowed, because of the specialized knowledge, skill, experience, training, or education of these witnesses.

Such opinion testimony should be judged like any other testimony.  You may accept it or reject it and give it as much weight as you think it deserves, considering the witnesses' specialized knowledge, skill, experience, training, or education, the reasons given for their opinions, and all the other evidence in the case.

1    **M.    Charts and Summaries Received in Evidence [Ninth Circuit Model 2.15]**

2        Certain charts and summaries have been admitted into evidence to illustrate information

3    brought out in the trial.  Charts and summaries are only as good as the testimony or other admitted

4    evidence that supports them.  You should, therefore, give them only such weight as you think the

5    underlying evidence deserves.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

## II.    INTRODUCTORY ANTITRUST INSTRUCTIONS

### A.    Purpose of the Sherman Act [No. 2]

The purpose of the Sherman Act is to preserve free and unfettered competition in the marketplace.  The Sherman Act rests on the central premise that competition produces the best allocation of our economic resources, the lowest prices, the highest quality, and the greatest material progress.

1

**B.      SIS's Claims and the Antitrust Statutes Offered by SIS [No. 3]**

2

SIS claims that Intuitive has violated the Sherman Act, and more specifically, each of

3
Section 1 and Section 2 of the Sherman Act.

4

SIS claims under Section 1 of the Sherman Act that Intuitive's agreements with its hospital

5
customers unreasonably restrained trade in the market for replacement and repaired EndoWrist

6
instruments through illegal tying of EndoWrist replacements with Intuitive's da Vinci surgical

7
robots.

8

SIS also claims under Section 1 of the Sherman Act that Intuitive entered into agreements

9
with its hospital customers and engaged in other related conduct that unreasonably restrained trade

10
in the market for replacement and repaired EndoWrist instruments through exclusive dealing in

11
that market.

12

SIS further claims that Intuitive has unlawfully obtained monopoly power in the market for

13
replacement and repaired EndoWrist instruments through a variety of anticompetitive acts, in

14
violation of Section 2 of the Sherman Act.

15

SIS also claims that Intuitive has unlawfully attempted to obtain monopoly power and has

16
a dangerous probability of obtaining monopoly power in the market for replacement and repaired

17
EndoWrist instruments through a variety of anticompetitive acts, in violation of Section 2 of the

18
Sherman Act.

19

Each of these is a separate claim that has distinct elements that SIS must prove.  SIS bears

20
the burden of proof on each of these claims.  Thus, you may find that SIS has proved all, none, or

21
only a subset of these claims.

22

Next, I will be instructing you on the elements required to prove each of these claims.

23

24

25

26

27

28

United States District Court
Northern District of California

1

**C.    Relevant Product Markets [No. 7]**

For each of SIS's antitrust claims, SIS must prove by a preponderance of the evidence that the relevant markets it alleges are valid antitrust markets.

The basic idea of a relevant product market is that the products within it are reasonable substitutes for each other from the buyer's point of view; that is, the products compete with each other.  In other words, the relevant product market includes the products that a consumer believes are reasonably interchangeable or reasonable substitutes for each other.  This is a practical test with reference to the actual behavior of buyers and marketing efforts of sellers.  Products need not be identical or precisely interchangeable as long as they are reasonable substitutes.  Thus, for example, if consumers seeking to cover leftover food for storage considered certain types of flexible wrapping material – such as aluminum foil, cellophane, or even plastic containers – to be reasonable alternatives, then all those products may be in the same relevant product market.

To determine whether products or services are reasonable substitutes for each other, you must consider whether a small but significant and non-transitory increase in the price of one product would result in enough customers switching from that product to another product such that the price increase would not be profitable.  In other words, will customers accept the price increase or will so many switch to alternative products or services that the price increase will be withdrawn?  Generally speaking, a small but significant and non-transitory increase in price is approximately a five percent increase in price not due to cost factors, but you may conclude in this case that some other percentage is more applicable to the products at issue.  If you find that customers would switch and that the price increase would not be profitable, then you must conclude that the products are in the same product market.  If, on the other hand, you find that customers would not switch, then you must conclude that the products are not in the same product market.

In evaluating whether various products or services are reasonably interchangeable or reasonable substitutes for each other under the price increase test I have just given you, you may also consider:

- customers' views on whether the products are interchangeable;

- the relationship between the price of one product and sales of another;

- the presence or absence of specialized vendors;

- the perceptions of either industry or the public as to whether the products are in separate markets;

- the views of SIS and Intuitive regarding who their respective competitors are; and

- the existence or absence of different customer groups or distribution channels.

In this case, SIS alleges there are two separate relevant product markets: (1) an alleged market for surgical robots used in minimally invasive soft tissue (or "MIST") surgery; and (2) an alleged aftermarket for replacement and repaired EndoWrist instruments.

Intuitive disputes SIS's definition of the alleged relevant markets.

First, Intuitive contends that the relevant product market in which Intuitive's da Vinci system competes includes all types (or "modalities") of surgery available to doctors to treat the conditions that can be treated by the da Vinci. In particular, Intuitive contends that its da Vinci system competes not just with other MIST surgical robots, but with laparoscopic surgery and open surgery as well.

Second, Intuitive contends that the alleged aftermarket for replacement and repaired EndoWrist instruments is an improperly defined single-brand aftermarket – that is, a market that is improperly limited to Intuitive's own brand of products.

If you find that SIS has failed to prove by a preponderance of the evidence either of the two relevant markets it alleges based on the instructions I have given you, then you must find for Intuitive on all of SIS's claims. If you find that SIS has proven the relevant markets it alleges, then you should continue to evaluate the remainder of SIS's claims.

United States District Court
Northern District of California

United States District Court
Northern District of California

**D.    Single-Brand Aftermarket [No. 7]**

To establish a valid single-brand aftermarket, SIS must prove each of the following four factors by a preponderance of the evidence:

(1)    the challenged aftermarket restrictions (which, here, are the alleged restrictions that Intuitive places in its contracts on the use with the da Vinci system of unauthorized instruments or instruments that have been modified by unauthorized third parties) are not generally known when hospitals make their "foremarket" purchase of the da Vinci system;

(2)    significant information costs prevent hospitals from forecasting life-cycle pricing accurately at the time they purchase their da Vinci surgical systems;

(3)    significant monetary or non-monetary switching costs exist; and

(4)    ~~general market-definition principles regarding~~ cross-elasticity of demand~~, like those on which I have instructed you,~~ do~~es~~ not undermine SIS's proposed single-brand market.

1    **III.    SIS'S CLAIMS UNDER SECTION 1 OF THE SHERMAN ACT**

2        **A.    Sherman Act Section 1 Claims Generally [No. 9]**

3        SIS brings two claims against Intuitive under Section 1 of the Sherman Act.  Section 1

4    prohibits contracts, combinations and conspiracies that unreasonably restrain trade.  The first

5    claim is for "tying," and the second claim is for "exclusive dealing."

6        To establish a violation of Section 1 of the Sherman Act, SIS must prove the following:

7        (1)    The existence of a contract, combination, or conspiracy between or among at least

8    two separate entities;

9        (2)    That the contract, combination, or conspiracy unreasonably restrains trade; and

10        (3)    That the restraint caused plaintiff to suffer an injury to its business or property.

United States District Court
Northern District of California

1          **1.      Rule of Reason Overview [No. 10]**

2          Under Section 1 of the Sherman Act, a restraint of trade is illegal only if it is found to be

3    unreasonable.  You must determine, therefore, whether the restraints challenged by SIS here –

4    namely, the alleged restrictions that Intuitive places in its contracts on the use with the da Vinci

5    system of unauthorized instruments or instruments that have been modified by unauthorized third

6    parties – are unreasonable.  In making this determination, you must first determine whether SIS

7    has proven that the challenged restraint has resulted in a substantial harm to competition in a

8    relevant product and geographic market.

9          If you find that SIS has proven that the challenged restraint results in a substantial harm to

10   competition in a relevant market, then you must consider whether Intuitive has shown that the

11   restraint produces countervailing competitive benefits.

United States District Court
Northern District of California

### 2.    Rule of Reason Proof of Competitive Harm [No. 11]

As I mentioned, to prove that the challenged restraints are unreasonable, SIS first must demonstrate that the restraints have resulted in a substantial harm to competition.  Harm to competition is to be distinguished from harm to a single competitor or group of competitors, which does not necessarily constitute harm to competition.

Furthermore, SIS must show that the harm to competition occurred in an identified market, known as a relevant market.  It is SIS's burden to prove the existence of a relevant market.  I instructed you earlier on how to make this assessment.  In this case, SIS alleges competitive harm only in one market: the alleged aftermarket for replacement and repaired EndoWrist instruments; SIS does not claim any competitive harm in the alleged market for surgical robots used in MIST surgery.

If you find that SIS has proven the existence of a relevant market, then you must determine whether SIS also have proven that the challenged restraints have a substantial harmful effect on competition in that market.  A harmful effect on competition, or competitive harm, refers to a reduction in competition that results in the loss of some of the benefits of competition, such as lower prices, increased output, or higher product quality.  If the challenged conduct has not resulted in higher prices, decreased output, lower quality, or the loss of some other competitive benefit, then there has been no competitive harm, and you should find that the challenged conduct was not unreasonable.

