Volume 13

Pages 2192 - 2428

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE ARACELI MARTÍNEZ-OLGUÍN

SURGICAL INSTRUMENT SERVICE        )
COMPANY, INC., et al.,             )
                                   )
          Plaintiffs,              )
                                   )
  vs.                              )  No. C 21-03496 AMO
                                   )
INTUITIVE SURGICAL, INC.,          ) San Francisco, California
                                   ) Friday
          Defendant.               ) January 24, 2025
-----------------------------------) 8:00 a.m.
AND RELATED COUNTERCLAIMS.         )
_____)

**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**

**APPEARANCES**:

**For Plaintiffs:**              MCCAULLEY LAW GROUP
                                 180 N. Wabash Avenue
                                 Suite 601
                                 Chicago, Illinois 60601
                            BY:  **RICHARD McCAULLEY JR., ESQ.**


                                 HALEY GUILIANO LLP
                                 111 Market Street
                                 Suite 900
                                 San Jose, California 95113
                            BY:  **JOSHUA V. VAN HOVEN, ESQ.**


          **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported By:   *Debra L. Pas, CSR 11916, CRR, RMR, RPR*
               Official Reporter - US District Court
               Computerized Transcription By Eclipse

**APPEARANCES**:   (CONTINUED)

**For Defendant:**                    PAUL, WEISS, RIFKIND, WHARTON
                                         & GARRISON LLP
                                      2001 K Street NW
                                      Washington, D.C. 20006
                             BY:  **KENNETH A. GALLO, ESQ.**
                                  **PAUL D. BRACHMAN, ESQ.**


                                      PAUL WEISS RIFKIND WHARTON
                                         & GARRISON LLP
                                      1285 Avenue of the Americas
                                      New York, New York 10019
                             BY:  **WILLIAM MICHAEL, ESQ.**
                                  **CRYSTAL PARKER, ESQ.**
                                  **ROBERT O'LOUGHLIN, ESQ.**


                                      PAUL, WEISS, RIFKIND, WHARTON
                                         & GARRISON LLP
                                      535 Mission Street
                                      24th Floor
                                      San Francisco, California 94105
                             BY:  **JOSHUA HILL, JR., ESQ.**


**Also Present:**                   **David Rosa**
                                    **Bobby Cox**
                                    **Ryan Lee**
                                    **Greg Posdal**
                                      - - -

## I N D E X

Friday, January 24, 2025 - Volume 13

| DEFENDANT'S WITNESSES | PAGE | VOL. |
|---|---|---|
| **DUQUE, GRANT** | | |
| (PREVIOUSLY SWORN) | 2216 | 13 |
| Direct Examination Resumed by Ms. Parker | 2217 | 13 |
| Cross-Examination by Mr. Van Hoven | 2254 | 13 |
| Redirect Examination by Ms. Parker | 2308 | 13 |
| Recross-Examination by r. Van Hoven | 2317 | 13 |
| | | |
| **SMITH, LOREN** | | |
| (SWORN) | 2318 | 13 |
| Direct Examination by Mr. Michael | 2318 | 13 |
| Cross-Examination by Mr. McCaulley | 2369 | 13 |
| Redirect Examination by Mr. Michael | 2410 | 13 |

- - -

## E X H I B I T S

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 282 | | 2286 | 13 |
| 461 | | 2291 | 13 |
| 515 | | 2385 | 13 |
| 536-R | | 2386 | 13 |
| 574 | | 2240 | 13 |
| 622 | | 2230 | 13 |
| 650 | | 2294 | 13 |
| 1500 | | 2338 | 13 |
| 1612-R | | 2340 | 13 |
| 1632.001-R | | 2333 | 13 |

—  —  —

| | |
|---|---|
| 1 | **Friday - January 24, 2025**                                    **8:04 a.m.** |
| 2 | **P R O C E E D I N G S** |
| 3 | ---o0o--- |
| 4 | (Proceedings held in open court, outside |
| 5 | the presence and hearing of the jury.) |
| 6 | **THE CLERK:**  Calling civil matter 21-3496, Surgical |
| 7 | Instrument Service Company Incorporated v. Intuitive Surgical |
| 8 | Incorporated. |
| 9 | Counsel, please state your appearances for the record, |
| 10 | starting with the plaintiff. |
| 11 | **MR. McCAULLEY:**  Good morning, Your Honor.  Rick |
| 12 | McCaulley on behalf of SIS. |
| 13 | With me at counsel table is Josh Van Hoven and Greg |
| 14 | Posdal, our corporate representative. |
| 15 | **THE COURT:**  Good morning. |
| 16 | **MR. GALLO:**  Good morning, Your Honor.  Ken Gallo for |
| 17 | defendant Intuitive. |
| 18 | With me is Crystal Parker, Bill Michael, and our corporate |
| 19 | representative Dave Rosa. |
| 20 | **THE COURT:**  Good morning. |
| 21 | All right, folks.  You all have things you want to tell me |
| 22 | about. |
| 23 | Where shall we start? |
| 24 | **MR. McCAULLEY:**  We had a bit of a surprise last night, |
| 25 | and Mr. Gallo and I had our first, perhaps, disagreement, but |

 1    we have worked on it and talked about it this morning.

 2         We had an order of witnesses since Tuesday, confirmed to

 3    the Court on Wednesday, defendant intended to call witnesses in

 4    a certain order with Dr. Smith testifying last.

 5         I can go through the preparations that we have made in

 6    contemplation of that order, Your Honor; but after the close of

 7    business last night, we were informed that they were changing

 8    the order of the witnesses and that Dr. Smith would testify

 9    late this morning presumably.

10         We had an email exchange.  I objected.  I had made plans

11    based on the way things were going.

12         Dr. Lamb was supposed to come in two nights ago.  He came

13    in late last night with the expectation, Mr. Gallo indicated,

14    he had three hours.  I know that Mr. Van Hoven, we allocated

15    the witnesses amongst each other, and I had planned today to

16    work with Dr. Lamb for the cross examination of Dr. Smith.

17         We got blind-sided by the change in the order of

18    witnesses, and I will need extra time to prepare.  I suppose I

19    could wander around and waste the jury's time, but I don't

20    intend to do that to the Court.  I don't intend to do that to

21    the jury or the Court staff.

22         But we wanted to enforce the -- the order of witnesses as

23    it's been disclosed for almost a week now.  And I talked to

24    Mr. Gallo this morning, and he said now that they are perhaps

25    thinking about dropping a witness altogether that we spent a

1    few days preparing for.

2        So I give Mr. Gallo a chance to respond.  We have been

3    talking about it in a civil manner, but the prejudice to us is

4    real in changing the order of the witnesses.

5            THE COURT:  Before you respond, Mr. Gallo, can I ask

6    Mr. McCaulley?  I want to get a finer point on it.  Without

7    assuming the prejudice you're describing, could you tell me

8    what it is you're asking for?

9            MR. McCAULLEY:  We're asking -- if they are still

10   going to call Dr. Howe, which they haven't said definitely one

11   way or the other, I would ask the Court to just enforce the

12   order of witnesses that has been contemplated all week.  If

13   they are not going to call Dr. Howe, then I may ask the court

14   for additional time before we put Dr. Smith on the stand.

15           THE COURT:  Thank you.  Mr. Gallo.

16           MR. GALLO:  Your Honor, two points.  One is, there is

17   no prejudice to the plaintiff at all.  And we're very seriously

18   considering dropping Dr. Howe and, therefore, Dr. Smith would

19   be the next witness.

20       The order is Grant Duque, who is on the stand.  We had

21   said on Tuesday Dr. Howe and then Dr. Smith.

22       You will recall that since Tuesday, I have been quite

23   clear that we hoped and expected to finish our case today.

24   There is no way I think Mr. McCaulley could have reasonably

25   believed that he could wait until Monday to cross-examine

 1    Dr. Smith, given the representations I have been making to the

 2    Court.

 3         Dr. Smith is our economist certain.  They have known he's

 4    going to testify for two years.  We disclosed the order on

 5    Tuesday so there can be no prejudice.  We disclosed the order

 6    on Tuesday of Duque, Howe, Smith.  We disclosed that same

 7    order.

 8         And then yesterday I began thinking very hard about the

 9    fact that I don't think we need Dr. Howe to testify.  So I sent

10    a note to Mr. McCaulley switching the order because I wanted to

11    hear the testimony of Mr. Duque and then make a final decision

12    about whether to pull Dr. Howe.  So I switched the order to

13    give us the ability to say we're not going to call Dr. Howe.

14    Mr. Smith will be the next witness up -- Dr. Smith will be the

15    next witness up.

16         So I really don't think we're going to call Dr. Howe.

17    That's the bottom line.  And the notion -- I mean, I must say,

18    Your Honor, the notion that the plaintiff isn't prepared to

19    cross-examine Dr. Smith today is -- I just don't think that's

20    because of anything we've done.  I have been as forthcoming

21    with the Court as I could possibly be that we were working hard

22    to close today.  I don't know how the plaintiffs could have

23    assumed that they didn't need to be ready to cross-examine

24    Dr. Smith today.

25         And it's quite common at the end of a case to say:  Oh, I

1    don't need this witness.  I mean, the way the evidence has come

2    in, I don't need the witness.  It happens all the time.  I'm

3    not playing some game here.

4        The idea that we're going to rest -- we're going to end

5    today with, frankly, all it would be would be Mr. Duque and 30

6    minutes of video and then ask the jury to have to come back

7    Monday to hear Dr. Smith when they otherwise could be done I

8    think is unfair to the jury.

9        So in summary, I guess what I'm saying is I don't think

10   there is any legitimate prejudice.  The plaintiff has known we

11   were trying to finish today.  They have known they are going to

12   examine Dr. Smith for two years.  He's our economic expert.

13       Switching the order of one witness on the last date or

14   removing a witness on the last day is hardly a monumental

15   thing, and I think the plaintiff is obligated to be ready.  So

16   that's -- that's it.

17       **THE COURT:**  So let me ask, because I'm looking at the

18   emails that were sent from Mr. Sherry on Tuesday and Wednesday

19   to Ms. Solorzano-Rodriguez.  You all have been very diligently

20   sending on.

21       In all candor, I haven't been paying particularly close

22   attention to the order of the witnesses other than to know

23   whether or not you need me to resolve objections with regard to

24   demonstratives or slides.

25       So what I see -- and mind you, of course, I trust that

1  there have been more emails between you all -- is that as of

2  Tuesday, Mr. Sherry writes that Intuitive is advised that it

3  will call Mr. Duque and Mr. Howe after Dr. Meng and Dr. Curet.

4       Okay.  Then yesterday, with an update, there is a note --

5  this is at 2:30 -- that Dr. Smith -- that Intuitive may begin

6  its direct examination of Dr. Smith today.

7       So, Mr. McCaulley, help me understand.  Because at least

8  from what little -- and mind you, I'm not supposed to see all

9  of it.  I haven't seen all of it, but at least from what I can

10  see, I know that I have had -- I think that I have had -- this

11  is the email I have printed out.  We have been on notice of

12  Dr. Smith coming Friday at least since --

13            MR. McCAULLEY:  Right --

14            THE COURT:  -- Wednesday at 2:30.

15            MR. GALLO:  Sorry.  I didn't mean to interrupt Your

16  Honor.

17       I believe that's true.  The only thing I would add to your

18  recitation is that we sent an email to the plaintiffs at 2:30

19  on Tuesday and gave them Dr. Smith's slides.  I'm told those

20  were emailed to the Court on Wednesday.  And the reason we did

21  it Tuesday, was that that meant he might go on as early as

22  Thursday.  In other words, we gave them our two-day notice on

23  Tuesday under the order we have been working with the Court.

24       I say that because I don't think that plaintiff could

25  legitimately say that they are surprised he's going on the

PROCEEDINGS

```
 1   stand on Friday.

 2           MR. McCAULLEY:  We're not surprised he's going on the

 3   stand on Friday, Your Honor.

 4       On Wednesday morning when we were here, Mr. Gallo gave the

 5   order of the witnesses, and they estimated yesterday that they

 6   had three hours.  I don't -- I'm not surprised that he's going

 7   on today.  I'm surprised that he's going on at 10:00 o'clock in

 8   the morning today.

 9       Dr. Lamb got here -- I don't want to -- I don't know

10   exactly what time, but after I was in bed.  And my plan was to

11   work with him today to be prepared for this afternoon.  We

12   certainly expected him to go.  We didn't expect to withdraw the

13   witness.  We didn't expect the change in the order of the

14   witnesses.  And I think under the circumstances, we worked very

15   hard to cooperate with each other.

16       Your Honor, I had wanted to raise this with the Court.  I

17   think it's unfair.  I think it puts us in a bad spot.  We were

18   prepared certainly to start the cross examination of Dr. Smith

19   today based on the timing that was given to us yesterday,

20   but --

21           THE COURT:  Mr. McCaulley, I need you to put a finer

22   point on it for me, because I'm -- I asked counsel to inform

23   each other of which witnesses they are going to call.  I'm not

24   expecting that the order is something to which anyone

25   necessarily needs to abide.  The point is to give you enough
```

PROCEEDINGS

 1   time to look at things.

 2        But that said, let's -- I do want to speak -- so I'm not

 3   going to -- I'm not going to require Mr. Gallo to call a

 4   witness he doesn't think he needs.  What I do want to figure

 5   out then is -- what I hear you saying is that you think you

 6   want some time with Dr. Bero between him hearing Mr. Smith's

 7   testimony and you doing your cross?

 8             **MR. McCAULLEY:**  With Dr. Lamb.

 9             **THE COURT:**  I'm sorry.  Thank you.

10             **MR. McCAULLEY:**  Mr. Bero is not here.

11             **THE COURT:**  Sorry.  I have been making everyone a

12   doctor for weeks now, as you all have seen.

13        So is that right, Mr. McCaulley, what -- ultimately what

14   I'm hearing is frustration at losing the time that you would

15   have had with Dr. Lamb -- excuse me, Mr. Lamb --

16             **MR. McCAULLEY:**  It's Dr. Lamb.

17             **THE COURT:**  Darn it.  It's Mr. Bero and Dr. Lamb.

18        ...with Dr. Lamb between Dr. Smith's cross -- excuse me,

19   Dr. Smith's direct and cross.

20             **MR. GALLO:**  That's what he's saying, you're right.

21        But, Your Honor, I really object to that idea.  I mean, if

22   where this is going is we put Smith on direct and they have the

23   weekend to prepare for cross, I find that -- that's

24   gamesmanship as opposed to what I'm doing.  I mean --

25             **THE COURT:**  Let me stop you, Mr. Gallo.

**PROCEEDINGS**

1    I have no interest in giving Mr. McCaulley the weekend.

2  I'm trying to figure out -- and maybe this is my not having a

3  clear enough understanding of how long you have with Mr. Duque.

4    **MR. GALLO:**  Mr. Duque is going to be about 40 minutes,

5  and we expect our direct of Dr. Smith to be an hour or less.

6  So we think we can do them both today and with, really,

7  frankly, quite fulsome cross examinations.  Both of them can be

8  done today.

9    **THE COURT:**  I think my hope is whether or not there is

10  a way to make it so that you get the lunch period.  That is

11  about as accommodating as I'm willing to be.

12    Because I don't disagree with Mr. Gallo.  The weekend -- I

13  don't want to leave that for Monday either, especially since it

14  doesn't look like there would be reason -- it doesn't sound

15  like the timing needs to spill that far into Monday.

16    So that's my -- that's my take on it.

17    **MR. McCAULLEY:**  And I never asked for -- for the

18  weekend, Your Honor.

19    But I do think if Dr. Lamb -- if Your Honor would indulge

20  me to allow him to sit at counsel table with me during the

21  direct examination of Dr. Smith and we could have the lunch

22  hour, I think that would be fine.

23    **THE COURT:**  Any objection, Mr. Gallo?

24    **MR. GALLO:**  I have no objection to that.  That would

25  be -- that would be fine.

```
 1              THE COURT:  All right.

 2              MR. McCAULLEY:  Are we not calling Dr. Howe?  Is that

 3    the --

 4              THE COURT:  I think Mr. Gallo gets to decide that in

 5    his own due course.

 6              MR. GALLO:  I would like to decide that after I see

 7    where we are after Mr. Duque testifies.

 8              THE COURT:  All right.  While you still have me, are

 9    there -- I think there are -- were there objections?  I think

10    some have been withdrawn, but there were some objections to

11    demonstratives and to maybe one exhibit.

12              MR. MICHAEL:  That's correct, Your Honor.  I think

13    it's one demonstrative and one exhibit.

14         Mr. McCaulley can, of course, correct me if I'm wrong

15    about that, but happy to address those or Mr. McCaulley's

16    objections.

17              THE COURT:  Thank you, Mr. Michael.

18         Mr. McCaulley, would you chat with me about which slide to

19    the demonstrative?

20              MR. McCAULLEY:  I took the wrong notes up here with

21    me, Your Honor, which I've realized I don't have them.  I think

22    they are down on 17.

23         But I think there's one issue.  The objections to the

24    exhibits are fine.  If the slide comes in, my recollection is

25    I'm okay with it.
```

PROCEEDINGS

 1      There's one slide that was vague that I don't know what

 2  the purpose of it is.  There's no discussion in Dr. Smith's

 3  report about the whole authorization issue and I -- the more

 4  important issue for me, Your Honor, is I wanted to address a

 5  scope objection in keeping with what we have been trying to do

 6  and raise issues before they become issues.

 7      I don't think that it -- and it may be that they say

 8  Dr. Smith doesn't intend to testify on any of that, but my

 9  position is, just so the Court knows, if your scope objection,

10  if that comes up, that's not in his reports.

11          **MR. MICHAEL:**  Sorry, Your Honor.  Just out of an

12  abundance of caution, I think Dr. Smith is in the courtroom.

13  So maybe we should ask him --

14          **THE COURT:**  Dr. Smith, if you would please leave us.

15  Apologies.

16          **MR. McCAULLEY:**  I'm sorry.  I didn't know what he

17  looked like.

18      (Dr. Smith exits the courtroom.)

19          **THE COURT:**  Maybe that's what I need to start asking

20  of the gallery before we start.

21      Go ahead.  Thank you, Mr. Michael.

22          **MR. MICHAEL:**  Of course.

23      So, actually, this is the first that I'm hearing of this

24  scope objection.  I don't think that was in anything that

25  Mr. McCaulley sent to us or to the Court.  But as to that

1    issue, I don't think it comes up in Dr. Smith's slides.

2        Dr. Smith, of course, does talk about the contract

3    provisions in -- well, in his report, and the contract

4    provisions are reflected in the slides.  And he talks about the

5    fact that the contract provisions say on their face that

6    instruments made or approved by Intuitive can be used with the

7    system.

8        And so I would expect that Dr. Smith will offer the

9    opinion that SIS was not excluded from having the opportunity

10   to compete because, among other reasons, the contract

11   provisions provide for the use of instruments made or approved.

12   And SIS never asked for approval.

13       I don't think he would go beyond that.  I don't think

14   there is anything beyond that in his report on that issue.  So

15   I think it would be limited to that, and that would be within

16   the scope of his opinions.

17       **MR. McCAULLEY:**  I didn't see it anywhere in the

18   reports, Your Honor.  So as I did for Dr. Lamb, we exchanged

19   notes about it.

20       I -- I'm glad I raised it.  I don't think it's in the

21   report.  I think we should deal with it now rather than in

22   front of the jury.

23       **THE COURT:**  I agree.

24       Mr. Michael, as we've done during some of the questioning,

25   I'm sure you -- I'm confident you have his report and can point

PROCEEDINGS

 1   me to the paragraph of his report.

 2           MR. MICHAEL:  I do have it, if I may have just a

 3   moment.

 4           THE COURT:  By all means.

 5       (Brief pause.)

 6           MR. VAN HOVEN:  Your Honor, I'm happy to be corrected.

 7   There is a couple hundred pages of report.  I didn't see it

 8   before I raised it with the Court.

 9           THE COURT:  I appreciate you all.  Better to do it now

10   than have the jury step out or to do it with them sitting in

11   the box.

12       (Brief pause.)

13           MR. MICHAEL:  I'm sorry.  Would the Court like a clean

14   copy of the report?

15           THE COURT:  Mr. Michael, let's do this.  It's okay.

16   It's okay.  It's okay.

17       Let's do this:  Read -- say what you would like to for the

18   record.  Pass your -- maybe you can't pass your copy to

19   Mr. McCaulley.  Maybe we do need a clean copy for

20   Mr. McCaulley.

21           MR. MICHAEL:  I can start reading it into the record

22   while we get a clean copy.

23           THE COURT:  Thank you.

24           MR. MICHAEL:  So this is Paragraph 53 of Dr. Smith's

25   report.  This is the rebuttal report to Dr. Lamb.  He says in

PROCEEDINGS

1    Paragraph 53b [as read]:

2         "Intuitive designed the da Vinci surgical system

3    with a product vision that can only be achieved by the

4    system as a whole.  Components of the system, such as

5    the da Vinci platform and EndoWrist, are integral to

6    the functioning of the system.  Moreover, many of the

7    components, including the EndoWrist instruments at

8    issue, only are used with the da Vinci surgical

9    system.  And the da Vinci surgical system only uses

10   components that have been manufactured or authorized

11   by Intuitive."

12   And then Paragraph 63, Dr. Smith says again [as read]:

13        "And in all instances, the da Vinci surgical

14   system uses components that are either manufactured or

15   carefully controlled and authorized by Intuitive."

16   He then gives the opinion at Paragraphs 131 through 133

17   that SIS can and does compete in many legitimate markets for

18   the repair of medical equipment.

19        And so I think that fairly encompasses the scope of what

20   Dr. Smith would say, that SIS was not excluded from competing.

21   And that, among other reasons for that, are that Intuitive's

22   contracts provide for the use of instruments made or authorized

23   by Intuitive.

24        MR. McCAULLEY:  I don't have a copy of the report in

25   front of me.

PROCEEDINGS

1           (Document tendered to counsel)

2           **MR. McCAULLEY:**  But it doesn't say SIS could have been

3    authorized or sought authorization.  That's not stated anywhere

4    in the report.  And if we're going to hear that on the stand,

5    it's beyond the scope of his report.

6           I understand 131 and 132.  133 talks about the fact that

7    SIS can compete in other areas, but it doesn't draw a

8    connection between this authorization issue.

9           This is a new issue that was raised for the first time

10   after expert reports, so I would expect that it wouldn't be in

11   there.  But what Mr. Michael just -- he kind of waved his hand

12   over 131, 132 and 133, but it's not in there.  There's no

13   connection.

14          **THE COURT:**  Mr. Michael, I'm realizing that I -- which

15   slide is it?

16          **MR. MICHAEL:**  So there are, I think, a couple of

17   slides.  So there are some slides that just show what the

18   contract provisions are.  I -- I don't believe there is or

19   could be any controversy over those.  Those are slides 12

20   through 14.

21          And Dr. Smith is just talking about the same contract

22   provisions that he talks about in his report.

23          **THE COURT:**  I'm realizing, Mr. Michael, the question

24   was probably better posed to Mr. McCaulley.

25          Mr. McCaulley, which slide is it -- I need to confirm you

PROCEEDINGS

1  don't object to the ones with the contract provisions.  Which

2  is the one you object to?

3       **MR. McCAULLEY:**  I'm not objecting to a slide in this

4  context, Your Honor.  I was worried that with the contract

5  provision, which has been shown to the jury multiple times

6  being part of the slides, said exactly what I think I hear them

7  saying they are going to argue from that slide.

8       I'm objecting to the testimony.  Beyond the scope.  I've

9  looked at 131, 132, and 133, which are the portions that talk

10  about SIS.

11      And I'm happy to hand up -- I'm happy to surrender the

12  copy that was just handed to me, if it would help Your Honor.

13      **THE COURT:**  I would appreciate that.

14      (Whereupon document was tendered to the Court.)

15      **THE COURT:**  My apologies.  I somehow thought this

16  was -- well, if I'm right, it sounds, Mr. McCaulley, like

17  you've looked at the slides and you're concerned about what

18  testimony will accompany those slides, which, in fact, taught

19  me, as much as I would prefer to do it outside the presence of

20  the jury, it may be better left to maybe waiting to hear the

21  answers that are drawn -- the answers to the questions that are

22  asked by Mr. Michael, assuming -- or whoever is questioning

23  Dr. Smith at that point.

24      **MR. McCAULLEY:**  Smith and Lamb are doctors.  Bero is

25  Mister.

PROCEEDINGS

```
 1            THE COURT:  I'm glad you all can keep it straight.
 2       Well, we're almost done, and I haven't done it yet.
 3       (Brief pause.)
 4            THE COURT:  I'm flipping back to 53, but having read
 5  131 through 133, I tend to agree with Mr. McCaulley.
 6            MR. MICHAEL:  It was 53 and 63, Your Honor.  And I
 7  think those should all be read together.
 8       (Brief pause.)
 9            THE COURT:  Can I ask you all -- Mr. McCaulley
10  surrendered his clean copy to me.
11       But you have yours, is that right, Mr. Michael?
12            MR. MICHAEL:  I do.
13            THE COURT:  I think the only place I've seen anything
14  about authorization is on -- is in Paragraph 63.
15            MR. MICHAEL:  And 53(b), Your Honor.
16            THE COURT:  Okay.
17            MR. MICHAEL:  I apologize.  It's just the bottom of
18  Page 34.
19            THE COURT:  I see it.  I see it.
20       So here -- so, Mr. McCaulley, your objection is as to the
21  fact that he could -- that he might offer an opinion about
22  whether SIS could have obtained authorization?
23            MR. McCAULLEY:  Right.
24            THE COURT:  So his report -- I agree with
25  Mr. McCaulley.  I think it's clear that he's opining that only
```

 1   authorized -- well, that only authorized entities -- that

 2   da Vinci surgical system only use components that have been

 3   manufactured or authorized by Intuitive, but I don't see

 4   anything in his report where he says anything about SIS's

 5   authorization or lack thereof.

 6        What am I missing, Mr. Michael?

 7             **MR. MICHAEL:**  Well, Your Honor, I think that his

 8   talking about the contract provisions and the fact that they

 9   allow authorized third parties and then taken together with his

10   opinion that SIS's is not excluded, I do think there's a

11   connection.

12        But, you know, if the point is that we can talk about the

13   contract provisions and what those provide and the fact that on

14   their face they allow for authorization and that Dr. Smith

15   would not go further than that, I'm not sure that's going to be

16   an issue in his testimony.  And I assume that would -- you

17   know, if he doesn't go further than that on the direct, his

18   cross would be accordingly limited to that as well.

19             **THE COURT:**  Great.

20             **MR. MICHAEL:**  So I'll -- I'll try to keep that in mind

21   with the questioning.

22             **THE COURT:**  And as with all things, we'll see how it

23   all plays out.

24        May I keep this?

25             **MR. MICHAEL:**  Of course, Your Honor.

PROCEEDINGS

```
 1          And I had understood that SIS had an objection independent
 2    as to one of the slides and one of the documents.  I hear
 3    Mr. McCaulley say he's withdrawing those, but, obviously, I
 4    don't want to put words in his mouth.
 5          MR. McCAULLEY:  I don't remember which ones they are,
 6    so I will withdraw it.
 7          THE COURT:  Okay.
 8          One last question for Intuitive's counsel -- oh, no.  I'm
 9    sorry.
10          Mr. McCaulley, this is actually a question for you.  This
11    is for both of you.
12          I think I understood Mr. Gallo to say that Dr. Smith would
13    be -- is likely the last witness?
14          MR. GALLO:  Other than -- yeah, likely, because I
15    think we're going to pull Dr. Howe, and I will tell the Court
16    that after Mr. Duque leaves the stand, except that there's
17    about 25 minutes of two depositions to play, and that's it.
18          THE COURT:  Okay.  And, Mr. McCaulley, I may ask you
19    this later, but at this point are you anticipating a rebuttal
20    whenever that comes, whether it's Monday or today?
21          MR. McCAULLEY:  I was anticipating a brief rebuttal on
22    Monday, depending on how today went.  And I may not actually
23    seek that, Your Honor.
24          THE COURT:  All right.  So as we have been doing, I
25    will not -- I will not yet make any promises to the jury about
```

**PROCEEDINGS**

1    when we're -- about when we'll -- when they will get the case

2    or what next week looks likes apart from letting them know that

3    whatever comes, Thursday we're dark.

4        **MR. GALLO:**  Yes.  Your Honor, in that regard, with

5    respect to Thursday, I -- I would like to make a request of the

6    Court that when you tell the jury that -- well, it sounds like

7    maybe it's not going to be done in the context of deliberation

8    yet.

9        What I was a little worried about, and I raised it with

10   Mr. McCaulley, is leaving an implication to the jury that they

11   should deliberate for some long or short period of time.  So,

12   in other words, if they get the case on Wednesday, I would just

13   ask the Court to consider phrasing the fact that we're going to

14   be dark on Thursday as "should you still be deliberating," or

15   words to that effect, so it doesn't imply they should sit back

16   there for three days if they don't need to.

17       **THE COURT:**  And can I -- of course.  And can I share

18   with you all that's one of the reasons I want to tell them

19   today.  They don't know -- they have -- I don't think they have

20   any sense of the fact that we're actually near the end.  We

21   don't -- you all especially know you're near the end, but they

22   aren't -- they are none the wiser.

23       So I think I mentioned this to you all yesterday, maybe

24   not.  It isn't clear to me at this point whether Juror Number 2

25   has actually said anything to any of other fellow jurors about

 1  needing the day to attend a service.  So I'm not planning to

 2  either.  I'm just going to say something has come up, and so

 3  we're dark; right?  Much like I did for my criminal trial last

 4  week.

 5          **MR. GALLO:**  Thank you.  Thank you.

 6          **MR. McCAULLEY:**  Your Honor, may I have the lunch hour

 7  to prepare for the cross examination?

 8          **THE COURT:**  Yes.  I heard -- I'm fine with that.

 9      And, importantly, I also heard Mr. Gallo not object to

10  that.  So I think that should be fine.  I'm hoping that arises

11  naturally out of the flow of the witnesses.

12          **MR. McCAULLEY:**  One last thing, Your Honor.  If we

13  do -- I would like some time to consider whether we're going to

14  have a rebuttal case.  If we are done at 1:30 or quarter to

15  2:00, I don't want to have to put a witness on if -- if

16  Mr. Gallo rests.  I think that's a fair request, that we

17  would -- if we have a rebuttal case, we would let the Court

18  know by Saturday morning at 9:00 a.m. and that we could start

19  it on Monday.

20          **THE COURT:**  So my only issue with that, Mr. McCaulley,

21  is that I don't have an easy way to tell the jurors not to come

22  on Monday if there's no rebuttal and we're instead just cutting

23  straight to charge conference and renewed motion for judgment

24  as a matter of law.

25          **MR. McCAULLEY:**  Can you remind me, Your Honor, what

PROCEEDINGS

```
 1   you're thinking about the charge conference and when closings

 2   would be then under those circumstances?

 3           THE COURT:  Well, at this point -- if -- here was my

 4   vision.

 5       Well, you know what?  We have the jury waiting back there.

 6   I'm going to bring them in and I'll share with you my vision at

 7   their next break.  But I want to get them started.  So let's go

 8   ahead and start with them and go from there.

 9           MR. GALLO:  Thank you.

10       (Jury enters the courtroom at 8:38 a.m.)

11           THE COURT:  Good morning.  Members of the jury, before

12   we start again with Mr. Duque, I have one small announcement

13   for you all in terms of planning for next week.

14       In light of my schedule, I just want to inform you that

15   Thursday we -- as we were last Friday, we will be dark.  So

16   just so you can plan, Thursday is a day you won't need to come

17   in.  So just so that you -- you've got that.

18       And with that, we're going to resume this morning

19   Ms. Parker's examination of Mr. Duque.

20       Please proceed.

21           MS. PARKER:  Thank you, Your Honor.

22                        GRANT DUQUE,

23   called as a witness for the defendant herein, having been

24   previously sworn, resumed the stand and testified further as

25   follows:
```

1       <u>DIRECT EXAMINATION (RESUMED)</u>

2   BY MS. PARKER:

3   Q.   Mr. Duque, when we ended yesterday, you had just told the

4   jury a bit about your background and some of the work that

5   you've done on EndoWrists over the years.

6        Do you recall that?

7   A.   I do.

8        MS. PARKER:  Mr. Lee, if we could please put up Slide

9   5.3.

10       (Document displayed.)

11  BY MS. PARKER:

12  Q.   And, Mr. Duque, can you see that on your screen?

13  A.   I can, yes.

14  Q.   Wonderful.

15       Mr. Duque, I want to talk in a little more detail about

16  the EndoWrists that you've helped design and test over the

17  years.

18       Can you tell the jury what's being shown on your slide

19  here?

20  A.   Sure.  This is just a high-level overview of a typical

21  EndoWrist instrument.

22  Q.   And at a high level, what are the basic components of an

23  EndoWrist?

24  A.   Sure.  I'll start on the tip.  We have the end effector

25  that includes the grip and the wrist components of the

 1  instrument.

 2      We have the instrument shaft, which is, essentially, just

 3  the long section there that connects the distal end with the

 4  proximal end.

 5      And then we have the instrument back-end.

 6          MS. PARKER:  Mr. Lee, if we could please go to Slide

 7  5.4.

 8      (Document displayed.)

 9  BY MS. PARKER:

10  Q.  Mr. Duque, I want to talk in a little more detail about

11  those different components of the EndoWrist that you told us

12  about.

13      What are we looking at here on this slide?

14  A.  We're looking at a side by side of an S/Si on the left and

15  an X/Xi on the right.  And then down below, we're looking

16  specifically at the instrument back ends.

17  Q.  What is the function of the back-end of a EndoWrist?

18  A.  Sure.  The back-end of the instrument is what engages to

19  the system arm.

20  Q.  And it appears here that the back-end of the S/Si

21  EndoWrist is a different shape than the back-end of the X/Xi

22  EndoWrist.

23      Why is that?

24  A.  Sure.  So the shape of the instrument back-end has to

25  conform to the shape of the system arm.

DUQUE - DIRECT/ PARKER

1            And so I'll point out in particular the orientation of the

2    main tube relative to the housing that's unique to the system

3    arm.  And so the way that the instrument installs onto the

4    system, the shape of the instrument, shape of the system arm

5    really defines how the instrument back-end has to lay out.

6    Q.    You used the word "housing."  What is the housing as it

7    relates to an EndoWrist?

8    A.    Sure.  The housing is what we call the cover or the

9    instrument housing.  It essentially just covers the entire back

10   end of the instrument.

11   Q.    What, if any, function does that housing serve?

12   A.    So within the instrument back-end there is a series of

13   cables, pulleys, bearings, cap stands, crimps, spooling round.

14   They aren't intended to have any inadvertent contact with

15   anything.  And so the instruments have to be handled.  The

16   housing protects all of those inner components.