In determining whether the challenged restraint has produced competitive harm, you may look at the following factors:

- the effect of the restraint on prices, output, product quality, and service;

- the purpose and nature of the restraint;

- the nature and structure of the relevant market;

- the number of competitors in the relevant market and the level of competition among them, both before and after the restraint was imposed; and

- whether Intuitive possesses market power.

The last factor mentioned, market power, has been defined as an ability to profitably raise

26

United States District Court
Northern District of California

prices, for a sustained period of time, above those that would be charged in a competitive market. A firm that possesses market power generally can charge higher prices for the same goods or services than a firm in the same market that does not possess market power.

An important factor in determining whether Intuitive possesses market power is Intuitive's market share, that is, its percentage of the products or services sold in the relevant market by all competitors. Other factors that you may consider in determining whether Intuitive has market power include market share trends, the existence of barriers to entry (that is, how difficult is it for other producers to enter the market and begin competing with Intuitive for sales), the entry and exit by other companies, and the number and size of actual competitors or potential competitors. If Intuitive does not possess a substantial market share, it is less likely that Intuitive possesses market power. If Intuitive does not possess market power, it is less likely that the challenged restraints have resulted in a substantial harmful effect on competition in the market.

1

### 3. Rule of Reason Evidence of Competitive Benefits [No. 12]

  If you find that SIS has proven that the challenged restraints resulted in substantial harm to competition in a relevant market, then you next must determine whether the restraint also benefits competition in other ways. If you find that the challenged restraints do result in competitive benefits, then you also must consider whether the challenged restraints were reasonably necessary to achieve the benefits. If SIS proves that the same benefits could have been readily achieved by other, reasonably available alternative means that create substantially less harm to competition, then they cannot be used to justify the challenged restraints.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**B.** **SIS's Tying Claim**

  **1.** **Tying Overview**

   SIS claims that Intuitive engaged in an unlawful tying arrangement.  A tying arrangement is one in which the seller will sell one product (referred to as the tying product) only on the condition that buyers also purchase a different product (referred to as the tied product) from the seller, or at least agrees that he will not purchase the tied product from any other supplier.  In this case, SIS claims that the da Vinci surgical robot is the tying product and a replacement or repaired EndoWrist instrument is the tied product.

1

### 2.    Rationale for Prohibition of Tying Arrangements [No. 14]

Not all tying arrangements are unlawful.  The essential characteristic of an invalid tying arrangement is a seller's exploitation of its market power over the tying product (the da Vinci surgical robot) to force buyers to purchase a tied product (replacement and repaired EndoWrist instruments) that buyers might have preferred to purchase elsewhere.

### 3.    Elements of Unlawful Tying [No. 16]

To prevail on its tying claim, SIS must prove each of the following elements by a preponderance of the evidence:

(1)    (a) MIST surgical robots and (b) replacement and repaired EndoWrist instruments are separate and distinct products;

(2)    Intuitive will sell da Vinci surgical robots only on the condition that the buyer also purchase replacement EndoWrist instruments from Intuitive, or that the buyer not purchase replacement or repaired EndoWrist instruments from any other supplier;

(3)    Intuitive has sufficient market power with respect to MIST surgical robots to enable it to restrain competition as to replacement and repaired EndoWrist instruments;

(4)    the alleged tying arrangement has foreclosed a substantial volume of commerce as to replacement and repaired EndoWrist instruments;

(5)    the alleged tying arrangement has unreasonably restrained trade in that it had a substantial adverse effect on competition as to replacement and repaired EndoWrist instruments; and

(6)    SIS was injured in its business or property because of the alleged tying arrangement.

If you find that the evidence is sufficient to prove all six of these elements, then you must find for SIS and against Intuitive on SIS's tying claim.  If you find that the evidence is insufficient to prove any one of these elements, then you must find for Intuitive and against SIS on SIS's tying claim.

1

**4.     Presence of Two Products [No. 17]**

2      The first element of its tying claim that SIS must prove is that the da Vinci surgical robot is

3 a separate and distinct product from replacement and repaired EndoWrist instruments.

4      To determine whether (1) the da Vinci surgical robot and (2) replacement and repaired

5 EndoWrist instruments are separate and distinct products, you should consider whether there

6 would be demand for each of them if they were offered separately.  If enough customers would

7 want to purchase the da Vinci surgical robot alone and replacement or repaired EndoWrist

8 instruments alone, then they are separate products.  On the other hand, if there is very little

9 demand for one of the products by itself, that is, without purchasing the other product at the same

10 time, then the da Vinci surgical robot and replacement and repaired EndoWrist instruments are not

11 two separate products for the purposes of the tying claim, even if they are sometimes sold

12 separately.

13      Products may be separate products even if one of them is useless without the other.  The

14 relevant issue is whether there is sufficient demand from customers to induce sellers to provide

15 them separately, even if the customer needs to obtain both products from one or more suppliers.

16

17

18

19

20

21

22

23

24

25

26

27

28

### 5.     Tying – Conditioned Sale [No. 18]

The second element of its tying claim that SIS must prove by a preponderance of the evidence is that Intuitive will sell da Vinci surgical robots only on the condition that the buyer also purchase replacement EndoWrist instruments from Intuitive, or that the buyer not purchase replacement or repaired EndoWrist instruments from any other supplier.

You may find that a tying arrangement exists between da Vinci surgical robots and replacement and repaired EndoWrist instruments if Intuitive either (1) refused to sell da Vinci surgical robots unless purchasers also agreed not to buy replacement and repaired EndoWrist instruments from another supplier, or (2) effectively coerced purchasers into buying replacement EndoWrists in addition to da Vinci surgical robots from Intuitive.  To prove coercion, SIS must prove by a preponderance of the evidence that Intuitive exploited its control over da Vinci surgical robots to force buyers into the purchase of replacement EndoWrists, which the buyers either did not want at all, or might have preferred to purchase elsewhere on different terms, and that any appearance of choice was illusory.  Mere sales pressure or persuasion is not coercion.

If Intuitive has made the purchase of da Vinci surgical robots and replacement EndoWrists together the only viable economic option, you may find that Intuitive has effectively tied da Vinci surgical robots to replacement and repaired EndoWrist instruments.  However, there is no coercion if da Vinci surgical robots and replacement and repaired EndoWrist instruments are offered separately for sale and separate purchase is economically feasible.

**6.    Existence of Market Power with Respect to the Tying Product [No. 23]**

The third element of its tying claim that SIS must prove by a preponderance of the evidence is that Intuitive has sufficient market power in the alleged market for MIST surgical robots to enable Intuitive to restrain competition as to the alleged aftermarket for replacement and repaired EndoWrist instruments.

You may find that Intuitive has market power with respect to MIST surgical robots if, by reason of some advantage, Intuitive has the power to raise its prices for MIST surgical robots without losing an appreciable amount of its business, or otherwise has the power to force a purchaser of MIST surgical robots to do something that the purchaser would not do in a more competitive market.

SIS may prove power over price with respect to MIST surgical robots by establishing that the price of the tied package is higher than the price of components sold in competitive markets.

In the alternative, you may determine whether Intuitive has market power with respect to MIST surgical robots by considering whether Intuitive has a high share of that market for MIST surgical robots such that purchasers do not have alternative sources of MIST surgical robots or a reasonably interchangeable substitute readily available.  If Intuitive's market share of the market for MIST surgical robots is below 30 percent, Intuitive does not have market power.  But if Intuitive's market share of the market for MIST surgical robots is above 30 percent, you may consider that in determining whether Intuitive has market power.  Whether a high market share is an indicator of Intuitive's power to raise prices without loss of appreciable business is a function of numerous market conditions, including the uniqueness of the product, the ability of existing competitors to expand production, and the ease (or difficulty) with which new competitors can enter the market and make a price increase unprofitable.  If you find that purchasers of MIST surgical robots do not have readily available alternative sources of supply and are forced as a practical matter to buy MIST surgical robots, you may find that Intuitive has market power.  You may also consider in your market power determination the presence of any unique features or costs associated with MIST surgical robots that effectively prevent others from offering a comparable product.

**7.      Foreclosure of a Substantial Volume of Commerce with Respect to the Tied Product [No. 24]**

If you determine that da Vinci minimally invasive surgical robots and replacement and repaired EndoWrist instruments are separate products that have been tied to one another, and that Intuitive has market power for MIST surgical robots, then you must determine whether SIS has proven that Intuitive has foreclosed a substantial amount of interstate commerce with respect to replacement and repaired EndoWrist instruments.

In determining whether Intuitive has foreclosed a substantial amount of commerce with respect to replacement and repaired EndoWrist instruments, you should first consider the total dollar amount of Intuitive's sales of replacement and repaired EndoWrist instruments in interstate commerce achieved by the tying arrangement in absolute terms.