17   Q.    And is the housing on the back-end of the EndoWrist that

18   we see here, is that designed to be opened or removed from the

19   EndoWrist at any time?

20   A.    No, not at all.

21   Q.    And as someone who builds and tests EndoWrists, what, if

22   any, concerns would you have with someone using an EndoWrist

23   where the housing had been removed and put back on?

24   A.    Sure.  So as I mentioned, there is cables, cables routing

25   on to pulleys.  If the housing is removed, I would be concerned

1  that any one of those cables could become damaged.  Any one of

2  those components could become damaged.  The cables could become

3  derailed, which would render the instrument non-functional.

4       There are -- in particular for the S/Si instrument

5  back-end, there are components that install directly onto the

6  housing.  There's a flush -- a component that we call the flush

7  tube.  It's necessary to properly clean the instrument.  It's

8  essentially a tube that runs from the proximal end of the

9  instrument all the way down to the distal end.  And during the

10 cleaning process, we need to deliver turbulent flow to the

11 distal end so it could be cleaned properly.

12      If you remove the housing, you can disturb that.  You can

13 kink that flush tube or damage it in a way that will not allow

14 that flow to get to the distal end.

15      In addition, there are some components.  These release

16 levers, they are components that are needed to remove the

17 instrument from the system arm.

18      In the S/Si instrument, those are retained by the assembly

19 of the housing to the main chassis component of the instrument

20 back-end.

21          MS. PARKER:  Mr. Lee, if we could please put up Slide

22 5.5.

23      (Document displayed.)

24 BY MS. PARKER:

25 Q.   Mr. Duque, I want to talk a little bit more about what's

DUQUE - DIRECT/ PARKER

1    under that protective housing that you just told us about.

2        What are we seeing here on Slide 5.5?

3    **A.**    Sure.  We are seeing the instrument back-ends with the

4    covers removed.

5    **Q.**    Starting on the left side of the slide under the heading

6    "S/Si," what are we seeing here at a high level?

7    **A.**    Sure.  Well, as I was just describing, you can see the

8    cables routing.  And so they exit the proximal end of the tube.

9    They are shown in this cyan or light blue color.  They route

10   through a series of pulleys that we call the back-end backup

11   pulleys so that they can route to the respective cap stands.

12       So each cable pair, which is coming from each of the

13   endofactor joints, they are routing to a particular cap stand.

14   The cables route into the cap stands onto these clamping pulley

15   components, which are shown there.  They have the -- the screws

16   to clamp and unclamp them.

17       And then we're also looking at the bearings and other

18   components and the -- release levers that I mentioned earlier,

19   they are shown in orange.

20   **Q.**    Thank you, sir.

21       And looking to the right side of this slide under the

22   heading "X/Xi" what, if any, key differences are there in this

23   top construction of the back-end between the different

24   generations of EndoWrists?

25   **A.**    Sure.  I'll first highlight that the -- the number of

 1  input disks or cap stands, there are a different number.

 2  There's actually five on the X/Xi instrument relative to on the

 3  S/Si where we only have four.  So major difference there.

 4      And then the arrangement of those cap stands or input --

 5  inputs are arranged in a different way that makes the overall

 6  instrument more compact.  But by doing that, the length of

 7  cables that are required to route them from these idler pulleys

 8  onto their respective cap stands is much, much longer.

 9          **MS. PARKER:**  If we can put up Slide 5.6, please,

10  Mr. Lee.

11      (Document displayed.)

12  **BY MS. PARKER:**

13  **Q.**   Mr. Duque, can you tell us what we're looking at here on

14  Slide 5.6?

15  **A.**   Sure.  Now we are looking at the bottom view of the

16  instrument back-ends, S/Si on the left with its four inputs,

17  and X/Xi on the right with its arrangement of five input disks.

18  **Q.**   And you referenced input disks.  Where do we see those on

19  the slides?

20  **A.**   They are the circular gray components.

21  **Q.**   And what's the function of the input disks on the -- the

22  bottom of the EndoWrists?

23  **A.**   So the input disks engage to mating features on the system

24  arm through a sterile adapter interface.

25  **Q.**   And when you say they "engage," what does that mean for

1  those of us that aren't mechanical engineers?

2  **A.**   Sure.  So they need to orient themselves and constrain

3  themselves in a way that when there's motion at the driving

4  end, which is the system arm, where driving motion through that

5  instrument side.

6           **MS. PARKER:**  Mr. Lee, if we could please go to Slide

7  5.7?

8      (Document displayed.)

9  **BY MS. PARKER:**

10 **Q.**   Mr. Duque, now moving to the other end of the EndoWrist,

11 what are we looking at here on Slide 5.7?

12 **A.**   Sure.  We're looking at a typical end effector of an

13 EndoWrist instrument.

14 **Q.**   Do all EndoWrists have the same end effector?

15 **A.**   They don't.

16 **Q.**   What end effector are we looking at here in this example

17 of EndoWrist?

18 **A.**   This is a large needle driver.

19 **Q.**   And it may be evident from the name, but what does a

20 needle driver do?

21 **A.**   Sure.  During this procedure, you may have to do suturing

22 and use a needle, a curved needle in most cases.  The needle

23 driver is specifically used to be able to hold the needle in a

24 rigid manner so that you can maneuver that needle to do things

25 like suturing.  It also needs to be able to handle the sutures

1   themselves in order to manage the sutures and tie knots.

2   **Q.**   And can you explain to us what we're looking at here in

3   the construction of this EndoWrist?

4   **A.**   Sure.  I'll start at the top.  I knew these were -- this

5   is a large needle driver because the grips have kind of a

6   carbide pad which allows for it to hold the needle properly.

7        The grips have a feature that is kind of shown labeled the

8   "yaw" and "grip pulley" that forms a pulley feature that the

9   drive cables are routed around.  So the cables are routed along

10   this feature, this pulley section of the grips.  As the cables

11   are pulled, it rotates that pulley, which causes motion of the

12   grips.

13        The cables, which are shown in red, they -- they route

14   through a series of pulleys that we call idler pulleys.  The

15   ones that are attached to the grips themself have to route

16   through a set of distal idler pulleys and then another set of

17   what we call proximal idler pulleys.  Essentially they are

18   going through one bend and another bend until it eventually

19   gets routed through some holes in the proximal clevis

20   component, which is shown down at the bottom in that dark gray.

21        I'll call out the one component in the middle, which we

22   call the distal clevis, in light gray, that's really the

23   structure of the wrist where all of the pulleys and the grips

24   are mounted to using pins.

25   **Q.**   And what, if any, design challenges exist in providing a

 1  surgical product that uses cables and pulleys like this?

 2  **A.**    Sure.  So as I mentioned, the cable has to route -- the

 3  distal most cables that route to the grips, in order for them

 4  to stay on their cable path and in order for us to have -- to

 5  preserve motion, we need to preserve the cable length of that

 6  cable path.  And so when the instrument wrist is articulated,

 7  we need to make sure that the cables stay on their respective

 8  paths.

 9        The instrument is small in diameter, so we have limited

10  real estate.  We have to route the cables through the -- a

11  distal joint and then a middle joint.  And so it has to go

12  through a series of pulleys, bending it in one direction around

13  the distal-most idlers shown in the middle and then through a

14  reverse bend through another set of idler pulleys.  It has to

15  be done in compact fashion.  Those pulleys themselves are

16  fairly small.

17  **Q.**    And based on your work designing EndoWrists what, if any,

18  weak points or potential points of failure have you observed in

19  the distal end of EndoWrists?

20  **A.**    Yes.  The -- essentially, the cables.  So the cables do

21  fail.  If the cables are articulating and traveling through

22  these pulleys as we're moving the wrist around and as they are

23  traveling, they are bending through these small diameter

24  pulleys, first in one direction and then in the other

25  direction.

1      We have multiple joints, and so the cables need to be able

2  to bend along one pin direction and then also bend along a

3  different axis, which is orthogonal, so now bending a different

4  direction.  That puts a lot of stress on the cables.

5      And because the cables have to go bend in one direction

6  and then the other, it's putting a great deal amount of stress

7  on the cables.  All through this, the cables are under tension

8  as well.

9  **Q.**   If it's so challenging to get these cables to go back and

10  forth in this tiny real estate, why use pulleys and cables to

11  control the distal end of the EndoWrist?

12  **A.**   We are trying to keep the instrument as compact as

13  possible.  We want small entry points, so 8 millimeter diameter

14  tools.

15      We are trying to mimic the dexterity of the human hand.

16  And the human hand has motions in one direction and also the

17  other direction.

18      They are applying tension.  We can't apply tension using

19  straight rods because they have to bend in a direction.

20      You might be able to achieve a single bend with things

21  such as a flat sheet or shim stock or flat metal bends.  But in

22  order to bend it in one direction and now the other direction,

23  you can only do that with cables.

24          **MS. PARKER:**  Mr. Lee, if we could go to Slide 5.9,

25  please.

 1          (Document displayed.)

 2    **BY MS. PARKER:**

 3    **Q.**   Mr. Duque, we have heard a lot about cables, and we won't,

 4    you know, go over this in a lot of detail today.  But can you

 5    explain to us, when we hear about cables and EndoWrists, what

 6    are we really talking about?

 7    **A.**   So this is a closeup view of our -- our cable.  The

 8    diameter of this cable -- this is a zoomed-in view.  The

 9    diameter of this cable is less than 20 thousandths, so it's

10    quite small.  This is a zoomed-in view.

11          The cable is made up of over 200 individual filaments,

12    wire, labeled wire.  That wire filament is one thou normally in

13    diameter.  That's the third of the thickness of a human hair,

14    so it's tiny.

15          The wires, wire filaments are wound into subcomponents

16    which we call the strands, and then those strands are wound

17    into a larger cable construction to make up the overall cable.

18          **MS. PARKER:**  You can take that down, Mr. Lee.  Thank

19    you.

20          (Document removed from display.)

21    **BY MS. PARKER:**

22    **Q.**   Mr. Duque, you told us yesterday when you joined

23    Intuitive, significant portions of the manufacturing process

24    were being done manually.

25          Do you recall that?

DUQUE - DIRECT/ PARKER

1    **A.**    I do.

2    **Q.**    And has that changed at all in the 24 years you have been

3    at Intuitive?

4    **A.**    Oh, absolutely.

5    **Q.**    And how so?

6    **A.**    There's a lot more automation.  We have had to scale.  We

7    have had to improve our quality.  We have had to improve our --

8    our repeatability.  So there's a lot more automation.

9         I mentioned before, when we first came in, everything was

10   done manually component by component.  Some of those components

11   now come in as subassemblies, coming from feeder lines or

12   coming from suppliers at some level of subassembly.

13        And then there's a lot of operations that had been done

14   manually in the past that are done with some level of

15   automation, semi-automation on the line today.

16   **Q.**    Mr. Duque, are you familiar with the term "calibration" as

17   it relates to EndoWrists?

18   **A.**    I am.

19   **Q.**    And how, if at all, is calibration relevant when

20   manufacturing EndoWrists?

21   **A.**    Sure.  So when you have the completed instrument assembly,

22   the cables are routed through the distal end effector end,

23   routed through the entire instrument and through the instrument

24   back-end.  So the assembly portion of it is mostly done, but

25   the cables are -- they still need to be tensioned and that

DUQUE - DIRECT/ PARKER

```
 1   tensioning is a calibration.
 2         The technicians need to set the appropriate amount of
 3   tension on each cable, and they do that to each cable pair.  So
 4   it's done on one side of the cable pair and then on the other
 5   side of the cable pair.
 6         And then after that's done the -- the instrument moves to
 7   a different fixture where they measure, you know, how much
 8   tension is applied.  And then also takes the measurements to
 9   compare the tension from one side of each joint to the other
10   side.  That needs to be balanced to -- within a certain
11   threshold so that we're ensuring that the offset of the end
12   effector is within a certain threshold of what we call the true
13   zero position.
14   Q.   And, Mr. Duque, I want to talk for just a minute about
15   that calibration process in a little more detail.
16         Starting with the older generation S and Si EndoWrists,
17   were those devices calibrated using a manual or an automated
18   process?
19   A.   For S/Si it was manual.
20   Q.   Mr. Duque, can you please turn in your binder to what's
21   been marked as Exhibit TX-622.
22         (Witness complied.)
23   A.   I'm here.
24   Q.   And do you recognize that document, sir?
25   A.   I do.
```

DUQUE - DIRECT/ PARKER

1    Q.   And what is it?

2    A.   So this is an example of a manufacturing processing

3    instruction or MPI.  It is one of several documents that we use

4    to define the manufacturing or assembly process involved to

5    build an EndoWrist instrument.  We also use it to train

6    assembly technicians.

7         MS. PARKER:  Your Honor, I would seek to admit

8    Exhibit 622 and publish it to the jury.  I understand there are

9    no objections.

10        MR. VAN HOVEN:  No objection.

11        THE COURT:  It's admitted and you may publish it.

12        (Trial Exhibit 622 received in evidence)

13        (Document displayed.)

14   BY MS. PARKER:

15   Q.   Mr. Duque, you mentioned these were manufacturing process

16   instructions.

17        Which generation of EndoWrists do these apply to?

18   A.   These are for IS1200, IS2000 and, IS3000 instruments.

19   Q.   Is there another name that the jury might recognize those

20   numbers by?

21   A.   Sure.  S/Si.

22   Q.   Mr. Duque, if we could go look at the first step of these

23   manufacturing process instructions.  It reads [as read]:

24        "Install the unit on an input nest with the

25        appropriate wrist nest."

DUQUE - DIRECT/ PARKER

1          Do you see that?

2     A.   I do.

3     Q.   What is an input nest?

4     A.   So an input nest is a fixture that adapts to the

5     instrument back-end.  It holds the input disks at their nominal

6     zero position.

7     Q.   What about a wrist nest, what is that?

8     A.   So the wrist nest is another fixture to install over the

9     instrument end effector and it holds the grip and wrist at its

10    nominal zero position.

11    Q.   And are the same input nests and wrist nests used in

12    calibrating every S and Si EndoWrist?

13    A.   No, they are different for each type of instrument.

14    Q.   Can someone go out and just buy one of those input nests

15    or wrist nests and use it to tension the cables on their

16    EndoWrists at home?

17    A.   No.  These are custom to our EndoWrists.

18    Q.   Mr. Duque, if we can look down on the page to step six of

19    the manufacturing process instructions.  It reads [as read]:

20          "Insert the cable tensioning tool into the

21          tensioning hole on a clamping pulley."

22          Do you see that?

23    A.   I do.

24    Q.   And what is a cable tensioning tool?

25    A.   So a cable tensioning tool is another fixture.  It's

DUQUE - DIRECT/ PARKER

1  essentially a miniature torque driver, very much like the

2  torque driver that you would use to set the torque on the lug

3  nuts of your car wheel; but this is one that's been specially

4  designed to apply the correct amount of tension to our

5  EndoWrist instruments.

6  **Q.**   And if we look to step seven, the first sentence reads

7  [as read]:

8         "Move the tensioning tool towards the crimp until

9         the correct tension is reached (indicated by the marks

10        on the tensioning tool)."

11        Do you see that, sir?

12 **A.**   I do.

13 **Q.**   What's being instructed here for the technician to do?

14 **A.**   Sure.  So the tensioning tool is installed onto holes or

15 receiving receptacles on each of the clamping pulleys.  They

16 are rotating it.  And as they are rotating it, there is an

17 indicator on the tensioning tool that the operator or the

18 technician is looking at.

19       When that indicator aligns with certain markings on that

20 tension tool, it's applying -- we know that that's applying a

21 certain threshold of tension to the cable.

22 **Q.**   And does every EndoWrist get tension to the same

23 indications or markings on the tensioning tool?

24 **A.**   No.  The tension is different for various instruments.

25 It's even different for each of the inputs.

1  Q.    Is that micro-tensioning tool with those markings that

2  your technicians use to tension the cables, is that something

3  that someone can go out and buy?  You mentioned it was similar

4  to what you used to adjust tension your tires.  Can I buy one

5  of those in a store?

6  A.    No.  It's custom to our manufacturing process.

7  Q.    If one of your technicians didn't have their

8  micro-tensioning tool one day, could they just tension the

9  cables in the S and Si EndoWrists by feel?

10 A.    No, they couldn't.  It's difficult.  It's hard to identify

11 how much tension is actually being applied to the cables

12 without the tensioning tool.  It can't be done by hand.

13 Q.    And what happens in the process briefly once -- once a

14 technician tensions the cables to the indicated markings, what

15 happens then to finish the tensioning process?

16 A.    Sure.  So they set an initial tension, as per the process

17 we described.  First they did one side of the cable pair and

18 then the other.  They will go through the series of the other

19 input disks to complete the tensioning on each of them.

20       Then the instrument gets installed onto another fixture

21 that we call the instrument performance tester and it will go

22 through a series of motions.  With the wrist nest on, holding

23 the end effector at its true zero position, this fixture will

24 drive a known amount of torque through each of the input disks

25 to measure how much translation there is.  Essentially how much

DUQUE - DIRECT/ PARKER

1    travel there is, how much stretch there is in the cable.

2    That's what we call slack.

3         So it's measuring the slack, kind of a measurement of how

4    much tension is applied for each direction.  It will turn in

5    one direction and then -- for taking a measurement in one of

6    the cables, and then turn in the opposite direction to measure

7    the tension on the other side of the cable.  So it's ensuring

8    it's within a certain threshold.  And then it's comparing the

9    tension from one side to the other to make sure that it's

10   balanced.

11   **Q.**   And does that happen for every EndoWrist that comes --

12   every S and Si EndoWrist that comes off the line?

13   **A.**   That's correct, for every joint.

14        **MS. PARKER:**  Mr. Lee, we can take that down for now.

15   Thank you.

16        (Document removed from display.)

17   **BY MS. PARKER:**

18   **Q.**   Mr. Duque, we have talked about the process for tensioning

19   S and Si EndoWrists.  What, if any, differences are there in

20   how Intuitive calibrates X and Xi EndoWrists?

21   **A.**   So for X/Xi, that tensioning process is automated.  When I

22   was describing the S/Si, the technician is applying tension.

23   You put it on a fixture that measures the tension and then

24   measures the balance between tension.  If it's not within a

25   certain threshold, they have to take it off and then re-tension

 1    to try to get to that target.  So it's bigger than -- they have

 2    to keep re-tensioning it until it falls within the certain

 3    acceptable thresholds.

 4         For X/Xi, after the instrument is built, cables are

 5    routed.  The cables are routed to the cap stands.  The bottom

 6    of the cap stand, one of the cable pairs, there's not -- it's

 7    not allowed to be adjusted.  It's -- there's no adjustment.  It

 8    just needs to be routed.

 9         And then there's a clamping pulley on the top section,

10    that has some ability to be rotated.  The technician only needs

11    to route it onto that spool.  They then put it onto an

12    Xi-specific instrument performance tester, and that fixture

13    will automatically set the appropriate amount of tension and

14    then go through a series of measurements to measure how far off

15    the instrument end effector is from the true zero position and

16    record that number.

17         And instead of having to chase after being within a

18    certain threshold, it will just take that measurement and

19    record that information onto the RFID chip of Xi instrument.

20    Q.   And you mentioned that you record that, that tensioning

21    information on the RFID chip.  Are you aware of any other names

22    for that chip that the jury might have heard?

23    A.   The RFID chip.

24    Q.   And are you familiar with something called an Atmel chip?

25    A.   I am.

1    Q.    How do those two things relate?

2    A.    The Atmel chip is part of the RFID assembly.

3    Q.    Mr. Duque, I want to talk a little bit about testing of

4    EndoWrists, which you told us briefly about yesterday was

5    something you had been involved in.

6        Is there a way for us to think about, at a high level, the

7    different types or buckets of testing that Intuitive does on

8    its EndoWrists?

9    A.    Sure.  At a high level, we have our formal V&V testing, so

10   formal testing that gets entered in and reported into our

11   design history folders.  And then we have informal testing,

12   things that we do to inform design decisions, to do cause

13   analysis, failure analysis and things like that.

14   Q.    Great.  Let's take those buckets separately.  Starting

15   first with that informal testing bucket, what do you mean when

16   you say "informal testing"?

17   A.    So informal is exactly that.  It's informal.  When we're

18   evaluating a design or a change to a design or doing failure

19   analysis, we want to get to decisions as quickly as possible.

20       So informal means exactly that.  It will do whatever is

21   needed to kind of answer those questions.

22       We might take, you know, some component level testing and

23   take them through, you know, a series of tests to failure or

24   accelerated testing to really exacerbate and test these things

25   so that we can make decisions quickly.  But it's informal

DUQUE - DIRECT/ PARKER

 1  because we're using, you know, components that are not fully

 2  traceable.  You know, they have been prototyped or they are,

 3  you know, not fully traceable.  We're using test methodologies

 4  that we've defined as needed for a question that we're trying

 5  to answer at the time.

 6  **Q.**    And what's the point of having informal testing?  Why not

 7  just jump to your formal testing and speed up the process?

 8  **A.**    Sure.  We're -- we're trying to look at solutions.  And so

 9  there may be something that we're trying to correct, something

10  that we're trying to improve.

11       As a design engineer, you know, you'll come up with

12  different ways to solve that.  You don't know -- you might have

13  multiple solutions to achieve the same -- the same thing.  In

14  order to really weed those out, to choose the most optimum

15  solution, you want to do that testing beforehand.  We don't

16  know what that final configuration is just yet.

17       And when we kick off formal V&V, formal V&V testing, it's

18  a huge amount of resources.  We want to have confidence in what

19  our best optimum solution is.

20  **Q.**    And moving to that second bucket, that formal -- I think

21  you referred it to as V&V testing?  What does V&V stand for?

22  **A.**    So V&V is verification and validation.

23  **Q.**    And what is the goal of that formal verification and

24  validation testing?

25  **A.**    So it's to ensure that all of the requirements, both

 1  functional requirements and product requirements, are met.

 2  **Q.**    And when we talk about formal verification testing, what

 3  does that part of the V&V equation encompass?

 4  **A.**    Sure.  Verification testing, those are tests that are

 5  quantifiable, things that we can measure and quantify.  They

 6  align with functional requirements, which are very specific.

 7      As an example, we might have a requirement that the -- a

 8  specific component must be able to withstand two pounds of

 9  force without breaking.

10      For the verification test, we'll actually apply a load

11  until it breaks and ensure that -- and take a measurement of

12  when it breaks and ensure that it meets that two-pound minimum.

13  So it's something that's measurable.

14  **Q.**    What about the other half of the equation, formal

15  validation testing?  What does that encompass?

16  **A.**    So validation testing are test cases that are assessed

17  qualitatively.  They align with requirements that are for the

18  product, sort of what a customer would see.  So we have product

19  requirements.

20      And the example I'll give is a product requirement might

21  be this device must be able to hold and retract a liver for a

22  specific procedure.  And so in the validation testing, we'll

23  have somebody that is acting as -- from the view of the

24  customer, we have a clinical engineer that's acting as the

25  voice of a customer, a surgeon, and they will go through a -- a

DUQUE - DIRECT/ PARKER

1    lab, a mock-up procedure, to demonstrate that they can, in

2    fact, retract a liver.

3    **Q.**   How do the test methodologies used for formal testing

4    compare to those that you use for that informal testing that

5    you described to us?

6    **A.**   Sure.  So with -- the formal V&V testing, it's regimented.

7    We need to have released protocols that have already been

8    reviewed, approved, and released before we start the testing.

9        The test devices that we're using, as well as the

10   equipment that we're using, they all have to be traceable

11   within calibration.  They -- we have to have a record of their

12   traceability, and they have to have been already confirmed to

13   meet the design intent of the specifications.

14   **Q.**   Okay.  Mr. Duque, can you please turn in your binder to

15   what's been marked as Exhibit 574.

16       (Witness complied.)

17   **Q.**   Do you recognize Exhibit 574, sir?

18   **A.**   I do.

19   **Q.**   What is it?

20   **A.**   This is a protocol for the reliability life test of the

21   Mega SutureCut and Large SutureCut improvements for grip cable

22   life.

23       **MS. PARKER:**  Your Honor, I would offer Exhibit 574.  I

24   understand there are no objections, and I would seek to publish

25   it to the jury, please.

 1              **MR. VAN HOVEN:**  No objection.

 2              **THE COURT:**  It's admitted, and you may publish it.

 3         (Trial Exhibit 574 received in evidence)

 4         (Document displayed.)

 5    **BY MS. PARKER:**

 6    **Q.**   Mr. Duque, you mentioned a moment ago that this is a life

 7    test protocol.

 8         Going back to the different buckets of testing that you

 9    were just telling us about, where does a protocol like this fit

10    into those buckets?

11    **A.**   Would fall under verification testing.

12    **Q.**   Sir, if we look down the page, there is a section titled

13    "Purpose."  Do you see that?

14    **A.**   I do.

15    **Q.**   And the second sentence under "Purpose" reads [as read]:

16              "The purpose of this testing is to confirm that

17         the test articles with the updated components meet the

18         requirements of the functional and architectural

19         requirements listed below."

20         Do you see that?

21    **A.**   I do.

22    **Q.**   And in terms that -- for those of us who, again, don't go

23    into this on a daily basis, what's being discussed there as the

24    purpose of the testing?

25    **A.**   Sure.  So the test articles with the updated components

DUQUE - DIRECT/ PARKER

1    means that we're trying to evaluate some change to an existing

2    design.  The Mega SutureCut and Large SutureCut needle driver,

3    they are already existing.  We were evaluating some change, and

4    it looks like that change included a component change.

5        When we make a component change, we want to ensure that

6    that change still meets all of the functional and architectural

7    requirements.

8    Q.   And if you were just making certain changes to an existing

9    product, why do you have to go through the whole testing

10   process if you're just changing, you know, certain components?

11   A.   So we want to ensure that we still meet all of the product

12   requirements.  It's sort of a regression test.  We don't want

13   to inadvertently implement a change that jeopardizes meeting

14   other requirements.  So we'll go through the series of all of

15   the functional and product and architectural requirements to

16   ensure that all of the requirements are still met.

17   Q.   If we could take a look at the second page of the exhibit,

18   sir.

19       If you look there, there is a section quited "Scope."  Do

20   you see that?

21   A.   I do.

22   Q.   Fifth paragraph starts "A Weibull design" --

23       Do you see that?

24   A.   I do.

25   Q.   It reads [as read]:

DUQUE - DIRECT/ PARKER

1              "A Weibull design of reliability analysis with a

2         90/90 (reliability and confidence) and a beta of 5 is

3         used to determine the production number of human

4         uses."

5         Do you see that?

6    **A.**   I do.

7    **Q.**   It's a lot for Friday morning.  We're going to take it in

8    pieces.

9         What does it mean when it talks about a Weibull design of

10   reliability?

11   **A.**   Sure.  A Weibull is a statistical model that's used to

12   predict reliability in life.

13   **Q.**   And what is the role or why are you using a statistical

14   model in your formal testing?

15   **A.**   We want to have confidence.  And so using a statistical

16   model gives us some amount of design margin.

17   **Q.**   Staying in that sentence, we saw a reference to 90/90

18   liability and confidence.  What is that discussing?

19   **A.**   So when we say 90/90, we are 90 percent confident that

20   90 percent of the devices will meet the requirement.

21   **Q.**   And in the next sentence, we see it reads [as read]:

22              "The projected number of human uses for this test

23         article is 10, requiring completion of 15 life

24         cycles."

25         Do you see that?

1   **A.**   I do.

2   **Q.**   And what is a life cycle when you're talking about

3   testing?

4   **A.**   A life cycle includes the instrument being used through a

5   procedure, but also includes the reprocessing steps.  So the

6   instruments are reusable.  And so they have to -- after they

7   are used, they have to go through a cleaning and sterilization

8   process.

9   **Q.**   And why if the -- if the number of human uses for this

10   article was going to be ten, why does your testing here show

11   you're doing 15 life cycles?

12   **A.**   Sure.  So the Weibull calculation, it's dependent on the

13   sample size.  And so as part of this protocol, it looks like

14   there's a sample size of four.  And for a sample size of four,

15   in order to meet 90 percent confidence for a 90 percent

16   reliability, those four test samples would need to achieve 15

17   to get the required 90 percent confidence.

18   **Q.**   And, Mr. Duque, if someone were just to look at the

19   results of the formal validation and verification testing done

20   on a particular EndoWrist and suggest that that was all of the

21   testing that had been done, would you agree or disagree with

22   that?

23   **A.**   I disagree.

24   **Q.**   Why is that?

25   **A.**   So the report would be the formal V&V report.  It doesn't

1    include or account for all of the preliminary testing that was

2    done, the feasibility testing that was done, the bench-top

3    testing that we talked about before, as well as any dry run

4    testing we may have done to get confidence going into formal

5    V&V.

6        It also doesn't account for any times that we've run the

7    formal V&V and we failed.  What we are looking at is the

8    successful result.

9    **Q.**   Mr. Duque, based on your experience working at Intuitive,

10   how would you describe the time and resources that Intuitive

11   puts into testing its EndoWrist products?

12   **A.**   It's significant.

13       **MS. PARKER:**  Mr. Lee, we can take that down.  Thank

14   you very much.

15       (Document removed from display.)

16   **BY MS. PARKER:**

17   **Q.**   Mr. Duque, you mentioned yesterday that when you joined

18   Intuitive in 2001, there were seven EndoWrists that were

19   already on the market; is that right?

20   **A.**   That's correct.

21   **Q.**   And were those EndoWrists being sold with a use limit?

22   **A.**   Yes, they were.

23   **Q.**   What was that limit?

24   **A.**   It was ten for all of them.

25   **Q.**   And what was your impression of that ten-use limit on

 1   EndoWrists when you joined in 2001?

 2   **A.**   When I first joined, the company was still very spartan

 3   and those devices were very new.  It was a -- it was a high

 4   bar.  We weren't achieving that through -- put even at life

 5   zero.  We were failing instruments coming off the manufacturing

 6   line, so it was a pretty high bar.

 7   **Q.**   And based on the work that you've done over the years at

 8   Intuitive, if it were suggested to you that the use limits on

 9   EndoWrists were a marketing ploy or a way to sell more

10   EndoWrists, what would your reaction to that be?

11   **A.**   I disagree.

12   **Q.**   Why is that?

13   **A.**   Like I said, it was -- it was difficult to achieve ten.

14   We had to redesign, optimize -- redesign the components,

15   redesign the processes, retest.  It took a while for us to get

16   to ten.  There was a time when we didn't achieve ten for some

17   of those instruments.

18   **Q.**   And based on your experience at Intuitive, if it were

19   suggested that the way that you should be setting use limits is

20   to test some EndoWrists until they fail and then pick a number

21   one under that, why isn't that a process you used to set use

22   limits?

23   **A.**   Well, we talked about the Weibull analysis.  When you're

24   running life tests, the data is not clean.  You'll run tests --

25   even if you had a target to, say, ten, some of those test

1    devices might fail at ten.  Some might fail at eight or nine.

2    Some of them will fail at 15.

3         The data is not clean.  But that's what data that goes on

4    into -- you take the aggregate of all those samples and you run

5    it through your Weibull calculation to calculate what

6    confidence and reliability.

7    **Q.**   Thank you, sir.

8         You testified just a moment ago that when you began

9    designing and testing EndoWrists, that the target was for them

10   to be used for ten uses.

11        Did there come a time when you began work to qualify

12   EndoWrists for use beyond ten lives?

13   **A.**   Yes.

14   **Q.**   And did that work have a name?

15   **A.**   We called it the Extended Use Program, or EUP, with

16   Intuitive.

17   **Q.**   And when did your work on the Extended Use Program begin?

18   **A.**   So we started talking about it at the very tail end of

19   2018, beginning of 2019.

20   **Q.**   And how did the Extended Use Program or your involvement

21   in it come about?

22   **A.**   Sure.  So I managed core instruments sustaining

23   engineering team.  So over the course of -- from the initial

24   launch of the Xi instruments, I have a team of engineers that

25   were working to improve the reliability.  That reliability

DUQUE - DIRECT/ PARKER

 1  number was not great when we initially started, launched the Xi

 2  instruments.  It took years to get it down.

 3       So we got it down to a certain point.  Over the course of

 4  four or five years, we got to a failure rate that was getting

 5  to a sustainable low number, below two percent, that we felt

 6  good about.

 7       And we started to ask the question:  Can we take credit

 8  for all of the various improvements we've made over the years

 9  to see if we can achieve something more?

10  Q.  And once that question popped up and you decided to look

11  at qualifying extended uses, what happened next?

12  A.  Those had a lot of instruments already in test for various

13  minor changes.  We had been making all these incremental

14  changes all along.  So we had a lot of engineering test devices

15  that had already undergone some level of testing to qualify

16  those individual changes.

17       We ran through a series of engineering tests to accelerate

18  some of the testings to inform, you know, as confidence of

19  whether or not it was -- we can achieve something more than

20  ten.

21  Q.  And did you immediately jump in and start testing all of

22  the X and Xi EndoWrists at the same time?

23  A.  No.

24  Q.  Why not?

25  A.  The life testing is a pretty big undertaking.  It requires

1    a lot of resources.  And we wanted to start with the ones that

2    made the most sense.  And so we looked at our instrument

3    portfolio and we identified which ones would be -- would have

4    the best chance of improving their -- their lives.  And, also,

5    which would have the most impact.

6    Q.    And what do you mean when you say "which ones would have

7    the most impact"?

8    A.    Sure.  We were looking at the instruments that were most

9    highly used.  What were the most popular instruments that our

10   customers were use using.

11   Q.    And why prioritize those instruments for extended life

12   testing?

13   A.    Resources investment is huge.  We want to -- as always,

14   want to have the most impact.  So if we're starting with the

15   most popular instruments that are used, that would have the

16   most impact to our customers.

17   Q.    What happened after you ran that engineering testing that

18   you were telling us about?  What was the next step in the

19   process?

20   A.    So we started to get an idea of what could be achieved,

21   gaining confidence.  Some instruments were better than others.

22   And so we started to -- we had enough data to be able to

23   present that and, more broadly across the organization, to

24   pitch it as an official project.

25   Q.    And did there come a time in the Extended Use Program

DUQUE - DIRECT/ PARKER

 1  testing that you did formal verification and validation

 2  testing?

 3  **A.**   Yes.

 4  **Q.**   And can you describe for us what that testing looked like?

 5  **A.**   So with the Weibull calculation and, you know, in order

 6  to -- for efficiency, we set on a sample size of 22, at least

 7  22 instruments.  That gives us good -- it optimizes the

 8  duration of test.

 9       We had to build up test units.  We had to update our

10  protocols so that they were allowing for testing through

11  failure.

12       So we had to go through the process of writing up a test

13  plan, the respective protocols, including the reliability

14  protocol.

15       And then we had to do the resource management.  So how

16  long does it take to test 22 instruments?  And we had to test

17  each of the instruments that were candidates for this EUP

18  program.