If the dollar amount of Intuitive's sales of replacement and repaired EndoWrist instruments was substantial, you should next consider whether there has been a substantial adverse effect on competition with respect to replacement and repaired EndoWrist instruments due to the tying arrangement.  If there was not a substantial adverse effect on competition with respect to replacement or repaired EndoWrist instruments due to the tying arrangement, then you must find in favor of Intuitive on the tying claim.

There is no substantial foreclosure if only a small percentage of sales in the market for replacement and repaired EndoWrist instruments were affected by the tying arrangement.  There also is no substantial foreclosure if you find that purchasers would not have bought replacement and repaired EndoWrist instruments at all in the absence of the tying arrangement.

**8.      Rule of Reason – Proof of Competitive Harm [No. 28]**

As I mentioned, to prove that the challenged restraints are unreasonable, SIS first must demonstrate that the restraints have resulted in a substantial harm to competition.  Although it may be relevant to the inquiry, harm that occurs merely to the individual business of SIS is not sufficient, by itself, to demonstrate harm to competition generally.  That is, harm to a single competitor or group of competitors does not necessarily mean that there has been harm to competition.

Furthermore, SIS must show that the harm to competition occurred in the alleged aftermarket for replacement and repaired EndoWrist instruments.  It is SIS's burden to prove the existence of a relevant market.  I instructed you earlier on how to make this assessment.

If you find that SIS has proven the existence of a relevant market, then you must determine whether SIS also has proven that the challenged restraints have a substantial harmful effect on competition in that market.  A harmful effect on competition, or competitive harm, refers to a reduction in competition that results in the loss of some of the benefits of competition, such as lower prices, increased output, or higher product quality.  If the challenged conduct has not resulted in higher prices, decreased output, lower quality, or the loss of some other competitive benefit, then there has been no competitive harm, and you should find that the challenged conduct was not unreasonable.

In determining whether the challenged restraint has produced competitive harm, you may look at the following factors:

- the effect of the restraint on prices, output, product quality, and service;

- the purpose and nature of the restraint;

- the nature and structure of the relevant market;

- the number of competitors in the relevant market and the level of competition among them, both before and after the restraint was imposed; and

- whether Intuitive possesses market power (a concept on which I have previously instructed you).

1

United States District Court
Northern District of California

**9.        Rule of Reason – Evidence of Competitive Benefits [No. 29]**

If you find that SIS has proven that the challenged restraints resulted in substantial harm to competition in a relevant market, then you next must determine whether the restraints also benefit competition in other ways.  If you find that the challenged restraints do result in competitive benefits, then you also must consider whether the restraint was reasonably necessary to achieve the benefits.  If SIS proves that the same benefits could have been readily achieved by other, reasonably available alternative means that create substantially less harm to competition, then they cannot be used to justify the restraint.

1

### 10.    Business Justification Defense [No. 31]

Intuitive contends that the alleged tying arrangement is justified.  If you find that SIS has proven all elements of a tying claim, then you should consider whether Intuitive has proven, by a preponderance of the evidence, a business justification for the tying arrangement.  Intuitive has the burden of proof on this issue.

Intuitive contends that its contractual restrictions on the unauthorized modification of EndoWrists by third parties are justified by procompetitive patient safety as well as asserted business reasons.

In determining whether the tying arrangement is justified, you must decide whether it serves a legitimate business purpose of Intuitive.  In making this determination, you should consider whether the justification Intuitive offers is the real reason that it imposed the tying arrangement.

You must also consider whether Intuitive's claimed objective could reasonably have been realized through substantially less restrictive means.  Even if some type of constraint is necessary to promote a legitimate business interest, Intuitive must not adopt a constraint that is more restrictive than reasonably necessary to achieve that interest.

In determining whether Intuitive's claimed objective could reasonably have been achieved through substantially less restrictive means, you may assess such factors as whether other means to achieve Intuitive's objective were more or less expensive and more or less effective than the means chosen by Intuitive.

If you find that Intuitive could reasonably have achieved its legitimate business purpose by substantially less restrictive means, then you may find that there was no business justification and find for SIS on the tying claim.  If you find that the alleged tying arrangement serves a legitimate business purpose of Intuitive, and that there are not substantially less restrictive means reasonably available to achieve that purpose, then you must find for Intuitive and against SIS on the tying claim.

1

### C.    SIS's Exclusive Dealing Claim

#### 1.    Elements of Exclusive Dealing [No. 32]

SIS also claims that Intuitive engaged in unlawful exclusive dealing.  Exclusive dealing arrangements require a buyer of a product or service to obtain that product or service exclusively from one supplier for a period of time.  Exclusive dealing arrangements are analyzed under the rule of reason to determine if they result in a substantial and unreasonable harm to competition in a relevant market.  From the standpoint of either the buyer or the seller, exclusive dealing arrangements may have potential procompetitive effects that benefit consumers and that need to be weighed against the potential anticompetitive effects of foreclosing competing suppliers' access to the buyer and the buyer's access to competing suppliers' products and services.

To establish that an exclusive dealing arrangement violates the Sherman Act, SIS must establish each of the following elements by a preponderance of the evidence:

(1)    agreements between Intuitive and its customers that totally foreclose customers from purchasing replacement and repaired EndoWrist instruments from competing suppliers;

(2)    the agreements were an unreasonable restraint of trade that resulted in a substantial adverse effect on competition in the alleged aftermarket for replacement and repaired EndoWrist instruments;

(3)    Intuitive had substantial market power in the alleged aftermarket for replacement and repaired EndoWrist instruments; and

(4)    SIS was injured in its business or property because of the agreements.

If you find that the evidence is insufficient to prove any one or more of these elements, then you must find for Intuitive and against SIS on SIS's exclusive dealing claim.  If you find that the evidence is sufficient to prove all four elements, then you must find for SIS and against Intuitive on SIS's exclusive dealing claim.

United States District Court
Northern District of California

**2.    Restrictions on Unauthorized Third-Party Products and Services Are Not Exclusive Dealing [No. 33]**

SIS challenges provisions of Intuitive's contracts with customers that restrict the use of unauthorized third-party products and services in connection with the da Vinci system as unlawful exclusive dealing.  If the seller of a product or service contractually requires its customers to buy another product or service either from the seller or from third parties that seller authorizes, such a contractual provision is not an exclusive dealing arrangement unless third parties cannot realistically obtain such authorization from the seller.  SIS bears the burden of demonstrating that third parties could not realistically obtain authorization from Intuitive and hence that third-party authorization was illusory.  If you find that SIS fails to meet this burden, then you must find in favor of Intuitive on SIS's tying claim.

### 3. Exclusive Dealing – Agreements that Substantially Foreclose Competition [No. 34]

In determining whether Intuitive's exclusive dealing contracts had a substantially harmful effect on competition in the relevant market, you should consider the nature and history of the use of exclusive dealing contracts in the aftermarket for replacement or repaired EndoWrist instruments, whether buyers of the aftermarket replacement or repaired EndoWrist instruments have independent reasons for entering into exclusive dealing contracts or were coerced into entering into them, whether other competing suppliers also offer exclusive dealing contracts, the extent of competition among competing suppliers for exclusive dealing contracts with buyers, Intuitive's position in the marketplace, the competitive alternatives to Intuitive's products or services, the reasons Intuitive and buyers entered into the exclusive dealing contracts at issue, and the effect of the use of exclusive dealing contracts on the ability of new firms to enter the market and on price and other competition in the market.

You also should consider whether the buyer is the final end user of the product. If the buyer is the final end user, the exclusive dealing contract forecloses competitors from that portion of the market represented by the buyer's purchases and makes it more likely that competition may be harmed if the buyer represents a substantial portion of the market.

In determining the extent to which Intuitive's exclusive dealing contracts foreclose competition on the merits, it is relevant to consider the percentage of the market foreclosed and the length of the foreclosure. Where the exclusive dealing contracts foreclose less than 30-40% of the market, this indicates that the harm from the foreclosure of competition is not substantial because there are alternatives available. Similarly, the shorter the duration of the contract, the less likely it is to harm competition. The longer the contract's duration, the more likely that the harm to competition will be greater, unless it is clear that there was vigorous competition on the merits to win the longer contract or the buyer as a practical matter can terminate the agreement on short notice without cause and without significant penalty. In such a case, the stated length of the exclusive contract is not the period in which it has a competitive effect.

1      In determining if Intuitive's exclusive dealing contracts substantially harmed competition,

2   you also should consider Intuitive's market power. If Intuitive does not possess market power,

3   then there cannot be substantial harm to competition from an exclusive dealing contract, and you

4   must find for Intuitive on this claim. If you decide that the buyers are sophisticated businesses

5   themselves which have countervailing power in negotiating contracts, this may offset any market

6   power Intuitive might otherwise have. If SIS cannot show that Intuitive had the power to force

7   buyers to enter into exclusive contracts they did not want, this would be an indication that Intuitive

8   lacks market power.