19       Twenty-two samples, it takes -- at best, you can do three

20  instruments on a system at a time.  So you need to have

21  multiple systems, you have to have multiple technicians that

22  have to be trained to the protocol.  And in addition to that,

23  you have to account for the reprocessing steps.

24       So within the protocols, we're trying to identify typical

25  worst case.  And so we'll have a reprocessing protocol.  That

**DUQUE - DIRECT/ PARKER**

1    reprocessing step takes over three hours.  And so it takes a

2    long time.

3         So at best you're getting, at most, one cycle a day on

4    each of these instrument sets.  So just to capture all that,

5    it's six, eight, ten weeks to do each instrument.

6    **Q.**   And you mentioned earlier that leading into the Extended

7    Use Program, you had done a lot of improvements or changes to

8    the X/Xi EndoWrist.  Do you recall that?

9    **A.**   I do.

10   **Q.**   Even after all of those improvements that you had made,

11   were there any EndoWrists where you had to make additional

12   changes before they entered into extended use testing?

13   **A.**   Yes.  So the original premise behind the EUP program was

14   let's take advantage of all the instrument improvements, design

15   improvements, manufacturing improvements that we've done over

16   the years and just test them as they are.

17        We were, thankfully, able to do that with five of the

18   instruments.  But there was one particular instrument that we

19   knew from our engineering bench-top testing and from previous

20   testing that we've done to qualify, you know, various other

21   changes, that it was just barely meeting ten.

22   **Q.**   And what did you have to do to that instrument before it

23   entered extended use testing?

24   **A.**   We had to make a significant design change, and it was a

25   change to the -- the cables themselves.

DUQUE - DIRECT/ PARKER

1  Q.   You talked about extended use testing for X and Xi

2  EndoWrists.

3      Were any steps taken as part of the Extended Use Program

4  to qualify S and Si EndoWrists for extended lives?

5  A.   No.

6  Q.   Why not?

7  A.   We were in new territory.  You know, we -- we hadn't

8  really tested to this level of rigor beyond ten.  So the

9  testing that we were doing for EUP program had to be done

10  uniquely for each instrument.

11     We chose the X/Xi platform and the specific instruments

12  for that initial set because they had the largest impact.  They

13  were the most popular instruments at the time.

14  Q.   Mr. Duque, I'll represent to you that the jury has heard

15  some testimony in the case that at times, Intuitive would

16  determine that testing performed on X and Xi EndoWrists could

17  be used and counted for S and Si EndoWrists.

18     Are you generally familiar with those kind of situations?

19  A.   I am.

20  Q.   And why then, when it came to testing extended lives,

21  could the testing on X/Xi EndoWrists not just be ported over

22  and used for the older generation EndoWrists?

23  A.   Sure.  We write justifications.  I talked about the amount

24  of resources that's required to go through reliability testing.

25  It's significant.

DUQUE - DIRECT/ PARKER

1          And so we're always looking at optimizing, you know, the

2     results of that testing to be applied to as many products as

3     possible.  So we -- we write justifications in that so that we

4     can gain the most out of this amount of work.

5          I've written those justifications myself.  Teams that

6     report to me, we've written those justifications.  But it has

7     to be done case by case.  It depends on the changes that we're

8     making.

9          So when we're assessing a design change, a component

10    change or a pulley change or even a cable change, we'll have to

11    go through that specific scope of the design change and assess

12    whether or not it makes sense that testing on one platform is

13    still applicable to the other.

14         In the case of comparing X/Xi instruments to the S/Si

15    instruments, as we just kind of walked through, there are

16    significant differences in terms of the back-end assembly, the

17    entire make-up of the instrument that didn't make sense.  We

18    couldn't make that assessment to say that one justifies or is

19    applicable to the other.

20    **Q.**   And, sir, did there come a time that Intuitive released

21    X/Xi EndoWrists with extended lives?

22    **A.**   Yes.

23    **Q.**   And when was that?

24    **A.**   That was in 2020.

25              **MS. PARKER:**  Your Honor, if I may have just one

DUQUE - DIRECT/ PARKER

```
 1   moment?  Thank you.
 2        (Discussion held off the record between defense
 3        counsel.)
 4        MS. PARKER:  Your Honor, may we have just a
 5   five-minute break really before we tender the witness?
 6        THE COURT:  It's a good time.
 7        Members of the jury, I'll remind you to please not begin
 8   discussing the merits of this case yet.  Do not do any
 9   research, do not chat with anyone; and if anyone tries to talk
10   with you about the case, please let us know.
11        All rise for the jury, please.
12        And we'll come back at -- let's call it 9:40.
13        (Jury exits the courtroom at 9:28 a.m.)
14        THE COURT:  Mr. Duque, you're welcome to take a break,
15   if you like to.
16        (Witness steps down.)
17        Counsel, a couple quick things.
18        THE COURT:  Mr. Van Hoven, yesterday's submission you
19   emailed to my Courtroom Deputy, please put it on the docket.
20        Actually, that might be it for right now.  I will see you
21   all at 9:40.
22        (Whereupon there was a recess in the proceedings
23        from 9:20 a.m. until 9:41 a.m.)
24        THE COURT:  Ms. Parker, continue if you have anything
25   else.
```

1           MS. PARKER:  No further questions, Your Honor.  We

2    will tender the witness.

3           THE COURT:  Thank you.

4           MS. PARKER:  Your Honor, we have been handed a series

5    of redactions that was never cleared with us.  If counsel

6    attempts to use these, we object.

7           THE COURT:  Get started, Mr. Van Hoven.  Let's see

8    where we get.

9        Mr. Van Hoven, before you start, can I ask, are those

10   redactions in this set?

11          MR. VAN HOVEN:  I don't have a set for you right now.

12   It's one line on each of two documents, and it's highlighted.

13          THE COURT:  All right.  Well, let's see where we get.

14       Go ahead.

15                       **CROSS-EXAMINATION**

16   BY MR. VAN HOVEN:

17   Q.   Good morning Mr. Duque.

18   A.   Good morning.

19   Q.   My name is Joshua Van Hoven.  I'm counsel for the

20   plaintiff SIS.

21       You have a great deal of familiarity with EndoWrist

22   instruments through your 20 years at Intuitive; right?

23   A.   I do.

24   Q.   I have what's previously been admitted as Trial

25   Exhibit 1644.001 and Trial Exhibit 1644.003.

1          **MR. VAN HOVEN:**  May I approach the witness and hand

2    these to him?

3          **THE COURT:**  You may.

4      (Whereupon documents were tendered to the witness.)

5    **BY MR. VAN HOVEN:**

6    **Q.**   You spoke a bit this morning about the proximal housing of

7    the EndoWrist instruments; right?

8    **A.**   The back-end housing.

9    **Q.**   Or back-end housing, also called proximal sometimes?

10   **A.**   The proximal end of the instrument, yes.

11   **Q.**   Could you show us where that proximal housing is on the

12   EndoWrist instrument?

13   **A.**   We're looking at the back-end of the instrument.  This

14   light gray is the housing.

15   **Q.**   And I will use back-end for that from now on out.  Sorry

16   about that.

17       What are the approximate dimensions of the back-end

18   housing?

19   **A.**   1.75 in one direction, and then roughly three and a half

20   inches, looking at it kind of in a -- this view.  And the

21   overall height of it is between two and a half and

22   three inches.

23   **Q.**   And, sorry, what was the length?  The length, that was

24   what?

25   **A.**   The length this way?

DUQUE - CROSS / VAN HOVEN

1   Q.   Yes.

2   A.   Approximately three and a half inches.

3   Q.   And where do the -- and that's where the cables -- there

4   are cables housed in that back-end housing; right?

5   A.   Correct.

6   Q.   And those are crimped to a steel rod that's in the shaft?

7   A.   They are crimped.  A steel rod that we call a crimp in

8   itself.

9   Q.   Can you show us in the instrument where that crimp

10  happens?

11  A.   I can't without removing the housing.

12  Q.   Can you point to approximately where that would be?

13  A.   So there would be crimps aligned with the axis of each of

14  the input disks.  And here, and towards the top here, at each

15  of the three locations for the three back input disks.

16  Q.   And, sorry.  Are you talking about the connection to the

17  input disks or to the rods for each -- that attach to each of

18  the cables?

19  A.   I'm talking about the crimps at the end of each of the

20  cables.

21  Q.   And I'm asking about the crimp location between the cables

22  and the rods, where is that?

23  A.   I see.  That would be in the very root of the main tube

24  section.

25  Q.   At the very top of that tube; right?

DUQUE - CROSS / VAN HOVEN

1    A.    The top is how I have it oriented now, yes.

2    Q.    And then the cable also then -- the full extension of that

3    cable then is between that crimp at the top to the connection

4    to the disk in the housing; right?

5    A.    Sorry.  Can you state that one more time?

6    Q.    Yes.  So I'm just trying to understand the cable, the

7    cables, where those actually are.  It goes from that top point

8    that you pointed to to a location in the housing; correct?

9    A.    That's correct.

10   Q.    And can we go to the distal or tool end?

11         And you just spoke about cables this morning, right, at

12   the distal end?

13   A.    I did.

14   Q.    And there's also a crimp between those cables to the

15   stainless steel rod at the distal end?

16   A.    That's correct.

17   Q.    Could you show us where that crimp is?

18   A.    Right around this area here (indicating).

19   Q.    So the length of the cables at that distal end would be

20   between the crimp and that -- the connections to the pulleys at

21   the tool?

22   A.    Sorry.  I didn't understand your question.

23   Q.    I'm asking about the length of the cable from that

24   crimping point to the distal tool.  Is that about what it is,

25   what you're showing there?

DUQUE - CROSS / VAN HOVEN

1  A.    Yes.  I would say from their termination point at the

2  joint to the -- around, I'd say, an inch back from this metal

3  section here.

4  Q.   And so -- and is that about an inch pretty typical for

5  EndoWrist instruments at the distal end?

6  A.   It depends on the instrument.  So some instruments have

7  longer wrists than others.

8  Q.   What would be one of the longest ones?

9         MS. PARKER:  Objection.  Vague.  Specific as to

10  generation of product.

11        THE COURT:  Specify that, please.

12  BY MR. VAN HOVEN:

13  Q.   For an Si, what would be about the longest length of the

14  cable at the distal end of the tool that you're aware of?

15  A.   Not more than two inches.

16  Q.   And what is that in centimeters?

17  A.   About five centimeters.

18  Q.   That's a lot less than ten; right?

19        MS. PARKER:  Objection.  Vague.

20        THE COURT:  Overruled.

21     Can you please answer that question, Mr. Duque.

22  A.   Five is half of ten.

23  BY MR. VAN HOVEN:

24  Q.   It's a lot less than 30, isn't it?

25  A.   It's less than 30, yes.

DUQUE - CROSS / VAN HOVEN

1    Q.    Quite a bit less, isn't it?

2    A.    Depends on what we're talking about.

3          THE COURT:  Sustained.

4    Keep going.

5    BY MR. VAN HOVEN:

6    Q.    I'd like to go back now to the -- the proximal -- or the

7    back-end.

8          And these instruments have to be interchanged during

9    surgery at times; right?

10   A.    That's correct.

11   Q.    And so they are designed to have, essentially, similar or

12   identical dimensions within the back-end housing?

13   A.    That's correct.

14   Q.    And so of those -- what is the approximate length of those

15   cables within the back-end housing within an Si instrument?

16   A.    It's different for each joint, because the cables are --

17   basically from that point they bend around a 90-degree bend, at

18   this section here (indicating).  And then they are moving to

19   each of the respective locations.

20         So these input disks have a longer length of cable than

21   this input disk, for example.

22   Q.    On the Si what's, approximately, the longest cable?

23   A.    Approximately two and a half inches.

24   Q.    What would that be in centimeters?

25   A.    So two and a half times 2.54.  So that would be six and

1    three quarters, about.

2    **Q.**    Thank you.  I had to look that up.  I've forgotten my

3    engineering training over time, but 2.54.  Good to know.

4              **MR. VAN HOVEN:**  Could we bring up defendant's

5    demonstratives 5.6?

6         (Document displayed.)

7              **MR. VAN HOVEN:**  Could we focus at the top -- I'm

8    sorry, at the items labeled "Yaw Input"?

9    **BY MR. VAN HOVEN:**

10   **Q.**   And what that's showing, on the left, are those the yaw

11   input disks for the Si instruments?

12   **A.**   That's correct.

13   **Q.**   And at the right, those are yaw input disks for Xi

14   instruments; right?

15   **A.**   That's correct.

16             **MR. VAN HOVEN:**  Can we go to Slide 5.6.

17        I'm sorry, 5.5.

18        And on the left side image, could you zoom in on the back

19   two items?

20        (Document displayed)

21   **BY MR. VAN HOVEN:**

22   **Q.**   And what we're seeing there on the left, those are the

23   yaw -- that's the yaw input on an Si instrument; is that right?

24   **A.**   That's correct.

25             **MR. VAN HOVEN:**  And if you could zoom in to the -- to

 1   the item next to the yellow shaft.

 2        Go up a little bit.  Yeah, there you go.

 3        (Document enlarged)

 4   BY MR. VAN HOVEN:

 5   Q.   If you look at that image, there is kind of a yellow tube

 6   coming in, and then those are -- there are two -- what are the

 7   two items just to the right of the yellow shaft?

 8   A.   Sorry?

 9   Q.   Yeah.  So there's a yellow tube coming in from the upper

10   left and then there are the cyan wires; right?

11   A.   Yeah, cables are cyan in color, yes.

12   Q.   And those are -- those are coupling to pulleys, right,

13   before they go to into the -- into that tube; right?

14   A.   That's correct.

15   Q.   And the pulleys that you're talking about, those are the

16   two items at the exit to that tube?

17   A.   Those -- that bank of pulleys we call the back-end idler

18   pulleys.

19   Q.   And when you're talking about cables and pulleys in the

20   proximal housing or the back-end housing, this is what you're

21   talking about; right?

22   A.   Correct.

23        MR. VAN HOVEN:  Could we on 5.5 go to the right side

24   image?

25        (Document displayed.)

**DUQUE - CROSS / VAN HOVEN**

1  **BY MR. VAN HOVEN:**

2  **Q.**   The top two, I guess, bluish-colored items, those are

3  where the -- those correspond to the yaw inputs of an Xi

4  instrument; is that right?

5  **A.**   Bluish color?  I question.

6  **Q.**   Bluish greenish color.

7  **A.**   Yes.  The two on the topmost, as this picture is oriented,

8  those are the yaw inputs, correct.

9  **Q.**   And are there red cables that extend towards sort of a

10  green-colored input point?

11  **A.**   That's correct.

12  **Q.**   And it's sort of hard to see, but that green item, is that

13  a pulley?

14  **A.**   Green items on the sort of -- I can't point.  On the left

15  side -- yeah, thank you -- those are what we call -- on the

16  X/Xi, those are the back-end idler pulleys.

17  **Q.**   When you're talking about cables and pulleys in the

18  back-end housing for the yaw input of an Xi instrument, this is

19  what you're talking about; right?

20  **A.**   Well, there are different pulleys.  So we have idler

21  pulleys.  We have pulleys that are part of the cap stands.

22  **Q.**   And the cap stands are what is -- what are under the green

23  highlighted items; right?

24  **A.**   The cap stands are part of the input disks.

25  **Q.**   And those pulleys and wires, or cables, those are what

DUQUE - CROSS / VAN HOVEN

1  you're talking about when you're talking about the pulleys and

2  cables in the back-end housing of an Xi instrument?

3  A.   When I talk about pulleys in the back-end, we have idler

4  pulleys, which are the green pulleys that they are making that

5  bend on the left side, the pulleys that are part of the input

6  disks, and then there are clamping pulleys which are the light

7  green components at the top of each input disk.

8  Q.   And those items you just enumerated, those are what you're

9  talking about when you're talking about cables and pulleys in

10  the back-end housing of the -- of an Xi instrument; correct?

11  A.   That's correct.

12        MR. VAN HOVEN:  Could we go back to 5.6?  And on the

13  right side, could we focus on what's labeled "Fifth Input"?

14     (Document displayed.)

15  BY MR. VAN HOVEN:

16  Q.   This is the fifth -- this is the fifth input of an XI

17  instrument; correct?

18  A.   That's correct.

19  Q.   And there was no fifth input on Si instruments, was there?

20  A.   That's correct.

21  Q.   And this is something that you described as a major change

22  during your testimony today; right?

23  A.   That's correct.

24        MR. VAN HOVEN:  Could we go back to 5.5 and focus on

25  the lower right, the lower green gear?

1          (Document displayed.)

2     **BY MR. VAN HOVEN:**

3     **Q.**    Is that green gear what corresponds to the fifth input?

4     **A.**    No, it does not.

5     **Q.**    That's the roll, isn't it?

6     **A.**    That's the roll axis, correct.

7              **MR. VAN HOVEN:**  Could we go to the left of that, to

8     the opposite, other side of the instrument?

9          (Document displayed.)

10    **BY MR. VAN HOVEN:**

11    **Q.**    So is the fifth input depicted here?

12    **A.**    You are looking at the -- that's the top of that

13    particular input, yes.

14    **Q.**    The thing that's highlighted in blue?

15    **A.**    Yes.

16    **Q.**    That doesn't connect to any cables here, does it?

17    **A.**    No, it does not.

18    **Q.**    It does not connect to any pulleys here, does it?

19    **A.**    Correct.

20              **MR. VAN HOVEN:**  Can we publish 573-R, which has been

21    previously admitted?

22              **THE COURT:**  You may.

23              **MS. PARKER:**  It's in evidence.  I just want to make

24    sure the witness is directed to a hard copy of the document.

25          (Document displayed.)

DUQUE - CROSS / VAN HOVEN

1  BY MR. VAN HOVEN:

2  Q.    You would have one.  It's either in the folders -- I think

3  it's in the folders there actually.

4  A.    The binder?

5  Q.    Not the binder.  I think it's in the folders.

6         THE COURT:  It's second from the end.

7         THE WITNESS:  Second from the end.

8  BY MR. VAN HOVEN:

9  Q.    Mr. Duque, you have been working with Si instruments for

10  over 15 years; right?

11  A.    My full tenure at Intuitive.

12  Q.    And when did you begin work related to Xi instruments?

13  A.    So Xi instruments were released with the Xi platform in

14  2014.

15  Q.    And did you work with Xi instruments prior to 2014?

16  A.    I was part of an engineering staff that was working on

17  S/Si instruments specifically, but we were at -- colleagues and

18  we were involved with some of the reviews of that program.

19  Q.    And this document is an IS4000 8-millimeter base

20  instruments CDR.  Do you see that?

21  A.    I do.

22  Q.    Is IS4000 referring to Xi?

23  A.    It does.

24  Q.    And a CDR is a critical design review; right?

25  A.    That's correct.

DUQUE - CROSS / VAN HOVEN

1          MR. VAN HOVEN:  Could we go to Page 19 of this

2    document.

3          (Document displayed.)

4    BY MR. VAN HOVEN:

5    Q.   This document, this page of the document has a disk

6    highlighted in red; is that right?

7    A.   I see something that's highlighted --

8          MS. PARKER:  Sorry.  Counsel, just to be clear, my

9    copy is black and white, and I want to see if the witness's is

10   as well.

11         THE WITNESS:  Mine is black and white.

12   BY MR. VAN HOVEN:

13   Q.   On the screen, do you see something highlighted in red?

14   A.   On the screen, I see something else highlighted

15   differently, yes.

16   Q.   Would that be the fifth input that we have been talking

17   about?

18   A.   That's correct.

19   Q.   And that's an end-of-life indicator, isn't it?

20   A.   For this particular instrument, for our core instruments,

21   that's the input that is associated with the end-of-life

22   indicator.

23   Q.   And there is a motor that turns that end-of-life indicator

24   at some point in the arm?

25   A.   There's a motor pack.  So there's -- the motor pack has

```
 1   motors at each of the five input disks.
 2   Q.   And there's one that lines up with this end-of-life
 3   indicator that is the fifth input disk; right?
 4   A.   That's correct.
 5   Q.   And what that does is, when an instrument reaches the end
 6   of life, it turns that end-of-life indicator; right?
 7   A.   That's correct.
 8   Q.   And a red dot shows up on the side of the instrument?
 9   A.   That's correct.
10   Q.   And the reason for that is that users attempt to use an
11   expired instrument in one of eight procedures; right?
12   A.   Sorry.  Can you rephrase the question?
13   Q.   Sure.  I'm looking at the document describing the fifth
14   input disk.  That's the end-of-life indicator.  Do you see
15   that?
16   A.   I do.
17   Q.   At the bottom of the document, it states that [as read]:
18        "Users attempt to use an expired instrument in
19        one in eight procedures."
20        Is that right?
21   A.   That's what I read, yes.
22   Q.   And was that a problem that Intuitive recognized?
23        MS. PARKER:  Objection.  Vague as to time.
24        THE COURT:  Mr. Duque, do you understand the question?
25        THE WITNESS:  Can you rephrase the question, please?
```

1  BY MR. VAN HOVEN:

2  Q.    Yes.  Is that a problem that Intuitive recognized, users

3  attempting to use expired instruments?

4  A.    My understanding is that we want to eliminate wasted time

5  in the OR.  If a user attempts to use an expired instrument,

6  that's a waste of time.

7        If an instrument that's expired is reprocessed, that's

8  also a waste of time.

9        So in the context of using your time efficiently, it's

10  something that we recognize as a shortcoming, yes.

11  Q.    So Intuitive recognized that in one of eight procedures, a

12  hospital thought that an EndoWrist instrument was safe to use

13  in a surgery?

14        MS. PARKER:  Objection, misstates the document.

15        THE COURT:  Mr. Duque, can you answer the question?

16        THE WITNESS:  Can you state the question again?

17        MR. VAN HOVEN:  Do you mind reading back the question?

18    (Requested portion of record read.)

19        THE WITNESS:  So the part that I am having trouble

20  answering is the safe, the safe part of it.

21  BY MR. VAN HOVEN:

22  Q.    Do you think hospitals would put an EndoWrist instrument

23  that they thought was unsafe to use on and try to use them in a

24  procedure?

25  A.    No.

1          **MS. PARKER:**  Objection, calls for speculation and

2    foundation.

3          **THE COURT:**  Overruled.

4       Keep going, Mr. Van Hoven.

5    **BY MR. VAN HOVEN:**

6    **Q.**   You spoke a little bit about motors in EndoWrist

7    instruments.  In the instances of that fifth input, that motor

8    would just turn the end-of-life indicator; right?

9    **A.**   For this instrument, yes.

10   **Q.**   I would like to talk about the other four input disks for

11   a minute and their relation to those motors.

12   **A.**   Okay.

13   **Q.**   The motors are in the robot arms?

14   **A.**   Correct.

15   **Q.**   And they interface with the four functional input disks?

16   **A.**   They interface with all five of the input disks.

17   **Q.**   As to those four that are functional, they interface with

18   those; right?

19   **A.**   They interface with all five of the disks.

20   **Q.**   Are there separate motors for each disk?

21   **A.**   Yes.

22   **Q.**   And so for the motors, four separate motors that interface

23   with the four separate input disks, they apply a torque to

24   those input disks to cause the movements at the distal end;

25   right?

DUQUE - CROSS / VAN HOVEN

1  A.    That's correct.

2  Q.    And that torque corresponds to a current that's applied to

3  the motor; is that right?

4  A.    That's correct.

5  Q.    And that current data is something that Intuitive stores

6  in its system logs?

7  A.    That's correct.

8  Q.    And it's sampled at a sampling rate?

9  A.    That's correct.

10 Q.    And you, in fact, as an engineer who's worked at Intuitive

11 20 years, you utilize that data in your work, don't you?

12 A.    We use it during diagnostics for failure analysis, yes.

13 Q.    Yeah, and because that tells you what actually happened in

14 a procedure; right?

15 A.    Not exactly.

16 Q.    It tells you the forces that were applied during a

17 procedure; right?

18 A.    It gives us a picture of what forces were put through the

19 instrument, yes.

20 Q.    And that information -- it also tells you -- if you look

21 at it over the multiple lives, it tells you the entire history

22 of those forces; right?

23 A.    If we have all that data, yes, it would give you a history

24 of all the torques and displacement.

25 Q.    And you actually use that data to look at the history of

1    instruments in your work; don't you?

2    A.    Case by case.  For failure analysis, when we're looking at

3    a returned instrument, we do utilize that data.

4    Q.    The use counter doesn't use any of that data, does it?

5    A.    Sorry.  Can you restate the question?

6    Q.    Yes, the use counter doesn't incorporate any of that data

7    or information, does it?

8    A.    The use counter -- I apologize.  I'm not understanding.

9    Please restate the question again.

10   Q.    Does the torque data get incorporated into the changing of

11   lives in a use counter in any manner?

12   A.    No, it does not.

13   Q.    And let's talk briefly about what the use counter does do.

14   Does a use counter count down when the instrument goes into

15   following mode?

16   A.    So there's a point at which we count a use.  And, yes,

17   what you're stating is -- when an instrument is installed, the

18   use isn't decremented until it goes into following.

19   Q.    And following means that the instrument is inserted onto

20   the robot.  That's -- well, it has to be inserted onto the

21   robot to go into following; right?

22   A.    More than that.

23   Q.    But that's one step.  It at least has to be on the robot?

24   A.    It at least has to be engaged on the robot arm.

25   Q.    And then the robot arm makes a movement?

1    **A.**    No.  In order for the instrument to go into following, the

2    patient-side assistant has to insert the instrument through the

3    tip of the cannula.

4    **Q.**    Is that the top tip of the cannula or the bottom or all

5    the way through the cannula?

6    **A.**    The tip, meaning what's inside the body wall of the

7    patient.

8    **Q.**    So once it's through the cannula into the patient, that's

9    another step before use count is decremented; right?

10    **A.**    That's correct.

11    **Q.**    And then the surgeon has to make a movement?

12    **A.**    So the instrument tip has to be inserted through the tip

13    of the cannula to a certain point where it aligns with the

14    previous position of the instrument that was installed before

15    that.

16          The surgeon -- at the surgeon's console, they don't go

17    into following until they go through a series of movements of

18    the masters.  And that initiates the instrument to go into that

19    following mode.

20    **Q.**    So once the surgeon goes through the series of movements

21    after it's been inserted, that's when a use count is

22    decremented; correct?

23    **A.**    That's correct.

24          **MR. VAN HOVEN:**  Could we bring up 622?

25          And could you also scroll to the next page?  Then back to

DUQUE - CROSS / VAN HOVEN

```
 1    the first page?
 2         (Document displayed.)
 3    BY MR. VAN HOVEN:
 4    Q.    These are manufacturing process instructions that
 5    Intuitive uses for Si instruments; correct?
 6    A.    That's correct.
 7    Q.    And these are the exemplar of the instruments that have
 8    been used through the life of the Si instruments; is that
 9    correct?
10    A.    This is representative of that, yes.
11    Q.    And how long is this document?
12    A.    How long?
13    Q.    Yeah.  How many pages?
14    A.    This is Page 1 of 2, so it's two pages.
15    Q.    And Intuitive thinks this is adequate to train its
16    assembly technicians; correct?
17    A.    Not by itself.
18    Q.    But did you say you use it to train assembly technicians?
19    A.    It's used in the training of assembly technicians.  But in
20    addition to that, we have specific tech trainers that are
21    trained to train others.
22    Q.    But this is what you put on the manufacturing floor;
23    right?
24    A.    It's on the manufacturing floor in addition to other --
25    other documents.
```

1    Q.   And this is the document -- and as you described it, this

2    document is used to define the manufacturing assembly process

3    for tensioning of cables and Si instruments?

4    A.   It's part of it, yes.

5    Q.   And you described this as being a manual process; correct?

6    A.   That's correct.

7    Q.   And Si instruments were made at least since 2008?

8    A.   That's correct.

9    Q.   And into the 2020s?

10   A.   Into the 2020s, yes.

11   Q.   And during that entire time, that was a manual process;

12   correct?

13   A.   That's correct.

14   Q.   And you were talking about a tensioning tool; do you

15   remember that?

16   A.   I do.

17   Q.   And you described, made an analogy to kind of a lug nut on

18   a tire?

19   A.   I was comparing it to a torque wrench.

20   Q.   Torque wrench for a -- yeah.

21   A.   That's correct.

22   Q.   And this tool, it's a physical tool.  You attach it to

23   the -- to the pulley -- I'm sorry, to the disk location?

24   A.   The tensioning tool, there's a feature on each of the

25   clamping pulleys on the Si instruments that accepts the tip of

1  the tensioning tool.

2  **Q.**   So sort of like a torque wrench would accept a lug nut on

3  a tire?

4  **A.**   A little bit different, but yes.   There's a -- a mating

5  feature.

6  **Q.**   And then the tool is pulled by a person?

7  **A.**   The tool is rotated.

8  **Q.**   By a person?

9  **A.**   Correct.

10  **Q.**   Did Intuitive think that using a manual process for cable

11  tensioning for the Si instruments was unsafe?

12  **A.**   No.   We go through an equipment validation tooling

13  qualification process that we use to validate what we're

14  intending to do.

15       So with that qualification process, we'll go through a

16  series of tests, testing that kind of the streams of the

17  process to account for variation in the assembly or the tools

18  itself.   And then go through a rigorous study to make sure that

19  we are ensuring the right amount of tension is applied.

20  **Q.**   So you didn't think that using this manual process for

21  over a decade was unsafe, did you?

22  **A.**   No.

23  **Q.**   And you didn't think that using this manual process for

24  over a decade would cause any harm to patients, did you?

25  **A.**   Not at all.

1   **Q.**   And hundreds of thousands, if not millions, of instruments

2   would have been tensioned using this manual process described

3   in these two-page instructions; correct?

4   **A.**   That's correct.

5   **Q.**   You were asked some questions about Intuitive's life

6   testing today; right?

7   **A.**   Yes.

8            **MR. VAN HOVEN:**   Can you bring up Trial Exhibit 574?

9        I'll try to find it, too.

10       (Brief pause.)

11           **MR. VAN HOVEN:**   I may not have it in our binder, but

12   it was one of their exhibits.

13           **THE COURT:**   I have it in your folder.

14           **MR. VAN HOVEN:**   Okay.   You do?

15           **MS. PARKER:**   Mr. Van Hoven, I believe the witness

16   still has his direct binder in there, and it should be in there

17   as well.

18           **MR. VAN HOVEN:**   And I just -- it's the second-to-last

19   folder.

20       Do you have it?

21           **THE WITNESS:**   I found it.   It was on screen for a

22   moment.

23           **MR. VAN HOVEN:**   Yeah.   Can you get that back on the

24   screen?

25           **THE WITNESS:**   I have the hard copy in front of me.

1          **MR. VAN HOVEN:**  Can we go to Section 5 of "Scope."

2   And zoom in on the last paragraph.

3          (Document displayed.)

4   **BY MR. VAN HOVEN:**

5   **Q.**    And you discussed Weibull analysis this morning; right?

6   **A.**    That's correct.

7   **Q.**    And the 90/90 reliability and confidence and a beta of

8   five in the first sentence, those are parameters for the

9   Weibull analysis?

10  **A.**    For this particular protocol, yes.

11  **Q.**    And then the next sentence [as read]:

12          "The test plan provides a projected number of

13          human uses for this test article of ten."

14          Do you see that?

15  **A.**    I do.

16  **Q.**    The final part of that sentence says [as read]:

17          "Requiring completion of 15 life cycles."

18          Right?

19  **A.**    That's correct.

20  **Q.**    For this particular test, in order to meet the projected

21  number of human uses of ten, all of the instruments under test

22  would have to complete 15 life cycles; is that right?

23  **A.**    That's correct.

24  **Q.**    Let's say that the projected number of human uses was

25  higher than ten.  Would that number of 15 have to change?

1    **A.**    Yes.

2    **Q.**    How would it change?

3    **A.**    So the Weibull analysis, to reach that 90 percent

4    confidence, takes into account the test size, the sample size.

5    And that's four here.

6         So if you wanted to qualify a larger number or something

7    more than ten, the required completion cycles would go up as

8    well.

9    **Q.**    So you'd have to do a different test than what Intuitive

10   did here; right?

11   **A.**    Yes.

12   **Q.**    The next sentence starts with [as read]:

13        "The actual production number of human uses for

14        the test article."

15        Do you see that?

16   **A.**    I do.

17   **Q.**    What is an actual production number of human uses for the

18   test article?  What is that referring to?

19   **A.**    So production number of human uses for the test article,

20   the actual number, I'm reading it, I read that as what we

21   programmed the instruments with.

22   **Q.**    Are you aware of any instance where the actual production

23   number of human uses for the test article hasn't been the

24   projected number of ten?

25   **A.**    Yes.

DUQUE - CROSS / VAN HOVEN

1   Q.   That would be for the Extended Use Program?

2   A.   That's one example, yes.

3        MR. VAN HOVEN:  I'd like to go to -- and, actually,

4   this is one of the exhibits with the redaction, 572-R.

5        Any objection?

6        MS. PARKER:  572 is already admitted without

7   redaction.

8        MR. VAN HOVEN:  Can we bring up 572?

9        THE COURT:  Mr. Van Hoven, can you tell us, is it in a

10  folder or the binder?

11       MR. VAN HOVEN:  Yes, it's in the binder, 572.

12       THE COURT:  I've got it.

13       Do you have it?

14       THE WITNESS:  It's in the binder?  One of the white

15  binders?

16       THE COURT:  Take mine.

17       (Whereupon exhibit binder was tendered to the

18        witness.)

19       THE WITNESS:  Thank you.

20       MR. VAN HOVEN:  Can we zoom in on the top portion of

21  this document?

22       (Document displayed)

23  BY MR. VAN HOVEN:

24  Q.   Do you see that you were the approval person for design

25  engineering?

1  **A.**   That's correct.

2  **Q.**   And just go back to the main document now.

3       The last document we were looking at, that was how the

4  tests are set up; correct?   That's the test procedure?

5  **A.**   The last document that we were looking at?

6  **Q.**   Yeah.   That was the test procedure?

7  **A.**   It was a full protocol.

8  **Q.**   And this is showing the results of one of those test

9  procedures; correct?

10          **MS. PARKER:**   Objection, mischaracterizes the document.

11          **THE COURT:**   Mr. Duque, can you answer Mr. Van Hoven's

12  question?

13          **THE WITNESS:**   Sure.

14       Can you ask the question one more time?

15  **BY MR. VAN HOVEN:**

16  **Q.**   Yes.   This is showing the results of the tests that were

17  performed according to some test protocol; correct?

18  **A.**   This is a report of -- which includes the results of

19  executing a protocol, yes.

20  **Q.**   So this is the output of performing one of those

21  protocols; is that fair?

22  **A.**   That's correct.

23          **MR. VAN HOVEN:**   Can we go to the "Test Summary"

24  section, number six, and focus on that last paragraph?