9      Finally, you should consider whether the process in which Intuitive secured exclusive

10   contracts itself involved competition. If you determine that the buyers formally or informally put

11   their exclusive contracts out for bid, and other competitors had an equal opportunity to compete

12   for the exclusive contracts against Intuitive, this is also evidence that Intuitive does not have

13   market power.

14      By considering all of these factors, you should determine whether the exclusive dealing

15   contracts adversely affected the price paid by buyers, output, or the quality of products offered in

16   the relevant market. Where a restraint does not adversely affect price, output, or product quality, it

17   is unlikely to substantially harm competition.

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

1

### 4.    Exclusive Dealing – Relevant Market [No. 37]

I have previously instructed you on the standards for identifying a relevant market.  For its exclusive dealing claim, SIS contends that the relevant product market is replacement and repaired EndoWrist instruments, while Intuitive contends that SIS has failed to allege the proper relevant product market.  If you find that SIS has proven its proposed relevant product market, then you should continue to evaluate the remainder of SIS's exclusive dealing claim.  However, if you find that SIS has failed to prove such a market, then you must find in Intuitive's favor on this claim.

1

**5.    Exclusive Dealing – Market Power [No. 39]**

2      I have previously instructed you on the standards for determining whether a party has

3  market power in a relevant market.  For purposes of SIS's exclusive dealing claim, it is SIS's

4  burden to demonstrate that Intuitive has market power in the market for replacement and repaired

5  EndoWrist instruments.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

### 6. Evidence of Competitive Benefits [No. 40]

If you find that SIS has proven that Intuitive's agreements with its customers constitute exclusive dealing arrangements that resulted in substantial harm to competition in the alleged aftermarket for replacement and repaired EndoWrist instruments, then you next must determine whether Intuitive's agreements also benefit competition in other ways. If you find that the exclusive dealing arrangements do result in competitive benefits, then you also must consider whether those restraints were reasonably necessary to achieve the benefits. If SIS proves that the same benefits could have been readily achieved by other, reasonably available means that create substantially less harm to competition, then they cannot be used to justify the restraint.

Antitrust law does not require Intuitive to use the least restrictive means of achieving a legitimate business purpose. Any alternative to the challenged conduct presented by SIS must be a substantially less restrictive means for achieving the same procompetitive rationales. A procompetitive rationale is a nonpretextual claim that Intuitive's conduct is indeed a form of competition on the merits because it involves, for example, greater efficiency or enhanced consumer appeal. To qualify as substantially less restrictive, an alternative means must be virtually as effective in serving the Intuitive's procompetitive purposes without significantly increased cost.

**IV.    SIS'S CLAIMS UNDER SECTION 2 OF THE SHERMAN ACT**

      **A.    Sherman Act Section 2 Claims Generally**

            **1.    Sherman Act Section 2 Overview [No. 43]**

      SIS asserts that Intuitive violated Section 2 of the Sherman Act by monopolizing or attempting to monopolize the alleged aftermarket for replacement and repaired EndoWrist instruments.  I will now instruct you on the elements of each of these claims.

1

## 2.      Elements of Monopolization Offered by SIS [No. 45]

SIS alleges that it was injured by Intuitive's unlawful monopolization of the alleged aftermarket for replacement and repaired EndoWrist instruments.  To prevail on this claim, SIS must prove each of the following elements by a preponderance of the evidence:

(1)      the alleged aftermarket for replacement and repaired EndoWrist instruments is a valid antitrust market;

(2)      Intuitive possessed monopoly power in the alleged aftermarket for replacement and repaired EndoWrist instruments;

(3)      Intuitive willfully acquired or maintained monopoly power in the alleged aftermarket for replacement and repaired EndoWrist instruments by engaging in anticompetitive conduct; and

(4)      SIS was injured in its business or property because of Intuitive's anticompetitive conduct.

If you find that SIS has failed to prove any of these elements, then you must find for Intuitive and against SIS on this claim.  If you find that SIS has proved each of these elements by a preponderance of the evidence, then you must find for SIS against Intuitive on this claim.

1

### 3.     Monopolization – Relevant Product Market [No. 47]

2      I have previously instructed you on the standards for identifying a relevant market.  For its

3 monopolization claim, SIS contends that the relevant product market is replacement and repair of

4 EndoWrist instruments, while Intuitive contends that SIS has failed to allege the proper relevant

5 product market.  If you find that SIS has proven its proposed relevant product market, then you

6 should continue to evaluate the remainder of SIS's monopolization claim.  However, if you find

7 that SIS has failed to prove such a market, then you must find in Intuitive's favor on this claim.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

### 4. Monopoly Power Defined [No. 48]

To prove its monopolization claim, SIS must prove by a preponderance of the evidence that Intuitive has monopoly power in the alleged aftermarket for replacement and repaired EndoWrist instruments.

Monopoly power is the power to control prices, restrict output, and exclude competition in a relevant antitrust market. More precisely, a firm is a monopolist if it can profitably raise prices substantially above the competitive level for a significant period of time. However, possession of monopoly power, in and of itself, is not unlawful. Monopoly power can be lawfully acquired and maintained through growth or development as a consequence of a superior product, business acumen, or historic accident.

I will now provide further instructions about how you may determine whether SIS has met its burden of proving monopoly power in the alleged aftermarket for replacement and repaired EndoWrist instruments.

1

### 5.    Monopoly Power – Direct Evidence [No. 49]

One way that SIS may prove monopoly power is through direct evidence that Intuitive has the ability to raise or maintain the prices that it charges for replacement and repaired EndoWrist instruments above competitive levels, can maintain those prices above a competitive level for a significant period of time, and that Intuitive has the ability to exclude competition.

SIS has the burden of proving that Intuitive has the ability to raise or maintain the prices that it charges for replacement and repaired EndoWrist instruments above competitive levels. SIS must prove that Intuitive has the power to do so by itself – that is, without the assistance of, and despite competition from, any existing or potential competitors.

SIS must also prove that Intuitive has the power to maintain prices above a competitive level for a significant period of time. If Intuitive attempted to maintain prices above competitive levels, but would lose so much business to other competitors that the price increase would become unprofitable and would have to be withdrawn, then Intuitive does not have monopoly power. Similarly, SIS must prove that Intuitive has the ability to exclude competition. For example, if Intuitive attempted to maintain prices above competitive levels, but new competitors could enter the market for replacement and repaired EndoWrist instruments or existing competitors could expand their sales and take so much business that the price increase would become unprofitable and would have to be withdrawn, then Intuitive does not have monopoly power. The ability to earn high profit margins or a high rate of return does not necessarily mean that Intuitive has monopoly power. Other factors may enable a company without monopoly power to sell at higher prices or earn higher profit margins than its competitors, such as superior products or services, low costs, or superior advertising or marketing. However, an ability to sell at higher prices or earn higher profit margins than other companies for similar goods or services over a long period of time may be evidence of monopoly power. By contrast, evidence that Intuitive would lose a substantial amount of sales if it raised prices substantially, or that Intuitive's profit margins were low compared to its competitors, or that Intuitive's margins go up and down or are steadily decreasing, might be evidence that Intuitive does not have monopoly power.

### 6.     Monopoly Power – Indirect Evidence [No. 50]

Another way that SIS may prove monopoly power in the market for replacement and repaired EndoWrist instruments is through indirect evidence of monopoly power such as Intuitive's market share, market share trends, barriers to entry, entry and exit by other companies, and the number and size of other competitors.  If this evidence establishes that Intuitive has the power to control prices and exclude competition in the market for replacement and repaired EndoWrist instruments, then you may conclude that Intuitive has monopoly power in the market.

*Market Share*

The first factor that you should consider is Intuitive's share of the market for replacement and repaired EndoWrist instruments.  Based on the evidence that you have heard about Intuitive's market share, you should determine Intuitive's market share as a percentage of total sales in the market for replacement and repaired EndoWrist instruments.  Intuitive must have a significant share of the market in order to possess monopoly power.

In evaluating whether the percentage of market share supports a finding of monopoly power, you also should consider other aspects of the market for replacement and repaired EndoWrist instruments, such as market share trends, the existence of barriers to entry (that is, how difficult is it for other producers to enter the market and begin competing with Intuitive for sales), the entry and exit by other companies, and the number and size of competitors.  Along with Intuitive's market share, these factors should inform you as to whether Intuitive has monopoly power.  The higher the company's share, the higher the likelihood that a company has monopoly power.

A market share below 50 percent is ordinarily not sufficient to support a conclusion that Intuitive has monopoly power.  However, if you find that the other evidence demonstrates that Intuitive does, in fact, have monopoly power despite having a market share below 50 percent, you may conclude that Intuitive has monopoly power.

*Market Share Trends*

The trend in Intuitive's market share is something you may consider.  An increasing market share may strengthen an inference that a company has monopoly power, particularly where that

1    company has a high market share, while a decreasing share might show that a company does not

2    have monopoly power.

3    *Barriers to Entry*

4        You may also consider whether there are barriers to entry into the market for replacement

5    and repaired EndoWrist instruments.  Barriers to entry make it difficult for new competitors to

6    enter the market for replacement and repaired EndoWrist instruments in a meaningful and timely

7    way.  Barriers to entry might include intellectual property rights (such as patents or trade secrets),

8    the large financial investment required to build a plant or satisfy governmental regulations,

9    specialized marketing practices, and the reputation of the companies already participating in the

10   market (or the brand name recognition of their products).