25

DUQUE - CROSS / VAN HOVEN

```
 1   BY MR. VAN HOVEN:
 2   Q.   Do you see that this in the third sentence discusses
 3   Weibull design of reliability analysis?
 4   A.   I see that, yes.
 5   Q.   And those would be the Weibull parameters that set the
 6   number of units you have to use to meet your target?
 7   A.   That's correct.
 8   Q.   And this is an example of where there's a target of ten
 9   lives; is that right?
10   A.   Yes.  We were -- this protocol is for a change to an
11   existing device that was already available.  And so we are
12   executing this protocol to ensure that we were still meeting
13   the existing device's requirements.
14   Q.   The ten that you had all along; right?
15   A.   Correct.  We're proving equivalence.
16   Q.   And so in here, there was a testing to 13 uses without
17   failures?
18   A.   I see that, yes.
19   Q.   And that's what you need to meet the ten; right?
20   A.   Correct.  Taking into account the sample size and the
21   target of 90 percent in confidence and reliability.
22        And I'll add that included in that Weibull statement is
23   that we are taking the beta of five.
24   Q.   And then once you met your target of ten, you didn't test
25   more than that; right?
```

1    **A.**   We were just proving equivalence to an existing product.

2    So we stopped testing there.

3    **Q.**   When you met your target of ten, you stopped testing?

4    **A.**   When we met our requisite confidence and reliability for

5    ten, yes.

6    **Q.**   You mentioned earlier that in 2001 the devices were very

7    new.  Do you remember that?

8    **A.**   I do.

9    **Q.**   And that's one reason that you thought ten uses was

10   appropriate at that time?

11   **A.**   The ten uses were preexisting to me, yes.

12   **Q.**   But that the devices were very new, that's one reason that

13   you thought ten uses was appropriate at that time; right?

14   **A.**   I thought the ten uses was a high bar, a challenge for me

15   and the team that I was on.

16   **Q.**   As of 2020, were Si devices new?

17   **A.**   No.

18   **Q.**   They were at least 12 years old; right?

19   **A.**   Si instruments were released -- Si instruments are S

20   instruments also.  So they would have been in existence since

21   2005.

22          **MR. VAN HOVEN:**  I'd like to bring up Trial

23   Exhibit 462.

24       Is there any objection?

25          **MS. PARKER:**  Can you please tell me which of the piles

1    that's in?

2              MR. VAN HOVEN:  Sure.  It's in this binder

3    (indicating), third -- I'm sorry, sixth tab.

4              MS. PARKER:  Are you seeking to admit 462-R?

5              MR. VAN HOVEN:  I'll get to this later.

6    A.   462?

7    BY MR. VAN HOVEN:

8    Q.   I'm sorry about that, Mr. Duque.  I had the wrong exhibit

9    there.

10        You talked a little bit this morning about informal

11   testing; is that right?

12   A.   That's correct.

13   Q.   And you talked about formal testing?

14   A.   That's correct.

15   Q.   At some point, you became aware of third-party instruments

16   that were changing the use counter; is that right?

17   A.   I became aware of some instruments that had been modified.

18   Q.   Changed the use counter?

19   A.   They are modified.  That's my initial impression of them.

20        But what actually happened, I don't know all of the

21   details to it, but they had been modified or changed.

22   Q.   And you knew that Intuitive was in possession of a number

23   of those instruments?

24   A.   That's correct.

25   Q.   But all you knew about them was through what you heard

1  through the RMA process; correct?

2  A.   Yeah, they came through the RMA process because they had

3  failed in some way.  And so they showed up with our FA team,

4  our failure analysis team, that were looking at the returned

5  instrument.

6  Q.   But that's the extent of your analysis, is what the RMA

7  team did?

8  A.   I was provided an instrument, so I did look at one

9  physically at the very beginning.  Then I had some pictures of

10  the instruments or samples of those instruments from the FA and

11  RMA teams.

12  Q.   The -- but you didn't perform any informal testing on

13  those instruments, did you?

14  A.   The instruments were -- came through the RMA loop so they

15  were already non-functional.  So I couldn't test them.

16  Q.   You didn't perform any testing; correct?

17  A.   I did not do any testing on them.

18  Q.   Are you -- so you talked about that RMA process.

19      Are you familiar with -- so you're familiar that

20  instruments come in from hospitals?

21  A.   I am.

22  Q.   And literally hundreds of thousands have come back to

23  Intuitive over the years; right?

24  A.   Cumulatively, yes.  Yes.

25  Q.   And are you aware there's a team at Intuitive that looks

1    at those instruments?

2            MS. PARKER:  Objection, scope, Your Honor.  The

3    witness wasn't asked about the RMA process on direct

4    examination.

5            THE COURT:  Sustained.  I think that's right,

6    Mr. Van Hoven.

7    BY MR. VAN HOVEN:

8    Q.   You spoke about the Extended Use Program this morning?

9    A.   That's correct.

10   Q.   The Extended Use Program was implemented on a subset of Xi

11   instruments; correct?

12   A.   That's correct.

13   Q.   It was not implemented on any Si instruments?

14   A.   That's correct.

15   Q.   The program started in 2019?

16   A.   That's correct.

17   Q.   That was about the same time that you became aware of

18   third-party modified instruments?

19   A.   Not -- not correct.

20   Q.   What's the relative timing between those events?

21   A.   I became aware of it several years before, 2016-ish.

22   Q.   And the Extended Use Program only came after that; right?

23   A.   We started discussing it in 2018.

24           MR. VAN HOVEN:  I believe there are no objections to

25   Trial Exhibit 282?

1          MS. PARKER:  No objection.

2          THE COURT:  It's admitted.

3      (Trial Exhibit 282 received in evidence)

4          THE COURT:  Would you like to publish it,

5   Mr. Van Hoven?

6          MR. VAN HOVEN:  Yes.  Can we publish 282?

7          THE COURT:  You may.

8          MS. PARKER:  I'm sorry, counsel.  Can you direct the

9   witness where to find his hard copy?

10      (Document displayed.)

11          MR. VAN HOVEN:  It's in the fifth tab of your binder,

12   of the larger binder.

13          THE WITNESS:  Thank you.

14          THE COURT:  Mr. Van Hoven, will Mr. Duque need the

15   EndoWrists again?

16          MR. VAN HOVEN:  No.

17          THE COURT:  Can we pass those back to you?  It will

18   give him a little more room up there.

19          THE WITNESS:  Thank you.

20      (Whereupon exhibits were returned to counsel.)

21   BY MR. VAN HOVEN:

22   Q.   Do you see the title of this, "Quality Review Board"?

23   A.   I do.

24   Q.   The Quality Review Board meets quarterly?

25   A.   That's correct.

```
 1  Q.   And they look at RMA and other data representing,
 2  essentially, the quality of the instruments?
 3  A.   Yeah.  RMA is one metric that we look at, yes.
 4           MR. VAN HOVEN:  Can we go to Slide 2 of this
 5  presentation and highlight the upper portion?
 6       Can we focus on the bottom or "X" axis of that?
 7       (Document displayed)
 8  BY MR. VAN HOVEN:
 9  Q.   So the "X" axis or the bottom of this slide is saying 2016
10  Q2 through 2018 Q4.  Do you see that?
11  A.   I do.
12  Q.   So that would be the time period that the RMA data -- or
13  that this is being considered for, that's being presented?
14  A.   For this graph I'll assume, yes.
15           MR. VAN HOVEN:  If we could look at the "Y" axis.
16       And can you make sure you show the language at the top as
17  well, above that axis?
18  BY MR. VAN HOVEN:
19  Q.   So this is a percentage of RMAs; is that right?
20  A.   This is the RMA rate.
21  Q.   Per procedure?
22  A.   That's correct.
23  Q.   So what percentage of procedures an Intuitive instrument
24  has a RMA?
25  A.   That's correct.
```

DUQUE - CROSS / VAN HOVEN

1    Q.   Or, as you described it, a failure that comes back to your

2    RMA team?

3    A.   That's correct.

4         MR. VAN HOVEN:  And could we go to the upper right?

5    There's some language that says "Model?"

6    BY MR. VAN HOVEN:

7    Q.   And it should be pretty clear.  But as we discussed this,

8    there is a green label for the da Vinci Si and a red label for

9    da Vinci Xi?

10   A.   I see that, yes.

11   Q.   And so when we look at this and we see a red plot, that

12   would show the number of failures of -- that come back to

13   Intuitive for da Vinci Xi?

14   A.   Well, we're talking about rates per procedure.

15   Q.   Yes.  But that's what we would see for Xi?

16   A.   For both Xi and Si.

17   Q.   The red -- but when we look at the plots, the red one will

18   be Xi; correct?

19   A.   That's correct.

20   Q.   The green one will be Si; correct?

21   A.   That's correct.

22        MR. VAN HOVEN:  Could we now show the plots?

23        (Document displayed)

24   BY MR. VAN HOVEN:

25   Q.   And you testified a minute ago that you started the

 1   Extended Use Program and looking into it in 2018?

 2   **A.**   We started talking about it at the end of 2018.  Not by

 3   coincidence, it coincided with reducing trend in our RMA rate.

 4   My team had been working on making improvements to the X/Xi

 5   platform over the course of several years, starting way back in

 6   2014.  And we were encouraged by the reduction in RMA rates.

 7        As you can see here, from 2017 Q2 to 2018 Q4, the -- there

 8   was a significant downward trend.  So we started to become more

 9   confident.

10   **Q.**   You testified a minute ago that you -- that Intuitive

11   started looking into the Extended Use Program in 2018; correct?

12   **A.**   We started talking about it in 2018, at the end of 2018.

13   **Q.**   And this has data all the way through the end of 2018;

14   correct?

15   **A.**   It does.

16   **Q.**   Does it appear that the Xi had a significantly higher

17   failure rate than the Si during this entire time period?

18             **MS. PARKER:**  Objection, form.

19             **THE COURT:**  Mr. Duque, do you understand that

20   question?

21             **THE WITNESS:**  I understand it as comparing the RMA

22   rate between X/Xi versus the S/Si.

23             **THE COURT:**  Overruled.

24        Please answer it.

25   **A.**   So there was a difference that X/Xi has more -- has a

1    higher RMA rate than the S/Si.  But as I was mentioning

2    earlier, the RMA rate for X/Xi was trending downward

3    significantly over the time period between 2017 and the end of

4    2018.

5    **BY MR. VAN HOVEN:**

6    **Q.**    And during that entire time period, it was significantly

7    higher than Si; right?

8    **A.**    It was higher, but reducing that difference.

9    **Q.**    It was getting closer to what Si had; right?

10   **A.**    That's correct.

11   **Q.**    And as you said, you were talking about the Extended Use

12   Program in late 2018.

13           **MR. VAN HOVEN:**  Could you bring up the box on the

14   right that shows 2018 Q4?

15      (Document displayed)

16   **BY MR. VAN HOVEN:**

17   **Q.**    And so this would have been the RMA data that you had

18   available to you when Intuitive was considering the Extended

19   Use Program in late 2018?

20   **A.**    We are tracking to a goal of being below 2 percent for

21   X/Xi.

22   **Q.**    This is the data you would have had available to you in

23   late 2018 when Intuitive was talking about the Extended Use

24   Program?

25   **A.**    This and other data, yes.

DUQUE - CROSS / VAN HOVEN

1   Q.   And this -- and as of 2018 Q4, that was 2.23 percent for

2   the X/Xi; right?

3   A.   That's correct.

4   Q.   1.37 for the S/Si; right?

5   A.   That's correct.

6   Q.   I want to do this preemptively.

7        Could you look at the second folder, Mr. Duque, of this

8   461?

9        (Witness complied.)

10       MR. VAN HOVEN:   I don't think this has been objected

11  to.

12       MS. PARKER:   No objection, Your Honor.

13       THE COURT:   Thank you.   It's admitted.

14       (Trial Exhibit 461 received in evidence).

15       MR. VAN HOVEN:   Publish the first page.

16       THE COURT:   Please do.

17       (Document displayed.)

18  BY MR. VAN HOVEN:

19  Q.   Do you see this as a da Vinci Si Instrument and Accessory

20  Catalog?

21  A.   I do.

22  Q.   From March of 2020?

23  A.   I do.

24  Q.   So this would have been at least a decade after Si

25  initially launched?

```
 1  A.   That's correct.

 2  Q.   It wasn't a new product then, was it?

 3  A.   No.

 4         MR. VAN HOVEN:  If we go to Page 2 and highlight on

 5  the left side the top two or three sets of...

 6  BY MR. VAN HOVEN:

 7  Q.   And so this is a catalog, and it's showing a variety of

 8  EndoWrist instruments; correct?

 9  A.   That's correct.

10  Q.   And about how many Si EndoWrist instruments were there as

11  of 2020?

12  A.   I don't know offhand.

13  Q.   More than 20?

14  A.   I'm actually not sure.

15  Q.   I guess let's just look at the instruments quickly, then.

16         MR. VAN HOVEN:  If we go to Page 3 of the document,

17  okay, show the top portion.

18         Page 4.  Okay.

19         (Document displayed)

20  BY MR. VAN HOVEN:

21  Q.   So these are -- these are examples of Si instruments that

22  were offered for sale by Intuitive as of 2020; right?

23  A.   That's correct.

24  Q.   And each of those had only ten uses?

25  A.   That's correct.
```

DUQUE - CROSS / VAN HOVEN

1  Q.   The same ten uses it had during its entire life from when

2  it was new to over a decade later?

3  A.   That's correct.

4  Q.   Could we go to the next set of EndoWrist instruments below

5  that?

6       These are EndoWrist instruments that Intuitive is offering

7  for sale in 2020; correct?

8  A.   That's correct.

9  Q.   Each of these has only ten uses available to it?

10 A.   That's correct.

11 Q.   And it's the same ten uses that it had from when it was

12 new in the 2000s to 2020; correct?

13 A.   That's correct.

14 Q.   And I prefer not to go through the rest of the catalog,

15 but can you confirm with me that at least most of the

16 instruments in there still have ten uses as their use limit?

17 A.   That's correct.

18      MR. VAN HOVEN:  I'd like to bring up Trial

19 Exhibit 650.

20      The binder, the larger binder.

21      MS. PARKER:  Sorry, counsel.  What number?

22      MR. VAN HOVEN:  650.

23      Any objection?

24      MS. PARKER:  No objection.

25      THE COURT:  It's admitted.

1          (Trial Exhibit 650 received in evidence).

2          **MR. VAN HOVEN:**  May we publish it?

3          **THE COURT:**  You may.

4          (Document displayed.)

5          **MR. VAN HOVEN:**  And I guess let's start at the

6    top-level email, sender, et cetera information.

7    **BY MR. VAN HOVEN:**

8    **Q.**   And do you see that this is an email chain between you,

9    Nicky Goodson, Disha Peswani, and Tim Limon?

10   **A.**   I do.

11   **Q.**   And you're discussing the Extended Use Program?

12   **A.**   That's correct.

13   **Q.**   As of this date, June 12, 2019, Intuitive is no longer

14   just talking about the Extended Use Program; they were working

15   on it?

16   **A.**   We are planning for execution of the testing for the EUP

17   program.

18   **Q.**   This is a little less than six months after the RMA data

19   that we were looking at from Q4 of 2018?

20   **A.**   That's correct.

21   **Q.**   We'll start working chronologically up the email chain.

22   I'd like to go to the bottom email from Bob DeSantis.

23        And you can see there that Bob DeSantis emails a number of

24   people, including you, and asks Disha [as read]:

25              "Can you provide an update on the Extended Core

1        Instrument Life Program?"

2        Do you see that?

3   **A.**   I do.

4   **Q.**   So Bob DeSantis was very interested in that program in

5   June of 2019; right?

6            **MS. PARKER:**   Objection.   Speculation.

7            **THE COURT:**   Sustained.

8   **BY MR. VAN HOVEN:**

9   **Q.**   What was Bob DeSantis' role at Intuitive as of June 2019?

10  **A.**   I'm reading it.   It says "GM and Senior V.P. for

11  Instruments and Accessories."

12  **Q.**   I guess as an GM and Senior V.P. of Instruments and

13  Accessories, what sort of -- what's his authority in the

14  organization, if you know?

15  **A.**   So all of instruments and accessories reported in to Bob

16  DeSantis, including the design engineering teams.

17  **Q.**   And sales?

18  **A.**   GM, I'll say that that's operational side and sales side

19  as well.

20  **Q.**   So Bob DeSantis was the guy in charge of the EndoWrist

21  business; right?

22  **A.**    Instruments and accessories, that includes EndoWrists,

23  yes.

24  **Q.**   If we go up to the next email in the chain from Disha

25  Peswani.   And you can see below she provides an update to

DUQUE - CROSS / VAN HOVEN

```
 1   Mr. DeSantis.  She says [as read]:
 2            "Below is the update on the Instrument Life
 3       Extension Project."
 4   A.   I see that, yes.
 5   Q.   I don't want to belabor every email in the chain.  So if
 6   we go up to the next one, Mr. DeSantis responds that he's
 7   interested in the overall project plan?
 8   A.   I see that, yes.
 9   Q.   He wants to know when these tasks will be complete?
10   A.   I see that, yes.
11   Q.   And he assumes we're running to failure and will
12   statistically back in what our life qualification is; right?
13   A.   Yes, that's correct.
14   Q.   You see that was the assumption of the person who was in
15   charge of the EndoWrist business?
16   A.   I do.  That's what I'm reading here, yes.
17   Q.   If we go up to the next email in the chain, this one from
18   Nicky Goodson addressing you.
19        In responding to Mr. DeSantis' email, assuming we're
20   running to failure and statistically backing in, does
21   Ms. Goodson say to you that [as read]:
22            "Prograsp will be mid to high twenties."
23   A.   I'm reading that is correct, yes.
24   Q.   And she also says that FBF and Cadiere will be early
25   twenties?
```

DUQUE - CROSS / VAN HOVEN

1    A.    I see that, yes.

2    Q.    And MSCND will be high teens?

3    A.    I see that, yes.

4    Q.    That's what she sent to you?

5    A.    That's correct.

6          MR. VAN HOVEN:  Can we go back up to the next email in

7    the chain?

8    BY MR. VAN HOVEN:

9    Q.    And here you're responding to Nicky's estimates; right?

10   A.    That's correct.

11   Q.    But before you do, Disha caught you in the aisle?

12   A.    Yes, I see that.

13   Q.    And so you gave numbers of cold graspers 15 lives; right?

14   A.    That's correct.

15   Q.    You gave numbers of bipolars 12 lives; right?

16   A.    Correct.

17   Q.    And you gave numbers of needle drivers 15 lives; right?

18   A.    That's correct.

19         MR. VAN HOVEN:  Can we go to the next email in the

20   chain?

21   BY MR. VAN HOVEN:

22   Q.    Here Nicky feels the need to clarify or confirm your

23   response; right?

24         MS. PARKER:  Objection, foundation.

25         THE COURT:  Overruled.

DUQUE - CROSS / VAN HOVEN

1    A.    Can you repeat the question, please?

2    BY MR. VAN HOVEN:

3    Q.    Yeah.  Here Nicky feels the need to clarify/confirm your

4    response; right?

5    A.    That's right.  I see that.

6    Q.    She says [as read]:

7             "I know how many lives we test for life testing,

8         but we typically don't get failures in life testing."

9         Right?

10    A.    I see that, yes.

11    Q.    Her clarification, she's asking [as read]:

12             "How many lives do we anticipate the instruments

13         completely failing?"

14         Right?

15    A.    Yes.  She's speaking in terms of -- Nicky Goodson was

16    responsible for the test engineers and the test technicians.

17    So she wanted to understand how much of our resources, how much

18    of our lab time would be required for projecting the schedule.

19    Q.    That's not what she said here, is it?

20    A.    She says -- she's stating [as read]:

21             "I'm asking how many lives do we anticipate the

22         instruments completely failing."

23    Q.    That's what she said; right?

24    A.    It is.

25    Q.    And then she asks you [as read]:

DUQUE - CROSS / VAN HOVEN

```
 1              "Are those the same numbers below?"

 2      Correct?

 3  A.    "Are those the same numbers below?"

 4      Yes.

 5              MR. VAN HOVEN:  And then let's go to the top email in

 6  the chain.

 7  BY MR. VAN HOVEN:

 8  Q.    In response to that question, you state that her original

 9  estimates were more likely?

10  A.    I state that, yes.

11  Q.    And for Prograsp and Cadiere, you expect mid-twenties?

12  A.    That's correct.

13  Q.    For MSCND, you expect low twenties?

14  A.    Correct.

15  Q.    And FBF and LND, you expect high teens?

16  A.    That's correct.  And this is for her project planning or

17  resource planning.  She was trying to understand how long it

18  would take for all of the test units to fail.

19          As I mentioned before, when we're doing life testing, they

20  don't all fail at once.  Some may fail early.  Some may fail

21  kind of in that middle.  And some may fail late.

22          And to answer her question for resource planning, I wanted

23  to cover if we tested all of the test units, all 22 or however

24  many test samples we were using, to test all of them, each of

25  them to failure, how far would they have to go?  How many
```

1    resources would they have to plan for.

2           MR. VAN HOVEN:  Can we go down to the email below?

3    BY MR. VAN HOVEN:

4    Q.    She didn't say any of that in this email, did she?

5    A.    She didn't say it, but I understood what her -- in the

6    context of what she's asking, I understood what she was needing

7    for her resource planning.

8    Q.    What she said was [as read]:

9              "We typically don't get failures in life

10        testing."

11         That's what she said; right?

12   A.    She's referring to previous life testing that we performed

13   prior to the EUP testing.

14   Q.    Yeah, for the 20 years of Intuitive's life testing; right?

15         MS. PARKER:  Objection.  Form.

16         THE COURT:  Sustained.

17         Mr. Van Hoven, if you're moving away from this email, I

18   might suggest this is a good time to take a break.

19         Members of the jury, we're going to come back at 11:05.  I

20   remind you not to discuss the case with anyone and not to do

21   any research.

22         All rise for the jury, please.

23         (Whereupon there was a recess in the proceedings

24          from 10:55 a.m. until 11:08 a.m.)

25         (Proceedings held in open court, outside

DUQUE - CROSS / VAN HOVEN

```
 1              the presence and hearing of the jury.)
 2         THE COURT:  Mr. Duque, can I ask you to step out,
 3    please.  I'm asking Mr. Duque to step out so I can chat with
 4    you all a little bit more about -- plan the rest of our day.
 5    We should probably have done that before, but I want to err on
 6    the side of caution at this point.
 7         (Witness steps out.)
 8         THE COURT:  All right.  So I figure we're getting the
 9    jury back in here at 11:15 or so.
10         We talked, Mr. McCaulley, about you having over lunch, but
11    I'm starting to -- I'm starting to think the way this is going,
12    you may not yet have had the testimony from -- from Dr. Smith.
13         So I just want to think about this so I can plan out when
14    to -- whether we are trying to stretch a little longer or --
15    yeah, where are we?
16         MR. VAN HOVEN:  As to Mr. Duque, there's not much
17    more.
18         THE COURT:  Okay.
19         MR. GALLO:  And the redirect is going to be very
20    short.  So Mr. Duque ought to be done very soon.
21         THE COURT:  Okay.  Thank you.
22         Maybe you all are just putting my mind at ease.  This
23    is -- it's probably too early to ask you, Mr. Gallo, and you
24    can, in fact, push off the question.  Have you made any
25    decisions about Dr. Howe?
```

DUQUE - CROSS / VAN HOVEN

```
1            MR. GALLO:  Yes.  We're not going to call Dr. Howe.

2   So Dr. Smith will go next.  And if he were on -- I think he's

3   an hour or less.  So if he goes on 11:20, 11:30 it should be no

4   problem.

5            THE COURT:  Sound good?

6            MR. McCAULLEY:  Sounds good.

7            THE COURT:  Thank you, both.

8       I wanted to figure out when and where I'm sending the --

9   not where, where in the break I'm sending the jury for lunch.

10      All right.  I'm going to go ahead and bring them back in.

11      Could someone please get Mr. Duque.

12      (Mr. Duque enters the courtroom.)

13      (Jury enters the courtroom at 11:12 a.m.)

14           THE COURT:  You may be seated.

15      The floor is yours, Mr. Van Hoven.

16  BY MR. VAN HOVEN:

17  Q.   Mr. Duque, I would like to ask you a few more questions

18  about the Extended Use Program, okay?

19  A.   Okay.

20  Q.   Sometime in fall of 2000, there was a switchover to

21  actually implementing extended use to customers?

22  A.   Sorry, fall of 2000?

23  Q.   Sorry, 2020.

24  A.   2020?

25  Q.   Yeah.
```

DUQUE - CROSS / VAN HOVEN

1    A.    Yes.

2    Q.    And at that point, as for those EndoWrist instruments, did

3    all instruments have the increased number of uses?

4              MS. PARKER:  Objection, form.

5              MR. VAN HOVEN:  That's a good objection.  I'll ask a

6    better question.

7    BY MR. VAN HOVEN:

8    Q.    As for new instruments that were sold after that

9    switchover time, as to those models that were within the

10   Extended Use Program, did they all have the increased number of

11   lives?

12   A.    The EUP portfolio, they had increased lives, but they were

13   different numbers for different families of instruments.

14   Q.    Right.  But you couldn't get a unit with the old number of

15   lives; is that right?

16   A.    I'm sorry?

17   Q.    You couldn't buy a new unit with the old number of lives

18   after that switchover?

19   A.    Eventually we moved all of our production over to the new

20   EUP program instruments.  But there was some transition time.

21   Q.    And you -- I think you noted that there was a select set

22   of instruments that were in the EUP program?

23   A.    That's correct.

24   Q.    Could you look at Exhibit 1407.  It's in the binder, I

25   think second one from the back.

DUQUE - CROSS / VAN HOVEN

1          MR. VAN HOVEN:  Any objection to 1407?

2          MS. PARKER:  Just a moment, please.

3      (Brief pause.)

4          MS. PARKER:  He needs to lay a foundation with this

5  witness with this particular document.

6  BY MR. VAN HOVEN:

7  Q.   Mr. Duque, have you seen a document like this before?

8          MS. PARKER:  Objection, form.  It should be:  Has he

9  seen this document before?

10  BY MR. VAN HOVEN:

11  Q.   Have you seen this document before, Mr. Duque?

12  A.   This looks familiar to me.

13  Q.   And is this the sort of document that you would consult

14  during your -- what you do in your job?

15  A.   I'm aware of the document.  I don't necessarily consult

16  or -- I don't author.  I'm not the owner of these types of

17  documents.

18  Q.   You're not -- you're not the owner of this document, but

19  this is a document you've seen?

20  A.   Something similar at least, yes.

21          MR. VAN HOVEN:  Move to admit Exhibit 1407.

22          MS. PARKER:  Your Honor, I don't think that

23  establishes foundation, that the witness has seen a similar

24  document but doesn't use it in the course of his job and hasn't

25  offered it.

DUQUE - CROSS / VAN HOVEN

1              **THE COURT:**  Do you have more to offer, Mr. Van Hoven,

2     on this?

3          I'll sustain it for now.  Do you have more to ask

4     Mr. Duque about this document to help?

5              **MR. VAN HOVEN:**  I was just hoping to discuss the

6     instruments, but I can discuss it without the document.

7     **BY MR. VAN HOVEN:**

8     **Q.**    Some of the instruments that -- as you said, only a

9     limited subset of the instruments received were in the EUP

10    program?

11    **A.**    That's correct.  The instruments that were tested or in

12    the scope of the testing.

13    **Q.**    Also, you can close that document so you're not referring

14    to it, because I don't -- because it's not admitted.  But the

15    rest of the instruments, those stayed with the ten lives that

16    were not in the EUP program?

17    **A.**    That's correct.

18    **Q.**    And were there price changes to the instruments that were

19    in the EUP program?

20    **A.**    The -- there were, yes.

21    **Q.**    And a number of those instruments, the prices increased;

22    correct?

23    **A.**    The cost-per-use was actually reduced.

24    **Q.**    But the cost that the hospital paid, that increased;

25    right?

DUQUE - CROSS / VAN HOVEN

1   A.   The cost of the individual instrument increased, but they

2   were rated for a higher number of lives.  So the result of that

3   was that the price-per-use was much lower.

4   Q.   And -- but the hospital, the price they paid went up on a

5   number of those instruments; right?

6   A.   For the individual units, yes.

7   Q.   And let's just talk about, as for example, Prograsp.  That

8   was an EUP instrument; right?

9   A.   That's correct.

10  Q.   And at some point, something in manufacturing changed from

11  when it was pre-EUP launch and post-EUP launch; right?

12  A.   That's correct.

13  Q.   What changed from pre-EUP launch to post-EUP launch, kind

14  of that short time period?

15  A.   So the EUP instruments, they had a different base number.

16  So we had to introduce them as a new SKU.

17       At the initial launch, we offered both the pre-existing

18  Prograsp, which had a 470 base point number, and then the EUP

19  version.  And they had to coexist.  So they had different part

20  numbers.

21       Because we had different part numbers as well as different

22  life numbers, what gets programmed on the RFID chips also

23  differed.  It had a different part number associated with it.

24  It had a different use rating programmed onto the RFID chip.

25  Q.   But those were the changes that were made pre-EUP launch

DUQUE - CROSS / VAN HOVEN

1    to post-EUP launch, in that time period; correct?

2    A.    That's correct.

3    Q.    But there are no design changes during that time period?

4    A.    Not for the Prograsp instrument.

5    Q.    But Intuitive did raise the price it charged to hospitals;

6    correct?

7    A.    Again, their price-per-use went down.  The price per the

8    individual SKU did go up.

9    Q.    So, but as far as that price change, the changes in that

10   time period were changing a part number and changing the use

11   count; right?

12   A.    Sorry.  Can you state that again?

13   Q.    Yeah.  During that time period, the changes were changing

14   the part number and changing the use count; correct?

15   A.    There are changes to what we program onto the instrument

16   based on the results of the EUP reliability testing.

17   Q.    And the price that hospitals paid increased after that;

18   right?

19   A.    Again, they pay a different price.  That increased for the

20   instrument.  But the instrument was rated for a higher life,

21   which results in lower cost per use.

22            MR. VAN HOVEN:  No further questions.

23            THE COURT:  Thank you, Mr. Van Hoven.

24            MS. PARKER:  I just have a few questions, Your Honor.

25            THE COURT:  By all means, Ms. Parker.

DUQUE - REDIRECT / PARKER

1          <u>**REDIRECT EXAMINATION**</u>

2  **BY MS. PARKER:**

3  **Q.**   Hello, Mr. Duque.

4  **A.**   Hello.

5  **Q.**   Mr. Duque, you were asked some questions by counsel, and

6  he showed you a chart about RMA data of S and Si instruments

7  versus X and Xi instruments.

8       Do you recall that?

9  **A.**   I do.

10 **Q.**   And you were asked some questions about how even though at

11 the late 2018 time frame the RMA numbers were higher for X and

12 Xi instruments, those are the ones that you pursued for

13 extended use.

14      Do you recall that?

15 **A.**   That's correct.

16 **Q.**   Why, if there was still a difference in RMA data, did your

17 team focus on X and Xi instruments for extended use?

18 **A.**   Sure.  So looking at that chart, the RMA rate was actually

19 reducing significantly.  And that was a result of all the

20 various changes that members of my team and others had been

21 implementing over the course of several years.

22      We are starting to see the fruits of our labor and we

23 could see that the trajectory was getting us down to the point

24 where we are at parity with the S/Si below two percent and even

25 lower.

DUQUE - REDIRECT / PARKER

1          The focus on EUP instruments on Xi instruments was because

2     we were trying to make the most impact.  And at the time, X/Xi

3     instruments, those were more in use.  There were more of those

4     that were being used on a daily basis.

5     Q.    And counsel was just asking you about some issues related

6     to cost of extended use instruments.

7          Do you recall that?

8     A.    I do.

9     Q.    And you said a number of times that the cost-per-use of

10    the extended use instruments went down.

11         Do you recall that?

12    A.    I do.

13    Q.    What do you mean by that?

14    A.    So the cost-per-use -- so as the example.  If an

15    instrument is rated for ten lives and it cost $2,000, the

16    cost-per-use would be $200.  So every time they use it, it cost

17    them $200.

18         When we increased the number of lives, we did increase the

19    per-unit cost; but the cost-per-use for Prograsp, as the

20    example, 18 divided by that higher number that we sold it for,

21    it was significantly less $200 per use.

22    Q.    And counsel asked you some questions about changes to

23    manufacturing for extended use products.

24         Do you recall that?

25    A.    I do.

DUQUE - REDIRECT / PARKER

1  Q.   And I think he asked you some questions about changing the

2  SKU and some data that was programmed on the chip.

3      Do you recall that?

4  A.   I do.

5  Q.   And if it were suggested that all that went into making

6  our extended use instruments was changing the SKU and changing

7  a little bit of data on the chip, would you agree or disagree

8  with that?

9  A.   I would disagree.

10 Q.   Why is that, sir?

11 A.   Again, I mean, that's only after all of the V&V testing

12 was completed.  We can't just sell a product with an arbitrary

13 number of uses.  We have to qualify it.

14     And so it's -- in order to get to that point where we can

15 reprogram them and sell them for a higher number of uses, we

16 have to do all of that V&V testing.

17 Q.   Sir, counsel asked you some questions about that --

18      MS. PARKER:   And, Mr. Lee, if we can put it on the

19 screen, Exhibit 622.

20     (Document displayed.)

21 BY MS. PARKER:

22 Q.   I think if you still have your smaller binder I gave you

23 at the beginning of the declaration, I think it's still in

24 there.

25     Mr. Duque, counsel asked you some questions about this

1   manufacturing process instruction document.

2        Do you recall that?

3   **A.**   I do.

4   **Q.**   And I just want to be clear, and I -- for the jury.  This

5   two-page document, is that the only instruction that we give

6   our technicians on how to tension our cables?

7   **A.**   No.

8   **Q.**   Can you just explain for a moment what other types of

9   instructions are given?

10  **A.**   Sure.  I mean, this is kind of a high-level cover.  We

11  have video of the manufacturing process that we use to train

12  our technicians.

13       The trainers are specifically trained to understand all of

14  the processes.  There's a lot here that is in the actual

15  process.  For example, six would say [as read]:

16            "Insert the cable tensioning tool into the

17            tensioning hole on the clamping pulley.  While holding

18            the tensioning tool in one hand, loosen both screws on

19            the pulley until the pulley turns freely on the input

20            shaft."

21       There is an actual sequence that has to take place.  It's

22  more than just what's written here.  And they learn that

23  through the trainer when they are using this tension tool,

24  there is a sequence that they have to maintain.

25       When they are rotating the tensioning tool, they actually

1    have to rotate it past the indicators.  And then slowly come

2    back down to the demarcations on the tension tool.  And that's

3    done purposefully, because you want to tension higher and then

4    reduce the tension to the calibration target.