11       Evidence of low or no entry barriers may be evidence that Intuitive does not have

12   monopoly power, regardless of Intuitive's market share, because new competitors could enter

13   easily if Intuitive attempted to raise prices for a substantial period of time.  By contrast, evidence

14   of high barriers to entry along with high market share may support an inference that Intuitive has

15   monopoly power.

16   *Entry and Exit by Other Companies*

17       The history of entry and exit in the market for replacement and repaired EndoWrist

18   instruments may be helpful to consider.  Entry of new competitors or expansion of existing

19   competitors may be evidence that Intuitive lacks monopoly power.  On the other hand, departures

20   from the market, or the failure of firms to enter the market, particularly if prices and profit margins

21   are relatively high, may support an inference that Intuitive has monopoly power.

22   *Number and Size of Competitors*

23       You may consider whether Intuitive's competitors are capable of effectively competing.  In

24   other words, you should consider whether the financial strength, market shares, and number of

25   competitors act as a check on Intuitive's ability to price its products.  If Intuitive's competitors are

26   vigorous or have large or increasing market shares this may be evidence that Intuitive lacks

27   monopoly power.  On the other hand, if you determine that Intuitive's competitors are weak or

28

United States District Court
Northern District of California

52

have small or declining market shares, this may support an inference that Intuitive has monopoly power.

*Conclusion*

If, through direct or indirect evidence, you find that Intuitive has monopoly power in the market for replacement and repaired EndoWrist instruments, then you must consider the remaining elements of this claim. If you find that Intuitive does not have monopoly power, then you must find for Intuitive and against SIS on this claim.

United States District Court
Northern District of California

1

2

### 7.    Willful Acquisition or Maintenance of Monopoly Power through Anticompetitive Conduct [No. 51]

3    The next element SIS must prove is that Intuitive willfully acquired or maintained

4    monopoly power through anticompetitive acts or practices.  Anticompetitive acts are acts, other

5    than competition on the merits, that have the effect of preventing or excluding competition or

6    frustrating the efforts of other companies to compete for customers within the alleged aftermarket

7    for replacement and repaired EndoWrist instruments.  Harm to competition is to be distinguished

8    from harm to a single competitor or group of competitors, which does not necessarily constitute

9    harm to competition.  Some examples of harm to competition include increased prices, decreased

10    production levels, and reduced quality.

11    Mere possession of monopoly power, if lawfully acquired, does not violate the antitrust

12    laws.  The acquisition or maintenance of monopoly power by supplying better products or

13    services, possessing superior business skills, or because of luck, is not unlawful.

14    A monopolist may compete aggressively without violating the antitrust laws, and a

15    monopolist may charge monopoly prices without violating the antitrust laws.  A monopolist's

16    conduct only becomes unlawful where it involves anticompetitive acts.

17    The difference between anticompetitive conduct and conduct that has a legitimate business

18    purpose can be difficult to determine.  This is because all companies have a desire to increase their

19    profits and increase their market share.  These goals are an essential part of a competitive

20    marketplace, and the antitrust laws do not make these goals – or the achievement of these goals –

21    unlawful, as long as a company does not use anticompetitive means to achieve these goals.

22    In determining whether Intuitive's conduct was anticompetitive or whether it was

23    legitimate business conduct, you should determine whether the conduct is consistent with

24    competition on the merits, whether the conduct provides benefits to consumers, and whether the

25    conduct would make business sense apart from any effect it has on excluding competition or

26    harming competitors.

27    For example, suppose there are five firms that make printers for home computers and that

28    these printers comprised a relevant product market.  Suppose also that Firm A developed a more

1   efficient manufacturing process that allowed it to sell profitably at a lower price than its

2   competitors.  If Firm A grew its market share and achieved monopoly power by selling profitably

3   at a lower price, it would not be unlawful for Firm A to achieve monopoly power in this way.

4   Developing more efficient processes and developing the ability to sell profitably at lower prices is

5   competition on the merits and benefits consumers, and it therefore is not anticompetitive conduct

6   even if it has a negative effect on competitors.

7          Similarly, in the same example, suppose Firm B developed and patented a revolutionary

8   new printer and consumers so preferred Firm B's printer that Firm B achieved monopoly power.

9   It would not be unlawful for Firm B to achieve monopoly power in printers in this way.  Firm B

10  "built a better mousetrap," which is competition on the merits and benefits consumers, and it

11  therefore is not anticompetitive conduct.

12         By contrast, in the same example, suppose that Firm C makes printers, but Firm C is the

13  world's only manufacturer of computers and that there are barriers to entry into the computer

14  market such that no other firm will be able to enter that market.  Suppose also that Firm C altered

15  its computers in such a way that only Firm C's printers would work with its computers, and that

16  the alteration does not improve the design of Firm C's computers or provide any benefits to

17  competition or consumers.  The only effect of the alteration is to exclude competing printer

18  makers from the marketplace.  It would be unlawful for Firm C to achieve monopoly power in the

19  printer market in this way.

20         As the example shows, the acts or practices that result in the acquisition or maintenance of

21  monopoly power must represent something more than the conduct of business that is part of the

22  normal competitive process or commercial success.  They must represent conduct that has made it

23  very difficult or impossible for competitors to compete and that was taken for no legitimate

24  business reason.  You may not find that a company willfully acquired or maintained monopoly

25  power through anticompetitive means if it has acquired or maintained that power solely through

26  the exercise of superior foresight and skill; or because of natural advantages such as unique

27  geographic access to raw materials or markets; or because of economic or technological

28

United States District Court
Northern District of California

1    efficiency, including efficiency resulting from scientific research; or by obtaining a lawful patent;

2    or because changes in cost or consumer preference have driven out all but one supplier.

3         If you find that SIS has proven by a preponderance of the evidence that Intuitive willfully

4    acquired or maintained monopoly power in the alleged aftermarket for replacement and repaired

5    EndoWrist instruments through anticompetitive acts, then you must consider whether SIS has

6    proved the remaining elements of this claim.  If, however, you find that SIS did not prove this

7    element by a preponderance of the evidence, then you must find for Intuitive and against SIS on

8    this claim.

9

10

11

1

### 8.    Attempt to Monopolize [No. 54]

In addition to alleging monopolization, SIS also alleges that it was injured by Intuitive's unlawful attempt to monopolize the alleged aftermarket for replacement and repaired EndoWrist instruments.  To prevail on its claim of attempted monopolization, SIS must prove each of the following elements by a preponderance of the evidence:

(1)    Intuitive engaged in anticompetitive conduct to accomplish its intended goal of achieving a monopoly;

(2)    Intuitive had a specific intent to achieve monopoly power in the alleged aftermarket for replacement and repaired EndoWrist instruments;

(3)    there was a dangerous probability that Intuitive would achieve its goal of monopoly power in the alleged aftermarket for replacement and repaired EndoWrist instruments; and

(4)    SIS was injured in its business or property by Intuitive's anticompetitive conduct. If you find that the evidence is insufficient to prove any one or more of these elements, then you must find for Intuitive and against SIS on SIS's claim of attempted monopolization.  If you find that the evidence is sufficient to prove all four elements as to Intuitive, then you must find for SIS and against Intuitive on SIS's claim of attempted monopolization.

1

### 9. Attempted Monopolization - Anticompetitive Conduct [No. 55]

It is not sufficient for SIS to prove that Intuitive intended to monopolize the alleged aftermarket for replacement and repaired EndoWrist instruments. SIS must also show that Intuitive engaged in anticompetitive conduct, coupled with an intent to monopolize and a dangerous probability that Intuitive would succeed.  Generally, a firm engages in anticompetitive conduct when it attempts to exclude rivals without an efficiency-enhancing justification for its conduct.

I have already instructed you on the standards for determining whether Intuitive engaged in anticompetitive conduct in the context of SIS's monopolization claim.  You should apply that same instruction here in the context of determining whether Intuitive engaged in anticompetitive conduct in connection with SIS's allegations that Intuitive attempted to monopolize the alleged aftermarket for replacement and repaired EndoWrist instruments.

### 10.    Specific Intent to Achieve Monopoly Power [No. 56]

SIS must prove that Intuitive had a specific intent to monopolize a relevant market. To do so, SIS must first prove that the aftermarket SIS is talking about – replacement and repaired EndoWrist instruments – is a relevant market for antitrust purposes. SIS must then prove that Intuitive had a specific intent to monopolize that market.

The court has already provided you with instructions on determining whether the alleged aftermarket for replacement and repaired EndoWrist instruments is a relevant market. If SIS proves that the aftermarket for replacement and repaired EndoWrist instruments is a relevant market, you must then decide whether Intuitive had the specific intent to monopolize that market. In other words, you must decide if the evidence shows that Intuitive acted with the conscious aim of acquiring the power to control prices and to exclude or destroy competition in the aftermarket for replacement and repaired EndoWrist instruments.