5        If you did it the other way, there's some constructional

6    stretch in the cables that wouldn't be taken out.

7        We described the cables.  It's a makeup of over 200

8    individual filaments.  There's interstitial space in there, and

9    that interstitial space, that's causing stretch.

10       And so the reason why we tension higher and then come back

11   down is to kind of take out all of that space so that we can

12   tension it in a reliable and repeatable fashion.

13       Sorry.  That was a long example.

14   **Q.**  No, I appreciate it.  Thank you, sir.

15       Counsel asked you a few questions about a -- whether you

16   had seen any EndoWrists that had been hacked by third parties.

17       Do you recall that?

18   **A.**  I do.

19   **Q.**  And you mentioned, I believe, that you saw a device in

20   person as well as photographs; is that correct?

21   **A.**  That's correct.

22   **Q.**  And did you make any observations from the device that you

23   saw?

24   **A.**  Yes.

25   **Q.**  And what was your reaction when you saw that device?

DUQUE - REDIRECT / PARKER

1    A.    Well, immediately I can see that the RTI board had been

2    modified.  There was a couple wires that were soldered onto it

3    and then an additional printed circuit board that was installed

4    onto it.

5         And the way it was installed in the example that I saw, it

6    was right in the middle of a couple of the input disks, right

7    in the area where some cables were traveling back and forth.

8         So one of my immediate observations was that there's an

9    electrical safety risk.  There's a requirement that any

10   electrical component that could take a charge be a certain

11   distance away from anything that can extend down to the tip of

12   the instrument to ensure that we don't inadvertently shock

13   either the patient or the user.

14        So I knew already that we were encroaching on some

15   electrical safety requirements.

16        MS. PARKER:  Your Honor, I would seek to admit and

17   publish to the jury Exhibit 836.

18        Counsel, I don't have a hard copy.  It's a video.  It's

19   not objected to.

20        MR. VAN HOVEN:  What foundation does he have for this?

21        MS. PARKER:  Your Honor, the witness was asked

22   questions about whether he observed and tested certain returned

23   devices.  This is a video of the procedure that was used to

24   hack those devices.

25        It's not an objected-to video, and I'd like to ask the

 1  witness whether what he sees in that video is consistent with

 2  the concerns he just raised about the device he inspected.

 3          **MR. VAN HOVEN:**  This witness has no basis whatsoever

 4  to -- no background.  He has never -- yeah.

 5          **THE COURT:**  Overruled.  You can use the video.

 6          **MS. PARKER:**  Mr. Lee, if we could please pull up 836.

 7      (Videotape played in open court.)

 8  BY MS. PARKER:

 9  **Q.**   Mr. Duque, I will represent to you this was a video

10  produced in the case from Rebotix.  Can you please tell the

11  jury what you just observed in that video?

12  **A.**   Okay, yeah.  It looks like they removed the housing

13  forcibly.

14  **Q.**   And you talked to us a little earlier today about the

15  housing.  What's your reaction to what you just saw there?

16  **A.**   I mean, that's not supposed to happen.  The housings are

17  there to protect the inside of the instrument, protect those

18  cables.

19      Yeah, that's -- not happy about it.

20  **Q.**   Fair enough, sir.

21          **MS. PARKER:**  Mr. Lee, can we please play the next clip

22  from the video?

23  BY MS. PARKER:

24  **Q.**   And, Mr. Duque, if you could please watch your screen.

25      (Videotape played in open court.)

1   Q.   Mr. Duque, I'll represent to you that that's a drill being

2   used to drill a hole into the S and Si EndoWrists.

3       Can you tell us what your reaction is to seeing that part

4   of the video?

5   A.   Umm, yeah.  It's -- these instruments are near and dear to

6   me.  That -- that's pretty abusive to the instrument.

7   Q.   What do you mean by that?

8   A.   I mean, you're drilling into the housing or the chassis

9   top with a drill.  There's particulate that's being generated.

10  That particulate is getting all over the pulleys and cables.

11      Yeah, it looks like an engineering workbench.

12          MS. PARKER:  Mr. Lee, if we could please play the next

13  clip.

14      (Videotape played in open court.)

15  BY MS. PARKER:

16  Q.   Mr. Duque, I know it's a little hard to see in the video,

17  but do you recognize that green device there has the circuit

18  board for the S and Si EndoWrist?

19  A.   Yes, that's the RTI board.

20  Q.   And what you can observe in the video is that a dental

21  pick is being used to scrape the covering off that RTI board?

22  A.   I see that, yes.

23  Q.   What's your reaction to that?

24  A.   It's pretty aggressive.  Just the RTI board is in a vice

25  clamp.  It looks like they are vice clamping on the pogo pins,

DUQUE - REDIRECT / PARKER

1   which are moving components.  They are scraping away the

2   pyrroline coating, which is intended to encapsulate the PCA

3   board to help it withstand the autoclave steam sterilization

4   cycle.

5       Yeah.  I mean, when we're prototyping instruments and

6   doing things on an engineering workbench, we might do things

7   like this, but totally informal.

8   Q.   And, Mr. Duque, you were asked some questions on your

9   examination on whether you conducted testing on the devices

10  that were returned to Intuitive through the RMA process, the

11  hacked devices.

12      Do you recall that?

13  A.   I do.

14  Q.   And you said that you didn't do testing on those.  Can you

15  explain why not?

16  A.   Well, first of all, the instruments were already broken,

17  which is why they were coming through the RMA loop.  I don't

18  know if they were non-functional because of the cables being

19  broken or something else, but they came through the RMA loop

20  for a reason.

21      But, I mean, you asked me do I -- I don't know why I would

22  test this -- these instruments.  They had been adulterated.  I

23  don't know what the history is.  I don't know what was done to

24  them.  To me, it was just adulterated product.

25  Q.   And why would you need to know the history of an

1  instrument in order to conduct the type of testing that you

2  told us about earlier today?

3  **A.**    I mean, without knowing the history of what the instrument

4  went through, I mean, I don't know what conclusions you could

5  draw from any testing.  I didn't have the back history.  I

6  didn't know that it went through something like this.

7       If we want to derive any reasonable conclusions or results

8  out of any testing, I need to know what the back history -- I

9  need to know the pedigree of the components being tested.

10  **Q.**    Thank you, Mr. Duque.  I have no further questions.

11            **THE COURT:**  Mr. Van Hoven?

12                    **RECROSS EXAMINATION**

13  **BY MR. VAN HOVEN:**

14  **Q.**    Mr. Duque, just a couple quick questions.

15       You don't know what aspect of the process that video is

16  even depicting, do you?

17  **A.**    I have no idea, no.

18  **Q.**    And you have no idea the Rebotix manufacturing process is

19  supported by dozens of validation tests?

20  **A.**    I have no idea.

21  **Q.**    You have no idea if there are specific instructions for

22  their techs who perform their process?

23  **A.**    I'm entirely unfamiliar with anything that's done at

24  this -- the Rebotix process.

25  **Q.**    No further questions.

SMITH - DIRECT / MICHAEL

1           THE COURT:  Mr. Duque, thank you so much.  You're

2    excused.

3          (Witness excused.)

4           THE COURT:  Come on forward, Mr. Michael.

5           MR. MICHAEL:  Thank you, Your Honor.

6          Intuitive calls Dr. Loren Smith.

7           THE COURT:  I recommend this is a good moment to

8    stretch, if you'd like to.

9                            **LOREN SMITH**,

10   called as a witness for the defendant, having been duly sworn,

11   testified as follows:

12          THE WITNESS:  I do.

13          THE CLERK:  Please be seated.

14      And state and spell your full name for the record.

15          THE WITNESS:  It's Loren Smith, L-O-R-E-N.  S-M-I-T-H.

16          MR. MICHAEL:  Your Honor, may I approach the witness

17   to hand up a binder?

18          THE COURT:  You may.  Thank you.

19         (Whereupon exhibit binder was tendered to the

20          witness.)

21                     **DIRECT EXAMINATION**

22   BY MR. MICHAEL:

23   Q.  Good morning, Dr. Smith.

24   A.  Good morning.

25   Q.  Can you please introduce yourself to the jury.

1   **A.**   My name is Loren Smith.

2   **Q.**   And are you an economist by profession?

3   **A.**   I am.

4   **Q.**   Were you retained by Intuitive Surgical in this case to

5   provide expert economic analysis and opinions?

6   **A.**   I was.

7   **Q.**   And have you prepared some slides to help explain your

8   analysis and opinions to the jury?

9   **A.**   I did.

10   **Q.**   If you would take a look in the front of your notebook at

11   Tab 1, or it should be labeled Demonstratives.

12      Do you see a document that's been marked DDX-6 for

13   identification?

14   **A.**   I do.

15   **Q.**   And is that a copy of your demonstrative slides?

16   **A.**   It is.

17      **MR. MICHAEL:**  Your Honor, I request permission to

18   publish Dr. Smith's slides to the jury.

19      **MR. McCAULLEY:**  No objection.

20      **MR. MICHAEL:**  Thank you.

21   And, Mr. Lee, if you could bring up Slide 1, please.

22   (Document displayed.)

23   **BY MR. MICHAEL:**

24   **Q.**   Dr. Smith, what is your educational background?

25   **A.**   I have a PhD in economics from the University of Virginia.

 1    My training was in -- my primary fields of interest were

 2    industrial organization, which is the strategic interaction of

 3    firms, and econometrics, which is basically statistics applied

 4    to economic questions.

 5    **Q.**    And what did you do after earning your PhD?

 6    **A.**    I began my career in government service.  So I was a staff

 7    economist at the United States Federal Trade Commission.

 8    **Q.**    What is the United States Federal Trade Commission?

 9    **A.**    So the Federal Trade Commission and the Department of

10    Justice split authority for regulating antitrust matters.  So

11    prospective mergers, conduct matters involving single firms.

12        They share -- it's not clear exactly how it happened, but

13    they split it.  And it's normally a long, like, historical

14    industry expertise that is split, but they do very much the

15    same thing.

16    **Q.**    And what was your role as an economist at the Federal

17    Trade Commission?

18    **A.**    So a lot of the time I spent doing a lot -- doing the same

19    thing that I do today.  I mean, investigating antitrust

20    matters.  Potentially getting involved in litigations.

21        The Federal Trade Commission and the Department of Justice

22    do investigations.  And then sometimes they end up litigating

23    like this, but often matters are resolved before that point.

24    **Q.**    So you're no longer in the government.  You're in private

25    practice today; is that correct?

**SMITH - DIRECT / MICHAEL**

1   A.    Yeah.  I have been for a little more than a decade.

2   Q.    And is all of your work in private practice as an economic

3   consultant, does all of that involve representing private

4   companies?

5   A.    No.  I still from time to time, probably three, four times

6   a year, work for the Federal Trade Commission or the U.S.

7   Department of Justice as an outside expert.

8   Q.    So the antitrust agencies of the United States have sought

9   out your services as an expert economist since you left the

10  government; is that correct?

11  A.    That's right.  So they are busy agencies, and they --

12  particularly litigations require a fair bit of resources, and

13  so they often outsource that to outside agencies.

14  Q.    And when you're serving as an expert economist in

15  litigation for the Federal Trade Commission or the Department

16  of Justice, are you consulting on the plaintiff's side of the

17  case or the defendant's side of the case?

18  A.    So if they ultimately decide to bring a lawsuit, they are

19  typically the plaintiff in a -- challenging a horizontal merger

20  or challenging a certain type of conduct by a firm.

21  Q.    Now, you're being paid for the time that you've spent

22  working on this case; is that correct?

23  A.    Yes.

24  Q.    And does your compensation depend in any way on the

25  outcome of the case?

1    **A.**    It does not.

2    **Q.**    Let me ask you to turn to the next slide, please.

3              **MR. MICHAEL:**  And, Mr. Lee, if you could bring that

4    up.

5         (Document displayed.)

6    **BY MR. MICHAEL:**

7    **Q.**    Is there an overarching question that you set out to

8    analyze in this case, Dr. Smith?

9    **A.**    Yes.  So I was asked to investigate or evaluate whether

10   certain conduct by Intuitive that has been challenged by the

11   plaintiffs here, so contractual provisions that they have, are

12   causing anticompetitive harm or are, alternatively, bringing

13   about pro-competitive benefits.

14             **MR. MICHAEL:**  Go to the next slide, please.

15        (Document displayed.)

16   **BY MR. MICHAEL:**

17   **Q.**    What factors does an economist consider in determining

18   whether conduct is causing, as you said, anticompetitive harm

19   or bringing about pro-competitive benefits?

20   **A.**    Well, in an ideal world, we would look at outcomes.  So

21   considering whether the challenged conduct is allowing

22   Intuitive to innovate better or improve the quality of their

23   product, lower prices or, alternatively, the opposite of those

24   things.  Is it harming innovation or quality or increasing

25   prices?

1        So that's the type of outcomes we would look to to

2    determine whether anticompetitive harm has been caused.

3    **Q.**   And did you analyze each of those factors in this case:

4    Innovation, quality, and price?

5    **A.**   I did.

6            **MR. MICHAEL:**  Let's go to the next slide, please.

7        (Document displayed.)

8    **BY MR. MICHAEL:**

9    **Q.**   Now, based on your analysis of the economic evidence in

10   the case, did you reach certain conclusions or opinions?

11   **A.**   I did.

12   **Q.**   Okay.  And we're going to talk about each one of these in

13   more detail, so I won't dwell on them now.

14       But is what we're looking at on Slide 4 a summary of the

15   key conclusions or opinions that you reached based on your

16   analysis of the economic evidence?

17   **A.**   Yeah.  That's a summary of the findings that I made.

18   **Q.**   Okay.  Well, let's start with the first one.

19           **MR. MICHAEL:**  You can go to the next slide, Mr. Lee.

20       (Document displayed.)

21   **BY MR. MICHAEL:**

22   **Q.**   And your first conclusion -- and I think you alluded to

23   this earlier -- says that outcomes were pro-competitive.  And

24   you talk about innovation, quality, and price.

25       First of all, what do you mean when you say "outcomes"?

**SMITH - DIRECT / MICHAEL**

1    A.    So just looking at the marketplace and Intuitive's place

2    in it and what they have been doing over the past 25 years and

3    whether it has been -- indicates that they have been behaving

4    competitively or whether it indicates, alternatively, that they

5    have been behaving like a monopolist.

6    Q.    Let's go to the next slide, please.

7        (Document displayed.)

8    Q.    What were the real world outcomes that you observed with

9    respect to innovation?

10    A.    This is one example.  So this is looking at their -- on

11    the left-hand vertical axis is the procedures that da Vinci has

12    been able to win versus traditional methods, like laparoscopy

13    and open surgery.

14        And on the right-hand axis is how much R&D they are

15    spending developing their product, improving its quality and so

16    on.

17        As you can see, they are both trending upward.  So it

18    indicates to me that they have continued to vigorously compete,

19    to grow their business.

20        And they have invested back into the business.  They have

21    been on an investment cycle over time that continues.  And they

22    continue to do that today more than they have ever done before.

23    Q.    Why does increasing investment in innovation matter to you

24    as an economist in assessing whether a market is competitive or

25    not?

1   A.   It's just a marker of pro-competitive activity.  If they

2   were a monopolist who had become lazy, they have this protected

3   market space, they may relax their R&D expenditures.  They may

4   decide they don't need to innovate as much as they did before.

5        By contrast, what they seem to be doing is investing more

6   over time rather than less.

7            MR. MICHAEL:  Let's go to the next slide, please.

8        (Document displayed.)

9   BY MR. MICHAEL:

10  Q.   Now, the next factor that you identified at the outset was

11  quality; is that right?

12  A.   Yes.

13  Q.   And from your perspective as an economist, did you see

14  evidence in this case that Intuitive competes on the basis of

15  product quality?

16  A.   Yeah, it's not -- I mean, this slide is important not just

17  in describing how they compete, but who they are competing

18  with.

19       So this is an illustration of their go-to-market strategy

20  with hospitals, where they go in.  They talk about how the

21  Intuitive surgical system, relative to traditional methods like

22  lap and open, have certain advantages:  They lower length of

23  stay, lower conversions.

24       And then that allows the hospital to weigh those benefits

25  and the cost of not having them against the capital outlay that

```
 1   an Intuitive surgical system requires.
 2           MR. MICHAEL:  And just for the record, the document
 3   that's being shown here has been marked TX-1325.  It's in
 4   evidence.
 5   BY MR. MICHAEL:
 6   Q.   Is it your understanding that this is an Intuitive
 7   document?
 8   A.   It is.  It's a -- I don't know if I've seen precisely this
 9   document, but I have seen documents -- I think I have seen this
10   document.
11   Q.   Okay.
12           MR. MICHAEL:  Let's go to the next slide, please.
13       (Document displayed.)
14   BY MR. MICHAEL:
15   Q.   Now, Dr. Smith, did you also analyze Intuitive's actual
16   prices for the da Vinci system over time?
17   A.   Again, yes.  Just in an effort to determine whether it
18   looks like they've been -- as they have gained sales and
19   arguably -- or the plaintiffs have accused them of gaining
20   monopoly power over time, has that been demonstrated by an
21   increase in their pricing?
22   Q.   And what did you find when you looked at da Vinci prices
23   over time?
24   A.   Well, these are the -- this is for the platforms, the
25   consoles.  And they have stayed relatively flat.
```

1      In real terms the dotted line there, that's adjusting for

2  inflation.  They have actually gone down a little bit since

3  2014.

4  **Q.**   Just to be clear about the terminology, when you say "real

5  terms," you mean prices adjusted for inflation; is that

6  correct?

7  **A.**   Yeah.  So the top line there is just like nominal, like

8  what is charged on the day it is charged, 2016, 2017, 2018.

9      The dotted line is effectively comparing everything in

10 2014 dollars, so it's adjusting everything down to account for

11 inflation.

12      **MR. MICHAEL:**  Let's look at the next slide, please.

13      (Document displayed.)

14 **BY MR. MICHAEL:**

15 **Q.**   So we just talked about prices for the da Vinci.

16      Did you also look at prices for EndoWrists specifically

17 over time?

18 **A.**   Yeah.  So these are actually going down in real and

19 nominal terms.  So this is price-per-procedure.

20      And you can see that over time, the prices of EndoWrist

21 instruments on a per-instrument basis is not really changing.

22 But as the hospitals, the doctors get more efficient with

23 operating the -- the da Vinci surgical systems, also as the

24 da Vinci surgical system continues to compete with lap and open

25 and do additional procedures that require different sets of

SMITH - DIRECT / MICHAEL

1    instruments, the price-per -- per-procedure are actually going

2    down for instruments.

3    Q.   In a market where competition is being harmed, do you

4    generally expect to see prices going up or going down?

5    A.   I would expect that they are over time gaining an

6    entrenching market power.  I would expect prices to be rising,

7    not falling.

8    Q.   And when you see prices staying flat or going down, is

9    that, generally, a pro-competitive outcome or an

10   anticompetitive outcome?

11   A.   It's consistent with their ongoing competition with lap

12   and open and their efforts to penetrate deeper into the

13   surgeries that traditionally have been occupied by those

14   methods.

15   Q.   So you just talked about some of the economic evidence of

16   outcomes that you saw with respect to innovation, quality, and

17   price.

18        Does the economic significance of any of that evidence

19   depend in this case on how you define the relevant market for

20   Intuitive's products, or is it independent of that?

21   A.   It's independent of it completely.  I mean, it's -- so

22   relevant -- to be clear, what relevant markets are in an

23   antitrust case like this one, they are indirect indicators of

24   market power, monopoly power.  These are -- this is just in a

25   direct assessment.  It doesn't depend on how the market is

SMITH - DIRECT / MICHAEL

1   defined or anything.  I'm looking at outcomes.

2       And so the two things are very much related, and we'll

3   talk about that in a minute.  But this tells me that the

4   markets that Dr. Lamb has defined are not telling you much

5   about the likely competitive effects of the challenged conduct.

6       MR. MICHAEL:  Let's go to the next slide, Slide 10,

7   please.

8       (Document displayed.)

9   BY MR. MICHAEL:

10  Q.   Does the economic evidence of outcomes with respect to

11  innovation, quality, and price indicate to you that Intuitive

12  was behaving like a monopolist?

13  A.   No.  And I think it's because of their continued desire to

14  do more and more surgeries at hospitals.  I mean, the evidence

15  indicates that over time, they are -- and we'll see some of

16  that in a minute -- gaining a greater share of surgeries

17  relative to lap and open.  And that's been their focus for 25

18  years.

19  Q.   So did the evidence you looked at show you that Intuitive

20  had stopped innovating or investing over time in research and

21  development?

22  A.   No.  They are increasing their investment in R&D over

23  time.

24  Q.   Did the evidence you looked at indicate that Intuitive had

25  cut output or reduced quality over time?

**SMITH - DIRECT / MICHAEL**

1  **A.**   No.   There has been significant instances of improved

2  provide quality over time, new platforms, extended use

3  instruments, examples.

4  **Q.**   Did the economic evidence you looked at indicate to you

5  that Intuitive had raised price over time?

6  **A.**   No, they have not.

7          **MR. MICHAEL:**  Let's go to the next slide, please.

8      (Document displayed.)

9  **BY MR. MICHAEL:**

10 **Q.**   Your next conclusion has to do with Intuitive's policies.

11 And I want to ask you at the outset:  Did you consider whether

12 Intuitive policies that SIS is challenging in this case did

13 anything to promote the pro-competitive outcomes that you just

14 described?

15 **A.**   Yeah.   I mean, it's been alleged that those policies are

16 causing anticompetitive harm.

17     Considered that possibility as well as the possibility

18 that they had other motivations and reasons.

19 **Q.**   And what conclusion did you reach about whether

20 Intuitive's policies on unauthorized instruments are

21 pro-competitive or anticompetitive?

22 **A.**   I think if you look at the policies themselves or

23 statements that Intuitive has historically made for 25 years

24 about those policies, they are there to ensure patient safety,

25 to foster investments, to protect Intuitive's reputation with

 1  hospitals and patients.

 2  **Q.**    And what does that lead you to conclude about whether the

 3  policies are pro-competitive or anticompetitive?

 4  **A.**    Those are rationale that lead to pro-competitive outcomes.

 5           **MR. MICHAEL:**  Let's go to the next slide, please.

 6      (Document displayed.)

 7  **BY MR. MICHAEL:**

 8  **Q.**    Now, you're familiar with a term -- and I believe the jury

 9  has seen these contract provisions before -- in Intuitive's

10  contracts that relates to "unauthorized instruments or

11  accessories;" correct?

12  **A.**    Yes, I've seen that.

13  **Q.**    And was that a term, in your understanding, that Intuitive

14  added to its contracts in 2019 or 2020, or was it there going

15  all the way back to 2000?

16  **A.**    So, I mean, the reason that this is interesting -- it was

17  there since 2000.

18  **Q.**    And why is that interesting to you as an economist?

19  **A.**    It's interesting because I don't think anybody in this

20  case, including Dr. Lamb, is arguing that Intuitive had

21  monopoly power in 2000.  And so the fact that they had these

22  same contract provisions then indicates that they were there

23  for a different reason.

24  **Q.**    And does it indicate anything to you about whether the

25  purpose of the contract terms was pro-competitive or

SMITH - DIRECT / MICHAEL

1  anticompetitive?

2  **A.**   It -- it at least is not consistent with them being

3  brought about by anticompetitive motivations.

4           **MR. MICHAEL:**  Let's go to the next slide, please.

5       (Document displayed.)

6  **BY MR. MICHAEL:**

7  **Q.**   Did you find the same thing to be true of the limited

8  license provision in Intuitive's contracts that SIS is

9  complaining about in this case?

10  **A.**   Yeah.  I mean, so the key terms about the limited life of

11  an instrument were there since 2000 in the contracts.  I think

12  we heard that was a part of the product design since 1995.

13  **Q.**   And if you go to the next slide, is the same thing also

14  true about the warranty provisions of Intuitive's contracts?

15       (Document displayed.)

16  **A.**   Yeah.  Those have been there since the beginning.

17  **Q.**   Now, Dr. Smith, in considering whether Intuitive's

18  contract provisions were pro-competitive or anticompetitive,

19  did you also consider what Intuitive said in its public filings

20  about the risks to its business whether those contract terms

21  were adopted?

22  **A.**   Right.  So they were there in 2000 before Intuitive

23  arguably had any significant market power.  And from the

24  beginning, so from 2000, they are outlining in their SEC

25  filings why they have such provisions.  They note that, you

 1  know, it protects safety, quality, reliability of the products,

 2  and so on.

 3  **Q.**   So let me ask you to turn to Tab 6 in your binder, please.

 4      (Witness complied.)

 5  **Q.**   And you should find there a document that's marked

 6  TX-1632.001-R.

 7  **A.**   Yes, I see it.

 8  **Q.**   Do you recognize that as a copy of Intuitive's 10-K filing

 9  from 2000 that you considered in connection with forming your

10  opinions in this case?

11  **A.**   Yes.  I recognize this document.

12      **MR. MICHAEL:**  Your Honor, I offer TX-1632.001-R into

13  evidence.

14      **MR. McCAULLEY:**  No objection, Your Honor.

15      **THE COURT:**  It's admitted.

16      (Trial Exhibit 1632.001-R received in evidence).

17      **MR. MICHAEL:**  Thank you.  And if I could publish an

18  excerpt of it on the next slide, that may be the easiest way to

19  do it.

20      Is that okay, Your Honor?

21      **THE COURT:**  You may.

22      **MR. MICHAEL:**  Thank you.

23      Mr. Lee, if you can go to Slide 15, please.

24      (Document displayed.)

25

1    BY MR. MICHAEL:

2    Q.    On this slide, Dr. Smith, are you showing an excerpt from

3    Intuitive's 10-K filing from the year 2000 that discusses

4    certain risks to Intuitive's business?

5    A.    Yeah.  I mean, this is sort of -- this is describing what

6    they perceive as risk to parts of their surgical system being

7    out of their control.

8    Q.    Okay.  And do those include some of the same kinds of

9    risks that you talked about a moment ago, including related to

10   patient safety and ensuring quality and reliability?

11   A.    Yeah.  I mean, I think they are saying, like, outcomes and

12   safety are paramount.  And if we -- if something happens that's

13   outside of our control, it's going to harm us.  It's going to

14   harm not just patients, it's going to harm our reputation.

15   Q.    Is protecting patient safety and ensuring product quality

16   a pro-competitive or anticompetitive purpose?

17   A.    They are very closely aligned.  I mean, patient safety is,

18   for a product like this, an aspect of its quality.

19   Q.    And are -- if contract provisions are designed to protect

20   patient safety and ensure product quality, does that tell you,

21   as an economist, anything about whether those contract

22   provisions are pro-competitive or anticompetitive?

23   A.    Consistent with their being pro-competitive.

24   Q.    Now, if by protecting patient safety and ensuring product

25   quality, having certain contract terms in place also helped

SMITH - DIRECT / MICHAEL

1   Intuitive to grow its business and become more successful, does

2   that change your conclusion about whether the contract terms

3   are pro-competitive or anticompetitive?

4   **A.**   No.  I mean, that I think that alignment of quality

5   outcomes, patient safety with Intuitive's financial interest is

6   what you might want.

7          **MR. MICHAEL:**  Let's go to the next slide, please.

8       (Document displayed.)

9   **BY MR. MICHAEL:**

10  **Q.**   Now, on this slide, Dr. Smith, are you showing an excerpt

11  of another 10-K filing, this one from 2021?

12  **A.**   I am.  Yes.

13         **MR. MICHAEL:**  And for the record, this is an excerpt

14  of TX-1632.022-R, which is already in evidence.

15         **MR. McCAULLEY:**  I'm sorry, counsel.  May I have the

16  number again, just for my notes?

17         **MR. MICHAEL:**  Yes.  It's on the slide as well.

18  TX-1632.022-R.

19  **BY MR. MICHAEL:**

20  **Q.**   Now, Dr. Smith, what, if anything, did the way in which

21  Intuitive described risks to its business here in 2021 indicate

22  to you about whether the contract terms had remained

23  pro-competitive over time?

24  **A.**   Yeah.  I mean, it's just this -- it's very similar to what

25  they had in 2000.  So the description of what is motivating the

 1  contractual provisions in their 10-K filings haven't changed.

 2          MR. MICHAEL:  Let's go to the next slide, please.

 3      (Document displayed.)

 4  BY MR. MICHAEL:

 5  Q.   Are you familiar with a concept in economics called free

 6  riding?

 7  A.   Yes.

 8  Q.   What is free riding, if you could explain that simply to

 9  the jury?

10  A.   Yeah.  Free riding is when one firm makes an investment in

11  something that another firm then benefits from without having

12  helped to pay for it.

13  Q.   And as a matter of economics, is it good for competition

14  or bad for competition when one firm makes an investment in

15  something and another company free rides on that investment?

16  A.   It can be bad for competition because it undermines the

17  incentive of the first firm to invest because portions of

18  the -- the return on that investment that they are anticipating

19  are being siphoned off by another company.

20  Q.   Did you see evidence of economic free riding occurring in

21  this case?

22  A.   Yes.  I mean SIS, in its marketing materials in

23  particular, leveraging brands that Intuitive has built up over

24  time.

25  Q.   Before we get there, just looking at Slide 17, what are

**SMITH - DIRECT / MICHAEL**

1   you depicting on this slide here?

2   **A.**   This is for a time period 1997 to 2021, an estimation of

3   Intuitive's investments in its products and how much of -- at

4   the same time, SIS invested in those same products.

5   **Q.**   And so did you see economic evidence in this case that SIS

6   was free riding in the sense that you described on Intuitive's

7   investment in research and development?

8   **A.**   Yeah.  So these are investments Intuitive has made that

9   have built up their reputation and their brand.  And then SIS

10  is benefiting from that without having paid anything for it.

11  **Q.**   Just so there's no confusion about the numbers, the other

12  day the jury heard testimony from Mr. Rosa that Intuitive, from

13  its founding through 2022, had invested, I believe, more than

14  $5 billion in R&D.  Here you show four plus billion dollars.

15      Can you explain the difference?

16  **A.**   Just a different time period.  I think in the continuation

17  of what I showed earlier, I believe Mr. Rosa said in 2022

18  Intuitive had invested another eight to -- eight to

19  $900 million, which would make it 5 billion, not 4 billion.

20  **Q.**   And that was not included in the --

21  **A.**   That was not included in my data.

22  **Q.**   Okay.  Now, in addition to free riding on Intuitive's

23  investments, did you see evidence in this case regarding

24  whether SIS was also free riding on Intuitive's reputation in

25  the marketplace?

**SMITH - DIRECT / MICHAEL**

 1  **A.**    Yeah.   I mean, their investments are what sort of

 2  contribute to that; not only the quality of their product, but

 3  also their reputation.

 4       And SIS, as I said earlier, in their marketing materials,

 5  often references Intuitive's brands.

 6  **Q.**    Take a look at Tab 3 in your binder, please, which is a

 7  document marked TX-1500.

 8       And can you tell me if you recognize this as an SIS

 9  marketing document that you considered in forming your opinions

10  in this case?

11  **A.**    It is.

12            **MR. MICHAEL:**  Your Honor, I offer TX-1500.

13            **MR. McCAULLEY:**  No objection.

14            **THE COURT:**  Thank you.   Mr. Michael, it's admitted.

15       (Trial Exhibit 1500 received in evidence)

16            **MR. MICHAEL:**  May we publish part of the document?

17            **THE COURT:**  You may.

18            **MR. MICHAEL:**  Mr. Lee, if we can go to the next slide,

19  Slide 18.

20       (Document displayed)

21  **BY MR. MICHAEL:**

22  **Q.**    Here you're showing an excerpt of 1500; is that correct?

23  **A.**    Yes.

24  **Q.**    And SIS in this marketing document states [as read]:

25            "A repaired EndoWrist is not an alternative or

1    replacement device.  It is an original da Vinci

2    manufactured device that has been repaired to original

3    specifications."

4        Can you explain how this relates to your opinion about

5    economic free riding?

6  **A.**   Yeah.  So there is value in the EndoWrist and the da Vinci

7    brands that has been built up over time through Intuitive's

8    investments in the quality -- the reputation for quality and

9    safe outcomes that they have demonstrated.

10       And this is -- SIS is basically taking those brand names

11   and putting it on their documents that they are handing to

12   hospitals for their service.

13          **MR. MICHAEL:**  Can you go to the next slide, please.

14       (Document displayed.)

15 **BY MR. MICHAEL:**

16 **Q.**   Before we move on, can you please summarize for the jury

17   why you concluded that Intuitive's policy on unauthorized third

18   parties was pro-competitive as a matter of economics?

19 **A.**   My review of the evidence indicates that those policies

20   are used by Intuitive to foster pro-competitive outcomes,

21   including protecting patient safety, improving the quality of

22   their product, building up Intuitive's reputation for providing

23   quality outcomes and good-patient outcomes, and continuing to

24   innovate.  And their pricing is not going up.

25 **Q.**   Now, did you also consider, in forming your opinions,

**SMITH - DIRECT / MICHAEL**

 1   whether other companies in the marketplace have similar

 2   contract terms or policies to Intuitive?

 3   **A.**   Yeah.  I mean, for similar reasons to looking at what

 4   Intuitive was doing way back at the beginning, before they

 5   arguably had any market power, it's interesting to know whether

 6   other firms that don't have a significant presence in the

 7   marketplace have similar contractual provisions.  It suggests

 8   that those contractual provisions have purposes that are

 9   unrelated to any anticompetitive action.

10   **Q.**   Let me ask you to turn to Tab 5 in your binder, which is a

11   document marked TX-1612-R, and to look specifically at Page 37

12   of that document.

13        (Witness complied.)

14   **Q.**   Dr. Smith, can you tell me whether this was a document

15   relating to contract terms of a company called Medrobotics that

16   you considered in forming your opinion?

17   **A.**   Yes.  Medrobotics was a -- another company that had a

18   device.  I think it's no longer present in the market.

19        **MR. MICHAEL:**  Your Honor, I offer TX-1612-R.

20        **MR. McCAULLEY:**  No objection.

21        **THE COURT:**  Thank you, Mr. McCaulley.  It's admitted.

22        (Trial Exhibit 1612-R received in evidence).

23        **MR. MICHAEL:**  Thank you.