There are several ways in which SIS may prove that Intuitive had the specific intent to monopolize. There may be evidence of direct statements of Intuitive's intent to obtain a monopoly in the aftermarket for replacement and repaired EndoWrist instruments. Such proof of specific intent may be established by documents prepared by responsible officers or employees of Intuitive at or about the time of the conduct in question or by testimony concerning statements made by responsible officers or employees of Intuitive. You must be careful, however, to distinguish between Intuitive's lawful intent to compete aggressively, which may be accompanied by aggressive language, and a true intent to acquire monopoly power by using anticompetitive means.

Even if you decide that the evidence does not prove directly that Intuitive actually intended to obtain a monopoly, specific intent may be inferred from what Intuitive did. For example, if the evidence shows that Intuitive lacked a legitimate business justification and the natural and probable consequence of Intuitive's conduct in the aftermarket for replacement and repaired EndoWrist instruments was to give Intuitive control over prices and to exclude or destroy competition, and that this was plainly foreseeable by Intuitive, then you may (but are not required to) infer that Intuitive specifically intended to acquire monopoly power.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

In this case, SIS argues that the conduct underlying the claim of attempt to monopolize also constitutes an unreasonable restraint of trade under Section 1 of the Sherman Act. If you find on that SIS has proven Intuitive restrained trade in the aftermarket for replacement and repaired EndoWrist instruments under the instructions you have received pertaining to Section 1 of the Sherman Act, then you may infer from such conduct that Intuitive had the specific intent to achieve monopoly power.

United States District Court
Northern District of California

### 11.    Dangerous Probability of Success [No. 57]

If you find that Intuitive had the specific intent to achieve a monopoly and engaged in significant anticompetitive conduct, you also must determine if the evidence shows the next element of attempt to monopolize: namely, that there was a dangerous probability that Intuitive would succeed in achieving monopoly power if it continued to engage in the same or similar conduct.

I have already defined monopoly power for you in Instruction No. [_48_].  You should use that same instruction to evaluate this element of SIS's attempted monopolization claim.

In determining whether there was a dangerous probability that Intuitive would acquire the ability to control price in the market, you should consider such factors as:

- Intuitive's market share;

- the trend in Intuitive's market share;

- whether the barriers to entry into the market made it difficult for competitors to enter the market;

- the likely effect of any anticompetitive conduct on Intuitive's share of the market.

Again, the purpose of looking at these and other factors is to determine whether there was a dangerous probability that Intuitive would ultimately acquire monopoly power.  A dangerous probability of success need not mean that success was nearly certain, but it does mean that there was a substantial and real likelihood that Intuitive would ultimately acquire monopoly power.

1   **V.    ANTITRUST INJURY & DAMAGES**

2       **A.    Injury & Causation**

3           **1.    Injury [No. 60]**

4       If you find that SIS has met its burden on each of the other elements of any of its claims, as

5   I have described them to you, then you must finally decide if SIS is entitled to recover damages

6   from Intuitive.

7       SIS is entitled to recover damages for an injury to its business or property if it can establish

8   three elements of injury and causation:

9       (1)    SIS was in fact injured as a result of Intuitive's alleged violation of the antitrust

10  laws;

11      (2)    Intuitive's alleged illegal conduct was a material cause of SIS's injury; and

12      (3)    SIS's injury is an injury of the type that the antitrust laws were intended to prevent.

1

### 2.    Causation [No. 62]

2    SIS must also offer evidence that establishes by a preponderance of the evidence that

3  Intuitive's alleged illegal conduct was a material cause of SIS's injury.  This means that SIS must

4  have proved that some damage occurred to it as a result of Intuitive's alleged antitrust violation,

5  and not some other cause.  SIS is not required to prove that Intuitive's alleged antitrust violation

6  was the sole cause of its injury; nor need SIS eliminate all other possible causes of injury.  It is

7  enough if SIS has proved that the alleged antitrust violation was a material cause of its injury.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

1

### 3.    Antitrust Injury [No. 63]

Finally, SIS must establish that its injury is the type of injury that the antitrust laws were intended to prevent. This is sometimes referred to as "antitrust injury." If SIS's injuries were caused by a reduction in competition, acts that would lead to a reduction in competition, or acts that would otherwise harm consumers, then SIS's injuries are antitrust injuries. On the other hand, if SIS's injuries were caused by heightened competition, the competitive process itself, or by acts that would benefit consumers, then SIS's injuries are not antitrust injuries and SIS may not recover damages for those injuries under the antitrust laws.

You should bear in mind that businesses may incur losses for many reasons that the antitrust laws are not designed to prohibit or protect against – such as where a competitor offers better products or services, or where a competitor is more efficient and can charge lower prices and still earn a profit. The antitrust laws do not permit SIS to recover damages for losses that were caused by the competitive process or conduct that benefits consumers.

In summary, if SIS can establish that it was in fact injured by Intuitive's conduct, that Intuitive's conduct was a material cause of SIS's injury, and that Intuitive's injury was the type that the antitrust laws were intended to prevent, then SIS is entitled to recover damages for the injury to its business or property.

United States District Court
Northern District of California

**B.    Damages**

**1.    Antitrust Damages – Introduction and Purpose [No. 64]**

If you find that Intuitive violated the antitrust laws and that this violation caused injury to SIS, then you must determine the amount of damages, if any, SIS is entitled to recover.

The fact that I am giving you instructions concerning the issue of SIS's damages does not mean that I believe SIS should, or should not, prevail in this case.  If you reach a verdict for Intuitive on the issue of liability, you should not consider the issue of damages, and you may disregard the damages instruction that I am about to give.

The law provides that SIS should be fairly compensated for all damages to its business or property that were a direct result or likely consequence of the conduct that you have found to be unlawful.

Antitrust damages are only compensatory, meaning their purpose is to put an injured plaintiff as near as possible in the position in which it would have been had the alleged antitrust violation not occurred.  The law does not permit you to award damages to punish a wrongdoer – what we sometimes refer to as punitive damages – or to deter particular conduct in the future.  Furthermore, you are not permitted to award to SIS an amount for attorney's fees or the costs of maintaining this lawsuit.

1

**2.     Damages for Competitors – Preparedness to Enter Business [No. 67]**

2

SIS claims that it was harmed because Intuitive's alleged antitrust violation prevented it

3

from entering a new line of business: repair of EndoWrist instruments.  To recover damages, it is

4

not necessary that SIS actually have entered into this new line of business if you find that

5

Intuitive's alleged antitrust violation prevented SIS from entering into this new business line.  SIS

6

must prove, however, that it had an intention to enter into this new line of business and that it had

7

taken concrete steps to prepare to do so.

8

In determining whether or not SIS has demonstrated the intention and preparedness to

9

enter this new line of business, you may consider such elements as the following: the background

10

and experience of the principals and employees of SIS; the ability of SIS to finance the new line of

11

business and to purchase the necessary facilities and equipment; and concrete and discernible steps

12

taken by SIS to enter into this new line of business.  Ultimately, to award SIS damages related to

13

its failure to enter this new business line, you must determine that had it not been for Intuitive's

14

alleged antitrust violation, SIS would have entered that business of repairing EndoWrist

15

instruments.

16

17

18

19

20

21

22

23

24

25

26

27

28

1

### 3.    Basis for Calculating Damages [No. 68]

2      You are permitted to make just and reasonable estimates in calculating SIS's damages.

3 You are not required to calculate damages with mathematical certainty or precision.  However, the

4 amount of damages must have a reasonable basis in the evidence and must be based on reasonable,

5 non-speculative assumptions and estimates.  Damages may not be based on guesswork or

6 speculation.  SIS must prove the reasonableness of each of the assumptions upon which the

7 damages calculation is based.

8      If you find that SIS has provided a reasonable basis for determining damages, then you

9 may award damages based on a just and reasonable estimate supported by the evidence.

10      If you find that SIS has failed to carry its burden of providing a reasonable basis for

11 determining damages, then you may not award damages, or you may award nominal damages not

12 to exceed one dollar.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

United States District Court
Northern District of California

### 4.    Causation and Disaggregation [No. 69]

If you find that Intuitive violated the antitrust laws and that SIS was injured by that violation, SIS is entitled to recover for such injury that was the direct result or likely consequence of the unlawful acts of Intuitive.  SIS bears the burden of showing that its injuries were caused by Intuitive's antitrust violation, as opposed to any other factors.  If you find that SIS's alleged injuries were caused in part by Intuitive's alleged antitrust violation and in part by other factors, then you may award damages only for that portion of SIS's alleged injuries that was caused by Intuitive's alleged antitrust violation.