24        May I publish an excerpt from Page 37 of the document?

25        **THE COURT:**  You may.

```
 1          MR. MICHAEL:  Mr. Lee, if you could go to Slide 20,

 2    please.

 3         (Document displayed.)

 4    BY MR. MICHAEL:

 5    Q.    What did you find, Dr. Smith, with respect to whether

 6    Medrobotics had any similar contract terms to Intuitive?

 7    A.    Yeah.  So a very similar term to what we read earlier

 8    about accessories made or approved by Intuitive.  Medrobotics,

 9    in their contracts, doesn't want their customers using

10    instruments that are not made or approved by Medrobotics.

11    Q.    And what did that piece of economic evidence tell you

12    about whether Intuitive's contract term were pro-competitive or

13    anticompetitive?

14    A.    It's just consistent with their having a motivation that's

15    not anticompetitive, certainly.  And, you know, for efficiency

16    reasons, you would expect that -- to have a term like this, you

17    know, it's not motivated by anticompetitive motivations, then

18    it's probably motivated by something pro-competitive.

19    Q.    Did you also look at the policies of a company called CMR?

20    A.    I have seen some of CMR's provisions.

21    Q.    Okay.  And if you look at Tab 1 in your binder, did you

22    consider the terms -- I'll wait until you're there.  Sorry.

23         (Witness complied.)

24    Q.    My question was with regard to Tab 1, which is a document

25    marked TX-1309-R.  Did you consider the terms set out in this
```

 1  document in conducting your economic analysis this case?

 2  **A.**   Yes, I've seen this document before.

 3        **MR. MICHAEL:**  Your Honor, I offer TX-1309-R into

 4  evidence.

 5        **MR. McCAULLEY:**  No objection.

 6        **THE COURT:**  It's admitted.

 7     (Trial Exhibit 1309-R received in evidence)

 8        **MR. MICHAEL:**  And this one, Your Honor, is under seal

 9  by a third party.  So I have hard copies to hand out to the

10  jury.

11     May I do that now?

12        **THE COURT:**  You may.

13        **MR. MICHAEL:**  Thank you.

14     (Whereupon Exhibit 1309-R was tendered to the jury.)

15        **THE COURT:**  Dr. Smith, do you have a copy?

16        **THE WITNESS:**  I do.  I do have a copy.  Thank you.

17     (Brief pause.)

18  **BY MR. MICHAEL:**

19  **Q.**   Dr. Smith, I'll direct you to Page 23 of TX-1309.

20  **A.**   Yes, I see it.

21  **Q.**   And I'm not going to ask you to read out loud any

22  significant parts of this, but do you see there's a heading

23  titled "Safety Features"?

24  **A.**   I do.

25  **Q.**   And below that there is some discussion of safety features

SMITH - DIRECT / MICHAEL

1  associated with the CMR system?

2  **A.**   Yes.

3  **Q.**   Apologies if I asked you this before, but could you just

4  remind us what you understand CMR to be?

5  **A.**   CMR is a -- they make a minimally invasive surgical

6  platform.  It's not been sold in the United States.  It's

7  sold in -- I think there's some in the UK and...

8  **Q.**   Sorry to interrupt.  Were you done?

9  **A.**   Yes, sir.

10 **Q.**   Okay.  And then if you look at the next page, Page 24, do

11 you see the second bullet up from the bottom of the page that

12 starts "The subject device"?

13 **A.**   Yes.

14 **Q.**   And I'll just ask you to read that to yourself.

15       (Witness complied.)

16 **A.**   Okay.

17 **Q.**   Dr. Smith, did you find that CMR had some similar policies

18 with respect to surgical instruments used with its system as

19 Intuitive did in this case?

20 **A.**   Yeah.  Similar policy, similar product design.

21 **Q.**   And what did that tell you about whether Intuitive's

22 policies were pro-competitive or anticompetitive?

23 **A.**   Well, this is a company, again, that is nascent.  So it

24 doesn't have any significant market power.

25       And this is under "Safety Features," so it tells me that,

```
 1   you know, it's consistent with Intuitive's policies being
 2   motivated by safety and quality.
 3          MR. MICHAEL:  Your Honor, we're done with that
 4   document.  Would you like it to be collected from the jury or
 5   should --
 6          THE COURT:  Yes, please.
 7          MR. MICHAEL:  Okay.
 8      (Exhibit 1309-R collected from the jury.)
 9   BY MR. MICHAEL:
10   Q.   Now, Dr. Smith, if we could go to your next slides, Slide
11   21, I want to --
12          MR. MICHAEL:  And do we have that on the screen,
13   Mr. Lee?
14      (Document displayed.)
15   BY MR. MICHAEL:
16   Q.   I want to talk about your next conclusion, which was that
17   Intuitive did not exclude SIS from competing; is that right?
18   A.   That's right.
19          MR. MICHAEL:  Let's go to Slide 22, please.
20      (Document displayed)
21   BY MR. MICHAEL:
22   Q.   And can you explain to the jury what you are depicting on
23   this slide and how it relates to your conclusion?
24   A.   Yeah.  So as to whether SIS's ability to compete has been
25   harmed, you might look at what they have been doing since the
```

**SMITH - DIRECT / MICHAEL**

1    challenged conduct, or the window of time that they are

2    alleging Intuitive did something.

3        And SIS is a company that provides services to hospitals.

4    They repair or refurbish medical device -- devices and

5    accessories, and they flourished during this time.  They have

6    continued to grow.  Their revenue from 2019 to 2023 has almost

7    tripled.

8            **MR. MICHAEL:**  Let's go to Slide 23, please, Mr. Lee.

9        (Document displayed.)

10   **BY MR. MICHAEL:**

11   **Q.**   Your next conclusion, Dr. Smith, relates to whether

12   Intuitive is a monopolist or has monopoly power; is that right?

13   **A.**   Yes.

14   **Q.**   Before we turn to discussing this specific evidence that

15   you looked at, can you explain to the jury what it means as a

16   matter of economics for a firm to have monopoly power?

17   **A.**   I think probably the easiest way to think about it is that

18   it's for a firm to sustain a price above the competitive level

19   for an extended period of time.

20   **Q.**   And in this case, did you find that Intuitive had the

21   power to raise prices before the competitive level, as you just

22   described?

23   **A.**   No.  I mean, my review of the evidence indicates that they

24   have continued to compete vigorously throughout the last 25

25   years, principally with other surgical modalities, lap and

1  open.

2  **Q.**   Let's look at some of that evidence now.

3        **MR. MICHAEL:**   And if we could, let's go to Slide 24,

4  please.

5        (Document displayed.)

6  **BY MR. MICHAEL:**

7  **Q.**   I want to start with SIS's claims that Intuitive's

8  da Vinci competes in a relevant market that is limited to what

9  SIS has termed MIST surgical robots.

10        What is the first thing that you looked at in terms of

11  data or economic evidence to evaluate that claim?

12  **A.**   I mean, I looked at Intuitive's focus and who they are

13  competing with and how they are going to market.

14        The surgical robot is not sold for use without the

15  instruments.  The instruments are not sold for use without the

16  robot.  And who they are focused on in their documents, in

17  their marketing materials, when they go to hospitals to have

18  conversations about doing more da Vinci surgeries is other

19  surgical solutions, lap and open.

20  **Q.**   And can you explain to the jury specifically what the data

21  is that you're showing on Slide 24?

22  **A.**   So this is over time, between 2012 and 2021, the number of

23  surgeries that were performed using these different modalities.

24  And you can see that da Vinci surgeries are, over time,

25  growing.

1      Traditional methods, lap and open, are declining sort of

2   in parallel with one another.  It indicates that some of the

3   surgeries that Intuitive is now doing come at the expense of

4   open and some come at the expense of laparoscopy.

5          MR. MICHAEL:  Let's go to the next slide, please.

6      (Document displayed.)

7   BY MR. MICHAEL:

8   Q.   Now, Dr. Lamb, in his testimony, talked about Intuitive

9   having a high market share, market share about 90 percent I

10  think is what he said.

11     Do you agree that Intuitive's market share was about

12  90 percent?

13  A.   No.  I think that's because I disagree that the market

14  he's defined is a relevant market.  So when we're talking about

15  the contract provisions that Intuitive has, you want to look at

16  the -- what they are focused on in competing and why those

17  terms are there.

18     They are offering a surgical solution to the marketplace,

19  and that's in competition with lap and open.  So I -- I just --

20  he and I just disagree about what the relevant market is here.

21  Q.   So can you explain what you did to look at shares and what

22  the data is that you're showing on Slide 25?

23  A.   Yeah.  So these are just some examples of surgeries that

24  are performed using different modalities.

25     Prostatectomy is one of the first procedures that were

1  done using an Intuitive surgical system, and they perform a

2  relatively high proportion of those.

3      Cholecystectomy is something that's more often done

4  laparoscopically.

5      And then a colon surgery is more often done using open

6  methods.

7      So these are just three examples of surgeries that can be

8  performed using a da Vinci surgical system and their relative

9  share of the surgeries that are performed using it.

10 Q.   So for prostatectomy, what was the da Vinci's relative

11 share as compared to open and lap that you observed in 2021?

12 A.   So that's the -- the most prevalent da Vinci surgery, and

13 they have a -- more than half of procedures are done doing --

14 using an Intuitive Surgical system.

15 Q.   And that's the 61 percent that you identify for a

16 prostatectomy?

17 A.   Yes.

18 Q.   And how about for cholecystectomy, removing the

19 gallbladder, what was da Vinci's share in 2021 for that

20 procedure?

21 A.   So there their share is much smaller.  I don't have a

22 number by the line there, but it looks like it's on the order

23 of maybe 12 percent.

24 Q.   And just to be clear, do you see the fourth column over?

25 The da Vinci share?

SMITH - DIRECT / MICHAEL

1  **A.**   Oh, 14 percent.  So I was close.

2  **Q.**   So I just wanted to make sure I understood your chart

3  here.

4       Is that what you're showing as da Vinci's share relative

5  to open and lap?

6  **A.**   Yes.

7  **Q.**   And how about for colon?

8  **A.**   It's 23 percent there.

9  **Q.**   Got it.

10       **MR. MICHAEL:**  Let's go to the next slide, please.

11       (Document displayed.)

12  **BY MR. MICHAEL:**

13  **Q.**   Now, was there any category or procedure type in which you

14  found that da Vinci surgery was the only surgical option and

15  did not compete with either open or lap?

16  **A.**   Not among surgeries that can be performed using the

17  da Vinci surgical systems.  All of them can be done using

18  laparoscopy and/or open methods.

19  **Q.**   And in most of those surgical categories, did da Vinci

20  surgery account for more than half or less than half of the

21  procedures?

22  **A.**   Only prostatectomy does it account for more than half.

23  **Q.**   Now, do the numbers that you're showing on Slide 26, do

24  those include all hospitals that do these procedures or only a

25  subset?

SMITH - DIRECT / MICHAEL

1    A.    This is across all hospitals.

2    Q.    So would some of these be hospitals that don't even have a

3    da Vinci?

4    A.    Yes.

5    Q.    And why did you believe it was relevant to look across all

6    hospitals, as opposed to only those that have a da Vinci in

7    assessing shares?

8    A.    There are two margins on which Intuitive is competing for

9    surgeries.

10        One is to convince a hospital that they should buy the

11   capital to have a da Vinci surgical system in the hospital so

12   that they can perform the surgery.

13        And then even for hospitals that have them, there's a

14   second margin on which they are competing, which is to have

15   that be used to perform the surgery.

16   Q.    So did you also consider what the share numbers show if

17   you look only at hospitals that already have a da Vinci system

18   or did as of 2021?

19   A.    Right.  So, I mean, it would ignore the first dimension of

20   competition I just talked about.

21        But, yes, if you focus only on hospitals that have

22   performed at least one da Vinci surgery, those shares are shown

23   on the next slide, I believe.

24        **MR. MICHAEL:**  So let's take a look that, Slide 27,

25   please.

```
 1              (Document displayed.)

 2     BY MR. MICHAEL:

 3     Q.    And explain what you found or summarize what you found,

 4     please, when you looked at share of procedures only at

 5     hospitals that have a da Vinci system?

 6     A.    So they average a little more, you know, a little higher

 7     share for the da Vinci surgical system.  And there are now two

 8     procedures where they have more than half, on average.

 9     Q.    And that's prostatectomy and hysterectomy?

10     A.    Yes.

11     Q.    And prostatectomy, the share here at hospitals that have a

12     da Vinci system is 76 percent as of 2021; is that right?

13     A.    Yes.

14     Q.    And for cholecystectomy, the other procedure we talked

15     about earlier, the share is 29 percent; is that right?

16     A.    Yes.

17              MR. MICHAEL:  Let's go to Slide 29, please, Mr. Lee.

18              (Document displayed.)

19     BY MR. MICHAEL:

20     Q.    Now, this is a document that we already looked at earlier

21     when you were talking about market outcomes, TX-1325.

22              I just want to ask you, and return to it now to ask you,

23     what does this comparison in Intuitive's document between

24     da Vinci surgery and open and lap tell you about the market in

25     which Intuitive competes?
```

**SMITH - DIRECT / MICHAEL**

1  **A.**    Yeah, so this is their focus.  They are -- their principal

2  focus is not competition with other robotic systems.  It's open

3  and laparoscopy and procedures.  And so they are going out to

4  hospitals trying to convince them to use the da Vinci surgical

5  system more often for procedures by explaining the quality

6  benefits that this system brings to the hospital.  So lower

7  length of stay, less narcotics, back to normal activity faster

8  so the patient experiences less pain in recovery.  And those

9  can lead to cost avoidance on a per-case basis that the

10  hospital then can consider in whether they want to add the

11  capital equipment or do more da Vinci surgical procedures.

12  **Q.**    So does this kind of comparison tell you anything as an

13  economist about whether Intuitive's prices are being

14  constrained by competition from open and lap surgeries?

15  **A.**    This is the margin on which they are competing.  So this

16  is where -- this is what is affecting their pricing.

17         **MR. MICHAEL:**  Let's go to the next slide, please.

18     (Document displayed.)

19  **BY MR. MICHAEL:**

20  **Q.**    You said that Intuitive faces competition and its prices

21  are constrained by competition from open and lap surgeries.

22     If that's correct, how do you explain the profit margins

23  that Intuitive earns on the da Vinci and EndoWrists?

24  **A.**    I think it's important to understand that as a matter of

25  economics, no level of margin indicates monopoly power.

**SMITH - DIRECT / MICHAEL**

1    So you have to consider whether that level of margin,

2  whatever it may be, is a competitive outcome or a monopoly

3  outcome.  And that can vary across industries.

4    And there are some very important factors as to why you

5  might expect higher price cost margins in an industry like this

6  where R&D is very important and the investments that they are

7  making are very risky than you would in a market for soybeans.

8  **Q.**   Did the contribution margins that Dr. Lamb talked about in

9  his testimony take into account Intuitive's investments in R&D

10  or the risks that Intuitive faced in its business?

11  **A.**   No.  And just to explain what that means, the R&D is not

12  taken into account in those contribution margins.

13    What is also not taken into account is when Intuitive

14  makes an investment, they don't know whether that investment is

15  going to be successful or not.  And they have risks associated

16  with it.

17    It may be there is just a one in three chance that a

18  certain investment is going to be successful.  And if that's

19  the case, then the margin that they need to earn to justify

20  that investment on the back end is three times as high as it

21  would be in the absence of that risk.

22  **Q.**   The jury has been shown a couple documents in this case in

23  which Intuitive is referred to as a monopoly.

24    Did you consider any of those kinds of documents in

25  forming your opinions?

1  **A.**   Yeah.  I looked at them.  I mean, the -- you know, the

2  word "monopoly" is thrown around a lot.

3     If what -- what I'm considering is whether they have

4  monopoly power in a relevant antitrust market or not, and I'm

5  considering what that relevant antitrust market is.  I don't

6  ignore those documents, but I consider them for what they are.

7  **Q.**   So did those types of documents affect your conclusions or

8  opinions in this case?

9  **A.**   No, because in the context of the broader record,

10  Intuitive's conduct and their continuing behavior, investment

11  in R&D, pricing, quality, is not consistent with monopoly.

12        **MR. MICHAEL:**  Let's go to Slide 32, please.

13     (Document displayed.)

14  **BY MR. MICHAEL:**

15  **Q.**   Now, SIS has also claimed in this case that there is a

16  second relevant market for EndoWrist repair and replacement.

17     Did you form some opinions regarding that alleged relevant

18  market?

19  **A.**   Yeah.  Again, I think it's inconsistent with the way that

20  Intuitive goes to market and how they compete.  They are not

21  competing in this alleged EndoWrist repair and replacement

22  market that Dr. Lamb has posited.

23  **Q.**   And can you summarize what the opinions were that you

24  formed specifically with respect to that allegation of a

25  relevant market in Endowrist?

SMITH - DIRECT / MICHAEL

1    A.   You know, segregating that market off or delineating it

2    ignores the fact that when the product is sold to hospitals,

3    they know up front not only are they buying a piece of capital

4    equipment, they are also committing to buying a stream of

5    instruments, either from Intuitive or someone authorized by

6    Intuitive, that they can consider when making that purchase.

7    And that's -- that's determined when they sign the contract.

8    Q.   So in your opinion, are -- is EndoWrist repair and

9    replacement its own separate product market or are EndoWrists

10   part of a single surgical system that competes against open and

11   lap?

12   A.   It's not a relevant market here.  I mean, the relevant

13   market here is a market for surgical solutions.

14        MR. MICHAEL:   Let me go to -- ask Mr. Lee to go to

15   Slide 33, please.

16        (Document displayed.)

17   BY MR. MICHAEL:

18   Q.   So far we have been talking mostly about the impact of

19   Intuitive's conduct on competition.  I now want to talk to you

20   briefly about whether Intuitive caused any injury or damages to

21   SIS.

22        And, first, just to be clear, does your opinion that

23   you've just explained to the jury that Intuitive's conduct was

24   good for competition, does that depend in any way on what

25   effect that conduct had on SIS's sales or profits?

SMITH - DIRECT / MICHAEL

1   **A.**   No.  I mean, it -- it's looking at whether they have

2   adversely affected competition.  Competition laws protect --

3   **Q.**   I don't want you to give a legal opinion.  But if you

4   could just speak about it as a matter of economics, please.

5   **A.**   As a matter of economics, we would be looking at whether

6   competition is harmed, not an individual competitor.

7   **Q.**   Did you, nevertheless, go on to consider in your analysis

8   whether or not Intuitive's conduct actually did cause SIS to

9   lose sales or profits?

10  **A.**   Sure.  Setting aside what I just said, that it didn't harm

11  competition, which would mean there was not injury, just

12  considering whether SIS itself was harmed in some way, I don't

13  see reliable evidence that that happened.

14  **Q.**   Okay.

15       **MR. MICHAEL:**  Let's go to the next slide, please.

16       (Document displayed.)

17  **BY MR. MICHAEL:**

18  **Q.**   And I want to ask you about some of the specific opinions

19  you reached on that topic.

20       First of all, did you see any reliable economic evidence

21  in this case that absent Intuitive's policies, some number of

22  hospitals would have converted to buying their EndoWrists from

23  SIS specifically?

24  **A.**   No.  I mean, SIS is a distributor, and it had very few

25  distributions before they filed this lawsuit.

**SMITH - DIRECT / MICHAEL**

 1  **Q.**  The jury has heard evidence about the fact that Rebotix

 2  owned a patent on its process for resetting EndoWrists.  You're

 3  familiar with that?

 4  **A.**  Yes.

 5  **Q.**  How did that affect your opinions, if at all, as to

 6  whether Intuitive's conduct caused SIS injury or damages?

 7  **A.**  Well, I think they were dependent on Rebotix for anything

 8  they were going to be able to do in the marketplace.  And

 9  Rebotix had a lot of options for distribution of its product.

10      And so I just don't think that the -- that the

11  essentiality of SIS that was put forward by Ms. Sergeant and

12  Mr. Bero is supported by the record.

13  **Q.**  And, finally, Mr. Bero testified that of the $140 million

14  in damages that he calculated, all but around 3 million of that

15  was attributable to X and Xi model EndoWrists.

16      How, if at all, did that affect your opinions regarding

17  SIS's claimed damages in this case?

18  **A.**  I mean, I think that requires a fair bit of speculation,

19  because no one had a -- no one had a reset program for the X

20  and Xi.  Rebotix didn't.  Restore didn't.  SIS didn't have one

21  for the Si, let alone the X/Xi.

22      So I think it just makes those damages the lion's share of

23  the damages have been put forward by the plaintiff very

24  speculative.

25          **MR. MICHAEL:**  Your Honor, I may be just about done.

```
 1   And we're at least a good stopping place.  I see it's 12:30.
 2       As far as I'm concerned, I just wanted to check with the
 3   Court whether you would like me to stop here.
 4       THE COURT:  Mr. Michael, depending how much you have,
 5   I would urge you to go ahead and finish.  But you tell me how
 6   much you have left.
 7       MR. MICHAEL:  I don't think very much at all.  If I
 8   could have one moment to confer with my team.
 9       THE COURT:  By all means.
10     (Discussion held off the record between defense
11      counsel.)
12   BY MR. MICHAEL:
13   Q.   So, Dr. Smith, if I could just ask you to go to the very
14   last slide in your demonstratives and just summarize briefly,
15   to go back to the overarching question that we started with:
16   What did the economic evidence show in this case to you, as an
17   economist, about whether Intuitive's conduct was
18   pro-competitive or anticompetitive?
19   A.   In my opinion, based on the evidence that I've reviewed,
20   Intuitive has continued to innovate at a very high and
21   increasing level.  The quality of their product has continued
22   to improve and the price of their product has not increased.
23       All of those things are consistent with them competing
24   vigorously with lap and open and behaving competitively and not
25   as a monopolist.
```

1    **Q.**   Thank you, Dr. Smith.  That's all the questions I have

2    right now.

3              **THE COURT:**  Thank you, Mr. Michael.

4        We're going to go ahead and take our lunch break here.

5        Mr. McCaulley, I will ask you to pick it up when we come

6    back.

7              **MR. McCAULLEY:**  Thank you.

8              **THE COURT:**  Folks, it's a little past 12:30 now.

9    Let's plan to come back at 12:15?  Well, let's call it 12:20.

10   I will -- better you all have a couple extra minutes.

11       A reminder -- don't run away yet.  A reminder, please, to

12   not discuss anything related to the case amongst yourselves or

13   with anyone else and not to engage in any independent research.

14   And that if anyone tries to speak with you about the case, to

15   please -- to please let us know.

16       And thank you to the jurors who were pointing me at the

17   clock.  Yes, I do mean 1:20, not 12:20.  Thank you all.

18       Everyone rise for the jury.

19       (Jury exits the courtroom at 12:34 p.m.)

20             **THE COURT:**  You may be seated.

21       Thank you, Dr. Smith, you may step down.

22       (Witness steps down.)

23             **THE COURT:**  Before anything else, one of the exhibit

24   tags from the EndoWrist's fell off.  So I want them -- if I

25   could ask you to pass this back.  Please reattach it.  Thank

PROCEEDINGS

1    you.

2           **MR. MICHAEL:**  We will do that.  Thank you, Your Honor.

3           **THE COURT:**  Folks, this morning, right, we were still

4    talking a little bit -- I think Mr. McCaulley had asked me what

5    I was envisioning in terms of charging the jury and the opening

6    arguments [sic].  I just want to address that briefly and

7    actually give you all your lunch break here.

8         Mostly I would reiterate what I have shared with you all

9    already, which is I understand -- I think it's the best

10   practice and I understand you all have asked to have the jury

11   charged before you give your opening arguments.

12        So, really, what I think is left undetermined at this

13   point is whether -- whether rebuttal is happening Monday or

14   we'll be done today.

15          **MR. McCAULLEY:**  I don't think -- I do still think that

16   I would like a short rebuttal case, Your Honor.

17        And if we start back at 1:20, I'm not even positive I will

18   be done with my cross of Dr. Smith by 2:30, but it will be

19   close to 2:30 if I'm to finish today.

20        So we would still want some time on Monday.  I think it

21   would be very brief, but -- but I'm -- at this point, I can't

22   say that I'm waiving my right to a short rebuttal.

23          **THE COURT:**  Nor am I necessarily -- I'm not asking to

24   you, Mr. McCaulley.

25          **MR. McCAULLEY:**  I didn't understand you to be, Your

1    Honor.

2        THE COURT:  Why don't we go ahead and take the 45

3    minutes or so we've got for lunch and come back.

4        Let me sketch out a few more things for you all.  Since I

5    do have your submissions about the jury instruction proposals

6    that either are no longer in play or that have been withdrawn,

7    we're putting together a charge.  And so we had already started

8    to put together a charge, but we are finalizing a charge to

9    share with you all to be able to discuss -- or at least to get

10   some reactions and let you make any further record that you

11   want beyond the submissions about the final instructions, as

12   I've started to lay them out.

13       So what I think -- what I think this means -- part of what

14   I think is hard to figure out is if you have rebuttal for

15   Monday, the jury will come in.  They will hear your rebuttal.

16   At that point, we will see what time there is in the day.

17       My sense is there needs to be enough time -- I'm going to

18   keep noodling this, but I'm realizing that it may just make

19   sense to ask them to come late because my sense is -- and you

20   all tell me otherwise, but my sense is whatever rebuttal you

21   may have, Mr. McCaulley, isn't necessarily going to change the

22   instructions.  I appreciate the shaking of the head.

23       MR. VAN HOVEN:  Shook my head no.

24       THE COURT:  You know what I'm doing.  Exactly.

25       So it may be that we do the charge -- the charge -- or our

 1   charge conference in the morning.  Then we'll have you come --

 2   I can at least ask the jury to come in a little bit later.  We

 3   can pause after your rebuttal case.  I can hear any renewed

 4   motion for judgment as a matter of law.  I can charge them.  My

 5   sense is that that might put us at about the lunch hour.

 6       If not, then we'll start with opening arguments and sort

 7   of figure out how to get that all in there so that the jury can

 8   start on Monday, if I have -- if my piecing of it is about

 9   right.

10       **MR. McCAULLEY:**  So we would give our closings on

11   Monday then?

12       **THE COURT:**  I think so.  I think that's how it would

13   all game out.

14       **MR. McCAULLEY:**  I think that would require us to

15   exchange our opening slides tomorrow.  I don't think we will be

16   in a position to be ready by tomorrow.

17       I had envisioned closing on Tuesday and exchanging of the

18   slides on Sunday.  But if Your Honor has any guidance on that.

19       **THE COURT:**  Mr. McCaulley, we have been talking about

20   possibly -- I think since yesterday there has been on the table

21   that -- that -- I see.

22       The idea would that be opening statements would happen on

23   Tuesday -- I'm sorry.  Closing statements might happen on

24   Tuesday.  This may just require -- I don't want to burden more

25   of the jury's time, so it may simply require turning that

1  around more swiftly.  You all turning around those slides more

2  swiftly than we have been doing, but let me think on that.

3      Mr. Gallo, thank you for your patience.  What have you

4  got?

5          MR. GALLO:  Two observations.

6      Beginning at the end, it seems to me, assuming it would be

7  acceptable to the Court, that we could exchange slides sometime

8  Sunday.  Hopefully, resolve most of the differences, and have a

9  very limited set of issues for Your Honor on Monday morning.

10      So, for example -- I mean, I could -- I would be prepared

11  to do it Saturday.  I don't have a problem with that.  But if

12  Mr. McCaulley wanted some time on Sunday, maybe noon on Sunday,

13  that would give us time to work out our differences and be

14  ready to present any issues to Your Honor first thing Monday

15  morning.

16      Second issue is, I would respectfully request that we do

17  everything possible to finish the cross examination of

18  Dr. Smith today, even if it means we -- the jury needs to stay

19  a little later because it will save so much effort and time on

20  Monday.

21      And I know that this is a personal issue, but, you know,

22  Dr. Smith has been here for much of the trial and he's got

23  three young children.  And I would hate to see him held over

24  for, essentially, four more -- three or four more days over a

25  half hour or something.  I mean, it just seems we ought to be

1    able to finish cross today.

2        I also think it's fairer, to be honest, that the cross

3    finish today.

4        **THE COURT:**  While I mull that over, before we come

5    back we'll ask the jurors if that's an option.

6        In all candor, given sort of where we are in the trial, on

7    the chance that you might have been prepared to start rebuttal,

8    any rebuttal you might have, I was thinking that it might make

9    sense to try and ask them to stay a little later.

10       So why don't we -- why don't we do this?  I will -- I hope

11   that they have fled maybe not the building, but at least the

12   room to get some fresh air.  But before -- before -- when they

13   are all back, we can query whether or not that's an option,

14   just to know.

15       **MR. GALLO:**  I appreciate it, Your Honor.  And two

16   other things.

17       Again, if there is going to be a rebuttal case on Monday,

18   I would appreciate some notice as to what it will be, for

19   example, this evening so we can prepare.  I don't know who the

20   witness would be, for example, who is going to testify.

21       And just so that there is no mistake, we have 25 minutes

22   of video testimony.  But that I think would fit within Your

23   Honor's plan for finishing up quickly on Monday.  It's only 25

24   minutes.

25       **THE COURT:**  Mr. Gallo, the 25 minutes would be today;

PROCEEDINGS

1    right?

2          MR. GALLO:  Well, if we can do it today, it would be

3    great.  I'm a little worried that we might not be able to

4    without holding the jury.

5       Of course it all depends on the length of the cross

6    examination.

7          THE COURT:  I see.  I see.  The video might be --

8    okay.  I understand it.  All right.

9          MR. GALLO:  Thank you.  Appreciate it.

10          THE COURT:  Thank you, counsel.  We'll see you all at

11   five minutes before I told the jury to come back.  1:15.

12       Thank you all.

13       (Whereupon at 12:42 p.m. proceedings were adjourned

14        for noon recess.)

15

16

17

18

19

20

21

22

23

24

25

<u>**P R O C E E D I N G S**</u>

**Friday January 24, 2025**                                      **1:17 p.m.**

---oOo---

1      (Proceedings held in open court, outside

2       the presence and hearing of the jury.)

3      **THE COURT:**  You may be seated.

4      Folks, really quickly, there were not a sufficient number

5  of jurors yet to ask them if they can stay late.  So I don't

6  have any update for you on that yet, but will soon.

7      I wanted to share my thinking with you about Monday,

8  Tuesday and sort of how to play these things out.

9      So I do want to get us started as quickly as possible to

10  give Mr. McCaulley time with his cross -- for his cross with

11  Dr. Smith.

12      Any redirect you might have, Mr. Michael, we'll find out

13  how late we can go with that.  But in the end, that's very -- I

14  imagine that's very likely where we'll stop today.

15      Monday we'll come back.  We will play the videos, unless

16  we get them to them today.  But on the chance that we don't, we

17  will play the videos on Monday.  You will get an opportunity to

18  put on any rebuttal case you might have, Mr. McCaulley.  And

19  I'm thinking at that point we possibly send the jury home to

20  give us enough time to hear the motion, talk through the

21  charge.

22      Because I don't love the idea of starting -- I don't love

**PROCEEDINGS**

1    the idea of charging them, and I don't think there will be

2    enough hours left in the day for them to hear both closing

3    arguments.

4        Go ahead.

5            **MR. McCAULLEY:**  Mr. Gallo and I had exactly the same

6    conversation and reached exactly the same conclusion.

7            **THE COURT:**  Great minds.

8            **MR. GALLO:**  That's all fine.  And Mr. McCaulley

9    represented to me that he's hopeful that his cross will end

10    around 2:30 or 2:45 or something.

11        And, obviously, I'm not -- the only reason I say that,

12    Your Honor, is the question I would then present to the Court

13    and -- I'm not sure we care, but we could either do our 25

14    minutes of video today, if the jury was able to stay until 3:00

15    or 3:15, and rest and then Mr. McCaulley could do his rebuttal

16    on Monday, or we could hold the videos and play them first

17    thing Monday morning.  I'm not sure I care.

18            **MR. McCAULLEY:**  Your Honor, I shared this with

19    Mr. Gallo.

20        My rebuttal case, I currently intend it to be two

21    witnesses, Mr. Posdal and Dr. Lamb.  And I would be shocked if

22    the direct portions of that would be more than -- I never want

23    to undershoot.  I was going to say 20 minutes, but I would say

24    half-hour.  Very limited.

25        I disclosed the issue to Mr. Gallo that Dr. Lamb would

PROCEEDINGS

 1   talk about.  We would get him on and off the stand.  I think

 2   the video and that would take an hour, plus cross, plus cross.

 3       If you played the video --

 4           THE COURT:  I'm going to stop you all only for this

 5   jury.

 6           MR. GALLO:  You want the jury.

 7           THE COURT:  Exactly.  I want the jury.  I want to give

 8   us all a fighting chance to get Dr. Smith on his way.

 9       And, also, from what you're describing, it actually may

10   make sense to hold the videos just because if they are going to

11   have to come on Monday, they might prefer that.  Otherwise,

12   we're just bringing them in for --

13           MR. McCAULLEY:  Thank you.

14           THE COURT:  Let's all rise for the jury.

15           MR. McCAULLEY:  I apologize for the catty-wampus this

16   morning.

17           THE COURT:  That's all right.

18           MR. McCAULLEY:  I will get the cross examination done.

19   I would be shocked if it took -- it may be 2:15 or sooner, if

20   we have a break.

21           THE COURT:  For what it's worth, Mr. McCaulley, I

22   wasn't thinking we would take one.  This is only about an hour

23   or so.  I'm hoping we can go to 2:30.

24           MR. McCAULLEY:  I'm not going to go past 2:30.  Give

25   me the hook.

SMITH - CROSS / McCAULLEY

1          (Jury enters the courtroom at 1:23 p.m.)

2          **THE COURT:**  You may be seated.

3      And, Mr. McCaulley, you're welcome to start your cross.

4          **MR. McCAULLEY:**  Thank you, Your Honor.

5                        <u>**CROSS-EXAMINATION**</u>

6  BY MR. McCAULLEY:

7  **Q.**    Okay.  We both have our glasses on.

8      Dr. Smith, I hopefully don't have too much.  One of the

9  disagreements that you have with Dr. Lamb is about the

10 definition of the "relevant market;" right?

11 **A.**    That's correct.

12 **Q.**    And you say that the relevant market is all the surgical

13 procedures that are done in the United States; is that fair?

14 **A.**    I think it's probably better defined as surgeries where

15 the da Vinci surgical system is competing.

16 **Q.**    And that would be against open surgeries, for example?

17 **A.**    Other modalities:  Open, lap, even now solutions that

18 don't require surgery.

19 **Q.**    I didn't hear anything about that on your direct exam.

20 What do you mean by "solutions that don't require surgery"?

21 **A.**    I mean, I think it's become more prevalent recently that

22 in addition to surgical solutions, that there are other

23 solutions.  It's not -- it's not a big part of the market, but

24 there are other options for patients.