SIS claims that it suffered injury because it lost sales and profits as a result of Intuitive's alleged violations of the antitrust laws.  Intuitive claims that any profits or sales lost by SIS occurred as a result of other factors that have nothing to do with the alleged antitrust violations. These include SIS's reliance on Rebotix to provide parts and services, rather than developing its own processes; SIS's lack of preparedness to launch a business based on "resetting" X/Xi EndoWrists, as opposed to S/Si EndoWrists; and preference by customers for purchasing EndoWrists from the original manufacturer for patient safety and liability concerns.  SIS is not entitled to recover for lost profits that resulted solely from these or other causes arising from the normal course of business activity.  The presence of these factors does not mean SIS did not suffer antitrust injury, but SIS is not entitled to recovery for damages caused by them.  SIS only may recover for damages caused by the alleged antitrust violations.

SIS bears the burden of proving damages by a preponderance of the evidence, including apportioning damages between lawful and unlawful causes.  If you find that SIS has not established a reasonable basis to apportion its alleged injuries between lawful and unlawful causes, or that apportionment can only be accomplished through speculation or guesswork, then you may not award any damages at all.  If you find that the SIS was injured by Intuitive's alleged antitrust violations, and there is a reasonable basis to apportion its alleged injuries between lawful and unlawful causes, then you may award damages.

United States District Court
Northern District of California

1

### 5.    Damages for Competitors – Lost Profits [No. 70]

SIS claims that it was harmed because it lost profits as a result of Intuitive's alleged antitrust violation.  If you find that Intuitive committed an antitrust violation and that this violation caused injury to SIS, you now must calculate the profits, if any, that SIS lost as a result of Intuitive's antitrust violation.  To calculate lost profits, you must calculate net profit: the amount by which SIS's gross revenues would have exceeded all of the costs and expenses that would have been necessary to produce those revenues.

### 6.     Damages for Competitors – Future Lost Profits [No. 71]

SIS claims that it was harmed because, had it not been for Intuitive's alleged antitrust violation, SIS would have earned profits for two (2) years into the future.  If you find that Intuitive committed an antitrust violation and that this violation caused injury to SIS, you now must calculate the future profits, if any, that SIS lost as a result of Intuitive's antitrust violation.

To calculate future lost profits, you must make a reasonable estimate of (1) the amount of profits, if any, that SIS would have earned in future years, and (2) the length of time for which it would have earned those profits.  In making this calculation, you are not required to calculate future lost profits with absolute mathematical certainty or precision, but you must not engage in guesswork or speculation.  In making this determination, you must consider the various factors that could affect the future success of SIS's business, such as general market or economic conditions, lawful competition SIS would face in the future, SIS's management of business, changes in technology or other business conditions, and other factors affecting SIS's future performance.

Your determination of future lost profits must have a reasonable basis in the evidence and cannot be speculative.  If there is no evidence from which you can make a reasonable estimate of lost future profits, you may not award damages for future lost profits.

In calculating future lost profits, you must calculate net profit.  In simple terms, net profit is gross revenues minus all of the costs and expenses that would be necessary to produce those revenues.

If you award damages for future lost profits, you must discount the amount to its present value, using a discount rate of interest that you find reasonable.  This is because the right to receive a certain sum of money at a future date is worth less than the same amount of money in hand today – this is known as the time value of money.  For example, if you had a choice to receive $1,000 today or a year from now, you would be better off receiving the money today and earning interest on it for a year – you would then have something more than $1,000 in a year from now.  Similarly, if you had a right to $1,000 a year from now and you asked for the money today, the person owing you the money a year from now could properly give you a lower amount,

United States District Court
Northern District of California

1    reflecting the value that could be earned on that money over the next year.  This lower amount is

2    known as an amount discounted to present value.  The rate of return to be applied in determining

3    present value should be the interest that can reasonably be expected from safe investments that can

4    be made by a person of ordinary prudence, who has ordinary financial experience and skill.

### 7.    Mitigation of Damages [No. 72]

SIS may not recover damages for any portion of its injuries that it could have avoided through the exercise of reasonable care and prudence.  SIS is not entitled to increase any damages through inaction.  The law requires an injured party to take all reasonable steps it can to avoid further injury and thereby reduce its loss.  If SIS failed to take reasonable steps available to it, and the failure to take those steps resulted in greater harm to SIS than it would have suffered had it taken those steps, then SIS may not recover any damages for that part of the injury it could have avoided.

Intuitive has the burden of proof on this issue.  Intuitive must prove by a preponderance of the evidence that SIS:

(1)    acted unreasonably in failing to take specific steps to minimize or limit its losses;

(2)    that the failure to take those specific steps resulted in its losses being greater than they would have been had it taken such steps; and

(3)    the amount by which SIS's loss would have been reduced had SIS taken those steps.

In determining whether SIS failed to take reasonable measures to limit its damages, you must remember that the law does not require SIS to take every conceivable step that might reduce its damages.  The evidence must show that SIS failed to take commercially reasonable measures that were open to it.  Commercially reasonable measures mean those measures that a prudent businessperson in SIS's position would likely have adopted, given the circumstances as they appeared at that time.  SIS should be given wide latitude in deciding how to handle the situation, so long as what SIS did was not unreasonable in light of the existing circumstances.

## VI.    INTUITIVE'S COUNTERCLAIMS

### A.    Intuitive's Counterclaims Overview [No. 73]

Now, I will instruct you on the law regarding Intuitive's counterclaims against SIS.

Intuitive brings a claim against SIS under the federal Lanham Act, 15 U.S.C. § 1125, based on false advertising and unfair competition.

Intuitive also brings two claims against SIS under California law: one for unfair competition under California's common law, and one for intentional interference with contractual relations under California's common law.

I will discuss each of these claims in turn.

1

**B.      Intuitive's Lanham Act Claim**

2

**1.      Lanham Act – Elements of False Statement Claim [No. 74]**

3

Intuitive claims that SIS is liable for unfair competition and false advertising under the

4

Lanham Act, 15 U.S.C. § 1125.  Specifically, Intuitive alleges that in its marketing materials and

5

communications disseminated to potential and actual customers, SIS has made numerous false and

6

misleading statements.  Intuitive further alleges that customer confusion as to the source or

7

affiliation of the "repaired" instruments is exacerbated by SIS's communications that misinform

8

customers that "a repaired EndoWrist is not an alternative or replacement device," but rather "an

9

original da Vinci manufactured device that has been repaired to original specifications."

10

To prevail on its claim for unfair competition and false advertising under the Lanham Act,

11

Intuitive must prove by a preponderance of the evidence:

12

(1)      SIS's advertisements were false or misleading;

13

(2)      SIS's advertisements deceived, or had the capacity to deceive, customers;

14

(3)      The deception had a material effect on purchasing decisions, meaning that it was

15

likely to influence customers' purchasing decisions; and

16

(4)      Intuitive has been injured as a result of the false advertising.

17

If you find that the evidence is insufficient to prove any one or more of these elements,

18

then you must find for SIS and against Intuitive on Intuitive's unfair competition and false

19

advertising claim.  If you find that the evidence is sufficient to prove all of the elements, then you

20

must find for Intuitive and against SIS on Intuitive's unfair competition and false advertising

21

claim.

22

23

24

25

26

27

28

United States District Court
Northern District of California

1

**2.     False or Misleading [No. 75]**

2       There are two ways in which SIS's advertisements may be false or misleading: they may

3   be literally false, or they may be literally true but misleading.  If an advertisement is literally false,

4   then it is presumed to deceive, or to have the capacity to deceive, customers, and Intuitive need not

5   prove that deception.  When evaluating whether an advertising statement is literally false, the

6   statement must be analyzed in its full context.

7       If you find that Intuitive has proved that SIS made false or misleading statements, then you

8   must assess the other elements of Intuitive's false advertising claim.  If you find that Intuitive has

9   not proved that SIS made false or misleading statements, then you must find for SIS on Intuitive's

10   false advertising claim.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

### 3.    Commercial Advertisement or Promotion [No. 76]

To constitute commercial advertising or promotion, a statement of fact must have been commercial speech, by SIS, for the purpose of influencing consumers to buy SIS's goods or services.  While the statement need not be made in a classic advertising campaign, but may consist instead of more informal types of promotion, the statement must have been disseminated sufficiently to the potential customers to constitute advertising or promotion within that industry.

If you find that Intuitive has proved that SIS's false or misleading statements were made in a commercial advertisement or promotion, then you must assess the other elements of Intuitive's unfair competition and false advertising claim.  If you find that Intuitive has not proved that SIS's false or misleading statements were made in a commercial advertisement or promotion, then you must find for SIS on Intuitive's unfair competition and false advertising claim.

United States District Court
Northern District of California

### 4.      Lanham Act Injury [No. 77]

Intuitive must prove by a preponderance of the evidence that it has suffered injury to a commercial interest in sales or business reputation as a result of SIS's statement, either by a direct loss of sales or a lessening of the goodwill associated with its products. This can be proved in a number of ways. For example, injury can be proved by showing that SIS having made false statements induced customers to switch their purchasing decisions, and purchase replacement and repaired EndoWrist instruments from SIS instead of from Intuitive. Injury could also be proved by showing that SIS cast aspersions on Intuitive's business or damaged Intuitive's products' reputation. Injury could also be proved if SIS's false or misleading statements reduced Intuitive's business by causing customers to demand fewer EndoWrists.