25 **Q.**    You're just being complete.  But the main point of your

SMITH - CROSS / MCCAULLEY

```
1   testimony was that the robot competes with open and lap; is
2   that fair?
3   A.   That the surgical solution, yeah, the entire solution
4   competes with lap and open.
5   Q.   Now, when the da Vinci was first introduced in early
6   2000s, MIST surgical robots was a brand-new category; correct?
7   A.   Was an innovation, was a new mode of doing surgery.
8   Q.   So it was new to the market, a new entry to surgical
9   solutions in the United States.  That's fair; right?
10  A.   It was a new option for getting a surgery done.
11  Q.   And that fact is supported -- one of the things you looked
12  at was Intuitive Surgical's substantial patent portfolio; is
13  that correct?
14  A.   I understand they have one.
15  Q.   And they had one at the time that they first entered the
16  market; correct?
17  A.   I'm not sure it's the same, but they have had a patent
18  portfolio.
19  Q.   And that patent portfolio, you understand from your work
20  in the economic field, patents give an innovator a period of
21  exclusivity in the market; right?
22       MR. MICHAEL:  Objection, calls for a legal conclusion.
23       THE COURT:  Well --
24  A.   They have been --
25       THE COURT:  Hold on.
```

1        MR. McCAULLEY:  Give her a second.

2        THE COURT:  Can you answer that based on your work

3    experience?

4        THE WITNESS:  I'm not a patent --

5        THE COURT:  Understood.  Can you answer that given

6    your economic expertise?

7        No.  It's fine, just...

8        THE WITNESS:  I mean, I can tell you as a layman my

9    understanding of patents.

10        MR. McCAULLEY:  Let me ask a few foundational

11    questions, Your Honor.  I will withdraw my question.

12        THE COURT:  That's fine.  Thank you.

13    BY MR. McCAULLEY:

14    Q.  Have you ever testified in a patent case before?

15    A.  I have not.

16    Q.  Do you have any understanding as to what the economic

17    effect of patents are in an economic market?

18        MR. MICHAEL:  Objection.  Vague.

19        THE COURT:  Do you understand the question, Dr. Smith?

20        THE WITNESS:  He's asking if I understand what a

21    patent is.  I mean, I think I understand that it keeps firms

22    from copying certain things that a firm does when -- when

23    developing a solution for something.

24    BY MR. McCAULLEY:

25    Q.  Okay.  And when Intuitive first introduced its MIST

1  surgical robots in the United States, there were substantial

2  patents surrounding it.  That's your understanding; right?

3  **A.**   I understand they had patents.

4  **Q.**   Well, when you have a new and emerging technology like

5  MIST surgical robots, when it first enters the market, it's

6  obviously going to compete for a place in the market; correct?

7  **A.**   Yes, and it has continued to do so.

8  **Q.**   And the MIST surgical robot, when it was introduced, the

9  da Vinci Standard, it was the only robot in the United States

10 for surgeries; correct?

11 **A.**   It was a new way of doing surgeries that competed with

12 more traditional methods.

13 **Q.**   And it's logical, isn't it, that at the time that

14 Intuitive entered into the market, it was going to try and

15 demonstrate the reasons why the robot should be used instead of

16 other surgical modalities; correct?

17 **A.**   Yeah, and I think it continues to do that.

18 **Q.**   And you don't disagree that Intuitive touts the da Vinci

19 robot as better than other surgical modalities; correct?

20 **A.**   It tells the market what it offers relative to those other

21 modalities.

22 **Q.**   And it says that it's better than those other modalities;

23 correct?

24 **A.**   I think there are features of it that are superior.  I

25 think that's what I shared earlier with that demonstrative.

1    Q.    And Intuitive touts those benefits of robotic surgery over

2    the other modalities, correct?

3    A.    That's how it competes.   That's part of how it competes.

4    Q.    It competes -- we have some documents if we need to, but

5    it competes on better outcomes; right?

6    A.    I think it highlights certain things that it is able to

7    achieve by being sort of less invasive than alternatives.

8    Q.    And you have been here throughout the testimony and heard

9    the benefits that Intuitive says come with the use of the robot

10   in surgery; right?

11   A.    Yeah.   I've heard about the quality of the product.

12   Q.    And you were here for Dr. Curet's demonstration of the

13   robot?

14   A.    I saw a portion of that, yep.

15   Q.    And her testimony about the fact that she experienced two

16   revolutions in her career?

17   A.    I think I've seen documents that say that.

18   Q.    And she testified to it on the stand, that she's been here

19   for what she called the laparoscopic revolution and a robotic

20   revolution; correct?

21   A.    That's the way she described it, yes.

22   Q.    And you don't have any reason to disagree with Dr. Curet,

23   do you?

24   A.    These are differentiated products.

25   Q.    The differentiated products, they tout the benefits or the

1  ergonomic benefits to the surgeon; right?

2  A.   They are describing the innovations that they are making.

3  Q.   And Intuitive also touts the fact that the robot provides

4  faster recovery times; correct?

5  A.   It does.  And I think it continues to improve that.

6  Q.   And I think you gave us a slide earlier today that -- I

7  believe the point was that patients that use -- that receive

8  robotic surgeries get less narcotics as part of the recovery.

9  Is that what you were pointing to?

10  A.   That was what was on that slide, that they would require

11  less pain medication.

12  Q.   And I don't know if you were here for some of the

13  testimony early on, but Dr. Mahal talked about the fact that

14  having a robotic surgery program was important for hospitals to

15  attract surgeons.  Is that a factor?

16  A.   I think it's a -- I think it's been described as a great

17  product.

18  Q.   And I think you talked about the fact that robotic surgery

19  competes on cost; correct?

20  A.   Yes, that's what the demonstrative I showed earlier was

21  illustrating.

22  Q.   And it competes on cost by lowering the costs of

23  complications associated with surgery; correct?

24  A.   Improving -- yeah, it improves outcomes.  It lowers

25  narcotic costs.  Those are benefits to the patient and to the

1   hospital that it then weighs against those other modalities.

2   **Q.**   I'm not sure you specifically talked about it, but I think

3   I've seen it in your materials.  It also has a much reduced

4   rate of conversions; correct?

5   **A.**   I think that was on that slide, yeah.  That by

6   conversions, they mean a surgery having to become an open

7   surgery.  And da Vinci touts a lower rate of that.

8   **Q.**   So when -- I think there were some benefits to shorter

9   hospitalization stays; correct?

10  **A.**   That was on that slide, yes.

11  **Q.**   Those aren't comparing costs of a robot to laparoscopic

12  equipment; fair?

13  **A.**   Disagree.  I think they are.  I think they are saying how

14  much it costs to do the surgery using the da Vinci surgical

15  system and then the hospital can determine whether the cost of

16  the system is worth it relative to laparoscopy or open.

17  **Q.**   So, think about the emergence of the new technology.

18  Obviously, initially it's going to take market share from other

19  modes of surgery; right?

20  **A.**   I don't know if that's obvious, but, yes, that is what

21  happened.

22  **Q.**   And if we think about when the automobile replaced a horse

23  and carriage, that was an advance in technology; correct?

24  **A.**   Long ago.

25  **Q.**   I wasn't there for it, but neither were you.

1    **A.**    I still live around some of them.

2    **Q.**    But you understand that as the new technology comes in, it

3    can be quite a bit different, but it can replace another mode

4    of transportation; correct?

5    **A.**    Yeah.  I mean, I think what you're describing is a

6    technological change that is a real -- that isn't ongoing.

7        What I showed in my report is that competition with open

8    and lap is ongoing.

9    **Q.**    And the thing that Intuitive markets is its ability for

10   physicians to deliver superior outcomes; correct?

11   **A.**    That's what it's explaining, yes; that it has the ability

12   to help the hospital achieve better patient outcomes, which

13   will help their reputation.

14   **Q.**    So if the -- you didn't give any testimony that I heard

15   about the price discipline imposed by surgical robots on

16   laparoscopic towers or vice-versa; correct?

17       **MR. MICHAEL:**  Objection.  Mischaracterizes the

18   testimony.

19   **A.**    And that's --

20       **THE COURT:**  Hold on.  Sorry.  Sorry, Dr. Smith.

21   Overruled.

22   Go ahead, Dr. Smith.

23       **THE WITNESS:**  Sorry.  Can you repeat that question or

24   have it read back?

25       **MR. McCAULLEY:**  Can we have the question read back?

SMITH - CROSS / MCCAULLEY

1          (Requested portion of record read.)

2   **A.**   It's not the way that Intuitive competes in the

3   marketplace, so it's not what I've studied.

4          I mean, I was looking at how -- I mean, they are

5   indirectly comparing the price of the da Vinci robot to

6   laparoscopic towers when they provide those -- quantify the

7   impact studies, because it allows the hospital to weigh the

8   relative cost of those different modes of surgery.

9   **BY MR. McCAULLEY:**

10  **Q.**   So I think you anticipated my next question, and I think

11  it was kind of a light-hearted moment between me and Mr. Rosa.

12         We talked about the fact a hospital doesn't buy a new

13  robot every time they are going to perform a surgery; right?

14  **A.**   Yeah.  I think they use the robot.

15  **Q.**   But they make a decision to buy a robot -- let me begin

16  again.

17         Intuitive's customers are the hospitals; right?

18  **A.**   Yes.

19  **Q.**   And they make that sale of the robot to hospital

20  administration; correct?

21  **A.**   I mean, I think there's more to it than that.  I think

22  that the hospital demand is derived from patient and physician

23  demand.  And -- but yes, I think the direct connection is to

24  the hospital.

25         And as I mentioned earlier, there's sort of two levels of

SMITH - CROSS / MCCAULLEY

```
 1   competition that Intuitive is engaged in.  The first is to get
 2   the capital equipment into the hospital.
 3       The second is to get them to perform surgery using the
 4   da Vinci surgical system.
 5   Q.   And why do they want the hospital to use the robot once
 6   it's in the system?
 7   A.   That's the whole point of the system, is to be used.  And
 8   they -- they want surgeries to be performed with it because
 9   that allows them to sell more systems, sell more components of
10   the system.
11   Q.   And sell more EndoWrists; right?
12   A.   Well, they -- they -- that is part of the package that
13   they offer to hospitals.  It's the surgical system that they
14   sell.
15   Q.   And the more times the robot gets used, the more money
16   they make; right?
17   A.   I mean, I think when they sell the system, they would like
18   for it to be used.  And they anticipate a certain return from
19   the sale of EndoWrists as part of that.
20   Q.   So if the robot gets sold and it just sits there,
21   Intuitive doesn't make any more money; right?
22   A.   I don't think that's what they want, no.
23   Q.   But you agree with me that they don't make any more money
24   if the robot doesn't get used?
25   A.   I think they want the robot to get -- I think they want
```

SMITH - CROSS / MCCAULLEY

1    the system to get used, not only because they make a return on

2    the EndoWrist, which is part of the business model they have

3    had from the beginning, but also because that -- the more

4    successful surgeries they have with that system, the more

5    systems they sell.

6    Q.   There's no fixed relationship between the number of

7    EndoWrists that a hospital will use at the time they enter into

8    the Sales License and Service Agreement with Intuitive when

9    they purchase the robot; right?

10   A.   They purchase the robot and the EndoWrist -- or the

11   contract for the EndoWrist at the same time when they sign a

12   deal with the hospital.  And the hospital is able to at that

13   point forecast how much they are going to use the system based

14   on its effectiveness and determine what their expenditure on

15   EndoWrists might be.

16   Q.   And that will be subject to the real world, how many times

17   a robot gets used, which I think is one of the things I think

18   you said was a consideration for Intuitive after the sale;

19   right?

20   A.   And I think that the amount that a given hospital spends

21   on the da Vinci surgical system will vary with the number of

22   surgeries that they perform.

23   Q.   I think you testified with Mr. Michael, but I'd just like

24   to explore it a little bit.

25       Mr. Michael didn't show you any, but he did ask you about

SMITH - CROSS / MCCAULLEY

1   how Intuitive referred to who it considered to be its

2   competition in some of its internal documentation; correct?

3   **A.**   Yeah.  As I said, I've seen a lot of documentation about

4   them competing with lap and open.  Yeah.

5          **MR. McCAULLEY:**  Your Honor, I'd like to, I believe,

6   offer for the first time Trial Exhibit 515.

7       I don't have a notebook, but may I hand a copy to the

8   witness?

9          **THE COURT:**  Hang on one second.

10      Any objection, Mr. Michael?

11         **MR. MICHAEL:**  Yes, Your Honor.  I believe we do have

12  objections to this document.  I would like to see a copy of it,

13  if I could.

14      (Document was shown to the counsel.)

15         **MR. MICHAEL:**  So, Your Honor, I'm not sure there's a

16  foundation to offer the exhibit into evidence right now; but

17  subject to that, I guess I'd ask to see if Mr. McCaulley can

18  lay a foundation for the document.

19         **MR. McCAULLEY:**  Sure.  Your Honor, on direct

20  examination, the witness was asked if he had seen internal

21  documents about how Intuitive referred to its competition.

22  This is an internal document that makes the statement.

23         **MR. MICHAEL:**  That was not the question to Dr. Smith,

24  Your Honor.

25         **THE COURT:**  May I see it?

 1       (Whereupon document was tendered to the Court.)

 2          THE COURT:  Members of the jury, I'm going to give you

 3    all a five-minute break while we sort this out.  Can you plan

 4    to be back -- well, we'll come get you about ten to 2:00.

 5       All rise for the jury.

 6       (Jury exits the courtroom at 1:43 p.m.)

 7          THE COURT:  Thank you, Dr. Smith.

 8       (Witness steps out.)

 9          THE COURT:  For the record, Dr. Smith is leaving.

10       You may all be seated.

11       I have a copy of -- I've got a copy of Dr. Smith's report.

12    I guess I just want to go back.

13       Mr. McCaulley, the question I think you're referring to,

14    or maybe the line of questioning you're referring to is when

15    Mr. Michael asked him about how Intuitive describes who its

16    competition is or who it competes with; is that right?

17          MR. McCAULLEY:  I believe so, Your Honor.  I can get

18    it from the real time.

19          THE COURT:  I may ask you.  I think --

20       Mr. Michael, can you make more pointed for me your

21    objection to this?

22          MR. MICHAEL:  Sure, Your Honor.  I -- first of all, I

23    don't think I asked that sort of big broad question of

24    Dr. Smith.  But in any event, no foundation has been laid for

25    this document.

1        I just checked, and it does not appear to be a document

2   that's on Dr. Smith's materials relied-upon list.

3        Similar issue came up during Dr. Lamb's testimony, and

4   Your Honor sustained an objection based on foundation to a

5   document that Dr. Lamb had not seen before and did not rely on.

6   And so it's really the same issue here.

7            **THE COURT:**  Let me ask you, Mr. McCaulley.  I think I

8   found it now.  Is it at Exhibit B in his report, the documents

9   he examined?

10           **MR. MICHAEL:**  That's correct, Your Honor.

11           **THE COURT:**  Mr. McCaulley, do you -- how do you intend

12  to lay a foundation?

13       **MR. McCAULLEY:**  I can simply ask him if he's seen the

14  document before.  If he says no, Your Honor, I can move on.  I

15  believe it was one of the materials considered in Dr. Lamb's

16  report, and he indicated he reviewed Dr. Lamb's report.

17       **MR. MICHAEL:**  Well, Your Honor, the same thing was

18  true of the exhibit that I tried to introduce with Dr. Lamb.

19       **THE COURT:**  All right.  So let's do this.  I don't see

20  it listed in -- it is not among the Bates stamped documents

21  that are listed in his report.

22       Mr. McCaulley, if you want to show it to him and ask him

23  if he's seen it to lay a foundation, I will allow that.  And if

24  he says no, you're going to move on.

25           **MR. McCAULLEY:**  Can I identify it as a document relied

SMITH - CROSS / MCCAULLEY

1    on by Dr. Lamb?

2            **THE COURT:**  Excuse me?

3            **MR. McCAULLEY:**  May I identify it as a document relied

4    on by Dr. Lamb?

5        You know, I'll just ask him if he's seen it before.

6            **THE COURT:**  Thank you.

7        And while we have the odd fortune of not being in the

8    presence of the jury, let me share with you all that they

9    indicated that they could stay a few minutes past 2:30 today,

10   which is why I felt comfortable excusing them for a few minutes

11   to do this.

12           **MR. McCAULLEY:**  My cross won't go that long, Your

13   Honor.

14           **THE COURT:**  I'm just letting you know in case.  I'm

15   letting you know that that -- that past 2:30 is on the table

16   should we need it.

17       This is a conversation we were having when they were

18   brought in last time.  That said, my inclination would still be

19   to have Intuitive do the videos on Monday just so that they

20   don't come in for next to nothing, if it's for just the

21   rebuttal on Monday, so that there's a little something that

22   hangs over.

23           **MR. GALLO:**  Whatever Your Honor decides is fine.

24           **THE COURT:**  Thank you, Mr. Gallo.

25       Whose copy -- Mr. McCaulley, do I have your copy of Trial

```
1   Exhibit 515?

2           MR. McCAULLEY:  I think so.

3           THE COURT:  Let me pass it back just in case.  Let's

4   go ahead and bring Dr. Smith back.

5       (Dr. Smith enters the courtroom)

6           MR. McCAULLEY:  I'm sorry, Your Honor.  I didn't mean

7   to hijack the proceedings.

8           THE COURT:  You didn't.  I'm trying to let them take

9   those little breaks when they can.

10      And, Alexis, if you can go grab them.  Thank you.

11      (Jury enters the courtroom at 1:48 p.m.)

12          THE COURT:  You may be seated.

13      Go ahead, Mr. McCaulley.

14          MR. McCAULLEY:  Thank you, Your Honor.

15      May I approach the witness?

16          THE COURT:  You may.

17      (Whereupon document was tendered to the witness.)

18  BY MR. McCAULLEY:

19  Q.   I've handed the witness what we've marked for

20  identification purposes as Trial Exhibit 515.

21      My question to you:  Is this a document that you've seen

22  before, Dr. Smith?

23  A.   Yes, I have seen this.

24  Q.   I want to direct your attention --

25          MR. McCAULLEY:  Your Honor, I move Trial Exhibit 515
```

```
 1   into evidence and request permission to publish it.

 2            MR. MICHAEL:  No objection, Your Honor.

 3            THE COURT:  It's admitted, and you may publish it.

 4        (Trial Exhibit 515 received in evidence)

 5            MR. McCAULLEY:  Thank you.

 6        Mr. Cox, can we have this document called up, please.

 7        And can you highlight the middle paragraph there that

 8   starts with "Re:  Your list below."

 9        (Document displayed.)

10   BY MR. McCAULLEY:

11   Q.   Dr. Smith, the document says [as read]:

12            "Re:  Your list below.  Most of them are

13        considered competitors, but I believe the ones in red

14        are not direct competitors since they do not do soft

15        tissue robotic surgery ."

16        Did I read that correctly?

17   A.   Yes.

18   Q.   This is from a Larry Cesnik at Intuitive Surgical,

19   correct?

20   A.   Yes.

21   Q.   So this would be an indication of how Intuitive viewed

22   itself in terms of who its competitors are; correct?

23   A.   This particular conversation, as I've said, I've seen a

24   lot of documents and most of them are talking about their

25   competition with open and lap.  This is talking about something
```

SMITH - CROSS / McCAULLEY

 1  different.

 2  **Q.**   I have another document I'd like to show you.

 3       In your studies in this case, did you become familiar with

 4  testimony from Mr. Glynn Vavoso of Intuitive Surgical?

 5  **A.**   I know the name, and I've read some of his deposition

 6  transcripts, I believe.

 7  **Q.**   Have you looked at and considered any of Mr. Vavoso's

 8  documents in connection with this case?

 9  **A.**   I don't know that I've seen all of his documents.  I have

10  seen some.

11       **MR. VAN HOVEN:**  Your Honor, I'd like to offer Trial

12  Exhibit 536-R.

13       May I show a copy to the witness, Your Honor?

14       **THE COURT:**  Let's wait to hear from counsel.

15       **MR. MICHAEL:**  No objection, Your Honor.

16       **THE COURT:**  It's admitted, and you may approach the

17  witness to share it with him.

18       (Trial Exhibit 536-R received in evidence)

19       (Whereupon document was tendered to the witness.)

20       **THE COURT:**  Would you like to publish it,

21  Mr. McCaulley?

22       **MR. McCAULLEY:**  I'll ask a foundational question

23  first, Your Honor.

24  **BY MR. McCAULLEY:**

25  **Q.**   Have you seen this document before in your studies of this

```
 1   case, Dr. Smith?

 2   A.    I believe so, yes.

 3         MR. McCAULLEY:  And I would like to publish it, Your

 4   Honor.  And I would ask --

 5         THE COURT:  You may.

 6         MR. McCAULLEY:  Thank you.

 7        I'd ask Mr. Cox if he can put up Page 3 of 3 and highlight

 8   that last sentence, Paragraph 12.

 9        (Document displayed.)

10   BY MR. McCAULLEY:

11   Q.    Do you understand, Dr. Smith, what Mr. Vavoso's position

12   is with Intuitive?

13   A.    I forget his title.

14   Q.    The jury has already seen testimony from him.  Do you

15   recall what department he works in?

16   A.    I think I&A.

17   Q.    What's that?

18   A.    I think Instruments and Accessories, I believe.

19   Q.    If you look at what the statement says under Paragraph 12,

20   it says, quote [as read]:

21           "We do not see ourselves in competition with

22           laparoscopy.  It's about the right tool for the right

23           job."

24        Do you see that?

25   A.    Yeah.
```

SMITH - CROSS / MCCAULLEY

1  Q.   Is this a document you considered in reaching your

2  opinions about how Intuitive viewed itself and who its

3  competitors were?

4  A.   Yeah.  I mean, this document, in particular, is

5  interesting because this looks like preparation for a panel.

6  And you're highlighting one part of it that really is

7  inconsistent with other parts of it.  There are other questions

8  in this document where his answers are:  We have had

9  competitors since the beginning.  Where he's referring to lap

10 and open.

11 Q.   But you'll agree with me he did say in Paragraph 12 that

12 laparoscopy is not considered competition; correct?

13 A.   Yeah.  I don't know -- I would be interpreting to try to

14 understand what he meant by that in the context of the broader

15 document, where he talks about facing competition since the

16 beginning.

17 Q.   I want to talk to you a little bit about Dr. Lamb's

18 conclusions on the relevant market.

19 A.   Sure.

20 Q.   From 1999 through 2018, approximately, Intuitive was the

21 only firm selling MIST surgical robots in the United States;

22 correct?

23 A.   Yeah, I don't know when Medrobotics might have sold -- it

24 sounds right.  I'll accept that.

25 Q.   So if Dr. Lamb is correct that MIST surgical robots are a

 1  relevant antitrust market, then since 1999 Intuitive has had

 2  market power in that relevant market.

 3      You would agree with that; right?

 4          **MR. MICHAEL:**  Object to the form.

 5          **THE COURT:**  Sustained.  It's compound.  It's just a

 6  lot.

 7      Can you break that down a little, Mr. McCaulley?

 8          **MR. McCAULLEY:**  I will break it down.

 9  **BY MR. McCAULLEY:**

10  **Q.**   If Dr. Lamb is correct that MIST surgical robots are a

11  relevant antitrust market, then Intuitive has market power in

12  that market; correct?

13  **A.**   These kind of questions are always hard, counsel, because

14  you're asking me to disagree with my own opinion about what the

15  relevant market is, and then accept his opinion, and then give

16  you a -- I don't disagree with his arithmetic, let's just put

17  it that way.  It's not that I disagree with.  I disagree with

18  his definition of the market.

19  **Q.**   I'm just trying to be clear.  I'm not asking you to agree

20  with Dr. Lamb.  I know you have a difference of opinion.  But

21  if the jury feels Dr. Lamb is right, I just want to establish

22  that you agree that Intuitive's market share would constitute

23  market power?

24  **A.**   But you're embedding in your question market share, and

25  that implies a market.  So I'm saying I don't disagree with the

SMITH - CROSS / MCCAULLEY

1   arithmetic.  I disagree it's a market.

2   **Q.**   I think we're saying the same thing.  I should have gotten

3   to this earlier.

4       Your primary business is testifying in disputes like this;

5   is that fair?

6   **A.**   I do a wide variety of consulting work.  I consult on

7   regulatory matters in front of the FTC and the Department of

8   Justice.  Increasingly I have been testifying more, but that

9   wasn't a very big part of my job when I started my career.

10  **Q.**   But now that's a big part of your job; right?

11  **A.**   It's become more of my job.  I would say it's half or less

12  of the time that I do consulting work.

13  **Q.**   Is it fair to say that in -- from the period 1999 to 2019,

14  Intuitive dominated the market for MIST surgical robots in the

15  United States?

16          **MR. MICHAEL:**  Objection to form.

17  **A.**   You keep saying the word "market" --

18          **THE COURT:**  Hold on.  Hold on.  You've got to let me

19  rule on the objections.

20          **THE WITNESS:**  Okay.

21          **THE COURT:**  Overruled.

22      You can continue, Mr. -- Dr. Smith.

23  **A.**   You keep saying the word "market" and then asking me to

24  accept something that you've said.  I -- I just -- that makes

25  me want to reiterate that I don't agree that that's a market.

1  I don't disagree with his arithmetic.

2  **BY MR. McCAULLEY:**

3  **Q.**   Okay.  I'm not trying to get you to agree with his

4  conclusion.  I just want to make sure we don't have to spend

5  more time on whether or not, if that's -- if that is a relevant

6  antitrust market, that Intuitive had market power in it.

7          **MR. MICHAEL:**  I object to counsel's commentary, and

8  the question is asked and answered.

9          **MR. McCAULLEY:**  I will withdraw it.  I will withdraw

10  the question.

11  **BY MR. McCAULLEY:**

12  **Q.**   With respect to the EndoWrist, do you agree there are no

13  functional substitutes for the repair and replacement of

14  EndoWrist surgical instruments?

15  **A.**   No, I don't agree with that.  Where the EndoWrists are

16  competing is in the application of surgical procedures, and

17  there are functional substitutes for that.

18  **Q.**   There's no functional substitute for an EndoWrist

19  currently available in the United States; correct?

20          **MR. MICHAEL:**  Object to time period, Your Honor.

21          **THE WITNESS:**  Umm --

22          **THE COURT:**  Hold on.

23      Would you state a time period, Mr. McCaulley?  Your

24  pending question is:  There is no functional substitute for an

25  EndoWrist -- oh, currently available in the United States.

**SMITH - CROSS / MCCAULLEY**

1        Please answer that, Dr. Smith, if you can.

2   **A.**    There's a premise embedded in that that there's a market

3   for EndoWrists, and I -- I've never agreed that that's a

4   market.

5        The functional substitute for the surgeries that are

6   provided with the da Vinci surgical system are laparoscopy,

7   open, other methods.

8   **BY MR. McCAULLEY:**

9   **Q.**    If a surgeon wants to use the da Vinci, they have to have

10  an EndoWrist; correct?

11  **A.**    They are essentially perfect complements.  They are a

12  singular product basically.

13  **Q.**    And a hospital -- you're familiar with the concept of the

14  use counter in the EndoWrist; correct?

15  **A.**    I know a little bit about the use counter, what I've read,

16  yes.

17  **Q.**    And you've read that every time an EndoWrist is used for

18  the tenth time it becomes disabled; correct?

19  **A.**    I think there are some that have longer lives now, but,

20  yeah, I think ten is a common denominator for that.

21  **Q.**    And I think we testified -- we touched on this earlier,

22  but how many EndoWrists a hospital needs depends on how many

23  surgeries it does with the robot; right?

24  **A.**    How many EndoWrists it will require as part of its

25  contract that it signed with Intuitive will depend on how many

 1  surgeries it does.

 2  **Q.**    And you're familiar, the reason that we're here is

 3  companies like Rebotix, in connection with SIS, offered a reset

 4  service for EndoWrists; correct?

 5  **A.**    I understand that there were third parties that were doing

 6  something to the instrument to reset it and give it back to

 7  hospitals, yes, resell it back to hospitals.

 8  **Q.**    And you understand that they were doing that at a lower

 9  cost than the cost of a corresponding new Intuitive EndoWrist;

10  correct?

11  **A.**    I understand they took an instrument from the hospital

12  that was expired.  They did something to it, reset it and sold

13  it back.

14       Yeah, I think the price was generally lower than what they

15  would have paid for a new instrument.

16  **Q.**    And you would agree that in the time period 2019 to 2020,

17  at least some hospitals preferred to buy those reset EndoWrists

18  than new EndoWrists from Intuitive; correct?

19  **A.**    I don't know that that's true once everything was

20  disclosed to them about what that meant for their contract with

21  Intuitive.

22  **Q.**    Well, once they learned that the robot was going to become

23  a paperweight, they had second thoughts; right?

24            **MR. MICHAEL:**  Objection, form, foundation.

25  **A.**    I just --

1      **THE COURT:**  Hold on.  Hold on, Dr. Smith.

2      **THE WITNESS:**  I'm sorry.

3      **THE COURT:**  Sustained.

4   Would you reask -- restate your question, Mr. McCaulley?

5   **BY MR. McCAULLEY:**

6   **Q.**   At least some hospitals were willing to use the repaired

7   EndoWrists, at least for some period of time; correct?

8   **A.**   I'm not sure -- I mean, I think that there were some reset

9   instruments used.  I'm not sure why each of those hospitals

10  stopped doing it.

11  **Q.**   You know about the campaign that was instituted by

12  Intuitive to stop those practices; correct?

13  **A.**   I don't know about -- I don't know that I've seen a

14  campaign.

15  **Q.**   You didn't study that as part of your work in this case?

16  **A.**   I understand what's in their contract.  I understand what

17  hospitals were being told about the EndoWrist resets.  And I'm

18  just not sure what all factors led to some of those hospitals

19  stopping using the EndoWrist or the reset EndoWrist.

20  **Q.**   Thank you for your answer.  I'm not sure it answered my

21  question though.

22       Are you familiar with what Intuitive did when it learned

23  that hospital customers were using reset EndoWrists?

24  **A.**   I know it was a concern for them because they were

25  concerned about unauthorized instruments being used.  It's in

SMITH - CROSS / MCCAULLEY

 1  their contract with the hospital.

 2      I think that they, with some hospitals, let them know that

 3  that was in their contract.

 4  **Q.**   But you didn't study that in any detail as part of your

 5  work on this case?

 6  **A.**   I mean, if it -- what I did study is in my report.

 7  **Q.**   And you're not a technical expert; correct?

 8  **A.**   I'm not an engineer.

 9  **Q.**   And, also, you're not offering any technical expertise

10  here; correct?

11  **A.**   As to the product?

12  **Q.**   Yes.

13  **A.**   No.

14  **Q.**   And you don't know the process that Rebotix used to reset

15  EndoWrists was unsafe; correct?

16  **A.**   I would not be the one to ask about that.

17  **Q.**   So you're not offering any opinions to the jury that there

18  was actually anything unsafe with what Rebotix was doing;

19  correct?

20  **A.**   No.  My opinions are related to Intuitive's incentives to

21  provide safe service relative to third parties' incentives to

22  provide safe service.

23  **Q.**   No testimony at all, no opinion at all about whether it

24  was actually safe or unsafe what Rebotix was doing with the

25  EndoWrists?

SMITH - CROSS / McCAULLEY

1  **A.**    Only their incentive to provide safe service, which

2  Intuitive has more at stake.

3  **Q.**    Do you know anything about Project Dragon that was

4  undertaken at Intuitive?

5  **A.**    I --

6           **MR. MICHAEL:**    Objection.    Beyond the scope of direct.

7           **THE COURT:**    Sustained.

8  **BY MR. McCAULLEY:**

9  **Q.**    Do you know whether Intuitive had a view internally as to

10 whether or not EndoWrists could be safely refurbished and

11 reset?

12          **MR. MICHAEL:**    Objection, scope.

13          **THE COURT:**    Sustained.

14          **MR. McCAULLEY:**    Your Honor, may we've a sidebar?

15          **THE COURT:**    Yes.

16      (Proceedings held at sidebar.)

17          **THE COURT:**    Remind me, Mr. McCaulley.

18          **MR. McCAULLEY:**    He testified on his direct that

19 patient safety justified what Intuitive did with respect to

20 writing the letters and shutting down and forcing their

21 contracts.

22          **MR. MICHAEL:**    Your Honor, that's not what he testified

23 on direct.    He testified that Intuitive had statements about

24 risks to its business that were related to patient safety and

25 he testified about how that was related to the contract terms.

 1          Mr. McCaulley has just asked him and just established that

 2    he is not an expert himself on the question of safety, and now

 3    he's going down a road of asking him more questions about

 4    things that he hasn't testified at all about on direct and was

 5    not claiming to be an expert about.

 6          **THE COURT:**  Your pending question is whether Intuitive

 7    had an opinion or --

 8          What was your question?  Your question about whether

 9    Intuitive had some understanding about that?

10          **MR. McCAULLEY:**  I think we all need the little screen,

11    Your Honor.

12          I can move in a different direction, Your Honor.  I'm not

13    trying to belabor this point.  I just wanted to -- I wanted to

14    make the point that he -- that Intuitive had an internal view

15    of whether or not an EndoWrist could be used past ten lives if

16    it was reconditioned.

17          I thought he had testified to that, but if he didn't, I'll

18    be corrected about it.

19          **MR. MICHAEL:**  He didn't, Your Honor.  And that is a

20    question about Project Dragon, which had nothing to do with his

21    direct testimony.

22          **THE COURT:**  All right.  We'll go back.  I'll sustain

23    it and ask you to move on.

24          Thank you.

25          (Proceedings held in open court.)

1          THE COURT:  I'll sustain Mr. Michael's objection.

2      And, Mr. McCaulley, your next question, please.

3  BY MR. McCAULLEY:

4  Q.   I think you testified, and you'll correct me if I'm wrong,

5  that SIS didn't suffer any damage in this case; correct?

6  A.   I think I said there was no economic evidence that they

7  were harmed in this case.

8  Q.   You have also offered testimony that SIS would have

9  siphoned sales away from Intuitive; correct?

10          MR. MICHAEL:  Objection, scope.  That was not in the

11  direct exam.

12          THE COURT:  I overruled the scope objection.

13      Dr. Smith, can you answer that question?

14  A.   I think what I can say is they did siphon sales away from

15  Intuitive for a period of time.

16  BY MR. McCAULLEY:

17  Q.   And once Intuitive intervened, the siphoning stopped;

18  correct?

19  A.   Again, it's not clear what was the driving factor behind

20  hospitals stopping using the reset instruments, but they did

21  stop.

22  Q.   I think you testified that Intuitive's continued

23  investment in research and development indicated that they did

24  not have a monopoly; correct?

25  A.   It's consistent with their ongoing competition with open

SMITH - CROSS / MCCAULLEY

1  and laparoscopy.

2  **Q.**    And you testified that Intuitive's spending on research

3  and development is more now than it was at any point in its

4  career -- or its history?

5  **A.**    It continues to increase, yes.

6  **Q.**    And that's also -- you testified, I think, about

7  agreements, and we'll talk about them in a minute, that other

8  robotic companies had with their customers; correct?

9  **A.**    Sorry.  I don't think I understood that question.

10  **Q.**    That's all right.  I will ask a more specific question.

11      You gave some testimony about contracts that CMR has with

12  its customers; correct?

13  **A.**    Oh, yes.  Uh-huh.

14  **Q.**    And you -- what was the other one that you talked about,

15  was it the Flex?