If you find that Intuitive has proved that SIS's false or misleading statements caused injury to Intuitive, then you should assess the other elements of Intuitive's false advertising claim. If you find that Intuitive has not proved that SIS's false or misleading statements caused injury to Intuitive, then you must find for SIS on Intuitive's unfair competition and false advertising claim.

United States District Court
Northern District of California

### C.     Intuitive's Common Law Unfair Competition Claim [No. 78]

Intuitive claims that SIS's conduct constitutes unfair competition under California's common law.  The essence of the tort of unfair competition is the inequitable pirating of the fruits of another's labor and then either "palming off" those fruits as one's own through deception, or simply gaming from them an unearned commercial benefit.

To prevail on this claim, Intuitive must prove that:

(1)     SIS subjectively and knowingly intended to confuse buyers of EndoWrists by passing off its products in such manner as to induce those customers to believe that SIS's repaired EndoWrists were identical to original EndoWrists sold by Intuitive;

(2)     Customers for EndoWrists were likely to be confused, meaning they were misled into thinking that SIS's repaired EndoWrists were actually identical to original EndoWrists sold by Intuitive; and

(3)     SIS thereby caused Intuitive a competitive injury, meaning that Intuitive must have suffered some actual economic harm to its business that was caused by SIS's deception of Intuitive's actual and potential customers.

If you find that Intuitive has proved each of these elements by a preponderance of the evidence, then you must find for Intuitive and against SIS on Intuitive's common law unfair competition claim.  If you find that Intuitive has not proved each of these elements by a preponderance of the evidence, then you must find for SIS and against Intuitive on Intuitive's common law unfair competition claim.

**D.    Intuitive's Tortious Interference with Contract Claim [No. 79]**

Intuitive claims that SIS intentionally interfered with the contracts between it and certain customers.  To establish this claim, Intuitive must prove all of the following:

(1)    That there was a contract between Intuitive and each of its customers at issue;

(2)    That SIS knew of such contracts;

(3)    That SIS's conduct prevented performance of the contract by Intuitive or made performance more expensive or difficult;

(4)    That SIS intended to disrupt the performance of the contracts between Intuitive and its customers, or knew that disruption of performance was certain or substantially certain to occur;

(5)    That Intuitive was harmed; and

(6)    That SIS's conduct was a substantial factor in causing Intuitive's harm.

If you find that Intuitive has proved each of these elements by a preponderance of the evidence, then you must find for Intuitive and against SIS on Intuitive's tortious interference with contract claim.  If you find that Intuitive has not proved each of these elements by a preponderance of the evidence, then you must find for SIS and against Intuitive on Intuitive's tortious interference with contract claim.

1

2

**E.      Intuitive's Damages**

**1.      Lost Profit Damages on Counterclaims [No. 80]**

If you decide for Intuitive on the question of liability on its counterclaims, then you should consider the amount of money to award to Intuitive as damages.  By instructing you on damages, the Court does not mean to suggest for which party your verdict should be rendered.

Damages consist of the amount of money required to compensate Intuitive for the injury caused by SIS's conduct.  Plaintiff must prove its damages by a preponderance of the evidence.

For the claims of unfair competition, false advertising, or tortious interference with contracts, Intuitive asks to be awarded lost profit damages.  That is, Intuitive asks to be awarded the lost profits that it would have earned but for SIS's unfair competition, false advertising, or tortious interference with contracts.

To decide the amount of damages for lost profits, you must determine the gross amount Intuitive would have received but for SIS's conduct and then subtract from that amount the expenses Intuitive would have had if SIS's conduct had not occurred.  The amount of the lost profits need not be calculated with mathematical precision, but there must be a reasonable basis for computing the loss.

1    **VII.    GUIDANCE REGARDING DELIBERATIONS**

2        **A.    Duty to Deliberate [Ninth Circuit Model 3.1]**

3        Before you begin your deliberations, elect one member of the jury as your presiding juror.

4    The presiding juror will preside over the deliberations and serve as the spokesperson for the jury

5    in court.

6        You shall diligently strive to reach agreement with all of the other jurors if you can do so.

7    Your verdict must be unanimous.

8        Each of you must decide the case for yourself, but you should do so only after you have

9    considered all of the evidence, discussed it fully with the other jurors, and listened to their views.

10        It is important that you attempt to reach a unanimous verdict but, of course, only if each of

11    you can do so after having made your own conscientious decision.  Do not be unwilling to change

12    your opinion if the discussion persuades you that you should.  But do not come to a decision

13    simply because other jurors think it is right or change an honest belief about the weight and effect

14    of the evidence simply to reach a verdict.

**B.    Consideration of Evidence—Conduct of the Jury [Ninth Circuit Model 3.2]**

Because you must base your verdict only on the evidence received in the case and on these instructions, I remind you that you must not be exposed to any other information about the case or to the issues it involves.  Except for discussing the case with your fellow jurors during your deliberations:

> Do not communicate with anyone in any way and do not let anyone
> else communicate with you in any way about the merits of the case
> or anything to do with it.  This includes discussing the case in
> person, in writing, by phone, tablet, computer, or any other means,
> via email, via text messaging, or any internet chat room, blog,
> website or application, including but not limited to Facebook,
> YouTube, Twitter, Instagram, LinkedIn, Snapchat, TikTok, or any
> other forms of social media.  This applies to communicating with
> your family members, your employer, the media or press, and the
> people involved in the trial.  If you are asked or approached in any
> way about your jury service or anything about this case, you must
> respond that you have been ordered not to discuss the matter and to
> report the contact to the court.

> Do not read, watch, or listen to any news or media accounts or
> commentary about the case or anything to do with it[, although I
> have no information that there will be news reports about this case];
> do not do any research, such as consulting dictionaries, searching
> the Internet, or using other reference materials; and do not make any
> investigation or in any other way try to learn about the case on your

82

own.  Do not visit or view any place discussed in this case, and do not use Internet programs or other devices to search for or view any place discussed during the trial.  Also, do not do any research about this case, the law, or the people involved—including the parties, the witnesses, or the lawyers—until you have been excused as jurors. If you happen to read or hear anything touching on this case in the media, turn away and report it to me as soon as possible.

These rules protect each party's right to have this case decided only on evidence that has been presented here in court.  Witnesses here in court take an oath to tell the truth, and the accuracy of their testimony is tested through the trial process.  If you do any research or investigation outside the courtroom, or gain any information through improper communications, then your verdict may be influenced by inaccurate, incomplete, or misleading information that has not been tested by the trial process.  Each of the parties is entitled to a fair trial by an impartial jury, and if you decide the case based on information not presented in court, you will have denied the parties a fair trial.  Remember, you have taken an oath to follow the rules, and it is very important that you follow these rules.

A juror who violates these restrictions jeopardizes the fairness of these proceedings, and a mistrial could result that would require the entire trial process to start over.  If any juror is exposed to any outside information, please notify the court immediately.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

### C.     Communication with Court [Ninth Circuit Model 3.3]

If it becomes necessary during your deliberations to communicate with me, you may send a note through the courtroom deputy, signed by any one or more of you.  No member of the jury should ever attempt to communicate with me except by a signed writing.  I will not communicate with any member of the jury on anything concerning the case except in writing or here in open court.  If you send out a question, I will consult with the lawyers before answering it, which may take some time.  You should continue your deliberations while waiting for the answer to any question.  Remember that you are not to tell anyone – including the court – how the jury stands, whether in terms of vote count or otherwise, until after you have reached a unanimous verdict or have been discharged.  Do not disclose any vote count in any note to the Court.

1

      **D.**       **Return of Verdict [Ninth Circuit Model 3.5]**

2

      A verdict form has been prepared for you.  [*Parties to propose explanation for verdict*

3

*form.*]  Please read the instruction that follows each question carefully, which is to say, please only

4

answer the questions required.

5

      After you have reached unanimous agreement on a verdict, your foreperson should

6

complete the verdict form according to your deliberations, sign and date it, and advise the

7

courtroom deputy that you are ready to return to the courtroom.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

**E.      Post-Discharge Instruction [Ninth Circuit Model 3.9]**

Now that the case has been concluded, some of you may have questions about the confidentiality of the proceedings.  Now that the case is over, you are free to discuss it with any person you choose.  By the same token, however, I would advise you that you are under no obligation whatsoever to discuss this case with any person.

If you do decide to discuss the case with anyone, I would suggest you treat it with a degree of solemnity in that whatever you do decide to say, you would be willing to say in the presence of the other jurors or under oath here in open court in the presence of all the parties.

Always bear in mind that if you do decide to discuss this case, the other jurors fully and freely stated their opinions with the understanding they were being expressed in confidence. Please respect the privacy of the views of the other jurors.

Finally, if you would prefer not to discuss the case with anyone, but are feeling undue pressure to do so, please feel free to contact the courtroom deputy, who will notify me, and I will assist.

**IT IS SO ORDERED.**

Dated: January 25, 2025

_____
**ARACELI MARTÍNEZ-OLGUÍN**
**United States District Judge**

United States District Court
Northern District of California