16  **A.**    Medrobotics.

17  **Q.**    So you also talked about the risk associated with making a

18  research and development investment; correct?

19  **A.**    That's correct.

20  **Q.**    And the fact that Intuitive continues to invest in

21  innovation means it's not a monopolist; correct?

22  **A.**    Their behavior is inconsistent with their being a

23  monopolist in the sense that they actually are increasing the

24  amount that they invest year over year.

25  **Q.**    Some of their fundamental patents have expired; correct?

SMITH - CROSS / MCCAULLEY

```
 1              MR. MICHAEL:  Objection, foundation.

 2              THE COURT:  Sustained.

 3   BY MR. McCAULLEY:

 4   Q.   Do you know if some of Intuitive's fundamental patents

 5   have expired?

 6              MR. MICHAEL:  Objection, relevance.

 7              THE COURT:  Overruled.

 8   A.   Their patent portfolio is not something that I studied in

 9   any detail.

10   BY MR. McCAULLEY:

11   Q.   So you don't have any opinion on how the patent portfolio

12   impacted Intuitive's plans or investments; right?

13   A.   I just observed that they continued to invest in the

14   product.  I don't know -- I have not made a connection to their

15   patents.

16   Q.   I think you said up until 2019, they didn't have any

17   competitors in robotic surgical systems; correct?

18              MR. MICHAEL:  Objection, mischaracterizes the

19   testimony.

20   A.   They always faced competition --

21              THE COURT:  Hold on.  Hold on.

22         Overruled.

23         I will remind everyone that counsel's questions aren't in

24   evidence.

25         Go ahead, Dr. Smith.
```

SMITH - CROSS / McCAULLEY

1  **A.**  They always faced competition.  They were an innovator in

2  bringing a new mode of surgery to the market, and they

3  continued to compete to do more surgeries.

4  **BY MR. McCAULLEY:**

5  **Q.**  But now they are facing competition in the robotic surgery

6  market -- let me begin again.

7      Starting in 2019 through 2022, Intuitive saw competition

8  in the robotic surgery market; correct?

9          **MR. MICHAEL:**  Objection to form.

10 **A.**  Your question --

11         **THE COURT:**  Hold on.

12         **THE WITNESS:**  Sorry.

13         **THE COURT:**  Sorry.  I'm just looking at the question

14 again.

15     (Brief pause.)

16         **THE COURT:**  Overruled.

17     Go ahead, Dr. Smith.

18 **A.**  Can I have it read back?  I apologize.

19     (Requested portion of record read.)

20 **A.**  That -- that question presumes there is a robotic surgery

21 market.  It -- and then you're asking me about a market that I

22 don't agree with.

23     They have always faced competition from lap and open.  I

24 never said that they don't compete with other surgical

25 solutions as they come about, but their principal competition

SMITH - CROSS / MCCAULLEY

1  has been with lap and open.

2  **BY MR. McCAULLEY:**

3  Q.   I'll try to ask a question without using the word "market"

4  and without losing my voice.

5       As of 2019 through 2022, there were other surgical robots

6  available in the United States; right?

7  A.   There have been some additional robotic platforms that

8  have come into the market, come into -- yeah, they have had

9  sales.

10 Q.   And you talked about the risk associated with investing in

11 research and development; fair?

12 A.   Yeah.  I think when you're really bringing a -- quite an

13 innovation to market, there's significant risks involved with

14 that.

15 Q.   But -- we looked at some of the financial statements that

16 you referred to -- let me begin again.

17      But Intuitive was making a lot of money by 2019; right?

18 A.   I mean, I think that's the point.  You can't look at those

19 margins that happen when they are earning a return on their

20 investment and glean from that that they have some sort of

21 monopoly power.  You have to consider the uncertainty

22 surrounding the investments they made when they made them, and

23 what the expected -- what the expected profit was when they

24 were facing that uncertainty.

25 Q.   My question is:  There's no uncertainty that they would be

SMITH - CROSS / MCCAULLEY

```
 1   profitable by 2019.

 2       You would agree with that; right?

 3   A.   I do not agree with that.  They were continuing to push

 4   the frontiers of where their robotic system can compete with

 5   lap and open, and there's risk from that.

 6       They are trying to do surgeries now with a da Vinci

 7   surgical system that they have never been able to do before.

 8   And I don't think they know whether they were going to compete

 9   those away from lap until they do it.

10   Q.   Well, there's not -- let me -- I'll leave it where it is.

11       You pointed out in Slide 20 of your slide deck that

12   Medrobotics has similar termination options as Intuitive;

13   correct?

14   A.   I'd have to look back.

15   Q.   I don't have control of your slides.  I apologize.

16   A.   Okay.  I can look here.

17           THE COURT:  They are behind the first tab.

18       Do you need a copy, Mr. McCaulley?

19           MR. McCAULLEY:  I have one here, Your Honor.

20   A.   Slide 20, yes.  Yes.

21       Yeah, termination should they use accessories not made or

22   approved by Medrobotics.

23   BY MR. McCAULLEY:

24   Q.   Do you know if Medrobotics limits the number of uses that

25   a hospital can use with a given instrument?
```

SMITH - CROSS / MCCAULLEY

1    **A.**    Not that particular facet of the da Vinci surgical system.

2    I think I talked about CMR has that.

3    **Q.**    But not Medrobotics?

4    **A.**    I don't know, to be honest.

5    **Q.**    You are familiar with the Senhance device?

6    **A.**    I have heard of the Senhance.

7    **Q.**    Does the Senhance device have a use counter?

8    **A.**    The Senhance is a -- is finding a different way to compete

9    in the marketplace.  These are differentiated products, as I

10   said.

11        My understanding is that the Senhance is what they call an

12   open platform.  So it has a different way of going to market

13   and competing with lap and open and Intuitive.

14   **Q.**    Now, at the early stages of the launch of the Intuitive

15   da Vinci system, it had no competitors for MIST robots;

16   correct?

17   **A.**    You keep -- you're asking me these questions that are hard

18   for me to answer because you're not -- you're not talking about

19   the market in the way that Intuitive competes in it.

20        So were they the only marketed surgical robot at the time?

21   Yes.

22   **Q.**    And you're familiar with the fact that companies that are

23   already charging a monopolist price are the -- unable to raise

24   prices; correct?

25   **A.**    Everyone is constrained by something.

SMITH - CROSS / McCAULLEY

1    Q.    Are you familiar with the term the "cellophane fallacy"?

2    A.    I am familiar with the cellophane fallacy.

3    Q.    I learned about it from you.  So can you explain to us

4    what that is?

5    A.    It's why a hypothetical monopolist test is not as useful,

6    potentially, in a monopolization case, because if someone -- if

7    a firm is already behaving like a monopolist, then asking if it

8    merged with something and could raise price by a snip is not a

9    useful question, because they are already pricing at the

10    monopoly level.

11    Q.    And they can't price -- let me withdraw that.  That's

12    fine.

13        I'd like to ask you some questions.  You said -- with

14    reference to, I believe it was Slide Number 4.  Sorry.  I've

15    got to read my own chicken scratch.

16        No, it wasn't Slide 4.  And while I'm trying to find it so

17    I can direct your attention to it, you talked about the fact

18    that SIS continued to make money over the time period from 2019

19    to 2022?

20    A.    Yes.  What I said was that Intuitive -- any conduct by

21    Intuitive has not affected SIS's ability to compete.

22    Q.    And I guess I'm wondering what you mean by that.  They

23    didn't compete for EndoWrists; correct?

24    A.    They continued to provide services to hospitals.  That's

25    what I meant by that question -- or that answer, sorry.

SMITH - CROSS / MCCAULLEY

1   **Q.**   I just wanted to make sure that you were clear.   SIS

2   continued to make money in its businesses that were unrelated

3   to the EndoWrist; correct?

4   **A.**   Yeah.   My understanding is that they stopped trying to

5   distribute the EndoWrists at some point.

6   **Q.**   Also, you put up a slide that had SIS's marketing

7   materials on there.   Do you remember that?

8   **A.**   Yes.

9   **Q.**   I believe it was Slide 18 of your presentation.

10   **A.**   Okay.

11   **Q.**   What SIS was offering at the time was a repair of an

12   Intuitive device; correct?

13   **A.**   My understanding is that it was Rebotix that was resetting

14   instruments.   I think they are calling it a repair here.   They

15   are advertising that they are doing it.

16        My understanding was what they were actually doing was

17   collecting them, sending them to Rebotix.   Rebotix was

18   resetting them, sending them back.   And then they were --

19   **Q.**   I'm sorry.   They were in a partnership with Rebotix.   You

20   understood that; correct?

21   **A.**   My understanding is that they were a distributor for

22   Rebotix.

23   **Q.**   So if you go into the pharmacy and you buy a CVS drug

24   alternative, your understanding is CVS is misbranding that if

25   someone else makes it?

SMITH - CROSS / MCCAULLEY

1     **MR. MICHAEL:** Objection. Form, foundation, and I

2   think calls for a legal conclusion.

3   **A.** Umm --

4     **THE COURT:** Hold on.

5     Mr. McCaulley, could you try rephrasing?

6     **MR. McCAULLEY:** I'll move on, Your Honor.

7   BY MR. McCAULLEY:

8   **Q.** In that Slide 18 you underline a few sentence in red. And

9   I just want to point out, EndoWrist is indicated as a

10  registered trademark; correct?

11  **A.** Yes.

12  **Q.** And da Vinci is indicated as a registered trademark;

13  correct?

14  **A.** Yes.

15  **Q.** The biggest brand that's located on the document that you

16  relied on is SIS; correct?

17  **A.** My point was just that they were leveraging Intuitive's

18  brands in the sale of this service that they were making.

19  **Q.** They weren't pretending to be Intuitive; right?

20  **A.** They were not -- they were not saying they were Intuitive,

21  but they were putting in their marketing materials Intuitive's

22  brands without Intuitive's approval.

23  **Q.** You're not a trademark lawyer; correct?

24  **A.** I'm not.

25  **Q.** Not offering any opinions about how trade names can be

1   lawfully used in advertising; correct?

2   **A.**   I was just speaking to free riding.

3   **Q.**   It's beyond your expertise; right?

4   **A.**   I'm not a trademark lawyer, yeah.

5           **MR. McCAULLEY:**  Your Honor, may I have a moment?

6           **THE COURT:**  You may.

7       You all are welcome to stretch for a moment.

8       (Discussion held off the record between plaintiff's

9        counsel.)

10          **MR. McCAULLEY:**  I'm sorry.  I just have a few more

11  questions.

12  **BY MR. McCAULLEY:**

13  **Q.**   You offered some testimony about the ability to reset the

14  X and Xi; correct?

15  **A.**   I think I said that no one had done it.

16  **Q.**   You were here for the testimony of Stan Hamilton of

17  Rebotix.  Did you hear that?

18  **A.**   It was a video transcript.  I may have seen some of it.

19  **Q.**   And you're familiar with the fact that Mr. Hamilton said

20  that Rebotix had the technology to reset the X and Xi; correct?

21  **A.**   I may have seen that testimony, but I don't recall anybody

22  having it.  And I know SIS didn't have it.

23  **Q.**   Did you see the testimony of Mr. Humphrey?

24  **A.**   I was here for Mr. Humphrey's testimony.

25  **Q.**   And you haven't heard anybody rebut that testimony;

1    correct?

2    **A.**    I can't say.

3    **Q.**    And Mr. Bero relies in his report on Mr. Humphrey's

4    analysis; correct?

5                **MR. MICHAEL:**  Objection to the form and to the

6    reference to a report not in evidence.

7                **THE COURT:**  Sustained.

8                **MR. McCAULLEY:**  Thank you.  That's a good objection.

9    **BY MR. McCAULLEY:**

10    **Q.**    You know that Mr. Bero testified.  You watched his

11    testimony here; correct?

12    **A.**    I saw Mr. Bero, yes.

13    **Q.**    Mr. Bero testified that he relied on Mr. Humphrey;

14    correct?

15    **A.**    Mr. Humphrey and Ms. Sergeant, yes.

16    **Q.**    You don't have any -- you haven't offered any technical

17    opinions about the feasibility of solving the encryption on the

18    X and Xi; correct?

19    **A.**    My only point was that I -- my understanding is that no

20    one has solved it.

21    **Q.**    And that's the only basis of your testimony, that the X

22    and Xi shouldn't be included in Mr. Bero's damages calculation?

23    **A.**    Well, I mean, there's a lot of reasons why those damages

24    are likely inflated having to do with whether -- starting with

25    whether Intuitive has done anything anticompetitive, but also

1    including the projections based on Ms. Sergeant's assumptions

2    about sales that would go through Vizient that are disconnected

3    from anything in the real world.

4    **Q.**    But you didn't offer any of those -- that testimony on

5    direct; correct?

6    **A.**    I wasn't asked a question about it.

7              **MR. McCAULLEY:**    Thank you, Your Honor.  I have nothing

8    further.

9              **THE COURT:**    Thank you, Mr. McCaulley.

10       Mr. Michael?

11             **MR. MICHAEL:**    Very briefly, Your Honor.

12       Could we bring up TX-536-R, please, a document that

13   Dr. Smith was shown on cross examination?  Can we have that,

14   Mr. Lee?

15       (Document displayed.)

16                       <u>**REDIRECT EXAMINATION**</u>

17   BY MR. MICHAEL:

18   **Q.**    Dr. Smith, you were asked some questions about one

19   sentence on one page of this document by Mr. McCaulley.  Do you

20   recall that?

21   **A.**    I do.

22   **Q.**    And you testified that in the rest of the document there

23   is discussion about the competition that Intuitive faces from

24   other surgical modalities, including open and laparoscopy;

25   correct?

1    A.    Yeah.

2    Q.    And Mr. McCaulley did not show you any other part of the

3    document.  He just showed you one sentence; right?

4    A.    Yeah.

5    Q.    Okay.  So I'd like to show you a couple other parts of the

6    document now.

7            MR. MICHAEL:  Mr. Lee, if you could highlight under

8    number two on Page 1 of the document the first sentence there?

9        (Document highlighted.)

10    BY MR. MICHAEL:

11    Q.    Dr. Smith, do you see that on Page 1 of this document it

12    says [as read]:

13            "We have had competitors from the beginning."

14        Do you see that?

15    A.    Yes.

16    Q.    And what do you understand that to be a reference to?

17    A.    I think that they are referring to other surgical

18    modalities that they compete with.

19    Q.    Right.  Mr. McCaulley asked you several times if at the

20    very beginning Intuitive was competing against any other

21    robotic-assisted system.

22        Do you recall those questions?

23    A.    Yes.

24    Q.    Okay.  So when Intuitive says we have had competitors from

25    the beginning, do you understand that to be a reference to

1  other robotic systems or to open and laparoscopy?

2         MR. McCAULLEY:  Objection.  Foundation, Your Honor.

3         THE COURT:  Mr. Michael, could you -- is this among

4  the documents he considered in preparing his report?

5         MR. MICHAEL:  This was a document he was shown on

6  cross examination.  And he testified he had seen before.  And

7  Mr. McCaulley asked him some questions about what he understood

8  the document to mean.

9         THE COURT:  Can you answer Mr. Michael's question?

10         THE WITNESS:  I can.

11  A.  Because as Mr. McCaulley kept saying during his cross

12  examination, there was a period of time where Intuitive had the

13  only robotic platform competing with these other surgical

14  modalities.  So I can only infer from that that what's being

15  referred to here is lap and open.

16  BY MR. MICHAEL:

17  Q.  And can I direct you to the top of the second page of the

18  document.  Under Number 4, do you see it says [as read]:

19         "Data is our friend.  When there are questions

20      around outcomes and economics, we seek out the data

21      with our team of healthcare economists.  And it is not

22      just national data, but using our hospital's own data

23      to quantify the impact.  When we do that, robotics

24      wins."

25      Do you see that?

1    **A.**    Yes.

2    **Q.**    And what do you understand the document to be referring to

3    when it says "robotics wins."  What does robotics win against?

4         **MR. McCAULLEY:**  Objection, foundation.

5         **THE COURT:**  Sustained.

6    **BY MR. MICHAEL:**

7    **Q.**    So as an economist, Dr. Smith, based on the evidence that

8    you've seen in the case, including this document, what did you

9    understand Intuitive's robotics system to be competing against?

10        **MR. McCAULLEY:**  Same objection, Your Honor.

11        **THE COURT:**  Overruled.

12   **A.**    So I know from studying this case that quantify the

13   impact, that's what I was showing earlier with the comparisons

14   to lap and open.  And so I know when they are talking about

15   robotics wins, they are talking about relative to other

16   surgical modalities.

17   **BY MR. MICHAEL:**

18   **Q.**    And let me now ask you to look at the top of Page 3 of the

19   document.

20        And do you see at the top of Page 3 there's a sentence

21   that says [as read]:

22             "Intuitive has always been at the forefront of

23        innovation and we're not stopping now."

24        Do you see that?

25   **A.**    I do.

1    Q.   And was that consistent or inconsistent with what you

2    observed in the economic evidence about Intuitive's ongoing

3    investment in innovation?

4    A.   It's consistent.

5    Q.   And then, finally, Mr. McCaulley asked you again about the

6    very end of the document where there was a question that says

7    [as read]:

8            "Will Intuitive ever go into laparoscopic

9        surgery."

10       Do you see that?

11   A.   Yes.

12   Q.   And is it your understanding, based on the evidence that

13   you've seen in this case, that Intuitive was itself planning to

14   go into laparoscopic surgery?

15   A.   Yeah.  It just -- I mean, this -- what was hard is this

16   sentence is sort of inconsistent with the rest of the document,

17   but I -- what they might mean is that they are not becoming a

18   laparoscopic option.

19       **MR. MICHAEL:**  You can take that down, Mr. Lee.

20       (Document removed from display.)

21   **BY MR. MICHAEL:**

22   Q.   Dr. Smith, you referenced in response to some of

23   Mr. McCaulley's questions the concept of differentiated

24   products.  Did I get that right?

25   A.   Yes.

1  Q.   Does the fact that two products are differentiated from

2  one another, does that mean that they are necessarily in

3  different product markets?

4  A.   No.  I mean, the vast majority of products that are sold

5  in the United States are differentiated in some way.  I mean,

6  that is to be distinguished from commodity products like

7  soybeans or something like that.  Almost anything else is

8  differentiated, and they compete with other things.

9  Q.   And do sellers of differentiated products, in your

10  economic understanding and expertise, do they compete by

11  marketing advantages versus disadvantages of the various

12  products?

13  A.   Yeah.  They add a dimension of competition.  It's not just

14  about price.  It's about offering a different solution to the

15  marketplace.  And that's what Intuitive -- what you see in

16  Intuitive's documents.  It's not just that they are competing

17  on price.  They are also pointing out how they are better than

18  other products.

19  Q.   And is that form of competition among differentiated

20  products where they are competing by marketing, their

21  advantages and disadvantages, does that indicate to you, as an

22  economist, that those products are in the same market or a

23  different market?

24  A.   It depends on how significantly they compete with one

25  another.  Intuitive is very focused on lap and open and

1   competing with them, and that's how I infer that they are in

2   the same product market in this case.

3   **Q.**    And just to be clear, did you consider in this case

4   Intuitive's products in lap and open products to be

5   differentiated products?

6   **A.**    They are differentiated products, yes.

7   **Q.**    Do you consider those products to be all part of one

8   market in which they compete against one another?

9   **A.**    They are in -- in a -- in the same relevant market here.

10  **Q.**    And so you talked about these differentiated products

11  competing against one another in terms of their quality and

12  advantages and disadvantages; is that correct?

13  **A.**    Yes.

14  **Q.**    Okay.  And let me ask if, if we could --

15          **MR. MICHAEL:**  Sorry, Your Honor.  I'll just need to

16  grab this document.  It's TX-464, which is already in evidence.

17  I do have some hard copies to hand out, if that's helpful.

18          **THE COURT:**  Yes, Mr. Michael.

19          **MR. MICHAEL:**  May I approach the witness, Your Honor?

20          **THE COURT:**  You may.

21          **MR. MICHAEL:**  Your Honor if I could publish Page 38 of

22  this document on the screen, please.

23      (Whereupon document was tendered to the witness.)

24          **THE COURT:**  You may.  I think you said it's already --

25  Mr. Michael, it's in evidence?

1          **MR. MICHAEL:**  It is in evidence, Your Honor.

2          **THE COURT:**  Go ahead.

3          **MR. MICHAEL:**  Thank you.

4      (Document displayed.)

5          **MR. MICHAEL:**  Thank you, Mr. Lee.

6   BY MR. MICHAEL:

7   **Q.**   So, Dr. Smith, my question is, we were talking about

8   Intuitive marketing its products in competition with open and

9   laparoscopy based on their clinical advantages and

10  disadvantages.

11      Here do you see an example of Intuitive also competing

12  against laparoscopic surgery by marketing a direct price

13  comparison?

14  **A.**   Yeah, that appears to be what they are doing here in this

15  document.

16  **Q.**   So in this case, have you seen evidence that Intuitive

17  competed with open and laparoscopy both on price and on

18  quality?

19  **A.**   Yeah.

20  **Q.**   Thank you.  That's all the questions I have.

21          **THE COURT:**  Thank you, Mr. Michael.

22      Thank you, Dr. Smith.

23      Mr. McCaulley, do you have -- I thanked you too soon.  Do

24  you have anything else, Mr. McCaulley?

25          **MR. McCAULLEY:**  No.  Thank you, Your Honor.

 1          **THE COURT:**  I thank you, Dr. Smith.  You are excused.

 2      (Witness excused.)

 3          **THE COURT:**  Members of the jury, so thank you all for

 4  staying a little bit later today than usual.  Let me share with

 5  you all that we are actually quite close to the end of the

 6  evidence.  So I want to just preview for you what's coming next

 7  week.  There is still -- there's still a bit more to do.

 8          So you all will come back -- we'll come back Monday.  As

 9  you have done all the other days, be here around 8:15.  We'll

10  put on the rest of the evidence, the rest of the -- their cases

11  that the parties have to present to you on Monday.  It will be

12  a shorter day than usual because then we have some business to

13  do before I give you your Jury Instructions and the parties

14  give their closing arguments.  That will happen on Tuesday.

15          So I just want to start to preview that for you, which is

16  just to make it -- just to crystallize it a bit, you won't be

17  here all day Monday -- all right? -- so that you are not

18  waiting around while we are trying to wrap up our own pieces.

19  You'll come and you'll hear what evidence there is left to

20  hear, and then you'll come back Tuesday and we'll get you the

21  case that day.

22          All right?  I remind you, as I must, to please not -- to

23  please not begin to discuss the case amongst yourselves, do not

24  discuss it with anyone, do not let anyone discuss it with you.

25  To please let us know if anyone should try to discuss it with

PROCEEDINGS

1    you, and to avoid any media accounts or anything that might

2    have to do with this case, and to not undertake any independent

3    research of your own.

4        All right.  With that, have a wonderful weekend.  I will

5    see you Monday.

6        All rise.

7        (Jury exits the courtroom at 2:40 p.m.)

8        **MR. McCAULLEY:**  Your Honor, before they scatter, I

9    thought you had said we would have a slightly later start on

10   Monday.  Was that still your intention or start at 8:30?

11       **THE COURT:**  Well, let me -- let me ask you all.  I

12   also -- one juror asked to speak with me so I also need to run

13   back there before they scatter.  But that's right.  I had said

14   that.

15       Can I ask you -- let me tell you what my time constraints

16   are on Monday.  I have a sealed setting at 4:00 o'clock.  I

17   have settings -- I have an additional setting at 3:00 o'clock,

18   that the 3:00 o'clock needs to be out in time to close the

19   courtroom and get the 4:00 o'clock in.

20       How long do you all think you need for the charge

21   conference?  I guess my question for you all is almost a how

22   much time do you want to spend making a record on any -- and

23   it's hard to ask this in the abstract.

24       But assume that you get nothing that you asked for -- it's

25   not going to happen for either of you, but assume for a moment.

PROCEEDINGS

```
 1    I think what I have on the record from you are your
 2    submissions, your statements for why yours is the better
 3    instruction proposed.
 4         My question for you is:  How much time do you want to
 5    spend that day discussing it further?
 6              MR. McCAULLEY:  Nobody wants to go first, Your Honor.
 7              MR. MICHAEL:  You're the plaintiff.
 8              MR. McCAULLEY:  I'm the plaintiff.  Thanks.
 9         Your Honor, if I had to say, the most that it would take
10    was probably 90 minutes, but I would guess it could be under an
11    hour.
12              MR. GALLO:  I think that's probably right.
13              THE COURT:  All right.  Well, then, okay.  Let's work
14    backwards, then.
15         Or let me ask you, Mr. McCaulley, do you have any sense --
16    you're right.  I had been thinking to tell the jury that we
17    would start with them maybe closer to -- if we do the charge in
18    the morning, that we start -- no, that we start with them maybe
19    closer to 10:00 o'clock?
20              MR. GALLO:  So, Your Honor, just for my understanding,
21    you're talking about us coming in at 8:00, doing the charge
22    conference, and then presenting the last evidence to the jury.
23         Okay.  Bill -- I think that's probably fine.  That would
24    allow two hours.  I think that's fine.
25              THE COURT:  Let me also ask them -- this is the other
```

```
 1   piece.  They are all waiting for me.  It's not just the one
 2   juror.  So I can also pause to ask them whether they would
 3   rather -- I want to see what suits them.
 4       I will share with you there are a couple of jurors, they
 5   asked to be here at 8:15.  There is a handful of them that show
 6   up a full hour ahead because that way the commute is bearable.
 7   So for those folks, the late start is probably not ideal.  So
 8   let me ask them.
 9       In the end, I think we'll end up with enough time and I'll
10   make sure you all get the time you need that day.
11       Let me run back there and speak with them, and I will be
12   back with hopefully in less than 15 minutes.
13       (Whereupon there was a recess in the proceedings
14        from 2:43 p.m. until 2:51 p.m.)
15       (Proceedings held in open court, outside the presence
16        of the jury.)
17       THE COURT:  You may be seated.
18       Counsel, let's pick it back up.  Who wants to pick it back
19   up?
20       Go ahead, Mr. McCaulley.
21       MR. VAN HOVEN:  I guess we're waiting to hear feedback
22   on the jurors on when they want to start.
23       THE COURT:  Sorry.  Thank you.
24       All right.  So I spoke with the jurors, and, yes, they
25   want to start in the morning at the regular time because --
```

```
 1   because for a handful of them, if we start later, they don't
 2   trust the traffic.  So they want to start at 8:30, which I
 3   think makes sense.
 4       And so what we'll do, to shuffle it all we'll start at
 5   8:30.  Twenty-five minutes of video from you, Mr. Gallo.
 6       Anything beyond that?
 7           MR. GALLO:  No.
 8           THE COURT:  And then, Mr. McCaulley, any -- you'll put
 9   on any rebuttal case you might have?
10           MR. McCAULLEY:  Yes, Your Honor.  And I will try to
11   pare it down to zero, but no more than 30 minutes.
12           THE COURT:  Well, at this point -- they are coming,
13   anyways.  So, you know, they are coming and what we'll do --
14       I imagine, Mr. Gallo, you will have a renewed motion to
15   make, so we'll do that at that time.  And we will plan to do
16   the charge conference thereafter.
17       I imagine that you all can expect to see something posted,
18   something for us to discuss and for you all to react to.  My
19   plan right now is to -- well, my plan is for tomorrow.
20       My plan is that you all should see it probably tomorrow
21   afternoon.  There is a -- I have a bad habit of wanting to say
22   you'll get it sooner and I'm fighting myself not to say that
23   right now.  I'm going to say tomorrow afternoon and stick with
24   it.  So we'll say tomorrow afternoon.
25       And they are your proposals.  So, really, it will be you
```

```
 1   all telling me why I picked the wrong one, but -- for the most
 2   part I think.
 3        What else?
 4        MR. GALLO:  We reached agreement on some things that
 5   probably is worth probably just putting in the record and,
 6   obviously, if the Court has a problem with it, you'll let us
 7   know.
 8        We agreed that Mr. McCaulley will give us any documents he
 9   wants to use with his rebuttal witnesses.  I think 9:00 o'clock
10   tomorrow morning is what we said.  So that we will have -- I
11   mean, you know, to try to sort of follow the protocol that we
12   have been following.  It's -- the timing is a little different,
13   but the spirit is the same.
14        THE COURT:  I appreciate that.  And we talked a little
15   bit earlier about demonstratives for your closing arguments.
16        MR. GALLO:  We had agreed that we would exchange our
17   demonstratives at -- subject to the Court's approval, at 5:00
18   o'clock on Sunday -- 6:00 o'clock on Sunday.  We would talk to
19   one another to try to resolve any objections at 8:00 p.m. on
20   Sunday so that we would be prepared to bring anything that's
21   outstanding to Your Honor Monday morning.
22        The only caveat being we also agreed, if it's acceptable
23   to the Court, to have a sort of little exception, maybe two or
24   three exhibits that we would exchange on Monday if we felt a
25   need to do so.
```

```
 1          THE COURT:  I hear you.  After we spoke on Sunday,

 2   this came to me in a dream.  That's fine.  I think that's fine.

 3          What I'll hope you all will do is right shortly before

 4   8:00 o'clock, just anything that you can give to me to look at,

 5   if there is anything that I need to look at in terms of

 6   demonstratives, pass them to Ms. Solorzano-Rodriguez.  She will

 7   bring them back.

 8          I said five to 8:00, but I don't mean that.  I actually

 9   probably mean ten to 8:00 so that I can come join you all at

10   8:00 o'clock and we can get that all resolved.

11          I guess we don't need to do it before the jury starts,

12   but --

13          MR. McCAULLEY:  I don't think so, Your Honor.

14          I also told Mr. Gallo, and I think we kind of agreed, our

15   slides are -- I'm not going to put any fire or pyrotechnics

16   into this.  It's just going to be citations to the evidence.

17          I can't promise there won't be a picture or two, but I

18   don't -- I think we have an understanding and we have been --

19   we've have had our moments, but we've been able to work

20   together, so I don't think there is going to be a problem.

21          MR. GALLO:  It's all fine, Your Honor.  And I agree.

22   I mean, if the Court wishes to handle it at 8:00 a.m., of

23   course, we can do it, but it can be handled later in the day.

24          THE COURT:  I'm realizing I'm just running through the

25   motions to get it all ready for the jury, but they won't
```

**PROCEEDINGS**

```
1   need -- they won't need that at 8:30.  So we can plan to do
2   that after.
3        Just block them for Ms. Solorzano-Rodriguez, and we can
4   plan to just take them up after we send the jury home for the
5   day.
6        In terms of -- well, I can always ask you this on Monday.
7   I would like you to start thinking about this, please,
8   Mr. McCaulley, whether you want -- you all each gave me --
9   Mr. McCaulley, you asked for about two hours for closing.
10  Mr. Gallo said, I think -- my note said something like two
11  hours on the outer edges there.
12        MR. GALLO:  That's fine.  Yeah.  I think it's going to
13  be shorter than that.  But if Mr. McCaulley is reserving two,
14  then I will reserve two.
15        MR. McCAULLEY:  I think I said at the outside as well,
16  Your Honor.  And my opening I thought was going to be longer
17  than it was, and it came in significantly under.  But, I mean,
18  it won't be more than two.  I would guess I would try to keep
19  to it 75 to 80 minutes.
20        THE COURT:  And, Mr. McCaulley, my one question for
21  you is -- and, again, this is something I would appreciate an
22  answer to on Monday, I don't need to hear it now -- is whether
23  you want -- whether it's 75 minutes or two hours, whether you
24  want all of it in one shot or if you want to reserve a piece of
25  it for after Mr. Gallo's.
```

PROCEEDINGS

1          **MR. McCAULLEY:**  I would reserve ten minutes, Your

2    Honor, but it would come out of the total.

3          **THE COURT:**  Yes, it would.

4       Okay.  Counsel, I think that's everything.  What else do

5    you all have?

6       I see Ms. Parker.

7          **MS. PARKER:**  Sorry, Your Honor.  We just had a

8    question about logistics for next week.  Apologies if we've

9    addressed this before and have forgotten it.

10       How would you like to go about sending exhibits back with

11   the jury for deliberation?  Do you want those in hard copy?  Do

12   you want them on a thumb drive?  Do you want something else?

13   Just so we can use the weekend to coordinate that on that

14   logistically.

15          **THE CLERK:**  Thumb drive.

16          **MS. PARKER:**  With just the admitted exhibits?

17          **THE CLERK:**  Correct.  And in addition, counsel will

18   need to reconcile those exhibits Monday once we end.

19          **THE COURT:**  Mr. McCaulley?

20          **MR. McCAULLEY:**  It does raise one question that

21   Mr. Gallo raised with me earlier about at the end of the case

22   if we had some documents that we wanted into evidence that

23   aren't objected to, if there was a procedure that the Court

24   would like us to follow or if the Court would like us to follow

25   the procedure of not doing that.

PROCEEDINGS

1        **THE COURT:**  Well, you'll remember that early on I -- I

2    think you can admit them into evidence, but they won't be part

3    of what goes to the jury; right?  What goes to the jury are

4    things that you have admitted and published to them.

5        **MR. GALLO:**  I think that may well resolve the issue,

6    Your Honor.  We can talk and see if there's any issue to raise

7    with you.

8        **THE COURT:**  Let me know Monday if there's more to

9    discuss.

10        **MR. McCAULLEY:**  You referred to Mr. Gallo's renewed

11    motion.  There are counterclaims, Your Honor, and I do

12    anticipate making a motion as well.  And just -- we'll come in

13    with video evidence, so I think it's closed.

14        I'm not giving away state secrets, but I'm not sure if

15    Mr. Gallo intends to send his counterclaims to the jury.  There

16    is no evidence of lost profits or damages --

17        **THE COURT:**  You're making that motion on Monday,

18    Mr. McCaulley.

19        **MR. McCAULLEY:**  Well, I want to preview it now, Your

20    Honor, because I'm not sure -- I don't want to take anybody by

21    surprise, but it might affect the charge as well.

22        **THE COURT:**  I'm sorry.  I thought we talked earlier

23    that the rebuttal would not affect the charge.  But you

24    think -- you think it would affect only the counterclaims?

25        **MR. McCAULLEY:**  Not the rebuttal, Your Honor.  The --

**PROCEEDINGS**

1    the Rule 50 motion from the plaintiffs.

2            **THE COURT:**  I see.  Well, I appreciate you flagging it

3    for me as a thing to at least make space for in my thinking.

4            **MR. McCAULLEY:**  Nothing further from the plaintiff,

5    Your Honor.

6            **MR. GALLO:**  Nothing further.  Thank you.

7            **THE COURT:**  Have a good weekend, all.  Hope you get

8    some rest.

9        (Whereupon at 3:00 p.m. further proceedings were

10        adjourned until Monday, January 27, 2025 at

11        8:00 a.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

### CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Friday, January 24, 2025